## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID WICHTERMAN, JR., as Administrator of the Estate of Daniel Wichterman, deceased,**<br>　　　　　　**Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO.  16-5796** |
| **CITY OF PHILADELPHIA,**<br>**CORIZON HEALTH,**<br>**POLICE CORRECTIONAL OFFICER**<br>**JUSTIN AVERY,**<br>**POLICE CORRECTIONAL OFFICER**<br>**WILLIAM GWALTHNEY,**<br>**TAIRU WAHABU, RN, and,**<br>**OFFICER JOYNER, BADGE NO. 114,**<br>　　　　　　**Defendants.** | |

**DuBois, J.**                                                                                    **July 16, 2019**

### M E M O R A N D U M

### I.　　INTRODUCTION

On January 30, 2015, Daniel Wichterman died while in custody of the Philadelphia Police Department.  Wichterman allegedly suffered an opioid overdose in a holding cell at the City of Philadelphia Police Detention Unit ("PDU") after being arrested on suspicion of driving under the influence of narcotics.  Plaintiff David Wichterman, Jr., the Administrator of the Estate of Daniel Wichterman, and his brother, commenced this action on November 9, 2016.  Plaintiff asserts the following claims in the Amended Complaint: (1) deliberate indifference under 42 U.S.C. § 1983 against Police Correctional Officers Justin Avery, William Gwalthney, and Lavern Joyner, and a nurse stationed at the PDU, Tairu Wahabu, R.N. (2) *Monell* claims against the City of Philadelphia and Corizon Health, and (3) and state law negligence claims against Wahabu and Corizon Health, Inc.

1

Presently before the Court are (1) Defendants' Motion for Summary Judgment filed by the City of Philadelphia and Police Correctional Officers Avery, Gwalthney, and Joyner (collectively, the "City defendants"), and (2) Motion for Summary Judgment filed by Corizon Health and Wahabu (collectively, the "Corizon defendants"). For the reasons that follow, City defendants' and Corizon defendants' motions are granted in part and denied in part.

## II.  BACKGROUND

### A.  Accident, Arrest, and Intake

On January 30, 2015, Daniel Wichterman was arrested on suspicion of driving under the influence ("DUI") after he was involved in a minor automobile accident. City Def. Stmt. of Undisputed Material Fact ("City SUMF") ¶¶ 7, 20. At approximately 3:00 p.m., two police officers, Officer Gregory Sulock and Officer Richard Greger responded to the accident. *Id.* ¶ 8. Wichterman informed both Sulock and Greger that he had taken heroin. *Id.* ¶¶ 12, 17. Both officers observed that Wichterman appeared intoxicated but testified that they did not believe he was in a state of overdose. *Id.* ¶¶ 13, 14, 15, 21, 23. Officer Sulock testified that Wichterman had glazed eyes, tiny pupils, was slumped in his seat, and was wobbly when he was removed from the car. *Id.* ¶ 13. According to Officer Greger, Wichterman's speech was slow, he was wobbly while standing, and that he had trouble keeping his eyes open. *Id.* ¶ 19. Despite these physical manifestations of intoxication, Wichterman was able to answer questions and walk without assistance. *Id.* ¶ 14. After Officer Greger determined that there was probable cause for a DUI charge, Wichterman was transported to the PDU. *Id.* ¶¶ 20, 24; Corizon Stmt. of Undisputed Material Facts ("Corizon SUMF") ¶ 7.

The two officers who transported Wichterman to the PDU, Shawn Oeschle and Mario DeLaurentis, observed that Wichterman was somewhat wobbly but did not believe that he required emergency care.  City SUMF ¶¶ 25, 27.

Wichterman arrived at the PDU at approximately 5:33 p.m., on January 30, 2015, at which point he was searched by Police Correctional Officer ("PCO") Stephen Taylor. [1]  Taylor testified that during his search Wichterman "looked high" but did not appear to be in need of emergency medical treatment.  *Id.* ¶ 33.  After the search was completed, Wichterman was escorted to the Accident Investigation Division ("AID").  City SUMF ¶¶ 28, 39.  The AID Officer on duty, Officer Patrick Farrell, interviewed Wichterman from approximately 5:40 to 6:12 p.m.  City SUMF ¶ 40; Pl.'s Statement of Facts ("Pl. SOF") ¶ 67.  As part of typical procedure, Officer Farrell received a copy of a 7548 form which provided a brief description of the circumstances surrounding the arrest.  Farrell Dep. 15:18–16:4.  That form notes that Wichterman "stated abusing heroin."  *Id.* at 68:10–21.  Farrell wrote in his notes that he observed Wichterman had constricted pupils, slow speech and movements, and a raspy voice–symptoms that Farrell believed to be consistent with heroin intoxication.  City SUMF ¶ 41; Farrell Dep. 60:11–22.  After conducting the interview, Farrell walked Wichterman to the nurse's station so that a blood draw could be performed to test for narcotics.  *Id.* ¶ 46.

### B.   Medical Screening by Nurse Wahabu

The nurse stationed at the PDU on January 30, 2015, was defendant Tairu Wahabu, who was employed by defendant Corizon Health, a private company which provides medical services to the PDU.  *Id.* at ¶ 5–6; Corizon SUMF ¶ 2.  Wahabu is a registered nurse who was trained to recognize the signs and symptoms of opiate addiction and overdose.  City SUMF ¶ 49.  Although

---

[1] Surveillance videos in the PDU captured Wichterman's arrival and intake from 5:31 to 5:49 p.m., his blood draw and medical screening from 5:44 to 6:16 p.m., and his time in the cell block from 6:17 to 10:49 p.m.

Wahabu knew that Wichterman had been arrested on suspicion of DUI, Wahabu testified that he was not aware that Wichterman was suspected of heroin use or that he had told arresting officers that he had used heroin.  Wahabu Dep. 174:19–175:9, 178:22–179:11.

