### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Tehum Care Services, Inc., | ) | |
| | ) | Case No. 23-90086 (CML) |
| Debtor. | ) | |

**RESPONSE OF KOHCHISE JACKSON, WILLIAM KELLY, ANDREW LYLES, RANDY McELHANEY, The Estate of KERRY MILKIEWICZ, The Estate of RICKY SCOTT, GREGORY ABRAHAM, and CHARLES JONES TO DEBTOR'S EMERGENY MOTION TO EXTEND AND ENFORCE THE AUTOMATIC STAY**

<u>INDEX OF EXHIBITS</u>

**Exhibit 1:** Excerpt from Corizon's March 17, 2021 Best and Final Offer to Missouri Department of Corrections

**Exhibit 2:** Complaint (ECF No. 1) in *Hyman v. Yescare Corp., et. al.,* 3:22-cv-01081, filed in the U.S. District Court for the Middle District of Tennessee on 12/30/2022.

**Exhibit 3:** University of Missouri's Reply Brief in Support of their Motion for a Preliminary Injunction, Case No. 22BA-CV01701-01, Circuit Court of Boone County, Missouri, filed 01/30/2023.

**Exhibit 4:** Tehum Care Services, Inc.'s Suggestions in Support of its Opposition to Plaintiff 's Motion for Preliminary Injunction, Case No. 22BA-CV01701-01, Circuit Court of Boone County, Missouri, filed 01/23/2023.

**Exhibit 5:** Corizon 2018-2019 Master Policy -Medical Group Professional Liability.

**Exhibit 6:** M2 LoanCo LLC Company Reinstatement, Filed January 18, 2023 with Florida Secretary of State.

BACKGROUND AND PRELIMINARY STATEMENT

At the time of its formation via a merger of two competing prison healthcare contractors in 2011, Corizon Health was the largest firm in the prison healthcare industry, managing the delivery of medical care to over 300,000 inmates for state and local government clients across the United States and generating annual revenues in excess of one billion dollars. But over the last seven years, Corizon rapidly lost market share to competitors. In the five-year period from March 17, 2016 to March 17, 2021, Corizon lost twenty-five prison and jail healthcare service contracts. These lost contracts covered facilities with a combined average daily population of 192,711 prisoners. (Ex. 1, pg. 12). Over the same time period, Corizon only won four new service contracts, covering a mere 20,810 prisoners. (Ex. 1, pg. 12).

In early 2021, contract renewals for Corizon's multi-year contracts with its two largest remaining clients, the Michigan and Missouri Departments of Corrections, were put out to bid via competitive public procurement processes in those states. Corizon lost both contracts to competitors. The Michigan and Missouri contracts had constituted over 50% of Corizon's remaining business at the time, and their expiration in the fourth quarter of 2021 rendered Corizon deeply-insolvent.

According to Corizon's then-CEO, James Hyman, in early December of 2021, while "[Corizon]'s financial situation was dire", (Mot. ¶ 5), an anonymous buyer

purchased Corizon. (Ex. 2, pg. 6, ¶ 34). The anonymous buyer(s) conducted <u>no due</u> <u>diligence</u> prior to acquiring this deeply-insolvent company. (Ex. 2, pg. 6, ¶ 35). All Directors were replaced as a condition of sale. (Ex. 2, pg. 6, ¶ 38). Almost immediately after the new slate of Directors assumed control, millions of dollars were siphoned out of Corizon to other entities controlled by these new Directors. (Ex. 2, pg. 8, ¶¶ 44-45, pg. 12, ¶¶ 57-59). Per Mr. Hyman, these related-party transactions were authorized by the same individual who placed Tehum Care Services into bankruptcy, Corizon Director Isaac Lefkowitz. [ECF No. 1, pg. 8].

The stripping of Corizon's assets accelerated in May of 2022. At that time, Corizon entered into a divisional merger transaction with itself, dividing its assets and liabilities between two surviving entities. Corizon's Plan of Merger refers to these entities as the "NewCo," (CHS TX, Inc.), and the "RemainCo." [ECF No. 59-10, pg. 23]. The RemainCo is now known as Tehum Care Services, the Debtor. A recent order entered in *Jackson v. Corizon Health, Inc.,* 2022 U.S. Dist. LEXIS 198717 (E.D. Mich. Nov. 1, 2022) summarizes the practical effect of this transaction:

> The divisional merger allocated the bulk of Corizon's assets to CHS TX. Specifically, CHS TX inherited all of Corizon's employees, all of Corizon's active contracts, and nearly all of Corizon's cash, equipment, real estate, and other assets. (Id. at PageID.3417-28). Both pre-division Corizon and CHS TX were owned by the same, sole-shareholder, and CHS TX also inherited Corizon's CEO and Chair, Sara Tirschwell. (Compare id. at PageID.3410, with ECF No 83-1, PageID.3371, and ECF No. 83-2, PageID.3391).

