**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
|  | ) |  |
| Debtor. | ) | **Re: Docket No. ___** |
|  | ) |  |

**INTERIM DIP ORDER (I) AUTHORIZING THE DEBTOR TO**
**(A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,**
**(II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of Tehum Care Services, Inc., the above-captioned debtor and debtor in possession (the "Debtor" or the "Borrower") in the above-captioned case (the "Chapter 11 Case") and pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures"), seeking entry of this Interim DIP Order (this "Interim DIP Order") among other things:

    (i)    authorizing the Debtor to obtain postpetition financing ("DIP Financing") pursuant to a superpriority, senior secured and priming debtor-in-possession term loan credit facility (the "DIP Facility"), subject to the terms and conditions set forth in that

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

[2] Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Credit Agreement (as defined herein).

certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* attached hereto as **Exhibit 1** (the "DIP Credit Agreement"), by and among the Debtor, as borrower, the Lenders party thereto (the "DIP Lenders"), and M2 LoanCo, LLC as administrative agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent", and together with the DIP Lenders, the "DIP Secured Parties"), consisting of a multiple draw term loan facility in the aggregate principal amount of up to, but not to exceed, $10 million (the "DIP Loans", and the commitments in respect thereof, the "DIP Commitments"), of which (a) $2 million will be advanced by the DIP Lenders, subject to compliance with the terms, conditions, and covenants described in the Approved Budget (as defined below) and the DIP Documents, on the Interim Closing Date (as defined in the DIP Credit Agreement) (the "Interim DIP Loan"), (b) $3 million will be advanced by the DIP Lenders, in one or more draws (each, a "Draw"), each in an amount no more than $500,000, upon five (5) business days' written notice, on the Final Closing Date (as defined in the DIP Credit Agreement) (the "Final DIP Loan"), provided that, on the date of each Draw under the Final DIP Loan, the Debtor is in compliance with the terms, conditions, and covenants described in the Approved Budget and the DIP Documents, and provided that all Milestones have been met at the time of such Draw, and (c) no sooner than 60 days after the Interim Closing Date, up to an additional $5 million to be made available by the DIP Lenders, in one or more Draws, each in an amount no more than $500,000, upon five (5) business days' written notice, up to the aggregate amount of the undrawn DIP Commitments, on or after the Additional Closing Date (as defined in the DIP Credit Agreement) (the "Additional DIP Loan"), provided that, on the date of each Draw under the Additional DIP Loan, the Debtor is in compliance with the terms, conditions, and covenants described in the Approved Budget and the DIP Documents, and provided that all Milestones have been met at the time of such Draw;

(ii)     authorizing the Debtor to execute, deliver, and perform under the DIP Credit Agreement and all other loan documentation, including security agreements, collateral agreements, pledge agreements, control agreements, and guarantees, and all other agreements, documents, certificates, and instruments delivered in connection herewith or therewith, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with this Interim DIP Order and the Final DIP Order (defined below), the "DIP Documents");

(iii)    authorizing the Debtor to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees, exit fees, other fees and fees payable pursuant to the Fee Letters and the DIP Credit Agreement), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other obligations due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv) subject to the Carve Out (as defined herein), granting to the DIP Secured Parties and the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(v) subject to the Carve Out, granting to the DIP Secured Parties and the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtor's estate (other than certain excluded property as provided in the DIP Documents) and all proceeds thereof, including, subject only to and effective upon entry of the Final DIP Order, any Avoidance Proceeds (as defined herein);

(vi) authorizing the DIP Agent, acting at the direction of the applicable required parties under the DIP Documents to take all commercially reasonable actions to implement and effectuate the terms of this Interim DIP Order;

(vii) upon entry of the Final Order, authorizing the Debtor to waive its right to surcharge the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code;

(viii) upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties;

(ix) confirming that section 552(b) of the Bankruptcy Code is inapplicable;

(x) authorizing the Debtor to use proceeds of the DIP Facility solely in accordance with this Interim DIP Order and the DIP Documents;

(xi) authorizing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xii) vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtor, the DIP Secured Parties, and the DIP Agent to implement and effectuate the terms and provisions of this Interim DIP Order, the DIP Documents and the Final DIP Order and to deliver any notices of termination described below and as further set forth herein;

(xiii) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim DIP Order and, upon entry, the Final DIP Order; and

(xiv) scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order

(the "<u>Final DIP Order</u>"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Russell Perry in Support of Debtor's Emergency Motion for Entry of Interim and Final DIP Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "<u>Perry Declaration</u>"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on March 17, 2023 (the "<u>Interim Hearing</u>"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtor and its estate, and is essential for the preservation of the value of the Debtor's assets; and it appearing that the Debtor's entry into the DIP Documents is a sound and prudent exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

4856-9366-8951

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.     *Petition Date*. On February 13, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

B.     *Debtor in Possession*. The Debtor has continued in the management and operation of its assets and property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     *Jurisdiction and Venue*. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter this Interim DIP Order and a Final DIP Order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Case and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 363(m), 364(c), 364(d)(1), 364(e), 503, 506 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.     *Committee Formation*. On March 2, 2023, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed a six-member official committee of unsecured creditors (the "Creditors' Committee") in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.  On March 6, 2023, the U.S. Trustee filed an amended notice of a reconstituted seven-member committee.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      *Notice*. The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Proper, timely, adequate and sufficient notice of the Interim Hearing and DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice of the DIP Motion or the entry of this Interim DIP Order shall be required. The DIP Motion complies with the requirements of Bankruptcy Local Rule 4001-1(b).

F.      *Cash Collateral*. As used herein, the term "Cash Collateral" shall mean all of the Debtor's cash, wherever located and held, including cash in deposit accounts, whether as original collateral of proceeds of DIP Collateral, that will constitute "cash collateral" of any of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G.      *Corporate Authority*. The Debtor, by and through its Chief Restructuring Officer, has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

H.      *Findings Regarding the DIP Financing and Use of Cash Collateral*.

(i)      Good and sufficient cause has been shown for the entry of this Interim DIP Order and for authorization of the Debtor to obtain financing pursuant to the DIP Documents.

(ii)      The Debtor has an immediate and critical need to obtain the DIP Financing and to use the Cash Collateral for (a) general corporate purposes of the Debtor, (b) costs, fees and expenses related to the DIP Facility and the administration of the Chapter 11 Case, (c) any other purposes agreed upon in the DIP Documents (as defined below), and (d) to fund the Carve Out in accordance with this Interim DIP Order, in each case subject to the terms and conditions of this Interim DIP Order (including the Approved Budget (as defined below)). In the absence of the DIP Facility and the use of Cash Collateral, the Debtor's estate would suffer immediate and irreparable

6

harm. The access by the Debtor to sufficient liquidity through the use of Cash Collateral, the incurrence of new indebtedness under the DIP Documents, and the other financial accommodations provided under the DIP Documents are necessary and vital to the preservation, maintenance and maximization of the value of the Debtor and to a successful, orderly liquidation of the Debtor.

(iii)    The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor has also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien.  Financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (1) perfected security interests in and liens on the DIP Collateral; (2) superpriority claims; and (3) the other protections set forth in this Interim DIP Order.

(iv)    Based on the DIP Motion, the Perry Declaration and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing and the terms on which the Debtor may continue to use the Cash Collateral pursuant to this Interim DIP Order and the DIP Documents are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)       Based upon the pleadings and proceedings of record in the Chapter 11 Case, (a) the extensions of credit under the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's-length among the Debtor (by and through its independent Chief Restructuring Officer) and the DIP Secured Parties with the assistance and counsel of their respective advisors; (c) the use of Cash Collateral, including, without limitation, pursuant to this Interim DIP Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtor by the DIP Secured Parties, including, without limitation, pursuant to this Interim DIP Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (e) the DIP Facility, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim DIP Order or any provision hereof or thereof is vacated, reversed, or modified, on appeal or otherwise.

(vi)      The Debtor has prepared and delivered to the advisors to the DIP Secured Parties an initial budget (the "13 Week Budget"), attached hereto as **Exhibit 2**. The 13 Week Budget reflects, among other things, the Borrower's anticipated uses of cash for each calendar week, in form and substance satisfactory to the DIP Lenders.  The Debtor shall submit to the DIP

Agent for approval, no less frequently than every two weeks, an updated rolling 13 Week Budget, which updated budget (upon approval from the DIP Agent with the approval of the DIP Lenders) shall become the Approved Budget for purposes of the DIP Documents. During any period a proposed budget has not been approved, the previously approved budget shall be the Approved Budget. Each budget delivered to the DIP Secured Parties shall be accompanied by such supporting documentation as reasonably requested by the DIP Secured Parties, and each budget shall be prepared in good faith based upon assumptions the Debtor believes to be reasonable. The DIP Secured Parties are relying, in part, upon the Debtor's agreement to comply with the Approved Budget, the other DIP Documents, and this Interim DIP Order in determining to enter into the postpetition financing arrangements provided for in this Interim DIP Order.

(vii)    By not later than 5:00 PM E.T. on Thursday after the second full calendar week following the Interim Closing Date (the "First Report Date"), and no later than 5:00 PM E.T. on each Thursday thereafter (together with the First Report Date, each a "Report Date"), the Debtor shall deliver to the DIP Agent a variance report for the applicable Report Period (as defined below) in form and substance acceptable to the DIP Agent (an "Approved Variance Report") showing comparisons of (a) aggregate actual cumulative cash receipts for such Report Period compared to the aggregate projected cumulative cash receipts of the Debtor for such Report Period as set forth in the Approved Budget (any such difference, a "Receipts Variance") and (b) actual cumulative cash disbursements on a line by line basis of the Debtor for such Report Period compared to the projected cumulative cash disbursements on a line by line basis for such Report Period as set forth in the Approved Budget (any such difference, a "Disbursements Variance"). The term "Report Period" means the weekly period beginning on Sunday and ending on the Saturday immediately prior to the applicable Report Date.

I.      *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim DIP Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Bankruptcy Local Rule 4001-1(b). Absent granting the relief set forth in this Interim DIP Order, the Debtor's estate will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of DIP Collateral (including Cash Collateral), in accordance with this Interim DIP Order and the DIP Documents are therefore in the best interests of the Debtor's estate and consistent with the Debtor's exercise of its fiduciary duties.

J.      *Sections 506(c) and 552(b) and Marshaling*.  The DIP Secured Parties have agreed to make the DIP Liens and the DIP Superpriority Claims subject to the Carve Out and payment (in a manner consistent with the Approved Budget and subject to the terms and conditions of this Interim DIP Order, and the DIP Documents) of certain expenses of administration of the Chapter 11 Case.  At the Final Hearing, the Court will consider whether the DIP Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code and the equitable doctrine of marshaling and other similar doctrines, consistent with paragraphs 9 and 10 of this Interim DIP Order.  The "equities of the case" exception in section 552(b) of the Bankruptcy Code does not apply to the DIP Secured Parties or the DIP Collateral to cover proceeds of the DIP Collateral.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*. The interim relief sought in the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents

4856-9366-8951

and this Interim DIP Order. All objections to this Interim DIP Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits. This Interim DIP Order shall become effective immediately upon its entry.

2.     *Authorization of the DIP Financing and the DIP Documents*.

(a)     The Debtor is hereby authorized to execute, deliver, enter into and, as applicable, perform all of its obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith. The Debtor is hereby authorized to immediately borrow money pursuant to the DIP Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the Debtor's performance of its obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtor and the DIP Agent (acting in accordance with the terms of the DIP Credit Agreement and at the direction of the applicable required parties under the DIP Documents) may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP

4856-9366-8951

Documents (and the payment of any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; provided that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the Debtor under the DIP Documents shall not, for purposes of this Interim DIP Order or any Final DIP Order, be considered amendments or modifications to the Approved Budget or the DIP Documents that require approval of this Court;

     (iii) the non-refundable payment to the DIP Secured Parties, as the case may be, of all fees, including the funding fee, indemnities, and professional fees (the payment of which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of this Interim DIP Order, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or other DIP Documents (or in any separate letter agreements, including, without limitation, any fee letters between the Debtor, on the one hand, and any of the DIP Secured Parties, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and disbursements of the professionals retained by, or on behalf of, any of the DIP Secured Parties (including without

limitation those of Norton Rose Fulbright US LLP and as necessary, other counsel and advisors (collectively, the "DIP Professionals")), without the need to file retention motions or fee applications; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

3.     *DIP Obligations*. Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtor, enforceable against the Debtor and its estate in accordance with the terms of the DIP Documents and this Interim DIP Order, and any successors thereto, including any trustee appointed in the Chapter 11 Case, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Case"). Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Secured Parties, in each case, under, or secured by, the DIP Documents or this Interim DIP Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this Interim DIP Order). Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Secured Parties (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections

13

502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    *Carve Out.*

(a)    As used in this Interim DIP Order, the term "Carve Out" means the following fees and expenses: (i) all statutory fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (ii) all reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000; (iii) all accrued and unpaid fees, disbursements, costs, and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtor or the Creditors' Committee and any other statutory committees appointed in the Chapter 11 Case unless approved by the DIP Agent) (the "Professional Fees") incurred by persons or firms retained by the Debtor, the Creditors' Committee or any other statutory committees appointed in the Chapter 11 Case pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (the "Professional Persons"), which Professional Fees (a) are allowed by the Court or another court of competent jurisdiction at any time, (b) were incurred (regardless of when invoiced or applied for) before delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), and (c) are subject to the amounts provided for in the Approved Budget (the amounts set forth in these clauses (i) through (iii), the "Pre-Carve Out Amounts"); and (iv) Professional Fees of the Debtor not to exceed $100,000, incurred after the first business day

14

following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

(b)     Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtor shall fund from the DIP Facility or cash on hand into a segregated account (the "Funded Reserve Account") held for the benefit of Professional Persons an amount equal to the aggregate amount of the estimated accrued fees of Professional Persons, based on the estimates provided weekly, (the "Weekly Fee Estimates"), remaining unpaid as of the Friday of the preceding week (and not previously funded to the Funded Reserve Account). Promptly after the delivery of the Carve Out Trigger Notice, the Debtor shall fund from the DIP Facility or cash on hand into the Funded Reserve Account an amount equal to (i) the aggregate amount of estimated accrued and unpaid fees of Professional Persons incurred before or on the first business day following delivery by the DIP Agent, at the direction of the DIP Lenders, of a Carve Out Trigger Notice (to the extent not previously funded to the Funded Reserve Account) and (ii) the Post-Carve Out Trigger Notice Cap.

(c)     For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtor, its restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered, at the direction of the DIP Lenders, following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), stating that the Post-Carve Out Trigger Notice Cap has been invoked.  Nothing herein shall be construed to impair the ability of any party to object to fees, expenses, reimbursement or compensation described in the Carve Out on any grounds.

(d)      *No Direct Obligation To Pay Allowed Professional Fees*. None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Case or any Successor Case under any chapter of the Bankruptcy Code. Nothing in this Interim DIP Order or otherwise shall be construed to obligate the DIP Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

5.      *DIP Liens*.

(a)      As security for the DIP Obligations, effective immediately upon entry of this Interim DIP Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, was and is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of the Debtor (the "DIP Collateral") including, without limitation (a) any and all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, inventory (wherever located), instruments (including, without limitation, promissory notes), documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtor's subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), hedge agreements, ships and vessels, furniture, fixtures, equipment (including documents of title), goods, vehicles, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general

intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance proceeds or other proceeds; (b) all owned real property interests and all proceeds of leased real property (including, for the avoidance of doubt, all owned real property interests and all proceeds of leased real property); (c) actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) effective only upon entry of the Final DIP Order, the proceeds or property recovered (whether by judgment, settlement or otherwise) of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law or foreign law equivalents (the "Avoidance Actions"), provided that no liens shall attach to Avoidance Actions; and (e) effective only upon entry of the Final DIP Order, the proceeds or property recovered (whether by judgment, settlement or otherwise) of any exercise of the Debtor's rights under section 506(c) and 550 of the Bankruptcy Code (the "Recovery Actions"), provided that no liens shall attach to Recovery Actions; in each case subject and subordinate to the Carve Out as set forth in this Interim DIP Order (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to this Interim DIP Order and the DIP Documents, the "DIP Liens").  The DIP

4856-9366-8951

Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the DIP Documents, if any, and any other Prepetition Permitted Prior Lien[4] (as defined in the DIP Credit Agreement).

        (b)      The DIP Liens shall be, in all cases, subject to the Carve Out and have the priority as follows:

        (i)      Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, first priority senior security interests in and liens upon the DIP Collateral, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code;

        (ii)      Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests in and liens upon all tangible and intangible prepetition and postpetition property of the Debtor that is subject to a Prepetition Permitted Prior Lien (i) in existence and properly perfected immediately prior to the Petition Date or (ii) in existence immediately prior to the Petition Date that is perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, which shall be junior and subordinate to such Prepetition Permitted Prior Liens and the Carve Out; provided that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such

---

[4] The DIP Documents shall include a schedule of Prepetition Permitted Prior Liens.  Nothing herein shall prejudice the rights of any party-in-interest, including but not limited to, the Debtor, the DIP Agent, or the DIP Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Prior Lien and/or security interests.

liens are not permitted thereunder or otherwise not entitled to priority under applicable law (including applicable contract law); and

(iii)     Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, first priority priming security interests in and liens on all DIP Collateral.

