1

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     -----------------------------------
 3   In Re

 4   KOLLEL MATEH EFRAIM, LLC, a/k/a
     MATEH EPHRAIM LLC, a/k/a
 5   KOLEL MATEH EFRAIM,

 6                                  Debtor.
     Chapter 7
 7   Case No. 04-16410 (SMB)
     -----------------------------------x
 8

 9
                        1290 Avenue of the Americas
10                      New York, New York

11

12                      January 30, 2008
                        10:30 a.m.
13

14

15              Deposition of JACK LEFKOWITZ,

16   before Marlene Lee, CSR, CRR, a Notary Public

17   of the State of New York.

18

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24           New York, New York 10022
                   212-750-6434
25                 REF: 86468
```

2

```
 1   A P P E A R A N C E S:

 2

 3   Attorneys for the Debtor

 4   BACKENROTH, FRANKEL & KRINSKY, LLP

 5        489 Fifth Avenue, 28th Floor

 6        New York, New York  10017

 7   BY:  SCOTT KRINSKY, ESQ.

 8        212-593-1100                (Telephone)

 9        skrinsky@bfklaw.com         (E-mail)

10        212-644-0544                (Fax)

11

12

13   BRYAN CAVE LLP

14   Attorneys for the Trustee

15        1290 Avenue of the Americas

16        New York, New York  10104-3300

17   BY:  ROBERT A. WOLF, ESQ.

18        CHRIS M. LaROCCO, ESQ.

19        212-541-3163                (Telephone)

20        chris.larocco@bryancave.com (E-mail)

21        212-541-1343                (Fax)

22

23

24   ALSO PRESENT:

25        VINAY AGARWAL
```

3

```
1   ------------------- I N D E X -------------------

2   WITNESS                 EXAMINATION BY          PAGE

3   JACK LEFKOWITZ      MR. WOLF                 6, 109

4                       MR. LaROCCO                  86

5

6

7   --------------- E X H I B I T S ---------------

8   TRUSTEE  DESCRIPTION                           PAGE

9   EXH. 1   COPY OF PETITION AND SCHEDULES        16
            FILED IN 1999, COMMENCING
10          BANKRUPTCY CASE OF NASSAU
            EQUITIES, LLC
11
    EXH. 2   COPY OF E-MAIL RECEIVED BY ATTORNEY   32
12          WOLF 1/16/08, FROM IISAAC

13  EXH. 3   COPY OF VOLUNTARY PETITION AND        35
            SCHEDULES FILED IN PRESENT
14          BANKRUPTCY CASE

15  EXH. 4   SECOND BANKRUPTCY FILING              39

16  EXH. 5   COPY OF AFFIDAVIT OF RABBI            52
            STEINWURZEL, SWORN TO 5/21/07,
17          FILED IN SUBJECT BANKRUPTCY CASE

18  EXH. 6   COPY OF ARTICLES OF ORGANIZATION      59
            OF MATEH EPHRAIM LLC
19
    EXH. 7   LEASE WITH RIDER                      62
20
    EXH. 8   PAGE FROM KALLAH MAGAZINE, SUMMER     72
21          2000 ISSUE

22  EXH. 9   BANK STATEMENTS SUBMITTED BY          89
            WITNESS'S COUNSEL SHOWING BANK
23          ACCOUNT FOR KOLEL MATEH EFRAIM,
            D.I.P.
24

25
```

4

1    ------------ E X H I B I T S (Cont'd) -----------

2    TRUSTEE   DESCRIPTION                              PAGE

3    EXH. 10  CHECKS WRITTEN ON THE ACCOUNT        92
              WHOSE STATEMENTS ARE IN TRUSTEE'S
4             EXHIBIT 9

5    EXH. 11  ONE-PAGE DOCUMENT, "CORPORATE       102
              RESOLUTION," KOLEL MATEH EFRAIM
6             D.I.P.

7    EXH. 12  COPY OF CONTRACT, 4/27/04,          114
              BETWEEN HELEN-MAY AS SELLER AND
8             ARON FIXLER AS PURCHASER

9    EXH. 13  ASSIGNMENT INSTRUMENT               125

10   EXH. 14  COPY OF FRONTS AND BACKS OF         128
              VARIOUS CHECKS
11
     EXH. 15  LETTER TO M.J. HALBERSTAM, ESQ.,    144
12            ON LETTERHEAD OF SCHER & SCHER,
              PC, COPY OF SO-CALLED OCCUPANCY
13            AGREEMENT ENTERED INTO SHORTLY
              SUBSEQUENT TO THE TIME OF THE
14            ASSIGNMENT

15   EXH. 16  SKETCH RE EASEMENTS                 152

16   EXH. 17  EXTENSION LETTER AGREEMENT          152
              EXTENDING CLOSING DATE
17
     EXH. 18  DEED                                159
18
     EXH. 19  FIRST DEED                          160
19
     EXH. 20  COPIES OF TWO ONE-PAGE LETTERS,     183
20            DATED 10-6-04 AND 10-11-04, EACH
              ON LETTERHEAD AND LOGO OF THE
21            FRIEDMAN FAMILY OF TORONTO

22   EXH. 21  COPY OF PAGE C-5 OF PERIOD CAL      200
              COMMUNITY, 5/16/07
23
     EXH. 22  COPY OF CHECK DRAWN ON THE          213
24            O ACCOUNT F MASKIL EL-DAL,
              INC., CHECK NO. 9286, 6/23/04
25

```
 1   ------------ E X H I B I T S (Cont'd) -----------

 2   TRUSTEE   DESCRIPTION                           PAGE

 3   EXH. 23  ACCOUNTING OF PAYMENTS MADE BY      220
                  MASKIL EL-DAL, INC. TO VARIOUS
 4              INDIVIDUALS AND ENTITIES FROM
                  5/19/04 - 9/20/04, PRODUCTION
 5              NOS. T 00025 THROUGH 00032

 6

 7

 8   ------ DOCUMENTS REQUESTED FOR PRODUCTION -------

 9   PAGE   69   LEASE DOCUMENTS

10          91   BANK ACCOUNTS STATMENTS

11         127   LETTER BETWEEN SCHER AND HALBERSTAM

12         127   ALL SCHER HALBERSTAM DOCUMENTATION

13         128   CONSENT DOCUMENT

14         143   APPRAISALS

15         143   APPRAISAL SHOWN TO THE WITNESS BY
                      THE GRIFFINS
16
           157   CLOSEING CONTRACTS
17
           162   TRANSFER TAX FORM
18
           212   WRITTEN GUARANTEES FOR LOANS
19

20

21   ------------- INFORMATION REQUESTED -------------

22   PAGE   82   NAME OF THE COMPANY THAT FURNISHED
                      THE FURNITURE TO THE LLC
23

24

25
```

```
 1                J A C K   L E F K O W I T Z ,
 2    having been called as a witness and duly
 3    affirmed by the notary (Marlene Lee), was
 4    examined and testified as follows:
 5
 6                    EXAMINATION BY MR. WOLF:
 7         Q.    Mr. Lefkowitz, good morning.
 8         A.    Good morning.
 9         Q.    I'm Bob Wolf, with the firm Bryan
10    Cave.  With me this morning is an associate
11    with our firm, Chris LaRocco, and Mr. Agarwal
12    from the accounting firm of Davis, Graber,
13    Plotzker & Ward, LLP, which is Trustee's
14    court-appointed accountant.
15                    As you know, our firm represents
16    Robert L. Geltzer, who is the Chapter 7 Trustee
17    of the Debtor entity named Kollel Mateh Efraim,
18    LLC, also known as Mateh Ephraim LLC, also
19    known as Kolel Mateh Efraim.
20                    (Discussion off the record.)
21         Q.    Could you give your full name and
22    your current address?
23         A.    Jack Lefkowitz.  1526 52nd Street,
24    Brooklyn, New York  11219.
25         Q.    That address you just gave is a
```

```
 1                    LEFKOWITZ
 2   residence?
 3        A.    Yes.
 4        Q.    This examination today is being
 5   conducted pursuant to Rule 2004 of the Federal
 6   Rules of Bankruptcy Procedure.  Am I correct
 7   that you consented to appear for this
 8   examination today --
 9        A.    Correct.
10        Q.    -- on behalf of the named Debtor?
11        A.    Correct.
12        Q.    Mr. Lefkowitz, have you ever had
13   your deposition taken before?
14        A.    Yes.
15        Q.    On more than one occasion?
16        A.    Yes.
17        Q.    Approximately how many times?
18        A.    Many occasions.
19        Q.    Have you ever had a Bankruptcy Rule
20   2004 examination conducted of you?
21        A.    2004?  I don't recall.
22        Q.    Have you had your deposition or
23   examination taken in some other bankruptcy
24   case?
25        A.    Yes.
```

```
 1                    LEFKOWITZ

 2        Q.    More than one such case?

 3        A.    Yes.

 4        Q.    How many such cases?

 5        A.    A few.

 6        Q.    Could you tell me the name of one

 7   of those cases?

 8        A.    One I recall was Nassau Equities.

 9        Q.    Were you a principal of that

10   entity?

11        A.    Yes.

12        Q.    That was a debtor in a bankruptcy?

13        A.    Yes.

14        Q.    In the Southern District of New

15   York?

16        A.    Correct.

17        Q.    What other bankruptcies have you

18   had your examination taken in?

19        A.    Don't recall.

20        Q.    But there have been others?

21        A.    Yes.

22        Q.    All right.  As you probably know

23   because you've had your deposition examination

24   taken before, I'm going to ask you a series of

25   questions today.  In response to each question,
```

```
1                    LEFKOWITZ
2   I request that you give a verbal answer because
3   the reporter who is transcribing my questions
4   and your answers cannot transcribe a hand
5   gesture or facial gesture; understood?
6        A.    We'll do our best.
7        Q.    Please wait until I've finished
8   asking a question before you give your answer.
9   If you don't understand a question I ask,
10  please say so and I'll try to rephrase the
11  question so that you can give me a verbal
12  answer.
13       A.    All right.
14       Q.    Please don't be offended, but I ask
15  this question of all deposition and examination
16  witnesses.  Are you on any medication or taking
17  any substance that would affect your ability to
18  answer my questions truthfully and accurately?
19       A.    No, sir.
20       Q.    Do you have any condition that
21  might affect your ability to answer my
22  questions truthfully or accurately?
23       A.    No.
24       Q.    Today I will probably be showing
25  you in the course of the examination some
```

```
 1                    LEFKOWITZ

 2    documents.  Do you have any condition that

 3    would affect your ability to read any of those

 4    documents?

 5          A.    No.

 6          Q.    Are there any questions you have

 7    about our procedures today?

 8          A.    Not yet.

 9          Q.    In preparation for this

10    examination, other than with your counsel --

11    and you are represented by counsel this

12    morning; correct?

13          A.    Correct.

14          Q.    That's Mr. Scott Krinsky of the

15    Backenroth firm?

16          A.    Correct.

17          Q.    Counsel for the Debtor?

18          A.    Correct.

19          Q.    Other than with your counsel, the

20    Debtor's counsel, have you had discussions with

21    anyone in connection with your examination

22    today?

23          A.    No.

24          Q.    Did you review any documents in

25    preparation for this examination today?
```

```
 1                    LEFKOWITZ

 2        A.    Yes.

 3        Q.    Could you tell me what documents

 4   specifically you examined?

 5        A.    Some documents my attorney had with

 6   him.

 7        Q.    Are they documents that have been

 8   produced to us previously?

 9        A.    Yes.

10        Q.    And could you tell me, do they

11   relate to real estate?  Or to something else?

12        A.    Real estate.

13        Q.    And what real estate do they

14   pertain to?

15        A.    Property in Cochecton that's the

16   subject matter of this litigation.

17        Q.    What specific documents relating to

18   the real estate did you look at?

19        A.    The signing of the contract.

20        Q.    Anything else?

21        A.    That's it.

22        Q.    Please tell me your date of birth.

23        A.    2-16-62.

24        Q.    And please describe to me your

25   educational background, beginning with college.
```

```
 1                    LEFKOWITZ

 2   Do you have a college degree?

 3        A.    Rabbinical college.

 4        Q.    Which rabbinical college?

 5        A.    UTA.

 6        Q.    Which stands for?

 7        A.    United Talmudic Academy.

 8        Q.    Where is that located?

 9        A.    Brooklyn, New York.

10        Q.    And were you ordained as a rabbi

11   through that academy?

12        A.    No.

13        Q.    Did you get some degree from that

14   academy?  A certificate?

15        A.    It's called a Talmudical degree.

16        Q.    And when did you receive that?

17        A.    1978.

18        Q.    Did you continue your education

19   anywhere else?

20        A.    No.

21        Q.    Were you ever ordained as a rabbi?

22        A.    No.

23        Q.    Other than a driver's license, do

24   you have any licenses?

25        A.    No.
```

```
 1                    LEFKOWITZ

 2        Q.    Have you ever had a real estate

 3   broker's license?

 4        A.    No.

 5        Q.    Have you ever had a real estate

 6   salesperson's license?

 7        A.    No.

 8        Q.    Are you currently married?

 9        A.    Yes.

10        Q.    Your wife's name is?

11        A.    Bluma

12        Q.    Lefkowitz?

13        A.    Correct.

14        Q.    Do you have any children?

15        A.    Yes.

16        Q.    How many?

17        A.    Eleven.

18        Q.    Can you tell me the age range of

19   those children?

20        A.    Twenty-five down to seven months.

21        Q.    Mazel Tov.

22              (Discussion off the record.)

23        Q.    Have you ever personally filed for

24   bankruptcy?

25        A.    No.
```

```
 1                      LEFKOWITZ

 2         Q.    Has your wife ever personally filed

 3   for bankruptcy?

 4         A.    No.

 5         Q.    Other than with respect to the

 6   named Debtor in this case, have you ever been a

 7   director, an officer, a member, or a partner of

 8   any entity that has filed for bankruptcy or

 9   against whom there was filed an involuntary

10   bankruptcy petition?

11         A.    Yes.

12         Q.    How many such entities?

13         A.    Maybe two or three.

14         Q.    Would you name them, please?

15         A.    I named them previously.  One,

16   which is Nassau Equities.

17         Q.    LLC?

18         A.    Right.  I don't recall the other

19   entities.

20         Q.    What was your position with Nassau

21   Equities, LLC?

22         A.    I was a member.

23         Q.    Were you the sole member?

24         A.    No.

25         Q.    Who were the other members?
```

```
 1                    LEFKOWITZ
 2        A.    There were a whole slew of them.
 3        Q.    Approximately how many?
 4        A.    Six.
 5        Q.    Were any of the members of Nassau
 6  Equities, LLC a member or manager of the
 7  present named Debtor?
 8        A.    No.
 9        Q.    And when was Nassau Equities, LLC
10  formed?
11        A.    Must be in the late '90s.
12        Q.    For what purpose was it formed?
13        A.    Real estate.
14        Q.    Was it in connection with acquiring
15  a certain piece of real estate?
16        A.    Correct.
17        Q.    Which one?
18        A.    150 Nassau Street.
19        Q.    Here in Manhattan?
20        A.    Correct.
21        Q.    Did it have an office?
22        A.    Yes.
23        Q.    Where was that located?
24        A.    World Trade Center.
25        Q.    What address at World Trade Center?
```

```
 1                      LEFKOWITZ

 2        A.    One World.

 3        Q.    And did Nassau Equities, LLC

 4   acquire the property 150 Nassau Street?

 5        A.    Yes.

 6        Q.    When did it acquire that property?

 7        A.    Late '90s.

 8        Q.    Before it filed for bankruptcy?

 9        A.    Correct.

10        Q.    And why did it file for bankruptcy?

11        A.    Don't recall the circumstances.

12        Q.    It was a voluntary petition;

13   correct?

14        A.    Yes.

15        Q.    And did it file for bankruptcy

16   after it had already closed on the sale -- I'm

17   sorry -- on the purchase of 150 Nassau Street?

18        A.    I don't know.  It was a lengthy

19   bankruptcy, seven years ago.  I wouldn't recall

20   the specifics of it.

21        Q.    Let's see if we can refresh your

22   recollection.

23             MR. WOLF:  Mark this as Trustee

24        Exhibit 1.

25             (Trustee Exhibit 1 for
```

```
 1                         LEFKOWITZ

 2              identification, copy of petition and

 3              schedules filed in 1999, commencing

 4              bankruptcy case of Nassau Equities, LLC.)

 5         Q.    Mr. Lefkowitz, you have in front of

 6    you what's been marked as Trustee Exhibit 1

 7    which appears to be a copy of the petition and

 8    schedules that were filed in 1999 to commence

 9    the bankruptcy case of Nassau Equities, LLC.

10              If you turn to the second page, do

11    you recognize the signature on the right-hand

12    side above the printed name "Jack Lefkowitz"

13    and the title "Managing Member" to be a copy of

14    your signature?

15         A.    Yeah.

16         Q.    Starting with the third page -- I'm

17    sorry, the fourth page of this document, it

18    appears that there's an affidavit of yours

19    pursuant to local rule.  Do you see that

20    document?

21         A.    Yeah.

22         Q.    If you turn to page 3 of that

23    affidavit, is that a copy of your signature?

24         A.    Yes.

25         Q.    Do you recall signing the original
```

```
 1                      LEFKOWITZ
 2  of that affidavit?
 3       A.    Yes.
 4       Q.    And if you go to paragraph 8 on
 5  page 2 of that affidavit, it states, "At the
 6  time of filing of the petition herein, the
 7  Debtor was in the business of acquiring that
 8  certain real property located at 150 Nassau
 9  Street, New York, New York."
10            Is that an accurate statement?
11       A.    It is.
12       Q.    So do I understand correctly from
13  that statement in your affidavit that the
14  Debtor -- I'm sorry, the Debtor, Nassau
15  Equities, LLC, had not yet closed on the
16  purchase of that property when it filed for
17  bankruptcy?
18       A.    Again, it would be very hard for me
19  to recollect the circumstances of that
20  bankruptcy.  But all the signatures on this
21  petition appear to be mine.  But I wouldn't
22  recall the circumstances.  I can read you what
23  the affidavit says.
24       Q.    I understand, but I'm trying to
25  refresh your recollection.
```

```
 1                    LEFKOWITZ

 2          A.    I don't think it will, because I

 3     don't recall.

 4          Q.    Let me ask you a few more

 5     questions.

 6          A.    Yeah.

 7          Q.    Paragraph 13 --

 8          MR. KRINSKY:  Let me note an

 9          objection.  I understand a Rule 2004

10          deposition can be a fishing expedition,

11          but I was under the impression that you

12          still have to show some sort of

13          connection to the financial condition or

14          the assets and liabilities of the Debtor.

15              I note on the record I'm not sure

16          there's anything regarding the Nassau

17          Equities bankruptcy from 1999 that would

18          bear on the financial condition of this

19          Debtor we have in this case.

20          MR. WOLF:  Your objection is noted.

21          I'll go on to my next question.

22          Q.    Paragraph 13 at the bottom of page

23     2 of your affidavit, Mr. Lefkowitz, states,

24     "The Debtor's petition was precipitated by a

25     time-of-the-essence deadline for the closing of
```

```
 1                      LEFKOWITZ
 2   the sale of the 150 Nassau Street property."
 3             Does that refresh your recollection
 4   that the time the Debtor, Nassau Equities, LLC,
 5   filed for bankruptcy, it had not yet closed on
 6   the purchase of that property?
 7        A.    The affidavit speaks for itself,
 8   but I don't recall the circumstances.
 9        Q.    Do you recollect what the outcome
10   was of the Nassau Equities, LLC bankruptcy?
11        A.    It lingered on for years.
12        Q.    And what happened at the end?  Was
13   the case dismissed?  Was there a resolution?
14   Was there a plan of reorganization?
15        A.    I wouldn't know.
16        Q.    You wouldn't know?
17        A.    I wouldn't recall.  I mean -- I'm
18   sure the bankruptcy record is what it is.
19        Q.    You were the managing member of
20   that entity; correct?
21        A.    Yeah, but it's no longer an active
22   entity and there's no reason for me to recall
23   something that's not active.  I'm sure if you
24   look on Pacer, you can --
25        Q.    We can do that.  Did Nassau
```

```
 1                    LEFKOWITZ
 2   Equities, LLC ever acquire the property at 150
 3   Nassau Street?
 4        A.    I don't recall.
 5        Q.    You don't recall if it acquired the
 6   property?
 7        A.    I don't know if Nassau Equity
 8   acquired it or some other entity acquired it.
 9   All I know is Nassau Equity doesn't own it, so
10   I don't know if Nassau Equity sold it or --
11   we'd have to go back in the file and look at
12   it.
13        Q.    Did any entity of which you were a
14   member, a partner, a director, or an officer
15   ever acquire that property?
16        A.    No.
17        Q.    Did Nassau Equities, LLC, assign
18   its contract rights to that property to anyone
19   else?
20        A.    Again, Mr. Wolf, you're asking me
21   questions about that property, that bankruptcy.
22   I'll be happy to answer it.  Let me go into the
23   Nassau Equity file, review it, and
24   chronologically put it all together again, and
25   bring it back to you.  I don't want to give you
```

```
 1                    LEFKOWITZ
 2   wrong answers.
 3        Q.    I'll reserve the right, after
 4   you've looked at those documents, to ask for a
 5   continuation of this examination on those
 6   issues.
 7        A.    I'm not trying to be evasive.  I
 8   just don't want to give you the wrong answers.
 9        Q.    Are you presently employed?
10        A.    Yes.
11        Q.    By whom?
12        A.    A company called New York MedScan.
13        Q.    Is that all one word?
14        A.    Yes.
15        Q.    Is that a corporation?
16        A.    It's an LLC.
17        Q.    Are you a member of that LLC?
18        A.    Yes.
19        Q.    Are you the managing member of that
20   LLC?
21        A.    Yes.
22        Q.    Are you the sole member of that
23   LLC?
24        A.    No.
25        Q.    Who else is a member?
```

```
 1                    LEFKOWITZ
 2        A.    My wife.
 3        Q.    Anyone else?
 4        A.    No.
 5        Q.    And when was that LLC formed?
 6        A.    Also sometime in the late '90s.
 7        Q.    And what is the business of New
 8   York MedScan, LLC?
 9        A.    Medical diagnostic.
10        Q.    Medical diagnostic company?
11        A.    It's an LLC.
12        Q.    I understand.  Is the company,
13   itself, in the business of medical diagnostics?
14        A.    Yes.
15        Q.    And what specifically does that
16   mean?  What does it do?
17        A.    That's exactly what it is.
18        Q.    Does it manufacture equipment so
19   doctors can undertake medical diagnoses?
20        A.    No.
21        Q.    Okay.  So what does it do?
22        A.    It's doing medical diagnostic.
23        Q.    Tell me what that means.
24        A.    It's diagnosing patients.
25        Q.    And any particular part of their
```

```
 1                    LEFKOWITZ

 2   bodies?

 3        A.    Whole body.

 4        Q.    Whole body.  And are they

 5   diagnosing for any particular types of disease

 6   or any particular types of injuries?

 7        A.    No.  It's mainly disease.

 8        Q.    And is there a business location

 9   for it?

10        A.    Yes.  751 Second Avenue.

11        Q.    What are the cross streets of that

12   address?

13        A.    Forty-first and 40th.

14        Q.    Is there a diagnostic equipment

15   located at those premises?

16        A.    Yes.

17        Q.    And who performs the diagnoses?

18        A.    Technologists.

19        Q.    Does the LLC employ those

20   technologists?

21        A.    Yes.

22        Q.    How many of them are there?

23        A.    Three of them.

24        Q.    Had you been involved in the

25   business of medical diagnostics before?
```

```
 1                    LEFKOWITZ

 2         A.    Before --

 3         Q.    Before you formed the company.

 4         A.    No.

 5         Q.    This was your first entree into

 6    that business area?

 7         A.    Yes.

 8         Q.    How did you get involved in that

 9    business area?

10         A.    You really want to know?  It's a

11    long story.

12         Q.    You can give me a short synopsis of

13    it.

14         A.    I had an office in the World Trade

15    Center.  As philanthropy work, I had an

16    individual I gave an office on the 89th floor

17    called patient liaison to Sloan-Kettering.  One

18    day he walked into my office and he said, "Do

19    you know anyone that has a pet in New York?"

20         Q.    A pet?

21         A.    Exactly.  A pet.  I said, "A pet?

22    Go to the park.  Everybody walks with a dog.

23    What are you talking about?"  He couldn't

24    explain me the problem.  I said, "Why don't you

25    take me to the problem."
```

```
 1                    LEFKOWITZ
 2            He took me to Sloan.  Sloan has a
 3  nuclear medicine department that do diagnoses
 4  on patients that possibly have cancer.  In the
 5  corridor was a line of 100 people waiting for
 6  the machine.  He had a patient that flew in
 7  from Panama that needed to go back.  He said he
 8  has to jump the line.
 9            I got to the nuclear medicine
10  department and spoke to the technologists.  I
11  saw this was a lucrative business if they have
12  a line of 100 trying to get onto a scanner that
13  charges $6,000 for half an hour.  Next month I
14  went into the business.  Short story.
15       Q.   And so do you spend the majority of
16  your work week at that company?
17       A.   Yes.
18       Q.   Do you have an office at that
19  location?
20       A.   Yes.
21       Q.   Does your wife also work at that
22  location?
23       A.   Occasionally.
24       Q.   Any of your children work at that
25  location?
```

1                         LEFKOWITZ

2          A.     They work in the field.

3          Q.     When you say "they work in the

4     field," meaning they work for the company

5     but --

6          A.     Virtual.

7          Q.     -- but outside?

8          A.     Virtual.  Today you don't have to

9     be in the office.

10         Q.     Right.  But they're working for the

11    company at other than the location of the

12    company?

13         A.     Correct.

14         Q.     Are you currently a member of any

15    other LLCs?

16         A.     Yes.

17         Q.     How many?

18         A.     How many?  That's -- I mean, one is

19    the Debtor.

20         Q.     The Debtor in this case; right?

21         A.     Correct.  The other one --

22         Q.     I hate to break this news to you,

23    but you may no longer be a member of that LLC.

24    We'll put that aside.

25         A.     I'll be happy to give it over to

```
 1                    LEFKOWITZ

 2    whoever wants it.

