**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **TEHUM CARE SERVICES, INC.** | § | **Case No. 23-90086** |
| | § | |
| **Debtor** | § | |
| | § | |

**ADREE EDMO'S OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

1.      Adree Edmo ("Ms. Edmo"), hereby files this Objection (the "Objection") to the Debtor's Emergency Motion (the "DIP Motion") [Dkt. No. 185] filed by the above-captioned debtor (the "Debtor") in the above-referenced case to obtain post-petition financing (the "Insider Financing") and respectfully states as follows:

**I.      Preliminary Statement**

2.      "Long before anyone had imagined such a thing as Chapter 11 bankruptcy, it was already well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all the debts of the corporation are paid." *In re DBSD N. Am., Inc.*, 634 F.3d 79, 94 (2d Cir. 2011) (citing *R.R. v. Howard*, 74 U.S. (7 Wall) 392, 409-10, 19 L. Ed. 117 (1868). Yet this is precisely what would happen if this Court approves the proposed Insider Financing—the controlling insider(s) M2LoanCo (the

"Insider Lender") would strip value from legitimate creditors, effectuate unprecedented third-party releases of entities unrelated to the Debtor, and keep control of the Debtor during and after the bankruptcy case. There is overwhelming evidence from the public record and even the limited testimony in this case that the Debtor, M2LoanCo, and YesCare, Inc. ("YesCare") are all under common control. Under applicable law, this Court must scrutinize closely the Insider Financing and overrule the DIP Motion. The Court should also overrule the DIP Motion because no funding would go to pay the unsecured creditors' claims. The purpose of the Insider Financing is to pay the estate professionals to quash the unwinding of the May 2022 divisional merger, thereby eliminating any fraudulent transfer liability whereby the Debtor's affiliates loaded the undercapitalized Debtor up with obligations, all the while granting wide third-party releases to all the insiders and their professionals for pre-petition and post-petition conduct. Based on this fact alone, because the Debtor cannot meet the standards under 11 U.S.C. 364, this Court should overrule the DIP Motion.

3.      This Court must also overrule the DIP Motion because the Insider Financing is an improper *sub rosa* plan that seeks to pre-wire material plan terms that expressly violate the absolute priority rule and Fifth Circuit law regarding third party releases and exculpation clauses.  The DIP Credit Agreement contains a default provision that would allow the insiders to steal value from the unsecured creditors in a way that violates the absolute priority rule.  No money from the Insider Transaction is going to the unsecured creditors, including Ms. Edmo.  The Debtor has no operations and no employees. No reorganization will happen. The harm to the estate and the creditors that would result from this scheme far outweighs any benefit that would be afforded by the Insider Financing.

4.     This bankruptcy case has been shrouded in mystery and false "emergencies" from the start.  The extremely unusual peculiarities include the Debtor's: (1) failure to file any Schedules or Statements of Financial Affairs while seeking "emergency" DIP financing with releases that violate Fifth Circuit law; (2) failure to file any "First Day" motions; (3) hiring of a Chief Restructuring Officer the same day as the Petition Date; (4) the "emergency" need for a broad stay to "protect" a multitude of third parties—including sovereign states that are prohibited from seeking bankruptcy relief; (5) the noticing of a hearing under seal with an hour's notice; and (6) the "emergency" need for financing from insiders for a company that has no operations or employees.  Each of these issues point to bad faith and /or collusive behavior, and taken together, they suggest there may even be fraud underlying this proceeding.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████



1

5.      Despite ███████████████████████████████████████████████████

the Debtor has focused exclusively on the immediate "need" to get an order approving

the Insider Financing.  If any motion warranted emergency status in this case, it would be

a motion for the appointment of an ombudsman, an examiner, or a Chapter 11 Trustee.

