**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| TEHUM CARE SERVICES, INC.,[1] | Case No. 23-90086 (CML) |
| Debtor. | |

**AFFIDAVIT OF PUBLICATION OF THE NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM IN THE NEW YORK TIMES AND THE WALL STREET JOURNAL**

This Affidavit of Publication includes the sworn statements verifying that the *Notice of Deadlines for the Filing of Proofs of Claim* was published and incorporated by reference herein as follows:

1. In *The New York Times* on May 8, 2023, attached hereto as **Exhibit A**; and

2. In *The Wall Street Journal* on May 9, 2023, attached hereto as **Exhibit B**.

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

# Exhibit A



The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

May 8, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/8/2023, NY & NATL, pg B2

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.08 15:48:41 -04'00'

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: TEHUM CARE SERVICES, INC.,[1] Debtor. ) Chapter 11 ) Case No. 23-90086 (CML)

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM**

**THE CLAIMS BAR DATE IS AUGUST 14, 2023**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim***. On May 2, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 499] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim ("Proofs of Claim") in the chapter 11 case of Tehum Care Services, Inc. f/k/a Corizon Health, Inc. (the "Debtor").

***The Bar Dates***. Pursuant to the Bar Date Order, ***all*** entities (including governmental units), including individuals, partnerships, estates, and trusts that have a claim or potential claim against the Debtor that arose prior to February 13, 2023, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before ***August 14, 2023 (the "Claims Bar Date")***. All entities holding claims arising from the Debtor's rejection of executory contracts and unexpired leases are required to file Proofs of Claim by ***the date that is (a) the later of the Claims Bar Date, and (b) the date that is thirty (30) days following entry of the order approving the Debtor's rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date")***. All entities holding claims affected by an amendment to the Debtor's Schedules are required to file Proofs of Claim by ***the later of (a) the Claims Bar Date, and (b) the date that is thirty (30) days from the date on which the Debtor mails notice of the amendment to the Schedules (the "Amended Schedules Bar Date")***.

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE CLAIMS BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim***. Each Proof of Claim must be filed, including supporting documentation, by either (i) electronic submission through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov), (ii) electronic submission using the interface available on the Claims and Noticing Agent's website at www.kccllc.net/tehum or (iii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system, so as to be ***actually received*** by the Claims and Noticing Agent on or before the Claims Bar Date, or any other applicable Bar Date, at the following addresses: **If by First-Class Mail:** Tehum Care Services, Inc. Claims Processing Center, c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245 -or- **If by Hand Delivery or Overnight Mail:** Tehum Care Services, Inc. c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

***Contents of Proofs of Claim***. Each Proof of Claim must: (1) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted (4) conform substantially with the Proof of Claim form provided by the Debtor or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based.

***Electronic Signatures Permitted***. Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim, or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

***Additional Information***. If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling the Debtor's restructuring hotline at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International); or (ii) visiting the Debtor's restructuring website at: www.kccllc.net/tehum.

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

# No End in Sight for Hollywood Writers' Strike

FROM FIRST BUSINESS PAGE

ing to stay out until something changes because they can't afford not to."

The Alliance of Motion Picture and Television Producers, which bargains on behalf of studios, streaming services and networks, has maintained that it hopes "to reach a deal that is mutually beneficial to writers and the health and longevity of the industry." Privately, however, member companies say they are prepared to weather a strike of at least 100 days. The most recent writers strike, which began in 2007 and ended in 2008, lasted that long.

"It's fair to say there's a pretty big gap," Bob Bakish, chief executive of Paramount Global, told analysts and investors on a conference call on Thursday. Paramount and its CBS subsidiary are prepared to "manage through this strike," he added, "even if it's for an extended duration."

Both sides have insisted that the other needs to make the first move to restart talks. None are scheduled. For the moment, media companies have turned to contract renewal negotiations with the Directors Guild of America, which start on Wednesday. That contract expires on June 30.

