**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Tehum Care Services, Inc.,[1] | ) | |
| | ) | Case No. 23-90086 (CML) |
| Debtor. | ) | |

## Various Creditors' Motion to Appoint a Chapter 11 Trustee

> If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

---

1    The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

## <u>INDEX OF EXHIBITS</u>

**Ex. 1**: *Proposed Order*

**Ex. 2**: *March 22, 2023 Hearing Transcript*

**Ex. 3**: *March 3, 2023 Hearing Transcript*

**Ex. 4**: *Deposition of Isaac Lefkowitz as M2 LoanCo Representative*

**Ex. 5**: *Certified Articles of Organization for Perigrove 1018 LLC*

**Ex. 6**: *May 12, 2023 Meeting of Creditors Transcript*

**Ex. 7**: *Pharmacorr Holdings, LLC Florida 2023 Annual Report*

**Ex. 8**: *Corizon Services LLC Articles of Organization*

**Ex. 9**: *"www.perigrove.com/portfolio-companies" webpage*

**Ex. 10**: *Perigrove LLC corporate filings*

**Ex. 11**: *Yescare Corp. Tennessee financing statement and attached Security Agreement*

**Ex. 12**: *Yescare Holdings LLC of New York Articles of Organization*

**Ex. 13**: *Yescare Holdings LLC of Georgia Articles of Organization*

**Ex. 14**: *Yescare Corp. Certificate of Formation*

**Ex. 15**: *Geneva Consulting LLC Certificate of Formation*

**Ex. 16**: *Geneva Consulting LLC New Jersey corporate filings*

**Ex. 17**: *Sigma RM LLC Articles of Organization*

**Ex. 18**: *Seven Trade, LLC Certificate of Formation*

**Ex. 19**: *1528 56th Street, LLC Articles of Organization*

**Ex. 20**: *Answer to Hyman Complaint*

**Ex. 21**: *Delaware Franchise Tax Reports for Valitas Intermediate Holdings, Inc.*

**Ex. 22**: *Deed and mortgage for 13 Cherry Ln, Pomona, NY*

**Ex. 23**: *'Yermie' Leitner Instagram engagement photo*

**Ex. 24**: *'Jay' Leitner perigrove.com profile*

**Ex. 25**: *Complaint filed by Debtor's prepetition counsel; 2:23-cv-11210 (E.D. Mich.)*

**Ex. 26**: *Arizona Department of Corrections Press Release, Dec. 27, 2022*

**Ex. 27**: *Declaration of Isaac Lefkowitz in Seven Trade LLC litigation*

**Ex. 28**: *Pharmacorr LLC corporate ownership disclosure statement, Oct. 1, 2020*

---

## VARIOUS CREDITORS' MOTION TO APPOINT A CHAPTER 11 TRUSTEE

1.     The below-listed parties in interest (the "Movants"), a group of trade creditors, tort claimants, and medical professionals who previously worked for the Debtor and are now defendants in employment-related tort lawsuits, seek entry of an Order appointing a Chapter 11 Trustee for "cause" pursuant to 11 U.S.C. § 1104(a).

### TABLE OF MOVANTS

| Trade Creditors | Medical-Professional Defendants (indemnification claimants) | Tort Claimants |
|---|---|---|
| Capitol Eye Care, Inc. | Dr. Keith Papendick, M.D. | RMSC Plaintiffs (K.A., S.A., L.R., L.J., and Jane Does 1-25) |
| Jefferson City Oral and Maxillofacial Surgery, LLC | Dr. Jeffrey Bomber, DO | Adree Edmo |
| CMMP Surgical Center, LLC | Dr. Rickey Coleman, DO | Kohchise Jackson |
| Mid-Missouri Anesthesia Consultants, P.C. | Dr. Victoria Hallett, DO | William Kelly |
| | Dr. Robert Lacy, DO | Derico Thompson |
| | Dr. Aleatha Reitsma-Mathias, MD | Phillip Buchanan |
| | Joshua Kocha, PA | |
| | Donna M. Rohrs, PA | |
| | Danielle Alford, PA | |
| | Kim Farris, PA-C | |
| | Dr. Charles S. Jamsen, MD | |
| | Rosilyn Jindal, PA | |
| | Teri A. Massey, NP | |

| | | |
|---|---|---|
| | Kristin A. Austin, NP | |
| | Dr. Rob Crompton, MD | |
| | Joshua Schad, NP-C | |
| | Patricia Lewis, NP | |
| | Leila Ghasemi, NP | |
| | Dr. Surjit S. Dinsa, MD | |
| | Dr. Janak R. Bhavsar, MD | |
| | Tana Hill, NP | |
| | Stacy Lindahl, NP | |
| | Dr. Mohammad Azimi, MD | |
| | Dr. Claire Pei, D.O. | |
| | Samantha Price, NP | |
| | Juliana Martino, NP | |
| | Dr. Ravi D. Yarid, DO | |

In support of their Motion, the Movants state as follows:

## **Preliminary Statement**

2.      The story of this case begins in late 2021, when Corizon Health, once the nation's largest correctional-facility health care contractor, lost "over $400M in revenue, pushing the company into insolvency." (Adv. Case No. 23-03049, Docket 12-9).   Corizon's revenue losses primarily reflect its failure to win renewal of its contracts with its largest and second-largest remaining clients, the Michigan Department of Corrections and the Missouri Department of Corrections. These two contracts together covered approximately 58,000 prisoners, representing over half of Corizon's remaining market share. (*See* Docket 75-1).

3.      The losses of the Michigan and Missouri contracts were financially devastating, given both the size of Corizon's business and the size of its existing liabilities. Corizon reported only $598 million in gross revenue for calendar year 2021. (Docket 482, p. 14). For the first four months of 2022, Corizon reported less than $103 million in gross revenue (or approximately $309 million on an annualized basis), and carried approximately $176 million in unsecured liabilities. (Docket 482, p. 14;

Docket 552, p. 2). As the Debtor's current sole Director, Mr. Lefkowitz, put it on December 9, 2021, "the recent massive losses of the company revenues" were "steering the company with its mounting liabilities to the brink of bankruptcy." (Adv. Case No. 23-03049, Docket 12-7, p. 2).

4.      Yet in early December of 2021, with apparent knowledge that the company was deeply-insolvent, an anonymous buyer purchased Corizon. (Adv. Case No. 23-03049, Docket 12-2, p. 3, ¶ 12). The identity of the buyer was never revealed to Corizon's then-CEO. (*Id.* at p. 4, ¶ 15). Nor was the buyer's identity revealed to the Debtor's Chief Restructuring Officer, (Ex. 2- March 22, 2023 Hearing Transcript, p. 88), or even to its bankruptcy attorneys. (Ex. 3- March 3, 2023 Hearing Transcript, p. 16-17). However, Mr. Lefkowitz, Abraham Goldberger, and David Gefner acted as "representatives" of the buyer during the purchasing process. (Adv. Case No. 23-03049, Docket 12-2, p. 4, ¶ 14). We now know that that buyer was "Perigrove 1018 LLC," a newly-formed entity owned by "a whole group of individual investors." (Ex. 4- Lefkowitz Dep. 23:2; Ex. 5- Perigrove 1018 LLC Articles of Organization). We also know that the Perigrove 1018 "group of investors" includes Mr. Lefkowitz, David Gefner, and Abraham Goldberger. (*Id.* at 22:10-23:20).

5.      Upon assuming control of Corizon, Lefkowitz and his Perigrove associates immediately got to work preparing for a corporate restructuring that would siphon off almost all of Corizon's assets into Yescare Corp., a new entity that they would also control.[2] They would leave behind most of Corizon's unsecured liabilities in a rump shell company, Tehum Care Services, which has since filed for bankruptcy protection. On the date it filed its Chapter 11 petition, Tehum had no employees, no operations, and did not even have a bank account. (Ex. 2- March 22 Hearing Transcript, p. 50).

