**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | )   Chapter 11 |
| Tehum Care Services, Inc.,[1] | ) |
| | )   Case No. 23-90086 (CML) |
| Debtor. | ) |

**OBJECTION TO JOINT EMERGENCY MOTION TO CONTINUE HEARING ON VARIOUS
CREDITORS' MOTION TO APPOINT A CHAPTER 11 TRUSTEE**

1.      Two months ago, a group of creditors in this case filed a motion to appoint a Chapter 11 trustee for "cause" pursuant to 11 U.S.C. § 1104(a)(1). The primary purpose of the motion was to prevent a conflicted director from steering the Debtor into a settlement that would permit him and his associates to keep the assets that they removed from the Debtor while it was insolvent, while purchasing releases of estate claims for less than the value of those pilfered assets. As the various creditors explained on June 30:

> Corizon's new owners were aware that their intended course of conduct would likely result in a fraudulent-transfer action. But to succeed and make money from their scheme, they would not need to successfully defend against that claim. Rather, all they would need to do is settle it. Any settlement will result in their new company, Yescare, purchasing a release of its fraudulent-transfer liability for less than the value of the assets that were removed from the Debtor.

(Docket 731, pg. 6, ¶ 6).

2.      Although the Debtor and Committee have yet to reveal the terms of their settlement, this may have been exactly what happened. The Debtor reported $103 million in gross revenue for the first four months of 2022. (Docket 482, p. 14). Thus, the operating business that the Debtor transferred to the Yescare parties on May 5, 2022 was generating annualized gross revenues of approximately $309

---

1    The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

million. The Yescare parties have since commenced performance under a four-and-a-half-year, $1.06 billion-dollar contract with the State of Alabama. (Docket 737, pp. 3-5). Adding in the new Alabama contract, the current annual gross revenue of the operating business is approximately $544 million. Under the proposed settlement, the Yescare parties will apparently get to keep this significant operating business while purchasing releases of any estate claims against them. We know very little else about the settlement, because the Debtor and Committee do not plan to reveal their term sheet to the Court and creditors until after their next interim DIP financing motion.

3.       The Debtor and Committee argue that the various creditors who filed the Trustee Motion will not be prejudiced by delaying consideration of the Trustee Motion such that the Debtor remains in possession through plan confirmation. (Emergency Mot. ¶ 14). They claim that, "the nature of the Plan and the Committee's central role in drafting and filing the Plan addresses any concerns regarding control of the Debtor's estate and prosecution of the estate's claims," (Emergency Mot. ¶ 7) and that "Confirmation of a Plan and the related settlement terms would resolve the same issues raised in the Trustee Motion." (Emergency Mot. ¶ 14).

4.       Setting aside the fact that "the nature of the Plan" cannot possibly address all concerns raised by the various creditors when neither the contours of the plan, nor even the details of the settlement, have been disclosed, the various creditors will be prejudiced by delaying the hearing on their motion until after the Debtor has had an exclusive opportunity to attempt to confirm a plan. If the hearing on the trustee motion is delayed until the plan confirmation hearing, the various creditors will effectively lose their chance to terminate the Debtor's plan exclusivity period under § 1121(c)(1) and propose a competing plan.

5.       Ordinarily, "the court has broad discretion in extending and terminating exclusivity[.]" *In re Borders Group, Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011). But 11 U.S.C. § 1121(c)(1) provides that a debtor's exclusive right to file a plan terminates automatically upon appointment of a chapter 11

trustee. *See In re Jasik,* 727 F.2d 1379, 1382 (5th Cir. 1984). Appointment of a chapter 11 trustee, in

turn, is mandatory once § 1104(a)(1) conduct is shown. *See, e.g., In re Amerejuve, Inc.,* 2015 Bankr.

LEXIS 1496 at *25 (Bankr. S.D. Tex. 2015) ("[t]he language of § 1104 requires appointment of a

trustee when fraud is proven"); *In re Savino Oil & Heating Co.,* 99 B.R. 518, 525 (Bankr. E.D.N.Y.

