IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 23-90086-11 |
| | § HOUSTON, TEXAS |
| TEHUM CARE SERVICES, INC., | § FRIDAY, |
| | § MAY 12, 2023 |
| DEBTOR. | § 2:00 A.M. TO 3:29 P.M. |

**CONTINUED SECTION 341 MEETING OF CREDITORS**

APPEARANCES:                    SEE NEXT PAGE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:


FOR THE US TRUSTEE:               DEPARTMENT OF JUSTICE
                                  OFFICE OF THE US TRUSTEE
                                  Andrew Jimenez, Esq.
                                  606 N. Carancahua Street
                                  Suite 1107
                                  Corpus Christi, TX 78401
                                  361-888-3261


FOR DEBTOR TEHUM CARE             GRAY REED McGRAW, LLP
SERVICES, INC.:                   Lydia Webb, Esq.
                                  Aaron Kaufman, Esq.
                                  1601 Elm Street, Suite 4600
                                  Dallas, TX 75201
                                  469-320-6111


FOR THE OFFICIAL UNSECURED        STINSON, LLP
CREDITORS COMMITTEE:              Nicholas Zluticky, Esq.
                                  1201 Walnut Street
                                  Suite 2900
                                  Kansas City, MO 64106
                                  816-691-3278


FOR TRACEY GRISSOM:               FRANK OZMENT ATTORNEY AT LAW
                                    LLC
                                  Valrey W. Early, III, Esq.
                                  217 Country Club Park
                                  Box 501
                                  Birmingham, AL 35213
                                  205-586-5127


FOR ADREE EDMO:                   M.E. HEARD, ATTORNEY, PLLC
                                  Mary Elizabeth Heard, Esq.
                                  100 NE Loop 210
                                  Suite 605
                                  San Antonio, TX 78216
                                  210-572-4925

                                  RIFKIN LAW OFFICE, PC
                                  Lori Rifkin, Esq.
                                  3630 High Street
                                  #18917
                                  Oakland, CA 94619
                                  510-414-4132

<u>APPEARANCES (CONTINUED)</u>:


FOR JEFFREY WALTER BOMBER,        HACKNEY ODLUM & DARDAS
ET AL:                            Connor McLaughlin, Esq.
                                  10850 E. Traverse Highway
                                  Suite 4440
                                  Traverse City, MI 49684
                                  231-642-5026


FOR M2LOANCO:                     Christian Gluck, Esq.


FOR KOHCHISE JACKSON AND          CROSS LAW, PLLC
WILLIAM KELLY:                    Ian Cross, Esq.
                                  402 W. Liberty Street
                                  Ann Arbor, MI 48103
                                  734-994-9590

1          **HOUSTON, TEXAS; FRIDAY, MAY 12, 2023; 2:00 P.M.**

2          MR. JIMENEZ:  Good afternoon, everyone.  Today is

3     May 12, 2023, it is 2:00 p.m. Central Standard Time.  We are

4     here for the continued Section 341 Meeting of Creditors in the

5     case of Tehum Care Services, Inc., Case No. 23-90086 pending

6     before the United States Bankruptcy Court for the Southern

7     District of Texas.

8          My name is Andrew Jimenez.  I am an attorney for the

9     United States Department of Justice and I represent the United

10    States Trustee.  I will be presiding -- I will be the

11    presiding officer at this meeting in this case.

12         I know there are several creditors on the phone and

13    this is a meeting of creditors and I will let creditors ask

14    questions of Tehum's representative.  Just wait until I call

15    you to ask your questions.

16         As a reminder, the 341 meeting is limited to ask

17    questions about the petition, the schedules, statement of

18    financial affairs or the general financial condition of the

19    Debtor.  If you need to ask questions beyond and cover other

20    subject matters, the bankruptcy laws provide other avenues

21    such as a 2004 Examination and you need to -- should you need

22    additional discovery of the Debtor or others that is beyond

23    the scope of Section 341 meeting.

24         For the Record this meeting is being digitally

25    recorded and the United States Trustee's recording is the only

1   authorized recording.  Nobody else should be recording this

2   meeting.

3           Will counsel for the Debtor please identify himself

4   or herself, please?

5           MS. WEBB:  Good afternoon.  This is Lydia Webb of

6   Gray Reed, counsel for the Debtor.  With me is my partner,

7   Aaron Kauffman.

8           MR. JIMENEZ:  Good afternoon.  And will the Debtor's

9   corporate representative identify for the Record, please?

10           MS. WEBB:  We have 2 representatives of the Debtor

11   today, so Russell Perry, the CRO of Ankura, and Mr. Isaac

12   Lefkowitz the Debtor's sole director.

13           MR. JIMENEZ:  Okay.  Mr. Perry, could you please

14   identify for the Record, state your full name.

15           UNIDENTIFIED SPEAKER:  Yes, [indiscernible].

16           MR. JIMENEZ:  So --

17           MR. PERRY:  Hi, this is Russell Perry.

18           MR. JIMENEZ:  Okay.  Before we --

19           MR. PERRY:  Yes, Your Honor.  Do I need to spell

20   Perry?

21           MR. JIMENEZ:  Okay.  Before we continue I will ask

22   everyone on the call please mute your lines unless you are

23   speaking because we're picking up some background noise.

24           So, Mr. Perry, I think I was able to hear you, but I

25   think there was somebody else speaking at the same time.  So

1   could you please state your full name for the Record, please?

2          MR. PERRY:  Sure.  This is Russell Perry, CRO of the

3   Debtor.

4          MR. JIMENEZ:  Thank you.

5          Mr. Lefkowitz, are you on the call?

6          MR. LEFKOWITZ:  Yes, sir.

7          MR. JIMENEZ:  Could you please state your full name

8   for the Record?

9          MR. LEFKOWITZ:  Isaac Lefkowitz.

10          MR. JIMENEZ:  Okay.  So I'm going to swear in the

11   Debtor representatives starting with Mr. Perry.  Would you

12   please raise your right hand.  And since this meeting is being

13   conducted telephonically, can you verbally confirm that your

14   right hand is up?

15          MR. PERRY:  Is it.

16          MR. JIMENEZ:  Do you swear or affirm that the

17   testimony that you're about to give is the truth, the whole

18   truth and nothing but the truth?

19          MR. PERRY:  I do.

20          MR. JIMENEZ:  And now, Mr. Lefkowitz, could you

21   please raise your hand, your right hand, and verbally confirm

22   when your right hand is up.

23          MR. LEFKOWITZ:  Is is.

24          MR. JIMENEZ:  Do you swear or affirm that the

25   testimony you are about to give is the truth, the whole truth

1     and nothing but the truth?

2            MR. LEFKOWITZ:  I affirm.

3            MR. JIMENEZ:  So normally in a -- I would verify the

4     identifications of the Debtor's representative, but since

5     we're conducting this meeting telephonically I won't be able

6     to do that.  So, Ms. Webb, can you, as an officer of the

7     Court, confirm that the individuals on the phone are indeed

8     who they claim to be?

9            MS. WEBB:  I can confirm.

10           MR. JIMENEZ:  So during this call I will be using

11     the term the Debtor, and when I say the Debtor I am referring

12     to Tehum Care Services, Inc., formerly doing business as

13     Corizon Health Services, Inc.  Does that make sense?

14           UNIDENTIFIED SPEAKER:  [Indiscernible].

15           MR. JIMENEZ:  Okay.  So, Mr. Perry, you as Chief

16     Restructuring -- the restructuring officer you signed the

17     voluntary petition of the Debtor.  Is that correct?

18           MR. PERRY:  That's correct.

19           MR. JIMENEZ:  Okay.  You also signed -- the

20     voluntary petition was filed on February 13, 2023 and then an

21     amended petition was filed on February 15, 2023.  Did you sign

22     the amended petition?

23           MR. PERRY:  I did, uh-huh.

24           MR. JIMENEZ:  And so now, Mr. Lefkowitz, did you

25     have an opportunity to -- and before I ask my question, I'm

1    going to make reference to the schedules and the statement of

2    financial affairs.  The schedule was filed at Docket Entry

3    Number 481 and the statement of financial affairs was filed at

4    Docket Entry 482.  Mr. Lefkowitz, do you have access to those

5    documents?  Do you have them nearby?  If I ask you specific

6    questions about the schedules can you -- are you able to look

7    at a document?

8            MR. LEFKOWITZ:  Yes, I can.

9            MR. JIMENEZ:  Okay.  So, Mr. Lefkowitz, did you have

10    an opportunity to read the global notes that were attached to

11    the bankruptcy documents?

12            MR. LEFKOWITZ:  Yes, I did.

13            MR. JIMENEZ:  Did you write the global notes?

14            MR. LEFKOWITZ:  It was authored by the attorneys,

15    but I reviewed it.

16            MR. JIMENEZ:  Okay.  These notes are helpful in

17    explaining, but from the United States's perspective -- the

18    United States Trustee's perspective, they [indiscernible]

19    schedules themselves.  So do you as the corporate

20    representative understand you are still held accountable for

21    the information that are on the schedules, do you understand?

22            MR. LEFKOWITZ:  Correct.

23            MR. JIMENEZ:  In larger cases representatives of

24    debtors often relied on other professionals for information

25    that appears on the schedules and statement of financial

1    affairs.  You understand that it is your responsibility as the

2    person that signed these documents to verify the information

3    is true and correct to the best of your knowledge and belief?

4            MR. LEFKOWITZ:  Yes, I do.

5            MR. JIMENEZ:  My office also understands that in

6    larger and complex cases small errors and omissions do occur,

7    it happens.  But do you understand that since you signed the

8    schedules it is your responsibility to make changes or

9    amendments to the schedules if you believe that the responses

10    are incorrect.

11            MR. LEFKOWITZ:  Correct.

12            MR. JIMENEZ:  So it is my understanding, and correct

13    me if I'm wrong, that you have a team of professionals that

14    assisted you with the preparation fo the schedules and

15    statement of financial affairs in this case?

16            MR. LEFKOWITZ:  That's right.

17            MR. JIMENEZ:  Can you describe generally the process

18    that occurred in preparing these documents?

19            MR. LEFKOWITZ:  Meetings with the team of Ankura

20    which is part of the CRO, and then teams of our legal counsel

21    representative.

22            MR. JIMENEZ:  And beyond meeting with the

23    professionals what else did you do to prepare these documents?

24            MR. PERRY:  Yeah, it's Russell Perry.  We also met

25    with contracted third party Sigma Contracting, Sigma Risk

1    Management I think as we've discussed in the past and their

2    role, they were instrumental in providing various documents

3    and records.  And obviously from the Ankura perspective we met

4    with Isaac and had obviously in our possession a number of

5    records and accounting entries and the like that allowed us to

6    prepare substantially all of the schedules that you see here.

7            MR. JIMENEZ:  So going back to Mr. Lefkowitz, did

8    you look over the information on the petition and schedules

9    and statement of financial affairs in this case before they

10   were filed with the Bankruptcy Court?

11           MR. LEFKOWITZ:  Yes, I did.

12           MR. JIMENEZ:  Mr. Perry, did you go over the

13   information in the bankruptcy petition before it was filed

14   with the court?

15           MR. PERRY:  I did.

16           MR. JIMENEZ:  Is the information in the Debtor's --

17   and for this question I want an answer from both of you, is

18   the information in the Debtor's petition, schedules and

19   statement of financial affairs true and correct to the best of

20   your knowledge and belief?

21           MR. PERRY:  They are.

22           MR. LEFKOWITZ:  Yes, sir.

23           MS. WEBB:  Excuse me, this is Lydia Webb, counsel

24   for the Debtor.  I do want to note that in reviewing the

25   information in preparation for this 341 meeting, we did

1  identify 2 areas that will need to be amended in the

2  schedules.  We intend to do that in short order.  But I do

3  want to note that for the Record here today.

4      One is references to a funding limit in Schedules A

5  and B, Item 77.  There were references to the global note but

6  we didn't actually get it in the schedule itself.  It was a

7  bust on our part and we will be updating the schedules

8  accordingly.  The other is with respect to the Debtor's bank

9  accounts, that's SOFA 18 in Schedule A Item 3.  As you

10  continue to collect more information on the Debtor we have

11  occasion to update that bank account information, and we

12  intend to do that in short order.

13      MR. JIMENEZ:  Thank you, Ms. Webb.

14      Mr. Lefkowitz, do you agree with what was just

15  stated by your attorney?

16      MR. LEFKOWITZ:  Yes, sir.

17      MR. JIMENEZ:  Are you aware of any other amendments

18  that need to be made to the documents?

19      MR. LEFKOWITZ:  I'm sure if there would be any

20  corrections and amendments, we'll make them in due course.

21      MR. KAUFMAN:  Let's not -- sorry, this is Aaron

22  Kaufman, I'll say not at this time.

23      MR. JIMENEZ:  Mr. Lefkowitz, do you agree with the

24  answer that was just suggested by your attorney?

25      MR. LEFKOWITZ:  Yes, sir.

1      MR. JIMENEZ:  And you adopt that answer as your own.

2      MR. LEFKOWITZ:  Correct.

3      MR. JIMENEZ:  Okay.  So can you describe generally

4   for the Record what does the Debtor do and how does it

5   generate revenue?

6      MS. WEBB:  This is Lydia Webb, counsel for the

7   Debtor.  I think as we've clearly stated, the Debtor

8   effectuated a divisional merger of --

9      MR. JIMENEZ:  Ms. Webb, Ms. Webb, I think I need --

10  I'm going to ask you to please let the witness ask the

11  question.

12     MR. LEFKOWITZ:  Okay.  Historically the Debtor was

13  in the health care correctional business providing

14  correctional health care to incarcerated inmates throughout

15  several states throughout the country.  The Debtor went to a

16  2-step divisional merger some time in May of '22 where

17  operations were divided where most of the ongoing operational

18  contracts were moved over to another company and the Debtor

19  kept some of its assets and liabilities, and its working

20  through its system of collecting, you know, whatever is owed

21  to the Debtor and dealing with that the Debtor owes to various

22  creditors.

23     MR. JIMENEZ:  You mentioned that the operational

24  contracts were moved to another company.  What is the name of

25  this company?

1          MR. LEFKOWITZ:  YesCare Corporation.

2          MR. JIMENEZ:  What is your relationship to YesCare?

3          MR. LEFKOWITZ:  I'm a director of YesCare as well.

4          MR. JIMENEZ:  So you mentioned that the divisional

5     merger took place in May of 2022.  So my question is, between

6     May of 2022 and the petition date, which is February 13, 2023,

7     what Tehum do during that period?

8          MR. LEFKOWITZ:  Basically monetizing its assets and

9     paying creditors and liabilities of the Debtor.

10         MR. JIMENEZ:  Okay.  Can you explain what you mean

11    when you monetizing its assets?

12         MR. LEFKOWITZ:  There are still outside parties that

13    owe money to the Debtor, various contracts, various insurance

14    carriers and the Debtor has creditors such as vendors and

15    other liabilities that is [indiscernible] in order to satisfy

16    those liabilities.

17         MR. JIMENEZ:  Who was operating Tehum prior to the

18    bankruptcy filing?

19         MR. KAUFMAN:  This is Aaron Kaufman, what do you

20    mean by operating the Debtor?

21         MR. JIMENEZ:  Okay.  So right now you have a Chief

22    Restructuring Officer, who was running the company Tehum prior

23    to the bankruptcy?

24         MR. KAUFMAN:  Do you mean who were the officers of

25    the company?

1          MR. JIMENEZ:  Who -- no, that's -- let's go back.

2     Who was running the --

3          MR. KAUFMAN:  Different question?

4          MR. JIMENEZ:   -- who was running the day-to-day

5     operations of Tehum prior to the filing of the bankruptcy?

6          MR. LEFKOWITZ:  I did.

7          MR. JIMENEZ:  Say that again?

8          MR. LEFKOWITZ:  I did.

9          MR. JIMENEZ:  That's you, Mr. Lefkowitz?

10          MR. LEFKOWITZ:  Correct.

11          MR. JIMENEZ:  When was Ankura retained to act as the

12     Chief Restructuring Officer?

13          MR. LEFKOWITZ:  At the time of the bankruptcy.

14          MR. JIMENEZ:  Ankura was not retained prior to the

15     bankruptcy?

