1

1          IN THE UNITED STATES BANKRUPTCY COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 23-90086-11
                              §     HOUSTON, TEXAS
5   TEHUM CARE SERVICES, INC.,§     TUESDAY,
                              §     JUNE 13, 2023
6          DEBTOR.            §     1:03 P.M. to 3:15 P.M.

7   **CONTINUED SECTION 341 MEETING OF CREDITORS (VIA TELEPHONE)**

8            CONDUCTED BY ANDREW JIMENEZ
                    TRIAL ATTORNEY

9

10        APPEARANCES (VIA TELEPHONE):  SEE NEXT PAGE

11

12

13

14

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23          www.judicialtranscribers.com

24

     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.
              No ERO present; no logs.

```
 1                    APPEARANCES (VIA TELEPHONE):

 2   FOR THE US TRUSTEE:            DEPARTMENT OF JUSTICE
                                    OFFICE OF THE US TRUSTEE
 3                                  Andrew Jimenez, Esq.
                                    615 E. Houston Street
 4                                  Suite 533
                                    San Antonio, TX  78205
 5                                  210-472-4640
                                    Fax:  210-472-4649
 6                                  andrew.jimenez@usdoj.gov

 7                                  OFFICE OF THE UNITED STATES
                                    TRUSTEE
 8                                  Ha Minh Nguyen, Esq.
                                    515 Rusk Street
 9                                  Suite 3516
                                    Houston, TX  77002
10                                  202-590-7962
                                    ha.nguyen@usdoj.gov
11
     FOR THE DEBTOR TEHUM CARE      GRAY REED & McGRAW, LLP
12   SERVICES, INC.:               Jason S. Brookner, Esq.
                                    1601 Elm Street
13                                  Suite 4600
                                    Dallas, TX  75201
14                                  469-320-6132
                                    Fax:  214-953-1332
15                                  jbrookner@grayreed.com

16
     CORIZON HEALTH SERVICES, INC. BERGER SINGERMAN LLP
17                                  James Gassenheimer, Esq.
                                    1450 Brickell Avenue
18                                  Suite 1900
                                    Miami, FL  33131
19                                  305-755-9500
                                    Fax:  305-714-4340
20                                  jgassenheimer@bergersingerman.
                                    com
21
                                    O'CONNOR KIMBALL LLP
22                                  Martin J. McAndrew, Esq.
                                    51 Haddonfield Road
23                                  Suite 330

24

25
```

```
 1                      APPEARANCES (CONTINUED):

 2                              O'CONNOR KIMBALL LLP
                                Martin J. McAndrew, Esq
 3                              51 Haddonfield Road
                                Suite 330
 4                              Cherry Hill, NY  08002-4805
                                856-663-9292
 5
                                Lydia R Webb
 6                              Gray Reed & McGraw LLP
                                1601 Elm St
 7                              Ste 4600
                                Dallas, TX 75201
 8                              469-320-6111
                                lwebb@grayreed.com
 9
    FOR THE OFFICIAL UNSECURED   STINSON, LLP
10  CREDITORS COMMITTEE:         Paul Brian Lackey, Esq.
                                2200 Ross Avenue
11                              Suite 2900
                                Dallas, TX  75201
12                              214-560-2201
                                Fax:  214-560-2202
13                              Paul.lackey@stinson.com

14  FOR CREDITOR BILLIE MANCELL: LAW FIRM OF DANIELA LABINOTI,
                                P.C.
15                              Daniela Labinoti, Esq.
                                707 Myrtle Avenue
16                              El Paso, TX  79901
                                915-581-4600
17                              daniela@labinotilaw.com

18  FOR THE INTERNAL REVENUE    Dorcas Basaldua
    SERVICE:                    1919 Smith Street
19                              Houston, TX  77002

20

21

22

23

24

25
```

1    **HOUSTON, TEXAS; TUESDAY, JUNE 13, 2023; 1:03 P.M.**

2          MR. NGUYEN:  You're on the Record, Andrew.

3          MS. JIMENEZ:  Good afternoon.  Today --

4          Thank you.  Thank you, Mr. Nguyen.

5          Good afternoon.  Today is June 13th, 2023.  The

6    time is 1:03 p.m. Central Standard Time.

7          We are here on the continued Section 341 Meeting

8    of creditors in the bankruptcy case of Tehum Care Services,

9    Inc., Case No. 23-90086, pending before the United States

10   Bankruptcy Court for the Southern District of Texas.

11         My name is Andrew Jimenez.  I am an attorney with

12   the United States Department of Justice, and I represent the

13   United States Trustee.

14         I am joined by my colleague, Ha Nguyen.  I will be

15   presiding -- I will be the presiding officer of this 341

16   Meeting of Creditors.  At about a little -- shortly before

17   2:30 p.m., I will need to step out of the meeting to attend

18   a court hearing.  If the meeting is still going on,

19   Mr. Nguyen will continue presiding the meeting at that -- at

20   that point so that all the creditors that are present can

21   have an opportunity to ask questions.

22         I know there are several creditors on the phone.

23   This is a Meeting of Creditors, and I will let creditors ask

24   the questions of Tehum's representatives.  I ask you to

25   please wait until your turn until you're called to ask

1   questions.

2          Creditors are free to ask questions and should be

3   -- should be limited to the Petition, Schedules, and

4   Statement of Financial Affairs, or the general financial

5   condition of the Debtor.  If you need additional

6   information, there are other avenues available under the

7   bankruptcy rules.  You could take a 2004 Examination should

8   you need additional discovery.

9          This meeting is being digitally recorded by the

10  United States Trustee, and the United States Trustee

11  recording is the only authorized recording.  Nobody else

12  should be recording this meeting.

13         Will counsel for the Debtor please identify

14  himself for the Record?

15         MR. KAUFMAN:  For the Record, this is Aaron

16  Kaufman with the law firm of Gray Reed as counsel for the

17  Debtor.

18         MR. JIMENEZ:  And now the Debtor's corporate

19  representative, please identify for the Record.

20         MR. LEFKOWITZ:  Isaac Lefkowitz --

21         MR. KAUFMAN:  Oh, sorry, Mr. Lefkowitz.  Just so

22  we're clear, there are -- there are two representatives of

23  Debtor present, but go ahead, Mr. Lefkowitz.

24         MR. LEFKOWITZ:  Isaac Lefkowitz on behalf of the

25  Debtor.

1          MR. KAUFMAN:  And the second one is Mr. Russell

2    Perry, the Chief Restructuring Officer.  He's also on the

3    line.

4          MR. JIMENEZ:  Mr. Perry, could you please state

5    your name for the Record?

6          MR. PERRY:  Hi.  This is Russell Perry.

7          MR. JIMENEZ:  Okay.  So I'm going to swear in the

8    witnesses.

9          First, I'll start with Mr. Lefkowitz.  Could you

10   please raise your right hand and state your full name for

11   the Record?

12         MR. LEFKOWITZ:  Isaac Lefkowitz.

13         MR. JIMENEZ:  Do you swear or affirm that the

14   testimony you are about to give is the truth, the whole

15   truth, and nothing but the truth?

16         MR. LEFKOWITZ:  I affirm.

17             ISAAC LEFKOWITZ, DEBTOR'S WITNESS, AFFIRMED

18         MR. JIMENEZ:  Mr. Perry, could you please raise

19   your right hand and state your full name for the Record?

20         MR. PERRY:  Russell Perry.

21         MR. JIMENEZ:  Do you swear or affirm that the

22   testimony you are about to give is the truth, the whole

23   truth, and nothing but the truth?

24         MR. PERRY:  I do.

25             RUSSELL PERRY, DEBTOR'S WITNESS, SWORN

1          MR. JIMENEZ:  Since this meeting is being

2    conducted telephonically, I cannot do what I normally do in

3    a Chapter 11 case, which is to verify the Government issued

4    identifications of the witnesses.

5          Mr. Kaufman, as an Officer of the Court, can you

6    please confirm that the individuals on the phone are,

7    indeed, Mr. Perry and Mr. Lefkowitz?

8          MR. KAUFMAN:  I can confirm that, yes.

9          MR. JIMENEZ:  So during this meeting, I will be

10   using the term "Debtor."  And when I say, "the Debtor," I am

11   referencing Tehum Care Services, Inc., formerly doing

12   business as Corizon Health Services, Inc.

13         So, Mr. Lefkowitz, I'll start my questions.  I'll

14   start my questions so that you can answer.  So on June 10th,

15   2023, the Debtor filed Amended Schedules in Docket No. 676

16   and an Amended Statement of Financial Affairs on Docket

17   No. 677.

18         Did you look over the information on the Amended

19   Schedules and Amended Statement of Financial Affairs before

20   they were filed with the Bankruptcy Court?

21         MR. LEFKOWITZ:  Yes, I did.

22         MR. JIMENEZ:  Is the information on the Debtor's

23   Amended Schedules and Amended Statement of Financial Affairs

24   true and correct to the best of your knowledge and belief?

25         MR. LEFKOWITZ:  Yes, they are.

1        MR. JIMENEZ:  At this time are there any changes

2  or amendments that you wish to make on the Petition,

3  Schedules, or Statement of Financial Affairs?

4        MR. LEFKOWITZ:  No, sir.

5        MR. JIMENEZ:  Do you have document -- Docket No.

6  676 in front of you?

7        MR. LEFKOWITZ:  Just a second.  I'll bring them

8  up.

9        Yes, I do.

10       MR. JIMENEZ:  Okay.  So I'm going to make

11 reference to various pages on the Document 676.  I first --

12 my first question if you could go to page 196 -- and we --

13 we're getting some feedback on the sound.  So if you're not

14 asking questions or if you're not answering questions at

15 this time, please put your lines on mute.  And please avoid

16 using speakerphone.

17       MR. LEFKOWITZ:  One second.  I'm scrolling to 196.

18       Yes.  I'm there.

19       MR. JIMENEZ:  Okay.  So on page 196 of 293, the

20 Debtor disclosed in Question No. 77 its other property --

21 the M2 LoanCo, LLC Funding Agreement with an undetermined

22 value.

23       My question is why is the value of the funding

24 agreement undetermined?

25       MR. LEFKOWITZ:  It needs to be reconciled and

1 analyzed whether the agreement was completely funded or

2 overfunded.

3          MR. JIMENEZ:  So what was the amount stipulated in

4 the agreement?

5          MR. LEFKOWITZ:  15 million.

6          MR. JIMENEZ:  Since the Petition date, has M2

7 LoanCo made payments?  Let me restate that.

8          As of today, has the Debtor received funds under

9 the funding agreement?

10          MR. LEFKOWITZ:  No.  Only on the specific ground.

11          MR. PERRY:  Mr. Jimenez, did you mean

12 postpetition?  I was unclear about that question.

13          MR. JIMENEZ:  Yes, it's postpetition.

14          MR. PERRY:  Okay.

15          MR. LEFKOWITZ:  Post Petition M2 LoanCo.

16     (Speakers talk at the same time.)

17          MR. JIMENEZ:  I didn't get your answer,

18 Mr. Lefkowitz.  Can you please repeat it?

19          MR. LEFKOWITZ:  I said postpetition -- I said

20 postpetition M2 LoanCo only funded under the DIP lending

21 arrangement.

22          MR. JIMENEZ:  Who negotiated the funding agreement

23 on behalf of the Debtor?

24          MR. LEFKOWITZ:  I did.

25          MR. LEFKOWITZ:  And who negotiated the funding

1    agreement on behalf of M2 LoanCo?

2           MR. LEFKOWITZ:  His name is Alan Rubenstein

3    (phonetic).

4           MR. JIMENEZ:  Can you please repeat the name?

5    Alan?

6           MR. LEFKOWITZ:  Rubenstein.

7           MR. JIMENEZ:  So what happened to me being able to

8    reconcile the amount of this funding agreement?  This

9    bankruptcy Petition was filed on February 14th, 2023.

10          MR. LEFKOWITZ:  So --

11          MR. PERRY:  Mr. Jimenez, this is Russel Perry.

12   Can I answer that?

13          MR. JIMENEZ:  Let's -- first, let's let

14   Mr. Lefkowitz answer, and then I'll go --

15          MR. PERRY:  Okay.

16          MR. JIMENEZ:  -- then I'll go to you.

17          MR. LEFKOWITZ:  So since the fundings were not in

18   in large tranches of money, it was basically payments of

19   invoices and creditors on behalf of the Debtor.  So that's

20   being reconciled to the facilitator who actually made a

21   payment to make certain that all the monies allocated were

22   allocated towards the arrangement.

23          MR. JIMENEZ:  So who is this facilitator who made

24   the payments?

25          MR. LEFKOWITZ:  Geneva Consulting.

1          MR. JIMENEZ:  Geneva Consulting?

2          MR. LEFKOWITZ:  Correct.

3          MR. JIMENEZ:  What is Geneva Consulting?

4          MR. LEFKOWITZ:  Geneva Consulting was a third-

5  party company that facilitated the actual payment and vetted

6  the backup paperwork for payments to be made on behalf of M2

7  LoanCo.

8          MR. JIMENEZ:  Who is Alan Rubenstein?

9          MR. LEFKOWITZ:  Alan Rubenstein is the director of

10  M2 LoanCo.

11          MR. JIMENEZ:  Does he still work with M2 LoanCo?

12          MR. LEFKOWITZ:  Yes.

13          MR. JIMENEZ:  So when you -- when you were

14  negotiating this funding agreement on behalf of the Debtor,

15  did you have counsel?

16          MR. LEFKOWITZ:  Yes.

17          MR. JIMENEZ:  When you were negotiating with

18  Mr. Rubinstein, did Mr. Rubinstein have counsel --

19          MR. LEFKOWITZ:  M2 LoanCo had --

20      (Speakers talk at the same time.)

21          MR. JIMENEZ:  -- under the funding agreement?

22          MR. LEFKOWITZ:  Absolutely.

23          MR. JIMENEZ:  Okay.  So under the funding

24  agreement, has M2 LoanCo made disbursements prepetition?

25          MR. LEFKOWITZ:  Correct.

1        MR. JIMENEZ:  Were those payment disbursements

2  made directly to the Debtor?

