# STOCK RESTRICTION AGREEMENT

THIS STOCK RESTRICTION AGREEMENT (this "**Agreement**") is made, entered into, and effective as of May 5, 2022 (the "**Effective Date**"), by and between GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**"), and SARA TIRSCHWELL ("**Tirschwell**", and together with the YesCare Entities, the "**YesCare Parties**"). Manager, YesCare Corp, CHS, Corizon New Mexico, and Tirschwell are each sometimes herein referred to as a "**Party**" and, collectively as, the "**Parties**."

## RECITALS

**WHEREAS**, Tirschwell owns 5% of the issued and outstanding equity interest in YesCare Corp (the "**YesCare Corp Interest**");

**WHEREAS**, YesCare Corp owns 100% of the issued and outstanding equity interest in CHS TX, Inc. (the "**CHS Interest**");

**WHEREAS**, CHS owns 100% of the issued and outstanding membership interest in Corizon Health of New Mexico, LLC (the "**Corizon New Mexico Interest**");

**WHEREAS**, concurrently with the execution of this Agreement, Manager and Tirschwell have entered into a Liaison Agreement under which Tirschwell has agreed to serve as a liaison between Manager and the YesCare Entities;

**WHEREAS**, concurrently with the execution of this Agreement, Manager and the YesCare Parties have entered into a Management Services Agreement; and

**WHEREAS**, concurrently with the execution of this Agreement, Manager and the YesCare Parties have entered into a Stock Transfer Agreement (the "**Transfer Agreement**") pursuant to which (i) Tirschwell has agreed to certain restrictions upon the YesCare Corp Interest, (ii) YesCare Corp has agreed to certain restrictions upon the CHS Interest, and (iii) CHS has agreed to certain restrictions upon the Corizon New Mexico Interest.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants and promises contained herein, and for other good and valuable consideration, the Parties hereto agree as follows:

1.  **TRANSFER RESTRICTIONS.**

    1.1.   **No Transfer**. The YesCare Parties agree to refrain from any direct or indirect sale, exchange, assignment, gift, pledge, hypothecation, trust, encumbrance, or other voluntary or involuntary (whether by operation of law, including the laws of inheritance and distribution or otherwise, except no prior notice shall be required in the event of a transfer by operation of law upon Tirschwell's death) transfer or disposal of any of the YesCare Corp Interest, the CHS Interest, and the Corizon New Mexico Interest or any rights or interests therein without the prior written consent of Manager.

- 1 -

**Exhibit #**

**Lefkowitz 9**

08/14/23 - MC

CONFIDENTIAL                                                                                       YC-E-038632

**1.2     Interest Certificates**.  Each ownership interest certificate evidencing the YesCare Corp Interest, the CHS Interest or the Corizon New Mexico Interest, if any, shall bear the following legend in bold print:

> THE OWNERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE AND THE TRANSFER THEREOF ARE SUBJECT TO CERTAIN RESTRICTIONS IMPOSED BY A STOCK RESTRICTION AGREEMENT, A COPY OF WHICH IS ON FILE WITH GENEVA CONSULTING LLC.

**1.3     Possession of Certificates**.  All certificates representing the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest (if any), together with an ownership interest power of attorney and assignment/stock power agreement separate from the certificates executed by any of the Parties shall be held in escrow by Manager pending the transfer of the YesCare Corp Interest, the CHS Interest or the Corizon New Mexico Interest pursuant to this Agreement.

## 2.     AUTHORITY; NOTICE REQUIREMENTS.

**2.1     Authority**.  Except as set forth below in Section 2.2, and as otherwise set forth in the governing documents of the YesCare Entities, each owner of a YesCare Entity has the full power and authority without the need to provide notice, obtain consent or approval, to take any action and exercise any right authorized by applicable law as an owner, director, manager and/or officer of such YesCare Entity.

**2.2     Notice Requirements.**

(a)     Each owner of a YesCare Entity (including Tirschwell) agrees to give Manager no less than one hundred eighty (180) days' advance written notice (which notice may only be waived in writing by Manager) before taking or approving, or causing a YesCare Entity or its officers, managers or directors, to take or approve, any of the following actions:

(i)     Amend the articles of incorporation, bylaws or other similar governing documents of a YesCare Entity;

(ii)     Admit any additional or new owners or issue any additional ownership interests or security convertible into a YesCare Entity security or ownership interest or in any other person or entity;

(iii)     Merge or consolidate a YesCare Entity with or into any other entity;

(iv)     Dissolve, sell, lease, pledge, exchange, or transfer all or substantially all of the assets of a YesCare Entity;

(v)     Mortgage, pledge, or grant a security interest in any YesCare Entity property;

(vi)     Incur or refinance any indebtedness for money borrowed by a YesCare Entity, whether secured or unsecured and including any indebtedness for money borrowed by a member or owner;

- 2 -

17788149v5

YC-E-038633

(vii)    Cause a YesCare Entity to lend money to or guaranty or become surety for the obligations of any person or entity;

(viii)    Compromise or settle any claim against or inuring to the benefit of a YesCare Entity involving an amount in controversy in excess of One Thousand and xx/100ths Dollars ($1,000.00);

(ix)    Incur any liability or make any single expenditure or series of related expenditures on behalf of a YesCare Entity in any twelve (12) month period in an amount exceeding Two Thousand Five Hundred and xx/100ths Dollars ($2,500.00)];

(x)    Construct any capital improvements, repairs, alterations or changes or enter into any capital transaction or capital lease on behalf of a YesCare Entity involving an amount exceeding Two Thousand Five Hundred and xx/100ths Dollars ($2,500.00);

(xi)    Elect, appoint, remove or terminate any officer, manager or director of a YesCare Entity;

(xii)    Hire or fire any YesCare Entity employee, staff member, contractor or consultant;

(xiii)    Cause a YesCare Entity to be a party to a reorganization;

(xiv)    Approve salaries, bonuses and/or severance pay of any YesCare Entity employee or other staff member;

(xv)    Cause a YesCare Entity to commence a voluntary case as debtor under the United States Bankruptcy Code;

(xvi)    Cause a YesCare Entity to commence any litigation, arbitration, or mediation against Manager;

(xvii)    Pay any dividend on a YesCare Entity's ownership interests or any other distribution to an owner of a YesCare Entity;

(xviii)    Any reclassification or recapitalization of the ownership interests of a YesCare Entity;

(xix)    Any redemption of ownership interests of a YesCare Entity;

(xx)    Any amendment to a contract between a YesCare Entity and a physician or non-physician practitioner;

(xxi)    Commencing any new professional service or terminating or materially modifying the types of professional services or other services furnished by a YesCare Entity; or

(xxii)    Entering into a new contract or agreement, or terminating an existing contract or agreement, including (without limitation) an agreement to provide correctional health care services to detainees

- 3 -

17788149v5

CONFIDENTIAL

YC-E-038634

and/or inmates in the care, custody, and control of certain prisons or jails.

(b)    The YesCare Parties shall give Manager prompt notice of any subpoena, government investigation, litigation, or claim against any of the YesCare Parties.

**2.3    Maintenance of the YesCare Entities**. Each owner of a YesCare Entity shall at all times take such reasonable action(s) as necessary to maintain such YesCare Entity as a legal entity in good standing and to cause such YesCare Entity to carry out its lawful purposes; provided, however, that each YesCare Entity pays any filing fees and/or other reasonable costs incurred by their respective owner(s) in respect of such actions as to such YesCare Entity.

**3.    TERM**. The term of this Agreement shall continue until terminated by written agreement of all of the Parties hereto or an earlier transfer of all of the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest pursuant to the Stock Transfer Agreement.

**4.    REMEDIES**. Each of the YesCare Parties recognize that Manager will be irreparably damaged in amounts difficult to ascertain if a YesCare Party breaches or threatens to breach any of the terms and provisions of this Agreement, which are to be observed or performed by a YesCare Party hereunder. Accordingly, in the event of any threatened breach or default or actual breach or default by a YesCare Party of the terms and provisions of this Agreement, which are to be observed or performed by a YesCare Party hereunder, Manager shall be entitled to immediate temporary injunctive and other equitable relief, without the necessity of showing actual monetary damages. Such remedies shall, however, be cumulative and not exclusive, and nothing contained herein shall be construed as prohibiting Manager from pursuing any other remedies available to it at law or in equity, including, but not limited to, enforcing its rights to specific performance hereunder.

**5.    MISCELLANEOUS.**

**5.1    Applicable Law**. This Agreement is being executed and delivered in the State of Texas and is intended to be governed by and construed and enforced in accordance with such laws. **EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY RIGHT IT/SHE MAY HAVE TO TRIAL BY JURY IN ANY COURT OR JURISDICTION IN RESPECT TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**5.2    Further Assurances**. Each Party hereto shall execute and deliver any and all additional documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its or her obligations under this Agreement or reasonably necessary to further the purposes of this Agreement.

**5.3    Modification or Amendments**. No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all Parties hereto.

**5.4    Entire Agreement**. This Agreement and the Transfer Agreement constitutes the entire understanding and agreement of the Parties hereto with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and canceled in their entirety and are of no further force or effect. The Recitals set forth above are true and correct and made a part of this Agreement.

17788149v5

CONFIDENTIAL                                                                                            YC-E-038635

      **5.5**    **Waiver**. Any term or provision of this Agreement may be waived in writing at any time by the Party or Parties entitled to the benefits thereof. Any waiver effected pursuant to this <u>Section 5.5</u> shall be binding upon all Parties hereto. No failure to exercise and no delay in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege. No waiver of any breach of any covenant or agreement hereunder shall be deemed a waiver of any preceding or subsequent breach of the same or any other covenant or agreement. The rights and remedies of each Party under this Agreement are in addition to all other rights and remedies, at law or in equity, including, but not limited to, enforcing its rights to specific performance hereunder.

      **5.6**    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

      **5.7**    **Notices**. Any notice or other communication required or permitted to be delivered under this Agreement shall be (i) in writing; (ii) delivered personally, by e-mail, by courier service or by certified or registered mail, first class postage prepaid and return receipt requested; (iii) deemed to have been received on the date of delivery or, if so mailed, on the third (3rd) business day after the mailing thereof; and (iv) addressed as follows (or to such other address as the Party entitled to notice shall hereafter designate in accordance with the terms hereof):

        If to Manager:             Geneva Consulting LLC
                                 885 Third Avenue, 29th Floor
                                 New York, NY 10022
                                 Attn:  David Gefner; Zalman Schapiro
                                 Email:  <u>dg@genevaempire.com</u>; <u>zs@perigrove.com</u>

        If to YesCare Corp:      YesCare Corp.
                                   3411 Yoakum Blvd, Apt 2901
                                 Houston, TX 77006
                                 Attn:   Sara Tirschwell
                                 Email:  <u>Sara.Tirschwell@corizonhealth.com</u>

        If to CHS:                CHS TX, Inc.
                                   3411 Yoakum Blvd, Apt 2901
                                 Houston, TX 77006
                                 Attn:   Sara Tirschwell
                                 Email:  <u>Sara.Tirschwell@corizonhealth.com</u>

        If to Corizon New Mexico:    Corizon Health of New Mexico, LLC
                                   3411 Yoakum Blvd, Apt 2901
                                 Houston, TX 77006
                                 Attn:   Sara Tirschwell
                                 Email:  <u>Sara.Tirschwell@corizonhealth.com</u>

        If to Tirschwell:          Sara Tirschwell
                                   3411 Yoakum Blvd, Apt 2901
                                 Houston, TX 77006

- 5 -

17788149v5

CONFIDENTIAL                YC-E-038636

Email: Sara.Tirschwell@corizonhealth.com

**5.8** **Confidentiality**. The Parties to this Agreement agree not to disclose its terms to any person or entity, other than their attorneys, accountants, financial advisors or, in Tirschwell's case, members of her immediate family or, in Manager's case, for any reasonable purpose that is reasonably related to its business operations; provided, that this Section 5.8 shall not be construed to prohibit any disclosure required by law or in any proceeding to enforce the terms and conditions of this Agreement.

**5.9** **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of each Party hereto and their respective successors, heirs and assigns. Subject to the immediately preceding sentence, this Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the Parties hereto and their permitted successors and assigns.

**5.10** **Construction**. The article, section and subsection headings used herein are inserted for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. As used in this Agreement, the masculine, feminine or neuter gender, and the singular or plural, shall be deemed to include the others whenever and wherever the context so requires.

**5.11** **Severability**. If any term or provision of this Agreement or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable such term or provision in any other jurisdiction, the remaining terms and provisions of this Agreement or the application of such terms and provisions to circumstances other than those as to which it is held invalid or enforceable.

**5.12** **Expenses**. Except as otherwise provided in this Agreement, each Party hereto shall pay its or her own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

**5.13** **Interpretation of Agreement**. Each Party hereto has had the opportunity to participate in the drafting of this Agreement. This Agreement is to be deemed to have been jointly prepared by the Parties hereto, and if any inconsistency or ambiguity exists herein, it shall not be interpreted against any Party hereto, but according to the application of rules of interpretation of contracts, if such an uncertainty or ambiguity exists. Each Party hereto has been or has had the opportunity to be represented by independent counsel in connection with the negotiation and execution of this Agreement.

**5.14** **Legal Advice**. The Parties each acknowledge that they have been advised to seek independent legal counsel for advice regarding the effect of the provisions of this Agreement, and has either obtained such advice of independent legal counsel, or has voluntarily and without compulsion elected to enter into and be bound by the terms of this Agreement without such advice of independent legal counsel.

**5.15** **Assignment**. This Agreement shall not be assignable by any of the YesCare Parties without the prior written consent of Manager. This Agreement shall be assignable by Manager at its sole discretion and without the prior written consent of any of the YesCare Parties.

**5.16** **Third Party Beneficiary**. This Agreement does not and is not intended to confer any rights or remedies upon any person other than the Parties hereto.

17788149v5

CONFIDENTIAL

YC-E-038637

**5.17**     **Joinder.**  Each of the subsidiaries and affiliates of YesCare Corp shall execute and deliver to Manager a joinder to this Agreement substantially in the form attached hereto as Exhibit "A", or in such other form and substance satisfactory to Manager, by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement.

*[Remainder of this Page Intentionally Left Blank]*
*[Signatures Begin on Following Page]*

17788149v5

CONFIDENTIAL                                                                                      YC-E-038638

CONFIDENTIAL

YC-E-038639

IN WITNESS WHEREOF the parties hereto have executed this Agreement, under seal each company acting by and through its duly authorized officer, as of the date and year first above written.

**MANAGER:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____
Name:   Zalman Schapiro
Title:    Authorized Signatory

**YESCARE ENTITIES:**

YESCARE CORP.
*a Texas corporation*

By: _____
Name:   Sara Tirschwell
Title:    CEO

CHS TX, INC.
*a Texas corporation*

By: _____
Name:   Sara Tirschwell
Title:    CEO

CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By: _____
Name:   Sara Tirschwell
Title:    CEO

**TIRSCHWELL:**

_____
Sara Tirschwell

*[Signature Page to Stock Restriction Agreement]*

17788149v5

**EXHIBIT "A"**

**JOINDER AGREEMENT**

(See attached)

*[Signature Page to Stock Restriction Agreement]*

17788149v5

CONFIDENTIAL

# JOINDER AGREEMENT

Reference is made to that certain Stock Restriction Agreement ("**SRA**") dated and effective as of May 5, 2022 (as amended), by and among GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**"), and SARA TIRSCHWELL ("**Tirschwell**", and together with the YesCare Entities, the "**YesCare Parties**"). The undersigned, being a newly formed or acquired subsidiary or affiliate of YesCare Corp (hereinafter referred to as a "**New YesCare Entity**"), hereby acknowledges that it has received and reviewed a complete copy of the SRA and all exhibits attached thereto, and agrees that, upon the execution of this Joinder Agreement and delivery of same to Manager, the New YesCare Entity is and shall become a YesCare Entity and one of the YesCare Parties to the SRA and shall be fully bound by, and subject to, all of the agreements, covenants, terms, conditions and restrictions of and included in the SRA, as a party thereto, and shall be entitled to all the rights and subject to all the obligations incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the SRA.

IN WITNESS WHEREOF, the party hereto, intending to be legally bound, has executed this Joinder Agreement as of _____, 20__.

UNDERSIGNED:

[Entity Name]

By: _____

Name: _____

Title: _____

17788149v5

## STOCK TRANSFER AGREEMENT

THIS STOCK TRANSFER AGREEMENT (this "**Agreement**") is made, entered into, and effective as of May 5, 2022 (the "**Effective Date**"), by and between GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**"), and SARA TIRSCHWELL ("**Tirschwell**", and together with the YesCare Entities, the "**YesCare Parties**"). Manager, YesCare Corp, CHS, Corizon New Mexico, and Tirschwell are each sometimes herein referred to as a "**Party**" and, collectively as, the "**Parties**."

### RECITALS

**WHEREAS**, Tirschwell owns 5% of the issued and outstanding equity interest in YesCare Corp (the "**YesCare Corp Interest**");

**WHEREAS**, YesCare Corp owns 100% of the issued and outstanding equity interest in CHS TX, Inc. (the "**CHS Interest**");

**WHEREAS**, CHS owns 100% of the issued and outstanding membership interest in Corizon Health of New Mexico, LLC (the "**Corizon New Mexico Interest**");

**WHEREAS**, the Parties are parties to that certain Management Services Agreement dated as of the Effective Date under which Manager provides specific administrative management services, but not including the provision of professional health care services, in exchange for a defined management fee (the "**Management Services Agreement**");

**WHEREAS**, concurrently with the execution of this Agreement, Manager and the YesCare Parties have entered into a Stock Restriction Agreement (the "**Restriction Agreement**") under which the Parties, as applicable, have agreed to certain restrictions with respect to the transfer of the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest;

**WHEREAS**, it is in the best interest of the Parties hereto to maintain consistency and certainty in the ownership and management operation of the YesCare Entities; and

**WHEREAS**, it is deemed in the best interest of the Parties hereto that an amicable arrangement be made for the imposition of limitations on the sale or other disposition of the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest.

### AGREEMENT

**NOW THEREFORE**, in consideration of the foregoing recitals and of the promises and the mutual covenants and undertakings hereinafter contained, the Parties hereto agree as follows:

1.    **Restrictions on Transfers of Interest**.  The YesCare Parties shall not sell, assign, transfer, gift, pledge, hypothecate, encumber or otherwise transfer (whether by operation of law or otherwise) or encumber in any manner or by any means whatsoever any interest in all or any part of the YesCare Corp Interest, the CHS Interest or the Corizon New Mexico Interest without the prior written consent of Manager.

- 1 -

17788148v6

CONFIDENTIAL

The YesCare Parties shall also place their respective certificate(s) representing the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest, if any, into the custody of Manager.

2.    **Restrictions on Contracts**.  The YesCare Parties agree not to enter into any new or terminate or modify any existing contracts for correctional health care services to detainees and inmates in the care, custody, and control of prisons and jails, without the prior written consent of Manager.

3.    **Transfer Events**.  For purposes of this Agreement, a "**Transfer Event**" means any of the following occurrences:

a.    the death of Tirschwell;

b.    Manager determines that Tirschwell is mentally incompetent or physically disabled;

c.    Tirschwell becomes disqualified under applicable law to be an owner of YesCare Corp;

d.    Manager, in its sole discretion and without cause, determines that Tirschwell no longer shall be an owner of YesCare Corp;

e.    any of the ownership interest of the YesCare Entities, including the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest, whether or not held by the YesCare Parties, are issued, transferred or attempted to be issued or transferred voluntarily, involuntarily by operation of law (due to bankruptcy, creditor's rights, or marital dissolution), or otherwise to any person other than a transferee designated by Manager;

f.    any petition for or other document causing or intended to cause a judicial, administrative, voluntary or involuntary dissolution of a YesCare Entity is filed;

g.    a receiver or custodian is appointed to take possession of all or any material part of the assets of a YesCare Party, or a general assignment is made by a YesCare Party for the benefit of any of such YesCare Party's creditors, or a case is filed by or against a YesCare Party under the applicable bankruptcy, insolvency, reorganization, receivership, moratorium or assignment for the benefit of creditors laws;

h.    Tirschwell's employment or other service relationship with as YesCare Entity or Manager is terminated (whether voluntarily or involuntarily);

i.    Tirschwell is convicted of, charged with, or investigated for any felony violation or any violation of law related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation or controlled substances;

j.    Tirschwell is disqualified from or is excluded from participation in any federal or state health care program, any workers' compensation program, or other third party reimbursement or payment programs;

- 2 -

17788148v6

CONFIDENTIAL                                                            YC-E-038644

k.      Tirschwell is listed in the Office of Foreign Assets Control's "Specially Designated Nationals and Blocked Persons" list;

l.      Tirschwell breaches any duty owed by Tirschwell to a YesCare Entity or Manager, including, but not limited to, the duty of loyalty and duty of care;

m.      any breach by a YesCare Party of the Management Services Agreement;

n.      any breach by Tirschwell of the Liaison Agreement by and between Tirschwell and Manager, dated as of even date hereof, as amended from time to time (the "**LA**");

o.      any termination of the LA;

p.      any termination of the Management Services Agreement; or

q.      any other event or circumstance, as determined by Manager in its sole discretion.

4.      **Transfer of Interest**.  Upon the occurrence of a Transfer Event, subject to the terms set forth below, all of the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest shall be immediately transferred to the Designated Transferee(s) (as defined below) without further action by a YesCare Party upon the following terms:

a.      The purchase price for all of the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest transferred to the Designated Transferee pursuant to this Section 4 shall be Five Hundred Thousand Dollars ($500,000).

b.      Payment of the purchase price for the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest shall be made to the applicable YesCare Party owner(s) in immediately available funds.  The purchase price shall be paid for the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest on the first business day following receipt by the Designated Transferee(s) of notice of such Transfer Event; provided, however, that in the absence of such notice, the Designated Transferee(s) shall, upon becoming aware of any such Transfer Event, promptly notify the YesCare Parties and Manager of such Transfer Event and tender to the applicable YesCare Party owner(s) the purchase price for the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest.

c.      Notwithstanding anything to the contrary herein, upon the occurrence of a Transfer Event, the ownership rights and obligations of a YesCare Party owner(s) in the applicable YesCare Entity shall be immediately deemed to have terminated irrespective of whether Manager has designated a Designated Transferee(s) and the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest shall be immediately deemed to have been transferred to the Designated Transferee(s) effective upon the date of such Transfer Event irrespective of the date of payment for such YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest.

d.      For purposes of this Agreement, "**Designated Transferee**" shall mean a licensed professional or entity who is qualified to own an interest in a professional entity in

- 3 -

17788148v6

CONFIDENTIAL                                                                 YC-E-038645

accordance with the laws of the State where such professional or entity is licensed, and who is designated to be the Designated Transferee by Manager.

e.    Contemporaneously with the execution of this Agreement, Tirschwell shall deposit with Manager, any ownership interest certificates (the "**Certificates**") of YesCare Corp, if any, duly endorsed in blank. Manager shall hold the Certificates on behalf of Tirschwell unless and until there is a Designated Transferee to whom the Interest represented by such Certificate(s) shall be transferred in accordance with the terms of this Agreement. If and when this Agreement requires transfer of the YesCare Corp Interest to the Designated Transferee, Manager is hereby authorized to and shall take such ministerial acts (such as typing or printing the name of the Designated Transferee on the form endorsed in blank by Tirschwell and delivering the Certificate, with the form endorsed in blank by Tirschwell so completed, to an appropriate agent of YesCare Corp) to allow YesCare Corp to effect the transfer of ownership of the YesCare Corp Interest represented by that Certificate to the Designated Transferee, as specifically contemplated by Tirschwell and YesCare Corp under this Agreement.

f.    Upon the occurrence of a Transfer Event, each owner of a YesCare Entity shall be disqualified as an owner of such YesCare Entity, and Tirschwell shall be deemed to have resigned as the manager, director and as the president, secretary, treasurer and as any other officer position of the applicable YesCare Entity (but not as an employee of such YesCare Entity, if Tirschwell is then an employee of such YesCare Entity).

g.    After the occurrence of a Transfer Event, each owner of a YesCare Entity shall not have or exercise any right or privilege as an owner of such YesCare Entity, including any right to receive any unallocated or undistributed dividend or to vote the shares/membership interests of the respective YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest or take any action on behalf of such YesCare Entity.

