**CONFORMED (AS OF MAY 5, 2022)**

THIRD AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of August 17, 2020

among

CHS TX, INC.,
and the other Borrowers from time to time party hereto
as the Borrowers,

YESCARE CORP.,
as Holdings,

CORTLAND CAPITAL MARKET SERVICES LLC
as Administrative Agent and Collateral Agent,

and

The Lenders Party Hereto

AMERICAS 112592764 v2

**Exhibit #**

**Lefkowitz 2**

08/14/23 - MC

YC-E-037687

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ...................................................... 1

| 1.01 | Defined Terms ................................................................................................................. 1 |
| 1.02 | Other Interpretive Provisions ....................................................................................... 30 |
| 1.03 | Accounting Terms ......................................................................................................... 31 |
| 1.04 | Rounding ....................................................................................................................... 32 |
| 1.05 | Times of Day ................................................................................................................ 32 |
| 1.06 | Classification of Loans and Borrowings ...................................................................... 32 |

ARTICLE II THE COMMITMENTS AND LOANS .............................................................. 32

| 2.01 | Initial Term Loans ........................................................................................................ 32 |
| 2.02 | Borrowings and Continuations of Loans ...................................................................... 32 |
| 2.03 | Prepayments .................................................................................................................. 33 |
| 2.04 | Reserved ........................................................................................................................ 35 |
| 2.05 | Repayment of Loans ..................................................................................................... 35 |
| 2.06 | Interest .......................................................................................................................... 35 |
| 2.07 | Other Payments to Administrative Agent ..................................................................... 36 |
| 2.08 | Computation of Interest, Fees and Other Payments ..................................................... 36 |
| 2.09 | Evidence of Debt ........................................................................................................... 37 |
| 2.10 | Payments Generally; Administrative Agent's Clawback .............................................. 37 |
| 2.11 | Sharing of Payments by Lenders .................................................................................. 39 |
| 2.12 | Increase in Commitments ............................................................................................. 40 |

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ....................................... 41

| 3.01 | Taxes ............................................................................................................................. 41 |
| 3.02 | Illegality ........................................................................................................................ 43 |
| 3.03 | Inability to Determine Rates ......................................................................................... 43 |
| 3.04 | Increased Costs; Reserves on Eurodollar Rate Loans ................................................... 44 |
| 3.05 | Compensation for Losses .............................................................................................. 45 |
| 3.06 | Mitigation Obligations; Replacement of Lenders ........................................................ 45 |
| 3.07 | Survival ......................................................................................................................... 46 |

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS .............................. 46

| 4.01 | Conditions precedent to Effectiveness .......................................................................... 46 |
| 4.02 | Conditions to All Borrowings ....................................................................................... 48 |

ARTICLE V REPRESENTATIONS AND WARRANTIES .................................................... 48

| 5.01 | Existence, Qualification and Power .............................................................................. 48 |
| 5.02 | Authorization; No Contravention ................................................................................. 49 |
| 5.03 | Governmental Authorization; Other Consents .............................................................. 49 |
| 5.04 | Binding Effect ............................................................................................................... 49 |
| 5.05 | Financial Statements; No Material Adverse Effect ....................................................... 49 |
| 5.06 | Litigation ....................................................................................................................... 50 |
| 5.07 | No Default ..................................................................................................................... 50 |
| 5.08 | Ownership of Property; Liens; Investments .................................................................. 50 |
| 5.09 | Environmental Compliance ........................................................................................... 51 |
| 5.10 | Insurance ....................................................................................................................... 51 |
| 5.11 | Taxes ............................................................................................................................. 51 |

CONFIDENTIAL

| 5.12 | ERISA Compliance | 52 |
|------|------------------|-----|
| 5.13 | Subsidiaries; Equity Interests; Loan Parties | 52 |
| 5.14 | Margin Regulations; Investment Company Act | 53 |
| 5.15 | Disclosure | 53 |
| 5.16 | Compliance with Laws | 53 |
| 5.17 | Intellectual Property; Licenses, Etc | 54 |
| 5.18 | [Reserved] | 54 |
| 5.19 | Casualty, Etc | 54 |
| 5.20 | Labor Matters | 54 |
| 5.21 | Collateral Documents | 55 |
| 5.22 | Reportable Transactions | 55 |
| 5.23 | Regulation H | 55 |
| 5.24 | Use of Proceeds | 55 |
| 5.25 | Compliance with Health Care Laws | 55 |
| 5.26 | HIPAA Compliance | 56 |
| 5.27 | Material Customer Contracts | 56 |
| 5.28 | Bond Documents | 57 |
| 5.29 | Beneficial Ownership Certification | 57 |

ARTICLE VI AFFIRMATIVE COVENANTS ........ 57

| 6.01 | Financial Statements | 57 |
|------|----------------------|-----|
| 6.02 | Certificates; Other Information | 58 |
| 6.03 | Notices. | 61 |
| 6.04 | Payment of Obligations. | 62 |
| 6.05 | Preservation of Existence, Etc | 62 |
| 6.06 | Maintenance of Properties | 62 |
| 6.07 | Maintenance of Insurance | 62 |
| 6.08 | Compliance with Laws | 63 |
| 6.09 | Books and Records; Conference Calls | 63 |
| 6.10 | Inspection Rights | 64 |
| 6.11 | Use of Proceeds | 64 |
| 6.12 | Covenant to Guarantee Obligations and Give Security | 64 |
| 6.13 | Compliance with Environmental Laws | 67 |
| 6.14 | Further Assurances. | 67 |
| 6.15 | Reserved. | 67 |
| 6.16 | Post-Closing Covenants | 67 |
| 6.17 | HIPAA Business Associate Agreement | 67 |

ARTICLE VII NEGATIVE COVENANTS ........ 68

| 7.01 | Liens | 68 |
|------|-------|-----|
| 7.02 | Indebtedness | 70 |
| 7.03 | Investments | 72 |
| 7.04 | Fundamental Changes | 74 |
| 7.05 | Dispositions | 74 |
| 7.06 | Restricted Payments | 75 |
| 7.07 | Change in Nature of Business | 76 |
| 7.08 | Transactions with Affiliates | 76 |
| 7.09 | Burdensome Agreements | 77 |
| 7.10 | Use of Proceeds | 78 |
| 7.11 | Financial Covenant | 78 |
| 7.12 | Capital Expenditures | 78 |

CONFIDENTIAL

| | | |
|---|---|---:|
| 7.13 | Amendments of Organization Documents | 78 |
| 7.14 | Accounting Changes | 78 |
| 7.15 | Prepayments, Etc. of Indebtedness | 78 |
| 7.16 | Amendment, Etc. of Indebtedness | 79 |
| 7.17 | Holding Company | 79 |
| 7.18 | HIPAA Business Associate Agreement | 79 |

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES .......................................................... 79

| | | |
|---|---|---:|
| 8.01 | Events of Default | 79 |
| 8.02 | Remedies upon Event of Default | 81 |
| 8.03 | Application of Funds | 82 |

ARTICLE IX ADMINISTRATIVE AGENT ............................................................................... 83

| | | |
|---|---|---:|
| 9.01 | Appointment and Authority | 83 |
| 9.02 | Rights as a Lender | 84 |
| 9.03 | Exculpatory Provisions | 84 |
| 9.04 | Reliance by Administrative Agent | 85 |
| 9.05 | Delegation of Duties | 85 |
| 9.06 | Resignation of Administrative Agent | 86 |
| 9.07 | Non-Reliance on Administrative Agent and Other Lenders | 86 |
| 9.08 | Administrative Agent May File Proofs of Claim | 87 |
| 9.09 | Collateral and Guaranty Matters | 87 |
| 9.10 | Right to Indemnity | 88 |
| 9.11 | Withholding Taxes | 88 |
| 9.12 | Secured Cash Management Agreements and Secured Hedge Agreements | 89 |
| 9.13 | Intercreditor Agreement and Conflicts | 89 |
| 9.14 | Erroneous Payments | 89 |

ARTICLE X MISCELLANEOUS ............................................................................................... 91

| | | |
|---|---|---:|
| 10.01 | Waivers, Amendments, Etc. | 91 |
| 10.02 | Notices; Effectiveness; Electronic Communications | 93 |
| 10.03 | No Waiver; Cumulative Remedies; Enforcement | 95 |
| 10.04 | Expenses; Indemnity; Damage Waiver | 95 |
| 10.05 | Payments Set Aside | 96 |
| 10.06 | Successors and Assigns | 97 |
| 10.07 | Treatment of Certain Information; Confidentiality | 100 |
| 10.08 | Right of Setoff | 100 |
| 10.09 | Interest Rate Limitation | 101 |
| 10.10 | Counterparts; Integration; Effectiveness | 101 |
| 10.11 | Survival of Representations and Warranties | 101 |
| 10.12 | Severability | 101 |
| 10.13 | Replacement of Lenders | 101 |
| 10.14 | Governing Law; Jurisdiction; Etc | 102 |
| 10.15 | WAIVER OF JURY TRIAL | 103 |
| 10.16 | No Advisory or Fiduciary Responsibility | 103 |
| 10.17 | Electronic Execution of Assignments and Certain Other Documents | 104 |
| 10.18 | USA PATRIOT Act | 104 |
| 10.19 | Time of the Essence.  Time is of the essence of the Loan Documents | 104 |
| 10.20 | Appointment of Company as agent of the Borrowers | 104 |
| 10.21 | Joint and Several Liability of the Borrowers | 104 |
| 10.22 | ENTIRE AGREEMENT | 105 |

AMERICAS 112592764 v2

iii

10.23    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ................................... 105

10.24    Acknowledgement Regarding Any Supported QFCs ................................................................ 106

10.25    Prohibition on Contesting Obligations....................................................................................... 107

10.26    AAS Agreement.......................................................................................................................... 107

CONFIDENTIAL                                                                                                            YC-E-037691

SCHEDULES

| | |
|---|---|
| 1.01 | Competitors |
| 4.01(c) | Material Owned Real Property |
| 5.06 | Litigation |
| 5.08(c) | Owned Real Property |
| 5.08(d)(i) | Leased Real Property (Lessee) |
| 5.08(d)(ii) | Leased Real Property (Lessor) |
| 5.12(d) | Pension and Multiemployer Plans |
| 5.13 | Subsidiaries and Other Equity Investments; Loan Parties |
| 5.16(a) | Compliance with Laws |
| 5.17 | Intellectual Property Matters |
| 5.25(b) | Health Care Permits |
| 5.25(c) | Certain Programs |
| 5.25(d) | Excluded Entities |
| 5.25(e) | Reporting Obligations |
| 5.27(a) | Material Customer Contracts |
| 5.27(b) | Material Customer Contracts |
| 5.28 | Bond Documents |
| 6.12 | Guarantors |
| 6.16 | Post Closing Covenants |
| 7.01 | Existing Liens |
| 7.02 | Existing Indebtedness |
| 7.03 | Existing Investments |
| 7.09 | Existing Restrictions |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| A-2 | Optional or Mandatory Prepayment Notice |
| B | Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Administrative Questionnaire |
| D-3-1 | United States Tax Compliance Certificate (For Non-U.S. Lenders That Are Not Treated As Partnerships For U.S. Federal Income Tax Purposes) |
| D-3-2 | United States Tax Compliance Certificate (For Non-U.S. Lenders That Are Treated As Partnerships For U.S. Federal Income Tax Purposes) |
| D-3-3 | United States Tax Compliance Certificate (For Foreign Participants That Are Not Treated As Partnerships For U.S. Federal Income Tax Purposes) |
| D-3-4 | United States Tax Compliance Certificate (For Foreign Participants That Are Treated As Partnerships For U.S. Federal Income Tax Purposes) |
| E | Guaranty |
| F | Security Agreement |
| G-1 | Perfection Certificate |
| G-2 | Perfection Certificate Supplement |
| H | [Reserved] |
| I | HIPPA Business Associate Agreement |

CONFIDENTIAL                    YC-E-037692

### THIRD AMENDED AND RESTATED CREDIT AGREEMENT

This THIRD AMENDED AND RESTATED CREDIT AGREEMENT is entered into as of August 17, 2020, (as amended, restated, supplemented and/or otherwise modified from time to time, the "Agreement"), among CHS TX, Inc., a Texas corporation (the "Company" and together with the other Persons party to this agreement as borrowers from time to time party hereto, the "Borrowers"), YesCare Corp., a Texas corporation ("Holdings"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), CORTLAND CAPITAL MARKET SERVICES LLC, in its capacities as administrative agent and collateral agent for the Lenders (in its capacities as administrative agent and collateral agent, the "Administrative Agent").

### PRELIMINARY STATEMENTS:

The Lenders are willing to make available to the Borrowers the credit facilities described herein, subject to and on the terms and conditions set forth in this Agreement.

### AGREEMENT:

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I
### DEFINITIONS AND ACCOUNTING TERMS

1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"AAS Agreement" means that certain Agreement Among Stakeholders, dated June 26, 2020, by and among the First Out Lenders (as defined therein), the Second Out Note Holders (as defined therein), the Third Out Lenders (as defined therein), M2 EquityCo, LLC and the Administrative Agent as the Second Out Note Holder Representative (as defined therein) and as the Agent (as defined therein).

"ABL Facility Closing Date" means the date upon which a Permitted ABL Credit Agreement becomes effective.

"Additional Commitments" has the meaning specified in Section 2.12(a).

"Additional Commitments Effective Date" has the meaning specified in Section 2.12(b).

"Additional First Out Lenders" means the Lenders providing the Additional First Out Loans.

"Additional First Out Loans" has the meaning specified in Section 2.12(a).

"Additional Loan Amendment" has the meaning specified in Section 2.12(c).

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrowers and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit D-2 or any other form approved by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

CONFIDENTIAL                                                                                           YC-E-037693

"Agent Fee Letter" means the letter agreement dated as of April 14, 2017 between the Borrowers and the Administrative Agent.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Anti-Corruption Laws" means any Law applicable to the Loan Parties or their Subsidiaries from time to time concerning or relating to bribery or corruption.

"Anti-Terrorism Laws" means any Law related to terrorism financing or money laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001).

"Applicable Percentage" means with respect to any Lender of any Class, a percentage equal to a fraction the numerator of which is the aggregate Outstanding Amount of the Loans and unused Commitments of such Lender under the applicable Class and the denominator of which is the aggregate Outstanding Amount of Loans and unused Commitments of all Lenders under the applicable Class; provided, that in the event any Commitments of any Class shall have expired or been terminated, the Applicable Percentages of any Lender of such Class shall be determined without taking into account such Commitments in either the numerator or the denominator.

"Applicable Rate" means, subject to Section 2.06, (a) with respect to the Additional First Out Loans, (i) 12% per annum for Eurodollar Rate Loans and (ii) to the extent applicable pursuant to Sections 3.02 or 3.03 or the determination of the Default Rate, 10% per annum for Base Rate Loans and (b) with respect to the Initial Term Loans, (i) 12% per annum for Eurodollar Rate Loans and (ii) to the extent applicable pursuant to Section 3.02 or Section 3.03 or the determination of the Default Rate, 10% per annum for Base Rate Loans.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender; provided that neither the Company nor any of its Affiliates (other than Affiliates that are existing Lenders) shall be an Approved Fund.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment" has the meaning given to such term in the Fourth Amendment.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

2

YC-E-037694

"Audited Financial Statements" means the Company's audited consolidated balance sheet as of December 31, 2018 and the related consolidated statements of income or operations, shareholders' equity and cash flows, including the notes thereto.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate plus 1/2 of 1%, (b) the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent) and (c) the Eurodollar Rate plus 1.00%. Notwithstanding the foregoing, the Base Rate shall not be deemed to be less than 2.50%. Any change in the Base Rate due to a change in the Federal Funds Effective Rate or such "prime rate" shall be effective as of the opening of business on the effective day of such change in the Federal Funds Effective Rate or "prime rate," as the case may be.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Bond Cash Collateral" means any deposits and pledges of cash made by the Company or any of its Subsidiaries securing the performance of Bond Documents and permitted pursuant to Section 7.01(f).

"Bond Contingent Obligations" means the contingent obligations of the Company and its Subsidiaries to the Bond Sureties under the Bond Documents, to the extent remaining unrealized, undetermined, unfixed and otherwise contingent in nature.

"Bond Documents" means the Bonds and the Bond Indemnity Agreements.

"Bond Indemnity Agreements" means any indemnity or similar agreement in favor of a Bond Surety.

"Bonds" means the surety bonds issued by the Bond Sureties, on behalf of the Company or any of its Subsidiaries, in favor of certain Governmental Authorities or other Persons with whom the Company or any of its Subsidiaries has contracted for the provision of healthcare services to inmates.

"Bond Sureties" means the Argonaut Insurance Company, Berkley Corp. and OneBeacon Surety Group, and each of their respective Affiliates, and each other nationally recognized surety and other surety reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

CONFIDENTIAL                                                                                     YC-E-037695

"Borrowing" means a borrowing consisting of any Loans of the same Type and Class made, converted or continued on the same date and, in the case of Eurodollar Rate Loans, as to which a single Interest Period is in effect.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such day that is also a London Banking Day.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a Capitalized Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person. For purposes of this definition, (i) the purchase price of any expenditures that are (a) purchased simultaneously with the trade-in of existing equipment, (b) made with Net Cash Proceeds excluded from the definition of "Extraordinary Receipt" pursuant to clause (a) of the proviso thereto, (c) purchased with the Net Cash Proceeds of an issuance of Qualified Capital Stock of Holdings after the Closing Date Not Otherwise Applied or (d) accounted for as capital expenditures of such Person and that are actually paid for or actually reimbursed in cash by a Person that is not Holdings or any of its Subsidiaries and for which none of Holdings or its Subsidiaries has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to any Person in respect thereof, in each case shall be included in Capital Expenditures only to the extent of the gross amount by which such purchase price exceeds the credit granted by the seller of such asset for the asset being traded in at such time, the amount of such Net Cash Proceeds or cash reimbursement, as the case may be, and (ii) any Capital Expenditures acquired in connection with any Permitted Acquisition shall be excluded from Capital Expenditures.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Company or any of its Subsidiaries free and clear of all Liens (other than Liens created under the Collateral Documents and other Liens permitted hereunder):

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 365 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 365 days from the date of acquisition thereof;

(c) commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than three months from the date of acquisition thereof;

4

YC-E-037696

(d)     Investments, classified in accordance with GAAP as current assets of the Company or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and 95% of the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition;

(e)     repurchase obligations of any Lender or any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities of the types described in clauses (a) and (b) above;

(f)     securities with maturities of three months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A-1 by S&P or P-1 by Moody's;

(g)     variable rate notes with a readily available market for liquidation, issued by any Person organized under the laws of any state of the United States of America or by any state, commonwealth or territory of the United States, in each case, to the extent backed by a letter of credit issued by a financial institution rated at least "A-1" (or the then equivalent grade) by Moody's or at least "A" (or the then equivalent grade) by S&P; and

(h)     securities with maturities of three months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition.

"Cash Management Agreement" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements, or treasury management services.

"Cash Management Bank" means any Person that on the Third Amendment and Restatement Effective Date is a party to a Cash Management Agreement with any of the Borrowers or an Affiliate of such party (other than any Loan Party) (in effect prior to the Third Amendment and Restatement Effective Date and continuing in effect thereafter), in its capacity as a party to such Cash Management Agreement.

"Casualty Event" means any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of Company or any of its Subsidiaries. "Casualty Event" shall include but not be limited to any taking of all or any part of any real property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Laws, or by reason of the temporary requisition of the use or occupancy of all or any part of any real property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"CFC" means a Person that is a "controlled foreign corporation" under Section 957 of the Code.

CONFIDENTIAL

YC-E-037697

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)        any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Investor becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 50% or more of the equity securities of Holdings entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis (and taking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right); or

(b)        Holdings shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Company (it being understood that none of the transactions contemplated in connection with the YesCorp Transaction shall be a Change of Control).

"Class" when used in reference to any Loan or Borrowing, refers to whether such Loan or the Loans comprising such Borrowing are Additional First Out Loans or Initial Term Loans, and when used in reference to any Lender, refers to whether such Lender has a Loan or Commitment of such Class. For the avoidance of doubt, the use of the term "Class" in this Agreement and the other Loan Documents is not intended to be in any way limiting, dispositive, or otherwise affect the classification of claims or interest under Section 1122 of the Bankruptcy Code of the United States.

"Closing Date" means April 14, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all of the "Pledged Collateral" and "Mortgaged Property" referred to in the Collateral Documents and all of the other property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the Security Agreement, each Control Agreement, the IP Security Agreement Supplements, each of the Mortgages, collateral assignments, Security Agreement Supplements, IP Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

6

YC-E-037698

"Commitment" means the Additional Commitments.

"Committed Loan Notice" means a notice of Borrowing, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A-1.

"Company" has the meaning specified in the introductory paragraph hereto.

"Company Materials" has the meaning specified in Section 6.02.

"Competitor" means each Person who is listed on Schedule 1.01.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consolidated Amortization Expense" means, for any period, the amortization expense of Company and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Consolidated Current Assets" means, at any date, all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Company and its Subsidiaries at such date.

"Consolidated Current Liabilities" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Company and its Subsidiaries at such date, excluding any short term Indebtedness.

"Consolidated Depreciation Expense" means, for any period, the depreciation expense of Company and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Consolidated EBITDA" means, at any date of determination, an amount equal to Consolidated Net Income of the Company and its Subsidiaries on a consolidated basis for the most recently completed Measurement Period plus (or minus, as applicable) without duplication and to the extent deducted in determining (or, in the case of clause (xi) below, to the extent not included in the determination of) such Consolidated Net Income:  (i) Consolidated Interest Expense, (ii) Consolidated Tax Expense, (iii) Consolidated Depreciation Expense, (iv) Consolidated Amortization Expense, (v) any fee, loss, charge, expense, cost, accrual or reserve attributable to the undertaking and/or implementation of any business optimization or any restructuring, provided that the aggregate amount that may be added back for any Measurement Period pursuant to this clause (v) shall not exceed for any Measurement Period the greater of (x) $6,000,000 and (y) 10% of Consolidated EBITDA for that Measurement Period, (vi) non-cash purchase accounting adjustments in accordance with GAAP, (vii) board of director fees and expenses, (viii) reasonable and customary costs, fees and expenses incurred in connection with any amendment, modification or waiver of any provision of any Loan Document or, to the extent permitted hereunder, any Permitted ABL Loan Document or otherwise in connection with the Transactions (including, for the avoidance of doubt and without limitation, the Deferred Payment Notes, Exchange Agreement, Purchase Agreement and Assignment executed in connection with the Fourth Amendment Transactions), including all restructuring costs and expenses incurred in connection with the Transactions, (ix) costs and expenses incurred in connection with any actual or proposed acquisition, merger, joint venture, issuance of equity interests, issuance of Indebtedness or disposition, in each case, permitted hereunder and whether or not consummated, (x) costs and expenses incurred (A) to the extent covered by indemnification or reimbursement provisions in any agreement with a Person that is not an Affiliate of the Company or any of its Subsidiaries in connection with a Permitted Acquisition or (B) to the extent indemnified or reimbursed by a Person that is not an Affiliate of the Company or any of its Subsidiaries and, in each case, only to the extent such costs and expenses are in fact reimbursed by such Person within three months of such incurrence; (xi) the proceeds of business interruption insurance, (xii) post contract termination losses (or minus gains) incurred in connection with the Arizona Customer Contract terminating on June 30, 2019;

7

YC-E-037699

provided that (i) the aggregate amount of losses that may be added back shall not collectively exceed $250,000 each calendar month, and (ii) such losses or gains shall only be added back or subtracted, as applicable, until the month ending December 31, 2019, (xiii) [reserved], (xiv) cost savings and operating expense reductions resulting from divestitures, contract terminations, restructurings, cost savings initiatives and other similar initiatives and actions, in each case, that were consummated during the applicable Measurement Period, which such cost savings and operating expense reductions are projected by the Company in good faith to be realized within the next eighteen months from such divestiture, contract termination, restructuring, cost savings initiative or other similar initiative or action, net of the amount of actual benefits realized during such period from such actions (calculated on a pro forma basis as though such cost savings and operating expense reductions had been realized on the first day of such period and as if such cost savings and operating expense reductions were realized during the entirety of such period); provided that the aggregate amount of cost savings and operating expense reductions included pursuant to this clause (xiv), shall not exceed the greater of $2,000,000 and 10% of Consolidated EBITDA for such Measurement Period (calculated before giving effect to the addback set forth in this clause (xiv)); and (xv) documented bona fide management, consulting, advisory, monitoring or similar services costs, fees and expenses payments to an Affiliate of, or investor in, M2 EquityCo, LLC or M2 LoanCo, LLC (or, in each case, any of their respective successors) for such services, costs, fees or expenses, provided that the aggregate amount of such payments that may be added back for any Measurement Period shall not exceed for any Measurement Period the greater of (i) $4,800,000 and (ii) 5% of Consolidated EBITDA for such Measurement Period (calculated before giving effect to the addback set forth in this clause (xv)); and (xvi) documented payments to, directly or indirectly, pay administrative or any other ordinary business costs of M2 HoldCo, LLC, provided that the aggregate amount of such payments that may be added back for any Measurement Period shall not exceed $250,000 for such Measurement Period. Notwithstanding anything to the contrary, subject to any adjustment set forth in the definition of "Pro Forma Basis" in relation to any event occurring after the Third Amendment and Restatement Effective Date, it is agreed that the Consolidated EBITDA for the fiscal quarters ended September 30, 2019, December 31, 2019 and March 31, 2020 shall be $544,000, $611,000 and $1,497,000, respectively.

