```
 1                UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3                              )  CASE NO: 23-90086-cml
                                )
 4                              )  Houston, Texas
     TEHUM CARE SERVICES, INC.  )
 5            Debtor.           )  Friday, March 3, 2023
                                )
 6                              )  1:01 PM - 5:06 PM
     ------------------------------)
 7

 8                             TRIAL

 9       BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
              UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Adam Baker, et al.:  R.J. SHANNON
                              Shannon & Lee, LLP
13                            700 Milam St., Suite 1300
                              Houston, TX 77002
14
     For Armando Banuelos
15   et al.:                  ERIN PRZYBYLINSKI
                              Hallinan & Killpack Law Firm
16                            5240 E. Pima Road
                              Tucson, AZ 85712
17
     For Angela Branum:       JOY BERTRAND
18                            Law Office of Joy Bertrand
                              P.O. Box 2734
19                            Scottsdale, AZ 85252
     For Capital Region
20   Medical Center:          ETHAN M. LANGE
                              Stueve Siegel Hanson, LLP
21                            460 Nichols Road, Ste. 200
                              Kansas City, MO 64112
22
     For Capital Eye Care
23   et al.:                  BLAKE I. MARKUS
                              Carson & Coil, PC
24                            515 East High Street
                              Jefferson City, MO 65102
25
```

```
 1   For Adree Edmo:           MARY ELIZABETH HEARD
                               Law Office of M.E. Heard, PLLC
 2                             100 NE Loop 410, Ste. 605
                               San Antonio, TX 78216
 3
     For Linda Floyd:          ADAM B. NACH
 4                             Lane & Nach, PC
                               2001 E. Campbell, Ste. 103
 5                             Phoenix, AZ 85016

 6   For Rachell Garwood
     et al.:                   REBEKAH BAILEY
 7                             Nichols Kaster, PLLP
                               4700 IDS Center
 8                             80 S. Eighth St.
                               Minneapolis, MN 55402
 9
     For Leona Miotke:         ANNE D. FOSTER
10                             Smith Foster King, LLP
                               25 NW 23rd Place, Ste. 6 #125
11                             Portland, OR 97210

12   For RMSC Plaintiffs:      JOHNIE J. PATTERSON
                               Walker & Patterson, PC
13                             P.O. Box 61301
                               Houston, TX 77208
14
     For Saint Alphonsus
15   Health System, Inc.:      JAMES BLAKE HAMM
                               Mehaffy Weber, PC
16                             2615 Calder Avenue, Ste. 800
                               Beaumont, TX 77702
17
     For St. Luke's Health
18   System, Ltd., et al:      BRYAN T. GLOVER
                               Stoel Rives, LLP
19                             600 University St., Ste. 3600
                               Seattle, WA 98101
20
     For the U.S. Trustee:     HA MINH NGUYEN
21                             Office of the U.S. Trustee
                               515 Rusk St., Ste. 3516
22                             Houston, TX 77002

23   For the Restructuring
     Officer:                  JASON S. BROOKNER
24                             Gray Reed & McGraw
                               1300 Post Oak Blvd., Ste. 2000
25                             Houston, TX 77056
```

```
 1    For Noah Schroder:           PRO SE

 2
      Court Reporter:              ZILDE MARTINEZ
 3
      Courtroom Deputy:            ZILDE MARTINEZ
 4
      Transcribed by:              Veritext Legal Solutions
 5                                 330 Old Country Road, Suite 300
                                   Mineola, NY 11501
 6                                 Tel: 800-727-6396

 7

 8
      Proceedings recorded by electronic sound recording;
 9    Transcript produced by transcription service.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              HOUSTON, TEXAS; FRIDAY, MARCH 3, 2023; 1:01 PM

2                          (Call to Order)

3         CLERK:  All rise.

4         THE COURT:  Please be seated.  All righty.  Good

5    afternoon, everyone.  This is Judge Lopez.  Today is March

6    the 3rd.  I'm going to call the 1:00 case, Tehum Care

7    Services, Inc., 29-90086.

8              Let me go ahead and start by taking appearances in

9    the courtroom, and then I will turn to the folks on the

10   phone.  If you'd give me a second before you start, Mr.

11   Brookner?  I'm just -- I want to see how many folks are on

12   the line.  I've got about 60 people on the line.  I'm going

13   to mute the line, and if you wish to make an appearance, I'm

14   just going to ask that you hit five star, and once we're

15   finished with appearances in the courtroom, I will then turn

16   to the phone and I'll start to unmute the lines.  Thank you.

17        AUTOMATED VOICE:  Conference muted.

18        THE COURT:  Mr. Brookner, good afternoon.

19        MR. BROOKNER:  Good afternoon, Your Honor.  Jason

20   Brookner and Amber Carson in the courtroom from Gray Reed.

21   On the line are our colleagues, Aaron Kaufman and Lydia

22   Webb, and also on the line is Russell Perry from Ankura who

23   is our proposed chief restructuring officer.

24        THE COURT:  Okay.  Good afternoon.  Good afternoon

25   to all of you.  Mr. Shannon, good afternoon.  Good to see
```

1    you.

2         MR. SHANNON:  Good afternoon, Your Honor.  R.J.

3    Shannon of Shannon & Lee, LLP.  I'm appearing today on

4    behalf of a number of people.  So, I'll run through them.

5    It's Hector Garcia, Jr., Adam Baker, Antonio Reali, David

6    Wichternman, Jr., Eileen McNamara, Clarence Dean, Paris

7    Morrigan, and then in conjunction with (indiscernible), PC

8    who Mr. Knox should be on the -- dialing in.  Also Henry

9    Snook, Jennifer Power, Ananda Slocum, and Linda Floyd.

10         THE COURT:  Go ahead.

11         MR. SHANNON:  And just so you know, Your Honor, we

12    are just representing them for this motion given the timing.

13         THE COURT:  Okay.  Thank you.  Mr. Nguyen, good

14    afternoon.

15         MR. NGUYEN:  Good afternoon, Your Honor.  Ha

16    Nguyen for the U.S. Trustee, and also on the screen should

17    be my colleague, Andrew Jimenez.

18         THE COURT:  I do see you.  Good afternoon, Mr.

19    Jimenez.

20         MS. HAMM:  Good afternoon, Your Honor.  I'm Holly

21    Hamm with Mehaffy Weber on behalf of Saint Alphonsus Health

22    System, and on the line maybe are Molly Mitchell and Keely

23    Duke from Duke Evett.  They're outside counsel in Idaho.

24         THE COURT:  Okay.  Thank you.  Mr. Patterson, good

25    afternoon.

```
 1            MR. PATTERSON:  Good afternoon, Judge.  Johnie
 2    Patterson here on behalf of what we're referring to as the
 3    RMSC plaintiffs.  They're unnamed sexual assault victims,
 4    have a pending litigation in New York.
 5            THE COURT:  Okay.
 6            MR. PATTERSON:  So, I'm here for them.
 7            THE COURT:  Thank you.  Okay.  I think -- anyone
 8    else in the courtroom wish to make an appearance?  Okay.  Is
 9    there someone on the line who wishes to make an appearance?
10    And I'd just ask that you please hit five star at this time.
11            Okay.  I'm going to start -- there's an area code
12    602 number.
13            MS. PRZYBYLINSKI:  Hi, this is Erin Przybylinski
14    from Hallinan and Killpack Law Firm.  I'm appearing on
15    behalf of Bradley Schwartz, Armando Banuelos, and Paul Lupe,
16    who have civil litigation out of Arizona.
17            THE COURT:  Okay.  Good afternoon.  A 210 number.
18            MS. PRZYBYLINSKI:  Good afternoon, Judge.
19            THE COURT:  I just unmuted a 210 line.
20            MS. HEARD:  Good afternoon, Your Honor.  Mary
21    Elizabeth Heard.  I'm appearing on behalf of Adree Edmo and
22    her -- along with Lori Rifkin, her council in the 1983
23    single action in the 9th Circuit, along with the National
24    Center for Lesbian Rights.
25            THE COURT:  Thank you.  Okay.
```

```
 1          MS. HEARD:  And Ms. Rifkin is available on the

 2   line should you need anything from her.

 3          THE COURT:  Okay.  Thank you very much.  Okay.

 4   Another 602 number.

 5          MR. NACH:  Yes, Your Honor.  Adam Nach on behalf

 6   of Henry Snook, Jennifer Power, Ananda Slocum and Linda

 7   (indiscernible) and successors and assigns.  Mr.

 8   (indiscernible) also made an appearance on our behalf, so

 9   thank you.

10          THE COURT:  Oh, okay.  Great.  Thank you.  A 573

11   number?

12          MR. MARKUS:  This is Blake Markus and Gabriel

13   Harris of Carson & Coyle, P.C.  We represent Capitol Eye

14   Care, Inc., Jefferson City Oral and Maxillofacial Surgery,

15   LLC, CMMP Surgical Center, LLC, and Mid-Missouri Anesthesia

16   Consultants, P.C. in a punitive class action in the Western

17   District of Missouri.

18          THE COURT:  Thank you.  Okay.  Let's see if we

19   have anyone else.  Yes, a 206 area code.

20          MR. GLOVER:  Good afternoon, Your Honor.  This is

21   Bryan Glover, Stoel Rives in Seattle, Washington.  I am here

22   on behalf of St. Luke's Health System, Limited and St.

23   Luke's Regional Medical Center, Limited.  Thank you.

24          THE COURT:  Thank you.  Okay.  Let's see if

25   there's anyone else.  Okay.  I've got a few more.  I've got
```

1    a 504 area code.

2         MS. FOSTER:  Good afternoon, Your Honor.  This is

3    Anne Foster from Portland, Oregon.  You said 504, but I have

4    a 503 area code.  I'm appearing -- of claimant Leona Miotke.

5         THE COURT:  Yes.  I meant to say 503.  It works

6    better when I put these one.  So, that is -- you are

7    correct, I am incorrect, and I'm going to put on my glasses

8    now.  Area code 612.

9         MS. BAILEY:  Good afternoon, Your Honor.  Rebekah

10   Bailey from Nichols Kaster.  I represent creditors Machelle

11   Pearson, Maria Sheldon, and Rachell Garwood who have a

12   putative class action filed, Pearson v. Washington, in the

13   Eastern District of Michigan.

14        THE COURT:  Okay.  Thank you.  208 area code?  208

15   area code, last three digits 522?

16        MR. SCHRODER:  Yeah, this is Noah Schroder just

17   representing myself pro se in a class action lawsuit.

18        THE COURT:  Okay.  Good afternoon, Mr. Schroder.

19   Thank you for your participation today.  Area code 414.

20        MS. BERTRAND:  Good afternoon, Your Honor.  This

21   is Joy Bertrand appearing for Angela Branum.  My pro hac

22   vice is pending.  Ms. Branum has litigation against Corizon

23   Healthcare in Arizona United States District Court.

24        THE COURT:  Okay.  And I think we -- I think we

25   signed your pro hac, so you're fine.  If there's someone who

1    has filed a pro hac and we haven't gotten to you, you are

2    free to participate today.  I'm going to ask everyone --

3              MS. BERTRAND:  Thank you.

4              THE COURT:  -- if you are not speaking, for the

5    folks whose line I've unmuted, I'm going to keep it unmuted.

6    I'd ask that you please monitor yourselves and put your

7    lines on mute, and obviously when you're ready to speak to

8    the Court, no problem, but I just want to make sure that you

9    mute your line.  816, last one.

10             MR. LANGE:  Your Honor, can you hear me?

11             THE COURT:  Yes.

12             MR. LANGE:  This is Ethan Lange.  (Indiscernible)

13   technical difficulty.

14             THE COURT:  I can hear you just fine, sir.  Good

15   afternoon.

16             MR. LANGE:  Good afternoon.  Thank you.  My name

17   is Ethan Lange.  I'm appearing on behalf of the University -

18   - the curators of the University of Missouri and Capitol

19   Region Medical Center.

20             THE COURT:  Okay.  Got it.  Thank you very much.

21   And again, everyone on the line, if you can please place

22   your phones on mute?

23             Before we get started, too, what I think we're

24   here for today, Mr. Brookner, I was just going to ask for

25   the -- kind of the 10,000-foot level introduction about kind

1    of where we are and where you -- where you intend to head in

2    this case.

3          MR. BROOKNER:  You're stealing my thunder.  So,

4    what I wanted to do if it's okay, give you the kind of who

5    we are, where we come from, where we're trying to go, a

6    little bit of background, high level, what we expect to try

7    to accomplish in this case, quickly talk about the motion

8    and the relief that we are now requesting, because we've

9    narrowed it since it was filed.

10         THE COURT:  Okay.

11         MR. BROOKNER:  And then I'll reserve argument for

12   the end after the evidence presentation.

13         THE COURT:  Okay.

14         MR. BROOKNER:  So, I'm sure you've probably read

15   in a bunch of pleadings, Your Honor, a variety of things

16   about the divisional merger, other pre-combinations that

17   occurred, but the upshot is starting with who the Debtor is

18   or was.  For 35 years, the Debtor was a nationwide provider

19   of health care services to correctional facilities, prison

20   systems, and jails, and the Debtor would enter into

21   contracts with governmental entities pursuant to which the

22   Debtor would provide or arrange for the provision of

23   healthcare services for inmates or other detainees in these

24   institutions.

25         In May 2022, so about nine or so months ago, there

1     was a combination merger of three other entities into the

2     Debtor's predecessor, and then dated as of May 1, 2022,

3     there was a by-the-book divisional merger under the Texas

4     Business Organizations Code pursuant to a plan of divisional

5     merger, which resulted in two entities, the Debtor and

6     CHSTX, Inc.  We'll just call them CHS or CHSTX.

7           And in the Debtor's view, all of the appropriate

8     documentation was executed and filed as required by the

9     Business Organizations Code with the Texas Secretary of

10    State.

11           Importantly, and Mr. Perry's declaration

12    accompanying the motion addressed this somewhat, before the

13    divisional merger took place the company was actually almost

14    at the bankruptcy courthouse steps on several occasions, and

15    that was due to a rising number of litigation claims,

16    liabilities which were continuing to increase, revenue

17    declines, margin compression, and other associated

18    deteriorating liquidity.

19           And so, one of the realities of the divisional

20    merger and one of its purposes and one of its effects, which

21    has been great, was that jobs were saved.  Over 3,000

22    employees kept their jobs, and that was the key to the

23    divisional merger.  It kept employees intact, saved jobs, it

24    kept the operating business out of bankruptcy.

25           So, as reflected more fully in the plan of

1    divisional merger, which we will put into evidence, it's

2    document -- excuse me, it's Exhibit No. 10 attached to our

3    witness and exhibit list, upon the merger's effectiveness,

4    the allocation of assets and liabilities between the Debtor

5    on the one hand and CHS on the other was, generally

6    speaking, subject to the document itself as follows.

7           CHS was allocated certain existing contracts, a

8    variety of other assets that were not allocated to the

9    Debtor, and also certain liabilities, and in that regard, a

10   variety of lawsuits, and perhaps most importantly,

11   approximately $100 million liability in funded debt

12   obligations.

13          On the other side of the ledger, the Debtor was

14   allocated all of the liabilities in connection with then-

15   existing litigation or litigation to be brought under

16   expired contracts or in connection with liabilities

17   otherwise allocated to the Debtor in the divisional merger.

18          For assets, the Debtor was the payee under a $15

19   million funding agreement with an entity called M2 Loan

20   Company, M2 Loan Co., a million dollars in cash, certain

21   insurance policies, and certain other assets that are

22   reflected in the plan of divisional merger.

23          And as we sit here today, we believe those key

24   assets could be in the approximate range of 15 to 25

25   million.  And like I said, a full and complete list of all

1    of the assets and liabilities allocated to each of the

2    entities is in the plan of divisional merger, which will be

3    before Your Honor today and is attached to (indiscernible).

4          Oh, and just so you have it handy, Schedule 3.01A

5    of the divisional merger document has the assets allocated

6    to CHS, Schedule 4.01A has the liabilities allocated to CHS,

7    and then 3.01B lists the assets allocated to the Debtor and

8    4.01B lists the liabilities allocated to the Debtor and the

9    schedules are rather thick and rather extensive.

10          So, the individual merger was affected as of May

11    1, 2022 and for the next nine-and-a-half months or

12    thereabouts, the Debtor attempted to work through its

13    liabilities through litigation, settlement, resolution

14    negotiation, sometimes using insurance as applicable,

15    sometimes just writing checks, but eventually there came a

16    time where the liabilities and the lawsuits remaining were

17    sufficiently overwhelming that Chapter 11 became necessary.

18          In addition, as we did mention in our motion,

19    there was the prospect of -- well, we thought there was a

20    prospect of a receiver being appointed in some litigation

21    pending in Missouri, which would have been arguably vested

22    with causes of action that are now vested in the Debtor,

23    fraudulent convenience, things of that sort.

24          And so alter ego, piercing the veil, I mean,

25    things that you always see as property of the estate, and it

1    was imperative to preserve those causes of action in order

2    to maximize value.  And so, we filed the petition, and here

3    we are.  We filed on February 13th.

4          I will tell you, as you might have figured out

5    from looking at the docket, we were a little rushed in the

6    filing because we did file a naked petition.  Our firm was

7    hired while the Super Bowl was on the day before.  So, we

8    didn't have an opportunity to do the traditional preparation

9    that Your Honor is used to seeing and that you used to do

10   when you were on this side of the bench, but we're slowly

11   getting our sea legs under us.  We're slowly wrapping our

12   arms around information and assets, liabilities, insurance,

13   talking to people, dealing with stuff so that we can move

14   forward in an efficient and quick manner in this case, in a

15   meaningful way that maximizes value for everybody.

16         And with that, I do want to make kind of a public

17   service announcement, if you will, Your Honor, to the people

18   who are on the phone who may not know me or Gray Reed or may

19   not be familiar with the happenings in Your Honor's court,

20   and I want to say this.

21         Some people have heard this, but for others it's

22   going to be new.  We know that there is a lot of history

23   between the Debtor on the one hand and the various

24   plaintiffs on the other, whether they are tort or contract

25   plaintiffs, and we know there's a lot of water under the

1    bridge and there's a lot of animosity that's out there.

2           People are angry.  I know that you've seen that

3    before.  We've seen it before.  We get that.  We understand

4    that.  As I just mentioned, we are the new kids in town,

5    okay?  We weren't here when any of that stuff took place.

6    We didn't engage in any of that.  That's different stuff,

7    different issues, and we believe that Chapter 11 is the best

8    way to maximize value for everyone, and that's the path that

9    we intend to pursue.  We're not here to wipe out unsecured

10   creditors.  We're not here to do bad things to people.

11   We're not here to be obstreperous or difficult or a pain to

12   work with.  I know that you know that's not our style and I

13   want everybody else to know that.  That's not what we're

14   here to do.

15          Instead, what we want to do is centralize

16   everything here in your court in the most efficient and

17   economic way to do the best job that we can do to pay out as

18   much as possible to people who have valid allowed claims at

19   the end of the day.

20          We are upstanding people.  We try to be to the

21   best of our ability.  We take our fiduciary duties very

22   seriously, and I know that you know that, and we expect

23   fully and we intend to fully execute those fiduciary duties

24   to the fullest extent possible under the law and under the

25   tools that are provided to us in the Bankruptcy Code.

1          So, with that, Your Honor, let's turn -- unless

2     you have any questions, we can turn to kind of where we are

3     in the case and what we see the work streams as being and

4     where we plan to go from here.

5          THE COURT:  Okay.  And I know there was a motion

6     to extend the time to file schedules by as well.  I'm just

7     going to grant that.  There's been no objection to it.  I

8     just -- so you can take that off the table.  Sounds like

9     everybody needs time now.  So, I just wanted to take that

10    one off the table.  I didn't know if that was part of your

11    presentation or not.

12         MR. BROOKNER:  I was going to mention it, but now

13    I don't have to.  Thank you.  But yes, so the time is -- has

14    not been our friend, and we're desperately trying to get

15    some time so that we can do the job that you expect of us

16    and the job that everybody else expects of us, and that's

17    really the key to the motion, but we'll come back to that.

18    I'm sure a lot of people are going to have a lot of things

19    to say about that.

20         THE COURT:  Well, the only -- so I've got just two

21    basic questions.  One, can you tell me a little bit more

22    about M2 and the relationship between M2 and the -- and the

23    Debtor?  That's one question if there's anything that can be

24    told to me about that.

25         MR. BROOKNER:  I cannot, and that's not because I

1    won't, it's because I am unable.

2         THE COURT:  Okay.  Okay.  And then the second

3    question is with respect to some of the litigation that's

4    pending around the country, is some of that -- are all those

5    litigations -- is your intent to stay them throughout where

6    they are today or is -- or is some of that going to get

7    removed and try to have -- get moved over to here?  And I'm

8    not encouraging.  I just want -- just curious as to kind of

9    whether some of it is coming my way or what the Debtor's

10   intent -- if there's anything you can tell me at this time

11   about that.

12        MR. BROOKNER:  I'll tell you everything that I

13   can, of course.  That dovetails into some of what I was

14   going to say in this motion that's pending before you right

15   now.

16        So, let me talk about that first, which is we are

17   not right now attempting to extend the stay to every piece

18   of litigation around the country.  Originally, we kind of

19   sort of asked for that, but we've now, after speaking to

20   various constituents, narrowed what we're asking for and

21   Docket 107, which was uploaded just about an hour ago or so,

22   that has a new form of proposed order attached to it, and

23   the last page or two of that order is a schedule showing

24   Your Honor and everybody else, all the parties in interest,

25   the exact cases that we are trying to effect in this motion,

1    I think there are 39 cases, and the parties that we are

2    seeking to have covered by the stay.  I think there are 23

3    parties.

4            So, as we sit here today, of all the cases and all

5    the defendants pending in the country, we're only looking to

6    deal -- to cover 39 specifically identified cases and 23

7    specifically identified defendants, who in our opinion and

8    belief have a right to indemnity back against the Debtor's

9    estate.  There's an identity of interest in our view.

10           Further to that point, Your Honor, originally we

11   were asking for endless relief, meaning give us the stay

12   forever unless and until something changes.  We've pulled

13   back on that again because of our discussions with people,

14   other constituents, which have been very constructive and we

15   appreciate the tone that we've had and the collaboration

16   we've already started seeing with some of our constituents,

17   and we are now seeking an interim order only for 35 days.

18           So, we're asking to press the pause button on

19   those 39 litigations with those 23 people for 35 days, and

20   we want to come back to Your Honor at some point between day

21   30 and day 35, assuming you agree to enter the order we've

22   submitted, to have a further hearing on where to go and what

23   to do next on these issues.

24           In connection with that, we may seek to supplement

25   or expand the list.  We may not.  We don't know, but that's

```
 1    where we are today on the request that -- on the relief that
 2    we're seeking.
 3               THE COURT:  Okay, thank you.
 4               MR. BROOKNER:  Did that answer Your Honor's
 5    question?
 6               THE COURT:  You did.
 7               MR. BROOKNER:  Okay.
 8               THE COURT:  You did.
 9               MR. BROOKNER:  So, coming back to where I was
10    about kind of where we are and where we're going, the
11    committee was -- a committee, the committee, was formed
12    yesterday.  They had their initial formation meeting today.
13    I think it was at 10 or 10:30 this morning.
14               So, the committee, although organized as an
15    entity, does not yet have any professionals employed.  And
16    so, part of the reason for the interim relief that we've
17    requesting -- been requesting is to let the committee figure
18    itself out and let the committee get its sea legs together
19    so that it can then get smart and engage in a constructive
20    dialogue with my firm about everything, including where to
21    go and what to do next on these matters.
22               We are actively working on securing DIP financing
23    to fund the administrative costs of this case, and my
24    understanding is that our potential DIP lender yesterday
25    retained counsel, and my understanding is that that counsel
```

1    is now looking at a draft term sheet, and we expect to be

2    trading drafts in the very near future, and we'll of course

3    abide by all of our duties under Section 364 as it comes to

4    DIP financing.

5         Just this week, Your Honor, we brought on KCC with

6    whom I know you're familiar as our claims agent.  A noticing

7    agent will be filing retention papers for KCC in the near

8    future was -- as well as for Gray Reed and Ankura as our

9    Chief Restructuring Officer, Russell Perry, in an ordinary

10   course professionals motion.

