```
1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3                                     )  CASE NO: 23-90086
                                      )
4       TEHUM CARE SERVICES, INC. AND )  Houston, Texas
        OFFICIAL UNSECURED CREDITORS')
5       COMMITTEE,                    )  Wednesday, March 22, 2023
                    Debtors.          )
6                                     )  1:33 p.m. to 4:39 p.m.
        ------------------------------)
7

8                                TRIAL

9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11      APPEARANCES:

12      For U.S. Trustee:        HA MINH NGUYEN
                                 Office of the United States Trustee
13                               515 Rusk Street, Suite 3516
                                 Houston, TX 77002
14
        For Debtor:              AARON M. KAUFMAN
15                               JASON S. BROOKNER
                                 LYDIA R. WEBB
16                               AMBER M. CARSON
                                 LONDON ENGLAND
17                               Gray Reed & McGraw LLP
                                 1601 Elm Street, Suite 4600
18                               Dallas, TX 75201

19      For Committee:           NICHOLAS ZLUTICKY
                                 Stinson LLP
20                               2200 Ross Avenue, Suite 2900
                                 Dallas, TX 75201
21
        For Adree Edmo:          MARY ELIZABETH HEARD
22                               M.E. Heard, Attorney, PLLC
                                 100 NE Loop 410, Suite 605
23                               San Antonio, TX 78216

24

25
```

```
 1    For Kelly/Jackson:        IAN CROSS
                                Cross Law PLLC
 2                              402 West Liberty Street
                                Ann Arbor, MI 48103
 3
      For Proposed DIP:        KRISTIAN W. GLUCK
 4                             JULIE GOODRICH HARRISON
                               Norton Rose Fulbright US LLP
 5                             1301 McKinney, Suite 5100
                               Houston, TX 77010
 6
      Court Reporter:          UNKNOWN
 7
      Courtroom Deputy:        UNKNOWN
 8
      Transcribed by:          Veritext Legal Solutions
 9                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
10                             Tel: 800-727-6396

11

12
      Proceedings recorded by electronic sound recording;
13    Transcript produced by transcription service.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2    DEBTOR'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3    RUSSELL PERRY          49    68/71/76/87/99

4

5

6    GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

7

8

9

10

11   DEBTOR'S EXHIBITS                      RECEIVED

12   Exhibit 5                              104

13   Exhibit 6                              55

14

15   GOVERNMENT'S EXHIBITS                          RECEIVED

16

17

18

19

20

21

22

23

24

25
```

```
1              HOUSTON, TEXAS; WEDNESDAY, MARCH 22, 2023; 1:33 PM
2                              (Call to Order)
3              THE COURT:  Okay.  Good afternoon, everyone.  This
4      is Judge Lopez.  Today is March 22nd.  I'll call the 1:30
5      case, which is 23-90086, the case of Tehum Care Services
6      Inc. here on several matters.  The line is completely muted.
7      I'm going to take appearances first in the courtroom and the
8      I will start working my way down the video.
9              MR. NGUYEN:  Good afternoon, Your Honor.  Ha
10     Nguyen for the U.S. Trustee.
11             THE COURT:  Good afternoon.  Okay.  I'm going to
12     start to unmute Debtor lines, those who represent the
13     Debtor.  Okay.
14             MR. KAUFMAN:  Good afternoon, Your Honor.  Aaron
15     Kaufman of Gray Reed for the Debtor.  And with me -- I'll
16     just kind of go through it.  I think we made an electronic
17     appearance, so this should appear in the minutes.
18             THE COURT:  Okay, great.
19             MR. KAUFMAN:  But Jason Brookner, Lydia Webb,
20     Amber Carson and London England should be either on the line
21     or listening.
22             THE COURT:  Okay.
23             MR. KAUFMAN:  And then for the Debtors, the chief
24     restructuring officer, Russell Perry, is also on the line.
25             THE COURT:  Okay.  Thank you.  And if there's
```

1    anyone else from the Debtors who believes they're going to

2    speak today, I would just ask that you hit five-star now.

3    Okay.

4           Anyone else wishes to make an appearance, let me -

5    - from the Committee.  Those who are members of the

6    Committee, why don't you hit five-star.

7           MR. ZLUTICKY:  Good afternoon, Your Honor.  This

8    is Nick Zluticky with Stinson for the Official Committee of

9    Unsecured Creditors.  And this should also be reflected in

10   the electronic appearances, but we also have Phil Ashfield

11   on the line as well.

12          THE COURT:  Okay.  Good afternoon.  Good

13   afternoon.  Anyone else from the Committee?  Okay.  If

14   anyone else wishes to make an appearance, please hit five-

15   star.  And I just ask once I unmute you -- I'm going to

16   completely unmute you.  So I would just ask that you please

17   keep your phone on mute unless you're addressing the Court.

18   Because you're going to remain completely unmuted.  Anyone

19   else wish to make an appearance?  Please hit five-star.

20          MS. HEARD:  Yes, Your Honor.  This is Mary

21   Elizabeth Heard on behalf of Adree Edmo.  And my co-counsel

22   are not going to be here today.  They're going to be

23   listening in.  But that's Amy Whelan with the Nashville

24   Center of Lesbian Rights and Lori Rifkin, who is a civil

25   rights trial attorney.  Thank you.

```
 1              THE COURT:  Thank you.  There's someone who sounds
 2    like they're in a car.  So please mute your line.  Okay.
 3              MR. CROSS:  Good afternoon, Your Honor.  Ian Cross
 4    on behalf of William Kelly and Kohchise Jackson.
 5              THE COURT:  Okay.  Good afternoon.
 6              MR. GLUCK:  Good afternoon, Your Honor.  Kristian
 7    Gluck and Julie Harrison of Norton Rose Fulbright on behalf
 8    of the proposed DIP lender, M2 LoanCo.
 9              THE COURT:  Okay.  Good afternoon.
10              MR. STAPLETON:  Good afternoon, Your Honor, Warren
11    Stapleton, attorney on behalf of the Arizona Department of
12    Corrections, Rehabilitation, and Reentry.
13              THE COURT:  Okay.  Good afternoon, Mr. Stapleton.
14    And good afternoon, Mr. Gluck and Ms. Harrison.  Anyone else
15    wish to make an appearance?  Please hit five-star.
16              Okay.  I'm going to turn it over to the Debtors.
17              MR. KAUFMAN:  All right.  Good afternoon.  For the
18    record, Your Honor, Aaron Kaufman for the Debtor.  Just a
19    quick housekeeping matter.
20              There's two items on the agenda.  We didn't file
21    an agenda because there's only two items, the bar date
22    motion and the DIP motion.  The bar date motion we've agreed
23    with the Committee to pass that to another hearing next
24    week.  Ms. Saldana gave us March 30th at 11:30 a.m. to push
25    that.  And the reason for the further continuances, the
```

1    Debtor is still working to try to get the schedules and

2    SOFAs on file.  March 30th is incidentally our current

3    deadline for the schedules and SOFAs.  And we're working to

4    meet that deadline, but we'll know more next week about

5    whether we'll be able to meet that deadline.  We may be

6    filing a motion to extend.  So what we would ask is that if

7    we do, we'll confer with the Committee and the U.S. Trustee

8    of course, but we may need to ask for that extension motion

9    to be set along with the bar date motion so that we can

10   continue working on the schedules and SOFAs to make sure we

11   have those on file in a timely fashion.

12        So unless the Court has any questions about the

13   bar date motion, I'll turn to the other matter, the DIP

14   motion.

15        THE COURT:  Okay.  You're asking me for an agreed

16   continuance.  I've got no issues with that.  Just remind me

17   of the date Ms. Saldana gave you, and that will be the

18   official date.

19        MR. KAUFMAN:  March 30th at 11:30.

20        THE COURT:  March 30th --

21        MR. KAUFMAN:  Central.

22        THE COURT:  11:30 a.m. Central.  We will take up

23   the bar date motion.  It's continued.  Everyone's rights are

24   preserved.  And not extending the objection deadline to

25   anything there.  But obviously if you have a deal with the

1    Committee or anything like that, everybody's rights are

2    preserved on that.  And if you can just get a notice of

3    rehearing on that sometime today, that would be great.

4              MR. KAUFMAN:  Will do, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              MR. KAUFMAN:  Next turning to the DIP motion which

7    was filed at Docket 185.  This morning, Your Honor, we did

8    file a revised proposed order which is Docket 233 at around

9    11:00 this morning.

10             THE COURT:  Mm-hmm.

11             MR. KAUFMAN: The revised order follows some I

12   would say extensive discussions with the Committee and

13   counsel for the proposed DIP lender.  It does not -- and

14   I'll just say this up front, it does not resolve all issues

15   raised by the Committee, but it does I think at least narrow

16   the issues for today's purposes.  And I will outline those

17   in a moment.

18             THE COURT:  Okay.

19             MR. KAUFMAN:  The DIP financing motion, just for

20   the record, was filed on March 15th.  That's exactly seven

21   days ago from today.  Right around the 30th day of the case.

22   So we filed it -- although we filed it as an emergency

23   motion, we've kind of given it a little time to breathe.

24   We've been working with the Committee, with the DIP lender

25   to try to narrow the issues, as I mentioned.

1           The motion is seeking interim financing of $2

2    million with some additional borrowing capacity on final

3    appeal with another $8 million, which we would be able to

4    borrow under certain terms and conditions, milestones that

5    are outlined in the motion.

6           I'll say the conditions and milestones are

7    important we think, but they are not issues for today as the

8    revised order reflects in the new Paragraph 15 of the

9    revised order, those milestones and conditions of subsequent

10   borrowing have all been removed from the proposed interim

11   order and they'll now be subject to approval and objections

12   at the final hearing.

13          So let me take a step back and talk about where we

14   are in the case today and where we think the case needs to

15   go in the short and the long-term futures.

16          Today of course is March 22nd.  The case was filed

17   just over five-and-a-half weeks ago.  The debtor is not

18   operating, it's not generating revenue, and it has zero cash

19   in the bank.  Zero cash.  But we do believe, and I

20   understand the Committee also believes that there are some

21   potentially valuable assets out there that we can use to pay

22   creditors through a Chapter 11 plan.  Those assets we think

23   include things like tax credits.  Those assets include

24   things like causes of action against insiders and third

25   parties potentially.  And those assets may include insurance

1    policies or proceeds.  It's still all very preliminary, the
2    merits and the value of all of these assets.  We still have
3    a lot of work to do to monetize these assets and come up
4    with a plan that we think creditors will accept.
5          And I'm going out on a limb here to say that I
6    think our interest, the Debtor's interests are aligned with
7    the Committee's to make sure we maximize the value of these
8    assets and disburse them to creditors pursuant to a plan.
9          And to do that, it will take work.  It will take
10   work to monetize the tax credit.  It will take work to
11   investigate and potentially pursue, or settle if there's
12   some low-hanging fruit, causes of action.  It will take work
13   to get our arms around the insurance and see how we can best
14   monetize or maximize those insurance policies to benefit
15   creditors universally through a plan.  And of course that
16   work is not free.  Chapter 11 is not a place to spend an
17   indefinite amount of time without some semblance of a plan
18   to exit Chapter 11.
19         We acknowledge that this case was filed in a
20   freefall, but that doesn't mean we as estate professionals
21   shouldn't do our best to soften the landing.  It is our hope
22   that we can spend the couple of months, maybe more if
23   needed, as we start getting in and doing work, investigating
24   claims, negotiating with targets, particularly if there's
25   some low-hanging fruit out there, and pulling cash wherever

1    possible, working collaboratively with the Committee to

2    propose a meaningful plan that creditors will accept.

3         As Your Honor knows from private practice,

4    professionals work best with deadlines.  As I said, the

5    milestones are off the table for today's hearing.  But even

6    if the DIP lender wasn't requesting and requiring milestones

7    within its credit -- within the DIP facility, we as

8    fiduciaries would be imposing the same or very similar

9    timelines on ourselves to ensure that the administrative

10   costs of this Chapter 11 process didn't negatively impact

11   creditor recovery.  And that's precisely why Mr. Perry and

12   his team at Ankura worked to prepare the 13-week budget,

13   that after some negotiations was ultimately accepted by the

14   DIP lender.

15        After concluding that there are no liquid assets

16   in the estate as of today, Mr. Perry made the reasonable

17   choice to look for sources of financing to take the burden

18   off of the estate professionals and make sure the estate was

19   well-funded to do the work necessary to propose and confirm

20   a Chapter 11 plan in this case.

21        And so the Committee raises concerns, and we'll

22   get into those concerns I assume in the next few minutes.

23   But one of the chief concerns that I expect Your Honor will

24   hear is why didn't M2 just give us the money for free under

25   the existing funding agreement.  M2's position seems to be

1   that it's already funded in excess of the $15 million

2   commitment under the funding agreement.  And we have some

3   additional work to do, understandably, to reconcile these.

4   As Your Honor can see in the proposed DIP order, the revised

5   one especially, those rights are expressly reserved.  And we

6   believe the 60-day challenge period to the proposed DIP

7   order gives the Debtor the time necessary to do that work

8   and have those discussions with M2 if we conclude that there

9   may be more money available under the funding agreement.

10  Again, it's still very preliminary.

11          THE COURT:  So let me ask you a question.  Mr.

12  Kaufman, let me ask you a question.  This is one of the

13  questions I had.  So let's say I approve the DIP on an

14  interim basis and $2 million.  And then you find out that M2

15  was permitted or had an obligation to fund let's just say $2

16  million.  What happens under the DIP?  How does the DIP,

17  whatever is agreed to in this DIP order affect -- I

18  understand you have the right -- it sounds like you have a

19  right to challenge that.  But what happens in that event?

20  Is it just set off?  Two million, two million?  Or what

21  happens?

22          MR. KAUFMAN:  Your Honor, all rights are reserved

23  in the interim order.  So there's nothing that --

24          THE COURT:  Yeah, I know.  But what happens

25  though?  I mean, do you have to sign an adversary proceeding

1    for that?  I just want to understand.  So let's just say you

2    find out and there' -- let's just find out -- and maybe even

3    M2 agrees with it.  Then what happens?  Or what if they

4    don't agree with it, then what happens?  I'm just trying to

5    understand what the reservation actually means and how it

6    works just for my understanding.

7           MR. KAUFMAN:  No, these are good questions and

8    questions that Mr. Gluck and I have spent a long time gaming

9    what happens in this scenario, what happens in this

10   scenario.  And specifically that $2 million hypothetical is

11   one that we've discussed.

12          The answer is, I mean, none of us wants to engage

13   in protractive litigation unnecessarily.  That's not in the

14   best interest of the estate.  Under the current form of the

15   proposed DIP order, I think it would be incumbent on the

16   Debtor to at least give notice to M2, the DIP lenders, that

17   we have -- here's what we found, we believe you owe $2

18   million under the funding agreement, here's our proposal to

19   address this issue.  And then I think, Your Honor, we would

20   come back to you to make sure that whatever agreement we've

21   resolved with the DIP secured parties, with the Committee on

22   notice, is ultimately approved so that all parties are aware

23   of what settlement we reach.  If we can't reach a

24   settlement, Your Honor, I think it would be incumbent on the

25   estate to file a lawsuit within that challenge period.  And

1    then of course that would probably be a termination event.

2             THE COURT:  How do you then start a lawsuit if you

3    have no money?  I'm sure that the DIP says that you can't

4    use the money.

5             MR. KAUFMAN:  Yes.  And we'll talk about this.

6    This is one of the issues raised by the Committee, is the

7    use of DIP loan proceeds.  Of course restricting our use of

8    DIP loan proceeds and cash collateral does not restrict the

9    rights of the Debtor to do things.  If we think we've got

10   meritorious claims against parties listed in that paragraph

11   19, there's no prohibition that we can't take those actions.

12   I suppose then we just couldn't pay the professionals for

13   the work related to the pursuit of those actions.

14            THE COURT:  That's where I'm starting to get

15   concerned.  In other words, if there is -- I'll put my cards

16   on the table and my questions on the table and then I'll let

17   you all think through them.

18            One is if M2 -- I don't even know who M2 is.  And

19   I'm sure I'll find more about that.  I don't know much about

20   M2 and I would like to know a little bit more about who they

21   are and their connection in this case.

