IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| TEHUM CARE SERVICES, INC.,[1] | § | Case No. 23-90086 (CML) |
| | § | |
| | § | |
| DEBTOR | § | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO JOINT EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), objects to (the "Objection") the joint emergency motion (the "Motion") seeking conditional approval of the Disclosure Statement filed by Tehum Care Services, Inc. (the "Debtor") and the Official Committee of Unsecured Creditors ("UCC"). In support of the Objection, the U.S. Trustee respectfully states:

## INTRODUCTION

1. The U.S. Trustee objects to the Motion for three primary reasons: (1) there is no basis for hearing the Motion on an expedited basis; (2) the Disclosure Statement currently on file

---

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

1

does not contain adequate information; and (3) the plan described by the Disclosure Statement is patently unconfirmable.

2. First, the Motion provides no cause to justify hearing this Motion on an expedited basis, in violation of the Bankruptcy Rules and Local Rules. Instead, the circumstances of this case, with a vulnerable population of creditors that face obstacles to participation even on regular notice, weigh in favor of requiring more time for review of the Disclosure Statement, rather than less, and certainly in not fewer than the presumptive 28 days. Moreover, recent admissions by the judicial mediator may raise issues about the propriety of the mediation that serves as the basis for the global settlement—and thus about the very propriety of the settlement and plan itself. This, too, counsels for more time to consider the circumstances of the mediation and resulting settlement.

3. Second, the U.S. Trustee objects to the Disclosure Statement because it does not contain adequate information about the plan and its ability to be confirmed pursuant to 11 U.S.C. § 1129. The plan and Disclosure Statement are premised on a $37 million global settlement of the estate's claims against various third parties and an employee retention credit ("ERC"). In his review of the Disclosure Statement, the U.S. Trustee has identified several information deficiencies that require modifications to comply with the adequate information standard under 11 U.S.C. § 1125. Given these deficiencies, the U.S. Trustee requests that the approval of the Disclosure Statement be denied, or alternatively, the Disclosure Statement be modified to contain adequate information in the following areas:

- the lack of adequate information concerning the insurance policies, the source of funds, if any, to pay self-insured retentions ("SIRs") and deductibles, and the impact on creditors' recovery if there are no available funds to pay the SIRs;

- the lack of adequate information concerning the availability of estate assets for creditors electing to opt out, including the disclosure of any retained causes of action that are not released;

- the lack of adequate information, and justification, concerning the Debtor's projection that $1.087 billion in unsecured personal injury ("PI") claims will be reduced to $25 to $50 million, resulting in a 17.2% and 36.6% recovery for PI claimants;

- the lack of adequate information, and legal justification for, the proposed non-debtor third-party releases for: Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; Sara Ann Tirschwell; Ayodeji Olawale Ladele; Beverly Michelle Rice; Jeffrey Scott King; Jennifer Lynee Finger; and Frank Jeffrey Sholey;

- the lack of adequate information concerning a data incident during the case; and

4. The plan described in the Disclosure Statement is patently unconfirmable due to gate-keeper and injunction provisions, the coercive opt out for the third-party releases, and disparate treatment of similarly situated creditors.

5. As an initial matter, the gate-keeper and injunction provisions in Art. IX.F of the plan improperly shift exclusive jurisdiction to the bankruptcy court over personal injury litigation brought by injured individuals and criminal complaints brought by the government against the Debtor, the Post-Effective Date Debtor, any Released Party or any Exculpated Party.

6. Moreover, while portrayed as a plan that will provide unsecured creditors, many of whom are incarcerated[2] and without legal representation, the ability to exercise options and preserve their rights, the plan is anything but voluntary or consensual. As written in the plan, unsecured creditors will only receive a recovery from the settlement of the *estate's* direct claims against the settling parties if they do not opt out of the broad and sweeping third-party releases to numerous named and unnamed non-debtors. Creditors—that do "elect" to opt out of the third-party releases— some of which are in the same class—will not receive *any* distribution from the

---

[2] *See Brief of Amicus Curiae in Support of Pro Se Litigants' Request for Notice and Opportunity to Participate in Chapter 11 Proceedings and Certain Objections of Final Dip Order* at Docket No. 576-1 at page 8 of 81, describing the unique obstacles that incarcerated creditors face in this case.

