IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| TEHUM CARE SERVICES, INC. | § § | CASE NO. 4:23-BK-90086 (CML) |
| | § § | CHAPTER 11 |
| Debtor. | § § § | |

### ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION, AND REENTRY'S LIMITED OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT

The Arizona Department of Corrections, Rehabilitation, and Reentry ("**ADCRR**"), by and through undersigned counsel, submits this Limited Objection (this "**Objection**") to *Debtor's Disclosure Statement Regarding Debtor and Official Committee of Unsecured Creditors' Joint Chapter 11 Plan* (the "**Disclosure Statement**") [Docket No. 984]. ADCRR believes that the Court should condition the approval of the Disclosure Statement upon the inclusion of certain information identified below.

**I.     Introduction.**

Between 2013 and 2020, ADCRR had contracted with Tehum's predecessor-in-interest (Corizon) for the medical care of prisoners incarcerated within the Arizona Department of Corrections system. Under the terms of the contracts between the parties, Corizon had indemnified ADCRR for claims against ADCRR arising from Corizon's negligence in connection with the provision of inmate medical services. The Corizon family of companies' divisional merger purported to place those liabilities with the Debtor -- Tehum Care Services, Inc. The assets, i.e., the ongoing business previously supporting the payment of the indemnity obligations went to CHS TX, Inc. and thence to YesCare, Inc. Based on estimates provided by the Debtor and other parties, it appears that the "asset side" (CHS TX/YesCare) of the divisional merger obtained approximately

1

$160 million worth of assets encumbered by approximately $90 million worth of secured debt.

In broad strokes terms, the Debtor's plan proposes the following: First, the Committee and the Debtor have settled potential estate claims related to the divisional merger for $37 million with releases to be conveyed to YesCare, CHS TX, M2 Loan Co., Geneva Consulting, Perigrove, and their owners (many of the owners of these related entities appear to be the same).[1] The settlement proceeds will be paid $25 million on (or before) the effective date, with $12 million due over the following year at $1 million per month. *See* Docket No. 985, p. 20.[2] It is unclear who the payor of the settlement is. Second, the settlement proceeds will be used first to pay the secured creditor (M2 Loan Co.) in full for all post-August 23, 2023 amounts advanced to the Debtor. Next it will be used to pay all remaining administrative expenses. *See id.* (Debtor estimates that the administrative expenses will be approximately $5.3 million by the date of confirmation. *See* Docket No. 984, p. 21.) Following those payments, the Debtor will have to pay priority tax claims of $8.5 million and additional priority claims of $717,000. *See id.*

The remaining funds will fall into two categories: (A) those headed to non-personal injury claimants (class 4); and (B) those headed to personal injury claimants (class 5). Docket No. 985, p. 18. Class 4 consists mainly of vendor claims in the face

---

[1] The released parties are identified in the plan as: "(a) the Settlement Parties; (b) M2 EquityCo, LLC; (c) Valitás Intermediate Holdings Inc.; (d) Valitás Health Services, Inc.; (e) M2 Pharmacorr Equity Holdings, LLC; (f) Pharmacorr/M2 LLC; (g) Pharmacorr Holdings LLC; (h) Endeavor Distribution LLC; (i) CHS Texas LLC; (j) Yes Care Holdings LLC; (k) Sigma RM, LLC; (l) DG Realty Management LLC; (m) Scaracor LLC; (n) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (o) Sara Ann Tirschwell; (p) Ayodeji Olawale Ladele; (q) Beverly Michelle Rice; (r) Jeffrey Scott King; (s) Jennifer Lynee Finger; (t) Frank Jeffrey Sholey; and (u) for each Entity listed in (a) through (t), each of their respective current and former officers, directors, employees, managers, attorneys, professional advisors, and agents; *provided*, *however*, that nothing herein shall release any claims or causes of action of any kind, by any Entity, against James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks." *See* Docket No. 985 p. 21.

