**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Tehum Care Services, Inc.,[1] | ) | |
| | ) | Case No. 23-90086 (CML) |
| Debtor. | ) | |

**WILLIAM KELLY, DERICO THOMPSON, AND KOHCHISE JACKSON'S OBJECTION TO JOINT EMERGENCY MOTION FOR AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

**Preliminary Statement**

1.      This is a liquidating Chapter 11 plan of reorganization.  But there are no assets to be liquidated. The only assets (except for certain tax credits likely to be offset by the IRS' claim) are avoidance actions against insiders. One of those insiders, YesCare Corp., purchased the Debtor's entire operating business on May 5, 2022, free of its debts to the creditors in this case, for only $100. (Adv. Case No. 23-03049, Document 37-7). As discussed *infra*, based on the information that has been made available to date, that business was likely worth approximately $173 million to $245 million at the time of this transfer. In addition to receiving the equity in the operating business, Yescare Corp. also acquired approximately $19.9 million in cash from the insolvent Debtor via the May 5th divisional merger transaction.

2.      While the plan proponents admit that a disclosure statement should typically reveal, "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers," (Docket

---

1   The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

986, pg. 11, ¶ 20),  the Disclosure Statement contains no information about the value of the operating business that was transferred to Yescare in the divisional merger. Nor does it even inform creditors of Yescare's receipt of nearly $20 million in cash.

3.      Following a three-day mediation conducted August 21st-23rd by the Honorable David R. Jones, the Debtor and the Committee agreed to settle all of the Debtor's claims against all of the insiders, including Yescare, for $37 million. On October 7, 2023, Judge Jones reportedly told the Wall St. Journal that he was, and is, in a romantic relationship with Yescare's attorney in this case, Elizabeth Carol Freeman. (Ex. 1). Property records show that since 2017, Judge Jones and Ms. Freeman have been co-owners of a single-family home in Houston, as joint-tenants with rights of survivorship. (Ex. 2; Ex. 3).

4.      Creditors have not been informed that Yescare's lawyer and the mediator who presided over the negotiation of the global settlement in this case share a household and are involved in an intimate relationship. Had they been so informed, many creditors likely would have objected to the appointment of Judge Jones as mediator. (Docket 602). The Debtor and the Committee should not necessarily be blamed for the omission as there is no evidence that they were aware of the relationship at the time they filed the Disclosure Statement. But the relationship nevertheless raises reasonable doubts as to the fairness of the mediation process and whether the settlement produced in the global mediation maximized the value of the Debtor's claims against Yescare. At a minimum, Creditors should be informed of the relationship between Yescare's lawyer and the mediator, and whether that relationship was known to the Committee or to the Debtor during the mediation process.

5.      In addition to withholding information from creditors about the potential value of most of the avoidance actions they intend to settle, the plan proponents have created a Hobson's choice for those creditors considering opting out of the 3rd-party releases. They did so by combining abusive gatekeeping provisions with a plan-confirmation timeline that requires creditors to decide whether to

opt-out before the date the proponents chose for challenges to the gatekeeping provisions to be adjudicated, January 8, 2024.

6.      In order for a creditor who opts-out to pursue a claim against a non-debtor insider, the plan requires the creditor to first **post a bond to pay the non-debtor insider's defense costs** in the event the claim is unsuccessful. (Docket 985, pg. 34). The plan proponents know, of course, that few creditors can afford to do this. That is the point. The plan proponents seek to create 3rd-party releases that appear consensual, while erecting as many impediments as possible for creditors to actually pursue their claims against non-debtor insiders. The plan proponents do so even though creditors who choose to opt-out *benefit the estate under the plan* by forfeiting their right to a share of the Estate's primary assets. (Docket 985, pg. 21, ¶ 3). The Debtor and Committee have no legitimate basis for discouraging opt-outs through these gatekeeping provisions, when every opt-out improves creditor recoveries from either the Liquidation Trust or the Personal Injury Trust.

7.      Why did the plan proponents include a clause which harms the estate by discouraging creditors from opting-out? Probably because "the clause is part of their bargain because without the clause [none of the insiders] would have been willing to provide the plan's financing." *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009). In other words, the Settlement Payment is consideration not only for granting releases of estate claims, but also for impeding third parties who may want to prosecute claims that are not estate property.

8.      Just as the Debtor may not sell releases of claims that it does not own, it may not sell the protection of onerous gatekeeping provisions to non-debtors who have nothing to do with the administration of the estate. When used in this way, the gatekeeping provisions serve the same function as prohibited third-party releases and render the proposed plan unconfirmable.

9.      In addition to deficiencies in the disclosure statement, in the mediation process, and in the plan itself, special attention must be paid to the voting procedures in this case. Unlike most complex Chapter 11s, many of the creditors in this case are unsophisticated individuals, with low levels of educational attainment and literacy, who either served or are presently serving time in prison. While some of these personal-injury claimants are represented by counsel, many are not. Those who are currently incarcerated have no way to ensure that either their ballots or their responses to the Debtor's objections to their claims will reach the Court or the Solicitation Agent in a timely manner. *See, e.g. Houston v. Lack,* 487 U.S. 266, 271 (1988).

