**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT REGARDING DEBTOR AND OFFICIAL
COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED JOINT CHAPTER 11 PLAN**

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Micheal W. Bishop (TX Bar No. 02354860)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
Amber M. Carson (TX Bar No. 24075610)
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7127
Facsimile: (713) 986-5966
Email:    jbrookner@grayreed.com
              mbishop@grayreed.com
              akaufman@grayreed.com
              lwebb@grayreed.com
              acarson@grayreed.com

*Counsel to the Debtor and Debtor in Possession*

Dated:  October 16, 2023

**STINSON**
Nicholas Zluticky (SD TX Bar No. 3846893)
Zachary Hemenway (SD TX Bar No. 3856801)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Email:   nicholas.zluticky@stinson.com
              zachary.hemenway@stinson.com

*Counsel to the Official Committee of Unsecured
Creditors*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

**FIRST AMENDED DISCLOSURE STATEMENT DATED OCTOBER 16, 2023**

**SOLICITATION OF VOTES TO ACCEPT OR REJECT**
**THE FIRST AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY THE DEBTOR AND**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

**RECOMMENDATION**

**The Plan is proposed jointly by the Debtor and the Official Committee of Unsecured Creditors. The global settlement reflected in the Plan represents a settlement and compromise that was reached after three days of mediation. The Debtor and the Committee believe the Plan maximizes the recovery for creditors and provides the best process for them to receive payment on their claims. The Debtor and the Committee strongly recommend that all holders of claims entitled to cast ballots vote to _accept_ the Plan.**

---

**WHAT IS THIS DOCUMENT, AND WHY AM I RECEIVING IT?**

This is the Disclosure Statement for the First Amended Joint Chapter 11 Plan (the "Plan") for Tehum Care Services, Inc., formerly known as Corizon Health Services, Inc., a Texas corporation (the "Debtor"), proposed jointly by the Debtor and the Official Committee of Unsecured Creditors (the "Committee"). Sometimes in this document, the Debtor and Committee are referred to as "the Proponents." For a more detailed summary of the Plan and an explanation of the bankruptcy process, you should review pages 1–4 of this Disclosure Statement.

You are receiving this information because you have filed a Proof of Claim against the Debtor, or you were otherwise listed as a party in interest in the Debtor's bankruptcy case. The Bankruptcy Code requires the Debtor and the Committee to send this information to you to allow you to decide how to vote (if applicable) or whether to respond to the Plan. Please read below for more information.

**WHO SENT ME THIS INFORMATION?**

This Disclosure Statement has been prepared by both the Debtor and the Committee. The Bankruptcy Court has determined that this document contains the necessary information to fairly inform you about the Plan so that you may make an informed decision on how to vote.

**WHAT IS THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS?**

The Committee is a group of seven unsecured creditors appointed by the Office of the United States Trustee, a division of the United States Department of Justice. The Committee's duty is to represent all unsecured creditors' interests in the bankruptcy case.

| Committee Member | Type of Claim | Filed Claim Amt. |
|---|---|---|
| Rachell Garwood[1] | Personal Injury | $   45,215,426.00 |
| Latricia Revell | Personal Injury | 5,000,000.00 |
| St. Luke's Health System, Ltd. | Non-Personal Injury | 31,304,520.14 |
| Capital Region Medical Center | Non-Personal Injury | 23,000,000.00 |
| Maxim Healthcare Staffing Serv., Inc. | Non-Personal Injury | 4,937,284.91 |
| Saint Alphonsus Health System, Inc. | Non-Personal Injury | 15,097,225.24 |
| Truman Medical Center, Inc. | Non-Personal Injury | 381,276.55 |

The Committee has agreed to vote "yes" on the Plan. The Committee agrees that the Plan provides a fair and reasonable settlement of claims that could have been asserted against certain insider and related parties, and that the Plan will fairly distribute the resulting funds among all creditors.

---

[1] Rachell Garwood filed her claim not individually, but as representative of a putative class of similarly situated women as set forth more fully in the Proof of Claim filed by Ms. Garwood.

### HOW DO I KNOW IF THE PLAN IS GOOD FOR ME?

The Debtor and Committee believe that the Plan is in the best interests of all creditors.  The most telling evidence that this Plan is good for is you is that the Committee co-sponsors and endorses the Plan.  Like you, each of the seven Committee members is a creditor waiting to get paid by the Debtor.

### WHAT ARE THE SOURCES OF PAYMENTS TO BE MADE UNDER THE PLAN?

The primary source of payment to be made under the proposed Plan will come from a $37 million settlement payment, which resulted from a three-day mediation.  The Plan incorporates the terms of this global settlement.  The terms of the global settlement can be found in Article IV.B. of the Plan and are discussed in greater detail on pages 10–11 of the Disclosure Statement.

The three-day mediation focused on the Estate's potential lawsuits against the Debtor's parent company, other entities it owns or controls, and certain of its directors and officers.  These claims primarily include avoidance actions belonging to the Debtor's Estate, such as claims for fraudulent transfer associated with transfers of funds from the Debtor's accounts, claims for fraudulent transfer associated with the Debtor's restructuring, including the divisional merger with CHS TX, Inc. discussed more fully in this Disclosure Statement, and preference claims involving transfers to Debtor-related entities prior to bankruptcy.

These claims are collectively the Debtor's largest asset, and if they were not resolved via settlement, the Debtor (and by extension, all creditors) would not receive any recovery from claims unless and until the Estate was successful in obtaining judgments and collecting funds from liable parties.  The decision to settle these potential claims involved careful consideration of the strengths and weaknesses of such claims, including potential hurdles to their successful prosecution and ability to recover judgments against the liable entities or individuals.  Absent a settlement, any funds the Debtor's Estate received via successful lawsuits against these parties would be further reduced by the legal costs associated with the suits, which would be paid with Estate assets.

Under the settlement, the Debtor will receive a total of $37 million in cash, plus releases of certain claims made against the Debtor, including a release of the obligation to repay a loan totaling $2.75 million made to the Debtor during this bankruptcy case, release of a lien on tax refund proceeds that was granted as part of that loan, and a release of over $24 million in unsecured claims that would otherwise dilute the pool of unsecured creditors.  In exchange for the $37 million in cash payments, the loan forgiveness, and the release of claims, the Plan provides broad releases in favor of certain insider and related parties, including YesCare, CHS TX, Geneva Consulting, M2 LoanCo, Perigrove, and other related entities and individuals.

While the Debtor intends to give these releases, creditors are not being compelled to provide their own releases.  Creditors who do not wish to release their own claims against these Released Parties may opt out of the releases on their ballots or opt-out forms.  **As discussed in greater detail in the Disclosure Statement, if you select the opt-out option, you waive any right to receive payments from this $37 million settlement fund, which is the primary source of payment for most creditors.  If you are considering this option, the Debtor and the Committee strongly recommend that you first consult a bankruptcy attorney to advise you on whether doing so is in your best interests.**

In addition to the global settlement payments, the Debtor believes it may be entitled to a significant Employee Retention Credit ("ERC") from the Internal Revenue Service.  Any tax credits, net of any offset rights the Internal Revenue Service may have for outstanding priority tax liabilities, will be available to the Estate for payment of creditors who have not opted out of the releases contemplated in the global settlement.

Additionally, certain personal injury claimants may have access to proceeds from insurance policies under which the Debtor is a named insured.  The Plan provides a path and a process for these creditors to access the Debtor's insurance coverage to the extent applicable to such Claims.

Finally, other Estate claims and causes of action may exist against third parties other than those released under the global settlement and the Plan.  The Debtor and the Committee believe these claims and causes of action may provide additional recoveries for creditors.

## WHEN AND HOW MUCH MONEY WILL I RECEIVE UNDER THIS PLAN?

The timing and amount of payments under the Plan will depend on what type of claim you have (Personal Injury or Non-Personal Injury), whether your claim amount has been determined by a court, and whether you decide to make any elections on your enclosed ballot.

The claims against the Debtor fall into two broad categories: (1) Personal Injury Claims, which are claims relating to allegations of medical malpractice, abuse, or neglect at facilities in which the Debtor served as a health care provider; and (2) Non-Personal Injury Claims, which are generally contract and trade claims based on the Debtor's contractual duties owed to contract counterparties and/or the Debtor's obligations owed to third parties.

As discussed in greater detail in the Disclosure Statement, there are important differences between these groups of claims.  The primary difference is that claimants with personal injury claims have multiple sources of funds beyond the Debtor's Estate that can be used to pay their claims, and claimants with non-personal injury claims will be looking exclusively (or nearly exclusively) to cash assets of the Estate for payment.  Additionally, the Bankruptcy Code imposes limits to the Bankruptcy Court's ability to determine the value of personal injury claims but imposes no such limits on any other types of claims.  In order to account for the existence and impact of these differences, the Plan proposes to create two separate trusts to administer and distribute money to these two different classes of creditors.

Below is a very brief overview of the Plan's proposed treatment.  A more detailed explanation of the different classes of claims and how they will be treated under the Plan can be found on pages 11–12 and 14–15 of the Disclosure Statement.

- "Convenience Claims" are those Proofs of Claim that were timely filed in the amount of **$5,000 or less**.  These claims will be paid in full in Cash approximately 30 days after the Plan becomes effective.

- Claimants who timely filed Proofs of Claim for **more than $5,000** may elect, on their ballots, to receive an Expedited Distribution.  By checking this box on the ballot, you are irrevocably agreeing to accept a one-time cash payment of $5,000 in full satisfaction of your Claim.  This option also constitutes a "yes" vote on the Plan and will constitute your consent to the releases provided under the Plan, regardless of any other boxes you may have checked on the ballot, including the opt-out election.  If you make this election, absent an objection to your Claim, you will receive your $5,000 payment approximately 60 days after the Plan becomes effective.

- If you do not opt for the $5,000 Expedited Distribution, and you have an unliquidated Personal Injury Claim, you will participate in a mandatory mediation process for your claim before trial.  Settlement through mediation will help expedite payment for your claim.

- If you would rather go to trial after participating in the mandatory mediation process, the Plan allows for that too.  But proceeding to trial could delay your distributions under the Plan.  The Plan ensures that all similarly situated claimants will receive the same rights to the available insurance proceeds (if any).

- There are over 350 Personal Injury Claims filed in the Bankruptcy Case (including Claims filed by third party co-defendants in Debtor-related personal injury actions who allege they are entitled to indemnification by the Debtor).  The face amount of those claims is over $1 billion.  However, the Debtor and Committee anticipate that those claim amounts will be reduced as the amounts of Allowed Claims are determined by the claims administration process described below.  Because only a small number of those Claims have been liquidated by a court, the Debtor and Committee cannot definitively estimate how long it will take to resolve all of those claims; however, the claims administration process will likely take 12 months or significantly longer depending on the case.  The Debtor and the Committee estimate that

Holders of Personal Injury Claims could receive 18.1% to 37.7% of their Allowed Claims under the Plan from the funds provided hereunder, the Debtor's insurance policies, and recoveries from non-Debtor co-defendants or their insurers. Further information regarding the Debtor's insurance policies may be found in **Schedule 2** to this Disclosure Statement.

- If you have an unliquidated Non-Personal Injury Claim, the Liquidation Trustee will contact you during the 180-day period after the Plan goes effective to propose a resolution of your Claim. If you are unable to reach an agreement with the Liquidation Trustee regarding the amount of your claim, the Bankruptcy Court will determine the amount of your claim, after notice and a hearing. Once all such claims have been determined, the Liquidation Trustee will make pro rata distributions to such claimants with Allowed Claims out of the available funds on hand.

- There are approximately 175 Non-Personal Injury Claims filed in the Bankruptcy Case. The face amount of those claims totals approximately $139 million in Non-Personal Injury Claims. The Debtor and Committee anticipate that those claim amounts will be reduced by the claims administration process described below. The Debtor and the Committee estimate that Holders of Non-Personal Injury Claims could receive 19.9% to 35.3% of their Allowed Claims under the Plan, depending on the final amounts allowed for such claims. The Debtor and the Committee anticipate that the funds provided hereunder will likely be the sole source of recovery for Holders of Non-Personal Injury Claims.

### WHY SHOULD I VOTE "YES" TO THE PLAN?

You should vote "yes" in support of the Plan because the Debtor and the Committee worked diligently over the past several months to negotiate a favorable settlement that is fair and reasonable and ensures quick and meaningful recoveries to you. If the Plan is approved, creditors will receive more than $40 million in value, comprised of cash, release of certain claims against the Debtor, and rights to tax credits, refunds, and other Estate causes of action. If the Plan is not approved, it is unlikely that the $37 million settlement fund will be available to pay creditors. Instead, the bankruptcy case will likely be converted to a chapter 7 liquidation, and a trustee will be appointed to pursue litigation or settlement with the same parties who are proposing to pay $37 million to the Debtor. The Debtor and Committee believe that a trustee would likely spend years pursuing this litigation, increasing (perhaps significantly) the cost of administering this case and without any certainty of a better recovery for creditors. A vote for the Plan will ensure that the Plan is approved by the Bankruptcy Court so that distributions can be made in the near term.

### WHAT IF I VOTE "NO" TO THE PLAN?

If the Debtor and Committee fail to collect the requisite number of "yes" votes, there is a chance that the Plan will not be approved by the Bankruptcy Court. By voting "no," you are not waiving your rights to distributions under the Plan, but you may be putting the Plan at risk of not being approved.

### WHAT IF I WANT TO OPT OUT OF THE SETTLEMENT IN THE PLAN?

Each ballot or notice sent with the Court approved solicitation packet will contain an option for you to opt out of the settlement and releases contained in the Plan.

It is important to note that the source for most of the cash distributions to be made under the Plan is the $37 million settlement fund discussed above. A more detailed description of the settlement and the various releases can be found on page 17 of the Disclosure Statement. The "Released Parties" include YesCare, CHS TX, Perigrove, M2 LoanCo, and several other related entities and individuals.

Again, if you are considering checking the opt-out box on your ballot or opt-out form, the Debtor and Committee strongly recommend you seek advice from bankruptcy counsel before doing so. You should also consider the following:

- First, by opting out of the releases, you are waiving any right to receive distributions from the $37 million settlement fund or the ERC fund. This will dramatically reduce your recoveries under the Plan.

- Second, even if you opt out of the third-party releases, the Plan still proposes to release the Debtor's causes of action against the Released Parties. These "Debtor Releases" are described on page 15 of the Disclosure Statement, and they may impact some of your claims, particularly if your claims derive from these Estate causes of action.

- Third, if you elect to receive an Expedited Distribution of $5,000, you may not opt out of the third-party releases.

- Finally, the Plan contains "gatekeeping provisions" that will require you to seek permission from the Bankruptcy Court before you are allowed to pursue your claims against the Released Parties. This will ensure consistency and predictability in rulings so that competing courts do not issue conflicting rulings about what claims are direct claims under applicable law.

### WHERE DO I SEND MY BALLOT OR OPT OUT FORM?

Your ballot or opt out form should be mailed to KCC, the Debtor's Solicitation Agent. Alternatively, you may fill out your ballot online using the electronic key and password mailed to you.

*YOUR BALLOT OR OPT OUT FORM WILL NOT BE COUNTED IF YOU SEND IT TO THE BANKRUPTCY COURT OR ANYONE OTHER THAN KCC.*

### DOES THIS PLAN PREVENT ME FROM HAVING MY DAY IN COURT?

The short answer is no. Even if you vote "yes" and the Plan is approved, you will still be entitled to your day in court.

If you have a Personal Injury Claim and decline all settlement proposals, you will be allowed to continue your lawsuit outside of the Bankruptcy Court. There may be insurance to cover your claim, depending on the nature of the claim, where the injury occurred, and the number of other potential claims that are asserted under the same policies.

If you have a Non-Personal Injury Claim, the Liquidation Trustee will attempt to settle your claim after the Effective Date. If you cannot reach an agreement with the Liquidation Trustee, you can have your claim heard by the Bankruptcy Court, after full notice and an evidentiary hearing under the Bankruptcy Rules.

Under either scenario, the Plan offers you options without limiting your rights to have your day in court, if that is what you desire.

### DO I NEED TO HIRE AN ATTORNEY TO EXPLAIN MY OPTIONS TO ME?

While this Disclosure Statement was prepared in plain English to make it easier for creditors to understand, the Debtor and Committee encourage all parties to seek legal counsel before making any decisions.

If you need help filling out your ballot, you are welcome to call KCC, the Debtor's Claims Agent, at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International). Please note, however, that KCC, as well as counsel to the Debtor and counsel to the Committee, are not your attorneys and cannot offer you legal advice.

If you want to object to the Plan or the Disclosure Statement, the Debtor and the Committee encourage you to hire counsel to file an appearance on your behalf.

## WHAT ARE THE DEADLINES FOR ME TO RESPOND?

Below are the key dates and deadlines relevant to the Plan:

- Ballots and Opt-Out Forms Due:  December 22, 2023
- Confirmation Objection Deadline:  December 22, 2023
- Hearing to Consider Confirmation of the Plan:  January 8, 2024

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN AS A DESCRIPTION OF THE PLAN AND THE CHAPTER 11 CASE, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE LEGAL EFFECT OF THE PLAN ON HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING, AND CONTAINS ESTIMATES, FORECASTS AND ASSUMPTIONS WHICH MAY PROVE TO BE MATERIALLY DIFFERENT FROM ACTUAL RESULTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATE ON WHICH THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR INDEPENDENT VERIFICATION.  THE INFORMATION CONTAINED HEREIN AND THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN.  ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON OTHER THAN THOSE CONTAINED HEREIN SHOULD NOT BE RELIED UPON.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL TO THE DEBTOR AND THE COMMITTEE.

THE SECURITIES AND EXCHANGE COMMISSION HAS NEITHER APPROVED NOR DISAPPROVED THIS DISCLOSURE STATEMENT, NOR HAS IT PASSED UPON THE ADEQUACY OR ACCURACY OF THE STATEMENTS CONTAINED HEREIN.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the Plan.

## TABLE OF CONTENTS

Page

I.      **General Information** ...............................................................................................1
        A.      Purpose of this Disclosure Statement...............................................................1
        B.      General Information Concerning Chapter 11.....................................................1
        C.      General Information Concerning Treatment of Claims and Interests...............1
        D.      Classes Impaired under a Plan..........................................................................2
        E.      Voting and Opt-Out Rights...............................................................................3
                1.      Voting on the Plan..................................................................................3
                2.      Opt-Out Rights.......................................................................................3
        F.      Confirmation and Consummation......................................................................3
                1.      Acceptance of the Plan...........................................................................3
                2.      Confirmation Without Acceptance By All Impaired Classes..................4
                3.      Best Interests Test..................................................................................4

II.     **Background and Events Leading Up to Chapter 11** ..............................................4
        A.      The Debtor's Business and Operations ..............................................................4
        B.      Perigrove Acquisition........................................................................................5
        C.      Transfers to Geneva Consulting, LLC and M2 LoanCo, LLC ..........................5
        D.      The Divisional Merger .......................................................................................6
        E.      Events Leading to Chapter 11 ...........................................................................7

III.    **The Debtor's Chapter 11 Case** .............................................................................7
        A.      Post-Filing Activities.........................................................................................7
                1.      The DIP Motion and the DIP Orders .....................................................7
                2.      The Stay Extension Motion and Adversary Proceeding .........................8
                3.      The Trustee Motion.................................................................................8
                4.      The Mediation Order ..............................................................................9
        B.      The Global Settlement .....................................................................................10
        C.      Exclusivity ......................................................................................................12
        D.      Bar Date ..........................................................................................................12
        E.      Claims Against the Debtor ...............................................................................12
                1.      In General .............................................................................................12
                2.      Administrative Expense Claims and Professional Fee Claims ...........13
                3.      DIP Claims...........................................................................................13
                4.      Priority State and Federal Tax Claims .................................................13

IV.     **The Plan** .................................................................................................................13
        A.      Summary of Key Plan Provisions ...................................................................14
        B.      Treatment of Classes of Claims and Interests .................................................15
                1.      Class 1 — Other Priority Claims ..........................................................15
                2.      Class 2 — Other Secured Claims..........................................................15
                3.      Class 3 — Convenience Claims.............................................................16
                4.      Class 4 — Non-Personal Injury Claims ................................................16
                5.      Class 5 — Personal Injury Claims ........................................................17
                6.      Class 6 — Contingent Indemnification Claims .....................................17
                7.      Class 7 — Interests in the Debtor .........................................................17
        C.      Release, Exculpation and Injunction Provisions .............................................18
                1.      Released Parties, Settlement Parties and Exculpated Parties ...............18
                2.      Debtor Release.....................................................................................18
                3.      Third-Party Releases............................................................................19
                4.      Exculpation ..........................................................................................20
                5.      Injunction and Gate Keeping ...............................................................20

| | | |
|---|---|---|
| **V.** | **The Liquidation Trust and the Personal Injury Trust** | **22** |
| | A. Two Trusts | 22 |
| | B. The Liquidation Trust | 22 |
| | 1. Liquidation Trust Assets | 22 |
| | 2. Liquidation Trust Claims Administration Process | 23 |
| | C. The Personal Injury Trust | 23 |
| | 1. Personal Injury Trust Assets | 23 |
| | 2. Personal Injury Trust Claims Administration Process | 24 |
| **VI.** | **Risk Factors** | **25** |
| | A. Bankruptcy Law Considerations | 25 |
| | 1. The Debtor Will Consider All Available Alternatives if the Plan Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor | 25 |
| | 2. Risks Related to Confirmation and Consummation of the Plan | 25 |
| | B. Risks Related to Recoveries Under the Plan | 27 |
| | 1. Estimated Recoveries to Holders of Allowed Claims and Interests Are Based on Assumptions and May Vary from Actual Recoveries | 27 |
| | 2. The Liquidation Trustee and the Personal Injury Trustee May Object to the Amount or Nature of a Claim or Interest | 28 |
| | 3. Litigation Matters | 28 |
| | C. Miscellaneous Risk Factors and Disclaimers | 28 |
| | 1. The Financial Information Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed | 28 |
| | 2. No Legal or Tax Advice Is Provided by This Disclosure Statement | 28 |
| | 3. No Admissions Made | 28 |
| | 4. Failure to Identify Litigation Claims or Projected Objections | 29 |
| | 5. Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors | 29 |
| | 6. No Representations Outside This Disclosure Statement Are Authorized | 29 |
| | 7. No Duty to Update | 29 |
| **VII.** | **Certain U.S. Federal Tax Consequences of the Plan** | **29** |
| | A. Introduction | 29 |
| | B. Certain U.S. Federal Income Tax Consequences to the Debtor | 30 |
| | 1. Cancellation of Debt and Reduction of Tax Attributes | 30 |
| | C. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Classes 4 and 5 | 31 |
| | 1. Gain or Loss - Generally | 31 |
| | 2. Tax Treatment of the Liquidation Trust and Personal Injury Trust and Holders of Beneficial Interests | 32 |
| | 3. General Tax Reporting by the Trusts and Beneficiaries | 32 |
| | D. Accrued Interest | 33 |
| | E. Market Discount | 33 |
| | F. Withholding and Information Reporting | 33 |
| **VIII.** | **Conclusion and Recommendation** | **34** |

**SCHEDULES AND EXHIBITS**

Schedule 1          Liquidation Analysis

Schedule 2          Professional Liability Insurance Policy Information

Exhibit A            Plan of Liquidation

Exhibit B            Form of Liquidation Trust Agreement

Exhibit C            Form of Personal Injury Trust Agreement

Exhibit D            Proposed LSA 9019 Order

4872-0136-1543

# I.   <u>General Information</u>

**A.      Purpose of this Disclosure Statement.**

This Disclosure Statement has been prepared by the Debtor and Committee to provide information to enable Holders of Claims and Interests, who are entitled to vote on the Plan, to make an informed judgment about the Plan.  Confirmation of the Plan pursuant to chapter 11 of the Bankruptcy Code depends, in part, upon the receipt of a sufficient number of votes in favor of the Plan.  However, Holders of Claims and Interests whose claims are unimpaired are deemed to have conclusively accepted the Plan and are not entitled to vote thereon.  As set forth in this Disclosure Statement, Holders of Claims in Classes 1 and 2 are unimpaired and deemed to have accepted the Plan.  Holders of Claims in Classes 3, 4, and 5 are impaired and entitled to vote to accept or reject the Plan.  Holders of Claims in Class 6 and Interests in Class 7 are impaired and deemed to reject the Plan because they are not entitled to receive any distribution under the Plan.

On October 17, 2023, after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Solicitation Order"), pursuant to section 1125 of the Bankruptcy Code, conditionally approving this Disclosure Statement as containing "adequate information."  "Adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the Holders of Claims and Interests in the Chapter 11 Case, that would enable such hypothetical investor to make an informed judgment about the Plan.

**B.      General Information Concerning Chapter 11.**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor in possession attempts to reorganize, or liquidate, its business for the benefit of itself, its creditors and equity interest holders.

The commencement of a chapter 11 case creates an Estate, comprised of all legal and equitable interests of the debtor in property as of the date the petition is filed, wherever located and by whomever held.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  The Debtor is operating as a debtor in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362(a) of the Bankruptcy Code provides for, among other things, an automatic stay of all attempts to collect prepetition debts against the debtor or to otherwise interfere with the debtor's property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the time a plan of reorganization is confirmed.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case.  A plan sets forth the means for satisfying the claims against and equity interests in the debtor.  Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case.  A debtor is generally then given 60 additional days during which it may solicit acceptance of its plan.  The deadlines may be extended or reduced by the court upon a showing of "cause."  In this case, the Debtor's exclusive right to file and solicit a plan has been extended two times.

**C.      General Information Concerning Treatment of Claims and Interests.**

A chapter 11 plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  After a chapter 11 plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides claims and equity interests into classes and sets forth the treatment for each class.  In accordance with section 1123(a) of the Bankruptcy Code, Administrative Claims have not been classified in the Plan.  A debtor is also required, under section 1122 of the

Bankruptcy Code, to classify claims and equity interests into classes that contain claims and equity interests that are substantially similar to the other claims and equity interests in such class.  The Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122.

The table below provides a summary of the classification, description, and treatment of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Article IV.B of this Disclosure Statement.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Convenience Claims | Impaired | Entitled to Vote |
| 4 | Non-Personal Injury Claims | Impaired | Entitled to Vote |
| 5 | Personal Injury Claims | Impaired | Entitled to Vote |
| 6 | Contingent Indemnification Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.**     **Classes Impaired under a Plan.**

Only classes of impaired claims or equity interests may vote to accept or reject a plan.  A class is "impaired" if the legal, equitable, or contractual rights relating to the claims or equity interests in that class are modified by the plan.  Modification for purposes of determining impairment, however, does not include curing defaults or reinstating maturity.  Classes of claims or equity interests that are not "impaired" under a plan of reorganization, and each member of such class, are conclusively deemed to have accepted the plan and thus are not entitled to vote.  Similarly, classes of claims or equity interests that will neither receive nor retain any property under a plan are deemed to not have accepted the plan and are thus not entitled to vote.  Accordingly, acceptances of a plan will only be solicited from holders of claims and/or equity interests in impaired classes that may receive distributions under the plan.

As set forth in section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan of reorganization unless, with respect to such class, the plan:  (1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default: (a) cures any such default that occurred before or after the commencement of the case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as it existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; (d) if the claim or interest arises from a failure to perform a non-monetary obligation (other than a default from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A)), compensates the holder (other than the debtor or an insider) for any actual pecuniary loss incurred by the holder as a result of such failure; and (e) does not otherwise

alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

All Holders of Claims in Classes 1 and 2 are unimpaired, as they will be paid in full. As a result, all Holders of Claims in Classes 1 and 2 are conclusively deemed to have accepted the Plan. Holders of Claims in Class 6 and Interests in Class 7 are impaired, as they are not entitled to receive any distribution under the Plan. As a result, Holders of Claims in Class 6 and Interests in Class 7 are conclusively deemed to have rejected the Plan. The Debtor and Committee are seeking the votes of Holders of Claims in Classes 3, 4, and 5.

**E.**     **Voting and Opt-Out Rights.**

    **1.**     **Voting on the Plan.**

Holders of Claims in Classes 3, 4, and 5 are impaired under the Plan and are entitled to vote to accept or reject the Plan. A Ballot casting a vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such Ballot was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

    **2.**     **Opt-Out Rights.**

The Plan provides third-party releases for certain insider and related parties, including YesCare, CHS TX, Geneva Consulting, M2 LoanCo, Perigrove, and other related entities and individuals, as more fully described in Article III.B below captioned "Global Settlement" and in Article IV.B of the Plan. If any Holder of a Claim or Interest does not wish to consent to a release of its individual claims and causes of action (if any) against the third parties proposed to be released, the Ballot or Opt-Out Form accompanying this Disclosure Statement allows you to opt out of the third-party releases, as long as you do not select the Expedited Distribution option. However, if you choose to opt out, (i) you will forfeit your allocation of (a) the $37,000,000 payment being offered by the Settlement Parties as consideration for the third-party release, and (b) any cash remaining in the ERC fund after payment of priority federal tax claims; and (ii) you will not receive a release from the Debtor or the other releasing parties. Because you will be giving up these rights by choosing to opt out, the Debtor and the Committee encourage you to consult with an attorney in making this decision.

**F.**     **Confirmation and Consummation.**

There are two methods by which a plan may be confirmed: (i) the "acceptance" method, pursuant to which all impaired classes of claims and interests have voted in the requisite amounts to accept the plan and the plan otherwise complies with section 1129(a) of the Bankruptcy Code; and (ii) the "cram-down" method under section 1129(b) of the Bankruptcy Code, which is available even if classes of claims vote against the Plan.

    **1.**     **Acceptance of the Plan.**

A plan is accepted by an impaired class of claims if the holders of at least two-thirds (⅔) in amount and more than one-half (½) in number of the allowed claims in such class actually voting vote to accept the plan. A plan is accepted by an impaired class of equity interests if holders of at least two-thirds (⅔) in amount of allowed equity interests in such class actually voting vote to accept the plan.

**BALLOTS THAT ARE SIGNED BUT THAT DO NOT EXPRESSLY INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL BE DISREGARDED.**

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class entitled to vote or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or equity interest in such class (*see* discussion of "Best Interests Test" below).

2.        **Confirmation Without Acceptance By All Impaired Classes.**

Under section 1129 of the Bankruptcy Code, the Debtor has the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by a class of Claims.

A plan may be confirmed notwithstanding its rejection by one or more classes of claims or equity interests if, in addition to satisfying the applicable requirements of section 1129(a) of the Bankruptcy Code, the plan (1) is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan and (2) does not "discriminate unfairly."

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of unsecured claims if, with respect to such dissenting class either (a) the plan provides that each holder of a claim of such class receive or retain property of a value equal to the allowed amount of such claim, or (b) no holders of junior claims or equity interests receive or retain any property under the plan on account of such junior claims or interests.

This fair and equitable standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or equity interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property under the plan on account of such claims or interests.  The Proponents believe that if a non-consensual confirmation is necessary, the requirements for non-consensual confirmation will be met and the Plan will be confirmed despite its rejection by any impaired dissenting Class of Claims.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Proponents believe that the Plan meets this requirement with respect to any Class of Claims that might reject the Plan, because classes of equal rank are treated equally under the Plan.

3.        **Best Interests Test.**

Notwithstanding acceptance of the Plan by each impaired Class, in order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in an impaired Class who has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides for each Holder of a Claim or Interest in such Class to receive or retain on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount each such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

In this case, the Debtor is liquidating. As a result, and by implication, constituents will receive under the Plan at least what they would otherwise receive if the chapter 11 case was converted and the Debtor was liquidated in chapter 7. To demonstrate compliance with the best interests test, the Debtor, with the assistance of its financial advisor, prepared the liquidation analysis attached hereto as **Schedule 1**.  The liquidation analysis shows that the value of the distributions provided to Holders of Allowed Claims under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.  Accordingly, the Proponents believe that the Plan is in the best interests of creditors.

II.        **Background and Events Leading Up to Chapter 11**

A.        **The Debtor's Business and Operations.**

The Debtor (formerly known as Corizon Health, Inc., a Texas corporation) was a nationwide provider of correctional healthcare, providing services in multiple states across the United States.[1]  In the ordinary course of its business, the Debtor entered into agreements with various (typically governmental) entities under which the Debtor

---

[1] In this section, all references to "Debtor" include any predecessor entity that merged into the Debtor as a result of the transactions discussed below.

would provide, or arrange for the provision of, healthcare services to certain inmates or detainees of the contract counterparty.

**B.      Perigrove Acquisition.**

By the end of 2021, the Debtor was facing dire financial conditions due to loss of major governmental contracts and significant litigation exposure.

In December 2021, the Debtor's ultimate parent, M2 HoldCo, LLC ("HoldCo") was acquired by Perigrove 1018, LLC ("Perigrove 1018"). Perigrove 1018 is affiliated with Perigrove, LLC ("Perigrove"). The Debtor believes that prior to the Perigrove acquisition, the Debtor's secured lender was M2 LoanCo, LLC ("LoanCo"). The Debtor contends that the loans were originated by other lenders in 2017 and acquired by LoanCo in or around June 2020. LoanCo is an affiliate of the Debtor by common ownership. The Committee disputes that this purported lender-borrower relationship was genuine and believes that the purported debt obligation was canceled and/or converted to equity by the actions, transactions, course of dealing, tax filings, and statements of the Debtor and LoanCo. When Perigrove 1018 acquired HoldCo, it also acquired LoanCo. The Debtor believes that as of February 28, 2022, the amount of secured debt owed by the Debtor to LoanCo was in excess of $97.8 million.

The Debtor's organizational structure as it existed in December 2021, when HoldCo was acquired by Perigrove 1018, was as follows:



**C.      Transfers to Geneva Consulting, LLC and M2 LoanCo, LLC.**

In December 2021, the Debtor's immediate parent company, Valitás Health Services, Inc. ("Valitás Health") entered into a Consulting Agreement with Geneva Consulting, LLC ("Geneva"). Geneva is affiliated with Perigrove. The Consulting Agreement called for an initial retainer of $3 million with $500,000 monthly payments for the duration of the agreement. Between December 2021 and May 2022, Valitás Health paid Geneva $5.5 million, consisting of the initial $3 million retainer, plus five monthly installments of $500,000 each.

4872-0136-1543

Also in December 2021, the Debtor and its subsidiary Corizon, LLC each opened a bank account at Signature Bank (the "Signature Accounts").  The remainder of the Debtor's bank accounts, all of which pre-dated the Perigrove acquisition, were at Bank of America.  Individuals affiliated with Perigrove were the sole signors on the Signature Accounts.  The Debtor's CFO and existing management did not have access to the Signature Accounts. Between December 2021 and May 2022, $23.3 million was transferred from the Debtor's Bank of America accounts to the Signature Accounts.

Between December 2021 and November 2022, the Debtor transferred approximately $24.5 million from the Signature Accounts to LoanCo.  LoanCo has disputed this amount.  During the same period, the Debtor made additional transfers to Perigrove, DG Realty Management LLC and PharmaCorr LLC, entities also affiliated with Perigrove.  However, the Debtor received subsequent transfers in the same amounts of the outgoing transfers that were made to these entities.

**D.      The Divisional Merger.**

In early 2022, the Debtor's board of directors, with the help of outside counsel, began considering restructuring alternatives other than bankruptcy.  One restructuring option was a combination merger and divisional merger under the Texas Business Organizations Code (the "TBOC")—a statutory framework that allows one or more corporate entities to merge into one or more surviving or new legal entities and allocate assets and historical liabilities among the resulting entities.

In May 2022, the Debtor and several of its affiliates, including Corizon, LLC, Valitás Health, and Corizon Health of New Jersey, LLC (collectively, the "Merger Entities") executed a corporate reorganization effectuated through two merger transactions under the TBOC:  a combination merger and a divisional merger.  The following steps comprised the combination merger:

a.      On April 28, 2022, the Debtor (previously incorporated in Delaware) converted to a Texas corporation.

b.      The Debtor and each Merger Entity merged pursuant to a plan of combination merger under Texas law (the "Combination Merger").

c.      The Debtor filed the Certificate of Combination Merger with the Texas Secretary of State on May 2, 2022, and the Combination Merger became effective on May 5, 2022.

d.      The Debtor was the sole survivor of the Combination Merger and was vested with all assets and liabilities of the Merger Entities. The Merger Entities ceased to exist.

The Debtor then effectuated a divisional merger as follows:

a.      The Debtor drafted the Plan of Merger, which provided that CHS TX, Inc. ("CHS") would be formed and documented which assets and liabilities were to remain with the Debtor and which were to be allocated to CHS.

b.      The approved Plan of Merger was in writing and included all information required by the TBOC.

c.      The Debtor filed the Certificate of Merger and Certificate of Formation for CHS. with the Texas Secretary of State on May 3, 2022, and the divisional merger became effective on May 5, 2022.

d.      LoanCo and the Debtor agreed to a funding agreement (the "Funding Agreement") pursuant to which LoanCo would pay or cause to be paid funding to the Debtor up to an aggregate cap of $15 million for payment of the Debtor's costs of operations and certain liabilities that arose prior to the divisional merger.

e.      On May 11, 2022, the Texas Secretary of State approved and accepted the Certificate of Merger and Certificate of Formation for CHS, effective as of May 5, 2022.  CHS was subsequently acquired by YesCare Corp. ("YesCare").

f.      On June 1, 2022, the Debtor changed its name from Corizon Health, Inc. to Tehum Care Services, Inc.

Pursuant to the divisional merger, the Debtor remained in existence and was allocated and remained vested with all inactive and expired customer contracts, as well as all historical liabilities related to such contracts.  The divisional merger agreement states that in return, the Debtor was released from its secured debt obligations to LoanCo, which were allocated to CHS.  As part of the divisional merger, the Debtor was allocated $1 million in cash, as well as the right to draw on the $15 million Funding Agreement.

