**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**JOINT MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING THE SETTLEMENT**
**BY AND AMONG THE DEBTOR, THE UCC, AND THE PARTIES**
**TO THE SETTLEMENT AGREEMENT AND (II) GRANTING RELATED RELIEF**

---

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON FEBRUARY 12, 2024, AT 1:00 P.M. (PREVAILING CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LÓPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LÓPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGE LOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LÓPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

Tehum Care Services, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), and the Official Committee of Unsecured Creditors (the "UCC") respectfully state the following in support of this joint motion (this "Motion"):

## Preliminary Statement

1.  In the ten months between the Debtor's bankruptcy filing and the conclusion of the Second Global Mediation (as defined below), the Debtor and the UCC (collectively, the "Movants") conducted lengthy, thorough investigations of various claims and causes of action belonging to the Debtor's bankruptcy estate (the "Estate"), often over strenuous objections inside and outside the courtroom from the targets of the investigations. As discussed further herein, the Movants' investigations included independent review of several hundreds of thousands of documents, numerous third-party subpoenas, and multiple depositions and witness interviews. The Movants' investigations revealed that the Estate may have meritorious claims against Perigrove 1018, LLC, M2 LoanCo, LLC, Geneva Consulting, LLC, directors or officers, and other transferees or beneficiaries of avoidable fraudulent transfers. The investigations also revealed potential claims for avoidable fraudulent transfers resulting from the divisional merger transaction in 2022.

2.  Following these thorough investigations, the Movants twice mediated with the Settlement Parties (as defined below) in an effort to remove any doubt that the Global Settlement reached was fair and equitable and in the best interest of the Estate and its creditors.

3.  As discussed in greater detail below, at the Global Mediations (as defined below), the Debtor and the UCC each focused on the relative merits and defenses of these Estate claims and causes of action, the lack of conclusive legal authority regarding the avoidability of divisional merger transactions, the costs, risks and likely duration of litigation, the potential hurdles, both logistical and temporal, to obtaining full recoveries from the liable parties, and the potential

2

damages that the Estate could seek (and recover) against potential defendants. The Debtor, the UCC, and the Settlement Parties engaged in extensive negotiations to resolve such potential claims during the mediation sessions. The UCC's active participation and fiduciary obligation to act in the best interest of all creditors helped to ensure the Global Mediations took the views of all creditors into account in the negotiations and settlement of these claims. Ultimately, the parties agreed to a settlement that avoids litigating all of those claims, provides significant value to unsecured creditors, and provides a more certain resolution for creditors in this case.

4.      As part of the Global Settlement, the Debtor and its Estate will provide broad releases to certain parties identified below (the "Released Parties") for the claims the UCC and the Debtor identified, as well as any other claims the Estate could have against them. The identities of the Released Parties are outlined in detail below, but essentially encompass the Settlement Parties and certain related entities, directors, and employees, including Isaac Lefkowitz.

5.      In exchange for the aforementioned releases, the Settlement Parties have agreed to contribute over $54 million in total value to the Debtor's Estate, comprised of $45 million in future payments and DIP loan advances, and the release prior DIP claims totaling $8.4 million and a waiver of all other prepetition claims against the Debtor's Estate. The Movants believe that this contribution is well within (or above) a reasonable range of settlement.

6.      If this Motion is granted, the Movants will file an amended joint plan incorporating the terms outlined herein and providing a structure for creditors to access the funds the Global Settlement provides for the Estate. Approving the Global Settlement will thus provide a clear path to an outcome that will maximize value for all creditors and bring finality to this chapter 11 case. For the reasons set forth herein, the Movants request that the Court approve the Global Settlement.

**Relief Requested**

7.     By this motion, the Movants seek entry of an order, substantially in the form attached hereto (the "Order"):  (a) authorizing entry into a settlement (the "Global Settlement") substantially on the terms attached as Exhibit 1 to the Order (the "Settlement Agreement"), by and among the Movants, on the one hand, and YesCare Corp. and its wholly owned subsidiaries (including CHS TX, Inc.), M2 LoanCo, LLC, M2 HoldCo, LLC, Perigrove 1018, LLC, Perigrove, LLC, PharmaCorr LLC, and Geneva Consulting, LLC (collectively, the "Settlement Parties"), on the other hand, and (b) granting related relief.

**Jurisdiction and Venue**

8.     This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334.  This is a core matter pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The statutory bases for the relief requested in this Motion are sections 105(a), 363(b) and 1107 of title 11 of the United States Code (the "Bankruptcy Code"), and rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

10.     On February 13, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 2, 2023, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the UCC pursuant to section 1102 of the Bankruptcy Code [Docket No. 77], as amended on March 6, 2023 [Docket No. 145].

11.     On May 22, 2023, the Court entered its *Stipulation and Agreed Order Regarding Appointment of a Mediator and Governing Related Mediation Procedures* [Docket No. 603].

Pursuant to that Order, the Settlement Parties, the Debtor and the UCC participated in a three-day mediation, held on August 21–23, 2023 (the "First Global Mediation").

12.     Following the First Global Mediation, the Debtor and the UCC, as joint plan proponents, filed a chapter 11 plan (as amended at Docket No. 1072) incorporating the resolution reached at the First Global Mediation and a disclosure statement in support of the plan (as amended at Docket No. 1071, the "Disclosure Statement").

13.     In response to concerns raised by the Court and U.S. Trustee regarding the First Global Mediation,[2] the Settlement Parties, the Debtor, and the UCC agreed to conduct a second global mediation with a different mediator.  On November 15, 2023, the Court entered its *Amended Stipulation and Agreed Order Regarding Appointment of Judge Christopher S. Sontchi (ret.) as Mediator and Governing Related Mediation Procedures* [Docket No. 1109], under which the Settlement Parties, the Debtor, and the UCC participated in another global mediation.

14.     On November 20, 2023, the United States Trustee appointed the Official Tort Claimants Committee (the "TCC").

15.     On November 29, 2023, the Court amended its Second Mediation Order to include the TCC and reschedule the mediation for the week of December 11, 2023 [Docket No. 1158] (the "Amended Mediation Order").

16.     Pursuant to the Amended Mediation Order, the Debtor, the UCC, and the TCC attended a mediation with the Settlement Parties , held on December 14, 2023 (the "Second Global Mediation," and together with the First Global Mediation, the "Global Mediations").  As a result of

---

[2] *See Objection of the United States Trustee to Joint Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* ¶ 2 [Docket No. 1022].

the Second Global Mediation, the Debtor and the UCC reached a settlement with the Settlement Parties, the terms of which are the result of extensive good-faith, arms-length, and mediated negotiations during the course of the Global Mediations and is the product of the sound exercise of the Debtor's and the UCC's business judgment.[3]  By this Motion, the Debtor and the UCC seek approval of such terms.

### Pre-Mediation Investigation of Claims

17.     The First Global Mediation was scheduled more than six months after the Petition Date, in large part to ensure that the Debtor and the UCC were able to conduct full and thorough investigations of the Estate's claims against all related parties.  The Debtor and the UCC recognized that Estate causes of action against these parties were the Debtor's largest asset, and they knew that any effective resolution short of litigation would include releases of claims both known and unknown.  As a result, the Debtor and UCC refused to move forward with the mediation process unless and until sufficient information had been provided to both identify all potential claims and effectively value them by assessing damages, strengths, and weaknesses.

18.     The UCC spent nearly five months investigating the pre- and post-filing activities of the Debtor, its parent company, their officers and directors, as well as other entities owned, controlled, or otherwise affiliated with the Debtor and/or Perigrove 1018, LLC.  The UCC evaluated potential causes of action that could be asserted on behalf of the Estate.  As early as March 22, 2023, the UCC knew that M2 LoanCo, LLC was seeking broad releases in exchange for its role as debtor in possession lender.

19.     The UCC deemed it necessary to ensure it had all the information required to fully evaluate the propriety of any proposed releases and to adequately identify and investigate the basis

---

[3] As of the filing of this Motion, the TCC has declined to take a formal position on the Global Mediation.  As the TCC requested, the Debtor and the UCC have waited more than one month to file this Motion.

for all potential Estate claims that could be asserted against any released parties. The UCC's inquiry was expansive and methodical.

20.     As part of its investigation, the UCC issued more than ten subpoenas to various entities affiliated with the Debtor and its parent company, including M2 HoldCo, M2 LoanCo, Geneva, Perigrove 1018, other entities the Debtor engaged in the process of its restructuring, and others the UCC believed had information relevant to the Estate's potential claims. The UCC faced substantial resistance to its discovery efforts, defended against multiple motions to quash and moved to compel compliance with four of its subpoenas.[4]

21.     A summary of the Debtor's and the UCC's discovery efforts is included in Schedule 5 to the Disclosure Statement. Through formal and informal discovery requests, the Debtor and the UCC collected and reviewed over 515,000 pages of documents, including bank records, e-mails, accounting records, internal Debtor communications, and communications with third parties associated with the Debtor and/or its related entities.

22.     The UCC also deposed Isaac Lefkowitz in four separate corporate representative capacities—for Perigrove 1018, for PharmaCorr, for Geneva, and for M2 LoanCo. In addition to these formal depositions, the Debtor and the UCC also conducted informal inquiries and interviews of Debtor and YesCare representatives and other relevant parties both directly and through counsel.

