## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| TEHUM CARE SERVICES,[1] | Case No. 23-90086 (CML) |
| Debtor. |  |

### MOTION OF THE OFFICIAL COMMITTEE OF
### TORT CLAIMANTS AND CERTAIN TORT CLAIMANTS
### <u>FOR STRUCTURED DISMISSAL OF CHAPTER 11 CASE</u>

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON FEBRUARY 12, 2024, AT 1:00 P.M. (PREVAILING CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LÓPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LÓPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGE LOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LÓPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS, AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1]   The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

The Official Committee of Tort Claimants, the estate fiduciary for tort claimants (the "TCC"), and the tort claimants represented by the law firms on the signature pages to this motion, hereby submit this motion (the "Motion")[2] seeking entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a), 554, 1103(c)(5), 1109(b), and 1112(b) of the Bankruptcy Code, dismissing the above-captioned chapter 11 case (the "Chapter 11 Case") and granting related relief.  In support of the Motion, the TCC and the co-movants[3] respectfully state as follows.

## PRELIMINARY STATEMENT

1.     The Debtor' bankruptcy was borne from a fraudulent transaction—a divisive merger that was intended to impair tort victims' ability to recover from a profitable tortfeasor.  The Debtor's board, management, and professionals are all entwined with YesCare and CHS TX, Inc.  The Debtor is a legal fiction created to perpetrate an obvious fraud.  The purpose of this bankruptcy—as devised by the Debtor's owners—is not to maximize value for the benefit of creditors, but to transfer value from creditors to equity holders through a bad faith settlement.

2.     This is not speculation.  This is exactly what the Debtor's plan does.  The Debtor has already proven through its actions that it exists solely to secure a nonconsensual non-debtor release for the benefit of YesCare and its affiliates to the detriment of the victims and their families.  The UCC is fully supportive of this outcome so long as its favored creditor group obtains a recovery it considers substantial.

3.     This case gives bankruptcy a bad name.  Corizon Health and its non-debtor insiders and beneficial owners created the factual basis for, and are trying to settle through this bankruptcy,

---

2    This is a filing pursuant to the *Stipulation and Agreed Confidentiality and Protective Order Regarding Production of Documents*. [Dkt. No. 1186].

3    Other claimants, including tort victims, who wish to join in the relief sought herein can do so by filing joinders to this Motion.

fraudulent transfer claims and personal injury and wrongful death claims asserted against them. Through clever bankruptcy machinations, Corizon Health and its beneficial owners seek to control—or become both the plaintiff and the defendant in—litigation against them based on their tortious conduct, and take from the victims their property, legal, and Constitutional rights. This case is an elaborate scheme to confirm a plan that includes nonconsensual third-party releases without the affirmative vote of the tort victims and over their vehement objection.

4.      A structured dismissal is the only path out of this case that is consistent with the Bankruptcy Code and its objectives. Through the dismissal of this case, the victims' ability to pursue YesCare and its non-debtor affiliates and insiders can be restored, and all claimants can and should be paid more than they will ever be paid in this Chapter 11 Case. This is the best outcome for the tort claimants and other unsecured creditors.

5.      Bankruptcy should not be used by tortfeasors to avoid responsibility for the harm that they caused, deny victims their rights against non-debtor entities, and prevent victims from being able to access our justice system. The Debtor's plan seeks to deny victims their legal rights and impose a *de minimis* settlement under which victims would be forced to accept pennies on the dollar on account of claims that are worth millions of dollars.

6.      The victims here were incarcerated. They did not deserve to die. They did not deserve to be provided substandard health care. Their families did not deserve to attend funerals of loved ones who would be alive today absent the misconduct of YesCare, its predecessors and beneficial owners. Bankruptcy is not a tool to prey on widows. This case is an affront to basic principles of justice and the dignity that every person deserves under our Constitution. It should be dismissed forthwith, and the claimants should be permitted to pursue their claims against all responsible parties before the state and federal courts of the United States.

7.      This case was designed to never allow for a just result.  By creating an administratively insolvent estate, incentivizing professionals to advocate for a cheap settlement, and pressuring claimants with few financial resources to settle, the parties who orchestrated this fraud have unleashed a case that could upend our justice system.  It is time for someone to take a stand against this.  The TCC is that party and the TCC seeks the dismissal of this case.

## BACKGROUND

8.      This is not a typical bankruptcy case.  The real party in interest here is not the Debtor.  This case is about YesCare and its tort liability.  To understand why—and what this case is truly about—it is helpful to begin with various failed attempts undertaken by wealthy companies to use the bankruptcy system to obtain a discharge of their tort liability to the detriment of victims harmed by their conduct.  It is, therefore, appropriate to begin with part of that history, or at least its most recent chapters, including the so-called "Texas Two Step," to appreciate what YesCare is trying to achieve and why a structured dismissal is the only mechanism for resolving this case.

### I.      The Texas Two Step (the Original)

9.      The "Texas Two Step" was first deployed by Georgia Pacific to avoid litigating thousands of asbestos lawsuits.  *See In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C. Nov. 2, 2017) (affiliate of Georgia Pacific).  It has since been deployed by other tortfeasors that have sought to use bankruptcy to gain a litigation advantage.[4]

---

[4]      *See In re DBMP, LLC*, No. 20-30080 (Bank. W.D.N.C. Jan. 23, 2020) (affiliate of Saint-Gobain Corp.); *In re Aldrich Pump LLC*, No. 20-30608 (Bankr. W.D.N.C June 18, 2020) (affiliate of Ingersoll Rand); *In re Murray Boiler LLC*, No. 20-30609 (Bankr. W.D.N.C. June 18, 2020) (affiliate of Ingersoll Rand); *In re LTL Mgmt. LLC*, No. 21-30589 (Bankr. D.N.J. Oct. 14, 2021) (affiliate of Johnson & Johnson) ("LTL 1.0"); *In re LTL Mgmt. LLC*, No. 23-12825 (Bankr. D.N.J. Apr. 4, 2023) (affiliate of Johnson & Johnson) ("LTL 2.0").

10.     The fact pattern in each case varies but the goal is always the same:  use the bankruptcy of a manufactured affiliate to create leverage and pressure tort victims into unacceptable settlement amounts that include a full release in favor of the non-bankrupt entity.

11.     The first step involves a state law divisive merger conducted by a subsidiary of a wealthy corporation.  The divisive merger typically occurs under a 1989 amendment to the Texas Business Corporations Act—hence the name *Texas* Two Step.  Under the merger, the subsidiary will split its assets and liabilities among two new entities.  One entity—"TortCo"—will house all the subsidiary's tort liabilities.  The other entity—"GoodCo"—will be vested with the subsidiary's productive assets and its non-tort liabilities.

12.     TortCo will agree to indemnify the entire non-debtor corporate family for the tort liability.  To avoid arguments that the divisive merger was fraudulent, TortCo is almost always provided with a funding agreement backstop from GoodCo and/or an affiliate to fund a bankruptcy case and provide funding to TortCo to pay tort claims within certain parameters.

13.     Next, TortCo will file for bankruptcy—often called the second step of the Texas *Two Step*.  TortCo will immediately seek to enjoin all tort liability litigation against all non-debtor affiliates and other indemnified parties.  This step is critical—without the Court's assistance in enjoining litigation against the solvent non-debtors, the Texas Two Step strategy is unlikely to succeed.  Once an injunction is obtained, TortCo, usually led by a purported "independent" board, will engage in mediation or other activities designed to prolong the bankruptcy case while tort victims suffer and receive no compensation for their injuries.

14.     The Texas Two Step is designed to provide the debtor and, more importantly, its non-debtor affiliates, with all the benefits of a bankruptcy—*i.e.*, a prolonged, if not multi-year stay of litigation—without any of the burdens of bankruptcy being imposed upon GoodCo or other non-

debtors who benefit from the stay and the enjoining of litigation pending before the bankruptcy case. Since the debtor is a shell and not an operating company, the debtor does not need to reach a settlement or confirm a plan; simply put, it has no incentive or reason to exit bankruptcy except on terms highly favorable to GoodCo.

15.     In a traditional scenario, a debtor seeking to reorganize has the incentive to negotiate in good faith and reach settlements with victims that will result in a plan acceptable to them. But in a Texas Two Step, the incentives are far different and indeed perverse. GoodCo can operate its business, conduct further corporate transactions and upstream profits to shareholders without court oversight, while claimants are stuck in bankruptcy, anchored by a debtor that has no need to exit bankruptcy, and cannot liquidate or obtain compensation for their claims.

16.     Typically, TortCo's primary objective is to stay in bankruptcy for as long as possible and prevent claimants—many of whom suffer from terminal diseases and will die before the bankruptcy case ends—from liquidating their claims to judgment. Not a single Texas Two Step case has resulted in a negotiated settlement with tort claimants holding compensable claims. Nor has any of the Texas Two Step cases resulted in a confirmable chapter 11 plan. Indeed, the first Texas Two Step, *Bestwall*, has lingered in bankruptcy for over six years with no resolution in sight.

17.     To believe or hope that the Texas Two Step would ever result in a confirmed plan may be to miss the point entirely. Even when a plan is proposed, it is often one that is unconfirmable. GoodCo and its parent will demand that the plan release them of their tort liability as a condition to providing funding for any settlement trust. *See*, *e.g*., LTL 2.0, Dkt. No. 525. And such funding typically will be withheld until there is a final, non-appealable order confirming the plan. If such a plan were confirmed by a Bankruptcy Court, it would face certain appeal.

18.     For example, in *LTL 2.0*, the debtor's proposed plan channeled the independent liability of non-debtor Johnson & Johnson ("J&J") to a section 524(g) trust even though the Third Circuit has held that a section 524(g) injunction cannot be used to shield a non-debtor party from its own direct and independent liability.  *See In re Combustion Eng'g, Inc*., 391 F.3d 190, 233 (3d Cir. 2004).  If a plan were somehow confirmed and upheld on appeal, the result would be the elimination of the right to a jury trial to hold a non-debtor responsible for its conduct through the bankruptcy of a manufactured entity.  For parties who had obtained a judgment in the tort system prior to the bankruptcy of the manufactured debtor, the result would be the nullification of the jury's verdict, without an appeal, with the judgment creditor being paid an amount deemed appropriate by the defendant (in its sole and absolute discretion).

## II.     The 3M Variation of the Texas Two Step

19.     While all the major Texas Two Step cases have been prosecuted by the same law firm that developed the strategy, other law firms more recently have attempted to implement similar strategies or innovations thereof.  The chapter 11 case of *In re Aearo Technologies LLC*, Case No. 22-02890 (Bankr. S.D. Ind. July 26, 2022), an affiliate of 3M, was a recent variation of this strategy.

20.     In that case, 3M faced liability for manufacturing and selling defective earplugs after acquiring the underlying operating business in the mid-2000s (and owning the operations for several years prior to terminating production of the defective product and several years prior to implementing the bankruptcy strategy).  Claimants sought to hold 3M liable in the tort system.

21.     3M located an affiliate in its organization that was also named as a defendant in the consolidated litigation—Aearo Technologies ("Aearo")—and placed that company into bankruptcy.  Aearo was, in substance, intended to be a Texas Two Step without the divisive merger

leading the way.  Prior to the bankruptcy, Aearo entered into a funding agreement pursuant to which Aearo agreed to indemnify the entire 3M corporate family for earplug and other tort liabilities.  *In re Aearo Tech. LLC*, 642 B.R. 891, 898 (Bankr. S.D. Ind. 2022).

22.     To avoid arguments that this indemnification obligation could be avoided as an actual or constructive fraudulent conveyance, Aearo also received a funding agreement backstop to fund a bankruptcy case and provide funding to pay tort claims within certain parameters, including claims for indemnification.  This made the funding agreement circular—Aearo's obligation to indemnify 3M could be satisfied by obtaining funds from 3M under the funding agreement.  *Id*. at 909-910 (finding that the funding agreement amounted to a circular agreement).

