```
                  UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                        .
 IN RE:                                 .  Case No. 23-90086-cml
                                        .  Chapter 11
 TEHUM CARE SERVICES, INC.,             .
                                        .  515 Rusk Street
                   Debtor.              .  Houston, Texas 77002
                                        .
                                        .  Tuesday, September 5, 2023
                                        .  8:47 a.m.
 . . . . . . . . . . . . . . . . . . . .
```

              TRANSCRIPT OF VARIOUS CREDITORS' MOTION TO APPOINT A
                        CHAPTER 11 TRUSTEE [731]
                BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Gray Reed & McGraw LLP |
| | By:  JASON BROOKNER, ESQ. |
| | AMBER CARSON, ESQ. |
| | AARON KAUFMAN, ESQ. |
| | EMILY F. SHANKS, ESQ. |
| | 1601 Elm Street, Suite 4600 |
| | Dallas, TX 75201 |
| | (469) 320-6050 |
| For Andrew Lyles, | Cross Law PLLC |
| Kohchise Jackson, | By:  IAN T. CROSS, ESQ. |
| William Kelly, and | 402 West Liberty Street |
| Derico Thompson: | Ann Arbor, MI 48103 |
| | (734) 994-9590 |

 TELEPHONIC APPEARANCES CONTINUED.


| | |
|---|---|
| Audio Operator: | Courtroom ECRO Personnel |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46048 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

     Proceedings recorded by electronic sound recording,
 transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):


For the Official         Stinson LLP
Committee of Unsecured   By:  NICHOLAS ZLUTICKY, ESQ.
Creditors:                    ZACHARY H. HEMENWAY, ESQ.
                         1201 Walnut, Suite 2700
                         Kansas City, MO 64106
                         (816) 842-8600

 For the U.S. Trustee:   Office of the United States Trustee
                         By:  ANDREW JIMENEZ, ESQ.
                              ROSS TRAVIS, ESQ.
                         515 Rusk Street, Suite 3516
                         Houston, TX 77002
                         (713) 718-4668

 For M2 LoanCo:          Norton Rose Fulbrigh US LLP
                         By:  KRISTIAN GLUCK, ESQ.
                         2200 Ross Avenue, Suite 3600
                         Dallas, TX 75201-2784
                         (214) 855-8210


 For Perigrove 1018, M2  Hayward PLLC
 HoldCo, and YesCare:    By:  MELISSA HAYWARD, ESQ.
                         10501 North Central Expressway
                         Suite 106
                         Dallas, TX 75231
                         (972) 755-7100

 For Arizona Department  Osborne Maledon, PA
 of Corrections:         By:  WARREN STAPLETON, ESQ.
                         2929 North Central Avenue
                         Suite 2100
                         Phoenix, AZ 85012
                         (602) 640-9354

 For Tracey Grissom:     Frank Ozment Attorney at Law LLC
                         By:  VALREY EARLY, ESQ.
                         217 Country Club Park, Box 501
                         Birmingham, AL 35213
                         (205) 586-5127


 For Phillip Buchanan:   SLU Law Legal Clinics
                         By:  MATT VIGIL, ESQ.
                         100 North Tucker Blvd. #704
                         St. Louis, MO 63101
                         (314) 977-7038
```

```
TELEPHONIC APPEARANCES (Continued):

For the Al-Amins:          The Burgess Law Group
                           By:  JANEL GLYNN, ESQ.
                           3131 East Camelback Road, Suite 224
                           Phoenix, AZ 85016
                           (602) 806-2107

 For Adree Edmo:           Rifkin Law Office
                           By:  LORI RIFKIN, ESQ.
                           3530 High Street, #18917
                           Oakland, CA 94619
                           (510) 414-4132


                           M.E. Heard, Attorney, PLLC
                           By:  MARY ELIZABETH HEARD, ESQ.
                           One International Center
                           100 NE Loop 410, Suite 605
                           San Antonio, TX 78216
                           (210) 572-4925

