**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S OBJECTION TO MOTION OF**
**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS AND CERTAIN**
**TORT CLAIMANTS FOR STRUCTURED DISMISSAL OF CHAPTER 11 CASE**
**[Relates to Docket No. 1260]**

---

[1] The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

4866-1984-9638

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ................................................................................................ 1

Factual and Procedural Background .......................................................................... 4

    I.      The Debtor's Growing Financial Distress Prior to the Bankruptcy Filing ............ 4

    II.     Procedural History of the Bankruptcy Case .......................................................... 13

    III.    The Settlement is a "Fantastic Result for Creditors" ............................................ 16

    IV.    The Motion to Dismiss Cites No "Evidence" of Bad Faith or other Cause for Dismissal ................................................................................................................ 19

Arguments and Authorities ...................................................................................... 24

    I.      The TCC Has Not Demonstrated Cause for Dismissal under 11 U.S.C. § 1112(b) ............................................................................. 24

    II.     The TCC's Motion Must Be Denied As an Improper *Sub Rosa* Plan ................. 31

            A.     The "Package" Proposed by the TCC is Indistinguishable from *Jevic* and *SmileDirectClub* and Therefore Must be Denied ...................................... 32

            C.     Derivative Standing is Not Warranted under *Louisiana World* ............... 36

            D.     Abandonment is Not Warranted By the Facts of this Case ...................... 37

            E.     There is No "Cause" for Relief from the Stays in This Case.................... 38

            F.     Dissolution of the UCC is Not Warranted ............................................... 39

    III.    The Settlement Does Not Contain "Non-Consensual Non-Debtor Releases" ...... 40

    IV.    The Settlement is the Clear Best Choice for Ensuring Creditor Recoveries ........ 47

Conclusion ............................................................................................................... 53

4866-1984-9638

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223 (S.D. Tex. 2011) .........................44

*Am. Nat'l Bank of Austin v. MortgageAmerica Corp.*
*(In re MortgageAmerica Corp.)*, 714 F.2d 1266 (5th Cir.1983)...................................... *passim*

*Blue Whale Corp. v. Grand China Shipping Dev. Co.*,
722 F.3d 488 (2d Cir. 2013).................................................................................................44

*In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) ..............................................................33

*Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*,
561 F.3d 377 (5th Cir. 2009) ...............................................................................................40

*In re Buffet Partners, L.P.*, 2014 WL 3735804 (Bankr N.D. Tex. July 28, 2014) .................31, 32

*Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008) .................................37

*In re Cash Media Sys., Inc.*, 326 B.R. 655 (Bankr. S.D. Tex. 2005).............................................37

*In re CEC Entm't, Inc.*, 625 B.R. 344 (Bankr. S.D. Tex. 2020) ....................................................31

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)..........................................................27

*Commonwealth Oil Refining Co. v. EPA (In re Commonwealth Oil Refining Co.)*,
805 F.2d 1175 (5th Cir. 1986) .............................................................................................37

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.*
*(In re Foster Mortg. Corp.)*, 68 F.3d 914 (5th Cir. 1997) .......................................................48

*In re Creekside Sr. Apts., L.P.*, 489 B.R. 51 (B.A.P. 6th Cir. 2013)..............................................25

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017).............................................31–33

*In re Dexterity Surgical, Inc.*, 365 B.R. 690 (Bankr. S.D. Tex. 2007) ..........................................43

*Dowling v. Narragansett Cap. Corp.*, 735 F. Supp. 1105 (D.R.I. 1990).......................................42

*Schertz-Cibolo-Universal City I.S.D. v. Wright (In re Educators Grp. Health Tr.)*,
25 F.3d 1281, 1284 (5th Cir. 1994)................................................................................41–43

*In re Emoral Inc.*, 740 F.3d 875 (3d Cir. 2014).......................................................................44, 45

i

*Fin. Sec. Assur. v. T–H New Orleans Ltd. P'ship*
    *(In re T–H New Orleans Ltd. P'ship)*, 188 B.R. 799 (E.D. La. 1995) .................................... 26

*Giron v. Zeytuna, Inc.*, 2022 WL 856385 (D.D.C. March 23, 2022) ............................................ 44

*In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009) .............................................. 33

*Halo Wireless, Inc. v. Alenco Commc'ns, Inc. (In re Halo Wireless, Inc.)*,
    684 F.3d 581 (5th Cir. 2012) ...................................................................................................... 37

*In re Highland Cap. Mgmt., L.P.*,
    No. 19-34054-SGJ11, 2022 WL 3959550 (Bankr. N.D. Tex. Aug. 30, 2022) ......................... 3

*In re HSM Kennewick, L.P.*, 347 B.R. 569 (Bankr. N.D. Tex. 2006) ........................................... 41

*In re Humble Place Joint Venture*, 936 F.3d 814 (5th Cir. 1991) ................................................. 25

*In re Iridium Oper. LLC*, 478 F.3d 452 (2d Cir. 2007) .................................................................. 33

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130 (2d Cir. 1993) ............................................. 44

*La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*,
    832 F.2d 1391 (5th Cir. 1987) .................................................................................................... 35

*La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988) ........................................... 40

*Law v. Siegel*, 571 U.S. 415 (2014) ............................................................................................... 31

*Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.)*,
    949 F.2d 585 (2d Cir. 1991) ....................................................................................................... 27

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986) .................................................... 23, 25

*Lockheed Martin Corp. v. Gordon*,
    16 S.W.3d 127 (Tex. App.—Houston [1st Dist. 2000, pet. denied]) ....................................... 45

*In re Lots by Murphy, Inc.*, 430 B.R. 431 (Bankr. S.D. Tex. 2010) ............................................. 26

*Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., LLC)*,
    912 F.3d 291 (5th Cir. 2019) ...................................................................................................... 42

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986) ............................... 36, 37

*In re Mirant Corp.*,
    Case No. 03-46590, 2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005) ............................. 26

*In re Moore*, 608 F.3d at 261 ................................................................................................... 41, 43

*Nat'l Rifle Assoc. of Am.*, 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021) .................................. 25, 26

ii

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.*
  *(In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349 (5th Cir. 1997) ....................................48

*Official Comm. of Unsecured Creditors v. Moeller (In re Age Refin. Inc.)*,
  801 F.3d 530 (5th Cir. 2015) ...........................................................................................48

*In re Ozcelebi*, 639 B.R. 365 (Bankr. S.D. Tex. 2022)....................................................24

*Pension Benefit Guar. Corp. v. Belfance (In re CSC Indus., Inc.)*,
  232 F.3d 505 (6th Cir. 2000) ...........................................................................................27

*In re Preferred Care Inc.*,
  No. 17-44642, 2019 WL 4877525 (Bankr. N.D. Tex. March 22, 2019) ..............................42

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599 (5th Cir. 1980)..........................48

*S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*,
  817 F.2d 1142 (5th Cir. 1987) ...................................................................................... *passim*

*Schimmelpenninck v. Byrne (In re Schimmelpenninck)*,
  183 F.3d 347 (5th Cir. 1999) ...........................................................................................43

*Schmermerhorn v. Centurytel, Inc. (In re Skyport Glob. Commc'ns, Inc.)*,
  No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011).....................................43

*In re Sherwood Enters., Inc.*, 112 B.R. 165 (Bankr. S.D. Tex. 1989) ...........................................26

*Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*,
  152 S.W.3d 817 (Tex. App.—Texarkana 2004) ...............................................................45

*In re SmileDirectClub, Inc.*,
  Bankr. Case No. 2390786 (CML), Docket No. 613, Docket No. 617 ............................31, 33

*Studensky v. Buttery Co., LLP (In re Argubright)*,
  532 B.R. 888 (Bankr. W.D. Tex. 2015)...........................................................................27

*Tex. Att'y Gen. v. Brown (In re Fort Worth Osteopathic Hosp., Inc.)*,
  387 B.R. 706 (Bankr. N.D. Tex. 2008)...........................................................................41

*U.S. v. Frontone*, 383 F.3d 656 (7th Cir. 2004)....................................................................26

*U.S. v. Sutton*, 786 F.2d 1305 (5th Cir. 1986).....................................................................31

*In re Ultra Petroleum Corp.*, 624 B.R. 178 (Bankr. S.D. Tex. 2020) .........................................31

*In re Ward*, 978 F.3d 298 (5th Cir. 2020).............................................................................31

*In re Wright*, 545 B.R. 541 (Bankr. S.D. Tex. 2016).................................................................48

**Statutes**

11 U.S.C. § 105(a) ..................................................................................30, 31

11 U.S.C. § 362(d) ........................................................................................38

11 U.S.C. § 541(a) ........................................................................................40

11 U.S.C. § 544(b) ........................................................................................43

11 U.S.C. § 548(a) ........................................................................................43

11 U.S.C. § 554(a) ........................................................................................36

11 U.S.C. § 1103(c) .......................................................................................30

11 U.S.C. § 1112(b) ..................................................................................23–24

11 U.S.C. § 1125(a) ......................................................................................34

11 U.S.C. § 1126 ..........................................................................................34

11 U.S.C. § 1127 ..........................................................................................34

11 U.S.C. § 1128 ..........................................................................................34

11 U.S.C. § 1129 ..........................................................................................34

Texas Bus. Org. Code § 10.008 ....................................................................45

**Other Authorities**

Charles Jordan Tabb, THE LAW OF BANKRUPTCY 4 (3d ed. 2014) ................................27

Fed. R. Bankr. P. 9019(a) ..............................................................................48

4866-1984-9638

Tehum Care Services, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), files this objection (this "Objection") to the *Motion of the Official Committee of Tort Claimants and Certain Tort Claimants for Structured Dismissal of Chapter 11 Case* [Docket No. 1260] (the "Motion to Dismiss") filed by the Official Committee of Tort Claimants (the "TCC"), and respectfully states the following:

### Preliminary Statement

1.      The Court is faced with two alternatives:  (a) approve an aggregate $55 million settlement that was carefully and thoughtfully negotiated over the course of several months, multiple rounds of mediation, and is unanimously supported by the Debtor and the Official Committee of Unsecured Creditors (the "UCC"), including each of the UCC's tort and non-tort claimant members; or (b) dismiss this case under a so-called "structured dismissal" that would force all creditors into a multi-year "race to the courthouse" where only the most aggressive and well-represented claimants will cross the finish line and actually recover anything of value.

2.      The Court's decision should be an easy one.  The $55 million settlement is supported by actual facts, actual analysis, and actual legal authority.  It is a sound exercise of the Debtor's business judgment—and supported by creditors whose views are informed and reasonable—because it maximizes value for all constituents and will enable the Debtor to make equitable distributions of estate assets to creditors under a to-be-revised confirmed chapter 11 plan.

3.      On the other hand, the Motion to Dismiss is merely a public relations piece, which contains little more than self-serving invective, rhetoric, and hyperbole.  It is unsupported by any facts or information that have not already been presented to the Court in one form or fashion over the last 12 months.  Instead, the TCC proposes to flip the Bankruptcy Code on its head

through a proposed *sub rosa* plan, masquerading as a "structured dismissal." The TCC's plan would stand to potentially benefit only a small handful of the TCC's constituents—those with access to insurance, namely the vast majority of Arizona claimants and a tiny number of claimants outside of Arizona. Interestingly, three of the six TCC members are from Arizona. The other three TCC members are not creditors of the Debtor at all.[2]

4.      As discussed below, the Motion to Dismiss focuses on—and misrepresents the terms of—a plan that has been displaced, will have to be amended, and is not otherwise currently up for approval. The **only matter** presently before the Court is the Debtor's and the UCC's *Joint Motion for Entry of an Order (I) Authorizing and Approving the Settlement by and Among the Debtor, the UCC, and the Parties to the Settlement Agreement and (II) Granting Related Relief* [Docket No. 1259] (the "9019 Motion") and the Settlement Agreement attached thereto. The Court can readily dispense with the TCC's argument about alleged "non-consensual non-debtor releases"—the Debtor and the UCC are ***not*** seeking approval of any such releases in the 9019 Motion. Rather, the TCC conflates the Debtor's proposed releases of **estate causes of action** with potential third-party releases that may be proposed under a separate plan (which will be filed after the Court approves the Settlement), and from which creditors will have the ability to opt out. ***To be clear, nothing in the Settlement prevents a claimant from having their day in court on the merits of their personal and direct claims***.

