```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                      .
IN RE:                                .  Case No. 23-90086
                                      .  Chapter 11
TEHUM CARE SERVICES, INC.,            .
                                      .  515 Rusk Street
                                      .  Houston, TX 77002
               Debtor.                .
                                      .  Friday, March 1, 2024
. . . . . . . . . . . . . . . .   .  11:04 a.m.
```

    TRANSCRIPT OF TRIAL DAY 1 RE: JOINT MOTION FOR ENTRY OF AN
ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT BY AND AMONG
    THE DEBTOR, THE UCC, AND THE PARTIES TO THE SETTLEMENT
      AGREEMENT AND (II) GRANTING RELATED RELIEF [1259];
    MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS AND
      CERTAIN TORT CLAIMANTS FOR STRUCTURED DISMISSAL OF
                   CHAPTER 11 CASE [1260]
        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:


 For the Debtor:            Gray Reed & McGraw LLP
                            By:  JASON S. BROOKNER, ESQ.
                                 AMBER M. CARSON, ESQ.
                                 AARON M. KAUFMAN, ESQ.
                                 LONDON ENGLAND, ESQ.
                            1601 Elm Street, Suite 4600
                            Dallas, TX 75201
                            469-320-6132

 APPEARANCES CONTINUED.

 Audio Operator:           Zilde Compean, ECR

 Transcription Company:    Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
 transcript produced by transcription service.
```

1

```
APPEARANCES (Continued):


For the Committee of     Brown Rudnick LLP
Tort Claimants:          By:  ERIC GOODMAN, ESQ.
                              D. CAMERON MOXLEY, ESQ.
                              GERARD T. CICERO, ESQ.
                              JESSICA N. MEYERS, ESQ.
                         7 Times Square
                         New York, NY 10036
                         212-209-4800

                         Brown Rudnick LLP
                         By:  MEGHAN MCCAFFERTY, ESQ.
                         One Financial Ctr
                         Boston, MA 02111
                         617-856-8200

                         Berry Riddell LLC
                         By:  MICHAEL W. ZIMMERMAN
                         6750 E Camelback Rd
                         Suite 100
                         Scottsdale, AZ 85251
                         480-385-2727

For the Official         Stinson LLP
Unsecured Creditors'     By:  NICHOLAS ZLUTICKY, ESQ.
Committee:               By:  ZACHARY H. HEMENWAY, ESQ.
                         1201 Walnut
                         Ste 2700
                         Kansas City, MO 64106
                         816-842-8600

For the Settling         Hayward PLLC
Parties:                 By:  MELISSA S. HAYWARD, ESQ.
                         10501 N. Central Expwy.
                         Suite 106
                         Dallas, TX 75231
                         972-755-7100

For Certain Officials    Munsch Hardt Kopf & Harr, P.C.
or Employees of the      By:  BRENDA LYNN FUNK, ESQ.
State of Idaho:          700 Milam Street
                         Suite 800
                         Houston, TX 77002
                         713-222-5832

For the U.S. Trustee:    Office of the United States Trustee
                         By:  HA MINH NGUYEN, ESQ.
                         By:  ANDREW JIMENEZ, ESQ.
                         515 Rusk St, Ste 3516
                         Houston, TX 77002
                         202-590-7962
```

APPEARANCES (Continued):


For RMSC Plaintiffs:        Walker & Patterson, P.C.
                            By:  JOHNIE J. PATTERSON, ESQ.
                            P.O. Box 61301
                            Houston, TX 77208-1301
                            713-956-5577

TELEPHONIC APPEARANCES:

For Arizona Department      Osborn Maledon, P.A.
of Corrections,             By:  WARREN JOHN STAPLETON, ESQ.
Rehabilitation, and         By:  CHRISTOPHER C. SIMPSON, ESQ.
Reentry:                    2929 North Central Avenue
                            Ste 2100
                            Phoenix, AZ 85012
                            602-640-9354


For Saint Alphonsus         MehaffyWeber PC
Health Care System:         By: BLAKE HAMM, ESQ.
                            500 Dallas St Ste 2800
                            Houston, TX 77002
                            713-655-1200


For M2 LoanCo, LLC:         Norton Rose Fulbright US LLP
                            By: KRISTIAN W. GLUCK, ESQ.
                            2200 Ross Ave
                            Suite 3600
                            Dallas, TX 75201-2784
                            214-855-8210

                            Norton Rose Fulbright US LLP
                            By:  PAUL TRAHAN, ESQ.
                            98 San Jacinto Blvd, Ste 1100
                            Austin, TX 78701
                            512-474-5201


For The Curators of         Jones Murray LLP
the University of           By:  ERIN ELIZABETH JONES, ESQ.
Missouri and Capital        602 Sawyer, Suite 400
Region Medical Center:      Houston, TX 77007
                            832-529-1999


For Creditor Elizabeth      Slater Legal PLLC
Frederick:                  By:  JAMES MURRAY SLATER, ESQ.
                            113 S. Monroe Street
                            Tallahassee, FL 32301
                            305-523-9023

TELEPHONIC APPEARANCES (Continued):


For St. Luke's Health    Stoel Rives LLP
System and St. Luke's    By: BRYAN T. GLOVER
Regional Medical         600 University St., Suite 3600
Center:                  Seattle, WA 98101
                         206-386-7555

For Tracey Grissom:      Frank Ozment Attorney at Law, LLC
                         By:  VALREY W. EARLY, III, ESQ.
                         217 Country Club Park, Box 501
                         Birmingham, AL 35213
                         205-586-5127


For William Kelly,       Cross Law PLLC
Kohchise Jackson,        By:  IAN CROSS, ESQ.
Derico Thompson:         402 W Liberty St.
                         Ann Arbor, MI 48103
                         734-994-9590

For Laura Medley:        LAURA MEDLEY (Pro se)
                         POB 490
                         Mesa, AZ 85211

Also Present:            MICHAEL RUSSANO

                         NATHAN ALVAREZ

                         DAVID BARTON

                         LIZ MERCURIO

I N D E X
3/1/2024

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|

FOR THE DEBTOR:

| David Barton | 147 | 193 | -- | -- |

| EXHIBITS | ADMITTED |
|----------|----------|
| ECF Number 1410-1 | 167 |
| ECF Numbers 1410-2 and 1410-3 | 145 |
| ECF Number 1410-5 | 145 |
| ECF Number 1410-10 | 156 |
| ECF Number 1410-12 | 158 |
| ECF Number 1410-18 | 145 |
| ECF Number 1410-36 | 145 |
| ECF Numbers 1410-44 through 1410-61 | 145 |
| ECF Number 1410-63 | 145 |
| ECF Numbers 1413-25 through 1413-28 | 145 |
| ECF Number 1413-31 | 145 |
| ECF Number 1413-34 and 1413-35 | 145 |
| ECF Number 1413-37 | 145 |
| ECF Number 1413-39 through 1413-41 | 145 |
| ECF Number 1428-132 | 145 |
| ECF Number 1428-136 | 145 |
| ECF Number 1428-173 | 145 |
| ECF Number 1428-288 | 145 |
| ECF Number 1428-329 through 1428-331 | 145 |
| ECF Number 1429-115 | 145 |
| ECF Number 1429-141 | 145 |
| ECF Number 1429-148 | 145 |
| ECF Number 1429-170 | 145 |
| ECF Number 1429-252 | 145 |
| ECF Number 1429-341 | 145 |
| ECF Number 1429-350 | 145 |

Barton - Direct/Zluticky                                    6

INDEX (CONTINUED):

3/1/2024

Page

OPENING STATEMENT BY MR. BROOKNER                    26
OPENING STATEMENT BY MR. HEMENWAY                    59
OPENING STATEMENT BY MR. GOODMAN                     76
OPENING STATEMENT BY MR. PATTERSON                  114
OPENING STATEMENT BY MR. NGUYEN                     125
OPENING STATEMENT BY MS. FUNK                       130
OPENING STATEMENT BY MS. JONES                      133
OPENING STATEMENT BY MR. GLOVER                     136
OPENING STATEMENT BY MR. STAPLETON                  138

1

1          (Proceedings commence at 11:04 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Okay.  Good morning, everyone.  This is

4   Judge Lopez.  Today is March the 1st.  I'm going to call the

5   eleven o'clock case, 23-90086, Tehum Care Services, Inc., on

6   probably just a bunch of stuff.

7              So why don't we just take appearances in the

8   courtroom, and then I will turn to the folks online.  If you

9   have dialed into the hearing, I would ask, and you hit "five

10  star", I'm going to unmute your line in a moment.  There are

11  about 60 folks on the line, so I've enabled the mute feature.

12  But once I unmute your line, you're going to remain unmuted.  I

13  just ask that you please just monitor yourselves so that we can

14  all hear each other, and we'll get started.  Good morning.

15             MR. BROOKNER:  Good morning, Your Honor.  Jason

16  Brookner from Gray Reed for the debtor, along with my

17  colleagues in the courtroom, Aaron Kaufman, Amber Carson,

18  London England, and we also have with us Michael Russano, who

19  is the global head of litigation for Ankura Consulting.

20             THE COURT:  Okay.  Good morning.

21             MR. GOODMAN:  Good morning, Your Honor.  Eric

22  Goodman, Brown Rudnick.  I've never had the pleasure of being

23  in front of Your Honor, my first time at your court, so thank

24  you.

25             THE COURT:  Welcome.

Barton - Direct/Zluticky                              8

 1            MR. GOODMAN:  Appreciate that.  With me today are my

 2   partners, Cameron Moxley --

 3            THE COURT:  Good morning.

 4            MR. GOODMAN:  -- who has been here before, got here

 5   before I did, Gerard Cicero --

 6            THE COURT:  Good morning.

 7            MR. GOODMAN:  -- Jessica Meyers in the back, and an

 8   associate, Megan McCafferty, who should stand up because she

 9   has been working a lot of very late days and evenings.

10            THE COURT:  Good morning.

11            MR. GOODMAN:  So I definitely want to give her a

12   shout-out, and my co-counsel, Michael Zimmerman --

13            THE COURT:  Good morning, Mr. Zimmerman.

14            MR. ZIMMERMAN:  Good morning.

15            MR. GOODMAN:  -- here on behalf of the Official

16   Committee of Tort Claimants.

17            THE COURT:  Okay.  Good morning.

18            MR. GOODMAN:  Thank you.  Oh, I'm sorry.  We also

19   have the pleasure today of having one of our committee members

20   present in the room.  So I'd like to introduce him, Nathan

21   Alvarez, member of our committee.

22            THE COURT:  Good morning.

23            MR. GOODMAN:  Thank you.

24            MR. ZLUTICKY:  Good morning, Your Honor.  Nick

25   Zluticky and Zach Hemenway from Stinson for the Official

1   Committee of Unsecured Creditors.  We have a couple of folks

2   appearing by video as well.  The Committee also is here by its

3   chairperson, Mr. David Barton, who's in the courtroom today.

4              THE COURT:  Good morning.

5              Hey, good morning.

6              MS. HAYWARD:  Good morning, Your Honor.  Good to be

7   back in your courtroom.  Melissa Hayward on behalf of the

8   settling parties.

9              THE COURT:  All right.  Good morning.

10             MS. FUNK:  Good morning, Your Honor.  Brenda Funk

11  with Munsch Hardt for the Idaho parties.

12             THE COURT:  Good morning.

13             MR. NGUYEN:  Good morning, Your Honor.  Ha Nguyen for

14  the U.S. Trustee.  Andrew Jimenez will be joining us as well,

15  but he's with Judge Rodriguez right now.

16             THE COURT:  Alrighty.  Good morning.

17             Good morning, Mr. Patterson.

18             MR. PATTERSON:  Good morning, Your Honor.  Johnie

19  Patterson here on behalf of the RMSC Plaintiffs.

20             THE COURT:  Okay.  Good morning.

21             Alrighty.  Let me turn to people online.  I'm just

22  going to go in the order in which I see them.  Here's a 602

23  number.  602 number?

24             MR. STAPLETON:  Good morning, Your Honor.  Warren

25  Stapleton appearing on behalf of the Arizona Department of

1    Corrections.

2            THE COURT:  Oh, good morning, Mr. Stapleton.

3            Here's an 801 number.

4            MR. ROTHSCHILD:  Good morning, Your Honor.  Brian

5    Rothschild for Utah School & Institutional Trust Land

6    Administration.  I'm here for the Paradox Resources case.  Is

7    this correct?  I maybe missed that hearing.

8            THE COURT:  Well, yeah.  That one was at 10:30, and

9    we have agreed to -- they're going to file something, and

10   they're going to -- or there'll be an objection deadline until

11   Monday at noon to see how it proceeds.  So that's the long and

12   short of that one.

13           MR. ROTHSCHILD:  Okay.  Your Honor, I spoke with

14   Mr. David Curry this morning, and I think we're on good terms

15   and working together very well.  I apologize.  I didn't get the

16   notice until this morning.  So thank you.

17           THE COURT:  Thank you.

18           Okay.  Here's a 409 number.

19           MR. HAMM:  Good morning, Your Honor.  Blake Hamm for

20   creditor Saint Alphonsus Health Care System.

21           THE COURT:  Okay.  Here's a 214 number.

22           MR. GLUCK:  Good morning, Your Honor.  Kristian Gluck

23   and Paul Trahan of Norton Rose Fulbright on behalf of M2

24   LoanCo., the DIP lender, and also one of the settling parties.

25           THE COURT:  Okay.  Good morning.

Barton - Direct/Zluticky                            11

1          Alrighty.  Here is a 520 number.  A 520 number?  All
2    right.  Here's a 713 number.
3          MS. JONES:  Good morning, Your Honor.  This is Erin
4    Jones on behalf of the Curators of the University of Missouri
5    and Capital Region Medical Center.  I would have liked to have
6    been there in person, but I am suffering from a viral plague of
7    some sort.  I didn't think you would want me to be there to
8    share.  So I am participating remotely today.
9          THE COURT:  I hope you're doing okay.  Thank you.
10         MS. JONES:  Thank you.
11         THE COURT:  Here's a 305 number.
12         MR. SLATER:  Good afternoon, Your Honor.  James
13   Slater on behalf of creditor of Elizabeth Federick.
14         THE COURT:  Alrighty.  And here's a 404 number.
15         MR. GLOVER:  Hi.  Good morning, Your Honor.  This is
16   Bryan Glover on behalf of St. Luke's.
17         THE COURT:  Alrighty.  Good morning.
18         Anyone else, please hit "five star."  I'm going to go
19   once -- I'm going to hit refresh, see if anyone's there.  All
20   right.  One more.  480 number.
21         MS. MEDLEY:  Laura Medley on behalf of myself, Your
22   Honor.
23         THE COURT:  Alrighty.  Good morning.
24         Here's a 205 number.
25         MS. MEDLEY:  Good morning.

1            THE COURT:  And another 480 number.

2            MS. MERCURIO:  Good morning, Your Honor.  This is Liz

3   Mercurio with the Law Offices of Scott Griffiths, representing

4   a member of the TCC.

5            THE COURT:  Okay.  Good morning.

6            MR. EARLY:  Good morning, Your Honor.  This is Val

7   Early in Birmingham.  I had myself on mute there for a minute,

8   representing Tracey Grissom.

9            THE COURT:  Alrighty.  Good morning.

10            MR. EARLY:  It's good.

11            THE COURT:  Alrighty.  I believe I have covered

12   everyone.  I will check this again shortly to make sure that I

13   haven't missed anyone.  But I know we're covered for now, so

14   why don't I turn this over to debtor's counsel?  Good morning.

15            MR. BROOKNER:  Thank you, Your Honor.  Good morning.

16   Jason Brookner, again, from Gray for the debtor.

17            We have a variety of things happening today.  And so

18   if it's okay, what I think I'd like to do is make a proposal to

19   Your Honor about the order of operations, if you will.  Okay.

20   And then we'll take our cues from you as we go.

21            THE COURT:  All right.

22            MR. BROOKNER:  So we do have the two motions set for

23   today, the 9019 motion by the debtors and the Committee, the

24   TCC's motion for structured dismissal.

25            THE COURT:  Uh-huh.

1           MR. BROOKNER:  In addition, we also have scheduled

2    two other motions that were objected to by the TCC, the motion

3    for a fifth interim DIP financing order, as well as a motion to

4    extend exclusivity.

5           THE COURT:  Okay.

6           MR. BROOKNER:  So -- and there's also a motion in

7    limine that was filed two days ago, and there have been some

8    back and forth on those, and I assume you want to take those

9    up.  So what the debtors and the Committee would propose are

10   the following.  With respect to DIP and exclusivity, those can

11   just be taken up as part of the overall evidentiary

12   presentation mixed in with, if you will, the rest of the

13   evidence.  The debtor's key witness for that is Mr. Perry, who,

14   as everybody knows, is unavailable today.  He's testifying

15   Tuesday.

16          THE COURT:  Oh, I didn't know that.

17          MR. BROOKNER:  Oh, okay.  I thought you knew that,

18   Your Honor.  Yes.  We had -- so there are a few key witnesses

19   that are unavailable today: the debtor's witness, Mr. Perry,

20   the TCC's expert, Mr. Atkinson, and Mr. Lefkowitz.

21          THE COURT:  Ah, okay.

22          MR. BROOKNER:  Those witnesses are all coming on

23   Tuesday.

24          THE COURT:  Alrighty.  I --

25          MR. BROOKNER:  Which is our next day.

Barton - Direct/Zluticky                         14

1          THE COURT:  Okay.  I heard -- the best description of

2    what it is to be a bankruptcy judge I've heard recently, and it

3    is that you walk into a dark room, and every now and then

4    someone flicks the lights open, ah --

5          MR. BROOKNER:  Right.

6          THE COURT:  -- and you kind of see it, and then they

7    flick it off, and then that's all I know.  And then it goes on.

8    Anyway, okay.

9          MR. BROOKNER:  Okay.

10          THE COURT:  So that works.

11          MR. BROOKNER:  So what I would suggest is, at least

12    with respect to the DIP motion and the exclusivity motion,

13    those just kind of be combined in with everything else, and

14    we'll deal with those at closing based on that.

15          THE COURT:  Okay, okay.

16          MR. BROOKNER:  Then I would suggest, Your Honor, we

17    start with the motion in limine filed by the TCC.  And then

18    after that, we have our openings.

19          THE COURT:  Okay.

20          MR. BROOKNER:  And I would submit or suggest or

21    request that we do debtor, UCC, TCC as an order of openings.

22          THE COURT:  Right.

23          MR. BROOKNER:  And then we would get to the

24    witnesses, and I believe we have two witnesses today,

25    Mr. Barton from the creditors' committee.

```
 1                THE COURT:  Okay.

 2                MR. BROOKNER:  And I believe Mr. Griffiths from the

 3    TCC.

 4                THE COURT:  Okay.

 5                MR. BROOKNER:  And I don't know how that wants to go.

 6    I don't know who's going to go first on that.  And then we'll

 7    deal with everything else on Tuesday because no other witnesses

 8    are here for today.

 9                THE COURT:  Okay.  And I've got a 5 hard stop, so

10    we're going to -- I proceed -- we've got to just work until 5.

11    If we're going to take a break for lunch, it's going to be, you

12    know, 35 minutes, you know, it'll be grab a sandwich and we're

13    going to get right back to work.

14                Folks, get comfortable.  I don't care if you want to

15    nibble on something in the courtroom.  Just take it out with

16    you.  We're just going to work until we can keep going.

17                MR. BROOKNER:  And then I just wanted to remind Your

18    Honor, I probably didn't have to, but at one of the immediately

19    prior status conferences when we talked about timing for today,

20    Your Honor limited the parties to 30 minute -- the key

21    parties to 30 minutes each --

22                THE COURT:  That part, I remember.

23                MR. BROOKNER:  -- for opening.  Okay.  Okay.  All

24    right.  Very well, Your Honor.

