IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE:, | § CASE NO. 23-90086-11 |
| | § HOUSTON, TEXAS |
| TEHUM CARE SERVICES, INC., | § TUESDAY, |
| | § MARCH 5, 2024 |
| DEBTOR. | § 1:05 P.M. TO 7:02 P.M. |

### HEARING ON MOTION TO APPROVE 9019 SETTLEMENT AGREEMENT AND TRIAL DAY TWO

BEFORE THE HONORABLE CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| ELECTRONIC RECORDING OFFICER: | ZILDE COMPEAN |
| COURTROOM DEPUTY: | ZILDE COMPEAN |

**(AUDIO ISSUES NOTED)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**<u>APPEARANCES</u>:**


FOR THE DEBTOR:                    GRAY REED & MCGRAW, LLP
                                  Jason S. Brookner, Esq.
                                  1601 Elm Street, Ste. 4600
                                  Dallas, Texas 75201
                                  214-954-4135


FOR THE UNOFFICIAL COMMITTEE      BROWN RUDNICK, LLP
OF THE TORT CLAIMANTS:            Eric R. Goodman, Esq.
                                  601 Thirteenth Street NW
                                  Suite 600
                                  Washington, D.C. 20005
                                  202-536-1740



          (Please also see Electronic Appearances.)

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| RUSSELL PERRY | | | | |
| By Mr. Kaufman | 19 | . | . | . |
| By Mr. Moxley | . | 143 | . | . |

| EXHIBITS: | Admitted |
|---|---|
| 13 | 45 |
| 14 | 45 |
| 15 | 45 |
| 16 | 47 |
| 22 | 31 |
| 32 | 120 |
| 33 | 126 |
| 73 | 116 |
| TCC 99 | 34 |
| 1410-42 & 1410-43 | 98 |

**\*\*\***

1          **HOUSTON, TEXAS, TUESDAY, MARCH 5, 2024, 1:05 P.M.**

2          THE COURT:  Okay.  Good afternoon, everyone.  This

3     is Judge Lopez.  Today is March the 5th.  I'm going to call

4     the 1:00 p.m. case continuation of Tehum here on a motion to

5     approve a 9019 settlement agreement.

6          There are a number of parties in the courtroom.  I'd

7     ask that if you are making an appearance, that you make it

8     electronically today.  The parties are going to want to save

9     as much time as we can today, to be as efficient as possible.

10          So if you're going to make an appearance, if you

11    know you're going to be speaking today, why don't you hit five

12    star, and at some point, I will unmute your line.

13          But for purposes of kind of where we are, I'd like

14    to just figure out if there's any housekeeping, and then get

15    right into the evidence.

16          MR. BROOKNER:  Yes, Your Honor.  Quick housekeeping.

17    Good afternoon.  Jason Brookner for the Debtor.  I will not

18    appear for everybody else who is with me today.  A couple of

19    quick things.

20          First, a little while ago, at Docket Number 1432, --

21          THE COURT:  Um-hum.

22          MR. BROOKNER:  -- we filed an amended form of order.

23    I have copies.  I have one to one of your assistants.

24          THE COURT:  I read it.

25          MR. BROOKNER:  Okay.  And we did that, Your Honor,

1    because we heard your comments, and we went back after the

2    hearing, and we read the documents and saw that perhaps, it

3    wasn't as clear as we all thought it was in light of your

4    comments.

5            And so the key revisions were in paragraph 6, which

6    now clearly reflect mutual releases; in paragraph 9 to again

7    be clear that no direct claims are being affected.  We've also

8    removed the opt out, and this way, there shouldn't be any

9    confusion that only estate claims are being released.

10            THE COURT:  Okay.  Walk me through the changes

11    again.

12            MR. BROOKNER:  Certainly, Your Honor.

13            THE COURT:  You said --

14            MR. BROOKNER:  If you go to Exhibit --

15            THE COURT:  Just walk, just the paragraph.

16            MR. BROOKNER:  Oh, do you need a copy?

17            THE COURT:  No, no.

18            MR. BROOKNER:  If you go to Exhibit B, Your Honor,

19    --

20            THE COURT:  Yeah.

21            MR. BROOKNER:  -- because that shows the changes

22    from what was originally in the last two pages.

23            THE COURT:  Yeah.  I'm looking at the redline.

24            MR. BROOKNER:  Okay.  So you'll see paragraph 6.  It

25    shows the redline that all of the released parties shall

1   release and shall be deemed to have released and waived all

2   claims and causes of action against the estate, including, but

3   not limited to, et cetera, et cetera.

4           THE COURT:  Right.  But my question was are they

5   releasing the parties who -- they're releasing all claims

6   against cause of action against the estate.

7           MR. BROOKNER:  Correct.

8           THE COURT:  Right?

9           MR. BROOKNER:  Right.

10          THE COURT:  But creditors are going to have to

11  release the third parties but the --

12          MR. BROOKNER:  No, there's no opt in, opt out

13  anymore.  We got rid of that.

14          THE COURT:  Oh.

15          MR. BROOKNER:  So this is only estate claims coming

16  and going.  That's all it is.  No opt in, no opt out.

17          THE COURT:  Okay.  No, I'm saying that was my

18  question, the opt in, opt out.  You're saying -- let me just

19  walk you through it.

20          MR. BROOKNER:  Sure.

21          THE COURT:  Go ahead.  Go ahead.  Keep going.

22          MR. BROOKNER:  So this pertains, paragraph 6

23  pertains to the estate's claims --

24          THE COURT:  Um-hum.

25          MR. BROOKNER:  -- that are being released, and those

1       parties who are settling will also be giving a release.  So

2       there's full mutual releases between the estate on the one

3       hand and all the other released parties on the other.  Has

4       nothing to do with individuals.  They're not opting in;

5       they're not opting out.  There is just the settlement, the

6       approved settlement of the estate claims.  And then we get to

7       paragraph 9.

8               THE COURT:  How is released parties defined?

9               MR. BROOKNER:  The released parties is defined in

10      the settlement agreement at paragraph 7, Your Honor, as the M2

11      parties in paragraph A who are the parties signing the

12      agreement, and then a variety of additional parties behind

13      them, including officers, directors, et cetera.

14              THE COURT:  Right, right, right, right.  But, I

15      guess, I had a -- maybe I wasn't clear with my question.  I

16      was wondering whether let's just say, for example, Mr.

17      Lefkowitz is going to receive a release from the estate,

18      right.

19              MR. BROOKNER:  Um-hum.

20              THE COURT:  Creditors who want to receive a recovery

21      under the proposed plan are going to have to agree Mr.

22      Lefkowitz or they'll receive -- or has that changed as well?

23              MR. BROOKNER:  That's changed.  The opt out is gone.

24      If you go to paragraph 9 on the next-to-last page, --

25              THE COURT:  Okay.

1     MR. BROOKNER:  -- you'll see in section A, first of

2 all, Creditors are only enjoined from pursuing estate claims

3 that are released here in the property of the estate.  That's

4 the first paragraph.

5     THE COURT:  Okay.

6     MR. BROOKNER:  And then second as you go further

7 down in the paragraph, we make it very clear that no

8 individual direct claims are being affected by anything in the

9 settlement agreement.

10     THE COURT:  Right.

11     MR. BROOKNER:  So if somebody has a direct claim

12 against YesCare -- so, for example, let's -- because Ms. Funk

13 also raised this issue.  Let's talk about her even though

14 she's not here but Mr. Forma (phonetic) is.

15     The State of Idaho had -- let's assume they had a

16 contract with Corizon.

17     THE COURT:  Um-hum.

18     MR. BROOKNER:  And then after the divisional merger,

19 they entered into a new contract with YesCare.  That second

20 contract, if there's a breach of that contract or other

21 damages flowing from that contract that they have with

22 YesCare, that is not touched by this.  That's not an estate

23 claim.  That claim is preserved.

24     Similarly, if they're -- if anybody has any kind of

25 direct claim against any released party, whatever that may be,

1    not being touched.

2          THE COURT:  Okay.  Okay.  I got it.  I got the case.

3    Thank you.

4          MR. BROOKNER:  Okay.

5          THE COURT:  All right.

6          MR. BROOKNER:  So those are the changes to the

7    order.  So that was kind of my first point.

8          My second point was I wanted to quickly talk about

9    the order of operation.  The parties conferred yesterday, and

10   we sent Ms. Saldana an email letting her know, what we're

11   going to do today is the Debtor through Mr. Kaufman is going

12   to put on Mr. Perry for direct, our CRO, and is subject to

13   cross, of course.

14         After that, Mr. Zluticky for the Committee will put

15   on Mr. Dundon as the Committee's second witness, subject to

16   cross.  We think that's probably going to take the whole day.

17         THE COURT:  Um-hum.

18         MR. BROOKNER:  If we have time left and we can

19   reasonably knock it out, Mr. Lefkowitz is in Houston, and we

20   will bring him in.  I don't think we're going to be going to

21   be able to get there, quite frankly, but if we do, then we do.

22         Otherwise, assuming we don't get through Mr.

23   Lefkowitz today, and we just do the two witnesses that are

24   teed up, we then have told Ms. Saldana we think we're going to

25   need two more full days potentially for this deal.

1          Because we're going to have -- we have to finish the

2     cross-examination of Mr. Barton that Mr. Moxley was doing last

3     week.  Then the TCC has to put on its two witnesses, Mr.

4     Atkinson and Mr. Griffiths.

5          THE COURT:  Okay.

6          MR. BROOKNER:  So we're going to have -- and then,

7     of course, Mr. Lefkowitz, presuming he doesn't get on today.

8     So we'll have four more to knock out, and we're waiting on Ms.

9     Saldana to get back to us with dates.

10          THE COURT:  I think she was waiting on me to get

11     back.  I was out of town yesterday so --

12          MR. BROOKNER:  Okay.  And that was all that I had in

13     so far as cleanup, housekeeping stuff.

14          THE COURT:  Okay.  Any initial housekeeping,

15     Counsel?

16          MR. GOODMAN:  Yeah, a few matters.

17          THE COURT:  Go ahead.

18          MR. GOODMAN:  Eric Goodman, Brown Rudnick here on

19     behalf of the Official Committee of Tort Claimants.  With me

20     today is Cameron Maxley, who will be handling the two

21     witnesses, Mr. Perry and Mr. Dundon.  Also, Michael Zimmerman,

22     co-counsel, Gerard Cicero, Meghan McCafferty, and Justin Myers

23     with our group today.

24          A few housekeeping matters.  Over the weekend, we

25     did have a meet and confer with the Debtor's counsel regarding

1   the witnesses -- who was going to be available, who was not

2   going to be available, and I thought it was sort of agreed

3   upon between us, there'd be Mr. Perry today, and then Mr.

4   Dundon.

5          We were in the process of preparing for Mr.

6   Lefkowitz, but we were told that he would not actually be

7   available today.  So we would not be ready to go forward with

8   him today.

9          THE COURT:  I've got a hard stop at 7, so it sounds

10  like we're just going to do Perry and Dundon today --

11         MR. GOODMAN:  Yeah.

12         THE COURT:  -- just from a practical standpoint.

13         MR. BROOKNER:  Yeah.  And Your Honor, if I may, I'd

14  like to apologize to the other side.  If there was confusion

15  on that score, then we apologize about the miscommunication.

16  That was not intended.

17         THE COURT:  So we'll do Perry and Dundon today.

18         MR. GOODMAN:  Perfect.  And then, of course, we're

19  going to need to beg the Court, ask the Court for future

20  dates.  So we're still waiting to --

21         THE COURT:  Yeah.

22         MR. GOODMAN:  -- sort of get a sense of that.  And

23  then I'd also like to talk about the changes to the proposed

24  order.

25         But I was curious if the Court has a sense of

1      timing, like we obviously, I think, are going to have a need

2      for maybe two more days.

3              THE COURT:  Yeah.  I need to check with my calendar

4      and case manager.  I literally just flew back a little earlier

5      today.  I will get you dates by tomorrow for sure, but we'll

6      make sure that it works for witnesses.

7              I think what we'll do is just give you a range of

8      dates.  I may have given out some dates for mediation, and

9      that's what I just need to confirm that I didn't do that, and

10     have folks locked in on something.  I don't want to -- so, but

11     my goal is to just give you dates as soon as we can.  See if

12     we can finish this up certainly in the next two weeks to be

13     sure, --

14             MR. GOODMAN:  Okay.

15             THE COURT:  -- if we can.

16             MR. GOODMAN:  Okay.

17             THE COURT:  But I know next week was spring break

18     too, and I didn't want to -- I knew -- I don't know what that

19     does to folks' schedules.  So I didn't want to jam anyone on

20     that as well.  So maybe we can just see what makes sense for

21     all the parties.

22             MR. GOODMAN:  It's bad for the Texas parents, Your

23     Honor.

24             THE COURT:  So, yeah.  Just let me know.  But I will

25     get with Ms. Saldana tonight and we'll shoot dates for

1    everyone in the next day or two, but I'm not going to jam

2    anyone when it comes to it or surprises on that.

3                MR. GOODMAN:  Okay.  Perfect.

4                THE COURT:  Okay?

5                MR. GOODMAN:  Yeah.  Wonderful.  Thank you so much,

6    Your Honor.

7                One other just sort of note regarding the changes to

8    the proposed order --

9                THE COURT:  Um-hum.

10               MR. GOODMAN:  -- that was filed just over an hour

11   ago, we did have a chance to quickly review it.  And I would

12   just sort of flag a couple things for the Court in terms of

13   considering the revisions versus the old version.

14               In our view, or our understanding is that the vast

15   majority, in fact, maybe all of the personal injury/wrongful

16   death claims here involve damages, you know, that occurred,

17   deaths that happened prior to the divisive merger, --

18               THE COURT:  Um-hum.

19               MR. GOODMAN:  -- right.  So most of the claimed

20   claimants that we represent again, it could be, you know, the

21   vast majority, if not all, we're talking about an injury or a

22   death that occurred prior to May 1, 2022, which is the date

23   that the divisive merger occurred.

24               In our view, and maybe you've seen this in the

25   papers -- and I think, you know, you read everything; you kind

1    of know our position on this -- is that, you know, a party

2    can't create successful liability by going through these

3    transactions, and then use those, you know, corporate

4    maneuvers to essentially take the position that they now own

5    and control those claims.

6          So there is a fundamental difference between us as

7    to what is a direct cause of action versus what is an estate

8    claim.  Here's the rub though on this, and I come back to the

9    shopping cart analogy that we used earlier.

10         We kind of need to know the answer to that question.

11   Because if the personal injury/wrongful death claims are now

12   estate causes of action and they're in that shopping cart,

13   that is a profoundly different shopping cart, right, than one

14   that would not include the personal injury and wrongful death

15   claims.

16         So I think this is a recurring theme, and this is,

17   in my view, kind of gets to the heart of the case.  And it

18   really, the Court's evaluation, if you think about the 9019

19   motion, because without clarity on that issue, I think it

20   becomes challenging, if not impossible, to sort of evaluate

21   the terms of the settlement offer.

22         So again, I know that they have made the changes and

23   we will, of course, continue to study them, but I think that

24   the fundamental issue still remains as to what is and is not

25   an estate cause of action; and therefore, what is and is not

1    being settled.

2                    THE COURT:  Thank you.

3                    MR. GOODMAN:  Thank you.

4                    UNIDENTIFIED MALE:  Your Honor, before I -- do you

5    want a copy of the order, or you have what you need?

6                    THE COURT:  I've got what I need.

7                    UNIDENTIFIED MALE:  Okay.

8                    Does anybody else need a copy?  Okay.  All right.

9    Thank you, Your Honor.

10                    MR. CORNWELL:  Your Honor, good afternoon.  John

11   Cornwell doing my best Brenda Funk impersonation today.  She's

12   on the phone, and she'll keep my honest.  I don't want to open

13   the floodgates for comments, but because the Idaho parties

14   issue was raised, I am here on behalf of the Idaho parties.

15                    Read the revisions to the proposed order same time

16   Your Honor saw them.  I've spoken to Mr. Brookner.  I think

17   that they resolved the two, I'll call it fundamental plan

18   issues, that the Idaho parties had with the proposed

19   settlement, namely, the direct causes of action are no longer

20   waived, and I think that's very clear, as well as the opt in,

21   opt out issue that I think is similar but a different legal

22   issue.

23                    Of course, Idaho parties has filed a statement and

24   reserved all rights to look at what's actually filed in a plan

25   and object, but I just want to be clear on the record that I

1      agree with Mr. Brookner's representations on the record.

2              THE COURT:  Thank you.

3              MR. CORNWELL:  Thank you.

4              THE COURT:  All right.  Mr. Kaufman?

5              MR. KAUFMAN:  Unless anyone has any other comments,

6      we'd like to get to the evidence.

7              THE COURT:  Let's go to it.

8              MR. KAUFMAN:  All right.  The Debtor at this time

9      would call Russell Perry to the stand.

10             THE COURT:  Okay.  Mr. Perry.

11             MR. KAUFMAN:  And as a housekeeping matter, I see

12     the Debtors Exhibit -- the Debtor UCC exhibit books are right

13     here.

14             THE COURT:  All right.  Is that for the witness?

15             MR. KAUFMAN:  Yes, for the witness.

16             THE COURT:  Got it.

17             MR. KAUFMAN:  I think.  Well, I assume those are for

18     the witness.

19             THE COURT:  I don't know.  You tell me.

20             MR. KAUFMAN:  If they were on the witness stand on

21     Friday.  No, no.  May I approach?

22             THE COURT:  Yeah.

23             MR. KAUFMAN:  I don't know if it was done last time,

24     Judge, but anybody else here, we, the RMSC plaintiffs would

25     invoke the rule, Judge.

1          MR. BROOKNER:  I don't think there are any witnesses

2     here who are parties.

3          THE COURT:  Why don't we find out?

4          Are there any witnesses who are in the courtroom?

5          MR. PATTERSON:  Your Honor, Matt Dundon of the UCC's

6     in the courtroom.

7          THE COURT:  Okay.

8          MR. ZLUTICKY:  He is a representative of the UCC

9     here today.  So with the --

10         THE COURT:  I can't hear you.

11         MR. ZLUTICKY:  Your Honor, Mr. Dundon is a

12    representative of the UCC, the representative of the UCC here

13    today.  So under A2, and then also under A3, he will be

14    essential to our claims of defense.  And so, we would ask that

15    he be permitted to stay notwithstanding a 615.

16         THE COURT:  Okay.

17         MR. MOXLEY:  Your Honor, good afternoon.  Cameron

18    Moxley of Brown Rudnick for the TCC.  Your Honor, our expert

19    witness, just as Mr. Dundon is, Mr. Atkinson may be listening

20    on the Zoom at different periods today as well.  So we have

21    the same argument as Mr. Zluticky.

22         THE COURT:  All right.  Let me just ask if there's

23    any fact witnesses.  Who are the other fact witnesses that

24    would even potentially even be called?

25         MR. MOXLEY:  Mr. --

1      THE COURT:  Mr. Lefkowitz, right, would be the only

2  one, but I don't see him on the line.

3      MR. MOXLEY:  Mr. Griffiths is the designee of the

4  TCC.  And so, I think under the rule, he can stay as well,

5  Your Honor.

6      MS. HAYWARD:  Your Honor, Melissa Hayward for the

7  settling parties.  I believe Mr. Lefkowitz may be listening.

8  However, he is a party representative for M2 Loan Co, the DIP

9  lender, and also for the settling party, so I would believe

10  that he is allowed to listen to the proceedings.

11      THE COURT:  Yes, party reps, I'm going to let them

12  stay.  Experts can stay.  You all will have to confirm for me

13  because there's no one -- everybody in the courtroom looks

14  fine if there's not anyone I know.  There's someone on the

15  line, but you-all know who the other witnesses are who

16  potentially you may call.

17      And if you need to, I'll take five minutes and let

18  you get him off the line, but I think other than that, I'm

19  ready to proceed.

20      MR. MOXLEY:  No one else for the TCC is affected,

21  Your Honor.

22      THE COURT:  All right.  Okay.  Can I have you raise

23  your right hand, sir?

24      (Witness sworn.)

25      THE WITNESS:  Yes.

19

1        THE COURT:  Okay.  I'll let the record reflect the
2    witness has been properly sworn in.
3        Counsel, you may proceed.
4                    DIRECT EXAMINATION
5    BY MR. KAUFMAN:
6    Q    Mr. perry, could you give the Court again your name and
7    your position in this case?
8    A    Sure.  My name is Russell Perry.  I'm the chief
9    restructuring officer for the Debtor.
10   Q    And as the chief restructuring officer, what are your
11   primary responsibilities in this case?
12   A    Well, in this case, it really starts -- well, I'd say
13   it's threefold.
14       One, gathering information facts, information that is
15   critical for the case to carry through, share that information
16   with the respective stakeholders.
17       Two, I think the second responsibility here is to
18   initiate and carry forth investigation into potential causes
19   of action.
20       And then, you know, three, the overarching responsibility
21   for really any CRO, specifically the CRO in this case is to
22   make decisions on behalf of the Debtor.
23   Q    We'll discuss each of these in turn, but first, let me
24   ask you is being a CRO in a Chapter 11 case a one-man or one-
25   person job?

1    A    In my experience, it's never a one-person job, no.

2    Q    So explain that to the Court.

3    A    Sure.  Well, so we -- so we're clear, my firm Ankura is

4    involved with this engagement beyond just me.  There are

5    multiple individuals within Ankura that works on the

6    engagement.  My team engages with not only the professionals

7    that are involved in the engagement, but also, we have

8    consistent engagement with the former employees of the Debtor,

9    we have engagement with other professionals in the case.

10       And I think as folks understand, there have been an

11   extensive amount of work completed in this case that I

12   couldn't have completed by myself.

13   Q    And I think you've talked about this in some prior

14   hearings, just your experience.  Can you list a few recent

15   cases where you served as a restructuring officer or a

16   financial adviser for a Chapter 11 debtor in the healthcare

17   industry?

18   A    Sure.  Let me start with Pipeline Holdings.  Pipeline was

19   a case filed here in the Southern District in front of Judge

20   Isgur late '22.  It was a case of seven hospitals.  One in

21   Dallas, four in LA.  There was another two in Chicago.  That

22   Chapter 11 was confirmed or the plan was confirmed in early

23   '23.

24       I'm currently the restructuring officer for Grupo Hima,

25   which is a group of hospitals that filed in Puerto Rico.

1      Like the Pipeline, so I'm clear, I was the chief

2  transformation officer which has the same fiduciary

3  responsibilities as a CRO.

4      Another case that I was a CRO in was a case called Gulf

5  Coast Holdings filed in Delaware.  It was a case in which all

6  the assets were effectively sold, and the estate was

7  liquidated.

8      And then by way of just an example, I was also the

9  restructuring adviser for a company by the name of Trident

10  Holding that filed in the Southern District of New York in

11  roughly 2018.

12  Q    And is that a complete, exhaustive list, or just a few

13  recent cases?

14  A    The latter.  I think in some of my declarations, I've

15  included many others.

16  Q    And in those cases you just mentioned, did any of those

17  cases require the Debtor to investigate estate causes of

18  action against third parties or insiders?

19  A    They did.  Um-hum.

20  Q    Tell the Court about those experiences.

21  A    Sure.  Let me lump Pipeline, Trident, and Gulf Coast

22  together and we can unpack if we need to.  In all three of

23  those situations, there were activities or transactions that

24  occurred prior to the filing.

25      In each of those three examples I gave, there were

1    investigations that were carried out, information that was

2    gathered, and sort of investigation results, you know, shared

3    respectively.

4        Various decisions were made by either the independent

5    directors or myself or some combination by which the decision

6    was made to either settle, not release, or, you know, some

7    other mechanism for those respective claims.

8        The fourth just to round out, because I gave you four

9    examples a second ago, the Grupo Hima engagement, which is

10   currently in Chapter 11, we are in the midst of negotiating

11   with both the unsecured creditor committee, as well as the

12   government of Puerto Rico with respect to some fairly

13   significant liabilities.

14       There have been quite extensive discussions around

15   potential cause of actions in that engagement.  It very well

16   could lead to an investigation or it could lead to, you know,

17   a settlement.

18   Q    The Debtor in this case has filed motions to approve a

19   settlement, a motion to authorize additional DIP financing,

20   and a motion to extend exclusivity.  Are you familiar with

21   those motions?

22   A    I am.

23   Q    And the TCC, the Tort Claimant Committee, has filed a

24   motion to dismiss.  Are you familiar with that motion?

25   A    I am.

1    Q    Did you authorize the filing of the Debtor's motions?

2    A    I did.

3    Q    And do you believe those motions are in the best

4    interests of the estate?

5    A    Absolutely.

6    Q    Let's talk about the strategy of this case.  How did you

7    come to be the chief restructuring officer for the Debtor?

8    A    Mr. Lefkowitz contacted me directly.  Basically said I

9    need a CRO.  Gave me his phone number.  I called him the

10   morning of the 13th directly.

11   Q    And when you first spoke with Mr. Lefkowitz, had you met

12   him before?

13   A    No, I hadn't.

14   Q    When did you -- maybe you said this -- when did you first

15   connect with Mr. Lefkowitz?

16   A    It was the morning of the bankruptcy filing, February the

17   13th.

18   Q    And so the record's clear, what is Mr. Lefkowitz's role

19   for the Debtor in this case?

20   A    He's the sole director of the Debtor.

21   Q    Does the Debtor, to your knowledge, have any other

22   officers or directors?

23   A    It only has the CRO, myself, and Mr. Lefkowitz as the

24   sole director.

25   Q    And you connected with Mr. Lefkowitz the morning of, I

1    think you said, February 13th of 2023?

2    A    That's correct.

3    Q    And did you agree to serve as the chief restructuring

4    officer?

5    A    I did shortly after.  Um-hum.

6    Q    Before you accepted the role, did you do any

7    investigation of the company?

8    A    I had some time to do that, and yes, I did.

9    Q    Okay.  Describe for the Court what steps you took to

10   research the company before you accepted the role.

11   A    Sure.  Well, I didn't know what the role was until I

12   spoke to Mr. Lefkowitz.  On that initial phone call, he

13   explained the details, who the company was, what transaction

14   had incurred, what the real urgency was around the Chapter 11.

15        Mr. Lefkowitz added Jason Brookner to that call.  Mr.

16   Brookner, Mr. Lefkowitz, and I then continued the conversation

17   around sort of the same topics.

18        We concluded that call, and, you know, I continued to do

19   sort of other investigation work on my own to understand and

20   sort of validate the best I could, you know, what really I was

21   dealing with.

22   Q    And when you spoke with Mr. Lefkowitz, did you understand

23   that Ankura had been involved with the company before that

24   call?

25   A    Well, as soon as he mentioned the name, not necessarily

1   to whom, but when he mentioned Corizon, right then I knew that

2   we were involved, we being Ankura, that we did have a prior

3   involvement.  And so, as part of my investigation, immediately

4   I picked up the phone and called another partner inside of

5   Ankura by the name of Roy Gallagher who was leading the

6   engagement for Ankura previously before my involvement.

7   Q    And based on your discussions with your engagement

8   partner, how long had Ankura been involved -- well, let me ask

9   the question this way.

10       When was Ankura first involved with Corizon?

11  A    I don't have the exact date, but I think it's around 2017

12  or so.

13  Q    And when did Ankura's engagement cease?

14  A    My understanding is the engagement ceased at the end of

15  2021.

16  Q    And so the record's clear, were you involved in that

17  engagement, you, Russell Perry, involved in the prior

18  engagement with Corizon?

19  A    I was not, no.

20  Q    You mentioned that Jason Brookner was added to the call,

21  your initial call with Mr. Lefkowitz.  Had you worked with

22  Gray Reed before?

23  A    I had not worked an engagement with Gray Reed.  I was

24  obviously very familiar with the firm and with Mr. Brookner

25  and yourself, but I had never worked with them.

1   Q    So what, if anything else, convinced you to agree to

2   accept the engagement as the chief restructuring officer for

3   Tehum?

4   A    Well, the initial conversation I had with Mr. Gallagher

5   from my firm at least validated to me that the situation was

6   what I'll call real, that the company, at least in the way he

7   described to me, had been under distress for quite some time

8   prior to '21, meaning while he was engaged.

9        He had at least general knowledge that there was a

10  divisional merger that had been carried out, and, you know, at

11  least I understood that there was a business previously, the

12  divisional merger had occurred, and that there was, you know,

13  substance here.

14       But I think more importantly, Mr. Brookner's involvement

15  probably was, you know, might have been the most important

16  aspect because I knew his reputation, the firm's reputation.

17       You know, he had indicated that he was sort of conflict

18  free from the matter.  And, you know, with that as a sort of

19  data point, I agreed to --

20  Q    I'm going to ask you to turn to the Debtor and UCC's

21  Exhibit 3.  It should be in the first exhibit book in front of

22  you.

23            MR. KAUFMAN:  Your Honor, for the record, this would

24  be at Docket 1410-3.

25            THE COURT:  Thank you.

1    BY MR. KAUFMAN:

2    Q    And what is this document?

3    A    This is the petition for filing Chapter 11.

4    Q    Okay.  And if you'll flip to page 6 out of 8 on that

5    document, what is that document?

6    A    6 of 8 is the corporate resolution.

7    Q    Okay.  And did you review this resolution before the

8    petition was filed?

9    A    I did.

10   Q    What is your understanding of the corporate resolutions

11   as it relates to your authority to act on behalf of the Debtor

12   and any obligations to report to Mr. Lefkowitz on your

13   actions?

14   A    Well, my understanding, and I believe I've testified on

15   this in the past, is this resolution provided me with sole

16   decision-making authority for the Debtor really over any

17   restructuring matters in which there may be a conflict that

18   Mr. Lefkowitz is involved in.

19   Q    So anything having to do with restructuring or where

20   there's a conflict of interest, is it fair to say that's

21   pretty much everything in this case?

22   A    Over the last year and a few days, it's been pretty much

23   everything.  Yes, that's right.

24   Q    So at any point during your engagement chief

25   restructuring officer, has Mr. Lefkowitz or anyone else

1    dictated to you the strategy for this case?

2    A    No.

3    Q    And without getting into your discussions with counsel,

4    describe for the Court the Debtors' process for determining

5    the strategy for this case.

6    A    Sure.  Well, let me describe it as the initial strategy,

7    right.  Because being that Ankura, and at least from my

8    capacity and Gray Reed had no involvement pre-petition.  We

9    really had to get into triage mode almost immediately.

10        What that meant was understanding the universe of

11   Creditors, pulling together and understanding the list of

12   Creditors that existed, a creditor matrix, and a noticing

13   perspective.  We had to gather information because we knew

14   schedules and statements were going to be complicated.

15        We immediately had to understand what the pending

16   lawsuits were because, you know, it's tricky.  And we had

17   thought that it was going to be tricky, that the automatic

18   stay was going to be communicated properly and carried out

19   effectively.  So we needed to understand that.

20        And three, I'd say, you know, importantly, the divisional

21   merger itself had substantial documentation to it, so we

22   needed to quickly get our arms around the divisional merger

23   for a number of different reasons.

24   Q    So you mentioned the divisional merger.  What were you

25   looking for during this triage mode, as you described it?

1    What were you looking for in the divisional merger in this

2    early period?

3    A    I guess twofold.  One, I needed access to assets, right.

4    I needed to understand did the company have cash allocated to

5    it.  Did the company have a funding agreement allocated to it?

6    You know, my knowledge sort of initially was that, you know,

7    those two assets likely existed, but I needed to understand

8    how, when, and what mechanism we could possibly execute upon

9    those.

10       And then to some extent, right, I needed to understand

11   just what liabilities were generated from that divisional

12   merger transaction from an allocation perspective just again

13   so I could get my arms around what were the liabilities of the

14   state as I thought about noticing and then ultimately

15   scheduling.

16   Q    And did you look into the divisional merger documents to

17   determine if there were other tangible assets, insurance, tax

18   credits, anything like that?

19   A    I did.  There are sections of the divisional merger

20   documents that speak to what's called remain co-assets.  There

21   are also schedules within the documents that provide for what

22   assets are allocated or were allocated to remain co versus

23   allocated to new co.

24       It did become apparent to us very quickly that there

25   were, you know, I would say a substantial number of insurance

1    policies that were allocated to remain co.

2        Obviously, we didn't know the underlying details amongst

3    those, but there were a number of insurance policies.

4        Two, we obviously confirmed there was a funding agreement

5    attached to and in concert with the divisional merger.  And

6    then there was limited cash, right, that was allocated.

7    Q    Did the Debtor prepare schedules and statements in this

8    case?

9    A    They did.  Multiple.

10   Q    And the most-recent one, if you'll turn in your exhibit

11   book to Exhibit 22, which I think is at the end of that first

12   binder.  Do you recognize this document?

13   A    I do.

14   Q    Did you help the Debtor prepare this document for filing?

15   A    I absolutely did.  Um-hum.

16   Q    And what was the date of the filing?

17   A    So this was filed on July the 19th of '23.

18        MR. KAUFMAN:  Your Honor, I offer Debtor UCC

19   Exhibit 22.

20        THE COURT:  Any objection?

21        (No verbal response.)

22        THE COURT:  22 is admitted.

23        (Exhibit 22 received in evidence.)

24   BY MR. KAUFMAN:

25   Q    Mr. Perry, is the plan of divisional merger and the

1    related documents attached to the Debtors' schedule of assets

2    and liabilities filed on July 19, 2023?

3    A    That's exactly what I was confirming.  Starts on page 16

4    of 202 for this document.

5    Q    Okay.  Let me go back.  You described that there was kind

6    of a triage mode in the early phases of the case.  How did the

7    case strategy develop once you got beyond the triage mode?

8    A    Well, again, from a triage perspective, you know, that

9    was understanding liabilities and assets.  Once we had to some

10   extent our sea legs, we knew that we immediately needed to

11   press pause on litigation across the country.

12        A very early hearing we had in this matter in front of

13   Your Honor was an extension of the automatic stay as certain

14   on Debtors.

15        A fairly small universe of claims when we now consider

16   filed claims in the case, and we knew that we needed to pause

17   that litigation.

18        Two, we knew pretty early on based on the various hats

19   that were worn by the insiders and the fact that there were

20   litigation matters across the country that there likely needed

21   to be a fairly thorough investigation.  And so, we needed to

22   move down that track as quickly as we could.

23        And third, again, in a matter that we also brought in

24   front of Your Honor very early in the case, we knew we needed

25   financing.  We needed capital because we had to fund

1      professionals who we knew were going to need to carry out a

2      pretty extensive workload.

3      Q    So let's unpack that first part a bit.  You said you

4      needed to put a pause on some of the litigation that was

5      ongoing across the country.  Why was that necessary?  Why did

6      the Debtor believe that was necessary in the early days?