Wahabu began Wichterman's evaluation by taking his vital signs, which Wahabu testified were "perfect."  City SUMF ¶¶ 50, 51.  Next, Wahabu drew Wichterman's blood.  Farrell Dep. 90:21–91:23; City SUMF ¶ 72.  Officer Farrell, who was present for the blood draw, retrieved the blood sample and returned to his office.  Farrell Dep. 96:14–97:15.

After Officer Farrell left, Nurse Wahabu began conducting Wichterman's intake screening by filling out a "receiving screening form" as required by Corizon policy.  Pl. SOF ¶ 76.  In response to question 4 on the screening form, which asked: "Does the inmate appear to be under the influence of, or withdrawing from[,] drugs or alcohol[?]" Wahabu circled "Y" for "yes."  *Id.* ¶ 78.  Next to the question Wahabu wrote the word "Klonopin."  *Id.*  Wahabu testified that, despite his affirmative answer to question 4, Wichterman did not actually appear to be under the influence of any drug.  *Id.* ¶ 79.  Wahabu explained that he answered "yes" to question 4 because Wichterman said that he took Klonopin for his anxiety.  Wahabu Dep. 174:9–18.  Wahabu also answered "yes" to questions 6 and 7 which asked about treatment for health conditions including use of prescription medication.  Pl. SOF ¶ 81.

For the remaining questions Wahabu selected "N" for "no."  *Id.* ¶¶ 82–83, Ex. 12A.  However, Wahabu did not circle responses for each question individually.  Wahabu circled "N" individually in response to questions 8 through 13 but simply drew a single straight line through all "N" response for questions 14 through 21, including question 15, which asked "Do you use drugs?"  *Id.* ¶¶ 82–83, Ex. 12A.  Wahabu testified that he asked Wichterman whether he used "any street drugs – heroin, crack, everything," and that Wichterman said "no, he hadn't used

anything like that." *Id.* ¶ 86.  There is a factual dispute as to whether Wahabu asked each of the questions 14 through 21 during the initial intake screening and whether Wahabu asked Wichterman about his drug use.  *Id.* ¶¶ 112, 113.

In contrast to Farrell's observations, Wahabu testified that he saw no signs of physical illness or intoxication when Wichterman was in his presence.  *Id.* ¶ 90.  Wahabu explained that if he noticed any of the symptoms described by Farrell–constricted pupils, lethargic speech, lethargic movements, or a raspy voice–in a detainee like Wichterman, he would have immediately sent the detainee to the hospital.  *Id.* ¶ 95.

Wahabu was familiar with how to treat an opiate overdose.  *Id.* ¶ 23.  Narcan, a drug that is often successful in reversing the effects of an opiate overdose, was available in the PDU at the time of Wichterman's arrest.  *Id.*  Wahabu testified that he had experience treating detainees with Narcan and estimated that he had administered Narcan approximately fifty times to detainees who appeared to be overdosing.  *Id.*  He also testified that in January of 2015 approximately half of the people admitted to the PDU were addicted to opiates.  Wahabu Dep. 158:3–13.

Wahabu has discretion to determine where detainees are sent after conducting their intake screening.  City SUMF ¶ 59.  At the end of Wichterman's screening, Wahabu decided that neither emergency medical care nor specialized observation was necessary and sent Wichterman to the general PDU population.[2]  *Id.* ¶ 60.

---

[2] In addition to conducting receiving screenings, Wahabu was required to go to the cell block every two hours to check on the well-being of all detainees.  Pl. SOF ¶ 18.  Video footage shows that Wahabu walked through the male cell block approximately every two hours during the time that Wichterman was confined.  Wahabu Dep. 216:6–21. Wahabu testified that he saw Wichterman sitting up with his eyes open during his rounds.  *Id.* 217:24–221:15.  This testimony is contradicted by Police Correctional Officer Joyner's testimony that Wichterman was unconscious and unable to be roused around that same time.  Joyner Dep. 40:13–41:3, 45:5–20.

### C.  The Cell Block

After the medical screening, Wichterman arrived on the cell block at approximately

6:17 p.m.  Pl. SOF ¶ 121; City SUMF ¶ 62.  The two Police Correctional Officers[3] ("PCOs")

assigned to the cell block at the time were defendants Justin Avery and William Gwalthney.

City SUMF ¶ 64.  Both Avery and Gwalthney testified that they had no concerns about

Wichterman's health or safety at the time he arrived on the cell block.  *Id.* ¶¶ 71, 73.  According

to Gwalthney, Wichterman appeared "totally normal" at the time he entered the cell block.  *Id.*

¶ 73.  Although they were both aware that Wichterman had been arrested on suspicion of DUI,

both testified that they were unaware that the substance he was suspected of using was heroin or

that Wichterman told the arresting officers that he had used heroin.  *Id.* ¶ 67.  Wichterman was

placed in cell #2 with another detainee, Michael Panichelli.  *Id.* ¶ 74.

From 6:17 to 10:15 p.m. Wichterman remained in his cell.  *Id.* ¶ 75.  Surveillance footage

shows that during those four hours Avery and Gwalthney walked up and down the corridor a

number of times, but neither physically entered Wichterman's cell until approximately 10:15

p.m.  *Id.* ¶¶ 76, 79.  Avery's deposition testimony, however, contradicts the video evidence.  In

his deposition Avery testified that he went into Wichterman's cell and attempted to rouse him

after Joyner was unable to wake him for fingerprinting between 8:00 and 9:00 p.m.  City SUMF

n.4.  According to Avery, he went into Wichterman's cell, called his name twice, nudged him,

concluded that he was sleeping, and returned to his post.  *Id.*  Avery explained that he thought

Wichterman was "sleeping it off."  *Id.*  The video surveillance footage, which neither party

alleges to have been doctored or compromised in any way, shows that Avery did not in fact enter

Wichterman's cell until 10:15 p.m.  *Id.*

---

[3] Police Correctional Officers are not sworn police officers.  City SUMF ¶ 118.  They are civilians who, although employed by the PPD, receive different training than sworn police officers.  *Id.*; Pl. SOF ¶ 43.