Corizon retained all of its expired contracts and their corresponding liabilities. Corizon also held onto one million dollars in cash, the right to collect on its insurance policies, and the right to collect up to four million dollars under a "funding agreement" with an affiliate of Corizon Health, provided that Corizon met "certain conditions." (ECF No. 83-4, PageID.3429-30). All other assets and liabilities passed to CHS TX. (Id. at PageID.3417-18).

After the divisional merger, YesCare, Inc., a corporation owned by CHS TX's CEO, acquired CHS TX, and CHS TX began informally doing business under its parent company's name. (ECF No. 83, PageID.3343; ECF No. 83-7; see, e.g., ECF No. 77-27 (explaining that CHS TX does business under the name "YesCare")). Corizon later changed its name to Tehum Care Services, Incorporated. (ECF No. 83-4, PageID.3587).

*Jackson v. Corizon Health, Inc.*, 2022 U.S. Dist. LEXIS 198717 at *3-*4. (E.D. Mich. 2022).

Although the RemainCo has now filed for Chapter 11 protection, the NewCo and its recently-incorporated parent, Yescare Corp., continue to operate the former Corizon assets outside of bankruptcy. After leaving behind most of Corizon's liabilities in the RemainCo, the NewCo is apparently solvent. Recent filings in a Missouri adversary proceeding reveal that these successor entities have over $173 million in assets, and those assets were encumbered by less than $98 million in long-term secured debt. (Ex. 3, pg. 29; Ex. 4, pg. 7).

The RemainCo's assets, in contrast, consisted of, 1) one million dollars in cash on May 5, 2022,[1] 2) an undisclosed funding agreement entered into with a Florida limited liability company under common control, M2 LoanCo LLC, and 3) insurance rights. The RemainCo's liabilities include approximately five hundred personal-injury and employment-law claims, [ECF No. 59-10, pp. 153-160], and per the Amended Petition, at least $31 million in trade debt. The RemainCo also purported to indemnify, "NewCo and its affiliates . . . for, any and all losses, damages, costs, expenses, taxes, liabilities, obligations, penalties, fines, claims of any kind . . . to the extent such Losses arise from or relate to the RemainCo Liabilities or RemainCo assets." [ECF No. 59-10, pg. 26].

The RemainCo's liability insurance rights are likely to be illusory, at least with respect to the hundreds of medical-malpractice personal-injury claims assigned to the RemainCo. That is because the RemainCo has not been allocated enough cash to meet the approximately $20-million-per-policy-year[2] self-insured retentions under its applicable insurance policies. The RemainCo's insurer will not make any payment unless the RemainCo pays the self-insured retention, regardless of any insured's insolvency. The RemainCo's insurance contract is quite explicit on this point:

Under no circumstances will we make any payment under this policy unless and until the First Named Insured has exhausted the Aggregate Self-Insured Retention

---

[1] This cash has likely already been exhausted by defense costs over the past nine months. Considering only the personal-injury and employment-law claims, the RemainCo's cash amounts to only $1,927 per lawsuit allocated to the RemainCo.

[2] See Ex. 5, pg. 1.

by the payment of damages arising from covered medical incidents. **If the First Named Insured is unable to pay any part of the Self-Insured Retention due to bankruptcy, insolvency, or other financial difficulty, then this policy will not be required to "drop down" to make payments of policy limits and/or defense costs**, and no payment of any kind will be available to the First Named Insured or any Insured under this policy.

(Ex. 5, pg. 32) (emphasis added).