(c)     The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor or its estate under section 551 of the Bankruptcy Code, or (ii) any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtor.

6.     *DIP Superpriority Claims*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtor (without the need to file any proof of claim) with priority over any and all claims against the Debtor (other than the Carve Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507, 546, 726, 1113, or 1114 of the Bankruptcy Code or any other provisions of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof (excluding Avoidance Actions and Recovery

Actions but, subject to the entry of the Final DIP Order, including any proceeds or property recovered from Avoidance Actions and Recovery Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds")) in accordance with the DIP Documents and this Interim DIP Order. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. The DIP Superpriority Claims shall be subordinate only to the Carve Out.

      7.     *Protection of DIP Lenders' Rights*.

      (a)     Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Bankruptcy Code section 362, and without any application, motion or notice to, hearing before, or order from the Court, other than, subject to the terms of the Final DIP Order, the DIP Agent (at the direction of the DIP Lenders, or as otherwise provided in the DIP Documents) may send a written notice by electronic mail (or other electronic means) to counsel to the Debtor, counsel to the Creditors' Committee, and the U.S. Trustee (any such notice shall be referred to herein as a "Termination Notice"), which shall be filed on the docket of the Chapter 11 Case, electing that one or more (without limitation) of the following shall occur: (1) the Debtor's authority to use cash collateral shall immediately terminate; (2) all DIP Obligations owing under the DIP Documents to be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtor; (3) the termination, reduction, or restriction of any further DIP Commitments to the extent any DIP Commitments remain outstanding; (4) the DIP Facility shall be terminated with respect to any future liability or obligation of the DIP Secured Parties, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP

Superpriority Claims, or the DIP Obligations; (5) any and all obligations of the DIP Secured Parties in connection with the DIP Facility under the DIP Orders and the DIP Documents shall immediately terminate; (6) the application of the Carve Out through the delivery of the Carve Out Trigger Notice; and (7) the exercise of any other right or remedy with respect to the DIP Collateral or the DIP Liens permitted under the DIP Documents.  The earliest date on which a Termination Notice is delivered by the DIP Agent (at the direction of the DIP Lenders) and filed on the Docket shall be referred to herein as the "Termination Date."  Following a Termination Date, the DIP Secured Parties shall not be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility, absent further order of the Court.

(b)     Upon the delivery of a Termination Notice, the Debtor, the Creditors' Committee, and the DIP Secured Parties consent to a hearing on an expedited basis solely to consider whether an Event of Default has occurred and is continuing.

(c)     Following a Termination Date and pursuant to an order of the Court (which may authorize the remedies set forth in this paragraph or any other appropriate remedy as then determined by the Court) upon an emergency motion by the DIP Agent (at the direction of the DIP Lenders) to be heard on no less than three (3) business days' notice (and the Debtor shall not object to such shortened notice) (the "Termination Enforcement Order"), the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, the DIP Orders, and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Liens based on the priorities set forth in the DIP Documents, subject to the Carve Out.  Following entry of the Termination Enforcement Order, except as otherwise ordered by the Court (including in any Termination Enforcement Order): (a) the Debtor is hereby authorized and directed to, with the exclusion of the Carve Out, remit to the DIP Agent (for the benefit of the DIP Lenders) one-

hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents; (b) the DIP Agent (at the direction of the DIP Lenders or as otherwise provided in the DIP Documents) may compel the Debtor to seek authority to, (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtor to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) pursuant to Bankruptcy Code section 363 (or any other applicable provision) on terms and conditions pursuant to Bankruptcy Code sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to Bankruptcy Code section 365, (c) the DIP Agent (at the direction of the DIP Lenders) may direct the Debtor to (and the Debtor shall comply with such direction to) dispose of or liquidate the DIP Collateral (or any other property of the Debtor to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property, (d) the DIP Agent may (at the direction of the DIP Lenders), or may direct the Debtor to (and the Debtor shall comply with such direction to), collect accounts receivable, without setoff by any account debtor, and (e) the Debtor shall take all action that is reasonably necessary to cooperate with the DIP Lenders in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Lenders in a manner consistent with the priorities set forth in the DIP Documents.

(d)     Any delay or failure of the DIP Secured Parties to exercise rights under the DIP Documents or the DIP Orders shall not constitute a waiver of their respective rights hereunder,

thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable document.

(e)     Without limiting the DIP Secured Parties' rights under the DIP Documents, the DIP Agent shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of the DIP Documents.  Notwithstanding the occurrence of the Termination Date or anything in the DIP Orders to the contrary, all of the rights, remedies, benefits and protections provided to the DIP Secured Parties under the DIP Orders shall survive the Termination Date.

(f)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to permit: (a) the Debtor to take all appropriate actions (to the extent any further action is necessary) to grant the DIP Liens and incur the DIP Superpriority Claims set forth in the DIP Orders, and to take all appropriate actions (including such actions as the DIP Secured Parties may reasonably request) to ensure that the DIP Superpriority Claims granted under this Interim DIP Order are perfected and maintain the priority set forth in this Interim DIP Order; (b) the Debtor to incur and pay all liabilities and other obligations referred to, required to be paid under, and in accordance with, this Interim DIP Order, and the DIP Secured Parties to retain and apply payments made in accordance with the terms of this Interim DIP Order and the DIP Documents; (c) the DIP Secured Parties to retain and apply payments made in accordance with the DIP Documents and this Interim DIP Order; (d) subject to the terms and conditions of this Interim DIP Order, the DIP Secured Parties to exercise, upon the occurrence of and at any time after any Termination Date, all rights and remedies provided for in this Interim DIP Order; and (e) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim DIP Order, without further notice, motion or application to, or order of the Court.

8.      *No Obligation to Extend Credit*. The DIP Lenders shall have no obligation to make any loan under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim DIP Order, as applicable, have been satisfied in full or waived by the DIP Secured Parties in accordance with the terms of the DIP Credit Agreement.

9.      *Limitation on Charging Expenses Against Collateral*. Subject to and effective upon the entry of the Final DIP Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Case (or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code), including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties (as the case may be) upon the DIP Collateral, shall be charged against or recovered from, the DIP Secured Parties or the DIP Collateral (including Cash Collateral), in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law without the prior express written consent (email shall suffice) of the DIP Secured Parties. No such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by the DIP Secured Parties.

10.      *No Marshaling*. Subject to entry of the Final DIP Order, the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

11.      *Section 552(b)*. The "equities of the case" exception in section 552(b) of the Bankruptcy Code does not apply to the DIP Secured Parties, the DIP Collateral, or the proceeds of the DIP Collateral.

12. *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP Agent by, through or on behalf of the DIP Secured Parties pursuant to the provisions of this Interim DIP Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through, or on behalf of, the Debtor.

13. *Use of Cash Collateral*. The Debtor is hereby authorized, subject to the terms and conditions of this Interim DIP Order, to use all Cash Collateral in accordance with the DIP Documents and the Approved Budget; *provided* that, except on the terms and conditions of this Interim DIP Order, the Debtor shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

14. *Disposition of DIP Collateral*. The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or otherwise permitted by an order of the Court.

15. *Perfection of DIP Liens.*

(a)    Without in any way limiting the automatically valid and effective perfection of the DIP Liens granted pursuant to paragraph 5 hereof, the DIP Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Agent, acting at the direction of the applicable required parties under the DIP Documents, under applicable local laws, or take possession of or control over cash or

securities, or to amend or modify security documents, or enter into, amend or modify intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("Perfection Actions"). Whether or not the DIP Agent, on behalf of the DIP Secured Parties and acting at the direction of the applicable required parties under the DIP Documents, shall take such Perfection Actions, the liens and security interests granted pursuant to this Interim DIP Order shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim DIP Order. Upon the request of the DIP Agent, acting at the direction of the applicable required parties under the DIP Documents, the Debtor, without any further consent of any party, and at the sole cost of the Debtor as set forth herein, is authorized and directed, and such direction is hereby deemed to constitute required direction under the DIP Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreement, including all local law documentation therefor determined to be reasonably necessary by such DIP Agent, acting at the direction of the applicable required parties under the DIP Documents. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim DIP Order may, in the discretion of the DIP Agent, acting at the direction of the applicable required parties under the DIP Documents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and

directed to accept a certified copy of this Interim DIP Order for filing and/or recording, as applicable. The Automatic Stay shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

16. *Preservation of Rights Granted Under this Interim DIP Order.*

(a)     The occurrence of (i) any Event of Default (as defined in the DIP Credit Agreement) or (ii) any violation of any of the terms of this Interim DIP Order, shall, after notice by the DIP Agent (acting in accordance with the terms of this Interim DIP Order) in writing to the Borrower (and, in the case of violation of any terms of this Interim DIP Order, and after indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments, constitute an Event of Default (as defined in the DIP Credit Agreement) under this Interim DIP Order and, upon any such Event of Default (as defined in the DIP Credit Agreement), interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code: (A) the DIP Superpriority Claims, the DIP Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim DIP Order until all DIP Obligations shall have been paid in full (and that such DIP Superpriority Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim DIP Order, including with respect to the Carve Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim DIP Order.

(b)      If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Carve Out. Notwithstanding any reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations incurred by the Debtor or DIP Liens granted to the DIP Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code, this Interim DIP Order and the DIP Documents with respect to all uses of Cash Collateral and DIP Obligations.

(c)      Except as expressly provided in this Interim DIP Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, and all other rights and remedies of the DIP Secured Parties granted by the provisions of this Interim DIP Order and the DIP Documents and the Carve Out shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Case; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in the Chapter 11 Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim DIP Order

and the DIP Documents shall continue in this Chapter 11 Case and in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, and all other rights and remedies of the DIP Secured Parties granted by the provisions of this Interim DIP Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated, and the Carve Out shall continue in full force and effect.

17.     *Case Milestones*.  As a condition to having access to the DIP Facility and the use of Cash Collateral, the Debtor has agreed to the following milestones (collectively, the "Milestones"):

(a)     no later than five (5) calendar days after the filing of the DIP Motion, entry of the Interim DIP Order;

(b)     no later than thirty (30) calendar days after the entry of the Interim DIP Order, entry of the Final DIP Order;

(c)     before the end of the Challenge Period (defined below), as may be extended by agreement in writing by the DIP Agent, duly authorized representatives for each the Debtor and the Creditors' Committee have agreed in writing to the key terms of an Acceptable Plan, or such representatives have agreed (on behalf of the Debtor and the Creditors' Committee) to attend mediation with the DIP Secured Parties and their parents, subsidiaries and affiliates to mediate the terms of an Acceptable Plan (including the resolution of any disputes raised prior to the end of such Challenge Period);

(d)     no later than July 14, 2023, the Debtor shall have filed the Acceptable Plan;

(e)     no later than July 14, 2023, the Debtor shall have filed (i) the Acceptable Disclosure Statement, and (ii) a motion seeking entry of the Acceptable Disclosure Statement Order;

(f)    no later than September 1, 2023, the Court shall have entered the Acceptable Disclosure Statement Order;

(g)    no later than September 1, 2023, the Court shall have entered the Acceptable Confirmation Order; and

(h)    no later than September 15, 2023, the Plan Effective Date shall have occurred.

For purposes of this paragraph 17:  (i) "<u>Acceptable Plan</u>" means a Chapter 11 Plan for the Chapter 11 Case, which Chapter 11 Plan is in form and substance satisfactory to the DIP Secured Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the DIP Secured Parties); (ii) "<u>Acceptable Disclosure Statement</u>" means the disclosure statement relating to an Acceptable Plan in form and substance acceptable to the DIP Secured Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the DIP Secured Parties); (iii) "<u>Acceptable Disclosure Statement Order</u>" means an order of the Bankruptcy Court approving the Acceptable Disclosure Statement, either on a conditional or final basis, as containing, among other things, "adequate information" as required by sections 1125 and 1126(b) of the Bankruptcy Code, in form and substance satisfactory to the DIP Secured Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the DIP Secured Parties); (iv) "<u>Acceptable Confirmation Order</u>" means an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the DIP Secured Parties (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the DIP Secured Parties); (v) "<u>Chapter 11 Plan</u>" means a chapter 11 plan filed in the Chapter 11 Case; and (vi) "<u>Plan</u>

Effective Date" means the effective date of the Acceptable Plan, pursuant to which substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Acceptable Plan shall have occurred..

18.     *Payment of Fees and Expenses*. The Debtor shall promptly pay the reasonable and documented fees and disbursements of the DIP Professionals (the "DIP Fees and Expenses") without reference to the Approved Budget. Subject to the review procedures set forth in this paragraph 18, payment of all DIP Fees and Expenses and shall not be subject to allowance or review by the Court. The DIP Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for compensation and reimbursement of fees and expenses; however, for any time that such professionals seek payment of fees and expenses from the Debtor after the entry of this Interim DIP Order and prior to confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices (containing the name of each time keeper along with hourly rates, number of hours worked and total fees charged) to the Debtor, the U.S. Trustee, and counsel to the Creditors' Committee (together, the "Review Parties"). In no event shall any invoice or other statement submitted by any of the DIP Secured Parties operate to waive the attorney/client privilege, the work-product doctrine or any other evidentiary privilege or protection recognized under applicable law. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt of such invoices by the Review Parties (the "Review Period"), which shall not be extended by the delivery of an Information Request or the timing of any reply thereto. If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the Debtor shall pay such invoices within three (3)

calendar days. If an objection to a professional's invoice is received within the Review Period, the Debtor shall promptly pay the undisputed amount of the invoice, without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtor is authorized and directed to pay, on or after the closing date of the DIP Financing, the DIP Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtor). No attorney or advisor to the DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtor to the DIP Secured Parties in connection with or with respect to the DIP Facility are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtor or any other person.

19.     *Releases of the DIP Secured Parties.*

(a)     Effective immediately upon the entry of the Interim DIP Order, and not subject to the Challenge Period (defined below), the Debtor hereby forever, unconditionally and irrevocably releases, discharges and acquits the DIP Secured Parties and each of their respective heirs, successors, assigns, officers, shareholders, directors, members, employees, managers, principals, attorneys and agents, past and present (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action

of any and every nature whatsoever, whether arising in law or otherwise, that relate to the DIP Loans, the making of loans under the DIP Facility and the authorization to use Cash Collateral, the DIP Documents, any acts, omissions or events resulting in the Court entering the DIP Orders, the validity, priority, perfection or avoidability of the DIP Loans or any liens securing any such debt, and any so-called "lender liability," equitable subordination or other claims or defenses at law or equity related to the DIP Loans.

(b)      Subject to the Challenge Period (as defined below), the Debtor hereby forever, unconditionally and irrevocably releases, discharges and acquits the Releasees of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, including, without limitation, (A) any and all claims and causes of action arising under the Bankruptcy Code, (B) the divisional merger between the Debtor and CHS TX, Inc. dated effective as of May 5, 2022 and/or the transactions contemplated thereunder (the "Divisional Merger"), and (C) that certain Funding Agreement dated May 5, 2022 by and between the Debtor as payee and M2 LoanCo, LLC as payor. The Debtor further waives and releases any defense, right of counterclaim, right of setoff or deduction to the payment of the DIP Loans that the Debtor now has or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Court entering the Interim Order.

20.      *Timing and Effect of Releases.*

(a)      The Debtor's releases contained in paragraph 19 of this Interim DIP Order shall be binding upon the Debtor and all other parties in interest, including, without limitation, the Creditors' Committee and any other statutory or non-statutory committees appointed or formed in

the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless, solely with respect to the Debtor's releases contained in paragraph 19(b) of this Interim DIP Order: (1) (A) the Debtor or the Creditors' Committee (*provided* that the Creditors' Committee has obtained the requisite standing pursuant to an order of this Court entered prior to the expiration of the Challenge Period and subject in all respects to any agreement or applicable law that may limit or affect its right or ability to do so) has filed an adversary proceeding no later than May 1, 2023, which is sixty (60) days after the appointment of the Creditors' Committee; (B) in the case of any other party in interest with requisite standing, April 14, 2023, which is sixty (60) days after the Petition Date; (C) in the case of a trustee being appointed or elected prior to sixty (60) days after the Petition Date, the later of (x) sixty (60) days after the Petition Date or (y) fourteen (14) days after such trustee's appointment or election; or (D) any such later date agreed to in writing by the DIP Agent (at the direction of the DIP Lenders in their sole and absolute discretion) (the time period established by the foregoing clauses (A)-(D), the "Challenge Period"), asserting or prosecuting any claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Releasees; and (2) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise.