 3         Q.    I think you already have.  But

 4    that's another issue.  Any others?

 5         A.    A company called Care to Care.

 6         Q.    Care to Care, LLC?

 7         A.    Yeah.

 8         Q.    What is that?

 9         A.    Care to Care, LLC is an RBM

10    company.

11         Q.    RBM --

12         A.    Radiology benefit management.

13         Q.    And so what does that company do?

14         A.    That company manages radiology

15    benefits for health insurance companies.

16         Q.    Can you explain a little bit what

17    that means, in laymen's terms?

18         A.    Companies like health insurance

19    companies are very diversified.  In health

20    care -- I can go on and on.  It's a political

21    issue now.  But basically there are certain

22    areas that insurance companies lack expertise,

23    and we provide these expertises to insurance

24    companies.

25         Q.    Is this for the purpose of advising
```

```
 1                    LEFKOWITZ

 2    or consulting with insurance companies as to

 3    how to deal with coverage of insureds when they

 4    have diagnostic tests of various kinds?

 5          A.    Exactly.

 6          Q.    Is that an LLC that you formed?

 7          A.    Yes.

 8          Q.    When did you form that one?

 9          A.    Recently.  About a year ago.

10          Q.    Are you the sole member of that

11    LLC?

12          A.    Yes.

13          Q.    Are there any other LLCs of which

14    you are a member?

15          A.    None that I recall at this point.

16          Q.    Are you a trustee of any

17    corporations or a member of the board of

18    directors of any corporation?

19          A.    No.

20          Q.    Have you ever been a trustee of a

21    religious corporation known as Kolel Mateh

22    Efraim?

23          A.    No.

24          Q.    Have you ever been an officer or

25    director or member or partner of an entity
```

```
 1                    LEFKOWITZ

 2   called First Quality Realty?

 3        A.    Yes.

 4        Q.    What kind of entity was that?

 5        A.    Real estate.

 6        Q.    Was it a corporation, or an LLC?

 7        A.    I think it was an LLC.

 8        Q.    What did it do in the area of real

 9   estate?

10        A.    Sole representative for a loft

11   building.

12        Q.    Did it own that loft building?

13        A.    I don't know if it owned it.  It

14   had contractual rights.  I don't recall.

15        Q.    Did it at some time file for

16   bankruptcy?

17        A.    Yes.

18        Q.    When did that occur?

19        A.    In the early '00s.

20        Q.    Early 2000s?

21        A.    Right.

22        Q.    What was the address of the

23   property that it had contractual rights to?

24        A.    I don't recall.

25        Q.    Was it located in Manhattan?
```

```
 1                    LEFKOWITZ

 2        A.    No.

 3        Q.    Brooklyn?

 4        A.    Yes.

 5        Q.    And where was the bankruptcy case

 6  filed?

 7        A.    I think it was the Southern

 8  District.

 9        Q.    What was the outcome of that

10  bankruptcy?

11        A.    I think it got resolved.

12        Q.    And how was it resolved?

13        A.    Paid off all its creditors.

14        Q.    Did it ever close on the purchase

15  of the loft building in Brooklyn?

16        A.    I don't think so.

17        Q.    Was something worked out in the

18  bankruptcy with regard to any security deposit

19  on the contract that the company had posted

20  with the landlord -- or the owner?

21        A.    It got resolved and got settled.

22        Q.    Are you familiar with an e-mail

23  address iisaac?

24        A.    No.

25        Q.    Are you familiar with an e-mail
```

```
 1                    LEFKOWITZ
 2   address, duma211@gmail.com?
 3        A.    No.
 4              MR. WOLF:   Trustee 2.
 5              (Trustee Exhibit 2 for
 6              identification, copy of e-mail received
 7              by Attorney Wolf 1-16-08, from iisaac.)
 8        Q.    Mr. Lefkowitz, you have in front of
 9   you what's been marked as Trustee Exhibit 2.
10   It's a copy of an e-mail that I received on my
11   office computer on January 16 of this year from
12   an iisaac, and it shows, in brackets, the
13   e-mail address I mentioned, duma211@gmail.com.
14   I note it was also sent to the attorney David
15   Carlebach at his e-mail address.  And the
16   subject listed is "Jack Lefkowitz - President
17   and CEO."
18        A.    Right.
19        Q.    Have you ever seen a copy of this
20   e-mail?
21        A.    Yes.
22        Q.    When did you see a copy of this
23   e-mail?
24        A.    I got it from Scott Krinsky
25   questioning me what this is and why it was sent
```

```
 1                    LEFKOWITZ

 2    to you.

 3         Q.    Do you know the answer to that

 4    question?

 5         A.    No clue.

 6         Q.    Do you have an idea of who sent it?

 7         A.    No clue.

 8         Q.    Are you familiar with the attorney

 9    named Isaac Nutovic?

10         A.    Yes.

11         Q.    Is this possibly his e-mail

12    address, duma211@gmail.com?

13         A.    I don't think so.  I think he has

14    an isaacnutovic e-mail address.

15         Q.    Do you have any e-mail addresses?

16         A.    Yes.

17         Q.    What are they?

18         A.    Either jacklefkowitz@gmail.com or

19    jlefkowitz@caretocare, or

20    jack@newyorkmedscan.com.

21         Q.    Do you have a Hebrew name?

22         A.    Yes.

23         Q.    What is it?

24         A.    Yitzchok.

25         Q.    Is your born English name Jack?  Or
```

1                          LEFKOWITZ

2    something else?

3         A.    My born English name?  No.  My born

4    English name is Yitzchok.

5         Q.    Have you ever been called Isaac?

6         A.    Yes.

7         Q.    Are you presently called Isaac by

8    some?

9         A.    My classmates, they call me Isaac.

10        Q.    But this is not your e-mail

11   address?

12        A.    No.

13        Q.    Is it any member of your family's

14   e-mail address?

15        A.    No.  Not that I know of.

16        Q.    So you don't know why whoever this

17   person was that sent this e-mail to me and

18   David Carlebach would have sent it?

19        A.    No clue.  I don't know what it is.

20   Basically a copy of our Web site.  This is

21   listed on our Web site.  I don't know what the

22   purpose is.

23        Q.    This is the Web site of the Care to

24   Care, LLC entity that you mentioned to me

25   before?

```
1                        LEFKOWITZ
2          A.      Correct.
3                  (Discussion off the record.)
4                  (Trustee Exhibit 3 for
5          identification, copy of voluntary
6          petition and schedules filed in present
7          bankruptcy case.)
8          Q.      Mr. Lefkowitz, you now have in
9     front of you what's been marked as Trustee
10    Exhibit 3 for identification.  Do you recognize
11    that to be a copy of the voluntary petition and
12    schedules that were filed in the present
13    bankruptcy case that we're talking about here?
14         A.      Yeah.
15         Q.      I'm sorry?
16         A.      Yes, sir.
17         Q.      You don't have to say "sir."
18         A.      It's just a habit.  If you get
19    offended by it, I won't do it.
20         Q.      That's okay.  Name of lender is
21    listed as Kollel Mateh Efraim, LLC.
22                 Does such an entity exist?
23         A.      Not to my knowledge.
24         Q.      You signed the original of this
25    petition; is that correct?
```

```
 1                    LEFKOWITZ

 2        A.    Yes.

 3        Q.    Can you tell me why a petition was

 4   filed with your signature on it for an entity

 5   that you tell me does not exist?

 6        A.    Because the attorneys made an error

 7   in the entity name, and there were corrections

 8   afterwards.  I don't know if this is the first

 9   petition or the second petition.  There were

10   two petitions.

11        Q.    I will represent to you that this

12   is the first petition.

13        A.    This was erroneously, and then he

14   pulled it again.  He called me up and said, "I

15   made a mistake.  We've got to refile it."  Up

16   to today, I don't know exactly which error

17   corrected what, but I know there were a lot of

18   errors in the filing.

19             MR. WOLF:  Would you read back the

20        last answer?

21             (The preceding answer was read

22        back.)

23        Q.    What other errors were there in the

24   filing, this filing we're looking at now,

25   Trustee Exhibit 3?
```

```
 1                    LEFKOWITZ

 2        A.    Mainly that dealt with the name of

 3   the entity and the Federal ID of the entity.

 4        Q.    I don't see any Federal ID --

 5        A.    But I remember there were

 6   discussion about two errors in the file.

 7        Q.    Do you know if there was a Federal

 8   ID number listed anywhere for this Debtor

 9   entity -- for this named entity called Kollel

10   Mateh Efraim in the schedules?

11        A.    I don't know.  You asked me about

12   what errors I remember.  I remember these two

13   errors.

14        Q.    My question --

15        A.    I don't see any Federal ID number

16   here.

17        Q.    Just while we're on this name --

18        A.    Right.

19              (Discussion off the record.)

20        Q.    -- those are Hebrew words or names;

21   is that correct?

22        A.    Correct.

23        Q.    Can you tell me what they mean?

24        A.    "Kolo" means general.  "Mateh" --

25        Q.    General?
```

```
 1                      LEFKOWITZ

 2         A.      General.

 3         Q.      As opposed to specific?

 4         A.      Like --

 5         Q.      Or general of an army?

 6         A.      Like the bank in France now that's

 7    going down, Societe Generale.  General.

 8    Instead of specific, general.

 9         Q.      Now you're talking.  General.

10    Okay.

11         A.      "Kolo" means general.

12         Q.      Doesn't it also, euphemistically,

13    mean a voice?

14         A.      No.  That's K-O-L.  In Hebrew when

15    you say "Kolel," it means this wallet includes

16    the book.  It's "Kolel," the book.

17         Q.      The overall general thing?

18         A.      Right.

19         Q.      And "Mateh"?  What does that mean?

20         A.      Tribe.

21         Q.      Tribe?  Is it ever used to mean a

22    staff?

23         A.      No.  Staff is --

24         Q.      Meaning like Moses held that type

25    of staff.
```

```
 1                        LEFKOWITZ

 2        A.    Oh.  That's --

 3        Q.    Spelled how?

 4        A.    I don't know how you spell it.

 5   There's "Mateh."  "Mateh" is staff.  "Mati" is

 6   tribe.

 7        Q.    Are you pronouncing your middle

 8   name here as "Mateh"?

 9        A.    Right.

10              (Discussion off the record.)

11        Q.    What is Efraim?

12        A.    Efraim is the son of Jacob, one of

13   the tribes, which is also a nickname.  Jews.

14   "Jews" has a nickname of "Mateh Efraim."

15        Q.    The last two names of this LLC

16   entity is a nickname or euphemism for "Jews"?

17        A.    Correct.

18              MR. WOLF:  This will be Exhibit 4.

19              (Trustee Exhibit 4 for

20        identification, second bankruptcy

21        filing.)

22        Q.    Mr. Lefkowitz, now you have in

23   front of you what has been marked as Trustee

24   Exhibit 4 for identification.

25        A.    Okay.
```

1                    LEFKOWITZ

2        Q.     And this appears to be what you

3    referred to before as the second bankruptcy

4    filing.

5        A.     Right.

6        Q.     And here the named Debtor is Mateh

7    Ephraim, LLC, dba Kollel Mateh Efraim, LLC.

8               Was this petition the one that, in

9    your words, corrected the mistake as to the

10   name of the Debtor entity in the first petition

11   we looked at, Trustee Exhibit 3?

12       A.     It was supposed to correct, but it

13   didn't correct at all.

14       Q.     First of all, did you sign this

15   petition?

16       A.     I think so.  Is this a signed

17   petition that I have?

18       Q.     If you look at the second page,

19   there appears to be what we call a conformed

20   signature.

21       A.     Correct.

22       Q.     Do you recall signing the original

23   of this petition?

24       A.     I don't recall it specifically, but

25   I think I signed it.

```
 1                        LEFKOWITZ

 2          Q.    You just said, before, that this

 3    did not correct certain things from the

 4    petition that has been marked as Trustee

 5    Exhibit 3.  What didn't it correct?

 6          A.    Well, the named entity is Mateh,

 7    M-A-T-E-H, Ephraim, E-P-H-R-A-I-M, LLC.

 8          Q.    Okay.

 9          A.    It never really had a dba of Kollel

10    Mateh Ephraim, LLC, and I think the EIN number

11    is wrong on this petition.

12          Q.    So why did you sign this petition

13    if it contained these errors?

14          A.    I signed whatever my attorney put

15    in front of me.  I really signed the signature

16    page.  "Here's something to be corrected," so I

17    signed it.

18          Q.    Didn't you review the contents of

19    this petition before you signed it?

20          A.    He basically just told me that I'm

21    correcting some corrections.  "Sign it."  So I

22    signed it.

23          Q.    Did he tell you what corrections

24    were being made by way of this petition?

25          A.    No.
```

42

```
 1                    LEFKOWITZ

 2        Q.    Are there any other errors

 3   contained in Trustee Exhibit 4?

 4        A.    These are the two errors that I

 5   recall.

 6        Q.    What, if anything, did you do to

 7   correct those errors?

 8        A.    Me?

 9        Q.    Yes.

10        A.    I didn't do nothing.

11        Q.    Do you know if the creditors listed

12   on the schedules to the petition that is

13   Trustee Exhibit 4 are the same creditors in the

14   same amounts listed in the petition that's been

15   marked as Exhibit 3?  Without yet comparing, do

16   you know?

17        A.    Don't know.

18        Q.    Would you accept my representation

19   if I told you that they are identical both in

20   name of creditor and in amount?

21        A.    I told you before, I'll accept

22   anything you say.

23        Q.    I don't want you to accept anything

24   I say --

25        A.    Why not?
```

```
 1                      LEFKOWITZ
 2        Q.    -- unless you believe what I said
 3   was true.  Do you understand that, by the way?
 4        A.    I have no reason not to believe.
 5   I'll accept whatever you say.  I don't think it
 6   matters.  It is what it is.  A record is a
 7   record.
 8        Q.    Is it your recollection that the
 9   creditors listed on the schedules to the
10   petition in Trustee Exhibit 4 were the same as
11   those listed on the schedules to the petition
12   in Trustee Exhibit 3?
13        A.    I just glanced at them.  They look
14   the same.
15        Q.    When was the entity Mateh Ephraim
16   LLC formed?
17        A.    Late '90s.
18        Q.    And from its inception were you its
19   sole member?
20        A.    Yes.
21        Q.    And did that remain true right
22   through the date that this petition, Trustee
23   Exhibit 4, was filed?
24        A.    Yes.
25        Q.    You've always been the sole member
```

44

```
 1                    LEFKOWITZ

 2   of that LLC?

 3        A.    I believe so.

 4        Q.    And so you've also been the sole

 5   managing member of that LLC?

 6        A.    I believe so.

 7        Q.    Are there any other positions or

 8   titles you have held with that LLC?

 9        A.    Maybe president.

10        Q.    Anything else?

11        A.    Not that I recall.

12        Q.    For what purpose was the LLC

13   formed?

14        A.    For the sole purpose of real

15   estate.

16        Q.    And was there a particular property

17   or properties that the LLC acquired an interest

18   in within the first year after it was formed?

19        A.    No.

20        Q.    It did not acquire an interest in

21   any real estate?

22        A.    Not that I recall.

23        Q.    First, did it acquire title to any

24   real estate?

25        A.    No.
```

```
 1                    LEFKOWITZ
 2              MR. KRINSKY:  Again, your question
 3         refers to the first year it was formed?
 4              MR. WOLF:  Yes.
 5         Q.    Did it become a contract vendee
 6    within the first year of any real estate after
 7    it was formed?
 8         A.    No.
 9         Q.    Did it become a tenant of any
10    property within the first year after it was
11    formed?
12         A.    Not that I recall.
13         Q.    Have there been any other officers
14    of the Debtor -- I'm sorry -- of Mateh Ephraim
15    LLC other than you as president?
16         A.    I don't think so.
17         Q.    Has that LLC ever had any
18    employees?
19         A.    No.
20         Q.    You were never an employee of that
21    LLC?
22         A.    No.
23         Q.    Are you familiar with an individual
24    named Abraham Steinwurzel?
25         A.    Yes.
```

```
 1                    LEFKOWITZ
 2        Q.    Is he an ordained rabbi?
 3        A.    I think so.
 4        Q.    Did he ever have any role with the
 5   LLC?
 6        A.    With the LLC itself?
 7        Q.    Yes.
 8        A.    I think he came in towards
 9   recently.
10        Q.    And by "recently," when do you
11   mean?
12        A.    The last few years.
13        Q.    Meaning within the last three
14   years?  Four years?
15        A.    Yes.  Last two to three years.
16        Q.    What did he come in as?
17        A.    As a member.
18        Q.    I thought you just said you've
19   always been the sole member of the LLC.
20        A.    You asked me a year after it was
21   formed.
22        Q.    Not with regard to that question.
23        A.    Oh, then you threw me off, then.
24        Q.    My questions with regard to
25   membership were -- I asked you, before, from
```

47

```
 1                    LEFKOWITZ
 2   inception until the date that the LLC filed its
 3   petition marked as Trustee Exhibit 4, were you
 4   the sole member?  And I believe your answer was
 5   yes.
 6        A.    That's '04.  We're '08 already.
 7        Q.    So you're telling me that sometime
 8   after the LLC's petition was filed, Abraham
 9   Steinwurzel became a member of the LLC?
10        A.    Right.  Right.
11        Q.    What percentage member did he
12   become?
13        A.    I don't recall what it was, but I
14   put him in as a member of the LLC.
15        Q.    Did this LLC, at its inception,
16   file what are called articles of organization?
17        A.    I think so.  It can't incorporate
18   without it.
19        Q.    Did those articles indicate that
20   you were the 100 percent member of that LLC at
21   that time?
22        A.    I don't recall.
23        Q.    Was there a filing done after Mr.
24   Steinwurzel became a member to indicate that he
25   had become a member of that LLC?
```

48

1                     LEFKOWITZ

2          A.     I don't think there is such a

3    structure of filing memberships.  Why would

4    such a thing happen?  Where do you file this?

5          Q.     Let me rephrase my question.  Was

6    there ever a document prepared and signed by

7    anyone to indicate -- I'm sorry --

8          A.     Go ahead.

9          Q.     I'm going to need to ask you to put

10   your BlackBerry aside.  This is examination.

11         A.     Don't get distracted by this.

12         Q.     But I don't want you to be

13   distracted.

14         A.     I'm not distracted.

15         Q.     Please put it away.  Thanks.

16                Was there a time when a document

17   was entered into which indicated that -- does

18   he go by Mr. Steinwurzel or Rabbi Steinwurzel?

19         A.     Rabbi Steinwurzel.

20         Q.     -- Rabbi Steinwurzel had become a

21   member of that LLC, whether it was filed or

22   not?

23         A.     I don't recall.

24         Q.     In becoming a member of the LLC,

25   did Rabbi Steinwurzel make some capital

```
 1                    LEFKOWITZ

 2   contribution to the LLC?

 3        A.    No.

 4        Q.    What was the reason for having him

 5   come in as a member of the LLC?

 6        A.    He made other contributions.  Sweat

 7   equity contributions.

 8        Q.    And what specifically were the

 9   nature of those sweat equity contributions?

10        A.    He was basically maintaining the

11   property there.

12        Q.    Maintaining what property?

13        A.    The property -- the subject

14   property of this litigation matter.  You want

15   me to spell out the address?

16        Q.    You're talking about what is

17   commonly referred to as the Meadows property?

18        A.    Correct.

19        Q.    And you say he was responsible for

20   maintaining the Meadows property.  What

21   specifically did he do in that regard?

22        A.    He called the landscaper when the

23   grass was too tall.  He bought chlorine when

24   the pool was dirty.  Made sure the oil was in

25   the tank.  If the septic tank overflowed, he
```

```
 1                    LEFKOWITZ
 2   took over it.
 3        Q.    Did he ever live up at the
 4   property?
 5        A.    I think so.
 6        Q.    Starting when?
 7        A.    Starting in the summer of '04.
 8        Q.    Would he just live at that property
 9   during the summers?
10        A.    Yes.
11        Q.    He didn't stay there in the winter
12   time?
13        A.    I think occasionally in the winter
14   time, too.
15        Q.    And what were the circumstances
16   that led Rabbi Steinwurzel to become a member
17   of the LLC?
18        A.    There were certain documents that
19   needed to be signed.  Certain arrangements.  He
20   was involved on a day-to-day basis with the
21   property.  So in order for him to have the
22   authority, he became a member.
23        Q.    I think you misunderstood my
24   question.
25        A.    Okay.
```

```
 1                    LEFKOWITZ

 2        Q.    What I'm asking is: What were the

 3  circumstances that first led him to become

 4  involved with the LLC?  You said he didn't

 5  become involved with the LLC until after the

 6  LLC's bankruptcy petition was filed.

 7        A.    Right.  What happened was, I

 8  signed -- let's see.  What happened?  I signed

 9  a petition.  That was in '04.  I wouldn't

10  recall exactly the circumstances, when and how

11  he became a member.

12        Q.    Had you known Rabbi Steinwurzel

13  prior to the time that the LLC filed its

14  petition?

15        A.    Yes.

16        Q.    For how long had you known him?

17        A.    Twenty-five years.

18        Q.    How had you known him?

19        A.    Known him as a rabbi in the

20  community.

21        Q.    Was he the rabbi of a particular

22  congregation?

23        A.    He is a rabbi of a congregation

24  Kolel Mateh --

25        Q.    K-O-L-E-L, M-A-T-E-H --
```

```
 1                    LEFKOWITZ
 2        A.    I wouldn't know how he spells it.
 3   But it's called Kolel, I believe, Efraim.
 4             MR. KRINSKY:  Can we take a
 5        two-minute break?
 6             MR. WOLF:  Can I finish this train
 7        of thought?
 8        Q.    Were you a member at the time of
 9   his congregation?
10        A.    No.
11        Q.    Had you ever been?
12        A.    No.
13        Q.    So how did you get to know him as a
14   rabbi?  Were you in school together?
15        A.    No.  Know him as a rabbi.  Just
16   like you know lawyers.  Known rabbis.  Known
17   doctors.
18        Q.    What were the circumstances
19   pursuant to which you first met him?
20        A.    I wouldn't recall.  That was
21   twenty-five years ago.
22             MR. WOLF:  Why don't we take a
23        two-minute break.
24             MR. WOLF:  Trustee Exhibit 5.
25             (Trustee Exhibit 5 for
```

```
 1                    LEFKOWITZ

 2          identification, copy of affidavit of

 3          Rabbi Steinwurzel, sworn to 5-21-07,

 4          filed in subject bankruptcy case.)

 5          Q.    Mr. Lefkowitz, you've been handed

 6   what has been marked Trustee Exhibit 5 for

 7   identification.  It is a copy of an affidavit

 8   of Rabbi Steinwurzel, sworn to May 21, 2007,

 9   filed in the subject bankruptcy case.

10          Do you recall seeing this document

11   at or about the time that it was filed?

12          A.    No.

13          Q.    Do you recall ever seeing it?

14          A.    No.

15          Q.    I'd like you to take a look at

16   paragraph 1, numbered 1 --

17          A.    Right.

18          Q.    -- in Rabbi Steinwurzel's affidavit

19   and tell me if, in that paragraph, Rabbi

20   Steinwurzel has accurately described what

21   functions he performed on behalf of the Debtor.

22          A.    Yes.

23          Q.    He accurately describes it?

24          A.    Yes.

25          Q.    And in the very first line of
```

```
 1                    LEFKOWITZ
 2   paragraph 1 he states, "I have been the rabbi
 3   for the Debtor" -- off the record --
 4                (Discussion off the record.)
 5        Q.    "-- for the Debtor Kollel Mateh
 6   Efraim LLC, aka Kollel Mateh Ephraim LLC, which
 7   is defined as the Debtor.
 8                (A conference was held between the
 9           witness and his attorney.)
10        Q.    What functions did -- when he says
11   he is -- he was the rabbi for the Debtor, what
12   did he do as the rabbi for the Debtor?
13        A.    There's a lot of things.  Made sure
14   the kitchen is kosher there.  He was performing
15   all the rabbinical duties that needed to be
16   done on the premises.
17        Q.    In paragraph 3 it continues on the
18   second page of his affidavit.
19        A.    Right.
20        Q.    He states, "In fact, the Debtor has
21   not earned any money subsequent to the filing
22   of its Chapter 11 case way back on October 4,
23   2004."
24        A.    Right.
25        Q.    "Rather, the Debtor has subsisted
```

```
 1                    LEFKOWITZ

 2    on insider loans and donations from its

 3    congregation."

 4         A.    Right.

 5         Q.    What congregation is he referring

 6    to?

 7         A.    Maskil el-Dal

 8         Q.    What is Maskil el-Dal?

 9         A.    Religious corporation.

10         Q.    And are you a Trustee or member of

11    the board of directors of that entity?

12         A.    Yes.

13         Q.    Are there any other trustees or

14    directors of that entity?