6.      Based on Mr. Perry's testimony at the first hearing on the DIP Motion, before the

petition was filed, the Debtor had used up the $15 million pursuant to the Funding

Agreement.  Allegedly, after using up the Funding Agreement funds, M2LoanCo extended

another $15 million—although it is unclear if any or all of that money was provided directly

to the Debtor or if M2LoanCo spent $15 million on behalf of the Debtor.  The Debtor has

not shown the creditor body the Funding Agreement.  The Debtor has not proved what, if

any, funds are still available.  At the last hearing, the Debtor wasn't aware of how those

funds were spent.  Mr. Perry's testimony was vague about these facts.  What is clear is

that the Debtor had a bank account before the petition date, and it had no funds in a bank

account on the Petition Date.  Regardless of how the funds were directed, without the benefit of schedules and SOFAs that creditors can analyze, at this stage we are left to assume that M2 LoanCo advanced that money without the expectation of repayment.

7.      Without this information, and without having filed schedules and statements of financial affairs, the Debtor seeks broad third-party releases and exculpation clauses for insiders and various other third parties (known and unknown) from all pre-petition and post-petition conduct whether related to the Insider Financing or not.  The Debtor has not provided any explanation of who or what is being released specifically, and with regard to all pre-petition and post-petition activity, from what these unknown players are being released.  For example, do co-defendants who are allegedly owed indemnification obligations fall under the definition of Releasees? Who and what is included in the term "agent" or "assign"?  Is the Debtor including the parties in the Adversary proceeding and the Motion to Extend the Stay as Releasees?

8.      At a minimum, this Court should defer consideration of the DIP financing until the Debtor has filed its Schedules and Statements of Financial Affairs.  Without those documents, it is impossible to know who owns the company or the details of payments made to date.  Without these documents, it appears that the Debtor is being financed by an improper "Insider" in an effort to sidestep the absolute priority rule, strip value from creditors, maintain control over the Debtor during and after the bankruptcy, and keep creditors from getting any kind of meaningful recovery.

**II.      The Insider Financing Fails to Meet the Requirements of Section 364 and Cannot Survive the Heightened Scrutiny that Applies to Insider Transactions.**

9.      There is no valid purpose for the Insider Transaction—let alone one that stems from sound business judgment—and certainly not one that meets the total fairness test. Because the Debtor has not filed schedules or statements of financial affairs, there is no way to scrutinize adequately the transaction.  The Debtor assures us that everything is on the up and up, but the Debtor's bald assertions don't suffice to meet the standard.  In fact, based on the Debtor's own evidence and everything within the four corners of the DIP Motion and the DIP Credit Agreement, there's no possibility the DIP is the result of an arms' length bargain **when the Debtor is controlled by the same person who is a signatory for M2LoanCo.**

10.      Under section 364(d), the Debtor has the burden of demonstrating: (a) that it is unable to obtain unsecured financing under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender.  *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 767 (Bankr. S.D.N.Y. 2020) *citing In re Republic Airways Holdings, Inc.*, No. 16-10429(SHL), 2016 Bankr. LEXIS 1927, 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 6, 2016).  The entire fairness standard requires proof of fair dealing and fair price and terms. *In re L.A. Dodgers*, Bankr. D. Del. 2011).

11.      Through the DIP Motion and the corresponding orders, the Debtor seeks to obtain financing from an insider, M2LoanCo, which will receive super priority claim status under 11 U.S.C. §§ 364(c) and 503(b).  M2LoanCo and the Debtor have a common parent:

M2HoldCo. Therefore, M2LoanCo meets the definition of a statutory insider under 11 U.S.C. § 101(31).   However, M2LoanCo and the Debtor appear to be more than just insiders.   They appear to be controlled by the same person.   The Debtor's own exhibit at ECF 59-10 shows Isaac Lefkowitz ("Mr. Lefkowitz") signed a contract on behalf of M2LoanCo.   Mr. Perry also testified at the first DIP Motion hearing that "Mr. Isaac Lefkowitz is the director of the Debtor."   Accordingly, Mr. Lefkowitz controls both M2LoanCo and the Debtor.