Like writers, directors want more money, especially regarding residual payments (a type of royalty) from streaming services, which have rapidly expanded overseas. Before streaming, writers and directors (and other creative contributors, including actors) could receive residual payments whenever a show was licensed, whether that was for syndication, an international deal or DVD sales. In the streaming era, as global services like Netflix and Amazon have been reluctant to license their series, those distribution arms have been cut off.

In addition to raises, however, writers want media companies — Netflix, in particular — to make structural changes to the way they do business. The companies — Netflix, in particular — say that is a bridge too far.

The W.G.A. has proposals for mandatory staffing and employment guarantees, for instance. The union contends that the proposals are necessary because entertainment companies are increasingly relying on what is known in Hollywood slang as a miniroom. In one example of a miniroom, studios hire a small group of writers to develop a series and write several scripts over two or three months. Because they have not officially ordered the series, studios pay writers less than if they were in a large, traditional writers' room.

And given the relatively short duration of the position, those writers are then left scrambling to find another job if the show is not picked up. If a show does get a green light, fewer writers are sometimes hired because blueprints and several scripts have already been created.

MARK ABRAMSON FOR THE NEW YORK TIMES

A picket line in Burbank, Calif., on Thursday. One analyst speculated that the strike could delay the fall TV season.

"While the W.G.A. has argued" that mandatory staffing and duration of employment "is necessary to preserve the writers' room, it is in reality a hiring quota that is incompatible with the creative nature of our industry," the studio alliance said in a statement on Thursday.

Writers responded with indignation. "We don't need the companies protecting us from our own creativity," said Mr. Keyser, whose writing credits include "Party of Five" and "The Last Tycoon." "What we need is protection from them essentially eliminating the job of the writer."

Writers also want companies to agree to guarantee that artificial intelligence will not encroach on writers' credits and compensation. Such guarantees are a nonstarter, the studio alliance has said, instead suggesting an annual meeting on advances in the technology. "A.I. raises hard, important creative and legal questions for everyone," the studios said on Thursday. "It's something that requires a lot more discussion, which we have committed to doing."

Mr. Keyser's response: Go pound sand.

"This is exactly what they offered us with the internet in 2007 — let's chat about it every year, until it progresses so far that there's nothing we can do about it," he said.

In that case, have fun on the picket lines, studio executives have said privately: It's going to be hot out there in July.

Over the last week, media companies conveyed an air of business as usual. On Thursday, HBO hosted a red carpet premiere for a documentary, while the Fox broadcast network announced a survivalist reality show called "Stars on Mars" hosted by William Shatner.

"3 . . . 2 . . . 1 . . . LIFT OFF!" the network's promotional materials read.

With the exception of late-night shows, which immediately went dark, Mr. Bakish assured Wall Street, "consumers really won't notice anything for a while." Networks and streaming services have a large amount of banked content. Reality shows, news programs and some scripted series made by overseas companies are unaffected by the strike. Most movies scheduled for release this year are well past the writing stage.

> *'Any hope that this would be fast has faded.'*
>
> Tara Kole, a founding partner of JSSK, an entertainment law firm.

Shares climbed on Friday for every company involved with the failed contract talks; investors tend to like it when costs go down, which is what happens when production slows, as during a strike. If the strike drags into July, analysts pointed out, studios can exit pricey deals with writers under "force majeure" clauses of contracts.

"The sorry news for writers is that, in declaring a strike, they may in fact be helping the streaming giants and their parent companies," Luke Landis, a media and internet analyst at SBV MoffettNathanson, wrote in a report on Wednesday.