---

2   For example, the Debtor's newly-installed CEO, Sara Tirschwell, incorporated Yescare Corp. in Texas on January 26, 2022. (Ex. 14- Yescare Corp. Certificate of Formation). The formation of Yescare Corp. occurred months before FTI Consulting rendered its fairness opinion regarding the proposed divisional merger. (Docket 705-1). Indeed, it occurred almost two weeks before FTI Consulting was even engaged for the project. (Docket 705, p. 10).

6.      Corizon's new owners were aware that their intended course of conduct would likely result in a fraudulent-transfer action. But to succeed and make money from their scheme, they would not need to successfully defend against that claim. Rather, all they would need to do is settle it. Any settlement will result in their new company, Yescare, purchasing a release of its fraudulent-transfer liability for less than the value of the assets that were removed from the Debtor. By removing the remaining productive assets from an insolvent entity, placing that entity into Chapter 11 as a debtor-in-possession, and then settling the claims between their debtor-in-possession and their new company, the sponsors of this scheme seek to retain value for themselves, the equity participants, profiting at the expense of unsecured creditors by evading the absolute priority rule codified in 11 U.S.C. §1129(b)(2)(B)(ii).

7.      Members of the "group of individual investors" that concocted this scheme should not be permitted to control the process of settling the Debtor's causes of action against themselves and their entities. As further explained in Sections I-IV below, ample cause exists to vest control of the debtor in a trustee who can exercise independent judgment over whether to litigate or settle the Debtor's causes of action against insiders, free from the obvious conflicts of interest that those insiders themselves possess.

8.      The usual presumption in favor of leaving prepetition management in control of a Chapter 11 debtor "finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization." *In re Vascular Access Ctrs., L.P.,* 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) (quoting *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc.,* 345 F.3d 313, 319 (3rd Cir. 2004)). But these considerations simply are not present under the facts of this case. Tehum has no business to manage; no operations to conduct. It is not reorganizing. Its primary assets appear to be

estate causes of action. The likely targets of the Debtor's avoidance actions are uniquely ill-suited to oversee the prosecution of those claims.

9.      The public interest will also be served by ensuring that the Debtor's claims are litigated, where appropriate, rather than hurriedly settled, as the Debtor's current management and its attorneys intend. This Debtor has apparently taken the position that Texas law allows any corporate entity to functionally discharge debt by dividing itself into an "AssetCo" and a "DebtCo," such that the claims of unsecured creditors are sequestered in the DebtCo shell company, while the predecessor's equity holders continue to own the productive assets of the business through their new AssetCo.  If the Debtor is correct that such a transaction is legal and enforceable against creditors, then virtually all unsecured liabilities in the United States, from tort claims, to trade debt, to intellectual property rights, are for practical purposes unenforceable.

10.      If Texas law really allows corporate entities to effectively discharge their unsecured liabilities in this manner, the world needs to know. "[Capital] markets work best when there are clear rules consistently applied. Although investors certainly value fairness, they place an even higher value on certainty. Investors can adjust for inequities. It is much harder to adjust for uncertainty." *In re Bulson*, 327 B.R. 830, 842 (Bankr. W.D. Mich. 2005). Any settlement in this case will leave in place the existing legal uncertainty surrounding whether Texas divisional mergers can be used to effectively discharge debt. So long as such uncertainty exists, bankruptcy entrepreneurs will be able to engineer similar transactions to exploit that uncertainty for profit. Encouraging this behavior not only undermines the distributional structure established by Congress for various classes of creditors through the Bankuptcy Code, it reduces the availability of credit and the efficiency of capital markets via the imposition of higher transaction costs. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 470 (2017). This Court should not shy away from permitting the parties to litigate, since some litigation is

necessary to produce a definitive ruling on the legal consequences of the divisional-merger transaction at the heart of this case.

### Legal Standard

11.     The appointment of a Chapter 11 trustee is governed by 11 U.S.C. § 1104(a), which provides, in part:

> "on request of a party in interest . . . and after notice and a hearing, the court shall order appointment of a trustee – (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause[.]"

The use of the word "shall" in a statute generally indicates that the referenced act is mandatory rather than discretionary. *See, e.g. Texas v. United States,* 606 F. Supp. 3d 437, 477-78 (S.D. Tex. 2022). The wording of § 1104(a) is no exception: "[o]nce a court finds that cause exists, the court has no discretion. A trustee must be appointed." *USHA SoHa Terrace, LLC v. RSG Holdings, LLC (in re Futterman),* 584 B.R. 609, 616 (Bankr. S.D.N.Y. 2018); *see also, In re Amerejuve, Inc.,* 2015 Bankr. LEXIS 1496 at *25 (Bankr. S.D. Tex. 2015) ("[t]he language of § 1104 requires appointment of a trustee when fraud is proven."). Yet while appointment of a Chapter 11 trustee is mandatory under § 1104(a)(1) once a movant demonstrates "cause," a showing of cause for purposes of § 1104(a)(1) does not necessarily require proof of fraud, dishonesty, incompetence, or gross mismanagement. *See, e.g. In re Marvel Entertainment Group,* 140 F.3d 463, 472 (3rd Cir. 1998) (holding that "the language of § 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed," based on "the impressive reasoning in *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600) (5th Cir.) (adopting on rehearing the opinion of dissent in 69 F.3d at 751)"). Other relevant factors which may establish "cause" to appoint a trustee under § 1104(a)(1) include:

conflicts of interest, including inappropriate relations between corporate parents and subsidiaries; misuse of assets and funds; inadequate record keeping and reporting, various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence. A court may consider "both the pre-and post-petition misconduct" when making the determination that "cause" exists for the appointment of a trustee.

*In re Klaynberg,* 643 B.R. 309, 318 (Bankr. S.D.N.Y. 2022) (internal citation omitted); *See also, In re Westbank Holdings, LLC,* 2022 Bankr. LEXIS 2109 at *39-*40 (E.D. La. 2022); *In re Sevino Oil & Heating Co.,* 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (holding that "where, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required.").

12.     Section 1104(a)(2) also provides a second, independent statutory basis for appointment of a chapter 11 trustee, when "such appointment is in the interest of creditors". It is well-established that "a history of transactions with companies affiliated with the debtor is sufficient cause to appoint a trustee" under § 1104(a)(2). *In re Golden Parks Estates, LLC,* 2015 Bankr. LEXIS 1912 at *14-*15 (Bankr. D. N.M. 2015) (citing cases). Other bases that have "been found to constitute a ground for appointing a trustee" under § 1104(a)(2) include, "acrimony between the debtor-in-possession's management and the creditors that impedes the reorganization effort," *In re Plaza de Retiro, Inc.,* 417 B.R. 632, 640-41 (Bankr. D.N.M. 2009) (collecting cases), and the Debtor's failure "to provide accurate information about their ownership, the recent prepetition change in ownership, and the terms of the transactions." *In re Celeritas Techs, LLC,* 466 B.R. 514, 521 (Bankr. D. Kan. 2011).