1989); *In re Sillerman,* 605 B.R. 631, 642 (Bankr. S.D.N.Y. 2019) ("[t]he statute is mandatory and

dictates that upon a finding of cause, the court is required to appoint a chapter 11 trustee"). Together, §

1121(c)(1) and § 1104(a)(1) of the Code operate to deny the benefits of lengthy plan-exclusivity and

solicitation-exclusivity periods to debtors who engage in serious fraudulent or dishonest conduct. When

a creditor can prove that a debtor-in-possession has engaged in such conduct,  that creditor can curtail

the court's otherwise-broad discretion, force the termination of the debtor's plan-exclusivity period, and

win the right to propose a competing plan.

6.      If consideration of the trustee motion is delayed until the plan confirmation hearing, § 1121(c)

(1) will be effectively sidestepped. Through its instant emergency motion, the Debtor and Committee

are attempting to maintain plan exclusivity without responding to the Trustee Motion on its merits. The

sole justification proffered for this unorthodox procedure is judicial efficiency.

7.      *In re Freelander, Inc. Mortg. People,* 86 B.R. 66 (Bankr. E.D. Va. 1988) addresses whether a

debtor may employ such a scheduling slight-of-hand in order to effectively moot a motion to appoint a

chapter 11 trustee. The *Freelander* court answered this question in the negative:

> "The Court is obligated by the terms of § 1104(a) to order the appointment of a trustee if
> the section is violated and to allow a circumvention of that responsibility by a ploy such
> as is proposed here would be an abdication of the Court's duty."

> *In re Freelander,* 86 B.R. at 68.

8.      The Debtor's present emergency motion for a continuance fits within what has become an

established pattern of leveraging whatever justifications are available to delay the adjudication of the

Trustee Motion on its merits. The Trustee Motion was filed June 30, and the response was due July 21.

On July 17, Debtor's counsel requested an extension of time to respond to the motion until after Labor Day. Movants consented to a one-week extension, pending further discussions after a status conference scheduled for the following day. (Ex. 1). Debtor's counsel did not contact the movants again following the July 18 status conference. Nor did the Debtor file a substantive response on July 28. Instead, the Debtor filed a brief, "initial Objection as a placeholder," and purported to reserve for itself, "the right to supplement this Objection following the completion of Mediation, in advance of any hearing on the Motion." (Docket 835, p. 1).

9.      The hearing on the Trustee Motion was then set for September 1. On August 4, Debtor's counsel requested that the various creditors consent to a continuance of the hearing to September 5 or later, because Debtor's counsel was not available on September 1. (Ex. 2). The various creditors agreed to continue the hearing to September 5. When the various creditors sought to take depositions in support of the Trustee Motion the week of August 28, Debtor's counsel insisted that none of them were available at any time that week to attend a deposition, yet also demanded an opportunity to depose any witness the various creditors intended to call. On multiple occasions, Debtor's counsel then attempted to leverage their purported scheduling conflicts, combined with their demand to depose the creditors' witnesses, in order to win a further adjournment of the Trustee Motion. (Ex. 3; Ex. 4).

10.      After the various creditors offered to proceed without taking any depositions, and without calling any witnesses other than Mr. Perry and Mr. Lefkowitz in order to eliminate the need for an adjournment precipitated by Debtor's counsel's scheduling conflicts, the Debtor filed the instant Emergency Motion. The Debtor set the hearing date for its Emergency Motion on September 1, the same day that Debtor's counsel had repeatedly asserted that they were unavailable, either to attend a deposition or to participate in a hearing on the Trustee Motion itself.