16          MR. LEFKOWITZ:  It was, Ankura did services to the

17     Debtor in 2021.

18          MR. JIMENEZ:  Who made the decision to retain Ankura

19     and Gray Reed?

20          MR. LEFKOWITZ:  I did.

21          MR. JIMENEZ:  I am assuming that there are retainers

22     for Ankura and Gray Reed.  Who funded the payment of the

23     retainers?

24          MR. KAUFMAN:  This is Aaron.  We disclosed this in

25     our -- each of our employment applications.  Neither of us has

1    a retainer.

2         MR. JIMENEZ:  Who funded the service provided by

3    Ankura and Gray Reed prior to the bankruptcy?

4         MR. KAUFMAN:  Again, Aaron Kaufman.  This was all

5    disclosed in our employment applications, we didn't provide

6    any services, other than the filing of the petition.

7         MR. JIMENEZ:  Mr. Lefkowitz, you just testified that

8    you had -- Ankura was providing services in 2021.  Is that

9    correct?

10         MR. LEFKOWITZ:  Correct.

11         MR. JIMENEZ:  Okay.  So who funded the services of

12    Ankura?

13         MR. LEFKOWITZ:  [Indiscernible].

14         MR. JIMENEZ:  And from the time after the divisional

15    merger until the bankruptcy case was filed who funded the

16    services of Ankura?

17         MR. LEFKOWITZ:  There wasn't any services in that

18    period.

19         MR. JIMENEZ:  How did the Debtor fund itself for the

20    period after the divisional merger until the filing of the

21    bankruptcy?

22         MR. LEFKOWITZ:  Through a funding agreement from a

23    lender.

24         MR. JIMENEZ:  And who is this lender?

25         MR. LEFKOWITZ:  M2 LoanCo.

1          MR. JIMENEZ:  Can you generally describe what you

2     believe are the causes for the bankruptcy filing?

3          MR. LEFKOWITZ:  It was some of the creditors moved

4     to install a state trustee into the Debtor, you know, prior to

5     exhausting litigation, and the Debtor felt it would be

6     devastating to the existing assets of the Debtor if a trustee

7     comes in, and we made a decision to file for Chapter 11.

8          MR. JIMENEZ:  Did you say that creditors moved to

9     install a state trustee.  When you say state trustee are you

10    referring to a receiver?

11         MR. LEFKOWITZ:  Correct.

12         MR. JIMENEZ:  Okay.  So was there an appointment of

13    a receiving in one of the state court litigations that you

14    were aware of?

15         MR. LEFKOWITZ:  No.

16         MR. JIMENEZ:  Do you remember in which state was

17    this receiver going to be appointed?

18         MR. LEFKOWITZ:  Missouri.

19         MR. JIMENEZ:  So now I'm going to make specific

20    reference to Docket 481.  On Page 2 of Docket -- I'm talking

21    Page 2 of 71, there is a statement in the global notes that

22    asset information is reflected as of the close of business on

23    January 31, 2023.  Do you see that?

24         MR. LEFKOWITZ:  Correct.

25         MR. JIMENEZ:  The Debtor did not provide any

1      information from January 31 to February 13.  Is that correct?

2            MR. PERRY:  This is Russell Perry.  To the extent

3      that liabilities could be identified and measured as of

4      February 13, that was certainly -- I disclosed and scheduled

5      the same point to the extent there were various payments that

6      were made between those time periods, to the extent there were

7      other disclosable items that occurred on the 13th or that were

8      in existence on the 13th, the Debtor certainly did schedule

9      those.

10            This reference really has to do with assets or

11      liabilities that might have been referenced from the Debtor's

12      financial statements, and so the reference is really in

13      regards to the fact that the Debtor's financial statements

14      were prepared at month end and a stub period financial

15      statement was not otherwise prepared.  So only a handful of

16      references were needed to bring forth the liability to the

17      13th.  For the most part substantially all of these schedules

18      and statements were unimpacted by that time period for those

19      roughly 13 days.

20            MR. JIMENEZ:  Mr. Lefkowitz, do you have something

21      different to add to my question?

22            MR. LEFKOWITZ:  No, I agree with Mr. Perry.

23            MR. JIMENEZ:  So, Mr. Lefkowitz, to your knowledge

24      were there any activities between January 31 to February 13?

25            MR. LEFKOWITZ:  There could have been some minor,

1    you know, check clearing and payments made but nothing

2    significant.

3         MR. JIMENEZ:  Did the Debtor transfer any funds or

4    expend any funds between January 31 and February 13?

5         MR. LEFKOWITZ:  No.

6         MR. JIMENEZ:  Did the Debtor receive any funds from

7    January 31 to February 13?

8         MR. LEFKOWITZ:  I'm not certain, and even the worry

9    was minute, you know, ACHs that came in.

10        MR. JIMENEZ:  Well, Mr. Lefkowitz, even if it's a

11   small amount, that information must be disclosed.  So to the

12   extent that it hasn't been done I'm going to ask you to go

13   over the records and make any necessary amendments to make

14   sure that any expenditure of funds, and funds received between

15   that period are accurately disclosed in the schedules.

16        MR. KAUFMAN:  This is Aaron Kaufman, and Isaac --

17        MR. JIMENEZ:  This is -- I'm sorry [indiscernible].

18        MR. KAUFMAN:   -- I'm going to let Isaac confirm,

19   but we've looked at the two bank accounts that we just

20   received the bank statements recently and they were showing a

21   zero balance during this period.  But we didn't have those

22   when we filed the schedules.  So I'll let Mr. Lefkowitz

23   describe if he knows anything else.

24        MR. LEFKOWITZ:  I agree with Mr. Kaufman, I just

25   responded because I didn't know of anything significant so I

19

1    left it as an open [indiscernible] but since Mr. Kaufman

2    confirmed that the accounts were zeroed out, so January 13 is

3    the -- February 13 is the zero date.

4         MR. JIMENEZ:  Okay.  So I just want to remind you

5    going forward my questions are directed to you, Mr. Lefkowitz.

6    You're the person under oath that needs to answer the

7    questions, it's not Mr. Kaufman.  So I'm going to -- all the

8    questions that I ask you I'm going to ask you to answer

9    directly.

10        MR. LEFKOWITZ:  Okay.

11        MR. JIMENEZ:  Schedule -- on Schedule A/B the Debtor

12   did not list any accounts.  So I know that your attorney

13   mentioned, and I think that's why we went over that.  There's

14   going to be amendments to include bank accounts.  Did I get

15   that correct?

16        MR. LEFKOWITZ:  Yes.

17        MR. JIMENEZ:  Okay.  So it was our understanding

18   that there was an account at Signature Bank.  Is that correct?

19        MR. LEFKOWITZ:  Correct.

20        MR. JIMENEZ:  Why isn't the Signature Bank account

21   listed here?

22        MR. KAUFMAN:  It is listed in the SOFA.

23        MR. JIMENEZ:  Mr. Kaufman, hold on a second.  This

24   is not [indiscernible] speaking, this is Andrew Jimenez.  And

25   I'm going to ask you to --

1          MR. KAUFMAN:  Oh, sorry.

2          MR. JIMENEZ:   -- please let Mr. Lefkowitz answer

3      the questions.

4          MR. LEFKOWITZ:  Okay.  So we thought the account was

5      closed, actually we thought the entire bank was closed, that

6      Signature Bank went under, but we later realized that the

7      account is still open through the FDIC but it has a zero

8      balance.

9          MR. JIMENEZ:  And so --

10         MR. KAUFMAN:  So, Mr. Jimenez, if you look in the

11     SOFAs you'll see them as closed accounts.  That's what we

12     tendered.

13         MR. JIMENEZ:  All right.  So that's one thing in the

14     SOFA --

15         MR. KAUFMAN:  And I'm not trying to answer -- I'm

16     not trying to answer for him, I'm trying to help you out to

17     clarify this.

18         MR. JIMENEZ:  And I'm not talking about the SOFA,

19     I'm talking about Schedule A/B, there were no accounts listed

20     on Schedule A/B.  Mr. Lefkowitz --

21         MR. LEFKOWITZ:  Correct.

22         MR. JIMENEZ:   -- does the Debtor have access to the

23     Signature Bank account?

24         MR. LEFKOWITZ:  Yes.

25         MR. JIMENEZ:  Do you know what is the balance in the

1       Signature Bank account?

2               MR. LEFKOWITZ:  Zero.

3               MR. JIMENEZ:  Why hasn't this account been closed?

4               MR. LEFKOWITZ:  We made an election that we don't

5       need the account.

6               MR. JIMENEZ:  Was the funding agreement deposited

7       into the Signature account?

8               MR. LEFKOWITZ:  No.

9               MR. JIMENEZ:  Did the Debtor offer a new debtor-in-

10      possession account?

11              MR. LEFKOWITZ:  Yes.

12              MR. JIMENEZ:  Where at?

13              MR. LEFKOWITZ:  Bank of America.

14              MR. JIMENEZ:  Could you please explain what is the

15      Cares Act Employee Retention Credit?

16              MR. LEFKOWITZ:  That is a federal program of

17      companies' employment that were harmed during the COVID

18      crisis.

19              MR. JIMENEZ:  And how does it work?

20              MR. LEFKOWITZ:  I mean there's a lot of intricate

21      details to it but in general the -- based on the employee

22      count and overtime hours and losses that a company suffered

23      during COVID gets credited back as a Cares Act credit from the

24      United States government.

25              MR. JIMENEZ:  And where is the Debtor in getting

1     these credits?

2          MR. LEFKOWITZ:  I beg your pardon?

3          MR. JIMENEZ:  Where is the Debtor in getting this

4     credit?

5          MR. LEFKOWITZ:  Where they are in the process?

6          MR. JIMENEZ:  Yeah.

7          MR. PERRY:  Yeah, it's Mr. Perry, it's Russell

8     Perry, can I answer this question, Mr. Jimenez?

9          MR. JIMENEZ:  Sure, go ahead.

10          MR. PERRY:  Okay.  To the post-petition activities

11     that my role as CRO is mainly dealing with, the Debtor has

12     completed eligibility documentation and calculations as it

13     relates to 1 of the 2 fiscal years that pertain to the ERC

14     program.  The Debtor retained a CPA firm to prepare what's

15     called 941X tax forms.  Those forms were, in fact, completed,

16     again, for 1 of the 2 fiscal years, and those forms were sent

17     to the IRS within the last week.

18          The other fiscal year that the ERC program pertains

19     to is in process, an outside consulting firm is working

20     through the eligibility criteria and the calculations, and

21     once those calculations are complete we'll be able to provide

22     those to the CPA who will complete forms and will file with

23     the IRS much like we did for the initial fiscal year.

24          MR. JIMENEZ:  Is the Debtor entitled to 9 million

25     total or is it 15 million total?

1           MR. LEFKOWITZ:  So it's broken up, again, to 2

2    separate fiscal years, the first fiscal year that had, in

3    fact, been submitted to the IRS on its face is worth 9

4    million.  Again, that's subject to the IRS receiving the

5    application, or at least the forms, and the submitting those

6    funds to the Debtor in the Debtor's bank account.  So that is,

7    you know, a number that has been identified and applied for.

8           The second tranche that you asked for, which in the

9    schedule should be fiscal year 2020, that's the amount that's

10   in process so that's an estimate.  We anticipate the number to

11   be in line with the number that we provided on the schedules,

12   but, again, the work is not complete.  I think we're --

13          MR. JIMENEZ:  Is that the --

14          MR. LEFKOWITZ:   -- roughly 7 to 10 days from

15   receiving information.

16          MR. JIMENEZ:  Is that the $6 million.

17          MR. LEFKOWITZ:  It is.

18          MR. JIMENEZ:  When does the Debtor expect to receive

19   those funds?

20          MR. LEFKOWITZ:  The first 9 million could be easily

21   9 to 10 months out, unless there is a party who chooses to

22   provide the Debtor with an advance or other, you know, form of

23   monetization of those credits.  There is a market for that

24   type of monetization.  We're in conversations with a handful

25   of parties.  It takes time to perform that diligence.  But if

1    no parties step up and agree to monetize those credits, the

2    IRS process alone could be, like I said, as long as 9 or 10

3    months, but we are in active discussions with potential

4    parties to like I said monetize those credits sooner rather

5    than later.

6            MR. JIMENEZ:  And what about the other 6 million for

7    2020?

8            MR. LEFKOWITZ:  Yeah, well, we won't be able to

9    monetize those or really speak to folks about those until the

10   credits are filed, the forms are filed with the IRS that

11   effectively provide for, you know, substantiation that the IRS

12   has the applications, and then at that point in time there'll

13   be an effort to potentially monetize to the extent the Debtor

14   needs to do that at that time.  But we're -- like I mentioned

15   a second ago, we're 2 to 3 weeks away from filing the 941X for

16   that fiscal year.

17           MR. JIMENEZ:  Okay.  So it will be fair to say the 9

18   million you said 9 to 10 months, this other 6 million I going

19   to be longer than that.

20           MR. LEFKOWITZ:  That's fair, un-huh.

21           MR. JIMENEZ:  Okay.  So, Mr. Lefkowitz, I want to

22   reference -- if you could go to Page 37 on Docket 481.  There

23   is a list of insurance policies.  Can --

24           MR. LEFKOWITZ:  Yes.

25           MR. JIMENEZ:  Why are the value of these policies

1    all undetermined?

2          MR. LEFKOWITZ:  Because we're still negotiating with

3    each of these various carriers.

4          MR. JIMENEZ:  Have you see the policies?

5          MR. LEFKOWITZ:  Not personally, no.

6          MR. JIMENEZ:  Were there any steps taken to

7    determine the value of the policies?

8          MR. LEFKOWITZ:  Yeah, there's a team at Gray Reed

9    that's diligently working on it.

10         MR. JIMENEZ:  I didn't hear the last part, could you

11    please repeat it?

12         MR. LEFKOWITZ:  There's a Gray Reed team, insurance

13    experts, that are diligently on the subject.

14         MR. JIMENEZ:  So can we expect an amendment to the

15    schedules to disclose the value of these insurance policies?

16         MR. LEFKOWITZ:  As the values get determined, I mean

17    there's constant negotiation and settlement discussions with

18    each and every one of these carriers.

19         MR. JIMENEZ:  So the answer, your answer is yes,

20    once you determine the values you will be amending the

21    schedules?

22         MR. LEFKOWITZ:  Correct.

23         MR. KAUFMAN:  Yeah, Mr. Jimenez, I don't -- this is

24    Aaron again, I don't know that I've ever amended schedules to

25    value insurance policies, but if we're able to do that, we'll

1        certainly do that.

2                MR. JIMENEZ:  Thank you, Mr. Kaufman.

3                Mr. Lefkowitz, moving to Page 42, there is a list of

4        states that the Debtor may have state tax liability to.  Why

5        are these amounts all a No?

6                MR. LEFKOWITZ:  Because they're all -- they all need

7        to be -- still need to be reconciled and filed and the tax

8        returns are still outstanding.

9                MR. JIMENEZ:  And this state tax liabilities, do you

10       know for what year they are for, what tax year?

11               MR. LEFKOWITZ:  Some of them are '22, some of them

12       go -- date back to '20.

13               MR. JIMENEZ:  So between 2020 to 2022?

14               MR. LEFKOWITZ:  Correct.

15               MR. JIMENEZ:  To your knowledge was the Debtor

16       current on all tax obligations?

17               MR. LEFKOWITZ:  Obligations?  Meaning what, filings?

18               MR. JIMENEZ:  Filings of tax returns and payment of

19       tax liability.

20               MR. LEFKOWITZ:  I'm not certain but I believe filing

21       was pretty much up-to-date, except the schedule, and I'm not

22       certain on the obligation.

23               MR. JIMENEZ:  Now on the statement of financial

24       affairs, looking at the statement of financial affairs from

25       2021 the company was generating 598 million, and in 2022 102

1   million.  Can you explain the drop in revenue between 2022 and

2   2021?

3           MR. LEFKOWITZ:  It simply lost many of its

4   contracts.

5           UNIDENTIFIED SPEAKER:  After the merger.

6           MR. JIMENEZ:  Can you identify which contracts the

7   company lost?