3        MR. LEFKOWITZ:  Through Geneva Consulting.

4        MR. JIMENEZ:  So M2 LoanCo would make the payments

5  to Geneva -- to Geneva Consulting, and then Geneva

6  Consulting will transfer the money to the Debtor?

7        MR. LEFKOWITZ:  No.  Geneva Consulting would make

8  the payments on behalf of the Debtor.

9        MR. JIMENEZ:  Can you give me examples to -- of to

10  whom would Geneva Consulting make those payments?

11        MR. LEFKOWITZ:  Say Geneva Consulting had an

12  invoice from AT&T.  So Geneva Consulting would make that

13  payment on behalf of the Debtor and direction of them, too.

14        MR. JIMENEZ:  Are you in any way associated with

15  Geneva Consulting?

16        MR. LEFKOWITZ:  I'm not an officer.  I may have

17  some role in the way that I help them vet the invoices.

18        MR. JIMENEZ:  I didn't -- I didn't understand your

19  answer.  You're breaking up.  Can you please repeat it?

20        MR. LEFKOWITZ:  I'm not an officer or a principal

21  in Geneva, but I did play a role in helping them vetting

22  those invoices and making those payments.

23        MR. JIMENEZ:  Can you be more specific?  What do

24  you mean when you say, "You play a role"?

25        MR. LEFKOWITZ:  Just to help them verify if the

1   payment is accurate or not.

2       MR. JIMENEZ:  Are you a director of Geneva

3   Consulting?

4       MR. LEFKOWITZ:  Not with the title director, no.

5       MR. JIMENEZ:  What title, if any, do you have?

6       MR. LEFKOWITZ:  I don't have a title.  I'm not

7   getting paid from Geneva Consulting.  I just help them make

8   sure that it's being processed correctly.

9       MR. JIMENEZ:  Are you an owner of Geneva

10  Consulting?

11      MR. LEFKOWITZ:  No.

12      MR. JIMENEZ:  Were you involved in the formation

13  of Geneva Consulting?

14      MR. LEFKOWITZ:  No.

15      MR. JIMENEZ:  Were you ever an owner of Geneva

16  Consulting?

17      MR. LEFKOWITZ:  No.

18      MR. JIMENEZ:  Prior to the Petition date, has

19  anyone, other than Geneva Consulting, made payments on

20  behalf of the Debtor?

21      MR. LEFKOWITZ:  Not that I'm aware of.

22      MR. JIMENEZ:  So when will you have the

23  information -- the reconciliation information about the

24  disbursements made under in the funding agreement?

25      MR. LEFKOWITZ:  I believe Ankura team is doing it

1   as we speak.

2          MR. JIMENEZ:  Who's doing that?

3          MR. LEFKOWITZ:  The Ankura team.  That's the CRO

4   of Russell Perry's firm that he's working at.

5          MR. JIMENEZ:  Okay.  So, Mr. Perry, can you give

6   us more information as to why the disbursements under the

7   funding agreement -- we don't have that information as of

8   today -- as of today?

9          MR. PERRY:  Yeah.  We -- well, we do -- we do have

10  the information.  I don't -- I don't think we are saying we

11  don't have the information.  I think we're saying we're

12  working through the analysis.  I believe I testified fairly

13  early on in the case that the information that we have been

14  provided totals roughly -- call it $40 million of payments

15  that were made post divisional merger prior to the Petition

16  date.

17         The 90-day payments alone include, you know,

18  roughly $6 million of payments.  We have that information.

19  We are working through the validation of each and every one

20  of those payments to the extent that they are material.

21         This would include things like reviewing invoices

22  that were supportive of those payments, reviewing the actual

23  information underpinning the exact nature of those services

24  when those services occurred, things of that nature.  So it

25  -- the information has largely been produced.  It's just a

1   matter of being able to process the information, validate

2   the information, Schedule the information, and, you know, at

3   some point being able to provide that information in a way

4   that folks have received from us -- the analysis.

5          MR. KAUFMAN:  Mr. Jimenez, this is Aaron Kaufman.

6   I'm going to just supplement all of that with the Committee

7   is doing a parallel investigation with the same information.

8   So it's kind of a joint effort here.

9          MR. JIMENEZ:  So --

10          MR. PERRY:  This is Russell.  The Committee --

11   we're doing a parallel investigation.  I'm not sure that we

12   have the same information.  I think we could drill down to

13   that more later.

14          MR. JIMENEZ:  Very well.  So going back to

15   Mr. Lefkowitz.

16          So, Mr. Lefkowitz, you testified that the funding

17   agreement is for $16 million, correct?

18          MR. LEFKOWITZ:  Correct.

19          MR. JIMENEZ:  Okay.  And if $40 million were

20   disbursed prepetition -- so is there anything else left

21   under the funding agreement that could be dispersed to the

22   Debtor to fund the bankruptcy?

23          MR. LEFKOWITZ:  No.  The balance of

24   (indiscernible) M2 funded is an unsecured creditor.

25          MR. JIMENEZ:  Can you please expand?

1          What do you mean by that?

2          MR. LEFKOWITZ:  Again, we'll use the number 40

3     that Russell used.  I don't think it's 40.  I think it's shy

4     of 40.  But if 15 million was on behalf of the funding

5     agreement, there's another balance that M2 LoanCo made a

6     business decision to fund the Debtor prior to the Petition

7     after the divisional merger so creditors can get settled.

8     We were trying to avoid bankruptcy, by all means, and we

9     kept on funding various creditors until we hit a deadlock.

10          MR. JIMENEZ:  So if I understood your answer,

11     you're saying that those $15 million under the funding

12     agreement are still available for creditors?

13          MR. LEFKOWITZ:  No.  Those have been funded

14     already.

15          MR. JIMENEZ:  And that was --

16          MR. LEFKOWITZ:  From May of '22.  I'm sorry.  I

17     didn't understand.

18          So from May of 2022 to February of 2023, actually,

19     the 15 million was funded from May of 2022 till end of June

20     of 2022.  And then from June 2022, February 2023, the

21     remainder of funding, not under the funding agreement, was

22     funded for the Debtor.

23          (Pause in the proceedings.)

24          MR. JIMENEZ:  So the funding agreement is listed

25     as an asset, as another -- as another type of property.  But

1   you're saying that it was already -- the $50 million were

2   already exhausted.

3          MR. LEFKOWITZ:  That's correct.  Correct.

4          MR. JIMENEZ:  Is that correct?

5          MR. LEFKOWITZ:  Correct.

6          MR. JIMENEZ:  They were dispersed.  So what is

7   left, then, under this funding agreement that could be used

8   to fund this bankruptcy?

9          MR. LEFKOWITZ:  I don't think there is any.

10          MR. JIMENEZ:  Then why are you listing this

11   agreement as an asset, as a property of the Debtor?

12          MR. LEFKOWITZ:  It's only listed to the potential

13   if anything shy of the 15 million was funded, but the

14   15 million was funded.

15          MR. JIMENEZ:  So this agreement is no longer a

16   property.  It's another liability of the Debtor.

17          MR. LEFKOWITZ:  It's not a liability to the Debtor

18   because the Debtor doesn't owe this 15 million back to M2

19   LoanCo.  M2 LoanCo undertook to fund the divisional merger

20   on behalf of the Debtor without expecting to get it -- to

21   get it paid back.  It's the other 25 million that M2 LoanCo

22   funded outside of the funding agreement that M2 LoanCo has a

23   claim to the debt.

24          MR. JIMENEZ:  Did you say 25 million possible

25   claim of M2 LoanCo?

1          MR. LEFKOWITZ:  Approximately that.

2          MR. JIMENEZ:  Okay.  I'm going to move now -- I'm

3  going to ask you to please reference page 204 of 239.

4          MR. LEFKOWITZ:  Okay.  I've got it.

5          MR. JIMENEZ:  Okay.  And here we have -- and in

6  page 204, the letter provides a list of insurance policies.

7  For every insurance policy included in the list, the letter

8  states that the current value of its insurance is

9  undetermined.  Why is that?  Why is -- why is the value

10 listed as undetermined?

11         MR. LEFKOWITZ:  Again, it needs to be analyzed

12 whether the entire equity of the policy has been exhausted

13 or not.

14         MR. JIMENEZ:  Does it -- does the letter have the

15 information about what is the cap or limit under each of the

16 insurance policies?

17         MR. LEFKOWITZ:  Yes.

18         MR. KAUFMAN:  Mr. Jimenez, this is Aaron Kaufman.

19 As we discussed offline before today, we are working to

20 supplement this chart.  We'll provide, to the extent we have

21 the information available, the policy limits, any SIR

22 requirements, that kind of information.  We're happy to

23 supplement this chart with that information.

24         MR. JIMENEZ:  Thank you, Mr. Kaufman.  The US

25 Trustee requests that the Debtor supplement the information

providing the policy limits in the SIR.

1       So I'm going to move to page 210 out of 239, the

2   Amended Schedules identifying new creditors.  On page 210 in

3   line 3.6, it states that Abraham Goldberger is a creditor

4   with an undetermined claim for indemnification.

5       Do you see what I'm referring to?

6       MR. LEFKOWITZ:  Yes.

7       MR. JIMENEZ:  Who is Abraham Goldberger?

8       MR. LEFKOWITZ:  Abraham Goldberger is an equity

9   holder in the parent company.  So we just listed him as a

10  potential indemnification claim.

11      MR. JIMENEZ:  When you say parent company, what

12  company are you referring to?

13      MR. LEFKOWITZ:  Perigrove 1018.  He was a former

14  officer.

15      MR. JIMENEZ:  Why did you -- go ahead.

16      MR. LEFKOWITZ:  As a former officer, we may have

17  some indemnification claims.  He may have some

18  indemnification claims to the Debtor.

19      MR. JIMENEZ:  He was a former officer of -- to

20  whom?

21      MR. LEFKOWITZ:  He was a former officer of the

22  parent company.

23      MR. JIMENEZ:  When you say parent company, who are

24  you referring to?

25      MR. LEFKOWITZ:  So prior to the divisional merger,

1  he was on the board of the company before the merger; so we

2  listed him onto the bylaws as a potential indemnity claim if

3  there is any.  It was just for disclosure.

4          MR. JIMENEZ:  Okay.

5          MR. LEFKOWITZ:  That's why it's undetermined.

6          MR. JIMENEZ:  Is the company before the merger

7  Corizon?

8          MR. LEFKOWITZ:  Correct.

9          MR. JIMENEZ:  Why is the claim undetermined?

10          MR. LEFKOWITZ:  Because he hasn't made a claim.

11  It's just -- we're just doing it as a disclosure of the

12  contingency claim -- unliquidated claim.

13          MR. JIMENEZ:  Moving on to page 215 out of 239, in

14  93.260 it states that CHS Texas, Inc. is a creditor with an

15  undetermined claim for indemnification.

16          Can you see this?

17          MR. LEFKOWITZ:  Correct.  Yes.

18          MR. JIMENEZ:  What is CHS TX, Inc.'s relationship

19  with the Debtor?

20          MR. LEFKOWITZ:  CHS Texas was formerly merged with

21  the Debtor, and then they divided.  Then there was a

22  divisional merger.  So they might have some unliquidated

23  claims arising out of that divisional merger as far as

24  (Speakers talk at the same time.) --

25          MR. JIMENEZ:  So CHS --

1          MR. LEFKOWITZ:  -- is concerned.

2          MR. JIMENEZ:  CHS TX -- it's still in existence

3  after the divisional merger?

4          MR. LEFKOWITZ:  Right.  CHS Texas and Corizon were

5  merged.  Then they divided.  CHS Texas went left, and the

6  Debtor right, or vice-versa.

7          MR. JIMENEZ:  What does CHF Texas, Inc. does *[sic]*

8  today?

9          MR. LEFKOWITZ:  The same -- the same type of

10 business -- correctional healthcare.

11         MR. JIMENEZ:  And does CHS Texas has operations?

12         MR. LEFKOWITZ:  Yes.

13         MR. JIMENEZ:  Are you a director in CHS Texas?

14         MR. LEFKOWITZ:  Yes.

15         MR. JIMENEZ:  Are you involved with CHS Texas in

16 any other capacity?

17         MR. LEFKOWITZ:  Other than a director, no

18         MR. JIMENEZ:  Will CHS Texas file a claim in this

19 bankruptcy case?

20         MR. LEFKOWITZ:  They haven't filed as of yet.  It

21 all depends whether there is, in my indemnification,

22 contingency claims.

23         MR. JIMENEZ:  I'm going to move on to page 220,

24 and on line 3.562 it states that "Isaac Lefkowitz is a

25 creditor with an undetermined claim for identification."

1          Are you the same person identified in the -- in

2     the Schedules as Isaac Lefkowitz?

3          MR. LEFKOWITZ:  Correct.

4          MR. JIMENEZ:  Why is this claim undetermined?

5          MR. LEFKOWITZ:  The same as -- it's the same

6     answer as the Goldberger claim.  I was a former officer.  So

7     there might be -- under the bylaws, there might be some

8     indemnification contingency claims.

9          MR. JIMENEZ:  Will you file a proof of claim in

10    this bankruptcy case?

11         MR. LEFKOWITZ:  I haven't decided.

12         MR. JIMENEZ:  As of today, do you believe that you

13    have a claim against the Debtor?

14         MR. LEFKOWITZ:  I don't have a claim today.  It

15    all depends whether, you know, the new company is going to

16    be litigated and whether there's going to be an

17    indemnification claim.

18         MR. JIMENEZ:  So moving on to page 221 in line

19    3.585, it states that "Jefferson Dunn (phonetic) is a

20    creditor with an undetermined claim for indemnification."

21    Who is Jefferson Dunn?

22         MR. LEFKOWITZ:  I'm sorry?  Which page is that

23    again?  Which page number?

24         MR. JIMENEZ:  221, line 3.585.

25         MR. LEFKOWITZ:  Jefferson Dunn.  It could be a

1   former employee of the Debtor.

2           MR. JIMENEZ:  It's a former employee of the

3   Debtor?

4           MR. LEFKOWITZ:  Correct.  Correct.

5           MR. JIMENEZ:  What did -- what did Mr. Dunn do

6   when he was employed by the Debtor?