5.    **Consideration for Stock Transfer Agreement**. Upon execution of this Agreement, Manager shall pay each owner of the YesCare Entities Ten and no/100 Dollars ($10.00), receipt of which is acknowledged by such owner of the YesCare Entities, as complete and adequate consideration for this Agreement.

6.    **Remedies**. Each of the YesCare Parties recognizes that Manager will be irreparably damaged in amounts difficult to ascertain if a YesCare Party breaches or threatens to breach any of the terms and provisions of this Agreement which are to be observed or performed by a YesCare Party hereunder, as applicable. Accordingly, in the event of any threatened breach or default or actual breach or default by a YesCare Party of the terms and provisions of this Agreement which are to be observed or performed by a YesCare Party hereunder, Manager shall be entitled to immediate temporary injunctive and other equitable relief, without the necessity of showing actual monetary damages. Such remedies shall, however, be cumulative and not exclusive, and nothing contained herein shall be construed as prohibiting Manager from pursuing any other remedies available to it at law or in equity, including, but not limited to, enforcing its rights to specific performance hereunder.

7.    **Third Party Holders**. Any person who becomes the holder or possessor of any of the YesCare Corp Interest, the CHS Interest or the Corizon New Mexico Interest by virtue of any judicial process shall immediately transfer all of such YesCare Corp Interest, the CHS Interest or the Corizon New

- 4 -

17788148v6

Mexico Interest to Manager's designee(s), whenever requested by Manager to do so, and none of said YesCare Corp Interest, CHS Interest or Corizon New Mexico Interest shall be entitled to any vote nor shall any dividend be paid or allowed on any such YesCare Corp Interest, CHS Interest or Corizon New Mexico Interest after failure to comply with such request.

8.    **Power of Attorney**.  In the event that a YesCare Party fails or refuses to execute, acknowledge and deliver such instruments, or cause the same to be done, that shall be required to effectuate the provisions of this Agreement, Manager (such party or parties hereinafter referred to as the "**Attorney-in-Fact**") may execute, acknowledge and deliver such documents for, or on behalf of, or in the stead of the any of the YesCare Parties, and such execution, acknowledgment and delivery by the Attorney-in-Fact shall be for all purposes as effective against and binding upon the YesCare Parties as though such execution, acknowledgement and delivery had been by such YesCare Parties.  Each of the YesCare Parties does hereby irrevocably constitute and appoint the Attorney-in-Fact as the true and lawful attorney-in-fact of such YesCare Parties and/or its/her successors and assigns, as the case may be, to execute, acknowledge and deliver such transfers and other documents contemplated by this <u>Section 8</u>.  It is expressly understood, intended and agreed by each of the YesCare Parties, for such YesCare Parties and their/her successors and assigns, that the grant of the power of attorney to the Attorney-in-Fact pursuant to this <u>Section 8</u> is coupled with an interest, is irrevocable and shall survive the death, termination or legal incompetency of Tirschwell, as the case may be, or the assignment of the interest each owner of the respective YesCare Entities (as applicable), or the dissolution or liquidation of the YesCare Entities.

9.    **Miscellaneous**.

a.    <u>Applicable Law</u>.  This Agreement is being executed and delivered in the State of Texas and is intended to be governed by and construed and enforced in accordance with such laws.  **EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY RIGHT IT/SHE MAY HAVE TO TRIAL BY JURY IN ANY COURT OR JURISDICTION IN RESPECT TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

b.    <u>Further Assurances</u>.  Each Party shall execute and deliver any and all additional documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its or her obligations under this Agreement or reasonably necessary to further the purposes of this Agreement.

c.    <u>Modification or Amendments.</u>  No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all Parties hereto.

d.    <u>Entire Agreement.</u>  This Agreement and the Restriction Agreement constitutes the entire understanding and agreement of the Parties hereto with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and canceled in their entirety and are of no further force or effect.  The Recitals set forth above are true and correct and made a part of this Agreement.

e.    <u>Waiver</u>.  Any term or provision of this Agreement may be waived in writing at any time by the Party or Parties entitled to the benefits thereof.  Any waiver effected pursuant to this <u>Section 9(e)</u> shall be binding upon all Parties hereto.  No failure to exercise and no delay in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege.  No waiver of any breach of any covenant or agreement hereunder shall be deemed a waiver of any preceding or subsequent breach of the same or any other covenant or agreement.  The rights and remedies of each Party under this Agreement are

- 5 -

17788148v6

YC-E-038647

in addition to all other rights and remedies, at law or in equity, including, but not limited to, enforcing its rights to specific performance hereunder.

       f.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, any one of which may be by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

       g.    <u>Notices</u>. Any notice or other communication required or permitted to be delivered under this Agreement shall be (i) in writing; (ii) delivered personally, by e-mail, by courier service or by certified or registered mail, first class postage prepaid and return receipt requested; (iii) deemed to have been received on the date of delivery or, if so mailed, on the third (3rd) business day after the mailing thereof; and (iv) addressed as follows (or to such other address as the Party entitled to notice shall hereafter designate in accordance with the terms hereof):

| | |
|---|---|
| If to Manager: | Geneva Consulting LLC<br>885 Third Avenue, 29th Floor<br>New York, NY 10022<br>Attn:  David Gefner; Zalman Schapiro<br>Email:  dg@genevaempire.com; zs@perigrove.com |
| If to YesCare Corp: | YesCare Corp.<br>3411 Yoakum Blvd, Apt 2901<br>Houston, TX 77006<br>Attn:   Sara Tirschwell<br>Email:  Sara.Tirschwell@corizonhealth.com |
| If to CHS: | CHS TX, Inc.<br>3411 Yoakum Blvd, Apt 2901<br>Houston, TX 77006<br>Attn:   Sara Tirschwell<br>Email:  Sara.Tirschwell@corizonhealth.com |
| If to Corizon New Mexico: | Corizon Health of New Mexico, LLC<br>3411 Yoakum Blvd, Apt 2901<br>Houston, TX 77006<br>Attn:   Sara Tirschwell<br>Email:  Sara.Tirschwell@corizonhealth.com |
| If to Tirschwell: | Sara Tirschwell<br>3411 Yoakum Blvd, Apt 2901<br>Houston, TX 77006<br>Email:  Sara.Tirschwell@corizonhealth.com |

       h.    <u>Confidentiality</u>. The Parties to this Agreement agree not to disclose its terms to any person or entity, other than their attorneys, accountants, financial advisors or, in Tirschwell's case, members of her immediate family or, in Manager's case, for any reasonable purpose that is reasonably

- 6 -

17788148v6

CONFIDENTIAL                                                                    YC-E-038648

related to its business operations; provided, that this Section 9(h) shall not be construed to prohibit any disclosure required by law or in any proceeding to enforce the terms and conditions of this Agreement.

i.      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each Party hereto and their respective successors, heirs and assigns.  Subject to the immediately preceding sentence, this Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the Parties hereto and their permitted successors and assigns.

j.      Construction. The article, section and subsection headings used herein are inserted for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.  As used in this Agreement, the masculine, feminine or neuter gender, and the singular or plural, shall be deemed to include the others whenever and wherever the context so requires.  For the purposes of this Agreement, unless the context clearly requires, "or" is not exclusive.

k.      Severability.  If any term or provision of this Agreement or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable such term or provision in any other jurisdiction, the remaining terms and provisions of this Agreement or the application of such terms and provisions to circumstances other than those as to which it is held invalid or enforceable.

l.      Expenses.  Except as otherwise provided in this Agreement, each Party hereto shall pay her or its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

m.      Interpretation of Agreement.  Each Party hereto has had the opportunity to participate in the drafting of this Agreement.  This Agreement is to be deemed to have been jointly prepared by the Parties hereto, and if any inconsistency or ambiguity exists herein, it shall not be interpreted against any Party hereto, but according to the application of rules of interpretation of contracts, if such an uncertainty or ambiguity exists.  Each Party hereto has been or has had the opportunity to be represented by independent counsel in connection with the negotiation and execution of this Agreement.

n.      Legal Advice.  The Parties each acknowledge that they have been advised to seek independent legal counsel for advice regarding the effect of the provisions of this Agreement, and has either obtained such advice of independent legal counsel, or has voluntarily and without compulsion elected to enter into and be bound by the terms of this Agreement without such advice of independent legal counsel.

o.      Assignment.  This Agreement shall not be assignable by any of the YesCare Parties without the prior written consent of Manager.  This Agreement shall be assignable by Manager at its sole discretion and without the prior written consent of any of the YesCare Parties.

p.      Third Party Beneficiary.  This Agreement does not and is not intended to confer any rights or remedies upon any person other than the Parties hereto.

q.      Attorneys' Fees.  If any action at law or in equity is necessary to enforce, contest or interpret the terms of this Agreement or to protect the rights obtained hereunder the prevailing Party shall be entitled to its/her reasonable attorneys' fees, including attorneys' fees on appeal, costs, and disbursements in addition to any other relief to which it/she may be entitled.

- 7 -

17788148v6

CONFIDENTIAL

YC-E-038649

r.      Additional Action and Documents.  It is the intent of this Agreement that Manager and the YesCare Parties have an amicable arrangement for the sale or other disposition of all of the YesCare Corp Interest, the CHS Interest and the Corizon New Mexico Interest to the exclusion of outsiders, consistent with the obligations imposed on the YesCare Parties under state law, and, to that end, the Parties hereto further agree for themselves to take whatever action and to execute whatever additional documents shall be necessary to effectuate the purposes of this Agreement.

s.      Definitions.

   i.    "**Person**" means any individual, trust, corporation, partnership, limited partnership, limited liability company or other business association or entity, court, governmental body or governmental agency.

   ii.   "**Subsidiary**" or "**Subsidiaries**" with respect to any Person, means any corporation, limited liability company, limited partnership, partnership, trust or other entity with respect to which such Person has the power, directly or indirectly through one or more intermediaries, to vote or direct the voting of sufficient securities or interests to elect a majority of the directors or management committee or similar governing body.

t.      Joinder.  Each of the subsidiaries and affiliates of YesCare Corp shall execute and deliver to Manager a joinder to this Agreement substantially in the form attached hereto as Exhibit "A", or in such other form and substance satisfactory to Manager, by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement.

*[Remainder of this Page Intentionally Left Blank]*
*[Signatures Begin on Following Page]*

- 8 -

17788148v6

CONFIDENTIAL

YC-E-038650

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as of the date first set forth above.

**MANAGER:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____

Name: Zalman Schapiro

Title: Authorized Signatory

**YESCARE ENTITIES:**

YESCARE CORP.
*a Texas corporation*

By: _____

Name: Sara Tirschwell

Title: CEO

CHS TX, INC.
*a Texas corporation*

By: _____

Name: Sara Tirschwell

Title: CEO

CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By: _____

Name: Sara Tirschwell

Title: CEO

**TIRSCHWELL:**

_____
Sara Tirschwell

*[Signature Page to Stock Transfer Agreement]*

17788148v6

# EXHIBIT "A"

## JOINDER AGREEMENT
(See attached)

17788148v6

CONFIDENTIAL                                                                                   YC-E-038652

## JOINDER AGREEMENT

Reference is made to that certain Stock Transfer Agreement ("**STA**") dated and effective as of May 5, 2022 (as amended), by and among GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**"), and SARA TIRSCHWELL ("**Tirschwell**", and together with the YesCare Entities, the "**YesCare Parties**").  The undersigned, being a newly formed or acquired subsidiary or affiliate of YesCare Corp (hereinafter referred to as a "**New YesCare Entity**"), hereby acknowledges that it has received and reviewed a complete copy of the STA and all exhibits attached thereto, and agrees that, upon the execution of this Joinder Agreement and delivery of same to Manager, the New YesCare Entity is and shall become a YesCare Entity and one of the YesCare Parties to the STA and shall be fully bound by, and subject to, all of the agreements, covenants, terms, conditions and restrictions of and included in the STA, as a party thereto, and shall be entitled to all the rights and subject to all the obligations incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the STA.

IN WITNESS WHEREOF, the party hereto, intending to be legally bound, has executed this Joinder Agreement as of _____, 20__.

UNDERSIGNED:

[Entity Name]

By:      _____
Name:   _____
Title:    _____

17788148v6

YC-E-038653

## MANAGEMENT SERVICES AGREEMENT

This MANAGEMENT SERVICES AGREEMENT (this "**Agreement**") is made, entered into, and effective as of May 5, 2022 (the "**Effective Date**"), by and between GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**"), and SARA TIRSCHWELL ("**Tirschwell**", and together with the YesCare Entities, the "**YesCare Parties**"). Manager, YesCare Corp, CHS, Corizon New Mexico, and Tirschwell are each sometimes herein referred to as a "**Party**" and, collectively as, the "**Parties**."

### RECITALS

WHEREAS, Manager owns certain assets, systems and infrastructure and is experienced in the provision of certain management, consulting, administrative, business, and other services in support of organizations and individuals engaged in the delivery of health care services;

WHEREAS, the YesCare Entities provide correctional health care services in a variety of states to detainees and inmates in the care, custody, and control of certain prisons and jails (the "**Professional Services**"); and

WHEREAS, the YesCare Entities desire to engage Manager to provide the management, consulting, administrative, finance and business, and such other services described in this Agreement so that the YesCare Entities may focus on the rendering of Professional Services, and Manager desires to provide such services to the YesCare Entities, all upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth below, and other good, valuable and sufficient consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### TERMS AND CONDITIONS

1.    Appointment.

1.1    Exclusivity.  During the Term (as defined in Section 9.1), the YesCare Entities hereby appoint Manager as their sole and exclusive provider of management and other business services as described in this Agreement (collectively, the "**Management Services**"), and Manager accepts such appointment and agrees to provide the Management Services to the YesCare Entities.  Manager shall provide such Management Services in a manner that meets the requirements of the business functions of the YesCare Entities.  Notwithstanding anything to the contrary contained in this Agreement, Manager may delegate any of its duties or rights under this Agreement to one or more of Manager's affiliates or to one or more subcontractors.

1.2    Representations and Warranties.  The YesCare Entities represent and warrant to Manager that none of (1) the YesCare Entities; (2) any of the YesCare Entities' officers, shareholders, members, managers or any of the YesCare Entities' employees; (3) to the knowledge of the YesCare Entities, any of the YesCare Entities' contractors and agents involved in the delivery of Professional Services under this Agreement; nor (4) the Physicians or Non-Physician Practitioners (as defined below), as applicable, of the YesCare Entities: (i) are currently or have ever been excluded, debarred, or otherwise ineligible to

- 1 -

17761764v8

participate in the federal health care programs as defined in 42 USC § 1320a-7b(f) (the "**Federal Healthcare Programs**"), any General Services Administration ("**GSA**") program, or any state healthcare programs; (ii) have been convicted of a criminal offense related to the provision of healthcare items or services but have not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Healthcare Programs, any GSA agreement, or any state healthcare programs; and (iii) are under investigation or otherwise aware of any circumstances which may result in the YesCare Entities, their officers, members, managers, or employees, or, to the extent involved in the delivery of Professional Services under this Agreement, its contractors, agents, joint ventures, affiliates or subsidiaries, or their Physicians or Non-Physician Practitioners, being excluded from participation in the Federal Healthcare Programs, any GSA agreement, or any state healthcare programs. The YesCare Entities further represent and warrant that (i) they do not participate in any Federal Health Care Programs (e.g., Medicare, Medicaid, etc.), and covenant that they will not participate in such Federal Health Care Programs without Manager's prior written consent, and (ii) the execution, delivery and performance of this Agreement by the YesCare Entities do not and will not result in a breach of, or constitute a default under, any agreement, lease or instrument to which any of the YesCare Entities is a party or by which it or its properties may be bound, including, without limitation, the Senior Debt Documents (as defined in the Security Agreement attached hereto as Exhibit "D"). The representations and warranties contained in this Section 1.2 shall be ongoing representations and warranties during the Term of this Agreement and the YesCare Entities shall immediately notify Manager of any change in the status of the representations and warranties set forth in this Section 1.2 and of any action of which the YesCare Entities become aware that could reasonably be foreseen to lead to such an event.

      1.3    Compliance with Corporate Practice of Medicine. THE PARTIES HERETO HAVE MADE ALL REASONABLE EFFORTS TO ENSURE THAT THIS AGREEMENT COMPLIES WITH APPLICABLE CORPORATE PRACTICE OF MEDICINE DOCTRINES AND OTHER SIMILAR DOCTRINES RELATED TO THE PROFESSIONAL SERVICES PROVIDED BY THE YESCARE ENTITIES. THE PARTIES HERETO UNDERSTAND AND ACKNOWLEDGE THAT SUCH LAWS MAY CHANGE, BE AMENDED, OR BECOME SUBJECT TO A DIFFERENT INTERPRETATION AND THE PARTIES INTEND TO COMPLY WITH SUCH LAWS IN THE EVENT OF SUCH OCCURRENCES. UNDER THIS AGREEMENT, THE YESCARE ENTITIES' PHYSICIANS AND NON-PHYSICIAN PRACTITIONERS SHALL HAVE THE EXCLUSIVE AUTHORITY AND CONTROL OVER THE DELIVERY OF THE PROFESSIONAL SERVICES FOR WHICH LICENSURE IS REQUIRED UNDER APPLICABLE LAWS AND THE PRACTICE OF SUCH PROFESSIONAL SERVICES. MANAGER SHALL HAVE THE SOLE AND EXCLUSIVE AUTHORITY TO MANAGE THE BUSINESS ASPECTS OF YESCARE, SUBJECT TO THE TERMS AND CONDITIONS HEREOF. THE PARTIES AGREE THAT THE INTENT OF THIS AGREEMENT IS FOR MANAGER TO PROVIDE ONLY ADMINISTRATIVE AND BUSINESS SUPPORT-TYPE SERVICES TO YESCARE, AND THAT MANAGER IS EXPRESSLY LIMITED TO ONLY PERFORMING ACTS AND DUTIES CONSISTENT WITH ADMINISTRATION AND BUSINESS SUPPORT-TYPE SERVICES.

2.    Duties and Responsibilities of Manager.

      2.1    Performance of Duties. Manager (or its designee) shall provide the Management Services in a competent, professional, orderly, and efficient manner in accordance with generally accepted management, administrative, and accounting practices, and, in addition, with at least the same degree of diligence and skill as is employed by Manager (or its affiliates) in the provision of management services to other providers that are, or will be, owned or managed by Manager (or its affiliates).

      2.2    Attorney-in-Fact. For good and valuable consideration, and to secure Manager's performance of certain obligations under this Agreement on behalf of the YesCare Entities, the YesCare Entities irrevocably appoint Manager (and any subcontractor designated by Manager) as their lawful

- 2 -

17761764v8

attorney-in-fact for the purposes set forth in <u>Sections 2.3 through 2.31</u> during the Term of this Agreement. Concurrently with the execution of this Agreement, and as requested by Manager from time to time during the Term, the YesCare Entities shall execute a power of attorney agreement in the form attached as <u>Exhibit "A"</u> (the "**Power of Attorney**"), and such appointment shall be construed as being coupled with an interest.

2.3      <u>Billing/Invoicing</u>.  Manager shall take all steps reasonably necessary (and, where required by applicable federal or state laws or where otherwise appropriate, in consultation with the YesCare Entities), to submit, process and collect all billings for payment from sheriffs, prisons, jails, and applicable correctional departments/agencies for all goods, items, and services provided by the YesCare Entities to their patients.  Manager shall bill/invoice for all fees charged by the YesCare Entities for professional services rendered by physicians employed by or contracting with the YesCare Entities (collectively "**Physicians**"), and any dentists, nurse practitioners, physician assistants, registered nurses, and other licensed healthcare personnel employed by or contracting with the YesCare Entities who are necessary for the YesCare Entities to furnish the Professional Services (collectively, "**Non-Physician Practitioners**").  Manager shall submit bills/invoices for services in compliance with applicable laws, regulations and the YesCare Entities' contracts.  If Manager becomes aware of any actual or alleged billing errors or any investigation or review by a governmental authority involving any alleged billing errors involving services provided by the YesCare Entities, Manager shall immediately notify the YesCare Entities of such matters, to the extent permitted by law.  Similarly, if the YesCare Entities become aware of any actual or alleged billing errors, the YesCare Entities shall immediately notify Manager of such matters.  To the extent permitted by law, Manager and the YesCare Entities shall reasonably cooperate in the investigation of matters involving billing errors arising under this Agreement, and in responding to any such investigations conducted by governmental authorities.  For the avoidance of doubt, the YesCare Entities shall, at all times, have exclusive control of the amount of fees charged by the YesCare Entities.

2.4      <u>Collections.</u>  Manager shall be entitled to: (i) collect and receive all revenue from whatever source, including accounts receivable due to the YesCare Entities in connection with the YesCare Entities' operations ("**Gross Revenue**"); and (ii) sue for and give satisfaction for monies due on account and to withdraw any claims, suits or proceedings pertaining to or arising out of Manager's or the YesCare Entities' right to collect such accounts; <u>provided</u>, <u>however</u>, that Manager shall not initiate a lawsuit to collect such monies due to the YesCare Entities without the applicable YesCare Entity's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

2.5      <u>Endorsement</u>.  Manager (or its designee) shall take possession of and endorse in the any of the YesCare Entities' names any notes, checks, drafts, bank notes, money orders, insurance payments and any other instruments received as Gross Revenue.

2.6      <u>Banking Powers</u>.  Manager (or its designee) shall deposit all Gross Revenue of the YesCare Entities into the YesCare Entities' Provider Accounts (as defined in <u>Section 2.7</u>).  The YesCare Entities shall not make any withdrawal from any bank account if to do so would impair Manager's ability to fulfill Manager's obligations under this Agreement.  Manager (and any subcontractor designated by Manager) shall have the right to make withdrawals from any of the YesCare Entities' Accounts to pay all taxes, costs and expenses incurred in the operation of the YesCare Entities, including payment of the Management Fee as set forth in <u>Section 8.1</u> and to fulfill all other tenets of this Agreement.  Neither the YesCare Entities, nor any other individual or entity (at the YesCare Entities' direction or permission) shall make any withdrawals from any Provider Account if doing so would impair Manager's ability to fulfill Manager's obligations under this Agreement.  Manager (and any subcontractor designated by Manager) shall have the right to make withdrawals from any of the YesCare Entities' Provider Accounts.

- 3 -

17761764v8

2.7   <u>Funds</u>.

      2.7.1   The YesCare Entities shall maintain, with the assistance of Manager, at a bank(s) designated by Manager, one or more bank accounts ("**Provider Accounts**"), in the name of and under the taxpayer identification number of the applicable YesCare Entities. The YesCare Entities shall take such action as is necessary to maintain Manager's authority to make withdrawals from and deposits into its respective Provider Accounts, either in accordance with <u>Section 2.2</u> and <u>Section 2.6</u>, or in accordance with an agreement by and among Manager, the applicable YesCare Entity and a designated bank. The YesCare Entities and Manager agree that no interest shall be payable from Manager to the YesCare Entities on such funds.

      2.7.2   The YesCare Entities shall not maintain any bank account for cash or Gross Revenue deposits that is not a YesCare Entity Account for purposes of this Agreement in connection with Professional Services rendered through the YesCare Entities.

2.8   <u>Personnel</u>.

      2.8.1   At the YesCare Entities' expense and upon request by the YesCare Entities, Manager (or its designee) shall provide to the YesCare Entities the support services of such non-physician, non-clerical, and non-administrative healthcare personnel (e.g., medical technicians, etc.) who may be employed by Manager (or its designee) as applicable law permits and as Manager shall determine are necessary for the YesCare Entities to furnish their services ("**Clinical Support Personnel**"), pursuant to an agreement between the YesCare Entities and Manager (the "**Employee Leasing Agreement**") in the form attached hereto as <u>Exhibit "B"</u>. The cost of providing such services to the YesCare Entities shall be set forth in the Employee Leasing Agreement. Manager represents and warrants that all Clinical Support Personnel shall be appropriately licensed or certified, shall perform all services within the scope of their licenses and certifications, shall perform all services in accordance with all laws and with prevailing and applicable standards of care and in accordance with the Policies (as defined below), and shall neither be excluded nor debarred from participation in Federal Healthcare Programs.