"Consolidated Funded Indebtedness" means, as of any date of determination, for the Company and its Subsidiaries on a consolidated basis, the sum of: (i) all obligations for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments (including the Loans, Deferred Payment Notes and any Permitted ABL Indebtedness) determined at its full par principal amount without giving effect to any original issue discount and including all capitalized and paid-in-kind interest thereon, (ii) all direct obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments, except to the extent that a demand thereunder has not been made and the obligations in respect thereof remain contingent, (iii) the outstanding principal portion of Capitalized Leases or Indebtedness secured by purchase money Liens, and (iv) subject to the following paragraph and without duplication, all other outstanding Indebtedness of the Company and its Subsidiaries.

Notwithstanding any other provision of this Agreement to the contrary, the term "Consolidated Funded Indebtedness" shall not be deemed to include Indebtedness consisting of (i)(A) Bond Contingent Obligations to the extent permitted hereunder or (B) obligations in respect of earn-outs and working capital adjustments (or similar types of post-closing payments), in each case to the extent not appearing in the liabilities section of the balance sheet of the Company or its relevant Subsidiary and not otherwise constituting indebtedness in accordance with GAAP, but without duplication of any other amount of Indebtedness included in Consolidated Funded Indebtedness in respect thereof or (ii)(A) Permitted Insurance Premium Indebtedness to the extent permitted hereunder or (B) net obligations under any Swap Contract.

"Consolidated Interest Expense" means, for any Measurement Period, the total consolidated interest expense of Company and its Subsidiaries for such Measurement Period determined on a

consolidated basis in accordance with GAAP and including, in any event, with respect to such Measurement Period, (a) interest paid in kind or capitalized, (b) net expenses incurred in connection with any Swap Contract, (c) to the extent constituting interest expense, unused commitment fees or payments, commissions, discounts and other fees or charges with respect to letters of credit and (d) the interest component of Capitalized Leases permitted hereunder, less (e) interest income, in each case of or by the Company and its Subsidiaries for such Measurement Period determined on a consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, at any date of determination, the net income (or loss) of the Company and its Subsidiaries on a consolidated basis for the most recently completed Measurement Period; provided that Consolidated Net Income shall exclude (a) the income (or loss) for such Measurement Period of any Person (other than a Subsidiary of the Company) in which the Company or any of its Subsidiaries has an ownership interest except to the extent of the amount of dividends or other distributions actually paid to the Company or any of its Subsidiaries in cash by such Person during such period (and in the case of a dividend or distribution to a Subsidiary of the Company, such Subsidiary is not precluded from further distributing such amount to the Company as described in clause (b)), (b) the net income of any Subsidiary of the Company for such Measurement Period to the extent that the payment of dividends or similar distributions by such Subsidiary is at the time prohibited by operation of the terms of its charter or of any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, except that the Company's equity in any net loss of any such Subsidiary for such Measurement Period shall be included, (c) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Company or is merged into or consolidated with the Company or any of its Subsidiaries or that such Person's assets are acquired by such Person or any of its Subsidiaries, (d) the proceeds of any life insurance policy, (e) gains or losses from Casualty Events or the Disposition of property or assets not in the ordinary course of business of the Company and its Subsidiaries, and related tax effects in accordance with GAAP, (f) any other non-recurring, non-cash or extraordinary gains or charges of the Company or its Subsidiaries, and related tax effects in accordance with GAAP and (g) non-recurring expenses relating to changes in senior management; provided that, to the extent such expenses are incurred on or after the Third Amendment Effective Date, such expenses shall not exceed $2,000,000 in the aggregate during such Measurement Period.

For purposes of this definition of "Consolidated Net Income," "non-recurring" means any gain or charge as of any date that is not reasonably likely to recur within the one year following such date; provided that if there was a unrelated gain or charge similar to such gain or charge within the one year preceding such date, such gain or charge shall not be deemed non-recurring.

"Consolidated Tax Expense" means, for any period, the tax expense of Company and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Leverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness as of such date to (b) Consolidated EBITDA, in each case, of the Company and its Subsidiaries on a consolidated basis for the most recently completed Measurement Period; provided that such Consolidated Total Leverage Ratio shall be determined on a Pro Forma Basis.

"Consolidated Working Capital" means, at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

9

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account, securities account or commodities account maintained by any Loan Party, a control agreement in favor of the Administrative Agent and, if applicable, and subject to the Intercreditor Agreement, the Permitted ABL Agent, in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank, securities intermediary or commodities bank, as the case may be, with which such account is maintained.

"Customer Contract" means an agreement, contract or arrangement between a Governmental Authority and the Company or one of its Subsidiaries.

"Debt Equivalents" of any Person means (i) any Equity Interest of such Person which by its terms (or by the terms of any security for which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event or otherwise (including an event which would constitute a Change of Control), (A) matures or is mandatorily redeemable or subject to any mandatory repurchase requirement, pursuant to a sinking fund or otherwise or (B) is convertible into or exchangeable for Indebtedness or Debt Equivalents, in each case in whole or in part, on or prior to the date that is 180 days after the latest Maturity Date for the Loans and (ii) if such Person is a Subsidiary of the Company but not a Subsidiary Guarantor, any Preferred Stock of such Person issued to a Person other than the Company or any of its Subsidiaries; provided, however, that any Equity Interests that would not constitute Debt Equivalents but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a Change of Control or a Disposition occurring prior to the 180th day after the latest Maturity Date for the Loans shall not constitute Debt Equivalents if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the payment in full of the Obligations (other than contingent indemnity obligations and obligations and liabilities under Cash Management Agreements and Secured Hedge Agreements, for which no claim has been made).

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of any cure period or other specified time period, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations (other than Obligations constituting principal on any Loan), an interest rate equal to (x) the Base Rate plus (y) the Applicable Rate plus (z) 2% per annum and (b) when used with respect to Obligations constituting principal on any Loan, an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2% per annum.

"Deferred Payment Notes" has the meaning assigned to such term in the Fourth Amendment.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any issuance or sale of any Equity Interests by or of any Subsidiary of the Company) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any

10

YC-E-037702

notes or accounts receivable or any rights and claims associated therewith (but shall exclude, for the avoidance of doubt, Casualty Events).

"Dollar" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person (other than an Ineligible Lender) that meets the requirements to be an assignee under Section 10.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.06(b)(iii)).

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution or the protection of the Environment or of human health (to the extent related to exposure to Hazardous Materials), including those relating to the manufacture, generation, handling, transport, storage, treatment, Release or threat of Release of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

11

YC-E-037703

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Company or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate or the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan or Multiemployer Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any ERISA Affiliate; or (i) a failure by the Company or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Company or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"Erroneous Payment" has the meaning specified in Section 9.14.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Rate" means for any Interest Period as to any Eurodollar Rate Loan, (i) the rate per annum determined by the Administrative Agent to be the offered rate which appears on the page of the Bloomberg Screen which displays the London interbank offered rate administered by ICE Benchmark Administration Limited (the "LIBO Rate") for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, published as of approximately 11:00 a.m. (London, England time), two Business Days prior to the commencement of such Interest Period; (ii) in the event the rate referenced in the preceding clause (i) does not appear on such page or service or if such page or service shall cease to be available, the rate determined by the Administrative Agent to be the offered rate on such other page or other service which displays the LIBO Rate for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, published as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period; or (iii) if the rates referenced in the preceding clauses (i) and (ii) are not available, the rate per annum equal to the arithmetic mean of rates offered by three major banks in the London interbank market for deposits in Dollars as at approximately 11:00 a.m. (London time), two (2) Business Days prior to the first day of such Interest Period for delivery on the first day of such Interest Period for the number of the days comprised therein and in an amount comparable to the amount of such Loan to be outstanding during such Interest Period or, if different, the date or time at which quotations would customarily be provided by major banks in the London interbank market for deposits of amounts in Dollars for delivery on the first day of such Interest Period; provided that if LIBO Rates are quoted under either of the preceding clauses (i) or (ii), but there is no such quotation for the Interest Period elected, the LIBO Rate shall be equal to the Interpolated Rate; and provided, further, that, notwithstanding the foregoing, the Eurodollar Rate shall not be deemed to be less than 1.25% per annum.

CONFIDENTIAL                                                                                                    YC-E-037704

"Eurodollar Rate Loan" means a Loan that bears interest at the Eurodollar Rate.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means, for any fiscal year of the Company, (a) the sum (for each fiscal year) of (i) Consolidated EBITDA for such fiscal year plus (ii) the amount of the decrease, if any, in Consolidated Working Capital (other than any such decreases arising from Permitted Acquisitions completed during such period) plus (iii) all cash income or gain to the extent excluded from Consolidated Net Income in the calculation thereof or subtracted from Consolidated Net Income in the calculation of Consolidated EBITDA minus (b) the sum, without duplication, for such fiscal year, of (i) scheduled principal payments, to the extent actually made with Internally Generated Cash, of Loans pursuant to Section 2.05 or, to the extent permitted hereunder, scheduled principal payments of other long-term Indebtedness of the Company and its Subsidiaries, (ii) Consolidated Interest Expense actually paid in cash by the Company and its Subsidiaries with Internally Generated Cash, (iii) to the extent permitted hereunder, Capital Expenditures actually made in cash by the Company and its Subsidiaries with Internally Generated Cash, (iv) the amount of Restricted Payments pursuant to Sections 7.06(c) and 7.06(d) made in cash by the Company and its Subsidiaries with Internally Generated Cash, (v) the amount of Investments pursuant to Sections 7.03(g) and 7.03(m) made in cash by the Company and its Subsidiaries with Internally Generated Cash (net of any returns of such Investment), (vi) all income taxes actually paid in cash by the Company and its Subsidiaries, (vii) the amount of the increase, if any, in Consolidated Working Capital in such fiscal year (other than any such increases arising from Permitted Acquisitions completed during such period), (viii) the amount of any post-closing payments or purchase price or working capital adjustments paid in cash by the Company and its Subsidiaries in respect of a Permitted Acquisition, (ix) post-Closing Date board of director fees and expenses, not to exceed the corresponding amount permitted to be added in the calculation of Consolidated EBITDA, paid in cash by the Company or any of its Subsidiaries, (x) reasonable and customary costs, fees and expenses paid in cash by the Company or any of its Subsidiaries in connection with any amendment, modification or waiver of any provision of any Loan Document, the Deferred Payment Notes or, to the extent permitted hereunder, any Permitted ABL Loan Document, (xi) costs and expenses paid in cash by the Company or any of its Subsidiaries in connection with any actual or proposed acquisition, merger, joint venture, issuance of equity interests, issuance of Indebtedness or disposition, in each case, permitted hereunder and whether or not consummated, (xii) costs and expenses paid in cash by the Company or any of its Subsidiaries (A) to the extent covered by indemnification or reimbursement provisions in any agreement with a Person that is not an Affiliate of the Company or any of its Subsidiaries in connection with a Permitted Acquisition or (B) to the extent indemnified or reimbursed by a Person that is not an Affiliate of the Company or any of its Subsidiaries and, in each case, only to the extent such costs and expenses are in fact reimbursed by such Person within three months of such incurrence, (xiii) costs and expenses paid in cash by the Company or any if its Subsidiaries in connection with the Transactions (including, for the avoidance of doubt, the AAS, the Exchange Agreement, the Purchase Agreement, the Assignment and the Deferred Payment Notes) and (xiv) cash expenses or charges that were excluded from Consolidated Net Income in the calculation thereof or added to Consolidated Net Income in the calculation of Consolidated EBITDA.

"Exchange Agreement" has the meaning assigned to such term in the Fourth Amendment.

"Excluded Subsidiary" has the meaning specified in Section 6.12(a).

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other Recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on or measured by its net income, however denominated (including, for the avoidance of doubt, any backup withholding in respect of such a Tax), any branch profits Taxes, and franchise Taxes imposed on it (in lieu of net income Taxes), by a jurisdiction (or any political subdivision thereof) as a result of such Recipient being organized or having its principal office

13

or applicable Lending Office located in such jurisdiction, or that are Other Connection Taxes, (b) in the case of a Non-U.S. Lender (other than an assignee pursuant to a request by the Company under <u>Section 10.13</u>), any U.S. federal withholding Tax that is required to be imposed on amounts payable to such Non-U.S. Lender pursuant to the Laws in force at the time such Non-U.S. Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Non-U.S. Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new Lending Office (or assignment), to receive additional amounts from the Company with respect to such withholding Tax pursuant to <u>Section 3.01</u>, (c) any U.S. federal withholding Tax imposed under FATCA and (d) any Taxes attributable to the failure of a Lender to comply with <u>Section 3.01(c)</u>.

"<u>Existing Credit Agreement</u>" has the meaning specified in the preliminary statements to this Agreement.

"<u>Extraordinary Receipt</u>" means any cash received by or paid to or for the account of any Person consisting of proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), other similar compensation or indemnity payments, including in respect of Casualty Events (but excluding, for the avoidance of doubt, cash received in the ordinary course of business); <u>provided, however,</u> that an Extraordinary Receipt shall not include (a) cash receipts from proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments to the extent that such proceeds, awards or payments in respect of loss or damage to equipment, fixed assets or real property are applied (or in respect of which expenditures were previously incurred) to replace or repair the equipment, fixed assets or real property in respect of which such proceeds were received in accordance with the terms of <u>Section 2.03(b)(iv)</u> or (b) cash receipts from indemnification payments or the proceeds of liability insurance used to cure or resolve the issue giving rise to the applicable indemnification claim or insurance claim.

"<u>FASB ASC</u>" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"<u>FATCA</u>" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with any of the foregoing, and any legislation, regulations, rules or practices adopted or enacted in respect of any such intergovernmental agreement, treaty or convention or otherwise in connection with any of the foregoing.

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate <u>provided that</u> (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average (rounded upwards, if necessary, to the next 1/100 of 1.0%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Fifth Amendment and Assumption</u>" means the Fifth Amendment, Assignment, Assumption, Waiver and Release to Third Amended and Restated Credit Agreement, dated as of the Fifth Amendment and Assumption Effective Date.

CONFIDENTIAL

YC-E-037706

"Fifth Amendment and Assumption Effective Date" has the meaning given to the term "Fifth Amendment Effective Date" in the Fifth Amendment and Assumption.

"Fourth Amendment" means the Fourth Amendment to the Second Amended and Restated Credit Agreement, dated on or about August 17, 2020, by and among the Loan Parties, the Administrative Agent and the Lenders party thereto who constituted on such date all Lenders.

"Fourth Amendment Accrued and Unpaid Interest" means the accrued and unpaid interest owed on the Initial Term Loans held by the Initial Term Lenders immediately prior to the Third Amendment and Restatement Effective Date.

"Fourth Amendment Transactions" shall mean the transactions contemplated by the Fourth Amendment, including (i) the execution, delivery and performance by the Loan Parties of the Fourth Amendment, the Reaffirmation and the other documents related thereto, (ii) the amendment and restatement of the Existing Credit Agreement by this Agreement pursuant to the Fourth Amendment and (iii) the payment of fees, expenses and other transaction costs in connection with the foregoing.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities. "GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Geneva Management Services Agreement" means the management services agreement, effective as of May 5, 2022, among the Company, Holdings, Corizon Health of New Mexico, LLC and Geneva Consulting LLC.

"Geneva Security Agreement" means the security agreement, made and entered into as of May 5, 2022, among the Company, Holdings, Corizon Health of New Mexico, LLC and Geneva Consulting LLC.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing

15

any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, Holdings, the Borrowers and each of the Subsidiaries of the Company listed on Schedule 6.12 and each other Subsidiary of the Company that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12.

"Guaranty" means, collectively, the Guaranty made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit E, together with each other guaranty and guaranty supplement delivered pursuant to Section 6.12.

"Guaranty Supplement" means joinder agreement principally in the form attached as Exhibit A to the Guaranty.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances or wastes, including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Health Care Laws" means all federal and state Laws regulating patient healthcare, healthcare providers or healthcare services or payment, including, but not limited to, Federal and State anti-kickback Laws, Federal and State false claims Laws, HIPAA, Medicare, Medicaid, and any other state or federal Law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance which regulates kickbacks, patient or program charges, recordkeeping, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation, or any other aspect of providing health care.

"Health Care Permit" has the meaning specified in Section 5.25(b).

"Hedge Bank" means any Person that, on the Third Amendment and Restatement Effective Date is a party to a Swap Contract or an Affiliate of such party (other than any Loan Party) (in effect prior to the Third Amendment and Restatement Effective Date and continuing in effect thereafter), in its capacity as a party to such Swap Contract; provided that with such interest rate Swap Contract is required or permitted under Article VI or VII herein.

"HIPAA" means the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, as amended.

"HIPAA Business Associate Agreement" means a business associate contract in accordance with 45 C.F.R. § 164.504 that permits the Company or any Subsidiary to disclose protected health information (as defined under HIPAA) to representatives and independent contractors of the Administrative Agent and each Lender.

HIPAA Compliance Plan" has the meaning specified in Section 5.26.

HIPAA Compliant" has the meaning specified in Section 5.26.

16

YC-E-037708

"Historical Workers' Compensation Claims" means obligations of the Company and its Subsidiaries under workers' compensation claims with respect to periods ending prior to August 17, 2020.

"Holdings" has the meaning specified in the introductory paragraph hereto.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 60 days after the date on which such trade account was created);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Debt Equivalents of such Person or any other Person or any warrant, right or option to acquire such Debt Equivalent, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

(i)    For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company (or corresponding type of Person in the applicable jurisdiction)) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Party" has the meaning specified in Section 10.04(b).

"Ineligible Lender" means (i) any of the Loan Parties, (ii) any natural person and (iii) any Competitor; provided, that, and notwithstanding anything to the contrary contained in this definition, the term Ineligible Lender shall not include any existing Lender (or an Affiliate or Approved Fund thereof).

"Information" has the meaning specified in Section 10.07.

"Initial Term Lender" means a Lender with an outstanding Initial Term Loan.

"Initial Term Loan" has the meaning specified in Section 2.01.

17

YC-E-037709

"Insolvency Proceeding" has the meaning specified in Section 8.01(f).

"Intellectual Property Collateral" has the meaning specified in the Security Agreement.

"Intercompany Notes" has the meaning specified in the Security Agreement.

"Intercreditor Agreement" means an intercreditor agreement, governing the security arrangements for the sharing of liens and the arrangements relating to the priority of Liens on the Collateral as between the Obligations and the Permitted ABL Indebtedness, that (x) is reasonably satisfactory to the Administrative Agent and the Required Lenders and (y) is executed by the Administrative Agent, on behalf of the Lenders, and Permitted ABL Agent, on behalf of the lenders providing Permitted ABL Indebtedness, and as may be further amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date for such Loan and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date for such Loan.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or continued as a Eurodollar Rate Loan and ending on the date three months thereafter provided that:

(a)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)      no Interest Period shall extend beyond the Maturity Date for the applicable Loan.

"Internally Generated Cash" means any cash of the Company or any Subsidiary that is not generated from a Disposition (other than Dispositions of inventory in the ordinary course of business), an Extraordinary Receipt, an incurrence of Indebtedness, an issuance of Equity Interests or a capital contribution.

"Interpolated Rate" means, in relation to the LIBO Rate, the rate which results from interpolating on a linear basis between:

(a)      the applicable LIBO Rate for the longest period (for which that LIBO Rate is available) which is less than the Interest Period of that Loan; and

(b)      the applicable LIBO Rate for the shortest period (for which that LIBO Rate is available) which exceeds the Interest Period of that Loan,

each as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period of that Loan.

"Investment" means, as to any Person, any acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests, debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a

CONFIDENTIAL                                                                                     YC-E-037710

substantial portion of the business of, such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Invitation for Bid" means an invitation by a Governmental Authority to submit a tender, proposal or quotation for the provision of certain services.

"IP Rights" has the meaning specified in Section 5.17.

"IP Security Agreement Supplement" means the Trademark Security Agreement and the Copyright Security Agreement dated as of April 14, 2017 between certain of the Loan Parties and the Administrative Agent and each other "Patent Security Agreement," the "Trademark Security Agreement" or the "Copyright Security Agreement", in each case as defined in the Security Agreement, delivered in accordance with Section 6.12 from time to time.

"IRS" means the United States Internal Revenue Service.

"Junior Liens" means Liens (other than Liens securing the Obligations) that are subordinated to the Liens granted under the Loan Documents on customary terms pursuant to an acceptable intercreditor agreement reasonably satisfactory to the Administrative Agent (it being understood that Junior Liens are not required to be *pari passu* with other Junior Liens, and that Indebtedness secured by Junior Liens may have Liens that are senior in priority to, or *pari passu* with, or junior in priority to, other Liens constituting Junior Liens).

"Last Out Parties" has the meaning specified in the penultimate paragraph of Section 8.03.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" has the meaning specified in the recitals hereof.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Company and the Administrative Agent in writing.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means the Initial Term Loans, the Fourth Amendment Accrued and Unpaid Interest which shall be added to the principal amount of the Initial Term Loans pursuant to Section 2.06(f), and any PIK Interest which shall be added to the principal amount of the applicable Loans pursuant to Section 2.06(e) and the Additional First Out Loans.

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Collateral Documents, (e) any Intercreditor Agreement, (f) the AAS, (g) the Agent Fee Letter, (h) each Additional Loan Amendment and (i) each other agreement designated in writing by the Company and the Administrative Agent as a "Loan Document".

CONFIDENTIAL

YC-E-037711

"Loan Parties" means, collectively, the Borrowers and each Guarantor.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities, condition (financial or otherwise) or results of operations of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under the Loan Documents, or of the ability of the Loan Parties to perform their obligations under the Loan Documents to which they are a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties of the Loan Documents to which they are a party; provided, however, that the loss, termination or expiration of any Customer Contract (other than any termination or loss expressly "for cause", which may be taken into account in determining whether there has been or will be a Material Adverse Effect) shall not, in and of itself, be deemed to constitute or have a Material Adverse Effect solely as a result of such loss, termination or expiration (it being understood that the facts or occurrences giving rise to or contributing to such loss, termination or expiration may be deemed to constitute, or be taken into account in determining whether there has been or will be, a Material Adverse Effect).

"Material Customer Contract" has the meaning set forth in Section 6.02(k) hereof.

"Material Owned Real Property" means any owned parcel of real property with a fair market value in excess of $1,000,000. As of the Third Amendment and Restatement Date, each Material Owned Real Property is set forth on Schedule 4.01(c).

"Maturity Date" means February 26, 2024.

"Maximum Rate" has the meaning specified in Section 10.09.

"Measurement Period" means, at any date of determination, the most recently completed four fiscal quarters of the Company for which financial statements have been or are required to be delivered pursuant to Section 6.01(a) or (b).

"Medicaid" means that government-sponsored entitlement program under Title XIX, P.L. 89-97 of the Social Security Act, which provides federal grants to states for medical assistance based on specific eligibility criteria, as set forth on Section 1396, et seq. of Title 42 of the United States Code.