11        And then importantly, and you'll see this coming,

12   a bar date motion so that we can move this process forward,

13   and then other necessary pleadings to keep the train running

14   smoothly down the tracks.

15        In that regard, we've also sketched out, again

16   very high-level, some general timelines we're going to do

17   our best to adhere to.  We know about the best laid plans of

18   mice and men, right?  And we know things happen in a

19   bankruptcy case that are sometimes unexpected and time

20   estimates and time -- ideas about time change, but today

21   Your Honor just orally, it sounds, granted our motion to

22   extend time on schedules.  So, hopefully we'll have those

23   filed timely by March 30th.

24        We've engaged with the U.S. Trustee and we expect

25   to have a preliminary 341 meeting, to commence the meeting

```
1    at least, the week of March 22nd, which I think would
2    probably have to be continued until after the schedules and
3    statements are filed.  But of course, we'll cooperate with
4    our friends at the U.S. Trustee's office to do -- to get
5    things done the way the U.S. Trustee wants to do it.
6              And I should also mention, by the way, we did
7    speak with Mr. Nguyen about today's motion and he was
8    instrumental in helping us get to the original form of order
9    we submitted at Docket No. 30 which was an interim -- an
10   interim order for 35 days.  Excuse me.  And then the listing
11   of people, we had given that to him.  And you know, U.S.
12   Trustee will say what it wants to say, but I think we're in
13   accord with U.S. Trustee's office.
14             THE COURT:  Okay.
15             MR. BROOKNER:  In theory, again, very high-level
16   theory, Your Honor, we'd like to set a bar date, and I know
17   we have to file a motion for the week of May 31st as a
18   general creditor bar date.  The governmental bar date
19   obviously we cannot effect.  That's set by statute.
20             And then ultimately high-level the golden chalice
21   would be to have a plan confirmed and for us to be done here
22   by the end of the year.  We think it's aggressive
23   considering how new this is and how much we still need to
24   learn, but we think we can do it, and we're going to try.
25             Lingering in bankruptcy is not a good thing.  We
```

1    know that.  We don't want to do that.  We want to get out

2    and start getting people paid, get claims resolved and get

3    people paid.

4            Now, we talked a little bit about the motion and

5    the form of order, so I can bypass that, because that was

6    next in my outline.  And I should tell -- I should tell Your

7    Honor that the form of order that you have reflects

8    resolutions.  I lost count because there's a lot of people.

9    It's with either four or five different constituents that

10   we've either headed off objections at the pass by virtue of

11   what's in the order or with respect to -- was it -- I call

12   him R.J.  I'm sorry.  What's your last name?

13           MR. SHANNON:  Shannon.

14           MR. BROOKNER:  I'm sorry, Mr. Shannon's client,

15   we've resolved with that as well as the joinder parties who

16   joined in their objection this morning.  So, that's been

17   resolved.  I'm sure you'll hear about that.  And I'm sure

18   you'll hear from some of the other parties with whom we've

19   resolved.  St. Luke's is one.  St. -- not (indiscernible) --

20   St. Alphonsus is another.  General Healthcare Corporation is

21   another, and there may be another one that's in there.

22           So, those have all been resolved, and now we're

23   left with I believe five live objections for today.  Docket

24   No. 63 was filed by Mr. Hyman.  Docket No. 75 -- excuse me -

25   - was filed by a group of Michigan plaintiffs.  I'm just

1    going to refer to them as the Michigan plaintiffs.  No. --

2    Docket No. 80 was filed by Ms. Edmo, E-D-M-O.  No. 88, which

3    was filed by the curators of the University of Missouri,

4    which reminds me I have to come back because I didn't answer

5    one of your questions.  Docket No. 93, which is the joinder

6    into the Garcia objection, which is 66, which is resolved.

7    So, those two are resolved.

8             Docket No. 94, certain New York plaintiffs

9    represented by Mr. Patterson and his far-away counsel.  And

10   then there was another response that hit the docket as we

11   were in the car, and I don't -- I don't have a copy of it.

12   I don't know the docket number.  I haven't even read it, but

13   that's another live objection.

14            So, that makes it --

15            THE COURT:  I saw 63, 75, the Edmo --

16            MR. BROOKNER:  Is live, 80 is live.

17            THE COURT:  Eighty.  Eighty.  That -- I just

18   needed to make sure I got the number, 88, 93 may or may not

19   be live, right, because it was a joinder.

20            MR. BROOKNER:  Yeah.

21            THE COURT:  Ninety-four, then there's another.

22            MR. BROOKNER:  Whatever came after 94.  It was

23   filed maybe an hour, hour and a half ago.

24            THE COURT:  Okay.  All right.  Let's see.  You may

25   be referring to 106.

```
 1            MR. BROOKNER:  Ms. Carson, who's the brains of the

 2    operation, tells me that it sounds right but she can't pull

 3    up the docket right now.

 4            THE COURT:  Garwood Pearson.  Does that sound --

 5            MR. BROOKNER:  Yes.  Okay.  She's nodding her head

 6    yes.

 7            THE COURT:  Okay.

 8            MR. BROOKNER:  Again, I haven't read it, so I

 9    can't answer any questions about.

10            THE COURT:  Okay.  Okay.

11            MR. BROOKNER:  The one question, just to backtrack

12    for a second, that I didn't answer, Your Honor, was about

13    removing and trying to swarm a bunch of cases from other

14    jurisdictions into your court.  We -- again, we haven't --

15    because it's been moving so quickly and we're drinking from

16    the proverbial firehose, we haven't had a chance to analyze

17    that other than there is one case in Missouri with the

18    curators and counsel who filed an objection is on the line -

19    -

20            THE COURT:  That's the one that you wrote about in

21    your pleading.

22            MR. BROOKNER:  Right.  That one's been removed.

23    That's now sitting in the Western District of Missouri

24    Bankruptcy Court in front of Judge Dow.

25            THE COURT:  Got it.
```

1          MR. BROOKNER:  And he has pending before him our

2     motion to transfer venue to you obviously.  And just the

3     other night, the curators filed a motion to remand.

4          THE COURT:  Okay.

5          MR. BROOKNER:  So, that's a battle that's about to

6     happen in Missouri.

7          THE COURT:  Okie dokie.

8          MR. BROOKNER:  So, turning to the motion itself,

9     and I'm not going to argue anything, I'm just going to give

10    you some facts as they pertain for what we're seeking, we

11    want to extend the stay because in the Debtor's belief, and

12    people have other beliefs, of course, that there's an

13    identity of interest between certain of the named

14    defendants, which are who are reflected in the exhibit, the

15    Docket No. 107, because there are indemnities running from

16    the Debtor to those people by virtue of contract, either

17    because of the divisional merger plan of merger or because

18    of various and sundry contracts that the Debtor entered into

19    with either people or other entities who in turn, you know,

20    we have to indemnify the entity and the people who work for

21    the (indiscernible).  So, we have the corporate document

22    indemnities on one hand and then we have the contractual

23    indemnities on the other.

24          We also in the motion asked for a ruling from Your

25    Honor that certain of the claims asserted in certain of

1   those cases are property of the estate, alter ego, pierce

2   the veil, fraudulent conveyance.

3            Because we believe, as I'm sure Your Honor knows

4   we believe, that those are property of the estate, we now

5   have the sole authority to pursue those claims or otherwise

6   deal with them.

7            THE COURT:  Part of the 39 -- any of them involve

8   those fraudulent transfer actions?

9            MR. BROOKNER:  There are some.

10           THE COURT:  Okay.

11           MR. BROOKNER:  I -- but I can't tell you which one

12   -- again, the complaints are big.  There's a lot of them.

13   We haven't analyzed each one --

14           THE COURT:  I got it.  And some of them may answer

15   a different cause of action.  I just --

16           MR. BROOKNER:  But some.  So, like, for example,

17   the curators have one and there are a few other people on

18   there that have them.

19           THE COURT:  Okay.

20           MR. BROOKNER:  And the exhibits, I believe -- do

21   we have (indiscernible)?  We don't.  Okay.  We don't have

22   the complaints (indiscernible).

23           THE COURT:  No worries.

24           MR. BROOKNER:  Generally speaking, Your Honor, the

25   claims against the Debtor as a high-level matter pending

1    throughout the country fall effectively into four buckets,

2    and we talked about this in the motion.

3           We have vendor claims for breach of contract,

4    money owed, and related type of traditional vendor claims,

5    if you will.  We have worker's comp and employment-related

6    claims.  I'm sorry -- three buckets.  And then we have

7    personal injury claims and professional liability claims.

8    Those are the three big buckets into which the lawsuits, and

9    I think there's about 500, 500 and change around the

10   country, those are the buckets into which they fall.  And

11   then again, we asked for interim relief, 30 days -- 35 days,

12   come back sometime around day 30, 31, 32 for a further

13   hearing, and we can go from there.

14          We do believe the evidence will show that we have

15   met our burden to extend the automatic stay under applicable

16   5th Circuit precedent, whether because of an identity of

17   interest or otherwise, and we do reserve the right to seek

18   supplemental relief to extend the stay further to other

19   people as time goes on.

20          Hopefully, we'll be able to have that universe

21   ready when we come back for the next hearing, but if we

22   don't, we'll seek appropriate relief.  We'll file an

23   appropriate pleading, and putting that aside, Your Honor, we

24   think the motion itself is pretty self-explanatory.

25          And again, that's all by way of background.  I

1  didn't want to make any argument.  I want to reserve legal

2  argument, and I do have legal argument, for the back end

3  subject to anything else anybody wants to say, and I -- but

4  I do reserve the right to come back before the evidentiary

5  presentation if Your Honor deems it appropriate to respond

6  to any comments that others may make before we get to the

7  evidence.

8         And then Ms. Carson will be handling the

9  evidentiary portion of the hearing, and then you'll see me

10  again on the backside for closing argument.

11         THE COURT:  Okay.  Thank you.  Let me start with

12  any comments from any parties in the courtroom before I open

13  it up to the line.  Mr. Shannon?

14         MR. SHANNON:  Yeah.  Sure, Judge.  I will -- I

15  will start.  As Mr. Brookner said, our objections have been

16  resolved through the revised proposed order as to this

17  interim -- the interim proposed order.  There might be, you

18  know, objections as to the final if there's any changes to

19  it.

20         Now, out of the claimants that were here today

21  representing, several of them were actually, you know, the

22  parties that filed Docket No. 66.

23         THE COURT:  Okay.

24         MR. SHANNON:  Several others were part of the

25  joinDer that Mr. Brookner discussed.  Now, really important

1    to those claimants is that the rights against non-Debtors

2    are preserved.  It's very important because, you know, it's

3    -- these claims against non-Debtors, at least some of them,

4    are not necessarily tied to the conduct of the Debtor or the

5    Debtor's predecessor.

6            I believe as the revised proposed order at Docket

7    I believe it's 107 does preserve those rights, one of the

8    issues we had was just kind of the breadth of it, that has

9    been fixed in our opinion.  The revised proposed order

10   specifies who exactly the stay is being extended to, and

11   frankly, as revised, it doesn't apply to anyone that I'm

12   here representing.

13           THE COURT:  Okay.

14           MR. SHANNON:  And just one other thing about it,

15   Judge, I would just say that it reserves all rights from the

16   interim to the final.  So, there's not going to be any

17   burden shifting or things like that.  But with that, Judge,

18   you know, I know there's a committee appointed.  I'm sure

19   they'll look at it.  I'm sure they'll consider that.  But

20   given that the -- that the scope of that proposed order has

21   been narrowed, we do not oppose the entry of the interim

22   order.

23           THE COURT:  Thank you very much.  Mr. Nguyen, go -

24   -

25           MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

 1    the U.S. Trustee.  Mr. Brookner is correct.  I did work

 2    through the proposed order on this motion with him, but

 3    that's not to say that we're in support of the motion.

 4    We're not tipping out thumb on the scale either way.  That's

 5    an order that I worked for Mr. Bruckner.  If the Court is

 6    inclined to grant the motion, that's an order the U.S.

 7    Trustee can live with.

 8              And the second thing, Your Honor, the committee

 9    was formed last night.  I've met with all the members this

10    morning.  You're going to get unsecured creditors from

11    almost all three of the buckets that Mr. Brookner mentioned.

12    It's a very diverse group.

13              They're ready to go, but they're just not -- they

14    couldn't retain counsel within the three hours of our first

15    organizational meeting.  So, you should be seeing them in

16    the next couple of weeks here.

17              THE COURT:  Thank you.

18              MS. HAMM:  Your Honor, Holly Hamm for St.

19    Alphonsus.

20              THE COURT:  Hey.

21              MS. HAMM:  I just wanted to kind of reiterate some

22    of the things that have been said.  St. Alphonsus is on the

23    creditors committee and they -- we didn't file a formal

24    objection.  We talked with the Debtor's counsel, Mr.

25    Brookner, to help basically preserve the position that the

1    UCC might want to take going forward, putting that break in,

2    this 35-day interim period in place so that a thorough

3    examination can be done and any, you know, objections are

4    preserved until that time.

5            THE COURT:  That makes sense, and it's -- thank

6    you very much.

7            MS. HAMM:  Mm-hmm.

8            THE COURT:  Okay.  A little dangerous, because

9    I've unmuted a bunch of lines, but let me open it.  Is there

10   anyone else in the courtroom who wishes to make a statement?

11   Okay.  Anyone on the line wish to make a statement, and I'm

12   sure you're probably going to bump into each other a little

13   bit, but Mr. Stromberg.  Yeah, if you can, raise your hand

14   and maybe that's the more efficient way.

15           Mr. Stromberg, you may be on mute.  I can't hear

16   you.  I can't hear you.  You may need to hit five star again

17   or -- let's see.  I can't hear you, Mr. Stromberg.  Let's

18   see.  How do you -- oh, I still can't hear you.  Let's see.

19   Mr. Stromberg, can you hit five star again?  Maybe I can

20   just see you.

21           MR. STROMBERG:  Ah, there we go.

22           THE COURT:  All right.

23           MR. STROMBERG:  Is that better, Your Honor?

24           THE COURT:  All righty.

25           MR. STROMBERG:  Thank you.  Mark Stromberg on

1    behalf of Lone Star Alliance, Inc.  It's a subsidiary of the

2    Texas Medical Liability Trust.  My client is an insurer.

3    They are defending 34 cases that are in various stages right

4    now with many of them having joint -- potentially jointly

5    liable co-defendants.

6            I'm in a similar situation to Mr. Brookner because

7    I really only got involved in this case within the last few

8    days and only entered my appearance yesterday, really only

9    found out about this hearing this morning.

10           So, I don't know to what degree the 34 cases were

11   involved with overlap, but we are in favor of this motion.

12   We think that the insurance policies that may apply to these

13   claims are policies that belonged to the estate, that there

14   are reasons that if the stay is not extended to the

15   potential co-obligors or co-defendants, this might impact or

16   affect the estate, not least because, number one, if these

17   defendants have a judgment entered against them then that

18   reduces the coverage that might be available to cover the

19   estate's obligations, because there is a per occurrence

20   limit.

21           Number two, if the estate is not present to defend

22   any comparative fault finding could wind up being more

23   against the estate than against the co-defendants.  And

24   number three, if there's any excess exposure resulting from

25   the -- from the claim against a co-defendant in excess of

1    the policy limits, that could come back to affect the

2    estate.

3            So, for a number of reasons, we think it is

4    prudent for the Court to consider this, especially so and as

5    much as it's an interim request, that it is not going to

6    permanently affect any of the parties' rights.  It will give

7    Mr. Brookner -- it will give me, candidly, the time to be

8    able to ascertain just, you know, what is going on with all

9    of the litigation and to determine how we might sort of

10   figure out a way to move these cases, many of them tort

11   cases, towards some sort of consensual resolution before

12   litigation proceeds, because the estate will have interests

13   in how this litigation proceeds.

14           THE COURT:  Thank you, sir.  Anyone else?

15           MR. STROMBERG:  Thank you, Your Honor.

16           THE COURT:  Anyone else?  If you'd just raise your

17   hand and I can just -- I've got you there.  Mr. Johnson?

18   And if you need to hit five star, let me know.

19           MR. JOHNSON:  Good afternoon, Your Honor.

20           THE COURT:  Good afternoon, Mr. Johnson.

21           MR. JOHNSON:  My name is Michael Johnson.  I'm

22   with Kay Griffin in Nashville, Tennessee, and we're one of

23   the -- we're attorney for James Hyman.  Mr. Hyman -- I just

24   wanted to make a brief statement on this, as Mr. Hyman's

25   situation and claims are a little bit different than I think

1     pretty much everything else we're talking about here.

2          Mr. Hyman is the former CEO of Valitas Health

3     Services, Inc., which was one of the pre-merger entities

4     that was finally merged into Corizon Health, Inc., and which

5     is, you know, the Debtor (indiscernible).  They're the

6     successor to his employment agreement.

7          We have a pending litigation in the Middle

8     District of Tennessee where the main office is in Brentwood,

9     Tennessee, and you know, we've talked about in our briefing

10    the reasons why we don't believe that the stay is applicable

11    to Mr. Hyman's claims, that the relief is -- sought is

12    appropriate in that case.

13         But I will say practically speaking now that the

14    release sought has been narrowed, which it was after we

15    filed our response to the 35-day timeframe, our -- we don't

16    have a case management conference in the Middle District

17    until April 12th at this point, which means in our district,

18    we can't do anything until that happens.

19         I mean, we would like to try and still effectuate

20    service in the meantime, and we don't want to have to come

21    back and re-argue the same thing in terms of the stay being

22    applicable to all of the co-defendants in Mr. Hyman's middle

23    district case.  But I just wanted to point that out on the -

24    - at the outset here.

25         THE COURT:  Thank you.

 1          MS. HEARD:  Your Honor?

 2          THE COURT:  Yes.  I'm sorry.  You -- yes, okay.

 3          MS. HEARD:  This is Mary Elizabeth Heard on behalf

 4   of Ms. Edmo.  I would like just to tell the Court I'd like

 5   to reserve any opening for -- I do have an evidentiary

 6   presentation on -- in support of our objection.

 7          THE COURT:  Okay.

 8          MS. HEARD:  And I'd like to reserve my opening for

 9   that after the (indiscernible).

10          THE COURT:  Thank you.  Ms. Heard, is your client

11   in the 39 cases?

12          MS. HEARD:  Your Honor, my client is in the very

13   end of post-judgment.  She's received an injunctive relief

14   and she is now trying to recover her attorney's fees.  She

15   was given an -- awarded a joint and several judgment against

16   the state of Idaho.

17          THE COURT:  I'm just trying to figure out if she's

18   on the revised list such that -- that's on -- that the

19   Debtors have filed.

20          MS. HEARD:  So, she is affected -- yes, sir.  She

21   is affected by it --

22          THE COURT:  Okay.

23          MS. HEARD:  -- because they are seeking to extend

24   the stay to the Idaho Department of Correction.

25          THE COURT:  Perfect.  Thank you so much.

1          MS. HEARD:  But we're a very special case even
2    within the subset of litigation.
3          THE COURT:  Got it.  Got it.  Thank you.  Thank
4    you for the clarification.
5          MS. HEARD:  (Indiscernible).  Okay.  Thank you,
6    Your Honor.
7          THE COURT:  Thank you.  Okay.  Anyone else?
8          MR. MARKUS:  Your Honor, Blake Markus representing
9    Capitol Eye Care, Inc. and other punitive class members from
10   the Western District of Missouri case.  I just wanted to on
11   the record join in with the objections of the curators of
12   the University of Missouri, the Eastern District Michigan
13   class action, and Mr. Hyman's objections as well.
14         We (indiscernible) all claims against the non-
15   Debtors belong to the estate, and in our case in the Western
16   District of Missouri, Judge Harpool has ordered the non-
17   Debtor parties to show cause as to why the case should not
18   proceed against them without the Debtor, and we think that
19   that would be appropriate for them to answer and that they
20   not be a part of the stay here (indiscernible).
21         THE COURT:  Thank you.  Ms. Bailey, did you have
22   your hand raised?
23         MS. BAILEY:  I did.  Thank you, Your Honor.  Can
24   you hear me?
25         THE COURT:  Just fine, thank you.

1          MS. BAILEY:  Okay.  Your Honor, our response was

2     the Docket No. 106, that the Debtor hasn't had the

3     opportunity yet to read.  So, I'll make it a little bit

4     easier on everybody.  It's clear to me from the

5     (indiscernible) that our case is not -- it appears that way,

6     our case is not contemplated with the narrower set of cases

7     for the stay, and if that remains true, then I'll reserve

8     our arguments for the time in which the Debtor may try to

9     extend it to us, but I just wanted to clarify that.

10          THE COURT:  Thank you very much.  Anyone else?

11          MR. LANGE:  Your Honor, Ethan Lange, Stueve Siegel

12     on behalf of the curators of the University of Missouri and

13     (indiscernible) region.

14          THE COURT:  Mr. Lange, I'm going to -- I'm going

15     to turn to you and then Mr. Glover after you finish.

16     Please, Mr. Lange, please proceed.

17          MR. LANGE:  Thank you, Your Honor.  I just wanted

18     to note that we are still listed on this interim order.  We

19     had a moment to look it over at Docket Entry 107.  It looks

20     like our case is still listed.

21          We continue to oppose the entry of even an interim

22     order.  And so, I just wanted to make that note, and like

23     other counsel, we would reserve our arguments after the

24     Debtor's presented its case.

25          I did want to note one thing since you asked a

1    question right at the outset about the relationship between

2    M2 Loan Co. and the Debtor, and I could answer that question

3    that it's an -- M2 Loan Co. is an indirect parent, the -- of

4    Corizon, former Corizon.  It was an indirect parent as well

5    of Valitas, which used to be the parent company of Corizon.

6            But the common parent, if you go up the chain, if

7    you will, is M2 Hold Co., so I just wanted to answer that

8    question.  M2 Loan Co. also owned the secure debt of CHSTX

9    and Tehum Care, the -- you know, the other entities or the

10   (indiscernible) CHSTX is the other entity in the divisional

11   merger with TM.

12           THE COURT:  Thank you.

13           MR. LANGE:  You're welcome.

14           THE COURT:  Mr. Glover?

15           MR. GLOVER:  Yeah.  Good morning, Your Honor.

16   This is Bryan Glover on behalf of St. Luke's.  St. Luke's is

17   a member of the committee and was just appointed and

18   certainly anticipates, you know, participating in pursuing

19   protecting its rights aggressively in this case.

20           However, for purposes of today's hearing, we have

21   been in contact with Debtor's counsel, and you know, been in

22   discussions and negotiated language that would go into the -

23   - that has gone into the proposed order that I understand is

24   being presented to the Court.  Just to avoid any confusion,

25   subject to the reservation of rights that is set forth in

1    the proposed order that is being presented to Your Honor,

2    St. Luke's has no objection to the entry of the order today

3    on an interim basis.