22            Two, if the estate -- and I'm just thinking

23   through hypotheticals, and I'm sure that there may be

24   answers to them.  I'll just get my questions out.  I don't

25   like when judges wait until the end to kind of get their

```
 1    questions out.  But I'm not going to strike a new deal.  I'm
 2    not doing any of that.  What I am saying is if it turns out
 3    that M2 had a funding agreement and M2 owed the estate $2
 4    million or $4 million and two of it -- you know, and I also
 5    approve a $2 million DIP, the Debtor can certainly work out
 6    a proposed agreement and try to come before the Court to
 7    resolve any issues related to that and the Committee will
 8    have a look at it and so will any other party in interest.
 9    But if M2 loses that, it doesn't -- you know, you don't get
10    -- you know, the question is do you get the $2 million plus
11    the releases or do you just -- did you just provide $2
12    million worth of funding which was essentially the
13    equivalent -- did you essentially by not doing that, did you
14    put yourself in a better position because now you have a $2
15    million super priority DIP claim when you were supposed to
16    provide the funding all along.  I want to know what happens
17    if M2 loses.  Does M2 just provide the $2 million?  And what
18    happens to the $2 million that were provided here?  Because
19    if M2 has to provide the $2 million, the question is under
20    what circumstances.  And if it was just to provide $2
21    million worth of funding, then there has to be something in
22    my mind that allows everyone to say, well, the $2 million
23    that Lop has approved really shouldn't have Been the $2
24    million that we used.  We really just used $2 million out of
25    the funding agreement, or some version of that.
```

```
 1          So those are my -- those are the two.  I just want
 2    to understand the scope of the Debtor releases today.  And
 3    it sounds like you're a challenge party, but just how it
 4    works and the scenarios, there's going to be a lot of
 5    questions about it.  And I would like to just deal with them
 6    up front.  And obviously I need to understand the
 7    Committee's perspective on some of this.  I understand the
 8    Debtor needs money, and I don't want to create a situation
 9    where the Debtor has a challenge period and then, you know,
10    essentially can't use any money to then come challenge it.
11    Because if that's the case, I'll bring everyone in 24 hours
12    and we won't have to spend a whole lot of money on an
13    adversary.  I'll bring someone in really fast to deal with
14    the situation.  In other words, there's got to be some real
15    teeth to the challenge period if we're going to have one and
16    what the scope of the releases are today.
17          I understand the Debtor needs money.  That part I
18    think I'm clear on.  What I do want to understand are the
19    terms of it.  And I'm not saying M2 has done -- these are
20    the questions I would ask of any other party that came in
21    with little cash and trying to understand the scope of what
22    I'm being asked on an interim basis.  So I don't think
23    anyone should read anything into it.  I just figured I would
24    get my questions out up front so that everyone can start
25    thinking about them.
```

1    MR. KAUFMAN:  No, and these are fair comments.  I

2    do think the intent -- and I won't speak for Mr. Gluck or

3    the DIP lender parties.  But I do think the intent in the

4    challenge period and the limitations on use of DIP loan

5    proceeds was intended to strike a fair balance between

6    recognizing the Debtor's immediate need for funding while

7    also preserving the estate's right to investigate these

8    funding obligations and make sure that at the end of the

9    day, if M2 had funding obligations, were not engaging in

10   protracted litigation.  We're engaging in a collaborative

11   process to offset those rights but also continue the flow of

12   funding whether it's -- in your hypothetical it's M2 owed $2

13   million but we need ten, there are other ways to skinny that

14   other than just engaging in litigation.  Because we may be

15   entitled to a $2 million offset, but we still need $8

16   million more.

17        And I can't answer your question, Your Honor.  I'm

18   sorry to say I can't answer your question based on the

19   language in the order because the language in the order I

20   think, specifically in Paragraph 19, does contemplate that

21   we're not using cash collateral to file action against M2.

22   I don't think anyone contemplates having to do so.  But if

23   it would give Your Honor some comfort, I would be happy to

24   take this offline and discuss with Mr. Gluck what M2 would

25   be willing to agree to in that Paragraph 19 to address the

1    Court's concerns about using DIP loan proceeds limited to

2    disputes over the funding agreement within the challenge

3    period.

4            THE COURT:  Everybody can think about it, but I

5    just want to make sure that the Debtor effectively has an

6    opportunity to request the funds.  And maybe it -- in other

7    words, I'm going to view the litigation very differently, if

8    it ever gets there, about the use of a funding agreement, of

9    which I'll likely learn more about as time goes on.  But M2

10   is asking for a waiver of that, things related to other

11   litigation.  And this is an interim hearing and I understand

12   M2's position.  Just with the amount of cash that the Debtor

13   has, I think we just ought to be really careful about what

14   is actually said and what these words mean.  And so a lot of

15   what I'm doing now is just poking around the edges to

16   understand what this really means so I can make sure that I

17   understand what I'm signing.

18           MR. KAUFMAN:  I understand.  And, Your Honor, I

19   would offer that the language that we tried to negotiate is

20   really intended to look very much like any other DIP order

21   where we have an outside third-party lender with some

22   (indiscernible) on their (indiscernible).  And so the

23   challenge period with respect to this funding agreement

24   challenge is not very different than the risk that a Debtor

25   would take if it decides to sue, or if it's a committee, the

```
1   risk that a committee would engage in if it decides, hey, we
2   want to sue this DIP lender over its liens, it's the risk
3   you run.  Because it would be an event of default.
4           THE COURT:  The difference is that in those cases,
5   there are still operations.  Right?  In the traditional
6   case, there are operations.  There's other things one can
7   look to.  Here, we're looking to one person, and they're
8   going to put a lot of conditions on what it is, I
9   understand.  But we still have a case, too.  The Debtor has
10  an obligation, the Committee still has to do its work.  And
11  I'm not suggesting that all of this cash should be used to
12  then go fund litigation against M2.  That's not what I'm
13  saying.  What I am saying is if there's an issue about the
14  funding agreement, it's not going to require an adversary
15  proceeding.  It's going to be a motion in front of me and
16  we're going to find out what the answer is really fast.
17  That's what I'm suggesting to the parties.  We're not going
18  to have an answer and declaratory relief -- I'm going to
19  come in here and find out what that contract says and we're
20  going to have a really fast hearing where everybody's rights
21  are respected, but we'll know what it is.  Because then I
22  think we can then determine whether -- if it's a turnover
23  action, then maybe there's an adversary.  But I'm going to
24  read that contract and we're going to all have a discussion
25  about how quickly, if there is any money, and what happened
```

1    there.  This isn't going to drag out into a four or five-

2    month situation where you've got milestones.  That's what I

3    mean.  And sometimes adversary proceedings can take a long

4    time because there are federal rules that apply there.  And

5    you've got milestones associated with the DIP.  And so they

6    can't fight each other.  They're going to have to -- and I'm

7    not suggesting how it works.  What I am saying is we're

8    going to come in really fast if you feel like there are some

9    funding obligations, it won't take much to get something in

10   front of me.

11              MR. KAUFMAN:  Understood.

12              THE COURT:  And preserving that right is more

13   important to me on an interim basis than what we do.

14              MR. KAUFMAN:  Understood.  And what I would

15   suggest on this point, Your Honor, is if you -- if the Court

16   would indulge me in going through the --

17              THE COURT:  Yeah, absolutely.

18              MR. KAUFMAN:  -- remaining issues that I think are

19   on the table for today.

20              THE COURT:  I'll stay quiet, I promise.

21              MR. KAUFMAN:  And Mr. Gluck -- no, no, no.  I

22   apologize for -- I'm not trying to interrupt the Court.  Mr.

23   Gluck may be able to answer this question, too.  But from

24   the Debtor's perspective, I think we would be okay with the

25   Court's suggestion of adding some language to Paragraph -- I

1   think it's Paragraph 19 that just says that this kind of a

2   dispute will be done pursuant to a motion heard on an

3   expedited basis.  But we can -- I feel confident that if Mr.

4   Gluck's client is amenable to such a provision, and of

5   course if the Court's ordering it, then Mr. Gluck and I can

6   just hammer out the language that addresses this Court's

7   concerns.

8          THE COURT:  Okay, thank you.  I'll stay quiet, I

9   promise.  What else?

10         MR. KAUFMAN:  Mr. Perry's declaration discusses

11  his efforts to find alternative sources of financing.  As of

12  today, there are none.  The debtor will continue, and Mr.

13  Perry's declaration discusses that he is continuing to

14  pursue this possibility.  And certainly as money comes in

15  through this interim DIP loan and professionals begin to do

16  the work necessary to monetize things like tax credits, the

17  Debtor may have some alternative sources of financing out

18  there.  But again, it's very preliminary.  And that's why we

19  need the financing today.

20         Mr. Perry's declaration also addresses how the

21  terms of financing were negotiated.  He recognizes that M2

22  is an affiliate (indiscernible) Your Honor's concern.  There

23  is an entity called M2 Holdco at the top that owns M2

24  LoanCo.  That is the DIP lender.  M2 LoanCo is the proposed

25  DIP lender.

1       Back up the chain at M2 Holdco and then down

2   another arm, a different column, is where the Debtor

3   ultimately resides.  So they are affiliates through common

4   ownership all the way up at M2 Holdco.  And there are some

5   common directors we believe.  But that's the extent of our

6   knowledge.  But for purposes of this DIP loan, the terms

7   were negotiated through counsel with Mr. Perry for the

8   Debtor making the decisions independently on what was in the

9   estate's best interest.  And that's addressed in Mr. Perry's

10  declaration.

11      Since the Committee's appointment -- and this kind

12  of bolsters the point of the arm's length nature of the

13  negotiation -- since the Committee's appointment on March

14  2nd and its retention of counsel roughly a week later, we've

15  worked closely with the Stinson firm, with Mr. Zluticky and

16  Mr. Ashfield.  We have not been able to resolve all their

17  issues.  But as the revised order at Docket 233

18  demonstrates, we're making progress.

19      And as I stand here today, I believe the only open

20  issues other than the ones the Court just raised, which do

21  overlap with some of the Committee's concerns I'll

22  recognize, are as follows.  And Mr. Zluticky can certainly

23  correct me if I'm missing anything.

24      The first one is the Committee challenges the

25  Debtor's need for funding today or whether professionals

1   should continue to finance the case until money comes in.

2        Our position, the Debtor's position is that the

3   professionals have already financed this case enough over

4   the last five-and-a-half weeks.  And now with the committee

5   hiring counsel, which was anticipated in the budget and the

6   Debtor's need to retain additional professionals who are not

7   willing to begin work without certainty of payment, Mr.

8   Perry and the Debtor are acting well within its business

9   judgment to the extent that immediate financing is needed to

10  keep this case moving down the path toward confirmation.

11       Second, the Committee challenges the scope and

12  timing of the releases, Paragraph 17B and 18 of the revised

13  proposed order.  My understanding though is that the initial

14  release, 17A, is acceptable to the Committee.  Again, Mr.

15  Zluticky can correct me if I'm mistaken.

16       Our position is that the 60-day challenge period

17  is consistent with local practice and also reasonable within

18  the work that we think we need to do.

19       THE COURT:  Tell me --

20       MR. KAUFMAN:  And if I could paraphrase --

21       THE COURT:  Tell me what the releases do today.

22       MR. KAUFMAN:  The releases today --

23       THE COURT:  The ones that are not subject to the

24  challenge period.   What happens today if I sign this order?

25       MR. KAUFMAN:  Today we are only releasing -- and

1    I'm pulling the language so I don't misstate it.  But today,

2    we are only releasing the parties listed in the releases.

3    So that's the DIP secured parties and each of their heirs,

4    successors, assigns, officers, shareholders, directors,

5    members, employees, managers, principals, attorneys, agents

6    past and present.  But in each case solely in their capacity

7    as DIP secured parties, they are released from --

8         THE COURT:  But what does that mean?  Right?

9    That's what I'm trying to figure out.  So they are going to

10   be released.  And that's a release third parties.  They're

11   going to be released from anything to the extent made in

12   their -- today -- and they're just going to be released in

13   their capacity as DIP lenders.  It's only in connection with

14   the DIP?

15        MR. KAUFMAN:  That's correct.  So we think this is

16   narrow --

17        THE COURT:  That's what I'm trying to figure out.

18   So what happens if it turns out that M2 should have funded?

19   That's what I'm trying to figure out.  Are they -- is there

20   a release?  If it turns out -- that's what I'm just trying

21   to understand.  And I should have provided a little bit more

22   clarity on that.  What happens today if it turns out M2

23   should have funded?  And I'm not saying they should have.  I

24   have no idea whether there was any obligation to fund it.  I

25   don't know.  But what happens -- what does this release

1    today if M2 turns out was wrong in their analysis and the

2    Debtor was -- and someone finds out M2 had an obligation to

3    fund?  Maybe that's the better way of saying it.  I haven't

4    heard from M2.  If M2 had an obligation to fund $2 million,

5    what happens --

6         MR. KAUFMAN:  From the Debtor's perspective, our

7    position is we're not releasing anything under the funding

8    agreement.  We have seen some initial -- Mr. Perry would

9    testify if called that he has done a very preliminary review

10   of a reconciliation of the funding, but we have our own

11   reconciliation to do.  But that the very -- at least M2's

12   position is that they already overfunded well in excess of

13   the $15 million.  And so this release, to Your Honor's

14   point, is this release doesn't release anything with respect

15   to the funding agreement.  I'm not sure I -- from Your

16   Honor's body language, I can't tell if I'm answering your

17   question --

18        THE COURT:  No, no, no.  I'm just probing.  I just

19   want to understand.  So if, you know -- I just -- I

20   literally just want to understand how it all plays out.  No,

21   don't read into my body language other than me studying text

22   and things of that nature.

23        MR. KAUFMAN:  Yeah.  And Mr. Gluck can confirm

24   this too when he has an opportunity.  But my understanding -

25   - and again, he can confirm if his understanding is the same

1    -- but that 17A is not intended to release anything with

2    respect to the funding agreement.  But that comes in 17B

3    subject to the challenge period.  So if there is an

4    obligation under the funding agreement, the Debtor will have

5    the right to demand it under the funding agreement, to an

6    offset to the money that's been lent.  And hopefully there's

7    free money out there.  We all hope there's free money out

8    there for the first 30-plus days of this case.  We haven't

9    found it, but we're going to keep looking.

10           THE COURT:  Okay.

11           MR. KAUFMAN:  So I've talked about the first two

12   points that I think the Committee has raised.  The third one

13   is the limitations in the use of DIP loan proceeds, which is

14   that next paragraph, 19.  The Committee takes the position

15   that we should be able to use loan proceeds to sue M2 and

16   its affiliates.  Obviously M2 won't agree to that.  And

17   we're comfortable as estate fiduciaries with the notion that

18   if we have viable claims to pursue including a challenge

19   pursuant to this DIP order, we should pursue them if that's

20   what's in the best interest of the estate, but we can't

21   expect them to defund those efforts.  It's the risk that the

22   Debtor has to be willing to take.

23           The fourth issue is the Committee just

24   fundamentally disputes that this loan was negotiated in good

25   faith.  I don't want to put words into the Committee's

1    mouth, but their position seems to be that M2 should have

2    just given this money away for free under the funding

3    agreement.  Our position, consistent with Mr. Perry's

4    declaration, is that M2 believes it's overfunded, but that

5    it's willing to loan the money while allowing the Debtor to

6    do its own independent investigation of the funding

7    agreement.  And under these circumstances, we believe M2 has

8    negotiated with us in good faith because our rights are

9    preserved, the cost of borrowing is pretty low, $40,000,

10   which is two percent of the draw plus the interest which is

11   picked.  We're not paying that.  We'll pay that on the

12   maturity date.  And the attorney's fees to help us draft and

13   negotiate the terms.  Of course M2 needs its own independent

14   counsel.  So those are the costs of borrowing.

15        Under the circumstances and given the lack of

16   alternative sources of funding, the Debtor's position is

17   that this does satisfy the good faith standard.  Mr. Gluck

18   can confirm this, but our understanding is that M2 will not

19   advance funds under the interim DIP loan without a finding

20   of good faith.

21        And then finally, this is kind of like a catchall.

22   But we've made some various change in the proposed interim

23   order, the revised order that the Committee just hasn't

24   signed off on yet for a number of reasons that Mr. Zluticky

25   can get into.  But those, if we're keeping score, my

1    understanding is those include paragraphs 2B(ii) and (iii).

2    That's, Your Honor, first writing.  So 2B(ii) and (iii),

3    Paragraph 5A concerning the definition of DIP collateral,

4    Paragraph 20 concerning the indemnity.  And I think that's

5    just a minor drafting thing is all.  And Paragraph 23

6    concerning exculpation.

7          So, Your Honor, I've done enough talking.  I

8    recognize this is an interim DIP hearing seeking only

9    interim relief today subject to a final hearing hopefully in

10    the next couple of weeks.  I think -- and Mr. Zluticky can

11    tell me if he has a different understanding, but I think we

12    can agree for purposes of today to rely on Mr. Perry's

13    declaration subject to cross and redirect as needed.  We've

14    also filed our witness exhibit list, which contains the

15    budget and the DIP agreement.

16          For the record, Your Honor, the witness and

17    exhibit list is Docket 192.  The budget is Exhibit 6.

18    Credit agreement -- sorry, I went out of order.  The credit

19    agreement is Exhibit 5.  The budget is Exhibit 6.  Mr.

20    Perry's declaration is Exhibit 7, but also filed

21    independently at Docket 186.

22          I noticed the Committee didn't file its own

23    witness and exhibit list.  So I think this covers the

24    evidence for today.  And again, anyone can correct me if I'm

25    misunderstanding this.

1        Unless the Court has any other questions for me, I

2   think now is a good time for me to stop talking and turn the

3   podium over to Mr. Gluck and Mr. Zluticky and then -- go

4   ahead.

5        THE COURT:  Thank you.  And, Ms. Heard -- I'll go

6   to Mr. Zluticky and then I'll turn it to Ms. Heard.  I

7   believe she also filed an objection.  So I will go in that

8   order.  Mr. Gluck?

9        MS. HEARD:  Your Honor, I just wanted to say

10  (indiscernible).  That's all at this point.