3

estate's primary assets (the $37 million settlement and ERC funds) to which they would otherwise be entitled by the Bankruptcy Code. Creditors that opt out will be left to recover from a barren estate, one that was stripped (by many of the same parties seeking a release) of all of its valuable assets as a result of the combination and divisional mergers that occurred prior to the bankruptcy filing. Under this balloting scheme, the choice for unsecured creditors to *consent* to a third-party release, as required by the Fifth Circuit, is simply an illusion. The proposed treatment under the plan would also violate Section 1123(a)(4) by providing an unequal distribution of estate assets to similarly situated creditors as well as Section 1129(a)(7) by neglecting to offer each dissenting creditor at least as much as they would in a hypothetical Chapter 7 liquidation of the Debtor. As such, the plan is patently unconfirmable on its face and the request to conditionally approve the Disclosure Statement must be denied.

## OBJECTION

### A. Emergency Relief is Not Appropriate Under the Facts of This Case

7. The UCC and the Debtor (the "Plan Proponents") are requesting an emergency hearing for the Court to grant conditional approval of the Disclosure Statement. Unless the court for cause shown reduces the time to object, parties must receive at least 28 days' notice for filing objections to a disclosure statement. Fed. Bankr. R. Proc. 2002(b), 9006(b). Moreover, Local Rule 9013-1(i) requires "[t]he motion must include a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency." The Motion is devoid of any statements articulating an emergency. Further, the Plan Proponents announced the mediated settlement on August 25, 2023, but the terms were not disclosed to the creditors until September 29, 2023.

8. In this case, the Court should not reduce the time for objecting to the Disclosure Statement for multiple reasons. First, the Court should not expedite the creditors' time for review of the Disclosure Statement and plan when the terms of the settlement were withheld from them for over a month. Second, recent admissions by the judicial mediator concerning counsel for one of the settling parties that received the valuable assets in the divisional merger that left Tehum with little other than liabilities may raise issues about the propriety of the mediation that serves as the basis for the global settlement—and thus about the very propriety of the settlement and plan itself.[3] Lastly, this case involves hundreds of incarcerated creditors, many of whom are facing unique obstacles when accessing the courts and the proceedings in this case. *See* Dkt. No. 576. The Court should afford these parties all procedural safeguards provided in the Bankruptcy Code and Rules and not expedite the consideration of the Disclosure Statement on shortened notice.

### B. Inadequate Information in the Disclosure Statement

9. The Disclosure Statement fails to satisfy the requirements for its approval as set forth in 11 U.S.C. § 1125 because it does not contain "adequate information." Section 1125(a) of the Bankruptcy Code defines "adequate information" as "information of a kind and in sufficient detail to enable such hypothetical, reasonable investor to make an informed judgment about the plan. The Court has discretion to determine whether, on a case-by-case basis, a disclosure statement contains "adequate information." *See Mabey v. Sw. Elec. Power Co.* (*In re Cajun Elec. Power Coop., Inc.*), 150 F.3d 503, 518 (5th Cir. 1998). In evaluating whether a disclosure statement contains adequate information, a court "shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing

---

[3] Dietrich Knauth, US Bankruptcy Judge Should Have Disclosed Personal Relationship – Experts (Oct. 10, 2023, 5:04 PM), https://www.reuters.com/legal/government/us-bankruptcy-judge-should-have-disclosed-personal-relationship-experts-2023-10-10/.

5

additional information . . . ." 11 U.S.C. § 1125(a)(1); *See also In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988) (stating that "The determination of what is adequate information is subjective and made on a case-by-case basis. This determination is largely within the discretion of the bankruptcy court"). The standard applied by the Fifth Circuit in *Texas Extrusion* was whether the information contained in the disclosure statement "was adequate to enable a reasonable creditor to make an informed decision about the Plan." *In re Texas Extrusion Corp.*, 844 F.2d at 1157.