[2] Unless otherwise noted all page references are to the electronically stamped page-number placed by the Court.

amount of $110 million, while Class 5 consists of inmate claims arising from wrongful death or medical negligence in the face amount of $1.087 billion. *See* Docket No. 984, p. 21. Class 4 claims will be paid from the Liquidation Trust and Class 5 will be paid from the Personal Injury Trust.[3] Docket No. 985, p. 18.

The Debtor estimates that the Liquidation Trust assets, which will consist of all the Debtor's assets but the Personal Injury Trust assets, should amount to between $25 million and $40 million. Docket 984, p. 116. These funds will pay approximately $14 million in administrative and priority claims (dollar for dollar) and $110 million of Class 4 "vendor-type" claims (on a pro rata basis). *See id* at pp. 116-117. The Personal Injury Trust assets will consist of the proceeds from certain insurance policies and should amount to between $9 million and $20 million. These funds will be used to pay the approved portion of $1.087 billion of claims (on a pro rata basis).[4]

The Debtor asserts that such a recovery for the personal injury claimants will be in the range of 17-36% of their Allowed Claims. Of course, this is not mathematically possible given the face amount of the filed Personal injury claims. But the Disclosure Statement indicates that, "the Debtor and Committee anticipate that those claim amounts will be reduced as the amounts of Allowed Claims are determined by the claims administration process described below." Docket No. 984, p. 4. Unfortunately, no analysis is provided to support the range of recoveries that the Debtor and the Committee anticipate. Further, the plan makes clear that: (a) no payments will be made on contingent indemnification claims, *see* Docket #985, p. 19; and (b) that "recoveries from non-Debtor co-defendants or their insurers," will make up a portion of the 17-36% anticipated recovery for Personal Injury Claims. *See* Docket #984, p. 4. The proposed

---

[3] Unless expressly defined in this Objection, capitalized terms have the meaning given to them in the Disclosure Statement and Plan.
[4] Both trust agreements afford Class 4 and Class 5 claimants an opportunity to take a $5,000 payment (dollar for dollar) in exchange for the full value of their claim.

plan therefore incentivizes ADCRR to work to obtain the largest possible recovery for Personal Injury Claims.

ADCRR does not intend this as a criticism of the plan. The Debtor and the Committee have done a lot of work attempting to balance many competing interests and fit a number of compromises within the ambit of Section 1129. That said, before ADCRR can support such a plan it needs certain information to refine its understanding of the outcomes inherent in the structure of the proposed plan. That information includes:

(1) The face amounts of the various insurance policies and the Debtor's understanding of the amounts remaining on those policies. Creditors need this information to understand what is in the "pool" of available assets being used to pay Personal Injury Claims and what individual Personal Injury Claimants might receive.

(2) The analysis the Debtor and the Committee relied upon to support their reduction of $1.087 billion worth of Personal Injury Claims to "Allowed" personal injury claims of "between $25 million and $50 million." Docket 984, p. 21. This information is necessary for ADCRR to understand the amounts of the recoveries that will be available to Personal Injury Claimants and ADCRR's exposure relative thereto.

(3) An exemplar of the opt-out form for the review of all parties. Without such information, the creditors will not understand exactly what they are opting into (or out of).

(4) The calculation of the amount of money that M2 LoanCo paid to the Debtor's creditors and the Debtor and the Committee's evaluation of the collectability of the released parties. This will allow the parties to evaluate whether the proposed settlement and proposed releases are appropriate.

(5) The payors of the settlement by releasee and amount. This will allow creditors to know whether individual non-debtor parties will obtain a release for little or no consideration.

(6) The value of any claims to be released under the settlement. This will allow the parties to evaluate whether the proposed settlement and proposed releases are appropriate.

## II.     Debtor's Disclosure Statement Lacks Adequate Information.

Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired claims and interests entitled to vote on the plan. 11 U.S.C. § 1125. Specifically, section 1125(a)(1) of the Bankruptcy Code provides, in relevant part, as follows:

> '[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the Plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the Holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the Plan.'