10.     Given the circumstances of the unrepresented Class 5 creditors in this case, it is a near certainty that a large number of ballots will be unsigned, filled-out incorrectly, arrive late, or be mailed to the Court or to Debtor's counsel rather than to the Solicitation Agent. The proposed voting procedures will allow the proponents of the plan to use this unusually-large number of irregular ballots to effectively game the voting process in their favor. Several provisions in the plan grant the proponents the right to selectively enforce the voting procedures, waiving defects for "Yes" votes, while strictly enforcing the proposed rules to disqualify "No" ballots with similar defects.

11.     The plan proponents seek to grant themselves the authority to "waive any defects or irregularities as to any particular Ballot at any time, either before or after the close of voting." (Docket 986, pg. 14, ¶ 24). The voting procedures also allow the plan proponents to selectively count the untimely votes. The proposed Class 5 ballot provides, "[i]f a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Proponents." (Docket 986-1 pg. 41, ¶ 7). In a typical case, where the major creditors are sophisticated entities represented by counsel, these provisions would not necessarily be objectionable. But they create an opportunity for abuse in light of the nature of the Class 5 creditors entitled to vote in this case.

<u>ARGUMENT</u>

12.     Under § 1125(b) of the Bankruptcy Code, a disclosure statement must contain "adequate information" before the Debtors may solicit acceptance of a plan of reorganization or liquidation. 11 U.S.C. § 1125(b). "Adequate information" is defined as being information of a kind, and in sufficient detail to the extent reasonably practicable in light of the nature and history of the debtor, to enable a hypothetically reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about a proposed chapter 11 plan of reorganization. See 11 U.S.C. § 1125(a)(1).

13.     Factors courts consider in determining whether a disclosure statement contains adequate information under section 1125(b) of the Bankruptcy Code include: (i) the type and amount of financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan and (ii) information relevant to the risks posed to creditors under the plan. *See, e.g., In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401 (Bankr. S.D. Tex. 2016) (adopting as a non-exhaustive list the factors set forth in *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)). A disclosure statement does not contain adequate information if it deprives objecting creditors of information that they may use to persuade others to vote against the proposed plan. *In re Perez*, 30 F.3d 1209, 1217 (9th Cir. 1994).

14.     Section 1125 also serves to prevent creditors from receiving misleading or false information. *See In re Applegate Prop., Ltd.*, 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991) (holding that "disclosure statements which are misleading, or which contain unexplained inconsistencies, should not be approved"); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 600 (Bankr. S.D.N.Y. 2006), clarified on denial of reconsideration, No. 02-41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) (determining that "an adequate disclosure determination requires a bankruptcy court to find not just that

there is enough information there, but also that what is said is not misleading"); *In re M.E.S., Inc.*, 148 B.R. 1, 2 (D.P.R. 1992) (concluding that "[w]e find that the bankruptcy judge properly exercised her discretion not to approve the unopposed disclosure statement, as she had more than enough reason to believe that the statement contained serious inaccuracies"). As discussed in greater detail below, the Disclosure Statement clearly contains inadequate information for purposes of section 1125(b).

15.     A disclosure statement that describes a patently unconfirmable plan—as the Disclosure Statement here does relative to the Proposed Plan—should not be approved. Pursuing solicitation on a patently unconfirmable plan is "an exercise in futility [that] only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988). Accordingly, if a debtor seeks approval of a disclosure statement for "a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." *Eastern Maine Elec. Co-op.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also, In re Am. Capital Equip.*, LLC, 688 F.3d 145, 148 (3d Cir. 2012) (holding that a bankruptcy court can determine at the disclosure statement stage that a chapter 11 plan is unconfirmable); *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation"); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (declining to approve a disclosure statement for an unconfirmable plan). Thus, it has been observed that "a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed." *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997).

16.     Here, for the reasons described below and those described in the Objection of the United States Trustee (Docket 1022) which these Objectors hereby join in and adopt as their own, the Disclosure

Statement both describes a patently unconfirmable plan and fails to provide adequate information for the proposed plan. The Joint Motion, therefore, must be denied in its entirety.

### I. The Disclosure Statement lacks any information about the potential value of the avoidance actions stemming from the Divisional Merger

17.     In order for creditors to make an informed decision about whether settling the Debtor's causes of action against insiders for $37 million is a good deal, they need to know the potential value of the released claims. The released claims can be divided into two categories: 1) avoidance actions arising from the May 5, 2022 divisional-merger transaction itself, and 2) avoidance actions relating to transfers that occurred outside of the divisional merger transaction. While the disclosure statement provides some information about the value of the second category of claims, (Document 984 Filed in TXSB on 09/29/23 Page 16 of 150), it lacks sufficient information, or any information, about the first category. Indeed, the claims with the highest potential value by far are those that relate to the transfers that occurred on or about May 5, 2022, in the divisional merger and related transactions.