**E.      Events Leading to Chapter 11.**

After the divisional merger, the Debtor was no longer an operating entity with active contracts or medical service providers.  Between May 2022 and February 2023, the Debtor sought to wind down its remaining business out of court.  During the same period, LoanCo asserts that it caused over $39 million to be paid to the Debtor's creditors pursuant to the Funding Agreement and a subsequent loan agreement.

However, the Debtor continued to be plagued by litigation.  On November 1, 2022, the Debtor entered into a Claims Management Services Agreement with Sigma RM, LLC ("Sigma").  Sigma represents that it is owned by a group of the Debtor's former in-house counsel and litigation support staff.  Pursuant to the Claims Management Services Agreement, the Debtor paid Sigma $150,000 per month.

The prepetition lawsuits filed against the Debtor generally fall into three categories: (a) vendor lawsuits, typically asserting breach of contract claims against the Debtor for unpaid invoices; (b) professional liability lawsuits, typically asserting medical malpractice and related claims against the Debtor; and (c) employment lawsuits, asserting employment discrimination or similar claims against the Debtor.

This litigation exposure ultimately led the Debtor to conclude a chapter 11 process was necessary to maximize and expedite creditor recoveries.

### III.  The Debtor's Chapter 11 Case

The Debtor's Chapter 11 Case was commenced by the filing of a voluntary chapter 11 petition on February 13, 2023 (the "Petition Date").  The Chapter 11 Case is pending before the Honorable Christopher M. López in the United States Bankruptcy Court for the Southern District of Texas.

**A.      Post-Filing Activities.**

**1.      The DIP Motion and the DIP Orders.**

As of the Petition Date, the Debtor had no cash on hand and because it was no longer an operating entity, had no means to obtain additional revenues.  The Debtor was not allocated any tangible real property under the divisional merger and, as of the Petition Date, though the Debtor was the beneficiary under the Funding Agreement, it did not appear that any additional amounts were available thereunder.[2] As a result, the Debtor was left with only potential Estate causes of action, tax refunds and similar receivables as potential collateral for post-petition financing.

On March 15, 2023, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens*

---

[2] The Debtor's professionals conducted an analysis of the amounts distributed pursuant to the Funding Agreement and determined that LoanCo funded at least $15 million to the Debtor's costs of operation and certain liabilities that arose prior to the divisional merger.

4872-0136-1543

*and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 185] (the "DIP Motion").  The DIP Motion set forth the terms of a senior secured loan facility in an aggregate principal amount of up to $10,000,000 (the "DIP Facility") funded by LoanCo.  The Debtor sought certain broad releases for LoanCo as part of the terms for the DIP Facility.

On March 22, 2023, the Bankruptcy Court held a hearing and entered the *Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 243] (the "First Interim DIP Order"), which has been amended and supplemented pursuant to Docket No. 476 (the "Second Interim DIP Order") and Docket No. 579 (the "Third Interim DIP Order," and together with the First Interim DIP Order and Second Interim DIP Order, the "DIP Orders").

To date, the Debtor has drawn $2.75 million of the DIP Facility.  As discussed more fully below, the Debtor anticipates drawing an additional $5.6 million on the DIP Facility to bring Professional Fee Claims current through August 31, 2023.

**2.      The Stay Extension Motion and Adversary Proceeding.**

On February 17, 2023, the Debtor filed its *Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 7] (the "Original Stay Motion").  By the Original Stay Motion, the Debtor sought to confirm the automatic stay applied to, or extend the automatic stay to cover, certain Non-Debtor Indemnified Parties (as defined in the Original Stay Motion) that were party to the Debtor's prepetition lawsuits.

On March 3, 2023, the Bankruptcy Court entered its *Order Regarding Debtor's Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 118] (the "Stay Order"). The Stay Order extended the automatic stay for 75 days to cover the litigation claims set forth on Exhibit 1 thereto.

On March 23, 2023, the Debtor commenced Adversary Proceeding No. 23-03049 (the "Adversary Proceeding") by filing its (i) *Complaint Seeking (I)(A) a Declaratory Judgment that the Automatic Stay Applies to Certain Claims and Causes of Actions Asserted Against Certain Non-Debtors and (B) an Extension of the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) a Preliminary Injunction Related to Such Actions* [Adv. No. 23-03049, Docket No. 1] (the "Adversary Complaint") and (ii) M*otion for an Order (I)(A) Declaring that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted against Certain Non-Debtors and (B) Extending the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) Preliminary Enjoining Such Actions* [Adv. No. 23-03049, Docket No. 2] (the "Adversary Stay Motion").  The Adversary Stay Motion sought substantially the same relief as the Original Stay Motion.

The Adversary Stay Motion was set for hearing on May 17, 2023.  Rather than take up the motion, the Bankruptcy Court ordered the Debtor, Committee and the Settlement Parties (defined below) to mediate their disputes, including the Adversary Stay Motion. All matters related to the Stay Order was subsequently adjourned to a date no earlier than August 31, 2023 [Docket No. 841].

At the Bankruptcy Court's suggestion, the Debtor has entered into stipulations with certain plaintiffs allowing them to proceed with their litigation under the circumstances set forth in the stipulations.  *See* Docket Nos. 237, 463, and 578.

**3.      Data Incident.**

While this case was pending, the Debtor received notice of a data incident that could have impacted data belonging to the Debtor and other parties.  Promptly after receiving such notice, the Debtor submitted a notice of claim to its applicable insurance carrier and engaged special data incident counsel.  The Debtor's special counsel has not identified potential causes of action or liabilities with respect to the Debtor arising out of or related to the incident.

4872-0136-1543

4. **The Trustee Motion.**

On June 30, 2023, certain creditors filed a motion seeking the appointment of a chapter 11 trustee. *See Various Creditors' Motion to Appoint a Chapter 11 Trustee* [Docket No. 731] (the "Trustee Motion"). The Trustee Motion contained various allegations of prepetition fraud by the Debtor's sole director, as well as postpetition misstatements by the same individual. The Debtor objected to the Trustee Motion. Neither the United States Trustee nor the Committee joined in the Trustee Motion.

On September 5, 2023, the Bankruptcy Court held a hearing on the Trustee Motion. During the hearing, the Committee expressed its position opposing the Trustee Motion. After considering the evidence and arguments of counsel, the Bankruptcy Court found that cause did not exist to appoint a chapter 11 trustee and denied the Motion. *See* Docket No. 932.

5. **The Mediation Order.**

On May 22, 2023, the Bankruptcy Court entered its *Stipulation and Agreed Order Regarding Appointment of a Mediator and Governing Related Mediation Procedures* [Docket No. 603] (the "Mediation Order"). The Mediation Order appointed the Honorable David R. Jones, United States Bankruptcy Judge for the Southern District of Texas, to mediate, among other things, (i) the releases sought in connection with the DIP Facility, (ii) the maximization of assets to be distributed through a chapter 11 plan, (iii) the Estate's claims against Debtor affiliates and related third parties, and (iv) the relief requested in the Adversary Complaint and Adversary Stay Motion. The Mediation Order also ordered the Debtor to invite its liability insurance carriers to participate in mediation(s).

To date, the Debtor has participated in three (3) separate mediations pursuant to the Mediation Order, each as described below.

(a) **The LSA Mediation.**

On July 13 and 14, 2023, Judge Jones conducted a mediation between the Debtor, the Committee, and Lone Star Alliance, Inc. ("LSA"). The mediation resulted in an agreed set of procedures for resolving and paying certain claims that fall within the Debtor's professional liability policies issued by LSA covering the Debtor's activities in the State of Arizona (the "LSA Arizona Policies").

On July 17, 2023, the Debtor filed its *Motion Pursuant to 11 U.S.C. §§ 105(a) & 502 and Bankruptcy Rules 3007 & 9019(b) for Entry of an Order Establishing Procedures for Resolution of a Certain Class of Claims with Rights Under Certain Arizona Insurance Policies Issued by Lone Star Alliance* [Docket No. 802] (the "9019 Motion"). The 9019 Motion sought approval of the Claims Resolution Procedures (as defined in the 9019 Motion), which provide a means for the impacted tort claimants to access available policy proceeds under the LSA Arizona Policies in an efficient manner. A hearing on the 9019 Motion was set for September 15, 2023. However, in light of the Global Settlement (defined below), the Debtor and the Committee opted to incorporate the Claims Resolution Procedures into the Plan and Confirmation Order. *See* Article III.B. The Claims Resolution Procedures are set forth in the form of proposed order granting the 9019 Motion, attached hereto as **Exhibit D**.

(b) **The Global Mediation.**

On August 21, 22 and 23, 2023, Judge Jones conducted a mediation between the Debtor, the Committee, YesCare, its wholly owned subsidiaries (including CHS TX, Inc.), Geneva, Perigrove 1018, Perigrove, HoldCo, LoanCo, and PharmaCorr LLC.[3] This mediation focused on resolving the Estate's claims against the Debtor's affiliate entities and certain related parties and individuals, including claims relating to the transfers referenced in Article II.C above, as well as claims relating to or arising out of the divisional merger. The mediation resulted in the Global Settlement discussed more fully in Article III.B below.

---

[3] YesCare, Geneva, Perigrove 1018, Perigrove, HoldCo, LoanCo, and PharmaCorr LLC are collectively referred to herein and in the Plan as the "Settlement Parties."

(c)     **The Lexington Mediation.**

On September 28, 2023, the Debtor, the Committee, and Lexington Insurance Company ("Lexington") participated in a mediation before Judge Jones. The goal of the mediation was to reach an agreed-upon path to maximize the insurance proceeds available for claims that fall within the Debtor's professional liability policies issued by Lexington. In the event a settlement is reached, the Proponents anticipate incorporating the terms of such settlement into the Plan.

**B.     The Global Settlement.**

On August 23, 2023, following three days of mediation conducted by Judge Jones, the Debtor, the Committee, and the Settlement Parties entered into a mediation term sheet resolving all issues among them in this Chapter 11 Case, subject to confirmation of the Plan (the "Global Settlement").

On October 7, 2023, as a result of a recently filed lawsuit, the *Wall Street Journal* published a story in which Judge Jones confirmed that he has been in a long-term romantic relationship with a lawyer who represented YesCare at the mediation. This relationship was not disclosed to the Debtor or the Committee and the Debtor and the Committee were unaware of this relationship prior to the article's publication.

While YesCare's lawyer attended the mediation, the primary participants over the three days of hard-fought negotiations were the Committee and the Debtor, on one side, and the Perigrove and M2 LoanCo entities, on the other. The Perigrove and M2 LoanCo entities were not represented by the same attorneys as YesCare; each had separate, independent counsel. The mediator pushed both sides aggressively and eventually, the Global Settlement was reached. While disappointed by the lack of disclosure, neither the Debtor nor the Committee believe that any potential conflict associated with the relationship impacted the negotiations or the Global Settlement in any way.

The Debtor and the Committee firmly believe that the Global Settlement maximizes the value of the Estate for the benefit of all creditors and that, as a result, they have a duty to continue to pursue its inclusion and incorporation in the Plan, and its approval as part of the Plan confirmation process. As set forth in this Disclosure Statement, the Global Settlement is an outcome that provides significant value to the Estate, avoids the risks of litigation of the claims among the parties, and eliminates years of protracted litigation which, even if successful, would significantly reduce any recovery by the costs of such litigation. Accordingly, the Debtor and the Committee strongly believe the settlement incorporated into the Plan meets the standard of reasonableness under Fed. R. Bankr. P. 9019(a) and should be approved.

In preparation for the mediation, the Debtor and the Committee completed a thorough investigation into these potential causes of action, including their strengths and weaknesses. Those potential causes of action include fraudulent transfer claims against various entities listed in the Debtor's Schedules, including entities with whom the Debtor's parent company entered into contracts, and/or various entities the Debtor's parent company owned or controlled. Successful litigation of each cause of action would require proof of actual or constructive fraud within the meaning of 11 U.S.C. § 548, the Texas Uniform Fraudulent Transfer Act, or similar statutes. To the extent these transfers were made to "insiders," as that term is defined under 11 U.S.C. § 547, they could also or alternatively be avoidable as preferential transfers under that statute.

The Debtor and the Committee identified additional avoidance claims which would implicate the divisional merger transaction, which is discussed in more detail on pages 6-7 of the Disclosure Statement. Although successful prosecution of these claims could bring significant assets into the Estate, the Debtor and the Committee concluded that such litigation would be incredibly protracted with challenging, novel, and fact-intensive issues, that liability and damages would be difficult to prove, and that collection of any judgment would be very difficult to obtain.

As described herein, the Global Settlement resolves all of these claims on behalf of the Debtor and its bankruptcy Estate, and grants releases to all of the persons involved and almost all of their officers and directors. The broad releases included also would encompass additional claims the Estate may have or have had beyond those outlined above. It also enumerates specific individuals to be released under the Global Settlement. The Committee's pre-mediation investigation identified potential tort and related claims against some, but not all, of

these persons for actions related to their respective roles with the Debtor and/or its related entities. These individuals, and their roles/titles with the Debtor, are:

- Yitzchak Lefkowitz a/k/a Isaac Lefkowitz, a director of the Debtor who also holds or held roles at related entities;
- Sara Ann Tirschwell, former Chief Executive Officer at Corizon Health, Inc. and YesCare;
- Ayodeji Olawale Ladele, Executive Vice President and Chief Medical Officer at Corizon Health, Inc. and YesCare;
- Beverly Michelle Rice, Senior Director and Assistant Controller at Corizon Health, Inc. and YesCare;
- Jeffrey Scott King, former Chief Legal Officer at Corizon Health, Inc. and current Executive Vice President and Chief Legal Officer at YesCare;
- Jennifer Lynee Finger, former Assistant General Counsel at Corizon Health, Inc. and current Assistant General Counsel at YesCare; and
- Frank Jeffrey Sholey, former Chief Financial Officer at Corizon Health, Inc. and current Chief Executive Officer at YesCare.

A summary of the settlement terms, which are part and parcel of the Plan, are as follows:

- The Settlement Parties shall pay the Debtor or Liquidation Trustee, as applicable, aggregate Cash in the amount of $37 million (the "Settlement Payment"). The Settlement Payment will be made in multiple tranches: (a) $25 million paid on the Effective Date (the "Initial Settlement Amount"); and (b) twelve installments of $1 million (each, an "Installment Settlement Payment"), with the first payment made thirty (30) days after the Effective Date and the subsequent 11 installments made every thirty (30) days thereafter until paid in full, with the final installment being made no later than 360 days after the Effective Date.

- On the Effective Date, the Settlement Parties shall release and waive all claims against the Debtor's Estate, including the DIP Lender's claims under the DIP Order that accrued prior to August 23, 2023, and the Proofs of Claim filed by Geneva Consulting LLC (KCC Claims Register No. 572 for $315,032.97) and M2 LoanCo, LLC (KCC Claims Register No. 589 for $24,032,965). Notwithstanding the foregoing, all amounts advanced by the DIP Lender pursuant to the DIP Order after August 23, 2023 shall not be released but shall instead be credited dollar-for-dollar against the Initial Settlement Amount.

- Upon payment in full of the Settlement Payment, the Releasing Parties (as defined below) shall release the following from any and all claims and causes of action: (a) the Settlement Parties; (b) M2 EquityCo LLC; (c) Valitás Intermediate Holdings Inc.; (d) Valitás Health Services, Inc.; (e) M2 Pharmacorr Equity Holdings LLC; (f) Pharmacorr/M2 LLC; (g) Pharmacorr Holdings LLC; (h) Endeavor Distribution LLC; (i) CHS Texas LLC; (j) Yes Care Holdings LLC; (k) Sigma RM, LLC; (l) DG Realty Management LLC; (m) Scaracor LLC; (n) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (o) Sara Ann Tirschwell; (p) Ayodeji Olawale Ladele; (q) Beverly Michelle Rice; (r) Jeffrey Scott King; (s) Jennifer Lynee Finger; (t) Frank Jeffrey Sholey; (u) for each Entity listed in (a) through (t), each of their respective current and former officers, directors, employees, managers, attorneys, professional advisors, and agents, but specifically excluding James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks.

- Upon payment in full of the Settlement Payment, there shall be deemed mutual releases by and among the Released Parties and creditors that do not opt-out of the third-party releases in Article IX.D of the Plan.

11

The Plan embodies the Global Settlement described above, and confirmation of the Plan will put to rest all disputes and potential disputes among the Debtor, the Committee, the Released Parties, and the Consenting Creditors who do not opt out of the release. The above description of the Global Settlement is a summary only; the actual terms of the Plan control.

The Global Settlement is the product of arms-length negotiations, and there was no fraud or collusion by and between the Debtor, the Committee, and the Settlement Parties. Litigation of the disputes raised at the mediation would be lengthy and costly, requiring proof of fact-intensive issues. Even if the parties litigated their disputes and a successful result was reached on behalf of the Debtor's Estate, any recovery would likely be significantly diminished by the cost and expense of litigation.

The Committee and the Debtor are mindful of their respective fiduciary obligations to act in the best interest of the Estate and all creditors and have evaluated the Global Settlement from that perspective. The Global Settlement allows the Debtor and the Committee to maximize recovery to the Estate, while avoiding the risks, costs, and delay of litigation. In addition, the Global Settlement provides significant benefit to the Debtor's Estate by allowing it to recover $37 million from the Settlement Parties for the benefit of all unsecured creditors. The Debtor and the Committee believe that the Global Settlement is fair, equitable, and in the best interest of the Debtor's Estate.

**C.     Exclusivity.**

Pursuant to prior order of the Bankruptcy Court, the deadline for the Debtor to file a plan was October 11, 2023 [Docket No. 971]. The Proponents filed the Plan on September 29, 2023, and the First Amended Plan on October 16, 2023. By order dated October [●], 2023, the Bankruptcy Court conditionally approved this Disclosure Statement, along with various procedures for soliciting votes on the Plan. A combined hearing to consider final approval of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") is set on or around **January 8, 2024, at [●] Central Time**.

**D.     Bar Date.**

The deadline for all creditors, including Governmental Units, to file proofs of claim against the Debtor was August 14, 2023. Any references in the Plan or Disclosure Statement to any Claims or Interests shall not constitute an admission of the existence, nature, extent or enforceability thereof.

**E.     Claims Against the Debtor.**

**1.     In General.**

A summary of Claims against the Debtor as set forth in the Proofs of Claim filed against the Debtor's Estate is as follows:[4]

| Priority Tax Claims | Other Priority Claims | Other Secured Claims | Convenience Class Claims | Non-Personal Injury Claims | Personal Injury Claims |
|---|---|---|---|---|---|
| $8.5 million | $717,600 | $16.4 million | $101,600 | $139.9 million | $760 million |

To date, Debtor has performed only a preliminary review of the actual Proofs of Claim filed. After accounting for duplicate claims, unliquidated claims, and claims that are objectionable on their face, the Debtor believes the pool of Allowed Non-Personal Injury Claims will range between $75 million and $100 million and the pool of Allowed Personal Injury Claims will range between $50 million and $75 million. The Debtor, the Liquidation Trust, and the Personal Injury Trust reserve any and all rights, claims, objections, or other defenses to

---

[4] Since all general unsecured claims were marked as contingent, unliquidated or disputed in the Debtor's Schedules, the discussion of Claims in this Disclosure Statement is limited to Proofs of Claim submitted to the Claims Agent.

all Claims. Objections to Claims will be pursued by the Liquidation Trust or the Personal Injury Trust, as applicable, after the Plan becomes effective.

2.      **Administrative Expense Claims and Professional Fee Claims.**

The Proponents believe that, as of the date of entry of the Confirmation Order, there will be approximately $4.1 million in unpaid Administrative Claims, comprised mostly of Professional Fee Claims arising after September 1, 2023. In addition to the Professional Fee Claims, the Debtor expects that Sigma will file an Admin Claim for approximately $1.2 million.[5]

Requests for payment of Administrative Claims must be filed no later than thirty (30) days following the Effective Date. Under the Plan, Allowed Administrative Claims will be paid in full on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after the date on which an order of the Bankruptcy Court allowing such Administrative Claim becomes a Final Order.

Final applications for the payment of Professional Fee Claims must be filed no later than forty-five (45) days following the Effective Date. The Liquidation Trust shall pay each Professional Fee Claim from the funds held in the Professional Fee Escrow Account no later than ten (10) days following entry of an order by the Bankruptcy Court Allowing such Professional Fee Claim.

3.      **DIP Claims.**

DIP Claims arising under the DIP Order that accrued prior to August 23, 2023 will be released pursuant to the Global Settlement. Any amounts advanced by the DIP Lender pursuant to an order granting the Debtor's *Motion for Entry of Fourth Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 928] (the "Fourth Interim DIP Motion") shall reduce the Initial Settlement Amount on a dollar-for-dollar basis. Under the budget attached to the Fourth Interim DIP Motion, the Debtor proposes to borrow an additional $5.6 million to pay Professional Fee Claims through August 31, 2023.

4.      **Priority State and Federal Tax Claims.**

The Proponents believe that, as of the Confirmation Date, there will be approximately $8.5 million owing in respect of Priority State and Federal Tax Claims. Each state Governmental Unit that holds an Allowed Priority Tax Claim will paid in full in Cash no later than ninety (90) days after the date on which such Priority Tax Claim becomes Allowed. Each federal Governmental Unit that holds an Allowed Priority Tax Claim will receive, at the sole option of the Debtor or Liquidation Trustee, as applicable, either:  (1) an amount of Cash from the ERC Fund equal to the amount of such Allowed Priority Tax Claim by the later of (a) ninety (90) days after the date on which such Priority Tax Claim becomes Allowed, or (b) ten (10) days after the date on which the ERC Fund is funded; or (2) regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

IV.  **The Plan**

Section IV of this Disclosure Statement is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the Plan, the

---

[5] Since the commencement of the Bankruptcy Case, the Committee has disputed the value of the services provided by Sigma and asked the Debtor to refrain from making payments under the pre-petition contract between the Debtor and Sigma. The Debtor paid $150,000 to Sigma for the March 2023 invoice and $120,000 as partial payment for the April 2023 invoice. Sigma contends (and the Committee disputes) that it continued providing services to the Debtor for the remainder of the Bankruptcy Case. The Debtor expects that Sigma will file an Administrative Claim for its unpaid post-petition invoices (which will be approximately $1.2 million, or $150,000 per month for the last eight months). The Committee or the Post-Effective Date Debtor (including one of the Trustees) will have the right to object to Sigma's Administrative Claim, if filed in a timely manner.

Plan Supplement and any attachments to the Plan. **Although the statements contained in this Disclosure Statement include summaries of the provisions of the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all related terms and provisions and should not be relied upon for a comprehensive discussion of the Plan.** Instead, reference is made to the Plan, the Plan Supplement and any attachments to the Plan for the full and complete statements of such terms and provisions. The Plan itself, in addition to the Plan Supplement and any attachments to the Plan will control in all respects. To the extent there are any inconsistencies between this Section IV and the Plan, the Plan Supplement and any attachments to the Plan, the Plan, Plan Supplement and the attachments to the Plan, as applicable, shall govern.

**A.      Summary of Key Plan Provisions.**

| Article | Plan Pages | Summary |
|---------|------------|---------|
| I | 1-9 | **Definitions and Rules of Interpretation**. This article contains the definitions used throughout the Plan, as well as conventions for computing time and determining the governing law that will apply to various provisions in the Plan. |
| II | 10-12 | **Administrative and Priority Claims**. This article details the treatment for certain Priority and Administrative Claims, such as state and federal taxes, post-bankruptcy loans and compensation of bankruptcy professionals. These types of claims are afforded higher payment priority under the Bankruptcy Code and, thus, the Debtor must ensure that they are paid or otherwise dealt with before the Plan can provide payments to other General Unsecured Claims. |
| III | 12-15 | **Classification and Treatment of Claims**. This article summarizes the different categories of claims and details the varying treatments for each class of Claims. A more detailed description of the Plan treatment is set forth immediately below in Article IV.B of this Disclosure Statement. |
| IV | 15-20 | **Means of Implementation**. This article contains the various provisions that are critical to the implementation of the Plan, including the terms of the Global Settlement in Article IV.B and the creation of the Liquidation Trust and Personal Injury Trust, as detailed in Article IV.E. This article also specifies how assets will vest in each of the Trusts and how Retained Causes of Action will be preserved for the benefit of creditors. |
| V | 20-22 | **Executory Contracts and Unexpired Leases**. This article details how Executory Contracts and Unexpired Leases will be treated under the Plan. By default, unless otherwise specified in the Plan, a Plan Supplement or separate motion filed with the Bankruptcy Court, all Executory Contracts and Unexpired Leases will be rejected. The Debtor's rights under insurance policies will be preserved under this article. |
| VI | 22-24 | **Distributions**. This article details how distributions will be managed after the Effective Date. |
| VII | 24-25 | **Reserves**. To ensure timely and proper payment of Priority, Administrative and Other Secured Claims consistent with Article II of the Plan, this article requires the Debtor or Liquidation Trustee to establish and maintain reserves for payment of Allowed Administrative and Priority Claims, as well as Other Secured Claims. |
| VIII | 25-27 | **Procedures for Resolving Certain Claims**. This article details how certain contingent, unliquidated and disputed Claims will be handled after the Effective Date. |

| Article | Plan Pages | Summary |
|---------|-----------|---------|
| IX | 27-30 | **Releases, Exculpations and Injunctions**. As summarized further in Article IV.C of this Disclosure Statement, Article IX of the Plan contains Debtor Releases (Article IX.C) and the Third-Party Releases (Article IX.D). This article also includes Exculpations (Article IX.E) and injunctions (Article IX.F). |
| X | 30 | **Conditions Precedent**. This article lists the various conditions precedent to the Effective Date of the Plan. As set forth in Article X.B, any of these conditions may be waived by joint agreement of the Proponents. |
| XI | 31 | **Modification, Revocation or Withdrawal**. This article details the terms for the Proponents to modify, revoke or withdraw the Plan. The Proponents do not anticipate making material modifications to the Plan, nor do they anticipate revoking or withdrawing the Plan. |
| XII | 31-32 | **Retention of Jurisdiction**. All plans contain provisions regarding the items over which the Bankruptcy Court retains jurisdiction after confirmation and the effective date. Article XII enumerates 19 different types of matters over which the Bankruptcy Court shall retain jurisdiction to decide, should they become issues in the future. |
| XIII | 32-35 | **Miscellaneous Provisions**. The last few pages of the Plan contain various miscellaneous provisions, such as where to send notice and how to find the Plan Supplement and other documents. |

**B.      Treatment of Classes of Claims and Interests.**

To the extent a Class contains Allowed Claims or Interests, the classification of Allowed Claims and Interests is specified below.

1.      Class 1 — Other Priority Claims

(a)      *Treatment:*  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash from the Liquidation Trustee on (or as soon as reasonably practicable after) the later of (i) the Effective Date or (ii) thirty (30) days after such Other Priority Claim becomes Allowed, or (iii) a date on which the Holder of such Other Priority Claim and the Debtor or Liquidation Trustee, as applicable, shall otherwise agree in writing.

(b)      *Voting:*  Class 1 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Secured Claims

(a)      *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the sole option of the Debtor or Liquidation Trustee, as applicable, either:

(i)      payment in full in Cash on the later of (w) the Effective Date (or as soon as reasonably practicable thereafter), (x) the date on which such Other Secured Claim becomes Allowed, (y) the date payment on account of such Other Secured Claim is due; or (z) the date on which the Holder of such Allowed Other

Secured Claim and the Debtor or the Liquidation Trustee, as applicable, shall otherwise agree in writing;

(ii)     the Debtor's interest in the collateral securing such Allowed Other Secured Claim; or

(iii)    other treatment that renders such Allowed Other Secured Claim Unimpaired.

(b)     *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.     Class 3 — Convenience Claims

(a)     *Treatment*: On the first Business Day that is thirty (30) days following the Effective Date, each Holder of a Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash.

(b)     *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

4.     Class 4 — Non-Personal Injury Claims

(a)     *Treatment*:

(i)     Subject to first seeking a recovery from any applicable insurance or other third parties pursuant to Article VI.G, on the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Non-Personal Injury Claim agrees to less favorable treatment, each Holder of an Allowed Non-Personal Injury Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the Liquidation Trust. Thereafter each such Holder shall receive Cash distributions from the Liquidation Trust. Distributions from the Liquidation Trust to Holders of Allowed Non-Personal Injury Claims shall be on a Pro Rata basis with all other holders of Liquidation Trust beneficial interests in accordance with the terms of the Liquidation Trust Agreement. For the avoidance of doubt, only Consenting Creditors will have the right to receive distributions from the Settlement Payment and excess ERC Funds, if any.

(ii)     Notwithstanding the above, each Holder of an Allowed Non-Personal Injury Claim shall have the option on the Ballot to elect for an Expedited Distribution. Any Holder of a Non-Personal Injury Claim who elects for the Expedited Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the releases contained in Article IX.D. An election on the Ballot for an Expedited Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot. An Expedited Distribution shall be paid by the Liquidation Trustee or an insurer, as applicable, on the later of (a) the Effective Date or (b) within ten (10) business days after such General Unsecured Claim becomes an Allowed Claim by Final Order.

(b)     *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed Non-Personal Injury Claims are entitled to vote to accept or reject the Plan.

16

5.      Class 5 — Personal Injury Claims

    (a)      *Treatment*:

        (i)      Subject to first seeking a recovery from any applicable insurance or other third parties pursuant to Article VI.G, on the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Personal Injury Claim agrees to less favorable treatment, each Holder of an Allowed Personal Injury Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the Personal Injury Trust.  Thereafter, each such Holder shall receive Cash distributions from the Personal Injury Trust.  Distributions from the Personal Injury Trust to Holders of Allowed Personal Injury Claims shall be paid to holders of Personal Injury Trust beneficial interests in accordance with the terms of the Personal Injury Trust Agreement.  For the avoidance of doubt, any treatment provided to one or more Holders of Personal Injury Claims pursuant to the provisions of the Confirmation Order approving the Insurance Settlement Motion shall take precedence over the treatment provided in this Article III.B.5.

        (ii)     Notwithstanding the above, each Holder of an Allowed Personal Injury Claim shall have the option on the Ballot to elect for an Expedited Distribution.  Any Holder of a Personal Injury Claim who elects for the Expedited Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the releases contained in Article IX.D.  An election on the Ballot for an Expedited Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot.  An Expedited Distribution shall be paid by an insurer, or the Personal Injury Trustee, as applicable, within sixty (60) days following the Effective Date.

    (b)      *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Personal Injury Claims are entitled to vote to accept or reject the Plan.

6.      Class 6 — Contingent Indemnification Claims

    (a)      *Treatment:*  On the Effective Date, all Contingent Indemnification Claims shall be Disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code.  Holders of Contingent Indemnification Claims shall not receive any distribution on account of such Claims.

    (b)      *Voting*:  Class 6 is Impaired under the Plan.  Holders of Contingent Indemnification Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

7.      Class 7 — Interests in the Debtor

    (a)      *Treatment:*  On the Effective Date, all Interests in the Debtor shall be cancelled, released, discharged, and extinguished.  Holders of Interests in the Debtor shall not receive any distribution on account of such Interests.

    (b)      *Voting*:  Class 7 is Impaired under the Plan.  Holders of Interests in the Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.      **Release, Exculpation and Injunction Provisions.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including third-party releases of and for the Debtor, the Released Parties or the Exculpated Parties, as applicable.

The Proponents believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate and in accordance with applicable law because, among other things, the releases are narrowly tailored to the Debtor and the Chapter 11 Case, and the Released Parties have contributed value to the Debtor, which facilitated the Debtor's ability to propose and pursue confirmation of the Plan.  The Proponents further believe that such releases, exculpations, and injunctions are a necessary part of the Plan.  The Proponents will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of confirmation of the Plan.

1.      **Released Parties, Settlement Parties and Exculpated Parties.**

The Released Parties are collectively the following, in each case in its capacity as such with each being a "*Released Party*":  (a) the Debtor; (b) Russell Perry, the Debtor's Chief Restructuring Officer; (c) the Committee and its members; (d) the Liquidation Trustee; (e) the Personal Injury Trustee; (f) the Settlement Parties; (g) M2 EquityCo LLC; (h) Valitás Intermediate Holdings Inc.; (i) Valitás Health Services, Inc.; (j) M2 Pharmacorr Equity Holdings LLC; (k) Pharmacorr/M2 LLC; (l) Pharmacorr Holdings LLC; (m) Endeavor Distribution LLC; (n) CHS Texas LLC; (o) Yes Care Holdings LLC; (p) Sigma RM, LLC; (q) DG Realty Management LLC; (r) Scaracor LLC; (s) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (t) Sara Ann Tirschwell; (u) Ayodeji Olawale Ladele; (v) Beverly Michelle Rice; (w) Jeffrey Scott King; (x) Jennifer Lynee Finger; (y) Frank Jeffrey Sholey; (z) for each Entity listed in (a) through (y), each of their respective current and former officers, directors, and managers; (aa) for each Entity listed in (b) through (y), each of their respective current and former employees and agents; and (bb) for each Entity listed in (d) through (y), each of their respective attorneys and other professional advisors; *provided*, *however*, that James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks shall not be a "Released Party."

The Settlement Parties are collectively, YesCare Corp., its wholly owned subsidiaries (including CHS TX, Inc.), Geneva Consulting, LLC, Perigrove 1018, LLC, Perigrove, LLC, M2 HoldCo, LLC, M2 LoanCo, LLC, and PharmaCorr LLC.

The Exculpated Parties are collectively, and in each case in its capacity as such:  (a) the Debtor; (b) the Committee and its members; and (c) Russell Perry, the Debtor's Chief Restructuring Officer.

2.      **Debtor Release.**

Article IX.C provides for releases of certain claims and causes of action the Debtor may hold against the Released Parties, including derivative claims. The Debtor Release is not effective until payment in full of the Settlement Payment.

**Pursuant to section 1123(b) of the Bankruptcy Code, upon payment in full of the Settlement Payment as provided in Article IV.B.1, and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, its Estate, and the Post-Effective Date Debtor shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each and all of the Released Parties from any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise that the Debtor, the Post-Effective Date Debtor, or the Estate has, have or may have against the Released Parties.**

**Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any Released Party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

3. **Third-Party Releases.**

Article IX.D provides for releases of certain Claims and Causes of Action the Releasing Parties may hold against the Debtor, the Liquidation Trust, the Personal Injury Trust, and the Released Parties relating to the Debtor or its predecessors, the Chapter 11 Case, or property of the Estate. The Released Parties are also granting mutual releases to Consenting Creditors. The Third-Party Releases are not effective until payment in full of the Settlement Payment.

The Releasing Parties are collectively the following, in each case in its capacity as such with each being a "*Releasing Party*": (a) the Debtor; (b) the Committee; (c) the Liquidation Trustee; (d) the Personal Injury Trustee; (e) the Settlement Parties; and (f) Consenting Creditors.

The Consenting Creditors are collectively the following, in each case in its capacity as such with each being a "*Consenting Creditor*": (a) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan <u>and</u> who do not check the box on the applicable form to affirmatively opt out of the releases contained in Article IX.D; (b) all Holders of Claims or Interests that abstain from voting on the Plan, vote to reject the Plan, or are deemed to reject the Plan <u>and</u> who do not (i) check the box on the applicable form to affirmatively opt out of the releases contained in Article IX.D or (ii) object to the Plan in respect of the releases; and (c) all Holders of Claims who elect to receive an Expedited Distribution.

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, upon payment in full of the Settlement Payment as provided in Article IV.B.1, and in exchange for other good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each and all of the Debtor, Post-Effective Date Debtor, and each Released Party, to the fullest extent permissible under applicable law, from any and all any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively (including any Causes of Action asserted or assertable on behalf of the Debtor, the Post-Effective Date Debtor, or the Estate, as applicable), matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, arising from, relating to, or connected with the Debtor (or any predecessor entity) or the Chapter 11 Case or affecting property of the Debtor's Estate, the Plan or the administration and implementation of the Plan, or based upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Upon the payment in full of the Settlement Payment as provided in Article IV.B.1, each of the Released Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Consenting Creditor to the fullest extent permissible under applicable law, from any and all any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, arising from, relating to, or connected with, the Debtor (or any predecessor entity) or the Chapter 11 Case or affecting property of the Debtor's Estate, the Plan or the administration and implementation of the Plan, or based upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

Notwithstanding anything contained herein to the contrary, the foregoing releases do not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, or (ii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

Each of the Releasing Parties knowingly grants the Third Party Releases notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statute or common law principle which would limit the effect of the Third Party Release to those claims actually known or suspected to exist as of the Effective Date.  In connection with their agreement to the foregoing Third Party Releases, the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:  "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

4.      Exculpation.

Article IX.E provides for the release and exculpation of the Exculpated Parties for certain acts or omissions taken in connection with the Chapter 11 Case.  The Exculpation contains a carve-out for actual fraud, willful misconduct or gross negligence.

Upon the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest, for any claim or cause of action arising from the Petition Date through the Effective Date, arising from, relating to, or connected with the administration of the Chapter 11 Case, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be deemed to have, participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code.  Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

5.      Injunction and Gate Keeping.

Article IX.F permanently enjoins Entities who have held, hold, or may hold Claims or Interests that are released or exculpated pursuant to the Plan from asserting such Claims or Interests against the Debtor, the Liquidation Trust, the Personal Injury Trust, the Exculpated Parties, or the Released Parties.

Upon the Effective Date, to the fullest extent permissible under applicable law, all Enjoined Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Post-Effective Date Debtor, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to claims or interests that have been released, discharged, settled, or are subject to exculpation under this Plan; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any claims or interests that have been released, discharged, or are subject to exculpation under this Plan; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any claims or interests that have been released, discharged, or are subject to exculpation under this Plan; (4) interfering

with the Consummation, implementation, and execution of the Plan and all documents related to the Plan; and (5) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any claims or interests that have been released, discharged, or are subject to exculpation under this Plan, unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise.