23.     While the UCC was conducting its investigation, the Debtor's professionals were conducting their own independent investigation and collaborating with the UCC where appropriate to make sure both the Debtor and the UCC were approaching the First Global Mediation with reasonable expectations of how to maximize value to the Estate and creditors. Although the Debtor

---

[4] The UCC filed a motion to compel certain discovery responses and document production from M2 LoanCo. *See* Docket No. 630. M2 LoanCo filed a formal response to such motion at Docket No. 683. Ultimately, the UCC withdrew its motion to compel, as reflected at Docket No. 787.

and the UCC were not completely aligned prior to the First Global Mediation, their respective views of the relative merits of the Estate's potential causes of action against the Released Parties were substantially similar, providing a path for the Debtor and the UCC to work together during mediation to reach a settlement that fell within both of their ranges of reasonable settlements.

### Identification of Released Parties

24.     The investigations revealed the following information regarding the Settlement Parties: [5]

a.   YesCare Corp. ("YesCare"), Yes Care Holdings, LLC, and CHS TX, Inc. ("CHS")

These entities were established in early 2022 in preparation for the Divisional Merger, which became effective in May 2022.  CHS is the surviving entity under the Divisional Merger and now operates as YesCare.  On information and belief, Yes Care Holdings, LLC holds equity in CHS.

b.   M2 LoanCo, M2 EquityCo, and M2 HoldCo

M2 LoanCo, LLC was formed as a Florida limited liability company on June 18, 2020.  M2 LoanCo was organized by James Gassenheimer, as authorized representative and registered agent, and the initial manager of M2 LoanCo was Michael Flacks.  On or about June 26, 2020, M2 LoanCo acquired certain loans, in an aggregate principal amount of $109,104,391.08, made by various lenders in 2017 to borrowers Valitás Health Services, Inc., a Delaware Corporation, Corizon, LLC, a Missouri limited liability company, and Corizon Health, Inc., a Delaware corporation.  In addition to the borrowers, the other loan parties under the credit agreement were Valitás Intermediate Holdings, Inc., a Delaware corporation, Corizon Health Clinical Solutions, LLC, a Delaware limited liability company, Corizon Health of New Jersey, LLC, a New Jersey limited liability company, PHS Community Care LLC, a Delaware limited liability company, PharmaCorr, LLC, a Delaware limited liability company and Endeavor Distribution, LLC, a Delaware limited liability company.  Cortland Capital Market Services LLC served as administrative agent and collateral agent under the credit agreement.  Thereafter, between May 12, 2021 and June 24, 2021, M2 LoanCo acquired certain senior notes, in an aggregate principal amount of $10,000,000, from various holders.  As of the date hereof, M2 HoldCo is still the sole member and manager of M2 LoanCo and Isaac Lefkowitz and Alan Rubenstein are the sole directors of M2 LoanCo. M2 LoanCo has no operations or employees.  M2 HoldCo is the sole member

---

[5] The following descriptions of the Settlement Parties may be found in Schedule 4 to the Disclosure Statement.

and manager of M2 EquityCo, LLC, which is the sole shareholder of Valitás Intermediate Holdings, Inc.

c.  Perigrove 1018, LLC ("Perigrove 1018") and Perigrove LLC ("Perigrove")

Perigrove 1018 is a private equity fund owned by several individuals, none of whom owns more than 10% of the company.  Perigrove 1018 is a related company with common ownership to Perigrove, LLC ("Perigrove"), which operated in the healthcare space at the time of the introductions referred to above. In late November and early December 2021, the Flacks Group team members were introduced to Mr. Lefkowitz and other Perigrove 1018 representatives as potential buyers for PharmaCorr.  Mr. Lefkowitz and Perigrove 1018 quickly shifted focus to a potential acquisition of all of the Debtor-related entities the Flacks Group owned.  After approximately a week of negotiations, Perigrove 1018 acquired the entire portfolio of companies from the Flacks Group on December 7, 2021.

d.  PharmaCorr LLC ("PharmaCorr")

Until 2021, PharmaCorr was a wholly owned subsidiary of the Debtor responsible for supplying the Debtor with pharmaceutical products and devices for use in its business.  As of June 2021, PharmaCorr is an indirect subsidiary of M2 HoldCo but no longer directly affiliated with the Debtor.

e.  Geneva Consulting, LLC ("Geneva")

Geneva and Perigrove share some common directors and authorized representatives, including Isaac Lefkowitz.  Representatives of Perigrove 1018 caused the Debtor's immediate parent company, Valitás Health Services, Inc., to enter into a Consulting Agreement with Geneva in December 2021.  After the Divisional Merger, the Debtor, M2 LoanCo, and Geneva entered into a Facilitator Agreement dated as of May 4, 2022, under which Geneva agreed to provide certain services to the Debtor and M2 LoanCo in connection with the Funding Agreement between the Debtor and M2 LoanCo. According to pleadings filed by M2 LoanCo in the Chapter 11 Case, M2 LoanCo contends that Geneva assisted in arranging, negotiating, and finalizing the terms of the Funding Agreement and subsequently acted as an agent for both the Debtor and M2 LoanCo.  M2 LoanCo also contends that Geneva coordinated the payment of expenses on behalf of the Debtor and ensured that funds were available from M2 LoanCo to make those payments.  M2 LoanCo also contends that Geneva also provides similar consulting services for YesCare, and that Geneva continued to perform services for the Debtor up to the Petition Date.  Geneva has not performed any services for the Debtor during the Chapter 11 Case.  The UCC disputes all of M2 LoanCo's contentions noted herein as to Geneva.

25.     The Released Parties include the Settlement Parties, as well as the following:[6]

a.  <u>Yitzchak Lefkowitz a/k/a Isaac Lefkowitz</u>

Mr. Lefkowitz is the Debtor's sole director.  Since Perigrove 1018's acquisition of the Debtor in December 2021, Mr. Lefkowitz has overseen every aspect of the Debtor's operations and finances until the Petition Date, when the Debtor executed board resolutions which, among other things, delegated sole authority to Russell Perry, the Debtor's Chief Restructuring Officer, for all restructuring matters and any matters where a conflict of interest may exist.  During the bankruptcy case, Mr. Lefkowitz testified as the Debtor's corporate representative at three (3) separate 341 creditor meetings.  Mr. Lefkowitz also testified at four (4) different depositions on behalf of M2 LoanCo, Perigrove 1018, PharmaCorr and Geneva.  Mr. Lefkowitz is a Released Party under the Plan.  Mr. Lefkowitz also testified that he is a director of YesCare, M2 LoanCo, M2HoldCo, Perigrove 1018, and Sigma.

b.  <u>Valitás Intermediate Holdings Inc. and Valitás Health Services, Inc.</u>

The predecessor entity of the Debtor and its immediate parent that merged into Corizon Health, Inc. under the May 2022 Combination Merger and Divisional Merger.  Today, Valitás Health Services, Inc. no longer exists, and Valitás Intermediate Holdings, Inc. is a special purpose entity with no assets or operations other than its ownership interest in the Debtor.

c.  <u>M2 Pharmacorr Equity Holdings LLC, Pharmacorr/M2 LLC, Pharmacorr Holdings LLC, and Endeavor Distribution LLC</u>

Until 2021, PharmaCorr was a wholly owned subsidiary of the Debtor responsible for supplying the Debtor with pharmaceutical products and devices for use in its business.  In June 2021, in an attempt to monetize PharmaCorr's business and allow PharmaCorr to market its services to customers other than the Debtor, the Flacks Group effectuated a spinoff transaction which established these entities.  The result is that PharmaCorr remains an indirect subsidiary of M2 HoldCo, but it is no longer directly affiliated with the Debtor.

d.  <u>Sigma RM, LLC</u>

Following the Divisional Merger, as part of the corporate restructuring of the Debtor and YesCare, several in-house legal staff formed their own company to provide contract services to YesCare and the Debtor and, thus, began receiving monthly contract service fees rather than compensation as W-2 employees.  On November 1, 2022, the Debtor entered into a Claims Management Services Agreement with Sigma RM, LLC ("<u>Sigma</u>").  Sigma represents that it is owned

---

[6] The following descriptions of the Released Parties may be found in <u>Schedule 4</u> to the Disclosure Statement.  A complete list of the Released Parties is attached hereto as **<u>Exhibit A</u>**.

by a group of the Debtor's former in-house counsel and litigation support staff. Pursuant to the Claims Management Services Agreement, the Debtor paid Sigma $150,000 per month. Corporate filings for Sigma reflect that the entity was organized by Isaac Lefkowitz and uses his address as its corporate service address. Mr. Lefkowitz has testified that he is an unpaid director of Sigma and listed his address for Sigma's service address to ensure he gets notice of legal filings made to Sigma. The UCC has disputed the validity of the Debtor's pre- and post-petition payments to Sigma, but has consented to a one-time payment to Sigma in full satisfaction of its potential Administrative Claim, which Sigma contends has accrued to over $1.5 million to date (and continues to accrue).

e. <u>DG Realty Management LLC</u>

The Debtor and the UCC know very little about this entity and do not believe the Estate has colorable claims against it. The only transactions noted between the Debtor and DG Realty are two transfers, both on the same day of December 27, 2021—transfer of $7.5 million to and from DG Realty in the same offsetting amounts. Mr. Lefkowitz has testified that this transfer was intended to be a short-term loan that became unnecessary.

f. <u>Sara Ann Tirschwell and Scaracor LLC</u> – CEO for the Debtor (December 2021–May 2022); CEO for YesCare (May 2022–February 2023). Scaracor LLC appears to be an entity owned or controlled by Ms. Tirschwell and used by her for her contractual employment with the Debtor. Based on the Debtor's investigations, the Debtor found no evidence of direct payments made by the Debtor (or its predecessor entities) to Ms. Tirschwell or Scaracor LLC.

g. <u>Ayodeji Olawale Ladele</u> – Former Executive Vice President and Chief Medical Officer (CMO) for the Debtor; now the CMO for YesCare.

h. <u>Beverly Michelle Rice</u> – Former Corporate Controller for the Debtor; now serves the same role for YesCare.

i. <u>Jeffrey Scott King</u> – Former Chief Legal Officer for the Debtor; now the current Executive Vice President and Chief Legal Officer for YesCare.

j. <u>Jennifer Lynee Finger</u> –  Former Assistant General Counsel at the Debtor and now Assistant General Counsel at YesCare and General Counsel of Sigma.

k. <u>Frank Jeffrey Sholey</u> –  Former CFO for the Debtor; was the CFO for YesCare but was elevated to CEO upon Tirschwell's departure.