23.     Once in bankruptcy, Aearo attempted to implement the classic Texas Two Step litigation strategy.  Aearo immediately moved to enjoin litigation against its non-debtor affiliates. The goal was to freeze all litigation against 3M while, at the same time, keeping 3M outside of the bankruptcy proceeding where it would be free to operate its business, conduct further corporate transactions and upstream profits to shareholders without court oversight.  Claimants, in turn, would be stuck in bankruptcy and could not liquidate their claims to judgment.  Aearo's goal was to create delay and confirm a plan that released 3M of its own tort liability.[5]

24.     Aearo's bankruptcy did not go according to plan.  The Bankruptcy Court refused to grant Aearo's request for injunctive relief at the beginning of the case.  *Aearo*, 642 B.R. at 912. This was critical.  Without an injunction, the parent in these cases cannot enjoy the intended litigation holiday or avoid paying defense costs while the bankruptcy is pending.

---

[5]     *See Informational Brief of Aearo Technologies LLC* [Dkt. No. 12] filed in *In re Aearo Tech. LLC*, Case No. 22-02890 (Bankr. S.D. Ind. July 26, 2022) ("The second cornerstone [of a plan of reorganization] would be a permanent channeling injunction and a third-party release of 3M.  This injunction would require that all Combat Arms-related claims be brought only against the settlement trust, and not the reorganized Aearo entities or their non-debtor affiliates.  The injunction would apply to all potential Combat Arms plaintiffs.").

25.     Aearo's bankruptcy—like LTL's bankruptcies—was also met with a motion to dismiss filed by an official committee representing the interests of tort claimants, among others. The Bankruptcy Court ultimately dismissed Aearo's bankruptcy as having been filed in bad faith. *See In re Aearo Tech. LLC*, No. 22-02896, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023). LTL's serial bankruptcy filings were also dismissed.[6]

26.     Following dismissal, 3M returned to the tort system where it faced the reality of litigation.   On August 29, 2023, roughly three months after Aearo's bankruptcy case was dismissed, 3M announced a settlement under which it agreed to pay $6 billion to settle the earplug lawsuits—roughly *six times* the amounts offered by 3M during Aearo's bankruptcy.   But for the dismissal of Aearo's bankruptcy—which was designed to suppress tort claim values and facilitate a multi-billion-dollar transfer from victims to equity—this settlement would not have occurred, and the victims would likely be stuck in bankruptcy to this day.

### III.     The YesCare Two-Step

27.     The YesCare Two-Step is also designed to suppress tort claim values and facilitate a transfer of millions of dollars from victims to equity.   Like *LTL 1.0* and *LTL 2.0*, this case involves a divisive merger followed by a bankruptcy filing by the manufactured debtor.   This case seeks to implement the core strategy that uses bankruptcy to shield affiliated companies from litigation in the tort system.   To fully appreciate why the YesCare variant of the Texas Two Step is arguably even more abusive than the schemes attempted by J&J and 3M, it is helpful to start with YesCare's corporate history and the liabilities that its predecessors faced in the tort system.

---

[6]     *See In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023) (reversing bankruptcy court decision and directing dismissal of bankruptcy petition); and *In re LTL Mgmt., LLC*, 652 B.R. 433 (Bankr. D.N.J. 2023) (dismissing LTL's second bankruptcy where the debtor did not file its petition in good faith).

A.     **Corizon's Corporate History and the Tort Claims**

28.     YesCare—like J&J and 3M—turned to bankruptcy to address its tort liability.  The Debtor's predecessors were in the business of providing healthcare services to inmates incarcerated in state and local prisons across the county.

29.     During the 2010s, a group of private equity funds owned the Corizon Health conglomerate.  During this period, Corizon was very profitable.  Many States had converted to providing healthcare to inmates by contracting with private companies and there were only a handful of competitors that were able to compete for these contracts.

30.     But Corizon Health ran into headwinds.  The disturbing truth of the private prison health care industry is that it incentivizes and provides a level of care that leads to medical malpractice and related liability.  With revenue fixed by a government contract, profits are maximized by minimizing costs.  The costs here are the costs of providing health care to inmates. Less healthcare equates with a higher rate of return.  This reality led to significant tort claims, including claims for wrongful death and permanent disability and disfigurement.

31.     The members of the TCC exemplify the tort claims arising from serious medical malpractice and neglect that the Debtor's insiders are trying to evade in this bankruptcy case.  Five TCC members have wrongful death claims, and the sixth TCC member suffered permanent disability and disfigurement caused by Corizon's business plan to avoid medical expenses by limiting care provided to inmates.

32.     **Daniel Allard**.  Daniel Allard had about one year left of a 2½ year sentence in an Arizona prison for attempted trafficking of stolen property.  Mr. Allard was found by a prison employee lying in brown vomit.  He was taken to Corizon's prison medical facility with bleeding

from his head and nose.  Despite clear signs of a traumatic head injury from a likely assault and deteriorating symptoms, Corizon did not call for emergency medical help for over two hours.

33.     Ignoring medical advice to fly Mr. Allard immediately to an emergency room, he was driven by ambulance to a Bisbee airport for helicopter transport to a Tucson hospital, where he died three days later.  Mr. Allard's grandmother—TCC member Aanda Slocum—filed a wrongful death case against Corizon in *Arizona District Court, Estate of Daniel Allard v. Corizon Health LLC*, Case 4:18-cv-00044-JCH (Claim 158-1).[7]

34.     **Michelle Morgan**.  In 2022, during Michelle Morgan's intake in a New Mexico jail, a Corizon employee noted that Ms. Morgan had been subjected to "ongoing issues of physical and emotional abuse."[8]  On May 3, 2022, Ms. Morgan requested counseling services, which Corizon refused to provide.  Ten days later, on May 13, 2022, Ms. Morgan committed suicide by hanging herself from her bunk bed.  Corizon employees' use of an automated external defibrillator to resuscitate her failed not once, but twice, because the battery power of two different devices had run down, rendering them unusable.  Ms. Morgan's daughter—TCC member Paris Morgan—is now pursuing a wrongful death claim against Corizon.  *See* Claim 500.

35.     **Jennifer Casey Norred**.  Jennifer Casey Norred was 36 years old and suffered from chronic schizophrenia, bipolar disorder and depression when incarcerated in a county jail for "stalking."  Ms. Norred had received mental health treatment before her incarceration.  Jail records documented at least one prior suicide attempt.

36.     On July 24, 2017, after months with virtually no treatment, no inquiry into her prior mental health condition and a failed suicide attempt, Ms. Norred was placed in a "restraint chair"

---

[7]     https://storage.courtlistener.com/recap/gov.uscourts.azd.1077356/gov.uscourts.azd.1077356.1.0.pdf

[8]     https://www.abqjournal.com/news/local/suit-alleges-mdc-guards-negligence-led-to-jail-death/article_0808296b-fcf8-5b33-97b2-3fe7be37ce19.html

for 24 hours against her will with limited supervision and few comforts or food breaks. Three days later, Ms. Norred tied her jail-issued uniform pants to her bunk and hung herself. Her mother—TCC member Elizabeth Frederick—filed a wrongful death case in Florida District Court against Corizon and the county. *Frederick v. McNeil*, Case No. 4:19-cv-162-MW-CAS (Claim 574).[9]

37.    The TCC members' claims are merely examples of atrocities suffered by many other tort claimants who deserve the right to seek compensation in the tort system.[10]

38.    **Tracey Grissom**.  For example, Tracey Grissom brought claims against Corizon after she was forced to suffer in agony and live in her own fecal matter for four months. Ms. Grissom was convicted of murdering her husband after, according to Ms. Grissom, he had raped her and caused injuries that required her to have a stoma (a surgically made hole) in her lower stomach, which connects to an ostomy bag that collects waste.

39.    For two days in 2017, Ms. Grissom suffered terrible pain while her intestines protruded several inches outside the stoma.  After a portion of Ms. Grissom's lower intestine was surgically removed, Corizon provided ill-fitting ostomy bags that leaked for four months on her body, clothing, and bedding.  Ms. Grissom filed a lawsuit against Corizon in Alabama District Court.  As the District Court judge framed her allegations, "For four months, her feces adhered to and excoriated her skin, it soiled her clothes, it covered her bedding, and it repulsed those around her, so much so that she was segregated from other inmates." *Grissom v. Corizon, LLC*, 2:19-cv-420 (Claim 527 & 598).[11]

40.    **David J. Hall**.  In Maryland, a jury awarded David J. Hall $3 million against Corizon for failing to treat a wrist fracture that had collapsed and required extensive surgery.

---

[9]    https://storage.courtlistener.com/recap/gov.uscourts.flnd.103873/gov.uscourts.flnd.103873.24.0.pdf

[10]    *See also* https://www.themarshallproject.org/2023/09/19/corizon-yescare-private-prison-healthcare-bankruptcy

[11]    https://casetext.com/case/grissom-v-corizon-llc-1.

Mr. Hall was provided only an Ace bandage and told his injury would "self-heal." The jury's award was reduced to $770,000 pursuant to Maryland statute. *See* Claim 243 & 585.

41. All actions filed by the hundreds of claimants have been stayed by this bankruptcy. And many cases against Corizon and its affiliates have been dismissed without prejudice because of this bankruptcy case.

### B. The 2020 Sale to the Flacks Group

42. As of 2017, BlueMountain Capital Management ("BlueMountain") was Corizon's largest ultimate beneficial owner. Given the mounting litigation, in the summer of 2020, BlueMountain decided to divest and sold the equity of Corizon to the Flacks Group, a Miami-based investment firm. Coincident to this sale, the Flacks Group formed the "M2" related entities to acquire Corizon's purportedly secured debt at a steep discount. Through this acquisition of debt and equity, the M2 companies became both Corizon's parent and secured lender.

43. The Flacks Group did not turn around Corizon's business. Instead, it spun off PharmaCorr—the prison health services adjacent pharmacy benefits manager—stripping Corizon of a profitable company. With this cash in hand, the Flacks Group evaluated a potential bankruptcy transaction as an exit strategy. But, by happenstance, the Flacks Group met Mr. Issac Leftkowitz and Perigrove—and thereby, an entreat with the owners of health care giant Genesis HealthCare—who convinced the Flacks Group to not file for bankruptcy and to sell the business to them instead.

### C. The Divisive Merger (aka ███████████)

44. Perigrove had a different vision for Corizon—█████████████████████ ████████████████████████████████████████████████. Code named ████████," Perigrove and its advisors set off to shield their companies from litigation in the tort system and impose a forced bankruptcy settlement on the victims and their families, thereby

13

freeing all future profits for equity holders.  *See* **Exhibit B** (filed under seal).  ▇▇▇▇▇▇▇ was designed to use bankruptcy to transfer millions from tort victims to equity.

45.     **Step 1—Acquire and Loot Corizon**.   As a starting point, in December 2021, Perigrove acquired (for an undisclosed consideration), Corizon Health, its parent, the M2 companies and their debt, all the profitable government contracts, and Corizon's cash.

46.     Perigrove then looted Corizon Health to the tune of approximately $30 million. The TCC contends that these transfers were both intentional and constructive fraudulent transfers that would be recoverable by any creditors in future litigation (inside or outside of bankruptcy).

47.     **Step 2—Create MergeCo**.  In May 2022, Perigrove directed Corizon and certain of its affiliates—*i.e.*, Corizon Health, Inc., Valitas Health Services, Inc., Corizon LLC, and Corizon Healthcare of New Jersey—to merge into a single entity called "MergerCo."  MergerCo included all the business entities with assets and ongoing operations.

48.     **Step 3—The Divisive Merger**.  MergerCo then undertook a divisive merger under Texas law.  Merger Co split its assets and liabilities among two entities.  One entity—"RemainCo" or "Corizon Health, Inc." or "TortCo"—housed the disfavored liabilities, including the tort claims asserted by the inmates and their families as well as liabilities owed to certain vendors and terminated employees.

49.     The other entity—"NewCo" or "CHS TX, Inc." or "GoodCo"—was vested with the MergerCo's productive assets and its favored liabilities.  The allocation of liabilities owed to vendors and former employees makes this case somewhat different.  In most Texas Two Steps, TortCo is allocated nothing but the disfavored tort liabilities.  But the YesCare version is different.