 Also Present:             RUSSELL PERRY
                           MICHAEL RUSSANO
                           Ankura Consulting Group
```

I N D E X
9/5/2023

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE MOVANTS: | | | | |
| Russell Perry | 19 | 123 | -- | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Movants' Exhibits 5 through 7 | 9 |
| Movants' Exhibit 19 | 93 |
| Movants' Exhibit 21 | 105 |
| Movants' Exhibit 28 | 9 |
| Movants' Exhibit 32 | 54 |
| Movants' Exhibit 33 | 9 |

| | PAGE |
|---|---|
| CLOSING ARGUMENT BY MR. CROSS | 167 |
| CLOSING ARGUMENT BY MR. BROOKNER | 175 |
| CLOSING ARGUMENT BY MR. HEMENWAY | 181 |
| COURTS' DECISION | 182 |

(Proceedings commence at 1:00 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  Okay.  Good afternoon, everyone.  This is Judge Lopez.  Today is September the 5th.  I hope everyone had a good Labor Day, those who could.  I'm going to call the one o'clock case, Tehum, here on a motion to appoint a Chapter 11 Trustee.

I'm going to mute the line.  There are about 35 folks on the line.  I'm just going to --

ELECTRONIC VOICE:  Conference muted.

THE COURT:  -- take appearances in the courtroom, and then I will turn to folks on the line who wish to make an appearance.  But this is an evidentiary hearing, so we'll see where this goes.  So let me go ahead and take appearances in the courtroom.

MR. BROOKNER:  Good afternoon.  Is it on?  Sorry.  Good afternoon, Your Honor.  Jason Brookner from Gray Reed for the debtor, along with Lydia Webb.  In the courtroom we also have Russell Perry from Ankura, who's our Chief Restructuring Officer; Michael Russano, who is legal department at Ankura; and last but not least, we have Emily Shanks, who is our newest associate, whose literal second day with us is today.  She just finished clerking for Judge Everett in the Northern District.

THE COURT:  Okay.  Thank you.

Good afternoon, sir.

MR. CROSS:  Good afternoon, Your Honor.  Ian Cross on behalf of the movants, Kohchise Jackson, William Kelly, and Derico Thompson.

THE COURT:  Okay.  Good afternoon.

MR. TRAVIS:  Good afternoon, Your Honor.  Ross Travis for the United States Trustee, and I'm joined by Andrew Jimenez on the phone.

THE COURT:  Okay.  Good afternoon to both of you.  Good to see you, Mr. Jimenez.

Alrighty.  Anyone else who will be participating in this hearing, why don't you hit "five star."

202 number?

MR. JIMENEZ:  Good afternoon, Your Honor.  This is Andrew Jimenez for the United States Trustee.

THE COURT:  Okay.  And again, only if you're just making an appearance to make an appearance, today's not that day.  We're here for an evidentiary hearing.  But if you're just here to participate in connection with the case, go -- here's a 214 number.

MR. GLUCK:  Good afternoon, Your Honor.  Kristian Gluck of Norton Rose Fulbright on behalf of M2 LoanCo, the DIP lender.

THE COURT:  Alrighty.  The 231 number?

MR. HACKNEY:  Good afternoon, Your Honor.  Tom Hackney here on behalf of former Corizon employees Dr. Jeffrey

Bomber and 27 others, co-signatories to the motion before the Court today.

THE COURT:  Okay, great.  Thank you, Mr. Hackney.

Good afternoon.  An 816 number.

MR. HEMENWAY:  Zach Hemenway and Nick Zluticky.  Good afternoon, Your Honor, Zach Hemenway and Nick Zluticky for the Committee.

THE COURT:  Alrighty.  Good afternoon.

And here's another 214 number.

MS. HAYWARD:  Good afternoon, Your Honor.  Melissa Hayward on behalf of Perigrove 1018, LLC, M2 HoldCo, M2 EquityCo, and Pharmacorr, LLC.

THE COURT:  Okay.  Good afternoon.  Those who have lines unmuted, I ask that you please keep your line on mute unless it's time to address the Court.

With that being said, I will turn it over to the movants.  Maybe we can just talk at the 10,000-foot level in housekeeping and how we intend to proceed today, and then we'll just jump right into it.  I don't need intros.  I just -- let's just jump right in.

MR. CROSS:  All right.  Good morning, Your Honor.

THE COURT:  Good afternoon.

MR. CROSS:  I'm sorry, good afternoon.  So I intend to do the opening.

THE COURT:  I don't need openings.  Let's just go

right to the evidence.  I'll give you a five-minute opening if you want, but I don't really need a whole lot.  I know what you're asking for, and I read your papers, so I know where you're going.  Let's just get to the evidence.

MR. CROSS:  Your Honor, I wanted to address what I expect the defense to be here, which is that Russell Perry is current management and Mr. Lefkowitz --

THE COURT:  It's your burden, right?  So just you go forward.  You don't have to worry about them.  Worry about your -- you carry the burden.

MR. CROSS:  All right.

THE COURT:  In other words, the evidence is what's going to carry it one way or the other, but if you want a short opening, I'll give you one.  But no one -- I'm not giving anyone a 30-minute opening on a motion to appoint a Chapter 11 Trustee.  The evidence will control what we do.

MR. CROSS:  All right.

THE COURT:  I just need to hear the evidence.

So what about documents?  How do we intend to proceed in terms of documents?

MR. CROSS:  I will --

THE COURT:  Is there agreement there?

MR. CROSS:  -- move to admit Movants' Exhibits 5, 6, 7, 28, and 33, and I understand there will be no objection to those.  That is correct.

THE COURT:  All right.  5 -- let me see, and that's at Docket -- can you just tell me which docket number we're talking about?

UNIDENTIFIED:  911.

MR. CROSS:  I believe it's 911.

THE COURT:  Okay.  911, 5, 6 --

MR. CROSS:  7, 28, and 33.

THE COURT:  28 and 33, okay, at Docket 911.

And you said  -- Mr. Brookner, you said no objection?

MR. BROOKNER:  No objection, Your Honor.

THE COURT:  Okay.  So at Docket 911, 5, 6, 7, 28, and 33 are admitted.

(Movants' Exhibits 5, 6, 7, 28, and 33 admitted into evidence)

MR. CROSS:  And now I'd like to move to admit the exhibits where there will be an objection, or at least some of them.

THE COURT:  You don't have to.  You're going to have to prove it up.

Mr. Brookner, any documents you wish to -- I just want the uncontested stuff.  We can get right to evidence on the stuff that we've got to prove up.

MR. BROOKNER:  Our Exhibit 1, Your Honor, is included in the exhibits we just agreed to, so we can either -- it's really up to Your Honor.  For the record, we can do it

separately or just have it included as one of Movants' exhibits.

THE COURT:  Which is your Exhibit 1, just so I'm -- I know what --

MR. BROOKNER:  Our Exhibit 1 is their Exhibit 33, is the petition with the resolution attached.

THE COURT:  Okay.  Can we just agree that 33 works for both?

MR. BROOKNER:  Certainly.

THE COURT:  Okay.

MR. CROSS:  Sure.

THE COURT:  Alrighty.  Okay.  In terms of witnesses, how do we intend to proceed today in terms of who's going to get called and the order of presentation?

MR. CROSS:  Your Honor, I want to argue the evidentiary objections and then call Mr. --

THE COURT:  We're not going to argue any.

MR. CROSS:  Sure.

THE COURT:  You're just going to put them up.  You can put the document on, put a witness on, and try to prove it up.

MR. CROSS:  Okay.

THE COURT:  In other words, let's just take on the evidence in a trial.  It's -- you don't have to -- I don't have any documents.  Somebody's going to have to authenticate a

document and put it up versus --

MR. CROSS:  Can we put up Exhibit 1?

THE COURT:  No, no, you're going to have to put on a witness who's going to authenticate a document and then they can see if there's an objection or not.

MR. CROSS:  Your Honor, a document can be self-authenticating.

THE COURT:  It can be, but take it up at the approach.  Which documents?

MR. CROSS:  So, for example, Exhibit 1 is self-authenticating, because it contains a certification of a notary, under 902(8).

THE COURT:  Okay.  We're going to do this.  All right.  All right.

MR. BROOKNER:  Your Honor, if I may?

THE COURT:  Hold on a second.  Let me just pull these up.  902 -- which documents are you trying to get in?

MR. CROSS:  I'm trying to get in the transcript of the deposition of Isaac Lefkowitz as M2 LoanCo's corporate representative on 5/12/23.

THE COURT:  Okay.  Okay.  Which other ones are you going to try to get in right now?  Might as well take them all at one time.

MR. CROSS:  Almost all of them.

THE COURT:  Okay.

MR. CROSS:  Exhibit 2, the transcript of the Tehum Care Services meeting of creditors on 5/12/23.

THE COURT:  Okay.

MR. CROSS:  Also self-authenticating.  Exhibit 3, transcript and U.S. Trustee's recording of the Tehum Care Services meeting of creditors on 6/13/23, also self-authenticating.

THE COURT:  Okay.

MR. CROSS:  Exhibit 4 for the same reason.  That is the transcript and U.S.T. recording of the Tehum Care Services meeting of creditors on 7/21/23.

THE COURT:  Okay.  No, I can read them, so you can just read them off.  1, 2, 3, 4 --

MR. CROSS:  8.

THE COURT:  1, 2, 3, 4, 8, uh-huh.

MR. CROSS:  9.

THE COURT:  Okay.

MR. CROSS:  10.

THE COURT:  Okay.

MR. CROSS:  11.

THE COURT:  Okay.

MR. CROSS:  12.

THE COURT:  Okay.

MR. CROSS:  13, 14, 15.

THE COURT:  Okay.

MR. CROSS:  17 through 27.

THE COURT:  Okay.

MR. CROSS:  29 to 32.

THE COURT:  Okay.

MR. CROSS:  34 and 35.

THE COURT:  34 and 35.  Let me make sure I got them right, okay?  1, 2, 3, 8, 9, 10, 11, 12, 13, 14, 15, 17 through 27, 29 through 32, 34, and 35.

MR. COOK:  Correct.

THE COURT:  Okay, thank you.

Mr. Brookner, what are your responses?

MR. BROOKNER:  We object to all of those at the present time, Your Honor.  Self-authenticating does not mean admissible.

THE COURT:  Does not --

MR. BROOKNER:  I think we need to see -- by the way, I'm not conceding self-authentication at this point.  But regardless, assuming that they are self-authenticating, it doesn't mean that they're admissible.  I think we need to see why they're offered and then we can take up admission at that time.

I would also note for the record that there's been a failure to comply with Rule 32(a)(6) of the Federal Rules of Civil Procedure, which effectively require a designation of which portions of a transcript are sought to be admitted so

that we have fair notice and that we can counter-designate. There's been no designation.  I guess if at some point the Court wants to take the entire transcript into evidence and then read the whole transcript, that's the Court's prerogative, but there have been no deposition -- excuse me, no depo or transcript designations under 32(b)(6).  I'm sorry, 32(a)(6). Excuse me.

THE COURT:  Mr. Cross, what's your answer?

MR. CROSS:  My response is that the transcripts are admissible --

THE COURT:  Kind of where I was going, right?  You want me to admit an entire transcript under -- you want me to admit an entire deposition transcript as self-authenticating without knowing exactly for what purposes you're offering and which sentence in there you're offering?

Like, that's -- I don't even know -- you want me to consider, on a motion to appoint a Chapter 11 Trustee, the entire transcript of Isaac Lefkowitz.  That's what you're asking me, right?  The entire transcript of Tehum Care Services, and I don't even know for what purposes you're offering it.  That's why I was saying why don't we just see where we go.

MR. CROSS:  Okay.

THE COURT:  The transcript of the U.S.T. recording, the transcript of two -- I don't even know what purpose you're

offering them for.  Then the 2004, I'm admitting all of this for the truth of the matter asserted without knowledge of relevance or for what purpose it could serve?  That's where I was going.

MR. CROSS:  So in terms of the hearsay --

THE COURT:  That's why I was trying to do this. Email -- you know, go ahead.  Emails exchanged between Corizon and the corporate structure.  So that's self-authenticating?

MR. CROSS:  It is actually.

THE COURT:  Okay.

MR. CROSS:  And --

THE COURT:  How is that self-authenticating?

MR. CROSS:  So under Barfield v. Federal Express Corp., 351 F.Supp.3d 1041, 1046, and Note 24.

THE COURT:  Does that mean it's admissible?

MR. CROSS:  It is admissible for the truth of the matter asserted under 801(d)(2)(D) because Mr. Sholey (phonetic) is an employee.

THE COURT:  How do I know this?  That's what I'm saying.  I don't even know if this guy's an employee.  I don't -- that's what I'm saying.  You're saying that, but we don't have into evidence that he is an employee to then determine whether this is a properly admissible document. That's where I was going, right?  You want me to -- I have to accept that as a factual premise, and that's -- so tell me how

I can accept that as a factual premise.  How do I know what you're saying to be true to then apply 801(d)?  Do you have a witness that can establish who that is?  In other words, that's where this stuff gets written.

MR. CROSS:  You can establish that Mr. Sholey is an employee from the transcript of the 2004 deposition.

THE COURT:  So you -- now we have hearsay upon hearsay?

MR. CROSS:  Well, we're saying the 2004 deposition isn't hearsay because it's statements made by Isaac Lefkowitz, who is the debtor's director.

THE COURT:  And is he -- he is unavailable to testify today?

MR. CROSS:  He is.

THE COURT:  We haven't even established that.  Do you see where we're going with this, Mr. Cross?  Is he unavailable to testify today?  Is Mr. Cross [sic] here?  Was he properly subpoenaed and unable to testify?  I have to have evidence of that to determine whether I should then accept this depo transcript.  I just want there to be --

MR. CROSS:  Your Honor --

THE COURT:  We have to have a process here.

MR. CROSS:  I have an affidavit of a process server who attempted service on Mr. Lefkowitz.

THE COURT:  Is it admitted into evidence?

MR. CROSS:  No, I have not.  Can I --

THE COURT:  Okay.

MR. CROSS:  And additionally --

THE COURT:  I'm just -- I just -- that's -- usually you have someone establish that the witness was unavailable, so then you try to move all the other stuff in.

MR. CROSS:  I'll just call Mr. Perry.  How about we proceed like that?  Sure.

THE COURT:  All of this may eventually come in, and just -- I don't -- but I just can't -- all of -- if there's disagreement about it, then just get it in through the Federal Rules of Evidence.  But if you think somebody's an employee, then get it in.  If you think that you're entitled to get testimony in because somebody was properly served and did not appear, then you can get that in, too.

I'm not saying you can't get it in, but I'm just saying we're not -- you just can't get it in just because something is self-authenticating.  Although I think -- in other words, I think it's different than getting in the debtor's schedules, right?

I think that's different than trying to tell me that an email, a February 22 email involving three people who I've never seen, that I need to make a call on that now.  And I don't know who any of these people are or for what purpose it's being offered or what's going on.

You're asking me to admit this under 801(d) because I need to then rely on another document.  Why don't we just get one document in and just build a house?  That kind of gets it to where it's going.  That's where I'm going.

MR. CROSS:  All right.  I'll call Russell Perry.

THE COURT:  Okay.  But in terms of witnesses today, who are we having?

MR. CROSS:  Mr. Perry.

THE COURT:  Just Mr. Perry is the only witness today?

MR. CROSS:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Perry, why don't you come on up.  I'm not saying these documents don't get in.  And I've got it -- I'm now saying we're going to take additional time, and I just think we've got to follow the rules, or make sure that we're comfortable that the rules are being applied.

So, Mr. Perry, why don't you raise your right hand.

RUSSELL PERRY, MOVANTS' WITNESS, SWORN

THE COURT:  Okay.  And I note that the witness has been duly sworn in.

Mr. Perry, there may come a time where you hear lawyers object.  I'd just ask that you give me an opportunity to respond to the objection, and I'll let you know if the witness can answer the question or if you have something else.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. CROSS:

Q    Mr. Perry, are you familiar with an individual by the name of Isaac Lefkowitz?

A    I am.

Q    How are you familiar with him?

A    I met him on February the 13th, when I was engaged in this engagement.

Q    Have you ever spoken with him in person?

A    I have.

Q    Have you ever testified with him at a 341 meeting?

A    I was present at the 341 meetings, yes.

Q    Okay.  Would you recognize his voice?

A    Should be able to, uh-huh.

MR. CROSS:  Okay.  Nathan, can you play the video of the Geneva 2004 exam.

MR. BROOKNER:  Objection, Your Honor.

THE COURT:  Your objection?

MR. BROOKNER:  I don't believe that the video was listed on the witness and exhibit list.

THE COURT:  Counsel, what's your response?

MR. CROSS:  Your Honor, I provided the videos to Mr. Brookner on Friday.  I believe they are listed.

THE COURT: Okay. Let's find out. 911 is -- which one -- which number is it? I don't know if it is or not.

MR. CROSS: It is Number 8.

THE COURT: Number 8, 2004 examination of Isaac Lefkowitz as corporate representative, transcript and video. Is that what you're going to refer to?

MR. CROSS: Yes.

THE COURT: Okay.

MR. BROOKNER: There's further been no establishment, Your Honor, that Mr. -- excuse me, that Mr. Lefkowitz is unavailable.

THE COURT: Huh?

MR. BROOKNER: He also I don't believe has established that Mr. Lefkowitz is unavailable.

THE COURT: Yeah.

MR. CROSS: All right.

THE COURT: He wants to ask a question about a video. Do you want to -- how do you want to -- are you trying to play the video or are you trying to -- or how do you wish to proceed?

MR. CROSS: Yes. I'm trying to play the video.

THE COURT: No, no, no, I'm not saying for what purpose. I just want to know how you wish to proceed. I'm going to let you proceed.

MR. CROSS: Okay. I would like to play the video.

THE COURT:  Okay.  I need -- that means I need to provide someone kind of GoToMeeting access, unless you're going to try to plug into the hardware.

MR. CROSS:  We're plugged into the hardware.

THE COURT:  You're plugged into the hardware?  Okay.  Just let us -- give us a second, because we just have to hit a button so that we can then give you --

MR. CROSS:  Go ahead.

(Video played from 1:19 p.m. to 1:19 p.m.)

MR. CROSS:  All right.  Let's stop it.

BY MR. CROSS:

Q    Mr. Perry, do you recognize the individual on the video screen?

A    There were only a few words.

MR. CROSS:  All right.  Why don't we play some more.

(Video played from 1:19 p.m. to 1:20 p.m.)

MR. CROSS:  All right.  We can stop it there.

BY MR. CROSS:

Q    Mr. Perry, do you recognize the voice that's being played in the courtroom?

A    Well, there's a video of your shoulder, so I recognize the video.

Q    Okay.  And is that Mr. Lefkowitz?

A    It appears to be, in the video over your shoulder, Mr. Lefkowitz, yes.

Q    And does it sound like his voice speaking on the video?

A    It's a little muffled, but from here, potentially, yes, it does sound like it is.  Yeah, uh-huh.

Q    Have you --

A    I mean, I could see his lips moving on the video.

Q    Have you ever met Mr. Lefkowitz in person?

A    I have.

Q    Where did you meet him?

A    I met him at his office.

Q    Where is his office?

A    His office is in New York, roughly Third Avenue, Lexington, sort of that area.

Q    Is it in the Lipstick Building?

A    I think that sounds correct, yes.

Q    Is it on the 29th floor?

A    I don't recall the floor that he's exactly on, but I've been to his office.

Q    Okay.  Does Mr. Lefkowitz live in New York, to your knowledge?

A    To my knowledge, yes.

Q    Have you ever met with Mr. Lefkowitz anywhere in Texas?

A    I have, uh-huh.

Q    Where did you meet him in Texas?

A    We attended mediation last week here in Houston.

Q    Other than the mediation, have you ever interacted with

Mr. Lefkowitz in Texas?

A    I don't believe so.  I don't recall.

         MR. CROSS:  Okay.  Your Honor, I'd like to move to admit the video for the purpose of demonstrating dishonesty and withholding information from creditors.  So not necessarily that the statements made in the video are true.  I'd like to admit it under Federal Rule 32(a)(3), which is an independent exception to the hearsay rule to the extent that it is offered for its truth.

         THE COURT:  What documents are being withheld?  You said for -- I'm sorry, I want to make sure -- I was writing it down.  I apologize.  You're admitting -- seeking to admit it for what purpose?

         MR. CROSS:  I'm seeking to admit it to show --

         THE COURT:  Document 8?

         MR. CROSS:  -- dishonesty and withholding it --

         THE COURT:  Dishonesty on behalf of whom?  I just want to make sure I'm understanding what you're saying.

         MR. CROSS:  For Lefkowitz.

         THE COURT:  You're saying Mr. Lefkowitz is being dishonest based upon what I heard?

         MR. CROSS:  We haven't watched the full segment of the video.  I just --

         THE COURT:  Now, how can I admit it for that purpose?  I mean, I'm serious.  I'm trying to get to where you're headed.

I didn't -- you're trying to admit an entire transcript based upon that portion. I just want to make sure I'm understanding it based upon -- for purposes of fraud and dishonesty of Mr. Lefkowitz based upon the clip that we heard?

MR. CROSS: No, Your Honor. I intend to play a 14-minute section of the video, and this is just the first bit. And I just wanted to have Mr. Perry authenticate it and verify that Mr. Lefkowitz lives in New York.

THE COURT: But you're moving to admission right now.

MR. CROSS: All right. Well, let's play this.

THE COURT: No, no. Wait, no, I'm just -- I've got to take this one at a time. You're moving to admit now. Is there a response to that? You just moved to admit. I've got to see if they agree or not.

No, the little one is just to kind of pick up background noise. There's just one main one, if you can come up.

In other words, you moved to admit. I can't now -- I've got to rule on your request.

MR. BROOKNER: There's a variety of issues. Certainly lack of foundation is one. Certainly there's been no showing under 32(e)(3) that's appropriate. This is Mr. Lefkowitz apparently attending a 2004 exam in a different capacity than in his capacity as the director, the sole director, of the debtor. And there's no question pending that

relates to the introduction of this video.

THE COURT:  So I'm going to over -- I'm going to deny admission based upon -- for the reasons that you've stated, because I've only heard three sentences, so I can't admit it there.  And I don't know where you're intending to kind of go with this 2004 exam.  I don't know anything about it, but you played a clip to ask the witness if he was able to identify who that person was, and then you moved for admission under, like, fraud exceptions, and I'm denying it for -- on that basis.  I haven't heard anything that would warrant admission based upon what I've heard.

MR. CROSS:  All right, Your Honor.

THE COURT:  Do you disagree?

MR. CROSS:  I disagree that the video is hearsay, but --

THE COURT:  No, no, no, but do you disagree that you haven't established that you've --

MR. CROSS:  Oh, I agree with you that we need to play a larger portion of the video to show the fraud or the purpose that it's being offered for.

THE COURT:  No, I didn't say that.  You're saying you agree that you need to play more video?

MR. CROSS:  Yes.

THE COURT:  Okay.  Okay.

MR. CROSS:  All right.  Why don't we go ahead.

(Video played from 1:25 p.m. to 1:26 p.m.)

MR. BROOKNER:  Your Honor, can I raise an objection at this point?

THE COURT:  What's the objection?

MR. BROOKNER:  The objection is what's going on here and what is the background and status of this?  All -- the only question pending is if Mr. Perry recognized the face and the voice of the person in the video.  There's no foundation as to what this examination is, when it took place, the capacity in which the deponent --

THE COURT:  I don't want a speaking objection, but I agree that the foundation sounds like one, and not the status of stuff is a proper objection.

So what's the -- what's your response to the objection to the foundation and relevancy?

MR. CROSS:  Your Honor, Mr. Perry testified that Mr. Lefkowitz is the director of the debtor.

THE COURT:  Okay, but -- got that, but how is -- what's the relevancy of what I'm playing -- what I'm hearing?

MR. CROSS:  Well --

THE COURT:  I think that's what it -- that's the objection, or foundation.

MR. CROSS:  All right.  I'll lay some more foundation if you'd like.

THE COURT:  No, no, I'm just saying that's the

objection.  I just want to make sure that I'm --

MR. BROOKNER:  Relevance and foundation.  Yes, Your Honor.

MR. CROSS:  So we're going to show this video. Mr. Lefkowitz is going to explain that he made all this --

THE COURT:  No, no, no, I don't want speaking objections either.

MR. CROSS:  Okay.

THE COURT:  There's a relevance -- and I didn't let him do it, so I can't let you do it either.  So how do you wish to proceed?

MR. CROSS:  I'll lay some more foundation with Mr. Perry.

THE COURT:  Okay.

BY MR. CROSS:

Q    Mr. Perry, are you familiar with the entity known as Geneva Consulting?

A    I'm generally familiar, yes.

Q    How did you become familiar with that entity?

A    Reviewing documents.

Q    What documents did you review?

A    Well, initially I reviewed a facilitator agreement, and then subsequent to that, a consulting agreement.

Q    Do you know if the debtor has made any payments to Geneva Consulting?

A    Over what time period are you asking?

Q    From December 2nd, 2021 to present.

A    December 2nd, 2021, yes, I believe they have, uh-huh.

Q    Do you know how much money they've paid to Geneva Consulting?

A    It was a little over $3 million.

Q    Do you know when those payments were made?

A    Yeah, between roughly December and May of '22.

Q    Were any of the payments made less than one year prior to the petition date?

A    Two payments would have been made in less than one year, yeah.

Q    Were those --

A    There was a payment in April and a payment in May.

Q    Were those payments listed on the SOFA?

A    No, they were not.

Q    Were they listed on the amended SOFA?

A    They were not.

Q    Were they listed on the second amendment to the SOFA?

A    They were not.

Q    Do you know who the directors of Geneva Consulting are?

A    I -- I don't.  There's a lot of hats here.  I don't have familiarity with what all the directors are of all the entities.

Q    Do you know who any of the principals of Geneva Consulting

are?

A    I don't know all the principals of all the entities here. And Geneva, I can't answer.  There's a lot to unpack with all those.

Q    Do you know if Mr. Lefkowitz is a director of Geneva Consulting?

A    I believe he's involved with Geneva Consulting, yes.

Q    Is he involved with the debtor?

A    Today debtor?  Are you talking present term?

Q    Yes, presently.

A    Yes, uh-huh.

Q    Okay.  And do you know if there were 2004 exams taken in this case?

A    I believe there have been a number of 2004 exams, yes.

Q    Was there a 2004 exam of Geneva Consulting?

A    I believe so, but I can't testify to that.

Q    What's that belief based on?

A    Well, as I prepared for this testimony here, I understood and I was working on what information that the debtor has effectively issued 2004s for, and there are a number of entities in which we've issued 2004s, and I believe Geneva is one of those.

Q    Did you attend a 341 meeting with Mr. Lefkowitz on June 13, 2023?

A    I have to get my dates.  I believe there were three 341

meetings.  Are you asking for the first amended or the second amended?

Q    The second.

A    No, I did not.

Q    You did not attend the second 341 meeting?

A    Can you repeat your question?  I'm sorry.

Q    You did not attend the second 341?

A    No, I'm sorry, before that.  You're asking me if I attended the 341 meeting?

Q    Yes

A    Yes.  I attended the 341 meeting, yes, uh-huh.

Q    Did you hear the U.S. Trustee ask Mr. Lefkowitz some questions about Geneva Consulting?

A    I believe it was a very lengthy 341 meeting.  I do not remember every exchange of information in that 341 meeting.

Q    Do you remember if Mr. Lefkowitz was asked any questions at all about Geneva Consulting?

A    There were a number of questions about all of the pre-petition activity that was disclosed in the schedules. That's the information we testified on.  I don't recall if he was specifically asked about a specific transaction.

         MR. CROSS:  Okay.  Nathan, can you play the testimony of the 341 meeting about Geneva Consulting?

         MR. BROOKNER:  Your Honor, objection again.

         THE COURT:  What's the basis?

MR. BROOKNER:  First of all, we still haven't established what capacity this deponent is sitting in and what the nature of this is.  Second of all, it's hearsay.  There's been no establishment that the witness is unavailable under the Federal Rules of Evidence.

THE COURT:  What's your response, Counsel?

MR. CROSS:  Your Honor --

THE COURT:  And if somebody can tell me who Geneva Consulting is, that would be helpful, too.  Y'all are talking about things that I don't necessarily know, but -- I got it, people are familiar with cases, but no one has even established who Geneva Consulting is.  And I don't know if it's important or not, but I figured I'd throw that out there while we're talking.

MR. CROSS:  So Mr. --

THE COURT:  Maybe they are really important.  I'm just saying I have no idea who Geneva Consulting is, but y'all are talking like everybody is up to speed.

MR. CROSS:  That's why we needed an opening, but --

THE COURT:  No, no, an opening is not evidence.  I want to be really clear about that.

MR. CROSS:  Understood.

THE COURT:  So let's be really clear.  You could have said everything in opening and not getting a lick of it into evidence, and I wouldn't have paid attention to it at all.

MR. CROSS:  So Mr. Lefkowitz's statements are admissible under 801(d)(2).

THE COURT:  Which statements are you seeking to admit?

MR. CROSS:  The statements in this video.

THE COURT:  All of them?

MR. CROSS:  Yeah.

THE COURT:  And what is the -- okay.

MR. CROSS:  Because he was a director of the debtor on the date he made the statements.

THE COURT:  Okay.  Is it -- how do I -- he is a director -- what is the subject upon which he's talking about?  Right?

MR. CROSS:  We're --

THE COURT:  Was it -- in other words, I understand -- I'm just trying to understand the scope of what you're asking me to admit here.  I'm not agreeing or disagreeing with you.  I just need to understand.  You're asking to admit a 2004 examination made by a person, an individual.  Okay.  And I got that part.  Or a representative capacity is the one manifested that adopted it or believed to be true.  Okay, I got me there.  Made by a person whom the party authorized to make a statement on behalf of the subject.  May have a little work on that. (d) --

MR. COOK:  I'm sorry, (d).

THE COURT:  Yeah, oh, 801(2)(d), right?  Okay.  No, I'm just going down the line.  Made by the party's agent on a matter within the scope of that relationship and while it existed.  Tell me -- based upon what I've heard, tell me how you get there.

MR. COOK:  So --

THE COURT:  Based upon the statements that I've heard, tell me how you get there.

MR. CROSS:  Mr. Perry has testified that Mr. Lefkowitz is currently the director of the debtor.

THE COURT:  Got that.

MR. CROSS:  The debtor is the party to the proceeding.

THE COURT:  Uh-huh.