---

[2] Of the six TCC members, three do not hold claims against the Debtor. (A) Paris Morgan and Elizabeth Frederick have claims that were specifically allocated to CHS TX in the Divisional Merger, and (B) LaTonda Smith, who is not a named plaintiff or even a next of kin (she was the fiancée of the deceased), and otherwise failed to file a proof of claim before the bar date, does not appear to hold a claim against the Debtor or CHS TX. Further, the two members in (A) above, Morgan and Frederick, are not subject to this Court's existing third-party preliminary injunction entered in Adversary No. 23-3049 [Adv. Docket No. 43]. The Debtor has filed an objection to the claims of Paris Morgan and Elizabeth Frederick. *See Debtor's Objection to KCC Claim Nos. 500 and 574 Filed By Paris Morgan, Personal Representative to the Estate of Michelle Morgan, Deceased, and Elizabeth Meta Frederick* [Docket No. 1369].

2

5.     That the TCC even filed its 51-page Motion to Dismiss demonstrates its fundamental misunderstanding of the facts and circumstances of this case and the proposed settlement.

6.     As the Hon. Stacey Jernigan is fond of saying, "facts matter."[3]  The Motion to Dismiss is nothing more than TCC counsel running the same playbook it has run in other *factually dissimilar* divisional merger cases, which contain mass toxic tort and/or product defect claims.  The facts of this case are profoundly different, and distinguishable from, each and every other case discussed in the Motion to Dismiss.  Specifically, the Debtor was in financial distress for years leading up to its divisional merger in May 2022.  Additionally, the Debtor's divisional merger was pursued as a strategic *alternative* to a free fall bankruptcy filing in 2021, not as part of any "Texas Two Step" strategy discussed in the Motion to Dismiss.  These facts and key distinctions matter.

7.     Also unlike every other case discussed in the Motion to Dismiss, dismissal of this case will not return claimants to a multi-district litigation (MDL) panel to ensure consistent results.  To the contrary, creditors would be left in a free-for-all-race-to-the-courthouse to get whatever assets or insurance proceeds can be seized, if any.[4]

---

[3] *See e.g.*, *In re Highland Cap. Mgmt., L.P.*, No. 19-34054-SGJ11, 2022 WL 3959550, at *29 (Bankr. N.D. Tex. Aug. 30, 2022) ("This court often states that 'facts matter'").

[4] Congress put an end to these races more than 40 years ago, when it passed the Bankruptcy Code:

> ***At least in modern bankruptcy law, the day of unfair and unseemly races to the courthouse is long gone***. Whatever else may be uncertain or unsettled in the construction of the new Bankruptcy Code, we think it beyond cavil that the principle of first-come-first-served has no place in bankruptcy law except to the very limited extent that specific provisions give it a place.

8.      If the Court gives the TCC its way, the vast majority *of its own constituents*—*i.e.*, alleged tort victims who do not have any realistic access to insurance—will be left in an endless litigation limbo with no practical chance of recovery.  Faced with these facts and realities, how the TCC, as a fiduciary *for all alleged tort victims*, could argue that dismissal is in its own constituents' best interests defies logic, defies reality, contravenes the duties placed on the TCC, and is intellectually dishonest.

9.      The Motion to Dismiss should be denied, and the 9019 Motion should be granted.

## Factual and Procedural Background

### I.      The Debtor's Growing Financial Distress Prior to the Bankruptcy Filing[5]

10.     The Debtor was formerly known as Corizon Health, Inc.[6]  Corizon was a nationwide provider of correctional healthcare, providing services in multiple states across the United States.  In the ordinary course of its business, Corizon entered into agreements with various entities (typically governmental) pursuant to which Corizon would provide, or arrange for the provision of, healthcare services in certain facilities of the contract counterparty.

---

*Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1278 (5th Cir.1983) (emphasis added).  It is impossible to believe that a "first-come-first-served" process is more efficient, more desirable, or creates more value than a collective process whereby distributions to creditors could, in theory, commence before year-end.  If the TCC does not like the choices afforded to creditors under a chapter 11 plan, it can negotiate for different choices and treatment that it prefers, and it can also object to the plan.  However, as stated above, plan issues are for another day.

[5] The following background is drawn from the disclosure statement filed by the Debtor and the UCC on October 27, 2023 [Docket No. 1071] (the "Disclosure Statement").  Although the TCC misunderstands the terms of the joint plans previously filed by the Debtor and the UCC and puts its own spin on the prior iterations of the plan and settlement contained therein, the TCC does not appear to raise any genuine fact issues regarding the events leading up to the bankruptcy filing and beyond.  *See, e.g.,* Motion to Dismiss, ¶¶ 42–84.  Indeed, the facts are essentially undisputed, which means everything boils down to whether the settlement is a superior option to dismissal.

[6] Disclosure Statement (PDF pp. 17–18 of 177).  The Debtor is sometimes herein referred to as "Corizon" as to events occurring prior to the May 5, 2022 Divisional Merger for narrative efficiency, ease of reference, and to avoid confusion as to the corporate changes going into effect on that date.

11.     For most of its history until the mid-2010s, Corizon's business was financially successful.[7]  Near the end of the decade, however, the company began to struggle due to the loss of key customer contracts and mounting liabilities, largely driven by claims asserted by incarcerated individuals alleging mistreatment or inadequate healthcare.  As a result of Corizon's dramatic decline in revenues, increase in asserted tort liabilities, and the impending maturity of its institutional debt, it began to market itself for potential acquisition by companies interested in "distressed" investments.[8]

12.     In June 2020, the Flacks Group acquired Corizon.  The Flacks Group is an investment company that focuses on "discounted assets" and has publicly portrayed itself and its principal as being willing to invest in assets that other investors "wouldn't touch."  According to audited financial statements dated around the time of the Flacks Group's acquisition, it was clear that Corizon was undergoing significant financial distress.  At the time of the transaction in 2020, Corizon's internal documents show that it was indebted to third-party institutional lenders for over $100 million in secured funded debt resulting from transactions that originated in or prior to 2017.[9]

13.     Upon and immediately following the 2020 acquisition, the Flacks Group established the following organizational structure for Corizon and its corporate family:

---

[7] Disclosure Statement (PDF p. 18 of 177).

[8] *Id.*

[9] *Id.*; *see also* Motion to Dismiss ¶¶ 42–43.



14.     In this Case, questions have been raised about the identity of M2 LoanCo, LLC ("M2 LoanCo") and other related parties.[10]  M2 LoanCo was established in 2020 by the Flacks Group as part of its transaction to acquire the secured funded debt instruments previously held by third-party institutional lenders.   According to company records, the amount of secured debt owed by the Debtor to M2 LoanCo as of February 28, 2022, was in excess of $97.8 million.[11]

15.     The Flacks Group was unsuccessful in its efforts to improve the company's financial performance or prevent its further decline.[12]  By the third quarter of 2021, Corizon's business was in even greater financial distress than when The Flacks Group had acquired it in 2020.  The company had lost its three largest company contracts and was facing millions of

---

[10] Disclosure Statement (PDF p. 18–19 of 177).

[11] *Id.*

[12] *Id.* (PDF p. 19 of 177); *see also* Motion to Dismiss ¶ 43.

dollars in tort and contract liabilities stemming from alleged inadequate care at the facilities it served and the impact of its dwindling revenues on performance of obligations.[13]

16.     As a result of this growing financial distress, the Flacks Group began exploring sale opportunities, debt restructuring, and bankruptcy (either chapter 11 or chapter 7).[14] Although Corizon's revenues had continued to decline, the Flacks Group seemed to view Corizon's pharmacy subsidiary—an entity called PharmaCorr, LLC ("PharmaCorr")—as a potentially profitable standalone business.  However, according to a third-party valuation conducted on May 13, 2021, around the time of the spin-off, the 11,661 ownership interests in PharmaCorr (of which Corizon indirectly held only 50.1%) were valued at $0.001 per share.[15]  In other words, PharmaCorr was of nominal value to Corizon. Thus, although PharmaCorr was split off from Corizon in June 2021, the Debtor did not lose any value as a result of the PharmaCorr transaction.

17.     During this same period of time throughout 2021, Corizon was working with investment bankers and restructuring professionals on dual tracks to prepare for a bankruptcy filing while attempting to find new capital in the form of investments, loans, or an acquisition.[16] When these efforts proved unsuccessful by the fourth quarter of 2021, the company targeted a bankruptcy filing for early December 2021.

18.     In late November and early December 2021, just a few days before the planned bankruptcy filing, members of the Flacks Group were introduced to Isaac Lefkowitz and other

---

[13] Disclosure Statement (PDF p. 19 of 177).

[14] *Id.*

[15] *Id.*; *see also* 409A Valuation Report, Dated May 13, 2021 (DEBTOR624838 – DEBTOR624856).

[16] *Id.*; *see also, e.g.*, E-mail from James Hyman (June 25, 2021) (DEBTOR624236 – DEBTOR624250); E-mail from Michael Swetz (Oct. 16, 2021) (DEBTOR624216 – DEBTOR624217).

investors.[17]  After approximately a week of negotiations, Mr. Lefkowitz and the other investors in an entity called Perigrove 1018, LLC ("Perigrove 1018") acquired the entire portfolio of companies from The Flacks Group.[18]

19.     As of December 7, 2021, Perigrove 1018 owned or controlled Corizon and all its owners and affiliates illustrated in the chart above, including: (1) M2 HoldCo, LLC, which itself owned M2 EquityCo, LLC and M2 LoanCo, LLC (2) Valitás Intermediate Holdings, Inc., which itself owned Valitás Health Services, Inc., Corizon Health, Inc., Corizon Health of New Jersey, LLC, and Corizon, LLC; and (3) M2/PharmaCorr Holdings, LLC, which owned PharmaCorr. Perigrove 1018's ownership structure of the Corizon entities is demonstrated in the following chart:[19]



[17] Disclosure Statement (PDF p. 19 of 177); *see also* Motion to Dismiss ¶ 43.

[18] *Id.*

[19] Disclosure Statement (PDF pp. 19–20 of 177); *see also* Motion to Dismiss ¶ 43.

20.     Beginning in January 2022 or earlier, the Debtor's board of directors, with the help of outside counsel, began to consider restructuring alternatives, including a combination merger and divisional merger under the Texas Business Organizations Code (the "TBOC")—a statutory framework that allows one or more corporate entities to merge into one or more surviving or new legal entities and allocate assets and historical liabilities among the resulting entities.[20]

21.     To be clear, these merger transactions were presented to Corizon's board of directors as strategic *alternatives* to a bankruptcy filing.  In the hundreds of thousands of pages produced in discovery reviewed by the Debtor in its investigations—all of which are also in the hands of both the TCC and the UCC—the Debtor located no specific communications or presentations suggesting that the Debtor was considering a bankruptcy filing as part of the divisional merger which, as the TCC notes in the Motion to Dismiss is the "typical" game plan: that is, engage in a divisional merger and then "immediately" file for chapter 11.  Motion to Dismiss ¶¶ 8–26 (discussing DMBP, Bestwall, Aldrich Pump, Murray Boiler, LTL Management and 3M/Aearo) and ¶ 52 ("Ordinarily, the next step is the immediate bankruptcy filing of TortCo—often hours after the divisive merger.  But the YesCare Variant did not involve an immediate bankruptcy filing").

22.     The merger plan included splitting the Corizon entities into two separate entities: (1) a "new" entity that would take on Corizon's operating assets and related liabilities and would continue operating as a going concern; and (2) a "remaining" entity that would continue to exist to hold and wind down Corizon's remaining, non-operating assets and liabilities.  The company

---

[20] Disclosure Statement (PDF pp. 22–23 of 177); *see also* Motion to Dismiss ¶¶ 44-50.

engaged counsel to assist with the legal planning and drafting as well as financial advisors to evaluate the "fairness" of the transaction being completed.[21]

23.     In May 2022, the Debtor and several affiliates, including Corizon, LLC, Valitás Health, and Corizon Health of New Jersey, LLC (collectively, the "Merger Entities") executed a corporate reorganization through two merger transactions under the TBOC:  first, a combination merger and then, the divisional merger.   The following steps comprised the combination merger:[22]

   a. On April 28, 2022, the Debtor (previously incorporated in Delaware) converted to a Texas corporation.

   b. The Debtor and each Merger Entity merged pursuant to a plan of combination merger under Texas law (the "Combination Merger").

   c. The Debtor filed the Certificate of Combination Merger with the Texas Secretary of State on May 2, 2022, and the Combination Merger became effective on May 5, 2022.

   d. The Debtor was the sole survivor of the Combination Merger and was vested with all assets and liabilities of the Merger Entities. The Merger Entities ceased to exist.

24.     The   Debtor   then   effectuated   a   divisional   merger   as   follows (the "Divisional Merger"):

   a. The Debtor drafted that certain Agreement and Plan of Divisional Merger ("Plan of Merger"), which provided that CHS TX, Inc. ("CHS TX") would be formed, and documented which assets and liabilities were to remain with the Debtor and which were to be allocated to CHS.[23]

   b. The approved Plan of Merger was in writing and included all information required by the TBOC.