25                THE COURT:  No, got it.  Thank you.
```

Barton - Direct/Zluticky                                16

1              MR. BROOKNER:  Thank you, Your Honor.

2              THE COURT:  Alrighty.

3              MR. BROOKNER:  So if you're on board with that, I

4    guess we move to the motion in limine.

5              THE COURT:  Well, let me just make sure --

6              MR. BROOKNER:  Okay.

7              THE COURT:  -- everybody's okay with kind of

8    proceeding.  I'm assuming -- and I'll say this for the record,

9    the motion, your 9019, their structured dismissal, exclusivity,

10   it all kind of -- we ought to just do everything at one time.

11   I don't care what order it is.  I'm not going to extend

12   exclusivity and then do a structured dismissal or do something

13   weird like that.  I ought to decide everything at the end of

14   the close of the evidence because I suspect that's the

15   evidentiary basis for it all.

16             So I do agree.  Maybe we can take up the motion in

17   limine and then take up openings and then put on the witnesses.

18   I don't care what order we go in there.  But maybe after the

19   motion in limine opening, then we can talk just housekeeping in

20   terms of docs that are in evidence and how parties wish to

21   proceed.

22             MR. BROOKNER:  That's fine for the debtors and the

23   Committee.

24             THE COURT:  Okay.

25             MR. BROOKNER:  The debtor and the Committee.

Barton - Direct/Zluticky                    17

1          THE COURT:  And I don't care about the openings in

2     terms of I suspect -- since your side is seeking the settlement

3     first, then I suspect your side should go.  So debtor, UCC, and

4     then I'll let TCC.  You know, I've got to get my acronyms

5     right, Tort Claims Committee, yeah.  I'll let the TCC go from

6     there.  But it will essentially all be the same, you know,

7     opposition for that, your request for a structured dismissal.

8     Okay.

9          MR. GOODMAN:  It's perfect from our side, Your Honor.

10          THE COURT:  Okay.  Alrighty.  So why don't we then

11     take a --

12          MR. GOODMAN:  I think we're the movant on the motion

13     in limine.

14          THE COURT:  You are.  You're get to go first on that

15     one.

16          MR. GOODMAN:  Gotcha.  I'll turn it over to my

17     colleague, Mr. Moxley.

18          THE COURT:  You got it.

19          MR. MOXLEY:  Good morning, Your Honor.  Cameron --

20     Good morning, Your Honor.  Cameron Moxley of Brown Rudnick,

21     co-counsel for the TCC, Judge.

22          Your Honor, we filed a motion in limine, and the

23     issues on that, Your Honor, we -- I would just draw your

24     attention, there's an annex to that that provides sort of --

25          THE COURT:  I did.  I read it.

Barton - Direct/Zluticky                    18

1          MR. MOXLEY:  You have?  Thank you, Your Honor.  I
2     think the argument, it essentially boils down to this, Judge.
3     There were a lot of questions that we asked of the debtor and
4     TCC's group of attorneys related to the process of the
5     investigation, the facts that were revealed to them by the
6     investigation, analysis that was undertaken, conclusions that
7     were reached, basic questions like what did you rely on in
8     determining, you know, to support the settlement motion.  And
9     at every turn, as the annex lays out, there were instructions
10    not to answer.

11          We're not here today, Judge, respectfully, to argue
12    about whether or not that material was actually privileged or
13    whether or not those instructions were proper.  I will say to
14    Your Honor, we don't think those -- that those questions went
15    to privileged information, and we don't think those
16    instructions were proper.

17          But that aside, what we're here on, Judge, is given
18    the instructions were given, and given the witnesses didn't
19    answer those questions, our view, respectfully, is that the
20    case law is clear, as laid out in our briefing, that you then
21    can't turn around and ask the witnesses those same questions
22    and elicit at the trial that same information that you shielded
23    from discovery.

24          If it turns out that the debtor and the TCC aren't
25    going to ask those questions, then maybe there's not an issue.

Barton - Direct/Zluticky                          19

1    But it seemed to us, from reading the way in which the

2    opposition to the motion to dismiss was framed, that that is

3    exactly what they intend to do.  They intend to rely on the

4    fact that an investigation occurred, that a mediation occurred,

5    that they did all of this work, and for -- and on the basis of

6    all of that work, they've reached the following conclusions.

7           Well, Judge, if we're not allowed to understand basic

8    information, for example, we asked the chief restructuring

9    officer, Mr. Perry, who was the debtor's designee, what role

10   did you play in the investigation?  He was instructed not to

11   answer that.  He's the chief restructuring officer, Your Honor,

12   and he was -- his testimony is that he supports and the debtor

13   supports the settlement.

14          So that's what the motion in limine, Judge, is about.

15   It's not about what -- us now untangling whether or not the

16   privilege -- the information we sought was actually privileged

17   or whether the instructions were proper.  It's just the

18   instructions were given.  We are where we are, and so they

19   should be limited, Judge, in what they should be able to

20   present today, Your Honor.  That's it.

21          THE COURT:  Got it.

22          MR. MOXLEY:  That's the motion.

23          THE COURT:  Thank you.

24          MR. MOXLEY:  Thank you, Your Honor.

25          Mr. Kaufman?

Barton - Direct/Zluticky                    20

1          MR. KAUFMAN:  Hello, Your Honor.  Aaron Kaufman for

2    the debtor.  And they stuck me in the back of the room, and

3    it'll help me argue this.

4          I understand and appreciate what Mr. Moxley's saying.

5    I think we just fundamentally disagree on what the law actually

6    is and how it applies to this case.  So let's start with what

7    the law is as it relates to bankruptcy settlements.

8          The law -- and it's cited in our response filed

9    yesterday -- says that a debtor does not have to waive its

10   privilege in able -- in order to be able to carry its burden in

11   demonstrating that the settlement is, as you'll hear from

12   Mr. Barton in a few moments, the UCC chairperson, a fantastic

13   result for creditors.

14         We cited Chassix Holdings, which is a case out of the

15   Southern District of New York, where the courts made clear that

16   the parties are not required to waive privilege to obtain

17   approval of settlements.  In Health Diagnostics, also cited in

18   our pleadings, the Court reiterated that a bankruptcy court

19   doesn't need to delve into privilege matters to understand

20   whether a settlement is fair and reasonable and in the best

21   interest of the estate.

22         The TCC has no substantive responses to those cases.

23   They simply want this Court to issue what amounts to a death

24   penalty sanction against the debtor and the UCC before the

25   Court even knows what questions will be asked and what evidence

Barton - Direct/Zluticky                    21

1  will be offered.  This is wholly unsupported by the case law,

2  and it does -- it's wholly unwarranted under the facts of this

3  case.

4          So I want to make clear, I understand Mr. Moxley had

5  one characterization of what questions he thought he asked in

6  the depositions.

7          THE COURT:  Mm-hmm.

8          MR. KAUFMAN:  These are lots of depositions.  We're

9  talking hundreds of pages and tens of hours of depositions.

10         THE COURT:  Folks, if you're on the line, I'm going

11 to ask that you please place your phone on mute.  I'm hearing a

12 little bit of noise in the background, and I just want to make

13 sure that I can hear everyone carefully and not worry about it.

14 It sounds like crunchy noise on the background there.

15         I apologize.  Go.

16         MR. KAUFMAN:  I was trying to make clear, we're

17 talking tens of hours' worth of depositions taken over the last

18 few weeks, hundreds of pages of transcripts.  A simple summary

19 of what questions were asked can't be done in the span of a

20 minute or two.  The Court would actually have to go page by

21 page to see what questions were actually asked and what answers

22 were given or instructed not to be given.

23         No one here -- when the Court actually studies the

24 deposition transcripts, it will be clear that no one was hiding

25 behind the privilege and no one was using the privilege as a

Barton - Direct/Zluticky                              22

1   sword.  But -- and Your Honor, how could that be?  Look at

2   what's actually been produced in this case.  There's no dispute

3   that hundreds of thousands of documents, spanning over 600,000

4   pages of documents, were produced in early December.

5         Then look at what we put on our exhibit and witness

6   list, which was filed on Wednesday around noon.  Of the 73

7   exhibits listed on the debtor and the UCC's joint exhibit and

8   witness list, every single document was produced and, in some

9   cases, reproduced, and again, in some cases, months before that

10  witness and exhibit list was filed.

11        The TCC's invocation of the phrase "sword and

12  shield," which appears many times over the course of these

13  pleadings, simply rings hollow, Your Honor, when you consider

14  the law cited in our response and the actual facts of this

15  case.

16        So let me step back for just a moment so the Court

17  has a more complete understanding and context before we talk

18  about what's in the deposition transcripts.

19        THE COURT:  No, just -- why don't we just talk

20  about -- I don't need to get into the specifics.  I just need

21  to know kind of -- they're saying you're going to come in and

22  argue that -- you know, you're going to try to hide behind

23  privileged information in a deposition and then you're going to

24  try to say that you relied on it in connection with the

25  subject.  Right?  That's the gist of it.

Barton - Direct/Zluticky                                23

1          I've gone through all the exhibits.  I've read

2   carefully everything that you've said.  What's the response to

3   that?

4          MR. KAUFMAN:  The specific response is we don't think

5   there will be an instance of a question that we intend to ask

6   our witnesses where that witness was instructed not to respond.

7   We're talking about, again, we limited our response to

8   production to a tiny subset of documents, less than 300, and

9   said these are the documents that we relied on.  These are the

10  documents we think are most relevant to the motion.  And the

11  TCC had an opportunity to put those in front of our witnesses

12  and ask questions, and they chose not to.

13         And as the TCC pointed out in their response, their

14  reply filed last night, and I agree, Mr. Zluticky even pointed

15  out, it is not our job to tell you how to ask your questions.

16  All we can do is look at the questions that you asked and

17  decide you're getting into privilege here.  You can't do that.

18         THE COURT:  All right.  So I'm going to just note

19  decisions on whether to grant motions in limine really are

20  discretionary, and I'm relying on Fifth Circuit case laws such

21  as Thomas v. Ameritas Life Insurance Corp., 34 F.4th 395 (5th

22  Cir. 2022) case.  Right?

23         So really the question then becomes in bench trials

24  whether it would create prejudice or confusion.  I think in a

25  bench trial setting, I'm comfortable allowing the process to

Barton - Direct/Zluticky                              24

1    proceed, but -- because I can -- I'll know if it's being used

2    or not as a shield and a sword, and I can deal with this.  All

3    right.

4              Motions in limine, when you look at Wright & Miller,

5    you know, really designed to prevent prejudicial evidence to a

6    party that's seeking, right, to exclude it from tainting a

7    jury, if you will.  But I think as the fact finder here, I'm

8    comfortable that I can, in the absence of true prejudice, up

9    front.

10             So I'm going to deny the motion in limine, but it's

11   without prejudice of someone coming in and saying, Judge,

12   they're not doing exactly what I said.  And the reality is, is

13   that I'm going to be weighing this really carefully.  This is

14   an important motion, right?  The life of the case itself, one

15   way or the other, relies on the evidence presented here.  And

16   so I think everyone would benefit from a very robust and

17   transparent process.

18             Again, I told you how bankruptcy judges and what we

19   know, and I'm only going to judge these decisions based upon

20   what I hear in the courtroom.  And so, you know, we'll see

21   where this goes.

22             But I get where you're going, Mr. Moxley.  If it

23   turns out, you know, I reserve the right to kind of make --

24   take this up at a different time, but it's without prejudice to

25   anyone's ability.  But I'm going to -- we'll see where this

Barton - Direct/Zluticky                    25

1    goes.

2         If they're telling me they don't think it's going to

3    happen, but, you know, someone just comes in and says -- I'm

4    using an extreme example, I'm not saying you're going to do

5    this.  But if someone were to come in and argue, you know, that

6    they relied on the advice of counsel in connection with the

7    settlement and that's really what they're really relying on,

8    right, it becomes really easy for me to decide that one, like

9    really easy, because I've got to make hard decisions.

10        So we'll see where things go.  But I don't know what

11   the evidence is going to be presented before me, and let's just

12   take it up and see where it goes.

13            MR. MOXLEY:  Thank you, Your Honor.

14            THE COURT:  All right.

15            MR. BROOKNER:  Thank you, Your Honor.

16            THE COURT:  All right.  Again, for the folks on the

17   line, there is someone definitely with your line open.  I'm

18   going to mute the entire line if I keep hearing it.  If you're

19   wearing AirPods, it may be you.  If you have headphones or

20   something, it may be you.  I'm just trying to make sure that we

21   can all hear each other.  That was you.  I'm muting the line.

22            AUTOMATED VOICE:  Conference unmuted.  Conference

23   muted.

24            THE COURT:  And parties, I'll unmute your lines in a

25   minute.

Barton - Direct/Zluticky                              26

1          Okay.  Let's proceed.

2          MR. BROOKNER:  I think we're ready for openings, Your

3    Honor.

4          THE COURT:  Mm-hmm.  Let's go.

5          MR. BROOKNER:  Thank you.  Good morning, Your Honor.

6    Again, Jason Brookner from Gray Reed for the debtor, along with

7    my colleagues, Aaron Kaufman, Amber Carson, and London England.

8    And if it's okay, I'd like to request that Ms. Carson at the

9    counsel table have -- you know, be designated as the operator

10   so she can put some slides up for us.

11         THE COURT:  You got it.

12         MR. BROOKNER:  All right.  Your Honor, when we first

13   saw you about a year ago, I told you how our firm had no

14   historical involvement with the debtor until very shortly

15   before this case was filed, that we took our fiduciary duties

16   seriously, that we would execute those duties to the best of

17   our abilities.  And as we sit here or stand here today, as the

18   case may be, we believe that we've done that.

19         The backdrop of this case is important because it's

20   very unlike many other cases that have come to your courtroom.

21   We understand being the debtor and its counsel.  We've always

22   understood that the debtor's creditors are real people with

23   real claims, both in contract and in tort, and we want to put

24   actual dollars into actual pockets as soon as humanly possible.

25   That has always been our goal and that is consistent with

Barton - Direct/Zluticky                                27

1   everything I've ever said to you in any hearing that we have

2   had.

3           And that, Your Honor, is why we are here today,

4   because along with the UCC, and I'm going to refer to the

5   Unsecured Creditors' Committee, of course, as the UCC, and the

6   Tort Committee will be referred to as the TCC, and I think

7   everybody is going to use that terminology today.

8           So the debtor and the UCC today are poised to jointly

9   deliver over $54 million in value to this estate, and following

10  approval, excuse me, of this settlement from Your Honor to get

11  cash into the pockets of real people as soon as possible.

12  Others, however, would prefer to have that bird in the hand set

13  free.  They'd allow it to fly away into a black hole of

14  litigation chaos with questionable timing for resolution, if

15  ever, and questionable results, if any.

16          Now, during trial, Your Honor, you're going to hear

17  testimony and you're going to see documents indicating that

18  some people did things that might be characterized as bad

19  things between the end of 2021 and the time of the divisional

20  merger in May of 2022.  And, yes, there were transfers that

21  were made that were inappropriate.  There were other actions

22  taken and other things done that were inappropriate.  And all

23  of that was uncovered by both the debtor and the UCC in their

24  respective investigations.

25          But all of that, Your Honor, was long before this

1  Chapter 11 case was filed.  Remember, the divisional merger,

2  which the evidence will show was an alternative to a Chapter 11

3  filing, occurred in May of 2022.  And the Chapter 11 case

4  wasn't filed until nine months later, which was a year ago,

5  just about a year ago, a little bit more, February of 2023.

6         And the Chapter 11 case, the evidence will show and

7  you'll see, was filed as a last resort and only on the cusp of

8  a receiver being appointed in Missouri State Court.  That does

9  not make this case a bad faith filing.  In fact, it's not even

10 a close call, Your Honor.  It was not a litigation tactic to

11 file.  The filing was not preordained, and the filing was not

12 prearranged.

13        It is not bad faith to file for Chapter 11 in order

14 to liquidate estate claims, centralize claims against the

15 debtor into one forum, into a collective proceeding, and then

16 maximize the value of those claims that the debtor has plus

17 whatever other assets the debtor has for distributions to

18 creditors.  NRA makes that clear, meaning the NRA case makes

19 that clear.  The Little Creek case makes that clear.  And

20 Little Creek's progeny made that clear.  It is a valid

21 bankruptcy purpose to use Chapter 11 to satisfy valid claims

22 against the estate, and that's exactly what we are doing in

23 this case.

24        THE COURT:  I'm going to tell you, Mr. Brookner, the

25 case has already been going on for a while.  So the concept of

Barton - Direct/Zluticky                                   29

1    dismissing it as a bad faith filing, I think is probably not

2    the way I think about the world.  I think I view the world as

3    either I approve this settlement or nothing left to do but

4    either convert or dismiss this case because the case -- I'm not

5    letting the case continue, right?  So this is the shot.  And so

6    it just seems to me that dismissal may be kind of a function,

7    like Judge, don't approve the settlement, and as a result,

8    there's nothing left to do but dismiss this case.  It's the

9    orderly way to get out of it.  And I don't think I need to get

10   into it.

11          I don't think -- if I don't approve the -- if I

12   approve the settlement, I think it's one way of viewing the

13   world.  If I don't approve the settlement, then I think I don't

14   even need to look at the Little Creek.  I can just look to

15   administrative insolvency.

16          MR. BROOKNER:  Well, maybe, Your Honor.

17          THE COURT:  But I'm just --

18          MR. BROOKNER:  I mean, we'll have to --

19          THE COURT:  I'm just telling you.

20          MR. BROOKNER:  We'll have evidence about that.  I'm

21   going to get to that as part of my opening.

22          THE COURT:  No, I'm just -- no, I got it.  But I'm

23   just telling you the way I'm viewing the world.  This -- we're

24   deciding all issues here now.  And there will -- and so that's

25   the -- those are the questions that I'm running through my

Barton - Direct/Zluticky                              30

1   mind.  But I got it.  I don't have evidence of administrative

2   insolvency, but I got a good feeling about it.

3            MR. BROOKNER:  Okay.

4            THE COURT:  So I think -- I don't think this is kind

5   of an NRA-type case.  This is a -- more of what the U.S.

6   Trustee told me.  It's time for this case to either reach its

7   eventual course or we've got to come up with something.  That's

8   the way I'm viewing the world.  And I'm not trying to skew

9   anybody's presentation.  It's just the way I think where it

10  kind of -- it's kind of where we are.

11           MR. BROOKNER:  I could not agree with you more, Your

12  Honor.  And, in fact, I had just finished giving you my good

13  faith speech, if you will.  And I'm going to get into some of

14  those issues as I proceed.  So if it's okay, rather than

15  respond now, I'd like to kind of stick with where I'm going.

16           THE COURT:  Sure.

17           MR. BROOKNER:  And then I'm happy to answer questions

18  or have a colloquy with you, Your Honor.

19           THE COURT:  No, no, no.  Absolutely.

20           MR. BROOKNER:  Okay.  So Your Honor, the debtor

21  believes when all the evidence is presented and the evidence is

22  closed and we've had closing arguments and all the views have

23  been heard, you're not going to have a choice but to approve

24  the 9019 motion.

25           There's $54 million of value to the estate.  That's

Barton - Direct/Zluticky                              31

1  what's in creditors' best interests.  Dismissal and sending

2  everybody black -- everybody back to this black hole of

3  litigation that's up on the screen is the worst possible things

4  for creditors.

5             THE COURT:  What if that's what they want?  How do I

6  view the world in that sense?

7             MR. BROOKNER:  That's what who wants?  That's what

8  the tort committee wants.

9             THE COURT:  Well, that's what I'm asking.  That's

10 what I'm asking.  So if -- what do I do if that's what they

11 want?

12            MR. BROOKNER:  If that --

13            THE COURT:  In other words, how do we balance?

14            MR. BROOKNER:  That's what the tort committee wants.

15 That's not what the unsecured creditors' committee wants.  And

16 that's not what the people want who filed joinders in respect

17 of the 9019 motion, who are sophisticated creditors, who are

18 owed over $75 million face amount of money, who have been

19 litigating with the debtor for more than five years,

20 approaching ten years, and they're begging Your Honor to not

21 send them back to court.  They don't want to go there, Your

22 Honor.

23            THE COURT:  Is there --

24            MR. BROOKNER:  And if those people --

25            THE COURT:  But then, why are we bringing the tort

1   folks along with that?  If those creditors want to settle, then

2   why don't they just settle?

3           MR. BROOKNER:  Because this is a global settlement.

4   This is not a one-off, two-off, three-off settlement.

5           THE COURT:  Okay.

6           MR. BROOKNER:  This is a global settlement.  It's a

7   package deal.  It's all or nothing.

8           THE COURT:  What's the standard that I should use to

9   evaluate in connection with this case?

10          MR. BROOKNER:  The settlement motion?

11          THE COURT:  Mm-hmm.

12          MR. BROOKNER:  Can we -- do we have those slides,

13  please?  Can we move to the settlement slides?  That's the

14  Jackson Brewing case and its progeny, Your Honor.

15          THE COURT:  All right.  But how do I view business

16  judgment, sound business justification kind of with a non -- in

17  other words, is it the same thing?  I've been thinking about

18  this, and I want to think about it out loud.  Is the standard

19  9019?  How do I view that?  Do I look at things differently

20  when there's an insider transaction, an insider?  Do I think

21  about it differently if there's a defunct debtor?  You know

22  what I mean?  It's what's business judgment -- what are the

23  sound business justifications when I'm faced with these

24  situations?

25          You know, I think it's different than debtor settles

Barton - Direct/Zluticky                 33

1   with third party, two parties come in, so we want to have a

2   9019.  I settle my litigation for X.  We do that all day, sound

3   business justification.  But a global settlement involving

4   insiders on an entity that has no operations, how do I --is it

5   Jackson Brewing, or is it Jackson Brewing with a closer eye?

6   In other words, do we -- when we do sales, do we look a little

7   different when it involves insiders, or is it just -- is that

8   still the standard?

9           MR. BROOKNER:  So I think, Your Honor, we're not

10  talking about a sale where an insider for the company is buying

11  assets.

12          THE COURT:  But that's who's really getting out of

13  the deal.

14          MR. BROOKNER:  Yeah, that's what they're getting out

15  of it.  But remember, Your Honor, you've got an unsecured

16  creditors' committee who's a fully independent fiduciary third

17  party.

18          THE COURT:  Mm-hmm.

19          MR. BROOKNER:  We also have a chief restructuring

20  officer who's an independent third party.  Those people

21  together have made these decisions, okay, not the insiders, not

22  the settling parties represented by Ms. Hayward.  They were on

23  the other side of the deal, okay, a mediated deal --

24          THE COURT:  Mm-hmm.

25          MR. BROOKNER:  -- with former Judge Sontchi.  And is

Barton - Direct/Zluticky                                    34

 1  he -- should I refer to him in this court as judge or mister?

 2              THE COURT:  You know, I don't know.  They never

 3  taught me that in baby judge school how I'm supposed to refer

 4  to folks who've retired.  I don't know the answer either.

 5              MR. BROOKNER:  Then we'll call him Mr. Sontchi.

 6  Mr. Sontchi did it, okay?  And it was dealt with by the

 7  independent fiduciaries in this case.  It's their decision.

 8              And so I would submit to Your Honor that the proper

 9  standard is the Jackson Brewing standard.  It's the business

10  judgment standard, Jackson Brewing, Foster Mortgage, and all of

11  their progeny.  That's the standard.

12              THE COURT:  They're going to come in and tell me that

13  this is basically sub rosa.  So how do I respond to that?  I

14  mean, it's coming, right?

15              MR. BROOKNER:  Of course.  Of course.  That's

16  actually next on my list, Your Honor.

17              THE COURT:  Yeah.

18              MR. BROOKNER:  It's next on my list.

19              THE COURT:  I'm out of the way.

20              MR. BROOKNER:  Okay.

21              THE COURT:  So essentially, you're packing this in

22  because you don't want to do it in a plan.  That's what's

23  coming, right?

24              MR. BROOKNER:  Okay.  So let's talk.

25              THE COURT:  You don't want to put this to creditor

Barton - Direct/Zluticky                    35

1   vote.

2          MR. BROOKNER:  Let's talk.  Let's talk.

3          THE COURT:  Is that -- how do we deal with that?

4          MR. BROOKNER:  Let's talk about that.  First of

5   all --

6          THE COURT:  I got questions for them too.  I'm just

7   kind of getting them all out now.

8          MR. BROOKNER:  Man, I am happy to answer your

9   questions.  You know that.  Your Honor, I'll banter with you

10  all day long.

11         THE COURT:  So no, I'm just trying to get it out

12  because this is an important issue.

13         MR. BROOKNER:  So look.  So let's talk about --

14  because the U.S. Trustee raises this sub rosa issue, okay?

15         THE COURT:  Mm-hmm.

16         MR. BROOKNER:  There's two elements that are

17  interrelated here, okay?  The sub rosa issue with -- let's call

18  it the separation issue.  If you remember when we came to you

19  the first time, we had a plan that encompassed the settlement

20  and we were going to do it all at the same time.

21         THE COURT:  Mm-hmm.

22         MR. BROOKNER:  You remember that, right?

23         THE COURT:  Mm-hmm.

24         MR. BROOKNER:  We decided based on what we were

25  hearing -- what we were kind of gleaning from Your Honor, and

Barton - Direct/Zluticky                          36

1   what we were hearing from other third parties, what we decided

2   collectively, the debtor with the Committee, was to separate

3   everything, to have a settlement hearing on full notice so

4   everybody could have their day in court, make their arguments,

5   be heard, and then following what we hope was approval, put

6   that into a plan and yet again give everybody their day in

7   court on full notice to come in and be heard and object and say

8   what they needed to say.

9           The settlement, okay, doesn't deal with

10  distributions.  It doesn't deal with classifications, okay?

11  There are certain releases that are contemplated as part of the

12  settlement, but they are subject to a plan.  There's nothing

13  sub rosa about this settlement.

14          THE COURT:  Okay.  Help me understand how that works.

15  And honestly, just generally, I've been trying to figure out

16  how that settlement and what's the difference between the

17  settlement -- the release that I would approve in connection

18  with the settlement and then what would be subject to the plan?

19          MR. BROOKNER:  So the settlement as a whole is

20  subject to the plan because once the money comes in -- or let

21  me rephrase, once the settlement is approved, we have to then

22  pivot to a plan process in order to have the money come in and

23  the releases go out and all of the consideration get whacked up

24  and distributed in connection with a global claims resolution

25  process.  We can't do that as part of a settlement.

Barton - Direct/Zluticky                    37

1          THE COURT:  But what would people be voting on in

2   connection with the plan?  That's the part that I've just --

3   mechanically, I just -- I --

4          MR. BROOKNER:  People are going to vote -- people are

5   going to be voting on what they always vote on.  They're going

6   to be voting on classification.  They're going to be voting and

7   objecting to releases and indemnifications and other

8   provisions.

9          THE COURT:  If I approve the releases here, how could

10  they --

11         MR. BROOKNER:  They're -- but it's subject to the

12  plan.

13         THE COURT:  That's the mechanical part that I'm still

14  not following.

15         THE COURT:  That's the mechanics.  You're approving

16  the influx of -- theoretically, you're approving the influx of

17  money effectively today and the settlement of the estate's

18  causes of action in exchange for that future influx of money.

19  There's also a DIP financing element to the settlement.

20         We then will go back to our neutral corners.

21  Hopefully, collectively, the three groups of us, the three

22  fiduciaries, will sit down if we have to have Mr. Sontchi come

23  back in again and help us, and we will then work on both the

24  distribution scheme and the claims reconciliation scheme.  And

25  all of that will hopefully be baked into what the debtor is

Barton - Direct/Zluticky                              38

1  optimistic will be, a consensual Chapter 11 plan for Your Honor

2  to take up at a confirmation hearing.

3          That's the process and the procedure that we are

4  contemplating.  And I hope that that clarifies it.

5          THE COURT:  No, no, no, it did.  It did.

6          MR. BROOKNER:  Okay.

7          THE COURT:  No more questions.  I'm going to stay

8  quiet.

9          MR. BROOKNER:  You know, this is good, Your Honor.  I

10  mean, you're making me bounce around, and I don't want to sit

11  down and have you --

12          THE COURT:  No, no, no.

13          MR. BROOKNER:  -- have questions that aren't

14  evidentiary that I can help you understand no.

15          THE COURT:  Those are the ones.  Those are the -- as

16  I think about kind of the evidence as it's going to be

17  presented, I wanted to know what stand -- legal standard you

18  think I need to be thinking about and then kind of how the

19  mechanics of what I'm asked to approve versus kind of what

20  they're asking me to do.  That was the -- those are the two

21  balancing factors, and you've answered the question.  So thank

22  you.

23          MR. BROOKNER:  Okay.  And I was actually right in

24  line with the way my outline is going, so --

25          THE COURT:  Perfect.

1            MR. BROOKNER:  -- thank you for doing it at that

2    point in time.

3            All right.  So now, let's talk about the motion and

4    the hearing, the settlement motion, the other side of the coin,

5    if you will, which is the dismissal motion, and the hearing

6    today and on Tuesday.  The evidence will show, Your Honor, that

7    the TC's case does not hold water.  It just doesn't.  What

8    you're going to hear from the TCC's own expert is that he

9    doesn't know whether dismissal is in the best interest of

10   creditors.  He doesn't know.  That was his deposition

11   testimony, and that's what he's going to say when he gets in

12   the box.

13           And if he was here today, we could have opened and

14   closed this case one, two, three.  We could have put him on.

15   He would have said that.  We could have been done.  But now we

16   have to wait, unfortunately, until Tuesday.

17           Regardless of what Mr. Atkinson says or doesn't say,

18   there is plenty of other evidence that's going to support

19   granting the 9019 motion and denying the motion to dismiss.

20   And for that, let's first turn to the Code, because we know, I

21   know you know, we start and we end with the language of the

22   Code.  That is the foundation for everything that you do and

23   that we do and that we all collectively need to do today and on

24   Tuesday.

25           So let's start.  There we go.  Ms. Carson put it up

1   on the screen.  We're going to start with Section 1112.  The

2   TCC seeks a structured dismissal under Section 1112.  And

3   Section 349, which we'll get to in a minute, talks about the

4   effects of dismissal.  Okay.

5            THE COURT:  Mm-hmm.

6            MR. BROOKNER:  So you're a plain language kind of

7   guy.  Let's talk about some plain language.  Work with me here.

8   Okay?

9            THE COURT:  Mm-hmm.

10            MR. BROOKNER:  The words structured dismissal don't

11   appear anywhere in the Code or anywhere in the rules.  It's a

12   made-up concept.  We both know that.

13            And the Supreme Court talked about it in <u>Jevic</u>.  In

14   Section 1121, excuse me, 1112(b)(1), it's clear that the Court

15   has two choices under that section.  It can convert or it can

16   dismiss.  And if there's a showing of cause for dismissal --

17   but first of all, there has to be a showing of cause to

18   dismiss.

19            THE COURT:  Mm-hmm.

20            MR. BROOKNER:  If there is a showing of cause, the

21   Court must make a sister finding that dismissal is in the best

22   interest of creditors.  I can tell by your nodding that, at

23   least for now, you appear to agree with me on my reading of

24   Section 1112.

25            I would respectfully submit to Your Honor that there

Barton - Direct/Zluticky                    41

 1  is no cause here.  First of all, there's no administrative

 2  insolvency.  We have a settlement in hand that will provide

 3  more than sufficient funding to cover administrative expenses.

 4  And regardless, we also have causes of action that can be

 5  pursued on a contingency fee basis, some of which are really

 6  good causes of action.  And they will recover perhaps as much

 7  as $30 million just by themselves, which will render this case

 8  more than administratively solvent.  We'll have a tremendous

 9  cushion for that to be the case.

10          So when we're talking about the plain language, we

11  know what cause is because there's an outline of what cause

12  includes.  And the only cause that the TCC has cited for

13  dismissal of this case that's listed in the statute is

14  administrative insolvency.  The other element of cause, if you

15  will, because the listing in the statute is just including,

16  it's not exclusive, it's exemplary, if you will, the only other

17  cause they say is that this is a bad faith filing.  That's it.

18          So we've already, I think, subject to the evidence,

19  dispatched with the whole bad faith thing, right, because

20  you're either going to dismiss or not dismiss, or you're

21  either -- let me rephrase.  You're either going to approve the

22  settlement or not approve the settlement and then potentially

23  dismiss the case.  We don't need to get to the bad faith stuff.

24  We just talked about that two minutes ago.

25          So the only thing that they have to rest on is

Barton - Direct/Zluticky                             42

1   administrative insolvency for purposes of cause.  But let's

2   assume for the sake of argument that they're right.  Let's go

3   there.  Let's assume that they're right we're administratively

4   insolvency.  We submit they're not right, but that's -- we're

5   making an example, okay?  So if that's the case, before you can

6   dismiss, you still have to find that dismissal is in the best

7   interest of creditors.

8            So what do those two words, "best interest," mean?

9   They're not defined in the Code.  Remember Warner Wolf from New

10  York growing up --

11           THE COURT:  I do.

12           MR. BROOKNER:  -- on TV, sportscaster?  He used to

13  say, let's go to the videotape, right?  So let's go to the

14  videotape, Your Honor.  The videotape here, because it's not in

15  the Code, is Webster's Dictionary or some other type of

16  dictionary.  I like Webster's.  The word "best," as defined in

17  Webster's, it's defined as a superlative of the word good.  It

18  means excelling all others or the most or the largest or the

19  most favorable.  That's best.  The word "interest" means an

20  advantage or a benefit.  Plain language, Webster's Dictionary.

21           And so if you put that all together, the term "best

22  interest" means what is the best outcome or the most favorable

23  outcome for creditors and what gives them the greatest benefit.

24  And that's the question.  And I have to say it again, Your

25  Honor, when you are faced with approving this settlement or

Barton - Direct/Zluticky                    43

1  sending everybody back into the chaos of a litigation black

2  hole, it's not even a close question.

3       Taking the money and working collaboratively with the

4  other two constituencies on a distribution and claims

5  reconciliation process is by far the better outcome and

6  infinitely, quote, "more favorable."  For the record, I'm

7  giving you air quotes now.  It's more favorable because that's

8  what gives creditors the greatest benefit.  And for that, you

9  don't have to look any further than the joinders that were

10 filed by the RMSC plaintiffs represented by Mr. Patterson, who

11 is here, at Docket Number 1399, St. Luke's at Docket Number

12 1377, Saint Alphonsus at 1382, and Capital Regional Medical

13 Center and the Curators at Docket Number 1392.

14      Mr. Patterson, as you know, represents some tort

15 claimants in a case pending in New York.  And the other three

16 joinders together that I just referenced represent claims in a

17 face amount of about $75 million.  Those joinders, all of them,

18 beg Your Honor not to send people back to the black hole of

19 litigation.

20      And here's what's important.  You're dealing in those

21 cases or those joinders with people who are well-heeled with

22 experienced, sophisticated counsel.  And they're saying, Your

23 Honor, we don't want to spend any more time.  We don't want to

24 spend any more money.  We've been spinning our wheels.  We've

25 been going around and around and around.  We have nothing to

Barton - Direct/Zluticky                              44

1    show for it.  What you have here with this settlement is a

2    concrete amount of money.  Maybe it's not the best, but it's

3    certainly not the worst.  It's down the middle, and we want

4    that.

5           And we will then go back to our neutral corners

6    later.  And if we have any independent, direct third-party

7    claims, we'll pursue those claims.  But let's get something

8    into people's pockets now rather than sending them back to

9    spend more time and more money and have more brain damage

10   trying to chase effectively their tails.

11          THE COURT:  How much is -- I know there's been a lot

12   of going back and forth about -- how much would actually go

13   back out into people's pockets when you back everything out?

14   What's the evidence going to show, the mechanics?

15          MR. BROOKNER:  Well, there's give or take, for the

16   settlement, $40 million in cash.  Okay.  The more time that we

17   deal with the TCC and motions to dismiss --

18          THE COURT:  I'm just talking if I approve the

19   settlement, how much money would go out, projected?

20          MR. BROOKNER:  There will be $40 million about in

21   cash that comes in that, put inside admin expenses, is ready to

22   go out the door, plus we have ERC credits.

23          THE COURT:  Yeah, but that's what I'm trying to

24   figure out.  Like, in other words, back out the admin, back of

25   the envelope, how much money are people counting for?

Barton - Direct/Zluticky                                    45

1            MR. BROOKNER:  Look, I can't back out the admin

2    because, you know, I don't know how much they're spending and

3    how much we're spending in response.

4            THE COURT:  So then -- but then how do I then gauge

5    how much value creditors are actually going to receive?  I've

6    got to -- there's got to be some measure of value for me to

7    understand.

8            MR. BROOKNER:  All right, well, then, let's put some

9    numbers on it.  I think the numbers we had on it and the

10   evidence is going to show it, and Mr. Perry is not here so I

11   can't ask him.  But I believe we had --

12           THE COURT:  I won't hold you to it.  I'm just trying

13   to get a sense --

14           MR. BROOKNER:  Right.

15           THE COURT:  -- of back of the envelope kind of where

16   we are.

17           MR. BROOKNER:  I believe we had about $12 million to

18   $15 million or so ballpark.  Is that right?  I'm looking behind

19   me.  For admin claims?  That was about the ballpark, okay?  And

20   we estimated a little high because --

21           THE COURT:  No, no, no.  I got it.

22           MR. BROOKNER:  I think it was the TCC had counsel

23   and --

24           THE COURT:  Let's just say there's $15, $17 --

25           MR. BROOKNER:  Okay.  So let's just say 15.  Let's

Barton - Direct/Zluticky                                    46

1   just put a number on it, okay?  That's 15 million from 40.

2   What's the math on that?

3           THE COURT:  25.

4           MR. BROOKNER:  25.  I'm sorry, it's from 54, Your

5   Honor.  Okay?  So do the math on that.  So you take 15 off.

6   We're at 39.

7           THE COURT:  Mm-hmm.

8           MR. BROOKNER:  Okay.  And then you layer back onto

9   that the ERC credits, which could be any place between $10 and

10  $20 million.  There's a question because the IRS has taken a

11  long time.  They have some offset rights.  But it's someplace

12  in that range.  Let's call it 10 to be -- make it easy.  Now

13  we're at 49.  Okay?  And there are other causes of action that

14  the estate has that are not being released, which haven't been

15  valued exactly right yet.  There's some preferences.  There's

16  some litigation against the Flacks Group and maybe against some

17  other third parties, which are not subject to the settlement.

18  They're not going anywhere.

19          So at a minimum, based on the math that we just

20  talked about, we're talking about 49 million.

21          THE COURT:  How does the mandatory -- is there still

22  a mandatory mediation?

23          MR. BROOKNER:  That's the plan that doesn't exist

24  anymore, Your Honor.

25          THE COURT:  Well, that's what I'm trying to ask.  I'm

Barton - Direct/Zluticky                              47

 1  just --

 2              MR. BROOKNER:  No.

 3              THE COURT:  -- I'm asking mechanically.  Just there

 4  were -- I'm going back to things I said before and now kind of

 5  going in.  So how does the settlement work now that was

 6  different than the last deal?

 7              MR. BROOKNER:  Well, because the last time it was

 8  baked in with the plan.

 9              THE COURT:  Right.

10              MR. BROOKNER:  And we were doing it all together.

11  But the plan, that plan doesn't work for any variety of

12  reasons.  That's why we separated everything out.  And we know

13  once you approve this settlement, we have to go back to the

14  other room with the tort committee, with the creditor's

15  committee, probably with Mr. Sontchi to figure out what the

16  claims reconciliation process looks like.  Is it similar to

17  what we had before?  Is it 180 degrees different or is it

18  someplace in between?  That's an open question that we just

19  don't know the answer to.

20              THE COURT:  Okay.  No, no, no.  That's fair.  That's

21  what I'm trying to understand.

22              MR. BROOKNER:  And I'll tell you, we understand the

23  tort committee wants to give their respective constituents

24  their day in court.  We get that.  We're not fundamentally or

25  philosophically opposed to that.  Okay?  The question is, what

Barton - Direct/Zluticky                                48

1  does it look like?  What are the contours that go around that

2  and how does it work?  And that's what we have to sit down and

3  talk about after you approve the settlement.  It's not part of

4  what we're doing today and Tuesday.

5              THE COURT:  Okay.

6              MR. BROOKNER:  Good?

7              THE COURT:  Mm-hmm, mm-hmm, mm-hmm.

8              MR. BROOKNER:  Okay.  You are right.  You're tracking

9  with me because this is exactly my outline.  This is great.

10 Okay.

11             All right.  We talked about the statute a little bit,

12 the language.  And then you look at Section 349, which talks

13 about the effects of dismissal.  And first, 349 also doesn't

14 have the word structured.  It's very simple.  It just says

15 dismissal.  And we can go to Webster's to see what "dismissal"

16 means.  Dismissal means the act of dismissing or the fact or

17 state of being dismissed, to reject, to put out of action, to

18 refuse to hear.  Okay?

19             And 349(b) says unless you order otherwise in

20 connection with dismissal, there's a litany of things in the

21 statute that happen, none of which are contained in the TCC's

22 motion or form of proposed order.  None of them.  You know what

23 349(b) says.  You dismiss cases.  You know what it says.

24 Nothing that they're asking you for is in 349(b).  And what the

25 statute says is what's in 349(b) happens unless you say it

1    doesn't happen.  That's what the statute says.

2              So when you look at that, you look at _Jevic_, and then

3    another recent case where Your Honor just gave a ruling,

4    _SmileDirect_, structural dismissal case.  Your Honor took _Jevic_

5    seriously, and what you said in _SmileDirect_ was I've got

6    opposition here.  If I had unanimity and everybody was on board

7    rowing in the same direction, I would do this.  But people are

8    opposing it.  I don't have unanimity in the creditor

9    constituency, and I'm not going to structurally dismiss this

10   case.  And you converted the case.  Right?

11             That's what we have here, Your Honor.  You don't have

12   unanimity.  A structural dismissal is a no-go.  It's not

13   permissible.  And there's nothing close to unanimity here.

14             You have one committee that represents a very

15   distinct and specific constituency asking you for something

16   that the other committee that represents all of the creditors

17   in this case, opposes.  And we have the various joinders.

18             So let's stop with the Bankruptcy Code and let's

19   focus on settlement.

20             THE COURT:  Mm-hmm.

21             MR. BROOKNER:  And let's go to Rule 9019.  Now,

22   neither the Code nor the rules, and this is what we talked

23   about just a few minutes ago, neither the Code nor the rules

24   have any true guidance for Your Honor as to what you need to be