7      A    Well, I would say this was the first sort of real in-

8      depth claim analysis that the Debtor conducted whereby it was

9      identified that certain claimants or certain plaintiffs had

10     asserted proper the estate actions as part of their lawsuits

11     at least in the Debtors' perspective.

12          And then second, we understood that there were

13     indemnification relationships between non-Debtor entities and

14     the Debtor.  And we really needed to press pause so that we

15     could martial the assets ourselves and understand what the

16     liabilities were in the case.

17               MR. KAUFMAN:  Your Honor, can I approach?

18               THE COURT:  Um-hum.

19     BY MR. KAUFMAN:

20     Q    I've handed you what's been marked as TCC Exhibit 99.

21               MR. KAUFMAN:  So, Your Honor, for the record, I

22     can't see, but I think this is Docket 1423-100.

23     BY MR. KAUFMAN:

24     Q    Have you seen this document before, Mr. Perry?

25     A    I have.

1    Q    And what is it?

2    A    This is my declaration.  The date is double copied up

3    top, but this should be from March of '23, and it's my

4    declaration in support of the automatic stay issues that I

5    talked about a second ago.

6    Q    If you turn to page 14, the last page, you'll see the

7    page of the document.

8    A    Ah, March 23rd.  Okay.

9    Q    And was it -- you said this was submitted in support of

10   the extension of the stay filed in this case?

11   A    Correct.

12          MR. KAUFMAN:  Your Honor, I offer TCC Exhibit 99.

13          THE COURT:  Any objection?

14          MR. MOXLEY:  No objection.

15          THE COURT:  TCC 99 is admitted.

16       (Exhibit TCC 99 received in evidence.)

17   BY MR. KAUFMAN:

18   Q    Flip with me in this document, TCC Exhibit 99, to page 9.

19   And I guess I should confirm this.  This was signed under

20   penalty of perjury, correct?

21   A    That's my understanding, yes.

22   Q    So paragraphs 22 and 23, do you see those two paragraphs?

23   A    I do.

24   Q    So you don't need to read this out loud, but based on

25   what you testified in these two paragraphs and submitted to

1    the Court under penalty of perjury, was the Debtor aware of

2    the existence of potential alter ego and successor liability

3    theories on March 23rd of 2023?

4    A    We were.  We were aware of the theories at the time

5    because some of the litigation matters that we had identified

6    asserted those remedies.

7    Q    And again, why was it important to pause litigation that

8    dealt with alter ego and successor liability theories in March

9    of 2023?

10    A    Well, in our view, these were properly estate-related

11    remedies that had these claims moved forward and let's call it

12    amounts liquidated, you know, in our view, it wouldn't have

13    allowed for us to be able to otherwise value, martial, and

14    really maximize the estate in regards to these types of

15    claims.

16    So we needed to press pause so it gave the Debtor the

17    ability to pursue those.

18    Q    And there is an expert report submitted by the Tort

19    Claimant Committee in this case, correct?

20    A    A declaration expert report.  Um-hum.  Yes.

21    Q    And that's submitted by Michael Atkinson of the Province

22    firm, right?

23    A    That's correct.

24    Q    Did you read that report?

25    A    I did.

1    Q    And did you attend the deposition taken on, I think it

2    was February 26th last week?

3    A    I did.  I attended in person.

4    Q    Mr. Atkinson suggests that the Debtor did not appear to

5    consider alter ego or successor liability theories.  Are you

6    familiar with that assertion?

7    A    I don't recall exactly where in his declaration, but I

8    recall he did assert that, yes.

9    Q    Do you agree with that statement?

10   A    I don't agree with his assertion.  I agree that he took

11   that position, but I don't agree with the assertion he was

12   making.

13   Q    Did the Debtor spend months investigating alter ego and

14   successor liability theories as part of the investigation?

15            MR. MOXLEY:  Objection, Your Honor.  Leading.

16            THE COURT:  Sustained.

17   BY MR. KAUFMAN:

18   Q    What did the Debtor do as part of its investigation?

19   What did the Debtor consider as part of its investigation?

20   A    The Debtor considered really any potential estate causes

21   of action that it could otherwise identify and potentially

22   liquidate.

23   Q    We're going to move to the next exhibit binder in front

24   of you.  If you'd turn to Exhibit Debtor UCC Exhibit 24.

25            MR. KAUFMAN:  Your Honor, for the record, this is

1   Docket 1410-24.

2              THE WITNESS:  Okay.  I'm here.

3   BY MR. KAUFMAN:

4   Q    Have you seen this document before?

5   A    I have.

6   Q    And what is it?

7   A    This is the bar date ordered that was -- the bar date

8   order that was filed in early May of '23.

9   Q    And what can you tell the Court about how this order came

10  to be submitted?

11  A    Well, the order is admittedly fairly lengthy because it

12  does include some forms in the back.

13       This was a fairly heavily-negotiated order, the way I'll

14  describe it.  It was also really important to both the Debtor

15  and at the time the Unsecured Creditors Committee, and it was

16  important because this was a really unique case.  It was

17  different than cases that may typically got forward, and

18  simply because of the, you know, incarcerated population that

19  we knew our Creditor base would likely have a number of.

20       So early on, what we needed to do was establish how we

21  notice, who we notice, the process by which we notice, and we

22  needed to understand and have an alignment to the best we

23  could with the Committee on carrying out those tasks.

24       You know, we collaborated the best we could.  We worked

25  with, directly with the Committee.  Again, we had to negotiate

1    a number of things in here.  Some, when I say negotiate, it

2    more related to assuring that the notice was conducted

3    properly, efficiently, and thoroughly, which means we also had

4    to involve our noticing agent.

5         But as it relates to the actual bar date itself, we

6    doubled what typically you would see, let's say, in a normal

7    Chapter 11, to the extent there are normal Chapter 11s whereby

8    the bar date was extended to 180 days as opposed to only 90.

9    Q    And do you believe the notice given that was negotiated

10   with the UCC, do you believe it was reasonably calculated to

11   maximize Creditor participation in this case?

12   A    I do, and that was the intention.

13   Q    And if you'll look -- I'm sorry to do this -- it's in the

14   first exhibit binder, Exhibit 18, Debtor and UCC Exhibit 18.

15        MR. KAUFMAN:  So, for the record, 14-18.  1410-18.

16   BY MR. KAUFMAN:

17   Q    This is the disclosure statement, right?

18   A    That is correct.

19   Q    And if you'll --

20   A    The second amended.

21   Q    The second amended disclosure statement filed in October

22   of last year, right?

23   A    The 27th of '23, correct.

24   Q    Turn to page 34 of 177 of that document.  And by 34, I

25   mean 34 at the top.

1    A    Okay.  I'm here.

2    Q    Do you see footnotes 11 and 12 of that document?

3    A    I do.

4    Q    What is being described in that provision of the

5    disclosure statement?

6    A    Well, 11 and 12 are referenced above in the bottom

7    paragraph of section D.  And really what we're looking to

8    communicate is that the Debtor mailed, disclosed, noticed

9    across a number of different, you know, time periods.

10        And in each one of these dockets, there's actually, we

11   just called a service of notice or something where we actually

12   indicate who received notice, how they received notice, and,

13   of course, what was actually noticed.

14   Q    So as KCC, the notice agent, was learning of new,

15   additional Creditors, is that -- were they serving

16   supplemental notices to those Creditors?

17   A    There were.  I don't have it memorized, but one of these

18   or multiple of these will be most likely 100-plus pages

19   because of the extensive nature of noticing.

20        But there is an iterative nature.  The Creditor matrix

21   that we originally utilized in, we'll call it February of '23,

22   is obviously different than the Creditor matrix we were using,

23   for example, in October because every notice that we received,

24   every piece of correspondence that we received, names that we

25   received, we assured they were added to the Creditor matrix so

1      that they received notice and proper information.

2      Q    And then there was a publication notice on top of that?

3      A    There was.

4      Q    Let's turn to the Debtor in possession of financing

5      motion filed in this case.  Can you briefly explain to the

6      Court what the sources of revenue were to the Debtor when the

7      case was filed?

8      A    Well, in terms of a, you know, finance and accounting

9      perspective, there was no revenue.  There was no operating

10     revenue for the Debtor.

11     Q    And why was that?

12     A    Well, when the company -- I don't want to say company --

13     when Corizon completed its divisional merger in May, there

14     were no operating contracts allocated to the Debtor.

15          And therefore, there was no operating revenue that was

16     received by the Debtor.

17     Q    And you mentioned the funding agreement a few minutes

18     ago.  What amounts were available to the Debtor under the

19     funding agreement when the bankruptcy case was filed in

20     February of 2023?

21     A    Well, from where I sit today, there was nothing

22     remaining.

23     Q    Why do you say it that way?  What do you mean?

24     A    Well, I was in this chair in, you know, March of '23

25     where Your Honor sort of quizzed me on whether or not I knew

1  how much was under the funding agreement.

2       And to the extent that there was information or amounts

3  under the funding agreement that I would be back in this court

4  to assure that I was taking the steps to access it.  So we

5  began almost immediately gathering the information in order to

6  understand whether there was any remaining amounts available

7  under the funding agreement.

8       And throughout the course of the engagement, it was

9  concluded through our analysis that there was no remaining

10  amounts left.

11  Q    Okay.  So if there was no amounts left under the funding

12  agreement, did you investigate other sources of capital or

13  cash that could be used to fund the bankruptcy case?

14  A    Oh, absolutely.

15  Q    Explain that process to the Corut.

16  A    Sure.  The day we filed, February the 13th, we had

17  received that morning correspondence from Synergy, our third-

18  party, what was called the employee retention tax credit.  We

19  had received a really extensive report from them that

20  basically indicated the Debtor had access to it was roughly

21  $10 million of employer retention credits.

22       There was a process by which we needed to bring those

23  into the estate, but they identified they were available and,

24  you know, obviously, I quickly latched onto those.

25       Second, we knew, as I mentioned earlier, the Debtor had

1      been allocated insurance policies and, you know, a number of

2      insurance contracts.  We didn't know whether or not there were

3      available funds underneath those and to what extent we could

4      use those, but we knew they were available.

5           Outside of those three things, the funding agreement,

6      which, as I said today, I know that there was nothing

7      available, the ERC credits, and, you know, insurance policies,

8      the real only other I'd say item available was just, you know,

9      any type of call it litigation that may exist or may come

10     about and whether or not I could, you know, figure out how to

11     monetize those in terms of bringing capital in.

12     Q    Were you able to monetize those immediately in the case

13     in February of 2023?

14     A    Well, when you say those, I wasn't available.  I wasn't

15     able to monetize any of those as much as I attempted to.

16     Q    So then what was your next step to make sure the case had

17     sufficient funds to pay for administrative expenses during the

18     case?

19     A    Well, just so we're clear, I spent quite a bit of time

20     actually engaging with third-party potential lenders.  I

21     testified on this, you know, some months ago.  The ERCs, at

22     least as how I viewed them, represented real collateral.

23          My attempt was to convince third-party lenders to lend on

24     that collateral.  I didn't have much other collateral to

25     offer, but I certainly exhausted efforts to determine whether

1       or not third-party lenders were available.

2           I had to pivot away from that eventually.  And really,

3       the source of capital in this case was M2 LoanCo who had

4       provided the funding agreement, who had provided an additional

5       loan agreement to the Debtor pre-petition, and so I started to

6       engage through counsel with M2 LoanCo for the ability to bring

7       in capital.

8       Q    You mentioned engaging M2 LoanCo through counsel.  How

9       did the DIP loan get negotiated with M2 LoanCo?

10      A    Well, the process that at least I undertook was that I

11      engaged directly through counsel or directly with counsel to

12      M2 LoanCo.

13      Q    And why was that?  Why did you have to go through

14      counsel?

15      A    Well, we talked earlier about the board resolution.  I

16      didn't have a great feel at the time, which I think I

17      testified to a couple times, as it relates to what Mr.

18      Lefkowitz's role was at the time of M2 LoanCo.

19          And what I didn't want to do was create, at least at the

20      time, any type of appearance or even a conflict that the

21      Debtor wasn't negotiating directly with M2 LoanCo, and so, I

22      chose to negotiate through counsel.

23      Q    And did you ultimately authorize the filing of a DIP

24      motion in this case?

25      A    I did.

1    Q    And is that motion what's been admitted as Debtor UCC
2    Exhibit 10?
3    A    This is the interim.  This -- that's correct.
4    Q    Okay.  And did the UCC object to the DIP motion?
5    A    Yes, they did.
6    Q    And their objection is the next exhibit, Exhibit 11,
7    right?
8    A    Correct.  This is their objection.
9    Q    And what resulted following the UCC's objection as it
10   relates to entry of an order on the motion?
11   A    Well, this objection was filed on the 21st of March.  I
12   believe the hearing occurred a few days later.  The Debtor in
13   the Committee, as well as M2 LoanCo did engage in negotiations
14   leading up to a hearing.
15        There were resolutions on a couple of fronts.  Not all
16   unfortunately.  And we brought forth a hearing in that, you
17   know, third week of March in order to seek approval of the DIP
18   order.
19   Q    And the Court ultimately entered that first interim DIP
20   order, right?
21   A    Ultimately, correct.
22   Q    And that's what's been admitted as Debtor UCC Exhibit 12?
23   A    That's correct.
24   Q    And did the Debtors submit subsequent interim DIP orders
25   after the entry of this first order?

1    A    There have been four total DIP orders entered by Your

2    Honor, and we have submitted now a fifth order.

3    Q    Okay.  And Debtor UCC Exhibits 13, 14, and 15, are those

4    the second, third, and fourth interim DIP orders entered in

5    this case?

6    A    That is correct.

7         MR. KAUFMAN:  Your Honor, I'll offer Debtor UCC

8    Exhibits 13, 14, and 15, which, for the record, are Docket

9    1410-13, 14, 15.

10        THE COURT:  Any objection?

11        MR. MOXLEY:  Your Honor, I don't mean to be

12   difficult with exhibits, particularly filings.  I thought what

13   our teams had agreed to was that docket entries would be --

14   could be subject to judicial notice, and wouldn't necessarily

15   need to be entered.

16        With that said, Your Honor, we'd be happy to do

17   whatever procedure the Court prefers with the judicial notice

18   of those documents.  We don't have objection.

19        MR. KAUFMAN:  Your Honor, my response to that is

20   that that is the general statement.  If it's just a pleading

21   filed on the docket, the Court can take judicial notice.  But

22   this document, we actually do intend for the Court to consider

23   the substance of it, so we ask that it be admitted.

24        THE COURT:  I'm okay admitting it.

25        MR. MOXLEY:  No objection, Your Honor.  Thank you.

1          (Exhibits 13, 14, and 15 received in evidence.)

2     BY MR. KAUFMAN:

3     Q    Is the Debtors --

4               MR. KAUFMAN:  Oh, I'll wait for a ruling.

5               THE COURT:  Oh, I'm fine.  They're admitted.

6     BY MR. KAUFMAN:

7     Q    Is the Debtor seeking entry of a final order on the DIP

8     motion at this time?

9     A    No.  We're seeking entry of an interim DIP order for --

10    Q    And the interim DIP order that the Debtor is seeking is

11    the next exhibit 16; is that correct?

12    A    That is correct.

13    Q    Is M2 LoanCo as the DIP lender requiring as a condition

14    of this additional interim financing the entry of a final

15    order?

16    A    They're not.

17    Q    And to your knowledge, has M2 LoanCo declared a default

18    or threatened to declare a default under the DIP loan?

19    A    No.

20    Q    Exhibit 16, Debtor UCC Exhibit 16, did you authorize the

21    filing of that motion?

22    A    I did.

23    Q    And does it include a proposed order and an interim

24    budget?

25    A    It does include a proposed order, and I do see the

1    budget.  That's correct.

2    Q    And was this negotiated with the DIP lender and the UCC?

3    A    It was.

4          MR. KAUFMAN:  Your Honor, I offer Exhibit 16, which

5    is the fifth interim DIP order.

6          THE COURT:  This one I see a little different than

7    the others, and I, subject to your -- I can admit this for

8    what you filed, but this has a budget.  And I don't know if I

9    should admit the budget for the truth of the matter asserted

10   and the numbers in there.

11         But I can certainly take it for what the parties

12   have filed, and what you're seeking as the fifth interim.

13         MR. KAUFMAN:  That's --

14         MR. MOXLEY:  That would be our position, Your Honor.

15         THE COURT:  You okay with that?  Okay.  Thank you.

16         MR. KAUFMAN:  That's fine.

17         (Exhibit 16 received in evidence.)

18   BY MR. KAUFMAN:

19   Q    Was this fifth interim DIP motion, the budget, and the

20   proposed order, was this negotiated as part of the global

21   settlement that was reached among the parties in this case?

22   A    It was.

23   Q    Okay.  If you'll scroll down in that motion to where the

24   proposed order begins, which I think is page 10 of the

25   document.

1    A    I'm here.

2    Q    Okay.  Describe for the Court your understanding of what

3    is being proposed in the interim order.

4    A    Well, this is entry into the fifth, as we've indicated.

5    It does include the advancing of another 5 million.  If we

6    look to page 11 of 16 and come to the bottom, this DIP order

7    really sets forth certain milestones conditions in order for

8    funding to occur.

9    Q    And when these milestones were negotiated, did the Debtor

10    anticipate having this hearing completed by now?

11    A    Oh, indeed.

12    Q    And is the Debtor now working with M2 LoanCo to extend

13    those milestones so that they tie into the end of this

14    hearing?

15    A    Yes, that's my understanding.

16    Q    Has M2 LoanCo indicated a willingness to push those dates

17    off a little bit?

18    A    That is my understanding, yes.

19    Q    What if the Court declines to approve the financing

20    proposed under this motion?

21    A    Well, I guess simplistically, it just means that the CRO

22    is continuing to ask the professionals to really finance the

23    case.

24    Q    And the Tort Claimant Committee argues that the estate is

25    administratively insolvent.  Are you familiar with that

1    allegation?

2    A    I wasn't here last Friday, but I do understand that that

3    allegation has been made.

4    Q    Do you agree that the estate is administratively

5    insolvent?

6    A    No, I do not.

7    Q    Can you explain to the Court why you think the estate is

8    administratively solvent?

9    A    Sure.  Well, I assess administrative solvency as kind of

10    a point in time similar to, call it a balance sheet.  Today,

11    let's just say if I was to assess outstanding fees and match

12    those up with what assets I would have available to martial

13    and pay those fees, then I believe there's assets that exceed

14    the amount of administrative expenses outstanding.

15        To me, and it may sound simplistic, but that's how I

16    assess solvency.

17    Q    And if the settlement that's being proposed today is

18    approved by the Court, and then a plan is later confirmed so

19    that the settlement goes effective, will the additional funds

20    under the settlement be sufficient to pay administrative

21    expenses in this case?

22    A    Yes, by a wide margin.

23    Q    And make distributions to Creditors?

24    A    That's correct.

25    Q    How much do you project of the settlement proceeds will

1    be available to Creditors in this case?

2    A    Well, of the settlement proceeds by themselves, the way

3    that I look at that is within the settlement agreement there's

4    a $40 million amount that would be funded upon, let's call it

5    the effective date, really, there's -- I feel the situation's

6    like.

7        But that 40 million would be funded and then netted out

8    of that would be occurred or call it incurred and owing or

9    unpaid administrative expenses.

10       Now for the budget that Your Honor just referenced,

11   there's a number they added to the budget that I called

12   settlement proceeds.  That number, at least per this budget,

13   was around 3, 3.1 million.

14       So the way that I look at it is the settlement proceeds

15   are 40.  The proceeds or the amount of the proceeds that would

16   need to fund administrative expenses per this budget is 3 and

17   change.  So let's call it roughly 35 million.

18       And I have to give a delta between 35 and what that exact

19   math would be simply because, number one, the budget was

20   prepared a few weeks ago.  My understanding is the TCC has

21   filed the applications that I didn't account for in this

22   budget.  I don't have a budget --

23   Q    You don't have --

24   A    -- all in.  And so --

25   Q    You don't have a --

1    A    -- I don't know what the delta would be.

2    Q    I'm sorry.  You said you don't have a budget.  What did

3    you mean by that?

4    A    Sorry.  From the TCC.  And so, I don't know if we're

5    going to deal with questions on this, but there is a line for

6    third committee in the budget.  And I believe it is lower than

7    the fee app, you know, the fee statements that have been filed

8    so far.

9        So when I say minimum of 35, the way that I think about

10   the settlement proceeds, I take the 40 and I deduct what would

11   be incurred but unpaid for professional fees.

12   Q    And are there other sources of recovery for Creditors in

13   this case beyond the settlement proceeds that are being

14   proposed?

15   A    Absolutely.

16   Q    And did you prepare a demonstrative for today that

17   demonstrates to the Court the potential waterfall of the

18   settlement?

19   A    Down to distributable assets.  I did.

20            MR. KAUFMAN:  Your Honor, could I approach and hand

21   this up?

22            THE COURT:  Sure.  Thank you.

23   BY MR. KAUFMAN:

24   Q    Could you walk the Court through this demonstrative and

25   explain to the Court what you're projecting based on the

1    statements you just made?

2    A    Sure.  As I mentioned a second ago, this is not a

3    complete waterfall, meaning I wasn't looking to recreate the

4    liquidation analysis in the original disclosure statement.

5         What I was looking to accomplish in this is to show what

6    proceeds were available after administrative and priority

7    claims were funded.

8         So let me take it in really three pieces.  The first

9    piece I'll talk about lines really 2 through 5 since there

10   wouldn't be cash in the estate simply because I'm using that

11   to fund expenses.

12        Row 2 are the employee retention credits I mentioned a

13   second ago.  Your Honor and others in this case may have seen

14   a smaller number when the original liquidation analysis was

15   filed.  That number has increased, you know, to a fair extent

16   because we worked closely with Synergy, the outside

17   consultant, to calculate additional amounts the Debtor was

18   qualified for under the ERC credit program.

19        The 25.9 million that you see is the amount that I

20   personally applied for through the IRS, through what's called

21   941-X forms.  The 19.5 is just simply a 25 percent discount on

22   that.  I have at least at this point no reason to believe that

23   those amounts won't be liquidated; it's just a matter of

24   timing.

25        The cause of action proceeds on number 3 or row 3, that

1      estimate admittedly is one that I worked closely with the

2      Committee on.  There are certain claims that the Debtor

3      believes it has that is not being released through this 9019.

4           For example, there are claims that are not being released

5      to a former equity owner called the Flacks Group.  There are

6      preference payments that are not being released.  We've simply

7      estimated those to be between 1.5 to 3 million.  I think the

8      Committee might think they're worth a little more.

9           Insurance proceeds within the disclosure statement, there

10     is a fairly thorough schedule on all the insurance policies

11     that the Debtor has possession of within a certain portion of

12     those.  And I'll reference those as being the Arizona policy

13     simply because we mediated and we had a process by which we

14     have embedded into the plan.

15          There are fairly substantial amounts of insurance

16     available with low SIRs.  We've simply estimated 5 to 10

17     million.  It's going to depend on the value of the claims

18     obviously, but we have included that as initial recovery.

19          And then, of course, you see the global settlement.  What

20     I've done in this schedule is I've said where were we in

21     August of '23 in the first settlement, and where are we now in

22     the '24 settlement.

23          So as it sits, at least for those four categories I've

24     just mentioned, 37 to 40 is somewhat comparable.  The

25     mechanics are a little bit more complicated beyond that, so

1    that's a $3 million improvement.

2         Now as you work down the page, the employee retention

3    credit offsets, just simply, those are fees and taxes.  The

4    first is the IRS tax claim that was filed.  At least

5    memorialized within the original plan or the plan that's on

6    file today, there is a notion that the ERC credits would apply

7    to those taxes.

8         It's what I've been in communication with the IRS about

9    throughout this engagement.  There's an understanding between

10   both parties that that would take place.

11        The Synergy fee that's referenced there is just the fee

12   that I referenced a little bit earlier.  It's contingent based

13   on the amount of cash received.

14        This is a different presentation and liquidation analysis

15   at least from 10, 11, and 12's perspective.  On row 10, I just

16   simply said what is the DIP budget showing or what did the DIP

17   budget show as total administrative expenses.

18        The August '23 settlement would've been until the end of

19   the year.  The January '24 settlement would be memorialized in

20   the budget that I just mentioned.  That would take us through

21   the end of April.  So those are total fees, end of the year

22   versus end of April.

23        And then the release on row 12 is just simply a

24   settlement concept.  That's what we --

25   Q    Let me stop you.  You skipped line 11.  Why did you skip

1    line 11?

2    A    Oh, I'm sorry.  I have a TBD.  So this goes back to the

3    point I was referring to earlier.  As it stands today, the

4    17.4 that is referenced on row 10 is budgeted, right, actual

5    incurred plus budgeted.

6        I do not know as I sit here today what incremental fees

7    may exist beyond what's in the budget, both from the Debtors'

8    perspective in the activities that we're dealing with now and

9    we may deal with going forward, and then, of course, from the

10   TCC's perspective and the UCC.

11   Q    Okay.  And line 12, you were talking about the DIP

12   facility obligation releases.  Why is it dramatically

13   different between the August settlement and the present

14   settlement?

15   A    Well, it's -- I will say it's a bit complicated.  But in

16   the original settlement, there was a dollar-for-dollar credit

17   for DIP amounts that would be advanced post that mediation,

18   meaning that 37 million would have been reduced by a certain

19   amount to fund administrative expenses such that the only

20   amounts that were available to release, at least at that

21   point, was the DIP that had been approved, which I think was

22   the first and the second, plus accrued interest.

23       The 14 million is really the concept that's now baked

24   into the new settlement, which would be the 8.5 plus accrued

25   interest that had already or would be contemplated to be

1    advanced, plus the additional five.

2        So when you take that, you add accrued interest, and you

3    add the fees, that 14.3 million is effectively the release of

4    the DIP claim that is memorialized in the 9019.

5    Q    So let me ask it this way.  The 37 settlement agreement

6    that was proposed from the August settlement and the 40 that's

7    being proposed under the present settlement, you say those are

8    kind of apples-to-apples, right?

9    A    To the best that I could create this demonstrative,

10   that's the way, at least in my mind, I think about it.

11   Q    But does the timing change, the timing of payment change?

12   A    The timing does.  The 37 million, the reason I put it on

13   a separate line is there was an amount in the first settlement

14   by which would come in at the effective date.  It was 25.

15       The incremental 12 would have come in monthly.  I think

16   it was a million a month, every month, for the next 12 months.

17   The current 9019 is for the 40 million to be received on the

18   effective date.

19   Q    No payout over time, right?

20   A    No payout over time.  What I haven't done in this

21   demonstrative -- and I do think I was asked this in some of my

22   prior testimony -- I have not applied any type of present

23   value --

24   Q    Then you mentioned line 12 under the old August

25   settlement only about 2.9 million has been released to the

1    DIP.  Now that's gone up by how much?

2    A    Well, it's just (inaudible).

3    Q    What else -- tell the Court about the remaining line

4    items under 15, 14 through 20.

5    A    Sure.  I'll just hit these briefly.  The plan trust

6    professional fee, you know, that was really a concept in the

7    first and second amended plan and disclosure statement.  I'm

8    making the assumption -- I don't know because once we

9    hopefully are able to reach an order on this 9019, I'd like to

10   move this case into plan negotiation stages.

11        I am assuming there would be a trust.  In any

12   liquidation, there's typically a trust.  In our original

13   liquidation analysis, we included fees for a trustee or

14   trustees of 2.1 to 2.8.  I've simply left that alone.

15        So I've left it here.  The U.S. trustee fees are simply a

16   calculation off of distributions.  And then the other

17   administrative expenses claim was a fairly important line

18   because that 1.2 you see in the bottom left represented a

19   potential claim that would have been filed or I thought would

20   may be filed by Cigma from an administrator perspective.

21        And then when you see the January 24th, that 755, 750 of

22   that is an amount that's memorialized within the budget.  So

23   all in all, when you come all the way down to row 20 -- and I

24   realize that was a lot of detail -- but when you come down to

25   row 20, at least for January '24, if I was preparing a

1    liquidation analysis based on the economics here, the amounts

2    available for Creditors, plural, Creditors, would be between

3    49 and 62 million.

4              THE COURT:  I'll just ask you a clarifying question.

5    For Cigma, how do they flow through this budget?  Can you just

6    remind me?

7              THE WITNESS:  Your Honor, there's a line item in the

8    budget that says Cigma risk management.  It's row 3 and

9    750,000 is budgeted back in January here in the budget.

10   BY MR. KAUFMAN:

11   Q    Has that amount been paid?

12   A    It has not.

13             MR. KAUFMAN:  Sorry, Your Honor.  I didn't mean to

14   step in.

15             THE COURT:  No, no, no, no.  I'm glad you asked the

16   question.  That was going to be my next question.  And then

17   the question after that is so under the proposed settlement,

18   what happens to that claim?

19             THE WITNESS:  That claim is dissolved.  750 is, in

20   fact, the full payment to Sigma.  And there are no amounts

21   going --

22             THE COURT:  So, I'm sorry.  In other words, is the

23   estate going to have to pay the 750 under the settlement or is

24   it released in exchange for the release?

25             THE WITNESS:  750 is the payment, Your Honor.  So

RUSSELL PERRY - DIRECT BY MR. KAUFMAN                    58

1      they're owed called only five today.  The construct today

2      would be to pay 750 for Sigma.  That resolves the outstanding

3      balance of the 1.5 in the amounts in the amounts occurring in

4      the future.

5               And no administrative claim would be filed for

6      Sigma.  And then, of course, the settlement mechanics then

7      step in from a length release perspective.

8               THE COURT:  they are owed 1.5 plus potentially some

9      other amounts.  The estate is going to settle it for 750 and

10     then kind of a waiver of any future services that Sigma would

11     provide?

12              THE WITNESS:  That's correct.  But they would still

13     continue to provide services.  Which is very important from my

14     perspective.

15              THE COURT:  Okay.  Thank you.  They're not releasing

16     the 750 though, correct.

17              THE WITNESS:  Correct.

18              THE COURT:  Okay.

19              MR. KAUFMAN:  Your Honor, I think I misunderstood

20     your question.

21              THE COURT:  No, no, no.  I was just making sure that

22     I understood kind of how they flow through here and what the

23     deal with Sigma is.  It's just more clarifying questions for

24     me.  I appreciate it.

25              MR. KAUFMAN:  All right.

BY MR. KAUFMAN:

Q    And so that I can clarify, I think Your Honor ask the 750 is not being released.  What is the -- your understanding of the deal with Sigma if the DIP and the settlement is approved?

A    Well Sigma is, I think, a release party under the 919.  I have to remember if they're a self -- but they are a release party under the 919.

The 750 would fund all outstanding amounts and amounts that would be incurred in the future.  And Sigma would continue to provide services to the Debtor going forward.

Q    So what's the benefit -- your understanding of the benefit of paying Sigma about half of what they're owed in exchange for a release from Sigma from future amounts owed?

A    Well, my job is to maximize value to the estate, right. And the bottom left of this demonstrative, just by way of example, I think the understanding at least up to this point in the case is that Sigma was not walking away from their administrative claim or at least their view of their administrative claim.

They had every intention to file that claim and they were going to come to court to litigate it.  At least that's my understanding.  So by settling I think there is at least as it stands today, value to the estate first as a scenario in which that administrative claim would be allowed.

Second, Sigma continues to provide services to the Debtor

1    and really what I'm doing in this 750 is I'm funding a
2    fraction of not only the expenses that have incurred today,
3    but I don't know how long this case will be.  But we may very
4    well continue to use their services in the future.  And I no
5    longer have an amount owing.
6    Q    And so the record is clear, what services does -- well
7    let me back up.  Who is Sigma?
8    A    Sigma's a group of individuals.  They were previously in
9    house counsel, is the way that the described to the Debtor.  I
10   believe it was in connection with Divisional merger, the group
11   of in house lawyers separated from the company's formed their
12   entity I believe they owned that entity.
13        And they now provide services on a contractual basis for
14   the Debtor, I believe, to other third party entities as well.
15   Q    And do you know whether Mr. Lefkowitz has a role with
16   Sigma?
17   A    My understanding is he's an unpaid director of Sigma.
18   But my understanding is he's not an equity owner of Sigma.
19   Q    And what services does Sigma provide?
20   A    Let me answer a little more past tense and present tense.
21   The initial work that the (indiscernible) and I think, Your
22   Honor had questions on this a few months ago, if I recall.
23   Sigma they maintain really the entire data base of personal
24   injury claims and various court claims against the Debtor.
25        When we filed, we really had no ability to get our arms

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1    around, where were the claims, where were they filed, who was

2    involved, who were the Defendants, what were some of the

3    underlying merits.

4         And so Sigma was important from a noticing, from a

5    documentation for us to be able to build the creditor matrix,

6    for us build creditor schedules.  Sigma also -- because they

7    refer to themselves as claims management, they also had

8    relationships with the other various counsels that were

9    defending the litigation from across the country on behalf of

10   the Debtor.

11        And so we had to utilize Sigma's relationship sort of

12   management some of those outside counsels so that we knew

13   that, you know, folks were in essence not incurring

14   administrative expenses that we couldn't afford to pay.

15        Now as we moved through the engagement, that was initial,

16   I think we may have talked about this, but there was a

17   extension of the automatic stay we sought.  I think multiple

18   follow-ups to that.  Maybe one or two.  To where Sigma was

19   very helpful for us and critical for us to really dig into

20   each of those individual claims.

21        You know, we can pull back the sheets ourselves and

22   things like that, but just the history of the actual claim.

23   Who is involved, how long it had been carried out, some of the

24   undergoing merits and the like Sigma helped us with that.

25        So they've been instrumental throughout really this

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1    entire process.  At the second mediation there was a request

2    to gather additional information.

3    Q    Let me just stop you.

4    A    Okay.

5    Q    Let's not get into what was discussed at mediation.  But

6    I'll ask the question.  Did Sigma assist you in providing

7    responses to requests made by the Tort Claimant Committee as

8    part of mediation.

9    A    Yeah that was my last piece.  In response to information

10   requests that were made by management and TCC, Sigma generated

11   a number of reports and, you know, data on claim activity that

12   we could provide to the various parties.

13   Q    I think that's enough on Sigma, unless the Court has any

14   follow-up questions.

15            THE COURT:  No thank you.

16   BY MR. KAUFMAN:

17   Q    The Tort Claimant Committee has alleged that M2 Loanco

18   has maintained control over the Debtor and the UCC by

19   withholding DIP funding.  Do agree with this characterization?

20   A    No.

21   Q    Why not?

22   A    Well first of all, the Debtor and the Committee we

23   haven't stopped working.  We haven't taken direction, we

24   haven't stopped working, we haven't otherwise been persuaded

25   by, you know, any type of action in that regard.