Defendant PCO Lavern Joyner was also on duty at the time, working as a fingerprint technician. *Id.* ¶ 65. Joyner was not stationed in the male cell block but instead was located in the front area of the PDU. *Id.* ¶ 65. Joyner entered the cell block and attempted to retrieve Wichterman for fingerprinting twice, once at 8:26 p.m. and again at 8:56 p.m. *Id.* ¶¶ 80, 83. Joyner testified that when she attempted to wake Wichterman she opened the door to cell #2, called his name once or twice, received no response, shut the door, and returned to her position. *Id.* ¶ 81. She further testified that she believed that Wichterman was sleeping and did not have any concerns about Wichterman's health or safety. *Id.* ¶ 82. In contemporaneous notes Joyner wrote that Wichterman was "knocked out," "would not move," and that he was "sleeping hard." Joyner Dep. 40:13–41:3, 45:5–20. The parties dispute whether Avery and Gwalthney were aware that Joyner was unable to wake Wichterman. Pl. Consol. Resp. 31.

At approximately 10:15 p.m., Wichterman's cellmate, Panichelli, informed Gwalthney that something might be wrong with Wichterman. City SUMF ¶ 91. Until that time Panichelli had not mentioned any concerns about Wichterman's well-being. *Id.* ¶ 87. Similarly, although cell #2 is within earshot of the desk where Avery and Gwalthney are stationed, Wichterman never called out to Avery, Gwalthney, or Joyner or told them that he wanted or needed medical assistance. *Id.* ¶¶ 88, 90. After being alerted that something was wrong at 10:15 p.m., Avery and Gwalthney entered Wichterman's cell, attempted unsuccessfully to wake him, and then called Wahabu for help. *Id.* ¶¶ 93, 94. At 10:18 p.m. Wahabu arrived at Wichterman's cell, began CPR, and instructed the PCOs to call 911. *Id.* ¶ 94–95.

Wichterman was pronounced dead at 11:31 p.m. *Id.* ¶ 97. His Autopsy and Toxicology Report stated that his cause of death was drug intoxication as a result of an opioid overdose. *Id.*

¶ 98; Corizon SUMF ¶ 25.  There is a factual dispute as to whether Wichterman consumed the fatal dose of heroin before or after arrival at the PDU.  Corizon SUMF ¶ 26.

### D.  PDU Procedure and Training

The PDU admits on average over 100 detainees per day.  City SUMF ¶ 99.  All Philadelphia DUI arrestees are sent to the PDU.  Pl. SOF ¶ 13.  Many of these individuals arrive at the PDU under the influence of drugs or alcohol.  City SUMF ¶ 101.  Approximately half of the arrivals at the PDU are addicted to opiates.  Wahabu Dep. 158:3–13; Pl. SOF ¶ 7.  To avoid difficult confrontations with intoxicated detainees, the PDU staff regularly employ an unofficial practice of allowing detainees to "sleep off" their intoxication before attempting to get them processed.  City SUMF ¶ 104.

Official policy in the PDU directly contradicts this unofficial practice.  For example, Philadelphia Police Directive 128 outlines a PCO's responsibilities when they encounter a semiconscious detainee including their obligation to report the situation to a supervisor or a nurse if they are unable to wake the detainee.  Pl. SOF ¶¶ 33, 34, 36.

Despite the PDU's regular admission of individuals struggling with opiate use disorder, the PDU does not provide its employees with regular training on how to recognize and address the signs and symptoms of opiate addiction, intoxication, or overdose.  *Id.* ¶¶ 49, 50.  Avery, Gwalthney, and Joyner all testified that they never received training on recognizing the signs of opiate intoxication or overdose.  *Id.*  Furthermore, although under Directive 82 police correctional officers are supposed to receive biannual training on how to recognize medical emergencies and provide basic medical assistance, none of the individually named defendants had any such training between 2012 and 2017.  *Id.* ¶ 53.

### E.  Procedural Background

On November 10, 2017, plaintiff, as Administrator of Wichterman's Estate, filed an Amended Complaint (Document No. 29).  The Amended Complaint asserts claims of (1) deliberate indifference against the individual defendants under the Eighth and Fourteenth Amendments, (2) violations of Wichterman's rights under the Eighth and Fourteenth Amendments by the City of Philadelphia and Corizon Health, and (3) and state law negligence claims against Corizon defendants.  The Eighth Amendment claims were later withdrawn on the ground that Wichterman, as a pretrial detainee, had no rights under the Eighth Amendment.  Pl. Consol. Resp. 2 n.2.  Likewise, plaintiff does not oppose dismissal of his municipal liability and corporate negligence claims against Corizon as set forth in Counts Two and Three of the Amended Complaint.  *Id.* at 2 n. 3.  However, he maintains his negligence claim against Corizon based on vicarious liability for Wahabu's conduct.  *Id.*

On May 30 and May 31, 2018, respectively, Corizon defendants filed a Motion to Exclude the Expert Report of Robert L. Cohen, M.D, and a Motion to Exclude the Expert Testimony of Sarah E. Wakeman, M.D.  (Document Nos. 37, 39).  The Court granted in part and denied in part Corizon defendants' *Daubert* motions in a Memorandum and Order dated June 19, 2019.

There are currently two motions pending: (1) City defendants' Motion for Summary Judgment (Document No. 40, filed May 31, 2018), and (2) Corizon defendants' Motion for Summary Judgment (Document No. 41, filed June 1, 2018).  Both motions are fully briefed and ripe for decision.