While the majority of Corizon's tort liabilities were left behind in the RemainCo, not all of them were. Corizon assigned the claims of one-hundred and sixty personal-injury claimants and twenty-one employment-law claimants to the NewCo in its Plan of Divisional Merger[3]. [ECF No. 59-10, pp. 147-151]. The Debtor is not seeking to extend the automatic stay to *these* tort claimants, despite the fact that they are pursuing recovery from the NewCo, for injuries allegedly inflicted by Corizon Health before the NewCo existed. These claimants' unimpeded access to the solvent successor entity means they will presumably be able to achieve full recoveries on their claims if they are successful. Only those Corizon personal-injury and employment-law claimants that Corizon unilaterally decided to assign to the RemainCo are being sequestered in this Chapter 11

---

3 The NewCo tort claimants are those whose injuries occurred prior to the divisional merger, but in facilities where Corizon was still providing services as of May of 2022. Prior to the divisional merger, Corizon had a practice of defending and indemnifying its employees for medical-malpractice and other prisoner tort claims asserted against them. Ceasing to indemnify its current employees for their pre-divisional-merger conduct likely would have disrupted CHS TX' operations in these facilities.

proceeding, where the Debtor now moves for an order prohibiting these claimants from similarly pursuing their claims against Corizon's solvent, operating successors.

Tehum Care Services is an entity built for bankruptcy. Its indemnification-and-funding-agreement structure allows the Tehum/CHS principals to "reap all the benefits of bankruptcy with none of the attendant burdens," *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 230132 at *9-*10 (N.D. Fl. Dec. 22, 2022), by quarantining vast majority of Corizon Health's unsecured creditors in this Chapter 11 proceeding without subjecting any significant Corizon assets are to bankruptcy court oversight. A stipulation included in the Plan of Divisional Merger provides that nearly-assetless Tehum Care Services has assumed broad indemnification obligations to the NewCo, its affiliates, its officers and directors. This language allows all of these "indemnified" parties to argue that they should all benefit from the automatic stay while they continue to operate the Corizon assets outside of bankruptcy.

The 2022 Restructuring also contains built-in impediments designed to hinder any attempts to "claw back" the Corizon assets into the bankruptcy estate.  First, the debtor, Tehum Care Services "irrevocably, unconditionally and completely waive[d] and release[d] and forever discharge[d] NewCo and its subsidiaries and its and their respective past, present or future directors, shareholders, managers, members, officers, [etc.]" from any claims it had against them before, or at, the time of the divisional

merger. [ECF No. 59-10, pp. 27-28]. Based on this preemptory release, the indemnified parties can assert that any fraudulent-transfer or breach-of-fiduciary-duty claims the Debtor might bring against them have already been settled and discharged.

Equally important is Corizon's choice of Texas law to govern its transaction with itself. [ECF No. 59-10, pg. 11]. Corizon changed its state of incorporation from Delaware to Texas immediately prior to consummating the divisional merger, although "Corizon did not conduct any business in Texas when it began the merger, and following the merger, neither Tehum, CHS TX, nor YesCare conduct any business in Texas." *Kelly v. Corizon Health, Inc.,* 2022 U.S. Dist. LEXIS 198725 at *20 (E.D. Mich. Nov. 1, 2022). One factor that made Texas an attractive venue for this transaction is that it is a more difficult jurisdiction for imposing liability on successor corporations. Delaware also permits divisional mergers, See 6 DE Code § 18-217, and Delaware also allows assignment of the assets and liabilities among the surviving entities. But Delaware permits such assignment only, "so long as the plan of division does not constitute a fraudulent transfer under applicable law." 6 DE Code § 18-217 (l)(4). Texas law, in contrast, provides that:

> "all rights, title, and interests to all . . . property owned by each organization that is a party to the merger is allocated to and vested . . . in one or more of the surviving or new organizations as provided in the plan of merger **without . . . any transfer or assignment having occurred.**"

Texas Business Organizations Code § 10.008 (emphasis added).

This statute enables the indemnified parties to raise the textualist argument that since there is no *transfer* of the Corizon assets, there can be no *fraudulent transfer*. And Texas law provides other important benefits to those seeking to evade their creditors. For example, Texas law expressly bans "de facto merger" as a means to impose liability on a corporation that acquires all of a predecessor's assets. *See Shapolsky v. Brewton*, 56 S.W.3d 120, 138-39 (Tex. App. 2001). Texas also generally does not recognize successor-liability theories of recovery. *See Allied Home Mortg. Corp. v. Donovan,* 830 F. Supp. 2d 223, 233 (S.D. Tex. 2011).