4856-9366-8951

(b)      If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (1) the Debtor's releases contained in paragraph 19(b) of this Interim DIP Order shall be binding on all parties in interest; and (2) the Releasees shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of the Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party acting or seeking to act on behalf of the Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor), whether arising under the Bankruptcy Code or otherwise.  If any such Challenge is timely filed during the Challenge Period, the releases contained in paragraph 19(b) of this Interim DIP Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or non-statutory committee appointed or formed in the Chapter 11 Case and on any other person or entity, except to the extent that the releases in paragraph 19(b) of this Interim DIP Order were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.

(c)      Nothing in this Interim DIP Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee or any other statutory or non-statutory committees appointed or formed in these Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, and any ruling on

standing, if appealed, shall not stay or otherwise delay the Chapter 11 Case or confirmation of any plan of reorganization.

21.     *Limitation on Use of DIP Financing Proceeds and Collateral.* Notwithstanding any other provision of this Interim DIP Order or any other order entered by the Court, no DIP Loans, DIP Collateral (including Cash Collateral) or any portion of the Carve Out, may be used directly or indirectly by the Debtor, the Creditors' Committee, any other official committee appointed in the Chapter 11 Case, any trustee appointed in the Chapter 11 Case or any successor case (including any chapter 7 case), or any other person, party, or entity, to (or support any other party to) (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner (i) the debt, collateral position, liens, or claims of the DIP Secured Parties, whether by (1) challenging the validity, extent, amount, perfection, priority, or enforceability of the DIP Obligations, (2) challenging the validity, extent, perfection, priority, or enforceability of the DIP Liens, or any mortgage, security interest, or lien with respect thereto, or any other rights or interests with respect thereto or any other rights or interests of any of the DIP Secured Parties, (3) seeking to subordinate (other than to the Carve Out or as set forth in the DIP Orders) or recharacterize the DIP Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (4) asserting any claims or causes of action against the DIP Secured Parties or any of their respective heirs, successors, assigns, officers, shareholders, directors, employees, attorneys and agents, past and present; (ii) the Divisional Merger, or (iii) YesCare Corp., a Texas corporation ("YesCare"); (b) prevent, hinder, or otherwise delay the DIP Secured Parties' assertion, enforcement, or realization on the DIP Collateral in accordance with the DIP Documents or the exercise of rights by the DIP Secured Parties once an Event of Default (as defined in the DIP Credit Agreement) has occurred and is continuing; (c) seek to modify the rights

granted to the DIP Secured Parties, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion; *provided, however*, that notwithstanding the foregoing, the Debtor's Professional Persons may use up to $500,000 in Cash Collateral or DIP Loan proceeds to investigate and notify parties of, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge, any claims that may exist against YesCare as a result of the Divisional Merger.

22.      *Indemnification*. The DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to, and all transactions contemplated by, the foregoing. Accordingly, without limitation to any other right to indemnification, the DIP Secured Parties shall be, and hereby are, indemnified (as applicable) as provided in the DIP Documents. The Debtor agrees that no exception or defense in contract, law, or equity exists as of the date of this Interim DIP Order to any obligation set forth, as the case may be, in this paragraph or in the DIP Documents to indemnify and/or hold harmless the DIP Secured Parties and any such defenses are hereby waived.

23.      *Interim DIP Order Governs*. In the event of any inconsistency between the provisions of this Interim DIP Order and the DIP Documents, the provisions of this Interim DIP Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by

this Court shall be consistent with and subject to the requirements set forth in this Interim DIP Order and the DIP Documents, including, without limitation, the Approved Budget.

24.     *Binding Effect; Successors and Assigns*. The DIP Documents and the provisions of this Interim DIP Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including, without limitation, the DIP Agent, the DIP Secured Parties, the Creditors' Committee, any other statutory or non-statutory committees appointed or formed in this Chapter 11 Case, the Debtor and its successors and assigns (including any chapter 7, chapter 11 or plan trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the Debtor's estate) and shall inure to the benefit of the DIP Agent, the DIP Secured Parties, and the Debtor and its successors and assigns.

25.     *Exculpation*. Nothing in this Interim DIP Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtor or in connection with its restructuring efforts. The DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtor.

26.     *Limitation of Liability*. In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral (including Cash Collateral) or

in exercising any rights or remedies as and when permitted pursuant to this Interim DIP Order or the DIP Documents, none of the DIP Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the Debtor; (b) owe any fiduciary duty to the Debtor, its respective creditors, shareholders or estate; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of the Debtor (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim DIP Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtor and its affiliates (as defined in section 101(2) of the Bankruptcy Code).

27.     *Cash Management*. The Debtor will maintain its cash management with an institution listed in the U.S. Trustee's list of authorized depositories.  No pledged bank account will be closed during the Chapter 11 Case without the prior consent of the DIP Agent and nothing in this Interim DIP Order will alter or impair any security interest or perfection thereof that arises after the Petition Date.

28.     *Credit Bidding*. The DIP Agent, for the benefit of the DIP Secured Parties, shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363, 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or

otherwise, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

29.     *Proceeds of Subsequent Financing*. If the Debtor, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Case or any successor case shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or the Interim DIP Order at any time prior to repayment of the DIP Obligations, including subsequent to the confirmation of any chapter 11 plan with respect to the Debtor (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be applied in accordance with this Interim DIP Order and the DIP Documents.

30.     *Discharge*. Subject to the terms and conditions of the DIP Credit Agreement, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in the Chapter 11 Case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Financing has been repaid in full on or before the effective date of such plan of reorganization or the DIP Secured Parties have otherwise agreed in writing.

31.     *Survival*. The provisions of this Interim DIP Order and the DIP Documents, any actions taken pursuant hereto or thereto, and all of the protections, rights, remedies, liens, priorities, privileges, and benefits granted to any or all of the DIP Secured Parties shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization or liquidation in the Chapter 11 Case, converting the Chapter 11 Case to a chapter 7 case, dismissing the Chapter 11 Case or any successor cases, withdrawing of the reference of the Chapter 11 Case, or providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court, or by any other act or omission. The terms and provisions of this

4856-9366-8951

Interim DIP Order shall continue in the Chapter 11 Case, in any successor cases, or following the dismissal of the Chapter 11 Case, notwithstanding the entry of any such order, and such protections, rights, remedies, liens, priorities, privileges, and benefits shall continue in full force and effect in these proceedings and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim DIP Order and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged.

32.     *No Waiver by Failure to Seek Relief.* The failure of any of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim DIP Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Secured Parties.

33.     *Effectiveness.* This Interim DIP Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim DIP Order.

34.     *Modification of DIP Documents and Approved Budget.* The Debtor is hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties providing for any consensual non-material modifications to the Approved Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim DIP Order, in each case consistent with the amendment

provisions of the DIP Documents; *provided*, *however*, that notice of any material modification or amendment to the DIP Documents shall be provided (which may be provided through electronic mail or facsimile) to the U.S. Trustee and any statutory committee, which shall have five (5) days from the date of such notice within which to object, in writing, to the modification or amendment. If the U.S. Trustee or any statutory committee timely objects to any material modification or amendment to the DIP Documents, the modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the Debtor's right to seek approval from the Court of a material modification on an expedited basis.  For the avoidance of doubt, the extension of a Milestone shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.  Until the DIP Financing has been paid in full, the Debtor shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to the Interim DIP Order or any provision hereof without the prior written consent of the DIP Secured Parties, and no such consent shall be implied by any action or inaction of the DIP Secured Parties.

35.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim DIP Order.

36.     *Payments Held in Trust*. Except as expressly permitted in this Interim DIP Order or the DIP Documents and except with respect to the Debtor, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP

Secured Parties and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim DIP Order.

37.     *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

38.     *No Third-Party Rights*. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

39.     *Necessary Action*.  The Debtor and the DIP Secured Parties are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim DIP Order.

40.     *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim DIP Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtor notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

41.     *Final Hearing*. A final hearing to consider the relief requested in the DIP Motion shall be held on March [●], 2023 at [●].m. (prevailing Central Time) and any objections or responses to the DIP Motion shall be filed on or prior to March [●], 2023 at 4:00 p.m. (prevailing Central Time) (the "Objection Deadline").

42.     *Objections*. Any party in interest objecting to the relief sought at the Final Hearing shall file written objections on the docket of this Chapter 11 Case no later than the Objection Deadline and otherwise in conformity with the Court's order establishing notice and case management procedures.

43.     *Service of Notice*. The Debtor shall promptly serve copies of this Interim DIP Order, or a notice containing the relevant provisions of paragraphs 41 and 42 above (either or both of which shall constitute adequate notice of the Final Hearing), to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court.

Signed: _____, 2023

_____
Christopher M. Lopez
United States Bankruptcy Judge

## **Exhibit 1**

**DIP Credit Agreement**

## SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "Agreement") is made as of March [17], 2023 by and among Tehum Care Services, Inc., a Texas corporation (the "Borrower"), each of the lenders from time to time party hereto (each, a "Lender") and M2 LoanCo, LLC, a Florida limited liability company, as the administrative agent (the "Administrative Agent").

### RECITALS

**WHEREAS**, on February 13, 2023 (the "Petition Date"), the Borrower commenced a voluntary case styled *In re Tehum Care Services, Inc.*, Case No. 23-90086 (Bankr. S.D. Tex.) (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the Chapter 11 Case is being administered in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

**WHEREAS**, from and after the Petition Date, the Borrower continues to operate its business and manage its property as a debtor and a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower seeks to obtain post-petition debtor-in-possession credit financing on the terms set forth in this Agreement, the other Loan Documents (as defined below) and the Interim Order (as defined below) (collectively, the "DIP Facility") consisting of a new money multiple draw term loan facility in an aggregate amount not to exceed $10,000,000 in accordance with the terms and conditions set forth in the Loan Documents (defined below); and

**WHEREAS**, all of the claims and liens granted under the Interim Order (defined below) and the Loan Documents in respect of the DIP Facility shall be subject and subordinate to the Carve Out (defined below).

### AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Administrative Agent, the Borrower and the Lenders agree as follows:

### ARTICLE 1.
### DEFINITIONS

Definition of Certain Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"13 Week Budget" shall mean the 13-week cash flow forecast commencing for the week ending March 3, 2023, in form and substance reasonably acceptable to the Administrative Agent.

"Acceptable Plan" shall mean a Chapter 11 Plan for the Chapter 11 Case, which Chapter 11 Plan is in form and substance satisfactory to the Secured Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the Secured Parties).

"Acceptable Confirmation Order" shall mean an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the Secured Parties (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Secured Parties).

"Acceptable Disclosure Statement" shall mean the disclosure statement relating to an Acceptable Plan in form and substance acceptable to the Secured Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the Secured Parties).

"Acceptable Disclosure Statement Order" shall mean an order of the Bankruptcy Court approving the Acceptable Disclosure Statement, either on a conditional or final basis, as containing, among other things, "adequate information" as required by sections 1125 and 1126(b) of the Bankruptcy Code, in form and substance satisfactory to the Secured Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Secured Parties).

"Advance" shall mean the Loan proceeds, or any part thereof, which may be disbursed by the Lenders to or for the account of Borrower pursuant to this Agreement, including without limitation, the Initial Advance, the Second Advance and the Third Advance. "Advances" shall mean more than one such Advance, as the context suggests or permits.

"Affiliate" of any Person shall mean (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer or director of such Person, and (c) with respect to any Lender, any Person administered or managed by such Lender, or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans. A Person shall be deemed to be "controlled by" another Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract, ownership of voting securities, membership interests or otherwise.

"Agent-Related Persons" shall mean the Administrative Agent, together with its respective Affiliates, and the officers, directors, employees, partners, agents and attorneys-in-fact of the Administrative Agent and their Affiliates.

"Approved Budget" shall mean the initial 13 Week Budget, to the extent acceptable to the DIP Secured Parties, in the form set forth on Exhibit A attached hereto, as such budget may be updated from time to time by the Borrower in accordance with the terms and conditions of the Interim Order.

"Avoidance Actions" shall have the meaning specified in the Interim Order.

4889-1961-8391

"Bankruptcy Code" shall have the meaning set forth in the Recitals hereto.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereto.

"Business Day" shall mean any day other than Saturday or Sunday on which commercial banking institutions are open for business in New York, New York.

"Capital Securities" shall mean all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Carve Out" shall have the meaning set forth in the Interim Order.

"Carve Out Trigger Notice" shall have the meaning set forth in the Interim Order.

"Case Milestones" shall mean each of the following milestones: (a) entry of the Interim Order by the Bankruptcy Court no later than five (5) calendar days after the filing of the motion therefor; (b) no later than thirty (30) calendar days after the entry of the Interim Order, entry of the Final Order; (c) before the end of the Challenge Period, as may be extended by agreement in writing by the Administrative Agent, duly authorized representatives for each of the Borrower and the Committee have agreed in writing to the key terms of an Approved Plan, or such representatives have agreed (on behalf of the Borrower and the Committee) to attend mediation with the Secured Parties and their parents, subsidiaries and affiliates to mediate the terms of an Approved Plan (including the resolution of any disputes raised prior to the end of such Challenge Period); (d) no later than July 14, 2023, the Borrower shall have filed the Acceptable Plan; (e) no later than July 14, 2023, the Borrower shall have filed (i) the Acceptable Disclosure Statement, and (ii) a motion seeking entry of the Acceptable Disclosure Statement Order; (f) no later than September 1, 2023, the Bankruptcy Court shall have entered the Acceptable Disclosure Statement Order; (g) no later than September 1, 2023, the Bankruptcy Court shall have entered the Acceptable Confirmation Order; and (h) no later than September 15, 2023, the Plan Effective Date shall have occurred.

"Cash Collateral" shall have the meaning specified in the Interim Order.

"Challenge Period" shall have the meaning specified in the Interim Order

"Change in Control" shall mean if the holders of the Capital Securities of the Borrower as of the Closing Date shall cease to own and control all or substantially all of the Capital Securities of the Borrower.

"Chapter 11 Case" shall have the meaning set forth in the Recitals hereto.

"Chapter 11 Plan" shall mean a chapter 11 plan filed in the Chapter 11 Case.

"Chief Restructuring Officer" shall mean Russell A. Perry, Senior Managing Director at Ankura Consulting Group, LLC.

"Closing" shall mean this Agreement and all of the other Loan Documents required to be delivered concurrently with this Agreement shall have been executed and delivered to the Administrative Agent, the conditions precedent to the closing of the Loan shall have been satisfied and the proceeds of the Initial Advance shall have been disbursed to or for the benefit of Borrower.

"Closing Date" shall mean the date of the Closing.

"Collateral" shall mean the "DIP Collateral" as defined in the Interim Order.

"Commitment Amount" shall mean up to $10,000,000.00, which shall be advanced pursuant to Section 2.1. The Commitment Amount may be increased by written agreement of the Borrower, the Administrative Agent and the Lenders for, among other things, filing fees for additional Chapter 11 petitions to be filed by affiliates of the Borrower.

"Committee" shall mean the official committee of unsecured creditors appointed in the Borrower's Chapter 11 Case.

"Default Interest Rate" shall mean, as of any day, the lesser of (a) an interest rate per annum for such day equal to the sum of (i) the Interest Rate for such day plus (ii) three percent (3.00%) or (b) the Maximum Rate.

"Deposit Account Control Agreement" shall mean the Deposit Account Control Agreement among Borrower, the Administrative Agent and a commercial bank reasonably satisfactory to the Administrative Agent.

"DIP Facility" shall have the meaning set forth in the Recitals hereto.

"DIP Liens" shall have the meaning specified in Section 6.2(a)(iv).

"Dividend" shall mean a payment made, liability incurred, or other consideration given by any Person (other than any stock dividend or stock split payable solely in Capital Securities of that Person) for the purchase, acquisition, redemption or retirement of any Capital Securities of that Person or as a dividend, return of capital, or other distribution in respect of that Person's Capital Securities.

"Divisional Merger" shall mean the divisional merger between the Borrower and CHS TX, Inc., a Texas corporation, dated effective as of May 5, 2022.

"Event of Default" shall mean any of the events specified in Section 7.1.

"Existing Borrower Liens" shall have the meaning set forth in Section 5.8.

"Final Order" shall mean an order of the Bankruptcy Court in the Chapter 11 Case authorizing and approving on a final basis, among other things, (a) the DIP Facility and the

extension of credit thereunder, including the incurrence by the Borrower of secured indebtedness in accordance with this Agreement, (b) the form of this Agreement and the other Loan Documents, (c) the granting of Liens and claims by the Borrower in favor of the Administrative Agent for the benefit of the Lenders, (d) the payment by the Borrower of the fees contemplated by this Agreement, (e) the other obligations of the Borrower under this Agreement and the other Loan Documents, (f) the Carve Out and (g) such other matters as are usual and customary for orders of this kind, which order shall be in form and substance satisfactory to the Administrative Agent in all respects, which order shall not have been vacated, reversed, modified or stayed, and as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof but only with the written consent of the Administrative Agent.