15         A.    Yes.

16         Q.    Who?

17         A.    Six of them.

18         Q.    Is Rabbi Steinwurzel one of them?

19         A.    No.

20         Q.    Has he ever been?

21         A.    No.

22         Q.    Is your wife one of them?

23         A.    No.

24         Q.    Is any family -- immediate family

25    member of yours one of them?
```

```
 1                    LEFKOWITZ

 2        A.    Yes.

 3        Q.    How many?

 4        A.    One.

 5        Q.    One of your sons?

 6        A.    No.  My wife's father.

 7        Q.    What's his name?

 8        A.    Dov Wilhelm.

 9        Q.    You say Maskil el-Dal has a

10   congregation?

11        A.    Yes.

12        Q.    Where is that congregation located?

13        A.    In Israel.

14        Q.    Where in Israel?

15        A.    Jerusalem.

16        Q.    What is its address?

17        A.    Admor.  Jerusalem, Israel.

18        Q.    There's a synagogue structure on

19   that location?

20        A.    Yes.

21        Q.    How many members of the

22   congregation are there?

23        A.    I don't know.  I don't follow it.

24        Q.    Approximately?

25        A.    Twenty-five, 30.
```

```
1                        LEFKOWITZ

2         Q.     And when was Maskil el-Dal formed?

3         A.     About 30 years ago.

4         Q.     Did you form it at that time?

5         A.     No.

6         Q.     Your father-in-law did?

7         A.     He was one of the founders.

8         Q.     When did you become a member of the

9    board?  Are you a Trustee or director of that

10   congregation?

11        A.     Trustee.

12        Q.     When did you become a trustee?

13        A.     About 20-some-odd years ago.

14        Q.     So the corporation was incorporated

15   under the laws of the State of Israel?

16        A.     State of New York.

17        Q.     Has that always been so?

18        A.     Yes.

19        Q.     Well, has it ever been

20   incorporated, or whatever the equivalent is, in

21   the State of Israel under the laws of the State

22   of Israel?

23        A.     I'm sure it has.

24        Q.     But you don't know for sure?

25        A.     No.
```

```
 1                    LEFKOWITZ

 2        Q.    Has Maskil el-Dal ever operated or

 3   had a congregation located in New York?

 4        A.    It had offices in New York.

 5        Q.    That's not my question.  Did it

 6   ever have a congregation that worshipped in a

 7   synagogue in New York?

 8        A.    Not to my knowledge.

 9        Q.    Are you and Rabbi Steinwurzel

10   fellow members of any other LLC besides the one

11   we've been talking about this morning?

12        A.    I am.  I don't know about him.

13        Q.    I'm asking for instances other than

14   with regard to what we've already been talking

15   about this morning.  Are there any other LLCs

16   in which you and he are both, together,

17   members?

18        A.    No.  He's really not a member of

19   this LLC, either.  He's just the manager.

20        Q.    You said, before, he was a member.

21        A.    He's a manager.

22        Q.    Are you correcting what you said

23   before?

24        A.    Correct.

25        Q.    So he's not a member.  So you've
```

```
 1                    LEFKOWITZ
 2   always been 100 percent member of the LLC known
 3   as Mateh Ephraim LLC?
 4        A.    Correct.
 5        Q.    And he has never been a member of
 6   that entity?
 7        A.    Correct.
 8        Q.    He is the manager of that entity?
 9        A.    Correct.
10        Q.    So is there any written document
11   pursuant to which he was appointed as the
12   manager of that LLC?
13        A.    No.  Not that I know of.
14        Q.    Again, he began functioning as the
15   manager of that LLC subsequent to the time that
16   that LLC filed its petition, which has been
17   marked as Trustee Exhibit 4?
18        A.    Correct.
19              THE WITNESS:  Can we go off the
20        record?
21              (Discussion off the record.)
22              MR. WOLF:  Mark Trustee Exhibit 6.
23              (Trustee Exhibit 6 for
24        identification, copy of articles of
25        organization of Mateh Ephraim LLC.)
```

60

```
 1                    LEFKOWITZ
 2        Q.    Mr. Lefkowitz, do you recognize
 3   Trustee Exhibit 6, which is now in front of
 4   you, to be a copy of the articles of
 5   organization of the entity Mateh Ephraim LLC?
 6        A.    Correct.
 7              (Discussion off the record.)
 8        Q.    Are you the person that caused
 9   these articles of organization to get filed?
10        A.    No.
11        Q.    Did you request anyone to prepare
12   these articles and get them filed?
13        A.    Yes.
14        Q.    Of whom did you request it?
15        A.    Meryl Wenig.
16        Q.    Is she or was she at the time an
17   attorney?
18        A.    Yes.
19        Q.    Spell it for the court reporter.
20        A.    Spelled on page 2.
21              MR. KRINSKY:  The document, if I
22        can identify it, is three pages.  My
23        understanding is that it's two separate
24        documents.  The third page is a printout
25        which is not part of the two pages
```

```
 1                    LEFKOWITZ

 2         before.  In essence, they're two separate

 3         documents, although they reflect similar

 4         information.

 5              MR. WOLF:  Right.  The third page

 6         is from the New York State Department of

 7         State to indicate that the articles of

 8         organization were filed on July 30, 1999.

 9         Thank you.

10         Q.    I see Meryl Wenig's name on the

11    second page, listing her as a filer.  Was she

12    an attorney at the time?

13         A.    Yes.

14         Q.    Was she with a particular law firm?

15         A.    Meryl Wenig.

16         Q.    It was her own law firm?

17         A.    Yes.

18         Q.    Located on Montague Street in

19    Brooklyn?

20         A.    At that time, right.

21         Q.    Once these articles of organization

22    were filed, was she the attorney for the LLC?

23         A.    She's my attorney.

24         Q.    She performs various services for

25    you?
```

```
 1                    LEFKOWITZ

 2        A.    Correct.

 3        Q.    Did those services include services

 4   on behalf of the LLC?

 5        A.    Correct.

 6        Q.    Since you mentioned, before, why

 7   the Debtor was formed, subsequent to its

 8   formation what has been its business?

 9        A.    I don't think it really had any

10   business other than trying to acquire property.

11            MR. WOLF:  Off the record.

12            (Discussion off the record.)

13            MR. WOLF:  Temporarily we're going

14        to deem a copy of a document that I'm

15        about to show the witness as Trustee

16        Exhibit 7.  It has a marking on it of

17        mine.  At a break, as I mentioned to

18        Counsel, we will get a clean copy of it

19        and mark that as the actual Trustee

20        Exhibit 7.

21            (Trustee Exhibit 7 to be marked for

22        identification, lease with rider.)

23        Q.    Right now I'm going to show you

24   what will ultimately be marked as Trustee

25   Exhibit 7, Mr. Lefkowitz.  I ask you if you can
```

```
1                    LEFKOWITZ
2    identify that document for us.
3         A.   It is the front page.  The name is
4    "Doctorate"?
5         Q.   No.  It's not coming out well.
6    Maybe you can look through the document and
7    tell me, then, what it is.
8         A.   Okay.
9              MR. KRINSKY:  Note how many pages
10             it is for the record, when you get a
11             chance.
12             THE WITNESS:  Okay.
13        Q.   Do you recognize what that document
14   is?
15        A.   I don't recognize it, but I see it.
16        Q.   What is it, pursuant to your
17   understanding?
18        A.   It looks like it's a lease between
19   -- something -- Garden City -- and -- not
20   clear.  A lease, with a rider to a lease.
21        Q.   Who are the parties listed on the
22   rider to the lease?
23        A.   Ingaioloa.
24        Q.   Is that listed as the landlord?
25        A.   Right.  On the rider.
```

64

```
 1                    LEFKOWITZ
 2          Q.    And who's listed --
 3          A.    Mateh Ephraim LLC.
 4          Q.    Do you see any signatures on any
 5     portion of that document?
 6          A.    Yeah.
 7          Q.    Is your signature on there?
 8          A.    No.
 9          Q.    Is there a signature on behalf of
10     the tenant entity you just mentioned?
11          A.    Yeah.
12          Q.    And who is it?
13          A.    I don't recognize it.  I don't
14     recognize the signature.
15          Q.    Do you recognize this to be Rabbi
16     Steinwurzel's signature?
17          A.    No.
18          Q.    It's not?  Or you don't recognize
19     it?
20          A.    I don't recognize it.
21          Q.    Have you ever seen his signature
22     before?
23          A.    I'm sure I have.
24          Q.    But you don't recognize this to be
25     his signature?
```

```
 1                    LEFKOWITZ

 2        A.    Don't recognize it.

 3              MR. KRINSKY:  Bob, can we identify

 4        the number of pages in the document?

 5              (A conference was held between the

 6        witness and his attorney.)

 7        Q.    Did you notice who notarized it?

 8   It appears to be alongside the signature, on

 9   behalf of the tenant entity here.  Did you

10   notice the notarization was done by Meryl

11   Wenig?

12        A.    Yes.  Meryl Wenig.

13        Q.    Do you recollect that shortly after

14   its articles of organization were filed by

15   Merle Wenig that the entity Mateh Ephraim LLC

16   entered into a lease with the then landlord of

17   the property, I believe it's 5608 13th Avenue,

18   Brooklyn, New York?

19        A.    Yeah.

20        Q.    You're aware of that?

21        A.    Yeah.

22        Q.    And am I correct that 5608 13th

23   Avenue, Brooklyn, New York is the present

24   location of the synagogue congregation known as

25   Kolel Mateh Efraim, of which Rabbi Steinwurzel
```

```
 1                      LEFKOWITZ
 2    is the rabbi?
 3         A.    Yeah.
 4         Q.    Does this refresh your recollection
 5    that shortly after the LLC was formed, it did
 6    become the tenant of that property?
 7         A.    Who became the tenant?
 8         Q.    The LLC.
 9         A.    It was shortly after, I'm now
10    recollecting, that I bought the business.
11         Q.    You bought what business?
12         A.    I bought a furniture business.
13         Q.    You bought a furniture business?
14         A.    Yeah.
15         Q.    You bought a furniture business
16    through what entity?
17         A.    I don't remember the entity.
18         Q.    The furniture business was located
19    where?
20         A.    13th Avenue.
21         Q.    5608 13th Avenue?
22         A.    Correct.
23         Q.    Rabbi Steinwurzel's congregation
24    that I just mentioned, the synagogue is
25    presently located at 5608 13th Avenue?
```

```
 1                     LEFKOWITZ
 2          A.    After we left, they came in.
 3          Q.    After who?
 4          A.    My furniture business.
 5          Q.    When was that?
 6          A.    Late '90s.
 7          Q.    Well, the LLC was not formed until
 8   July 26th, 1999.
 9          A.    That's late '90s; right?
10          Q.    That's the last five months of the
11   1990s.
12          A.    Okay.  What would you call that?
13   Early 2000s?  Or late '90s?
14          Q.    How long did you have the furniture
15   business?
16          A.    About a year.
17          Q.    That would take you into 2000.
18          A.    Right.
19          Q.    So you want to amend your prior
20   answer as to when Rabbi Steinwurzel's
21   congregation started the synagogue at that
22   location?
23          A.    I wouldn't amend any answer because
24   I don't know any specific dates.  I'm telling
25   you late '90s I remember now buying the
```

```
 1                    LEFKOWITZ
 2   furniture business.  I operated it about a
 3   year.  I don't mind the record being confused
 4   on those dates.
 5          Q.    I do mind.
 6          A.    The document speaks for itself.
 7          Q.    I'm asking you questions, Mr.
 8   Lefkowitz.
 9          A.    Yes.
10          Q.    How long did you operate that
11   furniture business?
12          A.    I told you.  About a year.
13          Q.    And then what happened with regard
14   to the tenancy that the LLC had at that
15   location?
16          A.    I remember I left.
17          Q.    Is it your understanding that the
18   religious congregation acquired title to the
19   property at 5608 13th Avenue?
20          A.    I remember subsequently.
21          Q.    Were you involved in any aspect of
22   that acquisition?
23          A.    I don't recall.
24          Q.    You don't recall if you were
25   involved in some aspect of that acquisition?
```

```
1                    LEFKOWITZ
2        A.    Right.
3        Q.    For a synagogue?
4        A.    Exactly.  Yeah.  I remember being
5  the tenant in that building.  I don't recall
6  being involved in --
7        Q.    Did the LLC continue to be a tenant
8  of the synagogue after the synagogue acquired
9  the property?
10       A.    No.
11       Q.    Did the LLC give up its lease?
12       A.    I don't know.  I don't recall.
13 There's documents on it.  I don't recall.
14 (REQ)  Q.    There are documents?
15       A.    Sure.  If there's a lease --
16             MR. WOLF:  I call for their
17        production.
18             THE WITNESS:  I don't know if I
19        have it.
20       Q.    Calling for it.  Take a look.  If
21 you have it, produce it through your counsel.
22       A.    The last address of that LLC is One
23 World Trade Center.  Where do you want me to
24 look?  In the pit?  Staten Island?
25             MR. KRINSKY:  There's no question
```

```
 1                    LEFKOWITZ
 2        pending.
 3        Q.    I've just said that I've made a
 4   request.  Take a look and see if you have any
 5   of the documents.  If you do, you'll give them
 6   to your counsel who will get them to me.
 7        A.    I can tell you right now I don't
 8   have any documents.
 9        Q.    That's not what you just said a
10   minute ago.
11        A.    I don't know what I said a minute
12   ago.  Right now, if you're asking if I have any
13   lease documents or termination lease documents
14   or any documents relating to the furniture
15   business of Mateh Ephraim LLC, prior to 2001,
16   if they exist, they're in the Staten Island
17   burial site of the WTC.
18        Q.    When did Mateh Ephraim LLC move out
19   of 13th Avenue?
20        A.    I told you sometime in '00.
21        Q.    And moved right to the World Trade
22   Center?
23        A.    It was always in World Trade
24   Center.  It just operated a business at 13th
25   Avenue.  The office was in World Trade Center.
```

```
 1                      LEFKOWITZ

 2         Q.    Who ran the furniture business

 3   there?

 4         A.    I don't recall right now, but I

 5   think the rabbi's wife was involved.  He was

 6   involved a bit.

 7         Q.    Did you pay them as employees of

 8   the company?

 9         A.    No.

10         Q.    As of the time the LLC entered into

11   this lease, did the congregation known as Kolel

12   Mateh Efraim exist?

13         A.    I have no clue.

14         Q.    Was Rabbi Steinwurzel a rabbi of

15   any congregation as of the time that you ran

16   this furniture company?

17         A.    No clue.

18         Q.    Do you know approximately when the

19   congregation acquired title to 5608 13th

20   Avenue?

21         A.    No clue.

22         Q.    Have you ever worshipped at that

23   synagogue?

24         A.    No.

25               (Discussion off the record.)
```

```
 1                    LEFKOWITZ
 2              MR. WOLF:  Trustee Exhibit 8.
 3              (Trustee Exhibit 8 for
 4         identification, page from Kallah
 5         Magazine, summer 2000 issue.)
 6         Q.    Are you aware, Mr. Lefkowitz, as to
 7    whether anyone on behalf of the LLC has ever
 8    engaged in the flower business?
 9         A.    No.
10         Q.    I'm showing you what's been marked
11    as Trustee Exhibit 8.  It is a page from Kallah
12    Magazine --
13         A.    Meaning "bridal."
14         Q.    It's the summer 2000 issue, also
15    known as the Jewish year of 5767.  In the upper
16    right-hand corner there is an ad with the name
17    Kollel Mateh Efraim.  Have you ever seen that
18    ad before?
19         A.    Yes.
20         Q.    When have you seen it before?
21         A.    341 meeting.
22         Q.    Is it something I showed you at
23    that time?
24         A.    Correct.
25         Q.    Had you ever seen it before that?
```

```
 1                    LEFKOWITZ

 2        A.    No.

 3        Q.    Are you familiar now with some

 4   flower business that has been operated under

 5   the name Kollel Mateh Efraim?

 6        A.    No.

 7        Q.    There is a line towards the bottom:

 8   "Inquire with Reb."  Is that short for

 9   "Rebitizen"?

10        A.    Right.

11        Q.    Meaning the wife?

12        A.    Right.

13        Q.    Meaning Rabbi Steinwurzel's wife?

14        A.    I should hope so.

15        Q.    C.F.W. Stein?

16        A.    Correct.

17        Q.    Do you understand her to be Rabbi

18   Steinwurzel's wife?

19        A.    Yes.

20        Q.    What does that stand for?

21        A.    I believe Chaia.  It could be

22   Hannah.  I don't know her first name.

23        Q.    Would you spell Rebitizen for the

24   reporter?

25        A.    R-E-B-I-T-I-Z-E-N.
```

```
 1                    LEFKOWITZ

 2              (Discussion off the record.)

 3         Q.    Is it your understanding that Rabbi

 4    Steinwurzel's wife has been operating some type

 5    of flower business under the name Kollel Mateh

 6    Efraim?

 7         A.    I have no clue.

 8         Q.    It has not been done at your

 9    direction?

10         A.    Not at all.

11         Q.    Has it ever been done at your

12    direction?

13         A.    No.

14         Q.    Have you ever discussed with her or

15    with Rabbi Steinwurzel why they are operating

16    that -- or she is operating that business under

17    the name Kollel Mateh Efraim?

18         A.    No.

19         Q.    Has any fee or any other monetary

20    amount or amounts ever been paid to the entity

21    that's the named Debtor in this bankruptcy case

22    by this flower business in this ad?

23         A.    I was reading.  I'm sorry.

24         Q.    At any time has this flower

25    business ever paid any monetary sum to the
```

1                     LEFKOWITZ

2    entity that is the Debtor in this bankruptcy

3    case?

4         A.    Not a cent.

5         Q.    By the way, do you recognize the

6    phone numbers that are on this ad?

7         A.    I think this is his home number.

8         Q.    Rabbi Steinwurzel's home number?

9         A.    I believe so.

10        Q.    Now, from the time that it was

11   first organized until its petition was filed in

12   bankruptcy, did the entity Mateh Ephraim LLC

13   have its business location at One World Trade

14   Center?

15        A.    Until the towers collapsed.

16        Q.    I'm sorry.  Right.  And then it

17   moved its premises to 751 Second Avenue?

18        A.    Correct.

19        Q.    Has it ever had any other location

20   out of which it has operated?

21        A.    No, except the subject property.

22        Q.    Meaning the Meadows property?

23        A.    Correct.

24        Q.    Let me mention some other addresses

25   that I've seen referenced in connection with

1                    LEFKOWITZ

2     the named Debtor entity.  Tell me if it was

3     ever an address that it used.

4               1526 52nd Street, Brooklyn, New

5     York.

6          A.    Yes.

7          Q.    It has used that address?

8          A.    Yes.

9          Q.    When did it use that address?

10         A.    I think it used it relating to the

11    acquisition of the adjacent parcels.

12              MR. WOLF:  Would you read that

13         answer back?

14              (The preceding answer was read

15         back.)

16         Q.    In Cochecton, New York?

17         A.    Correct.

18         Q.    The parcels adjacent to the Meadows

19    property?

20         A.    Correct.

21         Q.    Whose address is that?

22         A.    My home address.

23         Q.    Is there a reason your home address

24    was used with regard to the acquisition rather

25    than the 750 Second Avenue address?

1                          LEFKOWITZ

2          A.    So I can get the tax bills on time.

3          Q.    So the tax bills were mailed to

4    your home address?

5          A.    Correct.

6          Q.    Next address.  1264 56th Street,

7    Brooklyn, New York.

8          A.    Can we go off the record?

9                (Discussion off the record.)

10          Q.    1264 56th Street, Brooklyn, New

11    York.  Has the LLC ever used that address?

12          A.    No.

13          Q.    Do you recognize that address?

14          A.    1264 56th Street?

15          Q.    Yes.

16          A.    That must be Steinwurzel's home

17    address.

18          Q.    These addresses I've mentioned so

19    far, 52nd Street, 56th Street, are in Borough

20    Park; right?

21          A.    Right.

22          Q.    The location the LLC occupied at

23    751 Second Avenue was on the first floor?

24          A.    Correct.

25          Q.    Approximately how much square

```
 1                    LEFKOWITZ

 2  footage?

 3        A.    It had an office.

 4        Q.    I'm sorry?

 5        A.    An office.  Ten by 20.

 6        Q.    And who occupied that office?

 7        A.    I do.

 8              MR. KRINSKY:  Which address is

 9        this?

10              MR. WOLF:  751 Second Avenue.

11        Q.    You said "I do" in the present

12  tense.  Did you say, before, that address is

13  also the office of the diagnostic company?

14        A.    Correct.

15        Q.    Did the LLC ever pay any rent for

16  the 751 Second Avenue property?

17        A.    No.

18        Q.    Who paid the rent?

19        A.    Who paid the rent for 751 Second

20  Avenue?

21        Q.    Yes.

22        A.    New York MedScan.

23        Q.    And does New York MedScan have a

24  lease for that property?

25        A.    Yes.
```

```
1                    LEFKOWITZ

2        Q.    The MedScan entity had a lease at

3   the World Trade Center, also?

4        A.    I don't think so.  No.

5        Q.    Who had the lease at that location?

6        A.    Barclay Dwyer.

7        Q.    What's that?

8        A.    A company.

9        Q.    A company of yours?

10       A.    Right.

11       Q.    What kind of company?

12       A.    Real estate.

13       Q.    Did it own any real estate?

14       A.    At that time it did, yeah.

15       Q.    In Manhattan?

16       A.    Yes.

17       Q.    Does it own real estate now?

18       A.    No.

19       Q.    What happened to that real estate?

20       A.    Sold.

21       Q.    Did Barclay Dwyer ever file for

22   bankruptcy?

23       A.    No.

24       Q.    What was your position with Barclay

25   Dwyer?
```

```
 1                        LEFKOWITZ
 2          A.    Owner.  Principal.
 3          Q.    Was it an LLC?
 4          A.    I don't believe so.
 5          Q.    Corporation?
 6          A.    Yes.
 7          Q.    Were you the sole shareholder?
 8          A.    Yes.
 9          Q.    Did the Debtor ever pay any rent
10    for use and occupancy for its use of any
11    portion of the premises at One World Trade
12    Center?
13          A.    No.
14          Q.    5608 13th Avenue, Brooklyn.  Has
15    the LLC ever used that address?
16          A.    Yes.
17          Q.    When?
18          A.    Late '99, early '00.
19          Q.    When it was operating that
20    furniture company?
21          A.    Correct.
22          Q.    And did the LLC buy and sell
23    furniture at that time?
24          A.    It was more donating furniture than
25    selling.
```

```
 1                    LEFKOWITZ

 2        Q.    To whom was it donating furniture?

 3        A.    To poor people.

 4        Q.    Did it donate any furniture to any

 5   synagogue?

 6        A.    No.

 7        Q.    Did it ever?

 8        A.    No.  Synagogues don't use bedroom

 9   sets.

10        Q.    Is that all the type of furniture

11   it sold?

12        A.    Kitchen and bedroom furniture.

13        Q.    And where did the LLC acquire that

14   furniture from?

15        A.    I don't remember the furniture

16   company.  It was a furniture company.

17        Q.    Do you have any records which would

18   refresh your recollection as to what company

19   sold that furniture to the LLC?

20        A.    I don't.

21        Q.    Who would?

22        A.    Osama bin Laden.  It was in the

23   World Trade Center.

24              Why are you giving me the looks?

25        Q.    I thought that was an unnecessary
```

82

                        LEFKOWITZ

1

2       comment.  I asked you a straightforward

3       question.

4            A.    I answered you straightforward.

5       The company had offices in the World Trade

6       Center, North Tower.

7            Q.    We all know what happened.

8            A.    You're bringing my emotions out.  I

9       told you the documents got destroyed in the

10      fire and you asked me who would.  I told you

11      before.  You're giving me the looks like --

12           Q.    I asked you who would know what the

13      name of the company was that furnished the

14      furniture to the LLC?

15           A.    My answer is, I don't know.  It's

16      in the documents.  You asked who has the

17      documents.  I answered Osama bin Laden.

18      (INF) Q.    I'll leave a blank.  When you look

19      at the transcript and your recollection is

20      refreshed, I ask you to put in the name of the

21      company.

22                 (INFORMATION REQUESTED: -------

23      -------------------------------------------.)

24           Q.    1175 58th Street, Brooklyn, New

25      York.

```
 1                    LEFKOWITZ

 2         A.    No.

 3         Q.    Do you recognize that address?

 4         A.    No.

 5         Q.    5402 14th Avenue, Brooklyn, New

 6   York.

 7         A.    Don't know where that is.

 8         Q.    1424 43rd Street, Brooklyn, New

 9   York.

10         A.    1424 43rd Street?

11         Q.    Yes.

12         A.    No.

13         Q.    The entity which is the named

14   Debtor in the bankruptcy case, does it have an

15   employer identification number?

16         A.    Yes.

17         Q.    Do you know what that number is?

18         A.    Not by heart.

19         Q.    When was it assigned that number?

20         A.    Don't know.

21         Q.    Was it sometime in the last three

22   years?