12.     By definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor. *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020). Those kinds of transactions are inherently suspicious because they are "rife with the possibility of abuse." *Id.* (citing *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (internal citations omitted). Insider transactions must be closely scrutinized. *Pepper v. Litton*, 308 U.S. 295, 306 (1939). Moreover, because this is an insider transaction, the applicable test is not the "business judgment" standard. Rather, the burden is on the insider to show the inherent fairness and good faith of the challenged transaction. *Pepper v. Litton*, 308 U.S. at 306; *Porretto v. Williams (In re Porretto)*, 761 Fed. Appx. 437, 443 n. 9 (5th Cir. 2019) (internal citations omitted).   An insider's dealings with a bankrupt corporation are subject to rigorous or strict scrutiny. *Pepper v. Litton*, 308 U.S. at 306; *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991).

13.     The requirements of heightened scrutiny impose on the Debtor the burden of demonstrating the "entire fairness" of the Insider Financing.  The Debtor must show both that (a) the process leading up to the transaction, and (b) the price and terms of the

transaction "not only appear fair, but are fair." *In re Inkeepers USA Trust,* 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) *see also Pepper v. Litton*, 308 U.S. at 306-07; In re Los Angeles Dodgers, LLC, 457 B.R. 309, 313 (Bankr. D. Del. 2011) (insider DIP financing "requires proof of fair dealing and fair price and terms") *Anchorage Boat Sales, Inc*., 29 B.R. 275, 278 (Bankr. E.D.N.Y. 1983); *In re Bidermann Indus. U.S.A., Inc*., 203 B.R. at 549 ("the conduct of bankruptcy proceedings not only should be right but must seem right").  As the Supreme Court has explained, this standard "is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper v. Litton*, 308 U.S. at 307.

14.    The Debtor has not made even a threshold showing that the Insider Financing meets the entire fairness standard. The Insider Lenders have complete control over the plan process through the various milestones, and the penultimate indicator of bad faith— the Insider Lenders are the sole decisionmakers regarding the plan that may be filed. That is, the Insider Lenders won't even permit a plan to be filed unless it is an "Acceptable Plan."  As defined in the DIP Credit Agreement: "Acceptable Plan" shall mean a Chapter 11 Plan for the Chapter 11 Case, **which Chapter 11 Plan is in form and substance satisfactory to the Secured Parties in their sole discretion** (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the Secured Parties) [Dkt. 243, Page 44 (emphasis added)].

15.    That is, the Insider Lenders have sole discretion over what is included in the plan, and if an "Acceptable Plan" isn't filed by July 14, 2023, or if an "Acceptable Plan" isn't confirmed by the Insider Lenders' deadline, then the Debtor will have defaulted under the DIP Credit Agreement.  The consequences for default are dire.  Upon triggering a default,

M2 LoanCo, in its capacity as Administrative Agent, "may direct the Borrower to (and the Borrower shall comply with such direction) dispose of or liquidate the Collateral[.]" (Dkt. No. 243, Page 77, § 7.2(d)(iii)). M2 LoanCo seeks to include all "causes of action" of the Debtor in the DIP Collateral, including avoidance and recovery actions. (Dkt. No. 243, Page 16-17, § 5(a)).

16.     At the resulting sale of the Debtor's causes of action, M2 LoanCo will be entitled to credit bid. (*See* Dkt. No. 243, Page 36, ¶ 26). This would create the perverse scenario by which the Debtor's creditors—who were forced into that status by virtue of the divisional merger and subsequent bankruptcy— will be forced to pay millions of dollars to the insiders of the Debtor for the right to bring fraudulent transfer and alter ego causes of action against those same insiders. And even if some coalition of creditors is able to come up with the funds necessary to bid in excess of M2 LoanCo's credit bid, the insiders are still exceedingly likely to win the auction.