Writers, however, succeeded in making things difficult for studios over the first week. Apple TV+ was forced to postpone the premiere of "Still," about Michael J. Fox and his struggle with Parkinson's disease, because Mr. Fox refused to cross a picket line. In Los Angeles, writers picketed the Apple TV+ set for "Loot," starring Maya Rudolph, causing taping to halt. In New York, similar actions disrupted production for shows like "Billions," the Showtime drama. Other affected shows included "Stranger Things" on Netflix, "Hacks" on HBO Max and the MTV Movie & TV Awards telecast on Sunday, which was scheduled to go forward without a host after Drew Barrymore pulled out, citing the strike.

"The corporations have gotten too greedy," Sasha Stewart, a writer for the Netflix documentary series, "Amend: The Fight for America" as well as "The Nightly Show With Larry Wilmore," said from a picket line last week. "They want to break us. We have to show them we will not be broken."

Writers went into the strike energized. But a rally at the Shrine Auditorium in Los Angeles on Wednesday seemed to supercharge the group, in part because leaders from other entertainment unions turned out to support them — and in fiery fashion. During the 2007 strike, writers were largely left to stand alone, while a union representing camera operators, set electricians, makeup artists and other crafts workers blasted the writers for causing "devastation."

Ellen Stutzman, chief negotiator for the writers, received a standing ovation from the estimated 1,800 people who attended the rally. During the session, writers suggested expanding picket lines to the homes of studio chief executives and starting a public campaign to get people to cancel their streaming subscriptions.

Some writers realized that Teamsters locals, which represent the many drivers that studios rely on to transport materials (and people), would not cross picket lines. So they started to picket before dawn to intercept them. (The W.G.A. has advised a 9 a.m. starting time.) At least one show, the Apple TV+ dystopian workplace drama "Severance," was forced to shut down production on Friday as a result of Teamsters drivers' refusing to cross.

# Clearing Up the Confusion Over Mortgage Fee Changes

FROM FIRST BUSINESS PAGE

credit still pays.

"You still get a better rate and loan pricing if you make a higher down payment and have better credit," said Bob Broeksmit, president and chief executive of the Mortgage Bankers Association, an industry trade group.

In fact, the mortgage pricing update — which apply to loans backed by Fannie Mae and Freddie Mac, the two quasi-governmental entities that guarantee or purchase the majority of mortgages across the country — is old news. It has been baked into what borrowers pay for months.

The fees were recalibrated in January, when the regulator that oversees Fannie and Freddie — the Federal Housing Finance Agency, known as the F.H.F.A. — introduced new pricing charts that lay out how fees are applied to different borrowers and loan types. But the change may have resurfaced now because the updated fees became effective for loans delivered to Fannie and Freddie on May 1. Given the time it takes to close new loans and home purchases, the new fee menus had already been incorporated into mortgages for a while.

There's little borrowers can do to control the market forces that drove up interest rates on mortgages in the past year. They stood at 6.4 percent as of Friday, nearly twice their level at the start of last year. But your financial profile — your credit scores, the size of your down payment — also factors into how much you pay for a loan. That's where these fees come into play.

### The fees have been in place since 2008.

Depending on how borrowers stack up, they will pay a separate fee on a mortgage backed by Fannie Mae and Freddie Mac.

Those fees, which are a percentage of the loan amount, are often layered on top of a borrower's base mortgage rate; and the higher your credit score, the less you generally pay. In other words, the riskier the loan is deemed to be, the higher the fee.

These costs aren't new. They date back to the 2008 financial crisis, when housing prices plunged and mortgage defaults soared, devastating Fannie Mae and Freddie Mac. These fees helped shore up the companies' finances and are now used to pay for the guarantees these companies provide.

Under the new pricing structure, mortgage borrowers with higher credit scores — and down payments of about 15 percent to just under 20 percent — saw fees climb the most, while those with lower scores and down payments had the most significant declines. Critics seized on the seeming inequity of it all, including a chart that focused on how much prices were *changing* — but not the actual end costs.

Broadly speaking, a borrower's costs on the average $300,000 loan were projected to rise 0.04 percentage points, or $10 a month.