### I. Cause Exists for Appointment of a Chapter 11 Trustee Under § 1104(a) Because the Debtor's Management is Marred by Conflicts of Interest

13.     Throughout this case, the Debtor has been either unable, or unwilling, to reveal the identities of the persons who own and control the Debtor and its affiliates. (See, e.g. Docket 332-1, pp. 71-72, 88; Ex. 3- March 3rd Hearing Transcript, p. 16-17). Four months post-petition, we still do not

know the identities of all of the natural persons who are the ultimate beneficial owners of the debtor. The organizational chart below shows what is presently known about the ownership structure of the Debtor and its affiliated entities. This information has been revealed to the creditor body either through testimony in this case,[3] via corporate filings with state incorporation divisions[4], and disclosures of corporate ownership made in the course of litigation[5]:

**Known Ownership Structure of Debtor and Related Entities**



14.     The sole director of the Debtor is an individual named "Yitzchok Lefkowitz." (Ex. 4-Lefkowitz Dep., 5:6-19). Mr. Lefkowitz also goes by several other names, including "Isaac Lefkowitz,"

---

3   See Docket 186, Page 8; Ex. 6- Meeting of Creditors Transcript, pg. 84.
4   See Ex. 7- PharmaCorr Holdings, LLC 2023 Florida Annual Report
5   See Docket 332-7; Docket 332-19; Adv. Case No. 23-03049, Docket 37-7.

"Yitzchok Lefko*vits*,[6]" and "Jack Lefkowitz." (See Docket 332, pp. 18-20). In addition to serving as the sole director of the Debtor, Mr. Lefkowitz is also a director of nearly every entity in the Debtor's organizational structure. He is a Director of M2 LoanCo, M2 HoldCo, Valitas Intermediate Holdings, and the Debtor's ultimate corporate parent, Perigrove 1018 LLC. (Ex. 4,  16:23-17:19, 12:1-20; Ex. 21).

15.     Mr. Lefkowitz is also a director of Yescare Corp. (Ex. 4- Lefkowitz Dep. 72:23). At the continued 341 meeting on June 13, 2023, Lefkowitz testified that he is also a director of CHS TX, Inc., Yescare Corp.'s operating subsidiary. In addition to being a director of Yescare, Mr. Lefkowitz is responsible for monitoring Yescare's performance to ensure that Yescare is able to service its debt to M2 LoanCo. (*Id.* at 72:25-73:10). Mr. Lefkowitz has a substantial personal financial interest in ensuring that Yescare stays on track to pay the nearly $100 million it owes to M2 LoanCo, because Lefkowitz holds a 5% membership interest in Perigrove 1018 LLC. Perigrove 1018 LLC is the ultimate corporate parent of both M2 LoanCo and the Debtor. (*Id*. at 22:10-16). Mr. Lefkowitz identified two other individuals as members of Perigrove 1018 LLC: Abe Goldberger and David Gefner. (*Id*. at 22:20-23:20). Mr. Lefkowitz indicated that Perigrove 1018 may have other members, but claimed he could not remember who they were. (*Id*. at 23:16).

16.     The outstanding shares of Yescare Corp. are owned by Sara Tirschwell (5% stake), and Yescare Holdings LLC (95% stake). (Docket 332-7). Mr. Lefkowitz testified at the 341 meeting that he did not know who owns Yescare Holdings LLC. (Ex. 6, p. 91). But a firm called "Perigrove," of which Lefkowitz is a Vice-President, (Ex. 4, 11:2-11), lists both "Yescare" and "Pharmacorr[7]" among its

---

6 Lefkowitz testified at the Meeting of Creditors that he organized "Corizon Services LLC" in New York in December of 2021. Ex. 6, p. 95. The Articles of Organization for Corizon Services LLC of New York list the organizer of the entity as, "Yitzchok Lefko*vits*." (Emphasis added). (See Ex. 8- Corizon Services LLC Articles of Organization).

7   Pharmacorr LLC, an operating entity with employees, an Oklahoma City distribution center, and an inventory of prescription drugs, was a wholly-owned subsidiary of Corizon, LLC as of October 1, 2020. (Ex. 28- Pharmacorr LLC disclosure statement). By January 1, 2021, Pharmacorr LLC had become an indirect subsidiary of Valitas Health Services, Inc. (Docket 332-19).  Pharmacorr's assets were then mysteriously

"Portfolio Companies" on its website. (Ex. 9- www.perigrove.com/portfolio-companies webpage). The URL for the Perigrove website, "www.perigrove.com," matches the URL for the "IL@perigrove.com" email address that Lefkowitz testified that he used to conduct M2 LoanCo's business and to store its records. (Ex. 4, 35:9-37:11; 59:1-14). The other two known members of Perigrove 1018 LLC, David Gefner and Abe Goldberger, also have "@perigrove.com" email addresses. (Adv. Case No. 23-03049, Docket 12-9, p. 2).

17.     David Gefner appears to hold an equity stake in Perigrove. The Perigrove website indicates that Mr. Gefner is the firm's "Founder and Principal," (see https://www.perigrove.com/team/), and the Articles of Organization for Perigrove LLC lists "David Gefner" as the organizer of that entity. "David Gefner" is also listed as the "Manager" of Perigrove LLC on Perigrove's 2019 and 2021 biennial statements. (Ex. 10- Perigrove LLC corporate filings). As of December 31, 2022, David Gefner is also the President of Yescare Corp. (Ex. 11- Yescare Corp. Tennessee financing statement and attached Security Agreement, p. 10 of 11).

18.     There are two office addresses associated with Perigrove. One address, listed on the contact page of the Perigrove website, (https://www.perigrove.com/contact/), is 7 World Trade Center, 46th Floor, New York, NY. The other address, listed on the Perigrove LLC Articles of Organization, (Ex. 10), is 351 Spook Rock Rd., Suffern, NY. Mr. Lefkowitz has testified that Perigrove maintains a physical office at this Spook Rock Rd. location. (Ex. 4, 26:21-27:9). Many entities at issue in this case share one or both of these Perigrove addresses. The following chart summarizes the available address and organizer information for certain relevant entities[8]:

---

removed from the collateral securing a large debt obligation to M2 LoanCo LLC at the time of the divisional merger. (Docket 59-10, p. 185).

8   Corporate filings for these entities are attached as Exhibits 5, 10, 12, 13, 14, 15, 16, 17, 18, 19, and 21.

| Name of Entity | Organizer/ Incorporator | State of Incorporation/ Organization | Date of Incorporation/ Organization | Address (per corporate filings) | Address (per Debtor's Schedules/ SOFAs) |
|---|---|---|---|---|---|
| Yescare Holdings LLC | David Gefner | New York | 05/11/2022 | 7 World Trade Center, 46th Fl., New York, NY | |
| Yescare Holdings LLC | David Gefner | Georgia | 08/01/2022 | 7 World Trade Center, 46th Fl., New York, NY | |
| Yescare Corp. | Sara Tirschwell | Texas | 01/26/2022 | 3411 Yoakum Blvd. #2901, Houston, TX | 205 Powell Pl., Brentwood, TN |
| Perigrove 1018 LLC | David Gefner | New York | 12/02/2021 | 351 Spook Rock Rd., Suffern, NY | |
| Perigrove LLC | David Gefner | New York | 01/17/2017 | 351 Spook Rock Rd., Suffern, NY | |
| Geneva Consulting LLC | David Gefner | Delaware | 11/16/2021 | 7 World Trade Center, 46th Fl., New York, NY[9] | 7 World Trade Center, 46th Fl., New York, NY |
| Seven Trade LLC | David Gefner | Delaware | 02/05/2021 | 7 World Trade Center, 46th Fl., New York, NY[10] | |
| Sigma RM LLC | Yitzchok Lefkowitz | New York | 10/26/2022 | 1528 56th St., Brooklyn NY | "250 Greenwich St., 46th Floor"[11], New York, NY |
| 1528 56th Street LLC | Yitzchok Lefkowitz | New York | 11/14/2021 | 1528 56th St., Brooklyn NY | |

In light of the restructuring transaction he carried out in May of 2022, Mr. Lefkowitz' testimony that he does not know who owns Yescare Holdings LLC is simply not credible. On May 5, 2022, Lefkowitz executed an Equity Purchase and Sale Agreement on behalf of the Debtor's immediate parent, Valitas Intermediate Holdings, Inc., that transferred 100% of the capital stock of CHS TX, Inc. to Yescare

---

9   Per New Jersey Certificate of Registration for a Foreign Limited Liability Company.
10   Per Civil Cover Sheet filed by Seven Trade LLC in Case No. 7:22-cv-01673-PMH (S.D.N.Y. 2022).
11   "250 Greenwich Street" is the street address of the 7 World Trade Center office tower.