11.      The Debtor is not seeking to adjourn the hearing on the Trustee Motion on an emergency basis because it will be more costly to the estate to hold a hearing on the motion now, rather than at plan

confirmation. If anything, delaying the hearing will increase administrative costs since it will afford the movants time to take depositions. A motion to appoint a trustee for cause under § 1104(a)(1) does not require resolution of the same legal or factual questions as would be at issue in a plan confirmation hearing and the factual bases for the Trustee Motion are not limited to the Debtor's prepetition conduct. Issues raised in the Trustee Motion include the Debtor's postpetition payments of $150,000 per month to an entity formed and apparently controlled by the Debtor's sole director, (Docket 731, pp. 18-19, ¶¶ 27-29), and the Debtor's apparently willful and ongoing failure to disclose significant prepetition transfers in its SOFAs. (Docket 731, p. 20, ¶¶ 31-32). In fact, it has become increasingly clear in recent weeks that the Debtor has continued to flout its disclosure obligations and to intentionally mislead its creditors throughout its entire six-month tenure as an estate fiduciary.

12.     For example, even after two amendments to its schedules and SOFAs, the Debtor still has not disclosed the details of its prepetition transfers to Geneva Consulting. It has failed to do so despite repeatedly acknowledging under oath that it made significant cash transfers to Geneva while insolvent. On May 12, prior to both the amended SOFA and the second amended SOFA, the Debtor's director testified:

> Q Did money come from Corizon Health, Inc to fund Geneva Consulting?
>
> A **I think some money came in, correct.**
>
> Q Okay. And that would be something that you -- that you as director of
> M2 Loanco would cause?
>
> A **Correct.**
>
> (Docket 731-4, pg. 23, Dep. 87:13-19).

One month later, at a 341 meeting held on June 13, the Debtor testified:

> MR. CROSS: Did the Debtor make a pre-petition payment to Geneva's
> Consulting?

5

MR. LEFKOWITZ: **Yes.**

MR. CROSS: And when did it make those payments?

MR. LEFKOWITZ: **A few months prior while Geneva was doing consulting work for the Debtor.**

MR. CROSS: Was there a $3 million payment in December of 2021?

MR. LEFKOWITZ: **Yes.**

(Docket 854-1, pp. 89-90).

A $3 million payment in December of 2021 may not be the only prepetition payment the Debtor made to Geneva. Spreadsheets emailed to the Debtor's director by the Debtor's CFO in January of 2022, and by a Corizon/Yescare corporate accounting manager in November of 2022, (Ex. 5; Ex. 6) list a series of $500,000-per-month payments to Geneva in January, February, March, April, and May of 2022. The consulting agreement between the Debtor and Geneva describes the services to be provided in exchange for these payments with only two words: "corporate restructuring." (Ex. 7). Yet none of these payments were ever disclosed in response to SOFA Question 11. Nor were they disclosed in response to Question 4, Question 30, or Question 13.

13.     The Geneva payments are not the only material transfers to an affiliate that the Debtor has still failed to report. While the Debtor belatedly disclosed approximately $48 million in prepetition cash transfers to affiliates in its second amended SOFA on July 19, (*See* Docket 854, pp. 7-11), there is evidence that it made even more payments to the same affiliates that remain undisclosed. For example, the Debtor produced a payoff letter dated April 29, 2022, addressed to the Debtor and originating from M2 LoanCo. The letter is signed by Mr. Lefkowitz. It includes an attached schedule of twenty-seven "Senior Notes" purportedly held by M2 LoanCo and issued by the Debtor, in seemingly-random, non-round-dollar "Original Principal Amounts" ranging from under $10,000 to over $4 million, with no

issue date, maturity date, or interest rate information. (Ex. 8). The listed original principal amounts of the twenty-seven notes add up to exactly $10,000,000.00. The letter indicates that the payoff amount as of 04/29/22 is $5.5 million. A spreadsheet prepared by a Yescare corporate accounting manager shows a payment of $5.5 million on 4/29/2022, the same date as the payoff letter, for "Sellers Notes Payments." (Ex. 6). When asked about this payoff letter in a 2004 examination on August 14, the Debtor's director testified: "Then came April '22. There was a payment made on behalf of a pay-off letter." (Ex. 9, Dep. 50:18-22).