8           MR. LEFKOWITZ:  State of Idaho, State of Michigan,

9   State of Missouri, those are the bulk of the large, and then

10  some others.

11          MR. JIMENEZ:  And how about 2023, did the Debtor

12  have any gross revenue in 2023?

13          MR. LEFKOWITZ:  No.

14          MR. JIMENEZ:  Did the Debtor have any non-business

15  revenue in 2023?

16          MR. LEFKOWITZ:  No.

17          MR. JIMENEZ:  So looking at Attachment Number 3,

18  there are various payments to suppliers and vendors.  Why were

19  these payments made after the divisional merger?

20          MR. LEFKOWITZ:  When was it made?

21          MR. JIMENEZ:  After the divisional merger.

22          MR. LEFKOWITZ:  I didn't hear the question.  You

23  asked when or why?

24          MR. JIMENEZ:  Why.

25          MR. LEFKOWITZ:  To know who the Debtor owes money

1    to.

2            MR. JIMENEZ:  Okay.  But after the divisional merger

3    did the Debtor any operations?

4            MR. LEFKOWITZ:  Didn't have operations but it

5    undertook to collect assets and to pay some of the

6    liabilities.

7            MR. JIMENEZ:  Who is Sigma Risk Management?

8            MR. LEFKOWITZ:  It's a group of lawyers that manage

9    the PLI matters for the Debtor.

10            MR. JIMENEZ:  Manage what?

11            MR. LEFKOWITZ:  Professional liability matters,

12    plaintiffs that sue the Debtor.

13            MR. JIMENEZ:  And what services does Sigma Risk

14    Management provide to the Debtor?

15            MR. LEFKOWITZ:  They assess the claim, they allocate

16    the litigation to defense counsel to negotiate a settlement

17    with plaintiffs, anything and everything that has to deal with

18    professional liability.  Submits the claims to insurance

19    companies.

20            MR. JIMENEZ:  Who is BioReference Laboratories?

21            MR. LEFKOWITZ:  It's a nationwide laboratory company

22    that analyzes blood samples and all other type of lab work.

23            MR. JIMENEZ:  What services does BioReference

24    Laboratories provide to the Debtor?

25            MR. LEFKOWITZ:  Lab services.

1          MR. JIMENEZ:  So are any -- did BioReference

2    Laboratories provide lab services after the divisional merger?

3          MR. LEFKOWITZ:  No.

4          MR. JIMENEZ:  And who is Jackson Lewis, LLP?

5          MR. LEFKOWITZ:  That's a law firm representing aa

6    hospital in Missouri.

7          MR. JIMENEZ:  Representing a hospital?

8          MR. LEFKOWITZ:  Correct.

9          MR. JIMENEZ:  Does Jackson Lewis provide any

10   services to the Debtor?

11         MR. LEFKOWITZ:  No, they were representing a

12   plaintiff and this was in payment to the plaintiff.

13         MR. JIMENEZ:  Who is JDG COG Consulting?

14         MR. LEFKOWITZ:  It's a consulting company that

15   worked with the [indiscernible] before we entered into

16   [indiscernible].

17         MR. JIMENEZ:  What services does JDG COG Consulting

18   provide to the Debtor?

19         MR. LEFKOWITZ:  It doesn't provide anything to the

20   Debtor during post-December 21, these were all payments prior,

21   prior services.  So the Debtor did not receive any services

22   [indiscernible].

23         MR. JIMENEZ:  Who is, and forgive me if I'm

24   mispronouncing the name, Ayodeji Ladele, MD?

25         MR. LEFKOWITZ:  He is the Chief Medical Officer,

1     used to be the Chief Medical Officer of the Debtor.

2               MR. JIMENEZ:  Not anymore?

3               MR. LEFKOWITZ:  Not for the Debtor, no.

4               MR. JIMENEZ:  Is Mr. Ladele with YesCare?

5               MR. LEFKOWITZ:  Correct.

6               MR. JIMENEZ:  Who is J. Scott King?

7               MR. LEFKOWITZ:  He used to be the in-house counsel

8     for the Debtor.

9               MR. JIMENEZ:  And Mr. King is currently with

10    YesCare?

11              MR. LEFKOWITZ:  Yes.

12              MR. JIMENEZ:  In a similar role as in-house counsel?

13              MR. LEFKOWITZ:  Correct.

14              MR. JIMENEZ:  On Attachment 29 it looks like all

15    these positions ended on May 5 '22.  Is there a reason why

16    these positions terminated on May 5, 2022?

17              UNIDENTIFIED SPEAKER:  Yeah.

18              MR. LEFKOWITZ:  Because that's the day that the

19    divisional merger  --

20              MR. JIMENEZ:  I didn't get that.  Could you please

21    repeat the answer?

22              MR. LEFKOWITZ:  That is the day that the divisional

23    merger occurred.

24              MR. JIMENEZ:  Okay.  And what happened with these

25    positions, did all these people move to YesCare?

1          MR. LEFKOWITZ:  No, not all of them.

2          MR. JIMENEZ:  Okay.  What about A. Goldberger?

3          MR. LEFKOWITZ:  No, he was terminated.

4          MR. JIMENEZ:  What about Davy [indiscernible]?

5          MR. LEFKOWITZ:  Terminated.

6          MR. JIMENEZ:  What about F. Jeffrey Shully

7      [phonetic]?

8          MR. LEFKOWITZ:  Moved over to YesCare.

9          MR. JIMENEZ:  What about Jay Laytner [phonetic]?

10          MR. LEFKOWITZ:  Terminated.

11          MR. JIMENEZ:  And what about Sara Kushwell

12      [phonetic]?

13          MR. LEFKOWITZ:  Moved over to YesCare.

14          MR. JIMENEZ:  Does the Debtor keep medical records

15      of patients?

16          MR. LEFKOWITZ:  Yes.

17          MR. JIMENEZ:  Did those records contain personal

18      identifiable information?

19          MR. KAUFMAN:  This is Aaron Kaufman.  I just want to

20      make sure Mr. Lefkowitz understands that term since it's a

21      term of art.

22          MR. JIMENEZ:  I'll rephrase it, Mr. Kaufman, I'll

23      rephrase.

24          Do you keep personal identifiable information in the

25      medical records, and by that I mean social security numbers,

32

1       date of birth and information like -- of that sort?

2               MR. LEFKOWITZ:  We don't have social security

3       numbers, we do have date of birth, we do have name and inmate

4       numbers.

5               MR. JIMENEZ:  And who has custody of these records?

6               MR. LEFKOWITZ:  At present?

7               MR. JIMENEZ:  Correct.

8               MR. LEFKOWITZ:  (No audible response.)

9               MR. JIMENEZ:  Mr. Lefkowitz?

10              MR. LEFKOWITZ:  Yeah, I mean technically they're

11      sitting on Corizon's servers, old Corizon -- the Debtor's

12      servers.  But it's questionable whether the Debtor actually

13      has access to the server.

14              MR. JIMENEZ:  Who has access to the server?

15              MR. LEFKOWITZ:  I think this is something that we

16      decided not to discuss at the 341 meeting.  This was a

17      discussion *in camera* with the Judge and there's still going --

18      it's an ongoing process of who has access to the server.

19              MR. JIMENEZ:  I don't believe that is my question.

20      I meant my question is the Debtor -- under general

21      circumstances does the Debtor have access to that server?

22              MR. KAUFMAN:  Mr. Jimenez, can you just give us a

23      time frame, that might clarify things.

24              MR. JIMENEZ:  Sure.  So after the divisional merger

25      until today did the Debtor have access to the server that has

1    the medical records?

2         MR. LEFKOWITZ:  All right.  So the Debtor had access

3    from the divisional merger to approximately a week after the

4    bankruptcy filing.

5         MR. JIMENEZ:  Okay.  And that server was under the

6    control of the Debtor?

7         MR. LEFKOWITZ:  Correct.

8         MR. JIMENEZ:  Okay.  Okay.  At this time I'm going

9    to let creditors ask questions, starting with the Unsecured

10   Creditors Committee, Mr. Zluticky, do you have any questions?

11        MR. ZLUTICKY:  Yes, thank you very much.

12        MR. KAUFMAN:  Hold on, before we get started, I'm

13   not going to talk over you, this is Aaron, I just want

14   everyone to be -- Russell Perry has time constraints, he needs

15   to leave for the airport in, what, an hour?

16        MR. PERRY:  In an hour.

17        MR. KAUFMAN:  Okay.

18        MR. PERRY:  Unless my flight [indiscernible].

19        MR. KAUFMAN:  And we can stay.  And Mr. Lefkowitz

20   has until what time before we need to adjourn?

21        MR. LEFKOWITZ:  7:00.

22        MR. KAUFMAN:  7:00 Eastern, 6:00 Central.

23        MR. LEFKOWITZ:  Okay.

24        MR. KAUFMAN:  Okay.

25        MR. ZLUTICKY:  Thank you.  So Mr. Perry and

1    Mr. Lefkowitz, return to the schedules, Docket 481.  And

2    specifically what I'm focused on is Page 25 of 71.

3                MR. PERRY:  Okay.  We're here.

4                MR. ZLUTICKY:  Item 74.1, Corizon Health, Inc.

5    versus Cobra Specialty Insurance company.  Can you describe

6    generally what that lawsuit's about and what its status is?

7                MR. PERRY:  Yeah, so we scheduled this a cause of

8    action because this is a dispute with an insurance carrier

9    related to a claim that was filed and otherwise not paid out.

10   There were breach of contracts that were identified in regards

11   to that dispute and the matter is ongoing currently.  We don't

12   have a value for that specific claim, but we're continuing to

13   engage and would like to bring it to resolution.

14               MR. ZLUTICKY:  Who represents the Debtor in that

15   case?

16               MR. PERRY:  Yeah, I don't know the answer to that.

17               MR. ZLUTICKY:  And has there been an application to

18   employ that counsel filed?

19               MR. LEFKOWITZ:  I think it's only --

20               MR. PERRY:  We'll get -- we'll have to refer -- I

21   believe -- so I believe that was 1 of the names of counsel on

22   the OCP list that was approved, but we'll have to confirm.

23               MR. ZLUTICKY:  Okay.  And where is that action

24   pending?

25               MR. LEFKOWITZ:  Arizona.

1          MR. PERRY:  I think it's Arizona, that's right, uh-

2     huh.

3          MR. ZLUTICKY:  And what's the status of that action

4     currently?

5          MR. PERRY:  That action -- the issue is we

6     effectively pressed pause on any activity once we filed so we

7     could understand what the proper course of action would be

8     moving forward.  So were not actively working it at this point

9     in time, we need to [indiscernible] motion to approve, we need

10    to circle back with that respective counsel, determine whether

11    or not it makes sense to move forward.  You know, the

12    insurance carrier itself is sort of part of the Gray Reed

13    analysis that Mr. Lefkowitz was working -- or talking about a

14    little bit ago will be part of the analysis for this as well.

15    So we have sort of grouped it with other insurance matters.

16    This one being obviously a claim, the other policies being

17    obviously policies that we'd like to, you know, liquidate and

18    settle it somewhere.  But this is a dispute directly with the

19    insurance company with respect to payout and we need to move

20    it forward.

21         MR. ZLUTICKY:  What's the total amount that was

22    claimed under the policy that wasn't paid?

23         MR. PERRY:  I'll have to circle back.  The reason we

24    put undetermined is we haven't been able to identify the exact

25    amount.  And again, it's a breach of contract claim, that the

1    analysis is somewhat in its infancy and we need to push it

2    forward.

3              MR. ZLUTICKY:  And is this -- and then this was set

4    in the statement of financial affairs?

5              MR. PERRY:  As an interim policy it should be --

6              MR. ZLUTICKY:  No, I'm saying it's the cause of

7    action listed on Attachment 7.

8              MR. PERRY:  I'll have to cross-reference.  Let's

9    see --

10             MR. KAUFMAN:  And I kind of have my -- this is

11   Aaron, I don't my computer open, I just have the hard copy.

12   If you do a word search, it might move this faster.

13             MR. ZLUTICKY:  Yeah, I couldn't find it so that's

14   why I was asking is maybe it was under something else and so

15   probably need to amend the [indiscernible] to add that in.

16             MR. KAUFMAN:  All right.  Noted.

17             MR. ZLUTICKY:  Or point me, you know, to where I

18   missed it.  So the --

19             MR. KAUFMAN:  [Indiscernible].

20             MR. ZLUTICKY:  I'm sorry?

21             MR. PERRY:  I was saying if it's not on there, then

22   it was an inadvertent omission.  We'll add it.

23             MR. ZLUTICKY:  Sure.  So going back to the schedules

24   that came with the same page, 75K3 Cronos [phonetic] breach of

25   contract demand, what is -- who is Cronos?

1          MR. LEFKOWITZ:  Cronos is the payroll time keeping

2     system for the Debtor.

3          MR. ZLUTICKY:  And what's the breach of contract

4     demand, what -- can you describe that generally?

5          MR. KAUFMAN:  Since this is an ongoing settlement

6     discussion we're having with Cronos, I want to kind of veer

7     away from this.  We are actively discussing with Cronos.  I'm

8     happy to talk to [indiscernible] about this.

9          MR. ZLUTICKY  Okay.  I'm just trying to understand

10     what the [indiscernible] -- what the action's based on.

11          MR. LEFKOWITZ:  Cronos had a nationwide outage in

12     the year of --

13          MR. PERRY:  '21.

14          MR. LEFKOWITZ:   -- it was end of '21, beginning

15     '22, and it caused a significant amount of damage to the

16     company.

17          MR. ZLUTICKY:  Okay.  And that's something that is

18     not in litigation right now.  Is that correct?

19          MR. LEFKOWITZ:  Correct.

20          MR. ZLUTICKY:  Okay.  Earlier you said Ankura

21     provided services to the Debtor in 2021.  What services did

22     Ankura provide?

23          MR. LEFKOWITZ:  Solvency analysis.

24          MR. PERRY:  Yeah, Nick, it's Russell.  So Ankura's

25     engagement letter was a company-side financial advisory role.

1    It began I think some time in I think late '19, early '20.

2    Ankura did not have any type of CRO or fiduciary

3    responsibility, pure financial advisory, and they advised the

4    company with respect to liquidity, the evaluation of strategic

5    alternatives and other typical financial advisory type

6    responsibilities.  When the company was ultimately sold in

7    late '21 Ankura's engagement ended.

8           MR. ZLUTICKY:  Did Ankura provide any advice or any

9    services to the buyer of Corizon?

10          MR. PERRY:  It did not, no.  There was no

11   involvement with the transaction or a [indiscernible] role.

12          MR. ZLUTICKY:  Did Ankura provide any advisory

13   services related to the divisional merger?

14          MR. PERRY:  It did not, no.

15          MR. ZLUTICKY:  So other than the tax credit and the

16   lawsuit and the breach of contract claim I don't see any other

17   assets listed on the schedules.  Is that correct?

18          MR. PERRY:  Well, the ERC credits.  So ERC credits,

19   the breach of contract for the insurance provider, the various

20   insurance policies that we're working through.  And there'll

21   be other types of, you know, bankruptcy related issues and

22   matters that we'll pursue, preference actions and the like.

23          MR. ZLUTICKY:  So who is managing the Debtor's

24   electronic records?

25          MR. PERRY:  The Debtor's electronic records

1   currently are managed by a couple of different folks as we've

2   disclosed in the schedules.  Sigma Risk Management will manage

3   and have obviously information as it relates to PLI claims,

4   insurance policies, things of that nature.  We've worked

5   directly with Isaac on information that pertains to certain

6   Debtor's activities and the books and records there.  And then

7   to the extent that we each work through Isaac for other

8   resources that may have Debtor's books and records from prior

9   to the divisional merger, then we work with individuals at,

10  for example, YesCare.

11          MR. ZLUTICKY:  So I'm not asking necessarily who's

12  been a custodian of records historically, what I'm asking is

13  who's currently in charge of maintaining the Debtor's

14  electronic records?

15          MR. LEFKOWITZ:  Why don't you define electronic

16  records.

17          MR. ZLUTICKY:  Every singe record that is stored

18  electronically and is not a physical record.