7           MR. LEFKOWITZ:  I don't know his exact position,

8   but he worked on the Alabama contract out of the DOC

9   contract to the Debtor then.

10          (Speakers talk at the same time.)

11          MR. JIMENEZ:  And why did he quit?

12          MR. LEFKOWITZ:  Again, this is --

13          MR. JIMENEZ:  Well --

14          MR. LEFKOWITZ:  -- you know --

15          MR. JIMENEZ:  -- let --

16          MR. LEFKOWITZ:  -- these folks --

17          MR. JIMENEZ:  -- me ask --

18          MR. LEFKOWITZ:  -- these folks have --

19          MR. JIMENEZ:  -- let me ask -- let me ask the

20   question before you -- before you answer so that we have

21   a --

22          MR. LEFKOWITZ:  Oh.

23          MR. JIMENEZ:  -- clear record.  I'm sorry.

24          MR. LEFKOWITZ:  Okay.

25          MR. JIMENEZ:  So my next question is why is the

1   claim undetermined?

2           MR. LEFKOWITZ:  Because it's just an

3   indemnification claim.  So we don't know yet what the actual

4   dollar amount is.  It's just a contingency that I'll

5   liquidate.

6           MR. JIMENEZ:  Moving on to page 224.  Let me know

7   when you're there.

8           MR. LEFKOWITZ:  Yeah.

9           MR. JIMENEZ:  On line 3.739, it states that "Mary

10  Cook is a creditor with an undetermined claim for

11  indemnification."

12          MR. LEFKOWITZ:  Who is Mary Cook?

13          MR. LEFKOWITZ:  Right.  A former employee, the

14  same scenario as the previous one.

15          MR. JIMENEZ:  What did Ms. Cook did *[sic]* when she

16  was employed by the Debtor?

17          MR. LEFKOWITZ:  I don't recall exactly.  She may

18  have been nursing.

19          MR. JIMENEZ:  You got caught up.  Could you please

20  repeat that?

21          MR. LEFKOWITZ:  I said, I don't -- I don't recall

22  exactly what her position was.  I believe she was in nursing

23  then some sort of a medical provider, that she has an

24  indemnification claim.

25          MR. JIMENEZ:  Do you recall in what facility she

1    worked or what contract?

2         MR. LEFKOWITZ:  I don't know the facility, but

3    under the Alabama contract.

4         MR. JIMENEZ:  And why is the claim undetermined?

5         MR. LEFKOWITZ:  She's being sued by a former

6    inmate; so I don't think the claim has been quantified yet.

7    I'm not sure that the Debtor is liable or not, but we're

8    listing them as a contingent unliquidated claim under her

9    indemnification.

10        MR. JIMENEZ:  Moving to page 228.  Let me know

11   when you're there.

12        MR. LEFKOWITZ:  228.  Okay.

13        MR. JIMENEZ:  Line 3.941 states that "Patricia

14   Schmidt is the creditor with an undetermined claim" --

15        MR. LEFKOWITZ:  Right.

16        MR. JIMENEZ:  -- "for indemnification."

17        Who is Patricia Schmidt?

18        MR. LEFKOWITZ:  She was a doctor who -- she was a

19   medical provider under a separate agreement, the Michigan

20   contract.

21        MR. JIMENEZ:  Why is the claim undetermined?

22        MR. LEFKOWITZ:  Because the claim is still

23   outstanding, and it's on (indiscernible) that.

24        MR. JIMENEZ:  Ms. Patricia Schmidt is the

25   defendant in a lawsuit?

1          MR. LEFKOWITZ:  Correct.  And it has been stayed

2    due to the Chapter 11 filing.

3          MR. JIMENEZ:  Moving to page 230.  Let me know

4    when you're there.

5          MR. LEFKOWITZ:  2-3-0?

6          MR. JIMENEZ:  Yeah.  So, like, I'm going to

7    reference line 3.1066.  It states that "Louis Naegeli

8    (phonetic) is a" --

9          MR. LEFKOWITZ:  Right.

10         MR. JIMENEZ:  -- "creditor with an undetermined

11   claim for indemnification."

12         Who is Louis Naegeli?

13         MR. LEFKOWITZ:  A medical provider under the

14   Alabama contract.

15         MR. JIMENEZ:  Why is the claim undetermined?

16         MR. LEFKOWITZ:  I don't know.  Because it hasn't

17   been quantified yet, her --

18      (Speakers talk at the same time.)

19         MR. JIMENEZ:  Is there a lawsuit --

20         MR. LEFKOWITZ:  -- litigation against her.

21         MR. JIMENEZ:  -- involving Ms. --

22         MR. LEFKOWITZ:  I believe so.

23         MR. JIMENEZ:  On the same page a little further

24   down -- further down in line 3.1084, it states that "Sara

25   Tirschwell is a creditor with an undetermined claim for

1    indemnification."

2                Who is Sara Tirschwell?

3                MR. LEFKOWITZ:  She was an acting CEO of the -- of

4    the CHS Texas.

5                MR. JIMENEZ:  Does she -- does she continue to be

6    employed with CHS Texas?

7                MR. LEFKOWITZ:  No.

8                MR. JIMENEZ:  Is Ms. Tirschwell employed with any

9    -- with any of the other entities that exist after the

10   divisional merger?

11               MR. LEFKOWITZ:  No.

12               MR. JIMENEZ:  Is Ms. Tirschwell a defendant in any

13   lawsuit that involves the Debtor?

14               MR. LEFKOWITZ:  She is.

15               MR. JIMENEZ:  And why is the claim undetermined?

16               MR. LEFKOWITZ:  The case is stayed and hasn't been

17   quantified.

18               MR. JIMENEZ:  Moving to the next page --

19               MR. LEFKOWITZ:  I have --

20               MR. JIMENEZ:  -- page 2.  All right.  I didn't

21   hear that, sir.

22               MR. LEFKOWITZ:  I said she may have some

23   identification claims.

24               MR. JIMENEZ:  Moving to the next page, page 231,

25   in line 3.1091, it states that "Scott King is a creditor

1   with an undetermined claim for indemnification."

2          Who is Scott King?

3          MR. LEFKOWITZ:  He's the general counsel for CHS

4   Texas.

5          MR. JIMENEZ:  He's currently -- he currently has

6   that position as general counsel?

7          MR. LEFKOWITZ:  Correct.

8          MR. JIMENEZ:  Why is the claim undetermined?

9          MR. LEFKOWITZ:  It's the indemnification under,

10  you know, directors and officers.  It hasn't been

11  quantified.

12         MR. JIMENEZ:  Is Mr. King a defendant in any of

13  the lawsuits involving the Debtor?

14         MR. LEFKOWITZ:  Yes.

15         MR. PERRY:  Mr. Jimenez, it's Russell Perry.  Can

16  I just provide a little bit of context on the various

17  parties you've been asking questions about?

18         MR. JIMENEZ:  Sure.  Go ahead.

19         MR. PERRY:  Okay.  So there is currently an

20  adversary pleading in front of Judge Lopez related to the

21  extension of an automatic stay related to roughly 35 or so

22  potential contingent unliquidated indemnification claims

23  that may arise against the Debtor.

24         Docket No. 43 in that adversary proceeding lists

25  out the roughly 35 various claims today in which each of the

1   respective parties that you have asked questions about are

2   listed as a non-Debtor, indemnified party on the Schedule.

3          So if folks have additional questions, you know,

4   or Mr. Jimenez for -- we can certainly direct you to this --

5   there's a chart that has each respective state, each

6   respective case, the defendant in the proceeding underlying

7   the case itself, the potential non-Debtor indemnified party,

8   the type of indemnification claim, or other type of claim

9   that may give rise to either an identification or a

10  potential property of the estate.

11         This was the subject of the initial automatic stay

12  extension hearing in front of Judge Lopez.  We had a

13  subsequent hearing that was effectively now being dealt with

14  and will be handled in a mediation session that Judge Lopez

15  asked us or asked the Debtor's representative this morning

16  for an update on.

17         So each of these respective parties that you've

18  asked about over the last couple of minutes have been

19  Scheduled in Schedule F listed as a indemnification but

20  marked as contingent and unliquidated in order for there to

21  be disclosure as it relates to the extension of the

22  automatic stay adversary proceeding in this chart that was

23  filed.

24         I don't know that we laid that out perfectly in

25  the notes.  But, you know, there is a fairly comprehensive,

1  again, Docket 43 chart that provides a significant amount of

2  detail on each one -- each one of these.

3          MR. JIMENEZ:  Thank you, Mr. Perry.

4          Mr. Lefkowitz, moving now to page 237.  Let me

5  know when you're there.

6          MR. LEFKOWITZ:  Yes.

7          MR. JIMENEZ:  On line, 3.1420, it states that

8  "YesCare Corp. is a creditor with an undetermined claim for

9  identification."

10          First, what is YesCare Corp.'s relationship with

11  the Debtor?

12          MR. LEFKOWITZ:  There's no relationship with the

13  Debtor.  YesCare Corp. is part of CHS Texas.  It's wholly

14  owned by CHS Texas.

15          MR. JIMENEZ:  What does YesCare do?

16          MR. LEFKOWITZ:  The same as CHS Texas, nurse

17  correctional healthcare.

18          MR. JIMENEZ:  Are you a director in YesCare?

19          MR. LEFKOWITZ:  Yes.

20          MR. JIMENEZ:  Will YesCare file a claim in this

21  bankruptcy case?

22          MR. LEFKOWITZ:  It's undetermined yet.  Only if

23  there is some indemnification claims.

24          MR. JIMENEZ:  So I'm going to direct your

25  attention to page 185 of 239.

1          MR. PERRY:  Sorry.  Mr. Jimenez, could you say

2   that page -- can you give me that page again.  I didn't hear

3   it.

4          MR. JIMENEZ:  185.

5          MR. PERRY:  And the docket number?  Are we -- I'm

6   sorry.  Are we still on 676, or did we move to --

7          MR. JIMENEZ:  No.  The same document -- 676, same

8   document.

9          MR. PERRY:  Thank you.

10          MR. LEFKOWITZ:  Got it.

11          MR. JIMENEZ:  Okay.  So if you look at part one in

12   this document, it's a summary of assets and liabilities.

13   Part one is a summary of assets.  The summary -- the summary

14   of assets states that the value of Debtor's property is zero

15   dollars.

16          Do you believe that valuing in zero dollars the

17   property of the Debtor accurately reflects the financial

18   circumstances of the Debtor?

19          MR. LEFKOWITZ:  Yes.

20          MR. JIMENEZ:  Could you please expand?

21          MR. LEFKOWITZ:  We're basically still determining,

22   you know, what value of certain assets the Debtor has.  We

23   have a couple of buckets.  One of them is insurance claims

24   which we touched upon before; the other one is potential

25   claims that we have against third parties; and then there's

1 a bucket that relates to tax refunds from the IRS.

2       MR. JIMENEZ:  So the value -- although you are

3 still trying to figure out what is the value, but will it be

4 fair to say that the value is not zero?

5       MR. LEFKOWITZ:  We have them listed under other

6 contingents and unliquidated claims.  We definitely hope

7 it's not zero.  We believe it's not zero, but we don't have

8 the numbers today.  I mean, we definitely -- sure -- we sure

9 do know that monies are due to us from the insurance

10 companies.  We know there are monies that are due to us from

11 claims.  We know monies are due to us through the employment

12 retention credits under the CARES Act.  Exactly what those

13 dollar amounts are has not been quantified yet.  It's all in

14 the works.

15       MR. JIMENEZ:  So when will you have the

16 information?

17       MR. KAUFMAN:  Sorry, Mr. Jimenez.  I was going to

18 direct you and the witnesses to Schedule AB.

19       MR. JIMENEZ:  First of all, who's speaking?

20       MR. KAUFMAN:  Sorry.  Aaron Kaufman.  I thought

21 you knew my voice by now.  Aaron Kaufman for the Debtor.

22       I was going to help you see why the numbers in the

23 summary may be zero, but that the Schedules themselves do

24 have some numbers to work off of, and that would be -- you

25 know, goes to question 75, 74, 73.  Those questions kind of

1  show some of the buckets that Mr. Lefkowitz just talked

2  about.

3        We do have some numbers and, of course, as I told

4  you, we'll be supplementing the chart of the insurance

5  policies so you can see some of the claim limits, the SIR

6  requirements.  And even though we don't have a valuation

7  that we -- that we can definitively list here, that should

8  give creditors an idea of some of the -- I guess, a better

9  understanding of the Debtor's financial circumstances.

10        MR. JIMENEZ:  So, Mr. Kaufman, I see the questions

11  that you're referring to, and there appears be some numbers

12  there.  But when asked what is the current value of Debtor's

13  interest, it's -- everything is listed as undetermined.  And

14  then that carries forward to the summary, and it ends up

15  showing or telling creditors that the value of Debtor's

16  property is zero, and that's a concern because I think we

17  can all agree that the value is not zero.

18        And while I appreciate the efforts of the Debtor

19  to gather information to present accurate information, it's

20  been four months since the filing of the bankruptcy

21  Petition, and still the Schedules also reflecting that the

22  property has a value of zero, and to Debtor has the duty to

23  disclose, as accurate as possible, what is the value of

24  Debtor's property.  And that is my request to the Debtor

25  that the information would be provided in the Schedules.

1      MR. LEFKOWITZ:  We believe the value is zero.

2      MR. KAUFMAN:  So (Speakers talk at the same time.)

3      MR. LEFKOWITZ:  Sorry.

4      MR. KAUFMAN:  Go ahead.  Yeah.  Go ahead.

5      MR. LEFKOWITZ:  I'm saying we believe the value is

6  zero until you actually have all parties agree to the

7  amount.  Until then, it's just a claim, and we're working

8  through that.

9      MR. JIMENEZ:  So the Debtor recently filed a

10  Monthly Operating Report in Docket No. 684.  Do you have

11  access to that document?