      2.8.2   Manager shall: (i) recommend policies for the YesCare Entities regarding hours worked, days of vacation, days off, number of patients seen, and amount of time spent with patients with respect to the Physicians and Non-Physician Practitioners; (ii) recommend overall productivity standards for the YesCare Entities and the YesCare Entities' hours of operations; and (iii) recruit, retain, select, and assist the YesCare Entities in the employment or engagement with, promotion, discipline and termination, if appropriate, of the YesCare Entities' Physicians, Non-Physician Practitioners, and other employees and contractors. Manager shall develop general guidelines relating to the professional personnel matters described in this <u>Section 2.8.2</u>.

2.9   <u>No Public Relations, Marketing and Advertising</u>.   The Parties agree that Manager shall not provide any public relations, business development, marketing or advertising services to the YesCare Entities and that the Management Services shall not include in any way any public relations, business development, marketing or advertising services. The Parties further agree that any public relations, business development, marketing or advertising services of the YesCare Entities will be provided by direct employees of the YesCare Entities in accordance with applicable law.

2.10   <u>Contract Assistance</u>.   Manager is authorized to negotiate, enter into, amend and terminate, in the name and on behalf of any or all the YesCare Entities, all contracts as may be reasonably necessary or advisable for the day-to-day operations of the YesCare Entities ("**Contracts**"); provided that, to ensure smooth coordination of Manager's administration of all such Contracts, before a YesCare Entity executes any such Contract, such YesCare Entity shall provide at least ten (10) business days' prior written notice

- 4 -

17761764v8

CONFIDENTIAL

and a copy of such Contract to Manager. Manager shall not provide services contemplated by this Section 2.10 with regard to a YesCare Entity's operations to the extent that the provision of services by Manager would violate any applicable law.

2.11    Insurance. Manager shall arrange for the purchase by the YesCare Entities, at the YesCare Entities' cost and expense, of necessary insurance coverage for the YesCare Entities, including but not limited to workers' compensation insurance and professional liability insurance. Manager shall be responsible for ensuring that the YesCare Entities maintain at all times during the Term, workers' compensation insurance required by law, professional liability insurance, covering the YesCare Entities, Physicians, Non-Physician Practitioners, and other YesCare Entity employees and contractors, as required by law and under the Contracts of the YesCare Entities, and general commercial liability insurance, sufficient to cover any liabilities arising from the YesCare Entities' obligations under this Agreement.

2.12    Assets, Equipment and Supplies; Computer and Information Technology Systems.

2.12.1    Assets, Equipment and Supplies. Manager, on the YesCare Entities' behalf, shall select and purchase, lease, license or otherwise acquire or arrange for the use of all assets necessary for the YesCare Entities to provide the Professional Services, including, without limitation, medical, computer and other equipment, instruments, software, supplies, inventory, and other materials and items (collectively, "**Equipment**"), in such quantities and at such times as Manager shall determine to be necessary or appropriate to provide the Professional Services. Manager shall consult with the YesCare Entities to ensure that such Equipment is necessary and appropriate with respect to the delivery of the Professional Services. Unless otherwise herein specifically provided or otherwise specified in a correctional healthcare services agreement between a YesCare Entity and a government client, all right, title and interest in and to such Equipment shall at all times remain with Manager. The YesCare Entities shall not remove such Equipment from any the YesCare Entities' location without Manager's prior written consent. All of the costs and expenses related or incident to Manager's obligations under this Section 2.12 shall be the responsibility of and shall be for the account of the YesCare Entities, regardless of whether Manager provides such assets or procures such assets on the YesCare Entities' behalf.

2.12.2    Computer Systems. Without limiting the generality of the provisions of Section 2.12.1 above, Manager shall provide the YesCare Entities with computer hardware (including, without limitation, any and all necessary wiring) and software. Manager may determine from time to time that such hardware and software requires upgrading or replacement, the cost of which shall be the responsibility of Manager. Unless otherwise specified in a correctional healthcare services agreement between a YesCare Entity and a government client, all computer software, including, without limitation, such upgrades, shall remain the property of Manager during the Term of this Agreement and shall be returned to Manager upon termination hereof. The YesCare Entities are hereby granted a non-exclusive right to use said software and hardware during the Term of this Agreement.

2.13    Liaison. Tirschwell, a liaison ("**Liaison**"), pursuant to her agreement with Manager (the "**Liaison Agreement**") in the form attached hereto at Exhibit "C", which shall be executed and attached hereto, shall, to the extent provided under the Liaison Agreement, perform, or arrange for the YesCare Entities' delegate to perform, certain administrative duties set forth in the Liaison Agreement on behalf of Manager and facilitate communication and cooperation among the Physicians, Non-Physician Practitioners and Manager. In the event that the Liaison Agreement expires or terminates for any reason, Manager shall enter into a Liaison Agreement with a new individual of Manager's choosing to serve as the YesCare Entities' Liaison.

2.14    Accounting and Financial Administrative Services. Manager shall provide financial administrative services necessary and appropriate for the YesCare Entities' operations, including

- 5 -

17761764v8

CONFIDENTIAL

accounting, bookkeeping, capital and operating budgets, tax matters, payroll services, accounts receivable and accounts payable processing, and electronic data processing.

2.15    <u>Tax Matters; Corporate Filings</u>.  Manager shall, on the YesCare Entities' behalf and at the YesCare Entities' expense, prepare and file, or cause to be prepared and filed by qualified professionals, the annual report, tax reports and tax returns required to be filed by the YesCare Entities in compliance with all federal and state laws and regulations.  All amounts payable with respect to any of such taxes shall be the responsibility of and shall be for the account of the YesCare Entities.

2.16    <u>Budgets</u>.  Before the beginning of each calendar year during the Term, Manager will prepare and deliver to the YesCare Entities an annual budget (the "**Annual Budget**"), reflecting in reasonable detail anticipated revenues and expenses, anticipated personnel staffing and support services arrangements for the upcoming calendar year, which budget shall also include an appropriate adjustment for a short calendar year if the parties anticipate the Term will expire during the calendar year.  The Annual Budget shall be subject to the review and approval of the YesCare Entities.  In the event that Manager and the YesCare Entities are unable to approve any Annual Budget prior to the beginning of the calendar year to which such Annual Budget relates, the Annual Budget in respect of the preceding calendar year shall be annualized, if necessary, and deemed the Annual Budget for such new calendar year pending their agreement as to the new Annual Budget for that calendar year.  The Annual Budget for any calendar year may be amended or modified at any time by a written agreement executed by Manager and the YesCare Entities.

2.17    <u>Expenditures</u>.  Manager shall manage all cash receipts and disbursements of the YesCare Entities, including, without limitation, the payment on behalf of the YesCare Entities of all payroll and income taxes, assessments, licensing fees and other fees, costs, and expenses of any nature whatsoever in connection with its operation as the same become due and payable, unless payment thereof is being contested in good faith by the YesCare Entities.

2.18    <u>The YesCare Entities' Offices</u>.  Manager may, at the YesCare Entities' cost and expense, provide or otherwise license or arrange for the provision to the YesCare Entities of office space (the "**Offices**") for the YesCare Entities' use.  The YesCare Entities shall use and occupy such Offices solely in connection with the business of the YesCare Entities during the YesCare Entities' normal business hours as may be determined to be appropriate by the YesCare Entities, after consultation with Manager from time to time.  The YesCare Entities acknowledge that Manager may lease one or more Offices from a third party pursuant to the terms of an office lease or similar agreement or document (each, a "**Master Lease**").  The YesCare Entities shall: (i) not do anything which would constitute a breach of the terms and conditions of any Master Lease; (ii) be bound by all provisions of each Master Lease, including without limitation, any terms relating to the termination of such Master Lease(s); (iii) not sublet or assign any Office or any part of it, or permit its use by others for any purpose unless Manager gives the YesCare Entities its prior written consent, which consent may be withheld by Manager in Manager's sole discretion; (iv) not pledge, loan, create a security interest in, or abandon possession of, an Office; (v) not attempt to dispose of any Office or any part of it; or (vi) not permit any liens, attachments, charge, or other judicial process to be incurred or levied on any Office or any part thereof.  The YesCare Entities covenant and agree that Manager and its agents and affiliates shall have reasonable access to each Office during regular business hours for purposes of inspection.  The YesCare Entity shall immediately notify Manager of any damage or loss to person or property at or in an Office to which the YesCare Entity becomes aware.

2.19    <u>Licenses</u>.  Manager shall assist the YesCare Entities in applying for, obtaining and maintaining in the name and at the expense of the YesCare Entities, all reasonable and necessary licenses, permits, registrations, and certificates required or appropriate in connection with the business and operation of the YesCare Entities and the YesCare Entities' provision of Professional Services.  Upon the request of

- 6 -

17761764v8

the YesCare Entities, Manager shall provide evidence to the YesCare Entities of any such licenses, permits, registrations, and certificates.

2.20    Agency.  Except as otherwise provided herein, Manager shall have access to the YesCare Entities' Bank Accounts solely for the purposes stated herein and shall use all funds on deposit therein in accordance with the terms of this Agreement.

2.21    Litigation Management.  Manager shall, at the expense of the YesCare Entity, (a) manage and direct the defense of all claims, actions, proceedings or investigations against the YesCare Entity or any of its officers, managers, employees or agents in their capacity as such (provided, however, that no settlement of any malpractice claim against any Physician or Non-Physician Practitioner shall be entered into without the prior approval of such Physician or Non-Physician Practitioner, which approval shall not be unreasonably withheld or delayed), (b) manage and direct the initiation and prosecution of all claims, actions, proceedings or investigations brought by the YesCare Entity against any person other than Manager, and (c) cancel, modify, or terminate any Contract for the breach of or default by any other party thereto.  Manager shall: (i) promptly notify the YesCare Entity of all legal actions filed on behalf of or (as Manager becomes aware thereof) against the YesCare Entity; and (ii) provide all information or documentation requested by the YesCare Entity regarding such legal actions.

2.22    Policies.  Manager shall develop, provide and revise all necessary policies and operating procedures pertaining to the YesCare Entities' business operations and compliance (the "**Policies**").  Upon request of the YesCare Entities, Manager shall assist the YesCare Entities in the YesCare Entities' development and implementation of clinical practice guidelines, although the YesCare Entities shall never be required to follow any clinical practice guidelines developed by Manager.  Nothing in this Section 2.22 shall be construed to give Manager any control or influence over the practice of medicine or any of health care practice by the YesCare Entities or any of the Physicians or Non-Physician Practitioners employed or engaged by the YesCare Entities.

2.23    Training.  Manager shall furnish training services to the YesCare Entities with respect to all aspects of the operations of the YesCare Entities (other than matters related to clinical decision-making), including, without limitation, administrative, financial, billing, compliance and equipment maintenance matters.

2.24    Quality Assurance and Improvement Program.  Manager agrees to develop for the YesCare Entities' approval, and to implement for the YesCare Entities, a quality assurance and improvement program in accordance with recommendations made to the YesCare Entities or as required by law.  The YesCare Entities shall use commercially reasonable efforts to cause Physicians and Non-Physician Practitioners to participate in the development of such programs and to comply with the standards, protocols or practice guidelines established thereby.

2.25    Compliance.  Manager shall assist the YesCare Entities to operate in compliance with all applicable laws, regulations, and federal or state agency guidance.  Manager shall assist the YesCare Entities in establishing a culture that fosters the prevention, detection and resolution of instances of misconduct.  Manager shall be responsible for providing compliance training to Physicians, Non-Physician Practitioners, Clinical Support Personnel and all of Manager's employees, contractors, or agents providing services under this Agreement.

2.26    Protected Health Information.  Manager shall assist the YesCare Entities in the completion, maintenance and storage of patient medical records, including by providing Physicians and Non-Physician Practitioners with the administrative support necessary to complete medical records and periodically

- 7 -

17761764v8

reviewing medical records to confirm completeness. Manager shall protect the privacy and security of medical records in accordance with <u>Section 10.6</u> (Privacy and Security of Medical Records) below.

2.27 <u>Disclaimer</u>. To the extent Manager provides the YesCare Entities with equipment or Offices, the YesCare Entities acknowledge that Manager is not the manufacturer of the equipment or the manufacturer's agent or the developer, architect or owner of the Offices. ACCORDINGLY, THE YESCARE ENTITIES HEREBY AGREE TO TAKE THE OFFICES, IF ANY, AND EQUIPMENT, IF ANY, IN AN "AS IS" CONDITION. MANAGER HEREBY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER RELATING TO THE EQUIPMENT OR THE OFFICES, INCLUDING WITHOUT LIMITATION, THE DESIGN OR CONDITION OF THE OFFICES AND THE EQUIPMENT AND THE OFFICES AND THE EQUIPMENT'S MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESIGN, CONDITION, QUALITY, CAPACITY, MATERIAL OR WORKMANSHIP, OR AS TO PATENT INFRINGEMENT OR THE LIKE.

2.28 <u>Day-to-Day Services</u>. Manager shall furnish or obtain all telephones, paging devices, office services (including secretarial, transcription, reception, scheduling, duplication, facsimile services and document disposal services), janitorial services, maintenance services, security services, and any other services of a similar nature reasonably necessary in connection with the day-to-day operations of the YesCare Entities.

2.29 <u>Waste Management</u>. Manager shall arrange for the proper disposal of all medical and non-medical waste generated by the YesCare Entities, provided that such waste is generated in the ordinary course of Professional Services. The YesCare Entities shall use commercially reasonable efforts to cause their Physicians and Non-Physician Practitioners, and the Clinical Support Personnel to comply with all guidelines established by Manager with respect to the disposal of the YesCare Entities' waste.

2.30 <u>Manager's Right to Subcontract</u>. Manager may subcontract with other persons or entities for any of the Management Services that Manager is required to perform under this Agreement.

2.31 <u>Other Services</u>. Manager may provide all other reasonable management and administrative services in connection with the provision of the Professional Services.

3. <u>Professional Control Retained by the YesCare Entities</u>.

3.1 <u>Professional Services</u>. The YesCare Entities shall be responsible for and shall have complete authority, responsibility, supervision and control over their provision of Professional Services. Any purported delegation of authority by the YesCare Entities to Manager that would require or permit Manager to engage in the practice of medicine or provide the Professional Services shall be prohibited and deemed ineffective, and the YesCare Entities shall have the sole authority with respect to such matters. Manager shall not be required or permitted to engage in, and the YesCare Entities shall not request Manager to engage in activities that constitute the practice of a licensed profession. Manager shall not direct, control, influence, restrict or interfere with the exercise of independent clinical, medical, dental or professional judgment by the YesCare Entities or any Physician or Non-Physician Practitioner employed or engaged by the YesCare Entities in providing Professional Services. In furtherance thereof, Manager shall not engage in any of the following: (i) assumption of responsibility for the care of patients; and (ii) any activity that involves the unlicensed practice of medicine, dentistry, or any other health care profession.

4. <u>No Inducement; No Income Guarantee</u>. Manager and the YesCare Entities agree that they have reached an agreement regarding the terms and conditions of this Agreement in accordance with a good faith determination of the fair market value thereof. Manager shall neither have nor exercise any control or

- 8 -

17761764v8

direction over the number, type, or recipient of patient referrals and nothing in this Agreement shall be construed as directing or influencing such referrals. Nothing in this Agreement is to be construed to restrict the professional judgment of the YesCare Entities or any Physician or Non-Physician Practitioner to use any facility where necessary or desirable in order to provide proper and appropriate treatment or care to a patient or to comply with a patient's wishes. No part of this Agreement shall be construed to induce, encourage, solicit or reimburse the referral of any patients or business. The Parties acknowledge that neither this Agreement, nor any other agreement between the Parties requires or encourages the referral of patients to one another or any of their respective affiliates. Each Party represents and warrants to the other that no payment made under this Agreement shall be in return for the referral of patients or business. Furthermore, Manager has not guaranteed to the YesCare Entities that the arrangements contemplated hereunder will guarantee any amount of income to the YesCare Entities.

5.      Relationship of the Parties. The Parties expressly understand and agree that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association, or other affiliation or like relationship between the Parties, it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement. The Parties agree that their respective employees shall not have any claim under this Agreement or otherwise against the other Party or any of the other Party's affiliates for vacation pay, paid sick leave, retirement benefits, social security, workers' compensation, health, disability, professional malpractice or unemployment insurance benefits or other employment benefits of any kind.

6.      Responsibilities of the YesCare Entities.

        6.1      Physicians, Non-Physician Practitioners, and Professional Entities. The YesCare Entities shall have the authority to engage (whether as employees or as independent contractors), promote, discipline, suspend and terminate the services of Physicians and Non-Physician Practitioners. The YesCare Entities shall determine the salaries and provision of fringe benefits for Physicians and Non-Physician Practitioners after consultation with Manager. Nothing contained herein shall limit the YesCare Entities' duties and obligations to control all aspects of the practice of medicine, dentistry, and other applicable health care professions for which the YesCare Entities provide Professional Services, including, without limitation, clinical training and clinical supervision of the Physicians and Non-Physician Practitioners, and the care and safety of patients. Manager shall neither control nor direct any Physician or Non-Physician Practitioner in the performance of Professional Services. Notwithstanding the foregoing, Manager shall, as part of the Management Services, in consultation with the YesCare Entities, develop general employment and services agreement guidelines for the hiring or retention of Physicians and Non-Physician Practitioners (including through their respective employers, such as services agreements with professional entities) and upon adoption by the YesCare Entities, the YesCare Entities covenant to hire, retain, or contract with as well as terminate Physicians, Non-Physician Practitioners or their respective employers in accordance with such general employment and contractual guidelines (subject to the terms and conditions of any written employment or services agreement between the YesCare Entity and Physicians, Non-Physician Practitioners or their respective employers (as may be applicable)). With the assistance of Manager, and subject to the terms and conditions of any written employment or services agreement between the YesCare Entity and Physicians, Non-Physician Practitioners or their respective employers (as may be applicable), the YesCare Entity shall establish work schedules for all Physicians and Non-Physician Practitioners necessary to ensure adequate coverage; provided that Manager shall control all decisions relating to Clinical Support Personnel. The YesCare Entities and their supervising Physicians or Non-Physician Practitioners shall have full responsibility for and shall supervise and control all medical or health related services provided by Clinical Support Personnel (if any).

        6.2      Licenses, Certifications, Standards of Care. Each YesCare Entity shall require each Physician and Non-Physician Practitioner employed or engaged by such YesCare Entity to (a) maintain

- 9 -

17761764v8

                                                                                          YC-E-038662

without restriction all licenses, certifications, registrations and professional liability insurance necessary to provide the Professional Services; (<u>b</u>) perform all Professional Services in accordance with all laws and with prevailing and applicable standards of care and in accordance with the Policies (subject to the exercise of independent professional judgment in accordance with <u>Section 3</u> herein); and (<u>c</u>) maintain his or her skills through continuing education and training.

      6.3   <u>Cooperation with Manager on Billing</u>. The YesCare Entities shall require all Physicians and Non-Physician Practitioners to timely provide Manager with complete and accurate documentation, whether as part of a hard copy or electronic record, specifically identifying items or services furnished, in a form and substance as indicated by Manager in advance from time to time. The YesCare Entities shall be responsible for all billing decisions with respect to the provision of Professional Services to the YesCare Entities' clients.

      6.4   <u>Peer Review</u>. The YesCare Entities shall implement appropriate peer review and corrective action procedures for the Physicians and Non-Physician Practitioners, as required under applicable law. The YesCare Entities shall provide Manager with prompt notice of any material complaints relating to any Physician or Non-Physician Practitioner or arising out of the Professional Services rendered so that Manager may assess and comply with any potentially triggered duties under <u>Section 2.21</u> hereof.

      6.5   <u>Actions Requiring Manager's Approval</u>. Notwithstanding anything herein to the contrary, the YesCare Entities agree that the following actions shall require written approval of Manager:

         6.5.1   The issuance of ownership interests of any of the YesCare Entities or of any security convertible into the YesCare Entity's security or ownership interests;

         6.5.2   Commencing any new Professional Service or terminating or materially modifying the types of Professional Services or other services furnished by the YesCare Entities, except where competent staff is not reasonably available to continue providing such Professional Services or other services without modification or where the YesCare Entity reasonably determines that such change is required by law in which case the YesCare Entity shall give such written notice to Manager promptly;

         6.5.3   The payment of any dividend on any of the YesCare Entities' ownership interests or any other distribution to Tirschwell or YesCare Corp's employee stock ownership plan;

         6.5.4   Any consolidation of any of the YesCare Entities;

         6.5.5   Any sale, assignment, pledge, lease, exchange, transfer or other disposition, including, without limitation, a mortgage or other security device, of assets or leases, including the YesCare Entity's accounts receivable;

         6.5.6   Any purchase or other acquisition of assets at an aggregate cost to any of the YesCare Entities exceeding Two Thousand Five Hundred and No/100 Dollars ($2,500.00);

         6.5.7   Any incurrence of loans or other indebtedness by any of the YesCare Entities, or any grant of a lien, security interest or other encumbrance on the assets of any of the YesCare Entities;

         6.5.8   Any reclassification or recapitalization of the ownership interests of any of the YesCare Entities;

         6.5.9   Any redemption or purchase of any of the ownership interests of the YesCare Entities;

- 10 -

17761764v8

YC-E-038663

6.5.10   The dissolution or liquidation of any of the YesCare Entities;

6.5.11   The authorization for the employment or discharge of any employed individual, or the engagement or termination of engagement of any independent contractor or for the execution and delivery of any employment agreements or contracts with employees, independent contractors or consultants, or any amendments, modifications or terminations thereof, except in the case of an emergency involving substantial violation of any laws and standards applicable to the provision of Professional Services, in which case the YesCare Entity shall give prompt written notice to Manager;

6.5.12   The entering into of any contract by any of the YesCare Entities committing such YesCare Entity to incur more than One Thousand and No/100 Dollars ($1,000.00) in expenses on an annual basis;

6.5.13   Any amendment to a contract between any of the YesCare Entities and a Physician or Non-Physician Practitioner;

6.5.14   The creation of any indebtedness or any other obligation of the YesCare Entities by Tirschwell;

6.5.15   Any of the YesCare Entities' participation in a Federal Health Care Program (e.g., Medicare, Medicaid, etc.);

6.5.16   The submission of a request for proposal (or similar document) or entering into a contract by any of the YesCare Entities to render the Professional Services to a correctional facility; and

6.5.17   Entering into a new contract or agreement, or terminating an existing contract or agreement, with respect to the provision of correctional health care services to detainees and/or inmates in the care, custody, and control of certain prisons or jails.

6.6     The YesCare Entities' Governing Documents.   Prior to the execution of this Agreement, the YesCare Entities have provided to Manager for its review and approval, copies of certain governance and operational documents of the YesCare Entities, including, but not limited to the YesCare Entities' certificates of formation, company agreements, membership agreements, shareholders agreements, and any existing, written employment and/or independent contractor agreements between any of the YesCare Entities and any Physician or Non-Physician Practitioner.  The YesCare Entities shall consistently and uniformly utilize said governance and operational documents in the conduct of its business and shall comply with and require performance of all of the provisions contained therein.  The YesCare Entities hereby agree that, after the Effective Date, no revision or modification or termination shall be made to the YesCare Entities' governance and operational documents, and no new agreement or arrangement affecting the ownership or voting of the equity securities or membership interests (as applicable) of any of the YesCare Entities shall be made, without written notice to Manager at least ninety (90) days prior to the effectiveness thereof.

6.7     Scope.   The YesCare Entities shall provide all of their Professional Services at a designated location pursuant to an agreement to render correctional health care services, and shall not provide such services at other locations unless the provision of such health services at such locations is contemplated by an approved budget or if necessary for immediate treatment of an applicable emergency clinical condition. Failure to comply with the provision of this Section 6.7 shall be a breach of this Agreement, and, among other things, the applicable YesCare Entity, and not Manager, shall be responsible for all costs associated with such out-of-scope activities.