"Medicare" means that government-sponsored insurance program under Title XVIII, P.L. 89-97, of the Social Security Act, which provides for a health insurance system for eligible elderly and disabled individuals, as set forth at Section 1395, et seq. of Title 42 of the United States Code.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage Requirement" means, with respect to any Material Owned Real Property, (i) provision of (a) a policy or policies of title insurance issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent insuring the Lien of each Mortgage as a first priority Lien on the Material Owned Real Property described therein free of any other Liens other than Permitted Encumbrances and including such endorsements as the Administrative Agent reasonably requests and in such amounts as reasonably acceptable to the Administrative Agent and (b) a Mortgage executed by the applicable Loan Party in recordable form and otherwise in form and substance reasonably acceptable to the Administrative Agent, (ii) a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Material Owned Real Property and, if any such Material Owned Real Property is determined to be in a special flood hazard area, delivery of (x) a notice with respect to such flood hazard determination duly executed by the Borrowers and applicable Loan Party and (y)

20

evidence of flood insurance in compliance with Section 6.07 and the requirements of the National Flood Insurance Program, (iii) a local counsel opinion as to the due authorization, execution, delivery and enforceability of such Mortgage in the state in which the Material Owned Real Property described in such Mortgage is located and other matters customarily covered in real estate enforceability opinions in form and substance reasonably acceptable to the Administrative Agent, (iv) ALTA surveys in form and substance reasonably acceptable to the Administrative Agent and (v) such other affidavits, documentation or certificates as reasonably requested by the Administrative Agent.

"Mortgaged Property" means each Material Owned Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 6.12.

"Mortgages" means a mortgage, deed of trust, trust deed, deed to secure debt, leasehold mortgage, leasehold deed to secure debt and leasehold deed of trust, as applicable, made by the applicable Loan Party in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties in respect of Material Owned Real Property in form and substance reasonably acceptable to the Administrative Agent executed and delivered pursuant to Section 6.12.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Company or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Company or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means:

(a)     with respect to any Disposition by the Company or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of the Company or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the out-of-pocket expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, brokerage, consulting and other customary fees) incurred by the Company or such Subsidiary in connection with such transaction, (C) federal and state income taxes reasonably estimated to be actually payable within two years of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided that, if the amount of any estimated taxes pursuant to subclause (C) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds, (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Company or any Loan Party after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction and (E) in respect of Extraordinary Receipts, any out-of-pocket fees and expenses incurred by the Company or such Subsidiary in connection with the exercise and enforcement of any indemnification claim and incurred or reasonably anticipated to be incurred in investigating and addressing the issue resulting in such indemnification payment being made; and

CONFIDENTIAL

YC-E-037713

(b)     with respect to the sale or issuance of any Equity Interest by the Company or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by the Company or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) investment banking fees, the underwriting discounts and commissions, and other out-of-pocket expenses and other customary fees and expenses, incurred by the Company or such Subsidiary in connection therewith.

"Non-Excluded Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Non-U.S. Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Not Otherwise Applied" means, with reference to any amount of proceeds of any transaction or event, that such amount was not required to be applied to prepay the Loans pursuant to Section 2.03(b).

"Note" means a promissory note made by the Borrowers in favor of a Lender, evidencing Loans made by such Lender, substantially in the form of Exhibit B.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, Secured Cash Management Agreement or Secured Hedge Agreement, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and payments that accrue after the commencement by or against any Loan Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees or payments are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the Treasury Department of the United States.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original Credit Agreement" means that certain First Lien Credit Agreement, dated as of the Closing Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the effectiveness of the Existing Credit Agreement), by and among the Borrowers, Holdings, the lenders from time to time party thereto and the Administrative Agent.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and such jurisdiction (other than any connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Documents, or sold or assigned an interest in any Loan or Loan Document)

22

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise or property Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means, with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans, occurring on such date.

"Participant" has the meaning specified in Section 10.06(d); provided that no Person described in Section 10.06(b)(v) shall be a Participant.

"Participant Register" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan but excluding each Multiemployer Plan) that is maintained or is contributed to by the Company and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Certificate" means a certificate in the form of Exhibit G-1 or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"Perfection Certificate Supplement" means a certificate supplement in the form of Exhibit G-2 or any other form approved by the Administrative Agent.

"Permitted ABL Agent" means the administrative agent and collateral agent for the lenders providing Permitted ABL Indebtedness.

"Permitted ABL Credit Agreement" means an asset-based revolving credit agreement entered into by one or more Borrowers, as borrower(s), with one or more financial institutions, as lender(s), that is reasonably satisfactory to the Required Lenders, and as may be further amended, supplemented, restated or otherwise modified from time to time, in each case, in accordance with the terms thereof and with the consent (not to be unreasonably withheld) of the Required Lenders.

"Permitted ABL Indebtedness" means all Indebtedness incurred by any Loan Party pursuant to the Permitted ABL Credit Agreement and any related guaranty agreements.

"Permitted ABL Loan Documents" means, collectively, the Permitted ABL Credit Agreement and all guaranty agreements, security agreements, other agreements and instruments, in each case, related to the Permitted ABL Credit Agreement.

"Permitted Acquisition" has the meaning specified in Section 7.03(g).

CONFIDENTIAL

YC-E-037715

"Permitted Encumbrances" means Liens of the type described in clauses (a), (c), (d), (g) and (p) of Section 7.01.

"Permitted Insurance Premium Debt Documents" means insurance policies and/or other agreements, instruments and documents pursuant to which a financial institution finances insurance premiums of a Loan Party (other than Holdings) on customary and reasonable terms.

"Permitted Insurance Premium Indebtedness" means Indebtedness incurred pursuant to Permitted Insurance Premium Debt Documents in connection with the financing of insurance premiums in the ordinary course of business.

"Permitted Investor" means each holder of Equity Interests in M2 EquityCo, LLC as of the Third Amendment and Restatement Effective Date or any affiliates thereof.

"Permitted L/C Facility" means a letter of credit facility to be available for the issuance of letters of credit by the Additional Commitment Lenders and/or any other party acceptable to the Additional Commitment Lenders; provided that, a Permitted L/C Facility shall only be permitted under this Agreement so long as arrangements between the Company and the Workers' Compensation Insurers which are satisfactory to the Administrative Agent and the Required Lenders have been made prior to the establishment of the Permitted L/C Facility to ensure that the Workers' Compensation Cash Collateral is reimbursed or paid by the Workers' Compensation Insurers to the Company or any of its Subsidiaries immediately upon the receipt by the Workers' Compensation Insurers of letters of credit issued under the Permitted L/C Facility; provided further, that the Borrowers' obligations under the Permitted L/C Facility may be secured on a first lien basis with the Loans pursuant to the Collateral Documents.

"Permitted L/C Indebtedness" means all Indebtedness incurred by any Loan Party pursuant to the Permitted L/C Facility and any related guaranty agreements.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon plus other reasonable amounts paid, and underwriting discounts, defeasance costs, fees, commissions and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder or as otherwise permitted pursuant to Section 7.02, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted remaining average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, taken as a whole, (d) the terms and conditions (including, if applicable, as to collateral) of any such modified, refinanced, refunded, renewed or extended Indebtedness are not materially less favorable in the good faith discretion of the Company to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being so modified, refinanced, refunded, renewed or extended, (e) at the time thereof, no Event of Default shall have occurred and be continuing, (f) such modification, refinancing, refunding, renewal or extension is incurred by the Person or Persons who are the obligors on the Indebtedness being modified, refinanced, refunded, renewed or extended or would otherwise be permitted to incur such Indebtedness (including any guarantees thereof pursuant to Section 7.02 and Section 7.03) (g) with respect to any Permitted ABL Indebtedness, such

24

YC-E-037716

modification, refinancing, refunding, renewal or extension (1) is in accordance with the Intercreditor Agreement and (2) has been approved (such approval not to be unreasonably withheld) in writing by the Required Lenders and (h) with respect to any Loan Document or Deferred Payment Note, such modification, refinancing, refunding, renewal or extension is in accordance with the AAS.

"Permitted Unsecured Indebtedness" means any senior unsecured loans and/or notes or Subordinated Indebtedness of the Company or any other Loan Party (other than Holdings), no part of the principal of which is required to be paid (whether by way of mandatory sinking fund, mandatory redemption, mandatory prepayment or otherwise) prior to the date that is six months after the final maturity of the Loans outstanding on the date on which such Indebtedness is incurred (it being understood that any required offer to purchase such Indebtedness as a result of a change of control or asset sale shall not violate the foregoing restriction) and the terms and conditions of which (including with respect to covenants, events of default and remedies applicable thereto), taken as a whole, are not materially less favorable to Company and its Subsidiaries or the Lenders than this Agreement; provided that such Indebtedness (i) is not at any time guaranteed by any Subsidiaries other than Subsidiaries that are Guarantors and (ii) has no financial maintenance covenants (it being understood, for the avoidance of doubt, that financial covenant tests for the purposes of determining whether interest can be paid in cash or in-kind shall not be deemed to be financial maintenance covenants).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PIK Interest" has the meaning specified in Section 2.06(e).

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Company or any ERISA Affiliate or any such Plan to which the Company or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Platform" has the meaning specified in Section 6.02.

"Preferred Stock" means, with respect to any Person, any and all Equity Interests which are preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over another class of Equity Interests of such Person.

"Prepayment Notice" has the meaning specified in Section 2.03(a)(i), which shall be substantially in the form of Exhibit A-2.

"Privacy and Security Rules" has the meaning specified in Section 5.26.

"Pro Forma Basis" means, as to any Person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the Measurement Period: (i) in making any determination of Consolidated EBITDA, effect shall be given to any Dispositions or Permitted Acquisition, in each case that occurred during the Measurement Period, (ii) in making any determination on a Pro Forma Basis, (x) all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise, but excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes, in each case not to finance any acquisition) issued, incurred, assumed or permanently repaid during the Measurement Period shall be deemed to have been issued, incurred, assumed or permanently repaid at the beginning of such period and (y) the interest expense of such Person attributable to interest on any Indebtedness, for which pro forma effect is being given as provided in preceding clause (x), bearing floating interest rates shall be computed on a pro forma

CONFIDENTIAL

basis as if the rates that would have been in effect during the period for which pro forma effect is being given had been actually in effect during such periods (taking into account any Swap Contract applicable to the Indebtedness if the Swap Contract has a remaining term of at least 12 months).

Pro forma calculations made pursuant to the definition of the term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of the Company in accordance with Regulation S-X promulgated under the Securities Act of 1933, as amended or otherwise in express compliance with this definition and the definition of the financial metric being calculated and, in the case of Dispositions or Permitted Acquisitions, may include adjustments to give appropriate effect to identifiable and factually supportable cost savings or operating expense reductions projected by the Company in good faith to be realized within 12 months of the consummation of closures, terminations and specified actions taken or for which substantially all of the steps necessary for the realization thereof have been taken, during such Measurement Period in connection with such Disposition or Permitted Acquisition. The Company shall deliver to the Administrative Agent a certificate of a financial officer of the Company setting forth calculations of any such pro forma adjustments supporting them in reasonable detail; provided that no adjustments for cost savings shall be made with respect to such relevant transactions after the end of the first four consecutive fiscal quarters ended following such transaction, provided, further, that such adjustment for cost savings shall be limited, in any Measurement Period, to 10% of Consolidated EBITDA for such Measurement Period (prior to giving effect to such adjustment).

"Programs" has the meaning specified in Section 5.25(c).

"Protected Health Information" has the meaning specified in HIPAA.

"Public Lender" has the meaning specified in Section 6.02.

"Purchase Agreement" has the meaning assigned to such term in the Fourth Amendment.

"Qualified Capital Stock" means Equity Interests of Holdings that do not include a cash dividend and are not mandatorily redeemable by Holdings or any of its Subsidiaries or redeemable at the option of the holder of such Equity Interests, in each case prior to the 181st day following the Maturity Date (other than in connection with an asset sale or change of control, so long as the definitions of asset sale and change of control in the instruments governing such Equity Interests are no more restrictive with respect to Holdings and its Subsidiaries than the corresponding definitions herein and so long as the Obligations (other than contingent indemnification obligations and obligations and liabilities under Cash Management Agreements and Secured Hedge Agreements, for which no claim has been made) are either repaid or waived with respect to such asset sale or change of control prior to the redemption of such Equity Interests).

"QFC Credit Support" has the meaning specified in Section 10.24.

"Reaffirmation" has the meaning assigned to such term in the Fourth Amendment.

"Recipient" means the Administrative Agent and any Lender.

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment, or into, from or through any building, structure or facility.

26

YC-E-037718

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Required Additional First Out Lenders" means, at any time, Additional First Out Lenders having Additional First Out Loans and unused Additional Commitments representing more than 66.67% of the sum of the Additional First Out Loans and unused Additional Commitments of all First Out Lenders outstanding at such time; provided, that after the payment in full in cash of all Obligations owing to the Additional First Out Lenders under the Loan Documents and the termination of all Additional Commitments, all rights previously exercisable hereunder and under the other Loan Documents solely by the Required Additional First Out Lenders shall thereafter be exercisable by the Required Lenders.

"Request for Proposal" means a solicitation by a Governmental Authority for a tender, proposal or quotation for the provision of certain services.

"Required Lenders" means, at any time, the Lenders having Loans and unused Commitments representing more than 66.67% of the sum of the total Loans and such unused Commitments of all Lenders at such time.

"Responsible Officer" means the chief executive officer, president, chief financial officer, chief operating officer, vice president-finance, treasurer or controller of a Loan Party and solely for purposes of the delivery of any incumbency certificates, the secretary or any assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restatement Transactions" has the meaning assigned to such term in the Fourth Amendment.

"Restricted Payment" means any dividend or other distribution (whether in cash securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a Sanctioned Country or (c) any person controlled by any such person.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

CONFIDENTIAL

"Secured Cash Management Agreement" means any Cash Management Agreement that is entered into by and between the Company or any of its Subsidiaries and any Cash Management Bank; provided, however, that all obligations owing in respect of all such Cash Management Agreements shall not exceed $2.5 million at any time outstanding.

"Secured Hedge Agreement" means any interest rate Swap Contract required or permitted under Article VI or VII that is entered into by and between a Loan Party and any Hedge Bank; provided, however, that all obligations owing in respect of all such Swap Contracts shall not exceed $5.0 million at any time outstanding.

"Secured Parties" means, collectively, the Administrative Agent, each other Agent, the Lenders, the Hedge Banks, the Cash Management Banks, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"Securities Collateral" has the meaning specified in the Security Agreement.

"Security Agreement" means the security agreement, dated as of April 14, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Loan Parties and the Administrative Agent in substantially the form of Exhibit F, together with each other security agreement and Security Agreement Supplement delivered pursuant to Section 6.12.

"Security Agreement Supplement" means the "Joinder Agreement" as defined in the Security Agreement.

"Social Security Act" means the Social Security Act of 1965.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person (taken as a going concern) is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's general ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Customer Contract" has the meaning set forth in Section 6.02(k) hereof.

"Subordinated Indebtedness" means Indebtedness of any Loan Party or any of its Subsidiaries that is by its terms junior or subordinated in right of payment to the Obligations of such Loan Party upon terms and pursuant to documentation reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company.

CONFIDENTIAL

"Supported QFC" has the meaning specified in Section 10.24.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to- market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so- called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Third Amendment and Restatement Effective Date" means the date on which the conditions specified in Section 4.01 of the Agreement were satisfied (or waived by the Initial Term Lender).

"Threshold Amount" means $5,000,000.

"Total Assets" means the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the most recent balance sheet of the Company delivered pursuant to Section 6.01.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Transactions" means collectively (i) the "Transactions" as defined in the Existing Credit Agreement, (ii) the Restatement Transactions and (iii) the Fourth Amendment Transactions.

"Transactions Rule" has the meaning specified in Section 5.26.

CONFIDENTIAL

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

"United States Tax Compliance Certificate" has the meaning specified in Section 3.01(c).

"Unrestricted Cash" means, as of any date of determination, the aggregate amount of cash and Cash Equivalents held in bank accounts of the Loan Parties that arc subject to Control Agreements as of such date to the extent that the use of such cash for application to payment of the Obligations is not prohibited by law or any contract or other agreement, and such cash is free and clear of all Liens (other than Liens in favor of the Administrative Agent or the Permitted ABL Agent and any statutory Liens in favor of banks (including rights of set-off)).

"U.S. Lender" means a Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Loan Party" means any Loan Party that is organized under the laws of the United States, any state thereof or the District of Columbia.

"U.S. Special Resolution Regimes" has the meaning specified in Section 10.24.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Workers' Compensation Cash Collateral" means cash collateral that is held by a Workers' Compensation Insurer on the Third Amended and Restated Effective Date in an aggregate amount equal to $18,970,843 as collateral for the obligations of the Company and its Subsidiaries with respect to Historical Workers' Compensation Claims.

"Workers' Compensation Insurer" means each of AIG, Pacific Employers Insurance, Lumbermans Mutual Insurance and Liberty Mutual Insurance.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"YesCorp Transaction" means the "Transaction", as defined in the Fifth Amendment and Assumption.

1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same

CONFIDENTIAL

meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    When used herein, the phrase "to the knowledge of" (or words of similar import), when applied to the Company or any Guarantors, shall mean the actual knowledge of any Responsible Officer thereof.

1.03    Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, (i) Indebtedness of the Company and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FAS 141R, FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded and (ii) if at any time after the Closing Date, any obligations of the Loan Parties or any of their Subsidiaries that would not have constituted Indebtedness as of the Closing Date are recharacterized as Indebtedness in accordance with any relevant changes in GAAP, such recharacterized obligations shall not be considered Indebtedness for all purposes hereunder.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement or any covenant set forth in any Loan Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement or covenant to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement or covenant shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Company shall provide to the

31

YC-E-037723

Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP and (iii) to the extent that any change in GAAP after the Closing Date results in leases which are, or would have been, classified as operating leases under GAAP as it exists on the Closing Date being classified as a Capitalized Lease under as revised GAAP, such change in classification of leases from operating leases to Capitalized Leases shall be ignored for purposes of this Agreement.

        1.04    <u>Rounding</u>.  Any financial ratios required to be maintained by the Company pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

        1.05    <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

        1.06    <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.* a "Additional First Out Loan") or by Type (*e.g.*, a "Eurodollar Rate Loan") or by Class and Type (*e.g.*, a "Eurodollar Rate First Out Loan").  Borrowings also may be classified and referred to by Class (*e.g.*, a "Additional First Out Loan Borrowing") or by Type (*e.g.*, a "Eurodollar Rate Borrowing") or by Class and Type (*e.g.*, a "Eurodollar Rate Additional First Out Loan Borrowing").

## ARTICLE II
## THE COMMITMENTS AND LOANS

        2.01    <u>Initial Term Loans</u>.  Immediately prior to the Third Amendment and Restatement Effective Date, the Initial Term Lenders held outstanding Loans made to the Borrower in an aggregate amount equal to $114,943,095.12, which is comprised of $112,998,763.88 of principal and $1,944,331.24 of accrued and unpaid interest, which in accordance with Section 2.06(e) shall be accredited to principal as of the date hereof (the "Initial Term Loans").  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.  Loans shall be Eurodollar Rate Loans or, pursuant to Section 3.02 or Section 3.03, Base Rate Loans.  As of the Third Amendment and Restatement Effective Date the Initial Term Lenders held outstanding Initial Term Loans in an aggregate equal to $75,000,000, which is comprised of $75,000,000 of principal and $0 of accrued and unpaid interest, which in accordance with Section 2.06(e) shall be accredited to principal as of the date hereof and such Initial Term Loans shall continue to be Loans for all purposes of this Agreement and the Loan Documents.

        2.02    <u>Borrowings and Continuations of Loans</u>.

        (a)    Each Borrowing of Loans shall be made upon the Borrowers' irrevocable notice to the Administrative Agent.  Each such notice must be received by the Administrative Agent not later than 12:00 p.m. five Business Days prior to the requested date of any Borrowing of Additional First Out Loans.  Each notice by the Borrowers shall be made by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Company.  Each Committed Loan Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day), (ii) the principal amount of Loans to be borrowed and (iii) the wiring instructions of the account(s) into which the proceeds of the Loan should be deposited.  Each Eurodollar Rate Loan shall, subject to <u>Sections 3.02 and 3.03,</u> be automatically continued as a Eurodollar Rate Loan with a three month Interest Period on the last day of each Interest Period for such Eurodollar Rate Loan.

        (b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage.  Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the

CONFIDENTIAL

Administrative Agent's Office not later than 2:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon receipt from each Lender of the Applicable Percentage of its Loan and satisfaction of the applicable conditions set forth in Section 4.01 or Section 4.02, as applicable, the Administrative Agent shall make all funds so received available to the Borrowers in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Company.

(c)     The Administrative Agent shall promptly notify the Company and the Lenders of the interest rate applicable to any Interest Period upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Company and the Lenders of any change in the prime rate used in determining the Base Rate promptly following the determination of such change.

2.03     Prepayments.

(a)     Optional.

(i)     Subject to the last three sentences of this Section 2.03(a)(i), the Borrowers may, upon written notice to the Administrative Agent (a "Prepayment Notice"), voluntarily prepay (x) at any time and from time to time Additional First Out Loans in whole or in part without premium or penalty, and (y) at any time following (but not before) payment in full in Dollars of all Obligations owing to the Additional First Out Lenders (and so long as no Additional Commitment is then outstanding), any Initial Term Loans in whole or in part without premium or penalty; provided that (A), in each case, such notice must be received by the Administrative Agent not later than 12:00 p.m.: (1) three Business Days prior to any date of prepayment of Eurodollar Rate Loans and (2) one Business Day prior to any date of prepayment of Base Rate Loans outstanding pursuant to Section 3.02 or Section 3.03; (B) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof; and (C) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof or, in each case, if less, the entire principal amount thereof of the applicable Class then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) and Class of Loans to be prepaid in accordance with this Section 2.03(a) and, if Eurodollar Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage of the Class being prepaid in accordance with this Section 2.03(a)). If such notice is given by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein (provided, that the notice of any repayment of the Obligations in connection with the refinancing thereof may be contingent upon the closing of such refinancing or liquidity event). Any prepayment of a Eurodollar Rate Loan or Base Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. With respect to any Class of Loans, all prepayments pursuant to this Section 2.03(a) shall be applied against the remaining scheduled installments of principal due in respect of such Class of Loans in direct order of maturity. Each prepayment of Loans pursuant to this Section 2.03(a) shall be paid to the Lenders in accordance with their respective Applicable Percentages of the applicable Class being prepaid. For the avoidance of doubt, Loans repaid pursuant to this Section 2.03(a)(i) may not be reborrowed.

(b)     Mandatory.

(i)     Within ten Business Days after financial statements have been (or are required to be) delivered pursuant to Section 6.01(a) in respect of any fiscal year ending after the Third Amendment and Restatement Effective Date commencing with the fiscal year ending December 31, 2021 and any related Compliance Certificate has been (or is required to be) delivered pursuant to Section 6.02(a),

33

the Borrowers shall prepay (such prepayments to be applied as set forth in clause (v) below) an aggregate principal amount (provided, that if the following calculation results in a negative amount, such amount shall be deemed to be zero) of Loans equal to (A) 75% of Excess Cash Flow for the fiscal year covered by such financial statements, minus (B) the aggregate principal amount of Loans prepaid pursuant to Section 2.03(a)(i) during such fiscal year, so long as such prepayments are not funded with the proceeds of long-term Indebtedness, minus (C) the aggregate principal amount of Loans prepaid during such fiscal year; and provided that the percentage of Excess Cash Flow required to be applied as a prepayment will be subject to the following stepdowns: (x) 50% if the Company's Consolidated Total Leverage Ratio is less than or equal to 2.50:1.00 and greater than 2.00:1.00 as of the end of such fiscal year, (y) 25% if the Company's Consolidated Total Leverage Ratio is less than or equal to 2.00:1.00 as of the end of such fiscal year.