4            THE COURT:  Thank you.  Anyone else?

5            MR. BERTRAND:  Your Honor, this is Joy Bertrand.

6    I raised my hand.  If I may please speak?

7            THE COURT:  Yes.

8            MS. BERTRAND:  Your Honor, my client's case is

9    listed in the exhibit to the proposed revised order --

10   actually, I think it's on the list here, Branum v. City of

11   Phoenix with the indemnified clients being David Shinn and

12   the Arizona Department of Corrections.

13           We'd also object to being included in this.

14   There's more than simply Corizon and Department of

15   Corrections in the case of Ms. Branum's matter.  There's the

16   city of Phoenix, the Maricopa County Sheriff and

17   (indiscernible) system, all of whom had separate roles in

18   the death of Ms. Branum's husband, kind of culminating in

19   his care with Corizon.

20           And this is brought to a standstill, a complex

21   case that was actually kind of humming along in discovery,

22   and now all of the defendants in our matter believe that the

23   entirety should be stayed based on the Court's stay here.

24           We'd object to that.  I think it's going to be

25   incredibly inefficient to start out a case without that many

1    defendants and (indiscernible) moving parts simply because

2    Corizon, the indemnifying party to the Arizona Department of

3    Corrections, has filed for bankruptcy.  So, we would note

4    our objection for the record.  Thank you.

5          THE COURT:  Thank you very much.  Anyone else wish

6    to speak?  It -- I'd just note, this case was filed on

7    February 13th.  Several days later this emergency motion was

8    filed to extend -- enforce the automatic stay to certain

9    non-Debtor parties.

10          Now, it's kind of an understatement when you read

11    the pleadings and the responses to note that the motions and

12    the objections involve complex questions of law.  In fact,

13    even starting, it was -- it was a big universe of claims and

14    I -- and I had some questions about the scope of it.

15          It certainly has narrowed dramatically from where

16    we are and it looks like, you know, certain parties that

17    were objecting, as of now their objections are deemed moot

18    because the Debtor isn't seeking to seek to extend the stay

19    as to them.

20          But you know, what makes this case complicated is

21    that there are several buckets, and you know, there are --

22    there are claims against individuals.  There are claims

23    against former officers, some against affiliates.  And so,

24    each one of them is going to require a different level of

25    thought, and every case should be viewed on its own -- on

1    its own merits.

2            And they're all at different stages.  You know,

3    some of them seek to threaten the very existence of the

4    Debtor itself or to -- and so some of them, if they were to

5    proceed, at least on their face, could lead to this Court

6    rendering a judgment in one way or the other and then a

7    state court rendering a judgment one way or the other.

8            And so it -- it's just complicated.  And you know,

9    there are alter ego issues there that we have to deal with.

10   There are multiple defendants involved.  Some involve

11   questions of whether, you know, what the term, you know, AH

12   absolute indemnity and the rights of that and looking at AH

13   Robbins and their successor cases and seeing whether those -

14   - this case fits into those.

15           You know, I appreciate that the Debtor is trying

16   to make this an interim order and seeking to come back in 30

17   to 35 days, but I also think about, you know, issues.

18   There's a committee that's just got formed today and they

19   may have rights and want to share thoughts, and I -- and

20   I'm interested in hearing what the committee -- thoughts the

21   committee may have.

22           And so, you know, kind of balance the -- you know,

23   and this is an emergency hearing, right?  So, these are

24   essentially asking on very short notice.  So, I've got to

25   balance, you know, due process rights with the rights of

1    certain creditors who may have just retained counsel, I --
2    to consider all of this.

3            At the same time, I think, you know, there are
4    lawsuits out there that I -- you know, just on their face,
5    you know, could -- you know, but by the time I actually
6    could decide all of these issues, could -- you know, a lot
7    could occur between now and the time that I issue a ruling
8    one way or the other, depending on the state court could
9    enter a judgment, and a lot of things could happen between
10   now and then.

11           And so, I think what best serves the estate, what
12   best serves to preserve the rights of all parties, is I'm
13   going to -- I'm going to -- I'm going to issue a short
14   interim order staying just the litigation that the Debtor
15   seeks to go forward on.

16           If the Debtor wants to supplement it, you're going
17   to have to supplement it, and we're going to have to make
18   sure people get plenty of notice, but I want these parties
19   to have a full opportunity to have -- to brief their issues,
20   and I'm not sure they got it.  At the same time, I want the
21   Debtor to have a full and fair, robust opportunity to put on
22   their case as well.

23           And so, I'm going to issue a short order staying
24   the litigation as to these cases without -- and I'm going to
25   -- here's the schedule that I'm going to put everything on.

1    I want any party -- and the way I'm envisioning this is Mr.

2    Brookner, Ms. Carson, you know, y'all would re-notice this

3    for a full hearing on May 17th, right?  It's about 75 days

4    from today, and I'm considering my schedule as well, making

5    sure that I have enough time to kind of really allocate a

6    significant amount of time.

7            Any objections to your motion for the 39 would be

8    filed by April 3rd -- April 3rd, and they can just file it

9    on the docket.  No need to serve anything, just any fulsome

10   objections there, any response that you have, would be filed

11   by April 24th, so essentially 30 days from today, and it

12   really would give everyone essentially a full opportunity

13   with notice to find out who they are, get an opportunity to

14   file an objection to that.

15           April 24th, you'd file your response 45 days, and

16   essentially I'm holding a hearing, you know, a short time

17   after that on May 17th.  And I would hold it on May 17th

18   starting at 1 p.m., and we'll just go until we're done.

19           So, if that's the case, the parties should be

20   prepared to go late.  If you have witnesses, I'm going to

21   ask the parties to really consider, you know, that if, you

22   know, if you have any witnesses, I'm going to want them

23   live.  If other parties have witnesses, I'm going to give

24   them the flexibility to let them appear virtually.

25           The hearing will be a hybrid hearing.  So, we'll

1    hold court here and on video.  Any witness and exhibit lists

2    would need to be filed, you know, essentially by May 15th at

3    noon for that day.  Maybe there's evidence required in terms

4    of -- but I'm really asking Ms. Carson that you really work

5    with the parties, maybe some parties get added, maybe some

6    parties get dropped off.  I don't -- you know, but on the

7    17th, there's some agreement as to how the hearing will

8    proceed in terms of exhibits.

9            And it gives parties an opportunity if they wanted

10   to, you know, take some short -- you know, ask some

11   questions of the Debtor before the hearing and really put

12   their case on, and I think it would allow the Debtors a

13   fulsome opportunity.

14           But importantly, it also gives the committee an

15   opportunity to get up to speed.  They'll have -- they'll

16   have to hit the ground running, but I'm not jamming the

17   committee, but I think a -- I don't want to do an interim

18   hearing, because I'm afraid at the interim hearing the

19   committee may ask for more time, and I want to just set it

20   out, and we can just deal with everything on one day, May

21   17th.

22           I think the Debtor will be in a much better

23   position to articulate its arguments as to the insurance.

24   Mr. Stromberg can come in and articulate its issues.  But at

25   the same time, if someone wanted to really have an

1    opportunity to put on their best case as to why they don't

2    believe or brief the issue as to why they don't believe, the

3    stay should be extended and then they'll have that --

4    they'll have that case.  And I think holding it to, you

5    know, May 17th, you know, I think 75 days is -- it's real

6    but it's -- it's at the same time I think balancing the

7    fairness.  And a short brief I think will benefit all

8    parties because someone's going to -- you know, I've got a

9    rule on that, and I'm going to be prepared to rule on May

10   17th.  But everybody's going to want -- I'm going to want a

11   robust hearing -- a robust evidentiary hearing where I get

12   the benefit of fulsome briefing.

13          So, I'm saying everything there on the 39 days,

14   and if parties want to come in and file their objection,

15   they certainly can.  But on May 17th, it's an evidentiary --

16   it's a full evidentiary hearing as to those, and Mr.

17   Brookner, you can notice it out just to them so that

18   everybody else who may have been impacted by the parties,

19   and I think those who -- for example, I'm thinking of Mr.

20   Shannon's client or Ms. Bailey's client, you know, they can

21   take comfort, right, that the motion is now reset, and

22   certainly their rights are reserved as obviously somebody --

23   but you'll have -- you'll know what's going on with respect

24   to those clients, and they can go back to report to the

25   Court -- their respective courts.

1          And I think just giving you that little bit of

2    comfort getting a re-noticing, you know that you're not on

3    the list and don't have to worry about it.  And I think I'm

4    thinking about state courts as well who may want just

5    something from this Court about where we go.

6          Mr. Patterson?

7          MR. PATTERSON:  Yes, Your Honor and I want to make

8    sure, but I -- my understanding is you said you're going to

9    stay all litigation for 75 days or so, and I want to tell

10   you I was reserving my thoughts and what I had to say until

11   we started to put on the evidence, my understanding that was

12   going to be today.  And so, No. 1, we object.  We're not

13   waving our rights.  My clients are not waiving their

14   adversary protections.

15         THE COURT:  Mm-hmm.

16         MR. PATTERSON:  This is an adversary proceeding.

17         THE COURT:  Right.

18         MR. PATTERSON:  It should be.  They didn't file an

19   adversary proceeding, and what you're doing is you're

20   entering a preliminary injunction.  You're entering a TRO

21   with no finding of any of the required factors, and we want

22   to be carved out.  I represent four women -- four-plus

23   women.

24         THE COURT:  I'm just telling you what I'm thinking

25   about doing.  I didn't say I was going to do it.  They're

1   going to have to put on evidence.

2        MR. PATTERSON:  Right.

3        THE COURT:  If that's what you want, you'll have

4   it, Mr. Patterson.

5        MR. PATTERSEON:  I mean today, but we don't want

6   to be -- we don't want to stayed for 75 days.

7        THE COURT:  You may just be at the end of the

8   hearing, and you'll have whatever rights you have.

9        MR. PATTERSON:  Right.

10        THE COURT:  I'm just saying -- I'm just telling

11   you what I'm thinking.  These are my thoughts about --

12        MR. PATTERSON:  I'm sorry.  I thought you were

13   telling us what you're going to do.

14        THE COURT:  No, I said I was going to --

15        MR. PATTERSON:  I'm sorry.  I don't -- I don't

16   mean to jump the gun.  I apologize.

17        THE COURT:  No, no, no.  You'll have your rights,

18   and if you want to -- everybody's rights are reserved.  I'm

19   just telling you what my thoughts are, and some folks are

20   going to have to walk me off this schedule.  So, Ms. Carson

21   knows --

22        MR. PATTERSON:  Okay.  Then I'll wait until he

23   starts and then I'll come back.

24        THE COURT:  Okay.

25        MR. PATTERSON:  Thank you, Your Honor.

```
 1              THE COURT:  You know, why don't you introduce

 2    evidence, Ms. Carson?  I think the documents will do it for

 3    me, but you can keep going.

 4              MS. CARSON:  Good afternoon, Your Honor.

 5              THE COURT:  Good afternoon.

 6              MS. CARSON:  Again for the record, Amber Carson

 7    from Gray Reed on behalf of the Debtors.

 8              Your Honor, as Mr. Brookner mentioned, we filed

 9    our witness and exhibit lists at Docket No. 59.

10              THE COURT:  Okay.

11              MS. CARSON:  It includes 24 exhibits, the first of

12    which is Mr. Perry's declaration in support of the motion.

13    I'd like to go ahead and request that that declaration be

14    admitted into evidence today as his direct testimony.

15              THE COURT:  What's the docket number again Ms. --

16              MS. CARSON:  It's 59.

17              THE COURT:  Fifty-nine.

18              MS. CARSON:  This would be 59-1.  Mr. Perry is

19    available virtually for cross-examination, and I would like

20    to supplement Mr. Perry's declaration if admitted into

21    evidence with just a little bit of additional testimony for

22    today.

23              THE COURT:  Okay.  Let me go around.  Does anyone

24    object to the entry of the declaration?

25              MR. PEATTERSON:  Yes, Your Honor.  It's --
```

1            THE COURT:  Okay.  All righty, Mr. Perry is going

2   to have to testify.

3            MS. CARSON:  Understood, Your Honor.  I would also

4   like to go ahead just for efficiency's sake considering we

5   have so many exhibits and request the admission of Exhibits

6   2 through 24.

7            THE COURT:  Do all these relate to the 39?

8            MS. CARSON:  They do.

9            THE COURT:  Okay.

10           MS. CARSON:  Well, Your Honor, let me clarify

11   actually.  There are two that we removed from the list.  So,

12   Exhibit No. 21 and Exhibit No. 19 no longer relate to the

13   list of the 39.

14           THE COURT:  Which ones?

15           MS. CARSON:  It is Exhibit 19 and Exhibit 21.

16           THE COURT:  Okay.

17           MS. CARSON:  So, we can remove those.

18           THE COURT:  Nineteen and 21 or 19 through 21?

19           MS. CARSON:  Nineteen and 21.

20           THE COURT:  Okay.  So, 2 through 18 and 20, 22

21   through 24?

22           MS. CARSON:  Correct.

23           THE COURT:  Okay.

24           MS. HEARD:  Your Honor, I have an objection to

25   Exhibit 14, the entry of Exhibit 15, authentication,

1    hearsay, relevance.  It's not relevant to today --

2              THE COURT:  You can -- you can just -- you can

3    just object and they'll have to put it on.  Okay.

4              MS. HEARD:  Thank you.

5              THE COURT:  Just looking for any (indiscernible),

6    so 15 no.  Any other objections to any of the other

7    exhibits, the admission?

8              MR. PATTERSON:  Yes, Your Honor.

9              THE COURT:  Okay.

10             MR. PATTERSON:  Two through six are pleadings.

11   So, if the Court will admit those for the limited purpose of

12   showing what was filed, I'm okay with that, but otherwise

13   they're hearsay, and then 22 and 23.

14             THE COURT:  Okay.  So, you're okay with admitting

15   2 through 6 for the purposes of -- not for the truth of the

16   matter asserted within the pleadings, but the fact that

17   there are -- the pleadings themselves were filed?  I think

18   that's what you were mentioning, Mr. Patterson.  Did I get

19   that right?

20             MR. PATTERSON:  That's right, Your Honor.  I'm

21   sorry.  Yes.

22             THE COURT:  Okay.  No, no, no, I was -- I meant to

23   look at Ms. Carson, but I want to make sure that I got the

24   statement correct.  Are you okay with that?

25             MS. CARSON:  Yes.

1      THE COURT:  Okay.  Two through 6 are admitted into

2  evidence as for the -- recognize that they were pleadings on

3  file and they said what they said, but not necessarily for

4  the truth of the matter -- of the statements asserted

5  therein, and any other objections?  Okay.  So, let's see.

6  You've got --

7      MS. CARSON:  By my list, Your Honor, it looks like

8  exhibits -- we have objections to Exhibits 15, 20, and 22

9  outstanding.  Oh, excuse me, 22 and 23.

10      THE COURT:  So, that would mean that 2 through 14

11  are admitted, 16 through 18, 24 is admitted.  Did I get that

12  right?  Two through 14, 16 through 18, and 24?

13      MS. CARSON:  Yes.

14      THE COURT:  Okay.  Okay.

15      MS. CARSON:  All right.  Then I'll call Mr. Perry

16  to the stand -- the virtual stand.

17      THE COURT:  Okay.  Mr. Perry, if you're on the --

18  you're on the line?  Let's see, I need to --

19      MR. PERRY:  (Indiscernible).

20      THE COURT:  Okay.  I think I got you, Mr. Perry.

21      MR. PERRY:  All right.  Can you hear me, Your

22  Honor?

23      THE COURT:  Just fine.  Thank you very much, sir.

24  Let me have you raise your right hand.  Do you swear to tell

25  the truth, the whole truth, and nothing but the truth?

1          MR. PERRY:  I do.

2          THE COURT:  Okay.  Mr. Perry, you've been sworn

3    under oath and you understand the oath that you took is the

4    same that you would take if you were live in the courtroom

5    with me?

6          MR. PERRY:  Yes, sir.

7          THE COURT:  Okay.  And can you confirm for me,

8    since you're appearing virtually, whether you have any notes

9    with you in front of you or any documents or any statements

10   in front of you?

11         MR. PERRY:  I do not, Your Honor.

12         THE COURT:  Okay.  Just before we proceed, Ms.

13   Carson, in terms of presenting evidence, documents to the

14   witness, how do you intend to proceed?

15         MS. CARSON:  My colleague --

16         THE COURT:  Just from a technical standpoint?

17         MS. CARSON:  Yes, my colleague Aaron Kaufman is on

18   the line and he would be I'm sure happy to provide those

19   evidence if it's acceptable to the Court.

20         THE COURT:  Okay.

21         MS. CARSON:  If he can share his screen.

22         THE COURT:  Okay.  Mr. Kaufman, I'm going to make

23   you the presenter.  But again, I'm going to just ask that,

24   you know, I know that -- make sure that the examination --

25   the presentation of evidence follows the examination.

1    So, in other words, don't do that.  I want -- I
2    want -- I want the screen empty until she asks that a
3    document get put up and we can proceed like in Court, we
4    were live.  So, is there a way you can block your screen?
5    Or should I remove you as the presenter?
6    Thank you.  All right.  Ms. Carson, you may
7    proceed.
8    MS. CARSON:  Thank you.
9    DIRECT EXAMINATION OF RUSSELL PERRY
10   BY MS. CARSON:
11   Q    Mr. Perry, please state and spell your name for the
12   record.
13   A    Russell Perry, R-U-S-S-E-L-L, P-E-R-R-Y.
14   Q    Please introduce yourself to the Court.
15   A    Hello.  My name is Russell Perry.  I'm currently the
16   Chief Restructuring Officer -- the proposed Chief
17   Restructuring Officer for Tehum Care, the Debtor here in
18   front of Your Honor.  I'm a senior managing director at
19   Ankura Consulting.  We are a global consulting firm that
20   specializes in various aspects of distress, transactional
21   litigation-type matters.  I currently am the (indiscernible)
22   turn around and restructuring practice out of our Dallas
23   location.
24   I've been practicing restructuring for about 16
25   years.  My practice focuses mostly on the healthcare space.

```
 1   I worked with all various types of healthcare entities.  And

 2   my background is a bachelor of science in agribusiness from

 3   Texas A&M, an MBA from Texas A&M, and I'm currently a CFA

 4   charter holder.

 5   Q    And when were you retained by the Debtors as CRO?

 6   A    I was retained actually the day of the filing.  Much

 7   like Mr. Brookner mentioned in his opening, I also was

 8   notified of the potential Chapter 11 the night before in the

 9   wee hours of the morning.  I was officially retained that

10   morning and then became effectively this CRO of the Debtor

11   the day that the Debtor filed for Chapter 11.

12   Q    What specific types of restructuring or bankruptcy

13   related roles have you held?  Or titles, if you will?

14   A    I held -- yeah, (indiscernible) across the board.  I've

15   been a Chief Restructuring Officer, Chief Transformation

16   Officer, Strategic Restructuring Advisor.  I've been a

17   restructuring advisor.  I've been an independent director.

18   I've served in various interim management capacities, and

19   I've had various roles working both for the company side or

20   Debtor side engagements.  I've also represented lenders.

21   I've represented other various constituencies in in-court

22   and out-of-court restructuring situations.

23   Q    In those roles, what have been your general just -- or

24   what have been your duties generally?

25   A    Well, they're a little different in a fiduciary
```

1   capacity, like an officer role versus an advisor role.  So,

2   let me -- let me deal with the former.  You know, as a chief

3   restructuring advisor, for example, a CRO comes with various

4   authorities and fiduciary duties on behalf of the Debtor.

5   Typically the CRO reports directly to the Board of Directors

6   or the director of that specific Debtor with, again, certain

7   authorities to effectuate, shepherd, and execute a

8   restructuring plan.

9          My duties always start with a significant amount

10  of due diligence, due diligence around what assets the

11  Debtor may or may not own, what liabilities and obligations

12  are outstanding to the Debtor or the company that we are

13  working for.

14         We focused very strongly on financial performance,

15  on liquidity, on cash, understanding the path of why the

16  company or the Debtor is effectively in distress and why the

17  situation calls for someone like myself or my colleagues.

18         In my capacity, I'm reviewing financial

19  statements.  I'm reviewing documents.  I'm reviewing

20  contracts.  I'm reviewing, you know, organizational charts

21  and like in order to get your -- you know, to get our arms

22  around the extent of the situation, again, the cause of the

23  distress, and to form of view and a path as a -- as to the

24  strategic alternatives available to the Debtor.

25         So, it's a -- it's a very broad somewhat, you

1    know, wide open type situation at the beginning until we're

2    able to narrow down to exactly what the solution would be,

3    propose that solution to the various stakeholders involved

4    and seek to execute it, whether it be in court or out of

5    court.

6    Q    In the course of reviewing contracts, have you come

7    across any indemnity provisions?

8    A    You're referring to this individual case here?

9    Q    No, just in your general duties in your experience as

10   CRO or in those other roles, have you come across indemnity

11   provision when reviewing contracts?

12   A    I have.  Indemnity provisions (indiscernible) fairly

13   standard across various contractual obligations.  Many times

14   trade vendors will include indemnity agreements, contractors

15   positions.  You know, it's really across the board.  It's

16   not a surprise that an indemnification or hold harmless

17   provision (indiscernible) be contained in various documents

18   in which services are being provided.

19        My own engagement letter, for example, to Ankura

20   that the Debtor executed, we have an entire section and a

21   schedule related to an indemnification and the standards by

22   which that indemnification is governed.  So, I do see them

23   from time to time.

24        I'm not a lawyer.  I don't practice any type of

25   law.  So -- but I am aware of the existence of the

1    indemnification agreements and I do have a general

2    understanding of how they work.

3    Q    Have you served in any specific bankruptcy roles in

4    Texas recently?

5    A    I have.  We confirmed a Chapter 11 plan in front of

6    judges here just a few weeks ago in a matter by the name of

7    Pipeline Health.  Pipeline Health was a very complicated

8    safety net hospital Chapter 11.  I was the Chief

9    Transformation Officer similar to a CRO.  We filed in early

10   October, had a very extensive, complicated, but very fast-

11   moving case.  There were -- a confirmation hearing occurred

12   I think it was late mid-January and the effective date was

13   February 6th.  So, we're just wrapping up that engagement.

14            I had another situation I was involved in --

15            MR. PATTERSON:  Your Honor, I'm going to --

16            MS. HEARD:  Objection.

17            THE COURT:  Hold on a second.  There's an

18   objection pending.

19            MR. PATTERSON:  I hate to interrupt, but I'm going

20   to object as to relevance as it's not an employment hearing.

21   We've got his background.  I don't know that any of this is

22   relevant for today.

23            MS. CARSON:  I think establishing his background

24   is relevant since he is testifying, but I think that was the

25   last of the background information.  So, I'm happy to move

1    on, Your Honor.

2              THE COURT:  Okay.

3    BY MS. CARSON:

4    Q    Mr. Perry, since your retention by the Debtor, which

5    you said was on February 13th, what have you been doing to

6    get your arms around the Debtor situation?

7    A    Yes, just what you mentioned.  I've been working to get

8    my arms around.  I have two Ankura colleagues that have been

9    working alongside me as well as other folks inside the firm.

10   We have been meeting with as many individuals as we can from

11   the Debtor's director to obviously counsel, reviewing

12   documents, you know, gathering as much information and data

13   as we possibly can.

14             The work is underway.  We've had on-site meetings,

15   you know, with various folks.  We're developing work plans.

16   We have, you know, thousands upon thousands of pages that

17   we've -- we've flipped to -- you know, through and reviewed,

18   everything from organizational documents to various

19   contracts and the like and we'll discuss some of this as the

20   evidence is presented.

21             And so, our job has been, you know, much like we

22   would if we were involved much earlier than an actual

23   Chapter 11, our job has been to understand the assets and

24   the liabilities of the Debtor.