11       THE COURT:  Excuse me?

12       MS. HEARD:  I didn't know if you were -- he was

13  going over the evidence and I was just saying that I object

14  to the (indiscernible).  That's all at this time.  I didn't

15  know --

16       THE COURT:  Mr. Gluck represents M2.  We're just

17  taking openings.  And then I'm going to go to the Committee

18  and then I'm going to go to you.

19       MS. HEARD:  I understand.  Thank you.

20       THE COURT:  Thank you.

21       MR. GLUCK:  Thank you, Your Honor.  I'll try to

22  answer -- well, I will answer the question that you had

23  about sort of how it would work, at least from M2's

24  perspective.

25       And if Your Honor did approve the DIP loan on an

1   interim basis, the Debtor would borrow $2 million.  And that

2   $2 million would not be challengeable, irrevocable.  It

3   would be an obligation of the Debtor subject to the liens

4   that would be granted and the administrative super priority

5   claim.  To the extent that the Debtor were to find potential

6   causes of action related to M2 within its challenge period,

7   which is B of the release provision, and there's something

8   meritorious to that, I mean, I assume that the Debtor would

9   try to use that as an offset against whatever DIP

10  obligations there are.  But the actual obligations that

11  would be lent would not be challengeable, revocable.

12       M2 does require a good faith finding for it to

13  lend.  That's not a surprise.  I don't think -- I've never

14  represented a DIP lender -- I've never been in a complex

15  Chapter 11 case where a DIP lender hasn't gotten that

16  finding.  So that's certainly a prerequisite for M2 funding,

17  along with some of the other sort of items that Mr. Kaufman

18  outlined.  And it's probably best to maybe cover those sort

19  of at closing arguments if needed.

20       But with respect to how this would work with the

21  release provision is that $2 million would be hard, it would

22  be an obligation of the Debtor, and it couldn't be revoked.

23       So I'll pause and see if Your Honor has any

24  comments with respect to that.  But that is M2's view as to

25  how that would work.

1          THE COURT:  Okay.  Thank you.  Is there anything

2     else you wish to tell me at this time, sir?

3          MR. GLUCK:  No, Your Honor.  I will just reserve

4     the argument with respect to the other committee provisions

5     for final argument.

6          THE COURT:  Okay.  Thank you very much.

7          Let me hear from the Committee.

8          MR. ZLUTICKY:  Yes.  Thank you, Your Honor.  To

9     echo what Mr. Kaufman said, we've had productive discussions

10    with Debtor's counsel and we've been able to narrow the

11    issues significantly for today.  And the things that I

12    believe that are still remaining are the rights that my

13    client just cannot accept giving up in connection with this

14    interim DIP loan and that we don't think the Court should

15    allow to happen, either.

16         We're here today because there's a building on

17    fire and the lender is the only one willing to pay for the

18    cost of the fire truck.  But the problem is they are only

19    going to do that if we release now anything related to the

20    fire before we even know whether they lit the match.

21         And so here's what we know today.  We know that he

22    proposed lender is an insider of the Debtor.  We know that

23    there is a funding agreement in place under which M2 LoanCo

24    was obligated to fund up to $15 million.  We also know that

25    M2 LoanCo was the primary lender for the company prior to

1    both the divisional merger and the combination merger that

2    preceded it.  And that's the extent of what we know.  And

3    it's not the Debtor's fault.  They don't know anything more

4    than we do.  Debtor's counsel has been transparent with us

5    and they've been forthcoming with information.  Both sides

6    have worked really hard to narrow the scope of issues with

7    the proposed DIP loan.  We appreciate that cooperation and

8    we view that as a great first step in what will be a

9    collaborative process as we move forward in the case.

10            But my clients are concerned, Your Honor.  In the

11   last 48 hours, I've received calls from dozens of unsecured

12   creditors who are terrified that the lender is going to get

13   a release before we even know what we're releasing them

14   from.  And in light of what we've heard as recently as this

15   week, I don't know when we're going to get the information

16   we need to do an investigation.

17            I fully expect that by the final hearing on a DIP

18   motion, we will have a much better idea of when that would

19   happen.  But sitting here today, we simply don't know.  And

20   for the same reason, we have serious concerns about

21   collateral being pledged that includes causes of action and

22   tort claims when we don't even know the parties against whom

23   those claims exist.  It could very well be the lender or its

24   parent company or an affiliate, an officer or director.

25   It's simply not appropriate to pledge collateral for a loan

1    to a lender when we don't even know what the collateral is.

2    And more importantly, the potential sources of recovery for

3    these claims.

4          We've been told that the Debtor expects to receive

5    a $15 million tax refund.  That alone is more than seven

6    times the amount sought under the interim order.  And so in

7    our view, there's no justification for bringing this

8    additional, potentially significant collateral under these

9    circumstances without understanding the ramifications of

10   that.

11         And so we were able to narrow the scope of the

12   issues with the Debtors today.  We are not going to dispute

13   that the Debtor needs the money.  We understand that the

14   Debtor has no money and that estate professionals need to be

15   paid.

16         For purposes of the interim order, the heartburn

17   that we have on good faith, Your Honor, is how can we make a

18   finding that the lenders made the loan in good faith if it

19   turns out later they should have funded the $2 million under

20   the funding agreement and they knew it.  That's just

21   objectively bad faith.  And so how can we make a good

22   finding today?

23         And so that sort of takes me back full circle to

24   what we're really asking the Court to do today.  We're

25   asking the Court to please preserve all parties' rights here

```
 1    by not giving the lender releases before we even know what

 2    they're being released from, to stop us and the Debtor from

 3    giving up rights before we have time to understand what

 4    those rights are.  And that's what setting a challenge

 5    period today does.  That's what pleading this additional

 6    collateral does.

 7              And so what we're asking the Court today is to

 8    preserve the rights of everyone.  If the Court is inclined

 9    to approve the DIP loan, approve it without the non

10    (indiscernible) releases, without the non-DIP loan release.

11    And we can set a challenge period by the final hearing.

12              THE COURT:  Just so we're all -- I think I know

13    what you mean, but there could be other people listening.

14    What do you mean by that?  I want you to articulate it and

15    point to a paragraph.

16              MR. ZLUTICKY:  Absolutely.

17              THE COURT:  I'm doing this for the benefit --

18    there are a lot of folks on the phone and I want to make

19    sure everybody is on the same page.

20              MR. ZLUTICKY:  Thank you, Your Honor.  And I will

21    make sure I'm more precise with what I'm asking.

22              We're asking that 17A be made clear that it solely

23    relates to the making of the DIP loan and that the entity

24    that is being released is solely in its capacity as DIP

25    lender and not in its capacity as a party to the funding
```

1   agreement or the divisional merger or any actions related

2   thereto.

3           And what we're further asking is that 17B be

4   removed on an interim basis and that it be considered for

5   purposes of a final DIP order at a final hearing.  Because

6   right now, sitting here today, we don't even know when we're

7   going to have the information to investigate.  What we know

8   is we don't know a lot of things, and we don't know when

9   we're going to know it.  And so how can we commit today to a

10  challenge period at all when we don't even know when we're

11  going to get the information?  And if you look at what's

12  being released once the challenge period expires, it's

13  incredibly broad.  It's essentially any and all claim we may

14  have against M2 LoanCo, its affiliates, its parents related

15  to the divisional merger, the combination merger that

16  occurred before it.  We're essentially modifying 546 and

17  putting it into 60 days.

18          And Mr. Gluck is correct that I've never seen a

19  DIP loan without a challenge period.  But that is only in

20  the context of a lender who made a prepetition loan, and

21  only relating to the prepetition loan.  That is not what

22  we're doing here.  We're not going to be reviewing security

23  agreements and UCC-1 financing statements to see whether

24  they're properly perfected.  This is about potentially

25  egregious conduct that's going to need to be fully and

1    fairly investigated.  And right now, this challenge period

2    expires five days after the trial on the extension for a

3    stay.  There is so much we don't know today.  All we're

4    asking is that the Court not approve the releases and set

5    the challenge period today and to save that for a final

6    hearing when I think we'll all have a better idea of how

7    much time the Debtor actually needs.

8          THE COURT:  Mr. Kaufman, you can answer this

9    question for me.  The relief requested -- I studied the -- I

10   did get a chance -- I had a -- the interim.  When would you

11   need to come back for a final?

12         MR. KAUFMAN:  So initially we were hoping -- of

13   course the initial hearing was targeted for last week, last

14   Friday.  We were hoping to set us up to come out two weeks

15   after the interim hearing.  And if you look at the approved

16   budget, the approved budget has us starting to make draws on

17   the next $3 million tranche the first week of April.  I

18   think we could go two weeks out from today, which puts us I

19   think at April 5th or sometime in that week.  That gives us

20   -- that would give us a full 21 days between the filing and

21   the final hearing.  You know, more if the hearing is at the

22   end of the week or the start of the following week.

23        But that again requires us and requires the

24   professionals to finance the case a little bit after the

25   interim draw.  And I think we could live with that for a

```
 1    short period.  I think -- and we'll have to shuffle the deck

 2    a little bit in the approved budget to move money around to

 3    take amounts that are in line items to move those to the new

 4    professionals that will need to get retained.

 5            But to answer your question, Your Honor, probably

 6    the first week of April is what we're looking at for final

 7    approval.

 8            THE COURT:  You said the first week of April?

 9            MR. KAUFMAN:  First week of April.

10            THE COURT:  Okay.  Okay.  Thank you.  I just need

11    to understand.  Okay.

12            Ms. Heard, may I hear from you?

13            MS. HEARD:  (indiscernible).  So my client has a

14    $2.6 million liquidated attorney's fees claim.  We're in the

15    tail end of seven years of litigation that has gone up and

16    down to the Ninth Circuit.  And currently that amount has

17    been appealed to the Ninth (indiscernible).  The Defendants

18    include the Idaho Department of Corrections and I believe

19    three employees for IDOC.  And then (indiscernible), the

20    predecessor-in-interest to the Debtor and one of the doctors

21    I believe who worked there.  And that judgement is joint and

22    several, just to give you a little bit of an idea of the

23    scope here.

24            So my client's issue -- here we are, we're seven

25    years in and we're trying to get paid.  This is not the
```

1   beginning of litigation.  We've touched on this.  We're

2   going to come back to the motion to extend the stay.

3        My concern is I've never seen a DIP where we don't

4   know -- we haven't seen the loan agreement.  I don't know

5   who the lenders are.  I don't know who the DIP secured

6   parties are.  I don't know what it takes to become a new

7   lender that appears to get the same broad releases.  Which I

8   understand we'll take that -- most likely take that up at

9   the final hearing.  But what I'm hearing I think from

10  Debtor's counsel -- and I believe them that they don't know

11  -- is that they don't know who owns LoanCo, Holdco.  Does

12  that mean we don't know who owns the Debtors.  Are these all

13  the same parties?  I don't know.

14        And so I've anything with this much -- how do I

15  say -- lack of detail.  We haven't seen the loan agreement.

16  We haven't seen a drawdown history.  I was under the

17  impression that the $15 million, if it was mentioned as the

18  funding agreement in the first Perry declaration that was

19  part of the motion to extend -- I mean, maybe I missed

20  something.  I thought that that amount was something that

21  was going to be draw down over time.

22        Now, I understand if it's been eaten up, it's been

23  eaten up.  But that just seems like a pretty big

24  distinction.  So what are the terms of the funding

25  agreement?  Frankly, I don't think we have enough time

1   between the amount of -- when we received the amount of --
2   I'm sorry, the schedules and SOFAs on the 30th to the fifth.
3   But, I mean, we can come back and then come back again, I
4   guess.  But I think as a start, we need to know who is --
5   who owns what.  Who are the DIP parties, who are the
6   lenders, and what are the terms.  And that is really our
7   concern because the releases are so broad I'm not completely
8   sure if that means that it includes the indemnified parties
9   that they have under their motion to extend.  I mean, it's
10  just so incredibly broad.  It certainly is going to I
11  imagine (indiscernible) employee before and after.

12          But if there are claims against the prior lenders,
13  prior D&Os.  There's some overlap there.  And I've spent a
14  considerable amount of time looking at every public filing
15  that I can locate.  In Southern District of New York,
16  there's an extremely large list of litigation involving Mr.
17  Lefkowitz, who was mentioned in the various pleadings.
18  There's some confusion about (indiscernible) or whether or
19  not that is even a related entity.  And (indiscernible), do
20  they still own the company, does someone else still own the
21  company?  The company meaning the Debtor.  Who owns what?
22  There is a complete lack of clarity.

23          The other thing is, I've never seen a DIP that
24  doesn't purport to pay for operations of claims, meaning
25  general unsecured claims.  So all of this money -- and of

1    course (indiscernible) Mr. Bruckner and Mr. Hoffman and all

2    of their partners and employees (indiscernible).  But if

3    we're looking at April 5th and we're also looking at a $15

4    million tax refund, maybe this is just a question of timing.

5    And we can, you know, do something that doesn't involve any

6    releases of parties that we don't even know who they are yet

7    even on an interim basis just to get three weeks back.

8    Perhaps there's a way to get some of that money to come in.

9           But at this point until we hear from -- until we

10   can see the loan agreement, see what was drawn down and for

11   what, there's a lot of confusion.  And maybe -- I'm not in

12   any way blaming the professionals.  I'm just saying that I

13   think maybe hear from the actual parties, the -- who is

14   signing the checks.  You know?  I mean, there's got to be a

15   person somewhere.  So anyway, with that, Your Honor, we

16   object to the interim order in its current form that was

17   filed at 11:00.  And I'm also very concerned about really

18   hamstringing the Committee or any parties-in-interest that

19   would seek either derivative standing, or if the Debtors

20   themselves would seek -- it's just such a short time period.

21   And we're talking about sixty days.  And I don't really

22   understand what the emergency is.  And I also don't

23   understand -- it sounds to me like it's $30 million.  There

24   was 15 and then another 15 potentially.  And I think we need

25   to hear some clarity on that (indiscernible).  So maybe we

1   can hear from Mr. Perry.  But with that, we object.

2              Thank you, Your Honor.

3              THE COURT:  Thank you.  Does anyone else wish to

4   be heard in the form of an opening?  Okay.

5              Mr. Kaufman, how do you wish to proceed?

6              MR. STAPLETON:  Your Honor?

7              THE COURT:  Yes.  Was there someone?  Mr.

8   Stapleton, yes.  Please go ahead.

9              MR. STAPLETON:  This is Mr. Stapleton.  Thank you,

10  Your Honor.

11             The Arizona Department of Corrections

12  (indiscernible) another thing Mr. Zluticky said.  We agree

13  with what he said.  Our specific (indiscernible) we agree

14  that 17B should be removed.  We are okay with the interim

15  order that has been proposed provided that Mr. Zluticky is

16  okay with the provision with regard to the lien -- you know,

17  essentially the lien covering avoidance and recovery

18  actions.  So we would just be guided by what the Committee

19  does with regard to that paragraph.  So that's paragraph 5A.

20             And then the last thing (indiscernible) I

21  recognize, you know, we don't have a lot of time is we think

22  17A should just come out.  You know, and the reason is this.

23  17A is the provision that basically gives the DIP lender a

24  release immediately upon entry of the interim order.  The

25  Court proposed a hypothetical where the M2 loan company had

1    already -- essentially had not advanced $2 million that was

2    still available under the draw.  And so in essence at that

3    point the DIP loan might have been made what amounts to

4    under false pretenses.

5           The way this works is that would be released,

6    which means that it could essentially, at least the way it's

7    currently drafted, eliminate the Debtor's ability to set

8    off.  And so we think that that is a problem.

9           And then the second thing I would say about that

10   is -- you know, and this touches upon just in a way -- Ms.

11   Heard just said, you know, we don't know who the lenders

12   are.  In fact, the lenders are not identified in the credit

13   agreement.  And so while I appreciate the lender wanting

14   (indiscernible) and I actually want money to come into the

15   case, I don't see how the Court is in a position to grant a

16   good faith finding without knowing the identity of the

17   lenders.  I mean, I just don't know how else to say it.  And

18   with that, that's all I have to say, Your Honor.

19          THE COURT:  Thank you very much.  Okay.  Anyone

20   else?

21          MR. GLUCK:  Your Honor, this is Kristian Gluck on

22   behalf of M2 LoanCo.

23          THE COURT:  Yes, sir.

24          MR. GLUCK:  I had an offline conversation with Ms.

25   Heard about this, and I note it is not in the motion.  But

1    the only lender here is M2 LoanCo.  So I know there's been a

2    lot of speculation about that through this hearing, but it

3    is only M2 LoanCo.  So they would be the administrative

4    agent and they are also the lender.  And they are the sole

5    lender.