### *Inadequate Information Concerning Insurance Policies*

10.     The Disclosure Statement provides that "[a]dditionally, certain personal injury claimants may have access to proceeds from insurance policies under which the Debtor is a named insured. The Plan provides a path and a process for these creditors to access the Debtor's insurance coverage to the extent applicable to such Claims." *See* Dkt. No. 984, pg. 3. The Disclosure Statement, however, fails to disclose the insurance coverage risks, including any potential defenses to creditors' claims, that may impact their recoveries. Second, the Disclosure Statement is silent on the value of any available insurance policies. On the third iteration of the Debtor's Schedules A/B, the Debtor listed the value of several insurance policies as "undetermined." *See* Dkt. No. 810, pgs. 198-202. Lastly, the Disclosure Statement lacks any explanation as to how the plan will treat the SIRs and deductibles. Many of the Debtor's insurance policies require the Debtor to first pay SIRs and deductibles, often in amounts ranging from $250,000 to $2,000,000 per occurrence, before the insurance carrier is obligated to make payments under the policy. The Disclosure Statement does not state whether a third party is obligated to pay the SIRs or deductibles, whether funding is available to pay these obligations, or the impact on creditors' recoveries if the SIRs and

deductibles are not paid. The Disclosure Statement must be modified to address the insurance policies and the associated SIRs and deductibles.

### *Inadequate Information Concerning Retained Causes of Action*

11. The Disclosure Statement provides that creditors that "elect" to opt out of the third-party releases will have no right to any distribution from the $37 million settlement and the ERC fund. The Disclosure Statement provides that "[Opt-Out Beneficiary] will have no right to any distribution from the Liquidation Trust Assets except solely from [contingent and unliquidated] Estate claims and causes of action [other than those being settled in the $37 million global settlement]. The Opt-Out Beneficiaries shall receive their pro rata share of the Net Claim Proceeds and shall receive their first and final distribution as part of the Final Distribution." Dkt. No. 984, pg. 119. The Disclosure Statement does not identify which causes of action, if any, were not released as part of the global settlement or the potential value of those causes of action. Creditors will need this information to make an informed decision to evaluate the potential impact on their claim if they choose to opt out of the third-party releases. Similarly, if all causes of action—or all valuable causes of action—were released as part of the global settlement, creditors should be informed of that fact plainly and without ambivalence.

### *Inadequate Information and Justification Concerning the Reduction of $1.087 billion in Unsecured Debt*

12. The plan provides that unsecured PI claimants will receive a *pro rata* distribution from the Personal Injury Trust Funds. Presently, the face amount of PI claims totals approximately $1.087 billion. But the Plan Proponents project that these claims will be reduced to $25 to $50 million, "resulting in a 17.2% and 36.6% recovery for PI claimants." *See* Dkt. No. 984, pg. 56. The Disclosure Statement, however, does not provide any explanation for the conclusion that $1.087 billion in filed claims will be reduced by 97.7% (or 95.4% high end). This information is

necessary for creditors to make an informed judgment about the plan. The division of the proceeds from the mediation appears to be predicated on an assumption that both classes of unsecured creditors will receive similar returns. But if the PI claims were instead worth, for example, $50 to $100 million, the tort claimant classes' recovery would be half of the unsubstantiated projection or approximately 8.6% to 17.2%. The Disclosure Statement must be modified to include the Plan Proponents' support for its estimation that PI claims will be reduced by 97.7%.

### *Inadequate Information Concerning Third Party Releases for Directors, Officers, and Other Named Individuals*

13. The plan provides broad third-party releases to directors, officers, and other named individuals. Specifically, creditors that do "choose" to opt out of the releases must release the following individuals: Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; Sara Ann Tirschwell; Ayodeji Olawale Ladele; Beverly Michelle Rice; Jeffrey Scott King; Jennifer Lynee Finger; and Frank Jeffrey Sholey. The Disclosure Statement, however, does not contain basic information about who these individuals are or their connection to the Debtor and other entities involved in the combination and divisional mergers. The Disclosure Statement further does not state whether there are viable causes of action against these third parties, whether there is directors' and officers' liability insurance, and whether these individuals are contributing to the settlement in return for the releases of non-debtors, and if so, how much. The Disclosure Statement must be modified to include additional information to allow creditors to understand who these individuals are, their role in the proposed settlement, and the impact on their rights and recoveries if they do not opt out of the third-party releases.

### *Inadequate Information Concerning the Data Incident During the Case*

14. The Disclosure Statement does not contain information concerning a data incident that may impact the rights of creditors to pursue additional claims under state and federal law. On

8

March 20, 2023, the Debtor reported to the Court at a hearing of an incident. The Debtor, the U.S. Trustee, and the UCC appeared at the hearing, where the Debtor advised the Court on the data incident. The U.S. Trustee represented to the Court at the time that at some point during this case, information of the incident must be disclosed to the creditors. Since that hearing, the Debtor retained special cybersecurity counsel to investigate the matter. *See* Dkt. Nos. 468 and 689. Despite the Debtor's expenditure of estate funds to retain these professionals, to date, there has been no disclosure to the public and creditors regarding the incident. At the outset of the incident, the U.S. Trustee understood that the Debtor did not possess records. The Debtor's representative, however, later testified at a meeting of creditors that the Debtor stored and retained medical records of inmates. Given the broad releases under the plan, creditors should be afforded adequate information concerning this event to determine whether additional claims exist against the Debtor and other entities listed as released parties. The Disclosure Statement must be modified to include information concerning the data incident, the impact of the incident on potential claims and the effect of the third-party releases on those claims.