11 U.S.C. § 1125(a)(1): *In re Matter of Cajun Electric Power*, 150 F.3d 503, 518 (5th Cir. 1998)

The primary purpose of a disclosure statement is to provide all material information that creditors and interest holders affected by a proposed plan need to make an informed decision regarding whether to vote for the plan. *See, e.g., Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an

intelligent decision whether to vote for or against the plan."). Congress intended that such informed judgments would be needed to both negotiate the terms of, and vote on, a plan of reorganization. *Century Glove, Inc.*, 860 F.2d at 100.

"Adequate information" is a flexible standard, based on the facts and circumstances of each case. 11 U.S.C. § 1125(a)(1) ("adequate information means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"). Determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.").

In making a determination as to whether a disclosure statement contains adequate information, courts often draw from the oft-cited *In re Metrocraft Publishing Services, Inc.*, to require disclosures related to following topics:

1. the events which led to the filing of a bankruptcy petition;
2. **a description of the available assets and their value**;
3. the anticipated future of the company;
4. the source of information stated in the disclosure statement;
5. a disclaimer;
6. the present condition of the debtor while in Chapter 11;
7. the scheduled claims;
8. **the estimated return to creditors under a Chapter 7 liquidation;**
9. the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
10. the future management of the debtor;

11. the Chapter 11 plan or a summary thereof;

12. the estimated administrative expenses, including attorneys' and accountants' fees;

13. the collectability of accounts receivable;

**14. financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;**

15. information relevant to the risks posed to creditors under the Chapter 11 plan;

**16. the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;**

17. litigation likely to arise in a non-bankruptcy context;

18. tax attributes of the debtor; and

19. the relationship of the debtor with the affiliates.

*In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401–02 (Bankr. S.D. Tex. 2016) (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)) (emphasis added). The goal is to provide creditors with information that is sufficient to allow them to make an informed decision about the plan. *See id.* (citing *Texas Extrusion*, 844 F.2d at 1147). In deciding what is necessary the Court may consider the complexity of the case and weigh the benefits of providing the additional information against the costs of providing such information. *See id.* at 400-401 (citing *Texas Extrusion*, 844 F.2d at 1147 and 7 COLLIER ON BANKRUPTCY, ¶ 1125.01 (15th ed. 2015)). Debtor's Disclosure Statement does not provide "adequate information" to support approval of its Plan under the Fifth Circuit standard.

    **a. Amount of Remaining Insurance Coverage Must Be Disclosed.**

Given that over half of any settlement funds will go to the Non-Personal-Injury unsecured creditors, the key factor in estimating the recovery to Personal Injury claimants is the anticipated recovery from the Debtor's insurance policies. *See* Docket No. 984, p. 4., ("The Debtor and the Committee Estimates that Holders of Personal Injury Claims could receive 17% to 36% of their Allowed Claims"). In order to understand and

7

evaluate proponents' estimate, a creditor must be informed concerning the various policies available to the Debtor, corresponding policy limits under the Debtor's insurance policies and the amount of coverage remaining under self-consuming policies.

Further, creditors need to understand whether insurance coverage may differ by jurisdiction. For example, policies covering incidents in one state may be nearly depleted while policies covering other jurisdictions remain flush. Under the Personal Injury Trust Agreement, recoveries from insurers are pooled. *See*, Docket 984, p. 32. The pooled assets are then broken down into sub-trusts under the Personal Injury Trust. *See* Docket 984, pp. 137-38. Naturally this pooling and segregating of recoveries from various policies will benefit some claimants while working to the detriment of other claimants. Each individual creditor, including ADCRR, is entitled to understand any disparity in coverage between policies when deciding whether or not to vote in favor of the Plan.

Unfortunately, the Disclosure Statement contains no discussion of the Debtor's insurance policies, the carriers involved, policy limits for each policy, any estimate of recovery from the policies or coverage remaining under the policies. Without this information, the opacity of proponents' estimate is virtually impenetrable. Nor is it the case that the Debtor does not have access to this information. It filed a list of policies, by carrier and policy number, with its bankruptcy schedules on April 28, 2023. *See* Docket 481, pp. 37-41 (as electronically stamped). Doubtless, the Debtor's understanding of the limits of these policies – and the amounts remaining in each policy (per the insurer) – have increased since the case began. More importantly, such information is vital for Personal Injury Claimants and creditors like ADCRR, who need to understand the value of such assets to make an informed vote about the Plan.