18.     On May 5, 2022, all of the Debtor's bank accounts at Bank of America and all of the cash they contained[2], which totaled $17,616,352.98, as well as the Debtor's entire operating business, were transferred to a statutory insider[3] via a divisional-merger. That statutory insider, CHS TX, Inc., d/b/a "YesCare," was simultaneously purchased by another insider, Yescare Corp., for only $100. (Adv. Case No. 23-03049, Document 37-7). Yescare also received all of the cash in the Debtor's bank account at Signature Bank, Account No. 1504369087, less one million dollars that was left behind for the Debtor.[4]

---

2   *See* Second Amended SOFA, Document 811, pg. 25, ¶¶ 6-7; Document 677, pg. 221; Document 854-1, pg. 55.
3   That insider is CHS TX, Inc., d/b/a "YesCare," which at the time of the divisional merger was a wholly-owned subsidiary of the Debtor's parent company, Valitas Intermediate Holdings, Inc. *See, e.g., Kelly v. Corizon Health, Inc.,* 2022 U.S. Dist. LEXIS 198725 at *32 (E.D. Mich. 2022); 11 U.S.C. § 101(31)(E); 11 U.S.C. § 101(2)(B).

4   *See* Second Amended SOFA, Document 811, pg. 25, ¶ 6.

In order to reduce the balance of its '9087 account at Signature Bank to $1.0 million, the Debtor transferred an additional $2,312,583.00 to Yescare on or about May 1, 2022. (Docket 911-12, pg. 2).

19.     According to the Debtor, the consideration it received in exchange for giving up its entire business and $19,928,935.98 in cash consisted of: 1) CHS TX, Inc.'s assumption of "nearly $100 million" of the Debtor's purported secured debt to yet another statutory insider, M2 LoanCo, and 2) $15 million of funding from M2 LoanCo to pay liabilities. (Document 7, pg. 25, ¶ 10). The Debtor admits that it was insolvent at the time of this transaction. (Document 7, pg. 23, ¶¶ 5, 6).

20.     To understand the potential value of avoidance actions arising from the divisional merger itself, the creditors need the following information:

> a) What was the approximate value of the Debtor's operating business at the time of the divisional merger transaction?

> b) How much cash was moved to CHS TX, Inc. in the divisional merger transaction?

> c) What does M2 LoanCo claim it was owed as a secured creditor on May 5, 2022?

> d) How collectable are the released parties? Or in other words, what is the value of the operating business today?

> e) Is the secured debt purportedly owed to M2 LoanCo even a bona-fide debt obligation?

21.     The disclosure statement does not tell creditors that YesCare received bank accounts containing $17.6 million in cash from the Debtor on the date of the divisional merger. Nor does it tell creditors that YesCare received an additional $2.3 million from the Corizon Signature Account as part of the transaction. But the proposed disclosure statement does contain useful information about whether the purported secured debt to another insider, M2 LoanCo, that CHS TX, Inc./Yescare Corp. assumed in return for the Debtor's cash and assets is a bona-fide debt obligation. On that subject, the disclosure statement says:

"The Debtor contends that the loans were originated by other lenders in 2017 and acquired by LoanCo in or around June 2020. LoanCo is an affiliate of the Debtor by common ownership. ***The Committee disputes that this purported lender-borrower relationship was genuine and believes that the purported debt obligation was canceled and/or converted to equity by the actions, transactions, course of dealing, tax filings, and statements of the Debtor and LoanCo.*** When Perigrove 1018 acquired HoldCo, it also acquired LoanCo."

Docket 984, pg. 15 of 150 (emphasis added).

Assume for the sake of argument that the Committee's belief, informed by its investigation, is correct, and "the purported debt obligation was canceled and/or converted to equity[.]" If that is true, then the only consideration that the Debtor received in exchange for giving up both an operating business, and $19.9 million in cash, was a right to receive $15 million in cash through a funding agreement.

22.     A contractual right to receive $15 million cannot constitute reasonably-equivalent value for bank accounts containing $17.6 million, an additional payment of $2.3 million, *and* the Debtor's entire operating business. So the Debtor has a colorable avoidance action stemming from the divisional merger itself. In order to have any idea what this cause of action is worth, creditors need to know what the operating business is worth. The disclosure statement does not provide that information.

23.     In previous briefing, the Committee has asserted that "YesCare is estimated to have over $173 million in assets[.]" (Docket 360, pg. 4, ¶ 14). The Committee appears to have obtained this number from a brief filed by The Curators of the University of Missouri on January 20, 2023. Specifically, the Curators represented, "[b]ased on recently-produced financials, YesCare and CHS TX have over $173 million in assets." In support, they cited, "**Ex. 95**, YesCare Corp and Subsidiaries Balance Sheet." (Main Case Docket 75-3, pg. 35 of 39). The creditors in this case cannot see the balance sheet; it was filed in the Missouri state case under seal and was not filed on PACER with the removal papers. But the Committee subpoenaed it from the Curators, (Docket 522), so they should have access to the document.