No Person or Entity may commence or pursue a claim or cause of action of any kind against the Debtor, the Post-Effective Date Debtor, any Released Party, or any Exculpated Party that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or cause of action subject to Article IX.C, Article IX.D, or Article IX.E, including any claim or cause of action that was asserted or assertable on behalf of the Debtor, including any derivative, alter ego, successor liability, or similar claims and causes of action based on general harm to the Debtor, Holders of Claims and Interests, or any other party in interest, or a theory of lack of separation between the Debtor and a Released Party or Exculpated Party, without the Bankruptcy Court (i) first determining, upon motion that attaches a copy of the proposed complaint or petition, and after notice and a hearing, that such claim or cause of action represents a direct (as opposed to derivative) and colorable claim of any kind and (ii) specifically authorizing such Person or Entity to bring such claim or cause of action against the Debtor, the Post-Effective Date Debtor, any Released Party, or any Exculpated Party.  At the hearing on such motion, the Bankruptcy Court shall have sole and exclusive jurisdiction to assess whether the proposed complaint or petition satisfies the applicable Federal Rules of Civil Procedure (or other applicable rules of procedure), including rule 8 and rule 9 (as applicable), and to determine whether such claim or cause of action represents a colorable claim of any kind.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

Article IX.F also contains a gate keeping provision, requiring that enjoined Entities seek Bankruptcy Court approval before asserting any claim against a Released Party or Exculpated Party that could have been asserted by the Debtor or otherwise is related to the Chapter 11 Case or the Plan.

No Person or Entity may commence or pursue a claim or cause of action of any kind that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor, the administration of the Liquidation Trust or the Personal Injury Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind that is not resolved pursuant to a Final Order, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence, and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, to the extent legally permissible and as provided for in Article XII, shall have jurisdiction to adjudicate the underlying claim or cause of action to the extent colorable.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under the Plan shall be deemed to have consented to the injunction provisions set forth in this Article IX.  The Debtor, the Post-Effective Date Debtor, the Exculpated Parties, or the Released Parties shall be entitled to seek sanctions by motion for contempt or other appropriate proceeding for any violations of the Confirmation Order or this Plan, including the Release, Exculpation, Injunction, and Gate Keeping provisions set forth in this Article IX.

## V.   The Liquidation Trust and the Personal Injury Trust

### A.      Two Trusts

The Plan separates these two groups of creditors into two trusts in order to provide all claimants a process that is fair and equitable both as to the funds they ultimately receive and the process they will use for that recovery. Holders of Personal Injury Claims (Class 5 Claims) will receive an interest in the Personal Injury Trust, and Holders of Non-Personal Injury Claims (Class 4 Claims) will receive an interest in the Liquidation Trust.

The reason for the two trusts is that the Claims generally fall into two broad categories—Personal Injury Claims and Non-Personal Injury Claims.  As discussed in the introductory pages of this Disclosure Statement, the Debtor and the Committee had good reasons for dividing the Claims into these two broad categories.

First, most, if not all, of the Personal Injury Claims include multiple third-party defendants in addition to the Debtor, whereas the Non-Personal Injury Claims largely name only the Debtor and its affiliates as defendants. Second, Personal Injury Claims are subject to professional liability insurance policies, whereas very few of the Non-Personal Injury Claims asserted have any potential to implicate insurance coverage.  Finally, the Bankruptcy Code prevents the Bankruptcy Court from reaching a final determination as to the value of Personal Injury Claims without the consent of the Holders of such Claims, whereas the Bankruptcy Court may hear and resolve all Non-Personal Injury Claims.

Because of these distinctions, Holders of Personal Injury Claims potentially have multiple sources of funds from which to recover claims.  Holders of Non-Personal Injury Claims, on the other hand, will be limited to the Estate's existing cash and any additional assets generated from lawsuits and tax refunds for their recovery. Additionally, Holders of Non-Personal Injury Claims must have the value of their claim decided by the Bankruptcy Court.  Holders of Personal Injury Claims may choose to have the value of their claim determined by a court other than the Bankruptcy Court that has jurisdiction over such claims.

### B.      The Liquidation Trust.

All Holders of Class 4 Allowed Non-Personal Injury Claims will receive, in full and final satisfaction of such Claim, a beneficial interest in the Liquidation Trust.  Thereafter each such Holder shall receive Cash distributions from the Liquidation Trust.  Distributions from the Liquidation Trust to Holders of Allowed Non-Personal Injury Claims shall be on a Pro Rata basis with all other holders of Liquidation Trust beneficial interests, in accordance with the terms of the Liquidation Trust Agreement.  A copy of the proposed Liquidation Trust Agreement is attached hereto as **Exhibit B**.

#### 1.      Liquidation Trust Assets.

On the Effective Date, the Liquidation Trust will be funded with all assets of the of the Debtor or its Estate existing on the Effective Date (including all Retained Causes of Action) that are not Personal Injury Trust Assets, after giving effect to all distributions required to be made as of or prior to the Effective Date.  As set forth in Article IV.J of the Plan, the Debtor reserves and, as of the Effective Date, assigns to the applicable Trust the Causes of Action identified in the Plan Supplement as Retained Causes of Action.  On and after the Effective Date, the Liquidation Trustee and Personal Injury Trustee, as appropriate may pursue Retained Causes of Action on behalf of and for the benefit of the applicable Trust beneficiaries.  The Debtor incorporates the Schedules by reference.

With respect to the Global Settlement, the Liquidation Trust will receive (i) seventy-seven percent (77%) of the Cash from the $25 million Initial Settlement Payment after payment of Allowed Administrative Claims and Allowed Priority Tax Claims and (ii) fifty percent (50%) of the Cash from each Installment Settlement Payment. The Debtor and the Committee estimate that the Liquidation Trust will receive between $14.7 million and $16.5 million of the $37 million Settlement Payment.

The Liquidation Trust will also receive any excess amount of Cash from the ERC Fund after payment in full of Priority Federal Tax Claims and payment of any professional fees incurred by the Liquidation Trust in order to obtain the ERC.  The ERC is a tax credit for businesses that continued to pay employees while shut down due to

the COVID-19 pandemic or had significant declines in gross receipts from March 13, 2020 to December 31, 2021. As a healthcare service provider impacted by the COVID-19 pandemic, the Debtor believes it may be entitled to a significant ERC for tax years 2020 and 2021. The Debtor and the Committee estimate that after payment in full of Priority Federal Tax Claims, the remaining ERC could be between $5 million and $10 million. However, as discussed below, there can be no assurance when, or in what amount, any ERC will actually be paid.

### 2. Liquidation Trust Claims Administration Process.

Holders of Allowed Non-Personal Injury Claims will receive payment from the Liquidation Trust via a multi-step process set forth in the Liquidation Trust Agreement.

First, a Holder of a Class 4 Non-Personal Injury Claim will have the opportunity on the Ballot to elect to receive an Expedited Distribution of $5,000 in return for a full release of its Claim. If the Holder of the Claim elects the Expedited Distribution, and the Liquidating Trustee, who is in charge of the Liquidating Trust, confirms they are eligible, they will receive the settlement payment within 60 days of the date the Plan becomes effective.

If a Holder of a Class 4 Non-Personal Injury Claim does not choose to receive a $5,000 Expedited Distribution, they will be required under the terms of the Liquidation Trust Agreement to participate in a mediation, an out-of-court claims process where they meet with the Trustee and a neutral facilitator to potentially agree on an amount for an Allowed Claim. Before the mediation occurs, the Trustee will make a settlement proposal, and the Claimant may respond with additional information if they do not wish to accept the Liquidation Trustee's proposal. If the Claim is resolved through (or before) mediation, nothing further will be required before distributions can be made on the Claim.

If a Holder of a Class 4 Non-Personal Injury Claim cannot reach an agreement on the amount of an Allowed Claim through mediation or pre-mediation settlement, the Liquidation Trustee may file an objection to the Claim, and the Bankruptcy Court will determine whether the Claim should be Allowed and, if so, in what amounts. The Holder of the Class 4 Non-Personal Injury Claim will have its day in the Bankruptcy Court to present evidence and legal argument in support of the Claim under all applicable rules and law.

### C. The Personal Injury Trust.

All Holders of Class 5 Allowed Personal Injury Claims will receive, in full and final satisfaction of such Claim, a beneficial interest in the Personal Injury Trust. Under the terms of the Personal Injury Trust Agreement, distributions from the Personal Injury Trust to Holders of Allowed Personal Injury Claims shall be paid to holders of Personal Injury Trust beneficial interests in accordance with the terms of the Personal Injury Trust Agreement. A copy of the proposed Personal Injury Trust Agreement is attached hereto as **Exhibit C**.

### 1. Personal Injury Trust Assets.

On the Effective Date, the Personal Injury Trust will be funded with (i) twenty-three percent (23%) of the Cash from the Initial Settlement Payment after payment of Allowed Administrative Claims and Allowed Priority Tax Claims, (ii) fifty percent (50%) of the Cash from each Installment Settlement Payment, and (iii) all rights of the Debtor under its professional liability insurance policies, including Causes of Action against insurers providing such policies. The Debtor and the Committee estimate that the Personal Injury Trust will receive between $8.6 million and $9.1 million of the $37 million Settlement Payment.

### 2.      Personal Injury Trust Claims Administration Process.

Holders of Allowed Personal Injury Claims will receive payment from the Personal Injury Trust via a multi-step process set forth in the Personal Injury Trust Agreement.[6]

First, a Holder of a Class 5 Personal Injury Claim will have the chance on their Ballot to choose to receive an Expedited Distribution of $5,000 in return for a full release of their Claim.  If the Claimant chooses this Expedited Distribution and the Personal Injury Trustee, who is in charge of the Personal Injury Trust, confirms they are eligible, they will receive the settlement payment within 60 days of the date the Plan becomes effective.

If a Holder of a Class 5 Personal Injury Claim does not choose to receive a $5,000 settlement, they will be required to participate in a mediation, an out-of-court claims process where they meet with the Trustee and a neutral facilitator to potentially agree on an amount for an Allowed Claim.  All defendants in these claims and any insurers for policies that may cover the Claim will be invited to attend the mediation, and because the Personal Injury Trust will receive all the Debtor's rights in insurance policies relating to Personal Injury claims, it will be able to negotiate with and pursue rights against the Debtor's insurers.

Before the mediation occurs, the Personal Injury Trustee will provide the Claimant information about the Personal Injury Trustee's view as to the amount of the potentially Allowed Claim, as well as what insurance policies might apply, and any other information about those policies.  The Claimant can respond with additional information if they disagree with the Personal Injury Trustee's analysis on the Claim or the insurance policies.  If the Claimant and Personal Injury Trustee reach agreements on the Allowed Claim and/or reach a settlement agreement involving payment from other sources, mediation is the final part of the process aside from payment of the claim.

If a Claimant cannot reach an agreement on the amount of an Allowed Claim through mediation, the automatic stay in place will be lifted as to their claim and they will be able to pursue their case outside of Bankruptcy Court against the Debtor and any other parties.

At the end of this process, each Holder of a Personal Injury Claim will have (a) received payment on their claim via expedited settlement or sources other than the Debtor; (b) agreed with the Personal Injury Trustee on an Allowed Claim; (c) received an Allowed Claim as a result of winning a judgment against the Debtor outside of Bankruptcy Court after the automatic stay is lifted; or (d) had their claim disallowed by choosing to pursue it outside of Bankruptcy Court without success.  The Personal Injury Trust will pay creditors based on the amounts of their Allowed Claims.

Because a Holder of a Personal Injury Claim has multiple potential sources of a payment for their claim, the Personal Injury Trust has to take into account where funds come from and whether funds have been received by the Holder of the Claim in order to make sure the assets of the Personal Injury Trust are distributed fairly.

If a Holder of an Allowed Class 5 Personal Injury Claim gets a right to payment from the Debtor's insurer as part of a settlement or as a result of a judgment, the insurer's payment will go into a subtrust as set forth more fully in Exhibit 2 to the Personal Injury Trust Agreement (attached to this Disclosure Statement as **Exhibit C**).  Further information regarding the Debtor's insurance policies may be found in **Schedule 2** to this Disclosure Statement.  The members of that subtrust will share in the insurance payments based on the amounts of their Allowed Claims.  If a Holder of an Allowed Claim is successful in court outside of bankruptcy and gets a judgment against the Debtor, the holder will have to show the Personal Injury Trustee that they have tried to collect money from any other Defendants who are liable for that that judgment, and their Allowed Claim will be reduced by the amount they have already collected.  Finally, the Personal Injury Trustee will pay to Holders of Personal Injury Claims their share of the assets in the Personal Injury Trust based on the amount of their Allowed Claims following these adjustments.

---

[6] For the avoidance of doubt, any treatment provided to one or more Holders of Allowed Personal Injury Claims pursuant to the provisions of the Confirmation Order approving the 9019 Motion shall take precedence over the treatment provided in the Plan and the claims administration process set forth in the Personal Injury Trust Agreement.

4872-0136-1543

## VI. <u>Risk Factors</u>

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTOR WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PLAN SUPPLEMENT AND THE OTHER DOCUMENTS REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S RESTRUCTURING AND CONSUMMATION OF THE PLAN.

**A.**     **Bankruptcy Law Considerations.**

    **1.**     **The Debtor Will Consider All Available Alternatives if the Plan Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor.**

If the transactions contemplated by the Plan are not implemented, the Proponents will consider all available alternatives, including filing an alternative chapter 11 plan, converting to chapter 7, and any other transaction that would maximize the value of the Debtor's Estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtor than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Case, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

    **2.**     **Risks Related to Confirmation and Consummation of the Plan.**

        **(a)**     **Conditions Precedent to Confirmation May Not Occur.**

As more fully set forth in Article X of the Plan, the occurrence of confirmation and the Effective Date are each subject to a number of conditions precedent.  If each condition precedent to confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place.  In the event that the Plan is not confirmed or is not consummated, the Chapter 11 Case will likely convert to a case under chapter 7 of the Bankruptcy Code.

        **(b)**     **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class.  The Proponents believe the classification of Claims and Interests under the Plan complies with the requirements of the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and the Proponents may need to modify the Plan.  Such modification could require a resolicitation of votes on the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Plan's classifications of Claims and Interests is not appropriate.

        **(c)**     **The Debtor May Not Be Able to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Proponents may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.  The Proponents do not believe that any such transaction exists or is likely to exist that would be more beneficial than the Plan.

(d)      **The Proponents May Not Be Able to Secure Confirmation.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular Class under the plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

Subject to the limitations contained in the Plan, the Proponents reserve the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e)      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including third-party releases relating to claims and causes of action that may otherwise be asserted against the Debtor or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and, therefore, may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Plan because the Released Parties, the Debtor, and Exculpated Parties have made significant contributions to the Debtor's proposed exit from chapter 11 and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of Plan and the significant recovery it affords to Holders of Allowed Claims.

(f)      **The Debtor May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Proponents believe that the Plan satisfies these requirements, and the Proponents may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

      (g)      **The Chapter 11 Case May Be Converted to a Case under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Proponents believe that liquidation under chapter 7 would result in significantly decreased distributions being made to creditors than those provided for in the Plan because: (a) it is unlikely that the Global Settlement would be consummated outside of the protections of the Plan, (b) significant additional administrative expenses would result from the appointment of a chapter 7 trustee, and (c) additional litigation that a chapter 7 trustee might institute could take years to advance and conclude before Holders of Allowed Claims would see any recovery.

      (h)      **The Chapter 11 Case May Be Dismissed.**

If the Bankruptcy Court finds that the Debtor has incurred substantial or continuing loss or diminution to the Estate and lacks the ability to effectuate substantial consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss the Chapter 11 Case. In such event, the Proponents would be unable to confirm the Plan, which may ultimately result in significantly decreased distributions to creditors than those provided for in the Plan.

      (i)      **Risk of Non-Occurrence of the Plan Effective Date.**

Although the Proponents believe the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived by the Proponents, the Effective Date will not take place.

**B.**      **Risks Related to Recoveries Under the Plan.**

      **1.**      **Estimated Recoveries to Holders of Allowed Claims and Interests Are Based on Assumptions and May Vary from Actual Recoveries.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtor), including: (a) the successful confirmation of the Plan; (b) an assumed date for the occurrence of the Effective Date; (c) the ability of Liquidation Trustee and the Personal Injury Trustee to successfully reduce the amount of Non-Personal Injury Claims and Personal Injury Claims, respectively; and (d) the ability of Holders to exhaust all remedies and obtain separate recovery against applicable insurance policies, if any

The Debtor and the Committee believes the Debtor's Estate is entitled to receive a substantial ERC, and the ERC forms a portion of the recovery made available to Non-Personal Injury Claims under the Plan. However, there can be no assurance when, or in what amount, the ERC will actually be paid, and as of the date hereof it appears that the processing of ERC applications may be subject to significant delay.

Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Proponents cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

2.     **The Liquidation Trustee and the Personal Injury Trustee May Object to the Amount or Nature of a Claim or Interest.**

The Liquidation Trustee and the Personal Injury Trustee reserve the right to object to the amount or nature of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection or dispute.  Any Holder of a Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement.

Moreover, in the case of Class 5 Personal Injury Claims, as discussed at length throughout this Disclosure Statement, the vast majority of such claims are unliquidated and may be vastly overstated.  The ultimate timing and amounts of such recoveries for Holders of such Class 5 Personal Injury Claims will depend on a variety of factors, including the availability of insurance, recoveries from non-debtor sources, and the final liquidation of such Claims.  Further information regarding the Debtor's insurance policies may be found in **Schedule 2** to this Disclosure Statement.

3.     **Litigation Matters.**

The Debtor is party to certain lawsuits, legal proceedings, and claims arising out of its business operations.  The Debtor cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Case operates as a stay with respect to the commencement or continuation of litigation against the Debtor that was or could have been commenced before the commencement of the Chapter 11 Case.  In addition, the Debtor's liability with respect to litigation stayed by the commencement of the Chapter 11 Case generally is subject to settlement and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtor may be subject to settlement and release in connection with the Chapter 11 Case.

It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Liquidation Trustee or Personal Injury Trustee may become party to, nor the final resolution of such litigation.  The impact of any such litigation on recoveries could be material.

**C.     Miscellaneous Risk Factors and Disclaimers.**

1.     **The Financial Information Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Proponents relied on financial data derived from the Debtor's books and records that was available at the time of such preparation.  While the Proponents believe that such financial information fairly reflects the Debtor's financial condition, the Proponents are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.     **No Legal or Tax Advice Is Provided by This Disclosure Statement.**

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal and financial advisor(s) with regard to any legal, tax, and other matters concerning its Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to confirmation.

3.     **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtor and Committee) nor (b) be deemed evidence of

4872-0136-1543

the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.        Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. Subject to the release provisions of the Plan, the Liquidation Trustee or the Personal Injury Trustee may seek to investigate, file, and prosecute Claims and may object to Claims after confirmation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 5.        Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors.

The Proponents' respective counsel and financial advisor have relied upon information provided to them in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Proponents have performed certain due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.        No Representations Outside This Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  Those who are entitled to vote to accept or reject the Plan should promptly report unauthorized representations or inducements to counsel to the Debtor, counsel to the Committee, and the Office of the United States Trustee for the Southern District of Texas.

### 7.        No Duty to Update.

The statements contained in this Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### VII.    Certain U.S. Federal Tax Consequences of the Plan

#### A.        Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtor has not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of such Holder's individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtor within the meaning of the Tax Code, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, or the base erosion and anti-abuse tax, non-U.S. taxpayers, broker-dealers, banks,

mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, and passive foreign investment companies). Further, this summary assumes that each Holder holds only Claims in a single Class and holds each Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to (1) Holders that have Claims that are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (Classes 1, 2, and 3), or (2) Holders that are deemed to reject the Plan (Classes 6 and 7).

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CLAIM HOLDER IN LIGHT OF SUCH CLAIM HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. HOLDERS OF ALLOWED CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtor.**

**1.      Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("CODI"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including equity interests in the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been

determined. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

As a result of the transactions contemplated by the Plan, the Debtor expects to realize CODI. The exact amount of any CODI that will be realized by the Debtor, and the amount of any tax attributes required to be reduced, cannot be known with certainty at this time.

## C.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Classes 4 and 5.

The following discussion assumes that the Debtor will undertake the transactions currently contemplated by the Plan.  Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Plan.

Holders of Allowed Claims within Class 4 (Non-Personal Injury Claims) are to receive either (i) beneficial interests in the Liquidation Trust or (ii) if the Holder elects the Expedited Distribution, a one-time Cash payment from the Liquidation Trust in the amount of $5,000 in full and final satisfaction of such Claim. Holders of Allowed Claims within Class 5 (Personal Injury Claims) are to receive (i) beneficial interests in the Personal Injury Trust or (ii) if the Holder elects the Expedited Distribution, a one-time Cash payment from the Personal Injury Trust in the amount of $5,000 in full and final satisfaction of such Claim.

### 1.      Gain or Loss - Generally.

In general, each Holder of an Allowed Non-Personal Injury Claim or Personal Injury Claim will recognize gain or loss in an amount equal to the difference between: (i) the fair market value of its share of the Liquidation Trust Assets or Personal Injury Trust Assets, as applicable, received by such Holder in satisfaction of its Claim (other than with respect to accrued but unpaid interest); and (ii) the Holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). In effect, assuming the Liquidation Trust and the Personal Injury Trust each qualify as a liquidating trust (as more fully discussed below), the Debtor will be treated as transferring the Liquidation Trust Assets and the Personal Injury Trust Assets, as applicable, to the Class 4 and Class 5 Claim Holders in exchange for those creditors relinquishing their Claims.  The creditors are then treated as (i) in the case of Holders of Non-Personal Injury Claims, transferring the Liquidation Trust Assets to the Liquidation Trust in exchange for interests in Liquidation Trust; or (ii) in the case of Holders of Personal Injury Claims, transferring the Personal Injury Trust Assets to the Personal Injury Trust in exchange for interests in the Personal Injury Trust.

The Liquidation Trust and the Personal Injury Trust are intended to qualify as "grantor trusts" under sections 671 through 679 of the Tax Code. Accordingly, it is intended that each Holder of an Allowed on-Personal Injury Claim or Personal Injury Claim will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its allocable percentage of the Liquidation Trust Assets or Personal Injury Trust Assets, as applicable. Due to the likelihood that such a Holder may receive distributions after the Effective Date, the imputed interest provisions of the Tax Code may apply to treat a portion of such later distributions to such Holders as imputed interest income. Additionally, a portion of any gain realized may be deferred under the Tax Code's installment method of reporting certain gains realized with respect to the Holders' claims.

Upon allowance of their Claims, or as soon thereafter as possible, Holders of beneficial interests in the Liquidation Trust or the Personal Injury Trust, as applicable, are to be beneficiaries of a Cash distribution authorized by the Liquidation Trustee or Personal Injury Trustee, as applicable, to be shared as more fully described above. Any amount a Holder of beneficial interests in the Liquidation Trust or Personal Injury Trust, as applicable, receives as a distribution from the Liquidation Trust or Personal Injury Trust after the aforementioned Cash distribution should not be included for such Holder's federal income tax purposes as amount realized with respect of an Allowed Claim. Instead, such a distribution should be treated as received due to the Holder's status as the Holder of a beneficial interest in the Liquidation Trust or Personal Injury Trust, as applicable. Where gain or loss is recognized by a Holder with respect to its Claim, the character of said gain or loss as ordinary or capital (whether long-term or

short-term) is determined by a multitude of factors, including but not limited to the following: (i) the Holder's tax status; (ii) whether the Claim constitutes a capital asset in the hands of the Holder; (iii) how long it has been held; (iv) whether the Claim, if a debt instrument, was acquired at a market discount; and (v) whether and to what extent the Holder had previously claimed a bad debt deduction. To the extent a Holder purchased a Claim constituting a debt instrument from a prior Holder at a market discount, the Claim may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

As a general principle of the federal income tax, a Holder's adjusted tax basis in assets received (which may include the Holder's undivided interest in the Liquidation Trust Assets or Personal Injury Trust Assets, as applicable) equals the fair market value of said assets. The holding period for such assets will generally begin the day after the Effective Date.

### 2. Tax Treatment of the Liquidation Trust and Personal Injury Trust and Holders of Beneficial Interests.

As of the Effective Date, the Liquidation Trust and Personal Injury Trust (each, a "Trust," and together, the "Trusts") are to be established for the benefit of beneficial interest holders in each Trust.

The Trusts are each intended to qualify as a "liquidating trust" for U.S. federal income tax purposes under section 301.7701-4(d) of the Regulations.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.

Pursuant to the Plan, all parties are required to treat, for federal income tax purposes, each Trust as a grantor trust of which the Holders of the foregoing Claims are the owners and grantors, and the following discussion assumes that each Trust will be so respected for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of either Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully such classification, the federal income tax consequences (and the Trusts' reporting requirements) to either Trust, the Holders of Claims and the Debtor could vary from those discussed herein (including the potential for an entity level tax on any income of the Trusts).

### 3. General Tax Reporting by the Trusts and Beneficiaries.

For all U.S. federal income tax purposes, all parties must treat the transfer of the Liquidation Trust Assets to the Liquidation Trust and the transfer of the Personal Injury Trust Assets to the Personal Injury Trust, each in accordance with the terms of the Plan, as transfers of the such assets directly to the Holders of Allowed Non-Personal Injury Claims and Personal Injury Claims, as applicable, followed by the transfer of such assets by such Holders to the Liquidation Trust and Personal Injury Trust, as applicable. Consistent therewith, all parties must treat the Liquidation Trust and the Personal Injury Trust as grantor trusts of which such Holders are the owners and grantors.  Thus, such Holders (and any subsequent Holders of interests in the Liquidation Trust or Personal Injury Trust, as applicable) will be treated as the direct owners of an undivided interest in the assets of the Liquidation Trust or the Personal Injury Trust, as applicable, for all U.S. federal income tax purposes (which assets will have an adjusted tax basis equal to their fair market value on the Effective Date). Pursuant to the Plan and as of the Effective Date, the Liquidation Trustee will determine the fair market value of the Liquidation Trust Assets, the Personal Injury Trustee will determine the fair market value of the Personal Injury Trust Assets, and all parties must consistently use such valuation for all tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), the Trusts' beneficiaries will be required to report on their U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust or Personal Injury Trust, as applicable, in accordance with its relative beneficial interest. The character of items of income, deduction and credit

4872-0136-1543

to any Holder and the ability of such Holder to benefit from any deduction or losses may depend on the particular situation of such Holder.

The U.S. federal income tax reporting obligations of a Holder is not dependent upon the Liquidation Trust or Personal Injury Trust distributing any Cash or other proceeds.  Therefore, a Holder may incur a federal income tax liability with respect to its allocable share of the income of the trust regardless of the fact that the trust has not made any concurrent distribution to the Holder. In general, other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, a distribution of Cash by the Liquidation Trust or the Personal Injury Trust to Holders of beneficial interests in the respective trust will not be taxable to the Holder since such Holders are already regarded for federal income tax purposes as owning the underlying assets.

The Liquidation Trustee will file with the IRS annual information returns for the Liquidation Trust as a grantor trust pursuant to Regulation section 1.671-4(a); the Personal Injury Trustee will do the same for the Personal Injury Trust. The Liquidation Trustee and the Personal Injury Trustee will also send to each Holder of a beneficial interest in each respective Trust, a separate statement setting forth such Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return. The Liquidation Trustee and Personal Injury Trustee will also file, or cause to be filed, all appropriate tax returns with respect to any Liquidation Trust Assets or Personal Injury Trust Assets, as applicable, allocable to Disputed Claims, as discussed below.

**D.     Accrued Interest.**

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest, not previously included in income for U.S. federal income tax purposes, such amount should be taxable to the Holder as interest income.  Conversely, a Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtor.  The Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal.

**E.     Market Discount.**

The "market discount" provisions of the Tax Code provide that some or all of any gain realized by a U.S. Holder who is a Holder of a Claim, and who exchanges the Claim for any amount may be treated as ordinary income to said Holder instead of capital gains to the extent of "market discount" on the debt instruments constituting the exchanged Claim.

A debt instrument is generally considered to have been acquired at a "market discount" if it is acquired other than upon the instrument's original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (i) the sum of remaining payments on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to one quarter of one percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

When a U.S. Holder disposes of Allowed Claims in a taxable disposition, the gain recognized should be treated as ordinary to the extent of market discount accrued while the Allowed Claims were considered held by the U.S. Holder of the debt instrument. However, the foregoing recognition would not occur if the U.S. Holder elected to include market discount in its income as the market discount accrued (*i.e.* if the Holder of the Claim elected to accrue on a constant interest method).

**F.     Withholding and Information Reporting.**

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless the recipient is exempt, such as a corporation.  Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (i) is a corporation or other person exempt from backup withholding and, when required, demonstrates this or (ii) is a United States Person (as defined by section 7701(a)(30) of the Tax Code) that

provides a correct taxpayer identification number ("TIN") on Internal Revenue Service Form W-9 (or a suitable substitute form) and provides the other information and makes the representations required by such form and complies with the other requirements of the backup withholding rules.  A Holder may become subject to backup withholding if, among other things, the Holder (i) fails to properly report interest and dividends for U.S. federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN.  A Holder that does not provide a correct TIN also may be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax.  The U.S. federal income tax liability of a person subject to backup withholding is reduced by the amount of tax withheld as backup withholding.  If backup withholding results in an overpayment of U.S. federal income tax, the Holder may obtain a refund of the overpayment by properly and timely filing a claim for refund with the IRS.

## VIII.    Conclusion and Recommendation

For all of the reasons set forth in this Disclosure Statement, the Proponents believe confirmation and Consummation of the Plan is preferable to all other alternatives.  Consequently, the Proponents urge all Holders of Claims who are entitled to vote to **ACCEPT** the Plan, and to duly complete and return their Ballots in accordance with the instructions on the Ballots.  The Voting Deadline is 5:00 p.m. prevailing Central Time on **[December 22, 2023]**.  To be counted, your Ballot must be fully completed, executed and actually received by the Claims Agent by the Voting Deadline.

Respectfully submitted,

**Tehum Care Services, Inc.**

By:    _/s/ Russell Perry_____
Name: Russell Perry
Title:   Chief Restructuring Officer

**Official Committee of Unsecured Creditors**

By:    _/s/ David Barton_____
Name: David Barton
Title:   Committee Chair
             Deputy General Counsel of St. Luke's Health System

**Schedule 1**

**Liquidation Analysis**

## Liquidation Analysis[1]

As a condition to confirmation, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find that each creditor in an impaired class of creditors (*i.e.*, Classes 3–6 under the Joint Plan) has either accepted the Joint Plan or will receive or retain, on the Effective Date of the Joint Plan, property on account of such claim in an amount not less than the creditor would receive in a hypothetical chapter 7 liquidation.

Below is a hypothetical liquidation analysis (the "Liquidation Analysis"), illustrating what creditors would likely receive were the Debtor's chapter 11 case converted to a chapter 7 liquidation on the Effective Date of the Joint Plan.

This Liquidation Analysis compares recoveries under the Joint Plan to hypothetical creditor recoveries were the Debtor's assets to be disposed of under the direction of a chapter 7 trustee, without the benefit of the Global Settlement which is the foundation of the Joint Plan.

On the whole, as illustrated in this Liquidation Analysis, without the benefit of the Global Settlement, administrative costs will be higher, and net distributable proceeds to creditors would be lower.  For this reason, the Debtor and the Committee, as Proponents of the Joint Plan, believe that creditors will achieve higher recoveries under the Joint Plan than if the Debtor was liquidated under chapter 7.

## I.      Limitations and Key Assumptions Underlying the Hypothetical Liquidation

**THE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES DESCRIBED ABOVE AND MAY NOT BE USED FOR ANY OTHER PURPOSE.**

This Liquidation Analysis was prepared by the Proponents and their respective financial advisors and counsel.  The Liquidation Analysis contains numerous estimates, based upon a review of the Debtor's records and other documentation.  The claims that could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative claims (including the DIP Claims, a portion of which is being released under the Global Settlement, but which would not be released in a chapter 7 liquidation), and additional administrative claims that will be incurred by a chapter 7 trustee and the trustee's new professionals, including wind-down costs and chapter 7 trustee fees, have been estimated.

The Liquidation Analysis also includes estimates of the aggregate value of claims, by claim class, as described in the Joint Plan, as the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims.  Unless specifically referenced in the Notes below, the amount of claims reflected in the Liquidation Analysis is based on the proofs of claim actually filed on or before the bar date, which was August 14, 2023.  **Therefore, the estimates of claims set forth in**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement to which this Liquidation Analysis is attached.

this Liquidation Analysis should not be relied on for any other purpose, including determining the value of the ultimate distributions to be made under the Joint Plan.

**THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THIS LIQUIDATION ANALYSIS.**

The assumptions utilized in developing this Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Proponents or a hypothetical chapter 7 trustee at the present time. For example, in a hypothetical chapter 7 liquidation, it is unknown how quickly litigants will seek relief from the automatic stay, and how the timing of litigation may impact creditors' rights in the Debtor's various insurance policies. Accordingly, there can be no assurance that the values assumed in the Liquidation Analysis will be realized if the Debtor's assets were actually liquidated under chapter 7 of the Bankruptcy Code. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Proponents recognize that there are other potential liquidation alternatives that are not presented in the Liquidation Analysis, including alternatives that would give rise to further reduced and delayed creditor recoveries.

**THE DEBTOR RESERVES THE RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THIS LIQUIDATION ANALYSIS, INCLUDING A CHANGE TO THE UNDERLYING ASSUMPTIONS AND ANALYSIS.**

### General Assumptions

The following general assumptions were considered by the Proponents and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

1. Timing Considerations of Chapter 7 Case

   The Liquidation Analysis assumes an orderly liquidation of the Debtor over a 3-month period commencing on or around December 31, 2023 (the "Conversion Date"). This timeline assumes substantially all of the Debtor's assets (other than insurance proceeds, litigation proceeds, and recoveries from causes of action to be pursued by the chapter 7 trustee) will be realized by March 31, 2024, representing a three-month period following the Conversion Date.

   There can be no assurance, however, that a liquidation would be completed in such a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtor's assets would in fact ever be realized. In reality, proceeds from litigation and insurance will take months (if not years) to realize if the case is converted to chapter 7. Moreover, it is highly unlikely that a chapter 7 trustee will realize greater value from causes of action than the $37 million settlement amount that is part of the Global Settlement.

4881-1772-4291

2. <u>Professionals Involved in the Chapter 7 Case</u>

As part of a hypothetical chapter 7 case, the Proponents assume a chapter 7 trustee would choose to retain certain professionals, including counsel, financial advisors, and potentially others, to provide expertise and assistance in the Debtor's liquidation. The Liquidation Analysis assumes that the chapter 7 trustee would replace the Debtor's existing professionals with new professionals who do not have the same level of background knowledge as the Debtor's existing professionals.

It is possible that the chapter 7 trustee would retain the Committee's professionals to assist in the pursuit of certain estate causes of action to avoid duplication of effort and expense.

3. <u>Trustee Fees for Chapter 7 Administration</u>

Under section 326(a) of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the chapter 7 trustee's services not to exceed three percent (3%) of the moneys disbursed or turned over in the case by the chapter 7 trustee to parties in interest in excess of $1 million, excluding the Debtor, but including holders of secured Claims. The Proponents assume in the Liquidation Analysis that such fees would be approximately three percent (3%) of gross liquidation proceeds.

4. <u>Additional Claims</u>

Conversion of the Debtor's chapter 11 case to chapter 7 will trigger additional costs of administration that do not otherwise exist under the proposed Plan. Additionally, the DIP Claims proposed to be released under the Plan would not be released in a chapter 7 case. Examples of these kinds of Claims include tax liabilities triggered upon liquidation, Claims related to rejection of executory contracts, higher DIP Claims and other litigation Claims. These claims could be significant and will be entitled to priority in payment over General Unsecured Claims in the chapter 7 distribution waterfall. No adjustment has been made for these potential claims unless specified in the assumptions and notes to the Liquidation Analysis.

5. <u>Basis of Presentation</u>

The hypothetical Liquidation Analysis is based on the unaudited balance sheet and other documentation of the Debtor as of August 31, 2023, with certain adjustments to reflect anticipated activity through the Conversion Date.

6. <u>Additional Assumptions for Liquidation</u>

The Proponents assume a liquidation would be conducted pursuant to Chapter 7 of the Bankruptcy Code, with a chapter 7 trustee appointed to manage the bankruptcy estate. The chapter 7 trustee would be responsible for liquidating the Debtor's assets in a manner intended to maximize the recovery to creditors. Because the Debtor ceased operating in April 2022, the major components of the liquidation process would be as follows:

- pursuing Causes of Action, including avoidance actions under chapter 5 of the Bankruptcy Code, which are too speculative to value;[2]

- administering and managing costs and post-conversion expenses related to the monetization of estate assets, such as costs associated with litigation, claims reconciliation costs, estate wind down costs, and chapter 7 trustee and professional fees; and

- distributing net proceeds to claimants in accordance with the priority scheme under Chapter 7 of the Bankruptcy Code.

## II.    Consummation of the Plan Will Provide Greater Value to Creditors than a Chapter 7 Liquidation

Because distributions to creditors in a hypothetical chapter 7 liquidation, as reflected in the Liquidation Analysis, will be significantly lower relative to the forecasted recoveries under the Joint Plan, the Plan Proponents believe that consummation of the Joint Plan will provide greater value to such holders than would a liquidation under chapter 7 of the Bankruptcy Code.

---

[2] Under the Global Settlement, the Estate will receive $37 million, without incurring any additional litigation costs or expenses to pursue or collect such amounts.  For creditors recover more in a hypothetical chapter 7 liquidation, a chapter 7 trustee would not only have to prove damages in excess of $37 million, but the chapter 7 trustee would also have to actually collect an amount in excess of $37 million (to account for trustee fees and other expenses).  Finally, the chapter 7 trustee would have to complete this process faster than the expected approximately 13-month time frame under the Joint Plan—where the Initial Settlement Amount will be paid on or before the Effective Date, and the remaining $12 million will be paid in monthly installments starting 30 days after the Effective Date.