26.    In addition to the foregoing, the Movants' investigations revealed the following information about the Debtor's prior ownership group, the Flacks Group, which predated Perigrove 1018's ownership. According to its website, the Flacks Group was founded and is controlled by

Michael Flacks and specializes in the acquisition and operational turnaround of medium-sized businesses in complex situations. *See* https://flacksgroup.com/about-us/. Michael Flacks serves as the Chairman, CEO, and Founder, and James Gassenheimer serves as the Chief Legal Officer. It is unclear what role Charles Gassenheimer plays in the Flacks Group. The Flacks Group was the previous owner of the Debtor. Under its ownership, and prior to a December 2021 transaction with Perigrove 1018, the Flacks Group was responsible for establishing M2 HoldCo and M2 LoanCo to hold the equity and the secured debt owed by the Debtor, respectively. The Flacks Group was also responsible for the spin off transactions that resulted in PharmaCorr being moved out of the Debtor's ownership structure. This information is provided for context only.[7] None of the Gassenheimers nor any members of the Flacks Group are included in the definition of Released Parties, and any and all claims held by the Estate against the Flacks Group are retained under the Plan.

### Estate Causes of Action Identified in Advance of Mediation

27.     Based on their respective investigations, the Debtor and UCC identified four main categories of potential claims against the Released Parties. Each of the following categories is discussed in turn:

      a.  avoidance actions arising out of potential fraudulent transfers or preferential transfers made to M2 LoanCo;

      b.  avoidance actions arising out of potential fraudulent transfers or preferential transfers made to Geneva;

      c.  avoidance actions arising out of transfers to a third-party vendor to benefit non-debtor Perigrove 1018-related parties; and

      d.  potential avoidance actions arising out of the May 2022 Divisional Merger.

---

[7] Further detail regarding the Flacks Group is provided in the Disclosure Statement, Section II.A.

28.     **Avoidance Actions Against M2Loan Co.**  At all relevant times, M2 LoanCo had two directors—Isaac Lefkowitz and Alan Rubenstein.  M2 LoanCo had no employees and did not maintain e-mail records on its own server.  Based on the Movants' review of the Debtor's bank records, and following formal and informal inquiries to Mr. Lefkowitz, Jeff Sholey (the Debtor's former CFO and YesCare's current CEO) and other members of the Debtor's former accounting staff, the Debtor and the UCC identified the following transfers made by the Debtor from its bank accounts to M2 LoanCo:

| 12/29/2021 | $10,000,000.00 |
| 12/30/2021 | $5,000,000.00 |
| 1/4/2022 | $2,300,000.00 |
| 1/5/2022 | $600,000.00 |
| 1/31/2022 | $5,000,000.00 |
| 2/18/2022 | $600,000.00 |
| 3/8/2022 | $10,000,000.00 |
| 3/9/2022 | ($10,000,000.00) |
| 5/17/2022 | $1,000,000.00 |
| 11/14/2022 | $25,572.19 |
| 11/14/2022 | $12,583.00 |
| **Total to M2 LoanCo** | **$24,538,155.19** |

29.     Although M2 LoanCo disputes the Movants' characterization of these transfers listed above,[8] the Movants believe the Estate could bring claims to avoid and recover these transfers as fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes.  The potential defenses and settlement considerations are discussed further below.

30.     **Avoidance Actions Against Geneva.**  Perigrove 1018 acquired the equity ownership of the Debtor and M2 LoanCo from the Flacks Group in early December 2021, days before the Flacks Group had planned to commence a chapter 11 bankruptcy proceeding for the Debtor.  Within days of such acquisition, Perigrove 1018 appointed one of its directors, Isaac

---

[8] For example, M2 LoanCo contends that it transferred $3.5 million and $1.5 million to Corizon on March 23, 2023, and March 24, 2023, respectively, and those transfers are not accounted for as credits in the chart above.

Lefkowitz, as the decision-maker for all of the companies.  Mr. Lefkowitz, in turn, caused the Debtor to enter into a "Consulting Agreement" with Geneva on or about December 8, 2021.  The "Consulting Agreement" is between Valitás Health Services, Inc. and Geneva Consulting, LLC. Mr. Lefkowitz signed the Consulting Agreement as the "Interim CEO" for Valitás.[9]  A director listed on Perigrove's website signed the Consulting Agreement as "Director" of Geneva.  Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon Health, Inc., and Jeff Sholey, the then-CFO of Corizon Health, Inc., to transfer substantial sums to Geneva under the Consulting Agreement.  On December 8, 2021, the Debtor transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement.  The Debtor then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement.  In all, the Debtor transferred $5.5 million to Geneva before the Petition Date.

| 12/9/2021 | $3,000,000.00 |
|---|---|
| 1/11/2022 | $500,000.00 |
| 2/7/2022 | $500,000.00 |
| 3/1/2022 | $500,000.00 |
| 4/1/2022 | $500,000.00 |
| 5/2/2022 | $500,000.00 |
| **Total to Geneva** | **$5,500,000.00** |

31.    The Movants believe the Estate could bring claims to avoid and recover these transfers as fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes.  Geneva disputes these claims.  The potential defenses and settlement considerations are discussed further below.

32.    **Avoidance Actions Against Perigrove 1018-Related Parties.**  In addition to the $30 million identified above, the Movants identified additional sums, totaling approximately

---

[9] The Committee believes Mr. Lefkowitz may have not actually been in this role on the date of the contract nor had the authority to so bind the company.

$956,700, paid to Amerisource Bergen—a third-party vendor—to satisfy obligations of PharmaCorr, which ceased being a subsidiary of the Debtor under the Flacks Group's ownership and control:

| 1/31/2022 | $500,000.00 |
| 2/15/2022 | $456,707.08 |
| **Total to Amerisource Bergen** | **$956,707.08** |

33.     Based on the records reviewed by the Movants, the Movants believe that Estate could bring claims to avoid and recover these transfers from Amerisource Bergen, PharmaCorr, or other related entities that benefited from the payment.  Such transfers may be considered fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes.    PharmaCorr disputes these claims.  The potential defenses and settlement considerations are discussed further below.

34.     **Avoidance Actions Related to the Divisional Merger.**  As mentioned above, the transactions effectuated as part of the Divisional Merger caused the allocation of the Debtor's active contracts, employee assets, and other viable assets to CHS.  The UCC believes that this allocation effectuated a "transfer" that may be subject to avoidance under 11 U.S.C. §§ 544 and 548 or other applicable state fraudulent transfer statutes.  The Debtor and the UCC further believe that the financial advisory firm engaged to provide a fairness opinion on the transaction reached its fairness conclusions by relying on inaccurate information.  The UCC believes that, had the financial advisory firm received accurate financials and disclosures, it would not have made the findings or recommendations reflected in the fairness opinion.  When a fraudulent transfer claim is based on the transfer of an asset rather than an amount of money, damages for the transfer are calculated based on the value of the transferred asset at the time of the transfer.  As a result, any potential damages for this claim would be based on a calculation of the value of the transferred assets as of the Divisional Merger.

35. The UCC's pre-mediation investigation also identified potential tort and related claims against some, but not all, of the individuals included as Released Parties.

**Defenses and Settlement Considerations Supporting the Global Settlement**

36. While the Debtor and the UCC identified the above categories of potential claims and believe that multiple claims are meritorious, recovery of damages for the Estate nevertheless presented a challenge. Each claim outlined above would be subject to defenses, and the Estate would be required to pursue lengthy, costly litigation to achieve a final judgment, including appeals.

37. Although the Debtor and the UCC received a substantial amount of documentation as part of their investigations, it is reasonable to conclude—based on the hurdles presented to date—that the Released Parties would present vigorous defenses of these claims, making litigation a protracted and expensive endeavor with no certainty of success on the merits. Any litigation of these claims would likely require the engagement of one or more experts on the issues of solvency, reasonably equivalent value, and/or damages. These costs would be incurred by the Estate with no guaranteed path to reimbursement.

38. The UCC and the Debtor also recognized the corporate structure of the Released Parties could present additional difficulties in converting any judgment to cash proceeds. For example, the Debtor and the UCC assume that Geneva, M2 LoanCo, and other recipients of direct transfers from the Debtor do not maintain significant cash balances in their respective bank accounts. Collecting on any successful judgments would present another cost—by having to chase an unknown number of potential third-party transferees—and only adds to the uncertainty of litigation. Each of these claims would saddle the Estate with additional costs and administrative expenses and further delay any distribution to creditors.

4858-6633-6656

39.     The Movants also concluded that M2 LoanCo funded at least $15 million, the amount the Debtor was entitled to under the Funding Agreement, and thus the Movants do not believe there remain meritorious claims against M2 LoanCo under the Funding Agreement.