50.     The TCC's analogies "Step 3" in the YesCare scheme to a section 363 sale to an insider, where the insider takes all the productive assets and an assignment of the profitable

14

contracts (along with an assumption the related liabilities), rejects the non-profitable contracts, and leaves other undesirable liabilities (*e.g.*, terminated employee obligations) behind.

51.     True to form, the parties provided TortCo with a Funding Agreement with M2 Loan Co.  But the Funding Agreement here was subject to an aggregate cap of $15 million.  Under the Funding Agreement, M2 Loan Co., as the "Payee," could advance funds to TortCo and make earmarked payments to TortCo's creditors, which it did prior to the bankruptcy.

52.     **Step 4—Create a Structure to Eliminate Creditor Remedies**.  Ordinarily, the next step is the immediate bankruptcy filing of TortCo—often hours after the divisive merger.  But the YesCare variant did not involve an immediate bankruptcy filing.

53.     Once the divisive merger was complete, Sarah Tirschwell, who was the sole shareholder of NewCo, contributed 95% of that equity to another newly formed company called YesCare, which would be wholly owned by certain *undisclosed insiders*.  Upon information and belief, these insiders are the **same** people who controlled Corizon prior to the divisive merger.  The Funding Agreement was exhausted with millions of dollars being paid to preferred creditors.

54.     Perigrove understood that Texas's divisive merger statute does not eliminate the rights of creditors under existing law, including the right to (a) argue that YesCare and/or NewCo is Corizon's legal successor, (b) assert alter ego and veil piercing theories, and (c) assert fraudulent transfer claims (both actual and constructive fraud).  A divisive merger that creates an entity saddled with liabilities and no business assets constitutes the very transaction has been banned for close to 500 years since the United Kingdom passed the Statute of Elizabeth.

55.     When a divisive merger looks to be a fraud, creditors can challenge the merger as a fraud.  Texas law does not afford anyone a license to commit fraud.  For YesCare and NewCo, the claimants' state law remedies are the problem.

56.     Through the divisive merger and a subsequent bankruptcy filing, YesCare's objective was to *create* a new plaintiff that *controls* the tort claims and is controlled by YesCare. Understanding the arguments that can be advanced over what is property of a debtor's estate and the Debtor's DIP financing are key to understanding this scheme.

57.     TortCo—the Debtor entity—was destined for bankruptcy.  But unlike other Texas Two Steps, causing mortal delay was not the end game.  YesCare needs a nonconsensual third-party release.  The primary remedies available to victims of a fraudulent divisive merger are successor liability, alter ego and veil piercing, and fraudulent transfer claims.  Armed with these legal theories, tort victims can seek compensation in the tort system from parties like YesCare and NewCo on account of the particularized injuries that they suffered.  Victims can simply continue their lawsuits against YesCare, NewCo, and others as named defendants.

58.     But when a company files for bankruptcy, the right to assert state law fraudulent transfer claims vests in the trustee.  *See* 11 U.S.C. § 544(b).  Generally, creditors cannot pursue such claims while the case is pending.  In addition, causes of action that the *company* could assert against third parties under state law also become property of the estate under section 541(a).

59.     As explained below, the Circuits are split on whether a bankruptcy trustee has standing to assert claims that *belong to creditors* under state law against third parties under the doctrines of successor liability and alter ego.  *See* cases cited *infra* at fn. 30.  Courts, in certain circumstances, have held that a debtor in bankruptcy can assert creditor claims—*i.e.*, claims based on a particularized injury to claimants—based on successor liability and alter ego theories.

60.     When this occurs, Courts are often looking to a trustee to hold parties that engaged in misconduct that harmed creditors responsible.  But, in the context of a Texas Two Step, this logic results in a perverse reality.  If the tort claims asserted against YesCare, NewCo and others

under the doctrines of successor liability and veil piercing are estate causes of action—*i.e.*, they belong to TortCo during a bankruptcy proceeding—then YesCare can effectively control the tort claims asserted against it.[12]  Because of the DIP financing scheme discussed below, the Debtor here is controlled by the litigation targets—*i.e.*, the parties alleged to have committed fraud and alleged to be liable as successors or alter egos.

61.     By arguing that the tort claims against YesCare and NewCo (under a successorship or alter ego theory) are TortCo's property in a bankruptcy proceeding under section 541(a), YesCare and NewCo can use the Texas Two Step place themselves in the position of both the ***plaintiffs*** and the ***defendants***.  The same is true for fraudulent transfer claims.  The bankruptcy is used to take the property rights of the victims—*i.e.*, their tort claims against YesCare, NewCo, and others—and place them into the hands of a debtor controlled by the tortfeasor.

62.     The key to YesCare's variant of the Texas Two Step is to create a bankruptcy under which it controls the claims against ***itself*** and then can ***settle*** those claims under either a Rule 9019 settlement or a chapter 11 plan.  The primary obstacles to this happening are the Bankruptcy Court and estate fiduciaries who are charged with maximizing the value of a debtor's estate.

63.     But Perigrove devised a plan for this as well.  Before authorizing a bankruptcy filing, Perigrove made certain that the Debtor was deeply insolvent—*i.e.*, stripped of all its value **and** access to funding under the Funding Agreement.  This laid the foundation for an insider DIP loan.  Without the DIP loan, there is no funding for this case and no funding to pay professional fees, including the professionals retained by the Debtor and any official committees.

---

[12]   To be clear, the TCC does not believe that the personal injury and wrongful death claims asserted against YesCare, NewCo, and their non-debtor affiliates and insiders under the doctrines of successor liability or veil piercing are property of the Debtor's estate.  A contrary result would mean that section 541(a) violates the Fifth and Seventh Amendments of the Constitution.  The TCC raises and reserves the right to argue that section 541(a) violates the Fifth and Seventh Amendments to the extent that it means that such claims are the Debtor's property.

64.     The DIP loan denies funding for any committee or estate party that challenges any of the prepetition transfers or the very insider DIP that controls this case. *See* DIP Motion at pp. 8-9 (DIP Credit Agreement, ¶ 6.13, 6.36(r)), D.I. 185 (the "DIP Motion"). And the DIP loan is collateralized by liens on all conceivable estate causes of action (which the Debtor will argue include the tort claims against YesCare and NewCo). *See* DIP Motion at pp. 16-17 (defining DIP Collateral to include commercial tort claims and causes of action, among other items).

65.     **Step 5—File for Bankruptcy**. With the DIP loan fully negotiated and ready to go, the next step was to find professionals willing to represent the newly created debtor, file the petition, seek an injunction to shield YesCare and its non-debtor affiliates and insiders from litigation during the bankruptcy, move to approve the DIP loan (and the related liens and case controls), and then dangle a settlement before the parties as the only way out of the case.

66.     On February 12, 2023, just prior to the filing, the Debtor retained Gray Reed as bankruptcy counsel. And, on February 13, 2023, the Debtor filed its chapter 11 petition.

67.     **Step 6—Seek an Injunction**. Once in bankruptcy, the Debtor followed the Texas Two Step script. Like J&J and 3M, the Debtor sought an injunction to prevent claimants from pursuing their claims against YesCare and its non-debtor affiliates and insiders.[13] In the PI Action, the Debtor asserted its desires to control estate causes of action (including successor liability Claims) and the indemnity provided by the Debtor to its non-debtor affiliates, insiders, officers and directors, as part of the divisional merger as bases to support the injunction.

68.     On March 3, 2023, the Court entered its *Order Regarding Debtor's Emergency Motion to Extend and Enforce the Automatic Stay* [D.I. 118] and on May 18, 2023, the Court

---

[13]     *See* Complaint Seeking (I)(A) a Declaratory Judgment that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted Against Certain Non-Debtors and (B) Extension of the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) a Preliminary Injunction Related to Such Actions Tehum Care Services, Inc. v. Those Parties Listed in Appendix A, (the "PI Action") [Adv. P. 1].

entered its *Order (I)(A) Declaring that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted Against Certain Non-Debtors and (B) Extending the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) Preliminarily Enjoining Such Actions* (the "PI Order") [Adv. P. 43].  This Court's injunction appeared to dissolve on August 10, 2023, but has been extended by stipulation of certain parties in the months since.

69.     **Step 7—Negotiate with the UCC**.  After the filing, the United States Trustee appointed an Official Committee of Unsecured Creditors Committee (the "UCC").  *See* Amended Notice of Appointment of Official Committee of Unsecured Creditors [D.I. 145].  The UCC is comprised of ***five trade creditors*** of Corizon Health and two personal injury claimants.

70.     The UCC engaged professionals, who in turn negotiated a settlement and plan with the Debtor.  *See* Disclosure Statement Regarding Debtor and Official Committee of Unsecured Creditors' Joint Chapter 11 Plan [D.I. 984] (subsequently revised).  The TCC understands that the UCC negotiated the "settlement" and plan allocation among itself and the Debtor and without any lawyers present representing the interests solely of the tort claimants.  The results of that internal negotiation speak for itself and are embodied in the proposed plan.

### F.     The Proposed Plan of Reorganization

71.     The proposed plan reflects the final embodiment of YesCare's scheme.  As one may expect, the proposed plan treats the inmates and their families poorly (and that is probably an overly generous statement).

72.     **Unfair Discrimination**.  Unlike the plans proposed in other Texas Two Step cases, the Debtor's plan divides the claimants among three separate classes—Class 4 (Non-Personal Injury Claims), Class 5 (Personal Injury Claims), and Class 6 (Indemnification Claims).  Class 4, which includes the five trade creditors represented by the UCC, gets the lion's share of the money.

73.     The plan deploys a two-trust structure, with Non-Personal Injury Claims being channeled to the "Liquidation Trust" and Personal Injury Claims being channeled to the "Personal Injury Trust."  Under the settlement with the UCC, the Liquidation Trust gets between $14.5 and $15.5 million of the $37 million settlement, the right to pursue certain estates causes of action, including preference claims worth millions of dollars and claims against the Flacks Group (also worth millions of dollars), and ERC credits (purported to be worth between $5 and $10 million).[14] The Liquidation Trust can employee the professionals that currently represent the UCC.

74.     Holders of Non-Personal Injury Claims will enjoy a substantially higher recovery than holders of Personal Injury Claims.  The Personal Injury Trust gets between $8.5 and $8.8 million of the $37 million settlement and insurance rights that are presently estimated to have little to no value.  The filed proofs of claims alleged personal injury and wrongful death claims total approximately 200 (plus), with a face value of $775 million.

75.     Under the proposed settlement and plan, claimants on the UCC will receive between a 44% and 69% recovery, YesCare and NewCo will avoid millions of dollars in tort liability that it would otherwise face in the tort system, and assuming any funds are left after the payment of trust administrative claims, the inmates and their families stand to recover pennies on the dollar.  Wrongful death claims worth more than $5 to $10 million in the tort system may recover less than 1.2% of their claim—*e.g.*, $60,000 or $120,000—if the plan is confirmed and upheld on appeal.  Victims like David Hall may recover only $5,000 on his $770,000 judgment and be stripped of his right to pursue non-debtor tortfeasors for the difference.

---

[14]   On December 18, 2023, the Debtor and the UCC announced a revised settlement based on a $54 million cash contribution.  But this settlement presumes the existing allocation negotiated by the UCC for the benefit of Non-Personal Injury claims.

76.     Further, there has been no estimation proceeding in this case to ascertain the Debtor's aggregate tort liability.  Only self-serving and untested analysis presented in a liquidation analysis appended to the plan that admits the tort claims could be as high as $75 million.  $9 million is not enough money to administer a trust of the kind proposed by the UCC and the Debtor, let alone provide anything other than the $5,000 quick pay payments to victims.

77.     **<u>Non-Consensual Third-Party Releases</u>**.  To lock in their winnings, the plan also effectuates nonconsensual third-party releases.  This occurs through two mechanisms.