MR. CROSS:  Mr. Lefkowitz is making statements, while he is the debtor, about transactions with the debtor.

THE COURT:  So let me ask you, what's the date of this 2004 that you're referring to?

MR. CROSS:  August 14th.

THE COURT:  No, no, no.  Based on the evidence that I've got in front of me, tell me what date this witness has said that this is the date of the 2004.  You all have been talking about two of them.  Which one is this, the first or the second, and which are you talking about?

MR. CROSS:  Oh --

THE COURT:  No, no, I just want to know, has the witness testified to that?

MR. CROSS:  I believe the witness has not testified to the date of the statement.

THE COURT:  So how in the world do I know what I'm actually admitting?  I'm admitting the 2004 of what date, what time, by whom?  You're going to have to do a little better, Mr. Cross.

MR. CROSS:  Okay.

THE COURT:  I'm not saying it doesn't get in.  What I am saying is that if you want to authenticate, authentication comes before admissibility, and I don't even know what you've authenticated here.  You're authenticated -- there is a video that purports to be a 2004 exam, but you've also established that there were multiple 2004 exams, and I think you're asking for admission under 801(d), and we haven't even authenticated what this is, so --

MR. CROSS:  Mr. Perry --

THE COURT:  And if you think I'm wrong, I want you to tell me.  Maybe there's a date and Mr. Perry knows what he's looking at.  I'm not saying he doesn't.  What I'm saying is I'm sitting here listening and I'm being asked to weigh evidence, and we've got to -- I don't even know what I'm looking at.  I know what I'm looking at.

MR. CROSS:  Mr. Perry --

THE COURT:  I don't know what's the date of them and what's the relevance.  I don't even know who Geneva Consulting is.

BY MR. CROSS:

Q    Mr. Perry, you testified that you met Isaac Lefkowitz for the first time on February 13, 2023, correct?

A    Over an email exchange, uh-huh.  Or on the telephone, sorry, uh-huh.

Q    Was Mr. Lefkowitz a director of the debtor at that time?

A    I believe so, yes.

Q    And is Mr. Lefkowitz a director of the debtor today?

A    He is.

Q    And you testified that 2004 exams took place in this case?

A    The Committee has issued 2004s and the debtors have issued 2004s.  Yes, that's correct.

Q    So the 2004 exam would have taken place in this case at least after February 13th of 2023.

A    I don't know which 2004 you're referring to.  I'm sorry.

Q    Do you recognize the voices of anyone else in the video?

THE COURT:  Mr. Perry, do you know the answer to the question?

THE WITNESS:  I think he's playing an interview or a -- I wasn't --

THE COURT:  No, no, no, I want you to answer the question.  Do you recognize anyone else's voice in the video I

believe was the question.

Mr. Cross, if I got it wrong, let me know.

MR. CROSS:  That's correct.

THE WITNESS:  It was only a few minutes, Your Honor, but I think that was the Committee's attorney.

THE COURT:  No, no, it's a yes or no.  And if you do, what's the answer?

THE WITNESS:  The answer is if I hear it again, I can -- I'm sorry, Your Honor, I don't know the answer.  When I heard it earlier, I thought there was familiarity.

MR. CROSS:  All right.  Let's play a little bit more so he can hear the voices.

UNIDENTIFIED:  Do you want to go back or forward?

MR. CROSS:  Forward.

(Video played from 1:38 p.m. to 1:38 p.m.)

THE WITNESS:  Pause if you want.

MR. CROSS:  All right.

BY MR. CROSS:

Q    Do you recognize that voice that asked the question?

A    It sounds like that was the same voice that just announced themselves a few minutes ago, Zach from the Committee.

Q    Okay.  So fair to say that Zach from the Committee was questioning Mr. Lefkowitz in this video?

A    I don't know.  Based on voices and a camera behind your shoulder, it's what it appears to be.

Q    So do you think that this video is a 2004 exam taken in this case?

A    I don't know.  I wasn't present.

Q    Do you have any reason to believe that it is not a 2004 exam taken in this case?

A    I don't.

MR. CROSS:  Do you have an objection?

MR. BROOKNER:  Absolutely.  Have you -- are you moving to admit?  I'm sorry.

MR. CROSS:  All right.

THE COURT:  I just don't know what we're doing here.

MR. CROSS:  Can we play the --

MR. BROOKNER:  Your Honor, I need to object to the continued playing of a video when there's no foundation and there's been no establishment of what the video is, why it's being offered, nor has there been any establishment that the witness is unavailable.  It's being played in a vacuum.

THE COURT:  All right.  I've got a witness here, so you can ask the witness questions and you can try to get the stuff in another way, but you can ask him to -- I think he -- he's answered the questions.  I just -- I mean, you called him. You get to ask him questions and they get to answer.

MR. CROSS:  Your Honor, witness availability --

THE COURT:  I'm just asking, you've got a witness here, right?

MR. CROSS:  Okay.

THE COURT:  In other words, I need to make sure I understand what you're doing.  Are you using this witness to authenticate -- well, let me.  I gave this up a while back, but I just need to understand what we're doing here.

(Counsel confer)

BY MR. CROSS:

Q    Mr. Perry, do you recognize this document?

A    I'm looking at it over your shoulder, but yes, it appears to be our engagement letter.

Q    Hold on.  Let me give you a copy of the exhibit binders, if you'd like one.

THE COURT:  Hang on, I apologize.  Did we -- oh, I guess we -- it doesn't show up on your screen though.

MR. CROSS:  Would you like a paper copy?

THE COURT:  The witness --

THE WITNESS:  A paper copy would be helpful, sure.

MR. CROSS:  Okay.

THE COURT:  I apologize.  I thought when something showed up on the screen, it should pop up on your screen as well.

THE WITNESS:  It says out of range.

THE COURT:  Well, yeah, it says out of range.  I apologize, Mr. Cross.  No, no, you can approach.  I'm apologizing that when we put something on that screen, it

should have popped up on the witness screen as well, but it's not doing that.  I apologize.  You've got paper copies there?  Okay, good.

BY MR. CROSS:

Q    All right.  Let's go to the signature page on Page 12.

A    I'm sorry, where in the binder?

Q    Exhibit 28.

A    Okay.  Okay, I'm here.

Q    Is that your signature on the document?

A    It is.

Q    And who signed for Tehum Care Services?

A    Mr. Lefkowitz.

Q    Were the terms and conditions of the engagement agreement heavily negotiated?

A    No, it was a CRO engagement.

Q    They were not heavily negotiated?

A    It was a CRO engagement.

Q    I asked you if the terms of the engagement agreement were heavily negotiated.

A    No.

Q    Can you pull up Docket 118 -- or 188, I'm sorry, Page 14.  Do you recognize the document on the screen?

         THE COURT:  He doesn't have it in front of him.  Maybe we can just -- I can -- why don't I do this.  What document are you referring to?

MR. CROSS:  188, Page 14.

THE COURT:  Just give me a second.  I'm going to put it up, 188.

BY MR. CROSS:

Q    Do you recognize this, Mr. Perry?

THE COURT:  Just a second.  I'm going to pull it up on the screen so he can see it.  It should be able to get it in.  Give me a second.  I'm going to share my screen so we can all see it.  You said Page 14, Counsel?

MR. CROSS:  Yes.

THE COURT:  Okay.  Let me get you there.  If you'd just direct me where you want to go and I'll make sure.

BY MR. CROSS:

Q    Do you recognize this document, Mr. Perry?

A    It appears to be my first day declaration.  Sorry, it's the declaration for my retention and employment, uh-huh.

Q    All right.  And this is a document you executed under penalty of perjury in this case?

A    I believe so, uh-huh.

MR. CROSS:  Can we move to Page 5 of the declaration?

THE COURT:  And if there's a particular paragraph you want me to go to, just let me know.

MR. CROSS:  Yes, Paragraph 10.

THE COURT:  Okay.  There you go.

BY MR. CROSS:

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Q    Could you read that Paragraph 10 for the record?

A    It says, "The terms and conditions of the Engagement Agreement were heavily negotiated and reflect the parties' mutual agreement as to the substantial efforts and resources that will be required in connection with Ankura's engagement."

Q    So were the terms of the engagement agreement heavily negotiated?

A    I guess you'll have to define heavily negotiated.

Q    Well, how did you define it in this declaration you signed?

A    Well, CRO engagements are, in general, very authoritative driven, and the scope that we identified for this CRO engagement was the scope that was needed for this engagement here when we were retained.  So the way that the document reads, heavily negotiated, that's the subjectivity in that document that references that.

     MR. CROSS:  All right.  Can we go back to Page 4 of the engagement agreement?

     THE COURT:  Is that one of the exhibits here?

     MR. CROSS:  Yes, it's Exhibit 28.

     THE COURT:  One of your exhibits?

     MR. CROSS:  Yes, one of my exhibits.

     THE COURT:  You got it.  911, 28.  Give me a second and I'll get you there.  Is this the right document, Counsel?

     MR. CROSS:  Yes.

THE COURT: I want to make sure I didn't mess up, user error here. Okay. Any page? Just --

BY MR. CROSS:

Q    I would like to direct your attention to Page 4 of the engagement agreement, Paragraph 5. Could you read that paragraph out loud for the record.

A    It says, "Term of agreement: If either party hereto desires to terminate its relationship with the other or the engagement, it may do so at any time for any reason by giving written notice to the party. In such event, Ankura will be paid for fees and expenses incurred through the termination date, as well as for reasonable engagement closing costs."

Q    As a party to this agreement, is it your understanding that Paragraph 5 grants Mr. Lefkowitz the right to terminate you as the debtor's CRO for any reason and at any time?

A    That would be a legal conclusion. I'm not sure that that's what it says.

Q    Well, you're a signatory to this agreement, are you not? So what --

A    I am, uh-huh.

Q    So what do you understand that term to mean you agreed to?

A    I can read the words, and it just says if either party desires to terminate the relationship, they can do so by giving written notice to the other party.

Q    All right.

A     That's what the engagement letter says.

Q     I want to direct your attention to Page 2 of the engagement agreement.  Could you read for the record the paragraph at the top of the page, very top of the page.

THE COURT:  Oh, I'm sorry.

MR. CROSS:  Yes.

THE WITNESS:  It says, "In the event there is a disagreement as to any direction, guidance or instruction to be given to Ankura in connection with the foregoing, Ankura shall take such direction, guidance, or instruction from Mr. Isaac Lefkowitz."

BY MR. CROSS:

Q     So if Gray Reed were to tell you to do something as CRO of the debtor, and Mr. Lefkowitz said, no, I want you to do something else, then per the terms of your agreement with the debtor, whose instructions would you follow?

A     I wouldn't follow either of those instructions.

Q     Well, then what do you think is the -- what is your understanding of the meaning of the first paragraph on that page?

A     Well, if read it simply by itself, without any consideration of any other Board governance or any other provision in the document, it simply means if there's disagreement as to direction, guidance, or instruction, but you can't read the engagement letter in just that single sentence

to take guidance on the decision making process.

Q     What do you mean?

A     Well, step down two paragraphs below.  It says:
"Notwithstanding anything to the contrary, the Company and the
Board agree that the CRO should be authorized in such capacity
to make decisions with respect to all aspects of the management
and operations of the business, including, without limitation,
organization, HR, marketing, sales, operations, supply chain,
finance, admin, and other areas as the CRO may identify, in
such manner, as the CRO deems appropriate, subject only to
appropriate governance by the Board and the Company in
accordance with the Company's bylaws and applicable laws."

Q     What does the final clause mean, "Subject to appropriate
governance by the Board in accordance with the Company's bylaws
and applicable laws"?

A     Well, I'm not a lawyer, but my interpretation is that it
means what the words here say.  It says as subject to
appropriate governance by the Board in accordance with the
Company's bylaws.

Q     Who's on the Board of the debtor?

A     Mr. Lefkowitz is the sole director.

Q     Okay.  I want to direct your attention to Page 51 of
Movants' Exhibit 2.

          THE COURT:  Page 51 of Movants' Exhibit 2.

          MR. CROSS:  I believe it's 2.  The --

THE COURT:  Can you give me a docket number here?

MR. CROSS:  I'm sorry, it's not -- I think it --
strike that.  Not 2, we want the 27.

THE COURT:  Document?

MR. CROSS:  27.

THE COURT:  Your 27?

MR. CROSS:  Uh-huh.

THE COURT:  911-27?

MR. CROSS:  Yes.

THE COURT:  Okay.

MR. CROSS:  Page 51.

BY MR. CROSS:

Q    Mr. Perry, did you testify at an interim DIP hearing held on March 22, 2023 in this case?

A    I did.

Q    Could you please read aloud for the record the answer you gave at Lines 1 through 6 on Page 51?  I'm going to ask you some questions about it.

MR. BROOKNER:  Your Honor, objection.

THE COURT:  What's the basis?

MR. BROOKNER:  Is this impeachment?  Is this prior inconsistent statement?  Like, what -- you can't just be reading a transcript of the prior testimony without a proper foundation for its use.

THE COURT:  Counsel?

MR. CROSS: Your Honor, Mr. Perry is the CRO of the debtor. His prior statements are statements of the debtor under the hearsay exceptions.

THE COURT: For what purpose are you offering it I think is the question then, I thought -- I understood the basis of the objection.

MR. CROSS: I haven't moved to admit this yet. I'm going to ask him questions about his prior statement.

THE COURT: You didn't witness it -- you can -- but he's here, right? So you can ask him questions, but you don't have to -- in other words, what's the relevant -- I'm so confused by what's happening here. You want to bring in a document that you haven't listed on your witness and exhibit list.

MR. CROSS: I have. It's 27.

THE COURT: Oh, this is your 27. I apologize. Please proceed, Counsel.

MR. BROOKNER: Your Honor --

THE COURT: I'm going to let him ask a question, Mr. Brookner. I'm going to let him ask the question to see what -- I want to see where this goes.

I apologize. I thought we were still talking about movants. I got a little confused between movants and non-movants. You're right, it's your 27. I'll let you ask the question. But you normally don't get to ask questions about

documents that haven't been authenticated, but I'll let that slide.  But go ahead.

MR. CROSS:  Well --

THE COURT:  No, no, like, in other words, I don't know what -- you just told me to pull up 27.  Normally you would then ask, you know, is this document, so you would authenticate the documents, and then you would ask questions.  But normally you have to get a document into evidence before you get to ask people questions about it unless you're seeking to impeach him or to do something else with him.

MR. CROSS:  Well --

THE COURT:  That's where he's going, but I'm going to let you ask the question anyway.  I just wanted to make sure.  Let's just fast track this and let you ask the question.

MR. CROSS:  Thank you, Your Honor.  I tried to admit this exhibit at the beginning as self-authenticating, but let's go.

THE COURT:  I know, but they get to object.

BY MR. CROSS:

Q    So did you make the statement at Lines 1 through 6 at that hearing?

A    It doesn't have my name on the page, so are you asking me to recall if these were --

Q    Yeah.

A    If this is my testimony?  Do you mind scrolling through --

I mean, can I look at the document?  What am I -- actually, what am I looking at?

Q    Sure.  You're looking at Exhibit 27.  It's in one of the binders in front of you, if you'd like to flip to it, Page 51.

THE COURT:  Why don't I short-circuit this.  So here's a deposition trans -- it is a transcript of a deposition of a --

MR. CROSS:  Your Honor, it's a transcript of a hearing.

THE COURT:  Oh, it's a transcript -- oh, it's a hearing transcript dated March 22nd, 2023, at 1:33, and apparently you took the stand.  Did you disagree with that?  And here's what you said at Line -- Docket 51.

I'm going to allow it, Mr. Brookner.

MR. BROOKNER:  Understood, Your Honor, but I think we need to start with the question at the bottom of Page 50.

THE COURT:  No, no, no, no, he gets to ask the questions and you get to say something.

MR. BROOKNER:  Okay.  Thank you, Your Honor.

BY MR. CROSS:

Q    Does that appear to be a transcript of your testimony?

A    It does appear to be, uh-huh.

Q    Okay.  Could you read the answer you gave at Lines 1 through 6?

A    It says:

"A    Correct.  The debtor had no cash.  In fact, had no operating bank account.  We did move quickly to establish a bank account.  Unfortunately, we originally established that bank account in an institution and had to open a new bank account, so we do not have operating bank accounts today, but there's no cash on those accounts."

Q    All right.  I want to break that down a little bit.  When you say, "We did move quickly to establish a bank account," who is the "we" in that sentence?

A    Myself and my team.

Q    Who is your team?

A    Individuals that work under my direction at Ankura.

Q    What are their names?

A    Scott Rinaldi, Steve Petrocelli.

Q    Anyone else?

A    Yeah, sure.  Mike Kennelly, Michael Russano, Bryon Sergeant, David Cooper, and others.

Q    Was the bank account you were referring to in the second sentence opened at Signature Bank?

A    Well, we did quickly -- I did attempt to establish a bank account at Signature Bank.  That is correct, uh-huh.

Q    Did you physically go to a branch of Signature Bank to open the account?

A    No.

Q    Who opened the account?

A    Well, I attempted to open the account.  I was connected with an officer or a bank account representative at Signature. She collected all my personal information, collected information on the company.  And I worked through a, you know, CYA, or they call it KYA process to open a bank account.

Q    Do you live in Texas?

A    I do, uh-huh.

Q    Have you ever seen a physical branch of Signature Bank in Texas?

A    I don't recall.

Q    Have you ever opened an account at Signature Bank before the DIP account you attempted to open or did open for the debtor in this case?

A    My team uses Signature all the time for winddown trustee and other types of engagements.  Yes, Signature is a very important bank for Ankura.  Part of the reason why they agreed to open the account here is because they knew Ankura and they knew a lot of our other engagements.

Q    Who were the signers on the DIP account that you opened at Signature?

A    I was the only signatory.

Q    And did Signature Bank get closed by regulators on March 12th of this year?

A    I don't know if it was closed, but it certainly was shut down for a certain period of time, and I think it was taken

over by another bank.

Q    Did the debtor then open a bank account somewhere else?

A    I did, yes.

Q    How many bank accounts does the debtor have currently?

A    Well, I have two bank -- the debtor has two bank accounts, one at Bank of America and then another one at Bank of America. I have attempted -- I think I have verification that these accounts have been closed at Signature, this one account.

Q    Are you the only signer on the debtor's bank accounts?

A    I am.

Q    Did you authorize a payment of $150,000 from the debtor to Sigma Risk Management on 4/5/23 from Account Number 6404?

A    I did.

Q    Did someone tell you to make that payment, or did you decide to do it yourself?

A    We have a -- the debtor has a contractual obligation.  I received an invoice from that party.  I paid that payment based on that invoice.

Q    What is Sigma Risk Management?

A    They're an entity made up of former Corizon in-house lawyers that process claims, monitor claims, deal with all the various issues that come about with those claims.  They also deal with all the insurance policies and manage the interface between insurance carriers and the various claims that exist.

Q    Are Signature Risk Management and the debtor related in

any way?

A    I don't know who Signature Risk Management is.

Q    I'm sorry, Sigma.  Not Signature, Sigma Risk Management.

A    I believe there's been testimony and documents produced on that.  My understanding, based on my payment of Sigma, was the third-party contract that was in existence.

Q    Does Sigma and the debtor have any common directors?

A    I have not memorized who all of the directors are for all the entities.  I don't know.  If you can show me a document, I can certainly look at it.

Q    Do you know who owns Sigma Risk Management?

A    I don't.

Q    Do you know who organized Sigma Risk Management?

A    I don't, but there's been documents produced that I believe has indicated that information, but I don't have that information.

Q    Are you familiar with a person named Jennifer Finger?

A    I am.

Q    Who is Jennifer Finger?

A    Jennifer is our lead relationship or contact at Sigma.

Q    Does Sigma provide legal services to the debtor?

A    We don't use Sigma in the capacity of legal services, no.

Q    Have you ever communicated with Jennifer Finger by email?

A    I have.

            MR. CROSS:  Can we pull up Movants' Exhibit 32.

BY MR. CROSS:

Q    Do you see the email address of the sender on that exhibit?

A    I do, uh-huh.

Q    Is that the address that you corresponded with when you were communicating with Jennifer Finger by email?

A    I don't have Jennifer's email address memorized.  I'm sorry.  It's her name.  Appears to be her email signature.

Q    Do you see a logo on the email?

A    I do, uh-huh.

Q    When you communicated with her via email, did her emails bear that logo?

A    I don't recall.  I don't know that she always uses an email signature.  I don't recall.  That's the logo she uses on her emails.

        MR. CROSS:  Your Honor, I move to admit Exhibit 32 under 904(b)(4) and hearsay exception.  It's a statement of an employee or agent of the debtor.  It also falls under the conspiracy hearsay exception, which in the Fifth Circuit doesn't require that the common enterprise be illegal, and it's a statement against interest.

        THE COURT:  What is the conspiracy that you're referring to?  Counsel, that has not been admitted into -- that has not been referenced in this case.

        MR. CROSS:  So --

THE COURT:  How do I admit something under a conspiracy when you haven't established that there is one?  But that being said, I'll admit it for the statement.  It says what it says, right?  I'll admit it.

MR. CROSS:  Okay.  And --

THE COURT:  32 is admitted.  I'm going to admit 32 for -- it says what it says, right?

MR. CROSS:  Okay.

(Movants' Exhibit 32 admitted into evidence)

MR. BROOKNER:  Admit -- you're admitting it for the fact that it was said, Your Honor?

THE COURT:  Yeah.

MR. BROOKNER:  Okay.

THE COURT:  Isn't that what you want me to say?  I mean, I think you want me to admit it for the fact that Jennifer Finger sent this email on this date and said these words.  Right?

MR. CROSS:  I want to admit it for the truth of the matter asserted.

THE COURT:  That Corizon has filed for bankruptcy?  How do I know that?

MR. CROSS:  I want to admit it for the statement that I am an attorney who provided legal services for Corizon.

THE COURT:  I am an attorney who provided -- but how does this witness authenticate that?

MR. CROSS: So --

THE COURT: Am I missing something? Are you copied on this email?

THE WITNESS: I am not, Your Honor.

THE COURT: How can the witness authenticate for that reason, Counsel, based on this? Well, maybe you do need to --

MR. CROSS: So --

THE COURT: If you're trying to establish that there's someone named Jennifer Finger at Sigma who sent an email to an individual who's not on the stand and said these words, I can admit it for purpose of an email that says that. But other than that, now I guess you are going to have to find another basis if you want to establish it for I'm the one who provides legal services for Corizon. How does this witness authenticate that document?

MR. CROSS: So, Your Honor, there -- I have three cases that say --

THE COURT: Go ahead.

MR. CROSS: -- that an email exchange that contains distinctive characteristics can satisfy the authentication requirement under Rule 901(b)(4).

THE COURT: But he doesn't work for any of these individuals. He doesn't work for any of these companies. He never worked for Corizon. I got it if you've got a Corizon witness up there who can --

MR. CROSS:  Your Honor, it has nothing to do with -- the authentication standard has nothing to do with the witness. The authentic -- the email is authenticated --

THE COURT:  So you can just pull out an email just right now for no reason, just pull one out, and I've got to admit it because the authentication because --

MR. CROSS:  If you look at Holmes v. North Texas Health Care --

THE COURT:  No, no, what rule are you seeking to admit this under, Counsel?  Under what basis?  Under what rule under the Federal Rules of Evidence do you seek to admit this document?  The rules still mean something, so --

MR. CROSS:  So authentication --

THE COURT:  Is not admissibility.

MR. CROSS:  And hearsay --

THE COURT:  So there's an out-of-court statement offered for the truth of the matter asserted.  Okay.  I got it. That's the out-of-court statement offered for the truth of the matter asserted.  Okay.  And how do we authenticate that Jennifer Finger even exists?  He says he knows a general finger who's a -- Jennifer Finger who's a general counsel.  You want to admit that this email was sent by her to this guy on this date?

MR. CROSS:  I want to admit Jennifer Finger's statement as an out-of-court statement offered for the truth of

the matter asserted under 801(d)(2)(D) because she is an agent of the debtor.

THE COURT:  How is she an agent of the debtor?

MR. CROSS:  She's --

THE COURT:  Maybe I missed that part of the testimony.  Maybe you can establish how she's an agent of the debtor.

MR. CROSS:  Attorneys qualify as agents of their principal.

THE COURT:  So she's an attorney of this debtor?

MR. CROSS:  That's what we're trying to establish, Your Honor.

THE COURT:  No, no, no, no, no.  You're saying she's an -- you're trying -- let's say she's an email for -- a legal services for Corizon.  She's not an agent of the debtor.  Maybe I'm missing something here.  I promise if I'm missing something, I really want to get it right.  The debtor is Tehum Care Services, right?

MR. CROSS:  Correct.

THE COURT:  That's my debtor, right?

MR. CROSS:  Correct.

THE COURT:  Tell me how she's an agent of Tehum.

MR. CROSS:  Tehum Care Services is the same company as Corizon.

THE COURT:  No, no, no, establish based on the

evidence that you've presented to this Court to this date, tell me how she's an agent.  No.  That's what you've got to establish, right?  And you're going to start citing cases to me, but let's make sure that we're on the same page.

I don't know -- tell me how you establish, based upon the evidence, that you've established a foundation that Corizon equals Tehum, this Corizon.  I don't know how -- I mean, they -- this Corizon equals Tehum Care Services, the debtor that I have, establish that and then you may -- then maybe you get me there.  But I don't understand how you get me on Signature.

MR. CROSS:  Okay.

THE COURT:  I was willing to admit it --

MR. CROSS:  Understood.

THE COURT:  -- for that, there's a Jennifer Finger who says she provides legal services for Corizon, and apparently Corizon has filed for bankruptcy.  I don't know who that is.

MR. CROSS:  Understood.

THE COURT:  I don't -- in other words, there's a lot of different companies that file for bankruptcy all across the United States, and I don't know who Corizon -- if there's another Corizon that's filed for bankruptcy.  I know my cases, but that's it.  And I know in general and some other ones, that's that, but I don't know what that means.

MR. CROSS: All right. Understood.

BY MR. CROSS:

Q    Mr. Perry, are you familiar with an entity called Corizon Health?

A    There's an entity -- I don't know that that's an actual legal entity, Corizon Health. Can you give me the full name?

Q    Did the debtor change its name at any time prior to the petition date to your knowledge?

A    It did.

Q    And what did it change its name from?

A    It was -- there was a combination merger in May of 2022. Multiple entities were combined. Valitás, Corizon, a number of those with legal entities behind them. They all combined into one and changed their name to Tehum Care Services.

Q    When did they change their name to Tehum Care Services?

A    It would have been in connection with the divisional merger, May of 2022.

Q    What were the entities -- so I want to understand, there was a combination merger, correct?

A    Correct.

Q    And then there was a divisional merger?

A    That's correct.

Q    What were the parties to the combination merger?

A    You'll have to put a document in front of me. I -- there's four of them.

MR. CROSS:  Okay.  Can we pull up Plaintiffs' Exhibit 7, which has already been admitted.

THE COURT:  Can I do this?  Because I feel like I'm probably being far too helpful here, but I'd hate to be a stickler for the rules.  So I'm just going to do this.  Okay?

So I'm really trying to be helpful here because I think we're kind of getting mired in left field, and so I'm going to try to be helpful here.  I think I've been helpful before identifying that no one has mentioned who Geneva is, identifying that no one has identified who the Corizon entity is.  I think I'm really going out of my way to be helpful here.  And maybe it's not my job to be helpful, but I'm doing it anyway.

So Federal Rule of Civil Procedure 7032 provides that if a witness is more than 100 miles away, okay, the deponent can use their transcript, but right now -- and anyway, so there's a 2004.  Mr. Lefkowitz, I don't know -- for purposes that have been used, they'll be admitted.  They'll be used for whatever purpose they've been used for.  The statements that have been played will be considered as played.  Okay?  I'm just going to allow them.

Essentially, you can call a witness in your case-in-chief, but you can also kind of call them in a cross period, right?  So I'm going to let you -- kind of like if you were crossing this witness, I'm going to allow you to ask --

those statements say what they say.  Whatever you've played on the tape will be the tape.  Okay?

With respect to this, these documents here, you have not established to me that Corizon is the Corizon Tehum Care Services, Inc. that filed for bankruptcy.  I'm sure there were documents that could have been admitted to establish this.  I don't have anything, and I don't know what that email says.  So if you're asking to establish that Jennifer Finger is the lawyer for Corizon, okay, I mean, it says what it says.  The email says what it says.