---

[21] *Id.*

[22] *Id.*

[23] True and correct copies of the Plan of Merger (with all corresponding exhibits and schedules) have been filed in this chapter 11 case multiple times, including as attachments to the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs.  *See* Docket Nos. 810, 811.

c. The Debtor filed the Certificate of Merger and Certificate of Formation for CHS with the Texas Secretary of State on May 3, 2022, and the Divisional Merger became effective on May 5, 2022.

d. M2 LoanCo and the Debtor agreed to a funding agreement (the "Funding Agreement") pursuant to which M2 LoanCo would pay or cause to be paid funding to the Debtor up to an aggregate cap of $15 million for payment of the Debtor's costs of operations and certain liabilities that arose prior to the Divisional Merger.

e. On May 11, 2022, the Texas Secretary of State approved and accepted the Certificate of Merger and Certificate of Formation for CHS, effective as of May 5, 2022.  CHS was subsequently acquired by YesCare Corp. ("YesCare").

f. On June 1, 2022, the Debtor changed its name from Corizon Health, Inc. to Tehum Care Services, Inc.

25.     Pursuant to the Divisional Merger, Corizon (later renamed Tehum Care Services, the Debtor herein) remained in existence and was allocated and remained vested with all inactive and expired customer contracts, as well as all historical liabilities related to such contracts. The Plan of Merger states that in return, the Debtor was released from its secured debt obligations to M2 LoanCo, which were allocated to CHS TX, the entity the TCC refers to as YesCare.  As part of the Divisional Merger, the Debtor was to have been allocated $1 million in cash, as well as the right to draw on the $15 million Funding Agreement.[24]

26.     The Debtor and the UCC have both investigated the merits of potential causes of action arising from and prior to the Divisional Merger.  Those theories and their relative merits are discussed in further detail in the Disclosure Statement, as well as in the 9019 Motion.

27.     Upon the Divisional Merger, the Debtor ceased to be an operating entity with active contracts or medical service providers and retained significant pre-merger liabilities.

---

[24] Disclosure Statement (PDF p. 24 of 177); *see also* Motion to Dismiss ¶ 51.

Though the Debtor had been allocated cash, rights under the Funding Agreement, and rights under available insurance policies, its liabilities exceeded these assets.[25]

28.     The prepetition lawsuits and claims asserted against the Debtor generally fall into three categories: (a) vendor and service provider lawsuits or obligations, typically asserting breach of contract claims against the Debtor for unpaid invoices; (b) professional tort liability lawsuits or obligations, typically asserting medical malpractice and related claims against the Debtor; and (c) employment tort lawsuits or obligations, asserting employment discrimination or similar tort claims against the Debtor.

29.     Between May 2022 and February 2023, the Debtor attempted to wind down its remaining business and pay its outstanding liabilities out of court.  According to records produced to the Debtor, the UCC, and the TCC, M2 LoanCo paid or caused to be paid at least $15 million to legitimate creditors of the Debtor to satisfy liabilities allocated to the Debtor under the Plan of Merger.  But, the $15 million proved insufficient for the Debtor to satisfy all of its liabilities.  Moreover, one group of plaintiffs in Missouri state court was on the verge of having a receiver appointed to take control of the Debtor's assets.[26]  Thus, on or about February 13, 2023, the Debtor filed for chapter 11 to effectuate a more equitable distribution of its remaining assets.

---

[25] *See* Disclosure Statement (PDF p. 27 of 177); *see also id.* (PDF pp. 72–73) (Schedule 2, Professional Liability Insurance Policy Information).

[26] *See, e.g.*, *The Curators of the Univ. of Mo., et al. v. Tehum Care Services, Inc., et al.*, Adv. Proc. No. 23-4005 (Bankr. W.D. Mo.), *removed from* Circuit Court of Boone County, Missouri, Division 4, Case No. 22BA-CV01701-01.

## II.    **Procedural History of the Bankruptcy Case**[27]

30.    On February 13, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is managing its assets and liabilities as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 2, 2023, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the UCC pursuant to section 1102 of the Bankruptcy Code [Docket No. 77], as amended on March 6, 2023 [Docket No. 145].

31.    As of the Petition Date, the Debtor had no cash on hand or means to obtain additional revenues because it was no longer an operating entity.  The Debtor was not allocated any tangible real property under the Divisional Merger and, as of the Petition Date, it did not appear that any additional amounts remained available to the Debtor under the Funding Agreement.  As a result, the Debtor was left with only potential estate causes of action, tax refunds and similar receivables to offer as potential collateral for post-petition financing.  The Debtor is also an insured under several insurance policies, which the Debtor could use to pay allowed claims covered by those policies, but not to fund the costs of administering this bankruptcy case.

32.    On March 15, 2023, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 185] (the "DIP Motion").  On March 22, 2023, the Court

---

[27] The following discussion may be found in the 9019 Motion.  As stated earlier, there does not appear to be any genuine factual dispute at this point in the proceedings.

held a hearing and entered its *Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 243] (the "First Interim DIP Order").  The First Interim DIP Order has been amended and supplemented pursuant to Docket No. 476 (the "Second Interim DIP Order"), Docket No. 579 (the "Third Interim DIP Order"), and Docket No. 993 (the "Fourth Interim DIP Order").  The First Interim DIP Order, Second Interim DIP Order, Third Interim DIP Order, and Fourth Interim DIP Order are referred to collectively herein as the "DIP Orders."[28]

33.     As set forth in the First Interim DIP Order, M2 LoanCo is the only DIP Lender. *First Interim DIP Order*, ¶ 35.  To date, the Debtor has drawn a total of approximately $8.35 million under the DIP Orders.  On January 16, 2024, on the same day as the 9019 Motion and Motion to Dismiss were filed, the Debtor also filed its *Motion for Entry of Fifth Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1258] (the "Fifth Interim DIP Motion").  Under the terms of the Settlement (defined below) and the Fifth Interim DIP Motion, M2 LoanCo has agreed to advance an additional $5 million under a further

---

[28] The TCC's allegations in paragraph 65 of the Motion to Dismiss—that debtor in possession financing for this case was "fully negotiated and ready to go" before the Petition Date—is patently false.  The TCC should know this from the voluminous records produced in the case, or even a cursory review of pleadings filed relating to the DIP Orders. Perhaps this paragraph was an inadvertent carryover from a prior iteration of this pleading that may have been used in a different case.

interim order and approved modified budget.  The TCC has objected to the Fifth Interim DIP Motion, *see* Docket No. 1332.[29]

34.     On May 22, 2023, the Court entered its *Stipulation and Agreed Order Regarding Appointment of a Mediator and Governing Related Mediation Procedures* [Docket No. 603] (the "First Mediation Order").  Pursuant to that Order, the Debtor and the UCC participated in a three-day mediation between August 21 and 23, 2023, with various insiders and related parties (the "First Global Mediation").

35.     Following the First Global Mediation, the Debtor and the UCC, as joint plan proponents, filed (1) a chapter 11 plan (as amended at Docket No. 1072) incorporating the resolution reached at the First Global Mediation and (2) a disclosure statement in support of the plan (as amended at Docket No. 1071, the "Disclosure Statement").

36.     In response to concerns raised by the Court and U.S. Trustee regarding the First Global Mediation,[30] the Debtor and the UCC agreed to conduct a second global mediation with a different mediator.  On November 15, 2023, the Court entered its *Amended Stipulation and Agreed Order Regarding Appointment of Judge Christopher S. Sontchi (ret.) as Mediator and Governing Related Mediation Procedures* [Docket No. 1109] (the "Second Mediation Order").

37.     On November 20, 2023, before the commencement of mediation pursuant to the Second Mediation Order, the United States Trustee appointed the TCC.  *See* Docket No. 1127.

---

[29] The Debtor and the UCC believe the additional advances contemplated in the Fifth Interim DIP Motion are reasonable and necessary to ensure that administrative expenses remain minimal while the Debtor and the UCC pursue approval of the Settlement and confirmation of a to-be-filed revised chapter 11 plan.

[30] *See Objection of the United States Trustee to Joint Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* ¶ 2 [Docket No. 1022].

38.     Almost immediately following the TCC's formation, the Debtor and the UCC contacted proposed TCC counsel for inclusion in the upcoming mediation, and on November 29, 2023, the Court amended its Second Mediation Order to include the TCC as an additional mediation participant. *See* Docket No. 1158 (the "Amended Mediation Order").  With the TCC's agreement, the mediation was rescheduled to December 14, 2023.

39.     Pursuant to the Amended Mediation Order, on December 14, 2023, the Debtor, the UCC, and the TCC attended a mediation with the same insiders and related parties as the First Global Mediation (the "Second Global Mediation," and together with the First Global Mediation, the "Global Mediations"), with Judge Christopher S. Sontchi (ret.) as mediator.  As a result of the Second Global Mediation, the Debtor and the UCC reached a settlement with the insiders and related parties described in the 9019 Motion as the "Settlement Parties."  This settlement was the result of even more extensive good-faith, arms-length, and mediated negotiations, and is the product of the sound exercise of the Debtor's and the UCC's business judgment.

## III.     The Settlement is a "Fantastic Result for Creditors."[31]

40.     A summary of the Debtor's and the UCC's extensive discovery and investigative efforts is included in Schedule 5 to the Disclosure Statement.  As stated therein, through formal and informal discovery requests, the Debtor and the UCC collected and reviewed over 700,000 pages of documents, including bank records, financial statements, e-mails, accounting records, internal Debtor communications, and communications with third parties associated with the Debtor and/or its related entities.

---

[31] Depo. Tr. of David Barton, 209:5–10 (Feb. 14, 2024).

4866-1984-9638

41.     The UCC deposed Isaac Lefkowitz in four separate corporate representative capacities—for Perigrove 1018, PharmaCorr, Geneva, and M2 LoanCo.  The TCC has since taken two additional depositions of Mr. Lefkowitz—one in his individual capacity, and another in his corporate representative capacity for M2 LoanCo, as the UCC did nearly a year ago.  In addition to the first four formal depositions of Mr. Lefkowitz, the Debtor and the UCC also conducted informal inquiries and interviews of current and former employees of the Debtor and YesCare and other relevant parties both directly and through counsel.  Mr. Lefkowitz also testified at the Debtor's 341 meeting for over six collective hours, on three different occasions.

42.     Although the Debtor and the UCC were not aligned prior to the First Global Mediation, their respective views of the relative merits of the estate's potential causes of action against the proposed released parties were (unbeknownst to each other) substantially similar. This is what provided the foundation for the Debtor and the UCC to work collaboratively and collectively during the First Global Mediation to reach a settlement that fell within both of their respective ranges of reasonableness.  The Debtor and the UCC were then able to enhance the settlement—again working collectively and collaboratively—in the Second Global Mediation.

43.     Following extensive negotiations as part of both Global Mediations, the Debtor, the UCC, and several related parties entered into the Settlement Agreement, a true and correct copy of which was filed with the 9019 Motion (the "Settlement"). The Debtor and the UCC firmly believe that the Settlement maximizes the value of the Debtor's estate for the benefit of all creditors.

4866-1984-9638

44.     The TCC "attended" the Second Global Mediation but did not actively or meaningfully participate.[32]   But, those who **did** conduct investigations and who **did** actively participate in the negotiations at the Second Global Mediation—*i.e.*, the Debtor and the UCC— believe the Settlement is a "fantastic result" that provides significant value to the estate.   The Settlement avoids the risks of litigation and collectability, and eliminates years of protracted legal proceedings which, even if successful, would significantly reduce any recovery by the costs of such litigation.   Accordingly, on January 16, 2024, the Debtor and the UCC filed their 9019 Motion.   The recitations in the 9019 Motion are incorporated herein.

45.     At the hearings on the 9019 Motion and the Motion to Dismiss, the Court will hear from David Barton, the Chair of the UCC.   Mr. Barton has already given the following explanation in response to the TCC's questions about the merits of the Settlement:

> Q.  Mr. Barton, do you recall earlier today when, in response to some of my questions about the Rule 9019 Motion, you referenced that you thought the motion was well supported?
>
> A.  Yes.
>
> . . .
>
> Q.  What was the basis for your statement to that effect?
>
> MR. ZLUTICKY:      Objection.