25   looking at and thinking about when approving a settlement.  And

Barton - Direct/Zluticky                                    50

1  you did it when you were over here.  You've done it when you

2  were over there.  But we'll go through it again.

3       We have to go to the case law.  That's the videotape

4  for this particular issue.  And the case law is Jackson

5  Brewing.  That's the magisterial mother of all settlement

6  cases.  It came down in 1980 from the Fifth Circuit.  And for

7  40 years, 40 years, Your Honor, everybody's filed this case in

8  the Fifth Circuit.  Everybody.  And the standard has remained

9  the same and unchanged for 40 years.

10      To approve a settlement, Your Honor must evaluate

11 three factors, the probability of success in the litigation

12 with due consideration for the uncertainty in fact and law;

13 number two, the complexity and likely duration of the

14 litigation and any attendant expense, inconvenience, excuse me,

15 inconvenience and delay; and number three, and I quote, "all

16 other factors bearing on the wisdom of the compromise."  And

17 when Your Honor does that, as I know you know, you're not

18 conducting a mini-trial on the merits of the proposed

19 settlement.

20      You also don't have to take evidence.  You're allowed

21 to use your personal knowledge and your own common sense and

22 experience.  You don't have to take evidence to know that no

23 one has litigated and no court has ever issued a definitive

24 ruling on whether a Texas divisional merger is a fraudulent

25 conveyance, or whether it can otherwise be avoided, never mind

1  a focus on success or liability.  No one has cited to you any

2  such rulings in the papers, because you can bet if it existed,

3  we would all know that.

4          And the Court doesn't have to take any evidence to

5  know that any litigation like this that I just talked about to

6  attempt to unwind a divisional merger will be complicated to

7  the nth degree, will be painfully expensive, painfully time-

8  consuming with a very uncertain outcome.  And the only thing

9  that's certain from that litigation, Your Honor, is that it

10  will be appealed by one or the other or both parties until the

11  end of time, until the end of the appellate road, which means

12  more time, more money, more uncertainty, years of additional

13  complex, time-consuming, and expensive appellate litigation.

14          When we talk about the third factor, Jackson Brewing,

15  other factors bearing on the wisdom of the compromise, courts

16  have broken that down into two parts, as I know you know.

17  That's Foster Mortgage, Cajun Electric, and other cases, right?

18          First, the paramount interest of creditors with

19  proper deference to their reasonable views.  And second, the

20  extent to which the settlement is the product of arm's length

21  bargaining and not fraud or collusion.

22          Well, the second factor we already talked about,

23  because you asked me about insiders a minute ago, and I gave

24  you the answer.  We have a settlement that was put together at

25  a mediation with Mr. Sontchi, who was leading the charge, with

Barton - Direct/Zluticky                                    52

1   two independent fiduciaries to the unsecured creditors'

2   committee, and Mr. Perry, as the debtor's representative from

3   Ankura Consulting, with all of the other settling parties in

4   the other room, represented by their own counsel, Ms. Hayward,

5   and Mr. Gluck was there as well, and Mr. Perry, as I think Your

6   Honor knows, has made every operative decision for the debtors

7   since this case was filed, not Mr. Lefkowitz, not anybody else;

8   Mr. Perry, with, of course, the advice of counsel.

9          For anyone to contend that the settlement is not

10  arm's length would be frivolous at best.  Not that I'm

11  suggesting Your Honor was asking frivolous questions, but the

12  contention would be frivolous.  So now let's talk about the

13  paramount interest of creditors.  Let's go back to the first

14  prong of other factors bearing on the wisdom of the settlement.

15  We're talk -- we're in Foster Mortgage now.  We left Jackson

16  Brewing.  We're in Foster Mortgage interpreting the third prong

17  of Jackson Brewing.  You're with me, right?

18          THE COURT:  Mm-hmm.

19          MR. BROOKNER:  Okay.  So talking about paramount

20  interest, we've already talked about how Webster's defines the

21  word interest.  We've already done that.  It means advantage or

22  benefit.  We talked about that in connection with Section 1112.

23          Now let's talk about the word paramount.  Paramount

24  means, quote, "superior to all others or supreme."  If you put

25  those together, the question Your Honor has to answer, and we

Barton - Direct/Zluticky                                    53

1   think the answer is yes, is, is this settlement superior to all

2   other options?  And here, and again, you and I talked about

3   this a little bit a minute ago, there's really only three

4   options.  You can approve the settlement and we move forward

5   and we get through a plan process and all that; number two, you

6   don't approve the settlement and you dismiss the case; or

7   number three, which I think is an extraordinarily low

8   probability, somewhere between slim and none, is you deny both

9   motions and you send everybody back to figure out next steps.

10  I think that's a very low probability of happening.  But those

11  are the three options that are realistic that we have.

12          As we talked about earlier, and I know it's been

13  weighing on Your Honor for quite a while now, we've been here a

14  year.  We've been dancing and toying for a year and we cannot

15  continue to live like this.  The creditors don't want to live

16  like this.  The professionals don't want to live like this.

17  Your Honor doesn't want to live like this.  It's just not fair.

18  It's just not a good place to be.

19          So that makes, like I just talked about, option three

20  a non-starter, meaning deny both motions and let us go figure

21  something out.  We can't realistically do that.  We've got to

22  get to the end of the road.

23          As to dismissal, Your Honor, we would also submit to

24  you it's a non-starter.  And that's if for no other reason than

25  what I just talked about a minute ago, which is the $75 million

Barton - Direct/Zluticky                    54

1  in claims, Mr. Patterson's clients, or tort claimants, we're

2  saying to you, please, judge, please don't send us back to

3  litigation chaos.  And that's also, by the way, what Ms. Funk

4  wrote in her papers.  I think she coined the term litigation

5  chaos.  I want to give her due props for that.

6          Nobody who has counsel wants that.  And if people

7  with counsel don't want that, how do you think it's going to

8  play with the pro se claimants who don't have counsel?  And

9  there's a lot of them.

10          THE COURT:  Right, but what you're essentially

11 arguing is really, you know, do I put people back to what the

12 federal judicial system actually provides for, right, or

13 courts, right?  It's not litigation chaos.  It's just kind of

14 what you get if there were no bankruptcy case, right?  That's

15 really what I'm asking for.  I get the coinage of the term

16 litigation chaos, but it's really just sending you back from

17 what --

18          MR. BROOKNER:  From what you get.

19          THE COURT:  -- the law already provides, right?

20          MR. BROOKNER:  Okay.  That's it.

21          THE COURT:  But I'm not sure that's chaos.  It just

22 is what it is.

23          MR. BROOKNER:  That's fine.  I can stop with chaos.

24 I kind of liked it.  That's why I used it.

25          THE COURT:  No, I get it.

1          MR. BROOKNER:  But we can go back.  Ms. Carson will

2  put the black hole back up on the screen because that's what it

3  is.  It's a black hole.  It might not be chaos.  That's fine,

4  Your Honor.  I don't have to use that word.  But it is a black

5  hole.  And that's what people are telling you.  Like, we want

6  to get out of this black hole.  There's no end in sight.  We

7  don't want to be here.  We want to be here in this court.  We

8  want the money.

9          THE COURT:  I've got one more question for you, and I

10  know I took a lot of your time.

11         MR. BROOKNER:  You're fine, Your Honor.

12         THE COURT:  How then does -- there are a number of,

13  obviously, folks who are affected by what we may do here that

14  are incarcerated, how do I think, as I think through the

15  evidence and what the settlement proposes, how do I think about

16  individuals who are incarcerated and the rights that they may

17  or may not be impinged upon because of what I decide in

18  connection with the settlement?

19         MR. BROOKNER:  Well, I don't --

20         THE COURT:  I'm just thinking about how to think

21  about it.  I'm thinking about all these things, and I --

22         MR. BROOKNER:  Right.

23         THE COURT:  -- want to know how do I think about

24  that.

25         MR. BROOKNER:  So let me ask you a question, if I

Barton - Direct/Zluticky                                    56

1    might.  Can I play the devil's advocate?  What rights do you

2    think you would be impinging on by approving a settlement which

3    is subject to a plan that has yet to be filed?

4              THE COURT:  I don't know.

5              MR. BROOKNER:  Right.

6              THE COURT:  That's why I'm asking.  I'm telling you,

7    it's -- I'm the flick-the-lights guy, remember?

8              MR. BROOKNER:  Of course.

9              THE COURT:  You're the ones that know more --

10             MR. BROOKNER:  Sure.

11             THE COURT:  -- so I'm asking you.

12             MR. BROOKNER:  I would submit to you, Your Honor, the

13   settlement doesn't affect anybody's rights.  The only thing

14   that it affects is the estate's claims and the people who are

15   paying money.  To the extent there are any individual rights

16   that might be affected at some point, that's a plan issue, and

17   you can bet your bippy, pardon my colloquialism, that the tort

18   committee is going to be all over that.  They're going to be

19   all over that.

20             And we will deal with that in due course once you

21   have approved the resolution of the estate's claims, not

22   anybody else's claims, the estate's claims.  That's all we're

23   talking about with the settlement, the claims that I have as

24   the debtor, that they want, by the way, as part of the

25   structured dismissal, and they haven't complied with Louisiana

Barton - Direct/Zluticky                     57

1  World and all that, but that's just -- we don't have to talk

2  about that.  We'll deal -- that's a legal issue for later.

3           THE COURT:  Okay.

4           MR. BROOKNER:  All right.  So coming back to power

5  managers of creditors, it means all creditors, as I think Your

6  Honor knows, not just a specific subset of creditors, be they

7  pro se creditors, represented creditors, tort creditors, or

8  contract creditors, or others.  It's all creditors.

9           Now, I'm getting to the end here, Your Honor, and I

10 appreciate you bearing with me.

11          THE COURT:  Yes, you've got four minutes, and I'm

12 hoping.  I know I've taken some of your time.

13          MR. BROOKNER:  No, I've got -- I'm -- oh, no.

14          THE COURT:  I've given you some time back, though,

15 from my questions and everything.

16          MR. BROOKNER:  No, that's okay.  I'm going to move

17 quick.  I've only got two paragraphs to talk about that are

18 left, two concepts.  The first one is that you're going to hear

19 that the settlement falls well within the range of

20 reasonableness from what the debtor and the Committee believe

21 the claims might otherwise be worth.  Were they to be

22 litigated?  Accounting, of course, for everything that goes

23 with that, which is time, money, unknown results,

24 complications.  You've got to take a discount for all that.

25 You have to.

Barton - Direct/Zluticky                                 58

1          You can't say, oh, claims are worth $100 million, we

2    should get $100 million, without accounting for all the

3    discounts that you have to take as part of litigation.  $100

4    million doesn't just magically show up.  $87 million doesn't

5    magically show up.  You've got to go get it.  You've got to

6    spend time and money.  You have to fight with people.  You've

7    got to discount for that.  There's uncertainty in fact and law.

8          And Your Honor, the 54 million, all the evidence

9    seems to show is that it's within the range of reasonableness.

10   It's not the best.  It's not the worst.  It's someplace in the

11   middle.  And the settlement -- and by the way, you're going to

12   hear testimony from Mr. Atkinson that when he goes back and

13   readjusts the debtor's numbers from the disclosure statement,

14   which is kind of off menu at this point, but from the

15   disclosure statement, the last one we filed, that he sees the

16   global claims pool as being someplace between $137 and $185

17   million.  And he says that's the money that you should be

18   getting, which, again, doesn't take any discounts for risk,

19   time, uncertainty, et cetera.

20         But if you look at that just on its face, you take

21   the midpoint, which is about 155 million, you look at the

22   settlement of 54 million, which, by the way, again, doesn't

23   account for other assets, doesn't account for ERC credits,

24   doesn't account for other litigation.  We're talking just about

25   the settlement.  There's more to be had than just the

Barton - Direct/Zluticky                          59

1   settlement.  But if you look at a settlement of 54 million and

2   you take the midpoint of their expert's number, which is 155

3   million or thereabouts, you're talking about a third.  Pretty

4   good.  Pretty good.

5            So Your Honor, that's all I have to say about that.

6            THE COURT:  Thank you.

7            MR. BROOKNER:  Thank you for your time.

8            THE COURT:  Thank you.

9            I'll hear from the Committee.

10           MR. HEMENWAY:  Good morning, Your Honor.

11           THE COURT:  Good morning.

12           MR. HEMENWAY:  Zach Hemenway for the Unsecured

13   Creditors' Committee.

14           Your Honor, our creditors have been waiting a year

15   for this moment.  They've watched an investigation, multiple

16   mediations, and a case that's gone in directions that no one

17   expected, directions that have delayed progress and increased

18   administrative costs.

19           Now, finally, the Court is going to hear evidence and

20   tell them what's going to happen to them.  Are they going to be

21   helping us put together a plan that decides how the estate will

22   distribute at least $54 million?  Are we going to send them out

23   the door of this courthouse to go, as Your Honor alluded to,

24   back where they started?

25           Neither of these alternatives is perfect, and neither

Barton - Direct/Zluticky                                    60

1  is going to result in a path where creditors are made whole for

2  their injuries.  But this case has to move toward a resolution.

3  And when we look to the Bankruptcy Code and the applicable law,

4  the two fundamental questions before the Court today is whether

5  the $54 million is enough to settle the claims, the estate's

6  cause of action, and whether approving that settlement would be

7  in the best interest of creditors.  UCC believes that the

8  answer to both questions is yes.

9          But before I get into all that, I want to talk for a

10  minute about the creditors in this case.  Because regardless of

11  any of the disagreements we may get into today, I know that we

12  can all agree that, as Your Honor said, the life of the case

13  itself will be decided here, and that decision will have a

14  dramatic impact on all of the creditors and their chances at a

15  meaningful recovery.

16          The creditors in this case have suffered.  The

17  financial harm that Corizon wrought is significant, and many of

18  the creditors are members of a vulnerable population,

19  incarcerated individuals, whose injuries go well beyond the

20  financial.  There are claims based on wrongful death, abuse.

21  We're talking about serious physical and emotional injury

22  impacting these people and their entire families.  These are

23  injuries that are difficult for the civil justice system to

24  address, even in the best of circumstances.

25          And these are not the best of circumstances.  We're

Barton - Direct/Zluticky                           61

1    dealing with a failing company that was purchased by investors

2    who decided to loot it and start over.  We have insurance

3    policies that are designed not to address claims, but to

4    minimize cost of coverage.  And we have creditors who spent

5    years before this case even started chasing what felt like a

6    moving target.

7           The end result is that whatever decision the Court

8    makes on these pending motions, creditors are going to continue

9    to feel frustrated, exhausted, and even outraged, and they're

10   going to be justified in feeling that way.

11          We're all here on behalf of those frustrated

12   creditors, and we're all trying to find the best way to get

13   them compensated.  The UCC believes the settlement provides

14   that path.

15          Now, I'm going to start by going through what's in

16   dispute in the settlement, and then I'll talk about why the UCC

17   and creditors believe that it's a strong value for the causes

18   of action that are property of the estate.  I'll also cover

19   what the settlement motion is and isn't, and then I'll talk

20   briefly about why dismissal would be catastrophic for many

21   creditors.

22          Now, I want to address, before I get into that, a

23   couple questions Your Honor raised.  You asked what the

24   standard that's applicable here, and I think it's clear it's

25   Jackson Brewing plus the Foster Mortgage factors.

Barton - Direct/Zluticky                                    62

1          And as to whether or not there's any specific

2    attention on the fact that this is a settlement with insiders,

3    I think there's no question that it is.  That's the second one

4    of the Foster Mortgage factors.  We do look at whether it's an

5    arm's length transaction, and we have to look more closely when

6    the settling parties are insiders.

7          The other question Your Honor asked is -- or the

8    other thing Your Honor raised is the fact that this is

9    different, maybe, than a routine settlement that Your Honor may

10   see, or maybe you asked the question of that.  I would say it

11   absolutely is.  A global settlement like this carries a lot

12   more importance, covers a lot more.  I mean, this is the max,

13   this is the majority of the estate's assets in this case.  So

14   we think it is different, and that's why we wanted to have this

15   hearing that focuses entirely on it, rather than trying to get

16   it into a situation where we're conflating issues between a

17   plan and a settlement.

18         So let's start with what's in dispute in the

19   settlement.  There's objections that have all kinds of rhetoric

20   and things like that, but none of that really has any bearing

21   on the analysis, and the creditors shouldn't have to watch

22   admin fees being spent on attorneys calling each other names.

23         When we focus on what matters, the substance, the

24   only true dispute here is whether the settlement amount

25   provides sufficient value for the estate causes of action,

Barton - Direct/Zluticky                                  63

1   specifically those that arise out of the divisional merger.

2   There's no dispute on what those causes of action are.  Where

3   the UCC and TCC fundamentally disagree is on two aspects of

4   those causes of action, how viable they are and how valuable

5   they are.

6            Now, Rule 9019 simply says the Court can approve a

7   compromise after a hearing, and since that's all it says, we

8   look to Jackson Brewing and Foster Mortgage.  And the Court

9   doesn't have to decide who's right, the TCC or the UCC.  This

10  isn't a mini-trial on the merits.  Instead, we look to all

11  those factors to evaluate whether the settlement is reasonable.

12           So the Court will hear evidence today and next week

13  on these causes of action, all the causes of action against

14  settling parties that are going to be released in the

15  settlement.  And there's no dispute about what causes of action

16  are being released.  It's all of them.  It's right there in the

17  agreement.  If and only if the settling parties pay the full

18  amount, all causes of action against them that are property of

19  the estate will be released.  The TCC has tried to inject some

20  ambiguity as to what claims fall within that legal definition,

21  but they aren't arguing that the settlement doesn't cover all

22  causes of action.

23           Your Honor asked about the people who went out of the

24  settlement, and I think it's important to note that the

25  settlement won't prevent claimants from pursuing direct claims

Barton - Direct/Zluticky                    64

1    against third parties.  It is only the estate causes of action

2    that are in the scope.

3          The settlement motion that's before Your Honor

4    identifies all causes of action that we believe have any

5    material value.  Each of the potential causes of action that

6    the TCC has talked about in its opposition and its motion to

7    dismiss, including successor liability, was considered by the

8    UCC and the debtor in deciding to enter into the settlement,

9    and they're outlined in the settlement motion.

10         THE COURT:  You're settling the fraudulent transfer

11   litigation, essentially is what you're settling.

12         MR. HEMENWAY:  Correct.

13         THE COURT:  So no one's going to try -- in other

14   words, if I approve this settlement, no one can then challenge

15   to seek to try to unwind the divisional merger.  That's really

16   the effect of --

17         MR. HEMENWAY:  Yeah, I would say that is considered

18   an estate cause of action under Fifth Circuit law.

19         THE COURT:  Yeah, yeah.  Okay.

20         MR. HEMENWAY:  So I'm going to go through the causes

21   of action that are there.  We are settling the fraudulent

22   transfer litigation or cause of action, as Your Honor alluded

23   to.  There's also $31 million in pre-divisional merger

24   fraudulent transfers.  You haven't heard a lot about those

25   because they're not really in disagreement.  The TCC and UCC

Barton - Direct/Zluticky                    65

1    are on the same page there.  So I'll touch on those briefly.

2            There's $1 million that went to pay debts for

3    Pharmacorr, another company Paragon owned, $5.5 million that

4    went to Geneva, which is an insider entity, and $24.5 million

5    that Isaac Lefkowitz and M2 LoanCo took from the company.

6            Each of these counterparties challenges those

7    characterizations, and they say they have defenses, but we

8    don't really need to get into that here, because all of the

9    fiduciaries agree these claims have significant merit.

10           There also isn't any disagreement about whether that

11   $31 million figure would have to be discounted in value for

12   settlement analysis.  The Jackson Brewing factors that are

13   outline in Cajun Electric make it clear the Court has to

14   consider things like complexity, duration, and risk.

15           Here, the battle that creditors fought for years pre-

16   bankruptcy, and those that we fought in this case, suggests

17   that the cost of pursuing those could be significant, and there

18   may be a contingency fee arrangement if they were going to be

19   pursue.  Collection risks also may be higher there, given that

20   we're dealing with defendants who are experienced litigators

21   and experienced in moving money around.

22           So that brings us to the claims arising out of the

23   divisional merger.  As I said at the outset, that's where we

24   and the TCC aren't on the same page.

25           Actually, the debtor, UCC, and TCC all disagree with

Barton - Direct/Zluticky                                66

1   one another on these potential causes of action.  The UCC

2   believes that the estate has a valid cause of action against

3   YesCare and its owners based on a fraudulent transfer theory,

4   as Your Honor alluded to.

5          The debtor doesn't think this cause of action has

6   much material value.  They think it would be a challenge to

7   show the divisional merger constitutes a transfer within the

8   meaning of Section 548 because of the language in the Texas

9   statute.  And they also say that -- they also have concerns

10  because YesCare is going to say that the debt it took on in

11  that deal makes the deal fair.  They're also, of course, as

12  Mr. Brookner alluded to, concerned that no court has held a

13  divisional merger transaction to be a fraudulent transfer.

14         Now, we at the UCC, we acknowledge those concerns,

15  but we still believe this claim would have a chance of success

16  because it would put the transaction in a recognizable

17  bankruptcy context, a fraudulent transfer avoidable under

18  Chapter 5.  The images under Section 550 would likely be

19  calculated as the value of YesCare at the time of the

20  divisional merger, so we had our financial advisors look at

21  trying to figure out what that number might be.  As you'll hear

22  on Tuesday, they tried to run method -- they tried multiple

23  methods coming up with that, and they came up with a value

24  ranging from 0 to 75 million.

25         So to summarize, the UCC thinks the fraudulent

Barton - Direct/Zluticky                                67

1    transfer avoidance action has merit, but it comes with

2    significant litigation risk costs and complexity, and the

3    damages would be a challenge to prove and would cap out at $75

4    million.

5           The TCC doesn't really agree or disagree with this

6    analysis, Your Honor.  It hasn't engaged much on the fairness

7    of the divisional merger transaction except in its high-level

8    discussion of its motives, and its financial expert isn't going

9    to come here and tell you a value for YesCare as of May 22nd --

10   May 2022, or any other date.  Instead, the TCC has focused on

11   successor liability and alter ego.

12          The TCC's opposition is centered around three key

13   points.  First, they contend the debtor in the UCC didn't

14   consider successor liability.  Second, they contend those

15   claims are a slam dunk.  And third, they contend that the

16   settlement value for those claims exceeds $100 million.  But

17   none of these assertions withstand scrutiny.

18          This is where the rubber meets the road in the case

19   and in considering the settlement.  The TCC says we didn't

20   consider successor liability, and they pointed to some out-of-

21   context deposition testimony from last week.  But they know we

22   evaluated those claims.  It's right there in Paragraph 46 of

23   the motion.

24          As to the merits, they're telling us it's a slam dunk

25   because one magistrate in Michigan allowed a plaintiff to

Barton - Direct/Zluticky                    68

1    substitute CHS Texas as a party.  And they tell us these claims

2    are not only valuable but collectible because YesCare got a

3    contract in 2023 that has a high revenue number.

4            That's just not enough to make pursuing these claims

5    anything more than a serious gamble.  And there are ample

6    reasons why pursuing this cause of action would be a roll of

7    the dice.  First, pursuing successor liability here would

8    require viewing the divisional merger as a nullity and ignoring

9    the business organization's code.  It is untested, theoretical.

10   It's a novel claim that epitomizes the uncertain litigation

11   described in Jackson Brewing.

12           Second, you can't have successor liability without

13   liability.  This means that for this cause of action and only

14   this cause of action, it's not so much about the value of the

15   assets that were transferred.  It needs liability for the

16   underlying claim, then followed by a novel theory of recovery.

17           And then finally, to the extent this cause of action

18   is seen as viable, our investigation raises questions about its

19   value.  Our financial advisors looked at YesCare's financials

20   through the bankruptcy filing, the debtor's bankruptcy filing,

21   and they didn't see anything to suggest that the financial

22   analysis that they had done for May 2022 had significantly

23   changed.

24           The TCC views these claims, on the other hand, with

25   unbridled optimism.  So much so, it views their value as equal

Barton - Direct/Zluticky                            69

1   to the projected allowed claims of the entire creditor pool in

2   this case.  But even under the TCC's view, $54 million would be

3   reasonable.

4           The TCC's expert has suggested the total claims pool

5   would maybe 136 to 187 million, and that's prior to any

6   adjustment or discount for litigation risk, cost, or

7   settlement.  Given that we're talking about claims that would

8   be the first of their kind, that would require showing a

9   liability and present multiple collection unknowns, the $54

10  million settlement falls within the range of reasonableness

11  even under the TCC's view.

12          Additionally, I mentioned the Foster Mortgage

13  factors.  We need to talk about those, and they provide further

14  support for the settlement.  The first goes back to what I said

15  at the outset, the interest of creditors with proper deference

16  to their reasonable views.

17          The TCC has told us what its members think.  It also

18  has told the Court that those are the views of every tort

19  claimant in the case, and that those views mean that creditors

20  don't support the settlement.

21          There's two problems with that assertion.  First, the

22  UCC includes two tort claimants, and it unanimously supports

23  the settlement.  Second, the TCC's perspective completely

24  disregards the views of non-tort claimants.  These are

25  creditors that have filed more than $100 million in

Barton - Direct/Zluticky                           70

1  contract-based claims.  If it's a bad settlement, Your Honor,

2  they're getting less money, and if dismissal would lead to a

3  pot of gold, they had the resources and ability to get their

4  share of it.

5        The TCC cannot downplay or ignore the views of the

6  creditors who fully support the settlement, and that includes

7  two groups that filed joinders in this case that I'd like to

8  talk about briefly.  The first is St. Luke's Health System.

9        As my colleague, Mr. Zluticky, alluded to, the Court

10  will hear from David Barton today.  Mr. Barton is deputy

11  general counsel for St. Luke's, and he became chair of the UCC

12  at the outset of this case because Mr. Nguyen, the United

13  States Trustee, asked him to.  St. Luke's is a creditor because

14  it took care of incarcerated individuals' medical needs under

15  contracts with Corizon.  When it became time for Corizon to pay

16  its bill, it refused.  Though it fought Corizon in court for

17  years, St. Luke's still hasn't been paid any of the $31 million

18  it seeks.

19        Another group that filed a joinder is the RSMC

20  plaintiffs.  These are women who are incarcerated at Rose M.

21  Singer Center, which is part of Rikers Island in New York, who

22  have filed claims based on mistreatment and abuse perpetrated

23  by a member of Corizon's clinic staff.  One of the RSMC

24  plaintiffs, Latricia Revell, has been a member of the UCC from

25  the outset.  The RSMC plaintiffs have filed proofs of claim

Barton - Direct/Zluticky                           71

1    totaling $20 million relating to that lawsuit.

2              St. Luke's, Ms. Revell, and the rest of the UCC were

3    unanimous in voting to support the settlement, and they remain

4    unanimous in asking the Court to approve it.  These UCC members

5    are aware of the TCC's theories about successor liability,

6    alter ego, and the supposed pot of gold at the end of a long

7    litigation rainbow.  Yet, they are supporting the settlement

8    and asking the Court to approve it.  The Court should give

9    proper deference under Foster Mortgage to these views, which

10   are more than reasonable.

11             As the other point that the Fifth Circuit gives us in

12   its guidance, the UCC's support and my presence here

13   demonstrates that this is an arm's-length transaction.  There

14   is no love lost between the UCC and the settling parties.  We

15   fought them tooth and nail to get the evidence we needed to

16   push that settlement number as high as possible.  Your Honor

17   saw multiple motions to compel as part of that effort.

18             The parties seeking a Chapter 11 trustee used my

19   deposition of Mr. Lefkowitz as their primary evidence of his

20   evasiveness, and the TCC relies on the findings of our

21   investigation when it outlines his wrongdoing.

22             Make no mistake, another area where the TCC and UCC

23   agree is in their view of Mr. Lefkowitz and his colleagues at

24   Perigrove.  What they did was wrong, and it should not be

25   abided.  But those personal feelings cannot supersede the best

Barton - Direct/Zluticky                                72

1  interests of creditors, just as Mr. Barton's personal feelings

2  cannot define or determine what will get St. Luke's the best

3  recovery.  Sometimes you end up settling with your enemies even

4  when those personal feelings can make that really difficult.

5  The fact that UCC members support the settlement despite these

6  feelings is an indication of how strongly they believe the

7  settlement is the best path to a meaningful recovery.

8        It's paramount here that we listen to creditors, and

9  I think the RSMC plaintiffs have described the settlement as

10  well as anyone.  When Mr. Patterson filed their joinder

11  supporting the settlement motion, he referred to the settlement

12  as an imperfect but financially beneficial solution.  That's

13  exactly what it is, and that's why we agree with Mr. Patterson

14  that the settlement is reasonable and should be approved.

15        So that's what the settlement is.  As we're shifting

16  to the motion to dismiss, I want to be clear on what the

17  settlement is not.  It's not a settlement of anything other

18  than estate causes of action.  We've talked about that.

19  Neither the debtor nor the UCC have the authority to settle

20  anything else, and we're not attempting to.  Those causes of

21  action include successor liability and alter ego as a function

22  of Fifth Circuit law in Section 541.

23        As Mr. Brookner alluded to, the settlement is not a

24  plan.  It doesn't contain any plan, and as I stood right here

25  and told the Court in December, if the settlement's approved,

Barton - Direct/Zluticky                              73

1   we're going back to the drawing board and coming before you

2   with a new plan, and we want the input of the TCC, the United

3   States Trustee, and other creditors in that process.

4            I want to move now to the motion to dismiss.  This is

5   a big decision, as Your Honor alluded to.  Dismissal means

6   shaking the etch-a-sketch, making the last year meaningless,

7   and sending all creditors back into the civil court system.

8   And dismissal here would not be in the best interest of

9   creditors.  There's $54 million on the table, and the estate

10  projects an additional 10 to 20 million coming in before the

11  end of the case.

12           Now, there was some discussion about chaos earlier,

13  and I won't speak for Ms. Funk, but I think that what we're

14  talking about here is more than just going back to courts.

15  It's going back to courts and litigating against an entity that

16  isn't solvent.  So the chaos that I think is being referred to

17  is the idea that some creditors might be litigating against

18  Corizon, some against YesCare, some against other entities, and

19  there would be a confluence of theories and litigation all over

20  the place going in all different directions.

21           It's important to understand that the settlement

22  doesn't take away anyone's day in court.  It just means that

23  that day would come here in this Court, and Your Honor asked

24  specifically about the pro se plaintiffs, and I think that is a

25  good point to consider here.  If the case is dismissed, each of

Barton - Direct/Zluticky                    74

1   those pro se plaintiffs is on their own.

2            If the case is here, where everything can be dealt

3   with altogether, things like notices, procedures, those can

4   take into account the unique nature of those creditors, and we

5   can work with third parties to try to make sure that we are

6   implementing a plan and a procedure that does that.  Individual

7   court cases, that may be more difficult.

8            The TCC's proposed solution, on the other hand, would

9   send these creditors just on their way, armed with a

10  complicated theory of recovery, a lengthy row to hoe, and no

11  guarantee that they'll get a dime, even if they are successful,

12  and that's the plaintiffs with the resources to do it.

13           One thing I really appreciated at the outset, Your

14  Honor, was the discussion of dismissal and focusing on the

15  UST's perspective about the case needing to move, rather than

16  all of the, you know, what I'll call noise about bad faith and

17  everything else.  And the reason why I appreciate that on

18  behalf of the UCC is that it really underscores that this case

19  is not a referendum on divisional mergers, and treating it as

20  such disrespects the Bankruptcy Code and every creditor here.

21  These are real people with real claims, and we have an

22  obligation to try to get them as much real money as we possibly

23  can.

24           We think dismissing this case would virtually ensure

25  that every creditor, without significant resources to litigate

Barton - Direct/Zluticky                    75

1  claims, would get nothing at all, and the creditors with those

2  resources would have, at best, an uncertain path to recovery.

3           The settlement is the clear choice for these

4  creditors, and proceeding to get that money in the door and

5  figure out the best way to get it in their hands is the best

6  path here.  The UCC and its members ask the Court to approve

7  the settlement agreement.

8           THE COURT:  Thank you.

9           Before we start, can we just take a five-minute

10 break?  And then we'll -- my goal is -- well, we'll take a

11 five-minute break, I'll hear from you, and then if anyone on

12 the line who filed a joinder wishes to kind of make a short

13 statement -- I need to hear from the, obviously, the United

14 States Trustee, and then we'll kind of break for 30 to 35

15 minutes or let folks get something to eat.  But we'll break for

16 five minutes, and then we'll kind of complete all the openings,

17 and then we'll break for about 30 to 35 minutes.  Thank you.

18           THE CLERK:  All rise.

19       (Recess taken at 12:31 p.m.)

20       (Proceedings resumed at 12:36 p.m.)

21           THE CLERK:  All rise.

22           THE COURT:  Okay.  We are back -- well, not quite yet

23 back.  We'll be back in a minute.

24           Okay.  All right.  We're back on the record in Tehum.

25 Good -- well, I guess it's good afternoon now.

Barton - Direct/Zluticky                          76

1           MR. GOODMAN:  Yeah.  Good afternoon, Your Honor.

2    Eric Goodman, Brown Rudnick, on behalf of the Official

3    Committee of Tort Claimants.

4           We have a presentation to go through, Your Honor, but

5    I've been instructed by, you know, my elders that you always

6    listen to the judge so I'm going to go through just some quick

7    bullet point comments and then try to get to the presentation.

8           THE COURT:  Okay.

9           MR. GOODMAN:  I actually think the presentation

10   covers the material, but you know, I want to try to get to the

11   heart of the matter as fast as I can.

12          The first point is, there is a real dispute here over

13   what estate causes of action are being settled.  And we think

14   that that has a material impact on the value of the settlement.

15   You know, if the debtor is correct in terms of its views on

16   successor liability, alter ego claims, being in the pot, then

17   we think the settlement range is significantly higher, and

18   obviously, what's being offered would fall outside of that

19   range.

20          The next point I would like to make is our view is

21   the settlement was definitely not an arm's length transaction.

22   It is unequivocally an insider deal that's subject to

23   heightened scrutiny.  In our view, what you really have here

24   is, on the one hand, Mr. Lefkowitz, through various parties,

25   who was buying estate causes of action, if you will, for a

Barton - Direct/Zluticky                                    77

1  price, and the party with whom it is negotiating is the debtor

2  who has -- you know is taking the position that that's property

3  of the estate.  And of course, you know from the petition that

4  was filed, Mr. Lefkowitz's signature is there as the sole board

5  member, so this really is a deal by and between Mr. Lefkowitz

6  at its core, which makes it an insider deal.

7          Dismissal, in our view, means that the doors to our

8  justice system open immediately.  I heard statements that

9  appeals would go on forever.  That is just simply not true.

10 When a case is dismissed, an appeal cannot stop the dismissal

11 from going into effect.

12         In fact, I would note Johnson & Johnson appealed the

13 order dismissing its second "Texas Two-Step" case, the LTL

14 decision.  That appeal of the second bankruptcy is currently

15 pending before the United States Court of Appeals for the Third

16 Circuit.  And I believe today litigation is currently going

17 forward against Johnson & Johnson and its affiliates in state

18 court.

19         So dismissal does not mean that we are anchored for

20 years and years with an appeal.  Dismissal means the doors to

21 our justice system open immediately.

22         The creditors, in our view, do not like this plan.

23 They don't like it one bit.  The current deal on the table

24 would propose to allocate $12 million to pay the tort claims.

25 Those tort claims have a face value of $775 million.  I would

Barton - Direct/Zluticky                    78

1   submit to -- just one tort claim, in the -- you know, one of

2   those claims -- personal injury or wrongful death claims in the

3   tort system, if it were to hit punitive damages, could easily

4   exceed, you know, $10 million that would be set aside.

5          I want to make a point very clear, Your Honor.  The

6   money that's being allocated to the tort victims, that's before

7   all the administration costs of the trust.  And you know, based

8   on experience that I have working on behalf of trusts that have

9   been formed pursuant to Chapter 11 plans, those administrative

10  fees can be quite expensive, so you have to assume that there's

11  going to be money that's going to come off of that before

12  there's anything that's distributed to the claimants.

13          THE COURT:  And again, this is going to come as no

14  surprise to anyone that I'm --

15          MR. GOODMAN:  Yeah, go ahead.

16          THE COURT:  I'm hyper focused on distributable value

17  under -- and what creditors will or -- likely to see in a form

18  of a recovery.  So I'm -- and I know I'm pushing people on

19  openings about it, but it -- it's going to be something I'm

20  certainly focused on.  I'm just kind of putting it out there.

21  I kind of want to know, you know, if I approved a settlement,

22  theoretically, I mean, you know, kind of, where do

23  folks -- really to see if we're going to put money in people's

24  pockets, you know, kind of what's -- how much money and -- is

25  actually going to go in someone's pocket?

Barton - Direct/Zluticky                              79

1          MR. GOODMAN:  Yeah.  I mean, from our perspective,

2    we're looking at distributable value probably somewhere in the

3    range of $8 to $9 million to the tort victims if the settlement

4    is approved.  And again, that's to pay claims with a face value

5    of $775 million.

6          Now, I've heard some folks say that they don't want

7    to gamble and go back in the tort system, and my response is,

8    yes, please, we will take the tort system over that settlement

9    every day of the week without hesitation.

10          THE COURT:  How do I deal -- and I know -- how do I

11   think about, kind of, what we all -- what's possible in light

12   of what you said, which is, you know, I, theoretically, could

13   be disapproving a settlement and leaving pro se folks

14   in -- maybe incarcerated pro se out -- you know, out to

15   litigate, you know, and potentially may or may never see a

16   recovery?  How do I balance with, you know, kind of, solid

17   money that's theoretically on the table now, knowing that some

18   folks may never recover or may not have the funds to actually

19   pursue a recovery, and everybody's kind of out there on their

20   own?  How do I balance that?  I'm going to say that.

21          I'm going to ask you the question -- and I meant to

22   say this at the very outset:  Anyone who's looking for me to

23   one way form an opinion on divisional mergers and whether I

24   think they're good or bad, or whether I'm forming a referendum

25   on the mass tort system in the United States, you've got the

Barton - Direct/Zluticky                                    80

1  wrong judge.  I'm going to decide this issue up or down, based

2  upon the law and the facts, and I'm going to take no view one

3  way or the other on those things.  You know, those are -- to

4  me, those issues are for policymakers, not for this Court.

5        So I'm just telling everyone now, the way I'm

6  thinking about the issue before me, I've got a settlement, it's

7  either going to be up or down, based upon the way we think

8  about it.  But one of the things I have to think about is, you

9  know, bird in the hand versus, you know, kind of potentially

10 never providing a recovery for some folks.  And tell me how I

11 should think about that with respect to the tort claimants or

12 anyone else.

13        MR. GOODMAN:  Yeah.  I'll answer it directly.  There

14 is no bird.  There's no settlement.  If the settlement is

15 approved, no pro se claimant will ever receive a penny from

16 that settlement fund.

17        THE COURT:  And why do you say that?

18        MR. GOODMAN:  I'm going to get this into the

19 presentation --

20        THE COURT:  Oh, I should --

21        MR. GOODMAN:  -- but I'm going to --

22        THE COURT:  I should stay quiet, right, and let you

23 do your job.

24        MR. GOODMAN:  Yeah, I will get there.  But I want to

25 answer your question, because the reason is -- and I'll just

Barton - Direct/Zluticky                    81

1    state this from our experience working in the "Texas Two-Step"

2    cases.  I know, to your point, you're -- say it's not a

3    referendum on that, and I wouldn't suggest that this case would

4    be.  But there has never been a "Texas Two-Step" where anyone

5    has gotten paid anything out of the bankruptcy case.  And to

6    think otherwise is to really fundamentally -- a failure to

7    understand what the "Texas Two-Step" really does.

8            So for a -- you know, and I'm going to answer this

9    quite -- because you actually asked the perfect question

10   earlier, which you said, why don't they just settle, right?

11   Why don't the members of the UCC who like this so much, why

12   don't the commercial creditors who just want to settle for a

13   specific dollar amount, why don't they do so, right?  And the

14   answer to that question is because the tort claimants are the

15   bargain for consideration, right?  Mr. Lefkowitz's demand for

16   finality, right -- that's his requirement, right, he needs

17   finality.  If he doesn't get finality from a bankruptcy

18   proceeding, then he doesn't release the money.  So that's the

19   deal that was made, right?  The UCC, his constituency, the

20   commercial creditors, get the money when Mr. Lefkowitz gets a

21   shield that he can then use to protect himself and his

22   operating companies from liability in the tort system.

23           Every time that that has been tried, right, and

24   tried -- you know, run through a bankruptcy proceeding, it has

25   never been successful, right?  The result has either been the

Barton - Direct/Zluticky                          82

1   bankruptcy court has said, I'm dismissing the case.  That was

2   Judge Graham in the case involving 3M, and he's basically said

3   no.  In LTL, Judge Kaplan initially did not dismiss the case.

4   It went up to the Third Circuit.  Judge Ambro wrote the