1          You know, I'm involved another Chapter 11 in which I have

2     what I'll say a challenging DIP lender that didn't always fund

3     exactly to the budget and on time.  And, you know, we carried

4     out our duties per our fiduciary interest and our tasks.

5          So, you know, there's been no influence at all on, you

6     know, type of withholding or not funding or funding based on

7     whatever condition is in whatever DIP order.

8     Q    The Tort Claimant Committee has also alleged that the DIP

9     loans were pre-negotiated before the bankruptcy case was filed

10    last February.  Is that accurate?

11    A    No, I wasn't even retained until the bankruptcy was

12    filed.

13    Q    Do you believe the UCC has been complicit with either the

14    Debtor or M2 Loanco. as the DIP Lender in negotiating the DIP

15    orders in this case?

16    A    No.  I think the committee has been a strong adversary

17    throughout the entire process.  Which is, you know, been

18    memorialized within the fifth interim.

19    Q    Let's turn -- I want to talk about your investigations --

20    the Debtor's investigations in this case.  Would you turn to

21    Exhibit 2 in the Debtor and the UCC's Exhibit Book, Exhibit 2?

22    A    Okay.

23          MR. KAUFMAN:  For the record that's 410, docket

24    410-2, which I believe has been admitted.

25          THE WITNESS:  And I'm sorry, which one are we going

1   to?

2   BY MR. KAUFMAN:

3   Q     First binder, Exhibit 2.

4   A     First binder.  Okay, I'm sorry.

5   Q     And while you're doing that -- well let me know when

6   you're there.

7   A     I'm here.

8   Q     What is this document?

9   A     This is the execution copy of the settlement agreement.

10  Q     And are you asking the Court to approve this settlement

11  with the modifications that Mr. Brookner described a few

12  moments ago?

13  A     Yes, the modification, I think are memorialized order

14  that would supercede the language in the agreement.

15  Q     And let's talk about how this settlement came to be.  Did

16  the Debtor investigate the state causes of action before

17  entering into this settlement agreement?

18  A     It did.

19  Q     Tell the Court about the process, the investigative

20  process that the Debtor undertook.

21  A     Okay.  I think much of this is laid out in the disclosure

22  statement, but let me summarize it in my words.

23        The investigation really had two components. It had a

24  legal component and it had a financial component.  Counsel led

25  the investigation.  Counsel being Gray Reed led the

1    investigation.

2         There were Ankura professionals that reported to and

3    worked at the direction of Gray Reed in connection with that

4    investigation.  And the task was to investigate potential

5    causes of action via state mail.

6    Q    You mentioned some Ankura individuals.  Who are those

7    individuals?

8    A    Well my team consists of call it six core individuals

9    beyond myself.  Let me break them up into two buckets.  One

10   I'll refer to as the investigation team.  And the second I'll

11   refer to as sort of the CRO team.

12        The investigation team -- this is three individuals.  One

13   by the name Mike Conellie (phonetic).  Mike is a very

14   experienced seasoned restructuring and dispute professional.

15   Works within our transaction and valuation practice.  He is a

16   forensic accounting, fraud examiner.  I believe that he has a

17   CPA and a number of other credentials that allow him and help

18   him to focus in the expert role of disputes, transactions and

19   litigation matter.

20        He was assisted by two individuals in his team.  One

21   being Brian Sergeant (phonetic).  Brian is, as I recall,

22   finance in accounting, undergrad.  I believe he has his CPA.

23   The third individual is by the name of David Cooper.  David

24   Cooper has what's called a Charter Financial analyst

25   designation which is the same that I have.

1    Those three individuals were focused on the

2    investigation.  The three other individuals -- I think I've

3    explained to the Court in the past -- one Scott Renaldi

4    (phonetic).  Scott is and has a very extensive background in

5    Chapter 11 administration.  Both the preparation of, carrying

6    out the administration.

7    He's also served in multiple post confirmation roles.

8    And then Steve Petrocelli (phonetic) and Dillon Frankal

9    (phonetic) are two members of what I call the CRO team that

10   are -- one is a CPA.  They're both financing and accounting

11   restructuring centric professionals that their career is

12   dedicated to simply restructuring matters.

13   Q   So you mentioned that the investigation was led by Gray

14   Reed, especially on the legal side.  Explain to the Court the

15   extent of your involvement.  The process that you undertook to

16   become involved and apprise yourself of the status of the

17   investigation.

18              MR. MOXLEY: Objection, Your Honor.  I asked Mr.

19   Perry this exact question to explain his involvement in the

20   process and he was instructed not to answer that question.  So

21   I would object to him being able to answer that question at

22   today's trial.

23              THE COURT:  I'll allow you to cross him on it.  Go

24   ahead.

25   BY MR. KAUFMAN:

1    Q   Do you need me to reasked?

2    A   Please.

3    Q   Just describe for the Court your involvement, the steps

4    you took to apprise yourself of the status of these

5    investigations.

6    A   Sure.  I think I've testified in the past that my

7    involvement was to review reports and other information

8    produced by the investigation.  So let me explain that.

9        The Gray Reed and Ankura teams for months I had daily

10    calls on my calender to assure the teams came together daily.

11    As a CRO what I didn't want is to be in the dark.  I didn't

12    want to be in the dark.

13        I didn't want work to be carried out for two, three, four

14    weeks without really understanding what was occurring and what

15    was happening in this case was moving too quickly.  There were

16    too many factors to deal with.

17        And so my role was, again, to organize calls, to attend

18    calls, to stay informed as to how the investigation was

19    carrying out.

20        There were reports created.  I received that reports.  I

21    reviewed those reports.  And then, you know, there were other,

22    call it, analysis that, you know, I had a hand in helping

23    with.

24    Q   A hand in helping with as in -- explain that to the

25    Court.  Did you prepare reports?

1    A    There are certain reports that I prepared in connection

2    with the investigation.  There are certain reports, obviously,

3    that my Ankura team that I just described in connection with

4    the investigation.

5    Q    And has the Debtor, to your knowledge, produced all

6    non-privileged reports to the Tort Claimant Committee?

7    A    That is correct.  To my knowledge, all non-privileged

8    information has been produced.

9    Q    And based on your involvement in this process, did the

10   Debtor come up with a settlement range of the estate causes of

11   action before going into mediation?

12   A    It did.

13   Q    And did the Debtor reach a settlement with the UCC and

14   the M2 parties after the August -- we talked about the August

15   settlement.  Was the August settlement within that range?

16   A    On the economics that I walked through on the

17   demonstrative earlier, the 37 million plus small -- let's call

18   it release -- those were within the range that we had

19   originally identified, yes.

20   Q    And the terms of the August settlement were incorporated

21   into a Chapter 11 liquidating plan, right?

22   A    That's correct.

23   Q    Is the Debtor asking the Court to approve that Plan in

24   the settlement that was incorporated into the prior Plan?

25   A    There is no request for the Court to approve a Plan or

1      the original settlement now.

2      Q    And why not?

3      A    Well, we're here today seeking approval of the 9019 or

4      the settlement agreement, first of all, from the second

5      mediation, not the first.  And second we are not here seeking

6      approval plan perspective are, you know, some of the releases

7      that I think were discussed on Friday and this morning.

8           So the intention again, like I mentioned a second ago, is

9      if the order is entered for the settlement agreement, the

10     agreement is approved then what I would see as the parties now

11     moving to what I call Plan negotiation stage.

12          Which is taking the settlement, incorporating it within

13     the Plan and disclosure statement and working hopefully

14     collaboratively with the folks in this room to determine what

15     the allocation, distribution, or other mechanics needs to be

16     within the Plan.

17     Q    Mr. Perry, I know you weren't here on Friday when we

18     began opening statements.  Mr. Goodman -- I'll represent to

19     you, Mr. Goodman in his opening remarks, represented to the

20     Court that he believes the new settlement will only make eight

21     to $9 million of cash available for the Tort Claimants.

22          Is this accurate in your view based on your analysis?

23     A    I wasn't here for that presentation.  I'm not sure where

24     that number could have even come from.

25     Q    Okay.  Let's talk --

1    A    I don't know.

2    Q    Let's talk about your demonstrative that we just walked

3    through with the Court.  Is there an allocation of the funds

4    here on line 20?  Has there been any allocation of those

5    proceeds -- the 49 to $63 million?  Has that been allocated

6    between Tort or non-tort claimants yet?

7    A    It's why I didn't go below row 20.  I don't know what

8    that allocation would be.  To me, at least in my view as the

9    CRO, any of the provisions in the Plan that are not

10   incorporated in this settlement agreement, they're all subject

11   to further negotiations, discussion, quite sausage making

12   right of those mechanics.  And I hope we get to that point.

13   Q    You talked about a settlement range that the Debtor came

14   up with before the initial mediation in August.  Is the

15   current settlement -- the $54 million that's been represented

16   in the current settlement agreement -- is that within the

17   Debtors range of -- a settlement range?

18   A    It exceeds it.  But let me make sure we're all on the

19   same page.  The 54 that you're referencing -- and Your Honor I

20   didn't mention this earlier -- the 54 that maybe referenced in

21   connection with the second mediation is row five of the

22   settlement, 40 million.

23       In row 12 the DIP releases -- because again it's the DIP

24   that's been advanced to date plus the contemplated new DIP --

25   so that -- roughly those three numbers together -- DIP

1    advance, new DIP plus the 40, those total 54 million.

2        That's the 54 million folks continue to reference and

3    just to answer your question that 54 million actually exceeds

4    the range that we had come into the first mediation with that

5    we thought would be fair.

6    Q    I'm sorry.  I just want to make sure I'm clear.  You said

7    it exceeds -- the 54 exceeds the range that the Debtor came up

8    with before mediation?

9    A    That's correct.

10   Q    What is the Debtor's view of what's being released under

11   the settlement agreement?

12   A    Looks like what was discussed a second ago.  All estate

13   causes of actions against the release parties.

14   Q    And was that component of the settlement agreement

15   heavily negotiated?

16   A    Yes, very heavily.

17   Q    At arms length?

18   A    It was.

19   Q    Among which parties?

20   A    Well it was done so within two separate meditations.

21   I'll reference the two common interest -- well three interest

22   in both of those meditations were the Unsecured Creditors

23   Committee.  The -- obviously the Debtor and then the

24   settlement parties.

25       The second mediation was led by Judge Sanche (phonetic)

1    or Mr. Sanche.  I'm not sure how to reference him in here.

2          THE COURT:  Me either.

3          THE WITNESS:  But he led and then, of course, in

4    that second mediation I think folks are aware that the TCC's

5    representatives were at least present at that mediation.  So

6    those were the individuals that negotiated on behalf of their

7    respective interest.

8    BY MR. KAUFMAN:

9    Q    Let me ask the question this way.  Did the Debtor, as

10    part of it's investigation, conduct an evaluation of each and

11    every possible legal theory against each and every release

12    party elicited in the settlement agreement?

13    A    I've answered questions on this in the past.  I'm a

14    financial professional so when you use the word valuation, I a

15    kind a valuation to an actual true valuation meaning by the

16    confides of the valuation, you know, credentialing in the

17    process.

18        No, the Debtor did not conduct a valuation in the context

19    in which you may have just asked or any context of valuation

20    of each and every individual claim distinctively and

21    individually.

22    Q    How would you describe the Debtor's process for reviewing

23    claims, analyzing claims, and causes of actions against

24    release parties?

25    A    From, I think, much of this language I believe that is in

1    the agreement already, but our process was really governed by

2    call it an over arching sort of theory that we sought to

3    prove.  And then of that, when you take a step down to layers,

4    there were estate causes of action that we could really define

5    or calculate related to pre-petition transfers.

6         And then there were, you know, other potential causes of

7    actions, remedies, theories and the like that we really

8    couldn't put a value on.

9    Q    And why couldn't it -- just so we can understand -- both

10   of those statements.  Cash transfers.  You're referring to

11   cash out the door?

12   A    Cash that would have been transferred from the Debtor to

13   other parties.  Correct.

14   Q    And then the second bucket that you mentioned, things

15   that are harder to value.  Why were they harder to value?

16   A    Sure I don't mean to minimize.  But the second bucket

17   really had to do with any and all call it claims, theories or

18   remedies related to the divisional merger.

19        (Pause in the proceeding.)

20        Exercised to understand exactly what you calculate, how

21   you calculate it and more importantly whether a fraudulent

22   transfer even occurred.

23        So, again I was able to identify literally to the penny

24   transfers that were made on the first category.  But the

25   second category, you know, from a -- from just how we

1     approached it, we did not assign any type of estimate or
2     value.
3     Q    And just so the record's clear.  The first category
4     you're talking about cash transfers, right?
5     A    First category are cash transfers which are memorialized
6     in the agreement or, you know, sort the four main categories,
7     the first three.
8     Q    Okay.  And the second category, divisional merger
9     theories, right?
10    A    Divisional merger theories, correct.  Yeah.
11    Q    Okay.  And let me try to phrase this in a way that
12    Mr. Goodman did in his opening.  He mentioned it today.  I
13    think you heard him talk about the grocery shopping cart
14    analogy.
15         If the releases in the settlement agreement were the
16    check out counter at a local grocery store, what is it that
17    the M2 parties are getting from the estate through the
18    settlement?  What claims are being released under the
19    settlement?
20    A    Well it's much like the dialogue when we began the
21    hearing.  Estate cause of action, meaning causes of action
22    that the Debtor believes the estate, sorry that are property
23    of the estate, okay, in the two categories I just mentioned.
24    Cash transfers made from the Debtor to released parties, to
25    the extent there were.

1        And second, property of the estate related claims,

2   remedies, theories, related to the divisional merger.  The

3   M2 parties are receiving releases of those claims in those two

4   categories.

5   Q    Is the Debtor settling personal injury claims made

6   against the Debtor?

7   A    No.

8   Q    Is the Debtor settling creditors direct causes of action

9   that may exist against Yes Care or other release parties?

10  A    I'm sorry, did you say the word "direct?"

11  Q    Direct claims?

12  A    Non of those direct claims are being settled through this

13  agreement.

14  Q    So, let me see if I can move through here.  Explain for

15  the Court the Debtor's process for considering the merits of

16  the settlement given the various different legal theories that

17  the estate causes of action could include.

18  A    Sure, so this might sound a little ridged or calculated,

19  but it's the way that I understand the merits to be and how I

20  assess them.

21       First, we needed to, weaving the Debtor, we needed assess

22  the likelihood of success on bringing forth litigation on

23  these merits.  Two, we need to at least form a view as to the

24  cost to bring those actions forward.  Three, we needed to have

25  some view as it relates to the time it would take to pursue

1    litigation on those potential causes of action.

2         And then, you know, from my perspective the reason why we

3    needed mediation to occur is that we needed and at least in

4    mind again, creditors interaction and we needed to understand

5    the views of the creditors.

6         Which at least to the first in -- second mediation the

7    unsecured creditors committee provided.

8    Q    I want to turn back to the Disclosure Statement which is

9    Exhibit 18 in your book in front of you.

10        (Pause in the proceeding.)

11   Q    And for this one, I need you to turn to page 80 at the

12   top -- 8-0.

13        (Pause in the proceeding.)

14   Q    When you get there, tell the Court what that document --

15   what that part of the Disclosure Statement is.

16        (Pause in the proceeding.)

17   A    So page 80 is Schedule 5.  This is in a section of the

18   Disclosure Statement that speaks to earliest references of the

19   investigation and the investigation prime records of the

20   schedule.  And this schedule was really meant to disclose the

21   subpoenas, the Rule 2004 discovery notes.  I believe the

22   extent of the work that went into gathering documentation.

23   Q    And is this schedule that's filed with the Disclosure

24   Statement from October 27th of 2023, was it accurate at the

25   time that it was filed?

1    A    It was.

2    Q    And has the Debtor conducted additional discovery in

3    connection with this hearing -- with the Tort Claimant

4    Committee?

5    A    It has and it's produced additional documentation.

6    Q    has the Debtor made the documents listed here in Schedule

7    5 available to the Tort Claimant Committee?

8    A    To my knowledge, yes.

9    Q    And the subpoenas listed here on the first section, are

10   those the Exhibits in the Debtor's book -- I'm sure if we

11   could speed through it.  We can go page-by-page if you like.

12   But Exhibits 44 through 61, do they correspond to the docket

13   items listed here in the first section of Schedule 5?

14   A    I did glance through those before and that is my

15   understanding, yes.

16   Q    And those have been admitted into evidence, for the

17   record.  So in addition to the formal document request that

18   are listed here in Schedule 5 of the Disclosure Statement, did

19   the Debtor undertake additional and formal document requests?

20   A    It did.

21   Q    So describe those for the Court.

22   A    So really, I boil it down to two forms.  As I testified a

23   little bit earlier, In my capacity as the CRO, through the

24   Ankura team as well as the Gray Reed team, we had ongoing and

25   continuous dialogue with the former employees of the Debtor.

1          I would submit those as informal that related to per

2     matrix production, that related to understanding assets and

3     liabilities that were allocated.  Obviously, financial

4     statements.

5          We requested and asked, you know, numerous questions and

6     requested calls and dialogues, emails, et cetera with former

7     employees of the Debtor so that we could understand better.

8          All those were informal requests that weren't done within

9     the confines of discovery.

10    Q    But did they inform your views on the investigation?

11    Those informal discussions you had with the Debtor's former

12    employees?

13    A    There was certainly information gathered from those

14    informal discussions that were a component of the

15    investigation, yes.

16    Q    So, let's turn to the last section on page 2 of schedule

17    5.  So that's page 81 of 177 of the Disclosure Statement.

18    What does this section describe?

19    A    Page 81, this is the producing party of documentation --

20    Q    No, no sorry, Mr. Petty.  The last section.

21    A    Oh, I see.  I'm sorry.  That was the second part of

22    documents reviewed.

23         The last part -- this is -- these are the depositions and

24    the witness interviews that were conducted.

25    Q    And based on what's listed here in the Disclosure

1    Statement, as of October 27th, how many times had

2    Mr. Lefkowitz given sworn testimony in connection with this

3    case?

4    A    Prior to the TCC's deposition of Mr. Lefkowitz, he was

5    deposed four times in four different capacities and then he

6    testified in the initial 341 meeting and then two subsequent

7    341 meetings.

8    Q    And you mentioned the TCC's additional depositions.  Do

9    you understand that TCC has taken Mr. Lefkowitz deposition two

10    more times?

11    A    Yes.

12    Q    Do you believe the Debtor and the UCC's investigation in

13    this case has been thorough?

14    A    I think it's been extremely thorough and I think we spoke

15    to that in the motion.

16    Q    Okay.  Describe for the Court the extent to which you

17    believe the investigations conducted by the Debtor and the UCC

18    were independent.

19    A    The Debtor and UCC.  So I'm going to explain it from a

20    process perspective.  The onset, the committee was very vocal

21    as it relates to the discovery it wanted to take, the

22    depositions it wanted to take.

23        What we committed to do with the committee is attempt to

24    not duplicate discovery and document requests.  There was, you

25    know, effectively a handful of parties that were providing

1    documents.  We chose to collaborate with the Committee so that

2    there wasn't duplicating efforts in that regard.

3         There were a couple of analysis that were shared with the

4    committee.  Insurance, for example, that you'll see the

5    schedules within the Disclosure Statement.  Some of the

6    information with respect to the funding agreement that I've

7    already testified on.

8         Those are the only two areas that we really collaborated

9    on.  More information gathering and areas in which there was

10   information that we may have had or analysis that we shared.

11   Everything else was completely independent of themselves.

12        The Committee has their own financial advisor.

13   Obviously, their own counsel.  They chose to investigate in

14   the manner in which they proceeded.  I don't know how that

15   investigation was carried out.  But it was very independent

16   from ours and they have their own views and conclusions as to

17   the results of their investigation.

18        The Debtor conducted its own investigation and brought

19   forth our own views into the investigation from that

20   perspective.

21   Q    Let me ask this.  I asked about independence.  Was

22   Mr. Lefkowitz involved at all with the Debtor's side of the

23   investigation?

24   A    He had no involvement in the investigation, but for

25   providing depositions, to which, obviously the Debtor attended

1    and was involved in.

2        And to the extent that there was information that he

3    provided in response to discovery, you know, that was the

4    extent of his involvement.

5    Q    And was that done through counsel?

6    A    All through counsel.

7    Q    I'm going to turn back -- and I'm sorry to make you do

8    this -- back to Exhibit 2, which is the settlement agreement.

9    And now I want to talk about the released parties.

10       (Pause in the proceeding.)

11   Q    And I'm trying to orient myself to this because I know

12   some of what's in the settlement agreement has been modified

13   by the proposed order uploaded this morning.

14       But can you describe for the Court why the M2 parties are

15   defined one way in the introductory paragraph and the release

16   parties include additional people?

17   A    Yeah, it's very simple, at least in my mind.  The

18   M2 parties being Yes Care, and it's totally owned subsidiary,

19   (indiscernible) Texas, M2 Loanco, M2 Holdco, (indiscernible),

20   they were effectively involved in the mediation or they had

21   representatives from their respected entities.

22       They participated in the mediation and based on my

23   understanding, they have now the responsibility to ensure that

24   the settlement is ultimately paid.

25       Now that's why they're labeled as M2 parties.  I don't

1    know and I'm drawing a blank if they're referred to as

2    settlement parties in this document.  But anyway, we'll refer

3    to them as M2 parties.  Now you asked how they were different

4    than released parties.

5        Released parties just has a handful of names that are not

6    included in the M2 parties.

7    Q    Can you describe for the Court your understanding of why

8    the Debtor and the UCC agreed to include additional released

9    parties who are not necessarily going to be financial

10   responsible for paying the funds required under the

11   settlement?

12   A    Sure.  So, you know, technically -- at least in my

13   experience -- as a restructuring fiduciary when a settlement

14   is reached, its at often time the settling party's or the

15   party's that are funding the settlement, receiving something

16   in return, will provide a list of individuals or parties that

17   they would seek releases for.  Those are usually affiliated,

18   you know, and related parties.

19       That obviously happened here.  There was a request to

20   include those.  Now, as we sort of unpack that, at least in

21   our mind, the investigation the Debtor conducted really

22   included all these entities or individuals that are included

23   as release parties.

24       We didn't necessarily believe, at least as part of our

25   investigation, that there were meritorious claims against

1 these release parties.

2     (Pause in the proceeding.)

3     We thought that was substantial and was in a way we were

4 able to provide releases or at least willing to provide

5 releases to, you know, these parties in exchange for that

6 settlement.

7 Q   Did you believe as the Debtors representative, that the

8 proceeds from the settlement -- the settlement funds -- were

9 sufficient value for the estate to confer these releases to

10 these release parties?

11 A   That is my conclusion, yes.

12 Q   Let's talk about the Debtor's views on the reasonableness

13 of the settlement.  Based on your review of the -- let me back

14 up.  What sorts of documents did you and the Debtor review as

15 part of the investigation?  Did you review financial

16 documents?

17 A   I think some of this is included in the Disclosure

18 Statement.  So let me touch under my words.  Financial

19 statements, emails, documents attached to emails, board

20 presentations, audits, underlying analysis.  We didn't really

21 stop at anything.

22     We asked for literally everything and we gathered as much

23 data as we possibly could across, like I mentioned, financial,

24 legal, organizational, you know, and communications amongst

25 individuals.

1   Q    Were bank statements included in that bundle of documents

2   reviewed?

3   A    Bank statements were with a caveat.  And I know we didn't

4   touch on this, but one of the parties that we looked at in

5   Schedule 5, is a group called Flagstar.  We actually

6   subpoenaed Flagstar directly because we wanted the bank

7   statements from Flagstar -- formerly Signature Bank -- those

8   statements represented the accounts that for bank statements

9   that were opened in late '21 in connection with the

10  transaction.

11       The Debtor did not provide those as part of it's

12  discovery response.  And so we subpoenaed Flagstar directly

13  and received those.

14  Q    Were you able to get copies of the Debtor's old operating

15  accounts?

16  A    Are you referring to the bank statements?

17  Q    Sorry, bank statements from the Debtor's old operating

18  accounts, yes.

19  A    We were.

20  Q    And were those included as part of the Debtor's

21  investigation?

22  A    They were.

23  Q    What about loan documents?  Did you review loan

24  documents?

25  A    The answer is yes.  The Debtor has a very extensive

1    history with its debt obligation.  So there ware significant

2    amount of loan documents, pages, amendments and debt to equity

3    type conversions and assignment type things.  But there are

4    documents that were received by the Debtor and as part of the

5    investigation, we certainly reviewed those.

6    Q    You mentioned audited financial statements.  Did you

7    review -- what years for the Debtor's operating history did

8    you have audited financial statements available for your

9    review?

10   A    Debtor -- at least my understanding is the last audit

11   that was performed ended in 2019.  Which meant the audit would

12   have covered physical year '17, '18 and '19.  Those three time

13   periods.

14   Q    And did you have unaudited financial statements for the

15   period after 2019?

16   A    We did.  We had unaudited financial statements.

17   Q    And are those financial statements that you referenced,

18   the audited and unaudited financial statements, are those

19   Debtor UCC exhibits 27, 28, and 31?  And I think those will be

20   in the second book.

21   A    That is correct.  That's what I had reviewed previously,

22   yes.

23   Q    Did you also review as part of the Debtor's investigation

24   enterprise valuations that had been performed for the company

25   and its subsidiaries?

1    A    Yes, there were two.  One in mid-2020 conducted by my

2    firm that White & Case also referenced in their word

3    presentation in connection with the divisional merger.

4         And then there was a second valuation that was produced

5    at the end of '21 by FTI.  Well, the valuation date was the

6    end of '21.  I think it was prepared in early '22.  And my

7    understanding is that was in connection with their role as

8    divisional merger.

9    Q    And the Disclosure Statement talks about a spin off

10   transaction of Pharma Corp (phonetic).  Are you familiar with

11   that transaction?

12   A    I am.

13   Q    Was there a valuation of Pharma Corp done around the time

14   of that transaction?

15   A    There was.

16   Q    And did you view that valuation?

17   A    I did.  And I believe we produced it to the TCC

18   subsequent similar discussions that we had.

19   Q    Did you take steps to verify the accuracy of the

20   unaudited financials, that you discussed a moment ago, in the

21   valuations that we've just gone through?

22   A    I did.

23   Q    Describe those steps for the Court.

24   A    Sure.  Well let me start by saying I am -- I'm a

25   restructuring professional, that's all I do.  So myself and my

1    team were, unfortunately or fortunately, were experienced in

2    working with what I'll call imperfect information.

3         I would say an audit is largely as perfect as you can get

4    for the context in which it's trying to accomplish.  Outside

5    of the audit, you really have to dig in to understand what's

6    being provided to you and whether or not you can utilize that

7    to form any conclusions.

8         So, I mentioned earlier that my team includes forensic

9    accounting -- forensic accountants and fraud examiners.  They

10   are very experienced in pulling information from various data

11   points and various sources as is my restructuring team, to

12   understand (indiscernible) in the information.

13        So what we sought out to do because we didn't have an

14   audit after '91 is gather as many data points as we could.

15   Valuations, unaudited financials, bank records, trial

16   balances, general ledgers.  Even all the way down to -- and I

17   think we provided a lot of this in discovery, check stubs,

18   wire statements, you know, actual true cash transactions.

19        And what we did is we said does all of this hold

20   together?  We didn't have an audit.  We said can we verify to

21   the best of our ability that this information is as accurate

22   as it can be.

23        And when you go all the way down to actual bank

24   statements and see cash transfers in and out, and the work

25   that was done to work through that, it's the best that we

1 could do with the information that we had and I would say it

2 was an extremely extensive exercise.

3 Q And have you, on behalf of the Debtor, summarized the

4 Debtor's operating history based on the information and the

5 data points that you just described?

6 A In the Disclosure Statement, yes.

7 Q And, that's fair.  In Exhibit 18, Debtor UCC Exhibit 18,

8 is the Disclosure Statement right?

9 A Let me look.  Yes, that's correct.

10 Q And the Disclosure Statement has two sections.  Sections

11 two and three that describe the Debtor's operating history,

12 right?

13 A Yes, as I recall that is correct.

14 Q Do you believe those statements in Section s two and

15 three of the Disclosure Statement regarding the Debtor's

16 operation and operational history remain accurate today?

17 A I do.

18 Q Do you adopt those statements as your own?

19 A As it relates to explaining the operations of the Debtor

20 leading up to the Bankruptcy, I would.

21 Q From your review of the company's financials at the time,

22 what was the -- what was Corizons (phonetic) financial

23 position during the middle months of 2021?

24 A The middle months of 2021, the company is what I'll call

25 severe distress.  Recall the Ankura team was still engaged in.

1     The time period prior to the end of '21 part of the

2     investigation work I told you that I did was to ask questions

3     of the partner that was involved in that engagement as to the

4     level of distress in '21.

5          He certainly gave me his view.  Based on financial

6     statements, cash transactions and really just email

7     correspondence and communications again in the information

8     that we've already provided, it's pretty evident the company

9     was under severe distress in the middle of '21.

10          I think that's also evidence by kind of the book ends of

11    the enterprise valuations in the middle of '20, end of '21.

12    And if you simply take all those data points that I just

13    mentioned into play, the company was in a real downward

14    spiral.  And I would say there was a real question as to

15    whether or not there was any going concern of the business

16    that could be materialized.

17    Q    And the Disclosure Statement discusses strategic holding

18    alternatives being explored by the company in the middle to

19    third quarter -- middle -- let's call middle towards the end

20    of 2021.

21          Can you elaborate on what the company was planing based

22    on your review of the company records?

23    A    Sure.  It's detailed, again, really section three of the

24    Disclosure Statement.  But based on our information and our

25    knowledge of what was the financial condition at the end of

1   '21, the company, like I said, had either re-engaged in Ankura

2   or Ankura was already involved.  I don't know the exact times

3   that we started and stopped.

4       But Ankura was brought in the end of '21, sort of middle

5   to end not necessarily at that point, to seek a refinancing

6   party or lead any type of sale effort.

7       The Ankura team was preparing for bankruptcy.

8   Q    And did you see any evidence in the Debtor's books and

9   records that indicated that the Debtor had an exit strategy

10  for the potential bankruptcy that it was planning to file at

11  the end of 2021?

12  A    Based on our review of the information, there was no exit

13  strategy.  I think there had been multiple bankers.  Hired,

14  failed; hired, failed.  And based on, again, what we

15  understand both Arnold and Porter and Ankura were preparing

16  for, really what I call free-fall bankruptcy.

17      I didn't see any indication that there was -- that

18  financing brought order or they had a term sheet that they

19  were negotiating with any party or were saying they were

20  negotiating.  Really any path to push them through an 11.

21  Q    In your experience -- and we talked about the cases

22  you've been involved in -- in your experience as a

23  restructuring professional, when a company files a Chapter 11,

24  a free fall Chapter 11 with no exit strategy, what is the

25  likely result for general unsecured creditors?

1    A    Well in a free fall, liquidation it really comes down to

2    encumbered versus unencumbered assets.  In a free fall which

3    there are substantial unencumbered assets for the collateral

4    is encumbered by call it a secured lender, to which there

5    isn't value that exceeds that loan amount, i.e., the fulcrum

6    security there's little to no value for the unsecured outside

7    of, you know, maybe some sort of settlement effort or

8    something of that nature.

9        So typically in a free-fall Chapter 11 -- which we try

10   not to get our client's into -- it's a very bad outcome for us

11   and the creditors.

12   Q    Triesent (phonetic) didn't end up filing bankruptcy in

13   2021, did it?

14   A    No.

15   Q    What happened instead?

16   A    Again, as we sort of lay out, the Paragrove 1018 entity

17   purchased the -- really the equity, assumed the debt of

18   Corizon at the end of '21.  And the company avoided -- really

19   avoided Chapter 11.

20   Q    And Mr. Buckner in his opening statements and I again

21   appreciate that you weren't here on Friday, but he mentioned

22   in his opening statements that there will be evidence of some

23   very bad things happening.  Are those laid out in the

24   Disclosure Statement?

25   A    We did our best to detail those really starting on page

1    20 of 177.  And then it carries forward a couple of pages.

2    Q    And are those matters also described in the Rule 9019

3    motion, which is Exhibit 1?

4    A    They are.

5    Q    Let's turn to Exhibit 1, if we could.

6         (Pause in the proceeding.)

7    Q    And specifically, the infamous paragraph 27 that I'm sure

8    we'll hear a lot about.

9         (Pause in the proceeding.)

10   A    Okay, I'm here.

11   Q    Motion says there are forming categories of claims

12   identified by the Debtor and the UCC.  Did the Debtor consider

13   other legal theories that are not described in this paragraph?

14   A    It did.  I think I addressed those a little bit earlier.

15   But yes that's correct.

16   Q    And those legal theories are discussed in other motions

17   and other pleadings -- like the declaration that we talked

18   about a few moments ago?

19   A    We had no intention to otherwise not be transparent as to

20   those theories that we were looking to invest in.

21   Q    So lets start with the claims against M2 Loanco that's

22   discussed in the motion.  How did the Debtor conclude that

23   there were potential claims against M2 Loanco?

24   A    Well it just goes back to what I mentioned a second ago.

25   This was in connection with the review of cash transactions,

1    bank statements, you know, detailed trial balance level

2    information to which we identified transfers made which, to

3    based on our work, we couldn't connect to any type of at least

4    the time, ordinary course reason for those transfers to be

5    made.

6    Q    And what's the Debtor's belief about the likelihood of

7    success on the merits of a recovery action for the $24 and

8    half million listed in the motion against M2 Loanco?

9    A    Well, we discuss it in the motion.  We have no reason not

10   to believe that the M2 Loanco parties wouldn't otherwise

11   defend against this claim.  But with that said this is an

12   actual value that we can identify.  These are actual cash

13   transactions.  We can assign a number to them.  Point directly

14   to a transaction which has occurred.

15        So, we feel like we have a fairly strong position on the

16   likelihood of success.

17   Q    Did you consider -- you mentioned some defenses.  Did you

18   consider the risks and the costs of litigation if this claim

19   against M2 Loanco is not settled?

20   A    We did.

21   Q    Okay.  Describe those factors.  How did those factor into

22   the Debtor view on settlement?

23   A    Well, again we -- my sort of formulaic approach here was

24   do we think we have the likelihood of success on the merits?

25   Is perusing the claim costly and will it take time?

1        We certainly think there would be cost and would be cost

2   to litigating.

3   Q    Does the Debtor --

4   A    We think there's real merits on these claims.

5   Q    Does the Debtor have cash to pay counsel to pursue those

6   claims?

7   A    Not currently, no.

8   Q    So, how would the Debtor go about obtaining financing

9   for -- retain counsel to pursue those claims?

10  A    Looks like we're going to talk on monthly.  I think it

11  would be a on a contingency basis unless there was some way to

12  liquidate other assets.

13  Q    And in your experience, what is a normal contingency

14  range for claims of $20 million or more?