### III.    LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a mere "scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* at 252. In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal citations omitted). The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

### IV.    DISCUSSION

In the two pending motions, City defendants and Corizon defendants seek summary judgment on each of plaintiff's remaining claims. The Court addresses each of the pending motions in turn. For the reasons that follow, City defendants' and Corizon defendants' motions are granted in part and denied in part.

### A.  City Defendants' Motion for Summary Judgment

City defendants argue that summary judgment should be granted on all of plaintiff's claims against them, including plaintiff's (1) deliberate indifference claims against PCOs Joyner, Avery, and Gwalthney, and (2) *Monell* claim against the City of Philadelphia.  The Court addresses City defendants' arguments below.

### i.  Deliberate Indifference Claim Against Individual Defendants, Joyner, Avery, and Gwalthney

Plaintiff claims that Wichterman was unconstitutionally denied medical care by PCOs Joyner, Avery, and Gwalthney while he was a pretrial detainee at the PDU.  Plaintiff brings this Fourteenth Amendment violation claim pursuant to 42 U.S.C. § 1983.  To succeed, plaintiff must show (1) that Wichterman had "a serious medical need," and (2) "acts or omissions by [defendants] that indicate deliberate indifference to that need."  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (discussing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)); citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).[4]

"A finding of deliberate indifference requires proof of subjective knowledge, not objective knowledge, 'meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware.'"  *Johnson v. Coleman*, 506 F. App'x 125, 127 (3d Cir. 2012); *see also Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d 573, 584 (W.D. Pa. 2011).  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases

---

[4] Although plaintiff's deliberate indifference claims are asserted under the Fourteenth Amendment, the standard in *Estelle*, pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment, are applied in this case.  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) ("[T]he Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner,' without deciding whether the Fourteenth Amendment provides greater protections."); *see also Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 502 (M.D. Pa. 2017), *appeal dismissed sub nom. Ponzini v. Monroe Cty.*, No. 17-3134, 2017 WL 8727421 (3d Cir. Dec. 19, 2017) (discussing pretrial detainee rights to adequate medical care under the Fourteenth Amendment).

be condemned as the infliction of punishment." *Fox v. Horn*, No. 98-5279, 2000 WL 49374, at

\*4 (E.D. Pa. Jan. 21, 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).).

      Courts rigorously apply this subjective knowledge requirement.  For example, in *Fox v.*

*Horn*, a court in this District ruled that a plaintiff did not establish a deliberate indifference claim

against correctional officers who ignored an inmate's cries for help and medical attention where

there was "no evidence that [the defendant correctional officers] made the inference that

[plaintiff] faced substantial risk of serious harm and then deliberately ignored helping

[plaintiff]."  2000 WL 49374, at \*4.  The *Fox* court further stated that "even if the Defendant

Correction Officers should have been aware of [plaintiff's] illness, but were not as a result of

their non-compliance with proper procedures, there is not a cognizable claim for an Eighth

Amendment violation." *Id.*

      Even assuming that Wichterman's condition constituted a serious medical need,

plaintiff's deliberate indifference claims against Joyner, Avery, and Gwalthney must fail because

there is no evidence from which a reasonable juror could find that the defendant police

correctional officers were deliberately indifferent to Wichterman's serious medical need.

### 1.  *Police Correctional Officer Joyner*

      Plaintiff argues that there is sufficient evidence from which a reasonable jury could find

that Joyner was deliberately indifferent to Wichterman's serious medical need because (1) she

knew Wichterman was brought to the PDU under suspicion of a DUI, (2) she was unable to wake

Wichterman after two attempts, and (3) her actions violated city policy, Directive 128,[5] which

requires police correctional officers to advise a supervisor or nurse if they are unable to wake a

detainee.  Pl. Consol. Resp. 30–31.

---

[5] Directive 128, discussed *supra* in Section II(D), outlines a PCO's responsibilities when they encounter a
semiconscious detainee.

Joyner testified that although she knew Wichterman had been arrested on suspicion of a DUI, she did not know that he was alleged to have used heroin or that he told the arresting officers he had used heroin. City SUMF ¶ 67. Joyner visited Wichterman's cell twice between 8:00 and 9:00 p.m. in an effort to retrieve him for fingerprinting. *Id.* ¶¶ 80, 83. In addition to Joyner's testimony about her actions, video footage of the cell block provides evidence of the manner in which Joyner attempted to awaken Wichterman. Consistent with the available video footage, Joyner testified that when she attempted to wake Wichterman she opened the door to his cell, called his name once or twice, received no response, shut the door, and turned her attention to other detainees. *Id.* ¶ 81. She further testified that she believed that Wichterman was sleeping and did not have any concerns about Wichterman's health or safety. *Id.* ¶ 82. In contemporaneous notes after her first attempt to rouse Wichterman, Joyner wrote that he was - "knocked out" and "would not move," and after her second attempt, that he was "sleeping hard." Joyner Dep. 40:13–41:3, 45:5–20.

Deposition testimony further discloses that the PDU failed to train PCOs such as Joyner on signs of opioid overdose, recognizing medical emergencies, or what to do when an inmate will not wake up. Pl. SOF ¶¶ 49, 50. Joyner stated, consistent with the testimony of the other police correctional officers deposed in the case, that she had never seen Directive 128 prior to her deposition. Joyner Dep. 72:7–14.

Plaintiff cites a Seventh Circuit case, *Orlowski v. Milwaukee County*, to support the proposition that an officer's failure to tell supervisors when he was unable to wake a detainee is sufficient evidence for a reasonable jury to find that the officer acted with deliberate indifference. 872 F.3d 417, 424 (7th Cir. 2017). *Orlowski*, however, is distinguishable from the present case. In that case there was evidence that the officers involved knew or suspected that

the decedent's condition was imminently dangerous.  For example, one of the officers saw the decedent "struggling to breathe, making sudden moves, and making loud sounds." *Id.*  "He approached [the decedent] and tried to wake him up, but even with his name called and bed shaken, [the decedent] did not regain consciousness."  *Id.*  That same officer in *Orlowski* had also recorded in his log book that the decedent had a "severe sleeping disorder" and was "not breathing at times."  *Id.*

These facts are distinguishable from those presented in this case where Joyner merely called out to Wichterman from the door of his cell and did not investigate further when he failed to respond.  In contrast to *Orlowski,* there is no evidence in this case that Joyner saw Wichterman struggling to breathe or believed him to be in danger.