Yet another mechanism to protect the Corizon assets from the unsecured creditors is likely contained in the terms of the M2 LoanCo funding agreement. The principals may have set aside some funds to settle with the unsecured creditors of Corizon, but they did not allocate those funds to the Debtor. Had they done so, the settlement funds would have been subject to bankruptcy court oversight. Instead, these limited funds have only been made available through a conditional funding agreement with a Florida limited liability company, M2 LoanCo LLC. Recent filings indicate that M2 LoanCo is owned or controlled by Abraham Goldberger (Ex. 6) and Isaac Lefkowitz [ECF No. 59-10, pg. 194]. Goldberger and Lefkowitz were a Directors of Corizon prior to the divisional merger. [ECF No. 59-10, pp. 5-7]. They became CEO and Senior Vice President, respectively, of the RemainCo at the time of the merger. [ECF No. 59-10, pg. 5].

Goldberger and Lefkowitz also constitute the majority of the three-member Board of the RemainCo. *Id*. If this funding agreement with M2 LoanCo LLC resembles those employed by other companies that have engaged previous "Texas-two-step" restructuring maneuvers,[4] the conditions required for the provision of funding under the agreement will involve a third-party release of liability for the operating successor entity, its officers, and its directors. *See DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, 2021 Bankr. LEXIS 2194 at *30-*34 (Bankr. W.D.N.C. 2021).

The economic reality of what the Debtor's (and NewCo's) principals are seeking to do is retain enterprise value for themselves, the equity participants, while the majority of Corizon Health's unsecured creditors are impaired. The principals of the NewCo and RemainCo purchased Corizon while it was deeply-insolvent precisely because they believed they could achieve this outcome.  This bankruptcy, in which Tehum's only significant asset is a funding agreement with an LLC that is also controlled by its principals, is designed to impose a unilateral cap on Corizon's liability to a subset of Corizon's unsecured creditors, while Corizon's equity participants retain for themselves an interest in the reorganized entity without needing to bid against other potential buyers

---

4   While Texas law has permitted divisional mergers for over thirty years, use of the Texas Business Organizations Code ("TBOC") to place a corporation's assets beyond the reach of its unsecured creditors appears to be a recent innovation. "The first time any debtor in the country used this procedure was in *Bestwall* in 2017." *In re LTL Mgmt. LLC*, 2021 Bankr. LEXIS 3155 at *27 (Bankr. W.D.N.C. Nov. 16, 2021).

for that interest. Congress categorically prohibited such an outcome in a bankruptcy proceeding; it is a per-se violation of the absolute priority rule. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 437 (1999).

In addition to skirting the absolute priority rule through an innovative application of Texas corporation law, the Debtor now moves on an emergency basis to frustrate another of the primary goals of the bankruptcy code: the "equal treatment of similarly-situated creditors." *See In re Mirant Corp*, 316 B.R. 234, 242 n.16 (N.D. Tex. 2004) (collecting cases). While tort plaintiffs with claims stemming from pre-petition medical treatment provided by Corizon in Maryland and Wyoming prisons are allowed to pursue their claims against CHS TX unimpeded, the Debtor moves for an order preventing similarly-situated Michigan tort claimants from doing the same. And the Debtor also apparently seeks to extend the automatic stay to a vast array of non-debtors, halting the prosecution of direct claims for medical malpractice and civil rights violations currently pending against Corizon's state-and-local government clients. (Mot. ¶¶ 6, 33).

### The Objectors

The instant Objectors to this Emergency Motion are a group of Michigan tort claimants whose claims arose from medical care provided by Corizon or its contractors prior to the divisional merger. Each respondent holds a claim against one or more

individual medical providers, but the circumstances of the Objectors' claims otherwise differ.

Charles Jones' claim has been reduced to a $6.4 million judgment against three former Corizon nurses. He has no claim against the Debtor or CHS TX. Mr. Jones seeks to pursue collection of his judgment from these nurses' personal assets. While the Debtor is no longer a party to the *Jones* matter, its counsel filed a "Suggestion of Bankruptcy and Notice of Automatic Stay" in the *Jones* case on 2/22/23. The Debtor's Michigan counsel is apparently taking the position that this bankruptcy proceeding automatically stays enforcement of a judgment entered against the Debtor's former employees.