"Financial Officer" shall mean, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer shall mean a Financial Officer of the Borrower.

"Financing Orders" shall mean, together or individually, as applicable, the Interim Order and the Final Order.

"Funded Reserve Account" shall mean a segregated account of the Borrower held for the benefit of Professional Persons and subject to a Deposit Account Control Agreement.

"GAAP" shall mean generally accepted accounting principles of the United States, consistently applied, subject to fiscal year-end adjustments with respect to any interim financial statements or reports.

"Governmental Authorities" shall mean, collectively, all Federal, state and local or regional governmental agencies, boards, tribunals, courts or instrumentalities having jurisdiction over Borrower or its assets or property.

"Head Office" shall mean the Administrative Agent's headquarters, located at 2490 North East 7th Avenue, Suite 222, North Miami, Florida 33161, or such other location as the Administrative Agent may designate by providing the Borrower with not less than ten (10) days' prior written notice.

"Initial Advance" shall mean the Advance extended by the Lenders to the Borrower as of the Closing Date pursuant to Section 2.1 hereof.

"Insurance Policies" shall mean the following insurance policies, in each case acceptable to the Administrative Agent:

(a)    Policies providing for the insurance described in the insurance certificates attached hereto as Schedule 2;

(b)    Such other insurance as is required by any other Loan Document or as the Administrative Agent may otherwise reasonably require.

All Insurance Policies shall be "occurrence" based policies, issued on forms, by companies and in amounts satisfactory to the Administrative Agent.  All policies of liability insurance shall name the Administrative Agent and its successors and assigns as additional insureds. All insurance policies shall be issued by insurers acceptable to the Administrative Agent. Borrower may satisfy the insurance requirements of this Agreement and the other Loan Documents by using "blanket" policies which cover the property (or the other risks required to be insured hereby or thereby) and other properties or risks of Borrower, provided that any such blanket policy shall comply with the specific requirements set forth herein or therein.

"Interim Order" shall mean collectively, the orders of the Bankruptcy Court entered in the Chapter 11 Case, authorizing and approving on an interim basis, among other things, certain post-petition financing provided by the Lenders to the Borrower.

"Interest Rate" shall mean an interest rate of twelve percent (12.00%) per annum; provided, however, in no event shall the Interest Rate be greater than the Maximum Rate.

"Legal Requirements" shall mean all applicable laws, rules, regulations, ordinances, judgments, orders, decrees, injunctions, arbitral awards, permits, licenses, authorizations, directions and requirements of all Governmental Authorities, including but not limited to the United States Foreign Corrupt Practices Act.

"Lien" shall mean (a) any lien (statutory or otherwise), mortgage, deed of trust, pledge, hypothecation, assignment, security interest, charge, levy, restraint, or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (b) in the case of Capital Securities, any purchase option, call or similar right of a third party with respect to such Capital Securities.

"Loan" shall mean the loans and other extensions of credit advanced by the Lenders to the Borrower hereunder (including as evidenced by any Note requested from time to time by any Lender).

"Loan Documents" shall mean, collectively, this Agreement, any Note, the Security Agreements, the Financing Orders, the Deposit Account Control Agreement, any swap agreements, derivative agreements, interest rate protection agreements or similar agreements entered into by the Borrower with the Administrative Agent, any Lender or any Affiliate of the Administrative Agent or such Lender, and any other document, instrument or agreement evidencing or securing the Loan, together with any and all modifications and amendments to any of the foregoing.

"Majority Lenders" shall mean Lenders that hold more than fifty percent (50%) of the outstanding amount of the Loan.

"Material Adverse Effect" shall mean a material, adverse effect on (i) the business, property or condition (financial or otherwise) of the Borrower, or (ii) the validity or enforceability of this Agreement or any other Loan Document against the Borrower.

"<u>Maturity Date</u>" shall mean the earliest to occur of (a) September 15, 2023 (or such later date as the Administrative Agent in its sole discretion may agree in writing with the Borrower); (b) acceleration of the Loan and the termination of the commitments of the Lenders hereunder pursuant to this Agreement or the Interim Order; (c) thirty (30) days after entry of the Interim Order (or such later date as the Administrative Agent in its sole discretion may agree in writing with the Borrower) if the Final Order has not been entered and become a final, non-appealable order on or prior to the expiration of such thirty (30) day period; (d) the Plan Effective Date; (e) the date on which all or substantially all of the Borrower's assets are sold or otherwise disposed of under Section 363 of the Bankruptcy Code; and (f) the date upon which an order is entered converting or dismissing the Chapter 11 Case or appointing a chapter 11 trustee or an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Case.

"<u>Maximum Rate</u>" shall mean the maximum non-usurious rate of interest permitted for that day by whichever of applicable federal or New York (or any jurisdiction whose usury laws are deemed to apply to the Loan or any documents executed in connection therewith) laws permit the higher interest rate, stated as a rate per annum.  On each day, if any, that the Texas Finance Code establishes the Maximum Rate, the Maximum Rate shall be the "weekly ceiling" (as defined in Section 303 of the Texas Finance Code) for that day. The Administrative Agent may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code by notice to the Borrower, if and to the extent permitted by the Texas Finance Code.  Without notice to the Borrower or any other Person, the Maximum Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates.

"<u>Note</u>" shall mean any Promissory Note from time to time requested by any Lender and executed by Borrower to evidence the Loan, together with any and all modifications and amendments thereto and any note issued in substitution or replacement therefore.

"<u>Obligations</u>" shall mean, collectively, (a) the due and punctual payment by the Borrower of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the Loan) the Loan, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the Borrower to the Administrative Agent or the Lenders under this Agreement, the other Loan Documents and the Interim Order, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Borrower to the Administrative Agent or Lenders under or pursuant to this Agreement, the other Loan Documents and the Interim Order.

"<u>Person</u>" shall mean an individual, partnership, corporation, limited liability company, trust, unincorporated association, or other entity or association.

"<u>Permitted Liens</u>" shall mean with respect to any Person:

(a)      Liens in favor of the Administrative Agent granted pursuant to the Loan Documents; and

(b)      Any Prepetition Permitted Prior Lien.

"Petition Date" shall have the meaning set forth in the Recitals hereto.

"Plan Effective Date" shall mean the effective date of the Acceptable Plan, pursuant to which substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Acceptable Plan shall have occurred.

"Prepetition Permitted Prior Lien" shall mean the Liens set forth on Schedule 5.8 to the extent that the Administrative Agent consents in writing to any such Lien being prior to the Liens in favor of the Administrative and to the extent that such Liens, pursuant to Section 364(c)(3) of the Bankruptcy Code, constitute valid, enforceable, fully perfected security interests in and Liens on any Collateral, and any other non-avoidable or unavoidable security interests in and Liens on any Collateral, if any, that were in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Section 364(b) of the Bankruptcy Code.

"Professional Fees" shall have the meaning specified in the Interim Order.

"Professional Persons" shall have the meaning specified in the Interim Order.

"Quarter" shall mean a period of three (3) consecutive calendar months ending on March 31, June 30, September 30 or December 31.

"Responsible Officer" shall mean, as to any Person, the chief executive officer, president, chief financial officer, controller, treasurer, assistant treasurer or general counsel of such Person or, in the case of a Borrower, any other officer of the Borrower or other authorized individual designated in writing by the Borrower to the Administrative Agent and reasonably acceptable to the Administrative Agent.  Any document delivered hereunder or under any other Loan Document that is signed by a Responsible Officer of a Person shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Person and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Person.

"Second Advance" shall mean, after the making of the Initial Advance, one or more Advances in an aggregate amount up to $3,000,000 (in addition to the Initial Advance) extended by the Lenders to the Borrower from and after the Closing Date pursuant to Section 2.1 hereof.

"Secured Parties" shall mean the Administrative Agent and each Lender.

"Security Agreements" shall mean, collectively, all instruments, documents or agreements, now or hereafter executed by the Borrower or any other Person as security for the payment or performance of the Obligations, any Note or this Agreement, as such

agreements may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Subsidiary(ies)" shall mean, in respect of any Person, any corporation, association, joint stock company, limited liability company, partnership (whether general, limited or both), or business trust (in any case, whether now existing or hereafter organized or acquired), of which more than fifty percent (50%) of the outstanding voting Capital Securities or other ownership interest is owned either directly or indirectly by such Person and/or one or more of its Subsidiaries, or the management of which is otherwise controlled either directly or indirectly by such Person and/or one or more of its Subsidiaries.  Unless otherwise specified to the contrary herein or the context otherwise expressly requires, the term Subsidiary(ies) shall refer to the Subsidiary(ies) of the Borrower.

"Superpriority Claims" shall have the meaning specified in Section 5.14(b).

"Termination Date" shall mean the date on which the Termination Notice is delivered by the Administrative Agent pursuant to Section 7.2, regardless of whether the Termination Notice is filed on the Docket in the Chapter 11 Case on such date; provided that the Administrative Agent shall promptly file the Termination Notice on the Docket in the Chapter 11 Case.

"Termination Enforcement Order" shall have the meaning specified in Section 7.2

"Termination Notice" shall have the meaning specified in Section 7.2.

"Third Advance" shall mean, after the making of the Initial Advance and the Second Advance, one or more Advances in an aggregate amount up to $5,000,000 (in addition to the Initial Advance and Second Advance) extended by the Lenders to the Borrower from and after the Closing Date pursuant to Section 2.1 hereof.

"Third Advance Availability Date" shall mean the date which is sixty (60) days after the Initial Advance is disbursed by the Lenders to the Borrower pursuant to Section 2.1.

"UCC" shall mean the Uniform Commercial Code in effect in the State of New York from time to time.

"U.S. Trustee" shall have the meaning specified in the Interim Order.

"YesCare" shall mean YesCare Corp., a Texas corporation.

1.2     Accounting Terms.  Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP.  Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to the Administrative Agent pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with sound accounting practices and GAAP as in effect on the date of this Agreement.

1.3     Other Terms Defined in UCC.  All other capitalized words and phrases used in this Agreement and not otherwise specifically defined in this Agreement shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined in the UCC.

1.4     Interpretation. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," whether or not so expressly stated in each such instance and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), and any reference to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, (b) any reference herein to any person or entity shall be construed to include such person's or such entity's successors and permitted assigns, and (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof.

1.5     Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Texas law (or any comparable event under a different jurisdiction's law): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE 2.
## THE LOANS

2.1     Loan.   The Loan covered by this Agreement consists of one or more extensions of credit in an aggregate amount up to the Commitment Amount, regardless of whether represented by any Note. The Initial Advance in the amount of $2,000,000.00 shall be advanced by the Lenders to and received by the Borrower as of the Closing Date. The Borrower agrees to execute any Note from time to time requested by any Lender to evidence the Loan.  The Loan and all Advances thereof shall be subject to the terms and conditions of this Agreement and the other Loan Documents. The Lenders shall, subject to the conditions set forth in this Section and Section 4.2, make additional Advances (consisting of the Second Advance and the Third Advance) under the Loan from time to time. The Second Advance shall be advanced by the Lenders to the Borrower from time to time after the Closing Date upon not less than five (5) Business Days' notice to the Administrative Agent, in one or more Advances, each in an amount of up to $500,000.00. The Third Advance shall be advanced by the Lenders to the Borrower from time to time on or after the Third Advance Availability Date upon not less than five (5) Business Days' notice to the Administrative Agent, in one or more Advances, each in an amount of up to $500,000.00.   All Advances shall be made in accordance with the Approved Budget to the Borrower and, if the Administrative Agent determines that the Borrower has failed to utilize any Advance in accordance

with the Approved Budget, no Lender shall have any obligation to make further Advances. Except with respect to the Initial Advance, the Borrower shall provide written request to the Administrative Agent for any Advance at least five (5) Business Days prior to the funding of such Advance.  The aggregate amount of Advances outstanding at any time under the Loan shall not exceed the Commitment Amount.

2.2    Interest Rate.  The outstanding principal balance of the Loan shall bear interest at the Interest Rate, and interest shall be computed, assessed and payable as set forth below. Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, the outstanding principal balance of the Loan shall automatically bear interest at the Default Interest Rate.

2.3    Payment of the Loan. Subject to the remainder of this Article 2, the aggregate outstanding principal amount of the Loan, all accrued but unpaid interest thereon and all other Obligations shall be due and payable in full in cash on the Maturity Date and all commitments of the Lenders hereunder shall automatically terminate on the Maturity Date (*provided* that, for the avoidance of doubt, no later than the Plan Effective Date, the Obligations shall be indefeasibly paid in full in cash; *provided further* that the Administrative Agent (with the consent of the Lenders) shall have the option to agree to such other treatment of the Obligations as the Administrative Agent (with the consent of the Lenders) may select).

2.4    Calculation of Interest Rate. The Administrative Agent shall determine the amount of accrued and unpaid interest payable hereunder (whether on the Maturity Date or otherwise), which determinations shall be conclusive and binding absent manifest error.

2.5    Default Interest Rate. At all times after the occurrence and during the continuance of an Event of Default, interest on overdue payments and interest accruing during the continuance of such Event of Default shall accrue and bear interest at the Default Interest Rate.

2.6    Prepayment.

(a)    Optional Prepayments.  The Borrower may prepay the Loan in whole or in part at any time upon delivery of written notice to the Administrative Agent no later than 1:00 p.m. (Eastern Time) three (3) Business Days prior to the date of such prepayment (or such later time as the Administrative Agent may agree to in writing in its sole discretion). Any amounts so prepaid may not be reborrowed.

(b)    Mandatory Prepayments.  Until the Loan and the Obligations have been indefeasibly paid and performed in full, the Borrower shall pay the following amounts over to the Administrative Agent upon receipt as follows:

(i)    100% of the net cash proceeds of any sale or disposition of all or substantially all of the Borrower's assets pursuant to section 363 of the Bankruptcy Code;

(ii)    100% of the net cash proceeds of any other sale or other disposition by the Borrower of any assets;

11

(iii)    100% of the net cash proceeds from any casualty event or in connection with any eminent domain or condemnation proceeding (or settlement thereof);

(iv)    100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by the Borrower as set forth in the Approved Budget) by Borrower; and

(v)    100% of the net cash proceeds from any indebtedness incurred after the Closing Date that is not permitted hereunder or under the other Loan Documents.

(c)    <u>Prepayments Generally</u>.  In the event of any such prepayment of the Loan, any amounts prepaid shall be retired from the credit extended pursuant to this Agreement, such amounts shall not be subject to future Advances and the Commitment Amount shall be reduced by the amount of principal that is prepaid. In the event the Borrower prepays the Loan, such prepayment shall first be applied to all accrued interest and all other Obligations (other than the principal of the Loan) and second to the outstanding principal amount of the Loan.

2.7    <u>Fees and Prepaid Charges Fully Earned</u>. The Borrower agrees that all loan fees and other prepaid and other charges are earned fully as of the date of the Loan and will not be subject to refund, except as required by law or as otherwise expressly set forth herein. The Borrower shall pay to the Lenders on the date of each Advance a funding fee in an amount equal to two percent (2.00%) of the amount of each such Advance. All of the foregoing fees may be withheld from the amounts disbursed as Advances hereunder in the Administrative Agent's reasonable discretion.

2.8    <u>Payments to the Administrative Agent</u>.  All amounts payable hereunder by the Borrower to Lenders shall be paid by the Borrower to the Administrative Agent for disbursement to the Lenders pursuant to wire transfer instructions designated from time to time by the Administrative Agent to the Borrower in writing.

2.9    <u>Maximum Rate</u>. In the event that the application of any fee or other amount would cause the effective rate of interest on the Loan to be greater than the Maximum Rate, such Fees shall be reduced such that the effective rate of interest on the Loan is equal to the Maximum Rate. For the avoidance of doubt, the Fees shall not be included in the calculation of the Maximum Rate unless otherwise required by applicable Legal Requirements.

## ARTICLE 3.
## ADDITIONAL COSTS; INDEMNIFICATION

3.1    <u>Additional Costs</u>.  Notwithstanding any conflicting provision of this Agreement to the contrary, if any applicable law or regulation shall subject the Administrative Agent or any Lender to any tax, levy, impost, duty, charge, fee, deduction or withholding of any nature with respect to the Loan, this Agreement, any other Loan Document or the payment by Borrower of any amounts payable to the Administrative Agent or any Lender with respect to the Loan, this Agreement, any other Loan Document or any such other amount, then, and in each such case, the

Borrower will pay to the Administrative Agent for its own account or for disbursement to such Lender as applicable, within ten (10) days of written notice from the Administrative Agent, such additional amounts sufficient to compensate the Administrative Agent or such Lender for such additional tax, levy, impost, duty, charge, fee, deduction or withholding. Anything in this paragraph to the contrary notwithstanding, the foregoing provisions of this paragraph shall not apply in the case of any additional tax, levy, impost, duty, charge, fee, deduction or withholding resulting solely from or arising solely as a consequence of any taxes charged upon or by reference to the overall net income, profits or gains of the Administrative Agent or such Lender.