23         A.    I don't know.

24         Q.    Who went about actually filling out

25   the forms to obtain that identification number?
```

```
 1                    LEFKOWITZ
 2         A.    Could be someone in my office.
 3   Could be an accountant.  Could be a law firm.
 4         Q.    Was that number obtained at the
 5   time -- concurrently with the time in July of
 6   1999 when the articles of organization of the
 7   LLC were filed?
 8         A.    I believe so.
 9         Q.    And what's the basis of that
10   belief?
11         A.    That's how it usually works.
12         Q.    I know that's how it usually works.
13         A.    You form a company, you form a tax
14   ID number, and you operate.
15         Q.    Did that happen in this instance
16   with regard to this LLC?
17         A.    I don't know.
18         Q.    Do you recall whether, in the last
19   three years, the LLC obtained an employer
20   identification number, whether it was a new
21   number or its initial number?
22         A.    I remember there was a whole to-do
23   in the Bankruptcy Court about Federal ID
24   number.
25         Q.    Right.  As of that time when there
```

1                    LEFKOWITZ

2    was that to-do, as you called it, did the LLC

3    go about obtaining an employer identification

4    number?

5         A.    I don't know "obtaining," but we

6    were clarifying what the number is.

7         Q.    Who went about getting that

8    clarification?

9         A.    The law firm.

10        Q.    Mr. Krinsky's law firm?

11        A.    Right.

12        Q.    Do you recall what they were able

13   to obtain?

14        A.    Don't recall.

15        Q.    Do you recall that a new employer

16   identification number was obtained?

17        A.    Don't recall.

18        Q.    Do you recall whether the LLC ever

19   used an erroneous employer identification

20   number on any document other than the petition

21   that it filed which we marked as Trustee

22   Exhibit 4?

23        A.    I wouldn't know.

24             MR. WOLF:  Mr. LaRocco, my

25        colleague, is going to ask you a few

```
 1                    LEFKOWITZ

 2          questions in a distinct area, and then

 3          I'll resume my questioning of other areas

 4          that I have.

 5                  THE WITNESS:  Off the record.

 6                  (Discussion off the record.)

 7                  EXAMINATION BY MR. LaROCCO:

 8          Q.    Mr. Lefkowitz, did the Debtor

 9   entity have any bank accounts in the six years

10   prior to the filing of the Chapter 11 petition?

11          A.    I think there was a D.I.P.

12          Q.    Prior to filing Chapter 11

13   bankruptcy?

14          A.    Yes.  I believe so.

15          Q.    How many such bank accounts?

16          A.    I think one bank account.

17          Q.    Where -- with what bank was this

18   account?

19          A.    I believe Citibank.

20          Q.    And it was just the one bank

21   account with Citibank?

22          A.    Right.

23          Q.    What was the location of the bank

24   which the Debtor used?

25          A.    The lobby of the World Trade
```

```
 1                    LEFKOWITZ

 2   Center.

 3         Q.    Do you recall the account number

 4   for that bank account?

 5         A.    No.

 6         Q.    Do you retain any documentation

 7   regarding that bank account?

 8         A.    No.

 9         Q.    Who were the signatories on that

10   bank account?

11         A.    I presume it was me.

12         Q.    Would there be any other signatory?

13         A.    No.

14         Q.    Was this account still open at the

15   time the Chapter 11 case was commenced?

16         A.    I don't believe so.

17         Q.    Do you recall when it was closed?

18         A.    9-11-01.

19         Q.    Do you recall what the balance of

20   that account was when it was closed?

21         A.    No.

22         Q.    Subsequent to 9-11-01, did the

23   Debtor open another bank account?

24         A.    Not prior to bankruptcy, no.

25         Q.    So between 9-11-01 and the filing
```

```
 1                    LEFKOWITZ

 2   of the Chapter 11 bankruptcy in '04, there was

 3   no bank account for the Debtor?

 4         A.    Not to my knowledge.

 5         Q.    Did the Debtor have any funds

 6   during that time between '01 and '04?

 7         A.    '01?  No.

 8         Q.    You indicated that at the time the

 9   Chapter 11 bankruptcy, the Debtor opened a new

10   account?

11         A.    I believe so.

12         Q.    Was that a debtor-in-possession

13   account?

14         A.    I believe so.  Yes.

15         Q.    Where was that account set up?

16         A.    Don't know.

17         Q.    You don't recall the name of the

18   bank?

19         A.    No.

20         Q.    Do you recall the general location

21   of the bank?

22         A.    I don't recall.  I think it's in

23   the records that we submitted.

24         Q.    Was it Astoria Federal Savings?

25         A.    Could be.
```

89

                         LEFKOWITZ

1

2      Q.    Do you recall offhand the account

3  number for that bank account?

4      A.    No.

5      Q.    Were there any other bank accounts

6  set up at the time of the Chapter 11 filing on

7  behalf of the Debtor?

8      A.    No.

9           MR. LaROCCO:  Mark this as Trustee

10          Exhibit 9.

11          (Trustee Exhibit 9 for

12          identification, bank statements submitted

13          by witness's counsel showing bank account

14          for Kolel Mateh Efraim, D.I.P.)

15     Q.    I represent that this is bank

16  statements submitted to us by your counsel

17  which show a bank account for Kolel Mateh

18  Efraim, D.I.P.  I also represent there's a name

19  of Abraham Steinwurzel, with the address 1264

20  56th Street.

21          Mr. Lefkowitz, why was Abraham

22  Steinwurzel's name put on this bank account?

23     A.    I don't know.

24     Q.    Are you the managing member of the

25  entity that is the owner of this bank account?

```
1                    LEFKOWITZ
2         A.    No.  I'm the manager of Kolel Mateh
3    Efraim LLC.  I assume that Steinwurzel was
4    asked to open the account.
5         Q.    By whom?
6         A.    I don't recall the circumstances of
7    the opening of the account in '04, so I don't
8    remember.  And I've never seen these statements
9    before.
10         Q.    Do you have in your possession the
11    statement of the Debtor's D.I.P. account?
12         A.    No.
13         Q.    What is the circumstances that
14    would lead you not to have those bank
15    statements?
16         A.    They were never mailed to me.
17         Q.    So as the managing member of the
18    Debtor, you never had bank statements of the
19    Debtor's bank account mailed to you?
20         A.    Correct.
21         Q.    Do you have any idea why your
22    counsel would have sent the bank statements for
23    this bank account?
24         A.    No.
25         Q.    Is it your contention that these
```

1                    LEFKOWITZ

2     statements do not reflect a bank account owned

3     by or associated with the Debtor?

4          A.    I have no clue what this is.

5     Exhibit 9?

6          Q.    Yes.  Take your time.

7          A.    I'm seeing it for the first time in

8     my life.

9          Q.    I understand that.  Please take

10    your time to review it.

11         A.    I've reviewed it.  Every page of

12    it.

13         Q.    So you answered earlier that the

14    Debtor did set up a bank account at the time of

15    the Chapter 11 filing.

16         A.    Right.

17         Q.    But that you do not have any

18    statements for that.

19         A.    Correct.

20              MR. LaROCCO:  I'd like to call for

21    the production of those statements.

22    (REQ)  Q.    Please take the time to review

23    your records and see if you have any statements

24    of the bank account.

25         A.    Sure.

```
1                          LEFKOWITZ
2              MR. KRINSKY:  I can represent to
3          you it's my understanding these are the
4          statements.
5          Q.    With that representation in mind,
6    did you ever ask Abraham Steinwurzel to set up
7    a bank account on behalf of the Debtor entity?
8          A.    I don't recall.
9          Q.    Has the Debtor entity ever used the
10   name Kolel Mateh Efraim, as reflected on
11   Trustee Exhibit 9?
12         A.    It's used in all the petition
13   documents.  DBA.  AKA.
14             MR. LaROCCO:  I'd like to mark this
15         as Trustee Exhibit 10.
16             (Trustee Exhibit 10 for
17         identification, checks written on the
18         account whose statements are in Trustee's
19         Exhibit 9.)
20         Q.    I'll represent that these are
21   checks written on the account of which the
22   statements are in Trustee's Exhibit 9.  Please
23   take a moment to look through them.
24         A.    Yeah.
25         Q.    Have you ever seen any of these
```

1                     LEFKOWITZ

2    checks, to your recollection?

3         A.    No.

4         Q.    Are you familiar with the payee of

5    the first check on the first page, Frank Smith

6    & Sons?

7         A.    No.

8         Q.    Are you familiar with the payee on

9    the second check on the first page, Sutton

10   Underground?

11        A.    No.

12        Q.    Are you familiar with the third

13   payee, Carlebach, as attorney for what looks

14   like Helen-May Holdings?

15        A.    Yes.

16        Q.    Do you have any understanding of

17   why a check was written from this bank account

18   to Carlebach as attorney for Helen-May on July

19   10th, 2006?

20        A.    No.

21        Q.    Do you recognize the signature on

22   each of these checks on the first page?

23        A.    No.

24        Q.    I'm now looking at the first check

25   on the second page of this document, which is

```
 1                    LEFKOWITZ
 2     payee NCO Financial System.  Are you familiar
 3     with that entity?
 4          A.    No.
 5                MR. KRINSKY:  Note it's a
 6          three-page document.
 7          Q.    I am looking at the signatory --
 8          A.    Basically it says NYSEG.  I know
 9     what is that.
10          Q.    What is that?
11          A.    Utility company in the Meadows.
12          Q.    And the signatory on that is NCO
13     Financial System, Inc., as authorized signatory
14     for Kolel Mateh Efraim.  NYSEG, my set.  Are
15     you familiar with any authorization provided to
16     NCO Financial to write checks?
17          A.    No.
18          Q.    The next three checks here are also
19     payments to Carlebach as attorney for Helen-May
20     Holdings.  Do you have any recollection as to
21     why checks were written from this account to
22     David Carlebach, as attorney for Helen-May
23     Holdings?
24          A.    No.
25          Q.    Now, looking at the third page, the
```

```
 1                    LEFKOWITZ
 2   second check on the third page appears to have
 3   been written to A-I-L-E Processing.  Are you
 4   familiar with that entity?
 5        A.    I know who Aile Processing is, but
 6   I'm not familiar with this transaction.
 7        Q.    Who is Aile Processing?
 8        A.    A company that sells chicken.
 9        Q.    Chicken?
10        A.    Yes.
11        Q.    And did the Debtor purchase chicken
12   from Aile Processing?
13        A.    I have no clue.  I'm seeing this
14   for the first time.  You ask me who Aile
15   Processing is.  I assume it's the chicken
16   company.
17        Q.    Did the Debtor ever purchase
18   chicken from Aile Processing?
19        A.    Not that I know.
20        Q.    How are you familiar with the fact
21   that Aile Processing is a chicken distributor?
22        A.    One of the largest chicken
23   companies in New York.
24        Q.    I didn't know that.  Are you
25   familiar with the payee of the next check,
```

```
 1                    LEFKOWITZ

 2   which appears to be ANB Fish Company?

 3        A.    I know who ANB Fish Company is, but

 4   I have no idea what this $1500 check is.

 5        Q.    How are you familiar with ANB Fish

 6   Company?

 7        A.    A very famous gefilte fish company.

 8        Q.    The fourth check on this page,

 9   Golden Flow, is the payee.  Are you familiar

10   with Golden Flow?

11        A.    Yes.

12        Q.    Can you tell me who that company

13   is?

14        A.    They sell milk.

15        Q.    Can you tell me how you've become

16   familiar with the various food distributors

17   that these checks are paid to?

18        A.    These are all brand-name.  Golden

19   Flow is a milk company.  Aile Processing is a

20   chicken company.  ANB Fish -- I eat ANB Fish

21   once a week.  But I have no idea what these

22   transactions mean.

23        Q.    Are any of the businesses you're

24   involved in, do they require food service?

25        A.    The business that I'm --
```

1                    LEFKOWITZ

2          Q.    Do any of the businesses that you

3    are the manager or Trustee or have any

4    involvement --

5          A.    Other than the Debtor?

6          Q.    Including the Debtor.

7          A.    The Debtor had something to do with

8    food.  It operated some operations over there

9    in the Meadows which needed food.

10         Q.    Do you believe that these checks

11   were used for that purpose -- I'm sorry.

12   Excuse me.  Strike that question.

13                Do you believe that the checks in

14   Exhibit 10 to these food service companies were

15   made for the food services in the Meadows

16   property?

17         A.    I have no clue what these checks

18   are.

19         Q.    The Debtor's bank account set up on

20   the Chapter 11 filing, did the Debtor continue

21   to retain that account after the case was

22   converted to a Chapter 7 in October of '07?

23         A.    I don't know.

24         Q.    And you don't recall where that

25   checking account was set up?

```
1                    LEFKOWITZ

2          A.    No.

3          Q.    Or -- I'm sorry.  Where the account

4    was set up.

5                 I'm going to read a series of bank

6    account numbers from Astoria Federal Savings

7    Bank.  Please indicate after each one whether

8    you recognize the account.

9          A.    I can help you out.  I have no

10   relationship with any account in Astoria

11   Federal Savings Bank.  You can go through the

12   numbers.  They mean nothing to me.

13               MR. KRINSKY:  Why don't you let him

14        ask the question.

15         Q.    To your knowledge, you have no

16   affiliation with any bank account with Astoria

17   Federal Savings Bank?

18         A.    Correct.

19         Q.    Is Abraham Steinwurzel a signatory

20   on the Debtor's D.I.P. account?

21         A.    Don't know.

22         Q.    Do you know who set up the Debtor's

23   D.I.P. account?

24         A.    I don't recall the circumstances.

25         Q.    You're the managing member of the
```

```
 1                      LEFKOWITZ
 2   Debtor?
 3        A.    Correct.
 4        Q.    You do not know who is the
 5   signatory to the Debtor's bank accounts?
 6        A.    Correct.  Could be I am.  I don't
 7   know.
 8        Q.    Could be --
 9        A.    Could be I'm signatory.  Could be
10   I'm not.
11        Q.    If you were not signatory to the
12   Debtor's bank accounts, who would be?
13        A.    The records would reflect it.  It
14   wasn't an active account.  No major funds ran
15   through these accounts.  I don't know.
16        Q.    To your knowledge is Rabbi Abraham
17   Steinwurzel a signatory on the Debtor's bank
18   account?
19        A.    I don't know.
20        Q.    To your knowledge, are there any
21   funds left in any accounts of the Debtor?
22        A.    Not to my knowledge.
23        Q.    And to your knowledge, there's
24   currently only one bank account associated with
25   the Debtor entity?
```

```
1                     LEFKOWITZ

2          A.    I remember when we filed for

3    bankruptcy that the lawyers asked us to open up

4    a D.I.P. account.  A D.I.P. account was opened.

5    I don't believe there is any money in that

6    account.  I don't believe any money went into

7    that account.  I don't know if there's any

8    money left in that account.  If there is, it's

9    minute.

10         Q.    And you're not aware of any other

11   accounts?

12         A.    Correct.

13               EXAMINATION CONTINUED BY MR. WOLF:

14         Q.    Let me make a suggestion, Mr.

15   Lefkowitz.  I understood what you were just

16   saying in your last two answers.  You mentioned

17   that the attorneys for the named Debtor entity

18   advised that a debtor-in-possession account

19   should be set up; is that correct?

20         A.    Correct.

21         Q.    When you received that advice, did

22   you instruct someone to set up such an account

23   with someone other than you as the authorized

24   signatory?

25         A.    I don't recall the circumstances.
```

1                     LEFKOWITZ

2        Q.    Did Rabbi Steinwurzel discuss with

3    you at any point in time who should be the

4    signatories to the debtor-in-possession

5    account?

6        A.    Don't recall that.

7        Q.    You also said just a little while

8    ago in one of your answers that you're not

9    aware of any money running through a

10   debtor-in-possession account.

11       A.    I said major money.

12       Q.    Okay.  You do acknowledge, do you

13   not, that the checks that we see here reflected

14   in Trustee Exhibit 10 were disbursements made

15   by check out of that opened

16   debtor-in-possession account; right?

17       A.    Correct, which I call minor monies.

18       Q.    But there were certain monies that

19   did flow through the debtor-in-possession

20   account.

21       A.    This account.  Right.

22       Q.    And what was the source of those

23   monies?

24       A.    No clue.

25       Q.    Did you individually put any money

```
 1                    LEFKOWITZ

 2   or deposit any money into the

 3   debtor-in-possession account?

 4        A.   Me, personally, no.  I think I

 5   remember Maskil el-Dal advanced some money to

 6   Debtor.

 7        Q.   Was it deposit or deposits into the

 8   debtor-in-possession account?

 9        A.   I don't know if deposits or wires

10   or transfers.

11        Q.   Do you recall approximately how

12   much Maskil el-Dal, in total, caused to be

13   deposited into the debtor-in-possession account

14   from the beginning of that account until that

15   account ceased to operate or function?

16        A.   No.  Don't recall.

17             MR. WOLF:  Off the record.

18             (Discussion off the record.)

19             MR. WOLF:  Exhibit 11.

20             (Trustee Exhibit 11 for

21        identification, one-page document,

22        "Corporate Resolution," Kolel Mateh

23        Efraim D.I.P.)

24        Q.   Mr. Lefkowitz, you've been shown

25   now what has been marked as Trustee Exhibit 11.
```

<pre>
  1                     LEFKOWITZ
  2     It's a one-page document labeled "Corporate
  3     Resolution."  The name of the entity listed is
  4     Kolel Mateh Efraim D.I.P.
  5                     Have you ever seen an original or
  6     copy of this document before?
  7          A.    No.
  8          Q.    Okay.  Are you aware that at some
  9     point in time there was a signed corporate
 10     resolution of the debtor-in-possession given to
 11     Astoria Federal Savings in order to set up the
 12     debtor-in-possession account?
 13          A.    No.
 14          Q.    Do you recognize the address listed
 15     under the debtor-in-possession entity to be
 16     that of Rabbi Steinwurzel, his home address?
 17          A.    Correct.
 18          Q.    1264 56th Street, Brooklyn, New
 19     York?
 20          A.    Yes.
 21          Q.    Do you recognize Rabbi
 22     Steinwurzel's signature on this document?
 23          A.    No.
 24          Q.    Do you have any reason to believe
 25     that the person who signed this document is
</pre>

```
 1                    LEFKOWITZ

 2   anyone other than Rabbi Steinwurzel?

 3        A.    I don't know.  I don't know either

 4   way.  I also notice that, you know, D.I.P. was

 5   written into it.  I don't know when it was

 6   written into it.  It's definitely not a

 7   debtor-in-possession.

 8        Q.    I'm sorry.  What are you referring

 9   to?

10        A.    It's not the original LLC.

11        Q.    You mean it's not --

12        A.    I don't know.  It doesn't have all

13   the names listed and the bankruptcy --

14        Q.    All the names listed as the Debtor

15   entity in the case we're now taking this

16   examination in?

17        A.    Right.

18        Q.    Right.  And that's true, also, on

19   these checks that we saw marked as Trustee

20   Exhibit 10; correct?

21        A.    I don't have Exhibit 10.

22              Correct.

23        Q.    But do you know if there was any --

24        A.    I don't know either way.

25        Q.    Let me finish.  Do you know if
```

1               LEFKOWITZ

2    there was any debtor-in-possession bank account

3    set up other than what appears to be the

4    debtor-in-possession account whose checks are

5    included in Trustee Exhibit 10?

6          A.    I don't know.

7          Q.    When the LLC was first organized in

8    July of 1999, was it provided with any working

9    monetary capital?

10         A.    Don't recall.

11         Q.    Who made the lease payments under

12   that lease that we tentatively marked as

13   Trustee Exhibit 7?

14         A.    Mateh Ephraim.

15         Q.    The LLC entity I've been referring

16   to?

17         A.    Correct.

18         Q.    Where did the LLC get the funds to

19   make those rent payments?

20         A.    I don't recall how it got funded.

21   Probably myself.

22         Q.    You, individually?

23         A.    Correct.

24         Q.    Do you remember what the monthly

25   rent payments were?

```
 1                    LEFKOWITZ

 2        A.    No.

 3        Q.    Were there other times between the

 4   time of its formation and the time that it

 5   filed its Chapter 11 petition that the LLC

 6   received funds?

 7             MR. KRINSKY:  Could you read that

 8        back?

 9             (The pending question was read

10        back.)

11        A.    Which time was that, again?

12        Q.    From the time of its inception in

13   July of 1999 until it filed its petition.  I

14   believe the date on the LLC's petition --

15        A.    '04.  Sometime in '04.

16        Q.    Yes.  Sometime in '04.  I don't

17   seem to have the date here.  That's the period

18   of time.

19        A.    The last time it had a bank account

20   was 9-11-01.

21        Q.    You misunderstood my question.

22             (A conference was held between the

23        witness and his attorney.)

24        Q.    Talking about capitalization of the

25   LLC.  You mentioned at its inception you
```

1                    LEFKOWITZ

2    believe that you probably gave it some funds of

3    your own.

4         A.    And then in '04 I caused a lot of

5    funds to be lent to the entity.

6         Q.    By whom?

7         A.    Myself.

8         Q.    You, individually?

9         A.    No.  I was the one that caused

10   lending money to Mateh Ephraim.

11        Q.    Who actually lent the money?

12        A.    Maskil el-Dal.

13        Q.    Do you recall how much over that

14   period of time in the total was lent to the LLC

15   by Maskil el-Dal?

16        A.    1.5, $1.6 million.

17        Q.    And were those loans?  Or were they

18   capital contributions?

19        A.    Loans.

20        Q.    And do you recall approximately how

21   many such loans there were?

22        A.    As-needed basis.

23        Q.    And each time a loan from Maskil

24   el-Dal to the LLC was made, did the LLC give a

25   promissory note to Maskil el-Dal?

```
 1                    LEFKOWITZ

 2        A.    No.

 3        Q.    Did it ever do so?

 4        A.    No.

 5        Q.    Were there ever any written loan

 6   agreements between Maskil el-Dal and the LLC?

 7        A.    Not that I recall.

 8        Q.    Did the LLC ever pledge any assets

 9   in writing to Maskil el-Dal?

10        A.    Not that I recall.

11        Q.    Did it ever give a signed security

12   agreement or signed collateral agreement to

13   Maskil el-Dal?

14        A.    Don't know.

15             MR. WOLF:  I'm about to get into a

16        new area.  I think now might be a good

17        break time.

18             (Discussion off the record.)

19             (The luncheon recess was taken at

20        1:00 a.m.)

21

22

23

24

25
```

```
 1                    LEFKOWITZ
 2        A F T E R N O O N   S E S S I O N.
 3                    2:10 p.m.
 4          EXAMINATION RESUMED BY MR. WOLF:
 5        Q.    One follow-up question to this
 6   morning's session.  With regard to the bank
 7   account that the Debtor had at Citibank at the
 8   branch in One World Trade Center, you said once
 9   9/11 occurred, that was the end of that
10   account.
11            I realize the branch no longer,
12   unfortunately, existed, but the account would
13   have still been in existence.  Citibank
14   obviously continued to operate.  So --
15        A.    It was shut down altogether.
16        Q.    Didn't the account itself still
17   continue in existence beyond 9/11?
18        A.    I had a bunch of accounts with
19   Citibank at the time, and we were fighting over
20   records and what not.  I remember post-9/11 I
21   shut down all my accounts there.
22        Q.    I'm sorry.  You said fighting about
23   records?
24        A.    Yeah.
25        Q.    With Citibank?
```

```
 1                    LEFKOWITZ

 2        A.     Yeah.

 3        Q.     What was the fight about?

 4        A.     I don't remember exactly what it

 5   was, but I had a dispute with Citibank over

 6   accounts records.

 7        Q.     Were you contending that there was

 8   not as much being shown in your account --

 9        A.     There were deposits on that day

10   that didn't reflect.

11        Q.     On which day?

12        A.     9/11.

13        Q.     Did that -- how much were those

14   deposits?

15        A.     I don't remember.  Not just in the

16   Debtor.  It was my other accounts.

17        Q.     Do you recall whether or not, as

18   far as the Debtor's account was concerned, that

19   issue got rectified?

20        A.     Yeah.  I think so.

21        Q.     And what happened -- so there was

22   money recredited to the Debtor under that

23   account?

24        A.     I don't remember exactly what

25   happened, but I remember the accounts got
```

```
 1                    LEFKOWITZ
 2    closed and I didn't do business with Citibank
 3    again.  I didn't open any new accounts.
 4         Q.    Do you have any records of the
 5    Debtor with regard to the ultimate closing of
 6    that Citibank account?
 7         A.    No.
 8         Q.    Let's talk about the Meadows
 9    property.  How did you first become aware of
10    that property?
11         A.    Through a broker.
12         Q.    And who was that broker?
13         A.    That broker was -- I forgot his
14    name.  Who was that broker?  I don't recall the
15    name.  But I remember I paid him a commission.
16    That, I do remember.
17         Q.    His name wasn't Chaim Lefkowitz,
18    was it?
19         A.    No.  Chaim introduced me to that
20    broker.
21         Q.    Is Chaim a broker?
22         A.    He's my brother.
23         Q.    Is he a licensed real estate
24    broker, your brother?
25         A.    I don't know.
```

```
 1                    LEFKOWITZ

 2         Q.    So he introduced you to the broker

 3   whose name you can't remember who introduced

 4   you to the Meadows property?

 5         A.    Correct.

 6         Q.    And approximately when was that?

 7         A.    That was in the winter of '04.

 8   Winter of '04?  Summer '03 -- winter '03.

 9   Winter '03.  Summer '03/winter '04.

10         Q.    Either late 2003 or early 2004?

11         A.    Right.

12         Q.    Did you go up to view the property?

13         A.    Yes.

14         Q.    Did you put a bid in on the

15   property?

16         A.    No.

17         Q.    Did anyone on your behalf put in a

18   bid for that property?