17.     The existing terms would also permit the Financing Insiders to buy the estate causes of action against themselves for substantially less than the value of the assets they looted from pre-divisional-merger Corizon Health. With the consummation of that sale, the insiders will have quieted title to what are now the YesCare assets and effectively discharged all of the unsecured debt that they quarantined in this Chapter 11 proceeding. "Old equity" will have thus "acquired or retained the property interest without paying full value," defeating the intent of Congress as expressed in 11 U.S.C. § 1129(b)(2)(B)(ii). *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship,* 526 U.S. 434, 457 (1999).

18.     These terms violate the Debtor's fiduciary obligations to the estate—and thus must be rejected. *See In re Tenney Village Co., Inc.,* 104 B.R. 562, 569 (Bankr. D.N.H. 1989) (debtor's "pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").   In *Tenney Village*, the court denied a financing agreement where the confirmation of a plan over the lender's objection would constitute a termination event and permit foreclosure without a court order. Id. at 562. The court found that the financing terms effectively enabled the lender to control the debtor and its business, thereby "pervert[ing] the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [lender] and the Debtor's principals who guaranteed its debt." Id. at 568. Similarly, the terms of the Insider Financing, if approved, would enable the Insider Lender to control the reorganization process, a task that is reserved for the Debtor as a fiduciary for the estate.

### III.     The Insider Financing Contains Impermissibly Broad Non-Consensual Third-Party Releases and Exculpations.

19.     In addition to the issues raised above, the DIP Motion seeks broad third-party releases beyond the terms of the DIP for all pre-petition and post-petition conduct. The Court should reject these releases, which would shield the Debtor, co-defendants, and other unrelated parties from liability, including for causes of action unrelated to the proposed financing. The 1983 Judgment in Ms. Edmo's case, for instance, is final—the Idaho United States District Court has already ruled on liability.   If this Court releases even third parties, it will impermissibly extend bankruptcy protection to entities that could never otherwise have such protection—such as the Idaho Department of Corrections ("IDOC"). As a matter of public policy, this Court should not allow IDOC—a state entity—

to hide behind the Debtor's bankruptcy filing to further stall and potentially avoid payment altogether to a successful civil rights plaintiff—especially given the fact that IDOC is completely solvent and capable of paying the obligation owed to Ms. Edmo.

20.     Under 42 U.S.C. § 1983 and Idaho State law, Ms. Edmo's suit against IDOC and IDOC administrators in their official capacities amounts to a suit against the State of Idaho, and the State of Idaho is jointly and severally liable along with Corizon Defendants for the Fee Judgment.  IDAHO CODE Title 20, Chapter 2, § 20-201 ("The Department of correction shall, for the purposes of section 20, article IV, of the constitution of the state of Idaho, be an executive department of state government."); *see, e.g., Edmo*, 935 F.3d at 766 ("[T]he district court…ordered the State to provide the surgery."); *id*. at 799 ("Edmo sued Attencio, Zmuda, and Yordy in their official capacities. . . .  The State does not contest that Attencio, as Director of IDOC, and Zmuda, as Deputy Director of IDOC, would be responsible for implementing any injunctive relief ordered.  Edmo properly named them as defendants to her Eighth Amendment claim for injunctive relief.").

21.     In addition to States not being able to directly file for bankruptcy, federal law principles also prohibit a State from using bankruptcy law or proceedings to shield itself from a federal civil rights judgment obtained pursuant to 42 U.S.C. § 1983. In enacting § 1983, Congress affirmed that individuals can recover damages against state government actors who violate citizens' federal constitutional rights.  Congress intended § 1983 and its precursor, § 1 of the Civil Rights Act of 1871, to decisively guarantee that individuals can vindicate their civil rights in federal court. *See Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972) ("[Section 1] was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional

amendment.  As a result of the new structure of law that emerged in the post-Civil War era…the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established.).  The causes of action Congress established in the Civil Rights Act arise directly out of rights and duties under the Constitution and federal statutes, and "exist independent of any other legal or administrative relief that may be available as a matter of federal or state law.  They are judicially enforceable in the first instance."  *Burnett v. Grattan*, 468 U.S. 42, 50 (1984).  The Civil Rights Act was crafted specifically to safeguard individual civil rights in the face of abuse by State actors:  "The central aim of the Civil Rights Act was to provide protection to those persons wronged by the misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.") *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980); *see also Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 503 (1982) (The Civil Rights Act of 1871, along with the Fourteenth Amendment it was enacted to enforce, were crucial ingredients of the basic alteration of our federal system accomplished during the Reconstruction Era…[T]he Federal Government was clearly established as a guarantor of the basic federal rights of individuals against incursions by state power. . . . [I]n passing § 1, Congress assigned to the federal courts a paramount role in protecting constitutional rights.").

22.     Congress intended that federal court jurisdiction to protect constitutional rights under these statutes be given the broadest possible construction:  "This act is…in aid of preservation of human liberty and human rights.  All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed.  It would be most strange and, in civilized law, monstruous were this not the rule of interpretation." *Monell*

*v. Dep't of Social Services of City of New York*, 436 U.S. 658, 684 (1978) (quoting the Congressional Record, Glove App. 68); *see also id.* at 700 ("[T]here can be no doubt that § 1 of the Civil Rights Act was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights."); *Burnett*, 468 U.S. at 50 (holding that these statutes "are characterized by broadly inclusive language"); *Owen*, 445 U.S. at 635-36 ("[T]he congressional debates surrounding the passage of § 1 of the Civil Rights Act of 1871, 17 Stat. 13—the forerunner of § 1983—confirm the expansive sweep of the statutory language."). The Supreme Court emphasized the stated intent of the legislators to "throw[] open the doors of the United States courts to those whose rights under the Constitution are denied or impaired." *Mitchum*, 407 U.S. at 240.

23.     The ability of an individual to seek and recover money judgments in federal court from a state government entity that has violated her federal rights is an indispensable part of the federalism framework established by Congress. *See Owen*, 445 U.S. at 651 ("A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed."). Any decision having the effect of precluding individuals from collecting compensation for State violations of civil rights would vitiate the core objective of § 1983: "The central purpose of the Reconstruction Era laws is to provide compensatory relief to those deprived of their federal rights by state actors." *Felder v. Casey*, 487 U.S. 131, 141 (1988); *see also Burnett*, 468 U.S. at 53 ("The goals of the federal statutes are compensation of persons whose civil rights have been violated, and prevention of the abuse of state power.").

24.     Furthermore, the Supreme Court has recognized that civil rights suits brought by individuals under § 1983 serve a crucial public interest: "When a plaintiff succeeds in remedying a civil rights violation . . . [she] serves 'as a private attorney general,' vindicating a policy that Congress considered of the highest priority." *Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)); *see also id*. at 2214 ("A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes.").  The Supreme Court has observed "[h]ow uniquely amiss it would be, therefore, if the government itself—the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct—were permitted to disavow liability for the injury it has begotten." *Monell*, 436 U.S. at 651 (internal quotations omitted).

25.     The Debtor, the insiders, and all the potential releasees cannot be freed of liability for both the 1983 Judgment and the Fee Judgment by seeking approval of a totally unrelated transaction in bankruptcy court. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 527-28 (5th Cir. 2014) (holding that bankruptcy jurisdiction does not extend to action between non-debtors over non-estate property); *see also Callaway v. Benton*, 336 U.S. 132, 142 (1949) (noting "that Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate."). Yet that is precisely what would happen here—the Insider Financing, if approved, would effectively release even the State of Idaho from its own, independent liability for Ms. Edmo's claims and other claims like hers.  That would impermissibly extend "bankruptcy jurisdiction" to an "action between non-debtors over

non-estate property" thereby usurping the role of those other Courts and rulings.  *In re TMT*, 764 F.3d at 527-28.