But the specifics will vary based on your circumstances. Consider a borrower with a 740 credit score and a down payment of 20 percent. On a $300,000 mortgage, her upfront fee will rise to $2,625, or 0.875 percent of the loan, from $1,500, or 0.5 percent. If the borrower didn't pay the fee at closing, it could be baked into her interest rate — and the higher charge would add roughly 0.125 percentage points to the overall rate, or $25 a month, according to calculations by Mark Maimon, a senior vice president at NJ Lenders.

The change is more significant for a borrower with a score of 630 and a down payment of just under 5 percent — the upfront fee drops to 1.75 percent of the loan amount from 3.5 percent. On a $300,000 loan, that translates to $5,250, down from $10,500.

If they chose to incorporate the fee into their mortgage rate, the second borrower would now pay about one percentage point less, shaving about $193 from their monthly payment.

The bottom line: The borrower in the stronger financial position will still pay much less in fees, or half the amount paid by the individual with the lower score and down payment.

The pricing also reflects factors that may not be obvious: People with down payments of less than 20 percent are required to buy private mortgage insurance (which, according to Freddie Mac, can add $30 to $70 a month for every $100,000 you borrow). That means they pay more, in total, than those with down payments of 20 percent or more.

The insurance protects the lender, not the borrower — that, in turn, reduces some of the risk of borrower default to Fannie or Freddie and shifts it to the private insurer. "So those who put down less than 20 percent pose less risk," according to a recent paper by Jim Parrott of the Urban Institute, "and should pay less in fees."

### The misinformation fixated on creditworthiness.

Those nuances aren't easily explained in short clips on social media. Instead, many critics figured that less creditworthy borrowers were getting a break at the expense of those with higher scores.

"Did you ever think in a million years that having good credit it would actually punish you if you were buying or refinancing a home?" one outraged TikTok user asked.

Such sentiments — or some version of them — gained traction on cable television, social media and elsewhere. "We're hurting the good people," Mr. Carlson said during his segment.

Sandra Thompson, the director of the F.H.F.A., explained in a statement meant to "set the record straight" on why the agency made the changes, which began with a review of Fannie and Freddie's pricing and programs in 2021 (it was last updated in 2015). The agency reiterated that it had recalibrated the fees on its most traditional mortgages to better reflect the risks of the loans and to strengthen its finances.

"Higher-score borrowers are not being charged more so that lower-score borrowers can pay less," Ms. Thompson said in the statement.

### The mission is to make homeownership more accessible.

Providing lower and moderate income people with a sustainable path to homeownership is part of Fannie and Freddie's longstanding mission. And the F.H.F.A. said it made other changes to help support those goals.

At the beginning of last year, the agency said it would raise fees on loans that weren't exactly central to that mission: It increased pricing on vacation home loans, larger mortgages , as well as on borrowers who refinanced their loans and withdrew cash from their home equity. "It is through those increases that we were able to eliminate fees for certain home buyers that are lower or moderate income," according to F.H.F.A. officials.

Gary Acosta, a co-founder and the chief executive of the National Association of Hispanic Real Estate Professionals, said he thinks borrowers on the margins were paying an excessive amount in fees in relation to the risk they added to Fannie and Freddie's mortgage portfolios. But he doesn't think the price changes are meaningful enough to make a big difference.

"It is not clear that these price adjustments are going to result in more borrowers being able to participate in homeownership," Mr. Acosta said. These borrowers may still be more likely to find better pricing through the Federal Housing Administration, he said, a government agency that insures mortgages made largely to first-time homeowners, often with small down payments and lower scores than Fannie or Freddie will permit.

Mark Calabria, a former director of the F.H.F.A. and a senior adviser at the Cato Institute, a libertarian think tank, also expects the pricing changes to have minimal effects on the broader housing and mortgage markets.

But there are practical takeaways. People living in higher-cost areas who need larger mortgages to finance their homes, for example, may be better off getting mortgages through providers that hold the loans in their own portfolios instead of selling them to Fannie or Freddie.