Corp. (Adv. No. 23-03049, Docket 37-7). CHS TX, Inc. is the "NewCo" that received the Debtor's assets in the divisional merger.

19.     A condition precedent to the conveyance of the CHS equity to Yescare Corp. was the consummation of a second Equity Purchase and Sale Agreement, also dated May 5, 2022, "by and between Sara Tirschwell as Seller and Yescare Holdings, LLC as Purchaser." *Id.* at Section 2.4. This referenced agreement appears to be a transfer of 95% of the capital stock of Yescare Corp. from Sara Tirschwell to Yescare Holdings, LLC. A pleading filed by Yescare Corp. and CHS TX, Inc. in the *Hyman v. Yescare Corp*. litigation confirms that Sara Tirschwell transferred 95% of the capital stock of Yescare Corp. to Yescare Holdings, LLC on May 5, 2022. (Ex. 20- Answer to Hyman Complaint, p. 14, ¶ 104). A reply brief filed in a Missouri adversary proceeding indicates that the purchase price associated with this Tirshwell-Yescare Holdings transaction was a nominal sum of $95. (Docket 75-3, p. 34).

20.     There are two existing entities with the name "Yescare Holdings LLC." Yescare Holdings LLC of New York was formed by David Gefner on May 11, 2022, six days *after* the Tirschwell-Yescare Holdings LLC stock transfer. (Ex. 12). Yescare Holdings LLC of Georgia was formed a few months after that, on August 1, 2022, also by David Gefner. (Ex. 13). Both "Yescare Holdings" entities share the address (7 World Trade Center, 46th Floor, New York, NY) that is listed on the Perigrove website. The Georgia entity lists Mr. Gefner as a "Member" in addition to as its "Organizer."  (Ex. 13).

21.     The original transferor entity in this two-part transaction, Valitas Intermediate Holdings, Inc., had three officers in 2022: Abe Goldberger, David Gefner, and Isaac Lefkowitz. It had four Directors, consisting of those three officers plus Jay Leitner. (Ex. 21- Delaware Franchise Tax Reports for Valitas Intermediate Holdings, Inc.). Mr. Leitner is the Vice-President for Special Operations at

Perigrove. (Adv. Case No. 23-03049, Docket 12-2, p. 5). Goldberger, Gefner, Lefkowitz, and Leitner were also directors of the Debtor during the relevant time period in early 2022. (Docket 677, p. 224).

22.     It is inconceivable that Mr. Lefkowitz and his Perigrove colleagues would require Sara Tirschwell to transfer 95% of the Yescare Corp. stock to "Yescare Holdings, LLC," a company they had not even organized yet, as a condition precedent to transferring ownership of CHS TX to Tirschwell's entity, if they had no idea who the owner of Yescare Holdings, LLC would be. Ms. Tirschwell was the CEO of the Debtor from early 2022 through the date of the divisional merger. (Docket 482, p. 53). It is important to note that unlike the Debtor's other officers, the Debtor did not pay Ms. Tirschwell a salary. (Docket 482, p. 37). Her right to retain a 5% equity stake in the holding company that would receive the stock of the "NewCo" was her only known compensation for serving as the Debtor's CEO. The idea that the Debtor's Board of Directors (consisting of Gefner, Goldberger, Lefkowitz, and Leitner) would negotiate such an executive compensation package, without having any knowledge of who would own the other 95% of the post-divisional-merger Yescare enterprise, defies common sense.

23.     To date, there has been no on-the-record admission that a Perigrove-related entity owns the remainder of the Yescare Corp. stock through Yescare Holdings LLC. But all the available evidence, from the identity of the organizer of Yescare Holdings (David Gefner), to the shared physical address of Perigrove and Yescare Holdings, to David Gefner's status as both the "founder and principal" of Perigrove and the President of Yescare Corp., to the statements on the Perigrove website claiming that Yescare Corp. is one of Perigrove's "portfolio companies," point to ownership of Yescare Holdings by Perigrove or a Perigrove-related entity. And regardless of who owns Yescare Holdings LLC, the Debtor's management is conflicted, given Mr. Lefkowitz' on-the-record admissions that he is a director of Yescare Corp. and a director of CHS TX, Inc.

24.     Yescare Corp. and CHS TX, Inc. are Texas corporations. Under Texas law, corporate directors owe fiduciary duties to the corporations they serve. Among these duties is a duty of loyalty to

the corporation, which includes a duty not to engage in self-dealing. *See, e.g. Weiss v. Arabella Exploration, Inc. (in re Arabella Petroleum Co., LLC)*, 647 B.R. 851, 881 (Bankr. W.D. Tex. 2022). As a director, Mr. Lefkowitz owes Yescare Corp. and CHS TX fiduciary duties that are fundamentally incompatible with his responsibilities as the sole director of the Debtor. "In a chapter 11 case in which no trustee is appointed, the fiduciary duties to the Estate rest with a debtor-in-possession's directors." *In re Houston Reg'l Sports Network, L.P.,* 505 B.R. 468, 481 (Bankr. S.D. Tex. 2014). The fiduciary duties of a bankruptcy trustee include a "duty to maximize the value of the estate." *In re Bechuck*, 472 B.R. 371, 377 (Bankr. S.D. Tex. 2012). In this case, the value of the estate would be maximized by bringing all of the Yescare/CHS assets into the estate, either by unwinding the divisional merger, substantively consolidating Yescare and the Debtor, or otherwise attacking the divisional merger as a fraudulent transfer. Yescare Corp. and CHS TX would instead benefit from settling the Debtor's claims against them for the lowest sum possible.

25.     This circumstance presents a conflict of interest. Conflicts of interest constitute "cause" for the appointment of a Chapter 11 trustee. *See In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir. 1996). Conflicts which prevent a debtor-in-possession's management from adequately pursuing avoidance actions against insiders and non-debtor affiliates are not mitigated for purposes of § 1104(a) by the debtor's retention of bankruptcy lawyers and a CRO. *See In re Westbank Holdings, LLC,* 2022 Bankr. LEXIS 2109 at *43 (Bankr. E.D. La. 2022).    Indeed, to date, the retention of bankruptcy professionals does not appear to have prevented Lefkowitz from operating the Debtor for the benefit of Yescare and himself, rather than for the benefit of its creditors. The Debtor's professionals have been unable to act as a check on Mr. Lefkowitz' self-dealing behavior because he has concealed his conflicts of interest from them.

26.     For example, on or about March 15, 2023, Lefkowitz attempted to cause the Debtor to enter into a DIP financing agreement with M2 LoanCo that would **a)** prohibit the Debtor from using

DIP loan proceeds or its cash collateral to prosecute any estate causes of action against Yescare, (Docket 185-1, p. 36), **b)** terminate the Debtor's authority to use its cash collateral if "[t]he Bankruptcy Court enters an order unwinding the Divisional Merger," (*Id.* at p. 78), and **c)** grant broad releases of all potential estate causes of action to M2 LoanCo's "heirs, successors, assigns, officers, shareholders, directors, members, employees, managers, principals, attorneys and agents, past and present" subject to an extremely short 45-day challenge period, after which any complaint could not be amended. (*Id.* at pp. 32-35). During the negotiation of this proposed DIP financing agreement, Mr. Lefkowitz concealed the following relevant information from the Debtor's CRO:

1) His status as a director of Yescare Corp. (Ex. 2, p. 88).