14.     The Debtor clearly has knowledge of a $5.5 million payment to M2 LoanCo on 04/29/22. Yet it did not list the payment on its SOFA, on its amended SOFA, or on its second amended SOFA. (Docket 811, pg. 220).  Additional payments listed on the g/l spreadsheets prepared by the Debtor/Yescare corporate accounting department are also missing from the second amended SOFA. There is a $5 million "Debt Amendment Fee," also on 04/29/22. (Ex. 6). It is not listed in any of the SOFAs. There is a $500,000 payment for "Aircraft Title Service" on 01/06/2022 in a spreadsheet prepared by the Debtor's CFO. (Ex. 5). This entry is troubling, given that the Debtor did not list any aircraft in Schedule A/B. (Docket 810, pg. 191). This payment is not disclosed in the SOFAs.

15.     In addition to failing to disclose its payments to Geneva and other insider entities, the Debtor has been dishonest throughout this case concerning the Debtor's insiders' affiliations with Geneva. On May 12, the Debtor's director testified as follows:

> Q What is your role at Geneva Consulting LLC?
>
> **A I don't have a role in Geneva.**
>
> Q Have you ever been a director of Geneva Consulting LLC?
>
> **A I don't believe so.**
>
> Q Have you ever been an officer of Geneva Consulting LLC?
>
> **A I don't recall. I don't believe so.**

Q Does Perigrove own Geneva Consulting LLC?

**A I don't know who owns Geneva Consulting LLC. I don't know the structure of Geneva Consulting.**

(Docket 731-4, pp. 20-21, Dep. 76:18-77:9).

During the 341 meeting on June 13, the Debtor's director testified as follows:

MR. JIMENEZ: Are you a director of Geneva Consulting?

MR. LEFKOWITZ: **Not with the title director, no.**

MR. JIMENEZ: What title, if any, do you have?

MR. LEFKOWITZ: **I don't have a title. I'm not getting paid from Geneva Consulting. I just help them make sure that it's being processed correctly.**

MR. JIMENEZ: Are you an owner of Geneva Consulting?

MR. LEFKOWITZ: **No.**

MR. JIMENEZ: Were you involved in the formation of Geneva Consulting?

MR. LEFKOWITZ: **No.**

MR. JIMENEZ: Were you ever an owner of Geneva Consulting?

MR. LEFKOWITZ: **No.**

. . .

MR. CROSS: Who are the principals of Geneva Consulting?

MR. LEFKOWITZ: **I don't know.**

(Docket 854-1; 13:2-17, 90:4-6).

16.     On August 14, 2023, Mr. Lefkowitz appeared at a 2004 examination as the corporate representative of Geneva Consulting.  His testimony at the 2004 examination directly contradicted his prior sworn testimony at both the May 12 deposition and the June 13 meeting of creditors.  Mr.

Lefkowitz testified that he is, in fact, a director of Geneva Consulting, (Ex. 10, Dep. 26:5-24), that he was appointed as a director some time in 2021, (Ex. 10, Dep. 23:20-25:16), and that he was the person responsible for making financial decisions for Geneva with respect to its dealings with the Debtor, with M2 LoanCo, and with Yescare. (Ex. 10, Dep. 19:6-20:4; 22:2-6). On May 12, when asked if Zalman Schapiro had a role at Geneva Consulting, Lefkowitz testified, "I don't recall." (Docket 731-4, p. 21, Dep. 79:9-11). Yet on August 14, Lefkowitz said that Zalman Schapiro is the person he reports to in his role at Geneva Consulting and that he interacts with Zalman Schapiro in his role at Geneva on a daily basis. (Ex. 10, Dep. 58:1-17). In fact, Zalman Schapiro was the only person associated with Geneva that Mr. Lefkowitz was willing to identify. (Ex. 10, Dep. 54:2-55:15).