19          MR. LEFKOWITZ:  You mean like a telephone bill?

20          MR. ZLUTICKY:  I mean if it's electronically stored,

21  so it's not a hard copy and it is stored electronically, where

22  are those -- who's in charge of maintaining those records?

23          MR. LEFKOWITZ:  You're talking about post-petition

24  or prior to petition?

25          MR. ZLUTICKY:  I'm talking about post-petition.

1      MR. LEFKOWITZ:  So post-petition any records that

2  exists to the Debtor is stored on my email, on my Dropbox, and

3  I'm handing it over to Ankura or to Debtor's counsel as

4  requested.

5      MR. ZLUTICKY:  And the records that the Debtor had

6  pre-petition who is currently in charge of maintaining those

7  records?

8      MR. LEFKOWITZ:  Pre-petition, what period?

9      MR. JIMENEZ:  Excuse me, this is Andrew Jimenez.

10  For the witness, please let us know who is speaking because I

11  think a moment ago we had Mr. Perry testify and I'm not sure

12  if we have now Mr. Lefkowitz answering.  Who is speaking right

13  now?

14      MR. LEFKOWITZ:  Lefkowitz.

15      MR. JIMENEZ:  Okay.  So please when a different

16  witness starts answering a question, please state your name

17  for the Record so we can have a clear record of who is

18  providing the answer.

19      Please continue.

20      MR. LEFKOWITZ:  Okay.

21      MR. ZLUTICKY:  Mr. Lefkowitz, the Debtor had records

22  stored electronically at the time it filed bankruptcy.  Is

23  that correct?

24      MR. LEFKOWITZ:  Yes.

25      MR. ZLUTICKY:  And those records can be back years,

1      not just months.  Is that correct?

2               MR. LEFKOWITZ:  Correct.

3               MR. ZLUTICKY:  Okay.  Where are those records

4      currently maintained?

5               MR. LEFKOWITZ:  On the Corizon server.

6               MR. ZLUTICKY:  When you say Corizon server, can you

7      please describe in more detail what you mean by Corizon

8      server?

9               MR. LEFKOWITZ:  I can describe what Corizon is,

10     which I already did, and I describe to you what a server is.

11     So Corizon is the Debtor and a server is a piece of hardware

12     where information is stored.

13              MR. ZLUTICKY:  And Corizon in this statement is

14     Tehum Care Services, Inc., formerly known as Corizon Health,

15     Inc.?

16              MR. LEFKOWITZ:  Correct.

17              MR. ZLUTICKY:  And so you've already testified that

18     Corizon has no employees, so who is maintaining those

19     electronic records?

20              MR. LEFKOWITZ:  I do.

21              MR. ZLUTICKY:  You personally are in charge of the

22     maintenance of all of the Debtor's electronic records.

23              MR. LEFKOWITZ:  I'm not in charge of any

24     maintenance, I'm in charge of paying the bill of the server

25     that holds the records.  The server --

1          MR. ZLUTICKY:  When you say the -- go ahead.

2          MR. LEFKOWITZ:  No, you go ahead.  You spoke over

3    me, so finish.

4          MR. ZLUTICKY:  When you say the server that holds

5    the records, you earlier described a server as a box.

6    Obviously you're not making payments to a box, so who --

7          MR. LEFKOWITZ:  All right.  You're mixing --

8          MR. ZLUTICKY:   -- [indiscernible].

9          MR. LEFKOWITZ:  You're mixing up a box with a server

10   and you're mixing up the timing.  You asked me post-petition

11   and now you're asking pre-petition.  All records pre-petition

12   is sitting on a server called the Corizon server.

13         MR. ZLUTICKY:  And who hosts that server?

14         MR. LEFKOWITZ:  Some local hosting company in

15   Nashville, Tennessee.

16         MR. ZLUTICKY:  What's the name of that company?

17         MR. LEFKOWITZ:  I don't have it handy.

18         MR. ZLUTICKY:  Do you have it where you could

19   provide it?

20         MR. LEFKOWITZ:  Yes.

21         MR. ZLUTICKY:  Does HOCS Consulting provide any

22   services to the Debtor?

23         MR. LEFKOWITZ:  To the Debtor post-petition?

24         MR. ZLUTICKY:  Pre-petition.

25         MR. LEFKOWITZ:  Pre-petition, yes.

1      MR. ZLUTICKY:  What services?

2      MR. LEFKOWITZ:  IT services.

3      MR. ZLUTICKY:  I promise I don't mean to be glib,

4   but can you define what IT services means?

5      MR. LEFKOWITZ:  You know, if you're mouse doesn't

6   work, if your keyboard doesn't work, if your monitor blinks.

7      MR. ZLUTICKY:  Did they provide any services with

8   respect to servers that the Debtor had?

9      MR. LEFKOWITZ:  Yes.

10     MR. ZLUTICKY:  What were the services that they

11  provided with respect to the servers the Debtor had?

12     MR. LEFKOWITZ:  IT services, I wouldn't know the

13  specifics of it.

14     MR. ZLUTICKY:  Is HOCS Consulting the company in

15  Tennessee that's hosting the server?

16     MR. LEFKOWITZ:  No, I believe it's a different

17  vendor that's hosting the server.

18     MR. ZLUTICKY:  Does HOCS have any obligations with

19  respect to that server?

20     MR. LEFKOWITZ:  I don't know what that question is -

21  - I don't know what obligations to the server means.

22     MR. ZLUTICKY:  Are they in charge of maintaining the

23  server?

24     MR. LEFKOWITZ:  No, I don't believe so, they are no

25  longer associated with the Debtor.

1            MR. ZLUTICKY:  Effective as of what date?

2            MR. LEFKOWITZ:  Effective as of the bankruptcy

3      filing.

4            MR. ZLUTICKY:  So prior to the bankruptcy filing

5      they were involved with the Debtor?

6            MR. LEFKOWITZ:  Correct.

7            MR. ZLUTICKY:  And that ended on February 13, 2023

8      when the Debtor filed bankruptcy?

9            MR. LEFKOWITZ:  There about.

10            MR. ZLUTICKY:  Okay.  Was it -- did it end before

11      the bankruptcy case was filed?

12            MR. LEFKOWITZ:  I don't know the exact date that the

13      relationship turned, but thereabout, either a day before or a

14      day after or a day -- during the same day.  Just about the

15      same time.

16            MR. ZLUTICKY:  Who terminated the relationship?

17            MR. LEFKOWITZ:  I did.

18            MR. ZLUTICKY:  Why?

19            MR. LEFKOWITZ:  I wasn't ready to pay any fees

20      anymore.

21            MR. ZLUTICKY:  Did the Debtor still need the

22      services that HOCS was providing?

23            MR. LEFKOWITZ:  No.

24            MR. ZLUTICKY:  On the statement of financial

25      affairs, which is Docket 482, it is a 53-page document, I'm

1    looking specifically at Page 33 of 53.  28.1 and 28.2 it lists

2    the Salizoss [phonetic] Intermediate Holdings, Inc. is the

3    parent company of the Debtor.  Can you describe what

4    [indiscernible] --

5          MR. LEFKOWITZ:  100 percent.

6          MR. ZLUTICKY:   -- Salizoss Intermediate Holdings,

7    Inc. had in the Debtor as of the filing date?

8          MR. LEFKOWITZ:  It says right on the document,

9    100 percent.

10         MR. ZLUTICKY:  When is the last time that the Debtor

11    filed a consolidated tax return?

12         MR. LEFKOWITZ:  I believe in -- I believe it was

13    filed a month ago.

14         MR. ZLUTICKY:  Was there -- is there a refund due

15    under the consolidated tax return?

16         MR. LEFKOWITZ:  I don't have the return in front of

17    me.

18         MR. ZLUTICKY:  And prior returns had there been

19    refunds that are due and owing from the IRS?

20         MR. LEFKOWITZ:  Prior means when, what years?

21         MR. ZLUTICKY:  2020.

22         MR. LEFKOWITZ:  I think the company's been carrying

23    NOLs for quite a time.

24         MR. ZLUTICKY:  Those NOLs resulted in a tax refund?

25         MR. LEFKOWITZ:  No.

1      MR. ZLUTICKY:  Which accounting firm files these
2  consolidated tax returns?
3      MR. LEFKOWITZ:  Some local CPA firm in Nashville.
4      MR. ZLUTICKY:  I'm sorry, did you say Nashville,
5  Tennessee?
6      MR. LEFKOWITZ:  Correct.
7      MR. ZLUTICKY:  What is the Debtor's goal in this
8  bankruptcy case?
9      MR. LEFKOWITZ:  To settle with the creditors and
10  exit out of bankruptcy.
11      MR. ZLUTICKY:  Utilizing the tax credits, the Cronos
12  demands and the insurance claim.
13      MR. LEFKOWITZ:  And whatever other assets the Debtor
14  has access to.
15
16      MR. ZLUTICKY:  Have you personally, Mr. Lefkowitz,
17  done an investigation as to whether the Debtor has other
18  assets, like causes of action?
19      MR. LEFKOWITZ:  I'm involved in discussions, yes.
20      MR. ZLUTICKY:  Okay.  Well, I'm not looking to
21  invade attorney-client privilege, but to the extent that those
22  discussions were with someone other than counsel, who were
23  they with?
24      MR. LEFKOWITZ:  Only with counsel.
25      MR. ZLUTICKY:  Okay.  Is there anyone else at the

1    Debtor other than counsel who is investigating the Debtor's

2    assets including potential causes of action?

3              MR. LEFKOWITZ:  The Ankura firm..

4              MR. ZLUTICKY:  Anyone else?

5              MR. LEFKOWITZ:  I don't know if Ankura's hiring any

6    subcontractors, but it's mainly commissioned through the

7    Ankura firm.

8              MR. ZLUTICKY:  Other than any theoretical

9    subcontractors Ankura may hire, anyone else?

10             MR. LEFKOWITZ:  Not that I'm aware of.

11             MR. KAUFMAN:  Nick, Bradley was -- this is Aaron

12   Kaufman for the Record -- Bradley [indiscernible] whatever,

13   the Bradley firm is hired as special counsel on the Cronos

14   matter.

15             MR. ZLUTICKY:  Thank you.

16             MR. KAUFMAN:  And I think you heard Russell say that

17   there was a firm on the OCP list in the Cobra matter.

18             MR. ZLUTICKY:  Yes, thank you.

19             MR. ZLUTICKY:  Mr. Lefkowitz, you negotiated the

20   risk management agreement with Sigma on behalf of the Debtor.

21             MR. KAUFMAN:  Sorry, Nick, can you start over, there

22   was buzz in the middle of your question.

23             MR. ZLUTICKY:  Sure.  Mr. Lefkowitz, who negotiated

24   the agreement with Sigma Risk Management on behalf of the

25   Debtor?

1      MR. LEFKOWITZ:  I did.

2      MR. ZLUTICKY:  Did you interview any other risk

3   management firms before selecting Sigma?

4      MR. LEFKOWITZ:  Yes.

5      MR. ZLUTICKY:  Which ones?

6      MR. LEFKOWITZ:  I don't have the name in front of me

7   but then there were like 2 firms we reached out to that were

8   far more expensive and inexperienced in [indiscernible].

9      MR. ZLUTICKY:  Did the fact that Zalman Shapiro

10   [phonetic] was at Sigma Risk Management play a factor in

11   selecting Sigma Risk Management?

12      MR. LEFKOWITZ:  I don't think so.

13      MR. ZLUTICKY:  Was Zalman Shapiro at the other firms

14   you looked at?

15      MR. LEFKOWITZ:  No.

16      MR. ZLUTICKY:  And Zalman's also in-house counsel

17   for [indiscernible].

18      MR. LEFKOWITZ:  Correct.

19      MR. ZLUTICKY:  What is Perigrove's relationship to

20   the Debtor?

21      MR. LEFKOWITZ:  Perigrove has no relationship to the

22   Debtor.  I believe, Nick, we had a deposition this morning and

23   they were clarified exactly on the org chart and the corporate

24   structure.  So you have all the information.

25      MR. ZLUTICKY:  Okay.  Mr. Jimenez, those are all the

49

1     questions that the Committee has at this time.

2              MR. JIMENEZ:  Thank you.

3              MR. ZLUTICKY:  So we would pass the witness.

4              MR. JIMENEZ:  Thank you.

5              At this time there is a gentleman, first name Val,

6     please -- I said my apology because I didn't get your last

7     name correctly, the gentleman from Alabama.  Are you on the

8     line?

9              MR. EARLY:  Good afternoon.  Yes, [indiscernible]

10    I'm Val Early, E-A-R-L-Y.

11             MR. JIMENEZ:  Thank you.

12             MR. EARLY:  Like early in the morning.

13             MR. JIMENEZ:  Thank you, Mr. --

14             MR. EARLY:  Good afternoon, Mr. Lefkowitz.

15             Thank you, Mr. Jimenez.  Shall -- may I proceed?

16             MR. JIMENEZ:  Go ahead.

17             MR. EARLY:  Thank you.

18             Mr. Lefkowitz, I'm Val Early, I'm a lawyer in

19    Birmingham, and I represent Plaintiffs [indiscernible],

20    Corizon and a host of others.  I have just a few questions

21    question for you.  If I ask you something that you -- for

22    which you need clarification, I hope you will let me know.  If

23    you are unable to understand me, please tell me that, too.

24    Sometimes being from the Deep South I'm accused of speaking

25    too quickly to people, and that could be expected, so that,

1      ladies and gentlemen, was your piece of humor for the day.

2              MR. KAUFMAN:  I'm also from the -- this is Aaron

3      Kaufman, also from the South.

4              MR. EARLY:  Very well done.

5              Mr. Lefkowitz, do you know who owns the entity known

6      as Sigma Contracting?

7              MR. KAUFMAN:  Hold up, Mr. Early, just real quick

8      for -- so I can be clear on this.  Can you for the Record tell

9      us who your client is?

10             MR. EARLY:  My client is Tracey Grissom.

11             MR. KAUFMAN:  Thank you.  Okay.  Go ahead.

12             MR. EARLY:  I'll repeat the question.  Mr.

13     Lefkowitz, do you know who own the entity known as Sigma

14     Contracting?

15             MR. LEFKOWITZ:  No.

16             MR. EARLY:  Thank you.  Do you know who owns the

17     entity known as Sigma Risk Management?

18             MR. LEFKOWITZ:  Yes.

19             MR. EARLY:  Will you please tell me who that is?

20             MR. LEFKOWITZ:  It's a group of lawyers.

21             MR. EARLY:  I see.  And do you own any interest in

22     either Sigma Contracting or Sigma Risk Management?

23             MR. LEFKOWITZ:  No.

24             MR. EARLY:  Do you know where either of those

25     entities is physically located?

1           MR. LEFKOWITZ:  They operate all over the country

2      virtually.

3           MR. EARLY:  So they may have --

4           MR. LEFKOWITZ:  I don't nothing -- I don't know --

5      one minute, one minute, one minute, let me -- let me -- I'm

6      from the South too so let me talk slowly.  I know nothing

7      about Sigma -- I know nothing about Sigma contracting, so any

8      questions about Sigma contracting the answer is no, I don't

9      know, I don't even know who you're referring to.  Sigma Risk

10     Management --

11          MR. EARLY:  Well, you testified -- you testified

12     earlier this afternoon that Sigma Contracting had something to

13     do with this case and I was just following up on that.

14          MR. PERRY:  Now, Mr. Early, this is Russell Perry.

15     I specifically said earlier the Debtor contracted with Sigma,

16     Sigma Risk Management.  So if the words were Sigma

17     Contracting, it was in regards to the Debtor contracting with

18     Sigma.  Just so we are clear.  And it was my fault if earlier

19     when I was speaking I wasn't clear enough.  There is no entity

20     called Sigma Contracting the Debtor deals with.  It's Sigma

21     Risk Management, but there is a third party contract between

22     the Debtor and Sigma Risk Management.

23          MR. EARLY:  I'm sorry to have to do this, but will

24     you please tell me your name?

25          MR. PERRY:  My name is Russell Perry.

1          MR. EARLY:  Thank you.

2          MR. PERRY:  I'm the Debtor's --

3          MR. EARLY:  I just wasn't -- yes, I wasn't sure

4     who --

5          MR. PERRY:  Okay.

6          MR. EARLY:   -- was speaking.

7          Now back to the question, Mr. Lefkowitz.  Do you own

8     any real estate from which -- in which Sigma Risk Management

9     keeps any of its records?