12      MR. LEFKOWITZ:  Yes.

13      MR. KAUFMAN:  Okay.  I'm sorry.  684, you said?

14      MR. JIMENEZ:  Correct.

15      MR. KAUFMAN:  I don't have that in front of me.

16  If you'll just give me a moment.

17      MR. JIMENEZ:  Sure.  No problem.

18      MR. LEFKOWITZ:  Okay.

19      MR. KAUFMAN:  Okay.

20      MR. JIMENEZ:  Okay.  So -- let me wait for you,

21  Mr. Kaufman.

22      MR. KAUFMAN:  Oh, I'm ready.  Go ahead.

23      MR. JIMENEZ:  Okay.  So on Document 684 on page

24  No. 2, 2 out of 12, on part 2, letter E --

25      MR. LEFKOWITZ:  Right.

       MR. JIMENEZ:  -- it states, "total assets

1   $20,611,264."  Could you please explain what these assets

2   are?

3           MR. LEFKOWITZ:  It mainly comes from the balance

4   sheet of the insurance accruals.  Again, it's unliquidated

5   contingent.  For those accruals, we posted a number.

6           MR. JIMENEZ:  Were these assets acquired

7   post-petition?

8           MR. LEFKOWITZ:  No.

9           MR. JIMENEZ:  Then why is the value of these

10  assets not reflected in the Schedules?

11          MR. LEFKOWITZ:  You know, maybe Russell can

12  explain that more from an accounting -- from an accounting

13  that the -- this unliquidated contingent.

14          MR. PERRY:  Exactly.  Mr. Jimenez, it's Russell

15  Perry.  I'd like to answer that one.

16          It's fairly accounting specific.  So the Debtor's

17  balance sheet includes accrual-related calculations of what

18  the insurance policies may be worth.  Again, it's a

19  accounting calculation only and has been on the Debtor's

20  balance sheet.

21          The Monthly Operating Report simply provides the

22  Debtor's balance sheet as an exhibit.  And on the Debtor's

23  balance sheet, there is a value that is called "other

24  assets, 18.8 million" and therefore, we just carry that

25  forward in the Monthly Operating Report.

1          Now that value -- again, they -- an accounting

2     reference, and it's an accounting calculation.  It's not

3     meant to guide anyone as it relates to what a true

4     liquidated value of the insurance policies are.  But if you

5     were to look at Schedule A/B 73, the current value of the

6     Debtor's interest is undetermined in each one of the

7     respective insurance policies, and we discussed offline that

8     we would provide additional disclosure as to the value of

9     the policies, the SIRs remaining and other important and

10    relevant information.

11         I won't tell you that the amount is going to

12    perfectly agree to what the insurance actuary/accountants

13    would calculate, but we certainly will provide additional

14    disclosure related to the insurance policies that hopefully

15    will help explain why the numbers are what they are.  And

16    then, you know, happy to reference them back to the

17    18 million.

18         Again, it's an accounting calculation for

19    accounting purposes only.  And, again, we'll provide the

20    additional disclosure on the insurance policies.

21         MR. JIMENEZ:  So when can we expect that the value

22    of property disclosed Schedule A/B will be updated?

23         MR. KAUFMAN:  Again, Mr. Jimenez, this is Aaron

24    Kaufman.  I don't think we will ever be in a position to

25    update the Schedule A/B to provide a value of the insurance

1    policies.  And if we are able to settle with other parties

2    where we have affirmative claims against the parties, then

3    we will have a 9019 motion on file disclosing what we've

4    been able to settle for.

5           But in terms of updating the Schedule, I just

6    don't know how we ever do that.  I've never -- I've handled

7    dozens of Chapter 11 Debtor cases, and I don't -- I can't

8    think of one where we've amended the Schedules once we've

9    liquidated an affirmative claim.

10           MR. JIMENEZ:  Well, Mr. Kaufman -- and this is not

11   the place to have the debate, but, you know, the Schedules

12   are not -- are not just limited to insurance claims.

13   There's other property that is disclosed in the Schedule,

14   and the value is undetermined.

15           And in the last Meeting of Creditors, we did

16   discuss the tax refunds.  There were two separate tax

17   refunds.  In one of those I think the Debtor had a

18   definitive number of what is it going to be and that -- and

19   a timetable of -- as to how long they were expecting that

20   they would get it.

21           And my point is that there is information that the

22   Debtor has.  I understand that there, you know, there can be

23   some challenges with specific types of property, but there

24   is information that a Debtor has and should be used to --

25   should be reflected in the -- in the Schedules because it's

1  not accurate when the Schedules state that the value of

2  Debtor's property is zero.

3        I think everyone participating in this meeting

4  knows that the value is not zero.

5     (Speakers talk at the same time.)

6        MR. PERRY:  Again, I think we -- as we discussed

7  yesterday, we will supplement the information on the

8  insurance policies.  That's one bucket.  I don't -- I think

9  we all agree -- and Mr. Lefkowitz said a couple of times --

10  we don't think the values are zero.  We just don't have

11  another number to give you.

12        MR. JIMENEZ:  Mr. Lefkowitz, in the last Meeting

13  of Creditors, you stated that the Debtor keeps and maintains

14  the servers in which the medical records of inmates are

15  stored; is that correct?

16        MR. LEFKOWITZ:  Correct.

17        MR. JIMENEZ:  Now the Debtor currently does not

18  provide medical services to inmates; is that correct?

19        MR. LEFKOWITZ:  Correct.

20        MR. JIMENEZ:  And after the divisional merger, the

21  operating entity that provides the medical services is

22  YesCare; is that correct?

23        MR. LEFKOWITZ:  Correct.

24        MR. JIMENEZ:  So why is the Debtor keeping the

25  medical records of inmates?

1          MR. LEFKOWITZ:  There's still close to 500 pending

2    cases out there against the -- against the Debtor which

3    medical records are run.

4          (Speakers talk at the same time.)

5          MR. JIMENEZ:  I can barely hear you.

6          MR. LEFKOWITZ:  (Indiscernible).

7          MR. JIMENEZ:  I said I can barely hear you.

8          MR. LEFKOWITZ:  I'd say we still have -- I'd say

9    we still have well over 500 cases against the Debtor which

10   involves the medical records.  Without the medical records,

11   you can't defend those cases.

12         MR. JIMENEZ:  Is YesCare -- I'm sorry.  Is the

13   Debtor keeping records in addition to the -- whatever

14   records are involved in those 500 plus pending cases?

15         MR. LEFKOWITZ:  Whatever former contracts they

16   had, they still have those records.

17         MR. JIMENEZ:  And if YesCare needs access to

18   records, YesCare goes to the Debtor and requests those

19   records?

20         MR. LEFKOWITZ:  YesCare has its own server.

21         MR. JIMENEZ:  Is it different records or the same

22   records?

23         MR. LEFKOWITZ:  Depending if it's old or new.  At

24   the divisional merger, you know, records were copied over

25   and handed over to YesCare.  So if YesCare is named in a

1   lawsuit, the same as the Debtor is, they both have

2   duplicative records.

3           MR. JIMENEZ:  Are you familiar with prisoner

4   grievances?

5           MR. LEFKOWITZ:  Yes.

6           MR. JIMENEZ:  How did Corizon or Tehum keep record

7   of grievances made by prisoners?

8           MR. LEFKOWITZ:  The same server.

9           MR. JIMENEZ:  How would Corizon or Tehum receive

10  notice from the prison that a grievance has been filed?

11          MR. LEFKOWITZ:  Usually by mail.

12          MR. JIMENEZ:  Presently, are these records of

13  grievances made by prisoners kept by the Debtor?

14          MR. LEFKOWITZ:  Correct.

15          MR. JIMENEZ:  Are you aware of the number of

16  grievances that is kept by the Debtor?

17          MR. LEFKOWITZ:  No.

18          MR. JIMENEZ:  Did prisoners that filed grievances,

19  but not lawsuits against the Debtor, receive notice of the

20  bankruptcy filing?

21          MR. LEFKOWITZ:  I don't know.

22          MR. JIMENEZ:  So the US Trustee requests that you

23  find out whether the prisoners that have filed grievances

24  against the Debtor have received notice of the bankruptcy,

25  and if you -- if the Debtor has not sent out notices to

1  these prisoners, we ask that the Debtor send the notices of

2  the bankruptcy case.  So at this --

3          MR. LEFKOWITZ:  Okay.

4          MR. JIMENEZ:  Go ahead.

5      (Speakers talk at the same time.)

6          MR. KAUFMAN:  Mr. Jimenez, yeah, this is Aaron

7  Kaufman.  Since our discussion yesterday, we followed up

8  with Sigma, who manages the claims, the PLI and risk

9  management to get a better understanding of the world of --

10  well, you're calling them grievances.  She explained to us

11  that there is a distinction between, you know, what a

12  grievance might be, which apparently not all -- not all

13  prisons keep electronic records of grievances.  Some are the

14  -- some of those are just kept in the prisons themselves and

15  stored in boxes in hard copy and tort claims.  Tort claims

16  are not all litigation claims.  Some tort claims are

17  asserted that result in litigation.

18          The tort claims -- we're told we do keep

19  electronic records of those.  We have compiled the list of

20  the tort claims, and we're asking our notice agent to go

21  through the claims' matrix to see if we've missed any of the

22  tort claims that we have record of, and we'll make sure that

23  the tort claimants, whether there's litigation or not,

24  receive notice, actual notice of the bankruptcy.

25          We still need to confer and figure out the best

1  way to ascertain about those grievances because it doesn't

2  appear that there are electronic records of those grievances

3  on any servers.

4        MR. JIMENEZ:  But Mr. Lefkowitz just said they

5  said that those grievances were received by mail and that

6  they have records of those grievances.

7        MR. LEFKOWITZ:  You asked me, if the Debtor would

8  receive a grievance, how would we get it?  And the answer is

9  we wouldn't get it by email.  We wouldn't get it by fax.  We

10  will get it by mail.  But not all grievances actually came

11  through there.  Some grievances get just, you know, filed at

12  the facility they're located.

13        MR. JIMENEZ:  But the grievances that the Debtor

14  did receive are kept by the -- are kept -- are kept by the

15  Debtor, correct?

16        MR. LEFKOWITZ:  Correct.

17        MR. JIMENEZ:  Okay.  So the time is 2:09 p.m.  I'm

18  going to need to step out to attend a court hearing at this

19  -- at this moment.  I'm done with my questions, and I'll let

20  Mr. Nguyen continue presiding the meeting to allow the

21  creditors present to ask -- to ask questions to the Debtor.

22        Thank you all for your patience.

23        MR. NGUYEN:  Thank you, Andrew.  This is Ha Nguyen

24  from the US Trustee's Office.

25        If creditors have questions, we welcome all

1 questions.  This is a Meeting of Creditors.  So if you are

2 representing a creditor and you want to either Mr. Perry or

3 Mr. Lefkowitz any question, please state your name and your

4 question.

5    Remember, the questions do have to relate to the

6 Schedules -- the Petition, Schedules, and Statement of

7 Financial Affairs and/or the general condition of the

8 Debtor.  And if you need additional discovery, Rule 2004 is

9 available.

10    So the floor is open to any creditors that wish to

11 ask any questions.  Go ahead.

12    MR. MCKAY:  Hi.  This is Zach McKay for the

13 Committee.

14    MR. NGUYEN:  Go ahead.

15    MR. MCKAY:  I have some questions for

16 Mr. Lefkowitz.

17    So let's start with the Docket 677, if you could

18 put that in front of you.  That's the 224-page document.

19    MR. LEFKOWITZ:  Yeah.

20    MR. MCKAY:  And I'd like to have you turn to

21 page 203.

22    MR. LEFKOWITZ:  Okay.

23    MR. MCKAY:  And let me know when you're there

24 Mr. Lefkowitz.

25    MR. LEFKOWITZ:  Yes.

1          MR. MCKAY:  So on 26(c), there were some

2    additional firms and individuals listed who are in

3    possession of the Debtor's books and records when the case

4    was filed.

5          MR. LEFKOWITZ:  Right.

6          MR. MCKAY:  The first one we see there is Sigma

7    Risk Management, LLC.  What is Sigma?

8          MR. LEFKOWITZ:  Sort of a contract management

9    company that handles the PLI claims.

10          MR. MCKAY:  And it's located at 1528 56th Street

11    in Brooklyn, New York; is that correct?

12          MR. LEFKOWITZ:  Just for -- as a mailing address

13    where mail comes, but they're virtually remote around the

14    country.

15          MR. MCKAY:  So that's their mailing address, but

16    that's not a business address?

17          MR. LEFKOWITZ:  Correct.

18          MR. MCKAY:  Are you familiar with that address?

19          MR. LEFKOWITZ:  Yes.

20          MR. MCKAY:  Who owns the property located that

21    address, Mr. Lefkowitz?

22          MR. LEFKOWITZ:  1528 56th Street, LLC.

23          MR. MCKAY:  And are you a member of 1528 56th

24    Street, LLC?

25          MR. LEFKOWITZ:  Correct.

1          MR. MCKAY:  What books of account and records does

2    Sigma Risk Management have that belong to the Debtor?

3          MR. LEFKOWITZ:  They have access to all the

4    medical records.

5          MR. MCKAY:  When you say they have access to it,

6    can you explain to me what you mean by that?

7          MR. LEFKOWITZ:  They have access to the server of

8    all claims relating to litigation against the Debtor.

9          MR. MCKAY:  Is that a server that is managed by

10   Sigma Risk Management or managed by another company?

11         MR. LEFKOWITZ:  Managed by the Debtor.

12         MR. MCKAY:  Okay.  So does Sigma have any

13   documents that haven't been turned over to the Debtor?

14         MR. LEFKOWITZ:  Sigma does not have any documents.

15   Sigma has access to documents.

16         MR. MCKAY:  So why is Sigma listed as in

17   possession of the Debtor's books of accounts and records if

18   it simply has access to the documents the Debtor has?

19         MR. LEFKOWITZ:  Because they have access to it.

20         MR. KAUFMAN:  This is Aaron.  Just -- that's a --

21   that's a very vague question, and we're doing our best to

22   just provide as much information about who --

23         MR. MCKAY:  That's fine, Aaron.  I think he

24   answered the question.  I was trying to make sure I

25   understood why they were listed.  So I'm --

1       (Speakers talk at the same time.)