- 11 -

17761764v8

CONFIDENTIAL                                                                                      YC-E-038664

6.8     Security Agreement. Except to the extent the granting of a security interest is limited by application of law, the YesCare Entities and Manager shall execute a Security Agreement in the form attached hereto as Exhibit "D", which shall be executed and attached hereto, that grants and assigns to Manager a continuing security interest in all of the YesCare Entities' right, title and interest in (i) all furniture, fixtures, equipment and supplies, (ii) all leases, whether for personal or real property, (iii) all accounts, all payments and rights to payment from all sources, including, without limitation, those that are not evidenced by instruments or chattel paper, and whether or not they have been earned by performance, (iv) rights under contracts, (v) deposit accounts, (vi) proceeds of letters of credit of which the YesCare Entities are named beneficiaries, (vii) general intangibles, (viii) contract rights, (ix) chattel paper, (x) instruments, (xi) documents, (xii) insurance proceeds, and (xiii) all other indebtedness and obligations whatsoever owing to or owned or acquired by the YesCare Entities, together with all instruments and all documents of title representing any of the foregoing, all rights in any property that the same may represent, and all right, title, security and guarantees with respect to each of the foregoing, whether now owned or hereafter acquired (the "**Collateral**"). Manager acknowledges that the Collateral is subject to an existing first priority security interest securing the obligations of the YesCare Entities under that certain Third Amended and Restated Credit Agreement, dated as of August 17, 2020 (as assigned, assumed, amended, restated, supplemented and otherwise modified from time to time, the "Senior Credit Agreement"), among YesCare Corp, CHS, the lenders party thereto and Cortland Capital Market Services, LLC as administrative agent and collateral agent, and shall be subject to the subordination provisions set forth in the Security Agreement.

7.     Compliance with Laws. The Parties agree to cooperate with one another in the fulfillment of their respective obligations under this Agreement, and to comply in all material respects with all applicable laws, ordinances, statutes, regulations, directives, orders, and other lawful enactments or pronouncements of any federal, state, municipal, local or other lawful authority. Manager further agrees to comply in all material respects with all applicable federal and state laws, regulations and guidance in the performance of its duties to provide Management Services under this Agreement.

8.     Payments and Fees.

8.1     Management Fee. As compensation for the Management Services provided by Manager under this Agreement, the YesCare Entities shall pay to Manager (or its designee) a fee as set forth in Exhibit "E" (the "Management Fee"). Manager shall withdraw the Management Fee for each full or partial calendar month of Management Services provided during the Term from the YesCare Entities' bank account(s) on the fifteenth (15th) day of the month following each calendar month. In the event the Management fee is not timely paid in full to Manager in accordance with this Section 8.1, such outstanding Management Fee shall, in Manager's sole discretion, incur interest at a rate of twelve percent (12%) per annum. Manager shall, upon request from the YesCare Entities, furnish the YesCare Entities with a statement setting forth in reasonable detail the Management Fee and all expenses and compensation due to Manager for the immediately preceding month.

8.2     Reimbursement of Costs and Expenses. In addition to the Management Fee, Manager shall be entitled to full reimbursement (without mark-up) for all direct or indirect costs, expenses and liabilities incurred by Manager (including, without limitation, an allocable percentage of Manager's corporate overhead) in connection with its provision of Management Services under this Agreement or otherwise arising out of the operation, ownership or maintenance of the business of the YesCare Entities (the "**Manager Expenses**"). Manager shall, upon request from the YesCare Entities, submit an invoice to the YesCare Entities, dated no earlier than the thirtieth (30th) day of the month following the month in which the Manager Expenses being invoiced were incurred. Each such invoice shall state with reasonable detail the Manager Expenses that were incurred.

- 12 -

17761764v8

YC-E-038665

8.3     Assignment to Manager.  To the extent permitted by applicable law, the YesCare Entities assign to Manager (and its designees) all of the YesCare Entities' right and interest in all Gross Revenues of the YesCare Entities such that all Gross Revenues of the YesCare Entities shall be paid to and collected by Manager (or its designee) during the Term of this Agreement; provided, however, that no assignment shall be made of any such rights or interests, the assignment of which is prohibited by law.  The YesCare Entities hereby issue a standing instruction, which they shall confirm upon request from time to time, that all payments due to the YesCare Entities shall be remitted directly to Manager (or its designee) as their agent and attorney-in-fact hereunder.

8.4     Application of Payments.  The YesCare Entities hereby direct Manager, and Manager hereby agrees, to apply the YesCare Entities' monthly Gross Revenues for the following purposes, in the order of priority set forth below:

8.4.1     to pay all cumulative costs and expenses of operating the YesCare Entities' businesses, including, without limitation, insurance premiums, payroll and benefits for the YesCare Entities' employees and contractors, supply expenses, equipment purchase and lease expenses, auditing and tax preparation fees and fees of professional advisors, such as attorneys;

8.4.2     to pay all cumulative direct or indirect expenses incurred by Manager (including, without limitation, an allocable percentage of Manager's corporate overhead) in providing the Management Services, and in carrying out its duties hereunder on behalf of the YesCare Entities; and

8.4.3     to pay Manager the Management Fee.

8.5     Evaluation of Reasonableness.  The Parties agree that the Management Fee shall reflect the fair market value of the Management Services.  Payment of the Management Fee is not intended to be and shall not be interpreted or applied as permitting Manager to share in the YesCare Entities' fees for the Professional Services, but is acknowledged as the Parties' negotiated agreement as to the reasonable fair market value of the Management Services furnished by Manager pursuant to this Agreement and related agreements, considering the nature and extent of the Management Services required and the investment made by Manager.

9.     Term and Termination.

9.1     Term.  This Agreement shall have an initial term commencing as of the Effective Date and continuing in full force and effect for thirty (30) years (the "**Initial Term**") and shall renew automatically for additional five (5) year terms thereafter, unless terminated as provided herein (the Initial Term and any subsequent terms shall be referred to as the "**Term**").

9.2     Termination by Manager Without Cause.  Manager may terminate this Agreement at any time without cause upon ninety (90) days' advance written notice.

9.3     Immediate Termination By Manager.  Manager shall have the right, but not the obligation, to terminate this Agreement immediately upon notice to the YesCare Entities of any of the following events:

9.3.1     the cancellation or non-renewal of the professional or malpractice insurance of the YesCare Entities, any member of the YesCare Entities, or any Physicians or Non-Physician Practitioner employed or engaged by the YesCare Entities (other than due to the failure to pay premiums), and the inability to obtain replacement professional or malpractice insurance within ten (10) days thereafter;

9.3.2     the dissolution of any of the YesCare Entities;

- 13 -

17761764v8

                                                                                      YC-E-038666

9.3.3 the suspension or exclusion of Tirschwell, any Physician, or any Non-Physician Practitioner (as may be applicable) who is employed or engaged by any of the YesCare Entities from any state or Federal Health Care Program; provided that the applicable YesCare Entity may cure such breach by immediately terminating the employment or engagement of such Physician or Non-Physician Practitioner upon notice of such suspension or exclusion;

9.3.4 the date upon which any of the ownership interests held by any of the YesCare Entities is transferred or attempted to be transferred voluntarily, by operation of law or otherwise, to any person without the prior written approval of Manager;

9.3.5 the merger, consolidation, reorganization, sale, liquidation, dissolution, or other disposition of all or substantially all of the ownership interests or assets of any of the YesCare Entities without the prior written approval of Manager;

9.3.6 failure of any of the YesCare Entities to pay the Management Fee in the time frames set forth in Section 8 hereof;

9.3.7 any of the YesCare Entities materially altering or changing the scope of the Professional Services furnished by such YesCare Entity; or

9.3.8 any of the YesCare Entities' breach of any provision of Section 11 herein.

9.4 Immediate Termination by the YesCare Entities. The YesCare Entities shall have the right, but not the obligation, to terminate this Agreement immediately upon notice to Manager of the suspension, exclusion or debarment of Manager, any employee, contractor, vendor or agent of Manager, or any Clinical Support Personnel provided by Manager, from any state health care program, unless such exclusion relates to an individual (i.e., not Manager) and the excluded person is removed from performing any further activity on behalf of the applicable YesCare Entity immediately upon written notice from such YesCare Entity.

9.5 Termination by the Parties. This Agreement may be terminated as follows:

9.5.1 by mutual written agreement of the Parties;

9.5.2 by Manager immediately upon the filing of a petition in bankruptcy or the insolvency of any of the YesCare Parties, or by the YesCare Parties immediately upon the filing of a petition in bankruptcy or the insolvency of Manager;

9.5.3 by Manager, upon thirty (30) days' advance written notice of a material breach of any material provision of this Agreement by any of the YesCare Parties, which material breach is not cured within thirty (30) days after written notice is given, provided that such material breach continues for a period of thirty (30) days after written notice is given by Manager to the breaching YesCare Parties; or

9.5.4 by the YesCare Parties, upon thirty (30) days' advance written notice of a material breach of any material provision of this Agreement by Manager, which material breach is not cured within thirty (30) days after written notice is given, provided that such material breach continues for a period of thirty (30) days after written notice is given by the YesCare Parties to Manager.

9.6 Termination Obligations. In the event of termination or expiration of this Agreement, the YesCare Entities shall pay all Management Fees and costs and expenses owing to Manager hereof up through and including the date of termination or expiration and the Manager shall be obligated to pay all outstanding costs and expenses of the YesCare Entities taken into account in computing such Management

- 14 -

17761764v8

Fee.  After termination or expiration of this Agreement, the Parties shall reasonably cooperate with each other and provide each other access to such books, records and information as a Party may reasonably request, for purposes of defending against any subpoena or government investigation, audit, or any lawsuit or proceeding instituted by any third party and relating to any alleged or actual acts or omissions of a Party during the Term of this Agreement, or for any other legitimate purpose up through and including the date of termination or expiration.

9.7    Effect of Termination.  In the event of termination or expiration of this Agreement, the YesCare Entities shall no longer have any right to the equipment, supplies, personnel and Management Services provided by Manager hereunder.  Subject to Section 2.12.2, Section 9.6, and Section 10.5, the YesCare Entities shall immediately return to Manager any equipment, records and other items provided hereunder (including all copies thereof) and the Parties shall cease using any Confidential Information of the other Parties.  In the event of termination under this Section 9, the Parties will not enter into another agreement with each other for the Management Services on materially different financial terms prior to the one (1) year anniversary of the Effective Date.

10.    Records and Record Keeping.

10.1    Access to Information.  The YesCare Entities hereby authorize and grant to Manager full and complete access during the Term of this Agreement to all information, instruments and documents relating to the YesCare Entities that may be reasonably requested by Manager to perform its obligations hereunder, and shall disclose and make available to representatives of Manager for review and photocopying all relevant books, agreements, papers and records of the YesCare Entities.

10.2    Manager's Records and Systems.  At all times during and after the Term of this Agreement, all business records and information, including, without limitation, all books of account and general administrative records and all information generated under or contained in the management information system pertaining to the YesCare Entities, relating to the business and activities of Manager, shall be and remain the sole property of Manager; provided, however, that Manager shall provide the YesCare Entities with full access to all such business records and information, including but not limited to bank statements, cash disbursements, cash receipts, accounts payable and receivable, and contractual obligations of any kind.  Manager shall maintain such business records for such period of time as is customary for each type of business record and longer if required by law or by a correctional healthcare services contract between a YesCare Entity and a government client.

10.3    Manager's Electronic Systems.  The YesCare Entities acknowledge that Manager is the sole owner of any proprietary electronic records systems/software and that the YesCare Entities shall have no license or other right to copy, use, or transfer any rights to such systems/software, except for the right of access to the patient medical records as set forth herein as required by law and as necessary to provide the Professional Services.

10.4    Confidentiality of Business Records.  Manager and the YesCare Entities will adopt procedures to assure the confidentiality of the records relating to the operations of Manager and the YesCare Entities, including, without limitation, all statistical, financial and personnel data related to the operations of Manager and the YesCare Entities that is not otherwise available to third parties publicly or by law.

10.5    Maintenance, Retention and Storage of Records.  The Management Services shall include oversight of the maintenance and storage of all patient medical records of the YesCare Entities in their possession in accordance with applicable law.  Manager shall maintain patient medical records for a minimum of seven (7) years from the last date of service to the patient, and longer if required by law or necessary to protect the interests of the YesCare Entities.  The YesCare Entities shall retain ownership of,

- 15 -

17761764v8

and have access to all patient medical records as necessary to defend against any subpoena or government investigation, audit, or any lawsuit or proceeding instituted by any third party and relating to any alleged or actual acts or omissions of the YesCare Entities, or for any other legitimate purpose.

       10.6    <u>Privacy and Security of Medical Records</u>. The Parties agree to discharge their respective duties hereunder in accordance with the applicable provisions of HIPAA (as defined in <u>Exhibit "F"</u>) and all applicable state and federal laws governing the privacy and security of medical records. In furtherance of the foregoing, the Parties shall execute (and cause to be executed by their respective affiliates, as applicable) the HIPAA Business Associate Agreement attached hereto as <u>Exhibit "F"</u>, which is incorporated into this Agreement by this reference.

11.    <u>Protective Covenants</u>.

       11.1    <u>Confidential Information</u>. The Parties expressly acknowledge that, pursuant to this Agreement, each Party and its respective members, shareholders, officers, directors, employees, agents and contractors will be given access to, and be provided with, business methods, trade secrets and other proprietary information of the other Party in connection with their respective duties and activities. Each Party expressly acknowledges and agrees that Confidential Information, as defined below in <u>Section 11.2</u>, is proprietary and confidential and if any of the Confidential Information was imparted to or became known by any persons engaging in a business in any way competitive with that of the other Party, including, without limitation, the Party receiving Confidential Information and its members, shareholders, officers, directors, employees, agents and contractors, such disclosure would result in hardship, loss, irreparable injury and damage to the non-disclosing Party, the measurement of which would be difficult, if not impossible, to determine. Accordingly, each Party expressly agrees that the other Parties have legitimate interests in protecting the Confidential Information and business goodwill, that it is necessary for each Party to protect its business from such hardship, loss, irreparable injury and damage, that the following covenants are a reasonable means by which to accomplish those purposes, and that violation of any of the protective covenants contained herein shall constitute a breach of trust and is grounds for immediate termination of this Agreement and for appropriate legal action for damages, enforcement and/or injunction.

       11.2    <u>Trade Secrets, Proprietary and Confidential Information</u>. For purposes of this Agreement, "**Confidential Information**" is proprietary information obtained by a Party ("**Receiving Party**") from or regarding another Party ("**Disclosing Party**") and includes, without limitation: (<u>a</u>) lists containing the names of past, present and prospective clients, patients, or suppliers; (<u>b</u>) the past, present and prospective methods, procedures and techniques utilized in identifying prospective clients and in soliciting the business thereof; (<u>c</u>) the past, present and prospective methods, procedures and techniques used in the operation of the Party's business, including, without limitation, the methods, procedures and techniques utilized in marketing, provision of services and pricing; (<u>d</u>) compilations of information, records and processes which are owned by a Party and/or which are used in the operation of the Party's business; (<u>e</u>) statistical, personal, client information, and private information concerning a Party; (<u>f</u>) historical and financial information, business strategies, operating data, organizational and cost structures, product descriptions, pricing information, technology, know-how, processes, software, databases, trade secrets, and contracts; and (<u>g</u>) any information directly or indirectly obtained pursuant to this Agreement (including the terms and conditions of this Agreement). Notwithstanding the foregoing, "Confidential Information" shall not include information (<u>i</u>) which is or becomes part of the public knowledge or literature, not as a result of any breach of the provisions of this Agreement or (<u>ii</u>) which is lawfully disclosed, without any restriction on additional disclosure, to the receiving person or entity by a third party who is free lawfully to disclose the same, or (<u>iii</u>) patient health information protected by applicable law, including Protected Health Information ("**PHI**"), which shall be governed by the Parties' Business Associate Agreement. All Confidential Information is the property of the Disclosing Party and shall include proprietary information protected under the Uniform Trade Secrets Act. Receiving Party shall not, and shall require that its personnel not,

- 16 -

17761764v8

disclose to any person or entity, directly or indirectly, either during the Term or at any time thereafter, any Confidential Information, or use any Confidential Information other than in the course of meeting Receiving Party's obligations under this Agreement unless such Confidential Information is reasonably necessary in order for the YesCare Entities to litigate any claim against Manager. In the event the disclosure of Confidential Information is required by applicable law, an order of a court having competent jurisdiction or under subpoena from an appropriate government agency, Receiving Party shall use its reasonable best efforts to consult with Disclosing Party prior to making such required disclosure. Receiving Party agrees to return all Confidential Information to Disclosing Party, at Receiving Party's expense, upon the termination of this Agreement. This provision shall survive the termination of this Agreement.

11.3    Trade Names and Service Marks. The YesCare Entities shall not, absent Manager's prior written consent, use the trade names or service marks of Manager other than in a manner approved by Manager.

11.4    Intellectual Property Ownership. The YesCare Entities acknowledge and agree that all copyrights, trademarks, inventions, and other intellectual property and proprietary rights conceived, developed or created during the Term by the YesCare Entities during or in connection with the provision of Professional Services or the YesCare Entities' receipt of the Management Services or otherwise owned by the YesCare Entities through their employment during the Term of the Physicians or Non-Physician Practitioners whether complete or works in progress, whether prepared or acquired by the YesCare Entities, the Physicians or Non-Physician Practitioners or by any third party (collectively, the "**YesCare Entity Work Product**") shall be solely owned by Manager. The YesCare Entities agree to assign and do hereby assign to Manager any and all right, title and interest in and to such YesCare Entity Work Product. The YesCare Entity Work Product shall include, but not be limited to, all information, data, reports, studies, writings, programs, methods, forms, systems, services, designs, marketing and other ideas and concepts, products or processes, tests, techniques, developments, inventions, discoveries, innovations or materials (and any improvements or know-how related to any of the foregoing) developed, conceived, created, invented, contributed to, reduced to practice, or authored by the YesCare Entities (either solely or jointly with another or others) in the course of providing, and related to the provision of, Professional Services or receiving the Management Services during the Term or otherwise owned by the YesCare Entities during the Term through its employment of the Physicians and Non-Physician Practitioners; provided, however, that the YesCare Entity Work Product shall not include patient health information protected by applicable law, including PHI. Use and disclosure of PHI shall be governed by the Parties' Business Associate Agreement. During the Term, the YesCare Entities agree to at all times promptly disclose to the Manager in such form and manner as the Manager may reasonably require, any YesCare Entity Work Product, particularly including, but not limited to, the YesCare Entity Work Product subject to protection as Confidential Information (as described in Section 11.2), or which may be patentable or copyrightable. The YesCare Entities shall deliver the originals and all copies of any YesCare Entity Work Product to the Manager promptly upon the Manager's request or the termination, for cause or otherwise, or expiration of this Agreement.

11.5    Further Assurances. If by operation of law or otherwise the YesCare Entities acquire any ownership rights in any copyrights, trademarks, inventions, and other intellectual property and proprietary rights of Manager ("**Manager IP Rights**") or the YesCare Entity Work Product, or in any other intellectual property owned by Manager, by virtue of their respective activities pursuant to this Agreement or otherwise, such rights shall automatically vest in, or if not legally possible, be assigned promptly without restriction upon request to, Manager. To the extent any such rights cannot be assigned under applicable law, and to the extent allowed by applicable law, the YesCare Entities hereby waive such rights and hereby consent to any action of Manager that otherwise would violate such rights in the absence of such waiver or consent. The YesCare Entities agree to perform such acts as Manager may request, at the YesCare Entities' expense, in order to protect or confirm Manager's interest in any of the Manager IP Rights, the YesCare Entity Work

- 17 -

17761764v8

                                                                                                          YC-E-038670

Product or in any other intellectual property owned by Manager, including executing and delivering, without additional compensation, any and all documents that Manager reasonably determines may be necessary or desirable to perfect Manager's ownership of the Manager IP Rights, the YesCare Entity Work Product or other intellectual property owned by Manager from time to time. The YesCare Entities will not, and will not authorize anyone else to, use, adopt, register or attempt to register any Manager IP Rights or the YesCare Entity Work Product. This <u>Section 11.5</u> shall survive expiration or termination of this Agreement.

11.6   <u>Non-Solicitation; Non-Disparagement; Goodwill</u>.  The YesCare Parties agree that each shall not, during the Term, for any cause whatsoever, directly or indirectly, take any action that constitutes, results or may reasonably be expected to result in: (<u>a</u>) soliciting, diverting or interfering with any relationship that Manager or any of its affiliates has with any patients, health care providers or suppliers; (<u>b</u>) soliciting the termination of, or diverting or interfering with any relationship that Manager or any of its affiliates has with any person or entity affiliated with it or any of its affiliates as an independent contractor, supplier or provider; (<u>c</u>) entering into any agreement, the purpose of which would violate this <u>Section 11.6</u>; (<u>d</u>) soliciting, inducing or encouraging any individual employed or engaged by or affiliated with Manager or any of its affiliates (presently or in the then most recent twelve (12) month period) to curtail or terminate such affiliation or employment, or take any action that results in, or might reasonably be expected to result in any employee or contractor ceasing to perform services for Manager or its affiliates; or (<u>e</u>) disparaging Manager or any of its affiliates. The Parties shall portray each other in a positive light to the general public. The Parties agree that they will not disparage any of the other Parties to this Agreement during the Term and for a period of twenty-four (24) months following the termination of this Agreement. Nothing in this <u>Section 11.6</u> is intended to prohibit ordinary course employment decisions or the placement of general advertisements for employment, or to prohibit any Party or any of its affiliates who is a practicing health care professional from engaging in such professional practice or exercising such person's independent professional judgment, without consideration for any pecuniary interests of said professional, nor to restrict patient choice or require the referral of any patients for any service provided by any Party or its affiliates.

11.7   <u>Survival of Protective Covenants</u>.  Each covenant herein shall be construed as an agreement independent of any other provision of this Agreement, unless otherwise indicated herein, and shall survive the termination of this Agreement, and the existence of any claim or cause of action of any Party against another Party, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of such covenant.

11.8   <u>Extension of Restrictive Periods</u>.  If a Party violates the protective covenants set forth in this <u>Section 11</u> and the aggrieved Party brings legal action for injunctive or other relief hereunder, the aggrieved Party shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full restrictive periods of the protective covenants contained in this <u>Section 11</u>. Accordingly, such restrictive periods for the purposes of this <u>Section 11</u> shall be deemed to have a duration of the respective time periods stated in this <u>Section 11</u> computed from the date relief is granted, but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by such Party.

11.9   <u>Specific Performance and Other Remedies</u>.  The Parties understand and acknowledge that violation of this <u>Section 11</u> will cause irreparable harm to the non-violating Party, the exact amount of which will be impossible to ascertain, and for that reason the Parties agree that a Party shall be entitled to seek, without the necessity of showing any actual damage (unless required by law), from any court of competent jurisdiction temporary or permanent injunctive relief and/or specific performance of this Agreement restraining a Party or any person from any act prohibited by this <u>Section 11</u>. Nothing in this <u>Section 11.9</u> shall limit a Party's right to recover any other damages or remedies to which it is entitled as a result of the other Party's breach. If any one or more of the provisions of this <u>Section 11</u> or any word,

- 18 -

17761764v8

phrase, clause, sentence or other portion of this <u>Section 11</u> shall be held to be unenforceable or invalid for any reason, such provision or portion of provision shall be modified or deleted in such a manner so as to make this <u>Section 11</u>, as modified, legal and enforceable to the fullest extent permitted under applicable law.

11.10    <u>Severability of Restrictive Covenants</u>.  The Parties expressly agree and stipulate that the covenants and agreements contained in this <u>Section 11</u> are separate, severable and divisible, and in the event any portion or portions of the covenants and agreements contained herein are declared invalid or unenforceable by any court of competent jurisdiction, the validity of the remaining covenants and agreements shall not be affected thereby.

12.    <u>Indemnification</u>.