(ii)     Subject to Section 8(g) of the AAS, if the Company or any of its domestic Subsidiaries Disposes of any property (other than any Disposition of any property permitted by Sections 7.05(a), (b), (c), (d), (e), (f), (g), (h), (i), (j) and (l)) which results in the realization by such Person of Net Cash Proceeds in excess of $2,000,000 during any fiscal year, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of such Net Cash Proceeds within five (5) Business Days of receipt thereof by such Person (such prepayments to be applied as set forth in clause (v) below); provided, however, that, with respect to any Net Cash Proceeds realized under a Disposition described in this Section 2.03(b)(ii), at the election of the Company (as notified by the Company to the Administrative Agent on or prior to the fifth (5th) Business Day after receipt of such Net Cash Proceeds), and so long as no Default or Event of Default shall have occurred and be continuing, the Company or such Subsidiary may reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within (x) six (6) months following receipt of such Net Cash Proceeds or (y) if the Company enters into a legally binding commitment to reinvest such Net Cash Proceeds within six (6) months following receipt thereof, within ninety (90) days after the end of such 6-month period; and provided, further, however, that any Net Cash Proceeds not so reinvested shall be promptly applied to the prepayment of the Loans as set forth in this Section 2.03(b)(ii).

(iii)     Upon the incurrence or issuance by the Company or any of its Subsidiaries of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.02) (other than, to the extent that the Net Cash Proceeds thereof are not utilized to finance a Permitted Acquisition, Section 7.02(j)), the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom within five (5) Business Days of receipt thereof by the Company or such Subsidiary (such prepayments to be applied as set forth in clause (v) below).

(iv)     Upon any Extraordinary Receipt received by or paid to or for the account of the Company or any of its Subsidiaries, and not otherwise included in clause (ii) or (iii) of this Section 2.03(b), the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom within five (5) Business Days of receipt thereof by the Company or such Subsidiary (such prepayments to be applied as set forth in clause (v) below); provided, however, that with respect to any proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments, at the election of the Company (as notified by the Company to the Administrative Agent on or prior to the fifth (5th) Business Day after receipt of such Net Cash Proceeds), and so long as no Default or Event of Default shall have occurred and be continuing, the Company or such Subsidiary may reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within (x) six (6) months following receipt of such Net Cash Proceeds or (y) if the Company enters into a legally binding commitment to apply such Net Cash Proceeds within six (6) months following receipt thereof, within ninety (90) days after the end of such 6-month period; and provided, further, however, that any Net Cash Proceeds not so applied shall be promptly applied to the prepayment of the Loans as set forth in this Section 2.03(b)(iv).

(v)     Each prepayment of Loans pursuant to the foregoing provisions of this Section 2.03(b) and repayment of Loans on the Maturity Date pursuant to Section 2.05 (A) shall be applied first, ratably to the principal repayment installments of Additional First Out Loans then outstanding until

34

payment in full in Dollars of all Obligations owing to the Additional First Out Lenders, and second (so long as there are no Additional Commitments outstanding), ratably to the principal repayment installments of Initial Term Loans then outstanding and (B) shall be paid to the applicable Lenders in accordance with their respective Applicable Percentages applicable to the Class being prepaid.

(vi)     Notwithstanding any of the other provisions of clause (ii), (iii) or (iv) of this Section 2.03(b), so long as no Default under Section 8.01(a) or Section 8.01(f), or Event of Default shall have occurred and be continuing, if, on any date on which a prepayment would otherwise be required to be made pursuant to clause (ii) or (iv) of this Section 2.03(b), the aggregate amount of Net Cash Proceeds required by such clause to be applied to prepay Loans on such date is less than or equal to $5,000,000, the Borrowers may defer such prepayment until the first date on which the aggregate amount of Net Cash Proceeds or other amounts otherwise required under clause (ii) or (iv) of this Section 2.03(b) to be applied to prepay Loans exceeds $5,000,000.  Upon the occurrence of a Default under Section 8.01(a) or Section 8.01(f), or an Event of Default during any such deferral period, the Borrowers shall promptly prepay the Loans in the amount of all Net Cash Proceeds received by the Company or any of its Subsidiaries and other amounts, as applicable, that are required to be applied to prepay Loans under this Section 2.03(b) (without giving effect to the first sentence of this clause (vi)) but which have not previously been so applied.

(vii)     [Reserved].

(viii)     [Reserved].

(ix)     Each mandatory prepayment required to be made pursuant to this Section 2.03(b) shall be accompanied by a Prepayment Notice providing a reasonably detailed calculation of the amount of such prepayment delivered to the Administrative Agent at least one (1) Business Day prior to the date of such prepayment.

2.04     Reserved.

2.05     Repayment of Loans.

(a)     The Borrowers shall repay to the Administrative Agent for the ratable account of the Additional First Out Lenders on the Maturity Date, the aggregate principal amount of all Additional First Out Loans outstanding on such date.

(b)     The Borrowers shall repay to the Administrative Agent for the ratable account of the Initial Term Lenders on the Maturity Date the aggregate principal amount of all Initial Term Loans outstanding on such date.

2.06     Interest.

(a)     Subject to the provisions of Sections 2.06(b) and (e), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate and (ii) any Base Rate Loan made pursuant to Sections 3.02 or 3.03 shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate. Notwithstanding anything to the contrary herein, PIK Interest shall accrue for (i) each Eurodollar Rate Loan at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate plus 2.00% and (ii) any Base Rate Loan made pursuant to Sections 3.02 or 3.03 at a rate per annum equal to the Base Rate plus the Applicable Rate plus 2.00%.

35

YC-E-037727

(b)

(i)        If an Event of Default pursuant to <u>Section 8.01(a)</u> has occurred and is continuing, the aggregate principal amount of all Loans outstanding plus any amounts not paid when due shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)        If an Event of Default (other than an Event of Default pursuant to <u>Section 8.01(a)</u>) has occurred and is continuing then upon the request of the Required Lenders the aggregate principal amount of all Loans outstanding shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)        Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)        [Reserved].

(d)        Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto (and paid in accordance with <u>Section 2.06(e)</u> below) and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(e)        Interest due and payable on each Loan on each Interest Payment Date and, to the extent applicable, interest accruing at the Default Rate, shall, in each case, be (i) paid in cash; or (ii) at the election of the Borrower and with 5 Business Day' prior written notice to the Administrative Agent, paid-in-kind (or a combination thereof) and added to the outstanding principal amount of the applicable Loan, which shall thereafter constitute Loans of such Class hereunder and accrue interest in accordance with this <u>Section 2.06</u> (such interest that is paid-in-kind, the "<u>PIK Interest</u>").

(f)        Notwithstanding anything to the contrary, the Fourth Amendment Accrued and Unpaid Interest owed on any Loan that is outstanding on the Third Amendment and Restatement Effective Date immediately after giving effect to the transactions contemplated by the Fourth Amendment shall be paid-in-kind and added to the outstanding principal amount of the applicable Initial Term Loans on the Third Amendment and Restatement Effective Date, which shall thereafter constitute Initial Term Loans hereunder and accrue interest in accordance with this <u>Section 2.06</u>.

2.07        <u>Other Payments to Administrative Agent</u>.

(a)        [Reserved].

(b)        The Borrowers shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Agent Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2.08        <u>Computation of Interest, Fees and Other Payments</u>.

All interest and fees hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Base Rate at times when the Base Rate is based on the prime rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  Interest and fees shall accrue on each Loan or Commitment, as applicable, for the day on which the Loan is made or Commitment provided, as applicable, and shall not accrue on a Loan or Commitment, as applicable, or any portion thereof, for the day on which the Loan or such portion is paid or Commitment is terminated;

36

YC-E-037728

provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate, fees or other payments hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.09    Evidence of Debt.

The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrowers, the Class and Type thereof, and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise effect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrowers shall execute and deliver to such Lender a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), Class, amount and maturity of its Loans and payments with respect thereto.

2.10    Payments Generally; Administrative Agent's Clawback.

(a)    General.    All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage by reference to the appropriate Class (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. (or such later time determined by the Administrative Agent in its absolute discretion) shall be deemed received on the next succeeding Business Day and any applicable interest, fee or payment shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next succeeding Business Day, and such extension of time shall be reflected on computing interest, fees or other payments, as the case may be.

(b)    Funding by Lenders; Presumption by Administrative Agent.

(i)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period,

37

YC-E-037729

the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrowers prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Loans set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.10 are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.10 on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.10.

(e)    [Reserved.]

(f)    Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, fees and other payments then due hereunder, such funds shall be applied (i) first, toward payment of interest, fees and other payments then due hereunder to the Additional First Out Lenders, ratably among the Additional First Out Lenders entitled thereto in accordance with the amounts of interest, fees and other payments then due to the Additional First Out Lenders, (ii) second, toward payment of principal then due hereunder to the Additional First Out Lenders, ratably among the Additional First Out Lenders entitled thereto in accordance with the amounts of principal then due to the Additional First Out Lenders, (iii) third, toward payment of interest, fees and other payments then due hereunder to the Initial Term Lenders entitled thereto in accordance with the amounts of interest, fees and other payments then due to such party, and (iv) fourth, toward payment of principal then due hereunder to the Initial Term Lenders, ratably among the Initial Term Lenders entitled thereto in accordance with the amounts of principal then due to such parties.

38

YC-E-037730

2.11    Sharing of Payments by Lenders.

(a)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (i) Obligations in respect of any Class due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (x) the amount of such Obligations in respect of such Class due and payable to such Lender at such time to (y) the aggregate amount of the Obligations in respect of such Class due and payable to all Lenders with Loans of such Class hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Class due and payable to all Lenders with Loans of such Class hereunder and under the other Loan Documents at such time obtained by all the Lenders with Loans of such Class at such time or (ii) Obligations in respect of any Class owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (x) the amount of such Obligations in respect of such Class owing (but not due and payable) to such Lender at such time to (y) the aggregate amount of the Obligations in respect of the Class owing (but not due and payable) to all Lenders with Loans of such Class hereunder and under the other Loan Parties at such time) of payment on account of the Obligations in respect of the Class owing (but not due and payable) to all Lenders with Loans of such Class hereunder and under the other Loan Documents at such time obtained by all of the Lenders with Loans of such Class at such time then the Lender with Loans of such Class receiving such greater proportion shall (x) notify the Administrative Agent of such fact, and (y) purchase (for cash at face value) participations in the Loans of the applicable Class of the other Lenders with Loans in such Class, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders with Loans of such Class ratably in accordance with the aggregate amount of Obligations in respect of the Class then due and payable to the Lenders with Loans of such Class or owing (but not due and payable) to the Lenders with Loans of such Class, as the case may be, provided that:

(1)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(2)    the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of the Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to Holdings, the Company or any Subsidiary thereof (as to which the provisions of this Section shall apply).

(b)    If any Initial Term Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of Obligations in respect of the Initial Term Loans other than in accordance with this Agreement (including Section 2.03 and 2.05), such amount shall be held in trust by such Initial Term Lender for the benefit of the Additional First Out Lender, and shall be promptly paid over to the Administrative Agent, with any necessary endorsement for application (in accordance with this Agreement) to the payment of the Obligations owed to the Additional First Out Lenders then remaining unpaid until the payment in full of all Obligations owed to the Additional First Out Lenders.

The Borrowers consent to the foregoing and agrees, to the extent they may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

CONFIDENTIAL                                                                                                                                      YC-E-037731

2.12    Increase in Commitments.

(a)    So long as no Default or Event of Default has occurred and is continuing or would result therefrom, upon written notice to the Administrative Agent, at any time after the Third Amendment and Restatement Effective Date, the Company may request one or more additional Loans by requesting from the Lenders (which may include Initial Term Lenders) new commitments ("Additional Commitments") to provide such additional Loans (any Loans made in respect of the Additional Commitments, the "Additional First Out Loans"); and

(b)    If any Additional Commitments are added in accordance with this Section 2.12, the Administrative Agent and the Company shall determine the effective date (the "Additional Commitments Effective Date") of such addition. Additional First Out Loans may be made by any existing Lender (and each existing Lender will have the right, but not an obligation, to provide its pro rata portion of any Additional First Out Loans on terms permitted in this Section 2.12 and otherwise on terms reasonably acceptable to the Administrative Agent and the Company) or by any other bank or other financial institution that is not an Ineligible Lender; provided that (x) the Administrative Agent shall have consented (such consent not to be unreasonably withheld or delayed) to such Additional First Out Lender's providing such Additional First Out Loans if such consent would be required under Section 10.06(b) for an assignment of Loans to such Additional First Out Lender and (y) the Required Lenders shall have consented to any Lender that is not an Initial Term Lender or an Additional First Out Lender (prior to the making of the Additional First Out Loans) providing such Additional First Out Loans. As a condition precedent to such addition, the Company shall deliver to the Administrative Agent a certificate dated as of the Additional Commitments Effective Date signed by a Responsible Officer of the Company certifying that, before and after giving effect to such increase, (i) the representations and warranties contained in Article V and the other Loan Documents are true and correct in all material respects on and as of the Additional Commitments Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date, and except that for purposes of this Section 2.12(b), the representations and warranties contained in Section 5.05 shall be deemed to refer to the most recent financial statements furnished pursuant to the applicable clause of Section 6.01 and (ii) no Default or Event of Default exists immediately before or immediately after giving effect to such addition. On each Additional Commitments Effective Date, each applicable Lender or other Person which is providing an Additional Commitment, shall make an Additional Commitment to the Company in a principal amount equal to such Lender's or Person's Additional Commitment (unless otherwise agreed between the relevant Lenders and the Company).

(c)    Commitments in respect of Additional First Out Loans shall become Additional Commitments and Commitments under this Agreement pursuant to an amendment (an "Additional Loan Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Additional First Out Lender providing such Additional Commitments and the Administrative Agent. The Additional Loan Amendment may, without the consent of any other Loan Party or any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate to effect the provisions of this Section 2.12. In connection with any Additional Loan Amendment, the Borrower shall, if reasonably requested by the Administrative Agent, deliver customary reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Administrative Agent in order to ensure that such Additional First Out Loans are provided with the benefit of the applicable Loan Documents.

(d)    This Section 2.12 shall supersede any provisions in Section 2.11 or Section 10.01 to the contrary. Notwithstanding any other provision of any Loan Document, the Loan Documents may be amended by the Administrative Agent and the Loan Parties, if necessary, to provide for terms applicable to each Additional Commitment.

40

YC-E-037732

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    Taxes.

(a)    All sums payable by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall (except to the extent required by Law) be paid free and clear of, and without any deduction or withholding on account of, any Taxes.

(b)    If any Loan Party or any other applicable withholding agent is required by Law (as determined in the good faith discretion of the Loan Party or other applicable withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party under any of the Loan Documents: (i) the applicable Loan Party shall promptly notify the Administrative Agent of any such requirement; (ii) the applicable withholding agent shall make such deduction or withholding and timely pay to the relevant Governmental Authority any such Tax; (iii) if such Taxes are Non-Excluded Taxes, the sum payable shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding of Non-Excluded Taxes (including any deductions or withholdings of Non-Excluded Taxes attributable to any payments required to be made under this Section 3.01), the Lender or the Administrative Agent (as applicable), receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made (for the avoidance of doubt, no additional amounts shall be payable under this clause (iii) in respect of any Excluded Taxes and any amount deducted or withheld with respect to any Excluded Taxes under this Section 3.01(b)) shall be deemed for all purposes of this Agreement and the other Loan Documents to have been paid by the applicable Loan Party to the Person in respect of whom such Excluded Taxes were withheld); and (iv) the applicable Loan Party, if it is the applicable withholding agent, shall as soon as practicable after any payment of such Taxes deliver to the Administrative Agent evidence of timely payment of such Taxes reasonably satisfactory to the Administrative Agent.

(c)    Each Lender shall, at such times as are reasonably requested by the Borrowers or the Administrative Agent, provide the Borrowers and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrowers or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation (including any specific documentation required below in this Section 3.01(c)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrowers and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent), or promptly notify the Company and the Administrative Agent in writing of its inability to do so.

Without limiting the generality of the foregoing:

(1)    Each U.S. Lender shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(2)    Each Non-U.S. Lender shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and

41

from time to time thereafter upon the request of the Borrowers or the Administrative Agent) whichever of the following is applicable:

(A)     two properly completed and duly signed copies of IRS Form W-8BEN or W-8BEN-E (or any successor forms) (or any successor forms) claiming eligibility for the benefits of an income Tax treaty to which the United States is a party, and such other documentation as required under the Code in connection with such claim,

(B)     two properly completed and duly signed copies of IRS Form W-8ECI (or any successor forms),

(C)     in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the applicable form (or forms) of certificate <u>Exhibit D-3</u> (any such certificate, a "<u>United States Tax Compliance Certificate</u>") and (B) two properly completed and duly signed copies of IRS Form W-8BEN or W-8BEN-E (or any successor forms),

(D)     to the extent a Non-U.S. Lender is not the beneficial owner (for example, where the Non-US Lender is a partnership or a participating Lender), two properly completed and duly signed copies of IRS Form W-8IMY (or any successor forms) of the Non-U.S. Lender, accompanied by a Form W- 8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this <u>Section 3.01(c)</u> if such beneficial owner were a Lender, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Non-U.S. Lender on behalf of such beneficial owner), or

(E)     two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income Tax laws as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(3)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by Sections 1471 through 1474 of the Code if such Lender were to fail to comply with the applicable reporting requirements of those Sections (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under Sections 1471 through 1474 of the Code and to determine whether such Lender has or has not complied with such Lender's obligations under such Sections and, if necessary, to determine the amount to deduct and withhold from such payment.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver and shall notify the Borrowers if such Lender determined in good faith that it is not legally eligible to deliver any such documentation.

(d)     The Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

42

YC-E-037734

(e)     The Loan Parties shall, jointly and severally, indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes imposed on or attributable to any amount payable on account of any obligation of any Loan Party hereunder or under any other Loan Document payable by such Recipient (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), including any reasonable expenses related thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority; provided that the Loan Parties shall not be required to compensate a Recipient pursuant to the foregoing provisions of this Section for any Non-Excluded Taxes imposed more than nine months prior to the date that such Recipient, as the case may be, notifies the Loan Parties of its intention to claim compensation therefor (except that, if such Non-Excluded Tax is imposed on a retroactive basis, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof). A certificate as to the amount of such payment or liability prepared in good faith and delivered to the Borrowers by the Recipient on its own behalf or on behalf of another Recipient, shall be conclusive absent manifest error.

(f)     If a Recipient receives a refund of any Non-Excluded Taxes in respect of which it has received additional amounts or indemnification payments under this Section 3.01, then such Recipient shall pay to the Borrowers the amount of such refund, net of all out-of-pocket expenses of the Recipient (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Borrowers, upon the request of the Recipient, agree to repay such amount to the Recipient (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) if the Recipient is required to repay such refund to the applicable Governmental Authority. This subsection shall not be construed to require a Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

3.02     Illegality.

If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Company through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans shall be suspended. Upon receipt of such notice, all Eurodollar Rate Loans of such Lender shall be converted to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

3.03     Inability to Determine Rates.

If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Base Rate Loan or in connection with an existing or proposed Base Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding

43

YC-E-037735

such Loan, the Lenders shall promptly notify the Administrative Agent and the Administrative Agent will promptly so notify the Company and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, and (y) all Eurodollar Rate Loans shall be converted to Base Rate Loans (the interest rate on which Base Rate Loans shall be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate).  Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

    3.04    <u>Increased Costs; Reserves on Eurodollar Rate Loans</u>.

    (a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

    (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>);

    (ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it (except for Non-Excluded Taxes covered by <u>Section 3.01</u> and any Excluded Taxes); or

    (iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan the interest on which is determined by reference to the Eurodollar Rate (or, in the case of clause (ii) above, any Loan), or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

    (b)    <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

    (c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Company shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

    (d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided that</u> the Borrowers shall not be required to compensate a Lender or Lender's holding company pursuant to the foregoing provisions of this Section for

44

YC-E-037736

any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Reserves on Eurodollar Rate Loans. The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), which shall be due and payable on each date on which interest is payable on such Loan, provided the Company shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender. If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

3.05     Compensation for Losses. Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrowers; or

(c)     any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Company pursuant to Section 10.13; including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrowers shall also pay any customary administrative fees or other amounts charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

3.06     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not

CONFIDENTIAL                                                                                            YC-E-037737

otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrowers may replace such Lender in accordance with Section 10.13.

3.07    Survival. Each party's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent or any assignment by, or the replacement of, a Lender.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01    Conditions precedent to Effectiveness. The amendment and restatement of the Existing Credit Agreement is subject to the satisfaction (or waiver in accordance with Section 10.01) of the following conditions precedent:

(a)    The Administrative Agent's receipt of written notice (which may be by e-mail) from the Lenders that the following, each of which shall be originals or facsimile (followed promptly by originals sent to the Administrative Agent's counsel) unless otherwise specified, each, where applicable, properly executed by a Responsible Officer of the signing Loan Party, each dated on the Third Amendment and Restatement Effective Date (or, in the case of certificates of Government Authorities, a recent date before the respective Third Amendment and Restatement Effective Date) have been received by the Lenders and each are in form and substance reasonably satisfactory to the Lenders:

(i)    a Note executed by the Borrowers in favor of each Lender requesting a Note;

(ii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(iii)    such documents and certifications as the Lenders may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing and in good standing and (ii) a recent lien, tax lien, judgment and litigation search in each relevant jurisdiction with respect to the Loan Parties, which search shall have revealed no liens on the assets of such entity except for Liens permitted by the Loan Documents or liens to be discharged on or prior to the Third Amended and Restated Effective Date;

(iv)    a certificate of a Responsible Officer of each Loan Party either (A) attaching copies of all consents, licenses and approvals (other than routine change of ownership filings and other routine healthcare filings) required in connection with the consummation by such Loan Party of the Transaction and the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(v)    a certificate signed by a Responsible Officer of the Borrowers certifying (A) the conditions specified in Sections 4.01(d) and (e) have been satisfied, with any applicable evidence and (B) that the conditions set forth under Sections 4.01(f) and (g) are met, with any applicable evidence;

46

(vi)     an IRS Form W-9 in respect of each Borrower;

(vii)    a duly completed Perfection Certificate;

(viii)   evidence that all insurance required to be maintained pursuant to this Agreement and the other Loan Documents has been obtained and is in effect, together with the certificates of insurance and endorsements, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lender's loss payable, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral; and

(b)     All fees and expenses (including reasonable fees and expenses of counsel) required to be paid to the Administrative Agent on or before the Third Amended and Restated Effective Date shall have been paid, including to the extent invoiced on or prior to the Third Amended and Restated Effective Date, reimbursement or payment of all reasonable and documented legal fees of Weil, Gotshal & Manges LLP, fees payable to the Administrative Agent in accordance with the Agent Fee Letter and all out-of-pocket expenses required to be reimbursed or paid by the Borrowers hereunder or under any other Loan Document.

(c)     (i) The Administrative Agent shall have received, at least 5 Business Days prior to the Third Amendment and Restatement Effective Date, all documentation and other information about the Borrowers and the Guarantors as has been reasonably requested in writing prior to the Third Amendment and Restatement Effective Date by the Administrative Agent and that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and (ii) to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least two (2) Business Days prior to the Third Amendment and Restatement Effective Date, any Lender that has requested, in a written notice to the Company at least five (5) Business Days prior to the Third Amendment and Restatement Effective Date, a Beneficial Ownership Certification in relation to such Loan Party shall have received such Beneficial Ownership Certification.

(d)     No Default or Event of Default has occurred and is continuing (other than the Existing Defaults (as defined in the Fourth Amendment)), or would immediately result from the Fourth Amendment (including from the amending and restating of the Existing Credit Agreement by this Agreement).

(e)     The representations and warranties of the Loan Parties set forth in the Fourth Amendment, this Agreement, the other Loan Documents, shall be true and correct in all material respects (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect) on and as of the date of the Third Amendment and Restatement Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect) as of such earlier date.

(f)     The Lenders shall have received (i) evidence or confirmation that the Borrowers have obtained sufficient Bonds in such amounts that are required to be provided by the Company or its Subsidiaries pursuant to each Customer Contract in force as at the Third Amendment and Restatement Effective Date and (ii) confirmation from the Required Lenders that the amount, type and terms and conditions of such Bonds are satisfactory to the Required Lenders.

(g)     Except as set forth in Schedule 5.06, there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that has or could be reasonably likely to have a Material Adverse Effect.