25             Mr. Brookner mentioned, you know, some potential

1    asset recoveries, at least in his opening.  You know, we
2    have a general understanding that there are and hopefully
3    will be access to certain assets.  We have just now started
4    to gather the information to prepare the schedules and
5    statements of the Debtor.  That requires a significant
6    amount of data gathering with respect to previous
7    transactions, previous disbursement, the various assets, the
8    various contracts, and the various liabilities.
9           So, today, I think this is day 16 or so of my
10   role, and it's been very much the proverbial drinking from
11   the firehose, and you know, it continues even, you know, at
12   this time.
13   Q   Are you generally familiar with the Debtor's record-
14   keeping practices?
15   A   I am.  Of course that's, you know, part of the
16   questions and the diligence process that you do when you
17   step into a situation just to understand and try to form a
18   view as to what books and records exist, (indiscernible)
19   keeping them, how comprehensive they may be.
20          In this situation, because I've been working with
21   counsel to pull a lot of legal documents and contracts, my
22   understanding is the Debtor has an electronic data storage
23   database.  It's called E-Contract or something along those
24   lines, at least for legal documents.  The Debtor uses
25   PeopleSoft, for example, for financial statements.  You

1    know, we've been working through the books and records as it

2    relates to cash transactions, and you know, company

3    transactions and all those various things.

4         So, my understanding is that the books and records

5    are kept electronically.  I haven't had to sift through, you

6    know, boxes of files at least in the 16 days that I've been

7    involved.  Most of the information has been presented and

8    prepared electronically, and you know, provided to us

9    electronically.

10   Q    Mr. Brookner mentioned this a bit during his opening,

11   but prior to May 5, 2022, what was the Debtor's business

12   generally?

13   A    Sure.  Certainly I wasn't involved at that point, but

14   you know, my understanding is the Debtor was in fact

15   providing or would seek the provision of care to other

16   parties from a contractual obligation or relationship,

17   healthcare to correctional facilities across the country.

18   Based on what I've been able to read and ascertain, at one

19   point, the Debtor might have been the largest provider of

20   healthcare to correctional facilities across the country.

21        MR. PATTERSON:  Object at this point, Your Honor.

22   It's hearsay (indiscernible).  He said that's what he read.

23   So, it's hearsay.

24        THE COURT:  Sustained.

25   BY MS. CARSON:

1   Q   Mr. Perry, was the Debtor ever involved in a divisional

2   merger?

3   A   Yes, it was.  Mm-hmm.

4   Q   And when was that merger effective?

5   A   That merger was effective on May 5, 2022.

6   Q   Did the Debtor create a plan of divisional merger?

7   A   It did.

8   Q   And have you reviewed that plan?

9   A   I have.  I have reviewed that as part of my review of

10   the various documents the Debtors have produced.

11   Q   Mr. Kaufman, could you please pull up Exhibit 10?  Mr.

12   Perry, what is this document?

13   A   That's the board's consent?  That would have been the

14   consent for the divisional merger as I recall.

15   Q   And Mr. Kaufman, please go to Page 23 of 203 of that

16   document.  Is this the plan that you referenced?

17   A   It is.  That's the plan of divisional merger, correct.

18   It does say the date of May 1st, but the actual effective

19   date was I believe May the 5th through some other documents.

20   Q   Under the plan of divisional merger generally, what

21   liabilities were allocated to the Debtor?

22   A   Actually, there were quite a few.  So, generally, the

23   liabilities consisted of, you know, obligations related to

24   contracts that were allocated to the Debtor.  My

25   understanding is that they're contracts for services that

1    may not have been provided to the Debtor any longer or to --

2    I'm sorry, that services that were terminated that were no

3    longer being provided by the Debtor at that point in time,

4    and so the contracts and the related liabilities would have

5    been allocated to the Debtor.

6            In addition, my understanding is there were a

7    number of what's called PLI or personal liability, personal

8    injury-type claims that were also allocated to the Debtor,

9    other types of employee-related obligations and liabilities.

10           There's a fairly lengthy schedule at the back of

11   the plan of divisional merger that lays out exactly what was

12   allocated, but there were both, you know, assets and

13   liabilities.

14   Q    And what assets were allocated to the Debtor in the

15   divisional merger?

16   A    Yeah, so (indiscernible) really an asset, it was more

17   of a removal of -- that's not the right word, but there was

18   $100 million of secured debt that was allocated to call it

19   Newco or the current operating company that Mr. Brookner

20   mentioned in his opening.  So, that was a liability

21   originally on the former books of the original company that

22   was not allocated to the (indiscernible) so it was sort of

23   removed.  So, it wasn't necessarily an asset.  It was a

24   liability that didn't get allocated down.

25           Other assets were, you know, various potential

1    recoveries from insurance, you know, contracts.  There was I

2    think a million dollars or I know there was a million

3    dollars of cash that was allocated to the Debtor, and then

4    there was an agreement that is labeled the funding

5    agreement, and what that funding agreement represented was a

6    $15 million source of funds to the Debtor to fund

7    effectively resolution of claims and any cost or, you know,

8    other related expenses in order to effectively prosecute or

9    adjudicate those claims.

10   Q    You mentioned what you called Newco.  What entity is

11   Newco?  Do you recall the entity name?

12   A    So, yeah, at the time of the divisional merger, the

13   entity name was CHF Texas, Inc.  An entity by the name of

14   YesCare purchased that entity, and that's what I understand

15   is the reference to Newco, YesCare, and CHS Texas

16   effectively buying YesCare's purchase of CHS Texas.

17   Q    We talked about liabilities allocated to the Debtor in

18   the merger.  Were any liabilities also allocated to Newco or

19   CHS?

20   A    They were.  You know, similar to how I explained

21   (indiscernible) from a contractual standpoint, contracts

22   that were my understanding still in an active form, meaning

23   services were still being provided, those contracts as well

24   as the liabilities attached thereto were allocated to Newco.

25   There were also a significant amount of the, you know, types

```
 1    of cones that I mentioned a second ago, the personal
 2    liability, personal injury-type claims.  Those were also
 3    allocated to Newco.  The $100 million of secured debt
 4    obligations I mention a second ago, that was allocated to
 5    Newco, and there may have been, you know, a handful of trade
 6    obligations that didn't have a contractual obligation, but
 7    we're also allocated.  There's a full allocation schedule in
 8    the schedules of the planned divisional merger that sort of
 9    lay out exactly what was allocated to which entity.
10    Q    Mr. Perry, what is the purpose of the motion before the
11    Court today?
12    A    Well, the purpose is to provide for and establish an
13    automatic stay to various non-Debtor affiliates, non-Debtor,
14    you know, (indiscernible) or full officers and directors of
15    the Debtors, you know, non-Debtor contractual counterparties
16    in which there may be liabilities attached.  So, the purpose
17    of the motion is to provide for effectively a stay of those
18    various obligations in the litigation claims, roughly 39 of
19    them.
20            MS. HEARD:  Your Honor, I have an objection.  He's
21    already told us he's not a lawyer.
22            THE COURT:  That's not an objection.  What's your
23    objection, Counsel?  That's a statement.
24            MS. HEARD:  Your Honor, he's being -- I'm sorry.
25    He is -- he is -- he is arguing a legal position, and he is
```

1   not a lawyer.  He's being put on -- he's not being put on as

2   an expert witness.

3            THE COURT:  Counsel, what's your response?

4            MS. CARSON:  Your Honor, he was expressing his

5   view of why we are here before the Court as Chief

6   Restructuring Officer.  I believe he's available -- he's

7   able to express his view and opinion on the topic.

8            THE COURT:  Yeah, he's just talking about the

9   motion.  I'm going to overrule the objection.

10  BY MS. CARSON:

11  Q    Mr. Perry, are you aware that after the motion to

12  extend stay was filed, we filed a notice of revised proposed

13  order at Docket No. 107?

14           MR. PATTERSON:  Objection, Your Honor.  She's

15  leading the witness.

16           THE COURT:  Sustained.

17  BY MS. CARSON:

18  Q    Mr. Perry, after we filed our motion, did the Debtor

19  revise the proposed order attached to that motion?

20           MR. PATTERSON:  Objection, Your Honor.  Leading

21  the witness.

22           THE COURT:  It's -- overruled.  He an answer.  We

23  can get there.

24  BY MS. CARSON:

25  A    Yes, the Debtor did file a revised order -- proposed

1    order.

2    Q    Did that proposed order include an exhibit?

3    A    It did.

4    Q    And what was on that exhibit?

5    A    The exhibit would have listed 39 individual cases and

6    various non-Debtor affiliates, (indiscernible) officers and

7    other, you know, clients -- non-Debtor clients that we would

8    be seeking the stay for today.

9    Q    Are there any parties on that list whom the Debtor is

10   seeking to extend the stay to today that are not covered by

11   some type of indemnity provision?

12            MR. PATTERSON:  Objection, Your Honor.  She has to

13   lay the foundation that he has knowledge.  He hasn't

14   testified that there's any way he would know that.

15            THE COURT:  Sustained.

16   BY MS. CARSON:

17   Q    Let's move to discuss the lawsuit that you previously

18   mentioned, Mr. Perry.  How many cases are there in which the

19   Debtor is currently a defendant?

20   A    I'm still obviously gathering their information.  My

21   understanding is there's several hundred, maybe 300, 400.  I

22   think the count's pretty high.

23   Q    Have you generally reviewed each of the 39 complaints

24   that correspond to the cases potentially impacted by the

25   stay today?

1    A    I've generally reviewed them.  I have, you know, opened

2    them.  I've scanned just to get a feel for what exactly were

3    the claims that were being made.

4    Q    We've talked a little bit -- or Mr. Brookner mentioned

5    in his opening that these claims fall into different

6    buckets.  In which bucket or category do most of these

7    lawsuits fall?

8    A    Most of these are going to be the claims that I

9    mentioned a second ago related to what are called personal

10   injury, medical malpractice, things of that nature.  Most of

11   the claims, at least that I -- based on my understanding,

12   are going to relate to that category.

13   Q    In the motion to extend stay, I just want to clear up

14   some of the definitions that we used in there so that we are

15   all on the same page.  There are certain defined terms like

16   indemnified clients, indemnified D's and O's, non-Debtor

17   affiliates.  Are you familiar with those terms as used in

18   the motion?

19   A    I am.

20   Q    Who would fall into what we're calling the indemnified

21   client category?

22   A    This would include various state Department of

23   Corrections or the State Department of Correction Agency,

24   its Employees, its Officers.  (Indiscernible) an indemnity

25   related to that contractual obligation between the Debtor

1   and the state at that time and its employees.

2   Q   Who would qualify as what we're calling the indemnified

3   D's and O's?

4   A   That would have been the directors and officers at the

5   time of the divisional merger that would have been, you

6   know, identified through various documents that I've

7   reviewed.  It would have been, again, the directors and

8   officers of the Debtor entity.

9   Q   Are only D's and O's included under that defined term

10   or are others included as well?

11   A   Well within that category there are three or four names

12   that are not directors and officers but are -- there's an

13   indemnification relationship based upon a different type of

14   contract than what I mentioned earlier in the client

15   category that would have been --

16         MR. PATTERSON:  Objection to that, Your Honor.

17   It's hearsay and there's lack of foundation.  He can't

18   testify that there's any such agreement based upon his prior

19   testimony.  Plus, if he's referring to a document, we don't

20   have that document, so it's --

21         THE COURT:  I'll sustain it on that basis.

22   BY CARSON:

23   Q   Mr. Perry, who falls into the non-Debtor affiliate

24   definition?

25   A   That would be the entities I mentioned earlier as

1   Newco, CHF Texas and YesCare.

2   Q    I'll direct you and the Court to the demonstrative

3   chart that was filed at Docket No. 108.

4        MS. CARSON:  For the benefit of everyone in the

5   courtroom, I do have paper copies as well if you would like

6   them.  Your Honor, I believe there's also a paper copy up at

7   the bench for you.

8        THE COURT:  I'm just going to look at it on the

9   screen.  Thank you.

10  BY MS. CARSON:

11  Q    Mr. Perry, have you seen this chart before?

12  A    I have.

13  Q    And what does it reflect?

14       MR. PATTERSON:  Your Honor, I'm going to object.

15       THE COURT:  Hold on.  Hold on.

16       MR. PATTERSON:  I'm going to object as to hearsay.

17  This document, it's not demonstrative.  It's referring to

18  documents that aren't in evidence, and he's also -- based

19  upon his testimony, he can't verify the information, at

20  least as I've read it.  And so, I'm going to object --

21       THE COURT:  I'm going to -- I don't know what the

22  question that you're going to ask about the document, so --

23       MR. PATTERSON:  Well, she's asking him to read

24  something and interpret something --

25       THE COURT:  Why don't we let her ask it, Mr. -- I

1    was -- I need to get some clarification on what the question

2    was.  I apologize.  What's the question?

3              MS. CARSON:  Your Honor, this is just a

4    demonstrative to help us today walk through the different

5    entities, those 39 that we mentioned that are subject to the

6    stay.  Given that there are 24 exhibits, I thought it would

7    be helpful for everyone if we had just a list.  This is not

8    being -- we're -- I'm not requesting that this is going to

9    be admitted into evidence.  It's just to aid in walking

10   through the exhibits and the testimony today.

11             MR. PATTERSON:  Well, the problem is, is that the

12   only person being aided is the witness.  We don't need this.

13   The witness is here to provide us information.  Now, the

14   lawyer is giving him a tool to read off of.

15             THE COURT:  I disagree with that.  I'm going to

16   overrule.  We can just use that as a demonstrative for

17   purposes -- it's the relief requested in the motion.  It's

18   appropriate.

19   BY MS. CARSON:

20   Q    Mr. Perry, I think that you were cut off.  I asked what

21   does this chart reflect.

22   A    These represent roughly if my count's right 23 various

23   (indiscernible) names, indemnified clients and non-Debtor

24   affiliates, indemnified D's and O's, and to the question

25   asked a few minutes ago down at the bottom of the table,

1    three out of those four names are not technically

2    indemnified D's and O's.  They would be a separate

3    contractual obligation.

4              MR. PATTERSON:  Your Honor, I'm going to object to

5    foundation.  And if I could ask him two questions on voir

6    dire?  One question.  I'll limit it to one question.  I can

7    (indiscernible) on voir dire in this document.

8              THE COURT:  Yeah, I'm going to overrule you, Mr.

9    Patterson.  We're just talking about an exhibit that was

10   filed with the motion.

11             MR. PATTERSON:  Well --

12             THE COURT:  You'll be able to cross him.

13             MR. PATTERSON:  -- it wasn't filed with the

14   motion, Your Honor.

15             THE COURT:  No, I'm saying it's the supplemental

16   exhibit.  You can -- you can ask all your questions and I'm

17   sure that I'm going to give you a free rein to ask them,

18   but.

19             MR. PATTERSON:  Yes, sir.

20             THE COURT:  Thank you.

21   BY MS. CARSON:

22   Q    Mr. Perry, if you look about halfway down that page,

23   there's a category for non-Debtor affiliates.  What is the

24   basis for extending the stay to these non-Debtor affiliates?

25   A    Well, my thing is there's an indemnification

1 relationship between the Debtor and those two affiliates.

2 Q    And where are those indemnification obligations?

3 A    They're stated within the plan of divisional merger.

4 There's a specific section that references the indemnities

5 offered to Newco, and I define those two entities as the

6 Newco entities.

7 Q    If we go back to Exhibit 10, please?  And Page 4 of the

8 plan, which is Page 26 of 203 of the PDF, do you see the

9 indemnification provisions you referenced on this page?

10 A    I do.

11 Q    And where is it?

12 A    That's Paragraph 11, Subsection A, the (indiscernible)

13 indemnity.

14 Q    What does this paragraph provide generally?

15      MR. PATTERSON:  Objection, Your Honor.  Calls for

16 a legal conclusion.  He can -- we can all read it.  It's on

17 the screen, but it's improper to ask him what it means.

18      THE COURT:  Can you repeat your question again,

19 Counsel?

20 BY MS. CARSON:

21 Q    Mr. Perry, what is your understanding as CRO --

22      MR. PATTERSON:  Objection as to relevance.  It

23 doesn't matter what he thinks it means.

24      THE COURT:  I don't know what the question was,

25 though.  I'm going to --

1      MS. CARSON:  I'll move on.  I don't know if it's -

2  - this document is in evidence, so I can move on.

3  BY MS. CARSON:

4  Q    You previously testified, Mr. Perry, that you generally

5  reviewed each of the complaints that underlie our stay

6  extension request today.  Is the Debtor seeking to extend

7  the state to CHS or YesCare for any liabilities allocated to

8  CHS or YesCare in the plan of divisional merger?

9  A    They are not.  It -- no, that's not what the stay is

10  meant for.

11  Q    If we go back to the demonstrative chart, the very

12  first category there is indemnified clients.  What is the

13  basis for seeking to extend the stay to these indemnified

14  clients?

15  A    The basis would be the existence of an indemnification

16  clause between the Debtors and each individual contract

17  counterparty that these names would be contained within

18  (indiscernible).

19  Q    Are you aware that the Debtor filed a witness and

20  exhibit list at Docket No. 59?

21  A    I am.

22  Q    Have you reviewed that witness and exhibit list?

23  A    I did.  I did.  Mm-hmm.

24  Q    Are the contracts that include the indemnity --

25  indemnity provisions you referenced included on that list?

1          MR. PATTERSON:  Objection, Your Honor.  Calls for

2     hearsay --

3          THE COURT:  Yeah, I'll sustain.

4     BY MS. CARSON:

5     Q    Please turn to Exhibit 13.  Are you familiar with this

6     contract?

7     A    I have read through this contract.  Mm-hmm.

8     Q    And what is it?

9     A    This is a contract between the Debtor entity at the

10    time and the State of Arizona.

11    Q    Looking back at that demonstrative chart, the first

12    person in the indemnified client section is Charles Ryan.

13    What is the basis for seeking to extend the stay to Mr.

14    Ryan?

15    A    Well, in that agreement that you -- that we just had on

16    the screen, there is an indemnification clause within that

17    agreement that would have provided for an indemnification to

18    --

19         MR. PATTERSON:  Objection, Your Honor.

20         THE COURT:  Hold on.  There's an objection.

21    Counsel -- there's an objection.

22         MR. PATTERSON:  Calls for a legal conclusion if

23    he's going to tell us what the agreement means and what it

24    does.  That's -- he can't do that, which is what his answer

25    was doing.

1          THE COURT:  Overruled.  You can answer.

2    BY MS. CARSON:

3    A    Your Honor, there is a -- there's an indemnification

4    provision within this document, and based on what I've read,

5    the document provides for an indemnification for the state's

6    employees.

7    Q    If we go to Page 11 of 14 of Exhibit 13?  And Mr.

8    Perry, do you see any indemnification provisions here?

9    A    I do.  It's Paragraph 4.

10   Q    Are any other parties besides Mr. Ryan covered by this

11   same indemnity provision?

12   A    (indiscernible) I think there are two other parties

13   that are covered by this indemnification.  It would be on

14   the demonstrative.

15   Q    Please turn to Exhibit 22.  Are you familiar with this

16   document, Mr. Perry?

17   A    I am.  I've reviewed this document.  Mm-hmm.

18   Q    And what is it?

19   A    This is again an agreement between the City of New York

20   and the Debtor entity to provide, you know, healthcare

21   services.

22   Q    The second party on our demonstrative chart is the City

23   of New York.  What is the basis for seeking to extend the

24   stay to New York?

25   A    Similar to the last situation, there's an

1    indemnification provision within the document that would

2    provide for an indemnity --

3            MR. PATTERSON:  Objection, Your Honor, that's

4    hearsay.  He's referring to a document that's not in

5    evidence, and that would be hearsay.

6            THE COURT:  My understanding of the question was

7    what -- why are they seeking to extend the stay with respect

8    to the City of New York.  I don't --

9            MR. PATTERSON:  Sure, and his answer was referring

10   to something in this document.  That's hearsay.

11           THE COURT:  I think he was just talking generally.

12   I don't think he was referring to the document.  So, to the

13   extent he was, I misunderstand.  Maybe -- can you repeat

14   your answer?

15           THE WITNESS:  Sure.  We're seeking to extend the

16   stay to the City of New York due to an indemnification

17   relationship between the Debtor and the city.

18           THE COURT:  Okay.

19   BY MS. CARSON:

20   Q    Is this a true and correct copy of this document?

21           THE COURT:  Don't you probably need to flip

22   through?  Why don't you flip through the document?

23   BY MS. CARSON:

24   Q    I think we've scrolled through all 157 pages.  Thank

25   you, Mr. Kaufman.  Mr. Perry, is this a true and correct

1    copy of this document?

2    A    It appears so.  Mm-hmm.  Yes.

3              MR. PATTERSON:  Your Honor, I'd like to take the

4    witness on voir dire if I could.

5              THE COURT:  I think --

6              MS. CARSON:  Your Honor, Mr. --

7              THE COURT:  I don't think they've moved it into --

8              MR. PATTERSON:  Okay.  I'll wait.

9              MS. CARSON:  Mr. Kaufman, could you please turn to

10   Page 37 of 157?

11   BY MS. CARSON:

12   Q    Do you recognize the signature of the person signing

13   for Corizon on this page?

14             MR. PATTERSON:  Objection.  She's leading the

15   witness.

16             THE COURT:  Overruled.

17   BY MS. CARSON:

18   A    Yes, that's Stewart Campbell, the President and CEO --

19   COO at the time.

20   Q    And I believe at the beginning of your testimony, you

21   testified that you are generally familiar with the Debtor's

22   business records; is that accurate?

23   A    As familiar as I can be with the time that I've had,

24   yes.

25             MS. CARSON:  Your Honor, I'd move to admit Exhibit

1    22.

2                THE COURT:  Okay.  Any objection?

3                MR. PATTERSON:  Yes, Your Honor.  If I could take

4    the witness on voir dire?

5                THE COURT:  Okay.

6                VOIR DIRE EXAMINATION OF RUSSELL PERRY

7    BY MR. PATTERSON:

8    Q    Mr. Perry, you indicated under oath that you recognized

9    the signature --

10               THE COURT:  Mr. Perry, can you hear Mr. Patterson?

11   I want to make sure -- just to make sure.  Maybe might need

12   to get him close to a mic.

13               MR. PATTERSON:  I can --

14               THE COURT:  Hold on.  We're going to get a

15   microphone.  I want to make sure that you can hear him, and

16   more importantly that Mr. Patterson can articulate his

17   questions so that you can hear him correctly.

18   BY MR. PATTERSON:

19   Q    Can you hear me all right, Mr. Perry?

20   A    I can.  Mm-hmm.

21   Q    All right.  You said you recognized the signature

22   that's on the screen in front of you?

23   A    I recognize the signature through my reviewing of the

24   document.  Mm-hmm.

25   Q    Do you know this person?

 1    A    I do not.  I do not.

 2    Q    You've never met them, yet you recognize their

 3    signature?

 4    A    (Indiscernible) the signature of the document that I

 5    reviewed, and my understanding is from the information I

 6    reviewed that was the president and COO of the company at

 7    the time.

 8    Q    Wouldn't it be more accurate to say you recognize the

 9    identity of this person, not that you actually recognize

10    their signature, correct?

11    A    I don't fully understand the question.  I --

12    Q    Can you -- all right.  I'll ask it a different way.

13    Can you sit here and testify under oath that this is a

14    signature of the person whose name is typed underneath it?

15    A    I did not witness Stewart Campbell signing this

16    document.

17    Q    Okay.  That's not what you said.

18    A    I --

19    Q    You said you recognized the signature.  Do you?

20    A    I'm familiar with the signature on the screen, that

21    that is the same signature of the document that I reviewed.