6              THE COURT:  Okay.  Mr. Kaufman?

7              MR. KAUFMAN:  Thank you, Your Honor.  Just to echo

8    Mr. Gluck's comment there on the lender's identity.  In an

9    effort to try to accommodate Ms. Heard's concerns and

10   concerns raised by the committee as well, we added Paragraph

11   35 to the proposed order that identifies M2 LoanCo as the

12   sole lender and then providing that if there are any new

13   lenders that wish to join the credit agreement -- we're not

14   aware of as of today, but if any want to, we would have to

15   file a notice, comply with this paragraph, and give parties

16   14 days to object.  So my understanding is that the

17   Committee is actually okay with that language, but I'll let

18   Mr. Zluticky comment if I'm misstating.

19             MR. ZLUTICKY:  That's correct.  We are comfortable

20   with the language in 35 that if there were another party

21   other than M2 LoanCo that was going to contribute money to

22   this loan, that that would have to be disclosed to the

23   public by a notice that was filed by the Debtor and then we

24   would have 14 days to objection.

25             THE COURT:  Got it.  Okay.

```
 1              MR. GLUCK:  Your Honor, before I think we get into
 2      the evidentiary presentation, is it possible to take a short
 3      recess, Your Honor?  I think it would be very helpful for
 4      the hearing if we just take a short one.
 5              THE COURT:  How much time do you think you need?
 6      The only reason I'm asking is that normally I can see people
 7      coming back in the hallway.  You know?  I can't do that
 8      online.  So  you'll have to...
 9              MR. GLUCK:  Right.  I mean, I think ten minutes.
10      Just ten minutes, Your Honor, is all we need.
11              THE COURT:  I've got 2:34 on my clock here.  Why
12      don't we do 2:45?
13              MR. GLUCK:  that's plenty of time, thank you.
14              THE COURT:  Okay.  Go ahead, Ms. Heard.
15              MS. HEARD:  All I wanted to say is yes, I
16      understand that M2 LoanCo is more than just the
17      administrative agent, which was my original (indiscernible).
18      I'm asking who is M2 LoanCo and what is M2 LoanCo's
19      relationship to the DIP -- what is their prepetition
20      relationship, the people who are actually behind M2 LoanCo.
21              THE COURT:  Okay.
22              MS. HEARD:  And I don't think we know.
23              THE COURT:  All right.  I'll come back on at --
24      well, ten minutes.  Thank you.
25              Oh, I should tell everyone I'm going to mute the
```

 1    court line.  So again, the line will still remain open.  So,

 2    you know, I will give everyone an opportunity.  Just be

 3    careful.  I'm not going to -- I don't know what I will do.

 4    Maybe I'll do this.  I'm going to must everything.  I'm

 5    going to mute -- no, I don't want to do that because then

 6    I'll have to unmute everybody.  Everyone go to another

 7    phone.  Don't dial in because everyone will be able to hear

 8    what you're saying.  Okay.  Thank you.

 9            (Recess)

10            THE COURT:  Okay.  This is Judge Lopez.  I am back

11    on the record in Tehum.  Let's see, Mr. Gluck, are you

12    there?

13            MR. GLUCK:  Yes.  Yes, Your Honor.

14            THE COURT:  Okay.  Just checking in.  Maybe that's

15    the better way of doing it.  Are we ready to proceed or do

16    you think you need some more time or?

17            MR. GLUCK:  No, I'm fine, Your Honor.

18            THE COURT:  Okay.

19            MR. GLUCK:  So I was able to take care of what I

20    needed during the break.  Thank you so much for the break.

21    And I did let Mr. Kaufman know that I was coming back on

22    camera so I assume he'll be here shortly.

23            THE COURT:  Okay.  Thank you.  Give everyone a

24    little time to get back on.  Mr. Kaufman, are you there?

25            MR. GLUCK:  And Your Honor, this is Mr. Gluck

```
 1    again.  Can you actually see me on the screen?

 2              THE COURT:  I can, sir.

 3              MR. GLUCK:  Okay, because somebody had indicated

 4    earlier my camera was not working when I thought it was, so

 5    apologies if it was -- it showed it as being on but I just

 6    wasn't sure.

 7              THE COURT:  You got it.

 8              MR. GLUCK:  Your Honor, I guess a bit of

 9    housekeeping maybe.  Mr. Brookner I think is having trouble

10    getting unmuted.

11              THE COURT:  I might have done that on purpose.

12    I'm just kidding.

13              Ah, Mr. Brookner, I see -- sorry about that, Mr.

14    Brookner.

15              MR. BROOKNER:  Thank you, Your Honor.  I just

16    wanted to apprise you that Mr. Kaufman is kind of in

17    between, so you can just bear with us for just a few minutes

18    --

19              THE COURT:  No --

20              MR. BROOKNER:  -- he'll be right back.

21              THE COURT:  No worries.  No worries.

22              MR. BROOKNER:   Thank you.  Thank you.

23              MR. GLUCK:  Now --

24              MR. BROOKNER:  For the record, I am wearing a real

25    tie today.
```

```
1              THE COURT:  All righty, Mr. Kaufman, are you

2     there?  Hold on.  I thought I had unmuted you.  Did I get

3     you?

4              MR. KAUFMAN:  I'm here now.

5              THE COURT:  Okay, great.  Let me hear -- I believe

6     the Committee is unmuted.  Can you just confirm, Counsel?

7              MR. ZLUTICKY:  Yes.  Thank you, Your Honor.

8              THE COURT:  Okay.  Great.  Great, great, great.

9     All righty.  Mr. Kaufman, how do you wish to proceed?

10             MR. KAUFMAN:  I think we're ready to present

11    evidence and as I indicated in my opening, I would like,

12    because this is an interim hearing, to present evidence

13    through the declaration of Mr. Perry which was filed with

14    the motion at Docket 186 and then offer the two exhibits

15    filed with the motion, the approved budget and the credit

16    agreement.

17             I think I heard an objection to that.  Again, this

18    is an interim hearing.  I need to proffer that or just put

19    Mr. Russell -- or Mr. Perry on the witness stand and go

20    through his declaration.  Happy to do that but I'm trying to

21    conserve some time and make the evidentiary presentation as

22    efficient as we can.

23             THE COURT:  Let's take it --

24             MR. KAUFMAN:  Interim hearing.

25             THE COURT:  Let's take it one by one.  Why don't
```

```
 1    we -- let's see, there is -- where is the declaration?  It's

 2    at docket -- it's Docket 186?

 3              MR. KAUFMAN:  186, Your Honor.

 4              THE COURT:  Okay.  There any objection to the

 5    admission of 186 for purposes of today?

 6              MS. HEARD:  Yes, Your Honor.

 7              THE COURT:  Okay.

 8              MS. HEARD:  Mary Elizabeth Heard --

 9              THE COURT:  Okay.  All right.  Mr. Kaufman, you're

10    going to have to put him up.

11              MR. KAUFMAN:  Call Mr. Russell.

12              THE COURT:  Okay, Mr. Russell --

13              MR. KAUFMAN:  Mr. Russell Perry.

14              THE COURT:  Mr. Perry, is your line unmuted?  Let

15    me start with that.  No, I don't think it is.  Mr. Perry, is

16    that you?

17              MR. PERRY:  I'm here, Your Honor.

18              THE COURT:  Okay.

19              MR. PERRY:  Can you hear me okay?

20              THE COURT:  Yes.  Can you raise your right hand,

21    please?  You swear to tell the truth, the whole truth, and

22    nothing but the truth?

23              THE WITNESS:  I do.

24              THE COURT:  Okay.  All right, you can put your

25    hand down.  We going to begin with examination.  Mister --
```

1    whoever is taking the lead on examination, you may proceed.

2           MR. KAUFMAN:  That would be me, Your Honor.

3           DIRECT EXAMINATION OF RUSSELL PERRY

4    BY MR. KAUFMAN:

5    Q   Mr. Perry, could you introduce yourself to the Court

6    and tell the Court your position in this case?

7    A   Sure.  My name is Russell Perry.  I'm the senior

8    managing director at Ankura Consulting, within Ankura's

9    within turnaround and restructuring practice.  I have been

10    practicing restructuring for nearly 20 years, focused on

11    health care restructuring matters and equivalent type

12    distressed situations.  I currently serve as the Debtor's

13    chief restructuring officer.

14    Q   Do you have experience in case of serving as a

15    restructuring officer or financial adviser?

16    A   I do.

17    Q   Would you list a few of those recent cases?

18    A   Sure.  I actually completed an engagement in the

19    Chapter 11 case in the Southern District of Texas only a few

20    weeks ago for a Debtor entity by the name of Pipeline

21    Health.  In that case, I was the Debtor's chief

22    transformation officer, which had effectively the same

23    authority as a chief restructuring officer.  In another

24    situation, Gulf Coast Properties, I served as the assistant

25    chief restructuring officer in that situation and I've been

1    independent manager, strategic advisor, and other types of

2    CIO roles in and out of bankruptcy.

3    Q    When were you retained in this case?

4    A    I was actually retained on the day of the filing,

5    February the 13th.

6    Q    And since then, what have you done to review the

7    Debtor's financials and determine its availability of cash

8    or finance?

9    A    Sure.  Well, much like I would have done had I been

10   retained prefiling, myself and my team at my direction

11   immediately began reviewing the books and records of the

12   company.  We did discover that the Debtor at the time did

13   not have an operating bank account, did not have technically

14   cash in the Debtor's estate.

15        We started to, you know, review and evaluate what

16   potential assets were available for the Debtor in order to,

17   you know, fund the estate, you know, for the relief that we

18   are here.  And then of course we, you know, began working

19   through all the various things that we have the duty to

20   provide such as, you know, information for the U.S. Trustee,

21   information gathering for the schedules and statements that

22   we're currently compiling and of course, developing the

23   creditor matrix.

24   Q    Did I hear you say the Debtor on the petition date had

25   no cash?

1    A    Correct.  The Debtor had no cash and in fact, had no

2    operating bank account.  We did move quickly to establish a

3    bank account.  Unfortunately, we originally established that

4    bank account at an institution and had to open a new bank

5    account, so we do have operating bank accounts today, but

6    there's no cash in those accounts.

7    Q    Have you had an opportunity to review the Debtor's

8    potentially liquid assets?

9    A    I've reviewed more of the Debtor's illiquid assets than

10   the liquid assets.  Liquid assets to me would be, you know,

11   cash, cash collections, other assets that I can assign, you

12   know, a value to and perhaps even assign a date in which

13   that would be collected.  Here, there are potential and

14   contingent assets for sure, but as it relates to liquid

15   assets available to the Debtor, I have not been able to

16   identify any.

17   Q    In your view based on your analysis, are there any

18   liquid assets at the Debtor's disposal today?

19   A    I do not believe so.

20   Q    We talked, you've heard us in discussion in our opening

21   presentation, discuss the potential tax refunds or tax

22   credits.  What is your understanding of the timing and

23   potential availability of those refunds?

24   A    Sure.  So just for a slight background, these tax

25   credits are available to certain companies who retained, you

1    know, substantial part of their workforce throughout the

2    pandemic.  It was a CARES Act, effectively a program through

3    the CARES Act that allowed for potential, you know, credit

4    to tax obligations that would have arisen throughout the

5    pandemic.  In this situation, because the company prior to

6    the divisional merger prior to the Chapter 11 filing was in

7    fact an operating company that did employ the, you know,

8    employees.

9        The employee, you know, what they call the ERC,

10   employee retention credit, my understanding is there is

11   eligibility at least for one of the two fiscal years during

12   the pandemic, okay, 2021, you know, which would have been

13   the second year of the pandemic, at least according to the

14   program.  The way that the program effectively works is you

15   first have to go through a fairly extensive exercise with a

16   specialized party to determine eligibility.

17       That party also would calculate the potential size of

18   the opportunity.  And then only then would you be prepared

19   to then file the requisite forms with the IRS to qualify

20   for, let's call it reimbursement of or receipt of, you know,

21   that, ERC credit.  So, as it stands today, the Debtor has

22   completed a fraction of the work for only one of the years.

23   There's actually a substantial amount of work required to

24   not only determine the ability to, you know, liquidate the

25   single year that I'm referring to, but there hasn't been

```
 1   efforts to accelerate the other fiscal year which will take
 2   some time.
 3        All in all from, call it cradle to grave in the
 4   program, the original determination of the eligibility and
 5   calculation of the pool, so to speak, that's a three- to
 6   four-week process working with an outside consultant.  The
 7   accountant who is then tasked with preparing the IRS form,
 8   they also need roughly three or four weeks and then once the
 9   forms are submitted to the IRS, what I have learned over the
10   last you know, couple of weeks of chatting with individuals
11   is that it's an eight- to ten-month process to receive funds
12   back from the IRS.  That's the program, as I understand it.
13   Q    And is it -- based on your answer, is it fair to say
14   that the Debtor will have to hire outside professionals to
15   help with this work?  Is that fair?  Is that --
16   A    It will.  It will.  I'm actively engaging with a number
17   of those firms now.
18   Q    And does the Debtor currently have cash or financing to
19   pay those professionals?
20   A    It does not.
21   Q    So it needs cash to pay those professionals?
22   A    The Debtor requires cash in order to retain the
23   professionals.  For example, the CPA firm requires a
24   deposit.  The consulting firms will require funding or some,
25   you know, arrangement of funding.  So without cash, I'm
```

 1    going to have a very difficult time retaining any of these

 2    professionals.

 3    Q    So is it your belief that the Debtor requires immediate

 4    access to financing or cash?

 5    A    It is my belief, yes.

 6    Q    Have you undergone a process of putting together a

 7    budget for the financing and cash that the Debtor needs in

 8    the immediate future?

 9    A    I have.  My team and -- at the direction of me, and I

10    have prepared a budget to coincide with this interim DIP.

11    It's the best assumptions that we can make at least at this

12    stage of the process.  Currently, it does, you know, take

13    place over a 13-week period, you know, through call it the

14    May 26th date, we'll certainly be working on updating the

15    budget, maintaining the budget in real time.  Following the

16    appropriate protocol and requirements under the DIP

17    facility.

18    Q    Is the budget filed with the DIP motion at Docket No.

19    185-1 -- sorry.  Make sure I'm getting the docket number

20    right.  That's right.  Docket No. 185-1, is that the

21    approved budget that you prepared?

22    A    Yes, that's correct.

23    Q    And is it your understanding that the DIP lender has

24    approved that budget?

25    A    Yes.  My understanding is it is the approved budget.

1    Yes.

2              MR. KAUFMAN:  Your Honor, I'll offer what is filed

3    at Docket 185-1 and also Exhibit 6.  For purposes of today,

4    it's Docket 192-6.

5              THE COURT:  You got to pick one of them.  Which

6    one do you want to --

7              MR. KAUFMAN:  I think you'd prefer the witness and

8    exhibit list, right?

9              THE COURT:  Yeah, yeah.  That's exactly right.

10             MR. KAUFMAN:  Let's go with 192-6.

11             THE COURT:  Okay.  Any objection to the admission

12   of 192-6?  It's admitted.

13             (Exhibit 6 entered into evidence)

14   BY MR. KAUFMAN:

15   Q    Mr. Perry, during the first couple of weeks of this

16   case -- I'm sorry, strike that.  Pursuant to the budget, how

17   much does the Debtor need under the interim DIP loan?

18   A    Well, for the budget we prepared, we calculated a $2

19   million need that does allow for the funding of various, you

20   know, expenditures and provisions, at least through, call it

21   the end of March into the first week of April.  So the

22   budget has identified roughly a $2 million need through that

23   time period.

24   Q    And have you as the Debtor's chief restructuring

25   officer explored alternative sources of financing or cash?

1    A    I have.

2    Q    Can you talk to the Court -- describe for the Court

3    your process and who you contacted to try --

4    A    Sure.

5    Q    -- negotiate or find capital for this case?

6    A    Sure.  You know, similar to other Chapter 11 cases, you

7    know, the Debtor's task is certainly to identify the sources

8    of capital that would be at its avail for Debtor in

9    Possession financing or cash collateral.  Here, what my goal

10   was, was to speak to a number of potential parties in, let's

11   call it the following categories.

12        One, I wanted to speak to a traditional lender who is

13   well experienced who operates solely as a DIP lender who has

14   the, let's call it, appropriate risk profile to evaluate

15   whether or not it's interested in providing a DIP facility.

16   So I'll call that a traditional DIP lender.

17        Two, I reached out to a -- let's call it a liquidation

18   type lender and capital provider, a lender who has

19   experience in liquidating assets or understands, you know,

20   what the time, cost, and commitment would be to liquidate

21   various assets.

22        And then three, I spoke to two different individuals or

23   two different potential lenders, large capital providers who

24   specialize in what I'll call, you know, litigation

25   contingency claim and specialty financing type arrangements.

1   So to me, you know, while there are certainly other
2   potential DIP providers in other categories, those are the
3   three natural categories that I thought made the most sense
4   to speak to.
5       The message back to me was very consistent.  I was
6   unable or the Debtor was unable to provide let's call it
7   enough certainty around the collateral that would be
8   available to this prospective DIP lender or DIP lenders, and
9   timing in which that collateral would be available, and like
10  I said, the certainty that the collateral would be, you
11  know, able to be perfected and obviously, you know, in the
12  time in which the loan would be advanced.
13      Now, you know, a DIP lender is going to look for a
14  number of things as it makes a DIP facility available.  One,
15  the prospects of being paid back; two, you know, an economic
16  return; and of course, three, you know, as it relates to
17  number one, what the collateral would be to assure, that one
18  and two would be completed.  I didn't have, the Debtor
19  certainly doesn't have the ability to bring that type of
20  collateral or assurance to a third party DIP lender.
21      So then the message to all -- you know, so these folks
22  back to me, which didn't take very long, was at this point
23  in the case and at this point along the timeline, there
24  wouldn't be, you know, an appetite, not even a term sheet or
25  even a prospect of a potential financing.  But I've been

1   asked by all parties to come back to them at a future date,

2   you know, if circumstances change.