### ***Inadequate Information Insufficiently Tailored to the Creditor Body, Including Incarcerated Prisoners with Barriers to Accessing Information***

15. In the unique context of this case, the Disclosure Statement suffers from an additional infirmity—too much complexity for an ordinary creditor to digest and to understand, particularly those incarcerated prisoners with little to no internet access. In a recent case with a large body of unrepresented consumer creditors, the bankruptcy court exhorted debtors to frame their disclosure statement in more consumer-friendly terms than is traditional in chapter 11. *See In re Celsius Network, LLC*, No. 22-10964, (Bankr. S.D.N.Y. 8/17/2023), *Fourth Revised Disclosure Statement*, ECF No. 3332.

16. In *Celsius*, the disclosure statement included approximately 90 pages of questions and answers written in "plain English" before the more "traditional" elements in a typical disclosure statement. *Id.*, pp. 24-113. Those questions and answers ranged from "what is chapter 11" to "what will I receive from the debtors if the plan is consummated" to "what are releases and exculpations." The disclosure statement also attached as exhibits one- or two-page flow charts or decision trees for each type of claim, with each question followed by different paths depending on whether the answer was yes or no. For example, for the convenience class claims, the chart begins with a question of whether the "value of your total Account Holder Claim . . . [was] greater than $10 and less than $5,000 as of the Petition Date?" *Id.* at Exhibit H. Depending on whether that answer is "yes" or "no," the creditor follows a different path down the decision tree.

17. This case could similarly benefit from efforts to communicate information in a more creditor-friendly and easily digestible manner. Although this is not a crypto case with unsophisticated consumer creditors, it does have a creditor body with large numbers of incarcerated prisoners facing barriers to participation and easy access to information.

### C. The Court Should Not Approve the Disclosure Statement Because the Gate-Keeper and Injunction Provisions and the Coercive Opt Out from the Third-Party Releases Providing Disparate Treatment to Similarly Situated Creditors Render the Plan Patently Unconfirmable.

18. In addition to failing to meet the adequate information standard, this Court should deny the Disclosure Statement because the plan it describes contains provisions that render the plan patently unconfirmable. If the plan is patently unconfirmable on its face, the motion to approve the disclosure statement must be denied. *In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re American Capital Equipment, LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[a] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because

the plan described by the disclosure statement is patently unconfirmable." Here, the plan is patently unconfirmable because the gate-keeper and injunction provisions are overly broad and oppressive, and the disparate treatment afforded a creditor's claim depending on whether the creditor—many with zero experience in a chapter 11 case—opts out of the third-party release violates the Bankruptcy Code's requirements that similarly situated creditors be treated similarly and transforms allegedly consensual releases into nonconsensual releases obtained by coercion. Moreover, these issues also implicate the balloting process proposed in this case, making it vital to address the issue now.

### *The Gate-Keeper and Injunction Provisions*

19. The gate-keeper and injunction provisions in Art. IX.F of the plan improperly shift exclusive jurisdiction to the bankruptcy court over criminal complaints brought by the government against the Debtor, the Post-Effective Date Debtor, any Released Party, or any Exculpated Party and personal injury litigation brought by injured individuals. The plan requires that any person or entity that seeks to commence or pursue a cause of action must first obtain leave from the bankruptcy court. To wit: "[a]t the hearing on such motion, the Bankruptcy Court shall have sole and exclusive jurisdiction to assess whether the proposed complaint or petition satisfies the applicable Federal Rules of Civil Procedure (or other applicable rules of procedure), including rule 8 and rule 9 (as applicable), and to determine whether such claim or cause of action represents a colorable claim of any kind." Art. IX.F. The sole and exclusive jurisdiction of the bankruptcy court to determine whether a claim or cause of action includes: "negligence, bad faith, **criminal misconduct**, willful misconduct, fraud, or gross negligence." *Id*. (emphasis added).