ADCRR requests that the Disclosure Statement be supplemented with a schedule listing each of the Debtor's insurance policies for each jurisdiction, the policy limits of each policy and the amount of coverage remaining under each policy. Further, and to the

extent that the Debtor can do so, it should indicate which sub-trust each policy will be placed in.

### b. Debtor Must Disclose the Basis for Estimating its Dramatic Reduction in Personal Injury Claims.

After acknowledging that proofs of claims supporting Personal Injury Claims total $1.087 billion, the Debtor advances the unsupported statement that "Personal Injury Claims will range between $25 million and $50 million." Docket No. 984, p. 21. The estimated reduction from $1.087 billion to a mere $25 to $50 million – a reduction of over 95% -- is neither explained nor supported.

The dramatic and seemingly arbitrary reduction is not simply academic. The unsupported reduction acts as both: (i) a justification for allocation of the lion's share of settlement funds to other claimants; and (ii) is one of two key variables in estimating recovery for Personal Injury claimants (the other being the amounts available under the policies). If the Debtor's unsupported prediction proves inaccurate, the estimated return to an individual personal injury claimant could be slashed by Four Thousand Percent (4000%). The Debtor's basis supporting the estimated reduction in Personal Injury Claims is crucial information that creditors must understand in determining whether to vote in favor of the Plan.

### c. The Debtor Must Disclose the Opt-Out Form.

The Disclosure Statement provides that the Opt-Out Form accompanies the Disclosure Statement. *See* Docket No. 984, p. 13. To date, the Opt-Out Form has not been provided. The Debtor must disclose the Opt-Out Form. ADCRR specifically reserves all arguments relevant to the Opt-Out procedures.

### d. Details of LoanCo Payments Must Be Disclosed.

The Disclosure Statement recites that: "LoanCo asserts that is caused over $39 million to be paid to Debtor's creditors". *See* Docket No. 984, p. 17. The sum of payments made (or not made) to Debtor's creditors is a verifiable number and should not

9

be couched as an "assertion." If the Debtor wishes to lend credibility to M2 LoanCo by including such a statement in the Disclosure Statement, the Debtor must support the assertion with disclosure of the accounting of verified payments. Without such verified disclosure, the assertion in the context of the Disclosure Statement could be misleading and improper. At any rate, there is no reason for the Disclosure Statement to invite speculation when the facts are known or readily verifiable. The Court should require the Debtor to provide a verified schedule of payments. Without such a verification, the Court cannot be confident that the information provided is accurate.

### e. The Debtor Must Disclose the Consideration Provided by Each of the Released Parties.

In order to evaluate the propriety of each release granted under the Plan, creditors must understand the consideration provided by each recipient receiving a release. In the context of the Global Settlement, the Disclosure Statement describes the releases granted to the Settlement Parties in exchange for the Settlement Payment. *See* Docket No. 984, p. 20. However, in addition to the Settlement Parties, numerous entities and individuals are receiving releases under the Plan.[5] *Id*. This is very troubling because although the Settlement Parties provided some consideration in exchange for their release, it is unclear whether many of the Released Parties provided any consideration whatsoever.

The Disclosure Statement provides no description of why these additional parties are receiving releases and there is no indication that any such entity or individual has or will provide any value to the estate in exchange for the release. Of particular concern are the releases offered individual insiders such as Mr. Lefkowitz. There is no disclosure of any consideration provided by Mr. Lefkowitz that would justify any release. If the Debtor intends to release such third-party insiders, it is incumbent upon the Debtor to

---

[5] ADCRR has no issue with the proposed releases in favor of approved professionals and committee members as listed as parties (a) though (e) of the definition of Released Parties.

disclose any consideration personally contributed to the estate by each released third-party insider and to justify why such a release is in the best interest of the creditors.