24.     Other available information suggests that $173 million is a reasonable valuation of the operating business on the date of the divisional merger. The Debtor reported revenue for calendar year 2022 of $102,790,494.00. (Docket 811, pg. 183 of 225). The Debtor transferred its business to CHS TX/YesCare on May 5, 2022, so this $102-million figure represents only 124 days of operations. If we annualize the revenue reported in the SOFAs for the first four months of 2022, we reach an estimate of $302,568,792.82 for the annual revenue of the operating business. This comports with an affidavit reportedly signed by the CFO of the Debtor/YesCare, Jeff Sholey, some time prior to January 20, 2023. In his affidavit, Mr. Sholey reportedly asserted[5] that "CHS TX and YesCare generate in excess of $300 million in revenue on 'an annual basis.'" (Document 75-3, pg. 36 of 39). Mr. Sholey also stated that YesCare had negotiated a new state Department of Corrections contract, "set to begin in the second quarter of 2023, which Defendants anticipate will bring in 'in excess of $1 billion' in revenue." *Id.*

25.     Valuations of businesses are typically based on profits, not revenue. YesCare's its bid for a contract with the Florida Department of Corrections, submitted on July 13, 2022,  provides a useful benchmark for estimating the gross profit margin in its business. Florida's DOC requested bids on a "cost-plus" basis, as follows:

> The Department intends to reimburse the Vendor for actual direct costs associated with the provision of health care to its Inmates. In addition, the Department intends to pay the Vendor an administrative fee as a percentage of the actual direct costs the vendor incurs. The administrative fee must be inclusive of the Vendor's indirect costs (those costs not relating to the provision of healthcare to a particular Inmate) as well as any vendor profit.

26.     YesCare's bid was 9.9%. (Ex. 4- Price Information Sheet). We know this was an aggressive bid, because the Debtor's (and YesCare's) CEO, Sara Tirschwell, sent an email to a group of other Debtor executives regarding the upcoming bid for the Florida DOC contract. She said, "Sounds like Perigrove

---

5    Like the Yescare Corp. and Subsidiaries Balance Sheet, this affidavit was filed under seal in the Missouri state case and was not included in the removal papers. The Committee has access to it, but the creditors do not.

wants Florida. Be aggressive in your business plan please." (Ex. 5- Tirschwell email to Mike Murphy, Dana Bell, and Steve Tomlin).

27.     We also know that 9.9% may be an understatement of the profit margin that the principals of the Debtor/YesCare would have achieved had they won the Florida DOC contract. That is because many of the "actual direct costs" to be reimbursed by Florida taxpayers would consist of payments to affiliated subcontractors that are owned by the same principals that own YesCare. For example, in its Technical Proposal for the Florida contract, YesCare indicated that it would source pharmaceuticals for Florida's inmates from Pharmacorr, an affiliate. (Ex. 6- Florida Technical Proposal, PDF pg. 241 of 349). For hourly labor, which YesCare describes as "our most expensive and most valuable resource in any of our contracts[,]" (Ex. 6, PDF pg. 295 of 349), YesCare intended to use three temp staffing agencies also owned by insiders: United Staffing Solutions, Access Therapies, and CareerStaff Unlimited. (Ex. 6, PDF pg. 332-333 of 349).

28.     What about YesCare's "indirect costs" that must be covered by the 9.9% administrative fee, such as management, back-office, and administrative support services? We actually know how much these services cost, because YesCare contracted them out to Geneva Consulting, yet another entity under common ownership. (Ex. 6, pg. 23 of 349). We have a copy of the YesCare-Geneva management services contract and we can see how much Geneva is charging. (Docket 911-20, pg. 81 of 91). The fee[6] is $15 per-prisoner, per-month, with a monthly minimum of $500,000. *Id*. In a press release issued on May 16, 2022, eleven days after the divisional merger, YesCare represented that the number of prisoners in its contracted facilities was approximately 50,000.[7] This means that the contracted

---

6     This management fee is likely inflated, given the many other terms in the MSA contract that are almost comically favorable to Geneva. *See, e.g.* Docket 911-20, pp. 32-33 of 91, ¶¶ 6.5, 6.5.3, 6.5.6, 6.5.12; pp. 25-26 of 91, ¶¶ 2.4, 2.6, 2.7, 2.7.1, 2.7.2.

7     "Leading Healthcare Group Forms Yescare, Debuting New Vision and Leadership." Businesswire, May 16, 2022. https://www.businesswire.com/news/home/20220516005378/en/Leading-Healthcare-Group-Forms-YesCare-Debuting-New-Vision-and-Leadership

management fee at the time of the transaction was approximately $750,000 per month, or $9 million per year.

29.     With reasonable estimates for annual revenue ($302,568,792.82),  gross profit margin (9.9%), and annual management, back-office, and administrative-support overhead ($9 million), it is possible to reach a reasonable estimate of the EBITDA of the operating business at the time of the divisional merger:

> $302,568,792.82 (revenue) x 0.099 (gross margin) - $9,000,000 (management, back-office, and administrative-support overhead) = $20.95 million.