Tehum Care Services, Inc.
Case No. 23-90086
Liquidation Analysis

| ($ in thousands) | Note | Chapter 7 Liquidation — Book Value (Unliquidated) | Realization Low | Realization High | Liquidation Value Low | Liquidation Value High | Chapter 11 - Joint Plan — Book Value (Unliquidated) | Realization Low | Realization High | Liquidation Value Low | Liquidation Value High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| 1 Unrestricted Cash and Equivalents | A | $ - | --% | --% | $ - | $ - | | --% | --% | $ - | $ - |
| 2 Employee Retention Credits, gross | B | 16,723.1 | 75.0% | 100.0% | 12,542.3 | 16,723.1 | 16,723.1 | 75.0% | 100.0% | 12,542.3 | 16,723.1 |
| 3 Litigation Proceeds | C | - | 0.0% | 100.0% | - | TBD | - | 0.0% | 100.0% | - | TBD |
| 4 Causes of Action Proceeds | D | - | 100.0% | 100.0% | 1,500.0 | 40,000.0 | - | 100.0% | 100.0% | 1,500.0 | 3,000.0 |
| 5 Global Settlement | E | - | --% | --% | $ - | $ - | 37,000.0 | 100.0% | 100.0% | 37,000.0 | 37,000.0 |
| **6 Gross Proceeds from Estate Assets** | | **$ 16,723.1** | | | **$ 14,042.3** | **$ 56,723.1** | **$ 53,723.1** | | | **$ 51,042.3** | **$ 56,723.1** |
| 7 *Less:* Employee Retention Credits Setoff by Priority Federal Tax Claims | F | | | | $ (8,239.4) | $ (8,239.4) | | | | $ (8,239.4) | $ (8,239.4) |
| 8 *Less:* Employee Retention Credits - Synergi Administrative Fee (dkt 723) | G | | | | (310.9) | (414.6) | | | | (310.9) | (414.6) |
| 9 *Less:* Chapter 11 Administrative Costs | H | | | | - | - | | | | (8,510.9) | (8,510.9) |
| 10 *Less:* Global Settlement Available for Personal Injury Trust | I | | | | - | - | | | | (8,552.1) | (8,847.5) |
| **11 Chapter 7 Liquidation Costs** | | | | | | | | | | | |
| 12 Chapter 7 Trustee Fees | J | | | | $ (174.1) | $ (1,454.5) | | | | $ - | $ - |
| 13 Chapter 7 Professional Fees | K | | | | (2,600.0) | (18,000.0) | | | | - | - |
| **14 Total Chapter 7 Liquidation Costs** | | | | | **$ (2,774.1)** | **$ (19,454.5)** | | | | **$ -** | **$ -** |
| **15 Proceeds Available for Distribution** | L | | | | **$ 2,717.9** | **$ 28,614.6** | | | | **$ 25,429.0** | **$ 30,710.7** |
| 16 Insurance Proceeds & Third-Party Recoveries | M | | | | $ 5,000.0 | $ 10,000.0 | | | | $ 5,000.0 | $ 10,000.0 |
| 17 Global Settlement Available for Personal Injury Trust | I | | | | - | - | | | | 8,552.1 | 8,847.5 |
| **18 Additional Proceeds Available for Personal Injury Claims** | | | | | **$ 5,000.0** | **$ 10,000.0** | | | | **$ 13,552.1** | **$ 18,847.5** |
| **19 Total Proceeds Available for Distribution** | | | | | **$ 7,717.9** | **$ 38,614.6** | | | | **$ 38,981.1** | **$ 49,558.2** |

| ($ in thousands) | Note | Asserted Claim Amount | Chapter 7 Liquidation — Estimated Claims Low | Estimated Claims High | Estimated Low | Estimated High | Estimated Recovery $ Low | Estimated Recovery $ High | Chapter 11 - Joint Plan — Estimated Claims Low | Estimated Claims High | Estimated Low | Estimated High | Estimated Recovery $ Low | Estimated Recovery $ High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **20 Proceeds Available for Distribution** | | | | | | | **2,717.9** | **28,614.6** | | | | | **25,429.0** | **30,710.7** |
| 21 DIP Facility Obligations | N | | $ 8,964.8 | $ 8,964.8 | 30.3% | 100.0% | 2,717.9 | 8,964.8 | $ 6,011.8 | $ 6,011.8 | 0% | 0% | - | - |
| **22 Proceeds Available for Distribution after DIP Claims** | | | | | | | **$ -** | **$ 19,649.8** | | | | | **$ 25,429.0** | **$ 30,710.7** |
| **23 Administrative Claims** | | | | | | | | | | | | | | |
| 24 Plan Trusts' Professional Fees | O | | $ - | $ - | --% | --% | $ - | $ - | $ 2,800.0 | $ 2,100.0 | 100.0% | 100.0% | $ 2,800.0 | $ 2,100.0 |
| 25 Chapter 11 Administrative Costs | P | | 2,853.0 | 2,853.0 | 0.0% | 100.0% | - | 2,853.0 | - | - | --% | --% | - | - |
| 26 US Trustee Fees | Q | | - | - | --% | --% | - | - | 342.4 | 387.9 | 100.0% | 100.0% | 342.4 | 387.9 |
| 27 Other Administrative Expense Claims | R | 1,235.7 | 1,235.7 | 605.7 | 0.0% | 100.0% | - | 605.7 | 1,235.7 | 605.7 | 100.0% | 100.0% | 1,235.7 | 605.7 |
| **28 Total Administrative Claims** | | **$ 1,235.7** | **$ 4,088.7** | **$ 3,458.7** | | | **$ -** | **$ 3,458.7** | **$ 4,378.2** | **$ 3,093.6** | | | **$ 4,378.2** | **$ 3,093.6** |
| **29 Proceeds Available for Distribution after Administrative Claims** | | | | | | | **$ -** | **$ 16,191.1** | | | | | **$ 21,050.8** | **$ 27,617.1** |
| 30 Unclassified - Priority State Tax Claim | S | 297.4 | 297.4 | 297.4 | 0.0% | 100.0% | - | 297.4 | 297.4 | 297.4 | 100.0% | 100.0% | 297.4 | 297.4 |
| 31 Class 1 - Other Priority Claims | T | 717.6 | 717.6 | 717.6 | 0.0% | 100.0% | - | 717.6 | 717.6 | 717.6 | 100.0% | 100.0% | 717.6 | 717.6 |
| 32 Class 2 - Other Secured Claims | U | 16,375.7 | - | - | --% | --% | - | - | - | - | --% | --% | - | - |
| **33 Proceeds Available for Distribution after Priority / Secured Claims** | | | | | | | **$ -** | **$ 15,176.2** | | | | | **$ 20,035.9** | **$ 26,602.1** |
| 34 Class 3 - Convenience Claims | V | 101.6 | $ 101.6 | $ 101.6 | 0.0% | 12.1% | $ - | $ 12.3 | $ 101.6 | $ 101.6 | 100.0% | 100.0% | $ 101.6 | $ 101.6 |
| 35 Class 4 - Non-Personal Injury General Unsecured Claims | W | 139,861.6 | 100,000.0 | 75,000.0 | 0.0% | 12.1% | - | 9,098.3 | 100,000.0 | 75,000.0 | 19.9% | 35.3% | 19,934.3 | 26,500.5 |
| 36 Class 5 - Personal Injury General Unsecured Claims | X | 760,159.6 | 75,000.0 | 50,000.0 | 6.7% | 32.1% | 5,000.0 | 16,065.5 | 75,000.0 | 50,000.0 | 18.1% | 37.7% | 13,552.1 | 18,847.5 |
| 37 Class 6 - Contingent Indemnification Claims | Y | 6,570.0 | 6,570.0 | - | 0.0% | 0.0% | - | - | 6,570.0 | - | 0.0% | 0.0% | - | - |
| **38 Total Class 3-6 Claims** | | **$ 906,692.9** | **$ 181,671.6** | **$ 125,101.6** | | | **$ 5,000.0** | **$ 25,176.2** | **$ 181,671.6** | **$ 125,101.6** | | | **$ 33,588.0** | **$ 45,449.6** |
| **39 Total Proceeds Distributed** | | | | | | | **$ 7,717.9** | **$ 38,614.6** | | | | | **$ 38,981.1** | **$ 49,558.2** |

### III.    Notes to Liquidation Analysis

**Assets**

A. <u>Unrestricted Cash and Equivalents</u>
The Debtor has not operated since April 2022 and as such, has no ability to generate cash flow.  The only source of cash since the Petition Date has been from the DIP Facility.  The Debtor maintains no unrestricted cash balance and therefore the value of Unrestricted Cash and Equivalents is zero.

B. <u>Employee Retention Credits ("ERC")</u>
Employee Retention Credits represent refundable tax credits, authorized by the CARES Act, for keeping employees on payroll during the COVID-19 pandemic during calendar years 2020 and 2021.  The Debtor believes these tax credits would be pursued in either chapter 7 or chapter 11, and that the recovery estimates would be the same in either scenario.  The recovery amounts are presented before payment of Allowed Priority Federal Tax Claims and Allowed Administrative Claims of Synergi Partners, Inc. (*see* Docket No. 723).

C. <u>Litigation Proceeds</u>
Litigation proceeds represent the Debtor's scheduled claims against UKG and Coverys.  Proceeds from litigation are unable to be determined at this time and are therefore included as "TBD" in the Liquidation Analysis, for the high end of recoveries, and $0.00 for the low end of recoveries.

D. <u>Causes of Action Proceeds</u>
Potential recoveries in this line represent recoveries on any and all claims or causes of action owned by the Estate, but not including Litigation Proceeds from Note C.  As noted in the Plan and Disclosure Statement, the Plan proposes to settle certain of the Estate's potential Causes of Action against the Settlement Parties for $37 million.  The Proponents believe there are approximately $5 million in avoidance actions other than those settled as part of the Global Settlement.  Of that amount, the Proponents believe the range of realistic recoveries is between $1.5 million and $3 million.  Further, the Proponents do not believe that a chapter 7 trustee would be able to liquidate the Estate's claims against the Settlement Parties for an amount in excess of the $37 million Global Settlement amount.  As a result, the low-end of recoveries in Line 4 reflects a $0 recovery on the Estate's claims against the Settlement Parties, and only a $1.5 million recovery on other causes of action.  The $40 million high-end in Line 4 reflects the Trustee recovering the same $37 million as the Global Settlement, plus an additional $3 million in other avoidance actions.  The same assumptions are made for the chapter 11 scenario, with the $37 million Global Settlement reflected in Line 5 and discussed below.

E.  Global Settlement
Represents the total value of the settlement proposed under the Plan.  The Global Settlement is in the aggregate amount of $37 million, to be paid to the Debtor's Estate for distribution to Allowed Holders of Claims, other than the Settlement Parties, payable in multiple installments as follows:  (i) $25.0 million in Cash on the Effective Date (less amounts advanced before the Effective Date pursuant to prior orders of the Bankruptcy Court), and (ii) $12.0 million in Cash paid to the Liquidation Trustee in monthly installments of $1.0 million, with the first payment made 30 days after the Effective Date.

F.  Employee Retention Credits Setoff by Priority Federal Tax Claims
The Internal Revenue Service ("IRS") has filed amended Priority Federal Tax Claims totaling approximately $8.24 million.  The Debtor assumes that the IRS will offset its Claim against the Employee Retention Credits.  The Liquidation Analysis therefore deducts this amount from Gross Proceeds from Estate Assets in both the chapter 11 and 7 scenarios.

G.  Employee Retention Credits—Synergi Administrative Fee [Docket No. 723]
Pursuant to order of the Bankruptcy Court at Docket No. 723, Synergi has an Allowed Administrative Claim calculated as 10% of the refundable ERC returns filed by the Debtor after June 27, 2023 (the date of entry of the order) and actually approved and paid in cash to the Debtor or its successor.  The Debtor filed ERC returns after June 27 for 2020 in the aggregate amount of approximately $7.6 million.   Before June 27, 2023, the Debtor filed ERC returns for 2021 in the aggregate amount of approximately $9.1 million.  The Debtor assumes the IRS will combine the ERC credits for 2020 and 2021, and offset the approximate $8.2 million in priority IRS claims, and remit the balance to the Debtor.  For purposes of calculating the Synergi fee, the Debtor assumes the total priority IRS claim is allocated pro rata to each of 2020 and 2021, which results in the reflected fee to Synergi.

H.  Chapter 11 Allowed Administrative Costs
The Chapter 11 Allowed Administrative Costs of approximately $8.5 million represent the total unpaid administrative expenses for the chapter 11 case, comprised of: (i) approximately $5.7 million, of incurred but unpaid administrative claims through August 31, 2023;[3] and (ii) approximately $2.8 million in incremental Administrative Claims expected to be incurred for the remainder of the chapter 11 case through the anticipated Effective Date.

The chapter 7 scenario assumes no such reserves are held by the chapter 7 trustee.  However, as otherwise reflected in the Liquidation Analysis, and as explained further in subsequent Notes below, the ultimate costs of the chapter 11 case cannot be avoided by converting to chapter 7.  In chapter 7, chapter 11 administrative claims are junior to chapter 7 administrative claims,

---

[3] The Liquidation Analysis assumes that the Fourth Interim DIP Motion [Docket No. 938] filed on September 7, 2023, has been or will be approved.

but are nonetheless senior to General Unsecured Claims.  As a result, all chapter 11 administrative claims will have to be paid in full in chapter 7 before holders of General Unsecured Claims receive any distributions.

I.  Global Settlement Available for Personal Injury Trust

Under the Global Settlement, the Settlement Parties will pay the Debtor an initial $25.0 million on or before the Effective Date (less any amounts advanced pursuant to the Fourth Interim DIP Order).  This amount will be used to pay allowed administrative and priority claims after the Effective Date.  The remaining funds will be divided between the Liquidation Trust and the Personal Injury Trust, on a 77%-23% basis, respectively.  The subsequent monthly installments to be paid by the Settlement Parties of $1.0 million per month over 12 months (starting 30 days after the Effective Date) will be divided evenly between the two Trusts. Depending on the amount of priority and administrative claims that are ultimately Allowed and paid after the Effective Date, the Proponents estimate that the Personal Injury Trust will have approximately $8.6 million-$9.2 million in cash available to distribute to holders of Personal Injury Claims.  This amount may be higher if the Personal Injury Trust expenses are lower, or if the Allowed amount of administrative and priority claims are lower.

If the Plan is not confirmed, and the case is converted to chapter 7, no such reserve would exist for Personal Injury Claims. Instead, all holders of General Unsecured Claims would share *pro rata* in whatever net recoveries the chapter 7 trustee obtains (after paying Allowed priority claims, Allowed chapter 7 administrative expenses and Allowed chapter 11 administrative expenses).  This net recovery amount may never total $37 million, or even the $9.2 million that the Plan proposes to earmark for holders of Personal Injury Claims.

J.  Chapter 7 Trustee Fees

The Liquidation Analysis assumes hypothetical chapter 7 trustee fees would be as set forth in section 326(a) of the Bankruptcy Code.  The Proponents assume that chapter 7 trustee fees will be approximately 3% of Gross Proceeds from Estate Assets (Line  6).

K.  Chapter 7 Professional Fees

Chapter 7 Professional Fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the trustee.  In the Liquidation Analysis, chapter 7 Professional Fees are estimated to be approximately $2.0 million plus a 40% contingency fee on the Causes of Action Proceeds (Line 4).  This amount may fluctuate based on the length and complexity of the wind-down process and could be substantially greater if the claims cannot be resolved without the need for substantial litigation.

L.  [intentionally omitted]

4881-1772-4291

M. Insurance Proceeds & Third Party Recoveries

The high- and low-end recoveries reflected in Line 16 are the Debtor's best estimate as to the range of potential insurance recoveries based upon the Debtor's high-level review of the claims made under the Debtor's various insurance policies and the remaining limits thereunder. Any recoveries from insurance are believed to be the same in either chapter 7 or chapter 11. However, the key distinction is that the Plan offers a fair and efficient mechanism (as detailed in Exhibit 2 to the proposed Personal Injury Trust Agreement) for claimants to settle their claims and be paid from insurance. Conversely, a chapter 7 liquidation would leave every creditor to fend for itself without any way to ensure that proceeds are available for *all* personal injury claimants, rather than those who get their judgments first. A chapter 7 trustee would likely allow the automatic stay to lift for all claimants so that *pro se* litigants and other incarcerated individuals, most without access to counsel or judicial resources, would be at a severe disadvantage in the "race to the courthouse" that may exhaust proceeds under the Debtor's various insurance policies before most individuals have their day in court. Additionally, there is no way to determine how the potential recoveries from third parties might be distributed to creditors in either chapter 7 or chapter 11.

N. DIP Claims

In the Chapter 11 scenario, the DIP Claims represent the total DIP Ending Balance in the Approved Budget included in the Fourth Interim DIP Motion [Docket No. 928] less the amounts that will be released pursuant to the Global Settlement.

In the chapter 7 scenario, DIP Claims will be higher because the Estate will not benefit from the release of nearly $3 million in DIP Claims being released under the Joint Plan.

It is important to note that in the absence of advances made under the DIP Facility, the chapter 7 trustee would still have to pay chapter 11 administrative expenses for the same amount.

O. Plan Trusts' Professional Fees

This line estimates the projected expenses associated with the Personal Injury Trust and Liquidating Trust professional fees to be incurred after the Effective Date, as well as other wind down expenses necessary to discharge the duties and responsibilities of the respective Trusts.

These expected costs of $2.8 million and $2.1 million are estimated to be incurred in the chapter 11 scenario in low and high scenarios, respectively. However, the actual amounts could differ based on the length and complexity of the wind-down processes and could be higher or lower than the amounts assumed herein. For illustrative purposes, it is assumed that these expenses will be evenly distributed between the two trusts. In reality, the expenses are likely to vary between the two Trusts, which may impact the ultimate recovery for holders of Personal Injury Claims and Non-Personal Injury Claims.

4881-1772-4291

P.  Chapter 11 Administrative Costs

Chapter 11 Allowed Administrative Expenses represent the costs associated with the administration of the Debtor's chapter 11 case including professional fees and other administrative expenses through the confirmation of the Plan.

In the Chapter 11 scenario, the Fourth Interim DIP Motion is assumed to be approved and funding into a segregated bank account maintained by the Debtor is to occur in accordance with the Approved Budget, to pay Allowed Administrative Claims.

Under the Chapter 7 scenario, there will be no reserve to pay the incremental chapter 11 expenses incurred after September 1, 2023.  Thus, these unpaid, incremental expenses will remain outstanding and must be paid by the hypothetical chapter 7 trustee before there can be distributions to General Unsecured Creditors.

Q.  U.S. Trustee Fees

These fees represent the statutory fees payable to the US Trustee in the chapter 11 scenario and are approximately 0.8% of total distributions estimated to be made to creditors.  No UST fees will be required in the chapter 7 liquidation scenario.  Instead, the chapter 7 trustee will be entitled to a fee of up to 3% for all distributions made from the estate.

R.  Other Administrative Expense Claims

This line includes filed or anticipated Administrative Claims of approximately $1.2 million for entities other than estate professionals who have provided services to the Debtor during the chapter 11 case.  As discussed in the Disclosure Statement, Sigma Risk Management is likely to seek payment for its postpetition services.  The Committee disputes the value of these services and reserves all rights to object to any filed Administrative Claim.  For illustrative purposes, the Liquidation Analysis assumes a range for the ultimate Allowed Administrative Claims.  Because these Administrative Claims must be paid in full in chapter 11, the ultimate amounts allowed will impact recovery in the Chapter 11 scenario.

In a hypothetical chapter 7 liquidation, consistent with Line 25, unpaid chapter 11 administrative claims are senior in rights to payment to General Unsecured Claims, and must be paid in full before General Unsecured Claims may receive a distribution.  Thus, under this illustration, the Liquidation Analysis assumes that the chapter 7 chapter will be unable to pay the allowed chapter 11 administrative expenses in full, meaning that under the low-end scenario, there will be no funds left to pay holders of General Unsecured Claims.

S.  Unclassified – Priority State Tax Claims

This category includes approximately $297,400 of state tax claims entitled to priority treatment under the Bankruptcy Code.

In the chapter 11 scenario, all Priority State Tax Claims are estimated to receive 100% recovery in both the low and high scenarios, respectively.  To the extent all or a portion of any of these claims are disallowed or reduced, additional funds could be available for distribution to holders of General Unsecured Claims.

In the Chapter 7 scenario, the priority state tax claims will receive 0% recovery in the low-end scenario because there will not be sufficient funds on hand to pay such claims.

T.  Class 1 – Other Priority Claims
This category includes proofs of claim filed as "priority claims" in the approximate aggregate amount of $717,600, excluding the state and federal priority tax claims discussed above.

In the chapter 11 scenario, all Other Priority Claims are estimated to receive 100% recovery.

U.  Class 2 – Other Secured Claims
This category includes proofs of claims filed as "secured claims" in the approximate aggregate amount of $16.4 million.  These proofs of claim include the following: (i) claims filed by a group of insurance companies purportedly secured by approximately $13.1 million cash deposits held by such insurance companies, but allocated to CHS TX, Inc. in the divisional merger (*see* KCC Claim Nos. 583 & 584; *see also* Docket No. 810); and (ii) claims filed by trade vendors purportedly secured by equipment in the possession or control of the Debtor.

The Proponents do not believe that the insurance companies are entitled to any distribution from the estate because, among other things, the collateral purportedly securing such claims has been allocated to CHS TX, Inc. pursuant to the divisional merger.  To the extent the Debtor still possess any equipment leased from or financed by a trade vendor, such equipment will be tendered back to such creditor.  As a result, all of these "Other Secured Claims" have been zeroed out and removed from the Liquidation Analysis because the Proponents do not believe any such creditors are entitled to a distribution from the cash proceeds available.

V.  Class 3 – Convenience Claims
Convenience Claims represent any Claim that would otherwise be a General Unsecured Claim that is Allowed in the amount of $5,000 or less.

Proofs of claim filed in the approximately amount of $101,600 are assumed to receive 100% recovery in both the chapter 11 low and high scenarios, and no recovery in the chapter 7 low recovery scenarios.

10

W. <u>Class 4 – Non-Personal Injury Claims</u>
   Proofs of claim filed in the approximate amount of $139.9 million.  The Debtor estimates Non-Personal Injury Claims could be allowed in the range of $75 million-$100 million.  Depending on the ultimate amounts Allowed, and all of the other factors discussed herein, these claims could recover between 19.9% and 35.3% under the Joint Plan.

X. <u>Class 5 – Personal Injury Claims</u>
   Proofs of claim filed in the approximate face amount of $1.087 billion.  The Debtor believes these claims—the vast majority of which are unliquidated—are greatly overstated.  To reach the reflected high- and low-end numbers, the Debtor first accounted for, and deducted, duplicate claims, resulting in the approximate $760 million in "Asserted Claim Amount" reflected in line 36.  The Debtor then identified a peer-reviewed article in the Journal of the American Medical Association (JAMA) that looked at data from 1992-2014 relating to all medical malpractice payouts during that time period.  *See* "Rates and Characteristics of Paid Malpractice Claims Among US Physicians by Specialty, 1992-2014," JAMA Internal Medicine, Volume 177 Number 5 (May 2017), available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2612118.  This article concludes that, over the stated time period, the average medical malpractice payout was approximately $330,000.  The Debtor then reviewed the underlying source of the data in the cited article, which is information collected by the U.S. Dept of Health and Human Services.  The HHS maintains the "National Practitioner Data Bank," which tracks medical malpractice payments over time.  That data base can be queried by the public here:  https://www.npdb.hrsa.gov/analysistool/.  The Debtor queried the data base through the present date, and the results were consistent with the JAMA article referenced above.  For purposes of determining the range of claims, the Debtor looked at the number of claims remaining after de-duping the claims data base, resulting in 224 claims remaining.  For the high-end of the range, the Debtor assumed each claimant received the approximately $330,000 payout reflected above, resulting in $75 million for the high-end.  For the low-end of the range, of the 224 claims, the Debtor separated out 70 pro se claimants and assumed that each of them took the $5,000 Expedited Distribution under the Plan, and that the remaining 154 claimants received the $330,000 discussed above.  That resulted in the reflected low-range of $50 million.  The overall range of claims reflected herein is also consistent with the actuarial data of $65 million contained in the medical malpractice reserve reflected in the Debtor's balance sheet which is part of the MORs.

Y. <u>Class 6 – Contingent Indemnification Claims</u>
   Proofs of claim filed in the approximately amount of $6.6 million.  Section 502(e)(1) of the Bankruptcy Code disallows indemnification claims that are contingent at the time of allowance or disallowance.  As such, Contingent Indemnification Claims are assumed to be disallowed and, thus, receive no recovery under both the chapter 11 and 7 low and high recovery scenarios.

11

**Schedule 2**

**Professional Liability Insurance Policy Information**

## Schedule 2
## Professional Liability Insurance Policy Information

Although reasonable efforts have been made to depict the coverage accurately, the information below should not be used as a definitive source of information, including the exhaustion or erosion of relevant limits of liability.

**Professional Liability Policies**

| Policy | Period | Limits | Self-Insured Retention | Each Medical Incident Limit[*] | Each Medical Incident Self-Insured Retention[*] | Outstanding Self-Insured Retention | Aggregate Unpaid Limits |
|---|---|---|---|---|---|---|---|
| Lone Star Alliance 4-100109[†] | 3/4/2016-3/4/2017 | $6,000,000 (aggregate) $2,000,000 (per claim) | $50,000 (per claim) | n/a | n/a | $0.00 | $4,391,075 |
| Lone Star Alliance 4-100167[†] | 3/4/2017-3/4/2018 | $6,000,000 (aggregate) $2,000,000 (per claim) | $50,000 (per claim) | n/a | n/a | $0.00 | $435,149 |
| Lone Star Alliance 4-453898[†] | 3/4/2018-3/4/2019 | $6,000,000 (aggregate) $2,000,000 (per claim) | $50,000 (per claim) | n/a | n/a | $0.00-$30,601 (per claim) | $4,414,930 |
| Lone Star Alliance 4-454898[†] | 3/4/2019-7/1/2019 | $6,000,000 (aggregate) $2,000,000 (per claim) | $50,000 (per claim) | n/a | n/a | $38,452-$40,000 (per claim) | $3,701,266 |
| Lone Star Alliance 4-455388[†] | 7/1/2019-7/1/2021 | $6,000,000 (aggregate) $2,000,000 (per claim) | $50,000 (per claim) | n/a | n/a | $0.00-$50,000 (per claim) | $5,823,523 |
| Lone Star Alliance 4-100092 | 1/1/2016-1/1/2017 | $22,000,000 (aggregate) | $18,000,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $12,199,450 (aggregate) | $16,199,450 |
| Lone Star Alliance 4-100159 | 1/1/2017-1/1/2018 | $22,500,000 (aggregate) | $18,500,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $13,603,629 (aggregate) | $17,603,629 |
| Lone Star Alliance 4-453668 | 1/1/2018-1/1/2019 | $24,000,000 (aggregate) | $20,000,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $19,150,000 (aggregate) | $23,150,000 |
| Lone Star Alliance 4-454719 | 1/1/2019-1/1/2020 | $21,000,000 (aggregate) | $17,000,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $16,540,700 (aggregate) | $20,540,700 |
| Lone Star Alliance 4-455844 | 1/1/2020-1/1/2021 | $21,000,000 (aggregate) | $19,000,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $18,922,000 (aggregate) | $20,922,000 |
| Lexington 6797138 | 1/1/2012-1/1/2013 | $35,000,000 (aggregate) | $20,000,000 (aggregate) | $1,000,000-$3,000,000 | $1,000,000 | $424,547 (aggregate) | $12,811,659 |
| Lexington 6796728 | 1/1/2012-1/1/2013 | n/a | n/a | $500,000-$1,000,000 | n/a | n/a | n/a |
| Lexington 6797138 | 1/1/2013-1/1/2014 | $35,000,000 (aggregate) | $20,000,000 (aggregate) | $1,000,000-$10,000,000 | $1,000,000 | $0.00 | $8,043,570 |
| Lexington 6797600 | 1/1/2014-1/1/2015 | $48,000,000 (aggregate) | $24,000,000 (aggregate) | $250,000-$10,000,000 | $250,000-$1,000,000 | $262,540 (aggregate) | $9,045,085 |
| Lexington 6797914 | 1/1/2015-1/1/2016 | $48,000,000 (aggregate) | $24,000,000 (aggregate) | $250,000-$10,000,000 | $250,000-$1,000,000 | $1,802,051 (aggregate) | $17,849,542 |
| Ironshore 4334400 | 1/1/2020-1/1/2021 | $3,000,000 (aggregate) $1,000,000 (per claim) | $50,000 (per claim) | n/a | n/a | $31,469.12-$50,000 (per claim) | $3,000,000 |
| COPIC G-COP-600001 | 1/1/2021-1/1/2022 | $12,000,000 (aggregate) | $10,000,000 (aggregate) | $1,000,000-$3,000,000 | $1,000,000-$3,000,000 | $10,000,000 (aggregate) | $12,000,000 |
| Applied Medico-Legal Solutions G-AMS-600001 | 1/1/2022-1/1/2023 | $17,000,000 (aggregate) | $15,000,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $15,000,000 (aggregate) | $17,000,000 |
| Applied Medico-Legal Solutions G-AMS-600001 | 1/1/2023-1/1/2024 | $24,000,000 (aggregate) | $22,000,000 (aggregate) | $500,000-$3,000,000 | $1,000,000-$3,000,000 | $22,000,000 (aggregate) | $24,000,000 |

[*] Amounts may vary (a) depending on whether the insured is a physician or a "qualified healthcare provider" and, if so, whether the physician or "qualified healthcare provider" is enrolled in Medicare or certain state compensation funds; and (b) depending upon the state in which a medical incident occurred.  Aggregate medical incident limits and aggregate self-insured retentions may also apply.

[†] LSA Arizona Policy

4874-8067-2903.3

**Excess Professional Liability Policies**

| Excess/Umbrella Policy | Period | Underlying Policy or Schedule of Underlying Amount | Excess Limits | Excess Unpaid Limits |
|---|---|---|---|---|
| Coverys # 5-10038 | 3/4/2016-3/4/2017 | Lone Star Alliance #4-100109 | $8,000,000 | $8,000,000 |
| Coverys # 5-10229 | 3/4/2017-3/4/2018 | Lone Star Alliance #4-100167 | $8,000,000 | $5,000,000 |
| Coverys #5-10262 | 3/4/2018-3/4/2019 | Lone Star Alliance #4-453898 | $8,000,000 | $8,000,000 |
| Coverys # 005TN000025399 | 3/4/2019-7/1/2019 | Lone Star Alliance #4-454898 | $8,000,000 | $8,000,000 |
| Coverys # 005TN900026806 | 7/1/2019-7/1/2021 | Lone Star Alliance #4-455388 | $8,000,000 | $2,200,000 |
| Underwriters (Beazley) B0180C121204 | 1/1/2012-1/1/2013 | $5,000,000 each Loss or Medical Incident | $10,000,000 | $7,302,372 |
| Underwriters (Beazley) B0180C131204 | 1/1/2013-1/1/2014 | $5,000,000 each Loss or Medical Incident | $10,000,000 | $8,461,562 |
| Underwriters (Beazley) B0180PD1431204 | 1/1/2014-1/1/2015 | $5,000,000 each Loss or Medical Incident | $10,000,000 | $4,833,789 |
| Underwriters (Beazley) B0180PD1531204 | 1/1/2015-1/1/2016 | $5,000,000 each Loss or Medical Incident | $10,000,000 | $10,000,000 |
| Nationwide/Scottsdale HPS0000015 | 1/1/2016-1/1/2017 | $5,000,000 each claim for Medical Professional Liability<br>Insurer: Multiple Insurers and Self-Insurance | $10,000,000 | $10,000,000 |
| Nationwide/Scottsdale HPS0000036 | 1/1/2017-1/1/2018 | $5,000,000 each claim for Medical Professional Liability<br>Insurer: Multiple Insurers and Self-Insurance | $10,000,000 | $9,955,809 |
| Nationwide/Scottsdale HPS0000058 | 1/1/2018-1/1/2019 | $5,000,000 each claim for Medical Professional Liability<br>Insurer: Multiple Insurers and Self-Insurance | $10,000,000 | $9,236,460 |
| Nationwide/Scottsdale HPS0000093 | 1/1/2019-1/1/2020 | $2,000,000 each patient in damages<br>Insurer: self-insurance<br><br>$5,000,000 each patient in damages for Medical Professional Liability<br>Insurer: Multiple Insurers and Self-Insurance | $10,000,000 | $10,000,000 |
| Nationwide/Scottsdale HPS0000146 | 1/1/2020-1/1/2021 | $2,000,000 each patient in damages<br>Insurer: self-insurance<br><br>$5,000,000 each patient in damages for Medical Professional Liability<br>Insurer: Multiple Insurers and Self-Insurance<br><br>Ironshore Specialty Insurance Company 4334400<br>$1,000,000 per claim; $3,000,000 aggregate | $10,000,000 | $10,000,000 |
| Nationwide/Scottsdale HPS0000232 | 1/1/2021-1/1/2022 | $5,000,000 each claimant in damages<br>Insurer: self-insurance<br><br>$5,000,000 each claimant in damages for Medical Professional Liability<br>Insurer: self-insurance<br><br>Ironshore Specialty Insurance Company #HC7AAB65W8001<br>$1,000,000 per claim; $3,000,000 aggregate | $10,000,000 | $10,000,000 |
| Oxford 567-22-NC | 1/1/2022-1/1/2023 | Applied Medico-Legal Solutions Risk Retention Group, Inc., Policy No. G-AMS-600001, effective 1/1/2022-1/1/2023<br>$2,000,000 each Medical Incident | $10,000,000 | $10,000,000 |

**Exhibit A**

**Joint Chapter 11 Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR AND OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS' FIRST AMENDED JOINT CHAPTER 11 PLAN**

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Micheal W. Bishop (TX Bar No. 02354860)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
Amber M. Carson (TX Bar No. 24075610)
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7127
Facsimile:  (713) 986-5966
Email:      jbrookner@grayreed.com
            mbishop@grayreed.com
            akaufman@grayreed.com
            lwebb@grayreed.com
            acarson@grayreed.com

*Counsel to the Debtor and Debtor in Possession*

**STINSON**
Nicholas Zluticky (SD TX Bar No. 3846893)
Zachary Hemenway (SD TX Bar No. 3856801)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Email:   nicholas.zluticky@stinson.com
         zachary.hemenway@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................................1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
      GOVERNING LAW, AND OTHER REFERENCES..........................................................1
    A.     Defined Terms.................................................................................................1
    B.     Rules of Interpretation ...................................................................................9
    C.     Computation of Time .....................................................................................9
    D.     Governing Law ..............................................................................................9
    E.     Reference to Monetary Figures ....................................................................10
    F.     Controlling Document...................................................................................10

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS.....................................................10
    A.     Administrative Claims ..................................................................................10
    B.     Professional Fee Claims................................................................................11
    C.     DIP Claims ...................................................................................................12
    D.     Priority Tax Claims ......................................................................................12

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ...........12
    A.     Classification of Claims and Interests..........................................................12
    B.     Treatment and Voting of Classes of Claims and Interests ............................13
         1.     Class 1 — Other Priority Claims ....................................................13
         2.     Class 2 — Other Secured Claims.....................................................13
         3.     Class 3 — Convenience Claims.......................................................14
         4.     Class 4 — Non-Personal Injury Claims ..........................................14
         5.     Class 5 — Personal Injury Claims ...................................................14
         6.     Class 6 — Contingent Indemnification Claims ...............................15
         7.     Class 7 — Interests in the Debtor ....................................................15
    C.     Elimination of Vacant Classes......................................................................15
    D.     Voting Classes; Presumed Acceptance by Non-Voting Classes ....................15
    E.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.............16

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.............................................16
    A.     Sources of Consideration for Plan Distributions...........................................16
    B.     Global Settlement.........................................................................................16
         1.     The Settlement Payment. ................................................................16
         2.     Settlement Parties' Release of Certain Claims.................................17
         3.     Consent to Releases of the Released Parties. ...................................17
         4.     Settlement Releases. .......................................................................17
    C.     General Settlement of Claims .......................................................................18
    D.     Insurance Settlements ...................................................................................18
    E.     Post-Effective Date Debtor, Liquidation Trust, and Personal Injury Trust....................18
         1.     Post-Effective Date Debtor and the Liquidation Trust.....................18
         2.     Personal Injury Trust......................................................................18
    F.     Corporate Action..........................................................................................19
    G.     Vesting of Assets ..........................................................................................19
    H.     Effectuating Documents; Further Transactions.............................................20
    I.     Exemptions from Certain Taxes and Fees.....................................................20
    J.     Preservation of Causes of Action..................................................................20
    K.     Dissolution of Committee and Cessation of Fee and Expense Payments .......................21

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................21
    A.     Assumption or Rejection of Executory Contracts and Unexpired Leases.....................21

B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................................21
C.     Cure of Defaults and Objections to Cure and Assumption.................................................21
D.     Insurance Policies ................................................................................................22
E.     Modifications, Amendments, Supplements, Restatements, or Other Agreements ...................22
F.     Reservation of Rights ..........................................................................................22

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS.................................................23**
A.     Rights and Powers of the Debtor, Post-Effective Date Debtor, the Liquidation Trustee,
       and the Personal Injury Trustee................................................................................23
B.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.........................23
       1.     Delivery of Distributions in General...............................................................23
       2.     Minimum; De Minimis Distributions ...............................................................23
       3.     Undeliverable Distributions and Unclaimed Property .........................................23
C.     Manner of Payment..............................................................................................24
D.     Compliance Matters .............................................................................................24
E.     Allocation Between Principal and Accrued Interest......................................................24
F.     Setoffs and Recoupment .......................................................................................24
G.     Claims Paid or Payable by Third Parties ...................................................................24
       1.     Claims Payable by Insurance........................................................................24
       2.     Applicability of Insurance Policies .................................................................25
       3.     Claims Paid by Third Parties ........................................................................25

**ARTICLE VII. RESERVES ADMINISTERED BY THE LIQUIDATION TRUSTEE .......................25**
A.     Establishment of Reserve Accounts..........................................................................25
B.     Administrative and Priority Claims Reserve ...............................................................25
C.     Other Secured Claims Reserve ...............................................................................25

**ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS AND INTERESTS ...........................................................................26**
A.     Applicability.......................................................................................................26
B.     Allowance of Claims and Interests...........................................................................26
C.     Claims Administration Responsibilities.....................................................................26
D.     Estimation of Claims and Interests...........................................................................26
E.     Adjustment to Claims Without Objection ..................................................................26
F.     No Distributions Pending Allowance ........................................................................27
G.     Disallowance of Claims ........................................................................................27
H.     Claim Amendment Deadline ..................................................................................27
I.     Distributions After Allowance.................................................................................27
J.     No Interest.........................................................................................................27

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........................28**
A.     Compromise and Settlement of Claims, Interests, and Controversies .............................28
B.     Release of Liens .................................................................................................28
C.     Release by the Debtor, its Estate, and the Post-Effective Date Debtor ............................28
D.     Third-Party Releases............................................................................................28
E.     Exculpation .......................................................................................................29
F.     Injunction and Gate Keeping .................................................................................30
G.     Recoupment ......................................................................................................31
H.     Term of Injunctions or Stays ..................................................................................31

**ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...................................31**
A.     Conditions Precedent to the Effective Date. ...............................................................31
B.     Waiver of Conditions Precedent..............................................................................32
C.     Substantial Consummation ....................................................................................32

4870-6905-9718

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...............................**32**
    A.    Modification of Plan ..............................................................................................32
    B.    Revocation or Withdrawal of Plan .......................................................................32

**ARTICLE XII. RETENTION OF JURISDICTION** ...............................................................**32**
    A.    Jurisdiction ...........................................................................................................32

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ............................................................**34**
    A.    Additional Documents ..........................................................................................34
    B.    Statutory Fees.......................................................................................................34
    C.    Reservation of Rights ...........................................................................................34
    D.    Successors and Assigns ........................................................................................34
    E.    Service of Documents ..........................................................................................34
    F.    Entire Agreement .................................................................................................35
    G.    Plan Supplement Exhibits ....................................................................................35
    H.    Non-Severability ..................................................................................................36
    I.    Good Faith ............................................................................................................36
    J.    Waiver or Estoppel...............................................................................................36
    K.    No Attorney's Fees...............................................................................................36
    L.    Closing of Chapter 11 Case..................................................................................36

iv

**INTRODUCTION**

Tehum Care Services, Inc. and the Official Committee of Unsecured Creditors of Tehum Care Services, Inc. hereby propose the following joint first amended chapter 11 plan (as may be modified, supplemented, or amended, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.      *Defined Terms*

1.      "*Administrative Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case pursuant to sections 503(b) or 507 of the Bankruptcy Code.