40.     As to the cause of action arising from the Divisional Merger, pursuit of recovery would also require the Estate to persuade a court or jury that the Divisional Merger could be unwound as a fraudulent transfer.  Though the Texas Business Organization Code has, for years, allowed for a divisional merger, there is no definitive legal authority on the ability to unwind a divisional merger as a fraudulent transfer and, thus, any such cause of action is highly speculative and uncertain.

41.     If the fraudulent transfer theory to unwind the Divisional Merger is unsuccessful, the Estate would be forced to pursue potential claims against the Debtor's prepetition professionals, directors, and officers included as Released Parties for their respective roles in the transaction.  Such claims are also speculative, and far less valuable than the fraudulent transfer theories.  The Debtor did not maintain insurance for directors and officers, meaning that any judgment obtained against individual officers or directors would have to be collected from such individuals' non-exempt assets.  The Debtor is also obligated to indemnify most officers and directors for their conduct while acting in a corporate capacity for the Debtor.

42.     Claims against certain professionals, including certain of the Released Parties, similarly will be offset by the Debtor's contractual obligations to indemnify such professionals, rendering any such claims less valuable, absent proof of fraud, gross negligence, or willful misconduct.  To date, the Debtor and the UCC have found no evidence of fraud, gross negligence, or willful misconduct by the Debtor's prior professionals.

43.     Based on each Movants' independent investigation of such alternative theories, the Movants believe claims arising from the Divisional Merger present a novel issue, which introduces

significant risk into any analysis of the likelihood of success. Given the potential amounts at issue, the UCC assumed for purposes of its analysis that the Released Parties would appeal any judgment unwinding the Divisional Merger, adding significant cost and delay to the litigation process.

44.     Avoiding the Divisional Merger as a fraudulent transfer presents another significant impediment:  other than cash removed from certain of the Debtor's bank accounts, the Debtor's value as of May 5, 2022 was limited. At the time Perigrove 1018 acquired the Debtor and related entities, it did so for a nominal sum and such entities were on the verge of filing bankruptcy in December 2021. The company's financials did not improve between December 2021 and May 2022 and, by the time the Divisional Merger was effectuated, the entity that emerged with the active contracts—CHS TX/YesCare—certainly benefitted from shedding liabilities but nevertheless had limited or no value due to low margins on many of those contracts.

45.     When a company like the Debtor, and subsequently, CHS TX/YesCare, is awarded a contract, news coverage necessarily focuses on the gross amount that will be paid over the life of the contract, which can be substantial, because that is the only available public information associated with the contract. However, the costs of operations and meeting contractual obligations can be massive as well. The UCC's financial advisor examined the company's internal accounting records and believes that, as of the relevant time period, the company had multiple contracts with lifetime payouts of tens of millions of dollars, but for which the company's operating margin was minimal or negative. The Debtor's investigations included similar findings.

46.     The UCC and the Debtor have also evaluated the viability of potential claims against CHS TX/YesCare based on the Divisional Merger under theories based on, or derivative of, successor liability. Recovery under a successor liability would present additional challenges beyond those the Estate would encounter by simply challenging the Divisional Merger as a fraudulent transfer. In addition to presenting a novel legal theory, recovery under such a successor

liability theory would require a court of competent jurisdiction to disregard the relevant portions of the Texas Business Organization Code more directly than under the fraudulent transfer context.

47.     Prior to the Global Mediations, the Debtor and the UCC separately analyzed the claims they had identified, the accompanying ranges of damages, strength and weaknesses of those claims (including likely defenses), and other considerations important to the analysis, such as administrative costs and collectability.  Both the Debtor and the UCC calculated a settlement range based on all of these factors before the first day of mediation and again prior to the Second Global Mediation.

48.     The proposed settlement falls within the ranges that the Debtor and the UCC both determined to be reasonable, based on their independent pre-mediation investigations and analyses, as discussed above.

49.     Further detail regarding the potential merits, defenses, and reasonable settlement ranges for the claims against the Settlement Parties are discussed in the Disclosure Statement, Section III.B.2.

## The Global Settlement

50.     Following extensive negotiations as part of the Global Mediations, the Debtor, the UCC, and the Settlement Parties entered into the Settlement Agreement, a true and correct copy of which is attached to the Proposed Order as Exhibit 1.

51.     The Debtor and the UCC firmly believe that the Global Settlement memorialized in the proposed Settlement Agreement maximizes the value of the Estate for the benefit of all creditors.  The Global Settlement is an outcome that provides significant value to the Estate, avoids the risks of litigation and collectability, and eliminates years of protracted legal proceedings which, even if successful, would significantly reduce any recovery by the costs of such litigation. Accordingly, the Debtor and the UCC strongly believe the Global Settlement meets the standard

of reasonableness under rule 9019(a) of the Federal Rules of Bankruptcy Procedure and should be approved.

52.     As described herein, the Global Settlement resolves all of the aforementioned Estate claims, and grants releases to all of the persons involved and certain of their officers and directors (*i.e.* the Released Individuals, as defined in the Settlement Agreement).  The releases included also would encompass additional claims the Estate may have beyond those outlined above.

53.     The key terms of the settlement are as follows:[10]

a.      The Settlement Parties will advance another $5 million (the "DIP Advances") to the Debtor pursuant to a fifth interim DIP Order to be entered prior to or contemporaneously with the order approving the Settlement Agreement.

b.      On the effective date of the joint plan confirmed in this case (as will be amended to be consistent with the Settlement Agreement), the Settlement Parties shall release and waive all claims against the Debtor's Estate, including M2 Loan Co's claims under the DIP Orders (which are estimated to have accrued to over $8,770,940.02), and the Proofs of Claim filed by Geneva Consulting LLC (KCC Claims Register No. 572 for $315,032.97) and M2 LoanCo, LLC (KCC Claims Register No. 589 for $24,032,965).

c.      On the effective date of such confirmed joint plan, the Settlement Parties shall pay, or cause to be paid, to the Debtor or its successor in interest, as applicable, additional aggregate Cash in the amount of $40 million (the "Settlement Payment").

d.      Upon payment in full of the DIP Advances and the Settlement Payment:

i.       the Settlement Parties shall release the following from any and all claims and causes of action: (w) the Debtor; (x) Russell Perry, the Debtor's Chief Restructuring Officer; (y) the UCC and its members; (z) any trustees appointed under the chapter 11 plan; and

ii.      the Debtor, its estate, and the UCC shall release the Released Parties, as well as each Released Parties' respective current and former officers, directors, managers, employees, agents, attorneys and other

---

[10] The summary contained in this Motion is qualified in its entirety by the provisions of the Settlement Agreement. To the extent anything in this Motion is inconsistent with the Settlement Agreement, the terms of the Settlement Agreement shall control.

professional advisors; *but excluding* James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks, each of whom shall not be a "Released Party."

e.   Upon confirmation and the occurrence of the Effective Date of the Plan, and upon payment in full of the Settlement Payment, there shall be deemed mutual releases by and among the Released Parties and creditors that do not opt out of the third-party releases in Article IX.D of the Plan.

54.   The Movants believe entry into the Settlement Agreement is in the best interests of the Debtor and each of its stakeholders (including all general unsecured creditors).  ***First***, the Global Settlement resolves significant disputes between the Debtor and the Settlement Parties, the outcome of which is inherently uncertain, and resolves a number of material open issues in this case, including plan funding and the payment of claims held by the Settlement Parties.  ***Second***, the Global Settlement provides certainty because it ensures plan funding and provides a path to finalizing the liquidation and wind-down of the Debtor's estate.  ***Third***, the Global Settlement avoids costly litigation that would be required to resolve the outstanding issues.  ***Fourth***, the Global Settlement provides potentially substantial recovery to general unsecured creditors that would not otherwise be available without the Global Settlement.

55.   The Debtor's Chief Restructuring Officer and the UCC have concluded in their sound business judgment that settlement of the outstanding issues between the parties as contemplated by the Global Settlement is in the best interests of the Debtor's estates and all parties in interest.  Accordingly, the Movants seek authorization to enter into the Settlement Agreement and implement its terms as set forth therein and in the Order.

## Basis for Relief Requested

**I.   Settlements Are Favored in Bankruptcy, and Debtor's Business Judgment Is Given Significant Deference.**

56.   Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, . . . as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

57.    "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal citation and quotation marks omitted); *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *aff'd*, 662 F.3d 315 (5th Cir. 2011).  Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly."  *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

58.    A bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See Official Comm. of Unsecured Creditors v. Moeller (In re Age Refin. Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, a decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602–03  (5th Cir. 1980)); *In re ASARCO LLC*, No. 05-21207, 2009 WL 8176641, at *10 (Bankr. S.D. Tex. June 5, 2009).

59.    Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement.  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Instead, the court should determine whether the settlement as a whole is fair and equitable.  *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

60.     Furthermore, a proposed settlement "need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness." *In re Idearc Inc.*, 423 B.R. at 182 (quoting *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (internal quotation marks omitted)). "Basic to" the process of evaluating proposed settlements, then, "is the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry, Inc.*, 390 U.S. at 425.

## II.     The Global Settlement Satisfies the Three-Factor Test Courts in the Fifth Circuit Employ to Analyze Proposed Settlements.

61.     To determine whether a settlement is fair and equitable, this Court should consider and evaluate the following factors: "(1) [t]he probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) [t]he complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) [a]ll other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *In re Jackson Brewing Co.*, 624 F.2d at 602); *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1997); *In re Wright*, 545 B.R. 541, 561 (Bankr. S.D. Tex. 2016); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424–25 (providing that in determining whether a settlement is fair and equitable, a court should consider "the probabilities of ultimate success should the claim be litigated…[,] the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.").