78.     The first mechanism is the release set forth in Article IX of the plan.  Under this Article IX, all parties who have not "opted out"—even those with no actual notice of the bankruptcy proceedings—will be deemed to grant a release to YesCare and other non-debtors, including exculpation of the estate fiduciaries.

79.     The second mechanism is the proposed settlement of the estate causes of action against YesCare and its non-debtor affiliates and insiders.  Under the plan's Article IX(c), the Debtor and its estate shall release all estate causes of action against YesCare and the other Released Parties.  This release is broad and is intended to be the mechanism by which the Global Settlement is effectuated.  It specifically includes "rights, actions (including Avoidance Actions), suits . . . . powers, privileges  . . . whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, . . . assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort law, equity, or otherwise that the Debtor, the Post-Effective Date Debtor, or the Estate has, have or may have against the Released Parties."

80.     If approved, YesCare and NewCo could appear as a defendant in any pending litigation and argue that any tort claims against them grounded in a successor liability or alter ego theory are barred by the Debtor's confirmation order such that no claimants can hold them

responsible for their misconduct.  The same is true for fraudulent transfer claims aimed at undoing the divisive merger—the Debtor's insiders effectively act as both plaintiff and defendant of the tort claimants' claims under this scheme.

81.     The plan includes an "Opt Out" for claimants who reject the proposed plan settlement, but the "Opt Out" is illusory.  Due to the release in Article IX(c), any tort claimants who opt-out could be barred from pursuing their state law rights against YesCare and its non-debtor affiliates and insiders.  YesCare and NewCo could be armed with the ability to defend against any prepetition personal injury claim by arguing that it is grounded in a successor liability or alter ego theory—claims that the Debtor (as controlled by YesCare) allegedly settled under the plan.  The tort claimants' full value claims against YesCare and non-debtor affiliates and insiders could be extinguished under the plan without their consent.  Anyone who "opts out" will lose their claims.  The proposed plan is a new version of an old story where a debtor proposes a plan the cornerstone of which is a nonconsensual third-party release in favor of entities that elect to avoid the burdens of bankruptcy but want to enjoy all the benefits of bankruptcy.

82.     Most tort claimants will vote to reject the plan.  TCC will obviously object.  United States Trustee (who can appeal without posting a bond) will likely object.  Parties will argue that the plan engages in unfair discrimination, was not proposed in good faith, that the settlements are unreasonable, that the plan violates the best interests test, and that the releases are unlawful.

83.     Even Circuits that permit nonconsensual third-party releases would never permit something like this.  The plan—if approved over and crammed down upon tort victims—will be appealed through to at least the Fifth Circuit.  Victims and creditors have no real hope for near term payment under the proposed plan, however *de minimis* it is.

84.     The litigation over plan confirmation and the resulting appeals could easily go on for years, during which time YesCare and its non-debtor affiliates and insiders will continue to enjoy the benefits of an injunction and a litigation holiday.  Equity holders will continue to drink fine wine and pay themselves bonuses while the inmates, and their families, recover ***nothing***.  This entire bankruptcy scheme was designed and intended to achieve an unjust result.

## IV.     Possible Options for Resolving this Case

85.     The TCC and the co-movants have analyzed various options for resolving this case and have reached the conclusion that a structured dismissal is the only viable option.

### A.     A Creditor Plan

86.     In other Texas Two Step cases, committees have moved to terminate exclusivity to file a creditor plan.[15]  But in these cases, the divisive merger involved funding agreements that facially provided sufficient funding to pay administrative claims in full and, arguably the tort liability of the debtor as well.  This made it possible for the claimants to propose a plan that transferred the debtor's rights under the funding agreement to a trust consistent with section 1123(a)(5), which rights could then be used by the trust to fund the payment of tort claims as liquidated post-confirmation in accordance with Court-approved trust distribution procedures.[16]  Those creditor plans would not provide for the types of nonconsensual releases for non-debtors contemplated here.

---

[15]   *See In re LTL Mgmt., LLC*, No. 23-12825 (MBK) (Bankr. D.N.J. June 5, 2023) (Motion of the Official Committee of Talc Claimants to Terminate the Debtor's Exclusive Period Pursuant to 11 U.S.C. § 1121(d)(1), Dkt. No. 702); *In re LTL Mgmt., LLC*, No. 21-30589 (MBK) (Bankr. D.N.J. Sept. 15, 2023) (Motion of the Official Committee of Talc Claimants to Terminate the Debtor's Exclusive Period Pursuant to 11 U.S.C. § 1121(d)(1), Dkt. No. 2721).

[16]   *See In re LTL Mgmt., LLC*, No. 23-12825 (MBK) (Bankr. D.N.J. June 12, 2023) (Reply in Support of Motion of the Official Committee of Talc Claimants to Terminate the Debtor's Exclusive Period Pursuant to 11 U.S.C. § 1121(d)(1), Dkt. No. 759).

87.     The YesCare Two-Step involves a bankruptcy commenced after the commission of a fraud.  The Funding Agreement does not provide sufficient funding to pay administrative claims, tort claims, or commercial claims in full and does not make the full value of the predecessor available to pay claimants.  The Funding Agreement was drained prior to the filing.

88.     YesCare orchestrated a scheme whereby parties must support an unreasonable settlement that permits a tortfeasor to avoid responsibility for the harm it caused *for there to be funding to pay administrative claims, including the fees and expenses of estate professionals*.  The TCC does not support such a settlement.  A creditor plan cannot be confirmed unless administrative claims will be paid in full.[17]  Given this, there does not appear to be a path here to the confirmation of creditor plan that rejects a settlement with YesCare.

### B.      The Debtor's Plan

89.     Likewise, there is no path here to the confirmation of the Debtor's plan to harm tort claimants and transfer millions in value from creditors to equity holders.  The plan violates the best interest test, proposes unfair discrimination, was proposed in bad faith, and the Debtor's proposed settlement is an insider transaction that does not satisfy the Rule 9019 standard.

90.     The tort claimants will vote against plan confirmation.  The Debtor's plan, if confirmed, would take away the right to a jury trial, property rights, and the ability of tort claimants to collect from YesCare in the tort system.  The releases are unlawful in every Circuit—not just under Fifth Circuit case law—given the lack claimant support and a plan that fails to provide for substantial compensation to the impacted class of creditors.  *See Bank of N.Y. Tr. Co. v. 9 Official*

---

[17]     Section 1129(a)(9)(A) of the Bankruptcy Code provides that:  "Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."  And section 502(a)(2) of the Bankruptcy Code specifies the priority of administrative expenses.

*Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009) ("[T]his court has held that Section 524(e) only releases the debtor, not co-liable third parties.").[18]

91.    The Debtor may argue that the releases under its plan are voluntary because the claimants can theoretically opt-out.  But, again, the opt-out is illusory.  Any claimants who opt-out could be barred from pursuing their state law rights against YesCare and its non-debtor affiliates and insiders.  Anyone who opts out will be channeled into a brick wall.  Confirmation would be challenged by the TCC, claimants and public interest groups intent on preventing this case from leading to further abuses of the bankruptcy system.  No plan has been confirmed in a chapter 11 case that compares to what the Debtor and the UCC are proposing here.

### C.    Conversion to Chapter 7

92.    Next, the TCC and the co-movants considered whether conversion to chapter 7 would be in the best interest of creditors.  The problem with conversion is that it does not solve the problem that the Debtor is a Potemkin village with no hard assets and no funding source.

93.    A trustee could try to negotiate a settlement with YesCare that YesCare would be willing to support.  Alternatively, a chapter 7 trustee could litigate against YesCare (with no litigation funding unless the trustee was able to procure a loan) and attempt to bring funds into the estate that would ultimately be distributed to creditors.  The risk would be that the trustee will be incentivized to reach a cheap settlement that imposes the same estate release ramifications as the Debtor's plan that most, if not, all the claimants would reject.

---

[18]    Courts outside the Fifth Circuit generally require at least 85% acceptance from the class affected by a nonconsensual third-party release in a chapter 11 plan.  *See In re Millennium Lab Holdings II*, 945 F.3d 126, 132 (3d Cir. 2019) (93% acceptance), *cert. denied*, 140 S. Ct. 2805 (2020); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1045 (7th Cir. 1993) (95% acceptance); *Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989) (94% acceptance); *In re AOV Indus.*, 792 F.2d 1140, 1143 (D.C. Cir. 1986) (90% acceptance); *In re Am. Family Enters.*, 256 B.R. 377, 392 (D.N.J. 2000) (99% acceptance)*; In re Purdue Pharma L.P.*, 633 B.R. 53 (Bankr. S.D.N.Y. 2021) (96% acceptance); *In re Blitz U.S.A.*, 2014 Bankr. LEXIS 2461, at *15-16 (Bankr. D. Del. Jan. 30, 2014) (95% acceptance); *In re Master Mortgage Inv. Fund*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (95% acceptance).

94.     Such litigation, which could take years and years to complete, would create more delay and prevent victims from seeking to hold YesCare and NewCo responsible in the tort system. As the *Aearo* bankruptcy shows, the fastest path to payment is dismissal because it forces YesCare and NewCo back into the tort system where they face the reality of litigation.

95.     Further, a trustee is not needed to undertake this litigation, avoid the divisive merger, pursue claims against YesCare or NewCo, or recover for creditors.  Our legal system already provides tort victims with legal remedies and a clear path to recovery, which path can be pursued if this Court dismisses the Debtor's case.  These remedies already exist under state law.

### D.     Structured Dismissal

96.     The claimants—who are the stakeholders in this case—have a path to payment if the case is dismissed.  YesCare and the parties who orchestrated the fraud are liable for the claims against the Debtor and can pay such claims when they are liquidated in the tort system.  The claimants here should be afforded these rights absent a plan that has clear and broad support. Further, the claimants can assert claims against governmental entities and other parties who are co-liable with the Debtor, YesCare, and NewCo.  While bankruptcy is often a solution to problems, the unique circumstances presented by the YesCare Two-Step make bankruptcy the problem.

97.   **Successor Liability**.   YesCare, NewCo, and/or their affiliates are liable as the successor to Corizon.[19]   Under state law, successor liability is not a cause of action.[20]   Rather, successor liability is an equitable doctrine or a theory of liability that transfers liability for a claim from a predecessor to a successor when certain factors are present.   A successor may become liable

---

[19]   Corizon operated 50 facilities in over 27 different states.   For tort claims, the place of injury and the place of conduct causing the injury typically determines which state law applies.   *See In re Soporex, Inc.*, 446 B.R. 750, 762 (Bankr. N.D. Tex. 2011) (applying the Restatement's most significant relationship test to the choice of law question for tort claims and noting that "applicable law will usually be the local law of the state where the injury occurred."); *Kelly v. Corizon Health Inc*., No. 2:22-cv-10589, 2022 U.S. Dist. LEXIS 198725, *14 (E.D. Mich. Nov. 1, 2022) (applying Michigan successor liability and alter ego substantive law to claims against CHS and YesCare because "a state's interest in applying its law to citizens injured by foreign corporations [often] outweighs the interest of the incorporating state."); *accord Rowland v. Novartis Pharm. Corp.*, 983 F. Supp. 2d 615, 624 (W.D. Pa. 2013); *In re W.R. Grace & Co.*, 418 B.R. 511, 519 (D. Del. 2009).   For this reason, successor liability and alter ego doctrines may be analyzed differently with respect to the personal injury and wrongful death claims at issue here (depending on the state where the injury occurred).   *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 467 (3d Cir. 2006).   The TCC cites to case law in various states in this section of the Motion, including Texas.   But this should not suggest that any state law applies to any specific tort claim or any legal doctrines that impose liability on non-debtor third parties.   For an injury that occurred in Florida, Florida law would likely apply to the tort claims as well as remedies (*i.e.*, successor liability and alter ego) brought in aid of that personal injury claim.