I'm not sure you need to prove the truth of the matter asserted therein.  I'm not sure what that gets you.  The witness will be able to answer the questions that he has.  And right now what we have is, let's see, Document Number 731, exhibit -- there's an exhibit where now you're pulling up your motion to cross-examine the witness on your motion.

MR. CROSS:  I didn't pull --

THE COURT:  Maybe I got that wrong, 731-7.  I can absolutely get -- oh, there you are.  No, I didn't.  Now I've got it right.  Okay.

MR. CROSS:  No, no, it's not 731.  It's the witness and exhibit list.  It's 911.

THE COURT:  911 dash -- all right.  Let's go there. 911, which number?

MR. CROSS:  7.

THE COURT:  911-7, okay, the SOFAs.  Okay.  I think we've also established that there's a company named Geneva, and there looks like there were some payments that were never made in the SOFAs.  That's what I've got so far.  Here are these -- okay.  What page would you like me to go to, Counsel?

MR. CROSS:  It's going to be at the bottom of the divisional merger.  There are --

THE COURT:  I'm sorry, can you just point me to a page?  Just 2 of 225?  I don't know what page you want me to go to, if I've got the right doc up.

MR. CROSS:  It is --

THE COURT:  Maybe it's easier if you tell me what PDF page.  Maybe I can just get there a little quicker, or you can give me a bottom page number.  Whichever, just let me know which one you want.

MR. CROSS:  So let's go to Page 811 or -- of the -- yeah, 164 of the PDF.

THE COURT:  Okay.  All right.  Okay.  I'm trying to be helpful to you here.  All right.  Where do we go?

MR. CROSS:  Okay.

BY MR. CROSS:

Q    Mr. Perry, do you see the box checked on that document that says, "The filing entity will survive the merger"?

A    Uh-huh, I do.

Q    And this is a document that was submitted with the

debtor's SOFA, correct?

A    That's right.

Q    So the debtor assumes that it's authentic and the content is accurate.  Do you adopt it as true?

A    The document in the SOFA, trying to answer --

THE COURT:  I'll admit it.  It's in evidence, so it says what it says, so you don't even have -- it's in.

BY MR. CROSS:

Q    So did the entity named Corizon Health, Inc. survive the merger?

A    Inc.?  Yes, Corizon Health, Inc.  Correct.

Q    Okay.  Thank you.  And that entity is now called Tehum Care Services, Inc.?

A    Correct, uh-huh.

Q    So it changed its name after the divisional merger?

A    That's right, very soon after.

Q    Okay.  Back to Ms. Finger.  I believe you testified Ms. Finger is a lawyer.  Is that correct?

A    I don't know.  I did not testify that she's a lawyer. What I testified is Sigma is made up of a number of in-house lawyers that were working at Corizon.  I don't know that Jennifer Finger is a lawyer because I've never asked for her authentication or whatever, you know, the words would be for a lawyer.  But I understand that Sigma is made up of former lawyers.

Q    Do you know if Jennifer Finger was an officer or employee of the debtor within two years prior to the petition date?

A    I don't recall.

Q    Do you have any reason to believe that Jennifer Finger was an officer or employee of the debtor within two years prior to the petition date?

A    I don't.

MR. CROSS:  Can we go to Movants' Exhibit 2, Page 93.

THE COURT:  Exhibit 2.  I'm sorry, what page did you mention, Mr. Cross?

MR. CROSS:  93.

THE COURT:  93?  It's Page 93 on the bottom or like -- I guess maybe it may sync up.

MR. CROSS:  I think they sync up.

THE COURT:  91, 92, 93.  Okay.

MR. BROOKNER:  Objection.

THE COURT:  What's the basis of the objection?

MR. BROOKNER:  Improper use of transcript.  Mr. Perry is not the testifying human in this transcript.

MR. CROSS:  Your Honor, I'm going to ask Mr. Perry if he was --

THE COURT:  What are you --for what purpose are you bringing it?

MR. CROSS:  To demonstrate Mr. Perry's knowledge.

THE COURT:  You're saying Mr. Perry --

MR. CROSS:  So it's impeachment.

THE COURT:  All right.  What's the statement you're impeaching him on?  That he doesn't have knowledge --

MR. CROSS:  That he doesn't have a reason to believe --

THE COURT:  Okay.

MR. CROSS:  -- that Jennifer Finger was an officer or employee of the debtor.

THE COURT:  Okay.  All right.  I'll allow it.

MR. CROSS:  All right.

BY MR. CROSS:

Q    Mr. Perry, can you read Lines 10 through 15 of the record?

THE COURT:  Oh, I'm sorry, you said 10 through what line?

MR. CROSS:  Uh-huh, 10 through 15.

THE COURT:  Okay.

"MR. CROSS:  Were any of those individuals previously officers?

"MR. LEFKOWITZ:  No.  Maybe Jennifer Finger was, but I'm not sure if she was.  But Jennifer Finger left the debtor and she joined the group, and this group owns Sigma."

BY MR. CROSS:

Q    Were you present at the 341 meeting when Mr. Lefkowitz said that?

A    I was present at all the 341 meetings, yes.

Q    Mr. Perry, how long have you been a restructuring professional?

A    Since late 2007.

Q    How many times have you provided professional services to a Chapter 11 debtor?

A    A dozen or more.

Q    And in the course of your experience as a restructuring professional, have you become familiar with any legal requirements that professional persons such as yourself need to satisfy before they can be paid out of a bankruptcy estate?

A    Yes.

Q    What is your understanding of those requirements?

A    Professional services companies that are providing bankruptcy and restructuring related services have to be retained through the court process.

Q    And what does that involve?

A    A retention application, retention orders, things of that nature.

Q    Did Sigma Risk Management satisfy those requirements before you paid them $150,000 on April 5th.

MR. BROOKNER:  Objection.  Lack of foundation, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I paid Sigma based on an executory contract as an executory contract counterparty.  I'm not sure

if that's what your question was.  I'm sorry.

BY MR. CROSS:

Q     My question was did Sigma Risk Management satisfy those requirements before you paid them $150,000 on April 5th?

A     I do not believe Sigma was retained under any type of retention application or order, no.

Q     After the meeting of creditors on May 12th, did the debtor make another payment to Sigma of $120,000?

A     They did.

Q     Did you authorize that payment?

A     I did.

Q     Did you hear Mr. Lefkowitz testify during the May 12th meeting of creditors that Sigma is owned by a group of lawyers?

A     I see it on the screen here.  We were using -- the debtor was using Sigma for claim management services, not for legal services.

Q     Did you hear Mr. Lefkowitz testify during that meeting of creditors that Sigma also provides services to YesCare?

A     I don't recall in the testimony that he did, but I am aware of that.

Q     Did you hear Mr. Lefkowitz testify during the May 12th meeting of creditors that Jennifer Finger is among the lawyers who own Sigma, and that she may have been an officer or employee of the debtor?

        MR. BROOKNER:  Your Honor, I'm sorry.  I'm trying to

be respectful, and I know where you're going to go, but this is all hearsay. And, you know, these -- if he wants to call those witnesses, he can.

THE COURT: Overruled.

THE WITNESS: Well, you just had me read a statement of what Isaac said, so I can only speak to what I'm reading on the screen. On the screen, Isaac said maybe Jennifer Finger was, but I'm not sure if she was. But she left the debtor and she joined the group, and this group owns Sigma RM today.

BY MR. CROSS:

Q    But the debtor never sought permission from the court to retain Sigma, did it?

A    No. The debtor has an executory contract with Sigma.

THE COURT: I want you to answer the question. It's not whether there's an executory contract. The question is did you seek to retain them?

THE WITNESS: We did not.

THE COURT: Okay. Thank you.

BY MR. CROSS:

Q    So I believe you testified that Sigma is not providing legal services to the debtor.

A    I'm the CRO. I don't and have not utilized Sigma for legal services, no.

Q    Did the debtor request permission from the Court to employ Baker & Hostetler as its special cyber counsel?

A     It did.

Q     Do you consider the services provided by Baker to be legal services?

A     Absolutely.

Q     How were the services provided by Baker different from the services provided by Sigma?

A     They're two completely different professionals.  Sigma provides claim management.  We provide -- they provide information to us.

          THE COURT:  What is claim management?  What does that mean?

          THE WITNESS:  So, Your Honor, the --

          THE COURT:  In other words, it means a lot of stuff in our -- in the bankruptcy world, so I just want to kind of drill down and understand what you mean by claim management.

          THE WITNESS:  Sure.  So, Your Honor, the debtor has roughly call it 4- to 500 of personal injury, personal liability type claims that have been filed, tort claims, pro se claims, a number of things.  We've scheduled much of them.  Much of them were filed on the filed proof of claims.

          THE COURT:  Uh-huh.

          THE WITNESS:  Sigma effectively manages the inventory of those claims.  They document what claims have been filed.  They receive a lot of the information on those claims.  They package up that information.  They connect which claims are

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

applicable to which insurance policies.  Their job is to monitor what's occurring across the country with those claims. So we as the debtor used Sigma to gather all of that information for the ability to, number one, deal with the lift stay hearing that was in front of Your Honor.  Number two, to prepare all the SOFAs and schedules to deal with noticing.

THE COURT:  So they were assisting the debtor in carrying out its duties under this title?

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  They were assisting the debtor in carrying out its duties in connection with this case?

THE WITNESS:  They were assisting us with gathering and assimilating information, absolutely.

THE COURT:  Okay.  Were they doing this before the case?

THE WITNESS:  I believe so, Your Honor.  The contract predates my engagement.

THE COURT:  Okay.  Thank you.

BY MR. CROSS:

Q    Who negotiated the contract with Sigma, if you know?

A    I'm not aware of that.

Q    Did the debtor -- I'm sorry, back to Baker.  Did Baker represent the debtor in any litigation as special cyber counsel?

A    We have not had any litigation related to the cyber

matter, no.

Q     What exactly did Baker do for the debtor?

A     They represented the debtor with respect to a cyber incident.

Q     Does Ankura have a cybersecurity division?

A     They do.

Q     Was Ankura's cybersecurity division hired to do anything related to this case?

A     They were.

Q     Who paid for that?

A     It's part of the engagement for Ankura, so the estate will be paying for that.

Q     So Ankura has not been paid for the cybersecurity work yet?

A     I don't know.  We filed fee statements through a certain period of time, and I don't know if the hours for that team were included in the fee statement that we've been paid on.

Q     Mr. Perry, did you participate in the preparation of the original schedules and statement of financial affairs in this case?

A     I did.

Q     Did you review the original SOFA at any time before it was filed?

A     I did.

Q     Did you testify at the first meeting of creditors on

May 12th?

A    I did.

Q    And in that meeting, did you testify under oath that the statements and schedules filed on April 28th, 2023 were true and correct to the best of your information, knowledge, and belief?

A    I believe that's what I, yeah, testified to, uh-huh.

Q    Was the statement of financial affairs subsequently amended in this case?

A    They were.

Q    How many times?

A    We amended them twice.

        MR. CROSS:  I want to direct your attention to Movants' Exhibit 7, Page 220.

        THE COURT:  I apologize.  What exhibit was that, Mr. Cross?

        MR. CROSS:  Exhibit 7, Page 220.

        THE COURT:  Okay.  Just a second.  I'll try to find it from here.  You mean like 220 on the --

        MR. CROSS:  Yes, of the PDF.

        THE COURT:  Okay.  Thank you.

BY MR. CROSS:

Q    Do you know what we're looking at here, Mr. Perry?

A    I do.

Q    What does it show?

A       This is a number of cash transactions that occurred prior to the petition date.

Q       On May 12th, 2023, were you aware that the debtor made these payments?

A       On May the 12th?

Q       Yes.

A       This was filed in the second amendment.  I was aware of these transactions ahead of preparing the second.  I have to get a calendar out, if you're asking.  The second amendment I think was filed in July, and I became aware of these right before that.

THE COURT:  So the top of the page shows that it's filed on the docket on July 19th, if that helps refresh your recollection.

THE WITNESS:  Uh-huh.  And I became aware just before the filing of this, which is why it was included in the second amendment.

MR. CROSS:  Let's go to Exhibit 5, Page 26.

THE COURT:  Movant 5?

MR. CROSS:  Yes, Movant 5.

THE COURT:  Okay.

BY MR. CROSS:

Q       Do you see two bank accounts listed there, an account at Signature Bank with an account number ending in 9087, and a second account also at Signature Bank with an account number

ending in 9680?

A    I do.

Q    To your knowledge, besides those two accounts, did the debtor have any other bank accounts between the date of the divisional merger and the petition date?

A    I don't recall.  I don't think so.  The Signature accounts represented substantially all of the debtor accounts, if I recall.

Q    I want to direct your attention to Exhibit, I think it is 27, the transcript of the 341 meeting on May 12th.

          THE COURT:  You said 27, Counsel?

          MR. CROSS:  Uh-huh.

          THE COURT:  All right.  Just give me a second.

          MR. CROSS:  Or, I'm sorry -- no, I'm sorry, 2.

          THE COURT:  Exhibit 2?

          MR. CROSS:  Yes.

          THE COURT:  Okay.  What page?

          MR. CROSS:  It would be Page 18.

BY MR. CROSS:

Q    I want you to read Lines 18 to 23 for the record.

A    Okay.  It says:

          "MR. KAUFMAN:  I'm going to let Isaac confirm, but we've looked at the two bank accounts that we just received the bank statements recently and they were showing a zero balance. But we didn't have those when we filed the schedule.  So I'll

let Mr. Lefkowitz describe if he knows anything else."

Q    Do you agree with Mr. Kaufman that the debtor received the bank statements for two of the debtor's bank accounts after the original SOFA was filed on April 28th yet on or before May 12th?

A    I just read that here on the page, and I will not object to what Mr. Kaufman said.

Q    Okay.  Did you review those bank statements that Mr. Kaufman is talking about?

A    I did.

Q    Were those the bank statements for the 9680 Signature account and the 9087 Signature account?

A    I don't recall, but I believe so, yes.

Q    Did the debtor file an amended SOFA on June 10?

A    The date sounds correct.  You'd have to pull the document, but yes, I believe that's the date we did file an amended SOFA, yes.

Q    Okay.  So you would agree that at the time of the first amended SOFA, the debtor had been in possession of the bank records for the 9680 and 9087 Signature accounts for approximately a month?

A    Can you repeat your question?  Sorry, I want to make sure I understand the dates you're asking about.

Q    Would you agree that at the time the debtor filed the first amendment to the SOFA, the debtor had been in possession

of the bank records for the 9680 and 9087 Signature accounts

for approximately a month?

A    You'll have to describe what you mean by bank records.

         THE COURT:  I'm a little confused by that answer.

         THE WITNESS:  I'm sorry, Your Honor.  I'm not sure

what he's asking me.  Bank records?  Mr. Kaufman here says bank

statements.  We received bank statements on the day.

         THE COURT:  I think that's what --

         THE WITNESS:  I think that's what he asked.

         THE COURT:  I think that's fair.

         THE WITNESS:  And that's what we received.

         THE COURT:  That's fine then, yeah.

         THE WITNESS:  Okay, yeah.

BY MR. CROSS:

Q    So did you receive bank statements approximately a month

before you filed the first amended SOFA for those two Signature

accounts?

A    We did.

         MR. CROSS:   All right.  Let's go back to Movants'

Exhibit 7, Page 220.

         THE COURT:  Remind me the exhibit number again,

Counsel.

         MR. CROSS:  It's Exhibit 7 on Document 911.

         THE COURT:  220?

         MR. CROSS:  Page 220.

THE COURT:  All right.

BY MR. CROSS:

Q    Do you see any payments listed to M2 LoanCo for exactly $1 million?

A    I see a payment on May the 17th for 1 million.

Q    What is the date of the divisional merger?

A    Early May 2022.

Q    Does May 5th sound right?

A    Thereabouts, uh-huh.

Q    Would you agree that the payment of $1 million in May to M2 LoanCo was after the divisional merger?

A    It's what the bank activity indicated and it's what we scheduled, yes, uh-huh.

Q    Was the payment made from the Signature Bank account ending in 9087?

A    I don't recall.  It would be in the backup to the schedule.

Q    Was it made from one of the two Signature accounts?

A    Yes, uh-huh.

Q    Why was that $1 million payment to M2 LoanCo not included on the SOFA filed on June 10th?

A    We wouldn't have had the bank activity that you see here until we prepared the second amendment.

Q    But you testified that you got the bank records for the Signature accounts.

A    No, not bank records.

Q    The statements --

A    Correct.

Q    -- on May 12th.

A    That showed a zero balance the day that we came into the case.  We further gathered all of the information for the bank records, which would have been all the activity in the Signature accounts.

Q    So the statements didn't show a $1 million payment in the month of May with a date?

A    All of this bank activity would have come from the statements, the balance -- or from the bank records and activity.  The balance that I'm referencing was a single statement at a single point in time that had a zero balance.

Q    What was the purpose, or do you know the purpose of the $1 million payment to M2 LoanCo on May 17th, 2022?

A    I don't.

Q    Do you see any more payments to M2 LoanCo made after the date of the divisional merger?

A    November 14th, 2022, another November 14th, 2022.

Q    Do you know the purpose of those payments?

A    I do not.

Q    Do you see a $1 million payment to Perigrove?

A    I do, uh-huh.

Q    Do you know what account that payment was made from?

A   One of the Signature accounts, one of the two.

Q   Were you present at the third meeting of creditors? Actually, strike that.

Do you know what the purpose of the $1 million payment to Perigrove is?

A   I do not.

Q   Were you present at the third meeting of creditors on July 21st?

A   I was.

Q   Did you hear Mr. Lefkowitz testify that the $1 million payment to Perigrove on June 1st was for repayment of a loan from Perigrove?

A   I recall it being two or three hours.  I don't recall that exact testimony.  I'm sorry.

MR. CROSS:  Can we pull up Movants' Exhibit 14. Let's go to Page 39.

BY MR. CROSS:

Q   Mr. Perry, I'd like you to read Page 39 and 40 and see if that refreshes your memory.

A   Okay.  I see here -- I don't recall this exact exchange, but I see here in the testimony that it did occur, or in the transcript.

Q   So you would agree that Mr. Lefkowitz testified that the $1 million payment was repayment of a loan to Perigrove -- from Perigrove?

A    I can see the words here, and I will absolutely attest what I read is the transcript, yes.

Q    Have you ever seen any loan documents pertaining to that loan?

A    Personally, I don't believe I have.  My team may have, but not me.

Q    Do you know when Perigrove made that loan to the debtor?

A    I do not.

Q    Have you ever seen any documentation at all substantiating Mr. Lefkowitz's claim that there was a $1 million loan made to the debtor by Perigrove?

A    I personally have not.

Q    Are you aware of any?

A    There's been thousands of pages.  I'm not aware of any, but it doesn't mean it doesn't exist.

Q    How about the $5 million payment to Perigrove on 4/12/22. Do you know what that payment was for?

A    I don't.

Q    Have you ever seen any documents pertaining to a $5 million loan from Perigrove to the debtor?

A    I personally have not seen those documents, no.

Q    Do you know if Perigrove made any loans to the debtor?

A    I do not know.

Q    Let me direct your attention to Page 222 of this -- of the second amended SOFA, Exhibit 7.

THE COURT:  Appreciate it.  Page number was 2 --

MR. CROSS:  222.

THE COURT:  That makes it easy.  Okay.

BY MR. CROSS:

Q    Do you see some bank accounts listed on the page there?

A    I do, uh-huh.

Q    Were those accounts assigned to CHS Texas in the divisional merger?

A    They do appear to be the accounts that were allocated in the divisional merger.  Correct, uh-huh.

Q    Between December of 2021 and the date of the divisional merger, do you know if the debtor held any other bank accounts besides these listed bank accounts at Bank of America and the two accounts at Signature Bank?

A    I don't recall.  There may have been one additional bank account.  I recall these BofA accounts and the Signature accounts.  I don't recall if there were any others.

Q    Are there any accounts for which the debtor does not have access to the bank records?

A    Not that I'm aware of.

Q    Have you reviewed the bank statements for the Bank of America accounts?

A    My team reviewed bank activity.

Q    When did you obtain access to the -- strike that.

What do you mean by bank activity?

A     Throughout our investigation of the debtor's activities on a pre-petition basis, we gathered bank activity from Bank of America.  We reviewed the bank --

Q     And what's bank activity?  What exactly are you looking at?

A     We're looking at general ledger data.  We're looking at book entries.  We're looking at reconciliations.  To the extent we have bank statements, we're reviewing bank statements.

Q     Do you have bank statements for these accounts?

A     I don't recall if we have statements for these exact accounts.

Q     Did you ever attempt to obtain the bank statements for these accounts?

A     I believe through our investigation process we did, uh-huh.

Q     And did you succeed?

A     I don't recall.

Q     In your review of the activity for the Bank of America accounts and the Signature Bank accounts, did you see any wires in from Perigrove?

A     I'd have to go back to the activity again.  There was substantial inflows in and out.  We documented all of those.  I don't recall.

Q     Who has maintained the debtor's books and records between the petition date and May 12th, 2023?

A     My team and I have.

Q     Do you have access to all of the debtor's books and records?

A     The current books and records today?  Yes, we maintain those.  I have access to those.

Q     Do you have the -- access to all of the books and records covering the debtor's pre-petition activity from December of 2021 to the petition date?

A     What do you mean by books and records?

Q     Any electronic records showing payments made to or from the debtor.

A     Yeah.  We gathered much of or all of that information as part of our investigation.

Q     But you didn't find out if there were any payments made to the debtor by a Perigrove entity?

A     Sure.  We did a full-blown investigation.  It would have been part of our work product.

Q     All right.  Let's go back to Page 220.  How did you become aware that the debtor made these payments to affiliates?

A     We received historical Signature Bank statements from the inception of the accounts.  We prepared a spreadsheet of every single transaction in and out of those Signature accounts.

Q     And you had received -- you testified that you received those statements on May 12th, correct?

A     No, I did not testify to that.

Q    Did you receive any records from M2 LoanCo as part of your investigation?

A    Sure, uh-huh.

Q    What records did you receive?

A    A substantial amount of records, bank records, documents, other types of information.  It was a very voluminous response.

Q    Did the bank records show M2 LoanCo receiving these payments that are listed on Exhibit 13, or Attachment 13?

A    I'm sorry, I don't understand.  Ask me again what you're looking for.

Q    I'm asking you if the records you received from M2 LoanCo showed these payments to M2 LoanCo.

A    I don't recall.  I don't recall if the M2 record showed the inflow from these accounts.  I don't recall that information.

Q    Are the debtor and M2 LoanCo owned by a common parent?

A    I believe when you go all the way up the organizational structure, I believe that's the case, yes.

Q    What's that common parent?

A    I think at the very top it's Perigrove.

Q    Is it Perigrove LLC or Perigrove 1018, LLC?

A    1018, I believe.

Q    Did Perigrove 1018, LLC acquire the debtor in December of 2021?

A    That's what I believe, yes.

Q    Do you know who the members of Perigrove 1018, LLC are?

A    No.  There's a lot of hats.  There's a lot of entities.
There's a lot of players.  I do not know exactly who all the
members are.

Q    Do you know who any of the members are?

A    There's a handful.  Jay Leitner; I think Isaac's a member
of Perigrove, Mr. Lefkowitz.

Q    Do you know anyone else?

A    If you gave me organizational documents, I would be able
to recognize them.  But there are so many entities in this
engagement that knowing exactly which directors are in each,
all of them, there's no way I could memorize all of that.

Q    Is Abraham Goldberger a member of Perigrove 1018?

A    I don't recall, but the name is familiar.

Q    Do you know how much money Perigrove 1018 paid for the
debtor?

A    I do not.  I do not have details of that transaction, no.

Q    Do you know if the debtor owed any money to M2 LoanCo at
the time of the acquisition by Perigrove 1018?

A    Sorry, repeat that question.

Q    Do you know if the debtor owed any money to M2 LoanCo at
the time of the acquisition by Perigrove 1018?

A    I don't recall.  I don't recall if that's -- there's a
secured debt that was in place that was allocated as part of
the digital merger.  But you're asking about the Perigrove

transaction, so I don't know the answer.  I'm sorry.

Q    I'm not -- I'm sorry, I'm not asking about the Perigrove transaction.  I'm asking about at the time of the Perigrove transaction, was there an outstanding debt owed by the debtor to M2 LoanCo?

A    Yes, I believe there was.  Uh-huh, yeah.

Q    And did Perigrove 1018 also acquire M2 LoanCo in that transaction?

A    I don't have the specifics for that transaction.  You're asking about the December 21 transaction, correct?

Q    Yes.

A    Yeah.  I do not have the specifics for exactly which entities acquired which entities.

Q    Have you testified that M2 LoanCo and the debtor are owned by a common parent, which is M2 HoldCo?

A    If it was part of the organizational documents in my declaration, then the answer is yes.  We'd have to go back to my declaration for that.

Q    Do you know how much money or what the outstanding balance of the secured debt to M2 LoanCo was at the time the debtor was acquired by Perigrove 1018?

A    I think it was approximately 100- to 120 million.  That's all I know.

Q    Where does that information come from?

A    Just review of historical information.

Q     What historical information?

A     Information that we would have had gathered or questions we would have asked as we were compiling the schedules and the statements.  When we were reviewing the divisional merger documents, there was an allocation of a secured debt.

Q     And how much was the secured debt at the time of that allocation?

A     I want to say again approximately 100 million, if I remember correctly.

Q     Where did you get that information from?

A     It would have been either in the divisional merger documents or documents related thereto.

Q     Have you ever been able to ascertain the outstanding balance of the debtor's secured debt to M2 LoanCo at any time prior to the divisional merger?

A     Only to the extent that it would have been on the balance sheet that I would have reviewed, but otherwise I don't recall.

            MR. CROSS:  All right.  Let's pull up Exhibit 22.

            THE COURT:  Mr. Cross, I just want to give you just a heads up.  I'm trying to get someone to see if I can get this room to be a little cooler.  So when you find kind of a decent place -- I don't want to ruin your flow.  I just want you to think about a place where maybe we can take a ten-minute break, and I can try to get some tech people in here to see if they can make this room a little bit cooler.

MR. CROSS:  Oh, we can absolutely do that right now.

THE COURT:  Okay.  So why don't I just take a break. It's ten to 3.  I'll get the tech folks working on it.  Someone may come in, someone may do something on the back end, but I didn't want some kind of loud noise to kind of throw everything off.

And so first I would remind you that you're still under oath, okay, and you're to speak with no one about your -- about the context of your testimony while we're on break.  And we'll come back on at 3 p.m. Thank you.

MR. CROSS:  Okay.  Thank you.

THE CLERK:  All rise.

(Recess taken at 2:50 p.m.)

(Proceedings resumed at 3:05 p.m.)

THE CLERK:  All rise.

THE COURT:  Be seated.  Have a seat.  Back on the record in Tehum, and Mr. Perry, I'll remind you that you're still under oath.

Okay, Mr. Cross, you may proceed.

MR. CROSS:  All right.  Can we pull up Exhibit 22?

THE COURT:  Just give me one second here.

BY MR. CROSS:

Q    Mr. Perry, do you recognize this document?

A    This is a document I have reviewed, yes.

Q    What is it?

A    It was a document dated -- if you'll scroll up a little bit, Your Honor.

THE COURT:  Oh, sure.

THE WITNESS:  I don't know if there's -- I think there's a date here.  Yeah, April 29, 2022, referencing payoff of a permissory notice.

BY MR. CROSS:

Q    And when did you first see the document?

A    This was part of the documents that we have gathered as part of our investigation, so sometime during the course of the last couple of months.

Q    Does the document include a payoff amount as of April 29th, 2022?

A    It does, 5.5 million.

MR. CROSS:  Can we go to the second page?  Sorry, the signature page.  I guess it would be the third.

BY MR. CROSS:

Q    Do you recognize that signature?

A    I do.

Q    Whose signature is it?

A    It appears to be Mr. Lefkowitz's signature.

Q    And he is signing as a director of M2 LoanCo, correct?

A    That's what the documents states, uh-huh.

Q    Okay, let's go to the next page.  Can you tell us what we're looking at?

A    Series of dollar amounts under a column of original principal amount.

Q    Are these supposed to represent loans?

A    That, I do not know.

Q    Do you know if there was a $5.5 million payment made from the debtor to M2 LoanCo on or about April 29th, 2022?

A    No, there wasn't a payment, I don't believe, around April '22, no.

Q    What's the purpose of this document?

A    I don't know.  I didn't create the document.

Q    Do you know if the debtor ever borrowed those amounts?

A    I do not know the answer to that.

Q    But your testimony is there was not a payment on April 29th, 2022, of $5 million to M2 LoanCo?