---

[32] As the TCC's representative testified at deposition, the TCC did not take a vote or otherwise authorize the TCC to make any settlement proposals at the Second Global Mediation.   Depo. Tr. of Scott Griffiths 40:12–41:7 (Feb. 12, 2024) (rough).   Following the Second Global Mediation and at the TCC's request, the Debtor and UCC agreed not to file their 9019 Motion for several weeks to give the TCC time to review the documents produced by the Debtor and the UCC and otherwise get further up to speed in the case.   The Debtor and the UCC believed the TCC intended to use this time to provide comments to, or otherwise attempt to enhance, the Settlement.   As it turns out, the Debtor and the UCC were sorely mistaken—the TCC never engaged with the Debtor in any way before it unexpectedly announced its intent to file the Motion to Dismiss at an unrelated hearing on January 16, 2024.   Indeed, as reflected in TCC counsel's first monthly fee statement, spanning the period from the TCC's inception through December 31, 2023, counsel began preparing the Motion to Dismiss almost immediately upon being retained and prior to the commencement of the Second Global Mediation.   It is now clear that the TCC never intended to negotiate or otherwise deal with the Debtor and the UCC in good faith.   Instead, the very expensive "dismissal playbook" has been running since the outset and the cost will be foisted upon unsecured creditors.

A. It's based -- the motion is the fruit of an extensive and lengthy and hard fought investigation. It follows not one but two mediations where we achieved a fantastic result for creditors and, yeah, it's a very well-supported motion.[33]

## IV.    The Motion to Dismiss Cites No "Evidence" of Bad Faith or other Cause for Dismissal

46.    The Motion to Dismiss is "all hat, no cattle."  It contains 51 pages of invective, rhetoric, and hyperbole, but virtually no substance.  The few actual facts set forth in the Motion to Dismiss are not new to the Debtor, the UCC, or even this Court.  In fact, most of the TCC's vituperation has already appeared in the *Various Creditors Motion to Appoint a Chapter 11 Trustee* [Docket No. 731], filed on June 30, 2023.  This Court conducted an evidentiary hearing on that motion on September 5, 2023 and denied the same on the merits.[34]

47.    The TCC was appointed on November 20, 2023, nearly nine months into the case.  Hundreds of thousands of documents were produced to the TCC on December 7, 2023, immediately after the TCC signed an agreed protective order (which was provided to the TCC on November 27, 2023).  Even after the TCC filed its Motion to Dismiss on January 16, 2024, the Debtor and the UCC produced and reproduced more documents in response to formal discovery requests.  Yet, as of February 12, 2024, just one day short of the one-year anniversary of the Petition Date, a month after filing its Motion to Dismiss and almost three months after the TCC's appointment, the TCC's designated Rule 30(b)(6) representative was unable to articulate ***any*** factual basis to support the Motion to Dismiss.

---

[33] Depo. Tr. of David Barton, 208:15–209:10.

[34] *See Order Denying Motion* [Docket No. 932].

48.     Rather, the TCC's representative refused to testify on anything that the TCC's experts may still be analyzing, despite the fact that he could not even clearly define the scope of that analysis:

> Q.  (BY MS. ENGLAND)  Is the TCC taking the position that the topics that it plans to present expert witnesses on is secret?
>
> A.  I would tell you that secret being – whether it's secret or not, I don't know.  *But I do know that our experts haven't produced a report, or I haven't seen the report if I have.  So I'm not ready and willing to speak to anything that isn't defined in their opinions.*
>
> Q.  Does the TCC know -- how much does the TCC believe that Corizon was valued at at the time of the divisional merger?
>
> MR. ZIMMERMAN:  Objection; form. Foundation.
>
> THE WITNESS:  I don't know that there's enough information to answer that question at this point.  So I don't have an answer for you.  *I do know that in the disclosure statement, there are -- you know, there's a summary of the steps that were taken and how much valuation there was for the company and whether it was -- when they sold out [Pharmacorr] and whether Corizon has any kind of claim against [Pharmacorr] or Tehum has a claim against [Pharmacorr].*  I don't know.  I don't know those.  I just know that, like, I don't take -- I don't know where -- I just know when I was becoming a lawyer and I had partners tell me you don't take the words of other attorneys.  *You do your own independent investigation as well.  And so yes, I think that there's a number in the disclosure statement that may or may not be true, but I don't have enough information to make that determination today as to the valuation of Corizon before bankruptcy.*[35]

---

[35] Depo. Tr. of Scott Griffiths, 114:2–115:7 (rough) (emphasis added); *see also id.*, 27:19–28:1 ("I don't know the answer to that.  I would leave it – any analysis in this realm, I would leave to our experts."); 29:3–9 ("I don't know that there's anything that the experts need to analyze in prior litigation, but I rely on them to tell us the answer to that."); 84:3–19 ("I would say that right now any analysis being done [on the likelihood of success on the merits for breach of contract claims] is just in the realm of the experts. . . . I haven't seen anything from the experts to have shown that they have – that that has been done."); 84:25–85:9 ("I'll answer that question just to say that the words of the experts and the valuation of the experts put on it are going to probably be a major consideration for the TCC members when it comes time to reviewing and making approvals or objections to any settlement proposals for the Chapter 11 plan, for instance."), 106:20–107:5 ("The answer to the question is we rely on our experts and we rely on counsel to parse through most of [the documents produced].  And then information that is relevant would be shared with the TCC committee members.").

49.     The TCC's designated representative did acknowledge that he believed personal injury claims are vastly overstated in this case.   Indeed, in his experience, "like, dollars to doughnuts, if there's a pro se inmate that wrote a notice – wrote a claim for this bankruptcy case, it's going to have six zeros at the end of it.   They all do."[36]   That is "because they all want a million bucks."[37]   When pressed further, the TCC's representative testified that the TCC did not know the Debtor's historical average settlement paid to *pro se* litigants, but he did acknowledge that "they don't get a million dollars."[38]

50.     Mr. Griffiths' testimony regarding the aggregate amount of *pro se* tort claims is unsurprising.   On December 28, 2023—in response to the TCC's request made during the Second Global Mediation—the Debtor produced a 10-year history of payments made on personal injury claims against the Debtor.   According to this 10-year history, as the Court will hear, 95% of all *pro se* incarcerated plaintiffs' claims are dismissed or adjudicated without the claimant receiving anything on account of their claims against the Debtor.   The remaining 5% of such *pro se* plaintiffs—*i.e.*, one *pro se* plaintiff out of every 20—receives an average settlement payment of approximately $6,800.

51.     What is surprising, however, is how the TCC could have failed to review these data points before authorizing the filing of the Motion to Dismiss and how the TCC did not otherwise prepare its Rule 30(b)(6) witness.[39]   Such lack of preparation further underscores the

---

[36] Depo. Tr. of Scott Griffiths, 164:9–165:23.

[37] *Id.* at 167:10–24.

[38] *Id.*

[39] Scott Griffiths testified that he had represented several of the plaintiffs reflected in the Debtor's 10-year payment history. But when asked if he reviewed this payment history, he refused to answer:

> Q.   So is it fair to say that you've reached settlements on behalf of your individual
>       claimants with . . . Corizon?

absence of any rationally-based reasoning for dismissal of this case.  Indeed, if the TCC was truly representing the interest of all tort claimants, including *pro se* plaintiffs, these facts, ***in and of themselves***, should cause the TCC to support the Settlement, because any ensuing plan would provide a better recovery for the majority of *pro se* litigants than they would receive outside of this chapter 11 case.

52.     Further evidencing the TCC's failure to "do the work" before making a filing with the Court, the TCC's representative also testified the TCC ***still*** has not drawn a conclusion regarding the most basic information:  Debtor's financial status leading up to the Divisional Merger and the Petition Date:

> Q. Has the TCC conducted an examination of whether or not Corizon's business was increasing or decreasing between 2018 and 2021?
>
> MR. ZIMMERMAN:  Objection; form.  Foundation.
>
> THE WITNESS:  The answer is -- and I have answered this, but the TCC is in the process of doing that analysis of Corizon.  Again, I'll go back to what I said before, which is you don't take something that's in a disclosure statement.  You want to verify that it's true.  And so there might be some statement that says Corizon was losing its contracts and suffering in its business in 2018 to 2021.  That might be true, but without a full analysis of however many thousands of

---

> MR. ZIMMERMAN: Objection; form. Foundation.
>
> THE WITNESS: Yes, it's fair to say that. Individually, yes.
>
> Q. (BY MS. ENGLAND): And so individually you also have had an opportunity in the last week to determine whether the disclosures the debtor has made accurately represent the amount of those settlements.  Is that fair?
>
> MR. ZIMMERMAN: Objection; form. Foundation. Mr. Griffiths is here as a 30(b)(6). I'm going to instruct you not to answer that question.

*Id.* at 32:6–25.

pages of contracts that there were -- ***and I believe that that analysis is underway, but it's not current***.[40]

53.     As was apparent from the entirety of the TCC's Rule 30(b)(6) deposition, the TCC intends to rest its case largely upon an alleged expert report.  That is, an alleged expert report that purportedly has not been provided to the TCC itself, was not completed before the TCC filed its Motion to Dismiss, and which the TCC will not make available until February 23, 2024, which is the deadline to file this Objection.

54.     As of February 12, 2024, the TCC's representative had not reviewed the so-called "hot documents," as referenced by the TCC's counsel during the status conference on February 5, 2024.  Upon information and belief, these constitute a limited subset of 224 documents produced by the Debtor on February 2, 2024, in response to the TCC's formal requests for production:

> Q.  (BY MS. ENGLAND)  Has the TCC reviewed the 224 documents that were produced about ten days ago?
>
> MR. ZIMMERMAN:  Objection; form. Foundation.
>
> THE WITNESS:  The TCC -- the six sitting members, I don't know if they have or not.  And speaking for the TCC, I have not.
>
> Q.  (BY MS. ENGLAND)  Have you been provided the 224 documents the debtor produced about ten days ago?
>
> MR. ZIMMERMAN:  Objection; form. Foundation.
>
> THE WITNESS:  The answer is that documents have been -- I have access to the documents.  Have I reviewed them, no.[41]

---

[40] Depo Tr. of Scott Griffiths, 123:4–19 (Feb. 12, 2024) (rough) (emphasis added); *see also id.* 127:23–128:3 ("We just -- there isn't any answer that I can give you for that question yet today. Our experts haven't reviewed on whether pro se litigants' cases are meritorious or not.  And if they have, they haven't given me any information about that yet.").

[41] Depo. of Tr. of Scott Griffiths, 125:23–126:11 (rough).

55. The contrast between the TCC's lack of any meaningful review and analysis, on the one hand, and the extensive work performed by the Debtor and the UCC, on the other hand, is stark.

### Arguments and Authorities

### I.     The TCC Has Not Demonstrated Cause for Dismissal under 11 U.S.C. § 1112(b)

56. It is not until the final few paragraphs of its 51-page Motion to Dismiss that the TCC finally articulates three alleged bases for dismissal of this chapter 11 case, none of which is supported by actual evidence.

57. First, the TCC argues the estate is administratively insolvent because "the Debtor's and the UCC's professionals continue to accrue fees and costs in pursuit of YesCare's objectives, and the Debtor has no reasonable likelihood of rehabilitation given that its alleged 'rehabilitation' amounts to a fraud."  Motion to Dismiss ¶ 168 (citing 11 U.S.C. § 1112(b)(3)).[42] Second, the TCC argues this case was filed as a litigation tactic, citing *Little Creek* and other clearly distinguishable cases.  Motion to Dismiss ¶ 169.  And finally, the TCC broadly contends that "this case gives bankruptcy a bad name," and thus dismissal is in the best interest of certain creditors.  *Id.* ¶¶ 171-173.[43]

---

[42] The Motion to Dismiss incorrectly references section 1112(b)(3) for "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," which phrase is actually found in section 1112(b)(4)(A).  This mistake, while likely inadvertent, is critical because as discussed further herein, section 1112(b)(2) provides an exception where the alleged cause for dismissal is continuing loss or diminution of the estate.

[43] The allegations in the Motion to Dismiss and in various proofs of claim regarding the harms suffered by various personal injury claimants/victims are grievous.  Approving the settlement and confirming a plan is the best way to provide recoveries to these creditors, and others, as soon as possible, or otherwise allow them their day in court (as proposed in the now-obsolete plan on file).  On the other hand, dismissing this case will do nothing but delay if not also imperil these creditors' chances of seeing *any* recovery.