5   opinion -- the unanimous opinion of the Third Circuit,

6   reversing it.  And we're going to get to this in the

7   presentation, but I would submit that the case law in the Fifth

8   Circuit is even worse for this side on a lot of these issues.

9         So if we were to play this out, we just don't think

10  that there's any path in this bankruptcy case through which any

11  settlement funds would ever flow to any victims.  The only way

12  creditors in this courtroom -- and I'm not just saying this for

13  the tort victims, I'm also saying it for the commercial

14  creditors.  Their only path to recovery is dismissal.  And that

15  has been proven over and over again, in every "Texas Two-Step"

16  case that has ever been filed.  Did I answer your question?

17        THE COURT:  Mm-hmm.

18        MR. GOODMAN:  Okay.  A few more points before I get

19  to the presentation, I also want to point out that if the 9019

20  is approved, there's not going to be a consensual plan.

21  There's just simply not enough value on the table, even if all

22  of it were allocated to the tort victims for them to get, you

23  know, an upvote on -- in this case.

24        What would then happen if the Court were to approve

25  it, is it would obviously lock in the number, right?

Barton - Direct/Zluticky                                         83

1  Mr. Lefkowitz would never go higher, at that point, because

2  you've already told him that the settlement's reasonable at

3  that point.  You would then have contested plan confirmation.

4  As I said, you have claims with a face value of 775 million.

5  We are the majority in terms of value and number.  And of

6  course, you know, it would be a huge effort, but we would make

7  sure that every single, you know, person in the prison

8  population understood fully what was happening to them.  And I

9  can't imagine that all but a handful would, you know, vote yes

10 on something along these lines.

11        The case is administratively insolvent.  None of our

12 fees have been paid at all in this case.  And I point this out,

13 you know, I'm here advocating for dismissal, and you say,

14 Mr. Goodman, why would you do that to yourself?  And my answer

15 is, because it's the right thing.  You know, our fees right

16 now, I think, are tied to, you know, us agreeing, you know, to

17 go along with their scheme, and we're not doing it.

18        The interpretation that was offered to you regarding

19 1112(b) was incorrect.  I don't have the ability to put their

20 slide back on the screen, but I want to point out that cause is

21 what determines whether you convert or dismiss a case.  The

22 issue of best interest doesn't come into play until you're

23 trotting to decide if you want to dismiss or convert.  So just

24 saying we think this is in the best interest doesn't mean that

25 you would deny a motion to dismiss.

1          In fact, cause, based on the Fifth Circuit's decision

2     in Antelope, can arise when you have a filing that is done, in

3     just like this case, where you're trying to take control of

4     litigation claims, define the claims against insiders to become

5     state -- estate causes of action, and then try to settle those

6     out from under the victims.  I think the Antelope case is

7     almost directly on point in terms of what we're facing here.

8          The last point I want to make -- or another point I

9     want to make, is I've heard several references to

10    Mr. Atkinson's testimony, all of which has been inaccurate.

11    Mr. Atkinson basically came in and said there isn't enough

12    information, you know, to value the tort claims and there isn't

13    enough information to value the fraudulent transfer claims

14    involving the divisional merger.  His analysis basically

15    assumed, just for the sake of argument, that the debtors' math

16    was correct in terms of its value of the commercial claims and

17    the tort claim, and then on -- based on that, he was able to

18    offer a value of what the success, reliability, and alter ego

19    claims are.  But the representations made to you regarding his

20    opinions and report have been incorrect.

21          So with that said, any more questions before I go?

22          THE COURT:  No, but I promise if one comes out, I'll

23    spit it out.

24          MR. GOODMAN:  Please do.  I will say one of my many

25    faults is that I began my career as a law clerk to a federal

Barton - Direct/Zluticky                                        85

1  bankruptcy judge in Youngstown, Ohio.  And in some ways, I've

2  never left.  So whenever a judge asks me the question, I have

3  this need to be incredibly candid.

4          THE COURT: .  Right.  And I'll tell everyone:  The

5  reason I'm putting all these questions out is I don't want to

6  be the judge who then waits till the very end and asks a bunch

7  of questions that people should have been thinking about early

8  on in what's going on in my mind, and that could have been

9  answered.  That's literally what's going on.  I'm just trying

10 to be as transparent as possible in the process.

11         MR. GOODMAN:  No, I'd -- I really appreciate that

12 about you and how you've run the courtroom.  I note I did look

13 up your bio before I came down, and I noted that you started at

14 Weil, Gotshal in 2003, which was about the time I started Jones

15 Day on the company side, so it's possible that you and I were

16 drafting first-day motions at roughly the same time.  But in

17 any event, let me move on.

18         The way that we frame this case, we think that, you

19 know, the issue that is presented to the Court is as follows.

20 I'm going to read this presentation and then just talk about it

21 for really the next, you know, 20 minutes, or however long

22 you'll have me at the podium.

23         The question our view is this:  Can a tortfeasor, any

24 company that has caused harm, assign the liabilities that it

25 does not want to pay, here, the tort claims and other

1  disfavored claims, to a new debtor with no actual business at

2  all, the creation of which would trigger various state law

3  remedies, including successor liability, and then put that

4  debtor into bankruptcy, and use the bankruptcy to forever

5  extinguish the disfavored liabilities without the claimants'

6  consent, thus barring the victims from having access to our

7  judicial system?  That is, at its core, what this case is

8  about.  So the question I pose is, can it be done?

9            So let's unpack this.  Who is the tortfeasor?  The

10 tortfeasor is Corizon Health, a company that was in charge of

11 providing healthcare services to various prisons across the

12 country.  Today, Corizon Health is known as YesCare.  YesCare

13 is Corizon.  Corizon is YesCare.  Corizon was, again, as I

14 said, known as -- YesCare was known as Corizon Health until May

15 of 2022.  That's the date of the divisive merger.  Today

16 YesCare continues to operate Corizon Health's business.

17 Essentially, Corizon Health's business was just rebranded as

18 YesCare.

19           How did we get here?  We're here because people died,

20 and I'm going to try to get through the names and do the best I

21 can, but our committee members have suffered a great deal.

22 Their lives were cut short because of Corizon's misconduct:

23 Daniel Allard, Gary Lee Floyd, Tracey Grissom, Daniel J. Hall,

24 Michelle Morgan, Jennifer "Casey" Norred, Scott Snook.  They

25 were all incarcerated, but they were not sentenced to death,

Barton - Direct/Zluticky                                87

1   and unfortunately, they did die because of the malpractice that

2   was committed by Corizon, now known as YesCare.

3          We know from a Supreme Court decision from 1976,

4   Estelle v. Gamble, it was established that inmates have a

5   constitutional right to healthcare under the Eighth Amendment

6   prohibiting cruel and unusual punishment.  And that has been

7   the law in our country since 1976.

8          So what are the liabilities?  Well, we've gone over

9   this, but I'd like to retrace, just quickly.  We have personal

10  injury and wrongful death claims, again with a face value of

11  775 million.  Again, litigation could easily result in large

12  judgments, including punitive damages, if they're in the tort

13  system.  So we could easily see how just one of the several

14  hundred claimants could easily get to $12 million just on a

15  single claim.

16         Again, that's why Mr. Lefkowitz needs that shield,

17  right?  And that's why he's conditioning his payment on getting

18  that shield in this bankruptcy case.

19         The commercial claims are, unfortunately, victims as

20  well.  They are parties that YesCare doesn't want to pay,

21  right, because the counterparty is no longer considered

22  necessary to their ongoing business operations.  We have former

23  employees also no longer considered necessary to the business.

24  There are governmental claims for contribution and

25  indemnification that exist.

Barton - Direct/Zluticky                    88

1           And I would say if this case is successful, future

2   victims of this bankruptcy scheme could include the Pension

3   Benefit Guaranty Corporation, holders of environmental claims

4   under CERCLA, cancer victims.  And in fact, I would submit

5   YesCare could even do the whole thing again in five years if

6   it, you know, continues to provide inadequate healthcare to

7   prisoners and more people die as a result of that.  Really, the

8   liabilities in these types of cases include anyone that the

9   tortfeasor finds objectionable for any reason whatsoever.

10          So what is the debtor?  We used the term "Potemkin

11  village" in our brief.  It was a phrase that was shared with me

12  from a Supreme Court lawyer in the LTL case, so I can't claim

13  to have been well-read enough to have come up with this one on

14  my own, but that's -- I thought it was apt.  When I looked it

15  up, I discovered the meaning to be -- in its original meaning,

16  that it's a number of fake villages that were designed to

17  impress the Russian empress, Catherine the Great.  The term has

18  also become used to describe an elaborate facade designed to

19  hide an undesirable reality.

20          The debtor, in our view, is a Potemkin village.  It

21  has no business, it has no employees, it's never operated

22  anything post divisive merger, it has no going-concern to

23  approve -- to preserve, rather.  It has no funding at all,

24  other than funds that Mr. Lefkowitz decides to advance through

25  M2.  And this debtor is actually not even eligible for a

Barton - Direct/Zluticky                                    89

1    discharge under 1141(d)(3).  So the release parties

2    are -- would actually get a discharge that would be greater in

3    scope under the -- their proposed plan, than what the debtor

4    could even obtain under the Bankruptcy Code.

5            Again, with respect to the fact that there is no

6    business whatsoever, we actually asked the debtor to admit that

7    and they refused.  The UCC admitted it.

8            But we did note that the question was posed by the

9    United States Senate to YesCare.  The question was, "With

10   regard to Corizon's use of the divisional merger process to

11   separate its assets from its liabilities, what was the

12   rationale for determining which assets would be -- would

13   transfer or assign to whom" -- our debtor -- and "which would

14   be shielded from the reach of creditors through YesCare?"

15           The answer that YesCare gave to the United States

16   Senate is, pursuant to the divisional merger to whom it

17   allocated certain assets that were not necessary to sustain a

18   going-concern business, those assets, the assets allocated to

19   YesCare, were related to its operation on a go-forward basis.

20           It has been noted in the briefs the other parties,

21   they have protested and argued that our "Texas Two-Step" is not

22   like the others.  And I actually would actually agree with that

23   on some level.  This is somewhat different from other "Texas

24   Two-Steps".

25           I will note that the Jones Day version, that's been,

Barton - Direct/Zluticky                                    90

1   you know, really the firm that has sort of coined this process,

2   always leaves some operating assets with the debtor.  Often, it

3   takes the form of a ground lease to a fast food franchise like

4   a McDonald's.  But this debtor here actually doesn't have

5   anything that it can identify to support any argument that it

6   has any business whatsoever.  It is just a complete empty

7   shell.

8           Also, I would note that in the Jones Day version,

9   there is usually a funding agreement on its -- that, on its

10  face, purports to make funding available inside and outside of

11  bankruptcy, including to pay administrative claims and of

12  course, pay claimants as well.  Here you don't have such an

13  agreement because again, it was exhausted before the bankruptcy

14  was filed.

15          That means that the only source of funding that the

16  debtor has here is the insider DIP loan, and that is the

17  mechanism through which Mr. Lefkowitz controls who gets paid

18  and who does not.  And I would submit that I'm probably on the

19  list of people that he doesn't want to pay.  So again, we

20  haven't been paid anything in this case.  All of our fees

21  remain due and owing.

22          How was the debtor created?  The debtor went -- here,

23  the tortfeasor, which was Corizon, underwent a divisive merger.

24  I will note that divisive mergers are not per se fraudulent.

25  The divisive merger statute is not the problem.  You could have

Barton - Direct/Zluticky                              91

1  a company that has separate business lines, that divides

2  itself, and assigns the assets and liabilities associated with

3  each business line to separate entities.  You know, that can

4  happen and I would submit nothing wrong there.

5          The issue though is, you know, can a divisive merger

6  be fraudulent?  And the answer is yes, a divisive merger can be

7  fraudulent if the new entity is assigned nothing other than

8  liabilities and the parties intend to shield the operating

9  assets and future profits from the tort claimants, and that's

10  exactly what happened here.

11          Again, here we know that the divisive merger was not

12  legitimate.  And I think we in the UCC actually agree on this

13  one.  When something seems wrong, it often is.

14          And state law provides a host of remedies when

15  parties engage in this kind of conduct.  The one that's most

16  obvious to me, given my training as a bankruptcy lawyer -- and

17  again, I went right to the bankruptcy court and never left the

18  practice, so you know, here I stand -- is the fraudulent

19  transfer claims.  And you know, those are the ones that kind of

20  rise to the top, at least in the mind of, you know,

21  practitioners who deal with these all the time.

22          But I've also heard the phrase when your only tool is

23  a hammer, every problem looks like a nail.  And there actually

24  are other remedies in -- that are available under state law,

25  including successor liability doctrine, which would transfer

Barton - Direct/Zluticky                               92

1   the liability just to YesCare.  And you also have alter ego

2   doctrine, which would enable folks to chase down the beneficial

3   owners when they're playing a shell game and moving assets

4   around, as we see here.

5           And I'll note the Kelly case, you know, shows, and

6   it's a pretty lengthy decision, that the victims here actually

7   don't even need a bankruptcy case at all to recover from

8   responsible parties.  They can simply do what happened in this

9   case and name newco as the defendant.  And I would submit,

10  given everything that we've now learned through discovery, the

11  party that they should be naming is YesCare.

12          THE COURT:  Doesn't that then go to -- I guess, what

13  the other side is going to argue to me is that, like, what

14  you're proposing if I dismiss the case is literally sending

15  folks to go out there and go litigate for the next God knows

16  how many years in hopes of potentially getting God knows what

17  out of God knows who, right?

18          MR. GOODMAN:  But it never works --

19          THE COURT:  That's what they're saying.  And

20  they're -- you know, they're arguing, right, like Jackson

21  Brewing, you look, you know, why isn't that within the range of

22  reasonableness to try to get something in the door today as

23  opposed to who knows what, who knows when, and who knows how

24  much, right?  That -- that's what the other side is arguing.

25  What's -- how do you respond to that?  Well, how should I be

Barton - Direct/Zluticky                                          93

1    thinking about it as the evidence continues to play out?

2                MR. GOODMAN:  First of all, and we'll get to this in

3    detail, you know, there is no settlement, right?

4                THE COURT:  Got it.  I got you.  I got the premise.

5    Right.

6                MR. GOODMAN:  Proving the settlement means that there

7    is no money that would pay to anyone.

8                The other thing I would just point out, and we'll get

9    to this point a little bit later as well, every time that we

10   have seen a "Texas Two-Step" dismissed -- and you know, the

11   argument that you're hearing today has been made over and over

12   again.  You know, this is not the first time someone has come

13   into court and said, you know, Your Honor, if you don't approve

14   this settlement, the victims won't get any money, you have to,

15   it's in their best interest.

16               And of course, we've seen over and over again that

17   the second the case is dismissed, parties settle, right?  And

18   they really settle, they're really motivated to settle when

19   they're actually faced with litigation.  It's a crazy thing, I

20   know.

21               But when Mr. Lefkowitz and his companies are named in

22   lawsuits and they have to actually defend them, right, they

23   don't necessarily say, we're going to make everyone litigate.

24   They enter into settlements, and those settlements, in the

25   aggregate, are multiples higher, right, than what's being

Barton - Direct/Zluticky                    94

1    offered in this bankruptcy case.

2             Every creditor is harmed by this bankruptcy, every

3    single one.  Commercial, tort, government, they are all harmed

4    by this settlement, every single one.  So how does the debtor

5    pull this off in this one?  And this is, you know -- I'm sorry.

6    I need to go back.  Forget that slide, not important.

7             This is an interesting process, because being in the

8    Fifth Circuit, one question I've gotten asked over and over

9    again is, how are they doing this, because the Fifth Circuit

10   doesn't permit nonconsensual third party releases?  And this is

11   actually somewhat of a novel approach.  You know, this -- the

12   divisive merger process and it -- when it's done in a

13   fraudulent manner, like in this case, gives rise to, or

14   creates, the successor liability claim that creates the alter

15   ego claim, right?  It's those maneuvers and those circumstances

16   that then give rise to those legal remedies, if you will.

17            So here, from the debtors' standpoint, they now know

18   that, having undertaken this fraudulent, divisive merger, and

19   they saw the litigation in Michigan, everyone is just going to

20   come in and name, YesCare as the defendant, and they're going

21   to continue to face all of this litigation.  So how do they

22   stop it, right?  How do they keep it from happening?  And how

23   do they use the bankruptcy proceeding to make sure that these

24   victims never see or get their day in court and never -- are

25   never able to exercise their rights?

Barton - Direct/Zluticky                                    95

1           The argument, as we understand it, is that the debtor

2   now owns the tort claims arising from the personal injuries

3   suffered by the victims.  And again, these are injuries that

4   were suffered by victims like Mr. Alvarez back there.  That's

5   not an injury that was suffered by the debtor.

6           If the debtor is wrong about this, and you know,

7   we -- we've made our arguments in court -- honestly, we should

8   all go home.  Because the release that Mr. Lefkowitz is trying

9   to get out of this court isn't for sale, right?  You could

10  approve a settlement that involves the four avoidance claims

11  that they identify in their motion.  That doesn't get

12  Mr. Lefkowitz even halfway to first base, right?  He really

13  needs a settlement approved that wipes out, forever, the rights

14  of the tort victims to pursue him in state and federal court.

15  And those claims that -- if they are permitted to continue and

16  we hope they do, aren't going to be based on avoidance actions.

17  They're going to be based on successor liability and alter ego,

18  because those are the strongest claims.

19          And again, as is noted in our papers, we've made a

20  host of arguments as to why it just can't be the case that a

21  debtor owns the personal injury claims in this case.  And you

22  know, of course, we're, you know, preserving arguments for a

23  later day.  But I just want to note that in our view, we just

24  don't think that the claims are for sale.

25          But we do note that there is case law out there, and

Barton - Direct/Zluticky                                    96

1    I've tried my best as a former law clerk, you know, to give you

2    the citations to all the circuit courts that have grappled with

3    the issue of what do you do with an alter ego claim?  What do

4    you do with a successor liability claim?  Is it property of the

5    estate?  Is it not?  I think that the law is murky on these

6    kinds of issues, even within different circuits.  You find

7    panels that take different views.  But it really is a critical

8    issue because here it would inform what's being settled.

9          But I will note that there is a case in the Third

10   Circuit where the Third Circuit decided to find that a, quote,

11   "cause of action for successor liability belongs to the

12   bankruptcy estate."  I found that to be a remarkable statement

13   because there's no such thing as a cause of action for

14   successor liability.  It doesn't exist.  Successor liability is

15   just simply a doctrine that says, when you engage in these

16   kinds of corporate transactions, I will follow the company that

17   took the business.  It's a doctrine that makes the personal

18   injury claim one that can be pursued against YesCare.

19         The injury is still a personal injury claim.  It's

20   still a wrongful death claim.  That doesn't necessarily become

21   property of the estate.  But again, in Emoral, there, you have,

22   you know, an opinion, you know, that hasn't been taken up to

23   the Supreme Court yet, but we will get there at some point to

24   see if we can get that one overturned.

25         But again, I note that Mr. Lefkowitz is here to buy

Barton - Direct/Zluticky                    97

1  finality, right?  That's the key point.  That's the only thing

2  that makes the settlement work.  And if the lawsuits are going

3  to continue, and we think they should, then what he wants to

4  buy just isn't for sale.

5           But let's enter into a world where we're wrong on

6  this point.  Let's just assume, for the sake of argument, that

7  Your Honor decides that these personal injury wrongful death

8  claims asserted against the alter egos and the successors are

9  now property of the debtors' bankruptcy estate.  Now we have a

10  bigger problem in some ways, because we need to know what the

11  settlement is, right?

12          You asked the first question of the day, which was, I

13  want to really think about the 9019 motion.  I think you've

14  kind of prioritized that and said, you know, if I can't approve

15  the settlement, then we'll figure out what we're doing in this

16  case.  So if we're going to think about the 9019 motion, then

17  we really have to fundamentally understand what's being

18  settled, right?

19          I try to come up with analogies because I feel like

20  if I can't explain this to my kids or my wife, then I'm not

21  doing a very good job as a lawyer.  And I found myself at a

22  grocery store on date night.  That's -- you know, grocery store

23  on a date night is what happens when you have a 16-year old and

24  a 14-year old kid.  And we were in the grocery store and my

25  wife, as we walked in, grabbed a scanner for the grocery cart.

Barton - Direct/Zluticky                              98

1   And as we walked around the grocery store, every time she put

2   something in the grocery cart, she scanned it.  And then we

3   went to check out.

4           She parked the scanner into this, you know, machine

5   by the register.  A number popped up.  She put the credit card

6   in, and we left.  And I said, I've never understood how you do

7   this.  I always just get the groceries, put them in the cart

8   and stand in line.  She says, yeah, I don't like to stand in

9   line.

10          When we got into the parking lot and I said, wait a

11  second, what keeps people from just putting stuff in the

12  grocery cart and then checking out and not scanning everything?

13  And she turned to me and she said, that's called shoplifting,

14  that's illegal, you can't do that, right?

15          And that's where I kind of had an epiphany, right?

16  We have to know what's in the grocery cart, right, in order to

17  even evaluate a settlement in this case.  If the grocery cart

18  is just filled with bags of chips, then it's going to ring up

19  at a much lower price.  If the grocery cart is filled with

20  chips, and then underneath the chips are bottles of fine wine

21  and steaks, that's a materially different grocery cart, right?

22          And in our illustration, what we're trying to get

23  across, you know, to the Court here is that the meat and the

24  fine wine in my illustration, those are the successor liability

25  and alter ego claims that Mr. Lefkowitz is terrified of, right?

Barton - Direct/Zluticky                                         99

1  Those are the ones that have the most value that he wants to be

2  rid of through this bankruptcy proceeding.  The bags of chips

3  that are on top, some of them actually have quite a bit of

4  value, but they're really almost a disguise.

5         The point of the analysis that Mr. Atkinson really

6  did, as opposed to how it was represented to the Court, is that

7  if the successor liability, alter ego claims are part of the

8  cart, right, just based on the debtors' own math, right, just

9  based on their own valuation of the claims in this case, we

10 know that grocery cart is worth between $135 to $187 million,

11 with 135 being the absolute lowest point in the range of

12 reasonableness that the Court could even consider.

13        And again, we actually don't think that the claims

14 analysis is correct.  We think that if you actually did a full

15 blown estimation proceeding under Section 502(c) of the

16 Bankruptcy Code in this case, and we actually brought in claims

17 and we gathered more information, I think that that settlement

18 number would actually be at a much, much higher point, right?

19        But again, for the purposes of today, we don't have

20 access to that information.  I know that they didn't attempt to

21 get it from the claimants, probably because if they did, I'm

22 assuming that it would show that the settlement range would be

23 significantly higher.  But again, we're just trying to make the

24 point that if you just base it on the debtors' own math, the

25 settlement doesn't even pass any scrutiny, it just fails out of

Barton - Direct/Zluticky                    100

1   the gate.

2            The chips, again, in our view, are the avoidance

3   actions.  No one seems to know what the divisive merger claims

4   are worth.  We've asked this question at deposition, and no one

5   seems to have any idea.  We think that the motion fails on that

6   basis alone.

7            I would note that, in the presentation that you got,

8   did you notice how the UCC put a number on the first three

9   avoidance actions, but they didn't put a number on the divisive

10  merger one?  You might also notice in the motion that they

11  don't even attempt to value that claim either.

12           But our point really, though, is that this motion is

13  really hiding the true economic reality of the settlement

14  itself.  If you look at the Rule 9019 motion, if you go to

15  Paragraph 27, this is where they talk about the four, you know,

16  key claims that they investigated, and you saw the UCC put up

17  on the board and describe and talk about the number, right?

18  They don't mention successor liability in that paragraph.  They

19  don't mention alter ego.  In fact, they don't mention alter ego

20  claims anywhere in the settlement motion.

21           They're not novel theories.  I mean, you already have

22  a federal court that has said that they would happily

23  substitute-in parties that have continued the business

24  operations as the defendant in these proceedings, so I don't

25  know how you even get to the conclusion that they're, quote,

Barton - Direct/Zluticky                    101

1   "novel".

2            But again, if we look more carefully -- and I know

3   that they want to divorce the settlement from the plan, they

4   try to treat those like they're two separate things.  But if

5   you look carefully at the plan language of the disclosure

6   statement and how they're defining the releases and the

7   gatekeeping function, I think you can see quite clearly that

8   they are trying to sweep in the successor liability alter ego

9   claims in what's being released.  It's just not something they

10  want to advertise, right?

11           Because if you think about, it's kind of weird, a

12  debtor selling personal injury claims based on harm to, you

13  know, victims and then using the proceeds of that sale

14  transaction to pay off the commercial creditors.  I mean,

15  I -- it kind of makes my head want to explode as a bankruptcy

16  lawyer that this has even being brought before the Court.

17           But the point I'd make, though, is we know that these

18  are good claims, right?  And it's -- the point I'd also want to

19  make is it's not just the tort claimants, right?  It's the

20  commercial creditors.  It's the government creditors.  The

21  State of Arizona, if they want to go after YesCare and

22  Mr. Lefkowitz, they could do so as well in the event of a

23  dismissal.

24           So I'm going to skip forward a little bit because I

25  think I hit these issues.  I want to get to the divisive merger

Barton - Direct/Zluticky                    102

1  claims.  So sorry, I need a water break.

2          THE COURT:  Go for it.  You got about --

3          MR. GOODMAN:  So in our --

4          THE COURT:  You got about seven minutes on my clock.

5          MR. GOODMAN:  Okay.  The divisive merger claims,

6  again, we think that they have been undervalued.  We'll get to

7  this during the testimony and the financial advisor.  But we

8  think that, again, the attempt to rely on various documents and

9  financial statements that were provided by YesCare, we think,

10 is just a flawed approach in any respect.

11         The next thing I'm going to get to is my attempt to

12 respond to the UCC, because I know you're looking at us as a

13 fiduciary for the tort claimants, the UCC as a fiduciary for

14 all the claimants in the case.  So why is it that we're just

15 so -- in such adamant disagreement, you know, about the

16 settlement and what is sort of the best path forward?

17         And the UCC, you know, as you heard, they're trying

18 to convince folks that this is a good deal.  We've been accused

19 of representing a mere subset of the victims, which is not

20 true.  We represent all the tort victims.  But I would submit

21 simply that dismissal is the best option for all creditors in

22 this case, not just the tort claimants.

23         So to the TCC, I would offer the following:  First

24 point I would like to just point out to the Court is that the

25 TCC initially came before Your Honor and said that $37 million

Barton - Direct/Zluticky                    103

1  was the best deal that anyone could ever possibly negotiate.

2  Suddenly, a tort claimants committee exists, and by walking

3  into the room, you see the settlement go up by $15 million in

4  just one day.  That's a 40 percent increase.

5            THE COURT:  I thought I had something to do with

6  that, too, though.  You're taking --

7            MR. GOODMAN:  You did.  You did, yeah.

8            THE COURT:  You're stealing all my thunder.  I don't

9  see a bullet about me in there but that's all right.

10            MR. GOODMAN:  Yeah and I know -- all right, I'm going

11  to put -- we'll put in there, Judge Lopez, yes.

12            THE COURT:  No, but look, I mean, here's the

13  question, though --

14            MR. GOODMAN:  Yes, of course.

15            THE COURT:  You know what you're asking me, though,

16  right?  Like, in other words, there's -- you know, what -- we

17  all know what dismissal means, and we all know what comes with

18  dismissal --

19            MR. GOODMAN:  Yes.

20            THE COURT:  -- and the effect of it.  It's fast, it's

21  harsh, and it's going to leave a lot of people kind of in

22  limbo.  It'll settle over time, but you know -- and in other

23  words, like, there's no soft landing when it comes to dismissal

24  that I'm aware of.  That's what you're asking me, and I just

25  want to make sure that we're all clear.  I'm pushed-in on this.

Barton - Direct/Zluticky                        104

1   I pushed Mr. Brookner on one end, I'm going to push you on the

2   other end.  Like, dismissal is dismissal, and it's cut the

3   rope, and it -- it's a harsh landing on the way for a bunch of

4   people.  And that's what I'm dealing with.

5          And it's my -- and I got it, right?  I wear the robe,

6   I got to make the call.  But I'm just making sure everybody's

7   really clear about what they're asking me to do on both sides.

8          MR. GOODMAN:  I would respectfully submit, and I say

9   respectfully as I can, that you have it precisely the opposite,

10  right, that dismissal is the soft landing, right?  Approving

11  the settlement, that is the train wreck, right?  That is

12  litigation in perpetuity where no one gets paid anything.

13  Dismissal is the only path that any creditor in this case has

14  to getting paid anything at all on account of their claim.

15  That includes the pro ses, that includes the commercial claims,

16  that includes the tort claims, that includes the government

17  claims.  That is the only soft landing.

18          THE COURT:  There are people who have filed -- yeah,

19  but there are people who have filed joinders --

20          MR. GOODMAN:  Yes.

21          THE COURT:  -- who are saying, I think this is the

22  best path for me to get anything, right?  So it's -- I'm down

23  here to debate whether dismissal just means dismissal, and

24  doors close at that point, is what I mean, and maybe that's the

25  best way of saying.

Barton - Direct/Zluticky                    105

1           MR. GOODMAN:  Well, it -- we are actually at those

2     slides.

3           THE COURT:  As everybody's really clear about what I

4     mean.

5           MR. GOODMAN:  I'm sorry.  We're actually at those

6     slides.  So if you'll, you know, bear with me.  So as I've been

7     saying over and over again, the deal is illusory, right?  The

8     deal that is on the table is illusory.  There is no deal.  And

9     we've seen, in every single "Texas Two-Step" that has ever been

10    filed, trying to get money out of a "Texas Two-Step" is like

11    Charlie Brown trying to kick the football:  Lucy is always

12    going to pull the football away at the very last second, right?

13    And again, no one gets paid until the case is dismissed.

14          In this example, okay, Charlie Brown is any tort

15    claimant in this room who believes that if you approve this

16    settlement, they're going to get paid something, right?

17    They're not, it's not going to happen.  The football, that is

18    the settlement that is being dangled out, right.  If you'd just

19    support this bankruptcy case, if you'd just support the

20    releases, if you'd just, you know, give Mr. Lefkowitz a shield

21    so that he never has to be bothered again in the tort system,

22    right, that is the football that is there.

23          Now, who is Lucy in this example?  Lucy is actually a

24    little more complicated.  Lucy is obviously Mr. Lefkowitz,

25    right, because he is demanding finality.  But Lucy is also the

Barton - Direct/Zluticky                    106

1  Third Circuit.  Lucy is the Fifth Circuit.  Lucy is Judge

2  Graham.  Lucy are the courts.

3          THE COURT:  Yeah, but what you're saying is no one

4  ever gets paid because courts dismiss it, not that people

5  couldn't get paid, right?  If Lucy is the Third Circuit, then

6  that just means -- but then we got to get into the reasons that

7  the Third Circuit did what they did, right?  It -- I guess what

8  I'm saying is there's a difference between, if I approve this

9  settlement, no one's ever going to get paid because there's

10 really no settlement, or Judge, if you pull the football,

11 right, then no one -- then there's -- then no one is going to

12 get paid through the settlement because I will have done it.

13 That, there was a settlement in one instance, I took it off the

14 table as opposed to -- and I'm just trying to figure out

15 which -- what you're telling me.

16          Is there a settlement that's really illusory or are

17 you asking me to pull the football, in which there is a

18 settlement, I just take it off the table?

19          MR. GOODMAN:  I will answer your question.  There is

20 no settlement.  And here's why -- let's just play this out.

21 We, the TCC, say if you increase the pot by X dollars, right,

22 and you know, we'll come on board, you're still going to have

23 parties that are going to object, including the United States

24 Trustee.  We know that the plan would have to deliver these

25 kinds of releases in order for Mr. Lefkowitz to release the

Barton - Direct/Zluticky                    107

1   settlement funds.  And we know what the Fifth Circuit thinks

2   about these kinds of releases, right?  When it comes to a

3   nonconsensual third-party release, we know that since Feld v.

4   Zale was decided in 1995, the Fifth Circuit has a remarkable

5   run of saying to anyone who tries to get this kind of relief in

6   the bankruptcy court, the answer is no, right?

7          So then the question is, if we pivot into a world,

8   right, where you can use bankruptcy for the sole purpose,

9   right, of gaining control over the personal injury claims,

10  selling them, and then distributing the proceeds to parties

11  against their -- over their objection, right?  It's not like

12  you have a case here where the tort claimants and the

13  commercial claimants are all standing here arm-in-arm saying,

14  this is a great deal, would you please approve it, right?  You

15  don't have a situation like that at all.

16         What would here happen, I would submit -- and again,

17  I'm going try to say this in the most delicate way I can, but

18  the Antelope decision, we think, is almost directly on point.

19  You know, in the Antelope, you had a shareholder derivative

20  lawsuit, right?  You had something that was clearly property of

21  the debtor's bankruptcy estate.  It wasn't, we're going to

22  argue that it is.  It was a shareholder derivative lawsuit that

23  was brought and the company decided, we don't like this

24  lawsuit, so they filed for bankruptcy in order to take control

25  over it, right?

Barton - Direct/Zluticky                                    108

 1          And they actually confirmed a Chapter 11 plan of
 2   reorganization over the objection of the parties that were
 3   trying to bring this litigation.  The case actually went fully
 4   effective, right?  You had a plan of reorganization that bore
 5   the signature of a bankruptcy judge such as yourself, right;
 6   plan confirmed; derivative claims settled, right?  You know,
 7   the parties here were the plaintiffs, basically had the door
 8   shut in their face.  The plan went fully effective, which I
 9   assume means that the money was paid over.

10          It went up to the district court.  The district court
11   said reversed, vacated, and sent it back down to the bankruptcy
12   court, meaning that a fully consummated Chapter 11 plan was
13   pulled out by the Article III court upon the first layer of
14   appellate review.

15          What happened next is even more interesting to me.
16   The case went back to the bankruptcy court, and the bankruptcy
17   court then considered the evidence further and dismissed the
18   case as a bad faith filing.

19          And then the case went up to the United States Court
20   of Appeals for the Fifth Circuit.  And the party who had
21   proposed the plan and gotten the settlement across the goal
22   line said, this was outrageous; how could you do this to me; I
23   had a fully-consummated plan; surely the appeal must be
24   equitably moot, right, because I did everything that I was
25   supposed to do, I got my confirmation order, I paid all of the

Barton - Direct/Zluticky                                    109

1   money.  And the First -- Fifth Circuit said, no way, no way,

2   not on our watch, we are not going to ever invoke the doctrine

3   of equitable mootness to moot-out.

4           THE COURT:  I got it.  But now we're talking ten

5   years down the line, you know -- or time.  So in other words --

6           MR. GOODMAN:  Yes.

7           THE COURT:  -- the Fifth Circuit will do what the

8   Fifth Circuit does.  Antelope, I think, was confirmed in this

9   very courtroom.  And I don't know what happened, one way or the

10  other.  I think -- but that's not before me.

11          What's before me is just a settlement, and that's all

12  I'm focused on.  I'm just telling everyone now, telling me

13  what's going to happen down the line, I'm not interested.  What

14  I'm interested in is, do I approve this settlement based on the

15  facts and law in front of me.  And if you can prove to me that

16  the settlement is illusory, you win.  If not, then maybe they

17  win.  I don't know.  Or whether it's in the best in -- you

18  know, kind of, whether it's in the best interest of creditors

19  in the estate or, you know -- and what's in the basket?  I

20  agree with you there.  We just have to figure that out and

21  we'll weigh it.

22          MR. GOODMAN:  Well, again, I think there's multiple

23  ways that we get there.  I mean, I -- to your point, what's in

24  the basket, that's the first critical stay point, because that

25  defines what the price is.  You know, I think we're going to

Barton - Direct/Zluticky                    110

1   show you that how they define the basket means that the

2   settlement is completely outside the range of reasonableness.

3   And you know, you could end there and say it's over, right?

4          But I would also, again, make the further point, I do

5   think it is illusory, because, again, if the triggering event,

6   right, that causes the settlement money to be released is

7   something that we all know can't be obtained in a bankruptcy

8   proceeding, right, even if -- you know, again, I represent all

9   sorts of parties in these mass tort bankruptcy cases.  You

10  know, there are many folks out there who would love for

11  bankruptcy courts to be able to do this kind of work.  But when

12  these cases do present themselves, and they are what I call the

13  pure litigation tactic-type varieties, I -- we just haven't

14  seen one that's ever survived going up the chain.

15         And that's why I think, from an illusory standpoint,

16  you really kind of hit it because it -- you kind of have to ask

17  yourself, if I sign off on this 9019 settlement and I confirm

18  this plan of reorganization -- and you know, obviously, you

19  would never do that if you thought you were going to get

20  reversed.  But if the odds of reversal are, you know, sort

21  of --

22         THE COURT:  I don't think about that.

23         MR. GOODMAN:  Okay.

24         THE COURT:  I think about what the right answer is

25  and I do it.  And then people can -- above me can tell me if I

Barton - Direct/Zluticky                111

1  got it right or wrong.  That's my job.  And in other words, I

2  don't think about getting affirmed or reversed.  I think about

3  doing the job, the best job, based upon the facts and law that

4  I have in front of me.  And I'll make the decision.  In other

5  words, I really do.

6           I don't -- I have no idea what -- I'm bound by

7  precedent, obviously.  But I don't pretend to try to think

8  about what a district court or who the district court judge may

9  be or what she or he may be thinking or what Fifth Circuit may

10 or may not do.  I -- my job is to try to -- that may mean you

11 win, that may mean you lose.  I don't know.  But that's why

12 they do what they do and they ask me to do what I do --

13          MR. GOODMAN:  Understood.  Understood, yeah.

14          THE COURT:  -- you know?  So --

15          MR. GOODMAN:  A final point I wanted to make, you

16 know, in terms of our view about what happens if the case gets

17 dismissed, and I know that we have all the dire predictions

18 that you hear, but I would submit it's speculation.  There's no

19 evidence supporting it.

20          And in fact, again, I come back to the point, every

21 time that we've seen cases like this get dismissed, people

22 settle, right?  That's how things normally work out in its tort

23 system.  In fact, this actually happened.

24          This very thing happened in the 3M case.  They filed

25 their bankruptcy proceeding, not 3M, obviously.  But it was a

Barton - Direct/Zluticky                              112

1    subsidiary, Aearo, right, filed in the Southern District of

2    Indiana.  And you know, they went into bankruptcy and they

3    announced and they said, behold, you know, here's the

4    $1 billion settlement trust.  You know, they said, no one has

5    ever settled outside of bankruptcy, it can't be done.  And they

6    said, if you guys accept this and give us our releases, then

7    this billion dollars will appear and you will get the money.

8    Same situation here, right, just instead of a billion dollars,

9    it's the 50 or the 40, whatever it is that they're putting on

10   the table.

11            THE COURT:  I know.  But you're still arguing that I

12   should be against divisional mergers, right?  Because you keep

13   citing divisional merger cases and that they don't work or not

14   work.  And I'm telling you I'm going to approve a settlement

15   based on what's fair and (indiscernible - 1:23:49*).  I'm

16   not -- you know, I'm not -- you're not -- you know, like, no

17   one's going to cite this case for -- you know, and let's add

18   this to the list of stuff that works or doesn't work.  It's

19   going to be, there was a settlement on the table and Lopez

20   approved it or didn't approve it.

21            And I think Mr. Brookner is going to have to do the

22   same thing, you know?  I think he's going to have to tell me

23   there's a real settlement and this is a really good deal and

24   that they really thought about it.

25            And -- but I get -- I know what kind of case we have

Barton - Direct/Zluticky                    113

1  and I -- I am certainly mindful.  I'll tell you what I do think

2  about, and everybody knows this is, I'm concerned

3  about --  I've been concerned about, from the beginning of the

4  case and so I'll be looking for it, transparency; you know,

5  independence; and whether it was truly independence or not; and

6  whether this is really in the best interest of the estate and

7  creditors; and whether they thought about all creditors and not

8  just a subset of creditors.

9          I think because -- you know, and I do think about the

10 tide of the plan.  I know it's -- you can't -- there are two

11 separate stages, but to the extent that there -- one is

12 connected to the other, sometimes there are separate stages and

13 you got to look at them, sometimes, like, what's the triggering

14 event, right, where the money comes in and how much money is

15 actually going to go out and what people are actually going to

16 receive once you run the numbers and do the math, are things

17 that I'm truly interested in.

18          And it's not mean -- doesn't mean I like divisional

19 mergers, doesn't mean I don't like them.  It just means I got

20 to -- there's a motion in front of me and one to dismiss and

21 one to one to approve a settlement.  And that's what I've got

22 to weigh so --

23          MR. GOODMAN:  I understand.  I just want to point out

24 and my last point is, I actually picked the 3M case to

25 illustrate, you know, how much more money tends to be available

Barton - Direct/Zluticky                                114