15  A    Well in connection with kind of raised DIP financing,

16  those are some of the things that I was asking.  I also

17  regularly retain contingency counsel to pursue claims, you

18  know, in other matters.  And I've seen those range anywhere

19  from 20 percent at times to such as high as 50 percent just

20  based on the speculative nature of the claim they're pursuing.

21  Q    So based on those factors, do you assume that you have to

22  take a discount to settle the claims against M2 Loanco to

23  account for the cost of litigation and the risk of litigation?

24        MR. MOXLEY: Objection leading, Your Honor.

25        THE COURT:  Sustained.

1    BY MR. KAUFMAN:

2    Q    What is the Debtor's expectation of the ultimate

3    settlement range for a claim based on the factors you've

4    discussed?

5    A    I'm sorry are you referring only to M2 Loanco?

6    Q    Well start with M2 Loanco.  I'm going to ask these

7    questions again when we get to the other claims.

8    A    Okay.  Do you remind repeating the question?

9    Q    Yeah, what -- I don't remember my question.  But what is

10   your understanding of how you would have to discount the cause

11   of action against M2 Loanco based on the factors that you

12   already described?

13   A    Look, I don't think it's a perfect formulary because I

14   think it's unpredictable.  I think it's unpredictable because

15   of the cost that would need to be incurred.  It's also

16   unpredictable because of the time.

17        Right, I'll just mention for all of these and it'll be a

18   standard response.  I personally know M2 Loanco's counsel.

19   And I think they would be very vigorous in their defense.

20        Doesn't change my view on the likelihood of it, but I do

21   know that it would be likely costly and lengthy.

22   Q    And that factored into your analysis?

23   A    Sure.

24   Q    The next two categories discussed in the motion.  The

25   claims against Geneva and what we described as the Paragrove

1    1018 entities.

2          How did the Debtor determine that it might have claims

3    against those two entities or those groups of entities?

4    A    Same sort of answer in regards to at least let's call it

5    Geneva and Paragrove 1018's involvement.  The cash transfers

6    were, again, easy for us to identify once we had our process

7    in place.

8          The nature in which the cash transfers were made is where

9    we drew a conclusion that they were avoidable.  Meaning, we

10   did discover evidence of an agreement.  All right, that's

11   detailed here in the motion.  So clearly there was a contract

12   in place, at least based on our (indiscernible).

13         But the idea that a $3 million advance and then 500,000,

14   depending on payments and the way in which they were advanced,

15   did not agree to the exact payment terms in that contract.

16         So in our mind at least this created, I'll call it, a

17   claim that we thought was meritorious and could be meritorious

18   and therefore, we had put it in here in our motion with

19   respect to (indiscernible).

20   Q    Like the M2 Loanco claim, does the Debtor take the view

21   that the claims against -- well, what is the Debtor's view on

22   the likelihood of success on the merits of claims against

23   Geneva and the Paragrove 1018 parties based on these

24   transfers?

25   A    Yeah I don't think it necessarily changes compared to M2

1     Loanco.  They're just different.  There's a different rational

2     for why I think the opposing party may challenge and choose to

3     litigate.

4          But at the same time, we thought there were real merits

5     to these claims and we thought we could have a real likelihood

6     of success.

7          But, again, we thought it could be costly and take time.

8     We know the opposing counsel.

9     Q    Did M2 Loanco and Geneva file claims in this case --

10    proofs of claims in this case?

11    A    They both did.

12    Q    And did you review those proofs of claims as part of your

13    investigation -- as part of the Debtor's investigation?

14    A    Well I just reviewed them because they filed them.  So,

15    yes -- and the answer is yes.  But I also just reviewed them

16    in my capacity as CRO.

17    Q    And M2 Loanco, it's claim is Exhibit 42 in the Debtor's

18    UCC Exhibit book, right?

19         (Pause in the proceeding.)

20    A    That's correct.

21    Q    And Geneva's proof of claim is Exhibit 43, right?

22    A    That's correct.

23         MR. KAUFMAN:  Your Honor, I'll offer Exhibits 42 and

24    43 from the Debtor's Exhibit books, which is docket 1410-42

25    and docket 1410-43 respectfully.

1          THE COURT:  Similar to this, I'm going to admit them

2     just for the purposes that they were filed and that they say

3     what they say.  But not necessarily for the truth of the

4     matter asserted therein.

5          (ECF 1410-42 and 1410-43 received in evidence.)

6     BY MR. KAUFMAN:

7     Q    What can you tell the Court about the amount of M2

8     Loanco's claim based on what you see in Exhibit 42?

9     A    Sure.  Earlier I testified that early on in the case we

10    needed to get our hands around the funding agreement.  And

11    what we discovered is in between the divisional merger and

12    filing bankruptcy, M2 Loanco would -- their position is that

13    there were roughly 38 to $39 million that were distributed to

14    creditors or you know, claimants for the Debtor or at least

15    funded expenses.

16    Q    And how much -- oh, sorry.

17    A    Yeah, so maybe you're about to get there.  But the 15

18    million was satisfied -- at least per our calculations and M2

19    Loanco would, I think, agrees, that the incremental amount

20    above the 15 million up to the 39, I believe is memorialized

21    in this proof of claim through the separate loan agreement

22    that I spoke about earlier.

23    Q    And how much does M2 Loanco contend that it advanced over

24    and above the 15 million funding agreement?

25    A    I think it's roughly 24 to 25 million.

1    Q    And similar questions for Geneva.  How much does Geneva

2    contend that it is owed under its consulting agreement?

3    A    Proof of claim here I believe it says 300,000 and change.

4    Yeah, 315,000.

5    Q    And as part of the proposed settlement agreement, what is

6    your understanding of what will happen to these proofs of

7    claim?

8    A    Both of these proof of claim are being released.

9    Q    Does that have value to the estate to release proofs of

10   claims of this size?

11   A    Well absolutely there's value.  Calculating the exact

12   amount depends on ultimately how the Plan is going to be

13   negotiated and how amounts are, you know, calculated to be

14   distributed to creditors.  But, you know, they're absolutely

15   worth value.

16        THE COURT:  What do you mean by released?  I just

17   want to make sure I've got a clean record.  What do you mean

18   by these two proofs of claims being released?

19        What's your understanding of what happens to them?

20        THE WITNESS:  So in a restructuring context, I think

21   of -- adjudicate is a better word.  Meaning they're completely

22   removing them from the claims register.

23        THE COURT:  So they will not receive any

24   distributions on account of these claims or nor will they

25   assert any, right?

1          This would be subject, in your opinion, to one of

2     these claims where you file something to expunge the claim as

3     settled or something?

4               THE WITNESS:  Exactly.

5               THE COURT:  Okay.

6               THE WITNESS:  Hold and release, but really --

7               THE COURT:  No, no, I just wanted to make sure --

8               THE WITNESS:  -- my lawyer's term that's exactly

9     right.

10              THE COURT:  Okay.

11              THE WITNESS:  It would not be part of the claim

12    pool.

13              MR. KAUFMAN:  Your Honor, I believe the proposed

14    order has the word expunge in it.

15              THE COURT:  Yeah, no, no.  I just wanted to make

16    sure we're all using the same lingo.

17              As long as we get to the same meaning, that's all

18    that really matters.  They're all made up words.

19    BY MR. KAUFMAN:

20    Q    Mr. Perry, let's turn to the estate causes of -- the

21    fourth category mentioned in the motion.  The estate causes of

22    action arising from the divisional merger.

23         So, it might be helpful for you to turn Exhibit 1,

24    paragraph 27.

25    A    Okay, I'm here.

1    Q    Does paragraph 27 assign a specific number to the claims

2    arising from the divisional merger?

3    A    It does not.

4    Q    Why not?

5    A    Well, --

6              THE COURT:  What exhibit are you on?

7              MR. KAUFMAN:  One.

8              THE COURT:  Oh, I'm sorry.  Go ahead.

9              THE WITNESS:  In paragraph 27, Your Honor.

10         (Pause in the proceeding.)

11             THE WITNESS:  So just to orient, paragraphs 28,

12   paragraphs 30, paragraphs 32 actually have identified dollar

13   amounts.  This goes back to what I testified on a few minutes

14   ago.  Bank statements, cash transactions, trial ledgers we

15   were able to identify.

16             We did not assign a number or an estimate to any

17   potential avoidance actions arising out of the divisional

18   merger.

19   BY MR. KAUFMAN:

20   Q    Does the Debtor believe there may be meritorious claims

21   arising from the divisional merge?

22   A    The Debtor as it sits here today believes there maybe,

23   but we don't believe there's a very high likelihood of any

24   success on the merits related to the divisional merger.  So we

25   assigned a very little settlement value to it.

1      Q    Are you aware that TCC's position regarding success or

2      liability and alter ego theories?

3      A    Sure, I am.

4      Q    And does the Debtor share those views?

5      A    When you say "views" to make sure I'm clear.

6      Q    Does the Debtor agree with the TCC's views on success or

7      liability in alter ego theories?

8              MR. MOXLEY: Objection, Your Honor.  The question is

9      vague.  I'm not sure what he's talking about.

10             THE COURT:  Yeah, why don't you rephrase it?

11         (Pause in the proceeding.)

12     BY MR. KAUFMAN:

13     Q    Let me ask it this way.  Have you read the TCC's

14     objection to the 9019 motion?

15     A    I have.

16     Q    And what is your understanding of the TCC's views on

17     success or liability?

18     A    My understanding is there's two views.  One again my

19     understanding is that TCC takes the view that these are

20     remedies that are not owned by the estate or not property to

21     the estate.

22         Two, they believe that they is very meritorious claims

23     related to the divisional merger and connected to remedies

24     such as successful liability, alter ego.

25         I wasn't here on Friday, but I think there was some other

1    ones that were brought up, specifically that were being

2    mentioned.  So I think the TCC's view is there are extremely

3    meritorious claims.  They have a significant value attached to

4    them in manner of which they calculated them.

5         And the successor and liability and alter ego are two

6    remedies that they would choose to pursue under that.

7    Q    And again, we talked about Mr. Atkinson's report, his

8    declaration.  Did you read it?

9    A    I did.

10   Q    And there's a case cited a court opinion cited in his

11   opinion.  Are you familiar with that?

12   A    I think you're asking about the William Kelly opinion?

13   Yes, I am familiar with the William Kelly opinion.

14   Q    Have you reviewed that opinion?

15   A    I have.

16   Q    Based on your review of that opinion, I understand that

17   you're not a lawyer, did you see anything in that opinion that

18   applied Texas law as it relates to successor or liability

19   theories?

20   A    As I recall the opinion or the magistrate Judge very much

21   referenced Texas law in a discussion around jurisdiction, but

22   it did not apply Texas law.

23   Q    What law did it apply, if you know?

24        THE COURT:  I'm not really interested in hearing

25   about that.  I can read it.  Thank you.

1          MR. KAUFMAN:  Okay.

2          THE COURT:  No offense.

3     BY MR. KAUFMAN:

4     Q    Let me ask it this way.  In your experience as a chief

5     restructuring officer or any kind of a financial advisor

6     acting as an estate fiduciary duty, would you find it a good

7     exercise of litigation or business judgment to risk a $54

8     million to pursue litigation based on a single decision from a

9     non-binding court applying a different state's law?

10    A    So I'm the CRO and the fiduciary of the estate.  I

11    believe we have conducted a thorough investigation that the

12    $54 million settlement is value maximizing.  And the reason

13    I'm here seeking approval of these 9019 is because I think the

14    value supercedes the value that could otherwise be achieved

15    through an alternative.

16         And I wouldn't rest based on, you know, the opinion that

17    you just mentioned.

18    Q    Did the company have separate advisors in connection with

19    the divisional merger?

20    A    We did.

21    Q    Who were those, if you know.

22    A    The two that I am most aware of are Whiten Case and FTI.

23    Q    And have you reviewed the plan of divisional merger in

24    connection with your testimony -- the testimony you're giving

25    today?

1    A    I have.

2    Q    And did you review it as part of your investigation?

3    A    I reviewed it from, you know, starting the first day of

4    the case, absolutely.

5    Q    What's your understanding of what the plan of divisional

6    merger did with respect to Corizon's assets and liabilities?

7    A    Just from a simplistic standpoint, there were multiple

8    entities merged together.  That merger -- call it balance

9    sheet -- assets and liabilities were allocated partially to

10   NewCo (phonetic) and partially to Remainco (phonetic).

11        So you asked specifically -- Your Honor, do you need a

12   pause?

13             THE COURT:  No, keep going.

14             THE WITNESS:  You asked specifically about Corizon.

15   Remainco were allocated assets and liabilities.  NewCo was

16   allocated assets and liabilities.  So the divisional merger

17   really accomplished well I'd say two things.

18             One, merged these entities together.  Two, formed a

19   NewCo and then allocated, right, those documents -- those

20   assets and liabilities to NewCo and Oldco.

21   BY MR. KAUFMAN:

22   Q    Did Remainco --

23   A    Remainco.

24   Q    -- under the divisional merger as you understand it, were

25   liabilities allocated to Remainco as well -- I'm sorry.  The

1    NewCo, Remainco are confusing.  CHS Texas, Inc.  Is that the
2    NewCo as you understand it?
3    A     The NewCo.  Correct.
4    Q     Is it okay with you if I just say CHS Texas?
5    A     Fine.
6    Q     Under the Plan of divisional merger, did CHS Texas take
7    on through allocation liabilities?
8    A     they did.
9    Q     And what liabilities were those?
10   A     I put it in three broad categories.  There were, as I
11   recall, accrued compensation related liabilities for current
12   employees.  Two, there were liabilities related to on the
13   balance sheet what's called medical claims.  Those are third
14   party service providers that were continuing to provide
15   services in connection with the ongoing contracts.
16         And then three, there was a roughly 100 million.  I don't
17   have the exact number, but roughly 100 million of secured
18   debt.
19         Those sort of broad three buckets were all located to CHS
20   Texas.
21   Q     What about personal injury claims?  Were personal injury
22   claims allocated.
23   A     I apologize.  So medical claims and personal injury
24   claims those two amounts were both allocated in connection
25   with ongoing contracts, okay.

1          So medical claims, third party service providers, and

2     liabilities connected to those with ongoing contracts were

3     allocated to CHS Texas.  And then the allied claims that were

4     again connected to ongoing contracts were allocated.

5          And the PI claims specifically or we reference them as

6     tort claims here, the balance sheet was roughly, call it

7     90 million, as I recall.  Roughly 66 million from balance

8     sheets went to Remainco and roughly 20 and change were

9     allocated to NewCo or CHS Texas.

10    Q    You mentioned FTI was advising Corizon in connection with

11    the divisional merger.  Did FTI prepare an opinion regarding

12    the transaction?

13    A    They prepared both the valuation and a fairness opinion,

14    yes.

15    Q    Okay.  And those are in Exhibits 34 and 35 of the

16    Debtor's book, correct?

17         (Pause in the proceeding.)

18    A    Thirty-four is the analysis.  Thirty-five is the

19    valuation.  Yes.  There's another document they produced which

20    was an opinion letter, I think is the way they described it.

21    But these two are the substantive.

22    Q    And did you review those two documents as part of the

23    investigations that we've discussed?

24    A    I did.

25    Q    Did you review the underlying financial data discussed in

1    the opinions and the analysis?

2    A    I did.  I actually had my team cross reference the

3    numbers in those two to the both audit and unaudited financial

4    statements we received.

5    Q    And what is your understanding of the opinion given by

6    FTI in the analysis and the fairness opinion?

7    A    Well I answer that question two way because we talk about

8    it in this photo statement.  One, the opinion concluded that

9    the divisional merger and the economics attached to the

10   divisional merger were at the time a better outcome than had

11   the company filed for Chapter 11 and therefore liquidated it

12   in the manner I mentioned a few minutes ago, right free-fall.

13        The analysis had a valuation of the ongoing enterprise.

14   The total enterprise -- they call it the company.  And then it

15   had liquidation analysis to compare had a Chapter 11 occurred

16   versus divisional merger.

17        So anyway, in summary, the opinion itself and the

18   conclusion was that it was a fair transaction because

19   creditors were otherwise receiving a better recovery under the

20   divisional merger than they would have in our liquidation.

21   Q    And based on your review of the underlying financial data

22   that we just discussed, do you concur in that conclusion?

23   A    We detail this is in the Disclosure Statement that at

24   last the Debtor took issue to one specific calculation.  I

25   think the committee has -- the unsecured creditors committee

1   has other issues.

2       We specifically had one calculation issue that had that

3   calculation been changed, I think the same conclusion would

4   have been reached.

5   Q   Let's get it out in the open.  What was the calculation

6   that you disputed?

7   A   Sure.  Earlier I mentioned that we subpoenaed Flagstar

8   for bank statements.  Flagstar today was Signature Bank at the

9   time.  When we, as I mentioned earlier, were validating

10  numbers, were looking for as many data points as we could.

11      One of the things we were doing to validate the balance

12  sheet was cash really company based on what the banks were

13  saying.  And what we understood or basically what we

14  discovered from the Flagstar bank account is that at the time

15  there's a merger -- or the time in which this analysis was

16  completed, the cash wasn't actually in the bank.

17      The bank statement from Flagstar had a significant lower

18  number than what's referenced in the fairness opinion.

19  Q   And how does that change the conclusion that FTI reached,

20  if any?

21  A   Well, ironically that cash both Whiten Case -- I can't

22  remember if Whiten Case confirmed that FTI relied upon it or

23  vice versa, but that cash was unencumbered.  It was identified

24  as being unencumbered as part of the divisional merger so

25  therefore in a hypothetical liquidation would have flowed down

1      to unsecured creditors for a source of recovery.

2          FTI included that number in their analysis, right.  So in

3      their liquidation analysis, that -- I think it was roughly 22

4      million -- that 22 million flowed down to the unsecureds.

5          There's a lot to sort of unpack with that, but if you

6      just very simply remove the cash from the balance sheet per

7      the bank statements, then that 22 million wasn't there to flow

8      down to the unsecureds.

9          So at least in the Debtor's mind, that's a real

10     calculation flaw in the fairness opinion.  But again as we

11     took a step back from that calculation error and we reviewed

12     the, you know, abundance of information around it, the Debtor

13     doesn't a view that the underlying opinion is incorrect.  But

14     we certainly take a view that the calculations are incorrect

15     in the analysis.

16  Q    So I expect you're going to hear some --

17         THE COURT:  Let me just.  Just thinking may make

18     good sense to just take a five minute break here and let

19     everybody stretch their legs.  How much longer do you think

20     you have?

21         MR. KAUFMAN:  Fifteen, twenty minutes is what I'm

22     hoping.

23         THE COURT:  Okay.  Why don't we just take a five

24     minute break.  And I'll remind you that you're still under

25     oath.  We'll come back in about five minutes.  Thank you.

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1        THE CLERK:  All rise.

2     (Recess taken from 3:32 p.m. to 3:42 p.m.)

3          THE COURT:  Okay.  Back on the Record in Tehum.

4          MR. KAUFMAN:  I think I'm missing someone.

5          THE COURT:  Okay.

6          MR. KAUFMAN:  Oh, there we go.

7          THE COURT:  Oh.  Oh, sorry.

8          MR. KAUFMAN:  Got to wait for the defense.

9          UNIDENTIFIED SPEAKER:  Your Honor, I apologize.

10         THE COURT:  No, no, no worries.

11         MR. KAUFMAN:  I think -- are we ready?

12         THE COURT:  Yes, please.

13         MR. KAUFMAN:  Okay.

14              DIRECT EXAMINATION (CONT'D)

15    BY MR. KAUFMAN:

16    Q    Mr. Perry, I'm expecting that on cross-examination you'll

17    get a few questions, so, about this Paragraph 27 in Exhibit 1

18    which is the joint motion.  So let's [indiscernible 3:43:34]

19    that.  Why does Paragraph 27 of the 9019 motion only list

20    what -- I guess the quote is, Potential avoidance actions

21    arising out of the May 2022 divisional merger and not other

22    legal theories.

23    A    I have testified on this in the past, and I think it

24    aligns with my comments earlier.  The way that I sort of

25    bifurcated its state cause of actions were actual movements of

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1    cash versus avoidance actions, remedies, et cetera that relate

2    to the divisional merger.  So, you know, D sort of meant to

3    bring together as many of the actions, or all of the actions

4    that could be brought forth related to the divisional merger,

5    at least in the way that I have understood it and the way that

6    I approached it.

7    Q    And I know from Mr. Barton's testimony last week, and

8    again I appreciate you weren't here for that, but he was asked

9    why Paragraph 46 does not include the words Alter Ego.  Does

10   that mean the Debtor didn't -- the Debtor failed to consider

11   alter ego theories as part of its analysis?

12   A    No, it doesn't mean that the --

13   Q    Well, let me ask this, did the Debtor analyze alter ego

14   and successor liabilities -- theories as part of its analysis?

15   A    It did.

16   Q    You mentioned that you attributed very little settlement

17   value to claims and causes of action arising from the

18   divisional merger.  Why, why is that?

19   A    I'm going to come back to the formulaic way in which I

20   approached this process and this result.  And the way that I

21   approached it is do I believe that there is the ability to

22   achieve success on the merits of pursuing a claim to what

23   would the cost be that the Debtor would need to incur to

24   pursue these claims, and 3, the length of time it would take.

25         My understanding is based on some of the joiners

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1   that I've read, conversations I've had with creditors,

2   starting backwards and working the way forward is there have

3   been parties litigating for months, and I think against the

4   Debtors years, that have failed to collect pursuing, you know,

5   at least post-divisional merger the remedies or cause of

6   actions connected to that.  So I do think the assessment of

7   the risk of time is fairly substantial, to the cost that we

8   talked about earlier I think would also be fairly substantial

9   to defend against those, or at least the cost that will be

10  brought forth.

11          But to me you have to really get past Door A in

12  order to go to Door B and Door C, and Door A would be do I

13  think there would be a successful claim brought forth based on

14  the merits.  And that's where I sort of struggle with

15  assigning much settlement value to really any avoidance

16  action, remedy or theory attached to the divisional merger

17  because, you know, a number of different reasons.

18  Q    Well, elaborate on that, what are those reasons why you

19  can't get past Door A?

20  A    We spelled it out in the motion so, again, I'm going to

21  put it in my words.  In my mind, because the divisional merger

22  occurred in Texas according to Texas state law, appeared to be

23  carried out in accordance with that law, and governed by the

24  Texas Business Organizations Code, right, which we detail

25  here, I think that law, at least in my analysis, in the

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1    Debtor's analysis, provides a fairly difficult hurdle to

2    overcome in order to prove claims or otherwise theories

3    related to the divisional merger.

4         So I really struggle.  The Debtor, at least in our

5    assessment, I know other folks disagree, but the Debtor's

6    assessment is it's very difficult to even get past Door A in

7    order to assess what the cost and the time would be to

8    litigate.

9    Q    I'm going to turn to another matter.  As part of your

10   investigation did you review -- you mentioned trial balances.

11   Right?

12   A    I did.

13   Q    Was one of those trial balances broken up by contract-by-

14   contract that the Debtor had -- or that Corizon had before its

15   divisional merger?

16   A    It was.

17   Q    What does that data tell you about the Debtor's

18   operations?

19   A    Well, from an accounting perspective I'll use this term,

20   back trial balances, what's called consolidating, as opposed

21   to what folks are saying is consolidated.  So a consolidated

22   trial balance is, you know, a single row of data, balance

23   sheet income statement, all reconciles.  In a consolidating

24   view the accounting activity is comprised of components,

25   meaning the sum of the parts where you end up in a

1    consolidated view, so in consolidating view, the way the

2    company had prepared its trial balance data is by operating

3    contracts.

4         So at the time, at least in the trial balances that

5    I specifically recall, those trial balances were organized by

6    operating contracts or active contracts and then contracts

7    were terminated.  Right.  Because during this specific time

8    period that I was reviewing there was activity for

9    [indiscernible 3:49:52] contract.

10        But they organized it by active contracts,

11   terminated contracts, and it's a full trial balance.  So what

12   that means for, you know, [indiscernible 3:49:59] lingo is

13   it's just, it's your income statement and it's your balance

14   sheet.  And so the company had a methodology that it kept in

15   the ordinary course to actually account for revenue, expenses

16   and overhead allocation per contract.

17   Q    And I think I asked the question, I'm not sure I heard

18   your response.  This was part of your analysis and your

19   investigations leading up to the mediations, review of that

20   trial balance?

21   A    It was, but it was really just part of our original

22   diligence that we performed on the company.  Like I mentioned

23   earlier, really to draw conclusions around the level of

24   distress.  We needed to understand where the divisional merger

25   and the contracts are allocated, you know, the data points

1  sort of align.  So it was really in connection with more than,

2  you know, just the investigation.

3  Q    Exhibit 73 in the Debtor and UCC's exhibit book, it's a

4  native file so it's not actually in your binder.  Have you

5  reviewed that native exhibit -- Excel file before today?

6  A    If you're referring to the trial balance we're talking

7  about, yes, I have.

8          MR. KAUFMAN:  Your Honor, I would offer, and I don't

9  know how to do this because it's confidential, but I offer the

10  native Excel file that's described in Exhibit 73 and that

11  we've shared with TCC.

12          THE COURT:  Any objection?

13          MR. MOXLEY:  No objection, Your Honor.

14          THE COURT:  Okay.  It's admitted.

15      (Exhibit No. 73 received in evidence.)

16          MR. KAUFMAN:  And in terms of getting that into the

17  Record, I guess we'll have to coordinate with --

18          THE COURT:  Yeah.

19          MR. KAUFMAN:  Okay.

20          THE COURT:  What would be helpful for me is just

21  that there's -- is it going to be put on like a thumb drive or

22  something?

23          MR. KAUFMAN:  I think so, yes.

24          THE COURT:  If that's possible, I can take that.

25          MR. KAUFMAN:  I think it prints very small in PDF by

1    the way.

2            THE COURT:  I don't want that version.

3            MR. KAUFMAN:  Right.

4        (Laughter)

5    BY MR. KAUFMAN:

6    Q    Okay.  Based on your analysis of the native Excel file

7    that's Debtor/UCC's Exhibit 73, were you able to reach any

8    views regarding the profitability of the Debtor's historical

9    contracts?

10   A    I was.

11   Q    Tell the Court about those views.

12   A    Sure.  As I mentioned there's a consolidated view and

13   then there's a consolidating.  The consolidated view is what

14   you would typically see like in an audit financial statement.

15   The consolidating view, which is by contract, provides what

16   I'll call at least a guidepost for profitability by contract.

17            And so the company's process to account for revenues

18   and expenses by contract allows, at least for a reviewer of

19   the data to understand whether certain contracts are

20   profitable, and I'll define sort of profitable as like EBITDA

21   for example or any [indiscernible 3:52:45] amortization.  And

22   so, you know, a material amount of the contacts, at least in

23   that file, per the company's books and records, had a negative

24   EBITDA, meaning they did not incur a profit, they did not make

25   money [indiscernible 3:53:02].

1    Q    As part of your investigations did you also look at the
2    company's -- look into the company's terminated contracts over
3    the last 6 years?
4    A    I did.
5    Q    Is Exhibit 32 in your second binder, Debtor/UCC Exhibit
6    32, a list of those terminated contracts over the last 6
7    years?
8    A    It actually starts in I think it's 5 years from 2017
9    forward but --
10            THE COURT:  Exhibit?
11            MR. KAUFMAN:  32.  1410-32.  Oh, sorry, this one is
12    filed under seal so it's 1413-8.
13            THE WITNESS:  That is correct.  This is a list of
14    the contracts the company -- that was terminated and
15    information related to those contracts including the dates of
16    service in which the company was active.
17            MR. KAUFMAN:  Your Honor, I'd offer Debtor/UCC
18    Exhibit 32.
19            THE COURT:  Any objection?
20            MR. MOXLEY:  Your Honor, we do object to this
21    exhibit, it's not clear from the document and we -- I don't
22    think there's been any testimony on who created the list,
23    where it comes from.  We're just a little in the dark on the -
24    -
25            THE COURT: Yeah.  No, I think that's fair.  Why

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1   don't you provide a little bit more foundation.

2   BY MR. KAUFMAN:

3   Q    Mr. Perry, how was this list compiled?

4   A    When we -- I'll just give some reference, when we filed

5   our first set of Statement of Financial Affairs to the Debtor

6   within that Statement of Financial Affairs it had a declining

7   revenue number that we disclosed, and I think it was something

8   like 900 to 600 to 300 or something.  And I think, I wasn't

9   sure if it was Mr. Jimenez or who it was, but there was a

10  question during the first 341 meeting that said, Give me some

11  additional information as it relates to that decline in

12  revenue, why did revenue decline.

13        And my answer was, and testimony, because of lost

14  contracts.  And so to verify that and validate that further I

15  went back and spoke to and requested from the Debtor's former

16  employees that they provide me with additional detail on the

17  contracts that were either terminated or had expired leading

18  up to the divisional merger so that I could provide additional

19  detail in case that question came back up.  So this was from

20  the former employees of the Debtor.

21  Q    And is this information -- based on your understanding

22  and knowledge based on your review of the Debtor's books and

23  records is this information that's kept in the ordinary course

24  of business?

25  A    Well, I think it is their ordinary course, I mean they

1    manage contracts.  And so if you lose contracts, it is

2    absolutely in the ordinary course of business.  And I would

3    say this is all fairly public.  In connection with just making

4    sure that we sort of trusted the data, we went out and did,

5    you know, independent verification just through various

6    sources as well separate and apart.

7         MR. KAUFMAN:  Your Honor, I'll offer this Exhibit

8    32, which I think he's established is based on the Debtor's

9    books and records and information kept in the ordinary course

10   of business.

11        THE COURT:  [indiscernible 3:56:08].

12        MR. MOXLEY:  Your Honor, it sounds like this --

13   they're attempting to have this be a demonstrative.  I just --

14   we maintain our objection to this document.

15        THE COURT:  Yeah, I'm going to -- for the purposes

16   of -- demonstrative purposes I'll admit it, but not for the

17   truth of the matter asserted.

18        MR. KAUFMAN:  That's fine.

19        (Exhibit No. 32 received in evidence.)

20   BY MR. KAUFMAN:

21   Q    Let's turn to the next exhibit, Mr. Perry, Exhibit 33.

22        MR. KAUFMAN:  For the Record, Your Honor, it's file

23   under seal at 1413-9.

24   BY MR. KAUFMAN:

25   Q    What is this document, Mr. Perry?

1    A    It's really just a summary of 2 data points, 1 being the

2    list of contracts that we just discussed lined up with the

3    applicable year in which they either expired or were

4    terminated.  That data is represented in the Xs, in the

5    columns 2017 through '22.  And then the revenue by year, which

6    is at the top of the page, is simply '16, '17 and '18 audited

7    consolidated revenue, and then 2021 and '22 just simply from

8    the company's internal financial statements that we discussed.

9    Q    And who prepared this summary?

10    A    The Encura [phonetic 3:57:41] team prepared it.

11    Q    And did you review it before it was produced?

12    A    I did.

13    Q    Do you believe it accurately reflects and summarized

14    voluminous data that can't be easily -- cannot be easily

15    represented?

16    A    I do.

17    Q    And has the Debtor produced the underlying financial data

18    of the tort claimant committee in advance of the hearing?

19    A    Yes.

20    Q    Is that underlying data referenced in the exhibit list

21    that was filed last week?

22    A    I believe so, yes.

23         MR. KAUFMAN:  Your Honor, I'll offer this summary,

24    Exhibit 33.

25         THE COURT:  Any objection?

1          MR. MOXLEY:  We take the same position on this

2     exhibit --

3          THE COURT:  Yeah, I'll admit it --

4          MR. KAUFMAN:  Your Honor, on that one I do want to

5     respond because this one is an admissible summary, it's not a

6     demonstrative.

7          THE COURT:  Are we talking summary of voluminous

8     documents?

9          MR. KAUFMAN:  Yes, Your Honor.

10         THE COURT:  All right.  What's your response,

11    Counsel?

12         MR. MOXLEY:  Your Honor, I'm not sure that there's

13    a -- that there's been a foundation laid for how there's

14    voluminous documents that we couldn't summarize here so.

15         THE COURT:  I think that's fair.

16         MR. MOXLEY:  Yeah [indiscernible 3:58:46].

17         MR. KAUFMAN:  Okay.

18         MR. MOXLEY:  We have not objection to it being a

19    demonstrative, Your Honor, for the -- you know, just to be

20    clear, but not for the truth of the matter asserted.

21         THE COURT:  Got it.  Well, let's get to the summary

22    of the voluminous documents.

23    BY MR. KAUFMAN:

24    Q    Mr. Perry, what is the voluminous data summarized in this

25    summary?

1          THE COURT:  You can't call it the voluminous data

2     but --

3          (Laughter)

4          MR. KAUFMAN:  Well, I think I already asked him and

5     he said it was voluminous.

6          THE COURT:  Okay.

7     BY MR. KAUFMAN:

8     Q    Describe the data that's summarized in this chart.

9     A    Sure.  The top of the analysis represents financial

10    statement, or call it financial results of the company for a

11    course of 12 months, and all the underlying, right, detail

12    that would be used to calculate those financials.  And each or

13    the respective contracts that are indicated here with the Xs

14    represent contracts that were, again, either terminated or

15    lost.  The information was compiled by information provided by

16    the company.

17    Q    So let's just go column-by-column.  In the 2016 --

18         THE COURT:  Let me ask this, and I'm sorry, is there

19    any analysis of this, or is this a summary, or is there Encura

20    analysis in this document?

21         THE WITNESS:  This is the summary that's called

22    analysis.

23         THE COURT:  No, no, I'm just -- just in lay terms

24    for me, are you summarizing information here, or are you -- is

25    there any analysis that Encura did in connection with

1    producing this document?  Or is there any analysis, an Encura

2    analysis reflected on this document here?

3         THE WITNESS:  So if you see at the very top, Your

4    Honor, contract revenue analysis.  We called it the analysis

5    because what it's showing is reduction in revenue and how

6    that's correlated to loss of contracts.  So to me that's an

7    analysis as opposed to a summary of just numbers on a page or

8    numbers in boxes because there's a correlation factor that's

9    represented here.  So therefore that's why I called it an

10   analysis because it does sort of analyze revenue growth in

11   correlation with all contracts.

12        THE COURT:  Is this simple math or is this --

13        THE WITNESS:  Simple math.  Because, Your Honor,

14   it's revenue change year-over-year.  But the revenue generated

15   by the business was generated by these contracts and so

16   therefore when a contract is removed, revenue declines.  It's

17   the analysis.