The evidence in this case is insufficient to show that Joyner actually knew that Wichterman was overdosing.  As discussed in *Fox v. Horn*, it is not enough that Joyner's failure to act violated Directive 128, or that she arguably should have been aware of Wichterman's condition.  2000 WL 49374, at *4.  There must be evidence that she subjectively knew Wichterman was suffering from a heroin overdose and chose to leave him in his cell instead of seeking help.  Plaintiff fails to provide such evidence.

### 2.  *Police Correctional Officers Avery and Gwalthney*

The Court next turns to plaintiff's deliberate indifference claims against Avery and Gwalthney.  The Court concludes that these claims are even more tenuous because neither Avery nor Gwalthney entered Wichterman's cell or tried to wake him before approximately 10:15 p.m.

There is a factual question as to whether Avery and Gwalthney knew that Joyner was unable to wake Wichterman prior to 10:15 p.m. when they found Wichterman unconscious in his cell.  Plaintiff asserts that Avery and Gwalthney were either told by Joyner that Wichterman

14

would not wake up or simply overheard Joyner's failed attempts to bring Wichterman to be fingerprinted.  Pl. Consol. Resp. 31.

Although Avery and Gwalthney knew Wichterman had been arrested on suspicion of DUI, both testified that they did not know he had taken heroin and had no concerns about his health or safety when he arrived on the cell block.  City SUMF ¶¶ 71, 73.  He was walking under his own power and appeared "totally normal" according to Gwalthney.  *Id.* ¶ 73.  Furthermore, similar to Joyner, neither Avery nor Gwalthney had been trained to recognize the signs of opiate overdose.  Pl. SOF ¶¶ 49, 50.  Finally, video footage shows that at 10:15 p.m., after they were alerted that something was wrong by Wichterman's cellmate and were unable to wake Wichterman, they immediately contacted Nurse Wahabu for assistance.  City SUMF ¶¶ 93, 94.

Assuming *arguendo* that Avery and Gwalthney were aware that Wichterman did not wake up to be fingerprinted by Joyner, there is no evidence that they knew or suspected that he was overdosing.  Based on the evidence of record, no reasonable jury could find that Avery and Gwalthney subjectively knew that Wichterman was overdosing and chose to withhold medical treatment.

For the foregoing reasons, that part of City defendants' motion seeking summary judgment on plaintiff's deliberate indifference claims against Avery, Gwalthney, and Joyner is granted.[6]

### ii.  *Monell* Claim Against the City of Philadelphia

Next City defendants argue that summary judgment should be granted on plaintiff's *Monell* claim against the City of Philadelphia.

---

[6] Because the Court has granted City defendants' motion for summary judgment on the deliberate indifference claim against the individual city defendants–Joyner, Avery and Gwalthney–there is no need to address defendants' arguments that the individual city defendants are entitled to qualified immunity.  City Def. Mot. Summ. J. 15.

The liability of a municipality under 42 U.S.C. § 1983 is governed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Under *Monell*, a municipality cannot be subjected to liability solely because its agents or employees caused injury to another person. *Id.* at 694. Rather, a municipal entity may be liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights. *Id.*

The Third Circuit has held that there are three situations in which the actions of an employee can be considered the result of a "policy or custom" "rendering [a governmental] entity liable under § 1983." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). A policy or custom may exist (i) where an officer or entity promulgates a policy and the complained of act is simply an implementation of that policy; (ii) where no specific rule has been announced but "federal law has been violated by an act of the policymaker itself"; or (iii) where "the policymaker has failed to act" and "the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Id.* (internal quotations and citations omitted).

Plaintiff maintains that his *Monell* claim falls into the third category–where the policymaker failed to act and the need to take some action was so obvious that the policymaker can reasonably be said to have been deliberately indifferent. Specifically, plaintiff asserts that the City of Philadelphia was deliberately indifferent in failing to train PDU employees as to how to recognize and respond to the signs of drug overdose. In order to succeed on a "failure to train" claim, plaintiff must show (i) that the failure to train had a causal nexus to the

constitutional violation and (ii) that the policymakers exhibited deliberate indifference in their

failure to train employees. *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014).

City defendants argue that plaintiff's *Monell* claim must fail because (1) plaintiff cannot

establish an underlying constitutional violation; (2) there is no record evidence that

Wichterman's death resulted from any policy or custom of the City, and (3) there is no evidence

that any City of Philadelphia policymaker was deliberately indifferent to a risk of harm to

Wichterman or similarly situated persons. City Def. Mot. Summ. J. 19–23.

### 1. *Underlying Constitutional Violation*

Defendant argues that plaintiff's *Monell* claim must fail because plaintiff cannot establish

that any of the individual defendants were liable for an underlying constitutional violation. This

argument is misguided. City Def. Mot. 19–20. Although a "failure to train" claim cannot be

sustained without an underlying violation of constitutional rights, such a claim does not require

that an individual defendant be found liable for that violation.

A failure to train, supervise, or discipline employees can trigger municipal liability under

§ 1983 where "the failure amounts to 'deliberate indifference' to the rights of persons with

whom those employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d

Cir. 1999) (internal citation omitted); *Natale*, 318 F.3d at 584. "[W]hen city policymakers are on

actual or constructive notice that a particular omission in their training program causes city

employees to violate citizens' constitutional rights, the city may be deemed deliberately

indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S.

51, 61 (2011) (citation omitted).