The remaining claims are unliquidated. Randy McElhaney, the Estate of Kerrie Milkiewicz, and the Estate of Ricky Scott each hold claims against the Debtor, employees of the Debtor's clients, and former employees of Quality Correctional Care of Michigan, P.C. ("Quality"). Corizon contracted with Quality to provide physician services in the Michigan Department of Corrections during the term of its Michigan DOC contract. *See* [ECF No. 59-18]. Quality is solvent, and continues to provide physician services to CHS TX at two Michigan jails.

Andrew Lyles holds a claim against one former employee of Quality. Gregory Abraham holds a claim against a former Quality employee and a claim against the

Debtor. Kohchise Jackson holds a claim against a former Quality employee, a claim against the Debtor, and a claim against CHS TX. William Kelly holds claims against the Debtor, CHS TX, Quality, and five former Quality employees. Mr. McElhaney's, Mr. Jackson's, and Mr. Lyles' claims have survived dispositive motions and are ready for trial, while the *Kelly, Abraham, Scott,* and *Milkiewicz* cases are in discovery.

<u>ARGUMENT</u>

**I. § 362(a)(1) Does Not Stay Litigation Against the Debtor's Co-Defendants.**

With limited or no notice to numerous affected parties, the Debtor in this matter seeks to enjoin, on an emergency basis, the continued prosecution medical-malpractice and civil-rights claims pending nationwide against the Debtor's former state-and-local-government clients. The Debtor also seeks to stay most pending litigation against CHS TX, Inc., Yescare Corp, and their officers and directors. The sole basis advanced for staying this vast array of litigation against non-bankrupt third parties is that the Debtor has allegedly agreed to indemnify all of them. (Mot. ¶¶ 9, 10).

§ 362(a)(1) of the Bankruptcy Code is not ordinarily a valid statutory basis to stay direct claims pending against non-bankrupt co-defendants or third parties. *See, e.g., Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) *(*"[b]y its terms the automatic stay applies only to the debtor, not to co-debtors under Chapter 7 or

Chapter 11 of the Bankruptcy Code nor to co-tortfeasors."). Rather, it is the overwhelming consensus among the circuits, including the Fifth Circuit, that § 362(a) protects only "the debtor," and not the debtor's third-party co-defendants. *See, e.g. Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir. 1983) (holding that § 362(a) "facially stays proceedings 'against the debtor' and fails to intimate, even tangentially, that the stay could be interpreted as including any defendant other than the debtor . . . It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor"); *Williford v. Armstrong World Industries,* 715 F.2d 124, 126 (4th Cir. 1983); *Teachers Ins. & Annuity Asso v. Butler,* 803 F.2d 61, 65 (2nd Cir. 1986); *Austin v. Unarco Industries, Inc.,* 705 F.2d 1, 4 (1st Cir. 1983) ("had Congress intended § 362(a) to apply to solvent co-defendants, it would have said so");  *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1330 (10th  Cir. 1984) ("[i]t would make no sense to extend the automatic stay protections to solvent co-defendants. . . . Accordingly, we join the other circuit courts in concluding that 11 U.S.C. § 362 stays litigation only against the debtor, and affords no protection to solvent co-defendants."). This is because the plain language of § 362(a) limits the applicability of the automatic stay to "the debtor." As the Fifth Circuit has explained:

We begin our inquiry by examining the plain language of the statute. That language clearly focuses on the insolvent party. There are repeated references to *the debtor*. The stay envisioned is "applicable to all entities," § 362(a), but only in the sense that it stays all entities proceeding against the debtor. To read the "all entities" language as protecting co-debtors would be inconsistent with the specifically defined scope of the stay "against the debtor," § 362(a)(1). Continuing, we note that the remaining clauses of § 362(a) carefully list the kinds of proceedings stayed, in each instance explicitly or implicitly referring to "the debtor."

This literal interpretation of § 362(a) is bolstered by language which is notably absent from its provisions. By way of comparison, Chapter 13 specifically authorizes the stay of actions against co-debtors. 11 U.S.C. § 1301(a) ("a creditor may not . . . commence or continue any civil action . . . [against] any individual that is liable on such debt with the debtor"). No such shield is provided Chapter 11 co-debtors by § 362(a).

*Wedgeworth v. Fiberboard Corp.*, 706 F.2d 541, 544 (5th Cir. 1983) (emphasis in original).