3.2     <u>Indemnification</u>. Without derogating from any of the other provisions of this Agreement or any other Loan Document, Borrower hereby absolutely and unconditionally agrees to indemnify the Administrative Agent, each Lender and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns, upon demand by the Administrative Agent at any time and as often as the occasion therefor may require, against any and all claims, demands, suits, actions, damages, losses, costs, expenses and all other liabilities whatsoever which the Administrative Agent, such Lender or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns may sustain or incur as a consequence of (a) any failure by Borrower to pay any amount payable under this Agreement or any other Loan Document as and when such amount shall first have become due and payable (giving effect, however, to expiration of the period of grace (if any) applicable thereto), or (b) the acceleration of the maturity of any of the Obligations, or (c) any failure by a Borrower to perform or comply with any of the terms and provisions of this Agreement or any other Loan Document to which the Borrower is a party; provided that, the Borrower shall not be required to indemnify the Administrative Agent or any Lender due to any claims, demands, suits, actions, damages, losses, costs, expenses or other liabilities resulting from the gross negligence, willful misconduct or actual fraud of the Administrative Agent or such Lender or any of their successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns as determined by a court of competent jurisdiction.

3.3     <u>Statements by Administrative Agent</u>.  A statement signed by an officer of the Administrative Agent (for itself or on behalf of any Lender) setting forth any additional amount required to be paid by the Borrower under Sections 3.1 or 3.2 of this Agreement shall be submitted by the Administrative Agent (on its own behalf or at the direction of any Lender) to the Borrower in connection with each demand made at any time by the Administrative Agent or any Lender under either such Section.  A claim by the Administrative Agent or any Lender for all or any part of any additional amounts required to be paid by Borrower under such Sections may be made before or after any payment to which such claim relates.  Each such statement shall, in the absence of manifest error or bad faith, constitute conclusive evidence of the additional amount required to be paid to the Administrative Agent or such Lender.

# ARTICLE 4.
# CONDITIONS PRECEDENT

4.1     <u>Conditions to Closing</u>.  The Administrative Agent and the Lenders shall not be required to consummate the transactions contemplated by this Agreement or to disburse the Initial Advance unless the conditions set forth in this Section 4.1 shall have been completed to the Administrative Agent's satisfaction.

(a)     The Borrower shall have executed this Agreement and the other Loan Documents to which it is a party and shall have delivered the same to the Administrative Agent, and all of the Loan Documents shall be in full force and effect;

(b)     The Borrower shall have provided the Administrative Agent with a certificate from a duly authorized representative of the Borrower:  (i) attaching true and complete copies of the Borrower's Organizational Documents  (defined below), and certifying that the same are in full force and effect and unmodified; (ii) attaching a resolution authorizing the Borrower's execution and delivery of this Agreement and the other Loan Documents to which the Borrower is a party and its performance of its obligations under this Agreement and the other Loan Documents, and confirming that such resolution is in full force and effect; (iii) identifying the officers, members or managers of the Borrower who are authorized to execute and deliver this Agreement for and on behalf of the Borrower, and providing specimen signatures for such officers; and (iv) certifying that all representations and warranties contained herein and in any other Loan Document are true and correct in all material respects and that no default or Event of Default has occurred hereunder, under any other Loan Document;

(c)     The Administrative Agent shall have received all costs, expenses, fees and amounts due and payable by the Borrower on or prior to the Closing Date, including reimbursement or payment of all reasonable and documented (in summary form) out-of-pocket fees and expenses required to be reimbursed or paid by the Borrower under the Financing Orders (including the fees and expenses of Norton Rose Fulbright US LLP, as counsel to the Administrative Agent);

(d)     The Bankruptcy Court shall have entered the Interim Order, the Interim Order shall be in full force and effect and not stayed or subject to appeal, and the Borrower shall be in compliance in all respects with the Interim Order;

(e)     The representations and warranties of the Borrower under this Agreement and the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);

(f)     The Administrative Agent shall have received the Approved Budget, which Approved Budget shall have been approved by the Administrative Agent in its sole discretion;

(g)     The Borrower shall be in compliance with the Case Milestones;

(h)     No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Case; and

(i)     The Administrative Agent shall have received any other information (financial or otherwise) reasonably requested by the Administrative Agent, which information shall be in form and substance reasonably satisfactory to the Administrative Agent.

4.2     <u>Conditions to Subsequent Advances</u>.  The Lenders shall not be required to disburse any Advance after the Initial Advance unless the conditions set forth in this Section 4.2 shall have been completed to the Administrative Agent's satisfaction.

(a)     The conditions to the making of such Advance set forth in Section 2.1 shall have been satisfied;

(b)     The entry by the Bankruptcy Court of the Financing Orders in form and substance acceptable to the Administrative Agent in its sole and absolute discretion and no motion to reconsider having been made and appeal having been taken therefrom;

(c)     The Borrower shall be in compliance with the Financing Orders and Loan Documents;

(d)     No trustee, examiner or receiver having expanded powers shall have been appointed or designated with respect to the Borrower or its assets and properties and no unopposed motion filed by a party other than the Borrower shall be pending seeking similar relief that, if granted, would result in a person other than the Borrower exercising control over its assets and properties;

(e)     The Borrower shall have delivered each 13 Week Budget required subsequent to the initial Approved Budget, acceptable to the Administrative Agent in its reasonable discretion;

(f)     There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Borrower) threatened in writing in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Case or the consequences that would normally result from the commencement and continuation of the Chapter 11 Case) restraining, prohibiting or imposing material and adverse conditions upon the DIP Facility;

(g)     The representations and warranties of the Borrower under this Agreement and the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);

(h)     To the extent applicable, all necessary governmental, Bankruptcy Court and third-party orders, approvals and consents in connection with the Loan shall have been obtained and remain in effect and all applicable waiting periods shall have expired without

any action being taken by any competent authority, which in the judgement of the Administrative Agent restrains, prevents or imposes material and adverse conditions upon the Loan;

(i)     The Borrower shall have delivered to the Administrative Agent a request for an Advance substantially in the form of Exhibit B attached hereto;

(j)     The Borrower shall be in material compliance with the Approved Budget (including with respect to the use of Cash Collateral).

(k)     No Event of Default, or event which, with the giving of notice or the passage of time (or both) would constitute an Event of Default, has occurred and is continuing;

(l)     The representations and warranties of the Borrower in the Loan Documents shall be true and correct on the date of, and upon giving effect to, such Advance;

(m)     The Borrower shall have filed all appropriate reports and documents with the Internal Revenue Service regarding the 2021 employee retention credits;

(n)     Prior to making any Advance constituting a portion of the Third Advance, the entire available principal amount of Advances constituting the Second Advance (i.e., $5,000,000) shall have been disbursed by the Lenders to the Borrower and the Third Advance Availability Date shall have occurred;

(o)     The Borrower shall be in compliance with the Case Milestones; and

(p)     The Administrative Agent shall have received such other information, documents, instruments and agreements as it may reasonably request in connection with such Advance.

    4.3     Conditions for the Benefit of Administrative Agent and Lenders.  All of the foregoing conditions are imposed for the benefit of the Administrative Agent and the Lenders.  No party other than the Administrative Agent and the Lenders shall have standing to require the satisfaction of any such conditions, and no party shall be entitled to assume that the Lenders would refuse to make advances of Loan proceeds if any one or more of such conditions were to remain unfulfilled.  No party other than the Administrative Agent and the Lenders shall be or be deemed to be the beneficiary of any such conditions; any one or more, or all, of such conditions may be waived if the Administrative Agent shall deem it advisable to do so.

## ARTICLE 5.
## GENERAL REPRESENTATIONS AND WARRANTIES

    The Borrower represents and warrants to the Administrative Agent and the Lenders, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and thereafter, so long as any Obligations remain unpaid and outstanding, that:

5.1     Organization and Existence.

(a)     Subject to any restriction arising on account of the Borrower's status as a "debtor" under the Bankruptcy Code and any required approvals of the Bankruptcy Court, the Borrower (i) is duly organized, validly existing and in good standing as a limited liability company or corporation under the laws of the State of Texas or such other state of formation or incorporation; (ii)  is duly qualified to conduct business and in good standing in each other state in which it conducts its business; (iii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iv) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents, in each case, not subject to the automatic stay under the Chapter 11 Case or executed after the Petition Date.

(b)     The Borrower has provided the Administrative Agent with true, correct and complete copies of its Certificate of Formation or similar organizational document and bylaws (as amended and/or restated) and all of the exhibits thereto, as amended through the date hereof (collectively, the "Borrower's Organizational Documents").  All of the Borrower's Organizational Documents as certified and delivered to the Administrative Agent are otherwise unmodified and in full force and effect.

5.2     Due Authorization; Non-Contravention.

(a)     Subject to the Financing Orders, the execution and delivery by the Borrower of this Agreement and the other Loan Documents to which the Borrower is a party, the performance by the Borrower of all of its agreements and obligations under such documents and the making of the borrowings contemplated by this Agreement have been duly authorized by all necessary action on the part of the Borrower and do not and will not (i) contravene any provision of the Borrower's Organizational Documents; (ii) except those in which consent has been procured, conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any Lien (other than those in favor of the Administrative Agent pursuant to the Loan Documents) upon any of its property under any material agreement, indenture, mortgage or other instrument to which the Borrower is a party or by which the Borrower is bound or affected; (iii) violate or contravene or constitute a default any provision of any material law, rule or regulation (including without limitation, the Regulations of the Board of Governors of the Federal Reserve System) or any order, ruling or interpretation thereunder or any decree, order, injunction or judgment of any court or governmental or regulatory authority, bureau, agency or official binding on the Borrower; (iv) contravene or constitute a default under any covenant, indenture or agreement of or affecting the Borrower or any of its property or (iv) except for those that have been procured, require any waivers, consents or approvals by any of the creditors or trustees for creditors of the Borrower.

(b)     Except as to matters which the Borrower has procured, obtained or performed prior to or concurrently with its execution and delivery of this Agreement (including without limitation the Financing Orders), no approval, consent, order,

17

authorization or license by, or giving notice to, or taking any other action with respect to, any governmental or regulatory authority or agency is required under any provision of any applicable law:

> (i)      for the Borrower's execution and delivery of this Agreement and the other Loan Documents to which it is a party or the Borrower's performance of its obligations under this Agreement and the other Loan Documents and the borrowings contemplated by this Agreement; or

> (ii)      for the continuing legality, validity, binding effect, enforceability or admissibility in evidence of this Agreement and the other Loan Documents.

5.3      <u>General</u>.   There are no actions, suits or proceedings pending or, to the actual knowledge of Borrower, threatened against the Borrower, which could, if determined adversely to the Borrower, reasonably be expected to have a Material Adverse Effect.

5.4      <u>Loan Documents</u>.   On or before the Closing Date and subject to the Financing Orders, the Borrower will have duly executed and delivered each of the Loan Documents to which it is a party and each such Loan Document will be in full force and effect.   Each Loan Document to which the Borrower is a party shall constitute the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting the enforcement of creditor's rights and by general principles of equity).

5.5      <u>No Default</u>.   No event has occurred and is continuing, and no condition exists, which constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default.   The Borrower does not have any right to rescind, cancel or terminate this Agreement or any other Loan Document.

5.6      <u>Business Loan</u>.   The Loan is intended solely for business purposes.   Proceeds of the Loan shall be used solely in accordance with the Approved Budget.   No proceeds of the Loan shall be used for personal, family or household purposes.

5.7      <u>Ownership of Collateral; Encumbrances</u>.   The Borrower owns each item of Collateral.   Except for Permitted Liens, there are no liens of any nature whatsoever on any property of the Borrower other than Liens permitted hereunder, under the other Loan Documents or under the Financing Orders. The Borrower is not party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a lien on any property of the Borrower (other than liens permitted hereunder or under the Financing Orders) or otherwise result in a violation of the DIP Facility.

5.8      <u>Existing Indebtedness; Existing Liens</u>. As of the Closing Date, the Borrower does not have any indebtedness for borrowed money. <u>Schedule 5.8</u> sets forth an accurate and complete list as of the Closing Date of all Liens on the property of Borrower ("<u>Existing Borrower Liens</u>").

5.9      <u>Effectiveness</u>. There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

4889-1961-8391

5.10    Investment Company Act. The Borrower is not an "investment company" or an "affiliated person" of, or "promotor" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

5.11    Margin Stock. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. The Borrower will not take any action which might cause this Agreement, the other Loan Documents, the Financing Orders or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve System of the United States.

5.12    Complete Information. None of the representations or warranties made by the Borrower in this Agreement or any documentation delivered in connection herewith as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of the Borrower or any of its subsidiaries in connection with this Agreement or any such documentation (other than any statement which constitutes projections, forward looking statements, budgets, estimates or general market data), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered (it being recognized by the Administrative Agent and the Lenders that any projections and forecasts provided by the Borrower are based on good faith estimates and assumptions believed by the Borrower to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

5.13    Subsidiaries. The Borrower does not have any Subsidiaries with material operations or assets.

5.14    Security Interest.

(a)    This Agreement and the other Loan Documents, upon execution and delivery thereof by the parties thereto and entry of the Financing Orders (and subject to the terms therein), will create in favor of the Administrative Agent for the benefit of the Lenders a legal, valid and enforceable security interest in the Collateral described therein and the proceeds thereof, which security interest shall be deemed valid and perfected as of the Closing Date by entry of the Financing Orders with respect to the Borrower and which shall constitute continuing Liens on the Collateral having priority over all other Liens on the Collateral, securing all the Obligations, other than the Carve Out and as otherwise set forth in the Financing Orders. The Administrative Agent shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, any other Loan Document or the Financing Orders.

(b)     Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Borrower shall at all times constitute allowed senior administrative expenses against the Borrower in the Chapter 11 Case (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(a) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 361, 362, 363, 503(b), 506(c) (with any claims arising under Section 506(c) only subject to the entry of the Financing Orders), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other nonconsensual Lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to the proceeds of Avoidance Actions, subject, as to priority, only to the Carve Out and as otherwise set forth in the Financing Orders (such Obligations, collectively, the "Superpriority Claims").

## ARTICLE 6.
## COVENANTS OF BORROWER

The Borrower covenants and agrees with and warrants to the Administrative Agent and the Lenders that until all of the Obligations are paid and satisfied in full, the Borrower shall comply with, observe, perform or fulfill all of the covenants set forth in this Article 6, unless the Administrative Agent and/or the Lenders shall have otherwise consented in writing.

6.1     Reporting.

(a)     Borrower shall deliver to the Administrative Agent all reports required under the Financing Orders and copies of the financial statements, tax returns, books and records and any other information of the Borrower regarding its financial matters as the Administrative Agent may reasonably request promptly after the Administrative Agent's request therefor.

(b)     The Borrower shall promptly (and in no event later than five (5) Business Days after an officer of the Borrower becomes aware thereof) notify the Administrative Agent of the occurrence of any Event of Default or any event which, with the giving of notice or the passage of time or both, would become an Event Default.

6.2     Security Interest.

(a)     The Loan and all other Obligations from time to time outstanding under or in connection with this Agreement, the other Loan Documents and/or the Financing Orders, in all cases subject to the Carve Out, shall be:

(i)     Superpriority Claims;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, secured by valid, enforceable, first-priority, fully perfected security interests in and liens on the Collateral that was unencumbered as of the Petition Date (and does not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code);

(iii)     pursuant to section 364(c)(3) of the Bankruptcy Code, secured by valid, enforceable, fully perfected security interests in and liens on all of the Collateral, subject to and junior and subordinate to Prepetition Permitted Prior Lien; and

(iv)     pursuant to section 364(d)(1) of the Bankruptcy Code, secured by valid, enforceable, priming first priority, fully perfected security interests in and liens on the Collateral (collectively, the liens described in clauses (ii), (iii) and (iv), the "DIP Liens").

(b)     The DIP Liens shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.  Notwithstanding the foregoing, the Borrower shall take all actions that may be reasonably necessary or desirable, or that the Secured Parties may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the Administrative Agent in the Collateral, or to enable the Administrative Agent to protect, exercise or enforce its rights hereunder, under the Financing Orders and in the Collateral.

(c)     The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Borrower and its estate under Section 551 of the Bankruptcy Code, or (ii) any liens arising after the Petition Date including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Borrower.

(d)     The Collateral shall be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Loan Documents, and any other Prepetition Permitted Prior Lien.

6.3     Insurance.   The Borrower shall maintain insurance coverage pursuant to the Insurance Policies.

6.4     Borrower's Existence.  The Borrower shall preserve and maintain its existence and all of its rights, franchises and privileges.