19         A.    No.

20         Q.    At some point an individual named

21   Aron --

22         A.    Aron.

23         Q.    -- A-R-O-N, Fixler entered into a

24   contract with the owner of that property,

25   Helen-May Holdings, LLC.  I'll refer to that
```

```
 1                    LEFKOWITZ
 2   entity as Helen-May.
 3              (Discussion off the record.)
 4        Q.   Aron Fixler entered into a contract
 5   with Helen-May for the Meadows property.  Did
 6   you know Aron Fixler at the time?
 7        A.   Yes.
 8        Q.   How did you know him?
 9        A.   We grew up together.
10        Q.   Did the two of you grow up together
11   in Borough Park?
12        A.   No.
13        Q.   Where?
14        A.   In Williamsburg.
15        Q.   Williamsburg, Brooklyn.
16        A.   Right.
17        Q.   And were you aware that Aron Fixler
18   was going to be entering into the contract to
19   buy the Meadows property?
20        A.   No.  When I got to know the whole
21   gang, he was in contract already.
22        Q.   Oh.  So when you were introduced to
23   this property, he had already entered into a
24   contract?
25        A.   Right.  He was in the contract
```

```
 1                    LEFKOWITZ

 2   already.

 3        Q.    When you say he was in the

 4   contract, he'd signed it already?

 5        A.    Yeah.

 6             MR. WOLF:  Let's mark the contract.

 7             (Trustee Exhibit 12 for

 8        identification, copy of contract,

 9        4-27-04, between Helen-May as seller and

10        Aron Fixler as purchaser.)

11             (Discussion off the record.)

12        Q.    Mr. Lefkowitz, you now have in

13   front of you what has been marked as Trustee

14   Exhibit 12 and appears to be a copy of the

15   contract bearing a date of April 27, 2004

16   between Helen-May as seller and Aron Fixler as

17   purchaser.  You've seen a copy of that contract

18   before?

19        A.    Yes.

20        Q.    When for the first time did you see

21   a copy of that contract?

22        A.    When the assignment was negotiated.

23        Q.    The assignment of Mr. Fixler's

24   position as purchaser?

25        A.    Correct.
```

```
 1                    LEFKOWITZ

 2        Q.    And now that you see the date on

 3   this contract, April 27, 2004, can you tell me

 4   whether the broker who introduced you to the

 5   Meadows property did so prior to April 27, 2004

 6   or after April 27, 2004?

 7        A.    It was after.

 8        Q.    Okay.  And did he indicate to you

 9   that Aron Fixler was looking to assign his

10   interest as purchaser on that contract?

11        A.    Actually, I was introduced to go

12   partners with Fixler.

13        Q.    After Fixler had signed the

14   contract?

15        A.    Right.

16        Q.    And did you have any negotiations

17   to become Fixler's partner?

18        A.    I sat down with him and ultimately

19   I agreed to take it over.

20        Q.    Was there a written -- I'm going to

21   show you in a few minutes the short one-page

22   assignment of his rights.  But putting that

23   document aside, was there an actual written

24   agreement between you and Fixler or between

25   someone on your behalf and Fixler agreeing to
```

1                      LEFKOWITZ

2    purchase his rights under the contract?

3          A.    There was no other document that I

4    know of other than what's in the record of the

5    case.

6          Q.    A record --

7          A.    In the record of the case.  It was

8    submitted all kinds of records, in the subject

9    litigation.

10          Q.    Did you or someone on your behalf

11    pay something to Fixler to get an assignment of

12    the contract?

13          A.    I paid -- I basically paid by

14    replacing his deposit money.

15          Q.    How much had he deposited?

16          A.    I think $140,000.

17          Q.    So you caused a new $140,000 to be

18    delivered on your behalf to Helen-May in

19    substitution for his $140,000 deposit?

20          A.    Not to Helen-May.  To Fixler.

21          Q.    You gave the $140,000 to Fixler?

22          A.    Right.  Fixler gave $140,000 to

23    Helen-May and I gave 140,000 to Fixler.

24          Q.    I understand that.  And he then

25    assigned the contract.

```
 1                    LEFKOWITZ

 2        A.    Right.

 3        Q.    Are you telling me he didn't make a

 4   cent on the assignment?

 5        A.    Not didn't he make a cent, but he

 6   lost some money, probably, in legal fees.  And

 7   I also paid the broker that introduced him to

 8   Helen-May.  So I took over that obligation and

 9   I took -- and I saved his deposit.

10        Q.    Why didn't Fixler proceed to pursue

11   the contract, to close on the contract himself

12   or with you as a partner?

13        A.    Himself, he couldn't get financing

14   to close.

15        Q.    Right.

16        A.    So he came to me for money.  And I

17   didn't find a reason to become his partner.  So

18   I told him, "Listen.  You don't have money to

19   close.  You don't have anything to contribute

20   to the partnership.  I'm offering to take you

21   out of it."

22        Q.    And he said okay.

23        A.    He said okay.

24        Q.    Did Fixler have an attorney

25   representing him?
```

```
 1                    LEFKOWITZ
 2        A.    Michael Halberstam.
 3              (Discussion off the record.)
 4        Q.    Were you represented by an
 5   attorney?
 6        A.    No.
 7        Q.    You did it on your own?
 8        A.    Yes.
 9        Q.    At the time that he assigned the
10   contract, what business was Fixler in?
11        A.    I think he's in the clothing
12   business.  I think so.
13        Q.    Do you know if, at the time, he
14   owned any real estate?
15        A.    No idea.
16        Q.    And why were you interested in the
17   property?
18        A.    I was looking to do a development
19   upstate.
20        Q.    What type of development?
21        A.    Second home residential
22   development.
23        Q.    And so you were thinking of doing
24   that on the Meadows property?
25        A.    Correct.
```

119

```
 1                    LEFKOWITZ
 2        Q.    Were you going to make use of the
 3   existing structures on the Meadows property for
 4   that purpose?
 5        A.    No.
 6        Q.    Were you considering tearing down
 7   those existing structures?
 8        A.    The existing structures are sitting
 9   on maybe three acres of land.  I was looking
10   more to the acreage of the parcel than the
11   structures.
12              MR. WOLF:  Would you read that
13        back?
14              (The preceding answer was read
15        back.)
16        Q.    You mean the overall acreage.
17        A.    Yes.
18        Q.    And what were you looking to do:
19   Build freestanding residential units?  Or
20   connected townhouse-type units?
21        A.    No.  One-family homes.
22        Q.    And were you anticipating these
23   would be used as second homes by families
24   primarily in the summer?
25        A.    It's winterized homes being used as
```

```
 1                    LEFKOWITZ
 2  a secondary home.
 3        Q.    So they could be used all year
 4  around.
 5        A.    Right.
 6        Q.    And did you, before the assignment
 7  was made by Fixler, do any or cause anyone to
 8  do any studies or plans of what such a
 9  second-family home residential development
10  would look like?
11        A.    Yes.
12        Q.    Who did you use for that purpose?
13        A.    Well, it was myself.  Before I did
14  the deal I met with the owners and sat in the
15  owners' office.  Went through plans.  Took
16  along my contractor who I've built other sites
17  with.  We studied the site, the plans, the
18  zoning.  And we made our conclusions.
19        Q.    What contractor was that?
20        A.    Catskill Vacation Home Builders.
21        Q.    Are they located in the Catskill
22  area?
23        A.    Yes.
24        Q.    You said you had worked with that
25  contractor to build other developments.  Other
```

```
 1                     LEFKOWITZ
 2   developments in the Catskill region?
 3        A.    Correct.
 4        Q.    How many such developments?
 5        A.    Two.
 6        Q.    Where are they located?
 7        A.    In Fallsburg.
 8        Q.    Both in Fallsburg?
 9        A.    Yes.
10        Q.    Fallsburg proper?  Or South
11   Fallsburg?
12        A.    Fallsburg.
13        Q.    Were they on the sites of former
14   resorts in the Catskills?
15        A.    Everything in the Catskills is
16   former resorts, especially these size of sites.
17        Q.    I'm sorry --
18        A.    Same size of parcels.
19        Q.    And are there names to these two
20   sites?
21        A.    Yes.
22        Q.    What are they?
23        A.    One is called Twin Oaks and one is
24   called Lake Forest.
25        Q.    And how many units does Twin Oaks
```

```
 1                      LEFKOWITZ

 2   have?

 3          A.    Twin Oaks has 86.

 4          Q.    And the other?

 5          A.    The other has 142.

 6          Q.    And when was Twin Oaks built?

 7          A.    Twin Oaks was built in 1999.

 8          Q.    And -- I'm sorry.  The other is --

 9   what's the name?

10          A.    Lake Forest.

11          Q.    Lake Forest.  When was that built?

12          A.    We started in '00.  We completed it

13   in '03.

14          Q.    And did you build Twin Oaks -- who

15   owned the property of Twin Oaks when the

16   residential development -- when you were first

17   starting the residential development, to build

18   it?

19          A.    Who I bought it from?

20          Q.    No.  In what name did you buy it?

21          A.    Oh.  I think it was in Barclay

22   Dwyer.

23          Q.    And what about Lake Forest?

24          A.    Same.

25          Q.    Barclay Dwyer.  Does Barclay Dwyer
```

```
 1                    LEFKOWITZ
 2    own any units at the present time up there?
 3         A.    No.
 4         Q.    Are those units owned as
 5    condominiums?
 6         A.    Condominiums.
 7         Q.    So each of the units has been sold.
 8         A.    Yes.
 9               (Discussion off the record.)
10               THE WITNESS:  Back to Fixler.
11         Q.    Well, sort of.  On the assignment,
12    to which entity were Fixler's purchase rights
13    in the Meadows property assigned to?
14         A.    Supposed to be assigned to Mateh
15    Efraim LLC.
16         Q.    The LLC we've been talking about
17    earlier today?
18         A.    Correct.
19         Q.    The LLC that is a named Debtor in
20    this bankruptcy case?
21         A.    Correct.
22         Q.    You say it was supposed to be.  Are
23    you indicating that that's not what happened?
24         A.    No.
25         Q.    I'm sorry.  No, that's not what
```

```
 1                    LEFKOWITZ
 2   happened?
 3        A.    Right.
 4        Q.    We've got to watch our double
 5   negatives, you and me both.
 6              So to whom was Fixler's contract
 7   rights assigned?
 8        A.    I was negotiating the assignment.
 9   I was sitting in Halberstam's office.  I wrote
10   a check.  I had to leave.  I was there with
11   Steinwurzel.  Steinwurzel signed it and wrote
12   Kolel Mateh Efraim, but it should have been
13   Mateh Efraim, LLC.
14        Q.    When you said he wrote Kolel,
15   you're talking about Kolel Mateh Efraim; is
16   that correct?
17        A.    Yes.
18              MR. KRINSKY:  I think he said
19        Steinwurzel was there.
20        Q.    Steinwurzel signed it?
21        A.    Yes.
22              Why was Steinwurzel there?
23        Q.    That wasn't going to be my next
24   question, but go ahead.  Answer the question.
25        A.    Because I was looking to carry the
```

```
 1                    LEFKOWITZ

 2   property until development, so I was speaking

 3   to him whether he can occupy the property in

 4   the interim.  And there was this long marathon

 5   negotiation, and I left him there.  I said,

 6   "Here's a check.  Make sure it gets assigned

 7   over and we'll deal with it afterwards."

 8        Q.   It's your understanding that he

 9   signed the assignment instrument?

10        A.   Right.

11             (Trustee Exhibit 13 for

12             identification, assignment instrument.)

13        A.   Yeah.

14             MR. KRINSKY:  Wait till there's a

15             question pending.

16        Q.   You have in front of you Trustee

17   Exhibit 13?

18        A.   Right.

19        Q.   Do you recognize that document?

20        A.   Yep.

21        Q.   Is that the assignment instrument

22   you were just referring to?

23        A.   Yep.

24        Q.   And Rabbi Steinwurzel signed that

25   instrument?
```

```
 1                    LEFKOWITZ

 2         A.    Right.

 3         Q.    So you say that the incorrect

 4    entity name, incorrect entity, was typed below

 5    the signature line?

 6         A.    Correct.

 7         Q.    At some point in time did you or

 8    Rabbi Steinwurzel rectify that error?

 9         A.    There were discussions about it,

10    but I don't know if there were letters going

11    back and forth with Halberstam.  I remember

12    discussions about it.

13         Q.    Do you know if there was ever a new

14    assignment instrument executed that made clear

15    that Fixler was assigning the purchase rights

16    under the contract to the entity Mateh Ephraim

17    LLC?

18         A.    I remember there was such

19    discussion.  Could be there was some letters

20    back and forth.

21         Q.    Have you ever seen such a document?

22         A.    "Document" meaning a rectifying

23    document?

24         Q.    Correct.

25         A.    I've got to go through the letters
```

```
1                    LEFKOWITZ

2    between Scher and Halberstam.  There could be

3    something in the correspondence.

4    (REQ)        MR. WOLF:  I request production of

5    that correspondence.

6         A.    I think we did that.  Something in

7    the Scher and Halberstam.

8    (REQ)  Q.    I make a request on the record for

9    any documentation you have, whether it was

10   between Mrs. Scher and Halberstam or otherwise,

11   that was with regard to rectifying what you've

12   indicated was an error in the entity to whom

13   Fixler's rights were assigned.

14              MR. KRINSKY:  I think there may

15         have been one other request already.  I

16         can't remember.  I suggest there will be

17         more requests.  I assume you'll

18         memorialize in a letter?

19              MR. WOLF:  We will.

20              (Discussion off the record.)

21         Q.    The check that was delivered to

22   Fixler in connection with this assignment was

23   in what amount?

24         A.    I recall $140,000.

25         Q.    On whose account was that check
```

```
 1                    LEFKOWITZ

 2    drawn?

 3         A.   Maskil el-Dal.

 4         Q.   Once this assignment document,

 5    Trustee 13, was executed, was someone at

 6    Helen-May notified of the assignment?

 7         A.   I think so.

 8         Q.   And do you know who notified whom

 9    in that regard?

10         A.   Halberstam to Scher.  I think there

11    was even consent.  There was some consent

12    required.

13         Q.   Do you recall seeing a consent

14    document in writing?

15         A.   I recall something about consent,

16    yes.

17    (REQ)     MR. WOLF:  Requesting also

18    production of whatever consent there was.

19              THE WITNESS:  I think all those

20         documents have been produced to you.

21         Q.   We will take another look.  Off the

22    top of my head, I'm not remembering seeing such

23    a document.

24         A.   Okay.

25              (Trustee Exhibit 14 for
```

```
 1                      LEFKOWITZ

 2          identification, copy of fronts and backs

 3          of various checks.)

 4          Q.    I'm focusing on the top check of

 5  the first page at the present time.  Exhibit 14

 6  is a copy of a bunch of fronts and backs of

 7  various checks.  My only question is, focusing

 8  right now, Mr. Lefkowitz, on the top check on

 9  the first page of Trustee Exhibit 14, it's

10  drawn on the account of Maskil el-Dal, and it's

11  dated 5-19-04, which would appear to be the day

12  after the date of the assignment by Fixler.

13               It's a check made out to Michael J.

14  Halberstam, Esq., in the amount of $135,000.

15  And in the lower left corner in the memo

16  section there is handwritten "Loan to Kollel

17  Mateh Efraim on camp contract."

18               First of all, whose handwriting is

19  on this check?

20          A.    Looks like mine.

21          Q.    Is that your signature on the

22  check?

23          A.    Yeah.

24          Q.    I'm sorry?

25          A.    Yes, sir.
```

```
 1                    LEFKOWITZ

 2            (Discussion off the record.)

 3       Q.    What did this $135,000 represent?

 4       A.    I don't know.  I really don't.

 5  What's the date of the assignment?

 6            MR. KRINSKY:  The day before.

 7       Q.    May 18th, 2004.  The day before.

 8  Isn't this -- I'm assuming the $135,000 was

 9  going towards the equivalent of the security

10  deposit that you said, before, Fixler had given

11  to Helen-May as a down payment under the

12  contract.

13       A.    But he had 140, not 135.  Let me

14  just check this.

15       Q.    Okay.

16       A.    I don't see his deposit.  My

17  assumption would be 10 percent deposit.  I

18  don't know what -- this calls for a $49,000

19  deposit, so I don't know what it is.

20       Q.    Where do you see reference to a

21  $49,000 deposit?

22       A.    At the signature page of the

23  contract.  "The undersigned escrowee hereby

24  acknowledges receipt of $49,000 by check

25  subject to collection, held in escrow by Dan
```

```
 1                      LEFKOWITZ

 2    Scher."

 3                MR. KRINSKY:  If I can refresh his

 4          recollection.

 5                MR. WOLF:  If you want to go off

 6          the record and say something with all of

 7          us present, that's fine.

 8                (A conference was held between the

 9          witness and his attorney.)

10                (Discussion off the record.)

11          Q.    You don't know.  Okay.  The second

12    check on this first page, also that of Maskil

13    el-Dal, is dated May 20, 2004.  "Pay to the

14    order of Cong. Nyiregyhaz," $75,000."

15                Does "Cong." stand for

16    "congregation"?

17          A.    I don't know.

18          Q.    Is that your signature at the lower

19    right-hand corner of the check?

20          A.    Yeah.

21          Q.    Who would have typed in the content

22    on this check?

23          A.    Must have been someone in my

24    office.  I don't know how to type.

25          Q.    The memo at the bottom says, "Loan
```

```
 1                    LEFKOWITZ
 2   to Kolel Mateh Efraim, camp contract, payment
 3   to CS" -- all that's visible is "Lefko."
 4        A.    I think this is the commission.  I
 5   assume this is the commission payment between
 6   Fixler and --
 7        Q.    Is "CS" the initials of your
 8   brother Chaim Lefkowitz?
 9        A.    Chaim.  Could be.  I don't know.
10        Q.    Does he have a middle name?
11        A.    No.  He's known by "Chaim."  I know
12   he was involved in introducing the contract.
13   It could be he was the one that transferred
14   that check over to the commission guy.  I
15   remember it being a $75,000 commission payment.
16        Q.    Do you know how you pronounce the
17   name that starts with "N" on this check?
18        A.    No.
19        Q.    Are you familiar with a Jewish
20   congregation that is known by that name?
21        A.    No.
22        Q.    Do you recall why a payment you say
23   appears to be made for broker's commission
24   would have been made payable to what appears to
25   be a congregation?
```

```
 1                    LEFKOWITZ

 2         A.    I think there was something about

 3    keeping it in escrow until they agreed.  I

 4    don't recall.  I remember it was a $75,000

 5    payment.  I didn't want to pay directly to the

 6    broker because I didn't have an agreement with

 7    the broker.  There was some third party

 8    involved with holding this $75,000.

 9         Q.    Your brother Chaim at the time, May

10    of 2004, where did he reside?

11         A.    2004?  I don't recall.

12         Q.    Was it within New York State?

13         A.    Yeah.

14         Q.    Was it within Brooklyn?

15         A.    I think so.  Yeah.

16         Q.    What shul did he belong to?

17         A.    I've said --

18               (Discussion off the record.)

19         A.    We don't live in the same

20    community.  I wouldn't know where he belongs.

21         Q.    Where did you belong at the time?

22         A.    Hiechel Hatitleh

23         Q.    Is that a Hasidic congregation

24    located in Borough Park?

25         A.    Again, you touched a nerve.
```

1                    LEFKOWITZ

2          Q.    I'm sorry.

3          A.    The word "Hasidic" -- it's an

4    Orthodox congregation.

5          Q.    Okay.  And you don't recall what

6    congregation your brother belonged to at that

7    time?

8          A.    No.

9          Q.    But it wasn't yours.

10         A.    No.

11         Q.    At some point in time there was an

12   occupancy agreement entered into with Helen-May

13   with regard to the Meadows property; is that

14   correct?

15         A.    Yeah.

16         Q.    Was that shortly after, meaning

17   within two weeks or so, after the assignment of

18   the contract from Fixler to that Kollel Efraim

19   entity we saw on the document?

20         A.    The dates will probably speak for

21   themselves.

22         Q.    Let me ask you that.  Was the

23   concept of an occupancy agreement negotiated

24   subsequent to the assignment?

25         A.    Yes.

```
 1                    LEFKOWITZ

 2        Q.    And how did that occupancy

 3   agreement come about?  What led to the

 4   discussions about that concept?

 5        A.    I remember I sat down with the

 6   owners, with Helen-May --

 7        Q.    Was that Irene and Paul Griffin?

 8        A.    Yeah.  Paul Manley.

 9        Q.    Okay.

10        A.    And I told them that this property

11   needs a lot of -- needs a lot of help, and we

12   can't let it just sit and rot away.  I have a

13   camp that's willing to occupy it and they'll

14   throw some maintenance in and bring it back to

15   its condition.  By the time it's closed, I'll

16   have on what to close.

17        Q.    And what did he say?

18        A.    He said, "Okay.  We'll have an

19   occupancy agreement."

20             MR. KRINSKY:  Can we take a

21        two-minute break?

22             MR. WOLF:  Can I finish this

23        thought?

24             MR. KRINSKY:  I thought you were

25        going to start a whole round of new --
```

```
 1                      LEFKOWITZ
 2              MR. WOLF:  Just one question.
 3         Q.    You said, just before, you told
 4    Griffin that you had a camp.  What camp were
 5    you referring to?
 6         A.    Mateh Efraim camp.
 7         Q.    Was that a camp already in
 8    existence?
 9         A.    No.
10         Q.    That was a camp, then, that was
11    going to be set up?
12         A.    Yes.
13         Q.    And who was going to set it up?
14         A.    Steinwurzel.
15         Q.    Had he operated any camps up in the
16    Catskill region previously?
17         A.    Not that I know of.
18         Q.    And you had already spoken to Rabbi
19    Steinwurzel about the concept of having a camp
20    up at the Meadows property?
21         A.    Yes.
22         Q.    Did Rabbi Steinwurzel hold any
23    license or licenses that permitted him to
24    operate a camp?
25         A.    Don't know.
```

1                    LEFKOWITZ

2         Q.    Did he ever?

3         A.    I don't know.

4         Q.    Is it your understanding that that

5    was a New York State requirement, that the

6    operator of the camp needed to be licensed by

7    some agency of the State of New York in order

8    to operate the camp?

9         A.    No big deal.  Any individual can go

10   into the Health Department and get a license to

11   operate a camp.

12        Q.    Did someone do that in connection

13   with this camp?

14        A.    I don't know.

15        Q.    You left that for Rabbi Steinwurzel

16   to take care of?

17        A.    Exactly.

18        Q.    You had the contract rights -- your

19   entity -- you contend it was your entity was

20   now the purchaser, prospective purchaser, with

21   a contract vendee, I should call it, under this

22   contract.  Weren't you concerned about whether

23   or not the property was going to be operated in

24   a lawful manner?

25        A.    Yes.  I gave it to a responsible

```
 1                    LEFKOWITZ
 2   person to do it.
 3              MR. WOLF:  Do you want to take a
 4        two-minute break?
 5              MR. KRINSKY:  Sure.
 6              (A brief recess was taken.)
 7        Q.    Before we get to Trustee Exhibit
 8   15, let me ask you this.  You mentioned you had
 9   a contractor lined up with regard to the
10   Meadows property.  Did you also -- were there
11   any other consultants or professionals you had
12   retained at or around the time of the
13   assignment in connection with the development
14   you contemplated doing there?
15        A.    I remember we had an engineer out
16   there.
17        Q.    Who was that?
18        A.    A guy from Woodrich.  Adler.
19        Q.    A-D-L-E-R?
20        A.    Correct.
21        Q.    Woodrich.  Which state?
22        A.    New York.
23        Q.    Where is Woodrich, New York?
24        A.    In the Catskills.
25        Q.    Anybody else?  Any other
```

```
 1                    LEFKOWITZ

 2   professionals?

 3        A.    We hired a surveyor, but the survey

 4   came in much later.

 5        Q.    Who was the surveyor?

 6        A.    The surveyor was Eustin & Horowitz.

 7        Q.    And when did his survey come in?

 8        A.    A few months later.

 9        Q.    Did you have an appraiser?

10        A.    We did an appraisal.  I think we

11   had an appraisal twice.

12        Q.    When for the first time was it

13   appraised?

14        A.    It was appraised -- wait a second.

15   No.  There was an appraisal done on the

16   property, done by the Griffins, that we

17   updated.  We paid for the update.  When we

18   bought the two other parcels, we hired an

19   appraiser to incorporate all parcels.

20        Q.    All three?

21        A.    Yes.  Yes.

22        Q.    Was it the same appraiser who did

23   the upgrade in all three?