26.     The penultimate reason for the Insider Transaction is to protect the Debtor, insiders, and third parties (all of which haven't been clearly disclosed or even identified) by cutting off the ability of the Debtor to challenge the divisional merger and pursue fraudulent transfer and alter ego claims—the only value that exists in the estate from which to pay the unsecured creditors.  The ridiculously inadequate "challenge period" bears this intention out.  If this Court decides to approve the DIP Motion, the "challenge period" should not begin until the Debtor has filed its final version of its Schedules and Statements of Financial Affairs.

27.     In the plan context, third-party releases are not permitted in the Fifth Circuit. If third party releases are not permitted in the plan—where the creditors will be entitled to the protections of the plan process—then third-party releases certainly cannot be permitted in the context of the DIP Motion. Such releases are even more problematic in this case because the Insider Lenders are on both sides of the transaction, and they effectively are seeking to release themselves from liability to the company they control. *See In re Outer Harbor Terminal, LLC*, No. 16-10283 (LSS) 2017 Bankr. LEXIS 1263, at *31 (Bankr. D. Del. May 5, 2017) (interpreting DIP order releases not to extend to avoidance actions against lenders' affiliates who were "also insiders of the Debtor" because those parties' separate "relationships are not the subject of the Final DIP Order.")

28.     Furthermore, the broad releases the Debtor seeks have not been properly reflected in the relief sought in their motion.  Bankruptcy Rule 4001(c)(1)(B)(viii) requires that any motion seeking the approval of DIP financing that contains a "release, waiver, or

limitation on any claim or cause of action belonging to the estate" must "describe the nature and extent" of such waivers, releases, and limitations.  See Bankr. R. Fed. P. 4001(c)(1)(B)(viii). Here, there is no clear explanation that meets the rule. It is unclear what the "nature and extent" of the releases and exculpations—other than they seem to release everything as to every action as to any party out there.  Ms. Edmo respectfully requests that the Court strike such provisions from the form of the proposed order attached to the DIP Motion. The inclusion of such provisions is particularly inappropriate in this case, as no schedules or statements of financial affairs have been filed, and no investigation or review of insider transactions has been performed.  Plainly, other than potentially the Insider Lender, no one knows what is even being released.

## IV.      All Professionals Seeking Payment Through the Bankruptcy, Including the Insider Lender's Professionals, Must File Fee Applications Pursuant to Fed. R. Bankr. P. 2016.

29.      The DIP Motion provides that the Insider Lender's professionals will not be subjected to any oversight for their fees and costs.  DIP Lender's professionals are not excused by the Code from oversight.  Any attorneys' fees or professional fees must be brought before the court so that a determination on reasonableness and necessity can be made. This is especially important given the facts of this case: a liquidating entity with no operations with thousands of tort creditors, some of whom, like Ms. Edmo, have been fighting for justice for years, and have final judgments against Corizon.  The Debtor and the Insider Lenders should not be permitted to circumvent the Bankruptcy Code's requirements under sections 105, 327, 328, 330 and Fed. R. Bankr. P. 2014, 2016 and 2017 for any reason. *See In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 841 (3d Cir. 1994) ("[T]he integrity of the bankruptcy system. . . is at stake It is well established that "those

seeking compensation for professional services rendered [and reimbursement for necessary expenses incurred] on behalf of a debtor's estate bear the burden of proof in establishing the reasonable value of their services." *In re NRG Resources, Inc.,* 64 Bankr. 643, 650 (W.D. La. 1986) (citing *Neville v. Eufaula Bank & Trust Co. (In re U.S. Golf Corp.),* 639 F.2d 1197 (5th Cir. 1981)). "The Court has an independent duty to review fee applications." *In re S& M Distribs.*, No 21-33133, 2022 Bankr. LEXIS 1400, *7 (Bankr. S.D.Tex. May 16, 2022) (*citing In re Busy Beaver Bldg. Ctrs.* 19 F. 3d 833 (3d Cir. 1994)). Accordingly, the Court should reject this request and require motions from all attorneys and professionals seeking fees.