"It still pays for you to build your credit and to shop around," said Mr. Calabria, "even more now."

FDIC

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | |
|---|---|
| In re: TEHUM CARE SERVICES, INC.,[1] | ) Chapter 11 |
| Debtor. | ) Case No. 23-90086 (CML) |

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM**

**THE CLAIMS BAR DATE IS AUGUST 14, 2023**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim***. On May 2, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 499] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim ("Proofs of Claim") in the chapter 11 case of Tehum Care Services, Inc. f/k/a Corizon Health, Inc. (the "Debtor").

***The Bar Dates***. Pursuant to the Bar Date Order, ***all*** entities (including governmental units), including individuals, partnerships, estates, and trusts that have a claim or potential claim against the Debtor that arose prior to February 13, 2023, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before ***August 14, 2023 (the "Claims Bar Date")***. All entities holding claims arising from the Debtor's rejection of executory contracts and unexpired leases are required to file Proofs of Claim by ***the date that is (a) the later of the Claims Bar Date, and (b) the date that is thirty (30) days following entry of the order approving the Debtor's rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date")***. All entities holding claims affected by an amendment to the Debtor's Schedules are required to file Proofs of Claim by ***the later of (a) the Claims Bar Date, and (b) the date that is thirty (30) days from the date on which the Debtor mails notice of the amendment to the Schedules (the "Amended Schedules Bar Date")***.

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE CLAIMS BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim***. Each Proof of Claim must be filed, including supporting documentation, by either (i) electronic submission through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov), (ii) electronic submission using the interface available on the Claims and Noticing Agent's website at www.kccllc.net/tehum or (iii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system, so as to be ***actually received*** by the Claims and Noticing Agent on or before the Claims Bar Date, or any other applicable Bar Date, at the following addresses: **If by First-Class Mail:** Tehum Care Services, Inc. Claims Processing Center, c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245 -or- **If by Hand Delivery or Overnight Mail:** Tehum Care Services, Inc. c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

***Contents of Proofs of Claim***. Each Proof of Claim must: (1) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted (4) conform substantially with the Proof of Claim form provided by the Debtor or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based.

***Electronic Signatures Permitted***. Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim, or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

***Additional Information***. If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling the Debtor's restructuring hotline at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International); or (ii) visiting the Debtor's restructuring website at: www.kccllc.net/tehum.

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

# Exhibit B

# AFFIDAVIT

**STATE OF NEW JERSEY )**
**) ss:**
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Wayne Sidor, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

1 insertion(s) on the following date(s): 05/09/2023

ADVERTISER: TEHUM CARE SERVICES, INC.

and that the foregoing statements are true and correct to the best of my knowledge.

Wayne Sidor

Sworn to
before me this
9th day of May
2023

Notary Public



# BIGGEST 1,000 STOCKS

## How to Read the Stock Tables

The following explanations apply to NYSE, NYSE Arca, NYSE American and Nasdaq Stock Market listed securities. Prices are composite quotations that include primary market trades as well as trades reported by Nasdaq BX (formerly Boston), Chicago Stock Exchange, Cboe, NYSE National and Nasdaq ISE.

The list comprises the 1,000 largest companies based on market capitalization.

**Underlined quotations** are those stocks with large changes in volume compared with the issue's average trading volume.

**Boldfaced quotations** highlight those issues whose price changed by 5% or more if their previous closing price was $2 or higher.

**Footnotes:**
- ▲-New 52-week high.
- ▼-New 52-week low.
- **dd**-Indicates loss in the most recent four quarters.
- **FD**-First day of trading.
- **h**-Does not meet continued listing standards
- **lf**-Late filing
- **q**-Temporary exemption from Nasdaq requirements.
- **t**-NYSE bankruptcy
- **v**-Trading halted on primary market.
- **vj**-In bankruptcy or receivership or being reorganized under the Bankruptcy Code, or securities assumed by such companies.