2) That his Perigrove colleague and fellow Valitas Intermediate Holdings board member, David Gefner, is the President of Yescare Corp. (Ex. 2, p. 88, 90; Ex. 11).

3) His status as one of two directors of M2 LoanCo, an entity that has no officers or employees, rendering him a personal beneficiary of the proposed releases in the DIP order. (Ex. 2, p. 59, 71-72, 90; Ex. 4, 19:6-20:8; Docket 683, p. 3-4 n.7).

4) The fact that he is "the director" of M2 HoldCo, M2 LoanCo's sole member. (Ex. 4, 17:17-19; Ex. 2, p. 88).

5) His personal financial interest in M2 LoanCo through his 5% equity stake in its corporate grandparent, Perigrove 1018 LLC. (Ex. 4, 22:10-19).

The DIP financing agreement also included an "Approved Budget" which called for payments of $150,000 per month from the Debtor to an entity called "Sigma Risk Management." (Docket 475, audio file at 30:20-30:24). "Sigma Risk Management" is a d/b/a for a New York limited liability company, "Sigma RM LLC," which was formed by Lefkowitz on October 26, 2022. (Ex. 6- Meeting of Creditors transcript, p. 92; Ex. 17). Sigma was supposedly hired by the Debtor to manage professional-liability claims. (Ex. 6, p. 28). Lefkowitz represented the Debtor in the negotiation of the $150,000-per-month contract between the Debtor and Sigma. (*Id.* at 47-48). Sigma continues to receive the same

monthly compensation from the Debtor that it received prior to the bankruptcy filing, despite the fact that all professional-liability claims against the Debtor are now stayed.

27.     Lefkowitz has testified that Sigma Risk Management is "a group of lawyers that manage PLI matters for the debtor." (Ex. 6, p. 28). Yet Sigma is conspicuously absent from the list of firms the Debtor sought to retain via its "Ordinary-Course Professionals" motion. (*See* Document 295-1). None of the Sigma lawyers has filed a fee application, and the Debtor has not filed a Rule 2014 application to employ Sigma. The Debtor confirmed that it paid $150,000.00 to Sigma on 4/5/2023, (Document 684-1 Filed in TXSB on 06/12/23 Page 8 of 13), while also representing that, "all payments to or on behalf of professionals were approved by the Court." (Document 684 Filed in TXSB on 06/12/23 Page 8 of 12).

28.     At the 341 meeting on May 12, 2023, Lefkowitz proffered the following testimony concerning his connection to Sigma:

> MR. EARLY: – Now back to the question, Mr. Lefkowitz. Do you own any real estate from which -- in which Sigma Risk Management keeps any of its records?
>
> MR. LEFKOWITZ: **No.**
>
> MR. EARLY: Are you the owner or member of a company or partnership which owns real estate which leases to Sigma Risk Management?
>
> MR. LEFKOWITZ: **No.**
>
> [. . .]
>
> MR. CROSS: I want to direct your attention to I think Document 481 -- oh, I'm sorry, 482, Page 35 of 53. Do you see the line there, it lists the address of Sigma Risk Management at 1528 56th Street in Brooklyn, New York?
>
> MR. LEFKOWITZ: **Correct.**
>
> MR. CROSS: Have you ever been to that address?
>
> MR. LEFKOWITZ: **Yes.**
>
> MR. CROSS: What's there?

MR. LEFKOWITZ: **An office.**

MR. CROSS: Is that your office?

MR. LEFKOWITZ: **No.**

MR. CROSS: Whose office is it?

MR. LEFKOWITZ: **Sigma.**

(Ex. 6, pp. 52, 92-93).

29.     In its amended SOFA, the Debtor indicated that a firm in possession of the Debtor's books and records at the time this case was filed was, "Sigma Risk Management, LLC," located at 1528 56th St., Brooklyn, NY. (Document 677, p. 203). The record owner of the real property at 1528 56th St., Brooklyn, NY is a New York limited liability company, "1528 56th Street LLC," which purchased the property on January 6, 2022. (Adv. Case No. 23-03049, Docket 39-11). 1528 56th Street LLC was formed on November 14, 2021, less than two months prior to the closing date, by a "Yitzchok Lefkowitz." (Ex. 19). Mr. Lefkowitz has testified in this case that "Yitzchok" is his first name on his driver's license. (Ex. 4, 5:19). Mr. Lefkowitz also testified that he is a director of Sigma Risk Management. (Ex. 4, 91:4-6).

## II. Cause Exists Under § 1104(a)(1) Where Lefkowitz Likely Violated 18 U.S.C. § 152(7)

30.     Federal law prohibits any person, "acting in a personal capacity or as an agent or officer of any corporation," from "knowingly and fraudulently transfer[ing] or conceal[ing] any of . . . the property of such other person or corporation" either "in contemplation of a case under Title 11" or "with intent to defeat the provisions of Title 11[.]"  18 U.S.C. § 152(7). In the context of a corporate bankruptcy, "property of . . . [a] corporation" for purposes of § 152(7) "includes all property that would

have belonged to the debtor's estate but for a preferential transfer or fraudulent conveyance by a defendant." *United States v. Sabbeth,* 262 F.3d 207, 216 (2nd Cir. 2001).

31.     In December of 2021, shortly after taking control of the Corizon family of entities, Lefkowitz caused $3 million to be transferred from Valitas Health Services, Inc., which is one of the four corporate predecessors of the Debtor that were joined in the combination merger, to Geneva Consulting LLC, for future services described as "corporate restructuring." (Adv. Case No. 23-03049, Docket 12-2, p. 5, ¶ 22). Yet in response to Question 13 on the Debtor's Statement of Financial Affairs ("list any transfers of money or other property – by sale, trade, or any other means – made by the debtor or by a person acting on behalf of the debtor within two years before filing this case to another person, other than property transferred in the ordinary course of business or financial affairs") the Debtor checked the box for "none." (Docket 482, p. 22).

32.     When pressed on the issue at the May 12, 2023 meeting of creditors, Lefkowitz denied that he needed to amend his response to Question 13. (Ex. 6, pp. 78-79). He testified: "today the SOFAs are 100 percent accurate and my testimony is 100 percent accurate." (*Id.* at 79). In the Debtor's amended SOFA, filed on June 10, 2023 and signed by Lefkowitz, the Debtor again checked the box for "none" in response to Question 13. (Docket 677, p. 193). On June 12, 2023 at the continued Meeting of Creditors, Lefkowitz admitted that the Debtor did, in fact, make a pre-petition transfer of $3 million to Geneva Consulting in December of 2021.

33.     At his May 12th deposition, Lefkowitz testified that he did not know the identities of any officers or directors of Geneva Consulting. (Ex. 4 at 77:20-22). He further testified that, "I don't know who owns Geneva Consulting LLC. I don't know the structure of Geneva Consulting." (*Id.* at 77:7-9). Nor could Lefkowitz provide any information about anyone associated with Geneva Consulting, except for a single individual he knew only by her first name, "Miriam." (*Id.* at 78:18-79:11).

34.     Lefkowitz' professed lack of knowledge of the persons associated with Geneva Consulting is incredible. Geneva Consulting, LLC was formed on November 16, 2021, less than a month before Lefkowitz caused $3 million to be paid to the entity. (Ex. 15). It defies logic that Mr. Lefkowitz would authorize a $3 million payment for vaguely-defined services to an entity that had been in existence for less than a month, without having any knowledge of the identities of any persons associated with this newly-formed entity.