17.     Mr. Lefkowitz again testified on August 14 that he did not know who owns Geneva Consulting, and he denied knowing who any of its officers or other directors are. (Ex. 10, Dep. 26:17-27:11). But an email produced by the Debtor shows that on February 11, 2022, Mr. Lefkowitz informed the Debtor's C-suite leadership that Geneva Consulting is, "a wholly owned subsidiary of: Genesis HealthCare a publicly traded Company (GENN)." (Ex. 11). A second email, sent by one of the Debtor's employees on February 24, 2022 (Ex. 12) reads:

> This was provided by Isaac for the Arizona bid re: corporate structure.
>
> YesCare, Corp. is managed and financially supported by Geneva Consulting, LLC which is a subsidiary of Genesis Healthcare, a publicly traded company (GENN). The company's organizational chart is below



18.     At the July meeting of creditors, the Debtor refused to answer questions about whether Mr. Lefkowitz is on the board of directors of Genesis Healthcare, as stated on his LinkedIn page, or whether Genesis has an ownership interest in Yescare. (Docket 854-2, pp. 93-102). At the 2004 examination of Geneva on August 14, Mr. Lefkowitz affirmatively refused to disclose the identities of any of the Geneva employees or third-party service providers that allegedly provided millions of dollars worth of "corporate restructuring" services to the insolvent Debtor. The following testimony proffered by Mr. Lefkowitz on August 14 illustrates of the extent of the willful obstruction that creditors have endured throughout this case:

> Q You said you interact with a few employees?
>
> A **Correct.**
>
> Q And you said Zalman Schapiro?
>
> A **Zalman Schapiro and his team.**
>
> Q And is Zalman Schapiro an employee of Geneva?
>
> A **I don't know.**
>
> Q Who are employees that you said you interact with?
>
> A **Zalman Schapiro and his team.**
>
> Q Who is his team?
>
> A **Zalman has a team.**
>
> Q Who is on it?
>
> A **Zalman and his team.**
>
> Q Are Zalman Schapiro and his team -- is anybody from Zalman Schapiro's team employees of --
>
> A **I don't know. I'm not in HR so I don't know who is an employee and who is not.**

Q So when you said you believed Geneva has employees, what was that based on?

A **Belief.**

Q What was your belief based on?

A **Beliefs.**

Q What is your personal experience with Geneva having employees? Have you ever seen a payroll?

A **No.**

Q What basis do you have for thinking Geneva has employees other than belief?

A **Interact with them on a daily basis.**

Q When you say you interact with them on a daily basis, is that talking about Zalman Schapiro and his team?

A **Correct.**

Q And you told us that you don't know whether they're employees, so why would that be a basis --

A **I don't have --**

Q Go ahead.

A **I don't have direct knowledge who is an employee, who is an independent contractor, who is a W2, who is a 1099. I'm too busy all day long to do and get involved in stuff that I'm not a -- that I don't need to know. You're asking me if I know who is an employee. The answer is I don't know.**

Q Okay.

A **You're asking me --**

Q Who performs services for Corizon?

A **Corizon.**

11

Q For -- who at Geneva performs services for PharmaCorr, Corizon, any of the Corizon entities, YesCare, Tehum, any of the entities that we listed?

A **Geneva.**

Q Who at Geneva?

A **I told you who at Geneva. I'm the director. I interact with Zalman and team.**

Q Any other directors perform services for those entities?

A **You asked the question and I told you I'm not aware of.**

Q Okay. And you don't know the names of Zalman Schapiro's team?

A **I didn't say I don't know the names.**

 Q Okay. What are their names?

A **I didn't say that. I -- I said that I report to Zalman and team. I didn't say that I don't know their names.**

Q Okay.