10          MR. LEFKOWITZ:  No.

11          MR. EARLY:  Are you the owner or member of a company

12     or partnership which owns real estate which leases to Sigma

13     Risk Management?

14          MR. LEFKOWITZ:  No.

15          MR. EARLY:  Okay.  Now we'll switch gears a little

16     bit.  I want you to tell me very briefly have you ever been to

17     the physical structure in which the Debtor maintains its

18     office in Brentwood, Tennessee?

19          MR. LEFKOWITZ:  Yes.

20          MR. EARLY:  And are you aware that YesCare maintains

21     an office space in the same suite of offices?

22          MR. LEFKOWITZ:  No, not the same suite.

23          MR. EARLY:  No, the question was are you aware.

24          MR. LEFKOWITZ:  I'm aware that it's not in the same

25     suite.

53

1            MR. EARLY:  Very well.  Do you know where YesCare

2    maintains its offices?

3            MR. LEFKOWITZ:  All over the country.

4            MR. EARLY:  Are you aware that YesCare claims that

5    its office address is the same street and suite number as that

6    listed in the Debtor's petition for the Debtor?

7            MR. LEFKOWITZ:  Yeah, that is an office building

8    that has virtual mail, but that's all it is.  The physical

9    offices of YesCare is all over the country.

10           MR. EARLY:  So if I were to tell you for instance

11   that YesCare claims to be located at 205 Powell Place, Suite

12   104, Brentwood, Tennessee 37027, you cannot confirm or deny

13   that.  Is that accurate?

14           MR. LEFKOWITZ:  I can tell you the largest office

15   that YesCare has is right in your backyard in Montgomery,

16   Alabama.

17           MR. EARLY:  Can you answer my question, please?

18           MR. LEFKOWITZ:  I don't know what your question is

19   and I don't know what you're trying to say.  Basically

20   YesCare --

21           MR. EARLY:  I'm just trying to ask you a simple

22   direct question, Mr. Lefkowitz --

23           MR. LEFKOWITZ:  And I'm giving you simple direct --

24           MR. EARLY:   -- and I expect you to answer my

25   question at least --

1        MR. LEFKOWITZ:  Okay.  Very good.  So, YesCare --

2        MR. EARLY:  Can you confirm or deny --

3        MR. JIMENEZ:  Let's take a moment, let's take a

4    moment.

5        MR. EARLY:  Can you confirm --

6        MR. JIMENEZ:  Please let's take a moment.  This is

7    Andrew Jimenez.  So this proceeding is being recorded, if

8    people speak over each other --

9        MR. EARLY:  Yes.

10        MR. JIMENEZ:   -- we're not going to have a clear

11    record.  So, Mr. Lefkowitz, just listen to the question and

12    provide an anser to the question.  That's all you're required

13    to do.  Let's try to not engage in conversation, just answer

14    the question that is being asked.

15        Continue, Mr. Early.

16        MR. EARLY:  Thank you, Mr. Jimenez.

17        Mr. Lefkowitz, can you confirm or deny that the

18    physical location of YesCare is at 205 Powell Place, Suite

19    104, Brentwood, Tennessee 37027?

20        MR. LEFKOWITZ:  So I'm not going to confirm, I'm not

21    going to deny, I'm going to explain.  YesCare is based in

22    Texas, headquartered in Texas and it has a virtual office of

23    mail collection in 205 Powell Street in Brentwood.  So if this

24    doesn't answer the question, I don't know what else will.

25        MR. EARLY:  Actually it does, and thank you for

1     that.  I appreciate your candor.  I will ask you now to look

2     at the monthly report which was filed today for the Debtor, it

3     is Docket Number 552.  I will wait for a minute while you take

4     a look at that.  I have a question about it.

5              MR. LEFKOWITZ:  Okay.

6              MR. EARLY:  If you will please --

7              MS. WEBB:  Mr. Early, this is Lydia Webb, counsel

8     for --

9              MR. EARLY:  Yes, ma'am.

10             MS. WEBB:  -- excuse me, we don't have that

11    document printed so I'm going to pull it up electronically for

12    Mr. Lefkowitz.

13             MR. EARLY:  Sure.  Take your time.  I'll wait for

14    him.  I've got it right here.

15             MS. WEBB:  Excuse me, are you --

16             MR. EARLY:  The monthly report.

17             MS. WEBB:  -- for which month?

18             MR. EARLY:  It appears to be for the month ending

19    March 31, it is Docket Number 552.  It was filed today.

20    according to the CMECF stamp on its top border.

21             MR. LEFKOWITZ:  Okay.  I have it in front of me.

22             MR. EARLY:  Wonderful.  I would like for you to look

23    on the second page at Item Part 2E as in echo.  It's entitled

24    Total Assets.  According to the document at which you're

25    looking are total assets listed as $20,761,254?

1          MR. LEFKOWITZ:  Okay.

2          MR. EARLY:  Does your document have that figure

3    listed on Part 2, letter E?

4          MR. LEFKOWITZ:  Yes.  Yes.

5          MR. EARLY:  Thank you.  So as of March 31, 2023

6    according to this document the Debtor has assets totaling

7    $20,761,254.  Is that accurate?

8          MR. LEFKOWITZ:  Correct.  Correct.

9          MR. EARLY:  Now you testified earlier, or someone

10   testified earlier I'll just put it that way, that post-

11   petition the Debtor opened a bank account at Bank of America.

12   Do I remember that correctly?

13         MR. LEFKOWITZ:  Yes.

14         MR. EARLY:  Did the Debtor open more than 1 bank

15   account?

16         MR. LEFKOWITZ:  The Debtor opened up a bank account

17   at Signature Bank but never utilized it.

18         MR. EARLY:  Did the Debtor open more than 1 bank

19   amount at the Bank of America?

20         MR. LEFKOWITZ:  2 accounts.

21         MR. EARLY:  Very good.  I will ask you to look at

22   Document 552, which you were looking at it should have been

23   just a moment ago.  Go to the 17th sheet of that as opposed to

24   Page 17, the 17th sheet appears to be a copy of an attachment

25   to the monthly report.  I'll wait while you call that up.

1          MR. LEFKOWITZ:  Yes, sir.

2          MR. EARLY:  Mr. Lefkowitz, do you see that now?

3          MR. LEFKOWITZ:  Yes

4          MR. EARLY:  Thank you.

5          MR. LEFKOWITZ:  Yes, sir.

6          MR. EARLY:  It appears to be -- thank you -- it

7    appears to be a copy of a bank statement for an account ending

8    in 6404 at the Bank of America.  Is that -- or the document --

9    is the document you're looking at the same as the one I'm

10   looking at?

11         MR. LEFKOWITZ:  Correct.

12         MR. EARLY:  And it shows a balance I that bank

13   account of $2 million as of March 31.  Right?

14         MR. LEFKOWITZ:  Correct.

15         MR. EARLY:  Thank you.  I'll ask you to turn to the

16   23rd sheet of Docket 552.  Again, not the 23rd page, just the

17   23rd sheet.  It's hard sometimes when we have these numbered

18   documents that end up with attachments because you've got to

19   figure out what piece of paper it's on.  Page 23

20   [indiscernible].

21         MR. LEFKOWITZ:  Yes.

22         MR. EARLY:  Thank you.  It appears to be for a bank

23   account in the name of the Debtor ending in 6433 with a

24   balance as of March 31 of zero dollars.  Is that --

25         MR. LEFKOWITZ:  [Indiscernible].

1          MR. EARLY:   -- accurately describing that?

2          MR. LEFKOWITZ:  Correct.

3          MR. EARLY:  Thank you.  Now as of March 31 according

4     to your monthly report you had 20 million -- roughly

5     20,700,000 plus change in assets, of which, if we did my

6     numbers right, $2 million is in the bank.  Where's the other

7     $18 million?  What other -- what constitutes the balance of

8     those assets, is it physical property, is it money, is it

9     causes of actions, is it an insurance policy, I'm asking just

10    generally, if you can say.

11         MR. LEFKOWITZ:  Technically insurance related assets

12    as well as assets that's listed on the [indiscernible].

13         MR. EARLY:  Wonderful.  Thank you.  I'm going to ask

14    you -- let me make sure I'm going to call the right document

15    number, Docket 481.  Document 481.  Let me know when you're

16    ready.

17         MR. LEFKOWITZ:  Ready.

18         MR. EARLY:  Thank you.  According to that document

19    it appears to be the schedules filed in the case.  Just

20    recently, April 25 I think it says, or 28 rather.  So roughly

21    two weeks ago.  And at Page 14 it shows assets of zero dollars

22    into that one.  Is that accurate?

23         MR. LEFKOWITZ:  Page 14?

24         MR. EARLY:  Yes.

25         MR. LEFKOWITZ:  Yes, I'm already there, that's

1    correct.

2         MR. EARLY:  Thank you.  Zero dollars.  So is it

3    accurate then to say that between the date that document was

4    filed, April 28, and the date your monthly report was filed,

5    which is today, the Debtor has now increased its assets from

6    zero to just a shade under 21 million.  Is that accurate?

7         MR. LEFKOWITZ:  No, it's not accurate.

8         MR. EARLY:  Oh.  Can you tell me how that number has

9    increased so dramatically since the date of the filing of the

10   petition?

11        MR. LEFKOWITZ:  It's two different classes of

12   assets.  Page 14 deals with [indiscernible] and personal

13   property.

14        MR. EARLY:  Oh, I see.  All right.  Thank you.  Let

15   me see if I've got any [indiscernible].  Now you were asked

16   earlier about personal identifying information.  That is a

17   term of art, your lawyer was right.  It's a term of art used

18   in many respects in connection with HIPAA, the personal

19   privacy laws passed by our Congress to protect people's health

20   information.

21        And I don't know if I ever really understood from

22   you, Mr. Lefkowitz, if anybody is monitoring and/or protecting

23   any records involving any inmate's and patients that Corizon

24   may have treated while it was in existence?  Now if I'm

25   incorrect, please, by all means, tell me.  Is anyone

1     maintaining those records or securing them in any way?

2              MR. LEFKOWITZ:  Records are on a server that's

3     locked up.

4              MR. EARLY:  Okay.  And where is that server -- wait

5     a minute, let me back up, let me back up.  I'm jumping ahead

6     of myself like a pony at the circus.  Sorry about that.  This

7     server of which you have spoken is it a physical box that a

8     person could lift or touch or move or -- is it a box or is it

9     something in the cloud as they say?

10             MR. LEFKOWITZ:  No, it's physical hardware.

11             MR. EARLY:  Do you know where that box is located?

12             MR. LEFKOWITZ:  Nashville, Tennessee.

13             MR. EARLY:  Do you know the address at which that

14    box is located?

15             MR. LEFKOWITZ:  I don't have --

16             MR. EARLY:  And you said earlier -- let me, let

17    me -- I'm going to step on my own toes here.  I apologize.

18    You said earlier --

19             MR. LEFKOWITZ:  [Indiscernible].

20             MR. EARLY:   -- very, very clumsily you have -- you

21    are [indiscernible].

22             MR. LEFKOWITZ:  And I'm old enough to know how that

23    feels.

24             MR. EARLY:  But I think you said earlier that you

25    aren't exactly sure the name of the company and you would

1     provide it.  Are you thinking about the same thing?

2            MR. LEFKOWITZ:  Correct.

3            MR. EARLY:  And will provide that to your counsel

4     for distribution to those listening who want to know?

5            MR. LEFKOWITZ:  Absolutely.

6            MR. EARLY:  Wonderful.  That is just tremendous.

7     Thank you for that.  Have you ever -- do you know anything

8     about providing notice to people whose personal HIPAA records

9     have been -- whose data has been breached?  Do you know

10    anything --

11           MR. LEFKOWITZ:  Yes.  Yes, I do.

12           MR. EARLY:  Do you know whether the Debtor has ever

13    given such a notice to patients in the Debtor's -- the Debtor

14    and its employees have treated.  I'm sorry to stumble over my

15    words there, but it's sort of hard to describe.  Do you know

16    if the Debtor has ever given a HIPAA notice to anyone?

17           MR. LEFKOWITZ:  Not in the last 3 years.

18           MR. EARLY:  What relationship do you have, Mr.

19    Lefkowitz, with M2Loan Company?

20           MR. LEFKOWITZ:  I'm a director of that company.

21           MR. EARLY:  Oh.  And you -- I want to make sure that

22    I understand your role with the Debtor as well.  Are you the

23    director of the Debtor, the owner of the Debtor, the present

24    Debtor, tell me what your role is with the Debtor.

25           MR. LEFKOWITZ:  I'm a director of the Debtor.

1      MR. EARLY:  Thank you.  So you're a director of the
2  Debtor, and you're a director of M2Loan Company.  Now is
3  M2Loan company going to lend money to the Debtor?
4      MR. LEFKOWITZ:  Yes.
5      MR. EARLY:  Ah.  Okay.  Can you tell me, I think
6  this might be my last question, can you tell me who owns
7  Balitoss [phonetic] Intermediate Holdings?
8      MR. LEFKOWITZ:  M2HoldCo.
9      MR. EARLY:  N as in November or M as in Mike?
10      MR. LEFKOWITZ:  M as in mother.
11      MR. EARLY:  Mother.  Oh.  Thank you so much for
12  that.  M2HoldCo.  Is that right?
13      MR. LEFKOWITZ:  Correct.
14      MR. EARLY:  M2HoldCo.  Do you own an interest in
15  M2HoldCo?
16      MR. LEFKOWITZ:  No.
17      MR. EARLY:  Are you a director or officer or
18  shareholder with M2HoldCo?
19      MR. LEFKOWITZ:  I'm aa director, not an officer and
20  not a shareholder and not a --
21      MR. EARLY:  Wonderful.  Thank you.  And does
22  M2HoldCo have any relationship to M2LoanCo?
23      MR. LEFKOWITZ:  Yes.
24      MR. EARLY:  And what is that relationship?
25      MR. LEFKOWITZ:  They own M2LoanCo.

1          MR. EARLY:  Oh.  Do you know who founded M2HoldCo

2     and/or M2LoanCo?

3          MR. LEFKOWITZ:  No.

4          MR. EARLY:  Do you know where they were

5     incorporated?

6          MR. LEFKOWITZ:  If they ere I believe in

7     [indiscernible].

8          MR. EARLY:  Okay.  That's all I have for right now.

9     Thank you, gentlemen and ladies.

10         MR. JIMENEZ:  Thank you, Mr. Early.

11         So Ms. Elizabeth Heard, I know you and Ms. Rifkin

12    represent the same client, so I'm just going to ask that only

13    one of you ask questions, whichever one of either side wants

14    to go.

15         UNIDENTIFIED SPEAKER:  [Indiscernible].

16         MS. HEARD:  All right.  This is Mary Elizabeth

17    Heard.  We're covering different areas, but I'm going to defer

18    to Ms. Rifkin and have her go first, please.

19         MR. LEFKOWITZ:  This is Isaac Lefkowitz, can I take

20    a two-minute bio break?

21         MS. HEARD:  Fine with me.

22         UNIDENTIFIED SPEAKER:  Love the phrase -- love the

23    word, bio break.  Excellent.

24         MS. HEARD:  Yeah, that takes --

25         MR. JIMENEZ:  Yes.

1          MS. HEARD:  -- more than two minutes, it takes

2     five.

3          MR. JIMENEZ:  This is -- yes, this is Andrew Jimenez

4     presiding the meeting [indiscernible], and, yes, let's take a

5     five-minute break.

6          MR. LEFKOWITZ:  Thank you.

7                    (Recess taken.)

8          MR. JIMENEZ:  Going back on the Record.  This is

9     Andrew Jimenez for the United States Trustee.  The time is

10     3:54 p.m.  We did take a short five-minute recess and we are

11     back on the Record.

12          At this time, Ms. Rifkin, do you have any questions

13     for the Debtor?

14          MS. RIFKIN:  I do have questions.  And first I'd

15     like to clarify.  I'd like to take some of the time and pass

16     it to our bankruptcy counsel, Ms. Heard, after that.