2           MR. KAUFMAN:  And this is just a matter of full

3   disclosure here.

4           MR. MCKAY:  Yep.  So, Mr. Lefkowitz, why is

5   Sigma's mailing address 1528 56th Street?

6           MR. LEFKOWITZ:  Like I said, we -- they are

7   virtual all over the country, and we picked one address

8   where all the litigation comes in, so I can be part of it

9   when litigation pops up against the Debtor.

10          MR. MCKAY:  And what's your role at Sigma?

11          MR. LEFKOWITZ:  I don't have a role in Sigma other

12  than just a director that's monitoring and watching global

13  litigation.

14          MR. MCKAY:  Director of whom, Mr. Lefkowitz?

15          MR. LEFKOWITZ:  You just asked me if I'm a -- if

16  -- what my role is.

17          MR. MCKAY:  No.  You said other than as a

18  director.  Did you mean a director of Sigma?  A director of

19  the Debtor?

20          MR. LEFKOWITZ:  I don't know what words you're

21  putting into my mouth.  You asked me what my role in Sigma

22  is.  I'm not a principal of Sigma.  I'm not an officer in

23  Sigma.  I am a director, and I play a role in monitoring the

24  litigation.

25          MR. MCKAY:  And I appreciate you restating that.

1          My question was just, when you said I am a

2    director, did you mean the director of Sigma?

3          MR. LEFKOWITZ:  Correct.

4          MR. MCKAY:  Thank you.

5          Going to the next page, the other additional

6    company added as in possession of books and accounts --

7    books of accounts and records is YesCare Corporation.  What

8    books and accounts -- what books of accounts and records did

9    YesCare have of the Debtor when the case was filed?

10         MR. LEFKOWITZ:  So they both share access to the

11   same accounting system where invoices from creditors are

12   stored because some invoices belong to the Debtor, and some

13   invoices belong to YesCare.  So in order to differentiate,

14   in order to divide them, they both have access to the same

15   on-base system as appropriate.

16         MR. MCKAY:  Did you say on-base system?  Is that

17   the accounting system you're describing?

18         MR. LEFKOWITZ:  Correct.

19         MR. MCKAY:  And so does the Debtor have access to

20   that system to all the invoices of the Debtors on there

21   currently?

22         MR. LEFKOWITZ:  Yes.

23         MR. MCKAY:  And how long has the Debtor had that

24   access?

25         MR. LEFKOWITZ:  The last 40 years.

1        MR. MCKAY:  Okay.  And are those the only books of

2   accounts and records belonging to the Debtor that YesCare

3   has or had when the case was filed?

4        MR. LEFKOWITZ:  Correct.

5        MR. MCKAY:  Staying on a topic of books of

6   accounts and records, I'll have you turn back to page 202,

7   so two pages prior to where you were.  Let me know when

8   you're there.

9        MR. LEFKOWITZ:  I am.

10       MR. MCKAY:  On 26(a), where the Debtor is listing

11   all accountants and bookkeepers who maintained the Debtor's

12   books and records, it's been amended to add you as the

13   person who maintained the Debtor's books and records from

14   May 5th, 2022, to the present; is that correct?

15       MR. LEFKOWITZ:  Correct.

16       MR. MCKAY:  And why was that change made,

17   Mr. Lefkowitz?

18       MR. LEFKOWITZ:  Just the date.

19       MR. MCKAY:  And was the -- the previous date was

20   in error, then?

21       MR. LEFKOWITZ:  Correct.

22       MR. MCKAY:  Now you were involved in the original

23   Schedule; right?

24       MR. LEFKOWITZ:  Correct.

25       MR. MCKAY:  (Indiscernible).  Can you -- can you

1  tell me how the -- how the need to revise team came about?

2        MR. LEFKOWITZ:  How the new revised what?

3        MR. MCKAY:  Can you explain to me --

4        MR. KAUFMAN:  Are you asking -- are you asking --

5        MR. MCKAY:  Can you explain to me why the Debtor

6  -- yeah.

7     (Multiple speakers talk at the same time.)

8        MR. KAUFMAN:  State your question.

9        MR. MCKAY:  I'll ask the question again.  Yeah.

10 Let me ask the question a different way.  Is the date -- is

11 that date meant to relate to when the divisional merger

12 closed?

13       MR. LEFKOWITZ:  Correct.

14       MR. MCKAY:  Thank you.

15       What's your accounting background, Mr. Lefkowitz?

16       MR. LEFKOWITZ:  I'm a CPA.

17       MR. MCKAY:  And what other companies have you

18 maintained books and records for?

19       MR. LEFKOWITZ:  Throughout my life?

20       MR. MCKAY:  Let's say the last five years.

21       MR. KAUFMAN:  Zach, are you asking if he has

22 experience as an accountant or a bookkeeper?

23       MR. MCKAY:  Sure.

24       MR. KAUFMAN:  Can you just ask that?

25       MR. MCKAY:  I don't think there was an issue with

1   my question.  I think it's the same question, but if that's

2   -- if that -- if that's the question that he'll answer, then

3   I can ask that.  That's fine.

4           Mr. Lefkowitz?

5           MR. KAUFMAN:  I'm just trying to keep --

6       (Speakers talk at the same time.)

7           MR. MCKAY:  Do you have experience as a --

8           MR. KAUFMAN:  -- (indiscernible) what's in the

9   SOFAs and Schedules.

10          MR. MCKAY:  I asked him what other companies he

11  had maintained the books and records for which is the exact

12  wording that's in the statement.  So that was my question.

13          MR. LEFKOWITZ:  I don't think I have to list other

14  companies that I have experience in, but I do have

15  experience in keeping books and records in order.

16          MR. MCKAY:  What other companies have you done

17  that for since 2021?

18          MR. LEFKOWITZ:  That will be --

19      (Speakers talk at the same time.)

20          MR. KAUFMAN:  We don't need to answer that here.

21          MR. MCKAY:  Okay.  What other companies do you

22  maintain books and records for now?

23          MR. KAUFMAN:  Zach, we don't need to answer that

24  now.  We can do -- we can do a 2004 for that.

25          MR. MCKAY:  All right.  What did you do to

1 | maintain the books and records from May 5th forward?

2 |        MR. LEFKOWITZ:  Kept it on the server.

3 |        MR. MCKAY:  Which server?

4 |        MR. LEFKOWITZ:  (Indiscernible) server.

5 |        MR. MCKAY:  Is that the Debtor's server or

6 | YesCare's server?

7 |        MR. LEFKOWITZ:  The Debtor's server.

8 |        MR. MCKAY:  And that's separate from YesCare's

9 | server.  Is that how I understood your testimony earlier?

10 |        MR. LEFKOWITZ:  Correct.

11 |        MR. MCKAY:  And has the Debtor had access to that

12 | information throughout this bankruptcy case?

13 |        MR. LEFKOWITZ:  I believe so.

14 |        MR. MCKAY:  Do you have any reason to think they

15 | haven't?

16 |        MR. LEFKOWITZ:  There was a -- there was a

17 | pause --

18 |        MR. MCKAY:  I understand.

19 |        MR. LEFKOWITZ:  -- right after the filings.

20 |        MR. MCKAY:  And did you rely on anyone else to

21 | assist you with maintaining those books and records?

22 |        MR. LEFKOWITZ:  I don't know what assistance is

23 | needed to maintain.  As long as they are on the server and

24 | as long as there's access, then it's maintained.

25 |        MR. MCKAY:  So if the Debtor made payments or had

1   financial transactions in, say, June 2022, you were

2   responsible for maintaining the books and records, correct?

3           MR. LEFKOWITZ:  Correct.

4           MR. MCKAY:  And those would have been reflected in

5   those books and records, correct?

6           MR. LEFKOWITZ:  Correct.

7           MR. MCKAY:  So what did you do to update the

8   information on the server or ensure that those -- that

9   information was included in what was on the server?

10          MR. LEFKOWITZ:  We -- you know, we pulled the

11  records prior to payment, and we posted that we made

12  payment.

13          MR. MCKAY:  And when you say "we," that's yourself

14  and who else?

15          MR. LEFKOWITZ:  I procured some help from YesCare

16  folks.

17          MR. MCKAY:  Who are some of those folks?

18          MR. LEFKOWITZ:  They're various people from

19  financing.

20          MR. MCKAY:  From YesCare's financing group?

21          MR. LEFKOWITZ:  Correct.

22          MR. MCKAY:  And to the extent that those people

23  assisted with the books and records, has their information

24  been provided to the Debtor?

25          MR. LEFKOWITZ:  Which information?

1          MR. MCKAY:  Any documents that they created or had

2    that would be -- constitute the Debtor's books and records?

3          MR. LEFKOWITZ:  They didn't create any documents.

4    No documents were created.

5          MR. MCKAY:  Okay.  Let's go to page 209 on the

6    same document, Docket 677.

7          MR. LEFKOWITZ:  Uh-huh.

8          MR. MCKAY:  And at the bottom of the page, there

9    are seven payments removed.  Let me know when you're there.

10         MR. LEFKOWITZ:  I'm here.

11         MR. MCKAY:  And they're payments to a JDG.CLG

12   Consulting Group.  First of all, what is that entity?

13         MR. LEFKOWITZ:  That's an entity that did work for

14   the predecessor.

15         MR. MCKAY:  It did work for a predecessor to the

16   Debtor?

17         MR. LEFKOWITZ:  Correct.

18         MR. MCKAY:  Which predecessor?

19         MR. LEFKOWITZ:  So 2021, the Debtor was owned by a

20   financial company called the Flex Group, and JDG did

21   consulting work for the Flex Group, and this was part of the

22   payments as a termination agreement.  They didn't do any

23   work for the Debtor.

24         MR. MCKAY:  Is JDG.CLG affiliated with Charles

25   Gassenheimer?

1        MR. LEFKOWITZ:  I believe so.

2        MR. MCKAY:  And who is Mr. Gassenheimer?

3        MR. LEFKOWITZ:  Like I said, he was a consultant

4   for our predecessor.

5        MR. MCKAY:  Did he have any role at Flex Group?

6        MR. LEFKOWITZ:  I don't know.

7        MR. MCKAY:  And what type of consulting work was

8   being done by JDG.CLG?

9        MR. LEFKOWITZ:  I believe it was restructuring.

10       MR. MCKAY:  Restructuring work associated with one

11  of the Corizon entities?

12       MR. LEFKOWITZ:  Correct.

13       MR. MCKAY:  Was there any financing or credit

14  agreements involved in that work?

15       MR. LEFKOWITZ:  No.

16       MR. MCKAY:  And why was this removed from the

17  Schedule here?

18       MR. LEFKOWITZ:  Originally, we listed them as an

19  insider, but I think that real obvious he's not an insider.

20  He had nothing to do with the Debtor.

21       MR. MCKAY:  Let's move to page 221, please.  Let

22  me know when you're there, Mr. Lefkowitz.

23       MR. LEFKOWITZ:  2-2-1?

24       MR. MCKAY:  Yes, sir.  I'm still on Docket 677.

25       MR. LEFKOWITZ:  Okay.

1         MR. MCKAY:  So these are the closed financial

2    statements changes.  There's a number of accounts added for

3    Bank of America.  Why were those accounts included now and

4    not before?

5         MR. LEFKOWITZ:  This is just disclosure.  These

6    are accounts that were allocated to the divisional merger,

7    so full disclosure, we added those accounts.

8         MR. MCKAY:  What was the last -- I heard you until

9    the last three words there.  Full disclosure, you what?

10        MR. LEFKOWITZ:  I say these were accounts that

11   were allocated to the divisional merger.  So for full

12   disclosure, we amended it, and we listed it so you folks can

13   be aware of it.

14        MR. MCKAY:  Understood.  And there's no date

15   closed listed here.  Why is that?

16        MR. KAUFMAN:  Zach, this is Aaron.  We had a early

17   call with the US Trustee's Office yesterday, and we agreed,

18   as part of the additional supplements we'll make, that we'll

19   list the allocated -- the divisional merger date in the

20   column, and it'll just be changed at -- the title will be

21   changed to reflect that the date allocated will be May 5th

22   of 2020 --

23        MR. MCKAY:  Understood.  The closing date.  Okay.

24        MR. KAUFMAN:  Yeah.

25        MR. MCKAY:  Thank you, Aaron.

1          All right.  Then let's move to the last two, the

2    Signature bank accounts that were deleted.  Why were those

3    listed then deleted?

4          MR. KAUFMAN:  Those actually -- Zach, this is

5    Aaron again.  Those will appear in Schedule A/B in response

6    to Question 3 now because the accounts are still open.

7          MR. MCKAY:  Okay.  So my understanding,

8    Mr. Lefkowitz, is those accounts are still open, but there's

9    zero funds in them; is that correct?

10          MR. LEFKOWITZ:  Correct.

11          MR. MCKAY:  And when was the cash taken down to

12    zero on those accounts?

13          MR. LEFKOWITZ:  I don't know the date.

14          MR. MCKAY:  Do you know approximately how much was

15    in those accounts at the time of the divisional merger?

16          MR. LEFKOWITZ:  No.

17          MR. MCKAY:  Was it more than zero?

18          MR. LEFKOWITZ:  I don't have these answers.  I

19    don't have the documents in front of me.

20          MR. MCKAY:  Okay.  Let's go back to some of --

21    some of the questions you answered earlier.

22          You said earlier you negotiated the funding

23    agreement with M2 LoanCo on behalf of the Debtor; is that

24    correct?

25          MR. LEFKOWITZ:  Correct.

1      MR. MCKAY:  And Alan Rubinstein negotiated for M2

2  LoanCo?

3      MR. LEFKOWITZ:  Correct.

4      MR. MCKAY:  But you're the principal for M2

5  LoanCo, correct?

6      MR. LEFKOWITZ:  I'm not a principal.  I'm

7  involved.

8      MR. MCKAY:  What's your role at M2 LoanCo?

9      MR. LEFKOWITZ:  The director.

10      MR. MCKAY:  And in addition to being the Debtor's

11  corporate representative today, you're M2 LoanCo's corporate

12  representative in this case, too, correct?