12.1    <u>YesCare Entities' Indemnification</u>.    The YesCare Entities hereby agree to defend, indemnify and hold Manager and its affiliates and its respective officers, employees, shareholders, successors and assigns ("**Manager Indemnified Parties**") harmless from and against any and all liabilities, causes of action, damages, losses, demands, claims, penalties, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees and related costs) of any kind or nature whatsoever ("**Losses**") that may be sustained or suffered by any Manager Indemnified Party in any way caused by or arising from (i) any of the YesCare Entities' fraud or willful or intentional misconduct related to their operations, (ii) the provision of Professional Services, or (iii) any material breach by any of the YesCare Entities of any of their representations, warranties, covenants, obligations or duties under this Agreement and any other agreement entered into in connection with this Agreement, to the extent such Losses are not covered by the YesCare Entities' insurance.

12.2    <u>Tirschwell Indemnification</u>.  Tirschwell hereby agrees to defend, indemnify and hold the Manager Indemnified Parties harmless from and against any and all Losses that may be sustained or suffered by any Manager Indemnified Party in any way caused by (i) Tirschwell's fraud or willful or intentional misconduct related to the provision of Management Services by Manager, or (ii) any material breach by Tirschwell of any of her representations, warranties, covenants, obligations, or duties under this Agreement and any other agreement entered into hereunder, to the extent such Losses are not covered by Tirschwell's insurance.

12.3    <u>Manager Indemnification</u>.    Manager hereby agrees to defend, indemnify and hold Tirschwell and the YesCare Entities and their affiliates and their respective managers, members, officers, employees, shareholders, successors and assigns (the "**YesCare Indemnified Parties**") harmless from and against any and all Losses that may be sustained or suffered by any  of the YesCare Indemnified Parties in any way caused by Manager's fraud or willful or intentional misconduct related to its provision of Management Services or any material breach by Manager of any of its representations, warranties, covenants, obligations, or duties under this Agreement and any other agreement entered into in connection with this Agreement, to the extent such Losses are not covered by Manager's insurance.

12.4    <u>Survival</u>.  The provisions of this <u>Section 12</u> shall continue throughout the Term hereof and shall survive the termination of this Agreement for the duration of the applicable statute of limitations.

13.    <u>Exclusivity</u>.  During the Term of this Agreement, Manager shall serve as the YesCare Entities' sole and exclusive manager, and the YesCare Entities shall not engage any other persons or entities to perform any of the duties or functions that Manager is explicitly required to provide hereunder or that are reasonably expected to be able to be provided by a manager of a health care practice.  In light of the scope of the Management Services provided and investment to be made by Manager hereunder, and the considerable impact such actions could have on Manager's ability to perform its duties and functions hereunder, during

- 19 -

17761764v8

the Term of this Agreement, the YesCare Entities shall not engage in the Professional Services at or on behalf of any sheriff, prison, jail, correctional state agency/department, group practice, hospital, health clinic, public, nonprofit or for-profit entity, or any other person or entity without obtaining the prior written approval of Manager, which approval may be withheld in the sole discretion of Manager.

14.  Notices.  All notices, requests, consents, and other communications provided for by this Agreement shall be in writing, shall be addressed to the receiving Party's address set forth below or to such other address as a Party may designate by notice hereunder, and shall be either: (i) delivered by hand, (ii) sent by recognized overnight courier, (iii) sent by e-mail (with confirmation of transmission), or (iv) sent by certified mail, return receipt requested, postage prepaid to such address as each Party shall provide the other Party from time to time.  Notice shall be deemed given (A) upon delivery, if hand delivered, (B) on the next business day, if sent next day delivery by a recognized overnight courier, (C) upon delivery if sent by e-mail (with confirmation of transmission), or (D) if sent by certified mail, three (3) business days following the day such mailing is made.

15.  Entire Agreement: Amendment.  This Agreement, together with the exhibits attached hereto, contains the entire agreement between the Parties hereto with respect to the subject matter of this Agreement.  No amendment, alteration or modification of this Agreement shall be valid unless in each instance such amendment, alteration or modification is expressed in a written instrument duly executed in the name of the Party or Parties making such amendment, alteration or modification and approved by the other Parties.

16.  General.

16.1  Duty to Cooperate.  The Parties acknowledge that the Parties' mutual cooperation is critical to the ability of Manager to perform successfully and efficiently its duties hereunder.  Accordingly, each Party agrees to cooperate fully with the other in formulating and implementing goals and objectives that are in the YesCare Entities' best interests.

16.2  Limited Renegotiation.

16.2.1  This Agreement shall be construed to be in accordance with any and all federal and state laws, including, without limitation, laws governing applicable state health care programs.  In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision or guidance that has any material effect on any term of this Agreement, then the applicable term(s) of this Agreement shall be subject to renegotiation, and any Party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other Parties, to remedy such condition.

16.2.2  The Parties expressly recognize that upon request for renegotiation, each Party has a duty and obligation to the others only to renegotiate the affected term(s) in good faith and, further, each Party expressly agrees that its consent to proposals submitted by another Party during renegotiation efforts shall not be unreasonably withheld provided such proposals would not materially alter the economic outcome of this Agreement.

16.3  Choice of Law.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Texas, without regard to the conflict of laws provisions thereof. The Parties hereby consent to personal jurisdiction and venue in any action permitted to be brought in court pursuant to this Agreement in the State of Texas.  The YesCare Entities and Manager expressly waive any right they have or may have to a jury trial of any dispute arising out of or in any way related to this Agreement or any breach thereof.

- 20 -

17761764v8

CONFIDENTIAL

16.4    Waiver of Breach.  The waiver by any of the Parties of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

16.5    Force Majeure.  None of the Parties shall be liable or be deemed in default of this Agreement for any delay or failure to perform caused by Acts of God, war, disasters, strikes, epidemics, pandemics or disease outbreaks (including the COVID-19 virus pandemic), other public health emergencies or quarantine restrictions declared or implemented by any applicable governmental authority or partial or entire failure of utilities or other vital supplies, or any similar cause beyond the control of any of the Parties.

16.6    Severability.  If any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.  To the extent any act or service required of Manager in this Agreement should be construed or deemed, by any governmental authority, agency or court to constitute the practice of medicine, dentistry or other health care profession, the performance of said act or service by Manager shall be deemed waived and forever unenforceable, and this Agreement shall be suitably amended to cure the defect and provide a replacement to the defective provision as closely approximating the Parties' original intention as possible.

16.7    Successors and Assigns.  This Agreement shall bind each of the Parties and their respective successors and permitted assignees.  Assignment by the any of the YesCare Parties of any rights or obligations under this Agreement without the prior written consent of Manager is expressly prohibited. Manager is permitted to assign this Agreement or any rights or obligations hereunder to any third party (including any lender or purchaser of Manager) without the prior written consent of the YesCare Parties and any such assignee is an intended third-party beneficiary of this Agreement.

16.8    Joinder.  Each of the subsidiaries and affiliates of YesCare Corp shall execute and deliver to Manager a joinder to this Agreement substantially in the form attached hereto as Exhibit "G", or in such other form and substance satisfactory to Manager, by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement and the applicable exhibits attached hereto.

16.9    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

16.10    Waiver.  No term or condition of this Agreement shall be deemed to have been waived except by written instrument of the Party charged with such waiver.

16.11    Counterparts.  This Agreement may be executed in one or more counterparts (including, without limitation, counterparts delivered by facsimile or PDF attachment sent via e-mail), each of which shall be deemed an original, but all of which shall be one and the same document.

16.12    Survival.  The provisions of Section 11, Section 12 and this Section 16 and such other articles and sections of this Agreement which either expressly or by their natures survive expiration or other termination of this Agreement shall survive such expiration or other termination of this Agreement until each such provision expires in accordance with its respective terms.

16.13    Construction.  This Agreement has been drafted and negotiated jointly by the Parties, and this Agreement will be construed neither against nor in favor of any of the Parties.

16.14    Exhibits.  Any exhibits attached hereto are an integral part of this Agreement and are incorporated herein by this reference.

- 21 -

17761764v8

16.15    Remedies. The remedies provided to the Parties by this Agreement are not exclusive or exhaustive, but cumulative and in addition to any other remedies the Parties may have, in law or in equity.

16.16    Attorneys' Fees.  If legal action is commenced by any Party to enforce or defend its/her rights under this Agreement, the Prevailing Party (as hereinafter defined) in such action shall be entitled to recover its/her costs and reasonable attorneys' fees in addition to any other relief granted.  The term "*Prevailing Party*" shall mean the Party in whose favor final judgment after appeal (if any) is rendered with respect to the claims asserted in the complaint, and the term "*reasonable attorneys' fees*" are those attorneys' fees reasonably incurred in obtaining a judgment in favor of the Prevailing Party.

16.17    No Third Party Beneficiaries.  Other than as expressly provided in this Agreement, the Parties do not intend this Agreement to create any third party beneficiaries, including without limitation, individuals who are the subject of PHI.

16.18    Advice of Counsel.   The Parties acknowledge that they have been advised to seek independent legal counsel for advice regarding the effect of the terms and provisions hereof, and have either obtained such advice of independent legal counsel, or have voluntarily and without compulsion elected to enter into and be bound by the terms of this Agreement without such advice of independent legal counsel.

16.19    Further Assurance.  At any time, and from time to time, after the Effective Date, each Party will execute such additional instruments and take such action as may be reasonably requested by the other Parties to carry out the intent and purpose of this Agreement.

*[Remainder of this page intentionally left blank; Signature pages follow.]*

- 22 -

17761764v8

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

**MANAGER:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____
  21468DD09E9040D
Name:  Zalman Schapiro
Title:
    Authorized Signatory

Address for Notices to Manager:

Geneva Consulting LLC
885 Third Avenue, 29th Floor
New York, NY 10022
Attn:  David Gefner; Zalman Schapiro
Email:  dg@genevaempire.com; zs@perigrove.com

With a copy (which shall not constitute notice) to:

Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, GA 30363
Attn:  Hedy Rubinger, Esq.
Email:  hedy.rubinger@agg.com

**YESCARE ENTITIES:**

YESCARE CORP.
*a Texas corporation*

By _____
  A9552F5A43FD487
Name:  Sara Tirschwell
Title:  CEO

Address for Notices to YesCare Corp.:

3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Attn:  Sara Tirschwell
Email:  Sara.Tirschwell@corizonhealth.com

*[Signature Page to Management Services Agreement]*

17761764v8

CHS TX, INC.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

Address for Notices to CHS TX, Inc.:

3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Attn:    Sara Tirschwell
Email:  Sara.Tirschwell@corizonhealth.com


CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By: _____
Name: Sara Tirschwell
Title: CEO

Address for Notices to Corizon Health of New Mexico, LLC:

3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Attn:    Sara Tirschwell
Email:  Sara.Tirschwell@corizonhealth.com


*[Signature Page to Management Services Agreement]*

17761764v8

**Tirschwell:**

DocuSigned by:

_____

Sara Tirschwell, *Individually*

Address for Notices to Sara Tirschwell:

Sara Tirschwell
3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Email:  Sara.Tirschwell@corizonhealth.com

*[Signature Page to Management Services Agreement]*

17761764v8

## EXHIBIT "A"

### POWER OF ATTORNEY

(See attached)

17761764v8

CONFIDENTIAL

# POWER OF ATTORNEY

BY THIS POWER OF ATTORNEY ("Power of Attorney"), effective as of May 5, 2022 (the "Effective Date"), YESCARE CORP., a Texas corporation ("YesCare Corp"), CHS TX, INC., a Texas corporation ("CHS"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("Corizon New Mexico", and together with YesCare Corp and CHS, the "YesCare Entities", but each individually as, a "YesCare Entity"), appoint GENEVA CONSULTING LLC, a Delaware limited liability company ("Manager"), and any subcontractor designated by Manager, as the YesCare Entities' attorney-in-fact to perform the following acts in any of the YesCare Entities' name and place:

1.    To negotiate and execute all business agreements and leases on any of the YesCare Entities' behalf, as the same relate to any of the YesCare Entities, to the extent not contrary to applicable law;

2.    To take legal action against third parties to enforce the rights of the YesCare Entities, other than any rights the YesCare Entities may have against Manager, to the extent not contrary to applicable law; and

3.    To perform any act necessary and appropriate to the exercise of the foregoing purposes and to accomplish those set forth in the Management Services Agreement between any or all of the YesCare Entities and Manager, dated as of the Effective Date (the "Management Services Agreement"). Except as otherwise defined in this Power of Attorney, capitalized terms of this Power of Attorney shall have the same meanings given to such terms in the Management Services Agreement.

This Power of Attorney shall be effective as of the Effective Date and shall terminate upon the expiration or termination of the Management Services Agreement. Except as otherwise provided herein, this Power of Attorney shall be irrevocable during the Term of the Management Services Agreement. The YesCare Entities and Manager acknowledge that this Power of Attorney is entered into for good and valuable consideration and to secure Manager's performance of certain obligations of the YesCare Entities under the Management Services Agreement, and that Manager's appointment as attorney-in-fact shall be construed as being coupled with an interest.

By this Power of Attorney, the YesCare Entities grant Manager the authority to determine, in Manager's sole discretion, the time, manner and purpose for which any power conferred upon Manager in this Power of Attorney shall be exercised, as well as the conditions, provisions, and covenants of any instruments which may be executed by Manager pursuant to this Power of Attorney.

*[Remainder of this page intentionally left blank; Signature page follows.]*

17761764v8

CONFIDENTIAL                                                                        YC-E-038680

IN WITNESS WHEREOF, this Power of Attorney has been entered into under seal as of the Effective Date.

**YESCARE ENTITIES:**

YESCARE CORP.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CHS TX, INC.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By: _____
Name: Sara Tirschwell
Title: CEO

**MANAGER:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____
Name: Zalman Schapiro
Title: Authorized Signatory

*[Signature Page to Power of Attorney]*

17761764v8

YC-E-038681

## EXHIBIT "B"

### EMPLOYEE LEASING AGREEMENT

(See attached)

17761764v8

CONFIDENTIAL

## EMPLOYEE LEASING AGREEMENT

This **EMPLOYEE LEASING AGREEMENT** (this "Agreement"), effective as of May 5, 2022 (the "Effective Date"), is entered into by and between GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**").

## RECITALS

**WHEREAS**, Manager assists in the management of the YesCare Entities pursuant to a Management Services Agreement by and between Manager and the YesCare Entities effective as of Effective Date (the "Management Services Agreement");

**WHEREAS**, in order for Manager to fulfill its obligations under the Management Services Agreement, it may be necessary and desirable for Manager to recruit, employ and retain certain support personnel to be available to any or all of the YesCare Entities as leased employees; and

**WHEREAS**, upon the determination of a YesCare Entity that there is a need for such support personnel, Manager will provide  the services of such support personnel, in each case, according to the terms and conditions of this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the respective covenants and agreements of the parties contained herein, the parties hereto agree as follows:

**Section 1.** **Leased Employees.**

(a) **Engagement of Leased Employees.** Manager hereby agrees that the Clinical Support Personnel (as defined in the Management Services Agreement) and any replacement or other Clinical Support Personnel designated by Manager (the "Leased Employees") shall, during the Term (defined below), perform for the YesCare Entities such functions and services as the YesCare Entities shall determine, consistent with reasonable expectations in the YesCare Entities' industry of persons serving in similar positions.  The identity of the Clinical Support Personnel may be amended and deemed amended from time to time by the YesCare Entities and Manager to reflect the addition or deletion of Leased Employees, in each case without the need for any other writing or approval by the YesCare Entities or Manager.

(b) **Leased Employee Qualifications.** Manager shall ensure that each Leased Employee is reasonably qualified to perform the support functions and services specified by a YesCare Entity and, where applicable, that each Leased Employee maintains the applicable qualifications required by the particular state where such Leased Employee will render services in accordance with the Leased Employee's job classification.  The YesCare Entities may, from time to time, make recommendations to Manager on the experience, education and other qualifications of Leased Employees.  Leased Employees shall not include any physicians, optometrists, dentists, physician assistants, or nurse practitioners.

(c) **Exclusive Engagement.** The YesCare Entities shall not, without Manager's prior written consent, enter into any separate agreement for the lease or engagement of support personnel.

17761764v8

YC-E-038683

(d) **Removal of Leased Employees.** A YesCare Entity may request that Manager terminate a Leased Employee's appointment hereunder and remove such Leased Employee at any time and for any lawful reason by written notice delivered to Manager (a "Removal"). As of the effective date specified by a YesCare Entity in such notice, such individual shall no longer be a Leased Employee under this Agreement. Upon Removal of a Leased Employee, the YesCare Entity shall pay to Manager the amounts under Section 5(a) below that are accrued and unpaid as of the effective date of such Removal. The YesCare Entity shall remain liable for any additional amounts due to Manager related to such Leased Employee under this Agreement and shall pay over the same to Manager not later than the date that any such amounts shall become due and payable. Manager reserves the right, in its capacity as an employer, to hire, discipline or terminate the Leased Employees; provided, that Manager shall use commercially reasonable efforts to provide notice to and consult with the YesCare Entity regarding any proposed termination.

(e) **Place of Performance.** All work and services by the Leased Employees hereunder will be performed at the YesCare Entities places of business or at such other place or places as may be reasonably designated by a YesCare Entity or Manager (such place of business or other designated places, "Worksites"). These Worksites shall be maintained at the YesCare Entities' sole cost and expense and will be equipped as necessary for the reasonable and safe performance by the Leased Employees of their duties.

**Section 2.** **Term and Termination.**

(a) **Term of Agreement.** The term of this Agreement (the "Term") shall begin on the effective date of the Management Services Agreement and shall remain in effect for so long as the Management Services Agreement remains in effect.

(b) **Termination of Agreement.** This Agreement shall terminate upon, and only upon, the termination of the Management Services Agreement, in accordance with the terms of the Management Services Agreement.

**Section 3.** **Rights and Duties of Manager.**

(a) **Employment Relationship.** Manager (or its affiliate) shall at all times be the employer of the Leased Employees and, subject to Section 4(a), Manager shall have all rights and duties of an employer with respect to the Leased Employees, including without limitation the right to hire, fire, and discipline and to set wages, benefits, employment policies, and other terms and conditions of employment. Except as provided in Section 4 and the other terms of this Agreement, the YesCare Entities will have no rights or obligations with respect to the Leased Employees. Manager shall require each Leased Employee to acknowledge in writing that, notwithstanding that such Leased Employee is an employee of Manager (or its affiliate), he or she (i) has read and understands the terms and provisions of the YesCare Entity's employee handbook and other related terms and conditions imposed by a YesCare Entity related to the employment assignment, (ii) is bound by the policies so established by the YesCare Entity as if such Leased Employee were an employee of the YesCare Entity and (iii) understands that his or her appointment with the YesCare Entity or employment with Manager may be terminated for failure to comply with such policies.

(b) **Wages.** Manager shall compensate each Leased Employee for his or her services to a YesCare Entity under the terms of this Agreement and in an amount and manner determined by Manager ("Wages"), in its sole discretion, less all appropriate deductions (including withholding taxes and deductions for participation in benefit programs and other deductions authorized by such Leased Employee or as may otherwise be required by applicable law or legal or judicial process), and payable in accordance with Manager's payroll practices applicable to such Leased Employees. Manager shall determine the

17761764v8

amount of each Leased Employee's Wages and any adjustments to Wages in its sole discretion. The YesCare Entities may offer recommendations on adjustments to Wages paid to Leased Employees during the Term; provided that any such recommendations will not be binding on Manager.

        **(c)**    **Benefits.** Each Leased Employee will be eligible to participate in the employee benefit plans of Manager offered to similarly situated employees and existing on the Effective Date (the "Manager Benefit Plans"), subject to, and on a basis consistent with, the terms of such Manager Benefit Plans. Manager shall have the right to amend, modify, or terminate such Manager Benefit Plans in its sole discretion. Nothing in this Agreement shall be deemed to be, nor shall constitute an amendment or modification of, any employee benefit plan maintained by Manager or confer upon any Leased Employee the right to participate in any particular employee benefit plan offered by Manager (except in accordance with its terms, as such terms may be modified from time to time as provided herein).

        **(d)**    **Workers' Compensation Insurance.** During the Term, Manager shall maintain and keep in full force and effect workers' compensation insurance or self-insurance covering all of the Leased Employees. Manager shall prepare and file required documents pertaining to reporting claims arising during the Term under all applicable workers' compensation laws, and shall provide injured Leased Employees assistance to obtain medical and rehabilitation benefits.

        **(e)**    **Payroll.** Manager shall be responsible during the Term for payroll functions, payment of wages and all applicable federal, state and local withholding, employment, payroll and other taxes and reporting thereof relating to Wages paid to the Leased Employees.

        **(f)**    **Records.** Manager shall make and keep written records required by applicable law or this Agreement in connection with the Leased Employees' services to a YesCare Entity under this Agreement, including records evidencing the Fees (as defined below) owed to Manager under Section 5 of this Agreement.

        **(g)**    **Employment Practices.** Manager shall use reasonable efforts to comply with applicable employment-related laws with respect to the Leased Employees. Manager shall cooperate with the YesCare Entities and provide such assistance as any of the YesCare Entities may request in connection with any inquiry by any federal, state or local governmental authority, including any discrimination, harassment, retaliation, wrongful discharge or similar claims that may be brought against any of the YesCare Entities by any Leased Employee arising out of or while performing services for a YesCare Entity during the Term.

        **(h)**    **General Assistance.** To the extent advance notice is feasible, Manager shall timely communicate with the YesCare Entities during the Term regarding any requested changes in the appointment of a Leased Employee. Manager shall cooperate with the YesCare Entities and provide such assistance and information as the YesCare Entities may reasonably request in furtherance of this Agreement.

        **(i)**    **Confidentiality.** Manager shall treat all non-public personnel information provided by the YesCare Entities, their employees and agents to Manager in connection with providing the services under this Agreement as confidential information of the YesCare Entities, and Manager shall take all reasonable action to maintain such confidentiality. Manager shall comply with applicable law protecting the use or disclosure of such personnel information. Notwithstanding the foregoing, this provision will not prohibit Manager from making disclosures that are required or permitted by court order, regulatory authorities, subpoena, or applicable law.

17761764v8

**Section 4.**       **Rights and Duties of the YesCare Entities.**

**(a)**       **Performance of Services.**  The YesCare Entities shall comply with all applicable federal, state and local laws affecting the Leased Employees in connection with their performance of services under this Agreement and shall notify Manager of any alleged violation of such laws immediately upon becoming aware of any such alleged violation.  The YesCare Entities shall be responsible for assuring that all of the Leased Employees, while providing services for a YesCare Entity, are compliant with applicable laws.  The YesCare Entities shall provide and maintain in safe conditions: (i) the physical premises where the Leased Employees shall work, and (ii) all tangible and intangible property, assets and services necessary for the Leased Employees to perform their services to a YesCare Entities hereunder, including all equipment, materials, supplies and office services.

**(b)**       **Employment Practices.**  The YesCare Entities will comply with all applicable employment-related laws with respect to the Leased Employees.  THE YesCare Entities shall cooperate with Manager and provide such assistance as Manager may reasonably request in connection with any inquiry by any federal, state or local governmental authority, including any discrimination, harassment, retaliation, wrongful discharge or similar claims that may be brought against Manager by any Leased Employee arising out of or while performing services for any of the YesCare Entities during the Term.

**(c)**       **Workers' Compensation Claims.**  The YesCare Entities shall promptly notify Manager of any on-the-job injury or accident and/or claim for workers' compensation benefits involving any Leased Employee during the Term and shall cooperate with Manager and provide such assistance as Manager may reasonably request in order to process and administer any workers' compensation claim involving a Leased Employee.

**(d)**       **Records.**  The YesCare Entities shall make and keep written records of any and all transactions occurring in connection with this Agreement and the Leased Employees in a reasonable manner consistent with the requirements of applicable law and sound business practices.  To the extent permitted by applicable law, Manager shall have the right, at Manager's expense, to inspect such records during normal business hours on reasonable prior notice to the applicable YesCare Entity.

**(e)**       **FMLA Leave.**  During the Term, the YesCare Entities shall promptly notify Manager of any request for, or any situation that the YesCare Entities reasonably believes might entitle a Leased Employee to, leave under the Family and Medical Leave Act or other federal, state or local law providing for employee leave so that Manager can properly determine rights to and/or administer such leave, and shall provide such assistance as Manager may reasonably request in connection therewith.  A Leased Employee who takes or is on any such leave shall remain a Leased Employee during the Term.