47

YC-E-037739

Without limiting the generality of the provisions of <u>Section 9.03,</u> for purposes of determining compliance with the conditions specified in this <u>Section 4.01,</u> each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Third Amendment and Restatement Effective Date specifying its objection thereto.

4.02    <u>Conditions to All Borrowings.</u>

The obligation of each Lender to honor any Committed Loan Notice for any Loan is subject to the satisfaction (or waiver in accordance with <u>Section 10.01</u>) of the following conditions precedent:

(a)    The representations and warranties of the Borrowers contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect) on and as of the date of such Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect) as of such earlier date, and except that for purposes of this <u>Section 4.02,</u> each of the representations and warranties contained in <u>Section 5.05</u> shall be deemed to refer to the most recent applicable statements furnished pursuant to <u>Section 6.01.</u>

(b)    No Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof.

(c)    The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)    The making of the proposed Borrowing shall not violate any requirement of Law and shall not be enjoined temporarily, preliminarily or permanently.

(e)    Upon request by a Lender, such Lender shall have received a Note executed by the Borrowers in favor of such Lender.

Each Committed Loan Notice submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 4.02(a), (b),</u> and <u>(d)</u> have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrowers represents and warrants to the Administrative Agent and the Lenders that:

5.01    <u>Existence, Qualification and Power.</u>  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the Transaction, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

48

5.02    <u>Authorization; No Contravention</u>.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, and the consummation of the Transaction by such Loan Party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than Liens permitted under <u>Section 7.01</u> hereof), or under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law, except in each case referred to in clause (b)(i), (b)(ii) or (c), to the extent that such contravention or violation could not reasonably be expected to have a Material Adverse Effect.

5.03    <u>Governmental Authorization; Other Consents</u>.    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transaction, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof (subject to any Intercreditor Agreement)) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure to obtain or make which could not reasonably be expected to have a Material Adverse Effect.

5.04    <u>Binding Effect</u>.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.05    <u>Financial Statements; No Material Adverse Effect</u>.

(a)    The Audited Financial Statements, were prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein; (i) fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the periods covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein; and (ii) show all material Indebtedness and other material liabilities, direct or contingent, of the Company and its Subsidiaries as of the date thereof in accordance with GAAP consistently applied, including liabilities for Taxes, material commitments and Indebtedness.

(b)    The unaudited consolidated balance sheets with respect to the Company and its Subsidiaries and the related consolidated statements of income or operations delivered in accordance with <u>Section 6.01</u>, in each case, (x) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (y) fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the date thereof and their results

49

of operations for the period covered thereby, subject, in the case of clauses (x) and (y), to the absence of footnotes and to normal year-end audit adjustments.

        (c)    [Reserved].

        (d)    [Reserved].

        (e)    The consolidated forecasted balance sheet, statements of income or operations and cash flows of the Company and its Subsidiaries delivered pursuant to Sections 6.01(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing when such assumptions were made and at the time of delivery of such forecasts (it being understood that actual results may vary from such forecasts and that such variations may be material).

    5.06    Litigation.  Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or investigations being conducted or, to the knowledge of the Company, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Subsidiary of a Loan Party or against any of their properties or assets that (a) purport to affect or pertain to this Agreement, any other Loan Document, or the consummation of the Transaction, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

    5.07    No Default.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

    5.08    Ownership of Property; Liens; Investments.

        (a)    Each Loan Party and each of its Subsidiaries has good and marketable title in fee simple to, or valid leasehold interests in, all real property necessary to its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

        (b)    The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Liens set forth on Schedule 7.01, and as otherwise permitted by Section 7.01.

        (c)    Schedule 5.08(c) sets forth a complete and accurate list of all real property owned by each Loan Party and each of its Subsidiaries as of the Third Amendment and Restatement Effective Date, showing as of the Third Amendment and Restatement Effective Date the street address, county or other relevant jurisdiction, state, record owner and book value thereof.

        (d)    Schedule 5.08(d)(i) sets forth a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary of a Loan Party is the lessee as of the Third Amendment and Restatement Effective Date showing as of the Third Amendment and Restatement Effective Date the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual or monthly (as applicable) rental cost thereof.  To the Company's knowledge, as of the Third Amendment and Restatement Effective Date, each such lease is the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms except as such enforceability may be limited by Debtor Relief Laws or general principles of equity, regardless of whether considered in a proceeding in equity or at law.

        (e)    Schedule 5.08(d)(ii) sets forth a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary of a Loan Party is the lessor as of the Third Amendment and Restatement Effective Date, showing as of the Third Amendment and Restatement

CONFIDENTIAL                              YC-E-037742

Effective Date the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual or monthly (as applicable) rental cost thereof.  To the

(f)     Company's knowledge, as of the Third Amendment and Restatement Effective Date, each such lease is the legal, valid and binding obligation of the lessee thereof, enforceable in accordance with its terms except as such enforceability may be limited by Debtor Relief Laws or general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.09     Environmental Compliance.

(a)     The Loan Parties and their respective Subsidiaries and their respective operations and properties are in compliance with all Environmental Laws, except where any noncompliance claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     None of the properties currently owned or wholly operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; except as could not reasonably be expected to have a Material Adverse Effect, to the Company's knowledge there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or wholly operated by any Loan Party or any of its Subsidiaries; there is no asbestos or asbestos-containing material on any property currently owned, leased or wholly operated by any Loan Party or any of its Subsidiaries; and Hazardous Materials have not been Released at any location by any Loan Party or any of its Subsidiaries on, at, under or from any property currently owned, leased or wholly operated or, to the knowledge of the Loan Parties, formerly owned, leased or wholly operated by any Loan Party or any of its Subsidiaries except in each case as could not reasonably be expected to result in a Material Adverse Effect.

(c)     Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Materials at, on, under or from any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law except for such investigation or assessment or response action that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner that could not reasonably be expected to have a Material Adverse Effect.

5.10     Insurance.  The properties of the Company and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Company, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Company or the applicable Subsidiary operates and as otherwise required by Section 6.07.

5.11     Taxes.  Each of Holdings, the Company and its Subsidiaries has filed all United States federal, state, local and foreign Tax returns and reports required to be filed, all such returns and reports are materially correct, and each of Holdings, the Company and its Subsidiaries has paid all Taxes levied or imposed upon it or otherwise due and payable by it (including in its capacity as a withholding agent), except (a) those Taxes being contested in good faith by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (b) for any failures to make such filing or payment that could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.  There is no current, pending or proposed Tax

CONFIDENTIAL                                                                                                    YC-E-037743

audit assessment, deficiency or other claim against Holdings, the Company or any of its Subsidiaries that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

    5.12    <u>ERISA Compliance</u>.

    (a)    Except as would not reasonably be expected to result in a Material Adverse Effect, (i) each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws, (ii) each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service, and to the knowledge of the Company, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

    (b)    There are no pending or, to the knowledge of the Company, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

    (c)    Except as would not reasonably be expected to result in a Material Adverse Effect, (i) no ERISA Event has occurred, and to the Company's knowledge, no fact, event or circumstance exists that would reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan; (ii) the Company and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher; (iv) neither the Company nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Company nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, no event or circumstance has occurred or exists that would reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

    (d)    Except as would not reasonably be expected to result in a Material Adverse Effect, neither the Company nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan or Multiemployer Plan other than (A) on the Third Amendment and Restatement Effective Date, those listed on <u>Schedule 5.12(d)</u> hereto and (B) thereafter, Pension Plans or Multiemployer Plans not otherwise prohibited by this Agreement.

    (e)    This <u>Section 5.12</u> sets forth the exclusive representations and warranties with respect to Plans.

    5.13    <u>Subsidiaries; Equity Interests; Loan Parties</u>. As of the Third Amendment and Restatement Effective Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of <u>Schedule 5.13,</u> and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of <u>Schedule 5.13</u> free and clear of all Liens except those created under the Collateral Documents and Liens permitted under <u>Section 7.01(c)</u>. No Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of <u>Schedule 5.13</u>. All of the outstanding Equity Interests in the Company have been validly issued, are fully paid and non-assessable and are owned by

CONFIDENTIAL    YC-E-037744

Holdings in the amounts specified on Part (c) of <u>Schedule 5.13</u> free and clear of all Liens except those created under the Collateral Documents and Liens permitted under <u>Section 7.01(c)</u>. Set forth on Part (d) of <u>Schedule 5.13</u> is a complete and accurate list of all Loan Parties, showing as of the Third Amendment and Restatement Effective Date (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number or, in the case of any non-U.S. Loan Party that does not have a U.S. taxpayer identification number, its unique identification number issued to it by the jurisdiction of its incorporation. The copy of the charter of each Loan Party and each amendment thereto provided to the Administrative Agent is a true and correct copy of each such document as of the Third Amendment and Restatement Effective Date, each of which is valid and in full force and effect.

      5.14    <u>Margin Regulations; Investment Company Act</u>.

      (a)    The Borrowers are not engaged and will not engage, principally or as one of their respective important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the Collateral is margin stock (within the meaning of Regulation U issued by the FRB).

      (b)    None of the Company, any Person Controlling the Company, or any Subsidiary of the Company is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

      5.15    <u>Disclosure</u>. The Company has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (in writing) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document, but excluding any general industry information, at the time furnished (taken as a whole and as supplemented and updated by other information so furnished), contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided that,</u> with respect to projected financial information, budgets and pro forma data, the Company represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time when made and at the time so furnished; it being understood that such projections are not a guarantee of performance, may vary from actual results and that such variances may be material.

      5.16    <u>Compliance with Laws</u>.

      (a)    Except as set forth on <u>Schedule 5.16(a)</u>, each Loan Party and each Subsidiary thereof is in compliance in all respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or where such noncompliance could not reasonably be expected to have a Material Adverse Effect.

      (b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates (which for the purposes of this clause (b) shall not include any Lender) and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering, (iii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iv) engages

CONFIDENTIAL                  YC-E-037745

in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Laws.

(c)     The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Loan Parties, their Subsidiaries and their respective directors, officers and employees and to the knowledge of each Loan Party, its agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Loan Parties, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of each Loan Party, any agent of a Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No borrowing, use of proceeds or other transaction contemplated by this agreement will violate Anti-Corruption Laws or applicable Sanctions.

(d)     The Borrowers will not request any borrowing, and the Borrowers shall not directly or, to the best of their knowledge, indirectly, use, and shall ensure that Holdings and its Subsidiaries and its or their respective directors, officers, employees and agents shall not directly or, to the best of their knowledge, indirectly use the proceeds of any borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

5.17     Intellectual Property; Licenses, Etc.  Each Loan Party and each of its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, licenses and other intellectual property rights (collectively, "IP Rights") that are material for the operation of their respective businesses, without conflict to the Company's knowledge with the rights of any other Person, and Schedule 5.17 sets forth a complete and accurate list of all registered IP Rights owned or licensed to each Loan Party and each of its Subsidiaries as of the Third Amendment and Restatement Effective Date.  To the knowledge of the Company, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries and material to the business of such Loan Party or Subsidiary infringes upon any rights held by any other Person.  No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Company, threatened in writing, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

5.18     [Reserved].

5.19     Casualty, Etc.  As of the Third Amendment and Restatement Effective Date, neither the businesses nor the properties, including the Mortgaged Properties, of any Loan Party or any of its Subsidiaries are affected by any Casualty Event (whether or not covered by insurance, but other than ordinary wear and tear) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.20     Labor Matters.  There are no strikes, stoppages or slowdowns or other labor disputes against any Loan Party or any Subsidiary of a Loan Party pending or, to the knowledge of the Company or any Subsidiary, threatened that (individually or in the aggregate) would reasonably be expected to have a Material Adverse Effect.  Except as would not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect, hours worked by and payment made to employees of each Loan Party and each of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable requirement of law dealing with such matters.  All payments due from any Loan Party or any Subsidiary of a Loan Party on account of employee health and welfare insurance that (individually or in the aggregate)

54

YC-E-037746

would reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of such Loan Party or the relevant Subsidiary. This Section 5.20 contains the exclusive representations and warranties with respect to labor matters.

5.21    Collateral Documents. The provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority Lien on all right, title and interest of the respective Loan Parties in (a) the Collateral described therein and (b) all the Equity Interests of the Company and each of its Subsidiaries (other than any Excluded Subsidiary), subject to Liens permitted under Section 7.01. Except for filings completed prior to the Third Amendment and Restatement Effective Date and as contemplated hereby and by the Collateral Documents, no filing or other action will be necessary to perfect or protect such Liens.

5.22    Reportable Transactions. Neither the Company nor any of its Subsidiaries expects to identify one or more of the Loans under this Agreement as a "reportable transaction" on IRS Form 8886 filed with the U.S. tax returns for purposes of Section 6011, 6111 or 6112 of the Code or the Treasury Regulations promulgated thereunder.

5.23    Regulation H. No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968.

5.24    Use of Proceeds. The Borrowers will use the proceeds of the Loans to provide ongoing working capital and for other general corporate purposes of the Borrowers and Guarantors.

5.25    Compliance with Health Care Laws. Without limiting the generality of any other representation and warranty contained herein:

(a)    Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Loan Party, its Subsidiaries, and their respective officers, directors, employees, agents and contractors (exercising their respective duties on behalf of any Loan Party or any of its Subsidiaries) is, and within the last six years has been, in compliance with all relevant Health Care Laws.

(b)    Except as set forth on Schedule 5.25(b) and except as could not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect, each Loan Party and its Subsidiaries has (i) all licenses, consents, certificates, permits, authorizations, approvals, franchises, registrations, certificates of need, accreditations, and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities and accrediting organizations (each, a "Health Care Permit") necessary to operate its business, and (ii) not received notice and has no knowledge that any Governmental Authority or accreditation organization is considering limiting, suspending, terminating, or revoking any such Health Care Permit. All such Health Care Permits are valid and in full force and effect, except as could not reasonably be expected to have a Material Adverse Effect, and each Loan Party and each of its Subsidiaries is in material compliance with the terms and conditions of all such Health Care Permits and with the rules and regulations of the Governmental Authorities and accrediting organizations having jurisdiction with respect to such Health Care Permits.

(c)    To the extent it participates in a particular Program, each Loan Party and its Subsidiaries meets all of the requirements of participation and payment of any state or federal government health care programs, and any other public or private third party payor programs (collectively, "Programs") and is a party to valid participation agreements for payment by such Programs, except as could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.25(c), there is no investigation, audit, claim review, or other action pending or, to the knowledge of the Company, threatened which is likely to result in a revocation, suspension, termination, probation, material restriction,

55

YC-E-037747

material limitation, or non-renewal of any Program participation agreement or result in any Loan Party or any of its Subsidiaries exclusion from any Program, except as could not reasonably be expected to have a Material Adverse Effect.

(d)     No Loan Party, any of its Subsidiaries, or their respective officers, directors or, to the Company's knowledge, employees, agents and contractors has been or is currently excluded from participation in government health care programs; except (i) as set forth on <u>Schedule 5.25(d)</u> and (ii) with respect to employees, agents or contractors, where exclusion from participation in such government health programs could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     As of the Third Amendment and Restatement Effective Date, no Loan Party or any of its Subsidiaries (i) is a party to a corporate integrity agreement, (ii) has any reporting obligations pursuant to a settlement agreement, plan of correction, or other remedial measure entered into with any Governmental Authority other than those disclosed in <u>Schedule 5.25(e),</u> or (iii) with regard to any Health Care Laws and as relates to any presently existing circumstances, has been served with or received any search warrant, subpoena, civil investigative demand or contact letter, or received notice of any audit (other than routine audits in the ordinary course of business) from any Governmental Agency related to its business operations.

(f)     Without limiting the generality of the foregoing, each Loan Party and its Subsidiaries has maintained in all material respects all records required to be maintained by the Drug Enforcement Agency and State Boards of Pharmacy and other applicable regulatory agencies, as required by the Health Care Laws and, to the knowledge of the Company, there are no presently existing circumstances which would likely result in material violations of the Health Care Laws.

5.26     <u>HIPAA Compliance</u>.  To the extent that and for so long as (i) any Loan Party or any of its Subsidiaries is a "covered entity" as defined in 45 C.F.R. § 160.103, (ii) any Loan Party or any of its Subsidiaries and/or its respective business and operations are subject to or covered by the HIPAA administrative requirements codified at 45 C.F.R. Parts 160 and 162 (the "<u>Transactions Rule</u>") and/or the HIPAA security and privacy requirements codified at 45 C.F.R. Parts 160 and 164 (the "<u>Privacy and Security Rules</u>"), such Person has, except to the extent that the failure to do any of the following could not reasonably be expected to have a Material Adverse Effect: (x) established a plan for each Loan Party and each of its Subsidiaries to be and remain HIPAA Compliant (a "<u>HIPAA Compliance Plan</u>"); and (y) implemented its HIPAA Compliance Plan to ensure that such Person is HIPAA Compliant.  For purposes of this Agreement, "<u>HIPAA Compliant</u>" shall mean that a Person (1) is in compliance in all material respects with the applicable requirements of HIPAA, including all requirements of the Transactions Rule and the Privacy and Security Rules and (2) is not subject to, and is not likely to become subject to, any civil or criminal penalty or any investigation, claim or process that could reasonably be expected to have a Material Adverse Effect.

5.27     <u>Material Customer Contracts</u>.

(a)     As of the Third Amendment and Restatement Effective Date, <u>Schedule 5.27(a)</u> lists and identifies based on revenue earned of the twelve months ended May 31, 2020, each of the Material Customer Contracts.

(b)     As of the Third Amendment and Restatement Effective Date, except as set forth on <u>Schedule 5.27(b),</u> to the knowledge of the Responsible Officers, (i) within the last twelve months, no customer with respect to any Customer Contract has threatened in writing to cancel or otherwise terminate, other than in the ordinary course of business, its relationship with the Company or any Subsidiary thereof, and (ii) no customer with respect to a Customer Contract has during the last twelve months decreased

56

materially or threatened in writing to decrease or limit materially, other than in the ordinary course of business, its usage or purchase of services of Company or any Subsidiary thereof.

5.28    Bond Documents. Schedule 5.28 sets forth a true and complete list of all Bonds issued on behalf to the Loan Parties and their respective Subsidiaries as of the Third Amendment and Restatement Effective Date, and all of the Bond Indemnity Agreements to which any Loan Party is a party as of the Third Amendment and Restatement Effective Date. As of the Third Amendment and Restatement Effective Date, each of the Bond Documents is in full force and effect, no demand has been made by any beneficiary of a Bond for performance by the Bond Surety under such Bond and no amounts are due and payable to any Bond Surety with respect to any Bond Documents other than (i) premiums due in the ordinary course of the Loan Parties' business and (ii) the Bond Cash Collateral. As of the Third Amendment and Restatement Effective Date, no Loan Party or any of its Subsidiaries is in violation or breach of any Bond Document.

5.29    Beneficial Ownership Certification. As of the Third Amendment and Restatement Effective Date, to the best knowledge of each Borrower, the information included in each Beneficial Ownership Certification provided on or prior to the Third Amendment and Restatement Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than (A) contingent indemnification obligations and (B) obligations and liabilities under Secured Cash Management Agreements and Secured Hedge Agreements, in each case, for which no claim has been made), each of Holdings and the Borrowers shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03 and 6.11) cause each Subsidiary to:

6.01    Financial Statements. Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)    within 120 days after the end of each fiscal year of the Company ((including the fiscal year ending December 31, 2019); provided, that, for the fiscal year ending December 31, 2019, such financial deliveries and related independent certified public accountant's report and opinion shall not be due until August 31, 2020), a consolidated balance sheet of the Company and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Required Lenders, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (except for qualifications resulting from the Obligations or Permitted ABL Indebtedness being classified as short-term indebtedness during the one year period prior to the applicable maturity date); provided, that such opinion accompanying the consolidated statements for the fiscal year ending December 31, 2019 may be subject to a "going concern" or like qualification or exception (other than any exception or qualification as to the scope of the respective audit);

(b)    within 45 days after the end of each fiscal quarter of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations for such fiscal quarter and for the portion of the Company's fiscal year then ended, and the related consolidated statements of changes in shareholders' equity and cash flows for the portion of the Company's fiscal year then ended, in each case

CONFIDENTIAL

YC-E-037749

setting forth in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, such consolidated statements to be certified by the chief executive officer, chief financial officer, vice president-finance, treasurer or controller of the Company as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)       within 30 days after the end of each calendar month (other than the last calendar month of each fiscal quarter), a consolidated balance sheet of the Company and its Subsidiaries as of the end of each such month, and the related consolidated statements of income or operations for such month and for the portion of the Company's fiscal year then ended, and the related consolidated statements of changes in shareholders' equity and cash flows for such month and for the portion of the Company's fiscal year then ended, in each case setting forth in comparative form, as applicable, the figures for the corresponding month of the previous fiscal year and the corresponding portion of the previous fiscal year all in reasonable detail, such consolidated statements to be certified by the chief executive officer, chief financial officer, vice president-finance, treasurer or controller of the Company as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(d)       no later than 30 days after the end of each fiscal year of the Company, an annual business plan and budget of the Company and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Company, in form reasonably satisfactory to the Administrative Agent and the Required Lenders, of consolidated balance sheets and statements of income or operations and cash flows of the Company and its Subsidiaries on a quarterly basis for the then current fiscal year (including the fiscal year in which the Maturity Date occurs).

As to any information contained in materials furnished pursuant to <u>Section 6.02(c)</u>, the Company shall not be separately required to furnish such information under <u>Section 6.01(a)</u> or <u>(b)</u> above, but the foregoing shall not be in derogation of the obligation of the Company to furnish the information and materials described in <u>Sections 6.01(a)</u> and <u>(b)</u> above at the times specified therein.