22    Q    Okay, that it's similar to what you reviewed.  It's not

23    that you recognize this as a particular person's signature,

24    correct?

25    A    I reviewed information with respect to who the officers

```
 1    were at the time that this document was executed.  The
 2    information I reviewed suggested Stewart Campbell was, in
 3    fact, the president and COO.  I have seen his signature here
 4    on the page.  And so, I recognize his signature on the page
 5    with the document that I reviewed and I reviewed the fact
 6    that he was the president and COO or at least that's the
 7    information that was provided to me.
 8    Q    Okay.  And that's a lot of words, but that's not the
 9    question that was asked.  All right?  If you listen, Mr.
10    Perry, my question to you is you swore under oath you
11    recognize this as the signature of Mr. Campbell.  Is that
12    what you did or is that not what you did?
13    A    I testified that I recognized the signature of Stewart
14    Campbell because I recognize what's being shown on the
15    screen as the signature and the document that I've reviewed.
16    Q    Okay.  So, what you're doing today, and you're sticking
17    to the story, is you're telling this Court that under oath
18    you testified this is Mr. Campbell's signature, yet you've
19    never met the man, right?
20    A    I have never met Mr. Campbell.
21    Q    Okay.  That's not my question.  Listen to my question,
22    Mr. Perry.  Are you sticking to your story that your
23    testimony under oath today is you recognize Mr. Campbell's
24    signature even though you've never met the man?
25    A    The extent of my testimony is exactly what I testified
```

1    to, which is I reviewed this document.  I reviewed

2    information to understand who the President and COO was at

3    the time.  I -- by the review of that document, I recognize

4    the fact that the document on the screen has the same

5    signature as the document that was provided to me.  I have

6    never met Mr. Campbell.

7    Q    Right.  And I'm going to try one more time, right?

8    That's not my question.  We've got that.  This matches what

9    you were shown in person, right?  What's -- the picture on

10   your screen matches what was put on your desk to look at,

11   right?

12   A    That's correct.

13   Q    Okay.  My question, however, is are you giving this

14   Court sworn testimony that you recognize the signature of a

15   man you've never met?

16   A    I don't think my testimony is that I've met Mr.

17   Campbell.

18   Q    All right.

19   A    I'm -- I testified exactly what -- the words that I

20   used a second ago, which is this is a document that's been

21   based on my read signed and executed by the then president

22   and COO of the company.

23   Q    Okay.  And you would rather not answer my question.

24         MS. CARSON:  Your Honor, objection.  We're

25   bordering --

```
 1                THE COURT:  Sustained.  Sustained.
 2                MR. PATTERSON:  All right.
 3    BY MR. PATTERSON:
 4    Q    Is -- are you -- are you testifying under oath that
 5    this is a complete copy of this agreement?
 6                MS. CARSON:  Objection.  Misstates testimony.
 7                MR. PATTERSON:  Okay.
 8    BY MR. PATTERSON:
 9    Q    Is it not a complete copy?
10                MS. CARSON:  I believe the testimony --
11                MR. PATTERSON:  Hold on.  I'm asking the witness,
12    not the lawyer.
13                THE COURT:  Let him answer.
14    BY MR. PATTERSON:
15    A    My testimony is based on the fact that this document
16    was provided to me and represented to me that it is a
17    complete document.
18    Q    Who represented that to you?
19    A    The Debtor's affiliates who would have -- who I have
20    been gathering information from.
21    Q    No, who, which is a person, who represented that to
22    you?
23    A    Yeah, so this would have been provided by the
24    individual that works with the entity by the name of Sigma,
25    Jennifer Finger, who has been providing us with legal
```

1    documentation for us to review and consider.

2    Q    All right.

3    A    This was represented to me that it was in fact a

4    complete contract.

5    Q    Okay.  Ms. Finger told you this is a complete document.

6    There's nothing missing, right?

7    A    Correct.  I have not been told anything is missing from

8    this document.  Correct.

9    Q    No, that's not my question.  My question is, was it

10   represented to you that this was a complete document?

11   A    Yes.

12   Q    It was?  They told you that there's nothing missing

13   from this document?

14   A    This is the -- there are certain provisions in certain

15   documents where things are missing.  This is -- so I'd have

16   to flip back to this document again.  There is a specific

17   exhibit missing from one of the documents.  This was the

18   complete set of pages that was presented to me.  Your

19   question is whether or not every page in the complete

20   contract was provided to me and represented that it was

21   complete.  That's my understanding, but I could be

22   incorrect.  I've been -- again, this is two weeks.  There's

23   thousands of pages.  I'm doing my best to work through each

24   and every one of the documents.

25   Q    I appreciate the fact that it's only been two weeks.

1    We all do.  What I'm trying to make sure is that you're only

2    testifying under oath as to what you can swear to, all

3    right?  Is this a similar situation that we addressed with

4    the signature, right?  When you say this is a complete

5    document, isn't it true what you're saying is that based

6    upon what was given to you in person, this appears to be the

7    same thing, right?

8    A    (Indiscernible) electronically.  That's correct.  If I

9    can see the indemnification section of this document, I can

10   actually answer your question.

11   Q    Okay.  How does one provision tell -- how -- hold on.

12   How does one provision tell you whether it's a complete

13   document or not?

14   A    Because one of the documents that we're going to be

15   reviewing today has a specific exhibit in an indemnification

16   provision.  Maybe this document, if I could see the

17   indemnification provision, I could identify it then I could

18   answer your question.

19   Q    I thought you already looked through this complete

20   document.  You said you did.

21   A    I have looked through this document.

22   Q    Okay.  So, where in this --

23   A    I haven't memorized every page and provision, so if I

24   could see the indemnification provision, I can answer your

25   question.

1    Q    Okay.  So, where in this document is the Debtor named?

2    A    (Indiscernible) again, I'd have to scroll through the

3    document, but my understanding is the Debtor name would be

4    most likely at the very front of the documents in the

5    opening pages.

6    Q    All right.  Who do you -- who -- who -- if I were to

7    ask you who the Debtor is, who would you say?

8    A    The Debtor today is Tehum Care.

9    Q    It is?  That's not who filed the bankruptcy, is it?

10   A    Tehum Care Services, Inc. is on the Chapter 11

11   petition, I believe.

12   Q    All right.  And they're also in this contract?

13   A    They're not.

14   Q    Oh, they're not?

15   A    They're not a named party.

16   Q    Okay.  I thought you said that the Debtor was named in

17   this contract.

18   A    You didn't ask me if the Debtor was named in this

19   contract.  You said where can I find the name, and then you

20   asked me who the Debtor was, and I -- the Debtor was Tecum

21   Care Services, Inc., and I've already testified to the plan

22   of divisional merger that there were a (indiscernible) and a

23   Newco structure that was created.

24   Q    All right.

25   A    (Indiscernible) the document that was entered into

1    prior to the name Tecum Care Services, Inc.

2    Q    All right.  And we'll wrap this up.  But you also

3    testified having been there only 14 days, you're not --

4    you're not familiar with the records or the recordkeeping of

5    the Debtor, are you?

6    A    I don't think that's what I testified to a few minutes

7    ago.

8    Q    No, but I asked you a question.  You're not, are you?

9    A    I'm sorry.  You're going to have to repeat.  Are -- I

10   don't understand what you're asking me.

11   Q    It's pretty simple.  You're not familiar with the

12   Debtor's records or recordkeeping, are you?

13   A    I am generally familiar with the Debtor's

14   recordkeeping.  I think you're asking if I'm not familiar.

15   I'm generally familiar with the fact that there are

16   contracts that are maintained within various contract

17   databases and various electronic storage applications for

18   the various contracts.

19            MR. PATTERSON:  I renew my objection, Your Honor.

20   Lack of foundation.  It's hearsay, and it's not necessarily

21   a complete document.  He can't testify to it anyway.  He

22   can't even testify as to what it is.

23            MS. CARSON:  Your Honor, this is a 157-page

24   contract.  Mr. Perry has testified that he has reviewed

25   generally the Debtor's books and records during this time.

1    Personal knowledge includes opinions and inferences grounded

2    in observations and experience.  Again, Mr. Perry during his

3    time as CRO has testified that he's reviewed many documents.

4            Also, I do want to note, I don't believe this

5    contract actually affects Mr. Patterson's client --

6            MR. PATTERSON:  Your Honor --

7            THE COURT:  I think she's allowed to finish.

8    She's allowed to finish.

9            MR. PATTERSON:  Well, not if she's coaching the

10   witness, Your Honor.  So, just address the objection.

11           THE COURT:  I think -- I think everybody's been

12   speaking -- doing speaking objections.  So, I'm going to

13   allowed it.  The door got opened and I'm allowing it.  So,

14   everybody's been coaching today, so.  What else do you need

15   to say, Counsel?

16           MS. CARSON:  I would renew my request to admit

17   Exhibit 22 into evidence.

18           THE COURT:  I'm not going to admit 22.  I don't

19   think he can talk about it.  I think it's been properly

20   authenticated.  We'll proceed.  I need to talk -- I need to

21   take a break from this hearing.

22           Mr. Perry, there's a -- there's a 3:00 case that I

23   think should last about five minutes.  I'm going to take a

24   break from this case.  Mr. Perry, I'm going to still remind

25   you that you're still under oath.

```
1              (Recess)

2              THE COURT:  Can we just -- in Tehum, can we just

3    take a short break 'til 3 -- just give me eight minutes,

4    3:15?  And can you let Mr. Patterson know?  We're just going

5    to just take a break until 3:15 and then we'll pick back up.

6    I just want to sign this, get my stuff back up, and make

7    sure that my computer doesn't crash in the -- in the -- in

8    between.  I want to make sure.  Thank you.

9              MS. CARSON:  Understood.

10             CLERK:  All rise.

11             THE COURT:  Oh, no, no, no, no one rise.

12   (Indiscernible).  I'm sitting here.  All sit.  Let me figure

13   this out.  Yeah.  (Indiscernible).  Let's see.

14             (Recess)

15             CLERK:  All rise.

16             THE COURT:  Please be seated.  Okay.  I want to

17   thank everyone for allowing me to (indiscernible) for a bit

18   here.  Let me -- Mr. Perry, are you there?

19             MR. PERRY:  Can you hear Ms. -- Your Honor?

20             THE COURT:  Just fine.  Okay.  Ms. Carson, you may

21   continue.

22             MS. CARSON:  Mr. Kaufman, can you please turn to

23   Exhibit 24?

24             THE COURT:  Who?

25             MS. CARSON:  Mr. Kaufman, my colleague who's
```

1    running the documents.

2              THE COURT:  Let's see.  Yeah, I believe -- yeah,

3    he's still the presenter.

4              MS. CARSON:  And that was 24, please.  Twenty-

5    four, please, Mr. Kaufman.  Is your screen -- there we go.

6    Thank you.

7              DIRECT EXAMINATION OF RUSSELL PERRY

8    BY MS. CARSON:

9    Q    Mr. Perry, are you familiar with Exhibit 24?

10   A    Judging by the top of this page, this is a document

11   that I was provided with.  I am familiar with it.

12   Q    And --

13   A    Judging by what I'm seeing.

14   Q    -- what is this document?

15   A    This is a document between Corizon Health, Inc. and

16   Clackamas County that would have been for the provision of

17   healthcare services.

18   Q    The third person on our demonstrative chart is

19   Clackamas County.  What is the basis for seeking to extend

20   the stay to them?

21   A    An indemnification relationship between Corizon Health,

22   Inc. and Clackamas County.

23   Q    Please turn to Page 16 of 60.  And Mr. Perry, do you

24   see an indemnification provision?

25   A    (Indiscernible) hold harmless, but it references

1   indemnification, (indiscernible) harmless and defending the

2   client.  So, yes.

3   Q    Mr. Kaufman, can you please move to Exhibit 14?  And

4   Mr. Perry, what is this?

5   A    This is a contract again with the Florida Department of

6   Corrections, again for the provision of healthcare services.

7   Q    The fourth party on our demonstrative chart is the

8   Florida Department of Corrections.  What is the basis for

9   seeking to extend the stay to them?

10  A    Identification relationship with the Department of

11  Corrections.

12  Q    Mr. Kaufman, please turn to Page 2 of 8.  And Mr.

13  Perry, do you see an indemnification provision?

14  A    I do, Section I here, indemnification for contractors

15  acting as an agent to the state.

16  Q    Okay.  Mr. Kaufman, please turn to Exhibit 17.  Mr.

17  Perry, are -- what is this document?

18  A    (Indiscernible) Healthcare Services Agreement between

19  the County of Genesee, Michigan and Corizon Health, Inc.

20  Q    The sixth party on our demonstrative chart is Genesee

21  County.  What is the basis for seeking to extend the stay to

22  them?

23  A    An indemnification relationship with Genesee County and

24  Corizon Health, Inc.

25  Q    Mr. Kaufman, please turn to Page 11 of 23.  Mr. Perry,

1    do you see an indemnification provisions here?

2    A    I do, Section 9.3, hold harmless.

3    Q    Mr. Kaufman, please turn to Exhibit 12.  Mr. Perry,

4    what is this document?

5    A    This again is a contract with Alabama Department of

6    Corrections and Corizon with respect to healthcare services.

7    Q    The eighth party on our chart is Jefferson Dunn.  What

8    is the basis for seeking to extend the stay to him?

9    A    (Indiscernible) Jefferson Dunn was an employee of the

10   Alabama DOC and there's an indemnification relationship

11   (indiscernible) this document related to employees.

12   Q    Mr. Kaufman, please turn to Page 30 of 53.  Mr. Perry,

13   do you see an indemnification provision here?

14   A    Yeah, (indiscernible) indemnification.  I do.

15   Q    Are any other parties covered by this same

16   indemnification provision besides Mr. Dunn?

17   A    There are two other parties on the demonstrative that

18   would be -- that would relate to this same indemnification

19   provision as an employee of the State of Alabama.

20   Q    Is that Mary Cooks and Ruth Naglich?

21   A    It is.  Yes.

22   Q    Please turn to Exhibit 20.  And what is this document?

23   A    So, (indiscernible) is this is the contract for the

24   provision of healthcare services.  That section there says

25   contract title.  (Indiscernible) healthcare services again

1    between Corizon and the State of Missouri.

2    Q    The tenth person on our demonstrative chart is the

3    Missouri Department of Corrections.  So, what is the basis

4    for seeking to extend the stay to them?

5    A    Again, an indemnification relationship with the State

6    of Missouri.

7    Q    Please turn to Page 11 of 37.  Mr. Perry, do you see an

8    indemnification provision here?

9    A    I do.  Section (indiscernible) says contractor

10   liability, contractor shall be responsible, et cetera, et

11   cetera.  That's the indemnification provision that I

12   reviewed.

13   Q    Please turn to Exhibit 15.  And Mr. Perry, what is this

14   document?

15   A    (Indiscernible) contract with the Idaho Department of

16   Correction with respect to the provision of healthcare

17   services.

18   Q    To the best of your knowledge, is this a true and

19   correct copy of the document?

20   A    It's a document that was provided to me as true and

21   correct.  That's correct.

22         MS. HEARD:  Objection, Your Honor, nonresponsive.

23   Provided to him?

24         THE COURT:  Overruled.

25   BY MS. CARSON:

1    Q    Please turn to Page 10 of 18.  Mr. Perry, during the

2    time that you have been employed as CRO, I believe you said

3    you reviewed various business documents of the Debtor; is

4    that right?

5    A    That's correct.

6    Q    On those documents, have you seen various signatures of

7    people affiliated with the Debtor?

8          MR. PATTERSON:  Objection, Your Honor.  She's

9    leading the witness and there's no foundation that he knows

10    any of these people.

11          THE COURT:  Sustained on the leading.

12    BY MS. CARSON:

13    Q    Do any of the documents that you've reviewed during

14    your time as CRO contain signatures?

15    A    They do.

16    Q    And what types of signatures have you seen on those

17    documents?  And let me clarify.  Whose signatures have you

18    seen on those documents, and I understand there are many

19    documents, so I'm speaking generally.

20          MR. PATTERSON:  Objection, Your Honor.  It's lack

21    of foundation.  She's asking him to identify signatures.

22    That's what we spent 15 minutes on.  He doesn't have that

23    personal knowledge.  He can't testify.

24          THE COURT:  How do we know as to this witness?

25          MR. PATTERSON:  Well, because he --

```
 1           THE COURT:  Just let them ask the question and he
 2      can -- he can say whether he knows it or doesn't.
 3           MS. CARSON:  Perhaps I need to clarify my
 4      question.
 5      BY MS. CARSON:
 6      Q    My question is while reviewing documents, Mr. Perry,
 7      have you seen -- what types of signatures have you seen?
 8           MR. PATTESRON:  Objection, Your Honor.  It's just
 9      -- it's a vague question.  What -- how many types of
10      signatures are there?  I mean, I don't know.
11           THE COURT:  I know.  This is what opens the door
12      to the speaking objections now.  I'm going to -- I'm going
13      to shut that --
14           MR. PATTERSON:  Well --
15           THE COURT:  I'm shutting it all down.  I just want
16      -- I just want objections from now on, because I've got to
17      cut it both ways.  So, I only want objections.  Objection
18      vague, sustained.
19      BY MS. CARSON:
20      Q    Mr. Perry, who signed this document, Exhibit 15?
21           MR. PATTERSON:  Objection.  Lack of foundation,
22      Your Honor.
23           THE COURT:  Overruled.
24      BY MS. CARSON:
25      A    This document appears to be signed by Martin Moore.  My
```

1    understanding is Martin Moore was the CFO at the time of the

2    signature.

3    Q    What is the basis for that understanding?

4    A    Information provided to me by the Debtor's books and

5    records -- my review of the Debtor's (indiscernible) anyway.

6            MS. CARSON:  Your Honor, I'll move to admit

7    Exhibit 15.

8            THE COURT:  Any objection?

9            MS. HEARD:  Objection, Your Honor.

10           THE COURT:  What's the basis?

11           MS. HEARD:  Your Honor, lack of foundation,

12   hearsay.  I can take him on voir dire if you wish.  I'd like

13   to do that.

14           THE COURT:  Are you objecting or are you asking to

15   take him on voir dire?

16           MS. HEARD:  Well, I'm objecting at this point,

17   Your Honor.

18           THE COURT:  Okay.

19           MS. HEARD:  And I can -- I can -- I'll go ahead

20   and take him on voir dire.

21           THE COURT:  All right.  Let me -- let me hear the

22   response to the objection first.

23           MS. CARSON:  I hear two parts, lack of foundation

24   and that the contract is hearsay.  First, this contract is

25   not hearsay.  It's not being admitted for the truth of the

1    matter asserted.  As the 5th Circuit actually stated in

2    Leadership Software, which is 12 F.3d 527, and I quote,

3    "Signed instruments such as contracts, wills, and promissory

4    notes are writings that have independent legal significance

5    and are non-hearsay."

6           Your Honor, this document is a verbal act.  It has

7    legal obligations by the mere fact that it was made

8    regardless of the truth of any statements within here.

9           On the foundation point, Mr. Perry has indicated

10   that he has reviewed the Debtor's books and records.  He

11   said that this appears to be an accurate copy of this

12   document.  He stated that he has seen signatures on

13   documents while reviewing them.

14          I don't -- I don't hear any objection or real

15   argument that there's any issue with authenticity of this

16   document.

17          THE COURT:  Ms. Heard?

18          MS. HEARD:  Your Honor -- Your Honor, he's

19   testifying as to the indemnification relationship.  That is

20   hearsay.  We haven't seen this entire document.  I would

21   like for him to actually look through the entire document

22   first.

23          THE COURT:  I think that's fair to let him look at

24   the entire document.  It's 18 pages, right?

25          MS. HEARD:  I'm sorry.  I couldn't hear you, Your

 1    Honor.

 2              THE COURT:  Hold on.  I said I thought that was a

 3    fair request to have him look through the entire document.

 4              MS. CARSON:  Do you mind scrolling through, Mr.

 5    Kaufman?

 6              MS. HEARD:  Your Honor, in response to counsel's

 7    response, the issue is that this isn't a verbal act.  It's a

 8    series of -- it's not a contract in and of itself.  It's a

 9    series of pages that have different references.  It's not an

10    agreement in and of itself.  If you look through it, there

11    are various provisions that aren't tied to an actual

12    contract.  So, it's hearsay.  Lack of foundation.

13              THE COURT:  Counsel?

14              MS. CARSON:  Your Honor, this exhibit is being

15    admitted to show that the indemnification provisions exist,

16    not the truthfulness of anything within this document.

17              THE COURT:  What's the purpose of the purchase

18    order?  Can't you just admit the agreement?  The pages?

19              MS. CARSON:  That would be fine.  It was my --

20    well, it was my understanding that this was -- this entire

21    thing constituted the contract.  But if Counsel has an issue

22    --

23              MS. HEARD:  Your Honor --

24              MS. CARSON:  -- admitting certain of these pages,

25    I have no issue to remitting some of these.

1    MS. HEARD:  Your Honor, she's testifying, and Your

2    Honor, the whole thing should not come in.

3    THE COURT:  You -- well, I think she's answering

4    your question.  You mentioned that you thought that there

5    were a series of things that were unrelated, and I think

6    she's saying that it's her understanding that this is the

7    entire document.  So, I don't think she's testifying.  I

8    think she's responding to your objection that's where you've

9    been saying (indiscernible) that the document was somehow a

10   series of different documents put together.

11   MS. HEARD:  And Your Honor, I'm saying it isn't.

12   So, it's not a --

13   THE COURT:  It isn't what?  I'm sorry.  I'm not --

14   I'm not following.

15   MS. HEARD:  Your Honor, this -- okay, this isn't

16   the contract.  There is a purchase order, then there is a

17   letter at the end that says that Corizon has to respond.

18   This isn't the contract.

19   THE COURT:  Right, but I think that's -- that was

20   the -- and she's saying that it was her understanding that

21   it was -- that the entire document was the contract.  And I

22   -- that's why I was asking whether just limiting this to the

23   -- no, no, I understand the point now.  I just -- that was

24   the point that I wanted to clarify with Ms. Carson just to

25   make sure that we're all on the same page.  I think Ms.

1   Heard is saying that the entire document in there --

2          MS. HEARD:  I understand that, but she's not --

3          THE COURT:  -- and every part of it isn't, but as

4   compiled, that's not the agreement if I understand Ms. Heard

5   correctly.

6          MS. HEARD:  Your Honor, what I'm saying is that it

7   isn't her job to tell us it's her understanding it's the

8   whole contract, it's his, and this is not a contract.  It's

9   a purchase order with a letter telling us to write back --

10         THE COURT:  Well, that --

11         MS. HEARD:  -- (indiscernible) --

12         THE COURT:  -- see, this is when everybody starts

13  to testify and this is the problem, right?  Then people have

14  to then respond to that.  And so, why don't we just --

15  Counsel, what's your -- what are you -- what are you seeking

16  to do?

17         MS. CARSON:  Your Honor, as far as whether this is

18  a contract, this --

19         THE COURT:  No, no, I just want to know what

20  you're seeking to do.  Are you seeking to move the entire

21  document in or a portion?  How many pages is this?

22         MS. CARSON:  It is only 18 pages.

23         THE COURT:  What are you seeking to do?

24         MS. CARSON:  Mr. Kaufman, would you mind scrolling

25  down, please?  To the next page.  Actually, I have my paper

1    here.  There are terms and conditions which begin just a

2    couple of pages down from where you are, Mr. Kaufman.

3              THE COURT:  I just want to know what -- are you

4    seeking to move all 18 pages, a portion of them?  I just

5    need to -- that's the question that I've got just so I

6    understand what's on the table.