3   Q   And as part of your investigation or shopping of the

4   DIP, did you speak with any potential lenders that

5   specialize in lending against tax credits, like the one the

6   Debtor might have?

7   A   I did, and that was exactly what my goal was and that's

8   why I spoke to two very experienced, you know, capital

9   providers in the specialty and call it contingent asset

10   space.  Both of them, one more so than the other, you know,

11   are very interested in the collateral that would be provided

12   through these ERC credits.  You know, I think there would be

13   a potential opportunity either, you know, sell the tax

14   credit if that's something that we would seek to bring in

15   front of the Court or frankly lend against the tax credit.

16   You know, the underwriting process is a bit extensive.

17   What I just walked through a few minutes ago with the ERC

18   program, they would underwrite every step of the way I think

19   to give them comfort, right, that the collateral is, in

20   fact, you know, able to be received in the timeframe that

21   would be estimated, and then more importantly that there

22   would be a structure in place such that the monies couldn't

23   be clawed back.

24   So both of the parties are on my short list as well as

25   other parties that I'm gathering information for that when

1   the ERC program is advanced further, like there'll be a

2   capital source, a potential capital source for me to reach

3   back out to determine whether or not it makes sense to start

4   funding the case, you know, through an outside party.

5   Q    Let's talk about M2 LoanCo for a minute.  It is you're

6   your understanding that M2 LoanCo is an affiliate of the

7   Debtor by common ownership up through M2 HoldCo?

8   A    That's my understanding through a review of the

9   organizational structure, yeah.

10   Q    Do you know anything else about the ownership and

11   management of M2 LoanCo?

12   A    I really don't.  I know a single director that's been

13   working through counsel.  I've been working through counsel.

14   I don't have an extensive knowledge of M2 LoanCo in that

15   regard.

16   Q    And that's -- that was going to be my next question.

17   How did you manage the negotiations over the terms of the

18   DIP financing, DIP (indiscernible)?

19   A    Sure.  You know, I work directly through Debtor's

20   counsel.  You know, my direction was that Debtor's counsel

21   work directly with M2 and its representatives and then I

22   would work through counsel.  To me, that was the most

23   efficient way in which both of the time that we had avail

24   and the legal issues that I understood would be discussed

25   and negotiated.  So my interaction was mainly, again,

1    through Debtor's counsel based upon their interactions with,

2    you know, with the DIP -- potential DIP lender and its

3    representatives.

4    Q    Did you feel like you had the leverage and the ability

5    to negotiate independently of any oversight from any others

6    at the Debtor level, any insiders of the Debtor

7    (indiscernible) telling you what to do?

8    A    Oh, sure.  I made decisions independently of any other

9    party as my role as chief restructuring officer.  Again, my

10   decisions were based upon, you know, the availability of

11   capital through other means, the budget that was prepared,

12   and the need for the financing.  But yes, I worked

13   individually, independently.

14   Q    Let's, before we get into the terms of the financing,

15   let's talk briefly about the funding agreement.  Are you

16   aware of a funding agreement between the Debtor and M2

17   LoanCo?

18   A    I am.  That's how I became aware of the existence of

19   M2, to be honest, as a potential lender through their

20   relationship in the funding agreement, you know, with the

21   Debtor entity.  So I am aware of the existence of the

22   funding agreement.

23   Q    Did you do at least a preliminary investigation of

24   funding available under the funding agreement?

25   A    I've received information.  I would use the word

1  preliminarily -- you know, is certainly the right word to

2  describe.  We are continuing to receive information, request

3  information, compile information.  You know, preliminarily

4  what I've, at least the information that I've received would

5  suggest that disbursements have been made on behalf of

6  Debtor, you know, claimants and expenses and the like well

7  above the $15 million.

8      The condition I think of the funding agreement is

9  roughly $11 million on claims and roughly $4 million on

10  expenses, and based on the, again, preliminary information

11  we've received, there's been, you know, I think north of $30

12  million that's been disbursed since the merger date.

13  Q    Did you make a formal demand on M2 for payment under

14  the funding agreement?

15  A    I did.  I requested through counsel, of course, the --

16  an advance on the funding agreement or at a minimum, you

17  know, requested the, whether or not there was remaining

18  amount under the funding agreement that could be advanced.

19  Q    And was that that request met with a positive response?

20  A    No, no, it was denied.  The request was denied and the

21  response that I received back was that the $15 million

22  funding agreement had been fully satisfied, that amounts had

23  been provided, you know, pre-Chapter 11 on account of making

24  payments on claims and, you know, I was told the amounts

25  were well above the $15 million.

1   Q    And so you turned to negotiating a DIP facility with

2   them, too?  Is that correct?

3   A    So, yeah, in my evaluation, you know, the other

4   alternative, of course, absent funds available under the

5   funding agreement, at least for again, the preliminary work

6   that we've done is to, you know, seek funding through a

7   Debtor in Possession financing arrangement.

8   Q    And tell -- just briefly describe for the Court, the

9   process for the negotiations.  Were there term sheets?  Did

10  we trade drafts of credit agreements?  How did the process

11  present itself?

12  A    Sure.  So it started with the development of an initial

13  budget.  The initial budget is what at least gave us a bit

14  of the purview of capital needed during the interim period,

15  capital needed over, call it a three-month period, and gave

16  us a bit of guidance as to the amount that we would be

17  seeking.  That's where the amount in the, you know, DIP

18  motion and the credit agreement obviously were sourced from.

19       The process was, once a budget was in fact prepared, we

20  then, set up through counsel, prepared a draft of a DIP term

21  sheet.  We, you know, included all of the standard DIP type

22  provisions around reporting, you know, structure of

23  borrowing and the like, and provided, again through counsel

24  to representatives of the potential DIP lender here.  Over

25  the course of the last, I think, you know, two weeks, three

 1    weeks, there's been a number of terms initially of the term

 2    sheet, okay, where we started, multiple drafts, multiple

 3    revisions.

 4         There were certain structures within the term sheet

 5    such as an interest rate, concepts such as a variant

 6    testing, things of that nature that were negotiated out or

 7    in a different form or manner.  That term sheet was then

 8    ultimately agreed to and then the parties moved to the

 9    preparation of a credit agreement.

10         The credit agreement was of course, you know,

11    negotiated.  There were certain terms in the credit

12    agreement that were modified between counsels again with my

13    review.  And then at that point, the parties turned to

14    preparing the DIP order, the DIP motion, and the respective

15    information needed for today.

16    Q    And you mentioned that the term sheet went back and --

17    you went back and forth with the DIP lender on interest

18    rates and fees.  Do you believe that the interest rates and

19    fees ultimately agreed to are reasonable?

20    A    I do based on the circumstances of this situation and

21    the nature of the DIP for sure.  The original term sheet

22    had, for example, a cash pay feature.  Now it has a

23    (indiscernible) feature on the rate.  All in, the economics

24    are -- and, you know, at least in my opinion, fairly

25    standard in market.  I don't think there's anything that

1    I've seen that's egregious as it relates to the economics.

2    Again, we finalized a Chapter 11 case not too many weeks ago

3    and the economics were actually fairly in line and that was

4    an operating business with pretty stable collateral

5    packages.

6    Q    What are the draw fees proposed under this DIP

7    facility?

8    A    Two percent per draw is the fee on this facility.

9    Q    So for a $2 million draw on the interim, how much is

10   that?

11   A    It's just $40,000 for that initial piece.  Yeah.

12   Q    Your declaration talks about milestones.  Is it your

13   understanding that the milestones have been negotiated out

14   of the interim order except for the entry of the final

15   order?

16   A    Yes, that's my understanding.  I know the DIP order was

17   uploaded a few minutes before the hearing, but that's

18   correct.  The milestones, my understanding, have been

19   removed and we'll be discussing milestones potentially at

20   the final DIP hearing.

21   Q    Is it your under -- could you tell the Court your

22   belief, based on -- what is your conclusion of whether this

23   DIP lender has negotiated with the Debtor in good faith?

24   A    Well, my belief is that certainly has occurred.  You

25   know, my experience as a both financial advisor and

1    restructuring officer of, you know, prior examples, prior

2    situations in cases, you know, I sought to utilize the same

3    set of tools and steps and procedures that I've done in

4    other, again, situations that we've talked about here today.

5    I haven't seen, at least through my review of the

6    information, anything that would suggest that the loan isn't

7    being made in good faith.  So, you know, again, my

8    understanding is, and my basis of this process is that the

9    loan is being provided in good faith.

10   Q    And you heard Committee counsel's arguments that the

11   whole notion that the DIP lender was unwilling to provide

12   funding through the funding agreement is the basis for

13   withholding of a finding a good faith.  What's your response

14   to that?

15   A    Well, again, based on the information I've received --

16        MR. ZLUTICKY:  Your Honor, I'm going to object.  I

17   think he's calling for a legal conclusion.

18        THE COURT:  Yeah.  Well, I'm just going to let him

19   answer in the context of being a restructuring professional

20   and what his thoughts are, but I'm not going to take it as

21   kind of an analysis of any legal issues there.  So he can,

22   you know, kind of what he thought about that issue, I can --

23   he can certainly speak to but not -- it'll have no legal

24   effect, if you will.  After that, Mr. Perry do you --

25        THE WITNESS:  Okay, well, my conclusion --

1          THE COURT:  -- still remember the question?

2          THE WITNESS:  Yes.  Yes, Your Honor.

3    BY MR. KAUFMAN:

4    A    So my conclusion is solely based on my experience as a

5    restructuring professional as it relates to what is the, you

6    know, what is the availability of capital to fund this

7    Chapter 11 case, at least at this point in time, right.  My

8    natural very first step was to potentially seek amounts

9    available under the funding agreement.  It's what any

10   restructuring professional in my mind would have done.

11          Once I understood, again with the information that's

12   been provided to me, that funds were not available under the

13   funding agreement, you know, my natural next step was to

14   seek a Debtor in Possession financing facility to which I

15   canvassed, you know, the market in the categories that we

16   discussed earlier.

17          Naturally, you know, approached M2.  You know, through

18   this arrangement with the funding agreement and my knowledge

19   of who the entity -- the relationship of the entity with the

20   Debtor and that resulted in the DIP financing facility

21   today.  So I don't know if there's anything more than that

22   as a restructuring professional in the process that I

23   undertook to, you know, achieve where we -- what we're

24   seeking for today.

25   Q    And the relief is provided in the proposed DIP order,

 1   the interim proposed DIP order.  Do you believe those give

 2   the Debtor a sufficient amount of time to do the

 3   investigation before the broader releases for M2 become

 4   effective?

 5   A    Well, we're certainly looking to start right away.  We

 6   want there to be no delay in time.  You know, we do have,

 7   you know, information that that has been gathered to date.

 8   There will continue to be information gathered.

 9        You know, our thought is, you know, this is a Chapter

10   11 case that we are looking to, you know, prosecute

11   accordingly and our job is to start the investigation to

12   work diligently, effectively, to bring in the appropriate

13   resources and -- you know, that's needed to effectively

14   conduct the investigation and, you know, based on what I

15   have seen in other circumstances, I do think that's enough

16   time for us to complete the work with the resources that we

17   have.

18        Now, if it's not enough time, right, then I think we

19   would have the opportunity according, and as my role, I

20   would, you know, see whether or not we can achieve it.  But

21   I think the time that's allowed is the time that we can work

22   under effectively.

23             MR. KAUFMAN:  All right, I'll pass the witness.

24             THE COURT:  Okay.  Let me -- who wants to question

25   the witness?

1               MR. GLUCK:  Your Honor, I just had a brief

2      question, maybe two.

3               THE COURT:  Okay.  Well, let me just -- yeah, let

4      me start with the parties who are in support of the DIP.

5      I'll ask them to ask questions first and then anyone who

6      wishes to cross examine, essentially, may not support the

7      DIP or questions, you know, for approval of it.  I'll go

8      second.  So Mr. Gluck, why don't you proceed?

9               MR. GLUCK:  Thank you.  Thank you, Your Honor.

10              CROSS EXAMINATION OF RUSSELL PERRY

11     BY MR. GLUCK:

12     Q    Mr. Perry, I just want to touch on the ERC for a second

13     in your testimony.  Was it your testimony that the ERCs,

14     that the estate is likely to not see any recovery off of

15     those for eight to ten months?

16     A    Well, there's two potential paths to seek recovery on

17     the ERC.  One potential path is to prepare the proper

18     information, to submit that information to the IRS, and then

19     wait for, call it a full value of that ERC credit, which

20     could be eight to ten.  Some folks have told me it could be

21     longer because of the size of the potential credit here.  So

22     one path is in fact call it a ten to twelve month path.

23          The other path is to file the forms with the IRS which

24     again, only one fiscal year is even remotely close.  So

25     we're still four to eight weeks from being able to file

1    those forms.  Once the forms are actually filed with the

2    IRS, at that point in time, there would be a marketing

3    process to which we would evaluate whether or not you could

4    liquidate those ERC tax credits.

5         And, you know, Mr. Gluck, I think it's anybody's guess

6    how quickly someone could underwrite, you know, seek

7    approval within the internal committees and then obviously

8    come to the Court to seek approval either from a financing

9    perspective or a sale of those assets.

10        That's probably, again, a two- to three-month process,

11   would be my guess.  So at best two to three months, you

12   know, in the best scenario.  In the worst scenario we're

13   waiting about a year.

14   Q    So I think it's safe to say you're not going to receive

15   any ERC credits before the Court has the final hearing?

16   A    Correct.

17   Q    Are you -- you are familiar with the proposed interim

18   DIP order?

19   A    It was still moving as of, you know, not too long

20   before the hearing, but I am fairly familiar with what was

21   uploaded today, yes.

22   Q    Are you familiar with the various potential collateral

23   under -- that the Debtor proposed to pledge as collateral

24   for the DIP loan?

25   A    Generally familiar, yes.

1   Q   Is it the Debtor's proposal to provide as collateral,

2   you know, tort claims, causes of action?

3   A   Well, my understanding is with the order that was

4   uploaded, there was -- challenge claims or avoidance claims

5   was deferred to the final DIP hearing.

6   Q   Yes, Mr. Perry.  I'm actually referring to just like,

7   just tort claims or other causes of action, but separate and

8   apart from avoidance actions.

9   A   Yes, that's my understanding.

10   Q   Are you aware, I mean, has the Debtor filed any current

11   claims?  I mean, are there any current pending claims where

12   the Debtor is a plaintiff?

13   A   Not that I'm aware of, no.

14   Q   I mean, is it the Debtor's, you know, sort of intention

15   within the next -- you know, at least prior to the final

16   hearing to be filing any claims?

17   A   No.  We have a substantial amount of work to do to

18   determine whether or not claims even exist.

19   Q   So you're not expecting to have any recoveries from any

20   tort claims in, you know, in the near future, at least not

21   before the final hearing?

22   A   Correct, not before the final hearing.  Correct.

23          MR. GLUCK:  No further questions, Your Honor.

24          THE COURT:  Okay.  Thank you very much.  I'll just

25   go -- mister -- where are you?  I got to find the box.

```
 1    Let's see, where's the Committee?  I can't find the box.

 2    Let me ask if the Committee -- does the Committee have any

 3    questions?  Maybe I'll just do it that way.  I apologize.

 4              MR. ZLUTICKY:  Yes, Your Honor.  This is Nick

 5    Zluticky for the Committee.  I do have just a few questions

 6    of Mr. Perry.

 7              THE COURT:  All righty.

 8              CROSS EXAMINATION OF RUSSELL PERRY

 9    BY MR. ZLUTICKY:

10    Q    So hi, Mr. Perry.  It's good to talk to you.  I'm, as

11    you know, I'm Nick Zluticky.  I'm here for, in my capacity

12    as counsel for the Official Committee of Unsecured

13    Creditors.  I want to talk about your knowledge of M2 LoanCo

14    for a moment.  You said that you knew that M2 LoanCo was an

15    affiliate of the Debtor through common ownership; is that

16    right?

17    A    That is correct.

18    Q    And you said that you know one director at M2 LoanCo;

19    is that right?

20    A    There was a director that was working through -- yes.

21    There's a director working through Counsel.  My

22    understanding is, there was a director -- it's the director,

23    at least, that I know of that we were -- was conversing

24    (indiscernible).

25    Q    And who is the name of that director?
```

```
 1   A     Alan Rubenstein.

 2   Q     Do you know if there are any other directors of M2

 3   LoanCo?

 4   A     I do not know.

 5   Q     Do you know if there are any officers of M2 LoanCo?

 6   A     I do not.  I do not know.

 7   Q     Do you know if there are any managers of M2 LoanCo?

 8   A     I do not.

 9   Q     Do you know who the members are of M2 LoanCo?

10   A     I do not, I'm sorry.

11   Q     Do you have a list of all of M2 LoanCo's affiliates?

12   A     I do not.  I have the organizational chart that was

13   filed in my declaration.

14   Q     Okay.  Other than the knowledge that M2 LoanCo is an

15   affiliate, knowing Alan Rubenstein, and then your knowledge

16   of the funding agreement which we'll get into in a minute,

17   do you have any other knowledge of M2 LoanCo?

18   A     My under -- the other knowledge that I have through my

19   personal review of the divisional merger documents and the

20   ongoing review is that M2 LoanCo is a secured lender, I

21   think, to other affiliates.  That's the only understanding

22   that I have.

23   Q     So a couple of questions about the funding agreement

24   with M2 LoanCo.  You said that you made a request for

25   funding under the funding agreement and that request was
```

1    made to M2 LoanCo; is that right?