20. Thus, under the gate-keeper and injunction provisions, the U.S. Attorney's Office must first preview its criminal indictment or complaint with the bankruptcy court, and a bankruptcy

judge would have "sole and exclusive" jurisdiction to determine whether the federal government may bring a criminal charge against the Debtor or a released party. Such a scheme is inconsistent with the Bankruptcy Code, which affirmatively protects the government's ability to enforce its police and regulatory powers. *See* 11 U.S.C. § 362(b)(1) and (4). The Disclosure Statement provides no legal justification, nor can it, for such sweeping expansion of the bankruptcy court's jurisdiction to prohibit the government from enforcing its police and regulatory powers.

21.  Additionally, the plan requires that PI claimants with claims against the Debtor and other released parties to first come to the bankruptcy court to determine whether they have a colorable claim. If the bankruptcy court denies the PI claimant's motion, thereby, extinguishing the PI creditor's claim against the Debtor and/or released parties, the PI claimant would be denied their substantive due process rights to have their PI claims adjudicated by a state or Article III federal court. Due process protects not only the ability to bring a cause of action, *see, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), but specifically, the "[s]tatutory or common law entitlement to be fully compensated through a lawsuit for one's injuries." *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982). Further, Congress did not confer jurisdiction on the bankruptcy court for the "liquidation or estimation of contingent or unliquidated personal injury tort or wrong death claims against the estate…" *See* 28 U.S.C. § 157(b)(2)(B). But the plan effectively authorizes the bankruptcy court to exercise jurisdiction that title 28 expressly disallows. The Disclosure Statement provides no legal justification, nor can it, for expanding the bankruptcy court's jurisdiction to adjudicate personal injury matters under the gate-keeper and injunction provisions.

22.  Lastly, the Disclosure Statement states that creditors that "elect" to opt out of the third-party releases are required "to seek permission from the Bankruptcy Court before [they] are

12

allowed to pursue [their] claims against the Released Parties." Dkt. No. 984, pg. 6. As stated by one court in this district, "for a bankruptcy court to enforce the plan after confirmation and to enjoin a plaintiff from pursuing a claim, two requirements must be met: (1) the bankruptcy court must have jurisdiction to hear the plaintiff's claim under 28 U.S.C. § 1334; and (2) the bankruptcy court's confirmation order must specifically approve the release of the plaintiff's claim." *In re CJ Holding Co.*, 597 B.R. 597, 604 (S.D. Tex. 2019). The Disclosure Statement provides no legal justification for applying the third-party releases, injunction, and gate-keeper provisions to creditors that do not freely and voluntarily consent. Further, the Disclosure Statement does not explain that these infirmities render the plan unconfirmable.

### *The Opt-Out Procedure*

23. The plan deploys a coercive opt-out procedure to attempt to guarantee that largely unrepresented, incarcerated, and unsophisticated creditors will "grant" third-party releases in favor of non-debtors because if they do not, they risk receiving little to no recovery on their claims. The Disclosure Statement and plan provide that "if you choose to opt out, (i) you will forfeit your allocation of (a) the $37,000,000 payment being offered by the Settlement Parties as consideration for the third-party release, and (b) any cash remaining in the ERC fund after payment of priority federal tax claims…"[4] Dkt. No. 984, pg. 3. Under this balloting scheme, the opt-out procedure does not comply with the requisite voluntary "consent" for approval of third-party releases in the Fifth Circuit. Non-debtor releases must be accompanied by the releasing creditor's unambiguous and freely-given consent. *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007).

---

[4] Of course, this statement that the $37 million settlement is being paid as consideration for the third-party release is inaccurate. Rather, the $37 million is being paid *exclusively* to settle the estate's claims against those parties, and not a dime is being paid on account of independent claims creditors may hold against those same parties. The mediation did not include any individual creditors—only the committee that represents the collective interests of unsecured creditors but not the specific and individual interests of the creditors—nor did it need to because only the estate's claims were the subject of the mediation.

The Fifth Circuit concluded in *In re Pac. Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009) that a bankruptcy court may not confirm a plan that provides non-consensual non-debtor releases. *See also In re CJ Holding Co.*, at 608 (S.D. Tex. 2019). But by conditioning payment of the global settlement and the ERC (the estate's primary, and perhaps only, assets of any real value) on the release of numerous non-debtors, the plan employs coercive tactics and gives creditors a "Hobson's choice"—give the release to receive the recovery that the Bankruptcy Code entitles you to without giving a release or opt out, "roll the dice," and forego what you are legally entitled to under the law—no real choice, particularly in the context of the vulnerable creditor body in this case.