It appears that the Debtor is attempting to delay any such discloser until the confirmation trial.  *See* Docket No. 984, pp. 26-27.  ("The Proponents will be prepared to meet their burden to establish the basis for the releases . . . as part of confirmation of the Plan").  Such tactics should be unacceptable.  In determining how to vote on the Plan, the creditors are entitled to disclosure, including disclosure which will allow each creditor to determine whether they support the releases granted under the Plan.  If a release is being granted for no, or very little separate consideration, that is a fact each creditor is entitled know before casting its vote on the Plan.

For the avoidance of all doubt, ADCRR and the State of Arizona reserves all rights.  Neither ADCRR nor the State of Arizona intend to release any third-party pursuant to the Plan.

### f. The Proponents Must Disclose the Approximate Value of the Released Causes of Action.

The Plan releases nineteen separate third-party (non-bankruptcy professional) entities and individuals and an unknown number of such Released Parties' officers, directors, managers, agents, and advisors.  These Released Parties are specifically released from all Causes of Action held by the Debtor including Avoidance Actions.  Docket No. 984, p.27.  Although the Proponents acknowledge that the bankruptcy estate holds valuable Causes of Action including Avoidance Actions against these third-party Released Parties, the Debtor fails to include any discussion regarding the size or approximate value of the released Causes of Action.

In *Metrocraft* the court denied confirmation of the debtor's disclosure statement because the debtor failed to include critical financial information including the projected realizable value of voidable transfers and litigation claims against former principals.  *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 570-571 (Bankr. N.D. Ga. 1984).  Even

Case 23-90086   Document 1024   Filed in TXSB on 10/13/23   Page 12 of 13

where a precise valuation may be difficult, the *Metrocraft* court counsels that "the debtor is not excused from discussing the amount of preferences in approximate terms". *Id.* The value of the released Causes of Action is critical financial information for a creditor's decision regarding whether or not to vote for the Plan. *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 406 (Bankr. S.D. Tex. 2016) (holding that the lack of information concerning the value of estate assets failed to satisfy the *Metrocraft* factors). The financial disclosures are inadequate and the Disclosure Statement should be denied.

*******

ADCRR believes that the need for the foregoing information to properly evaluate the proposed plan. In addition, virtually all of this information should be readily available to the Debtor and the Committee. The Debtor knows (or should know) the value of the remaining insurance policies. The Debtor knows or should know the value of the released claims, the value to be provided by settlement payors, and the actual amount paid by M2 LoanCo. to the Debtor's creditors. Similarly, the Debtor and the Committee must have some analysis to support a 95% reduction in the face value of the Personal Injury Claims. Access to these data points will permit ADCRR and other creditors to make an informed decision about the plan. And, because such information should be readily available to the Debtor, it should not impose any significant burden on the estate

### III.  Reservation of Rights.

Please take further notice that neither this Objection, any subsequent appearance (by pleading or otherwise), nor any participation in or in connection with this case is intended to waive (i) the right to have final orders in non-core matters entered only after de novo review by a District Court Judge, (ii) the right to trial by jury in any case, controversy, or proceeding, (iii) the right to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, and (iv) any other

rights, claims, actions, defenses, setoffs or recoupments to which the ADCRR is, or may be entitled, under agreements, in law or in equity, are expressly reserved.

## IV. Conclusion.

For the foregoing reasons, ADCRR respectfully requests that the Court condition the approval of the Disclosure Statement upon the inclusion of the information sought above. ADCRR requests any other relief that the Court deems appropriate.

DATED this 13th day of October 2023.

**OSBORN MALEDON, PA**

By:  /s/ Warren J. Stapleton
Warren J. Stapleton
Christopher C. Simpson
2929 North Central Avenue
Suite 2100
Phoenix, Arizona 85012
Telephone: 602.640.9000
Facsimile: 602.640.9050
Email: wstapleton@omlaw.com
Email: csimpson@omlaw.com

*Counsel for the Arizona Department of Corrections, Rehabilitation, and Reentry*

## Certificate of Service

I hereby certify that on October 13, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Peggy Nieto