30.     According to an M&A trade publication, middle-market privately-owned companies in the healthcare sector traded at an average multiple of around 11.7 times EBITDA in 2022, while the average multiple across all industries was 10.4. (Ex. 7). At a multiple of 11.7, the Debtor's operating business would be worth approximately $245 million. At a 10.4 multiple, the equity value would be $218 million. The book value cited by the Committee at Docket 360 ($173 million) implies a multiple of approximately 8.25; significantly lower than the 2022 average for similar-sized companies, but within the realm of reasonable valuations.

31.     The Committee and the Debtor may have different estimates of the value of the Debtor's operating business on the divisional merger date. Whatever their valuation is, they need to disclose it to creditors and explain how it was computed. As currently proposed, the disclosure statement provides no information at all about the value of the assets that Yescare/CHS TX took from the Debtor in the divisional merger transaction.


**II. The Disclosure Statement provides misleading and contradictory information about the Debtor's potential avoidance actions arising from transfers unrelated to the divisional-merger transaction**

32.     In its Second Amended SOFA, (Docket 811, pg. 220) the Debtor reported making cash transfers to the following affiliates in the following total amounts in the two years prior to the petition date:

| Affiliate | Total Two-Year Payments |
|---|---|
| M2 LoanCo | $34,538,155.19 |
| Perigrove | $6,000,000.00 |
| DG Realty | $7,500,000.00 |
| Pharmacorr | $300,000.00 |

The Disclosure Statement also reveals an additional $5.5 million in two-year payments to yet another insider, Geneva Consulting LLC, that were never disclosed in the Debtor's SOFA. (Docket 984, pg. 15 of 150). There is probably a viable fraudulent-transfer claim arising from the Geneva payments, given the apparent control of Geneva by insiders, Geneva's admission that the Debtor was insolvent at the time of the payments, and the vague nature of the services Geneva supposedly provided.[8] The Perigrove payments ($6 million), the Pharmacorr payment ($300,000), and approximately $11.6 million of the M2 LoanCo payments were made within one year of the petition date. The disclosure statement provides the following explanation regarding the cash transfers to some of these affiliates:

> Between December 2021 and November 2022, the Debtor transferred approximately $24.5 million from the Signature Accounts to LoanCo. LoanCo has disputed this amount. During the same period, the Debtor made additional transfers to Perigrove, DG Realty Management LLC and PharmaCorr LLC, entities also affiliated with Perigrove. However, the Debtor received subsequent transfers in the same amounts of the outgoing transfers that were made to these entities.

> Docket 984, page 16.

The Disclosure Statement thus "contain[s] unexplained inconsistencies," *In re Applegate Prop., Ltd.*, 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991), and should not be approved. First, the Disclosure Statement mentions only $24.5 million in transfers to M2 LoanCo between December 2021 and

---

8    See Docket 911-19 (Consulting Agreement with the Debtor, describing services only as "Corporate Restructuring"); Docket 911-8, Dep. pp. 52:18-60:12. (Testimony of Lefkowitz as Geneva 12(b)(6) designee regarding nature of services).

November of 2022, while the Second Amended SOFA reports slightly over $34.5 million in transfers to M2 LoanCo during the same time period. The $10-million difference is unexplained. Second, the representations in the Disclosure Statement regarding the transfers to the other affiliates contradict the Debtor's testimony about these transfers during the third meeting of creditors on July 21, 2023. (Docket 854-2, pp. 38-40).

33.     Both the Disclosure Statement and the Debtor's testimony at the July 21st meeting of creditors describe payments from certain insider entities (Perigrove, DG Realty, and Pharmacorr) to the Debtor, and corresponding payments from the Debtor to these insiders. The key difference is in the order of payments. The Disclosure Statement describes the payments from the affiliates to the Debtor as "**subsequent** transfers in the same amounts of the outgoing transfers," (Docket 984, pg, 16) (emphasis added), while the Debtor's meeting-of-creditors testimony describes the payments to affiliates as **repayments of prior loans**, i.e., payments on account of antecedent debts owed to the affiliates before the transfers were made. For example, in its meeting-of-creditors testimony, the Debtor described the payments to Perigrove as follows:

> ANDREW JIMENEZ, TRUSTEE: In the -- in the -- in this list, you also, the debtor also disclosed ah, transfers to Perigrove. What is Perigrove?
>
> **ISAAC LEFKOWITZ: Perigrove is the same – same case, the principals of Perigrove have an equity interest in entities that ultimately own the debtor. And this too, was a loan to the debtor; this is a payment back.**
>
> ANDREW JIMENEZ, TRUSTEE: What was -- what was that loan used for?
>
> **ISAAC LEFKOWITZ: Ah, cash operations. To float their cash.**
>
> ANDREW JIMENEZ, TRUSTEE: Can you please repeat that?
>
> **ISAAC LEFKOWITZ: The debtor needed cash to float their cash flow. The Perigrove loaned them money and the Per -- and the debtor paid it back. Twice, once for 5 million and once for 1 million.**
>
> (Docket 854-2, Dep. pp. 39:24-40:20)

The order in which the payments were made is important, because "[a] debt is 'antecedent' for purposes of § 547(b) if it was incurred before the alleged preferential transfer." *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.),* 416 F.3d 394, 398 (5th Cir. 2005). If the $6 million paid to Perigrove in April and June of 2022 consists of repayments of loans from Perigrove to the Debtor, then the Debtor has a potential avoidance action against Perigrove under § 547(b)(4)(B) worth approximately $6 million. Yet the Disclosure Statement appears to conflict with the Debtor's sworn testimony about these payments. Instead of describing these payments as repayments of antecedent debts, the Disclosure Statement suggests that the payments from Perigrove to the Debtor occurred *after* the payments from the Debtor to Perigrove. This misleading description of these payments creates the impression that Perigrove has no § 547(b) liability.