2.      "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, unless otherwise specifically set forth in the Plan or a Final Order.

3.      "*Administrative and Priority Claims Reserve*" means a reserve established by the Liquidation Trustee on the Effective Date to be used to pay Holders of all Allowed Priority Claims and Allowed Administrative Claims, to the extent the same have not been paid in full on or before the Effective Date.

4.      "*Administrative Claims Objection Deadline*" means the first Business Day that is 21 days following the Administrative Claims Bar Date, unless otherwise specifically set forth in the Plan or a Final Order.

5.      "*Allowed*" means, any Claim:  (a) that is evidenced by a Proof of Claim Filed by the Claims Bar Date and as to which no objection has been interposed on or before the Claims Objection Deadline or such other applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court; (b) that is listed in the Schedules and is not identified as contingent,  unliquidated, or disputed, and for which no Proof of Claim has been timely Filed and as to which no objection has been interposed on or before the Claims Objection Deadline; or (c) Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court.

6.      "*Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases (with proposed cure amounts and assignee, as applicable) that will be assumed by the Debtor, which list shall be included in the Plan Supplement.

7.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination or other claims, causes of action or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, causes of action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such claim(s), cause(s) of action or remedy(ies) were commenced prior to the Effective Date.

8.      "*Ballot*" means the form of ballot approved by the Bankruptcy Court and provided to Holders of Claims to indicate their votes to accept or reject the Plan and to make an election with respect to the Third-Party Release provided by Article IX.D hereof.

9.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect and as may be hereafter amended.

10.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court of the United States having jurisdiction over the Chapter 11 Case.

1

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as now in effect or hereafter amended.

12.     "*Bar Date*" means, as applicable, (i) the Claims Bar Date, (ii) any other date or dates established or to be established by this Plan or by a Final Order of the Bankruptcy Court setting a deadline by which Proofs of Claim must be Filed and (iii) the Administrative Claims Bar Date.

13.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

14.     "*Cash*" or "*$*" means legal tender of the United States of America.

15.     "*Causes of Action*" means any claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, owned by or otherwise accruing to the Debtor and its Estate, whether arising before, on, or after the Petition Date.

16.     "*Challenge Period*" has the meaning ascribed to such term in the DIP Order.

17.     "*Chapter 11 Case*" means the above-captioned chapter 11 bankruptcy case of the Debtor.

18.     "*Claim*" means any claim against the Debtor, as defined in section 101(5) of the Bankruptcy Code.

19.     "*Claims Agent*" means Kurtzman Carson Consultants LLC.

20.     "*Claims Bar Date*" means the last date to file Proofs of Claim against the Debtor, which was August 14, 2023, for all creditors including Governmental Units.

21.     "*Claims Objection Deadline*" means one hundred eighty days (180) days after the Effective Date unless extended by further order of the Bankruptcy Court.

22.     "*Claims Register*" means the official register of Claims against and Interests in the Debtor maintained by the Claims Agent.

23.     "*Class*" means any category of Holders of Claims or Interests classified by this Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

24.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the Office of the United States Trustee, as the same may be reconstituted from time to time.

25.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

26.     "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court, including any adjournments thereof, to consider confirmation of the Plan.

27.     "*Confirmation Objection Deadline*" means the date that is at least fourteen (14) Business Days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

28.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement as containing adequate information pursuant to sections 1125 and 1126 of the Bankruptcy Code.

29.     "*Consenting Creditors*" means collectively the following, in each case in its capacity as such with each being a "*Consenting Creditor*":  (a) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not check the box on the applicable form to affirmatively opt out of the releases contained in Article IX.D; (b) all Holders of Claims or Interests that abstain from voting on the Plan, vote to reject the Plan, or are deemed to reject the Plan and who do not (i) check the box on the applicable form to affirmatively opt out of the releases contained in Article IX.D or (ii) object to the Plan in respect of the releases; and (c) all Holders of Claims who elect to receive an Expedited Distribution.

30.     "*Consummation*" means the occurrence of the Effective Date.

31.     "*Contingent Indemnification Claim*" means any Claim for indemnification against the Debtor of any kind or nature whatsoever, whether arising under or pursuant to any type of bylaws, organizational or formation documents, board resolutions, management or indemnification agreements, employment or other services contracts, at common law, in equity or otherwise, and whether pertaining or related to past and present directors, officers, employees, attorneys, accountants, investment bankers, clients, state agencies, or other professionals and agents of the Debtor related to services provided to, by or for the Debtor at any time prior to the Effective Date that is contingent as of the Effective Date; *provided* that Contingent Indemnification Claims shall not include any Claim for indemnification against the Debtor if, prior to the Effective Date, such Claim has been adjudicated as non-contingent by Final Order of a court of competent jurisdiction.

32.     "*Convenience Claim*" means any General Unsecured Claim that is filed in an amount of $5,000 or less.

33.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

34.     "*Debtor Release*" means the release given on behalf of the Debtor and its Estate to the Released Parties as set forth in Article IX.C.

35.     "*Debtor*" means Tehum Care Services, Inc. f/k/a Corizon Health, Inc., a Texas corporation, in its capacity as a debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

36.     "*Defaulted Settlement Payment*" is defined in Article IV.B.1(b)(iii).

37.     "*DIP Claims*" means all Claims of the DIP Lender arising under and pursuant to the DIP Facility, the DIP Documents, and the DIP Order.

38.     "*DIP Credit Agreement*" means that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* attached to the DIP Order as Exhibit 1, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

39.     "*DIP Documents*" means, collectively, the DIP Credit Agreement, the DIP Order, and all other agreements, documents, and instruments related thereto, as may be amended, modified, restated, or supplemented from time to time.

40.     "*DIP Facility*" means the senior secured debtor in possession term loan facility, as provided for under the DIP Documents and authorized pursuant to the DIP Order.

41.     "*DIP Lender*" means M2 LoanCo, LLC, in its capacity as the DIP Lender (as defined in the DIP Order) as supplemented in subsequent orders.

42.     "*DIP Order*" means, collectively, (a) the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Docket No. 243], (b) all additional interim orders entered by the Bankruptcy Court authorizing the Debtor to incur postpetition obligations thereunder, and otherwise amending, supplementing, or modifying such authority from time to time and (c) any interim or final order or orders entered by the Bankruptcy Court granting the Debtor's *Motion for Entry of Fourth Interim DIP Order (I) Authorizing Debtor to (B) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 928].

43.     "*Disallowed*" means any Claim or Interest or portion thereof that is not Allowed or Disputed.

44.     "*Disclosure Statement*" means that certain disclosure statement relating to the Plan, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

45.     "*Disputed*" means any Claim or Interest or portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Proof of Interest or a motion for payment has been timely Filed with the Bankruptcy Court, to the extent the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.

46.     "*Distribution*" means Cash, property, interests in property or other value distribution to Holders of Allowed Claims, or their designated agent, including the Liquidation Trust Beneficiaries and the Personal Injury Trust Beneficiaries, as applicable under this Plan, or any trust agreement governing a trust created under this Plan.

47.     "*Distribution Date*" means the date on which the Liquidation Trustee or the Personal Injury Trustee, as applicable, first makes distributions from the Settlement Payment to Holders of Allowed Non-Personal Injury Claims or Personal Injury Claims as provided in the Plan.

48.     "*Distribution Reserve Accounts*" means the Cash reserve accounts established pursuant to this Plan by the Liquidation Trustee or Personal Injury Trustee, as may be applicable, including but not limited to the Administrative and Priority Claims Reserve and the Other Secured Claims Reserve.

49.     "*Effective Date*" means the later of the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in **Error! Reference source not found.** have been satisfied or waived.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

50.     "*Enjoined Parties*" means (i) all Entities that have held, hold, or may hold Claims against or Interests in the Debtor (whether or not Proofs of Claim or Proofs of Interest have been filed and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, and (iii) for each Entity listed in (i) and (ii), such Entity's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

51.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

52.     "*ERC Fund*" means a segregated account to be funded by the proceeds of employee retention tax credits received by the Debtor or Liquidation Trustee, as applicable.

53.     "*Estate*" means the estate of the Debtor as created under section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Case.

54.     "*Expedited Distribution*" means a one-time Cash payment in the amount of $5,000, to be made to a Holder of a General Unsecured Claim that irrevocably elects, as evidenced on a Ballot timely and validly submitted by such Holder, to have such General Unsecured Claim reduced to $5,000 and paid (upon Allowance) in full and final satisfaction of such Claim.

55.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtor; (b) the Committee and its members; and (c) Russell Perry, the Debtor's Chief Restructuring Officer.

56.     "*Executory Contract*" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

57.     "*File*" or "*Filed*" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Case or, with respect to the filing of a Proof of Claim or Proof of Interest, the Claims Agent.

58.     "*Final Decree*" means the decree contemplated in Bankruptcy Rule 3022.

59.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, reconsideration, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a stay, new trial, reargument, reconsideration, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument, reconsideration, or rehearing has been sought, (i) such order or judgment has been resolved by the highest court to which the order or judgment could be appealed, *certiorari* shall have been denied, or a stay, new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument, reconsideration or rehearing shall have expired; *provided*, *however* that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules or state or local rules has been or may be filed relating to such order or judgment.

60.     "*General Unsecured Claim*" means any unsecured claim (including, for the avoidance of doubt, any Personal Injury Claim and Non-Personal Injury Claim) that is not an Administrative Claim, a Secured Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, or a Claim that is otherwise paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court.

61.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

62.     "*Holder*" means an Entity holding a Claim or an Interest.

63.     "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

64.     "*Initial Settlement Amount*" is defined in Article IV.B.1(a).

65.     "*Installment Settlement Payment*" is defined in Article IV.B.1(a).

66.     "*Insurance Settlement Motion*" means the Debtor's *Motion Pursuant to 11 U.S.C. §§ 105(a) & 502 and Bankruptcy Rules 3007 & 9019(b) for Entry of an Order Establishing Procedures for Resolution of a Certain Class of Claims with Rights Under Certain Arizona Insurance Policies Issued by Lone Star Alliance* [Docket No. 802],

which settles and compromises certain disputes related to insurance policies issued by Lone Star Alliance under sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rule 9019.

67.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 357].

68.    "*Interest*" means any interest, equity, or share in the Debtor, including all options, warrants, or other rights to obtain such an interest or share in the Debtor, whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

69.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

70.    "*Liquidation Trust*" means that certain trust that will come into existence on the Effective Date, which shall be formed pursuant to, and governed by, the provisions of the Plan and the Liquidation Trust Agreement.

71.    "*Liquidation Trust Agreement*" means the agreement establishing and governing the Liquidation Trust dated as of the Effective Date, substantially in the form included in the Plan Supplement.

72.    "*Liquidation Trust Assets*" means all assets of the Debtor or its Estate existing on the Effective Date (including all Causes of Action) that are not Personal Injury Trust Assets, after giving effect to all distributions required to be made as of or prior to the Effective Date.

73.    "*Liquidation Trustee*" means the trustee of the Liquidation Trust, who shall be selected by the Committee, in consultation with the Debtor, and who shall be named in the Plan Supplement.

74.    "*Local Bankruptcy Rules*" means the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas as now in effect or hereafter amended.

75.    "*Non-Personal Injury Claim*" means any General Unsecured Claim that is not a Personal Injury Claim.

76.    "*Opt-Out Form*" means the form included with the notice sent to (a) Holders of Claims or Interests that are deemed to accept or reject the Plan, or (b) Holders of Disputed Claims, which provides such Holders the opportunity to elect to opt out of the Third-Party Releases contained in Article IX.D.

77.    "*Ordinary Course Professional*" means a Professional employed by the Debtor pursuant to the Ordinary Course Professionals Order.

78.    "*Ordinary Course Professionals Order*" means the *Amended Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 638].

79.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Case.

80.    "*Other Secured Claim*" means any Secured Claim, other than a DIP Claim.

81.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

82.    "*Personal Injury Claim*" means any General Unsecured Claim that directly, indirectly or derivatively, is attributable to, arises from, is based upon, relates to, or results from alleged personal injury tort or wrongful death claims within the meaning of 28 U.S.C. § 157(b)(2)(B).

6

83.     "*Personal Injury Trust*" means that certain trust that will come into existence on the Effective Date, which shall be formed pursuant to, and governed by, the provisions of the Plan and the Personal Injury Trust Agreement.

84.     "*Personal Injury Trust Agreement*" means the agreement establishing and governing the Personal Injury Trust dated as of the Effective Date, substantially in the form included in the Plan Supplement.

85.     "*Personal Injury Trust Assets*" means (a) twenty-three percent (23%) of the Cash from the Initial Settlement Payment after payment of Allowed Administrative Claims and Allowed Priority Tax Claims; (b) fifty percent (50%) of the Cash from each Installment Settlement Payment; and (c) all rights of the Debtor or its Estate existing on the Effective Date under its professional liability insurance policies, including Causes of Action against insurers providing such policies, but no other Causes of Action.  For the avoidance of doubt, the Personal Injury Trust Assets shall not include funds held in the Professional Fee Escrow.

86.     "*Personal Injury Trustee*" means the trustee of the Personal Injury Trust, who shall be selected by the Committee, in consultation with the Debtor, and who shall be named in the Plan Supplement.

87.     "*Petition Date*" means February 13, 2023, the date on which the Debtor commenced the Chapter 11 Case.

88.     "*Plan of Divisional Merger*" means that certain *Agreement and Plan of Divisional Merger* dated as of May 1, 2022, by Corizon Health, Inc.

89.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be filed in one or more parts of volumes by the Debtor, at least seven (7) calendar days prior to the Confirmation Objection Deadline, as the same may be amended, supplemented, or modified from time to time on the terms set forth herein, containing, without limitation: (a) the form of Liquidation Trust Agreement; (b) the form of Personal Injury Trust Agreement; (c) the Assumed Executory Contract and Unexpired Lease List; (c) a schedule of Retained Causes of Action; (d) the identity and compensation of the Liquidation Trustee; and (e) the identity and compensation of the Personal Injury Trustee.

90.     "*Post-Effective Date Debtor*" means the Debtor, the Liquidation Trust, or any successor thereto after the Effective Date responsible for winding down the Debtor's Estate and implementing the terms of the Plan.

91.     "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

92.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

93.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in such Class.

94.     "*Professional*" means any Entity retained by and to be compensated from the Estate pursuant to sections 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code.

95.     "*Professional Fee Claims*" means any Claim by a Professional under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and/or reimbursement of expenses in the Chapter 11 Case.

96.     "*Professional Fee Escrow*" means the segregated account established pursuant to the DIP Order for the payment of Professional Fee Claims during the course of the Chapter 11 Case.  The Professional Fee Escrow shall be funded by the Debtor, no later than the Effective Date, in an amount of Cash equal to the expected Allowed Professional Fee Claims.  The Professional Fee Escrow and the Cash therein shall remain subject to the jurisdiction of the Bankruptcy Court and shall not be used for any purpose other than to pay Allowed Professional Fee Claims.  If, following the payment of all Allowed Professional Fee Claims in full there remains Cash in the Professional Fee Escrow, such Cash shall be transferred to the Liquidation Trust and become part of the Liquidation Trust Assets.

97. "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

98. "*Proof of Interest*" means a proof of Interest Filed in the Debtor's Chapter 11 Case.

99. "*Proponents*" means the Debtor and the Committee, together, as joint proponents of the Plan.

100. "*Released Parties*" means collectively the following, in each case in its capacity as such with each being a "*Released Party*":  (a) the Debtor; (b) Russell Perry, the Debtor's Chief Restructuring Officer; (c) the Committee and its members; (d) the Liquidation Trustee; (e) the Personal Injury Trustee; (f) the Settlement Parties; (g) M2 EquityCo LLC; (h) Valitás Intermediate Holdings Inc.; (i) Valitás Health Services, Inc.; (j) M2 Pharmacorr Equity Holdings LLC; (k) Pharmacorr/M2 LLC; (l) Pharmacorr Holdings LLC; (m) Endeavor Distribution LLC; (n) CHS Texas LLC; (o) Yes Care Holdings LLC; (p) Sigma RM, LLC; (q) DG Realty Management LLC; (r) Scaracor LLC; (s) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (t) Sara Ann Tirschwell; (u) Ayodeji Olawale Ladele; (v) Beverly Michelle Rice; (w) Jeffrey Scott King; (x) Jennifer Lynee Finger; (y) Frank Jeffrey Sholey; (z) for each Entity listed in (a) through (y), each of their respective current and former officers, directors, and managers; (aa) for each Entity listed in (b) through (y), each of their respective current and former employees and agents; and (bb) for each Entity listed in (d) through (y), each of their respective attorneys and other professional advisors; *provided*, *however*, that James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks shall not be a "Released Party."

101. "*Releasing Parties*" means collectively the following, in each case in its capacity as such with each being a "*Releasing Party*":  (a) the Debtor; (b) the Committee; (c) the Liquidation Trustee; (d) the Personal Injury Trustee; (e) the Settlement Parties; and (f) Consenting Creditors.

102. "*Retained Causes of Action*" means Causes of Action scheduled in the Plan Supplement as "retained" and transferred to the applicable Trust.

103. "*Schedules*" means, collectively, the schedule of assets and liabilities, schedule of Executory Contracts and Unexpired Leases and statement of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code, if any, as such schedules may be amended, modified, or supplemented from time to time.

104. "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on upon property in which the Debtor has an interest to the extent of the value, as of the Effective Date, of such interest or Lien or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

105. "*Settlement Parties*" means, collectively, YesCare Corp., its wholly owned subsidiaries (including CHS TX, Inc.), Geneva Consulting, LLC, Perigrove 1018, LLC, Perigrove, LLC, M2 HoldCo, LLC, M2 LoanCo, LLC, and PharmaCorr LLC.

106. "*Settlement Payment*" is defined in Article IV.B.1(a).

107. "*Settlement Payment Cure Period*" is defined in Article IV.B.1(b)(ii).

108. "*Settlement Payment Default*" is defined in Article IV.B.1(b)(i).

109. "*Settlement Payment Default Cure Notice*" is defined in Article IV.B.1(b)(ii).

110. "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article IX.D.

111. "*Trust*" or "*Trusts*" means either or both of the Liquidation Trust and the Personal Injury Trust, as the context may require.

112. "*Trust Agreement*" or "*Trust Agreements*" means either or both of the Liquidation Trust Agreement and the Personal Injury Trust Agreement, as applicable.

113.    "*Trustee*" or "*Trustees*" means either or both of the Liquidation Trustee and the Personal Injury Trustee, as applicable.

114.    "*Unexpired Lease*" means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

115.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

116.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

117.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6).

B.    *Rules of Interpretation*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (4) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (5) any effectuating provisions may be interpreted by the Debtor or the Liquidation Trustee in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (13) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.    *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

4870-6905-9718

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the documents contained in the Plan Supplement, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Claims have not been classified and shall be treated as follows:

A.      *Administrative Claims*

Except as otherwise provided by a Final Order entered by the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the Debtor, its counsel, counsel to the Committee and, if filed after the Effective Date, the Litigation Trustee and the Personal Injury Trustee, no later than the Administrative Claims Bar Date.  Each request for payment of an Administrative Claim must set forth, at a minimum, (a) the name of the Holder of the Administrative Claim, (b) the amount of the Administrative Claim and (c) a detailed basis for the Administrative Claim.  A failure to file any such request by the Administrative Claims Bar Date shall result in the Administrative Claim in question being discharged and its Holder being forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtor, its Estate or any other Entity.

A request for payment of an Administrative Claim that has been properly and timely Filed and served shall become an Allowed Administrative Claim unless an objection is filed by the date that is thirty (30) days after such request has been Filed and served.  If a timely objection is Filed, the Administrative Claim in question shall become Allowed only to the extent set forth in a Final Order of the Bankruptcy Court.

Unless otherwise agreed by a Holder of an Allowed Administrative Claim and the Debtor or the Liquidation Trustee, as applicable, each Holder of an Allowed Administrative Claim and Claims for U.S. Trustee Fees will receive, in full and final satisfaction of its Administrative Claim, Cash in an amount equal to the Allowed amount of such Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date; (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than ten (10) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court or as otherwise agreed to between the Holder of such Allowed Administrative Claim and the Liquidation Trustee.

If an Administrative Claim is Allowed after the Effective Date and there are insufficient funds to pay such Allowed Administrative Claim from the Administrative and Priority Claims Reserve, any unpaid portion of such Allowed Administrative Claim shall be paid seventy-seven percent (77%) from the Liquidation Trustee from the Liquidation Trust Assets and twenty-three percent (23%) from the Personal Injury Trustee from the Personal Injury Trust Assets.

4870-6905-9718

B.      *Professional Fee Claims*

      1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>

Every Professional holding a Professional Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order approving the same shall File a final application for payment of such Professional Fee Claim no later than 45 calendar days after the Effective Date. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules. The last date to object to such final fee application shall be the 21st day after such fee application has been Filed, and all final fee applications shall be set for hearing on the same day, as the Bankruptcy Court's calendar permits, after consultation with counsel to the Debtor. The Liquidation Trustee shall pay the full amount of each Professional Fee Claim no later than ten (10) days following entry of a Final Order by the Bankruptcy Court Allowing such Professional Fee Claim from the funds held in the Professional Fee Escrow Account.

      2.      <u>Professional Fee Escrow Account</u>

As soon as is reasonably practicable after the Effective Date, the Debtor shall fund the Professional Fee Escrow Account (from Cash on hand and the Initial Settlement Amount) in an amount sufficient to pay all expected Allowed Professional Fee Claims in full. The Professional Fee Escrow Account shall be held for the sole benefit of Estate Professionals until all Allowed Professional Fee Claims been paid in full. No Liens, claims, or interests of any kind shall encumber the Professional Fee Escrow Account or the Cash contained therein in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Debtor's Estate or of the Post-Effective Date Debtor. Funds held in the Professional Fee Escrow Account shall be considered property of the Liquidation Trust to be distributed by the Liquidation Trustee under the terms and conditions set forth in the Plan and the Liquidation Trust Agreement.

Upon Allowance of a Professional Fee Claim, the same shall be paid as soon as reasonably practicable in Cash by the Liquidation Trustee from the funds held in the Professional Fee Escrow Account; *provided* that the Debtor's and the Liquidation Trustee's obligations to pay Allowed Professional Fee Claims shall not be limited or be deemed limited to funds held in the Professional Fee Escrow Account. To the extent that there are insufficient funds in the Professional Fee Escrow Account to satisfy all Allowed Professional Fee Claims in full, any such Allowed Professional Fee Claims (or portions thereof that remain unpaid from the Professional Fee Escrow Account) shall be paid as an Allowed Administrative Claim in accordance with Article II.A.

When all Allowed Professional Fee Claims have been irrevocably paid in full pursuant to one or more Final Orders of the Bankruptcy Court (as and if such Final Orders may be required), any remaining funds held in the Professional Fee Escrow Account shall be paid seventy-seven percent (77%) to the Liquidation Trust and twenty-three percent (23%) to the Personal Injury Trust.

      3.      <u>Professional Fee Escrow Amount</u>

Each Professional shall provide a reasonable and good-faith estimate of its fees and expenses incurred in rendering services to the Debtor before and as of the Effective Date that are projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtor no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be, nor shall it be deemed to be, an admission or limitation with respect to the amount of any Professional Fee Claim. If a Professional does not provide an estimate of its Professional Fee Claim, the Debtor may estimate the amount of unpaid and unbilled fees and expenses of such Professional. The aggregate amount of Professional fee estimates as of the Effective Date shall be utilized by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account.

      4.      <u>Post-Effective Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Liquidation Trustee or Personal Injury Trustee, as applicable, may, in the ordinary course of business and without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pay the reasonable, actual, and documented

legal, professional, or other fees and expenses incurred on or after the Effective Date in connection with administering the Liquidation Trust and the Personal Injury Trust, as applicable, and in accordance with the Plan, Liquidation Trust Agreement, and Personal Injury Trust Agreement, as applicable.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate.

C.    *DIP Claims*

DIP Claims shall be treated and satisfied pursuant to the global settlement set forth in Article IV.B.2.

D.    *Priority Tax Claims*

1.    Priority Federal Tax Claims

Except to the extent that a federal Governmental Unit Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each federal Governmental Unit Holder of such Allowed Priority Tax Claim will receive, at the sole option of the Debtor or Liquidation Trustee, as applicable, either:  (1) an amount of Cash from the ERC Fund equal to the amount of such Allowed Priority Tax Claim by the later of (a) ninety (90) days after the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, or (b) ten (10) days after the date on which the ERC Fund is funded; or (2) regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.  For the avoidance of doubt, federal Governmental Unit Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

2.    Priority State Tax Claims

Except to the extent that a state Governmental Unit Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each state Governmental Unit Holder of such Allowed Priority Tax Claim will receive an amount of Cash equal to the amount of such Allowed Priority Tax Claim no later than ninety (90) days after the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter. For the avoidance of doubt, state Governmental Unit Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority State Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
### CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

A.    *Classification of Claims and Interests*

All Claims and Interests, other than the Claims addressed in Article II, are classified as set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.

12

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Convenience Claims | Impaired | Entitled to Vote |
| 4 | Non-Personal Injury Claims | Impaired | Entitled to Vote |
| 5 | Personal Injury Claims | Impaired | Entitled to Vote |
| 6 | Contingent Indemnification Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment and Voting of Classes of Claims and Interests*

    1.      Class 1 — Other Priority Claims

        (a)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash from the Liquidation Trustee on (or as soon as reasonably practicable after) the later of (i) the Effective Date or (ii) thirty (30) days after such Other Priority Claim becomes Allowed, or (iii) a date on which the Holder of such Other Priority Claim and the Debtor or Liquidation Trustee, as applicable, shall otherwise agree in writing.

        (b)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

    2.      Class 2 — Other Secured Claims

        (a)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the sole option of the Debtor or Liquidation Trustee, as applicable, either:

            (i)      payment in full in Cash on the later of (w) the Effective Date (or as soon as reasonably practicable thereafter), (x) the date on which such Other Secured Claim becomes Allowed, (y) the date payment on account of such Other Secured Claim is due; or (z) the date on which the Holder of such Allowed Other Secured Claim and the Debtor or the Liquidation Trustee, as applicable, shall otherwise agree in writing;

            (ii)      the Debtor's interest in the collateral securing such Allowed Other Secured Claim; or

            (iii)      other treatment that renders such Allowed Other Secured Claim Unimpaired.

4870-6905-9718

(b)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      Class 3 — Convenience Claims

(a)      *Treatment*:  On the first Business Day that is thirty (30) days following the Effective Date, each Holder of a Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash.

(b)      *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 — Non-Personal Injury Claims

(a)      *Treatment*:

(i)      Subject to first seeking a recovery from any applicable insurance or other third parties pursuant to Article VI.G, on the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Non-Personal Injury Claim agrees to less favorable treatment, each Holder of an Allowed Non-Personal Injury Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the Liquidation Trust.  Thereafter each such Holder shall receive Cash distributions from the Liquidation Trust.  Distributions from the Liquidation Trust to Holders of Allowed Non-Personal Injury Claims shall be on a Pro Rata basis with all other holders of Liquidation Trust beneficial interests in accordance with the terms of the Liquidation Trust Agreement.  For the avoidance of doubt, only Consenting Creditors will have the right to receive distributions from the Settlement Payment and excess ERC Funds, if any.

(ii)      Notwithstanding the above, each Holder of an Allowed Non-Personal Injury Claim shall have the option on the Ballot to elect for an Expedited Distribution.  Any Holder of a Non-Personal Injury Claim who elects for the Expedited Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the releases contained in Article IX.D.  An election on the Ballot for an Expedited Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot.  An Expedited Distribution shall be paid by the Liquidation Trustee or an insurer, as applicable, on the later of (a) the Effective Date or (b) within ten (10) business days after such General Unsecured Claim becomes an Allowed Claim by Final Order.

(b)      *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Non-Personal Injury Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 — Personal Injury Claims

(a)      *Treatment*:

(i)      Subject to first seeking a recovery from any applicable insurance or other third parties pursuant to Article VI.G, on the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Personal Injury Claim agrees to less favorable treatment, each Holder of an Allowed Personal Injury Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the Personal Injury Trust.  Thereafter, each such Holder shall

14

receive Cash distributions from the Personal Injury Trust. Distributions from the Personal Injury Trust to Holders of Allowed Personal Injury Claims shall be paid to holders of Personal Injury Trust beneficial interests in accordance with the terms of the Personal Injury Trust Agreement. For the avoidance of doubt, any treatment provided to one or more Holders of Personal Injury Claims pursuant to the provisions of the Confirmation Order approving the Insurance Settlement Motion shall take precedence over the treatment provided in this Article III.B.5.

(ii)     Notwithstanding the above, each Holder of an Allowed Personal Injury Claim shall have the option on the Ballot to elect for an Expedited Distribution. Any Holder of a Personal Injury Claim who elects for the Expedited Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the releases contained in Article IX.D. An election on the Ballot for an Expedited Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot. An Expedited Distribution shall be paid by an insurer, or the Personal Injury Trustee, as applicable, within sixty (60) days following the Effective Date.

(b)     *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Personal Injury Claims are entitled to vote to accept or reject the Plan.

6.     Class 6 — Contingent Indemnification Claims

(a)     *Treatment*: On the Effective Date, all Contingent Indemnification Claims shall be Disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code. Holders of Contingent Indemnification Claims shall not receive any distribution on account of such Claims.

(b)     *Voting*: Class 6 is Impaired under the Plan. Holders of Contingent Indemnification Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

7.     Class 7 — Interests in the Debtor

(a)     *Treatment*: On the Effective Date, all Interests in the Debtor shall be cancelled, released, discharged, and extinguished. Holders of Interests in the Debtor shall not receive any distribution on account of such Interests.

(b)     *Voting*: Class 7 is Impaired under the Plan. Holders of Interests in the Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

D.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

15

E.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

To the extent any Class is impaired under the Plan and such Class fails to accept this Plan in accordance with section 1126(c) or (d) of the Bankruptcy Code, the Proponents hereby request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.  The Proponents reserve the right to modify the Plan in accordance with Article XI to the extent, if any, that Plan confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration for Plan Distributions*

Sources of consideration for Plan distributions shall be:  (1) Cash on hand; (2) the Settlement Payment; (3) the Debtor's insurance policies; and (4) the Liquidation Trust Assets and the Personal Injury Trust Assets, as applicable.

B.      *Global Settlement*

The Debtor, the Committee, and the Settlement Parties have reached a global resolution of all issues among them in this Chapter 11 Case.  Pursuant to Bankruptcy Rule 9019, the Plan does, and shall, constitute a compromise, settlement, and release of all potential claims by and among the Settlement Parties on the terms set forth below.  Entry of the Confirmation Order shall constitute approval of the global resolution set forth below, which shall become effective upon the Effective Date.

1.      The Settlement Payment.

(a)     The Settlement Parties shall pay or cause to be paid to the Debtor or Liquidation Trustee, as applicable, aggregate Cash in the amount of Thirty-Seven Million Dollars ($37,000,000.00) (the "Settlement Payment"), as follows: (i) on or before the Effective Date, the Settlement Parties shall pay or cause to be paid to the Debtor's estate Cash in the amount of Twenty-Five Million Dollars ($25,000,000.00) (the "Initial Settlement Amount"), reduced as set forth in Article IV.B.2; and (ii) after the Effective Date, the Settlement Parties shall pay or cause to be paid to the Liquidation Trustee Cash in the aggregate amount of Twelve Million Dollars ($12,000,000), in installments of One Million Dollars ($1,000,000.00) (each, an "Installment Settlement Payment"), with the first payment to be made thirty (30) days after the Effective Date (or, if such day is not a Business Day, the next succeeding Business Day), and the subsequent eleven (11) installments to be made every thirty (30) days thereafter (or, if such day is not a Business Day, the next succeeding Business Day) until paid in full, with the final installment being made no later than three hundred and sixty (360) days after the Effective Date (or, if such day is not a Business Day, the next succeeding Business Day).  The exact payment dates for each Installment Settlement Payment shall be set forth in an amended Plan Supplement to be filed on the Effective Date.

(b)     Settlement Payment Default.

(i)     The Settlement Parties' failure to timely pay or cause to be paid any of the Installment Settlement Payments shall constitute a "Settlement Payment Default."

(ii)    Upon occurrence of a Settlement Payment Default, the Debtor or either Trustee, shall promptly provide written notice of the Settlement Payment Default (a "Settlement Payment Default Cure Notice") to counsel for the Settlement Parties at the following email addresses:   mhayward@haywardfirm.com,

kristian.gluck@nortonrosefulbright.com, julie.harrison@nortonrosefulbright.com, taddavidson@andrewskurth.com, and pguffy@huntonak.com. The Settlement Parties shall cure the Settlement Payment Default by making the missed Installment Settlement Payment within seven (7) business days of receipt of the Settlement Payment Default Cure Notice (the "Settlement Payment Cure Period").

(iii)   In the event that an Installment Settlement Payment is not paid in full by the end of the applicable Settlement Payment Cure Period (a "Defaulted Settlement Payment"), any releases proposed to and from the Settlement Parties in Article IV.B.4, Article IX.C, and Article IX.D shall be null and void.

2.   Settlement Parties' Release of Certain Claims.

On the Effective Date, the Settlement Parties shall release and waive all claims and causes of action against the Debtor's estate, including, without limitation, the DIP Lender's claims under the DIP Order that accrued prior to August 23, 2023, and the Proofs of Claim filed by Geneva Consulting LLC (KCC Claims Register No. 572 for $315,032.97) and M2 LoanCo, LLC  (KCC Claims Register No. 589 for $24,032,965), which Claims shall be Disallowed for all purposes and expunged from the Claims Register; provided, however, that all amounts advanced by the DIP Lender pursuant to the DIP Order on or after August 23, 2023, shall not be released but shall instead be credited dollar-for-dollar against the Initial Settlement Amount.

3.   Consent to Releases of the Released Parties.

As set forth more fully on the Ballot or Opt-Out Form, all Consenting Creditors shall be deemed to have consented to the Third-Party Release contained in Article IX.D regardless of whether a Ballot or Opt-Out Form has been submitted.  In consideration for the Third-Party Release set forth in Article IX.D and the other releases set forth in this Plan, the Settlement Parties shall provide the Settlement Payment.  **Any Holder of a Claim or Interest who has checked the box on the Ballot or Opt-Out Form to opt out of the Third-Party Release or has objected to the Plan in respect of the release shall be deemed to have forever waived and forfeited its right to its applicable share of the Settlement Payment and any applicable proceeds of the ERC Fund (after payment in full of all Allowed Priority Tax Claims, as provided in Article II.D.1).**

4.   Settlement Releases.

Upon payment in full of the Settlement Amount as provided in Article IV.B.1, and as more fully described in Article IX.D, the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any causes of action, directly or derivatively, by, through, for, or because of the foregoing entities, shall be deemed to have released, and shall be permanently enjoined from any prosecution or attempted prosecution of, any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, which any of them has or may have against: (a) the Settlement Parties; (b) M2 EquityCo LLC; (c) Valitás Intermediate Holdings Inc.; (d) Valitás Health Services, Inc.; (e) M2 Pharmacorr Equity Holdings LLC; (f) Pharmacorr/M2 LLC; (g) Pharmacorr Holdings LLC; (h) Endeavor Distribution LLC; (i) CHS Texas LLC; (j) Yes Care Holdings LLC; (k) Sigma RM, LLC; (l) DG Realty Management LLC; (m) Scaracor LLC; (n) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (o) Sara Ann Tirschwell; (p) Ayodeji Olawale Ladele; (q) Beverly Michelle Rice; (r) Jeffrey Scott King; (s) Jennifer Lynee Finger; (t) Frank Jeffrey Sholey; and (u) for each Entity listed in (a) through (t), each of their respective current and former officers, directors, employees, managers, attorneys, professional advisors, and agents; provided, however, that nothing herein shall release any claims or causes of action of any kind, by any Entity, against James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks or any obligations under this Plan; provided, further, that nothing herein shall release claims or causes of action to enforce

the terms of the Plan, including but not limited to the global settlement provisions in this Article IV.B; *provided*, *further*, that nothing in this Article IV.B.4 shall alter or diminish the release set forth in Paragraph 17 of the DIP Order; *provided*, *further*, that the Challenge Period (as defined in the DIP Order) is extended for the Liquidation Trustee through the date the releases in Article IV become effective. For the avoidance of doubt, the releases described in this paragraph are not effective unless and until the full Settlement Amount is paid by the Settlement Parties, including, without limitation, each Installment Settlement Payment pursuant to Article IV.B.1.