62.     Factors "bearing on the wisdom of the compromise" include:  (a) "the paramount interest of creditors with proper deference to their reasonable views"; and (2) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  *In re Foster Mortg. Corp.*, 68 F.3d at 917–18; *Cajun Electric*, 119 F.3d at 356; *In re Wright*, 545 B.R. at 561.

63.     In *Foster Mortgage*, the Court of Appeals for the Fifth Circuit vacated and remanded a bankruptcy court's approval of a debtor's settlement with its parent company where it concluded that the bankruptcy court failed to take into consideration "that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors."  *See In re Foster Mortg. Corp.*, 68 F.3d at 918.  Thus, when considering creditors' paramount interests and the process by which the settlement was reached, this Court should recognize that the UCC, which is comprised of seven members holding both tort and non-tort claims, was heavily involved in the settlement process and is not a joint proponent of the Global Settlement proposed herein.  As such, the Debtor and the UCC believe that the Global Settlement is fair, equitable, in the best interest of the Debtor's Estate, and meets each of the *Jackson Brewing* factors as well as the heightened standards espoused in *Foster Mortgage*.

### A.     The Debtor is not Certain to Succeed in Litigating the Issues Between the Debtor and the Released Parties.

64.     The claims and causes of action resolved as part of the Global Settlement are complex, and the risks of litigation are high.  As detailed above, there are few settled issues of fact or law in connection with such claims and causes of action.  If the parties litigated these claims and causes of action, the Settlement Parties indicated that they would deny and defend liability, leading to uncertainty as to how such claims would be resolved.  The complexity of the issues creates substantial uncertainty as to whether the Debtor would prevail if such claims were litigated

in or outside of this Court.  Accordingly, the Global Settlement satisfies the first factor of the *Jackson Brewing* test.

**B.      Continued Litigation with the Released Parties Would Be Complex, Costly, and Inconvenient.**

65.     As discussed above, the issues involved with the released claims and causes of action are extremely complex.  There are numerous disputed issues of law and fact that are unlikely to be resolved quickly by any court or through any singular pre-trial filing.  Moreover, the Movants believe that the Released Parties may have valid defenses to some or all of these claims.  Litigation of the disputes raised at the Global Mediations would be lengthy and costly, and the Debtor does not have any authorized funding to pursue litigation in connection with these issues.

66.     In contrast, the Global Settlement represents a quantifiable and certain resolution of all outstanding issues related to claims against the Released Parties.  The Movants do not believe that expending resources litigating claims against the Released Parties would materially further the interests of the Estate considering the inherent risk of nonrecovery and the benefit of a comprehensive Global Settlement that promotes closure.

67.     To date, the Movants have expended significant resources in furtherance of a global resolution of the material open issues in these cases.  The continued litigation of these issues will result in protracted, costly litigation to the Estate.  Accordingly, the Global Settlement satisfies the second factor of the *Jackson Brewing* test.

**C.      The Global Settlement is in the Best Interests of Creditors and was Conducted at Arms-Length, in Good Faith and with Extensive Participation by the UCC.**

68.     The Global Settlement is in the best interests of creditors, as evidenced by, among other things, the UCC's active participation and negotiation thereof.  The UCC represents the interests of, and is mindful of its fiduciary obligation to act in the best interest of, all general unsecured creditors.  The seven member UCC includes creditors holding both personal injury

claims and non-personal injury claims.  The UCC has evaluated the Global Settlement from that perspective and taken all creditors' reasonable views into consideration before deciding to support the Global Settlement.

69.     The Global Settlement maximizes recovery to the Estate and provides certainty while avoiding the risks, costs, and delays associated with litigation.  In addition, the Global Settlement provides significant benefit to the Debtor's Estate by contributed over $54 million in total value to the Estate, of which the Debtor and the UCC anticipate will allow for approximately $40 million to be distributed to unsecured creditors and certain administrative claimants.  It is thus in the best interest of the Debtor's estate.

70.     Additionally, the alternative to the Global Settlement is likely a chapter 7 conversion, which would do nothing more than create additional costs and uncertainty for all parties and prevent creditors—particularly unsecured creditors—from obtaining the increased recoveries contemplated by the Settlement Agreement.  The additional costs in chapter 7 would likely include a percentage fee based on disbursements, additional professional fees associated with a chapter 7 trustee selecting advisors, and litigation costs related to the claims and causes of action against the Released Parties.  Approval of the Global Settlement provides much-needed closure to numerous disputed issues and represents the best possible path to reach a successful conclusion to this chapter 11 case for all stakeholders.

71.     Furthermore, the Global Settlement is the product of arms-length negotiations, and there was no fraud or collusion by or among the Debtor, the UCC, or the Settlement Parties.  The Debtor, UCC, and Settlement Parties have been in ongoing discussions regarding a global settlement of the disputes between the parties since the First Global Mediation in August 2023 and agreed on the terms of the Settlement Agreement following not one, but two hard-fought Global

Mediations that have occurred over a total of four days.  Accordingly, the Global Settlement satisfies the third factor of the *Jackson Brewing* test.

72.     Based on the foregoing considerations, the Movants respectfully submit that the Global Settlement represents a fair and reasonable compromise that is in the best interest of the Debtor's estate.  Pursuant to the Order, the Debtor and the UCC will be able to avoid the expense, delay, and distraction of further litigation and resolve significant material issues related to plan confirmation.  Accordingly, the Movants respectfully request that the Court authorize them to enter into and implement the terms of the Settlement Agreement as such action is a reasonable exercise of the Debtor's business judgment and in the best interest of its bankruptcy estate.

WHEREFORE, the Movants respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 16th day of January, 2024.

| | |
|---|---|
| */s/ Jason S. Brookner* | */s/ Nick Zluticky (with permission)* |
| **GRAY REED** | **STINSON LLP** |
| Jason S. Brookner (TX Bar No. 24033684) | Nicholas Zluticky (SDTX Bar No. 3846893) |
| Aaron M. Kaufman (TX Bar No. 24060067) | Zachary Hemenway (SDTX Bar No. 3856801) |
| Lydia R. Webb  (TX Bar No. 24083758) | 1201 Walnut, Suite 2900 |
| Amber M. Carson (TX Bar No. 24075610) | Kansas City, Missouri 64106 |
| 1300 Post Oak Boulevard, Suite 2000 | Telephone: (816) 842-8600 |
| Houston, Texas 77056 | Email:  nicholas.zluticky@stinson.com |
| Telephone: (713) 986-7126 | zachary.hemenway@stinson.com |
| Facsimile:  (713) 986-5966 | |
| Email:      jbrookner@grayreed.com | *Counsel to the Official Unsecured Creditors'* |
| akaufman@grayreed.com | *Committee* |
| lwebb@grayreed.com | |
| acarson@grayreed.com | |

*Counsel to the Debtor*
*and Debtor in Possession*

## Certificate of Service

I certify that on January 16, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

4858-6633-6656

## Exhibit A

### Summary of the Released Parties and the Settlement Parties

***M2 LoanCo, M2 EquityCo, and M2 HoldCo***.  M2 LoanCo, LLC was formed as a Florida limited liability company on June 18, 2020.  M2 LoanCo was organized by James Gassenheimer, as authorized representative and registered agent, and the initial manager of M2 LoanCo was Michael Flacks.  On or about June 26, 2020, M2 LoanCo acquired certain loans, in an aggregate principal amount of $109,104,391.08, made by various lenders in 2017 to borrowers Valitás Health Services, Inc., a Delaware Corporation, Corizon, LLC, a Missouri limited liability company, and Corizon Health, Inc., a Delaware corporation.  In addition to the borrowers, the other loan parties under the credit agreement were Valitás Intermediate Holdings, Inc., a Delaware corporation, Corizon Health Clinical Solutions, LLC, a Delaware limited liability company, Corizon Health of New Jersey, LLC, a New Jersey limited liability company, PHS Community Care LLC, a Delaware limited liability company, PharmaCorr, LLC, a Delaware limited liability company and Endeavor Distribution, LLC, a Delaware limited liability company.  Cortland Capital Market Services LLC served as administrative agent and collateral agent under the credit agreement.  Thereafter, between May 12, 2021 and June 24, 2021, M2 LoanCo acquired certain senior notes, in an aggregate principal amount of $10,000,000, from various holders.  As of the date hereof, M2 HoldCo is still the sole member and manager of M2 LoanCo and Isaac Lefkowitz and Alan Rubenstein are the sole directors of M2 LoanCo.  M2 LoanCo has no operations or employees.  M2 HoldCo is the sole member and manager of M2 EquityCo, LLC, which is the sole shareholder of Valitás Intermediate Holdings, Inc.

***Valitás Intermediate Holdings, Inc. and Valitás Health Services, Inc***.  The predecessor entity of the Debtor and its immediate parent that merged into Corizon Health, Inc. under the May 2022 Combination Merger and Divisional Merger.  Today, Valitás Health Services, Inc. no longer exists, and Valitás Intermediate Holdings, Inc. is a special purpose entity with no assets or operations other than its ownership interest in the Debtor.