[20]   *See*, *e.g.*, *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 290 (N.D.N.Y. 2012) (holding that "'successor liability' is not a separate cause of action against a defendant based on the predecessor's conduct" and noting that courts in other circuits have generally agreed); *Automotive Indus. Pension Trust Fund v. Ali*, No. C–11–5216, 2012 WL 2911432, *8 (N.D. Cal. July 16, 2012) (holding that, in the context of ERISA, successor liability is not an independent cause of action but simply a theory for imposing liability based on a predecessor's ERISA violation) (citations omitted); *Tindall v. H & S Homes, LLC*, No. 5:10–CV–044, 2012 WL 369286, *2 (M.D. Ga. Feb. 3, 2012) (holding that "'[s]uccessor liability is not a tort.   It is an equitable tool used to transfer liability from a predecessor to a successor'" (quotation omitted)); *In re Fairchild Aircraft Corp*., 184 B.R. 910, 920 (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998) ("successor liability does not create a new cause of action against the purchaser so much as it transfers the liability of the predecessor to the purchaser"); *Robbins v. Physicians for Women's Health, LLC*, 90 A.3d 925 (Conn. 2014) ("[W]hile successor liability may give a party an alternative entity from whom to recover, the doctrine does not convert the claim to an in rem action running against the property being sold.   Nor does the claim have an existence independent of the underlying liability of the entity that sold the assets."); *Featherston v. Katchko & Sons Constr. Servs., Inc.*, 244 A.3d 621, 733 (Conn. App. Ct. 2020) ("Successor liability is a theory of liability to be alleged in support of a claim rather than raised as an independent claim."); *Columbia State Bank v. Invicta Law Group PLLC*, 402 P.3d 330, 332 (Wash. Ct. App. 2017) ("a claim for successor liability follows an underlying cause of action" and "merely exists to extend 'the liability on that cause of action to a corporation that would not otherwise be liable.'"); *Brown Bark III, L.P. v. Haver*, 219 Cal. App. 4th 809, 823, 162 Cal. Rptr. 3d 9, 20 (Cal. Ct. App. 2013) ("[S]uccessor liability is not a separate claim independent of Brown Bark's breach of contract claims.   To the contrary, successor liability is an equitable doctrine that applies when a purchasing corporation is merely a continuation of the selling corporation or the asset sale was fraudulently entered to escape debts and liabilities."); 19 C.J.S. CORPORATIONS § 901 (2023) ("Successor liability does not create a new cause of action against the purchaser of a corporate predecessor so much as it transfers the liability of the predecessor to the purchaser"); L. Hock, comment, *Successor Liability in Asset Purchases of Bankrupt Health Care Providers*, 19 BANKR. DEV. J. 179, 182 (2002) ("Successor liability is an equitable doctrine that depends on state law.   It does not give rise to a new cause of action, nor does it create an in rem claim running against the purchased property.   Instead, successor liability provides for a transfer of liability from the original corporation to the acquiring corporation.").

for the debts of the predecessor when the transaction amounts to a consolidation or *de facto* merger, the transaction is fraudulent or done with the intent to escape liability, or the purchaser is a mere continuation of the seller.[21]

98.     A transaction amounts to a consolidation or *de facto* merger when it has the economic effect of a statutory merger but is in the form of an acquisition or transfer of assets. Non-exclusive elements of a *de facto* merger include a continuation of the enterprise of the seller corporation, continuity of shareholders, the liquidation or dissolution of the seller, and the purchaser's assumption of seller's obligations necessary for the uninterrupted continuation of normal business operations.[22]

---

[21]   *See Farouk Sys., Inc. v. AG Glob. Prod.*, LLC, No. CV H-15-0465, 2016 WL 1322315, at *7 (S.D. Tex. Apr. 5, 2016) (noting that the Restatement of Torts allows for successor liability if:  "(1) there is express assumption of liability; (2) the acquisition results from a fraudulent conveyance to avoid liability; (3) the acquisition constitutes a consolidation or merger with the predecessor; and (4) the acquisition results in the successor becoming a continuation of the predecessor"); *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 233 (S.D. Tex. 2011) (under Texas law "the only two circumstances in which a successor business that acquires the assets of another business also acquires its liabilities or debts are (1) the successor expressly agrees to assume liability or (2) the acquisition results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor."); *United States v. Americus Mortg. Corp.*, No. 4:12-CV-02676, 2013 WL 4829284, at *4 (S.D. Tex. Sept. 10, 2013) (accord); *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, No. CIV.A. H-08-2911, 2010 WL 1417900, at *6 (S.D. Tex. Apr. 7, 2010), *aff'd sub nom. Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.*, 635 F.3d 734 (5th Cir. 2011) (accord); *see also Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985) (applying Mississippi law) ("There are, however, four generally recognized exceptions to this rule:  (1) when the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) when the transaction may be considered a de facto merger; (3) when the successor may be considered a 'mere continuation' of the predecessor; or (4) when the transaction was fraudulent."); *Stearns Airport Equip. Co. v. FMC Corp.*, 977 F. Supp. 1263, 1269 (N.D. Tex. 1996) ("A successor may be held liable (1) where the successor expressly or impliedly agrees to assume the liability of the predecessor, (2) when the transaction may be considered a de facto merger, (3) when the successor is a mere continuation of the predecessor, and (4) when the transaction is fraudulent.").

[22]   *See Suarez v. Sherman Gin Co.*, 697 S.W.2d 17, 20 (Tex. Ct. App. 1985) (factors that are indicative of a de facto merger include:  "(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations. (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation. (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.").

99.     Here, NewCo (or CHS TX, Inc.) is a mere continuation of Corizon.  Its business operations are identical.  The divisive merger was fraudulent and was done with the intent to escape liability.  There was a continuity of shareholders, normal business operations continued without interruption, and the Debtor commenced a bankruptcy proceeding shortly after its creation.  The doctrine of successor liability imposes on NewCo all the Debtor's liabilities.  All claimants of the Debtor have a path to recover in full on account of their claims in the tort system.

100.     These issues have already been litigated, with at least one District Court holding that NewCo is liable as Corizon's successor.  *See Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 U.S. Dist. LEXIS 198725, *31 (E.D. Mich. Nov. 1, 2022) (adding CHS TX, Inc. [NewCo] as a defendant in a prepetition action and finding "[c]onsidering the totality of the circumstances here, I find that CHS TX is a mere continuation of pre-division Corizon . . . . Evidently, CHS TX picked up right where Corizon left off.  Indeed, CHS TX holds itself out to clients as Corizon's successor.").

101.     **Alter Ego / Veil Piercing**.  The Debtor's beneficial owners are also liable as the Debtor's alter ego.  Alter ego and veil piercing are also not causes of action.[23]  They are also

---

[23] *See*, *e.g.*, *Peacock v. Thomas*, 516 U.S. 349, 866 (1996) ("Piercing the corporate veil is not itself an independent ERISA cause of action, 'but rather is a means of imposing liability on an underlying cause of action.'") (quoting 1 C. Keating & G. O'Gradney, Fletcher Cyclopedia of Law of Private Corporations § 41, p. 603 (perm. ed.1990)); *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 n.10 (D. Del. 2010) ("[p]iercing the corporate veil is not itself an independent [ ] cause of action, but rather is a means of imposing liability on an underlying cause of action."); *Villnave Constr. Servs., Inc. v. Crossgate Mall Gen. Co. Newco, LLC*, 201 A.D.3d 1183, 1187-88 (N.Y. Sup. Ct. 2022) ("Properly understood, an attempt to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners"); *A.L. Dougherty Real Estate Mgmt. Co., LLC v. Su Chin Tsai*, 98 N.E.3d 504, 515 (Ill. App. Ct. 2017) ("Piercing the corporate veil is not a separate cause of action but instead is a means for imposing liability in an underlying cause of action"); *Gallagher v. Persha*, 891 N.W.2d 647, 654 (Mich. Ct. App. 2016) (piercing the corporate veil is a remedy and not a separate cause of action); *Phillips v. United Heritage Corp.,* 319 S.W.3d 156, 158 (Tex. App. 2010) (holding that alter ego liability is not a substantive cause of action but "[r]ather, they are a means of imposing on an individual a corporation's liability for an underlying cause of action."); *In re Texas Am. Exp., Inc.*, 190 S.W.3d 720, 725 (Tex. App. 2005) (accord).

equitable doctrines or a legal remedy.  Alter ego and veil piercing theories do not create new causes of action.  Rather, they impose liability on the company's owner when certain factors are present.

102.    These factors include:  the parent and subsidiary have common stock ownership, common directors or officers, the parent and subsidiary have common business departments, the parent and subsidiary file consolidated financial statements, the parent finances the subsidiary, the parent caused the incorporation of the subsidiary, the subsidiary operated with grossly inadequate capital, the parent pays salaries and other expenses of subsidiary, the subsidiary receives no business except that given by the parent, the parent uses the subsidiary's property as its own, the daily operations of the two corporations are not kept separate, and the subsidiary does not observe corporate formalities.[25]

103.    Here, there is common beneficial and actual ownership, common directors and officers, the parent finances the subsidiary, the Debtor was grossly undercapitalized at its inception, and the Debtor has no business function other than to exist in bankruptcy and try to obtain a release for its master.  The proposed plan, which makes releasing YesCare and its non-

---

[24]    *See generally Ledford v. Keen*, 9 F.4th 335, 339 (5th Cir. 2021) ("Texas law permits courts to disregard the corporate fiction when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."); *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008) ("We have held that the limitation on liability afforded by the corporate structure can be ignored only when the corporate form has been used as part of a basically unfair device to achieve an inequitable result.  Examples are when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation, achieve or perpetrate a monopoly, circumvent a statute, protect a crime, or justify wrong."); 1 FLETCHER CYC. CORP. § 41 (2022); 15 Tex. Jur. 3d CORPORATIONS § 162.

[25]    *See*, *e.g.*, *U.S. v. Jon-T Chemicals, Inc*., 768 F.2d 686, 691-92 (5th Cir. 1985); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 321 (Bankr. W.D. Tex. 2009) (noting that the Texas Supreme Court has held that "[a]lter ego applies when there is only a unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice.  It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation and whether the corporation has been used for personal purposes.  Alter ego's rationale is: if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.").  In the Fifth Circuit, fraud is not a necessary element of alter ego liability when the underlying cause of action is a tort, especially if the alter ego corporation was undercapitalized.  *See Jon-T Chemicals*, 768 F.2d at 692-93.

debtor affiliates and insiders the highest priority, shows that the Debtor functions solely as a façade for the Debtor's beneficial owners who have been pulling the strings in the background at all relevant times.[26]  The doctrine of veil piercing imposes on these parties all the Debtor's liabilities. All claimants of the Debtor have a path to recover on account of their claims in the tort system.

104.    **Fraudulent Transfer**.  The divisive merger can also be unwound as a fraudulent transfer.  State law allows for avoidance of actual fraudulent transfers made on or within 4 years before the petition date.  *See* Tex. Bus. & Comm. Code § 24.005.  To establish actual fraud, the movant must show that the transfer or obligation was made "with actual intent to hinder, delay, or defraud any creditor of the debtor."  *Id*. at § 24.005(a)(1).

105.    Actual intent is often inferred through circumstantial evidence and "badges of fraud."  Badges of fraud include whether the transfer or obligation was to an insider, the transfer was of substantially all the debtor's assets, the debtor was insolvent or became insolvent shortly after the transfer or was made, and the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  *Id*. at § 24.005(b).

106.    Here, the divisive merger occurred within the past 4 years, and was done with the actual intent to hinder, delay, and defraud creditors.  The Debtor is a Potemkin Village with YesCare and its beneficial owners in total control.  The Debtor was created to be insolvent and file for bankruptcy for the sole purpose of securing a cheap release for YesCare and its non-debtor affiliates and insiders.

---

[26]  *See, e.g.*, *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 303 (5th Cir. 2007) (affirming District Court's piercing of the corporate veil due to debtor's use of the corporation for a fraudulent transfer); *JNS Aviation, Inc. v. Nick Corp.*, 418 B.R. 898, 908 (N.D. Tex. 2009), *aff'd sub nom. In re JNS Aviation, LLC*, 395 F. App'x 127 (5th Cir. 2010) (affirming Bankruptcy Court piercing of the corporate veil between corporations where the same owners of one corporation isolated the corporate family's liabilities in "a worthless shell.").