A    Not that I recall, no.

Q    Was there a payment on or around April 29th, 2022, to any other entity that you recall from the debtor?

A    If there was, I -- I may have scheduled it in that exhibit that we've been looking at.  So you could reference back to that exhibit.

Q    All right, let's go to Exhibit 19.  Mr. Perry, have you seen this document before?

A    I have, uh-huh.

Q    What is it?

A    This is a document or an agreement between Valitas Health

Services, Inc. and Geneva Consulting Services that are described here, say corporate restructuring.

Q    Can we go to the signature page?  Do you recognize the signatures of the signatories on this document?

A    I recognize Mr. Lefkowitz, Your Honor.

Q    Do you know the -- an individual by the name of Jay Leitner?

A    I'm familiar with the name, yes, uh-huh.

Q    Was he ever a director of the debtor?

A    I don't recall.  We'd have to look at the divisional merger documents for that.

Q    Did you list him as a director in the SOFA?

A    You have to show me the document, and I could testify to it.

         THE COURT:  You can answer if you know the answer. And then they can refresh your recollection one way or the other, but you can answer whether you know or no, don't know the answer.

         THE WITNESS:  Yes, Your Honor.  I don't know, but if you want to recall my memory from the SOFA, I'm happy to.

         MR. CROSS:  Okay, let's go to Exhibit 7, the SOFA.

         THE COURT:  And the SOFA is doc --

BY MR. CROSS:

Q    And let's go to Page 225.  Does that -- do you remember now, after reviewing this document?

A     Former partners/officers.  This would have been filed in July second amended SOFA.  Jay Leitner was a director from February 14, '22 to May 5th, '22, uh-huh.  What we scheduled in the SOFAs.

Q     Now, that February 14th date, did all those individuals become directors on February 14th or did you just use that because it's one year before the petition date?

A     The latter.

Q     Okay.  So back to Exhibit 19.  We've established that Mr. Leitner was a director of the debtor prior to the divisional merger.  Correct.

A     Remember the dates in that schedule.  February 22, that's correct, Your Honor.

Q     And Mr. Lefkowitz was also a director of the debtor?

A     He was.

Q     And under this agreement, what are the services that Geneva has agreed to provide?

        MR. BROOKNER:  Objection, Your Honor.

        THE COURT:  What's the basis?

        MR. BROOKNER:  It's not admitted yet.

        MR. CROSS:  Your Honor, I move to admit the consulting agreement between the debtor and Geneva Consulting.

        MR. BROOKNER:  Objection.  It hasn't been properly authenticated with respect, at least, to the final signature.

        THE COURT:  Why don't you ask a couple more

questions, see if you can get in?

BY MR. CROSS:

Q    Mr. Perry, you've reviewed this document before, correct?

A    I have read this document, yes.

THE COURT:  Good enough for me.  I'll allow it.  I'll admit it.  Thank you.

(Movants' Exhibit 19 admitted into evidence)

MR. CROSS:  Thank you.

BY MR. CROSS:

Q    So what are the services that Geneva was supposed to provide under this contract?

A    Your Honor, would you mind scrolling back up?  I just have to actually read the services on the document.

THE COURT:  Well, no, the question is, do you know.  You're saying -- you want him just to read the --

MR. CROSS:  I want to ask him what --

THE WITNESS:  I wasn't around at the time.

THE COURT:  What his understanding was or what the document says?  I don't --

MR. CROSS:  Just what his understanding is.

THE COURT:  Ah.

BY MR. CROSS:

Q    What is your understanding of the services?

A    Corporate restructuring.

Q    What is that?

A     What is the definition of corporate restructuring or in the context of this agreement?

Q     In the context of this agreement?

A     I don't know.  I wasn't present at the time of that agreement, so I don't know exactly the services that were provided.

Q     What was the compensation paid for those services?

A     The document calls for a lump sum fee of 3 million upfront retainer and then 500,000 each month for the duration of the agreement after a six-month retainer.

Q     Were there any $500,000 payments made by the debtor monthly to Geneva Consulting?

A     There were, uh-huh.

Q     And when were those payments made?

A     They were made, I believe, January through May of '22.

Q     So some of them were made within one year of the petition date, correct?

A     That's right.

Q     And those payments were not listed on any of the SOFAs, correct?

A     That's correct.

Q     Why not?

A     Well, effectively, there's four places we could have potentially listed the Geneva payments:  Question 4, Question 11, Question 30.  Across the board, there is an existence of a

consulting agreement.  There is a definition of services.  We, therefore -- you know, when we compiled the information, concluded that these payments were made in ordinary course, so we didn't include it in Schedule 13.  We didn't include it as it related to an insider payment and as it relates to corporate restructuring.  Typically, for a corporate restructuring schedule, I use firms like mine, firms like other corporate restructuring related firms, legal firms, that sort of thing.  Geneva Consulting is not a firm that I'm familiar of, of providing corporate restructuring services.  In hindsight, could you have potentially included two payments of 500,000 in the SOFA that called for corporate restructuring?  I think you could potentially argue that would be the case.

Q     Why didn't you include it as payments to or for the benefit of an insider?

A     Based on discussions with counsel and my team, we didn't conclude at the time that Geneva Consulting met the definition.

Q     Do you know who owns Geneva Consulting?

A     There are a lot of chess pieces.  The answer is no.

        MR. CROSS:  Can we pull up Exhibit 13, please?  I want to go to the second email on the bottom of the first page.

        THE COURT:  Bottom of first page or bottom of second page?

        MR. CROSS:  Bottom of the first page.

        THE COURT:  Okay.

BY MR. CROSS:

Q    Do you recognize any of the email addresses on that email?

A    Isaac Lefkowitz is the from.  There's no email address, but I clearly recognize the name.  The other email addresses predated my time.  I don't recognize an @corizonhealth.inc. The individuals that are listed here use a different email address, at least in my communication with them.

Q    But do you recognize the individuals?

A    Scott King and Jeff Sholey?  I certainly recognize, uh-huh.  Sarah Tirschwell has been mentioned in documents.

Q    Who are Scott King and Jeff Sholey?

A    They're current officers of YesCare.

Q    Are they former officers of the debtor?

A    They are.

Q    Who is Sarah Tirschwell?

A    Another former officer of the debtor.

Q    Do you see on the bottom right corner of the document, there is a exhibit sticker and a stamp that says debtor 138299?

A    I do, uh-huh.

Q    Do you know what that debtor 138299 means?

A    I believe it's the number that identifies documents that have been provided.

Q    So is this a document that was produced by the debtor?

A    I don't know the answer to that.

            MR. CROSS:  Your Honor, I move to admit Exhibit 13.

MR. BROOKNER:  Objection, Your Honor.

THE COURT:  What's the basis?

MR. BROOKNER:  It's hearsay.  It's not properly authenticated.  The witness is not on this document.  He has no personal knowledge of it.

THE COURT:  For what purpose is this being admitted?  Do you seek admission, counsel?

MR. CROSS:  It's being admitted to show that Mr. Lefkowitz knows who the owner of Geneva Consulting is.

THE COURT:  It's not admitted.  Denied.  You can't -- we don't know that.  I don't -- this witness, it's hearsay.  I don't -- I can't admit that for the truth of the matter asserted.  It's not admitted.  You can ask your next question.

BY MR. CROSS:

Q    So you don't know who owns Geneva Consulting?

A    I do not personally know the owners of Geneva.

Q    Do you know any of the individuals associated with Geneva Consulting.

A    Through testimony, there's been names provided.  I don't recall exactly those names.  I would have to consult with my team through our investigation.

Q    Is Jay Leitner associated with Geneva Consulting?

A    I don't -- I don't know the answer to that.  Mr. Cross, there's a lot of chess pieces here.  I have not memorized every director of every entity.  It's just not possible for me.

Q    Do you know if Mr. Lefkowitz is associated with Geneva Consulting?

A    I don't know the answer to that.

MR. CROSS:  Give me a second, Your Honor.

THE COURT:  Absolutely.  Take your time.

MR. CROSS:  Let's go to Exhibit 3.  Can we go to Page 90?

THE COURT:  Sure.

BY MR. CROSS:

Q    Can you read the first five lines?  You don't need to read it out loud, just read it to yourself.

A    Okay.

Q    Were you there when Mr. Lefkowitz said that?

A    I was present at the 341 meeting, yes.

Q    And he testified that he didn't know who the principals of Geneva Consulting are, correct?

A    Says here, Mr. Cross, "Who are the principals, Mr. Lefkowitz?"  "I don't know."  So that's what the words would indicate.

MR. CROSS:  Can we go to the video, Exhibit 8?

MR. BROOKNER:  I just have a question, Your Honor.  I don't remember if you admitted that video for all purposes or only for the prior clip that was played.

THE COURT:  For the statements that what it said, for what I heard.

MR. BROOKNER:  For the prior.  Okay, thank you.

THE COURT:  What page are we going to?

MR. CROSS:  Oh, I'm sorry, the video.  I want to play the rest of the video.

THE COURT:  We're not going to play the 14-minutes video.

MR. CROSS:  Okay.

THE COURT:  Yeah, we just -- you know, we're not doing that.  So if you want to point me to statements that you seek to admit -- and I'm not, for example, admitting, and I want to be really clear now, today's date is August 14th, you know, like the videographer today, the Lawrence Wallace (phonetic) representing the Planet Depos.  We're not doing this for all purposes.  If you want to use the deposition for a purpose, as if he was testifying here today, which is what the rules require, then you can use it, but I'm not going to play your 14 minutes of video.

MR. CROSS:  Okay, thank you, Your Honor.

THE COURT:  Just take your time.  But I mean, but I want to be really clear.

MR. CROSS:  All right, let's go to Page 27.

THE COURT:  Do you have questions for this witness?  I mean, we can do this after.  In other words, unless you're going to ask him questions about this, I don't want to interrupt your examination, but --

MR. CROSS:  Sure.

THE COURT:  -- if you have questions for him, we can deal with the --

MR. CROSS:  We can do this after.

THE COURT:  -- depo designations after.

MR. CROSS:  All right.  Then, let's go to Exhibit 21.

THE COURT:  All right.

BY MR. CROSS:

Q    Have you seen this document before?

A    I've seen it as part of your exhibit package, and my team has seen it as part of their investigation.

Q    What is it?

THE COURT:  I'm not sure he answered the question.

BY MR. CROSS:

Q    Have you seen the exhibit before?

A    I have, uh-huh.

THE COURT:  Thank you.

BY MR. CROSS:

Q    What is it?

A    It's a credit agreement.  Your Honor, would you mind scrolling up?  It's a credit agreement between CHS Texas, YesCare, Portland Capital Market, and then the lenders.

Q    What is the date listed under the title?

A    Document says August 17th, 2020.

Q    I want to direct your attention to Page 38.  You don't

need to read it out loud, but could you read to yourself Paragraph 2.01.

THE COURT:  Mr. Brookner?

MR. BROOKNER:  Yes, Your Honor.  If -- I believe if the -- if Counsel wants to ask questions of the witness about the document, he needs to have it admitted into evidence.

THE COURT:  I agree.

BY MR. CROSS:

Q   Does this appear to be the same document that you reviewed as part of your investigation, Mr. Perry?

MR. BROOKNER:  Objection.  That's not the testimony, Your Honor.

THE COURT:  No, he can answer.

MR. CROSS:  It's a question.

THE COURT:  He can answer the answer.

THE WITNESS:  I don't recall.  It's 113-page credit agreement.  I don't recall if it's the same document.

BY MR. CROSS:

Q   Do you have any reason to believe that it's not?

A   At this point, I do not.

Q   Want you to direct your attention to the bottom of, let's say, the first page.

THE COURT:  Page 1 of the PDF?

MR. CROSS:  Yes.

THE COURT:  Okay.

BY MR. CROSS:

Q    Do you see that little stamp in the bottom corner?

A    I -- confidential?  Right corner?

Q    The right corner, yes.

A    I do.

Q    And confidential is in the left corner, correct?

A    It is.

Q    And what's the stamp in the right corner?

A    You want me to read it to you?

Q    No, I'm asking you if you know what it is.

A    Typically in a legal document, it's a stamp by a legal firm with a -- that basically says it was a document that relates to shared information.

Q    The stamp that starts YC-E and then has a number.

A    Uh-huh, right.  I'm not a lawyer, but that's typically what I see in legal documents stamped at the bottom, means documents were shared.

Q    So this -- does this appear to be a document that was produced by another party?

A    Based on the stamp and the -- I don't know the answer to that, I'm sorry.

Q    Did you review any documents produced by YesCare as part of your investigation?

A    Sure, YesCare provided a ton of information, uh-huh.

Q    And did those documents include that little stamp on them?

A    I don't recall if all the documents had a little stamp on them.

Q    Did any of them have the little stamp?

A    The documents that I reviewed, no.  I reviewed Excel spreadsheets and other transactions.

Q    Do you have any reason to believe that this credit agreement is not genuine or the same credit agreement that you reviewed?

A    I can't opine on that.  No.

        MR. CROSS:  Your Honor, I moved to admit it under 901(b)(4), based on its distinctive characteristics:  The Bates stamp, the exhibit sticker, the stamp that says confidential.

        THE COURT:  You're referring to Federal Rule of Evidence --

        MR. CROSS:  901(b)(4).

        THE COURT:  901 deals with authentication, not admissibility, right?

        MR. CROSS:  No, admissibility.  So it -- for admissibility, Your Honor, this is a contract, correct?

        THE COURT:  Oh, it's -- thought you were asking me.

        MR. CROSS:  I'm sorry.

        THE COURT:  Yes.

BY MR. CROSS:

Q    Mr. Perry, is this a contact?

        THE COURT:  That was for you, Mr. Perry.

THE WITNESS:  I wasn't there at the time.  It's a credit agreement.  Are you asking me if a credit agreement is a contract?  I --

BY MR. CROSS:

Q    Yes.

A    Generally, in the financial world, a credit agreement represents a contract, yes.

MR. CROSS:  Okay.  So documents such as contracts are outside -- they are not hearsay because they're verbal acts.  They have independent legal significance apart from the words said.

THE COURT:  Contract is a verbal act?

MR. CROSS:  Yes.  And as the Fifth Circuit actually stated in Leadership Software, which is 12 F.3d 527, and I quote, "Signed instruments such as contracts, wills, and promissory notes are writings that have independent legal significance and are nonhearsay."

THE COURT:  That's a better answer than what you just said.  I like that.

MR. BROOKNER:  May I --

THE COURT:  That's not a verbal act.

MR. BROOKNER:  I still object, Your Honor.  And --

THE COURT:  I just want to be really clear that you moved under one basis and then you cite the Fifth Circuit for something completely different.  All right.  I'm going to allow

it for the purpose that there is a loan document out there that says this.  All right?  That's what he can testify to, that there's a loan document out there that he may have reviewed.  This may be the one.  And this says what it says.  Not necessarily for the truth of the matter asserted therein, but this is a third amended and restated credit agreement.  If you have another witness who can authenticate it or if you have another basis for doing so, but your act -- your verbal act is rejected, but I'll admit it for this purpose.  There's a loan document out there with CHC and YesCare and Cortland Capital that the witness says he's reviewed, and he thinks this is it.

MR. BROOKNER:  For the record, Your Honor, it's not signed.  There's no signature pages.

THE COURT:  I don't know.  I'm just admitting it for what it is.  It says what it says and does what it does.  This may be the signed version or not.  You get to cross him on that or ask him questions.  The verbal act is a first.  I'll take that one under -- actually, doesn't matter.  It comes in, so I'll let you ask questions on it.  Go ahead.

(Movants' Exhibit 21 admitted into evidence)

BY MR. CROSS:

Q    All right.  I want to direct your attention to Page 38.  38 of the PDF, not 38 of the document.

THE COURT:  It's 38 of the PDF.

BY MR. CROSS:

Q    And could you read -- you don't need to read it out loud, but Paragraph 2.01, and let me know when you're ready.

A    Okay.  I've read the provision one time through.

Q    So from what you just read, are you able to ascertain what the balance of the debt to M2 LoanCo was on August 17th, 2020?

        MR. BROOKNER:  Your Honor, I need to object to that question.  I apologize.

        THE COURT:  What's the basis?

        MR. BROOKNER:  This was admitted for the -- he's asking for the truth of the matter in this document, and it was admitted solely for the fact that it was said.

        THE COURT:  That it says what it says.  I'm going to allow him to ask the question.

        Go ahead, Mr. Cross.  You're asking him to testify about a document.  Right.  We got this in.  I'm just pointing this out.  I noticed this, too.  But -- well, no, just go ahead and ask your question.  I'm going to get you Page 38.

BY MR. CROSS:

Q    Are you able to ascertain what the balance of the debt to M2 LoanCo was on August 17th, 2020?

A    I'm not.  I would just be able to read the words on the page.

        THE COURT:  Well, which paragraph are we looking at here?

        MR. CROSS:  2.01.

THE COURT:  Okay.

THE WITNESS:  I mean, the first sentence says, immediately prior to the effective date, initial term loans held (indiscernible) amount of equal to 114, which comprised of 112, 1.9 of accrued and unpaid interest in accordance with 206(e), which I suppose we'd have to reference.

THE COURT:  Shoot, sorry.

THE WITNESS:  That's okay, Your Honor.  I'd have to spend time with the document to answer your question.  I typically don't take a single paragraph in 113-page document and draw a conclusion from it.  In this one, I don't think I could draw a conclusion from that single paragraph of a balance of a debt obligation in 2020.

BY MR. CROSS:

Q    How about from the final sentence of Paragraph 2.01?

A    Okay.  I read it, and I still can't give you an answer.  It's referencing a 2.06(e).  It's referencing accredited to principal.  It's referencing initial term loans.  It's referencing loans for purposes of this agreement and the loan documents.  I would need some real time to get into this credit agreement, reference other provisions, reference supporting documents to give you an answer.  I can't give you an answer.

Q    Have you ever reviewed the credit agreement before in your six months as the CRO of the debtor?

A    A credit agreement prepetition?

Q    Have -- no, have you reviewed this credit agreement?

A    My team might have reviewed this credit agreement in connection with our investigation.  I have not gone through, word for word, every 113 pages.  There was over 700,000 pages produced.

THE COURT:  That's not the question.  The question is, have you reviewed this document.

THE WITNESS:  I have not --

THE COURT:  Didn't ask if you -- I don't think he asked you if you reviewed every word of every 113 pages.  The question is, have you reviewed it.

THE WITNESS:  I am -- I have not reviewed this document in --

THE COURT:  Thank you.

BY MR. CROSS:

Q    In the six months as CRO for the debtor, have you become aware of any additional amounts borrowed by the debtor from M2 LoanCo between August 17th, 2020, and December 3rd, 2021?

MR. BROOKNER:  Your Honor --

THE COURT:  Uh-huh?

MR. BROOKNER:  I'm sorry, but I need to object.  But the -- M2 LoanCo and the debtor are not parties to this agreement on its face.

THE COURT:  I'm just asking if he knows on the basis of his document.

THE WITNESS:  I do not know.

BY MR. CROSS:

Q    You testified before that the debtor was relieved about $100 million of secured debt to M2 LoanCo as part of the divisional merger.  Right?

A    I said approximately, uh-huh.

Q    What was the loan document that memorialized that secured debt?

A    I don't know the exact document.  I would have assumed it was the credit agreement.

Q    The third amended and restated credit agreement.

A    I don't know which exact document.  I don't know the answer to that.

Q    Is it possible it's this document?

A    It's possible.

Q    In your six months as CRO of the debtor, have you become aware of any additional amounts borrowed by the debtor from M2 LoanCo between August 17th, 2020 and December 3rd of 2021?

A    I -- I'm not.  I'm not aware of those.

Q    So you're not aware of any additional borrowings?

A    I'm not, no.

Q    Do you know the applicable interest rate for the debtor's secured debt to M2 LoanCo that it was relieved of in the divisional merger?

A    I do not.

Q    Do you know approximately how much it was?

A    I don't.  I have to reference documents.

Q    Do you know if it was based on three-month LIBOR?

A    I don't know.

Q    All right, let's go to Page 18.

          THE COURT:  Of this document, Counsel?

          MR. CROSS:  Yes.

          THE COURT:  Okay.

BY MR. CROSS:

Q    Could you read to yourself the definition of euro-dollar rate in the bottom paragraph?

A    Okay, I've read the paragraph.

Q    So based on your reading of the paragraph and your experience as a financial professional, would you agree that if three-month LIBOR is under 1.25 percent, the euro-dollar rate is 1.25 percent?

A    I'll have to ask you to repeat the question.  And you're referencing LIBOR or --

Q    Yes.

A    Document says LIBO.

Q    LIBO.  Sure, LIBO.

A    So repeat the question again.

Q    If the LIBO rate is under 1.25 percent, is the euro-dollar rate 1.25 percent per the credit agreement?

          MR. BROOKNER:  Objection, Your Honor.

THE COURT:  I think he's just reading from the document.

MR. BROOKNER:  Exactly.  The document says what it says.

THE COURT:  Yeah, agreed.  Overruled.  I should say I'll sustain the objection.  The document says what it says.

BY MR. CROSS:

Q    Do you know if the interest rate applicable to the debtor's secured debt to M2 LoanCo was over 20 percent?

A    I don't know the answer to that.

Q    You have no idea the interest rate at all?

A    I did not calculate the interest rate, no.

Q    And you didn't calculate the amount of the debt at any point prior to the divisional merger.

A    My team may have in connection with the investigation.  I did not.

Q    How did you determine that the debt on the day of the divisional merger was $100 million?

A    I didn't determine it was 100 million.

MR. CROSS:  All right, let's go back to Exhibit 7, Page 220.

THE COURT:  Give me a second.  I apologize.  My computer froze for a second here, see if I can get you there.

BY MR. CROSS:

Q    Can you tell us how much money the debtor paid to M2

LoanCo between December of 2021 and the date of the divisional merger?

A     It would be the sum of the transactions that you see here on the screen.

Q     And do you know if any of those transactions caused the debt owed under the credit agreement to go down?

A     We walked through a payoff letter a few minutes ago, and my understanding is there's a connection between that payoff letter and the debt balance.

Q     The $5.5 million payoff letter?

A     Correct.

Q     Do you see any payments in the schedule for $5.5 million?

A     This payment is cash transactions.  No, I do not see a 5.5 million you're asking about.

Q     So this is not on an accrual basis?  Correct.

A     These are cash transactions?  Correct.

Q     Do you know who David Gefner is?

A     I'm familiar with the name.

Q     Who is he?

A     He's a person that's involved in the various entities that we've been discussing.

        MR. CROSS:  Let's pull up Exhibit 18.

BY MR. CROSS:

Q     Have you ever seen this -- I'm sorry.

        THE COURT:  Sorry.

BY MR. CROSS:

Q    Have you ever seen this document before?

A    Yes.

Q    And what is it exactly?

A    My understanding is it's a letter of commitment created March 22 of 2022.  We refer to the proposed -- the proposal submitted in response to RFP.  It's a proposal in response to an RFP.

Q    Do you see the address at the bottom of the first page?

A    I do, uh-huh.

Q    Does that look like the address where you met with Mr. Isaac Lefkowitz?

A    Looks familiar.  Yes.

Q    Let's go to the bottom of the second page.  Do you see the signatures there?  You recognize either of those signatures?

A    I'm not familiar with either of their signatures.  I recognize the names, but I don't have familiarity with their actual signatures.

Q    Okay, let's pull up Exhibit -- would it be helpful to compare their signatures with an authenticated specimen?

        MR. BROOKNER:  Objection, Your Honor.  The testimony is he doesn't recognize the signature.  If Counsel has a question, he can ask a different question.

        THE COURT:  I think that's right.

BY MR. CROSS:

Q    But this does look like the document that you reviewed before, correct?

A    It appears to be, uh-huh.

Q    And when did you review it?

A    This specific document, I reviewed yesterday in connection with this hearing.

          MR. CROSS:  Your Honor, I move to admit Exhibit -- I believe it's 18.  I'm going to ask for comparison with an authenticated specimen by the trier of fact the signatures of Mr. Gefner and Ms. Tirschwell on the divisional merger documents, which are already admitted as part of Exhibit 7.

          THE COURT:  Counsel?

          MR. BROOKNER:  Objection, Your Honor.  Lack of foundation.  Hearsay.  Relevance.

          THE COURT:  What's your response, Counsel?

          MS. CROSS:  Your Honor, it's not hearsay because as Ms. Carson stated on March 3rd --

          THE COURT:  Wait, who's Ms. Carson?

          MR. CROSS:  Amber Carson, debtor's counsel.

          THE COURT:  You're referring it's not hearsay because of a --

          MR. CROSS:  I'm going to quote her hearsay response.

          THE COURT:  Okay.

          MR. CROSS:  As the Fifth Circuit actually stated in Leadership Software --

THE COURT: You're quoting another lawyer who's referring to a Fifth Circuit case.

MR. CROSS: I'm saying that she's right. They're raising the same hearsay objection that --

THE COURT: I want to know what your objection is. I don't -- I hate to say it this way, but I don't care what Ms. Carson said. I want to know what you said, so I want you to make an argument.

MR. CROSS: Okay.

THE COURT: That's not --

MR. CROSS: So relevance --

THE COURT: All due respect to Ms. Carson, who's not in the room, who's not arguing a motion, I don't know what she said and why she said it at the hearing. I want to know what you want -- what you're saying and what case you're citing. Why is this not hearsay, and is this document been properly authenticated? That's the objection. I want the response.

MR. CROSS: So for authentication --

THE COURT: Yes.

MR. CROSS: -- 902(3) allows the trier of fact to authenticate a document via a comparison with an authenticated specimen.

THE COURT: So you want me to go comparison by an expert witness or the trier of fact.

MR. CROSS: We have authenticated specimens of the

signatures of Ms. Tirschwell and Mr. Gefner from the plan of divisional merger, which is included in Exhibit 7.

THE COURT:  All right, let's see if we can authenticate it.  See how good I -- what page am I looking at, Counsel?

MR. BROOKNER:  I have a comment at the appropriate time, Your Honor.

THE COURT:  I do, too.

MR. BROOKNER:  Thank you.

MR. CROSS:  I apologize, I need to find -- okay.  We have a signature of Ms. Tirschwell on Page 171 of Exhibit 7.

THE COURT:  171?

MR. CROSS:  Uh-huh.

THE COURT:  Okay.  All right.  That is that.  And how do I know that that's Ms. Tirschwell?  How do I know that's Ms. Tirschwell, who signed this, sir?  Because she put it up here, and you're saying that this is what that is.  What was the other exhibit you wanted me to look at?

MR. CROSS:  The debtor has --

THE COURT:  What was the other exhibit that you just put on that you wanted --

MR. CROSS:  18, 18.

THE COURT:  18.

MR. CROSS:  Or I'm sorry -- yes.  Wait, is it 18 or 19?

THE COURT:  Perhaps it's -- I can't do it.  I'm not going to admit it.  I don't have the ability to determine whether those two signatures are the same and whether she signed this document.  You want to cross him on it, get testimony out of him out of it, and I simply cannot do it.  I'm unable to do it with my comparison with my eyes.  I apologize.  You may -- I'm looking at it here.  What was the page number for the other one?

MR. CROSS:  I believe it was 171.

THE COURT:  I don't believe the rule even applies to what you're asking me to do.  It's usually to kind of.

MR. CROSS:  All right, so my second basis on authentication is Carter v. H2R Rest Holdings, LLC (N.D. Tex. Jul. 20, 2020).

THE COURT:  Do you cite to a rule, Counsel?

MR. CROSS:  Yes.  901(b)(4).

THE COURT:  901(b)(4), the appearance, content, substance and other distinctive items taken together.  But somebody has to testify to that, right?  You're asking -- who's testifying to that?

MR. CROSS:  Your Honor --

THE COURT:  No, it's not in.

MR. CROSS:  Okay.

THE COURT:  There we go.

BY MR. CROSS:

Q    Do you know who organized Geneva Consulting, Mr. Perry? Have you ever seen the articles of organization?

A    For?

Q    Geneva Consulting.

A    I have not.

THE COURT:  I want to be clear.  His testimony about the document comes in, right?  The doc itself.  But he said what he said about it.  You can get that in.

BY MR. CROSS:

Q    Do you have any reason to believe that David Gefner is not the CEO of Geneva Consulting?

A    I don't have any reason to believe or not believe.

Q    How about this document?

A    I don't understand the question.

Q    Never mind.  Strike that.

So you made no investigation at all about who owned this entity and whether they were an affiliate of the debtor?

MR. BROOKNER:  Your Honor, that's not the witness's testimony.  Mischaracterizes.

THE COURT:  He can answer.

THE WITNESS:  No -- I'm sorry, repeat your question.

BY MR. CROSS:

Q    You did not investigate at all who owns the Geneva entity and whether they are an affiliate of the debtor?

A    My team and my counsel did.

Q    And what were the results of their investigation?

        MR. BROOKNER:  Objection to the extent it's intruding upon the attorney-client privilege.

        THE COURT:  Okay.  Perry, you can answer.  Obviously not attorney-client privilege stuff, but you can answer if you know.  If you can say without answering -- without violating the attorney-client privilege that's been asserted by your counsel.

        THE WITNESS:  Okay, I won't answer.

BY MR. CROSS:

Q    Mr. Perry, who holds the attorney-client privilege for the debtor?

        MR. BROOKNER:  Objection, Your Honor.  Calls for a legal conclusion.

        THE COURT:  He can answer if he knows.

        THE WITNESS:  I don't know.

BY MR. CROSS:

Q    Was Geneva Consulting party to any agreements with YesCare?

A    Repeat your question again.

Q    Was Geneva Consulting, to your knowledge, a party to any agreements with YesCare?

A    I believe so, yes.

Q    And what are those agreements?

A    I believe there's an MSA with YesCare in Geneva.

Q      What's an MSA?

A      A master service agreement.

Q      And what services does Geneva provide under that agreement?

A      I'm not -- I don't know the answer to that.

Q      How are you aware of that agreement?

A      I think it's either mentioned in the divisional merger or documents related to the divisional merger references an MSA relationship.

Q      Does the debtor have any potential causes of action against YesCare?

A      Any causes of actions were investigated would have been included in a work product.

Q      Does the debtor possess any potential causes of action against YesCare as an asset?

A      Potentially.

Q      Did you investigate those causes of action at all?

A      Sure.  My team and my counsel investigated all these causes of actions.  Yes, uh-huh.

Q      Did you investigate any potential causes of action against Geneva?

A      We investigated all cause of actions that were potentially available, yes.

Q      And you did not investigate -- or you're not going to tell us what the results of your investigation as to the ownership

of Geneva was because of -- it's subject to attorney-client privilege, correct?

MR. BROOKNER:  Objection to the form of the question, Your Honor.  And it also is not supported by the testimony.

THE COURT:  He can answer.

THE WITNESS:  I recall the question related to something different than the ownership.  I don't know the ownership and I think I've testified that I don't know the ownership.

BY MR. CROSS:

Q    Why didn't you include the payments to Geneva on SOFA Exhibit -- Question 4?

A    I think I've answered that.  I'm happy to answer it again.

Q    Why don't you?

A    Okay.  4 four is related to payments to insiders and affiliates.  And at the time, didn't meet the definition of an insider and affiliate.

Q    Why didn't you include them on SOFA Question 11?

A    Earlier, I testified that Question 11 refers to corporate restructuring services, if I have my recollection correctly on SOFA.  And typically, we don't include -- or I don't include -- preparing SOFAs, firms that aren't -- or in the market of providing corporate restructuring services, at least in my familiarity, and therefore they just weren't included.  In hindsight, I could have easily included the last two payments

if you take the words from the contract at its face.

MR. CROSS:  All right.  Your Honor, at this time, I'd like to attempt to admit some of the deposition transcript of Isaac Lefkowitz as M2 LoanCo's corporate representative.

THE COURT:  Okay.

MR. CROSS:  That will be Exhibit 1.

THE COURT:  911-1?

MR. CROSS:  Yes.

THE COURT:  Okay.  It's -- give me a second.  Let me get there.  911-1, okay.  Where do you wish to go?

MR. CROSS:  I want to go to Page 20 of the PDF.

THE COURT:  Page 20 of the PDF.  Okay.

MR. CROSS:  And Page 76 of the deposition transcript.

THE COURT:  76 of the depo -- okay.  Is this -- just out of -- I just want to make sure.  Is this still in connection with his examination, or are we done?

MR. CROSS:  No, I'm done with -- I guess I'm done with Mr. Perry's examination unless I need him to authenticate Mr. Lefkowitz's voice.

THE COURT:  Okay.  Well, hopefully we don't do that again.  I -- let me just -- I probably need to just turn it over to cross, and then we can take this up.

MR. CROSS:  Okay.

THE COURT:  All right.  Or other examination.  But we'll take this up as soon as you're done.

MR. CROSS:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.

MS. WEBB:  Thank you, Your Honor.  Lydia Webb of Gray Reed on behalf of the debtor.  I'm going to try to be brief.

THE COURT:  I want you to take your time.

CROSS-EXAMINATION

BY MS. WEBB:

Q    Good afternoon, Mr. Perry.

A    Afternoon.

Q    What are your primary responsibilities as the chief restructuring officer in this case?

A    I boil it down to three things:  One, make decisions on behalf of the debtor; two, lead an investigation, the appropriate resources; and three, disclose information.

Q    Is being a CRO a one-man job?

A    No.

Q    Why not?

A    Typically, the engagements that I'm involved in -- and this one in particular -- they are very complicated.  They're very complex.  There are a lot of moving pieces, a lot of moving parts, a lot of numbers, transactions, et cetera, et cetera.  It requires a team, a team of lawyers, a team of financial professionals, folks that work at my job.  There's no way I could tackle all of this as a single individual.

Q    As CRO, have you committed to memory every detail about

the debtor and its history?

A    Clearly not, no.

Q    Why not, Mr. Perry?

A    Well, I consider myself to have a nice -- or a good memory, except for, you know, every single minutia and piece of information.  I just don't consider it to be humanly possible.

Q    And the trustee motion and, by some of Mr. Cross's questions, seem to insinuate that Mr. Lefkowitz is really the one running the show here on behalf of the debtor, not you.  Is that true?

A    No.

Q    Why?

A    Because I have sole decision-making authority.

        MS. WEBB:  Your Honor, I'm sorry.  I think I'm just going to ask you to look at one exhibit.  It's part of my presentation.  Can we go to Movants' Exhibit 33, please?

        THE COURT:  I'm going to put it up on the screen. Just give me a second.  Screen.  Okay.

        MS. WEBB:  And, Your Honor, will you scroll down to the corporate resolutions?  It should be Page 4 or so.  Yes, right here.

BY MS. WEBB:

Q    Mr. Perry, what is this?

A    This is the corporate resolution that was executed the day of the bankruptcy.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Q    Uh-huh.  And Mr. Cross asked you earlier about the anchor engagement letter in this case.  Do you recall that?

A    He did.

Q    Do you recall him asking you about whether that agreement was heavily negotiated?

A    I do.

Q    Is it accurate to say that every provision of the engagement lever -- letter was heavily negotiated?

A    Not every provision.

Q    And the termination provision that Mr. Cross asked you about, as that more -- would you consider that to be heavily negotiated, or is that more boilerplate?

A    No, it's in every engagement letter that we execute.

Q    And, Mr. Perry, what is your understanding about the interplay of the language in the engagement letter versus the corporate resolutions you're looking at right now?

A    Well, earlier, I referenced a paragraph in the engagement letter, and our practice -- and again, the way that I partake my activities is that a corporate bylaw or corporate resolution supersedes any authority that may be governed by the engagement letter.  So if there is a corporate resolution, such as this one, this will guide my activities if it differs at all from what's stated in the engagement letter.

          MS. WEBB:  Your Honor, could you scroll down, I think, to the bottom of this page?  Yes.

BY MS. WEBB:

Q    Mr. Perry, what do the corporate resolutions state regarding your role as CRO?

A    Well, the paragraph there, sort of in the middle of the page, states that clearly the company employs me as a CRO to represent and assist the company in carrying out its duties under the Bankruptcy Code.  And the next paragraph says that the CRO should have sole decision-making authority for all restructuring matters, any matter where the sole director identified below has or may have a conflict of interest or for such other matters as a sole director may otherwise delegate to the CRO.

Q    Who is making the substantive decisions in this Chapter 11 case?

A    I am.

Q    How do you make decisions in this case?

A    I gather information.  I direct my team, my resources counsel, to partake in specific tasks, and we execute our fiduciary duties upon that.

Q    What is your understanding of Mr. Lefkowitz's actual or potential conflicts in this case?

A    Well, I think as I've testified, this is a very complicated chessboard.  It's what we talked about at the beginning of this hearing.  Mr. Lefkowitz wears a lot of hats across that chessboard.  He and his relationships are such that

this corporate resolution gives me the sole decision-making authority over the debtor itself.

Q    So in light of that, have you ever asked Mr. Lefkowitz for authority or permission before making any decision in this case?

A    No.

Q    Has Mr. Lefkowitz made any decisions on behalf of the debtor during the case?

A    No.

Q    Has Mr. Lefkowitz questioned or tried to veto any of your decisions in this case?

A    No.

Q    Let's walk through some of the major decisions in this case.  Who signed the petition?

A    I did.

Q    Who negotiated the DIP on behalf of the debtor?

A    I did.

Q    Who made the decisions regarding the stay extension litigation?

A    I did.

Q    And who made decisions related to stipulations and settlements?

A    I did.

Q    Since you were engaged to CRO, has the debtor transferred any money to Mr. Lefkowitz?

A     No.

Q     To Geneva?

A     No.

Q     To M2 LoanCo?

A     No.

Q     To Perigrove?

A     No.

Q     Now, Mr. Cross asked you about the payments to Sigma during the case.  Do you recall that?

A     I do.

Q     Were those payments disclosed to the Court and to the Committee?

A     Absolutely.

Q     Mr. Cross also asked you about the DIP accounts that were opened after the start of this case.  Does Mr. Lefkowitz have access to those accounts?

A     No.

Q     Mr. Perry, I want to move on to the investigation that you referred to several times during your testimony today.  Now, without getting into privilege, there has been investigation conducted by Ankura and Gray Reed into potential estate causes of action.  Is that correct?

A     Absolutely.

Q     And again, without getting into privilege and speaking only as to process, what did Ankura and Gray Reed do to

investigate those potential claims and causes of action?

A    Well, look, they first gathered a substantial amount of information.  There were formal, informal discoveries or 2004s that were served, subpoenas that were served.  There were interviews conducted.  There was a substantial amount of work all done, quite frankly, in the collaboration and with the collaboration of the Committee.  So with that information gathering, then was an analysis stage in which information was assimilated, analyzed, and evaluated, and then there was effectively a work product produced at the end of that engagement or investigation.

Q    And you hit on this, but I want to be clear.  Did you direct the debtors professionals to share information with the Committee in the course of this investigation?

A    Absolutely.

Q    Do you have any idea of the number of pages that your team's reviewed in connection with this investigation?

A    I think it's over a half a million, like 6- or 700,000 pages of documents have been reviewed by my team or the Gray Reed team.

Q    And with the exception of privileged communications, did the debtor share those documents with the Committee?

A    Oh, absolutely.

Q    Did Ankura conduct an analysis of the debtor's pre-divisional merger transactions?

A      Yes.

Q      Did Ankura conduct an analysis of the debtor's post-divisional merger transactions?

A      It did.

Q      Did Ankura share those analyses with the Committee?

A      It did.

Q      And without getting into mediation, privilege, or confidentiality, were the findings of the investigation used at mediation?

A      Absolutely, yes.

Q      Was Mr. Lefkowitz involved with the debtor's investigation?

A      No.

Q      Was Mr. Lefkowitz updated or apprised about the status and the results of the investigation as it proceeded?

A      No.

Q      Did Mr. Lefkowitz oversee any part of the investigation?

A      Absolutely not.

Q      I now want to turn to the last category that you mentioned, and that was disclosures.  In the trustee motion and, I think, by Mr. Cross's questioning of you today, I think the movants are insinuating that debtor has not complied with its disclosure requirements and that has misled creditors.  Do you agree with that statement?

A      No.

Q    Why?

A    Well, as I just testified, we disclosed or shared over 6- to 700,000 pages of documents.  We filed three sets of SOFAs and SOALs, an initial and then two supplemental SOFAs and SOALs.  We were extremely transparent throughout the entire process, and there wasn't information outside of privileged documents that the debtor maintained that it didn't share with the Committee.

Q    What was your role in preparing the statements and schedules filed in this case?

A    Well, my team, at my direction, compiled the data from the various sources that it had available to it, took that data, populated it into the SOFAs and SOAL templates with the notification and claims agent, and then ultimately, when the draft was prepared, we presented it, reviewed it with Mr. Lefkowitz, and then he ultimately authorized it.

Q    Why -- and by authorizing, you mean sign?

A    Correct.

Q    Why didn't you sign the schedules and statements?

A    Well, the schedules and statements relate to prepetition activity.  I was retained the day of the bankruptcy.  I didn't have personal knowledge of any of the activity that occurred prepetition.  Typically, in a case in which I'm CRO or not, it's a corporate representative that executes those documents that has familiarity with the prepetition activity.

Q    You discussed earlier with Mr. Cross how the schedules and statements were amended several times in this case, right?

A    They were.

Q    Who made the decision to amend?

A    I did.

Q    Why?

A    Look, for the sake of transparency and disclosure, the first amendment was, you know, additional disclosure with regards to the divisional merger documentation.  Global notes were amended.  There were other, you know, categories that needed to be supplemented with the information that we gathered in between the original filing and that first amendment. Mr. Cross asked me about the bank statements at the time of the petition date.  There was a second amendment, largely driven by the request of the U.S. Trustee to further disclose and provide more transparency on the insurance policies.  But while we were completing, or at least working through our investigation of prepetition activity, we identified the transfers that Mr. Cross quizzed me about a little bit earlier, and we, of course, included those in the amended -- the second amended SOFA.

Q    I want to ask you a little bit more about that and particularly the signature bank statements that we received as part of discovery, right?  Do you recall that Mr. Cross asked you about the timing of receiving those bank statements?

A     Yes, uh-huh.

Q     And how, as he characterized it, it took about a month between us receiving those bank statements and whether those transfers actually showed up on SOFA 13.

A     Right.

Q     Is that accurate?

A     Uh-huh.

Q     Okay.  Do you recall whether those statements reflected the names of the transferees receiving those payments?

A     I don't recall, but what I do recall is that -- I don't recall if the names weren't there, but what I do recall on the first amended SOFA is I did not have the information in order to prepare the transfers.  I had the information to indicate that there was a zero balance at the petition date.

Q     Do you recall that the identity of the transferees of those signature bank account transfers were part of Ankura and Gray Reed's investigation?

A     Yes, absolutely.

Q     There was also some questions about the Bank of America bank statements.  Do you recall that line of questioning with Mr. Cross?

A     I do.  I do.

Q     And is it your recollection that your team reviewed all of the debtor's bank statements, both Signature and Bank of America, for the relevant time period?

A     That's my recollection, yes.

Q     And we -- we've covered this.  We've received a significant amount of documents in this case, and you referenced documents received from M2.  Do you recall that?

A     I do.

Q     But we didn't actually receive bank statements from M2, did we?

A     Not that I recall, no.

Q     Now, you were asked quite a few questions about the Geneva transfers, and I am not going to belabor that.  But were those Geneva transfers otherwise disclosed to the Committee as part of discovery?

A     Oh, absolutely.

Q     And were the Geneva transfers a subject of Gray Reed and Ankura investigation?

A     They were absolutely a subject of the investigation.

Q     You also talked briefly about the payoff letter to M2 that had a series of dollar amounts ascribed to them.  Do you recall that?

A     I do.

Q     Were those payments disclosed?

A     The cash payments were disclosed, yes.

Q     Could you clarify that for the Court?

A     Sure.  SOFA 22 referenced a number of payments to M2.  Two of those payments occurred in December of 2021.  They total 15

million.  The payoff letter references 5.5.  There are some other book entries that add to roughly $15 million.  I correlate that $15 million of book entries, which include the 55 in the payoff letter, to the $15 million cash transfers. The issue is timing.  The book entries, as Mr. Cross indicated and took us through, were in April.  The cash transfers actually occurred in December.  So they were disclosed, but they were disclosed as again, cash transfers, not accrual or book activity when I say disclosed in the SOFAs.

Q    Correct.  Okay.  And to be clear, were those transfers a subject of Gray Reed and Ankura's investigation?

A    Oh, absolutely, uh-huh.

Q    Okay.  Mr. Perry, other than you, does the debtor have any current officers?

A    No.

Q    Who is managing the affairs of the debtor post-petition?

A    I am.

Q    Has anyone other than you managed the affairs of the debtor's post-petition?

A    I'm the sole decision-making authority.  There are individuals on my team that work in my direction.

Q    Sure.  Other than you and Ankura.

A    Uh-huh.

Q    Are you and Ankura estate fiduciaries in this case?

A    I am.

Q    Do you believe that you and Ankura have discharged your fiduciary duties in accordance with the Bankruptcy Code and the rules?

A    I do.

Q    Has the debtor worked with the Committee in this case?

A    Very closely.

Q    Do you have an understanding of whether the Committee supports appointment of a Chapter 11 trustee?

A    My understanding is they do not support.

Q    Do you think the appointment of a Chapter 11 trustee is in the best interest of creditors and this estate?

A    No, I do not.

Q    What are the potential negative consequences of appointing a Chapter 11 trustee at this time?

A    Well, as I've testified, the Gray Reed and Ankura teams have conducted an extremely thorough and transparent investigation.  That investigation was obviously the basis of the mediation, as we have discussed.  In my view, a Chapter 11 trustee, at least if I was put in that role, would likely need to either start from scratch or determine whether or not it can utilize any of the work that was completed.  They would need time.  They would need, obviously, funding.  They would need resources.  It would be effectively starting over.  In my opinion, our teams, both collectively Ankura, Gray Reed, and the Committee, have conducted a very transparent and thorough

investigation.  And again, a Chapter 11 trustee, in my view, would effectively need to start over and the estate would need to pay for that.

Q      What is the debtor's cash on hand?

A      Currently, we have about $200,000 of cash.

Q      And is that amount -- is that -- sorry, strike that.

       Where is that cash held?

A      In the two debtor-in-possession accounts, but mostly in a segregated professional fee account.

Q      How do you plan on financing the rest of this Chapter 11 case?

A      Well, the anticipation -- and I think we addressed it at the last status hearing -- or counsel.  We anticipate drawing on the DIP for fees and expenses or administrative fees and expenses that have been incurred through August the 30th.  And then, there would be another mechanism in connection with confirmation to fund administrative expenses from, you know, 9/1 through the effective date.

Q      Are you aware of any sources of additional financing available to the debtor?

A      No, I'm not.

Q      Are you aware of any collateral available to secure additional financing?

A      Yeah, I can speak to potential collateral because I sought DIP financing for a number of weeks, as I've testified

previously. There are, the way I see it, potentially two sources of collateral that a lender may or may not choose to leverage. One would be estate cause of actions, as we've discussed. I think in this case, while there is a mediation, there was a settlement in the estate cause of action or the investigation work that underpin that settlement. Based on my discussions with third-party lenders, that's still not enough to offer up as collateral to lend against. The other component of collateral that at least I've had discussions with potential lenders about relate to employee retention credits or, you know, tax refund credits. We're in a, you know, process currently with the IRS to apply for those ERC credits. The IRS has filed a proof of claim in the case. I can't sit here today and provide anybody any security that that collateral would otherwise be liquidated and could be used as a form of collateral financing.

Q    Thank you, Mr. Perry. That's all I have.

THE COURT: Thank you.

Before I turn it back, is there anyone who's a -- wishes -- on the line who may wish to ask this witness any questions? Really probably just referring to the Committee here. Mr. Hemenway, you don't? You don't have to say yes or no. You can give me a thumbs up or thumbs down. Just --

MR. HEMENWAY: (Indiscernible).

THE COURT: Thumbs down, that's all I needed to hear.

MR. HEMENWAY:  No, Your Honor.

THE COURT:  Alrighty.  Mr. Cross, how much time do you think you need?

MR. CROSS:  Not much, 10 or 15 minutes.

THE COURT:  Why don't we just take, like, a five-minute break, and then we'll come back and then we'll continue.  I'll remind you that you're still under oath.  Thank you.

THE CLERK:  All rise.

(Recess taken at 4:25 p.m.)

(Proceedings resumed at 4:37 p.m.)

THE COURT:  -- under oath, and we are back on the record in Tehum.

MR. CROSS:  Can I have Exhibit 33, please?

THE COURT:  Exhibit 33.  Just one moment.  Movant's 33?

MR. CROSS:  Yes.

THE COURT:  Okay.

CROSS-EXAMINATION CONTINUED

BY MR. CROSS:

Q    So Mr. Perry, you testified that you were delegated some authority by the debtor by this document, correct?

THE COURT:  Just a second.  Let me get it up.

All right, I'm going to get to it in a moment.

911-33.  There we go.

Is this where you were going, Mr. Cross?

MR. CROSS:  Yes.

THE COURT:  Okay.  Just wanted to make sure.

MR. CROSS:  Thank you.

THE COURT:  Thank you.

BY MR. CROSS:

Q    Mr. Perry, this -- you remember testifying about this Certificate of Resolutions of Tehum Care Services, Inc. just a moment ago?

A    I do.

Q    And is this the document that gives you your authority to act for the debtor?

A    This in the combination of the engagement letter.

Q    Is this Certificate of Resolutions irrevocable?

A    I don't know the answer to that.  That's -- would be a legal conclusion.

Q    Can I direct your attention to the second resolution?  See where it says, "Resolved that Isaac Lefkowitz and Russell Perry, each an authorized signatory, being hereby are authorized empowered, directed", et cetera?

So are your powers, at least per the Certificate of Resolutions from the Board of Directors, equivalent to the powers held by Mr. Lefkowitz?

A    No, they're not equivalent at all.

Q    And why are they different?

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

THE WITNESS:  Your Honor, would you mind scrolling down to the bottom of this page?

The reference here that I read a little bit earlier, this corporate resolution provides me as the CRO with sole decision-making authority for all restructuring matters.  "Any matter with a sole director identified below has or may have a conflict of interest."  I have sole decision-making authority over the debtor.

BY MR. CROSS:

Q    And for such other matters as the sole director may delegate to the CRO, right?

A    That's right.  The document is signed by the sole director.  He's delegated sole decision-making authority to me, as the CRO.

Q    And do you understand that delegation to be irrevocable or revocable?

A    I don't have an opinion on that.

Q    Did you testify that since the petition date, the debtor has not sent any money to Mr. Isaac Lefkowitz?

A    That's correct.

Q    Has the debtor sent any money to any entity of which Mr. Isaac Lefkowitz is a director?

A    I -- I don't know the answer to that.

Q    All right.  Let's go to Exhibit 2, Page 92.

You don't need to read it out loud, but can you read the

testimony on that page?

MR. BROOKNER:  Objection, Your Honor.

THE COURT:  How does this answer whether he knows the answer?

MR. BROOKNER:  Thank you.

MR. CROSS:  Because he was present.

THE COURT:  Why don't you lay the foundation first, and then I'll feel better.  Let me put it that way.

BY MR. CROSS:

Q    Mr. Perry, were you present at this 341 meeting?

A    I was.

Q    Did you hear this testimony?

A    I was present and I heard testimony.  Are you asking me if I -- if I recall the words on this page?  I'd have to read it.

THE COURT:  I think that's what he's asking you to do.

THE WITNESS:  Okay.

THE COURT:  What lines?

THE WITNESS:  Let me take some time here.

MR. CROSS:  The entire Page 92.

THE WITNESS:  Okay.

BY MR. CROSS:

Q    Does that refresh your recollection as to whether you've sent any money to any entity of which Mr. Lefkowitz is a director since the petition date?

A     We have funded two payments to Sigma Risk Management.

Q     And does it also reflect your -- or refresh your recollection as to who the organizer of Sigma Risk Management is?

A     I'd have to read the words on the page.

"Mr. Cross:  Did you organize Sigma?

"Mr. Lefkowitz:  Yes."

So the words on the page would suggest that Mr. Lefkowitz, based on his testimony and the words on the page, organized Sigma.

Q     And this was on May 12th, 2023, correct?

A     That's correct.

Q     And then you sent a payment to Sigma after that date?

A     I don't have the dates memorized.  I've sent a payment for April services.  I've sent a payment for -- I'm sorry -- for March services, and I've sent a payment for April services. I've not sent a payment to Sigma since that point in time at the request of the Committee.

Q     Did you sent the payment for April services in May?

A     I think that's correct because they would've invoiced us after the month.

Q     You testified that you negotiated the debtor-in-possession financing agreement, correct?

A     Through counsel, that's correct.

Q     Who did you negotiate it with?

A      Through counsel.  I worked with my counsel.  My counsel worked with M2 counsel, Kristian Gluck.

Q      So did you ever talk to anyone at M2 when negotiating?

A      Sure.  Mm-hmm.

Q      And who did you talk to?

A      I talked to an individual by the name of Alan Rubenstein.

Q      At the time you negotiated the DIP financing agreement, were you aware of whether or not Mr. Lefkowitz was a director of M2 LoanCo?

A      I was aware that he was a potential director, which is why I did not negotiate with him directly, why I went through counsel and went through another representative of M2 LoanCo.

Q      At the time you negotiated the DIP financing agreement, were you aware of the $33 million plus in payments to M2 LoanCo listed at Attachment 13?

A      I was not.

Q      And M2 LoanCo requested releases of all claims that the debtor might bring against them in the DIP financing agreement. Is that correct?

A      It was an interim DIP.  I think the releases were in connection with the final DIP.  We only sought relief under an interim DIP.

       I'm sorry.  Are you asking about in the negotiations or what was actually --

Q      I'm asking you what you asked for, not what you got in the

original motion for an interim and final DIP.

A     Okay.  On the interim DIP, I asked for funding under the conditions in which the DIP lender was willing to fund them.

Q     And those conditions included broad releases for the DIP lender of all causes of action, not just causes of action related to it in its capacity as a DIP lender, correct?

A     As I recall?  My recollection is releases were requested for the amount of the interim DIP draw provided.  A challenge period was established.  It set forth an investigation.  And then releases after that challenge period, subject to any potential -- bringing forth those causes of action would've been granted, but not in connection with the interim DIP.

          MR. CROSS:  Okay.  I don't have further questions --

          THE COURT:  Yeah.

          MR. CROSS:  -- for this witness.

          THE COURT:  Okay, thank you very much for your time.

     (Witness excused)

          THE COURT:  Let's see, Mr. Cross.  Do you have any other witnesses?

          MR. CROSS:  I do not.

          THE COURT:  Okay.  Thank you very much.  Any other -- oh, you wanted to try to get -- move some of the documents in.

          MR. CROSS:  Yes.

          THE COURT:  Okay.  Just to make sure I don't go out of order, no, let's go through this.  911-1, I believe, was

where we were.

MR. CROSS:  Yes.

THE COURT:  All right.  I get it right at the end of the day, right?

Okay, what statements do you wish to proceed to get in?  All right, where do we go?

MR. CROSS:  I'd like to take you to Page 19 of the -- or, I'm sorry, Page 20 of the PDF --

THE COURT:  Okay.

MR. CROSS:  -- and admit Page 76 of the transcript through 77 of the transcript which follows on Page 21 of the PDF.

THE COURT:  Let me just be very clear, because I want to make sure I get it right because some -- as I read 76, it starts with a second line of an answer, and I want to make sure that we're really clear that I'm being very specific about what I'm to consider.  So maybe we can just be really -- like, 76, line X to 77, line -- if I'm looking at the right --

MR. CROSS:  Okay.  Yes, you are.

THE COURT:  I just want to make sure.

MR. CROSS:  So let's start at 76, Line 3.

THE COURT:  Okay.

MR. CROSS:  And we'll go to 77, Line 9.

THE COURT:  Okay.

Mr. Brookner?

MS. WEBB:  Your Honor, if you'll give us a minute, we haven't had the opportunity to examine this.

(Counsel confer)

MR. BROOKNER:  Sorry for the sidebar, Your Honor.

THE COURT:  Sounds like the -- sounds like the consideration has been --

MS. WEBB:  I was going to let Mr. Brookner read it before he objected to it, but you know.

MR. BROOKNER:  It doesn't -- it doesn't really matter what it says.  Your Honor, we object for the same reasons we set forth on the record earlier which include but are not limited to the fact, now that the evidence has closed, there's been no showing that Mr. Lefkowitz is "unavailable" as defined in the Rules of Evidence.