58.     Before discussing the merits of each stated basis for dismissal, the Court must first consider the legal standards applicable to the Motion to Dismiss, as set forth in 11 U.S.C. §1112(b)(1) (with emphasis added):

> Except as provided in paragraph (2) of subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, *whichever is in the best interests of creditors and the estate*, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

59.     The TCC's first ground for dismissal—alleged administrative insolvency and absence of reasonable likelihood of rehabilitation—is not applicable here.  Section 1112(b)(2) of the Bankruptcy Code provides that the Debtor's administrative insolvency, alone, cannot serve as a "cause" to dismiss a chapter 11 case where the Debtor can demonstrate a plan is likely to be confirmed within a reasonable time, and there is "reasonable justification" for the alleged losses—*i.e.,* unpaid professional fees.  *See* 11 U.S.C. § 1112(b)(2).[44]  "To demonstrate cause pursuant to § 1112(b)(4)(A), the moving party must show that there is both (1) a substantial or continuing loss to or diminution of the estate *and* (2) the absence of a reasonable likelihood of

---

[44] Section 1112(b)(2) provides:

> The court may not . . . dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that . . . dismissing the case is not in the best interests of creditors and the estate, and the debtor or another party in interest establishes that—
>
> (A) there is a reasonably likelihood that a plan will be confirmed . . . ; and
>
> (B) the grounds for . . . dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>
>> (i)   for which there exists a reasonable justification for the act or omission; and
>>
>> (ii)  that will be cured within a reasonable period of time fixed by the court.

rehabilitation."  *In re Ozcelebi*, 639 B.R. 365, 384 (Bankr. S.D. Tex. 2022) (citing *In re Creekside Sr. Apts., L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013)).

60.     The TCC cannot carry this burden.  First, there is no substantial or continuing loss.  There are only interim fees being incurred (none of which has been allowed on a final basis),[45] and there are, or will be, sufficient liquid assets to pay these fees.  The Settlement (along with other unliquidated assets, such as tax credits and claims not being released) will provide more than enough funds to pay allowed professional fees in full, but even if the Settlement is not approved, the TCC cannot show that the Debtor's other assets (including those described above) and litigation assets would be insufficient to pay these administrative expenses.  Second, the record in this case demonstrates that the Debtor and the UCC have made substantial efforts toward their prior joint plans, and the 9019 Motion clearly explains that the Debtor and the UCC will file a new or amended chapter 11 plan once this Court approves the Settlement.  Thus, the Court can summarily dispense with the first ground for dismissal—the TCC cannot prove that the Debtor is suffering continued losses other than interim professional fees (which are now skyrocketing **only** because of the TCC's litigation contrivances).

61.     The TCC's second and third stated grounds for dismissal are redundant and amount to an allegation of "bad faith" in filing this case.  "Bad faith" is not among the enumerated grounds for "cause" in section 1112(b)(4), although a debtor's "lack of good faith" has long been recognized by courts in the Fifth Circuit as an additional basis for "cause" to dismiss.  *See Nat'l Rifle Assoc. of Am.*, 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021) ("*NRA*")

---

[45] Were it not for the TCC's Motion to Dismiss and litigation tactics, professional fees would have been substantially lower than they are now expected to be.  Regardless, the TCC cannot "exempt" its counsel from the fee accrual analysis.

(citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986) and *In re Humble Place Joint Venture*, 936 F.3d 814, 816-17 (5th Cir. 1991)).

62.    A movant seeking dismissal for "lack of good faith" must first satisfy the initial burden of proving a *prima facie* lack of good faith in filing the bankruptcy case, and then the burden shifts to the debtor to demonstrate good faith. *NRA*, 628 B.R. at 270 (citing  *In re Mirant Corp.,* Case No. 03-46590, 2005 WL 2148362, at *7 n.20 (Bankr. N.D. Tex. Jan. 26, 2005) (noting that some courts hold the burden of showing good faith is on the debtor while other courts hold that the movant has an initial burden to present a *prima facie* case of a lack of good faith before the burden shifts to the debtor to show good faith); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989)).  In general, a bankruptcy case is considered to have been filed in good faith where it serves some valid bankruptcy purpose.  *NRA* at 270-71 (citation omitted).  Thus, even if this Court finds the TCC can meet its initial burden of proving *prima facie* lack of good faith, the Debtor can readily demonstrate that this case was filed for a proper bankruptcy purpose—*i.e.*, equality of distributions to creditors.

63.    As Judge Bohm has explained, the  "the twin pillars of bankruptcy are: (1) the discharge of the debtor, in order to obtain a 'fresh start'; and (2) the satisfaction of valid claims against the estate." *In re Lots by Murphy, Inc.*, 430 B.R. 431, 436 (Bankr. S.D. Tex. 2010) (Bohm, J.) (citing *Fin. Sec. Assur. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship),* 188 B.R. 799, 807 (E.D. La. 1995), *aff'd, Fin. Sec. Assur. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship),* 116 F.3d 790 (5th Cir. 1997)).  Even if the "first pillar" cannot be satisfied because the debtor is liquidating through chapter 7 or chapter 11, the rationale behind the "second pillar" can nonetheless be satisfied where the bankruptcy prevents creditors from racing to the courthouse to seize the debtor's assets, thereby providing for "a more

27

orderly liquidation, or a reorganization, [that] would yield a larger total recovery." *See id.* (quoting *U.S. v. Frontone,* 383 F.3d 656, 659 (7th Cir. 2004)).  Maximization of recoveries by providing an equal playing field for the Debtor's hundreds of creditors is exactly why this case was needed, and exactly what the prior plans (and the forthcoming revised plan following Settlement approval) will provide.

64.     Equality of distribution among creditors is the second of these "twin pillars" described by Judge Bohm.  *See In re Combustion Eng'g, Inc.,* 391 F.3d 190, 239 (3d Cir. 2004) ("The Bankruptcy Code furthers the policy of 'equality of distribution among creditors' by requiring that a plan of reorganization provide similar treatment to similarly situated claims"); *Pension Benefit Guar. Corp. v. Belfance (In re CSC Indus., Inc.)*, 232 F.3d 505, 508 (6th Cir. 2000) ("[A] fundamental objective of the Bankruptcy Code is to treat similarly situated creditors equally"); *Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 598 (2d Cir. 1991) ("In holding that the PCH/Liona agreements did not constitute a 'true lease,' we sought to implement what is perhaps the predominant policy objective of a bankruptcy proceeding—equal treatment of similarly situated creditors"); *see also Studensky v. Buttery Co., LLP (In re Argubright)*, 532 B.R. 888, 893 (Bankr. W.D. Tex. 2015) (King, J.) ("While one purpose of bankruptcy law is to provide a fresh start for the honest but unfortunate debtor, another primary purpose is to provide for equitable treatment of creditors in recovery of their claims").[46]

65.     The Debtor has consistently maintained that one of its primary reasons for filing of this case was to maximize estate assets for equitable distributions to all creditors:

---

[46] "The primary justification for a bankruptcy law is not the fresh start, laudatory though that goal may be. Rather, the core function of bankruptcy is as a *collective creditors' remedy* that furthers the goals of efficiency and distributive justice." *Id* at 838 n.5 (quoting Charles Jordan Tabb, THE LAW OF BANKRUPTCY 4 (3d ed. 2014) (emphasis in original)).

28

> Through this chapter 11 process, the Debtor hopes to effectuate a plan of liquidation to maximize and expedite creditor recovery. However, as of the Petition Date, there are several hundred pending lawsuits and arbitrations throughout the country—some of which are attacking or may attack the validity of the Divisional Merger—where the Debtor is one of multiple codefendants, with many of the Debtor's co-defendants having contractual indemnity rights against the Debtor for any judgment rendered against them. ***Therefore, the best way to ensure that creditor recoveries are not diminished by piece-meal litigation in multiple venues across the country is for the Court to extend the automatic stay to protect co-defendants holding an indemnity right against the Debtor, while the Debtor formulates and consummates a plan of liquidation.*** [47]

66.     Unlike the cases cited in the Motion to Dismiss, this bankruptcy case is far from a two-party dispute.  Indeed, this case includes hundreds of creditors in multiple states, with wide-ranging types of claims, including general trade creditors, health care service providers, former employees, and personal injury claimants.  Unlike the "Texas Two Step" examples cited in the Motion to Dismiss, there is no MDL or similar mechanism for the Debtor's creditors to receive fair or equitable treatment through the tort system.  To the contrary, as stated above, if the chapter 11 case is dismissed, the default is a race to the courthouse, with some creditors having access to insurance and the vast majority not.  If this case is dismissed, the result unquestionably will be disparate treatment for similarly situated creditors, particularly the large majority of creditors who are *pro se* and lack the same access to counsel and the judicial system that other claimants may have.

67.     The Debtor and the UCC participated in the Global Mediations to achieve these *exact* goals, and in furtherance thereof filed their initial joint plan on September 29, 2023.  As detailed above and discussed more fully in the 9019 Motion, the Debtor has clearly stated a valid and good faith basis for pursuing an orderly liquidation through chapter 11.  The Debtor's and

---

[47] *See Debtor's Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 7] ¶ 3 (emphasis added).

the UCC's efforts have, subject to Court approval, secured a $55 million Settlement which provides the foundation for fair and equitable distributions to creditors.  Under the facts and circumstances of this case, the Court can readily determine that this case was filed in good faith, for a valid bankruptcy purpose, not as a litigation tactic.

68.     Finally, the TCC contends that dismissal is somehow in the best interests of creditors.  But, when specifically asked about this exact issue at deposition, the TCC's Rule 30(b)(6) representative could not remotely articulate why a dismissal—never mind a structured dismissal—is necessary, or how dismissal would ensure any kind of equality or uniformity of treatment for litigants:

> Q.  (BY MS. ENGLAND)  How does the structured dismissal and going back to the individual courts provide for uniform treatment of court claimants?
>
> MR. ZIMMERMAN:    Objection; form.  Foundation.    Calls for speculation.  Legal conclusion.
>
> THE WITNESS:  ***The answer is I don't know what uniform treatment of litigants is***.  So -- but it would allow each litigant to be returned to the place it was before, minus the year and a half or however the long delay had been for the automatic stay.  So they would be able to just resume their litigation.  The lift the stay would be lifted and the court's presumably would go through and, say, here's a new scheduling order.  Here's a revised -- you know, here's a trial schedule and be ready to go.
>
> Q.  (BY MS. ENGLAND)  Why is a structured dismissal superior to a regular dismissal of the bankruptcy case?
>
> MR. ZIMMERMAN:  Objection; form. Foundation.
>
> THE WITNESS:  ***I don't have an answer for you today on that.  I don't know.  As far as I'm concerned, it could just be dismissed and just go back to work.***[48]

---

[48] Tr. of Scott Griffiths, TCC Representative, 132:16–133:13 (rough) (emphasis added).

69.     Even the TCC's representative fails to apprehend the benefits of the chapter 11 process, and he clearly understands (and even prefers) that dismissal of this bankruptcy case would create a free-for-all race to the courthouse.  Thus, how dismissal could remotely favor the general interests of the creditor body as a whole is perplexing, if not baffling, and the TCC has no evidence to demonstrate otherwise.

## II.     The TCC's Motion Must Be Denied As an Improper *Sub Rosa* Plan

70.     Had the TCC simply asked this Court to dismiss this bankruptcy case, the Court could end its inquiry there, as there is no "cause" that has been demonstrated under section 1112(b) of the Bankruptcy Code.  But, not to be dissuaded by the specific language and provisions of the Bankruptcy Code, the TCC unabashedly asks for **extraordinary additional** relief to potentially benefit only its own constituents and its own professionals, at the expense of all other constituents:

    a.   appointment of the TCC as a *de facto* trustee over all estate causes of action;

    b.   dissolution of the UCC, an estate fiduciary;

    c.   termination of the automatic stay and injunctions entered in this Case;

    d.   abandonment of estate causes of action to **certain** creditors, including claims that the Debtor and the UCC have proposed to settle for $55 million, which funds would benefit of **all** creditors;

    e.   procedures to keep this case open for at least one year to allow the TCC's professionals to compensate themselves; and

    f.   retention of jurisdiction by this Court to oversee all of the foregoing.

71.     Other than a passing reference to section 105(a) of the Bankruptcy Code, the Motion cites no statutory authority for this remarkable, if not astonishing, relief.  *See* Motion ¶

118 (citing sections 105(a), 554, 1103(c)(5),[49] 1109(b), and 1112(b)).  This shortcoming is fatal to the remaining relief requested in the Motion to Dismiss.  The TCC cannot simply throw around the word "cause" as a basis for its extraordinary request.  "[T]he word 'cause' is too weak a reed upon which to rest so weighty a power."  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466, 137 S. Ct. 973, 985, 197 L. Ed. 2d 398 (2017) (citations omitted).

72.     For the sake of completeness, each component of the requested relief is discussed in turn.

### A.     The "Package" Proposed by the TCC is Indistinguishable from *Jevic* and *SmileDirectClub* and Therefore Must be Denied.