```
 1   after the case is dismissed --

 2             THE COURT:  No, I'm aware.

 3             MR. GOODMAN:  -- because it wasn't a divisional

 4   merger.

 5             THE COURT:  No, I'm aware.  Yeah, I've read -- no,

 6   no, you know?

 7             MR. GOODMAN:  I have conclusions.  But honestly, if

 8   I've answered your questions --

 9             THE COURT:  No.

10             MR. GOODMAN:  -- I can sit down.  If you have more

11   questions for me, I will stay at the podium as long as you

12   desire.

13             THE COURT:  No, I think you've answered my questions.

14   Thank you very much.

15             MR. GOODMAN:  Thank you.

16             THE COURT:  Mr. Patterson?  Good afternoon,

17   Mr. Patterson.

18             MR. PATTERSON:  Good afternoon, Judge.  How are you?

19             THE COURT:  Good.

20             MR. PATTERSON:  Yeah, I found this quite interesting.

21             THE COURT:  That makes two of us.

22             MR. PATTERSON:  As you know, I represent RMSC

23   plaintiffs, three women out of Rikers that were abused.  And so

24   we are tort claimants.  We are also unsecured creditors.  And

25   as was provided earlier, one of the women does actually sit on
```

Barton - Direct/Zluticky                                115

1   the unsecured creditors' committee, just separate counsel so

2   that is separate and apart from my representation.

3        This is not a good case, right?  I don't like this

4   debtor.  It doesn't have anything to do with Mr. Brookner.  I

5   don't like this debtor.  I don't like what they've done.  I

6   don't like how they've operated.  And maybe I'm a little more

7   simplistic, but on behalf of my clients, I'm looking at this a

8   little bit differently.  And I will say up front, I'm not

9   comfortable with the triggering event, right, because it's kind

10  of holding us hostage.  I'd prefer if this were just a

11  standalone settlement.

12       THE COURT:  And what is your understanding of -- and

13  I know I should have -- I forgot to ask that -- about it.  What

14  is your understanding of the triggering event?  What

15  brings -- what makes the money come in, if you will?

16       MR. PATTERSON:  My understanding is confirmation of a

17  plan that incorporates the terms and includes the

18  (indiscernible - 1:27:41*).  But that's just my understanding

19  of it.  I have no --

20       THE COURT:  No, no.  I'm going to push everybody on

21  that, too, because I'm trying to make sure that I understand

22  it.

23       MR. PATTERSON:  So I'm a little uncomfortable with

24  that.  I'm a little uncomfortable with the settlement, quite

25  frankly.  But we're supporting it for a couple of reasons.

Barton - Direct/Zluticky                          116

1         And I'm a little more simplistic than maybe the

2   others that have talked here, but looking at the numbers,

3   number one -- let's look at the numbers.  Again, I don't claim

4   to know, I only know what's been told or what I've heard today,

5   big numbers thrown around, 30 million predivisional transfers

6   potentially.  I've heard 100 million, up to an average of

7   160 million of successor liability.  Or, I'm sorry, an average

8   of 160 successor liability, I think, is what the TCC provided.

9         If you look at that, that's $190 million,

10   potentially, of claims.  And you go out and this case is

11   dismissed and someone goes and tries to collect that, it's not

12   going to be collect -- there's not going to be a lawsuit for

13   $190 million.  There's going to be 600 lawsuits for 100 million

14   that get sorted out some way all across the country over the

15   next ten years.  So it's an ugly process.  I wouldn't call it

16   chaos, but it's a mess, procedurally.  You put those together,

17   you have about 190 million.  If you take off 40 percent to

18   45 percent, that's another 80 million.

19         The way we look at it is they're offering 55, 54,

20   best case out there, maybe is 180 to 100 today.  I'm buying

21   into that for my clients.  To me, that sounds, yeah, that's

22   about right, that's close.  And I get the money today, you

23   know, meaning in the next year, versus hiring a lawyer,

24   goes -- finding these guys, suing them, serving them, trying

25   it, to a jury, probably, which will take at least 18 months, 24

Barton - Direct/Zluticky                         117

1  months, maybe longer, depending on what part of the country,

2  and then collecting or trying to collect, right?

3           And I'm not saying any of that's impossible or any of

4  it's way too difficult, right, especially for these smart guys

5  that are here.  But it's, I think, realistically, four years

6  down the road, five years down the road, and today you're going

7  to offer me 60, 70, 80 percent of potential recovery.  Yeah,

8  I'm going to take that every time.

9           The second piece that sold us -- and everyone doesn't

10 necessarily agree with me, but I believe it, and I've counseled

11 the people who've asked me -- is, I don't think this stay is

12 still in place.  This 105 extension is gone, it expired in

13 August of last year, and I can go and continue my lawsuit

14 against the State of New York for my women if I want to, and

15 nothing in this settlement reimplements that.  And I'm going to

16 fight it, and I would probably change my mind if I weren't able

17 to pursue those claims on behalf of my clients, right, that

18 extension that we fought, you -- everyone remembers, right?

19          I've told Mr. Brookner, he doesn't necessarily agree,

20 I believe, by the terms of this Court's orders, that stay is

21 gone.  And this settlement doesn't try to reimpose it.  Not

22 that they won't try in the plan, but I will fight that.  But

23 this -- I'm telling you, for my clients, that's significant so

24 I can go sue the State of New York and the city of New York or

25 Rikers, whomever else, as well as my claim here.  That's

Barton - Direct/Zluticky                                118

1   important.

2          So I heard the arguments about illusory and there's

3   no real deal and there's no real settlement.  I'll be honest

4   with you, Judge:  I don't understand that.  Either they're

5   offering to pay the 54 million or they're not.  And if they

6   don't, I would prefer to be here, wherever -- where you've got

7   jurisdiction over a whole host of these people, and we can

8   bring them all here and find out why they didn't pay.  Or if

9   it's not really a settlement, I prefer to be here than out

10  there, 100 percent.

11         And likewise, I didn't understand selling the tort

12  claims.  The -- I had this discussion with Mr. Brookner.

13  There's either property of the estate, claims that are property

14  of the estate, or they're not.  If I have a direct claim

15  against YesCare, I don't think anyone's touching that here.  I

16  don't think Mr. Brookner has the authority.  He might can put

17  it on a piece of paper, but he doesn't have my claim to sell

18  and transfer.  It's either property the estate or it's not

19  property of the estate.

20         THE COURT:  That's --

21         MR. PATTERSON:  That may be a problem.

22         THE COURT:  And that's part of where -- I mean,

23  hopefully, yeah.  And the evidence will have to kind of wear

24  out.  But at the end of the day, those are the kind of things

25  that I absolutely want to understand exactly what everyone

Barton - Direct/Zluticky                    119

 1   understands so that there's no confusion three years down the

 2   line, someone then --

 3            MR. PATTERSON:  Right.

 4            THE COURT:  -- coming in and saying, wait, I wanted

 5   this because of this deal, that deal.  There's got to be

 6   absolute clarity as to what is being -- what is contemplated

 7   being settled in this litigation.

 8            MR. PATTERSON:  Right.  And look, while you get out

 9   to the edges, it becomes very confusing and very fuzzy.  I

10   think, at least here, the lawyers here know what's property  of

11   the estate.  We know the fraudulent transfer claims are there.

12   We know the alter ego claims are there.  These successor

13   liability type claims are there, right?  Anything that flows

14   through the debtor is going to be there.  And I'm okay with

15   that.

16            And I'm also okay with this Court saying, if there's

17   a dispute as to what was settled, come hash it out.  That's

18   what -- look, that's what you do every day.  That's what we do

19   every day, is figure out what's property of the estate.  And so

20   that part doesn't bother me as much because I think I generally

21   understand what it is being settled.

22            The third-party release argument, likewise, I don't

23   buy it.  I don't see where the third-party release is coming

24   in.  I mean, the release is the settlement of these claims.

25   They're paying money.  You get a release.  It's not like

Barton - Direct/Zluticky                    120

1   they're obtaining the release in the plan.  I know it will be

2   reflected in the plan, but more than likely, this will just

3   adopt, as it's allowed to do, the 9019 terms into the plan.

4   And so if there were releases being provided or proposed that

5   expand or go beyond the 9019, we're going to be in here

6   objecting.

7           THE COURT:  I think the concern is that people aren't

8   going to have the kind of opt-out option that you would.

9   Essentially, I would be approving a release now that no one

10  could opt out of.  You know, like, everybody would be bound by

11  that, and that you couldn't kind of check the box to get out of

12  it, I think is the argument.  I'm not sure it's right or wrong.

13  I'm just articulating what I think the concern is.

14          MR. PATTERSON:  But there -- I view it a little bit

15  differently.  I don't view it as a third party.  He --

16          THE COURT:  No, I get where you're going.

17          MR. PATTERSON:  This deal doesn't release a claim

18  that I own, right?  That's a third-party release.  You're

19  telling me I can't sue you, right?  They're saying, Judge, we

20  have these claims against you, you're going to pay us money,

21  we'll give you a release, right?  And I'm over here saying,

22  should the debtor really do that, and are you giving up too

23  much or too little?  That's all that's happening today.  To me,

24  third-party release never comes into play.  This is a direct

25  claim:  I'm settling claims against you, you're giving me

Barton - Direct/Zluticky                              121

1   money, I'm releasing you from those claims.

2               THE COURT:  So do you think for -- with respect to

3   your claimants, you could -- I got the State of New York,

4   right?  You can --

5               MR. PATTERSON:  Right.

6               THE COURT:  -- if -- to the extent you wanted to go

7   after them.  Do you think you can go after YesCare?

8               MR. PATTERSON:  If I have a direct claim, yes.

9               THE COURT:  Direct claim against YesCare?

10              MR. PATTERSON:  Yes.  He can't settle my direct

11  claim.

12              THE COURT:  In other words, I'm just exploring the

13  option.  I'm --

14              MR. PATTERSON:  Yes.

15              THE COURT:  Because I want people to really kind of

16  fully explore what I think.

17              MR. PATTERSON:  Right.  Now -- and we're going to

18  hear what the evidence is as we go through but --

19              THE COURT:  You mean post -- kind of post-divisional

20  merger, if YesCare -- if you have a claim against YesCare that

21  you can go after them?

22              MR. PATTERSON:  I still have it.  If it's a direct

23  claim, it's here.

24              THE COURT:  Okay.

25              MR. PATTERSON:  He doesn't have the authority, and

Barton - Direct/Zluticky                    122

1    I'm pointing to Brookner and you know, the debtor.

2              THE COURT:  Yeah, I know.

3              MR. PATTERSON:  The debtor doesn't have the authority

4    to settle my direct claim.  They can jump up and down and say

5    the magic words, but they can't settle my direct claim.  They

6    don't own it.  They can't release it.  That's a third-party

7    release.  I don't view anything in these documents as

8    purporting to be a third-party release.  I could be wrong

9    again.  I read like everyone else.  Maybe I need the shopping

10   cart explanation.  I don't know.

11             Another important piece that the Court has asked

12   everyone about that I think is also important is those that are

13   still incarcerated, they -- those pro ses, the people that

14   don't have lawyers, that they can't afford, the fancy guys that

15   come in here and you know, this case gets dismissed, those

16   people get forgotten.  There's no question in my mind,

17   100 percent, those people will never collect a penny.  Joe

18   Smith sitting in prison at Rikers Island -- I know it's a

19   women's prison -- but Janice Smith, right, she will never

20   collect a dime.  Why?  Because she doesn't have access to

21   counsel.  She doesn't have access to the courts.  She doesn't

22   have information.  She can't afford a lawyer, which is what she

23   needs.  I can 99 percent guarantee this Court that those people

24   are the people that will be damaged, forgotten, and left if

25   this case is dismissed.

Barton - Direct/Zluticky                     123

1          Does that affect me or my clients?  Not directly.

2   Does it affect me as a human?  Yeah, it does.  It bothers me

3   just because I know what's happened, right?  Is that any

4   different if this case remains?  Yes.

5          And I think your question is how do they get paid?

6   How do they get represented?  How do they participate?  Well,

7   number one, you have a committee right here with very

8   expensive, smart lawyers, a table full of them, that represent

9   them in this case, and you can look to them and say,

10  the -- they are your responsibility, you better make sure that

11  their interests are protected, right?  I didn't hear them talk

12  about that.

13         Number two, you have the Justice Department standing

14  in this courtroom every time there's a hearing.  The Justice

15  Department is answerable to those -- for those people.

16  It -- they are their responsibility.  They are sitting in their

17  housing.  So the Justice Department better be prepared to tell

18  you what's going to happen to them and their claim.  And so

19  personally, I think that's a significant piece because no one's

20  addressed it.  No one's answered you other than, you know, I

21  don't know.  I do know.  As a practicing lawyer, I do know

22  those people will collect zero and it's guaranteed if this case

23  is dismissed, guaranteed.  So that's really all I have, Judge.

24         I think that all of, all the sideshow about the

25  merger, bad faith, good faith, as far as me and my clients are

Barton - Direct/Zluticky                    124

1   concerned, I could care less.  It -- today, that stuff doesn't

2   matter.  I want to know the big numbers, right?  I'm

3   interested, is the 30 million predivisional transfers, is that

4   a real number?  I want to know what is this successor liability

5   number?  I know we can't pin it down, but somebody give me a

6   pretty good range.  Is it the 100 million or is it 600 million?

7   I don't know.  I only know what these guys, these smart guys

8   tell us.  And so that's what I'm looking for.  But based upon

9   the knowledge I have right now, you know, the return is not

10  bad.

11          And I don't want to have to chase it.  If you're

12  going to offer that through this settlement to my clients in

13  this Court, where you have control of everyone, that's easy for

14  me, Judge.  We take that every time so that I don't have to

15  chase and run all over the country chasing these guys.

16  Because, look, quite frankly, they're on to their next deal.

17  People are going to have their shots at these guys.  If they

18  really stole this money, they're going to steal again from

19  somebody else.  They're going to get it.  They'll -- let

20  somebody else chase them.  I -- for my clients, let's get the

21  money in, get our distribution, and let us go pursue our claims

22  in New York state.

23          THE COURT:  Thank you very much.

24          MR. PATTERSON:  Thank you, Your Honor.  And I've got

25  to step out at two o'clock --

Barton - Direct/Zluticky                              125

```
 1              THE COURT:  Please leave.
 2              MR. PATTERSON:  -- and I won't be back till Tuesday.
 3   I've got to go to a funeral so --
 4              THE COURT:  Not a problem at all.
 5              MR. PATTERSON:  I -- but I'm -- I anticipate the
 6   party doesn't really start till Tuesday for me anyway, right?
 7              THE COURT:  Got it.
 8              MR. PATTERSON:  Okay.
 9              THE COURT:  Got it.  Thank you very much.
10              Mr. Nguyen?
11              MR. NGUYEN:  Thank you, Your Honor.  I will be brief
12   because I think we want to get to the evidence, and the
13   evidence will be more important.
14              THE COURT:  Why don't you take as much time as you
15   need?  It's important.
16              MR. NGUYEN:  Understood, Your Honor.
17              THE COURT:  Thank you.
18              MR. NGUYEN:  The United States Trustee, we've -- I
19   (indiscernible - 1:42:37*) an opposition to the 9019 motion,
20   and we also filed a response in support of the TCC's motion to
21   dismiss.  We outlined the reasons why we believe dismissal is
22   appropriate.
23              With respect to the 9019, the U.S. Trustee dispute
24   whether the settlement is a fantastic deal for creditors.
25   Everyone's pointing to Ms. Funk's joinder pleading.  One
```

Barton - Direct/Zluticky                              126

1   of -- she hit --

2           THE COURT:  She's gone viral.

3           MR. NGUYEN:  I won't mention the litigation chaos,

4   but one of the things she mentioned in her pleading is very

5   important.  Initially, we were told that, prior to the second

6   mediation, the parties were going to come in here, drew the

7   9019, and just determine the size of the pot.  But this 9019

8   motion goes beyond determining the size of the pot.  It has a

9   lot of strings attached.

10          Your Honor asked about what are the trigger events to

11  the effectiveness of the settlement?  They tell you right there

12  in the settlement, all creditors are enjoined.  It's on

13  page -- Paragraph 9.  "All creditors are enjoined from pursuing

14  any claims or causes of action against the released parties

15  with the scope of the release herein."  That is a requirement

16  of the settlement before Mr. Lefkowitz hand over a single dime

17  to these creditors.

18          Another condition -- so another one of those

19  conditions that we found extremely problematic is, if a

20  creditor opt out of the third party release, as it was stated

21  in the second amended plan, they're not entitled to receive

22  property of the estate.  You don't get a dime from this

23  settlement unless you give Mr. Lefkowitz what he wants.  It's

24  finality.  It's that shield that the TCC mentioned.

25          So you know, these condition precedent are given in

Barton - Direct/Zluticky                         127

1  favor of those parties that essentially what we put in our

2  pleading, looted the debtor prior to the prepetition loan.  We

3  don't like it.  We don't have to make a determination of

4  whether divisional merger was inappropriate.

5       But I think those facts diluting the transfer, those

6  are all relevant for Your Honor in terms of analyzing the 9019

7  standard, because you actually are -- in looking at the

8  settlement, you are looking at an insider transaction.  All of

9  those facts that happened prior is relevant to that heightened

10 scrutiny standard under Foster Mortgage that Your Honor has to

11 look.  You ought to canvas the facts, looked at all the

12 evidence.  You don't have to do a mini-trial, but you know,

13 these facts are relevant for Your Honor to determine whether at

14 the end of the day, is the deal fair and equitable for

15 creditors?

16      We submit, given the many inappropriate transfers,

17 that -- Mr. Cross, when he presented his Chapter 11 motion to

18 appoint a Chapter 11 trustee, you know, there were transfers

19 that weren't disclosed.  It took multiple iterations before

20 those transfers were put out for everyone to know.

21      So you know, Your Honor, in terms of looking at the

22 settlement -- and I think another big piece of this is looking

23 at the value of YesCare.  My office attended several

24 deposition.  We've received documents.  But at the end of the

25 day, if you're going to value the claims and be able to make a

Barton - Direct/Zluticky                128

1  judgment call of whether it's fair and reasonable and within

2  the lowest range of reasonableness, I think you need to know

3  how much YesCare is worth or how much YesCare is worth today.

4  Because under successive liability theory, alter ego theory,

5  you know, the debtor and YesCare is one and the same.  If

6  YesCare is operating today and was an extension of the debtor,

7  I think you need to know what that value is and whether the

8  value that the UCC and the debtor settle under the settlement

9  is worth those claims for the fraudulent transfers.

10         Your Honor, I will -- I'm going to be brief with

11  this.  You know, the Court is -- it is a court of equity.  When

12  examining this deal, I think the case, taken as a whole and all

13  of the contingency imposed in the settlement as part of these

14  condition precedent that we outlined in our pleading, I just

15  think it's impossible for this Court to find that it's in the

16  best interest of creditors to approve this deal.

17         THE COURT:  Is what the trustee -- I was trying to

18  dig a little deeper into what you're really asking.  Are you

19  saying don't approve the settlement or are you saying don't

20  approve the settlement, make them put it in a plan?

21         MR. NGUYEN:  Your Honor, the -- for the U.S. Trustee,

22  the number doesn't matter.  What they're asking in terms of

23  those --

24         THE COURT:  It's the -- because when you talk about

25  the strings, are you saying that should be put out to a

Barton - Direct/Zluticky                           129

1  creditor vote and let the plan process play out or --

2            MR. NGUYEN:  But even if you put those in a plan, our

3  argument -- those provision renders any plan patently --

4            THE COURT:  Patently unconfirmable anyway.  So you're

5  saying, it doesn't -- that's the -- okay.  That's what I was

6  trying to figure out.

7            MR. NGUYEN:  The deal doesn't work.  I've never seen

8  a case where two similar creditor group, unsecured creditors,

9  where if you don't give the third-party release, you don't get

10 a dime of estate causes of action.  These creditors, if it's

11 estate assets, they get a share in that no matter what,

12 regardless of whether they give an opt-out or not.  That's how

13 the Code works.  I've never seen it set up this way.

14            There are gatekeeping provisions that are required

15 under the condition precedent.  You -- of -- if Your Honor

16 approved that gatekeeping-keeper provision, Your Honor would be

17 determining whether the government has a colorable claim for

18 criminal misconduct.  That's how broad these provisions are in

19 the Code.  They want finality, so they cast a wide net.  So

20 under those condition precedent, I think it renders any plan

21 patent unconfirmable.  This deal doesn't work.

22            We've been here for two years.  We've gone through

23 two mediation.  It's very expensive.

24            Thank you.  Two mediation in one year.  Thank you,

25 Mr. Brookner.

Barton - Direct/Zluticky                                    130

1           It's been a long road and it's time to fish or cut

2    bait.  If this deal doesn't work, dismissal seems to be the

3    appropriate answer, Your Honor.  Thank you.

4           THE COURT:  Thank you.

5           Alrighty.  Ms. Funk?  I should say the infamous.

6           MS. FUNK:  I -- Your Honor, Brenda funk again for the

7    Idaho parties.  You know, I -- we filed a simple pleading in

8    this case.  We were really trying to just indicate to the Court

9    how much of a difficult position creditors are in in this case.

10   And I stand by that.

11          Going back to the basket analogy, and this is

12   something that the U.S. Trustee's office was getting to, they

13   are not just trying to settle estate causes of action, they are

14   settling Idaho's causes of action.  They are settling every

15   other state's causes of action.  We cannot get a distribution

16   under the plan unless we release our standalone direct causes

17   of action against YesCare.  I have tried to confirm that with

18   debtor counsel and with Ms. Hayward.  They all indicated that's

19   what's going to happen under the plan.  So I have to --

20          THE COURT:  That's what I mean.  So that's where I'm

21   trying to --

22          MS. FUNK:  And that's what I thought Your Honor was

23   getting to earlier, trying to figure out what's in the basket.

24          THE COURT:  No, no, no.  But I -- it's where I'm

25   going to.  It's trying to understand.  But in other words, the

Barton - Direct/Zluticky                131

1   settlement is -- well, there's a settlement and then there's a

2   plan.  But what you're alluding to, if I get it right, is that

3   there seems to be a little different -- you know, Mr. Patterson

4   had the understanding that if he could sue -- if he had a

5   direct claim against YesCare, he could sue him.  You seem to

6   think that your client, the State, can't, like, somehow I would

7   block the -- my -- me approving the settlement would somehow

8   infringe upon your -- the State of Idaho's right.

9           MS. FUNK:  If the conditions precedent to the

10  settlement agreement are satisfied and we are forced

11  to -- we're going to be forced -- the State of Idaho is going

12  to be forced to either opt in or opt out of the distribution.

13  And --

14          THE COURT:  But that's under the plan, right?

15          MS. FUNK:  That's under the plan.  But again, these

16  are conditions precedent.

17          THE COURT:  But what you're saying is that I've

18  locked in the course, if you will.

19          MS. FUNK:  Yes, right.

20          THE COURT:  I got it.

21          MS. FUNK:  And for anyone to stand up and say, well,

22  we can go back and you know, try and negotiate these provisions

23  of this plan later, you know, I don't believe that YesCare or

24  any of these parties would necessarily renegotiate once this

25  Court gives its stamp of approval to the condition precedent to

Barton - Direct/Zluticky                        132

1    the settlement.

2              And so when you're looking at the basket,

3    Your Honor -- we're standing up here talking about valuation.

4    We're going to be asking about how much value was attributed to

5    people's direct causes of action when you came up with this

6    $54 million number, because that $54 million number includes my

7    clients' claims.

8              THE COURT:  Got it.

9              MS. FUNK:  Thank you.

10             THE COURT:  Thank you.  Anyone else wish to be heard?

11             Alrighty.  I'm going to go to folks online.  If there

12   was anybody who filed -- I'm only going to ask if you filed

13   like a joinder or an opposition.  And it -- and if you're not

14   here, you got to be brief.  That's the judge's newly-imposed

15   rule on this.  Let me open up the line.

16             I will say from the outset, I hope no one is reading

17   or trying to get a read on me.  It would -- I'm pushing either

18   way at this point, just trying to understand the scope of where

19   things go.  But I got it.  It's telling someone not to do

20   something that they're probably trained to do.

21             So let me -- I'm going to unmute a few lines here.

22   And again, I'm -- if I'm -- if it's just because you filed a

23   joinder or a document in support or against this, I'll hear

24   you, but it's got to be brief.  Here's a 409 number.

25             MR. HAMM:  Yes, Your Honor.  Thank you.  Blake Hamm,

Barton - Direct/Zluticky                                    133

1   for creditor Saint Alphonsus Healthcare Systems.  Saint

2   Alphonsus supports the 9019 motion for two reasons.

3          THE COURT:  Okay.

4          MR. HAMM:  The first reason is because Saint

5   Alphonsus has experience with what will likely happen if the

6   case is dismissed.  Saint Alphonsus, like many other people,

7   chased Corizon, then CHS and affiliates since 2018 in Idaho

8   District Court.  And on the verge of obtaining summary judgment

9   in those cases, we're in bankruptcy.  So it's not our belief or

10  Saint Alphonsus's belief that dismissal will necessarily result

11  in better settlements coming forward.

12          Number two, what Saint Alphonsus believes is, as

13  people have discussed in the basket, is not the value of claims

14  so much, it's the -- what we think the value of YesCare is.

15  And that's assuming that you could prevail on alter ego or

16  successor interest liability claims of that sort.  And we

17  expect what we'll hear from the evidence is that YesCare is not

18  valued at a billion dollars, that it's going to be something

19  far less, making the pot of money that would be available for

20  creditors here, reasonable, given those circumstances.  Thank

21  you, Your Honor.

22          THE COURT:  Thank you.

23          713 number?

24          MS. JONES:  Thank you, Your Honor.  This is Erin

25  Jones for the Curators of the University of Missouri, as well

Barton - Direct/Zluticky                    134

1  as Capital Region Medical Center.  And I will keep my comments

2  very brief, at the risk of being one, repetitive, but also

3  destroying everybody's eardrums with my horrible voice.  I will

4  reserve most of my comments for closing, which I can hopefully

5  do in person in a courtroom next week.

6          But I do want to say that my clients support the

7  motion to settle.  They oppose the motion to dismiss.  I want

8  to reiterate that, to a large extent, my clients think about it

9  very similarly to the way Mr. Patterson described and also

10  echoing Mr. Hamm's comments about what it really looks like to

11  litigate on the outside, so to speak, with these parties, and

12  not necessarily resulting in a better outcome.

13          You know, we're really looking at, you know, if you

14  hit an absolute, you know, walk-off grand slam to win the World

15  Series, what is that number and how long does it take to get

16  there?  Discount it for time, discount it for the cost of

17  attorneys, discount it for experts, discount it for costs, and

18  you get into a range of outcomes, and I think that the

19  settlement is within that range.

20          And to that end, Your Honor asked questions about

21  what's the standard to be applied here?  And you had asked a

22  question of, you know, is there a different standard because

23  the settlement involves insiders?  You know, I don't know that

24  it changes the standard, but I think everybody's looking at

25  this with heightened scrutiny, and I think that, you know,

Barton - Direct/Zluticky                          135

1   there's an evidentiary burden that the debtor and the UCC have

2   to meet.  And I think they're going to put on independent

3   fiduciaries that are going to talk about that, and they're

4   going to put on evidence of values to the estate that comes

5   from these claims.

6          You know, and secondly, you asked whether the fact

7   that the company is defunct and is not operating more, whether

8   that changes the standard.  And I think the answer is no.  I

9   mean, as you know, Your Honor, I represent Chapter 7 trustees

10  all the time in complex cases, and it's the same standard that

11  we apply in a Chapter 7 case where we're liquidating a company.

12  We still apply the Jackson Brewing and the Foster Mortgage

13  standards.  So I don't think it's a different standard just

14  because the company is liquidating.

15         And so we would ask the Court to approve the 9019

16  based on the applicable standards, which we agree are Jackson

17  Brewing and the Foster Mortgage; and then also not to dismiss

18  the case, and with a real concern, especially in the structured

19  dismissal for the request for the Court to abandon and to grant

20  exclusive standing to the TCC, I guess after the

21  dismissal -- which I don't know how the TCC is going to even be

22  a thing after a dismissal -- but to grant them exclusive

23  standing to pursue certain estate causes of action.

24         I think the fact that they want them is evidence that

25  it would not be in the best interest to dismiss the bankruptcy

Barton - Direct/Zluticky                                    136

1  case because, you know, there's value here for creditors.  And

2  to the extent that they would have standing to pursue those

3  claims, so would my client.  And I don't think that my client's

4  right should be abridged by a request that is exclusively for

5  the benefit of tort claimants.

6           And based on that, I would ask the Court to approve

7  the 9019 and dismiss the motion to dismiss.  And I'm going to

8  reserve the rest of my comments for closing.

9           THE COURT:  Okay.  There are two more folks.  There's

10 a 404 number.

11          MR. GLOVER:  Good afternoon, Your Honor.  This is

12 Brian Glover on behalf of St. Luke's.

13          THE COURT:  Yes?

14          MR. GLOVER:  St. Luke's supports the settlement.

15 Now -- and there are just two quick points that I'll make here,

16 and I won't -- I will not belabor them.  First, St. Luke's sits

17 on the unsecured creditors' committee, and Mr. Barton, who's in

18 the Courtroom today, is the Committee chair.  St. Luke's has

19 seen the factual and the economic analysis, and to quote

20 Mr. Barton, believes that the settlement is a fantastic result.

21 You'll see and you'll heal -- hear evidence on this point

22 during the hearing.

23          And second, St. Luke's is a creditor and has

24 litigated with Corizon for years.  It knows what it is like to

25 litigate with these folks.  And given the settlement dollars

Barton - Direct/Zluticky                          137

1  that are on the table, St. Luke's strongly prefers the

2  settlement over the alternative, which is going back into the

3  federal court litigation system.  It will have to continue to

4  litigate with Corizon and get a judgment.

5            Now, St. Luke's actually has a summary judgment

6  motion that's on file.  It's been fully briefed.  St. Luke's is

7  potentially on the precipice of getting a judgment, a large

8  judgment, against the debtor.  And so in that regard, maybe if

9  there is a dismissal, the landing for St. Luke's may be a

10 little bit softer than it would be for some of the estate's

11 other creditors.

12           However, you know, any judgment that St. Luke's were

13 to obtain would be worthless unless there's money to pay it.

14 And to make that happen, St. Luke's would have to pursue third

15 parties by asserting the same claims and the same theories of

16 recovery that are subject to the settlement approval motion

17 being heard today.  It's going to have to do that in race to

18 the courthouse fashion, with the risk of inconsistent results

19 around the country on these issues, and will be competing with

20 all of the estate's other creditors.

21           St. Luke's knows what it like -- what it looks like

22 to litigate with and pursue and chase Corizon.  And with that,

23 St. Luke's strongly prefers the settlement over the prospect of

24 continued litigation and asks you to grant the 9019 motion.

25 Thank you.

Barton - Direct/Zluticky                           138

1           THE COURT:  Thank you very much.

2   There's one more.  It's a 602 number.

3           MR. STAPLETON:  Good afternoon, Your Honor.  Arizona

4   Department of Corrections, Warren Stapleton.  Just wanted to

5   say three quick things.  One is, I do think you do have to

6   apply heightened scrutiny.  I don't think it's the same as a

7   Chapter 7.  And that's because in a Chapter 11, you're allowing

8   debtor to retain some measure of control over the causes of

9   action that are being settled.  And obviously here, there's

10  some coextensive or overlapping between the ownership of the

11  debtor and the parties being released, and so that control

12  necessitates a heightened level of scrutiny.

13          In terms of looking at the merits of the settlement,

14  I break it down into three categories.  I would say, you know,

15  what I'll call the plain vanilla fraudulent transfers, which I

16  don't think there was any argument about.  That's the

17  $31 million number.  I think there's a lot of agreement on

18  that.  Then there's the divisive merger fraudulent transfers.

19  I think there's no real number except the UCC has said between

20  zero and $75 million.  And then there's successor liability,

21  which I think, at this point, everyone agrees is also being

22  settled.  And there aren't really numbers for that yet, or at

23  least not numbers before the Court.  But I'm -- like, in terms

24  of evaluating the terms of the settlement, I would look at

25  those three buckets as the three buckets.

Barton - Direct/Zluticky                                139

1           And I know there -- there's a -- sort of an idea of

2    maybe there's overlap between the divisive merger and successor

3    liability.  And I would say they're different because in terms

4    of the successor liability, it allows claimants to reach past

5    the value of the debtor as of May 1st of 2022, which would be

6    the date of the merger.  So that's basically the upside that's

7    being protected, and that's why they want the releases.

8           The last thing I would say is, and this echoes what

9    Ms. Funk said, which is the triggering of the payment -- of the

10   settlement payment is the confirmation of a plan that releases

11   all three of those things, of the fraudulent transfer, the

12   divisive merger, and the successor liability.  That really

13   can't be done until the plan is before the Court, and so I'm

14   not sure we can do this.  I think Chapter 11 is a negotiation,

15   and I agree with Ms. Funk that once the settlement is approved,

16   the negotiating ability, at least in terms of the incentives

17   for YesCare to negotiate, are gone.  And that's all I have.

18           THE COURT:  Thank you very much.

19           Folks, let's it's now 2:02.  Can we come back and

20   start at 2:40?  Thank you.

21           THE CLERK:  All rise.

22       (Recess taken at 2:02 p.m.)

23       (Proceedings resumed at 2:39 p.m.)

24           THE COURT:  Okay, well, let's get started.  We're

25   back on the record.

Barton - Direct/Zluticky                              140

 1          MR. KAUFMAN:  Yeah, I think before we call our first

 2  witness, we were just going to do the housekeeping matters, of

 3  which stipulations or which exhibits the parties had agreed.  I

 4  know I conferred with Ms. Meyers and Mr. Moxley last night.  I

 5  don't want to miss

 6          THE COURT:  I left my pen.  I'm going to step out.

 7  Don't do the all rise thing.  I'm just going to be right back.

 8          Okay.

 9          MR. KAUFMAN:  All right.  So lots of exhibits in

10  front of you.

11          THE COURT:  All right.

12          MR. KAUFMAN:  I think -- how do you want to do it?

13  You want to go through the ones that we stipulated?

14          MS. MEYERS:  Sure.  So I think it would make sense to

15  start with what we had emailed about initially, and then I know

16  that Mr. Kaufman followed up with some additional ones that

17  they were willing to stipulate to.

18          MR. KAUFMAN:  Okay.  So -- oh, I didn't print a color

19  copy, so I'm not going to see your red writing.

20          MS. MEYERS:  I have it written down, if you want, if

21  you'll trust me to --

22          MR. KAUFMAN:  So for the debtor's exhibits -- so the

23  debtor and the UCC filed a joint list.  And I apologize, Your

24  Honor, we didn't specify this the way the local rules tell us

25  to, but I'm going to refer to what's in the debtor and the --

Barton - Direct/Zluticky                                    141

```
 1              THE COURT:  We call Dallas liberties.  Is that what
 2   it's for?
 3              MR. KAUFMAN:  Dallas.  That one --
 4              THE COURT:  Go ahead.
 5              MR. KAUFMAN:  So the debtor and --
 6              THE COURT:  You had to take one  for the team.  Go
 7   ahead.
 8              MR. KAUFMAN:  -- Debtor and UCC Exhibits 2, 3, 5,
 9   18 --
10              THE COURT:  Hold on a second.  Debtor, UCC.  And this
11   is docket number what?
12              MS. MEYERS:  1-4-1-0.
13              MR. KAUFMAN:  1-4-1-0.
14              THE COURT:  That's the star in the show.  Okay.
15   1-4-1-0, the docket numbers are -- I should say the exhibit
16   numbers are?
17              MR. KAUFMAN:  Yeah, I think you can -- the docket
18   numbers -- the dash docket numbers --
19              THE COURT:  Yeah.
20              MR. KAUFMAN:  -- should be the same as the exhibit.
21   So 2, 3, 5, 18.
22              THE COURT:  Okay.
23              MR. KAUFMAN:  44 through 61.  36.
24              THE COURT:  Wait, 2, 3, 5, 18, 44 through 61, then
25   36.
```

Barton - Direct/Zluticky                    142

1          MR. KAUFMAN:  Now, we're going backwards.

2          THE COURT:  Now we're going back.  Okay.  I just want

3  to make sure.

4          MR. KAUFMAN:  36.  Now, back forwards to 63.

5          THE COURT:  Okay.

6          MR. KAUFMAN:  And then, there are some filed under

7  seal.

8          THE COURT:  Okay.

9          MR. KAUFMAN:  And those are Exhibits 25, 26, 27, 28,

10  31, 34, 35, 39, now go backwards to 37, 40, and 41.

11          THE COURT:  And that's at docket number -- the seal

12  is under what docket?

13          MR. KAUFMAN:  1413.

14          THE COURT:  Okay, so I've got at 1410, 2, 3, 5, 18,

15  36, 44 through 61, and 63?

16          MR. KAUFMAN:  Yes, Your Honor.  1413-25, 26, 27, 28,

17  31, 34, 35, 39, 37, 40, 41.  That's it.

18          THE COURT:  Okay.

19          MR. KAUFMAN:  On the TCC, the list is filed at 1411,

20  right?

21          MS. MEYERS:  That's correct.

22          MR. KAUFMAN:  Okay.

23          MR. KAUFMAN:  I don't think the documents are on the

24  docket yet.

25          MS. MEYERS:  We discussed with counsel yesterday.

Barton - Direct/Zluticky                    143

 1  They sent -- we had sent a list through requesting admission on

 2  certain ones.  They sent back another list identifying the ones

 3  that they were willing to admit.  And so I sort of culled down

 4  the list, and, you know, we may have additional ones that I

 5  think we can stipulate to.  But at this point, my understanding

 6  is that there's an agreement on TCC 329, TCC 330 and 331.

 7           MR. KAUFMAN:  You're going in a different order than

 8  me.  Sorry, can you slow down?

 9           MS. MEYERS:  I apologize.

10           MR. KAUFMAN:  329, I don't see that.  Hold on just a

11  second.

12           THE COURT:  How about you all figure this out, and

13  then you can just tell me and we can read them into the

14  numbers.  You want me to step off, or DO you want to huddle up

15  to the side or --

16           MR. KAUFMAN:  Yeah, if that -- that might be quicker.

17           THE COURT:  Okay, I'll give you five minutes.  Thank

18  you.

19       (Recess taken at 2:46 p.m.)

20       (Proceedings resumed at 2:50 p.m.)

21           THE COURT:  Okay, we are back on the record in Tehum.

22  Counsel --

23           MS. MEYERS:  Thank you, Your Honor.

24           THE COURT:  -- I'll let you go forward.

25           MS. MEYERS:  So --

Barton - Direct/Zluticky                                    144