18        MR. MOXLEY:  Your Honor, may I be heard?  Judge,

19   under the rules we appreciate that Mr. Perry did not need to

20   prepare a written expert report, but I think, Judge, that the

21   prejudice to the TCC is that they're trying to get in the

22   truth of the matter asserted through a demonstrative.  But

23   what a written analysis from Mr. Perry in an expert report

24   form may have looked like, that's where the prejudice is, Your

25   Honor.

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1          So from an evidentiary perspective we think the
2     appropriate ruling is to take it as a demonstrative and not
3     for the truth of the matter asserted because we haven't had an
4     opportunity to question Mr. Perry on that or understand what
5     the analysis is that he did with respect to this
6     demonstrative, Judge.
7          MR. KAUFMAN:  Your Honor, I do want to respond to
8     that because that's just not true.  This was produced on
9     February 2 with our production request -- request for
10    production responses, and Mr. Perry's deposition was 2 weeks
11    later.  They did have the opportunity to ask him questions
12    about this summary.
13         MR. MOXLEY:  We maintain the objection, Your Honor.
14         THE COURT:  Yeah, I'm going to -- I'm going to
15    sustain the objection.  I think the -- I think if what you're
16    summarizing -- there is revenue by year, unless you're going
17    to tell me -- it's seems to me that someone has done some
18    analysis and it's not just summarizing the information, that
19    someone has gone through, and tell me if I'm wrong, but you --
20    someone at Encura has done some math to determine whether the
21    revenue growth -- and plugging some analysis in there so that
22    something climbed by 11 -- 17.7 percent decline.
23         You're not simply summarizing a document that I
24    can't review, you're summarizing the document but then
25    providing a layer of analysis as to what these summaries then

1    show, and that starts to look more like a demonstrative than

2    just here are 10 contracts and here's what they say.  So I'll

3    treat this as a demonstrative.  Thank you.

4            MR. KAUFMAN:  That's fine, Your Honor.

5        (Exhibit No. 33 received in evidence.)

6    BY MR. KAUFMAN:

7    Q    Mr. Perry, let's walk through this summary that's in

8    Exhibit 33.  And just walk the Court through where the data

9    came from and what your summary is, what your analysis is.

10   A    Sure.  I think it's more simplistic than what's being

11   referenced by me, so let me make sure I clear it up.  The line

12   that says, Revenue by year --

13   Q    Where did that data come from?

14   A    -- it's simply from the annual financial statements of

15   the business that have been provided.  Annual, annual 2016,

16   what was the total consolidated revenue of the business,

17   1,000,089,000 all rounded.  In 2017 what was the -- your

18   revenue for this [indiscernible 4:03:33]?  I believe you'll

19   find the same numbers in the Debtor's SOFAs.  They're just

20   simply the total revenue generated by the Debtor in these

21   respective fiscal years.

22           But summarized down below is just simply the

23   contracts that were terminated or lost and an X next to a

24   column in the year of the loss.  There really is not

25   underlying, nor do we -- I don't believe we have the data to

1     even connect that a contract specifically calculates to, for

2     example in 2017 a 17.7 percent decline.  We're simply saying

3     in 2017 revenues climbed by 17.7, 5 contracts were lost.  And

4     that's really the extent of the analysis.

5     Q    And we talked about Exhibit 73, the trial balance,

6     contract-by-contract trial balance.  How does that help you

7     understand the downward trend that you referenced before, if

8     at all?

9     A     Only because -- I'll say the connection between those 2

10    are that the consolidated trial balance provides financial

11    performance by contract.  However, there's a revenue

12    component, but more importantly there's a profit component in

13    trial balances.  This is not profit, this is strictly revenue.

14    So there is a difference between those 2.

15    Q    Why is revenue growth or loss relevant to the Debtor's

16    financials, or Corizon's financials before the divisional

17    merger?

18    A    It's just a data point to indicate the distress the

19    company was in.  My understanding is if you go even back

20    before 2016 the company's, I think, revenues at one point

21    might have been a billion and a half, a billion five, billion

22    six.  This starts at 2016 so it's a billion.

23              And the 2022 number is an annualized number of what

24    the company was incurring in revenue through the first call it

25    4 months of 2022 annualized, to the extent that the Debtor was

1    to continue its business for a whole year.  So again, it's

2    just meant to show that the Debtor's revenues were

3    substantially declining here.

4    Q    And how do these negative trends in revenue over the

5    period described in this summary inform the Debtor's view

6    regarding claims arising from the divisional merger in 2022?

7    A    Well, again, my view is that claims related to the

8    divisional merger -- my view is that there's a low likelihood

9    of successful merit simply because I don't know that the

10   activities related to the divisional merger necessarily caused

11   harm to the Debtor because the Debtor was in such severe

12   financial distress at the time that the alternative to a

13   divisional merger I think the outcome, at least based on

14   everything I reviewed, would have been worse for unsecured

15   creditors than had it not.

16   Q    Let's turn to the personal injury claims asserted in this

17   case.  Again, we talked about Mr. Atkinson's report.  Are you

18   aware that he takes the view that successor liability theories

19   may be viable in this case?

20   A    I do.

21   Q    And do you understand what he believes the proper measure

22   of damages would be for successor liability theories?

23          MR. MOXLEY:  Objection, Your Honor.  I'm not sure

24   how the witness knows [indiscernible 4:07:08] --

25          THE COURT:  Yeah, do you know?

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1          THE WITNESS:  [indiscernible 4:07:11] the deposition

2    so I recall the process that he played out, but I don't --

3    yeah, I didn't write his report, but I do recall the position

4    he took.

5          THE COURT:  [indiscernible 4:07:22].

6          UNIDENTIFIED SPEAKER:  Sorry, I didn't hear you.

7          THE COURT:  No, no, no.

8          MR. KAUFMAN:  I mean if we don't want to talk about

9    the Atkinson report, then let's not talk about the Atkinson

10   report for the rest of the case.

11         THE COURT:  No, no, that's not really true.  I mean

12   I think we have to establish that he actually knows what's in

13   the report, or maybe not even what's in the report because

14   that's in evidence yet or even been discussed, but maybe you

15   can discuss generally what he understands Atkinson to say.

16   I'm okay with kind of a general theory on successor liability,

17   or alter ego claims or proper measure of value, but I think

18   you can put your position forth.  But if you don't know, you

19   know, maybe you can do it on rebuttal.  But I'm just thinking

20   through --

21         MR. KAUFMAN:  I'm trying to be efficient with our

22   court time.

23         THE COURT:  No, don't worry about me.

24         MR. KAUFMAN:  If you'd rather us wait --

25         THE COURT:  Why don't you ask questions and let's

1    see if someone objects.  But I think I'll sustain that

2    objection because I think we still have to establish that he

3    has personal knowledge of what we've been talking about.

4    BY MR. KAUFMAN:

5    Q    Mr. Perry, did you review the expert report?

6    A    I did.

7    Q    And did you attend Mr. Atkinson's deposition?

8    A    I did.

9    Q    And based on your review of his report and your

10   attendance at the deposition what is your understanding of Mr.

11   Atkinson's view on the proper measure of damages for successor

12   liability theories?

13   A    My recollection is he laid out a general process and that

14   process involved both an understanding of the financial

15   wherewithal of the other party and too, a value of the

16   underlying claims subjected to the theory.

17   Q    And as part of your work for -- as a CRO for the Debtor

18   in this case have you conducted a valuation of personal injury

19   claims?

20   A    No.

21   Q    Describe the process that -- how would you describe the

22   process for what you've done with respect to the personal

23   injury claims?

24   A    [indiscernible 4:09:29] valuation [indiscernible

25   4:09:32].  What I have done is I've estimated amounts related

1       to those claims.  They were memorialized and classified in the

2       prior Disclosure Statement that is on file.  In that

3       Disclosure Statement I really just assigned a dollar amount to

4       Class 5, what I called, you know, tort claimants, personal

5       injury claimants, and it was, again, an estimate for purposes

6       of the best interest test for the Disclosure Statement and I

7       do believe it served as a number to help guide parties to come

8       up with an allocation.

9       Q    An allocation of the settlement proceeds?

10      A    [indiscernible 4:10:17]?

11      Q    Since the Debtor's final liquidation analysis with its

12      Disclosure Statement in October of 2023 have you spent more

13      time reviewing personal injury claims filed in this case to

14      better -- get a better understanding of the likely amounts

15      that those claims may be allowed?

16      A    Naturally we have conducted more, you know, reviews,

17      yeah.

18      Q    Describe that process for the Court.

19      A    Well, I would say that there were multiple instances in

20      which we reviewed and analyzed the claims, and I'm only

21      mentioning here what we had originally referred to a Class 5,

22      or the tort claims.  Since we prepared the original

23      liquidation analysis we did review more on a claim-by-claim

24      basis whether the claims for example were filed in a duplicate

25      nature, whether the claims that were filed were filed as for

1    example a priority claim or an administrative claim as opposed

2    to, you know, an unsecured claim.

3           There is a claim that we, I think we included in

4    Class 5 for purposes of call it soliciting had we solicited a

5    Disclosure Statement that I think was filed, for example it

6    was like a priority sort of relation claim so it wasn't

7    necessarily a real -- in the way the Proof of Claim was filled

8    out, right, an unsecured personal injury claim.  So we had to

9    go through each claim and really understand and we took more

10   time to understand where it sort of fit within the respective

11   categories.

12          2, and I'm going to describe these broadly, so 2,

13   since we prepared the liquidation analysis we have also

14   received additional information on the experience the company

15   had in paying these claims, claims that had been closed out

16   for the 10 years prior.  This was the analysis that I

17   mentioned earlier that Cigna Health produced at the request of

18   the TCC.  And then I've also received additional information

19   from Cigna as it relates to the underlying information for the

20   actual filed claims.

21          So, you know, as part of the review of the claims

22   I've certainly gone through both the filed claims as well as

23   tried to understand more information on the historical nature

24   of the settlement and pay out of the claims.

25   Q    You mentioned that Sigma produced some reports to you

1    based on the company's historical payments.  Was that all

2    produced to the TCC last year?

3    A    It was.

4    Q    Let's turn to Exhibit 25 in the Debtor/UCC book.

5         MR. KAUFMAN:  Your Honor, for the Record this is

6    filed under seal at 1413-1.  And I believe it's been admitted,

7    25?

8         THE COURT:  You said 25.  Right?

9         MR. KAUFMAN:  Yes, Your Honor.

10   BY MR. KAUFMAN:

11   Q    Did you prepare this document?

12   A    My -- the Encura team prepared this at my direction.

13   Q    And what can you tell the Court about this document,

14   Exhibit 25?

15   A    Sure.  It's -- this is a summary of the what I'll call

16   the tort claims or the personal injury claims in this case.

17   So starting from the top we identified 292 personal injury

18   claims that were actually scheduled, meaning included in

19   Schedule F of the Debtor's schedules of assets and

20   liabilities.  Of the 292 scheduled claims 162, so dropping

21   down 2 lines, actually filed claims, filed a Proof of Claim.

22   So 162 of the 292.

23        Now total filed claims per our accounting is roughly

24   242 total filed personal injury claims, filed but not

25   scheduled, pure math, would be, you know, 80, and then the

1    scheduled claims but not filed, again, pure math, is 130.  The

2    last line that we have included on the schedule I think, you

3    know, was important when we prepared the analysis but it's

4    even important now, but I think we've cleared this up in the

5    proposed order, 61 of the 242 claims.  Again, 61 is the very

6    bottom row, allocated to YesCare.  61 of the 242 filed

7    personal injury claims in this case were actually allocated to

8    YesCare in connection with the divisional merger.

9            My understanding is the revisions to the settlement

10   agreement are that these claims would not be claims against

11   the Debtor, therefore are not included in or impacted by the

12   settlement today.

13   Q    So I want to make sure the Court understands that last

14   line, the 61.  We talked about, under the divisional merger,

15   some personal injury claims were actually allocated to CHS TX.

16   Is that what's described in this line here?

17   A    Correct.  This would be a subset of those claims, that's

18   correct.

19   Q    And what's the Debtor's view on whether those claims are

20   properly asserted against the Debtor?

21   A    Well, I don't think they're Debtor claims at all.

22   Q    And, in fact, the Debtor has already objected to 2 of

23   those claims.  Is that correct?

24   A    That's correct.  And so just to connect the dots, of the

25   242 claims in my view you'd have to reduce the 242 by 61 to

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1    actually, you know, get a measurement of the total asserted

2    personal injury claims in this case.

3    Q    And the objection that I just mentioned is that under

4    Debtor/UCC Exhibit 7?

5    A    Yes, that is correct.

6    Q    So of these 242 claims listed in Exhibit 25 here, when

7    you take out the claims that are allocated to CHS TX the

8    Debtor believes are not properly asserted against the Debtor

9    and could be asserted directly against [indiscernible 4:17:00]

10   how many are left?

11   A    There's probably 180 or so.

12   Q    And of that 180 or so do you how many of those are pro se

13   claims?

14   A    Yes, it's not here, but it's roughly half and half.

15   Q    Why does it matter whether claims are pro se versus

16   represented cases?

17   A    Well, I think it's important really -- it really started

18   at the very beginning of the case from a noticing perspective

19   we had to make sure that pro se claimants who didn't have

20   represented counsel receive notice for them that we could

21   reach them, we could notify them, they were receiving

22   correspondence.  So we talked about that a little bit earlier.

23        2, it was important for us -- it wasn't

24   [indiscernible 4:17:49] original relation analysis because we

25   had understood through discussions and understanding the

1    historical behavior of the settlement process, that pro se

2    claimants typically settle for much lower amounts, which is

3    why when they prepared the original liquidation analysis, the

4    calculation that had a lower [indiscernible 4:18:12] assign

5    lesser amounts to pro se claims, at least on the low end than

6    the high end.

7            Now to take it further when we received the 10-year

8    data that TCC requested --

9    Q    Well, I'm going to get to that.

10   A    Oh, okay.

11   Q    Why don't we do that now.  Turn to Exhibit 26 in your

12   notebook --

13   A    Okay.

14   Q     -- which I believe has been admitted.

15           MR. KAUFMAN:  And for the Record this is filed under

16   seat at Docket 1413-2.

17           THE COURT:  What number would that be?

18           MR. KAUFMAN:  It's 26.

19           THE COURT:  [indiscernible 4:18:47].

20   BY MR. KAUFMAN:

21   Q    Mr. Perry, while the Court's turning to that exhibit, can

22   you describe what this is?

23   A    I'm not sure.  I didn't realize we -- we've gone through

24   a lot of numbers so let me try to summarize this.  This is

25   what I'll call a compilation, this is a summary of the

RUSSELL PERRY - DIRECT BY MR. KAUFMAN

1    underlying data that has been produced and was provided,

2    again, in response to the TCC's requesting 10 years of

3    historical data of settlement activity.

4         The far left basically says that of all cases that

5    were closed over the previous 10 years pro se cases

6    represented 2,358 of all claims filed, or cases brought forth.

7    And roughly 5 percent of them represented -- or resulted in a

8    payment.  So 121 of the 2,358 actually received a payment on

9    account of their claims.

10   Q    I want to make sure the Court appreciates that.  5

11   percent, so 1 in 20 of the total 2300 claims resulted in a

12   payment above zero.  What happened to the other 95 percent of

13   those claims?

14   A    They were closed with no payment.

15   Q    Okay.  And then the remaining lines, total paid

16   indemnity, average indemnity and the rest, what are you

17   describing there?

18   A    It's very simple.  Indemnity just means payment in sort

19   of actuarial or [indiscernible 4:20:19] terms, so paid

20   indemnity total is just the total amounts of payments that

21   were made, the average is just simply the average, so it's

22   math, 828 divided by the 121 and then the $351 is just simply

23   the total paid divided by the total claims brought forth.

24   Basically what it means is over the 10-year history for the

25   pro se claimants that actually received money the average

1    payment was 6,848.

2              If I flip to the middle --

3    Q    Well, before you do that, let's talk -- what is -- what

4    does that median indemnity payment describe?

5    A    Again, that's just a math term.  So if you take all of

6    the claims that were paid and you take the mid point of the

7    total claims paid, it just represents the mid point.  So 5,000

8    is just the mid point of the data.

9    Q    And under the old plan, the one that we're not pursuing

10   confirmation of anymore, are you aware that there was a

11   settlement offer, an initial settlement offer that creditors

12   could elect into?

13   A    Yes.

14   Q    And what was the amount that was offered for those

15   claimants?

16   A    $5,000.

17   Q    Are you aware of any claimants who prematurely agreed to

18   accept that number?

19   A    Yeah, a handful actually reached out to the Debtor, I

20   don't recall if there were correspondence filed on the docket,

21   but I do know the Debtor received correspondence, a couple of

22   pro se claimants actually asked where -- when we could send

23   them a check and gave us an address to send it to them.  So,

24   yeah, that was a component of the first plan.  I don't know

25   whether or not, you know, it will be in the new plan.

1    Q    Okay.  Now let's move to that middle column, and describe

2    for the Court what you're describing there.

3    A    Sure.  And I assume since I oriented, you know, Your

4    Honor and the rest of the folks as to what this means, the

5    represented cases just are just the different numbers, right,

6    859 claims were filed and closed, roughly 43 percent of those

7    actually received payment.

8    Q    A larger number than the pro se.

9    A    Sure.  A larger number, $64.6 million of payments were

10   made by the Debtor.

11   Q    Over the 10-year history?

12   A    Over the 10-year history.  That equates on an average,

13   again, only focused on the 376 that were paid of about

14   171,000, but if you take into account all the claims that were

15   filed or brought forth, it's roughly 75,000 with a median of

16   30.

17   Q    And let's turn to -- well, before I turn to the next

18   page, Page 2 of the document, we talked about you attended Mr.

19   Atkinson's deposition.  Right?

20   A    I did.

21   Q    And he was asked about the 10-year history, payment

22   history of the Debtor.  Right?

23   A    That's what I recall, yes.

24   Q    And can you describe for the Court your understanding of

25   whether he believed it was reliable or useful in his analysis?

1    A    Sure.  I don't mean to simplify his testimony at all, but

2    his comment was that, really two-fold, 1, he thought there was

3    a wide range of disparity in the data, meaning too wide of a

4    range of payments in order to use it as any type of guidepost.

5    And then he just basically said, you know, along the same

6    lines, This case doesn't call for applying a simple average.

7    Q    Okay.  And now turn to Page 2 and describe for the Court

8    your view on whether there's a wide disparity in payments made

9    over the last 10 years, according to the Debtor's historical

10   records.

11   A    Sure.  And again, this is, so we're clear, a 10-year

12   history.  The top left of the page really is pretty self-

13   explanatory, 100 percent of the pro se claimants received a

14   payout less than 100,000, and nearly 3/4 of all represented

15   claimants received a payout under 100,000.

16   Q    What's the significance of the summary described here in

17   Exhibit 26 of the Debtor/UCC's joint exhibits as it relates to

18   the Disclosure Statement and the liquidation analysis that you

19   used in the Disclosure -- the old Disclosure Statement?

20   A    Well, very simply the prior liquidation analysis applied

21   the high end, an average of call it $330,000 to every single

22   filed claimant.  I think one would likely consider this data

23   if we sought to revisit any type of estimated amounts for

24   those claims.

25   Q    Mr. Perry, I know it's been a long afternoon.  Hopefully

1    we can speed through the rest of this.  Do you believe the

2    settlement agreement that's been proposed was negotiated in

3    good faith?

4    A    I do.

5    Q    Do you believe it was negotiated at arms length amount

6    numerous parties that included the Unsecured Creditors

7    Committee in this case?

8    A    I do.

9    Q    Do you believe the settlement is in the best interest of

10   creditors?

11   A    I do.

12   Q    Why?

13   A    I think it's in the best interest because I think it's

14   value maximizing.  I think if the plan is confirmed with at

15   least the ability to quickly liquidate claims, or a process to

16   liquidate claims, then the money that would be received by the

17   Debtor on the effective date could be distributed hopefully in

18   some timely fashion, and I believe when taking all the factors

19   that I mentioned today into account, I think it's in the best

20   interest of creditors.

21   Q    Does the settlement dictate any specific allocation of

22   funds between different classes of creditors in this case?

23   A    No, not the settlement.

24   Q    Are you asking the Court to confirm a plan today that

25   would lock in treatment of creditors?

1    A    For distributions, no.

2    Q    In seeking approval of this settlement do you believe the

3    Debtors take into account the reasonable views of creditors?

4    A    I do.

5         MR. KAUFMAN:  Your Honor, I'll pass the witness.

6         THE COURT:  Okay.  Let me just ask if everyone --

7    anyone who supports the relief has any questions they wish to

8    ask.

9         MR. KAUFMAN:  Your Honor, before I formally pass,

10   even though I've already passed the witness, I do have a thumb

11   drive with Exhibit 73 if I --

12        THE COURT:  Okay.  You can just leave it with my

13   courtroom deputy.  Thank you.

14        Okay.  Let's turn to cross.

15        UNIDENTIFIED SPEAKER:  Your Honor, we have witness

16   binders for the Court and the witness.  We'll hand those out

17   now if we could?

18        THE COURT:  Thank you.

19        UNIDENTIFIED SPEAKER:  Thank you.

20        (Pause in the proceedings.)

21        MR. MOXLEY:  Your Honor, again for the Record,

22   Cameron Moxley of Brown Rudnick for the TCC.  Judge, do you

23   have a copy of the Perry witness binder?

24        THE COURT:  I do.  Thank you.

25        MR. MOXLEY:  Okay.  Mr. Perry, do you have a copy of

1    the binder as well, sir?

2              THE WITNESS:  I do.

3              MR. MOXLEY:  Excellent.

4                        CROSS-EXAMINATION

5    BY MR. MOXLEY:

6    Q    Good afternoon, sir.

7    A    Good afternoon.

8    Q    Mr. Perry, I had a chance to meet you at your deposition

9    and a couple of other depositions as well.  Nice to see you

10   today, sir.  Mr. Perry, today in the course of our discussion

11   we may reference certain materials which are in the binder

12   that you have there, the white binder.

13            We'll also put them up on the monitor.  That may,

14   for some exhibits, be helpful to you.  It's entirely up to you

15   which one you want to consult, but we may put them there as

16   well and highlight certain things that may aid you and the

17   Court and those participating in the proceedings today.  Okay?

18   A    Okay.

19   Q    Mr. Perry, when I took your deposition on February 16 of

20   2024 you testified on behalf of the Debtor.  Correct?

21   A    Correct.

22   Q    Your firm, sir, Encura, became involved with the Debtor

23   years before.  I believe you testified the actual name of

24   Tehum was used back in approximately 2017.  Right?

25   A    No, that's not correct.  Tehum's name wasn't used then,

1    it was Corizon's name.

2    Q    Correct, before Tehum's name was used, back in --

3    A    Right.

4    Q     -- 2017.  Correct?

5    A    Right.

6    Q    Okay.  Under the previously-filed second amended plan

7    that the Debtor and the UCC jointly proposed you individually,

8    sir, were an exculpated party.  Correct?

9    A    That's my understanding.

10   Q    And under the definition of released party in that second

11   amended plan you were also a released party.  Correct?

12        MR. KAUFMAN:  Your Honor, I'm just going to lodge a

13   best evidence objection.  If we're going to talk about a

14   specific document, let's put it in front of the witness.

15        THE COURT:  Okay.

16        MR. MOXLEY:  I was going to say can we --

17        THE COURT:  Yeah --

18        MR. MOXLEY:   -- put the document on -- I'm not sure

19   if it's --

20        THE COURT:  -- I'm sure Mr. Perry knows if he was a

21   released or an exculpated party in the plan.  But he can

22   answer if he knows.  If not, we'll put the document in front

23   of him.

24        THE WITNESS:  I believe that's the case.  If we want

25   to review the document, we can, but I do believe I was a

1     released party, yes.

2     BY MR. MOXLEY:

3     Q    Okay.  Let's talk about what's at issue in this hearing,

4     sir.  You're aware that 1 of the motions this hearing concerns

5     is the Debtor's and the UCC's joint motion asking the Court to

6     approve the Debtor's and the UCC's settlement agreement.

7     Right?

8     A    Correct.

9     Q    If you look at the third tab of your binder, sir, it's

10    labeled as TCC-125, that's a copy of the joint motion seeking

11    approval of the settlement agreement.  Right?

12    A    Yes [indiscernible 4:30:47].

13    Q    And Exhibit 1 to this document is the settlement

14    agreement itself.  Correct?  It begins at Page 37 of the

15    filing, if that helps you, sir.

16    A    That is correct.

17    Q    Okay.  For ease of reference can we -- we'll refer to the

18    settlement agreement that is Exhibit 1 to this as the

19    settlement or the settlement agreement today.  Is that fine

20    with you, sir?

21    A    Yes, that works.

22    Q    Okay.  Let's go back to the motion itself and let's turn

23    to Page 2 of the filing and let's look at Paragraph 1.

24    A    Okay.  I'm here.

25    Q    Okay.  Great.  Mr. Perry, the Rule 9019 motion in

1      Paragraph 1 states that the Debtor and the UCC each undertook
2      investigations of various claims and causes of action
3      belonging to the Debtor's bankruptcy estate.  Right?
4      A     After a lengthy thorough -- yeah, that's correct
5      [indiscernible 4:31:46].
6      Q     Okay.  And these may appear on your screen if that helps
7      you, sir.
8      A     Sure.
9      Q     Obviously you have glasses.
10     A     I believe you -- yeah, you just read the highlighted
11     version, sir.  Okay.
12     Q     Yes.  Okay.  Let's discuss that investigation that the
13     Debtor undertook, you testified a bit about that on direct.
14     Let me ask you a few questions about that.  I see at
15     Paragraphs 1, and I know you're familiar with this document,
16     Paragraphs 27 through 35 of the motion there are descriptions
17     of the investigations into potential avoidance actions against
18     M2 LoanCo, Geneva, Pear Grove, as well as potential avoidance
19     actions arising out of the divisional merger.  Right?
20     A     That is correct.
21     Q     And I think you testified on direct that the Debtor
22     doesn't believe that there are particularly meritorious
23     avoidance action claims arising out of the divisional merger.
24     Is that right?
25     A     Correct.

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    Q    Do you recall when I asked you that question at your

2    deposition you were cautioned not to reveal privileged

3    information.  On that basis you testified you couldn't answer

4    my question, do you recall that?

5    A    I don't think I understand your question.  Repeat that

6    again to me what you're saying I testified to.

7    Q    Sure.  Let's actually -- it'll be easier, let's just take

8    a look at your deposition transcript.  This is the first

9    document in your binder, and it's, for identification

10   purposes, TCC-150.

11   A    Okay.  I'm there.

12   Q    Turn to Page 124, please, sir.

13             UNIDENTIFIED SPEAKER:  What page again?

14             MR. MOXLEY:  124.

15             THE WITNESS:  Okay.

16   BY MR. MOXLEY:

17   Q    Do you see, sir, at Line 8 I said, So, Mr. Perry, as the

18   Debtor's Rule 30(b)(6) designee, can you tell me why it is the

19   Debtor does not think that there are meritorious claims,

20   avoidance action claims arising from the transactions in

21   connection with the divisional merger?

22             Mr. Kaufman objected to form and cautioned you not

23   to reveal privileged or attorney work product information, and

24   your answer at Line 20 was, I'm not able to identify any

25   answers that I can give you outside of those directions.  Do

1   you see that?  Is that your testimony, sir?

2   A    I do, but just so we're clear, this was in response to me

3   testifying that I did not believe there were meritorious

4   claims, which is what I just testified to.

5   Q    When I asked you why that was you said you couldn't tell

6   me.  Right?

7            MR. KAUFMAN:  Your Honor, I'm going to object to

8   this limited reading of a very lengthy deposition.  There are

9   many instances if we were to read the --

10           THE COURT:  I know, but he's allowed to ask about

11  this one though.  So I'll overrule the objection.

12  BY MR. MOXLEY:

13  Q    My question, simply the question pending right now, Mr.

14  Perry, is just that was what you testified to at your

15  deposition.  Correct?

16  A    It's what I'm reading on the page here, correct.

17  Q    Thank you.  At Paragraph 46 of the motion -- let's go

18  back to the motion, sir.  Are you familiar with Paragraph 46

19  of the Rule 9019 motion?

20  A    I am.

21  Q    And at Paragraph 46 there's a reference to the Debtor

22  having also "evaluated the viability of potential claims

23  against CHS TX/YesCare based on the divisional merger under

24  theories based on or derivative of successor liability.  Do

25  you see that?

1    A    I do.

2    Q    Mr. Perry, are you aware that Corizon Healthcare of New

3    Jersey, LLC, a New Jersey LLC, was a part of the combination

4    merger that was the first step in the divisional merger?

5    A    I would have to reference the divisional merger document

6    to understand exactly which entity.  So I'm happy to -- if you

7    want to go to the divisional merger document, I think there's

8    a section that says where it merged.

9    Q    My question is, as you sit there today are you aware of

10   that entity, sir?

11   A    I don't specifically recall without referencing the

12   document if that specific entity was part of the merger.

13   Q    Are you aware that under New Jersey law lawyers and

14   advisors who advised on a fraudulent transfer may be held

15   liable for that fraudulent act?

16         MR. KAUFMAN:  Objection, calls for a legal

17   conclusion.

18         MR. MOXLEY:  Just asking if he's aware of it.

19         THE COURT:  Just ask him if he's aware.  Overruled.

20         THE WITNESS:  I'm not aware in my capacity, no.

21   BY MR. MOXLEY:

22   Q    Did the Debtor investigate potential causes of action

23   against lawyers and advisors under New Jersey law?

24   A    I'm not aware.

25   Q    One way or the other.  You're not aware one way or the

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    other, is that your testimony?

2    A    Correct, I'm not aware.

3    Q    And some states allow for aiding and abetting liability

4    in connection with fraudulent transfers, are you aware of

5    that?

6    A    That I'm not aware of.

7    Q    Did the Debtor investigate potential aiding and abetting

8    fraudulent transfer causes of action?

9    A    I assume counsel did through its investigation.

10   Q    That's an assumption you're making as you testify today,

11   sir?

12   A    That would be part of the investigation which I believe

13   would be privileged according to conversation with counsel.

14   Q    My question, sir, is as you sit there today do you have

15   personal knowledge of whether or not aiding and abetting

16   fraudulent transfer causes of action were investigated by the

17   Debtor?

18   A    I don't know personally whether or not that's the case.

19   I believe it is.

20   Q    What's the basis of that belief?

21   A    Because there was a thorough and lengthy investigation

22   directed by [indiscernible 4:36:59] counsel and [indiscernible

23   4:37:01] the investigation of all the various legal theories.

24   Q    Did the Debtor investigate whether any of the law firms

25   that advised on the divisional merger may have liability in

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    New Jersey [indiscernible 4:37:13]?

2    A    I'm not aware.

3    Q    You are aware that the settlement agreement releases

4    claims against the attorneys and professional advisors for

5    each of the released parties.  Right?

6    A    I am.

7    Q    But you're not aware of whether the Debtor investing --

8    investigated those potential claims against attorneys or

9    advisors.  Is that right?

10   A    I'm sorry, the claims you just mentioned or claims --

11   Q    Yes, sir.

12   A    -- in general?  The claims of the abetting and the like

13   I'm not aware on those very specific claims.

14   Q    Mr. Perry, are you aware of which law firms and advisors

15   provided advice on the divisional merger?  I believe you

16   testified previously as to who those advisors were.

17   A    I believe the law firm was White & Case, financial

18   advisor was FTI.

19   Q    Do you know one way or the other whether or not the

20   Debtor investigated whether or not there may be any estate

21   causes of action against either of those advisors?

22   A    The investigation did look into whether or not there were

23   estate causes of action against those advisors, yes.

24   Q    You have personal knowledge of that?

25   A    That was part of our investigation was to determine

1    whether or not there was meritorious claims against those

2    advisors.

3    Q    Okay.  I asked you a moment ago whether or not you were

4    aware of whether or not claims against law firms or advisors

5    were undertaken, and your testimony was that you were not

6    aware.  Correct?

7    A    Mr. Moxley, you asked me about a very specific claim, I

8    told you I wasn't aware, my personal knowledge of that very

9    specific claim you just mentioned.  I just now testified to

10   your new question that counsels' connection with the

11   investigation did absolutely investigate whether or not there

12   were meritorious claims against the advisors.

13   Q    I see.  Okay.  Thank you, sir.  Mr. Perry, did -- I

14   believe you testified on direct about the timing of when

15   Encura previously was involved with advising Corizon.  Did

16   Encura provide any advice to Corizon on the divisional merger?

17   A    Not to my knowledge, no.

18   Q    You're not able to tell me, Mr. Perry, as you sit here

19   today, what value the Debtor thinks could be recovered from

20   the avoidance actions relating to the divisional merger.  Is

21   that right?

22   A    That's fair.

23   Q    The Debtor understands that a potential $1 billion

24   Alabama contract that YesCare eventually was awarded was on

25   the horizon prior to the divisional merger.  Right?

1          MR. KAUFMAN:  Your Honor, I will object to the best

2     evidence of this.

3          THE COURT:  He's just asking if he's aware.

4          THE WITNESS:  [indiscernible 4:40:23].

5     BY MR. MOXLEY:

6     Q    You can answer the question, sir.

7     A    Your question was was a contract on the horizon.  Based

8     on my understanding there were discussions about responding to

9     a request for a proposal prior to the divisional merger.  I

10    don't know if that meets the definition that there was a

11    contract on the horizon, but there absolutely were discussions

12    related to responding to an RFP.

13    Q    Mr. Perry, you did no work on the Tehum engagement before

14    February 13 I believe you testified.  Right?

15    A    Correct, there wouldn't have been a Tehum engagement, but

16    I did no work for Tehum before February 13, that's correct.

17    Q    Fair enough.  Understood, sir.

18    A    The question -- yeah.

19    Q    Yes, the matter that is now this bankruptcy proceeding,

20    that resulted in this, you didn't work on this matter before

21    February 13, before you got that call from Mr. Lefkowitz

22    [phonetic 4:41:42].  Right?

23    A    Correct.

24    Q    All right.  Where did you get your information from in

25    order to provide your first day declaration?

1    A    A culmination of information we received from former

2    employees of the Debtor, Sigma Risk Management, discussions

3    with Mr. Lefkowitz, and documents and other information we

4    would have collected immediately upon the filing.

5    Q    Looking again, sir, at Paragraph 46 of the motion, you

6    see -- look at that, it says -- the very bottom line, sir, on

7    Page 18 of the document that begins, In additional to

8    presenting, do you see that?  If you read with me, sir, it

9    says, In additional to presenting a novel legal theory,

10   recovery under such a successor liability theory would require

11   a court of competent jurisdiction to disregard the relevant

12   portions of the Texas Business Organizations Code more

13   directly than under the fraudulent transfer context.  Do you

14   see that?

15   A    I do.

16   Q    Mr. Perry, have you read the Texas Business Organizations

17   Code?

18   A    I referenced the sections that discussed the divisional

19   merger.