> The precedent in our circuit requires the district court to review the plaintiffs'
> municipal liability claims independently of the section 1983 claims against the
> individual police officers, as the City's liability for a substantive due process
> violation does not depend upon the liability of any police officer . . . . the district

court must evaluate the municipal liability claims in light of the standards set forth above, notwithstanding the outcome as to the claims against the individual police officers.

*Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) (internal citations omitted).  In this case, although there is no evidence that PCOs Joyner, Avery, and Gwalthney were deliberately indifferent in failing to provide medical care to Wichterman, a reasonable jury could still find that Wichterman's constitutional right to adequate medical care was violated if city policymakers were deliberately indifferent in failing to provide training to the PCOs.

### 2.  *Causal Nexus*

Next, City defendants argue that there is no evidence that Wichterman's death resulted from any policy or custom of the City.  To establish a § 1983 claim on a failure to train theory, the failure to train must have "a causal nexus with [the plaintiff's] injury."  *Thomas*, 749 F.3d at 226 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).  "Liability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.'"  *Id.*  Instead, "the causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'"  *Id.* (quoting *Canton*, 489 U.S. at 391).

In this case the evidence establishes a causal nexus.  Specifically, if PCO Joyner had been appropriately trained to recognize a semi-conscious state as a sign of overdose she would have, or should have, immediately contacted Wahabu at 8:30 p.m., when she was first unable to wake Wichterman.  At that point Wahabu would have, or should have, administered Narcan which likely would have saved Wichterman's life.  Evidence shows that Narcan was available in the PDU on January 30, 2015, that Wahabu was trained to administer Narcan, and that Narcan, when

timely administered, is effective in preventing many overdose deaths.  City SUMF ¶ 117;

Wahabu Dep. 150:17–153:16; *see Koukos v. Chester Cty.*, No. 16-4602, 2017 WL 511634, at

*11 (E.D. Pa. Feb. 7, 2017) (identifying an appropriately pled causal nexus where a plaintiff

stated that "had officers been trained accordingly, they would have recognized [plaintiff's]

symptoms, known that he needed immediate medical attention and permitted him to obtain it").

The Court concludes that a reasonable jury could find a causal nexus between the City's

failure to train its PCOs in recognizing and responding to symptoms of overdose and

Wichterman's death.

### 3.  Deliberate Indifference

Finally, to succeed on a failure to train claim, a plaintiff must establish that the

policymakers exhibited deliberate indifference in their failure to train their employees.  *Thomas*

*v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014).

City defendants argue that plaintiff fails to provide evidence that any City of Philadelphia

policymaker was deliberately indifferent to a risk of harm to Wichterman or similarly situated

persons.  In support of this argument, City defendants point out that plaintiff has not established

that any policymaker was aware of similar unlawful conduct in the past but failed to take

precautions against future violations. City Def. Mot. Summ. J. 22.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action."  *Thomas*, 749 F.3d

at 223.  Typically, a pattern of similar constitutional violations is necessary to show deliberate

indifference for the purposes of failure to train.  *Id.*  "A pattern of violations puts municipal

decisionmakers on notice that a new program is necessary, and '[t]heir continued adherence to an

approach that they know or should know has failed to prevent tortious conduct by employees

may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Id.* (quoting *Bryan Cty.*, 520 U.S. at 407).

In some cases, however, a plaintiff may assert a failure to train claim premised on a single incident. To do so a plaintiff must show that the need to train officers was "so patently obvious" that the municipality's failure to train constituted deliberate indifference to the "highly predictable consequence" that failing to train would result in constitutional violations. *Connick*, 563 U.S. at 64 (citing *Canton*, 489 U.S. at 390). "Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'" *Thomas*, 749 F.3d at 223–24 (quoting *Bryan Cty.*, 520 U.S. at 409).

For example, in *Thomas v. Cumberland County* the Third Circuit held that, even without establishing a pattern of violations, there was sufficient evidence for a reasonable jury to find deliberate indifference where Cumberland County failed to provide de-escalation and intervention training to prepare officers at a county correctional facility to handle inmate-on-inmate violence. 749 F.3d at 225. In reaching that conclusion, the Third Circuit noted that "the officers here have no reason to have an independent education, knowledge base, or ethical duty that would prepare them to handle the volatile conflicts that might lead to inmate-on-inmate violence." *Id.* The court further concluded that Cumberland County "failed to provide protective measures" to prevent mistakes "in a situation that occurs frequently." *Id.* at 226.

In this case, plaintiff does not identify a pattern of constitutional violations in support of his failure to train claim. However, similar to the facts in *Thomas*, where inmate-on-inmate violence was common, in this case, the PDU frequently admitted detainees who were intoxicated

on opiates.  Wahabu estimated that nearly half of the individuals admitted to the PDU on a daily basis were intoxicated on opiates.  Wahabu Dep. 158:3–13.  Furthermore, PCOs are not expected to have independent knowledge of how to handle medical emergencies.  Finally, although a registered nurse worked in the PDU, as a practical matter, the PCOs spent much more time on the cell block and could not be expected to call the nurse for assistance if they were not trained to recognize common signs of medical distress.  Training PCOs to recognize opioid overdose would be a basic protective measure designed to prevent mistakes in a situation that occurs frequently.

In this case, plaintiff has identified a failure to provide specific training – how to recognize and respond to the signs of opiate overdose.  The Court concludes that given the prevalence of opioid use in 2015, the PDU's role in detaining individuals arrested under suspicion of DUI, and the substantial number of times that Narcan had to be administered in the PDU, a reasonable jury could find that the need to train officers to recognize signs of overdose and contact medical personnel to assist when a detainee is semi-conscious was "so patently obvious" that municipal policymakers' failure to train was deliberate indifference to the predictable consequence of failing to treat an overdosing detainee. [7]

For the foregoing reasons, that part of City defendants' Motion for Summary Judgment on plaintiff's *Monell* claim is denied.