While the Fourth Circuit articulated an atextual "unusual circumstances" exception to this rule in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), the *Robins* exception is not triggered whenever a non-debtor defendant holds an indemnification claim against the debtor. *See, e.g., Johnson v. Fifth Third Bank, Inc.*, 476 B.R. 493, 502 (W.D. Ky. 2012) (collecting cases). "[I]f the "unusual circumstance" exception is broadened to permit a stay any time that a contractual indemnification provision is at issue, given their prevalence in commercial transactions, then the exception would effectively become the rule." *Smith v. Blitz U.S.A, Inc.*, 2012 U.S. Dist. LEXIS 47817 at *14 (D. Minn. 2012). The Fifth Circuit has held that even where "a

successful claim by [Plaintiff] against [a non-debtor defendant] would probably result in a lawsuit by [the non-debtor defendant] against the debtors seeking indemnification . . . **the merits of that probable litigation are not [plaintiff's] problem . . . its claim is not directed against the debtors' property and is not subject to a stay under § 362(a).**" *Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case),* 483 F.3d 292, 302 (5th Cir. 2007) (emphasis added).

The Debtor claims that litigation against indemnified parties, such as the municipalities that were its former clients, must be stayed because "any judgment against any Non-Debtor Indemnified Party would entitle such party to file a claim for indemnification against the Debtor in this chapter 11 case." (Mot. ¶ 34). But this argument is a red herring. Indemnified parties do not need to wait until claims against them are reduced to judgment to file their claims for indemnification against the Debtor. *See, e.g., In re Huffy Corp.,* 424 B.R. 295, 300-301 (Bankr. S.D. Ohio 2010). The "accrual approach" to indemnification claims in bankruptcy, i.e., requiring the indemnitee to wait until a right to payment under the indemnification agreement accrues under state law before filing a claim against the Debtor, "has been universally rejected." *Trevino v. HSBC Mortg. Servs. (In re Trevino),* 535 B.R. 110, 148 (Bankr. S.D. Tex. 2015). Rather, because a "claim" for bankruptcy purposes includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," 11 U.S.C. § 101(5)(a), each indemnitee's claim against the Debtor arises upon "the signing of the indemnification agreement itself[.]" *In re Trevino,* 535 B.R. at 148*; See also, Lycoming Engines v. Superior Air Parts, Inc. (In re Superior Air Parts, Inc.)*, 486 B.R. 728, 739 (N.D. Tex. 2012) (holding that "a right to indemnification is a pre-petition "claim" under the Bankruptcy Code where the indemnification agreement is executed pre-petition, even if the facts giving rise to actual liability did not occur until after the discharge."). The indemnified parties' indemnification claims against the debtor have already arisen, and exist regardless of the progress of any litigation against the indemnified parties. Staying litigation against the indemnified parties will not protect the bankruptcy estate from the indemnified parties' indemnification claims.

Extension of the automatic stay to CHS TX and Yescare Corp. due to their purported indemnity rights is particularly unwarranted where, as is the case here, these indemnified parties have manufactured the relationship that forms the basis for their effort to benefit from the automatic stay by "executing a funding agreement and indemnity agreement" between entities under common control, in which the indemnitor entity is saddled with massive liabilities and placed into bankruptcy, while the indemnitee entities receive all of the major assets of the business and seek to operate

them outside of bankruptcy while also benefiting from the automatic stay.[5] *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 230132 at *9-*10 (N.D. Fl. Dec. 22, 2022); *see also, 3M Occupational Safety LLC v. Those Parties Listed on Appendix A to the Complaint (In re Aearo Techs. LLC)*, 642 B.R. 891, 910-11 (S.D. Ill. 2022).  Extending the automatic stay to the sponsors of such a scheme permits them to "reap all of the benefits of bankruptcy with none of the attendant burdens." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 230132 at *10. If CHS TX and Yescare Corp wish to benefit from the debtor protections of Chapter 11, they should themselves "pay the price of admission to an Article I forum – here, reorganization and submission to the oversight of a bankruptcy court." *Id.* at *9.