6.5     Compliance with Legal Requirements. The Borrower shall comply in all material respects with all applicable Legal Requirements, and will promptly notify the Administrative Agent in the event that the Borrower receives any notice, claim or demand from any Governmental

Authority asserting the violation of any applicable Legal Requirement which could reasonably be expected to have a Material Adverse Effect upon the Borrower. The Borrower may contest the propriety or the applicability of any Legal Requirement, provided (a) that the Borrower shall provide the Administrative Agent with written notice of such contest; (b) that there shall then be no uncured Event of Default; (c) that such contest shall be initiated in good faith in accordance with the appropriate legal or administrative procedure therefor and diligently prosecuted to a timely completion; (d) that such contest shall not, in the Administrative Agent's judgment, jeopardize the security for the Loan or any portion of the Borrower's assets to imminent risk of loss or forfeiture; and (e) the Borrower shall indemnify the Administrative Agent and each Lender from and against any and all liability, loss, cost, damage and expense which may be incurred by or asserted against any such party in connection with or arising from such contest except for any liability, loss, cost, damage or expense resulting due to the gross negligence or willful misconduct of the Administrative Agent or any such Lender.

6.6     Notice of Litigation & Acceleration. The Borrower shall furnish or cause to be furnished to the Administrative Agent within five (5) Business Days after the Borrower shall have first become aware of the same, a written notice identifying, and describing the Borrower's proposed response to (i) the commencement or institution of any legal or administrative action, suit, proceeding or investigation by or against the Borrower in or before any Governmental Authority, in each case which could reasonably be expected to have a Material Adverse Effect, or (ii) acceleration of any outstanding indebtedness for borrowed money of the Borrower.

6.7     Notice of Other Events.

(a)     If (and on each occasion that) any Event of Default shall occur, the Borrower shall, promptly after the Borrower becoming aware of the same, furnish the Administrative Agent with a written notice specifying the nature of such Event of Default and describing the Borrower's proposed response thereto.

(b)     Immediately upon the Borrower first becoming aware of any of the following occurrences, the Borrower will notify the Administrative Agent in writing of: (i) the rescission, cancellation or termination of, or the occurrence of a breach, default or event of default under or with respect to any material agreement or contract to which the Borrower is a party; or (ii) any events of default under any material agreement of the Borrower or any material violations of any applicable Legal Requirements.

6.8     Payment of Taxes and Other Claims.  Subject to the Approved Budget, the Borrower shall pay and discharge promptly before interest and penalties accrue, all taxes, assessments and other governmental charges or levies at any time imposed upon it or upon its income, revenues or property, as well as all claims of any kind (including claims for labor, material or supplies) which, if unpaid, might by law reasonably be expected to become a Lien upon all or any part of its income, revenues or property other than Permitted Liens, to the extent that payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Case.

6.9     Payment of Obligations.  The Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loan and all fees and other amounts payable hereunder or

under the Loan Documents as and when required by this Agreement and the other Loan Documents.

      6.10    <u>Governmental Consents and Approvals</u>.

      (a)    The Borrower will obtain all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any Governmental Authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any applicable Legal Requirement:

      (i)    for the performance by the Borrower of any of its agreements or obligations under this Agreement or any other Loan Document to which it is a party or for the payment by the Borrower to the Administrative Agent at its Head Office of any sums which shall become due and payable by the Borrower thereunder;

      (ii)    to ensure the continuing legality, validity, binding effect or enforceability of this Agreement or any other Loan Document;

      (iii)    to continue the proper operation of the business and operations of the Borrower.

      6.11    <u>Reserved</u>.

      6.12    <u>Further Assurances; Maintenance of Liens</u>.

      (a)    The Borrower shall execute and deliver, or cause to be executed and delivered, such agreements, documents and instruments in furtherance of this Agreement, the other Loan Documents and the Financing Orders as the Administrative Agent may from time to time reasonably request (i) to carry out more effectively the purposes of this Agreement, the other Loan Documents and the Financing Orders, (ii) to subject to the liens created hereby any of the Collateral, (iii) to perfect and maintain the validity, effectiveness and priority of the Liens created hereby and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Administrative Agent and the Lenders the rights granted or now or hereafter intended to be granted to the Administrative Agent and the Lenders under this Agreement, the other Loan Documents and the Financing Orders. The Borrower shall maintain the security interest created by under the Loan Documents as a perfected security interest having at least the priority required hereby and defend such security interest against all other claims and demands.

      (b)    Pursuant to the terms of the Financing Orders, no filings or other action (including the taking of possession or control) will be necessary to perfect or protect the Liens and security interests created pursuant to this Agreement, the Financing Orders or any other Security Agreement. Upon entry by the Bankruptcy Court, the Liens and security interests created by the Financing Orders shall automatically constitute fully perfected first priority Liens on, and security interests in, all right, title and interest of the Borrower in the Collateral covered thereby (including after-acquired Collateral), in each case free of all

4889-1961-8391

Liens other than Permitted Liens, and prior and superior to all other Liens other than as provided in the Financing Orders. Notwithstanding the foregoing, upon the reasonable request of the Administrative Agent, the Borrower and each of its Subsidiaries shall take any additional actions requested, with respect to any property of the Borrower, in each case constituting Collateral, to cause such property to be subject to a Lien pursuant to the Security Agreements or the Financing Orders or to evidence the Lien on such property, including to execute and deliver such security documents (in proper form for filing, registration or recordation, as applicable) as are requested by the Administrative Agent, and take such actions necessary or advisable to subject such property to a Lien or evidence of the Lien on such property pursuant to the Security Agreements or the Financing Orders.

6.13    Use of Proceeds. The proceeds of the Loan and the Cash Collateral shall be used for (a) general corporate purposes of the Borrower, (b) fees, costs and expenses related to the DIP Facility and the administration of the Chapter 11 Case, and (c) to fund the Carve Out, in each case in accordance with the Financing Orders and the Approved Budget. The proceeds of the Loan may not be used for any other purpose, including but not limited to personal, family or household purposes. The proceeds of the Loan and the Cash Collateral shall not be used to commence any action against the Administrative Agent, any Lender or any of its or their Affiliates, employees, directors, officers or principals.

6.14    Reserved.

6.15    Acquisition of Margin Securities.    The Borrower shall not use the proceeds of the Loan to purchase or acquire (or enter into any contract to purchase or acquire) any "margin security" as defined by any regulation of the Federal Reserve Board as now in effect or as the same may hereafter be in effect.

6.16    Payment of Claims; Encumbrances. The Borrower shall (i) keep the Collateral free of any Lien, encumbrance, charge or claim (other than the Permitted Liens and except for the Liens arising under the Loan Documents); and (ii) other than Permitted Liens, not encumber its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any Lien to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof.

6.17    Borrower's Organizational Documents; Name Changes. The Borrower shall not modify, amend or terminate any of the Borrower's Organizational Documents (including without limitation, to change its name), or permit any of the Borrower's Organizational Documents to be modified, amended or terminated (including without limitation, to change its name) which materially and adversely affect the rights and remedies of the Administrative Agent or any Lender (and provided that such modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of this Agreement), without the prior written consent of the Administrative Agent.    The Administrative Agent's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Event of Default at the time of Borrower's request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the

passage of time, or both) violate any provision of this Agreement. The Borrower shall not appoint or permit the appointment of any officer, director or manager without the prior written consent of the Administrative Agent.

6.18    Prohibition of Assignments, Transfers and Encumbrances.  Borrower shall not, directly or indirectly (i) except in the ordinary course of business, sell, transfer, lease or otherwise dispose of all or any portion of its assets or any interest therein, or seek authority of the Bankruptcy Court to do any of the foregoing, without the prior written consent of the Administrative Agent; (ii) except for Permitted Liens, encumber, hypothecate, create a security interest or create or permit any Lien upon or affecting the Collateral; (iii) assign, transfer or encumber any interest of Borrower under this Agreement or under any other Loan Document, or delegate any of Borrower's duties or obligations hereunder or thereunder; (iv) make any material change in its capital structure except as expressly permitted herein; (v) change its name without providing 30 days' prior written notice to the Administrative Agent, or consolidate with or merge into any other Person or permit any other Person to merge into it (except where Borrower is the surviving entity); or (vi) enter into any sale-leaseback transaction.

6.19    Prohibition of Other Indebtedness.  Without the Administrative Agent's prior written consent, which may be withheld or conditioned in the Administrative Agent's sole discretion, Borrower shall not, directly or indirectly, become or remain obligated for any indebtedness for borrowed money, or for any indebtedness incurred in connection with the acquisition of any property, real or personal, tangible or intangible.

6.20    Loans, Acquisitions, Guaranties, Affiliate Transactions. The Borrower shall not, directly or indirectly, (i) make any loan, investment, advance or extension of credit to any Person, (ii) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any Capital Securities of any other Person, (iii) incur any obligation as surety or guarantor, other than in the ordinary course of business, (iv) enter into any transaction with an Affiliate that is not on terms and conditions as favorable to the Borrower as would be obtainable in a transaction with a Person that is not an Affiliate or (v) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

6.21    Dividends; Distributions.  Without the prior written consent of the Administrative Agent and the Bankruptcy Court, Borrower shall not (i) make any transfers of cash or other property to any Persons that are not the Borrower hereunder or (ii) pay any Dividends on its Capital Securities.

6.22    Expenses; Taxes; Indemnity.

(a)    The Borrower hereby agrees to pay all reasonable and documented professional fees and out-of-pocket expenses incurred by the Administrative Agent and each Lender in connection with the establishment of the DIP Facility, including without limitation, the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, but not limited to, the fees and expenses of the Administrative Agent and the Lenders' counsels), and including expenses incurred in connection with defending the validity and enforceability of

Obligations or any of the liens or adequate protection securing the same, shall be promptly paid by the Borrower on no less than a monthly basis.

(b)     The Borrower hereby agrees to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of the Administrative Agent or the Lenders) now or hereafter determined by the Administrative Agent to be payable in connection with this Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and Borrower agrees to save the Administrative Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions. All payments of the Loan shall be made by the Borrower to the Administrative Agent free and clear of and without deduction or withholding for or on account of any taxes whatsoever, withholdings or other deductions. If any taxes are required to be withheld or paid, then the Borrower shall pay such taxes to the applicable Governmental Authority and the Borrower shall send the original or a certified copy of the receipt evidencing such tax payment, within five (5) Business Days of its receipt of the same. The Borrower shall pay and indemnify and hold the Administrative Agent and each Lender harmless from and against, any taxes that may at any time be asserted in respect of the Loan, unless resulting from the gross negligence or willful misconduct of the Administrative Agent or any such Lender as determined by final and nonappealable judgment of a court of competent jurisdiction.

(c)     The Borrower hereby agrees that neither the Administrative Agent nor any Lender shall have any liability for, and to reimburse and indemnify the Administrative Agent and each Lender and each of its and their officers and directors (collectively, the "Indemnified Parties") from and against, any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including without limitation, the fees and disbursements of counsel for such Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto) (collectively, "Indemnified Liabilities") that may at any time be imposed on, asserted against or incurred by such Indemnified Party as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document or any transaction from time to time contemplated hereby, but excluding any such Indemnified Liabilities resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as finally determined by a court of competent jurisdiction.

(d)     All out-of-pocket costs and expenses of the Secured Parties relating to the DIP Facility and the Chapter 11 Case, including without limitation, prepetition and post-petition reasonable and documented fees, costs, expenses and disbursements of Norton Rose Fulbright US LLP, as counsel to the Secured Parties, and as necessary, other counsel and advisors (collectively, the "DIP Professionals"), shall be payable by the Borrower promptly upon written demand without reference to the Approved Budget.  A copy of the summary invoice (containing the name of each time keeper along with hourly rates, number of hours worked and total fees charged) shall be provided by the Borrower to the Office of the U.S.

Trustee and counsel for any statutory committee. The DIP Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Bankruptcy Court for compensation and reimbursement of fees and expenses.

(e)     This Section 6.22 shall survive the repayment of the Obligations (and the termination of all commitments hereunder), any foreclosure under, or any modification, release or discharge of, or termination of, this Agreement and the other Loan Documents.

6.23     <u>Reserved</u>.

6.24     <u>Reserved</u>.

6.25     <u>Collateral</u>. The Borrower shall maintain in good working order all material properties used in the business of the Borrower (other than ordinary wear and tear, casualty and condemnation and to the extent not causing a material adverse effect), as and to the extent in good working order as of the Petition Date.

6.26     <u>Change in Control</u>.  Borrower shall not permit a Change in Control.

6.27     <u>Funded Reserve Account</u>. Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Borrower shall fund from the DIP Facility or cash on hand into the Funded Reserve Account an amount equal to the aggregate amount of the estimated accrued fees of Professional Persons, based on the estimates provided weekly, remaining unpaid as of the Friday of the preceding week (and not previously funded to the Funded Reserve Account). Promptly after the delivery of the Carve Out Trigger Notice, the Debtor shall fund from the DIP Facility or cash on hand into the Funded Reserve Account an amount equal to (i) the aggregate amount of estimated accrued and unpaid fees of Professional Persons incurred before or on the first Business Day following delivery by the Administrative Agent, at the direction of the Lenders, of a Carve Out Trigger Notice (to the extent not previously funded to the Funded Reserve Account) and (ii) the Post-Carve Out Trigger Notice Cap (as defined in the Interim Order).

6.28     <u>Deposit Account Control Agreement; Cash Management</u>. Upon request of the Administrative Agent, the Borrower shall deliver to the Administrative Agent, in accordance with the Financing Orders, the Deposit Account Control Agreement in form and substance reasonably acceptable to the Administrative Agent executed by the Borrower and a commercial bank reasonably satisfactory to the Administrative Agent. Except as set forth above, the Borrower shall maintain its cash management arrangements in a manner consistent with its prepetition practices.

6.29     <u>Additional Subsidiaries</u>. The Borrower shall not create or acquire any Subsidiary after the Closing Date without the prior written consent of the Administrative Agent.

6.30     <u>Case Milestones</u>. The Borrower shall comply with the Case Milestones, subject to modification by written agreement of the Administrative Agent and the Borrower.

6.31     <u>Chief Restructuring Officer</u>.  The Chief Restructuring Officer of the Borrower shall continue to be retained and shall be vested with all restructuring decision-making authority for any and all issues where any members of the board of directors of the Borrower are conflicted.

6.32    Inspection. The Borrower shall permit the Administrative Agent and its representatives and designees to visit and inspect the properties, books and records of the Borrower upon reasonable notice; *provided* that no disclosure of information by the Borrower to the Administrative Agent in connection with any such inspection shall be required to the extent that such disclosure would result in the breach of any confidentiality obligations to which the Borrower is subject or if such disclosure would compromise attorney-client privilege or require the disclosure of attorney work product.

6.33    Approved Budget.

(a)    Commencing March 31, 2023 (pursuant to the Interim Order) for the thirteen-week period ending June 9, 2023, and continuing no less frequently than every two weeks thereafter (and if such date is not a Business Day, the following Business Day), the Borrower shall deliver to the Secured Parties a supplement to the initial Approved Budget, updating and/or extending the period covered by the initial Approved Budget (or the previously supplemented Approved Budget) so that it covers at least the period ending 13 weeks from the week in which the supplement is delivered. Such supplemental Approved Budgets shall be subject to the approval of the Administrative Agent in its reasonable discretion, and without further order of the Bankruptcy Court. The Approved Budget (including any approved supplemental Approved Budget) shall remain the Approved Budget in effect with respect to the period covered by such Approved Budget until such time as the Administrative Agent approves any such supplemental Approved Budget.

(b)    Each Approved Budget delivered to the Secured Parties shall be accompanied by such supporting documentation as reasonably requested by the Secured Parties, and each Approved Budget shall be prepared in good faith based upon assumptions the Borrower believes to be reasonable.

(c)    The Borrower shall provide to the Administrative Agent such other financial and operational reporting as reasonably requested by the Administrative Agent from time to time.