24        A.    I don't think so.  No.

25        Q.    When was the updated appraisal of
```

```
 1                    LEFKOWITZ
 2    the Griffins or Helen-May done?
 3         A.    I don't recall.
 4         Q.    Was it after the assignment?
 5         A.    I believe so.  I was shown an
 6    appraisal before the assignment.  This was
 7    marketed to me by the Griffins.  Fixler had no
 8    clue what he bought.  He had no idea what this
 9    property was.  So the Griffins made me the
10    sales pitch.  Took me out to the property.
11    Showed me the appraisal and survey.  They
12    showed me all kinds of plans and sewer systems
13    and acreages and zonings and what not.  So I
14    took a whole packet of documents from their
15    office, went to the assignment, and then I
16    dealt with those professionals.
17         Q.    Do you recall what value the
18    appraisal they showed you indicated the Meadows
19    plot had?
20         A.    I remember like a million-five, a
21    million-six.
22         Q.    At some point was there an
23    appraisal -- or did you see an appraisal done
24    of the Meadows property by someone named Harold
25    Roder?
```

1                    LEFKOWITZ

2          A.    Yes.  He's the one that we hired

3    after -- when all three parcels were --

4          Q.    Did he come up with an appraised

5    value?

6          A.    Yes.

7          Q.    What was that value?

8          A.    I think it was much higher than the

9    original appraisal.

10         Q.    Than the one the Griffins had

11   showed you?

12         A.    Yes.

13         Q.    What was the value that Roder

14   showed for the Meadows property?

15         A.    Like $3 million, I think.

16         Q.    And then you say he also appraised

17   the two parcels that the Debtor bought

18   outright?

19         A.    Well, it was including.

20         Q.    So Roder's appraisal had an

21   appraised value of in excess of three million

22   for the three parcels in the aggregate?

23         A.    Right.

24              MR. KRINSKY:  I think his testimony

25         is that he thinks it was --

```
 1                    LEFKOWITZ
 2        A.    I remember -- we were under the
 3   belief that it was 77 acres.  So was Roder
 4   under the belief that it was 77 acres.  And
 5   then we added 11 or 13 acres of the other
 6   parcel.  So we had a total of something like
 7   80-and-change acres.  Based on that, he wrote
 8   up his appraisal.  But all of that is
 9   erroneous.
10        Q.    Well, when did Roder do this
11   appraisal?
12        A.    As I said, I believe after we
13   purchased the other two parcels.
14        Q.    Where is Roder from?
15        A.    Also upstate.
16        Q.    In the Catskills area?
17        A.    Maybe in Middletown.
18        Q.    Do you know how many times he went
19   up to the properties in order to do his
20   appraisal?
21        A.    No.
22        Q.    Did you accompany him on any of his
23   visits?
24        A.    Never met him.
25        Q.    Did he produce a written report?
```

```
 1                    LEFKOWITZ

 2        A.    Yes.  It's in the record.

 3        Q.    It may be in the record.

 4             MR. WOLF:  Off the record.

 5             (Discussion off the record.)

 6        (REQ)  MR. WOLF:  I'm requesting

 7        production of whatever appraisal or

 8        appraisals --

 9        A.    I don't have any more documents

10   than I already gave you.

11             MR. KRINSKY:  I'll look.

12        Q.    Did the appraisal that the Griffins

13   showed you have any statement in there that

14   indicated or contended that the acreage of just

15   the Meadows parcel was 77 acres?

16        A.    Yes.

17   (REQ)        MR. WOLF:  I'm requesting also

18   production of the appraisal that was shown to

19   the witness by the Griffins.

20             THE WITNESS:  The Griffins have

21        that.  I wouldn't have that.

22             MR. KRINSKY:  I'll look and see

23        what we have.

24        Q.    Let's get to the occupancy

25   agreement.  Trustee's Exhibit 15 is in front of
```

144

```
 1                    LEFKOWITZ
 2   you, on the letterhead of Scher & Scher, PC.
 3                    (Trustee Exhibit 15 for
 4            identification, letter to M.J.
 5            Halberstam, Esq., on letterhead of Scher
 6            & Scher, PC, copy of so-called occupancy
 7            agreement entered into shortly subsequent
 8            to the time of the assignment.)
 9        Q.    It's in letter form to Michael J.
10   Halberstam, Esquire.  My first question is: Do
11   you recognize this to be a copy of the
12   so-called occupancy agreement entered into
13   shortly subsequent to the time of the
14   assignment?
15        A.    Yes.
16        Q.    And were you personally involved in
17   negotiations of the terms that are contained in
18   this occupancy agreement?
19        A.    Yes.
20        Q.    And were those negotiations
21   face-to-face?
22        A.    No.
23        Q.    Were they over the phone?
24        A.    Yes.
25        Q.    And with whom did you have those
```

```
 1                    LEFKOWITZ

 2   negotiations?

 3        A.    Dan Scher.

 4        Q.    You dealt with him directly, as

 5   opposed to his client?

 6        A.    Correct.

 7        Q.    And do you recall the approximate

 8   length of the period during which these

 9   negotiations occurred?

10        A.    I don't know.  Prior to June 3.

11        Q.    It was approximately two weeks

12   between the date of the assignment and the

13   occupancy agreement?  Was it about a two-week

14   period during which the negotiations took

15   place?

16        A.    Correct.

17        Q.    Did anyone else negotiate on your

18   behalf with regard to the terms of this

19   agreement?

20        A.    Halberstam.

21        Q.    Halberstam, I thought you said, had

22   been Fixler's attorney.

23        A.    I inherited him.  The box, the

24   chicken, and everything.

25        Q.    And the attorney.
```

```
 1                     LEFKOWITZ

 2          A.    Right.

 3          Q.    And Halberstam is located here in

 4   New York?

 5          A.    39 Broadway.

 6          Q.    And did you sign this occupancy

 7   agreement?

 8          A.    I did.  My name is spelled wrong,

 9   but I did.

10          Q.    Is that a copy of your signature on

11   page 4 of the document in the lower right-hand

12   corner?

13          A.    Yes.  Uh-huh.

14          Q.    And where were you when you signed

15   that document?

16          A.    No clue.

17          Q.    Were you in your attorney's office?

18          A.    No.  This was all facsimile.

19          Q.    And Mr. Halberstam also signed the

20   document; correct?

21          A.    Correct.

22          Q.    Now, under this occupancy agreement

23   and the contract, when was the sale of the

24   property to close?  When was it scheduled for?

25          A.    For -- I think there was,
```

147

```
 1                    LEFKOWITZ
 2  subsequent, some extensions.
 3       Q.   I understand that.  But under the
 4  initial occupancy agreement, what was the
 5  scheduled closing date?
 6       A.   You want me to read the agreement?
 7  The closing date should take place on or about
 8  September 27, '04, time-of-the-essence.
 9       Q.   Is that your recollection, that
10  that was the agreed-to initial closing date?
11       A.   I don't recall, but that's what the
12  document says.
13       Q.   And without, for the moment,
14  looking at the document, do you recollect that
15  there were certain payment obligations that --
16       A.   The occupancy required.
17       Q.   -- the purchaser was to make to
18  Helen-May in connection with the occupancy?
19       A.   Correct.
20       Q.   And what were those?
21       A.   Some expenses, from page 2.
22  Mortgage, 9750.  Insurance 2500.  Interest on
23  client's credit cards, 3500.
24       Q.   Were those payments made?
25       A.   Yes.
```

```
 1                    LEFKOWITZ
 2        Q.    Were they made on a monthly basis?
 3   Are these payments monthly payments?  Or
 4   one-shot payments?
 5        A.    No, they can't be monthly.
 6        Q.    You say they can't be?
 7        A.    Right.
 8        Q.    And why is that?
 9        A.    Because I don't believe that -- the
10   truth is, I don't know.
11        Q.    There's one item here on page 2
12   that says, "Interest on our client's credit
13   card debt, $3500."  What did that relate to?
14        A.    I don't know.  All I can tell you,
15   if my lawyer would have written something like
16   this, he wouldn't be my lawyer.  So I don't
17   know.  Griffin had credit card and credit card
18   interest, and he asked for $3500.  I don't
19   know.
20        Q.    Did the title close on September
21   27, 2004?
22        A.    No.
23        Q.    Why didn't it close on September
24   27, 2004?
25        A.    I don't know.  I think there was a
```

149

1                          LEFKOWITZ

2    subsequent extension to that.

3         Q.    We're going to get to that.   What

4    I'm looking for: Was there a reason why it

5    didn't close on September 27, 2004?   I'm not

6    suggesting there's some nefarious purpose or

7    whatever, but I'm trying to ascertain why the

8    date did get extended.

9         A.    Because I think we were insisting

10   on closing with a survey because there was some

11   easements on the property.   And we didn't have

12   the easement -- we didn't have the survey

13   concluded in September.

14        Q.    What kind of easements turned out

15   to be on the property?

16        A.    There is some easements from

17   neighbors on Route 52.

18        Q.    Easements with regard to their

19   ability to walk across the property?

20        A.    Titles to the property.   There are

21   sliver easements running through the property.

22        Q.    Sliver easements to give those

23   neighboring owners what?   I'm sorry.

24              Don't do a drawing yet.

25        A.    I want to exhibit it.

```
 1                       LEFKOWITZ

 2          Q.    Sliver easements for right of

 3     access?

 4          A.    Right.  Do you have the survey?

 5          Q.    I don't have the survey.  I'm not

 6     trying to get into a lot of details.  I'm just

 7     curious.  This is the first time I'm hearing

 8     about certain sliver easements.

 9          A.    When you do a title search on the

10     Meadows, you'll find the neighboring properties

11     have sliver easements onto the Meadows

12     property.  We insisted on a survey.  I remember

13     the surveyor who we hired and paid couldn't do

14     the survey because it was summertime and they

15     needed a fly-over, and there were too many

16     leaves, so they had to wait till the leaves

17     fell.

18                 Finally, the survey came in and

19     then we discovered we don't have 77 acres, only

20     60 acres.  And we started the bickering about

21     where did the acres disappear.  And that's when

22     all the litigation blew up.

23          Q.    I'm still trying to figure out

24     what -- an easement, as I presume you know,

25     does not mean the person in whose favor the
```

```
 1                    LEFKOWITZ
 2    easement runs has -- they have some use to the
 3    property.  What use did these people have under
 4    these easements?
 5         A.    Let me draw.
 6         Q.    It may be an exhibit.  Make it
 7    neat.
 8         A.    This is Route 52 and this is Route
 9    114.  The Meadows is right here; the two other
10    parcels, parcel 1, parcel 2, and this is parcel
11    3.
12         Q.    Parcel 3 is the Helen-May parcel.
13         A.    Which goes all the way through
14    another road here, which I don't remember the
15    name.  There are a few owners on this side, on
16    Route 52, that have either fire exit through
17    here, or fire exit through there.
18         Q.    Okay.  In case there was a fire --
19         A.    If a fire truck needs to go
20    through.  If ever it gets developed.  It's a
21    100-year-old easement, so when you do the
22    title, it comes up.  So we wanted to have it on
23    the survey.
24         Q.    Could you disattach that piece of
25    paper?  We're making it an exhibit.
```

```
 1                    LEFKOWITZ
 2        A.    No. 16.
 3               (Trustee Exhibit 16 for
 4        identification, sketch re easements.)
 5               (Discussion off the record.)
 6        Q.    Did the dispute with regard to the
 7   acreage arise before the extension of the
 8   September 27th, 2004 closing date was agreed
 9   to?
10        A.    No.
11        Q.    After?
12        A.    When we got the survey.
13        Q.    Right.  Okay.
14               (Discussion off the record.)
15               (Trustee Exhibit 17 for
16        identification, extension letter
17        agreement extending closing date.)
18               THE WITNESS:  Yeah.
19        Q.    Do you recognize Trustee Exhibit
20   17 --
21        A.    Yeah.
22        Q.    -- to be the extension letter
23   agreement that extended the closing date?
24        A.    Yeah.
25        Q.    And did you also sign this
```

1                    LEFKOWITZ

2    document?

3         A.    Yeah.

4         Q.    Is that a copy of your signature in

5    the lower right-hand corner of the second page?

6         A.    Yeah.

7         Q.    And is that your attorney, Michael

8    Halberstam's, signature above yours?

9         A.    That, I wouldn't know, but it seems

10   to be.

11        Q.    You have no reason to doubt that

12   that's his signature, do you?

13        A.    No.

14        Q.    Do you see the paragraph on the

15   first page of Exhibit 17 that starts, "The

16   payment to Irene Griffin of the consulting

17   fee" --

18        A.    "1,000 per week."  Right.

19        Q.    That was eliminated.  But those

20   sums up to that date were still outstanding,

21   according to the last sentence of that

22   paragraph.  Do you see where I'm reading?

23        A.    Right.

24        Q.    Were those payments of $4,000 made

25   to Irene Griffin?

154

```
 1                    LEFKOWITZ

 2         A.    I don't recall.  These are all --

 3    you know, there was a bunch of gypsy

 4    conversation.  "Pay my credit card.  Pay my

 5    consulting."  Besides paying their property, we

 6    were paying their life bills.  But I don't

 7    remember which got paid and didn't.

 8         Q.    The last page, "The person will pay

 9    the additional sum of $20,250 upon return of

10    this letter and $20,250 on or before October

11    27, time is of the essence" --

12         A.    Right.

13         Q.    -- were either of those two

14    payments made?

15         A.    Two were made.  One was stopped.

16         Q.    Which one was stopped?

17         A.    I think the second one was stopped.

18         Q.    And why was it stopped?

19         A.    Because we discovered that we have

20    less than 77 acres.

21         Q.    At some point am I correct that the

22    LLC, Mateh Ephraim LLC started what we call an

23    adversary proceeding in a bankruptcy case with

24    regard to the dispute with Helen-May over the

25    Meadows property?
```

```
 1                      LEFKOWITZ

 2           A.    Correct.

 3           Q.    Before that happened, there was

 4    obviously a bankruptcy case filed.

 5           A.    Right.

 6           Q.    And who determined to file that

 7    bankruptcy case?

 8           A.    I did.

 9           Q.    Did you discuss the idea of filing

10    the bankruptcy with Rabbi Steinwurzel before

11    the bankruptcy filing occurred?

12           A.    No.

13           Q.    Is there a reason you didn't?

14           A.    Reason I didn't?

15           Q.    Is there a reason you didn't?

16           A.    He has no clue what bankruptcy is.

17           Q.    Prior to the time the bankruptcy

18    was filed, through some entity or entities, you

19    purchased two adjoining parcels that were

20    contiguous with the Meadows property; is that

21    correct?

22           A.    Right.

23           Q.    And when did that happen?

24           A.    June, I think.

25           Q.    Of 2004?  Just a few weeks after
```

```
 1                    LEFKOWITZ
 2   you got the assignment; correct?
 3        A.    Correct.
 4        Q.    And how did that come about?
 5        A.    I went out to the property, to the
 6   Meadows.  I saw a for-sale sign on the next
 7   door.  I walked in to the guy.
 8        Q.    I'm sorry.  But is this after the
 9   assignment was executed?  Or before?
10        A.    After.
11        Q.    Okay.  I'm sorry.  Go ahead.
12        A.    Walked into the guy and I asked him
13   what's going on.  He said, "Well, we're selling
14   the property."  I asked him how much.  He gave
15   me a price.  I asked him the activity.  He said
16   my brother-in-law, he's going to contract this
17   week on his side.
18              So I went over to the
19   brother-in-law and I asked him, "If I meet that
20   price, will you sell it?"  And he said, "If you
21   close right now, I'll sell."  So I immediately
22   bought those parcels.  I didn't want to lose
23   the property.
24        Q.    So there was no contract of sale?
25   You went right to closing?
```

```
 1                    LEFKOWITZ

 2        A.    I think it was happening at the

 3   same time.

 4        Q.    Simultaneous.

 5              (A conference was held between the

 6         witness and his attorney.)

 7              (Discussion off the record.)

 8        Q.    Before we get into those documents

 9   themselves, how much total did you pay for the

10   two parcels adjacent to the Meadows property?

11        A.    Like 460.  470.

12        Q.    Total?

13        A.    Right.

14        Q.    There were contracts of sale for

15   these two properties that you said were

16   executed simultaneously with the closing?

17        A.    It wasn't prior to the closing,

18   that's for sure.  If there were any, it would

19   have been at the closing.

20        Q.    So simultaneous.

21        A.    That's what I'm saying.

22   (REQ)      MR. WOLF:  We have not seen those

23   contracts.  I'm requesting production of those

24   contracts.

25              THE WITNESS:  I wouldn't have them.
```

1                          LEFKOWITZ

2          Q.    Why wouldn't you have them?

3          A.    I gave you all my closing documents

4    on those parcels.

5          Q.    When you say you gave me, when did

6    you do that?

7          A.    Before the 341 meeting.

8          Q.    I remember you giving us documents.

9    I'm not saying you didn't.  I don't remember

10   those contracts being among the documents.

11         A.    Not contracts.  I gave you the

12   closing file of those two parcels at that

13   meeting.

14              MR. KRINSKY:  He's specifically

15         asking if there were contracts.

16         Q.    I'm not sure about what you just

17   said, but I'm telling you, we have yet to see

18   the actual contracts of sale for these two

19   properties.  What you're looking at are the

20   deeds.

21         A.    Where did you get those?  From that

22   file?

23         Q.    No.  I don't believe so.  These

24   came to us independently.

25         A.    Because --

1                        LEFKOWITZ

2        Q.    What you gave us may or may not

3    have included the deeds.  But I'm telling you,

4    I don't recall seeing the contracts.

5        A.    No.  I recall giving you closing

6    documents.  I don't know if there was a

7    contract of sale.  There was an appraisal.

8    There were surveys.  Checks.

9        Q.    Why don't we do this.  We'll look

10   in our files.  Your counsel and you will look

11   in your files.  If you see contracts of sale,

12   you'll please produce them.

13            Is Trustee Exhibit 18 a copy of the

14   deed for the -- for one of the two parcels that

15   was purchased?

16            (Trustee Exhibit 18 for

17            identification, deed.)

18       A.    Again, these deeds are erroneous

19   deeds.  I don't believe there's such a thing as

20   Kollel Mateh Efraim LLC.

21       Q.    You're reading from the name on the

22   deed, Kollel Mateh Efraim LLC?

23       A.    Yeah.  Ssiti & Fahrije Saii.  The

24   other is Naroli Naim.

25            (A conference was held between the

```
 1                    LEFKOWITZ

 2          witness and his attorney.)

 3                  (Discussion off the record.)

 4      Q.    So that was one of the two parcels.

 5      A.    Which one are you up to?

 6      Q.    We're up to Trustee Exhibit 19.

 7                  (Trustee Exhibit 19 for

 8          identification, first deed.)

 9      Q.    You say there's also a mistake on

10  that exhibit as far as the name of the

11  purchaser?

12      A.    Correct.

13      Q.    That has the same purchaser entity

14  name as the first deed that's Trustee Exhibit

15  19; correct?

16      A.    Correct.

17      Q.    And was there any -- ever any

18  corrective deed filed with respect to either of

19  these two parcels?

20      A.    I don't know.  I don't know if

21  Michael Halberstam did.  Basically closed the

22  deed with a nonexisting entity.  I don't know

23  what the title company thought when they

24  closed.

25      Q.    And the title company insured
```

```
 1                    LEFKOWITZ

 2    titles here; right?

 3         A.    Right.

 4         Q.    Were you present at the closing?

 5         A.    No.

 6         Q.    Was anyone on behalf of the closing

 7    present at the closing?

 8         A.    Halberstam.

 9         Q.    And only Halberstam?

10         A.    Yes.

11         Q.    Did you ever sign any transfer tax

12    forms with regard to this sale?

13         A.    I don't recall.  Probably did.

14    (REQ)        MR. WOLF:  I also request

15    production of copies of the transfer tax forms.

16              THE WITNESS:  I'm telling you, it's

17         in the file I gave you.

18              MR. WOLF:  Off the record.

19              (Discussion off the record.)

20         Q.    Why did whatever entity did

21    purchase these two parcels buy them?

22         A.    Because I wanted to develop 86

23    acres.  I don't want somebody else to buy it;

24    then I won't be able to have it.

25         Q.    How many acres do these two parcels
```

162

```
 1                    LEFKOWITZ

 2    comprise?

 3         A.    Either 13 or 15.  And they're the

 4    key value to this acreage.  There's road

 5    frontage.  That makes a property value.  You

 6    can have a lot of acreage deep in the woods.

 7    These 13 acres have probably more value than

 8    the 50 acres next door.

 9         Q.    Was it your intent to have some of

10    the development -- residential development you

11    talked about on these two Debtor parcels?

12         A.    Correct.  As a combination.

13         Q.    You were going to do it on all

14    three?

15         A.    Right.

16         Q.    How many units, approximately, did

17    you contemplate building, total, on all --

18         A.    One or two acres.

19         Q.    And how many bedrooms did you

20    anticipate each of these houses would have?

21         A.    2500 square feet.

22         Q.    But how many bedrooms would there

23    be?

24         A.    2500 square feet.  You can do two,

25    four, six.
```

```
 1                    LEFKOWITZ

 2        Q.    So there's no closing.  There's a

 3   dispute about the acreage on the Meadows

 4   parcel; right?

 5        A.    Right.

 6        Q.    And the bankruptcy case is filed.

 7        A.    Right.

 8        Q.    I think in or about October of

 9   2004.

10        A.    About.

11        Q.    And then the adversary proceeding

12   is commenced against Helen-May and Irene

13   Griffin in the bankruptcy case; correct?

14        A.    Yes.

15        Q.    And I believe the allegations in

16   the complaint in the adversary proceeding

17   included misrepresentations about the amount of

18   acreage; right?

19        A.    Correct.

20        Q.    And who conveyed those

21   misrepresentations?

22        A.    Griffins.

23        Q.    In what way did they convey those

24   misrepresentations?

25        A.    There was a set-up.  Sales
```

```
 1                    LEFKOWITZ
 2   material.
 3           Q.    And that sales material said 77
 4   acres?
 5           A.    Correct.
 6           Q.    Were there any oral representations
 7   made by the Griffins or on their behalf about
 8   the acreage?
 9           A.    Yes.  He walked me, I think, twice,
10   three times the property, and told me about the
11   77 acres.
12           Q.    And did they tell you on what basis
13   they had come up with that figure?
14           A.    He even showed me a tax bill.  The
15   tax bill showed 77 acres.  He showed me a city
16   map that had 77 acres on it.
17           Q.    Again, this was just for the
18   Meadows parcel.
19           A.    Right.
20           Q.    Any other forms that the
21   misrepresentations came in?
22           A.    The appraisal.  He had a survey,
23   too, that showed 77 acres, but he never gave me
24   the appraisal -- I mean the survey.
25           Q.    The survey.  How do you know his
```

```
 1                    LEFKOWITZ
 2   survey showed -- it showed 77 acres?
 3        A.    Right.
 4        Q.    How do you know the survey showed
 5   77 acres if he never gave it to you?
 6        A.    We were studying it.
 7        Q.    He showed it to you.  He didn't
 8   give it to you.
 9        A.    He said, "I don't want you to rely
10   on mine.  Go get your own."
11        Q.    Once the occupancy agreement was
12   entered into, was anything done to the Meadows
13   parcel?
14        A.    Anything done as far as what?
15        Q.    Any improvements.  Any renovations.
16   Were any structures torn down?
17        A.    No structures were torn down.
18   There were a lot of renovations.  We had to
19   bring it up to code for occupancy.
20        Q.    Tell me what groups of renovations
21   were made.
22        A.    Several buildings did not have
23   HVAC.  We installed HVAC.
24        Q.    Let me stop you there.  Did the
25   buildings that had HVAC installed include
```

```
 1                    LEFKOWITZ
 2    the -- let me call it fairly large structure --
 3    probably the largest on those premises -- in
 4    which I understand those boys who came to the
 5    summer camp there occupied?
 6        A.    No.  There was large structures
 7    that had HVAC that needed to be replaced.  And
 8    there were smaller structures where it was
 9    sleeping quarters and did not have HVAC at all
10    that needed to be installed.  We installed
11    that.  There was one building that was very
12    tiny rooms and we needed to open up and connect
13    rooms so families can stay.  So we did
14    renovation there.
15        Q.    Which building was that?
16        A.    I think the motel building.
17        Q.    Is that where Wolfgang and the
18    other care-giver lived?
19        A.    Yes.
20        Q.    Go ahead.
21        A.    And painting.  Plumbing corrosion.
22    The swimming pool had to be brought up to code.
23    There was a new septic system that went in.
24    There was a chlorination system that the Health
25    Department insisted we put in before we come
```

1                      LEFKOWITZ

2    in.  We put that in.  Roofs.  Boilers.

3    Whatever it took to shape the place up.

4         Q.    And could you approximate for me

5    how much, dollar-wise, was expended to do these

6    renovations?

7         A.    I think it was, like, close to a

8    million dollars.

9         Q.    And who supplied the funds with

10   which to make these renovations?

11        A.    Maskil el-Dal.

12        Q.    Where did Maskil el-Dal get that

13   money from?

14        A.    Where did Maskil el-Dal get that

15   money?  Maskil has funds accumulated over 30

16   years.

17        Q.    It had accumulated that money, so

18   it had it available.

19        A.    Yeah.

20        Q.    It didn't have to borrow it from

21   others?

22        A.    No.

23        Q.    And during what period of time was

24   this money expended?

25        A.    Most of it happened in the year of

```
 1                    LEFKOWITZ

 2   '04.

 3        Q.    I didn't hear you mention anything

 4   about renovating or kosherizing the kitchen

 5   facilities at the premise.  Was that done,

 6   also?

 7        A.    Yes.

 8        Q.    Do you recall approximately how

 9   much was expended doing that?

10        A.    A few hundred thousand dollars.

11        Q.    Did Maskil el-Dal supply the funds

12   for that, too?

13        A.    Yes.

14        Q.    Who did that kosherizing of the

15   kitchen?

16        A.    Well, it was not just kosherizing.

17   It was also bringing in new equipment.

18        Q.    Right.  Okay.  So one company

19   supplied the new equipment?

20        A.    It was a company that supplied and

21   consulted.  It was a company called All

22   Refrigeration.

23        Q.    They're one of the creditors of the

24   bankruptcy estate; correct?

25        A.    I think so.
```

```
 1                    LEFKOWITZ
 2        Q.    Did they -- you're going to have to
 3   spell it for her.  You had a mashigach certify
 4   that the kitchen was kosher?
 5        A.    Yes.  Called supervisor.  I saw one
 6   of the checks.
 7        Q.    Who was it?
 8        A.    Rabbi Steinmetz.
 9              Correct.  Exhibit 14.
10        Q.    Tell us the number of the check and
11   the date.
12        A.    Check No. 9275 on 6-21-2004.
13        Q.    Bin Yu Min Steinmetz?
14        A.    Yes.
15        Q.    He got $750?
16        A.    Seems like it.
17              MR. WOLF:  Off the record.
18              (Discussion off the record.)
19        A.    There was also communication
20   systems that went in.
21        Q.    What kind of communication systems?
22        A.    Telephone.
23        Q.    Who did you use for that?
24        A.    SOS Communication.
25        Q.    Do you know an individual named
```

```
 1                    LEFKOWITZ

 2   Mark Terkeltaub?

 3        A.    Yes.

 4        Q.    Who is he?

 5        A.    He was the manager on the premises

 6   in '04.