## V.      The Insider Lender(s) is Not Entitled to a Good Faith Determination under Section 364(e).

30.      This Court cannot presume good faith and the proponent of "good faith" under 364(e) bears the burden of proof. *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 520 (5th Cir. 2014); *In re Revco D.S., Inc.*, 901 F.2d 1359, 1366 (6th Cir. 1990) (good faith under section 364(e) "should not be presumed."). The "essence of good faith [under section 364(e)] requires a court to look to the integrity of an actor's conduct during the proceedings." *In re Solidus Networks, Inc.*, No. BAP CC-08-1046-MKKPA, 2008 WL 8462968, at *4 (B.A.P. 9th Cir. Dec. 24, 2008) (internal citations omitted). Good faith is lacking where there is: "(1) fraud, collusion, … or an attempt to take grossly unfair advantage of other[s]; (2) act[ing] for an improper purpose; or (3) [k]nowledge of the illegality of a transaction." *In re Revco D.S., Inc.*, 901 F.2d 1359, 1366 (6th Cir. 1990) (internal citations and quotation marks omitted). "Under § 364(e), a purpose is improper if it intentionally conflicts with the Bankruptcy Code." *Solidus Networks, Inc.*, 2008 WL 8462968, at *5. "Where it is evident from the

loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith, and it is irrelevant what the improper purpose is."  *In re EDC Holding Co.*, 676 F. 2d at 948.

31.     The Fifth Circuit has held that the good faith standard in 364(e) cannot be met in instances of fraud, collusion between parties, or an attempt to take grossly unfair advantage by the DIP Lender.  *Id*. at 521. In the ordinary course, in making a good faith determination under section 364(e), the Court is generally required to find that the "[l]ender is not an 'insider' or 'affiliate of the Debtor'" before deciding that the Insider Financing was concluded in good faith, and therefore that it is also "entitled to the full protection of section 364(e) of the Bankruptcy Code."  *In re Arena Media Networks, LLC*, No. 10-10667(BRL), 2010 WL 5264241, at *2 (Bankr. S.D.N.Y. Feb. 25, 2010).

32.     The Debtor has failed to establish good faith and cannot do so given that the proposed lenders *are* insiders—what's more, they appear to be the same people who are in control of the Debtor. The DIP Motion and the Insider Financing fail to meet the entire fairness standard and the standard for good faith under 11 U.S.C. § 364(e), and accordingly, must be rejected by this Court.

## VI.     The Insider Funding Is an Impermissible *Sub Rosa* Plan.

33.     The terms of the Insider Financing circumvent basic procedures and safeguards of Chapter 11.  Even if a good faith finding were available to insiders, however, the Debtor and the Insider Lender do not qualify for the protections of section 364(e) because they intentionally assembled a transaction that subverts the principles of absolute priority and would constitute a prohibited, *sub rosa* plan.  Here, the Debtor and the Insider Lender intentionally seek to violate absolute priority and short-circuit the bankruptcy process.

Because the Insider Financing has an "intended effect that is improper under the Bankruptcy Code," the transaction cannot have been concluded in good faith. *In re EDC Holding Co.*, 676 F.2d at 948. The proposed financing has an impermissible *sub rosa* plan effect because it seeks to predetermine material plan terms and distribute value without the safeguards of the larger plan confirmation process. The Debtor's motion must be denied on that basis. *See In re Laffite's Harbor Development I, LP*, No. 17-36191-H5-11, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) ("The Bankruptcy Court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.")