**Wall Street Journal stock tables reflect composite regular trading as of 4 p.m. and changes in the closing prices from 4 p.m. the previous day.**

Monday, May 8, 2023

ADVERTISEMENT

# The Marketplace

To advertise: 800-366-3975 or WSJ.com/classifieds

AVIATION

Pilot Shortage?
Supply Chain Excuses?
Jet Card Frustration?

EXECUTIVE FLIGHT MANAGEMENT
TRANS AMERICAN CHARTER LTD.
(630) 536 1610
www.efmtac.com

37 years of individual solutions.

### BANKRUPTCIES

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. |
| Debtor. | ) | 23-90086 (CML) |

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM**

**THE CLAIMS BAR DATE IS AUGUST 14, 2023**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim***. On May 2, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 499] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim ("Proofs of Claim") in the chapter 11 case of Tehum Care Services, Inc. f/k/a Corizon Health, Inc. (the "Debtor").

***The Bar Dates***. Pursuant to the Bar Date Order, ***all*** entities (including governmental units), including individuals, partnerships, estates, and trusts that have a claim or potential claim against the Debtor that arose prior to February 13, 2023, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before ***August 14, 2023 (the "Claims Bar Date")***. All entities holding claims arising from the Debtor's rejection of executory contracts and unexpired leases are required to file Proofs of Claim by ***the date that is (a) the later of the Claims Bar Date, and (b) the date that is thirty (30) days following entry of the order approving the Debtor's rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date")***. All entities holding claims affected by an amendment to the Debtor's Schedules are required to file Proofs of Claim by ***the later of (a) the Claims Bar Date, and (b) the date that is thirty (30) days from the date on which the Debtor mails notice of the amendment to the Schedules (the "Amended Schedules Bar Date")***.

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE CLAIMS BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim***. Each Proof of Claim must be filed, including supporting documentation, by either (i) electronic submission through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov), (ii) electronic submission using the interface available on the Claims and Noticing Agent's website at www.kccllc.net/tehum or (iii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system, so as to be ***actually received*** by the Claims and Noticing Agent on or before the Claims Bar Date, or any other applicable Bar Date, at the following addresses: **If by First-Class Mail:** Tehum Care Services, Inc. Claims Processing Center, c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245 -or- **If by Hand Delivery or Overnight Mail:** Tehum Care Services, Inc. c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

***Contents of Proofs of Claim***. Each Proof of Claim must: (1) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted (4) conform substantially with the Proof of Claim form provided by the Debtor or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based.

***Electronic Signatures Permitted***. Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim, or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

***Additional Information***. If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling the Debtor's restructuring hotline at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International); or (ii) visiting the Debtor's restructuring website at: www.kccllc.net/tehum.

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

CAREERS

M & A BUSINESS BROKERS
Buying and Selling Businesses
6 Figure Commissions
As an Independent Contractor
Our 38th Year
Gottesman Company
Work From Home / Outside Sales
Support Services & Training
Send Letter & Resume to:
brokers@gottesman-company.com

### DEA

**LEGAL NOTICE**

The U.S. Dept. of Justice, Drug Enforcement Administration (DEA) New York gives notice that the property listed below has been abandoned to the custody of the United States and has remained unclaimed. The property shall be held for 30 days from the date of initial publication of notice. Upon expiration of this 30 day period title to the property will vest in the United States. Any person desiring to claim this property must file with the DEA within 30 days. Claims may be filed at the following address: DEA New York Division, 99 Tenth Ave., NY, NY 10011. Attn: TFO Oscar Rivas. **Last date to file: 6/1/2023.** Group: T-32, Case: CT-17-0065, Asset I.D.: 17-DEA-633354, Property: $7,000.00 USC, Place Seized: Bronx, New York, Owner: Edan Miguel Bueno-Diaz, Date of Custody: 07/28/2017.