35.     In fact, all of the persons identified in the record as associated with Geneva are persons with whom Lefkowitz should be familiar. Geneva's organizer was David Gefner. (Ex. 15). A New Jersey foreign-entity registration and alternate name certificates for Geneva Consulting LLC, filed in October of 2022, identify David Gefner as Geneva's "Member" and "General Partner." (Ex. 16). David Gefner is also a director of the Debtor's immediate corporate parent, Valitas Intermediate Holdings, Inc. (Ex. 21). Valitas Intermediate Holdings is the holder of 100% of the outstanding voting securities of the Debtor. (Docket 677, p. 205). Valitas Intermediate Holdings is therefore an "affiliate" of the Debtor, *see* 11 U.S.C. § 101(2)(A), and Mr. Gefner is a statutory insider of the Debtor for purposes of the Bankruptcy Code. *See* 11 U.S.C. § 101(31)(E); § 101(31)(B)(iv).

36.     Two other individuals have been identified in the record as signatories for Geneva Consulting on contracts it executed with the Debtor and other related entities. They are Zalman Schapiro, (Ex. 4 at 80:19-81:10), and Jay Leitner. (Adv. Case No. 23-03049, Docket 12-2, p. 5, ¶ 23). Mr. Lefkowitz knew Zalman Schapiro to be Perigrove's in-house counsel. (Ex. 4 at 81:16-17). Per the Debtor's Schedules, Zalman Schapiro is the person to whom correspondence for Geneva Consulting should be directed, and Geneva's address is listed as the Perigrove office at 7 World Trade Center, 46th Floor, New York, NY. (Docket 481, p. 70). "Jay" Leitner, whose legal name appears to be Yermiah[12]

---

12 Leitner and Gefner are apparently close friends. In May of 2018, David Gefner co-signed a mortgage on a house purchased by "Yermiah Leitner." (Ex. 22- Deed and mortgage for 13 Cherry Ln, Pomona, NY). Gefner's signature on the mortgage matches his signature on the Corizon divisional merger documents.

Leitner, holds or held many of the same positions as Lefkowitz. Like Lefkowitz, Leitner is a VP at Perigrove, (Adv. Case No. 23-03049, Docket 12-2, p. 5, ¶ 23), was a director of the Debtor in early 2022, (Docket 677 p. 224), and was a director of the Debtor's sole shareholder, Valitas Intermediate Holdings. (Ex. 21).

37.     Geneva Consulting is clearly controlled by statutory insiders of the Debtor known to Lefkowitz. Geneva may even be controlled by Lefkowitz himself: documents provided under seal to the Regents of the University of Missouri apparently establish that "Corizon Health director Lefkowitz also controls Geneva Consulting, LLC." (Docket 75-3, p. 33). The UCC's counsel has represented to this Court that on May 25, 2023, "counsel for Geneva informed counsel for the Committee that he had been retained **and his client contact at Geneva was Isaac Lefkowitz.**" (Docket 668 p. 4) (emphasis added).

38.     To violate § 152(7), the defendant need only fraudulently transfer a corporation's funds "in contemplation of bankruptcy *or* with the intention to defeat the bankruptcy laws." *United States v. Haymes,* 610 F.2d 309, 310 (5th Cir. 1980) (emphasis in original).  A jury may draw the inference that a defendant acted "in contemplation of bankruptcy" from evidence that the defendant was aware of "the grave financial condition of [the corporation] and the likelihood it would fall into bankruptcy." *Haymes,* 619 F.2d at 311. Lefkowitz' own contemporaneous statements demonstrate that he acted in contemplation of bankruptcy at the time of the December 2021 transfer of funds to Geneva Consulting. In a letter Lefkowitz sent to outgoing CEO James Hyman on December 9, 2021, Lefkowitz mentioned, "the recent massive losses of the company revenues and steering the company with its mounting liabilities to the brink of bankruptcy[.]" (Adv. Case No. 23-03049, Docket 12-7, p. 2). In an email that Lefkowitz sent to Mr. Hyman the following day, he wrote:

---

Engagement photos posted to Instagram less than two months before this house was purchased show a man, identified as "Yermie Leitner," standing next to his bride. The man in the engagement photo is clearly the same individual that is portrayed on the Perigrove website as "Jay Leitner." (*compare* Ex. 23; Ex. 24).

"We will deal in short order with your employment termination by all the options available to the company, either through a friendly severance, or through aggressive litigation with you, **or alternatively through a bankruptcy filing which will wipe out all of your claims** . . ."

(Adv. Case No. 23-03049, Docket 12-9, p. 2) (emphasis added).

39.     The "claims" that Lefkowitz threatened to "wipe out" via a bankruptcy filing in his December 10, 2021 email were Mr. Hyman's rights to severance and other benefits under Hyman's employment agreement with Valitas Health Services. Valitas Health Services, Inc. is the same entity that Lefkowitz had caused to transfer three million dollars to Geneva Consulting during the previous week. Lefkowitz' documented, contemporaneous threat shows that he was contemplating a bankruptcy filing that would 'wipe out' the claims of unsecured creditors of Valitas Health Services, within days of transferring $3 million from Valitas Health Services to Geneva.

### III. The Divisional Merger Transaction constitutes "Cause" under § 1104(a)(1)

40.     The May 2022 divisional merger transaction also likely constitutes both a violation of 11 U.S.C. § 152(7), and a "prepetition course of conduct" that "in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee." *In re Savino Oil & Heating Co.,* 99 B.R. 518, 526 (E.D. N.Y. 1989) (appointing trustee where debtor executed prepetition "Metamorphosis Agreement" that effectively shifted its retail fuel oil operations to new entity under common ownership). In *United States v. Davis,* 767 F.2d 1025 (2nd Cir. 1985), a conviction under § 152(7) was upheld based on the following conduct:

"what Judge Conner described as the "sweetheart" deal by which Intersystems Design and Technology Corporation ("IDT") – a new company formed and controlled by Davis – assumed all of General Dynamics' contracts with Frigitemp . . . at a time when it was clear to all concerned that the actual bankruptcy of Frigitemp was imminent."

*United States v. Davis,* 767 F.2d at 1040. Like the defendant in *Davis* and the debtor in *Savino,* the Debtor in this case engineered and executed a transaction that shifted its operating business to a newly-

formed entity controlled by insiders. As in *Davis* and *Savino*, the Debtor carried out its transaction while it was insolvent, and subsequently filed a bankruptcy petition.

41.     The Debtor has raised essentially two arguments in support of its position that its prepetition transaction with itself is not a fraudulent transfer. First, it has argued that its transaction was not a "transfer" under Texas law. (Docket 677 p. 7; Docket 74-4, p. 16). Second, it has argued that the transaction was not fraudulent: the Debtor claims that it received *more* value in exchange for divesting itself of its operating business than its business was worth, such that the transaction actually *benefitted* its unsecured creditors. (*See, e.g.* Docket 7, p. 24). In support of this claim, the Debtor relies on an opinion letter produced by a consulting firm. The Debtor's attorneys and its CRO have repeatedly alluded to this letter, but have never attached it as an exhibit to any of their filings. (Docket 186, p. 4; Docket 7, p. 24).[13]

42.     Let us turn first to the 'transfer' argument. In the bankruptcy context, "what constitutes a transfer and when it is complete is a matter of federal law." *Tower Credit, Inc. v. Schott (In re Jackson)*, 850 F.3d 816, 818 (5th Cir. 2017) (quoting *Barnhill v. Johnson*, 503 U.S. 393, 397 (1992)). The Bankruptcy Code defines a "transfer" as encompassing "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54). This definition encompasses "any transfer of an interest in property, including a transfer of possession, custody, or control, even if there is no transfer of title, because possession, custody, and control are interests in property." *First Union Nat'l Bank*, 252 B.R. 69, 78 (Bankr. E.D. Va. 2000). Congress intended this definition of "transfer" to be, "as broad as possible . . .