A **You're putting words into my mouth and you're creating a record of avoidance.**

Q No. I apologize, I -- I would like to know their names. I'm not trying to create a record that you don't know their names. What are their names?

A **I said I work with Zalman and team. I report to Zalman. These are the group that does the services on behalf of Geneva.**

Q Who is team?

A **The question has been asked and answered.**

Q No, it hasn't.

A **Yes, it has.**

Q Who is the team?

A **It has been asked and answered.**

12

Q Okay. Let's try it a different way. You said you interact with them daily. Who do you interact with daily other than Zalman Schapiro as to Geneva?

A **Zalman and team.**

Q And you're not going to tell us who the team is?

A **Exactly.**

Q How many people are on the team?

A **The question has been asked and answered.**

Q Does the team exist?

A **Yes.**

Q And you're not going to tell us how many people are on it or any of their names?

A **Exactly.**

(Ex. 10, 55:1-59:2).

19.     "Where, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." *In re Savino Oil & Heating Co.,* 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). Mr. Lefkowitz' conduct throughout this case has continued to meet the § 1104(a)(1) standard. He has amply demonstrated that he is unwilling to act as a responsible estate fiduciary, and there is no justification for delaying consideration of the various creditors' motion so that Mr. Lefkowitz can remain in control of the Debtor through the plan confirmation process.

/s/ *Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Kohchise Jackson, William Kelly, and Derico Thompson
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994-9590
ian@lawinannarbor.com

**CARSON & COIL, P.C.**

_____
Gabriel E. Harris                MO66461
Blake I. Markus                  MO61755
Attorneys for Capitol Eye Care, Inc., et. al.
515 East High Street | P.O. Box 28
Jefferson City, Missouri 65102
Phone:  573-636-2177
Fax:  573-636-7119
Blake.M@carsoncoil.com

**Hackney Odlum & Dardas**

_/s/ Thomas G. Hackney_
Thomas G. Hackney (P81283)
Attorney for Former Corizon
Medical Provider Employees
10850 E. Traverse Hwy. Ste. 4440
Traverse City, MI 49684
(231) 642-5026
thackney@hodlawyers.com

**M. E. Heard, Attorney, PLLC**

_/s/ Mary Elizabeth Heard_
MARY ELIZABETH HEARD
Texas State Bar No. 24096727
SD # 2943737
100 NE Loop 410, Suite 605
San Antonio, Texas 78216
Telephone: (210) 572-4925

_Co-Counsel for Adree Edmo_

**NATIONAL CENTER FOR LESBIAN RIGHTS**

_/S/ Amy Whelan, Esq._
AMY WHELAN, ESQ.
Pro Hac Vice
California State Bar No. 215675

National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: 415-365-1338
Facsimile: 415-392-8442
Email: AWhelan@NCLRights.org

*Co-Counsel for Adree Edmo*


**RIFKIN LAW OFFICE**

*/s/ Lori Rifkin*
LORI RIFKIN
Pro hac vice
California State Bar No. 244081
Email: lrifkin@rifkinlawoffice.com
Rifkin Law Office
3630 High St., # 18197
Oakland, CA 94619
Telephone: (510) 414-4132

*Co-Counsel for Adree Edmo*


**Saint Louis University School of Law Legal Clinic**

*/s/ Brendan D. Roediger*
Brendan D. Roediger,  Missouri Bar No. 60585
Attorney for Phillip Buchanan
100 N. Tucker Blvd., Ste. 704
Saint Louis, MO 63101
*314-977-2551*

**FRANK OZMENT ATTORNEY AT LAW, LLC**

*/s/ Frank Ozment*
Alabama Bar ID 7203-N73J
*/s/ Valrey W. Early, III*
Alabama Bar ID EAR001
Attorneys for Tracey Grissom
501 217 Country Club Park
Mountain Brook, Alabama 35213
t: 205.413.9973
e: FrankOzmentLaw@gmail.com
e: EarlyLawOffice@gmail.com

15