17          MR. JIMENEZ:  Okay.  So I'll accommodate, but please

18     remember, you know, we're trying to, you know, only one --

19     we're trying to do it only one attorney for each party just to

20     make sure that everyone has an opportunity.  I just want to

21     make sure that everyone in the call today gets an opportunity.

22     So please make it brief and then we'll pass to Ms. Elizabeth

23     Heard.

24          MR. KAUFMAN:  Yeah --

25          MS. RIFKIN:  Thank you.  And I recognize that --

1    MR. KAUFMAN:   -- Mr. Jimenez -- Mr. Jimenez, I

2    don't have a problem with Ms. Rifkin and Ms. Heard sharing

3    time.  I would just suggest -- I would just suggest maybe that

4    if questions have already been asked, if we could just move

5    along, that'll maybe speed some things along.

6    MS. HEARD:  This is Mary Elizabeth.  I can confirm

7    that I will not be duplicating any questions that have been

8    asked.

9    MR. JIMENEZ:  Okay.  So there's a dog barking in the

10    background.  Whoever has the dog could you please make sure

11    you mute your line?  Okay.

12    MR. KAUFMAN:  There's no dogs in the -- from the

13    Debtor's [indiscernible].

14    MS. RIFKIN:  That is -- this is Lori Rifkin, that

15    was my dog.  I am on a headset.  As soon as someone stops

16    passing by I think she'll stop.  I'm sorry.

17    MR. JIMENEZ:  Okay.  Let's get started, Ms. Rifkind.

18    MS. RIFKIN:  Can --

19    MR. JIMENEZ:  We can hear you.

20    MS. RIFKIN:  Okay.  Mr. Lefkowitz, does Corizon, LLC

21    still exist?

22    MR. LEFKOWITZ:  What does that mean?

23    MS. RIFKIN:  Does Corizon, LLC still exist?

24    MR. LEFKOWITZ:  Why don't you give over the

25    questioning to your colleague and go take care of -- and come

1   back --

2           MS. RIFKIN:  You know what, Mr. Lefkowitz --

3           MR. LEFKOWITZ:  It's very hard to hear you.

4           MS. RIFKIN:  Okay.  I'll take a 20 second break and

5   I'll be back.

6           MR. JIMENEZ:  Ms. Heard, do you want to go ahead?

7           MS. HEARD:  Sure.  I'm happy to pick up and let her

8   have a minute.

9           All right.  My questions are directed to --

10          MS. RIFKIN:  I'm back.  Ms. Heard, Ms. Heard, I'm

11  back.

12          MS. HEARD:  Okay.  [Indiscernible].

13          MS. RIFKIN:  Mr. Lefkowitz, can you -- can you hear

14  me now?

15          MR. LEFKOWITZ:  Yes.

16          MS. RIFKIN:  Does Corizon, LLC still exist?

17          MR. LEFKOWITZ:  Corizon, LLC changed its name to

18  Tehum Care Services which is the current Debtor.

19          MS. RIFKIN:  Can you please turn to Document 482,

20  Page 52?

21          MR. LEFKOWITZ:  Yes.

22          MS. RIFKIN:  All right.  Do you see the line for

23  business name, Corizon, LLC?

24          MR. LEFKOWITZ:  Correct.

25          MS. RIFKIN:  And you reviewed the Debtor's schedule

1    of financial affairs that we're looking at before it was

2    submitted you already testified.

3              MR. LEFKOWITZ:  We already testified --

4              MS. RIFKIN:  Is that correct?

5              MR. LEFKOWITZ:   -- and we asked questions not to be

6    repeated for the sake of time management, so, yes --

7              MR. JIMENEZ:  Mr. Lefkowitz --

8              MR. LEFKOWITZ:   -- I testified to that --

9              MR. JIMENEZ:  Mr. Lefkowitz, this is Andrew Jimenez.

10   Just answer the questions, do not engage in conversation with

11   the person asking the questions.  Let's move on.

12             MR. LEFKOWITZ:  Okay.

13             MS. RIFKIN:  Mr. Lefkowitz, please explain what it

14   means that it says for Corizon, LLC on Page 52 under dates

15   business existed, 11/8/1982 through May 5, 2022?

16             MR. LEFKOWITZ:  That's the dates that company was

17   existed under the name Corizon, LLC.

18             MS. RIFKIN:  So I'm going to ask again, does

19   Corizon, LLC still exist?

20             MR. LEFKOWITZ:  With a name change.  Through a

21   merger.

22             MS. RIFKIN:  Did Corizon, LLC cease to exist as of

23   May 5, 2022?

24             MR. LEFKOWITZ:  Yes, at the merger.

25             MS. RIFKIN:  What entity assumed liability after

1     May 5, 2022 for the lawsuit with the Plaintiff Adree Edmo as

2     listed on Page 39 of this Document 482?

3              MR. LEFKOWITZ:  [Indiscernible].

4              MR. KAUFMAN:  Sorry.  Ms. Rifkin, can you repeat

5     that while we're flipping?

6              MS. RIFKIN:  Sure.  Let me know when you've gotten

7     to Page 39.

8              MR. KAUFMAN:  We're there.

9              MS. RIFKIN:  All right.  Do you see the lawsuit,

10    Adree Edmo the Idaho Department of Corrections?  That is the

11    second line --

12             MR. LEFKOWITZ:  Yes, I do.

13             MS. RIFKIN:   -- on this document.  Okay.

14             MR. LEFKOWITZ:  Yes, I do.

15             MS. RIFKIN:  What entity -- what entity assumed

16    liability for this lawsuit after May 5, 2022?

17             MR. LEFKOWITZ:  Tehum Care Services.

18             MS. RIFKIN:  Did Tehum Care Services retain any

19    counsel to represent it in this lawsuit?

20             MR. LEFKOWITZ:  Yes.

21             MS. RIFKIN:  And what is the name of that counsel?

22             MR. LEFKOWITZ:  It's in Sherman, Idaho, you wouldn't

23    know who that is, I don't recall the name.

24             MS. RIFKIN:  Was it Parsons Behle?

25             MR. LEFKOWITZ:  Correct.

1          MS. RIFKIN:  And did Tehum have a retainer with
2     Parsons Behle to represent it in that lawsuit?
3          MR. LEFKOWITZ:  I would assume so.
4          MS. RIFKIN:  What -- turning to Page 35 of this
5     document, let me know when you're there.
6          MR. LEFKOWITZ:  Yeah.
7          MS. RIFKIN:  All right.  I'm going to direct your
8     attention to 2 lines where the firm Parsons Behle & Latimer is
9     listed.  Do you see that?
10         MR. LEFKOWITZ:  Yes.
11         MS. RIFKIN:  Do you know what the payment listed to
12    Parsons Behle on November 16, 022 was for?
13         MR. LEFKOWITZ:  Legal services.
14         MS. RIFKIN:  And what entity made that payment to
15    Parsons Behle?
16         MR. LEFKOWITZ:  The Debtor.
17         MS. RIFKIN:  Is that Tehum?
18         MR. LEFKOWITZ:  Correct.
19         MS. RIFKIN:  And that payment that came from
20    Tehum's --
21         MR. LEFKOWITZ:  Oh, well --
22         MS. RIFKIN:   -- account --
23         MR. LEFKOWITZ:   -- one second, one second, I
24    misspoke.  It wasn't Tehum, it was Corizon, in November Tehum
25    did not exist.

1          MS. RIFKIN:  In November 2022 you just testified --

2          MR. LEFKOWITZ:  No -- I'm sorry, I'm sorry, November

3     20 -- yeah, I'm sorry, relax, I'm sorry.  November '22 is

4     Tehum.  Correct.

5          MS. RIFKIN:  And what bank account was that payment

6     made from?

7          MR. LEFKOWITZ:  I don't know.

8          MS. RIFKIN:  Who was responsible for paying -- for

9     making that payment?

10          MR. LEFKOWITZ:  The Debtor.

11          MS. RIFKIN:  And who are the directors of the Debtor

12     as of November 16, 2022?

13          MR. LEFKOWITZ:  I am.

14          MS. RIFKIN:  Any other directors?

15          MR. LEFKOWITZ:  No.

16          MS. RIFKIN:  Were there any -- who were the officers

17     of the Debtor as of November 16, 2022?

18          MR. LEFKOWITZ:  There is no officers.

19          MS. RIFKIN:  Who were the employees of the Debtor as

20     of November 16, 2022?

21          MR. LEFKOWITZ:  There is no employees.

22          MS. RIFKIN:  Other than yourself as the sole

23     director of the Debtor on November 16, 2022 who else worked

24     for or represented the Debtor?

25          MR. LEFKOWITZ:  Quite a few law firms.

1          MS. RIFKIN:  Who controlled access to the Debtor's

2     bank accounts on November 16, 2022?

3          MR. LEFKOWITZ:  I do.

4          MS. RIFKIN:  Did anybody else control access to the

5     Debtor's bank accounts on November 16, 2022?

6          MR. LEFKOWITZ:  Not that I'm aware of.

7          MS. RIFKIN:  Mr. Lefkowitz?

8          MR. LEFKOWITZ:  Yeah, yeah, not that I'm aware of.

9          MS. RIFKIN:  As the sole director of the Debtor on

10    November 16, 2022 would you have been aware whether anybody

11    else had access to the Debtor's bank accounts on that date?

12         MR. LEFKOWITZ:  Correct.

13         MS. RIFKIN:  And your testimony is that you're not

14    aware of anyone other then yourself who had control or access

15    of the Debtor's bank account as of November 16, 2022.

16    Correct?

17         MR. LEFKOWITZ:  Correct.

18         MS. RIFKIN:  Who authorized the payment from the

19    Debtor to Parson Behle & Latimer on November 16, 2022?

20         MR. LEFKOWITZ:  I did.

21         MS. RIFKIN:  And what account was that make out of

22    specifically --

23         MR. LEFKOWITZ:  I don't know.

24         MS. RIFKIN:   -- and I'm not -- okay, what account -

25    - what bank account to clarify did the Debtor have open on

1    November 26, 2022?

2              MR. LEFKOWITZ:  It's all in the Record.

3              MS. RIFKIN:  I would like you to clarify since you

4    just testified you weren't sure.

5              MR. LEFKOWITZ:  That's just like you don't remember

6    your bank account number so don't I, so if there's anything --

7    accounts is listed in the record, in the report.

8              MS. RIFKIN:  What bank was the bank account at that

9    was used to pay Parsons Behle & Latimer on November 16, 2022?

10             MR. LEFKOWITZ:  I don't know sitting here today

11   which bank account cut a payment to Parsons in November '22.

12             MR. KAUFMAN:  Lori, this is Aaron Kaufman.  Just so

13   we're clear, not every payment in SOFA 3 came from the 2

14   Signature accounts, some were made by third parties on behalf

15   of the Debtor.  That's the reason --

16             MS. RIFKIN:  Okay.

17             MR. KAUFMAN:   -- for the confusion.

18             MS. RIFKIN:  Mr. Lefkowitz, who paid Parson Behle &

19   Latimer on November 16, 2022?  You testified previously it was

20   the Debtor.  Would you like to change your testimony after

21   comments from your lawyer?

22             MR. LEFKOWITZ:  I don't want to change the

23   testimony, I want to change -- I want to clarify.  If there

24   was a payment made, I personally approved it.  Exactly from

25   where that payment went I cannot tell you today without having

1    the bank records in front of me.

2              MS. RIFKIN:  Did a third party pay that -- make that

3    payment on behalf of the Debtor on November 16, 2022?

4              MR. LEFKOWITZ:  Sitting here today I don't know.  I

5    would have to go back to the records, and this is a summary,

6    this is not a detailed report, but from the summary I cannot

7    tell.  I can go ahead and investigate and come back to you and

8    let you know how it was made.

9              MS. RIFKIN:  Which records -- where are the records

10   located that you would need to review?

11             MR. LEFKOWITZ:  They're all electronic records.

12             MS. RIFKIN:  And so are you testifying that the

13   payments listed in Attachment 3 on the schedule of financial

14   affairs represent payments made not only by the Debtor but by,

15   potentially by third parties on the Debtor's behalf?

16             MR. LEFKOWITZ:  Correct.

17             MS. RIFKIN:  And what third parties made payments

18   that would be encompassed in these -- in this schedule?

19             MR. LEFKOWITZ:  [Indiscernible] --

20             MS. RIFKIN:  Even if you don't remember specific --

21   uh-huh.

22             MR. LEFKOWITZ:  What does uh-huh mean?

23             MS. RIFKIN:  Anyone else?

24             MR. LEFKOWITZ:  Geneva Consulting made third party

25   payments for the Debtor.

1          MS. RIFKIN:  Did anybody else make third party

2     payments on behalf of the Debtor that's reflected?

3          MR. LEFKOWITZ:  Yeah, there could have been law

4     firms through escrow accounts.

5          MS. RIFKIN:  Who was responsible for reviewing the

6     records of all payments made within 90 days before filing this

7     case to prepare the schedules?

8          MR. LEFKOWITZ:  I did.

9          MR. JIMENEZ:  Ms. Rifkin --

10          MS. RIFKIN:  And do you remember if you looked --

11     yes?

12          MR. JIMENEZ:  This is Andrew Jimenez.  Please start

13     to wrap it up if you want to leave some time for Ms. Heard to

14     ask questions.  It's 4:10 p.m. and we still have other

15     creditors waiting to ask questions.

16          MS. RIFKIN:  All right.  Mr. Lefkowitz, did Scott

17     King provide legal services ro Corizon, LLC in October 2022?

18          MR. LEFKOWITZ:  No.

19          MS. RIFKIN:  Did Scott King provide legal services

20     to Tehum in October 2022?

21          MR. LEFKOWITZ:  No.

22          MS. RIFKIN:  Did Scott King provide legal counsel

23     for the Debtor from October 2022 to January 2023?

24          MR. LEFKOWITZ:  No.

25          MS. RIFKIN:  Did the Debtor provide notice to its

1    attorneys in the Edmo lawsuit of the divisional merger that

2    had taken place on May 5, 2022?

3            MR. LEFKOWITZ:  I don't know what the attorneys did.

4            MS. RIFKIN:  You were, as you said, the sole

5    director for the Debtor on May 5, 2022.  Correct?

6            MR. LEFKOWITZ:  Correct.

7            MS. RIFKIN:  Did you direct anyone to provide notice

8    to the lawyers in the Edmo case that we talked about of the

9    divisional merger or the change -- entity change to Tehum any

10   time between May 5, 2022 and December 31, 2022?

11           MR. LEFKOWITZ:  I don't recall.

12           MS. RIFKIN:  Those are my questions.  Thank you.

13   I'll turn it over to my colleague.

14           MR. JIMENEZ:  Thank you, Ms. Rifkin.

15           MS. HEARD:  Thank you, Ms. Rifkin.

16           Sorry, this is Mary Elizabeth Heard.  I am here on

17   behalf of Adree Edmo.  Mr. Lefkowitz, earlier you testified

18   that accounts were zeroed out in January of 2023.  Which

19   accounts were zeroed out?

20           MR. LEFKOWITZ:  Those were accounts in Signature

21   Bank.

22           MS. HEARD:  Okay.  So bank accounts.

23           MR. LEFKOWITZ:  Correct.

24           MS. HEARD:  And what do -- okay, and what do you

25   mean by zeroed out?

1           MR. LEFKOWITZ:  The accounts were closed.

2           MS. HEARD:  All right.  I was under the impression

3    that you testified earlier that those accounts were still

4    open.

5           MR. LEFKOWITZ:  Right, that's because when we zeroed

6    out the accounts, we thought the accounts closed.  But

7    apparently the accounts are still open and has a zero balance

8    in them.

9           MS. HEARD:  Okay.  So let me say this another way.

10    So you drew down the balance to zero.  Is that correct?

11           MR. LEFKOWITZ:  I don't know if I drew down or it

12    got drawn down, it became zero balance.

13           MS. HEARD:  Well, you're the sole director of the

14    Debtor and are you the only one with access to the account?

15           MR. LEFKOWITZ:  Right.  But if the account has $25

16    and the bank charges a $25 fee and it turns it into zero, it

17    wasn't me that zeroed out, it was the bank that zeroed out.