13      MR. LEFKOWITZ:  One of them.

14      MR. MCKAY:  I beg your pardon?

15      MR. LEFKOWITZ:  One of them.

16      MR. MCKAY:  Who are the others?

17      MR. LEFKOWITZ:  Alan Rubinstein.

18      MR. MCKAY:  Alan Rubinstein has been M2 LoanCo's

19  corporate representative in this case?

20      MR. LEFKOWITZ:  As well, correct.

21      MR. KAUFMAN:  Zach, you're starting to -- you're

22  starting to go afield of the 341 Meeting topics.

23      MR. MCKAY:  I'm asking follow-up questions on

24  questions that were answered earlier.

25      So tell -- on the funding agreement negotiations,

1  did you ask for more than 15 million on behalf of the

2  Debtor?

3         MR. LEFKOWITZ:  I don't recall the full

4  negotiations.

5         MR. MCKAY:  What do you recall?

6         MR. LEFKOWITZ:  That we determined

7  (indiscernible).

8         MR. MCKAY:  We -- you and Alan Rubinstein

9  determined that?

10         MR. LEFKOWITZ:  No.  It's -- it was Alan

11  Rubinstein with counsel and the Debtor and counsel, whoever

12  was involved in the initial merger.  It was a back and forth

13  until we finalized on a number of 15 million.

14         MR. MCKAY:  And what was the back and forth?

15         MR. LEFKOWITZ:  14-16.

16         MR. MCKAY:  Okay.  When we talked about the

17  funding agreement, you mentioned Geneva Consulting, their

18  involvement in that.

19         Is there a contract between the Debtor and Geneva

20  Consulting, or was there a contract between the Debtor and

21  Geneva Consulting?

22         MR. LEFKOWITZ:  I believe so.

23         MR. MCKAY:  How much did Geneva get paid under

24  that contract?

25         MR. LEFKOWITZ:  I think their debt is the least

1   amount of money.

2           MR. MCKAY:  Do you know how much they were owed

3   under the contract approximately?

4           MR. LEFKOWITZ:  It was a fraction of a percent, I

5   believe.

6           MR. MCKAY:  More than a $100,000?

7           MR. LEFKOWITZ:  I believe so.

8           MR. MCKAY:  More than $300,000?

9           MR. LEFKOWITZ:  I don't know.  It's a fraction of

10  (indiscernible).  I don't know exactly, but I know they

11  didn't get paid.

12          MR. MCKAY:  Who negotiated that contract for

13  Geneva?

14          MR. LEFKOWITZ:  It was a multiparty.

15          MR. MCKAY:  What does that mean?

16          MR. LEFKOWITZ:  The Debtor's folks, Geneva's

17  folks, and them two folks.

18          MR. MCKAY:  Yeah.  That's what I'm asking.  Who

19  were the Debtor's folks?

20          MR. LEFKOWITZ:  Myself.

21          MR. MCKAY:  And who were Geneva's folks?

22          MR. LEFKOWITZ:  It was their general counsel.

23          MR. MCKAY:  Who's that, Mr. Lefkowitz?

24          MR. LEFKOWITZ:  Zalman Shapiro.

25          MR. MCKAY:  Okay.  And who were M2's -- M2

1   LoanCo's folks?

2           MR. LEFKOWITZ:  Alan Rubenstein.

3           MR. MCKAY:  Is Zalman Shapiro M2 LoanCo's counsel,

4   as well?

5           MR. LEFKOWITZ:  I don't believe so.

6           MR. MCKAY:  Okay.  And if I understood your

7   testimony earlier, you said that Geneva vetted the backup

8   for payments made on behalf of M2 LoanCo; is that correct?

9           MR. LEFKOWITZ:  Correct.

10          MR. MCKAY:  Did they do it for all the payments

11  made?

12      (Several speakers at the same time.)

13          MR. LEFKOWITZ:  I beg your pardon?

14          MR. MCKAY:  Did they do that for all the payments?

15          MR. LEFKOWITZ:  I can say for all or most --

16          MR. MCKAY:  Okay.

17          MR. MCKAY:  -- on behalf of the Debtor.  Whatever

18  payments were made on behalf of the Debtor, they did it.

19          MR. MCKAY:  On behalf of the Debtor by M2 LoanCo?

20          MR. LEFKOWITZ:  From M2 LoanCo.

21          MR. MCKAY:  And you testified that you played a

22  role in helping Geneva with that process; is that right?

23          MR. LEFKOWITZ:  Correct.

24          MR. MCKAY:  And what was your role?  How did you

25  help them?

1          MR. LEFKOWITZ:  To identify, you know, the actual

2   creditor, the amounts and --

3          MR. MCKAY:  Why did they need your help,

4   Mr. Lefkowitz?

5          MR. LEFKOWITZ:  It was a credit of -- a creditor

6   of XYZ Corporation popped up.  How would they know who XYZ

7   is?

8          MR. MCKAY:  Well, isn't that what you were paying

9   them for?

10          MR. LEFKOWITZ:  They were -- they were just doing

11   the administrative work, but the actual negotiations of the

12   actual payments they weren't doing.  I was doing it.  So

13   they could have seen an invoice of $100 and a payment of

14   $99.  They got stuck.  They needed my help out.

15          MR. NGUYEN:  Hey, Zach, we're sitting at about 95

16   minutes.  Can we -- if you have any more questions on the

17   facilitator funding agreement, can we do that by 2004 and

18   let other questions -- let other creditors ask questions?

19          MR. MCKAY:  I'm just -- I'm just about done.

20          Do you know who owns Geneva, Mr. Lefkowitz?

21          MR. KAUFMAN:  That's a 2004 topic.

22          MR. MCKAY:  But we were talking about the funding

23   agreement and it being listed on here, and Mr. Lefkowitz

24   testified that M2 LoanCo is claiming 25 million owed from

25   the Debtor.

1       I'm trying to understand that item on the

2  Schedule.

3       MR. KAUFMAN:  Yeah.  I think Mr. Jimenez asked him

4  the question.  He answered it.  If you have more questions,

5  let's do that by 2004.

6       MR. MCKAY:  I'm not understanding why the question

7  would be appropriate for Mr. Jimenez and not from the

8  Committee.  Can you explain that?

9       MR. KAUFMAN:  Well, he already answered it.

10      MR. MCKAY:  You're talking about a topic.  I

11 haven't even asked the question.

12      MR. NGUYEN:  Yeah.  If you want -- let's keep

13 moving.  There are other creditors that have questions.

14 We're already at 95 minutes.  Let's keep moving.

15      MR. MCKAY:  All right.  You said earlier M2

16 LoanCo's position is that it's funded $38 million under the

17 funding agreement.  Is that right, approximately?

18      MR. LEFKOWITZ:  Approximately is right.

19      MR. MCKAY:  Do you understand the --

20   (Speakers talk at the same time.)

21      MR. MCKAY:  Oh, go ahead.  I'm sorry,

22 Mr. Lefkowitz.  Go ahead.

23      MR. LEFKOWITZ:  I said under the funding

24 agreement, M2 15 million.  In addition, they funded

25 approximately another 25 mil.

1          MR. MCKAY:  So what was the basis for funding the

2    other 25 million?

3          MR. LEFKOWITZ:  It was a business decision to

4    preserve the secured loan (indiscernible).

5          MR. MCKAY:  Okay.

6          MR. LEFKOWITZ:  And to keep the Debtor out of

7    bankruptcy.

8          MR. MCKAY:  And I believe you testified earlier

9    that, as a result of that, M2 LoanCo is -- has made a claim

10   for approximately $25 million?

11         MR. LEFKOWITZ:  They have not made a claim.

12         MR. MCKAY:  Then can you clarify what you said

13   earlier?  You mentioned M2 LoanCo and 25 million.

14         MR. LEFKOWITZ:  They are an unsecured creditor,

15   but they have not made a claim as of yet.

16         MR. MCKAY:  Appreciate it.  Thanks for the

17   clarification.

18         And what has the Debtor done to evaluate that

19   assertion of 25 million as an unsecured creditor by M2

20   LoanCo?

21         MR. LEFKOWITZ:  Provided all the documents.

22         MR. MCKAY:  And how have you been involved in that

23   process?

24         MR. LEFKOWITZ:  Helping collecting all those

25   documents.

1          MR. MCKAY:  Okay.  That's all my questions for

2   him.

3          MR. NGUYEN:  Thank you from the Committee for

4   their questions.

5          Any other creditors, if you have questions of

6   Mr. Lefkowitz or Mr. Perry, please state your name and who

7   you represent, and you may proceed.

8          MS. BASALDUA:  This is Ms. Basaldua with the

9   Internal Revenue Service.  Can you hear me?

10         MR. NGUYEN:  Yes.  Go ahead, ma'am.

11         MR. LEFKOWITZ:  Yes.

12         MS. BASALDUA:  Okay.  Great.  I would like to ask

13  Mr. Lefkowitz what type of services -- okay.

14         First, let me ask -- Corizon Health Services or

15  Healthcare -- did they merge into Tehum Care Services?

16         MR. LEFKOWITZ:  Corizon Health --

17         MS. BASALDUA:  Yes, sir, Corizon Healthcare.

18         MR. LEFKOWITZ:  Correct.  Merged into Corizon,

19  LLC.

20         MS. BASALDUA:  Do you know when they merged?

21         MR. LEFKOWITZ:  No.  I don't have that date.

22         MS. BASALDUA:  Is Corizon -- is it out of

23  business, or they merged?

24         MR. LEFKOWITZ:  So Corizon merged with Corizon

25  Health.  Then they merged with CHS Texas, and then they

1  divided.  So Corizon does not have operations, but it has

2  liabilities, and it has certain claims of assets.

3          MS. BASALDUA:  And -- okay.  So let me ask you.

4  Again, on Document 676, page 2, it says, "The Debtor no

5  longer has operating -- the Debtor is no longer operated.

6  The assets and liability information is therefore derived

7  from the last month's ending period ending prior to the

8  post-petition."

9          So it's telling me it's no longer operating.

10          MR. LEFKOWITZ:  Correct.

11          MS. BASALDUA:  So is Corizon no longer

12  operating --

13          MR. LEFKOWITZ:  Corizon, which is the Debtor --

14          MS. BASALDUA:  -- even once they merged?

15          MR. LEFKOWITZ:  So let me --

16          MR. PERRY:  Hi.  Isaac, maybe let me take a quick

17  shot.  Hi, this is Russell Perry.  I'm the Debtor Chief

18  Restructuring Officer.  I'm sorry.  I didn't catch your

19  name, but I did hear you're with the IRS, representing the

20  IRS; is that correct?

21          MS. BASALDUA:  Yes.  My name is Ms. Basaldua, and

22  I'm with the Internal Revenue Service here in Houston.

23          MR. PERRY:  Okay.  All right.  Very nice to hear

24  from you.  I'm actually very glad you dialed in.

25          As the Debtor's CRO, I have been personally

1  dealing with and engaging with an IRS revenue officer.  I'm

2  happy to provide name and contact information on this call

3  or separately offline.  This individual has been requesting

4  a substantial amount of information from the Debtor, things

5  that -- and questions that you're asking here related to the

6  name change, related to tax EINs, related to potential IRS

7  tax obligations.

8          We have provided and continue to provide this

9  officer with a substantial amount of information.  I'm happy

10  to and would love to incorporate and include you in those

11  discussions because I certainly -- you know, we're not aware

12  that there was another IRS individual involved.  We can

13  share with you again the information that we have already

14  shared and anything in addition to that.  Again, information

15  such as, you know, the divisional merger documents, the

16  combination merger documents which describe exactly which

17  entities were merged and therefore dissolved or survived.

18          All of this information has been provided to this

19  other IRS officer.  So I'm just, you know, letting you know

20  that, you know, there has been a substantial amount of work

21  completed to educate at least this other officer.  I don't

22  have knowledge as to where that information has gone within

23  the Internal Revenue Service.

24          But, again, if you wouldn't mind reaching out

25  separately either to counsel or directly with me, I

1   certainly would love to involve you in those discussions

2   because I don't want, you know, for there to be information

3   lost that's already been shared.

4         MS. BASALDUA:  Okay.  Thank you.  I'm aware of the

5   revenue officer, but let me give you -- I'm aware of the

6   revenue officer.

7         Let me give you my fax number.  It is --

8         MR. PERRY:  Okay.

9         MS. BASALDUA:  -- 888-279-6228.  My email address

10   is Dorcas, D-o-r-c-a-s. the initial "M," as in Mary,

11   .basaldua, B, as in boy, a-s-a-l-d-u-a @irs.gov.  My

12   telephone number is area code 346-227-6544.

13         I still have a couple of questions to ask.

14   Although, I understand you have worked with the revenue

15   officer, but I still -- he's in the -- he's a revenue

16   officer in the collection department, and I am in the

17   bankruptcy department.  Okay?

18         MR. PERRY:  Oh, perfect.  Okay.  We've actually

19   been trying to reach someone in the bankruptcy department.

20   So that's -- that's great.  Okay.

21         MS. BASALDUA:  Okay.  But just so Mr. Lefkowitz

22   would know that the IRS has filed a proof of claim, and

23   today we will be sending out some letters.  Excuse me.  My

24   voice is a little hoarse.

25         We'll be sending out a Letter 982.  It informs you

1  about your plan.  A 986, the filing obligations, tax

2  obligations, and a Letter 1714 explains your rights as a

3  taxpayer.

4         So we'd also enclose in it Publication 1.  Well,

5  the Letter 1714 are for unfiled tax returns, and the

6  Publication 1 is for your rights as a taxpayer.  So when you

7  get these, if you have any questions, just check with your

8  attorney, and your attorney can give us a call.

9         Another question that we had -- I was wanting to

10  know -- so -- okay.  So the dates are unknown at this time.

11  What type of business is Tehum?  Hello?

12         MR. LEFKOWITZ:  So -- yeah.  So Tehum is just a

13  name change from Corizon Health Services to Tehum Care

14  Services, but it does not have any operations presently

15  while it's in bankruptcy.

16         MS. BASALDUA:  Okay.  So what was Corizon?  What

17  type of business?

18         MR. LEFKOWITZ:  Correctional healthcare providing

19  the medical care for incarcerated folks and deals with

20  prisoners.