**(f)**       **General Assistance.**  The YesCare Entities shall timely communicate with Manager during the Term regarding the performance of the Leased Employees and any changes requested by a YesCare Entity regarding a Leased Employee's duties, responsibilities or position.  The YesCare Entities shall cooperate with Manager and provide such assistance and information as Manager may reasonably request in furtherance of this Agreement, including but not limited to providing access (in compliance with applicable law) to applicable YesCare Entity documents and data.

**(g)**       **Confidentiality.**  The YesCare Entities shall treat all personnel information provided by Manager, their employees and agents to the YesCare Entities in connection with providing the services under this Agreement as confidential information of Manager, and the YesCare Entities shall take all reasonable actions to maintain such confidentiality.  The YesCare Entities shall comply with all privacy laws and other laws protecting the use or disclosure of such personnel information.

17761764v8

      **(h)**    **Policies and Procedures.** The YesCare Entities will have authority to establish lawful and reasonable employment policies and procedures applicable to services provided by Leased Employees under this Agreement. The YesCare Entities agree to provide reasonable advance notice of any such policies or procedures (or any amendments to such policies or procedures) to Manager and applicable Leased Employees.

      **(i)**    **Insurance Coverage.** The YesCare Entities shall secure and maintain comprehensive general liability insurance at all times during the Term.

      **Section 5.**    <u>**Amounts to be Paid by the YesCare Entities**</u>.

      **(a)**    **Fees.** The YesCare Entities shall pay to Manager amounts equal to the total compensation and other costs incurred or paid by Manager to or on behalf of the Leased Employees for providing services under this Agreement, together with the other costs incurred by Manager in making the Leased Employees available, as provided below (collectively, the "<u>Fees</u>"). The Fees shall be determined by adding together the following expenses attributable to the services of the Leased Employees for each applicable payroll period (or partial payroll period) during the Term, whether such expenses are known and payable during the Term or only after the expiration of the Term:

      (i)    All gross Wages or other compensation (including bonuses, vacation pay, paid time off, sick pay and any other paid leave) paid by Manager to or on account of the Leased Employees, including, for the avoidance of doubt, amounts actually paid and amounts withheld for any reason, including for federal, state and local taxes;

      (ii)    All applicable federal, state and local taxes, including unemployment and employment taxes (*e.g.*, FICA) payable by Manager and attributable to the Leased Employees (but not including amounts withheld from the Leased Employees' Wages as provided in <u>Section 5(a)(i)</u>);

      (iii)    All amounts paid or incurred by Manager to or on account of the Leased Employees for workers' compensation insurance and any workers' compensation claims based on occurrences during the Term;

      (iv)    The cost paid or suffered by Manager on behalf of Leased Employees for coverage under any applicable Manager Benefit Plans, including Manager's health and retirement plans, during the Term. For any Manager Benefit Plan that is self-insured, the amount to be reimbursed to Manager by the YesCare Entities shall be the amount which accrues and is payable by Manager as the aggregate employer contribution for the coverage of the Leased Employees (and their spouses and dependents), plus any costs and expenses related to the administration of such plan that are allocable to the Leased Employees; and

      (v)    To the extent not provided or excluded above, all other external costs and expenses or amounts paid to third parties, if any, incurred by Manager arising from the services provided by Leased Employees under this Agreement, including but not limited to payroll processing fees and other administrative expenses.

      **(b)**    **Procedures for Reimbursement of Fees.** Within ten (10) business days after the end of each payroll period during the Term, Manager will provide a statement to the YesCare Entities showing the Fees owed by each YesCare Entity for such payroll period (the "<u>Manager Statement</u>"). The applicable YesCare Entities shall pay Manager the amount in the Manager Statement within two (2) business days after receipt of the Manager Statement. Following the expiration of the Term, Manager will provide a Manager Statement to the YesCare Entities of any outstanding Fees incurred prior to the

17761764v8

expiration of the Term that were not previously paid by the YesCare Entities, and the applicable YesCare Entities shall pay Manager such outstanding Fees within two (2) business days after receipt of the Manager Statement.

**Section 6.**    <u>Non-Solicit</u>. During the period beginning on the date hereof and ending two (2) years after the termination or expiration of the Term (the "<u>Restriction Period</u>"), the YesCare Entities shall not, directly or indirectly, (<u>i</u>) solicit for employment, employ or otherwise interfere with the relationship of Manager or any of its affiliates with any natural person who is or was employed by or otherwise engaged to perform services for Manager or any of its affiliates at any time during the Term (in the case of any such activity during such time) or during the twelve (12) month period preceding such solicitation, employment or interference (in the case of any such activity during the Restriction Period but after termination or expiration of the Term) or (<u>ii</u>) induce any employee of Manager or any of its affiliates to engage in any activity which the YesCare Entities are prohibited from engaging in under any of this <u>Section 6</u> or to terminate such employee's employment with Manager. The YesCare Entities acknowledge and agree that the covenants, obligations and agreements of the YesCare Entities contained in this <u>Section 6</u> relate to special, unique and extraordinary matters and that a violation of any of the terms of such covenants, obligations or agreements will cause Manager and its affiliates irreparable injury for which adequate remedies are not available at law. Therefore, the YesCare Entities agree that Manager shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) to restrain the YesCare Entities from committing any violation of such covenants, obligations or agreements. These injunctive remedies are cumulative and in addition to any other rights and remedies Manager and its affiliates may have.

**Section 7.**    <u>Indemnification</u>.

     **(a)**    **Indemnification by Manager**. Manager shall hold the YesCare Entities free of and harmless from all liability, judgments, costs, damages, claims or demands, including reasonable attorneys' fees, to the extent arising out of any negligent act or omission of Manager in the performance or nonperformance of its obligations and duties under this Agreement.

     **(b)**    **Indemnification by the YesCare Entities.** The YesCare Entities shall hold Manager free of and harmless from all liability, judgments, costs, damages, claims or demands, including reasonable attorneys' fees, in any way arising out of (i) the performance, nonperformance, or breach by the YesCare Entities of their obligations and duties under this Agreement, (ii) the failure of any Leased Employee to comply with or perform services pursuant to this Agreement, (iii) the action or inaction of any Leased Employee in the performance of services pursuant to this Agreement, (iv) the failure of any Leased Employee to comply with applicable law in the performance of services pursuant to this Agreement, (v) any other matter relating to the employment (including termination of employment) of any Leased Employee by Manager during the Term (including, but not limited to, claims arising out of tort, contract, equity, implied covenant, invasion of privacy, violation of any collective bargaining agreement, defamation, personal injury, wrongful discharge, emotional distress, discrimination (whether based on race, sex, age, color, national origin, religion, disability, sexual preference, or any other class protected by law), harassment, retaliation, occupational safety and health claims, work-related injuries, claims for workers' compensation benefits, claims for insurance or other employee benefits, claims for wages, any claim under the Age Discrimination in Employment Act (29 U.S.C. §621 et. seq.), the Civil Rights Act (42 U.S.C. §1981), Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e et. seq.), the Civil Rights Act of 1991 (42 U.S.C. §1981(a) et. seq.), the Americans With Disabilities Act (42 U.S.C. §12101 et. seq.), the Employee Retirement Income Security Act of 1974, as amended (29 U.S.C. §1001, et. seq.), or the Family Medical Leave Act (29 U.S.C. §2601 et. seq.), any claim under the Fair Labor Standards Act of 1938 (29 U.S.C. §201 et. seq.), the Rehabilitation Act of 1973 (29 U.S.C. §701 et. seq.), the Worker Adjustment and Retraining Notification Act of 1988 (29 U.S.C. 2107(a) et. seq.), any claim under common law, and any

17761764v8

claim under any federal, state, or local statute, regulation, constitution, order or executive order); and (vi) the operation of the YesCare Entities' businesses by any Leased Employee and the performance or non-performance by any Leased Employee of any duties or functions by or on behalf of a YesCare Entity. The foregoing indemnifications shall survive the termination of this Agreement. Notwithstanding the foregoing, the YesCare Entities' indemnification obligations pursuant to this <u>Section 7</u> shall not apply to the extent of any liabilities, damages, costs, compensation, losses, expenses, fines, penalties, or attorneys' fees arising out of or resulting from Manager's own gross negligence, willful misconduct, breach of this Agreement, or failure to comply with applicable law; <u>provided, however,</u> that the gross negligence or willful misconduct of a Leased Employee, or any action or failure to act by a Leased Employee that causes Manager to be in breach under this Agreement shall not be attributed to or be deemed to be the gross negligence or willful misconduct or breach of Manager. In the event Manager shall be made a party to any suit or other legal proceeding in connection with this Agreement, the YesCare Entities shall, at Manager's request, defend Manager therefrom.

**Section 8.** **Status of Parties.** Nothing in this Agreement shall be construed to create a joint venture, partnership, association, joint-employer or like relationship between Manager and the YesCare Entities, and their relationship as of the Effective Date is and shall remain that of independent parties. Provided that the YesCare Entities have paid the Fees, the YesCare Entities shall not be responsible for the payment of Wages, taxes or benefits to the Leased Employees. The parties understand and agree that under the Management Services Agreement, Manager may be providing assistance to the YesCare Entities in the development and implementation of policies and procedures, training programs, compliance programs, and other services related to administration of the YesCare Entities. Notwithstanding the foregoing, nothing in this Agreement or the Management Services Agreement should be construed as limiting the YesCare Entities' ultimate obligation for supervision of its personnel and compliance with applicable law.

**Section 9.** **Successors and Assigns.** Except as expressly provided herein, no party shall delegate its duties or assign its rights hereunder, in whole or in part, without the prior written consent of the other parties. Notwithstanding the foregoing, Manager shall have the right to assign all or part of its rights and interest herein or delegate or subcontract for the performance of any and all duties required to be performed by Manager as set forth herein (i) to any subsidiary or affiliate thereof or (ii) upon the transfer of all or substantially all of its business and/or assets (by whatever means).

**Section 10.** **Governing Law; Jurisdiction.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to the principles of conflicts of laws thereof. The parties hereto expressly consent to the personal jurisdiction of the state and federal courts of Texas in connection with any lawsuit filed with respect to this Agreement.

**Section 11.** **Notices.** All notices, requests, demands and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received, if personally delivered; when transmitted, if transmitted by telecopy, electronic or digital transmission method; the day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case, notice shall be sent to:

<u>If to a YesCare Entity:</u>

YesCare Corp.
3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Attn: Sara Tirschwell
Email: Sara.Tirschwell@corizonhealth.com

17761764v8

CHS TX, Inc.
3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Attn:    Sara Tirschwell
Email:  Sara.Tirschwell@corizonhealth.com


Corizon Health of New Mexico, LLC
3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Attn:    Sara Tirschwell
Email:  Sara.Tirschwell@corizonhealth.com


If to Manager:

Geneva Consulting LLC
885 Third Avenue, 29th Floor
New York, NY 10022
Attn:    David Gefner; Zalman Schapiro
Email:  dg@genevaempire.com; zs@perigrove.com

or to such other address as a party may have furnished to the other parties in writing in accordance herewith. Notice shall be deemed given if personally served on the date it is personally delivered, or if mailed, the date it is deposited in the mail in accordance with the foregoing.  Any party may change the address at which to send notices by notifying the other parties of such change of address in writing in accordance with the foregoing.

Section 12.    **Amendment**.  No amendment or modification of this Agreement or any of its provisions shall be binding upon any party unless made in writing and signed by the parties hereto.

Section 13.    **Validity**.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

Section 14.    **Entire Agreement**.  This Agreement together with the Management Services Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the parties in connection therewith.  This document and all other documents specifically referenced herein, constitutes the entire agreement between the parties regarding the services to be provided by the parties hereto.  No representations, promises, conditions or warranties with reference to the execution of this document, including, but not limited to, pro forma and other financial information, have been made or entered into between the parties hereto other than those expressly provided herein.

Section 15.    **Waiver**.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the other impacted party(ies).  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party(ies) under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision of this Agreement.

Section 16.    **Severability; Blue Pencil**.  Nothing contained in this Agreement shall be construed so as to require the commission of an act contrary to law and whenever there is any conflict

17761764v8

                                                      YC-E-038690

between any provision hereof and any present statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event, the provisions hereof affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law and to carry out the purposes hereof. The YesCare Entities and Manager agree that the covenants contained in Section 6 are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants as to the court shall appear not reasonable and to enforce the remainder of these covenants as so amended

**Section 17.** **Survival**. Manager and the YesCare Entities hereby agree that the provisions of this Agreement that are intended to survive following the termination or expiration of the Term, including but not limited to Sections 3(i), 4(h), 6, 7, 17 and 21, shall survive the termination or expiration of the Term in accordance with their terms.

**Section 18.** **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same instrument.

**Section 19.** **No Assumption of Liabilities**. Manager and the YesCare Entities agree that Manager is not assuming any obligation or liability of the YesCare Entities as a result of this Agreement.

**Section 20.** **Waiver of Claims**. The YesCare Entities agree that they will not sue, make any claim or demand, or otherwise seek any relief or damages from Manager (or its affiliates or assigns) arising out of, or in any way related to, the conduct of the Leased Employees or services rendered by the Leased Employees, other than actions arising out of a breach by Manager of this Agreement.

**Section 21.** **No Transfer of Property Rights**. All right, title, and interest in and to Manager's intellectual property shall at all times remain with Manager. All right, title, and interest in and to the YesCare Entities' intellectual property shall at all times remain with the YesCare Entities. No party's ownership rights, including, but not limited to, any intellectual property rights, shall be transferred pursuant to this Agreement. This Section 21 shall survive termination of this Agreement.

**Section 22.** **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person (including any Leased Employee) any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

*[Remainder of this page intentionally left blank; Signature page follows.]*

17761764v8

CONFIDENTIAL   YC-E-038691

**IN WITNESS WHEREOF**, the YesCare Entities and Manager have executed this Agreement under seal as of the date first written above.

**YESCARE ENTITIES:**

YESCARE CORP.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CHS TX, INC.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By _____
Name: Sara Tirschwell
Title: CEO

**MANAGER:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____
Name: Zalman Schapiro
Title: Authorized Signatory

*[Signature Page to Employee Leasing Agreement]*

17761764v8

YC-E-038692

# EXHIBIT "C"

## LIAISON AGREEMENT

(See attached)

17761764v8

CONFIDENTIAL

## LIAISON AGREEMENT

THIS LIAISON AGREEMENT (this "Agreement") is entered into as of May 5, 2022 (the "Effective Date") by and between GENEVA CONSULTING LLC, a Delaware limited liability company ("Manager"), and SARA TIRSCHWELL ("Tirschwell").

## RECITALS

WHEREAS, Manager has entered into a Management Services Agreement dated as of the Effective Date with the YesCare Entities (as that term is defined in the Management Services Agreement);

WHEREAS, Manager wishes to have Tirschwell serve, and Tirschwell is willing to serve, as a liaison between Manager and the YesCare Entities as set forth in this Agreement; and

WHEREAS, Tirschwell's services to Manager pursuant to this Agreement shall be separate and apart from any other engagement, employment or services provided by Tirschwell to Manager.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and promises contained herein, and for other good and valuable consideration, the parties hereto agree as follows:

### Section 1.    LIAISON SERVICES

During the term of this Agreement, Tirschwell shall provide (or shall designate another individual, so long as such other individual is approved by Manager in writing, to provide) such liaison services as Manager may reasonably request from time to time with respect to Manager and the YesCare Entities (the person providing such services, the "Liaison"), including but not limited to (a) assisting Manager in communicating to the YesCare Entities and their employees and independent contractors information regarding Manager's mission, vision, core values and quality standards; (b) requesting from the YesCare Entities and providing to Manager such information as Manager may reasonably request regarding the activities and practices of the YesCare Entities so that Manager may determine whether such activities and practices are consistent with Manager's mission, vision, core values and quality standards; and (c) serving as a liaison between Manager and the YesCare Entities in connection with all other communications between Manager and the YesCare Entities.

### Section 2.    LIAISON RESTRICTIONS

During the term of this Agreement, Tirschwell shall not provide any liaison services that are substantially similar to the liaison services that are provided hereunder to any medical or other health care practice or management company.

### Section 3.    DUTIES OF MANAGER

3.1    **Compensation**. As compensation for the services to be performed under this Agreement, Manager shall pay Tirschwell a monthly fee of Five Hundred Dollars ($500)], payable in arrears. The fee payable under this Section 3.1 shall hereinafter be referred to as the "Liaison Fee."

17761764v8

CONFIDENTIAL                                                                                          YC-E-038694

**3.2**  **Expenses**.  Manager shall pay directly, or reimburse Tirschwell for, all properly documented, reasonable and necessary business expenses incurred by Tirschwell and approved by Manager in advance in the discharge of Tirschwell's duties hereunder.

**3.3**  **Administrative Support**.  In support of Tirschwell's provision of services hereunder, Manager shall provide such administrative support services as may be reasonably required, including, but not limited to, maintaining of minutes, establishing and maintaining of checking accounts, accounting, and preparing and filing of annual statements and tax returns, for the YesCare Entities.  The cost of such services shall be borne entirely by Manager.

### Section 4.    TERM AND TERMINATION

The term of this Agreement shall begin on the Effective Date and shall remain in effect until terminated in accordance with this Section 4.  Manager and Tirschwell may terminate this Agreement for any reason upon thirty (30) days' prior written notice by either party (the date of such notice, the "Notice Date") or, if sooner, at the time when Tirschwell ceases to provide services to Manager (including but not limited to by reason of Tirschwell's death or disability, or by mutual agreement).  In the event this Agreement is so terminated, Tirschwell shall be entitled to receive the Liaison Fee and expenses through such termination, but the Liaison shall not be required to render any services hereunder after the Notice Date.

### Section 5.    GENERAL PROVISIONS

**5.1**  **Binding Effect; Assignment**.  This Agreement shall be binding on and inure to the benefit of Manager and its respective successors and permitted assigns.  This Agreement shall also be binding on and inure to the benefit of Tirschwell and her heirs, executors, administrators and legal representatives.  Tirschwell shall not assign this Agreement without Manager's prior written consent.  This Agreement shall be assignable by Manager in its sole discretion.

**5.2**  **Unauthorized Disclosure**.  During the term of this Agreement and following any termination thereof, without the prior written consent of Manager, except to the extent required by an order of a court having competent jurisdiction or under subpoena from an appropriate government agency, Tirschwell shall use her best efforts to consult with Manager prior to responding to any such order or subpoena, and except as required in performance of Tirschwell's services hereunder, Tirschwell shall not use or disclose any confidential or proprietary trade secrets, customer lists, drawings, designs, marketing plans, management organization information (including, but not limited to, data and other information relating to members of the Board of Directors of, or to the management of, Manager or any of its affiliates), operating policies or manuals, business plans, financial records, or other financial, commercial, business or technical information (i) relating to Manager or any of its affiliates; or (ii) that Manager or any of its affiliates may receive belonging to customers or others who do business with Manager or any of its affiliates (collectively, "Confidential Information") to any third Person (defined below) unless such Confidential Information has been previously disclosed to the public generally or is in the public domain, in each case, other than by reason of Tirschwell's breach of this Section 5.2.

**5.3**  **Return of Documents**.  Upon the termination of this Agreement, Tirschwell shall deliver to Manager (i) all property of Manager and any of its affiliates then in her possession and (ii) all documents and data of any nature and in whatever medium of Manager and any of its affiliates, and Tirschwell shall not take any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any Confidential Information.

17761764v8

5.4     **Confidentiality of Agreement**.  The parties to this Agreement agree not to disclose its terms to any person or entity, other than their attorneys, accountants, financial advisors or, in Tirschwell's case, members of her immediate family or, in Manager's case, for any reasonable purpose that is reasonably related to its business operations; provided, that this Section 5.4 shall not be construed to prohibit any disclosure required by law or in any proceeding to enforce the terms and conditions of this Agreement.

5.5     **Entire Agreement**.  This Agreement constitutes the entire agreement between Manager and Tirschwell with respect to the subject matter hereof, and supersedes all undertakings and agreements, whether oral or in writing, previously entered into by Manager and Tirschwell with respect thereto.  All prior correspondence and proposals (including, but not limited to, summaries of proposed terms) and all prior offer letters, promises, representations, understandings, arrangements and agreements relating to such subject matter (including, but not limited to, those made to or with Tirschwell by any other person) are merged herein and superseded hereby.  The Recitals set forth above are true and correct and made a part of this Agreement.

5.6     **Governing Law**.  This Agreement shall be governed in all respects, including as to interpretation, substantive effect and enforceability, by the internal laws of the State of Texas, without regard to conflicts of laws provisions thereof that would require application to the laws of another jurisdiction other than those that mandatorily apply.

5.7     **Amendments; Waiver**.  No provision of this Agreement may be modified or waived unless such modification or waiver is in writing and, in the case of a waiver, executed by the party making such waiver, or, in the case of a modification, executed by both parties.  No waiver by any party hereto at any time of any breach by any other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.  No waiver of any provision of this Agreement shall be implied from any course of dealing between or among the parties hereto or from any failure by any party hereto to assert its rights hereunder on any occasion or series of occasions.

5.8     **Severability; Blue Pencil**.  In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.  The parties agree that the covenants contained in Sections 5.2 through 5.4 hereof are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants as to the court shall appear not reasonable and to enforce the remainder of these covenants as so amended.

5.9     **Notices**.  Any notice or other communication required or permitted to be delivered under this Agreement shall be (i) in writing; (ii) delivered personally, by e-mail, by courier service or by certified or registered mail, first class postage prepaid and return receipt requested; (iii) deemed to have been received on the date of delivery or, if so mailed, on the third business day after the mailing thereof; and (iv) addressed as follows (or to such other address as the party entitled to notice shall hereafter designate in accordance with the terms hereof):

(A)     If to Manager:

Geneva Consulting LLC
885 Third Avenue, 29th Floor
New York, NY 10022

17761764v8

Attn:   David Gefner; Zalman Schapiro
Email:  dg@genevaempire.com; zs@perigrove.com

(B)     If to Tirschwell:

Sara Tirschwell
3411 Yoakum Blvd, Apt 2901
Houston, TX 77006
Email:  Sara.Tirschwell@corizonhealth.com

**5.10    Survival**.  The parties hereby agree that the provisions of this Agreement that are intended to survive the termination of this Agreement shall survive such termination in accordance with their terms.

**5.11    Further Assurances**.  Each party hereto agrees with the other party hereto that it will cooperate with such other party and will execute and deliver, or cause to be executed and delivered, all such other instruments and documents, and will take such other actions, as such other parties may reasonably request from time to time to effectuate the provisions and purpose of this Agreement.

**5.12    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  The parties hereto agree to accept a signed facsimile copy or portable document format of this Agreement as a fully binding original.

**5.13    Headings**.  The section and other headings contained in this Agreement are for the convenience of the parties only and are not intended to be a part hereof or to affect the meaning or interpretation hereof.

*[Remainder of this page intentionally left blank; Signature page follows.]*

17761764v8

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement under seal as of the Effective Date.

**MANAGER:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____

Name: Zalman Schapiro

Title: Authorized Signatory

**TIRSCHWELL:**

_____

Sara Tirschwell

*[Signature Page to Liaison Agreement]*

17761764v8

YC-E-038698

# EXHIBIT "D"

## SECURITY AGREEMENT

(See attached)

17761764v8

CONFIDENTIAL

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Agreement") is made and entered into as of May 5, 2022 (the "Effective Date"), by and between YESCARE CORP., a Texas corporation ("YesCare Corp"), CHS TX, INC., a Texas corporation ("CHS"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("Corizon New Mexico", and together with YesCare Corp and CHS, "Debtors", but each individually as, a "Debtor"), and GENEVA CONSULTING LLC, a Delaware limited liability company ("Secured Party"). Each Debtor and Secured Party may also be referred to herein as a "Party", and collectively, as the "Parties."