6.02     <u>Certificates; Other Information</u>.  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent for further distribution to the Lenders:

(a)       concurrently with the delivery of the financial statements referred to in <u>Sections 6.01(a) and (b)</u>, (i) a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, vice president-finance treasurer or controller of the Company (which delivery may be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes), (ii) a copy of management's discussion and analysis with respect to such financial statements and (iii) a schedule and written summary, in reasonable detail, of all outstanding Bonds as of the last day of the last month covered by such financial statements;

(b)       promptly after any request by the Administrative Agent, copies of any written audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them;

(c)       promptly after the same are available, copies of all annual, regular, periodic and special reports and registration statements which the Company has filed with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

CONFIDENTIAL

(d)       promptly, but in any event within 1 Business Day, after the furnishing thereof, copies of any statement, report or notice of default furnished to any lender or holder of debt securities pursuant to the terms of any indenture, loan or credit or similar agreement of any Loan Party or of any of its Subsidiaries in relation to Indebtedness having an aggregate principal amount in excess of the Threshold Amount and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(e)       within 30 days after the end of each fiscal year of the Company, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for the Loan Parties and their Subsidiaries in form and detail reasonably satisfactory to the Administrative Agent and containing such additional information as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably specify;

(f)       within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each material notice or other material correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other material inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(g)       not later than five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all material notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any material instrument, indenture, loan or credit or similar agreement;

(h)       promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in the Mortgages to be subject to any materially adverse restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(i)       within 90 days after the end of each fiscal year of the Company a report supplementing Schedule 5.13 containing a description of all changes in the information included in such Schedule as may be necessary for such Schedule to be accurate and complete, each such report to be signed by a Responsible Officer of the Company and to be in a form reasonably satisfactory to the Administrative Agent;

(j)       not later than 30 days after such amendment, copies of each material amendment to any Organization Document of any Loan Party;

(k)       within 5 Business Days after occurrence, notice of the entering into, termination (other than pursuant to its terms), cancellation or non-renewal of, material breach, violation or default under, or material amendment, modification or change to, (i) any Customer Contract with the State of Missouri, the Alabama Department of Corrections, the State of Michigan, the Kansas Department of Corrections, the Philadelphia Department of Corrections, the State of Wyoming, the State of Tennessee and the State of Idaho (any such Customer Contract described in this clause (i), a "Specified Customer Contract") or (ii) any other Customer Contract (other than any Customer Contract terminating on or prior to the Third Amendment and Restatement Effective Date) not otherwise included in the foregoing clause (i), which Customer Contract constitutes one of the ten highest grossing Customer Contracts of the Company and its Subsidiaries based on revenue earned for the twelve months ended as of the most recently ended fiscal quarter for which financial statements have been delivered pursuant to Section 6.01(b), as of any date of determination (any such Customer Contract described in this clause (ii), a "Material Customer Contract"), which notice, if delivered due to any material breach, violation or default thereunder, any termination (other than pursuant to its terms), cancellation or non-renewal thereof or any material amendment, modification

59

or change thereto, the reason for such event or the underlying circumstances thereof, and, with respect to any such Specified Customer Contract or Material Customer Contract being entered into, a copy thereof;

(l)      not less than 10 days prior to making any reimbursement or indemnification payment to a Bond Surety under or in connection with the Bond Documents, written notice of such payment required (provided that, if compliance with such 10-day notice period would result in a default by the Company of any such payment obligation, the Company shall instead deliver notice of such payment promptly after the making of such reimbursement or indemnification payment) and promptly, and in any event within 5 days, written notice of (A) a written claim of indemnity, or written request for delivery or posting of collateral, under any Bond Indemnity Agreement or any Loan Party obtaining knowledge thereof, (B) a draw on any Bond or a written demand or request by the beneficiary of any Bond to make a draw on any Bond, or any Loan Party obtaining knowledge thereof, or (C) early termination of, or a default under, any Bond, or any Loan Party or any of its Subsidiaries receives notice of the foregoing;

(m)     promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, including information about their respective day-to-day operations and bank statements for deposit accounts held by such parties, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time reasonably request in writing (it being understood that there shall be no requirement to provide (and no request shall be made to so provide) any contract level profitability);

(n)      [reserved];

(o)      written notice to the Administrative Agent of the proposed entering into of, or any change, amendment or other modification of, any Permitted ABL Loan Document or of any refinancing thereof, as soon as practicable, but in any event not less than 5 Business Days prior to the effectiveness thereof, which notice shall include true, correct and complete copies of all documents (which may be drafts followed by execution copies) to be executed and delivered in connection therewith for distribution to the Lenders;

(p)      without limiting the foregoing clause (o), the Company shall promptly provide, but in any event not less than 2 Business Days after the execution thereof (or in the case of unexecuted reports and filings, delivery thereof), to the Administrative Agent for distribution to the Lenders true, correct and complete executed copies (or in the case of unexecuted reports, final versions of such reports or filings, as applicable) of all certificates, filings and reports delivered from time to time in respect of any Permitted ABL Credit Agreement and any Permitted Refinancing thereof that are required to be delivered thereunder (including all certificates, filings and reports regarding the determination of the borrowing base under the Permitted ABL Credit Agreement and the calculation of Permitted ABL Availability);

(q)      [reserved];

(r)      [reserved]; and

(s)      on the ABL Facility Closing Date, the Company shall deliver a certificate signed by a Responsible Officer certifying as to (i) the initial stated maturity date of the Permitted ABL Indebtedness and (ii) the resulting affect (if any), in accordance with the definition of "Maturity Date", of such initial stated maturity date on the definition of "Maturity Date".

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(c) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Company posts such documents, or provides a link thereto on the Company's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Company's

behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Company shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Company shall notify the Administrative Agent (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Company with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Company hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Company hereunder (collectively, "Company Materials") by posting the Company Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Company or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Company hereby agrees that it will use commercially reasonable efforts to identify that portion of the Company Materials that may be distributed to the Public Lenders and that (w) all such Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Company Materials "PUBLIC," the Company shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Company Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Company or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

6.03    Notices. Promptly notify the Administrative Agent and each Lender in writing:

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including arising out of or resulting from (i) breach or non-performance of, or any default under, a Contractual Obligation of the Company or any Subsidiary; (ii) any dispute, litigation, investigation, proceeding or suspension between the Company or any Subsidiary and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Company or any Subsidiary, including pursuant to any applicable Environmental Laws;

(c)    of the occurrence of any ERISA Event, that would reasonably be expected to result in a Material Adverse Effect;

(d)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof, except for changes as required by GAAP;

(e)    [reserved]

(f)    of (i) the outcome (whether a win or a loss) of any Request for Proposal or Invitation for Bids that the Company or its Subsidiaries have pursued (provided that, in the case of a win,

CONFIDENTIAL

YC-E-037753

the Company is only required to notify the Administrative Agent of the outcome to the extent such information becomes publicly available) and (ii) the cancellation or termination of a contract to which the Company or one of its Subsidiaries is a party that generates greater than $10,000,000 of revenue for the twelve month period ending with the most recent month for which financial statements have been delivered to the Administrative Agent under Section 6.01(c) of this Agreement; and

(g)   any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification.

Each notice pursuant to this Section 6.03 (other than Section 6.03(e)) shall be accompanied by a statement of a Responsible Officer of the Company setting forth details of the occurrence referred to therein and stating what action the Company has taken and proposes to take with respect thereto.

6.04   Payment of Obligations.   Pay and discharge as the same shall become due and payable all of its material Tax obligations and liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted that stay the enforcement of such claim and adequate reserves in accordance with GAAP are being maintained by the Company or such Subsidiary.

6.05   Preservation of Existence, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

6.06   Maintenance of Properties. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear, casualty and condemnation excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except in the case of clauses (a) and (b) where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07   Maintenance of Insurance.

(a)   Maintain with financially sound and reputable insurance companies that are not Affiliates of the Company insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and all such insurance shall (i) provide for not less than 30 days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance (or, in the case of non-payment of premium, not less than 10 days' prior notice), (ii) name the Administrative Agent as additional insured on behalf of the Secured Parties (in the case of liability insurance) or mortgagee or loss payee (in the case of property insurance), as applicable, (iii) if reasonably requested by the Administrative Agent, include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Administrative Agent.

(b)   In addition to, and without limiting the foregoing, Company and its Subsidiaries shall maintain or require the maintenance of medical malpractice and other professional insurance with a responsible insurance company that is not an Affiliate of the Company for and covering each Loan Party and each Loan Party's employees, officers, directors or contractors who provides professional medical services to patients. Such insurance shall cover such casualties, risks and contingencies, shall be of the type and in amounts, and may be subject to deductibles and reasonable self-insured retentions as are customarily maintained by Persons employed or serving in the same or a similar capacity.

CONFIDENTIAL                                                                                           YC-E-037754

(c)     With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time reasonably require (but not to exceed amounts permitted under applicable law), if at any time the area in which any improvements are located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

6.08    Compliance with Laws.

(a)     Comply in all material respects with the requirements of all Laws (including all Laws administered by OFAC, all Anti-Terrorism Laws, all applicable "know your customer" and anti-money laundering rules and regulations, all Anti-Corruption Laws and the Beneficial Ownership Regulation) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances, other than with respect to compliance with Laws administered by OFAC, Anti-Terrorism Laws and Anti-Corruption Laws, in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

(b)     Comply with all applicable Health Care Laws except where noncompliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)     Obtain, maintain and preserve, and take all necessary action to timely renew, all Health Care Permits which are necessary to operate its business except where such failure to obtain, maintain or preserve could not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect.

(d)     (i) Remain in material compliance with all requirements of participation and payment of any Programs in which it participates, and (ii) maintain valid participation agreements for payment by any material Program that it bills and participates in.

(e)     Maintain on its behalf a corporate health care regulatory compliance program which complies in all material respects with all applicable Health Care Laws and which, during the term of this Agreements, shall be modified from time to time, as necessary, to ensure continuing compliance with all applicable Health Care Laws.

6.09    Books and Records; Conference Calls.

(a)     (i) Maintain proper books of record and account, in which full, true and correct entries in all material respects in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Company or such Subsidiary, as the case may be, and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Company or such Subsidiary, as the case may be.

(b)     Notwithstanding anything to the contrary in this Section 6.09, none of the Company or any Loan Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any documents, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

63

6.10     Inspection Rights.     Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Company and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent (and its representatives and independent contractors) on behalf of the Lenders may exercise rights under this Section 6.10 and the Administrative Agent shall only exercise its rights as it reasonably deems necessary; provided, however, that when an Event of Default exists and is continuing the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Company at any time during normal business hours and upon reasonable advance notice; provided further, that the Company shall be given reasonable prior written notice of, and a representative of the Company shall be given reasonable opportunity to be present at, any meetings with the Loan Parties' accountants.  Notwithstanding anything to the contrary in this Section 6.10, none of the Company or any Loan Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any documents, information or other matter (i) that constitutes non-financial trade secrets or non- financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

6.11     Use of Proceeds.  On and following the Third Amendment and Restatement Effective Date, use the proceeds of the Additional First Out Loan Borrowings to provide ongoing working capital and for general corporate purposes, in each case not in contravention of any Law or of any Loan Document or any other use not explicitly prohibited under the Loan Documents.

6.12     Covenant to Guarantee Obligations and Give Security.

(a)     Upon the formation or acquisition of any new direct or indirect Subsidiary (other than Corizon Health of New Mexico, LLC and any Subsidiary (each such Subsidiary, an "Excluded Subsidiary") that (A) is not organized under the laws of the United States of America, any state thereof or the District of Columbia or (B) is not described in the foregoing clause (A) and that (1) has no material assets other than the Equity Interests of one or more CFCs or (2) is held directly or indirectly by a CFC) by any Loan Party, then the Company shall, at the Company's expense:

(i)     within 10 Business Days after such formation or acquisition, cause such Subsidiary, and cause each direct and indirect parent of such Subsidiary (if it has not already executed the Guaranty or a Guaranty Supplement), to duly execute and deliver to the Administrative Agent a Guaranty Supplement, in form and substance reasonably satisfactory to the Administrative Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)     within 10 Business Days after such formation or acquisition, furnish to the Administrative Agent a description of the owned real properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)     within 30 days after such formation or acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to duly execute and deliver to the Administrative Agent, Mortgages in respect of any Material Owned Real Property of such Subsidiary or parent (and such other instruments or documents as are necessary to satisfy the other conditions of the Mortgage Requirement), a Security Agreement Supplement, a Control Agreement to the extent required by Section 6.12(d), a Perfection Certificate Supplement, an IP Security Agreement Supplement in respect of any Intellectual Property Collateral of such Subsidiary or parent and other security

64

YC-E-037756

and pledge agreements, as specified by and in form and substance reasonably satisfactory to the Administrative Agent, together with all certificates and instruments representing the "Securities Collateral" (as such term is defined in the Security Agreement) of such Subsidiary or parent accompanied by undated stock powers or instruments of transfer executed in blank and instruments evidencing any Intercompany Notes accompanied by undated instruments of transfer executed in blank and such other documents as the Administrative Agent deems necessary in order to create and perfect any Lien in connection therewith, securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on all such real and personal properties,

(iv)     within 30 days after such formation or acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) that may be reasonably necessary or advisable in the opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the Mortgages, Control Agreements, Security Agreement Supplements, IP Security Agreement Supplements and security and pledge agreements delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms, subject to the Liens permitted under Section 7.01,

(v)     within 30 days after such formation or acquisition, deliver to the Administrative Agent, upon the Company's receipt of the written request of the Administrative Agent in its reasonable discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (i), (iii) and (iv) above, and as to such other matters as the Administrative Agent may reasonably request,

(vi)     as promptly as practicable after such formation or acquisition, deliver, upon the written request of the Administrative Agent in its reasonable discretion, to the Administrative Agent with respect to each Material Owned Real Property, title reports, surveys, opinions, life of loan flood hazard determinations and such other documentation as reasonably required by the Administrative Agent, each in scope, form and substance reasonably satisfactory to the Administrative Agent, provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent, and

(vii)     within 30 days after such formation or acquisition, (i) such documents and certifications as the Administrative Agent may reasonably require to evidence that such Subsidiary and any direct and indirect parent of such Subsidiary that is not a Loan Party is duly organized or formed, and that such Subsidiary or parent is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (ii) a recent lien, tax lien, judgment and litigation search in each relevant jurisdiction with respect to such Subsidiary or parent, which search shall have revealed no liens on the assets of such entity except for Liens permitted by the Loan Documents or liens to be discharged on or prior to the execution of a Security Agreement Supplement in accordance with Section 6.12(a)(iii).

(b)     Upon the acquisition of any property by any Loan Party, if such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected, first priority (subject to

65

any Intercreditor Agreement), security interest in favor of the Administrative Agent for the benefit of the Secured Parties, then the Company shall, at the Company's expense:

(i)     within 10 Business Days after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail reasonably satisfactory to the Administrative Agent,

(ii)     within 30 days after such acquisition, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent, (A) a Mortgage in respect of any Material Owned Real Property (and such other instruments or documents as are necessary to satisfy the other conditions of the Mortgage Requirements) and (B) a Perfection Certificate Supplement updated to reflect such acquired property and other security and pledge agreements, as specified by and in form and substance reasonably satisfactory to the Administrative Agent, securing payment of all the Obligations of the applicable Loan Party under the Loan Documents and constituting Liens on all such property,

(iii)     within 30 days after such acquisition, deliver to the Administrative Agent, upon the Company's receipt of the written request of the Administrative Agent in its reasonable discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clause (ii)(A) above, and as to such other matters as the Administrative Agent may reasonably request, and

(iv)     within 30 days after such acquisition, cause the applicable Loan Party to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be reasonable, necessary or advisable in the opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on such property, enforceable against all third parties,

(v)     concurrently with the financial statements furnished to the Administrative Agent pursuant to Section 6.01(b), cause the applicable Loan Party to execute and deliver to the Administrative Agent IP Security Agreement Supplements for all Intellectual Property Collateral acquired during such fiscal quarter, and

(vi)     as promptly as practicable after any acquisition of a Material Owned Real Property, deliver, upon the written request of the Administrative Agent in its reasonable discretion, to the Administrative Agent with respect to such real property, a Mortgage, title reports, opinions, surveys, life of loan flood hazard determinations and any and all other documentation as reasonably required by the Administrative Agent, each in scope, form and substance reasonably satisfactory to the Administrative Agent.

(c)     At any time upon the reasonable written request of the Administrative Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may deem reasonably necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, Mortgages, Control Agreements, Security Agreement Supplements, IP Security Agreement Supplements and other security and pledge agreements.

(d)     Each Loan Party shall ensure that the Administrative Agent shall have received, on the Closing Date and thereafter immediately upon any account meeting the criteria specified herein, a counterpart, duly executed and delivered by the applicable Loan Party and the applicable depositary bank, securities intermediary, commodities bank or commodities intermediary, as the case may be, of a Control Agreement with respect to (i) each deposit account maintained by any Loan Party with any depositary bank, (ii) each securities account maintained by any Loan Party with any securities intermediary and (iii) each

66

commodities account maintained by any Loan Party with any commodities bank or commodities intermediary, in each case excluding any "Excluded Account" (as such term is defined in the Security Agreement).

6.13    <u>Compliance with Environmental Laws</u>.  Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, response or other corrective action in accordance with the requirements of all Environmental Laws necessary to address Hazardous Materials at, on, under or emanating from any properties owned, leased or wholly operated by it; <u>provided, however,</u> that neither the Company nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.14    <u>Further Assurances</u>.  Promptly upon reasonable written request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

6.15    <u>Reserved</u>.

6.16    <u>Post-Closing Covenants</u>.  The Company shall, and shall cause each Subsidiary to, comply with the terms and conditions set forth on <u>Schedule 6.16</u> (which may be waived or amended in accordance with Section 10.01).

6.17    <u>HIPAA Business Associate Agreement</u>.  Promptly notify the Administrative Agent of the inclusion of any Protected Health Information contained in any document proposed to be delivered in connection with this Agreement or any Loan Document.  Prior to any such proposed disclosure of Protected Health Information to the Administrative Agent, the Company and each Subsidiary that is a "covered entity" under HIPAA and the Administrative Agent shall promptly enter into the HIPAA Business Associate Agreement, in substantially the form of <u>Exhibit I</u>; <u>provided</u> that if the Administrative Agent elects not to enter into a HIPAA Business Associate Agreement, the Company and each Subsidiary shall de-identify any relevant Protected Health Information in accordance with 45 CFR §164.514 from such document or information that is to be delivered in connection with this Agreement; <u>provided further</u> that (i) any failure to deliver any information required under this Agreement which constitutes to Protected Health Information caused by the delay or failure of the Administrative Agent to execute the HIPAA Business Associate Agreement shall not constitute an Default or Event of Default and (ii) the failure or delay of the Administrative Agent to execute the HIPAA Business Associate Agreement in substantially the form of Exhibit I shall not be deemed to be a failure of the Loan Parties to comply with this Section 6.17 (subject to the first proviso above).

CONFIDENTIAL

YC-E-037759

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than (A) contingent indemnification obligations and (B) obligations and liabilities under Secured Cash Management Agreements and Secured Hedge Agreement, in each case, for which no claim has been made), the Borrowers shall not, nor shall they permit any Subsidiary to, directly or indirectly, and solely in the case of Section 7.17, Holdings shall not:

7.01     Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Company or any of its Subsidiaries as debtor, or collaterally assign any accounts or other right to receive income, other than the following:

(a)     Liens pursuant to any Loan Document (including, for the avoidance of doubt, Liens pursuant to any Loan Document with respect to a Permitted L/C Facility).

(b)     Liens existing on the Closing Date and listed on Schedule 7.01 and any renewals or extensions thereof, provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by Section 7.02(e), (iii) the direct or any contingent obligor with respect thereto is not changed, except as otherwise permitted hereunder and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.02(e);

(c)     Liens for Taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted that stay the enforcement of such claim, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)     statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are (i) in an amount not in excess of $250,000 individually or in the aggregate when taken together with all such Liens or (ii) not overdue for a period of more than 60 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person provided, that any Lien permitted pursuant to this clause (d) shall not secure Indebtedness for borrowed money;

(e)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation;

(f)     deposits and pledges of cash securing the performance of Bond Documents and other documents evidencing bonding requirements under Customer Contracts with Governmental Authorities for the provision of healthcare services to inmates, or Bond Contingent Obligations and other obligations of the Company thereunder, but only to the extent, in any such case, such deposits or pledges are incurred, made or otherwise arise in the ordinary course of business, secure obligations not past due (giving effect to any grace period thereunder) and provided that such deposits and pledges shall not exceed $10,000,000 in the aggregate at any time;

(g)     easements, zoning, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)     Liens securing judgments and awards for the payment of money not

68

CONFIDENTIAL                                                                      YC-E-037760

constituting an Event of Default under Section 8.01(h);

(i)     Liens securing Indebtedness permitted under Section 7.02(g); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and the proceeds thereof and (ii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition;

(j)     Liens on property of a Person existing at the time such Person is merged into or consolidated with the Company or any Subsidiary of the Company or becomes a Subsidiary of the Company; provided that such Liens were not created in contemplation of such merger, consolidation or Investment and do not extend to any assets other than those of the Person merged into or consolidated with the Company or such Subsidiary or acquired by the Company or such Subsidiary, and the applicable Indebtedness secured by such Lien is permitted under Section 7.02(h);

(k)     other Liens securing obligations outstanding in an aggregate principal amount not to exceed $500,000;

(l)     the replacement, extension or renewal of any Lien permitted by clause (j) above upon or in the same property theretofore subject thereto or the replacement, extension or renewal (without increase in the amount (other than for accrued interest and fees and expenses) or change in any direct or contingent obligor) of the Indebtedness secured thereby;

(m)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more of accounts maintained by the Company or any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; provided that in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(n)     Liens arising from filing precautionary Uniform Commercial Code financing statements regarding leases;

(o)     Liens securing Swap Contracts entered into for *bona fide* hedging purposes of Company or any Loan Party not for purposes of speculation and permitted under Section 7.02(a);

(p)     leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Company or any material Subsidiary, taken as a whole, or (ii) secure any Indebtedness;

(q)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection and (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business;

(r)     Liens solely on any cash earnest money deposits made by the Company or any of the Loan Parties in connection with any letter of intent or purchase agreement pursuant to a Permitted Acquisition;

(s)     Liens securing Permitted ABL Indebtedness, subject to the provisions of the Intercreditor Agreement;

(t)     Liens on Permitted Insurance Premium Debt Documents and the proceeds thereof to the extent securing Permitted Insurance Premium Indebtedness; and

CONFIDENTIAL

YC-E-037761

(u)     Liens granted pursuant to the Geneva Security Agreement.

7.02     Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     obligations (contingent or otherwise) existing or arising under any Swap Contract, provided that (i) such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates and (ii) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(b)     Indebtedness in respect of Permitted ABL Indebtedness (and any Permitted Refinancing thereof);

(c)     Indebtedness of a Subsidiary of the Company owed to the Company or a wholly-owned Subsidiary of the Company or of the Company owed to a wholly-owned Subsidiary of the Company, which Indebtedness shall (A) in the case of Indebtedness owed to a Loan Party, constitute "Intercompany Notes" under the Security Agreement, (B) be on terms (including subordination terms) reasonably acceptable to the Administrative Agent and (C) be otherwise permitted under the provisions of Section 7.03;

(d)     Obligations under the Loan Documents;

(e)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.02 and any Permitted Refinancing thereof;

(f)     Guarantees of the Company or any Guarantor in respect of Indebtedness otherwise permitted hereunder of the Company or any other Guarantor and Guarantees in the ordinary course of business of suppliers, customers and licenses of the Borrowers and their respective Subsidiaries;

(g)     Indebtedness in respect of Capitalized Leases and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i); provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $10,000,000;

(h)     Indebtedness of any Person that becomes a Subsidiary of the Company after the Closing Date pursuant to a Permitted Acquisition in accordance with the terms of Section 7.03(g), which Indebtedness is existing at the time such Person becomes a Subsidiary of the Company (other than Indebtedness incurred in contemplation of such Person's becoming a Subsidiary of the Company);

(i)     unsecured Indebtedness in an aggregate principal amount not to exceed $5,000,000 at any time outstanding;

(j)     Permitted Unsecured Indebtedness (including Subordinated Indebtedness and Indebtedness issued to sellers party to the relevant Permitted Acquisition, in each case to the extent constituting Permitted Unsecured Indebtedness) to the extent the Net Cash Proceeds of such Indebtedness are, contemporaneously with the issue thereof, utilized to finance a Permitted Acquisition; provided that immediately before and immediately after giving effect to the incurrence of such Indebtedness on a Pro Forma Basis, (w) no Default or Event of Default shall have occurred and be continuing, (x) the Company and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 7.11 and (y) the Consolidated Total Leverage Ratio of the Company shall not exceed 3.50:1.00; provided that in each case of (x) and (y) such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01 as though such purchase, other acquisition or incurrence of Indebtedness associated therewith had been consummated as of the first day of the fiscal period covered thereby;

70

YC-E-037762

(k)      Obligations pursuant to any Cash Management Agreement incurred in the ordinary course of business;

(l)      Indebtedness representing obligations to reimburse third parties pursuant to any letter of credit or surety bond, which letter of credit or surety bond, as the case may be, is intended to provide security for workers' compensation claims, payment obligations in connection with sales tax and insurance in the ordinary course of business and in an aggregate face amount not to exceed such amount required for the Company and its Subsidiaries to comply with its obligations with respect to workers' compensation claims or such payment obligations in connection with sales tax and insurance, as applicable;

(m)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five Business Days following its incurrence;

(n)      Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(o)      Indebtedness representing deferred compensation to employees of the Company and the Loan Parties incurred in the ordinary course of business;

(p)      Indebtedness incurred by the Company or any of the Loan Parties in respect of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees, other than Bond Contingent Obligations;

(q)      Bond Contingent Obligations incurred in the ordinary course of business and pursuant to contractual obligations not to exceed in the aggregate, at the time of incurrence, modification or amendment, the greater of (x) $80,000,000 and (y) an amount equal to ten percent (10%) of gross revenues of the Company and its Subsidiaries for the twelve (12) month period ending with the most recent month for which financial statements have been delivered (provided, that if the maximum permitted amount of such Bond Contingent Obligations is being determined with respect to the issuance of a Bond in connection with a new Customer Contract (but not a renewal of, or modification or amendment to, an existing Customer Contract), the calculation of revenue pursuant to the foregoing clause (y) shall give effect to pro forma adjustments to revenue that would have been earned by the Company had such Customer Contract been entered into on the first day of the twelve (12) month period ending with the most recent month for which financial statements have been delivered, as determined by the Company and consented to by the Administrative Agent, based upon and derived from information delivered to and reasonably consented to by the Administrative Agent), and in any such case, (i) only to the extent remaining contingent in nature (it being agreed and understood that the Company shall be required to comply with the foregoing restrictions each time any surety requirements under any Bond Document are amended or otherwise modified, and any Bond Document is renewed, replaced or entered into) and (ii) Bonds that are cash-collateralized or collateralized with letters of credit shall not be counted against such amount limitations;

(r)      Permitted Insurance Premium Indebtedness;

(s)      Indebtedness consisting of promissory notes issued by any of the Loan Parties to present or former officers, directors, consultants, agents, employees to finance the repurchase or redemption of Equity Interests for which Restricted Payments are permitted to be made pursuant to Section 7.06(d), provided that, the payment of obligations under such Indebtedness, when taken together with all payments made under Section 7.06(d), shall not exceed the amount of payments permitted to be made pursuant to Section 7.06(d); provided further, that, any such Indebtedness (i) shall at all times be unsecured and subordinated in right of payment to the prior payment in full in cash of the Obligations and (ii) shall not

71

YC-E-037763

require any interest payments on such Indebtedness to be paid in cash prior to the payment in full in cash of the Obligations;

(t)     Indebtedness arising from agreements of any Loan Party providing for indemnification, adjustment of purchase price or acquisition price or similar obligations, in each case, incurred or assumed in connection with any Permitted Acquisition or Disposition of any business, assets or a Subsidiary not prohibited by this Agreement;

(u)     Indebtedness pursuant to a Permitted L/C Facility (and any Permitted Refinancing thereof);

(v)     Indebtedness pursuant to a Deferred Payment Notes (and any Permitted Refinancing thereof); and

(w)     any obligations arising under the Geneva Management Services Agreement.