7              MS. CARSON:  My original ask was to move the

8    entire exhibit into evidence.  However, I don't believe all

9    of them need to be admitted into evidence.  I would request

10   that Pages 11 through 18 --

11             MS. HEARD:  Your Honor, I object.  Eleven through

12   18, there's no signature.  This is just their standard

13   terms.  You know, I mean, if that's actually what this is,

14   the witness needs to be telling us is this the contract, is

15   this the only contract, is this the last contract, is this

16   the whole document?

17             THE COURT:  I think you're testifying.  Counsel,

18   you're testifying again.  I just -- you're just objecting.

19   What's the basis of the objection?  It's not authentication?

20   Relevance?  What's the --

21             MS. HEARD:  Your Honor, I -- yes.

22             THE COURT:  Where are you going?

23             MS. HEARD:  Well, it's hearsay, lack of foundation

24   --

25             THE COURT:  Okay.

1        MS. HEARD:  -- (indiscernible) and relevance.

2    Thank you, Your Honor.

3        THE COURT:  Ms. Carson, is this contract signed?

4        MS. CARSON:  Your Honor, it is.  Mr. Perry

5    testified that it is signed on Page 10 of 18.

6        THE COURT:  Can you go up to 10 of 18?

7        MS. CARSON:  And --

8        THE COURT:  Go ahead.

9        MS. CARSON:  Mr. Perry -- well, I was going to ask

10   him to read from this.

11       THE COURT:  No, no, no, no.  I'm just -- I want

12   you to respond.  So, she's saying hearsay.

13       MS. CARSON:  Right, well this --

14       THE COURT:  Authentication.

15       MS. CARSON:  -- this page confirms the agreement.

16   It says it on the page.  Mr. Perry testified that this is

17   signed as you can see on the screen.

18       MS. HEARD:  Your Honor --

19       THE COURT:  She's got to be able to finish, Ms.

20   Heard.  I want -- I want her to finish and then you can --

21   then you can speak.

22       MS. HEARD:  She can't testify.  Thank you.

23       THE COURT:  I think you -- I think y'all are both

24   testifying.  I think that's fair, so I'm not paying

25   attention to that testimony.  I'm just listening to the

1    legal argument.  You said it wasn't signed.  She's pointing

2    to a page saying it's signed.  That -- she's got to be able

3    to respond to that.

4              MS. CARSON:  This appears --

5              MS. HEARD:  Your Honor, she's asking for 8 -- for

6    11 through 18 to come in, and that is not signed.

7              THE COURT:  That's a different argument.  What I'm

8    saying is that's a different argument than the one that you

9    just made.

10             MS. CARSON:  I would request that the entire

11   document be admitted, Your Honor.  The first page says this

12   contract.

13             THE COURT:  I don't need you to read anything.

14   Just --

15             MS. CARSON:  This appears to be a contract offer

16   and acceptance.  It is signed by the Debtor.

17             THE COURT:  You're just asking for the admission

18   of 59-15?

19             MS. CARSON:  Of Exhibit 15.

20             THE COURT:  Exhibit 15.

21             MS. CARSON:  Yes.

22             THE COURT:  What's your final -- okay.  Mr.

23   Kaufman --

24             MS. HEARD:  And Your Honor, again --

25             THE COURT:  I'm listening.

1          MS. HEARD:  Sorry.  Your Honor, again, I'm

2    objecting, lack of foundation and hearsay, and this -- it's

3    not a contract.  He hasn't -- it's -- we don't know if it's

4    the whole contract.

5          THE COURT:  Well, then I'm going to overrule your

6    objection, because I think whether it's a contract or not is

7    irrelevant as to whether it's an admissible document and

8    whether, you know, you can -- we can always supplement the

9    record if the document is incomplete.  The Rules of Evidence

10   can provide that I be provided a complete document.  But I

11   do think he's -- I do think your objection as to the

12   foundation and the authentication, I think he properly

13   authenticated what the document was, and he said it was

14   signed.

15         So, Ms. Carson, you can move on, but I'm just

16   admitting it for purposes of today.

17         MS. HEARD:  And --

18         THE COURT:  Overruled, Ms. Heard.  You can

19   proceed.

20         MS. HEARD:  -- Your Honor, I also had raised

21   relevance, and this --

22         THE COURT:  All right.

23         MS. HEARD:  -- this contract terminated

24   (indiscernible) 31, 2018.

25         THE COURT:  I'll overrule it.  I am -- thank you.

```
 1   Go ahead, Ms. Carson.

 2             MS. CARSON:  Thank you, Your Honor.

 3   BY MS. CARSON:

 4   Q    Mr. Perry, the seventh party on our demonstrative chart

 5   is the Idaho Department of Corrections.  What is the basis

 6   for seeking to extend the stay to them?

 7   A    (Indiscernible) relationship between the parties.

 8   Q    I'm sorry.  You cut out.  Would you mind restating

 9   that?

10             THE COURT:  Hold on a second.  Folks, let me just

11   -- folks, if everyone can mute your line unless you are the

12   witness, I would really appreciate it.  There's some beeping

13   in the back and I'm trying to avoid -- just a second.

14             Mr. Perry, I'm going to mute the entire line.  I'm

15   going to ask you to hit five star.  Ms. Heard, I'm going to

16   ask you to hit five star.

17             AUTOMATED VOICE:  Conference muted.  Conference

18   unmuted.

19             THE COURT:  Mr. Perry, is that you?  Ms. Heard,

20   have I unlocked -- have I unmuted you?  All right.  Ms.

21   Heard, can you hit five star?  Mr. Perry, can you hear me?

22             THE WITNESS:  I can.  Yes, Your Honor.

23             THE COURT:  Okay, great.  Thank you.

24             THE WITNESS:  Can you hear me, Your Honor?

25             THE COURT:  Just fine.  Ms. Heard, was that you
```

1    that I just unmuted?

2            MS. HEARD:  Your Honor, can you hear me?

3            THE COURT:  Just fine.  Thank you very much.

4    Okay, we'll just proceed this way.  Thank you.

5    BY MS. CARSON:

6    Q    I'm going to re-ask my question since we didn't get

7    your reply, Mr. Perry.  What is the basis for seeking to

8    extend the stay to the Idaho Department of Corrections?

9    A    The indemnification relationship between the parties.

10           MS. HEARD:  Objection, Your Honor.

11           THE COURT:  What's the basis?

12           MS. HEARD:  Again, this is hearsay, and the

13   document, it terminated in 2018.  It's not relevant.

14           THE COURT:  I thought we were talking about a

15   different document.  Are we still talking about the same

16   document?

17           MS. CARSON:  We're talking about the same

18   document, yes.

19           THE COURT:  Why don't you just move on, Ms.

20   Carson?

21           MS. CARSON:  Mr. --

22           THE COURT:  I'm going to sustain the objection.

23   Why don't you move on to something else?

24           MS. HEARD:  And Your Honor, can --

25           THE COURT:  I sustained the objection.

1          MS. HEARD:  I move to strike (indiscernible).

2     Thank you.

3     BY MS. CARSON:

4     Q     All right.  Let's look back at the demonstrative chart

5     and let's move to the very last section, the indemnified D&O

6     section, and let's just go through each of those, Mr. Perry.

7     The first is Abraham Goldberger.  Who is Mr. Goldberger?

8     A     A former director/officer of the Debtor.

9     Q     And what is the basis for extending the stay to him?

10    A     The indemnification provided through the bylaws.

11    Q     Please turn to Exhibit 8.  And are you familiar with

12    this document?

13    A     Judging by the top half of this page, I have, yes, I've

14    seen this document.  I'm familiar with it.

15    Q     What is it?

16    A     These are the bylaws of Corizon Health (indiscernible)

17    through the State of Texas.

18    Q     Please turn to Page 6 of 8.  And Mr. Perry, do you see

19    an indemnification provision here?

20    A     (Indiscernible) Section 6.01, (indiscernible) of

21    existing and former directors and officers.

22    Q     Was it your testimony that Mr. Goldberger would be

23    covered by this indemnification?

24    A     Yes, that's my understanding.

25    Q     Would any other people in this indemnified D&O section

1    of our demonstrative be covered by the same indemnification

2    provision?

3    A    They would.  The demonstrative has, if I recall,

4    roughly five individuals that would be covered by -- it's my

5    understanding by that provision.

6    Q    Mr. Kaufman, can you pull up the demonstrative again?

7    If you can read those names, Mr. Perry, can you tell us who

8    else in this section would be covered by the bylaws you

9    mentioned?

10   A    (Indiscernible) Mr. Goldberger, Mr. (indiscernible),

11   Mr. Lefkowitz, and Ms. Tirschwell would be covered, and Mr.

12   Scott King.  One, two, three, four, five.

13   Q    Is that because all of these parties are current or

14   former D&Os of the Debtor?

15   A    That's my understanding.  Yes.  Mm-hmm.

16   Q    Are there any other bases for covering the D&Os that

17   you mentioned besides these bylaws for any of the D&Os that

18   you mentioned?

19   A    (Indiscernible) in addition to the bylaws, the plan of

20   divisional merger that we walked through a bit earlier also

21   provides an indemnification from (indiscernible) to

22   directors and officers.  So, in the bylaws, as well as the

23   plan of divisional merger.

24   Q    Who specifically would be covered under those

25   indemnification provisions from the plan of divisional

1    merger?  Would it be all of these or just some of these?

2              MR. PATTERSON:  Objection, Your Honor.  Calls for

3    a legal conclusion.

4              THE COURT:  Sustained.

5    BY MS. CARSON:

6    Q    You did not mention Dr. Schmidt or Mr. Yarnell.  Why

7    are they on this list?

8    A    Well, they're in the category for D's and O's, but

9    they're not in fact D's and O's.  They're different.  It's

10   just the labeling.  The reason they're on this list is that

11   I understand there is an indemnification relationship

12   through other types of contracts that Dr. Schmidt and Mr.

13   Yarnell would have been subject to or operating under

14   anyway.

15   Q    Okay.  Let's go through both of them individually.

16   What is the basis specifically for the potential

17   indemnification of Dr. Schmidt?

18             MR. PATTERSON:  I'm going to --

19             THE COURT:  Hold on a second.

20             MR. PATTERSON:  This calls for a legal conclusion

21   for the basis.

22             THE COURT:  What's the question again?

23             MS. CARSON:  The question is, what is the basis

24   for the Debtor's proposed indemnification or the basis for

25   potential indemnification of Dr. Schmidt.  I believe that's

 1    how it was worded.

 2              THE COURT:  I'm going to allow it.  Just -- not as

 3    a legal conclusion but based on his understanding, if he has

 4    any, I should say.

 5              THE WITNESS:  I understand your -- I'm sorry, Your

 6    Honor.  Am I to answer?

 7              THE COURT:  You're to answer to the extent you

 8    have -- based on -- based on your -- based on your

 9    understanding, to the extent there is any, if you have one.

10    BY MS. CARSON:

11    A    So, I understand there to be an identification

12    relationship through an agreement that would provide

13    indemnification for Dr. Schmidt.

14    Q    Mr. Kaufman, can you please turn to Exhibit 18?  And

15    what is this, Mr. Perry?

16    A    It's an agreement with -- between Dr. Schmidt and

17    Corizon Health, Inc., and another entity for the provision

18    of healthcare services.

19    Q    And Mr. Kaufman, if you could scroll down to Page 2,

20    please?  Mr. Perry, do you see an indemnification provision

21    in this document?

22    A    I do, Section 4, indemnification.  This paragraph here.

23    Q    All right.  Next, you mentioned we're going through

24    these two -- last two individually.  What is the basis for

25    the indemnification of Mr. Yarnell?

1    A    My understanding is there is an indemnification

2    relationship between Mr. Yarnell with Mr. (indiscernible)

3    according to the contract I reviewed.

4    Q    Mr. Kaufman, please turn to Exhibit 16.  And what is

5    this document, Mr. Perry?

6    A    This is a document between again Corizon Inc. and

7    Correctional Healthcare for the provision of healthcare

8    services.

9    Q    Mr. Kaufman, please turn to Page 16 and scroll through

10   Pages 16 and 17, if you would, so we can see them.  Mr.

11   Perry, what is this, Pages 16 and 17?

12   A    This appears to be an indemnity agreement with respect

13   to the provision of services (indiscernible) association we

14   just discussed, Correction Healthcare Associates

15   (indiscernible).

16   Q    Do you believe this could potentially include Mr.

17   Yarnell?

18   A    That's my understanding.  Yes.

19   Q    So, Mr. Perry, according to your testimony today, the

20   parties that we went through are covered by indemnities.  In

21   your opinion, why does that matter to the Debtor?

22   A    Well, to the extent they are covered by the

23   indemnities, you know, the Debtor has a duty to effectively

24   both pursue various causes of action and other potential

25   recoveries to the Debtor's estate that would allow for the

1    maximization of recovery, and in addition, you know, we --

2    effectively the Debtor is seeking for the ability to

3    effectively press pause (indiscernible) within these various

4    cases that could give rise to a substantial claim against

5    the Debtor (indiscernible) uncapped liability.  That's the

6    rationale for the stay, at least at this time.

7    Q    You're a restructuring professional.  What are some of

8    the main goals of Chapter 11 generally?

9    A    Well, you know, with the main goal, just the

10   overarching goal is to maximize the value of the estate for

11   the benefit of the creditors according to the Asset Priority

12   Rule.  I mean, that's ultimately what we're trying to

13   accomplish, whether that be, you know, a liquidating plan or

14   some other form.  The goal is to determine what is the, you

15   know, value or the value maximizing ability of the various

16   assets the Debtors may have at its disposal and how those

17   would effectively create value for the various creditors.

18   The goal of Chapter 11, that's what we're trying to

19   accomplish here.

20   Q    In your opinion, does the extension of the stay

21   requested in our motion comport with those goals?

22   A    It does.

23        MS. CARSON:  Your Honor, I'll pass the witness.

24        THE COURT:  Okay.  Let me start with any cross-

25   examination from anyone in the courtroom.  Mr. Patterson, do

1    you have any cross-examination for this witness?

2              MR. PATTERSON:  Actually, just a few -- a few

3    things, Your Honor?  Yes.  I'm sorry, yes.

4              THE COURT:  Okay.  Mr. Perry, can you -- I just

5    want to make sure that you can hear Mr. Patterson okay, and

6    if you can't, just let us know.  We're tweaking the mics in

7    this courtroom, and I'm -- it's not Mr. Patterson.  It's

8    just, you know, making sure that the new tech that got put

9    in actually is working the way everybody thinks it is.

10             CROSS-EXAMINATION OF RUSSELL PERRY

11   BY MR. PATTERSON:

12   Q    Mr. Perry, is it correct that you haven't provided

13   anything to the Court in writing that provides any indemnity

14   agreement related to the Rikers Island litigation?

15   A    It doesn't ring a bell.  I don't believe so based on my

16   recollection.

17   Q    Well, there's no written evidence regarding any

18   indemnity of the Debtor to the City of New York, correct?

19             MAN:  Your Honor, object (indiscernible).

20             THE COURT:  I'll --

21             MR. PATTERSON:  Just asking him if he knows.

22             THE COURT:  Yeah.  I'll --  you can answer if you

23   know.

24   BY MR. PATTERSON:

25   A    I guess (indiscernible) identification provision within

1   the City of New York document, but that's the extent that I

2   know.

3   Q    All right.  And you haven't provided the Court any

4   written documents evidencing the Debtor's supposed indemnity

5   obligation to Sidney Wilson, have you?

6   A    Well, the demonstrative that we were just reviewing,

7   Sidney Wilson was at the bottom of the page.

8   Q    Right.

9   A    My understanding is -- yeah.

10  Q    Other than the demonstrative --

11  A    Is that your question?

12  Q    Other than the demonstrative, I understand the name

13  appears on the demonstrative, I'm asking you if you've

14  provided the Court any other writing that supports that

15  allegation.

16  A    There's an agreement that I don't believe was admitted

17  into evidence, but we went through so much today.  I don't

18  recall.

19  Q    Okay, I'm asking -- I'm asking about anything admitted

20  into evidence.

21  A    I don't believe so.  It's been a long testimony, but I

22  don't believe we covered that.

23  Q    All right.  Are you familiar, Mr. Perry, with the

24  litigation in New York State styled K.A., the initials K.A.

25  v. the City of New York, Corizon Health, Inc., and Sidney

1    Wilson?  Are you familiar with that litigation?

2    A    That litigation has come up in reviews of the various

3    records.  If you recall, I testified there's several hundred

4    claims.  So, I've certainly reviewed many of them.  This

5    particular claim would have been one that it would have been

6    discussed (indiscernible) but there's been hundreds, so I'll

7    do my best.

8    Q    Well, my question though is are you familiar with it?

9    That's just yes or no.

10   A    Okay.  So, let me just make sure I understand your

11   question again.  Am I familiar with the case?  And

12   (indiscernible) the definition (indiscernible).  I'm sorry

13   (indiscernible).

14   Q    All right.  Let me break it down.  Are you familiar

15   with the allegations made in the litigation?  I'm going to

16   refer to it as the New York litigation if that's okay with

17   you.

18   A    So, in discussions with the Debtors and discussions --

19   the Debtor's representatives and discussions with Counsel,

20   there have been discussions of numerous claims, all sorts of

21   various claims.  Some are -- we talked about today, some we

22   haven't.  This claim that you're referencing, I -- sorry, I

23   forgot how you defined it, it has come up in discussion

24   along with, you know, many, many others, for sure.

25   Q    Okay.  My question --

```
 1   A    I don't know if that (indiscernible) familiarity.  I'm
 2   sorry.  But I'm familiar in that the name has been mentioned
 3   and we've discussed it along with, you know, many, many,
 4   many other cases.
 5   Q    Okay.  So, is it fair to say you're not familiar with
 6   the litigation?  Well, it's one or the other.  It's one or
 7   the other, Mr. Perry.  You -- you're either here to testify
 8   that you're familiar with this litigation or you're not.
 9   So, take a stand.
10        THE COURT:  Yeah, I'm going to -- I'm going to
11   sustain the objection.  I think we can -- he can answer the
12   question, but I think we can all tone the temperature down a
13   little bit, here.
14   BY MR. PATTERSON:
15   Q    All right.  Are you familiar with this New York
16   litigation or are you not, Mr. Perry?
17        MAN:  Objection.
18        THE COURT:  No, he can answer.  I'll overrule.
19   BY MR. PATTERSON:
20   A    I am generally familiar with this litigation, yes.
21   Q    Generally.  Do you know who the defendants are?
22   A    I think you just named one of the defendants.  I don't
23   have the case memorized with respect to all of the
24   defendants, if there are more than one, but you did just
25   named Sidney Wilson, and my understanding is at least the
```

```
1    minimum that's one defendant as I understand it.

2    Q    All right.  Can you name any more?

3    A    I don't have the other defendants memorized.  I

4    apologize.

5    Q    And -- well, it doesn't matter if they're memorized.

6    Can you name any?

7    A    The answer is no.  I --

8    Q    Okay.

9    A    The answer is no.

10   Q    Can you name the plaintiffs?

11   A    You just mentioned the City is in New York.  My

12   understanding is this was a New York related case, so the

13   plaintiff here, I would suggest, would have been receiving

14   healthcare-related services through the City of New York.

15   That's the extent of the familiarity, because again, I've

16   had (indiscernible) I've had some time and (indiscernible).

17   Q    I'm not faulting you, Mr. Perry, but -- we understand

18   it's only been two weeks, but based on the relief you

19   requested, that's why I'm asking these questions.  Can you

20   provide the Court with an allegation that's made in the New

21   York litigation?

22   A    From my understanding, it's a personal injury-related

23   matter is my understanding.

24   Q    Okay.  And specifically, can you provide the Court with

25   a single allegation that's made in that litigation?
```

1    A    (Indiscernible) a little earlier, I heard some

2    allegations, so I have become more familiar with them, but

3    my understanding is there were allegations of personal

4    injury or malpractice, assault, those sorts of things.  I

5    would have to familiarize myself with (indiscernible)

6    familiarize myself with many others, but that's my

7    understanding.

8    Q    Understood.  Now, you've asked this Court and you've

9    based -- you've asked for very specific release -- relief,

10   correct?

11   A    I've asked for interim relief related to the

12   application of automatic stays to various defendants, that's

13   correct.

14   Q    Right.  You've asked the Court to enjoin my clients

15   from prosecuting their litigation in New York, correct?

16   A    I've ask -- I don't understand the question.  You'll

17   have to ask it again.  My relief is for the Debtor, and to

18   the extent that the Debtor has an indemnity claim that would

19   be brought against it or would otherwise be liquidated, I'm

20   asking for a stay in that regard.

21   Q    All right.  And if there's not such an indemnity, then

22   you're not asking the Court to stay, correct?

23   A    I'm asking the Court to stay under the basis that there

24   may be the indemnity that we've already referenced.  That's

25   the basis that I'm asking for the relief.

1   Q    That there may be an indemnity or that you've provided

2   the Court with proof of an indemnity?

3   A    Well, the indemnity that I would have read on the

4   screen would have been the indemnity that as I stand today

5   and as I'm intensifying would be the basis of the relief.

6   But again, that's why we're asking on an interim basis and I

7   believe that was -- we discussed that earlier.

8   Q    Okay.  Okay.  Are you asking the Court to enjoin any

9   litigation for which you haven't provided the Court with

10  proof of an -- of at least an alleged indemnity?

11            THE COURT:  I think the question has just been

12  asked and answered, Mr. Patterson.

13            MR. PATTERSON:  All right.  And if I -- I guess I

14  didn't hear the answer then.  I don't know what the answer

15  is.

16            THE COURT:  Why don't you ask it one more time and

17  we'll get there.

18            MR. PATTERSON:  All right.

19  BY MR. PATTERSON:

20  Q    So, as representative of the Debtor, you're not asking

21  the Court to enjoin litigation for any cases in which you

22  haven't provided at least some form of an indemnity or an

23  alleged indemnity; isn't that correct?

24  A    That's a lot to unpack.  We walked through over the

25  last however long the various indemnity provision that I

1    have reviewed and that is the basis of seeking interim

2    relief through this Court.  If there was the existence of an

3    indemnification provision which I testified on and was

4    entered into evidence, then that's the basis of where I'm

5    asking for relief.

6    Q    All right.

7    A    So, I know you're asking the question opposite, and I -

8    - that's the basis of the relief I'm asking for on an

9    interim basis.  You know, so to the extent that it wasn't

10   part of my testimony or to the extent that the

11   indemnification wasn't covered by me or presented by me,

12   then I certainly aren't -- I'm not asking for relief for an

13   indemnification that we didn't review today.

14   Q    All right.  I just have a couple more questions for

15   you, and I know you're not familiar at all with the

16   allegations in the New York litigation, but if I told you

17   that the allegations involved Mr. -- if I told you that the

18   allegations involved Mr. Sidney Wilson systematically and

19   repeatedly raping women that were in prison who could not

20   leave as part of his medical -- supposed medical treatment

21   of these women, do you think that kind of claim should not

22   be heard?

23         MR. PATTERSON:  He's here asking for the relief,

24   Judge.  I'm asking if that's what the relief he wants.  He's

25   the only guy that can say yes or no.

1          THE COURT:  I'm going to sustain the objection.

2     You can ask another question.

3          MR. PATTERSON:  I'm sorry, Your Honor.  So, I

4     can't ask him if he wants to stay --

5          THE COURT:  No, no, because it's not relevant to

6     the relief requested whether he thinks something should

7     proceed or not.  That's not what -- that's not -- that's

8     what you asked and that's not what we're here today.

9          MR. PATTERSON:  That's right.

10         THE COURT:  They're asking -- they're asking for

11    an interim stay.  You can ask questions about the interim

12    stay, Mr. Patterson.