2    A    That's right.  It would have been a request through

3    counsel.  It wasn't a written request.  It was a verbal

4    request through counsel.

5    Q    So there's no written request?

6    A    Correct.

7    Q    The information that you've requested from M2 LoanCo

8    and received, what information is that?

9    A    The information I've requested includes disbursement

10   records, various call it entries of the expenses that have

11   been disbursed by entities for the Corizon related, at the

12   time, or Tehum related claims.  I've also requested and in

13   receipt of, you know, of the activity and the way that the

14   cash flows in between the various entities and M2 LoanCo.

15        Again, it's preliminary.  We're gathering the

16   information, but I've requested, effectively, all of these

17   cash activities, the entries, the, you know, detail as to

18   who was paid and what time period was, you know, were

19   payments made, you know, at least from the point of the

20   funding agreement being effective and the time of the

21   filing.

22   Q    And you said your review is preliminary.  What do you

23   mean by preliminary?

24   A    So we're just receiving information in real time.  I

25   don't think we have a complete set of information at this

1    point.  It's preliminary in that I haven't concluded yet if

2    the information is complete.  So like I said, the

3    information we have received, you know, disbursement

4    records, entries of expenses being paid, things of that

5    nature, that's been received but Mr. Zluticky, until I can

6    determine that there's no other information out there or

7    available to me to complete the reconciliation, I have to

8    consider it preliminary and we're certainly going to

9    continue to, you know, work through that process.

10    Q    And the information that you've received is M2 LoanCo's

11    records; is that right?

12    A    At this point, it's been a -- my understanding is it's

13    been a combination of M2 LoanCo information.  It's been a --

14    information prepared by representatives at the outside

15    management companies, for example, Sigma Risk Management

16    who's in charge of working through and assisting the Debtor

17    with claims, information provided by, you know, other

18    affiliates of -- you know, that were involved in divisional

19    mergers, so the YesCare entity, Geneva entity

20    (indiscernible) that effectively would, in my opinion, have

21    books and records or any information that I can use to

22    complete the reconciliation.

23    So it was a, really an ask across all of the various

24    entities that may have been involved in the divisional

25    merger so that I can, you know, hopefully receive a complete

1    set of information to complete the analysis.

2    Q    Does the Debtor have its own books and records that

3    show amounts funded by M2 LoanCo?

4    A    We're working through that process.  At this time, I do

5    not know.

6    Q    So there was some discussion about the challenge period

7    and I believe the response was that you were looking to

8    start right away; is that right?

9    A    That's correct.  I suppose that's a bit of a vague term

10   or description, but that is correct that, you know, we are

11   looking to engage in and start working through an

12   investigation with respect to the challenge period.

13   Q    Do you have an estimate of when you're going to have

14   access to all of the Debtor's books and records to be able

15   to make it -- to be able to start that investigation?

16   A    I would start the investigation with the information we

17   currently have and to the extent that there's additional

18   information needed, I do not have an estimate as to at what

19   point in time we would receive all the information needed

20   for the analysis, but we certainly would start with the

21   information we have.

22   Q    And then there was finally a discussion of tort claims

23   and causes of action.  Do you know what tort claims the

24   Debtor may have at the moment?

25   A    I do not.

1    Q    And the Debtor hasn't filed schedules that would list

2    those claims, correct?

3    A    They have not, not as of this hearing.

4    Q    And do you have any knowledge of what causes of action

5    the Debtor has?

6    A    Not at this time.

7    Q    But yet those are being pledged to M2 LoanCo as

8    collateral for this DIP loan?

9    A    Correct.

10           MR. ZLUTICKY:  Your Honor, I don't have any

11   further questions of the witness.  Thank you.

12           THE COURT:  Okay.  Thank you.  Let me turn, Ms.

13   Heard, do you have any questions?

14           MS. HEARD:  Thank you, Your Honor.  I do.  Can you

15   hear me?  Can everyone hear me?

16           THE COURT:  Yes.

17              CROSS EXAMINATION OF RUSSELL PERRY

18   BY MS. HEARD:

19   Q    All right.  Mr. Perry, my name is Mary Elizabeth Heard.

20   I appeared at the last hearing, but we didn't actually do

21   any examining, I don't believe.  I represent Adree Edmo

22   along with the National Center for Lesbian Rights

23   (indiscernible).

24           THE COURT:  Ms. Heard, we can't hear you now.  I

25   heard the first part.

```
 1              MS. HEARD:  Let me just do this.  I'm having some
 2    trouble with that ear connector thing.
 3    BY MS. HEARD:
 4    Q    Anyway, so I represent Ms. Adree Edmo.  Can you hear
 5    me?
 6    A    I can.  I can.
 7    Q    Okay, great.  Great.  I don't know what's going on with
 8    this.  Anyway, I heard you mention that there had been $30
 9    million of amounts paid under the funding agreement; is that
10    what you said, on behalf of the Debtor?
11    A    Well, what I specified to is that at least the
12    information that I've received to date, there is a sum of
13    payments that have been made on account of call it Debtor
14    payments to the tune of roughly $30 million, in fact a
15    little north of that.  And when we file the schedules and
16    the statements, we'll be of course working through those
17    payments and providing that information.
18    Q    Okay.  And you said, and I wrote this, payments of
19    amounts on claims.  What claims were paid?
20    A    I haven't been able to review the information in
21    detail.  I -- my understanding is there were liabilities of
22    the Debtor, you know, post divisional merger, expenses paid
23    to, you know, continue to work through those claims, action
24    defenses, and the like so I haven't been able to go line by
25    line by line.  But my understanding is the payments were
```

1    across a number of broad categories.

2    Q    Okay.  So I'm going to go back to your proffer in the

3    first hearing and also, you know, largely the same in this

4    one -- At least this sentence is the same.  In there you

5    say, "Moreover, as a part of the --

6         MR. KAUFMAN:  Your Honor, I'm going to object.

7    Ms. Heard objected to the use of a declaration.  We're just

8    relying on his testimony today for today's hearing.

9         THE COURT:  I think she's using it for impeachment

10   purposes, at least that's what I think is going on, so I'll

11   allow it.  But Ms. Heard, you'll have to -- I'll give you an

12   opportunity.  If it's not for that, then I'll entertain the

13   objection again.

14        MS. HEARD:  I'm -- yes, it is for impeachment

15   purposes and I'm looking at the document.  It's filed as

16   part of the witness and exhibit list, Document 59-1 and also

17   it was at Document 7 in this case.

18   BY MS. HEARD:

19   Q    As a part of the divisional merger, the Debtor was

20   allocated a million in cash as well as the right to draw on

21   the $15 million funding agreement, $11 million of which was

22   earmarked for the Debtor's creditors.  That same sentence

23   appears in your declaration today.  So $11 million was

24   earmarked for the Debtor's creditors.  And you're telling me

25   $30 million was paid, but we don't know to whom; is that

1    correct?

2    A    I have the information to evaluate who was paid.  I

3    just need to work through the analysis.

4    Q    Okay.  Well, let me say it another way.  Was the $30

5    million for the Debtor, payments on the Debtor's behalf to

6    creditors paid prepetition.  Are these all prepetition

7    payments?

8    A    Correct.  Yes.  Prepetition.

9    Q    Okay.  So my next question is, have you read the

10   funding agreement?

11   A    I have read the funding agreement.  Yeah.

12   Q    Okay.  Who are the signatories to the funding

13   agreement?

14   A    I'd have to reference the funding agreement, but I --

15   it would be signatories of, of course, the various parties.

16   I think M2 LoanCo would have been a party and the now

17   Debtor.

18   Q    I understand, but who's signing on behalf of M2 LoanCo?

19         MR. KAUFMAN:  Your Honor, I'm going to object.

20   That evidence isn't before Mr. Perry.  It's not an exhibit.

21   He can testify if he knows but sounds like he doesn't.

22         THE COURT:  Well, why don't we just let him answer

23   the question?

24   BY MS. HEARD:

25   A    Right, I would have to pull the document back up and

1    read the name to you.

2    Q    All right.  I understand.  It just -- it seems like

3    it's an important piece.  All right.  Have you had any

4    conversations with Michael Flacks in the negotiation of this

5    DIP?

6    A    That name does not ring a bell.  I do not think so.

7    Q    Okay.  How about Charles Gassenheimer?

8    A    No, ma'am.

9    Q    All right.  You mentioned the obligations paid to the

10   Geneva entity.  Is that Geneva Consulting LLC?

11   A    That's my understanding, yeah.

12   Q    Okay.  What payments were made to Geneva Consulting

13   LLC?

14   A    I'm sorry, I didn't -- I don't think I testified that

15   payments were made to them.  There was a cash management

16   system in place in which certain payments were made by

17   Geneva on behalf of the Debtor.

18   Q    All right.  So let me look at my note real quick

19   because I thought I wrote something different.  I thought

20   that you said there were payments made to Sigma, YesCare,

21   and the Geneva entity.

22              MR. KAUFMAN:  Objection --

23   BY MS. HEARD:

24   Q    -- your testimony?

25              THE COURT:  He can answer.

```
 1   BY MS. HEARD:

 2   A    No, I haven't testified on who received payments from

 3   the Debtor's records.  My testimony was that I have received

 4   information from my team and I will be evaluating the

 5   information as to exactly who was paid, who funds were

 6   disbursed to in between the date of the divisional merger

 7   and the filing date as part of our process to prepare the

 8   Statement of Financial Affairs.  But I didn't -- think I

 9   testified that any payments were made to any of those

10   entities.  It's the information that I -- it is a party that

11   I requested information from.

12   Q    All right.  And what information did you get from those

13   parties?

14   A    I've received at least to date information with respect

15   to the payments that have been made, disbursements that have

16   been made between the date of the divisional merger and

17   leading up to the filing date.

18   Q    Okay.  So maybe this is where my confusion is coming

19   from.  So when you say the payments that have been made, can

20   you explain to me what that sentence means?  The payments

21   from where to where?

22   A    Sure.  I'll back up to the data of the division merger.

23   As I think discussed in my declaration, there was an

24   allocation of assets and liabilities to let's call it a

25   RemainCo and a NewCo, RemainCo now be the Debtor entity.  My
```

1   understanding of the information that we are currently

2   evaluating is that payments have been made on account of the

3   liabilities or various expenses related to the contract and

4   the liabilities that were allocated to the Debtor between

5   the date of the division merger and the date of filing.

6   Q    Okay.  And who was making the decisions about which

7   liabilities to pay?  Have you come across that?

8   A    I don't have an answer for that question.

9   Q    Okay.  Is there anyone you have spoken to at the Debtor

10  who could have an answer to that question?

11  A    I'm happy to include that in the analysis of the

12  funding agreement reconciliation.  I suppose the answer is -

13  -- I will certainly ask.  I do not know if someone has and

14  where the answer will be, but I will certainly follow up on

15  that.

16  Q    Okay.  I'm sorry, I -- you kind of lost me.  So the is

17  answer, no, you don't know anyone who can --

18  A    Can you ask the --

19  Q    -- answer these questions?

20  A    -- question again?

21  Q    Sure.  I mean, we can -- we agree that liabilities were

22  paid, right, between the date of the merger and now, and

23  they total approximately $30 million or what you know so

24  far.  And I'm saying, who is the decider who made the

25  decision about which liabilities to pay?

1    A    I don't know the answer to exactly how the decision

2    making process was carried out.

3    Q    Is it a committee --

4              THE COURT:  Can I --

5    BY MS. HEARD:

6    Q    -- of people?  Is it one person?

7              THE COURT:  Can I just ask what this has to do

8    with the DIP that's before me?

9              MS. HEARD:  Sure, Your Honor.  I mean, the issue

10   is that we can't seem to drill down.  I mean, essentially

11   they're asking the Court to make a good faith finding and we

12   have very little information about who is LoanCo, who owns,

13   you know --

14             THE COURT:  Right --

15             MS. HEARD:  -- the Debtor, and who's making the

16   decisions about which liabilities to pay --

17             THE COURT:  I was asking about your specific --

18             MS. HEARD:  -- in exchange for these --

19             THE COURT:  I'm just asking about your specific

20   question on that one.

21             MS. HEARD:  Okay.  Well, $30 million is paid and

22   I'm trying to understand which liabilities were paid because

23   my client wasn't.  And if that -- they're asking to be

24   released --

25             THE COURT:  What does that have to do with --

1    right.  Why don't you ask another question, Ms. Heard?

2    BY MS. HEARD:

3    Q    Okay.  Who are the secured DIP parties?

4    A    I believe that was addressed earlier, just M2 LoanCo is

5    single DIP lender and agent.  I believe the DIP order

6    specified, I want to think Paragraph 30, 35, something,

7    there was a specification around that point.

8    Q    Okay.  So does Mr. Isaac Lefkowitz, is he involved with

9    M2 LoanCo, to your knowledge?

10   A    Mr. Isaac Lefkowitz is the director of the Debtor.

11   I've been working with Alan Rubinstein as a representative

12   of M2 LoanCo.

13   Q    Okay --

14   A    -- question.

15   Q    Does Mr. Isaac Lefkowitz have an interest in M2 LoanCo

16   personally?

17            MR. KAUFMAN:  Objection.  That calls for a legal

18   conclusion.

19            THE COURT:  No, I don't think it --

20            MS. HEARD:  To his knowledge.

21            THE COURT:  Yeah, to your knowledge,

22   BY MS. HEARD:

23   A    I do not know the answer to that.

24   Q    Okay.  How about Perigrove?  Do you know anything about

25   Perigrove's relationship to M2 LoanCo?

1   A    I don't.  My understanding is Perigrove is an entity

2   that may provide funding to M2 LoanCo, but that's the extent

3   of my knowledge.

4   Q    Okay.  So right now, you're corporate restructuring

5   officer.  I understand that you just joined February 13th.

6   Are you aware of who bought this entity -- I'm sorry,

7   Corizon and the predecessors in interest to the current

8   Debtor?  Let me say that --

9   A    (indiscernible).

10  Q    In 2020, the predecessors in interest to this Debtor

11  were purchased by an undisclosed person, entity, group of

12  individuals, I don't know.  Do you know who bought this

13  entity?

14           MR. KAUFMAN:  Just got to object --

15  BY MS. HEARD:

16  A    I do not.

17           MR. KAUFMAN:  -- to the first part of that

18  question, because that sounded like testimony.

19           THE COURT:  Well, why don't you rephrase the

20  question, Ms. Heard.  I going to let you ask it.  I just

21  want to make sure that we have a clean question.

22           MS. HEARD:  Sure.  I understand.

23  BY MS. HEARD:

24  Q    Who purchased this?  Who purchased the predecessor in

25  interest to Tehum Health Care in 2020?

1   A     I do not know who the purchasing entity was in 2020.

2   Q     Okay.  Do you know if it was an entity or an

3   individual?

4   A     I do not.

5   Q     Do you know --

6   A     (indiscernible).

7   Q     -- anything about that transaction?  All right.  You

8   know, we've talked today, in your testimony you talked about

9   how you've done, you've been involved in DIPs before and

10  there are certain standard terms and all of that.  I'm not -

11  - I'm just saying that in very broad strokes.  I'm not

12  trying to re-characterize your testimony.  I'm just not

13  going to rehash it word by word.  Have you ever seen a DIP

14  for an entity that is liquidating?

15  A     I have, yes.

16  Q     Okay.  And that dip that you're thinking of, did it

17  only purport to pay estate professionals?

18  A     No, the DIP provided for the payment of administrative

19  expenses to wind up the affairs of the estate, which would

20  have included professionals, but wouldn't include things

21  like notification agents or administrative agents, you know,

22  U.S. Trustee, any potential expenses borne by the Debtor in

23  order to wind up the estate.

24  Q     And was that in the context of a an 11 -- Chapter 11?

25  A     It was.

1    Q    And in that situation, were any claims paid at all?

2    A    I mean, claims -- I'm sorry, general unsecured claims.

3    Yeah, those claims would have been paid, you know, after,

4    you know, for example, a plan of reorganization would have

5    been proposed as (indiscernible) statements solicited and

6    approved and, you know, recovery specified and agreed to on

7    account of unsecure claims.  That's when the claims would

8    have been paid, once the recoveries have been identified and

9    the plan was set forth.

10   Q    No, I understand that, but this is a -- there's no,

11   there's no reorganizing here.  This is a liquidation,

12   correct?

13   A    That's correct.

14        MS. HEARD:  Okay.  Thanks, Your Honor.  I'll pass

15   the witness.

16        THE COURT:  Okay.  Does anyone have any -- anyone

17   else have any questions for the witness?  Mr. Cross?