24. The plan also purports to provide different treatment to similarly situated creditors within the same class. Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment . . . ." Section 1123(a)(4) implements a fundamental bankruptcy policy of equality of distribution to similarly situated creditors. *Begier v. IRS*, 496 U.S. 53, 58(1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property"). The plan at Art. IV.B.3 provides that "Any Holder of a Claim or Interest who has checked the box on the Ballot or Opt-Out Form to opt out of the Third-Party Release or has objected to the Plan in respect of the release shall be deemed to have forever waived and forfeited its right to its applicable share of the Settlement Payment and any applicable proceeds of the ERC Fund…" Under this opt out procedure, a personal injury creditor in class 5 that elected to opt out of the third-party releases would not receive the same distribution from estate assets as a creditor

in the same class that did not opt out. This proposed treatment violates Section 1123(a)(4) and cannot be approved.

26. Lastly, the Plan Proponents cannot show that Section 1129(a)(7) has been satisfied when implementing the opt-out procedure. Section 1129(a)(7) requires a plan of reorganization to meet the "best interests" test, "which requires that each dissenting creditor receive at least as much as they would in a hypothetical Chapter 7 liquidation of the Debtor." *In re LMR, LLC*, 496 B.R. 410, 440 (Bankr. W.D. Tex. 2013). The Plan Proponents bear the burden of proof on compliance with Section 1129(a)(7) by a preponderance of the evidence.[5] *In re Harborwalk, LP*, 2010 WL 3619911, at *3 (Bankr. S.D. Tex. Sept. 10, 2010).

26. The Disclosure Statement is silent as to why a compromise of the estate's causes of action against third parties, including fraudulent conveyance claims as a result of a divisional merger, would require creditors to grant broad third-party releases to participate in the distribution of the proceeds. Under a hypothetical Chapter 7 liquidation of the Debtor, a trustee would be appointed to marshal assets (the ERC) and prosecute claims (fraudulent conveyances) on behalf of the estate and creditors. In a Chapter 7, creditors—precluded by the Chapter 11 plan from receiving their pro rata share of the estate's global settlement simply for "opting out" of the coercive third-party releases—*would* receive a pro rata share of the estate's recovery against the released parties. Dissenting creditors in this Chapter 7 scenario would not be compelled to grant a gratuitous third-party release to receive their statutorily required share of the estate's proceeds. Under these circumstances, the dissenting creditors would receive more in a hypothetical

---

[5] The Debtor's liquidation analysis, attached as Schedule 1, is insufficient and provides no information of the value of the litigation claims or how the value of these claims may affect a potential distribution in a liquidation. *See* Dkt. No. 984, pg. 49. Dissenting creditors, including those that intend to opt out of the third-party releases, should be provided a full and transparent liquidation analysis showing the value of their claims in a hypothetical Chapter 7 liquidation. The Plan Proponents did not carry their burden with respect to Section 1129(a)(7).

liquidation, and thus, Section 1129(a)(7) is not satisfied, and the Disclosure Statement must be denied.

## CONCLUSION

27. For the reasons discussed in the Objection, the Court should deny approval of the Motion and the Disclosure Statement and grant such other and further relief as it may deem just and proper.

Dated: October 13, 2023,                KEVIN M. EPSTEIN
                                        UNITED STATES TRUSTEE

                                        */s/ Ha Nguyen*
                                        Ha Nguyen, Trial Attorney
                                        California Bar #305411
                                        E-mail: Ha.Nguyen@usdoj.gov
                                        Office: 713-718-4655
                                        Cell: 202-590-7962

                                        */s/ Andrew Jiménez*
                                        Andrew Jiménez, Trial Attorney
                                        District of Columbia Bar 991907
                                        E-mail:Andrew.Jimenez@usdoj.gov
                                        Office: 713-718-4668

                                        United States Department of Justice
                                        Office of the United States Trustee
                                        515 Rusk Street, Suite 3516
                                        Houston, Texas 77002
                                        Facsimile: 713-718-4670

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in this bankruptcy case on October 13, 2023.

                                        */s/ HA M NGUYEN*
                                        Ha M. Nguyen