34.     The plan proponents have failed to adequately explain this discrepancy and have not informed creditors whether there is a viable $6-million preferential-transfer action against Perigrove. Indeed, the proponents have failed to include any information about the value of any of the Debtor's avoidance actions, whether against insiders or not, in either the Disclosure Statement or in their liquidation analysis. And the Debtor does have viable avoidance actions.

35.     For example, the Debtor transferred of over $1.5 million to Henry Ford Allegiance Health (HFAH)  on December 19, 2022, less than ninety days prior to the petition date. (Docket 811, pg. 205). The Debtor made this payment to settle a lawsuit that HFAH filed against the Debtor in August of 2022 to collect a trade debt. (Ex. 8- Complaint; Ex. 9- Voluntary Dismissal). "A payment that a debtor makes pursuant to the terms of a pre-petition settlement agreement is made 'for or on account of an antecedent debt' as provided in § 547(b)(2)." *Williams v. McKesson Corp. (In re Quality Infusion Care, Inc.)*, 2013 Bankr. LEXIS 5044 at *17 (Bankr. S.D. Tex. 2013). Additionally, settlement payments "do not fall within the 'ordinary course of business' defense of section 547(c)(2)." *Am. Honda Fin. Corp. v. A.*

*Angelle, Inc. (In re A. Angelle, Inc.)*, 230 B.R. 287, 299 (Bankr. W.D. La. 1998). It thus appears that the Debtor holds a viable avoidance action against HFAH worth approximately $1.5 million.

36.    The Debtor's 90-day payments total over $6 million. The Debtor's one-year payments to insiders (excluding the transfers of $19.9 million in cash and a business worth approximately $173-$245 million via the divisional merger) total at least $17.9 million. There may be numerous other viable preference actions that both the Disclosure Statement and the liquidation analysis completely fail to account for. The need to inform creditors of "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers," *In re Divine Ripe, L.L.C.,* 554 B.R. 395, 407-08 (Bankr. S.D. Tex. 2016), is particularly acute here, where avoidance actions are the only significant assets of the estate. Creditors should not be asked to approve releases of potential claims against insiders like Yescare, Geneva, Perigrove, and M2 LoanCo without being informed of the total value of the cash and/or assets that each of these entities received from the Debtor.

### III. The abusive nature of the gatekeeping provisions renders the plan unconfirmable

36.    There are many reasons why this plan is unconfirmable. But of particular importance to the instant Objectors is the Plan's purported application of the injunction and gatekeeping provisions of Article IX.F to the "Released Parties," a category that includes non-debtor insiders who received assets from the Debtor in the divisional merger. The Estate obtains absolutely no benefit from the application of the Article IX.F injunction and gatekeeping provisions to these insiders. None of these insiders is a "bankruptcy trustee, or a court-approved professional" to whom the *Barton* doctrine would apply. *See Foster v. Aurzada (In re Foster)*, 2023 U.S. App. LEXIS 52 at *12 (5th Cir. 2023). None of them will serve as "post-Effective-Date management," in need of protection from vexatious litigation "as they consummate the Plan, wind down the assets, and administer the Claimant Trust and the Litigation Sub-Trust." *In re Highland Cap. Mgmt., L.P.,* 2023 Bankr. LEXIS 527 at *28 (Bankr. N.D. Tex. Feb. 27,

2023). Rather, they are simply third-party non-debtor insiders, receiving what are effectively non-consensual, non-debtor releases in disguise.

37.     The Fifth Circuit has repeatedly held that a Chapter 11 case cannot be used[9] to limit the liability of third parties that do not themselves enter bankruptcy. *See, e.g. In re Pacific Lumber Co.*, 584 F.3d 229, 252-53 (5th Cir. 2009). A liability shield is what the insiders want, of course; it is the reason they created the Tehum entity, the reason they placed it into bankruptcy, and the reason they directed their counsel to file the Stay Motion (Docket 7) and the adversary proceeding (Adv. No. 23-03049). Since binding Fifth Circuit precedent categorically prohibits the insiders from obtaining non-consensual third-party releases in a Chapter 11 plan, they have instead bargained to become beneficiaries of onerous gatekeeping provisions that provide no benefit to the Estate and whose sole purpose is to make prosecution of claims against these insiders as difficult as possible.