C.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

D.      *Insurance Settlements*

The Plan incorporates the Insurance Settlement Motion as if set forth fully in the Plan. The Insurance Settlement Motion shall be approved as part of the Plan pursuant to the Confirmation Order.

E.      *Post-Effective Date Debtor, Liquidation Trust, and Personal Injury Trust*

1.      Post-Effective Date Debtor and the Liquidation Trust

On the Effective Date, the Liquidation Trust will be formed pursuant to the Liquidation Trust Agreement to receive and liquidate the Liquidation Trust Assets and wind down the Debtor's Estate. In addition, the Liquidation Trust shall serve as a successor to the Debtor pursuant to sections 1123(a)(5)(B) and (b)(3)(B) of the Bankruptcy Code to: (a) administer the terms of the Plan (other than as the Plan relates to Personal Injury Claims), including making payments in accordance with Articles II and III to all Holders of Claims and interests other than Personal Injury Claims; (b) make distributions pursuant to the Liquidation Trust Agreement; (c) assert any Cause of Action on behalf of the Debtor that constitutes a Liquidation Trust Asset; and (d) take such other action as may be authorized by the Liquidation Trust Agreement, including objecting to any and all Claims other than Professional Fee Claims.

Upon the transfer of the Liquidation Trust Assets, as more fully set forth in the Liquidation Trust Agreement, the Debtor will have no reversionary or further interest in or with respect to the Liquidation Trust Assets. For U.S. federal income tax purposes, the beneficiaries of the Liquidation Trust will be treated as grantors and owners thereof and it is intended that the Liquidation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Liquidation Trust be treated as if they had received an interest in the Liquidation Trust Assets and then contributed such interests to the Liquidation Trust.

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtor shall be deemed to have resigned and the Liquidation Trustee shall be appointed as the sole manager, director, and officer of the Post-Effective Date Debtor and shall succeed to the powers of the Debtor's managers, directors, and officers. From and after the Effective Date, the Liquidation Trustee shall be the sole representative of, and shall act for, the Post-Effective Date Debtor. The Post-Effective Date Debtor or the Liquidation Trustee, as applicable, shall be deemed to be substituted in lieu of the Debtor as the proper party in interest in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtor or the Liquidation Trustee to file motions or substitutions of parties or counsel in any such matter.

2.      Personal Injury Trust

On the Effective Date, the Personal Injury Trust shall be formed to receive and liquidate the Personal Injury Trust Assets for the benefit of Holders of Allowed Personal Injury Claims. The Personal Injury Trust shall: (a) make

18

distributions to Holders of Allowed Personal Injury Claims in accordance with this Plan and the Personal Injury Trust Agreement; (b) assert any Cause of Action constituting a Personal Injury Trust Asset on behalf of the Post-Effective Date Debtor including, without limitation, seeking full recovery of any and all available insurance proceeds from any insurers; and (c) take such further action as may be authorized by the Personal Injury Trust Agreement, including objecting to Personal Injury Claims.  The proceeds of the recoveries on any of the Personal Injury Trust Assets shall be deposited in and become the property of the Personal Injury Trust.

Upon the transfer of the Personal Injury Trust Assets, the Debtor will have no reversionary or further interest in or with respect to the Personal Injury Trust Assets.  For all U.S. federal income tax purposes, the beneficiaries of the Personal Injury Trust will be treated as grantors and owners thereof and it is intended that the Personal Injury Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.  Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Personal Injury Trust be treated as if they had received an interest in the Personal Injury Trust Assets and then contributed such interests to the Personal Injury Trust.

F.      *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or in any of the documents contained the Plan Supplement (including any action to be undertaken by the Post-Effective Date Debtor or Personal Injury Trustee, as applicable) shall be deemed authorized and approved, and, to the extent taken by the Debtor prior to the Effective Date, ratified, confirmed and approved without any requirement for further action by Holders of Claims or Interests, the Debtor, or any other Entity in all respects.  All matters provided for in the Plan involving the corporate structure of the Debtor or the Post-Effective Date Debtor, as applicable, and any corporate action required by the Debtor or the Post-Effective Date Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtor or the Post-Effective Date Debtor, as applicable.

Upon the Effective Date or as soon as reasonably practicable thereafter, after making all distributions required to be made under the Plan, the Debtor shall be deemed to have been dissolved and terminated and the Liquidation Trustee shall be responsible for effectuating such dissolution.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Post-Effective Date Debtor or the Liquidation Trustee, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtor or Post-Effective Date Debtor.  The authorizations and approvals contemplated by this Article IV.F. shall be effective notwithstanding any requirements under non-bankruptcy law.

G.      *Vesting of Assets*

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's Estate, all Causes of Action, any property acquired by the Debtor under the Plan, and any proceeds of any of the foregoing, other than the Personal Injury Trust Assets, shall automatically vest in the Liquidation Trust free and clear of all Liens, Claims, interests, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Liquidation Trustee may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, except as otherwise provided in the Liquidation Trust Agreement.

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all Personal Injury Trust Assets and any proceeds thereof shall automatically vest in the Personal Injury Trust free and clear of all Liens, Claims, interests, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Personal Injury Trustee may use, acquire, or dispose of Personal Injury Trust Assets and compromise or settle any Personal Injury Claims or Causes of Action constituting Personal Injury Trust Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, except as otherwise provided in the Personal Injury Trust Agreement.

4870-6905-9718

H.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Liquidation Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the documents contained in the Plan Supplement, in the name of and on behalf of the Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

I.      *Exemptions from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, no transfers of property under the Plan shall be subject in any way to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, including but not limited to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in either Trust; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan.  Each appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

J.      *Preservation of Causes of Action*

Except as otherwise provided in this Plan, an agreement or document entered into in connection with the Plan, or in a Final Order of the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and as set forth more fully in the Disclosure Statement, the Debtor reserves and, as of the Effective Date, assigns to the applicable Trust the Causes of Action identified in the Plan Supplement as Retained Causes of Action.  On and after the Effective Date, the Liquidation Trustee and Personal Injury Trustee, as appropriate may pursue Retained Causes of Action on behalf of and for the benefit of the applicable Trust beneficiaries.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidation Trustee or the Personal Injury Trustee, as appropriate, will not pursue any and all available Causes of Action against it.  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Liquidation Trustee and Personal Injury Trustee expressly reserve all Causes of Action for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Plan confirmation or Consummation.

The Debtor, the Liquidation Trustee, or the Personal Injury Trustee, as applicable, reserves such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  The Liquidation Trustee and Personal Injury Trustee, as applicable, shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*K.*      *Dissolution of Committee and Cessation of Fee and Expense Payments*

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case; *provided that* the Committee shall have post-Effective Date standing to object to Administrative Expense Claims and Professional Fee Claims and shall be entitled to file a Professional Fee Claim for services related thereto and otherwise provided before the Effective Date, subject to rights of any party in interest to object thereto.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either the Liquidation Trustee or Personal Injury Trustee or to be compensated or reimbursed per the Plan and the Liquidation Trust Agreement or Personal Injury Trust Agreement in connection with such representation.

<u>**ARTICLE V.**</u>
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

*A.*      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court,  unless an Executory Contract or Unexpired Lease: (1) was previously assumed or rejected by the Debtor; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a pending motion to assume filed on or before the Effective Date; or (4) is identified on the Assumed Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments, or rejections described above as of the Effective Date.

Contracts or leases that were not allocated to YesCare Corp. or its wholly owned subsidiaries (including CHS TX, Inc.) under the Plan of Divisional Merger but under which YesCare Corp. is or was operating after May 5, 2022, are not Executory Contracts or Unexpired Leases.  To the extent that such contracts are determined to be Executory Contracts or Unexpired Leases by a Final Order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from such contracts or leases must be filed with the Claims Agent and served on the Post-Effective Date Debtor no later than thirty (30) days of the later of the Effective Date or entry of such Final Order.

*B.*      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be the subject of a Proof of Claim Filed with the Claims Agent and served on the Post-Effective Date Debtor no later than thirty (30) days after the later of (i) the Effective Date or (ii) the date of entry of a Bankruptcy Court order approving such rejection.  Such Proof of Claim may be objected to in accordance with the provisions of Article VIII and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that is not the subject of a timely Filed Proof of Claim shall be Disallowed for all purposes in this Chapter 11 Case, discharged, and forever barred.

*C.*      *Cure of Defaults and Objections to Cure and Assumption*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

4870-6905-9718

The Debtor shall provide notices of proposed cure amounts to counterparties to Executory Contracts and Unexpired Leases as part of the Plan Supplement. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by counsel to the Debtor and the Committee no later than the Confirmation Objection Deadline. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed for all purposes in this Chapter 11 Case, discharged, forever barred, and expunged without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Insurance Policies*

Notwithstanding anything to the contrary herein, each of the insurance policies and any agreements, documents, or instruments relating thereto issued to or entered into by the Debtor prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtor; *provided*, *however*, that to the extent any such insurance policy is determined by Final Order to be an Executory Contract, then, notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such insurance policy and assign the same to the Personal Injury Trust if a Personal Injury Trust Asset, or to the Liquidation Trust if a Liquidation Trust Asset. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to any insurance policy, and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any insurance policy shall be indefeasible. Nothing in the Plan, the Plan Supplement, the Confirmation Order, or any other order of the Bankruptcy Court, (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third-party administrators pay claims covered by such insurance policies.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Except as otherwise provided in a Final Order, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease on Schedule G of the Debtor's Schedules, nor anything contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Post-Effective Date Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, the Liquidation Trustee, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease to assume or reject it, including by rejecting such contract or lease effective as of the Confirmation Date.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Rights and Powers of the Debtor, Post-Effective Date Debtor, the Liquidation Trustee, and the Personal Injury Trustee*

On and after the Effective Date, the Personal Injury Trustee and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any Personal Injury Claim, subject to the terms hereof and the Personal Injury Trust Agreement.  On and after the Effective Date, the Liquidation Trustee and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any Claim other than Personal Injury Claims subject to the terms hereof and the Liquidation Trust Agreement.

The Post-Effective Date Debtor, the Liquidation Trustee, and the Personal Injury Trustee, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Liquidation Trustee or the Personal Injury Trustee is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Liquidation Trust Assets or the Personal Injury Trust Assets, as applicable.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided in the Plan or the applicable Trust Agreement, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Effective Date by the Trustees or other third parties, as applicable:  (a) to the party designated to receive payment on any Proof of Claim or Proof of Interest; or (b) at the addresses set forth in any written notices of address changes delivered to the applicable Trustee after the Effective Date.  Neither the Post-Effective Date Debtor nor either of the Trustees shall incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

2.      Minimum; De Minimis Distributions

No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim unless provided otherwise in one of the Trust Agreements, as applicable.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Liquidation Trustee or the Personal Injury Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the later of (a) the Effective Date and (b) the date of the distribution.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust or the Personal Injury Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court, for distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

Neither the Liquidation Trustee nor Personal Injury Trustee nor their respective agents and attorneys are under a duty to take any action to either (a) attempt to locate any Holder, or (b) obtain an executed Internal Revenue Service Form W-9 from any Holder; *provided* that in their sole discretion, the Liquidation Trustee or Personal Injury Trustee, as applicable may periodically publish notice of unclaimed distributions.

If, at the time either of the Trusts terminates there remains unclaimed property in such Trust, such property shall be donated by the applicable Trustee to the Anthony H.N. Schnelling Endowment Fund maintained by the American Bankruptcy Institute, to assist in the provision of resources for research and education.

C.    *Manner of Payment*

At the option of the applicable Trustee, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

D.    *Compliance Matters*

In connection with the Plan and all distributions hereunder, to the extent applicable, the Trustees are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan or pursuant to the Liquidation Trust Agreement and the Personal Injury Trust Agreement shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Trustees shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Trustees reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

E.    *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

F.    *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, the Post-Effective Date Debtor and the Trustees may, pursuant to the Bankruptcy Code, applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that such Post-Effective Date Debtor or Trustee, as applicable, may hold against the Holder of such Allowed Claim.  In no event shall any Claim Holder be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Post-Effective Date Debtor or either Trustee (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to implement such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

G.    *Claims Paid or Payable by Third Parties*

1.    <u>Claims Payable by Insurance</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtor's insurers, sureties, or non-Debtor payors pays or satisfies a Claim in full or in part, or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged and Disallowed without the need for a Claim objection to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

2.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

3.      <u>Claims Paid by Third Parties</u>

Each Trustee, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, including on account of recourse to collateral held by third parties that secure such Claim. To the extent a Claim Holder receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Trustee to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**<u>ARTICLE VII.</u>**
**RESERVES ADMINISTERED BY THE LIQUIDATION TRUSTEE**

A.      *Establishment of Reserve Accounts*

The Liquidation Trustee shall establish each of the Distribution Reserve Accounts, which, notwithstanding anything to the contrary contained in this Plan, may be effectuated by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Liquidation Trustee.

B.      *Administrative and Priority Claims Reserve*

On the Effective Date, the Liquidation Trustee shall establish the Administrative and Priority Claims Reserve. The Administrative and Priority Claims Reserve shall be used to pay Allowed Administrative and Priority Claims.  If all or any portion of an Administrative or Priority Claim shall become a Disallowed Claim, then the amount on deposit in the Administrative and Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in such Reserve, shall remain in the Administrative and Priority Claims Reserve to the extent that the Liquidation Trustee determines necessary to ensure that the Cash remaining in the Administrative and Priority Claims Reserve is sufficient to ensure that all Allowed Administrative and Priority Claims will be paid in accordance with the Plan.

C.      *Other Secured Claims Reserve*

On the Effective Date if appropriate, the Liquidation Trustee shall establish the Other Secured Claims Reserve by depositing Cash proceeds from the sale of assets securing the Other Secured Claims, if any.  The Other Secured Claims Reserve shall be used to pay Allowed Other Secured Claims to the extent not satisfied by the return of the assets securing the Allowed Other Secured Claim.  If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve or be transferred out of the Other Secured Claims Reserve to the extent that the Liquidation Trustee determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan.

The Debtor shall not have any reversionary or other interest in or with respect to any of the Distribution Reserve Accounts.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS**

A.      *Applicability.*

All Disputed Claims against the Debtor, other than Administrative Expense Claims, shall be subject to the provisions of this Article VIII.  All Administrative Expense Claims shall be determined and, if Allowed, paid in accordance with Article II.  None of the terms or provision of this Article VIII shall apply to Personal Injury Claims, which shall be exclusively processed, liquidated, and paid by the Personal Injury Trustee in accordance with the Personal Injury Trust Agreement.

B.      *Allowance of Claims and Interests*

After the Effective Date, the applicable Trustee shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claim Allowed pursuant to the Plan or Final Order of the Bankruptcy Court entered before the Effective Date.  Except as expressly provided in the Plan or in any Final Order of the Bankruptcy Court entered prior to the Effective Date (including the Confirmation Order and the DIP Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan, the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Case allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Court pursuant to Bankruptcy Rule 9019 or otherwise, if any, shall be binding on all parties.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date the Liquidation Trustee shall have the sole authority to:  (1) file, withdraw, or litigate to judgment objections to Claims or Interests, except for Professional Fee Claims; (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and direct the Claims Agent to adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.J.

D.      *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtor or the Liquidation Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Liquidation Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Liquidation Trustee without the Liquidation Trustee having

to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes Allowed.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Liquidation Trustee.

**EXCEPT AS PROVIDED HEREIN OR IN AN ORDER OF THE BANKRUPTCY COURT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE AUTOMATICALLY DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL BY, FROM OR OF THE BANKRUPTCY COURT, THE DEBTOR, THE PERSONAL INJURY TRUSTEE, OR THE LIQUIDATION TRUSTEE.  HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

H.      *Claim Amendment Deadline*

**ANY AMENDMENTS TO ANY CLAIM TIMELY FILED BY THE BAR DATE MUST BE MADE WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE.  ANY AMENDMENTS FILED MORE THAN THIRTY (30) DAYS AFTER THE EFFECTIVE DATE SHALL BE DEEMED INEFFECTIVE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH AMENDED CLAIMS.**

I.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Liquidation Trustee shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

J.      *No Interest*

Unless otherwise specifically provided for by the Plan or the Confirmation Order, or unless otherwise required by applicable bankruptcy law, no postpetition interest shall accrue or be paid on any Claim or Interest and no Holder of any Claim or Interest shall be entitled to interest accruing on or after the Petition Date.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable.

B.    *Release of Liens*

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Debtor or the Liquidation Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.    *Release by the Debtor, its Estate, and the Post-Effective Date Debtor*

**Pursuant to section 1123(b) of the Bankruptcy Code, upon payment in full of the Settlement Payment as provided in Article IV.B.1, and in exchange for other good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, its Estate, and the Post-Effective Date Debtor shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each and all of the Released Parties from any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise that the Debtor, the Post-Effective Date Debtor, or the Estate has, have or may have against the Released Parties.**

**Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any Released Party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

D.    *Third-Party Releases*

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, upon payment in full of the Settlement Payment as provided in Article IV.B.1, and in exchange for other good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each and all of the Debtor, Post-Effective Date Debtor, and each Released Party, to the fullest extent permissible**

28

under applicable law, from any and all any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively (including any Causes of Action asserted or assertable on behalf of the Debtor, the Post-Effective Date Debtor, or the Estate, as applicable), matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, arising from, relating to, or connected with the Debtor (or any predecessor entity) or the Chapter 11 Case or affecting property of the Debtor's Estate, the Plan or the administration and implementation of the Plan, or based upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Upon the payment in full of the Settlement Payment as provided in Article IV.B.1, each of the Released Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Consenting Creditor to the fullest extent permissible under applicable law, from any and all any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, arising from, relating to, or connected with, the Debtor (or any predecessor entity) or the Chapter 11 Case or affecting property of the Debtor's Estate, the Plan or the administration and implementation of the Plan, or based upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything contained herein to the contrary, the foregoing releases do not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, or (ii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

Each of the Releasing Parties knowingly grants the Third-Party Releases notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statute or common law principle which would limit the effect of the Third-Party Release to those claims actually known or suspected to exist as of the Effective Date. In connection with their agreement to the foregoing Third-Party Releases, the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

E.      Exculpation

Upon the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest, for any claim or cause of action arising from the Petition Date through the Effective Date, arising from, relating to, or connected with the administration of the Chapter 11 Case, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. The Exculpated Parties shall be deemed to have, participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code. Each Exculpated Party

shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

F.    *Injunction and Gate Keeping*

Upon the Effective Date, to the fullest extent permissible under applicable law, all Enjoined Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Post-Effective Date Debtor, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to claims or interests that have been released, discharged, settled, or are subject to exculpation under this Plan; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any claims or interests that have been released, discharged, or are subject to exculpation under this Plan; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any claims or interests that have been released, discharged, or are subject to exculpation under this Plan; (4) interfering with the Consummation, implementation, and execution of the Plan and all documents related to the Plan; and (5) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any claims or interests that have been released, discharged, or are subject to exculpation under this Plan, unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise.

No Person or Entity may commence or pursue a claim or cause of action of any kind against the Debtor, the Post-Effective Date Debtor, any Released Party, or any Exculpated Party that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or cause of action subject to Article IX.C, Article IX.D, or Article IX.E, including any claim or cause of action that was asserted or assertable on behalf of the Debtor, including any derivative, alter ego, successor liability, or similar claims and causes of action based on general harm to the Debtor, Holders of Claims and Interests, or any other party in interest, or a theory of lack of separation between the Debtor and a Released Party or Exculpated Party, without the Bankruptcy Court (i) first determining, upon motion that attaches a copy of the proposed complaint or petition, and after notice and a hearing, that such claim or cause of action represents a direct (as opposed to derivative) and colorable claim of any kind and (ii) specifically authorizing such Person or Entity to bring such claim or cause of action against the Debtor, the Post-Effective Date Debtor, any Released Party, or any Exculpated Party.  At the hearing on such motion, the Bankruptcy Court shall have sole and exclusive jurisdiction to assess whether the proposed complaint or petition satisfies the applicable Federal Rules of Civil Procedure (or other applicable rules of procedure), including rule 8 and rule 9 (as applicable), and to determine whether such claim or cause of action represents a colorable claim of any kind.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

No Person or Entity may commence or pursue a claim or cause of action of any kind that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor, the administration of the Liquidation Trust or the Personal Injury Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind that is not resolved pursuant to a Final Order, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence, and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, to the extent legally permissible and as provided for in Article XII, shall have jurisdiction to adjudicate the underlying claim or cause of action to the extent colorable.

30

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under the Plan shall be deemed to have consented to the injunction provisions set forth in this Article IX.  The Debtor, the Post-Effective Date Debtor, the Exculpated Parties, or the Released Parties shall be entitled to seek sanctions by motion for contempt or other appropriate proceeding for any violations of the Confirmation Order or this Plan, including the Release, Exculpation, Injunction, and Gate Keeping provisions set forth in this Article IX.**

G.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtor or the Post-Effective Date Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B:

1.      the Bankruptcy Court shall have entered the Confirmation Order;

2.      the Settlement Parties shall have funded the Initial Settlement Amount;

3.      the Liquidation Trust shall be established and funded and the Liquidation Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Liquidation Trust Agreement;

4.      the Personal Injury Trust shall be established and funded and the Personal Injury Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Personal Injury Trust Agreement;

5.      the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

6.      substantially final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed;

7.      the Administrative and Priority Claims Reserve shall have been established and funded;

31

8.      the Professional Fee Escrow shall have been established and funded; and

9.      the Other Secured Claims Reserve shall have been established and funded.

B.      *Waiver of Conditions Precedent*

The Proponents, together by joint agreement, may agree to waive any of the conditions to the Effective Date set forth above at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1125 and 1125 of the Bankruptcy Code, the Proponents may jointly propose in writing to alter, amend, or modify materially the Plan prior to or after Confirmation.  Holders of Claims and Interests that have accepted the Plan shall be deemed to have accepted the Plan as altered, amended, or modified; *provided, however*, that any Holders of Claims and Interests who were deemed to accept the Plan because such Claims or Interests were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modifications, such Claims and Interests continue to be Unimpaired.  For purposes of this Article XI only, the Liquidation Trustee shall be deemed a Proponent entitled to seek amendment of the Plan under section 1127 of the Bankruptcy Code.

B.      *Revocation or Withdrawal of Plan*

The Proponents reserve the right to jointly revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Proponents jointly revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

A.      *Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code for, among other things, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests, except as otherwise expressly provided in the Plan;

4870-6905-9718

2.      hear and determine all matters relating to Professional Fee Claims;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, interpret, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Case and (b) the Plan, the Confirmation Order, the Trust Agreements, and all settlements (including the global settlement described in Article IV.B. of the Plan), contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      adjudicate, decide, or resolve any and all matters related to the Plan (including the global settlement described in Article IV.B. of the Plan);

9.      issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation, implementation or enforcement of the Plan, including all settlements (including the global settlement described in Article IV.B. of the Plan), releases, exculpations and injunctions provided for under the Plan;

10.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under all settlements (including the global settlement described in Article IV.B. of the Plan), agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order;

11.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.G.3; (b) with respect to the releases, injunctions, and other provisions contained in Article IX, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan (including the global settlement described in Article IV.B. of the Plan), the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

12.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order, including the Confirmation Order;

14.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15.      hear and determine all matters relating to the settlement and release provisions contained in Article IV and the releases, injunctions, exculpations, and gatekeeping provisions contained in Article IX;

16.      enforce all orders previously entered by the Bankruptcy Court;

17.      hear any other matter not inconsistent with the Bankruptcy Code; and

18.      enter an order or Final Decree concluding or closing the Chapter 11 Case.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

*A.      Additional Documents*

On or before the Effective Date, the Proponents may jointly file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor, the Liquidation Trustee, or the Personal Injury Trustee, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*B.      Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a), including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by the applicable Trustee for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

*C.      Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Proponents with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of either of the Proponents with respect to Holders of Claims or Interests prior to the Effective Date.

*D.      Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, affiliated investment funds or investment vehicles, managed accounts or funds, investment managers, advisors, and sub-advisors with discretionary authority, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*E.      Service of Documents*

All notices, requests, and demands relating to the Plan shall be in writing to be effective and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

34

**If to the Debtor:**

>Tehum Care Services, Inc.
>Attention: Russell Perry, Chief Restructuring Officer
>2021 McKinney Avenue, Suite 340
>Dallas, TX 75201
>E-mail:     russell.perry@ankura.com

with copies to:

>Gray Reed
>Attention:  Jason S. Brookner and Aaron M. Kaufman
>1300 Post Oak Boulevard, Suite 2000
>Houston, Texas 77056
>E-mail:     jbrookner@grayreed.com; akaufman@grayreed.com

**If to the Commitee:**

>David Barton, Chairperson for Official Committee
>of Unsecured Creditors of Tehum Care Services, Inc.
>190 E. Bannock Street
>Boise, ID 83712
>Email:     bartond@slhs.org

with copies to:

>Stinson
>Attention:  Nicholas Zluticky and Zachary Hemenway
>1201 Walnut, Suite 2900
>Kansas City, MO 64106
>E-mail:     nicholas.zluticky@stinson.com; zachary.hemenway@stinson.com

**If to the Liquidation Trustee, to:**

>[Address to be provided in the Plan Supplement]

**If to the Personal Injury Trustee, to:**

>[Address to be provided in the Plan Supplement]

After the Effective Date, the Liquidation Trustee shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

F.      *Entire Agreement*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.      *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  The Plan Supplement is available upon written request to Debtor's counsel or

4870-6905-9718

Committee counsel at the addresses above, by downloading such exhibits and documents for free from the Claims Agent's website at https://www.kccllc.net/tehum, or from the Bankruptcy Court's website for a fee at https://ecf.txsb.uscourts.gov/.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.      *Non-Severability*

        If, prior to Plan confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the Debtor and the Committee, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtor and the Committee.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

I.      *Good Faith*

        Upon entry of the Confirmation Order and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor, the Committee, the Exculpated Parties, and the Released Parties will be deemed to have solicited votes on the Plan, or otherwise participated in the Plan process, in good faith and in compliance with the Bankruptcy Code, and, therefore, no such parties, individuals, or the Trustees will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or participation in the Plan process.

J.      *Waiver or Estoppel*

        Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor, the Committee, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

K.      *No Attorney's Fees*

        Except for the fees of Professionals, no attorneys' fees shall be paid by the Debtor or the Trustees with respect to any Claim or Interest unless otherwise specified in the Plan or by a Final Order of the Bankruptcy Court.

L.      *Closing of Chapter 11 Case*

        The Liquidation Trustee shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

4870-6905-9718

Dated:  October 16, 2023

Respectfully submitted,

**Tehum Care Services, Inc.**

By:   _/s/ Russell Perry_____
Name: Russell Perry
Title: Chief Restructuring Officer

-and-

**Official Committee of Unsecured Creditors**

By:   _/s/ David Barton_____
Name: David Barton
Title: Chair

**Exhibit B**

**Form of Liquidation Trust Agreement**

### THE TEHUM CARE SERVICES, INC. LIQUIDATION TRUST AGREEMENT

This trust agreement (the "Trust Agreement") is made and entered into by and between Tehum Care Services, Inc. (the "Debtor") and _____ (the "Trustee") pursuant to the Joint Chapter 11 Plan of Liquidation (together with any and all amendments, exhibits, and schedules, the "Plan") filed in the Debtor's chapter 11 bankruptcy case, case no. 23-90086 (the "Bankruptcy Case"), before the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). Unless otherwise stated in this Trust Agreement, capitalized terms used in this Trust Agreement shall have the meanings as ascribed to them in the Plan, Confirmation Order, and Bankruptcy Code.

### RECITALS

A.      On the Petition Date, the debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.      It is anticipated that in 2024, the Bankruptcy Court will enter an order confirming the Plan (the "Confirmation Order").

C.      The Plan anticipates the existence of the Liquidation Trust and the transfer and assignment to the Liquidation Trust of the Liquidation Trust Assets.

D.      Pursuant to the Plan, the Liquidation Trust is to use the Liquidation Trust Assets to pay, if and only to the extent not otherwise paid under the Plan, the Class 1, Class 2, Class 3 and Class 4 Claims and carry out the purposes of the Plan.

E.      The Liquidation Trust is established for the benefit of the Beneficiaries of the Liquidation Trust, as defined in Section 1.6 of this Trust Agreement, and is intended to qualify as a "Designated" or "Qualified Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated under the Internal Revenue Code and codified at 26 C.F.R. §§ 1.468B-1 to -5.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises and provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

### DECLARATION OF TRUST

Subject to the occurrence of the Effective Date, the Debtor hereby absolutely assigns to the Liquidation Trust, and to its successors in trust and its successors and assigns, all rights, title, and interest of the Debtor in and to the Liquidation Trust Assets;

TO HAVE AND TO HOLD unto the Liquidation Trust and its successors in trust and its successors and assigns forever;

IN TRUST NEVERTHELESS upon the terms and subject to the conditions set forth in this Trust Agreement and for the benefit of the Beneficiaries, as defined below, as and to the

extent provided in the Plan, and for the performance of, and compliance with, the terms of this Trust Agreement, the Plan, and the Confirmation Order;

PROVIDED, HOWEVER, that upon termination of the Trust in accordance with Article IV of this Trust Agreement, this Trust Agreement shall cease, terminate, and be of no further force and effect; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED that the Trust Assets are to be held and applied by the Trustee upon the further covenants and terms and subject to the conditions set forth in this Trust Agreement.

I.

AGREEMENT OF TRUST

A.     Creation and Name. The Debtor hereby creates the Liquidation Trust known as "The Tehum Care Services, Inc. Liquidation Trust," which is the Liquidation Trust provided for in the Plan. In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

B.     Purpose. The purpose of the Trust is to assume responsibility for preserving, managing, liquidating, and distributing Liquidation Trust Assets to Holders of Class 1, Class 2, Class 3 and Class 4 Claims, in accordance with the Trust Agreement and the requirements of the Plan and Confirmation Order, to receive assignment of the Liquidation Trust Assets from the Debtor, and to pursue recoveries against any parties other than the Released Parties under the Plan.

C.     Transfer of Liquidation Trust Assets. Pursuant to the Plan and upon the occurrence of the Effective Date, the Debtor will irrevocably transfer, absolutely grant, assign, convey, set over and deliver to the Liquidation Trust at all times as set forth in the Plan, all of the Debtor's rights, titles, and interests in and to the Liquidation Trust Assets to be held in trust and for the uses and purposes stated in this Trust Agreement and in the Plan. The Trustee is hereby authorized to file with the proper governmental authorities any and all documents necessary or helpful to establish the Liquidation Trust.

D.     Irrevocability. The Liquidation Trust shall be irrevocable. The Debtor shall not alter, amend, revoke, or terminate the Liquidation Trust. The Debtor shall have no power or authority to direct the Trustee to return any of the Liquidation Trust Assets to the Debtor.

E.     Beneficiaries. The beneficiaries of the Liquidation Trust are Holders of Allowed Class 1, Class 2, Class 3 and Class 4 Claims under the Plan whose Claims are (i) Allowed by Final Order of the Bankruptcy Court or written agreement between the Holder of such Claim and The Trustee, and (ii) not otherwise paid under the Plan (the "Beneficiaries").

F.     Acceptance of Assets and Assumption of Liabilities.

1.     In furtherance of the purposes of the Liquidation Trust, the Trustee hereby accepts the role of trustee of the Liquidation Trust and accepts the grant, assignment,

transfer, conveyance, and delivery of the Liquidation Trust Assets to the Liquidation Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan, and the Confirmation Order.

2.      In furtherance of the purposes of the Liquidation Trust, the Trustee, on behalf of the Liquidation Trust, hereby expressly assumes all responsibility for preserving, managing, liquidating, and distributing Liquidation Trust Assets to the Beneficiaries in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order. The Claims of the Beneficiaries will be evaluated by the Trustee in accordance with the Trust Distribution Plan, attached as Exhibit 2 to this Trust Agreement.

3.      The Trustee shall have all of the rights, powers, and duties set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, and available under applicable law, for accomplishing the purposes of the Liquidation Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Liquidation Trust, and applicable law. The Trustee shall have the authority to bind the Liquidation Trust within the limitations set forth in this Trust Agreement, but shall be acting in the capacity as Trustee, and not individually, for all purposes contained in this Trust Agreement.

4.      In furtherance of the purposes of the Liquidation Trust, the Trustee assumes responsibility for (a) making payments to the Beneficiaries; (b) receiving, collecting, liquidating, maintaining, and distributing the Liquidation Trust Assets; and (c) fulfilling all other obligations of the Liquidation Trust under this Trust Agreement, the Plan, and the Confirmation Order. The Liquidation Trust will be administered consistent with the purpose of the Liquidation Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the value of the Liquidation Trust Assets or as otherwise provided in the Plan or Confirmation Order.

5.      All Liquidation Trust expenses and all liabilities of the Liquidation Trust with respect to the Beneficiaries shall be payable solely by the Trustee out of the Liquidation Trust Assets.

## II.

## CORPUS OF THE TRUST

A.      Trust Composition. The Liquidation Trust Assets shall include all property transferred to the Liquidation Trust pursuant to the Plan, Confirmation Order, and any future orders of the Bankruptcy Court, including without limitation all rights of every kind, nature, and description transferred to the Trust pursuant the Plan.

B.      Transfer to Trust. As of the Effective Date, pursuant to the Plan and Confirmation Order, title to and all rights and interests in the Liquidation Trust Assets shall be transferred to the Liquidation Trust free and clear of all Liens, claims, encumbrances or Interests of any kind in

the Liquidation Trust Assets of any other Person (including all Liens, claims, encumbrances or Interests of creditors of, or holders of claims against or Interests in the Debtor) in accordance with Sections 1123, 1141, and 1146(a) of the Bankruptcy Code, except as otherwise provided for in the Plan. The Trustee, on behalf of the Liquidation Trust, shall receive the Liquidation Trust Assets when they are transferred to the Liquidation Trust.

C.      Trustee's Right to and Title and Interest in Trust Assets. Upon the transfer of the Liquidation Trust Assets, the Trust succeeds to all of the Debtor's and the Estate's right to and title and Interest in the Liquidation Trust Assets, and the Debtor and the Estate shall have no further right to, or title or Interest in or with respect to, the Liquidation Trust Assets or this Liquidation Trust, except as provided in this Trust Agreement, the Plan, or the Confirmation Order.

D.      No Tax on Transfers to Trust. Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Liquidation Trust, including any deeds, bills of sale, or assignments executed in connection with any transfer to the Liquidation Trust or receipt or disposition/sale of assets by the Liquidation Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or similar tax.

E.      Spendthrift Provision. To the fullest extent permitted by law, neither the principal nor income of the Liquidation Trust, in whole or in part, shall be subject to (a) any legal or equitable claims of creditors of any Beneficiary or others, (b) legal process, or (c) voluntary or involuntary transfer, assignment, anticipation, pledge, or other form of alienation or encumbrance except as may be ordered by the Bankruptcy Court.

F.      Trust Corpus. Subject to the terms of the Plan, the entirety of the Liquidation Trust's corpus shall be available to pay the Beneficiaries and authorized expenses. The Trust Corpus shall be allocated, administered, and distributed as provided in the Trust Distribution Plan, the Plan, and the Confirmation Order.

III.

POWERS AND DUTIES OF TRUSTEE

A.      Trustee's Bond. The Trustee shall not be required to post any bond, surety, or other security for the performance of the Trustee's duties unless otherwise ordered by the Bankruptcy Court and, in the event the Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any bond or surety shall be borne by the Liquidation Trust and paid for from the Liquidation Trust Assets.

B.      Powers and Duties. The Trustee shall have, in addition to any other powers and duties conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable bankruptcy law, the Plan, and the Confirmation Order), the Plan, and the other provisions in this Trust Agreement, the following powers and duties:

1.      To act as custodian of, and to receive, control, manage, liquidate, monetize, and dispose of, all Liquidation Trust Assets for the benefit of the Beneficiaries

as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms contained in this Trust Agreement, the Plan, and the Confirmation Order.

2.      To abandon any property which the Trustee determines in the Trustee's reasonable discretion to be of *de minimus* value or of more burden than value to the Liquidation Trust.

3.      To protect and enforce the rights in and to the Liquidation Trust Assets by any method deemed appropriate, including without limitation by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

4.      To enter into contracts in the course of administering the Liquidation Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan.

5.      To open and maintain bank accounts on behalf of the Liquidation Trust, deposit funds in the bank accounts, and draw checks on the bank accounts, as appropriate under this Trust Agreement, the Plan, and the Confirmation Order.

6.      To obtain all reasonably necessary insurance coverage with respect to any property that is, or may in the future become, a Liquidation Trust Asset.