***PharmaCorr, M2 PharmaCorr Equity Holdings LLC, PharmaCorr/M2 LLC, PharmaCorr Holdings LLC, and Endeavor Distribution LLC***.  Until 2021, PharmaCorr was a wholly owned subsidiary of the Debtor responsible for supplying the Debtor with pharmaceutical products and devices for use in its business.  In June 2021, in an attempt to monetize PharmaCorr's business and allow PharmaCorr to market its services to customers other than the Debtor, the Flacks Group effectuated a spinoff transaction which established these entities.  The result is that PharmaCorr remains an indirect subsidiary of M2 HoldCo, but it is no longer directly affiliated with the Debtor.

***Perigrove, LLC and Perigrove 1018, LLC***.  Perigrove 1018 is a private equity fund owned by several individuals, none of whom owns more than 10% of the company.  Perigrove 1018 is a related company with common ownership to Perigrove, LLC ("Perigrove"), which operated in the healthcare space at the time of the introductions referred to above.  In late November and early December 2021, the Flacks Group team members were introduced to Mr. Lefkowitz and other Perigrove 1018 representatives as potential buyers for PharmaCorr.  Mr. Lefkowitz and Perigrove 1018 quickly shifted focus to a potential acquisition of all of the Debtor-related entities the Flacks Group owned.  After approximately a week of negotiations, Perigrove 1018 acquired the entire portfolio of companies from the Flacks Group on December 7, 2021.

***YesCare Corp., Yes Care Holdings LLC, and CHS TX, Inc***.  These entities were established in early 2022 in preparation for the Divisional Merger, which became effective in May 2022.  CHS TX, Inc. is the surviving entity under the Divisional Merger and now operates as YesCare Corp.  On information and belief, Yes Care Holdings, LLC holds equity in CHS TX, Inc. d/b/a YesCare Corp.

***Sigma RM, LLC***.  Following the Divisional Merger, as part of the corporate restructuring of the Debtor and YesCare, several in-house legal staff formed their own company to provide contract services to YesCare and the Debtor and, thus, began receiving monthly contract service fees rather than compensation as W-2 employees.  On November 1, 2022, the Debtor entered into a Claims Management Services Agreement with Sigma RM, LLC ("Sigma").  Sigma represents that it is owned by a group of the Debtor's former in-house counsel and litigation support staff.  Pursuant to the Claims Management Services Agreement, the Debtor paid Sigma $150,000 per month.  Corporate filings for Sigma reflect that the entity was organized by Isaac Lefkowitz and uses his address as its corporate service address.  Mr. Lefkowitz has testified that he is an unpaid director of Sigma and listed his address for Sigma's service address to ensure he gets notice of legal filings made to Sigma.  The UCC disputes the validity of the Debtor's pre- and post-petition payments to Sigma and has reserved all rights with respect to Sigma's potential Administrative Claim.

***DG Realty Management LLC***.  The Debtor and the UCC know very little about this entity and do not believe the Estate has colorable claims against it.  The only transactions noted between the Debtor and DG Realty are two transfers, both on the same day of December 27, 2021—transfer of $7.5 million to and from DG Realty in the same offsetting amounts.  Mr. Lefkowitz has testified that this transfer was intended to be a short-term loan that became unnecessary.

***James Hyman***.  Former CEO of the Debtor until he resigned on December 3, 2021.

***Scott King***.  Former Chief Legal Officer (CLO) for the Debtor.  Now CLO for YesCare.

***Isaac Lefkowitz***.  Mr. Lefkowitz is the Debtor's sole director.  Since Perigrove 1018's acquisition of the Debtor in December 2021, Mr. Lefkowitz has overseen every aspect of the Debtor's operations and finances until the Petition Date, when the Debtor executed board resolutions which, among other things, delegated sole authority to Russell Perry, the Debtor's Chief Restructuring Officer, for all restructuring matters and any matters where a conflict of interest may exist.  During the bankruptcy case, Mr. Lefkowitz testified as the Debtor's corporate representative at three (3) separate 341 creditor meetings.  Mr. Lefkowitz also testified at four (4) different depositions on behalf of M2 LoanCo, Perigrove 1018, PharmaCorr and Geneva.  Mr. Lefkowitz is a Released Party under the Plan.  Mr. Lefkowitz also testified that he is a director of YesCare, M2 LoanCo, M2HoldCo, Perigrove 1018, and Sigma.

***Russell Perry and Ankura***.  The Debtor's financial advisor prior to acquisition by Perigrove 1018.  The pre-acquisition Ankura team was led by Roy Gallagher and assisted CFO Jeff Sholey with preparing materials for sale to a strategic buyer or alternatively, a bankruptcy filing.  Ankura largely ceased work for the Debtor in early December 2021, when Perigrove 1018 consummated its acquisition from the Flacks Group, with the exception of an occasional call and e-mail to provide information to the new Perigrove 1018 management team.  Russell Perry of Ankura was hired as Chief Restructuring Officer on February 13, 2023 (the same day Tehum filed for

4858-6633-6656

bankruptcy).

*Jeffrey Sholey*.  Former Chief Financial Officer (CFO) for the Debtor.  Was the CFO for YesCare but was elevated to CEO upon Tirschwell's departure.

*Sara Tirschwell and Scaracor LLC*.  Ms. Tirschwell was first introduced to the management team in mid-December 2021 and was designated as Chief Executive Officer (CEO) for the Debtor on or about December 17, 2021.  She continued in this role for YesCare until her termination in early 2023 (around the time of the bankruptcy filing).  Scaracor LLC appears to be an entity owned or controlled by Ms. Tirschwell and used by her for her contractual employment with the Debtor. Based on the Debtor's and the UCC's investigations, neither Ms. Tirschwell nor Scaracor LLC received any direct payments from the Debtor during her employment.

*Michelle Rice*.  Former Corporate Controller for the Debtor.  Now serves the same role for YesCare.

*Geneva Consulting, LLC*.  Geneva and Perigrove share some common directors and authorized representatives, including Isaac Lefkowitz.  Representatives of Perigrove 1018 caused the Debtor's immediate parent company, Valitás Health Services, Inc., to enter into a Consulting Agreement with Geneva in December 2021.  After the Divisional Merger, the Debtor, M2 LoanCo, and Geneva entered into a Facilitator Agreement dated as of May 4, 2022, under which Geneva agreed to provide certain services to the Debtor and M2 LoanCo in connection with the Funding Agreement between the Debtor and M2 LoanCo.  According to pleadings filed by M2 LoanCo in the Chapter 11 Case, M2 LoanCo contends that Geneva assisted in arranging, negotiating, and finalizing the terms of the Funding Agreement and subsequently acted as an agent for both the Debtor and M2 LoanCo.  M2 LoanCo also contends that Geneva coordinated the payment of expenses on behalf of the Debtor and ensured that funds were available from M2 LoanCo to make those payments. M2 LoanCo also contends that Geneva also provides similar consulting services for YesCare, and that Geneva continued to perform services for the Debtor up to the Petition Date.  Geneva has not performed any services for the Debtor during the Chapter 11 Case.  The UCC disputes all of M2 LoanCo's contentions noted herein as to Geneva.

*Ayodeji Olawale Ladele*.  Former Executive Vice President and Chief Medical Officer (CMO) at the Debtor. Now CMO for YesCare.

*Jennifer Lynee Finger*.  Former Assistant General Counsel at the Debtor. Now Assistant General Counsel at YesCare and General Counsel of Sigma.

*FTI Capital Advisors, LLC*.  FTI Capital Advisors, LLC was engaged by the Debtor to provide advisory services with respect to the Divisional Merger. M2 LoanCo, LLC agreed to indemnify FTI Capital Advisors, LLC in accordance with the terms and conditions of the engagement letter. FTI Capital Advisors, LLC contends that it has incurred fees and expenses since the Petition Date related to the investigation conducted by the Debtor and the UCC that it contends are covered by M2 LoanCo's agreement to indemnify. The Debtor and the UCC do not believe the Estate has claims against FTI Capital Advisors, LLC and are agreeable to release them in connection with the release being granted to M2 LoanCo.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | **Re: Docket No. ___** |

**ORDER APPROVING JOINT MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT
BY AND AMONG THE DEBTOR, THE UCC, AND THE PARTIES TO THE
<u>SETTLEMENT AGREEMENT AND (II) GRANTING RELATED RELIEF</u>**

Upon the joint motion (the "<u>Motion</u>")[2] of Tehum Care Services, Inc., the above-captioned debtor and debtor in possession (the "<u>Debtor</u>") and the Official Committee of Unsecured Creditors (the "<u>UCC</u>") for entry of an order (this "<u>Order</u>"), which is the result of a mediated settlement with the Settlement Parties, approving and authorizing the Debtor and the UCC to enter into and perform under the Settlement Agreement attached hereto as **Exhibit 1**, and granting related relief, all as set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

4858-6633-6656

and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's Estate, its creditors, and other parties in interest; and this Court having reviewed the Motion, and all objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein are overruled with prejudice; and the Court having determined that the legal and factual bases set forth in the Motion and the record of the hearing (the "Hearing") on the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefore, and based on the Court's findings of fact and conclusions of law made at the Hearing, which are incorporated herein by reference,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      The terms and conditions of the Settlement Agreement, including the total consideration to be realized by the Debtor pursuant thereto, is fair and reasonable, and the transactions are in the best interest of the Debtor, its creditors, and its estate.  The Debtor and the UCC have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for entering into the Settlement Agreement.  The Debtor's and the UCC's entry into the Settlement Agreement reflects the Debtor's and the UCC's exercise of prudent business judgment consistent with their fiduciary duties.