107.    The divisive merger can also be challenged as a constructive fraud.  Constructive fraud requires a movant to show that the debtor received less than reasonably equivalent value in exchange for the transfer, and that the transfer caused the debtor to be engaged, or about to be engaged, in a business or transaction for which any property remaining with the debtor was an unreasonably small capital, or that the debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.  *Id.* at § 24.005(a)(2).

108.    Inadequate capital turns on the nature of the debtor's business and whether it is "reasonably foreseeable" that the debtor will be able to "generate sufficient profits to sustain operations."[27]  Importantly, inadequate capital includes financial difficulties short of equitable insolvency[28]—*i.e.*, whether the debtor can generate enough cash to pay its debts and still sustain operations.  *See In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989). The test is "reasonable foreseeability."  *Peltz v. Hatten*, 279 B.R. 710, 744 (D. Del. 2002).

109.    Among the factors that courts consider in determining foreseeability is the length of time the debtor survived (or avoided a bankruptcy filing) after the transfer.  *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 397 (Bankr. S.D. Tex. 2008) (debtor left with unreasonably small capital even though it did not file for bankruptcy for over two years after the transfer).

---

[27]    *See In re Lyondell Chem. Co.*, 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017) ("[T]he concept of 'unreasonable small capital' encompasses a test that incorporates an element of 'reasonable foreseeability.'") (quoting *Moody*, 971 F.2d at 1083); *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) (unreasonably small capital signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable).

[28]    *See In re North Am. Clearing, Inc.*, No. 6:08-ap-00145, 2014 WL 4956848, at *8 (Bankr. M.D. Fla. Sept. 29, 2014) ("Although not defined in the Bankruptcy Code, the most common view is that 'unreasonably small capital denotes a financial condition short of equitable insolvency.'"); *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) ("[T]he cases recognize that the unreasonably small capital test may be easier for a plaintiff to satisfy than insolvency because 'unreasonably small capital' means 'difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future.'") (quoting *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989)).

110.     Here, the divisive merger allocated the Debtor—an entity with no business operations—with little besides liabilities.  The Debtor was systematically stripped of its assets, which are now owned and operated by a highly profitable multi-million-dollar business.  The Debtor has no means to generate positive cash flow and is now facing administrative insolvency.  And the Debtor avoided bankruptcy for less than nine months following the divisive merger.  Further, the professionals who advised on the divisive merger may face liability for aiding and abetting the fraudulent transfer and for engaging in a conspiracy to commit fraud—providing another source of recovery for victims.[29]

111.     Like other Texas Two Step debtors, the Debtor and its conspirators here may argue that the operation of the divisive merger did not constitute a "transfer" under Texas state law.  *See* Tex. Bus. Org. Code § 10.008(a)(2)(C) (a divisive merger takes place without "any transfer or assignment having occurred").  But Texas law does not use the same "without any transfer" language for the transfer of liabilities as it does regarding the transfer of assets, and thus the transfer of the liabilities to the Debtor would remain a "transfer" under Texas law.  *Compare id. with* § 10.008(a)(3).  With the transfer of liability undone, the liability goes to NewCo.

112.     Further, the Texas Business Organizations Code states that it "**does not abridge any right or rights of any creditor under existing law**."  *Id.* at § 10.901 (emphasis added).  These rights include the right to challenge a transfer as fraudulent, as well as the right to hold successors and alter egos liable under Texas law.  The definition of "transfer" in the Texas Uniform

---

[29]     *See, e.g.*, *In re Rest. Dev. Grp., Inc.*, 397 B.R. 891, 894 (Bankr. N.D. Ill. 2008) (denying motion to dismiss a claim against former attorneys of a restaurant company who allegedly engaged in a scheme to defraud the company's creditors); *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (creditors may bring claims against one who assists another in executing a fraudulent transfer); *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 799 N.E.2d 756 (1st Dist. 2003) (refusing to dismiss claim against a law firm for aiding and abetting a client's fraudulent scheme).  Under the Debtor's plan, the professionals who orchestrated the divisive merger are conveniently included within the definition of "Released Parties."  *See* Plan at Art. I.A.100(bb).

Fraudulent Transfer Act "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Tex. Bus. & Comm. Code § 24.002(12).  This definition is broad enough to encompass a divisive merger.

113.    The Bankruptcy Court in *In re DBMP LLC* (Case No. 20-30080, Bankr. W.D.N.C.), addressed this issue.  In *DBMP*, the committee moved to avoid a divisive merger as a fraudulent transfer.  The debtor in *DBMP*, like the Debtor here, was a made-for-bankruptcy entity whose assets were stripped on the eve of the filing.

114.    The debtor moved to dismiss the fraudulent transfer claims argued that the allocation of assets and liabilities under the Texas divisional merger statute did not constitute a transfer within the meaning of section 548 of the Bankruptcy Code.  The *DBMP* Court rejected this argument.  *See Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*, Adv. No. 21-03023-JCW (Bankr. W.D.N.C. 2021), July 7, 2022 Hr'g Tr. [Dkt. No. 85], at 23:24-25:4 (attached as **<u>Exhibit C</u>**).  The result should be the same under the Texas Fraudulent Transfer Act.

115.    This is just the tip of the iceberg.  Claimants here can also bring actions against officers and directors for breaching their fiduciary duties.  The description of the foregoing legal remedies available to victims is by no means exhaustive.  And, critically, this litigation can be brought outside of bankruptcy.  And claimants can pursue claims against governmental entities and other parties who are co-liable with the Debtor, YesCare, and NewCo.

116.    Bankruptcy is not the best forum for this litigation to take place, particularly given the constraints imposed by the DIP financing and the lack of funding available to estate professionals to pursue causes of action that YesCare does not want them to pursue.  In fact, when

faced with litigation in state court by parties YesCare does not control or influence, YesCare would be free to settle claims and pay judgments.

117.    The legal theories upon which YesCare and other parties can be held accountable here are neither novel nor difficult to plead.  Pending litigation shows that plaintiffs are already aware that YesCare and NewCo can be held liable for all the claims at issue in this case.  The Court need only restore creditor remedies and eliminate injunctions and the stay so that parties can recover from YesCare and its non-debtor affiliates and insiders.

## JURISDICTION

118.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a), 554, 1103(c)(5), 1109(b), 1112(b) of the Bankruptcy Code.

## RELIEF REQUESTED

119.    By this Motion, the TCC and the co-movants seek an order terminating the preliminary injunction, granting the TCC standing to prosecute, settle, and abandon certain estate causes of action, authorizing the abandonment of certain estate causes of action that may constitute property of the estate, and dismissing this case pursuant to section 1112(b) of the Bankruptcy Code.

## ARGUMENT

### I.    The Court Should Terminate the Preliminary Injunction

120.    As a threshold matter, the Court should terminate the preliminary injunction.  No bankruptcy resolution is possible given YesCare's conduct.  There is no possible rehabilitation here.  This case was a fraud from its inception.  The Debtor's arguments regarding shared insurance have proven to be illusory.  Most of the claims do not have access to insurance.  And, where they do, they are subject to substantial self-insured retentions.

121.     To the TCC's knowledge, no insurer, other than LSA, has expressed any interest in settling.  No insurer has agreed that its policies cover the claims at issue.  Even if coverage does exist, the pursuit of that coverage is not inextricably linked to liquidation of the tort claims against YesCare or the Debtor.  Such coverage would require the commencement of a separate proceeding by the insured against the insurer.  To the extent that any insurance is property of the estate, claims against non-debtor insureds can proceed while leaving the issue of coverage for another day.

122.     Whatever injunctions are presently in place to protect YesCare and its non-debtor affiliates and insiders should be terminated.  This follows from the request that the Court dismiss this case under section 1112(b) of the Bankruptcy Code since dismissal would end the case and, therefore, terminate the automatic stay imposed under section 362(a).  However, lest there be any doubt, the TCC also requests that the Court terminate all injunctions as part of the dismissal so that they are no longer in effect and no longer present a bar to litigation against YesCare and NewCo.

## II.       The TCC Should be Granted Standing to Purse Estate Causes of Action

123.     Next, the TCC should be granted standing to pursue certain alleged estate causes of action against YesCare and its non-debtor affiliates.  As a threshold matter, the TCC acknowledges that there is Circuit split over what constitutes an estate cause of action.

124.     **What is an estate cause of action?**  Section 541(a)(1) defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  Causes of action belonging to the debtor prior to bankruptcy constitute estate property.  A debtor has authority to pursue and settle such causes of action.

125.     Whether a cause of action is available to the debtor and constitutes "property of the estate" is determined by state law.  *See*, *e.g.*, *Butner v. United States*, 440 U.S. 48, 49 (1979).  If state law allows a company to assert a claim against another party, the claim is property of the

estate, and a bankruptcy trustee can assert it.  If a claim belongs to the debtor's creditors under state law, section 541(a) **does** **not** confer standing to assert such claim on a trustee.

126.    A trustee has **no** **standing** generally to sue third parties on behalf of the estate's creditors.  *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 434 (1972). If a claim is specific to a creditor, it is a personal claim and is a legal or equitable interest only of the creditor that suffered the injury.  *Id.*  If the "cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."  *In the Matter of Educators Group Health Trust v. Wright*, 25 F.3d 1281 (5th Cir. 1994).

127.    Notwithstanding the Supreme Court's guidance on this issue, the Circuits are split on whether a bankruptcy trustee has standing to assert claims that belong to creditors under state law against third parties under the doctrines of successor liability and alter ego.[30]

128.    Some Circuits have held that when the underlying claim against a debtor involves a personalized injury (*e.g.*, a tort claim against the debtor), such claim does **not** become an estate cause of action—or property of the debtor's estate—to the extent that such claim is asserted against a successor of the debtor or an alleged alter ego of the debtor under state law.  These Courts recognize that when an injury gives rise to a claim ***against*** a debtor which can be brought against

---

[30]    *Compare Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1250-51 (9th Cir. 2010) (alter ego claim not property of the estate); *Board of Trustees of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164 (3d Cir. 2002) (same); *In re RCS Eng'g Products Co.*, 102 F.3d 223, 226-27 (6th Cir. 1996) (same); *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) (same); *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225-26 (8th Cir. 1987) (same); *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 232 (Bankr. S.D. Ohio 2008) (same); *with In re Tronox Inc.*, 855 F.3d 84, 99-104 (2d Cir. 2017) (holding alter ego claims are property of the estate); *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014) (holding successor liability claims are property of the estate); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135-36 (4th Cir. 1988) (holding alter ego claims are property of the estate); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 704-05 (2d Cir. 1989) (same); *Koch Refining v. Farms Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987) (same); *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir. 1987) (same).

a successor of the debtor or an alleged alter ego of the debtor under state law, that claim does not transform into a claim that can be brought ***by*** a debtor because the debtor has filed for bankruptcy.[31]

129.    Other Courts, however, have reached a contrary result.  The theory behind this view, as recently articulated by the Third Circuit in *Emoral*, is that while the claims of all creditors involve an "individualized" injury, the case that must be put on and proven to impose liability on a successor or an affiliate is common to all creditors.  740 F.3d 875.