In addition, this is a deposition of Mr. Lefkowitz in his capacity as a representative of M2, not as a representative of the debtor, and as a result, the applicable portion of -- I believe it's Rule 804; I have to double-check it -- does not apply because he is not in his representative capacity as a party for this deposition.

THE COURT:  Counsel, what do you respond?

MR. CROSS:  There are at least four bases to admit the deposition.

THE COURT:  Okay.

MR. CROSS:  Federal Rule 32(a)(3) because

Mr. Lefkowitz was a director of the debtor on the date of the M2 LoanCo deposition.

THE COURT:  Okay.  I got it.  It -- he's more than 100 miles away.  Why don't we just use that one?

MR. CROSS:  All right.

THE COURT:  Alrighty?  And the rules are still written in a way that doesn't contemplate virtual attendance, so he couldn't be subpoenaed.  So you can use it for any reason so long that it would be admissible under the rules as if he were testifying.  So we got past 7032.

So now give me the rule that would allow this to come in if he were testifying, Federal Rules of Evidence.  So 7032, got it.  That's the Civil -- Rules of Civil Procedure.  Now give me the Federal Rule of Evidence that you're proceeding on.

MR. CROSS:  402.

THE COURT:  402.  Okay.

What's your -- I mean, let's walk through this.  The general admissibility of relevant evidence?  You're going to have to give me one a little bit better than that one there.

MR. CROSS:  So is the objection hearsay?  Is the objection authentication?  Is the objection relevance?

THE COURT:  I think he said them all.  I think he said all three of them.

MR. CROSS:  Okay.  So authentication:  the transcript is self-authenticating because it's accompanied by a

certificate of acknowledgement by a notary public.

THE COURT:  Okay.

MR. CROSS:  Hearsay:  32(a)(3) and 38.2(a)(4) [sic] operate as independent exceptions to the hearsay rule.  See Fletcher v. Tomlinson, 895 F.3d 1010, 1020 & n.9 which collects cases.

And then relevance:  We're going to show another statement by Mr. Lefkowitz where he says the opposite about his connection to Geneva Consulting showing that he lied under oath.

THE COURT:  For purposes of today, I'm going to allow it, Mr. Brookner.  I'm going to overrule your objection.

Where else do you want to go, Counsel?

MR. CROSS:  So let's go to Exhibit 8.

THE COURT:  Exhibit 8.

MR. CROSS:  Pae 27 of the PDF.  Page 26 of the transcript.

THE COURT:  Hold on, hold on a second.  Let me just get there.

Page 27.  Okay.  All right.  Where do we go?

MR. CROSS:  Can we go from 12 to --

THE COURT:  12 starts with "Okay" on Page 27.  Do I have the right thing?  You want 27 of the PDF or 27 of the -- oh, you're going --

MR. CROSS:  Yeah.  I'm saying Line 12 on Page 26 --

THE COURT:  Oh, okay.

MR. CROSS:  -- which is 27 of the PDF.

THE COURT:  Okay, got it.  Okay.  Good, good, good, good.  Okay, thank you.

MR. CROSS:  So Line 12 through Line 11 of the following page.

THE COURT:  All right.  I'm going to allow it.

MR. CROSS:  Thank you, Your Honor.

THE COURT:  Where do you go next?

Just to be clear, I'm admitting this for what Mr. Lefkowitz said at his 2004, right?  Like in other words, he's saying he's a director of Geneva, that kind of stuff.

MR. CROSS:  Yes.

THE COURT:  Right?

MR. CROSS:  Not necessarily for the truth but for the fact that he made contradictory statements which cannot --

THE COURT:  I don't know if they're contradictory, and I get to make that call, but he made those statements on the record, right?

MR. CROSS:  Okay.

THE COURT:  I got it.

MR. CROSS:  Thank you, Your Honor.

THE COURT:  Okay.

MR. BROOKNER:  I just -- also want to just, without objecting, just also be clear for the record.  So far, these

depositions were of Mr. Lefkowitz in a different capacity for --

THE COURT:  I understand.  They are what they are.

MR. BROOKNER:  Yes.

THE COURT:  I know.

MR. BROOKNER:  Thank you.

MR. CROSS:  Okay.  Going back to Exhibit 1.

THE COURT:  Okay.

MR. CROSS:  I want to admit Line 25 on Page 103.

THE COURT:  Hold on.  Can I just -- Page 103 of the PDF?  Well, it has to be 103 of the --

MR. CROSS:  Oh, I'm sorry.

THE COURT:  No, no.

MR. CROSS:  103 of the transcript.

THE COURT:  All right.

MR. CROSS:  And it is page --

THE COURT:  I just realized, there's 54 pages of the PDF, so that can only make sense.  That was on me.  Sorry. What line did you say?

MR. CROSS:  25 of --

THE COURT:  Mm-hmm.

MR. CROSS:  -- Page 103 of the transcript --

THE COURT:  Okay.

MR. CROSS:  -- through Line 9 on the following page.

THE COURT:  I'm going to admit it for the same

reason.

Where do we go next?

Mr. Brookner, to the extent -- I'm just going to be fair to you.  I'm going to let you put in the statements on the page to admit at the same time for the purposes of the deposition.  So I'm just going to -- you're making an objection that -- for the purpose of this, that he's making a deposition on behalf of another entity.  I'm going to let you, you know, get your -- but I'm letting him go in first, and then I'm going to let you get your counter in.

MR. BROOKNER:  My counterdesignations, you mean, Your Honor?

THE COURT:  Mm-hmm.

MR. BROOKNER:  Okay.  I don't know that I can do that on the fly, quite honestly.

THE COURT:  I'm not asking you to.  But I'm just saying, but if you want to recognize that this is done for someone else, I'm going to let you do it because I'm letting him get it in.  In other words, if you're saying -- you made an objection.  There's a line in here that you want me to look at to establish your point, let me know.

MR. BROOKNER:  Very likely.  Thank you.

THE COURT:  Go ahead, Counsel.

MR. CROSS:  All right, let's go to Exhibit 3.

THE COURT:  Exhibit 3.  Okay.

MR. CROSS:  And I want to admit -- I want to start on Page 12.

MR. BROOKNER:  I'm sorry, Your Honor.  Is that 12 of the PDF or 12 of the --

MR. CROSS:  It -- they're the same.  12 of the PDF --

THE COURT:  Oh, these actually sync up.

MR. CROSS:  -- and 12 of the transcript are the same.

THE COURT:  I just confirmed that myself.  I appreciate it.  Thank you.  Okay.

MR. CROSS:  And go to 17 on the following page.

THE COURT:  Wait, wait.  I'm sorry.  Page 12, what line do we start with?

MR. CROSS:  I'm sorry.

THE COURT:  No worries.

MR. CROSS:  14.

THE COURT:  Start at 14.  Now we're taking the United States Trustee's deposition -- examination at a 341 meeting.  Okay.  Alrighty.

MR. CROSS:  To 17 on the following page.

THE COURT:  Okay.  All right.  I'll allow it.

Where do you go from there?

MR. CROSS:  Let's go to Exhibit 4.

THE COURT:  How many more of these do you have.  Do you know?

MR. CROSS:  Let's see.  I have a number.

THE COURT:  Tell me how any of this relates to current management?

MR. CROSS:  So --

THE COURT:  I'll let you get them all in.

MR. CROSS:  I have a --

THE COURT:  I want you to get them all in, and I want you to write them down, but I want you to tell me how -- what this has to do with current management.

MR. CROSS:  Our position is that Mr. Lefkowitz is current management under the statute.

THE COURT:  And how do you define "current management"?  The statute doesn't define "management" or "current."

MR. CROSS:  Well, the case law does, and --

THE COURT:  No.  I can -- I'm a textualist, so let's walk with the text.

MR. CROSS:  All right.  So let's go to 1104(e).

THE COURT:  1104 -- 1104 --

MR. CROSS:  Subsection (e).

THE COURT:  (e), alrighty.  Okay.

MR. CROSS:  1104(e) provides that "The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor" --

THE COURT:  Mm-hmm.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

MR. CROSS:  -- "the debtor's chief executive or chief financial officer" --

THE COURT:  Mm-hmm.

MR. CROSS:  -- "or members of the governing body who selected the debtor's chief executive or chief financial officer" --

THE COURT:  Yep.

MR. CROSS:  -- "participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting."

THE COURT:  Okay.  I'm there.

MR. CROSS:  So since 1104(e) requires the U.S. Trustee to seek appointment of a Chapter 11 trustee --

THE COURT:  Mm-hmm.

MR. CROSS:  -- when any of those three categories of people participated in fraud, dishonesty, or criminal conduct --

THE COURT:  Okay.  You don't see a difference between the words -- notice that the word "current management" isn't used in any of those?  You don't think Congress made a difference between them and maybe distinguished between the two?  Maybe I should give effect to every word.  That's what the Supreme Court has told me to do:  give effect to every word, to every meaning, every word so as to not -- you know, like, (indiscernible).  So the United States Trustee can "move

for appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor". Okay? I think that's -- so they use "governing" -- "current members of the governing body of the debtor". That's different. That's -- can we agree that those are different words than "current management"? Can we just agree that just on its face, the words "current management" are different than --

MR. CROSS: Yes, I agree.

THE COURT: -- "current governing body of the debtor"? Can we agree that -- can we agree with that? The debtor's chief executive officer -- chief executive or CFO, or members of the governing body who selected them. So this is a burden on the United States Trustee. I'm focused now on what is meant by 104(a)(1) "current management".

MR. CROSS: So in Commodities Futures Trading Commission v. Weintraub [sic] --

THE COURT: Okay.

MR. CROSS: -- which is 471 U.S. at 352-53 --

THE COURT: Yep.

MR. CROSS: -- the Supreme Court interpreted --

THE COURT: Mm-hmm.

MR. CROSS: -- 1104(a)(1) and found that "Congress contemplated that, when a trustee is appointed" --

THE COURT: Mm-hmm.

MR. CROSS:  -- "he assumes control of the business, and the debtor's directors are 'completely ousted.'"

THE COURT:  I agree with that.  Tell me what that has to do with the word "current management".  I agree with every one of those statements.  Once you appoint a Chapter 11 trustee, current management is -- they're ousted.  I agree with that 100 percent.  Tell me how -- what that has to do with the definition of current management?

MR. CROSS:  We're saying that the definition of current management includes the debtor's directors.

THE COURT:  You're saying -- okay.  Okay, and that's an argument that I can understand.  Okay.

I'm going to -- I'm going to agree with that.  All the -- I'm going to admit all the statements that you want in. Just read them out.

MR. CROSS:  Okay.

THE COURT:  Yes.  And then we're going to have a conversation about textualism and how the -- how I -- how I interpret the statute and how I think the Fifth Circuit's telling me to do so.

I want you to get them all in.  I want you to make a -- I want you to make your record.  Your argument, and I appreciate you making it, is that current management includes the directors?

MR. CROSS:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you.

MR. CROSS:  All right.  I would like to admit --

THE COURT:  Just list them.

MR. CROSS:  Okay.

THE COURT:  You can just rattle them off.

MR. CROSS:  This is Exhibit 4 --

THE COURT:  Okay.

MR. CROSS:  -- Line 24 through Line 6 on the following page.

THE COURT:  Okay.

MR. BROOKNER:  Your Honor, I'm sorry.  I didn't catch the pages.

THE COURT:  You can repeat it, Counsel.

MR. CROSS:  40 -- or, I'm sorry.  Line 3 on Page 40 to Line 6 on Page 41.

I want to go to Exhibit 29.  And I want to start at 52.

THE COURT:  Hang on.  29, I got it.

MR. CROSS:  And this is --

THE COURT:  Who is this?

MR. CROSS:  This is a 341 meeting in a different case with another debtor run by Mr. Lefkowitz.

THE COURT:  Oh.  Okay.  All right.

MR. CROSS:  And I want to admit it not for the truths of the matter asserted --

THE COURT: No, no, no, no. But I -- I know, but now you're -- I was trying to give you the Lefkowitz ones, and now you're going to try to tell me -- we're kind of going beyond this, so now we're going to have to go with these one by one.

So this is a 20 -- 911-29 is a meeting of creditors in the In re Suffern Partners. Did I get that right?

MR. CROSS: Correct.

THE COURT: In a United States Bankruptcy Court for the Southern District of New York where they're -- let's see. Who is being examined here? This is -- okay. This is Mr. Lefkowitz in his capacity as the CEO of Suffern Partners?

MR. CROSS: Correct.

THE COURT: Okay.

MR. CROSS: And I am not seeking to admit it for its truth.

THE COURT: Wait, wait. Why don't we get to the lines.

MR. CROSS: Okay. 52 --

THE COURT: Page?

MR. CROSS: Page 55 of the PDF, 52 of the transcript.

THE COURT: 55 of the PDF. Okay.

MR. CROSS: Start at Line 8.

THE COURT: Start at Line 8. Okay.

MR. CROSS: And go to Line 23 on the following page.

THE COURT: Okay. You're seeking to admit it for

what purpose?

MR. CROSS:  To show a false statement, Your Honor.

THE COURT:  I don't -- that's not a --

MR. CROSS:  So the statute says "fraud, dishonesty" --

THE COURT:  Mm-hmm.

MR. CROSS:  -- "gross mismanagement".  Dishonesty is one of the bases to appoint a trustee under 1104(a)(1).

THE COURT:  Mm-hmm.  Yes, sir.

MR. CROSS:  And I'm seeking to admit it to show that Mr. Lefkowitz has been dishonest in his testimony for debtors.

THE COURT:  For which debtors?  We're not -- we're not --

MR. CROSS:  Either one.

THE COURT:  No, no, no.  I'm just trying to make sure I understand, because you're talk -- there's a debtor in Suffern; there's a debtor in this case.  I want to know which one you're talking about.

MR. CROSS:  The debtor in this case.

THE COURT:  You want to seek to admit this statement -- I'm still confused.  I need you to be clearer as to what you're asking.

MR. CROSS:  So we have two statements.  We have one statement that he is a director of Perigrove and has been since 2019 or 2020.  And we have another statement that he is not a

director of Perigrove and he's not an officer and he has no affiliation.

THE COURT:  So you're going to seek to admit --

MR. CROSS:  Both statements to show that they cannot both be true.

THE COURT:  So how do I know which one he was dishonest in?  No, no.  In this case, which one?  Does he tell the truth in this case or was he dishonest in it?

MR. CROSS:  We're agnostic as to whether he is being honest or not.

THE COURT:  Well, why is it misman --

MR. CROSS:  Or I'm sorry.

THE COURT:  -- dishonesty.  So --

MR. CROSS:  We're agnostic as to whether the statement is true.

THE COURT:  Okay.  Counsel?

MR. CROSS:  That's the basis.

THE COURT:  I -- in other words, I -- I can admit it for a statement -- I'm happy to do this.  Mr. Lefkowitz said -- now, I get to draw the conclusions as to whether this is dishonesty or what this means, but again, you haven't established for me what this means or whether he was the -- in other words, if someone's honest in this case but may've been dishonest in another case, you think we should appoint a Chapter 11 trustee in this case?

MR. CROSS:  Well --

THE COURT:  Or maybe he changed -- like, I don't know.  I guess that's what I'm asking you.  Why don't I ask you that question.  What do you think the answer to that question is?  Say someone has been 100 percent honest in connection with this case with this debtor, but then there's a statement that seems inconsistent with what he said in another case.  Is that the -- that -- is that cause to appoint -- should we throw management out because there's an inconsistent statement --

MR. CROSS:  Well --

THE COURT:  -- but there's honesty in this case?  I'm just -- I'm not saying, respect to Mr. Lefkowitz.  I'm asking you in connection with -- as you understand the Code should work or the Code does work.  Do you think, if someone can find an inconsistent statement someone said five years ago -- and let's just say they did it on their own -- do you think that's a basis to remove someone as a Chapter 11 -- to remove them and appoint a Chapter 11 trustee?

MR. CROSS:  Your Honor, I think the evidence is cumulative.

THE COURT:  No, no.  I'm asking you, but what -- you're asking me -- I'm asking you a question now.  You get to answer this one now.  You get to -- you get to argue what you want, but I want to make sure that you answer this question for me.  In other words, I want to understand what you're arguing.

MR. CROSS: So --

THE COURT: Just answer my hypothetical. Say somebody -- there's a statement saying I'm not a director, but then in this case, they're saying they are a director, but then it turns out that they actually are one.

MR. CROSS: I think the first hypothetical you gave me, if someone, you know, lied five years ago and has --

THE COURT: I don't know if they lied or not. I'm just saying there's two statements, right? And we're just -- they're pointing them out to say, both can't be true. Either you were or you weren't. But it turns out that in this case, in the case before the current judge, it turns out the statement was true. Is that cause to dismiss someone in Chapter 11?

MR. CROSS: Perhaps not by itself. But in combination with all the other evidence of statements that Mr. Lefkowitz has made about whether he is directors of various affiliates that received money from the debtor. I think it's one small piece of evidence in an overall presentation of evidence showing of Mr. Lefkowitz's pattern of dishonesty.

THE COURT: But you -- I just want to be really clear. You're showing inconsistent statements.

MR. CROSS: Yes.

THE COURT: But Mr. Lefkowitz -- you're saying that proves dishonesty.

MR. CROSS:  Yes.  I would say two -- two statements under oath that are -- cannot both be true proves dishonesty.

THE COURT:  I don't know if it does or not, but I understand that's what you're arguing.  Okay.

All right.  Where do you go next?

MR. CROSS:  I want to go to Exhibit 3.  Start at Page 89, Line 20 through Line 6 on the following page.

THE COURT:  Okay.  Where do you go next?

MR. CROSS:  Let's go to Exhibit 13.

THE COURT:  Okay.  What purposes do you seek the admission of this document?

MR. CROSS:  To show dishonesty.

THE COURT:  I'm denying that.  That's not a -- that's not a basis to admit a document under the Federal Rules of Evidence.  You have to cite, like --

MR. CROSS:  Okay, Your Honor.

THE COURT:  There is -- no, no.

MR. CROSS:  So do you want the --

THE COURT:  That's -- that was your shot.  That was your -- it's actually your second shot on this document.  So go to another one.  The word "dishonesty" is not in the Federal Rules of Evidence.

MR. CROSS:  So the word --

THE COURT:  For purposes of 801, it's just not.  So you don't -- you don't seek to admit something for the purpose

of dishonesty.  You seek to admit a document for the truth of the matter asserted, to establish a prior inconsistent statement.  You've got to give me something.

MR. CROSS:  So I'm saying it's not for the truth of the matter asserted.

THE COURT:  Go to another document, Counsel.

MR. CROSS:  Okay.

(Pause)

MR. CROSS:  Go to Exhibit 8.  I want to start at Page 57, Line 1.

THE COURT:  What was the line number?

MR. CROSS:  Line 1.

THE COURT:  What page?  I'm sorry.

MR. CROSS:  57.

THE COURT:  57, Line 1.  Line 1 to what?

MR. CROSS:  59, Line 2.

THE COURT:  Give me a second to read it.

(Pause)

MR. CROSS:  19, Page 19 of the same document.

THE COURT:  I wanted to --

MR. CROSS:  Oh, sorry.

THE COURT:  I wanted to give them an opportunity to read it, Counsel.

MS. WEBB:  We've read it, Your Honor.

THE COURT:  Okay.

Where do we go next?

MR. CROSS:  Page 19 of the transcript, Page --

THE COURT:  Same transcript?

MR. CROSS:  Yes.

THE COURT:  Okay.  Page 19.

MR. CROSS:  Line 1.

THE COURT:  Oh, I'm sorry.  Line 1, Page -- oh, Page 19, not PDF Page 19.  Okay.

MR. CROSS:  And going to Page 20 of the transcript, Line 4.

THE COURT:  Okay.

MR. CROSS:  All right.  I believe that's it.

THE COURT:  Okay.  Thank you.  Why don't we just get right to argument.

Mr. Cross, why don't you proceed.  I'll give you as much time as you need on the closing.  Take your time.  Okay.

MR. CROSS:  So --

THE COURT:  Wait, wait, wait.  I should say.  Wait, wait.  Let me make sure I've got my -- I want to make sure -- I should make sure that the record is closed with respect to the evidence on your side, Counsel.

MR. CROSS:  Agree, Your Honor.

THE COURT:  Okay.  Let me turn it over to the debtor's side.

MR. BROOKNER:  The debtors rest, Your Honor.

THE COURT:  Okay.  So can I --

MR. BROOKNER:  Excuse me.  The debtor, singular, rests.

THE COURT:  Can I then conclude that the record is closed -- the evidentiary record?

MR. BROOKNER:  From the debtor's perspective, yes, Your Honor.

THE COURT:  Okay.  Alrighty.  Let's proceed to -- wait.  Hold on, hold on.  There's a joinder here, and I want to make sure I don't disrespect anyone.

Anyone on the line wish to address the Court before we get to closing?

Okay.  Let's proceed.

MR. CROSS:  Okay.

THE COURT:  Okay, thank you.

MR. CROSS:  So the Bankruptcy Code sets forth two avenues of appointment for a Chapter 11 trustee.

THE COURT:  Mm-hmm.

MR. CROSS:  One mandatory and one discretionary. Subsection (a)(2) is the discretionary avenue.  (a)(2) allows the Court to appoint a trustee even without a showing of cause and to consider the interest of the estate, the creditors, and a variety of equitable factors.

But under Subsection 1104(a)(1), the Court has absolutely no discretion.  The Court is required to appoint a

trustee upon finding cause under 1104(a)(1).

THE COURT:  I -- don't I have discretion in finding cause?  If I find it, I have no discretion, right?

MR. CROSS:  That -- correct.

THE COURT:  Okay.

MR. CROSS:  The case law interpreting 1104(a)(1) is very clear.  We've cited it -- cited a lot of it in our briefing.  The overwhelming consensus of authority is that if cause is shown under 1104(a)(1), the Court must grant the motion.

THE COURT:  Mm-hmm.

MR. CROSS:  Considerations like the interest of creditors, the cost of the trustee, et cetera, are simply not relevant.

So the issue the parties have briefed most extensively is the standard of proof applicable to a motion under 1104(a)(1).

THE COURT:  Mm-hmm.

MR. CROSS:  There's a split of authority on the standard of proof.  The Fifth Circuit hasn't taken a side.  Our position explained in the reply brief is that under Grogan v. Garner, the preponderant standard is the correct standard.

The standard of proof issue has been adequately addressed in the briefing, so I don't think I need to talk about it further, unless you have questions, Your Honor.

THE COURT: No questions. You're going on preponderance of the evidence?

MR. CROSS: Correct.

THE COURT: Okay, thank you.

MR. CROSS: So that's the standard of proof.

What do we have to prove? The text of the statute tells us that cause includes fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after the commencement of the case or similar cause. And I'll come back to "or similar cause" and exactly what that means in a minute, but first I want to focus on the preceding clause which is fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after commencement of the case.

By its terms, the statute directs the Court to consider both prepetition and post-petition conduct by current management. And we know the defense here is that current management is -- it hinges on the definition of "current management" under Section 1104(a)(1), even though that hasn't been really briefed by the parties. And our position is that Mr. Lefkowitz is current management because he is the sole director of the debtor.

And as we can see from another section of the statute, current management clearly includes the board of

directors, even when the board has hired an untainted officer.

So I already spoke with you about 1104(e).  And if current management, for purposes of 1104(a), just meant officers and not directors, Congress would not have required the U.S. Trustee to move for appointment of a Chapter 11 trustee under 1104(a) when the governing body that selected the untainted CEO were, themselves, engaged in fraud.

And we can also see that 1104(a)(1) is intended to remove bad directors from Commodities Futures Trading Commission v. Weintraub [sic] which found that Congress contemplated that when a trustee is appointed, the debtor's directors are completely ousted.

In cases where courts have denied motions under 1104(a)(1) on the basis that post-petition management is different from prepetition that engaged in fraud, the tainted prepetition management has, in fact, been completely ousted. For example, in Adams v. Marwil, which is 564 F.3d 541 (2d Cir. 2009), a court-appointed receiver had assumed control of the debtor's business.

In 1031 Tax Group, which is another leading case on those issue cited by the defendants -- or, I'm sorry, the debtor, the debtor's principal executed an irrevocable delegation letter in which he irrevocably surrendered all of his authority and control over the debtor.  The governance structure of the company in 1031 Tax Group was changed, and an

individual who was not selected by the principal was made the sole director, sole manager, and partner of the debtor.

In cases where tainted management maintains any vestiges of control or a tainted board simply hires a new corporate officer, courts have held that the presence of the new officer does not defeat a motion under 1104(a).  Examples include Sharon Steel, 871 F.2d at 1227 (3d Cir. 1989), In re Westbank Holdings, 2022 Bankr. LEXIS 2109 at 43, which is Eastern -- Bankruptcy Eastern District of Louisiana, 2022, and Woodlawn Community Development Corp., 613 B.R. 671 (N.D. Ill. 2020).  Both Woodlawn and Westbank say the same thing, which is where the board of directors remains the same, appointment of a new CEO or CRO does not mean that the debtor is under new management for purposes of 1104(a)(1).

Mr. Lefkowitz is still the sole director of the debtor.  He has not been complete ousted.  He retains authority to supervise Mr. Perry, fire Mr. Perry, or curtail or expand Mr. Perry's powers.  Therefore, he is current management for purposes of 1104(a)(1).  And that means that the time period that's relevant to this case -- in this case is the time that current management, meaning Mr. Lefkowitz, has been in control of the debtor.  And that is December of 2021 to present.

Mr. Perry testified that the debtor was acquired by the current ownership group, Perigrove 1018, in December of 2021.  So we can break up that time into three chunks:  a five-

month period prior to the divisional merger, a nine-month period between the divisional merger and the petition date, and a six-and-a-half-month period after the filing of the petition.

Moving on to the actual conduct that constitutes cause, obviously, the things enumerated in the statute:  fraud, dishonesty, gross mismanagement.  But the statute also says "or similar cause".  In decisional law interpreting 1104(a)(1) tells us that "or similar" -- what "or similar cause" means. Cajun Electric Power Coop, 74 F.3d 599 (5th Cir. 1996) says that similar cause includes conflicts of interest.

In re Savino Oil, 99 B.R. at 526 (E.D.N.Y. 1989) holds that where the debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required.  In re Savino Oil also says that a transaction similar to the transaction that occurred in this case in which an insolvent entity transfers its operating business to another entity controlled by the same principals constitutes cause in and of itself.

So we talked about the debtor's prepetition and post-petition business dealings with a few related entities:  Geneva Consulting, M2 LoanCo, Perigrove, and Sigma Risk Management. Mr. Lefkowitz testified that he was a director of Geneva.  Then he testified that he wasn't a director of Geneva, twice. Geneva received $3 million in December of 2021 and subsequent $500,000 payments every month between December of 2021 and the

date of the divisional merger that were never listed on the schedules.

When Mr. Lefkowitz testified that he had no position at the company, that he doesn't know who Geneva's principals are, he's being dishonest. And if you look at his 2004 examination, he says he made all of the financial decisions for Geneva with respect to all of the other entities at issue in this case.

Moving on to M2 LoanCo, the debtor made $34 million in payments to M2 LoanCo between the change of control and the date of the divisional merger. The payments were never included in the SOFA. They were never included in the amended SOFA. They appear in the second amended SOFA. But Mr. Lefkowitz obviously knew about the payments because he is a director of M2 LoanCo. And he's also the only director of the debtor.

Mr. Lefkowitz testified at the deposition of M2 LoanCo on May 12th that all of M2 LoanCo's business records were kept in his email account, IL@Perigrove.com, and his Dropbox account. And he knew for a fact that M2 LoanCo had no other business records. So how could he not have known at the time he signed the SOFA and at the time he signed the amended SOFA about these $34 million in payments?

And then there was an attempt to enter an interim DIP order granting M2 LoanCo releases before those payments were

disclosed to the Court and creditors.

Perigrove.  We have a $1 million payment to Perigrove after the date of the divisional merger.  We have a $5 million payment to Perigrove right before the divisional merger. Mr. Perry had -- he testified that there was no information he had seen to substantiate Mr. Lefkowitz's testimony that those were repayments of loans.

We had a $1 million payment to M2 LoanCo after the date of the divisional merger.  The debtor was supposed to be relieved of all its debt to M2 LoanCo on the merger date. There's no reason for the debtor to be making a payment of $1 million to LoanCo two weeks after the divisional merger. LoanCo was supposed to be paying the debtor $15 million under a funding agreement.

Sigma Risk Management.  Mr. Lefkowitz testified that he organized Sigma Risk Management and he's a director of Sigma Risk Management.  And the debtor made post-petition payments to Sigma Risk Management.

Mr. Perry testified that Sigma Risk Management is run by a group of lawyers who are providing some services related to claims, personal injury claims to the debtor.  Why wasn't there a retention application?  Why wasn't there a declaration of disinterestedness?

Mr. Perry also testified that Sigma Risk Management provides services to YesCare.  So did Mr. Lefkowitz.  That's

why there wasn't a declaration of disinterestedness.  It's because Sigma Risk Management is not disinterested.

And Your Honor, I believe we've shown dishonesty.  I believe we've shown fraudulent transfers and fraud.  And I think siphoning money out of the company or transferring money out of the company while it's insolvent and then failing to disclose those transfers on the SOFA satisfies the standard under 1104(a)(1).

And do you have any questions?

THE COURT:  No, sir.  Thank you very much for your time.

MR. CROSS:  Thank you.

THE COURT:  Thank you.

Mr. Brookner?

MR. BROOKNER:  Thank you, Your Honor.  Jason Brookner, Gray Reed, for the debtor.

The movants are attempting to use a trustee motion as really nothing more than a referendum on a divisional merger and an attempt to otherwise deal with -- excuse me -- an attempt to otherwise deal with estate causes of action that are being dealt with properly under the Rules and in accordance with the Bankruptcy Code.

To secure the appointment of a trustee under 1104(b), the movants must show cause which, as Your Honor noted earlier, requires proof of fraud, dishonesty, incompetence, or gross

mismanagement by current management, either before or after the petition date, or that somehow the interest of creditors will be served by the appointment of a trustee. And I'm going to get to the relevant legal standard here in just a moment.