73.     "A bankruptcy court is undoubtedly forbidden from exercising its equitable powers in contravention of the Code."  *In re Ultra Petroleum Corp.,* 624 B.R. 178, 200 (Bankr. S.D. Tex. 2020); *see also In re CEC Entm't, Inc.,* 625 B.R. 344, 353 (Bankr. S.D. Tex. 2020).

74.     A bankruptcy court's powers under section 105(a) "must and can only be exercised within the confines of the Bankruptcy Code."  *See Law v. Siegel*, 571 U.S. 415, 421 (2014); *In re Ward*, 978 F.3d 298, 303 (5th Cir. 2020) ("A bankruptcy court may not contravene specific statutory provisions pursuant to its § 105 powers. Nor does § 105 permit the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.").  Section 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."  *See U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (citations omitted).

---

[49] Section 1103(c)(5) merely allows an official committee to "perform such other services as are in the interest of those represented."  But as discussed herein, the TCC's own representative could not articulate what those interests are or who those creditors are, nor is it clear how "perform[ing] such other services" includes seeking relief not contemplated by the Bankruptcy Code—that is, a "structured dismissal" that potentially benefits but one portion of a debtor's creditor constituency.

75.     Despite framing the Motion to Dismiss as a "structured dismissal," the TCC fails to discuss or distinguish from *Jevic*, the seminal Supreme Court decision regarding "structured dismissals."  This omission is quite telling.  In *Jevic*, the Supreme Court expressly rejected a "structured dismissal" that allowed for distributions outside the statutory priority scheme of the Bankruptcy Code, and without unanimous creditor consent.  *See Jevic*, 580 U.S. at 464.  The TCC does not even mention *Buffet Partners*, one of the earliest published opinions in this Circuit authorizing a structured dismissal.  *See generally In re Buffet Partners, L.P.*, 2014 WL 3735804 (Bankr N.D. Tex. July 28, 2014).  Although the Supreme Court did not express a view on the propriety of the *Buffet Partners* decision, the Supreme Court noted that *Buffet Partners* was distinguishable because no creditor or economic stakeholder opposed the structured dismissal:

> We have found no contrary precedent, either from this Court, or, for that matter, from lower court decisions reflecting common bankruptcy practice. The Third Circuit referred briefly to *In re Buffet Partners, L.P.*, 2014 WL 3735804 (Bkrtcy.Ct.N.D.Tex., July 28, 2014). The court in that case approved a structured dismissal. (We express no view about the legality of structured dismissals in general.) ***But at the same time it pointed out "that not one party with an economic stake in the case has objected to the dismissal in this manner."*** *Id.,* at \*4.

*Jevic*, 580 U.S. at 467 (emphasis added).

76.     The improper "priority skipping" and redistribution of assets rejected in *Jevic* is exactly what the TCC proposes to do through its Motion to Dismiss, plus more.   The Motion to Dismiss seeks to appoint the TCC as *de facto* trustee over estate causes of action and then use "abandonment" as the vehicle to assign certain derivative remedies to personal injury claimants. The Motion to Dismiss offers no opportunity for other affected creditors to vote on the proposed

redistribution or opt in or out of this proposed treatment. And this is to say nothing of the TCC ignoring *Louisiana World* and otherwise adhering to its requirements.[50]

77.     Even assuming the multifaceted "structured dismissal" sought by the TCC somehow complied with the Bankruptcy Code's provisions, it is unquestionably a *sub rosa* plan that is otherwise prohibited. *See generally In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets."); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 427 (Bankr. S.D. Tex. 2009) ("The Court sees no authority to provide the benefits of the Congressional scheme in this case without compliance with the Congressional requirements."); *In re Iridium Oper. LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (stating that "sub rosa plans are prohibited" to prevent "transactions that will, in effect, short circuit the requirements of chapter 11 for confirmation of a reorganization plan") (internal quotations omitted).

78.     While this Court has approved structured dismissals in **limited circumstances** in the past, particularly where creditors supported dismissal or no economic stakeholder opposed, the Court has also recently denied a motion for structured dismissal that was far less overreaching than the relief proposed in the Motion to Dismiss. *See In re SmileDirectClub, Inc.*, Case No. 23-90786 (CML), Docket No. 613 (audio of ruling on sale and structured dismissal motions), Docket No. 617 (order denying motions and converted cases to chapter 7). In denying the debtors' proposed sale and structured dismissal motions in the *SmileDirectClub* case, this Court cited to *Jevic* and *Braniff* (among other cases) for the proposition that a structured

---

[50] Depo. Tr. of Scott Griffiths 172:3–6 ("Q. (BY MS. ENGLAND) Has the TCC approved a letter from the TCC to the debtor requesting the rights to assert estate causes of action? A. No.").

dismissal containing a plan-like "package" of relief should not be approved without unanimous (or at least overwhelming) support and consent from the affected creditors. The TCC's proposed structured dismissal is exactly the kind of "plan package" the Court rejected in *SmileDirectClub*. As unanimous or overwhelming creditor consent to structed dismissal was lacking there, it is similarly lacking here.

**B.     The Motion to Dismiss Fails to Make Critical Disclosures to Creditors.**

79.     The Motion to Dismiss fails to comply with the procedural safeguards of sections 1125-1129 of the Bankruptcy Code, which ensure transparency and fairness to creditors regarding the proponents, and the terms of a chapter 11 plan. The TCC does not disclose any information, never mind "adequate information" regarding the TCC, its members, or its "structured" distribution scheme, as required by section 1125(a) of the Bankruptcy Code. Nor does the Motion to Dismiss otherwise set forth any of the 1125 disclosure elements, or afford creditors the opportunity to vote on the extraordinary relief requested. The Motion to Dismiss is riddled with misleading, inaccurate and incendiary misstatements, and makes impossible promises to creditors that the TCC knows (or should know) it cannot deliver.[51]

---

[51] It is, thus, no surprise that virtually all of the joinders filed prior to the objection deadline are *pro se* claimants. *See, e.g.,* Docket Nos. 1283 (Windhurst), 1305 & 1334 (Tripati, *pro se*), 1329 & 1340 (Dalal, *pro se*), 1330 (Kirschke, *pro se*), 1331 (Dittmer, *pro se*), 1337 (Rolle, *pro se*), 1341 (Ervin, *pro se*), 1343 (Reid, *pro se*), 1345 (Harrell, *pro se*), 1348 (Patterson, *pro se*), 1367 (various creditors represented by Ian Cross). The joinder filed by Arizona Department of Correction, Rehabilitation, and Reentry ("ADCRR") is equally suspect. *See* Docket No. 1365. The ADCRR's rationale for opposing the Settlement has nothing to do with creditor recoveries in this case, other than its own (which was nominal under the prior versions of the plan).

Similarly, the U.S. Trustee's objection filed at Docket No. 1380 should be taken with a grain of salt. The 9019 Motion provides a lengthy discussion of why the causes of action arising from the Divisional Merger have limited value, if any. *See* 9019 Motion ¶¶ 32-33, 36-49. As the Court will hear on March 1, 2024, the TCC took extensive discovery to assess how the Debtor and the UCC each, independently, valued these causes of action.

The U.S. Trustee also somehow forgets that the UCC represents **_all_** claimants in this case, _**including personal injury claimants**_. Thus, if the Court is to give any weight to the TCC's views on dismissal, it must give equal (or greater weight) to the UCC's views on the Settlement. The U.S. Trustee is also mistaken about the size of the personal injury claim pool in this case. By the TCC's own admission, personal injury claims filed in this case may be _**vastly overstated**_. See *supra* ¶ 49 (quoting Depo. Tr. of Scott Griffiths, 164:9–165:23, 167:10–24). The remainder of the issues raised by the U.S. Trustee are plan confirmation issues and are premature at this stage.

80.     The Motion to Dismiss further fails to disclose to creditors that half of the TCC's members **_are not even creditors in this case_**, and that the three remaining TCC members' claims are likely to be covered by insurance whereas the vast majority of other creditors in this case do not have access to insurance.[52]   These are all key facts that should be disclosed—not just to personal injury claimants, but to **_all_** creditors with claims arising from "tort" liabilities—before they can decide whether to support or object to (or, vote on) the TCC's *sub rosa* plan.   Without an informed view from creditors, there is simply no way for the Court to assess whether the extraordinary relief set forth in the Motion to Dismiss and accompanying proposed order is in the best interest of all creditors or is otherwise consistent with the Bankruptcy Code.

**C.     Derivative Standing is Not Warranted under _Louisiana World_.**

81.     In addition to its inadequate disclosures, the Motion to Dismiss also fails to demonstrate a factual or legal basis to confer derivative standing on the TCC to have estate claims somehow "abandoned" to a class of claimants.

82.     To obtain derivative standing in a chapter 11 case, it is the movant's burden to demonstrate: (i) a colorable claim exists; (ii) the debtor has refused unjustifiably to pursue the claims; and (iii) movant obtains leave of court to sue on behalf of the estate.   *See generally La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987).

83.     The Motion to dismiss dedicates exactly three (3) short paragraphs to the "facts" underlying the request for derivative standing, which are nothing more than a rote repetition of allegations and general postulation.   *See* Motion to Dismiss ¶¶ 151-53.

---

[52] *See* Disclosure Statement (PDF p. 27 of 177); *see also id.* (PDF pp. 72-73) (Schedule 2, Professional Liability Insurance Policy Information).

84.     In *Louisiana World*, the Fifth Circuit noted that the debtor unjustifiably refused to bring claims against its directors and officers due to a conflict of interest.  *See id.* at 1397-98. Here, not only has the TCC failed to make a proper *Louisiana World* demand on the Debtor, but the TCC has not demonstrated that conflict exists, and there is no evidence that the Debtor refused to pursue the estate's claims.

85.     First, pursuant to the resolutions attached to the Debtor's voluntary petition, the Chief Restructuring Officer ("CRO") was delegated "sole decision-making authority for all restructuring matters, any matter where the Sole Director identified below has or may have a conflict [of] interest, and for such other matters as the Sole Director may otherwise delegate to the CRO."[53]  There cannot be any questions about the CRO's independence in this case.

86.     Second, there have been well-documented months long investigations by both the Debtor and the UCC into estate claims, and the estate's relevant assets and liabilities.  The estate's claims have been the subject of multiple rounds of mediation (the Global Mediations) and the Debtor and the UCC believe the Settlement represents a reasonable and appropriate resolution, which includes a significant cash payment.

87.     The TCC—having not even asked the Debtor to pursue any alleged cause of action, or otherwise demonstrated a conflict to render the request futile—cannot demonstrate any unjustified refusal to pursue estate causes of action.  Accordingly, derivative standing is not warranted or appropriate.

### D.     <u>Abandonment is Not Warranted By the Facts of this Case.</u>

88.     Abandonment of estate causes of action is also not warranted.  Abandonment under section 554(a) of the Bankruptcy Code requires a showing that the property is

---

[53] *See* Certificate of Resolution [Docket No. 1] (PDF pp. 6-8 of 8).

"burdensome to the estate" or "of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 497 (1986). The TCC does not—and cannot—contend that the estate's causes of action are burdensome or of inconsequential value to the estate. The TCC **knows** the estate has valuable claims against third parties. This can be inferred from the TCC's demand for derivative standing, discussed above. The TCC's motives are transparent—the TCC simply seeks to favor its members and constituents above all the Debtor's other creditors.

89.     As Judge Bohm astutely observed, it is the **Debtor's** prerogative to determine which causes of action to pursue on behalf of the estate—not the TCC's. *See In re Cash Media Sys., Inc.*, 326 B.R. 655, 672 (Bankr. S.D. Tex. 2005):

> Therefore, in the case at bar, it is the Trustee's prerogative to determine which causes of action she will pursue and in which venue (within the constraints of 28 U.S.C. § 1334) she will pursue them. *Carter v. Carter*, 21 S.W.3d 441, 443 (Tex. App.—San Antonio 2000. The Debtor filed a Chapter 7 petition in this Court; the Debtor's Estate is under this Court's jurisdiction; and the Estate is under the Trustee's control. Regardless as to how Franklin personally feels about any potential cause of action owned by the Estate, he does not possess a right to pursue such cause on behalf of the Debtor. That right is vested solely in the Trustee.

90.     The estate's causes of action are unquestionably valuable—to the tune of $55 million—thus making abandonment inappropriate and unwarranted.