```
 1              THE COURT:  I've got TCC -- that Docket 1411, if
 2   we're taking those, which exhibits?
 3              MS. MEYERS:  So it's exhibits -- and I apologize,
 4   these are --
 5              THE COURT:  No worries.
 6              MS. MEYERS -- completely out of numerical order, but
 7   it's TCC 329.
 8              THE COURT:  Okay.
 9              MS. MEYERS:  TCC 330 and 331.
10              THE COURT:  Okay.
11              MS. MEYERS:  TCC 173.
12              THE COURT:  Okay.
13              MS. MEYERS:  132.
14              THE COURT:  Okay.
15              MS. MEYERS:  136.
16              THE COURT:  Alrighty.
17              MS. MEYERS:  288.
18              THE COURT:  Alrighty.
19              MS. MEYERS:  And then we get into the confidential
20   exhibits on the TCC's list.
21              MR. KAUFMAN:  Sorry, Ms. Meyers.  288's under the
22   confidential one.
23
24              MS. MEYERS:  Oh, I apologize.  Okay.  288 is
25   confidential.  And then the other confidential exhibits are
```

1   342, 350, 115, 148 --

2            THE COURT:  You said 1-5-0, 148?

3            MR. KAUFMAN:  No, no, 1-1-5.

4            MS. MEYERS:  1-1-5.

5            THE COURT:  1-1-5.

6            MS. MEYERS:  1-4-8, 141, 170, and 252.

7            THE COURT:  329, 330, 331, 173, 132, 136, 288, 342,

8   350, 115, 148, 141, 170, 252.

9            MR. KAUFMAN:  That's correct.

10           MS. MEYERS:  That's correct, and I believe we'll have

11  more.

12           THE COURT:  Okay, sounds great.  These will be deemed

13  admitted -- well, they will be admitted into the record, not

14  deemed.  They are admitted into the record.  Okay.

15      (ECF Numbers 1410-2, -3, -5, -18, -36, -44 through -61,

16  and -63 admitted into evidence)

17      (ECF Numbers 1413-25 through -28, -31, -34, -35, -37, -39

18  through -41 admitted into evidence)

19      (ECF Numbers 1428-132, -136, -173, -288, and -329 through

20  331 admitted into evidence)

21      (ECF Numbers 1429-115, -141, -148, -170, -252, -342, and -

22  350 admitted into evidence)

23           THE COURT:  Okay.  Any other housekeeping we should

24  take up?

25           MR. KAUFMAN:  We're ready for evidence.

Barton - Direct/Zluticky                     146

1          THE COURT:  All right, call your first witness.

2          MR. ZLUTICKY:  Your Honor, Nick Zluticky for the

3  unsecured creditors' committee.  So is Your Honor's aware, but

4  I'm more saying this for everybody on the Webex, we have

5  additional evidence that we're going to be presenting on

6  Tuesday, so I don't want anyone to be dialing in today to think

7  today will complete the UCC's presentation of evidence.

8          THE COURT:  I'm not worried about --

9          MR. ZLUTICKY:  Understood.

10          THE COURT:  I've got the job to do, so you present

11  the evidence as it goes, and we'll -- today, we start and we go

12  till 5.  So clearly, we're not finishing anything, so let's

13  just proceed.

14          MR. ZLUTICKY:  Thank you very much, Your Honor.  So

15  the Official Committee of Unsecured Creditors calls David

16  Barton.

17          THE COURT:  Alrighty.  Mr. Barton, come on up.  Okay.

18  Can you please raise your right hand?

19   DAVID BARTON, UNSECURED CREDITORS' COMMITTEE'S WITNESS, SWORN

20          THE COURT:  Okay.  Please be seated, And just make

21  sure the mic is close to you so we can hear you.  If you

22  have -- hear an objection, I just ask that you please give me

23  an opportunity to resolve the objection.  And if you need a

24  break at all, just let me know.  Okay?

25          THE WITNESS:  Thank you, Your Honor.

Barton - Direct/Zluticky                    147

```
 1              THE COURT:  Alrighty.  And just -- you can adjust the
 2   mic to make it work, but you can hear.
 3              All right.  Counsel, you may proceed.
 4              MR. ZLUTICKY:  Thank you, Your Honor.
 5                          DIRECT EXAMINATION
 6   BY MR. ZLUTICKY:
 7   Q    Please state your name for the record.
 8   A    My name is David Barton.
 9   Q    Where are you currently employed?
10   A    I'm employed with St. Luke's Health System in Idaho.
11   Q    How long have you been employed at St. Luke's?
12   A    A little more than 13 years.
13   Q    And is it okay with you if I refer to St. Luke's Health
14   System as St. Luke's, colloquially?
15   A    Yes.
16   Q    Okay.
17              THE COURT:  Can you see if you can get that mic just
18   a little closer to you?
19              Zilde, can we see if we can -- maybe we can just
20   adjust it.
21              THE WITNESS:  How's this?
22              THE COURT:  Whatever you just did is much better.
23   Thank you.
24   BY MR. ZLUTICKY:
25   Q    All right.  What is your job title at St. Luke's?
```

Barton - Direct/Zluticky                               148

1   A    Deputy general counsel.

2   Q    When did you graduate law school?

3   A    Graduated from law school in 2002.

4   Q    From what university?

5   A    University of California at Berkeley.

6   Q    Okay.  And do you -- what was your undergraduate degree

7   in?

8   A    Philosophy.

9   Q    And when did you obtain your undergraduate degree?

10  A    1988.

11  Q    What did you -- what was your profession between 1988 and

12  law school?

13  A    I was a philosophy professor, teaching at various

14  universities.

15  Q    After you graduated law school, where did you go to work?

16  A    I went to work at a firm called Folger, Levin & Khan in

17  San Francisco.  It's a litigation firm.

18  Q    Did you have an area of expertise at Folger Levin?

19  A    I did.  It was a broad area, general commercial

20  litigation.

21  Q    When did you join St. Luke's?

22  A    I joined St. Luke's Valentine's Day, 2011.

23  Q    What are your job duties as the deputy general counsel for

24  St. Luke's?

25  A    Two primary sets of job duties, I have.  One is managing

Barton - Direct/Zluticky                    149

1  our relationships legally with our physicians, financial

2  relationships with the physicians, as well as their issues

3  regarding their membership on our medical staff.  And then I'm

4  also responsible for overseeing non-malpractice litigation.

5  Q    In your job title ass deputy general counsel and your job

6  duties you just described, do you oversee in-house and outside

7  counsel in performing your role?

8  A    I do.

9  Q    And do you manage litigation for St. Luke's?

10 A    I do.

11 Q    To the extent that it's non-malpractice litigation?

12 A    Correct.

13 Q    Are you familiar with a company named Corizon Health, Inc?

14 A    I am.

15 Q    How are you familiar with Corizon.

16 A    In two ways.  First, I'm of course, aware of the

17 litigation that St. Luke's has filed against Corizon.  And

18 then, I'm familiar with Corizon because St. Luke's has had a

19 relationship with Corizon where we took care of patients

20 through a contract with Corizon who couldn't be taken care of

21 in the prisons.  So we took care of Corizon patients.

22 Q    And were there any other services that St. Luke's provided

23 to Corizon other than what you've just described?

24 A    Not that I'm aware of.

25 Q    Prior to 2014, did Corizon pay St. Luke's for those

Barton - Direct/Zluticky                    150

1  services, generally?

2  A     Yes.

3  Q     And at some point, did Corizon stop paying St. Luke's for

4  those services?

5  A     They did.

6  Q     Did St. Luke's file a lawsuit against Corizon for failure

7  to pay for those services?

8  A     Yes, we did.

9  Q     Approximately when was that lawsuit filed?

10  A     I believe 2018.

11  Q     So approximately five years prior to the filing of this

12  bankruptcy case?

13  A     That's right.

14  Q     How is St. Luke's involved in this bankruptcy case?

15  A     We're a creditor, and we have a seat on the creditors'

16  committee.

17  Q     So, Mr. Barton, Exhibit 5 in the notebook in front of you

18  has already been admitted into evidence.  I'm just going to ask

19  you a couple of quick questions about it.

20  A     I see it.

21  Q     Okay.  Now this exhibit says St. Luke's is owed

22  approximately $31.3 million from Corizon.  Do you see that on

23  the first page of Exhibit 5?

24  A     I don't yet.

25  Q     Okay.  It might be on the second page.

Barton - Direct/Zluticky                    151

1   A    I see it on the second page, yes.

2   Q    Okay.  How would you characterize 31.3 million in terms of

3   St. Luke's receivables?

4   A    Very substantial.  I'm not aware of a larger receivable.

5   Q    And at some point prior to February 13, 2023, did Corizon

6   change its name to Tehum Care Services, Inc.?

7   A    Yes.

8   Q    Is it your understanding that Tehum Care Services, Inc. is

9   the debtor in this bankruptcy case?

10  A    Yes.

11  Q    So we talked about your involvement a bit in this

12  bankruptcy case.  How did you become involved after they filed?

13  A    I believe I was contacted by Mr. Nguyen, who's here in the

14  court today, and he explained what the creditors' committee

15  does.

16  Q    So did the United States Trustee's office ask you to join

17  the Official Committee of Unsecured Creditors?

18  A    They did.

19  Q    Before this committee, had you ever served on an unsecured

20  creditors' committee in a bankruptcy case before?

21  A    No.

22  Q    Did you agree to join the UCC in this case?

23  A    I sure did.

24  Q    Why?

25  A    As I mentioned a moment ago, I am familiar with Corizon in

Barton - Direct/Zluticky                                    152

1   two separate arenas, familiar with them through litigation we

2   had against them and familiar with them through the care we

3   provide to Corizon's patients.  In both of those circumstances,

4   I had concerns about Corizon's behavior.  Certainly, it's been

5   difficult to litigate against them.  Seemed to me that it was

6   likely that we were not the only entity or person that Corizon

7   had harmed, and I eagerly wanted to join a committee whose job

8   it was to make sure that creditors who had been harmed by

9   Corizon got some money in their pockets.

10  Q    Are you the chair of the UCC?

11  A    I am.

12  Q    And have you served as chair since the formation of the

13  UCC in March 2023?

14  A    Yes.  I think I might have been interim chair at the very

15  beginning, but I've been chair.

16  Q    How would you describe the level of engagement in the

17  bankruptcy case of the UCC's members?

18  A    Very high.

19  Q    Why do you describe it that?

20  A    You know, first, it's an extraordinary collection of

21  intellects, a very high level of understanding and commitment

22  among the members of the UCC.  The discussions we have are

23  illuminating and fruitful.  We have a variety of different

24  perspectives on the committee, and frankly, they're very

25  interesting meetings.

Barton - Direct/Zluticky                 153

1   Q    So how often does the UCC hold these meetings?

2   A    We hold meetings at least once a week.  We have a regular

3   meeting on Monday mornings at 9:30 my time.  And we have -- in

4   addition, we will schedule meetings when there are important

5   issues for the Committee to consider or preparation for

6   mediation, for example.  There will be additional meetings in

7   those circumstances.

8   Q    Is there any particular reason the UCC picked Monday

9   mornings?

10  A    There is.  We chose the time of day in order to

11  accommodate the schedule of one of our tort claimants on the

12  Committee who needed to have the -- have this happen in the

13  morning.

14  Q    How is the attendance at those meetings?

15  A    The attendance is good.  I don't believe we've ever failed

16  to have a quorum.

17  Q    Do you attend those meetings?

18  A    I do.

19  Q    In your view, what's the goal of the UCC?

20  A    We protect the interest of the creditors.  And in this

21  context, that means getting as good a recovery for them as

22  possible.

23  Q    How does the UCC accomplish that goal or try to accomplish

24  that goal?

25  A    Well, we do it by, you know, initially retaining advisors

Barton - Direct/Zluticky                              154

1   who we direct to perform an investigation into the matters and

2   uncover claims. But we do it through directing an

3   investigation, overseeing that investigation, assessing the

4   fruits of that investigation.

5   Q    Who are the members of the UCC?

6   A    There is St. Luke's.  There is Saint Alphonsus Health

7   System.  There's Rachell Garwood.  There's Latricia Revell.

8   There is Maxim Healthcare Staffing.  Truman Medical Center.

9   And it's another Missouri health system.

10  Q    Is that Capital Region?

11  A    Capital Region Medical Center.  Thank you.

12  Q    Have Ms. Garwood and Ms. Revell asserted tort claims

13  against the debtor in this case?

14  A    They have.

15  Q    Does the UCC represent the interest of all creditors?

16  A    We certainly do.

17  Q    Including creditors with tort claims like Ms. Garwood and

18  Ms. Revell?

19  A    Yes, and I should say unsecured creditors.

20  Q    Do the tort claimant members on the UCC attend most

21  meetings either personally or through their respective counsel?

22  A    I don't think there's one where they've both missed.  Yes,

23  the answer is yes.

24  Q    Does the UCC listen to those members?

25  A    Yes, and -- we certainly do.

Barton - Direct/Zluticky                          155

```
1    Q    Does the UCC give the opinions of those members any more
2    or less weight than the opinions of other UCC members?
3    A    We don't give them special weight because of the nature of
4    the claims, but we do give special weight because of the nature
5    of the information we might get.  Those who represent
6    incarcerated claimants have a perspective that I don't have
7    that the Committee, as a whole, needs.  And so we listen very
8    carefully when they raise that perspective.
9    Q    So I want to turn back to the proceedings in the case for
10   the moment.  At some point did the debtor file a motion to
11   borrow money in this bankruptcy case?
12   A    Yes.
13   Q    Okay.  And if you could open the binder to Exhibit 10.
14   A    I've got it.
15   Q    Do you recognize this document?
16   A    I do.
17   Q    How do you recognize this document?
18   A    This -- I recognize it from having seen it previously
19   during the course of the Committee's work.
20   Q    And what is it?
21   A    This looks to be the debtor's initial motion for -- to get
22   DIP financing, DIP loan.
23             MR. ZLUTICKY:  Your Honor, I would offer Exhibit 10.
24             THE COURT:  Any objection?
25             MR. MOXLEY:  No objection, Your Honor.
```

1           THE COURT:  Alrighty.  Exhibit 10 is admitted.

2           (ECF Number 1410-10 admitted into evidence)

3  BY MR. ZLUTICKY:

4  Q    Mr. Barton, who was the proposed lender under this

5  diploma?

6  A    I think it was M2 LoanCo.

7  Q    Did the UCC approve the terms of the proposed DIP loan?

8  A    No, we didn't like the terms of the DIP loan, the proposed

9  DIP loan.

10 Q    Did the UCC file an objection to the DIP motion?

11 A    We did.

12 Q    Can you please open the binder to Exhibit 11?

13 A    I'm there.

14 Q    Do you recognize this document?

15 A    Yes.

16 Q    How do you recognize this document?

17 A    This is the objection that the Committee authorized be

18 filed against the DIP motion.

19 Q    Were you involved in preparing this document?

20 A    Yes.

21 Q    And what is the document again?

22 A    It's the objection of the UCC to the DIP motion.

23          MR. ZLUTICKY:  Your Honor, I offer Exhibit 11.

24          THE COURT:  Any objection?

25          MR. MOXLEY:  No objection, Your Honor.

Barton - Direct/Zluticky                    157

```
1              THE COURT:  11 is admitted.
2          (ECF Number 1410-11 admitted into evidence)
3   BY MR. ZLUTICKY:
4   Q    Did the UCC object to M2 LoanCo receiving a lien on
5   avoidance actions?
6   A    Yes.
7   Q    Do you have an understanding of what avoidance actions
8   means?
9   A    I do.
10  Q    What is that understanding?
11  A    An avoidance action is what you -- the kind of action you
12  take to undo a fraudulent conveyance.
13  Q    Why did the UCC object to M2 LoanCo receiving a lien on
14  avoidance actions?
15  A    Because if we then recovered against M2 LoanCo, if we had
16  a -- if the estate brought a claim against M2 LoanCo, M2 LoanCo
17  would then just take that money from the debtor and it wouldn't
18  do much good.
19  Q    At the time, did the UCC believe there were claims against
20  M2 LoanCo?
21  A    We believed there were possible claims against M2 LoanCo,
22  yes.
23  Q    Did the UCC object to the releases proposed for M2 LoanCo,
24  YesCare, and other related parties in the proposed DIP loan?
25  A    Yes.
```

Barton - Direct/Zluticky                              158

1   Q    Why?

2   A    Because we thought there were claims against them that

3   could bring money into creditors' hands.

4   Q    So if you could open your binder to Exhibit 12, please.

5   Do you recognize this document?

6   A    I do.

7   Q    How do you recognize this document?

8   A    I believe the Committee reviewed it in the course of its

9   work, including myself.

10  Q    What is this document?

11  A    This appears to be the order that was issued on the DIP

12  motion after the objections levied by -- you know, leveled by

13  the UCC.

14          MR. ZLUTICKY:  Your Honor, I offer Exhibit 12.

15          THE COURT:  The objection.

16          MR. MOXLEY:  No objection.

17          THE COURT:  12 is admitted.

18       (ECF Number 1410-12 admitted into evidence)

19  BY MR. ZLUTICKY:

20  Q    Did the bankruptcy court grant M2 LoanCo a lien on

21  avoidance actions, to your knowledge?

22  A    No.  Excuse me, let me clarify that.  I do have knowledge

23  of that, and they did not -- and the Court did not.

24  Q    Thank you for the clarification.

25          THE COURT:  He is a lawyer.

```
 1              MR. ZLUTICKY:  That's right.

 2  BY MR. ZLUTICKY:

 3  Q     Did the bankruptcy court permit the releases requested by

 4  M2 LoanCo, YesCare, and other related parties?  3:10:18

 5  A     It did not.

 6  Q     So then, given all that, do you know why the TCC continues

 7  to refer to the DIP motion in its pleadings and not the DIP

 8  order?

 9  A     I don't know why they do that.

10  Q     Did the UCC identify areas that required the UCC's

11  investigation in this bankruptcy case?

12  A     Yes.

13  Q     Was the divisional merger one of those areas?

14  A     It was.

15  Q     Do you have an understanding of what the divisional merger

16  is that's been described in this case?

17  A     Yes.

18  Q     What is that understanding?

19  A     My understanding is that it was a transaction whereby

20  Corizon consolidated all of its various entities and then

21  divided those entities into two entities, one being Corizon,

22  which ultimately became the debtor later, nine months down the

23  line, and then a company called -- I believe it was called CHS

24  at the time.

25  Q     Does CHS operate under another name now?
```

Barton - Direct/Zluticky                                160

1  A    They operate under the name, YesCare.

2  Q    Were there other areas of investigation that UCC pursued

3  in addition to the divisional merger?

4  A    Yes.

5  Q    Can you give me an example of those areas?

6  A    Sure.  Fraudulent conveyance claims, breach of fiduciary

7  duty, alter ego, successor liability.

8  Q    Did those include fraudulent conveyance, successor

9  liability -- the other claims you mentioned, did those include

10 claims against the proposed settlement parties in this case?

11 A    Yes.

12 Q    As chair of the UCC, what role did you have in

13 investigating potential claims or causes of action?

14 A    I participated, along with the rest of the Committee, in

15 directing that investigation into what claims the estate might

16 have.

17 Q    What did you do to pursue that investigation?

18 A    We began by hiring the right folks.  So we carefully

19 selected counsel initially, and then with the assistance of

20 counsel, we also carefully selected financial advisors.  We

21 directed those professionals to issue document subpoenas, to do

22 depositions, and everything necessary to find out what sums of

23 money might be available and, you know, we might be able to get

24 to the creditors.

25 Q    Did you request updates from the UCC's professionals on

Barton - Direct/Zluticky                                      161

1   the scope of the investigation?

2   A    Yes.  On a regular basis.

3   Q    Did you request updates from the UCC's professionals on

4   the status of that investigation?

5   A    Yes.

6   Q    So in addition to what you previously described, what did

7   the UCC do to investigate those potential claims or causes of

8   action?

9   A    We issued document requests resulting in, I think, about

10  5- or 600,000 pages of documents.  We took depositions of the

11  major players.  I think we took the deposition of Isaac

12  Lefkowitz a number of times, and we met with substantial

13  resistance that had to be overcome with motions to compel, and

14  we doggedly pursued the information we needed to understand how

15  to get money to the creditors.

16  Q    Did the UCC request documents from the debtor as part of

17  its investigation?

18  A    Yes.

19  Q    Did the debtor produce documents to the UCC in response to

20  that request?

21  A    Pardon me?

22  Q    Did the debtor produce documents to the UCC in response to

23  that request?

24  A    Yes.

25  Q    Did the UCC request documents from M2 LoanCo as part of

Barton - Direct/Zluticky                               162

```
 1  its investigation?

 2  A    Yes.

 3  Q    And did M2 LoanCo produce documents to the UCC in response

 4  to its request?

 5  A    Yes.

 6  Q    Did the UCC have any disputes with M2 LoanCo regarding the

 7  production of documents?

 8  A    I believe we did.

 9  Q    Did the UCC file a motion to compel in this court to

10  compel M2 LoanCo to produce additional documents?

11  A    Yes.

12  Q    Did M2 LoanCo produce additional documents to the UCC

13  after that motion was filed?

14  A    Believe they did.

15  Q    So, Mr. Barton, I'm going to try to get through the next

16  couple of questions in summary form, which is, did the UCC

17  request documents from YesCare?

18  A    Yes.

19  Q    Did the UCC request documents from FTI?

20  A    Yes.

21  Q    Did the UCC request documents from M2 HoldCo?

22  A    Yes.

23  Q    Did the UCC request documents from M2 EquityCo?

24  A    Yes.

25  Q    Did the UCC request documents from Perigrove 1018, LLC?
```

Barton - Direct/Zluticky                                    163

1    A    Yes.

2    Q    Did the UCC request documents from Geneva?

3    A    Yes.

4    Q    Okay.  Ultimately, did those parties produce documents in

5    response to the UCC's request?

6    A    Yes.

7    Q    Now I want to ask a couple of questions about Flacks

8    Group.  Did the UCC request documents from Flacks Group as part

9    of its investigation?

10   A    I don't -- yes, we did.

11   Q    And did Flacks Group produce documents to the UCC in

12   response?

13   A    I think they did.

14   Q    Okay.  Did the UCC complete its investigation into Michael

15   Flacks and Flacks Group?

16   A    No.

17   Q    Did the UCC mediate with Michael Flacks and Flacks Group?

18   A    No.

19   Q    Are Michael Flacks or Flacks Group being released under

20   this settlement?

21   A    No.

22   Q    All told, approximately how many documents were produced

23   to the UCC by the settlement parties as part of the UCC's

24   investigation?

25   A    I actually don't know how many documents.  You know, I

Barton - Direct/Zluticky                                  164

1   think it's about 500- or 600,000 pages.

2   Q    Did the UCC review all 500 or 600,000 pages of documents

3   and conducting its investigation?

4            MR. MOXLEY:  Objection, Your Honor.  Your Honor, this

5   is one of the issues that I asked Mr. Barton about at his

6   deposition.  I specifically asked him were UCC members ever

7   shown --

8            THE COURT:  Can you just get close to the mic?  I

9   just want to make sure I can hear you, sir.

10           MR. MOXLEY:  Yes, Your Honor.  I apologize, Your

11  Honor.

12           THE COURT:  No, no, no.

13           MR. MOXLEY:  No, I'm happy to hand up the Court a

14  copy of Mr. Barton's deposition transcript if the Court needs

15  it.  But at Page 138 of his transcript, I asked him were the

16  UCC members ever shown any documents that were reviewed as part

17  of the investigation, and he was instructed not to answer that

18  question.  And Counsel --

19           THE COURT:  I'll let you cross him on it, and it'll

20  go to the way.  I'll overrule.  He can answer.

21           MR. MOXLEY:  Thank you, Judge.

22           MR. ZLUTICKY:  Thank you, Your Honor.

23  BY MR. ZLUTICKY:

24  Q    Did the UCC review all 500,000 pages of documents in

25  conducting its investigation?

Barton - Direct/Zluticky                           165

1  A    We did.  Either through the UCC or through counsel, yes.

2  Q    Did the UCC also take depositions as part of its

3  investigation into potential claims and causes of action?

4  A    Yes.

5  Q    You said the UCC took the deposition of Mr. Lefkowitz

6  several times?

7  A    Yes.

8  Q    Did the UCC depose M2 LoanCo.

9  A    Yes.

10  Q    Did it depose Perigrove 1018?

11  A    Yes.

12  Q    Did it depose Geneva?

13  A    Yes.

14  Q    Did it depose Pharmacorr?

15  A    Yes.

16  Q    Did it depose YesCare?

17  A    Yes.

18  Q    Did the UCC attend the 341 meeting of creditors in this

19  case?

20  A    Yes.

21  Q    Did the UCC ask questions at the 341 meeting of creditors

22  of the witnesses appearing under oath?

23  A    Yes.

24  Q    Did the UCC ask questions at every continued 341 meeting

25  of creditors of the witnesses appearing under oath?

Barton - Direct/Zluticky                                166

1  A    Pardon me, I didn't quite catch that.

2  Q    Did the UCC ask questions of witnesses that appeared at

3  continued 341 meetings?

4  A    Yes.

5  Q    Did the UCC receive all of the information it asked for in

6  its investigation of the settlement parties?

7  A    I doubt it.

8  Q    Okay.  And why not?

9  A    I -- it's -- I don't think it's possible to know for

10 certain that every document that we might want to have looked

11 at has been produced, but we're satisfied that we have the

12 information we need.

13 Q    Why are you satisfied that you received the information

14 you needed?

15 A    We have the information we need to evaluate the value of

16 claims relative -- I should say prior to the first mediation.

17 We wanted to make sure that we didn't have that mediation until

18 we felt we were in a situation where we could assess the value

19 of our claims so that we could assess the reasonable range of

20 settlement.  So we delayed that first mediation until we had

21 that information.  And so when I say we're satisfied that we

22 have the information we need, that's what I mean.  It was good

23 enough.  We had enough information to go into the mediation.

24 Q    So, Mr. Barton, if you could turn to Tab 1 of your binder.

25 A    Here's.

Barton - Direct/Zluticky                167

 1   A    I am there.

 2   Q    Do you recognize this document?

 3   A    Let me just look at the date on it.  Yes, I do.

 4   Q    How do you recognize this document?

 5   A    Through the work that I've done with the Committee.

 6   Q    What is this document?

 7   A    This document is the Committee's and debtor's motion for

 8   authorizing and approving the settlement.

 9            MR. ZLUTICKY:  Your Honor, I offer Exhibit 1.

10            THE COURT:  Any objection to the admission of 1?

11            MR. MOXLEY:  No objection.

12            THE COURT:  Exhibit 1 is admitted.

13        (ECF Number 1410-1 admitted into evidence)

14   BY MR. ZLUTICKY:

15   Q    Mr. Barton, if you could turn to Paragraph 27 of Tab 1.

16   A    Paragraph 27?

17   Q    Yeah, it starts on Page 12.

18   A    Okay.  I'm there.

19   Q    Okay.  Paragraph 27 lists four main categories of claims.

20   Do you see that in Paragraph 27?

21   A    Yes, I do.

22   Q    Are those the only potential claims against the settlement

23   parties the UCC identified?

24   A    No.

25   Q    What other types of claims -- what other types of

Barton - Direct/Zluticky                                      168

1   additional potential claims against the settlement parties did

2   the UCC identify?

3   A    They would include the ones I mentioned previously.  They

4   would include altered ego claims, successor liability, breach

5   of fiduciary duty.

6   Q    And we'll get to those claims in a bit, but first, let's

7   focus on Paragraph 28 of the settlement motion titled Avoidance

8   Actions Against M2 LoanCo.  Do you see that in Paragraph 28 of

9   the settlement motion?

10  A    I do.

11  Q    After completing its investigation, did the UCC identify

12  potential claims against M2 LoanCo?

13  A    Yes.

14  Q    What types of claims?

15  A    Fraudulent conveyance claims, for the most part.

16  Q    Are those the transfers described in Paragraph 28 of

17  Exhibit 1?

18  A    Yes.

19  Q    What is the total amount of those transfers?

20  A    Little over 24 and a half million.

21  Q    Does the UCC have a view on the merits of those claims?

22  A    We think it's -- we think those claims are meritorious.

23  We think those conveyances were, in fact, fraudulent.

24  Q    Okay.  And why do you think that?

25  A    There wasn't equivalent value or even close to equivalent

Barton - Direct/Zluticky                                    169

1   value exchanged.

2   Q     But how do you know that?

3   A     Through the investigation that we did.

4   Q     Do you know whether M2 LoanCo disputes those claims?

5   A     They do dispute those claims.

6   Q     Did the UCC -- well, let me back up for a moment.  Do you

7   know whether there was a prepetition loan between M2 LoanCo and

8   the debtor?

9   A     I believe there was.

10  Q     Okay.  And did the UCC look into that prepetition loan?

11  A     Yes.

12  Q     Okay.  Did the UCC identify any claims against M2 LoanCo

13  relating to that prepetition loan?

14  A     Yes.

15  Q     What types of claims?

16  A     There was about $80 million that was characterized as a

17  loan from M2 LoanCo to the debtor that we do not believe was an

18  actual loan, that the debtor here, Tehum, should not owe to M2

19  LoanCo.

20  Q     And was that loan allocated to YesCare under the

21  divisional merger we spoke about earlier?

22  A     That's my understanding.

23  Q     What is the UCC's view on the merits of those claims?

24  A     The claims are strong.  They're meritorious claims.

25  Q     Do you know whether M2 LoanCo disputes those claims?

Barton - Direct/Zluticky                                    170

1    A    They do.

2    Q    Do you know whether the debtor disputes those claims?

3    A    I believe it does.

4    Q    Paragraph 30 of the settlement motion describes potential

5    claims against Geneva Consulting.  Do you see that in Paragraph

6    30?

7    A    Avoidance actions against Geneva, yes.

8    Q    After completing its investigation, did the UCC identify

9    potential claims against Geneva?

10   A    Yes.

11   Q    What kinds of claims?

12   A    More fraudulent transfer claims.

13   Q    Are those the transfers described in Paragraph 30 of the

14   settlement motion?

15   A    Yeah, it's in the table at the bottom of that paragraph.

16   Q    What is the total amount of those transfers?

17   A    Five and a half million.

18   Q    What is the UCC's view on the merits of those claims?

19   A    We think those are meritorious claims. We think those

20   conveyances were fraudulent.

21   Q    Why do you believe that?

22   A    Again, we don't see evidence of equivalent value for the

23   transfers.

24   Q    And does the UCC know that the transfers occurred?

25   A    Yes.



Barton - Direct/Zluticky                                171

1  Q    How does the UCC know the transfers occurred?

2  A    We uncovered those in our investigation.

3  Q    Do you know whether Geneva disputes those claims?

4  A    They dispute those claims, yes.

5  Q    Paragraph 32 of the settlement motion describes potential

6  claims against Pharmacorr.  Do you see that in Paragraph 32?

7  A    I see --

8  Q    It says it's avoidance actions against Perigrove 1018 and

9  related parties.  Do you see that in Paragraph 32?

10 A    I do.

11 Q    And so if you read Paragraph 32, it describes transfers

12 that benefited Pharmacorr, though.  Do you see that at the top

13 of --

14 A    I do.

15 Q    After completing its investigation, the UCC identified

16 potential claims against Pharmacorr?

17 A    Yes.

18 Q    And what are those claims?

19 A    Again, they're fraudulent transfer claims.

20 Q    And those are the transfers described in Paragraph 32 of

21 the --

22 A    Yes.

23 Q    -- settlement motion?

24 A    That's correct.

25 Q    What is the total amount of those transfers?

Barton - Direct/Zluticky                    172

1   A    Just shy of a million.

2   Q    What is the UCC's view on the merits of those claims?

3   A    Again, we think those were improper transfers.

4   Q    Do you know whether Pharmacorr disputes those claims?

5   A    They do dispute those claims.

6   Q    After completing its investigation, did the UCC identify

7   potential claims against YesCare?

8   A    We did.

9   Q    And what are those claims?

10  A    There are fraudulent transfer claims. There's also a claim

11  that the, you know, creation of YesCare was achieved through a

12  fraud.  And there are successor liability claims, as well.

13  Q    Do those claims arise out of the divisional merger?

14  A    Yes.

15  Q    Why does the UCC believe there are fraudulent transfer

16  claims against YesCare?

17  A    Well, when you do a divisional merger, you're required

18  under the Texas Code to allocate assets to each of the entities

19  that are -- that survive the transaction.  And we believe that

20  the way in which those funds were allocated in the divisional

21  merger was unfair to creditors and fraudulent in that sense.

22       MR. ZLUTICKY:  So, Your Honor, I'm getting into just

23  maybe two or three questions that are probably confidential or

24  deal with a confidential document.

25       THE COURT:  I don't think you're putting it up on the

Barton - Direct/Zluticky                        173

1  screen, but you can talk about it generally.

2             MR. ZLUTICKY:  We're not putting it up on the screen,

3  Your Honor.

4             THE COURT:  Okay.  Then, you can continue.

5             MR. ZLUTICKY:  Okay.

6  BY MR. ZLUTICKY:

7  Q    Did FTI prepare an opinion on the divisional merger?

8  A    FTI did prepare an opinion.

9  Q    Have you reviewed it?

10 A    Yes.

11 Q    What was that opinion that FTI rendered about the

12 divisional merger?

13 A    Well, it was an opinion that the transaction was fair and

14 specifically that it was fair to creditors.

15 Q    What is the -- and this transaction, do you mean the

16 divisional merger?

17 A    I mean the divisional merger, yes.

18 Q    What is the UCC's view of that fairness opinion?

19 A    We think it's pretty much worthless, that the information

20 it was based on was not accurate.

21 Q    What do you mean that the information wasn't accurate?

22 A    I don't believe that FTI had accurate information about

23 the amount of money that would be available to creditors.

24 Q    And why do you say that?

25 A    I say that because we know that certain amounts were

Barton - Direct/Zluticky                              174

1  hidden from FTI, that there wasn't full disclosure of the

2  financial situation of the relevant entities.

3  Q    What is the UCC's view on the merits of the claims against

4  YesCare?

5  A    We think they're meritorious.

6  Q    Okay.  Why?

7  A    We think they're meritorious because there was fraud in

8  the way this merger -- in the way this divisional merger was

9  done.  However, it is likely that in order to undo that

10 divisional merger and find that the YesCare that, you know,

11 survived the merger was really a successor to the debtor may

12 require overturning the Texas statute authorizing divisional

13 mergers.  And so that is just a -- you know, a claim that is

14 uncertain.

15 Q    Do you know whether YesCare disputes those claims?

16 A    They do dispute those claims.

17 Q    Did the UCC review the insurance policies of the debtor

18 and its predecessors as part of its investigation?

19 A    We did.

20 Q    Did that include review of directors and officers or D&O

21 insurance policies?

22 A    Yes.

23 Q    And what did the UCC discover with respect to those

24 policies?

25 A    There isn't D&O insurance available.

Barton - Direct/Zluticky                                    175

1    Q    Does that impact the UCC's view on claims against the

2    settlement parties?

3    A    Yes, particularly regarding alter ego claims where, you

4    know, you are trying to get to an individual director or

5    officer.  The fact that there is no insurance to pay those

6    claims diminishes the value of those claims.

7    Q    So you brought up alter ego.  If you could turn to

8    Paragraph 46 of the settlement motion.

9    A    I've got it.

10   Q    And I'm quoting from the document.  It says, "The UCC and

11   the debtor have also evaluated the viability of potential

12   claims against CHS TX/YesCare based on the divisional merger

13   under theories based on or derivative of successor liability."

14   Did I read that correctly in Paragraph 46?

15   A    You did.

16   Q    Okay.  And did those potential claims include successor

17   liability?

18   A    Yes.

19   Q    What other potential claims were included in that

20   evaluation?

21   A    You know, claims of a similar nature.  Piercing the

22   corporate veil.  Alter ego.

23   Q    Did the UCC evaluate those claims against YesCare prior to

24   the mediations?

25   A    We did.

Barton - Direct/Zluticky                    176

1  Q    Okay.  Why?

2  A    We wanted to make sure that every possible source of

3  recovery was identified so that we could maximize our position

4  going into the mediation and get the best possible result.

5  Q    Okay.  So not asking you to give a legal opinion, Mr.

6  Barton, but just in your understanding, what is the difference

7  between alter ego and successor liability?

8  A    Successor liability gets you to the next company.  Alter

9  ego gets you to the officers or directors of the company, if

10  you will.  That good enough, or do you want to --

11  Q    Answering the questions is great.  Does the UCC believe

12  potential alter ego or successor liability claims exist against

13  YesCare?

14  A    Yes.

15  Q    And does the UCC believe potential alter ego claims exist

16  against the other settlement parties?

17  A    Yes.

18  Q    What is the UCC's view on the merits of those claims?

19  A    I think they're meritorious, but it's difficult to pierce

20  the corporate veil.

21  Q    Okay.  What causes you to say that?

22  A    Well, partly it's just experience in litigation.  I would

23  say it's experience.

24  Q    Does the UCC have any other views on the merits of these

25  claims?

Barton - Direct/Zluticky                    177

```
 1  A    I don't know.

 2  Q    The UCC's view on the merits of those claims, is that

 3  based in part on the investigation the UCC conducted?

 4  A    Yes.

 5  Q    Does the UCC know whether YesCare disputes these claims?

 6  A    YesCare disputes these claims.

 7  Q    Does the UCC know whether the other settlement parties

 8  dispute these claims?