20   Q    Okay.  Are you familiar with Section 10.901 of that Code?

21   A    I have not memorized it.  If you want to pull it up, I'm

22   happy to read it.

23   Q    Sure.  Let's -- we'll look at that in a minute, but would

24   you agree that successor liability theory provides a creditor

25   with certain rights vis-á-vis a successor entity?

RUSSELL PERRY - CROSS BY MR. MOXLEY

1  A    Let me make sure you're not asking me a legal question.

2  Can you repeat that again so I'm sure --

3  Q    Now we've talked a lot about successor liability and

4  alter ego.  You and I talked about it at your deposition.  I

5  think you testified to it on direct as well today, sir.  Is

6  that right?

7  A    Uh-huh.

8  Q    Okay.  Do you have an understanding of what successor

9  liability is?

10  A    Generally, from a non-lawyer's perspective.

11  Q    What is that understanding, sir?

12  A    Very simply that there was a continuation of the business

13  such that a successor would be liable for liabilities of the

14  predecessor party.

15  Q    Okay.  So a creditor of a predecessor party would have a

16  right under successor liability theory to assert and seek to

17  recover damages from that successor entity.  Correct?

18  A    If it was determined that that was a successor entity,

19  then from a non-lawyer layman's terms that sounds correct.

20  Q    That's your understanding.

21  A    Yeah, I do a lot of healthcare bankruptcies and so we

22  deal with this in the context of Medicare quite often.

23  Q    It's in the context of bankruptcy that you're familiar

24  with it, successor liability provides a creditor with a right

25  to bring a lawsuit against a successor entity.  Right?

1    A    Sorry, repeat that again for me.

2    Q    Sure.  No, of course, sir.  So you referenced your

3    experienced with this.  My question is, successor liability

4    provides a creditor with the right to bring a lawsuit against

5    successor entity.  Right?

6    A    I think a creditor could bring a lawsuit asserting

7    successor liability, sure.

8    Q    Okay.  And are you familiar -- you're familiar with the

9    alter ego doctrine I believe you testified earlier.  Is that

10   right?

11   A    Generally, from a non-lawyer's perspective.

12   Q    And what is that general non-lawyer's understanding of

13   alter ego liability?

14   A    In a non-lawyer's perspective I sort of equate it to like

15   a Jekyll and Hyde, meaning the shareholder has the same

16   responsibility as the company --

17   Q    Okay.

18   A    -- [indiscernible 4:45:06].

19   Q    And so that alter ego doctrine allows for a creditor to

20   bring a claim seeking damages against the Jekyll or the Hyde,

21   whichever side you're on.  Is that right?

22   A    Sure.  A claimant could pursue a claim based on that

23   theory, sure.

24   Q    Okay.  And fraudulent transfer law, you're familiar with

25   fraudulent transfer law generally.  Right?

1    A    Generally.

2    Q    Okay.  And it provides a creditor with rights to avoid

3    transactions.  Right?

4    A    That's correct.

5    Q    Okay.  And fraudulent transfer claims, those are causes

6    of action with their own elements.  Right?

7    A    I think that's fair.

8    Q    Yeah, as juxtaposed to successor liability or alter ego

9    which are more akin to remedies.  Correct?

10   A    Correct.

11   Q    Okay.  Let me show you that Section 10.901 of the Texas

12   Business Organizations Code.  It's going to come up on your

13   screen there.  I believe it's in your binder as well.  It is

14   in your binder at Tab 10, it's the 10th tab, I don't really

15   what it's called here.  Oh, you see it's labeled 10.901

16   Creditors.

17           THE COURT:  It should be on the screen too for you.

18   BY MR. MOXLEY:

19   Q    Yeah, do you see how your binder had labels on it, sir?

20   A    Okay.  10.901.  Okay.

21   Q    You see the one that says 10.901.  So you can turn to it

22   there or you can see it on your screen.

23   A    Okay.  Is that a single page?

24   Q    It is, sir.

25   A    Okay.

1    Q    Okay.  So you have 10.901 of the Texas Business

2    Organizations Code in front of you.  You see it provides that

3    this Code does not affect, nullify or repeal the antitrust

4    laws or abridge any right or rights of any creditor under

5    existing law.  Do you see that?

6    A    I do.

7    Q    Were you aware of this provision of the Texas Business

8    Organizations Code prior to looking at it just now in the

9    courtroom?

10   A    I may have reviewed it, but I don't recall exactly

11   reading the words on the page.

12   Q    Okay.  Would you agree with me, sir, that based on these

13   terms of the Code the Texas divisional merger statute

14   expressly provides that it does not abridge any right or

15   rights of any creditor under existing laws?

16             MR. KAUFMAN:  Objection, this one actually does call

17   for him to conclude.

18             THE COURT:  I do agree.  I'll sustain the objection.

19   BY MR. MOXLEY:

20   Q    Are you aware, sir, of the July 2022 decision in the

21   bankruptcy case of DVMP?

22   A    Is there a further definition of DVMP?

23   Q    I'm just asking if you're aware, but I'd like to know if

24   that means anything to you, sir.

25   A    As I sit here today it doesn't, but as we talk about it I

1    may.

2    Q   Okay.  Let me show you the decision.  It's at TCC Exhibit

3    180, and it's in your binder at -- it's the next tab I

4    believe, sir, it's labeled DVMP.

5    A   What's the number?

6    Q   Oh, you know what, I'm sorry, I apologize.  Let's take

7    that -- we'll leave that up on the screen.  I apologize, sir,

8    it's not in your binder, I made a mistake.

9    A   Are you referring to the asbestos --

10   Q   No, I'm going to bring this up on your screen actually.

11   It's not a document that we put in your binder.  It's TCC

12   Exhibit 180, it's in our exhibits.

13             THE COURT:  It's in my binder.  It may be in his

14   binder.

15             MR. MOXLEY:  Oh, it is in your binder.

16             THE WITNESS:  I've got a lot of documents here,

17   we're getting into regarding an asbestos claim?

18             THE COURT:  That's what I looked at.

19             MR. MOXLEY:  Okay.  Okay.

20             THE COURT:  You're referring to a July 7, 2022

21   hearing transcript?

22             MR. MOXLEY:  Yes, the transcript, sir.

23             THE COURT:  All right.  It may be -- if you go 1

24   page back, that's what I'm --

25             THE WITNESS:  Okay.

1        THE COURT:  If you want to approach, you certainly

2    can, just to make sure we're looking at the same thing.

3        THE WITNESS:  Yeah, I think so.  This it here?

4    Okay.

5        MR. KAUFMAN:  I don't have it in my binder, but

6    beyond that I would object to relevance and hearsay at this.

7        MR. MOXLEY:  Well, I haven't even asked the question

8    yet, Your Honor.

9        THE COURT:  He didn't ask the question yet so I

10   don't know.

11       MR. KAUFMAN:  Yeah, I'll wait.

12       MR. MOXLEY:  Okay.  You can have a seat, sir.  Thank

13   you.  Are you --

14       THE WITNESS:  It's okay, ask your question.

15   BY MR. MOXLEY:

16   Q   Okay.  Mr. Perry, do you know that any of the cases that

17   are currently pending before Judge Whitley that involve cases

18   that involve divisional mergers under the Texas Business

19   Organizations Code?

20       MR. KAUFMAN:  Objection to relevance.

21       THE COURT:  Overruled.

22       THE WITNESS:  I'm not aware.

23   BY MR. MOXLEY:

24   Q   Okay.  Are you at all familiar with the case of In re

25   Aldrich Pump that's before Judge Whitley in the Western -- in

1    the Bankruptcy Court for the Western District of North

2    Carolina?

3    A    I have a very high level layman term -- layman

4    understanding.

5    Q    Okay.  And are you also aware of the case *In re Murray*

6    *Boiler* that involved an affiliate of Ingersoll Rand?

7    A    That I'm not familiar with, no.

8    Q    Okay.  So there are 3 cases right now pending before

9    Judge Whitley in the Bankruptcy Court for the Western District

10   of North Carolina that involve divisive mergers under Texas

11   law.  Now that I've represented that to you does that -- are

12   you familiar with those cases?

13   A    From a very high level I'm familiar that there are

14   divisional merger bankruptcies, but I don't have any detail or

15   really any understanding of the overall mechanics or merits of

16   those bankruptcies.

17   Q    Okay.  So looking at what's in your binder there, TCC

18   Exhibit 180, the transcript from a DVMP hearing.  We'll put it

19   up on the screen.

20           MR. MOXLEY:  If we could turn to Page 23.

21           MR. KAUFMAN:  Your Honor, I object, this one's not

22   in evidence and I would object that it's hearsay.

23           THE COURT:  And what's the relevance --

24           MR. MOXLEY:  Your Honor -- Your Honor --

25           THE COURT:   -- of showing another transcript from

1     another --

2              MR. KAUFMAN:  And I was going to also object to

3     relevance.

4              MR. MOXLEY:  Your Honor, let me make the relevance

5     argument if I could, sir.

6              THE COURT:  Okay.

7              MR. MOXLEY:  At Paragraph 46, which I showed the

8     witness earlier, the Debtor and the UCC make the argument that

9     successor liability is a novel theory that would require

10    disregarding the Texas Business Organizations Code.  There is

11    case law coming out of Judge Whitley's decision as well as

12    other decisions that we plan to talk to the Court about

13    through Mr. Perry and an argument that specifically hold --

14             THE COURT:  You can talk --

15             MR. MOXLEY:   -- that's not the case.

16             THE COURT:   -- to me about it.  You're not going to

17    talk to Mr. Perry about what a hearing transcript is or what

18    he determines about it.  You can bring it up here and I can

19    weigh the wisdom of Judge Whitley, which I have no idea about

20    until just about now, you can -- we can take up legal argument

21    with me and people can talk cases and case law and

22    transcripts.  I'm really good at that stuff, but I don't think

23    we need to ask the witness about it who said he barely had an

24    understanding of these other cases.  So if you have other

25    questions for the witness that don't relate to this, let's

1    continue.

2              MR. MOXLEY:  Okay.  Thank you, Your Honor.

3    BY MR. MOXLEY:

4    Q    Mr. Perry, why is it, at Paragraph 46, that the Debtor

5    thinks disregarding the Texas Business Organizations Code is

6    necessary in order to bring a successor liability claim?  Why

7    does it ever think that, that's my question, sir.

8    A    My answer is because that's the conclusion that the

9    Debtor reached.

10   Q    Okay.  We need to understand, sir, the basis for the

11   Debtor's view in your prior testimony on the fact that the

12   successor liability claim is a novel theory.  I'd like to

13   understand how it is the Debtor reached that conclusion.

14   A    As I testified earlier, the divisional merger that's

15   memorialized within the Texas Business Organizations Code has

16   been a state law from my understanding, you know, I think for

17   much longer than I've been practicing, and based on the way in

18   which we assessed the ability to successfully litigate a

19   divisional merger, or claims related to a divisional merger,

20   you would need to disregard the portions of the Business Code

21   that allowed the divisional merger to occur.

22   Q    Did anyone before today bring to your attention the fact

23   that there are cases that have decided that successor

24   liability claims do not require disregarding the Texas

25   Business Organizations Code?

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    A    Not to my knowledge.

2    Q    No one brought that to your attention before today.

3    A    Not to my knowledge, no.

4    Q    Okay.  Do you think that the Texas divisive merger

5    statute gives anyone the right to commit fraud, sir?

6    A    I'm sorry, will you repeat that question?

7    Q    Yes, Mr. Perry.  Do you think that the Texas divisive

8    merger statute gives anyone the right to commit fraud?

9    A    No.

10   Q    Do you think that the argument that the divisive merger

11   statute does not give companies the right to commit fraud is

12   novel?

13   A    No.

14   Q    Mr. Perry, let me ask you a question.  If you were

15   completely wrong on the law as set forth in Paragraph 46, does

16   that mean the settlement's unreasonable?

17             MR. KAUFMAN:  Your Honor, I'm going to object that

18   this calls for speculation.

19             THE COURT:  I don't know what you mean by if you're

20   wrong on the law.  Who is the you in this situation?

21             MR. MOXLEY:  Yes, Your Honor.  If the Debtor is

22   wrong -- I'll rephrase the question, Your Honor.

23             THE COURT:  Uh-huh.

24   BY MR. MOXLEY:

25   Q    Mr. Perry, if the Debtor and the UCC are wrong about

1    their assertion at Paragraph 46 in the Rule 9019 motion that

2    disregarding the Texas Business Organizations is necessary in

3    order to bring a successor liability claim, the Debtor and UCC

4    are wrong about that, does that mean that the settlement is

5    unreasonable?

6    A    No, not at all.

7    Q    What's your basis for that answer, sir?

8    A    If we're wrong on the law, there is a concept within the

9    settlement agreement the creditors can bring forth their

10   claim, put forth in front of Your Honor and litigate whether

11   or not we're wrong.  And if that's the case, then, you know,

12   we've presented that.

13   Q    Isn't the fact that the Debtor and the UCC think that

14   successor liability claims are novel and would require

15   disregarding the Texas Business Organizations Code, isn't that

16   a reason why you discount their value?

17   A    A component.

18   Q    Right.  So if you're wrong about that, then their value

19   is higher than you currently ascribe it.  Correct?

20   A    I just want to make sure I understand, Mr. Moxley, what

21   you're saying.  Are you implying that if the -- okay, I just

22   want to make sure I understand --

23   Q    Uh-huh.

24   A    -- because I'm kind of wading into legal territory.  I

25   think what you're asking me, tell me if I'm wrong, is that if

1    the divisional merger can be unwound --

2    Q    I'll stop you there, that's not what I'm asking.

3    A    Then I don't know what -- Mr. Moxley, you're sort of

4    asking the same question about divisional -- you know, the

5    Texas Business Organizations Code.  So I'm going to ask you to

6    ask me a question that doesn't require me to form some sort of

7    legal conclusion from a non-lawyer's perspective.

8    Q    Okay.  We'll let the Judge rule on the questions about

9    whether my questions are proper or not, okay, so don't concern

10   yourself with that.

11   A    I'm not concerned about it, but I'm going to ask you to

12   repeat it to me --

13   Q    I'm going to -- I'm absolute --

14   A    -- in a way that I can understand it.

15            THE COURT:  Hold on.  Hold on.  Just --

16            MR. MOXLEY:  I'm going to repeat it.

17            THE COURT:  Hold on.  You don't -- Mr. Perry, you

18   don't get to ask questions.  You get to answer them and he

19   gets --

20            THE WITNESS:  Your Honor, I'm trying.

21            THE COURT:   -- people get to object.  And so he

22   gets to ask the questions.

23            Go ahead and ask your question.

24            MR. MOXLEY:  Thank you, Judge.

25   BY MR. MOXLEY:

1    Q    Mr. Perry, my question is this -- actually let's do it

2    this way, I want to be careful.  I appreciate you want to be

3    careful.  Let's look at Paragraph 46 of the Rule 9019 motion.

4    Okay.  Do you have it in front of you, sir?

5    A    Oh, I do.

6    Q    Okay.  In the Rule 9019 motion at Paragraph 46 the Debtor

7    and the UCC state, In addition to presenting a novel legal

8    theory, recovery under such a successor liability theory would

9    require a court of competent jurisdiction to disregard the

10   relevant portions of the Texas Business Organizations Code

11   more directly than under the fraudulent transfer context.  Do

12   you see that sentence I read, sir?

13   A    I do.

14   Q    Okay.  So my question, sir, is not about unwinding the

15   divisional merger, my question is about whether or not if the

16   Debtor is wrong that the Texas Business Organizations Code,

17   the statute has to be disregarded, what affect does that have

18   on the reasonableness of the settlement?

19   A    As I sit here today the settlement is still reasonable

20   even under that scenario.

21   Q    And we talked a moment ago about the fact that one of the

22   factors that leads the Debtor to discount successor liability

23   claims is that the Debtor thinks they are not as viable.

24   Correct?

25   A    That's correct.

1    Q    Okay.  And so if the Debtor is wrong about that and they

2    are more viable, then the value of those claims should be

3    ascribed a higher value than what the Debtor currently

4    ascribes to them.  Correct?

5    A    That would require a different conclusion than the Debtor

6    reached.  The Debtor reached the conclusion that's laid out in

7    the motion and therefore ascribe the very small settlement

8    [inaudible 4:58:07].

9    Q    Right.  And so the Debtor hasn't done an analysis of

10   whether or not the successor liability claims may be more

11   properly ascribed a higher value if the divisional merger

12   statute did not need to be disregarded.  Correct?

13   A    Sure.  That was part of our analysis.

14   Q    That was part of your analysis.

15   A    Well, sure, Mr. Moxley, we, as part of our analysis as I

16   testified a little earlier, the Door A that I referenced was

17   do the merits provide for successful litigation.  As part of

18   our investigation and the conclusions the Debtors reached, we

19   concluded that the merits of disregarding the Texas Business

20   Organizations Code would be complicated and complex among

21   other things.

22   Q    Okay.  And if they weren't complicated and complex and,

23   in fact, if there was case law saying its easy, you don't have

24   to do that, that would change the analysis.  Correct?

25   A    If the analysis changed, the outcome could change.  I

1   suppose if the analysis -- the facts that we investigated

2   changed, then the outcome could change, yes.

3   Q    I think, Mr. Perry, you said earlier that you considered

4   the likelihood on the merits of the claims that the Debtor is

5   trying to settle.  Is that right?

6   A    That's right.

7   Q    Okay.  How did you assess the likelihood of success on

8   the merits?

9   A    I'm going to try not to wade into privilege because a lot

10  of what we discussed on this was privileged conversation.

11  From a non-privileged standpoint we assessed the fact that we

12  thought it would be extremely complicated and complex to

13  otherwise disregard Texas law to create a path to litigate

14  those claims.

15  Q    So if the Debtor's analysis as you just described it is

16  actually contrary to the Texas Business Organizations statute

17  and to case law, doesn't that undermine the Debtor's analysis

18  regarding the likelihood of success on the merits of those

19  claims?

20          MR. KAUFMAN:  Your Honor, I'm trying not to object,

21  but I feel like this one's been asked 3 or 4 times and

22  answered 3 or 4 times.

23          THE COURT:  I'll let this one last -- well, I do

24  agree.  What about that point?  Go ahead and answer this one.

25          THE WITNESS:  If one was to assume that the approach

1    we took, which is assuming that disregarding the relevant

2    portions of the Code is very complicated and complex, would

3    require time and expense, if someone was to conclude that we

4    were wrong, then it could, in fact, modify a conclusion that

5    someone would reach.  It's not the conclusion we reached.

6    Q    Okay.  Mr. Perry, the Debtor did not negotiate any

7    consideration specifically for the successor liability claims

8    that it is releasing on behalf of personal injury creditors,

9    did it?

10   A    No, that's not a true statement.

11   Q    Why is that not a true statement?  So you did do that?

12   A    Our settlement is releasing all causes of action against

13   released parties, that's what we're proposing.  And to the

14   extent that someone other than the Debtor believes there's a

15   meritorious claim that could be brought about in connection

16   with the divisional merger, i.e. other parties that were

17   involved in negotiations, then, you know, there would have

18   been value.

19        What I testified at earlier is that I could easily

20   identify a value for the other 3 categories, I couldn't

21   identify a number to assign to the fourth category.  But we

22   absolutely negotiated on the basis that we were releasing all

23   estate causes of action.

24   Q    Okay.  But Paragraph 46 doesn't say anything about

25   specifically what consideration the Debtor is obtaining in the

1    settlement from those causes of action.  Correct?

2    A    No.

3    Q    It just states that the successor liability recovery here

4    presents a novel legal theory.  Right?

5    A    No, it says that we have valuated the viability of the

6    claims based on the successor liability.  Recovery would

7    present additional challenges beyond those that would -- you

8    know, the state would encounter by simply challenging the

9    divisional merger.

10        So what we're doing in Paragraph 6 is we're saying

11   we, A, have evaluated the viability of the claims and B, that

12   we determined the Debtor and the Committee as this was a joint

13   motion that the evaluation of the viability of those claims is

14   extremely challenging because of the word better here in the

15   paragraph.

16   Q    I think you testified before on direct that you're

17   generally aware of the *Kelly v Corizon* decision in that case.

18   Correct?

19   A    Generally, yes.

20   Q    Give me one moment.

21        (Pause in the proceedings.)

22   BY MR. MOXLEY:

23   Q    Have you reviewed that decision before?

24   A    I have.

25   Q    Let's take a look at that decision.  It's at TCC-172.

1          MR. KAUFMAN:  Your Honor, before we get into this, I

2     started to get into this on direct but the Court indicated

3     that the Court didn't want to hear about this, so --

4          MR. MOXLEY:  I have just a -- I'm sorry, please

5     continue, Mr. --

6          THE COURT:  No, no, I've got to hear a question

7     first before I know where this is going.

8     BY MR. MOXLEY:

9     Q    Do you have the decision in front of you, sir?

10    A    I do.

11    Q    Okay.  Do you understand that the William Kelly who is

12    the plaintiff in this decision is the same William Kelly who

13    has filed a Proof of Claim in this case?

14    A    That's my understanding.

15    Q    Okay.  And it's your understanding that in the Kelly

16    decision the Eastern District of Michigan magistrate judge

17    determined that CHS TX could be substituted in as a defendant

18    in that case.  Correct?

19         MR. KAUFMAN:  Your Honor, I'll object that that

20    calls for hearsay and this is a document that's not in

21    evidence.

22         MR. MOXLEY:  Your Honor, I'm just asking if he's

23    aware of what Mr. Kelly, who's filed a claim in this case, I'm

24    going to ask him questions about Mr. Kelly's claim in a

25    moment, sir, I want to understand if he's aware of what --

RUSSELL PERRY - CROSS BY MR. MOXLEY

1         THE COURT:  But we're not referring to the document

2    now.  You're just asking him general questions.

3         MR. MOXLEY:  Just if he's aware.

4         THE COURT:  Okay.

5         MR. MOXLEY:  I was using the document so he would

6    see the individual's name, sir.

7         THE COURT:  Okay.  I'm just -- we're not referring

8    to the doc, you're just asking general questions at this

9    point.

10        MR. MOXLEY:  That's right.

11        THE COURT:  Okay.  Yeah, he can answer.

12        THE WITNESS:  I am aware that a magistrate judge in

13   a pretrial matter reached a conclusion adding CHS TX to the

14   claim, correct.

15   BY MR. MOXLEY:

16   Q    Okay.

17   A    The lawsuit.

18   Q    And you don't need to read the document, sir, I'm just

19   asking if you're aware.  Are you aware in reaching that

20   conclusion the Michigan court determined that the Texas

21   Business Organizations Code had to be disregarded?

22   A    No, I'm not aware of that.

23   Q    One way or the other?

24   A    I'm not going to argue what is stated in the text, but

25   I'm not aware that that's the position they took, no.

1    Q    Okay.  If the settlement agreement attached to the Rule

2    9019 motion that the Debtor seeks approval of is approved,

3    would Mr. Kelly's claim against CHS TX be released?

4    A    To the extent that it's not a direct claim against CHS

5    TX, that underlying remedy to pursue would be released.

6    However, the settlement agreement as modified would allow Mr.

7    Kelly to come before the Court, state his position as to

8    whether he has a direct claim against CHS TX.

9    Q    I see.

10   A    We have not taken that right away from them.

11   Q    If he had a successor liability claim though, then that

12   claim would be released.  Correct?

13   A    Same answer.  If it's a direct claim against CHS TX for

14   what I believe this opinion's doing he would have the ability

15   to bring forth to the Court his argument as to the fact that

16   he would have a direct claim.  If he has a direct claim, it's

17   not being released.

18   Q    Your understanding of the Kelly decision is that it

19   allows for a direct claim by Mr. Kelly?

20   A    No, that's not my understanding.  I'm not forming any

21   legal conclusion on this event.

22   Q    Okay.  My question is a little bit different than I think

23   the question that you're answering, sir.  So let me just ask

24   a slightly different question.  My question is, if Mr. Kelly's

25   claim against CHS TX is a claim asserted on a successor

1    liability basis, that claim is released under the as modified

2    form of order that the Debtor has submitted.  Correct?

3            MR. KAUFMAN:  Your Honor, I'm going to object that

4    this is asked and answered, and to the extent that Mr. Moxley

5    doesn't think it was asked and answered, he's asking for Mr.

6    Perry to make a legal conclusion about what the opinion says.

7            MR. MOXLEY:  Your Honor, may I respond?

8            THE COURT:  Uh-huh.

9            MR. MOXLEY:  Your Honor, we're trying to get clarity

10   on what's in the shopping cart.

11           THE COURT:  Yeah.

12           MR. MOXLEY:  We're trying to understand what claims

13   are being released.  This is the Debtor's witness, he's the

14   CRO.

15           THE COURT:  No, I think he can answer.  There have

16   been a lot of questions about successor liability and alter

17   ego questions that were asked up front and I think he's fair

18   to peruse about his understanding about how the settlement

19   agree would affect someone's claims or not.

20           So you can answer.  Here.  Here.

21           THE WITNESS:  Sure.  To the extent the claim is a

22   derivative claim and not a direct claim against CHS TX, it

23   would be released under the motion, correct.

24   BY MR. MOXLEY:

25   Q    Okay.  Was the value of Mr. Kelly's claim against CHS TX

1    considered in reaching the settlement agreement?

2    A    Define value -- I'm sorry, Mr. Moxley, can I ask you to

3    repeat the question again?

4    Q    Yes.  Let me take a step back.  Are you aware of any

5    documents in the Record in this case produced by the Debtor

6    that ascribe value, a dollar figure, to Mr. Kelly's claim?

7    A    The -- I'm sorry, you're asking if there was a filing?

8    Q    No, sir.

9    A    I'm sorry, repeat your question again.  I just want to

10   make sure I answer your question very clearly because we're

11   using the term value and I want to make sure I --

12   Q    Sure.

13   A    -- I can answer your question.

14   Q    And I appreciate that you want to be careful.  My

15   question is, are you aware of any documents in the Record,

16   meaning produced in discovery in the case as well, sir --

17   A    Sure.

18   Q    -- that reflect any kind of a dollar figure estimate for

19   Mr. Kelly's claim?

20   A    As I sit here today the document that I would reference

21   to answer that question would be the Proof of Claim that Mr.

22   Kelly would have filed in the case.

23   Q    Okay.  Let me show you what's been marked as Debtor's

24   Exhibit 33.  And we're going to -- that's an Excel file so

25   we're going to bring that up on the screen if we could.

1          MR. MOXLEY:  If that's okay, Your Honor.

2          THE COURT:  Uh-huh.

3          MR. MOXLEY:  Because there's no real easy way to do

4    that with an Excel file.  So if we could bring up Debtor's

5    Exhibit 33.

6          MR. KAUFMAN:  Exhibit 33 is not an Excel file and it

7    is a confidential document filed under seal.  So I would -- I

8    would ask that it not be projected.

9          THE COURT:  Well, it's not going to go -- no one

10   else outside this courtroom can see it.

11         MR. KAUFMAN:  There are people in this courtroom

12   that are not subject to the protective order.

13         MR. MOXLEY:  I'm sorry, Your Honor, I was making

14   sure the --

15         THE COURT:  No, no.

16         MR. MOXLEY:   -- document wasn't visible.

17         THE COURT:  I understand.  I think the objection

18   is -- hold on a second, don't put anything up on the screen

19   yet -- there are documents that are filed under seal that --

20   we have folks who are not subject to the protective order.

21         MR. KAUFMAN:  Yeah, and we may be referencing a

22   different document because 33 is just a PDF.

23         MR. MOXLEY:  I have it as Debtor 624827.

24   [indiscernible/inaudible 5:11:05].

25         MR. KAUFMAN:  Oh, I see, this -- so 33 is a summary

1          of the document Mr. Moxley is referring to.  So you're

2          referring to what's underneath.

3                    MR. MOXLEY:  Yeah, I think you put this on a zip

4          drive just a moment ago.  Isn't this --

5                    MR. KAUFMAN:  No, that was --

6                    MR. MOXLEY:  Oh, it was a different one.

7                    MR. KAUFMAN:   -- that was 73.

8                    MR. MOXLEY:  Okay.  All right.  So I'm referring to

9          what is Debtor's Exhibit 33.

10                   MR. KAUFMAN:  Okay.

11                   THE COURT:  Okay.

12                   MR. KAUFMAN:  That one hasn't been offered, but go

13         ahead.  I would ask that we clear the courtroom, the parties

14         that aren't subject to the protective order, if we're going to

15         put this on the screen.

16                   THE COURT:  Let me -- who's not subject to the

17         protective order here?

18                   MR. NGUYEN:  Your Honor, the US Trustee is not.  We

19         generally don't sign protective orders.

20                   THE COURT:  Yeah, no.

21                   MR. NGUYEN:  But we just have agreements with the

22         parties.

23                   THE COURT:  Just agreements with the parties.  We

24         can put it up on the screen.  Let's go.

25                   MR. MOXLEY:  Thank you, Your Honor.

1    BY MR. MOXLEY:

2    Q    Mr. Perry, what's on your screen --

3         THE COURT:  I would ask is if you just -- just so

4    we're clear, you can put it up on the screen or you can just

5    show it to them.  I mean we can turn the camera -- can't we

6    turn the cameras off still?  We can turn the TVs off if you

7    want, and then you can just ask your question.  But he can see

8    it.

9         MR. MOXLEY:  He can -- okay.  I just want to make

10   sure that Mr. Kaufman --

11        THE COURT:  Wait, is there a --

12        UNIDENTIFIED SPEAKER:  [indiscernible 5:12:10].

13        THE COURT:  Yeah.

14        UNIDENTIFIED SPEAKER:  Okay.

15        MR. MOXLEY:  Okay.

16        THE COURT:  So you can just turn around and turn

17   that television right on.

18        UNIDENTIFIED SPEAKER:  [indiscernible 5:12:15].

19        UNIDENTIFIED SPEAKER:  Yeah.

20        THE COURT:  Yeah.  I'm saying if you don't want

21   anyone in the courtroom to see it, we can turn those --

22        UNIDENTIFIED SPEAKER:  You can turn all those

23   screens off.

24        THE COURT:  -- you can turn the screens off, yeah.

25        UNIDENTIFIED SPEAKER:  Let's see [indiscernible

1       5:12:25].

2                    THE COURT:  Okay.  Just giving you the option, but

3       just don't make me push the button, you push the button.

4            (Laughter.)

5                    MR. MOXLEY:  Thank you, Your Honor.

6       BY MR. MOXLEY:

7       Q    So, Mr. Perry, what's on your screen now -- let me just

8       make sure you see an Excel file on your screen.

9       A    I do.  I do.

10      Q    Okay.  So this is Debtor's Exhibit 33.  This document is

11      part of an exhibit that is labeled on the exhibit list as --

12      I'll just represent to you, sir, on the exhibit list as

13      Summary of Revenue Growth (Loss by Terminated Contracts 2016

14      to 2022).  Let me direct your attention, please, if I could,

15      and we'll bring this up to Line 2665.  Are you familiar with

16      this Excel file, sir?

17      A    I am.

18      Q    Okay.  And you understand it's a document that was

19      produced by the Debtor.  Right?

20      A    Correct, this is the information we gathered from Sigma,

21      correct.

22      Q    Okay.  And what -- just generally what does this

23      document, what does this Excel file show?

24      A    So I only see a snippet so I'm going to trust that it's

25      the sort of native file of what was produced but this appears

1    to be what's called loss run information for filed claims.

2    Q    Okay.  You see there's a line here that says, Inmate, the

3    top heading for that column is Inmate and then there's a

4    Kelly, William.  Do you see that?

5    A    I do.

6    Q    Okay.  And that's the same William Kelly from the *Kelly v*

7    *Corizon* decision.  Are you aware of that?

8    A    That's my understanding.

9    Q    Okay.

10         MR. MOXLEY:  Let's go over to Column W if we could

11   in this.

12   BY MR. MOXLEY:

13   Q    Okay.  You see there's a heading to this column called

14   Claim Likelihood.  Do you see that?

15   A    I do.

16   Q    Okay.  And do you see that what's listed for Line 2665,

17   Mr. Kelly's line, the words are High exposure, 750K to 1.99

18   million.  Do you see that?

19   A    I do.

20   Q    And the Debtor's position, Mr. Perry, is that if Mr.

21   Kelly's claim is, I think you called it before a derivative

22   claim, then it would be released under the settlement

23   agreement.  Correct?

24   A    No, the claim against CHS TX --

25   Q    The claim against CHS TX --

1    A    -- not a claim against the Debtor.

2    Q    Yes, sir.  It's going to be against CHS TX.  I'll

3    rephrase, sir.  The Debtor's position is that Mr. Kelly's

4    claim against CHS TX, not the Debtor, would be released under

5    the settlement agreement if that claim was, as you described

6    it, a derivative claim.  Correct?

7    A    Correct, if it was determined to be a derivative claim,

8    that's correct.

9    Q    And your understanding is that successor liability claims

10   are derivative claims.  Is that right?

11   A    My general non-lawyer's understanding, correct.

12   Q    Okay.  And the lowest range for Mr. Kelly's claim that's

13   listed here is $750,000.  Right?

14   A    Sure, per the Sigma spreadsheet we're looking at.

15   Q    Okay.  Mr. Kelly won't receive $750,000 from this

16   settlement, will he?

17   A    I can't answer that, Mr. Moxley.

18   Q    You can't?  You cannot answer that?

19   A    No, I can't answer what any individual creditor would

20   receive as part of the settlement --

21   Q    Is it your --

22   A     -- on an individual basis.

23   Q    How much -- how many dollars is it your understanding

24   that will go to creditors in this case, creditors, all

25   creditors, from the settlement agreement?

1    A    Well, I walked through a demonstrative earlier today and

2    I think there's potentially 50 to $60 million of distributable

3    value here.

4    Q    Okay.

5    A    That's only if I estimated the insurance properly and the

6    other causes of action, I think there's probably other parties

7    in the room that would contest that insurance would be worth

8    more, at least to certain claimants, and that they could

9    attest the cause of actions could be worth more.  If that's

10   the case, my numbers could be conservative, but to answer your

11   question, 50 to 60 million is my estimate as it stands as I

12   sit here today of what could be distributed to creditors.

13   Q    Let's take 1 quick sidebar, sir.  Let's look at your

14   deposition transcript quickly if we could.

15   A    Okay.

16        MR. KAUFMAN:  Can we take the confidential document

17   down now, Your Honor?

18        THE COURT:  Yeah.

19   BY MR. MOXLEY:

20   Q    Turn to Page 87 in your deposition transcript.

21        THE COURT:  Thank you.

22        MR. MOXLEY:  Page 87.

23        THE WITNESS:  Okay.

24   BY MR. MOXLEY:

25   Q    I apologize, 86, it's just --

1    A    Okay.

2    Q    -- Page 86.

3    A    Okay.

4    Q    Line 11 on Page 86 my question to you was, I'm reading

5    now, my question was, Have you done an assessment of insurance

6    recoveries in connection with this case?  Mr. Kaufman lodged

7    an objection.  And then your answer was, I don't believe

8    assessment of insurance has anything -- or is anything to do

9    with the 9019 motion so I'm not sure I have an answer to give

10   you.