_____

[7] To the extent City defendants reiterate the argument raised in their Motion to Dismiss, and rejected by this Court, that plaintiff's claim must fail because he does not identify a specific policymaker involved in the formation of the alleged municipal custom or policy, the Court disagrees.  *See Wichterman v. City of Philadelphia*, No. 16-5796, 2017 WL 1374528, at *3 (E.D. Pa. Apr. 17, 2017).  A municipal policymaker need not be "specifically identified by the plaintiff's evidence.  Practices so permanent and well-settled as to have the force of law [are] ascribable to municipal decisionmakers."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *see also Olivieri v. Cty. of Bucks*, 502 F. App'x 184, 189 (3d Cir. 2012) ("This does not mean, however, that the policymaker must be specifically identified by the plaintiff's evidence; rather, practices so widespread as to have the force of law are ascribable to local government policymakers.  If custom is established by proof of knowledge and acquiescence, then a single application of the custom can suffice to show liability.").

### B. Corizon Defendants' Motion for Summary Judgment

Corizon defendants argue that summary judgment should be granted on plaintiff's (1) deliberate indifference claim against Wahabu, (2) state law negligence claims against Wahabu and Corizon, and that (3) punitive damages should not be available to plaintiff against Wahabu. The Court addresses Corizon defendants' arguments in turn.

#### i. Deliberate Indifference Claim Against Wahabu

Plaintiff claims that Wahabu unconstitutionally denied Wichterman medical care while he was a pretrial detainee at the PDU.[8]  As discussed above in reference to City defendants' motion, although plaintiff's deliberate indifference claim against Wahabu is asserted under the Fourteenth Amendment, the Court utilizes the standard enunciated in *Estelle*, pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment, in addressing the claim.  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).  To succeed on his deliberate indifference claim plaintiff must show that (1) Wichterman had "a serious medical need," and (2) acts or omissions by Wahabu indicate "deliberate indifference" to that need.  *Id.* at 582 (discussing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)), *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

A medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987); *Tsakonas v. Cicchi*, 308 F. App'x 628, 632 (3d Cir. 2009).  "In addition, where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious."  *Monmouth Cty. Corr.,* 834 F.2d at 347.

---

[8] Although Wahabu was an employee of Corizon, not the City of Philadelphia, the employees of independent contractors can be held liable for deliberate indifference where they are acting under the color of state law.  *See Lee v. Abellos*, No. 13–0486, 2014 WL 7271363, at *7 (E.D. Pa. Dec. 19, 2014).

 "A finding of deliberate indifference requires proof of subjective knowledge, not objective knowledge, 'meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware.'"  *Johnson v. Coleman*, 506 F. App'x 125, 127 (3d Cir. 2012).  A plaintiff asserting deliberate indifference "must provide an evidentiary basis for concluding that prison officials had a 'sufficiently culpable state of mind.'"  *Gravley v. Tretinik*, 414 F. App'x 391, 394 (3d Cir. 2011).  "Deliberate indifference requires that prison officials know of an excessive risk to an inmate's health or safety and affirmatively disregard that risk."  *Id.*

Plaintiff argues that the facts concerning (1) Wahabu's observations of Wichterman at the time he drew Wichterman's blood, (2) Wahabu's receiving screening of Wichterman, and (3) video evidence of Wahabu's failure to monitor Wichterman, support his deliberate indifference claim against Wahabu.  Pl. Consol. Resp. 46–49.  Although the Court has examined the record in the light most favorable to plaintiff, plaintiff's deliberate indifference claim against Wahabu must fail because there is no evidence that Wahabu was subjectively aware of Wichterman's serious medical need.

First of all, at the time Wahabu drew Wichterman's blood, he evaluated Wichterman and concluded, based on his judgment as a registered nurse, that Wichterman was not in need of medical assistance.  Wahabu testified that Wichterman's vital signs were "perfect" and that he did not appear to be intoxicated.  City SUMF ¶¶ 50, 51, 79, 86.  Although there is a question of fact as to whether Wahabu was aware of or suspected that Wichterman was intoxicated, such knowledge alone would not show that Wahabu was subjectively aware of a serious medical condition.

23

Although an overdose is undoubtedly a serious medical condition, routine intoxication is not. *See e.g. Grayson v. Peed*, 195 F.3d 692, 694–96 (4th Cir. 1999) (rejecting argument that signs of intoxication are sufficient to establish a serious medical need, stating "to accept appellant's claim would be to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers. That would be a startling step to take.").  Routine intoxication is dealt with on a daily basis in the PDU and is not the type of condition that typically leads to life-long handicap or permanent loss.  Furthermore, it is not the type of condition for which "a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

Plaintiff argues that Wahabu's testimony—that he would have sent Wichterman to the hospital if he had noticed any signs of intoxication—establishes that intoxication presents a serious medical need.  Pl. Consol. Resp. 49; Pl. SOF ¶ 95.  The Court disagrees.  Plaintiff's argument conflates the legal definition of a serious medical need with Wahabu's independent standard for sending detainees to the hospital and is, ultimately, unconvincing.  Therefore, even if Wahabu observed signs of intoxication, that knowledge alone would not establish that Wahabu had subjective knowledge of Wichterman's serious medical need.

Next, plaintiff argues that Wahabu's alleged failure to complete the receiving screening form in full and ask Wichterman about his prior drug use shows that he was deliberately indifferent.  Pl. Consol. Resp. 47.  However, assuming that Wahabu failed to question Wichterman about his drug use, such failure does not, without more, evince subjective knowledge of a serious medical condition.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our

cases be condemned as the infliction of punishment." *Fox v. Horn*, No. 98-5279, 2000 WL 49374, at *4 (E.D. Pa. Jan. 21, 2000) (stating that even if a defendant "should have been aware of [plaintiff's] illness, but [was] not as a result of their non-compliance with proper procedures, there is not a cognizable claim for an Eighth Amendment violation.").