## II. Michigan-Law Based Successor-Liability Claims Against CHS TX, Inc. are not Property of the Bankruptcy Estate

Some of the Michigan personal-injury plaintiffs are pursuing Michigan-law-based successor-liability claims against CHS TX, Inc. *See, e.g. Kelly v. Corizon Health, Inc.*, 2022 U.S. Dist. LEXIS 198725 at *23-*34 (E.D. Mich. 2022). The Debtor argues that

---

5   Only one Circuit to date has ruled on this divisional-merger-plus-indemnification-and-funding-agreement strategy for sequestering creditors in a Chapter 11 proceeding and benefiting from the automatic stay while continuing to operate the productive assets of a company outside of bankruptcy. The Third Circuit recently dismissed that case as a bad-faith filing. *See LTL Mgmt.. LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt LLC)*, __ F.4th __, 2023 U.S. App. LEXIS 2323 at *49 (3rd Cir. Jan. 30, 2023).

these claims are property of the bankruptcy estate. (Mot. ¶¶ 35-39). The Debtor is mistaken; the Michigan-law-based successor liability claims against CHS TX belong solely to the Michigan personal-injury claimants. Unlike alter-ego or fraudulent-transfer claims, these claims do not allege injury to the Debtor, do not stem from the depletion of estate assets, and could not have been asserted by the Debtor at the time of filing.

"Whether the bankruptcy estate or a creditor can pursue a claim against third parties is a recurring issue in bankruptcy law." *Meridian Capital CIS Fund v. Burton (In re Buccaneer Res., L.L.C.),* 912 F.3d 291, 293 (5th Cir. 2019). In the Fifth Circuit, "[w]hether a particular state-law claim belongs to the bankruptcy estate **depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case.**" *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 584 (5th Cir. 2008) (citing *Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281, 1284 (5th Cir. 1994)) (emphasis added). The source of this rule is 11 U.S.C. § 541(a)(1), which defines the bankruptcy estate as, "all legal or equitable interests of the debtor in property at the commencement of the case." *In re S.I. Acquisition, Inc.,* 817 F.2d 1142, 1149 (5th Cir. 1987).

In conducting the property-of-the-estate analysis for a given cause of action, courts often consider whether the claim alleges a harm to the debtor. *See, e.g., In re*

*Educators Group Health Trust*, 25 F.3d at 1284 (5th Cir. 1994). If the claim does not involve any harm to the debtor, the debtor would have lacked standing to raise the claim itself at the time of its bankruptcy filing; the claim therefore cannot be estate property under § 541(a)(1). *See Burton (In re Buccaneer Res., L.L.C.),* 912 F.3d 291, 293 (5th Cir. 2019) (explaining that no-harm-to-the-debtor claims represent "the simple case" where the claim "cannot be part of the estate.").

But a finding that the claim alleges harm to the debtor does not mean the claim is necessarily estate property. Even where a claim alleges an injury to the debtor, the estate only owns the claim if a second condition is satisfied: "the debtor otherwise could have brought a cause of action under Texas law for its direct injury as of the commencement of the case." *In re Educators Group Health Trust,* 25 F.3d at 1285 n.2 (5th Cir. 1994). As a result, it is possible for groups of creditors and the estate to simultaneously hold separate claims, against the same defendant, for essentially the same wrongful conduct. *See Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 585 (5th Cir. 2008).

For example, the Fifth Circuit found in *In re S.I Acquisition, Inc.,* 817 F.2d 1142 (5th Cir. 1987) that a Texas-law alter-ego claim was bankruptcy-estate property. The panel held that, "[o]f most importance to our decision, however, is whether a corporation could assert an action against itself based upon alter ego." *In re S.I Acquisition, Inc.,* 817

F.2d at 1152. Since Texas law alter-ego claims require "misuse[] of the corporation" by a control entity, and "theoretically nothing in Texas law prohibits a corporation from asserting on its own an action based on alter ego," the panel held that this cause of action "is "property of the estate" within the meaning of section 541(a)(1)." *Id.* at 1153.

But the same is not true of successor-liability claims. First, Texas law explicitly prohibits Texas corporations from asserting successor liability claims against entities that acquire their assets. *See McKee v. American Transfer & Storage,* 946 F. Supp. 485, 487 (finding that "Texas law does not generally recognize successor liability . . . [t]he Texas Business & Corporations Act eliminates the doctrine of implied successor liability"). The Debtor, a Texas corporation at the time of the commencement of the bankruptcy case, thus could not have brought a successor-liability claim against CHS TX, Inc., another Texas corporation, under applicable state law. For this reason alone, any successor liability claims against CHS TX, Inc. cannot be estate property. *See Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 586 (5th Cir. 2008).