6.34    Reserved.

6.35    Financing Orders. The Borrower shall comply with the terms and conditions of the Financing Orders.

6.36    Negative Covenants. So long as any amount remains due and outstanding under the DIP Facility, the Borrower shall not, nor shall it permit any of its Subsidiaries or Affiliates to, do any of the following:

(a)    without the prior written consent of the Administrative Agent, take any action that could restrain, prevent or otherwise impose adverse conditions on the DIP Facility and the actions contemplated thereby;

(b)    incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred consistent with the Approved Budget, any other indebtedness permitted to be incurred by (and with the prior written consent of) the

28

Administrative Agent and the Bankruptcy Court, and any unsecured obligations incurred in the ordinary course of business by the Borrower);

(c)     incur any liens (other than liens securing indebtedness required or permitted by the DIP Facility to be secured, other liens permitted (with prior written consent) by the Administrative Agent, and customary nonconsensual liens);

(d)     make any investments in any other person or make any loan to any other person (other than investments contemplated by and consistent with the Approved Budget, intercompany loans made with the proceeds of Loans that are evidenced by promissory notes pledged to the Administrative Agent to secure the Obligations on a first- priority basis, other investments permitted (with prior written consent) by the Administrative Agent);

(e)     engage in any business other than the business engaged in by the Borrower on the Petition Date and other business activities which are reasonably related or ancillary to the foregoing or otherwise permitted (with prior written consent) by the Administrative Agent;

(f)     sell or transfer any assets outside the ordinary course of business, unless such sale or transfer results in the indefeasible payment in full in cash of the Obligations (other than dispositions permitted (with prior written consent) by the Administrative Agent);

(g)     directly or indirectly, by operation of law or otherwise, acquire any material assets or equity interests of another person, merge, consolidate or dissolve (other than acquisitions of assets contemplated by and consistent with the Approved Budget or permitted (with prior written consent) by the Administrative Agent);

(h)     terminate or make any modification to the capital structure or any organizational documents of the Borrower that would be adverse to the Administrative Agent in any respect or restraining, prohibiting or imposing material and adverse conditions upon the DIP Facility;

(i)     engage in any transactions with affiliates, except as set forth in the Approved Budget, transactions in the ordinary course of business upon fair and reasonable terms no less favorable to the Borrower and its subsidiaries than would be obtained in a comparable arm's length transaction with a non-affiliate or otherwise as permitted (with prior written consent) by the Administrative Agent;

(j)     use the Collateral (including the Cash Collateral) except as set forth in DIP Facility;

(k)     amend any of the Financing Orders or any Bankruptcy Court order relating to cash management or the Approved Budget without the prior written consent of the Administrative Agent in its sole and absolute discretion;

4889-1961-8391

(l)      agree to entry of any order precluding or modifying the Administrative Agent's or any Lenders' rights to credit bid up to the full amount of the outstanding Obligations for the Borrower's assets;

(m)      consent to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having priority senior to or pari passu with those granted to the Administrative Agent, except as otherwise expressly permitted by the DIP Facility;

(n)      make any debt repayments (other than in accordance with the Approved Budget or permitted (with prior written consent) by the Administrative Agent);

(o)      make any dividends or other distributions on account of the capital stock of the Borrower or its subsidiaries (other than ordinary course tax distributions and corporate overhead expenses in accordance with the Approved Budget and other dividends or distributions permitted (with prior written consent) by the Administrative Agent); or

(p)      except upon 30 days' prior written notice to the Administrative Agent and delivery to the Administrative Agent of all additional financing statements and other documents reasonably requested by the Administrative Agent as to the validity, perfection and priority of the security interests provided for herein, with respect to the Borrower: (a) change the location of its chief executive office from that specified on the signature pages hereto or in any subsequent notice delivered pursuant to this provision; or (b) change its name, jurisdiction of incorporation or organization, identity, federal employer identification number, organizational identification number or corporate structure;

(q)      file or propose any Chapter 11 Plan that does not indefeasibly satisfy and pay in full all of the Obligations in cash; or

(r)      use any Cash Collateral, Loan proceeds or any portion of the Carve Out, directly or indirectly, whether by the Borrower, any official committee appointed in the Chapter 11 Case, or any trustee appointed in the Chapter 11 Case or any successor case (including any chapter 7 case), or any other person, party, or entity, to (or support any other party to) (i) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner (x) the debt, collateral position, liens, or claims of the Secured Parties, whether by (1) challenging the validity, extent, amount, perfection, priority, or enforceability of the Obligations, (2) challenging the validity, extent, perfection, priority, or enforceability of the DIP Liens, or any mortgage, security interest, or lien with respect thereto, or any other rights or interests with respect thereto or any other rights or interests of any of the Secured Parties, (3) seeking to subordinate (other than to the Carve Out or as set forth in the Financing Orders) or recharacterize the Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (4) asserting any claims or causes of action against the Secured Parties or any of their respective heirs, successors, assigns, officers, shareholders, directors, employees, attorneys and agents, past and present; (y) the Divisional Merger (defined below), or (z) YesCare; (ii) prevent, hinder, or otherwise delay the Secured Parties' assertion, enforcement, or realization on the Collateral in accordance with the Loan Documents or the exercise of

rights by the Secured Parties once an Event of Default has occurred and is continuing; or (iii) seek to modify the rights granted to the Secured Parties, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion. Notwithstanding the foregoing, the Borrower's Professional Persons may use up to $500,000 in Cash Collateral or Loan proceeds to investigate and notify parties of, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge, claims that may exist against YesCare as a result of the Divisional Merger.

Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, if any provision of any Loan Document conflicts with the provisions contained in this Section 6.36, this Section 6.36 shall control in all respects and for all purposes.

## ARTICLE 7.
## DEFAULTS AND REMEDIES

7.1    <u>Events of Default</u>.  Any of the following events shall constitute an "<u>Event of Default</u>" under this Agreement:

(a)    The Borrower shall fail to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in this Agreement, any other Loan Document, or the Financing Orders.

(b)    Any representation or warranty made by the Borrower in this Agreement, any other Loan Document, or the Financing Orders shall prove untrue in any material respect or materially misleading; provided, however, that for purposes of this paragraph, any materiality qualifier (but not a "Material Adverse Effect" qualifier) included in any representation or warranty made by the Borrower in this Agreement or in any other Loan Document shall be disregarded.

(c)    The cessation of the DIP Facility or any provision of this Agreement, any other Loan Document, or the Financing Orders being in full force and effect or the DIP Facility or any provision of this Agreement, any other Loan Document, or the Financing Orders being declared by the Bankruptcy Court to be null and void or the validity or enforceability of any provision of the DIP Facility or this Agreement, any other Loan Document, or the Financing Orders being contested by the Borrower or the Borrower denying in writing that it has any further liability or obligation under any provision of the DIP Facility, this Agreement, any other Loan Document, or the Financing Orders, or the Administrative Agent or the Lenders ceasing to have the benefit of the Liens granted by the Loan Documents or the Financing Orders.

(d)    The occurrence of an "Event of Default" under any of the Financing Orders, or any of the Financing Orders being amended or modified without the prior written consent of the Administrative Agent.

(e)    A Change in Control.

(f)    The occurrence of a Termination Event.

31

(g)     The entry of a Financing Order in form or substance that is not acceptable to the Administrative Agent in its sole discretion.

(h)     The failure of the Borrower to meet any Case Milestone unless extended in accordance with the Financing Orders.

(i)     The entry of an order of the Bankruptcy Court approving any claims for recovery of amounts under Section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any Collateral.

(j)     The use of Cash Collateral for any purpose other than to fund the Carve Out or in a manner consistent with the Approved Budget, the Loan Documents and the Financing Orders.

(k)     The filing of any application by the Borrower (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Case which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the Financing Orders, or pursuant to any other financing agreement made with the prior written consent of the Administrative Agent.

(l)     The commencement of any action by the Borrower or other authorized person (other than an action permitted by the Financing Orders) against any of the Secured Parties or any of their agents and employees, to contest or challenge in any manner the Loan or any other Obligation payable to, the Collateral and the Liens therein and any claims (including any Superpriority Claim) of, the Secured Parties.

(m)     (1) The Borrower files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Financing Order and/or any Loan Document, or to disallow the Obligations, in whole or in part, or (2) any material provision of the Financing Orders, or any other order of the Bankruptcy Court approving the Borrower's use of Cash Collateral, shall for any reason cease to be valid and binding (without the prior written consent of the Administrative Agent).

(n)     any request made for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a Financing Order, as entered by the Bankruptcy Court, without the prior written consent of the Administrative Agent;

(o)     The filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 or a Chapter 11 Plan in the Chapter 11 Case, without the consent of the Administrative Agent that, in either case, does not provide for indefeasible payment in full in cash to the Secured Parties of the Obligations and all other amounts outstanding under this Agreement, the other Loan Documents and/or the Financing Orders on closing of such sale or the effective date of such Chapter 11 Plan.

4889-1961-8391

(p)     The appointment in the Chapter 11 Case of a trustee, receiver, examiner or disinterested person with expanded powers (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code).

(q)     The granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the Collateral exceeding $100,000 in value in the aggregate, provided, however, that this provision shall not apply to personal injury or wage/hour claimants seeking relief from the automatic stay to proceed solely against applicable insurance policies.

(r)     failure to pay principal, interest or other Obligations in full when due, including without limitation, on the Maturity Date.

(s)     if the Borrower requests authority to obtain any financing not consented to by the Lenders.

(t)     the filing of any Chapter 11 Plan or related disclosure statement not consented to by the Lenders, other than a Chapter 11 Plan that indefeasibly satisfies the Obligations in full in cash;

(u)     The conversion of the Debtor's Chapter 11 Case to chapter 7.

(v)     The termination of the Debtor's exclusive right to file and/or solicit acceptances of a Chapter 11 Plan.

(w)     The Bankruptcy Court enters an order modifying, reversing, revoking, staying, amending, supplementing, rescinding, vacating or otherwise modifying the Interim Order, the Final Order or any Loan Document.

(x)     The Bankruptcy Court enters an order unwinding the Divisional Merger.

(y)     The dismissal of the Chapter 11 Case.

7.2   <u>Certain Remedies</u>.

(a)     Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before or order from the Bankruptcy Court, but subject to the terms of the Final Order, the Administrative Agent may (or, at the direction of the Lenders or as otherwise provided in the Loan Documents, will) send a written notice to the Borrower, counsel to the Committee and the U.S. Trustee (such notice, the "<u>Termination Notice</u>"), which shall be filed on the docket of the Chapter 11 Case, electing that one or more (without limitation) of the following shall occur:

(i)     the Borrower's authority to use Cash Collateral shall immediately terminate;

       (ii)     all of the unpaid Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under this Agreement, any other Loan Document and the Financing Orders shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

       (iii)    the termination, reduction or restriction of the commitment of the Lenders to make the Loan or any Advance thereunder (if any), whereupon such commitment shall be terminated;

       (iv)    the DIP Facility shall be terminated with respect to any future liability or obligation of the Secured Parties, but, for the avoidance of doubt, without affecting any of the DIP Liens, the Superpriority Claims or the Obligations;

       (v)     any and all obligations of the Secured Parties in connection with the DIP Facility under the Financing Orders and the Loan Documents shall immediately terminate;

       (vi)    the application of the Carve Out through the delivery of the Carve Out Trigger Notice; and

       (vii)    any other action or the exercise of any other right or remedy (including without limitation, with respect to credit bidding and the liens in favor of the Administrative Agent and the Lenders) permitted under this Agreement, any other Loan Document, or the Financing Orders, or by applicable law (including without limitation, the rights of a secured creditor under the Uniform Commercial Code).

       (b)    Following the Termination Date, the Secured Parties shall not be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility, absent further order of the Bankruptcy Court. The Termination Notice shall be given by electronic mail (or other electronic means) to counsel to the Borrower, counsel to the Committee, and the U.S. Trustee.

       (c)    Upon the delivery of the Termination Notice, the Borrower, the Committee, if any, and the Secured Parties consent to a hearing on an expedited basis solely to consider whether an Event of Default has occurred and is continuing.

       (d)    Following the Termination Date and pursuant to an order of the Bankruptcy Court (which may authorize the remedies set forth in this Section 7.2 or any other appropriate remedy as then determined by the Bankruptcy Court) upon an emergency motion by the Administrative Agent (at the direction of the Lenders) to be heard on no less than three (3) Business Days' notice (and the Borrower shall not object to such shortened notice) (the "Termination Enforcement Order"), the Administrative Agent shall be entitled to exercise all rights and remedies in accordance with the Loan Documents, the Financing Orders and applicable law, and shall be permitted to satisfy the relevant Obligations and DIP Liens based on the priorities set forth herein and in the other Loan Documents, subject to the Carve Out. Following entry of the Termination Enforcement Order, except as

otherwise ordered by the Bankruptcy Court (including in any Termination Enforcement Order):

(i)      the Borrower is hereby authorized and directed to, with the exclusion of the Carve Out, remit to the Administrative Agent (for the benefit of the Lenders) one-hundred percent (100%) of all collections, remittances, and proceeds of the Collateral in accordance with the Loan Documents;

(ii)      the Administrative Agent may (or, at the direction of the DIP Lenders or as otherwise provided in the Loan Documents, will) compel the Borrower to seek authority to, (x) sell or otherwise dispose of all or any portion of the Collateral (or any other property of the Borrower to the extent a lien is not permitted by law to attach to such property, the proceeds of which are Collateral) pursuant to Bankruptcy Code section 363 (or any other applicable provision) on terms and conditions pursuant to Bankruptcy Code sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (y) assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Bankruptcy Code section 365;

(iii)      the Administrative Agent (at the direction of the Lenders) may direct the Borrower to (and the Borrower shall comply with such direction to) dispose of or liquidate the Collateral (or any other property of the Borrower to the extent a lien is not permitted by law to attach to such property, the proceeds which are Collateral) via one or more sales of such Collateral or property and/or the monetization of other Collateral or property;

(iv)      the Administrative Agent may (at the direction of the Lenders), or may direct the Borrower to (and the Borrower shall comply with such direction to), collect accounts receivable, without setoff by any account debtor;

(v)      the Administrative Agent (for the benefit of the Lenders) shall be authorized to succeed to any of the Borrower's rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory with respect to the Collateral; and

(vi)      the Borrower shall take all action that is reasonably necessary to cooperate with the Lenders in the exercise of their rights and remedies and to facilitate the realization of the Collateral by the Lenders in a manner consistent with the priorities set forth in the Loan Documents.

(e)      Without limiting the Secured Parties' rights under the Loan Documents, the Administrative Agent shall be entitled to apply the payments or proceeds of the Collateral in accordance with the provisions of the Loan Documents. Notwithstanding the occurrence of the Termination Date or anything in the Financing Orders to the contrary, all of the rights, remedies, benefits and protections provided to the Secured Parties under the Financing Orders shall survive the Termination Date.

7.3     No Implied Waiver; Rights Cumulative. No failure or delay on the part of the Administrative Agent or any Lender in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver thereof (including without limitation, a waiver of any default or Event of Default). No right, remedy, power or privilege conferred on or reserved to the Administrative Agent or any Lender under any of the Loan Documents, in equity or at law is intended to be exclusive of any other right, remedy, power or privilege which may then be, or may thereafter become, available to the Administrative Agent or such Lender.  All rights, remedies, powers and privileges available to the Administrative Agent and the Lenders shall be cumulative; any of the same may be exercised at such time or times and in such order and manner as the Administrative Agent or such Lender shall (in its sole discretion) deem expedient.

## ARTICLE 8.
## ADMINISTRATIVE AGENT

8.1     Appointment and Authorization of Administrative Agent.  (a) Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     Notwithstanding any provision contained in this Agreement providing for any action in the Administrative Agent's reasonable discretion or approval of any action or matter in the Administrative Agent's reasonable satisfaction, the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law.  The Administrative Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any other Agent-Related Person in any capacity.

4889-1961-8391

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Loan Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Loan Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by the Borrower to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In connection with the foregoing, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 8.2 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Loan Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article 8 (including Section 8.7, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

8.2     <u>Delegation of Duties</u>. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Loan Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Administrative Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct.

8.3     <u>Liability of Administrative Agent</u>. No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender for any recital, statement, representation or warranty made by the Borrower or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan

Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Loan Documents, or for any failure of the Borrower or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of the Borrower or any Affiliate thereof.

       8.4    <u>Reliance by Administrative Agent</u>. (a) The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

       (b)    For purposes of determining compliance with the conditions specified in Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

       8.5    <u>Notice of Default</u>. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any default or Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such default or Event of Default and stating that such notice is a "notice of default".  The Administrative Agent will promptly notify the Lenders of its receipt of any such notice.  The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Lenders and otherwise in accordance with Article 7; *provided* that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

       8.6    <u>Credit Decision; Disclosure of Information by Administrative Agent</u>. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and

that no act by the Administrative Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of the Borrower or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Borrower or any of its Affiliates which may come into the possession of any Agent-Related Person.

8.7    <u>Indemnification of Administrative Agent</u>.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of the Borrower and without limiting the obligation of the Borrower to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 8.7.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 8.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Professional Fees) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any.  The undertaking in this Section 8.7 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

8.8    <u>Successor Administrative Agent</u>. The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower.  If the Administrative Agent resigns under this Agreement, the Lenders shall appoint a successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed).  If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders and, if no default or Event of Default has occurred and is continuing, the Borrower, a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent", shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article 8 and Section 6.22 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement.  If no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor agent as provided for above.  Lenders assuming the role of Administrative Agent as specified in the immediately preceding sentence shall assume the rights and obligations of the Administrative Agent (including the indemnification provisions set forth in Section 8.7) as if each such Lender were the Administrative Agent.  Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Loan Documents, the successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.