 7        Q.    Did you or your entity employ him

 8   there?

 9        A.    Yes.

10        Q.    I thought you had said before,

11   though, the rabbi was the manager.

12        A.    The rabbi was the rabbi.  He was

13   the manager.  Trucks go in.  Trucks go out.

14   The rabbi didn't make sure trucks get unloaded

15   and mattresses go on beds.

16        Q.    Did you know Mark Terkeltaub before

17   he became manager?

18        A.    Yes.

19        Q.    How did you know?

20        A.    He said, "I don't have a job."  I

21   said, "I've got a job for you.  Go Upstate and

22   run the place."

23        Q.    Did he reside on the premises?

24        A.    Yes.

25        Q.    In the same structure where
```

1                    LEFKOWITZ

2     Wolfgang did?

3          A.    I don't know.

4          Q.    How long was he up there?

5          A.    From May of '04 till Labor Day of

6     '04.

7          Q.    And then he ceased to be the

8     manager there?

9          A.    I think so.

10          Q.    Did you obtain the consent of

11    Helen-May with regard to any of these

12    renovations or additions that you did?

13          A.    Yes.

14          Q.    Were those obtained in writing?

15          A.    No.  She was on the premises.

16          Q.    I'm sorry.  Who was on the

17    premises?

18          A.    She was on the premises.

19          Q.    Who is "she"?

20          A.    Helen.  Irene Griffin.

21          Q.    I'm just going back to Trustee

22    Exhibit 15, the occupancy agreement, for a

23    moment.  The last sentence on the first page

24    that continues on the top of the second page

25    states as follows: "The list of all proposed

172

1                           LEFKOWITZ
2     improvements purchaser proposes must be
3     furnished to seller and its attorney by fax in
4     writing no less than three days prior to the
5     commencement of such work for seller's
6     approval.  Seller may withhold approval for
7     such improvements for any reason or no reason
8     at all."
9              A.    Right.
10             Q.    Were any such list of proposed
11    improvements ever sent to the purchaser?
12             A.    I don't believe so.
13             Q.    But did Irene Griffin give her
14    consent to a number of these improvements?
15             A.    Yes.
16             Q.    She did orally?
17             A.    Yes.  She was very happy.
18             Q.    During the year 2004 did anyone
19    occupy any portion of the Meadows property
20    other than Mark Terkeltaub, the rabbi, and the
21    caretakers?
22             A.    Well, in the summer of '04 we
23    rented it out to -- on a weekend basis.
24    Nightly basis.
25             Q.    And to whom did you do that?

```
1                    LEFKOWITZ

2          A.    People wanted to come up to spend

3    the weekend in the Catskills.

4          Q.    In what structure or structures

5    would they stay?

6          A.    I believe in all of them.

7          Q.    Was there a camp operated during

8    any portion of the summer of 2004 at the

9    Meadows property?

10         A.    Yes.

11         Q.    So there was both a camp operated

12   and there were people, individuals or couples,

13   whomever, who came up and used other portions

14   of the property; is that correct?

15         A.    Correct.

16         Q.    Were there any convention-type

17   groups or business groups that came up to use

18   the property?

19         A.    No.

20         Q.    Who established the room rates or

21   occupancy rates for the people that came up for

22   a weekend, or whatever?

23         A.    This guy Mark Terkeltaub.

24         Q.    Was there a set price per room for

25   the weekends?
```

174

1                          LEFKOWITZ

2          A.     With a crib.  Without a crib.

3          Q.     Different prices?

4          A.     I would assume so.  I wouldn't

5    know.

6          Q.     Did he consult with you about what

7    rates to set?

8          A.     No.

9          Q.     You let him set that?

10         A.     Yeah.

11         Q.     Do you recall approximately how

12   much was collected from those who used the

13   premises for weekends or any portion of time

14   during the year 2004?

15         A.     Don't recall exactly.  It was a few

16   hundred thousand dollars.

17         Q.     Was there any group or family that

18   paid more than $25,000 towards that amount?

19         A.     No.

20         Q.     And to whom were these occupancy

21   rates paid to?

22         A.     To Mark.

23         Q.     To him individually?

24         A.     It was mostly in cash.  Cash and

25   credit card.

```
 1                    LEFKOWITZ

 2          Q.    And -- well, when it was paid by

 3   credit card, to whom was the credit card

 4   payment made payable?

 5          A.    To the suppliers.

 6          Q.    Directly to the suppliers?  How

 7   would that work?

 8          A.    The dairy guy says, "You owe me

 9   $20,000."

10                "Okay, the next few guests, we'll

11   accept the credit card."  Same thing happened

12   with the chicken guy.

13          Q.    They would make credit card

14   payments directly to those entities?

15          A.    Some of them, yeah.

16          Q.    But there were -- you said a few

17   hundred thousand that was collected from these

18   rates.

19          A.    Right.

20          Q.    Was any of that collected by the

21   named Debtor in this bankruptcy case?

22          A.    Not a penny.

23                (Discussion off the record.)

24          Q.    Could you grab a hold of Exhibit 3

25   again, please.
```

1                    LEFKOWITZ

2          A.     Three.  That must be a petition.

3          Q.     It is a petition.

4          A.     Page --

5          Q.     You've got to go towards the back.

6     It's a document labeled "Statement of Financial

7     Affairs."

8                    MR. LaROCCO:  Past all the

9          schedules.  After Schedule H.

10                   THE WITNESS:  "Amount 300,000.

11         Source.  2004"; right?

12                   MR. KRINSKY:  Wait for a question.

13         Q.     This is headed "Income From

14    Employment or Operation of Business."

15    Underneath that heading the statement asks the

16    Debtor to "state the gross amount of income the

17    Debtor has received from employment, trade, or

18    profession, or from operation of the Debtor's

19    business from the beginning of this calendar

20    year to the date this case was commenced."

21                   And it says in the amount of

22    300,000 for the year 2004.

23         A.     Correct.

24         Q.     This question does ask for the

25    source.  The source is not listed.  But I'll

1                     LEFKOWITZ

2     now ask you: What was the source of that

3     $300,000?

4          A.    As I just testified, those were the

5     income of the people that came up to stay

6     there.

7          Q.    So was any of that income deposited

8     into an account or accounts of the Debtor

9     itself?

10         A.    The answer is no.

11         Q.    None of it.

12         A.    No.

13         Q.    So I'm clear.  No, none of it was

14    deposited into a Debtor's account or accounts?

15         A.    I don't believe the Debtor had an

16    account at that time.

17         Q.    How much was paid by the camp with

18    regard to its use and occupancy of the premises

19    during, I guess, the summer of 2004?

20         A.    I think it's part of that $300,000.

21    They also didn't pay.  They just paid directly

22    their expenses.  They paid maintenance.  They

23    paid utilities.

24         Q.    There was nothing separate that

25    they paid to the named Debtor itself?

```
 1                    LEFKOWITZ

 2          A.    No.

 3          Q.    I want to be clear, because we're

 4   looking at the statement of financial affairs

 5   for the incorrectly named, according to you,

 6   Debtor.  Let's quickly look at Exhibit 4, which

 7   is the petition of the entity Mateh Ephraim

 8   LLC.  It states here, "dba, Kollel Mateh

 9   Efraim, LLC."

10          A.    It's an exact mirror-image

11   petition, isn't it?

12          Q.    It should be.  Let's look at the

13   statement of financial affairs there.

14          A.    It's identical.

15          Q.    Identical.  Question No. 1, the

16   amount is listed as $300,000 for the year 2004.

17   So did the camp actually turn over or deposit

18   any money with Mateh Ephraim LLC directly?

19          A.    None.

20          Q.    Was there a contract or some

21   written agreement between the camp and Mateh

22   Ephraim LLC?

23          A.    No.

24          Q.    What was the name of the camp?

25          A.    Mateh Ephraim.
```

179

```
 1                    LEFKOWITZ
 2         Q.    E-P-H-R-A-I-M?
 3         A.    It was in Hebrew.  It wasn't in
 4    English.
 5         Q.    Okay.  Fair enough.
 6               Who was the director of the camp?
 7         A.    Rabbi Steinwurzel.
 8         Q.    How many campers were there at the
 9    camp that summer?
10         A.    Twenty-five, 30.
11         Q.    What was the age range of those
12    campers?
13         A.    Thirteen to 15.
14         Q.    And from what geographic location
15    did those campers come?
16         A.    I think Brooklyn and Rockland.
17         Q.    Did any of the campers come from
18    families that were members of Rabbi
19    Steinwurzel's congregation?
20         A.    I believe so.
21         Q.    What's the basis of that belief?
22         A.    I remember he started that camp and
23    was taking kids from all over the place.
24         Q.    Did he advertise for that camp?
25         A.    I don't know.
```

```
 1                      LEFKOWITZ

 2          Q.     There was staff for the camp?

 3     Counselors?  Teachers?

 4          A.     Families, yes.

 5          Q.     When you say "families," what do

 6     you mean?

 7          A.     There were families.  Couples that

 8     had various positions.  I don't know exactly

 9     who did what.

10          Q.     And were they paid anything by

11     anybody for those positions?

12          A.     I think just food and board.

13          Q.     They got free room and board?

14          A.     Right.

15          Q.     And food?

16          A.     Yes.

17          Q.     Do you know what the campers did at

18     this camp?  Was it -- were they mostly classes

19     and worship?  Were there other things done at

20     this camp?

21          A.     Swimming.  Ball.  Running.

22     Horseback riding.  Who knows?

23          Q.     They did horseback riding on the

24     premises?

25          A.     Not on the premises.  The area has
```

```
 1                    LEFKOWITZ
 2   horseback riding.
 3               MR. WOLF:  Off the record.
 4               (Discussion off the record.)
 5        Q.    And the camp ran from when to when
 6   in the year 2004?
 7        A.    I think from July 4th to Labor Day.
 8        Q.    And did the campers' families pay a
 9   fee or fees for sending their kids to this
10   camp?
11        A.    I don't believe so.
12        Q.    They did not.
13        A.    No.
14        Q.    Was this same camp run at the
15   Meadows property in the summers of 2005 through
16   2007?
17        A.    No.  I think he regrouped with a
18   different group later.
19        Q.    Starting in 2005?
20        A.    '5 -- now we're in '8?  So it's --
21   yeah.  '6, '7 he had a different group.
22        Q.    After the end of the summer when
23   the camp ceased to operate, were there, later
24   on, during the year 2004 -- we're talking about
25   basically September through December 2004 --
```

```
 1                    LEFKOWITZ
 2    did anyone go up and stay at the premises and
 3    pay room rates or whatever?
 4         A.    No.  It was shut down on Labor Day.
 5         Q.    Okay.  Was anything scheduled for
 6    sometime between September and December for use
 7    by any group or any individuals?
 8         A.    I think there was -- I believe in
 9    September there was some.
10         Q.    Do you know what that was?
11         A.    Succoth holiday, I think.  I
12    remember there was some disaster.  I go by
13    memory.
14              MR. KRINSKY:  Some disaster?
15              THE WITNESS:  Yeah.
16         Q.    It was your understanding there was
17    some group planned to be there during the
18    Succoth holiday?
19         A.    Right.
20         Q.    Do you know what group this was?
21         A.    No.  I remember there was a group
22    that came up, and they froze to death, and they
23    didn't pay.  Something like that.
24         Q.    They froze to death, figuratively,
25    I hope.  Not literally.
```

                        LEFKOWITZ

1

2       A.      Correct.

3       Q.      That was during Succoth?

4       A.      September.

5       Q.      Were any succahs actually

6  constructed on the premises at the time?

7       A.      I wouldn't know.

8       Q.      Did you, during the year 2004, ever

9  stay up at the premises?

10      A.      No.

11      Q.      Have you ever stayed up at the

12  premises?

13      A.      No.

14              (Discussion off the record.)

15              (Trustee Exhibit 20 for

16          identification, copies of two one-page

17          letters, one dated 10-6-04, the other

18          dated 10-11-04, each on letterhead and

19          logo of the Friedman family of Toronto.)

20              THE WITNESS:  Yeah, this is the

21          guys.

22              MR. WOLF:  For the record, let me

23          state we've now marked as Trustee's

24          Exhibit 20 copies of two letters, each

25          one page, one dated October 6, 2004, the

```
 1                    LEFKOWITZ
 2          other dated October 11, 2004.  They're
 3          each on the letterhead and logo of the
 4          Friedman family of Toronto.
 5               THE WITNESS:  Yeah.
 6               MR. WOLF:  Each of them are
 7          addressed to Kollel Mateh Efraim LLC, at
 8          751 Second Avenue, New York, New York,
 9          10017.  The first one underneath that
10          address says "Mr. Mark," with a K. Taub.
11          Q.    Do I understand that's a
12     misspelling of Mr. Terkeltaub?
13          A.    He was called that.
14          Q.    And the next one has "Jack
15     Lefkowitz" underneath.
16               Do you recall the dispute?
17          A.    I recall something --
18          Q.    The Friedman family of Toronto, was
19     that an actual family or business group?
20          A.    That's an individual that calls
21     themselves Friedman Group.
22          Q.    What was your understanding as to
23     who was supposed to be coming down in the fall
24     of 2004 to make use of a portion of the Meadows
25     premises?
```

                              LEFKOWITZ

1
2          A.    He's in the business.  He takes a
3    space and rents them out to girls' schools.  He
4    brings up girls' schools for the weekend.
5          Q.    Is it your understanding he was
6    planning to do that sometime in the fall of
7    2004?
8          A.    That's correct.
9                (Discussion off the record.)
10         Q.    So is it your understanding that he
11   had booked a portion of the Meadows property
12   for use by some of these girls during the fall
13   of 2004?
14         A.    Correct.
15         Q.    So what happened?
16         A.    He went up there, and he got chased
17   away by the Griffins.  He got into a dispute.
18   I don't know.  I don't think he ended up
19   occupying.
20         Q.    Did you get involved in some of
21   those discussions?
22         A.    None.
23         Q.    Do you know if any money was
24   retained by the Debtor entity or anyone else as
25   far as a reservation fee that had been made

```
 1                    LEFKOWITZ
 2   here?
 3        A.    No.
 4        Q.    It was not retained?
 5        A.    No.
 6        Q.    Was something given back?
 7        A.    I don't think he gave us a deposit.
 8   He gave a credit card but we never charged it.
 9        Q.    And were there any other groups
10   that came up in the fall of 2004 or the winter
11   of 2004?
12        A.    Nope.
13        Q.    Subsequent to December 31, 2004
14   until the first of the two bankruptcy filings
15   took place -- I'm sorry.  Withdrawn.  I didn't
16   mean that.
17              For the period starting January 1,
18   2005 until this bankruptcy case was converted
19   to a Chapter 7 case, which I believe was at the
20   end of October of 2007, did anyone other than
21   any care-givers and the camp occupy any portion
22   of the Meadows property?
23        A.    No.
24        Q.    Were any efforts made to bring to
25   the property, for weekends or other periods of
```

```
 1                    LEFKOWITZ
 2    time, individuals, couples, and/or families, as
 3    had been done during portions of the year 2004?
 4         A.    Well, in order to do that, money
 5    had to go into the property.  You had to
 6    winterize the property.  During the winter time
 7    it was impossible.  It had to be shut down.
 8    And during the summer time, again, money had to
 9    go in, in order to accommodate families,
10    because none of those families that were in '04
11    wanted to come back unless we did renovations
12    to the property.
13         Q.    How do you know that?
14         A.    That's what they were complaining.
15         Q.    They complained after they stayed
16    in 2004 about the conditions?
17         A.    Right.
18         Q.    So were any efforts made to
19    renovate the property so that such individuals
20    could be attracted back to use the property?
21         A.    We had a dispute with the Griffins.
22    We didn't want to pump money into a property
23    where we don't know what the end result is
24    going to be with the property.
25         Q.    Then why was a camp operated on the
```

```
 1                     LEFKOWITZ
 2    property in each of the summers of 2005 through
 3    2007?
 4          A.    A 14-year-old boy has different
 5    needs than a 25-year-old married woman with a
 6    baby.
 7          Q.    That may be.
 8          A.    It was able to accommodate the
 9    14-year-old boys without any major money going
10    into it.  But in order to accommodate families,
11    money had to go in.
12          Q.    Did the camp that was operated in
13    each of the summers of 2005 through 2007 pay
14    anything to the named Debtor entity for the
15    use -- for the operation, use, of the facility
16    to run the camp in any of those summers?
17          A.    They didn't pay the Debtor.  They
18    paid for the utilities and upkeep and
19    maintenance that went into the property.
20          Q.    There was nothing they paid above
21    that to the Debtor entity?
22          A.    Right.
23          Q.    Did the Debtor entity obtain the
24    permission of the Bankruptcy Court to use or to
25    allow the use of a portion of the Meadows
```

```
 1                    LEFKOWITZ
 2    property during the summers of 2005 through
 3    2007 by the camp?
 4         A.    Whatever permission was obtained in
 5    the Bankruptcy Court is in the bankruptcy
 6    record.
 7         Q.    But that's not my question.  Do you
 8    know whether or not such -- I'll even go back.
 9    Did the Debtor ever seek to get such permission
10    either from Helen-May or from the Bankruptcy
11    Court?
12         A.    Permission to do what?
13         Q.    To allow a portion of the Meadows
14    property to be used by the camp during each of
15    the summers of 2005 through 2007.
16         A.    Well, we had an occupancy agreement
17    that we signed with them in 2004.  That
18    occupancy agreement was assumed in the
19    Bankruptcy Court.  U&O was paid to the
20    Bankruptcy Court.  There was nothing changed in
21    '04, '05, '06, '07 to undo the occupancy
22    agreement.
23         Q.    You said U&O paid to the Bankruptcy
24    Court?
25         A.    Yes.  To David Carlebach.
```

```
 1                    LEFKOWITZ
 2         Q.    He's not Bankruptcy Court.
 3         A.    I said Bankruptcy Court?
 4         Q.    You said --
 5         A.    I said as per the Bankruptcy Court.
 6         Q.    It was paid to David Carlebach as
 7   attorney for Helen-May?
 8         A.    Right.
 9         Q.    Tell me if I'm wrong.  At a certain
10   point in time the Debtor ceased making those
11   payments; is that correct?
12         A.    No.  At a certain point in time the
13   Debtor ceased to make the subsequent payment
14   that the U&O got increased.  We made U&O
15   payments.  Then Carlebach came in and
16   litigated.  Those payments are not sufficient.
17   The camp couldn't pay it anymore.  I wasn't
18   going to invest anymore in lending the Debtor
19   into any D.I.P. loans.  So that's when he
20   obtained the judgment.
21         Q.    And that judgment was for
22   approximately $250,000?
23         A.    Correct.
24         Q.    Because -- tell me if I'm wrong --
25   the U&O, standing for use and occupancy,
```

1                    LEFKOWITZ

2    payment obligation of the Debtor increased from

3    somewhere between four and $5,000 a month to

4    approximately $13,000 or so a month?

5         A.    More.  15,000 plus additional

6    insurance payment.

7         Q.    Do you recall approximately when

8    that increase occurred?

9         A.    No.

10        Q.    Was it in the year 2006?

11        A.    I wouldn't recall.

12        Q.    Not everything is so --

13             MR. WOLF:  Let me get

14        clarification.  Scott, do you recall when

15        that increased?

16             MR. KRINSKY:  It's sort of a --

17        what happened was, there was a hearing

18        the day of the settlement --

19             MR. WOLF:  I want this on the

20        record.  I want the approximate dates.

21             MR. KRINSKY:  The day of the

22        settlement was July 20th, 2005.  That's

23        the day we entered the settlement on the

24        record, which was subsequently

25        overturned.

```
 1                    LEFKOWITZ
 2          MR. WOLF:  Right.
 3          MR. KRINSKY:  On that same day
 4     prior to the settlement there was an
 5     increase in the U&O from something like
 6     5,000 to whatever -- 12, 13, whatever
 7     that number was.  We then spent the next
 8     two years litigating the settlement
 9     issue.
10          When the settlement issue was
11     ultimately ruled against us adversely,
12     that there was lack of authority by Mr.
13     Orseck, at that point in time Helen-May
14     then said, "Aha.  You now retroactively
15     owe us all that money dating back to July
16     20th, '05."  This is sometime in maybe
17     March of '07.  Prior to March of '07 no
18     one had ever asked us for that money.
19          In fact, we had a hearing before
20     Judge Bernstein in December of '05 in
21     which the U&O was reduced to 4209.  So we
22     believed we were current on all our
23     obligations until roughly March of '07
24     when we were told for the first time that
25     we now owe not 4209 but 12, 13, 14,
```

```
 1                    LEFKOWITZ
 2         whatever that much higher number was,
 3         times 22 or something like that.
 4              MR. WOLF:  That was approximately
 5         when?  2007?
 6              MR. KRINSKY:  March/April of '07,
 7         roughly.
 8              MR. WOLF:  Around that time am I
 9         correct that Judge Bernstein in the
10         bankruptcy case issued an order that set
11         forth the aggregate amount of such
12         monthly use and occupancy payments that
13         were due from the Debtor to Helen-May?
14              MR. KRINSKY:  Around that time.  It
15         was not an easy process.  It wasn't
16         simple.  I think it was litigated a few
17         times over a course of maybe a few
18         months.  It wasn't a simple signing of
19         the order.  There were several hearings
20         on it, I believe.
21         Q.    Let me ask you this, Mr. Lefkowitz.
22    By the summer of 2007 --
23         A.    Last summer.
24         Q.    -- this past summer, you were
25    aware, were you not, that the Debtor, as per
```

```
1                    LEFKOWITZ
2    the court, had an obligation to make payment to
3    Helen-May of in excess of $250,000 in back use
4    and occupancy payments; correct?
5           A.    Yeah.  Why didn't I make the
6    payment?
7           Q.    Well, I'll accept that, but that's
8    not my main question.  Why didn't the Debtor
9    make the payment, that aggregate payment, at
10   that time?
11          A.    That I had no money.
12          Q.    And since it had no money and since
13   it knew that the use and occupancy charges were
14   continuing to accrue, why did you not
15   consider -- why did the Debtor not consider
16   either not having the camp occupy the premises
17   that summer of 2007, or requiring the camp, if
18   it wished to operate, to, in addition to
19   whatever expenses it was bearing, to pay those
20   use and occupancy amounts?
21          A.    Because the camp did a tremendous
22   value to the asset by maintaining the facility
23   so if and when we come and buy the property, we
24   buy a property that's maintained to a certain
25   degree.  So we were fortunate enough that the
```

1                    LEFKOWITZ

2    camp said, "Okay, we will pay utilities,

3    maintenance to upkeep the premises."

4         Q.    Are you aware that there were, at

5    least according to Helen-May, additional

6    charges that were accruing on the property

7    under the terms of the occupancy agreement for

8    as long as the Debtor entity had physical

9    possession of those premises but there was not

10   a closing of the purchase of the property?

11        A.    That is a clause that Helen-May

12   interprets it one way and we interpret it

13   another way.  We interpret it if there won't be

14   a closing, that we are obligated to close.

15   There will be a 1,500 penalty per day every day

16   we don't close if we are obligated to close.

17   But if we are not obligated to close, that

18   penalty doesn't kick in.

19              So far, no court has ruled that we

20   are obligated to close.

21        Q.    In the year 2007 did you have any

22   discussions with anyone about the possibility

23   of preserving the Debtor's rights as the

24   contract vendee of the Meadows parcel but

25   giving up its occupancy of those premises so

```
 1                    LEFKOWITZ
 2   that there could be no accruing -- alleged
 3   claim that Helen-May had for such use and
 4   occupancy?
 5        A.    No, the only discussions we had was
 6   global settlement discussions.
 7        Q.    And those broke down when?
 8        A.    When Helen-May came up with a --
 9             MR. KRINSKY:  Let me just --
10             MR. WOLF:  Let me finish.
11             MR. KRINSKY:  You've got to
12        clarify.  Time frame.
13        Q.    When was the last time you ever
14   participated in a global settlement discussion?
15        A.    It was in the courthouse in front
16   of Judge Bernstein.  We took a break.  We went
17   outside.  I settled it with Orseck.  Orseck
18   went to the public phone.  Made a phone call.
19   Came back.  It's done.  We shook hands.  And
20   then we litigated ever since that he wasn't
21   authorized to settle.
22        Q.    But that was back in the year 2005;
23   right?
24        A.    Yes.  We kept on talking to
25   Carlebach and Scher.  The latest discussion was
```

197

```
 1                    LEFKOWITZ
 2    the day before it got converted.
 3              MR. WOLF:  Off the record.
 4              (Discussion off the record.)
 5         Q.    Mr. Lefkowitz, at any time since
 6    its formation in July of 1999, has the entity
 7    Mateh Ephraim LLC ever held any assets or owned
 8    any assets that we have not already discussed
 9    here today?
10         A.    No.
11         Q.    There's no other real estate in
12    which it has had an interest?
13         A.    No.
14         Q.    Any personalty in which it's had an
15    interest?
16         A.    Just merchandise that's up in the
17    Meadows.
18         Q.    And the furniture operation?
19         A.    Yeah, but that stuff was in '99.
20         Q.    It no longer has any of those
21    assets?
22         A.    No.
23         Q.    Did it sell those assets to
24    anybody?
25         A.    It was given away.
```

```
 1                    LEFKOWITZ
 2        Q.    Oh, right.  You said that.  So
 3   nothing else.
 4        A.    No.
 5        Q.    Since the conversion of the case to
 6   a Chapter 7 in late October 2007, have you,
 7   you, personally, had any discussions with
 8   anyone other than anyone in my firm, as counsel
 9   to the Trustee, or with the trustee himself,
10   with regard to possibly purchasing the Meadows
11   property and/or the two adjoining parcels?
12        A.    No.
13        Q.    Have you had such a discussion with
14   any brokers?
15        A.    No.
16        Q.    Have you placed any advertisements
17   anywhere or have any been placed on your behalf
18   with regard to a disposition of any of those
19   parcels?
20        A.    No.
21        Q.    You understand, do you not, that
22   since the case was converted in late October of
23   2005, neither you, individually, or the named
24   Debtor entity has the right to advertise --
25        A.    Do anything.
```

```
 1                    LEFKOWITZ

 2        Q.    -- let me finish -- advertise,

 3   communicate with anyone other than the trustee

 4   or his counsel, or to seek to influence anyone

 5   with regard to purchasing or not purchasing any

 6   of those parcels?