34.     Giving the Insider Lender veto power over the Debtor's plan further supports the finding that the Insider Financing amounts to an impermissible *sub rosa* plan. In *In re Braniff Airway, Inc*., the Fifth Circuit held that the district court could not approve a sale under 11 U.S.C. § 363 that amounted to a *sub rosa* plan. 700 F.2d 935, 939-40 (5th Cir. 1983). Because the sale "had the practical effect of dictating some of the terms of any future reorganization plan," the Fifth Circuit concluded that "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with the sale of assets." *Id*. Other courts have found that section 364 cannot be used to effectuate what is, in essence, a *sub rosa* plan. The BAP for the Ninth Circuit has explained:

> While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender. Thus, courts

> look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest. The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.

*Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP 1992) (citations omitted); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("The court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

35.     As the Supreme Court has explained, debtors in Chapter 11 are not permitted to enter into transactions that "circumvent the [Bankruptcy] Code's procedural safeguards." *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017).  So-called "*sub rosa*" plans are prohibited . . . based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of Chapter 11 for confirmation of a reorganization plan."  *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir.1983).

36.     Congress granted creditors the right to vote down proposed plans of reorganization that provide returns to old equity holders without paying creditor claims in full—a protection that "has long been considered fundamental to the Bankruptcy Code's operation."  *Jevic*, 137 S. Ct. at 984; *see also In re Belk Properties, LLC*, 421 B.R. 225-26 (Bankr. N.D. Miss. 2009) (rejecting as "*sub rosa* chapter 11 plan" proposed DIP

financing that would enable the lender to obtain a controlling equity stake in the debtor.) The proposed transaction here does the opposite—it improperly vests the Insider Lenders with "significant opportunity for self-enrichment at the expense of creditors." *In re DBSD North America*, 634 F.3d at 100. Accordingly, as a matter of law, the DIP Motion effects an impermissible violation of absolute priority and must be denied. *See Jevic*, 137 S. Ct. at 987 (overturning deviation from priority rules, observing that it would be impermissible to "'alter the balance struck by the statute'") (*citing Law v. Siegel*, 571 U.S. 415, 427 (2014)).

## VII.    Reservation of Rights

Ms. Edmo hereby reserves the right to amend, modify, or supplement this Objection, including any further objections to the final DIP order or any other interim DIP orders.

## VIII.   Prayer

WHEREFORE, PREMISES CONSIDERED, Ms. Edmo respectfully prays that the Court deny the relief sought in the DIP Motion and grant all other just relief.

Submitted on April 10, 2023.

Respectfully submitted,

**M. E. Heard, Attorney, PLLC**

/s/ Mary Elizabeth Heard
MARY ELIZABETH HEARD
Texas State Bar No. 24096727
SD # 2943737
Email: meheard@heardlawfirm.net
M. E. Heard, Attorney, PLLC
100 NE Loop 410, Suite 605
San Antonio, Texas 78216
Telephone: (210) 572-4925


*Co-Counsel for Adree Edmo*


**RIFKIN LAW OFFICE**

/s/ Lori Rifkin
LORI RIFKIN
*Pro hac vice*
California State Bar No. 244081
Email: lrifkin@rifkinlawoffice.com
Rifkin Law Office
3630 High St., # 18197
Oakland, CA 94619
Telephone: (510) 414-4132


*Co-Counsel for Adree Edmo*

**NATIONAL CENTER FOR LESBIAN RIGHTS**

/S/ Amy Whelan, Esq.
AMY WHELAN, ESQ.
*Pro Hac Vice*
California State Bar No. 215675
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: 415-365-1338
Facsimile: 415-392-8442
Email: AWhelan@NCLRights.org


*Co-Counsel for Adree Edmo*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing OBJECTION was served on April 10, 2023, via the Court's electronic case filing (ECF) system on all parties receiving ECF notices in these cases.

<u>/s/ Mary Elizabeth Heard</u>
MARY ELIZABETH HEARD