THE WALL STREET JOURNAL.
THE MARKETPLACE
ADVERTISE TODAY
(800) 366-3975
For more information visit:
wsj.com/classifieds

© 2023 Dow Jones & Company, Inc. All Rights Reserved.

## Dividend Changes

| Company | Symbol | Yld % | Amount New/Old | Frq | Payable / Record |
|---|---|---|---|---|---|
| **Increased** | | | | | |
| Apple | AAPL | 0.6 | .24 /.23 | Q | May18 /May15 |
| Arbor Realty Trust | ABR | 13.2 | .42 /.40 | Q | May31 /May19 |
| BlackRock TCP Capital | TCPC | 13.0 | .34 /.32 | Q | Jun30 /Jun16 |
| Brinks | BCO | 1.4 | .22 /.20 | Q | Jun01 /May15 |
| CNO Financial Group | CNO | 2.6 | .15 /.14 | Q | Jun23 /Jun09 |
| Lifevantage | LFVN | 3.6 | .035 /.03 | Q | Jun15 /Jun01 |
| Microchip Technology | MCHP | 2.1 | .383 /.358 | Q | Jun05 /May22 |
| Pool | POOL | 1.2 | 1.10 /1.00 | Q | May31 /May17 |
| Timken | TKR | 1.7 | .33 /.31 | Q | May30 /May16 |
| **Reduced** | | | | | |
| Great Ajax | AJX | 14.4 | .20 /.25 | Q | May31 /May15 |
| **Foreign** | | | | | |
| Atlantica Sustain Infr | AY | 6.9 | .445 | Q | Jun15 /May31 |
| Brookfield Bus Partners | BBU | 1.5 | .0625 | Q | Jun30 /May31 |
| Brookfield Renew Pfd A17 | BEPpA | 6.9 | .32813 | Q | Jul31 /Jul14 |
| Brookfield Renewable | BEPC | 3.8 | .3375 | Q | Jun30 /May31 |
| Brookfield Renewable Ptrs | BEP | 4.3 | .3375 | Q | Jun30 /May31 |
| City Office REIT | CIO | 8.2 | .10 | Q | Jul21 /Jul07 |
| City Office REIT Pfd A | CIOpA | 10.9 | .41406 | Q | Jul21 /Jul07 |
| Credicorp | BAP | 2.7 | 6.73854 | A | Jun09 /May19 |
| Enerplus | ERF | 1.4 | .055 | Q | Jun15 /May31 |
| Essent Group | ESNT | 2.3 | .25 | Q | Jun12 /Jun01 |
| Gpo Aeroportuario ADR | PAC | 2.9 | 2.08944 | SA | May30 /May17 |
| Magna International | MGA | 3.4 | .46 | Q | Jun02 /May19 |
| Mercer International | MERC | 3.3 | .075 | Q | Jul06 /Jun28 |
| Open Text | OTEX | 2.3 | .24299 | Q | Jun23 /Jun02 |
| Pembina Pipeline | PBA | 5.9 | .49671 | Q | Jun30 /Jun15 |
| Wheaton Precious Metals | WPM | 1.2 | .15 | Q | Jun02 /May19 |
| **Special** | | | | | |
| Chord Energy | CHRD | 3.5 | 1.97 | | May30 /May16 |
| FS KKR Capital | FSK | 13.4 | .05 | | May31 /May17 |
| International Seaways | INSW | 1.3 | 1.50 | | Jun28 /Jun14 |

Sources: FactSet; Dow Jones Market Data

**KEY: A: annual; M: monthly; Q: quarterly; r: revised; SA: semiannual; S2:1: stock split and ratio; SO: spin-off.**

## New Highs and Lows

The following explanations apply to the New York Stock Exchange, NYSE Arca, NYSE American and Nasdaq Stock Market stocks that hit a new 52-week intraday high or low in the latest session. **% CHG**-Daily percentage change from the previous trading session.

Monday, May 8, 2023