---

13  On June 21, 2023, the UCC filed this letter as an exhibit to a motion to compel the consultant's compliance with a subpoena. The letter makes clear that in rendering its opinion, FTI Consulting made no attempt to determine the value of the assets that were shifted to CHS TX. As FTI Consulting explains:  "we express no view as to, and our opinion does not address, the current or future price or current or future value of any equity interests in the Company or of any assets of the Company" (Docket 705-1, p. 7), and "[i]n arriving at our opinion, we have not [] made or obtained any valuations or appraisals of the assets or liabilities of the Company or any subsidiaries." (Docket 705-1, p. 5).

[i]ndeed, the Code's expansive definition encompasses literally every mode of parting with an interest in property." *In re Besing,* 981 F.2d 1488, 1493 (5th Cir. 1993) (cleaned up).

43.     A diverse array of transactions thus fit within the expansive definition of a 'transfer' for bankruptcy law purposes. These include a taxpayer's election to carry forward net operating losses, *Gibson v. United States (In re Russell)*, 927 F.2d 413, 416 (8th Cir. 1991), a state court's dismissal of a tort lawsuit as a discovery sanction, *In re Besing,* 981 F.2d at 1493-94, a division of a marital estate via a property settlement agreement, *See Citibank N.A. v. Williams (In re Williams)*, 159 B.R. 648, 663 (Bankr. D.R.I. 1993), and even a "Partition Agreement" that transformed the community property interest of a married couple in their Texas Homestead into two separate 50% interests in the same Texas Homestead, one held by each spouse. *Wiggains v. Reed (In re Wiggains)*, 2015 Bankr.  LEXIS 1460 at *56 (Bankr. N.D. Tex. 2015).

44.     Regardless of whatever Texas law may have to say on the matter, the Debtor's divisional-merger transaction clearly constitutes a bankruptcy-law "transfer." Like the 'Metamorphosis Agreement' of *Savino Oil,* 'the "sweetheart" deal' in *United States v. Davis*, and even the 'Partition Agreement' in *Wiggains*, the divisional merger in this case caused the Debtor to be dispossessed of certain interests in property. Those interests included possession, custody, or control of various assets. This is all that is required under § 101(54). Indeed, as one court that has examined this transaction has found, "the division was little more than a transfer of assets between corporations." *Jackson v. Corizon Health,* 2022 U.S. Dist. LEXIS 198717 at *27 (E.D. Mich. 2022).

45.     Next, the Debtor argues that the transaction was not fraudulent. A transfer is fraudulent under the Bankruptcy Code if the debtor made the transfer "with actual intent to hinder, delay, or defraud" any creditor, 11 U.S.C. § 548(a)(1)(A), or if the debtor "received less than a reasonably equivalent value in exchange" for the transfer, and made the transfer while insolvent. 11 U.S.C. § 548(a)(1)(B). The phrase "hinder, delay, or defraud" is stated in the disjunctive, such that "an intent to

hinder or to delay or to defraud is sufficient." *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 661

(5th Cir. 2017). § 548(a)(1)(A) and § 548(a)(1)(B) are also enumerated in the disjunctive. In other

words, if the Debtor's actual intent in entering into the transaction was to hinder, delay, or defraud

creditors, "the adequacy of consideration and the solvency of the transferor is immaterial." *45 John*

*Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts LLC)*, 605 B.R. 602, 2023 Bankr. LEXIS

1016 at *18 (Bankr. S.D.N.Y. 2023).

    46.    An extraordinary complaint, (2:23-cv-11210, E.D. Mich.), filed against Lefkowitz on

May 22, 2023 by the Debtor's own prepetition counsel, shows that this is the rare case where actual

intent to hinder, delay, or defraud creditors is likely to be readily provable by direct evidence. Counsel's

complaint describes a Zoom meeting that occurred on August 19, 2022. The meeting was attended by

Lefkowitz, by multiple attorneys from Chapman Law Group (the firm that has represented the Debtor

in almost all of its tort litigation in Michigan for over a decade), and by J. Scott King, an executive at

Corizon/Yescare. During the meeting:

> Lefkowitz told a story to explain **what the Texas two-step was and how the process was used to force plaintiffs into accepting lower settlements** and why CLG should have no concerns for its fees/expenses or the indemnification of its clients.
>
> i.    A person (Lefkowitz/Yescare) had a friend [the Debtor] that could not pay his creditors and needed money to continue business. The person (Lefkowitz/Yescare) loaned him some money to get him on his feet. The person (Lefkowitz/Yescare)  **told him that in the future every time a creditor called start babbling like a fool and the creditor will go away and you will save money.** A year later the person (Lefkowitz/Yescare) called the friend [the Debtor] and said he wanted his money back and the friend [the Debtor] started babbling. The person (Lefkowitz/Yescare) then said you fool I taught you that trick now pay up.
>
> ii.    Defendant Lefkowitz told this story to assure CLG that Yescare or him personally, had the money to pay all attorney fees and indemnity payments as needed.
>
> (Ex. 25, pp. 7-8) (emphasis added).

    47.    If, as Lefkowitz apparently represented to the Debtor's attorneys, 1) Yescare had all the

money it needed to cover the Debtor's defense and indemnification obligations to the Debtor's former

medical-professional employees, 2) Yescare fully intended to guarantee those obligations in spite of the divisional merger's purported allocation of most of the professional-liability claims to the Debtor, and 3) the purpose of the transaction was not to actually abandon those obligations in a grossly-undercapitalized non-operating entity, but rather "to force plaintiffs into accepting lower settlements," then the divisional merger transaction was carried out with actual intent to hinder, delay, or defraud creditors under § 548(a)(1)(A).

48.     Of course, there is another possibility: Lefkowitz may have lied to the Debtor's lawyers about his intent in carrying out the transaction. Indeed, the Chapman Law Group complaint alleges that:

"Defendant Lefkowitz did not deny that he intentionally lied when he guaranteed that Defendant Yescare and Defendant Lefkowitz would indemnify all former employees and pay the CLG past present and future attorney fees and costs."

(Ex. 25, p. 8, ¶ 35).

49.     If Lefkowitz intentionally lied to Debtor's prepetition counsel about Yescare's willingness, or its ability, to defend and indemnify the Debtor's former medical-professional employees, he committed fraud. "[F]or purposes of the federal fraud statutes, 'the term 'scheme to defraud' is not readily defined, but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money." *United States v. Caldwell*, 302 F.3d 399, 414 (5th Cir. 2002) (quoting *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992)).

50.     The services that Chapman Law Group performed, and the litigation costs it advanced, between August 19, 2022 and the petition date were "something of value." So was the 4.5-year, $1.06 billion Alabama Department of Corrections contract that Yescare won on or about December 27, 2022 and finalized in early 2023. (Ex. 26- ADOC Press Release; Adv. Case No. 23-03049, Docket 13-6).

27

Concealing the Debtor's financial instability from the State of Alabama until the ADOC contract was finalized may have been Lefkowitz' primary motivation for encouraging Chapman Law Group to continue litigating, and to keep its former-employee co-defendants in the dark about its insolvency. Per Debtor's prepetition counsel:

> Defendant Lefkowitz stated CLG withdrawal as counsel in the approximately 100+ open claims would cause catastrophic consequences to Yescare and the progress they were making in developing new business. . . .

> **Defendant Lefkowitz stated Defendant Yescare was about to land some significant contracts and needed CLG to stay on as counsel and not notify CLG clients of the potential financial instability of The Client**. . . .