18    So the accounts got to zero balance and earlier was thought

19    the accounts were closed.  Actually the bank is even closed,

20    there's no longer -- the bank don't even exist.  But

21    apparently the FDIC took it over the account is practically --

22    technically the account number is still open and it has a zero

23    balance in the account.

24           MS. HEARD:  Yes, I understand the concept of

25    receivership.  I'm just trying to say -- trying to clarify

1     when you say zero out did you take money out of those accounts

2     and direct it somewhere else?

3            MR. LEFKOWITZ:  No.

4            MS. HEARD:  All right.  So your testimony as you sit

5     here today is that the bank had certain charges and that is

6     what caused the bank account o go down to zero in January of

7     2023?

8            MR. LEFKOWITZ:  No, I didn't say that, I said

9     zeroing out, not necessarily mean that I personally zeroed it

10    out.  The account was diluted down, no longer deposits went

11    in, payments went out in ordinary course of business and

12    automatically the account became dormant.  We thought earlier

13    that dormant means the account was closed.  Apparently the

14    account is not closed but dormant.

15           MS. HEARD:  I understand that the account is

16    basically empty and has no funds going in and out at this

17    point.  My question relates as to January of 2023, and you're

18    telling me as you sit here today that you did not draw down

19    those funds that ere in the account at that time to zero, i.e.

20    zero it out?

21           MR. LEFKOWITZ:  Correct.

22           MR. KAUFMAN:  I'm sorry, this is Aaron Kaufman.

23    We're -- I feel like we're just asking the same question.  Let

24    me see if I can help.

25           MS. HEARD:  [Indiscernible] really we can talk

1    later, but I'm here to get testimony of the Debtor under oath
2    please.  Thank you.
3              MR. KAUFMAN:  Oh, I get it, and he's giving it to
4    you, and what I'm trying to direct you to are the SOFAs that
5    list the transfers out so --
6              MS. HEARD:  And I studied them very closely.  Thank
7    you, Mr. Kaufman.  Okay.
8              MR. KAUFMAN:  Good.
9              MS. HEARD:  I'll move on.  So I want to look -- take
10    a look at Docket 482, Page 22, and I'll give you a second to
11    look at it.
12             MR. LEFKOWITZ:  Yeah.
13             MS. HEARD:  So in that -- in the SOFAs, I believe
14    this is the SOFA, yeah, it says, List any transfers of money
15    or other property by sale, anyway would you read it, made by
16    the Debtor or a person acting on behalf of the Debtor.  It
17    sounds like maybe you need to amend this because right now it
18    says none and is that something you're planning on amending?
19             MR. LEFKOWITZ:  I don't think so, but if we need to
20    amend it as, you know, information comes in, we'll amend it.
21    But I don't believe it needs to be amended.
22             MS. HEARD:  Well, I mean your lawyer came in and
23    reminded us just a moment ago that third parties made some
24    payments on behalf of the Debtor.  And you just told me that
25    the account went down to zero.  You're the only one who

1    controls that account, so I'm just giving you an opportunity

2    to perhaps go back and amend that.

3         MR. KAUFMAN:  All right.  Let's move on, I think he

4    answered your question.

5         MS. HEARD:  Mr. Kaufman, again, I am here just like

6    everyone else to get sworn testimony from the Debtor and I

7    don't believe he has answered my question.  I think you were

8    just trying to move things along for your own reasons.

9         MR. LEFKOWITZ:  I can answer your question.  I

10   believe the SOFAs are 100 percent accurate and I believe my

11   testimony is 100 percent accurate.  You may be confused with

12   information and I don't blame you because you hadn't lived

13   through this process, but if we need to amend something, we'll

14   absolutely amend.  But [indiscernible] today the SOFAs are

15   100 percent accurate and my testimony is 100 percent accurate.

16   If you find some --

17        MS. HEARD:  Okay.

18        MR. LEFKOWITZ:   -- inconsistency, you can ask again

19   and we'll clarify both under oath and offline.

20        MS. HEARD:  All right.  I really appreciate that.

21   Okay.  So were any transfers made on behalf of the Debtor by

22   Perigrove?

23        MR. LEFKOWITZ:  No.

24        MS. HEARD:  Were any transfers made on behalf of the

25   Debtor by Geneva?

1          MR. LEFKOWITZ:  Yes.

2          MS. HEARD:  All right.  What transfers were made on

3     behalf of the Debtor by Geneva, please?

4          MR. LEFKOWITZ:  To trade creditors and liabilities.

5          MS. HEARD:  Okay.  So trade creditors and

6     liabilities.  What do you mean by liabilities?

7          MR. LEFKOWITZ:  Like your client, considered a

8     liability, PLI.

9          MS. HEARD:  Oh, have you made a payment to my client

10    that I've missed?

11         MR. LEFKOWITZ:  No, no, I said -- you asked me what

12    means liability so I responded that your client is not a trade

13    creditor, is considered a liability.

14         MS. HEARD:  All right.  So you're saying any

15    liability associated with litigation.

16         MR. LEFKOWITZ:  Correct.  Or claims.

17         MS. HEARD:  What is a claim?

18         MR. LEFKOWITZ:  Claim means prior to litigation.

19         MS. HEARD:  Okay.  But that's still like, you know,

20    a litigation claim just not a lawsuit hadn't been filed.  Is

21    that what you mean?

22         MR. LEFKOWITZ:  You can interpret it whichever way

23    you want.  A claim is a claim and litigation is litigation.

24         MS. HEARD:  But I don't want to interpret it, I want

25    you to tell me what the word claim means to you.

1          MR. LEFKOWITZ:  No, I'm telling you a claim is not
2      litigation, litigation is not a claim.
3          MS. HEARD:  Okay.  Did Sigma make any transfers on
4      behalf of the Debtor?
5          MR. LEFKOWITZ:  No.
6          MS. HEARD:  So when the Debtor pays $150,000 a month
7      to Sigma Risk Management, LLC, how is that money allocated?
8          MR. LEFKOWITZ:  To Sigma for their services,
9      contracted services.  It's a group of 12 lawyers with PLI
10     experience with software and subscriptions and all kinds of
11     tools that they use to manage PLI liabilities and to deal with
12     insurance carriers.  It's a monthly fee for these group of 12
13     lawyers.
14         MS. HEARD:  Okay.  And Sigma does this PLI claims
15     handling for the Debtor and YesCare.  Correct?
16         MR. LEFKOWITZ:  Under different contracts, different
17     agreements.
18         MS. HEARD:  Oh, sure, but I'm just saying that
19     they -- both YesCare and the Debtor are [indiscernible] Risk
20     Management, LLC.  Correct?
21         MR. LEFKOWITZ:  Correct.  Correct.
22         MS. HEARD:  Okay.  Did Pensa [phonetic] Partners
23     make any transfers on behalf of the Debtor?
24         MR. LEFKOWITZ:  No.
25         MS. HEARD:  Did Veritas Intermediate make any

1      transfers on behalf of the Debtor?

2              MR. LEFKOWITZ:  Veritas Intermediate is merged into

3      the Debtor, so it's the same as the Debtor.

4              MS. HEARD:  All right.  So I'm sorry, the other

5      Veritas entity.

6              MR. LEFKOWITZ:  I don't know what other means.

7              MR. KAUFMAN:  You mean Pelitoss [phonetic]?

8              MS. HEARD:  I'm sorry, Pelitoss is what I meant to

9      say.

10             MR. LEFKOWITZ:  No.

11             MS. HEARD:  Has YesCare made any transfers on behalf

12     of the Debtor?

13             MR. LEFKOWITZ:  No.

14             MS. HEARD:  Did M2LoanCo make any transfers on

15     behalf of the Debtor?

16             MR. LEFKOWITZ:  Yes.

17             MS. HEARD:  Okay.  And ballpark approximately how

18     much money?

19             MR. LEFKOWITZ:  Over $30 million.

20             MS. HEARD:  All right.  Has Joel Landau [phonetic]

21     made any transfers on behalf of the Debtor?

22             MR. LEFKOWITZ:  Not associated with the Debtor.

23             MS. HEARD:  So your answer is no.

24             MR. LEFKOWITZ:  Correct.

25             MS. HEARD:  Okay.  Has David Harrington made any

1    transfers on behalf of the Debtor?

2         MR. LEFKOWITZ:  Not associated with the Debtor and

3    the answer's no.

4         MS. HEARD:  Okay.  Does Corizon have any connection

5    to Genesis Healthcare?

6         MR. LEFKOWITZ:  Does Corizon have any -- not

7    directly to Corizon, no.

8         MS. HEARD:  Okay.  Does it have any connection

9    indirectly?

10        MR. LEFKOWITZ:  Yes.

11        MS. HEARD:  Could you please explain?

12        MR. LEFKOWITZ:  There may be a stockholder of the

13   parent company.

14        MS. HEARD:  Who is the stockholder of which company?

15        MR. LEFKOWITZ:  When you identify the company I'll

16   tell you which stockholder is who.

17        MS. HEARD:  Okay.  I'm just following up on your

18   answer there, and I believe you said there may be a

19   stockholder in the company, so could you please tell me what

20   you mean by stockholder?

21        MR. LEFKOWITZ:  I said it's possible, I'm not 100

22   percent certain that Genesis has some principal interest in

23   the parent company.

24        MS. HEARD:  And what is the parent company?

25        MR. LEFKOWITZ:  Perigrove 1018, LLC.

1              MS. HEARD:  And Perigrove 1018C (sic) is the parent
2        company of what?
3              MR. LEFKOWITZ:  M2HoldCo.
4              MS. HEARD:  All right.  So did Perigrove 1018, LLC
5        buy M2HoldCo in December of 2021?
6              MR. LEFKOWITZ:  Correct.
7              MS. HEARD:  And how much did Perigrove pay?
8              MR. LEFKOWITZ:  I don't have that information in
9        front of me.
10              MS. HEARD:  Okay.  Who would have that information?
11              MR. LEFKOWITZ:  Counsel.
12              MS. WEBB:  Ms. Heard, I think we're getting a little
13        far afield of the Debtor's assets and liabilities.
14              MS. HEARD:  Well, the problem is, and I respect that
15        you're saying that, but the problem is there are so many
16        ownership sort of layovers through all of this, that it's a
17        very complicated web and we're just trying to get some
18        answers.  But I will move on.
19              All right.  So I'd like to take a look at Docket
20        552, Page 2 of 12.
21              MR. JIMENEZ:  Ms. Heard, this is Andrew Jimenez.
22        It's 4:25, I want to be mindful that there are at least 3
23        other creditors waiting to ask questions.  So please start to
24        wrap it up in the next 5 minutes.
25              MS. HEARD:  I understand.  This is really -- very

85

1    few questions left.

2              MR. JIMENEZ:  Thank you.

3              MS. HEARD:  All right.  [Indiscernible].  Sure, I

4    understand.

5              I think this is the same one that Mr. Early asked

6    questions about.  [Indiscernible] Page 2 of 12.

7              MR. LEFKOWITZ:  Uh-huh.

8              MS. HEARD:  Were there -- okay.  Great.  So I'm

9    looking at letter M, pre-petition unsecured debt,

10   approximately 176 million.  Is that correct, Mr. Lefkowitz?

11             MR. LEFKOWITZ:  Correct.

12             MS. HEARD:  All right.  I'm going to turn now to

13   Docket 481, Page 14.

14             MS. WEBB:  Give us a minute.

15             MS. HEARD:  Sure.  Absolutely.

16             MS. WEBB:  Page 14?

17             MS. HEARD:  481 [indiscernible].

18             MS. WEBB:  We're there.

19             MS. HEARD:  All right.  So I'm looking at Line 3B,

20   total amount of non-priority -- and you have no priority

21   unsecured claims, so I'm just skipping to 3B, 82 million, what

22   account would be more than doubling of the pre-petition

23   unsecured debt from the 28th of April to the 12th of May?

24             MS. WEBB:  Ms. Heard, I'm going to ask Mr. Perry to

25   answer that because I believe it's a technical accounting

1       question with a presentation.

2                MR. Perry, can you answer?

3                UNIDENTIFIED SPEAKER:  He did.  He did.

4                MS. HEARD:  Could I ask Mr. [indiscernible] first,

5       please?

6                MS. WEBB:  I mean if he doesn't --

7                MR. PERRY:  Well, here's the problem, here's the

8       issue -- this is Russell Perry -- I prepared --

9                MS. HEARD:  Okay.

10               MR. PERRY:  -- the MOR, I signed the MOR, you're

11      asking about a number in the MOR.  So I'm happy to address the

12      number in the MOR and then you can continue to aks -- you can

13      continue to ask your question.  But if you're asking about the

14      question in the MOR, I can answer that.

15               MS. HEARD:  Sure.

16               MR. PERRY:  [Indiscernible] myself prepared the MOR.

17               MS. HEARD:  Okay.  Okay.  I understand that.  But I

18      mean we have the sole director of the Debtor here so I'm

19      assuming he approved it.

20               MS. WEBB:  Mr. Perry signed the MOR.

21               MR. PERRY:  It was a monthly operating report signed

22      by myself.  He reviewed it, but he didn't need to approve it.

23      So I'm happy --

24               MS. HEARD:  Okay.

25               MR. PERRY:  -- to address the 176 million if you'd

1     like.

2            MS. HEARD:  Sure.  Why don't you tell me what the

3     176 million of pre-petition unsecured debt includes.

4            MR. PERRY:  Sure.  It's just a simple balance sheet

5     estimate for the Debtor's various liabilities across all --

6     various categories that we've discussed including trading

7     claims, trade creditors, other claims, personal liability

8     claims, special liability claims, all the various things that

9     we've discussed that make up the liabilities.  It's a balance

10    sheet estimate and a balance sheet accrual for the Debtor's

11    books and records.  It is not meant to be a creditor-by-

12    creditor, claim-by-claim build up.  It's simply an accrual

13    based financial statement of liability.

14           The Debtor's schedules go claim-by-claim, liability-

15    by-liability and to the extent that there's an inability to

16    identify a value distinct from the Debtor's balance sheet

17    accrual liability it'll be undetermined in the schedules.  The

18    delta will be anything that's in the unsecureds, list of

19    unsecured claims that have undetermined, the Debtor's accrual

20    books and records and the financial statements may assign a

21    value to that claim, but the schedules do not.  That --

22           MS. HEARD:  Okay.

23           MR. PERRY:  It's simply accounting.

24           MS. HEARD:  [Indiscernible].  Okay.  It's very

25    helpful.  So my understanding from what you've said, and

1    please correct me if I'm wrong, is that there are -- well,

2    let's see, approximately, what, 90,000 -- or, well, let's just

3    say approximately twice the amount of identified claims are in

4    claims for which you have not yet assigned a number in the

5    schedules.  Is that -- probably not the best way of saying it.

6    Maybe let me --

7            MR. PERRY:  Yeah, you just used 90,000.  Were you

8    talking about 90 million?

9            MS. HEARD:  Okay.  I'm going to [indiscernible]

10   million.

11           MR. PERRY:  Okay.

12           MS. HEARD:  So there's 82 million that is

13   articulated for lack of a better word in the Docket 481 in the

14   schedules.  Right?  And the difference between the 82 million

15   here and the 176 million in the MOR is what, sir?

16           MR. PERRY:  Yeah, again, it's liabilities and other

17   claims that the Debtor's schedules do not assign a value to.

18   Okay.  So for example if you were to go line-by-line in the

19   Debtor's Schedule F, what you'll see in many of the

20   professional liability claims is a value of undetermined.  And

21   the reason for that is on the Debtor's balance sheet there may

22   be reserves or accrual related, accounting related values

23   assigned to certain claims.  But it does schedule almost the

24   value [indiscernible].

25           Okay.  So any type of value for a potential claim.

1    But an actuarial report or a reserve were prepared by an

2    actuary or an accounting firm and they assign a value for

3    balance sheet debt purposes.  Okay.  So one is a GAAP

4    financial statement or at least the values by which the

5    balance sheet was created at one point in time was prepared

6    for GAAP.  The schedules will not assign a value to those

7    professional liability claims unless there -- you know, had

8    reached some sort of [indiscernible] that would allow for them

9    to be liquidated.