21         MS. BASALDUA:  Okay.  So does your -- does -- I'm

22  going to have to refer it as Tehum because that's the new

23  name.

24         MR. LEFKOWITZ:  Correct.

25         MS. BASALDUA:  So does Tehum have any employees?

1          MR. LEFKOWITZ:  No.

2          MS. BASALDUA:  No employees?

3          MR. LEFKOWITZ:  Correct.

4          MS. BASALDUA:  Does it have -- does it have

5  officers?  Corporate officers?

6          MR. LEFKOWITZ:  Presently, it has a Chief

7  Restructuring Officer who is Russell Perry.

8          MS. BASALDUA:  So is there a president?  Vice

9  president?  Treasurer?  Secretary?

10          MR. LEFKOWITZ:  Not necessarily, no.

11          MS. BASALDUA:  So they have no employees?

12          MR. LEFKOWITZ:  No.

13          MS. BASALDUA:  Are they getting -- is anyone

14  getting paid a salary?

15          MR. LEFKOWITZ:  No.

16          MS. BASALDUA:  What happened to the employees?

17          MR. LEFKOWITZ:  No longer operating.

18          MS. BASALDUA:   As of when?

19          MR. LEFKOWITZ:  As of May 5th of 2022.

20          MS. BASALDUA:  May 5th, 2022?

21          MR. LEFKOWITZ:  Uh-huh.

22          MS. BASALDUA:  Okay.  Were there any assets of

23  Corizon or of Tehum now?  When I say "assets," were there

24  any personal property other than what was discussed earlier?

25  Any type of equipment?

1        MR. LEFKOWITZ:  No.

2        MS. BASALDUA:  Medical supplies?

3        MR. LEFKOWITZ:  No.

4        MS. BASALDUA:  Okay.  Are you aware that the IRS

5 audited the claim for some unfiled tax returns?

6        MR. LEFKOWITZ:  No, other than what you just told

7 us.

8        MS. BASALDUA:  Okay.  The IRS is looking for some

9 Forms 945s for 2017 to 2022, also for some Forms 1120 for

10 2021 and 2022, which we need those returns in our office by

11 September the -- excuse me -- by June 27th.

12        Also -- so if there are no assets, then you're not

13 making any federal tax deposits, correct?

14        MR. LEFKOWITZ:  Correct.

15        MS. BASALDUA:  Okay.  Do you -- can you provide

16 us, not over the phone but later, a list of the officers

17 that we -- that you had before?

18        MR. LEFKOWITZ:  Yes.

19        MS. BASALDUA:  A list of the officers and their

20 position and their titles.

21     (Multiple speakers talk at the same time.)

22        MR. LEFKOWITZ:  (Indiscernible) Schedules --

23        MS. BASALDUA:  Can you provide the Schedule?

24        MR. LEFKOWITZ:  -- but we'll provide them.

25 Can you provide them by June 27th?

1       MR. KAUFMAN:  They are on file in the -- sorry.

2   This is Aaron Kaufman, Counsel for the Debtor.

3       The list of officers that were with the Debtor

4   before the merger and were allocated as part of the merger

5   -- all of that is on file with the Schedules.  We filed the

6   plan of divisional merger with the Schedules this time

7   around.  So that's on file, but I'm happy to email you so

8   that it's easier for you to find.

9       MS. BASALDUA:  If you would, I would appreciate

10  that.

11      What caused the liability?  Because we have a

12  liability for 2020.  So what caused that liability?  Do you

13  know?

14      MR. LEFKOWITZ:  2020 --

15      MR. PERRY:  Isaac, I'm happy to answer it.

16      MS. BASALDUA:  These are for some -- these are for

17  some 941 liabilities.

18      MR. PERRY:  Yeah.  I'm happy to answer it, Isaac,

19  unless you want to take it.

20      MR. LEFKOWITZ:  So just -- no.  Go ahead, Russell.

21      MR. PERRY:  Yeah.  Okay.  So this is a question

22  that I have been, and my team here at Ankura, have been

23  working on validating and verifying.

24      We received transcripts from the revenue officer I

25  mentioned a few minutes ago that you are aware of.

1    We actually mailed them to my office; therefore,

2  the fiscal year 2020 and 2021, we have taken those

3  transcripts and we have prepared fairly detailed Schedules

4  of what the information in those transcripts are

5  communicating, and it appears the information that the IRS

6  has provided to us suggests that the taxes from 2020 that

7  are unpaid related to the employer portion of employee taxes

8  provided as a form of relief under the Federal Government's

9  CARES Act in connection with COVID and supporting businesses

10  throughout the country during the COVID period in addition

11  to the employer portion of withholdings.

12    The transcripts also indicate that there are

13  various liabilities related to penalties, related to

14  interest, and other types of collection fees that have been

15  charged to or recorded on the Debtor's EIN.

16    I did pull up the proof of claim just while we're

17  on this phone here.  It doesn't appear the proof of claim

18  agrees perfectly to the transcripts that we've been

19  provided.  However, it does appear that there is reference

20  to those time periods and referencing the FICO-related

21  nature of the taxes, which again, we will now work to

22  reconcile the tax transcripts to these proof of claims to

23  hopefully validate the information I just told you, which is

24  that the liability is, again, mostly made up of what's

25  called a 2302 deferral, which again is the federal tax code

1  section related to the employer portion of withholding.

2         MS. BASALDUA:  Okay.  So I have looked at the

3  proof of claim myself, and it's for the second quarter,

4  third quarter, and fourth quarter of 2020.  So there is a

5  large amount of the liability.  So what you're telling me is

6  that you've received the account transcripts, and they are

7  not basically what our proof of claim is showing.  Is that

8  correct?  So you're going to go back and reconcile your

9  files to see what's different from ours?

10        MR. PERRY:  I will.  I will.  Exactly.  Simply

11 because, as I pull up the proof of claim in real time, I

12 also was not aware of it.  The revenue officer did not let

13 me know.  In fact, he had indicated that the proof of claim

14 wasn't going to be filed until he and I had reconciled the

15 numbers, but that's okay.  But now that I have the proof of

16 claim, I'll be able to reconcile the numbers and the proof

17 of claim to the numbers that have been provided to us.  That

18 is correct.

19        MS. BASALDUA:  Okay.  So, basically, that's fine.

20 You can reconcile your forms, but in the meantime, we're --

21 our proof of claim will remain as filed.  Okay?  Once you

22 provide us the documentation, if you feel there was a

23 deposit made that we're not aware of, then we will need a

24 copy of that check front and back so that we can look for

25 that deposit.  Otherwise, that claim will remain as filed.

1    On the unfiled tax returns that are listed on

2 there, either we get the returns filed, or they're just

3 going to stay the way they are as well.  And more than

4 likely we will be contacting our counsel as well so that

5 they can be aware of this proof of claim being filed as

6 well.  Okay?

7    MR. PERRY:  Oh, that'd be wonderful.  Yeah.  Thank

8 you.

9    MS. BASALDUA:  Okay.  So the deadline for the

10 returns is still going to be June the 27th.  I'm sending you

11 out a letter today.  If the returns have been filed or if

12 they're not -- you're not liable for them, then you need to

13 indicate that on that particular form.  If you're no longer

14 filing those forms, then you need to file a final return.

15 Okay?  And let us know.  Otherwise, the IRS is going to be

16 requesting them.

17    As a compliance issue, we will be looking to make

18 sure -- you know, since you're telling me now you have no

19 employees, then has the corporation -- has Tehum filed a

20 final 941 -- 940?  You know, corporate tax returns.  If not,

21 we need those final returns.  If not, we're going to be

22 looking for one as well as part of our compliance.

23    So you either -- to be in compliance, just file a

24 -- if you're no longer going to have employees or be paying

25 the 940's, then just file a zero return so we'll know that

1  you no longer have those employees.  We also need that by

2  June 27th, a final return.  Okay?

3          MR. LEFKOWITZ:  I don't know -- I don't know if

4  June 27th -- I don't know if June 27th is a realistic date.

5  (Indiscernible).

6          MS. BASALDUA:  Okay.  Well, you tell me what date

7  is good for you.

8          MR. LEFKOWITZ:  You know, I believe we can

9  definitely, you know, get things done, but we would probably

10  need another month, towards the end of July.

11          MS. BASALDUA:  Okay.  That's not a problem.  I'll

12  give you till July 27th.  Okay?  Just so you know what I

13  need --

14          MR. LEFKOWITZ:  Well --

15          MS. BASALDUA:  -- I need a final return.  If you

16  no longer have employees, the date the final return --

17          MR. LEFKOWITZ:  941?

18          MS. BASALDUA:  941s, a final 940.  I need the

19  Forms 1120s that I mentioned that are on the proof of

20  claim --

21          MR. LEFKOWITZ:  Correct.

22          MS. BASALDUA:  -- and the forms 945 that I

23  mentioned earlier that are also on the proof of claim.

24  We're setting the date for July 27th for those returns to be

25  filed.

1          Also, when you file your claim, just make sure

2    that the IRS proof of claim is provided for.  If we do not

3    receive the returns, then the IRS can request your case to

4    be dismissed.  Okay?

5          MR. LEFKOWITZ:  Okay.

6          MS. BASALDUA:  (Speakers talk at the same time.)

7    the claim.

8          MR. LEFKOWITZ:  Russell, why don't you give -- go

9    ahead.

10         Russel, why don't you give the address where all

11   the notices should come from the IRS?  I don't know -- what

12   address do you have in your letter that you're sending to

13   us?

14         MS. BASALDUA:  Let me give you my address.  Okay?

15   My address is 1919 Smith Street, Houston, Texas, 77002.

16   Under the Houston, Texas, please write the word stop,

17   s-t-o-p, 5024, the initials H-o-u, attention: D. Basaldua,

18   B-a-s-a-l-d-u-a, and that will be to the Internal Revenue

19   Service.

20         (Speakers talk at the same time.)

21         MR. LEFKOWITZ:  And also what about this -- go

22   ahead.

23         MS. BASALDUA:  This is where you're going to mail

24   me.  This is where you're going to mail --

25         (Speakers talk at the same time.)

1          MR. PERRY:  Yeah.  I'll email.

2          MS. BASALDUA:  -- and the final returns.

3          MR. PERRY:  Perfect.  We'll -- I -- what I'm going

4   to do is send -- I'm going to prepare an email.

5          Ms. Basaldua, I'll prepare an email with my

6   contact information and mailing address for these various

7   issues.  I do see that on the proof of claim, the address

8   was used under the Petition.  So -- but we also have a copy

9   of it filed online.

10          So what we're going to do is key up an email,

11   prepare an email for you because I also obviously want to

12   share the information that's been shared to the other

13   revenue officer, and we'll engage directly with you with

14   respect to these final forms that need to be filed by the

15   end of July.

16          MS. BASALDUA:  Great.  I also will need a list of

17   all corporate officers and their titles.

18          MR. PERRY:  Okay.  I provided that to be the

19   other revenue officer, so no problem.  Absolutely.

20          MS. BASALDUA:  Okay.  Do y'all have any questions

21   for me?

22          MR. PERRY:  I do not.

23          MS. BASALDUA:  Okay.

24          MR. LEFKOWITZ:  But we have -- we have your email

25   address.  (Indiscernible).

1          MS. BASALDUA:  Mr. Lefkowitz, do you have any

2   questions?

3          MR. LEFKOWITZ:  No.  We don't, no, but should

4   there -- anything come up, we'll send you an email.

5          MS. BASALDUA:  Okay.  Thank you.  That's all the

6   questions I have.  Thank you.

7          MR. NGUYEN:  Okay.  Thank you very much.  This is

8   Ha Nguyen from the US Trustee's Office.

9          Is there any other creditor on the line that wish

10  to ask Mr. Lefkowitz or Mr. Perry any questions?

11         Please state your name, and who you represent, and

12  you may proceed.

13         MR. MOSELEY:  Yes.  This is Brian Moseley

14  (phonetic).  I represent Mack Lloyd in a civil rights

15  lawsuit.  I have some questions about the insurance

16  policies, and this may have been addressed earlier, and

17  there may be a supplement being filed, but just so I'm

18  clear.

19         MR. NGUYEN:  Go ahead.

20         MR. MOSELEY:  We were provided --

21         Go ahead?

22         MR. NGUYEN:  Yep.

23         MR. MOSELEY:  Go ahead?

24         MR. NGUYEN:  Yep.  Go ahead.

25         MR. MOSELEY:  Okay.

1        We were provided information about two different

2   policies.  One is the primary policy of Lone Star Alliance.

3   It's a $21 million policy, total policy limit, with

4   17 million aggregate self-insured retention.

5        So my first question:  Is the amount of the

6   aggregate self-insured retention -- is that what is going to

7   be supplemented?

8        MR. PERRY:  Yes.  We'll supplement the Schedule

9   with both the face value of the policy, as well as the SIR

10  amount to the self-insured retention amount on a either per

11  claim basis or, you know, an aggregate.

12       I will note that, you know, there are certain

13  policies that are included in some of the divisional merger

14  documentation that was filed in the Schedules.  But if you

15  would, just allow us to prepare that supplemental, and in

16  that supplemental, you'll be able to reference the exact

17  insurance policy.

18       The time period that it applies, obviously -- you

19  know, the -- if applicable, the face value and the SIR.  So

20  we absolutely will be preparing that information in

21  supplemental.

22       MR. MOSELEY:  Okay.  Fine.  I'll wait on that,

23  then.

24       Okay.  Those are my questions.  Thank you.

25       MR. NGUYEN:  Thank you, Mr. Moseley.

1          If any other creditors have questions, please

2    state your name, who you represent, and you may proceed.

3          MR. KENNEDY:  Yes.  Yes.  My name is Leon Kennedy.

4    I represent Benjamin Oryang.  I would like to know what are

5    the indemnifications regarding the claims of the prisoners?

6          MR. PERRY:  Aaron, do you want to talk about

7    mediation and the plan?

8          MR. KENNEDY:  Not --

9          MR. PERRY:  I'll try to answer that.

10          MR. KENNEDY:  -- not the bankruptcy court.  Not

11    the bankruptcy court.  I'm talking about regarding the

12    inmates' claims.