## RECITALS

**WHEREAS**, concurrently with execution of this Agreement, Debtors, Sara Tirschwell and Secured Party are executing that certain Management Services Agreement, effective as of the Effective Date (as amended, restated, supplemented and/or otherwise modified from time to time, the "Management Services Agreement");

**WHEREAS**, CHS and YesCare Corp are parties to that certain Third Amended and Restated Credit Agreement, dated as of August 17, 2020 (as amended, restated, supplemented and/or otherwise modified from time to time, the "Senior Credit Agreement" and the "Loan Documents" thereunder, the "Senior Debt Documents"), among YesCare Corp, CHS, the lenders party thereto and Cortland Capital Market Services, LLC as administrative agent and collateral agent (in such capacity, acting on behalf of the "Secured Parties" thereunder, the "Senior Creditor"), which is secured by substantially all of the assets of YesCare Corp and CHS (such collateral, the "Senior Collateral"); and

**WHEREAS**, Debtors and Secured Party desire to enter into this Agreement to grant a security interest to Secured Party in the Collateral (as hereinafter defined) to secure the Obligations (as hereinafter defined).

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein, Debtors and Secured Party agree as follows:

1. <u>Grant of Security Interest</u>. For valuable consideration, the receipt of which is hereby acknowledged, Debtors hereby grant and collaterally assign to Secured Party a continuing security interest in all of Debtors' right, title and interest in the collateral (the "Collateral") described in Section 2 (Description of Collateral) of this Agreement, and the security interest hereby created shall attach immediately on execution of this Agreement by Debtors and shall secure the following obligations: (i) the payment and performance of Debtors' obligations under the Management Services Agreement, including without limitation, payment of any delinquent Management Fees (as defined in the Management Services Agreement) owed to Secured Party pursuant to Section 8 of the Management Services Agreement, (ii) the payment and performance of Debtors' obligations under this Agreement, (iii) all amounts under any modifications, renewals or extensions of any of the foregoing obligations, and (iv) any of the foregoing that arises after the filing of a petition by or against any Debtor under Title 11 of the United States Code (the "Bankruptcy Code"), even if the obligations do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise (collectively, the "Obligations"). Subject to Sections 4 and 11, Debtors shall execute (if applicable) and deliver, in a form acceptable to Secured Party, all documents that are reasonably necessary to perfect and maintain the perfection of the security interest in the Collateral, including, without

17761764v8

limitation, any financing statement or other statements or notices. Any such financing statement or other statements or notices shall be on a form or forms approved by the applicable Secretary of State or by the entity to which notice is to be given, and shall be filed or delivered in the manner required by the Uniform Commercial Code of such applicable state (the "Code"). Debtors also hereby grant and transfer to Secured Party as additional security, a security interest in any and all after acquired Collateral in which Debtors hereafter acquire rights.

2.    Description of Collateral. The Collateral covered by this Agreement and in which a security interest is hereby granted and transferred to Secured Party is as follows: all present and future rights of Debtors to (i) all furniture, fixtures, equipment and supplies, (ii) all leases, whether for personal or real property, (iii) all accounts, all payments and rights to payment from all sources, including, without limitation, those that are not evidenced by instruments or chattel paper, and whether or not they have been earned by performance, (iv) rights under contracts, (v) deposit accounts, (vi) proceeds of letters of credit of which a Debtor is named beneficiary, (vii) general intangibles, (viii) chattel paper, (ix) instruments, (x) documents, (xi) insurance proceeds, (xii) inventory and all other goods, (xiii) investment property, and (xiv) all other indebtedness and obligations whatsoever owing to or owned or acquired by a Debtor, together with all instruments and all documents of title representing any of the foregoing, all rights in any property that the same may represent, and all right, title, security and guarantees with respect to each of the foregoing, whether now owned or hereafter acquired. The Collateral in which the one or more holders of "Obligations" under the Senior Debt Documents (the "Senior Obligations") and the Secured Party (or their representatives) hold a security interest or Lien (as defined below) is referred to herein as the "Shared Collateral".

3.    Security Interest in Proceeds. Debtors also hereby grant and transfer to Secured Party a security interest in any and all proceeds, as defined in the Code, of the Collateral or any part of the Collateral (hereinafter, the "Proceeds"). Any and all references hereinafter to "Collateral" shall be deemed to include Proceeds.

4.    Subordination.

4.1    Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection of any Lien granted to Secured Party on the Shared Collateral or of any Liens granted to the Senior Creditor on the Shared Collateral (or any actual or alleged defect in any of the foregoing) and notwithstanding any provision of the Code, any applicable law, this Agreement, any Senior Debt Document or any other circumstance whatsoever, the Secured Party hereby agrees that (a) any Lien on the Shared Collateral securing any Senior Obligations now or hereafter held by or on behalf of the Senior Creditor or any agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Shared Collateral securing the Obligations and (b) any Lien on the Shared Collateral securing the Obligations now or hereafter held by or on behalf of Secured Party or any agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Shared Collateral securing any Senior Obligations. All Liens on the Shared Collateral securing any Senior Obligations shall be and remain senior in all respects and prior to all Liens on the Shared Collateral securing any Obligations for all purposes, whether or not such Liens securing any Senior Obligations are subordinated to any Lien securing any other obligation of any Debtor or any other person or otherwise subordinated, voided, avoided, invalidated or lapsed.

4.2    Secured Party agrees that it shall not (and hereby waives any right to) contest or support any other person in contesting, in any proceeding (including any insolvency or liquidation proceeding), the

17761764v8

CONFIDENTIAL                                                                                    YC-E-038701

validity, extent, perfection, priority or enforceability of any Lien securing any Senior Obligations held (or purported to be held) by or on behalf of the Senior Creditor or other agent or trustee therefor in any Senior Collateral.

      4.3     The Senior Creditor shall not be responsible for perfecting and maintaining the perfection of Liens with respect to the Shared Collateral for the benefit of the Secured Party, and until the Senior Obligations have been repaid in full, Secured Party shall not take any steps to perfect any Lien on the Shared Collateral other than the filing of financing statements. The provisions of this Section 4 are intended solely to govern the respective Lien priorities as between the Senior Creditor and Secured Party and shall not impose on the Senior Creditor or Secured Party or any agent or trustee therefor any obligations in respect of the disposition of proceeds of any Shared Collateral which would conflict with prior perfected claims therein in favor of any other person or any order or decree of any court or governmental authority or any applicable law.

5.     Covenants, Representations and Warranties of Debtors.  Debtors hereby covenant, represent and warrant to Secured Party that:

      5.1     Debtors are the full legal and equitable owners of the Collateral and no other person or entity has any right, title, interest, or claim in or to the Collateral or any part of the Collateral (other than the Liens granted in favor of Secured Party hereunder and Liens on the Shared Collateral granted in favor of Senior Creditor under the Senior Debt Documents). Debtors have the right and lawful authority to pledge the Collateral hereunder and the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action of Debtors. This Agreement is a legally valid and binding obligation of Debtors, enforceable against them in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles relating to or limiting creditors' rights generally.

      5.2     Debtors own the Collateral free and clear of any lien, security interest, charge or encumbrance ("Lien"), other than the Liens granted in favor of Secured Party hereunder and Liens on the Shared Collateral granted in favor of Senior Creditor under the Senior Debt Documents.

      5.3     No financing statement or other instrument similar in effect covering all or any part of the Collateral is or shall be on file in any recording office, except such as may have been filed in favor of (i) Secured Party relating to this Agreement and (ii) Senior Creditor relating to the Senior Debt Documents. The execution, delivery and performance of this Agreement by Debtors do not and will not result in a breach of, or constitute a default under, any agreement, lease or instrument to which a Debtor is a party or by which it or its properties may be bound, including, without limitation, the Senior Debt Documents.

      5.4     This Agreement creates a valid security interest in the Collateral, securing the payment of Management Fees under the Management Services Agreement and any other Obligations hereunder. Upon the filing of a financing statements naming Debtors as "debtor", naming the Secured Party as "secured party" and describing the Collateral with the relevant state agency/body, the security interests in the Collateral granted to Secured Party will constitute perfected security interests therein to the extent a security interest in such Collateral can be perfected by the filing of financing statements under the Code as in effect in the states of such filing offices, prior to all other Liens on the Collateral (except for Liens created under the Senior Debt Documents and Liens having priority over Secured Party' Lien by operation of law, and all such filings of financing statements have been made or will be made on the date hereof.

17761764v8

5.5     Debtors shall pay before delinquency all taxes or other governmental charges levied against the Collateral and all assessments or liens in connection with the Collateral or necessary to preserve the Collateral and will pay any tax that may be levied on any Obligation secured hereby.

5.6     Debtors shall promptly notify Secured Party in writing of any event that affects the value of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against the Collateral.

5.7     Debtors shall within thirty (30) days' notify Secured Party of any change of a Debtor's name, identity, form of organization, jurisdiction of organization or the principal place of business of such Debtor.

5.8     The records regarding the Collateral shall be located at the principal office of a Debtor or, if applicable, the management company managing a Debtor's business and shall not, during the continuance of this Agreement, be removed from those premises without the prior written consent of Secured Party. Debtors shall maintain all records and evidence of or pertaining to the Collateral, herein called the "Records," in an updated state at Debtors' cost and expense. Debtors shall not, without the prior written consent of Secured Party, sell or otherwise dispose of any portion of the Records until all amounts secured by the security interest created by this Agreement have been fully and finally paid.

5.9     Secured Party and its authorized representatives or agents, upon at least two (2) business days' prior written notice, shall have the right at any time during normal business hours and at reasonable intervals to enter the premises where the Collateral is located and inspect said Collateral and to enter the premises where the Records are located and inspect the Records. For purposes of this Agreement, the term "business day" shall mean any day that is not a Saturday, Sunday or United States national holiday.

5.10    Subject to Section 4 and Section 11, when requested by Secured Party, Debtors, at the expense of Debtors, shall execute and deliver any written instruments and documents and do any other acts necessary or reasonably desirable in order to perfect and protect any security interest granted or purported to be granted hereunder or to enable Secured Party to exercise and enforce its rights and remedies hereunder or to in any other way effectuate more fully the purpose and provisions of this Agreement.

5.11    DEBTORS SHALL DEFEND, INDEMNIFY AND HOLD SECURED PARTY HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, COSTS, DAMAGES, LIABILITIES OR EXPENSES, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES THAT SECURED PARTY MAY SUSTAIN OR INCUR BY REASON OF DEFENDING OR PROTECTING ITS SECURITY INTEREST OR THE PRIORITY THEREOF OCCASIONED BY A DEBTOR'S BREACH OF ANY COVENANT CONTAINED IN THIS SECTION 4 (COVENANTS, REPRESENTATIONS AND WARRANTIES OF DEBTORS), OR ENFORCING PAYMENT OF THE OBLIGATIONS HEREBY SECURED, OR IN THE PROSECUTION OR DEFENSE OF ANY ACTION OR PROCEEDING CONCERNING ANY MATTER GROWING OUT OF OR CONNECTED WITH THIS AGREEMENT, THE OBLIGATIONS OR THE COLLATERAL, EXCEPT WHERE SUCH LOSSES, COSTS, DAMAGES, LIABILITIES, EXPENSES OR FEES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SECURED PARTY.

5.12    Debtors shall not make or agree to any reduction in the original amount owing on any account receivable of Debtors, nor accept less than the original amount owing in satisfaction of a receivable; provided, however, that prior to the occurrence of a Default or during any cure period for a Default, if applicable (so long as Debtors are taking actions in good faith to cure such Default) under this Agreement or the Management Services Agreement, Debtors may take such actions (i) only if taken in the ordinary

17761764v8

course of Debtors' business and in accordance with their current policies and (ii) so long as such policies of Debtors are substantially similar to such policies then in effect at other organizations in the same or similar business as Debtors.

5.13    In the event of a Default (as hereinafter defined) hereunder or a default under the Management Services Agreement, Debtors shall pay all expenses incurred by Secured Party in connection with the collection of the Collateral, including expenses of and incidental to accounting, correspondence, collection effort, reporting to account or contract debtors, filing, recording and record keeping.

6.    Debtors Remain Liable.  Anything herein to the contrary notwithstanding, (i) Debtors shall remain liable under any contracts and agreements included in the Collateral, to the extent set forth therein, to perform all of their duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by Secured Party of any of the rights hereunder shall not release Debtors from any of their duties or obligations under the contracts and agreements included in the Collateral and (iii) Secured Party shall not have any obligation or liability under any contracts and agreements included in the Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of a Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

7.    Insurance.

7.1    Debtors shall, at their own expense, maintain insurance with respect to the Collateral and business of Debtors in such amounts, against such risks, in such form and amounts and with such insurers, as shall be satisfactory to Secured Party from time to time, but not in excess of the full insurable value thereof.  Debtors shall provide at least thirty (30) days' prior written notice to Secured Party of cancellation, material amendment, reduction in scope or limits of coverage or lapse.  Debtors shall, if so requested by Secured Party, deliver to Secured Party original or duplicate policies of such insurance and, as often as Secured Party may reasonably request, a report of a reputable insurance broker with respect to such insurance.  Further, Debtors shall, at the request of Secured Party at any time when the Senior Obligations have been repaid in full and discharged, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 5 hereof and cause the respective insurers to acknowledge notice of such assignment.

7.2    Upon the occurrence and during the continuance of any Default under this Agreement, subject to Section 4 hereof, all insurance payments in respect of the Collateral shall be paid to and applied by Secured Party as specified in Section 11.4 hereof.

8.    Actions by Secured Party.  In the event of Default under the terms of this Agreement or a default under the Management Services Agreement, Secured Party shall, if the Senior Obligations have been repaid in full and discharged, also have the right, at its option, to enter the premises where the Records or any part of the Records are located, and cause to be performed as agent and on the account of Debtors any such acts as it may deem necessary for the proper maintenance of the Records or the maintenance and preservation of any part of the Collateral.  Any monies expended or expenses incurred by Secured Party under this Section 8 shall also be secured by the security interest created by this Agreement and shall be due and payable by Debtors to Secured Party, together with interest at the highest rate allowed by law, on demand.

9.    Waiver of Rights and Defenses.  Debtors hereby waive any right to require Secured Party to proceed against any account debtor or to proceed against the Collateral, including, but not limited to, any accounts assigned hereunder and Debtors waive the right to require Secured Party to pursue any other remedy for the benefit of Debtors and agree that Secured Party may proceed against Debtors for the amount of any

17761764v8

indebtedness owed by a Debtor to Secured Party without taking any action against any account debtor or any other party and without selling or otherwise proceeding against the Collateral or applying any security it may hold.

10.    Default Defined.  The term "Default" shall mean the occurrence of any of the following events:

        10.1    Failure to keep or perform and cure within any applicable grace period as provided herein any of the terms or provisions of this Agreement;

        10.2    Failure to keep or perform any of the material terms or provisions of the Management Services Agreement, or any ancillary agreements, exhibits or schedules attached thereto;

        10.3    The levy of or any attachment, execution or other process against a Debtor that is not cured or dismissed within any applicable grace period as provided herein in an amount in excess of One Thousand Dollars ($1,000) against the Collateral, except pursuant to the Senior Debt Documents;

        10.4    The insolvency or dissolution of a Debtor;

        10.5    (i) The application for the appointment of a receiver or custodian for a Debtor or the property of a Debtor, (ii) the entry of an order for relief or the filing of a petition by or against a Debtor under the provisions of the Bankruptcy Code, or any other bankruptcy or insolvency law, or (iii) any assignment for the benefit of creditors by or against a Debtor;

        10.6    Any representation, warranty or certification made by a Debtor in connection with this Agreement or the Management Services Agreement shall be false in any material respect on the date as of which made;

        10.7    Secured Party's security interest in the Collateral (to the extent a security interest in such Collateral can be perfected by the filing of financing statements under the Code as in effect in the states of such filing offices) is not at all times a perfected security interest; or

        10.8    A Debtor shall fail, breach or default in the performance of any of the obligations or covenants owing by such Debtor to Secured Party pursuant to any agreement.

11.    Remedies Upon Default.  In the event of a Default, Secured Party shall have all the rights and remedies afforded a secured party by the Code, as amended from time to time, and may, in connection therewith, also:

        11.1    Enter on a Debtor's premises to assemble and take possession of the Records;

        11.2    Subject to Section 4 and Sections 11.6, 11.7 and 11.8 below, require a Debtor to assemble the Records and make their possession available to Secured Party at a place designated by Secured Party that is reasonably convenient to both such Debtor and Secured Party;

        11.3    After giving a Debtor written notice, notify the account debtors obligated on any or all of the Collateral to make payment directly to Secured Party, and to take control of all proceeds of any such Collateral, and to compromise said Collateral;

17761764v8

CONFIDENTIAL                                                                                                 YC-E-038705

11.4    Apply the proceeds received from the sale or other disposition of the Collateral upon Default, in addition to the items specified in the Code, to the payment of reasonable attorneys' fees and legal expenses incurred by Secured Party as a result of a Debtor's Default.

11.5    Subject to applicable law, take immediate possession of the Collateral and use and operate said Collateral.  For the purpose of taking immediate possession of the Collateral, Secured Party may enter into any premises upon which the Collateral is located, and search for the same and take possession and keep and store the same on said premises until sold or delivered or, in the alternative, may remove the Collateral or any part thereof to such other place as Secured Party may desire.  Secured Party may require a Debtor to assemble the Collateral and to make it available to Secured Party at a place to be designated by Secured Party that is reasonably convenient to all Parties.  Secured Party may, at its option, sell and dispose of all the Collateral at a public auction or, if permitted by the Code, private sale for cash or for credit, upon such terms as it may elect, after giving such notice as is required by the Code, and such Debtor shall be credited with the amount of any such sale only when the cash proceeds thereof are actually received by Secured Party.  Any requirements of notice shall be met if such notice is mailed, postage prepaid, at least ten (10) calendar days before the time of sale or other disposition.  None of the Collateral subject to the security interest created hereby need be in view of those attending any such sale or other disposition or be in its physical possession at or as a condition to selling or otherwise disposing thereof.  Secured Party is specifically given the right to bid and purchase at any public auction or private sale, if permitted under the Code.  Secured Party may sell the Collateral described herein or any other Collateral as Secured Party may have securing the Obligations (including real property Collateral) in such order, priority and lots as Secured Party, in its sole and absolute discretion, may designate and no Debtor shall have the right to direct in what order or priority the Collateral may be sold.  All expenses of retaking, holding, preparing for sale, selling or the like shall include, without limitation, Secured Party's reasonable attorneys' fees and other legal expenses and disbursements.

11.6    Notwithstanding the foregoing or anything to the contrary herein, if any of the Senior Obligations remain outstanding, whether or not any insolvency or liquidation proceeding has been commenced by or against the Debtors, (i) Secured Party will not (w) institute (or direct or support any other person in instituting) any insolvency or liquidation proceeding against any Debtor, (x) exercise or seek to exercise any rights or remedies (including setoff, recoupment and, except to the extent provided below, the right to credit bid, if any) with respect to any Shared Collateral in respect of any Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object (or support any other party contesting, protesting or objecting) to any foreclosure proceeding or action brought with respect to the Shared Collateral or any other Senior Collateral by the Senior Creditor in respect of the Senior Obligations, the exercise of any right by the Senior Creditor (or any agent or sub-agent on their behalf) in respect of the Senior Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter, if applicable, or similar agreement or arrangement to which the Senior Creditor either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies relating to the Shared Collateral under the Senior Debt Documents or otherwise in respect of the Senior Collateral or the Senior Obligations, or (z) object to the forbearance by the Senior Creditor from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Shared Collateral in respect of Senior Obligations and (ii) the Senior Creditor shall have the exclusive right to enforce rights, exercise remedies (including setoff, recoupment and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Shared Collateral, and to determine and direct the time, method and place for exercising any such rights, enforcing any such remedies or conducting any proceeding with respect to any such exercise or enforcement with respect to the Shared Collateral without any consultation with or the consent of any Secured Party; provided, however, that in each instance in a manner not otherwise

17761764v8

inconsistent with the terms of this Agreement, (A) in any insolvency or liquidation proceeding commenced by or against any Debtor, Secured Party may file a claim, proof of claim, or statement of interest with respect to the Obligations, (B) Secured Party may take any action (not adverse to the prior Liens on the Shared Collateral securing the Senior Obligations or the rights of the Senior Creditor to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Shared Collateral, (C) Secured Party may file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of any Secured Party, including any claims secured by the Shared Collateral and (D) Secured Party may join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Shared Collateral initiated by the Senior Creditor.    In exercising rights and remedies with respect to the Senior Collateral, the Senior Creditor may enforce the provisions of the Senior Debt Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by it to sell or otherwise dispose of Shared Collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

11.7    So long as any Senior Obligations remain outstanding, Secured Party agrees that it will not take or receive any Shared Collateral or any proceeds of Shared Collateral in connection with the exercise of any right or remedy (including setoff and recoupment) with respect to any Shared Collateral in respect of the Obligations. Without limiting the generality of the foregoing, unless and until the Senior Obligations have been paid off and discharged in full, the sole right of Secured Party with respect to the Shared Collateral is to hold a Lien on the Shared Collateral in respect of Obligations pursuant to this Agreement for the period and to the extent granted herein and to receive a share of the proceeds thereof, if any, after the Senior Obligations have been repaid in full.

11.8    (i) Secured Party agrees that it will not take any action that would hinder any exercise of remedies undertaken by the Senior Creditor with respect to the Shared Collateral under the Senior Debt Documents, including any sale, lease, exchange, transfer or other disposition of the Shared Collateral, whether by foreclosure or otherwise, and (ii) Secured Party hereby waives any and all rights it may have as a junior lien creditor or otherwise to object to the manner in which the Senior Creditor seek to enforce or collect the Senior Obligations or the Liens granted on any of the Senior Collateral, regardless of whether any action or failure to act by or on behalf of the Senior Creditor is adverse to the interests of Secured Party. Secured Party hereby acknowledges and agrees that no covenant, agreement or restriction contained in this Agreement shall be deemed to restrict in any way the rights and remedies of the Senior Creditor with respect to the Senior Collateral as set forth in this Agreement and the Senior Debt Documents.

12.    <u>Additional Rights of Secured Party and Waiver</u>.  Debtors hereby expressly consent to any delay or indulgence by Secured Party in enforcing any of the obligations secured hereby and to any extension of time for payment of any indebtedness due Secured Party. The cessation of the liability of a Debtor for repayment of the Obligations for any reason other than full payment, or any extension, renewal, forbearance, change of rate of interest (if applicable), amendment or modification of the Management Services Agreement or Secured Party's acceptance, release or substitution of security, or any impairment or suspension of Secured Party's remedies or rights against a Debtor shall not in any manner affect the liability of such Debtor hereunder or Secured Party's security interest in the Collateral. This Agreement in no manner supersedes, alters, restricts or cancels any of the terms and provisions contained in the Management Services Agreement. Nothing contained in this Agreement and no act or omission on the part

17761764v8

YC-E-038707

of Secured Party pursuant to the terms hereof shall be deemed a waiver by Secured Party of any rights or remedies under the Management Services Agreement and this Agreement is made and accepted without prejudice to any such rights or remedies possessed by Secured Party.

13.    Charges Incurred Under this Agreement.  All advances, charges, costs and expenses, including reasonable attorneys' fees, incurred or paid by Secured Party in exercising any right, power or remedy conferred by this Agreement, or, in the event of enforcement thereof through a proceeding of any sort, awarded by the court or arbitrator hearing or deciding the action or proceeding giving rise to the utilization of such attorney, shall become a part of the Obligations secured hereunder and shall be paid to Secured Party by Debtors immediately and without demand following notification of the occurrence thereof, and to the extent not paid within five (5) calendar days thereafter, shall bear interest at the maximum rate permissible by the State of Texas.

14.    Termination.  This Agreement and the security interest in the Collateral created hereby shall terminate after payment and performance in full of all Obligations arising under the Management Services Agreement, and the subsequent termination of the Management Services Agreement.  Upon such payment and performance in full of all Obligations and the termination of the Management Services Agreement, the Collateral shall be released from the security interest hereby created and Secured Party will, at Debtors' expense, execute and deliver to Debtors such documents as Debtors shall reasonably request to evidence such release.