7.03     Investments.  Make or hold any Investments, except:

(a)     Investments held by the Company and its Subsidiaries in the form of Cash Equivalents;

(b)     Loans or advances made to (i) officers, directors and employees of the Company and Subsidiaries in connection with such Person's purchase of Equity Interests of a Loan Party and/or any Subsidiary to the extent consummated as "non-cash" transactions and (ii) to employees in the ordinary course of business, in an aggregate amount for all such loans and advances made under this Section 7.03(b) not to exceed $1,000,000 at any time outstanding;

(c)     Investments by the Company and its Subsidiaries in Loan Parties (other than Holdings);

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e)     Guarantees permitted by Section 7.02;

(f)     Investments existing on the Closing Date and set forth on Schedule 7.03 and any modification, extension or renewal thereof; provided that the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.03;

(g)     the purchase or other acquisition of all of the Equity Interests in, or all or substantially all of the property of, any Person that, upon consummation thereof, will be owned directly by the Company or one or more of its Subsidiaries (including as a result of a merger or consolidation) (each, a "Permitted Acquisition"); provided that, with respect to each purchase or other acquisition made pursuant to this Section 7.03(g):

(i)     (A) any such newly-created or acquired Subsidiary shall comply with the requirements of Section 6.12 and (B) the aggregate amount of cash or property provided by or on behalf of the Company and its Subsidiaries to make any such purchase or acquisition of assets that are not purchased or acquired (or do not become owned) by a Loan Party or in Equity Interests in Persons that do not become Loan Parties upon consummation of such purchase or acquisition shall not exceed 5.0% of Total Assets as of the end of the Measurement Period last ended;

72

YC-E-037764

(ii)      the lines of business of the Person to be (or the property of which is to be) so purchased or otherwise acquired shall be substantially the same or generally related lines of business as one or more of the principal businesses of the Company and its Subsidiaries in the ordinary course;

(iii)      immediately before and immediately after giving effect on a Pro Forma Basis to any such purchase or other acquisition, and any incurrence or assumption of Indebtedness in connection therewith, (w) no Event of Default shall have occurred and be continuing, (x) the Company and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 7.11 and (y) the Consolidated Total Leverage Ratio of the Company shall not exceed 3.50:1.00; provided that in each case of (x) and (y) such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01 as though such purchase, other acquisition, incurrence or assumption of Indebtedness associated therewith had been consummated as of the first day of the fiscal period covered thereby;

(iv)      the Company shall have delivered to the Administrative Agent prior to the date on which any such purchase or other acquisition is to be consummated, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, certifying that all of the requirements set forth in this clause (g) have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition; and

(v)      the aggregate amount of cash consideration (excluding amounts raised through the issuance of Equity Interests of Persons other than the Company and its Subsidiaries) paid by or on behalf of the Company and its Subsidiaries for any such purchases or acquisitions shall not exceed $75,000,000 individually or $200,000,000 in the aggregate (when taken together with all such Permitted Acquisitions);

(h)      any Investment made as a result of the receipt of non-cash consideration from sale of assets permitted hereunder;

(i)      any Investments received in compromise of obligations of such Persons incurred in the ordinary course of trade creditors or customers that were incurred in the ordinary course of business, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(j)      Swap Contracts permitted by Section 7.02;

(k)      Investments in prepaid expenses, negotiable instruments held for collection, utility and workers' compensation, performance and similar pledges or deposits made in the ordinary course of business;

(l)      endorsements of negotiable instruments and documents in the ordinary course of business;

(m)      Investments by the Company and its Subsidiaries not otherwise permitted under this Section 7.03 in an aggregate amount not to exceed $500,000;

(n)      Guarantees by the Company or any Subsidiary of leases (other than Capitalized Leases) of the Company or any Subsidiary that do not constitute Indebtedness in the ordinary course of business;

(o)      Investments resulting from pledges or deposits described in Sections 7.01(e), (f) or (r);

73

YC-E-037765

(p)　　any Investments provided that (i) at the time of such Investment, no Default or Event of Default shall have occurred and be continuing or would result therefrom, (ii) immediately before and immediately after giving effect on a Pro Forma Basis thereto (x) the Company and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 7.11 and (y) the Consolidated Total Leverage Ratio of the Company shall not exceed 3.50:1.00 provided that in each case of (x) and (y) such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01 as though such Investment had been consummated as of the first day of the fiscal period covered thereby; and

(q)　　any Investment in connection with the YesCare Transaction or under the Geneva Management Services Agreement.

7.04　　Fundamental Changes. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)　　any Subsidiary may merge with (i) the Company, provided that the Company shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, provided that when any Loan Party (other than Holdings) is merging with another Subsidiary, such Loan Party shall be the continuing or surviving Person;

(b)　　any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Company or to another Loan Party (other than Holdings);

(c)　　any Subsidiary that is not a Loan Party may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to (i) another Subsidiary that is not a Loan Party or (ii) to a Loan Party; and

(d)　　in connection with any Permitted Acquisition under Section 7.03(g), the Company or any Subsidiary of the Company may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; provided that (i) the Person surviving such merger shall be a wholly-owned Subsidiary of the Company (except where the Company is the merging Person) and (ii) in the case of any such merger to which any Loan Party (other than the Company) is a party, such Loan Party is the surviving Person; provided, further, that if the Company is a party to any transaction effected pursuant to this Section 7.04(d), the Company shall be the continuing and surviving Person.

Notwithstanding anything to the contrary in this Section 7.04, each of the transactions contemplated in connection with the YesCare Transaction shall be permitted.

7.05　　Dispositions. Make any Disposition except:

(a)　　Dispositions of obsolete, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)　　Dispositions of inventory or the other tangible property in the ordinary course of business;

(c)　　Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

74

YC-E-037766

(d)      Dispositions of property by any Subsidiary to the Company or to a wholly- owned Subsidiary or by the Company to a wholly-owned Subsidiary; provided that if the transferor of such property is a Guarantor or the Company, the transferee thereof must either be the Company or a Guarantor;

(e)      Dispositions permitted by Section 7.04;

(f)      the sale or other disposition of cash and Cash Equivalents otherwise permitted under this Agreement;

(g)      the unwinding of any Swap Contracts which are permitted under Section 7.02(a);

(h)      a Restricted Payment that is permitted by Section 7.06 or an Investment that is permitted by Section 7.03;

(i)      the granting of a Lien permitted under Section 7.01;

(j)      Dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in a bankruptcy or similar proceeding and exclusive of factoring or similar arrangements;

(k)      so long as no Event of Default has occurred and is continuing or would result therefrom, Dispositions by the Company and its Subsidiaries of property; provided that the fair market value of all property so Disposed of shall not exceed $5,000,000 per fiscal year from and after the Closing Date and at least 75% of the purchase price for such property shall be paid to the Company or its Subsidiaries in cash or Cash Equivalents;

(l)      leases, licenses, subleases, or sublicenses entered into in the ordinary course of business, to the extent that they do not materially interfere with the business of the Company or any Subsidiary; and

(m)      any Dispositions contemplated in connection with the YesCare Transaction or under the Geneva Management Services Agreement;

provided, however, that any Disposition pursuant to Section 7.05(a) through Section 7.05(f) and Section 7.05(k) shall be for fair market value.

7.06      Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except that:

(a)      each Subsidiary may make Restricted Payments to the Company, any Subsidiaries of the Company that are Guarantors and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)      the Company and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person;

(c)      (A) for any taxable period for which the Company is a member of a group filing a consolidated or combined income Tax return with Holdings or any other direct or indirect parent of the Company, the Company may make payments of dividends or other distributions to Holdings, the proceeds of which will be used to pay consolidated or combined U.S. federal, state, local and/or foreign income Taxes imposed on Holdings or its direct or indirect parent to the extent such income Taxes are attributable to the income of the Company and/or its Subsidiaries; provided, however, that (i) the amount of such payments in respect of any taxable period does not, in the aggregate, exceed the amount that the Company and/or its Subsidiaries that are members of such consolidated or combined group would have been required

75

YC-E-037767

to pay in respect of such U.S. federal, state, local and/or foreign income Taxes (as the case may be) in respect of such taxable period if the Company and/or its Subsidiaries paid such income Taxes directly as a stand-alone consolidated or combined income Tax group (reduced by any such Taxes paid directly by the Company or any Subsidiary) and (B) the Company may declare and pay cash dividends to Holdings not to exceed an amount necessary to permit Holdings to pay (i) reasonable and customary corporate and operating expenses (including reasonable out-of-pocket expenses for legal, administrative and accounting services provided by third parties, and compensation, benefits and other amounts payable to officers and employees in connection with their employment in the ordinary course of business and to board of director observers) and (ii) franchise fees or similar Taxes and fees required to maintain its corporate existence; and

(d)    so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Company may make Restricted Payments to permit, directly or indirectly, the purchase of Equity Interests of M2 EquityCo, LLC from present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of the Company or any of its Subsidiaries upon the death, disability, retirement or termination of the applicable officer, director, consultant, agent or employee, or pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement, and to the extent that distributions to fund such purchase results in the creation of a taxable gain or income to the members of M2 EquityCo, LLC, the Company may make Restricted Payments to Holdings to permit Holdings to make Restricted Payments in amounts required by such members to pay income taxes resulting from such distributions; provided that any such Restricted Payments under this clause (d) shall only be made in the form of a promissory note issued by the Company pursuant to Section 7.02(s); provided further, that, the aggregate amount of such Restricted Payments under this clause (d) shall not exceed the sum of $1,000,000 in any fiscal year plus the amount of any key man life insurance proceeds received by the Company and its Subsidiaries in such fiscal year; provided further, that any amount not used in any fiscal year may be carried over to the next fiscal year.

(e)    any Loan Party may make Restricted Payments (or to pay, directly or indirectly, administrative or any other ordinary business costs of M2 Holdco, LLC; provided that, the aggregate amount of such Restricted Payments under this clause (e) shall not exceed $250,000 in any calendar year.

(f)    any Loan Party may make Restricted Payments pursuant to customary indemnification and expense reimbursement policies adopted in the ordinary course of business with respect to directors, board observers, operating partners and consultants of such Loan Party.

(g)    any Loan Party may make Restricted Payments to pay documented bona fide management, consulting, advisory, monitoring or similar services costs, fees and expenses payable to any Affiliate of, or investor in, M2 EquityCo, LLC or M2 LoanCo, LLC (or, in each case, any of its respective successors), provided that the aggregate amount of such Restricted Payments under this clause (g) shall not exceed $400,000 in any calendar month.

(h)    any Loan Party may make Restricted Payments contemplated in connection with the YesCare Transaction and under the Geneva Management Services Agreement.

7.07    Change in Nature of Business.  Engage in any material line of business substantially different from those lines of business conducted by the Company and its Subsidiaries on the Fifth Amendment and Assumption Effective Date or any business substantially related or incidental thereto.

7.08    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of the Company, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Company or such Subsidiary as would be obtainable by the Company or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate.

CONFIDENTIAL

YC-E-037768

The following items will not be deemed to be transaction with an Affiliate and, therefore, will not be subject to the provisions of the prior paragraph:

(a)     transactions between or among the Company and/or any Loan Party (other than Holdings);

(b)     dividends or other Restricted Payments permitted by Section 7.06;

(c)     reasonable and customary directors' fees not to exceed $200,000 in the aggregate in any fiscal year (provided, however, that no directors' fees and expense in excess of such amount shall be paid during the term of this Agreement but shall accrue and be paid following the prior payment in full in cash of all of the Obligations), indemnification and similar arrangements, consulting fees, employee salaries, bonuses or employment agreements, compensation or employee benefit arrangements, incentive and severance arrangements with any officer, director or employee of the Company or a Loan Party entered into in the ordinary course of business;

(d)     the existence of, and the performance by any Loan Party of its obligations under the terms of, any limited liability company, limited partnership or other Organization Document or securityholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Closing Date and which has been disclosed to the Lenders as in effect on the Closing Date, and similar agreements that it may enter into thereafter; provided, however, that the existence of, or the performance by any Loan Party of obligations under, any amendment to any such existing agreement or any such similar agreement entered into after the Closing Date shall only be permitted by this Section 7.08(d) to the extent not more adverse to the interest of the Lenders in any material respect, when taken as a whole, than any of such documents and agreements as in effect on the Closing Date;

(e)     the making of Loans to the Borrowers (and any related transactions including the granting of security and provision of guarantees by the Loan Parties) by any Lender or an Affiliate of such Lender;

(f)     the YesCare Transaction and any transactions contemplated under the Geneva Management Services Agreement.

7.09     Burdensome Agreements. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or the Permitted ABL Loan Documents) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Company or any Guarantor or to otherwise transfer property to or invest in the Company or any Guarantor; provided, however, that this clause (i) shall not prohibit any such limitation (A) contained in any agreement in effect on the Closing Date and set forth on Schedule 7.09, (B) contained in any agreement in effect at the time any Subsidiary becomes a Subsidiary of the Company, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of the Company, (C) which are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.03 and applicable solely to such joint venture entered into in the ordinary course of business, (D) which are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (E) which are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Subsidiary, (F) which are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (G) which are customary restrictions contained in sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (H) contained in the Geneva Management Services Agreement or the Geneva Security Agreement or (I) which are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (ii) of any Subsidiary to Guarantee the Indebtedness of any Borrower or (iii) of the Company or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, that this clause

77

(iii) shall not prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.02(g) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness, (B) covenants in documents creating Liens permitted by Section 7.01 prohibiting further Liens on the properties encumbered thereby or (C) customary provisions restricting assignment of any agreement entered into in the ordinary course of business; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

7.10    Use of Proceeds.  Use the proceeds of any Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

7.11    Financial Covenant.  Permit Consolidated EBITDA for any fiscal quarter ending on the dates set forth below to be less than set forth opposite such date below:

| Fiscal Quarter Ending Date | Amount |
| --- | --- |
| September 30, 2020 | $5,800,000 |
| December 31, 2020 | $6,800,000 |
| March 31, 2021 | $6,800,000 |
| June 30, 2021 | $5,100,000 |
| September 30, 2021 | $7,500,000 |
| December 31, 2021 | $9,400,000 |
| March 31, 2022 | $10,400,000 |
| June 30, 2022 | $10,800,000 |
| September 30, 2022 | $10,900,000 |
| December 31, 2022 | $11,000,000 |

7.12    Capital Expenditures.  Make any Capital Expenditure except for Capital Expenditures in the ordinary course of business exceeding, in the aggregate for the Company and its Subsidiaries during any fiscal year an amount equal to $10,000,000.

7.13    Amendments of Organization Documents.  Amend any of its Organization Documents in a manner materially adverse to the Lenders (it being understood that the changes to the Organization Documents undertaken in connection with the YesCare Transaction are not materially adverse to the Lenders).

7.14    Accounting Changes.  Make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year.

7.15    Prepayments, Etc. of Indebtedness.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of (i) any Subordinated Indebtedness or (ii) any Permitted Unsecured Indebtedness, other than, in each case, any Permitted Refinancing thereof.

78

7.16    Amendment, Etc. of Indebtedness.  Amend or modify any term or condition of (a) any Subordinated Indebtedness or any Permitted Unsecured Indebtedness in any manner that is materially adverse to the Lenders or otherwise in contravention of any applicable subordination agreement, (b) any Permitted ABL Indebtedness in any manner that is in contravention of the Intercreditor Agreement or (c) any Deferred Payment Notes in any manner that is in contravention to any agreement.

7.17    Holding Company.  In the case of Holdings, engage in any business or activity other than (a) the ownership of all outstanding Equity Interests in the Company, (b) maintaining its corporate existence, (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (d) the execution and delivery of the Loan Documents and the Permitted ABL Loan Documents to which it is a party and the performance of its obligations thereunder, (e) activities incidental to the businesses or activities described in clauses (a) through (d) of this Section, (f) activities expressly (i) required to be undertaken by Holdings pursuant to Article VI or (ii) permitted to be undertaken by Holdings under this Article VII, (g) activities under or relating to the Geneva Management Services Agreement or the Geneva Security Agreement and (h) activities undertaken in connection with the YesCare Transaction.

7.18    HIPAA Business Associate Agreement.  To the extent that a HIPAA Business Associate Agreement is required by Section 6.17, terminate the HIPAA Business Associate Agreement.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01    Events of Default.  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Company or any other Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or (ii) pay within five days after the same becomes due, any interest on any Loan, any fee or other payment due hereunder or any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants.  The Company fails to perform or observe any term, covenant or agreement contained in (i) any of Sections 6.02(s), 6.03(a) or 6.03(b), 6.05 (provided that, in the case of any failure of (i) a Borrower to remain in good standing, such Borrower shall have 10 days and (ii) any Subsidiary of the Company to remain in good standing, such Subsidiary shall have 30 days, in each case from the date such Borrower or such Subsidiary, as applicable, has knowledge thereof to cure such failure), 6.11 or Article VII or (ii) any of Sections 6.01, 6.02, or 6.03 (other than subsections (a) and (b)) and, solely in the case of this clause (ii), such default shall continue unremedied for a period of five (5) Business Days after the occurrence thereof; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the Company's receipt of written notice thereof by Administrative Agent to the Company; or

(d)    Representations and Warranties.  Any representation, warranty or certification made or deemed made by or on behalf of the Company or any other Loan Party herein, in any other Loan Document or in any document delivered in connection herewith or therewith (subject to, in the case of general industry information, projection financial information, budgets and pro forma data, the limitations set forth in Section 5.15) shall be inaccurate or misleading in any material respect (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect) when made or deemed made; or

(e)    Cross-Default. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or

79

otherwise but giving effect to any grace period) in respect of the Permitted ABL Indebtedness or any Indebtedness (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than the Threshold Amount; or

(f)     Insolvency Proceedings, Etc.  Any Loan Party or any Subsidiary thereof institutes or consents to the institution of any proceeding under any Debtor Relief Law (any such proceeding, an "Insolvency Proceeding"), or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)     Inability to Pay Debts; Attachment. (i) Any Loan Party or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the Loan Parties taken as a whole and is not released, vacated or fully bonded within 30 days after its issue or levy; or

(h)     Judgments. (i) There is entered against any Loan Party or any Subsidiary thereof one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (less any amounts covered by independent third-party insurance as to which the insurer has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 60 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal, discharge or otherwise, is not in effect; or

(i)     ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of the Company under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount that would reasonably be expected to result in a Material Adverse Effect, or (ii) the Company or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that would reasonably be expected to result in a Material Adverse Effect; or

80

YC-E-037772

(j)  *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations (other than (A) contingent indemnification obligations and (B) obligations and liabilities under Secured Cash Management Agreements and Secured Hedge Agreements, in each case for which no claim has been made), ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(k)  *Change of Control*.  There occurs any Change of Control; or

(l)  *Collateral Documents*.  Any Collateral Document shall for any reason (other than pursuant to the terms thereof and any Intercreditor Agreement) cease to create a valid and perfected first priority Lien (subject to Liens permitted by Section 7.01) on a material portion of the Collateral purported to be covered thereby except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements; or

(m)  *Intercreditor Agreement*.  At any time following the incurrence by the Loan Parties of any Permitted ABL Indebtedness (i) the Intercreditor Agreement shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the Permitted ABL Indebtedness; or (ii) the Company or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of the Intercreditor Agreement or (B) that the Intercreditor Agreement exists for the benefit of the Administrative Agent and the Lenders; or

(n)  *Bonds*.  The Company or any of its Subsidiaries is unable to obtain surety credit, from a Bond Surety, in amounts at least sufficient to enable the Company and its Subsidiaries, taken as a whole, to conduct their respective businesses in the ordinary course without material disruption or material impairment provided that no such Event of Default will occur under this Section 8.01(n) to the extent that replacement surety credit from a Bond Surety for such sufficient amounts is obtained within 5 Business Days of such failure to obtain surety credit.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the failure to perform or observe any term, covenant or agreement contained in this Agreement or any other Loan Document, solely for purposes of compliance with the AAS (as reasonably determined by the Required Lenders), shall not result in an Event of Default hereunder or thereunder.

8.02  *Remedies upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)  declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)  declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)  exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and applicable Law;

CONFIDENTIAL

YC-E-037773

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to a Borrower under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

8.03     Application of Funds. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02) or in the case of any Insolvency Proceeding, any amounts received or any payment or distribution of cash, securities or other property, in each case, on account of the Obligations shall, subject to the payment priority provisions of the AAL, be paid to the Administrative Agent, on behalf of the parties entitled thereto, and subsequently applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including (i) reasonable fees, charges and disbursements of counsel to the Administrative Agent; (ii) amounts payable under Article III and (iii) amounts owing in respect of (x) the preservation of Collateral or the Administrative Agent's security interest in the Collateral or (y) with respect to enforcing the rights of the Secured Parties under the Loan Documents) payable to the Administrative Agent;

Second, to payment of that portion of the Obligations then owing under Secured Hedge Agreements and Secured Cash Management Agreements, ratably among the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Second held by them;

Third, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including reasonable fees, charges and disbursements of counsel to the Lenders arising under the Loan Documents and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such proceeding) on the Additional First Out Loans, ratably among the Additional First Out Lenders in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Additional First Out Loans, ratably among the Additional First Out Lenders in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to payment of that portion of the Obligations constituting accrued and unpaid interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such proceeding) on the Initial Term Loans, ratably among the Initial Term Lenders in proportion to the respective amounts described in this clause Sixth payable to them;

Seventh, to payment of that portion of the Obligations constituting unpaid principal of the Initial Term Loans, ratably among the Initial Term Lenders in proportion to the respective amounts described in this clause Seventh held by them;

Eight, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Loan Documents that are then due and payable to the Administrative Agent and the other

CONFIDENTIAL

YC-E-037774

Secured Parties, ratably based upon the respective aggregate amounts of all such Obligations then owing to the Administrative Agent and the other Secured Parties; and

Ninth, the balance, if any, after all of the Obligations have been paid in full in cash, to the Borrowers or as otherwise required by Law.

Notwithstanding the foregoing, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may reasonably request, from the applicable Cash Management Bank or Hedge Bank, as the case may be. Each Cash Management Bank or Hedge Bank not a party to the Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX hereof for itself and its Affiliates as if a "Lender" party hereto.

Notwithstanding anything to the contrary in this Agreement, if any amounts, payments or other distributions of cash, securities or other property on account of the Obligations owed to the Secured Parties other than the Additional First Out Lenders (collectively, the "Last Out Parties") are made and received by any Last Out Party when not permitted to be made by any Loan Party or accepted by a Last Out Party under this Agreement when not permitted to be received by such Last Out Party, such amounts, payments or other distributions of cash, securities or other property shall be held in trust by such Last Out Party for the benefit of the Additional First Out Lenders and shall be promptly paid over to the Additional First Out Lenders, with any necessary endorsement, for application (in accordance with this Agreement) to the payment of the Obligations owed to the Additional First Out Lenders then remaining unpaid, until the payment in full of all Obligations owed to the Additional First Out Lenders.