13         MR. PATTERSON:  Your Honor, if I could, they're

14    asking for an injunction, and the standards in the 5th

15    Circuit, one of the standards for an injunction is public

16    interest, all right?  And I think that whether this serves

17    the public interest, he's entitled to give the Court his

18    opinion.  And I'm asking what his opinion is.

19         THE COURT:  I understand.  I overruled your

20    objection.  You can ask another question, Mr. Patterson.

21         MR. PATTERSON:  All right.

22    BY MR. PATTERSON:

23    Q    Then does my question refresh your recollection as to

24    the allegations in the New York litigation, Mr. Perry?

25         THE COURT:  He can answer the question, Mr. -- he

1    can answer the question.  I'm going to overrule it.

2    BY MR. PATTERSON:

3    A    When you made your appearance, you actually stated the

4    allegations, which now that you've stated them again with,

5    you know, more definition, I'm now familiar more with the

6    case, because you just brought up the various allegations of

7    the case.  So, I have more familiarity now than I did when I

8    walked into the courtroom, I supposed.

9    Q    Okay.  And my question was whether my statements

10   refresh your recollection, not whether you now know what

11   I've said.  I don't care if you -- if you can believe me or

12   not believe me.  I'm asking if it refreshes your -- any

13   prior knowledge or recollection you may have had from

14   looking at documents.

15   A    If it refreshes?  The detail you provided of the case,

16   you know, I answered you earlier that I understood these to

17   be assault, personal injury, and malpractice, those types of

18   things, and the way that you've defined it certainly, you

19   know, provides additional detail.  I don't know if that

20   refreshes my recollection.  I'm not sure how to answer that

21   question.  I apologize.

22   Q    All right.  Would you disagree that I accurately

23   relayed at least some of the allegations in the New York

24   litigation?

25   A    I suppose I would not disagree that the way that you

1    described the allegations of who you're representing were

2    true and accurate.  They would have been spelled out in the

3    claim as part of the interim relief that I've asked.  That's

4    part of the reason why we're asking for the interim relief

5    is to (indiscernible) all these things.

6    Q    All right.

7    A    Including the basis of these (indiscernible).

8    Q    You would agree, would you not, that the allegations

9    made by the four women in New York alleged Mr. Wilson, as a

10   past employee of the predecessor of the Debtor,

11   systematically raped them while they were incarcerated?

12   Would you agree or disagree with that?

13            MR. PATTERSON:  I know.  He hasn't answered yet.

14   I have no testimony.  I'm asking him --

15            THE COURT:  He can answer.

16            MR. PATTERSON:  -- if he agrees or disagrees with

17   that.

18            THE COURT:  He can answer the question whether he

19   knows that's an allegation.

20   BY MR. PATTERSON:

21   A    I have reviewed hundreds of cases.  I haven't memorized

22   every allegation of every case.

23   Q    It's --

24            THE COURT:  Okay, Mr. Perry, I'm going to ask you

25   -- Mr. Perry, I'm going to ask you, do you know whether it's

1   an allegation or not; yes or no?

2   BY MR. PATTERSON:

3   A    My understanding is it's an allegation, correct.  I

4   mean, I've already testified to that I thought.

5          THE COURT:  All right.  That's what we're just --

6   that's the basis of the question.  That's it.  So, I just

7   wanted to make sure we can cover that ground and move.

8   BY MR. PATTERSON?

9   Q    Thank you.  So, you understand that that allegation has

10  been made against Mr. Wilson in the New York litigation,

11  just to be clear, not that it's true, that the allegation is

12  made?

13  A    Correct.  My understanding is there have been

14  allegations made to my -- which is what I (indiscernible) a

15  second ago.  yes, that is correct (indiscernible).

16  Q    Among other allegations, correct?  That's just one

17  specific one.

18  A    Again, the basis of the interim relief is to get a

19  deeper understanding of all of these (indiscernible).  I

20  don't have every single allegation that was the basis of the

21  claim.

22  Q    Okay.

23  A    A deep understanding.  (Indiscernible) do I have a

24  general familiarity, and I answered that I have a general

25  familiarity.

1   Q    All right.  Okay.  Let's go --

2   A    (Indiscernible) --

3         THE COURT:  Mr. Perry, I just want you to answer

4   the questions that are asked.  Okay?

5   MR. PATTERSON:

6   Q    Okay.  You clearly want to tell the Court that this is

7   just interim relief you're asking, so let's go there.

8   Specifically, you would like this Court, this bankruptcy

9   court, to enjoin the prosecution.  You would -- you want to

10  enjoy these women from continuing their litigation against

11  Mr. Wilson on their allegations of systematic rape while in

12  prison, right?  That's what you want the Debtor and this

13  Court to do?

14  A    What we've sought relief for is the extension of the

15  automatic stay.

16  Q    Yes or no?

17  A    (Indiscernible) the automatic --

18  Q    Yes or no?

19  A    -- (indiscernible) answer --

20  Q    Yes or no?  It's an easy question.

21  A    Right, and I -- I'm sorry, you talked over my answer.

22  I did say yes, if in fact the automatic stay would prevent

23  the pursuit of the indemnification claims against the

24  Debtor.

25  Q    Okay.

1    A    Then the answer would be yes.

2    Q    Okay.  If the automatic stay, but are you asking the

3    Court to take one more step and enjoin the further

4    prosecution of Mr. Wilson for these alleged rapes?  Is that

5    what you want to happen today?

6    A    I'm seeking for an extension of the automatic stay

7    against this defendant, and the automatic stay would in fact

8    (indiscernible) the pursuit of this claim.

9            MR. PATTERSON:  Right.  Your Honor, again, we

10   don't waive our rights.  We think that this is an improper

11   motion, was required to be brought under 7001.  Procedurally

12   as to us, we're not waiving them and we ask the Court to

13   deny it based upon that alone, but I have no further

14   questions for Mr. Perry.

15           THE COURT:  Thank you very much.  Ms. Heard, do

16   you have any questions or does anyone have any questions for

17   this witness?

18           MS. HEARD:  Your Honor, Ms. Rifkin is going to be

19   doing cross-examination.

20           THE COURT:  Oh, sorry.  I apologize.  I just --

21   Ms. Rifkin, can I have you hit five star or are you already

22   unmuted?  I can't hear you.  Hold on a second.  I've got to

23   get to you.  Can you --

24           MS. RIFKIN:  Am I on now?

25           THE COURT:  Yes.  Yes, you are.  Thank you very

1   much, Ms. Rifkin.  You may proceed.

2          MS. RIFKIN:  Thank you, Your Honor.  Please let me

3   know if there's an echo, because I'm (indiscernible) the

4   phone and the computer.

5          CROSS-EXAMINATION OF RUSSELL PERRY

6   BY MS. RIFKIN:

7   Q    Mr. Perry, you testified that you've reviewed all of

8   the complaints relevant to the Debtor, relative to the

9   request (indiscernible) indemnify clients on the

10  demonstrative, correct?

11  A    My testimony was that I had -- I think the words used,

12  generally reviewed.  I certainly have reviewed a significant

13  amount of claims, and for these particular claims, I did

14  have the opportunity to review them generally.  I wouldn't

15  say that I --

16  Q    You're familiar with my -- you're familiar with my

17  client, Ms. Adree Edmo's case against the Idaho Department

18  of Corrections and Corizon?

19  A    I'm generally familiar with that case, yes, through my

20  review of the -- of the claim.

21  Q    You reviewed Ms. Edmo's specific complaint in this

22  federal case?

23  A    As part of my review of the claims, I did, you know,

24  generally review the document, yes.

25  Q    You submitted a declaration in this case in which you

```
 1    stated that there have been no distinct direct claims

 2    asserted against the non-Debtor affiliate in any of the

 3    lawsuits.  Is IDOC, the Idaho Department of Corrections, a

 4    non-Debtor affiliate to which you're referring?

 5              MS. RIFKIN:  It's impeachment evidence, Your

 6    Honor.

 7              THE COURT:  I'll allow it.  But it's not in front

 8    of him, so he can't -- yeah.

 9              MS. RIFKIN:  I read the sentence that I'm

10    referring to.  I can read it again.

11              THE COURT:  Why don't you?

12    BY MS. RIFKIN:

13    Q    Okay.  You were -- in your declaration, there has been

14    no distinct, direct claims asserted against the non-Debtor

15    affiliates in any of the lawsuits.  Is Idaho Department of

16    Corrections among the non-Debtor affiliates that you're

17    referring to?

18    A    The non-Debtor affiliates are (indiscernible) CHS Texas

19    (indiscernible) a defined term.

20    Q    Okay.  So, the Idaho Department of Corrections is a

21    non-better non-affiliate?

22    A    It's in the category of what we refer to as indemnified

23    clients on the demonstrative that we discussed earlier, not

24    an affiliate.

25    Q    And you're aware that Ms. Edmo filed distinct, direct
```

```
 1    claims against the Idaho Department of Corrections on which
 2    a federal judge already found liability against the Idaho
 3    Department of Corrections?
 4    A    Understanding, yes, I believe that's correct.  Mm-hmm.
 5    Q    And you're aware that a federal judge already issued a
 6    final judgment in Ms. Edmo's for 2.6 approximately million
 7    dollars in attorney's fees and costs that is jointly and
 8    severally liable against Idaho Department of Corrections and
 9    Corizon?
10    A    That's my understanding when I reviewed both the
11    objection and the basis of the claim.  That's my
12    understanding.  Mm-hmm.
13    Q    And is it -- so, this claim already has a certain
14    value, a value certain, correct?
15    A    Based on what I reviewed, that would be correct.  So,
16    it would be referred to as a liquidated claim.
17    Q    Okay.  And you are contending that under an
18    indemnification agreement, some indemnification agreement
19    somewhere, that Corizon will owe Idaho Department of
20    Corrections for the entirety of Ms. Edmo's claims; is that
21    correct?
22    A    Based on the existence of the indemnification
23    provisions that we -- that I testified to earlier within
24    that document, that would be my understanding as I sit here
25    today.
```

1   Q   And because Ms. Edmo's claim is already liquidated,

2   Corizon or its successor entity will owe the exact same

3   amount either to Ms. Edmo or to the Idaho Department of

4   Corrections in this case either way, right?

5   A   To the extent that it's a liquidated claim, as we just

6   discussed, then that would be -- I'm sorry.  I think you

7   asked me if we -- if the Debtor would owe that.  To the

8   extent that it's a liquidated claim, then it would be a

9   liquidated claim in the bankruptcy court (indiscernible)

10   that context.  I'm sorry.  (Indiscernible).

11   Q   Let me clarify.  So, we already discussed -- you

12   already acknowledged this claim is in fact a liquidated

13   claim, correct?

14   A   Based on my review of the document, I would -- as I sit

15   here today, I would -- I would certainly suggest that's a

16   liquidity claim.  If I was preparing the Debtor's schedule,

17   that's what I would do.  Yeah.  Mm-hmm.

18   Q   And so, the claim amount of that liquidated claim will

19   remain the same regardless of whether it is Ms. Edmo

20   considered to be the creditor or Idaho Department of

21   Corrections considered to be the creditor as with respect to

22   this specific case, Ms. Edmo's case, isn't that correct?

23   A   That the value would remain the same?  To the extent

24   that there's interest or anything else that would accrue,

25   that would be a different opinion, but to the value that was

1    liquidated per the judgment that you just asked me about, my

2    understanding is yes, that would be the value and it would

3    not change.  I think that's what you're asking.

4    Q    Yes.  So, it does not change regardless of whether it

5    is Ms. Edmo who is considered the creditor or the Idaho

6    Department of Correction, correct?

7    A    Based on my understanding, that would be correct

8    (indiscernible) the indemnification, the claim would come

9    back to the Debtor, which is exactly why we're asking for

10   relief.  I believe so.  Yes.

11   Q    Okay.  And the indemnification that you're claiming you

12   reviewed earlier, we were looking at the Exhibit 15, you're

13   aware that that set of documents, regardless of one --

14   whether one calls it a contract, expired in 2018, correct?

15   A    That's my understanding, that it expired in 2018.

16   That's correct.

17   Q    You haven't -- and you haven't submitted any other

18   documents to provide evidence of a current indemnification

19   agreement between Idaho Department of Corrections and

20   Corizon that would cover Ms. Edmo's claim, correct?

21   A    The document we submitted would be the only document

22   that I would have submitted for evidence.  I didn't see

23   anything (indiscernible).

24   Q    And that expired in 2018, correct?

25   A    That's my understanding.  Yes.

1    Q    And Ms. Edmo received her fee judgment in the year

2    2022, correct?

3    A    That's my understanding.  Yes.  Mm-hmm.

4    Q    And it's also correct that you haven't provided any

5    evidentiary support for indemnification that is actually

6    applicable to Ms. Edmo's specific fee judgment claim, the

7    one we've been talking about, that's already liquidated.

8    A    The basis of my testimony is that the indemnification

9    that was within that Idaho contract that we discussed

10   earlier would provide for a basis of the indemnification of

11   that fee.  That was the basis of my testimony.

12   Q    And were you there when that contract was enacted?

13   A    Was I there like physically present?  Is that what you

14   mean?

15   Q    That's right, or on the phone or video or present

16   during a meeting in which that contact was enacted?

17   A    I was not, no.  I've only been associated with the

18   Debtor for two weeks.

19   Q    Do you know if that contract extended beyond its

20   expiration date of 2018?

21   A    I do not know the answer to that.

22   Q    So, you'd agree that you have no basis for contending

23   that there's an indemnification clause that covers Ms.

24   Edmo's specific fee judgment in 2022 between Idaho

25   Department of Corrections and to (indiscernible) or Corizon.

1    You'd agree with that, right?

2    A    I'd have to consult.  I'd have to review.  I would use

3    the interim basis that we would be seeking to determine the

4    answer to that.  As it stands here today, I do not know the

5    answer to your question.

6    Q    So, the answer to my question is I'm correct, you do

7    not have any evidence of any applicable indemnification

8    agreement applicable to Ms. Edmo's specific claim.  As we

9    sit here today, you have no evidence of that, correct?  Yes

10   or no?  Correct?  Yes or no?

11          THE COURT:  Ms. Rifkin, I think you've asked -- I

12   think in your exuberance, you've asked like six questions in

13   there.  So, I don't -- I don't -- you know, I just want to

14   make sure that -- make sure that he's answering one question

15   so that we have a clean record.

16          MS. RIFKIN:  Yes, Your Honor.  Why don't I -- why

17   don't I repeat just one question to make it -- to make the

18   record clear?

19   BY MS. RIFKIN:

20   Q    So, it's correct that as you sit here today, you have

21   no evidence of an indemnification provision between the

22   Idaho Department of Corrections and Corizon that applies to

23   Ms. Edmo's specific fee judgment obtained in 2022, correct?

24   Yes or no?

25   A    The evidence I provided was the indemnification within

1    the agreement.  That's the evidence that I provided to the
2    basis of that indemnity.
3    Q    And we've been over that that expired in 2018.
4    A    The contract expired in 2018, correct.  Whether the
5    indemnification had a legal basis to extend to that fee
6    judgment, I can't make that legal conclusion.  I'm not a
7    lawyer.  We presented the evidence of the indemnification
8    provision within the contract.  That's the basis for which
9    I'm seeking relief.
10   Q    And just to clarify, you're not aware of any other
11   evidence that would support indemnification of IDOC with
12   respect to Ms. Edmo's specific claim, correct?
13   A    Correct.  As I sit here today, the evidence we
14   presented is the evidence that I'm aware of that would
15   provide for that indemnification.  As I said today, in the
16   time I've had, you know, I'm not aware of any other
17   provision or agreement or evidence yet that we've put for.
18        MS. RIFKIN:  Those are all of my questions.  Thank
19   you.
20        THE COURT:  Thank you.  Anyone else wish to ask
21   questions of this witness?  Oh, on -- just on cross.  I
22   think I've got one more here, a 248 number.
23        MS. FILIPOVIC:  Good afternoon, Your Honor.  Can
24   you hear me?
25        THE COURT:  Yes, just fine.

1          MS. FILIPOVIC:  Thank you.  If I may, I represent

2     several of the claimants from Michigan, in particular Kerrie

3     Milkiewicz, the estate of Kerrie Milkiewicz.

4          THE COURT:  Okay.  You may proceed, ma'am.

5          CROSS-EXAMINATION OF RUSSELL PERRY

6     BY MS. FILIPOVIC:

7     Q    Mr. Perry -- thank you so much, Your Honor.  Mr. Perry,

8     I have a couple of questions for you as it relates to the

9     claim, the estate of Kerrie Milkiewicz.  Have you seen the

10    proposed order that was filed in with this motion?

11    A    I'm sorry.  To which motion are you referring?

12    Q    Your emergency motion for the extension and stay of

13    proceedings.

14    A    The proposed order, there's a red line that was up

15    later that (indiscernible) just a bit before the Court.  I

16    reviewed it quickly.  I can't say that I've memorized it,

17    but I am familiar with the proposal that was uploaded.  Yes.

18    Q    Okay.  And so, you are aware then that the Estate of

19    Milkiewicz v. Genesee County, et al. is included on that

20    proposed order and all the other versions of it prior to?

21    A    Correct.

22    Q    What documents have you looked at as it relates to that

23    that particular case?

24    A    So, for that case, again, I reviewed the agreement that

25    we admitted into evidence a bit earlier, the indemnification

1   provision that we pointed to, and you know, in the midst of

2   reviewing all the various complaints, both these and the

3   hundreds of others, you know, I've generally scanned these.

4   Q    I know.  I'm just trying to (indiscernible) there any

5   (indiscernible) you know, like (indiscernible).

6         THE COURT:  Miss, I couldn't hear your question.

7   I think you were breaking up, and I -- do you mind asking

8   that question again?

9         MS. FILIPOVIC:  Yes.  Your Honor, just for the

10   record, there is another woman on the line speaking right

11   now that is not (indiscernible) asking questions.

12         THE COURT:  Oh, that's it.  Got it.

13         MS. FILIPOVIC:  Somebody's not --

14         THE COURT:  Got it.  Okay.  Every -- can you

15   please place your phones on mute?  I'm trying to avoid

16   hitting five star again, so if someone -- Counsel, I

17   apologize.  Please proceed.

18   BY MS. FILIPOVIC:

19   Q    So, Mr. Perry, is it fair to say then just based off of

20   what you just testified to that you did at least review

21   some, even if it's a quick glance through a complaint, on

22   Kerrie Milkiewicz.

23   A    Kerry Milkiewicz.  You're referring -- you're referring

24   to the Michigan agreement, correct, and the claim that would

25   have been under the Michigan agreement?

1    Q    Yes.

2    A    That specific agreement and what we testified earlier

3    was the indemnification related to the county if I recall,

4    and the county was who was the defendant we're looking to

5    extend the stay, so you just named somebody else as part of

6    it, and I don't have familiarity with that name.  I have

7    familiarity with the fact that we extended -- they are

8    seeking extension to the state or the county.

9    Q    Right.  But so, in the proposed order and what was

10   included in this lawsuit for the estate of Kerrie Milkiewicz

11   v. Genesee County, et al., case number 17-CV-13047, are you

12   aware that that case was closed in 2019, that it was

13   dismissed without prejudice?

14   A    I can't say that I'm aware of that, no.

15   Q    Okay.  Are you aware that a new Kerrie Milkiewicz case

16   was filed with brand new allegations, brand new parties in

17   2020?

18   A    I am not aware.  Again -- no, I'm not aware of that.

19   Q    So, sitting here today, do you know which complaint you

20   even read?

21   A    There was a complaint with the -- against the county

22   that this identification would apply to.  So, I've -- if I

23   tell you I've memorized every complaint, I wouldn't be

24   truthful.  So, what I've tried to do is match up the various

25   complaints with the various defendants and work through

1    them.  I've read a lot -- I've read a lot of paper over the

2    last, you know, few days, as you can imagine.

3    Q    Sure.  But you testified earlier today that you

4    included various cases or you're seeking the extension and

5    application of a stay for various cases in which there may

6    be an indemnification that can come through the Debtor.

7    What was your determination that Ms. Milkiewicz's case would

8    be one of those?

9    A    To the extent that the county was named as a defendant

10   and there was an indemnification provision that provided the

11   indemnity to the county, that was the basis.

12   Q    Sure.  Is Corizon listed in this case?

13   A    I don't have the defendants memorized.  So, my

14   understanding is the reason why case would have been sought

15   for application of the stay is that Debtor would have been

16   either a named defendant or would have an identification to

17   the named defendant.

18   Q    Sure.  Now, if there were named defendants from

19   Corizon, and let's say they were all dismissed and the only

20   thing that had remained was Genesee County and its deputies,

21   would your indemnification agreement apply to them?

22   A    You're asking if the indemnification agreement -- I'm

23   sorry.  (Indiscernible) --

24              THE COURT:  Yeah.  I'll agree with that.

25              MS. FILIPOVIC:  Well, Your Honor, I'm just trying

1    to understand how they were trying to pick it or put these

2    particular cases, because like I said, the case that we --

3    that they have listed on this order, which quite frankly if

4    you stay a case that's closed, is -- that would work for us

5    anyway, but I want to make sure that I understand what was

6    going into the thought process for putting some of these

7    cases here.

8          So, I'm not necessarily referencing an exhibit.  I

9    just want to know based on what he decided or what he

10   recommended to extend the stay, like, what was

11   (indiscernible) and considered?

12         THE COURT:  I think -- I think it's fair to ask

13   the question just that way and see if he can answer it.  I

14   don't think we need to --

15   BY MS. FILIPOVIC:

16   A    Okay.  Answer the -- you want to ask it again?

17   Q    Sure.  So, Mr. Perry, what I'm trying to get at is if

18   there was -- like, for example, if an order had been entered

19   where all of the Corizon doctors, nurses, or people

20   affiliated with Corizon had been dismissed and the only

21   thing left was Genesee County and its deputies, would that

22   indemnification agreement that you had looked at, would that

23   be something then that you would have considered in asking

24   still for the extension?

25   A    I believe so, because the indemnification provides for

1    an indemnification of the county and its employees, which I

2    believe would have covered the folks that you just named.

3    Q    Okay.  So, you're saying that the way that you chose

4    this is if the indemnification -- if they had any kind of

5    indemnification agreement, whether or not it would have

6    actually given any liability to the Debtor, they were

7    included in your motion?

8    A    That's the basis of the interim relief.  That's

9    correct.  If the -- if there was an indemnification

10   provision, then I'm seeking release such that an

11   identification claim could be liquidated against the Debtor.

12   That is the basis of my testimony.  That's correct.

13   Q    How would you determine whether or not the actual

14   claims can go against the Debtor?

15   A    You're asking what would be the process --

16   Q    Yes.

17   A    -- to liquidate a claim?

18   Q    No.  I'm asking how would -- how are you determining

19   whether or not all of these claims, every single one of them

20   that are listed here, would even be subject to this such

21   that a stay would be warranted?  In other words, if, for

22   example, Genesee County was dismissed from this case, then

23   they wouldn't be on the hook and neither would you guys for

24   Genesee County, correct?

25   A    If Genesee County as an indemnified party was released

1    from the case, then that would be correct.  There wouldn't

2    be (indiscernible) relationship and it's my understanding.

3    I'm not a practicing lawyer, but yeah, that's my

4    understanding.  Yes.  Mm-hmm.

5    Q    What is your understanding of how do you relieve

6    somebody when they're not able to move forward with their

7    claim?

8    A    Well, the information that was provided, and the basis

9    for electing these various (indiscernible) that we're

10   seeking an indemnity is that there could be a liquidated

11   indemnity claim presented to the Debtor at some point in

12   time such as the indemnity applies.