18        MR. CROSS:  Thank you, Your Honor.

19             CROSS EXAMINATION OF RUSSELL PERRY

20   BY MR. CROSS:

21   Q    Good afternoon, Mr. Perry.  I represent Kohchise

22   Jackson and William Kelly, two tort claimants in Michigan.

23   I believe you testified that M2 LoanCo and the Debtor have a

24   common parent which is M2 HoldCo, a Florida LLC; is that

25   correct?

1    A    That is correct.  That's from the organizational chart

2    in my declaration.  Yeah.

3    Q    Who are the members of M2 HoldCo?

4    A    I don't have that information.

5    Q    Is it possible that any person who owns or controls

6    LoanCo or HoldCo is also an insider of YesCare or YesCare

7    Holdings?

8         MR. KAUFMAN:  Your Honor, I'm just going to object

9    to the relevance.

10        THE COURT:  I'm --

11        MR. CROSS:  The reason I ask --

12        THE COURT:  -- overrule the objection.  He can

13   answer if he knows.

14   BY MR. CROSS:

15   A    I'm sorry, are you saying is it possible that that

16   exists?

17   Q    Yes.

18   A    I suppose it's possible but I don't know that I have a

19   basis for determining.  I (indiscernible) information as it

20   relates to who that would be today and what those officers

21   are.

22   Q    The reason I ask is that there appears to be provisions

23   in the credit agreement that provide benefits to YesCare.

24   Would you agree with that?

25   A    Can you explain, you use the word benefits, what do you

1    mean by benefits?

2    Q    For example, have you read the credit agreement?

3    A    I have gone through the credit agreement but the DIP

4    order, you know, is certainly what is currently guiding the

5    DIP facility, but I have gone through the credit agreement

6    when it was prepared.

7    Q    So you saw negative covenant 6.36R which prohibits the

8    debtor from using the loan proceeds or its cash collateral

9    to investigate, analyze, commence, prosecute, threaten,

10    litigate, object to, contest, or challenge in any matter the

11    divisional merger or YesCare?

12    A    Yes, if that's the provision you're reading from the

13    credit agreement, that sounds correct.  I would defer back

14    to the DIP order as it relates to guidance for the DIP.

15    Q    Would you agree that that provision benefits YesCare?

16    A    I suppose in the narrow view in that the DIP financing

17    wouldn't be used for that purpose, that's where there may be

18    a benefit.  But, I don't think it says that the

19    investigations can't continue or investigation can't occur.

20    It's just the use of the proceeds.

21    Q    I believe you testified Perigrove is an entity that

22    provides funding to LoanCo; is that right?

23    A    To my very, very limited understanding.  I have no

24    books and records to specify that.

25    Q    Do you know who the principal of Perigrove is?

1   A    I do not.

2   Q    Have you ever visited its website?

3   A    I have not.

4   Q    Are you familiar with an individual by the name David

5   Gefner?

6   A    I'm sorry, I don't recall that name.

7   Q    Are you -- I believe you testified you're familiar with

8   an Isaac Lefkowitz; is that right?

9   A    I am.

10  Q    I noticed in, I think it's exhibit or ECF 59-10, there

11  was a document signed on behalf of LoanCo Isaac Lefkowitz.

12  Do you know if Mr. Lefkowitz has authority to act on behalf

13  of LoanCo?

14  A    I do not know the answer to that.

15  Q    Do you know who Abraham Goldberger is?

16  A    I know reference to him through documents in the

17  divisional merger, but I do not know anything beyond that.

18  Q    Have you ever spoken with him?

19  A    I have not.

20  Q    Now you said you've read the funding agreement between

21  LoanCo and the Debtor, correct?

22  A    I'm generally familiar with it.  I have read it in

23  connection with gathering information.

24  Q    What consideration did LoanCo receive in exchange for

25  providing over $15 million of funding to the Debtor?

1       MR. KAUFMAN:  Objection, calls for a legal

2  conclusion.  Objection, it's irrelevant to this DIP motion.

3       THE COURT:  What's your response, Counsel?

4       MR. CROSS:  Your Honor, I think that where -- he

5  testified that this agreement was negotiated in good faith

6  between the Debtor and I just want to understand why LoanCo

7  is advancing funds to the Debtor without any hope of being

8  paid back, which appears to be what happened in the funding

9  agreement, like what their motivation is for providing this

10 funding.

11      THE COURT:  He can answer if he knows.  How can he

12 --

13      THE WITNESS:  I actually do not know the answer to

14 your question.

15      THE COURT:  Yeah, was going to ask, how can he

16 know their motivation, Counsel?

17      MR. CROSS:  Well, he can know if there's any

18 consideration provided in the agreement itself because he's

19 read the agreement.

20      THE COURT:  I'm not sure that goes -- go ahead.  I

21 understand.

22 BY MR. CROSS:

23 Q    So was there any consideration provided in the

24 agreement?

25      MR. KAUFMAN:  Raise my abductions again.

```
 1              THE COURT:  Overruled.

 2   BY MR. CROSS:

 3   A    I'm sorry, I would have to go back to review the

 4   funding agreement to determine.  As it stands today, I do

 5   not know the answer to your question.

 6   Q    So is it fair to say that the estate's primary assets

 7   at this time are the ERC tax refund and estate causes of

 8   action?

 9   A    I would say, certainly a primary asset is the ERC

10   credits.  Another potential asset would be, you know,

11   insurance proceeds to the extent they're liquidate-able.

12   Other sort of, you know, potential litigation matters that

13   we would potentially pursue and then, you know, to the

14   extent that there's cause of action claims for sure, but

15   because I don't have a value for them, I can't necessarily

16   say whether or not there's value but certainly is a

17   potential asset of the Debtor.

18   Q    So would it be fair to say that the estate's fraudulent

19   transfer claims against YesCare are a primary asset of the

20   estate?

21   A    I think there -- if there's value to that cause, if

22   there is a cause of action, if there's value to it, then

23   absolutely, it will be value to the estate.  Where I sit

24   today, I do not have information and analysis that would

25   suggest that it's valuable but causes of action generally
```

1    are valuable to a Chapter 11 Debtor if they're liquidate-

2    able and the Debtor pursues them.

3    Q    So why did LoanCo insist in this funding agreement that

4    its loan proceeds and the Debtor's cash collateral could not

5    be used to pursue causes of action against YesCare?

6         MR. KAUFMAN:  Objection.  That calls for Mr. Perry

7    to speculate into the thoughts of other parties.

8         THE COURT:  Sustained.

9    BY MR. CROSS:

10   Q    I noticed in 7.1 of the credit agreement, there are

11   some events of default and one of them, X, is the Bankruptcy

12   Court entering an order unwinding the divisional merger.

13   Why is that?  Why would that be an event of default?

14        MR. KAUFMAN:  Your Honor, I'm going to object only

15   because I haven't yet offered the credit agreement, but I'm

16   happy to do so now.

17        THE COURT:  It's fine.  He can answer.

18   BY MR. CROSS:

19   A    That was a condition provided by M2 LoanCo in exchange

20   for receiving DIP financing.  You know, I -- at this point,

21   I simply evaluated what was available and whether or not

22   financing was available under what conditions.  That's a

23   negative covenant that M2 LoanCo put in place and I can't

24   speak to whether or not, you know, that is -- what value

25   that has to M2 LoanCo.  I think that was your question.

1    Q    So you don't know why M2 LoanCo insisted on that

2    provision?

3    A    That's not a provision that I specifically had dialogue

4    with Counsel as it relates to why it's an event of default.

5    No.

6    Q    Would a consolidation with YesCare bringing all of the

7    YesCare assets into the bankruptcy estate substantially

8    increase the value of the bankruptcy estate assets?

9              MR. KAUFMAN:  Your Honor, that calls for

10   speculation and a legal conclusion.

11             THE COURT:  Sustained.

12   BY MR. CROSS:

13   Q    I noticed in your declaration, you indicated that if

14   this financing wasn't approved, there would be a race to the

15   courthouse to tap the Debtor's insurance.

16             MR. KAUFMAN:  Your Honor, I'm sorry.  I think Mr.

17   Cross is referring to a different motion.

18             THE COURT:  Which declaration are you referring

19   to, Mr. Cross?

20             MR. CROSS:  (indiscernible).  I guess it's,

21   perhaps he hasn't testified to it.  It was just submitted as

22   evidence and Ms. Heard objected.

23             THE COURT:  Okay.

24   BY MR. CROSS:

25   Q    Are you familiar with the Debtor's available insurance

1    policies?

2    A    We are beginning the diligence process to understand

3    the Debtor's insurance policies.  I have a very, very, very

4    high level understanding.

5              Q    Are there any insurance policies that would

6    cover the contract claims of the trade creditors such as the

7    hospital system?

8              MR. KAUFMAN:  Objection.  Calls for legal

9    conclusion.  Also, it's irrelevant to the DIP motion.

10             THE COURT:  What's the relevancy, Counsel?

11             MR. CROSS:  He's argued that if the Debtor doesn't

12   receive financing, there will be a race to the courthouse

13   (indiscernible).

14             THE COURT:  Can you -- where is that language in

15   the DIP -- in the declaration?  What paragraph are you

16   referring to?

17             MR. CROSS:  I believe it's Paragraph 28.

18             THE COURT:  All right.

19             MR. CROSS:  -- document --

20             MR. KAUFMAN:  Your Honor, I think Mr. Cross is

21   looking at a different declaration.

22             THE COURT:  Yeah.  No, no, no, no, no.  He's

23   looking at the right declaration.  Yeah.

24             MR. KAUFMAN:  I see it.

25             THE COURT:  Yep.  It's fair game.  You can ask the

```
 1   question.

 2   BY MR. CROSS:

 3   Q    So there's no insurance that covers the contract

 4   claims, right?

 5   A    I don't  -- that's not a conclusion I think I have the

 6   ability to draw yet.  We're just now evaluating the

 7   insurance policies and what potential insurance recoveries

 8   exist.

 9   Q    Are you aware of the self-insured retention applicable

10   to the Lone Star policies?

11   A    My understanding is there are self-insured retentions

12   as components of the insurance policies, but again, very

13   preliminary.  We've only started discussions.  We're

14   gathering data in real time.  But my understanding is that

15   there are SIR provisions as part of the policies, but that's

16   the extent of my understanding.

17   Q    Do you know if any of the SIRs have been satisfied?

18   A    We're gathering the information to determine that.  So

19   as it sits today, I do not have that information available.

20   Q    Would you agree that under the credit agreement, an

21   event of default allows the secured party to revoke the --

22   its authorization for the Debtor to use the cash collateral

23   and force the sale of the Debtor's remaining assets?

24   A    You have to point me to the exact provision and

25   potentially read it out loud, but it sounds accurate based
```

1    on my read.

2    Q    And you agree that a sale of the Debtor's assets would

3    include a sale of causes of action that are estate property?

4    A    As an asset of the Debtor, under your scenario in which

5    there would be a sale of the asset, causes of action as an

6    asset would -- I believe so.  That sounds correct that that

7    would be a sale of assets.  Yes.

8    Q    And those causes of action would include any fraudulent

9    transfer claims against YesCare, right?

10            MR. KAUFMAN:  Your Honor, I'm objecting just

11    because it's not relevant to the interim DIP hearing.  It

12    may be relevant to the final hearing.  Avoidance actions

13    aren't DIP collateral under the interim order.

14            THE COURT:  Well, I'm going to allow him to ask

15    his questions.  He can -- go ahead, Mr. Perry, you can

16    answer.

17    BY MR. CROSS:

18    A    Yeah, as I mentioned earlier, the DIP order, you know,

19    is sort of the guidance that I'm relying upon and avoidance

20    actions were deferred to the final hearing.

21    Q    I understand.  I'm just asking you about what the --

22    what LoanCo has put in the credit agreement or the agreement

23    that you've negotiated with them which you testified is,

24    they're not willing to provide financing on more favorable

25    terms than this agreement, correct?

1   A    In the DIP order, the revised DIP order that was

2   uploaded today, that's the basis of my conclusion in

3   combination with of course the credit agreement, but there's

4   items in the DIP order that govern, that precede.

5   Q    So any sale of the Debtor's fraudulent transfer claim

6   against YesCare, the secured party has a right to credit

7   bid, correct, under the credit agreement?

8           THE COURT:  Yeah.  Now, Mr. Cross, I think you're

9   going a little  -- that's not going to happen in two weeks.

10  So I'm comfortable that we can cross that bridge when we get

11  there.

12          MR. CROSS:  (indiscernible).

13          THE COURT:  No, no, I understand the questions and

14  I think they're fair.  I just want to really kind of laser

15  focus on the relief that's requested before me, but I'm

16  going to give you some leeway and I think I've shown it to

17  you and I can tell you with great confidence there'll be no

18  sale in the next few weeks.

19          MR. CROSS:  All right.  No further questions.

20          THE COURT:  Thank you.  Mr. Stapleton, do you have

21  any questions, sir?

22          MR. STAPLETON:  Yes, Your Honor.  If I might,

23  briefly.

24          THE COURT:  Sure.

25          MR. STAPLETON:  And I'm going to focus on the

1  challenge period because that's really what I think I'd like

2  to cover.

3              CROSS EXAMINATION OF RUSSELL PERRY

4  BY MR. STAPLETON:

5  Q    Mr. Perry, my name is Warren Stapleton.  I represent

6  Arizona Department of Corrections really, for all intents

7  and purposes.  Just a basic question.  Did the Debtor have a

8  bank account between May of 2022 and the petition date?

9  A    Yes, I believe it did during that time.  Yes.

10 Q    Have you received any bank records from the Debtor for

11 that time period?

12 A    We're gathering those records for -- in connection with

13 filing SOFAs and schedules.  So we've requested it.  If

14 we've received it, it will certainly be part of our, you

15 know, statements that we'll file with the Court.  At this

16 point, I can't, in my mind put my memory on the exact file

17 that would have bank records, but I do know there was a bank

18 account in existence and it was closed at some point between

19 the merger and the petition date.

20 Q    And do you know the approximate value of cash that

21 moved through those accounts?

22 A    I'm sorry, which account are you referring to?

23 Q    The bank -- the Debtor's bank account.  I mean all of

24 them.  Do you have any idea of what the amount of cash that

25 moved through them was?

```
 1    A    I don't have an accounting of exactly the amount that

 2   moved through the Debtor's account, no.  I do not have that.

 3    Q    Okay.  And I think you testified earlier that you do

 4   not currently know the value of the Debtor's causes of

 5   action; is that correct?

 6    A    That's correct.

 7    Q    And do you have an idea of what the universe of

 8   unsecured claims is in this case in terms of amount/

 9    A    We'll have a -- I have a very general idea based on

10   balance sheet liabilities.  You know, it's a very broad

11   range, anywhere between about $60 to $80 million of

12   potential unsecured claims.  Some of those are frankly just

13   actuarial calculated, but once we file the schedules, on the

14   docket here in the coming days, we'll have a much more

15   specified number.

16    Q    And the schedules are due on March 30th; is that

17   correct?

18    A    Currently, they are due on the 30th, correct.

19    Q    And do you anticipate filing them on March 30th?

20    A    As it stands today, we have not requested a delay of

21   that date, but it is entirely possible that we do.

22    Q    Now, you indicated -- well, let me stick with the

23   Debtor for a second.  There is -- does the Debtor have a

24   general ledger?

25    A    It does.
```

1    Q    Okay.  So that's how you had access to a balance sheet

2    then, it's the Debtor's balance sheet that you're talking

3    about, correct?

4    A    Correct.  The Debtor's balance sheet.  That's correct.

5    Q    Okay.  And so is there a liability on that balance

6    sheet for the amount that they received from M2 LoanCo, the

7    $15 million funding?

8    A    My understanding is there's no liability related to

9    that $15 million funding, no.

10   Q    (indiscernible).

11   A    I'm sorry, can you repeat that?

12   Q    So it just amounts to a DIP, it's just (indiscernible)

13   or in other words, it would just show up as an asset perhaps

14   on those?

15   A    It's not going to show up on the balance sheet at all,

16   at least at the last financial statement that I've seen,

17   it's -- nor an asset or a liability, at least for the

18   financial statements that I have reviewed.  If that's your

19   question.  I'm sorry, Mr. Stapleton, but --

20   Q    That's okay.  I assume if it was a funding agreement

21   that you could still draw upon and it wasn't a loan, then it

22   would be an asset, right, because it would be money that you

23   could get by drawing upon it.  Is it -- am I incorrect?

24   A    On the date of the division merger, that's exactly how

25   I would've expected the accounting to occur.  Yes.

1    Q   Okay.  Okay.  And with regard to the divisional merger,

2    it seems like you've indicated that approximately -- M2

3    LoanCo has represented that it paid approximately $30

4    million on the Debtor's behalf; is that correct?

5    A   No, not M2 LoanCo.  I'm sorry.  I didn't -- if that was

6    my testimony, that was incorrect.  M2 LoanCo, you know,

7    based on what I've seen did not disburse on the Debtor's

8    behalf.  M2 LoanCo would have provided the funding in order

9    for other entities to disburse on the Debtor's behalf.