38.     The Plan technically allows individual creditors to opt-out of third-party releases for entities such as YesCare. But before an opt-out creditor can proceed with any claim against an insider that has any relationship to the divisional merger, the opt-out creditor is required to first file a motion in bankruptcy court requesting permission to pursue their claim. Such a motion shall include:

> "a proposed attorney fee reserve . . . that will be deposited into the Bankruptcy Court's registry to indemnify . . . the Released Parties named in the complaint or petition . . . against costs associated with the successful defense of any claim that is allowed to proceed."

(Docket 985, pg. 34 of 41).

In other words, the Plan not only purports to impose fee-shifting in favor of the insiders, it requires opt-out creditors to post a bond to pre-pay the insiders' defense costs in the event their suit is unsuccessful.

39.     The inclusion of this fee-shifting provision in the plan is contrary to public policy. The instant objectors, like nearly all of the personal injury claimants who are creditors in this case, are seeking to

---

9 The Bankruptcy Code provides a limited statutory exception to this rule for asbestos cases. *See* 11 U.S.C. § 524(g). None of the liabilities at issue in this case involve asbestos.

recover not merely for state-law negligence but for violations of their Eighth Amendment rights to be free of cruel and unusual punishment under 42 U.S.C. § 1983. Congress has prescribed a regime of limited fee-shifting in favor of plaintiffs in prisoner civil-rights litigation. *See, e.g. Murphy v. Smith*, 138 S. Ct. 784 (2018) (discussing computation of prevailing-party attorneys' fees under the Prison Litigation Reform Act). Federal courts may not require a plaintiff who brings an unsuccessful civil rights claim to pay the defendants' attorneys fees, "unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe*, 449 U.S. 5, 15 (1980). As the *Hughes* Court explained:

> To take the further step of assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of [civil rights laws] . . .
>
> These limitations apply with special force in actions initiated by uncounseled prisoners. Faithful adherence to the principles of *Haines v. Kerner* dictates that attorney's fees should rarely be awarded against such plaintiffs. The fact that a prisoner's complaint, even when liberally construed, cannot survive a motion to dismiss does not, without more, entitle the defendant to attorney's fees. An unrepresented litigant should not be punished for his failure to recognize subtle factual or legal deficiencies in his claims.

*Hughes*, 449 U.S. at 14-15.

40.     The civil rights claims brought by the instant Objectors are not "frivolous, unreasonable, or groundless." Mr. Jackson's underlying claims, for example, have already survived both a motion to dismiss, *see Jackson v. Corizon Health, Inc.*, 2020 U.S. Dist. LEXIS 113536 (E.D. Mich. 2020), and a motion for summary judgment. *see Jackson v. Corizon Health Inc.*, 596 F. Supp. 3d 834 (E.D. Mich. 2022). When the Debtor transferred its business to CHS TX, Inc. d/b/a "YesCare" via the divisional-merger transaction, Mr. Jackson also successfully established CHS TX, Inc.'s liability on his claims as a successor to the Debtor under Fed. R. Civ. P. 25(c) and Michigan's successor-liability doctrine. *See Jackson v. Corizon Health Inc.*, 2022 U.S. Dist. LEXIS 198717 (E.D. Mich. Nov. 1, 2022).

41.     Mr. Jackson's position that his pending claim against CHS TX, Inc. is his property, and not the property of the Tehum bankruptcy estate, is also far from frivolous. "Whether a particular cause of action is available to the debtor, and thus constitutes "property of the estate," is determined by state law." *Spartan Tube & Steel v. Himmelspach (In re RCS Engineered Prods. Co.),* 102 F.3d 223, 225 (6th Cir. 1996) (citing *Butner v. United States,* 440 U.S. 48, 59 (1979)). Following an extensive choice-of-law analysis, the court determined that Mr. Jackson's Rule 25(c) motion, brought in a case pending in federal court under federal-question jurisdiction, should be analyzed under state law, and specifically Michigan law, notwithstanding the Debtor's and Yescare's incorporation in Texas. *See Jackson v. Corizon Health Inc.,* 2022 U.S. Dist. LEXIS 198717 at *9-*23. Unlike under the law of Texas, "[u]nder Michigan law, an alter ego claim is not considered property of the bankruptcy estate." *Nieto v. Unitron, LP,* 2006 U.S. Dist. LEXIS 54443 at *16 (E.D. Mich. 2006) (citing *In re RCS Engineered Prods. Co.,* 102 F.3d 223, 226-227 (6th Cir. 1996)).

42.     *Nieto v. Unitron, LP* is almost perfectly on point with respect to this issue. That case involved a Texas corporation, Unitron, Inc., that did business in Michigan and became liable to Michigan plaintiffs. *Id.* at *4-*5. Unitron, Inc.'s owner then formed Unitron, LP, a new Texas entity. The owner transferred all of Unitron, Inc.'s business operations, its management team, and its employees to Unitron, LP. *Id.* at *6. This transaction rendered Unitron, Inc. deeply-insolvent; it had no business operations, no assets other than $12,000 in a bank account, and massive liabilities to its Michigan creditors. *Id.* at *5-*7. Once all of Unitron, Inc.'s assets had been transferred to Unitron, LP, the owner of both entities changed the name of Unitron, Inc. to "Norino Company," and filed a voluntary bankruptcy petition for Norino in a Texas bankruptcy court the next day. *Id.* at *6-*7.