7.      To incur on behalf of the Liquidation Trust, and pay from the assets of the Liquidation Trust, all fees, costs, and expenses of administering the Liquidation Trust as provided in this Trust Agreement and the Plan. These fees, costs, and expenses include: (a) the fees of bankruptcy claims and/or distribution agents, (b) the fees and costs of professionals employed by the Trustee (the "Professionals"), including without limitation claims reviewers, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries, or auditors, (c) the premiums charged by insurers, including without limitation professional liability insurers, (d) reimbursement of any statutory fees and court costs incurred by the Debtor (i) in the event the Trustee opposes the closure of the Bankruptcy Case, from the date of the filing of any such opposition through the closure of the Bankruptcy Case or (ii) should the Trustee reopen the Bankruptcy Case in the future.

8.      In accordance with the Trust Distribution Plan, to make distributions, in accordance with the Trust Distribution Plan and Plan to Beneficiaries who have provided signed copies of all required releases and forms.

9.      In the Trustee's discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Liquidation Trust.

10.     To retain any attorney-at-law, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Liquidation Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence. In no event, however, shall the Trustee incur fees

from any professional, except the Trustee's primary legal counsel, in excess of $50,000.00 without prior approval of the Bankruptcy Court.

11.     To make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan or the Liquidation Trust or to maintain and administer the Liquidation Trust.

12.     To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including without limitation Bankruptcy Rule 2004.

13.     To amend, modify, or alter the Trust Agreement by filing a motion with the Bankruptcy Court, with notice to the Beneficiaries, the Debtor, and any or all other parties in interest. For the avoidance of doubt, the amendments, modifications, or alterations may not be inconsistent with the terms of the Plan, the terms of the Confirmation Order, or the purpose of the Liquidation Trust, as identified in Section 1.2 of this Trust Agreement.

14.     Upon any event terminating the Liquidation Trust, to defer distribution of Liquidation Trust Assets for a reasonable time needed to wind up the affairs of the Liquidation Trust, including time needed to provide for payment of debts and expenses, although the Beneficiaries' rights to distributions shall vest immediately.

15.     To comply with Section 345 of the Bankruptcy Code with regard to the investment of the Liquidation Trust Assets. The Trustee is relieved of any obligation to diversify.

16.     To establish the accounts, funds, and reserves, as required by the Plan, for ease of administration. Nothing in this provision shall restrict the Trustee's authority to pool the accounts, funds, or reserves for investment purposes or require separate bank accounts for the accounts, funds, or reserves.

17.     To be responsible for only the Liquidation Trust Assets delivered to the Liquidation Trust and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

18.     The Liquidation Trust will assume all duties, obligations, and indemnification responsibilities outlined in the Plan.

19.     To protect and enforce the rights in and to the Liquidation Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity, including prosecuting, compromising, settling and collecting on any litigation Assets.

C.     Limitations on the Trustee. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

      1.      Guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

      2.      Loan Trust Assets;

      3.      Make any transfer or distribution of Liquidation Trust Assets other than those authorized in this Trust Agreement, the Plan, or the Confirmation Order;

      4.      Engage in any trade or business; or

      5.      Engage in any investments or activities inconsistent with the treatment of the Liquidation Trust as a "Designated" or "Qualified Settlement Trust."

## IV.

## TERMINATION OF THE TRUST

A.      Pre-Confirmation Termination. The Trustee shall terminate the Trust if (a) the Effective Date does not occur within one year from the date the Trust Agreement is executed by the Debtor and the Trustee or (b) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code prior to confirmation of the Plan (the "Pre-Confirmation Termination"). Upon the Pre-Confirmation Termination of the Liquidation Trust, the Trust Agreement shall be null and void and of no force and effect, with the Trustee and the Debtor both discharged from any and all duties and obligations provided for in this Trust Agreement.

B.      Post-Confirmation Termination. The Trustee shall terminate the Liquidation Trust after (a) the Trustee's liquidation, administration, and distribution of the Liquidation Trust Assets in accordance with this Trust Agreement and the Plan and (b) the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan (the "Post-Confirmation Termination"). The Liquidation Trust shall terminate no later than the fifth anniversary of the Effective Date unless extended by the Trustee after giving the Beneficiaries reasonable prior written notice.

C.      Post-Confirmation Termination Procedures. After the Post-Confirmation Termination of the Liquidation Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until the Trustee's duties in this Trust Agreement and Plan have been fully performed. The Trustee shall retain the books, records, documents, and files that shall have been delivered to, or created by, the Trustee until distribution of all the Liquidation Trust Assets. For purposes of this provision, the Liquidation Trust Assets will be deemed distributed when the total amount remaining in the Liquidation Trust is less than $100,000.00. At the Trustee's discretion, all of the books, records, documents, and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Liquidation Trust Assets or (b) the date until which the Trustee is required by applicable law to retain the books, records, documents, and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents, or files relating to the Liquidation Trust without giving the Beneficiaries reasonable prior written notice.

D.      Post-Confirmation Termination Distribution. Upon Post-Confirmation Termination of the Liquidation Trust, provided that all fees and expenses of the Liquidation Trust have been paid or provided for in full, the Trustee will make a final distribution to the remaining Beneficiaries of the Liquidation Trust.  All unclaimed or undeliverable funds, if any, shall be distributed to a charity supporting improvement of healthcare in correctional facilities.

E.      Discharge, Exculpation, and Exoneration. Upon Post-Confirmation Termination of the Liquidation Trust and accomplishment of all activities described in this Article, the Trustee and the Trustee's Professionals shall be discharged and exculpated from liability, and the Trustee's bond (if any), shall be exonerated except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or his designated agents or representatives. The Trustee may, at the expense of the Liquidation Trust, seek an order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in this Section.

## V.

## IMMUNITY, LIABILITY, AND INDEMNIFICATION OF TRUSTEE

A.      Limitations on Liability. Neither the Trustee nor any of the Trustee's duly designated agents, representatives, or Professionals shall be liable for any act or omission taken or omitted by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or the Trustee's designated agents, representatives, or Professionals. The Trustee may, in connection with the performance of the Trustee's functions, and in the Trustee's sole and absolute discretion, consult with the Trustee's Professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with the advice or opinions rendered by the Trustee's Professionals. Notwithstanding this authority, the Trustee shall be under no obligation to consult with the Trustee's Professionals, and the Trustee's good faith determination not to consult with the Trustee's Professionals shall not result in the imposition of liability on the Trustee, unless the determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

B.      No Recourse Against the Trustee Personally. No recourse shall be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, or Professional retained by the Trustee in accordance with the terms of this Trust Agreement, Plan, or Confirmation Order, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement executed by the Trustee in implementation of this Trust Agreement or the Plan or by reason of the creation of any indebtedness by the Trustee under the Plan for any purposes authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against, and be satisfied only out of, the Liquidation Trust Assets and shall be evidence only of a right of payment out of the Liquidation Trust Assets. The Trustee may be held liable for the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability

for these grounds is established, recourse may be had directly against the Trustee. The Liquidation Trust will not be covered by a bond.

C.     Indemnification. The Trustee, using Liquidation Trust Assets, shall defend, indemnify, and hold harmless the Trustee, the Trustee's officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of the state of Texas is entitled to defend, indemnify, and hold harmless its trustees, officers, directors, agents, representatives, and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement; provided that neither the Trustee nor the Trustee's officers, directors, agents, representatives, or employees shall be defended, indemnified, or held harmless in any way for any liability, expense, claim, damage, or loss for which they are ultimately held liable under Section 5.1 of this Trust Agreement.

## VI.

## COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE AND ITS AGENTS

A.     Trustee Compensation. The Trustee shall be entitled to receive compensation from the Liquidation Trust Assets as detailed in Exhibit 1.

B.     Compensation of the Trustee's Professionals. Any Professional retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered paid by the Trustee from the Trust Assets.

C.     Reimbursement of Expenses. Any and all reasonably necessary costs and expenses incurred by the Trustee and any Professional retained by the Trustee, in performing their respective duties under this Trust Agreement and the Plan, will be reimbursed by the Trustee from the Trust Assets.

## VII.

## SUCCESSOR TRUSTEE

A.     Vacancy Caused by the Trustee's Resignation or Removal.

1.     The Trustee may resign at any time upon 30-days written notice to be filed with the Bankruptcy Court. The outgoing trustee (the "Outgoing Trustee") shall, within 30 days after the Outgoing Trustee's resignation takes effect, deliver to the successor trustee (the "Successor Trustee") all of the Liquidation Trust Assets which were in the possession of the Outgoing Trustee along with a complete list of Liquidation Trust Assets and a complete accounting of all transactions engaged by the Outgoing Trustee while serving as the Trustee.

2.     Any Beneficiary may petition the Bankruptcy Court to remove the Trustee for cause, which shall be limited to recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

3.     In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the Successor Trustee all of the Liquidation Trust Assets which were in the possession of the Trustee along with a complete list of Liquidation Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such.

B.     Outgoing Trustee Obligations. In the event of the resignation or the removal of the Trustee, the Outgoing Trustee, in addition to the duties imposed under Sections 7.1.1 or 7.1.2, shall:

1.     Execute and deliver by the effective date of the resignation or removal the documents, instruments, records, and other writings as may be reasonably requested by the Successor Trustee to effect the resignation or removal of the Outgoing Trustee and the conveyance of the Liquidation Trust Assets to the Successor Trustee.

2.     Deliver to the Successor Trustee all documents, instruments, records, and other writings relating to the Liquidation Trust Assets as may be in the possession or under the control of the Outgoing Trustee.

3.     Otherwise assist and cooperate in effecting the assumption of the Outgoing Trustee's obligations and functions by the Successor Trustee.

The Outgoing Trustee hereby irrevocably appoints the Successor Trustee (and any interim trustee) as the Outgoing Trustee's attorney-in-fact and agent with full power of substitution for the Outgoing Trustee and in the Outgoing Trustee's name, place, and stead to do any and all acts that the Outgoing Trustee is obligated to perform under this Trust Agreement. The appointment of the Successor Trustee as the Outgoing Trustee's attorney-in-fact and agent shall not be affected by the subsequent disability or incompetence of the Outgoing Trustee. The Bankruptcy Court may also enter any order necessary to effect the termination of the appointment of the Outgoing Trustee and the subsequent appointment of the Successor Trustee.

C.     Appointment of Successor Trustee. Any vacancy in the office of the Trustee shall be filled by the nomination of a majority of the members of the UCC (notwithstanding dissolution of the UCC on the Effective Date), subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and a hearing. If at least three (3) members of the UCC do not participate in the nomination of the Successor Trustee within 10 days after the Outgoing Trustee resigns, is removed, or otherwise becomes unable to serve, the Bankruptcy Court shall designate a successor, after notice to Beneficiaries.

D.     Preservation of Record of Changes in Trustees. A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

VIII.

TRUSTEE REPORTING AND DISCHARGE

A.      Annual Accountings. The Trustee shall prepare, at least annually, a written accounting of the administration of the Liquidation Trust listing the current assets with fair market values and detailing all transactions that occurred during the period covered by the accounting. Each accounting may be filed with the Bankruptcy Court for as long as the Bankruptcy Case remains open and pending before the Bankruptcy Court. Copies of the accounting shall be available to the Beneficiaries upon request. However, the Trustee shall redact any and all confidential and personal identifying information from any and all accountings or reports filed with the Bankruptcy Court or provided to any Beneficiary.

B.      Approval of Accountings and Discharge of the Trustee. At any time when the Bankruptcy Case is open, the Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1 of this Trust Agreement. Upon the entry of an order of the Bankruptcy Court approving the accounting, the Trustee shall be discharged from all liability to the Liquidation Trust, any Beneficiary, or any Person who has or may have a claim against the Trustee or Trust for acts or omissions in the Trustee's capacity as Trustee with respect to all assets listed and transactions detailed in the accounting.

IX.

SECTION 468B SETTLEMENT FUND

A.      Qualification. In accordance with the Plan, the Trustee shall take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of Section 468B of the Internal Revenue Code of 1986 (as amended, the "Tax Code") and the regulations promulgated pursuant the Tax Code (the "Treasury Regulations"). The Debtor shall be the "Transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "Administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

B.      All Events Test and Economic Performance Requirement. It is intended that the transfer of the Liquidation Trust Assets to the Liquidation Trust shall satisfy the "All Events Test" and the "Economic Performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461-1(a)(2).

C.      Employer Identification Number. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

D.      Relation-Back Election. If applicable, the Trustee and the Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2) to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

E.      Filing Requirements. The Trustee shall cause to be filed, on behalf of the Liquidation Trust, all required federal, state, and local tax returns in accordance with the

provisions of Treasury Regulation Section 1.468B-2(k)(1). The Debtor shall file an election statement satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Liquidation Trust is treated as a grantor trust under Section 671 of the Tax Code and the Treasury Regulations. The election statement shall be included with the Liquidation Trust's first timely filed trust income tax return. The Debtor shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15 of the year following each calendar year in which the Debtor makes a transfer to the Liquidation Trust.

F.     Broad Powers of the Trustee. The Trustee is empowered to take all actions, including any action consistent with those expressly set forth in Article IX of this Trust Agreement, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the Treasury Regulations. Further, the Trustee may, unilaterally and without order from the Bankruptcy Court, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with Article IX of this Trust Agreement, provided such amendment does not create any tax liabilities or administrative responsibilities for the Debtor.

X.

BENEFICIARIES

A.     Register. The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the (i) names and addresses of the Beneficiaries and the actual distributions made to the Beneficiaries pursuant to the Plan. The Trustee may rely upon the Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by the holder, or proper notice of a name or address change, which has been delivered by the Beneficiary to the Trustee.

B.     Rights of Beneficiaries. The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of the Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Liquidation Trust Assets, or any right to call for a partition or division of the Liquidation Trust Assets. Title to all the Liquidation Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to the Beneficiaries under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

C.     Tax Identification Numbers. The Trustee shall require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The Trustee shall condition the payment of any distribution to any Beneficiary upon receipt of the number and records or documents.

XI.

MISCELLANEOUS PROVISIONS

A.      Plan Incorporation. The terms of the Plan and the Confirmation Order are incorporated into and made part of this Trust Agreement as if fully set forth herein. In the event of any conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall govern.

B.      Notices. All notices or deliveries required or permitted under this Trust Agreement shall be given as directed in the Plan, to the following:

If to the Trust or Trustee:

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented Beneficiary, to the address for the Beneficiary provided in the Proof of Claim.

If to the Debtor:

with a copy to:

C.      Waiver. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect the right or remedy or constitute a waiver by the party of any right or remedy pursuant to this Trust Agreement. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

D.      Reimbursement of Costs. If the Trustee, the Liquidation Trust or the Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement of a provision of this Trust Agreement, the Trustee, the Liquidation Trust or the Debtor, as the case may be, shall be entitled to collect from the non-prevailing party any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, incurred in connection with the dispute or enforcement action.

E.      Entirety of Trust Agreement. Except with respect to the Plan and Confirmation Order, this Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter in this Trust Agreement. This Trust Agreement, together with the Exhibits to the Trust Agreement, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed in the Trust Agreement. It is acknowledged that there are no communications or oral understandings that are contrary to, or that in any way restrict, this Trust Agreement and that all prior agreements or understandings within the scope of the subject matter of this Trust Agreement are, upon execution and delivery of this Trust Agreement, superseded, null, and void.

F.      Counterparts. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on the counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute

one and the same instrument. Facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.

G.      Captions. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

H.      Representation. It is acknowledged that each of the parties to this Trust Agreement has reviewed this Trust Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing this Trust Agreement. Each of the parties to this Trust Agreement relied upon its own judgment and that of its counsel in executing this Trust Agreement and has not relied on, or been induced by, any representation, statement, or act by any party that is not referred to in this instrument. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America. Each of the parties entered into this Trust Agreement voluntarily, with full knowledge of its significance, and the Trust Agreement is, in all respects, complete and final.

I.      Interpretation. This Trust Agreement has been reached through negotiations between the parties to this Trust Agreement. Each of the parties to this Trust Agreement acknowledges that the party has participated in the drafting of this Trust Agreement and reviewed the terms of the Trust Agreement and, as such, no rule of construction shall apply which might result in this Trust Agreement being construed in favor or against any of the parties, including without limitation, any rule of construction to the effect that ambiguities ought to be resolved against the drafting party. The parties to this Trust Agreement have used their own judgment in entering into this Agreement.

J.      Savings Clause. If any clause or provision of this Trust Agreement shall for any reason be held invalid or unenforceable by the Bankruptcy Court or any other court with competent jurisdiction, such invalidity or unenforceability shall not affect any other clause or provision in this Trust Agreement, but this Trust Agreement shall be construed, insofar as reasonable to effectuate the purpose of this Trust Agreement, as if the invalid or unenforceable provision had never been contained in the Trust Agreement.

K.      Applicable Law. This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Texas applicable to contracts and trust agreements made and to be performed in this Trust Agreement, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and any Treasury Regulations shall be governed by federal tax law and all matters of federal bankruptcy law shall be governed by the Bankruptcy Code and federal bankruptcy law.

**[SIGNATURE PAGE TO FOLLOW]**

     IN WITNESS WHEREOF, the Debtor and the Trustee execute this Trust Agreement as of the ___ of _____, 2024.

**TRUSTEE:**

[             ]

By: _____

Title: _____

**TEHUM CARE SERVICES, INC.,**
a Texas corporation, as Debtor

By: _____

Title: _____

**EXHIBIT 1**

**TRUSTEE COMPENSATION**

[To be submitted with Plan Supplement]

## EXHIBIT 2

## TRUST DISTRIBUTION PLAN

Below sets forth the proposed Trust Distribution Plan for the Liquidation Trust.  This Trust Distribution Plan may be amended or modified by amendment to the Trust Agreement, the Plan or the Confirmation Order, or as otherwise permitted in the Trust Agreement.  All capitalized, undefined terms shall have the meanings ascribed to them in the Plan and the Trust Agreement.

## I.      Liquidation Trust Assets

The Liquidation Trust shall receive all assets of the Debtor's Estate not otherwise assigned to the Personal Injury Trust, including, without limitation, the following:

A.      Cash allocated to the Liquidation Trust under the Plan and the Confirmation Order including, without limitation, the portion of Cash allocated to the Liquidation Trust from the Initial Settlement Payment.

B.      Fifty percent (50%) of the amount of each Supplemental Settlement Payment as those payments are received from the Settlement Parties.

C.      All right, title and interest of the Debtor in and to all tax credits and refunds including, without limitation, all employee retention credits.

D.      All rights under insurance policies not assigned to the Personal Injury Trust.

E.      All Estate claims and causes of action.

For informational purposes only, after payment of all Administrative Claims and Professional Fee Claims, the Debtor and the Committee anticipate that the Liquidation Trust Assets will have a value of between $25 million and $40 million.

## II.     Beneficiaries Under Liquidation Trust

The Beneficiaries of the Liquidation Trust are defined in the Trust Agreement, and are generally described as follows:

A.      Administrative Claims (if and only to the extent that the Allowed Administrative Claims are not satisfied in full by the Administrative and Priority Claims Reserve);

B.      Professional Fee Claims (if and only to the extent that the Allowed Professional Fee Claims are not satisfied in full by the Professional Fee Escrow Account and, after exhaustion of the Professional Fee Escrow Account, the Administrative and Priority Claims Reserve);

C.      Class 1 Other Priority Claims (if and only to the extent that the Allowed Priority Claims are not satisfied in full by the Administrative and Priority Claims Reserve);

D.      Class 2 Other Secured Claims;

E.      Class 3 Convenience Claims; and

F.      Class 4 Non-Personal Injury Claims.

The Classes of Claims described herein shall only be deemed Beneficiaries (i) if included within the definition of Beneficiaries under the Trust Agreement and (ii) if and only to the extent that you are a Holder of an Allowed Claim as defined in the Plan.

## III.      Initial Settlement Procedure

A.      Initial Settlement Payment and Election.

Pending an initial review and approval by the Trustee, the Liquidation Trust Beneficiaries holding Class 3 Convenience Claims will receive payment in full of such claims within thirty (30) days of the Effective Date.

All other Beneficiaries shall have the option in their Plan Ballot to make an election to receive an Expedited Distribution in the amount of $5,000 in full and final settlement of their Claims.  In order for such election to be valid as to shared Claims, each claimant must so elect, and payment of the settlement shall be distributed pro rata to such claimants if unanimous election occurs for a shared Claim.  If the Liquidation Trustee has not objected to any Claim for which the Holder has elected Expedited Distribution, all Expedited Distributions shall be paid within sixty (60) days following the Effective Date.  Acceptance of such payment by a claimant or claimants constitutes agreement to waive and release in full all claims against the Debtor as well as any claim against any other defendant or insurer relating in any way to the claimant's claim against the Debtor.

B.      Mandatory Mediation

1.      Mandatory Mediation: Each beneficiary of the Liquidation Trust who has not elected to accept the Expedited Distribution and each Beneficiary whose Claim is the subject of a claim objection shall proceed to a mandatory mediation process for further resolution of their claim.  Mediations pursuant to this section shall be conducted by a mediator selected by the Trustee and approved by Judge Lopez.  The mediator shall determine any aspects of the mediation process not specifically addressed herein.

2.      Pre-Mediation Notice: Unless the Trustee deems such Pre-Mediation Notice unnecessary, each beneficiary who proceeds to mediation shall receive, within forty-five (45) days of the Effective Date of the Plan, a Pre-Mediation Notice from the Trustee containing the Trustee's preliminary analysis of the value of each Beneficiary's Claim.

3.      Response to Pre-Mediation Notice: Within forty-five (45) days of receiving the Pre-Mediation Notice, the Beneficiary shall provide a response to the Pre-Mediation Notice indicating whether the Beneficiary is in agreement with the Trustee's analysis as to the value of the Beneficiary's Claim.  To the extent the Beneficiary disagrees with the Trustee's analysis, the Beneficiary must provide documentation outlining the basis for their challenge.

4.      Claim Allowance and Objection: To the extent the Beneficiary agrees with the Trustee's analysis as to the value of the beneficiary's claim, the Trustee may agree to a stipulated Claim in the amount of the preliminary analysis of value without any further order of the Bankruptcy Court so long as the amount of the stipulated Claim is $500,000 or less.  Any stipulation regarding a stipulated Claim of more than $500,000 shall be subject to approval by the Bankruptcy Court after notice and an opportunity for hearing.  If the Trustee believes a dispute as to the value may exist based on a Beneficiary's response to the Pre-Mediation Notice or if no response is received, the Trustee may file an objection to the Beneficiary's Claim.

5.      Mediation Disclosures:  The mediation shall include an initial exchange of information in which the Beneficiary will provide relevant information about their claim to the extent such information was not included in their response to the Pre-Mediation Notice and the Trustee will provide any information or documentation the mediator deems necessary.  These initial disclosures will include the information required by Fed. R. Civ. P. 26(a)(1) as incorporated by Fed. R. Bankr. P. 7026.  For the avoidance of doubt, the Confirmation Order shall provide that Fed. R. Civ. P. 26(a)(1) applies to claim objections under Fed. R. Bankr. P. 9014(c).

6.      Mediation Claim Summaries: Prior to mediation, the Trustee will provide to the mediator a statement of no more than five pages outlining the Liquidating Trust's position on the Claim and the Trust's view on settlement.  The Beneficiary shall provide to the mediator a statement of no more than five pages outlining the Beneficiary's view as to the value of their claim and the basis for such view, unless the mediator deems such submittal unnecessary.

7.      Mediation Settlement-Approvals:  The Trustee shall have the authority to agree to a stipulated allowed claim of $500,000 or less as part of a mediation settlement without order of the Court or any other further approval.  If a mediation settlement includes a proposed allowed claim exceeding $500,000, such settlement must be approved by the Bankruptcy Court after notice and an opportunity for a hearing.

## IV.      Claim Objection Procedure

If mediation is unsuccessful, the Trustee's objection the Claim shall proceed forward as a contested matter under Fed. R. Bankr. P. 9014 and the Claim shall be allowed in such amount determined by the Bankruptcy Court.

## V.      Distribution of Liquidation Trust Assets to Beneficiaries

A.      All Beneficiaries holding Claims other than Class 3 or Class 4 Claims shall receive distributions on the conditions and timelines set forth in the Plan and the Trust Agreement.

B.      All Beneficiaries holding Class 3 Claims shall receive distributions on the conditions and timelines set forth in Section III.A. of the Trust Distribution Plan.

C.      All Beneficiaries holding Class 4 Claims who have made an election for an Expedited Distribution shall receive distributions on the conditions and timelines set forth in Section III.A. of the Trust Distribution Plan.

D.      All Beneficiaries holding Class 4 Claims who have not made an election for an Expedited Distribution shall receive distributions as follows:

1.      On or before sixty (60) days after the Claim Objection Deadline (the "Initial Distribution Date"), the Trustee shall make an initial distribution to all Beneficiaries of the Liquidation Trust who hold Allowed Claims that are not the subject of an objection.

2.      Every one hundred twenty (120) days after the Initial Distribution Date, the Trustee shall make an interim distribution to Beneficiaries of the Liquidation Trust who hold Allowed Claims that are not the subject of an objection; provided, however, the Trustee may elect to delay a distribution in the Trustee's sole discretion.

3.      After the Trustee has liquidated all Liquidation Trust Assets and completed the Claim allowance process, the Trustee shall make a final distribution to the Beneficiaries of the Liquidation Trust (the "Final Distribution"), which shall include the proceeds from liquidation of Estate claims and causes of action after deducting the costs, expenses, and attorneys' fees incurred in liquidating such claims or causes of action (the "Net Claim Proceeds").

## VI.      Distribution of Liquidation Trust Assets to Opt-Out Beneficiaries

Any Beneficiary who has opted out of the releases of the Released Parties set forth in the Plan (each an "Opt-Out Beneficiary") will have no right to any distribution from the Liquidation Trust Assets except solely from Estate claims and causes of action.  The Opt-Out Beneficiaries shall receive their pro rata share of the Net Claim Proceeds and shall receive their first and final distribution as part of the Final Distribution.

**Exhibit C**

**Form of Personal Injury Trust Agreement**

**THE TEHUM CARE SERVICES, INC. PERSONAL INJURY TRUST AGREEMENT**

This trust agreement (the "Trust Agreement") is made and entered into by and between Tehum Care Services, Inc. (the "Debtor") and _____ (the "Trustee") pursuant to the Joint Chapter 11 Plan of Liquidation (together with any and all amendments, exhibits, and schedules, the "Plan") filed in the Debtor's chapter 11 bankruptcy case, case no. 23-90086 (the "Bankruptcy Case"), before the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). Unless otherwise stated in this Trust Agreement, capitalized terms used in this Trust Agreement shall have the meanings as ascribed to them in the Plan, Confirmation Order, and Bankruptcy Code.

## RECITALS

A.      On the Petition Date, the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.      It is anticipated that in 2024, the Bankruptcy Court will enter an order confirming the Plan (the "Confirmation Order").

C.      The Plan anticipates the existence of the Personal Injury Trust and the transfer and assignment to the Personal Injury Trust of the Personal Injury Trust Assets.

D.      Pursuant to the Plan, the Personal Injury Trust is to use the Personal Injury Trust Assets to pay, if and only to the extent not otherwise paid under the Plan, the Class 5 Claims and carry out the purposes of the Plan.

E.      The Personal Injury Trust is established for the benefit of the Beneficiaries of the Personal Injury Trust, as defined in Section 1.6 of this Trust Agreement, and is intended to qualify as a "Designated" or "Qualified Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated under the Internal Revenue Code and codified at 26 C.F.R. §§ 1.468B-1 to -5.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises and provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

## DECLARATION OF TRUST

Subject to the occurrence of the Effective Date, the Debtor hereby absolutely assigns to the Personal Injury Trust, and to its successors in trust and its successors and assigns, all rights, title, and interest of the Debtor in and to the Personal Injury Trust Assets;

TO HAVE AND TO HOLD unto the Personal Injury Trust and its successors in trust and its successors and assigns forever;

IN TRUST NEVERTHELESS upon the terms and subject to the conditions set forth in this Trust Agreement and for the benefit of the Beneficiaries, as defined below, as and to the

extent provided in the Plan, and for the performance of, and compliance with, the terms of this Trust Agreement, the Plan, and the Confirmation Order;

PROVIDED, HOWEVER, that upon termination of the Personal Injury Trust in accordance with Article IV of this Trust Agreement, this Trust Agreement shall cease, terminate, and be of no further force and effect; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED that the Personal Injury Trust Assets are to be held and applied by the Trustee upon the further covenants and terms and subject to the conditions set forth in this Trust Agreement.

I.

AGREEMENT OF TRUST

A.      Creation and Name. The Debtor hereby creates the Personal Injury Trust known as "The Tehum Care Services, Inc. Personal Injury Trust," which is the Personal Injury Trust provided for in the Plan. In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

B.      Purpose. The purpose of the Personal Injury Trust is to assume responsibility for preserving, managing, liquidating, and distributing Personal Injury Trust Assets for the benefit of Holders of Class 5 Claims, in accordance with the Trust Agreement and the requirements of the Plan and Confirmation Order, to receive assignment of the Personal Injury Trust Assets from the Debtor, to pursue recoveries against any parties other than the Released Parties under the Plan, to receive assignment of the rights included in the Personal Injury Trust Assets from the Debtor, and to pursue recoveries consistent with those rights.

C.      Transfer of Personal Injury Trust Assets. Pursuant to the Plan and upon the occurrence of the Effective Date, the Debtor will irrevocably transfer, absolutely grant, assign, convey, set over and deliver to the Personal Injury Trust at all times as set forth in the Plan, all of the Debtor's rights, titles, and interests in and to the Personal Injury Trust Assets to be held in trust and for the uses and purposes stated in this Trust Agreement and in the Plan. The Trustee is hereby authorized to file with the proper governmental authorities any and all documents necessary or helpful to establish the Personal Injury Trust.

D.      Irrevocability. The Personal Injury Trust shall be irrevocable. The Debtor shall not alter, amend, revoke, or terminate the Personal Injury Trust. The Debtor shall have no power or authority to direct the Trustee to return any of the Personal Injury Trust Assets to the Debtor.

E.      Beneficiaries. The beneficiaries of the Personal Injury Trust are Holders of Allowed Personal Injury Claims under the Plan whose Claims are (i) Allowed by Final Order of the Bankruptcy Court or written agreement between the Holder of such Claim and The Trustee, and (ii) Claims are not otherwise paid under the Plan (the "Beneficiaries").

F.      Acceptance of Assets and Assumption of Liabilities.

1.      In furtherance of the purposes of the Personal Injury Trust, the Trustee hereby accepts the role of trustee of the Personal Injury Trust and accepts the grant, assignment, transfer, conveyance, and delivery of the Personal Injury Trust Assets to the Personal Injury Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan, and the Confirmation Order.

2.      In furtherance of the purposes of the Personal Injury Trust, the Trustee, on behalf of the Personal Injury Trust, hereby expressly assumes all responsibility for preserving, managing, liquidating, and distributing Personal Injury Trust Assets to the Beneficiaries in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order. The Claims of the Beneficiaries will be evaluated by the Trustee in accordance with the Trust Distribution Plan, attached as Exhibit 2 to this Trust Agreement.

3.      The Trustee shall have all of the rights, powers, and duties set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, and available under applicable law, for accomplishing the purposes of the Personal Injury Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Personal Injury Trust, and applicable law. The Trustee shall have the authority to bind the Personal Injury Trust within the limitations set forth in this Trust Agreement, but shall be acting in the capacity as Trustee, and not individually, for all purposes contained in this Trust Agreement.

4.      In furtherance of the purposes of the Personal Injury Trust, the Trustee assumes responsibility for (a) making payments to the Beneficiaries; (b) receiving, collecting, liquidating, maintaining, and distributing the Personal Injury Trust Assets; and (c) fulfilling all other obligations of the Personal Injury Trust under this Trust Agreement, the Plan, and the Confirmation Order. The Personal Injury Trust will be administered consistent with the purpose of the Personal Injury Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the value of the Personal Injury Trust Assets or as otherwise provided in the Plan or Confirmation Order.

5.      All Liquidation Trust expenses and all liabilities of the Personal Injury Trust with respect to the Beneficiaries shall be payable solely by the Trustee out of the Personal Injury Trust Assets.

II.

CORPUS OF THE TRUST

A.      Trust Composition. The Personal Injury Trust Assets shall include all property transferred to the Personal Injury Trust pursuant to the Plan, Confirmation Order, and any future

orders of the Bankruptcy Court, including without limitation all rights of every kind, nature, and description transferred to the Personal Injury Trust pursuant the Plan.

B. Transfer to Personal Injury Trust. After the Effective Date, pursuant to the Plan and Confirmation Order, title to and all rights and interests in the Personal Injury Trust Assets shall be transferred to the Personal Injury Trust free and clear of all Liens, claims, encumbrances or Interests of any kind in the Personal Injury Trust Assets of any other Person (including all Liens, claims, encumbrances or Interests of creditors of, or holders of claims against or Interests in the Debtor) in accordance with Sections 1123, 1141, and 1146(a) of the Bankruptcy Code, except as otherwise provided for in the Plan. The Trustee, on behalf of the Personal Injury Trust, shall receive the Personal Injury Trust Assets when they are transferred to the Personal Injury Trust.

C. Trustee's Right to and Title and Interest in Trust Assets. Upon the transfer of the Personal Injury Trust Assets, the Trust succeeds to all of the Debtor's and the Estate's right to and title and Interest in the Liquidation Trust Assets, and the Debtor and the Estate shall have no further right to, or title or Interest in or with respect to, the Personal Injury Trust Assets or this Personal Injury Trust, except as provided in this Trust Agreement, the Plan, or the Confirmation Order.

D. No Tax on Transfers to Personal Injury Trust. Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Personal Injury Trust, including any deeds, bills of sale, or assignments executed in connection with any transfer to the Personal Injury Trust or receipt or disposition/sale of assets by the Personal Injury Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or similar tax.

E. Spendthrift Provision. To the fullest extent permitted by law, neither the principal nor income of the Personal Injury Trust, in whole or in part, shall be subject to (a) any legal or equitable claims of creditors of any Beneficiary or others, (b) legal process, or (c) voluntary or involuntary transfer, assignment, anticipation, pledge, or other form of alienation or encumbrance except as may be ordered by the Bankruptcy Court.

F. Personal Injury Trust Corpus. Subject to the terms of the Plan, the entirety of the Personal Injury Trust's corpus shall be available to pay the Beneficiaries and authorized expenses. The Personal Injury Trust Corpus shall be allocated, administered, and distributed as provided in the Trust Distribution Plan, the Plan, and the Confirmation Order.

III.

POWERS AND DUTIES OF TRUSTEE

A. Trustee's Bond. The Trustee shall not be required to post any bond, surety, or other security for the performance of the Trustee's duties unless otherwise ordered by the Bankruptcy Court and, in the event the Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any bond or surety shall be borne by the Personal Injury Trust and paid for from the Personal Injury Trust Assets.

B.      Powers and Duties. The Trustee shall have, in addition to any other powers and duties conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable bankruptcy law, the Plan, and the Confirmation Order), the Plan, and the other provisions in this Trust Agreement, the following powers and duties:

1.      To act as custodian of, and to receive, control, manage, liquidate, monetize, and dispose of, all Personal Injury Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms contained in this Trust Agreement, the Plan, and the Confirmation Order.

2.      To abandon any property which the Trustee determines in the Trustee's reasonable discretion to be of *de minimus* value or of more burden than value to the Personal Injury Trust.

3.      To protect and enforce the rights in and to the Personal Injury Trust Assets by any method deemed appropriate, including without limitation by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

4.      To enter into contracts in the course of administering the Personal Injury Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan.

5.      To open and maintain bank accounts on behalf of the Personal Injury Trust, deposit funds in the bank accounts, and draw checks on the bank accounts, as appropriate under this Trust Agreement, the Plan, and the Confirmation Order.

6.      To obtain all reasonably necessary insurance coverage with respect to any property that is, or may in the future become, a Personal Injury Trust Asset.

7.      To incur on behalf of the Personal Injury Trust, and pay from the assets of the Personal Injury Trust, all fees, costs, and expenses of administering the Personal Injury Trust as provided in this Trust Agreement and the Plan. These fees, costs, and expenses include: (a) the fees of bankruptcy claims and/or distribution agents, (b) the fees and costs of professionals employed by the Trustee (the "Professionals"), including without limitation claims reviewers, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries, or auditors, (c) the premiums charged by insurers, including without limitation professional liability insurers, (d) reimbursement of any statutory fees and court costs incurred by the Debtor (i) in the event the Trustee opposes the closure of the Bankruptcy Case, from the date of the filing of any such opposition through the closure of the Bankruptcy Case or (ii) should the Trustee reopen the Bankruptcy Case in the future.

8.      In accordance with the Trust Distribution Plan, to make distributions, in accordance with the Trust Distribution Plan and Plan to Beneficiaries who have provided signed copies of all required releases and forms.

9.      In the Trustee's discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Liquidation Trust.

10.     To retain any attorney-at-law, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Liquidation Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence. In no event, however, shall the Trustee incur fees from any professional, except the Trustee's primary legal counsel, in excess of $50,000.00 without prior approval of the Bankruptcy Court.

11.     To make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan or the Personal Injury Trust or to maintain and administer the Personal Injury Trust.

12.     To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including without limitation Bankruptcy Rule 2004.

13.     To amend, modify, or alter the Trust Agreement by filing a motion with the Bankruptcy Court, with notice to the Beneficiaries, the Debtor, and any or all other parties in interest. For the avoidance of doubt, the amendments, modifications, or alterations may not be inconsistent with the terms of the Plan, the terms of the Confirmation Order, or the purpose of the Personal Injury Trust, as identified in Section 1.2 of this Trust Agreement.

14.     Upon any event terminating the Personal Injury Trust, to defer distribution of Personal Injury Trust Assets for a reasonable time needed to wind up the affairs of the Personal Injury Trust, including time needed to provide for payment of debts and expenses, although the Beneficiaries' rights to distributions shall vest immediately.

15.     To comply with Section 345 of the Bankruptcy Code with regard to the investment of the Personal Injury Trust Assets. The Trustee is relieved of any obligation to diversify.