B.      The Settlement Agreement has been negotiated by the Debtor, the UCC and the Settlement Parties (and their respective affiliates and representatives) in good faith, at arm's length, and without collusion or fraud.  The Debtor, the UCC and the Settlement Parties will be acting in

---

[3] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. See Bankruptcy Rule 7052.

good faith if they proceed to consummate the transactions contemplated by the Settlement Agreement at any time after entry of this Order, subject to the terms and conditions of this Order and the Settlement Agreement, as applicable.

C.       Pursuant to *In re Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995), the Court has given due and adequate deference to the reasonable views of creditors in considering the proposed settlements and compromises embodied in the Settlement Agreement.

Now, therefore, upon the record of the Hearing and any related proceedings held before this Court with respect to the Motion, the evidence adduced at the Hearing, and the statements of counsel during such Hearing, and based upon all such findings and conclusions, IT IS HEREBY ORDERED THAT:

1.       The Motion is granted subject to the terms of this Order.

2.       The Global Settlement is approved pursuant to the Settlement Agreement attached hereto as **<u>Exhibit 1</u>**, *provided*, *however*, that the releases contemplated under the Settlement Agreement shall remain subject to entry of an order confirming the Movants' amended joint plan and the occurrence of the Effective Date of such joint plan.

3.       The Movants are hereby authorized to enter into the Settlement Agreement and to enter into, perform, execute, and deliver all documents, and take all actions, necessary or desirable to immediately continue and fully effectuate, comply with, and implement the Global Settlement in accordance with the terms, conditions, and agreements set forth in the Settlement Agreement.

4.       Pursuant to sections 105 and 363(b) of the Bankruptcy Code, Bankruptcy Rule 9019, and all applicable law, the Settlement Agreement and the terms and provisions included therein are approved in their entirety. The Settlement Agreement is valid, binding, and enforceable against the Debtor, the UCC and the Settlement Parties in accordance

3

4858-6633-6656

with its terms.  The Settlement Agreement satisfies all applicable requirements of the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rule 9019.

5.      The failure to describe specifically or include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Debtor's and the UCC's entry into and performance under the Settlement Agreement is approved in its entirety.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the Settlement Agreement and this Order.

Signed: _____, 2024

_____
Christopher M. López
United States Bankruptcy Judge

4

# Exhibit 1

**Settlement Agreement**

**Execution Copy**

## SETTLEMENT AGREEMENT

      This Settlement Agreement (this "Agreement") is entered into as of January 15, 2024, by and among YesCare Corp. and its wholly owned subsidiaries (including CHS TX, Inc.), M2 LoanCo LLC, M2 HoldCo, LLC, Perigrove 1018, LLC, Perigrove, LLC, PharmaCorr LLC, and Geneva Consulting, LLC (collectively, the "M2 Parties"), Tehum Care Services, Inc. (the "Debtor"), and the Official Committee of Unsecured Creditors of Tehum Care Services, Inc. (the "UCC," and together with the M2 Parties, and the Debtor, the "Parties").

## Recitals

      WHEREAS, on February 13, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") initiating the bankruptcy case captioned *In re Tehum Care Services, Inc.*, No. 23-90086 (the "Chapter 11 Case") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Court").

      WHEREAS, M2 LoanCo, LLC ("LoanCo") is the debtor in possession lender (the "DIP Lender") under (a) the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Docket No. 243], and (b) all additional interim orders entered by the Bankruptcy Court authorizing the Debtor to incur postpetition obligations thereunder, and otherwise amending, supplementing, or modifying such authority from time to time, including the *Fourth Interim DIP Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 993] (collectively, the "DIP Order").

      WHEREAS, on August 10, 2023, Geneva Consulting, LLC filed proof of claim KCC 572/ECN-138, asserting a $315,032.97 general unsecured claim against the Debtor's bankruptcy estate (the "Geneva Proof of Claim").

      WHEREAS, on August 10, 2023, LoanCo filed proof of claim KCC 589/ECN-147, asserting an unliquidated general unsecured claim of no less than $24,032,965 against the Debtor's bankruptcy estate (the "M2 LoanCo Proof of Claim").

      WHEREAS, the UCC and the Debtor believe that the Debtor's estate may have meritorious claims against the M2 Parties, directors or officers, and other transferees or beneficiaries of avoidable fraudulent transfers.

      WHEREAS, on May 22, 2023, the Court entered its *Stipulation and Agreed Order Regarding Appointment of a Mediator and Governing Related Mediation Procedures* [Docket No. 603] (the "First Mediation Order").

      WHEREAS, on August 21–23, 2023, pursuant to the First Mediation Order, the M2 Parties, the Debtor, and the UCC participated in a three-day mediation (the "First Global Mediation").

WHEREAS, following the First Global Mediation, the Debtor and the UCC, as joint plan proponents, filed a chapter 11 plan [Docket No. 1072] (the "Plan") incorporating the resolution reached at the First Global Mediation and a disclosure statement in support of the Plan [Docket No. 1071] (the "Disclosure Statement").

WHEREAS, on November 15, 2023, the Court entered its *Amended Stipulation and Agreed Order Regarding Appointment of Judge Christopher S. Sontchi (ret.) as Mediator and Governing Related Mediation Procedures* [Docket No. 1109] (the "Second Mediation Order").

Whereas, on November 20, 2023, the United States Trustee appointed the Official Tort Claimants Committee ("the "TCC").

Whereas, on November 29, 2023, the Court amended its Second Mediation Order to include the TCC and reschedule the mediation for the week of December 11, 2023 [Docket No. 1158] (the "Amended Mediation Order").

WHEREAS, on December 14, 2023, pursuant to the Amended Mediation Order, the Parties and the TCC participated in a second mediation (the "Second Global Mediation").

WHEREAS, the Parties wish to resolve and fully settle and compromise all outstanding claims among them, without admitting any facts or liability, in order to avoid further costs, inconvenience, and burdens.

**Agreement**

NOW THEREFORE, in consideration of the recitals set forth above and the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     **Recitals**.  The above statement of facts set forth in the Recitals is true and correct, and the Recitals hereby are incorporated herein as set forth herein.

2.     **Effective Date**.  The Effective Date of this Agreement is the date of entry of an order of the Court entered in the Chapter 11 Case pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure approving this Agreement; *provided*, *however*, that the Plan Settlement Payment and the releases set forth herein shall be conditioned upon entry of an order of the Court in the Chapter 11 Case confirming a chapter 11 plan with the provisions set forth in Paragraph 9.

3.     **Consideration**.  The Parties have agreed to enter into this Agreement in exchange for the releases and other covenants expressed herein, as well as for the Settlement Payments and advances described in Paragraphs 4 and 5.

4.     **Settlement Payments**.  The M2 Parties shall make or cause to be made the following advances and releases:

a.     **$2,000,000.00** to be advanced to the Debtor on January 18, 2024 (the "January Settlement Payment"), to be held by the Debtor in trust for the benefit of the DIP Lender and subsequently released to the Debtor upon approval by the Court of the

terms and conditions of a fifth interim DIP Order (the "<u>Fifth Interim DIP Order</u>"). If the Court denies or otherwise declines to approve the Fifth Interim DIP Order, the Debtor or any successor in interest shall promptly return the January Settlement Payment to the DIP Lender; *provided, however,* that in the event the Fifth Interim DIP Order is not entered and these funds are returned to the DIP Lender, the DIP Lender will advance **$2,000,000.00** to the Debtor pursuant to a subsequent DIP Order entered by the Court on terms acceptable to the DIP Lender and that are consistent with the terms and conditions of this Agreement.

b.   **$2,000,000.00** to be advanced to the Debtor on February 20, 2024 (the "<u>February Settlement Payment</u>"), pursuant to the terms and conditions of the Fifth Interim DIP Order; *provided, however,* that the M2 Parties' obligation to fund the February Settlement Payment shall not become due until either: (i) the Bankruptcy Court has entered an order approving this Agreement; or (ii) the Official Tort Claimants Committee (the "<u>TCC</u>") has agreed in writing not to object to the Court's approval of this Agreement; *provided, further,* that if neither of the foregoing conditions has occurred by February 20, 2024, the February Settlement Payment shall be advanced to the Debtor within 72 hours of either condition referenced above being met.

c.   **$1,000,000.00** to be advanced to the Debtor on April 18, 2024, (the "<u>April Settlement Payment</u>," and together with the January Settlement Payment and the February Settlement Payment, the "<u>Pre-Plan Settlement Payments</u>"), pursuant to the terms and conditions of the Fifth Interim DIP Order; *provided, however,* that the M2 Parties' obligation to fund the April Settlement Payment shall not become due until either: (i) the Bankruptcy Court has entered an order approving this Agreement; or (ii) the TCC has agreed in writing not to object to the Court's approval of this Agreement; *provided, further,* that if neither of the foregoing conditions has occurred by April 18, 2024, the April Settlement Payment shall be advanced to the Debtor within five (5) business days of either condition referenced above being met.

d.   At least **$8,770,940.02** in the form of M2 LoanCo releasing any and all obligations (the "<u>Existing DIP Release</u>") owed by the Debtor in connection with funds already advanced pursuant to the DIP Order, with such release to occur on the effective date of a chapter 11 plan (the "<u>Plan Effective Date</u>").[1]

e.   **$40,000,000.00** (the "<u>Plan Settlement Payment</u>," and together with the Pre-Plan Settlement Payments, and Existing DIP Release, the "<u>Settlement Payments</u>"), to be paid to the Debtor or its successor, as applicable, in aggregate cash upon the Plan Effective Date.

---

[1] This amount is approximate because it is based on the most recent weekly reporting; to the extent additional fees and interest have accrued since that date, those will be added to the amount being released.