130.    The plaintiffs in *Emoral* were individuals who suffered injuries arising from exposure to chemicals manufactured by a company called Emoral, Inc. ("Emoral").  *Id.* at 877.  Emoral sold its assets to a company called Aaroma Holdings LLC ("Aaroma").  *Id.*  After the sale, the plaintiffs asserted their personal injury claims against Aaroma under a state law successor liability theory.  Thereafter, Emoral filed for bankruptcy and a trustee was appointed.  *Id.*

131.    The trustee alleged that the asset sale to Aaroma was a fraudulent transfer—likely on the grounds that the purchaser paid less than reasonably equivalent value for Emoral's assets.  *Id.*  Rather than litigating the issue, Aaroma settled for $500,000.  The settlement agreement was worded more broadly than just releasing the fraudulent transfer claim and provided that the trustee was releasing Aaroma from any causes of action that are property of the debtor's estate.  *Id.*

---

[31]    Because the tort claim requires proof of a particularized injury, it follows that every tort claim asserted against a successor under the doctrine of successor liability or a defendant under the doctrines of alter ego and veil piercing also requires proof of a particularized injury.  A successor cannot be held responsible for a tort claim under the doctrine of successor liability absent proof of the elements of the underlying tort claim.  To illustrate this point: consider a parent and a wholly owned subsidiary where the subsidiary has $500 million in bond debt and $5 million in contingent and disputed tort liability.  If the tort claimant were to sue the parent, the tort claimant would first have to prove the merits of the tort claim.  This would require proof that the tort claimant suffered an injury.  If the tort claimant prevailed on the merits of the underlying tort claim, the next question would be whether the parent could be held responsible for the claim.  If the tort claimant prevailed under the doctrines of successor liability, alter ego or veil piercing, the parent would be liable for the tort claim involving the injury to the claimant.  But the parent would not necessarily become liable for $500 million in bond debt—particularly if the bond claimants were not part of the litigation between the tort claimant and the parent.

132.     Post-settlement, Aaroma argued that the personal injury claims asserted against it under a successor liability theory were estate claims and were barred by the order approving the settlement.  *Id.* at 877-78.  The Court that approved the settlement disagreed and held that the personal injury claims were "not property of the estate" since they alleged injuries that were personal to the plaintiffs and were not generalized injuries "suffered by all shareholders or creditors of Emoral."  *Id*.  However, the Third Circuit held that the personal injury claims asserted against Aaroma under a state law successor liability theory were estate causes of action and, therefore, were barred by the Bankruptcy Court's order approving the settlement.

133.     The Third Circuit reasoned that the "remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims."  *Id.* at 880 (quotation omitted).  According to the Circuit, if successful, a finding of successor liability "would have the effect of increasing the assets available for distribution to ***all creditors***."  *Id*. (emphasis added).

134.     Thus, the Third Circuit held that a "cause of action" alleging successor liability is "a generalized claim constituting property of the estate."  *Id.* at 881.  Under this reasoning, that when a successor liability claim is successfully asserted by a trustee in bankruptcy on behalf of creditors, the result is that all the successor's assets are "available for distribution" to all the debtor's creditors—*i.e.*, the "pool of assets" available to all creditors increases.  *Id.* at 880-81.

135.     Applied here, this means that NewCo's assets may be available for distribution to all the Debtor's creditors.  But the Third Circuit's ruling in *Emoral* was not favorable to the tort victims ***in that case***.  Under the Third Circuit's ruling, the personal injury claims against Aaroma alleging successor liability belonged to the bankruptcy estate and, therefore, were included within the definition of released claims under the settlement agreement between Aaroma and the trustee.

*Id.* at 882.  The personal injury claims ended up being barred and, in effect, released without so much as a vote on a chapter 11 plan or the victims' consent.  The settlement approved in *Emoral* ended up functioning like a nonconsensual third-party release.

136.    Further, it is doubtful that the trustee in *Emoral* believed at the time he settled the fraudulent transfer claims against Aaroma for a mere $500,000 that he was also settling successor liability claims which, if successfully asserted, would have made all Aaroma's assets available to pay Emoral's creditors.  If the estate causes of action included successor liability claims, the settlement amount of $500,000 may have been well outside the range of reasonableness.

137.    The Debtor—as controlled by YesCare—is likely to ignore the Fifth Circuit's ruling in *In the Matter of Educators Group Health Trust v. Wright*, 25 F.3d 1281 (5th Cir. 1994), and rely instead on the Fifth Circuit's decision in *S.I. Acquisition*, wherein the Fifth Circuit held that an action based on alter ego allegations was an estate claim.  817 F.2d at 1153.  Such reliance is misplaced for several reasons.

138.    **First**, *S.I. Acquisition* did not involve a debtor that was manufactured by the litigation target.  The Fifth Circuit's holding in *S.I. Acquisition* was consistent with supporting those who attempt to "remedy" an abuse of the corporate form.  817 F.2d at 1153.  The Debtor's bankruptcy turns *S.I. Acquisition* on its head by using a fictious legal entity (*i.e.*, the Debtor) created by the tortfeasor (*i.e.*, Corizon) to carry out an abuse of the corporate form.

139.    *S.I. Acquisition* does not stand for the proposition that a tortfeasor against whom personal injury and wrongful death claims are asserted can seize control over those claims by undertaking a divisive merger (*i.e.*, the transaction that triggers successorship) followed by a bankruptcy filing of the manufactured debtor.  If this were the law, then any defendant could

control tort claims asserted against it by committing fraud.  This would not "remedy" an abuse of the corporate form.  It would be an abuse of the corporate form.

140.    **Second**, *S.I. Acquisition* was based on the Fifth Circuit's reading of Texas law.  As explained above, for tort claims, the place of injury and the place of conduct causing the injury typically determines which state law applies.  *See supra* fn. 19.  Corizon operated 50 facilities in over 27 different states.  The law in most states would not support the right of a debtor to assert a tort claim based on harm caused by the debtor based on the doctrine of successor liability or any other legal doctrine.  *See supra* fn. 20 and fn. 23.

141.    Here, the personal injury and wrongful death claims in this case give rise to a claim *against* the Debtor which can be brought against a successor or an alleged alter ego under state law.  There is no explicit or implicit alleged harm to the Debtor.  The Debtor was not forced to suffer in agony and live in its own fecal matter for four months.  Claimants also have the right under state law to avoid certain fraudulent transfers made with the intent of hindering, delaying, or defrauding their ability to recover on account of their claims.  These are the rights and remedies that exist because of Corizon's fraud and misconduct.

142.    However, to eliminate this issue, to the extent that any of these rights or theories of recovery result in a determination that the causes of action belong to the Debtor's estate (and are not available to the claimants themselves during the pendency of the Debtor's bankruptcy proceedings) under *S.I. Acquisition*, *Emoral*, or similar case law, the TCC now seeks exclusive standing to pursue, settle, and abandon them for the benefit of the creditors whose rights may have been taken from them (without due process or compensation) due to the Debtor's bankruptcy filing.

143.   **Who has standing to assert estate causes of action?**  It is well-settled within this Circuit that Courts may allow, under appropriate circumstances, an official committee to pursue causes of action on behalf of the estate.[32]  Although the Bankruptcy Code does not expressly authorize an official committee the standing to initiate an adversary proceeding and/or to pursue other causes of action typically brought by the trustee or the debtor-in-possession, the Bankruptcy Code does establish official committees for the express purpose of protecting the rights of their constituents and similarly situated creditors.[33]

144.   To achieve this purpose, section 1103(c), which enumerates the statutory functions of an official committee, authorizes committees to "perform such other services as are in the interest of those represented."  11 U.S.C. § 1103(c)(5).  To that end, section 1109(b) provides that:

> A party in interest, including the debtor, the trustee, *a creditors' committee*, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added).

145.   Indeed, this general right to be heard would ring hollow unless official committees are also given the right to act on behalf of the estate if a debtor-in-possession or a trustee that is explicitly granted the right to act for the estate unjustifiably fails to act.[34]

---

[32]   *See Contractor Creditor's Comm. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987) (discussing how "[a] number of bankruptcy courts have held that in some circumstances, a creditors' committee has standing under 11 U.S.C. §1103(c)(5) and/or §1109(b) to file suit on behalf of debtors-in-possession…or the trustee."); *In re Chesapeake*, Case No. 20-33233, (Bankr. S.D. Tex.) Jan. 13, 2021 Hr'g Tr. at 325:5-11.

[33]   *See* H.R. Rep. No. 95-595, at 91-92 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6053-54.

[34]   *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568-69 (3d Cir. 2003) (holding that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code implicitly authorize a court to grant a creditors' committee derivative standing to prosecute an avoidance action when the trustee or debtor-in-possession cannot or will not do so, or when the debtor-in-possession is unlikely to act); *In re iPCS, Inc.,* 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead."); *In re Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that the right to be heard would

146.     Courts in the Fifth Circuit have granted creditors' committees standing in connection with claims similar to the causes of action at issue here by operation of their equitable powers.[35]  Moreover, the practice of conferring standing upon official committees to pursue actions on behalf of a bankruptcy estate is widely followed and accepted in other jurisdictions as well.[36]

147.     In the Fifth Circuit, where an official committee seeks to pursue an action without the consent of the debtor, the committee must satisfy a three-part test to be granted derivative standing.  Under this test, the committee may obtain derivative standing where:

> (i)      a colorable claim exists;
>
> (ii)     the debtor-in-possession refused unjustifiably to pursue the claim; and
>
> (iii)    the committee first receives leave to sue from the bankruptcy court.

*La. World Exposition*, 832 F.2d at 1397.

148.     The TCC satisfies each of the elements of this test and should be granted standing to further pursue any estate causes of action that in substance constitute remedies that creditors could bring outside of bankruptcy in aid of their effects to hold YesCare and its non-debtor affiliates and insiders responsible for their conduct and fraud.

149.     **Colorable Claims**.  Asserting a "colorable claim" is a relatively low threshold to satisfy, requiring the court to find that the claim is "not without merit."[37]  In granting standing to

---

be empty unless those who have such a right are also given the right to act when the debtors refuse to do so).

[35]     *See* cases cited *supra* at 32.

[36]     *See, e.g., Unsecured Creditors Comm. v. Noyes (In re STN Enters.),* 779 F.2d 901, 904 (2d Cir. 1985) (concurring with those bankruptcy courts that have held that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code imply a qualified right for creditors' committees to initiate litigation with the approval of the bankruptcy court).

[37]     *In re Distributed Energy Sys., Corp.*, Case No. 08-11101 (KG) (Bankr. D. Del.) [Dkt. No. 315] ("[T]he colorable claim issue, of course, is plausibility. . . I don't even have to find that it has merit; I just have to find that it's not without merit."); *see also Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) ("Caselaw construing requirements for 'colorable' claims has made it clear that the required showing is a relatively easy one to make."); *Official Comm. of Unsecured Creditors v. Hudson United Bank (In re Am.'s Hobby Ctr., Inc.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (observing that only if the claim is "facially defective" should standing be denied).

the committee in *In re Chesapeake Energy Corp.*, Judge Jones remarked that the standard for a 'colorable' claim was akin to a claim that was not sanctionable under the Rules of Professional Conduct: "Colorability is a really low standard.  It doesn't take a lot to get over the colorability standard.  And I do find that the claims asserted by the Committee meet that….[T]here are plenty of lawyers who would put their name pursuant to Rule 11 on a complaint that sets forth those claims, and if that's not exactly the colorability argument or standard, it's awfully close."[38]

150.    Here, as explained above, the tort claimants have personal injury or wrongful death claims that can be asserted against YesCare and its non-debtor affiliates under the doctrines of successor liability and veil piercing.  And they can seek to avoid the divisive merger as a fraudulent transfer under Texas law (to the extent necessary to ensure their recovery on account of their claims).  These claims satisfy the colorability standard.  Indeed, it is difficult to imagine how YesCare and its non-debtor affiliates could possibly avoid summary judgment.

151.    **Debtor in Possession**.  Here, the Debtor is intertwined with, and beholden to, the targets of the causes of action.  In fact, this is the key feature of the YesCare Two-Step—use a divisive merger to create an entity that (a) is controlled by YesCare and (b) can argue that it can settle the personal injury and wrongful death claims without the victims' consent.

152.    The Debtor's board, management, and professionals are all entwined with YesCare and NewCo.  The Debtor is a legal fiction created to perpetrate an obvious fraud.  The purpose of this bankruptcy—as devised by the Debtor's owners—is **not** to maximize value for the benefit of creditors, but to transfer value **from** creditors to equity holders through a bad faith settlement.