The debtor respectfully submits that as a result of the uncontroverted evidence presented today, the movants have failed to meet their burden. And the evidence has shown, Your Honor, at least the following.

First, the resolutions appointing -- excuse me -- the resolutions accompanying the petition state explicitly that the CRO has sole decision-making authority for all restructuring matters, any matter where the sole director has a conflict, and any other matter delegated to the CRO. As you have heard, there are no such "other matters". And Mr. Perry has otherwise been the person in charge of this case and has made every day-to-day and every substantive decision.

Although Mr. Lefkowitz unquestionably remains the sole director, that is his only position. He's not an officer. He's not a manager. And again, to reiterate or repeat, all day-to-day decisions have been made by Mr. Perry.

Mr. Lefkowitz has not sought to impose his will on Mr. Perry or Gray Reed, for that matter. He has not attempted to veto any decisions that have been made, and he has not in any way tried to wrest control of any part of this case.

The debtor's bank accounts are under the control of

Mr. Perry since the time the case was filed, and he has kept tight controls over the cash.  There has been no denuding of any kind of any cash or assets.

Yes, Mr. Lefkowitz signed the schedules and the SOFAs and was the principal deponent at the 341 meeting which continued across three different days.  The reason for that, of course, as Mr. Perry testified, was that the schedules and SOFAs pertained exclusively to prepetition financial matters of which Mr. Perry had no personal knowledge.  As a result, it made perfect sense for Mr. Lefkowitz to sign and be the deponent, not Mr. Perry.  But again, Your Honor, that was all for prepetition financial matters.

For post-petition matters, every single post-petition matter, it's been Mr. Perry 100 percent of the way, making decisions and riding herd over these Chapter 11 -- over this Chapter 11 case, day in and day out.  And in that regard, as the evidence made clear today through the testimony, the debtor has made all appropriate disclosures either via schedules and SOFAs through various amendments, through the filing of monthly operating reports which are current, as you can tell by the docket, and through fulsome and tremendous amount of discovery, all of which was provided to the Unsecured Creditors' Committee.

There was a reference earlier to Section 1104(e), but as Your Honor surely knows, that's a provision that pertains to

the Office of the U.S. Trustee and requires the U.S. Trustee to file a motion to appoint a trustee under certain circumstances, and the U.S. Trustee has not filed its own motion, nor has the U.S. Trustee joined in the movant's motion under 1104(a).

As to 1104 -- I guess (a)(2); I don't have my card in front of me -- the interest of creditors, last week you said on the record at status conference that you wanted to hear about how this case would be financed if a trustee was appointed. And the testimony has shown, there's only about $200,000 in cash on hand which is sitting in the professional fee escrow account pursuant to the terms of the interim DIP order. The testimony showed that the prospect of securing new financing is slim at best because there is little to no collateral to backstop any financing, other than litigation proceeds and ERC credits which are in flux. And even if they get processed, which could take several more -- several months from now or longer, the IRS likely has an offset claim against most or all of those ERC credits for tax liability.

And directly related to the interest of creditors, Your Honor, and there wasn't a lot of discussion about it today, but you can certainly take judicial notice of it, and although the terms will not be made public until we file our plan later this month, Judge Jones, as you well know, presided over a three-day mediation at which a global settlement was reached. And Your Honor ordered that global settlement; that's

Docket 603.  And that global settlement was reached among the debtor, the Committee, and various other entities with which Mr. Lefkowitz is associated, all as set forth in Docket Number 303.

That settlement remains subject to finalization and definitive documentation, and of course, the terms and substance are still subject to the confidentiality provisions in the mediation order.  But if a trustee is appointed, there's a serious question as to whether the trustee would or could abide by the settlement and whether the settlement would remain intact, or whether the cases would devolve into endless litigation.  That is a huge risk that's just not worth taking at this point, and it's not a risk that's in the interest of creditors to take.

Instead, the debtor submits respectfully, that the interest of creditors would be to allow them to see the plan and exercise their rights to vote, object, and be heard with respect to the same.  I think you'll hear from the Committee that the Committee believes, as well, that that is what is in the best interest of creditors.

Of also additional note, the Committee did not join in the trustee motion, and you did not see the Committee here today taking sides against the debtor in connection with the trustee motion.

We do not believe the movants have met their burden

of proof, and I want to talk about that for just a moment. Although in the briefing, there was some commentary that was actually not wrong about the Cajun Electric Co-op case, the bottom line is that at least in Texas, if not throughout the country, the clear and convincing standard remains the governing standard. And I have a variety of cases that I'll cite for the record, many of which I'm sure Your Honor is familiar with.

There's the Ironside case by Judge Rodriguez, 2022 WL 509890 from the Southern District of Texas Bankruptcy Court in 2022. There is the National Rifle Association case, the NRA case, from the Northern District of Texas Bankruptcy Court in 2021: 628 B.R. 262. The Ford Steel case at 629 B.R. 871 from the Bankruptcy Court in the Southern District of Texas, 2021. The Amerejuve -- A-M-E-R-E-J-U-V-E -- case, 2015 WL 2226344, Bankruptcy Southern District of Texas 2015, Judge Bohm. The Millennium Management case, 2014 WL 792115 from the Bankruptcy Court in the Southern District of Texas, 2014. And the Patman Drilling case, 2008 WL 724086 from the Bankruptcy Court in the Northern District of Texas. And there are a variety of additional cases from other districts that also adopt the clear and convincing standard.

Finally, Your Honor, getting to the question of current management and what that means and how courts have addressed that when a CRO -- independent CRO has been

appointed, there actually are not very many cases out there, but we did find four. And in each of those cases, when an independent CRO was appointed and effectively displaced management, the Court declined to appoint a Chapter 11 trustee. For the record, and for Your Honor, those cases are: the Blue Stone Real Estate case, 392 B.R. 897 (Bankr. M.D. Fla. 2008); the 1031 Tax Group case that Mr. Cross referenced at 374 B.R. 78 (Bankr. S.D.N.Y. 2007); the Express Grain Terminal case at 2022 WL 245421, Bankruptcy Court, Northern District of Mississippi in 2022; and the Tanglewood Farms case at 2011 WL 606820 from the Bankruptcy Court in the Eastern District of North Carolina in 2011. And that case was interesting because it was specifically denied a motion to appoint a trustee where the CRO was successfully running the case as current management.

And with that, Your Honor, the debtor respectfully requests that you deny the motion. We respectfully submit you should deny the motion.

Thank you.

THE COURT: Thank you. Let me just hear, anyone on the line wish to address the Court in connection with this motion?

MR. HEMENWAY: Your Honor, Zach Hemenway for the Committee.

THE COURT: Okay.

MR. HEMENWAY:  I'd like to just address the Court briefly since the Committee's position has been discussed by the parties and as an estate fiduciary.

The Committee does oppose the motion.  We do so because we don't believe that cause exists to appoint a trustee, and we also don't believe that doing so would be in the best interest of creditors, particularly in light of the mediation settlement and the forthcoming joint plan.

And I think the fact that it's a joint plan is important to consider here because it means that the Committee isn't just saying there's a settlement and moving forward in that way would be in the best interest of creditors.  The Committee will be working with the debtor to ensure that that is the case.  And we think that appointing a trustee could put that into jeopardy.

THE COURT:  Thank you.

Okay, just give me one minute.

(Pause)

THE COURT:  Okay, so before the Court is consideration of a motion to appoint a Chapter 11 trustee in this case.  It was filed at Docket Number 731, and it was filed by numerous parties.  And the Court considers this motion very seriously, considers the objections that have been filed to it seriously, and considers the matters incredibly serious.

The Court has jurisdiction under 28 U.S.C. 1334.

It's a core proceeding under 28 U.S.C. 157(b)(2)(A) concerning the administration of the estate.

I want to thank both parties. I don't want to forget to do that, so I'm going to do it up front. I thought the briefing was excellent. I thought the argument was excellent.

I probably pushed both sides, including the witness, a little too much. I did it on purpose because I'm trying to get the -- trying to get down. These are really serious issues, and the parties clearly take them seriously, and there are people who are represented by Mr. Cross, and by others who signed who take this case very seriously. So I want to thank them. I want to thank the debtors for really kind of putting the effort that I thought was required.

I thought today -- there was a motion to adjourn the hearing on this, but I firmly believe that parties had filed a motion and they had requested their day in hearing, and they believed that they had sufficient ground to proceed, and I wanted to make sure and honor that. Parties were entitled -- were afforded more than sufficient due process to respond, and so this has been out for a while.

And so I just note, much has said been about the divisional merger that took place before the bankruptcy case that's been filed, been subject to much litigation outside of this court and some in it. Much has been said about parties such as M2 and YesCare and Isaac Lefkowitz. And I thought

today, the process worked just fine.

People are entitled to ask really hard questions, and the statute does provide that if I do find that there's cause, that I shall appoint a Chapter 11 trustee.  And that's what 1104(a)(1) says, right?  For cause.  And then they say including fraud, right, dishonesty, gross mismanagement of the current management of the debtor.  (b) says, by the way, if not that, then if it's in the best interest of the estate, which is -- I view as two separate standards, and everybody seems to do so as well, today.

So let's turn to the statute, and let's look at it. And I want to kind of walk through some analysis.  1104(a) says that at any time after the commencement of the case but before confirmation of a plan, on the request of a party-in-interest, which we clearly have, and after notice of a hearing, which we clearly have, the Court shall order the appointment of a trustee for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, right, by current management.

So there has to be including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after the commencement of the case or for similar cause.  1104.

So what does the word "current management" mean?  I'm going to just note -- I'll cite some law here.  Everybody's

been citing some law, so I'll cite some too.  All right?  Interpreting the Bankruptcy Code begins with analyzing the text; Ransom v. FIA Card Services, 562 U.S. 61, 69 (2011).  And in Trout Point Lodge v. Handshoe, 729 F.3d 481, 486 (5th Cir. 2018), Fifth Circuit said the task of statutory interpretation begins and, if possible, ends with the language of the statute.  BedRoc v. United States, 541 U.S. 176 (2004):  The preeminent canon of statutory interpretation requires to "presume that [the] legislature says in a statute what it means and means in a statute what it says there."  And it was quoting Connecticut National Bank v. Germain, 503 U.S. 249, 253 (1992).

1104(a)(1) talks about current management.  Right?  I think we can all agree on what the word "current" means, so I won't bore anyone with that.  But it does mean, if you think about, present time is certainly contemplated there.  And I would note that the Fifth Circuit has also told me that the text is alpha.  All right?

And fine Supreme Court guidance, such as Schindler Elevator Corp. v. United States, 563 U.S. 401 (2011):  When statutes don't define a word, we look to their ordinary meaning.  So "current", applying Webster's dictionary, means "present".

We then go to "management".  I think you'd find plenty of U.S. Supreme Court cases and Fifth Circuit cases, when a statute defines its word -- does not define a word, you

look to its ordinary meaning, and the ordinary meaning can be found in a credible dictionary.  I'm using Webster's.  Okay?

The meaning of that has not changed, and I would note 1104(a)(1) was passed in connection with the 1978 reforms. I'll get to (e) which was passed in 2005.

So what does "management" mean?  "Management" means the act -- the persons who manage a business organization, right, or institution.  What does it mean?  To exert -- "manage", the word "manage" means "to exert control over, to direct, or to administer".  Right?  So who is directing the administration of the business?  Right?

You can go to Black's dictionary.  Black's defines it, "management", as the people in a company who are responsible for its operation.

Who's operating the business?  That's Mr. Perry, and that's what the testimony says.  It's Mr. Perry.  That's current management.  It's Mr. Perry.  And the word "current" is present.

It's an interesting question of law whether you apply the word "current" to mean at the time the motion was filed or at the time the case was filed, but it says "current management".  And who's current management?  It's you, Mr. Perry.  I don't have to make that distinguishment, but I note it for the record.  But you were appointed CRO before, so that doesn't really matter.  But you are current management, my

understanding, and based on the uncontroverted testimony, you make all the decisions.  No one's trying to exert influence over you.  Quite frankly, you did participate in the mediation which took place.  You've been directing the affairs of the debtor on a day-to-day basis.  You're current management.

I've heard a lot about Mr. Lefkowitz.  I haven't heard anything about you.  I've heard that people could have control over you, but I haven't heard of anybody doing it to you.

I'm glad you realize that being CRO -- that sentence in there did trouble me in your engagement letter, and you'd want to think about those on a go-forward because I, quite frankly, relied on the statements in the -- what was granted authority to you.  Quite frankly, you would've had a conflict had you tried to exercise it, in my opinion.  And I haven't heard any testimony that there is any.  I heard about possibilities, but none of it actually took place.

I think CROs have a duty to the estate, right, to the debtor itself, fiduciary duty.  And when you get retained in the case, that means something completely different.  It means that we can then analyze your actions and determine, not just for compensation reasons, but we can look at your actions.  But I haven't heard anything today that questions what you did.

It talks about Mr. Lefkowitz.  We had a lot of testimony about Mr. Lefkowitz today who's a director.  He's not

management.  He's a director.  And words have to be applied according to their ordinary meeting.  You can't fit them in there.

And I think we ought to -- you don't just look at a statute.  Right?  You look at -- you can -- plenty of cases.  Right?  You don't just look at cases in a vacuum, or statutes, I should say, in a vacuum.  You look at how the play within the broader context.  You look at other words to see if you can gain meaning from other words.  And I think Mr. Cross actually highlighted the very point that current management means something other than what's here.

1104(e) was passed in 2005.  Right?  This passed over -- just think about it -- over 20 years after, and Congress knew how to use that word.  It was in the same statute.  But they chose to use other words.  Right?  And you've got to read a statute to give effect to every word and to give harmony to every word.  You can find consistent -- the word "current management" is only found one place in the statute, and it's only found in Title 11 in this section.  The word "current management" is only used one time, and it means this.

1104(e) says the United States Trustee shall move for the appointment of a trustee if there's reasonable ground that current members of the governing body of the debtor.  Who is the governing body?  Is that management?  Is that the same

thing?  But if that's the case, then "governing body" has to mean something else than "management" because the next one is the debtor's CEO.  The one after that is CFO.  Right?  So it's got to mean something different.  You can't read "director" to also mean "management" because then that makes 1104(e) superfluous.

And -- then let's go forward, or the members of the governing body who selected the CEO.  Right?  Like, that, now, we're talking directors.  Who selects the CEO?  Who selects the CFO?  If they engage in anything, the trustee's got to come forward.

You look to Collier's about what the statute meant for guidance, a leading treatise on bankruptcy.  Collier's says that -- at least puts forward that this was passed as part of the BAPCPA to get over situations where current management was put in by someone else, and then they said, well, that was current management.  Current management is (indiscernible), so you survive under (a)(1), but now the trustee has an obligation.  If someone put that person in and they -- and they're the one who committed the fraud, then the trustee has to go in and bring it in.  But that's not -- that's not what I have here today.

So "current management" has to mean something different if you apply the text.

I then look to -- I look to other leading treatises

Supreme Court and the Fifth Circuit certainly rely on.  Scalia and Garner's Reading Law:  The Interpretation of Legal Text.  Canon 25.  "A word or phrase is presumed to have the same meaning throughout a text.  A material variation, in turn, suggests a variation in its meaning."

There's one other time.  In 2020, Congress passed another statute.  362(b)(29) was passed I believe in 2020.  It uses the word "governing body" there.  That "governing body" is used there.  So it passed in 2005, used the words "governing body" used here, and in 2020 it's used there, but it's used for the governing body of a -- I'm going to read it.  362(b)(29).  I want to make sure that I've got this right for you because I think this provides a good statutory analysis just to kind of know what that means, or what it was -- or what one can glean by just looking at the statute.  Notice, we're just applying a textualist analysis in a lot of these cases.

362(b)(29) refers for any action under (A) amateur sports organization to replace a national governing body.  Right?  We're talking -- we're not talking management.  "Governing body" means something different than directors [sic].  "Governing body" -- excuse me -- means something different than "current management".  Congress knew how to use "current management" there.  You look at what the effect of those words and how they're used in other statutes, right?

Canon 27 under Scalia and Garner.  "Harmonious-

Reading Canon.  The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."  That's what we have here.

So the question is, is there cause?  We've heard a lot of testimony about things that happened in connection with the divisional merger.  A lot of statements made about transfers.  Geneva, Yes.  CRO's telling me they investigated it.  He investigated them.  I don't know the conclusions of those investigations, and there may be something.  I don't know.  I'm told there's a joint plan coming out, but the joint plan, honestly, means nothing to me today because I don't have it and I don't know what it says.

The question is, is there enough cause as I sit here today based upon what I have.  I do know that the debtor's been in mediation several days.  I do know that they're saying there's an announcement between them and the Committee.  Okay.  What the terms of them are, I don't know.  Whether they address these issues that were raised today, I have no idea.  I haven't seen it.  I'll wait and read it with everyone else.  But there's going to be transparency on these issues.

There were questions about the SOFA payments, and I really appreciate Mr. Cross' analysis there and examination there.  Certainly something to be there.  They showed up in the second.  Why they didn't show up in the first, I don't know.  But had we been sitting here today, and there was, you know,

multimillion transfers not showing up, no answer, didn't appear in a second amended SOFA, that would've tipped the sails [sic] in another direction maybe.

Debtor filed in February 20- -- debtor filed in February of this year.  I think it's been clear how I felt about -- and I haven't granted them.  I think it -- or at least its firm, too.  Committee's been on it.  I've been on it.  An actual case.  I just don't think there's cause today under any standard.  You can call it preponderance of the evidence.  You can call it clear and convincing evidence.  There's not a preponderance of the evidence that current management is engaged in fraud, that there's been fraud.

The standard can't just be fraud in and of itself, right?  And that would disqualify -- they'd have to put a Chapter 11 trustee in virtually every case involving fraud in a Chapter 11 context, right?  So that can't be the standard. Right?  And Collier's even talks about this.  Right?  You've got -- the question is are the folks who are operating the day-to-day frauds or dishonest with the Court?  Are the people who are running the company who the debtor-in-possession is -- are they frauds?  Are they dishonest?  Right?  Are they doing something that requires putting someone else in immediately because bankruptcy is built on transparency.  And without transparency, we have nothing in this.  Right?  And that's where we are.

So I think the text supports the analysis that I'm providing. And I provided what I hope is a strong textual analysis as to the way to read this statute. And I've got it. There are cases saying once management is out, directors out -- I mean, I got it. I didn't -- I think -- I got it. They say that.

But let's read the statute, and let's see what it requires. And "current management" can't mean directors. If that's the case, then every other way -- the word "director" is not used there, Congress knows what it says. And I'm going to presume what it says is what it means and what it didn't mean to say. And I'm not going to interpret it according to its intent. I'm going to interpret it -- I'm going to interpret the statute according to what it says. And that's what it says, and that's what we're doing.

So I'm going deny the motion to appoint a Chapter 11 trustee. I'm also going to find that it's not in the best interest of creditors to appoint one at this time.

The reality is -- and let's be honest -- this case is going to come to a real close really fast. It is. Appointing a Chapter 11 trustee at this time, you know, would create -- I don't know where the money's going to come from. Debtor doesn't have a whole lot. Debtor's got to get out of bankruptcy real fast. Those are just the facts.

The debtor says it has a plan. It's going to have to

get it on fast.  If not, there's going to be another kind of motion that's filed, and it's going to have some weight.  All right?

All right.  The question is do you dismiss or convert this case.  That's the -- if there's a plan that doesn't work.  Right?  There aren't going to be a whole lot of Plan Bs and Plan Cs in connection with this case.  This case is coming to a conclusion one way or the other.

Debtors and the Committee are doing to put forth a plan, I'm told a joint plan.  I don't believe things until I see it in writing and signed by people.  Deals always change. You never have a deal until it's on the table.  And everybody's going to get a chance to read it, and creditors will have a chance to read on it and vote on it.  That's the way the process work.

Appointing a Chapter 11 trustee under (b) would essentially halt everything, put everything to a grinding halt and really require a dismissal or conversion.  A Chapter 11 trustee at this stage, giving someone the keys to a case with no money and no budget, dismissal or conversion would make more sense in that instance in my opinion.

So the debtor will continue -- current management, in my opinion, based on what I've heard, based on the evidence -- forget about my opinion -- based upon the record before me has not committed fraud, mismanagement.  There are -- there is a

troubled past, here, and I don't make light of it.  I don't make light of it.  And there are investigations that are going on, and I don't know what the results of them are, but I'm told that they were investigated carefully.  We'll see if that's true or not.  Right?  Plans have to be filed in good faith.  If there are settlements in there, they have to be satisfied on a standard of business judgment.

Put the debtor -- the debtor will be put to its evidentiary burden for sure.  The question is should this management be supplanted for management, for someone that we don't even know.  At this time, I think, under (b), the answer's no.  And do I have evidence under (a), to satisfy it?  No.

But I think -- I think, Mr. Carr [sic] -- I think the process has been well served today.  I think creditors know far more than what they did before.  I think the process has had far more transparency, as required.  I'm not going to -- Trustee has its own job under 1104.  If it feels like it needs to bring it, it'll bring it.  But I'm not telling it what to do, and I'm not saying that it should.  That's not before me today.  We're using 1104(e) -- I want to really careful -- for purposes of statutory construction and analysis under the most conservative principles that you can find.  That's the standard.

And I think -- and I want to give everyone -- I don't

know, "comfort" is not the right word, but I'll just say "reality". I think the debtors know this, too. Right? This -- you've got to try to put forth a confirmable plan or this case is going to take a different turn. And I don't know what that turn is, and I'm not here to speculate on it, but the reality is that this case is -- has to reach a final resting place at some point really soon, and I think putting a Chapter 11 trustee would not do that. There are far more parties that want other things.

I think I've adhered closely to the text, closely to the case law, and that's my ruling for today.

So I'll enter a short order for the reasons stated on the record.

I don't want to make light of what I heard today, and I'm not. I've listened to a lot of it. I know I've pushed Mr. Carr [sic] in certain directions, and we were talking about evidence and what was said and what wasn't said, but I heard every word you said. I read every document you put in. I know. I hear you. And I read it. I don't know what it amounts to.

I look forward to reading if there's really going to be a plan, and if a plan doesn't get filed, then the debtors have to give me a status conference as soon as possible and tell me why it isn't there. In there, I see no wrong.

If there are other things that you discover,

Mr. Perry, you'd better disclose them.  I think you know, bankruptcy courts, especially in this district, take transparency incredibly serious.  So I think you ought to take your job -- I'm not saying you're not.  I'm just really -- you don't want to go down the road.  I'd rather overdisclose than under in connection with any case.  I will construe -- understand, I will construe, and if you -- I don't really find -- I know I signed the order, but if Lefkowitz tries to change anything what we're talking about here, your job is to come to me.  That's the way this works.  And I'll strike that paragraph.  It's meaningless to me.  I'm just telling you now.

And if anybody has any confusion about that, Counsel, if you have any confusion about that, I'm happy -- I'm just telling you I find it meaningless because I read what was filed with the petition as giving you sole authority.  And if there's any conflict there, then I need -- and I find that someone -- I find that it's your job to come to me.  And I don't care how you get it to me, but you've got to come to me.

But it sounds like it hasn't happened, so we don't have an issue.  I'm just saying it so that it's said.

Appointing a Chapter 11 trustee is an extraordinary remedy, which means -- you know, regardless of what bar you think about, it's a high bar, it's an extreme remedy.  Right? You don't just come in, put someone on because there's been fraud in connection with the case.  You take fraud really

seriously. There are stay causes of action that you have to investigate. But you don't just remove, not automatic. Right?

I agree with the 1031 line of cases that it's the exception, rather than the rule, but I take it seriously that if I do find cause -- what's cause? It's determined on a case-by-case basis. Right? And what you see in the cases, this Court's looking at the facts of that case and saying is there cause to remove you. Is there the -- is there the bad stuff that the Code is talking about there to make sure that the trustee, this debtor, the management has got to go today. As a result of that, come out right away. And anybody can bring it. Right? It's that serious. That's (indiscernible).

I don't know, based upon what I've heard -- I want to be really clear, because it's not just those on your merit; it's not choosing sections. It's cause. Right? It's including. But including means including but not limited to, right?

I haven't heard any control by insiders. I haven't heard it. A lot of concern about it. A lot of things to be thinking about with respect to Geneva and their roll and payments that were made. And we'll learn more. We'll learn more, but I want to learn more soon.

But it's fact-intensive. I've listened to the evidence. I allowed a lot in today, folks. Okay? Let's just be honest. I allowed a lot in because I wanted to hear a lot.

And I thought these matters were so serious that when there was a call one way or the other, I made the call to allow it in. I haven't heard of anybody concealing.

Mr. Perry, you've heard everything I've said, and I believe I'm faithful to Cajun Electric.

Okay. I think that's enough for today. I really appreciate everyone's time. You all have a good day.

THE CLERK: All rise.

(Proceedings concluded at 6:15 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Alicia J. Jarrett*

_____

ALICIA JARRETT, AAERT NO. 428    DATE: January 29, 2024

ACCESS TRANSCRIPTS, LLC