### E.     There is No "Cause" for Relief from the Stays in This Case.

91.     Similarly, the Motion to Dismiss should be denied to the extent it seeks to terminate or lift the automatic stay or injunction as to estate causes of action. The injunction contained in section 362 of the Bankruptcy Code is self-executing, *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008), and constitutes a fundamental debtor protection that, together with other provisions of the Bankruptcy Code, provides a debtor with a "breathing spell" that is essential to a successful chapter 11 process. *Halo Wireless, Inc. v.*

*Alenco Commc'ns, Inc. (In re Halo Wireless, Inc.)*, 684 F.3d 581, 586 (5th Cir. 2012) (internal quotations omitted); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1146 (5th Cir. 1987); *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) ("The automatic stay provision of the Bankruptcy Code, § 362(a), has been described as one of the fundamental debtor protections provided by the bankruptcy laws." (citation and internal quotation marks omitted)).  *See Commonwealth Oil Refining Co. v. EPA (In re Commonwealth Oil Refining Co.)*, 805 F.2d 1175, 1182 (5th Cir. 1986) ("The purpose of the automatic stay is to give the debtor a 'breathing spell' from his creditors, and also, to protect creditors by preventing a race for the debtor's assets." (citation omitted)). Until the releases proposed under the Settlement become effective, the injunctions in effect in this case simply maintains the *status quo*.

92.    The Motion to Dismiss lacks even a passing reference to section 362(d) of the Bankruptcy Code and fails to recite any "cause" other than the self-serving references in the Motion to Dismiss itself.  Disrupting the *status quo* at this very late stage in the case would undermine substantial creditor recoveries from the Settlement.  This component of the Motion to Dismiss must be denied.

### F.    Dissolution of the UCC is Not Warranted

93.    Finally, though not even requested in the Motion to Dismiss, the proposed order attached thereto asks the Court to dissolve the UCC.  It goes without saying that the UCC is an independent estate fiduciary, appointed by the U.S. Trustee nearly one year ago to represent the interests of *all* unsecured creditors in this case.  How the UCC could be dissolved upon dismissal but the TCC nevertheless remains intact on a "limited basis" is an oddity to say the least, wholly lacking support in the Bankruptcy Code or the case law.

94.     As such the TCC's proposed dissolution of the UCC and its own "limited continuation" must be denied.

### III.     The Settlement Does Not Contain "Non-Consensual Non-Debtor Releases"

95.     The Motion to Dismiss discusses the prior joint plans filed by the Debtor and the UCC (which will be amended following approval of the Settlement).  In doing so, the TCC misstates the releases proposed under those plans and conflates the third-party releases under those plans (or any proposed) plan with a release of *estate claims*, as proposed in the Settlement. The fact, as borne out by the terms of the Settlement, is that it does not release any direct claims held by individual creditors against third parties.

96.     The operative "debtor" release from the 9019 Motion and corresponding Settlement is as follows:

> ***Upon the Plan Effective Date and full funding of all payments described herein***, ***the Debtor and the Committee, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any causes of action, directly or derivatively, by, through, for, or because of the foregoing entities***, shall be deemed to have released, and shall be permanently enjoined from any prosecution or attempted prosecution of, any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including avoidance actions arising under chapter 5 of title 11 of the United States Code), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, which any of them has or may have against: (a) the M2 Parties; (b) M2 EquityCo LLC; (c) Valitás Intermediate Holdings Inc.; (d) Valitás Health Services, Inc.; (e) M2 Pharmacorr Equity Holdings LLC; (f) Pharmacorr/M2 LLC; (g) Pharmacorr Holdings LLC; (h) Endeavor Distribution LLC; (i) Yes Care Holdings LLC; (j) Sigma RM, LLC; (k) DG Realty Management LLC; (l) Scaracor LLC; (m) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (n) Sara Ann Tirschwell; (o) Ayodeji Olawale Ladele; (p) Beverly Michelle

40

Rice; (q) Jeffrey Scott King; (r) Jennifer Lynee Finger; (s) Frank Jeffrey Sholey; (t) FTI Capital Advisors, LLC; and (u) for each Entity listed in (a) through (t), each of their respective current and former officers, directors, employees, managers, attorneys, professional advisors, and agents; *but excluding* James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks (collectively, the "Released Parties"); *provided* that nothing in this Agreement shall alter or diminish the release set forth in Paragraph 17 of the DIP Order; *provided, further*, that the Parties do not release any claims related to this Agreement, including for breach of the representations and warranties contained herein.[54]

97.    The emphasized language above makes two things clear:  (i) the releases in the Settlement only become effective upon the effective date of a chapter 11 plan; and (ii) the only claims being released are estate causes of action held "directly or derivatively, by, through, for, or on behalf of" the Debtor and the UCC, not any individual claims.[55]  As is apparent from the Motion to Dismiss, the TCC disagrees that derivative causes of action and legal remedies, including successor liability and alter ego theories, constitute property of the estate that the Debtor can settle.  But the TCC cannot change the law by simply ignoring it or disagreeing with it.

98.    The bankruptcy estate created by section 541(a) includes all state and federal legal rights and causes of action held by the debtor at the commencement of its bankruptcy case.  *See In re S.I. Acquisition, Inc.*, 817 F.2d at 1149 (citing *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1274 (5th Cir.1983)). This includes derivative claims.  *See, e.g., Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009) ("By definition then, a cause of action for breach of fiduciary duty owed to the corporation that is property of the corporation at commencement of

---

[54] *See* Settlement Agreement ¶ 7 (emphasis added).

[55] The Debtor reserves the right to provide further briefing on the constitutionality of 11 U.S.C. § 541(a).  Because the TCC did not brief this issue in its Motion to Dismiss (other than a passing comment in footnote 12), the Debtor does not believe the constitutionality of section 541(a) is properly before the Court.

the chapter 11 case becomes property of the debtor's estate, regardless of whether outside of bankruptcy the case was more likely to be brought by the corporation directly or by a shareholder or creditor through a derivative suit."); *La. World Exposition v. Fed. Ins. Co*., 858 F.2d 233, 245–46 (5th Cir. 1988) (holding that a derivative action against debtor's officers and directors was property of the estate); *Tex. Att'y Gen. v. Brown (In re Fort Worth Osteopathic Hosp., Inc.)*, 387 B.R. 706, 712 (Bankr. N.D. Tex. 2008) ("If a bankruptcy intervenes, it is the estate that is entitled to recovery on claims pursued derivatively of a debtor.").

99.     When claims against a non-debtor are property of the estate, only the debtor has standing to pursue them. *See In re S.I. Acquisition, Inc*., 817 F.2d at 1150 ("[A] section 362(a)(3) stay applies to a cause of action that under state (or federal) law belongs to the debtor [or] that seeks to recover property of the estate where the property is held or controlled by a person or entity other than the debtor."); *Schertz-Cibolo-Universal City I.S.D. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994) ("If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim.").  This is true even if outside the bankruptcy proceeding, a creditor might otherwise be entitled to assert such claims.  *See In re Moore*, 608 F.3d at 261 ("The right to recoup a fraudulent conveyance, which outside of bankruptcy may be invoked by a creditor, is property of the estate that only a trustee or debtor in possession may pursue once a bankruptcy is under way." (citation omitted)); *see also In re HSM Kennewick, L.P.*, 347 B.R. 569, 571 (Bankr. N.D. Tex. 2006) ("Section 362(a)(3) implements a stay of any action, whether against the debtor or third parties, that seeks to obtain or exercise control over the property of the debtor.").

100.     Despite the TCC's attempt to cloud the issue, Motion to Dismiss ¶ 59, the law in the Fifth Circuit has been clear for over four decades:

> We think that the analysis already undertaken in Section I.A of this opinion demonstrates that under Texas law a cause of action under the trust fund (denuding) theory is in the right of the corporation, though, to be sure, that right is assertable (and usually is asserted) by the corporation's creditors.[] ***This somewhat anomalous situation—where a cause of action assertable by creditors actually belongs to the corporation—is best understood through an analogy to the typical shareholders' action against a corporation's officers and directors.*** Like most jurisdictions, Texas has established such a right of action, which can be brought either directly by the corporation or, if the corporation refuses to act, by a shareholder in a derivative action. See Tex.Bus.Corp.Act Ann. art. 5.14 (Vernon 1980); 15 Tex.Jur.3d Corporations §§ 165-79 (1981). Despite the fact that the action under normal circumstances is frequently not brought by the corporation itself, ***the courts have uniformly held that, upon bankruptcy, it passes to the trustee, who is then charged with prosecuting it for the benefit of all creditors and shareholders***. See 4 Collier on Bankruptcy ¶ 541.10[8] (15th ed. 1983) (citing representative cases).

*In re MortgageAmerica Corp.*, 714 F.2d at 1275 (emphasis added, footnote omitted); *see also Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., LLC)*, 912 F.3d 291, 293–96 (5th Cir. 2019) (analyzing the direct versus derivative distinction and holding, among other things, that "[i]f harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate" and "[a]s long as the injury a creditor is pursuing against a third party does not stem from the depletion of estate assets, the injury is a direct one that does not belong to the estate" (emphasis added)).  Thus, if an award of damages to the company (the debtor) can redress any loss to the creditors, the action is derivative.  *See Dowling v. Narragansett Cap. Corp.*, 735 F. Supp. 1105, 1113 (D.R.I. 1990); *see also In re Preferred Care Inc.*, No. 17-44642, 2019 WL 4877525, at *4–7 (Bankr. N.D. Tex. March 22, 2019) (discussing the direct versus derivative distinction, the Fifth Circuit's recent *Buccaneer* decision, and holding that if a claim depends upon or derives from harm to the estate or depletion of estate assets, the claims are derivative, and if the claims do not depend upon harm to the estate

43

they are direct); *In re Educators Grp. Health Tr.*, 25 F.3d at 1284–85 (holding claims to be derivative where they asserted harms arising from harm to the estate).

101.     When determining whether a claim is property of a debtor's estate, "the Code's general policies of securing and preserving the debtor's property and ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern." *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 359 (5th Cir. 1999).

102.     In the Fifth Circuit, alter ego/veil piercing theories are derivative claims that are property of the debtor's bankruptcy estate.  *See, e.g.*, *In re S.I. Acquisition, Inc.*, 817 F.2d at 1153 (holding that alter ego claims are property of a debtor's estate and staying a third-party action under section 362(a)(3)); *In re Schimmelpenninck*, 183 F.3d at 365–66 (holding that reverse veil piercing theories are property of the debtor's estate and enjoining a third-party action). Similarly, it should now be beyond reproach fraudulent transfer claims are equitable remedies that become property of a debtor's bankruptcy estate upon its bankruptcy filing.  11 U.S.C. §§ 544(b) & 548(a); *see also, e.g., In re MortgageAmerica Corp.*, 714 F.2d at 1275; *In re S.I. Acquisition, Inc.*, 817 F.2d at 1150; *In re Educators Grp. Health Tr.*, 25 F.3d at 1284–86; *The Cadle Co. v. Mims (In re Moore)*, 608 F.3d at 261.

103.     The TCC contends that successor liability claims either belong to individual creditors or should only be pursued by the TCC.  Motion to Dismiss ¶¶ 57-61 (discussing the interplay between sections 541(a) and 544(b) of the Bankruptcy Code); ¶¶ 80-81 (discussing the impact of the Settlement on successor liability remedies); ¶¶ 97-100 (listing cases addressing successor liability theories); ¶¶ 127-142 (discussing cases addressing standing to pursue successor liability remedies); ¶¶ 159-165 (discussing who should have standing to pursue successor liability remedies).  But the question of "***who may assert***" a claim is not the same as

"*who owns*" that claim.  *See In re MortgageAmerica Corp.*, 714 F.2d at 1275.  Who owns a successor liability remedy is governed by the law of the company's state of incorporation—which here, is Texas.  *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007); *Schmermerhorn v. Centurytel, Inc. (In re Skyport Glob. Commc'ns, Inc.)*, No. 08-36737, 2011 WL 111427, at *15 (Bankr. S.D. Tex. Jan. 13, 2011); *Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 496 (2d Cir. 2013); *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993).

104.    The court in *Giron v. Zeytuna, Inc.*, 2022 WL 856385 (D.D.C. March 23, 2022), discussed a two-part test for determining when (and if) alter ego, veil piercing, and successor liability claims are property of the estate.  Such claims will be property of the estate when: (i) the law of the state of the debtor's formation allows an entity to pierce its own corporate veil or assert claims against an alter ego or successor entity, and (2) the veil-piercing, alter ego, or successor liability "claim" is general, with no particularized injury arising that could be brought by any creditor of the debtor.  In that case, the claim in question is property of the estate. *Id.* at *7 (citing, *inter alia*, *In re Emoral Inc.*, 740 F.3d 875, 879-81 (3d Cir. 2014)).