 9  A    I believe other settlement parties dispute these claims.

10  Q    Okay.  And we talked earlier about a Texas divisional

11  merger statute.  Have you read that statute before?

12  A    Yes.

13  Q    To your knowledge, has it been repealed by the Texas

14  legislature?

15  A    It has not been repealed.  It is on the books.

16  Q    To your knowledge, has it been invalidated by a court in

17  Texas or by the Supreme Court of the United States?

18  A    It has not.

19  Q    Did this factor into the UCC's view on the alter ego and

20  successor liability claims?

21  A    Of course, yes.

22  A    How?

23  A    It is speculative to think you're going to win on a theory

24  that requires overturning a statute that's been on the books

25  for a long time.  It's not impossible, but it's not a great
```

1   hook to hang your hat on.

2   Q      Do you have experience pursuing fraudulent conveyance

3   claims?

4   A      I do.

5   Q      Okay.  What is that experience?

6   A      Just recently pursued a fraudulent conveyance claim

7   against a person in Idaho.

8   Q      And your experience pursuing fraudulent conveyance claims,

9   did those experiences inform your view on pursuing those

10  fraudulent conveyance claims against the settlement parties?

11  A      They did.

12  Q      In what way?

13  A      In the fraudulent conveyance claim I just mentioned, we

14  happened to be successful, but the reason we were successful is

15  because this defendant had actually produced a YouTube video in

16  which they said they had engaged in the transaction in order to

17  hide money that would otherwise be due under a judgment.  So we

18  just had the best possible evidence you could have.  So we did

19  win that claim.  But typically, you have to make a more

20  substantial showing than that to win on a fraudulent conveyance

21  claim.

22          THE COURT:  I haven't had one of those.

23  BY MR. ZLUTICKY:

24  Q    Mr. Barton, did the UCC participate in the first global

25  mediation, August 2023?

Barton - Direct/Zluticky                                        179

 1  A    We did.

 2  Q    Did you attend the first mediation in August 2023?

 3  A    I did.  I attended that here in Houston.

 4  Q    Okay.  So you attended in person?

 5  A    I did.

 6  Q    How long did that mediation last?

 7  A    Three days.  Two and a half.

 8  Q    So without revealing anything protected by the Court's

 9  orders on confidentiality of the mediation, did the UCC

10  significantly participate in the mediation?

11  A    Yes.

12  Q    At that mediation, did the parties to the mediation reach

13  a settlement?

14  A    We did.

15  Q    Did the UCC approve that settlement?

16  A    Yes.

17  Q    Was that approval unanimous?

18  A    It was.

19  Q    So in August 2023, what was your view on the terms of the

20  settlement?

21  A    In -- the terms of the August 2023 settlement, we thought

22  it was a good settlement.

23  Q    Now, did the August 2023 settlement contemplate a plan

24  would be filed incorporating its terms?

25  A    Yes.

Barton - Direct/Zluticky                180

1  Q    So -- make sure I have this exhibit number right.  So if

2  you could turn to Tab 18, and I believe this has already been

3  admitted.

4            THE COURT:  Yes.

5  BY MR. ZLUTICKY:

6  Q    Okay.  So this is the second amended disclosure statement

7  regarding the debtor and the Official Committee of Unsecured

8  Creditors second amended joint Chapter 11 plan.  Do you see

9  that?

10 A    I do.

11 Q    And attached that is a copy of that second joint amended

12 plan.  Do you see that?

13 A    I do.

14 Q    Now, there's been a fair amount of discussion in

15 depositions and in motion practice about the plan, but I want

16 to ask very clearly, Mr. Barton, does the UCC support

17 confirmation of that plan?

18 A    Nope.

19 Q    Why not?

20 A    Well, it relates to a settlement that has been superseded

21 by an even better one, and it would be the Committee's

22 expectation that any plan that is going to be implemented in

23 connection with the settlement that's currently on the table

24 would be prepared with the TCC.  So we're not interested in

25 this one at this time.

Barton - Direct/Zluticky                    181

1   Q    Is there any circumstance under which the UCC would

2   support confirmation of that plan.

3   A    Reflected here in Exhibit 18?  No.

4   Q    Will the UCC ever seek confirmation of that plan?

5   A    No.

6   Q    Why not?

7   A    For the reasons I just stated.  It's no longer relevant.

8   Q    Has the UCC made any determination of what would be

9   included in a new plan?

10  A    We have not -- no, we have not.

11  Q    Now, the UCC is aware there have been some reports of

12  allegations of a relationship between the first mediator and an

13  attorney who represented YesCare.  Is that right?

14  A    Okay.

15  Q    Were you aware of any such relationship in August 2023

16  when the first mediation occurred?

17  A    No, of course not.

18  Q    Was anyone on the UCC or any of the UCC's professionals

19  aware of that?

20  A    I have no reason to believe they were.  None at all.

21  Q    The UCC eventually requested that the Court appoint a new

22  mediator, Mr. Sontchi, to conduct a second mediation.  Is that

23  correct?

24  A    Yes.

25  Q    Why?

Barton - Direct/Zluticky                    182

1   A    The situation was certainly unfortunate.  We thought, as a

2   Committee, about what the best way to approach it was, and we

3   just approached it with, you know, the guiding principle in

4   mind.  Let's maximize a recovery for the creditors.  So let's

5   turn this to our advantage.  That's what we did.  We thought,

6   goodness, this -- you know, what happened probably means the

7   Court's not going to approve the existing plan and settlement,

8   and so that gives us leverage.  We can negotiate a better deal.

9   Q    And did the UCC use that leverage to try to negotiate a

10  better deal?

11  A    We did.

12  Q    Why?

13  A    Because we wanted to put more money into the hands of the

14  creditors.

15  Q    Did the UCC participate in the second global mediation in

16  December 2023?

17  A    Yes.

18  Q    Did you participate in the second global mediation?

19  A    I did.  This time, remotely.  I stayed in Boise.

20  Q    So without revealing anything protected by the Court's

21  orders on confidentiality of the mediation, did the UCC

22  significantly participate in the mediation?

23  A    Yes.

24  Q    At that mediation, did some of the parties to that

25  mediation reach a settlement?

Barton - Direct/Zluticky                          183

1    A    Yes.

2    Q    Did the UCC approve that settlement?

3    A    Yes.

4    Q    Okay.  And was that approval unanimous?

5    A    It was.

6    Q    What was your view on the terms of the December 2023

7    settlement?

8    A    I was really pleased by it.  Fifty-four million was more

9    than I expected we would get.

10   Q    So why is this December 2023 settlement higher than the

11   amount of the August 2023 settlement?

12   A    Well, I -- you know, I suppose that's a question for the

13   debtor, but my theory is -- or for the settlement parties,

14   rather, but -- for the other settlement parties.  But my view

15   is that we had substantial leverage going into that because the

16   other parties knew that the existing plan and settlement was

17   not going to get approved, and so they needed to come up with

18   more money, and we were there to extract.

19   Q    So if you could please turn to Exhibit Tab 2?  And this is

20   another one I believe has already been admitted.  So I want to

21   ask you a couple of questions about this agreement.

22             THE COURT:  Which exhibit was it?

23             MR. ZLUTICKY:  Exhibit 2, Your Honor.

24             THE COURT:  Okay.  Thank you.

25   BY MR ZLUTICKY:

Barton - Direct/Zluticky                                    184

1  Q    Do you have tab two open, Mr. Barton?

2  A    Yes.

3  Q    Okay.  This is the settlement agreement between the

4  debtor, the UCC, and the settling parties.  Is that correct?

5  A    Just need to look at the date here.  January 16th, '24,

6  yes, that's correct.

7  Q    What claims are being settled under the terms of the

8  proposed settlement agreement?

9  A    To your knowledge, all claims of the estate and only

10 claims of the estate.

11 Q    Are any claims held by non-debtors being released under

12 the terms of the proposed settlement, to your knowledge?

13 A    No.

14 Q    Are any claims that creditors have against non-debtor

15 third parties being released under the terms of the proposed

16 settlement, to your knowledge?

17 A    No.

18 Q    Approximately how much money is being paid by the

19 settlement parties in exchange for the releases in the

20 settlement agreement?

21 A    About 54 million.

22 Q    Are those parties also releasing claims they may have

23 against the estate?

24 A    Yes.

25 Q    Are non-estate claims being released in that settlement,

Barton - Direct/Zluticky                    185

1   to your knowledge?

2   A    I think I may have misheard the last question.  Could you

3   repeat it?  I just want to make sure my testimony was accurate.

4   Q    Sure.  Are the settlement parties releasing claims they

5   may have against the debtor?

6   A    No.

7   Q    So --

8   A    Yes.  I apologize.  The settlement parties are releasing

9   claims that they have against the debtor.

10  Q    The releases are mutual?

11  A    Yes, the releases are mutual.

12           THE COURT:  I almost kicked you under the table.

13  BY MR. ZLUTICKY:

14  Q    Are any non-state claims being released in the settlement

15  agreement, to your knowledge?

16  A    They are not being released.

17  Q    Does the UCC have a view on whether the settlement is a

18  fair result for creditors?

19  A    We do.

20  Q    And what is that view?

21  A    Well, as has been quoted here already, I personally think

22  it's a fantastic view.  And the UCC thinks it's a good deal, a

23  fantastic deal.

24  Q    Why do you think that?

25           MR. MOXLEY:  Objection.  Objection, Your Honor.  Your

Barton - Direct/Zluticky                186

1   Honor, I specifically asked Mr. Barton what did the UCC rely on

2   when it decided to support the settlement involving the

3   divisional merger claims which are part of the settlement here.

4   He was instructed not to answer that question.  Respectfully,

5   Judge, I think given the instructions to not answer that

6   question, it's inappropriate for Mr. Barton to be able to

7   testify as to why he holds the headline view that he supports

8   the motion.

9             THE COURT:  Overruled.  You can answer.

10            THE WITNESS:  $54 million.  I mean, I think in

11  anyone's world, that is a lot of money.  It is high relative to

12  the amount of money, frankly, that we believed was even

13  available to anybody.  It is reasonable relative to the value

14  of the claims we asserted.  And most importantly, I think, from

15  the Committee's perspective, it gets money into the hands of

16  creditors now.

17            My client, St. Luke's, has been pursuing Corizon for

18  years.  The Committee pursued Corizon for a full year.  All

19  that time they were hiding money, moving it around, playing

20  games.  We finally got the money.  So I regard that as a very

21  important thing that we now have money that can be made

22  available to creditors.

23  BY MR. ZLUTICKY:

24  Q    Is the length of time to receive money a factor in the

25  UCC's view of the settlement?

Barton - Direct/Zluticky                                187

1   A     Yes.

2   Q     Okay.  To your knowledge, how long will it take for the

3   estate to receive the settlement funds?

4   A     My understanding is that will be available upon

5   confirmation of a plan that's not yet before the Court.

6   Q     Did the UCC form a view of how long it would take to

7   obtain judgments against these parties on these claims?

8   A     Yes.

9   Q     What is that view?

10  A     Many years.  If the question is about -- could you repeat

11  the question?  I apologize.

12  Q     What is the UCC's view of how long it would take to obtain

13  judgments against the settling parties for these claims?

14  A     If the estate were asserting the claims?

15  Q     That is correct.

16  A     Okay.  It would take years.

17  Q     How would you describe the litigation with Corizon in the

18  lawsuit filed by St. Luke's in 2018?

19  A     Frustrating.

20  Q     Why do you say that?

21  A     The tactics that were used were ones you don't usually

22  see, even in hard-fought litigation?  Strategic changes in

23  counsel to create delays, changes in corporate formation where,

24  despite federal court rules that require you to apprise the

25  court of your corporate structure, despite that, they failed to

Barton - Direct/Zluticky                                188

1  disclose those changes.  There were maneuvers like that that

2  successfully delayed the litigation to the point where it's now

3  five years old.

4  Q    And in those five years, did St. Luke's obtain a judgment

5  against Corizon?

6  A    We didn't.

7  Q    Did that inform your view on the possible length of time

8  to obtain judgments against the settling parties?

9  A    Yes.

10 Q    Did St. Luke's Health System incur attorneys' fees, costs,

11 and expenses in its litigation against Corizon?

12 A    We did.

13 Q    How would you describe the amount of those fees?

14 A    Hundreds of thousands of dollars.

15 Q    Did that inform your view on the possible cost of

16 obtaining judgments against the settling parties?

17 A    It did.

18 Q    Did the UCC form a view of how much it could cost to

19 obtain judgments against the settling parties on these claims?

20 A    Yes.

21 Q    And what is that view?

22 A    That it would be very high and, you know, probably high

23 enough that we wouldn't be able to use, you know, estate funds

24 to do it.  We'd have to do it on contingency.

25 Q    Are there risks in pursuing the potential claims against

Barton - Direct/Zluticky                    189

1    the settling parties that we've discussed today?

2    A    Yes.

3    Q    What are some of those risks?

4    A    There's -- you know, of course, there's the ordinary risks

5    that, you know, are associated with any litigation.  You just

6    may not get the evidence you hope to, and you may not be able

7    to convince a jury.  But then, you know, in addition to that,

8    there's special problems with these defendants.  They do engage

9    in fraudulent transfers, and they can be expected to continue

10   the game of hiding their money.  And so I do think collection

11   poses special problems.

12   Q    Now, if this settlement's approved, do you know how much

13   of this settlement St. Luke's would get?

14   A    Nope.

15   Q    Do you know how much of this settlement tort claimants

16   would get?

17   A    No.

18   Q    Why not?

19   A    Well, there isn't a plan yet, that we would develop that.

20   My hope would be that we would develop that with the TCC.

21   Q    Now, you're aware that the TCC's objected to the

22   settlement motion, right?  Are you aware the TCC's filed a

23   motion to dismiss this bankruptcy case?

24   A    Yes.

25   Q    Did the UCC ever consider filing a motion to dismiss this

Barton - Direct/Zluticky                              190

1    case at some point?

2    A    We did.

3    Q    When was that?

4    A    Early on, when the Committee was first formed.

5    Q    And why didn't the UCC file a motion to dismiss then?

6    A    Our job is to recover as much money for the creditors as

7    possible, and we thought long and hard about it, but it didn't

8    seem to us to be right to gamble with the creditors' money on a

9    fairly speculative claim.  We -- as I've testified, we do think

10   there were merits to it.  Right.  And perhaps it's possible to

11   undo the transaction.  Perhaps it's possible to undo the Texas

12   statute and get it overturned, but I don't think that's a

13   sufficient basis to use the creditors' money.

14   Q    You've spent the past twelve months chairing a committee

15   representing the unsecured creditors in this bankruptcy case.

16   Is that right?

17   A    Yes.

18   Q    And you've been involved in the UCC's investigation,

19   prosecution, mediation and settlement processes in this case?

20   A    Yes.

21   Q    Through that experience, have you formed a view on whether

22   the settlement is a good result for all creditors?

23   A    Yes.

24   Q    Can you tell us what that view is?

25   A    I think it's a good result for creditors.  I think we

Barton - Direct/Zluticky                                 191

1    should take this money.

2    Q    Okay.  And through your experience, have you formed a view

3    on whether dismissing the bankruptcy case would be a good

4    result for all creditors?

5    A    Yes.

6    Q    Okay.  And what is that view?

7    A    That it would be a disaster.

8    Q    Why do you say that?

9    A    I think it's overwhelmingly likely that 100 percent of the

10   pro se plaintiffs and a good chunk of the incarcerated

11   plaintiffs who have claims won't see anything as a result of

12   the settlement.  I don't know how it is possible for a creditor

13   in that situation to marshal the resources to pursue the kinds

14   of claims that have been described in the TCC's motion.

15   Q    Well, now, St. Luke's is owed more than $31 million,

16   though.  Is that right?

17   A    Yes.  Okay.

18   Q    Okay.  Does St. Luke's have the resources to pursue

19   Corizon and YesCare and others in Idaho if the case were

20   dismissed.

21   A    We sure do.

22   Q    And we already talked about St. Luke's has a motion for

23   summary judgment pending in that current case in Idaho, right?

24   And St. Luke's asserted successor liability claims in that

25   case, right?

Barton - Direct/Zluticky                              192

1   A    That's right.

2   Q    Would St. Luke's be in possibly a better position than

3   others to pursue its claims to collection?

4   A    I don't think we'd be in a good position, but we'd be in a

5   better position relative to others, yes, because we have those

6   resources.  And we're pursuing this claim with a lead counsel

7   who is the former United States Attorney for the District of

8   Idaho.  I do not think that most creditors are going to be in a

9   position to be able to do that kind of thing.

10  Q    Well, then why then do you think it's not in St. Luke's

11  best interest to just go back to court in Idaho and fight it

12  out?

13  A    Don't get me wrong.  That's what we'll do if this is

14  dismissed.  We'll fight it in Idaho.  But I have grave doubts

15  as to our ability to collect anything.

16  Q    So through your experience today that we've discussed,

17  have you formed a view of the settlement parties, YesCare M2

18  LoanCo, Perigrove, Mr. Lefkowitz?

19  A    I suppose so.

20  Q    What is that view?

21  A    That I don't trust them.

22  Q    What causes you to say that?

23  A    I've seen the fraudulent transfers.  I've seen the efforts

24  to hide money from creditors.  And I haven't seen evidence of

25  some sort of epiphany whereby they're all going to change their

Barton - Direct/Zluticky                              193

1   behavior.

2   Q    So given that that is your view, why is the UCC settling

3   with those settlement parties?

4   A    For the benefit of the creditors.  We can get $54 million

5   available now, and I don't think we're going to do better in

6   any other way.  And I don't like them, but that doesn't mean I

7   won't settle with them.

8           MR. ZLUTICKY:  Your Honor, I have no further

9   questions and pass the witness.

10          THE COURT:  Let's see, any other questions from this

11  side, the parties who are in favor?  I'm just going to step off

12  for a second.  I'm going to call the AC folks and make sure

13  that the AC is actually on.  I'm just going to step off.  If

14  you wouldn't mind just staying right where you are.  Do you

15  need a break?

16          THE WITNESS:  I'm fine, Your Honor.

17          THE COURT:  Okay.  Let's just take a two -- I'm just

18  going to take two minutes and make a quick phone call.

19          THE CLERK:  All rise.

20      (Recess taken at 3:57 p.m.)

21      (Proceedings resumed at 4:04 p.m.)

22          THE COURT:  I apologize.  Okay.  Let's proceed with

23  cross-examination.

24          MR. MOXLEY:  Thank you, Your Honor.

25                          CROSS-EXAMINATION

Barton - Cross/Moxley                    194

1   BY MR. MOXLEY:

2   Q     Good afternoon, Mr. Barton.

3   A     Good afternoon.

4   Q     Sir, my name is Cameron Moxley.  I'm with the law firm of

5   Brown Rudnick.  We're co-lead counsel to the TCC.  We had a

6   chance, actually, to meet by video when I took your deposition

7   previously.  It's nice to see you in person, sir.

8   A     Nice to see you.

9   Q     Mr. Barton, today, in the course of our discussion, we may

10  reference certain materials.  Those are in the white binder

11  that's sitting there before you.

12          MR. MOXLEY:  Your Honor, I believe the Court has a

13  copy of that binder as well.  Thank you, Judge.

14  BY MR. MOXLEY:

15  Q     And they'll also come up, Mr. Barton, on the screen in

16  front of you.

17  A     Oh, they will?

18  Q     So you're welcome to rely on either, and if there are --

19  if there's areas of documents you want us to zoom in on on your

20  screen, we can do that.  Okay?

21  A     Great.

22  Q     Okay.  Mr. Barton, I think you testified earlier you're

23  the chairman of the Official Committee of Unsecured Creditors,

24  correct?

25  A     Yes.

Barton - Cross/Moxley                          195

1    Q     Okay.  And as I referenced a moment ago, it was on

2    February 14th of this year that I asked you questions at a

3    deposition we conducted by video, right?

4    A     Yes.

5    Q     Okay.  And you testified at that deposition on behalf of

6    the Official Committee of Unsecured Creditors, or the UCC,

7    right?

8    A     Right.

9    Q     You have a bachelor's degree in philosophy from Stanford

10   University, correct?

11   A     Yes.

12   Q     And you have a Ph.D. in philosophy from the University of

13   California at Berkeley, right?

14   A     Yes.

15   Q     And you testified earlier you have a law degree from

16   Berkeley as well, correct?

17   A     Yes.

18   Q     And you're currently the Deputy General Counsel for St.

19   Luke's Health System, correct?

20   A     Yes.

21   Q     I think Mr. Zluticky asked you before, we can refer to

22   them as St. Luke's today, right?

23   A     Yes, that's just fine.

24   Q     Okay.  And St. Luke's has filed a proof of claim in this

25   case.  I think you looked at it when -- on the direct

1  examination, right?

2  A    Yes.

3  Q    Could you open your binder -- the white binder, this time,

4  sir -- to Tab 173?  These are -- the tabs are by exhibits.

5            MR. MOXLEY:  (Indiscernible) Your Honor, this is the

6  exhibit list.

7            THE COURT:  What number did you say?

8            MR. MOXLEY:  173.

9            THE COURT:  1-7-3?

10            MR. MOXLEY:  That's TCC Exhibit 173.

11            THE COURT:  Oh, okay.  I see it.

12            MR. MOXLEY:  Your Honor, there may be some

13  duplication on our list and the debtor's list, but --

14            THE COURT:  Oh, okay.

15            MR. MOXLEY:  -- so I'll use our numbers, but --

16            THE COURT:  Oh, I can find your binder.

17            MR. MOXLEY:  Okay.  Very good.  Thank you, Judge.

18  BY MR. MOXLEY:

19  Q    Mr. Barton, do you have -- do you have TCC Exhibit 173

20  there in front of you?

21  A    Thank you.

22  Q    Is that a copy of St. Luke's proof of claim?

23  A    Yes.

24  Q    St. Luke's bankruptcy counsel has mentioned this case as

25  (indiscernible).

1   A    We did.  That's correct.

2   Q    Is that correct?  Thank you, sir.

3        Mr. Barton, are you aware that one of the motions at issue

4   in this hearing is the debtor's and the UCC's joint motion

5   asking the Court to approve the debtor's and UCC's settlement

6   agreement, right?

7   A    Yes.

8   Q    And if you look at Tab 125 in your binder, which is TCC

9   Exhibit 125, turn to that, please?

10  A    I've got it.

11  Q    Okay.  And this is a copy of the joint motion seeking

12  approval of the settlement agreement, right?

13  A    Yes, sir.

14  Q    Okay.  Mr. Barton, for ease of reference, can we refer to

15  that motion that is in your binder at TCC Exhibit 125 as the

16  Rule 9019 motion?

17  A    Fine.

18  Q    Okay.  And the Rule 9019 motion attaches the settlement

19  agreement that is sought to be approved, right?

20  A    Yes.

21  Q    Okay, and if you could -- that settlement agreement's at

22  Exhibit 1 to the 9019 motion which begins at Page 37 of the

23  file, right?

24  A    I'm sorry.  I'm not seeing that.

25  Q    If you turn to Page -- you see the top of -- there's the

Barton - Cross/Moxley                    198

1  page number at the very top of the document, sir.

2  A     Ah.

3  Q     I'd ask you to turn to Page 37 of 47.

4  A     I've got it, yes.

5  Q     Okay.  And it should be on your screen, as well, sir, if

6  that's helpful.

7  A     Very good.

8  Q     Okay.  And Mr. Barton, can we refer to the settlement

9  agreement that is Exhibit 1 to the Rule 9019 motion today as

10  "the settlement"?

11             THE COURT:  Mr. Moxley, can you pull that mic, just

12  bend it a little bit towards you?

13             MR. MOXLEY:  Yes, Your Honor.

14             THE COURT:  All right.

15             MR. MOXLEY:  Is that better?

16             THE COURT:  Much better.  Thank you.

17             MR. MOXLEY:  Thank you, Your Honor.  And I'll try to

18  stay closer to the microphone.

19             THE COURT:  No, no, no, no.

20             MR. MOXLEY:  Okay.

21             THE COURT:  Just keep doing what you're going.

22             MR. MOXLEY:  Okay.

23  BY MR. MOXLEY:

24  Q     Mr. Barton, my question, just to repeat it, was can we

25  refer to the settlement agreement today, just for ease of

Barton - Cross/Moxley                                    199

1   reference, as "the settlement"?

2   A    I suppose so.

3   Q    Okay.  If you have any confusion --

4   A    Yeah.

5   Q    -- when I'm asking my question just let me know.  Okay?

6   Is that fine, sir?

7   A    Yes.

8   Q    Okay.  So going back to the Rule 9019 motion itself,

9   Mr. Barton, if we could -- same tab, just go back to the

10  motion, beginning page, beginning of the document, let me draw

11  your attention to Page 2.  And then you see Paragraph 1 of the

12  motion on Page 2?

13  A    Yes.

14  Q    And the Rule 9019 motion at Paragraph 1 states that the

15  UCC and the debtor each undertook investigations of various

16  claims and causes of action belonging to the debtor's

17  bankruptcy estate, right?

18  A    Yes.

19  Q    Okay.  Now, once the Rule 9019 was filed, Mr. Barton,

20  there were no further investigatory steps the UCC was taking in

21  order to determine whether or not to support the settlement

22  agreement, correct?

23  A    No.

24  Q    That's incorrect?

25  A    I think that's incorrect.

Barton - Cross/Moxley                              200

1  Q    Okay.  Let's look at your deposition transcript, if we

2  could, sir.  That's the first tab of the -- your binder.  No,

3  your white binder there, sir.  Go to -- it's TCC Exhibit 123

4  for identification purposes.  This is your deposition

5  transcript.  Do you see that, sir?

6  A    Yup.

7  Q    Okay.  Let me ask you to turn to Page 150.  I'm sorry,

8  sir.  Bear with me one second, sir.  I'm sorry.  Page 123.  I

9  apologize.  123.  And if you're on Page 123 with me,

10 Mr. Barton, could you look at Line 3?  Do you see there, I

11 asked you, were there any further investigatory steps the UCC

12 was taking under the Rule 9019 motion was filed in order to

13 determine whether or not to support the settlement.

14 Mr. Kaufman interjected an objection to form, and then your

15 answer was, "Not in order to determine whether or not to

16 support the settlement.  As I said, there is unanimous support

17 for the settlement.  That has never wavered."  Was that your

18 testimony, sir, in response to that question?

19 A    That was my testimony.

20 Q    Was your testimony accurate?

21 A    My testimony is accurate.

22 Q    Okay, so when you answered the question "no" today, why

23 did you answer the question differently today, sir?

24 A    Did I mishear your question?  I thought the question was

25 whether there was any ongoing investigation.

Barton - Cross/Moxley                          201

1   Q    I see.  Okay, so you stand by the testimony from your

2   deposition?

3   A    Yes.

4   Q    Okay.  Let's discuss the investigation that the UCC

5   undertook.  The UCC investigated potential avoidance claims

6   against M2 LoanCo, right?

7   A    Yes.

8   Q    Okay.  And that investigation was performed by the Stinson

9   and Dundon Advisers firms, correct?

10  A    No.  It was performed by the UCC directing the counsel to

11  do that.

12  Q    Okay.  Let's turn to Page 151 of your transcript, sir,

13  your deposition transcript.  I asked you at Line 2 of Page 151

14  who performed that investigation, and your answer was "Stinson

15  and Dundon Advisers at our direction, at the direction of the

16  UCC," correct?

17  A    Yes.

18  Q    Okay, so my question, sir, was who conducted the

19  investigation that is described in the Rule 9019 motion.

20  A    Okay, it -- well, I don't -- Stinson and Dundon did it at

21  the direction of the UCC.  I -- that means that the UCC did it.

22  We were in charge of it.

23  Q    Okay.  Did UCC members carry out the investigation

24  personally?  Or did they task the Stunson [sic] and Dundon

25  firms with carrying out the investigation?

Barton - Cross/Moxley                                    202

1    A    Both.

2    Q    I see.  Okay.  The Rule 9019 motion reflects that the

3    transfers to M2 LoanCo and the -- that the UCC believes could

4    be avoided totaled approximately $24.5 million, correct?

5    A    I believe so.

6    Q    Okay.  That's at motion -- that's at Paragraph 28 of the

7    motion, right, which we can turn back to.

8              MR. MOXLEY:  That's at Tab 125, Your Honor.

9              THE WITNESS:  I see on the screen, here.

10   BY MR. MOXLEY:

11   Q    Okay, very good.  The screen (indiscernible).  That's

12   correct, right, $24-1/2 million?

13   A    Yes.

14   Q    Okay.  The UCC also investigated potential avoidance

15   actions against Geneva, right?

16   A    Yes.

17   Q    And does Paragraph 30 of the Rule 9019 motion describe

18   those?

19   A    If you could give me a moment, if you would, to pull this

20   up in the binder?

21   Q    Of course.

22   A    What's the tab number?

23   Q    The tab number is 125, and page -- or Paragraph 30 begins

24   at Page 13 of the document.

25   A    Okay.

1  Q    And what was the amount of those claims, sir, as set forth

2  in the motion?

3  A    You're -- under avoidance actions against Geneva?

4  Q    Correct.

5  A    5-1/2 million.

6  Q    The UCC also investigated potential avoidance action

7  claims based on transfers to a third party that benefitted the

8  Perigrove 1018 related parties, right?

9  A    Yes.

10  Q    That's described at Paragraph 32 of the motion?

11  A    Yes.

12  Q    Okay.  And those potential transfers to a third party for

13  the benefit of Perigrove total approximately $956,000, correct?

14  A    Yes.

15  Q    Okay.  And the UCC also looked at potential avoidance

16  actions related to the divisional merger, right?

17  A    Yes.

18  Q    And it was the -- was it the Stinson and Dundon firms that

19  investigated the potential divisional merger avoidance actions,

20  as well?

21  A    At the direction of the UCC.  It was the UCC's

22  investigation, as I've testified.

23  Q    Okay.  Let's look at your deposition transcript again, if

24  we could, sir.

25  A    Okay.

Barton - Cross/Moxley                    204

1   Q    I'd ask you turn to Page 199.

2        Are you with me, sir, Page 199?

3   A    Yes.

4   Q    Okay.  If you could look at Line 12, you'll see at your

5   deposition I asked you, "To the extent the UCC has any view at

6   all as to what the value of the potential avoidance actions

7   rising from the divisional merger is, would that view come from

8   any source other than its advisors, Dundon and the Stinson

9   firm."  Do you see that?

10  A    I see that question, yes.

11  Q    And do you see there that counsel to the UCC instructed

12  you not to answer that question?

13  A    I do.

14  Q    And you testified that you had followed counsel's

15  instructions, correct?

16  A    I did.

17  Q    Okay.  What about potential causes of action for theft of

18  business opportunity?  Was that a cause of action the UCC

19  identified and investigated?

20  A    I don't recall that.

21  Q    You have no memory of that cause of action being raised?

22  A    I don't.

23  Q    So the UCC hasn't concluded that claims for potential

24  theft of business opportunity -- hasn't concluded if -- whether

25  or not those have any value, correct?

Barton - Cross/Moxley                    205

```
 1              MR. ZLUTICKY:  Objection, Your Honor.  Misstates the
 2    witness' testimony.  He said he didn't recall.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Could you repeat the question, please?
 5    BY MR. MOXLEY:
 6    Q    Yes.  Mr. Barton, the question was if you don't recall
 7    whether or not -- sorry.  Strike that.
 8         If you don't recall whether the UCC investigated claims
 9    for theft of potential business opportunity, am I correct that
10    the UCC has not ascribed a value to those potential causes of
11    action?
12    A    I don't know that they have.
13    Q    As the chairperson of the UCC, you're not aware of the UCC
14    having ascribed any value to those potential claims, are you?
15    A    That's correct.
16    Q    Would I also be correct, then, sir, in assuming that the
17    settlement value that is set forth in the settlement agreement,
18    that no portion of that is ascribed to claims or causes of
19    action based on theft of potential business opportunity?
20    A    I don't know.
21    Q    I think you testified on direct, sir, that breaches of
22    fiduciary duty were causes of action that the UCC investigated
23    as well, correct?
24    A    Yes, correct.
25    Q    And is your testimony the same that those causes of action
```

Barton - Cross/Moxley                                    206

1    were investigated by the UCC directing the Stinson and Dundon

2    Advisers firms?

3    A    Right.

4    Q    Okay.  And what value did the UCC conclude that the

5    fiduciary duty claims have?

6    A    I don't know.

7    Q    There's no value set forth for those claims in the Rule

8    9019 motion, right?

9    A    That's correct.

10   Q    Okay.  And what portion, if any, does the UCC ascribe to

11   potential breaches of fiduciary duty claims in the settlement

12   agreement?

13   A    I think they're problematic claims because they would be

14   brought against directors and officers of these companies, and

15   there isn't insurance to cover those claims.  So I don't think

16   they're particularly valuable claims, but they're claims.

17   Q    Thank you, sir.  My question was a little different.  It

18   was is there a dollar amount of the settlement payments that

19   the UCC ascribes to those claims?

20   A    Not to my knowledge.

21   Q    Okay.  Did anyone other than the advisors at the Stinson

22   and Dundon firms advise the UCC with respect to the issue of

23   whether or not the UCC should enter into the settlement

24   agreement and pursue the Rule 9019 motion?

25   A    The question, whether anyone advised -- other than Stinson

1  and Dundon advised the UCC?

2  Q    Correct, sir.

3  A    Not to my knowledge.

4  Q    Now, the UCC believes that the divisional merger here --

5  you know what I'm referring to when I say "the divisional

6  merger", yes?

7  A    Yes.

8  Q    Okay.  I believe you testified to that on direct, as well,

9  correct?

10  A    Yes.

11  Q    Okay.  The UCC believes that the divisional merger here

12  was unfair to creditors, right?

13  A    Certainly.

14  Q    And the UCC believes that the divisional merger here may

15  have involved fraud, right?

16  A    Yes.

17  Q    But you don't know what the value of the divisional merger

18  avoidance claims is, do you?

19  A    We don't have a precise dollar figure, no.

20  Q    In fact, I think you testified before that you think it's

21  nearly impossible to value it, right?

22  A    It's very difficult.  Yes, sir.

23  Q    You would agree that the measure of damages on what claim

24  relating to the divisional merger would be would be what was

25  the value of CHS, which later became YesCare immediately after

```
 1  that divisional merger transaction, right?

 2  A    Correct.

 3  Q    And that would be the value of what was transferred

 4  arguably fraudulently, right?

 5  A    Right.

 6  Q    And you think it's hard to come up with that number,

 7  right?

 8  A    Yes.

 9  Q    You don't know what the value of what was transferred as

10  part of the divisional merger was, right?

11  A    We don't have precise numbers, correct.

12  Q    Now, the UCC undertook substantial work to try to find out

13  the value of CHS TX, Inc. immediately after the divisional

14  merger but was unable to get that information, right?

15  A    We were able to get a lot of information, but not

16  information that gave us a precise dollar value.

17  Q    And again, that substantial work was work that was

18  performed by the Stinson and Dundon firms at the UCC's

19  direction, right?

20  A    Fair.

21  Q    Are you aware, Mr. Barton, that YesCare has held itself

22  out as continuing Corizon's business?