11          Is that still your testimony, sir, or you're

12   thinking insurance recoveries are today relevant to the 9019

13   motion?

14   A    Well, the 9019 motion does not include a discussion of

15   the other assets that can be otherwise collected.  But based

16   on my understanding of Friday and some of the discussions I've

17   had, there were questions as it relates to what amount of call

18   it distributable value would drop to creditors.

19          So to me the only way to really answer that question

20   is not to look at individual pieces or components, which would

21   just simply be looking at the 40, my view you have to take

22   into account other potential recoveries in order to answer

23   that question.

24   Q    I see.  So taking into account whatever potential

25   recoveries you think are appropriate, as you sit here today

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    under oath is it your testimony that it is possible that Mr.

2    Kelly will receive $750,000 under this settlement agreement?

3    A    I can't testify that it's possible, but I also can't

4    testify it's not possible.  As we leave here, Mr. Moxley,

5    hopefully with a 9019 approved, the TCC, the Committee, the

6    Debtor will work collaboratively I hope on figuring out how to

7    allocate the proceeds properly and updating the waterfall

8    analysis.

9    Q    How do you know, sir, whether or not Mr. Kelly's claim is

10   a derivative one or not?

11   A    Well, I'm not a lawyer --

12   Q    Uh-huh.

13   A    -- first, but I have been a practicing -- or a

14   practitioner in the restructuring space for, you know, nearly

15   20 years.  My general understanding when I'm involved in cases

16   is that successor liability, alter ego, those sorts of

17   remedies are both property of the estate and derivative

18   claims.

19   Q    Are you aware, Mr. Perry, that Mr. Kelly opposes this

20   approval of the settlement?

21   A    I believe that's the case, yes.

22   Q    Have you reviewed the joinder that he filed to the TCC's

23   objection to the Rule 9019 motion?

24   A    I reviewed 3 or 4 joinders fairly generally so I think I

25   did review it, but I didn't memorize it.

1    Q    That's fine, but you've reviewed it.

2    A    I have.

3    Q    Okay.  Do you think that this settlement is fair to Mr.

4    Kelly?

5    A    I think the settlement maximizes the value for the estate

6    and I believe it maximizes the value that once the case moves

7    forward would maximize the recovery to Mr. Kelly and other

8    claimants as part of this engagement -- or part of this

9    filing.

10   Q    If Mr. Kelly -- if it turns out that Mr. Kelly won't

11   receive $750,000 or more, then would you agree with me that

12   the settlement agreement is not in his best interest?

13   A    No, I don't agree at all.

14   Q    And why is that?

15   A    2 answers.  First of all the 750,000 is a reference in a

16   loss run analysis provided by Sigma.  I didn't have anything

17   to do with that, I didn't value that, I don't know where that

18   number came from.  So you're using that as a bit of a yard

19   stick and I really can't comment on the 750 and make a

20   decision one way or the other.

21        But I will say that as a fiduciary in this case, and

22   as the CRO, my job is really two-fold to put it broadly.

23   Maximize value to the estate and distribute that value fair

24   and equitably across all creditors.  So what my job here is to

25   do is to maximize the value of the estate and maximize the

1    recovery to Mr. Kelly and all the creditors in the estate.

2    That's why I'm here to do.

3    Q    Mr. Perry, why is it in Mr. Kelly's best interest for

4    him to be forced against his consent to have his claim

5    channeled to a trust that will not have funding to pay him in

6    full when in the event of dismissal of this bankruptcy case he

7    will be free to pursue his claim against CHS TX in the Eastern

8    District of Michigan.

9           MR. KAUFMAN:  Your Honor, I'll object that that's a

10    compound question --

11           THE COURT:  It is compound.

12           MR. MOXLEY:  I can rephrase, Your Honor.

13    BY MR. MOXLEY:

14    Q    Mr. Perry, if the settlement is approved and a plan -- I

15    appreciate there's not a plan that's part of the settlement

16    agreement, the plan is contemplated, but you would agree with

17    me that the contemplated plan would have a trust that claims

18    would get channeled to.  Correct?

19    A    I don't know the answer.  I think that's what you all

20    have discussed as a potential avenue, but I don't know that

21    that's been advanced very far.

22    Q    Okay.  Okay.  Let me ask you this -- let me ask it this

23    way then, sir.  Why do you think it is that it's best for Mr.

24    Kelly that his claim be addressed via the settlement agreement

25    and that he not be free to pursue it in the Eastern District

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    of Michigan?

2    A   Very simply I think we can return value to Mr. Kelly on

3    account of his claim in a predictable and timely manner.  I

4    don't think that exists outside the Bankruptcy Court.

5    Q   So your testimony is you think that the Debtor is best

6    suited to decide what's in Mr. Kelly's best interest.

7    A   That's not what I said.

8    Q   Okay.  Don't you think Mr. Kelly and his attorneys who

9    have objected to the settlement know what in their best

10    interest -- know what's in his best interest, excuse me?

11    A   I can't testify on the -- as to what Mr. Kelly or Mr.

12    Kelly's attorneys believe or don't believe.

13    Q   If it were the case that there is case law that says you

14    don't have to -- sorry, excuse me.  Strike that.  Mr. Perry,

15    if there is case law that holds that you don't have to

16    disregard the Texas Business Organizations statute to bring a

17    successful liability claim against CHS TX, do you think that

18    the argument that you'd have to disregard that statute to

19    bring a successful liability claim is a novel one?

20           MR. KAUFMAN:  Objection, this calls for speculation

21    and I think it's been asked and answered a few times already.

22           THE COURT:  I do think it calls for speculation.

23           MR. MOXLEY:  Okay.  I'll withdraw the question, Your

24    Honor.  I appreciate the Court's ruling.

25    BY MR. MOXLEY:

RUSSELL PERRY - CROSS BY MR. MOXLEY

1   Q    What authority are you aware of, Mr. Perry, for the
2   position that you would have to disregard the Texas Business
3   Organizations statute in order to bring a successor liability
4   claim?
5   A    I think it's two-fold --
6   Q    Okay.
7   A     -- based on my knowledge and the results of the work
8   that we conducted in this engagement.  One is my understanding
9   is disregarding the Organizations Code either has never been
10  done or has been done in a very limited number.  I don't know
11  if it's ever been done.  And Number 2, my understanding is
12  that if it is to be done, it's going to be extremely
13  expensive, extremely costly and will take a significant amount
14  of time to litigate that point.  That's our view.
15  Q    Right.  So you're not aware of any cases that say that
16  you have to disregard the Texas Business Organizations statute
17  in order to being a successor liability claim, are you?
18  A    I'm not a lawyer, Mr. Moxley, I don't know what cases
19  have and haven't been done from a case law perspective.
20       MR. MOXLEY:  Your Honor, I'd like to put up a
21  demonstrative, a board that we have.  I don't know if the
22  Court would like to take a short break [indiscernible 5:25:25]
23  or I can just do that right now in the --
24       THE COURT:  No, I'll give you a couple of minutes to
25  set up.

1        MR. MOXLEY:  Thank you, Judge.

2        THE COURT:  And just from a housekeeping standpoint

3   how much longer do you think you have, and it's not to rush

4   you, it's just for me to just get a sense of --

5        MR. MOXLEY:  No, I appreciate that, Your Honor.

6        THE COURT:  -- are we [indiscernible 5:25:37]

7   today --

8        MR. MOXLEY:  I think --

9        THE COURT:  -- with the other witness and kind of

10   what we're thinking about.

11        MR. MOXLEY:  No, I appreciate that.  You know, I had

12   thought that we would have a couple of hours of cross, but

13   that was when I think we thought there was about an 1-1/2 or 2

14   hours of direct and went I think a little over 3-1/2.  So --

15        THE COURT:  Yeah, but are we going to finish -- are

16   we just going to finish 1 witness today is --

17        MR. MOXLEY:  I think I will --

18        THE COURT:  -- is the real question.

19        MR. MOXLEY:   -- I think I will have a least an hour

20   and a half.

21        THE COURT:  Okay.  So why don't -- so why don't we

22   just plan on finishing Perry today --

23        MR. MOXLEY:  Sure.

24        THE COURT:  -- and then we'll -- just I'm thinking

25   about whoever may be called, Mr. Dunman [phonetic 5:26:06],

1      that at least he knows what's up.

2                  MR. ZLUTICKY:  Yes, thank you, Your Honor.  So

3      despite the Court's 615 ruling earlier about invoking the

4      Rule, we thought it best to just keep Mr. Dunman out of the

5      proceedings so he didn't hear Mr. Perry's testimony.  He's

6      here in the courthouse and he will be here to testify, but it

7      sounds like we're probably not going to get to him today.

8                  THE COURT:  That's right.  I figure --

9                  MR. ZLUTICKY:  And so that'll be our --

10                  THE COURT:   -- we'd give him a heads up.

11                  MR. ZLUTICKY:  Yeah, and so I'll give him that heads

12      up and that'll be part of what we'll have to work out with

13      scheduling.

14                  THE COURT:  Okay.  All right.  Let's take our

15      five-minute break.  And do you need anything from the Court in

16      terms of set up or --

17                  MR. MOXLEY:  No, we can do it ourselves, Your Honor.

18      Thank you.  Thank you, Judge.

19                  COURT SECURITY OFFICER:  All rise.

20            (Recess taken from 5:26 p.m. to 5:36 p.m.)

21                  THE COURT:  Back on the Record in Tehum.

22                  Counsel, you may proceed.

23                  MR. MOXLEY:  Thank you, Your Honor.  I think on your

24      screen, the witness' screen and then here in the courtroom, we

25      have a demonstrative.

1          THE COURT:  Oh, all right.  I'll look at the big

2     screen.  Okay.

3          MR. MOXLEY:  Very good.  Thank you, Judge.

4                CROSS-EXAMINATION (CONT'D)

5     BY MR. MOXLEY:

6     Q    Mr. Perry, you can see Demonstrative No. 1, I think in a

7     few places on your screen in front of you.

8     A    I can.

9          Q    Okay.

10    A    Four places.

11         Q    Okay.  And you see that we have here in the

12    courtroom, that demonstrative with the heading "Pre-Bankruptcy

13    Framework."  Do you see that?

14    A    I do.

15         Q    And on the left of that demonstrative we have the

16    Claimant.  Do you see that?

17    A    I do.

18         Q    This is -- okay.

19    A    The right.

20         Q    And you see the arrow pointing from the claimant to

21    YesCare/CHS Texas, Inc., based on the doctrine of successor

22    liability, as that arrow is labeled.  Do you see that?

23    A    Top arrow points it To Whom.  Second arrow points to Yes

24    Care; correct.

25         Q    Okay.  The second arrow I'm going to ask you a

1    question about, sir.

2    A    Okay.

3        Q    Would you agree with me that before the bankruptcy

4    petition was filed, that successor liability-based causes of

5    action against YesCare and CHS Texas was something that was

6    owned by the claimant?

7    A    I don't have an answer to that.  I don't know.

8        Q    Okay.  And is that -- you don't have an answer?  You

9    don't -- strike that.  You don't have any understanding of

10   whether or not pre-bankruptcy filing, a claimant would own a

11   successor liability claim against YesCare and CHS Texas?

12           MR. KAUFMAN:  Your Honor, I tried not to object, but

13   the more I hear it -- the more I'm hearing that he's asking

14   for Mr. Perry to make a legal conclusion about ownership.

15           THE COURT:  I think that's right.  You can probably

16   ask it a different way where it doesn't like you're asking for

17   a legal conclusion.

18           MR. MOXLEY:  Okay.  Thank you, Your Honor.

19   BY MR. MOXLEY:

20   Q    Mr. Perry, we talked before about your general

21   understanding from a non-lawyer's perspective of what

22   successor liability is; correct?

23   A    Correct.

24   Q    Okay.  And you understood, I believe -- and we talked

25   earlier about that -- that successor liability would allow a

1    claimant to assert a claim, a cause of action, against a

2    successor entity; correct?

3    A    Correct.  Pursue a remedy of successor liability and

4    collect on that claim; correct.

5    Q    Right.  Okay.  Is it the Debtor's understanding that the

6    ownership of that claim, a successor liability claim, changed

7    pre- and post-petition filing?

8              MR. KAUFMAN:  Your Honor, the same objection as

9    before.  Ownership is a legal conclusion.

10             MR. MOXLEY:  I asked him what --

11             THE COURT:  No, it's not.  No, it's not.  I think

12   he's a CRO who has dealt with sophisticated companies.  I

13   think he can express his understanding of the concept of

14   ownership.  To the best of your ability, I think you can

15   answer the question if you know the answer.

16             THE WITNESS:  I know part of the answer.  I am, to

17   Your Honor's point, a restructuring professional.  I deal

18   often times in Chapter 11 situations in which successor

19   liability is asserted, and in those situations they are

20   property of the estate, it's been my understanding.  I have

21   not dealt with, nor do I have much experience in successor

22   liability being brought forth prior to a bankruptcy to give

23   you an answer of who's the owner of that.

24             MR. MOXLEY:  I see, okay.

25   BY MR. MOXLEY:

1    Q    So post-bankruptcy filing, your understanding is that
2    successor liability-based claims would be the estate's
3    property; correct?
4    A    I've never understand it any different than that.
5    Q    Understood.  That is your understanding; correct?
6    A    Correct.
7    Q    Okay.  Let me ask you this question.  If Mr. Kelly won
8    his lawsuit against CHS Texas in Michigan, who would -- who
9    would the money go to?
10   A    Well, do you mean one lawsuit?
11   Q    If he has a claim against CHS Texas in the Eastern
12   District of Michigan.  If he wins on that claim and he gets a
13   judgment, and that judgment is paid, who does the money get
14   paid to?
15   A    My understanding is it would be paid to a single
16   creditor.  It would be paid to him only.
17   Q    It would be paid to him only; correct?
18   A    But he may have legal fees and expenses and the like, but
19   yes.  He would receive payment on that claim individually, is
20   my understanding.
21   Q    Okay.
22   A    So that's correct.
23   Q    Okay.  But if -- okay, got it.  And is it your
24   understanding that if the settlement agreement is approved,
25   then Mr. Kelly would no longer be able to pursue that claim in

1      Michigan?  Is that your understanding?

2      A    No.

3      Q    Your understanding -- your testimony is that me may be

4      able to continue to pursue his claim against CHS Texas in

5      Michigan, if the settlement agreement's approved?

6      A    Sure.  We have a provision in the settlement agreement

7      that provides him with the ability to come to court to present

8      an argument that it's a direct claim.

9      Q    And if he loses --

10     A    If he proves that argument that it's a direct claim

11     against CHS Texas, then absolutely he can pursue it.

12     Q    And if he -- what is your understanding of what a direct

13     claim is?

14     A    That CHS Texas caused him harm.

15     Q    Okay.  That's a direct claim.

16     A    My non-lawyer layman's description of a direct claim,

17     correct.

18     Q    Okay.

19     A    If harm was caused by that party; correct.

20     Q    Okay.  And if he wanted to assert -- who, in Mr. Kelly's

21     case, caused the harm?  Corizon; right?

22     A    My understanding is the incident occurred prior to the

23     divisional merger, and therefore his original claim, to my

24     understanding, was against Corizon, who he asserted originally

25     committed a harm to him; correct.

1    Q    Right, okay.  So he suffers a physical injury, and the

2    entity that caused that suffering, the claim, the direct claim

3    would be against Corizon.  That's your understanding; correct?

4    A    That's my understanding.

5    Q    Okay.  Now Mr. Kelly has a claim against CHS Texas in

6    that Michigan case.  You understand that as well, I believe

7    you testified earlier; right?

8    A    I understood the Michigan case added CHS Texas to the

9    lawsuit.

10   Q    Right.

11   A    Correct.

12   Q    Okay.  If Mr. Kelly were -- strike that.  The entity, CHS

13   Texas didn't exist at the time Mr. Kelly was injured; correct?

14   A    I don't have the exact dates memorized, so I'm not aware

15   that it existed at the exact time of the injury.

16   Q    When is your understanding that CHS Texas came into

17   existence?

18   A    Sometime around the divisional merger, so early '22.

19   Q    Right.  So if Mr. Kelly was injured prior to the

20   divisional merger, it was Corizon who injured him, not CHS

21   Texas; correct?

22   A    Well, here's how I can answer it.  His claim was

23   allocated to Corizon, and therefore the claim, at least per

24   the divisional merger, was a claim of Corizon's.

25   Q    Okay.  So if he has a claim against CHS Texas now, that

RUSSELL PERRY - CROSS BY MR. MOXLEY

1  claim would be based on a successor liability theory of

2  recovery; correct?

3  A    Well, to my understanding, yes.

4  Q    Okay.  And your understanding also is that successor

5  liability claims, once you're in the bankruptcy world, are

6  property of the estate; correct?

7  A    I so.

8  Q    Okay.  Do you think the bankruptcy filing caused the

9  claimants to lose causes of action that they may have had

10 against YesCare or CHS Texas?

11 A    When you say claimants, claimants against the Debtor or

12 claimants in general?

13 Q    Any claimants, sir.

14 A    No.  If there's a claimant that their claim was allocated

15 directly to YesCare or a claimant that believes they have a

16 direct claim to YesCare or CHS or any non-Debtor entity, then

17 the bankruptcy court -- well, let me put it this way.  The

18 9019 settlement we're seeking doesn't impact their claim at

19 all.

20 Q    Is Mr. Kelly's claim against CHS Texas now the Debtor's

21 property?

22 A    To the extent that it's a derivative claim, it's property

23 of the estate.

24 Q    Okay.  Can you identify for me, Mr. Perry, any form of

25 notice that a claimant like Mr. Kelly would have received

1    before he -- before his claim turned into property of the

2    Debtor's estate?

3    A    Sorry, Mr. Moxley, it's my fault.  I don't understand

4    your question.

5    Q    Okay.  My question is:  Your testimony, I believe, just

6    now, Mr. Perry, was that Mr. Kelly's claim against CHS Texas,

7    if derivative, is now part of the Debtor's estate; correct?

8    The Debtor's property now.

9    A    Correct.

10   Q    My question is, when did claimants like Mr. Kelly get

11   notice of the fact that their claims may now be property of

12   the Debtor's estate?

13   A    I'm going to give you the answer from the CRO's

14   perspective.  When we originally filed the automatic stay

15   extension, I personally filed a declaration by which I took a

16   position -- the Debtor took the position that remedies such as

17   successor liability, alter ego and the like were properties of

18   the estate.  In fact, we actually abbreviate an appellee, and

19   there's a demonstrative in some of the hearings that say POE

20   and there's a column next to a specific claimant that would

21   have been incorporated in that automatic stay, there would

22   have been words like successor liability, alter ego -- those

23   are the two that I think were the most prominently used in

24   connection to claimants that would have sought that remedy.

25           So very early on, in March of '23, within a month or

1    so, maybe the last half of the case filed, the Debtor did, in

2    fact, put forth notice of a hearing, did put forth information

3    with respect to identifying those remedies as property of the

4    estate and, as I recall, we were very transparent in open

5    court with regard to our position.

6    Q    So let me just make sure I understand, sir.  A

7    claimant's cause of action to recover damages suffered prior

8    to the  May 2022 divisional merger against YesCare, that's now

9    property of the Debtor's estate; correct?

10   A    You'll have to repeat that again.

11   Q    A claimant's cause of action to recover damages suffered

12   prior to the May 2022 divisional merger against YesCare are

13   now property of the Debtor's estate.  Is that right?

14   A    The answer is now, if I understand what you're asking

15   correctly.  And here's why.  An injury may have very well

16   occurred prior to May of 2022, but had that claimant been,

17   let's say, connected to or related to an ongoing contract that

18   YesCare ultimately was allocated as part of the divisional

19   merger, that claim survived the divisional merger.  What I

20   mean by that is that claim is a direct claim against YesCare.

21   Q    What if the claim wasn't so allocated?  Then it's part of

22   the Debtor's estate; right?

23   A    Let me make sure because I've been answering questions so

24   long, I want to make sure I give you the -- if the claim was

25   not allocated to YesCare and the injury occurred prior to May

1    of 2022, and the claimant therefor allocated

2    to -- to whom, asserted a successor liability or alter ego

3    remedy with their claim, then that is property of the estate.

4    Q    Right.  And that claim that you just described would be

5    released by the settlement agreement if it's approved;

6    correct?

7    A    To the extent that it's a derivative claim, and the

8    claimant otherwise doesn't come to court to prove something

9    otherwise, then that's correct.

10   Q    Okay.  The Debtor thinks that it is settling alter ego

11   claims; right?

12   A    The Debtor thinks?  I don't understand your question.

13   The Debtor thinks?

14   Q    The Debtor thinks that it is -- the Debtor's

15   understanding of the settlement agreement is that it is

16   settling alter ego claims; correct?

17   A    The Debtor evaluates alter ego claims as derivative

18   claims and therefore property of the estate, and therefore are

19   being released as part of the settlement.

20   Q    And the Debtor has not assigned any estimate or value to

21   alter ego causes of action; right?

22   A    Correct.  I testified on that earlier, that we didn't

23   chop up any type of value on a cause-by-cause action; correct.

24   Q    And the Debtor hasn't ascribed a specific value to

25   successor liability causes of action either; right?

1    A    That's correct.

2    Q    Okay.  The Debtor's view -- strike that.  Your view, Mr.

3    Perry, is that even though you don't know the value of those

4    claims that we just talked about, you don't think they're

5    particularly valuable, and $54 million is a lot of money and,

6    all things considered, the settlement's a good deal.  Is that

7    your view?

8    A    $54 million is a lot of money, I will agree with you on

9    that for sure.  I will also agree with you that it didn't

10   carve up settlement value on a claim-by-claim, remedy-by-

11   remedy basis.  But what my conclusion was earlier today and in

12   response to your question, I do believe that taking all of

13   these causes of action into account, the $54 million is

14   absolutely a value maximizing an out for all of these causes.

15   Q    Okay.  Wouldn't it be nice to know, though, before you

16   release them, to know whether or not the claims that we just

17   described, that you haven't ascribed a particular value to,

18   were worth hundreds of millions of dollars?

19   A    Sure, it would be nice to know whether or not claims were

20   worth hundreds of millions of dollars, yes.

21   Q    I believe you testified earlier on direct that the estate

22   causes of action caused harm to the Debtor.  Do you recall

23   that testimony?

24   A    I do.

25   Q    Could you explain what you meant by that?

1    A    Sure.  In a simplistic way -- and I think I testified

2    along these same lines -- in the first category, which I

3    described, which is my best example, to the extent that real

4    cash was transferred out of the Debtor that based on the

5    Debtor's conclusion wasn't substantiated in some form, then,

6    you know, that is harm caused by the Debtor, i.e., cause to

7    all the creditors such that when you can avoid that and get

8    that cash back, you can then distribute it to creditors in a

9    fair and equitable way.

10   Q    I see.  So, well how, Mr. Perry, does a personal injury

11   claim against YesCare, based on a successor liability theory,

12   involve an injury suffered by the Debtor?

13   A    You'll have to repeat that, I apologize.

14   Q    Well, you would agree with me that some of the successor

15   liability claims against YesCare may involve wrongful death;

16   correct?

17   A    Claimants that assert successor liability may involve

18   wrongful death.  They may.

19   Q    They may; right?

20   A    They may.

21   Q    The Debtor didn't die in prison; right?

22   A    Those are claims asserted against the Debtor.

23   Q    I'm talking about a successor liability claim against

24   YesCare.  How was the Debtor injured -- strike that.  My

25   question is:  How does a personal injury claim against

1     YesCare, that is asserted on a successor liability theory of

2     recover, involve an injury to the Debtor?

3                 MR. KAUFMAN:  Your Honor, this is an extremely

4     compounded, confusing question, that also requires some legal

5     analysis.

6                 MR. MOXLEY:  The question is not compound, Your

7     Honor.

8                 THE COURT:  I don't think it was compound.  Can you

9     ask the question again?

10                MR. MOXLEY:  Yes, Your Honor.

11    BY MR. MOXLEY:

12    Q    How does a per -- yes, Your Honor.  My question, Your

13    Honor, is how does a personal injury claim against YesCare,

14    based on a successor liability theory, involve an injury

15    suffered by the Debtor?

16                THE COURT:  He can answer.

17                MR. KAUFMAN:  Same objection.

18                THE COURT:  Well, that was a lot.  It was a lot

19    there.  "By the Debtor."  Who are you defining as the Debtor?

20    That's the question I've got.  Tehum?

21                MR. MOXLEY:  Tehum, yes, Your Honor.

22                THE COURT:  Yeah, I'll let you ask it.  Just use the

23    word Tehum in there and you can ask your question, and he can

24    answer if he knows.

25                THE WITNESS:  I really don't know the answer to the

1    question.

2            MR. MOXLEY:  Okay.  Let me start again.

3    BY MR. MOXLEY:

4    Q    You testified before that estate causes of action caused

5    harm to the Debtor; correct?  That's what you testified to.

6    A    In our analysis, if there was harm to the Debtor through

7    our causes of action, that is correct, we would pursue those;

8    yes, right.

9    Q    My question to you, sir, is if the Debtor takes the

10   position that a personal injury claim is based on successor

11   liability against YesCare, on an injury that occurred prior to

12   the divisional merger, is an estate cause of action, how does

13   that involve harm to the Debtor?

14           MR. KAUFMAN:  Your Honor, it's the same compound and

15   confusing.

16           THE COURT:  I'm going to overrule.  He can answer if

17   he knows.

18           THE WITNESS:  I don't know the answer to that

19   question.

20           MR. MOXLEY:  Okay.

21   BY MR. MOXLEY:

22   Q    And that's because -- that's because the harm that was

23   suffered was a personal injury to that human being; correct?

24   A    Correct.  The claimant asserting the claim was injured.

25   Q    Right.

1    A    Correct.

2    Q    Right.  The Debtor was not injured by Corizon's actions;

3    correct?

4    A    The Debtor is Corizon.  I'm not following you.

5    Q    No, the -- sorry.  My question -- my question, Mr. Perry,

6    is that it wasn't the Debtor who suffered in a personal injury

7    tort claim.  It was the person who was physically injured, who

8    suffered; correct?

9    A    The claimant who had a personal injury, the Debtor is who

10   harmed that creditor in that situation.  That's your position.

11   Q    Yeah.

12   A    Correct.

13   Q    And if you're going to bring that claim on a successor

14   liability theory against YesCare, it's the Debtor's position

15   now that that's the Debtor's asset; correct?

16   A    The Debtor's position is that a successor liability

17   remedy to pursue an underlying claim, recoveries under that

18   claim is property of the estate.

19   Q    Right.  And so the estate wasn't actually harmed in that

20   scenario; right?  So not all estate causes of action actually

21   do involve harm to the Debtor; correct?

22   A    I don't know how to answer your question.

23   Q    If YesCare is required to pay on a personal injury claim

24   asserted by a claimant, would that harm the Debtor?

25   A    (No response.)

1    Q    I can ask that question again if you'd like.

2    A    Okay, please.

3    Q    Sure, of course.  And I can do that any time you like,

4    okay?  Do that any time you like.

5         My question is:  If YesCare is required to pay on a

6    personal injury claim asserted by a claimant in this case,

7    that would not harm the Debtor; would it?

8    A    A claimant of the Debtor or a claimant of YesCare?  I'm

9    sorry, I don't mean to ask a question.  I'm just trying to

10   clarify.  Maybe you'll have to ask it again --

11   Q    Sure.

12   A    -- because the definition of claimant in the question, I

13   think has me confused.

14   Q    Okay.  So imagine a scenario where YesCare has a judgment

15   against it, and it has to make a payment, okay?

16   A    Got it.

17   Q    YesCare has a judgment against it and has to make a

18   payment.

19   A    Perfect, got it.

20   Q    Okay.  Now, assume that the judgment creditor in that

21   case is a tort claimant in this case.

22   A    Are you talking about YesCare or Corizon?

23   Q    For the claim against YesCare on a successor liability

24   theory.  They have a claim against YesCare, they get a

25   judgment, and YesCare has to pay them.  YesCare, having the

1    right to object to that claimant in that scenario, doesn't

2    harm the Debtor; does it?

3              MR. KAUFMAN:  Your Honor, I'm going to object to the

4    extreme compoundedness of this question.  He's clearly

5    confusing the witness and I just want to keep the record

6    clean.

7              THE COURT:  Overruled.  YesCare pays a claim against

8    the Debtor, is what he's trying to ask.  Does it harm the

9    Debtor?  That's my distilled version of the question.

10             THE WITNESS:  Yeah, I'll have to process that, Mr.

11   Moxley.  As I sit here, I can't give you an answer.

12             MR. MOXLEY:  Okay.  Let me ask it again.

13             THE WITNESS:  I think I can get there if I process

14   it for awhile, but I'm not sure I fully follow where you're

15   going and what you're asking.  So I really can't give you an

16   answer.

17   BY MR. MOXLEY:

18   Q    YesCare is a non-Debtor; correct?

19   A    Correct.

20   Q    If YesCare has to expend money to pay a vendor, does that

21   affect the Debtor?

22   A    Who is that, please?

23   Q    YesCare's vendor.

24   A    If YesCare pays their own vendor, it has nothing to do

25   with this bankruptcy case.

1    Q    Correct?

2    A    Correct.

3    Q    Okay.  So now imagine that instead of a vendor, YesCare

4    is paying a claimant with a personal injury tort claim against

5    YesCare.  Same answer, right?  The Debtor's not harmed by

6    YesCare having to make that payment.

7    A    Correct.  YesCare making payments to YesCare claimants

8    has nothing to do with the Debtor; correct.

9    Q    Thank you, sir.  If CHS Texas paid Mr. Kelly, based on

10   his claim, would that harm the Debtor?

11   A    I don't believe it would cause harm to the Debtor unless

12   it caused other creditors to not receive recoveries on account

13   of their claims.

14   Q    Would the Debtor be better off if CHS Texas and YesCare

15   had to pay the claims against them that may be asserted on a

16   successor liability basis?

17   A    I'm sorry.  As that one again, please.

18   Q    Would the Debtor be better off if CHS Texas and YesCare,

19   non-Debtors, had to pay the claims against them based on

20   successor liability?

21   A    It's a hypothetical that I think is perhaps binary.  So

22   I'll answer it based on my understanding of your question,

23   which is:  If YesCare and CHS Texas paid a claim of the

24   Debtor, would it -- yes, I believe the Debtor would be better

25   off because the claimant pool would reduce and we would

1    maximize value for the rest of the claimants.

2    Q    No, not my question.

3    A    Okay, I'm sorry.

4    Q    So I'll ask my question --

5    A    I am trying very hard, sir.  Please feel free --

6    Q    No, and I'm not trying to be difficult with you.  I'm

7    trying to be as clear as I can.  Would the Debtor be better

8    off, sir, if CHS Texas and YesCare had to pay claims asserted

9    against them, YesCare and CHS Texas?  Not claims asserted

10   against the Debtor; claims asserted against YesCare and CHS

11   Texas.  Would the Debtor be better off if YesCare and CHS

12   Texas paid thsoe claims rather than the Debtor?

13   A    If there were direct claims brought forth against YesCare

14   that they had to pay, it would reduce the claimant pool of the

15   Debtor, and the Debtor could always maximize value for the

16   rest of the creditors.

17   Q    Okay.  Now, I'm asking it -- now I'm asking, you said

18   direct claims in that answer.  now, I'm asking you about

19   successor liability claims.

20   A    I don't have an answer for you on that.

21   Q    And why is that?

22   A    Because, again, I don't think I could have achieved for

23   the Debtor -- could have achieved this settlement with this

24   amount of money, in a value-maximizing way, had successor

25   liability claims, alter ego claims, and other derivative

1    claims, not been released.

2         So I do think the Debtor would be harmed in your

3    hypothetical if, in fact, those claims were allowed to be

4    pursued, they were interpreted as not property of the estate,

5    and I couldn't bring forth a settlement.

6         MR. MOXLEY:  Your Honor, I think we have -- could we

7    just take a five-minute break?  Is that possible?

8         THE COURT:  Yeah, of course.  Yup, you got it.

9         COURT CLERK:  All rise.

10        (Recess taken from 6:03 p.m. to 6:11 p.m.)

11        COURT CLERK:  All rise.

12        THE COURT:  Back on the Record in Tehum, and I

13   remind you that you're still under oath.  Counsel, you  may

14   proceed.

15        MR. MOXLEY:  Thank you, Your Honor.

16              CROSS-EXAMINATION (CONT'D)

17   BY MR. MOXLEY:

18   Q   Mr. Perry, let me -- let me try to pick up where wre left

19   off and see if we can do that.

20   A   Sure.

21   Q   Mr. Perry, your view is that wrongful death claims

22   against YesCare or CHS Texas under a successor liability that,

23   in your view, is derivative, are estate causes of action and

24   would be released under the settlement agreement.

25        MR. KAUFMAN:  All right, Your Honor, I have to --

1    oh, I'm sorry, finish your question.

2              MR. MOXLEY:  I think I finished it.

3              MR. KAUFMAN:  Oh, okay.  I object that that is a

4    compound question, talking about wrongful death claims against

5    YesCare being derivative, and it's compound and very

6    confusing.

7              THE COURT:  Overruled.  You can answer.

8              THE WITNESS:  Please ask the question again.

9              MR. MOXLEY:  Of course, sir.

10   BY MR. MOXLEY:

11   Q    Your view is that wrongful death claims against YesCare

12   or CHS Texas, under a successor liability theory that in your

13   view is derivative, is an estate cause of action released

14   under the settlement agreement; correct?

15   A    Correct.

16   Q    So it's your view, then, that personal injury and

17   wrongful death claims can be settled under the settlement

18   agreement without those tort victims' consent.

19   A    Repeat the question again, please, for me.

20   Q    It is your view then, sir, that personal injury and

21   wrongful death claims are being settled under the settlement

22   agreement without those tort victims' consent.

23   A    The settlement agreement, they are seeking approval of

24   that agreement.  We have an opportunity to solicit a plan that

25   would allow creditors to vote yes or no under the plan, but

1  the settlement agreement could very well be approved over the

2  objection of certain claimants.

3  Q    And but for the fact that the settlement agreement, if

4  approved, and the plan if confirmed, would release personal

5  injury tort claims without those victims' consent, you would

6  not have the $54 million settlement that you now have with the

7  M-2 parties; correct?

8  A    Okay, I'll ask you to repeat it again, one more time.

9  Q    But for the fact that without being able to release

10  personal injury tort claims, without those tort victims'

11  consent, you would not have the $54 million settlement that

12  you now have with the M-2 parties; correct?