Finally, plaintiff argues that Wahabu's failure to properly check on Wichterman during his rounds demonstrates deliberate indifference. Wahabu was required to go to the cell block every two hours to check on the well-being of all detainees. Pl. SOF ¶ 18. Video footage shows that Wahabu walked through the male cell block approximately every two hours while Wichterman was confined but did not turn his head to look into Wichterman's cell. Wahabu Dep. 216:6–21. Wahabu testified that, while making rounds, he saw Wichterman sitting up with his eyes open, but that testimony is contradicted by PCO Joyner's statement that Wichterman was unconscious and unable to be roused around that same time. *Id.* 217:24–221:15; Joyner Dep. 40:13–41:3, 45:5–20. However, even if Wahabu failed to properly check on Wichterman, his failure to do so would only mean that he did not see Wichterman unconscious in his cell, it would not be evidence that he was aware of Wichterman's serious medical need.

Based on the absence of evidence that Wahabu was subjectively aware that Wichterman was overdosing, the Court concludes that no reasonable jury could find that Wahabu was deliberately indifferent to an excessive risk to Wichterman's health and safety.

For the foregoing reasons, that part of Corizon defendants' Motion for Summary Judgment on plaintiff's deliberate indifference claim against Wahabu is granted.[9]

---

[9] As discussed *supra* in Section II(E), plaintiff does not oppose dismissal of his § 1983 municipal liability claim against Corizon.

ii.   Negligence Claims against Wahabu and Corizon

Corizon defendants' only argument supporting their position that summary judgment should be granted on plaintiff's state law negligence claims against Wahabu and Corizon is that plaintiff has not provided any admissible expert opinions on standard of care and causation to maintain a *prima facie* case of medical negligence.

The Court disagrees.  In its June 19, 2019 Memorandum and Order, the Court denied (1) those parts of the Corizon defendants' Motion to Exclude the Testimony of Robert L. Cohen, M.D. which sought to prohibit Dr. Cohen from testifying to standard of care and causation, and (2) that part Corizon defendants' Motion to Exclude the Testimony of Sarah E. Wakeman, M.D. which sought to prohibit Dr. Wakeman from testifying to causation.   The Court concluded that "[i]n context, Cohen's testimony regarding "improper nursing action[s]" is best interpreted as a reference to the standard of care" and that "Cohen's opinions as to the standard of care required of a registered nurse in the correctional setting [are] based on good grounds" and meet the requirements of Rule 702.  *Wichterman v. City of Philadelphia*, No. 16-5796, 2019 WL 2568340, at *6 (E.D. Pa. June 20, 2019).  The Court also concluded that both Cohen and Wakeman's expert reports offered admissible opinions as to causation.  *Id.* at *10.

The Court therefore denies that part of Corizon defendants' motion seeking summary judgment on plaintiff's state law negligence claims against Wahabu and against Corizon based on *respondeat superior* liability.[10]

---

[10] As discussed *supra* in Section II(E), plaintiff does not oppose dismissal of his corporate negligence claim against Corizon.

26

iii.  Punitive Damages Against Wahabu

Plaintiff's Amended Complaint seeks punitive damages against the individual defendants. Am. Compl. Section VI(B).  Corizon defendants' motion argues that summary judgment should be granted as to plaintiff's punitive damages claim against Wahabu.  Corizon Def. Mot. 20.

Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Tearpock-Martini v. Borough*, 98 F. Supp. 3d 697, 703 (M.D. Pa. 2015) (quoting *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)).  "A showing of actual malice, however, is not necessary.  The plaintiff must establish that the defendant acted with a 'subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations.'" *Id.*

This Court has held that "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Kenney v. Montgomery Cty.*, No. 13-2590, 2013 WL 5356862, at *9 (E.D. Pa. Sept. 25, 2013) (citing *Farmer*, 511 U.S. at 836–37) (allowing a punitive damages claim to proceed against correctional physician based on sufficient allegations of deliberate indifference); *Tenon v. Dreibelbis*, 190 F. Supp. 3d 412, 418 (M.D. Pa. 2016) ("the standard to show 'deliberate indifference' is substantially the same as the standard to show 'reckless or callous indifference.'").  The Court ruled *supra* that no reasonable jury could find that Wahabu was deliberately indifferent to Wichterman's serious medical condition.  *See supra* Section IV(B)(i).  For similar reasons, the Court concludes that a reasonable jury could not find that Wahabu recklessly disregarded Wichterman's constitutional right to adequate medical care.

Thus, the Court grants that part of Corizon defendants' motion seeking summary judgment on plaintiff's punitive damages claim against Wahabu.

## V.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part City defendants' and Corizon defendants' motions, as follows:

(1)    In ruling on City defendants' Motion for Summary Judgment:

- That part of City defendants' Motion seeking summary judgment on plaintiff's Fourteenth Amendment deliberate indifference claims against Avery, Gwalthney, and Joyner is granted, and

- That part of the City defendants' Motion seeking summary judgment on plaintiff's Fourteenth Amendment *Monell* claim against the City of Philadelphia is denied.

(2)    In ruling on Corizon defendants' Motion for Summary Judgment:

- That part of Corizon defendants' Motion seeking summary judgment on plaintiff's Fourteenth Amendment deliberate indifference claim against Wahabu is granted,

- That part of Corizon defendants' motion seeking summary judgment on plaintiff's negligence claims against Wahabu and against Corizon based on Corizon's *respondeat superior* liability is denied,

- That part of Corizon defendants' motion seeking summary judgment on plaintiff's punitive damages claim against Wahabu is granted, and

- Those unopposed parts of Corizon defendants' motion seeking summary judgment on plaintiff's municipal liability and corporate negligence claims against Corizon are granted.

(3)     Plaintiff's Eighth Amendment deliberate indifference and *Monell* claims against City defendants and Corizon defendants are withdrawn with prejudice by agreement of plaintiff.

An appropriate Order follows.