The Michigan personal-injury claimants' successor-liability claims also could not have been asserted by the debtor at the commencement of the bankruptcy case for a second reason:  they do "not depend on any harm to the debtor." *Meridian Capital CIS Fund v. Burton, (In re Buccanneer Res., L.L.C.),* 912 F.3d 291, 294 (5th Cir. 2019).

Michigan imposes successor liability on asset purchasers even when fair value was paid for the assets, and no injury has been inflicted on the predecessor corporation. *See, e.g. Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 411 (1976) (holding arms-length purchaser of corporation's assets liable for injury sustained by Michigan resident on machine previously manufactured by asset-seller corporation); *Ryan Racing v. Gentilozzi,* 231 F. Supp. 3d 269, 285, 289 (W.D. Mich. 2017) (imposing successor liability under Michigan law on entity that continued predecessor's auto-racing activities, despite "no evidence that RSR gave less than reasonably equivalent value for the assets it purchased."). Michigan recognizes the "mere continuation" doctrine of successor liability, which "simply asks whether a successor corporation is the reincarnation of its predecessor—and a successor corporation can be a continuation of its predecessor even if the predecessor corporation continues to exist with just enough assets to satisfy its liabilities." *Kelly v. Corizon Health,* 2022 U.S. Dist. LEXIS 198725 at *33 n.9 (E.D. Mich. 2022). Imposition of successor liability under Michigan law requires no fraud, no fraudulent transfers, no misuse of the corporate form, and most importantly, no injury to the predecessor corporation. The Debtor does not have standing to assert these claims, so they do not fall within the definition of estate property under § 541(a)(1).

The Debtor could argue, in the alternative, that although the Michigan tort claimants *causes of action* are not estate property, they nevertheless should be stayed under § 362(a)(3) because they seek to obtain assets of CHS TX, Inc., and *the CHS TX assets themselves are estate property* under § 541(a)(1). *See In re S.I Acquisition, Inc.*, 817 F.2d 1142, 1150 (5th Cir. 1987). The assets of CHS TX could be considered estate property because they were fraudulently transferred in the divisional merger, therefore, the Debtor "retained a legal or equitable interest in the property fraudulently transferred to [CHS TX]" at the commencement of the bankruptcy case. *In re S.I. Acquisition, Inc.*, 817 F.2d at 1150.

The problem with endorsing this view is that it leads to a conclusion that no one may sue CHS TX, or seek to collect payment from CHS TX, for any reason, during the pendency of this Chapter 11 proceeding. Currently, hundreds of plaintiffs are suing CHS TX for claims relating to medical treatment provided by Corizon in Maryland and Wyoming prisons before CHS TX existed. [ECF No. 59-10, pp. 147-151]. Additional personal injuries will likely arise from CHS TX' "post-Tehum-petition" conduct in these state prison systems. While all of these claims seek recovery from the fraudulently-transferred assets, none of them are *premised on the fraudulent transfer*. Thus, they do not fall within the ambit of § 362(a)(3). "As long as the injury a creditor is pursuing against a third party does not stem from the depletion of estate assets, the injury is a

direct one that does not belong to the estate." *Meridian Capital CIS Fund v. Burton, (In re Buccanneer Res., L.L.C.),* 912 F.3d 291, 295 (5th Cir. 2019). Michigan law successor-liability claims satisfy this test.

CONCLUSION

For all the foregoing reasons, the Debtor's Emergency Motion should be denied.

Local Rule 9013-1(g)(1) Certification

Undersigned counsel certifies that they conferred with counsel for Debtor regarding the Debtor's Emergency Motion and they were unable to resolve this matter.

/s/ *Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Creditors Kohchise
Jackson, William Kelly, and Andrew
Lyles
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994-9590
ian@lawinannarbor.com

**Fieger, Fieger, Kenney &
Harrington, P.C.**
*/s/ Milica Filipovic*
MILICA FILIPOVIC (P80189)

Attorney for Creditors: Kerrie
Milkiewicz, Charles Jones, Alexander
Sabrie, Ricky Scott, Gregory Abraham
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555/ (248) 355-5148
m.filipovic@fiegerlaw.com


THE MICHIGAN LAW FIRM, PC
*/s/ Racine M. Miller*
RACINE M. MILLER (P72612)
*Pro Hac Vice Pending*
Attorney for Randy McElhaney
135 North Old Woodward Ave,
Suite 270
Birmingham, MI 48009
Phone: 844.464.3476
Fax: 248.237.3690
racine@themichiganlawfirm.com