**ARTICLE 9.**
**MISCELLANEOUS PROVISIONS**

9.1    <u>Amendments, etc</u>. Except as specifically provided otherwise herein or in any other Loan Document, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower therefrom, shall be effective unless in writing signed by the Administrative Agent, the Majority Lenders and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    extend or increase the commitment of any Lender (or reinstate any commitment terminated pursuant to Section 7.2) without the written consent of such Lender;

40

(b)     reduce the principal of, or the rate of interest specified herein on the Loan, or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided*, *however*, that only the consent of the Majority Lenders shall be necessary to amend the definition of "Default Interest Rate" or to waive any obligation of the Borrower to pay interest at the Default Interest Rate;

(c)     change any provision of this Section or the definition of "Majority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; or

(d)     release or subordinate the Liens securing the Obligations on all or all substantially all of the Collateral, other than as provided in the Loan Documents, without the written consent of each Lender.

9.2     <u>Consent or Approval</u>.

(a)     In all instances in which the Administrative Agent's or any Lender's approval of or consent to any item, matter or circumstance is contemplated by the terms of this Agreement or any other Loan Document, such approval or consent or the exercise of such judgment shall (unless otherwise specified) (i) be within the absolute discretion of the Administrative Agent or such Lender, and (ii) be expressed only by a specific writing intended for such purpose and signed by the Administrative Agent and/or such Lender.

(b)     The Administrative Agent and each Lender shall not, by reason of its consent or approval of any item or matter submitted to it, be deemed to have assumed or undertaken any responsibility or obligation for the adequacy, accuracy, completeness, efficacy, form or content of any such matter or item.

9.3     <u>Duration</u>.  This Agreement shall continue in full force and effect and the duties, covenants, and liabilities of Borrower hereunder and all the terms, conditions, and provisions hereof relating thereto shall continue to be fully operative until all Obligations have been satisfied in full, provided, however that notwithstanding the provisions of this Section, the Loan shall be due and payable as set forth in this Agreement and in any other Loan Document.

9.4     <u>Survival of Representations</u>.  All representations and warranties made by or on behalf of Borrower in this Agreement or any other Loan Document shall be deemed to have been relied upon by the Administrative Agent and the Lenders notwithstanding any investigation which may be made by the Administrative Agent or any Lender.  All such representations and warranties shall survive the closing of the transactions described herein and the disbursement of the proceeds of the Loan until all of the Obligations shall have been fully, finally and indefeasibly paid in full.

9.5     <u>Binding Effect; Assignment; Third-Party Beneficiaries</u>.  This Agreement shall inure to the benefit of and be binding upon Borrower, the Administrative Agent, the Lenders, and their respective successors and assigns; provided, however, that this Agreement, the other Loan Documents and the Loan may not be assigned by Borrower without the consent of the Administrative Agent.  No other person or entity shall be a direct or indirect legal beneficiary of

or have any direct or indirect cause of action or claim in connection with, this Agreement or any other Loan Document.

9.6    Counterparts.  This Agreement and the other Loan Documents may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement. Receipt by telecopy or electronic transmission of any executed signature page to this Agreement or any other Loan Document shall constitute effective delivery of such signature page.

9.7    Notices.  Except for any notice required under applicable law to be given in another manner, all notices, requests, consents, demands, or other communications required or permitted to be given pursuant to this Agreement shall be deemed sufficiently given when delivered either (i) personally with a written receipt acknowledging delivery, (ii) three (3) Business Days after the posting thereof by United States first class, registered or certified mail, return receipt requested, with postage fee prepaid, or (iii) addressed to the following and via electronic mail at the address below (with a hard copy sent as otherwise permitted in this Section 9.7):

|  |  |
|---|---|
| If to the Administrative Agent or any Lender: | M2 LoanCo, LLC<br>Attn: Alan Rubenstein<br>2490 North East 7th Avenue, Suite 222<br>North Miami, FL 33161<br>alan@horowitzrubenstein.com |
| With a copy to: | Norton Rose Fulbright US LLP<br>Attn: Kristian Gluck and Julie Goodrich Harrison<br>2200 Ross Ave<br>Dallas, Texas 75201<br>kristian.gluck@nortonrosefulbright.com<br>julie.harrison@nortonrosefulbright.com |
| If to Borrower: | Tehum Care Services, Inc.<br>Attn:  Chief Restructuring Officer<br>Russell A. Perry, Senior Managing Director<br>Ankura Consulting Group, LLC<br>2021 McKinney Avenue, Suite 340<br>Dallas, Texas 75201<br>russell.perry@ankura.com |
| With a copy to: | Gray Reed & McGraw LLP<br>Attn: Jason S. Brookner and<br>Aaron M. Kaufman<br>1300 Post Oak Boulevard, Suite 2000<br>Houston, TX 77056<br>jbrookner@grayreed.com<br>akaufman@grayreed.com |

4889-1961-8391

Any party, at any time, may designate additional or different addresses for subsequent notices or communication by furnishing notice to the other party in the manner described above.

9.8     Waiver of Jury Trial.   Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right to jury trial with respect to any claim, demand, action or cause of action arising under this Agreement and the other Loan Documents or in any way connected with or related to the dealings in respect hereof or thereof, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise.

9.9     Entire Agreement.   This Agreement, together with other Loan Documents and the Financing Orders, constitutes the entire agreement between Borrower, the Administrative Agent and the Lenders with respect to the making and funding of the Loan, and no representations or agreements, express or implied, have been made to or with Borrower not herein or therein contained.  This Agreement, the other Loan Documents and the Financing Orders shall not be amended or modified, nor may any of their terms or conditions be waived, except by an instrument in writing duly executed by the Administrative Agent, the Lenders and the Borrower.

9.10    Jurisdiction; Governing Law.   This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal, substantive laws of the State of New York, without giving effect to conflicts of laws principles (other than Section 5-1401 and Section 5-1402 of the New York General Obligations Law). Each party hereto hereby consents and agrees that the state and federal courts located in the State of Texas shall have jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining to this Agreement or any other Loan Document or to any matter arising out of or relating to this Agreement or any other Loan Document; provided that during the Chapter 11 Case the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining to this Agreement or any other Loan Document or to any matter arising out of or relating to this Agreement or any other Loan Document; provided, further that nothing in this Agreement shall be deemed to operate to preclude the Administrative Agent from bringing suit or taking other legal action in any other jurisdiction to realize on any security for the Obligations, or to enforce a judgment or other court order in favor of the Administrative Agent. The Borrower hereby expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and the Borrower hereby waives any objection that the Borrower may have based upon lack of personal jurisdiction, improper venue or *forum non conveniens* and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

9.11    Headings.     Paragraph headings used in this Agreement are intended for convenience of reference only, and shall not be deemed to alter, affect or limit the meaning of any provision of this Agreement.

9.12    Severability.   In case any provision in or obligation hereunder or in any related document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

9.13   Relationship.   The relationship between Borrower and each of the Administrative Agent and each Lender is strictly contractual in nature, and is governed entirely by this Agreement and the other Loan Documents.  Nothing contained in this Agreement, and no action which the Administrative Agent or any Lender may take hereunder or in respect of the Loan, will create any agent, partnership, co-venture or joint venture between Borrower and any of the Administrative Agent and any Lender or will make the Administrative Agent or any Lender liable in any manner to any party dealing with Borrower.

9.14   Patriot Act.   The Borrower is not (or will not be) a person with whom the Administrative Agent or any Lender is restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, those Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not knowingly engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide to the Administrative Agent and each Lender with any additional information that the Administrative Agent or such Lender deems necessary from time to time in order to ensure compliance with all applicable Laws concerning money laundering and similar activities.

9.15   Press Releases. With the written consent of Borrower in each instance, which shall not be unreasonably withheld or delayed, the Administrative Agent may publish press releases and advertising material relating to the Loan using Borrower's name, logo or trademark.   The Administrative Agent shall provide Borrower with a draft reasonably in advance of publication.

9.16   Counsel. BORROWER HEREBY ACKNOWLEDGES THAT THE BORROWER HAS BEEN ADVISED BY THE ADMINISTRATIVE AGENT AND THE LENDERS TO SEEK THE ADVICE OF AN ATTORNEY OR AN ACCOUNTANT IN CONNECTION WITH THE LOAN AND THIS AGREEMENT. BORROWER HEREBY ACKNOWLEDGES THAT BORROWER HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY AND ACCOUNTANT OF THE BORROWER'S CHOICE IN CONNECTION WITH THE LOAN AND THIS AGREEMENT. BORROWER HEREBY REPRESENTS AND ACKNOWLEDGES THAT BORROWER HAS EITHER BEEN REPRESENTED BY LEGAL COUNSEL AND AN ACCOUNTANT PRIOR TO THE BORROWER'S EXECUTION HEREOF OR HAS KNOWINGLY ELECTED NOT TO BE SO REPRESENTED.

9.17   Construction. This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to each party hereto and thereto and are the products of all parties. Accordingly, this Agreement and the other Loan Documents shall not be construed against the Administrative Agent merely because of the Administrative Agent's involvement in their preparation.

9.18   Waivers. The Borrower hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment and diligence with respect to this Agreement and any other Loan Document, and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may

be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under the Bankruptcy Code, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the Obligations and any and all extensions, renewals, and modifications hereof.

9.19   <u>Incorporation of Financing Orders by Reference</u>.   The Borrower, the Administrative Agent and the Lenders hereby agree that any reference contained herein to the Financing Orders shall include all terms, conditions and provisions of such Financing Order and that the Financing Orders are incorporated herein for all purposes. To the extent there is any conflict or inconsistency between the terms of any of the Loan Documents and the terms of the Financing Orders, the terms of the Interim Order or the Final Order, as applicable, shall govern.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered of the day and year first set forth above.

**BORROWER:**

**TEHUM CARE SERVICES, INC.,**
a Texas corporation

By: _____

    Name: _____

    Title: _____

**LENDERS**:

**M2 LOANCO, LLC**,
a Florida limited liability company

By: _____
Name: _____
Title: _____

# **SCHEDULE 2**

## **INSURANCE**

See attached.

## SCHEDULE 5.8

## EXISTING BORROWER LIENS

None.

# **EXHIBIT A**

## **APPROVED BUDGET**

(see attached)

# **EXHIBIT B**

## **FORM OF REQUEST FOR ADVANCE**

(see attached)

**<u>Exhibit 2</u>**

**13 Week Budget**

**Tehum Care Services, Inc.**
**DIP Budget**
**Confidential - Subject to Material Revision**

| ($ in thousands) | wk 1 Actual Post 2/17/23 | wk 2 Actual Post 2/24/23 | wk 3 Forecast Post 3/3/23 | wk 4 Forecast Post 3/10/23 | wk 5 Forecast Post 3/17/23 | wk 6 Forecast Post 3/24/23 | wk 7 Forecast Post 3/31/23 | wk 8 Forecast Post 4/7/23 | wk 9 Forecast Post 4/14/23 | wk 10 Forecast Post 4/21/23 | wk 11 Forecast Post 4/28/23 | wk 12 Forecast Post 5/5/23 | wk 13 Forecast Post 5/12/23 | wk 14 Forecast Post 5/19/23 | wk 15 Forecast Post 5/26/23 | 15-wk Act / Fcst Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Misc. Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2 Total Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 3 Sigma Risk Management | - | - | - | - | (150.0) | - | - | (150.0) | - | - | - | (150.0) | - | - | - | (450.0) |
| 4 Bradley | - | - | - | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | - | - | - | - | (100.0) |
| 5 ERC - CPA | - | - | - | - | - | - | - | - | (9.6) | - | - | - | - | - | - | (9.6) |
| 6 Insurance | - | - | - | - | - | - | - | (184.3) | - | - | - | - | - | - | - | (184.3) |
| 7 Ordinary Course Claim Support | - | - | - | - | - | - | - | - | - | - | - | (60.0) | - | - | - | (60.0) |
| 8 Other Trade Payables | - | - | - | - | - | (50.0) | - | - | (50.0) | - | - | - | (50.0) | - | - | (150.0) |
| 9 Subtotal - Op. Disbursements | $ - | $ - | $ - | $ (12.5) | $ (162.5) | $ (62.5) | $ (12.5) | $ (346.8) | $ (72.1) | $ (12.5) | $ (12.5) | $ (210.0) | $ (50.0) | $ - | $ - | $ (953.9) |
| 10 Net Operating Cash Flow | $ - | $ - | $ - | $ (12.5) | $ (162.5) | $ (62.5) | $ (12.5) | $ (346.8) | $ (72.1) | $ (12.5) | $ (12.5) | $ (210.0) | $ (50.0) | $ - | $ - | $ (953.9) |
| 11 Gray Reed | (125.0) | (125.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (120.0) | (1,810.0) |
| 12 Ankura - CRO / Financial Advisory | (44.3) | (28.9) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (61.5) | (873.2) |
| 13 Ankura - Investigations | - | - | - | (31.3) | (31.3) | (31.3) | (31.3) | (31.3) | (31.3) | (31.3) | (31.3) | - | - | - | - | (250.0) |
| 14 Claims Agent | - | - | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (21.2) | (275.0) |
| 15 Norton Rose Fulbright | - | - | - | - | (100.0) | - | (50.0) | - | - | - | (10.0) | - | - | (10.0) | - | (170.0) |
| 16 UCC Professionals | - | - | - | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (300.0) |
| 17 DIP Fees | - | - | - | - | (40.0) | - | (10.0) | (8.0) | (8.0) | (4.0) | (6.0) | (8.0) | (6.0) | (6.0) | (4.0) | (100.0) |
| 18 UST Fees | - | - | - | - | - | - | - | - | (20.4) | - | - | - | - | - | - | (20.4) |
| 19 Chapter 11 Filing Fees | - | (1.8) | - | - | - | - | - | - | - | - | - | - | - | - | - | (1.8) |
| 20 Other Restructuring Costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 21 Subtotal - Restructuring | $ (169.3) | $ (155.7) | $ (202.7) | $ (258.9) | $ (398.9) | $ (258.9) | $ (318.9) | $ (266.9) | $ (287.3) | $ (262.9) | $ (274.9) | $ (235.7) | $ (233.7) | $ (243.7) | $ (231.7) | $ (3,800.4) |
| 22 Net Cash Flow | $ (169.3) | $ (155.7) | $ (202.7) | $ (271.4) | $ (561.4) | $ (321.4) | $ (331.4) | $ (613.8) | $ (359.4) | $ (275.4) | $ (287.4) | $ (445.7) | $ (283.7) | $ (243.7) | $ (231.7) | $ (4,754.3) |
| 23 Beginning Book Cash Balance | - | (169.3) | (325.0) | (527.7) | (799.2) | 639.4 | 317.9 | 486.5 | 272.7 | 313.3 | 237.9 | 250.4 | 204.7 | 221.1 | 277.4 | - |
| 24 Net Cash Flow | (169.3) | (155.7) | (202.7) | (271.4) | (561.4) | (321.4) | (331.4) | (613.8) | (359.4) | (275.4) | (287.4) | (445.7) | (283.7) | (243.7) | (231.7) | (4,754.3) |
| 25 DIP Draw | - | - | - | - | 2,000.0 | - | 500.0 | 400.0 | 400.0 | 200.0 | 300.0 | 400.0 | 300.0 | 300.0 | 200.0 | 5,000.0 |
| 26 Ending Book Cash Balance | $ (169.3) | $ (325.0) | $ (527.7) | $ (799.2) | $ 639.4 | $ 317.9 | $ 486.5 | $ 272.7 | $ 313.3 | $ 237.9 | $ 250.4 | $ 204.7 | $ 221.1 | $ 277.4 | $ 245.7 | $ 245.7 |
| 27 DIP Balance Beginning | - | - | - | - | - | 2,000.0 | 2,000.0 | 2,500.0 | 2,900.0 | 3,300.0 | 3,500.0 | 3,800.0 | 4,200.0 | 4,500.0 | 4,800.0 | - |
| 28 DIP Draw | - | - | - | - | 2,000.0 | - | 500.0 | 400.0 | 400.0 | 200.0 | 300.0 | 400.0 | 300.0 | 300.0 | 200.0 | 5,000.0 |
| 29 Subtotal - DIP Balance (Excl. PIK) | $ - | $ - | $ - | $ - | $ 2,000.0 | $ 2,000.0 | $ 2,500.0 | $ 2,900.0 | $ 3,300.0 | $ 3,500.0 | $ 3,800.0 | $ 4,200.0 | $ 4,500.0 | $ 4,800.0 | $ 5,000.0 | $ 5,000.0 |
| 30 PIK Interest | - | - | - | - | - | - | - | 12.2 | - | - | - | 32.4 | - | - | 37.7 | 82.3 |
| 31 Total - DIP Balance Ending | $ - | $ - | $ - | $ - | $ 2,000.0 | $ 2,000.0 | $ 2,500.0 | $ 2,912.2 | $ 3,312.2 | $ 3,512.2 | $ 3,812.2 | $ 4,244.6 | $ 4,544.6 | $ 4,844.6 | $ 5,082.3 | $ 5,082.3 |