 7        A.    I understand about influence.  I

 8   understand about advertising.  Communicating?

 9   The last time I checked, there was an American

10   flag in this country.  I can communicate with

11   anyone and everyone on any topic.

12        Q.    Well, let me just say, you are

13   aware that any effort that you might make to

14   either encourage someone to buy or not to buy

15   any of these parcels would be in derogation of

16   Trustee's right to administer the Debtor's

17   bankruptcy estate.

18        A.    That, I understand.  You're saying

19   I have no right to communicate about any of

20   these parcels.  It's known out there that I was

21   a previous owner of the parcel.  A caretaker

22   called me last week.  I don't know if I don't

23   have the rights to -- I probably don't have the

24   right to shill anything or encourage or --

25        Q.    What was the caregiver calling you
```

```
 1                    LEFKOWITZ

 2   last week about?

 3        A.    She doesn't have oil in the tank

 4   and the building is freezing.

 5        Q.    Why is she calling you?

 6        A.    She said Helen-May doesn't give

 7   response.

 8        Q.    Oil in the tank on which parcel?

 9        A.    On the Meadows.

10        Q.    The question stands.  Why is she

11   calling you?

12        A.    She called me up.

13        Q.    Did you tell her she should be

14   calling Trustee or Trustee's counsel?

15        A.    I told her to call Robert Wolf, and

16   I gave Robert Wolf's number.

17        Q.    You understand that any such

18   communication in the future should be routed to

19   my office; right?

20        A.    Absolutely.

21              (Discussion off the record.)

22              (Trustee Exhibit 21 for

23         identification, copy of page C-5 of

24         periodical Community, 5-16-07.  )

25        Q.    You have in front of you what's
```

```
 1                    LEFKOWITZ

 2   been marked as Trustee Exhibit 21.  It's the

 3   copy of page C-5 of a periodical called

 4   Community.  The date is May 16, 2007.  And

 5   there is a box towards the upper right-hand

 6   side that's mostly -- is that Yiddish?  Or

 7   Hebrew?

 8        A.    Hebrew.

 9        Q.    Mostly in Hebrew, but with some

10   English, which includes the two lines, "Meadow

11   Hotel, Foresterdale, NY."

12              Have you ever seen this

13   advertisement before?

14        A.    Yes.

15        Q.    When for the first time did you see

16   it?

17        A.    Judge Bernstein's court.

18        Q.    What was the context in which you

19   saw it in Judge Bernstein's courtroom?

20        A.    Carlebach.  He made a whole to-do

21   about it.

22        Q.    Did he have the full newspaper

23   there?  Or just the ad?

24        A.    No.  This was an exhibit to one of

25   his motions.
```

```
 1                    LEFKOWITZ
 2        Q.    Are you familiar with the
 3   periodical, "Community"?
 4        A.    No.
 5        Q.    Do you know what it is?
 6        A.    No clue.
 7        Q.    Are you able to translate the
 8   Hebrew that appears in this ad?
 9        A.    Yes.
10        Q.    Could you translate?  Please don't
11   say it in Hebrew.  It will confuse the
12   transcript.  Tell us what it means, in English.
13        A.    "To all the schools of the United
14   States.  Notice.  Whoever is being proposed to
15   buy" --
16        Q.    I'm sorry?
17        A.    - "proposed to buy the Meadows
18   Hotel in Foresterdale, New York presently
19   occupied by Camp Mateh Efraim, please connect
20   with us so we don't have any loss of money."
21        Q.    Do you recognize the two telephone
22   numbers that are down at the bottom of that ad?
23        A.    No.
24        Q.    Are either of them yours?
25        A.    No.
```

```
 1                       LEFKOWITZ

 2        Q.    Are either of them Rabbi

 3   Steinwurzel's?

 4        A.    No clue.

 5        Q.    Have you ever called Rabbi

 6   Steinwurzel?

 7        A.    I have.

 8        Q.    Do you know what the area code is

 9   to his home number?

10        A.    Where is that flower exhibit?

11              Flower Exhibit, 8.

12        Q.    Do you recognize at least one of

13   the phone numbers on Trustee Exhibit 8 to be

14   that of Rabbi Steinwurzel's home?

15        A.    First one.

16        Q.    718-435-6393.

17              (There was a conference between the

18        witness and his attorney.)

19              MR. KRINSKY:  You said it's the

20        same?

21              THE WITNESS:  Not the same.

22        Q.    Did you recognize the second

23   number, 486-0815?

24        A.    No.

25              See.  I keep track of your
```

1                   LEFKOWITZ

2   exhibits.

3        Q.    Do you know who put this ad in this

4   periodical?

5        A.    No clue.

6        Q.    Did anyone ever discuss with you

7   who put it in this periodical?

8        A.    No.

9        Q.    Did you ever ask anyone to put any

10  ad in a periodical or other media with regard

11  to this property at any time in the year 2007?

12       A.    No.

13       Q.    How about the year 2006?

14       A.    Never.  I had nothing to do with

15  any articles, advertisements.  They mean

16  nothing to me.

17       Q.    Mr. LaRocco has pointed out to me

18  that the word "Community" that appears at the

19  top of this page may refer just to this section

20  of the periodical; that the actual periodical

21  may be called Hamodia.  Are you familiar with

22  that periodical?

23       A.    Yes.

24       Q.    What is it?

25       A.    It's a local newspaper.  I

```
 1                    LEFKOWITZ

 2   shouldn't say local.  It's international.

 3        Q.    It's an international newspaper?

 4        A.    It's an Israeli newspaper.

 5        Q.    Is it circulated in the United

 6   States?

 7        A.    Some communities.

 8        Q.    Including in Crown Heights?

 9        A.    That, I don't know.

10        Q.    Do you ever read it?

11        A.    No.

12        Q.    Do you know if Rabbi Steinwurzel

13   ever reads it?

14        A.    Don't know what he reads and

15   doesn't read.

16        Q.    I forgot to ask you something about

17   the camp operations in the years 2005 through

18   2007.  Did the campers or their families pay

19   any fees for sending the boys to that camp?

20        A.    No idea.

21        Q.    You mentioned, before, that the

22   camp was sort of reconstituted starting in the

23   summer of 2005.  It was a different operation

24   than it was in the summer 2004.  How did it

25   change?
```

1                    LEFKOWITZ

2          A.    Volume of kids.

3          Q.    There was a larger volume?

4          A.    Right.

5          Q.    How many kids were there in the

6     summer of 2005?

7          A.    I wouldn't know, but I once heard

8     50 or 60 kids.

9          Q.    What was the age range?

10         A.    Same range.  Thirteen to 15.

11         Q.    Were there staff members for that

12    camp?

13         A.    Don't know.

14         Q.    How about for the summer of 2006?

15    How many kids?

16         A.    I don't know.  I wasn't on the

17    property since '05.

18         Q.    And you were on the property during

19    the summer of 2005, so you observed some of the

20    cam operations?

21         A.    I can't remember.  I came to visit

22    it once.

23         Q.    Did any of your children go to the

24    camp?

25         A.    My children?  I think I had -- I

```
 1                    LEFKOWITZ
 2  think I had a son there last year.
 3         Q.    You mean in the summer of 2007?
 4         A.    '7.  Right.
 5         Q.    How old?
 6         A.    Fifteen.
 7         Q.    Did you pay any fee for him to go
 8  to that camp?
 9         A.    No.  I paid enough.
10         Q.    Do you know if any of the staff
11  other than -- withdrawn.  Was Rabbi Steinwurzel
12  paid anything to operate the camp?
13         A.    No.
14         Q.    Do you know if any staff members
15  were paid?
16         A.    No.  I think they were only paid
17  room and board.
18         Q.    Do you know if any arrangements
19  have yet been made for the use of the Meadows
20  property in 2008, summer of 2008, as a camp?
21         A.    I don't think so.  I think it was
22  turned over to the Griffins.
23         Q.    Right.  But before that happened,
24  had any plans been made to operate a camp on
25  the premises again for the summer of 2008?
```

1                          LEFKOWITZ

2          A.    Yes.

3          Q.    And had there been any fees

4     accepted, or anything like that?

5          A.    No.

6          Q.    What plans had already been made

7     towards the end of operating the camp there

8     again -- let me finish -- in the summer of

9     2008?

10         A.    They were under the assumption.

11    They would have just gone back there.

12         Q.    Are you familiar with a real estate

13    broker named Abraham Lowy?

14         A.    No.

15         Q.    Are you familiar with a real estate

16    brokerage company called -- I'll spell it --

17    AYL Realty Corp.?

18         A.    Never heard of it before.  Sounds

19    like Abraham Lowy.  AYL.

20         Q.    Any address in Brooklyn with --

21    that would be on North 11th Street?  Would that

22    be in Williamsburg?

23         A.    Greenpoint.

24              THE WITNESS:  Off the record.

25              (Discussion off the record.)

1                    LEFKOWITZ

2        Q.     Are you aware of a broker named

3    Warren Blumenthal?

4        A.     No.

5        Q.     Are you aware of a realty company

6    called Catskill Sales Associates?

7        A.     Catskill Sales Associates?  No.

8        Q.     Are you aware as to whether or not

9    any Jewish congregations have expressed an

10   interest in either purchasing or occupying the

11   Meadows property?

12       A.     No.

13       Q.     Let me ask a few additional

14   questions about Maskil el-Dal.  If you answered

15   this before, I apologize for asking it again,

16   but I don't recall the question and/or the

17   answer.

18              Do you have a position with that

19   entity?

20       A.     Trustee.

21       Q.     You're a trustee.  And you said

22   your father-in-law is one of the founding

23   trustees?

24       A.     Yes.

25       Q.     And is your father-in-law still

```
 1                    LEFKOWITZ

 2   alive?

 3        A.    Yes.

 4        Q.    Where does he live?

 5        A.    Israel.

 6        Q.    In Jerusalem?

 7        A.    Yes.

 8        Q.    And he's a member of the

 9   congregation known as Maskil el-Dal in

10   Jerusalem?

11        A.    Correct.

12        Q.    Do you know who the rabbi is of

13   that congregation?

14        A.    He is.

15        Q.    He is.  Okay.  I'm sorry.  His full

16   name is?

17        A.    I gave it earlier, I think.

18        Q.    I'm sorry.

19        A.    Dov Wilhelm.

20        Q.    You did mention that.  Dov Wilhelm.

21   For how long has he lived in Israel?

22        A.    I think he was born there.

23        Q.    So he's lived there all his life?

24        A.    Yep.

25        Q.    And -- again, you may have answered
```

1                    LEFKOWITZ

2    this before, but I don't have notes on it.

3    Approximately how many members are there of

4    that congregation at present?

5         A.    Twenty-five or 30.

6         Q.    Individuals?

7         A.    Individuals.  Families.

8         Q.    And the monies that Maskil el-Dal

9    has generated or accumulated over the years,

10   they came from where?

11        A.    Donations, mostly.

12        Q.    Donations from the congregants

13   themselves, exclusively?  Or from anyone else?

14        A.    Over 30 years, I don't know if it's

15   exclusively or not.

16        Q.    And how has it come about that

17   Maskil el-Dal has made loans to the named

18   Debtor entity in this case?

19        A.    I applied for it.

20        Q.    And when you say you applied for

21   it, did you have to do that through an actual

22   written application of some kind?

23        A.    No.  Orally.

24        Q.    And have there been resolutions

25   adopted by the board of trustees of Maskil

1                    LEFKOWITZ

2    el-Dal authorizing the making of such loans?

3         A.    There was a blanket authorization

4    of whatever loans they make on my behalf, that

5    I'm personally guaranteed to.

6         Q.    But that's not in writing?

7         A.    It's going back years.  I don't

8    know whether I have it in writing.

9    (REQ)  Q.    I request production of any

10   written guarantees that you're referring to,

11   and any other writings that memorialize the

12   requests made for or the authorizations given

13   by Maskil el-Dal's board for the making of

14   these loans to the Debtor entity.

15        Q.    Does Maskil el-Dal have any

16   employees?

17        A.    No.

18        Q.    So Rabbi Steinwurzel has never been

19   a rabbi or employee of that entity?

20        A.    Never associated with that entity.

21        Q.    He's never served as a rabbi or

22   assistant rabbi for that congregation?

23        A.    No.

24             MR. WOLF:  I'd like to take a

25             five-minute break.  We're getting close

```
 1                    LEFKOWITZ
 2          to the end of the questioning I have for
 3          today.  I need to consult with my
 4          colleagues here.  Let's take a
 5          five-minute break.
 6                    (A brief recess was taken.)
 7                    (Trustee Exhibit 22 for
 8          identification, copy of check drawn on
 9          the account of Maskil el-Dal, Inc., check
10          No. 9286, 6-23-04.)
11          Q.    Mr. Lefkowitz, there's now been put
12   in front of you what has been marked as
13   Trustee's Exhibit 22 for identification.  It
14   appears to be a copy of a check drawn on the
15   account of Maskil el-Dal, Inc., check No. 9286,
16   with a date of June 23, 2004.
17                    Do you recognize any of the
18   handwriting on this check?
19          A.    Yes.
20          Q.    Whose is it?
21          A.    Mine.
22          Q.    Is that a copy of your signature on
23   the lower right-hand corner?
24          A.    Yes.
25          Q.    And this check is for the amount of
```

```
 1                     LEFKOWITZ
 2    $451,000; is that correct?
 3          A.    Correct.
 4          Q.    And the memo indication in the
 5    lower left says, "The Meadows loan for contract
 6    deposit."  What does this check relate to?
 7          A.    This bought the two bank checks to
 8    buy the other two properties.
 9          Q.    It looks like it says, "Pay to the
10    order of Lefkowitz."
11          A.    Yes.
12          Q.    That was you?
13          A.    When you go into a bank -- let me
14    give you an answer.
15          Q.    Go ahead.  I know where you're
16    going.
17          A.    When you go into a bank to buy a
18    bank check, the bank makes you write the check
19    to yourself.
20          Q.    And you gave it to the bank --
21          A.    Two bank checks, which I gave you
22    copies of.
23          Q.    Right.  So this -- did any of this
24    money, before the bank checks were cut, go into
25    any personal account of yours?
```

```
 1                      LEFKOWITZ
 2        A.    No.
 3        Q.    So it was given straight to the
 4   bank.  And the bank was who?
 5        A.    Citibank, I assume.
 6        Q.    Citibank issued the bank checks?
 7        A.    Correct.
 8        Q.    And they were for a total of
 9   $451,000?
10        A.    Yes.
11        Q.    And that was the total amount of
12   what?
13        A.    Of the two bank checks that bought
14   the two adjoining parcels.
15        Q.    That was the total aggregate price
16   of the two parcels?
17        A.    Correct.
18        Q.    And I notice that the account on
19   this check and a whole bunch of others that
20   were marked as Trustee Exhibit 14 says "Maskil
21   el-Dal, Inc."  The address below that is your
22   residence; is that correct?  1526 52nd Street?
23        A.    Maskil has an office in that
24   building.
25        Q.    I'm sorry.  What building?
```

1                    LEFKOWITZ

2          A.    1526 52nd Street.

3          Q.    Is that your residence also?

4          A.    That's correct.

5          Q.    So Maskil el-Dal has an office

6    within your house?

7          A.    It's a six-story building.  The

8    first floor, Maskil occupies.

9          Q.    Townhouse-type building?

10         A.    Call it what you want.

11         Q.    Other than the office Maskil el-Dal

12   occupies, does the rest of the space serve as

13   your family --

14         A.    No.  There are a couple of other

15   offices.

16         Q.    Other office companies that you are

17   an officer of?

18         A.    My wife.

19         Q.    Do they include an office of the

20   named Debtor in this bankruptcy case?

21         A.    No.

22         Q.    And Maskil el-Dal, Inc. is the name

23   of the religious corporation formed in New

24   York; is that correct?

25         A.    Correct.

```
 1                    LEFKOWITZ

 2          Q.    And what year was it formed in?

 3          A.    About 30 years ago.

 4          Q.    Let's go back to Exhibit 4,

 5   referred to, euphemistically, as the second

 6   Debtor's petition, that of Mateh Ephraim LLC,

 7   dba Kollel Mateh Efraim, LLC.

 8                If you look at Schedule F, about

 9   mid way through the document, "Creditors

10   holding unsecured nonpriority claims."

11                The first one -- these I believe

12   are in alphabetical order.  "All refrigeration

13   and equipment, $230,000."  Do you see where I

14   am?

15          A.    Yeah.  Yes, sir.  Yes.

16          Q.    There are $230,000?

17          A.    Yeah.

18          Q.    Is that accurate?

19          A.    Yes.

20          Q.    That was for -- what?

21          A.    That's for equipment and supplies.

22          Q.    That they supplied at the Meadows

23   property?

24          A.    Correct.

25          Q.    Heavily Koshered Cuisine.  $46,000?
```

```
 1                    LEFKOWITZ

 2        A.    Yes.

 3        Q.    That was for food brought into the

 4   camp?

 5        A.    I think this is from the '04 --

 6   from the hotel family services.

 7        Q.    And they are a kosher food

 8   supplier?

 9        A.    Caterer.

10        Q.    Then there's Helen-May Holdings,

11   LLC, $1,260,000.

12        A.    Right.

13        Q.    What does that amount represent?

14        A.    Balance of the contract.

15        Q.    Then there's Mark Terkeltaub,

16   $15,000.

17        A.    Right.

18        Q.    What was that for?

19        A.    Management.

20        Q.    He didn't get paid all of his fees?

21        A.    I guess so.

22        Q.    Have you had any discussions with

23   Mark Terkeltaub about his claim?

24        A.    Yes.  Sure.

25        Q.    When is the last time you had such
```

```
 1                    LEFKOWITZ

 2  a conversation?

 3       A.   Every time he stops me he says,

 4  "Where's my money?"

 5       Q.   Did you tell him to speak to the

 6  trustee?

 7       A.   Some is his own personal

 8  reimbursement.  Credit cards.  I don't know.

 9       Q.   Maskil el-Dal.  $1,200,000 is

10  listed here.

11       A.   Yes.

12       Q.   What does that represent?

13       A.   All the monies Maskil advanced on

14  behalf of the Debtor.

15       Q.   Michael Halberstam, $10,000.

16  What's that the for?

17       A.   Legal fee.

18       Q.   Legal fee in connection with what?

19       A.   All these Halberstam letters.

20  $2500 a pop.

21            (Discussion off the record.)

22       Q.   SOS Communications.  $90,000.

23       A.   Yeah.  They have equipment there.

24  They're begging to get it back.

25       Q.   Were they ever paid anything for
```

```
 1                    LEFKOWITZ

 2   any of the services or equipment they provided?

 3        A.    Yes.

 4        Q.    Do you know how much?

 5        A.    I saw some checks here before.

 6        Q.    I don't want you to start adding

 7   them up.  Do you have an idea without looking

 8   at them?

 9        A.    Maybe 20,000.  They put in a whole

10   new communication system.

11              (Discussion off the record.)

12              MR. WOLF:  We need a break.

13              (A brief recess was taken.)

14        Q.    You have in front of you what has

15   been marked as Trustee Exhibit 23.

16              (Trustee Exhibit 23 for

17         identification, accounting of payments

18         made by Maskil el-Dal, Inc. to various

19         individuals and entities from 5-19-04

20         through 9-20-04, production Nos. T 00025

21         through 00032.)

22        Q.    This is several pages -- it's

23   handwritten at the bottom.  It looks to me like

24   it says T 00025 through T 00032.

25        A.    Called Bates stamps.
```

```
 1                    LEFKOWITZ
 2            MR. KRINSKY:  I can represent that
 3       in order to show my good faith and get
 4       the trustee documents as soon as humanly
 5       possible in this case, I put "T" for
 6       Trustee and attempted to Bates-stamp the
 7       documents that way.
 8            MR. WOLF:  Off the record.
 9            (Discussion off the record.)
10       Q.    Have you ever seen any portion of
11  Trustee Exhibit 23 before?
12       A.    No.
13       Q.    Do you understand this to be an
14  accounting of payments made by Maskil el-Dal,
15  Inc. to various individuals and entities from
16  May 19 of 2004, which I think is the day after
17  the assignment we referred to earlier, through
18  September 20, 2004?
19       A.    All I can tell you, I'm getting
20  sick reading this.
21       Q.    Is that what you understand it to
22  be?
23       A.    Yes.
24       Q.    And then let me ask you this: What
25  is shown -- if you go to the last page of the
```

```
 1                      LEFKOWITZ
 2    whole document, it says there's a total of
 3    $316,135.64; that all these payments that are
 4    listed in here made by Maskil el-Dal, Inc.
 5    aggregate that amount.  Then there's an item
 6    that says "Outstanding" -- that may mean a
 7    check hadn't been cashed -- to Kosher, Inc.,
 8    $45,000?
 9         A.    No.
10               THE WITNESS:  Off the record.
11               (Discussion off the record.)
12         Q.    This is my question: Does this
13    accounting set forth what the alleged basis is
14    of the $1.2 million claim that has been either
15    noticed or filed by Maskil el-Dal, Inc. against
16    the named Debtor in this bankruptcy case?
17         A.    Yes.
18               MR. WOLF:  At this point I have no
19         further questions --
20               THE WITNESS:  Hold on a second.
21         Q.    Yes?
22         A.    Yeah.  Okay.  I'm sorry.
23         Q.    Nothing more?
24               MR. WOLF:  At this point I have no
25         further questions of the witness today.
```

1                    LEFKOWITZ

2         But during the course of the examination

3         today we've made a request for a number

4         of documents.  We will send to the

5         Debtor's counsel a list compiling the

6         categories of documents we've asked for

7         and requesting the production of them.

8              Once we've had an opportunity to

9         review the documents that are produced in

10        response to that, we'll then contact the

11        Debtor's counsel to schedule a

12        continuation date of this examination.

13             That's it for today.

14             (Time noted: 5:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              A C K N O W L E D G M E N T

 2

 3    STATE OF NEW YORK    )

 4                         :ss

 5    COUNTY OF NEW YORK  )

 6

 7        I, JACK LEFKOWITZ, hereby certify that I

 8    have read the transcript of my testimony taken

 9    under oath in my deposition of January 30,

10    2008; that the transcript is a true, complete

11    and correct record of my testimony, and that

12    the answers on the record as given by me are

13    true and correct.

14

15

16                      ----------------------

17                      JACK LEFKOWITZ

18

19     Signed and subscribed to before me

20    this ---- day of -------------, 2008.

21

22

23    -----------------------------------

24    Notary Public, State of New York

25
```

```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK   )

 4                                    : ss.

 5   COUNTY OF NEW YORK  )

 6

 7        I, MARLENE LEE, a Certified Shorthand

 8   Reporter, Certified Realtime Reporter and

 9   Notary Public within and for the State of New

10   York, do hereby certify:

11        That JACK LEFKOWITZ, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony given by the witness.

15        I further certify that I am not related to

16   any of the parties to this action by blood or

17   marriage, and that I am in no way interested in

18   the outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set my

20   hand this ____ day of _____, 2008.

21

22   _____

23   MARLENE LEE, C.S.R, C.R.R.

24

25
```

```
 1                    ***ERRATA***

 2         ELLEN GRAUER COURT REPORTING  CO. LLC
             126 East 56th Street, Fifth Floor
 3                New York, New York 10022
                       212-750-6434
 4

 5   NAME OF CASE: IN RE: KOLLEL MATEH EFRAIM, LLC
     DATE OF DEPOSITION: January 30, 2008
 6   NAME OF WITNESS: JACK LEFKOWITZ

 7   PAGE  LINE   FROM      TO         REASON

 8    ____|___|_____|_____|_____

 9    ____|___|_____|_____|_____

10    ____|___|_____|_____|_____

11    ____|___|_____|_____|_____

12    ____|___|_____|_____|_____

13    ____|___|_____|_____|_____

14    ____|___|_____|_____|_____

15    ____|___|_____|_____|_____

16    ____|___|_____|_____|_____

17    ____|___|_____|_____|_____

18    ____|___|_____|_____|_____

19    ____|___|_____|_____|_____

20    ____|___|_____|_____|_____

21                     _____

22   Subscribed and sworn before me

23   this_____day of _____, 2007.

24   _____    _____

25   (Notary Public)       My Commission Expires:
```