> Several times Lefkowitz made statements to CLG president Ronald W. Chapman, Sr. that CLG services were necessary without which his plan to grow Yescare would fail.

(Ex. 25, pp. 6, 7, 14, ¶¶ 25, 31-d., 70).

51.     "[A] defendant commits fraud when he makes a company appear solvent when it is not." *United States v. Blocker*, 104 F.3d 720, 730 (5th Cir. 1997). The need to conceal the Debtor's insolvency (and thus Yescare's potentially massive fraudulent-transfer liability) from the State of Alabama until the ADOC contract was finalized also explains Yescare/Perigrove/M2 LoanCo's peculiar decision to spend a total of $39,032,965, more than double the $15,000,000 allegedly allocated to the Debtor under the Funding Agreement, to haphazardly settle claims against the Debtor between May 2022 and the petition date. (Docket 630, p. 8). Lefkowitz testified at the June 13, 2023 continued meeting of creditors that the $15 million available under the Funding Agreement was exhausted by June of 2022.  In essence, $24 million of outside money was subsequently spent to delay Tehum's Chapter 11 filing from the summer of 2022 to February of 2023. (Docket 683, pp. 4-5). It is not clear what benefit the principals could have hoped to reap from their eight-figure investment in delaying the Tehum bankruptcy filing, other than hiding Yescare's potential fraudulent-transfer liability from the State of Alabama during the contract negotiation process.

**IV. "Cause" exists under § 1104(a)(2) given the Debtor's directors' history of self-dealing transactions with affiliated companies while the Debtor was insolvent**

52.    "Courts have found that a history of transactions with companies affiliated with the debtor is sufficient cause to appoint a trustee in the best interests of creditors." *In re Westbank Holdings, LLC,* 2022 Bankr. LEXIS 2109 at *41 (Bankr. E.D. La. 2022) (quoting *In re Golden Park Estates, LLC,* 2015 Bankr. LEXIS 1912 at *6 (Bankr. D.N.M. 2015)). The Debtor was a Delaware corporation until April 28, 2022, and thereafter became a Texas corporation. Under both Texas and Delaware law, corporate directors owe a fiduciary duty of loyalty to the corporations they serve, which includes a duty not to engage in self-dealing. *See, e.g. Husted v. Taggart (In re ECS Ref., Inc.),* 625 B.R. 425, 444-45 (Bankr. C.D. Cal. 2020);   *Weiss v. Arabella Exploration, Inc. (in re Arabella Petroleum Co., LLC),* 647 B.R. 851, 881 (Bankr. W.D. Tex. 2022).

53.    In this case, the Debtor's directors engaged and attempted to engage in various self-dealing transactions while the Debtor was insolvent. Examples include the corporate restructuring itself, which transferred the Debtor's operating business to Yescare Corp., an entity in which the Debtor's former CEO and director Sara Tirschwell owns a 5% interest, the Debtor's business dealings in early 2022 with United Staffing Solutions, a staffing agency owned by director Abe Goldberger's wife, (Docket 677, p. 133; Docket 332-40) which Abe Goldberger serves as CEO, (Docket 332-41, p. 4), and the Debtor's payment of millions of dollars to Geneva Consulting LLC, a newly-formed entity controlled by insiders, for "corporate restructuring" services. (Adv. Case No. 23-03049, Docket 12-2, p. 5, ¶ 22).

54.    Another relatively-straightforward example of self-dealing behavior is the transaction between the Debtor and Seven Trade LLC that was attempted in January and February of 2022. Lefkowitz, who at the time was a director of both the Debtor and Seven Trade LLC, tried to cause

Seven Trade LLC to purchase 350,000 COVID test kits for $2,065,000, which it would then immediately resell to the insolvent Debtor for $3,251,500. (Ex. 27- Lefkowitz Declaration, ¶¶ 1, 4, 7, 36). This transaction was intended to generate a nearly-instantaneous $1,161,500 profit for Seven Trade LLC at the insolvent Debtor's expense. (Ex. 27, ¶ 39).

55.     Seven Trade LLC is a Delaware limited liability company, organized on February 5, 2021 by David Gefner. (Ex. 18). Jay Leitner's LinkedIn profile asserts that "Jay also directs Seventrade, a global import-export company he cofounded in early 2021." (Docket 332-20, p. 2). In a sworn declaration, Lefkowitz admitted that he is a director of Seven Trade LLC and that he was personally involved in attempting to consummate the COVID-test transaction. (Ex. 27, ¶¶ 1, 4, 37). At the time of this attempted transaction, Lefkowitz, Leitner, and Gefner were all directors of the Debtor, and they were all directors of Valitas Intemediate Holdings, the Debtor's corporate parent. Lefkowitz and his Perigrove colleagues' flagrant attempt to siphon nearly $1.2 million in arbitrage profits out of the insolvent Debtor is perhaps the clearest available evidence that Mr. Lefkowitz is unlikely to act as a responsible fiduciary for the Debtor's creditors. Ample cause exists to relieve Mr. Lefkowitz of his control of the Debtor and replace him with an independent trustee.

## **Relief Requested**

WHEREFORE, for all the above-mentioned reasons, the Movants respectfully request that the Court enter the attached Order (Ex. 1), directing the United States Trustee to appoint a Chapter 11 Trustee to manage the Debtor's affairs, and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

**CROSS LAW PLLC**

/s/ *Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Kohchise Jackson, William
Kelly, and Derico Thompson
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994-9590
ian@lawinannarbor.com

**CARSON & COIL, P.C.**

Gabriel E. Harris           MO66461
Blake I. Markus             MO61755
Attorneys for Capitol Eye Care, Inc., et. al.
515 East High Street  |  P.O. Box 28
Jefferson City, Missouri 65102
Phone:  573-636-2177
Fax:  573-636-7119
Blake.M@carsoncoil.com

**Walker & Patterson, P.C.**

/s/ *Johnie Patterson*
Johnie Patterson, SBN 15601700
Attorney for RMSC Plaintiffs
P.O. Box 61301
Houston, TX 77208
713-956-5577
jpp@walkerandpatterson.com

**Hackney Odlum & Dardas**

/s/ *Thomas G. Hackney*
Thomas G. Hackney (P81283)
Attorney for Former Corizon
Medical Provider Employees
10850 E. Traverse Hwy. Ste. 4440
Traverse City, MI 49684
(231) 642-5026
thackney@hodlawyers.com

**Saint Louis University School of Law Legal Clinic**

*/s/ Brendan D. Roediger*
Brendan D. Roediger,  Missouri Bar No. 60585
Attorney for Phillip Buchanan
100 N. Tucker Blvd., Ste. 704
Saint Louis, MO 63101
314-977-2551


**M. E. Heard, Attorney, PLLC**

*/s/ Mary Elizabeth Heard*
MARY ELIZABETH HEARD
Texas State Bar No. 24096727
SD # 2943737
100 NE Loop 410, Suite 605
San Antonio, Texas 78216
Telephone: (210) 572-4925

*Co-Counsel for Adree Edmo*


**NATIONAL CENTER FOR LESBIAN RIGHTS**

*/S/ Amy Whelan, Esq.*
AMY WHELAN, ESQ.
Pro Hac Vice
California State Bar No. 215675
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: 415-365-1338
Facsimile: 415-392-8442
Email: AWhelan@NCLRights.org

*Co-Counsel for Adree Edmo*


**RIFKIN LAW OFFICE**

*/s/ Lori Rifkin*
LORI RIFKIN
Pro hac vice
California State Bar No. 244081
Email: lrifkin@rifkinlawoffice.com
Rifkin Law Office

3630 High St., # 18197
Oakland, CA 94619
Telephone: (510) 414-4132

*Co-Counsel for Adree Edmo*