10         So the delta that you're asking about, that

11    90 million, will be what's called actuarial related reserves

12    to each one of those PLIs will probably make up 90 percent is

13    my guess of the difference, and in Schedule F you'll see the

14    word undetermined next to many of those.  And that really does

15    explain the difference.

16         MS. HEARD:  No, and I understand that.  What I'm

17    trying to get at here is that, and I understand that a lot of

18    claims including our -- my client's claim has been designated

19    as unliquidated, disputed, and undetermined at this point.

20    But, and let me ask my question now, does the 176 million in

21    pre-petition unsecured debt include potential amounts

22    estimated for fraudulent transfer claims?

23         UNIDENTIFIED SPEAKER:  [Indiscernible].

24         MR. PERRY:  No.  I wouldn't think so, no.  This is

25    exactly the way I described it a second ago.  The Debtor's

1     balance sheet wouldn't likely have valued the type of claims

2     that I referred.

3            MS. HEARD:  All right.  I have no further questions.

4     Thank you.

5            MR. JIMENEZ:  Thank you.

6            MR. KAUFMAN:  Mr. Jimenez, how much longer do you

7     think we're going to do this today?  Ms. Webb and I need to

8     probably get into an Uber in about 30 or 45 minutes to make

9     our flight.

10           MR. JIMENEZ:  Okay.  I'll keep that in mind.

11    Hopefully we can -- we can wrap it up by then.  I just want to

12    give everyone that showed up today an opportunity to ask

13    questions.  So --

14           MR. KAUFMAN:  Okay.

15           MR. JIMENEZ:   -- Mr. Connor, I don't want to

16    mispronounce your last name, I think I got it wrong, you're

17    representing a group of doctors from Michigan?

18           MR. McLAUGHLIN:  Yes, thank you, Mr. Jimenez.

19    Connor McLaughlin for Dr. Bomber and other Michigan providers.

20    I don't have any questions.

21           MR. JIMENEZ:  Thank you.

22           Christian Gluck for M2Loan Company.

23           MR. GLUCK:  No questions.

24           MR. JIMENEZ:  Is there anyone on the call that I

25    have not given an opportunity yet to ask questions of the

1    Debtor?

2         MR. CROSS:  I would like to ask questions of the

3    Debtor.  This is Ian Cross, I represent Kohchise Jackson and

4    William Kelly.

5         MR. JIMENEZ:  Yes.  Could you please repeat your

6    name?

7         MR. CROSS:  Ian Cross.

8         MR. JIMENEZ:  Go ahead.

9         MR. CROSS:  Mr. Lefkowitz, you I believe previously

10   testified you're a director of YesCare.  Do you mean YesCare

11   Holdings, LLC or YesCare Corp?

12        MR. LEFKOWITZ:  YesCare Corp.

13        MR. CROSS:  Do you know who the members of YesCare

14   Holdings, LLC are?

15        MR. LEFKOWITZ:  No.

16        MR. CROSS:  Who are the other directors of YesCare

17   Corp?

18        MS. WEBB:  I think -- excuse me, Mr. Cross, we're

19   here for Tehum Care.  If you have questions about YesCare,

20   YesCare has [indiscernible] counsel.  I think you can properly

21   address those questions to YesCare's counsel.

22        MR. CROSS:  All right.  I'll move on.  Mr.

23   Lefkowitz, are you a director of Sigma Risk Management?

24        MR. LEFKOWITZ:  No.

25        MR. CROSS:  You are not.

1          MR. LEFKOWITZ:  Correct.

2          MR. KAUFMAN:  Sigma.  That's it.

3          MR. CROSS:  Did you organize --

4          MR. LEFKOWITZ:  Oh, sorry.  I'm sorry, I'm sorry,

5    I'm taking it back.  I am a director.  I thought you meant

6    Sigma Contracting that he mentioned before.  Sigma Risk

7    Management I am a director.

8          MR. CROSS:  Okay.  What state is Sigma Risk

9    Management organized in?

10          MR. LEFKOWITZ:  I believe in New York.

11          MR. CROSS:  Did you organize Sigma Risk Management?

12          MR. LEFKOWITZ:  Yes.

13          MR. CROSS:  Is the name of the entity Sigma RM, LLC?

14          MR. LEFKOWITZ:  Correct.

15          MR. CROSS:  I want to direct your attention to I

16    think Document 481 -- oh, I'm sorry, 482, Page 35 of 53.  Do

17    you see the line there, it lists the address of Sigma Risk

18    Management at 1528 56th Street in Brooklyn, New York?

19          MR. LEFKOWITZ:  Correct.

20          MR. CROSS:  Have you ever been to that address?

21          MR. LEFKOWITZ:  Yes.

22          MR. CROSS:  What's there?

23          MR. LEFKOWITZ:  An office.

24          MR. CROSS:  Is that your office?

25          MR. LEFKOWITZ:  No.

1          MR. CROSS:  Whose office is it?

2          MR. LEFKOWITZ:  Sigma.

3          MR. CROSS:  I believe you testified the owners of

4     Sigma were 12 lawyers.  Do you know their names?

5          MR. LEFKOWITZ:  Not all of them, some of them, yeah.

6          MR. CROSS:  What are the ones you remember?

7          MR. LEFKOWITZ:  Jennifer Finger, Steve Brown, Brit

8     Hannen [phonetic], Christian Gilder [phonetic], I don't recall

9     the others.

10         MR. CROSS:  Were any of those individuals previously

11    officers of the Debtor?

12         MR. LEFKOWITZ:  No.  Maybe Jennifer Finger was

13    but -- I'm not sure if Jennifer Finger was but Jennifer Finger

14    left the Debtor and she joined the group and this group owns

15    Sigma RM today.

16         MR. CROSS:  Why did you organize Sigma RM?

17         MR. LEFKOWITZ:  For the very same purposes, to hand

18    it over to these lawyers to manage [indiscernible] in the

19    Debtor's affairs.

20         MR. CROSS:  Well, all of the PI cases against the

21    Debtor are stayed.  Correct?

22         MR. LEFKOWITZ:  No.

23         MR. KAUFMAN:  And of the Debtor, yes.

24         MR. CROSS:  What PI cases --

25         MR. JIMENEZ:  So I'm sorry --

1          MR. CROSS:   -- are not going to get --

2          MR. JIMENEZ:   -- I'm sorry, before you continue on

3     the Record I'm picking up somebody is like whispering

4     something to witness.  I will ask you to --

5          MR. KAUFMAN:  Sorry, that was -- sorry, Aaron

6     Kaufman, I was trying to clarify I guess the Debtor.

7          MR. JIMENEZ:  Okay.  So --

8          MR. KAUFMAN:  Just making sure Mr. Lefkowitz heard

9     the question.

10          MR. JIMENEZ:  So Mr. Lefkowitz is the witness.

11     Please don't coach or instruct in any way how to answer the

12     questions, please.

13          Please continue.

14          MR. KAUFMAN:  Understood.

15          MR. CROSS:  Well, what PI cases against the Debtor

16     are not stayed?

17          MR. LEFKOWITZ:  I guess not at the Debtor but

18     against individual former employees of the Debtor are not

19     stayed.

20          MR. CROSS:  Is the Debtor liable for claims against

21     individual former employees?

22          MR. KAUFMAN:  That's a legal question, Mr. Cross.

23          MR. CROSS:  Your objection is noted.

24          MR. KAUFMAN:  He can't answer about legal questions.

25     He's not a lawyer.

1          MR. CROSS:  Mr. Lefkowitz, did you organize an

2     entity called Corizon Services, LLC in New York in December of

3     2021?

4          MR. LEFKOWITZ:  Yes.

5          MR. CROSS:  Why did you organize that entity?

6          MR. LEFKOWITZ:  I don't remember, but it's a dormant

7     entity.

8          MR. CROSS:  What is its relationship to the Debtor,

9     if any?

10          MR. LEFKOWITZ:  There's not.

11          MR. CROSS:  So if all the PI cases against the

12     Debtor are -- oh, I'm sorry.  Why did Corizon Health change

13     its name to Tehum Care Services?

14          MR. LEFKOWITZ:  I don't know.

15          MR. CROSS:  Who made the decision to change the

16     name?

17          MR. LEFKOWITZ:  I did.

18          MR. CROSS:  And you don't know why you decided to do

19     that?

20          MR. LEFKOWITZ:  Correct.

21          MR. CROSS:  What [indiscernible]?

22          MR. LEFKOWITZ:  I don't know.

23          MR. CROSS:  Is the Debtor's ultimate parent current

24     Perigrove 1018, LLC?

25          MR. LEFKOWITZ:  Correct.

1          MR. CROSS:  And you -- what is your -- do you have
2      an ownership interest in Perigrove 1018, LLC?
3          MR. LEFKOWITZ:  Yes.
4          MR. CROSS:  How did you obtain that ownership
5      interest?
6          MR. LEFKOWITZ:  I was part of the group that formed
7      it.
8          MR. CROSS:  Who else was in that group?
9          MR. LEFKOWITZ:  A large group of investors.
10         MR. CROSS:  Well, tell me all the ones you can
11     remember.
12         MR. KAUFMAN:  Mr. Cross, let's stick to how this
13     relates to the Debtor's financial condition.
14         MR. CROSS:  Oh, it relates to the Debtor's potential
15     causes of action, it's assets.
16         MR. KAUFMAN:  Oh.  Can you focus your question,
17     that's too broad a question.
18         MR. CROSS:  Why did -- okay.  I have no further
19     questions.
20         MR. JIMENEZ:  Is anyone else on the call that have
21     not yet had the opportunity to ask questions to the Debtor?
22       (No audible response.)
23         MR. JIMENEZ:  Okay.  So the Debtor has announced
24     that it needs to make amendments to the schedules.  For that
25     reason I will continue this meeting of creditors.  How much

1     time do you need to make the amendments?

2            MR. KAUFMAN:  Ms. Webb and I are convening by eye

3     contact.  We don't really know.

4            MS. WEBB:  I'm not sure.

5            MR. PERRY:  It's Russell Perry.  I think we'll

6     need --

7            MR. KAUFMAN:  [Indiscernible] --

8            MR. PERRY:  -- likely --

9            MR. KAUFMAN:  -- just, Mr. Jimenez, just so you're

10    clear, Mr. Perry has had to leave our room, he's in a car and

11    not with us.  So we can't confer right now.

12           But go ahead, Mr. Perry --

13           MR. PERRY:  Yeah.

14           MR. KAUFMAN:  -- if you have an idea.

15           MR. PERRY:  No, I think we'll need a few days to

16    work with counsel and --

17           MR. JIMENEZ:  Okay.

18           MR. PERRY:  -- Mr. Lefkowitz, so I would suggest

19    that we circle back and provide you with a firm date --

20           MR. JIMENEZ:  Well --

21           MR. PERRY:  -- early next week.

22           MR. JIMENEZ:  -- I need a date today to reschedule,

23    so I was looking at June 2 to reschedule the meeting of

24    creditors.  It could be in the morning or in the afternoon.  I

25    just want to make sure that that will give you enough time to

1      file the amendments.

2                MR. KAUFMAN:  You said what date, June 2?

3                MR. JIMENEZ:  June 2.  Correct, 3 weeks from now.

4                MR. KAUFMAN:  So that would --

5                MR. PERRY:  Yeah, here's the issue, so it would

6      likely give us enough time.  Unfortunately I am personally

7      traveling with my family that day.  So --

8                MR. JIMENEZ:  Okay.

9                MR. PERRY:   -- can we choose another date?

10               MR. JIMENEZ:  So the --

11               MR. PERRY:  Would the following Monday or Tuesday

12     work?

13               MR. JIMENEZ:  Yes, who is this speaking?

14               MR. PERRY:  Sorry, it's Russell Perry again.

15               MR. JIMENEZ:  Okay.  So, yes, let's find a date on

16     the following week -- the following week.

17               MR. PERRY:  Yes, so June --

18               MR. JIMENEZ:  Does June --

19               MR. PERRY:   -- 9 is available.

20               MR. JIMENEZ:  Okay.  I was going to suggest June 6,

21     is that available?

22               MR. KAUFMAN:  June 6.  No conflicts from Debtor's

23     counsel.

24               Mr. Perry, will you be back in town?

25               MR. PERRY:  I'll be back, yeah.

1          MR. JIMENEZ:  Okay.  So June 6 at 1:00 p.m. Central

2    Standard Time.  Does that work?

3          MR. PERRY:  It works for me.

4          MS. WEBB:  I just want to bring this up, I don't

5    know if anyone is going to -- we have a large bankruptcy

6    [indiscernible] that day, just letting you know.  But in case

7    anyone didn't have it in their calendar, but I'll let him go

8    ahead and schedule for the day he wants.

9          MR. KAUFMAN:  Yeah, and it's on my calendar but I

10   assumed the continued 341 meeting would be quick based on the

11   amendments that we intend to make.

12         MS. WEBB:  Yeah, I just wanted to remind everyone in

13   case it wasn't on their calendar for that day.

14         MR. JIMENEZ:  Okay.  So I understand.  So let's do

15   June 6 -- June 9.  That way everybody who's attending the

16   seminar --

17         MR. KAUFMAN:  Gotcha.

18         MR. JIMENEZ:   -- can do it without the distraction

19   of the 341.

20         MR. KAUFMAN:  Well, we have a conflict I'm hearing

21   June 9.  So let's -- I think we should stick with June 6.

22         MR. JIMENEZ:  Didn't you say a moment ago that June

23   9 was available?

24         MR. KAUFMAN:  Mr. Lefkowitz, if we need him present,

25   is not available on June 9.

1          MR. PERRY:  Sorry, are we talking about the 9th or

2     the 6th?

3          MR. JIMENEZ:  Well, so my question was about the

4     9th, if everybody was available on the 9th, because on the 6th

5     some of the attorneys have a conference.  So you say the 9th

6     you're not available --

7          MR. LEFKOWITZ:  So, Russell, you can --

8          MR. JIMENEZ:  Go ahead.

9          MR. LEFKOWITZ:  I'm not available, but Russell is.

10          MR. JIMENEZ:  No, but you're -- you are the person

11     who signed the schedules and the SOFA.

12          MR. LEFKOWITZ:  Right.

13          MR. JIMENEZ:  So what about --

14          MR. KAUFMAN:  Either we stick with June 6 or we go

15     to the week --

16          MR. LEFKOWITZ:  So either we do it the 6th or we go

17     to the following week.

18          MR. JIMENEZ:  What about the 8th?

19          MR. LEFKOWITZ:  I'm traveling.

20          MR. JIMENEZ:  And when will you be back?

21          MR. LEFKOWITZ:  I'll be back after that weekend,

22     what is it -- I'll be back on the 12th.

23          MR. JIMENEZ:  You'll be traveling on the 7th?

24          MR. LEFKOWITZ:  Actually that whole week I'm going

25     to be out, from the 7th till the 12th.

1    MR. JIMENEZ:  Okay.  Okay.  So let's -- it's --

2    either we do it the 6th or we move to the 12th or the 13th.

3    And I want to take everyone into consideration.  We have other

4    attorneys not just Debtor's counsel participating.  So a

5    quick, you know, a quick answer, do you want to move to 12th

6    or 13th?

7    MR. KAUFMAN:  That's fine.

8    MR. JIMENEZ:  Okay.  Let's do June 13.

9    MR. KAUFMAN:  Still 1:00 p.m. Central?

10    MR. JIMENEZ:  Yes, 1:00 p.m. Central.

11    MR. KAUFMAN:  Got it.  All right.  Anything else for

12    today?

13    MR. JIMENEZ:  No, thank you all for your

14    appearances.

15    MR. PERRY:  Thank you.

16    MR. KAUFMAN:  Thank you.

17    (Hearing adjourned 10:36 a.m.)

18    * * * * *

19    *I certify that the foregoing is a correct transcript*

20    *to the best of my ability produced from the electronic sound*

21    *recording of the proceedings in the above-entitled matter.*

22    /S./ MARY D. HENRY

CERTIFIED BY THE AMERICAN ASSOCIATION OF
ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337
JUDICIAL TRANSCRIBERS OF TEXAS, LLC
JTT TRANSCRIPT #67356
DATE:  JUNE 14, 2023