13          MR. PERRY:  Yeah.  Could you clarify that?  And,

14    Mr. Kennedy, can you tell -- I didn't hear the name of your

15    client.

16          MR. KENNEDY:  Okay.  My client's name is Benjamin

17    Oryang.

18          MR. PERRY:  How do you -- could you spell that for

19    me?

20          MR. KENNEDY:  The court --

21          Pardon me?

22          MR. PERRY:  Could you spell your client's name for

23    me?

24          MR. KENNEDY:  Benjamin, B-e-n-j-a-m-i-n, Oryang,

25    O-r-y-a-n-g.

1          MR. PERRY:  Okay.  And your question is what is

2     the Debtor's intent to -- with respect to the inmates'

3     claims?  Could you -- could you, yeah, explain that or

4     clarify that?  I don't really understand what you're asking.

5          MR. KENNEDY:  Well, they have -- they have certain

6     claims -- filed their claims against your company, and

7     they're trying to find out -- monetary claims going for

8     damages, et cetera.  I'm just wondering what would be you

9     guys' intentions being whatever you're liable for.  Are you

10     going to before the bankruptcy clears out all the other

11     supplemental (inaudible).

12          What are your intentions regarding the inmates'

13     complaints?

14          MR. PERRY:  So we're still in the process of

15     maximizing the available assets that the Debtor has at its

16     disposal to pay creditors.  Your client is among a long list

17     of creditors who have rights to assert a claim.  Your client

18     should definitely -- if you believe they're entitled to some

19     payment from the Debtor, you should file a proof of claim.

20     I assume you've gotten notice of the proof of claim

21     deadline.

22          So file your proof of claim.  We are working

23     closely with the Committee.  There is a mediation that we're

24     trying to get scheduled, and hopefully that is one way that

25     we can bring in some money to pay creditors.  We -- if you

1    were listening for the first hour or so --

2         MR. KENNEDY:  Yeah.

3         MR. PERRY:  -- to Mr. Jimenez's questions, there

4    are insurance assets also available.  There may be some tax

5    credits also available, and the Debtor does have some

6    affirmative claims against other third parties that we're

7    still working through to try to monetize to bring in money

8    to pay creditors.

9         What will ultimately happen, we think, is there

10   will be a plan, a Chapter 11 plan proposed for creditors to

11   review, and that will -- that will tell creditors how

12   they're getting paid.  But, of course, for creditors to get

13   paid, they need to have a proof of claim on file.  But --

14        MR. KENNEDY:  Yeah.  Thank you very much.

15        MR. NGUYEN:  Okay.  Thank you, Mr. Kennedy.

16        Is there any other creditors on the line that wish

17   to ask either Mr. Perry or Mr. Lefkowitz any questions?

18   Please state your name and who you represent, and you may

19   proceed.

20        MR. CROSS:  Hi.  This is Ian Cross.  I represent

21   Kohchise Jackson and William Kelly.

22        MR. NGUYEN:  Go ahead, Mr. Cross.  Thank you.  You

23   may proceed.

24        MR. CROSS:  Thank you.

25        Can -- Mr. Lefkowitz, can you direct your

1  attention to Document 677, page 223?

2          So I see there is a list of other businesses in

3  which the Debtor has or has had an interest.  Does that list

4  include subsidiaries of the businesses on the list?  For

5  example, a subsidiary of Corizon, LLC.

6          MR. LEFKOWITZ:  Correct.

7          MR. PERRY:  Ian, can you repeat that or rephrase

8  that?  I didn't follow the question.

9          MR. CROSS:  So we have a list of subsidiaries in

10 which the Debtor had or has had an interest.  Does the list

11 include subsidiaries of entities that were subsidiaries of

12 Corizon Health, Incorporated?  In other words, companies

13 where Corizon Health, Incorporated was the corporate

14 grandparent.

15         MR. LEFKOWITZ:  I'm not sure what you're referring

16 to, but this is the list of entities that are operated

17 under.

18         MR. CROSS:  Did the Debtor ever own a company

19 called Pharmacorr, LLC?

20         MR. LEFKOWITZ:  No.

21         MR. CROSS:  In the divisional merger was a meeting

22 held by M2 LoanCo against the assets of Pharmacorr

23 (indiscernible) as part of that transaction?

24         MR. LEFKOWITZ:  You're going to have to refer to

25 the divisional merger documents, whatever the documents

1  called for.

2          MR. CROSS:  Do you -- are you familiar with the

3  entity Pharmacorr, LLC?

4          MR. LEFKOWITZ:  Yes, I am.

5          MR. CROSS:  How are you familiar with it?

6          MR. LEFKOWITZ:  They used to be a provider of

7  pharmacy for the Debtor.

8          MR. CROSS:  Was it under -- was it ever owned by

9  Valitas Healthcare Services, Incorporated?

10          MR. LEFKOWITZ:  No.

11          MR. CROSS:  Was it ever owned by Corizon, LLC?

12          MR. LEFKOWITZ:  No.

13          MR. CROSS:  Okay.  Is the Debtor -- I'm sorry.  I

14  believe you testified M2 LoanCo paid 25 million to the

15  Debtor on an unsecured basis in excess of the amount owed

16  under the of the funding agreement in order to preserve the

17  secured loan that M2 LoanCo has; is that correct?

18          MR. LEFKOWITZ:  Correct.

19          MR. CROSS:  How did those payments preserve a

20  secured loan that M2 LoanCo has?

21          MR. LEFKOWITZ:  Prevents from the Debtor to go

22  into bankruptcy.

23          MR. CROSS:  And why would the Debtor going into

24  bankruptcy interfere with M2 LoanCo's security interest?

25          MR. LEFKOWITZ:  They were service providers to CHS

1   Texas.  They wouldn't have gotten paid.  Those service

2   providers would have been interrupted; so CHS Texas would

3   have tanked, and therefore, the bank alone would secure

4   that.

5           MR. CROSS:  Well, the Debtor is in bankruptcy now,

6   and has CHS Texas tanked?

7           MR. LEFKOWITZ:  No.  That's post 25 million of

8   settlement.

9           MR. CROSS:  Well, I'm just trying to understand

10  why 25 million of settlement affected CHS Texas's operations

11  at all.

12          MR. LEFKOWITZ:  I didn't say it affected.  I said

13  we made a business decision and to fund the Debtor prior to

14  bankruptcy to settle out those creditors to avoid a

15  bankruptcy.  We felt it's business-wise not to file for

16  Chapter 11.

17          MR. CROSS:  We is Tehum, correct?

18          MR. LEFKOWITZ:  What's that?

19          MR. CROSS:  You were trying to avoid filing a

20  Chapter 11 with Tehum --

21          MR. LEFKOWITZ:  Correct.

22          MR. CROSS:  -- not a Chapter 11 with CHS, right?

23          MR. LEFKOWITZ:  Correct.

24          MR. CROSS:  So why does whether or not you file a

25  Chapter 11 with Tehum have any effect on CHS or its

1  operations?

2        MR. LEFKOWITZ:  I think -- I think I said it once.

3  I don't mind repeating it as many times until you'll

4  understand it.

5        There were contract providers that did service for

6  the Debtor prior to filing for bankruptcy.  These same

7  medical providers were also medical providers after the

8  divisional merger to CHS Texas.  If they would have

9  interrupted service, CHS Texas would have tanked.  If CHS

10  Texas would have tanked, the M2 loan -- secured loan would

11  have been in jeopardy.

12        So there's a $100 million in secured loan.

13        MR. CROSS:  These are providers -- these are

14  individual medical providers associated with contracts where

15  CHS Texas was continuing to service the contract, right?

16        MR. LEFKOWITZ:  Correct.

17        MR. CROSS:  And then there were another bucket of

18  medical providers associated with expired contracts,

19  correct?

20        MR. LEFKOWITZ:  Correct.

21        MR. CROSS:  And the expired contracts were

22  allocated to the Debtor in the divisional merger, correct?

23        MR. LEFKOWITZ:  Correct.

24        MR. CROSS:  And the active contracts were

25  allocated to CHS.

1          MR. LEFKOWITZ:  Correct.

2          MR. CROSS:  So wouldn't the providers that are

3    associated with the active contracts not be subject to any

4    kind of indemnity or suit against the Debtor?

5          MR. PERRY:  Sorry.  Ian, can you rephrase that?

6    I don't understand that.

7          MR. CROSS:  All right.  I'll --

8        (Speakers talk at the same time.)

9          MR. LEFKOWITZ:  I think -- I think -- I think

10   you're asking a legal question.  You don't need to rephrase

11   it.  If it's a legal question, I don't know the answer to

12   that.

13         MR. CROSS:  Was Ms. Tirschwell ever a CEO of the

14   Debtor?

15         MR. LEFKOWITZ:  Prior to the original merger.

16         MR. CROSS:  When did she assume that office?

17         MR. LEFKOWITZ:  I believe in January of '22.

18         MR. CROSS:  Okay.  I'm going to direct your

19   attention to 677, page 209 of 224.

20         MR. NGUYEN:  Hey, Ian.  This is Ha Nguyen in the

21   US Trustee's Office.

22         Can you get a little bit closer to the phone?  The

23   recording is picking it up, but it's very light.

24         MR. CROSS:  Sure.  How's that?

25         MR. NGUYEN:  Yeah.  That's better.  Thank you.

1          MR. CROSS:  Okay.  So I see on page 209 there are

2     a number of payments to officers of the Debtor.  For

3     example, Mr. Ladell (phonetic), Mr. Shirley, and Mr. King.

4          MR. LEFKOWITZ:  Correct.

5          MR. CROSS:  But I don't see any payments to a

6     Sarah Tirschwell.  So --

7          MR. LEFKOWITZ:  Correct.  She was never paid.

8          MR. CROSS:  Why was she serving as the CEO if she

9     wasn't compensated?

10          MR. LEFKOWITZ:  She was installed by the

11     principals as a CEO -- as an interim CEO, but she didn't get

12     compensated from the company itself.

13          MR. CROSS:  How was she compensated?

14          MR. LEFKOWITZ:  Like I said, the principal

15     companies compensated her.

16          MR. CROSS:  So was she an employee of a company

17     other than the Debtor?

18          MR. LEFKOWITZ:  Correct.

19          MR. CROSS:  And what company is that?

20          MR. LEFKOWITZ:  I don't know.  I don't have it in

21     front of me, but she was under a consulting agreement.  She

22     just was given the title of CEO.

23          MR. CROSS:  Was she associated with Geneva

24     Consulting?

25          MR. LEFKOWITZ:  Like I said, I don't know.  I

1  would have to refer back to her consulting agreement, who

2  was the actual employer.  It could have been a number of

3  companies that employed her.

4           MR. CROSS:  Did the Debtor enter into a consulting

5  agreement with Geneva Consulting?

6           MR. LEFKOWITZ:  Yes.

7           MR. CROSS:  When did it enter into that agreement?

8           MR. LEFKOWITZ:  Not a -- not a consulting

9  agreement.  It was an MSA agreement.

10           MR. CROSS:  What does MSA stand for?

11           MR. LEFKOWITZ:  Management Service Agreement.

12           MR. CROSS:  You entered into the Management

13  Service Agreement.

14           MR. LEFKOWITZ:  We provided all the agreements.  I

15  don't have the actual dates in front me.

16           UNIDENTIFIED SPEAKER:  Ian, could you kind of keep

17  those closer to what's in the Schedules and Statements.  If

18  you have questions beyond that, we'll take those up

19  separately.

20           MR. CROSS:  Did the Debtor make a pre-petition

21  payment to Geneva's Consulting?

22           MR. LEFKOWITZ:  Yes.

23           MR. CROSS:  And when did it make those payments?

24           MR. LEFKOWITZ:  A few months prior while Geneva

25  was doing consulting work for the Debtor.

1         MR. CROSS:  Was there a $3 million payment in

2 December of 2021?

3         MR. LEFKOWITZ:  Yes.

4         MR. CROSS:  Who are the principles of Geneva

5 Consulting?

6         MR. LEFKOWITZ:  I don't know.

7         UNIDENTIFIED SPEAKER:  Ian, you can

8 (indiscernible) that up separately.  We're now way outside

9 the scope of the 341 Meeting.

10         MR. CROSS:  All right.  We'll bring it up in a

11 2004.

12         MR. CROSS:  I don't have further questions.

13         MR. NGUYEN:  Thank you, Mr. Cross.

14         Is there any other creditor on the phone that

15 would like to ask any questions?  Please state your name,

16 who you represent, and you may proceed.

17     (No audible response.)

18         MR. NGUYEN:  All right.  I don't hear anyone else.

19         Mr. Kaufman, what I'm going to do is I'm going to

20 continue this 341 meeting for 30 days and no need to appear.

21 This is for documents only so we can get those amendments on

22 file.

23         If we need to recall Mr. Lefkowitz or Mr. Perry,

24 we'll let you know.  I just want to have that date on --

25         MR. KAUFMAN:  Okay.

1          MR. NGUYEN:  -- noted on the -- on the docket so

2     we can just track the amendments.  And if everything -- we

3     take a look at the amendments, and we have no further

4     questions, then we'll just conclude it then.

5          So I'm going to kick this out for 30 days.  I'm

6     going to put it on -- let me pull up my calendar real

7     quickly.  I apologize.

8          So I'm going to continue this out to -- we'll do

9     July 21st, at 1:00 p.m., but that's just the date and time

10    I'm just reserving right now.  I -- it's for documents only

11    right now.

12         So we'll work with Mr. Lefkowitz and Mr. Perry and

13    the Debtors if we need them to return to testify.  Okay?

14         Does that make sense?

15         MR. KAUFMAN:  Makes sense.  Thank you very much,

16    Mr. Nguyen.

17         MR. NGUYEN:  Okay.  I appreciate everyone's time.

18    Thank you, and the meeting is continued to July 21st.

19         Thank you.

20      (Meeting adjourned.)

21

22

23

24

25              * * * * *

1          I certify that the foregoing is a correct

2    transcript to the best of my ability from the electronic

3    sound recording of the telephonic proceedings in the above-

4    entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #67485

10   DATE:  JULY 26, 2023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25