15.    Notices. All notices permitted under this Agreement shall be in writing signed by the Party giving same and shall be deemed effective upon personal delivery, one (1) day after delivery by recognized overnight courier, or three (3) days after mailing by certified or registered mail, postage prepaid, as follows:

> If to Secured Party, addressed to:
>
> Geneva Consulting LLC
> 885 Third Avenue, 29th Floor
> New York, NY 10022
> Attn:   David Gefner; Zalman Schapiro
> Email:  dg@genevaempire.com; zs@perigrove.com
>
> If to a Debtor, addressed to:
>
> YesCare Corp.
> 3411 Yoakum Blvd, Apt 2901
> Houston, TX 77006
> Attn:    Sara Tirschwell
> Email:  Sara.Tirschwell@corizonhealth.com
>
> CHS TX, Inc.
> 3411 Yoakum Blvd, Apt 2901
> Houston, TX 77006
> Attn:    Sara Tirschwell
> Email:  Sara.Tirschwell@corizonhealth.com
>
> Corizon Health of New Mexico, LLC
> 3411 Yoakum Blvd, Apt 2901

17761764v8

Houston, TX 77006
Attn:   Sara Tirschwell
Email:  Sara.Tirschwell@corizonhealth.com

16.   <u>Time Is of the Essence</u>.  Time is hereby expressly declared to be of the essence of this Agreement.

17.   <u>Assignment</u>.  Secured Party may assign its rights under this Agreement and the security interest created by this Agreement.  Should Secured Party assign its rights under this Agreement or the security interest created by this Agreement, Secured Party's assignee shall be entitled, on written notice of the assignment being given by Secured Party to Debtors, to all performance required of Debtors in this Agreement and all payments and monies when due that are secured by this Agreement.  This Agreement and each of its provisions shall be binding on the heirs, executors, administrators, successors and assigns of each of the Parties hereto.  Except as otherwise provided in this Agreement, nothing contained in this <u>Section 17</u> shall be deemed a consent to the sale, assignment or transfer by a Debtor of the Collateral or the obligations of such Debtor under this Agreement.

18.   <u>Entire Agreement</u>.  This Agreement, together with the Management Services Agreement, constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

19.   <u>Governing Law; Uniform Commercial Code</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.  It is the intention of the Parties that this Agreement is entered into pursuant to the Code and terms defined in such Code not otherwise defined in this Agreement are used in this Agreement as defined in that Code on the date of this Agreement.  Any provisions of said Code not specifically included herein shall be deemed a part of this Agreement in the same manner as set forth herein in its entirety; and any provisions of this Agreement that might in any manner be in conflict with any of the provisions of said Code shall be deemed superseded by said Code, and to that extent the provisions hereof that are superseded by the Code shall be severable and the invalidity of one shall not invalidate another.

20.   <u>Secured Party Appointed Attorney-in-Fact</u>.  Debtors hereby irrevocably appoint Secured Party to be Debtors' attorney-in-fact, with full authority in the place and stead of Debtors and in the names of Debtors, Secured Party or otherwise, from time to time in Secured Party's discretion, when a Default exists and is continuing, to take any action and to execute any instrument that Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

   20.1   To obtain and adjust insurance required to be maintained by Debtors or paid to Secured Party pursuant to <u>Section 7</u> (<u>Insurance</u>) hereof;

   20.2   To ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for monies due and to become due under or in respect of any of the Collateral;

   20.3   To receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with <u>Section 11</u> (<u>Remedies Upon Default</u>) hereof;

   20.4   To file any claims or take any action or institute any proceedings that Secured Party may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral;

17761764v8

20.5    To pay or discharge taxes or liens, levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Secured Party in its sole discretion, and such payments made by Secured Party to become obligations of Debtors to Secured Party, due and payable immediately without demand;

20.6    To sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents relating to the Collateral;

20.7    Generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Secured Party were the absolute owner thereof for all purposes, and to do, at Secured Party's option and Debtors' expense, at any time, or from time to time, all acts and things that Secured Party deems necessary to protect, preserve or realize upon the Collateral and Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as Debtors might do; and

20.8    To exercise all of Debtors' rights, powers and privileges under any of Debtors' contracts and to require Debtors, as determined in Secured Party's sole discretion to (i) take such actions as may be necessary to assign such rights to Secured Party, (ii) continue to perform in accordance with the terms of such contracts and (iii) use their best efforts to preserve the value of each contract.

21.    Indemnification.  SECURED PARTY SHALL INDEMNIFY DEBTOR FROM AND AGAINST ALL LOSSES OCCASIONED BY SECURED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN EXERCISING THE FOREGOING POWERS.  AS SET FORTH IN SECTION 13 (CHARGES INCURRED UNDER THIS AGREEMENT), DEBTORS SHALL REIMBURSE SECURED PARTY FOR ANY COSTS INCURRED BY SECURED PARTY IN EXERCISING THE FOREGOING POWERS.

22.    Secured Party May Perform.  If Debtors fail to perform any agreement contained herein, Secured Party may itself perform, or cause performance of, such agreement, and the expenses of Secured Party incurred in connection therewith shall be payable by Debtors.

23.    Headings.  Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement or be given any substantive effect.

24.    Severability. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision of obligation and in any other jurisdiction, shall not in any way be affected or impaired thereby.

25.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement.

26.    Third Party Beneficiary.  The Senior Creditor is a third party beneficiary to Sections 4.1, 4.2, 4.3, 11.6, 11.7 and 11.8 of this Agreement and the provisions contained therein, and may enforce such provisions (including the priority of the Liens securing the Senior Obligations as provided in Section 4.1) against Secured Party or any of the Debtors.  No amendment to this Agreement that is adverse to the Secured Creditor shall be valid unless (i) agreed to in writing by the Senior Creditor or (ii) the Senior Obligations have been repaid in full and discharged.

17761764v8

IN WITNESS WHEREOF, Secured Party and Debtors have executed this Agreement under seal as of the date first written above.

**SECURED PARTY**:

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____
Name: Zalman Schapiro
Title: Authorized Signatory

**DEBTORS:**

YESCARE CORP.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CHS TX, INC.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By: _____
Name: Sara Tirschwell
Title: CEO

*[Signature Page to Security Agreement]*

17761764v8

## EXHIBIT "E"

## MANAGEMENT FEE

As consideration for the Management Services provided by Manager, the Management Fee during the Term of this Agreement shall be as follows: for each inmate at the facilities being serviced by the YesCare Entities, YesCare Entities shall pay to Manager the amount of fifteen dollars ($15.00) per month, with the minimum aggregate Management Fee of Five Hundred Thousand ($500,000) Dollars. In the event one of the Parties in good faith believes, based on advice of competent legal counsel, that the Management Fee may potentially violate applicable state or federal law, the Parties may adjust the Management Fee in such manner as to comply with applicable state or federal statutes and regulations while preserving, as closely as possible, the financial substance of the Management Fee. In addition, the Management Fee will be subject to revision by Manager (without the need to obtain the YesCare Parties' written agreement) upon obtaining a fair market value opinion from an independent valuation company as to a fair market value of the Management Fee. The Parties hereby agree to revisit the discussion of the Management Fee prior to the YesCare Entities' adoption of the Employee Stock Ownership Plan, whereupon changes to the Management Fee shall be agreed upon by the Parties. The Management Fee under this provision shall be compensation for the Management Services furnished by Manager under this Agreement and has been determined in a manner that the Parties believe represents the fair market value of all such Management Services.

17761764v8

YC-E-038712

**EXHIBIT "F"**

**HIPAA BUSINESS ASSOCIATE AGREEMENT**

(See attached)

17761764v8

CONFIDENTIAL

## HIPAA BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("*BAA*") supplements and is made a part of the underlying Management Services Agreement and is entered into by and between YESCARE CORP., a Texas corporation, CHS TX, INC., a Texas corporation, and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company (each, a *"Covered Entity"* and, collectively, *"Covered Entities"*), and GENEVA CONSULTING LLC, a Delaware limited liability company ("*Business Associate*") (each, a "*Party*" and, collectively, the "*Parties*").

### RECITALS

**WHEREAS**, Business Associate and Covered Entities have entered into a Management Services Agreement (the "*Agreement*") dated as of May 5, 2022, to which this BAA is appended, under which Business Associate has agreed to provide certain management services to Covered Entities.

**WHEREAS**, under the terms of the Agreement, Covered Entities shall provide, and Business Associate shall have access to, certain information some of which may constitute Protected Health Information ("*PHI*") and Electronic Protected Health Information ("*ePHI*").

**WHEREAS**, the Parties desire to protect the individual privacy and provide for the security and confidentiality of the PHI and ePHI disclosed to Business Associate by a Covered Entity or generated by Business Associate on behalf of a Covered Entity in accordance with the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("*HIPAA*") and its accompanying privacy and security regulations ("*HIPAA Regulations*"), the Health Information Technology for Economic and Clinical Health Act, enacted as part of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5), and its attendant regulations and guidance ("*HITECH Act*"), and other applicable laws.

**WHEREAS**, consistent with the terms of the Agreement, the Parties desire to set forth the terms under which Business Associate is required to handle any PHI and ePHI disclosed to it by a Covered Entity, or created or received on behalf of a Covered Entity.

**WHEREAS**, as part of the HIPAA Regulations, Covered Entities are required to obtain "satisfactory assurances" from Business Associate that it will appropriately handle and safeguard any PHI disclosed to it by a Covered Entity or generated by it on behalf of a Covered Entity and that Business Associate will implement safeguards that "reasonably and appropriately" protect the confidentiality, integrity, and availability of any ePHI that it creates, receives, maintains, or transmits on behalf of a Covered Entity. Accordingly, the Parties enter into this BAA governing Business Associate's use and disclosure of PHI and Business Associate's implementation of safeguards to reasonably and appropriately protect the confidentiality, integrity, and availability of ePHI.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements contained herein, and the exchange of information pursuant to this BAA, the Parties agree as follows:

1.      Definitions:

        a.      "*Data Aggregation*" shall have the same meaning given to such term in 45 C.F.R. § 164.501 and shall include the combining of PHI received or created by Business Associate to permit data analyses relating to Health Care Operations of a Covered Entity.

1

17761764v8

CONFIDENTIAL                                                                                        YC-E-038714

      b.     "*Designated Record Set*" shall have the same meaning given to such term in 45 C.F.R. § 164.501, limited to such records that are maintained, in whole or in part, by or for a Covered Entity.

      c.     "*Electronic Protected Health Information*" or "*ePHI*" shall have the same meaning as the term "electronic protected health information" in 45 C.F.R. § 160.103, limited to the information created, received, maintained or transmitted by Business Associate from or on behalf of a Covered Entity.

      d.     "*Health Care Operations*" shall have the meaning set out in its definition at 45 C.F.R. § 164.501.

      e.     "*Individual*" shall have the same meaning as the term "individual" in 45 C.F.R. § 160.103 and shall include a Person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

      f.     "*Privacy Rule*" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. part 160 and part 164, Subparts A and E.

      g.     "*Protected Health Information*" or "*PHI*" shall have the same meaning as the term "protected health information" in 45 C.F.R. § 160.103, limited to the information created, received, maintained or transmitted by Business Associate from or on behalf of a Covered Entity.

      h.     "*Required by Law*" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

      i.     "*Secretary*" shall mean the Secretary of the Department of Health and Human Services or his or her designee.

      j.     "*Security Rule*" shall mean the Standards for Security of Electronic Protected Health Information at 45 C.F.R. part 160 and part 164, Subparts A and C.

      k.     "*Standard Transaction*" shall mean a transaction that complies with an applicable standard adopted under 45 C.F.R. Part 162.

Any other terms used in this BAA, but not otherwise defined, shall have the same meaning as those terms in the Privacy Rule, Security Rule, or any other HIPAA Regulations.

      2.     <u>Limits on Use and Disclosure of PHI</u>: Except as otherwise specified herein, Business Associate may use and disclose PHI only as necessary to perform its obligations under the terms of the Agreement. All other uses and disclosures not specifically permitted or required by this BAA or as permitted or required by state or federal law are strictly prohibited.

      3.     <u>Standard Transactions:</u> If Business Associate conducts any Standard Transactions on behalf of a Covered Entity, Business Associate shall comply with the applicable requirements of 45 C.F.R. Part 162.

      4.     <u>Privacy Rule Obligations and Activities of Business Associate</u>: With regard to the use and/or disclosure of PHI, Business Associate shall:

17761764v8

CONFIDENTIAL

a. Not use or further disclose PHI other than as permitted or required by this BAA or as Required by Law;

b. Use appropriate safeguards to prevent the use or disclosure of PHI other than as provided for by this BAA;

c. Report to a Covered Entity's designated privacy officer or other designated administrator or officer, within a reasonable amount of time, any use and/or disclosure of the PHI that is not permitted or required by the terms of this BAA and of which Business Associate becomes aware, including Breaches of Unsecured PHI in accordance with Section 8 herein;

d. Require that any subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate for services provided to a Covered Entity agree, in writing, to adhere to substantially the same restrictions and conditions on the use and disclosure of PHI that apply throughout this BAA to Business Associate with respect to such PHI;

e. Upon request of a Covered Entity, provide access to PHI maintained by Business Associate on behalf of such Covered Entity in a Designated Record Set to such Covered Entity or to an Individual, as directed by such Covered Entity, in accordance with the requirements of 45 C.F.R. § 164.524. Such access shall be permitted within a reasonable period of time sufficient for such Covered Entity to comply with its obligations under 45 C.F.R. § 164.524;

f. Upon request of a Covered Entity, make available for amendment any PHI maintained in a Designated Record Set by Business Associate on behalf of such Covered Entity within a reasonable period of time sufficient for such Covered Entity to comply with its obligations under 45 C.F.R. § 164.526. Further, Business Associate shall incorporate any such amendments into the PHI maintained by it in a Designated Record Set on behalf of such Coverd Entity in accordance with 45 C.F.R. § 164.526;

g. Make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, a Covered Entity available to the Secretary for purposes of the Secretary determining such Covered Entity's compliance with the Privacy Rule;

h. Make information available to a Covered Entity regarding Business Associate's disclosures of PHI, and document such disclosures, sufficient to permit such Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528; and

i. Upon termination of the BAA, as provided for in Section 9 herein, if feasible, return to the applicable Covered Entity or destroy all PHI received from, or created or received by, Business Associate on behalf of such Covered Entity that Business Associate still maintains in any form and retain no copies of such PHI or, if such return or destruction is not feasible, Business Associate shall extend the protections of this BAA to such PHI and limit further use or disclosure to those purposes that make the return or destruction of such PHI infeasible, for so long as Business Associate maintains such PHI. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate.

3

CONFIDENTIAL

5.    <u>Permitted Uses and Disclosures by Business Associate</u>. Except as otherwise limited in this BAA:

a.    Business Associate may use or disclose PHI to perform functions, activities, or services for, or on behalf of, a Covered Entity as specified in the Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by such Covered Entity, except as permitted in <u>Section 5(b)-(d)</u>. To the extent Business Associate is carrying out any of such Covered Entity's obligations under the Privacy Rule pursuant to the terms of the Services Agreement or this BAA, Business Associate shall comply with the requirements of the Privacy Rule that apply to such Covered Entity in the performance of such obligation(s);

b.    Business Associate may use PHI in its possession for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate;

c.    Business Associate may disclose PHI for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that such disclosures are Required By Law, or provided that Business Associate obtains reasonable assurances, from the person to whom the PHI is disclosed that it will remain confidential and be used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and that person notifies Business Associate of any instances of which it is aware in which the confidentiality of the PHI received has been breached;

d.    Except as otherwise limited in this BAA, Business Associate may use PHI to provide Data Aggregation services to a Covered Entity as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B); and

e.    Business Associate may use PHI to report violations of law to appropriate state or federal authorities as permitted by 45 C.F.R. § 164.502(b)(2)(v).

6.    <u>Privacy Rule Obligations of Covered Entities</u>: A Covered Entity shall:

a.    Provide Business Associate with its notice of privacy practices which it maintains in accordance with 45 C.F.R. § 164.520, as well as any changes, amendments or modifications to such notice prior to or immediately upon such changes, amendments, or modifications taking effect;

b.    Provide Business Associate with any changes in, or revocation of, authorization by an Individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures of PHI, prior to or immediately upon such changes or revocations taking effect;

c.    Notify Business Associate of any restriction to the use or disclosure of PHI that a Covered Entity has agreed to in accordance with 45 C.F.R. § 164.522, if such changes affect Business Associate's permitted or required uses and disclosures of PHI, prior to or immediately upon such restrictions taking effect; and

d.    Not request Business Associate to use or disclose PHI in any manner that would not be permitted under the Privacy Rule if done by a Covered Entity, except for Data Aggregation or management and administrative activities of Business Associate as permitted in Section <u>5(b)-(d)</u> herein.

4

17761764v8

CONFIDENTIAL                                                                          YC-E-038717

7.      Security Rule Obligations of Business Associate: With regard to the Security Rule, Business Associate agrees that it shall:

a.      Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the ePHI that Business Associate creates, receives, maintains or transmits on behalf of a Covered Entity and shall comply with the applicable provisions of the Security Rule with respect to ePHI;

b.      Ensure that any subcontractor to whom Business Associate provides such ePHI agrees, in writing, to comply with the applicable requirements of the Security Rule to protect that ePHI; and

c.      Report to a Covered Entity any "Security Incident" (as that term is defined at 45 C.F.R. § 164.304) of which Business Associate becomes aware including Breaches of Unsecured PHI in accordance with Section 8 herein; provided, however, that the Parties acknowledge and agree that this section constitutes notice by Business Associate to each Covered Entity of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which notice to such Covered Entity by Business Associate shall not be required. "*Unsuccessful Security Incidents*" shall include, but not be limited to, pings and other broadcast attacks on Business Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of PHI.

8.      Breach Notification: Business Associate shall be required to notify a Covered Entity of any Breach of "Unsecured PHI" (as that term is defined at 45 C.F.R. § 164.402) in accordance with 45 C.F.R. §164.410, without reasonable delay but in no event later than ten (10) business days after discovery of a Breach except as provided in 45 C.F.R. § 164.412 where a law enforcement official determines that notification would impede a criminal investigation or cause damage to national security.

9.      Term and Termination:

a.      The Term of this BAA shall be effective as of the commencement of the term of the Agreement, and shall terminate when the Agreement terminates.

b.      If a Covered Entity makes the determination that Business Associate has breached a material term of this BAA, such Covered Entity shall: (i) provide Business Associate with 30 days' written notice of the existence of an alleged material breach; and (ii) afford Business Associate an opportunity to cure the alleged material breach upon mutually agreeable terms. Nonetheless, in the event that mutually agreeable terms cannot be achieved within 30 days, such a failure to cure the alleged material breach shall be grounds for the immediate termination of this BAA.

c.      Upon Business Associate's knowledge of a material breach by a Covered Entity, Business Associate shall notify such Covered Entity of such breach in reasonable detail, and provide an opportunity for such Covered Entity to cure the breach or violation, or if cure is not possible, Business Associate may immediately terminate this Agreement.

d.      In the event this BAA is terminated, the destruction, return or continued maintenance of PHI in possession of Business Associate shall be controlled by Section 4.i of this BAA, and Business Associate's obligations set forth thereunder shall survive termination of this BAA.

5

17761764v8

CONFIDENTIAL

YC-E-038718

10. <u>Integration</u>: This BAA shall be incorporated into and made a part of the Agreement. In the event that any term or provision of this BAA contradicts or conflicts with a term or provision of the Agreement, that term or provision of this BAA shall control.

11. <u>Miscellaneous</u>:

a. <u>Amendment</u>. The Parties acknowledge that state and federal laws relating to data security and privacy are rapidly evolving and that amendment of this BAA may be required to provide for procedures to ensure compliance with such developments. Thus, in the event that any mandatory provisions of HIPAA, the HIPAA Regulations, or the HITECH Act (collectively, "*Applicable Laws*") are amended in a manner that renders this BAA inconsistent therewith, then, upon the request of a Party, the Parties agree to promptly enter into negotiations concerning the terms of an amendment to this BAA consistent with the standards and requirements of Applicable Laws. A Party may terminate the BAA upon thirty (30) days written notice in the event (i) the other Party does not promptly enter into negotiations to amend this BAA when requested pursuant to this Section or (ii) the Parties are unable to reach an agreement sufficient to satisfy the standards and requirements of Applicable Laws.

b. <u>Survival</u>. The respective rights and obligations of Business Associate under <u>Section 4.i</u> of this BAA shall survive the termination of this BAA.

c. <u>Interpretation</u>. Any ambiguity in this BAA shall be resolved in favor of a meaning that permits compliance with the applicable provisions of HIPAA, the HIPAA Regulations, and the HITECH Act.

d. <u>No Third Party Rights</u>. This BAA shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; provided, however, that nothing in this BAA is intended, nor shall it be construed, to confer upon any person or entity other than the Parties hereto and their respective successors and assigns, any rights remedies, obligations or liabilities whatsoever.

e. <u>Applicable Law</u>. The validity, enforceability and interpretation of this BAA shall be governed by the same laws as are applicable to the Agreement and by the Privacy Rule and the Security Rule.

f. <u>Entire Agreement</u>. This BAA constitutes the entire agreement between the Parties regarding the confidentiality of PHI and the security and integrity of ePHI, and supersedes all other agreements, express or implied, oral or written, between the Parties related to the subject matter of this BAA.

*[Signatures on Following Page]*

6

17761764v8

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have duly executed this BAA as of the date first above written.

**BUSINESS ASSOCIATE:**

GENEVA CONSULTING LLC
*a Delaware limited liability company*

By: _____
Name: Zalman Schapiro
Title: Authorized Signatory

**COVERED ENTITIES:**

YESCARE CORP.
*a Texas corporation*

By _____
Name: Sara Tirschwell
Title: CEO

CHS TX, INC.
*a Texas corporation*

By: _____
Name: Sara Tirschwell
Title: CEO

CORIZON HEALTH OF NEW MEXICO, LLC
*a New Mexico limited liability company*

By _____
Name: Sara Tirschwell
Title: CEO

*[Signature Page to HIPAA Business Associate Agreement]*

17761764v8

## EXHIBIT "G"

## JOINDER AGREEMENT

(See attached)

17761764v8

YC-E-038721

## JOINDER AGREEMENT

Reference is made to that certain Management Services Agreement ("**MSA**") dated and effective as of May 5, 2022 (as amended), by and among GENEVA CONSULTING LLC, a Delaware limited liability company ("**Manager**"), and YESCARE CORP., a Texas corporation ("**YesCare Corp**"), CHS TX, INC., a Texas corporation ("**CHS**"), and CORIZON HEALTH OF NEW MEXICO, LLC, a New Mexico limited liability company ("**Corizon New Mexico**", and together with YesCare Corp and CHS, the "**YesCare Entities**", but each individually as, a "**YesCare Entity**"), and SARA TIRSCHWELL ("**Tirschwell**", and together with the YesCare Entities, the "**YesCare Parties**"). The undersigned, being a newly formed or acquired subsidiary or affiliate of YesCare Corp (hereinafter referred to as a "**New YesCare Entity**"), hereby acknowledges that it has received and reviewed a complete copy of the MSA and all exhibits attached thereto, and agrees that, upon the execution of this Joinder Agreement and delivery of same to Manager, the New YesCare Entity is and shall become a YesCare Entity and one of the YesCare Parties to the MSA and to the following agreements attached as an exhibit to the MSA: (1) Exhibit A – Power of Attorney; (2) Exhibit B – Employee Leasing Agreement; (3) Exhibit D – Security Agreement; and (4) Exhibit F – HIPAA Business Associate Agreement (collectively, the "**Ancillary Agreements**") and shall be fully bound by, and subject to, all of the agreements, covenants, terms, conditions and restrictions of and included in the MSA (including, without limitation, the Exhibit "E" Management Fee) and the Ancillary Agreements, as a party thereto, and shall be entitled to all the rights and subject to all the obligations incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the MSA.

IN WITNESS WHEREOF, the party hereto, intending to be legally bound, has executed this Joinder Agreement as of _____, 20__.

UNDERSIGNED:

[Entity Name]

By:      _____
Name:  _____
Title:   _____

17761764v8

YC-E-038722