In the event of an Insolvency Proceeding, the provisions of this Section 8.03 and Section 10.25 are intended to be and shall be enforceable as a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code of the United States.

## ARTICLE IX
## ADMINISTRATIVE AGENT

9.01    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably appoint the Administrative Agent to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers, rights and remedies as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Without liming Section 9.13, in the event that any obligations (other than the Obligations) are permitted to be incurred hereunder and secured by Liens permitted to be incurred hereunder on all or a portion of the Collateral, each Lender authorizes the Administrative Agent to enter into, or amend, as applicable, the Intercreditor Agreement, any other intercreditor agreements, subordination agreements and amendments to the Collateral Documents to reflect such arrangements on terms acceptable to the Administrative Agent. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Borrowers shall not have rights as third party beneficiaries of any of such provisions.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as

83

YC-E-037775

"collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 9.10, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

9.02   Rights as a Lender.  Any Lender that is also serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that pursuant to such activities, the Administrative Agent and its Related Parties may receive information regarding any Loan Party or any Affiliate of any Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent and its Related Parties shall be under no obligation to provide such information to them.

9.03   Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)   shall not be subject to any fiduciary or other implied (or express) duties or obligations arising under the agency doctrine of any applicable Law, regardless of whether a Default has occurred and is continuing;

(b)   shall not have any duty to take any action (including the failure to take an action) or exercise any powers, except rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law;

(c)   shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)   shall not be liable for any action taken or not taken by it (i) (A) under or in connection with any of the Loan Documents or (B) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment; provided that the Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice clearly marked as a "Notice of Default" or comparable term describing such Default is given to the Administrative Agent by the Company or a Lender; provided, further, that in the event the Administrative Agent shall receive such a

84

notice, the Administrative Agent shall give notice thereof to the Lenders, provided that failure to give such notice shall not result in any liability on the part of the Administrative Agent;

(e)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the representations, warranties, covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, (vi) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations or as to the use of the proceeds of the Loans, (vii) the properties, books or records of any Loan Party, (viii) the existence or possible existence of any Event of Default or Default or (ix) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent; and

(f)     shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

9.04     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Company), independent accountants and other experts and professional advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants, experts or professional advisors. No Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or (where so instructed) refraining from acting hereunder or under any of the other Loan Documents in accordance with the instructions of Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

9.05     Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory and indemnification provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their activities as Administrative Agent.  Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by the Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Loan Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights

85

YC-E-037777

and rights to indemnification) shall not be modified or amended without the consent of such sub-agent and (iii) such sub-agent shall only have obligations to the Administrative Agent and not to any Loan Party, Lender or any other Person and no Loan Party, Lender or other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise against such sub-agent.

9.06     Resignation of Administrative Agent.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Company.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Company (which shall not be unreasonably withheld or delayed) other than to the extent an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including the obtainment of the Company's consent to the extent required); provided that if the Administrative Agent shall notify the Company and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).   The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

9.07     Non-Reliance on Administrative Agent and Other Lenders.

(a)     Each Lender represents and warrants that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. The Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and the Administrative Agent shall not have any responsibility with respect to the accuracy or completeness of any information provided to Lenders.

86

(b)     Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption and funding its Loan on the Closing Date or thereafter or by the funding of any Additional First Out Loan, as the case may be, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Administrative Agent, Required Lenders, Required Additional First Out Lenders or Lenders, as applicable on the Closing Date or thereafter or as of the date of funding of such Additional First Out Loan, as the case may be.

9.08     Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same in accordance with the Loan Documents;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.07 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

9.09     Collateral and Guaranty Matters.  Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) irrevocably authorizes the Administrative Agent, at its option and in its discretion,

(a)     to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (A) contingent indemnification obligations and (B) obligations and liabilities under Secured Cash Management Agreements and Secured Hedge Agreements for which no claim has been made), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with Section 10.01;

(b)     to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

87

YC-E-037779

(c)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.09. In each case as specified in this Section 9.09, the Administrative Agent will, at the Borrowers' expense and upon receipt of any certifications reasonably requested by the Administrative Agent in connection therewith, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

9.10      Right to Indemnity. Each Lender, on a pro rata basis, severally agrees to indemnify and hold harmless the Administrative Agent, to the extent that the Administrative Agent shall not have been reimbursed by any Loan Party (and without limiting its obligation to do so), for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent in any way relating to or arising out of this Agreement or the other Loan Documents; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable judgment. If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share thereof; and provided, further, that this sentence shall not be deemed to require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

9.11      Withholding Taxes. To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, within 10 days after written demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent as a result of the failure of the Administrative Agent to properly withhold any Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.11. The agreements in this Section 9.11 shall survive the resignation and/or replacement of the Administrative Agent, any

88

assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

9.12   <u>Secured Cash Management Agreements and Secured Hedge Agreements</u>.   No Cash Management Bank or Hedge Bank that obtains the benefits of <u>Section 8.03,</u> the Guaranty or any Collateral by virtue of the provisions hereof or of the Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than to the extent expressly provided in the Loan Documents.   Notwithstanding any other provision of this <u>Article IX</u> to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent or the Company (through the Administrative Agent) may reasonably request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

9.13   <u>Intercreditor Agreement and Conflicts</u>.   The Administrative Agent is hereby authorized to enter into the Intercreditor Agreement, and the parties hereto acknowledge that such Intercreditor Agreement is binding upon them.   Each Secured Party (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreements and (b) hereby authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.   Each Secured Party acknowledges and agrees that the Administrative Agent (or one or more of its respective Affiliates) may (but are not obligated to) act as the debt representative, collateral agent and/or administrative agent or like terms for the holders of Indebtedness representing the Permitted ABL Indebtedness or a Permitted Refinancing thereof or a refinancing of the Loans.   Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against the Administrative Agent or any of its affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

9.14   <u>Erroneous Payments</u>.

(a)     Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof) (<u>provided</u>, that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a)(i) with respect to an Erroneous Payment unless such demand is made within 30 days of the date of receipt of such Erroneous Payment by the applicable recipient), such Lender shall promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or

89

any similar theory or doctrine.  A notice of the Administrative Agent to any Lender under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)        Without limiting immediately preceding <u>clause (a)</u>, each Lender hereby further agrees that if it receives a payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine.  Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) if a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)        The parties hereto hereby agree that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this <u>Section 9.14</u>), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)        In addition to any rights and remedies of the Administrative Agent provided by law, Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this <u>Section 9.14</u> and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Administrative Agent or any of its Affiliate, branch or agency thereof to or for the credit or the account of such Lender. Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)        Each party's obligations under this <u>Section 9.14</u> shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

CONFIDENTIAL                                                                                                 YC-E-037782

## ARTICLE X
## MISCELLANEOUS

10.01    Waivers, Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Company or any other Loan Party therefrom, shall be effective unless (i) in the case of this Agreement, in writing signed by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders), the Company and each Loan Party, with a copy provided to the Administrative Agent if it has not signed or (ii) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by the Administrative Agent (with the consent of the Required Lenders) and each Loan Party that is party thereto, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)      extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(b)      postpone any date fixed by this Agreement or any other Loan Document for (i) any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment or (ii) any scheduled reduction of the Loans or Commitments hereunder or under any other Loan Document without the written consent of each Lender;

(c)      reduce the principal of, or the rate of interest or premium specified herein (other than to de-accelerate the Obligations) on, any Loan or (subject to clause (ii) of the proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(d)      change the order of application of any reduction in the Commitments, any prepayment or repayment of Loans, the application of proceeds from Collateral or otherwise amend the provisions of Section 2.03(a), Section 2.03(b)(v), Section 2.04(c), Section 2.10(a), Section 2.10(f), Section 2.11, Section 8.03 (or, in the case of each of the foregoing listed sections in this clause (d), the component definitions thereof, to the extent such amendment to such component definitions causes a similar effect), the definition of "Applicable Percentage" or "Funding Applicable Percentage" in a manner that would by its terms alter the pro rata sharing of payments required thereby (except in connection with a transaction permitted under Section 2.12) without the consent of each Lender;

(e)      change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender;

(f)      release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)      release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to Section 9.09 (in which case such release may be made by the Administrative Agent acting alone);

91

(h)     impose any greater restriction on the ability of any Lender to assign any of its rights or obligations hereunder without the written consent of each Lender;

(i)     amend the proviso contained in Section 2.12(a)(i) (or the component definitions thereof, to the extent such amendment to such component definitions causes a similar effect), the definition of "Permitted L/C Facility", the definition of "Permitted ABL Indebtedness", the definition of "Permitted L/C Indebtedness", Section 7.02(b) (or the component definitions thereof, to the extent such amendment to such component definitions causes a similar effect), or Section 7.02(u) (or the component definitions thereof, to the extent such amendment to such component definitions causes a similar effect), without the written consent of each Lender; or

(j)     whether by means of any amendment, supplement or other modification hereto or to any other Loan Document, including entry into any new intercreditor agreement, (A) subordinate (including structural subordination) or make pari passu the right to receive payments in respect of the Obligations in respect of the Additional First Out Loans and/or Initial Term Loans to the prior payment of any other obligation or Indebtedness (other than Permitted ABL Indebtedness, Permitted L/C Indebtedness or pursuant to the AAS) or (B) subordinate (including structural subordination) or make pari passu the priority of the Liens securing the Obligations in respect of the Additional First Out Loans and/or Initial Term Loans to the priority of any Liens securing any other Indebtedness (other than Permitted ABL Indebtedness, Permitted L/C Indebtedness or pursuant to the AAS), in each case without the written consent of each Lender;

(k)     amend Section 2.12(a) to allow the Additional First Out Loans to be incurred by the Borrowers in any form other than as Additional First Out Loans, without the written consent of each Additional First Out Lender;

and provided, further, that until payment in full in Dollars of all Obligations owing to the Additional First Out Lenders, (A) no amendment, forbearance, modification or waiver of any provision of this Agreement or any other Loan Document that inures to or runs solely in favor of the Additional First Out Lenders or the Required Additional First Out Lenders and no consent to any departure by any Loan Party therefrom (including any waiver of conditions precedent to the making of any Additional First Out Loans), shall be effective unless in writing signed by the Required Additional First Out Lenders and Required Lenders; provided that, copies of all amendments, waivers and consents (to the extent the Administrative Agent is not a party thereto) shall be delivered to the Administrative Agent, and if not so delivered to the Administrative Agent, such amendment, waiver or consent shall not be effective with respect to the Administrative Agent and the Administrative Agent shall have no liability for failure to comply with the terms thereof and (B) no amendment to the definition of "Required Additional First Out Lenders" or this proviso shall be effective unless in writing signed by all Additional First Out Lenders;

and provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document, (ii) the Agent Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto (iii) no Lender consent is required to effect any amendment or supplement to the Intercreditor Agreement (x) in connection with any refinancing of the Loans or Permitted Refinancing of the Permitted ABL Indebtedness, as expressly contemplated by the terms of the Intercreditor Agreement (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Intercreditor Agreement as are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (y) that is expressly contemplated by any Intercreditor Agreement in connection with joinders and supplements; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

92

CONFIDENTIAL                                                                                      YC-E-037784

Notwithstanding any provision herein to the contrary, this Agreement may be amended with the written consent of the Required Additional First Out Lenders, the Administrative Agent and the Company (i) to add one or more additional term loan facilities to this Agreement, in each case subject to the limitations in Section 2.12, and to permit the extensions of credit and all related obligations and liabilities arising in connection therewith from time to time outstanding to share ratably (or on a basis subordinated to the existing facilities hereunder) in the benefits of this Agreement and the other Loan Documents with the obligations and liabilities from time to time outstanding in respect of the existing facilities hereunder, and (ii) in connection with the foregoing, to permit, as deemed appropriate by the Administrative Agent and approved by the Required Additional First Out Lenders and Required Lenders, the Lenders providing such additional credit facilities to participate pro rata in any required vote or action required to be approved by the Required Lenders and/or Required Additional First Out Lenders.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Additional First Out Lender or each Lender, as applicable, and that has been approved by the Required Additional First Out Lenders or the Required Lenders, respectively, the Company may replace such non-consenting Additional First Out Lender or Lender, as applicable, in accordance with Section 10.13; provided, that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Company to be made pursuant to this paragraph) and includes the payment to such Additional First Out Lender or Lender, as applicable, of all amounts owed including any premiums.

10.02   Notices; Effectiveness; Electronic Communications.

(a)   Notices Generally.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)   if to Holdings, the Borrowers, the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)   if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Company).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)   Electronic Communications.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Company may, in its discretion, agree to accept notices

93

YC-E-037785

and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMPANY MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMPANY MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMPANY MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Borrowers, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Company's or the Administrative Agent's transmission of Company Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc.  Each of Holdings, the Borrowers and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Company and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Company Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Company or its securities for purposes of United States federal or state securities laws.

(e)    Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Company or the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms

94

YC-E-037786

thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Company or the Borrowers. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.03   <u>No Waiver; Cumulative Remedies; Enforcement</u>. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents and under applicable Law against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 8.02</u> for the benefit of all the Lenders; <u>provided, however,</u> that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with <u>Section 10.08</u> (subject to the terms of <u>Section 2.11</u>), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided, further,</u> that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 8.02</u> and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to <u>Section 2.11</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

10.04   <u>Expenses; Indemnity; Damage Waiver</u>.

(a)   <u>Costs and Expenses</u>. The Loan Parties, jointly and severally, shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent (including the reasonable fees, charges and disbursements of Weil, Gotshal & Manges LLP, as counsel for the Administrative Agent and one local or special counsel in each applicable jurisdiction and one conflicts counsel for all of the Lenders (or, in the case of conflicts counsel, each affected Lender or group of similarly situated Lenders and, if so similarly situated, the Administrative Agent)), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)   <u>Indemnification by the Borrowers</u>. The Loan Parties, jointly and severally, shall indemnify and hold harmless each Agent, each Lender, each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses

95

YC-E-037787

(including reasonable fees and disbursements of counsel and financial advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of (i) the Loans, this Agreement and the other Loan Documents or any of the transactions contemplated thereby; or (ii) any actual or proposed use of the proceeds of the Loans; (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under or from any property owned, leased or operated by the Company or any of its Subsidiaries, or any Environmental Liability related in any way to the Company or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company or any other Loan Party or any of the Company's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnified Party is a party thereto, <u>except</u> to the extent such claim, damage, loss, liability or expense (x) is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party or any of its affiliates, officers, directors, employees, agents, advisors, attorneys and representatives, (y) results from a claim brought by any Loan Party against an Indemnified Party for a material breach of such Indemnified Party's obligations under any Loan Document, if the Loan Parties have obtained a final and non-appealable judgment in their favor on such claim as determined by a court of competent jurisdiction or (z) arises from any dispute that does not involve an act or omission by any Loan Party or any of their Affiliates and that is brought against such Indemnified Party by any other Indemnified Party other than any such dispute against such Indemnified Party in its capacity or in fulfilling its role as an Agent (or sub-agent thereof) or an affiliate, officer, director, employee, agent, advisor, attorney or representative thereof. In the case of an investigation, litigation or other proceeding to which the indemnity in this <u>section 10.04(b)</u> applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by a Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. For the avoidance of doubt, this <u>Section 10.04(b)</u> shall not apply to Taxes other than Taxes that represent losses, claims, damages, liabilities or related expenses with respect to a non-Tax claim.

(c)     <u>Waiver of Consequential Damages, Etc.</u>   To the fullest extent permitted by applicable law, none of the Loan Parties shall assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)     <u>Payments</u>.   All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(e)     <u>Survival</u>.   The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

10.05   <u>Payments Set Aside</u>.   To the extent that any payment by or on behalf of the Borrowers is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its

96

right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.06   Successors and Assigns.

(a)   Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)   Minimum Amounts.

(A)   In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)   any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Loans or Commitment of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, shall not be less $1,000,000, unless the Administrative Agent otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

97

CONFIDENTIAL

YC-E-037789

(ii)      Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)      Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)      the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Company shall be deemed to have consented to any such assignment (other than to a Competitor) unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (1) any Commitment if such assignment is to a Person that is not a Lender with an existing Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (2) any Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund.

(iv)      Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  Prior to any assignment becoming effective, the assignee, if it is not a Lender, must deliver to the Administrative Agent an Administrative Questionnaire and all documentation and other information about the assignee as has been reasonably requested in writing by the Administrative Agent and that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(v)      No Assignment or Participation to Certain Persons.  No such assignment or any participation in accordance with Section 10.06(d) shall be made to any Ineligible Lender.  Notwithstanding anything to the contrary in this Agreement, the Borrowers (on behalf of themselves and the other Loan Parties) and the Lenders acknowledge and agree that the Administrative Agent shall have no responsibility or obligation to determine whether any Lender or potential Lender or participant meets or does not meet the criteria set forth in this Section10.06(b)(v).

(vi)      Certain Additional Payments.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment and the assignor shall deliver to the Administrative Agent any Note issued to it with respect to the assigned Loan and upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply

98

YC-E-037790

with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest thereon) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior written notice.  The requirement for a Register set forth in this Section 10.06(c) and the requirement for a Participant Register set forth in Section 10.06(d) shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h), 881(c)(2) and 4701 of the Code.

(d)     Participations.  Subject to Section 10.06(b)(v), any Lender may at any time, without the consent of, or notice to, the Company or the Administrative Agent, sell participations to any Person (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant.  Subject to subsection (e) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the limitations and requirements of such Sections and Sections 3.06 and 10.13) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by applicable law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.11 as though it were a Lender.  Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrowers) maintain a register on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless such entitlement to a greater payment results from any Change in Law after the sale of the Participation takes place.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank;

99

provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

10.07   Treatment of Certain Information; Confidentiality.   Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (provided that the Administrative Agent or Lender that discloses any Information pursuant to this clause (c) shall provide the Company prompt notice of such disclosure to the extent permitted by applicable Law), (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be a Lender pursuant to Section 2.12 or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) with the consent of the Company or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Company.

For purposes of this Section, "Information" means all information received from the Company or any Subsidiary relating to the Company or any Subsidiary or any of their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by the Company or any Subsidiary, provided that, in the case of information received from the Company or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Company or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States federal and state securities Laws.

The requirements of this Section 10.07 shall survive the termination of this Agreement for a period of two years.

10.08   Right of Setoff.   If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency), but excluding payroll, employee benefits, security deposit, withholding, escrow, trust accounts, tax withholding accounts or other similar fiduciary accounts at any time held by such Lender or any such Affiliate to or for the credit or the account of a Borrower or Holdings against any and all of the obligations of a Borrower or Holdings now or hereafter existing under this Agreement or any other Loan Document to

100

YC-E-037792

such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of a Borrower or Holdings may be contingent or unmature or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Company and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. Notwithstanding the provisions of this Section 10.08, if at any time any Lender or any of their respective Affiliates maintains one or more deposit accounts for a Borrower or Holdings into which Medicare and/or Medicaid receivables are deposited, such Person shall waive the right of setoff set forth herein.

10.09    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

10.10    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective on the Third Amendment and Restatement Effective Date. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

10.11    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

10.12    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.13    Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for

CONFIDENTIAL                                                                                    YC-E-037793

the account of any Lender pursuant to <u>Section 3.01</u> or if any other circumstance exists hereunder that gives the Company the right to replace a Lender as a party hereto, then the Company may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided that</u>:

(a)  the Company or such assignee shall have paid to the Administrative Agent the assignment fee specified in <u>Section 10.06(b)</u>;

(b)  such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans and any premium thereon (assuming for this purpose that the Loans of such Lender were being prepaid) from the assignee and any amounts payable by the Borrowers pursuant to <u>Section 3.01, 3.04</u> or <u>3.05</u> from the Borrowers (it being understood that the Assignment and Assumption relating to such assignment shall provide that any interest and fees or payments that accrued prior to the effective date of the assignment shall be for the account of the replaced Lender and such amounts that accrue on and after the effective date of the assignment shall be for the account of the replacement Lender);

(c)  in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01,</u> such assignment will result in a reduction in such compensation or payments thereafter; and

(d)  such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply. Each Lender agrees that, if the Company elects to replace such Lender in accordance with this <u>Section 10.13</u>, it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; <u>provided that</u> the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register.

10.14  <u>Governing Law; Jurisdiction; Etc.</u>

(a)  <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)  <u>SUBMISSION TO JURISDICTION</u>.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK SITTING IN NEW YORK COUNTY AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (OTHER THAN AS PROVIDED IN ANY MORTGAGE WITH RESPECT TO ITSELF), OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS

CONFIDENTIAL                                                                                                    YC-E-037794

BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWERS OR THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     WAIVER OF VENUE.   EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

10.15   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.16   No Advisory or Fiduciary Responsibility.    In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of Holdings and the Borrowers acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, are arm's-length commercial transactions between Holdings, the Borrowers and their Subsidiaries, on the one hand, and the Administrative Agent, on the other hand, (B) the Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrowers are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Holdings, the Borrowers or any of their Subsidiaries, or any other Person and (B) the Administrative Agent does not have any obligation to Holdings, the Borrowers or any of their Subsidiaries with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Holdings, the Borrowers and their Subsidiaries, and the Administrative Agent does not have any obligation to disclose any of such interests to Holdings, the Borrowers or their Subsidiaries.   To the fullest extent

CONFIDENTIAL                                                                                                          YC-E-037795

permitted by law, the Borrowers hereby waive and release any claims that they may have against the Administrative Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.17   Electronic Execution of Assignments and Certain Other Documents.   The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

10.18   USA PATRIOT Act.   Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA Patriot Act. The Borrowers shall, promptly following a written request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

10.19   Time of the Essence.   Time is of the essence of the Loan Documents.

10.20   Appointment of Company as agent of the Borrowers.

Each Borrower hereby designates the Company to act as its agent hereunder. The Company may act as agent on behalf of each Borrower for purposes of delivering Committed Loan Notices and notices under Article II and other notices, giving instructions with respect to the disbursement of the proceeds of Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents. The Company hereby accepts such appointment. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Company shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

10.21   Joint and Several Liability of the Borrowers.

(a)   Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents with the other Borrowers in consideration of the financial accommodations to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, or each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)   Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 10.21), it being the intention of the parties hereto that all of the Obligations shall be joint and several obligations of each Borrower without preferences or distinction among them.

104

CONFIDENTIAL

YC-E-037796

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this Section 10.21 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower (in its capacity as a Guarantor of the other Borrower's obligations hereunder and not in its capacity as a Borrower) hereby waives, to the fullest extent permitted by applicable law, notice of acceptance of its joint and several liability, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by the Administrative Agent or the Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the fullest extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower (in its capacity as a Guarantor of the other Borrower's obligations hereunder and not in its capacity as a Borrower) hereby assents to, and waives, to the extent permitted by law, notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any parties payment thereon, any waiver, consent or other action or acquiescence by the Administrative Agent or the Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the Administrative Agent or the Lenders.

(f)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Administrative Agent or the Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations (other than contingent indemnification obligations) have been paid in full.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Administrative Agent or any Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations (other than contingent indemnification obligations) and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations (other than contingent indemnification obligations) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

10.22   ENTIRE AGREEMENT.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

10.23   Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-

105

YC-E-037797

down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

10.24     <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Secured Hedge Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b)     As used in this <u>Section 10.24,</u> the following terms have the following meanings:

(i)     "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(ii)     "Covered Entity" means any of the following:

(A)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

106

YC-E-037798

(B)      a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(C)      a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)      "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(iv)      "QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

10.25    Prohibition on Contesting Obligations.

(a)      The Initial Term Lenders agrees that it shall not (and hereby waives any right to) contest, object to or support any other Persons in contesting or objecting to, in any proceeding (including any Insolvency Proceeding), the Obligations owed to the Additional First Out Lenders (or the priority of payment applicable to such Obligations) under this Agreement.

10.26    AAS Agreement.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of a conflict or inconsistency between the terms of this Agreement and the terms of the AAS Agreement, the terms of the AAS Agreement shall prevail.

*          *          *

107

CONFIDENTIAL                                          YC-E-037799