13   Q    And for all of those could be's, it's fair to say that

14   there's claims that could also be dismissed, therefore

15   they're being tied up in your stay unnecessarily when they

16   could be release, correct?

17   A    Well, that's the basis of the interim relief, because

18   if we discover that there are no identity claims that exist,

19   then we certainly wouldn't seek final stay application to

20   those.  So, that would be correct.  What you said is

21   correct.  If we do determine if that's the case during this

22   interim period, then that is absolutely correct.  There

23   would be no reason extend the stay.

24   Q    Do you -- what is your understanding of what type of

25   claims are indemnified?

1    A     Well, the indemnification language is actually fairly

2    broad in each of these agreements, negligence, some of them

3    are gross negligence, harmful conduct, misconduct, you know,

4    and like such that there would have been misconduct

5    occurring by those individuals, you know, related to the

6    (indiscernible) at the time.  So, you know, the

7    indemnification provision that (indiscernible) a number of

8    different types of actions.

9    Q     Is it your testimony that these indemnification -- even

10   if it had nothing to do with the Debtor, your Debtor here,

11   that they could apply to those claims?

12              THE COURT:  You can answer.

13   BY MS. FILIPOVIC:

14   A     Yeah, I'm sorry, you'll have to repeat your question.

15   I didn't understand.

16   Q     Sure.  Is it your testimony today that there -- every

17   single claim where an indemnification agreement exists is

18   covered by the indemnification agreement?

19   A     So, every claim in which an indemnification exists --

20   so, then the basis for the interim relief is because I have

21   to assume today that if there's an indemnification provision

22   that exists, it does extend to that defendant that would

23   have been named.  That's the basis for the asking of my

24   relief.  It's also the basis for the interim nature of the

25   relief.  So, that is correct.

1    Q    How would indemnity be appropriate on a case that is

2    closed?

3    A    I'd have to -- I would have to do more research on

4    determining whether or not there's an indemnity that is

5    actually valid for a case that was closed.  That would be

6    part of what I would be doing, working with counsel over the

7    next few weeks to determine that.

8    Q    Sure.  How did you determine to include a case that was

9    closed?

10   A    I worked with the Debtor and the Debtor's

11   representatives to identify a number of cases in which the

12   indemnity may apply and stay relief for those cases.

13   Q    And in doing so, you never once saw an order dismissing

14   the 17-CV-13047 three years prior to you bringing a motion?

15   A    I did not, no.

16         MS. FILIPOVIC:  That's all I have, Your Honor.

17   Thank you.

18         THE COURT:  Thank you.  Okay.  Anyone else have

19   any questions for this witness?  And if you'd please hit

20   five star to be recognized?  Okay.  Wait, I've got one more.

21   Give me a second.  There's a 615 number I've unmuted.

22         MR. JOHNSON:  Yes, Your Honor.  Michael Johnson

23   for Mr. Human.  Can you hear me?

24         THE COURT:  Just fine.  Thank you.

25         MR. JOHNSON:  Okay, great.

```
 1              CROSS-EXAMINATION OF RUSSELL PERRY
 2   BY MR. JOHNSON:
 3   Q    Mr. Perry, my name is Michael Johnson.  I'm one of the
 4   lawyers for James Hyman.  Are you familiar with Mr. Hyman?
 5   A    I'm generally familiar within my review of the case
 6   that he presented and the objection filed.
 7   Q    Okay.  So, you're aware that Mr. Hyman is the former
 8   CEO of Valitas Health?
 9   A    That's what I read, correct, what I understand.
10   Q    Okay.  Now, with respect to the claims in Mr. Hyman's
11   case pending in the Middle District of Tennessee, I want to
12   focus on the indemnified D&O's as you all have defined them,
13   and it's -- and that would be Mr. -- or that would be
14   Goldberger, Gefner, Lefkowitz, Tirschwell, and King.  And if
15   I understood your testimony correctly, there are -- there
16   are two documents that you all are relying on to show in the
17   indemnification that could be asserted against the Debtor
18   with respect to those individuals, and those are the bylaws
19   of Corizon and the agreement and plan of divisional merger;
20   is that right?
21   A    That's correct.  Those are the two pieces of evidence
22   that we (indiscernible), yes, Mm-hmm.
23   Q    And so, I want to -- first on the -- on the bylaws of
24   Corizon, you looked at those earlier and there were --
25   there's a couple parts of that Paragraph 6.0 -- the bylaws
```

1    that I want to focus on.  The first is that the bylaws say

2    the indemnity is provided to the fullest extent permitted by

3    the Texas Business Organization Code.  Do you recall that

4    part of the bylaws indemnity provision?

5    A    It sounds familiar.  Mm-hmm.  Yeah.

6    Q    And are you aware that the -- that Texas Business

7    Organization Code Section 8.101 provides that a company may

8    indemnify if they found that the director acted in good

9    faith in a manner that they reasonably believed to be in the

10   best interest of the company?  Are you familiar with that

11   statute?

12          THE COURT:  Yeah, I'll sustain that objection.

13   BY MR. JOHNSON:

14   Q    So, you're not -- so, you testified that you believe

15   that there's indemnity under Section 6.01 of the Corizon

16   bylaws with respect to those indemnified D&Os, correct?

17   A    I testified to the existence of the indemnification,

18   correct.  That is correct.  Yes.

19   Q    Do you have any opinion on whether any of those

20   indemnified D&Os acted in good faith with respect to the

21   allegations in Mr. Hyman's lawsuit?

22          THE COURT:  What's the relevance of that?  Wait,

23   what's the relevance?

24          MR. JOHNSON:  Your Honor, the bylaws incorporate

25   the Texas Business Organizations Code as a limitation on the

```
 1    indemnity right for directors and officers.  Texas Business
 2    Organization Code 8.101 --
 3            THE COURT:  I'm sorry.  You're making legal
 4    argument, right?  You're making legal argument.  Why are we
 5    asking this witness about --
 6            MR. JOHNSON:  I'm asking -- I'm asking -- I'm
 7    trying to get -- what I'm trying to get at is what the
 8    witness -- if the witness has an opinion or any knowledge
 9    about whether the D&Os acted in good faith or in the best
10    interest of the company thus triggering the indemnity in Mr.
11    Hyman (indiscernible) --
12            THE COURT:  Why don't we just -- why don't we just
13    ask him -- I guess, why don't we just ask him lay questions?
14    If you're going to get to -- either we're going to have to
15    put the code in front of him or folks are going to object.
16    But if you want to ask just general questions like the one
17    you did, I think that's perfectly fine.  Go ahead and ask.
18    BY MR. JOHNSON:
19    Q    Mr. Perry, do you have any knowledge about whether the
20    defendants, the D&Os in Mr. Hyman's case, acted in good
21    faith with respect to the allegations that are subject to
22    that case?
23    A    I do not.  I do not.
24    Q    And do you know -- do you have any knowledge about
25    whether the D&Os that are defendants in Mr. Hyman's case,
```

```
 1    what they believed or was in the best interest of the Debtor

 2    with respect to those allegations?

 3              THE COURT:  Sustained.

 4              MR. JOHNSON:  Well, Your Honor, I was asking what

 5    he knew.  Do you have any knowledge about what they

 6    believed?  I'm not asking him to speculate.

 7    BY MR. JOHNSON:

 8    Q    Have you -- let me ask it this way?  Have you ever

 9    spoken to any of the D&O defendants in Mr. Hyman's case?

10    A    With respect to the (indiscernible); is that what

11    you're asking?

12    Q    Correct, with respect to the allegations in Mr. Hyman's

13    case.

14    A    I have not spoken to the D&Os about the merits of this

15    case.  No, I have not.

16    Q    Okay.  So, you have no basis -- well, let me ask it

17    this way.  So, if -- to the extent Article 6.01 of the

18    Corizon bylaws limits indemnification to the extent

19    permitted by the Texas Business Organization Code, do you

20    have any opinion on whether that indemnity is triggered with

21    respect to the D&O defendants in Mr. Hyman's case?

22              THE COURT:  You can -- I'll let him answer if he

23    knows the answer.

24    BY MR. JOHNSON:

25    A    I do not know the answer.  I'm sorry.
```

```
 1   Q    Okay.  Now, are you aware that Mr. Hyman's complaint --
 2   in Mr. Hyman's complaint, the breach of fiduciary duty
 3   claims against the D&O defendants relate to their roles as
 4   directors of Valitas Health Services, Inc. and not the
 5   Debtor?  Are you aware of that?
 6   A    I am aware that there are fiduciary duty claims that
 7   have been made.  Which entities they apply to and which
 8   directors or officers we're sorting through, but I am fully
 9   aware that the claims have been made from a fiduciary duty
10   standpoint, yes.  I think you asked maybe a couple of
11   questions.  Yes.
12   Q    Okay.  Now, I want to look briefly at the
13   indemnification provisions in the agreement and plan of
14   divisional merger.  Now, that -- the provision that you were
15   focusing on earlier in your testimony was in 11A where it
16   says (indiscernible) the Debtor has to indemnify and hold
17   harmless Newco, which is CHS TX Inc.; is that right?
18   A    Correct.  Mm-hmm.
19   Q    And it says hold harmless Newco and its affiliate,
20   right?  Do you know what -- and so affiliates is not defined
21   in that agreement.  Do you know what Newco's affiliates --
22   what that's referring to in that agreement?
23             THE COURT:  If he knows.
24   BY MR. JOHNSON:
25   A    To the document at the time, Newco was referencing CHS
```

```
1    Texas.  YesCare purchased CSH Texas, which would be the --
2    that's how my understanding of the document is, that the
3    affiliates would relate to YesCare and CHS Texas.  That's my
4    understanding.  I think that's your question.
5    Q    Okay.  Yeah, that was -- that's all was looking for was
6    your understanding.  And at the time that this document was
7    signed, (indiscernible) Gefner and Goldberger were not
8    directors or officers of CHS TX, correct?
9    A    There's a page in the division merger that provides the
10   directors and officers of Newco and (indiscernible).  I
11   don't have it perfectly memorized, but I think what you just
12   said is accurate.  They were directors and officers of
13   (indiscernible) not Newco.  Yeah.
14   Q    Right.  Okay.
15        MR. JOHNSON:  All right, Your Honor.  That's all
16   the questions I have for this witness.  Thank you.
17        THE COURT:  Okay, here's what we're going to do.
18   I'm right where (indiscernible) I've listened to the
19   evidence and I'm right where I kind of started when I --
20   when I listened to all the motions, and that is today's not
21   the day to -- today's -- there are -- there are parties who
22   are not here.  There are issues.  There are documents that
23   I'm not seeing and these are real serious issues.  There are
24   contracts here and agreements and lawsuits and damages and
25   parties, and I'm not granting the Debtor's relief today.
```

1          I said it from the beginning, I was not going to

2   take up the motion today.  I think today was the day, and

3   now I remain even more convinced.  What today has shown is

4   that we ought to take this really seriously, and there are

5   real serious issues that need to be considered, multiple

6   parties.

7          That's what I've heard.  Multiple lawsuits, right,

8   multiple parties within lawsuits, some judgments that may --

9   final, some that remain contingent, some that are real

10  serious allegations, some that, you know, may be subject to

11  absolute indemnity obligations, some that may have -- that

12  indemnity obligation may be done.

13         Just a host of range of issues all across the

14  country, right?  Fraudulent transfer litigation, arguments

15  raised in briefings that some of this may not even be

16  subject to property of the estate, some of it may be

17  property of the estate.

18         Today -- and we're (indiscernible) you know, asked

19  to grant relief on an emergency basis.  I got that the

20  Debtor has limited it to the -- to the 39 parties, so folks

21  like Ms. Bailey's client and Mr. Shannon's client.  You

22  know, this is not to expand and go back.  It's to really

23  hammer down and Mr. Perry statements will be Mr. Perry's

24  statements, and what he has said, he's said, and it's -- and

25  it's evidence and it's in the record.

1          But there are legal arguments whether, you know,
2     this should be proceeding under Federal Rule 7001 or this
3     is, you know, essentially a temporary injunction, whether
4     that's the legal proceeding.

5          You know, and I want parties to have -- I want an
6     evidentiary hearing where everything is taken up in full.  I
7     don't -- we need to get this right.  This is an estate here,
8     and there are serious claims that are being asserted in some
9     of these litigations, some that threatened the very
10    existence of the Debtor, some that I suspect that the Debtor
11    may look at and say, well, you know, on further review,
12    maybe some don't apply, you know?  The Debtor is looking at
13    this and I -- from what I hear from Mr. Perry is they're
14    doing a thorough review, but they may decide to go forward
15    with every one of those claims.  They may decide that some
16    need to get stipped out.

17         I don't know, but today's not the day, but I will
18    -- you know, what's important to me is that we preserve the
19    right of parties to make a full objection to the relief
20    requested.

21         What's also important, that, you know, to the
22    extent that there are assets of the estate that they not get
23    lost, you know, that assets of the estate are not lost in
24    this process until we get to a final hearing.

25         And I've got to hear this, and I've got to take

1    each one of these lawsuits on their own -- on their own

2    merits, not lumping anything together, and I think I would

3    benefit with the insight of the creditors committee as well

4    to look into this.  So, you know, I'm right back where I

5    think I started.

6         I can do this on my own.  I can issue my own

7    injunction under 105A and I don't need to use 7001.  I'm

8    preserving due process.  I'm preserving due process rights

9    of every affected party in this case, and that's what I'm

10   going to do.  And I'm also going to protect and preserve

11   assets of the estate and protect potential erosion of the

12   estate.

13        I don't want to get to the point where I issue a

14   judgment on something and assets of the estate have been

15   eroded.  I'm asking the parties to continue to talk during

16   this process.  The Court has certainly has the power under

17   Section 105 to issue an injunction and governed by the

18   standards in non-bankruptcy context, right?  And I believe

19   that the Debtor based on what I've heard has satisfied that

20   standard but not for -- not for the basis in its -- in its

21   own motion.  I just think we've got to get to where things

22   are, and there's enough from what I'm hearing where I'm

23   doing it on my own.

24        This is the Court taking up the relief requested

25   in your motion on May 17th, and any objection from any

```
 1    party, including parties who aren't here, including parties
 2    who maybe you want to file a supplement, maybe you don't,
 3    maybe there's some parties in here who need to be able to
 4    articulate their positions, and I'm not going to make
 5    somebody do it on seven days' notice.  I'm just not going to
 6    do it.
 7            So, parties are -- I'm going to give parties 'til
 8    April 3rd to file a response, and the Debtor will have until
 9    April 24th to file a response.  And I'm going to come in on
10    May 17th and we're going to have an evidentiary hearing, and
11    the Debtor may -- Ms. Carson, Mr. Brookner, if -- you know,
12    I'm going to temporarily on my own order stay those cases,
13    but I'm going to give you the right, and I'm telling you,
14    use it wisely, you know, unless I order otherwise, which
15    means that if something comes up and you think one doesn't
16    need to be on there, then stip it out and tell my case
17    manager, and we'll remove them from the list.
18            But that's going to give Ms. Bailey's client, and
19    I'm thinking of Mr. Shannon's client and other clients who -
20    - whose parties -- whose claims are not -- were originally
21    affected, now they're not, and they're going to have clarity
22    as well, and we're going to -- we're going to take this up.
23            And if Mr. Stromberg wants to, you know, come in,
24    he just got retained as well, and he's going to be able to
25    make his arguments as well.  We're going to -- we're going
```

1  to preserve the rights of all parties, and I've heard

2  nothing today that tells me a short, 75-day window which may

3  apply to some, may not apply to all, isn't going to affect

4  the parties.  And parties, somebody wants to come in and

5  file something and say Your Honor, I want a hearing before

6  then, file it and we'll take it up.

7        I'm not saying -- I'm not binding anyone to this

8  forever.  If somebody has a good argument, they feel like

9  they want to go forward, I'm asking the Debtor to have a

10 conversation with them, and if it can be resolved, it can be

11 resolved.  But not -- I'm going to preserve everyone's

12 rights, but I'm not -- I'm going to make sure that if the

13 Debtor has an argument as to why the stay should be

14 extended, you know, I've got to think about the entire

15 estate.

16        And I get it, there are some individuals from what

17 I've heard who have some real issues, real claims, real

18 strong stuff that was being described today.  And so, I

19 don't want anyone to think, especially parties to those

20 litigations, that I'm not taking everything that they're

21 saying seriously.  What I'm doing today is preserving

22 everything for them.  I want a robust -- I want to take this

23 seriously.  I want to think about the law carefully, and for

24 me to do my job, I've got to preserve where things are.

25        There are going to be other parties who are going

1    to come in and take a look at this, and I'll -- and I want

2    them to have the opportunity to think about this.  The

3    Debtor may want to supplement, may need to supplement.  I

4    want things where they go.  And I'm telling you, due process

5    is going to be on the forefront of my mind.  So, I don't

6    want somebody stuck in, you know, two days before the

7    hearing.  I want to make sure everyone has a full, robust

8    opportunity.

9              And I know counsel's here who's a member of the

10   committee.  I don't know who they're going to hire and if

11   they're going to hire lawyers, but I would ask that they

12   listen to what I did today, and I believe they'll have the

13   opportunity to do so.

14             So, that's, that's my ruling.  I'm doing it on my

15   own under 105, and I certainly have the ability to do so.

16   Everyone's arguments are preserved whether -- for example,

17   whether this should be an adversary proceeding or not,

18   whether -- you know, everything is preserved and Mr. Perry's

19   statements are Mr. Perry's statements, and they'll carry,

20   right?  I'm not -- he's not going to get a do-over on

21   anything that he said.

22             Folks, we are where we are, and I'm -- I've got to

23   do the right thing, and that means preserving the rights of

24   all parties, and I think a short 75-day extension where the

25   Debtor can really think about this -- and if somebody wants

1    to file something, you certainly have the right to do so,

2    and if somebody files it, I'll read it.  I issued -- I held

3    this hearing on short notice, but this case really just

4    started, and I've got to think about the entire estate, and

5    I want to make sure that I'm doing the right thing and that

6    the estate is protected as well as the rights of all

7    parties, including some who may need to go hire a lawyer and

8    have their right to come in and question the witnesses.

9         So, I want a robust hearing on May 17th for those

10   parties that are there.  I'll issue a very short order.  I'm

11   doing it on my own, and I'm going to consider the relief

12   requested in your motion, but I'm going to consider it as to

13   those shortened parties there.  And if somebody stips

14   something out, I'm not saying they have to, what I'm saying

15   is I'm going to give the flexibility so that is something

16   gets stipped out before that, I signed the KCC order as well

17   and I've signed the extension motion.  I'm not saying no.

18   I'm not saying yes.  What I'm saying is I want to hear more.

19   Parties will have the ability to supplement this.  We've got

20   to take our time and do this right, and I'm going to go back

21   and I'm going to go back and read indemnity agreements when

22   we're -- at the time.  At the time, I'm going to go back and

23   I'm going to study this, because I think I've got to do this

24   on a case by case basis, which means that some may -- maybe

25   they all stay, maybe some of them go.  So, that's my ruling.

1           Just one quick question.

2           MS. HEARD:  Your Honor, can I just ask --

3           THE COURT:  Just one question in the courtroom and

4     then I'm going to turn -- just one question then I'm going

5     to turn to -- I'm going to start in the courtroom and then

6     just work my way out.

7           MR. BROOKNER:  I just wanted to clarify.  You're

8     only talking about -- your ruling is only with respect to

9     the 39 that are on our list?

10          THE COURT:  Sounds like that's what you're asking

11    for, right?

12          MR. BROOKNER:  Right.  I don't want to be a hog

13    and get slaughtered.  I --

14          THE COURT:  No, no, no, that's what I'm saying.

15          MR. BROOKNER:  -- just want to make sure that it's

16    clear.

17          THE COURT:  I'm -- yeah, to those that are

18    attached on Exhibit 1, and that's what I'm saying.  That

19    gives --

20          MR. BROOKNER:  Right.

21          THE COURT:  That gives the other parties, Mr.

22    Shannon -- it gives them the clarity.  They can go back to

23    their state courts if they need to or their clients and say,

24    you know, we're not -- unless otherwise, you're going to

25    have to notice them out.  There's going to have to be an

1    entirely new process to get someone who's not involved who's

2    not on that list on that list.

3         MR. BROOKNER:  I got it.  I just wanted the

4    clarity.  Thank you, Your Honor.

5         THE COURT:  Thank you.  Ms. Heard?

6         MS. HEARD:  Your Honor, yes, thank you.  I -- the

7    issue for us is the 75-day stay will harm my client, and we

8    were going to try to present that to the Court.  There's a

9    deadline next week in our case and we're proceeding against

10   a state -- an arm of the state.  They can't (indiscernible)

11   for bankruptcy anyway, so they shouldn't be able to get a

12   stay through this process.

13        THE COURT:  I've heard enough.  I'm -- if you

14   want, we can schedule a hearing shortly thereafter.

15   (Indiscernible) we can schedule another hearing and we can

16   talk about it, but that's my ruling for today.  I'm doing it

17   on my own.  I'm not taking up their motion.  I'm preserving

18   everything, and I'm asking everyone to take a hard look to

19   see what (indiscernible).  I'm not taking this up on an

20   emergency basis, but I am issuing under 105.  I'm preserving

21   everybody's rights, and if somebody wants to come in and ask

22   for an emergency as to them, I can -- you know, I can

23   consider things on a one-off basis if the merits require it.

24   Everybody's rights are preserved.  Mr. Patterson?

25        MR. PATTERSON:  Your Honor, quick, and I know

1    everyone needs to get out of here, but for the record, on

2    behalf of my clients, we don't believe that you can do

3    anything differently than the Debtor can do.  The rules

4    apply to the Court as well as they apply to the parties, and

5    I think that an injunction requires certain findings,

6    certain procedural protections, and my clients are not

7    waiving those.

8              THE COURT:  Understood.

9              MR. PATTERSON:  Just for the record.

10             THE COURT:  Understood.  Understood.

11             MR. PATTERSON:  And I'm not -- I'm not challenging

12   the Court for that.

13             THE COURT:  No, I understand.

14             MR. PATTERSON:  And I also think Stern plays a

15   major role here, especially with someone like my clients

16   that are citizens of New York.  They've never come here.

17   They're not creditors.  Their defendants aren't creditors,

18   right?  So, we have no connection to this, and I don't think

19   Stern allows this Court to take not only subject matter

20   jurisdiction but personal jurisdiction and then order them -

21   - because you're ordering them not to act, and I -- and I

22   just believe the Court is overstepping its jurisdiction and

23   overstepping its authority for the record.

24             THE COURT:  Understood.  Understood.  I -- and I

25   respect that.  I do believe that the standards are met.  I

1    do believe they're met for purposes of me today.  I'm

2    issuing my own order.  I think there's a reasonable

3    likelihood of success on the merits.  I do think I'm

4    concerned about irreparable injury if the relief is denied.

5    I do believe I'm concerned about the non-moving party for

6    harm.  I do think it's in the public interest for me to get

7    this right and not do this on seven days' noticing to give

8    all parties an opportunity to come in and make their

9    arguments and everybody's rights are preserved.

10            That's my ruling, and I'm -- I'm telling you, I'm

11   asking everyone to continue to have conversations.  I know

12   Debtor's counsel will answer any calls.  That's my ruling

13   for today.  Thank you.

14            CLERK:  All rise.

15            (Proceedings adjourned at 5:06 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                         I N D E X

 2

 3                         RULINGS

 4                                          Page      Line

 5    Motion to Extend Time to File Schedules,

 6    GRANTED                                  16         7

 7    Motion to Extend Stay, DENIED           148        25

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  March 13, 2023
```