10   Q   Okay.  So I guess what I'm getting to on that point is

11   simply that it looks like the divisional merger wasn't quite

12   as hermetically sealed as you might have anticipated or at

13   least as an outsider might have anticipated.  Is that a fair

14   statement?

15          MR. KAUFMAN:  Objection.  Calls for a legal

16   conclusion.

17          THE COURT:  I'm not sure that was a legal

18   question.  The hermetically sealed, but I --

19          MR. KAUFMAN:  Medical.  Calls for a medical

20   conclusion.

21          THE COURT:  I -- Mr. Stapleton, why don't you ask

22   another question.

23          MR. STAPLETON:  Sure, Your Honor.

24   BY MR. STAPLETON:

25   Q   Let me put it to you this way.  If we have to go

1   through to all these different entities to sort out whether

2   the divisional merger was sort of -- or the, that the

3   parties adhered to the divisional merger and the Debtor

4   didn't seem to have bank accounts for a good part of time,

5   it looks like we're going to be going to outside parties to

6   find out what happened with regard to the Debtor's finances

7   prepetition; is that correct?

8   A    That's correct.  Yeah.

9   Q    Okay.  And so would you agree that it would be easier

10   from a -- in terms of the challenge period if the challenge

11   period were longer since you have more time to get discovery

12   from these folks rather than shorter?  Wouldn't the Debtor

13   be better off if it was longer rather than shorter?

14   A    Information is available and is provided to my team and

15   myself timely, I don't know that it matters if it comes from

16   four people or one person or ten people.  As long as the

17   information is available when we complete the work.

18          MR. STAPLETON:  I have nothing further, Your

19   Honor.

20          THE COURT:  Okay.  All righty.  Mr. Perry, sounds

21   like you are off the virtual chair, so thank you.

22          THE WITNESS:  -- Your Honor.

23          THE COURT:  Mr. Kaufman, any other evidence?

24          MR. KAUFMAN:  No.  Just for purposes of the

25   record, I will formally offer Exhibit 5 from our exhibit

1    list which is again for the record Docket 192-5.  It's the

2    credit agreement that was attached to the motion.

3           THE COURT:  Any objection?  All right, it's

4    admitted.

5           (Exhibit 5 entered into evidence)

6           MR. KAUFMAN:  And no, that will conclude the

7    Debtor's evidence in support of the motion --

8           THE COURT:  Okay.

9           MR. KAUFMAN:  -- for interim relief.

10          THE COURT:  Does anyone have any other evidence

11   they wish to present to the Court?  Okay.  Here's what I'm

12   going to do.  I've considered the evidence and I've read

13   pleadings and I've considered the arguments of that have

14   been raised and I very much appreciate it and I understand

15   the concerns all across the board.

16          This case comes with many interested parties and

17   we certainly were introduced to -- I was certainly

18   introduced to many of them.  Many of them are represented by

19   counsel today, many of them who have been litigating with

20   the Debtors for quite some time and have some history with

21   the Debtors far more than this Court.  And I, at the same

22   time, I understand that -- where the debtor sits today.

23          The Debtor needs cash and professionals don't work

24   without cash there aren't many liquidating 11s where funds

25   don't go to unsecure creditors initially, right?  You got to

1    pay employees.  You got to pay administrative costs.

2    Sometimes you got to keep the lights on in buildings, so it

3    happens all the time.  But there is some path towards it.

4            I understand where the Debtor is.  The Debtor

5    needs cash and the Debtor needs to operate to be able to

6    keep a case alive.  And so I understand the pressure and

7    where the Debtor is and I know that these professionals, it

8    certainly seems from everything Mr. Perry has provided and

9    all the work that's been done and who the professionals are

10   who are representing the Debtor, they've been working

11   incredibly hard and so I understand.  There's no question

12   about that and no question about the amount of work Ankura

13   has done here.

14           The reality is there's just a lot of work to get

15   done in a short amount of time and when you need money, you

16   got to come in and ask for it.  And no situation is perfect.

17   So I understand the position that the Committee finds itself

18   in and many other creditors, Mr. Stapleton, Ms. Heard's

19   creditor, Mr. Cross' clients.

20           Right, there's a lot of questions about who the

21   proposed lender is and their relationship and how it --

22   everything falls through and what decisions can be made

23   today under the basis of providing emergency relief, you

24   know, and whether, you know, whether M2 or its affiliates

25   should be funding this initially.

1       I also understand where M2 is at least

2    (indiscernible).  I don't want anyone to read into anything

3    that has happened today, at least from my perspective, that

4    M2 is a bad actor, right.  I think M2 is entitled to ask

5    for, you know, terms upon which they're willing to loan.  I

6    think that's -- that happens all the time and I think it's

7    up to the Court to say whether it's acceptable or not, but I

8    don't think it's necessarily bad faith to propose a loan on

9    some terms.

10      I think, you know, the question then becomes for

11   me -- so I don't want anyone to construe that at least M2's

12   professionals, I think they've put forth a DIP agreement

13   and, you know, whether M2 is supposed to fund or not is a

14   different question and what happens if it turns out that

15   they are supposed to fund is a very different question.

16      The Court considers the statute and what 364 says

17   and based on the evidence, I do think interim relief is

18   appropriate subject to a couple of conditions and M2 is

19   going to have to tell me whether, you know, they agree to

20   them or not.  But this is what I'm willing to sign an

21   interim order saying.

22      Like, I do think that all the relevant provisions

23   of 364, they're to this Court's knowledge and based on the

24   evidence, there's no one else that's going to put money into

25   this and that's understandable under the circumstances, not

1    to say that someone can't come in, but it's understandable

2    that Ankura just hasn't found anyone.  It's not for lack of

3    trying.

4              And maybe they will find someone who can, who will

5    come in on a DIP and that would be, you know, subject to the

6    acceptable paragraphs, you know, where everybody gets to

7    know who they are.  I think that works.  I like the way the

8    Committee -- I appreciate the Debtor and the Committee

9    working on that.  I think that makes sense.  It provides

10   transparency and it provides some process here.

11             The reality is though, I think M2 has to

12   understand, it's just a lot of unknown.  I think given a

13   little bit more time, Ankura, the Debtor's professionals can

14   get even more comfortable but I think we're going to need a

15   little bit more time to fully understand exactly where

16   things stand and maybe a little bit more knowledge about the

17   agreement, the funding agreement and what's required or not.

18             So I'll give -- I think when it comes to Paragraph

19   17(a), I do agree with the Committee that it should just be

20   limited to M2 as a DIP lender.  Right, if you -- if they

21   provide $2 million worth of funding, they should based upon

22   everything that I've heard, I do think the Debtor can

23   stipulate and provide a release of them in their capacity as

24   a -- in connection with making this loan.  I think that

25   makes a sense.  It's standard.  It's appropriate.  No

1    question about that.

2              So I think B, yeah, there's a couple of things

3    about B that give me a little pause.  And B1 is a

4    hypothetical that I out there, so the last sentence, right.

5    Subject to the challenge period, the Debtor's going to waive

6    any right of setoff.  You know, if it turns out and I

7    believe, I've gotten to know Mr. Gluck a little bit.  He's a

8    -- you know, and I know the folks who are working with him.

9    They're all standup professionals and so I've got -- I have

10   no concerns about that.

11             I'm, just want a process where if it turns out in

12   someone's legal analysis I disagree with, you know, the

13   answer is, you know, there's no, you know, there's got to be

14   a mechanism for a setoff and I'm not signing any order that

15   says that there's going to be a waiver of a setoff or the

16   Debtor has to file a, you know, an adversary proceeding and

17   then spend money and then figure out where it's going to get

18   the money.

19             So that last paragraph, to me at least, maybe it

20   can be subject to a final.  I think all of 17(b) can be

21   subject to a final and somebody can come in and ask me in a

22   final.  I feel a lot more comfortable in a final.  If

23   someone's asking me to do something on an interim, I think

24   that at least that sentence would have to come subject to

25   final approval and I think if you're asking me on an interim

1    basis to not put 17(b) subject to a final, I think 18 is

2    going to have to get pushed out and I think it's going to

3    have to get pushed out for the Debtor and I think it's going

4    to have to get pushed out for everyone else.

5           So I don't think April 14th is going to work and I

6    don't think May 22nd is going to work.  But if you're asking

7    me to push it to a final and then consider it and I don't

8    have to deal -- I don't have to think about it today and I

9    do think the Debtor can be entitled to receiving the funding

10   and I think the collateral is what the collateral is and

11   it's subject to, I think the proposed order at 233, gives me

12   greater comfort.  I do think 17(a) needs to -- Mr. Zluticky,

13   his comments and what he was proposing I think, make perfect

14   sense for me, right.

15          This is an interim hearing and the proposed final

16   that's being requested is essentially like two weeks away,

17   so we're talking April 4 and I'm happy to give April 4th, a

18   hearing date on April 4th to consider the relief requested.

19   You know, maybe like at two o'clock, subject to my case

20   manager running in here and telling me not to do it at two

21   o'clock, right, with an objection deadline maybe of a few

22   days before, right.  We can figure that out.  Maybe the

23   Friday before.

24          You know, it would be March 31st, right, so you're

25   talking nine days.  17(b) can go to a final if not, and I

1   think 18 is going to have to get pushed out to sometime in

2   June for all parties so that whatever challenge period goes

3   on, no one is going to give anything away in the next -- I'm

4   not giving anything away in the next two weeks.  We're not

5   going to have a situation where the Debtor needed $2 million

6   to continue funding operations and it essentially gave a lot

7   away to someone who may have already been required to fund.

8        I don't know enough about M2 yet and I think we

9   all need to know a little bit more about who M2 is and how

10  they fit in the structure, but that's not to say that M2 has

11  done anything wrong, that M2 is acting in any way other than

12  a professional who's seeking to get a loan on terms.  I

13  think that the proposed funding terms are incredibly

14  reasonable.  So -- and I understand.  Like to me, the Debtor

15  did a really good job of negotiating this under the

16  circumstances.  These are really tough times.

17       I would tell the debtor and its professionals; it

18  seems to me really -- you know this.  I'm saying it so that

19  everyone can hear me say it.  I need greater clarity on the

20  path for the rest of the cases, and what I mean by that is

21  someone's going to have to step up and fund this all the way

22  through.  I don't want professionals being subjected to not

23  knowing whether they're going to get paid or not or whether

24  creditors understand if I put a pause on litigation that

25  there's, work is actually going to get done and people are

1    going to be able to negotiate with them in good faith.

2         So I don't know if what is being requested is

3    enough on a final or on what terms it is, but I'd sure feel

4    a lot better knowing about the tax refund and where that's

5    going and what comes in on that and who's going to step up

6    and make sure that this estate gets the proper funding that

7    it needs so that we can have -- run a case and that Debtor's

8    professionals can be focused on working as -- and what

9    causes of action it may or may not have in analyzing that.

10        I think that's really important and I think it

11   would give more comfort to the process and more transparency

12   to the process.  And that's not to say that people haven't

13   been working hard because they really have.  I'm just

14   saying, I'm focused more on non-debtor parties.  I want

15   somebody to step up and -- if that's what they're willing to

16   do -- and make sure that this case has enough to go forward.

17        It's a lot of work to get done and I don't want

18   Debtor's professionals to feel like they can't do the full

19   extent of their job, that the Committee can't do the full

20   extent of its job and Ankura or whoever needs to get hired

21   by the Debtor -- there's a lot of work that needs to get

22   done in connection with this case and, you know, motions are

23   coming flying in.  There's going to be another motion to --

24   you know, there's a motion as to kind of stay extension

25   motion.  That's going to require a lot of work.  There's --

1    somebody needs to review insurance.

2         There's a lot of work that needs to get done and

3    Gray Reed needs to make sure that it can do all of its work,

4    and I know that they'll do the work.  It's just a lot to get

5    done and I want to make sure they feel they've got the

6    support that they need in Ankura and that's, again, it's not

7    to say that M2 hasn't done what it -- everything that it was

8    supposed to do or stepping up.  That's not what I'm saying

9    at all.  We just don't know what we don't know.

10        And so I don't want to cast aspersions or paint

11   any pictures on anyone at all.  So I think the definition of

12   good faith and what good faith means for a DIP, you know, it

13   means one thing at one time.  It could mean something else

14   at another time.  And so that's just the way I view it.  I

15   don't think -- I think I'm making a good faith finding based

16   upon what's been presented to me today and I've got no

17   basis, I've got no reason to think that anything is other

18   than good faith.  But that could change.

19        I hope it doesn't because that makes me get more

20   involved in the process.  I hope to never have to cross that

21   bridge.  I'd much rather call balls and strikes.  But we are

22   what we are.  The Debtor needs funding and I'm going to make

23   sure that the Debtor has the funding that it needs, and so

24   what Mr. Gluck is going to have to tell me is -- and maybe

25   it needs some time to work with the Debtor.  I've got a 4:30

1    that I can -- three o'clock that I could call for a while

2    and parties can come back and tell me what they're thinking

3    about doing or they can tell me now.  I give you full

4    flexibility.  I don't like doing things on the spot and I

5    don't like me rewriting sentences because I don't know how

6    that falls through the waterfall and I don't want to do that

7    to anyone.  You all just tell me what you want to do.  But I

8    do, I tell you, we're coming back in two weeks and so that

9    goes into my thinking a lot, so --

10        MR. KAUFMAN:  Your Honor, I --

11        THE COURT:  Go ahead, Mr. Kaufman.

12        MR. KAUFMAN:  I understand your points on

13   Paragraphs 17(b) and 18.  I know Mr. Gluck needs to confer

14   with his client and we'll need to, if there's some drafting

15   that needs to be done, I think I understand what the Court

16   is suggesting there.  On 17(a), I'm not sure I understand

17   what change was required over and above the changes that I

18   thought we agreed to with the Committee.

19        THE COURT:  Well, I -- it may be -- it may have

20   been enough.  I just want to make sure that everybody, when

21   they read it, that's what it means.  Maybe that's the better

22   way of saying it.  I'm not sure it needs a drafting tweak.

23   That's a fair point, Mr. Kaufman.  I just want to make sure

24   that everybody keeps their powder dry on 17(a) and then the

25   real -- if there's some tweaking that 17(b) and maybe a

1   conforming change to 18, if it's necessary is really where

2   the, you know, wordsmithing would come.

3          And I think you could -- someone could plug in

4   April 4th at 2 p.m. with an objection deadline of March

5   31st.  You know, I would do 5 p.m.  I don't want to do the

6   end of the day because that's just going to jam some poor

7   associate who's going to have to work 'til 11:59.  I don't

8   want to do that.  I've gotten soft.

9          MR. KAUFMAN:  Understood.

10          THE COURT:  So -- and I'm just telling you, if the

11   parties are (indiscernible) on the tweaks and the language

12   or tell me what they want to do and then upload an order, I

13   will sign it.  I don't care what time it is at night.  I'll

14   sign it tonight if that's what we need to do or if we need

15   to go further into it tonight.

16          I just, I think everyone will know a little bit

17   more on April 4th and that's where I'm going.  And I think

18   it preserves the concerns that Mr. Stapleton has.  I don't

19   think it needs to come out, but maybe if we pushed out more

20   time on the challenge period or if it got pushed to a final,

21   I think, I think you're okay.  I think Mr. Cross' client, I

22   think I signed some stipulation involving one of his

23   clients.  And I think Ms. Heard's concerns can also be

24   alleviated for today.

25          But at the same time, I want to make sure the

1 Debtor has enough runway to figure out what it wants, what

2 it seems like it's still working on and it's not to say that

3 it's not working hard.  That's where I'm going and the

4 Committee at the same time.  So Mr. Gluck, tell me what you

5 want to do.  I can call my 3 p.m. and I can give everyone

6 some time or I can pick a time and maybe we can come back, I

7 don't know, 5:15 and talk about it.

8   MR. GLUCK:  We are definitely, Your Honor, going

9 to need some time.  So we have a few things we need to

10 discuss.  You know, I don't want to keep people here too --

11 so maybe we go with 5:15 and then if we need some more time,

12 we can come back and --

13   THE COURT:  Okay.

14   MR. GLUCK:  -- and ask for that.

15   THE COURT:  Okay.  I'm going to -- I've got a 4:38

16 -- it's 4:38.  I'm going to just take three or four minutes,

17 just step off of the bench.  I'm going to call my three

18 o'clock at like 4:41, so Mr. Fuqua, (indiscernible), just

19 hang on.  I'm just going to step out for a second and then

20 come back in and just grab my notes for that hearing and

21 then I'll come back on, and we can come back on at 5:15 and

22 we can check in and I won't jam anyone, but maybe we can all

23 check in at 5:15.

24   And again, if you want to have offline

25 conversations, do it not on this line.  I'm going to keep

1    the line open, so if you dial back in, please keep your

2    phone on mute.  Realize that I'm -- I'll be conducting

3    another hearing.  Okay?  All right, and I'm open to other

4    proposals.  I don't want to -- you know, we can check in at

5    5:15 and you can, you can ask me for something else.  I'm

6    not saying this is, you know, like this -- I'm giving

7    everyone a full range of options, but let's talk at 5:15 and

8    see where we are.  Okay?  Thank you.

9            MR. GLUCK:  Thank you.

10           (Proceedings adjourned at 4:39 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 30, 2023
```