43.     While the Norino bankruptcy case was pending, the Michigan creditors sued Unitron, LP in federal district court in Michigan. They alleged that Unitron, LP was liable to them as an alter-ego of the bankrupt shell. Unitron, LP moved to dismiss, arguing that, "because Norino filed for Chapter 7

bankruptcy, the Bankruptcy Trustee is the only party that can assert alter ego claims against Unitron LP

for the benefit of Norino's creditors and the Bankruptcy Court is the only court that may consider such

claims." *Id.* at *9. Unitron, LP further argued that Texas law must govern the property-of-the-

bankruptcy-estate analysis for the Michigan plaintiffs' alter-ego claims, given Norino's and Unitron,

LP's status as Texas corporations headquartered in Texas. *Id.* at *15.

44.     The court recognized that both entities were incorporated in Texas, the Norino bankruptcy

proceeding was pending in Texas, and that "[u]nder Texas law, an alter ego claim is considered

property of the bankruptcy estate." *Id.* at *15. Yet the court held that Michigan law, rather than Texas

law, governed the property-of-the-estate analysis for the Michigan plaintiffs' alter-ego claims:

> when the rights of third parties external to the corporation are at issue, the state directly affected
> by the alleged corporate wrongdoing must be allowed to determine the extent to which the
> corporate veil may be pierced. [citing *Chrysler Corp. v. Ford Motor Co.,* 972 F. Supp. 1097,
> 1103 (E.D. Mich. 1997)]. Stated otherwise, the law that governs the alter ego issue will be that of
> the state with the "most significant relationship" to the lawsuit. *Id.*

> Applying that choice-of-law rule here, Michigan is the state with the most significant
> relationship to the lawsuit. Plaintiffs' claims for lifetime health benefits arise out of their
> employment at a Michigan plant, pursuant to a CBA negotiated in Michigan, with a union
> headquartered in Michigan. All of the Plaintiffs are Michigan residents, as is their health
> insurance provider. **Accordingly, Michigan law governs whether Plaintiffs' ERISA and**
> **LMRA claims, alleged under an an alter ego theory, are property of the bankruptcy estate.**
> **They are not.** *See In re RCS Engineered Products Co.,* 102 F.3d at 227.

*Nieto v. Unitron, LP,* 2006 U.S. Dist. LEXIS 54443 at *21 (E.D. Mich. 2006) (emphasis added).

45.     Objectors William Kelly and Kohchise Jackson have colorable civil-rights claims pending

against a non-debtor, CHS TX, Inc., in a federal district court in Michigan. The Sixth Circuit has held

that claims against an alleged corporate reincarnation of a bankruptcy debtor are not property of the

estate when the claims are premised on Michigan's common-law of veil-piercing. *See Spartan Tube &*

*Steel v. Himmelspach (In re RCS Engineered Prods. Co.),* 102 F.3d 223, 226-27 (6th Cir. 1996). In both

Mr. Kelly's and Mr. Jackson's cases, the court has already held that Michigan law governs the successor-liability question notwithstanding CHS TX, Inc's incorporation in Texas. *See Kelly v. Corizon Health Inc.*, 2022 U.S. Dist. LEXIS 198725 (E.D. Mich. 2022); *Jackson v. Corizon Health Inc.*, 2022 U.S. Dist. LEXIS 198717 (E.D. Mich. 2022). Mr. Kelly's and Mr. Jackson's continued prosecution of their claims against CHS TX, Inc. will also have no conceivable effect on the bankruptcy estate; CHS TX, Inc. did not even file a claim for indemnification in the Tehum bankruptcy. Where a non-debtor's claims against another non-debtor "are not property of the estate and they have no effect on the estate[,]" the bankruptcy court lacks jurisdiction over the controversy. *Feld v. Zale Corp. (in Re Zale Corp.)*, 62 F.3d 746, 755 (5th Cir. 1995).

46.     Yet Mr. Kelly and Mr. Jackson will not be able to prosecute their claims against CHS TX, Inc. if they are required to first post a bond with the bankruptcy court to cover CHS TX, Inc.'s defense costs in the event they are unsuccessful at trial. The plan's gratuitous application of onerous injunction and gatekeeping provisions to CHS TX, Inc., a party that will have no role at all in the administration of the estate, in order to shield CHS TX, Inc. from litigation that cannot have any effect on the estate, is the functional equivalent of a non-consensual non-debtor release.

47.     Bankruptcy courts lack the power to issue a § 105 injunction "if it effectively discharges a nondebtor." *Zale Corp*, 62 F.3d at 760. That is what the plan's application of the injunction and gatekeeping provisions of Article IX.F to parties other than the Debtor, the Committee, and estate professionals is designed to do. The plan is thus unconfirmable as written, and the Disclosure Statement should not be approved.


        Respectfully submitted,

**CROSS LAW PLLC**

/s/ *Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Kohchise Jackson, William
Kelly, and Derico Thompson
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994-9590
ian@lawinannarbor.com