16.     To establish the accounts, funds, and reserves, as required by the Plan, for ease of administration. Nothing in this provision shall restrict the Trustee's authority to pool the accounts, funds, or reserves for investment purposes or require separate bank accounts for the accounts, funds, or reserves.

17.     To be responsible for only the Personal Injury Trust Assets delivered to the Personal Injury Trust and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

18.     The Personal Injury Trust will assume all duties, obligations, and indemnification responsibilities outlined in the Plan.

19.     To protect and enforce the rights in and to the Personal Injury Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings

or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity, including prosecuting, compromising, settling and collecting on any litigation Assets.

C.      Limitations on the Trustee. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

1.      Guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

2.      Loan Personal Injury Trust Assets;

3.      Make any transfer or distribution of Personal Injury Trust Assets other than those authorized in this Trust Agreement, the Plan, or the Confirmation Order;

4.      Engage in any trade or business; or

5.      Engage in any investments or activities inconsistent with the treatment of the Personal Injury Trust as a "Designated" or "Qualified Settlement Trust."

IV.

TERMINATION OF THE TRUST

A.      Pre-Confirmation Termination. The Trustee shall terminate the Personal Injury Trust if (a) the Effective Date does not occur within one year from the date the Trust Agreement is executed by the Debtor and the Trustee or (b) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code prior to confirmation of the Plan (the "Pre-Confirmation Termination"). Upon the Pre-Confirmation Termination of the Personal Injury Trust, the Trust Agreement shall be null and void and of no force and effect, with the Trustee and the Debtor both discharged from any and all duties and obligations provided for in this Trust Agreement.

B.      Post-Confirmation Termination. The Trustee shall terminate the Personal Injury Trust after (a) the Trustee's liquidation, administration, and distribution of the Personal Injury Trust Assets in accordance with this Trust Agreement and the Plan and (b) the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan (the "Post-Confirmation Termination"). The Personal Injury Trust shall terminate no later than the fifth anniversary of the Effective Date unless extended by the Trustee after giving the Beneficiaries reasonable prior written notice.

C.      Post-Confirmation Termination Procedures. After the Post-Confirmation Termination of the Personal Injury Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until the Trustee's duties in this Trust Agreement and Plan have been fully performed. The Trustee shall retain the books, records, documents, and files that shall have been delivered to, or created by, the Trustee until distribution of all the Personal Injury Trust Assets. For purposes of this provision, the Personal Injury Trust Assets will be deemed distributed when the total amount remaining in the Personal

Injury Trust is less than $100,000.00. At the Trustee's discretion, all of the books, records, documents, and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Personal Injury Trust Assets or (b) the date until which the Trustee is required by applicable law to retain the books, records, documents, and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents, or files relating to the Personal Injury Trust without giving the Beneficiaries reasonable prior written notice.

D.      Post-Confirmation   Termination   Distribution.   Upon   Post-Confirmation Termination of the Personal Injury Trust, provided that all fees and expenses of the Personal Injury Trust have been paid or provided for in full, the Trustee will make a final distribution to the remaining Beneficiaries of the Personal Injury Trust.  All unclaimed or undeliverable funds, if any, shall be distributed to a charity supporting improvement of healthcare in correctional facilities.

E.      Discharge, Exculpation, and Exoneration. Upon Post-Confirmation Termination of the Personal Injury Trust and accomplishment of all activities described in this Article, the Trustee and the Trustee's Professionals shall be discharged and exculpated from liability, and the Trustee's bond (if any), shall be exonerated except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or his designated agents or representatives. The Trustee may, at the expense of the Liquidation Trust, seek an order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in this Section.

V.

IMMUNITY, LIABILITY, AND INDEMNIFICATION OF TRUSTEE

A.      Limitations on Liability. Neither the Trustee nor any of the Trustee's duly designated agents, representatives, or Professionals shall be liable for any act or omission taken or omitted by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or the Trustee's designated agents, representatives, or Professionals. The Trustee may, in connection with the performance of the Trustee's functions, and in the Trustee's sole and absolute discretion, consult with the Trustee's Professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with the advice or opinions rendered by the Trustee's Professionals. Notwithstanding this authority, the Trustee shall be under no obligation to consult with the Trustee's Professionals, and the Trustee's good faith determination not to consult with the Trustee's Professionals shall not result in the imposition of liability on the Trustee, unless the determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

B.      No Recourse Against the Trustee Personally. No recourse shall be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, or Professional retained by the Trustee in accordance with the terms of this Trust Agreement, Plan, or Confirmation Order, by legal or equitable proceedings or by virtue of any statute or otherwise,

nor upon any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement executed by the Trustee in implementation of this Trust Agreement or the Plan or by reason of the creation of any indebtedness by the Trustee under the Plan for any purposes authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against, and be satisfied only out of, the Personal Injury Trust Assets and shall be evidence only of a right of payment out of the Personal Injury Trust Assets. The Trustee may be held liable for the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability for these grounds is established, recourse may be had directly against the Trustee. The Personal Injury Trust will not be covered by a bond.

C.      Indemnification. The Trustee, using Personal Injury Trust Assets, shall defend, indemnify, and hold harmless the Trustee, the Trustee's officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of the state of Texas is entitled to defend, indemnify, and hold harmless its trustees, officers, directors, agents, representatives, and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement; provided that neither the Trustee nor the Trustee's officers, directors, agents, representatives, or employees shall be defended, indemnified, or held harmless in any way for any liability, expense, claim, damage, or loss for which they are ultimately held liable under Section 5.1 of this Trust Agreement.

VI.

COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE
AND ITS AGENTS

A.      Trustee Compensation. The Trustee shall be entitled to receive compensation from the Personal Injury Trust Assets as detailed in Exhibit 1.

B.      Compensation of the Trustee's Professionals. Any Professional retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered paid by the Trustee from the Trust Assets.

C.      Reimbursement of Expenses. Any and all reasonably necessary costs and expenses incurred by the Trustee and any Professional retained by the Trustee, in performing their respective duties under this Trust Agreement and the Plan, will be reimbursed by the Trustee from the Trust Assets.

VII.

SUCCESSOR TRUSTEE

A.     Vacancy Caused by the Trustee's Resignation or Removal.

     1.     The Trustee may resign at any time upon 30-days written notice to be filed with the Bankruptcy Court. The outgoing trustee (the "Outgoing Trustee") shall, within 30 days after the Outgoing Trustee's resignation takes effect, deliver to the successor trustee (the "Successor Trustee") all of the Personal Injury Trust Assets which were in the possession of the Outgoing Trustee along with a complete list of Personal Injury Trust Assets and a complete accounting of all transactions engaged by the Outgoing Trustee while serving as the Trustee.

     2.     Any Beneficiary may petition the Bankruptcy Court to remove the Trustee for cause, which shall be limited to recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

     3.     In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the Successor Trustee all of the Personal Injury Trust Assets which were in the possession of the Trustee along with a complete list of Personal Injury Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such.

B.     Outgoing Trustee Obligations. In the event of the resignation or the removal of the Trustee, the Outgoing Trustee, in addition to the duties imposed under Sections 7.1.1 or 7.1.2, shall:

     1.     Execute and deliver by the effective date of the resignation or removal the documents, instruments, records, and other writings as may be reasonably requested by the Successor Trustee to effect the resignation or removal of the Outgoing Trustee and the conveyance of the Personal Injury Trust Assets to the Successor Trustee.

     2.     Deliver to the Successor Trustee all documents, instruments, records, and other writings relating to the Personal Injury Trust Assets as may be in the possession or under the control of the Outgoing Trustee.

     3.     Otherwise assist and cooperate in effecting the assumption of the Outgoing Trustee's obligations and functions by the Successor Trustee.

The Outgoing Trustee hereby irrevocably appoints the Successor Trustee (and any interim trustee) as the Outgoing Trustee's attorney-in-fact and agent with full power of substitution for the Outgoing Trustee and in the Outgoing Trustee's name, place, and stead to do any and all acts that the Outgoing Trustee is obligated to perform under this Trust Agreement. The appointment of the Successor Trustee as the Outgoing Trustee's attorney-in-fact and agent shall not be affected by the subsequent disability or incompetence of the Outgoing Trustee. The Bankruptcy Court may also enter any order necessary to effect the termination of the appointment of the Outgoing Trustee and the subsequent appointment of the Successor Trustee.

C.     Appointment of Successor Trustee. Any vacancy in the office of the Trustee shall be filled by the nomination of a majority of the members of the Committee (notwithstanding dissolution of the Committee on the Effective Date), subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and a hearing. If at least three (3) members of the Committee do not participate in the nomination of the Successor Trustee within 10 days after the Outgoing Trustee resigns, is removed, or otherwise becomes unable to serve, the Bankruptcy Court shall designate a successor, after notice to Beneficiaries.

D.     Preservation of Record of Changes in Trustees. A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

## VIII.

## TRUSTEE REPORTING AND DISCHARGE

A.     Annual Accountings. The Trustee shall prepare, at least annually, a written accounting of the administration of the Personal Injury Trust listing the current assets with fair market values and detailing all transactions that occurred during the period covered by the accounting. Each accounting may be filed with the Bankruptcy Court for as long as the Bankruptcy Case remains open and pending before the Bankruptcy Court. Copies of the accounting shall be available to the Beneficiaries upon request. However, the Trustee shall redact any and all confidential and personal identifying information from any and all accountings or reports filed with the Bankruptcy Court or provided to any Beneficiary.

B.     Approval of Accountings and Discharge of the Trustee. At any time when the Bankruptcy Case is open, the Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1 of this Trust Agreement. Upon the entry of an order of the Bankruptcy Court approving the accounting, the Trustee shall be discharged from all liability to the Personal Injury Trust, any Beneficiary, or any Person who has or may have a claim against the Trustee or Trust for acts or omissions in the Trustee's capacity as Trustee with respect to all assets listed and transactions detailed in the accounting.

## IX.

## SECTION 468B SETTLEMENT FUND

A.     Qualification. In accordance with the Plan, the Trustee shall take all reasonable steps to ensure that the Personal Injury Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of Section 468B of the Internal Revenue Code of 1986 (as amended, the "Tax Code") and the regulations promulgated pursuant the Tax Code (the "Treasury Regulations"). The Debtor shall be the "Transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "Administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

B.     All Events Test and Economic Performance Requirement. It is intended that the transfer of the Personal Injury Trust Assets to the Liquidation Trust shall satisfy the "All Events

Test" and the "Economic Performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461-1(a)(2).

C.      Employer Identification Number. Upon establishment of the Personal Injury Trust, the Trustee shall apply for an employer identification number for the Personal Injury Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

D.      Relation-Back Election. If applicable, the Trustee and the Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2) to treat the Personal Injury Trust as coming into existence as a settlement fund as of the earliest possible date.

E.      Filing Requirements. The Trustee shall cause to be filed, on behalf of the Personal Injury Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The Debtor shall file an election statement satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Personal Injury Trust is treated as a grantor trust under Section 671 of the Tax Code and the Treasury Regulations. The election statement shall be included with the Personal Injury Trust's first timely filed trust income tax return. The Debtor shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15 of the year following each calendar year in which the Debtor makes a transfer to the Personal Injury Trust.

F.      Broad Powers of the Trustee. The Trustee is empowered to take all actions, including any action consistent with those expressly set forth in Article IX of this Trust Agreement, as the Trustee deems necessary to reasonably ensure that the Personal Injury Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the Treasury Regulations. Further, the Trustee may, unilaterally and without order from the Bankruptcy Court, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with Article IX of this Trust Agreement, provided such amendment does not create any tax liabilities or administrative responsibilities for the Debtor.

X.

BENEFICIARIES

A.      Register. The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the (i) names and addresses of the Beneficiaries and (ii) the actual distributions made to the Beneficiaries pursuant to the Plan. The Trustee may rely upon the Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by the holder, or proper notice of a name or address change, which has been delivered by the Beneficiary to the Trustee.

B.      Rights of Beneficiaries. The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative

of the Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Personal Injury Trust Assets, or any right to call for a partition or division of the Personal Injury Trust Assets. Title to all the Personal Injury Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to the Beneficiaries under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

C.      Tax Identification Numbers. The Trustee shall require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The Trustee shall condition the payment of any distribution to any Beneficiary upon receipt of the number and records or documents.

XI.

MISCELLANEOUS PROVISIONS

A.      Plan Incorporation. The terms of the Plan and the Confirmation Order are incorporated into and made part of this Trust Agreement as if fully set forth herein. In the event of any conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall govern.

B.      Notices. All notices or deliveries required or permitted under this Trust Agreement shall be given as directed in the Plan, to the following:

If to the Personal Injury Trust or Trustee:

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented Beneficiary, to the address for the Beneficiary provided in the Proof of Claim.

If to the Debtor:

with a copy to:

C.      Waiver. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect the right or remedy or constitute a waiver by the party of any right or remedy pursuant to this Trust Agreement. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

D.      Reimbursement of Costs. If the Trustee, the Personal Injury Trust or the Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement of a provision of this Trust Agreement, the Trustee, the Personal Injury Trust or the Debtor, as the case may be, shall be entitled to collect from the non-prevailing party any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, incurred in connection with the dispute or enforcement action.

E.    Entirety of Trust Agreement. Except with respect to the Plan and Confirmation Order, this Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter in this Trust Agreement. This Trust Agreement, together with the Exhibits to the Trust Agreement, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed in the Trust Agreement. It is acknowledged that there are no communications or oral understandings that are contrary to, or that in any way restrict, this Trust Agreement and that all prior agreements or understandings within the scope of the subject matter of this Trust Agreement are, upon execution and delivery of this Trust Agreement, superseded, null, and void.

F.    Counterparts. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on the counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.

G.    Captions. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

H.    Representation. It is acknowledged that each of the parties to this Trust Agreement has reviewed this Trust Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing this Trust Agreement. Each of the parties to this Trust Agreement relied upon its own judgment and that of its counsel in executing this Trust Agreement and has not relied on, or been induced by, any representation, statement, or act by any party that is not referred to in this instrument. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America. Each of the parties entered into this Trust Agreement voluntarily, with full knowledge of its significance, and the Trust Agreement is, in all respects, complete and final.

I.    Interpretation. This Trust Agreement has been reached through negotiations between the parties to this Trust Agreement. Each of the parties to this Trust Agreement acknowledges that the party has participated in the drafting of this Trust Agreement and reviewed the terms of the Trust Agreement and, as such, no rule of construction shall apply which might result in this Trust Agreement being construed in favor or against any of the parties, including without limitation, any rule of construction to the effect that ambiguities ought to be resolved against the drafting party. The parties to this Trust Agreement have used their own judgment in entering into this Agreement.

J.    Savings Clause. If any clause or provision of this Trust Agreement shall for any reason be held invalid or unenforceable by the Bankruptcy Court or any other court with competent jurisdiction, such invalidity or unenforceability shall not affect any other clause or provision in this Trust Agreement, but this Trust Agreement shall be construed, insofar as reasonable to effectuate the purpose of this Trust Agreement, as if the invalid or unenforceable provision had never been contained in the Trust Agreement.

K.      Applicable Law. This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Texas applicable to contracts and trust agreements made and to be performed in this Trust Agreement, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and any Treasury Regulations shall be governed by federal tax law and all matters of federal bankruptcy law shall be governed by the Bankruptcy Code and federal bankruptcy law.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Debtor and the Trustee execute this Trust Agreement as of the ___ of _____, 2024.

**TRUSTEE:**

[                    ]

By: _____

Title: _____

**TEHUM CARE SERVICES, INC.,**
a Texas corporation, as Debtor

By: _____

Title: _____

**EXHIBIT 1**

**TRUSTEE COMPENSATION**

[To be submitted with Plan Supplement]

**EXHIBIT 2**

**TRUST DISTRIBUTION PLAN**

Below sets forth the proposed Trust Distribution Plan for the Personal Injury Trust.  This Trust Distribution Plan may be amended or modified by amendment to the Trust Agreement, the Plan or the Confirmation Order, or as otherwise permitted in the Trust Agreement.  All capitalized, undefined terms shall have the meanings ascribed to them in the Plan and the Trust Agreement.

**I.      Personal Injury Trust Assets**

The Personal Injury Trust shall receive the following assets from the Debtor's Estate:

A.      Cash allocated to the Personal Injury Trust under the Plan and the Confirmation Order including, without limitation, the portion of Cash allocated to the Personal Injury Trust from the Initial Settlement Payment.

B.      Fifty percent (50%) of the amount of each Supplemental Settlement Payment as those payments are received from the Settlement Parties.

C.      All right, title and interest of the Debtor in and to all personal injury, medical malpractice or other related insurance policies.

For informational purposes only, after payment of all Administrative Claims and Professional Fee Claims, the Debtor and the Committee anticipate that the Personal Injury Trust Assets will have Cash of at least $10 million plus rights under insurance policies having a value of between $9 million and $20 million.  In addition, as set forth more fully herein, Beneficiaries of the Personal Injury Trust will have the ability to pursue recoveries from additional defendants who are not also Released Parties and such defendants' insurers.

**II.     Beneficiaries Under Liquidation Trust**

The Beneficiaries of the Personal Injury Trust are defined in the Trust Agreement, are generally described as all Holders of Class 5 Personal Injury Claims and shall only be deemed Beneficiaries (i) if included within the definition of Beneficiaries under the Trust Agreement and (ii) if and only to the extent that they are a Holder of an Allowed Claim as defined in the Plan.

The Personal Injury Trust will include the following subtrusts to hold all right, title and interest of the Personal Injury Trust in and to all proceeds from any insurance policies, claims, causes of action or related recoveries by the Personal Injury Trust arising out of or related to any insurance policies assigned to the Personal Injury Trust under the Plan.  The subtrusts and corresponding Beneficiaries are hereby described as follows:

A.      Lone Star Alliance (Arizona) Subtrust:  a subtrust under the Personal Injury Trust established for the benefit of all Holders of Personal Injury Claims that are determined by the Trustee or the Bankruptcy Court to be covered by one or more insurance policies under which (i) Lone Star Alliance or one or more of its

affiliates is the insurer, (ii) the insurance policies were obtained by the Debtor for its contract with the Arizona Department of Corrections, and (iii) they are the subject of the Insurance Settlement Motion with Lone Star Alliance as defined under the Plan (the "LSA Arizona Subtrust").

B.   Lone Star Alliance (National):  a subtrust under the Personal Injury Trust established for the benefit of all Holders of Personal Injury Claims that are determined by the Trustee or the Bankruptcy Court to be covered by one or more insurance policies under which (i) Lone Star Alliance or one or more of its affiliates is the insurer, (ii) the insurance policies are not covered by the LSA Arizona Subtrust (the "LSA National Subtrust").

C.   Lexington:  a subtrust under the Personal Injury Trust established for the benefit of all Holders of Personal Injury Claims that are determined by the Trustee or the Bankruptcy Court to be covered by one or more insurance policies under which Lexington, AIG, or one or more of their affiliates is the insurer (the "Lexington Subtrust").

D.   Coverys:  a subtrust under the Personal Injury Trust established for the benefit of all Holders of Personal Injury Claims that are determined by the Trustee or the Bankruptcy Court to be covered by one or more insurance policies under which Coverys, or one or more of its affiliates is the insurer (the "Coverys Subtrust").

The Trustee shall have the authority to create any additional subtrust, in the Trustee's sole discretion, to the extent the Trustee deems necessary for distribution of any additional insurance recoveries.

## III.   Initial Settlement Procedure

A.   Initial Settlement Election

All Beneficiaries shall have the option in their Plan Ballot to make an election to receive an Expedited Distribution in the amount of $5,000 in full and final settlement of their Claims.  In order for such election to be valid as to shared Claims, each claimant must so elect, and payment of the settlement shall be distributed pro rata to such claimants if unanimous election occurs for a shared Claim.  If the Trustee has not objected to any Claim for which the Holder has elected Expedited Distribution, all Expedited Distributions shall be paid by the applicable insurer, if any, within sixty (60) days following the Effective Date.  Acceptance of such payment by a claimant or claimants constitutes agreement to waive and release in full all claims against the Debtor as well as any claim against any other defendant or insurer relating in any way to the claimant's claim against the Debtor.

B.   Mandatory Mediation Procedure

1.   Mandatory Mediation: Each Beneficiary of the Personal Injury Trust who has not elected to accept the Initial Settlement as described in the preceding paragraphs shall proceed to a mandatory mediation process for further resolution of their claim.  Mediations pursuant to this section shall be conducted by a mediator selected by the Trustee and approved

by Judge Lopez.  The mediator shall determine any aspects of the mediation process not specifically addressed herein.  To the extent there are mediator fees or reasonable administrative costs associated with a Beneficiary's participation in the mediation, the Debtor's applicable insurer, if any, will pay such fees.

2.     Pre-Mediation Notice: Each Beneficiary who proceeds to mediation shall receive, within 45 days of the effective date of the Plan, a Pre-Mediation Notice from the Trustee.  The Pre-Mediation Notice shall contain (a) the Trustee's preliminary analysis as to the insurance policy or policies application to the Beneficiary's claim, and the corresponding subtrust or subtrusts which would apply (for further discussion of such subtrusts, see Section ___, infra); and (b) the Trustee's preliminary analysis of the value of the Beneficiary's claim, solely for purposes of facilitating further discussion and dispute resolution procedures.

3.     Response to Pre-Mediation Notice: Within 45 days of receiving the Pre-Mediation Notice, the Beneficiary shall provide a response to the Pre-Mediation Notice indicating whether the Beneficiary is in agreement with the Trustee's analysis as to the value of the Beneficiary's claim and the Beneficiary's subtrust eligibility.  To the extent the Beneficiary disagrees with either analysis, the Beneficiary must provide documentation outlining the basis for their challenge.

4.     Claim Objections: If the Trustee believes a dispute may exist based on a Beneficiary's response to the Pre-Mediation Notice or if no response is received, the Trustee may file an objection to the Beneficiary's proof of claim.

5.     Mediation Disclosures:  The mediation shall include an initial exchange of information in which the Trustee will provide relevant information about the insurance policy or policies applicable to the Beneficiary's claim, and the Beneficiary will provide relevant information about their claim to the extent such information was not included in their response to the Pre-Mediation Notice.

6.     Mediation Participants: All additional indemnified insureds who have been identified as defendants or potential defendants will be invited to attend the mediation. Insurers who are responsible under any insurance policy that may apply to the claim will also be invited to attend.  At the mediator's discretion, additional defendants and/or their insurers may be invited to attend.

7.     Mediation Claim Summaries: Prior to mediation, the Trustee will provide to the mediator a statement of no more than five pages outlining the Personal Injury Trust's position on the claim and the Personal Injury Trust's view on settlement.  The Beneficiary shall provide to the mediator a statement of no more than five pages outlining the Beneficiary's view as to the value of their claim and the basis for such view, unless the mediator deems such submittal unnecessary.

8.     Mediation Settlement-Approvals:  The Personal Injury Trust shall have the authority to agree to a stipulated allowed claim of $500,000 or less as part of a mediation settlement without order of the Court or any other further approval.  If a mediation settlement includes a proposed allowed claim exceeding $500,000, such settlement must be approved by

majority vote of a seven-member Settlement Review Committee to be created by the Trustee, to consist of attorneys for Beneficiaries and Beneficiaries themselves.

        9.    Mediation Settlement-Payments from Insurers:  To the extent a mediation settlement includes an agreement by an insurer to pay funds in settlement of a Beneficiary's claim, such funds shall be paid to the Personal Injury Trust.  The Trustee shall place these funds in a subtrust for the benefit of Beneficiaries whom the Trustee has determined to be claimants under the applicable group of insurance policies.  Funds in the insurance subtrusts shall be distributed to subtrust beneficiaries pursuant to the process described in the subsequent section and outlined in the applicable trust documents.

## IV.    Litigation

If the mediation process is unsuccessful in resolving a Beneficiary's claim, the Trustee shall stipulate to the lifting of any stay and allow the Beneficiary to move forward in litigating their claim.

## V.    Distribution of Personal Injury Trust Funds

    A.    Eligibility: All Beneficiaries of the Personal Injury Trust who have not elected and received the $5,000 Initial Settlement payment shall be eligible to receive distributions from the funds within the Personal Injury Trust assets, as follows:

    B.    Holders of Stipulated Allowed Claims Resulting from Mediation: All Beneficiaries who are holders of stipulated allowed claims resulting from a successful mediation process shall look first to funds in any insurance subtrust of which the Beneficiary is a member. The Trustee shall make distributions to beneficiaries of each subtrust on a pro rata basis based on the amount of their respective claims.  Any funds received from such subtrust(s) shall reduce the Beneficiary's allowed claim by the received amounts.  The Trustee will subsequently make distributions to Beneficiaries on a pro rata basis based on the amount of their adjusted stipulated allowed claims.

    C.    Holders of Judgments Against the Debtor following Unsuccessful Mediation: If a Beneficiary's claim was not resolved in mediation and the Beneficiary received a judgment following the lifting of the stay as to their claim, the Beneficiary must demonstrate to Trustee that they have made best efforts to collect on the judgment from any other defendants in that case.  Following such satisfactory demonstration, the Beneficiary shall receive a stipulated allowed claim in the principal amount of the judgment, excepting punitive damages, and reduced by any recovery the Beneficiary has received from other sources.  The Beneficiary shall look next to funds in any insurance subtrust of which the Beneficiary is a member.  The Trustee shall make distributions to beneficiaries of each subtrust on a pro rata basis based on the amount of their respective claims.  Any funds received from such subtrust(s) shall reduce the Beneficiary's allowed claim by the received amounts.  The Trustee will subsequently make distributions to Beneficiaries on a pro rata basis based on the amount of their adjusted stipulated allowed claims.

**Exhibit D**

**Proposed LSA 9019 Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TEHUM CARE SERVICES, INC.,[1] | ) Case No. 23-90086 (CML) |
| | ) |
| Debtor. | ) |
| | ) **Re: Docket No. 802** |

**AGREED ORDER APPROVING PROCEDURES
FOR RESOLUTION OF A CERTAIN CLASS OF CLAIMS WITH RIGHTS UNDER
CERTAIN ARIZONA INSURANCE POLICIES ISSUED BY LONE STAR ALLIANCE**

Upon the motion (the "Motion")[2] of Tehum Care Services, Inc., the above-captioned debtor and debtor in possession (the "Debtor") for entry of an order (this "Order"), which is the result of a mediated settlement with the Official Committee of Unsecured Creditors (the "Committee") and Lone Star Alliance, Inc. ("LSA," and together with the Committee and the Debtor, the "Parties"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. The following procedures (the "Claims Resolution Procedures") are effective immediately. The Debtor is hereby authorized, without further order of the Court, to resolve claims asserted by any and all persons that have asserted prepetition claims that are potentially covered by the LSA Arizona Policies (each, a "Class Claimant," and collectively, the "Class Claimants"), as follows:

> a. Elective Settlement: All Class Claimants shall have the opportunity to accept an immediate $5,000 cash payment per claim (the "Elective Settlement"), irrespective of the number of claimants, to be paid by LSA, in exchange for a full and final satisfaction and release of all claims against the Debtor's bankruptcy estate (or the estate's successor in interest), LSA, and all insureds under the LSA Arizona Policies. The proposed form of notice and release is attached hereto as **Exhibit 1**.

> b. Mandatory Mediation. All Class Claimants who do not accept the Elective Settlement must proceed to mandatory mediation, as detailed below:

> > i. Hon. David R. Jones will be the mediator unless the parties (including the Debtor and LSA) agree otherwise or he is unavailable. If the parties cannot agree on an alternative mediator, Judge López will select the mediator.

> > ii. The order approving these Claims Resolution Procedures shall contain appropriate provisions to authorize Class Claimants who are incarcerated individuals and the representatives of the Parties, including LSA, to participate in mediation by video, telephone, or other available means.

> > iii. LSA shall cover the reasonable fee, if any, of the mediator and the reasonable administrative costs for any incarcerated individual, who is incarcerated at the time of the mandatory mediation, to appear by telephone or video conferencing at the mandatory mediation process. LSA shall attend each mediation, as set forth above. Payment of such costs shall not reduce the applicable available limits of liability in the LSA Arizona Policies. Such administrative costs are limited to only the usage charges for the incarcerated individual's appearance by telephone or video conferencing and will not include any cost for hardware, software, or other equipment for such appearance at the mandatory mediation. LSA shall be provided an invoice documenting any incurred reasonable administrative costs for an incarcerated individual's attendance at the mandatory mediation.

    iv.   At mediation, if the Class Claimant agrees to accept an amount proposed to be paid by LSA, then payment of 95% of such amount to the Class Claimant shall be in full and final satisfaction and release of all claims against the Debtor's bankruptcy estate (or its successor in interest), LSA, and all insureds under the LSA Arizona Policies.  The remaining 5% of such agreed amount shall be paid to the Debtor's bankruptcy estate (or its successor in interest) to help offset the administrative costs related to the Claims Resolution Procedures.  Nothing herein shall prevent any insurer providing excess or umbrella coverage to the Debtor from participating in mediation.

    v.   If any claim does not settle at mediation, the automatic stay will lift, and the Class Claimant may proceed to litigation on the terms set forth below.

c.   <u>Litigation</u>: If the Class Claimant proceeds to litigation under these Claims Resolution Procedures, the following process shall govern such litigation:

    i.   If a Class Claimant establishes (whether by settlement or final judgment) a claim against the Debtor and/or additional insureds for which the LSA Arizona Policies provide coverage (each, a "<u>Covered Claim</u>"), LSA shall pay to the Debtor's bankruptcy estate (or its successor in interest), within 30 days after the settlement or judgment becomes final, the amount of the Covered Claim, up to any available limits under the LSA Arizona Policies, and such payment shall be held in trust (the "<u>LSA Arizona Claim Personal Injury Trust</u>").  Such payment shall immediately release LSA from any further obligation for that claim under the LSA Arizona Policies and for any liabilities of LSA in connection with or related to such claim under the LSA Arizona Policies.

    ii.   To satisfy any judgment, settlement or award against the Debtor and additional insureds under the LSA Arizona Policies, the Class Claimant's recovery will be limited to (1) any available insurance proceeds; and (2) assets of additional insureds with respect to liabilities either (a) in excess of the insurance coverage under the LSA Arizona Policies or (b) not covered under the LSA Arizona Policies.

    iii.   After all remaining claims implicating coverage under the LSA Arizona Policies have been adjudicated, the amounts held in the LSA Arizona Claim Personal Injury Trust shall be distributed pro rata to the Class Claimants who have proceeded to litigation and successfully established Covered Claims hereunder.   Such distributions shall constitute full and final satisfaction and release of all claims against the Debtor's estate (or its successor in interest), LSA, and, solely to the extent of and for the period of coverage under any of the LSA Arizona Policies, all insureds, including additional insureds, under the LSA Arizona Policies.  For the avoidance of doubt, LSA will not make payment into the LSA Claim Personal Injury Trust on account of any claims not covered under the LSA Arizona Policies.

Nothing herein is intended to affect any claims against third parties not covered by the applicable insurance policies.

2.      Notwithstanding anything in the LSA Arizona Policies to the contrary, the Debtor shall consent to, and not object to, any settlement agreed upon between LSA and the Class Claimant as part of the above-listed Claims Resolution Procedures.

3.      All settlements reached pursuant to the above-listed Claims Resolution Procedures are hereby approved without further order of this Court unless the amount to be paid in such settlement exceeds $500,000.

4.      The Parties are authorized to take all reasonable actions necessary to effectuate and implement the Claims Resolution Procedures set forth above.

5.      LSA shall support any chapter 11 plan filed in this case, provided such plan incorporates the Claims Resolution Procedures and contains provisions consistent with the terms set forth herein, and provided further that LSA's support remains subject to its right to be heard on or object to any specific confirmation issue that may arise during the confirmation process.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the Claims Resolution Procedures and this Order.

Signed: _____, 2023

_____
Christopher M. López
United States Bankruptcy Judge

4

4860-7169-1377

**Agreed as to form and substance:**

| | |
|---|---|
| /s/ Jason S. Brookner | /s/ Zachary Hemenway (w/ permission) |

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684)

Aaron M. Kaufman (TX Bar No. 24060067)

Lydia R. Webb  (TX Bar No. 24083758)

Amber M. Carson (TX Bar No. 24075610)

1300 Post Oak Boulevard, Suite 2000

Houston, Texas 77056

Telephone:  (713) 986-7126

Facsimile:  (713) 986-5966

Email:        jbrookner@grayreed.com

                    akaufman@grayreed.com

                    lwebb@grayreed.com

                    acarson@grayreed.com

*Counsel to the Debtor*
*and Debtor in Possession*

**STINSON LLP**

Paul B. Lackey (TX Bar No. 00791061)

2200 Ross Avenue, Suite 2900

Dallas, TX 75201

Telephone:  (214) 560-2201

Email:        paul.lackey@stinson.com

Edwin Caldie

Phillip Ashfield

50 South Sixth Street, Suite 2600

Minneapolis, MN 55402

Telephone:  (612) 335-1500

Email:        ed.caldie@stinson.com

                    phillip.ashfield@stinson.com

Nicholas Zluticky

Michael Pappas

Zachary Hemenway

1201 Walnut, Suite 2900

Kansas City, MO 64106

Telephone:  (816) 842-8600

Email:        nicholas.zluticky@stinson.com

                    michael.pappas@stinson

                    zachary.hemenway@stinson.com

*Counsel to the Committee*

*-and-*

| |
|---|
| /s/  Mark Stromberg (w/ permission) |

**STROMBERG STOCK, PLLC**

Mark Stromberg (TX Bar No. 19408830)

8350 N. Central Expressway, Suite 1225

Dallas, Texas 75206

Telephone: (972) 458-5353

Facsimile:  (972) 861-5339

Email:        mark@strombergstock.com

*Counsel for Lone Star Alliance Inc.,*
*A Risk Retention Company, a subsidiary*
*of Texas Medical Liability Trust*

**<u>Exhibit 1</u>**

**Form of Elective Settlement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**NOTICE OF ELECTIVE SETTLEMENT
OPTION RELATING TO LSA ARIZONA POLICIES**

   **PLEASE TAKE NOTICE** that on _____, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. __] (the "Claims Procedures Order") establishing procedures for the resolution of claims that may be covered by certain Lone Star Alliance, Inc. professional liability insurance policies for the Debtor's activities in the State of Arizona, which are numbered as follows:  4-100109, 4-100167, 4-453898, 4-454898, and 4-455388, effective March 4, 2016, through July 1, 2021 (collectively, the "LSA Arizona Policies").  The Court's order is attached to this Notice as **Schedule 1**.

   **PLEASE TAKE FURTHER NOTICE** that you are receiving this Notice as a person who has asserted a prepetition claim that may be covered by the LSA Arizona Policies.  Pursuant to the Claims Procedures Order, LSA has agreed to offer $5,000 per claim.  If you are the sole claimant, you may accept **an immediate $5,000 cash payment**.  If you are a joint claimant, you may accept your proportional share of a $5,000 cash payment, only if all claimants sign and return an Elective Settlement Acceptance Form.  Payment is in exchange for a full and final satisfaction and release of all claims against Tehum Care Services, Inc. f/k/a Corizon Health, Inc. (the "Debtor"), the Debtor's estate (or the estate's successor in interest), Lone Star Alliance, Inc., and all insureds under the LSA Arizona Policies. Your election must be made within 60 calendar days from the date of entry of the Claims Procedures Order. If you elect not to accept this $5,000 cash payment in exchange for a full and final release of your claim, the claim will proceed to mandatory mediation as described in **Schedule 1**.  Additional information about the Claims Procedure Order issued by the Court, and this alternative mandatory mediation process, is set forth in **Schedule 1** below.

---

**EXCEPT AS OTHERWISE SET FORTH IN THE CLAIMS PROCEDURES ORDER, ALL PERSONS WHO HAVE ASSERTED CLAIMS COVERED BY THE LSA ARIZONA POLICIES AND AGREE TO ACCEPT THIS ELECTIVE SETTLEMENT, IN EXCHANGE FOR $5,000.00, WHICH IS ACKNOWLEDGED AS GOOD, ADEQUATE, AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AGREE TO EXPRESSLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE THE DEBTOR, THE DEBTOR'S ESTATE AND ANY SUCCESSOR IN INTEREST TO THE DEBTOR'S ESTATE, LONE STAR ALLIANCE, INC., AND ALL INSUREDS UNDER THE LSA ARIZONA POLICIES (INCLUDING THE STATE OF ARIZONA AND ITS DEPARTMENTS, AGENCIES, BOARDS, COMMISSIONS, OFFICERS, AND OFFICIALS) FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BASED ON OR RELATING TO THE DEBTOR.**

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

**PLEASE TAKE FURTHER NOTICE** that all persons who have asserted claims covered by the LSA Arizona Policies and elect not to accept the $5,000 cash payment and release **must proceed to mandatory mediation** as described in **Schedule 1**.

2

## ELECTIVE SETTLEMENT ACCEPTANCE
## FORM RELATING TO LSA ARIZONA POLICIES

**To accept all, or your proportional share (as appliable), of a $5,000 payment in full and final satisfaction of all claims in exchange for the release as described above, please complete the following form**:

---

**By signing this form, I acknowledge that I am releasing the Debtor, its estate (and successors in interest to the Debtor's estate), Lone Star Alliance, Inc., and all insureds under the LSA Arizona Policies (as defined in the Notice of Elective Settlement Option), for any and all claims based on or relating to the Debtor, and in exchange, I will receive a cash payment as described above. I understand that if my claim is shared with other claimants, my election is not effective unless all other claimants sign and return an Elective Settlement Acceptance Form.**

Name of Claimant: _____
                                               (Print or Type)

Signature: _____

Name of Signatory: _____
                                               (If other than Claimant)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

---

## PLEASE COMPLETE, SIGN, AND DATE THIS FORM AND RETURN
## BY _____, 2023 TO:

---

**Tehum Care Services, Inc. Claims Processing Center**
**c/o KCC**
**222 N. Pacific Coast Hwy., Ste. 300**
**El Segundo, CA 90245**

**or**

**[KCC email address]**

---

4860-7169-1377