4883-5222-7730

5.    **Settlement Payment Structure and Corresponding Orders.**  The Parties further agree to the following:

a.    <u>Existing DIP Release</u>.  In effecting the Existing DIP Release described in Paragraph 4.d above, and consistent with Paragraph 6 below, effective on the Plan Effective Date, M2 LoanCo, LLC, as DIP Lender, shall release its claims pursuant to the DIP Order for all amounts due, including all amounts advanced, all fees incurred and any interest accrued.

b.    <u>Additional DIP Advances.</u>  M2 LoanCo shall approve an amended DIP Budget that includes the Pre-Plan Settlement Payments defined in Paragraph 4 of this Agreement, *provided*, *however*, that the Fifth Interim DIP Order shall include reasonable milestones for the remainder of the Chapter 11 Case.  The Debtor will file and seek entry of the Fifth Interim DIP Order, which shall provide for additional borrowings from M2 LoanCo in the aggregate amount of $5,000,000.00, as set forth above.  As set forth in Paragraph 6 below, effective on the Plan Effective Date, M2 LoanCo shall release its claims for repayment of these additional advances upon the Plan Effective Date, including all amounts advanced, all fees incurred, and any interest accrued.

6.    **M2 Parties' Release of Claims.**

On the Plan Effective Date, the M2 Parties shall release and waive all claims and causes of action against the Debtor's estate, including (i) the DIP Lender's claims under all DIP Orders, (ii) the Geneva Proof of Claim, and (iii) the M2 LoanCo Proof of Claim, all of which claims (i)-(iii) shall be disallowed for all purposes and expunged from the claims register (collectively, the "<u>M2 Releases</u>"); *provided*, *however*, that the Parties do not release any claims related to this Agreement, including for breach of the representations and warranties contained herein.

7.    **Settlement Releases.**

Upon the Plan Effective Date and full funding of all payments described herein, the Debtor and the Committee, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any causes of action, directly or derivatively, by, through, for, or because of the foregoing entities, shall be deemed to have released, and shall be permanently enjoined from any prosecution or attempted prosecution of, any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including avoidance actions arising under chapter 5 of title 11 of the United States Code), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, which any of them has or may have against: (a) the M2 Parties; (b) M2 EquityCo LLC; (c) Valitás Intermediate Holdings Inc.; (d) Valitás Health Services, Inc.; (e) M2 Pharmacorr Equity Holdings LLC; (f) Pharmacorr/M2 LLC; (g) Pharmacorr Holdings LLC; (h) Endeavor Distribution LLC; (i) Yes

4

4883-5222-7730

Care Holdings LLC; (j) Sigma RM, LLC; (k) DG Realty Management LLC; (l) Scaracor LLC; (m) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (n) Sara Ann Tirschwell; (o) Ayodeji Olawale Ladele; (p) Beverly Michelle Rice; (q) Jeffrey Scott King; (r) Jennifer Lynee Finger; (s) Frank Jeffrey Sholey; (t) FTI Capital Advisors, LLC; and (u) for each Entity listed in (a) through (t), each of their respective current and former officers, directors, employees, managers, attorneys, professional advisors, and agents; *but excluding* James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks (collectively, the "<u>Released Parties</u>"); *provided* that nothing in this Agreement shall alter or diminish the release set forth in Paragraph 17 of the DIP Order; *provided*, *further*, that the Parties do not release any claims related to this Agreement, including for breach of the representations and warranties contained herein.

8.      **Payment of Unpaid DIP Budget Expenses**.

All unpaid expenses reflected in the budget attached to the Fifth Interim DIP Order shall be paid from monies funded pursuant to Paragraph 4 of this Agreement and any subsequent DIP Order approved by the Court.

9.      **Conditions Precedent**.

a.      The effectiveness of this Agreement is conditioned upon the entry of an order of the Court, in form and substance acceptable to the M2 Parties, approving this Agreement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure and the entry of an order of the Court confirming a chapter 11 plan containing, to the fullest extent permitted by applicable law, the following provisions:

i.      all creditors shall be enjoined from pursuing any claims or causes of action against the Released Parties in accordance with the scope of the releases herein;

ii.      any parties who opt out of the settlement outlined in this Agreement shall not be authorized to receive distributions from the Settlement Payments or pursue claims or causes of action against the Released Parties unless they first seek authority from the Court upon motion and secure a Court order finding that such creditor's claims or causes of action were not released or otherwise enjoined under the plan;

iii.      approval of the M2 Releases described in Paragraph 6 of this Agreement;

iv.      approval of releases substantially similar to the releases in Paragraph 7 and that are in the current Plan in favor of the Released Parties by all creditors that do not opt-out of the settlement outlined in this Agreement;

v.      exculpations, plan injunctions and required gatekeeping provisions substantially similar to those that are in the current Plan to ensure the finality of the Plan and confirmation order; and

vi.     that contracts that were not allocated to YesCare Corp. and its wholly owned subsidiaries (including CHS TX, Inc.) under the May 2022 divisional merger but under which YesCare is still operating post-divisional merger are not executory contracts of the Debtor, or, that to the extent that such contracts are determined to be executory by final order of the Court, such contract counterparty must file a proof of claim within 30 days of the later of the Effective Date or entry of such final order.

10.    **Costs**. The Parties agree that all costs and expenses associated and incurred in connection with this Agreement, including attorneys' fees, shall be paid by the Party incurring same. If any Party is required to bring suit or action to enforce this Agreement against any other Party, the prevailing Party in such suit or action shall be entitled to recover its fees and costs incurred in the enforcement litigation but shall not be entitled to recover fees and costs incurred prior to the Court's approval of this Agreement.

11.    **Merger**. This Agreement contains the full, final, and complete agreement of the Parties, and supersedes all prior negotiations, understandings, representations, warranties, and agreements pertaining to the subject matter of this Agreement.

12.    **Severability**. If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall nevertheless survive and remain in full force and effect and shall in no way be affected, impaired, or invalidated.

13.    **Voluntary Agreement and Advice of Counsel**. The Parties hereto, and each of them, acknowledge, represent, and declare that they have been represented in the negotiations for and in the performance of this Agreement by counsel of their own choice or have had such opportunity; that they have carefully read this Agreement; that they have had this Agreement fully explained to them by such counsel or have had such opportunity; and that they understand and are fully aware of the contents, implications, and ramifications of this Agreement and of its legal effect. This Agreement, including all of its terms and conditions, was negotiated at arms'-length and represents a final, mutually agreeable, and acceptable agreement. The Parties, and each of them, further acknowledge, represent, and declare that they each sign this Agreement freely, voluntarily, of their own free will and volition, and without duress.

14.    **Authority.** All Parties represent and warrant that they have the full right and authority to execute this Agreement. All Parties represent and warrant that the signatory below has the full right and authority to sign for and bind the Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, parents, subsidiaries, affiliates, representatives, officers and directors, successors, heirs, and assigns.

15.    **Investigation**. Each Party hereto represents that it has made a full and complete investigation of the circumstances surrounding the subject matter of this Agreement, that it has full knowledge of all facts involved therein, and in making this Agreement has not relied upon any statements or representations pertaining to this matter by the other Parties hereto or any person or persons representing them.

16. **Mutual Construction**.  This Agreement shall be construed as if all of the Parties jointly prepared this Agreement, and any uncertainty or ambiguity shall not be interpreted against any one Party.

17. **Disclaimer of Reliance**.  Each Party warrants and represents that no express or implied promise, agreement, representation, inducement, or condition not set forth in this Agreement has been made or relied upon by said Party in executing this Agreement and disclaims any reliance on any such express or implied promise, agreement, representation, inducement, or other condition.

18. **Further Assurances**.  Each Party agrees to take or cause to be taken any and all action and to execute and deliver any and all additional documents, instruments, and writings necessary to consummate, make effective, and carry out the terms and provisions of this Agreement.

19. **Headings**.  The headings of the sections and subsections of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof or affect in any way the meaning or interpretation of this Agreement.

20. **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument.  All counterparts so executed shall constitute one agreement binding upon all Parties, notwithstanding that all Parties are signatory to the original or the same counterpart.  A photocopy of the executed version of this Agreement is for all purposes deemed original.

21. **Jurisdiction and Choice of Law**.  This Agreement shall be construed pursuant to the laws of the State of Texas without regard to its conflicts of law rules.  The Court shall have exclusive jurisdiction over any and all disputes between or among the Parties, whether in law or equity, arising out of, relating to, or connected with this Agreement, and the Parties hereby consent to and submit to the jurisdiction of the Court for any such action.  To the extent the Court fails or refuses to assert jurisdiction over any such dispute, the Parties agree that any such dispute shall be brought in and heard by the state or federal courts sitting in Harris County, Texas.

*[signature page follows]*

4883-5222-7730

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

TEHUM CARE SERVICES, INC.

By: _____

Russell Perry
Chief Restructuring Officer

OFFICIAL   COMMITTEE   OF   UNSECURED
CREDITORS FOR TEHUM CARE SERVICES, INC.

By: _____

     Nick Zlutick, Stinson LLP
     Counsel and Authorized Representative

M2 LOANCO, LLC

By: _Alan Rubenstein_____
Alan Rubenstein
Director

4883-5222-7730

YESCARE CORP.,
CHS TX, INC.,
GENEVA CONSULTING, LLC,
PERIGROVE 1018, LLC,
PERIGROVE, LLC,
M2 HOLDCO, LLC, and
PHARMACORR, LLC

By: _____
    Isaac Lefkowitz
    Authorized Representative

11