153.    This is not speculation.  This is what the Debtor's plan does.  The Debtor has already proven through its actions that it exists solely to secure a release for the benefit of YesCare

---

[38] *See In re Chesapeake*, Case No. 20-33233 (Bankr. S.D. Tex.) Jan. 13, 2021 Hr'g Tr. at 325:5-11 (attached hereto as **Exhibit D**).

and its affiliates to the detriment of victims and their families.  The UCC is fully supportive of this outcome so long as its favored creditor group obtains a recovery it considers substantial and all administrative expenses are paid.

154.    **The TCC Should be Granted Standing**.  The TCC should be granted exclusive standing to prosecute, settle, and abandon the estate causes of action.  To entrust the Debtor—an entity created, owned, and controlled by YesCare—with settling the estate causes of action would invite mischief.  Rather than maximizing the value of the estate causes of action, the UCC and the Debtor (acting at the direction of YesCare) will find the lowest rung in the range of reasonableness and then attempt to settle at exactly that, to the detriment of the tort victims.  This is not speculation.  There can be no illusion at this point that the Debtor is controlled by parties willing to support an unreasonable settlement.  Given this, the TCC should be granted standing.

**III.    The Court Should Authorize the TCC to Abandon the Estate Causes of Action**

155.    And, upon the granting of such standing, the TCC moves to abandon back to the claimants the estate causes of action that in substance constitute remedies that claimants could use outside of bankruptcy in aid of their effects to hold YesCare and its non-debtor affiliates responsible for their conduct and fraud.  *See In re Wilton Armetale, Inc.*, 968 F.3d 273, 284 (3d Cir. 2020) (trustee can relinquish estate causes of action); *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008) (when a trustee abandons an estate cause of action, the interest in the claim reverts as if the bankruptcy was never filed).  The proposed Order included herewith sets out the necessary steps and timing of such steps to accomplish this result.

156.    To be clear, the proposed abandonment does not involve any hard assets, real estate, business assets, or property that belonged to the Debtor prior to the commencement of its bankruptcy case.  The Debtor is a legal fiction.  The abandonment here is intended to restore the

claimants' legal rights *to the extent that* they are now impaired by this case so that injured parties can pursue their claims against YesCare and its non-debtor affiliates and insiders.

157.    Upon dismissal, to the extent any causes of action involving claims (tort claims and commercial claims) that can be asserted against YesCare and its non-debtor affiliates and insiders based on any theory of liability (including successor liability and veil piercing) are property of the Debtor's estate, such causes of action can be abandoned and relinquished to the applicable claimants to pursue against YesCare and its non-debtor affiliates and insiders in the tort system.

158.    The Debtor's temporary ownership of the claims against it and YesCare (if any) would end.  Successor liability and alter ego are theories of liability that can be asserted by persons or entities that have suffered damages caused by a tortfeasor.  Those theories—to the extent that they are currently property of the Debtor's estate—can be restored to their rightful owners.[39]  The same is true for the ability to avoid certain transactions under state law.

159.    **These are rights that belonged to the claimants under state law prior to the bankruptcy.  And this should be done explicitly to avoid any argument by YesCare or NewCo that they acquired any new defenses because of this bankruptcy case**.

160.    Again, one aspect of the Texas Two Step that is ripe for abuse is the control that "GoodCo" can attempt to exert over the tort claims against it.  By arguing that the tort claims *against* TortCo and GoodCo (under a successorship theory) are TortCo's property under section 541(a), GoodCo can use the Texas Two Step to place itself in the position of *both* the plaintiff *and* the defendant, and then negotiate a settlement with itself in order to extinguish those claims.

---

[39]  Again, the TCC does not believe that the personal injury and wrongful death claims asserted against YesCare, NewCo, and their non-debtor affiliates and insiders under the doctrines of successor liability or veil piercing are property of the Debtor's estate.  A contrary result would mean that section 541(a) violates the Fifth and Seventh Amendments of the Constitution.  The TCC raises and reserves the right to argue that section 541(a) violates the Fifth and Seventh Amendments to the extent that it means that such claims are the Debtor's property.

161.     As applied to Mr. Kelly's lawsuit in the Eastern District of Michigan, NewCo's (or CHS TX, Inc.'s) position is that Mr. Kelly's lawsuit *against* NewCo (under a successorship theory) is now the Debtor's property under section 541(a) such that the Debtor (as controlled by YesCare and NewCo) can now settle Mr. Kelly's claims without his consent.  *See Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 U.S. Dist LEXIS 198725, *31 (E.D. Mich. Nov. 1, 2022).

162.     The proposed structured dismissal avoids this clear and obvious abuse by eliminating NewCo's ability to use the bankruptcy case to effectuate an insider settlement that attempts to deprive victims of their legal rights and remedies.  Once the victims' rights are restored, there is nothing further for the Court to do other than dismiss this case.

163.     Unlike most standing motions, the TCC here is **not** asking this Court to oversee the litigation against YesCare, NewCo, and the insiders who orchestrated this scheme.  Nor is the TCC proposing that this Court liquidate or estimate personal injury or wrongful death claims.  The TCC is not attempting to convert this Court into an alternative forum for the resolution of tort liability—the tort system in the United States already exists for that purpose.  Rather, the TCC is seeking to free this Court of this case entirely so that it can focus on legitimate bankruptcy cases.

164.     The only parties that could be expected to object to this are YesCare, NewCo, and parties who have negotiated preferential settlements for themselves and believe (mistakenly) that they will get paid quickly (rather than having to wait years while the plan is appealed before they get paid anything).  But this is not a reason to deny the victims their legal rights.  The victims here believe that YesCare, NewCo, and the parties who orchestrated this fraud are liable for hundreds of millions of dollars in damages and that they will recover substantially more in the tort system than YesCare or NewCo would ever contribute to this case.

165.    YesCare and NewCo may assert that the Debtor's liability is less than asserted and that in their view the successor liability, alter ego, and fraudulent transfer claims are not meritorious.  But they are not the parties who were harmed.  They are the parties that caused the harm.  This bankruptcy should not be run for their benefit.  YesCare is entitled to test its defenses in the tort system, but its views are not a basis for this Court to deny victims of their legal rights.

### IV.    <u>The Court Should Dismiss the Case for Cause</u>

166.    Finally, dismissal is the best outcome for creditors.  Tort and commercial claims can seek recovery from YesCare and NewCo.  Given the proposed abandonment, YesCare and NewCo will not be able to point to any aspect of this case to gain a litigation advantage over the claimants.  The parties with meritorious claims will finally be permitted to seek justice.

167.    Section 1112(b)(1) of the Bankruptcy Code provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

168.    Section 1112(b)(3) of the Bankruptcy Code defines the term "cause" to include, *inter alia*, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  Here, the Debtor is administratively insolvent, which insolvency deepens by the day as the Debtor's and the UCC's professionals continue to accrue fees and costs in pursuit of YesCare's objectives, and the Debtor has no reasonable likelihood of rehabilitation given that its alleged "rehabilitation" amounts to a fraud.  Consummating a fraud cannot constitute a legitimate rehabilitation under the Bankruptcy Code.

169.    Dismissal is further warranted here since the Debtor's bankruptcy was filed as a litigation tactic.  *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In Matter of Little Creek*

*Dev. Co.)*, 779 F.2d 1068 (5th Cir.1986) (the seminal bad faith case, which opined, *inter alia*, that it is bad faith to file bankruptcy as a follow on to state court litigation); *Investors Group, LLC v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014) (affirming dismissal of chapter 11 case where case was filed "as a litigation tactic" and finding that filing for bankruptcy to gain a litigation advantage "on its own" is sufficient to warrant dismissal).[40]

170.     Here, the Debtor was created for a litigation purpose—*i.e.*, to give YesCare and NewCo the ability to assert control over the fraudulent transfer claims and tort claims asserted against them under doctrines of successor liability and alter ego theories.   The Debtor's sole existence is to serve as a liability management tool for the benefit of non-debtors so that their profits can be shielded from tort victims (including through non-debtor injunctions already implemented in this case).   This case exists to harm tort victims, create undue delay, and pressure victims to capitulate and accept an unfair settlement.   As such, this case presents a classic bankruptcy-as-a-litigation tactic maneuver that should be rejected.

171.     And, finally, dismissal is warranted here as being in the best interest of creditors. The Court should walk a mile in the claimants' shoes.   A family member who was incarcerated dies due to inadequate healthcare—a death that was entirely preventable had proper care been provided.   The estate brings a wrongful death claim like the other wrongful death claims that have resulted in judgments against Corizon in the tort system.   To avoid this litigation Corizon (aided

---

[40]     *See In re Capital Equity Land Trust No. 2140215*, 646 B.R. 463, 478 (Bankr. N.D. Ill. 2022) (finding cause for dismissal based upon "the totality of the circumstances" where bankruptcy case was filed as a "litigation tactic"); *In re Royal Properties, LLC*, 604 B.R. 742, 750 (Bankr. N.D. Ill. 2019) (weighting the "totality of the circumstances" in concluding that bankruptcy case filed as a "litigation tactic" was not filed in good faith); *In re Silberkraus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000) ("[I]t constitutes bad faith to file bankruptcy to impede, delay, forum shop, or obtain a tactical advantage regarding litigation ongoing in nonbankruptcy forum—whether that nonbankruptcy forum is a state court or a federal district court."); *In re HBA East, Inc.*, 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

by professionals, attorneys, and financial advisors) orchestrates a Texas Two Step. An injunction is entered, and all litigation is stayed.

172. The victims are then told following months of court proceedings that the proposed plan negotiated by the Debtor and the UCC will pay them pennies on the dollar, provide an illusory "opt out," deny them the right to a jury trial, and the right to seek compensation before federal and state courts from the wealthy parties that caused the death of their family members. This case gives bankruptcy a bad name.

173. Dismissal here is necessary to preserve the integrity of the courts. Victims should have the right to pursue their claims against YesCare, NewCo, and the other non-debtor parties who orchestrated the divisive merger. The TCC was charged with remembering those who were in prison, those who are in prison, and ensuring that their voices are heard in this case. Today those voices have cried out for justice. This case should not become another headline about bankruptcy abuse. This Motion is about doing the right thing. This case should be dismissed.

## NOTICE

174. Notice of this Motion has been served on: (a) the U.S. Trustee; (b) counsel to the Debtor; and (c) all persons who have formally appeared in this Chapter 11 Case and requested service pursuant to Bankruptcy Rule 2002. Considering the nature of the relief requested herein, the Committee respectfully submits that no other or further notice need be provided.

## NO PRIOR REQUEST

175. No prior request for the relief sought in this Motion has been made to this or any other court in connection with this case.

## CONCLUSION

176.     **WHEREFORE**, based on the foregoing, the TCC and the co-movants respectfully request that the Court grant the Motion and grant such other and further relief as the Court deems necessary and appropriate.

Dated: January 16, 2024
        New York, New York

/s/ Eric R. Goodman
David J. Molton, Esquire
Eric R. Goodman, Esquire
Gerard T. Cicero, Esquire
Susan Sieger-Grimm, Esquire
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
(212) 209-4800; (212) 209-4801 (f)
dmolton@brownrudnick.com
egoodman@brownrudnick.com
gcicero@brownrudnick.com
ssieger-grimm@brownrudnick.com
*Co-Lead Counsel to the Tort Claimants'*
*Committee*

Michael W. Zimmerman, Esquire
BERRY RIDDELL LLC
6750 E. Camelback Rd. Suite #100
Scottsdale, AR 85251
(480) 385-2727
mz@berryriddell.com
*Co-Lead Counsel to the Tort Claimants'*
*Committee*

James Slater
SLATER LEGAL PLLC
113 S. Monroe Street
Tallahassee, FL  32301
*Counsel for Elizabeth Frederick*

Jason Wallace
HUFFMAN WALLACE & MONAGLE, LLC
122 Wellesley Dr. SE
Albuquerque, NM  87106
*Counsel for Paris Morgan*

Adam Nach
LANE & NACH, P.C.
2001 East Campbell Avenue, Suite 103
Phoenix, AZ  85016
*Counsel for Aanda Slocum, LaTanda Smith, and Henry Snook*