105.    Nothing under Texas law limits a corporation from piercing its own veil or pursuing successors.  *See, e.g., In re S.I. Acquisition, Inc.*, 817 F.2d at 1153 ("As in *In re MortgageAmerica* we recognize that an action based on alter ego allegations is assertable, and is usually asserted, by the debtor corporation's creditors. But this fact does not negate our conclusion, as it did not in *In re MortgageAmerica, that theoretically nothing in Texas law prohibits a corporation from asserting on its own an action based on alter ego and that in fact the underlying policy of the remedy supports this conclusion*.") (emphasis added).

45

106. Under Texas law, successor liability is not generally recognized as a viable cause of action without one entity expressly assuming the liabilities of another. *See Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 233–34 (S.D. Tex. 2011) ("Texas law does not generally recognize successor liability for subsequent purchases of corporate assets. . . . Furthermore the Texas legislature has refused to recognize the theory that a successor corporation is a mere continuation of its predecessor as an exception to the traditional rule that a successor corporation does not assume the liabilities of a predecessor."); *Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 828 (Tex. App.—Texarkana 2004) ("Texas courts generally recognize the distinction among corporate affiliates, even when one clearly dominates the other."); *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139–40 (Tex. App.—Houston [1st Dist. 2000, pet. denied]) ("Texas strongly embraces the non-liability rule. To impose liability for a predecessor's torts, the successor corporation must have expressly assumed liability.").

107. The Plan of Merger effectuated by the Debtor before the commencement of this case was explicit. It clearly allocated certain assets and liabilities to the Debtor, while allocating other assets and liabilities to CHS TX, Inc. Texas law could not be more explicit on the effect of this merger: "When a merger takes effect, . . . all rights, title, and interests to all real estate and other property owned by each organization that is a party to the merger is allocated to and vested, subject to any existing liens or other encumbrances on the property, in one or more of the surviving or new organizations as provided in the plan of merger *without . . . any transfer or assignment having occurred*." Texas Bus. Org. Code § 10.008(a)(2) (emphasis added). The Plan of Merger did not cause CHS TX to assume any of the liabilities that were allocated to the

Debtor thereunder.  The Plan of Merger specifically allocated liabilities between the Debtor and CHS TX.

108.    In any event, even if a claim for successor liability was viable under Texas law, it would be treated like any other derivative claim in bankruptcy—which is, property of the estate—because the underlying basis would be "generalized harm" to the Debtor just like an alter ego claim.  *See, e.g.*, *In re MortgageAmerica Corp.*, 714 F.2d at 1275, 1277-78 (concluding that a "right of action" under state law become property of the estate to end the "the day of unfair and unseemly races to the courthouse"); *In re Emoral Inc*., 740 F.3d at 880–82 (stating that "state law causes of action for successor liability, just as for alter ego and veil-piercing causes of action, are properly characterized as property of the bankruptcy estate" and citing cases).

109.    Here, "successor liability" remedies will be released under the Settlement *only* to the extent such remedies are based on "generalized harm" caused to the Debtor by the Released Parties (as defined in the Settlement).  If a creditor can prove some "particularized harm" and direct harm caused to it, then that is a direct claim which is not being released.

110.    The claims being released under the proposed Settlement are well within the confines of the Bankruptcy Code's definition of "property of the estate" that the Debtor has the right to settle.

**IV.      The Settlement is the Clear Best Choice for Ensuring Creditor Recoveries.**

111.    Finally, although already adequately addressed in the 9019 Motion, the discovery taken since the TCC filed its Motion to Dismiss only bolsters the fact that the Settlement is the best way to bring substantial value to the estate (and the Debtor's creditors) and allow for equitable distributions to creditors in the near term.  The deposition testimony of the Debtor's and UCC's representatives makes abundantly clear that the Debtor's and the UCC's respective investigations were thorough and complete.

112.    First, David Barton, Chair of the UCC, testified as follows:

Q. Okay. So once the Rule 9019 Motion was filed on January 16th of 2024, was there any investigation the UCC still needed to complete before, in the UCC's view, the Rule 9019 Motion could be taken up by the Court and decided?

MR. ZLUTICKY: Object to form.

A. ***I think we filed the motion because we were ready for the Court to rule on it***. Am I understanding your question correctly?

Q. I think so. Let me ask it a slightly different way.

Were there any further investigatory steps the UCC was taking after the Rule 9019 Motion was filed in order to determine whether or not to support the settlement?

MR. KAUFMAN: Objection to form.

A. Not in order to determine whether or not to support the settlement. ***As I said, there is unanimous support for the settlement that has never wavered.***[56]

113.    Russell Perry, the Debtor's CRO, testified as follows:

Q. And is there any information that you would have wanted -- you, the Debtor, would have wanted to analyze with respect to these claims described in paragraphs 32 and 33 [of the 9019 Motion] that you were not able to analyze?

A. As I sit here today, no.

. . .

Q. Okay. In doing that process to come up with that estimate [of claims for purposes of the liquidation analysis], was there any information that was not available to the Debtor that would have been helpful?

MR. KAUFMAN: Objection to form.

A. No.[57]

---

[56] Depo. Tr. of David Barton, 121:14–123:12 (emphasis added).

[57] Depo Tr. of Russell Perry, 120:14–18, 252:6–10.

4866-1984-9638

114.    And, finally, Matt Dundon, the UCC's financial advisor, echoed both prior statements:

> Q. Mr. Dundon, in conducting the UCC's investigation, was there any information that was not available to the UCC that you would have found helpful?

> MR. ZLUTICKY:  Object to form.

> **A.  *I believe that we got what we needed.***[58]

115.    The Debtor and the UCC have considered all factors applicable to Rule 9019(a) settlements: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of compromise, including the extensive arms-length negotiations that went into the Settlement and the reasonable views of creditors regarding the Settlement.  *See Official Comm. of Unsecured Creditors v. Moeller (In re Age Refin. Inc.)*,801 F.3d 530, 540 (5th Cir. 2015); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602–03 (5th Cir. 1980)); *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1997); *In re Wright*, 545 B.R. 541, 561 (Bankr. S.D. Tex. 2016).

116.    Through the depositions taken by the TCC over the past several weeks, the TCC has had an opportunity to discover how the Debtor, the UCC, and the settlement parties arrived at the $55 million settlement amount.  Unsurprisingly, the Debtor and the UCC came to different conclusions regarding the relative value and merits of various estate causes of action but, after

---

[58] Depo Tr. of Matt Dundon, 141:17–23 (emphasis added).

extensive arms-length negotiations, arrived at a settlement amount they both believe is fair and reasonable, taking the foregoing factors into consideration.

117.    For example, Mr. Perry testified as follows on behalf of the Debtor:

Q.  Did the Debtor – strike that.

Has the Debtor ascribed any estimated value to potential avoidance actions that may arise from the divisional merger?

MR. KAUFMAN: Objection to form. I'll leave it there for now.

A. The Debtor ascribes very little value to this potential claim.

BY MR. MOXLEY:

Q.  Okay. I noticed in the Rule 9019 motion there are tables with respect to the other categories, right?

A.  Uh-huh.

Q.  And there's not such a table with respect to the divisional merger description, correct?

A.  Correct.

Q.  And is the reason for that, your last answer, that the Debtor just simply ascribes very little value to those claims?

A.  That's fair, yes.

. . .

Q.  Okay. Is the value of the avoidance claims arising out of the divisional merger transactions something that the Debtor and the UCC coordinated on with respect to their investigations?

MR. KAUFMAN: Objection to form.

A.  The Debtor and the UCC conducted independent investigations and, therefore, arrived at their own conclusions, the Debtor and the committee, independent of each other as it relates to any value ascribed to that claim.[59]

---

[59] Depo. Tr. of Russell Perry, 127:12–128:24; *see also id.* 113:2–21 ("The defenses that I think could possibly be brought forth would be along those lines. ***Expensive, costly, lengthy, defended vigorously***. . . . The released parties

118.    Mr. Barton gave further color on why the UCC's views differed from the Debtor's, but explained how the parties ultimately reached agreement on how best to monetize the estate's causes of action:

> Q.  Would you like to see the individuals that orchestrated that Divisional Merger transaction held accountable for their conduct in that regard?
>
> MR. ZLUTICKY: Object to form.
>
> . . .
>
> A.  I would like to see, again, ***as much recovery as possible***. That is my fiduciary duty. That is the goal that I have. You know, I would love to see people who do bad things be held accountable for it.
>
> ***But my job, and the job of the UCC, is to maximize recovery for creditors. That is what we are focused on***.
>
> Q.  Right.
>
> So the UCC would support a higher settlement amount if it could be achieved, correct?
>
> MR. ZLUTICKY: Object to form.
>
> A.  If it can be achieved now.
>
> Q.  If it could be achieved now, the answer is "yes," correct?
>
> MR. ZLUTICKY: Object to form.
>
> A.  If you come back today and tell me you won $100 million instead of the $54 million we got, I would high five you.
>
> Q.  Thank you, sir.
>
> A.  ***Time matters, though.*** Because every moment that we let this settlement opportunity slip, money is trickling out of the estate to pay the professionals and others. And so, of course, we would like more money. We want more money to get in the pockets of creditors. ***So it's not just the dollar value of the settlement, it's the way you get***

---

or settlement parties in this case have very competent counsel. ***I would have to think that they would come up with potentially substantially more defenses than even what I could understand***.") (emphasis added).

> ***the money quickly into the hands of creditors before the money is
> squandered by professionals or other activities.***[60]

119.    Finally, Mr. Dundon explained the UCC's analysis, factoring in the risks and costs

of litigation and collection, which allowed the UCC to arrive at a similar settlement range as the

Debtor (unbeknownst to each other):

> Q.   Okay.  Did -- did the UCC analyze the value of the assets that, in the
> Divisional Merger, ultimately, as you described in your last answer,
> went to YesCare?
>
> MR. ZLUTICKY:  Object to form.
>
> A.   Yes.
>
> Q.   And what was the result of that analysis?
>
> MR. ZLUTICKY:  Object to form.
>
> A.   The UCC determined that those assets were worth something
> between $0 and $75 million.
>
> …
>
> Q.   So Mr. Dundon, the avoidance claims based on the Divisional
> Merger could be worth up to $75 million; is that right?
>
> MR. ZLUTICKY:  Objection to form.
>
> A.   ***No.***  At least some portion of the $15 million funding agreement
> would likely be ascribed to the value received by the Debtor. And
> preference prosecutions are not free.
>
> They cost a lot of money.  They take a long time.  There is always a
> risk that a judge might disagree with you in whole or in part in
> coming to an award or a judgment.  And then any judgment you get
> takes a lot of time and money to enforce and collect.  And there is no
> assurance that you are going to collect it in full.
>
> ***So a hefty discount would need to be taken from that $75 million to
> get to a present value of an avoidance action on a risk-adjusted
> basis.***[61]

---

[60] Depo. Tr. of David Barton, 233:25–235:21 (emphasis added).

120.     The Debtor and the UCC have faithfully executed their fiduciary duties in connection with the Settlement, the terms of which are the product of thorough investigations, arms' length negotiations and reasonable assessments of the relevant settlement factors discussed above.  The Settlement falls well within the range of reasonableness and is a "fantastic result for creditors."[62]

### Conclusion

121.     The 9019 Motion and the Motion to Dismiss are just two sides of the same coin. If the Settlement meets the legal standards for approval the Court has no choice but to deny the Motion to Dismiss.  As stated earlier, the Court's decision is an easy one.  The Settlement falls well within the range of reasonableness and should be approved, whereas the Motion to Dismiss is ill-conceived, based on faulty premises, and is not in creditors' best interests.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order denying the Motion to Dismiss, and granting such other relief as the Court deems appropriate under the circumstances.

---

[61] Depo. Tr. of Matt Dundon, 65:6–65:18, 89:6–90:2 (emphasis added).

[62] Depo. Tr. of David Barton, 209:2–10.

Respectfully submitted this 23rd day of February, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
    Aaron M. Kaufman
    Texas Bar No. 24060067
    Lydia R. Webb
    Texas Bar No. 24083758
    Amber M. Carson
    Texas Bar No. 24075610
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone:    (713) 986-7127
Facsimile:    (713) 986-5966
Email:    jbrookner@grayreed.com
    akaufman@grayreed.com
    lwebb@grayreed.com
    acarson@grayreed.com

*Counsel to the Debtor*
*and Debtor in Possession*

**<u>Certificate of Service</u>**

I certify that on February 23, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas to all parties authorized to receive electronic notice in this case.

*/s/ Jason S. Brookner*
Jason S. Brookner

4866-1984-9638