23  A    Yes.

24  Q    For example --

25  A    Yes.
```

Barton - Cross/Moxley                                    209

```
 1  Q    Okay.  Well, let me just ask you, for example, sir, are
 2  you aware of YesCare marketing statements to the effect that
 3  they are a continuation of -- that YesCare is a continuation of
 4  Corizon's business?
 5  A    I'm not aware of marketing statements.
 6  Q    Okay.  Let me show you a document, sir.  It's at 270 in
 7  your binder.
 8            MR. KAUFMAN:  Your Honor, we're going to object to
 9  this one.
10            MR. ZLUTICKY:  Objection, Your Honor.
11            MR. KAUFMAN:  There's no predicate for this.  It's a
12  100 -- it's hearsay within hearsay, and probably a third layer
13  of hearsay on top of that.  It's never been produced in this
14  case until Wednesday despite discovery requests asking for
15  identification and production of documents like this.  We don't
16  even know who made this document.
17            MR. MOXLEY:  You know what, Your Honor, let me ask a
18  couple questions about the document in front of the witness.
19            MR. KAUFMAN:  We would object to that, too.
20            THE COURT:  No, why you don't tell me a little bit
21  about it before I let you.
22            MR. ZLUTICKY:  Well, there's been no foundation
23  laid --
24            THE COURT:  Yeah.
25            MR. ZLUTICKY:  -- for this document.
```

Barton - Cross/Moxley                    210

```
 1          THE COURT:  You're going to have to lay -- I'll give
 2   you an opportunity to lay some foundation, but --
 3          MR. MOXLEY:  Your Honor, I can -- I'll withdraw the
 4   request that he look at the document.  I'll just ask him some
 5   questions without the document --
 6          THE COURT:  Okay.
 7          MR. MOXLEY:  -- without the use of the document if
 8   that's okay.
 9          THE COURT:  Thank you.
10          MR. MOXLEY:  Thank you, Your Honor.
11   BY MR. MOXLEY:
12   Q    Mr. Barton, are you aware that YesCare has held itself out
13   as claiming to have over 40 years of experience in the
14   correctional healthcare space?
15   A    I'm not.
16   Q    YesCare has not been around for 40 years, correct?
17   A    An entity under that name has not been around for 40
18   years.
19   Q    The entity that was -- that preceded YesCare was Corizon
20   Health, right?
21   A    Well, CHS, and then, yeah.
22   Q    Yes?  Okay.
23   A    Yes.
24   Q    Mr. Barton, you don't think it's appropriate that a
25   company could divide itself like Corizon did here, right?
```

Barton - Cross/Moxley                                          211

1  A    What do you mean by "like they did here"?

2  Q    Where --

3  A    What aspect of the -- what aspect of it are you focusing

4  on?

5  Q    Yes, where operational assets are placed in one company

6  and liabilities are largely placed in another company.  You

7  don't think that's appropriate, do you?

8  A    I don't have a view on that, on what you've just

9  described.  I have a view on a company doing that and then --

10  and then having the entity that they, you know, deprived of

11  assets and just gave the liabilities to, and then declaring

12  bankruptcy for that entity.  I don't think that's appropriate.

13  Q    Okay.  If we could look at the -- back at Tab 125, which

14  is the tab that's the 9019 motion and the settlement agreement,

15  sir?  And if I could ask you to turn to Page 38 of 47.

16  A    Tab 47?

17  Q    Sorry.  No, no.  Tab 125, the Rule 9019 motion, and then

18  if you could turn to Page 38, sir.  So we're within the

19  settlement agreement.

20  A    I'm there.

21  Q    Okay.  And if you look at Page 38, you'll see there begins

22  at the bottom of that page, Section 4, Settlement Payments?

23  A    Yes.

24  Q    Okay.  Do you recall that Section 4 of the settlement

25  agreement provides for the M2 parties to make certain

Barton - Cross/Moxley                                    212

1   settlement payments, right?  See that, sir?

2   A    I see that.

3   Q    Okay.  And Mr. Barton, you're familiar with the settlement

4   agreement, right?

5   A    I am.

6   Q    Okay.  Just to -- for ease of reference, if you turn back

7   to the prior page, the very first paragraph under the heading

8   "Settlement Agreement", you see that -- you see there's a

9   definition there for the -- who the M2 parties are?

10  A    Yes.

11  Q    Okay.  And YesCare Corp. and CHS TX, Inc. are among the M2

12  parties as defined in the settlement agreement, correct?

13  A    Yes.

14  Q    Now, the UCC does not know whether or not YesCare has the

15  financial ability to make the settlement payments called for by

16  Section 4 of the settlement agreement, right?

17  A    We don't have certainty on that.

18  Q    You don't know, correct?

19  A    Yes.

20  Q    Now, Mr. Barton, going back to the causes of action that

21  are set forth in the Rule 9019 motion and described in it, they

22  include the potential avoidance actions against Perigrove,

23  Geneva, and M2 LoanCo, right?

24  A    Pardon me.  I -- can you repeat that?  I just didn't catch

25  that.

Barton - Cross/Moxley                                    213

```
 1   Q    Of course.

 2   A    I was looking at the document.

 3   Q    No, of course, sir.  So just thinking back in your mind --

 4   we can -- I can show you the document, if it's easier, but the

 5   causes of action that are set forth in the Rule 9019 motion and

 6   described in it, they include the potential avoidance actions

 7   against Perigrove, Geneva, and M2 LoanCo, right?

 8   A    I don't see them in the settlement agreement right now.

 9   Can you point me to that?

10   Q    Let -- yeah, let me make this much easier for you.  I'm

11   sorry.  I apologize.  Let's go back to the settlement

12   agreement -- or the Rule 9019 motion.

13   A    Mm-hmm.

14   Q    And we can look at, just for example, just start at

15   Paragraph 1.

16   A    I'm going to need the tab.

17   Q    I'm sorry.  Paragraph -- 125.  Same tab.  Same tab we're

18   in.  Yup.  It's on the screen as well, if that helps, sir.

19   A    Okay.

20   Q    Do you see -- you see there's a reference there to the

21   movant's investigations revealed the estate may have

22   meritorious claims against Perigrove 1018, M2 LoanCo, Geneva

23   Consulting, and it goes on from there, correct?

24   A    Where are you?  What --

25   Q    Paragraph 1, sir.
```

Barton - Cross/Moxley                              214

```
 1  A    Yes, I see.

 2  Q    Okay.  And the causes of action that are set forth in the

 3  Rule 9019 motion and described in it include the potential

 4  avoidance claims arising from the divisional merger as well,

 5  right?

 6  A    Yes.

 7  Q    There are no other specific causes of action that you're

 8  aware of that the UCC investigated that are not described in

 9  the Rule 9019 motion, though, right?

10  A    I don't know the answer to that question.

11  Q    Okay.  Let's look, again, then, at your deposition

12  transcript, sir, if we could?

13  A    Okay.  I'm not sure I understand the question.  There's a

14  lot of double negatives in it.

15  Q    Let me ask --

16  A    Can you repeat it?

17  Q    Yeah, of course.  Let me ask the question again.  There

18  are no other specific causes of action that you are aware of

19  that the UCC investigated that are not described in the Rule

20  9019 motion, right?

21  A    That are not described in the Rule 9019 motion?

22  Q    Yes, sir.

23  A    Not that I'm aware of.  The Rule 9019 motion does describe

24  successor liability and related claim.

25  Q    Yes.  My question is about what the UCC investigated.  And
```

Barton - Cross/Moxley                                     215

1  any claims that -- did the UCC investigate any claims that are

2  not described in the Rule 9019 motion?

3  A    Not that I'm aware of.

4  Q    Not that you're aware of.  I'm a little bit confused

5  because earlier today, you testified about how the UCC

6  investigated alter ego claims.

7  A    Yes.

8  Q    Alter ego claims are not referenced in the Rule 9019

9  motion, are they?

10 A    Successor liability and related theories are related --

11 are described in the 9019 motion.

12 Q    Right.  And I think Mr. Zluticky asked you to tell you --

13 to tell him the difference between alter ego and successor

14 liability.

15 A    Yes.

16 Q    They're different doctrines, correct?

17 A    They are different.  They are related doctrines, but

18 different.

19 Q    And alter -- the alter ego doctrine is not referenced in

20 the Rule 9019 motion, correct?

21 A    That's not correct.  Successor liability and related

22 doctrines are referenced.

23 Q    I see.  So your testimony is that the reference at

24 Paragraph 46 to the successor liability doctrine is also a

25 reference to alter ego, even though the words "alter ego" do

Barton - Cross/Moxley                          216

```
 1  not appear in that paragraph.  Is that your testimony?

 2  A    Can I go to --

 3  Q    Of course.

 4  A    -- Paragraph 46?

 5  Q    Of course.  Let's do that.

 6  A    I believe there's a reference to -- to related theories.

 7  "UCC and the debtor have also evaluated the viability of

 8  potential claims against CHS TX and YesCare based on divisional

 9  merger under theories based on or derivative of successor

10  liability."  I do take that to include alter ego.

11  Q    You do?

12  A    Yes.

13  Q    What value in the settlement does the UCC ascribe to the

14  alter ego claims that are not specifically referenced by

15  express terminology?

16  A    I'm not aware of --

17  Q    (Indiscernible).

18  A    I'm not aware of a particular value placed on them.

19  Q    Are breach of fiduciary duty claims that I think you also

20  testified to on direct examination described anywhere in the

21  Rule 9019 motion?

22  A    They're mentioned, yes.

23  Q    They are?

24  A    Yes.

25  Q    Okay.  And who are those claims against, sir?
```

Barton - Cross/Moxley                          217

```
 1  A    They'd be against directors and officers of the various
 2  entities that were among the settlement parties.  They may
 3  include directors and officers of entities that were not among
 4  the settlement parties, such as the Flacks Group.
 5  Q    And are the causes of action that are being settled by the
 6  settlement agreement all described in the Rule 9019 motion?
 7  A    I don't know.
 8  Q    Let me ask you to turn to your deposition transcript if I
 9  could, again, sir, which is the first tab of the binder.  If
10  you could turn to Page 240?
11            THE COURT:  Which tab, Counsel?
12            MR. MOXLEY:  Yes, Your Honor, the first tab in the
13  binder.
14            THE COURT:  Oh, okay.  Sorry.
15            MR. MOXLEY:  It's Tab 123.
16            THE COURT:  Sorry.
17            MR. MOXLEY:  Yup.
18            THE COURT:  I'm with you.
19            MR. MOXLEY:  It's the transcript, sir, yes.
20            THE COURT:  Oh, okay.  Got it.
21            MR. MOXLEY:  Yes.
22            THE WITNESS:  Okay.
23  BY MR. MOXLEY:
24  Q    We're at Page 240, Mr. Barton.  And if I could ask you to
25  look at Line 13.  I asked you, "As you sit here today as the
```

Barton - Cross/Moxley                                    218

1   UCC's designee, are you aware of any causes of action that are

2   being settled in the settlement agreement that are not

3   described in the Rule 9019 motion?"  There was an objection.

4   Then your answer was, "I am not, sitting here now, aware of

5   such things."  Correct?

6   A    Yes.

7   Q    So at your deposition, you weren't aware of any causes of

8   action that are being settled that are not described in the

9   Rule 9019 motion.  Is that still your testimony, sir?

10  A    Look, I don't have an exhaustive understanding of

11  everything that's listed in the 9019 motion.  So I don't know

12  the answer to your question right now, sitting here.

13  Q    So as you sit here today, it's possible there are claims

14  that are being settled under the settlement agreement that are

15  not described in the Rule 9019 motion, correct?

16  A    No.  That's not correct.  The --

17  Q    Okay.  So one of the things -- one of those things has to

18  be true, sir.

19  A    The -- can you repeat your last question?

20  Q    Yes, sir.  My question is, is it possible, as you sit

21  there today, that there are potential claims, causes of action

22  that are being settled by the settlement agreement that are not

23  described in the Rule 9019 motion?

24  A    Well, you would have to look at the settlement agreement

25  that describes the -- what's being settled.  That is where I'm

Barton - Cross/Moxley                                219

```
1   coming from here.  I mean, I don't know why we're looking to

2   the 9019 motion.  The 9019 motion attaches the settlement

3   agreement, so you can look to the cause -- you can see what

4   causes of action are being settled in the 9019 -- in the

5   settlement agreement.  Those are estate claims.

6   Q    Well, we're looking at the -- strike that.

7        You're a lawyer, correct?

8   A    Yes.

9   Q    Okay.  Are you aware that a settlement agreement in the

10  context of this bankruptcy proceeding needs to be presented to

11  the Court for the Court to approve?

12  A    Yes.

13  Q    Okay.  So I'm looking at the Rule 9019 motion because it

14  describes -- it purports to describe the settlement agreement,

15  the basis for the seeking of the approval of the settlement

16  agreement that is attached to it.  Do you understand that?

17  A    Yes, it attaches the settlement agreement itself.  Yes.

18  Q    Right.  So my question for you, sir, and I -- I am, at

19  least, not sure if I am clear on what your testimony is because

20  it seems to me that it's different today versus your

21  deposition.  So let me just ask you the question cleanly, and

22  we'll see what your answer is.

23       Are you aware, as you sit here today, of whether or not

24  there are any causes of action that are being settled by the

25  settlement agreement that are not described in the Rule 9019
```

Barton - Cross/Moxley                          220

1   motion?

2   A    I am not aware.

3          THE COURT:  Can I ask a question?  I'm sorry.  You

4   know, I want to understand the settlement agreement, if you've

5   got the settlement agreement up.  And I want to make sure that

6   I'm understanding something, and I don't mean to steal your

7   thunder here.  I -- I'm just -- I'm looking at the agreement.

8   I just want to make sure that I ask these questions before I

9   forget to ask them.

10          So the settlement agreement -- I mean, like, the

11  actual agreement, right?  The actual thing that I'm being asked

12  to approve.  So 12 -- the exhibit to -- what's attached to the

13  9019.

14          MR. MOXLEY:  Yes, Your Honor.

15          THE COURT:  Okay.  It's between what we'll call the

16  M2 parties, the debtor, and the committee, right?  It provides

17  for settlement payments, obviously.  It's got the settlement

18  payments, but I'm going to, like, 6, 7, 8, and 9 -- 6, 7, and

19  9.  I get -- and don't read into this.  I just want to make

20  sure I'm understanding kind of what the UCC's understanding is

21  as to this.

22          So 6 says that on the effective date, the M2 parties,

23  which are defined up here, are going to release and waive all

24  claims and causes of action against the debtor's estates,

25  including some proofs of claim, right?  So the M2 parties,

Barton - Cross/Moxley                    221

1  which is YesCare, M2 LoanCo, the M2 Perigrove, Pharmacorr, and

2  Geneva.  And then on the plan effective date, the debtor and

3  the committee waive any claims and causes of action against all

4  of these individuals listed A through --

5          MR. MOXLEY:  U.

6          THE COURT:  -- U.  Right?  As I read this -- and I

7  want to make sure I've got this right, and then all creditors

8  are going to be enjoined from going against the released

9  parties here, right -- because that's what 9(a) says -- in a

10  plan, in a settlement.  They're going to have to be enjoined.

11          I don't know how that works, by the way.  Somebody's

12  going to have to explain to me what I'm -- what I'm approving

13  here and how this works or how you opt -- what the plan is

14  contemplating, because I don't understand the opting out of the

15  settlement.  But maybe that's just a technical point that

16  somebody can explain.  Let me just to the question.

17          As I read this, and I don't know if the claim exists

18  or not, but I'm just exploring, so Sigma gets a release under

19  the plan, and all creditors are bound, but Sigma can still sue

20  someone, and so can Mr. Lefkowitz, and so can Endeavor.  Right?

21  They -- Pharmacorr.  Like, theoretically, like, they're not

22  part of the M2 parties that are releasing, but then they're

23  getting releases, and all creditors are bound by the release,

24  but then they can turn around and sue someone.  So they can

25  turn around and sue the very people -- and I don't know if they

1  have any claims or not; I just want to make sure that I
2  understand as I'm reading the document -- can Isaac Lefkowitz
3  turn around and sue someone, although he's getting a release
4  for the -- like, in other words, if he had a counterclaim
5  against someone on litigation, he would get released under this
6  settlement agreement.  But then he can turn around and sue them
7  offensively.  And nothing would bind him because nothing here
8  binds him because he just can't sue the released parties
9  because he'd technically be a creditor, I suspect, or maybe --
10  do I have that right?
11            THE WITNESS:  Your Honor, I don't know.
12            THE COURT:  Or could Sigma sue someone?
13            THE WITNESS:  My understanding has been that the
14  releases are mutual, and --
15            THE COURT:  I don't -- that's what I'm saying.  And
16  if it is, then I want to make sure that that's your
17  understanding, and I want somebody to -- I agree with you,
18  we've got to look to the terms of the -- motions say things,
19  but I'm being asked to approve a settlement, and that's what'll
20  be attached to the order.  And I just want to understand the
21  way the settlement works.
22            So you know, DG Realty, right?  Could they turn
23  around and sue someone who's actually getting -- they would be
24  released from all cred -- but can they turn around and sue
25  someone?  And I need to kind of just understand that.

Barton - Cross/Moxley                                              223

 1                 MR. MOXLEY:  Your Honor, as I understand the Court --
 2                 THE COURT:  Can YesCare sue someone?
 3                 MR. MOXLEY:  Yes, Your Honor.  As I understand the
 4      Court, I believe you're asking the witness these questions?
 5                 THE COURT:  Yes, yes.
 6                 MR. MOXLEY:  Yes.
 7                 THE COURT:  I'm asking the witness.
 8                 MR. MOXLEY:  I don't want you --
 9                 THE COURT:  Is it the committee's understanding --
10                 MR. MOXLEY:  Yes.
11                 THE COURT:  The -- yeah, the committee witness.  I'm
12      just -- but I just want to understand that because I know that
13      they did a bunch of research, and they're analyzing claims, and
14      I just want to make sure that I'm understanding -- that's
15      question 1, you know.  In other words, can one of these
16      released parties turn around and sue a third-party creditor?
17      It's like -- you know, using, like, the State of Idaho, right.
18      Could someone then -- no, I guess you can't say the state.  But
19      we'll get it right.  Entity.  You know, like, let's use the --
20      you know, the Missouri Curators or something.  You know, could
21      you turn around and sue them, or could you sue a prison and
22      say, you know you tortiously did some stuff to me.  You know,
23      are they released -- they're getting released from anything
24      offensively, but can they then turn around and sue.  That's
25      question 1.  And then question -- well, let's get through

Barton - Cross/Moxley                                 224

1   question 1.  Do you have an understanding of that one way or

2   the other?

3           THE WITNESS:  Your Honor, I'm -- I'm afraid I don't

4   have an understanding.

5           THE COURT:  Okay.  No, no, no.  It's fair.  And then

6   question 2 is do you -- how does 9 -- what's your understanding

7   of the way 9(a) works?  In other words -- or 9(b) -- 9(i) --

8   excuse me -- 9(a)(i), 9(a)(ii).  It says that all creditors are

9   going to be enjoined from any -- within the release parties,

10  but then any party who opts out of the settlement.  But I

11  don't -- what's your understanding of how they would opt out of

12  the settlement that they're not a party to?  And I'm sure

13  there's a very technical way to do it.  I just want to make

14  sure that I'm -- I understand what's contemplated because

15  they're not a party to the agreement.

16          THE WITNESS:  Your Honor, I don't know if this is

17  helpful.

18          THE COURT:  I'll take anything you've got.

19          THE WITNESS:  Okay.

20          THE COURT:  There could be other witnesses that can

21  explain it to me.  I just -- you're the committee rep.  I just

22  want to make sure that I'm understanding what I'm being asked

23  to approve one way or the other.  I'm just -- I'm just diving

24  into the guts of it, of the deal, and I just want to make sure

25  that I understand what's mutual, what's one way, what's the

Barton - Cross/Moxley                                    225

1  other way so I can kind of understand the scope of it.  I've

2  got a good feel of the investigations that the committee did

3  and what they looked at.  I just want to make sure that I get

4  because I -- that's what it is.  So don't read too much into

5  it.  I'm just making sure that I understand the full scope, and

6  you're here, and --

7                  THE WITNESS:  Okay.

8                  THE COURT:  -- we've got a hard 5 stop, so.

9                  THE WITNESS:  I don't know if this is -- is helpful,

10 but we have deliberately bifurcated this into two phases.  The

11 first phase would be the global settlement where we get an

12 amount that we can make available to creditors.

13                  But the second stage, where a plan is developed,

14 hasn't occurred yet.  And it is our desire and fervent hope

15 that the TCC will work with us on putting that plan together.

16                  THE COURT:  But I'm -- so the question I've got is --

17                  THE WITNESS:  So -- so there is some uncertainty --

18                  THE COURT:  -- I'm just trying to understand, so --

19 if I approve a settlement today -- well, not today -- if I

20 approve this settlement, I'd need to understand what, like,

21 9(a)(ii) means so that I know there's no confusion, and when we

22 get down the line, what it means to opt out of a settlement so

23 that we don't get -- so at least -- I know it's not for you,

24 but I'm just throwing it out there -- I need -- somebody's

25 going to have to explain that to me so that when we get to --

Barton - Cross/Moxley                    226

1  if we get there, that there's no confusion and no one has holes

2  of value about what this really means and we're not litigating

3  that.

4          I need to understand what that is, but I also need to

5  understand if -- I'm not saying he has any claims, but can he

6  turn -- can Mr. Lefkowitz turn around and sue someone and say,

7  you know what, I've got the release.  Now, here I come for,

8  you know, X, Y, Z.  Can YesCare turn around and sue folks in

9  connection with this case, anyone who came at one of the

10  companies?  And so those are my questions.

11          Did you all investigate claims that -- Sigma -- with

12  respect to Sigma, did you investigate claims and causes of

13  action with respect to Sigma?

14          THE WITNESS:  I believe so.

15          THE COURT:  Okay.  Okay, sorry.  We were coming up on

16  the time, and I needed to just -- we're going to break until

17  Tuesday.  I needed to just understand this from the committee's

18  perspective, and I'm sure there'll be other reps, as well.

19          MR. MOXLEY:  No, no, absolutely, Your Honor.  I just

20  didn't want the Court to --

21          THE COURT:  No.

22          MR. MOXLEY:  -- hear me not answering questions and

23  think that I was not being responsive.

24          THE COURT:  No, no, no, no.

25          MR. MOXLEY:  I understood you were asking the

Barton - Cross/Moxley                                    227

1   witness.  Okay.

2   BY MR. MOXLEY:

3   Q    Well, similarly, Mr. -- sorry, Mr. Barton.  Did you

4   have -- if you have an answer for the Judge's question, please

5   go ahead.

6   A    I don't.  Go ahead.

7   Q    Okay.  Similarly, though, just as the Judge wishes to

8   understand the operation of 9, the TCC wishes to understand

9   what the UCC understands is actually being settled.  Were you

10  here for Mr. Goodman's opening from the TCC?

11  A    I was.

12  Q    Okay.  And you saw the basket analogy for the grocery

13  store that he used?

14  A    I did.

15  Q    Okay.  So I'm going to ask you some questions that are

16  designed to help us understand what the UCC's understanding is

17  of what's in the basket.

18  A    Okay.

19  Q    Okay?  So you've never heard anyone suggest that personal

20  injury tort claims are now estate claims, given that we're in

21  the bankruptcy court, right?

22  A    I have not.

23  Q    Okay.  And it's your view that the settlement agreement

24  does not purport in any of its language to settle the claims of

25  the tort claimants, right?

Barton - Cross/Moxley                                           228

1    A    It settles only estate claims.

2    Q    It would be an incorrect view if a settling party to the

3    settlement agreement took the position that a personal injury

4    tort claim is an estate claim that is settled by the settlement

5    agreement, correct?

6    A    Correct.

7    Q    Okay.  And it would be an incorrect view of the settlement

8    agreement if claims asserted against YesCare by personal injury

9    tort claimants were viewed by one of the parties to the

10   settlement agreement as being settled by the settlement

11   agreement, right?

12   A    If they're direct claims against YesCare.

13   Q    Explain what you mean, sir.

14   A    Yeah.  So if -- the estate -- the settlement agreement

15   settles claims of the estate.

16   Q    Mm-hmm.

17   A    My understanding is that the law in this circuit is that

18   successor liability claims are claims of the estate.  So to the

19   extent that a claim against YesCare is really a claim against

20   Tehum, and you're using a successor liability theory to get to

21   YesCare, my understanding is that those are claims of the

22   estate.

23   Q    Okay.  So it's your understanding that claims that

24   personal injury tort claimants may have that they -- that arose

25   prior to the divisional merger against Corizon, they can no

Barton - Cross/Moxley                                    229

1   longer pursue those claims against YesCare if the settlement

2   agreement is approved, correct?

3   A    Successor liability claims, my understanding is, are

4   claims of the estate.

5   Q    Okay.

6   A    In this circuit.  I think there's an open legal question

7   about which you all will dispute about, but that's my

8   understanding.

9   Q    So any person -- just let me make sure I understand.  Any

10  personal injury claim that arose prior to the divisional merger

11  is released because it would be, by necessity, a successor

12  liability claim if asserted against YesCare or CHS TX, correct?

13  A    Successor liability claims, my understanding is those are

14  claims of the estate.

15  Q    Okay.  Did the UCC value -- ascribe a value to the

16  personal injury claims that arose prior to the divisional

17  merger?

18  A    To the totality of personal injury claims?

19  Q    Yes, sir.

20  A    I don't think so.

21  Q    Okay.  If the UCC didn't ascribe a value to the personal

22  injury claims that arose prior to the divisional merger, how

23  does the UCC know whether this is a good settlement or not?

24  A    The settlement makes $54 million available right away to

25  creditors, and it doesn't -- and there isn't another better

Barton - Cross/Moxley                                    230

1  alternative on the table.

2  Q    Does the UCC know the value of the successor liability

3  claims that are being settled by this agreement?

4  A    I don't have an exact dollar figure to give you.

5  Q    Do you have a ballpark figure that you could give?

6  A    I don't.

7  Q    And that's because the UCC actually didn't ascribe a value

8  or come up -- or come up with a value of what the successor

9  liability claims that are being settled by this agreement is,

10 correct?

11 A    I don't know.  I don't know.

12 Q    You just don't know one way or the other?  Other than you,

13 that's the chairperson of the UCC, who else at the UCC would

14 know the answer to that question?

15 A    I don't know.

16 Q    If you don't know, no one at the UCC knows, right?

17 A    We're -- I don't think that's necessarily true, but I am

18 not aware that the UCC knows the exact dollar amount of any of

19 those claims.

20 Q    Okay.  So a universe of -- strike that.

21      Yes, Mr. Barton, what about alter ego claims that are

22 being settled?  Has the UCC valued the alter ego claims that

23 are being settled?

24 A    We don't have an exact dollar figure for the alter ego

25 claims.

Barton - Cross/Moxley                                           231

1  Q    So the UCC is supporting a settlement of -- that will

2  release claims that it has not come to a view on what they are

3  valued at.  Is that right?

4  A    I -- I think we do not have an exact dollar figure for the

5  claims that we're releasing.  That's fairly typical in a

6  settlement.  Rarely do you have that kind of exact information.

7  Q    Without knowing the value of something that you're giving

8  away, though, sir, how does the UCC know that the settlement

9  agreement is a fair and reasonable deal to creditors?

10 A    We have an understanding of -- of the -- the merits and

11 difficulties in recovering under those claims, so.

12 Q    What's your understanding of the merits of those claims,

13 sir?

14 A    Well, it's a difficult kind of claim to pursue.  To the

15 extent that these claims would involve invalidating a Texas

16 statute, authorizing divisional mergers, you know, it's going

17 to be a speculative claim and decrease the value of it.

18 Q    Mr. Barton, you said during your direct testimony that you

19 would need to overturn the Texas statute to assert claims

20 against YesCare, and I think you just said it again just now,

21 correct?

22 A    There are certain claims where, you know, it -- it would

23 seem that that would be necessary.

24 Q    Why do you think that?

25 A    Well, the Texas statute authorizes the kind of divisional

Barton - Cross/Moxley                                    232

```
 1  merger that was engaged in here.  And so it allows the division

 2  of a company to create a new company that is not the successor

 3  of -- of the entities that were part of the merger.  So to the

 4  extent that we're claiming that YesCare that emerged from this

 5  merger is, in fact, a successor of the debtor, it's a good

 6  argument you need to overturn the statute to make that claim.

 7  Q    Are you aware of the Kelly case in the federal district

 8  court in Michigan?

 9  A    No.

10  Q    Okay.  No one's made you aware of that case?

11  A    I'm not aware of it.

12  Q    Okay.  Would it surprise you to hear that a federal

13  district court in Michigan has already ruled that CHS TX can be

14  a defendant party on a successor liability theory in a claim

15  that a claimant had previously asserted against Corizon?

16            MR. ZLUTICKY:  Objection, Your Honor.  Hearsay.

17            THE WITNESS:  I don't have a basis to know whether

18  what you're saying is accurate.

19            THE COURT:  Well, he can answer.  Hold on a second.

20            THE WITNESS:  Oh, I'm sorry.  Apologies.

21            THE COURT:  Hold on.  Hold on, folks.

22            He can answer if he knows the answer to that

23  question.

24            Go ahead.

25            THE WITNESS:  I don't know whether -- I don't have a
```

Barton - Cross/Moxley                                    233

1   knowledge of what you just said.  I can't speak to whether it

2   would surprise me or not.

3   BY MR. MOXLEY:

4   Q    Okay.  Okay.  Would it impact your view as to whether or

5   not successor liability claims to be brought would require

6   overturning the Texas statute?  Would it impact your view if

7   you -- if you knew that a federal district court has already

8   done that without overturning the Texas statute?

9            MR. ZLUTICKY:  Objection, Your Honor.  Hearsay.

10            THE COURT:  Why is it hearsay if it's -- if he's

11   asking if it would impact his views?

12            MR. ZLUTICKY:  Well, he's stating something -- he's

13   asking witness to speculate on something that hasn't happened,

14   plus he's talking about something that --

15            THE COURT:  But that's not hearsay, right?  So is

16   the --

17            MR. ZLUTICKY:  Well, but there's also something he's

18   asking for the witness (indiscernible).

19            THE COURT:  Overruled.  He can answer if he knows.

20            THE WITNESS:  Can you repeat the question, please?

21   BY MR. MOXLEY:

22   Q    Would it impact your view, sir, as to whether or not a

23   successor liability claim here to be brought would have to --

24   would have to overturning the Texas statute if a federal

25   district court has already done just that without overturning

Barton - Cross/Moxley                    234

1   the Texas statute?

2   A    I don't know.  I'd have to look at the details of that

3   case to know whether it has any application here at all.

4   Q    Okay.  And no one's advised you of that -- of the case I

5   referenced.  Is that right?

6   A    I think it's been mentioned today, but I'm not aware of

7   the case.

8   Q    Before today, you were not aware of the Kelly case.  Is

9   that right?

10  A    That's correct.

11            MR. MOXLEY:  Your Honor, I'm cognizant of the time.

12  I'm just going to try to get to my next subject.  Your Honor,

13  I'm not -- I'm not able to conclude the witness' testimony.

14            THE COURT:  No, that's what I'm saying.  So just find

15  a logical stopping point, and if it's now, then we'll stop now.

16  If you want to -- you want to get some more stuff in, you can,

17  and we'll pick up at the appropriate time.

18            Mr. Zluticky?

19            MR. ZLUTICKY:  Your Honor, just very briefly, I do

20  know that Mr. Barton has to attend a conference that I believe

21  begins tomorrow, and I don't know that he'll be available on

22  Tuesday the 5th.

23            THE COURT:  I know.

24            MR. ZLUTICKY:  If he --

25            THE COURT:  We can figure something out, and

Barton - Cross/Moxley                                    235

 1  whether -- let's just be practical and figure out the -- what

 2  makes the most sense.

 3           MR. ZLUTICKY:  I just wanted to make the Court aware

 4  of that.

 5           THE COURT:  Yeah, yeah.  I'm not going to -- yeah.

 6  I'm not going to jam you.  And yeah, but I do appreciate you

 7  letting me know.  So that may mean that on Tuesday, if he can't

 8  make Tuesday, then maybe we just go out of order and then

 9  finish him at the appropriate time, if that makes sense.

10           MR. MOXLEY:  We're happy to do that.  I -- our

11  understanding was that the Court had made available Tuesday and

12  Wednesday morning.

13           THE COURT:  Ah.  Wednesday morning's getting tricky

14  for me.

15           MR. MOXLEY:  Okay.

16           THE COURT:  Just on stuff.  But what I'm saying is

17  we'll just be convenient.  I'm not going to jam him.

18           MR. MOXLEY:  Okay.  Let me -- if the Court will give

19  me just one moment?

20           THE COURT:  Oh, absolutely.

21           MR. MOXLEY:  Okay.

22  BY MR. MOXLEY:

23  Q    Okay, let's do this.  Could you turn to 267 in your

24  binder, sir?

25           THE COURT:  Let me ask you.  How much more time do

Barton - Cross/Moxley                                    236

1   you think you have with him?  And I don't want to rush you.

2   Just logically.

3              MR. MOXLEY:  Yes, Your Honor.  I think probably, if

4   I -- I think I could do it very quickly probably in --

5              THE COURT:  No, no, no.  Just, like, normal time.

6   How much time do you think you need?

7              MR. MOXLEY:  One and a half to two hours.

8              THE COURT:  Okay.  Okay.  Okay.

9              MR. MOXLEY:  Okay.

10             THE COURT:  And then I know -- does someone else have

11  questions for the witness?  And I'm sure there'll probably be

12  some redirect.  Is the U.S. Trustee going to want to ask

13  questions, as well?

14             MR. NGUYEN:  Not at this time, Your Honor.

15             THE COURT:  Okay.  All right.  I'll stay quiet and

16  let you keep working.

17             MR. MOXLEY:  That's okay.  Thank you.  Thank you,

18  Judge.

19  BY MR. MOXLEY:

20  Q    Mr. Barton, as part of the investigation that the UCC

21  conducted, did the UCC direct its advisors to look for publicly

22  filed cases involving the settlement parties?

23  A    I don't recall we gave that specific instruction.

24  Q    Okay.  Let's look at 267 in your binder, sir.  That's the

25  statement that St. Luke's filed.  Are you there, sir?

Barton - Cross/Moxley                    237

1   A    Yes.

2   Q    Okay.  This is filed on the docket at 1377.  And this is a

3   copy of that statement that St. Luke's filed.  Correct, sir?

4   A    Yes.

5   Q    Okay.  Now, we looked earlier on your direct testimony.  I

6   believe St. Luke's claim is approximately $31.3 million.

7   Approximately, correct?

8   A    Yes.

9   Q    Okay.  There's -- this statement at 267 describes,

10  generally, the litigation that St. Luke's has brought against

11  Corizon previously, correct?

12  A    Yes.

13  Q    Okay.  And if you look at the proof of claim, that goes

14  into some more detail?  There's an annex to that proof of

15  claim, correct?  We can look at that real quickly.  That proof

16  of claim is at 173 of your binder, sir.  And if you turn --

17  when you're at 173, if you turn a couple pages in, you'll find

18  the annex.

19  A    Mm-hmm.

20  Q    Okay.  And at Paragraph 3 of the annex, St. Luke's

21  describes its lawsuit, correct?

22  A    Right.

23  Q    And there, St. Luke's states, "Prior to the petition date,

24  the debtor who formerly operated as and assumed the liabilities

25  of Corizon Health, Inc., contracted with the Idaho Department

Barton - Cross/Moxley                                    238

 1   of Corrections ("IDOC") to provide on-site medical care to IDOC

 2   inmates and to pay outside providers, including St. Luke's, for

 3   medical care that could not be provided within the prison

 4   walls.  Corizon reimbursed St. Luke's at rates specified in a

 5   January 2011 memorandum of understanding with St. Luke's."  Did

 6   I read that correctly?

 7   A    Yes.

 8   Q    Okay.  And then the next paragraph describes how on July

 9   1st of 2014, Corizon unilaterally abandoned its payment

10   agreement with St. Luke's and started reimbursing at the

11   significantly lower Idaho Medicaid rate based on its

12   interpretation of an Idaho statute, right?

13   A    Yes.

14   Q    Okay.  And in January 2018, the Idaho Supreme Court agreed

15   with St. Luke's position that Corizon could not reimburse at

16   the Medicaid rate, right?

17   A    That's what the document says, yes.

18   Q    So St. Luke's sued Corizon to recover the millions of

19   dollars that Corizon underpaid and still owed St. Luke's,

20   right?

21   A    Right.

22   Q    Those are the damages St. Luke's is owed:  the millions of

23   dollars that Corizon underpaid St. Luke's, right?

24   A    Right.

25   Q    Okay.  Sometime after St. Luke's filed that lawsuit

1  against Corizon seeking those damages, the debtor then filed

2  its petition commencing this bankruptcy case, right?

3  A    Yes.

4  Q    Okay.  Okay.

5           MR. MOXLEY:  Your Honor, I apologize.  I think any

6  other line of inquiry --

7           THE COURT:  No, no.  I don't want you to apologize.

8           MR. MOXLEY:  -- would take more than two minutes so,

9  yes.

10          THE COURT:  Okay.  Why don't we, then, stop now, and

11 we'll pick up on Tuesday.

12          I will remind you that you're still under oath during

13 this entire time.  So I want to make sure you're not speaking

14 with anyone about your testimony.  Okay?

15          I very much appreciate everyone's time.  I'm going to

16 step off for about five minutes and let everyone kind of clear

17 out, and then we'll pick back up with the 5 p.m.

18          Thank you very much.

19          MR. MOXLEY:  Thank you, Your Honor.

20      (Proceedings concluded at 4:57 p.m.)

21                        *  *  *  *  *

22

23

24

25

1

2                    **C E R T I F I C A T I O N**

3

4          I, Alicia Jarrett, court-approved transcriber, hereby

5    certify that the foregoing is a correct transcript from the

6    official electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9

10

11    _____

12    ALICIA JARRETT, AAERT NO. 428     DATE: March 6, 2024

13    ACCESS TRANSCRIPTS, LLC

14

15

16

17

18

19

20

21

22

23

24

25