13  A    The releases are connected to the settlement, so without

14  the releases I would not have a settlement, as it stands

15  today, correct.

16  Q    Isn't this settlement then, Mr. Perry, effectively

17  monetizing the value of the personal injury and wrongful death

18  claims against YesCare?

19  A    Successor liability or direct claims?

20  Q    Yes, sir, successor liability.

21  A    By way of releasing estate causes of action, and

22  therefore liquidating those, we are in fact settling those

23  claims in order to bring money into the estate to distribute

24  to creditors.

25  Q    And you appreciate, sir, that you're essentially

RUSSELL PERRY - CROSS BY MR. MOXLEY

1     advocating for a settlement under which the entities

2     controlled by Mr. Lefkowitz are purchasing personal injury and

3     wrongful death claims from the Debtor without those victims'

4     consent.

5     A    I don't believe that I define it, or the Debtor defines

6     it, as purchasing personal injury claims.  I think we are

7     releasing estate causes of action in order to return value to

8     claimants.

9     Q    Doesn't this settlement agreement essentially sell the

10    pain and suffering experienced by members of our committee in

11    this courthouse?

12    A    I'm sorry, please repeat the questoin again.

13    Q    Doesn't this settlement agreement essentially sell the

14    pain and suffering experienced by the members of our

15    committee, the TCC, on the steps of this courthouse?

16    A    I don't believe it sells at all.  I think what this

17    settlement does is provides substantial value to the estate

18    that we can then distribute to creditors in a value-maximizing

19    way.

20    Q    Well, how is the Debtor insuring that the appropriate

21    amount of settlement funds are allocated to personal injury

22    tort claims?

23    A    I would welcome the TCC's cooperation in assuring that we

24    get the allocation right when we form the plan, after we have

25    a settlement approved.

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    Q    You would agree with me, Mr. Perry, that the face value

2    of the personal injury tort claims here is approximately $775

3    million; right?

4    A    Not my definition of face value, no, I don't agree.

5    Q    You don't agree?

6    A    No.  That's the value of a proof of claim, not the face

7    value.

8    Q    Okay.  So the value of the personal claims for the

9    personarl injury tort claimants in this case total

10   approximately $775 million; correct?

11   A    Sure, approximately, uh-huh.

12   Q    And you would agree with me that, if you look at the

13   proof of claims for commercial cred -- for commercial

14   creditors, those total approximately $75 million; right?

15   A    Proof of claim totals, I think it's somewhere around

16   there, maybe a little bit north of there.  That seems right.

17   Q    Why isn't the Debtor advocating for a settlement where 90

18   percent of the settlement proceeds are reserved for tort

19   claimants?

20   A    I'm sorry.  I don't understand, Mr. Moxley.  There is no

21   allocation even contemplated in the settlement agreement.

22   Q    You're aware there was a prior plan that provided for

23   allocation; correct?

24   A    Sure, but we're not arguing a plan today.

25   Q    Right.  So at that point in time, though, the Debtor

1    wasn't advocating for an allocation of 90 percent of the

2    settlement proceeds to go to the tort claimants; was it?

3    A    Under the old plan structure?

4    Q    Yes.

5    A    Under the old plan structure, there was a mechanism that

6    allocated claims, let's call it as fair and equitably as the

7    allocation could arrive at based on an estimated amount of

8    claims.

9    Q    Okay, and it didn't --

10   A    Based on proof of claims.

11   Q    And that allocation methodology didn't provide for 90

12   percent of the settlement funds to go to the tort claimants;

13   did it?

14   A    Not that I'm aware of, no.

15   Q    And wasn't that prior allocation essentially taking the

16   proceeds from the sale of the tort claimants' liability and

17   giving it to commercial creditors?

18        MR. KAUFMAN:  Your Honor, I'll object to that

19   question.  Mr. Perry's already testified that he doesn't view

20   it as a sale.

21        THE COURT:  Overruled.  You can answer.

22        THE WITNESS:  Correct.  I don't view it as a sale,

23   but let me answer it -- let me answer your question.  Mr.

24   Moxley, the allocation was not -- in the previous plan was not

25   based upon, as you referred to it, face value of proof of

1      claim amounts.

2              It was based on an estimated amount for each

3      respective class, and the allocation in the old plan that's

4      not in front of the Court, was based on that approach at that

5      time.  Nowhere in this settlement are we discussing,

6      memorializing or seeking approval for any allocation.

7      BY MR. MOXLEY:

8      Q    Do you think it's appropriate for a family's wrongful

9      death claim against YesCare to be sold and controlled by the

10     Debtor?

11     A    If a family has a wrongful death claim against YesCare, I

12     would assume that they would pursue that claim against YesCare

13     and the Debtor wouldn't stand in their way of pursuing a claim

14     against YesCare.

15     Q    If that claim was a successor liability claim, which you

16     understand to be a derivative claim, the settlement agreement

17     would stand in the way of that family pursuing that claim

18     against YesCare; correct?

19     A    No.  The settlement agreement would liquidate that claim

20     to provide value to that victim --

21     Q    Right.

22     A    -- or to that claimant.

23     Q    Right.  The Debtor would control that claim, not the

24     claimant.

25     A    The Debtor would return value to the claimant quickly,

1    fair and equitably, along with all the creditors.

2    Q    You testified, sir -- switching gears just a bit for a

3    minute.  You testified that you've reviewed personal injury

4    claims in this case; right?

5    A    I have.

6    Q    Okay.  Do you have medical records for the personal

7    injury claims asserted against the Debtors?

8    A    To the extent medical records were included in claim

9    arguments we would have reviewed, we would have them, but we

10   otherwise don't have possession of a plethora of medical

11   records, no.

12   Q    And the same for medical bills.  You don't have

13   possession of the tort claimants' medical bills; correct?

14   A    Correct.  That would be part of what I would assume they

15   would assert as part of their claim.

16   Q    Have you conducted any interviews with any personal

17   injury claimants in this case?

18   A    I have not.

19   Q    Have you attempted to calculate the damages suffered by

20   any personal injury claimant?

21   A    I have attempted to estimate the amount of total claims

22   for personal injury claimants.  I think for that definition of

23   damages, then I have attempted to estimate an amount for

24   purposes of a liquidation analysis.

25   Q    In the aggregate, I take it; right?

1    A    For all personal injury claimants that have filed claims

2    in this case; correct.

3    Q    Right.  Not for any particular individual claimant;

4    right?

5    A    As part of the analysis by which we arrived at an

6    estimate, we had to review individual claims, in particular

7    the proof of claims that were asserted and the type of the

8    claim that may have been asserted, so that we could properly,

9    to the best of our ability, come up with an actual estimate of

10   that for purposes of the liquidation analysis.

11   Q    How did you go about calculating the value of the

12   wrongful death claims?

13   A    I didn't calculate the value, and I believe I've never

14   testified that I've ever calculated the value of a wrongful

15   death claim.  I've estimated an amount for that claim in

16   connection with the liquidation analysis and then, as I

17   testified earlier, there's been new information provided at

18   the request of the Committee, Mr. Moxley, that helps provide

19   additional data points that could sharpen the pencil, so to

20   speak, on that estimate amount.

21   Q    And the estimate amount that you referenced twice in your

22   last answer, is that the amount that the Debtor thinks is

23   recoverable on that particular wrongful death claim?

24   A    Well, it's the amount that I -- the Debtor used in order

25   to estimate what the potential claim may be worth with respect

1    to liquidation analysis purposes.

2    Q    Okay.  So you prefer the term "worth" instead of "value,"

3    fair?

4    A    We estimated an amount of what we believe to be at least

5    -- and, again, in connection with liquidation analysis

6    -- of that class of claims.

7    Q    Okay.  So let me ask you the question then, slightly

8    differently.  How did you go about calculating the worth of a

9    wrongful death claim?

10   A    My using "worth" was maybe a -- I wasn't referring to

11   value.  I was referring to an estimate amount, and I'll give

12   you an explanation of how we arrived at an estimated amount of

13   those what I'll call classified tort claims or personal injury

14   claims.  And that is, at least in connection with the

15   liquidation analysis, we sought to understand how many filed

16   claims were personal injury claims, how many of those

17   claimants were represented by counsel versus how many of those

18   claims were pro se, i.e. didn't have counsel.

19        We then applied a methodology by which on the low

20   end, we assumed pro se claimants would accept the $5,000,

21   which was a mechanism under the old plan.  The represented

22   would effectively -- in terms of estimating the amounts, we

23   calculated the represented cases multiplied by the average in

24   a peer-reviewed article.

25        On the high end, we assumed all claimants, every

1    claimant that filed a claim, would effectively be multiplied

2    by that number that we discovered in a peer-reviewed article,

3    and that represented the high end.

4          In terms of estimating the amounts, it was simply

5    what I'll call formulaic based on that methodology that I just

6    laid out.

7    Q    Got it.  So it wasn't you sitting down, looking at a

8    wrongful death claim and coming up with the worth or dollar

9    figure that you would ascribe to that particular wrongful

10   death claim; correct?

11   A    No, I did not ascribe an individual -- you know, like an

12   estimate on each and every individual claim.  In the

13   liquidation analysis, the Debtor performed the analysis as I

14   just mentioned.

15         Subsequent to preparing that liquidation analysis,

16   again -- sorry to be redundant, but the analysis that -- or

17   the information and data that we produced to the TCC, and that

18   I testified on a bit earlier, may allow for the parties to

19   take a more detailed claim-by-claim of valuation of whether

20   the estimate can be assigned different than the methodology we

21   took in the liquidation analysis.  That process and evaluation

22   will, you know, be determined as we move forward.

23   Q    Okay.  So part of your process was not to calculate the

24   damages that were suffered by any particular wrongful death

25   claimant; correct?

1    A    I'm sorry, part of my what?

2    Q    Part of the analysis that you undertook --

3    A    Uh-huh.

4    Q    -- was not to ascribe -- was not to come to a view on

5    what the analysis of the damages that were actually suffered

6    by any particular wrongful death claimant?

7    A    Mr. Moxley, the analysis that I did was to calculate the

8    estimated amount of claims.  The Debtor doesn't necessarily

9    view that as damages; we view that as the estimate amount of

10   claims.

11   Q    That's what I'm trying to understand, sir.  What, in your

12   mind, is the difference between the estimated amount of the

13   claims and the damages that were suffered by a particular

14   wrongful death claimant?

15   A    Well, to answer your question, the difference would be

16   the estimated amount of the claims.  It's just the methodology

17   and approach that I just laid out for you in the liquidation

18   analysis that, to some extent, form the basis of how the

19   allocation was arrived at.

20        The damages -- and you asked me how they're

21   different.  The damages, ultimately of the personal injury

22   claims, to me that's a reference to liquidated claims.  And

23   the old plan put forth a process by which claimants could

24   liquidate their claims to arrive at that number that would

25   represent the damages.

1    Q    Mr. Perry, have you ever testified in a medical

2    malpractice case before?

3    A    I have not.

4    Q    Do you think that you're qualified to offer an opinion

5    regarding the worth of a medical malpractice claim?

6    A    I haven't been asked to do that, nor have I been involved

7    in it, so I don't have an answer for you.

8    Q    I believe you testified on Direct that the Debtor, Tehum

9    Care Services, is in financial distress; right?

10   A    I don't believe that was mentioned, Mr. Moxley.

11   Q    Okay.  Is the Debtor in financial distress?

12   A    Today?  I'm sorry, Mr. Moxley.  I testified that the

13   Debtor was in financial distress prior to the divisional

14   merger and leaving up to the division merger.  I don't believe

15   I testified that it's in financial distress today.

16   Q    Okay.  Well, given the distress the Debtor was in then at

17   that time, wouldn't the deeper pocket for claimants of any

18   type, to assert claims against the YesCare?

19   A    I don't think I could conclude that YesCare has a deeper

20   pocket.

21   Q    Let's go -- let's turn to -- let's turn back to the

22   settlement agreement, sir, which is at TCC 125 in your binder.

23   A    Oh, yeah, 125.

24   Q    125, yeah.

25   A    Okay, I have it.

RUSSELL PERRY - CROSS BY MR. MOXLEY

1    Q    Okay.  And let's go to Section 9 of the settlement

2    agreement, which is at page 41 of 47 of the filing.  I think

3    this will be brought up on your screen also, if that helps

4    you, sir.

5    A    Okay.

6    Q    Okay.  And you see Section 9 has a heading "Conditions

7    Precedent."  Do you see that?

8    A    I do.

9    Q    Now, we know that this may have changed, given that the

10   Debtor filed around noon today a revised agreement and

11   proposed order.  And we'll take a look at that revised version

12   in a moment.

13   A    Okay.

14   Q    I'd like to look at just this version for now, if we

15   could, okay?

16   A    Okay.

17   Q    All right.  So at Section 9, are these -- are these

18   conditions that must be satisfied before any settlement funds

19   are released for payment to creditors?

20   A    Yes, that's correct.

21   Q    You see condition number romanette ii?  Do you see that

22   condition, sir?

23   A    I do.

24   Q    Okay.  So under this prior version, the version that is

25   TCC-125, appreciating, again, that there's been a subsequent

1     filing.  But under this prior version, for the claimant in

2     this case who opted out, received distributions from the

3     settlement payments.

4          MR. KAUFMAN:  Your Honor, I'll object to the

5     relevance of this question, given the changes.

6          THE COURT:  Well, I think he can talk about what it

7     was before and then what it is currently now.  I think that's

8     fair game.  Understanding that it's changed, but I think they

9     can explore what was going on before.

10         MR. KAUFMAN:  Yes, sir.  Thank you.

11         THE WITNESS:  So in the previous construct and per

12    this Section 9, subsection ii, parties who opt out of the

13    agreement shall not be authorized to receive distributions or

14    pursue claims unless they seek authority from the Court fining

15    that that claim was not released or otherwise enjoined.

16    BY MR. MOXLEY:

17    Q    Okay.  What was the phrase that you used?  It was the

18    "previous construct," I think.  Just now in your answer?

19    A    Yes, and I read from the previous settlement agreement

20    that the new revised -- I'm sorry.  Settlement order would

21    supercede.

22    Q    Let's use that phrase, "previous construct," which is

23    easier, correct?

24    A    Okay.

25    Q    So under the previous construct, could a claimant in this

1    case, who opted out, bring a lawsuit against a released party

2    based on the doctrine of successor liability?

3    A   They could bring a lawsuit over to Your Honor under any

4    doctrine.

5    Q   No, no.  My question is, if it was based on the doctrine

6    of successor liability, would that lawsuit be allowed to go

7    forward or, under the previous construct, would it be

8    prohibited?

9    A   This subsection is a condition on what the Court would

10    decide as to whether that could move forward, not the Debtor.

11    The clause basically said -- and this was -- you know,

12    obviously we've removed this.  But what this clause says is,

13    if you opt out of the settlement you won't receive

14    distributions, but you are entitled to bring forth a lawsuit

15    to the Court to seek authority under the plan.

16    Q   (Glitch in the audio) finding that such creditors' claims

17    or causes of action were not released or otherwise enjoined

18    under the plan.  Do you see that?

19    A   I do.

20    Q   And claims for successor liability or alter ego would

21    have been released under the plan -- or under this prior

22    construct; correct?

23    A   Under this prior construct, a remedy such as successor

24    liability and alter ego are being released under the current

25    and the former construct.

1    Q    Okay.  So what was the point of the prior construct's

2    opt-out if the claimant couldn't recover from anyone?

3    A    Well, the point was we didn't want to take claimants' day

4    in court away if they believed they had a claim that wasn't

5    being released under this agreement.  We wanted them to bring

6    it forth to court.  We didn't want to stop them from being

7    able to do that.

8    Q    Okay.  Under the prior construct, if they opted out, they

9    couldn't get any of the settlement payments; right?

10   A    That's correct, under the current -- you know, prior

11   construct, that's right.

12   Q    And if their claim was based on successor liability, then

13   that claim was released, so they couldn't bring that claim;

14   right?

15   A    If a -- under the -- correct.  The Debtor believes

16   successor liability claims are, by nature, derivative property

17   of the estate an they're being released.

18   Q    Right.  So what was the point of the agreement?  What

19   recourse did the claimant have?

20   A    Constructive.  We moved to strike it and it doesn't exist

21   any longer.  I really can't tell you what the point of it was.

22   I can tell you in a way that, you know, provides any clarity

23   other than the fact that we struck it.

24   Q    Okay.  So, now I'd like you to explain to me how the new

25   version works, and I think we can bring that up on the screen.

1    Is that the agreement up on the screen, the new filing?

2         (Conferring with associate.)

3    Q    We'll bring that up on our screen for the ease of

4    reference.

5    A    Okay.

6    Q    You're familiar with it, of course; right?  You're

7    familiar with the new filing?

8    A    You know, we worked on this over the weekend, and then

9    finalized it literally minutes before we filed it with the

10   Court, so --

11   Q    Okay.  So I'd like to show you the redline of that

12   section, of that Section 9.  And I'd like -- my question, sir,

13   is -- you worked on it over the weekend.  And my question,

14   sir, is how does that section work now?  Can you explain that

15   to the Court?

16   A    Sorry, you're referring to Section 9?

17   Q    Yes, sir.

18   A    How does it work.  Who's controlling the screen?  I'm

19   curious.

20   Q    If you --

21   A    If we could maybe zoom out a little bit so I could see

22   all of Section 9?

23   Q    All right.

24   A    Or they can just scroll down.  I don't know.  Or maybe

25   there's a piece of paper I can look at.

1    Q    We can hand up a copy.

2    A    Okay, perfect.

3              MR. MOXLEY:  May I approach?

4              THE COURT:  Certainly.

5         (Document presented to witness.)

6              THE WITNESS:  Okay, thank you very much.

7              MR. MOXLEY:  So just noting for the Record, Judge,

8    that I've handed the witness a copy of the new proposed

9    filing.

10             THE COURT:  Yes.

11             THE WITNESS:  And just so we're on the same page,

12   what I am looking at is page 3 of this Notice of Proposed

13   Order.  Subsection 9 -- well, Section 2, which says paragraph

14   9 is stricken and replaced in its entirety with the following.

15             The redlines here, this is not the redline, however

16   to answer your question, what Section 9 is doing now is

17   removing really any notion of an opt-out at all, meaning if

18   there was a plan solicited, there wouldn't be a box to check

19   for an opt-out.  Parties would only have the ability to vote

20   for or against the plan.

21             And we have effectively allowed for any claimant,

22   again, to bring forth a lawsuit to Your Honor to allow Your

23   Honor to determine whether or not they either have a direct

24   claim against a non-Debtor or, you know, some other argument

25   that would allow for a payment by a non-Debtor entity, and

1      therefore wouldn't be subject to the release.

2              In addition, we have defined more clearly that these

3      releases have no bearing whatsoever on claimants that have

4      direct claims against third parties on or after -- for harm

5      caused to them on or after May the 5th, 2022.  I believe that

6      was an issue that was brought to the Court on Friday.

7              Further, claims that were allocated to CHS Texas in

8      connection with the divisional merger, to which I testified

9      earlier there was roughly 61 of those, of the 242 filed

10     claims, that those claimants would effectively be -- I think,

11     Your Honor, I discussed it as released or, you know, removed

12     from the docket, so it was a claim register so to speak, and

13     they can allow them to pursue their claim directly.

14             So, really what we've done is we've removed the opt-

15     out provision entirely, but what's remained is the ability for

16     a claimant to bring forth to the Court an argument as relates

17     to what their claim basis may be.

18     BY MR. MOXLEY:

19     Q    Under the new construct, Mr. Perry, could a creditor

20     allocated to CHS Texas, assert a claim against YesCare under a

21     theory that YesCare was a successor to Corizon?

22     A    I don't have an answer to that.  I don't know.

23     Q    And you don't have an answer to that and you don't know

24     because -- I'm asking you, is that because such a claim would

25     go before the Bankruptcy Court and the judge would decide?

1    A    No.

2    Q    All right.  Can a claimant in this case, under the new

3    construct, whose injury arose prior to May 1st of 2022, bring

4    a lawsuit against a released party to recover on account of

5    that injury?

6    A    If it's a direct claim, of course they can.

7    Q    And if it's a claim that's based on successor liability,

8    it would be an estate cause of action and they couldn't;

9    correct?

10   A    If it was a claim -- well, I'm sorry.  I think your first

11   question, Mr. Moxley, was if the claim was allocated.  If the

12   claim was not allocated to CHS and the claim was allocated to

13   the Debtor --

14   Q    Uh-huh.

15   A    -- and that claim is asserting a theory of successor

16   liability, and that claim, therefore, is derivative in nature,

17   it's being released, then they aren't able to pursue unless it

18   is a direct claim.  If the claimant that was allocated the

19   claim, was allocated to NewCo, they can pursue that claim.

20   Q    Got it.  So under the new construct, the holder of a tort

21   claim, whose claim arose prior to the divisional merger, and

22   it was a successor liability claim, their sole remedy would be

23   to seek compensation from whatever mechanism the plan

24   provides; correct?

25   A    It's binary.  If they have a direct claim, the settlement

RUSSELL PERRY - CROSS BY MR. MOXLEY

232

1      agreement allow for them to assert that claim directly.

2      There's a mechanism they can bring to Your Honor.  If it's not

3      a direct claim and it's allocated to the Debtor, and that

4      claimant is asserting remedies that are property of the

5      estate, that claim would reside in the Bankruptcy Court and we

6      are settling that and providing a value to creditors.

7      Q    Are you aware, Mr. Perry, sitting here today, of any

8      direct claim that a personal injury claimant of this estate

9      would have against any of the released parties?

10     A    I'm aware that of the 242 claims filed in this case --

11     and let me be clear, these are claimants that filed a proof of

12     claim asserting a liability in this case, meaning the Debtor,

13     Tehum Care Services, has a liability connection to that

14     claimant.  To the extent that that claimant's claim was

15     allocated to YesCare in connection that there's a merger, my

16     view is they are not a claimant of the Debtor.

17     Q    Okay.

18     A    They, therefore, have a direct claim against a released

19     party and we are basically putting a process in place to

20     release them from this estate, and not enjoin them in the

21     settlement, and giving them at path to pursue that claim.

22     Q    Okay.  Now, imagine you have a claim that's altlocated to

23     Tehum.

24     A    Okay.

25     Q    Okay.  The claim seeks recovery on a successor liability

1    theory of liability.  What position would the Debotr take if
2    that claimant, under this new construct, brought that claim to
3    Judge Lopez?
4    A    The Debtor doesn't take any position.  If they want to
5    bring a claim to Judge Lopez, they should bring a claim to
6    Judge Lopez.  The judge will rule whether or not it's a direct
7    or indirect claim, meaning per the language, whether that
8    claim was released as part of the settlement or not.
9    Q    And how would the judge decide whether or not a claim was
10   a successor liab -- was a successor liability claim that was
11   released or not?
12           MR. KAUFMAN:  I'll object to that because it
13   requires the judge to be clairvoyant but (indiscernible due to
14   very low audio volume.)
15           THE COURT:  And me, too.
16   BY MR. MOXLEY:
17   Q    So am I right, Mr. Perry, that you don't know, as you sit
18   here today, which personal injury tort claims that are filed
19   in this case will or will not be settled under the settlement
20   agreement; is that right?
21   A    I'm sorry, repeat the question again.
22   Q    As you sit here today, do you know which of the personal
23   injury tort claims filed in this case, will or will not be
24   released under the settlement agreement?
25   A    I don't understand the question, Mr. Moxley.  I don't

1   think we're releasing tort claims.

2   Q    Okay.

3   A    Personal injury tort claims aren't being released.

4   Q    If they're -- if the personal injury tort claims that

5   allege -- that assert or seek -- strike that.  Personal injury

6   tort claims that would seek recovery from YesCare on a

7   successor liability basis are being released under the

8   settlement agreement; correct?

9   A    That is correct.

10  Q    Okay.  Do you know which of the claims on file in this

11  case would be released?

12  A    Well, as a matter of fact, let me answer that.  Of the

13  242 claims that have been filed in this case, 61 of those are

14  allocated to YesCare.  That's not your question but I just

15  want to make sure that we're working through this mess so I

16  can answer your question in a way that we all understand it

17  and I understand it.

18          242 have been filed, 61 are allocated to YesCare.

19  The Debtor filed in March of '23 an extension of the automatic

20  stay to non-Debtors subject to -- I think it was roughly 39

21  claims at the time.  We received a short extension of that

22  from Your Honor.  We came back.  We then sought an extension

23  of that automatic stay.

24          In that proceeding, there was an exhibit attached to

25  maybe my declaration or at least the motion, that detailed

1      roughly 34 claims because, you know, five had been otherwise

2      settled out.

3            And of those 34 claims that we sought extension of

4      stay, I believe three, maybe four of those claims asserted

5      successor liability or alter ego.  The analysis that the

6      Debtor undertook, leading up to that extension, was to

7      identify other non-Debtor entities that would serve as a

8      Defendant to which there may be an indemnification

9      relationship between those two parties, i.e. YesCare and the

10     Debtor or others, such that if there was a successor liability

11     claim asserted, we could put a stay and we could figure out

12     that claim.

13           So the reason I needed to explain it to you, Mr.

14     Moxley, is based on the Debtor's analysis and understanding of

15     the claims that have been filed in the case, we believe the

16     number of claims, as we sit here today, that have asserted

17     successor liability or alter ego, are probably three or four

18     of the 242.

19     Q    Okay.  I know you weren't here on Friday, but you're

20     aware generally that there's been some discussion in some of

21     the openings and other comments throughout the hearing, about

22     the concern, about what would happen to pro se claimants if

23     this case were dismissed.

24     A    If you can explain to me.  I wasn't here on Friday.

25     Q    Okay.

1    A    So I don't have a knowledge of what was discussed on

2    Friday in that regard.

3    Q    Okay.  Well, wew talked a little bit earlier about

4    -- I think it was Debtor's Exhibit 26, where you went through

5    a little bit of how much pro se claimants have received over

6    the last ten years in terms of settlements; correct?

7    A    Correct.

8    Q    Okay.  And there's been some discussion, I'll represent

9    to you, during the openings about concern about what happens

10   to the pro se claimants if this -- if this bankruptcy case

11   were to be dismissed, okay?

12   A    Okay.

13   Q    Okay.  Are you aware, sir, of the Amicus filing in this

14   case by a number of organizations, including the American

15   Civil Liberties Union and others?  Are you aware of that

16   filing?

17   A    I am aware that they filed, you know, something in the

18   case recently.

19   Q    And have you read that filing?

20   A    I've read it, you know, quickly, but I did read it, sure.

21   Q    Okay.  It's on the docket in the case.  It's at Docket

22   No. 1398, and it was filed on February 26th.  I'm going to

23   show it to you on your screen.  I don't have this in the

24   binders.  It's a -- it's just a docket that's been -- or an

25   item that's been filed on the docket.

1          Let's look at page 2 of the filing, if we could.

2          MR. KAUFMAN:  Your Honor, I object to -- this is

3     hearsay.

4          THE COURT:  I haven't seen it yet, so I don't know

5     what he's putting up.  Okay, what's the question?

6          MR. MOXLEY:  The question is, I asked him if he's

7     read the document.  And now I'm just turning to a page in the

8     document, sir.  There's no question pending right now.

9          THE COURT:  Okay.

10    BY MR. MOXLEY:

11    Q   Mr. Perry, do you see on the -- on page 2 of this filing,

12    it's on your screen, that the Amicus -- the Amicus parties

13    that filed this are the ACLU, the Center for Constitutional

14    Rights, Human Rights Defense Center, Public Justice, Rights

15    Behind Bars, and the UC Berkeley Center for Consumer law and

16    Economic Justice.

17         MR. KAUFMAN:  I do object because Mr. Moxley just

18    asked if Mr. Perry can see what the document says on the

19    screen, which is hearsay.

20         MR. MOXLEY:  Your Honor, there's an Amicus filing in

21    the case.  I'm asking the witness just if he's aware of who's

22    filed the filing.

23         MR. KAUFMAN:  Different question.

24         THE COURT:  Why don't you re-ask that one.

25         MR. MOXLEY:  Sure.

1    BY MR. MOXLEY:

2    Q    Mr. Perry, are you aware of who -- which organizations

3    made this filing?

4    A    My understanding is the organizations represented here in

5    the text on the screen made the filing.

6    Q    Okay.  Would you agree with me, sir, that there are

7    likely claimants in this case who missed the bar date?

8    A    I don't have a conclusion whether that's likely.  There

9    have been a very small handful, again I want to say five or

10   six and I may have that estimate a little off, but of claims

11   that have -- proof of claims that have come in past the bar

12   date.  And we actually included that in the claims register

13   data that we provided.

14   Q    Okay.  Could a claimant, who missed the bar date, recover

15   from whatever trust is set up as part of the plan, if the

16   settlement is approved?

17   A    The Debtor really hasn't concluded whether it's going to

18   object to claims that missed the bar date.  It's not something

19   we've discussed at this point.

20   Q    Could such a claimant, who missed the bar date, bring a

21   derivative successor liability claim against YesCare?

22   A    A claimant that missed the bar date could bring any

23   claim, whether it's direct, derivative or other.  Sure.  A

24   claimant that missed the bar date could bring any claim they

25   wanted.  I don't object to that just because they missed teh

1    bar date.

2    Q   Could they bring a derivative successor liability claim

3    against YesCare?  That's the question, sir.

4    A   You may be asking the question a little bit differently

5    because I'm perhaps not following.

6    Q   Sure.  Could a claimant, who missed the bar date, bring a

7    derivative successor liability claim against YesCare?

8    A   A claimant that missed the bar date can file a claim in

9    this case asserting successor liability against YesCare.  Yes,

10    they can do that.

11    Q   They can file that.  Would that claim be released under

12    the settlement agreement?

13          MR. KAUFMAN:  Your Honor, I do have to object

14    because this is both speculative and requires a legal

15    conclusion.

16          THE COURT:  I'll sustain.

17    BY MR. MOXLEY:

18    Q   Let me ask you this question, Mr. Perry.  A pro se

19    claimant who missed the bar date would likely receive zero

20    dollars for his or her claim if the settlement is approved;

21    correct?

22    A   No, I would disagree with that.

23    Q   What's the basis for that disagreement, sir?

24    A   First of all, I just testified taht the Debtor hasn't

25    concluded that claims filed after the bar date would be

1    otherwise, you know, expunged or discharged or what have you.

2    We haven't concluded that.  And I'll -- you know, there are

3    other cases that I've been involved in where claimants that

4    did miss the bar date were considered in terms of their

5    participation in the claims.

6            So if a pro se claimant filed a claim after the bar

7    date, and the Debtor and other stakeholders discussed and

8    concluded that it would bring forth an exception, and sought

9    relief from Your Honor on that, I don't know what the process

10   would be legally.  But if there was a conclusion that a

11   claimant could assert a claim after the bar date, and that

12   claim could be allowed, and they asserted successor liability,

13   then they would absolutely be considered in the plan.

14   Q    Let's look again -- you looked at this on your Direct.

15   Let's look again at Debtor Exhibit 26.

16           THE COURT:  Counsel, just so we can kind of just do

17   a little housekeeping how much more do you think you have?

18           MR. MOXLEY:  Your Honor, I would need a -- I would

19   need a short break to determine that, to be honest with you.

20           THE COURT:  Why don't we -- why don't I give it to

21   you, just so I can get a sense of kind-of just timing.  I

22   think it would just be important, but I think that's entirely

23   fair, so would like three or four minutes make sense?

24           MR. MOXLEY:  Yes, it would, Your Honor.

25           THE COURT:  Okay.

1            MR. KAUFMAN:  And in terms of Redirect, Your Honor,
2    so far I've got just like five minutes or less.
3            THE COURT:  Okay.  Well, let's just see where we go.
4    Thank you.
5            COURT CLERK:  All rise.
6            THE COURT:  Well, actually one question that you
7    can answer for me in connection with the order, the proposed
8    order.  I don't know if -- I'm just doing this now so I don't
9    forget.  It's a little out of order.  Okay.  Paragraph 3, the
10   new paragraph 60, the Released Parties language.  Just a point
11   of clarification for me.  Just so it says:  Provided however
12   that the capital p, Parties do not release any claims.  I
13   don't know if that's intended to be Parties because Parties is
14   defined in the preamble as a certain group, or whether that
15   means Released Parties  Just --
16           MR. MOXLEY:  No.  That means that the Parties are a
17   subset of the Released Parties.
18           THE COURT:  I just wanted to make sure that that
19   was --
20           MR. MOXLEY:  That was intentional.
21           THE COURT:  Okay.  That's all I needed to --
22           MR. MOXLEY:  To the extent that there's a breach of
23   the agreement, the signatories retain all claims against each
24   other for the breach of the agreement.
25           THE COURT:  You got it.  That's what I needed to

1    know.  Thank you.

2         (Recess taken from 6:56 p.m. to 7:01 p.m.)

3         MR. MOXLEY:  We have a number of specific topics

4    that we have no addressed today yet, to still get to.  I

5    think, given the pace we've been going, I think on those

6    discrete topics we'll maybe go a little faster than we have

7    been.

8         I think it's probably 60 to 90 minutes.  And so

9    we're happy to come back or --

10        THE COURT:  Let's figure out another time where we

11   can complete this examination.  It doesn't make a lot of sense

12   to -- this is really important to a lot of people, including

13   the Debtors.

14        We'll pick days and the two days that I'll pick, I

15   know I'm going to be here and we're going to start early and

16   we're going to go really late on those.  And so we won't be

17   the afternoon; we'll go -- we'll go late and we'll get

18   everything done, so we're going to try to pick days that we

19   can get everyone in here.

20        So I'll remind, you're going to be under oath for a

21   long time.

22        So I just thank everyone.  I'm going to get with my

23   case manager today and we'll figure out two days where we can

24   block off and maybe start around 9:00 a.m. and then just go

25   'til 9:00 -- maybe 9:00 'til 8:00, 9:00 'til 9:00 on those

1    days, and see if we can do them consecutively back-to-back,

2    and see if we can get all the witnesses here.  Okay?

3             MR. MOXLEY:  Thank you, Judge.

4             THE COURT:  Thanks everyone.

5             MR. KAUFMAN:  Thank you.

6             COURT CLERK:  All rise.

7             THE COURT:  Everyone's excused.  I'm just going to

8    turn off computers.  You're welcome to go.  Thank you.

9             MR. MOXLEY:  Thank you, Your Honor.

10         (Proceedings adjourned at 7:02 p.m.)

11                            * * * * *

12        *I certify that the foregoing is a correct transcript*

13   *to the best of my ability produced from the electronic sound*

14   *recording of the proceedings in the above-entitled matter.*

15     */S./  MARY D. HENRY*

16   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19   *JTT TRANSCRIPT #68354*

20   *DATE FILED:  MARCH 15, 2024*

21

22

23

24

25