```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2             FOR THE SOUTHERN DISTRICT OF TEXAS

 3                      HOUSTON DIVISION

 4   IN RE:                    §    CASE NO. 23-90086-11
                               §    HOUSTON, TEXAS
 5   TEHUM CARE SERVICES, INC.,§    MONDAY,
                               §    MARCH 25, 2024
 6           DEBTOR.           §    9:31 A.M. TO 8:28 P.M.

 7            CONTINUATION OF TRIAL (VIA ZOOM)

 8        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE

 9

10

11

12      APPEARANCES:                SEE NEXT PAGE

13      COURTROOM DEPUTY/ERO:       ZILDE COMPEAN

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24
     Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.
```

1                    **APPEARANCES (VIA ZOOM):**

2

3   FOR THE DEBTOR:              GRAY REED MCGRAW, LLP
                                 Aaron Kaufman, Esquire
4                                Jason S. Brookner, Esquire
                                 Amber M. Carson, Esquire
5                                London England, Esquire
                                 1601 Elm Street, Suite 4600
6                                Dallas, TX 75201
                                 (469) 320-6111
7

8                                ANKURA
                                 Russell A. Perry, CRO
9                                Michael Rosano
                                 2021 McKinney Avenue
10                               Suite 340
                                 Dallas, TX 75201
11                               (214) 200-3699

12

13  OFFICIAL UNSECURED CREDITORS' STINSON LLP
    COMMITTEE:                   Nicholas Zluticky, Esquire
                                 Zachary H. Hemenway, Esquire
14                               1201 Walnut
                                 Suite 2700
15                               Kansas City, MO 64106
                                 (816) 842-8600
16

17

18  OFFICIAL COMMITTEE FOR TORT  BROWN RUDNICK LLP
    CLAIMANTS:                   Cameron Moxley, Esquire
                                 Eric R. Goodman, Esquire
19                               Jessica N. Meyers, Esquire
                                 Gerard T. Cicero, Esquire
20                               Meghan McCafferty, Esquire
                                 7 Times Square
21                               New York, NY 10036
                                 (212) 209-4800
22
                                 BERRY RIDDELL LLC
23                               Michael W. Zimmerman, Esquire
                                 6750 East Camelback Road
24                               Suite 100
                                 Scottsdale, AZ 85251
25                               480-385-2727

3

1                          **APPEARANCES (CONT'D):**

2


3    FOR THE U.S. TRUSTEE:         DEPARTMENT OF JUSTICE
                                   OFFICE OF THE US TRUSTEE
4                                  Andrew Jimenez, Esquire
                                   615 E. Houston Street
5                                  Suite 533
                                   San Antonio, TX  78205
6                                  (210)472-4640
                                   Fax: (210) 472-4649
7

8                                  OFFICE OF THE UNITED STATES
                                   TRUSTEE
9                                  Ha Minh Nguyen, Esquire
                                   515 Rusk Street
10                                 Suite 3516
                                   Houston, TX  77002
11                                 (202) 590-7962

12


13   FOR THE SETTLING PARTIES:     HAYWARD PLLC
                                   Melissa S. Hayward, Esquire
14                                 10501 North Central Expressway
                                   Suite 106
15                                 Dallas, TX  75231
                                   (972) 755- 7104
16

17   FOR M2 LOANCO LLC:            NORTON ROSE FULBRIGHT US LLP
                                   Kristian W. Gluck, Esquire
18                                 2200 Ross Avenue
                                   Suite 3600
19                                 Dallas, TX 75201-7932
                                   (214) 855-8210
20

21   FOR RMSE PLAINTIFFS:          WALKER & PATTERSON, P.C.
                                   Johnie J. Patterson, Esquire
22                                 4815 Dacoma Street
                                   Houston, TX  77092
23                                 (713) 956-5577

24
     (Please also see Electronic Appearances.)
25

4

1                              **INDEX**

2

3  WITNESS:              Direct      Cross      Redirect      Recross

4  RUSSELL PERRY
    By Mr. Kaufman       .           .          175           .
5   By Mr. Moxley        .           55         .             .

6  ISAAC LEFKOWITZ
    By Mr. Brookner      183         .          .             .
7   By Mr. Zluticky      .           207        .             .
    By Ms. Meyers        .           211        .             .
8
   SCOTT GRIFFITHS
9   By Mr. Moxley        377         .          479           .
    By Ms. England       .           417        .             .
10  By Mr. Hemenway      .           430        .             .
    By Mr. Patterson     .           456        .             486
11

12 EXHIBITS:                        Received

13 Exhibit 42                       203
   Exhibit 43                       199
14
   TCC Exhibit 116                  372
15

16                              ***

17

18

19

20

21

22

23

24

25

                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          **HOUSTON, TEXAS; MONDAY, MARCH 25, 2024; 9:31 A.M.**

2          THE COURT:  Good morning, everyone.  This is

3    Judge Lopez.  Today is March 25th.  I'm going to call the

4    9:30 a.m. case and continuation of trial in Tehum Care

5    Services, 23-90086.

6          I hope everyone had a great weekend.  And there

7    are about -- a number of people on the line I've been unable

8    to mute feature.  Why don't I take appearances in the

9    courtroom, and then maybe we can talk a little housekeeping

10   this morning?

11         Good morning, Mr. Kaufman.

12         MR. KAUFMAN:  Good morning, Your Honor.  For the

13   Debtor, Aaron Kaufman with the Gray Reed Law Firm.  Also,

14   from the Gray Reed Law Firm, Jason Brookner, Amber Carson,

15   London England.  And for the Debtor, you have Russell Perry,

16   the CRO and Michael Rosano from the Ankura.

17         THE COURT:  Oh, okay.  Good morning.  Good morning

18   to all of you.

19         Good morning.

20         MR. ZLUTICKY:  Good morning, Your Honor.

21   Nick Zluticky and Zack Hemenway for the Official Committee

22   of Unsecured Creditors.

23         THE COURT:  Good morning.

24         MR. MOXLEY:  Good morning, Your Honor, for the

25   Official Committee of Tort Claimants DCC, Cameron Moxley of

1  Brown Rudnick.  With me today, Your Honor, is Eric Goodman,

2  Jessica Meyers, Gerard Cicero, and Meghan McCafferty.  We're

3  also with our co-counsel, Michael Zimmerman.

4          THE COURT:  Okay.  Good morning.  Good morning to

5  all of you.

6          MR. JIMENEZ:  Good morning, Your Honor and court

7  staff, Andrew Jimenez, together with my colleague Ha Nguyen

8  for the United States Trustee.

9          THE COURT:  Good morning.

10          MS. HAYWARD:  Good morning, Your Honor.

11  Melissa Hayward here on behalf of the settling parties.

12          THE COURT:  Okay.  Good morning.

13          MR. GLUCK:  Good morning, Your Honor.

14  Kristian Gluck on behalf of M2 LoanCo.

15          THE COURT:  Ah.  Good morning, Mr. Gluck.

16          Mr. Patterson, good morning.

17          MR. PERRY:  Good morning, Your Honor.  Johnie

18  Patterson here on behalf of the RMSE plaintiffs, the

19  New York plaintiffs.

20          THE COURT:  Okay.  Good morning.  Let's see.

21  Anyone on the line?  There's about -- close to 50 people on

22  the line.  Let's just see.  Okay.

23          Mr. Kaufman?

24          MR. KAUFMAN:  So for housekeeping, we'll continue

25  with Mr. Perry.  I think Mr. Moxley said about 60 to 90 more

1   minutes with Mr. Perry.  We'll see where we are on redirect,

2   Recross after that.  And then we'll go to Mr. Lefkowitz, who

3   I understand we've kind of estimated, combined, about two

4   and a half to three hours.  Hopefully, we can stick to that

5   and then get to Mr. Griffiths, the TCC's witness where I

6   think we've estimated a combined two hours.

7           So hopefully we can get that done today.  If we

8   have extra time, we'll move to the TCC's witness --

9           THE COURT:  Okay.

10          MR. KAUFMAN:  -- Mr. Atkinson (phonetic).

11          THE COURT:  I didn't -- there was a new case they

12  filed a little while ago, and I didn't get it.  So we're --

13  the road is clear.

14          I have a little bit of housekeeping to just ask

15  the parties and really more for the lawyers.  Since we last

16  met, I've been giving a lot of thought to, obviously,

17  everything that's transpired and the revised order.

18  Everyone has done a fine job explaining it.  There's just

19  something I'm -- it's unclear to me, and maybe I can ask a

20  couple of questions, and it'll become, like, super clear to

21  me, but I wanted to make sure I kind of asked it on the

22  outset.

23          Here's the -- well, assuming I approve the motion

24  and the order, right, and the proposed form of order as

25  stated, what's enforceable?  What does the Court enforce

1   immediately there?  Or not immediately, but what can the

2   Court enforce between that and by the time we get to a plan,

3   if we get to one?

4           MR. KAUFMAN:  Do you want us to go through this

5   now?

6           THE COURT:  Yes.

7           MR. KAUFMAN:  Okay.

8           THE COURT:  In other words, it's been on my mind a

9   lot.  I'm still unclear as to what's enforceable.  I want to

10  call it stages.  I don't want to call it a --

11          MR. KAUFMAN:  Right.

12          THE COURT:  -- two-step because then it's just --

13  it feeds -- right.  But maybe for purposes of -- I approve

14  this order.  What's enforceable is question one.

15          MR. KAUFMAN:  Yeah.

16          THE COURT:  Question two is what findings would I

17  be making in this case that would be binding in a Chapter 11

18  plan.

19          MR. KAUFMAN:  So the first -- the answer to your

20  first question, Your Honor, I think what's enforceable is

21  that the agreement itself is enforceable.

22          THE COURT:  What does that mean?

23          MR. KAUFMAN:  Right.  So it is a binding contract

24  between the Debtor -- among the Debtor, the Committee, the

25  UCC, and the settling parties.  And I understand the issue

1  is the releases aren't yet enforceable, but the terms of the

2  agreement themselves -- so you have the settlement, the

3  initial settlement payments, the 2 million that's already

4  being held in escrow, as Your Honor will hear later this

5  morning --

6           THE COURT:  Right.

7           MR. KAUFMAN:  -- the second 2 million, pursuant to

8  the DIP order, which would come in within 72 hours of

9  approval, and then the fifth million dollars, another

10  million dollars under the DIP, which would come in

11  thereafter.  The 40 million would have to come in through

12  the plan.

13           THE COURT: Can the -- can the DIP money be used

14  immediately or is it held in escrow?

15           MR. KAUFMAN:  The DIP money could be used

16  immediately, pursuant to the DIP order.

17           THE COURT:  Right.

18           MR. KAUFMAN:  A separate --

19           THE COURT:  Separate, a separate DIP order.  So is

20  this an RSA?

21           MR. KAUFMAN:  We haven't thought of it that way,

22  but if you're -- if that gives Your Honor some comfort.

23           THE COURT:  Well, no.  I don't approve RSA.  So

24  that's the question.

25           MR. KAUFMAN:  Right.

1          THE COURT:  So is this an RSA?  In other words,
2    that's why I'm trying to figure out what's -- what --
3          MR. KAUFMAN:  I would say, Your Honor, it is not
4    --
5          THE COURT:  What am I being asked to do today?
6          MR. KAUFMAN:  -- an RSA because, when I think of
7    an RSA, I'm thinking we're kind of binding parties to vote a
8    certain way.  We're binding parties to certain planned
9    treatment, and we haven't done any of that other than --
10          THE COURT:  But you're agreeing --
11          MR. KAUFMAN:  -- the narrow releases.
12          THE COURT:  -- you're agreeing to agree on the
13   terms of a plan and what payments would look like if there
14   was a plan.  Right?  No.  You are.  You're agreeing that
15   somebody's going to put in the money.
16          MR. KAUFMAN:  Yes.
17          THE COURT:  And they're going to be entitled to
18   releases.  Are the releases that I approve, if I were to
19   approve under this -- are my -- in other words, are those --
20   is someone going to -- will I be making findings today in
21   connection with the Settlement Agreement that would be
22   binding as to whether I've approved the releases under the
23   plan?
24          MR. KAUFMAN:  I think the answer is no, and I'll
25   let other parties speak who are in support of the Settlement

1  Agreement.

2         THE COURT:  No.

3         MR. KAUFMAN:  But my understanding --

4         THE COURT:  I want the Debtors to understand it,

5  and that's what I'm trying to -- in other words, this is me

6  just trying to figure out what exactly I'm being asked to do

7  today.  And then -- because we don't have a plan in front of

8  us.  So I just want to understand kind of what are we

9  locking in in connection with the Settlement Agreement

10 that's separate than what will happen in connection with the

11 plan?

12        MR. KAUFMAN:  So separate, what would happen under

13 a plan and what we're hoping to engage with the TCC further

14 on, once the Settlement Agreement is approved, is we still

15 have a lot of things that would need to go into a plan.

16        THE COURT:  I know.

17        MR. KAUFMAN:  We need --

18        THE COURT:  But I'm just trying to figure out --

19 but what am -- what am I locking in today by approving this

20 agreement?  That's what I don't --

21        MR. KAUFMAN:  Yeah.

22        THE COURT:  That's what I'm -- I --

23        MR. KAUFMAN:  The only thing we're locking in, as

24 I understand, as the Debtor understands it, is the DIP funds

25 that would help us get through so that we can propose the

1   plan of liquidation and the releases, the narrow releases

2   for the parties that are contributing the additional 40

3   million, pursuant to a plan --

4           THE COURT:  So I'll throw --

5           MR. KAUFMAN:  -- but nothing else.

6           THE COURT:  -- I'll throw a hypothetical out at

7   you.   If -- let's assume the plan -- they don't agree to

8   anything.  They're not -- you've got to put your own plan --

9   Debtors and Creditor.  A tort claimant votes no in, let's

10  just say, a class, a hypothetical class.  So you've got to

11  satisfy 1129(a)(7).  Is the liquidation analysis going to

12  show that there's a settlement that Lopez approved for this

13  amount of money?  And so there's the bag of money and that

14  this is what you would get under the plan.

15          MR. KAUFMAN:  So, as Your Honor may recall from

16  Mr. Perry's first day of testimony a few weeks ago, we gave

17  a hypothetical waterfall that includes some assets that are

18  not dealt with under the settlement.  That's the --

19          THE COURT:  Agreed.

20          MR. KAUFMAN:  -- that's the ECR.  That's the --

21          THE COURT:  That's what I'm saying.  But would you

22  include this -- the pot of money that, pursuant to the

23  settlement as part of the liquidation analysis, say?

24          MR. KAUFMAN:  Of course.

25          THE COURT:  But there's going to have to be a

1    separate valuation?  In other words, are the findings that

2    I'm making about the value of those claims going to be

3    binding in in a Chapter 11 plan?  The only reason I'm asking

4    is the question is do I have to start thinking about 1129

5    factors today?  Or am I going to be locking in findings that

6    I would be making under 1129?  Are essentially the Tort

7    Claims' Committee going to have two cracks at the -- two

8    cracks at this?  That's what I'm trying to figure out.

9              MR. KAUFMAN:  It -- Your Honor, I don't -- I don't

10   understand that there are any findings today that lock in

11   the Court's findings under 1129(a) in a plan that hasn't yet

12   been filed.  So if that gives the Court some comfort --

13             THE COURT:  But if I approve a settlement and the

14   settlement approves says that the plan will include

15   releases, and I've approved that under 9019, have I -- have

16   I approved the releases?

17             MR. KAUFMAN:  I think --

18             THE COURT:  I bet you the folks who are going to

19   put in $40 million probably think I did.

20             MR. KAUFMAN:  -- I think the Court is making

21   findings that the settlement is a reasonable -- a fair and

22   reasonable resolution of this specific bucket shopping cart

23   --

24             THE COURT:  But --

25             MR. KAUFMAN:  -- of causes of action.

1          THE COURT:  -- but what's binding today?

2          MR. KAUFMAN:  That would be binding.  That would

3   be binding in a plan.  So we're not --

4          THE COURT:  No, no, no.

5          MR. KAUFMAN:  -- proposing under a plan a separate

6   settlement.

7          THE COURT:  Right.  So you can't -- the Debtor

8   can't -- the Debtor has agreed to lock itself into proposing

9   a plan that says this, and parties have agreed to put that

10  in there.  But is that an RSA?

11         MR. KAUFMAN:  I don't think it is an RSA because

12  --

13         THE COURT:  Tell me why it's different.

14         MR. KAUFMAN:  Because an RSA -- my understanding

15  of an RSA -- and maybe we're discussing different things.

16         THE COURT:  It's just a restructuring support

17  agreement.  Two -- a bunch of parties agree, and everybody

18  is bound by the terms of that agreement.

19         MR. KAUFMAN:  An RSA --

20         THE COURT:  In other words, it -- is it --

21         MR. KAUFMAN:  -- locks in voting.  An RSA locks in

22  certain classification of claims often.

23         THE COURT:  The committee -- the committee -- the

24  committee has agreed; right?  If people are providing

25  releases, the committee has agreed to support.  So have the

1   release parties.  So have the Debtors.  That's locking --

2          MR. KAUFMAN:  But this Settlement Agreement

3   doesn't lock in a specific way of treating Creditors other

4   than the few proofs of claim by the settling parties that

5   they're agreeing to release.  That's all it does with

6   respect to claims against the estate.  There's no -- there's

7   no allocation of proceeds to specific Creditors.  There's no

8   treatment of Creditors in the Settlement Agreement.  That's

9   all up for negotiation after the Court approves the

10  Settlement Agreement, and TCC reserves its right to object

11  to anything we do if they don't (crosstalk).

12          THE COURT:  What's binding?  What -- how does the

13  Settlement Agreement then get used in connection with the

14  Chapter 11 plan?

15          MR. KAUFMAN:  So a Chapter 11 plan often includes

16  settlements.

17          THE COURT:  Uh-huh.

18          MR. KAUFMAN:  In fact, we proposed that back in

19  September and October.  And then we decided, you know what,

20  let's bifurcate that.

21          THE COURT:  Why --

22          MR. KAUFMAN:  But a plan --

23          THE COURT:  -- why was that?  Why was that?  I

24  guess you don't have to tell me that.

25          MR. KAUFMAN:  I mean, candidly, Your Honor,

1    reading the Court's view of how the Court wanted to take

2    these up -- take up the issues of whether the settlement is

3    fair and reasonable and whether the allocation of proceeds

4    were fair and reasonable.

5            THE COURT:  You read that from me?

6            MR. KAUFMAN:  We -- if we misread it, we

7    apologize.

8            THE COURT:  No, no, no.

9            MR. KAUFMAN:  That was -- is our read.

10           THE COURT:  You don't have to apologize.  I'm just

11   wondering.  In other words, but are -- am I giving -- are we

12   essentially setting ourselves up where the Tort Claimants'

13   Committee is going to have two cracks -- two cracks at this?

14   Right?  Like saying that the settlement isn't fair and

15   reasonable here and then getting to a plan and then saying

16   don't approve any of the -- don't approve any of the --

17   fine, Lopez.  We lost on round one, but here comes round

18   two.  Don't approve any of these releases, and you're not

19   bound to approve any of the releases.  And if I can prove to

20   you that one of these parties shouldn't be released, then

21   the whole Settlement Agreement gets blown up again.

22           In other words, am I giving the Tort Claimants'

23   Committee and the, you know, potentially tort claimants and

24   the United States Trustee essentially -- not giving them,

25   but do -- would they essentially have two cracks at the

1  apple to stop the Settlement Agreement?  I just view it

2  differently if someone puts in all the money or has agreed

3  to say -- in other words, it's one thing if somebody says,

4  we're going to settle, and I'm going to put $40 million up,

5  making a number up.  I'm putting $40 million today.  It's

6  sold.  Approve this settlement, and this is the sale.  I'm

7  putting $40 million, whatever, and we can go forward in a

8  plan.

9         It's a different kind of deal where you're saying

10  everything is contingent upon the filing of a plan.  I don't

11  think I've ever seen anything like this.  That's why I'm

12  asking.  I'm not saying it doesn't exist because I haven't

13  seen every plan, obviously, all across the country, but it

14  just -- it's what I'm trying to understand in terms of

15  what's being locked in today because there's a lot of

16  testimony.

17         Are the -- are the -- are the findings -- right?

18  The findings would be binding; right?  In other words,

19  right, it would have a collateral estoppel effect for sure

20  in terms of, you know, what Mr. Perry sent me.  Is he going

21  to get back up again and have to go through a separate

22  cross?  That's what I'm trying to figure out.  I think, if

23  the answer is no, then I think I just need to know that.

24         MR. KAUFMAN:  I think what we're talking about, in

25  a normal plan, where we put everything on the table as we

1   did in September --

2           THE COURT:  Uh-huh.

3           MR. KAUFMAN:  -- a settlement is one component of

4   how we're addressing, how we are valuing, how we're dealing

5   with certain estate causes of action under that plan.  What

6   we're doing, instead, today, and asking the Court to do, is

7   approve the Debtor and the UCC's way of addressing a narrow

8   subset of the causes of action, the estate causes of action,

9   so that we can take -- we can monetize those causes of

10  action.

11          And so the binding -- what you're asking -- what

12  Your Honor is asking is what is binding when we get to

13  confirmation is the Debtor and the UCC have addressed the

14  narrow estate causes of action in the plan, and the Court

15  has already approved the way that that is being done.  The

16  releases -- I -- we're asking the Court to approve that the

17  way of dealing with that, the monetizing, and in exchange

18  for monetizing the estate causes of action, we're giving

19  these releases that will be in a plan.  But I do think --

20          THE COURT:  Right.  But the --

21          MR. KAUFMAN:  -- just so we're clear --

22          THE COURT:  -- money doesn't come in until there's

23  a final order.

24          MR. KAUFMAN:  Correct.

25          THE COURT:  Right?

1           MR. KAUFMAN:  The additional 40 million.  Now we
2   do get the prefunding.
3           THE COURT:  You get the prefunding.
4           MR. KAUFMAN:  The DIP.
5           THE COURT:  The DIP sum.
6           MR. KAUFMAN:  Yes.
7           THE COURT:  Yeah.
8           MR. KAUFMAN:  Which is essential to maintain that
9   the estate is administratively solvent.  We can get a plan
10  confirmed, or we can file a plan.  We're not asking the
11  professionals to work for free --
12          THE COURT:  No, no, no.
13          MR. KAUFMAN:  -- as Mr. Goodman will appreciate.
14          THE COURT:  No.
15          Mr. Goodman, what's your understanding of what the
16  -- the way this -- what I'm being asked to do?
17          MR. GOODMAN:  Can you hear me okay,, Your Honor?
18          THE COURT:  Yeah.  Yeah.  I don't think there's a
19  right or wrong answer.  I just need -- I'm -- I've been
20  thinking about this.  In other words, what am I -- what's
21  enforceable?  So when I sign the order, parties can come in,
22  and then I -- what I don't want to do is come two, three
23  months down the line, if I approve this one way or the
24  other, or assuming that I would approve it, but just
25  assuming that it would, then there's confusion about what I

1    did two, three months down the line.

2          I'd rather do it now, and I'd rather think about

3    these issues before the parties, you know, get to closing

4    and then I ask the questions.  I just think that'd be highly

5    unfair to all the parties.

6          MR. GOODMAN:  So, Your Honor, Eric Goodman, Brown

7    Rudnick, on behalf of the TCC.  I can share with you my

8    understanding of it.  But, of course, we're not the ones who

9    are the parties to (crosstalk) --

10         THE COURT:  No.  I know.  But what do you think --

11         MR. GOODMAN:  Yeah.

12         THE COURT:  -- is happening?

13         MR. GOODMAN:  So, first, I will say that we've

14   never seen it done this way either.  In all the mass tort

15   cases that we have worked on, ordinarily, what we see happen

16   is that the Debtor wants to do everything through a plan of

17   reorganization.  And the reason for that is, again, the --

18   sort of the exchange is someone's paying money, right, into

19   the plan, whether it's as part of the settlement, 524(g)

20   injunction, whatever mechanism is occurring there, the money

21   is being paid.  And in return for that, they're getting the

22   benefit of the releases that are set forth in the plan.

23   Right?

24         So that's the ordinary way that we see it.  I'm

25   certainly not objecting to this process because I think it

1    does give us two bites at the apple if you will.  We get to

2    litigate the 9019 motion and then, of course, turn around

3    and litigate all of the plan confirmations' issues as well.

4    So I'm not going to, you know, take what's been given to us

5    in that sense.  But I will note, first off --

6             THE COURT:  Mr. Goodman, I guess part of what I'm

7    trying to think through -- the issue -- is, if it's the case

8    that you would then have two opportunities -- and let's just

9    say to attack releases.  I'm just making up one aspect of it

10   -- I'd rather everyone know that now or at least my views on

11   whether you would have that perspective now or not before we

12   actually kind of run into disagreement, you know, and

13   several months down the line, assuming this got approved.

14   That's what I'm really just trying to make sure that I

15   understand -- that we're all really clear as to what this

16   does.  And then, if that's the case, then there'll be

17   another opportunity.  Or is this, today, binding parties,

18   you know, for a potential plan several months down the line?

19   That's what I'm just trying to make sure that's -- that

20   everybody's crystal clear about the way we all think about

21   this, so that there's no confusion, so when I sign this or

22   don't sign it, that everybody's really clear about what that

23   means.

24             MR. GOODMAN:  So the plan releases are currently

25   not before the Court --

1          THE COURT:  Uh-huh.

2          MR. GOODMAN:  -- by virtue of the fact that they

3   are releases in a plan of reorganization.  The plan isn't

4   before the Court today.  What's before the Court is the 9019

5   motion as well as our motion to dismiss the bankruptcy case

6   as a bad-faith filing.  So those are the two things that are

7   before the Court.

8          What's strange about the settlement that we're

9   looking at here -- and I actually do think it's an RSA, and

10  I'll get into that in a minute as to why I think it is an

11  RSA.  But if you look at the settlement, right, it's akin to

12  a conditional sale.  Right?  You have -- the Debtor saying I

13  have these estate causes of action.  Right?  The estate

14  causes of action are really the only Debtor's -- the

15  Debtor's only assets.  So that's the only thing that's

16  available for them sort of to sell or to settle in this

17  context.

18         And what they're -- my understanding of what

19  they're proposing is they're saying we have a buyer, right,

20  who wants to purchase these estate causes of action.  That

21  buyer has agreed to a price.  But the sale, even if it's

22  approved by the Court, pursuant to the 9019 motion, is still

23  conditioned upon this Court approving the releases and the

24  plan which are not before the Court at this time.

25         So it's really a conditional sale.  And if you

1  look carefully at the changes that were made to the proposed

2  order, it's a sale that doesn't actually go effective until

3  there is a final non-appealable order confirming a Chapter

4  11 plan of reorganization.  Right?

5          So I don't think Mr. Lefkowitz actually parts with

6  the settlement proceeds or really would pay anything until

7  -- you know, the court would have to first approve the 9019

8  motion.  The Court would then have to deny the motion to

9  dismiss, obviously.  Then we would have to get through the

10  Disclosure Statement hearing.  We'd have to figure out how

11  to do plan voting with a population that's incarcerated.

12          Then you would have a Contested Confirmation

13  Hearing and then, you know, all the appeals that would

14  follow from that.  You wouldn't actually get to final

15  non-appealable order until all the appeals have then been

16  exhausted.  That would be the point in time where the sale,

17  if you think of it as a sale, would finally be consummated.

18  Right?

19          So it's not up until that point way, way down the

20  road that you would actually see any of the money coming in

21  and being available to pay Creditors in this case.  That's

22  my understanding of how they have just set this up from a

23  mechanic's standpoint if that's helpful to Your Honor.

24          THE COURT:  Yeah.  No, no.  It is.

25          MR. GOODMAN:  And --

1    THE COURT:  And just what I'm trying to figure out

2    -- and maybe the question is better set for, like, M2 and

3    Mr. Lefkowitz's counsel.  What do you think you're getting

4    if I sign this order in connection with the plan?  It may be

5    helpful for me to -- go ahead, Mr. Goodman.  I've just been

6    thinking.  I just -- I don't want someone who signs a

7    Settlement Agreement to have a different understanding than

8    what I think I'm being asked to do, and I'm just -- I just

9    want to air all this out at the beginning.  But I'll give

10   you --

11   MR. GOODMAN:  Yeah.

12   THE COURT:  -- I'll give you time to finish.

13   MR. GOODMAN:  I think this is really helpful, but

14   I have a couple other points to get to, but I think this is

15   a very important conversation.  The issues that you're

16   raising are things that we've been thinking through as well.

17   To the extent that they are getting something right now by

18   the Court approving a settlement or a sale that doesn't

19   actually go effective for, you know, two, three years down

20   the road, to the extent that they are getting something, if

21   there is going to be any kind of collateral estoppel issues,

22   you know, that raises a concern that we have in terms of

23   appeals that would occur prior to plan confirmation.  Right?

24   I mean, ordinarily, when you have a 9019

25   settlement and someone says, I'm settling -- you know, let's

1    get out of the estate causes of action framework.  Let's

2    just say that the Debtor has a claim against someone based

3    on litigation that was running prior to the bankruptcy.  So

4    it's not like a bankruptcy type cause of action.  It's just

5    a lawsuit that was pending.  And they come before the Court

6    and they say, we would like to settle this lawsuit.  The

7    defendant -- you know, we've been in the world of litigation

8    for two years.  We've finally reached a resolution.  They're

9    willing to pay this money today to settle that claim.  The

10   Court hears the 9019 motion.  You say approved.  The money

11   is then paid.  You know, the Settlement Agreement is

12   executed, and that's kind of a done deal.

13           Ordinarily, that would be considered a final

14   non-appealable order, right, and that could be then taken up

15   if someone objected and didn't like it.  This is, again, I

16   would call strange land and not something that I'm

17   accustomed to seeing in mass tort cases is because, even

18   though you have before the Court the 9019 motion, you have

19   before the Court this proposed sale of estate causes of

20   action, they're not actually willing to consummate that sale

21   transaction until -- again, this is just based on the

22   documents that they have filed -- until there is a final

23   non-appealable order confirming the plan which, again, is

24   not before Your Honor.  Right?

25           So if you were to say, for example, I am

1   approving the settlement today, practically speaking, what

2   that means is that you've set a ceiling, right, in terms of

3   the amount of money that the release parties will pay.  I

4   can't imagine, practically speaking, a scenario where you

5   say, I approve the 9019 settlement -- you said that this was

6   fair and reasonable.  That means the dollars, practically

7   speaking, aren't going to go up.  That's why I said at the,

8   you know --

9            THE COURT:  Because --

10            MR. GOODMAN:  -- opening argument that you've now

11   sort of locked the case path into a Contested Confirmation

12   Hearing because there's just, at that point, not going to be

13   enough dollars in the system, right, to ever reach any kind

14   of resolution involving the tort claimants.

15            But in terms of the reason why I think it's an

16   RSA, if you think through sort of the RSA or kind of the

17   essence of an RSA, right, it's folks saying, if the plan

18   includes these provisions, I will support it.  Right?  I

19   mean, whether it's the bondholders saying we will vote for

20   it; if it's the party who's going to pay the money saying, I

21   will pay the money; if the Debtor is saying, I will propose

22   this plan, like, it's sort of like the stepping stone to try

23   to get to a plan of reorganization.  Right?

24            THE COURT:  Is this like -- is this like exit

25   financing?

1          MR. GOODMAN:  I wouldn't -- exit financing is an

2    interesting way of thinking of it, but exit -- not really

3    because exit financing would occur upon exit from

4    bankruptcy.  Their settlement doesn't actually pay until

5    entry of final non-appealable order.  So that's, like, two

6    years after exit financing.  So it's not exit financing

7    either.

8          What you have is you have a population, like a

9    subset of this bankruptcy proceeding.  Right?  And these are

10   interesting proceedings because you have multiple parties

11   and groups and constituencies, committees representing

12   different groups.

13         You have certain parties who've said we've come

14   together and we have agreed on a framework for a plan.

15   Right?  And so long as the plan contains these things, one

16   of which is the, you know, full and complete release that

17   Mr. Lefkowitz and the M2 and all of those parties are

18   demanding, as long as the plan satisfies these conditions,

19   then we support it, right, that we're on board and we want

20   to move forward, and we will, you know, support the

21   transaction as it's proposed.

22         But, like, an RSA, typically speaking, it's with a

23   subset of parties in a Chapter 11 case.  Right?  You could

24   begin a case with an RSA between the Debtor and bondholders.

25   Or the RSA could be with the Debtor and certain

1   constituencies, and then maybe a committee signs on to it

2   later on.  But what you don't have here is the other parties

3   in interest, right, aren't part of this.

4           Like, the TCC is objecting.  You have individual

5   tort claimants who are objecting.  So we're not parties to

6   the Settlement Agreement.  In fact, we're the opposite.

7   Right?  We're opposing it.  We're saying, you know, the

8   Honor -- Your Honor shouldn't approve it.

9           THE COURT:  I sat watching -- I thought about it

10  over the weekend, and I thought about it when I picked this

11  up after a very gut-wrenching game last night.  I am a

12  University of Houston -- and I just kept -- I kept coming

13  back to, you know, am I just approving the DIP money coming

14  in?  Is that the only enforceable thing that I'm doing?  And

15  so that's then got me to question.  And I think a lot about

16  kind of -- you know, I've given a lot of thought to -- and

17  obviously I haven't reached any conclusions.  We're not at

18  the close of evidence, but I've been thinking a lot about

19  kind of what everyone's understanding as to what they're

20  getting.  And I think a lot about Mr. Patterson, who was

21  here saying, you know, my client's not going to get anything

22  unless they get something here, but is this what locks it

23  in, or is it the plan?

24          You know, I grew up in Queens.  I know exactly

25  where Riker's Island is.  I -- so these things are certainly

1   on my on my mind, but, you know, what I -- what I would -- I

2   just want to make sure everybody's on the same page as to

3   what this settlement would do or not do and what's -- that's

4   why I start with the question of, first, principles.  What's

5   -- I got the relief requested.  But what's enforceable?

6           MS. HAYWARD:  Your Honor, if I may?

7           THE COURT:  Yeah.

8           MS. HAYWARD:  Melissa Hayward for the settling

9   parties.  I think from the settling parties' perspective, we

10  are asked -- we are asking the Court to approve a

11  settlement.

12          THE COURT:  Uh-huh.

13          MS. HAYWARD:  The releases are effectuated as part

14  of that settlement.  The releases do not become effective

15  until there is effective date under a plan.  Right?  And

16  that's when the payment comes in.  But to answer Your

17  Honor's question, yes, I believe that the Settlement

18  Agreement, and to the extent Your Honor approves it and

19  finds that it's a valid exercise of the Debtor's business

20  judgment, the Settlement Agreement, upon being approved, is

21  effective.

22          Now it does not determine the terms of the plan.

23          THE COURT:  Kind of like a sale, subject to --

24          MS. HAYWARD:  Subject.  Exactly, Your Honor.  It's

25  like a conditional sale, subject to, you know, other things.

1   And so --

2             THE COURT:  So certain closing conditions.

3             MS. HAYWARD:  Exactly.

4             THE COURT:  Maybe you get there, maybe you don't.

5   But I've approved --

6             MS. HAYWARD:  That's exactly right.

7             THE COURT:  -- I've approved everything today.

8             MS. HAYWARD:  That's exactly right.  So I do not

9   believe that the Committee has a second bite at the apple as

10  far as the releases go because the plan -- while the plan

11  will incorporate those releases, the releases are actually

12  effectuated through the approval and entry of a Settlement

13  Agreement.  The obligations to make the settlement payment

14  are effectuated upon the approval of a Settlement Agreement

15  here.

16            Now they're conditioned upon, obviously,

17  confirmation of a plan and the effective date.  But what we

18  are asking the Court to do today --

19            THE COURT:  In other words, somebody couldn't come

20  in -- well, and, I guess, somebody could, but,

21  theoretically, if someone were to challenge -- and I'll just

22  use M2 because it's just an easy one -- said, they are not

23  entitled to a release, Your Honor, and/or -- you know,

24  they're not entitled to the releases for X, Y, and Z reasons

25  under this plan, theoretically, that --

1           MS. HAYWARD:  That ship will have sailed.

2           THE COURT:  That ship will have sailed because --

3           MS. HAYWARD:  Yes, Your Honor.

4           THE COURT:  -- it's been settled.

5           MS. HAYWARD:  Because it's -- because the Court

6    has approved a settlement finding that it is a reasonable

7    exercise.  The terms of the settlement are approved.

8           THE COURT:  Right.

9           MS. HAYWARD:  Right?

10          THE COURT:  But here's the confusion for me:  is

11   that all that is contingent upon a plan that none of us have

12   seen what it looks like.  So, in other words, if there's a

13   plan that is just -- let's just say it gives -- I'm coming

14   up with a -- I'm not saying anybody would do this.  I'm

15   coming up with a really bad example, but it makes the point.

16   What if the plan says, you know, non-tort claimants, if you

17   opt out, you get 2 percent?  You know, tort claimants --

18   tort claimants, you get 2 percent if you opt out.

19          MS. HAYWARD:  Uh-huh.

20          THE COURT:  Everybody else gets 98 percent.

21   There's no way in the world I could -- I could approve a

22   plan that would say something like that, but, if you had the

23   votes, then, theoretically, someone would be able to say,

24   like, Your Honor, like, this is exactly what we said we --

25   this was exactly what was going to happen.  You know, this

1   is -- we're now creating -- because this -- your original --

2   your original version of the Settlement Agreement was like a

3   9019 with a death trap provision in it.  Right?  Like, you

4   can -- yes, it was because you can opt out.  You know, you

5   can opt out in the settlement.  So you kind of took that

6   out.

7          But where -- it's still subject -- it's all

8   subject to kind of a plan that we haven't seen, and that's

9   what I'm wrestling with.  How can I have it subject to a

10  plan when I don't know how these releases fit within the

11  greater structure of a plan that we just haven't seen?

12          MS. HAYWARD:  Well, Your Honor, I don't think that

13  the releases do fit within the structure of a plan.  The

14  releases are effectuated from the settlement.  Right?  The

15  plan will incorporate those releases.

16          THE COURT:  That's what I mean.

17          MS. HAYWARD:  But --

18          THE COURT:  But then how do -- say the plan

19  incorporates the releases in a plan that I just -- that just

20  makes me really uncomfortable.  That's the -- that's the

21  question.  And what do we do there?

22          MS. HAYWARD:  Then the plan doesn't get confirmed.

23  Right?  And then we have that issue.  But the settlement has

24  nothing to do with the terms of a plan.  I mean, it's

25  contingent upon some plan going effective at a -- at a later

1    date.  But the settlement itself has nothing to do with the

2    terms of a plan or a confirmed plan.

3              THE COURT:  That's why this feels like an RSA.

4    Right?  Because no money has to exchange until there's a

5    final non-appealable order.  Right?  Nobody's bind --

6    nobody's bound on the -- like, the effective -- the

7    effective date could occur and the -- well, it's even

8    unclear when the effective date would be because the plan

9    couldn't go effective until there's a -- until the

10   settlement kicked in, until the $40 million at least --

11             MS. HAYWARD:  Right.

12             THE COURT:  -- came in.  So I'm really confused as

13   to --

14             MR. GOODMAN:  Your Honor, if I could, I think,

15   answer the question.  The releases in the 9019 cannot be

16   effective upon the entry of an order approving the

17   settlement.  The reason for that is that they are explicitly

18   conditioned upon the entry of a final non-appealable order

19   --

20             THE COURT:  Right.  Somebody can go sue.

21             MR. GOODMAN:  -- of a plan.

22             Right.  So let's just hypothetically play this

23   out.  Okay?  The Court says, based on the evidence, that you

24   approve the settlement.  Right?  So that's approved.  The

25   Court says I'm going to approve the DIP order.  I'm going to

1   deny the motion to dismiss.  We then proceed to Disclosure

2   Statement.  There's objections.  The Court approves the

3   Disclosure Statement.  Then we go to solicitation.  Then we

4   go to a Contested Plan Confirmation Hearing.  We argue

5   unfair discrimination.  We argue best interest of Creditors.

6   We object to the releases that are in the plan because now

7   they're finally before the Court for the first time.

8          If the Court were to then confirm that plan, it

9   goes up on appeal and joins -- at that point, it could also

10  join the appeals of the 9019 and the motion to dismiss.  And

11  those appeals finally work themselves through the system.

12  And you finally get it to the day where you have a final

13  non-appealable order confirming the plan of reorganization

14  and approving the releases, right, that are the sort of

15  central issue.  Like, again, without the releases, there's

16  no money.  Right?  That's the condition.  Right?

17         If at that point in time you have a denial of

18  certiorari by the U.S. Supreme Court, the Fifth Circuit's

19  opinion is now a final, you know, non-appealable order.

20  Mr. Lefkowitz and the M2 Loan parties could say, nah, never

21  mind.  I'm not paying money.  Right?

22         Because, at this point, they still have the money

23  in their bank account.  Right?  They haven't paid anything

24  to anyone at this point.  They could say no, at that point

25  in time, because they haven't satisfied that condition.

1   They're not going to get released.  They're not going to be

2   in a situation where they've been released, you know, and

3   they have gotten the benefit of the sale transaction without

4   actually paying the money.  That'd be like saying, you know,

5   I showed up at 363 Sale.  I was the highest bidder.  I won

6   the auction.  The Court approved the sale.  Right?  And then

7   I never paid the sale money.  You don't own the property.

8   Right?  You've got to pay it.

9         So it's not until you have that final step.

10  Right?  You have to have final non-appealable order plus

11  payment, right, in order for the, quote, releases to be

12  effective.  We're not going to be a situation where the

13  Debtor is saying, I am selling the property.  I am releasing

14  all of my causes of action, right, without actually getting

15  the money in the door.  Right?

16        And because they have put that payment date so far

17  down the road in the future, right, I don't think that you

18  could say that the releases are effective upon the Court

19  entering an order approving the 9019 because, again, the

20  settlement itself is contingent upon the plan coverage.

21        THE COURT:  I think what Ms. Hayward is saying is

22  that, essentially, the inclusion of a party as a release

23  party probably couldn't be challenged because I would have

24  approved it in the settlement (indiscernible).  In other

25  words, not whether they would actually be released, but, you

1    know, someone couldn't try to pick off and say

2    (indiscernible) or someone, you know, who's a release party.

3    DG Realty Management can breathe a little easier in the

4    sense that because, you know, they can't be taken out.

5    That's what I was trying to figure out.  Can someone take

6    them off?

7              MR. GOODMAN:  But can --

8              THE COURT:  Can someone take -- I don't want to

9    stop naming names here, because then it starts getting

10   weird, because I --

11             MR. GOODMAN:  But, again, Your Honor --

12             THE COURT:  FTI, right, Capital.  You know, can

13   they be taken out?  Or am I making that decision now?

14   That's where I'm going.

15             MR. GOODMAN:  But, again, if the money's never

16   paid, right --

17             THE COURT:  No, no.  I agree with that there.

18             MR. GOODMAN:  Right.

19             THE COURT:  I guess what I'm saying is -- but am I

20   -- am I -- am I, in essence, agreeing that these folks

21   should be entitled to a release under a Chapter 11 plan

22   today?  That's what's in my --

23             MS. HAYWARD:  Your Honor is approving release as

24   part of a settlement -- that releases should be given, not

25   as part of a plan but as part of the terms of this

1    Settlement Agreement --

2              THE COURT:  But then why do you want it in a plan?

3              MS. HAYWARD:  -- which will be incorporate --

4              THE COURT:  But then why do you want it in a plan,

5    then?  Why do you need both?  Because that's not what you're

6    saying.  What you're saying now is I'm approving it today.

7    But then why am I just not approving it today?  Why does it

8    need to be in a plan if that's what the parties need?

9              MR. GOODMAN:  From the Debtor's perspective, I

10   think it was because we were concerned that doing releases

11   of this many parties outside of a plan might give the Court

12   some heartburn.  If the Court is willing to grant these

13   releases outside of a plan, we can probably go back into our

14   --

15             THE COURT:  Well, I'm sure they'll take it.  Yeah.

16   But the problem is they're not going to put the 40 million

17   in.

18             MR. GOODMAN:  Correct.

19             THE COURT:  But --

20             MR. GOODMAN:  I think we can have some

21   negotiations.

22             MS. HAYWARD:  I --

23             THE COURT:  No, no, no.  I got it.  I'm just

24   thinking out loud here.

25             Ms. Hayward --

1          MS. HAYWARD:  I think a lot of this, Judge, was

2  leftover from sort of the original structure --

3          THE COURT:  No, no, no, no.  I got it.

4          MS. HAYWARD:  -- and sort of how it was --

5          THE COURT:  I think it makes sense.  That's why

6  I'm just trying to figure out today -- I think, if parties

7  agree to be release parties, they should know exactly what

8  -- if I sign an order, what they're getting today or, you

9  know, at some point or not.

10          MR. GOODMAN:  I --

11          THE COURT:  Mr. Goodman, I've got questions for

12  you, too.

13          MR. GOODMAN:  Yeah.

14          THE COURT:  Because I've been doing a lot of

15  thinking about this.  So the dismissal that you're -- that

16  the Tort Claims' Committee is -- they're seeking it to be --

17  my understanding it's preferred to be structured.  Right?

18  Or just --

19          MR. GOODMAN:  I'll take any dismissal.

20          THE COURT:  Well, no, no.  Because I was going to

21  say because that's an almost an -- a non-consensual one, in

22  this case, is almost a nonstarter for me; so that won't

23  happen.  So the question is, if the case is dismissed, then

24  it -- then it's a -- it's a strong hammer, and we all go --

25  everybody goes their own ways.  That's what's on the table.

1    And I'm not -- I'm not structuring it.  I don't think the

2    code requires me to do it.  And I think, under these facts,

3    where I've got folks here to say, no, I'm not going to even

4    consider this proposal -- I'm going to dismiss it -- but

5    we're going to do this in a way where we're setting up a

6    bunch of other things that start to look planny to me as

7    well, I think is almost a nonstarter.

8            I think what's on the table is maybe denial of

9    everything or telling the folks to go back and put something

10   in a plan or dismissing the case, and everybody goes where

11   they are, and the case ends.  That's what's, to me, in my

12   mind, on the table because -- and I'm not sure that's -- I

13   just think this case is so different than other even cases.

14           I think YesCare is just -- Tehum is just -- it's

15   different than Aero (phonetic) or all the other cases, in my

16   mind, for a lot of different reasons.  I'm not saying for

17   better or for worse.  It's just different.  In other words,

18   you've got a different set of facts, a different parent --

19           MR. GOODMAN:  Yeah.

20           THE COURT:  -- if you will.

21           MR. GOODMAN:  Well --

22           THE COURT:  But I don't -- but I -- I'm just

23   telling everybody what I think is really on the table.

24           MR. GOODMAN:  And to answer your question about

25   dismissal, I just want to be clear.  We are seeking just

1    dismissal.  I feel bad that we have interjected the concept

2    of structured dismissal because that's probably not the

3    right word to use for what we're asking for.  I know that

4    you usually think of structured dismissal in a case where

5    the Debtors are, you know, a real business.  They come and

6    they file for bankruptcy.  They sell their assets.  They

7    don't have enough money to consummate a plan.  So you

8    dismiss it, pursuant to a certain structured process.

9    That's not what we're doing here.

10          So I think the use of the word structured probably

11   was not our best choice of words.  We're seeking dismissal.

12   Right?  The same relief that was sought in LTL, the same

13   relief that was sought in the Aero case.  We just note that,

14   you know, in those dismissal orders, it wasn't just one line

15   saying, you know, case dismissed.  Because there was, you

16   know, housekeeping and administrative issues that had to be

17   dealt with.

18          THE COURT:  Yeah.  This case is different than the

19   --

20          MR. GOODMAN:  But that was really smart.

21          THE COURT:  -- others because --

22          MR. GOODMAN:  Yeah.

23          THE COURT:  -- this case is so -- well, it's

24   different than the others.  Right?  That was done really

25   early on, and you can find a way out.  I'm just telling you

1   the way I'm thinking about it.

2             MR. GOODMAN:  Yeah.  But --

3             THE COURT:  That what the parties want.  That's

4   what I'm --

5             MR. GOODMAN:  The one thing I just wanted to sort

6   of flag to the Court's attention --

7             THE COURT:  Uh-huh.

8             MR. GOODMAN:  -- is that if you think about the

9   9019 as it was initially proposed -- right?

10            THE COURT:  Uh-huh.

11            MR. GOODMAN:  So the 9019 motion that was filed

12  with the court back in January -- the Settlement Agreement

13  that was attached to that agreement is actually very

14  different than the one that's now before the Court.  Think

15  about it.  The initial 9019 motion, the initial settlement

16  agreement, provided for payment on the effective date.  And

17  if you look at the version of the plan that was on file, the

18  term effective date was defined to mean administrative order

19  --

20            THE COURT:  It was a different definition.  Right.

21            MR. GOODMAN:  -- confirming the plan.  So, in

22  theory --

23            THE COURT:  Uh-huh.

24            MR. GOODMAN:  Or I think not in theory.  I think

25  the agreement, as drafted, contemplated that Mr. Lefkowitz

1  would actually consummate the sale transaction if and when

2  the Court entered an order confirming the plan,

3  notwithstanding the appellate risk.  Right?  They could

4  follow from that.  They have changed that.  I think the

5  Court noticed when they --

6          THE COURT:  Uh-huh.

7          MR. GOODMAN:  -- you know, introduced the redline

8  order --

9          THE COURT:  Uh-huh.

10          MR. GOODMAN:  -- they changed it --

11          THE COURT:  Uh-huh.

12          MR. GOODMAN:  -- you know, all so carefully so

13  that no longer is the sale, you know, effective, upon Your

14  Honor entering an order confirming a plan.  Now the money

15  doesn't get paid until there's a final non-appealable order

16  which, in my experience, sadly takes a very long time to go

17  through in certain cases.

18          THE COURT:  Okay.

19          MR. GOODMAN:  We're actually still dealing with

20  this issue in the Boy Scouts case, and that plan was

21  confirmed close to two years ago.  So, you know, that change

22  means that, practically speaking, your sale doesn't actually

23  get consummated again until we're way down the road, in

24  terms of, you know, the timing of this case.

25          This is why I actually come back to -- when you

1   think about the changes that they made, right, it kind of

2   started off like an RSA, and now it really looks like an RSA

3   in the sense that you just have parties saying, Your Honor,

4   if you approve the settlement -- and, practically speaking,

5   you cap, right, the amount that they have to pay for these

6   releases.

7           Again, I assure you it will probably not go any

8   higher if the Court approves the settlement.  That would be

9   -- your Court will have now found -- Your Honor will have

10  now found that these causes of action can be --

11          THE COURT:  I think that's right.

12          MR. GOODMAN:  -- settled for the specific dollar

13  amount.  Right?

14          THE COURT:  I think that's right.

15          MR. GOODMAN:  That's what your finding would be in

16  that sense.  But the plan releases -- they haven't been

17  approved.  The Chapter 11 plan itself hasn't been confirmed.

18  So all of the conditions that have to be satisfied for that

19  sale to actually consummate -- none of that has been, you

20  know, determined approved.  And we, of course, would argue,

21  and, I think, correctly have the ability to present all of

22  our objections to all of those documents and, you know,

23  continue to litigate these issues.

24          THE COURT:  Thank you.

25          Mr. Zluticky?

1           MR. ZLUTICKY:  Yes, Your Honor.  So what this

2      settlement is doing is it's settling the estate's causes of

3      action against the settling parties, and the settling

4      parties are getting releases.  There's conditions to the

5      payment of the 40 million, but they are paying 14 of the 54

6      million in advance.  The 40 million is when the plan goes

7      effective.

8           And, look, I understand people will -- people may

9      appeal things.  It may take time.  But the converse is

10     there's this discussion of they're not making the payment

11     until it goes effective.  They also don't get the releases

12     either.  Like, if they don't pay the money --

13          THE COURT:  Yeah.

14          MR. ZLUTICKY:  -- they don't get released.  And so

15     the point of this, from the Committee's perspective, is all

16     we are doing is settling the estate's causes of action

17     against the settling parties.  We are not deciding today how

18     that money will be divided.  We're not deciding today any

19     other plan issues.  That's all up for negotiation.  We're

20     hopeful --

21          THE COURT:  I will everybody what I'm really

22     concerned about.  Okay?

23          MR. ZLUTICKY:  Yeah.

24          THE COURT:  Everybody has the right to appeal.  So

25     if people want to appeal --

```
 1            MR. ZLUTICKY:  Sure.

 2            THE COURT:  -- all the way to Supreme Court,

 3   that's --

 4            MR. ZLUTICKY:  Of course.

 5            THE COURT:  Everyone has the right to go do that.

 6   Right?  And so I -- my job is to try to make the best

 7   decision on the ground that I can.

 8            MR. ZLUTICKY:  Yes.

 9            THE COURT:  I am concerned about the burn rate

10   here.  Right?  It's --

11            MR. ZLUTICKY:  We are too.

12            THE COURT:  I know.  I'm sure everybody is

13   incredibly conscious of that.  And so at some point it then

14   -- you know, having a long trial here and then, if it turns

15   out that, you know, there's going to be another bite at the

16   releases on the back end, right, then that's a second

17   animal.  And all that essentially is cutting into a

18   potential recovery that would be entitled to the folks who

19   have signed and said we support this.  Right?

20            And so that's -- I'm concerned about plan

21   distributable value as well although that doesn't

22   necessarily change the legal answer.  It's just if we're

23   going to -- you know, the question is are we doing this

24   twice, or are we just doing this once?  That's where I'm

25   going with --
```

1           MR. ZLUTICKY:  Your Honor --

2           THE COURT:  -- where we are.

3           MR. ZLUTICKY:  -- Your honor, from the Committee's

4   perspective on the releases, we're doing this once.  We're

5   doing it today.  It -- to the extent that the plan contains

6   other releases or releases that are broader or treatment

7   that is broader or different from what's in the settlement

8   agreement, then everybody's going to have an absolute

9   ability to attack that and we'll be ready for a robust

10  debate, and we hope negotiation with the tort claimants and

11  other creditors on a plan.

12          But to the extent that the releases in the plan

13  are the same releases in the Settlement Agreement and no --

14  and nothing different, then those releases are being

15  approved as part of this settlement.

16          THE COURT:  Okay.  Thank you.

17          MR. GOODMAN:  Can I -- can I just clarify

18  something?  Because I hear the word release being used, and

19  I don't know that we're being precise enough with the term.

20  So you're talking about releases in a plan of

21  reorganization.

22          THE COURT:  Uh-huh.

23          MR. GOODMAN:  Right?  Those are the releases that

24  the plan effectuates.  And you can have voluntary or

25  consensual releases that trigger whether or not someone

1   votes in favor of the plan or not, whether they object or

2   not.  And then you have sort of the other breed of plan

3   releases, which is the non-consensual third-party release

4   that you see in planned reorganization.  So those are

5   releases that are part of the plan.

6          When you're talking about a 9019 transaction,

7   right, you're really talking about the sale or the

8   settlement of --

9          THE COURT:  Uh-huh.

10          MR. GOODMAN:  -- estate causes of action.  Right?

11   So in that context, the question really is what's in the

12   grocery cart, right, and how much is -- how much are the

13   items in the grocery cart worth, and is the settlement, you

14   know, within the range of reasonableness such that I could

15   approve it under the 9019 standard, giving due consideration

16   to the fact that you have the insiders and all of those

17   issues.

18          In both instances, right, it's conditional.

19   Right?  The sale of the estate causes of action, again,

20   isn't effectuated until the money is paid.  The money isn't

21   paid until you have a final non-appealable order confirming

22   the plan.  The plan releases are also conditional, right,

23   upon the Court approving or confirming the plan of

24   reorganization and then those going effectuated.

25          What I understand the M2 Loan parties and

1    Mr. Lefkowitz to be saying -- I hear this in. you know,

2    almost every mass tort case -- is I don't pay my money until

3    I get finality.  Right?  And that applies not just for plan

4    releases, but that also applies to the settlement of the

5    estate causes of action.  Right?

6            Mr. Lefkowitz doesn't swipe his credit card,

7    right, at the grocery store until he knows that he's buying

8    finality.  That's the issue.  So that's why I actually do

9    sort of view this as more akin to an RSA.  Now from our

10   perspective, we obviously need to make sure that we object

11   to and make every argument, you know, possible, because I

12   don't want to be in a situation where we're deemed to have

13   waived anything.

14           So we have to do our job in this case and make all

15   the arguments and all the objections that we can make.  So

16   from that standpoint, it does feel, to me, like it's two

17   bites of the apple because I can't think of any other way to

18   do this from our perspective.  Right?

19           I mean, we're kind of put in the position where we

20   have to object to the 9019.  We're going to have to then

21   turn around and raise all of the objections at plan

22   confirmation because I can't be in a situation where someone

23   says, well, you should have done this, and you didn't.

24   Right?  So that's the situation that we're in.

25           THE COURT:  And the legal basis -- or I should say

1  that I was thinking about this too, and I -- we're not at

2  the close of evidence.  So -- but I want to start thinking

3  about this in terms of to just flat out dismiss a case,

4  I've got to find, among other things, that you know, there's

5  not a reasonable likelihood of, you know, of confirming a

6  plan.  Right?

7          But if I tell them go put this in a plan and put

8  it out for a vote, then how do I dismiss the case?

9          MR. GOODMAN:  So our --

10          THE COURT:  In other words --

11          MR. GOODMAN:  Yeah.  Yeah.  Yeah.  I hear what --

12  I --

13          THE COURT:  That's where I'm going.

14          MR. GOODMAN:  Very good question, Your Honor, and

15  one that we've been thinking about as well.  So if you're

16  thinking about dismissal in terms of the 1112(b), I think,

17  (1) factor, right, which is, you know --

18          THE COURT:  (Indiscernible).

19          MR. GOODMAN:  (Indiscernible).  Well, you have,

20  you know, inability to confirm a plan of reorganization.

21  You can combine that with administrative insolvency.  You

22  know, professionals not being paid their fees, I think --

23          THE COURT:  Uh-huh.

24          MR. GOODMAN:  -- you know, would trip that gate if

25  the 9019 is denied, and the argument is, well, we just can't

1   get a plan confirmed, then I think you could run into a

2   dismissal under those factors and based on those

3   circumstances.

4          The other sort of side to this, right, is the

5   dismissal that you saw in the Antelope case, right, where

6   the court says, wait a second.  If the whole purpose of the

7   bankruptcy proceeding is for insiders/defendants to take

8   control over and settle estate causes of action -- and, you

9   know, there they were truly derivative claims.  Right?

10  There was a shareholder lawsuit in that case.

11         Here we have a situation where the Debtor is

12  arguing that it is an ascent created derivative for estate

13  causes of action through the divisive merger and the

14  bankruptcy proceeding.  Right?

15         Our argument would be is that's just not a

16  legitimate use of the bankruptcy system, per se, and that

17  the case should be dismissed on -- for cause on that basis.

18  So that's not what I would call, you know, the 1112(b)(1)

19  form of dismissal.  That's more of the -- you know, the

20  Fifth Circuit has, you know, thought in these terms going

21  back to -- I'm blanking on the name of the case, but I think

22  it was one of the first cases involving dismissal for cause.

23  It was actually a 1990s case.  And it's bothering me --

24  really, really bothering me that I can't remember the name

25  of it.  So I really apologize to Your Honor --

1              THE COURT:  No worries.

2              MR. GOODMAN:  -- for falling down on that one.

3    But if the Court were convinced that this case is basically

4    just the use of the bankruptcy system, right, to take

5    control --

6              THE COURT:  But now we're getting back to whether

7    -- kind of a policy perspective, whether divisive mergers

8    are appropriate or not, because it's really what you're

9    saying.  Because this -- again, this case is different than

10   others.  And, again, I'm making no comment about LTL, Aero,

11   or any of those cases.  I'm just talking about the facts of

12   this case.  Right?

13             This divisive merger is different than other cases

14   where I know the courts have kind of thought about these

15   issues.  And there's no telling what I would think about

16   them if I was put in those situations.  So I don't -- I

17   don't like putting myself in shoes where I didn't sit

18   through evidence.

19             But in this case, a divisive merger took place a

20   while back.  Right?  And so I just think this case is

21   different than a lot of other cases, and that doesn't mean

22   that the plan is going to get confirmed.  That doesn't mean

23   that.  But, again, I'm just telling everyone I read texts

24   really literally, and I agree.  I think Fifth Circuit case

25   law is really based on kind of a single asset real estate

1    case.  So it's not the --

2              MR. GOODMAN:  That was (crosstalk).

3              THE COURT:  Yeah.  So I am --

4              MR. GOODMAN:  But to be very clear, Your Honor, I

5    don't -- I don't have any qualms --

6              THE COURT:  No, no.  I know.

7              MR. GOODMAN:  -- whatsoever --

8              THE COURT:  I'm not saying anyone does.

9              MR. GOODMAN:  -- with the Texas statute or

10   divisional -- I don't have any issue with divisional

11   mergers.  I'm in cases all the time where companies go and

12   enter into demerger agreements, and they separate assets and

13   liabilities.  That, you know, happens all the time.  And,

14   you know, the suggestion or the, you know, view is that

15   we're coming in and we're saying that, you know, divisional

16   mergers are wrong.  I'm saying unequivocally we're not

17   taking that position.  That's never been our view.

18             Our view simply is that, if you have a -- if you

19   use the statute, right, in an improper way, right, and you

20   say I'm going to create a company where I'm going to put all

21   of the assets over here and assign nothing but the

22   liabilities to this entity, now you've fallen into a fact

23   pattern where it is -- can be attacked as a fraudulent

24   transfer.  That was Judge Whitley's, you know, analysis in

25   the DBMP decision was, yeah, you know, you can do these

1    things, but the consequence is that you're, you know,

2    hindered, delaying, defrauding creditors, all of those

3    rights and remedies survive under the Texas statute.  And

4    you can continue -- you can bring those claims and those

5    causes of action.

6              So our point simply, in terms of back to this

7    dismissal concept, is, in our view, they went through these

8    corporate machinations.  They used the statute in order to

9    give themselves an argument, right, that these are now

10   derivative or state causes of action.  Again, we will, you

11   know, continue to argue that they didn't succeed, right, and

12   that, you know, party is alleging successor liability still

13   on their tort claim.

14             But to the extent that they did, you know, put the

15   Debtor in a position where it can claim ownership of these

16   causes of action, you do then fall into the Antelope fact

17   pattern, right, where you have a case that's being used for

18   that litigation purpose.  And that's -- you know, that would

19   be the argument that we would be presenting to the Court for

20   dismissal.

21             And, Your Honor, if I could -- I appreciate we're

22   starting to get into closing arguments a little bit now.

23             THE COURT:  No, no, no.

24             MR. GOODMAN:  We still have --

25             THE COURT:  I totally did it.  Right?

1           MR. GOODMAN:  We have three witnesses today, three

2    witnesses for Wednesday.  Our estimates are showing, you

3    know, seven to eight hours today, seven to eight hours on

4    Wednesday, plus closing arguments.  We'd really like to get

5    to the evidence unless the Court has some additional

6    questions.

7           THE COURT:  You shutting me down?

8           MR. GOODMAN:  No, I'm hoping we can get to

9    evidence.

10          THE COURT:  I'm just saying --

11          MALE SPEAKER:  Your Honor, I actually would like

12   to take you back up on your prior statement.  I think you

13   said --

14          THE COURT:  No, no, no.  I've gotten -- let's get

15   to your evidence then.  All right.  And --

16          MR. KAUFMAN:  Thank you for your thought.  Thank

17   you.

18          THE COURT:  Yeah.  Yeah.

19      (Recess taken from 10:25 a.m. to 10:34 a.m.)

20          THE CLERK:  All rise.

21          THE COURT:  Okay, let's proceed.

22          MR. MOXLEY:   Good morning, Your Honor, Cameron

23   Moxley of Brown Rudnick for TCC.  Judge, I think we're going

24   to continue with Mr. Perry's cross-examination.

25          THE COURT:  Let's do so.  Mr. Perry, come on up.

1        (Pause in the proceeding.)

2            THE COURT:  Good morning, I'll remind you that

3   you're still under oath.  Okay.

4            MR. MOXLEY:  And, Your Honor, Your Honor has at

5   the bench, two binders that I handed to your clerk, Judge.

6   One is the documents binder.  I find it be convenient for

7   everybody to have a second binder that just has transcripts

8   in it.  So it has his deposition transcription in it as well

9   as the first two days of the hearing.

10           So that's the reason for the two binders, Judge.

11           THE COURT:  Got it.

12               CROSS-EXAMINATION OF RUSSELL PERRY

13  BY MR. MOXLEY:

14  Q    And Mr. Perry you have those binders at your -- at your

15  witness stand as well, sir.

16       Just so you know, I think the other two binders, I

17  believe, are the exhibits from the Debtor and the UCC.

18  A    Okay, great.

19  Q    Those are the materials in front of you.

20           MR. MOXLEY:  And, Your Honor, what I thought we

21  would do is, I'll do the same thing as we did last time

22  where I'll have a reference the document in the binder.

23  We'll also put it on the screens for convenience, if that's

24  helpful to Your Honor and to the witness.

25           THE COURT:  Okay.  And before we start do I need

1   to -- anyone I need to give presenter roles to?  Are you

2   going to put the -- if someone's going to put the doc on the

3   screen or someone controlling the screens and all that good

4   stuff.

5            MR. MOXLEY:  Let me just check if Mr. Barber knows

6   how to do it.

7            THE COURT:  All right.

8        (Pause in the proceeding.)

9            MR. MOXLEY:  He does, okay.  And Your Honor, what

10  we would suggest we do as well is invoke the rule.  I think

11  there maybe some fact witnesses in the room.  I believe I

12  saw Mr. Lefkowitz at some point in the room.

13           THE COURT:  All right.

14           MR. MOXLEY:  And I'd argue that he should not be

15  present in the room.

16           THE COURT:  Is there anyone in the room?

17           MR. KAUFMAN:  Well Mr. Lefkowitz is not in the

18  courtroom, but I think he's a party representative for the

19  settling parties.  So to the extent he comes back in, I

20  think he's entitled to hear just like the Griffiths and

21  anyone else.

22           THE COURT:  Okay, let's proceed.  Let's just keep

23  going.

24           MR. MOXLEY:  Very good Judge.  Thank you, Your

25  Honor.

1  BY MR. MOXLEY:

2  Q    Again, good morning, Mr. Perry.

3  A    Good morning.

4  Q    Cameron Moxley, Brown and Rudnick on behalf of the TCC.

5  Mr. Perry, we've obviously had a chance to meet a few times

6  now.  It's good to see you, sir.

7       Mr. Perry, we're of course, picking up on your cross-

8  examination continued from March 5th.  Since Court adjourned

9  on March 5th, have you had any discussion at all with

10  counsel to the Debtor?

11  A    I have.

12  Q    Have any of those discussions with counsel for the

13  Debtor pertained in anyway with this case?

14  A    They have.

15  Q    And have any of those discussions pertained in any way

16  with the topics of your testimony?

17  A    No.

18  Q    Since the hearing adjourned on March 5th, have you had

19  any discussion with Mr. Lefkowitz?

20  A    I believe just in short conversation after the hearing

21  last time.  That's it.

22  Q    Okay.  And did that conversation concern the topics of

23  your testimony?

24  A    Oh, no.

25  Q    Okay.  Did you have any conversations or other

1  communications, electronic or otherwise, with anyone other

2  than counsel for the Debtor or with Mr. Lefkowitz that

3  concern the topics of your testimony?

4  A    No.

5  Q    Mr. Perry, in response to Mr. Kaufman's questions on

6  direct examination, you testified that you believed the

7  Debtor is not administratively solvent, correct?

8  A    Correct.

9  Q    And the basis for reaching that conclusion is that the

10 Debtor will have sufficient funds to pay administrative

11 claims at the settlement, correct?

12 A    Correct.

13 Q    If the settlement is not approved, will the Debtor have

14 access to sufficient funds to pay administrative claims in

15 full?

16 A    As I sit here today, my understanding is yes.

17 Q    And what's that understanding based on?

18 A    it's based on assets that I believe the Debtor can

19 modify in order to fund incur but outstanding administrative

20 claims to date.

21         MR. MOXLEY:  And, Your Honor, I have a few

22 questions on these lines.  I just want to note we're very

23 cognitive of -- TCC is very cognitive of the conversation

24 had this morning and the questions that Your Honor is

25 thinking about.

1          We just think it would be helpful to have some of

2    the evidence developed in the record on those points.

3          THE COURT:  Take your time.

4          MR. MOXLEY:  Thank you, Judge.

5    BY MR. MOXLEY:

6    Q    Absent -- let me ask you this, Mr. Perry.  Absent the

7    settlement, does the Debtor have access to sufficient funds

8    to pay the estate professionals in this case?

9    A    It will.  It requires monetization of certain assets

10   the Debtor owns.

11   Q    Okay.  And you're an estate professional, correct?

12   A    I am.

13   Q    Is the payment of your fees and expenses contingent on

14   the Court's approval of the settlement and the confirmation

15   of the Plan?

16   A    I wouldn't say it's contingent, no.

17   Q    Okay.  If it's not contingent on those things, who will

18   pay you?

19   A    The resources the estate otherwise liquidates.  The

20   value that is brought into the estate in order to fund

21   administrative expenses and to fund creditors.  I will get

22   paid out of those amount.

23   Q    And you mentioned in a couple of your answers so far

24   that there would be assets that would be monetized.  What

25   assets do you have in mind?

1  A    When I originally testified on direct, we walked the

2  Court through a demonstrative that included both the 54

3  million that we're discussing 919 as well as other potential

4  pockets of what I'll call assets or value or value.

5       One of those, just for example, is the employee

6  retention tax credit.  When I originally began this case, I

7  felt those were worth any where from $9 million to maybe

8  somewhere in the high teens.

9       Throughout the process of this case, we have engaged

10 with third parties to where I have filed what's called 941

11 X's of the IRS to the tune of roughly 20 -- I want to say

12 just a shy under $30 million.

13      There's a $10 million priority tax claim.  So if we

14 were to confirm a plan, I would anticipate that 10 million

15 being set off by that roughly 30 with 20 million left for

16 the estate.

17 Q    Okay.  And Mr. Perry, we're going to take a look at the

18 ERCs today.  But let me just ask you a couple of questions

19 based on that response there.

20      My understanding of your testimony then from the last

21 time on direct and then your answer just now, is that you

22 now realize that the Debtor will be able to get ECR tax

23 money earlier than it previously thought it would; is that

24 right?  Earlier in time?

25 A    No, I've never -- I don't believe I've ever testified

1  to a timing issue with that.

2  Q    Okay, so it's not a timing issue.  It's an amount

3  issue; is that right?

4  A    It's both.

5  Q    Okay.  I think you testified on direct that it went up

6  by a certain amount.  And I think you just testified now as

7  well that you thought it would be a lower number.  Now you

8  think it's a higher number, correct?

9  A    When I originally the -- when the Debtor filed its

10 original schedule of assets and liabilities, I think we had

11 estimated ERCs -- I'm going off of memory, but somewhere

12 around 9 million to 15 million.  Something like that.

13      The reason that the amount has gone up from where I sat

14 from the original filing of the souls to today is really a

15 matter of adding additional years under the filing.  And

16 then completing additional analysis with the third party

17 consultant by which I could -- that allowed me to file

18 those.

19      So, when we originally estimated the amount, it was for

20 one certain fiscal year.  Since that point in time, we've

21 added another fiscal year and then we've completed an

22 analysis on top of that.

23 Q    Got it, okay.  We'll come back to the ERCs and we'll

24 look at your demonstrative in a bit.  Mr. Perry, is the

25 payment of the fees and expenses of the TCC's professionals

1  contingent upon the Court's approval, the settlement and the

2  confirmation of the Plan?

3  A    I don't know the answer to that.

4  Q    Okay.  So your testimony is that your fees and expenses

5  will be able to be paid even absent the approval and

6  settlement because you'll be able to monetize assets, but

7  you're not sure if the TCC's professional fees will be paid?

8  Is that your testimony?

9  A    At this point in time, the administrative expenses in

10 the case really across the board, I think, are subject to

11 final fee application, Court's orders things of that nature.

12 I was answering a question as it relates to whether were

13 administrative insolvent including my fees.

14     I'm not at this point taking a position as it relates

15 to whether anybody's fees are going to be official approved

16 by the Court and then otherwise allow to be paid.  That's a

17 different topic in my mind.

18 Q    Okay.  The settlement as it existed at the time the

19 Rule 9019 motion was filed, provided for the payment of the

20 settlement proceeds at the effective date of the Plan,

21 correct?

22 A    That's correct.

23 Q    I'd be happy to show you that if you want to see that

24 document.  So at any point, I mean we'll look at it in a

25 second.  But if you want to see a document, at any point

1  today let me know, okay?

2       Are you familiar with the last Plan that's currently on

3  file?

4  A    The Plan?

5  Q    The second amended plan?

6  A    Generally familiar, yes.

7  Q    Okay.  And are you familiar with how that Plan on file,

8  the second amended plan, defines the term effective date?

9  A    I'd have to look at the language.

10 Q    That's fine.  Let's do that.  It's in Tab 12 of your

11 binder.

12          MR. MOXLEY:  This is -- Your Honor, this is TCC's

13 Exhibit 167 for the record.  And we're looking at  Page 8 of

14 42 at Tab 12.

15 BY MR. MOXLEY:

16 Q    I believe it will come on your screen as well,

17 Mr. Perry, if that's helpful.

18      (Pause in the proceeding.)

19 Q    Are you there, sir?

20 A    I am.

21 Q    Okay.  And you see that the definition of effective

22 date at number 48.  There it references Article X of the

23 Plan as what specifics the conditions precedent to the

24 effective date.  Do you see that?

25 A    I do see number 48, yes.

1  Q    Okay.  Do you see the reference to Article X with

2  respect to the conditions precedent to the effective date in

3  that definition?

4  A    I do see a reference, yes.

5  Q    Okay.  Are the conditions precedent to the effective

6  date set forth in Article X of the Plan?  Are you aware of

7  that?

8       (Pause in the proceeding.)

9  A    I would have to review the Plan that was filed and I'd

10 have to Article X.

11 Q    Okay.  Do you know sitting here today without looking

12 at it, sir, what the conditions precedent to the effective

13 date as set forth in Article X of the second amended Plan

14 are?

15 A    I would need to reference Article X and we could walk

16 through it.

17 Q    Okay, so let's look at that then.  It's at Page 36 of

18 42 of this document.

19      (Pause in the proceeding.)

20         MR. MOXLEY:  So just for the record, Judge, we're

21 looking at Article X, second amended Plan, TCC's

22 Exhibit 167.  And we're now Page 36 of 42 of the filing.

23 The conditions precedent to the effective date.

24 BY MR. MOXLEY:

25 Q    Do you see that section, sir?

1          MR. KAUFMAN:  Your Honor, just for the record, if

2    we could show the entire Article X, which carries on to the

3    next page, that would be --

4          THE COURT:  I think he gets to conduct this

5    examination, Counsel.

6          Go ahead.

7          MR. MOXLEY:  Thank you, Your Honor.

8    BY MR. MOXLEY:

9    Q    There are nine conditions to the effective date listed

10   in Article X, do you see that?

11   A    See nine under section A, correct.

12   Q    Okay.  With the benefit of seeing this provision now,

13   Mr. Perry, what are the nine conditions precedent to the

14   effective date as set forth in Article X of the Plan that is

15   currently on file?

16        And I appreciate that it's not a Plan the Debtor is

17   advocating for at this time.  I just want to understand what

18   the conditions precedent to the effective date were under

19   the last filed Plan.

20   A    Happy to read all nine.  There is a condition that says

21   the Bankruptcy Court shall have entered the confirmation

22   order.  The settlement parties shall have funded the initial

23   settlement amount.

24        The liquidation trust shall be established and funded

25   and the trustee shall have been appointed in accordance to

1   the provision of the Plan in terms of the trust agreement.

2   The personal injury trust shall be established and fund and

3   the personal injury trustee shall have been appointed in

4   accordance with the provisions of the Plan and the terms of

5   the personal injury trust agreement.

6       The Debtor shall have obtained all authorizations,

7   consents, regulatory approvals, ruling or documents that are

8   necessary to implement and effectuate the Plan.

9       Substantially final version of the Plan supplement, all

10  the schedules, documents and exhibits contained therein.

11  And also their schedules, documents, supplements and

12  exhibits to the Plan have been filed.

13      The administrative and priority claims reserve shall

14  have been established and funded.  Professional fee escrow

15  shall have been established and funded and the other secured

16  claims reserve shall have been established and funded.

17  Q    And are you aware, Mr. Perry, of that the term final

18  order is a defined term in the Plan that is currently on

19  file -- the Plan that we're looking at right now?

20  A    I'd have to go back to the definition.  It's been

21  awhile since we filed it.

22  Q    Let's look at that definition.  It's on Page 9 of 42 in

23  the same document.

24      (Pause in the proceeding.)

25  Q    Do you see it there, sir, at definition number 58?

1  A    I do.

2  Q    Okay.  So final order, you see as a defined term,

3  paragraph -- definition number 58 on Page 9 of 42.  If you

4  look back with me now, at Article X.  So go back to Page 36.

5       (Pause in the proceeding.)

6  Q    Do you have Article X in front of you again, sir?

7  A    I do.

8  Q    The term final order is not used in Article X of the

9  plan, is it?

10  A    I don't believe that I read those words at all, no.

11  Q    So, Mr. Perry, under the Second Amended Plan that is

12  the last filed Plan by the Debtor in the case, the entry of

13  a final order confirming the Plan is not a condition

14  precedent to the effective date, correct?

15  A    I don't see the words in Article X.  I'd have to study

16  a little bit closer Article X as it relates to any

17  correlation to the final order.  But I also the words in

18  Article X.

19  Q    Okay.  You had an understanding, though, to the prior

20  Plan when it was filed, correct?

21  A    I did have an understanding when we filed it back in

22  October.

23  Q    Was it your understanding at that time that a final

24  non-appealable order was a condition precedent to the

25  effective date?

1    A    My understanding was what was written in the Plan at

2    the time was, in fact, the mechanics that we had potentially

3    solicited to be disclosed.

4    Q    Okay.  So under this Plan, the Second Amended Plan --

5    which again I appreciate the Debtor is not advocating for

6    that Plan right now.  But under that Plan, the effective

7    date could occur after the Bankruptcy Court enters the

8    confirmation order, correct?

9    A    That's likely, yes.  It's likely in every plan.

10   Effective date usually occurs after the confirmation order

11   is entered.

12   Q    Thank you, sir.  And are you aware that the term

13   confirmation order is a defined term in this Second Amended

14   Plan?

15   A    Yes.

16   Q    Okay.  Do you know what it means, confirmation order,

17   in this Plan?

18   A    I'm happy to read the definition.

19   Q    You can look back at the definition.  That's fine.  So

20   that's on Page 7 of 42.

21        (Pause in the proceeding.)

22   Q    So if you look at Page 7 of 42, it's at definition

23   number 28.  Do you see confirmation order defined there,

24   sir?

25   A    I do.

RUSSELL PERRY - CROSS BY MR. MOXLEY                69

1   Q    And the term final order is not used in the definition

2   of confirmation order as defined in this Plan, is it?

3   A    I do not see the word final order, correct.

4   Q    So under the settlement as it existed at the time the

5   Rule 9019 motion was filed, the settlement funds would have

6   been available for distribution on the effective date,

7   correct?

8   A    The effective date, per the definition of the

9   settlement agreement.

10  Q    Right.

11  A    There's no -- there's not a Plan today that connects

12  the settlement agreement to a plan.  We're looking at an old

13  plan.

14  Q    And I understand.  Except for now, my question -- I

15  should have made that more clear.  I apologize.

16  A    Okay.

17  Q    So now stepping away from this document, sir.

18  A    Okay.

19  Q    Under the settlement as it existed at the time of the

20  Rule 9019 Motion was filed, settlement funds would have been

21  available for distribution on the effective date, right?

22  A    Per the definition of the 9019 agreement.

23  Q    Yes, sir.

24  A    Yes.

25  Q    Okay.  So the claimants under this version of the Plan,

1  the settlement agreement before.  Strike that.

2      The claimants under the prior version of the settlement

3  agreement did not have to wait for all the appeals that may

4  follow a confirmation order to be exhausted before they

5  could receive a distribution, correct?

6  A   I don't have an answer for that.  I'd have to study the

7  plan much closer.

8  Q   Okay.

9      (Pause in the proceeding.)

10 Q   Let's go back now to the Second Amended Plan.  So, --

11 and picking up on your answer a couple of answers ago.  I

12 think you recognize that it's common that a confirmation

13 order may happen on one date and later in time the effective

14 date would occur, correct?

15 A   Correct.

16 Q   Okay.  And so that was the case under the Second

17 Amended Plan as well.  And, in fact, under the Second

18 Amended Plan, the confirmation order would occur first, the

19 effective date would then occur and then if there were

20 appeals, a final non-appealable order may issue at some

21 point in time, correct?  Those would be three separate

22 dates.

23 A   Sounds correct.

24 Q   Is it still contemplated that the effective date will

25 occur before there is a final order confirming the Plan

1   under the new proposed order?

2           MR. KAUFMAN:  Objection, Your Honor.  This calls

3   for speculation.

4           MR. MOXLEY:  Your Honor, it calls for the witness

5   -- the witness is the Debtor's CRO.  It calls for an

6   understanding of what the current newly proposed form of

7   order provides for.

8           MR. KAUFMAN:  I heard it as asking him what's

9   going to be in the Plan that's not filed.  But if --

10          THE COURT:  If we're just talking about the order

11  -- the current version of the proposed order, I think it's

12  fair.  We're talking about what maybe included in the Plan.

13  I think that expands -- sounds like you're going to the

14  order, so.

15          MR. MOXLEY:  Yes, Your Honor.

16          THE COURT:  Okay.

17          THE WITNESS:  Sure, can we flip to the order and -

18  -

19  BY MR. MOXLEY:

20  Q    I need to understand your --

21  A    Okay.

22  Q    -- as you sit there today, what's your understanding.

23  A    My understanding is what the language in the revised

24  form of order will govern when the payment would come in.

25  Q    Okay.  So, Mr. Perry, you previously testified on

1   direct examination that you believe that the Debtor is not

2   administratively insolvent as the settlement funds will be

3   available to pay administrative claims on the effective

4   date, correct?

5   A    Upon the effective date that is correct.

6   Q    Okay.  You're aware that about an hour before you began

7   your testimony on March 5th -- which was several calendar

8   days after this hearing began on March 1st -- the Debtor

9   filed a revised form of order on the Rule 9019 Motion,

10  right?

11  A    There's been a lot of filings.  So I need to get my

12  dates correct.  Can you re-ask your question and I'll think

13  about the dates while you're asking.

14  Q    My question is very simple.  You're aware that about an

15  hour before you began your testimony on March 5th -- which

16  was several calendar days after the hearing began on March

17  1st -- the Debtor filed a revised form of order on the Rule

18  9019 Motion?

19  A    Correct.

20  Q    And you worked on that over the weekend before you

21  began testifying, right?

22  A    Counsel worked on it.  I was party -- part of that

23  process, correct.

24  Q    Okay.  I just want to be very clear about that.  So

25  let's just take a quick look at your direct testimony, which

1    if you look at your transcript binder, sir.  And I just

2    direct you to Tab C, which is day two of this hearing.

3         (Pause in the proceeding.)

4    Q    And if you turn in that binder to Page 228 at Tab C.

5         (Pause in the proceeding.)

6    A    I'm here.

7    Q    Okay.  And you see your answer beginning at line 8.

8    You know, we worked on this over the weekend and then

9    finalized it literally minutes before we filed it with the

10   Court.  See that?

11   A    I do.  I see that.

12   Q    That testimony was accurate, correct?

13   A    Of course.

14   Q    Okay.  And you reviewed the revised form of order

15   before it was filed, right?

16   A    I did.

17   Q    Okay.  You were aware of the terms of the revised form

18   of order before you began testifying that day, correct?

19   A    Generally, yes.  I reviewed it quickly before one set

20   was a final form.  It was moving up until literally minutes

21   before we filed.

22   Q    Okay.  Did the Debtor share a copy of the revised form

23   of order with the UCC before it was filed on March 5th?

24   A    that would have been discussions between counsel.  I

25   don't know.  I believe so.

RUSSELL PERRY - CROSS BY MR. MOXLEY                    74

1   Q     What's the basis of that belief?

2   A     Because my understanding is there was conferment in the

3   agreement over the weekend between UCC and the Debtor.

4   Q     There was --

5   A     There was discussions and agreement as it relates to

6   language between the settlement parties, the UCC and the

7   Debtor.

8   Q     And those discussions happened over the weekend?

9   A     It happened up until minutes prior to the filing of it,

10  yes.

11  Q     That's what I'm trying to understand.  Were those

12  discussions happening up until minutes before it was filed?

13  A     Yes.

14  Q     And, so your understanding is and your belief is that

15  the UCC saw a draft of the form of order in the form it was

16  filed with the Court on March 5th, before it was filed; is

17  that right?

18  A     I can't testified to what the UCC did or didn't see.

19  My understanding is that drafts were exchanged.  But I can't

20  testified to what the UCC actually did see, didn't see.

21  Q     Okay.  Do you have an understanding of whether the UCC

22  approved the revised form of order before it was filed?

23  A     I don't.

24  Q     You just don't know one way or another?

25  A     I don't.

1  Q    Okay.  Did the Debtor share a draft of the revised form

2  of order with the TCC before it was filed?

3  A    I don't know the answer to that.  I believe so, but I

4  don't know the answer.

5  Q    Would it surprise you if I told you the answer to that

6  was no a draft of the form of order was not shared with TCC

7  before it was filed?

8  A    I have no response, Mr. Moxley.  I don't know one way

9  or another.

10  Q    You're not aware of any discussions having happened

11  with the TCC over the weekend about the revised form of

12  order, right?

13  A    No one discussed with me from TCC the order or whether

14  counsel discussed I wouldn't have knowledge of that.

15  Q    You're not aware -- were you told by anybody that we

16  just talked to the TCC about this form of order they think

17  X, Y and Z?

18  A    Not that I recall.

19       (Pause in the proceeding.)

20  Q    Who worked on those revisions with you over that

21  weekend?

22  A    The counsel to the Debtor.

23  Q    Anyone else?

24  A    Counsel to the Debtor.  That's it.

25  Q    Okay.  Who was involved with the negotiations over the

1  changes to the proposed form of order; do you know?

2  A    It would have been counsel for the Debtor, counsel for

3  the settlement parties, counsel for the UCC.

4  Q    And you know that to be the case; is that right?

5  A    That's the only thing I know.  Whether or not there

6  were other parties involved, I'm not aware of that.

7  Q    Okay.  So who for the settling parties was involved in

8  the negotiations?

9  A    My understanding, their counsel.

10 Q    Is that Ms. Hayward?

11 A    It is.

12 Q    Anybody else, counsel to the settling parties, who was

13 involved to your knowledge?

14 A    My understanding is Mr. Cluck (phonetic) was also

15 involved.

16 Q    Okay.  Was counsel -- is it your understanding that

17 Ms. Hayward, among the settling parties that she represented

18 in connection with those discussions about the changes to

19 the form of order represented YesCare?

20 A    Yes, I believe Ms. Hayward represents YesCare.

21 Q    Are you aware of anybody else?  Any other counsel who

22 represented YesCare in connection with those discussions

23 about changes to the revised form of the proposed order

24 A    As I sit here today, I'm not aware.

25 Q    Okay.  Did Mr. Lefkowitz participate in those

1  discussions?

2  A    I'm not aware.

3  Q    Is it your understanding that Mr. Lefkowitz

4  participated through counsel, Ms. Hayward, in those

5  discussions?

6  A    I'm not aware.

7  Q    Who first raised the idea of revising the proposed form

8  of order at all?

9  A    Discussions between Debtor's counsel and myself.  I

10  don't know who initially raised it, but over the weekend

11  there were discussions around revising the order following

12  the hearing.

13  Q    Okay.  But you don't know if the first suggestion that

14  we may want to consider revising the form of proposed order

15  came from the Debtor or not; is that right?

16  A    That's correct.  I don't know who first suggested it,

17  correct.

18  Q    Okay.  In the revised form of order, the Debtor changed

19  the trigger date for the settlement payment from the

20  effective date to the date that a final order is entered

21  confirming the Plan, right?

22  A    That's my understanding, yes.

23  Q    Okay.  Let's look at Tab 19 of your binder at the red

24  line of the proposed form of order.

25         (Pause in the proceeding.)

1          MR. MOXLEY:  And, Your Honor, this was filed on

2   the docket at 1432 on Motion.

3   BY MR. MOXLEY:

4   Q    And if we look at the -- if we look at the red line,

5   let's turn to Page 3, if we could, sir.  And it's Page 6 of

6   the filing if you're looking at those pages, at the top of

7   that.

8          (Pause in the proceeding.)

9   A    Okay.

10  Q    You see where it says in Paragraph 2 conditions

11  precedent of the effectiveness of the settlement agreement

12  is conditioned upon "the entry of a final order of the Court

13  that is not subject to an appeal confirming a Chapter 11

14  plan."

15  A    The words are a little different than what you

16  described, but I can read it.

17  Q    We'll be very clear.  We'll just read it.  So you see

18  at Paragraph 2 it says, "Paragraph 9 of the settlement

19  agreement is stricken and replaced in its entirety with the

20  following:  Nine.  Conditions precedent:  A.  The

21  effectiveness of this agreement is conditioned upon an entry

22  of an order of the Court in form and substance acceptable to

23  the M2 parties, approving this agreement pursuant to Rule

24  9019 of Federal Rules of Bankruptcy Procedure and the entry

25  of a final order of the Court that is not subject -- that is

1  not thus subject of an appeal, confirming a Chapter 11 Plan

2  containing to the fullest extent committed by applicable law

3  the following provisions."  And there's romanettes one

4  through five.

5       Do you see that?

6  A    I do.

7  Q    So under the revised form of order filed on March 5th

8  of this year, the settlement money does not show up until

9  there is a final order confirming the Plan, correct?

10 A    Correct.

11 Q    Okay.  Let's look at the old version of Paragraph 9,

12 this is at Tab 3 of your binder, sir.  Flip to Tab 3 of me.

13 It'll come on the screen too, Mr. Perry.  I'm not trying to

14 play gymnastics.

15 A    Okay.  I worry about the other one open.

16 Q    Very good.  We're going to Tab 3.

17      (Pause in the proceeding.)

18 A    Okay, I'm here.

19 Q    And then at Tab 3 if you'll turn to Page 41 of 47 of

20 the filing.  The numbers at the top.

21      (Pause in the proceeding.)

22 Q    And so we're looking again now on -- at this page of

23 Paragraph 9, conditions precedent.  And that A under

24 Paragraph 9 A of the prior version of the proposed order

25 that was initially filed with the Rule 9019 Motion states,

1   "the effectiveness of this agreement is conditioned upon the

2   entry of an order of the Court in form and substance

3   acceptable to the M2 parties approving this agreement

4   pursuant to Rule 9019 of the Federal Rules of Bankruptcy

5   Procedure and the entry of an order of the Court confirming

6   a Chapter 11 Plan containing, to the fullest extent

7   permitted by applicable law the following provisions."  And

8   there's romanettes one through six that follow.

9        Do you see that?

10  A    I do.

11  Q    Okay.  So there the effectiveness of the settlement

12  agreement was conditioned upon the entry of an order of the

13  Court confirming the Plan not a final non-appealable order,

14  correct?

15  A    I believe that's correct.

16  Q    So, Mr. Perry, an hour before you began your testimony

17  in this case -- again as we talked about several calendar

18  days after this hearing began -- the Debtor changed a

19  condition, the obligation to make the settlement payment of

20  the settlement coming from at the time of the confirmation

21  order to the time of a final non-appealable order, correct?

22  A    That change was made, correct.

23  Q    Okay.  But, Mr. Perry when you were asked on direct

24  examination by Mr. Kaufman about how the Debtor would have

25  access to the funds necessary to pay administrative claims,

1  you testified that the Debtor would have the funds on the

2  effective date, correct?

3  A    Correct.

4  Q    Okay.  You actually did not just say that once.  You

5  actually twice testified that it would be the effective date

6  when the money would come in.  Remember that?

7  A    I don't remember if I testified to it twice, but I do

8  recall the effective date being the trigger date so to

9  speak.

10 Q    Okay.  I just want to make sure that you and I are both

11 clear on what your testimony was with that.  Because I don't

12 want you to feel like I'm misrepresenting anything to you.

13      So let's just take a quick look at your testimony which

14 is again in your transcript binder.  And if you could turn

15 with me to Page 48.

16      (Pause in the proceeding.)

17 Q    If you would look with me of Page 48 of your -- the

18 second day of this hearing -- the transcript of the second

19 day of this hearing.  And I'm at line 25, Mr. Perry.

20 A    Okay.

21 Q    The question begins how much do you project -- do you

22 see that?

23 A    I do.

24 Q    So Mr. Kaufman asked you how much do you project of the

25 settlement proceeds will be available to creditors in this

RUSSELL PERRY - CROSS BY MR. MOXLEY                    82

1   case.  And your answer was, "well of the settlement proceeds

2   by themselves the way that I look at that is within the

3   settlement agreement there's a $40 million amount that would

4   be funded upon let's call it the effective date -- really

5   there's I feel the situation like, but that 40 million would

6   be funded and then netted out of that would be occurred or

7   call it incurred and owing or unpaid administrative

8   expenses."

9       And your answer continues from there.  Do you see that,

10  sir?

11  A    I do.

12  Q    Okay.  And then if you look at Page 55 of your

13  transcript, sir.  And if you look with me at line 17.  See

14  you testified the current 9019 is for the 40 million to be

15  received on the effective date.

16  A    I do see that.

17  Q    Are you aware that an appeal of a confirmation order

18  can take two to three years before all appeals are exhausted

19  and you get to that final non-appealable order?   Are you

20  aware of that?

21  A    I'm not aware of the general timeline of how an appeal

22  shake out other than the fact that it would take some time.

23  Q    Okay.  How can the Debtor receive the settlement funds

24  on the effective date if the parties now have to wait some

25  time -- I'll represent to you it could take a couple of

1  years -- for a final order confirming a plan?

2         MR. KAUFMAN:  Objection, Your Honor.  It does call

3  for speculation.

4         THE COURT:  It does call for a bit of speculation.

5  I think you can -- well --

6         MR. MOXLEY:  May I be heard?

7         THE COURT:  Yeah, go ahead.  But I get the point.

8  It won't be there on the plan effective date as defined in

9  the Plan.  In the current version of the Plan, but we don't

10 know how the Plan is going to define plan effective date.

11        MR. MOXLEY:  That's right.

12        THE COURT:  Any future date.  So, that's why I

13 think Mr. Kaufman has a good point about what may lead to

14 speculation.

15        MR. MOXLEY:  Okay, my question, though, was --

16 thank you Judge and I appreciate that.  I'll rephrase the

17 question if I could.

18 BY MR. MOXLEY:

19 Q   Mr. Perry, what I'm trying to understand is when you

20 testified in response to Mr. Kaufman's question about how it

21 would be that you knew that administrative claims would be

22 paid that your understanding was it was because the

23 settlement proceeds would be received on the effective date.

24 That's what your testimony was, right?  Twice.

25 A   Correct.

1  Q    Okay.  So my question is how did you have that

2  understanding if the changes that we just went through in

3  detail to the proposed order were made.  So the question is

4  very narrow.  It's how did you have that understanding when

5  you gave that answer to Mr. Kaufman given the changes to the

6  proposed order?

7  A    My understanding was that the payment would be made

8  upon the effective date.  I don't believe there's anything

9  in the new order that would have modified my answer.

10 Q    Okay.

11 A    The effective date is the date in which I anticipate

12 the payment to come in.

13 Q    Okay.  But we looked at your testimony, just to be

14 clear.  What you didn't say to the Court was that we have to

15 wait for the settlement payment to arrive and there's a

16 final non-appealable order.  You didn't testify to that,

17 correct?

18 A    I don't know that I was asked the question if I needed

19 to wait for an appeal to be exhausted.

20 Q    Is there anything going to the exchange that we and the

21 discussion that we just had with the Court about the

22 definition of effective date and what the Plan might provide

23 in that regard.  Is there anything in the proposed form of

24 order for the Rule 9019 Motion that's now proposed, that

25 would alert parties to the notion that the Debtor and the

1  UCC intended to revise the Plan and that definition of

2  effective date in a new Plan?

3  A    Well, there isn't a Plan that connects that item.

4  Q    Right.

5  A    The 9019 speaks to conditions in certain plan

6  constructs.  But that's there.  We haven't proposed a Plan

7  that correlates with this yet.

8  Q    Exactly.  So there's nothing in the 9019 -- strike

9  that.  There's nothing in newly proposed form of order for

10 the Rule 9019 Motion that would alert anybody to the fact

11 that the definition of the effective date might be different

12 than the last definition you supplied to that term, in the

13 last plan, right?  Because there isn't one.

14 A    Well, Mr. Moxley, in my deposition and my testimony and

15 others I think there's been discussions multiple times that

16 the Plan that was filed back in October is not the Plan.

17 Otherwise what we sought for approval of this Court.

18 Q    Right.

19 A    I would be surprised that folks would be confused by

20 the fact that this Plan doesn't connect with this 9019

21 because I think we discussed that whole time.

22 Q    Right.  I understand what you're saying, Mr. Perry.

23 What my point is -- I think we're actually just talking past

24 each other a bit.

25 A    Okay.

1  Q    My point, sir, is simply that there is a definition of

2  effective date in the last filed Plan.  A Plan that the

3  Debtor is no longer advocating for, correct?

4  A    Correct.

5  Q    Okay.  And there's nothing in the 9019 Motion -- I'm

6  sorry.  There's nothing in the 9019 new proposed form of

7  order that says to anybody that we're going to supply a new

8  definition of effective date; is that right?

9  A    I don't have an answer to that.

10 Q    Okay.  The revised plan of -- let's just do it this

11 way.  The revised form or order that we looked at -- it's at

12 Tab 19 in your binder if you want to look at it again.  It

13 revises Paragraphs 6 and 9 of the settlement agreement,

14 right?

15      (Pause in the proceeding.)

16 Q    I don't mean to rush you sir.  Let's turn to Tab 19.

17      (Pause in the proceeding.)

18 Q    So if you turn to Tab 19 and if you turn again, with

19 me, to Page 3 of the -- page of the document.  It's Page 6

20 of 13 of the filing.

21      I use the phrase of the filing when I mean the top

22 numbers.

23 A    Sure.

24 Q    Okay.  So if you look at Page 6 of 13 of the filing,

25 you see that Paragraph 2 says that Paragraph 9 of the

RUSSELL PERRY - CROSS BY MR. MOXLEY                    87

1  settlement is stricken and replaced.  Do you see that?

2  A    I do.

3  Q    And if you look at the next page at Paragraph 3 it says

4  that Paragraph 6 of the settlement agreement is revised to

5  read as follows.  Do you see that?

6  A    I do.

7  Q    Okay.  It doesn't -- no where in this proposed form of

8  order it doesn't purport to make any edits to Article X of

9  the old Plan that you're no longer advocating for, right?

10 A    I don't see a reason why I need to.

11 Q    So you would agree with me?

12 A    The document reads in Section 9 the effectiveness of

13 this agreement is conditioned upon order of the court, form

14 and substance as we read a second ago, entry of a final

15 order of the Court, not subject to appeal, confirming a

16 chapter 11 plan.  It doesn't say confirming the Plan filed

17 in October.

18      It says a chapter 11 plan.  That Plan has not been

19 proposed yet.

20 Q    Right.  So when you gave your testimony that the Debtor

21 would have the funds to pay administrative claims on the

22 effective date, is it fair, in your view, that parties may

23 have assumed that you meant the effective date as that term

24 was defined in the prior plan?

25 A    I can't testify as to how parties may assumed my

1   testimony, Mr. Moxley.  I was referring to the effective

2   date of a Plan yet to be filed.

3   Q    Okay, that's fair.  And is there any document in this

4   case that supplies a definition of effective date since the

5   second amended plan was filed?

6   A    I don't believe so.

7   Q    So the last definition in time -- and I would submit

8   probably the only definition of effective date that has been

9   supplied in this case, are the definitions that were

10  supplied in prior iterations of a plan that the Debtor is no

11  longer advocating for, correct?

12          MR. KAUFMAN:  Your Honor, I'm going to object at

13  this point that this has been asked and answered a few times

14  and I'm objecting to the relevance at this point.

15          THE COURT:  I will agree with you on the asked and

16  answered.  I get the point

17          MR. MOXLEY:  Okay, thank you, Judge.

18  BY MR. MOXLEY:

19  Q    So, Mr. Perry, just to be clear, when you gave your

20  testimony the Debtor would have funds to pay administrative

21  claims in the effective date, did you want anybody to assume

22  that you were referencing the old date -- the old

23  definition, excuse me, for effective date?

24  A    No.

25  Q    Okay.  I noticed, Mr. Perry, that when you first

1  testified the settlement funds would be received on the

2  effective date, we read it.  You stumbled a bit on the

3  answer.  Do you recall that?

4  A    Sure.  I can explain why.

5  Q    Sure. I'd like to hear the explanation.

6  A    Sure, because the effective date in the old plan does

7  not reference or relate to the effective date in this 9019.

8  I'm using effective date broadly.  An effective date as a

9  term that is typically understood within a Chapter 11

10 context.

11 Q    Okay.  I don't think the Debtor's counsel asked you any

12 questions that would have -- that prompted you after you

13 gave that testimony to say, let me clear now before

14 settlement funds come in, you've got to have a final non-

15 appealable order.  Is that right?

16 A    I don't recall whether that question was asked or not.

17 I don't believe so.

18 Q    You didn't testify as to that, correct?

19 A    I don't believe that I was asked that.

20 Q    Were you in the courtroom that day before your

21 testimony began?

22 A    I was.

23 Q    Did you hear Judge Lopez ask Debtor's counsel to walk

24 through the changes that were made in the proposed new

25 filing?

1  A     Yes, I was here for that exchange.

2  Q     Okay.  I don't recall there being any discussion about

3  the need for a final non-appealable order when we walked

4  through those changes for the settlement fund to be paid.

5  Do you recall any such discussion?

6  A     I only recall there was an exchange of the information.

7  I don't exactly recall the exact exchange.

8  Q     Okay.  Mr. Perry let me ask you this question.  Why did

9  the Debtor change section 9, conditions precedent, in the

10 middle of the hearing on this Rule 9019 Motion?

11 A     I think the changes were made based upon discussions

12 with parties as to certain things they heard from the Court

13 and the Court's concerns.  And other discussions amongst the

14 parties.

15 Q     Okay.  Who does the change requiring a final non-

16 appealable order benefit?

17 A     I think it benefits likely all parties.

18 Q     How does it benefit creditors?

19 A     Well, first and foremost, providing a firm definition

20 for when settlement proceeds will be received allows for the

21 distributions to be made to the creditors quickly and

22 efficiently. I think it just provides for guidance and

23 finality on that.

24 Q     Okay.  We just talked about this though, Mr. Perry,

25 under the prior Plan, the distributions could be made after

1  confirmation of a Plan because the settlement payments would

2  be made at that time and not subject to appellate risk,

3  correct?

4  A    The Article X that we referenced earlier provides for

5  certain conditions of the plan.  Whether that changes how

6  quickly the distributions can made to creditors versus the

7  current Plan, I don't know.

8  Q    That's your testimony that you don't know how it

9  changes Plan distributions can be made to creditors?  I just

10 want to be clear, that's your testimony.

11 A    I think because we haven't negotiated a new Plan, the

12 mechanics of a new Plan.

13 Q    Okay.  But you have negotiated the mechanics of the

14 proposed form of order for the settlement agreement.  And

15 it's mechanics are that the settlement payments don't have

16 to be made until there's a final non-appealable order,

17 right?

18 A    Correct.

19 Q    Okay.  Can you identify any conceivable benefit to the

20 Debtor from this change requiring a final non-appealable

21 order before the settlement payments arrive?

22 A    I may be losing my voice.  Yes, the Debtor is able to

23 effectuate the plan mechanics; it's able to distribute

24 proceeds to creditors and carry out the plan mechanics.

25 Q    Is the benefit to the Debtor, sir, that absent agreeing

1  to money not coming in until there's a final non-appealable

2  order that you wouldn't have a settlement?

3  A    Can you repeat that question?

4  Q    Yes, sir.  The question is --

5  A    Can I get some more water?

6         MR. MOXLEY:  Oh, let's pause for a moment, Your

7  Honor.

8         THE COURT:  Of course, thank you.

9      (Pause in the proceeding.)

10 BY MR. MOXLEY:

11 Q    Take a moment.

12 A    I think they call it a frog in your throat, I think.

13 Q    Yeah, take a moment, sir.

14     (Pause in the proceeding.)

15 A    Okay.  Mr. Moxley, would you mind asking the question

16 again?

17 Q    Not at all, Mr. Perry.  Not at all.  My question was,

18 let's just take a quick step back.

19 A    Sure.

20 Q    I'd ask you could you identify a benefit for the Debtor

21 in this change.  And I think your testimony was,

22 essentially, that it allowed for the Debtor to proceed with

23 these settlement mechanics.  Is that essentially what your

24 answer was?

25 A    Settlement mechanics partly.  But also allows us to

RUSSELL PERRY - CROSS BY MR. MOXLEY                    93

1   carry out whatever may be the mechanics in the plan to

2   distribute proceeds to the creditors.  The settlement

3   agreement does not address how funds will ultimately be

4   distributed to creditors, the mechanics of that and the

5   timing of that.

6   Q    Okay.

7   A    It simply brings money into the estate.

8   Q    Okay.  My question though, sir, is the real benefit to

9   the Debtor for making this change, the change being the

10  change to a final non-appealable order being required before

11  settlement payments are required to be paid.  Is the real

12  benefit for the Debtor that but for reaching that agreement,

13  the Debtor wouldn't have a settlement with the settlement

14  parties?

15  A    The settlement parties were -- my understanding as I

16  testified earlier -- were included in and part of the

17  negotiations and discussions to reach this language.  If the

18  Debtor is unable to receive the settlement dollars but for

19  this language, then absolutely the Debtor needs to

20  effectuate this language if this is what the settlement

21  parties are requiring in order to bring the money into the

22  estate to distribute to creditors.

23  Q    And is it your understanding, sir, as the CRO of the

24  Debtor who participated and was aware of the nature of those

25  discussions, that that was a requirement of one or more of

RUSSELL PERRY - CROSS BY MR. MOXLEY                94

1  the settling parties before they would agree to the

2  settlement?

3  A    I'm not aware.  I believe they were part of the

4  discussions.  I'm not aware of the answer to that question.

5       (Pause in the proceeding.)

6  Q    Under the prior construct of the proposed order, it was

7  the settling parties.  The M2 parties, Mr. Lefkowitz, who

8  were exposed to appellate risks because they would have paid

9  the money before appeals were exhausted, correct?

10 A    I don't know the answer to that.

11 Q    Okay.  It is your understanding, though, that under the

12 prior construct settlement payments had to arrive at

13 confirmation.  They were not able to wait to pay until there

14 was a final non-appealable order, correct?

15 A    Under the language that we reviewed a minute ago for

16 the old plan not connected to this 9019, my understanding is

17 the Plan conditions in Article X state the confirmation

18 order would need to be entered.

19 Q    That would mean, mechanically, that the creditors could

20 have been paid those funds earlier in time, under that prior

21 construct than under the new construct, correct?

22      MR. KAUFMAN:  Your Honor, this is calling for

23 speculation.

24      THE COURT:  I'll sustain the objection.

25      MR. MOXLEY:  Thank you.

1          (Pause in the proceeding.)

2    BY MR. MOXLEY:

3    Q    Mr. Perry, is it your understanding of the mechanics

4    here that the M2 parties will not have to pay anything until

5    all appeals are exhausted, assuming there is a confirmation

6    order and a plan -- the 9019 is approved and there's a

7    confirmation order?

8    A    I'm sorry.  Mr. Moxley that was --

9    Q    I'll rephrase it.

10   A    Yeah, repeat that for me because --

11   Q    Is it your understanding, just as the mechanics of how

12   the new proposed form of order works, that the M2 parties,

13   including Mr. Lefkowitz will not have to pay anything for

14   years until after appellate process have run their course

15   and a final non-appealable order is made?

16   A    That's not my understanding.

17   Q    Not your understanding.  When do you understand the

18   settlement payments will be made?

19   A    Upon the entry of a final order of the Court, not

20   subject to an appeal.  But, you said years.  I don't have an

21   understanding of whether it's years, months, days.

22   Q    So whatever that pass of time is, that's when it

23   happens?

24   A    It happens when there's a final order that's not

25   subject to an appeal.

1  Q    Okay.  Is it part of the new construct that the

2  settlement payment will be put into escrow at confirmation

3  to void any risk of the settlement money might not be there

4  when that time arrives when a final non-appealable order is

5  obtained?

6  A    Are you referencing a doc -- I'm sorry.  There's no

7  document that I'm aware of that has that mechanic.

8  Q    Right.

9       (Pause in the proceeding.)

10  Q    Why was it that the prior version of Section 9 of the

11  settlement agreement did not require the entry of a final

12  order confirming the Plan as a condition, the effectiveness

13  of the agreement?   Why wasn't the new construct, the

14  construct previously?

15  A    It was a result of a negotiations initially in which

16  Judge Sanchez (phonetic) was -- Mr. Sanchez was involved

17  during mediation.

18  Q    Right.  That was something that was negotiated

19  previously with the UCC, right?

20  A    It was.

21  Q    You attended the -- did you attend the first day of the

22  hearing?  No, you weren't here on March 1st?

23  A    Correct, I was not here.

24  Q    Okay.  Did you hear about Mr. Barton's testimony on the

25  first day of the hearing that the most important reason from

1  the committee's perspective why the UCC supports the

2  settlement is because it gets money into the hands of

3  creditors now?

4  A    I wasn't here.  Mr. Moxley, for that I don't recall

5  that testimony.

6  Q    Did anybody make you aware of the fact that Mr. Barton

7  testified that his understanding of what that meant, the now

8  money in the hands of creditors now meant that on

9  confirmation of the Plan?

10 A    No one made me aware of Mr. Barton's testimony.

11 Q    Okay.  New proposed form of order doesn't provide for

12 settlement payments to arrive now at confirmation of the

13 Plan.  It's down the road when a final non-appealable order

14 is obtained, right?

15 A    The new language as it's written in 9A requires a final

16 order not subject to an appeal.

17      (Pause in the proceeding.)

18 Q    And I think, Mr. Perry, that you actually previously

19 testified on questioning on the second day of this hearing

20 that one of the reasons you thought the deal was a good

21 deal, was because people would be paid quickly, right?

22 A    Happy to look back at the transcript, if I used the

23 word quickly.

24 Q    You can look at that.

25 A    Talk about timing.

1  Q    Let's look at the transcript.  Again, it's Tab C of the

2  transcript binder, sir.  And if you would turn with me to

3  Page 141.

4        (Pause in the proceeding.)

5  Q    And if you look at Page 141, Mr. Kaufman on direct

6  asked you, "Do you believe the settlement is in the best

7  interest of creditors?"  Your answer was, "I do."

8        Question, "Why?"

9        Your answer, "I think it's in the best interest because

10 I think it's value maximizing.  I think if the Plan is

11 confirmed, with at least the ability to quickly liquidate

12 claims or a process to liquidate claims, then the money that

13 would be received by the Debtor on the effective date could

14 be distributed hopefully in some timely fashion.

15       "And I believe when taking all the factors that I

16 mentioned today into account, I think it's in the best

17 interest of the creditors."

18       That was your testimony, right?

19 A    Yeah.

20 Q    Is it your expectation, Mr. Perry, that Ankura is going

21 to have to wait until a final order confirming the Plan as

22 entered before it gets paid its fees and expenses in this

23 case?

24 A    I don't -- Ankura has not filed a final fee

25 application, nor has there been, I think, a hearing set for

1  that.  So I don't have an (indiscernible).

2  Q    Okay, is the Debtor intending to pay its professionals

3  -- its professionals, the Debtor's professionals, prior to

4  the entry of a final order confirming a plan in this case?

5  A    There are fee compensation procedures set up today.

6  And that's what the Debtor would follow until the Court

7  would change that -- those mechanics.

8  Q    Okay.  And the Debtor intends to do that, I take it,

9  from your earlier testimony by monetizing certain assets,

10 correct?

11 A    I'm sorry, intends to do what?

12 Q    I'll just ask it.  How does -- under the -- your last

13 answer where you say the Debtor plans to pay professionals

14 in accordance with the current mechanics in place.  How does

15 the Debtor plan to have money to do that?

16 A    Well, currently within the 9019 there's a construct

17 where an additional 5 million would be received.  That 5

18 million is memorialized within the budget, that I believe I

19 testified on originally, that the budget has budgeted

20 payments to be made to professionals according to the

21 mechanics of the compensation procedures today.

22       And there is a final column, at least in the budget

23 that's been filed, that has what I'll call effectively a

24 plug of monies that would be available to fund professionals

25 upon final fee application.

1  Q     Okay.  Is there -- other than those mechanics that are

2  set forth, is there any other agreement, any side agreement

3  for Ankura to be paid its fees in connection to this case?

4  A     No, there's no side agreement.

5  Q     Is the Debtor intending to pay the TCC's professionals

6  in this case prior to the entry of a final non-appealable

7  order confirming the Plan?

8  A     I don't know.

9  Q     What would inform that decision whether the TCC's

10 professionals would be paid prior to a final non-appealable

11 order confirming the Plan?

12 A     I would need to study the compensation procedures

13 today.  I would need to understand whether or not there's a

14 court order that would allow for the Debtor to fund fees.  I

15 would need to understand whether there's objection periods

16 that have run, whether there's a fee application process

17 required.

18       It's really mechanics of both compensation and

19 available funding the Debtor may have.

20 Q     Okay.  And you previously testified the Debtor had

21 under estimated the fees and expenses for the TCC's

22 professionals in the budget, correct?

23 A     Compared to the filed fee statements as of today, that

24 is correct.

25 Q     Other than the DIP loan, does the Debtor have any other

1  source of funds available to pay professional fees and

2  expenses in this case?

3  A     Yeah.

4  Q     The ECR credit?

5  A     If they're liquidated, yes.

6  Q     Anything other than that?

7  A     I receive small amounts -- I say I, the Debtor receives

8  small amounts.  Usually a couple of times a week we receive

9  checks on old AR, old reimbursement claims, small amounts.

10 Those are fairly small dollars, but they are received.

11      There are, you know, clearly other type of cause of

12 actions that aren't being released in the 9019 that could

13 effectively be liquidated.  The ERC's, there's two elements

14 of that.  One is, we would wait for the IRS to actually fund

15 those ERC's or we could, you know, potentially monetize them

16 with third party.

17 Q     Okay.  And I appreciate that there are mechanics for

18 making payments.  This question is slightly different from

19 the mechanics.  I'm asking, Mr. Perry, for your knowledge.

20 Do you have knowledge of whether or not M2 Loan Co will make

21 money available to pay TCC's professionals in this case?

22 A     I don't have knowledge of that outside of what's in the

23 budget today.

24 Q     Okay.  What is -- do you have any understanding at all

25 the amount of money that M2 Loan Co would make available to

RUSSELL PERRY - CROSS BY MR. MOXLEY                    102

1  pay the TCC professionals in this case?

2  A    I do not.

3  Q    How is -- how will the Debtor be able to satisfy its

4  obligation to pay the TCC's professionals in this case?

5  A    My testimony originally, I walked through a

6  demonstrative where I had three numbers on a page.  And I'm

7  happy to reference it.

8       But I had total anticipated administrative expenses.  I

9  had amounts that had been paid or anticipated to be paid.

10  And then I had a delta, meaning an A minus.  A being total

11  fees, B meaning amount available under the DIP for funding.

12       Well my testimony way, I believe, and I'm probably not

13  going to have state it perfectly, but there was about a

14  $3 million number that I've estimated as part of the DIP

15  budget through a date certain in which that 3 million would

16  need to be funded by assets of the Debtor, including the

17  liquidation of the cause of action, the 40 million that

18  we're talking about today.

19       To the extent that that number is either too high or

20  too low, I would still expect the mechanics to be the same

21  as it relates to how those are funded.

22  Q    Okay.  And can the Debtor currently pay its debts as

23  they become due in the ordinary course of business?

24  A    Yes.

25  Q    Their obligations.

1  A    We -- the Debtor currently has, you know, assets to the

2  extent that there is an agreement to fund or make payments

3  on those debts today.  And when I say debts, I mean if folks

4  have filed fee statements or there's fee applications and

5  there are procedures in place to allow them to be paid.

6       I haven't done the exact math, but I believe we would

7  have enough in reserve to fund up until a point in time and

8  then I would need to liquidate other assets.

9  Q    Okay.  Well let me ask you as a matter of fact.  As we

10 sit here today, can the Debtor currently pay its obligations

11 to the estate professionals as they become due and owing

12 each month?

13 A    I have two forms of assets.  Assets I can to liquidate

14 and assets I have already liquidated.  As I sit here today -

15 - and I would need to run the calculations specifically, but

16 I believe I would be able to use the amounts that I have

17 already liquidated to fund certain amounts.  And then I

18 would need to liquidate other assets to fund other incurred

19 amounts yet to be approved by the Court to be paid.

20 Q    Okay.  But your testimony is you could take those

21 steps; is that right?

22 A    Sure.

23 Q    So, -- okay.

24      (Pause in the proceeding.)

25 Q    Mr. Perry and Your Honor, I have -- I'd like to move to

RUSSELL PERRY - CROSS BY MR. MOXLEY                     104

1  a different topic now.  I would be happy to just carry on, I

2  really don't want to do that.  But if the Court or the

3  witness would like a break, I'd be happy to take a short

4  break as well.

5          THE COURT:  Mr. Perry?

6          THE WITNESS:  No, I don't need a break.

7          MR. MOXLEY:  Carry on?

8          THE COURT:  How long do you think you have?

9          MR. MOXLEY:  For the entirety of it sir?  I

10 believe -- I would love to say I can finish in one more

11 hour.

12         THE COURT:  Okay, let's keep going.

13         MR. MOXLEY:  Okay, very good.

14 BY MR. MOXLEY:

15 Q    So we talked a little bit, Mr. Perry, about the

16 employee retention credits or commonly referred to as the

17 Eric's, right?

18 A    We have.

19 Q    And the ECR is a refundable tax credit for certain

20 eligible businesses that have employees that were effected

21 during the COVID 19 pandemic, right?

22 A    Generally that's correct, yes.

23 Q    Okay.  That's what it says in the IRS website?

24 A    Yeah, I can't remember if it says reimbursable or what,

25 but yes that's correct.

RUSSELL PERRY - CROSS BY MR. MOXLEY                    105

1  Q    Okay, very good.  Very good.  And the Disclosure

2  Statement and the notes to the liquidation analysis,

3  discusses ERCs.  I'd like to take a look at that.

4       If we could go to Tab 18 in your binder, sir.

5       (Pause in the proceeding.)

6  Q    Tab 18 -- and this is just for the record, this is

7  TCC's Exhibit 27.  It's the second amended Disclosure

8  Statement.  And if you turn with me to Page 65 of the

9  filing.

10      (Pause in the proceeding.)

11 Q    Mr. Perry, so I stopped saying this.  Can we -- you

12 understand when I say of the filing, you mean the pages that

13 are written on the top of the page?

14 A    I do.

15 Q    Okay.  That's what I say, so.  Very good.  So we're on

16 Page 65 of the filing.  The Disclosure Statement says that

17 -- and I'm looking at Section G.  Do you see Section G on

18 the page?

19 A    I do.

20 Q    And the Disclosure Statement there says the Debtor

21 filed ECR returns after June 27th for 2020 in the aggregate

22 amount of approximately $7.6 million.  And returns for 2021

23 in the aggregate amount of approximate $9.21 million, right?

24 A    It does say that.

25 Q    And the Disclosure Statement goes on to state that the

1   Debtor assumes the IRS will combine the ECR credits of 2020

2   and 2021 and offset the approximate $8.2 million in priority

3   IRS claims and remit the balance to the Debtor, right?

4   A    Correct.

5   Q    And the prior seconded amended plan estimated Eric's to

6   be 12.6 million to $16.7 million, right?  I think you

7   pointed to a cite for that, if that's helpful, sir.  That's

8   at Page 63 of the filing.

9         (Pause in the proceeding.)

10  Q    I'm looking at row two in particular.

11  A    That is correct.

12  Q    Okay very good.  And you testified on direct that on

13  the morning of this bankruptcy filing, February 13th, you

14  received, I think you said, a really extensive report from

15  Synergy indicating the Debtor would have access to

16  approximately $10 million of ERCs.  Do you recall that

17  testimony?

18  A    I don't recall using really extensive, maybe I did.

19  But I did receive a report from Synergy, yes, that allowed

20  for the application of the additional proceeds.

21  Q    If you used that phrase -- I'll represent to you that

22  you did.

23  A    Oh, no worries.

24  Q    If you used it -- if you used it, that was accurate

25  correct?  Is that right?

1   A    It is accurate that the amounts were increased by an

2   additional analysis provided to us by Synergy.

3   Q    No, no.  My question is a little bit different, sir.

4   So let's just make sure we're clear on this.  Let's go to

5   the transcript.  Just quickly.  It's at Page 40 of your

6   direct examination.

7        (Pause in the proceeding.)

8   Q    Are you with me on Page 40, sir?

9   A    I am.

10  Q    If you look at line 11 to 24.  Do you see line 11, "So

11  if there was no amounts left under the funding agreement,

12  did you investigate other source of capital or cash that

13  could be used to fund the bankruptcy case?"  You said,

14  "Absolutely."

15       "Explain that process to the Court."  You were asked to

16  do that and you said, "The day we filed, February 13th, we

17  had received that morning correspondence from Synergy, our

18  third party, that was called the Employee Retention Tax

19  Credit.  We had received a really extensive report from them

20  that basically indicated that the Debtor had access to it,

21  roughly $10 million from Employer Retention Credits."  That

22  was your testimony, right?

23  A    What, that relates to $10 million.

24  Q    I understand.  That's my question.  That was your

25  testimony about the 10 million, correct?

1   A      Different 10 million.

2   Q      Different 10 million?

3   A      Correct.

4   Q      Okay, explain to me what you mean by different 10

5   million.

6   A      Sure.  So on February the 13th, when we filed, Synergy

7   Debtors third party tax consultant, we'll call them,

8   provided a report that morning as well as calculations,

9   files, things that I believe have been shared with TCC, that

10  "describe why the Debtor was qualified to receive these

11  credits."  And explained the calculations.

12       Now, the reason why I testified that it was roughly 10

13  million is because that 10 million relates to the

14  liquidation analysis where it says, before June 27th -- and

15  I'm looking at Section G -- the Debtor filed ECR returns for

16  2021 in the aggregate amount of approximately 9.1 million."

17  One fiscal year.

18       My testimony here -- and I appreciate the words really

19  intensive -- because I felt relative to what I think you

20  others have received in this context -- the Debtor did

21  receive a fairly extensive report on why the Debtor

22  qualified for roughly 10 million.  The liquidation analysis

23  had a perfect number of 9.1 and change.

24       But that was for fiscal year 21.  Now as I testified a

25  minute ago, the Debtor has filed what we call 941 X's for

RUSSELL PERRY - CROSS BY MR. MOXLEY                    109

1   2021.  It's now filed 941 X's for 2020.  And when you

2   combine those fiscal years, the number is much higher per

3   what I have in my demonstrative which takes almost less than

4   $30 million.

5   Q    Okay, that's very helpful.  Thank you for explaining

6   that.  Let's look at that demonstrative, if we could.  It's

7   in Tab 20 of your binder.  This is your demonstrative.

8        If you go to Tab 20, just to set this out for the

9   record.

10  A    Okay.

11  Q    Let me know when you're there, sir.

12       (Pause in the proceeding.)

13  A    I'm here.

14  Q    You're there.  Okay.  And just for the record and for

15  the Court's benefit, I'll just note that there's the

16  handwriting at the top that says Perry Demo One that is --

17  I'll represent to you that's my handwriting.

18  A    Okay.

19  Q    So this is a scan of my copy of the demonstrative that

20  was handed out in hard copy form.  I'm making the Court --

21  A    Correct.

22  Q    So, if you look at the employee retention credits line

23  two, you have the August 2023 settlement and January 2024

24  settlement columns.  And you have the numbers there for each

25  of those, the same, with the estimates of the high and the

1  low.  Do you see that?

2  A    I do.  Yeah they're the same.

3  Q    They're the same as of that time, right?  As of each --

4  A    They're the same as of the time of this demonstrative

5  was prepared, correct.

6  Q    Right.  Okay, okay.  Now you had testified, I think, on

7  direct that the Eric's went up a fair extent, was the phrase

8  that you used, from what was in the liquidation analysis

9  versus what you now represent in the demonstrative, correct?

10 A    That's correct.

11 Q    Okay.  And can you just explain why it was that those

12 amounts increased to that magnitude from what was in the

13 liquidation analysis to what's in the demonstrative?

14 A    Sure.  So the third party consultant, Synergy, was

15 engaged to calculate the amounts of the credits that would

16 be available to the Debtor.  Both whether the Debtor

17 qualified for those and then the calculations connected to

18 that qualification.

19     Synergy performed I believe months of work around this

20 both to confirm the qualification and then obviously to

21 calculate it.

22     As I mentioned a second ago, when we -- when the case

23 was filed, I was aware of 9.1 million for fiscal year '21.

24 Synergy had yet to complete its analysis for fiscal 2020.  I

25 don't have the exact date, but I believe that analysis was

1   completed I want to say sometime towards the end of the

2   year.  Maybe September, October.

3        That added an additional 7 million in change to the

4   total.  Okay, fiscal year 21.  We then asked Synergy to go

5   back and determine whether or not there were additional ECR

6   credits available to the Debtor.

7        I think they call it -- they reference it as a term

8   like payroll optimization, I believe, is their word for it.

9   But whether there was additional amounts available to the

10  Debtor for both fiscal years 2020 and 2021.  Synergy

11  performed additional diligence.  They completed additional

12  calculations.  And they provided us with a analysis both

13  supporting our qualifications information as well as the

14  actual self filed backup calculations.

15       And those numbers revised from this -- let's call it

16  7.6 plus the 9.1.  They revised up to the numbers on the

17  high end of my demonstrative.

18  Q    Got it.

19  A    Close to 26 million.

20  Q    Thank you.

21  A    It's technical, so I hope --

22  Q    No, no.  I appreciate the explanation.  When in time

23  did you receive that analysis from Synergy that caused your

24  estimation to go up as reflected in the demonstrative?

25  A    It was sometime before I shared the file with TCC as

1  part of their request for information.  So probably

2  December, maybe late December, early January.  I don't have

3  an exact date.

4  Q    Okay.  But before you received that analysis in

5  December or early January, you didn't have reason to think

6  that -- strike that.  You received that analysis in December

7  or early January, that's when your understanding of the

8  number went up?  That's when, in time, it happened?

9  A    I needed the analysis to be complete before I could

10 even take a position on whether or not there was there

11 additional amounts.  I didn't know until I received the

12 report.

13 Q    Okay.  Okay.  So is it -- so when the Disclosure

14 Statement was filed on October 27th -- and I'm looking back,

15 just so you know, I'm looking at Page 63, which is that

16 chart we just looked at in the liquidation analysis.  The

17 numbers that are reflected in row two there for the ECR

18 credits, those numbers are the 12.5 to 16.7 million, right?

19 A    Correct.

20 Q    Okay.  So what I guess I'm trying to understand, sir,

21 is why was it that in October, that was what was represented

22 in the Disclosure Statement on the likely recovery on the --

23 I say recovery, the likely amounts to be received on the

24 ERCs.  Was that all based on Synergy?  Was it based on your

25 work?  How was it that those numbers came to be in the

1   Disclosure Statement.

2   A     And the Debtor didn't calculate these numbers.  The

3   Debtor's tax advisor, as I call it, Synergy Tax Credit

4   Advisor.  Synergy provided the Debtor with both the written

5   reports confirming qualifications as well as the

6   calculations.

7        Those are all the numbers that I had at the time that I

8   could essentially verify.  The 941 X's for 2021 had been

9   filed.  The 2020 had not been filed.

10       So therefore, the IRS wasn't even informed yet of the

11  additional 7.6.  They were only informed of the 9.1.

12  Q     Got it.

13  A     So at that point in time, it's the only numbers that I

14  was aware of.

15  Q     Would this had been possible for Synergy to calculate

16  the numbers that resulted in the approximately $26 million

17  that you estimate now in the high end for the ERCs, would it

18  have been possible to do those calculations before the

19  Disclosure Statement was filed?

20  A     Oh I pushed them all the time.  And we had pushed them

21  to do the calculations.

22  Q     Right, you were pushing them.

23  A     It wasn't available to me until they submitted the

24  report and they were giving me no guidance on what the

25  potential opportunity was.

RUSSELL PERRY - CROSS BY MR. MOXLEY                    114

1   Q    Right.  So you were just waiting on them to complete

2   that task?

3   A    I didn't know for sure that it was a task that they

4   were going to complete because number one, the idea of this

5   sort of optimization, this third, sort of stage in the

6   process.  And my mind was a bit speculative as it relates to

7   whether or not we qualified; whether or not the calculations

8   were going to be completed; whether or not it was even

9   available.

10      I mean, it was very speculative up until the point in

11   time where I received a report, reviewed the report and felt

12   comfortable with filing.

13   Q    Okay.  What I'm wondering is, I know how much care you

14   wanted to take in terms of feeling comfortable with the

15   report and being able to file accurate forms.  I'm wondering

16   why the same level of care wasn't taken with respect to the

17   Disclosure Statement?  Why were these numbers that could

18   have been calculated in October, put in here at these lower

19   figures when if only that task had been completed, you could

20   have had more accurate information in the Disclosure

21   Statement?

22   A    The Disclosure Statement was accurate as I understood

23   it at the time.  I didn't have a payroll optimization

24   analysis.  I had no idea -- I don't even think Synergy had

25   really begun the analysis at that point in time.

115

1   Q     You're a restructuring professional.

2   A     Very correct.  I am.

3   Q     You understand the importance of Disclosure Statements

4   as to the process, right?

5   A     I do.

6   Q     Okay.  You understand the Court has to approve a

7   Disclosure Statement as containing adequate information

8   before you can solicit those on the Plan, right?

9   A     I do.

10  Q     And the difference is between the Disclosure

11  Statement's estimates and your estimates now and the

12  demonstrative that you shared with us on March 5th and with

13  the Court, they're pretty dramatically different, aren't

14  they?

15  A     Yeah, I was elated.  Another $10 million of proceeds to

16  distribute to the creditors.  I thought it was a fantastic

17  result.  When the report came in, I was -- yeah, I was

18  extremely excited and to be honest I worked very hard

19  getting these numbers in.

20        And once they were received, you know, obviously beyond

21  filing a -- this Disclosure Statement, you know, I was ready

22  to incorporate it into an updated analysis.

23  Q     And how certain as you sit there today, sir, are you

24  that the ECR range will remain that estimate 19 to $26

25  million?

RUSSELL PERRY - CROSS BY MR. MOXLEY                    116

1    A    That's probably a better question for the IRS.  I have

2    been engaging with the IRS since the, you know, probably a

3    week or two after the case filed.

4         There was an IRS officer that attended one of the 341

5    meetings.  We have engaged with that individual.  We have

6    engaged with other individuals.  I've received

7    correspondence from the IRS that effectively has confirmed

8    the filing of the 941 X's.

9         And the IRS has personally confirmed to me that three

10   of -- of three tax id's, one of tax ids they've already

11   applied some of the credits to some of the outstanding

12   taxes.

13        So as I sit here today, I can't speak for the IRS.  I

14   don't pull the trigger for the IRS.   I don't otherwise file

15   the forms, you know, inside the IRS to make this official.

16        What I do know is that the IRS has communicated to me

17   that there is a moratorium in place for filed ECR credits.

18   That there was a potential deadline of a date, but I think

19   it was sometime in January, in which all ECR 941 X forms

20   needed to be filed.

21        And to this date, the IRS has yet to communicate it to

22   me that they're not going to follow along with the logistics

23   in the plan, which is to apply the credit once the

24   moratorium is lifted, to the priority tax claim amount and

25   distribute the rest to the Debtor.

1   Q    Any chance you might find another $10 million tomorrow?

2   A    Well, since you asked.  You know, part of my original

3   testimony was back on the demonstrative for number 20.

4   Q    Yep.

5   A    I think my testimony was that some of these other

6   amounts in here -- for example the 1.5 to 3 million there

7   maybe other folks that enter evidence, I believe, that

8   number might be like.

9       There's amounts in here on the insurance line at 5 to

10  10 million.  You know, that process clearly needs to play

11  out, particularly in the State of Arizona to determine

12  whether or not there's additional proceeds for claimants and

13  those amounts.

14      So, Mr. Moxley, I can't tell you there's another 10

15  million, but you know, my hope is as the CRO, that there are

16  additional amounts that can be distributed to the estate.

17  Q    Okay.  Let's turn to the insurance please.  On direct

18  examination, you testified that among the sources of capital

19  to fund the bankruptcy case that you looked at, were

20  insurance policies that were allocated to Debtor in the

21  divisional merger, right?

22  A    That's correct.

23  Q    And at the outset, you knew there were insurance

24  policies, but you didn't know much beyond that about, I

25  think you said, the extent that we could use those insurance

1  policies, right?

2  A    Correct.  The divisional merger documentation I think

3  provided for the insurance policies that were allocated to

4  called RemainCo, obviously the Debtor, today, but we knew

5  the presence of insurance policies.  We didn't know the

6  mechanics of those policies and that took some time to

7  determine.

8  Q    Okay.  Are you an expert in insurance loss, sir?

9  A    I'm not, no.

10 Q    Are you an expert in coverage defenses?

11 A    No, I'm not.

12 Q    Do you have any special certifications in insurance

13 coverage?

14 A    I have no certifications in insurance, no.

15 Q    Did you evaluate the insurance coverage?

16 A    Counsel did.

17 Q    Not you, right?

18 A    I evaluated the results of the analysis.  I

19 participated in two separate mediation sessions and I have a

20 general understanding of, you know, the insurance policies

21 and the mechanics that we disclosed.

22 Q    Who are the counsel that analyzed the insurance

23 coverage?

24 A    Both the Unsecured Creditors Committee, I believe,

25 provided counsel, insurance specialist, as well as the

1  Debtor.

2  Q    You say the insurance specialist.  Are you aware of

3  which attorneys at Gray Reed for the Debtor are insurance

4  specialist as you said?

5  A    Yes.  Stephanie is one and I'm just drawing a blank on

6  the other.  But there's a practice in Gray Reed my

7  understanding specializes in strictly insurance.  They were

8  part of the first mediation, assisted with the analysis and

9  developed an analysis leading up to both mediations and I

10 think assisted with development of the exhibits that were

11 filed with the plan.

12 Q    Did those two Gray Reed insurance attorneys provide you

13 with a memoranda concerning insurance available in this

14 case?

15         MR. KAUFMAN:  Your Honor, I'm going to object.

16 This is calling for attorney/client privilege information.

17         MR. MOXLEY:  Your Honor, he put in his

18 demonstrative a value for the insurance coverage which we

19 think -- spoiler alert -- is too speculative.  And so I can

20 understand the basis for his understanding that the

21 insurance can be between 5 and $10 million.

22         THE COURT:  I think you can answer without

23 revealing any attorney/client privilege.

24         THE WITNESS:  Okay, so the analysis of the

25 insurance and any further analysis of the insurance would

1  have been part of the mediation because we mediated

2  insurance policies twice.  So I can't answer and I won't

3  answer anything that may invoke communication privilege.

4          But what I can do if assuming in any of these

5  binders the insurance exhibit exists, I can walk us through

6  that.  And I can explain my rational to 5 to 10 million and

7  why, you know, the number is really an estimate.

8  BY MR. MOXLEY:

9  Q    And we'll get to that.  I want to hear your analysis on

10 the 5 to 10 million.  But before we get there, what I'd like

11 to understand, Mr. Perry, just what that analysis is based

12 on.  So I appreciate those things happened in mediation.

13 I'm not asking you to disclose substantive mediation

14 discussions.

15     All I'm asking you to do is just to confirm whether or

16 not you were provided with any written analysis by the Gray

17 Reed lawyers that you said were insurance coverage

18 attorneys.  Did they provide you any written analysis

19 coverage?

20     Don't tell me what it is.  Just did they provide you

21 any?

22 A    There was analysis provided to the Debtor, the

23 mediator, and to other parties in connection with the

24 mediation.

25 Q    By those insurance attorneys about insurance?

1   A      Yes.

2   Q      Okay.  And did anyone for -- you mentioned that counsel

3   to the UCC, the Stenson firm, also had insurance analysis

4   undertaken.  To your knowledge, was -- were those lawyers

5   who also specialized in insurance?

6   A      It's my understanding, yes.

7   Q      Okay.  And did you receive any written analysis from

8   the Stenson firm insurance lawyers about insurance coverage

9   in this case?

10          MR. KAUFMAN:  Your Honor, I'm going to object on

11  the basis of mediation privilege.  If the settlement party

12  or the mediation party provided written materials to

13  Mr. Perry, that would be strictly covered by the mediation.

14          MR. MOXLEY:  Your Honor, again, I'm not asking for

15  the substance, I'm just asking were written materials on

16  insurance provided.  We really need to, I think Your Honor,

17  to understand what the basis of Mr. Perry's demonstrative

18  numbers are with respect to insurance.

19          He's testified now that he received some written

20  analysis from the Debtor.  I'd like to understand if he

21  received written analysis from the UCC.  I'm not going to

22  ask for what the conclusions were.  I just want to know

23  whether he got any analysis.

24          THE COURT:  Counsel?

25          MR. KAUFMAN:  It's whether he got written

1  materials or not in the context of mediation is strictly

2  covered by mediation.

3          THE COURT:  I think that's right.  I think that's

4  right.  I'll sustain the objection.

5          MR. MOXLEY:  Okay.

6      (Pause in the proceeding.)

7  BY MR. MOXLEY:

8  Q    Mr. Perry, do you know how long coverage actions

9  typically take?

10 A    I only know generally that there could be a length of

11 time between when an incident occurs and when a final payout

12 to a claim that may exist.  And part of those payouts may be

13 insurance related.

14 Q    Okay.  If I told you sometimes insurance coverage

15 disputes can last years, if not decades, would that surprise

16 you?

17 A    It wouldn't surprise me.

18 Q    Do you know how much those coverage litigations that

19 can last years or decades may cost?

20 A    My understanding it could be a costly process depending

21 on the nature of the claim and the litigation that adheres.

22 Q    Have you every personally advised on a coverage action?

23 A    I have not.

24     (Pause in the proceeding.)

25 Q    I'm going to ask this question without attempting to

RUSSELL PERRY - CROSS BY MR. MOXLEY                    123

1   invade any mediation issues.  If there's a mediation

2   component, just let me know.

3        But outside of mediation, did you evaluate claims and

4   defenses that may arise in actual coverage in this case?

5   A    Not outside of mediation.

6   Q    You testified on direct examination about insurance

7   being available herewith "low SIRs."  I can show you that

8   testimony if you need it.  But my question to you is just,

9   what is an SIR?

10  A    SIR stands for self insured retention.  In layman's

11  terms it basically means work that can do with the

12  deductible.  Meaning you have to fund a certain amount prior

13  to being able to have access to the actual underlying

14  proceeds of the insurance policy.

15  Q    What other risk factors that you consider when you're

16  preparing your demonstrative regarding specifically the

17  insurance estimates.

18  A    Risk factors just would have included the process by

19  which a claimant would otherwise be able to liquidate

20  proceeds under the policy.  Part of the initial mediation,

21  as a result of that mediation was procedures that had been

22  produced from that.

23        Other mediation or other processes that would allow a

24  claimant to mediate with that insurance provider and seek a

25  liquidation of their claim.

RUSSELL PERRY - CROSS BY MR. MOXLEY                    124

1  Q    Who are the insurance companies that issue policies to

2  the Debtor?

3  A    I'd have to look at the demonstrative and I can walk

4  you through those. There's a handful of them.

5  Q    The names of the policies are in your demonstrative?

6  A    Yeah.

7  Q    Let's look at that and it's at Tab 20.

8       (Pause in the proceeding.)

9  A    It's not a demonstrative.  In the exhibit to the

10 Disclosure Statement.

11 Q    Oh, the exhibit to the Disclosure Statement.

12 A    Correct.

13 Q    I see.  Could you turn us to that -- that where you're

14 referring to?

15 A    I was just handed the binder this morning, so if you're

16 telling me it's not here, then I won't --

17 Q    Oh you --

18 A    -- flip every page.

19 Q    -- I'm sorry.  I apologize.  I can refer you to the

20 Disclosure Statement.

21 A    Okay.

22 Q    Where in the Disclosure Statement?  You can do that,

23 okay.  All right, so we're looking at Tab 18, sir.

24       MR. KAUFMAN:  Your Honor, I think the TCC's binder

25 at Tab 18 is not the entirety of the Disclosure Statement.

1   So just to help Mr. Moxley, we may want to use the one

2   that's in the Debtor's, in UCC's exhibit.

3        MR. MOXLEY:  That's fine.  I assure, Your Honor,

4   that was an advertent.

5        MR. KAUFMAN:  Which, incidentally, is Tab 18 in

6   our binder, too.

7        MR. MOXLEY:  Well, there you go.

8        MR. KAUFMAN:  It's at Debtor UCC Exhibit 18.  It's

9   docket number 1410-18.

10        MR. MOXLEY:  Thank you, Mr. Kaufman.

11        (Pause in the proceeding.)

12   BY MR. MOXLEY:

13   Q    So that's in the black binder, sir.

14   A    Okay.

15   Q    Go to Tab 18 there.  And, again, Mr. Perry, just the

16   question as you're going to that is just what are the names

17   of the insurance companies?

18   A    Okay.

19   Q    And I'm happy for you to reference the Disclosure

20   Statement noted.

21        (Pause in the proceeding.)

22   A    Okay, so I am on Page 72 of 177, Tab 18.  And this is a

23   schedule that was attached to the Disclosure Statement filed

24   last October.

25        The schedule here lays out the policy and the column

RUSSELL PERRY - CROSS BY MR. MOXLEY                126

1   that says policy most of these are the names of the

2   insurance companies.  Some of the policies have, obviously,

3   much longer names, but Lone Star Alliance, Lexington,

4   Ironshore, Plymadico (phonetic), Coveries (phonetic),

5   Nationwide, Oxford.

6        These are names of the policies and often times also

7   the name of the insurance company.

8   Q    Very good, sir.  And my question now is did you read

9   any of these policies?

10  A    I read and reviewed the analysis that was produced as

11  part of mediation.

12  Q    Okay.  Is it your understanding that someone for the

13  Debtor reviewed the policies that are scheduled here?

14  A    Yeah.

15  Q    Okay.  Are you aware -- this also sets forth the limits

16  on each of the policies, correct?

17  A    It does, yes.

18  Q    Okay.  And what is the column excess unpaid limits

19  represent?

20       (Pause in the proceeding.)

21  A    Okay, you're referring to Page 73.

22  Q    I apologize, yes.

23  A    Okay so Page 72 is professional liability policies.

24  Page 73 are excess policies.

25  Q    Right.

1   A    What that basically means is these are policies that

2   sit on top of underlying policies.  Meaning these are

3   sometimes we refer to them as like balloon policies or

4   umbrella policies.  They step in, you know, when there are

5   large claims that are liquidated and SIR is not satisfied.

6        So excess limits just basically means these are the

7   limits underneath the policies that would begin at certain

8   points in time.

9   Q    Okay.  Are you aware of the remaining limits on these

10  policies?  Is that set forth anywhere in this schedule?

11  A    Which policy?

12  Q    Of any of the policies that are listed on the schedule

13  two that you're pointing us to where the remaining limits.

14  What's left on those insurance policies is that represented

15  anywhere in this?

16  A    Well, the schedule two or Page 72 has a column that

17  says outstanding self insured retention.  Second to the

18  right.  In -- I'll just focus on the what we call LSA

19  policies, Loan Star Alliance.

20       And what you see is outstanding self insured retention.

21  For example for the first two policies are zero.  That means

22  that number that I referenced a second ago or the

23  terminology where I used the term deductible because it's

24  technical insurance for most of us, that's what would be

25  synonymous with the self insured provision.  Those amounts

1   have already been paid.

2       Now the far right column of aggregate unpaid limits,

3   those are the unpaid limits available underneath the policy

4   that the SIR would need to be satisfied in order to get to

5   those.  Okay, so it's just pure math.

6   Q    Right.

7   A    So, for example, the first two, there's a $4.4 million

8   amount unpaid under that policy without an SIR.  So that

9   would be the amount available under that policy.

10  Q    That's how this chart works.  I just want to make sure

11  the record was clear on how the chart works.

12  A    That's correct.

13  Q    Okay, so for each of these policies, we can do that

14  math, I think using those two columns, correct?

15  A    You can.

16  Q    Okay.  Are you aware of what the triggering events are

17  for these policies?

18  A    I don't know what you're referring to triggering

19  events.

20  Q    That's fine.  Are you aware if the claims have been

21  submitted under these policies -- if any claims been

22  submitted?

23  A    That would have been part of mediation analysis.

24  Q    Okay.  I'm not trying to interfere with that, so if

25  that's the case, just let me know that.  Are you aware of

RUSSELL PERRY - CROSS BY MR. MOXLEY                    129

1  whether or not any claims have been paid or denied under any

2  of these policies?

3  A    I won't answer what was in the mediation analysis, but

4  what I will tell you is that, for example, the first row

5  again says $6 million aggregate, $2 million per claim would

6  be the third column on the left.

7       And the aggregate unpaid limit is less than that.  That

8  just basically means there have been claims paid.  I don't

9  know under each individual policy, as I sit here today,

10  outside of the mediation analysis, whether there is claims

11  that have been denied.  But I do know that just based on the

12  numbers in this demonstrative, there have been paid a claim.

13  Q    Thank you, understood.  Have you, Mr. Perry, met with

14  any of the insurers that are listed in schedule two?

15  A    Yes, we mediated twice with insurance.

16  Q    Oh, I'm sorry.  Outside of mediation?

17  A    Outside of mediation I believe counsel has interacted

18  with every single one of the insurers because early on in

19  this case there was a process set forth where which we would

20  mediate with the insurance companies separate and apart from

21  a global mediation.

22       So the goal was to mediate with the various insurance

23  policy -- insurance carrier, set forth a process or even

24  liquidate policies.  Only two of those insurance carriers

25  agreed to met with us.

1  Q    Do you know why that is the others did not agree --

2  A    Those have been likely discussions between counsel.

3  But my understanding is, you know, there were others --

4  other policy -- insurance carriers that didn't agree to

5  mediate because they wanted to see the results of, you know,

6  earlier mediation or initial mediation.

7       Meaning no one wanted to be the first mover.  Once, you

8  know, we mediated with LSA and set forth, then, you know,

9  only one of the parties came forward to mediate.

10 Q    So let's look at your demonstrative now, which is

11 Page -- Tab 20 of our binder, sir.  I think you can set the

12 Debtor's binder aside now.

13 A    I'll leave it open.  I think I know where we're headed.

14 Q    Okay.  Don't steal my thunder.

15 A    Okay.

16 Q    So in your demonstrative -- and let me just ask do you

17 happen to know if demonstrative (indiscernible).  Okay, very

18 good.  All right.

19       In your demonstrative, it's Tab 20 of your binder, you

20 testified on direct examination about line four, the

21 insurance line, right?

22 A    I did.

23 Q    Okay.  And the low estimate in your insurance line,

24 line four of your demonstrative, was -- you ascribed to

25 insurance proceeds and third party recoveries $5 million in

1  low end and $10 million on the high end, right?

2  A    That's correct.

3  Q    Okay.  So, what is your basis for those low and high

4  estimates?

5  A    If we flip back to the liquidation analysis.  Schedule

6  2 within that analysis, and the steps that I just walked the

7  Court through we go see in that far right column -- again

8  when you just simply perform math, is that first policy

9  alone has $4.4 million available.

10      The next policy 400, the next policy call it 4.4.  The

11  next policy, you know, 3.7.  The next policy 5.8.  The next

12  policy 4 million.  The next policy 4 million, the next

13  policy another 4 million.  I could keep going.

14      But the point is if the SIR's are satisfied, then there

15  are substantial amounts available under these insurance

16  policies.  My view $5 million is just simply a, you know,

17  call it an estimate of what could be available for

18  claimants.

19      Now, the issue is the process would need to take place

20  in order for both claims to be liquidated and the insurance

21  carriers to pay out.  But, of course, that was the intent of

22  mediation and, you know, the LSA process that we then put in

23  place, provides for the debt to occur.

24  Q    And just to make sure that we're clear on -- let me ask

25  you this first.  How could the SIR be satisfied?

1   A    Well the SIR historically have been satisfied just

2   through, you know, payments to claimants or payments to you

3   know, individuals underneath the policy or folks that had

4   filed claims and which amounts have already been paid.

5   Q    Right.  So let's just go through this process so that

6   the record is clear.  So the process to get to these

7   insurance amounts, you have to file the claim and

8   potentially win any coverage dispute if the claim was

9   contested by the insurance company, right?

10  A    I can't testify on behalf of an insurance company and

11  exactly what their process would be.  But at a very high

12  level, you would file a claim.  There would be a process by

13  which you would liquidate that claim and then the insurance

14  carrier would pay out.

15  Q    Okay.  And you understand, Mr. Perry -- well let me

16  strike that.  Let me just lay this foundation.  You

17  obviously -- I think you testified on direct about this --

18  you read Mr. Atchinson's declaration that was exchanged in

19  connection with this case, right?

20  A    I did.  It's been a while, but yes I did read it.

21  Q    Okay.  And you understand that Mr. Atchison used the

22  insurance asset as too speculative to assign any particular

23  value to it, right?

24  A    I don't recall him taking that position, but if it was

25  part of his analysis then, you know, it's fair.

1  Q    Okay.  Well what I'd like you to -- I don't know if you

2  can answer this next question given that last answer,

3  Mr. Perry, but I'll ask it anyway.

4       What's the basis for your disagreement with MR.

5  Atchinson that the insurance is too speculative to value

6  since you ascribe a value?

7  A    Well, I can't testify as to what Mr. Atchinson

8  thinking.  I think he can testify and I think will testify

9  to that.  But what I can say is both the Debtor and the

10 committee -- again I want to be careful with mediation --

11 but there has been sensitive analysis of each and every one

12 of these policies of claims that have been filed within each

13 of these policies.

14      And the analysis that was produced at mediation was,

15 you know, comprehensive, was fulsome and you know, allowed

16 for us to effectively mediate.

17 Q    Okay.  Will there be enough money paid to the personal

18 injury trust to satisfy the SIRs in these policies?

19 A    Each individual claim requires its own process and have

20 satisfied the SIR assuming it hasn't already been satisfied.

21 Q    Okay.  Let me ask you this very basic question.  How

22 certain are you that the insurance recoveries will be

23 between five and 410 million?

24 A    I really can't answer the question as to how certain

25 of.  You know, I'm confident that the process that the

1  Debtor and the committee mediated, that allows for a

2  claimant to bring forth its claim, mediate, otherwise

3  litigate its claim and you know, reach a liquidated amount.

4  I believe that process is very certain at least as it

5  relates to what resulted from the mediation.

6       And I believe it provides an opportunity an opportunity

7  for creditors bring forth their claim in a forum that allows

8  tem to liquidate it.  And, you know, based on what I

9  testified around the aggregate unpaid limits here, are

10 substantial amounts of insurance policies or amounts under

11 the insurance policies available.

12 Q    Okay.  Let's just contrast your thinking on the level

13 of certainty that you have around five to $10 million

14 insurance asset against the level of certain that you have

15 in ERC credit.

16      I believe on direct examination I can point you to

17 testimony if you like.  You testified that you had no reason

18 to believe those amounts won't be liquidated.  It's just a

19 matter of time for the ERC, is that right?

20 A    That's correct.

21 Q    Okay.  So your level of certainty around the ERCs is

22 that you filed out the form, submitted the form.  It's just

23 a matter of time of the IRS running through its processes

24 and that money will come in one day.  We don't know when,

25 but it'll come in one day, right?

1  A     That's correct.

2  Q     Okay.  Not so with the insurance recoveries, right?

3  They're subject to the process that you just outlined for

4  us, right?

5  A     Apples to oranges and the reason for that is I already

6  completed a process on the -- for the ERC's by which we

7  "liquidated" that amount meaning we've run -- we've engaged

8  third party consultants to run the numbers.

9      We've determined that we're qualified.  We have filed

10 those amounts and we are now waiting for payment.  That's a

11 different process at least at it relates to how we are in

12 the stage, in an insurance policy process.

13 Q     Very different process, right?

14 A     Not necessarily but it is different as it relates to

15 where I am in the ERC process and where we are in the

16 insurance process.

17     I, the Debtor, am the one that has brought forth the

18 amounts under the ERC credits.  I have personally signed the

19 941 X forms.  I personally engaged with the IRS.  And I have

20 the ability to say that this is a liquidated amount that I'm

21 waiting for payment.

22     The insurance process is a little bit different because

23 there are claims that have been filed under each of these

24 insurance policies.  We have put forth a process that would

25 allow for the claimant to move forward.

1    The claimant will have the ability to bring forth its

2    argument of why it believes the claim would be liquidated at

3    a certain amount.  The insurance company and the claimant

4    will otherwise litigate that.  That will determine or result

5    in a liquidated claim that my hope is the plan would provide

6    payment for.

7    Q    Mr. Perry, to whom do you owe fiduciary duties?

8    A    I owe fiduciary duties to all the creditors in this

9    case.

10   Q    Do you owe a fiduciary duty to Mr. Lefkowitz?

11   A    Well, as it states currently, Mr. Lefkowitz has filed

12   or at least related parties have filed proof of claims.  To

13   the extent that makes him a creditor in this case through

14   those proof of claims, then I have a fiduciary duty to all

15   creditors in this case.

16   Q    Right.  And so that means also you owe a fiduciary duty

17   to tort claims, right?

18   A    All creditors in this case, correct.

19   Q    After the TCC was formed, did you meet with any TCC

20   members?

21   A    I don't believe I've met with any TCC members, no.

22   Q    Did you, Mr. Perry, request a meeting with a TCC

23   member?

24   A    No, we engaged with TCC professionals to begin my

25   process in the restructuring matter and in Chapter 11.

1  Q    After the TCC was formed, did you make any

2  presentations to the TCC members or their professionals?

3  A    Yes.  At the first mediation that the TCC joined I

4  specifically remember a discussion at the beginning of that

5  mediation in which there were -- oh, I'm sorry.  I'm sorry.

6          MR. KAUFMAN:  I'm going to cut Mr. Perry off at

7  this point --

8          MR. MOXLEY:  All right.

9          MR. KAUFMAN:  -- we're going to get into

10 mediation.

11         MR. MOXLEY:  I know and I did not mean to elicit

12 the mediation testimony.  That's fine.  Thank you.

13         THE WITNESS:  My fault.  Ask your question again

14 and I'll --

15 BY MR. MOXLEY:

16 Q    Let me just --

17         THE COURT:  It's privileged to say whether someone

18 gave a presentation at mediation?

19         MR. KAUFMAN:  I think Mr. Perry answered the

20 question, but then he was going a step further.

21         THE WITNESS:  Yeah, I was probably going to keep

22 talking, so I appreciate that.

23         THE COURT:  Okay.

24 BY MR. MOXLEY:

25 Q    So just to the Judge's point, just so the Record is

1  clear, you gave a presentation to the TCC.  Your testimony

2  is that you gave a presentation to the TCC and their

3  professionals at the mediation.

4      Outside of mediation have you given any presentations

5  to TCC members or their professionals?

6  A    I count on the professionals to provide any information

7  that I provide to the TCC to the members, just to be fair.

8  I have provided and responded to a number of inquiries from

9  TCC professionals.

10     Analyses, diligence question things of that nature.  I

11  would consider that to be presentation.  Presentation has a

12  lot of different meanings.  So in the diligence responses

13  that I provided the TCC professionals I think that

14  absolutely would, you know, would constitute a presentation.

15 Q    Under the last filed plan -- so we're going back to the

16  second amended plan now -- all the ERCs would go to the

17  trust for the non-PI plans, right?

18 A    Under the October plan, there was an allocation that

19  was created that had a lot of different mechanics that I

20  would fully anticipate we would restructure and reset based

21  on new mechanics under a new Plan.

22 Q    Okay, so restructuring and resetting was not my

23  question.  But let's just do this is a more formal way then

24  Mr. Perry.  Look at Tab 18 in your binder.

25         (Pause in the proceeding.)

RUSSELL PERRY - CROSS BY MR. MOXLEY                    139

1   Q    That again is the -- it's actually the seconded amended

2   Disclosure Statement, Tab 18.  UCC's Exhibit 27 for the

3   Record.  And if you could turn with me to Page 142 of the

4   filing.

5        And if you look at section number one, pull up the --

6   A    Okay.  I'm here.

7   Q    -- see if that's all right title and interest of the

8   Debtor and in to all tax credit refunds including without

9   limitation, all employee retention credits are in the trust

10  distribution plan.

11  A    I do.

12  Q    And the insurance coverage and the insurance recoveries

13  went to the separate trust of the PI claims, right?  That's

14  at Page 164.

15       (Pause in the proceeding.)

16  A    And there's a Subsection (d) on age 142 that says, "All

17  rights under policies not assigned to first injury trial."

18  So under the old construct of the Plan, I believe what that

19  meant was all the insurance policies would be assigned to

20  the PI trust.

21  Q    Right, okay.  So the insurance recoveries went to the

22  trust for the PI claimant and the ERC credits all went to

23  the non-PI trust under the old plan, right?

24  A    Under the old plan that's correct.

25  Q    And I fully appreciate, Mr. Perry, the Debtors is not

RUSSELL PERRY - CROSS BY MR. MOXLEY                    140

1  advocating for this second amended plan or it's Disclosure

2  Statement any longer.

3      But at the time that this was filed, the Debtor

4  supported that allocation, right?

5  A   At the time it was a joint plan, both the Debtor and

6  the committee supported the allocation, correct.

7  Q   Why, Mr. Perry, would the Debtor consistent with its

8  fiduciary duties are that only the non-PI claimants would

9  get the ERC money?

10 A   Well the answer to that question I would need to

11 reference the liquidation analysis connected to the original

12 plan.  If you'd like to do that, I can walk you through it.

13 Q   How -- just before we do that, how would that inform

14 the answer to that question?

15 A   Because it has calculations on what estimated

16 recoveries were for each prospective class.

17 Q   Okay.  Well before we take that exercise, let me ask

18 you this.  Aren't all general unsecured creditors of the

19 estate entitled to share in access?

20 A   Depending on the absolute priority of the Chapter 11

21 process, unsecured creditors would share any proceeds below

22 a certain amount.  Because then other claimants have been

23 fast forward.

24 Q   And is there for any reason why the ERC asset is

25 different is a different type of asset than what you just

1  described?

2  A    No, we -- the Debtor and the committee started with a

3  full amount available for distribution to creditors and the

4  calculations for Class IV and Class V under the previous

5  plan were meant to show up, you know, fairly similar

6  recovery for both parties.

7  Q    So if I ask you this question, why are the ERC assets

8  being excluded from certain of the creditors under the old

9  plan, namely the PI claimants, could you answer that

10  question without referencing the liquidation analysis?

11  A    Sure.

12  Q    Okay, what's your answer?

13  A    Because there are other assets that are allocated only

14  to the PI trust that aren't allocated to the liquidation

15  trust.  It's just math.  You said what are estimated

16  amounts, assets.  How do we effectively allocate those --

17  the Class IV and Class V to receive a similar recovery such

18  that neither class is disadvantage according, you know,

19  consistent with the other.

20  Q    Okay.  And that's your understanding why the Debtor was

21  comfortable with the allocation of the ERC credits in the

22  old plan?

23  A    You know, it was a fair and equitable approach is what

24  it was.

25  Q    And is that -- is that the focus of the Debtor making

RUSSELL PERRY - CROSS BY MR. MOXLEY                    142

1  sure there's a fair and equitable distribution of assets to

2  all creditors?

3  A    In value maximizing, yes.

4  Q    Well let me ask you this, is the Debtor's -- I'm just

5  trying to understand where the Debtor is coming from in

6  terms of how assets that are pooled will ultimately be dealt

7  with among creditors.

8       Is the Debtor focused on maximizing the value of all

9  assets and then allowing for the UCC, the TCC other

10 interested parties to negotiate from there how they will be

11 allocated?  Is that the Debtor's approach?

12 A    Yes, that's -- my hope is, Mr. Moxley, we finish this

13 hearing and we get right to work on that exact point.

14 Q    Is the Debtor essentially agnostic as to how the assets

15 are allocated?  The ideas is to maximize their value and

16 then we'll leave it to the committees and other interested

17 parties to work on allocation?

18 A    The Debtor needs to have a role in that process.

19 Q    Is it your view that the Debtor should be an advocate

20 for equitable pre-minimum for all creditors?

21 A    Creditors is going to be one of the parties that will

22 propose a plan that likely we'll need to testify on the fact

23 that the plan is fair and equitable and value maximizing.

24 And as the Debtor and my role, I intend to ensure that a

25 Plan that I put forth would, in fact, accomplish that.

1        I think any allocation or how the actual proceeds would

2   be distributed to creditors and how it would flow through

3   the actual plan that we've yet to pull together, I think

4   would be absolutely in the best interest of the Debtor to be

5   part of that.

6   Q    What I'd like to understand, Mr. Perry, is why the

7   Debtor was comfortable before with having ERC credits --

8   which are really, as you testified, fill out the form,

9   certain this money will come in just a matter of time.

10  Versus the insurance recoveries which are subject to the

11  more elongated process that we discussed.

12       Why was the Debtor comfortable with that allocation of

13  insurance going to PI's and the ERC which are more certain

14  going to the non-PI trust?

15            MR. KAUFMAN:  Objection, Your Honor.  This

16  question has been asked and answered a couple of times

17  already.

18            THE COURT:  I agree.  Sustained.

19       (Pause in the proceeding.)

20            MR. MOXLEY:  Your Honor, I have just a hand full

21  of topics left.  It may still take -- I believe I told you

22  at 11:30 I thought approximately an hour.  I think I

23  probably have another 20 minutes or so.

24            THE COURT:  Keep going.

25            MR. MOXLEY:  Can we keep going?  Okay, very good.

1  Thank you, Judge.

2  BY MR. MOXLEY:

3  Q    You testified, Mr. Perry -- you testified Mr. Perry on

4  direct examination about the 10 year settlement history

5  reflected in Debtor's Exhibit 26.  Do you recall that?

6  A    I do.

7  Q    Okay, let's take a look at that if we could.  Debtor's

8  Exhibit 26 is in your binder.  And I will tell you where it

9  is in just one second.

10      (Pause in the proceeding.)

11  Q    It is at Tab 9.

12      (Pause in the proceeding.)

13  A    Okay, let's see Tab 9 here appears to be an order on

14  the automatic stay.  Am I looking at something wrong, Tab 9?

15           THE COURT:  I think he's talking about his binder,

16  not the black binder.

17           THE WITNESS:  Oh, okay.  There are a few binders

18  here.  All right.  So let's see Tab 9.

19           MR. MOXLEY:  Thank you, Judge.

20      (Pause in the proceeding.)

21           THE WITNESS:  Okay, I'm here.

22  BY MR. MOXLEY:

23  Q    Okay.  So Debtor's Exhibit 26 is essentially, I believe

24  you testified a summary that reflects that to whom it's

25  predecessor, Horizon, over the last 10 years have resolved

1 claims asserted by claimants as represented in the table set

2 forth, correct?

3 A    Correct.

4 Q    And so those tables reflect in the left column, that

5 over the last 10 years claims asserted by 121 pro se

6 claimants involved a monetary payment for that pro se

7 claimant, correct?

8 A    That's correct.

9 Q    And the total amount of money paid to those 121 pro se

10 claimants -- according to this summary exhibit -- was

11 $828,636, correct?

12 A    Total paid by the Debtor.

13 Q    Oh, paid by the Debtor, yes sir.

14 A    Yes, correct.

15 Q    Mr. Perry, would you agree with me that given this

16 history any notion that pro se claimants can only get paid

17 if the bankruptcy settlement is approved, would be factually

18 inaccurate, right?

19 A    Well, this information shows that one in 20 received a

20 payment with an average payment of 351 across all those

21 claims.  So, in that scenario, there is process by which one

22 in 20 pro se claimants received about $350.

23 Q    And the Debtor's Exhibit 26 -- I appreciate that.  In

24 Debtor's Exhibit 26 reflects that over $64 million has been

25 paid to represented tort claimants over the last 10 years,

RUSSELL PERRY - CROSS BY MR. MOXLEY                146

1   right?

2   A     Correct.

3   Q     That reflects that over 40 percent of those represented

4   claimants were resolved with a payment, right?

5   A     That is correct.

6   Q     Given that history, would you agree with me that the

7   notion that represented claimants -- those represented by

8   lawyers -- can only get paid if a bankruptcy settlement is

9   approved, is also factually inaccurate, right?

10        (Pause in the proceeding.)

11  A     That condition again, one more time.

12  Q     So given that more than 40 percent of represented

13  claimants in the last 10 years settled for a monetary

14  payment and the aggregate amount of that money paid to them

15  was over $64 million.  The notation that represented court

16  claimants here could only recover in the bankruptcy case,

17  that's factually in accurate.

18        They could recover -- they have recovered outside of

19  bankruptcy previously, correct?

20  A     I don't think I've ever testified that there hasn't

21  been payments made outside of bankruptcy.  So I'll put that

22  out there.  This Exhibit does show that folks have been paid

23  outside of bankruptcy.

24  Q     Thank you.

25  A     What this doesn't show and supposed what I failed to

1  include, is the date in which the occurrence occurred on

2  these claims.  And the length of time it took between an

3  occurrence of an event and the time in which it was paid.

4       For example, the pro se column of those 200 or 2,358

5  claims, those are only claims that have been closed in the

6  last the last 10 years.

7       Meaning claims that have been brought to finally.  The

8  actual incurrence on those claims date all the way back to

9  almost 2000, 2001, 2002.  So, there are claims that were

10  paid, you know, between 2014 and 2024, for example.  But the

11  incident occurred sometime much earlier than that.  Almost

12  10, 15 years.

13       Pro se is one of the or I'm sorry, on of the

14  represented cases the incident occurred in 1995.  I think

15  you asked me a second ago if the insurance process takes

16  time.  What I'll tell you even the time in which the Debtor

17  would make payments has taken a considerable amount of time

18  based on what I've seen in this analysis.

19       I think we've shared those with TCC.  So that's not

20  reflected in here, but this only represents payments made

21  over the last 10 years or the final case was last 10 years.

22  Q    Understood, thank you, sir.  Mr. Perry, none of us,

23  including you know as we sit here today which of the

24  settling parties will contribute to the settlement payments

25  provided in Section 4 of the Settlement Agreement?

RUSSELL PERRY - CROSS BY MR. MOXLEY                148

1  A    We negotiated with settlement parties, plural, and we
2  expect payment to be made by the settlement parties.
3  Q    The question was different than that.  So just listen
4  to my question if you could sir.
5       My question is, none of us, including you, know which
6  one or more of the settling parties will actually make the
7  payment provided for in Section IV, correct?
8  A    As I sit here today, that is correct.
9  Q    And as the Debtor's CRO, what diligence have you done
10 into whether any of the parties who would be obligated to
11 make those payments, if the settlement is approved and the
12 Plan is confirmed, whether they have the ability to actually
13 make those settlement payments called for in Section IV?
14 A    Well those would have been discussions that would have
15 been had at mediation as it relates to the payments being
16 made and the motivation for making those payments.  I.e.,
17 they received the releases and there's been nothing provided
18 to me that would suggest that the payments won't be made.
19 Q    Okay.  So in -- my question is about what diligence
20 you've done.  So your testimony is the diligence that you've
21 done was all done in the course of the mediation with
22 respect to the settling parties and their abilities to make
23 settlement payment?
24 A    Well ability to make the settlement payments is a
25 little bit different.

RUSSELL PERRY - CROSS BY MR. MOXLEY                    149

1  Q     Please answer my question, though, sir.

2  A     Okay, so repeat your question because you're throwing -

3  - I'm sorry.

4  Q     That's okay.  Let me ask a new question.  My question

5  is outside of mediation, -- let me ask it this way.  Outside

6  of mediation, have you under taken any efforts and diligence

7  efforts to determine whether or not any of settling parties

8  have the ability to make the settlement payments set forth

9  in section four?

10 A     Not outside of mediation, no.

11 Q     Okay.  Do you have any assurance that the entities that

12 would be obligated to make the settlement payments, if those

13 conditions arise, won't immediately file for bankruptcy and

14 then seek to claw back the settlement payments of the

15 creditors?

16 A     I don't know the answer to that.

17 Q     And if you don't know the answer to that, then that

18 means I think by definition, that you don't have such an

19 insurance, right?

20 A     Based on mediation, based on as we sit here today.  My

21 understanding and belief is that the settlement parties will

22 make the payment when the time comes the payment needs to be

23 made.  I have not assessed or even discussed whether or not

24 there could be the hypothetical event after that, that would

25 result in a potential claw back.

1  Q    Okay.  Mr. Perry, you don't know what the value -- and
2  I'm purposely, sir, using value.  I know that's a term for
3  you -- a term of art for you.
4      You don't know what the value of each of the companies
5  obligated to make those settlement payments is, right?
6  A    I do not.
7  Q    And under -- and just so the record is clear, what I
8  was saying there with respect to value, I know that you as a
9  restructuring professional, a financial professional, you
10 ascribe meaning to therm term value, correct?
11 A    I do.
12 Q    Okay.  And can you just very briefly explain what your
13 understanding of value is?
14 A    Sure.  Value to me -- at least in the context of this
15 engagement -- would be a process by which an amount would be
16 ascribed based on a certain set of methodologies that would
17 be call it understood in practice by, you know, folks that
18 specialize in valuation.
19 Q    Right.  And so you haven't undertaken any of those
20 methodologies to determine a valuation of any of the
21 settling parties who may be obligated if all the conditions
22 are met, to make the settlement payments under Section IV of
23 the settlement agreement, right?
24 A    Correct.
25 Q    On direct examination you were asked about the

1   documents that the Debtor reviewed as part of its

2   investigation.  And specifically, I think, Mr. Kaufman asked

3   if you had reviewed financial documents.  Do you recall

4   that?

5   A    I do.

6   Q    And in your answer you testified that -- and I'm

7   quoting you now -- you know let me show it to you.  I don't

8   want any misunderstanding.

9   A    Okay.

10  Q    So I'm looking at the day two transcript.  And it's at

11  Page 83.

12       (Pause in the proceeding.)

13  Q    And at line -- beginning at line 12, Mr. Kaufman asked

14  you, "Let's talk about the reviews on the reasonableness of

15  the settlement based on your review of the -- let me back

16  up.  What sorts of documents did you and the Debtor review

17  as part of the investigation?  Did you review the financial

18  documents?"

19       And your answer was, "I think some of this is included

20  in the Disclosure Statement so let me touch under my work.

21  Let me touch under my words."  And I ask that you skip with

22  me to the second to the next paragraph.

23  A    Sure.

24  Q    You said, "We asked for literally everything and we

25  gathered as much data as we possibly could across, like I

RUSSELL PERRY - CROSS BY MR. MOXLEY                    152

1  mentioned, financial, legal, organizational, you know the

2  communication amongst individuals."  Do you see that?

3  A     I do.

4  Q     And I'm not showing you that, Mr. Perry, just for the

5  record is clear and the Judge is -- I'm not showing you that

6  to impeach anything sir.  I wanted to ask you some questions

7  about that.  And I wanted you to have the benefit of your

8  testimony in front of you when I did so.

9        So, Mr. Perry when you testified about asking for

10 literally everything, you didn't get financial statements

11 from YesCare after February of 2023, did you?

12 A     That is correct.  We received financial statements up

13 to the date of the filing, correct.

14 Q     Okay.  So -- but you asked for literally everything.

15 So I'm sure if they -- I'm sure you wanted financial

16 statements after February 2023, they just weren't produced,

17 correct?

18 A     Correct.

19 Q     Let me ask you this.  What happens if the Debtor

20 prevails, confirmation order is entered and whatever amount

21 of time we are down the road, you won all the appeals and

22 there's now final non-appealable order in the Debtor's

23 hands.

24       At that time, --

25 A     No, I'm sorry.  I thought that you were done.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1  Q    At that time, the settling parties then don't make the

2  settlement payment.  What happens then?

3  A    Under that hypothetical, the releases aren't provided

4  and the Debtor has the ability to pursue litigation.

5  Q    And at that time when -- if that scenario were to play

6  out, the settling parties would have enjoyed whatever amount

7  of time it is that elapsed from not having to defend or deal

8  with litigation or make any settlement payments, correct?

9  A    I don't know if that's an enjoinment, but I do know

10 that they certainly would have time between, you know, call

11 it today and at what point in time they would make the

12 payments.

13 Q    So to avoid the risk of that scenario, have you

14 demanded that the settling parties put the settlement

15 payment in escrow now or at confirmation or at some point

16 before you get to the final non-appealable order?

17 A    The settlement that we see today is protected or was at

18 least was negotiated under mediation.  So I can't speak to

19 whether or not there were negotiations on that point during

20 the mediation process.

21     But what resulted in the mediation that was effectively

22 run by Mr. Sanchee (phonetic) is what you see in the paper.

23 Q    And so if we don't see escrow mechanism in the paper,

24 that's not part of the deal, right?

25 A    That's correct.

RUSSELL PERRY - CROSS BY MR. MOXLEY                    154

1    Q    Let's switch gears for a moment if we could.  You're

2    aware that FTI was asked to analyze the divisional merger,

3    right?

4    A    I was.

5    Q    And FTI opined on the divisional merger noting that it

6    had made a certain assumptions and caveats to announce but

7    it had an opinion, right?

8    A    Correct, the fairness.

9    Q    Right.  And Mr. Perry, you received a letter from FTI's

10   counsel in March of last year that took issue with your

11   characterization of FTI's opinion that you had provided in a

12   file declaration in this case, right?

13   A    I assume that's not -- I don't know if that letter is

14   any way privileged.  I don't think so.  I did receive a

15   letter from FTI's counsel, yes.

16   Q    It's actually an exhibit.  So let me show you that

17   exhibit.  It's Tab 8 in your binder, it's TCC's Exhibit 329.

18   A    Okay.

19        (Pause in the proceeding.)

20   Q    What is in an exhibit at 329 is a declaration from

21   Bradley Hend (phonetic) which is -- who is at FTI and that

22   declaration attaches the letter.  I'll point you to that.

23        It's at -- if you go to -- it's going to come up on

24   your screen too.  If you go to the very end of the document

25   sir, and then flip back a couple of pages.  You'll see

RUSSELL PERRY - CROSS BY MR. MOXLEY                    155

1  Exhibit 4 to that declaration is a letter from Reed Smith

2  dated March 17th, 2023.  Do you see that document, sir?

3  A    I do.

4  Q    Okay.  And this a copy of the letter that you received

5  from FTI's counsel, right?

6  A    Yes.

7  Q    And if we look at Page 2 of the letter.  Actually, you

8  know, it's funny.  I think labeled Pages 2 and 3, Page 2

9  oddly enough.  So I'm looking at Page 3 at the top.

10 A    Okay.

11 Q    I just noticed that.  You see the second paragraph from

12 the bottom that begins, "As you are also aware."

13     (Pause in the proceeding.)

14 A    I do.

15 Q    Okay and so FTI's counsel wrote to you "As you are also

16 aware the opinion specifically set forth the factual

17 information provided by Horizon upon which FTI relied in

18 rendering it's opinion and noted that FTI was relying on the

19 factual accuracy of the information provided accordingly.

20     "The statement in the declaration that FIT 'conducted

21 wide scale due diligence' is misleading and over states the

22 scope of FTI's assignment."  Do you see that?

23 A    I do.

24 Q    And the next paragraph they ask that you "refrain from

25 making any further misleading and incomplete or inaccurate

1  statements regarding the role of FTI and the services and

2  advice rendered by FTI."  Do you see that/

3  A    I do.

4  Q    What steps, if any, Mr. Perry, did you take to correct

5  your declaration after you received this letter?

6        (Pause in the proceeding.)

7  A    I have to confer with counsel fully to recall, but if I

8  remember correctly, we believed revised language in

9  subsequent filings related to FTI's work.

10 Q    Okay, so if we looked at the Rule 9019 Motion -- let's

11 do that now.  It's at Tab 3 in your binder.

12       (Pause in the proceeding.)

13 Q    And at Tab 3, sir, if you could look at Paragraph 34.

14 Which is at Page 15 of the filing.

15       (Pause in the proceeding.)

16 A    Okay.

17 Q    Do you see at Page 34, in the middle of that paragraph,

18 there's a sentence that says, "the Debtor and the UCC

19 further believe?"

20 A    I do.

21 Q    And that sentence continues, "Debtor and the UCC

22 further believe that the financial advisory firm engaged to

23 provide fairness on transactions reached fairness

24 conclusions by relying on inaccurate information."  Do you

25 see that?

1  A    I do.

2  Q    So is your testimony that the step that you took after

3  receiving the March letter from Reed Smith, was to

4  essentially include that sentence in the 9019 Motion?

5  A    No.

6  Q    Okay, what else did you do in response to the Reed

7  Smith letter?

8  A    Well the Reed Smith letter took offense to the fact

9  that we used the words "conducted wide scale diligence."

10 Q    Right.

11 A    That's what they took offense to.  So we took in

12 further pleadings and subsequent pleadings we were careful

13 not to state their role as conducting wide scale due

14 diligence.  And I had my own view on that and why I used

15 those words.  But we chose carefully because they say in

16 this letter -- I'm not -- you know, to stop misstating what

17 our role was in the work that we did.

18      Which was, in our words, conducted wide scale due

19 diligence.  Those words were not in the 9019 Motion.

20 Q    I see, okay.  Let's look at -- changing the tab in your

21 binder.  Let's look at Tab 7, please.

22      (Pause in the proceeding.)

23 A    Okay.

24 Q    This is TCC Exhibit 229.  And my understanding -- and

25 Mr. Kaufman will correct me if I'm wrong -- is that the

1  Debtor stipulates that 229 may be admitted into evidence.

2      But I'm going to ask you a few questions now, sir.  If

3  you look at Exhibit 229, which is at Tab 7 in your binder,

4  this is the Debtor's response to a letter from nine United

5  States Senators asking for information about the provisional

6  merger in this bankruptcy case, right?

7  A    Yes, that's what this appears to be.

8  Q    And this letter is from -- you're familiar with this

9  letter, right?

10 A    I am looking for the date.  November 15th, correct.

11 This letter was prepared back in November.

12 Q    Okay and the letter is from Gray Reed, Debtor's

13 counsel, to these senators that are identified on Page 1 of

14 the letter, correct?

15 A    That's correct.

16 Q    You were the CRO of the Debtor when this letter was

17 sent, right?

18 A    Correct.

19 Q    And at the time this letter was sent, the Debtor had no

20 other employees beside ourself, correct?

21 A    I don't necessarily consider myself an employee.  But -

22 -

23 Q    Fair enough, let me rephrase it.  There were no

24 employees of the Debtor at the time this letter was sent,

25 right?

1    A    Correct.

2    Q    Okay.  So to the extent that Gray Reed had client

3    authorization to send this letter, it must have come from

4    you, right?

5    A    We conferred as a team of advisors.  The Debtor, the

6    counsel and myself we, quite frankly, had to discuss you

7    know, whether or not we were a, going to respond; b, in what

8    manner and what context would be.

9    Q    Did Mr. Lefkowitz review this letter before it was

10   sent?

11   A    I'm not aware whether he did or didn't.

12   Q    Do you know if anyone other than yourself and the Gray

13   Reed firm reviewed the letter before it was sent?

14   A    My colleague, Mr. Rosoano (phonetic) might have

15   reviewed it as well. That would probably the extent of my

16   understanding.

17   Q    Okay.  Did you authorize -- just as a matter of fact.

18   Did you authorize this letter to be sent to these nine

19   United States Senators?

20   A    It was discussed as a team.  I don't know whether or

21   not I authorized the sending of the letter or it was just

22   part of process to prepare the letter.

23   Q    Okay.

24         THE COURT:  I'm not sure I understand the answer.

25   Did you authorize it or not?

1          THE WITNESS:  I had no problem with sending it, so

2   I think --

3          THE COURT:  Not what I asked.

4          THE WITNESS:  -- I would have been an

5   authorization.

6          THE COURT:  That's not what I asked.  I just want

7   to know did you authorize this or not?  Like did you say.

8          THE WITNESS:  I was okay with sending this letter.

9   Yes.

10          THE COURT:  Maybe we're just not using the same

11   words.  I'm using the word authorize, you're using the word

12   okay with sending.  What's the --

13          THE WITNESS:  I'll explain, Your Honor.

14          THE COURT:  No, no.  I just want you to say yes or

15   no. Did you authorize this or not?  In other words, you're

16   the CRO did you authorize someone sending this letter?  Yes

17   or no?

18          THE WITNESS:  Yes, I authorized it.  Yes.

19          THE COURT:  That's all I needed to know.  Thank

20   you.

21   BY MR. MOXLEY:

22   Q    And Mr. Perry, you would not authorize a letter being

23   sent to the United State Senate to United States Senators

24   that contained materially false information, would you?

25   A    That would not have been my intent.

1        THE COURT:  Did you read it before it was sent?

2        THE WITNESS:  I did.

3        THE COURT:  Okay.

4   BY MR. MOXLEY:

5   Q    Let's look at Page 14 of the letter.

6   A    Okay.

7   Q    And you see Mr. Perry -- and I know you're familiar

8   with the letter.  Do you see the format of the letter was

9   essentially to set forth the United States Senators

10  questions and then to provide a response to that question

11  directly underneath that question, correct?

12  A    Correct.

13  Q    That was the structure of the letter, right?

14  A    Correct.

15  Q    Okay and so if you look at Page 14 of the letter,

16  there's a response to the Senator's question number eight.

17  And you see question number eight from Senators was, "What

18  is the total value of to whom's current assets?  Please

19  include a full accounting of any funding agreement, lump sum

20  payment, or other revenue stream provided to Tehum following

21  the divisional merger process."  Do you see that question?

22  A    I do.

23  Q    Okay.  And you see the answer set forth to that

24  question was, "The only real assets the Debtor has are

25  potential causes of action against third parties."  Do you

1    see that?

2    A    I do.

3    Q    The Debtor told these United States Senators the truth

4    in this letter, right?

5    A    At the time, that's correct.

6    Q    And the truth is the only real assets the Debtor has

7    are it's estate causes of action, right?

8    A    Well and that's what the words on the page say, but

9    they also say the Debtor also potentially has so called

10   Chapter 5 causes of action.  Because it's variety of third

11   parties for pre-petition transfers.

12        So I think the intent of this was to explain to the

13   Senators that potential causes of action have real value and

14   that there was a settlement of those causes of action.

15   Q    Well, let's not just take the letter's word for it.

16   Let's look at what you explained to Judge Lopez on March

17   5th.  Turn with me in your transcript from day two of the

18   hearing to Page 39.

19   A    Okay.

20        (Pause in the proceeding.)

21   Q    And if you look at --

22   A    I'm here.

23   Q    Did you go to Page 39?

24            THE COURT:  No, can you give me a second to get

25   there?

1          MR. MOXLEY:  Yes, Judge.

2          THE COURT:  What page are you on?

3          MR. MOXLEY:  I'm on -- I'm in Tab C, Your Honor,

4   day two transcript, Page 39.

5          THE COURT:  Oh transcript.  Sorry.

6          MR. MOXLEY:  Yes, the Perry transcript.

7          THE COURT:  Binder 1 of 1?

8          MR. MOXLEY:  Yes.

9          THE COURT:  Okay.

10         MR. MOXLEY:  That was a mistake on the --

11         THE COURT:  Oh, oh, C.  Got it.  Got it.  What

12  page?

13         MR. MOXLEY:  Page 39, Judge.

14         THE COURT:  Okay.  Thank you.

15     (Pause in the proceeding.)

16  BY MR. MOXLEY:

17  Q   Yes.  And Mr. Perry at Page 39 of the March 5th hearing

18  transcript, beginning at line 4 you were asked by

19  Mr. Kaufman "Let's turn to the Debtor-in-Possession of

20  financing motion filed in this case.  Can you briefly

21  explain to the Court what the sources of revenue were to the

22  Debtor when the case was filed."

23     And your answer was, "Well in terms of A, you know,

24  finance and accounting prospective, there was no revenue.

25  There was no operating revenue to the Debtor."

1        Question, "And why was that?"

2        Answer, "Well, when the company -- I don't want to say

3   company when Horizon completed their provisional merger in

4   May, there were no operating contracts allocated to the

5   Debtor and therefore there was no operating revenue that was

6   received by the Debtor."

7        And then the next question from Mr. Kaufman was, "And

8   you mentioned the funding agreement a few minutes ago.  What

9   amounts were available to the Debtor under the funding

10  agreement when the bankruptcy case was filed in February of

11  2023."

12       And your answer was, "Well, from where I sit today,

13  there was nothing remaining."

14       That's what you testified to on March 5th, correct?

15  A    I did.

16  Q    Was that testimony accurate?

17  A    It was.

18  Q    Statement in the letter to the United States Senators

19  was also accurate, correct?

20  A    It was accurate in the words that it uses.  The only

21  real assets.  What the language fails to mention are other

22  potential assets available to the Debtor.

23  Q    You just failed to mention that to the United States

24  Senators?

25  A    No, if you look at Page 8, it talks about the best

1   interest test.  It talks about the liquidation analysis.

2   And it says the liquidation analysis is annex to the

3   Disclosure Statement in schedule 1.  So I don't know that

4   it's clear enough in this letter.  I would definitely admit

5   to that.

6        But we directed the Senators to the liquidation

7   analysis.  And the liquidation analysis would have included

8   all of the other assets even in addition to the causes of

9   action.

10  Q    Let me just make sure I understand your testimony,

11  Mr. Perry.  Your testimony is that when you set forth the

12  question number 8 to these United States Senators where they

13  asked you what's the total value of to whom's current

14  assets.  And the first sentence of that answer was the only

15  real assets the Debtor has is are potential causes of action

16  against third parties.

17       Your testimony today is that you expected those

18  senators to turn back to an earlier page in the letter to

19  find out there was a best interest test and all the things

20  you just said.  Is that your testimony?

21  A    I can't testify to what Senators would or wouldn't do.

22  But we reference specifically in this response the plan, the

23  Disclosure Statement, the liquidation analysis.

24       We reference it.  Our point in responding to this

25  letter was to be fully transparent with these Senators as it

1  relates to the process that has taken place and potential

2  recovery to creditors.

3       The choice of words in this specific section, did not

4  intend to otherwise mislead or to suggest that there weren't

5  other assets available to the creditors as well.  I think

6  the intent was just to say right that there are material.

7  The really only assets are potential causes of action

8  against third parties.

9  Q   So let's say Senator Durban was particularly interested

10 in the answer to question number 8.  And if you turn to the

11 answer to that, you read that first sentence and it said the

12 only real assets that the Debtor has is potential causes of

13 action against third parties.  You would forgive him for

14 concluding his analysis of that question there and having

15 the understanding that the only real assets the Debtor has

16 are causes are action, right?

17          THE COURT:  You don't have to answer that.

18          MR. KAUFMAN:  Object needs speculation about what

19 Senator Durban would --

20          MR. MOXLEY:  I'll withdraw the question.

21 BY MR. MOXLEY:

22 Q   I can show you the petition of you need it, Mr. Perry,

23 but Mr. Lefkowitz signed the resolution attached to the

24 petition authorizing the filing of the bankruptcy case,

25 right?

1  A    Let's go to the petition.

2  Q    Let's do that.  Okay, so that's Debtor Exhibit 3 which

3  is Tab 16 of my binder.

4       (Pause in the proceeding.)

5  Q    And if you turn to the very -- let's do this the right

6  way.  Sir, are you at Tab 16?

7  A    I am.

8  Q    You see that this is the petition?

9  A    Correct.

10  Q    The petition attaches the resolution authorizing the

11  filing of the petition, correct.

12  A    This is the certificate of resolution which names me as

13  the CRO.  But the actual petition -- the actual petition

14  that you're asking about it was signed by me.

15  Q    The resolution -- the resolution that's attached to the

16  petition was signed by Mr. Lefkowitz on the last page.

17  A    Correct, the resolution attached to the petition, yes.

18  Q    Yes.  Okay.  And Mr. Lefkowitz also signed the

19  settlement agreement that it sought to be approved in this

20  hearing on behalf of YesCare Corp, CHS Texas, Inc.,

21  Faragrove (phonetic) LLC, Faragrove 1018 LLC, M2 Hold co,

22  LLC and Geneva Consulting LLC, correct?

23  A    That's correct as I recall.

24  Q    You know what let's just make sure we're clear on this.

25  Let's look at Tab 3 of the binder.

1          (Pause in the proceeding.)

2    A    I'm here.

3    Q    And if you turn to the -- Tab 3, you'll agree with me,

4    this is TCC's Exhibit 125.  It's the joint motion for

5    approval of the settlement agreement, correct?

6    A    Correct.

7    Q    And the settlement agreement itself is attached to that

8    motion, right?

9    A    It should be.  Yes, correct.

10   Q    Okay.  And if you turn to the very last page of the

11   document, Page 47 of 47.  And that's on your screen now, as

12   well.  You see that Mr. Lefkowitz signed on behalf of those

13   entities that I previously listed?

14   A    That is correct.

15   Q    And the Debtor, by this settlement agreement, is now

16   agreeing to release all of what it considers to be estate

17   claims against Mr. Lefkowitz and the parties that he signed

18   on behalf of, correct?

19   A    Correct.

20   Q    And Mr. Lefkowitz is the person who signed the

21   resolution that was attached to the petition, correct?

22   A    Correct.

23   Q    Mr. Perry, you understand the personal injury and

24   wrongful death claim that's in the case are real people,

25   right?

1   A      Absolutely.

2   Q      Did you review the joinder that was filed by Antoinette

3   Windhurst?

4   A      I scanned a number of joiners both in favor and in

5   opposition.  I didn't memorize them.

6   Q      Okay before we turn to Ms. Windhurst's joinder let me

7   ask you just one quick question back on the ERC's that I

8   neglected to ask before.

9        Just to get the Debtor's opinion of what is or what

10  isn't fair and equitable would the Debtor have viewed the

11  last plan as equitable if it knew at the time that the ERC's

12  were worth not 9.1 million, but worth 25 or $26 million?

13           MR. KAUFMAN:  Objection, this calls for

14  speculation.

15           MR. MOXLEY:  I'm asking, Your Honor, he's the

16  Debtor's CRO.  I'm asking --

17           THE COURT:  Yeah I agree.  Overruled.

18           THE WITNESS:  The allocation process under the old

19  plan was based on the amounts we -- at that time -- were

20  aware distributable to the estate.

21           If I knew now what I knew then, I believe the

22  allocation process for the calculations to allocate would

23  have been slightly different just simply by the result of

24  math.

25           Meaning higher numerator, meaning more assets to

1   bring in to the estate would have potentially modified the

2   allocation.

3   BY MR. MOXLEY:

4   Q    Right.  So you may not have been comfortable with that

5   allocation if you had known the ERCs were actually worth

6   more?

7   A    It would just change the input for the calculation.

8   Q    And the inputs may have changed to the effect that more

9   assets may have been put in the PI trust, right?

10  A    Well that would have been simply one variable.  There

11  could be hypotheticals of, you know, dozens variable in any

12  of those.  For sure it would have changed the allocation,

13  yes.

14  Q    Okay.  So let's look in our binder at Tab 13.  And

15  this, for the record, is marked TCC Exhibit 51.  It was a

16  joinder that was filed in this case at docket number 1283

17  back in January.

18       Do you have TCC exhibits?  The one in front of you,

19  sir.

20            MR. KAUFMAN:  Just so the Record is clear, this is

21  not in evidence, TCC 51.

22            MR. MOXLEY:  I don't believe it is.  It was filed

23  filed in the case.

24            THE WITNESS:  I'm here.

25  BY MR. MOXLEY:

RUSSELL PERRY - CROSS BY MR. MOXLEY                    171

1  Q    Have you review this before, sir?

2  A    This was filed in January.  I believe I scanned it.

3  Yes.

4  Q    Okay.  Are you aware that Mrs. Windhurst's husband, who

5  was serving a sentence for possession of a firearm in

6  violation of a his parole conditions, died allegedly because

7  of Horizon's misconduct?

8  A    Well I'm aware of what it states in the joinder.  And I

9  believe there is a paragraph that explains his condition.

10  And I believe, if I'm correct, that it states the nature of

11  the claim, which I believe would constitute what you said

12  yes.

13  Q    Okay.  Did you, Mr. Perry, ever ask a holder of a

14  wrongful death claim in this case whether they think the

15  settlement provides enough money for the death of their

16  family member?

17  A    I have not engaged with an individual tort claimant,

18  no.

19        THE COURT:  Mr. Perry, if you can just get a

20  little closer to the mic.  I want to make sure that we're

21  picking you up.

22        THE WITNESS:  Yeah, I was wondering which mic over

23  here was working.

24        THE COURT:  Well, that's the one.  Thank you.

25        THE WITNESS:  Oh, that's perfect.

1  BY MR. MOXLEY:

2  Q    Does it surprise you, Mr. Perry, to know that Mrs.

3  Windhurst doesn't think that this is such a fantastic deal?

4  A    I guess nothing would surprise me.  I would like to,

5  you know, believe that the settlement that's in front of us

6  today and the process that we would hopefully negotiate to

7  bring proceeds to creditors would absolutely be in their

8  benefit.

9  Q    You understand that by this joinder that Mrs. Windhurst

10 is taking the position in this case that she is joining the

11 motion to dismiss this bankruptcy case?

12 A    That's my understanding by this joinder, yes.

13 Q    Do you also understand that Mrs. Windhurst is not alone

14 in joining TCC's motion to dismiss, is she?

15 A    Well Tcc has it's members.  There are I think multiple

16 other joinders, if I'm not mistaken to the TCC.  So that

17 would constitute --

18 Q    Right, there are multiple other tort claimants who have

19 filed joinders in support of TCC's motion to dismiss,

20 correct?

21 A    Correct.

22 Q    Have you taken their views, those who have filed

23 joinders, in support of the Motion to Dismiss, into account?

24 A    We negotiated with the unsecured creditors committee

25 specifically.  And bringing forth this settlement in my mind

RUSSELL PERRY - CROSS BY MR. MOXLEY                    173

1   at least for the Debtors business judgment is a value

2   maximizing proposition.  And I believe is in the best

3   interest of the creditors.

4         So, you know, through negotiating with the UCC, that's

5   my ability to say that we have, in fact, taken account of

6   creditors views in this case.

7   Q     Okay.

8             MR. MOXLEY:  Your Honor, may I step away from the

9   podium for one moment?

10            THE COURT:  Of course.

11         (Pause in the proceeding.)

12  BY MR. MOXLEY:

13  Q     Mr. Perry, the UCC is the committee that wanted 100

14  percent of the ERC payments to go to the non-PI trust in the

15  prior plan, correct?

16  A     The UCC was part of the calculations for that, yes.

17  Q     And they supported that allocation, correct?

18  A     I believe so, yeah.

19  Q     Thank you.

20            MR. MOXLEY:  Your Honor, that you Mr. Perry.  Your

21  Honor, the TCC has no further questions for Mr. Perry at

22  this time.  We'll pass the witness.

23            THE COURT:  Thank you.

24            MR. KAUFMAN:  Can we take a short break, Your

25  Honor.

1          THE COURT:  Well I'm just going to do housekeeping
2     to try figure out maybe it makes.
3          MR. KAUFMAN:  I would definitely love a break.  I
4     was going to see if anyone else was going to ask Cross
5     before we discuss Redirect.
6          THE COURT:  Okay.  Well is there anyone else in
7     the courtroom that has questions for this witness?  If you
8     do, I just want to get a sense of timing more than anything
9     else?
10         MR. KAUFMAN:  Yeah, Redirect, I think will be very
11    short, five to 10 minutes.
12         THE COURT:  Okay.  From a timing perspective,
13    anyone else?
14         MR. NGUYEN:  (Indiscernible).
15         THE COURT:  Okay, thank you.  All right let's go.
16         MR. KAUFMAN:  Oh, I was going to ask for -- I need
17    a break.
18         THE WITNESS:  I need a break.
19         THE COURT:  No, you wanted to go, Mr. Kaufman.
20    You told me.  No.  I'm here.  Let's go.
21         THE WITNESS:  Oh my goodness. It better be quick.
22    I'm bouncing in my seat, too.
23         MR. KAUFMAN:  Your Honor, can we -- just as an
24    administrative matter have Ms. Carson have sharing
25    privileges.

1          THE COURT:  Yeah.

2       (Pause in the proceeding.)

3              REDIRECT EXAMINATION OF RUSSELL PERRY

4  BY MR. KAUFMAN:

5  Q    Mr. Perry, on cross-examination, Mr. Moxley asked you

6  about finality of the order, do you recall that?

7  A    I do.

8  Q    And he estimated that appeals could take years.  Do you

9  recall that?

10 A    I recall he referenced years.

11 Q    Who ultimately controls whether the TCC appeals?

12 A    Well in this situation I only can assume that example

13 was because the TCC would appeal based on discussions.

14 Q    And I think you testified that if this settlement is

15 approved, you would hope that the TCC engages with the

16 Debtor and the UCC to come to a consensual resolution?

17 A    Absolutely.

18 Q    Could you turn in the Debtor's UCC exhibit book to

19 Volume 2?  Look at Exhibit 36.

20      And as you're turning to that I'll ask you the premise

21 questions.  On cross Mr. Moxley asked you about FTI sending

22 you a letter asking you or commenting about your

23 characterization of FTI's work.  Do you recall that line of

24 question?

25 A    I do.

1    Q    Looking at Exhibit 36, do you understand that FTI is

2    supporting this settlement?

3    A    I do.

4    Q    Ms. Carson is going to pull up the transcript from the

5    day two from your cross-examination on day two of the trial.

6    Give her a minute.

7         (Pause in the proceeding.)

8              MR. KAUFMAN:  And for the record we're

9    referencing --

10             THE COURT:  Are you using go to meeting or are you

11   using the hard.

12             MS. CARSON:  I'm actually in both.  So which ever

13   one.

14             THE COURT:  I just made you the presenter.  Tell

15   me if that works.  If not, I will --

16             MR. MOXLEY:  Your Honor, I'm just not quite clear

17   why we're going back to the witness' is this impeachment?

18   Is he impeaching Mr. Perry?

19             MR. KAUFMAN:  No, I'm just because it's been two

20   and half weeks since this question was asked so I just want

21   to refresh everyone's recollection.

22             THE COURT:  Well that's not the purpose of

23   redirect.  You can redirect, but I'm refreshed.  It's up to

24   you.

25             MR. KAUFMAN:  Okay.

RUSSELL PERRY - REDIRECT BY MR. KAUFMAN                 177

1  BY MR. KAUFMAN:

2  Q    Do you recall two and half weeks ago when Mr. Moxley

3  first started doing your cross-examination, he asked you a

4  question to the effect of wouldn't it be nice if the Debtor

5  had done an analysis of whether success or liabilities were

6  worth $100 million.  Do you recall that question?

7  A    There was a lot of questions on successful liability,

8  but I vaguely remember a question about value.

9  Q    Did the Debtor do an assessment of successor liability

10  and alter ego theory as part of its due diligence?

11  A    Yes.

12  Q    And did the UCC -- do you understand that the UCC did

13  it's own analysis?

14  A    I do.

15  Q    And do you understand that the settlement parties had a

16  view about the merits of success or liability and alter ego

17  theories?

18  A    Yes.

19  Q    And ultimately a settlement was reached and that's the

20  product of the settlement before the Court, right?

21  A    Correct.

22          MR. KAUFMAN:  Your Honor, if I could have just a

23  moment.

24          THE COURT:  Of course.

25      (Pause in the proceeding.)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

 1           MR. KAUFMAN:  Your Honor, I'll pass the witness.

 2           THE COURT:  Any further questions?

 3           MR. MOXLEY:  I think that

 4           THE COURT:  Okay, thank you very much for your

 5      time Mr. Perry.  How much time do we need before we start

 6      back up again?

 7           How much time to the parties need?  Can we come

 8      back at 1:45?  Okay, let's come back at 1:45.  Thank you.

 9         (Recess taken from 1:04 p.m. to 1:48 p.m.)

10           THE COURT:  Okay.  We are back on the Record in

11      Tehum.  Let's call in the next witness.

12           MS. HAYWARD:  Your Honor, before we begin, if I

13      may?

14           THE COURT:  Yes.

15           MS. HAYWARD:  Your Honor raised some points this

16      morning that caused my mind to at least start churning.  The

17      point of the settlement agreement is obviously that --

18           THE COURT:  Why don't you check with -- are we

19      okay?  That was my bad joke for Mr. Kaufman to make sure

20      that we could --

21           MS. HAYWARD:  Your Honor, he's going to hurry me

22      up too.

23           THE COURT:  Yeah, I'm sorry.  Go ahead.

24           MR. KAUFMAN:  Just so the Record's clear,

25      Mr. Kaufman has been yelled at by a number of people off the

1  Record.

2              THE COURT:  Okay.  I'm sorry.

3              MS. HAYWARD:  So, Your Honor, lawyers tend to

4  complicate deals.

5              THE COURT:  Uh-huh.

6              MS. HAYWARD:  And there's the old adage, right,

7  that lawyers --

8              THE COURT:  I'm sorry.  Go ahead.

9              MS. HAYWARD:  -- mess up deals.  I've spoke with

10 my clients --

11             THE COURT:  Yes.

12             MS. HAYWARD:  -- the settling parties.  And we do

13 not need a settlement to be effective that, you know,

14 probably was a relic from the previous version of the

15 settlement agreement.  So my clients are willing to amend

16 the settlement agreement such that payment will be made

17 within 90 days of a final order approving a 9019 in this

18 case.

19             And so hopefully, that alleviates some of this

20 complication that I think is unnecessary as far as whether a

21 plan gets confirmed or not.  So with that said, you know,

22 obviously, once there is a final order approving a 9019

23 agreement, my clients will fund the settlement in full

24 within 90 days.

25             THE COURT:  Okay.  Let's see.

1          Counsel, if you have -- you're standing up.  I'm

2    just turning to you if you have any --

3          MR. GOODMAN:  You know, it's a constantly-moving

4    target, Your Honor.  I guess the way I hear that questioned,

5    it does raise in my mind a question which is, you know, what

6    happens if the Court were to enter that order, it'd be

7    subject to appeal.  Are they saying that they will fund

8    into, you know, an escrow or pay the full amount

9    notwithstanding the appeal, or would the appeal of the 9019

10   then mean that the money isn't paid.

11         If the answer is that if the 9019 is appealed, I

12   think we're back almost at the same position, right, because

13   again, they're going to be waiting for that entire process

14   to run its course.  And this is a huge difference if you

15   think about it, because remember the original Rule 9019, the

16   original settlement, right, everything cued off of plan

17   effective date.

18         THE COURT:  Uh-huh.

19         MR. GOODMAN:  So, they were putting themselves, if

20   you think about it, they were putting themselves in the

21   exact position that, you know, the Debtor in Antelope found

22   itself in, right, where the Court approved the settlement,

23   they went effective, they paid the money, right.

24         They took all of the risk regarding an appeal, you

25   know, taking place.  It ultimately didn't go well for them

1  because the Court did vacate the confirmation order, and

2  they were in that position, right.

3            It's really a question of time, right, in terms of

4  triggering a date.  So, everything that I've just heard as a

5  practical matter may actually be completely meaningless.

6  That's my concern.

7            THE COURT:  I'm more in the I just need to know --

8  in other words, the chairs have got to stop at some point so

9  I know exactly what I'm being asked to approve one way or

10  the other.  So I don't -- I appreciate the statement and the

11  update, and it's something certainly for me to consider.

12            MS. HAYWARD:  Yes, Your Honor.

13            THE COURT:  And if the parties want to continue,

14  then let's continue.

15            MR. GOODMAN:  Thank you.

16            THE COURT:  Thank you.

17            MS. HAYWARD:  Thank you, Your Honor.

18            THE COURT:  All right.

19            MR. BROOKNER:  Good afternoon.

20            THE COURT:  Mr. Brookner, good afternoon.

21            MR. BROOKNER:  Good afternoon, Your Honor.  Jason

22  Brookner for the Debtors.  Just I wasn't sure was Mr. Perry

23  dismissed as a witness?  Is he done?

24            THE COURT:  I believe.

25            MR. BROOKNER:  I thought you said he was done, but

1   I wanted to just confirm.

2            MR. MOXLEY:  We have no further questions for him.

3            THE COURT:  Okay.  Perfect.

4            MR. BROOKNER:  Okay.

5            THE COURT:  Yeah, no, no.  My understanding is

6   that he was dismissed as a witness.

7            MR. BROOKNER:  Okay.  I just wanted to make sure.

8   Thank you.  With that, the Debtors would call Isaac

9   Lefkowitz.

10           THE COURT:  Okay.

11           MR. BROOKNER:  I'm sorry, the Debtor singular.

12           THE COURT:  Good afternoon, sir.  Can you please

13  raise your right hand?

14      (Witness sworn.)

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  Thank you.  I'll let the Record

17  reflect that the witness has been properly sworn in.

18           Just a couple of housekeeping matters.

19           Mr. Lefkowitz, if you can make sure that mic is

20  close to you and that it picks up your voice.  Yes, sir.

21           Another question is in terms of binders for

22  Mr. Lefkowitz, there are some binders there.  Are those the

23  ones that he's -- people will be referring to?  I just want

24  to make sure before we get started on that.

25           MR. BROOKNER:  On my examination, they will be the

1 black binders to his left.

2             THE COURT:  Okay.  Can we just --

3             MR. BROOKNER:  I can -- you want me to -- I can

4 move them.

5             THE COURT:  Yeah.  Just put them to the side.

6 Just it makes it a little easier.

7             And in terms of presenter role, all that good

8 stuff, --

9             MR. BROOKNER:  I do not expect to have anything up

10 on the screen.

11            THE COURT:  Okay.  If anything changes, will you

12 please let me know?

13            MR. BROOKNER:  Of course, Your Honor.

14            THE COURT:  Thank you.

15            MR. BROOKNER:  Thank you.

16            THE COURT:  Counsel, you may proceed.

17            MR. BROOKNER:  Thank you, Your Honor.

18             DIRECT EXAMINATION OF ISAAC LEFKOWITZ

19 BY MR. BROOKNER:

20 Q    What is your name, please?

21 A    Isaac Lefkowitz.

22 Q    And Mr. Lefkowitz, did you hold a position with the

23 Debtor at the time it filed for Chapter 11 in February of

24 2023?

25 A    Yes.

1    Q    What was that position?

2    A    Director.

3    Q    Were you the sole director?

4    A    Correct.

5    Q    Do you still hold that position?

6    A    Yes.

7    Q    As part of the filing, did the Debtor through its sole

8    director approve certain resolutions, corporate resolutions?

9    A    Yes.

10   Q    All right.  And as part of those resolutions, did the

11   Debtor appoint Russell Perry of Ankura Consulting as the

12   chief restructuring officer?

13   A    Yes.

14   Q    And specifically, was Mr. Perry vested with a variety

15   of powers and decision-making authority?

16   A    Correct.

17            MS. MEYERS:  Objection.  Leading.

18            THE COURT:  Well, it's background, so I'm okay

19   with it.  Thank you.

20   BY MR. BROOKNER:

21   Q    I'd like, Mr. Lefkowitz, I'd like to direct you in the

22   book in Volume 1 to Tab No. 3, Exhibit 3.

23   A    Got it.

24   Q    Are you familiar with that document?  Have you seen it

25   before?

1  A    Yes.

2  Q    Okay.  Looking at the top stamp, the top page stamp

3  where it says 1 of 8, 2 of 8, et cetera, --

4  A    Okay.

5  Q    -- please turn to Page 6 of 8.

6          THE COURT:  Which exhibit?  I'm sorry.

7          MR. BROOKNER:  Exhibit 3, the Debtor's Exhibit 3,

8  Your Honor.

9          THE COURT:  Thank you.

10          THE WITNESS:  Yes.

11 BY MR. BROOKNER:

12 Q    Okay.  Are these the resolutions that were adopted as

13 part of the bankruptcy filing?

14 A    Correct.

15 Q    All right.  I'd like you to take a look on Page 6, the

16 next-to-the-last resolved paragraph, and would you please

17 read that out loud?

18 A    The next to what?

19 Q    The next-to-last paragraph that says resolved on the

20 page.  It starts with "Resolved that the CRO shall have."

21 A    "Resolved that the CRO shall have the sole decision-

22 making authority for all restructuring matters, any matter

23 where the sole director indemnified below has or may have a

24 conflict of interest, and for such other matters as the sole

25 director may otherwise delegate to the CRO."

1  Q     Why was that resolution particularly adopted?

2  A     So there shouldn't be any confusion of who has the sole

3  decision making.

4  Q     But why was that a question?  Why was that -- why did

5  you think there would be a question about the decision

6  making?

7  A     I was the sole director.  I'm also an insider, and I

8  wanted to make the world clear that the CRO has the full

9  authority by himself.

10  Q     So that there wasn't any potential conflict of

11  interest?

12  A     Correct.

13  Q     Now since the time, Mr. Lefkowitz, that the Chapter 11

14  case was commenced, have you tried to impose your will on

15  either Mr. Perry or Debtor's counsel in any way?

16  A     No.

17  Q     Have you demanded that the CRO or Debtor's counsel

18  either take or refrain from taking specific actions?

19  A     No.

20         MS. MEYERS:  Objection.  Leading.

21         THE COURT:  Overruled.

22  BY MR. BROOKNER:

23  Q     Have you prevented in any way or attempted to prevent

24  the CRO or the Debtor's counsel from investigating potential

25  causes of action against the released parties in the

1  settlement agreement?

2  A    No.

3  Q    Have you tried to fire the CRO?

4  A    No.

5  Q    Have you attempted to replace the CRO?

6  A    No.

7  Q    Now if you recall, how many different mediations have

8  taken place in this case?

9  A    Two sets -- actually, three sets.

10 Q    Did you attend all of those sets of mediation?

11 A    Two out of three.

12 Q    Did you attend as the Debtor's representative?

13 A    Settlement parties.

14 Q    So that was my next question.  So settlement parties,

15 you were all of -- let me withdraw that.

16      You attended in the capacity as the representative for

17 the settlement parties; is that correct?

18 A    Correct.

19 Q    Okay.  Now I'd like you, Mr. Lefkowitz, in the same

20 book that you're in, flip back to Tab No. 2.

21 A    Got it.

22 Q    Are you familiar with this document generally?

23 A    Yes.

24 Q    What is it?

25 A    A settlement agreement.

1  Q    Now I'd like to direct your attention to the

2  introductory paragraph, the very first paragraph that

3  defines a bunch of people.

4  A    Okay.

5  Q    You see where it defines the M2 parties?

6  A    Yes.

7  Q    Are those the parties for whom you were the

8  representative at both mediations, at the mediations?

9  A    Correct.

10  Q    Let's talk about the first mediation for a minute.  Do

11  you remember when that occurred around?

12  A    November.

13  Q    No, that's the second.  The first one --

14  A    Oh.

15  Q    -- if I told you it was August, --

16  A    Correct.  In August.

17  Q    August 23?

18  A    Yeah.

19  Q    Do you remember generally who attended that mediation?

20  A    Yes.

21  Q    Who attended?

22  A    It was the Debtor, Gray Reed, Debtor's counsel, a team

23  of Ankura, the UCC, attorneys for UCC, the FA for the UCC,

24  the YesCare folks, the attorney representing the YesCare,

25  and obviously, the mediator, Judge Jones.

ISAAC LEFKOWITZ - DIRECT BY MR. BROOKNER                189

1   Q    And was there a human representative from the Committee

2   also in attendance?

3   A    I believe so.

4   Q    Now at the time YesCare -- well, as we sit here today,

5   who represents YesCare and CHS?

6   A    Ms. Melissa Hayward.

7   Q    Now before Ms. Hayward was engaged by YesCare and CHS,

8   they had different counsel, right?

9   A    Correct.

10  Q    And it was that counsel who appeared at the first

11  mediation?

12  A    Correct.

13  Q    And at the time, did either you or anyone else at CHS

14  and YesCare have any ideas or knowledge about the alleged

15  intimate relationship that existed between counsel and

16  another former judge?

17  A    Still don't have that knowledge today.

18  Q    Now following the first mediation, and I think you

19  answered the question earlier, YesCare and CHS hired new

20  counsel, right?

21  A    Correct.

22  Q    And that's Ms. Hayward.  Now after the first mediation,

23  did the M2 parties as defined in the agreement agree to go

24  back to another mediation?

25  A    Correct.

ISAAC LEFKOWITZ - DIRECT BY MR. BROOKNER                    190

1    Q      Why?

2    A      Because I participated in several hearings here in

3    Judge Lopez's courtroom, and we've heard from the Court the

4    unsatisfactory of the terms and conditions of the

5    settlement, and we said we're ready to go back to a second

6    try at the apple.

7    Q      And at the second -- do you remember when the second

8    mediation took place on or around?

9    A      End of the year.

10   Q      In December, like mid-to-late December, --

11   A      Correct.

12   Q      -- 2023?  At the second mediation, who attended for the

13   M2 parties; do you remember?

14   A      It was the YesCare folks, it was M2, it was the Cigma

15   team.

16   Q      Did Ms. Hayward attend?

17   A      I believe so, yeah.

18   Q      And did M2 have its own independent counsel attend?

19   A      Yes.

20   Q      Mr. Gluck, right?

21   A      Correct.  And his partners.

22   Q      And do you remember did the Debtor attend that

23   mediation?

24   A      Yes.

25   Q      Who attended for the Debtor, if you remember?

1    A    Mr. Perry.

2    Q    Did Gray Reed come?

3    A    Yes.

4    Q    Did Mr. Perry have other colleagues who also attended?

5    A    Correct.

6    Q    And what about the UCC; do you remember who attended

7    from the UCC?

8    A    These folks at the table here -- Mr. Goodman.

9    Q    No, that's the TCC.

10   A    Oh, UCC.

11   Q    The UCC.  Yeah.  Who came from the UCC?

12   A    Nick, Zach -- sorry for calling you in the first name

13   but I don't remember if their FA was there or not.  Yeah, I

14   believe so.  She was there as well.

15   Q    Uh-huh.

16   A    And there were other folks virtual.

17   Q    Did that -- so the UCC had its individual members or

18   one or more on the telephone?

19   A    Correct.

20   Q    Now let's talk about the TCC, the folks at this table.

21   Did any of them attend that second mediation?

22   A    Yes, they did.

23   Q    And do you remember who came for the TCC?

24   A    It was the three attorneys.  I think it was led by

25   Mr. Goodman.

1  Q    Mr. Goodman.  Was Mr. Cicero sitting in the back, was

2  he there?

3  A    Yes.

4  Q    And Mr. Zimmerman, who's sitting at the table right

5  here?

6  A    Yes.

7  Q    Okay.  Where was the second mediation?

8  A    In Norton Fulbright's office in New York.

9  Q    And who mediated that mediation?

10 A    Judge Sontchi.

11 Q    Now obviously, because we're here today, we reached a

12 settlement at the second mediation, right?

13 A    Correct.

14 Q    And if you compare the second mediated settlement to

15 the first, does the second mediated settlement have more

16 consideration coming to the estate or less consideration

17 coming to the estate?

18 A    More.

19 Q    Did you push the Debtor's counsel or chief

20 restructuring officer at the mediation to agree to anything?

21 A    No.

22 Q    Did you try to impose your will at the mediation on

23 either Debtor's counsel or the CRO?

24 A    No.

25 Q    Were the negotiations in your opinion hard fought?

1          MS. MEYERS:  Objection, Your Honor.  We're getting

2  into the substance of the mediation.  So we've already been

3  --

4          THE COURT:  Well, if --

5          MS. MEYERS:  -- asking questions about what was

6  done at the mediation, and now they're asking him questions

7  about it.

8          THE COURT:  There may have been some doors opened

9  and maybe you get through them.  I'll allow it.  Continue.

10          MR. BROOKNER:  All right.

11  BY MR. BROOKNER:

12  Q    Were the negotiations hard-fought and were the settling

13  parties pushed hard?

14  A    Very hard.

15  Q    Now would you characterize the mediations as easy?

16          MS. MEYERS:  Objection.  Leading.

17          THE COURT:  Sustained.

18  BY MR. BROOKNER:

19  Q    How would you characterize the mediations?

20  A    Very tough.

21  Q    Do you remember how long the first mediation went?

22  A    Three days.

23  Q    How about the second one?

24  A    One day.

25  Q    Without getting into substance, at the second

1  mediation, did you talk to the TCC's representative who

2  attended?

3  A    Yes, at length.

4  Q    Did you attempt to get them on board with the

5  settlement?

6  A    Absolutely.

7  Q    Did they get on board?

8  A    No.  They weren't interested in settling.  They didn't

9  even give me a number that they're interested in settling.

10 Q    Now in this case, since it's been filed, do you

11 remember, do you know how many times the UCC on this side

12 through Mr. Hemingway and Mr. Zluticky have taken your

13 deposition?

14 A    At least four times.

15 Q    Did they also question you at the 341 meeting of

16 creditors?

17 A    Three times.

18 Q    That was my next question.  You testified three times

19 at the 341 meeting?

20 A    Total of seven depositions.

21 Q    Now you're aware that the UCC served up a bunch of

22 discovery in the case?

23 A    Yes.

24 Q    How would you characterize that discovery?

25 A    Brutal.

1   Q     Extensive?

2   A     Over a half a million documents.

3   Q     Time consuming?

4   A     Yes.

5   Q     Half a million documents.  Now did the UCC object to

6   the original DIP financing that was sought in the case from

7   M2?

8   A     Yes.

9   Q     And as a result of that, did M2 get everything it

10  originally asked for as part of the original request?

11  A     No.

12           MS. MEYERS:  Objection.  Leading.

13           THE COURT:  Sustained.

14  BY MR. BROOKNER:

15  Q     Did there come a time when M2 made some concessions in

16  connection with the DIP financing?

17           MS. MEYERS:  Objection.  Leading.

18           THE COURT:  Overruled.  We can get through it.

19           THE WITNESS:  Yes, it did.

20  BY MR. BROOKNER:

21  Q     And do you know off the top of your head, do you

22  remember what some of those concessions were?

23  A     Dealing with third-party releases.

24  Q     How about the challenge period; were there extensions?

25  A     Extending the challenge period.

1  Q    What about a lead on avoidance actions; was that

2  covered?

3  A    Yes.

4  Q    And at the end of the day, was there a hearing, or was

5  it resolved consensually?

6  A    Resolved consensually.

7  Q    Well, actually, there was a hearing, wasn't there?

8  A    Yes.

9  Q    All right.  Now are you aware of the fact that the TCC

10  has objected to entry of the next interim DIP order?

11  A    Yes.

12  Q    As we sit here today, are the M2 parties ready,

13  willing, and able to fund the fifth interim DIP order

14  following approval by the Court?

15  A    I believe M2 already partially funded.

16  Q    Tell me about that.  What did M2 partially fund

17  already?

18  A    M2 funded $2 million towards that DIP order that's

19  still pending.

20  Q    And that's sitting in escrow, isn't it?

21  A    Correct.

22  Q    Pending entry of the order?

23  A    Correct.

24  Q    Now I want to look a little more closely at Exhibit 2,

25  which is the settlement.  Do you know -- and this is not a

1    memory contest; you can turn the pages and take a minute and

2    read -- do you know what the settlement requires of the M2

3    parties?

4    A    Yes.

5    Q    What does it require?

6    A    To basically forgive the funding that they funded over

7    the funding agreement to the tune of $24 million, to forgive

8    the total DIP financing to the tune of $15 million, and to

9    fund an additional $40 million.

10   Q    And I want to direct your attention in the settlement

11   agreement.  You can turn to Page 2, Paragraph No. 4.  You

12   see how there's a variety of Subsections under number 4?

13   A    Correct.

14   Q    Are those the obligations you just discussed in your

15   testimony?

16   A    Correct.

17   Q    Let me direct your attention to Paragraph 6, which is

18   on the next page.  What does that paragraph provide for?

19   A    Release of claims.

20   Q    Okay.  So but that covers a few things, right?

21   A    Yes.

22   Q    Okay.  You referenced earlier some DIP advances.

23   A    Correct.

24   Q    Are those covered by this?

25   A    Yes.

1  Q    And you also mentioned something about advances under

2  the funding agreement.  Is that covered by this?

3  A    Correct.

4  Q    Now there's an entity called Geneva.  Are you familiar

5  with that entity?

6  A    Yes.

7  Q    And if you flip back to the first page, the very first

8  paragraph, --

9  A    Yeah.

10 Q    -- are the Geneva parties included in the definition of

11 M2 parties?

12 A    Yes.

13 Q    And do you believe that Geneva is waiving its claims

14 against the estate pursuant to this Paragraph 6?

15 A    Correct.

16 Q    I'd like to direct your attention in the other binder

17 if you will to Tab No. 43.

18 A    Okay.

19 Q    Are you familiar with -- well, can you identify this

20 document?

21 A    It's a proof of claim by Geneva.

22 Q    And did you testify as a 30(b)(6) witness for Geneva in

23 this case or as Geneva's 30(b)(6) witness?

24 A    I believe so.

25 Q    Take a second.  Look at the proof of claim.

1  A     Yeah.

2  Q     Do you have firsthand knowledge of the basis of this

3  proof of claim?

4  A     Yes.

5  Q     And if you look at box number 7 on Page No. 2, what is

6  the amount listed for the proof of claim?

7  A     $315,032.97.

8  Q     And as we just discussed, Geneva's going to be waiving

9  this as part of the settlement, right?

10 A     Correct.

11        MR. BROOKNER:  Your Honor, move for the admission

12 of Exhibit 43 for the purposes of not for the truth of the

13 matter, the validity of the claim, but for the fact that

14 there's a validly-filed proof of claim in the amount of

15 315,032.97.

16        THE COURT:  Any objection?

17        MS. MEYERS:  No objection.

18        THE COURT:  Okay.  It's admitted for that purpose.

19   (Exhibit 43 received in evidence.)

20        MR. JIMENEZ:  Your Honor, if I may?

21        THE COURT:  Yeah.

22        MR. JIMENEZ:  Respectfully, I was going to ask

23 if --

24        THE COURT:  Oh.

25        MR. JIMENEZ:  -- the documents that are being

1  admitted, if they could be placed on the screen because not

2  everyone here in the courtroom have the binders, and I think

3  we also have people on the call that are not able to see

4  what documents are being referred to in the interrogation.

5          THE COURT:  I'm going to let them conduct their

6  examination.  But it's proof of claim 43 is -- I should say

7  -- not proof of claim 43.  Document 43.

8          MR. BROOKNER:  It's document number --

9          THE COURT:  43.

10         MR. BROOKNER:  -- 1410 -- 1410-43.

11         THE COURT:  Yeah.  Yeah.  I got it.  Sometimes,

12 you know, if you can put it on the screen, great.  If not,

13 conduct your examination.  But I'm being sensitive to the --

14 I'm happy people are on, but I need to see it.  So --

15         MR. BROOKNER:  If you want, we can have Ms. Carson

16 as a --

17         THE COURT:  Ms. Carson, if you want to put stuff

18 on, to the extent that you can, but I got it.  There's some

19 stuff that's filed under seal and I don't want to -- you've

20 got kind of pick and choose which ones.

21         MR. BROOKNER:  We're not.  I only have one more to

22 hit, and then we'll be done.

23         THE COURT:  Okay.  I think we can proceed.  It's

24 just a proof of claim.

25         MR. BROOKNER:  And the next one just for counsel

1  is another proof of claim.  And I can show you the book and

2  apologies.  Okay.

3  BY MR. BROOKNER:

4  Q    Mr. Lefkowitz, let's talk about M2 Loan Co.  Are you a

5  director of M2 Loan Co?

6  A    Yes, I am.

7  Q    Now prior to the divisional merger, did M2 Loan Co make

8  a secured loan or was M2 Loan Co a secured lender to the

9  Debtor?

10  A    Yes.

11  Q    Do you remember how much that was for about?

12  A    100 million.

13  Q    And did M2 Loan Co believe at the time of the

14  bankruptcy filing that that was a valid and enforceable loan

15  obligation against the Debtor?

16         MS. MEYERS:  Objection.  Leading.

17         THE COURT:  Overruled.

18         THE WITNESS:  Yes.

19  BY MR. BROOKNER:

20  Q    As we sit here -- well, now there was a divisional

21  merger in May of '22, right?

22  A    Correct.

23  Q    What happened to the M2 Loan Co obligation in the

24  divisional merger; do you remember?

25  A    Yes.

ISAAC LEFKOWITZ - DIRECT BY MR. BROOKNER                202

1   Q    What happened?

2   A    It was moved over to CHS TX.

3   Q    It was allocated to CHS TX?

4   A    I don't know the difference between moving and

5   allocation, but allocated, correct.

6   Q    As we sit here today, does M2 Loan Co believe that that

7   obligation remains a valid and enforceable obligation

8   against CHS TX?

9   A    Absolutely.

10  Q    Okay.  I'd like you to go back to the book for a

11  second, and flip to the immediately-prior tab, which is

12  Tab number 42, and see if you could just please identify

13  that document.

14  A    Yes.

15  Q    What is it?

16  A    It's an M2 Loan Co claim.

17  Q    And if you look at -- it's number 7, so see attachment.

18  If you look at the attachment, which is -- look at the --

19  oh, by the way, this is document number 1410-42, 1410-42.

20  If you flip to Page 6 of 54, Page No. 3 on the bottom, do

21  you see that?

22  A    Yeah.

23  Q    Do you see there's an approximate amount that M2

24  contends is owing to it?

25  A    Yes.

1    Q    On the third line.  What is that amount?

2    A    $24,032,965.

3    Q    And do you have firsthand knowledge of these amounts in

4    this proof of claim?

5    A    Yes.

6    Q    And again, to be clear, if the settlement is approved

7    and becomes effective, is M2 Loan Co waiving the amounts on

8    this proof of claim?

9    A    Waiving and voiding.

10        MR. BROOKNER:  Your Honor, move for the admission

11   of Exhibit 42 to the extent that it's a timely-filed proof

12   of claim in the amount of at least 24,032,965.

13        THE COURT:  Any objection?

14        MS. MEYERS:  No objection.

15        THE COURT:  It's admitted for that purpose.

16     (Exhibit 42 received in evidence.)

17   BY MR. BROOKNER:

18   Q    Mr. Lefkowitz, if the settlement is not approved, do

19   you have an understanding as to what happens?

20   A    Yes.

21   Q    What happens?

22   A    All hell breaks loose, back to litigation.

23   Q    And do you believe that the UCC will seek standing to

24   assert those claims against the settlement parties?

25        MS. MEYERS:  Objection.  Calls for speculation.

1          THE COURT:  He can answer if he has personal

2  knowledge.

3          THE WITNESS:  Yes.

4  BY MR. BROOKNER:

5  Q    Yes, you have personal knowledge, or, yes, you think

6  that's what will happen?

7  A    Yes, I have personal knowledge that that's what's going

8  to happen.

9  Q    Okay.  And were that to happen, how would the

10 settlement parties respond?

11 A    We would vigorously defend it.

12 Q    Do you know by the same token, if the settlement is

13 approved, what would happen if the M2 parties nonetheless

14 fail to comply with their obligations?  Do you know what

15 happens then?

16 A    Back to square one.

17 Q    No releases?

18 A    Correct.

19 Q    Crazy litigation?

20 A    Correct.

21 Q    All hell breaks loose?

22 A    Yeah.

23 Q    Now let's go back.  I know I'm flipping around and I

24 apologize.  Let's go back to Exhibit No. 2, Paragraph 7.  If

25 you'd take a minute, just take a look at that.

1   A    Yeah.

2   Q    Does Paragraph 7 contemplate releases by other parties

3   who are waiving claims and causes of action against the

4   estate?

5   A    Other than listed here?

6   Q    No, in addition to the M2 parties.

7   A    Whatever they're listed in the -- in Paragraph 7.

8   Correct.

9   Q    And there are people listed in Paragraph 7 over and

10  above the M2 parties as they're defined in the front of the

11  document?

12  A    Yes.

13  Q    Now before the last hearing, and I think you heard

14  reference to it earlier on Mr. Perry's cross-examination,

15  you know that there was an amended form or proposed order

16  filed.

17  A    Correct.

18  Q    And do you know what the purpose of filing that amended

19  form of order was?

20  A    To clear up some confusing factors by the released

21  parties.

22  Q    About who is releasing who and what?

23  A    Correct.

24  Q    Now do you believe -- do you have any reason to believe

25  that if approved by Judge Lopez, that the settlement would

1    preclude any individual creditors with a tort creditor's

2    contract or otherwise from asserting individualized, direct

3    claims against any third parties?

4    A    The courthouse is open to anyone that wants to sue.

5    Q    Now going back to this paragraph settlement, the

6    Paragraph 7 in the settlement, these releases, is this a

7    material term of the agreement for the settlement parties?

8    A    Absolutely.

9    Q    Would the settling parties be willing to settle on the

10   terms in the settlement agreement without Paragraph 7?

11   A    Not at all.

12   Q    Now before you and I started our examination, you saw

13   that Ms. Hayward came up and made an announcement to the

14   Court, right?

15   A    Yes.

16   Q    And at this point, just to be clear, the settlement

17   parties have moved off of the requirement for there to be a

18   non-appealable confirmation order, plan confirmation order,

19   right?

20   A    Correct.

21   Q    And now instead, the settlement parties will put in the

22   $40 million payment once there's a final, non-appealable

23   order approving just the settlement; is that right?

24   A    The 9019 motion.

25            MS. MEYERS:  Objection.  Leading.

1          THE COURT:  Sustained.

2   BY MR. BROOKNER:

3   Q    Do you have an understanding now since the plan

4   confirmation order concept has gone away when the settling

5   parties will infuse the $40 million called for under the

6   settlement?

7   A    Yes, I've instructed Ms. Hayward not to condition the

8   plan to the settlement.

9   Q    Right.  So now it's just once there's a final

10  settlement order, the settlement monies will come in, in the

11  manner that Ms. Hayward described.

12  A    Correct.

13          MR. BROOKNER:  Pass the witness, Your Honor.

14          THE COURT:  Thank you.  Anyone have questions who

15  supports the relief requested?

16          MR. ZLUTICKY:  Thank you, Your Honor.

17            CROSS-EXAMINATION OF ISAAC LEFKOWITZ

18  BY MR. ZLUTICKY:

19  Q    Mr. Lefkowitz, my name is Nick Zluticky.  I represent

20  the Official Committee of Unsecured Creditors.  We've met a

21  few times.  I just have a few questions for you.

22      I've taken your deposition a few times in this case; is

23  that right?

24  A    Correct.

25  Q    We've attended a couple of mediations with one another?

1    A     Yes.

2    Q     So earlier, Mr. Brookner was asking you about M2 Loan

3    Co and you're a director of M2 Loan Co; is that right?

4    A     Correct.

5    Q     And you understand that the Committee contends that

6    there's been money transferred to M2 Loan Co by the Debtor

7    that the Committee believes should be returned to the

8    Debtor?

9    A     Yes.

10   Q     And you understand the Committee's reason for that

11   position is because the Committee believes those transfers

12   were fraudulent transfers?

13   A     The Committee's view, but yes.

14   Q     And does M2 Loan Co agree with the Committee that those

15   transfers made were fraudulent transfers?

16   A     Absolutely not.

17   Q     And you understand that -- you were asked earlier about

18   Geneva Consulting.  You're a director of Geneva Consulting;

19   is that right?

20   A     Correct.

21   Q     And you understand the Committee's position is there

22   was money transferred from the Debtor to Geneva Consulting

23   that should be returned to the Debtor; is that right?

24   A     Yes.

25   Q     And you understand the Committee's reason for that

ISAAC LEFKOWITZ - CROSS BY MR. ZLUTICKY                209

1   position is that the Committee believes those transfers were

2   fraudulent transfers?

3   A    I don't understand it, but that's their claim.

4   Q    Does Geneva agree with the Committee's position that

5   those transfers were fraudulent transfers?

6   A    Absolutely not.

7   Q    Earlier, you were asked about a loan that M2 Loan Co

8   made to the Debtor prior to the divisional merger; do you

9   recall that?

10  A    Yes.

11  Q    And you said that loan was approximately $100 million.

12  A    At that time.  Today, it's about 120.

13  Q    And that is a loan that you'd testified was allocated

14  or moved to CHS TX as part of the divisional merger?

15  A    Correct.

16  Q    You understand the Committee's position is that that

17  loan that Corizon owed to M2 Loan Co was not a valid debt,

18  right?

19  A    I hadn't seen any documents to that.  But yeah, it

20  could be that claim.

21  Q    Does M2 Loan Co agree that that loan is not a valid

22  debt?

23  A    No, not at all.

24  Q    And earlier, we mentioned the divisional merger, and

25  that's the merger by which assets and liabilities were

ISAAC LEFKOWITZ - CROSS BY MR. ZLUTICKY                    210

1  allocated to CHS TX and then to Tecum Care services the

2  Debtor; is that right?

3  A    Correct.

4  Q    And you understand the Committee's position is the

5  divisional merger left the Debtor Tehum with less than

6  reasonably-equivalent value in exchange for what it

7  transferred?

8  A    That's the claim that the UCC's making, but it's not

9  so.

10 Q    Do you have a position at Perigrove 1018 LLC?

11 A    Yes.

12 Q    And what is that position?

13 A    A director.

14 Q    Does Perigrove 1018 agree with the Committee's position

15 on the divisional merger?

16 A    Absolutely not.

17 Q    You understand that if we do not settle the estate's

18 claims against the settlement parties, that the Committee or

19 the Debtor or both are going to pursue claims and causes of

20 actions against the settling parties?

21 A    I believe so.

22 Q    This was your statement of all hell breaking loose.

23 A    Right.

24 Q    Okay.  And those parties include Perigrove 1018,

25 YesCare, M2, and Geneva?

1  A     Right.

2  Q     And you understand that the Committee could also seek

3  to pursue among other things successor of liability claims

4  against YesCare?

5  A     I don't know how, but they could.

6  Q     And do you know whether YesCare, M2, Geneva, and

7  Perigrove would defend those claims?

8  A     Oh, sure.

9  Q     And would they?

10 A     Yes.

11         MR. ZLUTICKY:  Your Honor, I have no other

12 questions.  I'll pass the witness.

13         THE COURT:  Thank you.  Anyone else have any

14 questions for this witness who supports the relief

15 requested?  Okay.  Let's turn to cross-examination.

16         MS. MEYERS:  Apologies.  We have binders of the

17 exhibits and then the transcripts --

18         THE COURT:  All right.

19         MS. MEYERS:  -- may be there too.

20         THE COURT:  Thank you.  Do we need presenter role

21 or shifting of the monitor?

22         MS. MEYERS:  Yes, please.

23         THE COURT:  You've got it.

24           CROSS-EXAMINATION OF ISAAC LEFKOWITZ

25 BY MS. MEYERS:

ISAAC LEFKOWITZ - CROSS BY MS. MEYERS                    212

1  Q    Good afternoon, Mr. Lefkowitz.  Jessica Meyers on

2  behalf of the TCC.  It's nice to see you again.  We met at

3  your deposition on February 8th of 2024.

4       Do you remember that?

5  A    Yes.

6  Q    Okay.  And I may be referring to some of your testimony

7  from your deposition so it's included in the white binder

8  that we just gave you.  And there's also some exhibits in

9  there, and I'll call those out by tab number.  Okay?

10 A    Okay.

11 Q    So you understand that the Debtor and UCC have moved

12 for approval of a settlement pursuant to Rule 9019, right?

13 A    Correct.

14 Q    And to make things easier, I'm going to refer to that

15 as the 9019 motion, okay?

16 A    Okay.

17 Q    And I'll refer to the settlement or the settlement

18 agreement, when I refer to those, I'm referring to the

19 settlement that's the subject of the 9019 motion, right.

20      So let's turn to TCC Exhibit 125, which is in Tab 5 of

21 our binder.

22           THE COURT:  Your new binder.  Counsel, you said

23 Tab 5?

24           MS. MEYERS:  Yes.

25           THE COURT:  Thank you.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

 1            Can Mr. Lefkowitz put the other binders away for

 2   now?

 3            MS. MEYERS:  Yeah.

 4            THE COURT:  Okay.

 5            MS. MEYERS:  We will not be referring to those.

 6            THE COURT:  Great.

 7            THE WITNESS:  That's good, right?  Exhibit what?

 8   BY MS. MEYERS:

 9   Q    Tab 5, please.  It's TCC Exhibit 120.

10   A    Okay.

11   Q    Now you've seen this document before, right?

12   A    Yes.

13   Q    Okay.  And if you see the numbers at the top of the

14   page, could you please turn to Page 37 out of 47?

15   A    Yes.

16   Q    Do you recognize this as the settlement agreement?

17   A    Correct.

18   Q    All right.  And if you could turn to 47 out of 47, do

19   you see your signature on that page?

20   A    Yes.

21   Q    And it says you signed the agreement as an authorized

22   representative of the parties listed on that page, correct?

23   A    Correct.

24   Q    And you participated in the negotiation of the

25   settlement on behalf of these parties; is that right?

1    A    Yes.

2    Q    And for the record, those parties are:  YesCare Corp;

3    CHS TX, Inc.; Geneva Consulting, LLC; Perigrove 1018 LLC;

4    Perigrove LLC; M2 Hold Co, LLC; and Pharmacore, LLC,

5    correct?

6    A    Correct.

7    Q    Let's start with the YesCare Corp.  You're a director

8    of YesCare; is that correct?

9    A    Yes.

10   Q    And do you hold a position at CHS TX?

11   A    Probably only as a director.

12   Q    You believe you're a director or CHS TX?

13   A    Correct.

14   Q    And that's how you became an authorized signer for CHS?

15   A    Correct.

16   Q    And CHS TX is a direct subsidiary of YesCare; is that

17   correct?

18   A    Correct.

19   Q    What about Geneva Consulting?  You don't currently hold

20   an official position at Geneva; is that right?

21   A    I think I testified that I am a director at Geneva.

22   Q    You're currently a director at Geneva.

23   A    I believe so.

24   Q    Okay.  And I believe you testified that Mr. Solomon

25   Shapiro authorized you to sign on behalf of Geneva; is

1  that --

2  A    Correct.

3  Q    And what's Mr. Shapiro's position at Geneva?

4  A    I think he's the general counsel there.

5  Q    Mr. Shapiro's also in-house counsel at Perigrove LLC;

6  is that right?

7  A    General counsel.

8  Q    General counsel is his position?

9  A    Correct.

10 Q    And you're also a director of Perigrove LLC; is that

11 correct?

12 A    No, I'm not.

13 Q    You're not currently a director of Perigrove LLC?

14 A    I was then.

15 Q    You were at this time --

16 A    Correct.

17 Q    -- but you're not currently.

18 A    Ct

19 Q    And you're a director of Perigrove 1018 LLC, correct?

20 A    Correct.

21 Q    And you still hold that position?

22 A    Correct.

23 Q    You're also a director of M2 Hold Co; is that right?

24 A    Correct.

25 Q    And you're the sole director of M2 Hold Co?

1   A      No.

2   Q      There's another director of M2 Hold Co?

3   A      Yes.

4   Q      And who is that?

5   A      Oh, I'm sorry.  I confused between Hold Co and Loan Co.

6   Hold Co, I'm the sole.  Loan Co, no.

7   Q      And what's the relationship between M2 Hold Co and M2

8   Loan Co?

9   A      I believe M2 Hold Co is the parent to M2 Loan Co.

10  Q      And finally, you're also a director of Pharmacore, LLC?

11  A      Correct.

12  Q      Okay.  Let's go back to the first page of the

13  settlement agreement, which is on Page 37 out of 47.  You

14  see that there's a number of parties listed that are defined

15  collectively as M2 parties.  Do you see that?

16  A      Correct.

17  Q      And again for the record, this is YesCare Corp,

18  including CHS TX; M2 Loan Co, LLC; M2 Hold Co, LLC;

19  Perigrove 1018 LLC; Perigrove LLC; Pharmacore, LLC; and

20  Geneva Consulting, LLC.  Do you see that?

21  A      Correct.

22  Q      So is it fair to say you signed the settlement

23  agreement on behalf of --

24  A      All those.

25  Q      Except for M2 Loan Co, correct?

1   A     Correct.

2   Q     Okay.  But you are a director of M2 Loan Co?

3   A     Correct.

4   Q     And you testified as a representative of M2 Loan Co in

5   this case, correct?

6   A     Correct.

7   Q     In addition to the M2 parties, the Debtor is a party of

8   the settlement agreement.

9   A     Yes.

10  Q     And you're the Debtor's sole director?

11  A     Of what?  Of the Debtor?

12  Q     Yes.

13  A     Correct.

14  Q     And you are the one who caused Tehum to file for

15  bankruptcy; is that right?

16  A     Correct.

17  Q     And you engaged --

18  A     I didn't cause it; I filed it, but go ahead.

19  Q     And you engaged Tehum's bankruptcy counsel Gray Reed,

20  right?

21  A     Correct.

22  Q     Now let's take a look at Paragraph 4 of this agreement,

23  which is on the next page.

24  A     Yeah.

25  Q     This provision's entitled settlement payments; do you

ISAAC LEFKOWITZ - CROSS BY MS. MEYERS                    218

1   see that?

2   A    Yes.

3   Q    And it says here the M2 parties -- you see that the M2

4   parties -- it says here, "The M2 parties shall make or cause

5   to be made the following advances in releases."  Do you see

6   that?

7   A    Yes.

8   Q    Does that mean it's essentially up to you to release

9   the settlement payments?

10  A    No.

11  Q    Aren't you the sole -- you're the sole director of M2

12  Hold Co, for example, right?

13  A    This is not M2 Hold Co.  This is M2 Loan Co.

14  Q    This says M2 parties.

15  A    But this refers to the DIP payments, which is M2 Loan

16  Co.

17  Q    So the settlement agreement says, "The M2 parties shall

18  make or cause to be made the following advances."  Do you

19  see that?

20  A    Yes.

21  Q    And so M2 Hold Co is one of the M2 parties; isn't that

22  right?

23  A    Yes.

24  Q    Okay.  And you're the sole director of M2 Hold Co,

25  right?

1   A      Yes.

2   Q      Okay.  So isn't it really, if you withhold your -- if

3   you don't cause M2 Hold Co to make a payment, isn't that

4   holding up the payment?

5   A      No.

6   Q      So who's making the payment?

7   A      Other parties can make payment.

8   Q      Do you know which ones will be making this payment?

9   A      There's a list of all parties, so any one of the

10  parties can make the payment.

11  Q      At this time, has it been determined which of the M2

12  parties will be making the settlement payment?

13  A      No.

14  Q      You're a director of all of the M2 parties; isn't that

15  right?

16  A      Yes.

17  Q      Except for I think you said you're no longer a director

18  of Perigrove LLC; is that right?

19  A      Correct.

20  Q      If you're not a director of Perigrove LLC, who from the

21  settling parties authorized the revision to the settlement

22  today?

23  A      I think I testified that I -- oh the revision of

24  today's settlement?

25  Q      On behalf of Perigrove LLC.

1    A    Counsel conferred with clients.

2    Q    And who at Perigrove LLC would have made that

3    authorization?

4    A    It could be Zalman Shapiro, the general counsel.  I

5    don't know.

6    Q    Okay.  You see that there's a $40 million payment

7    contemplated in Subsection (e), Paragraph 4?

8    A    Yes.

9    Q    Where is the $40 million going to come from?

10   A    From the settlement parties.

11   Q    From which ones?

12   A    Hasn't been allocated yet.

13   Q    Is there an escrow fund with $40 million sitting in it

14   right now?

15   A    Escrow fund?  Not that I know of.

16   Q    As of today, do any of the M2 parties have $40 million

17   on hand?

18   A    I believe so.

19   Q    Which one has $40 million on hand?

20   A    I don't have their bank statements in front of me, but

21   they do.

22   Q    How do you know that?

23   A    I'm involved in these companies.

24   Q    Okay.  So you sitting here today, collectively, you

25   believe that the M2 parties have $40 million on hand?

1  A    You settle it today; we can write you a check today.

2  Q    None of the $40 million dollars is going to come from a

3  party other than the M2 loan parties; is that right?

4  A    I didn't say that.

5  Q    Okay.  Is that a possibility?

6  A    Possibilities, we can discuss possibilities, of course.

7  Q    Is it contemplated that any of the $40 million dollars

8  settlement payment, is it contemplated that that would come

9  from any party other than the M2 Loan --

10  A    No.

11  Q    -- the M2 parties?  No.  Okay.  Let's move on to

12  Paragraph 7.  That starts on Page 40.

13  A    Page 40?

14  Q    On Page 40 of 47, looking at the top.

15  A    Oh, okay.

16  Q    Paragraph 7.  Do you see the list of parties starting

17  with Subsection (a) and the M2 parties that are defined

18  collectively as the released parties?  It goes on to

19  Page 41.

20  A    Correct.

21  Q    And these are parties that are receiving releases from

22  creditor claims under the settlement; --

23  A    Correct.

24  Q    -- is that right?  Okay.  You're personally receiving a

25  release, right?

1   A     Me too?

2   Q     Yes, you're listed under Subsection (m); do you see

3   that?

4   A     Correct.

5   Q     And your release under the settlement agreement is not

6   mutual, is it?

7   A     No.

8   Q     Right?  You're not releasing any claims you might have

9   against a creditor of Tehum.

10         MR. BROOKNER:  Objection, Your Honor.  This was a

11  -- there was a misstatement earlier, and I didn't say

12  anything.  The document says nothing about releases to and

13  from creditors.  The document relates to releases to and

14  from the estate.  And so, this is a particularly -- this is

15  a precise issue that needs to be properly addressed.

16         Counsel is conflating what the document and the

17  amended form of order say.

18         THE COURT:  Why don't you just object, and then --

19         MR. BROOKNER:  Oh.

20         THE COURT:  -- take it up on redirect?

21         MR. BROOKNER:  That's fine.

22         THE COURT:  Okay.  Thank you.

23  BY MS. MEYERS:

24  Q     To be clear if, for example, you had a claim against an

25  unsecured creditor of Tehum, that claim's not being

1  released, right?

2  A    I personally filed a claim?

3  Q    If -- excuse me.  If you had a claim, let's say, for

4  defamation against --

5  A    You're asking a hypothetical?

6  Q    I'm saying if you had a claim against a member --

7  A    When you say you, you mean me personally?

8  Q    Personally, you as a released party.

9  A    I haven't filed a claim.

10 Q    I understand.  I'm saying if you had a claim against a

11 member of the UCC, that claim's not being released under

12 this settlement agreement, right?

13 A    No.

14 Q    So if this settlement agreement is approved, you could

15 -- I'm not saying you would -- but you could sue a member of

16 the UCC, right?

17 A    Sue on what?

18 Q    For any claim that you might have existing at this

19 time.

20 A    There's a flag hanging out there.  You know, anyone can

21 sue anyone.  I don't follow your line of questioning.  If I

22 can sue the creditors?

23 Q    Nothing in this agreement --

24 A    Precludes me --

25 Q    -- releases claims that you might have against a

1   creditor, for instance.

2   A    Right.  This is not a mutual release.

3   Q    Okay.  Now based on the terms of the settlement

4   agreement, you're not identified as one of the parties

5   responsible for the settlement payment, right?

6   A    There's no one identified.  The settlement parties.

7   Q    I'm sorry.  Can you repeat that?

8   A    No one is individually identified; it's a group of

9   parties.

10  Q    Right.  The M2 parties are identified as being

11  responsible for the settlement payment.

12  A    Correct.

13  Q    And you're not one of the M2 parties?

14  A    No.

15  Q    Okay.  So based on the settlement agreement, you're not

16  personally obligated to pay any amount of a settlement

17  payment, right?

18  A    We will participate if we have to.

19  Q    Right.  You testified at your deposition that you would

20  contribute to the settlement payment to get a release; is

21  that right?

22  A    Correct.

23  Q    Okay.  You said you'd contribute $10?

24  A    Minimum.

25  Q    Well, at the time, you said -- at your deposition, you

1   said you'd contribute $10, right?

2   A    I said -- I meant to say that for consideration, you

3   need to pay $10.  If it's missing $10 in the settlement,

4   I'll contribute it, but if it's missing 10 million, I'll

5   contribute too.

6   Q    So is $10 all you can afford to contribute?

7   A    I just said if it's missing 10 million, I will

8   contribute 10 million as well.

9   Q    Do you personally have the ability to contribute the

10  full 40 million?

11         MS. HAYWARD:  Objection, Your Honor.  Relevance to

12  whether or not Mr. Lefkowitz can loan.

13         THE COURT:  Overruled.  You can answer.

14         THE WITNESS:  If need be.

15  BY MS. MEYERS:

16  Q    If need be, you could contribute the entire $40

17  million?

18  A    Correct.

19  Q    Could you contribute more than that?

20  A    We're talking about a settlement.  I've contributed

21  more.

22  Q    Well, if there was a new settlement, could you

23  contribute more than $40 million dollars to it?

24         MS. HAYWARD:  Objection, Your Honor.  This is --

25         THE COURT:  I'll sustain that objection.

1  BY MS. MEYERS:

2  Q    I'd like to direct your attention to Subsection (u) in

3  Paragraph 7.  You see that it provides for each entity

4  listed in A through T, each of their respective current and

5  former officers, directors, employees, managers, attorneys,

6  professional advisers, and agents; and then it excludes a

7  couple of individuals.

8       Do you see that those individuals are defined as

9  released parties -- the attorneys, directors, officers?

10 A    Yes.

11 Q    Okay.  So the M2 parties are listed in Subsection (a)

12 as a released party, right?

13 A    Right.

14 Q    And so according to Subsection (u), the current and

15 former directors, officers, employees, managers, attorneys,

16 professional advisers, and agents of each of the M2 parties

17 is also getting a release; is that right?

18 A    Correct.

19 Q    Okay.  And you're a current or former director of most

20 of the M2 parties, right?

21 A    Okay.

22 Q    M2 -- excuse me.  Strike that.  YesCare Corp is one of

23 the M2 parties, right?

24 A    Yes.

25 Q    And you're a director of YesCare Corp?

1   A     Yes.

2   Q     All right.  You're not the only director of YesCare

3   Corp though, are you?

4   A     No.

5   Q     How many directors are there?

6   A     Many.

7   Q     Do you know approximately how many?

8   A     Probably a dozen officers and directors.

9   Q     Do you know who those individuals are?

10  A     Some, yeah.

11  Q     And who are they?

12  A     They're listed here.

13  Q     Where are they listed?

14  A     Jeffrey Scott King, Jeffrey Sholey, Ladele.

15  Q     Those are all directors of YesCare?

16  A     Correct.

17  Q     Is that all of the directors of YesCare Corp to your

18  knowledge?

19  A     I wouldn't know today if it's all or it has been

20  changed.

21  Q     Have you ever attended board meetings with your fellow

22  directors of YesCare Corp?

23  A     Yes.

24  Q     Okay.  But you don't remember who those people are?

25  A     They keep changing.  They keep moving.

1  Q    When was the last time you attended a board meeting?

2  A    December.

3  Q    Who was on the board as of December -- I assume you

4  mean 2023?

5  A    Correct.

6  Q    Who was on the board in December of 2023?

7  A    I don't recall all their names down in, you know, back

8  then, but that's why we kept it broad, general -- officers

9  and directors, whoever they are.

10 Q    Okay.  So sitting here today, you can't tell us each

11 director of YesCare Corp who's getting released, right?

12 A    There is in detail, and then there's in general.

13 Q    Where could I look to get a list of the current and

14 former directors of YesCare?

15 A    I'm sure in the books, in the minutes of YesCare.

16 Q    To your knowledge, has that been produced to the TCC?

17 A    I don't know what has been produced to the TCC.  We've

18 produced everything to the Debtor.

19 Q    Who's the beneficial owner of YesCare Corp?

20 A    I don't know.

21 Q    You don't know who the beneficial owner is?

22 A    Correct.

23 Q    Okay.  I think we've already established you're a

24 director of multiple entities, right?

25 A    Yes.

1  Q    So you understand that directors owe a fiduciary duty

2  to the beneficial owners, right?

3           MS. HAYWARD:  Objection.  Calls for legal

4  conclusion.

5           THE COURT:  Can you repeat the question, Counsel?

6           MS. MEYERS:  I said, do you understand that as a

7  director, you owe a fiduciary duty to the owners of the

8  company.

9           THE COURT:  I think he can answer that question.

10  Overruled.

11           THE WITNESS:  But I still don't know who the

12  owners are.

13  BY MS. MEYERS:

14  Q    So you just don't know who's --

15  A    I think we went through this line of questioning in

16  seven depositions.  And then finally, you asked me if I'm an

17  owner, and I said I'm not.

18           THE COURT:  Mr. Lefkowitz, unfortunately, I wasn't

19  at any of the depositions.  So she gets to ask all the

20  questions, and you get to answer them.  So answer --

21           THE WITNESS:  Okay.

22           THE COURT:  -- ask your next question.

23  BY MS. MEYERS:

24  Q    So you don't -- your testimony is that you don't know

25  to whom you owe your fiduciary duty as a director of YesCare

1  Corp?

2  A    I feel fiduciary duty to the company, but I don't know

3  who the shareholders of the company are.

4  Q    YesCare Corp isn't a public company, is it?

5  A    No.

6  Q    It's privately held?

7  A    Correct.

8  Q    Is it closely held?

9  A    I don't know.

10  Q    You don't know?

11  A    No.

12  Q    Perigrove LLC is also one of the M2 parties; is that

13  right?

14  A    Yes.

15  Q    And you're a director -- you were a director of

16  Perigrove LLC?

17  A    Correct.

18  Q    Who appointed you to be a director of Perigrove LLC?

19  A    I don't recall.  It was many years ago.

20  Q    How many years ago was it?

21  A    Probably seven or eight years ago.

22  Q    Do you know whether Perigrove LLC has any other

23  directors?

24  A    It does.

25  Q    Do you know who they are?

1   A     I'm no longer a director in Perigrove.

2   Q     Who were the other directors when you were a director

3   of Perigrove LLC?

4   A     I interacted with general counsel.

5   Q     Is the general -- are you referring to Mr. Shapiro?

6   A     Correct.

7   Q     Was he a director of Perigrove LLC?

8   A     I believe so.

9   Q     Are you aware that there were any other, other than

10  yourself and Mr. Shapiro, are you aware of any other

11  directors of Perigrove LLC?

12  A     No.

13  Q     You don't know of any others?

14  A     Correct.

15  Q     So you've never attended a board meeting with any other

16  directors?

17  A     Correct.

18  Q     Is Michael Flax a director of Perigrove LLC?

19  A     No.

20  Q     How do you know that if you don't know they are?

21  A     I know who Michael Flax is, and he has no relationship

22  to the company.

23  Q     So there are people that you know have a relationship

24  to the company that might be a director; is that what you're

25  saying?

1   A    You just asked me about Michael Flax, and I know

2   Michael Flax has nothing to do with our company.

3   Q    So you don't know if there are other directors of

4   Perigrove LLC who are getting a release under this

5   settlement?

6   A    Are you talking about these names listed here?

7   Q    Well, I'm talking about that Perigrove LLC is an M2

8   party, correct?

9   A    Right.

10  Q    And the officers and directors and managers and agents

11  are all getting --

12  A    Releases.

13  Q    -- releases.  So --

14  A    And they're not listed in the agreement --

15  Q    Right.  So --

16  A    -- just in case they were left out.  Correct.

17  Q    Right.  So we don't know who those people are --

18  A    Correct.

19  Q    -- with respect to Perigrove LLC?

20  A    Or any of the entities.

21  Q    Okay.  Can you turn to Tab 6 in your binder?  And this

22  is TCC Exhibit 291.  If you turn to the second page, do you

23  recognize this is a page from Perigrove LLC's website?

24          THE COURT:  Which exhibit --

25          MR. BROOKNER:  Objection.

1          THE COURT:  -- are you referring to, Counsel?

2          MS. MEYERS:  It is TCC Exhibit 291, and it's on

3    Tab 6.

4          THE COURT:  Oh, I'm in Tab 6.  I saw it.  Okay.  I

5    think there's an objection.

6          MR. BROOKNER:  Yes.  Objection.

7          THE COURT:  What's the objection?

8          MR. BROOKNER:  It's hearsay and until the document

9    comes into evidence, we can't really ask questions about it.

10         MS. MEYERS:  Your Honor, I've literally just put

11   the document and asked him if he recognized it so --

12         THE COURT:  Yeah.  I think she's allowed to get a

13   little foundation in there to see if she can --

14         MR. BROOKNER:  Okay.  I'll --

15         THE COURT:  Okay.

16         MR. BROOKNER:  -- come back.

17         MS. HAYWARD:  Your Honor, I'm just saying that the

18   document is on the screen and it has not yet been admitted,

19   so it shouldn't be shown to --

20         THE COURT:  I think she's just showing it to the

21   witness to see if -- to authenticate.  We haven't gotten to

22   admission yet.  I think if the document, they're allowed to

23   authenticate.

24         MS. MEYERS:  Yeah.  I believe it's from the

25   website.  I don't believe it's a confidential document.

1          MS. HAYWARD:  Your Honor, I just wasn't sure if it

2   was being shown to Webex and everybody before it had been

3   admitted.

4          THE COURT:  Okay.  Why don't we just proceed on

5   the binders.  You can take it down for now.

6   BY MS. MEYERS:

7   Q    Mr. Lefkowitz, do you recognize this as a page from

8   Perigrove LLC's website?

9   A    I think this question was asked at the deposition as

10  well, and I think I remember testifying that I hadn't seen

11  the website, and I know nothing about this document.

12  Q    Do the people on this page work for Perigrove LLC to

13  your knowledge?

14  A    Today, used to?

15  Q    Today.

16  A    I don't know.  I'm not in Perigrove today.

17  Q    Do you know if David Gefner is the founder and

18  principal of Perigrove LLC?

19  A    I don't have direct knowledge of that.

20  Q    You don't know one way or another whether David Gefner

21  is the founder and principal of --

22  A    Correct.

23  Q    -- Perigrove LLC?  So you don't -- you can't -- sitting

24  here today, you can't recognize any of these people as

25  someone at the entity that you were formerly a director of?

1   A     I didn't say that.

2   Q     Okay.  Which one of these --

3   A     You asked me if I recognized the people.  I recognize

4   the people.  You asked me if I know if he was the founder; I

5   said no, I don't.

6   Q     Understood.  Are you aware that any of these

7   individuals are still affiliated with Perigrove LLC?

8   A     I don't know.

9   Q     Do you know whether any of these individuals are

10  directors of Perigrove LLC?

11  A     Today, I don't know.

12  Q     Do you know whether they ever have been in the past?

13  A     No.

14  Q     You don't know whether any of these individuals have

15  ever been a director of Perigrove LLC?

16  A     Correct.

17  Q     Do you know whether any of these individuals are an

18  officer of Perigrove LLC?

19  A     I don't know.

20  Q     You don't know.

21  A     No.

22  Q     Not currently or previously.

23  A     Correct.

24  Q     So, but it's possible that some of these people are

25  getting a release under the settlement agreement, right?

1    A     Possibly.

2    Q     You just don't know?

3    A     Correct.

4    Q     You know what I'm referring to when I say DNO

5    insurance?

6    A     Yes.

7    Q     Do you know, when you were a director of Perigrove LLC,

8    did they have DNO insurance?

9    A     Don't know.

10   Q     Do you know who the beneficial owner of Perigrove LLC

11   is?

12   A     No.

13   Q     Do you have an ownership interest in Perigrove LLC?

14   A     No.

15   Q     Do you know of any person who does have an ownership

16   interest in Perigrove LLC?

17   A     No.

18              THE COURT:  Mr. Lefkowitz, you may have mentioned

19   this.  When did you stop becoming affiliated with Perigrove

20   LLC?

21              I apologize if you already asked the question.  I

22   was just going through my notes.

23              THE WITNESS:  January of this year.

24              THE COURT:  Thank you.  That does lead me to

25   another question.  When was this document signed, do you

1  recall?  Was it --

2          THE WITNESS:  Which --

3          THE COURT:  The -- I'm sorry.  I should've been a

4  little bit more precise.  The settlement agreement was filed

5  on the docket on January 16th.  When did -- do you recall --

6          THE WITNESS:  Recall right after the settlement.

7  I dis-associated myself --

8          THE COURT:  Okay.

9          THE WITNESS:  -- from the company.

10         THE COURT:  Thank you.

11 BY MS. MEYERS:

12 Q    Mr. Lefkowitz, did you just say you ceased to be a

13 director of Perigrove LLC in January 2024?

14 A    I still held a VP position, but I was no longer a

15 director.

16 Q    Okay.  Can you turn to Tab 2, which is the confidential

17 portion of your deposition transcript?

18 A    Yeah.

19 Q    And do you see that this is dated February 8, 2024?

20 A    Okay.

21 Q    And then can you turn to Page 220?

22 A    220?

23 Q    Yeah.  Excuse me.  Yes, 220.

24 A    Okay.

25 Q    Do you see at line 8 someone asked, "Are you a director

1   of Perigrove LLC?"  Answer, "I am."

2   A    Okay.

3   Q    That's testimony you gave on February 8, 2024?

4   A    Right.

5   Q    So is that accurate?  Were you still a director of

6   Perigrove LLC at the time?

7   A    I held the position of VP, the position, but not as a

8   director.  So if this needs to be corrected, yes.

9   Q    Okay.  So that was inaccurate testimony that you

10  provided?

11  A    Obviously.

12  Q    Perigrove 1018 is also an M2 party, right?

13  A    Correct.

14  Q    And you're a director of that entity?

15  A    Yes.

16  Q    Does Perigrove 1018 have any other directors?

17  A    Not that I'm aware of.

18  Q    You've never interacted with someone who held

19  themselves out as a director?

20  A    Correct.

21  Q    And does Perigrove 1018 have any officers?

22  A    I'm sure it does.

23  Q    Do you know who they are?

24  A    No.

25  Q    Does Perigrove 1018 have any employees?

1   A    I don't know.

2   Q    Does Perigrove 1018 have any DNO insurance?

3   A    I don't know.

4   Q    Who would know that, if not you?

5   A    General counsel, principals.

6   Q    Who's the general counsel of -- well, excuse me.

7   Strike that.  Who's the general counsel of Perigrove 1018?

8   A    Mr. Shapiro.

9   Q    So Mr. Shapiro's getting a release under this

10  settlement agreement; is that right?

11  A    If he falls under the category.

12  Q    But whether there's any other directors or officers of

13  Perigrove 1018, you don't know whether there's any other

14  that are getting released under the settlement?

15  A    Correct.

16  Q    You have a 5 percent ownership interest in Perigrove

17  1018?

18  A    Correct.

19  Q    Do you hold that position indirectly or through an

20  entity?

21  A    Through an entity.

22  Q    And what's the name of that entity?

23          MS. HAYWARD:  Objection.  Relevance, Your Honor.

24          THE COURT:  What's the relevance, Counsel?

25          MS. MEYERS:  Your Honor, this is a potential

1  source.  This is an individual that's getting released that

2  could potentially be -- have an alter ego claim against them

3  that's being released under this agreement.

4          THE COURT:  Which individual?  I'm sorry.  I was

5  going through the -- I have the settlement agreement open

6  right now.

7          MS. MEYERS:  Mr. Lefkowitz holds his ownership

8  interest in Perigrove 1018 --

9          THE COURT:  Uh-huh.

10          MS. MEYERS:  -- through an entity, not

11  individually.

12          THE COURT:  Right.

13          MS. MEYERS:  So the entity is --

14          THE COURT:  I'm sorry.  I apologize.  Can you

15  repeat the question?  I know how the entity --

16          MS. MEYERS:  I said what's the name of the entity.

17          THE COURT:  Ah.  Overruled.

18          THE WITNESS:  Company called Godfried (phonetic)

19  Wire Company.

20  BY MS. MEYERS:

21  Q    Does that entity hold any other interests other than

22  your interest in Perigrove 1018?

23          MS. HAYWARD:  Objection.  Your Honor, again, I

24  don't think that this is proper.

25          THE COURT:  Yeah.  I'm with you on that now.  I

1  think we got the name of the entity.  So I'll sustain the

2  objection.

3           MS. MEYERS:  Thank you, Your Honor.

4  BY MS. MEYERS:

5  Q    Do you know who owns the remaining 95 percent of

6  Perigrove 1018?

7  A    No.

8  Q    Do you know whether Perigrove LLC is a beneficial

9  owner?

10 A    I don't know who the owners are.

11 Q    Okay.  So we've talked about the parties that are

12 receiving a release under Paragraph 7, and those were

13 defined as the released parties, right?

14 A    Correct.

15 Q    What's your understanding of the claims that are being

16 released against the released parties?

17 A    The claims.

18 Q    What are they being released from?

19 A    Any claims.

20 Q    Any and all claims?

21 A    Correct.

22 Q    And just to make sure I'm understanding, is it any and

23 all claims of the Debtor and its creditors?

24 A    Whoever the other party they're handing the money over

25 to.

1  Q     So an incarcerated individual who has a personal injury

2  claim against the Debtor, that person's claims are being

3  settled by the settlement agreement, right?

4          MS. HAYWARD:  Objection, Your Honor.  This is --

5          THE COURT:  He can answer the question if he

6  understands that's the case or not.  You-all can --

7  overruled.

8          THE WITNESS:  I don't know what difference does it

9  make if he's incarcerated or not.

10 BY MS. MEYERS:

11 Q     I'm using that as an example.  Do you understand

12 whether that person's claim is being released under the

13 settlement agreement or not?

14 A     Whoever has a claim.

15 Q     Anyone who has a claim against the Debtor?

16 A     Whoever has a claim and is listed in the agreement,

17 there's a release.

18 Q     And any of those individuals would be barred from

19 pursuing claims against a released party; is that your

20 understanding?

21 A     Whoever receives the funds, correct.

22 Q     And a released party includes YesCare, right?

23 A     We listed them.  M2 parties.

24 Q     The idea is that the settlement payment is going to buy

25 peace for the all the released parties; is that fair?

1  A    I don't know what buy peace means.

2  Q    Well, let's turn to your transcript.  This is again the

3  confidential transcript.  So it's Tab 2, and let's turn to

4  Page 177.

5       Directing your attention to line 11.  Question, "If the

6  settlement is approved, what happens to the claims that are

7  pending against Corizon Health and the various tort

8  victims?"  There was a number of objections.  "I think we

9  discussed it before.  Money is going to buy peace."  Do you

10 see that?

11 A    Yeah, line 20.

12 Q    Yes.  So buying peace is your goal here, correct?

13 A    Okay.

14 Q    That's what you testified on February 8th, right?

15 A    Things changed since then, but okay.

16 Q    What's changed?

17 A    Brown Rudnick submitted the $3 million legal bill.  You

18 don't think it changed?

19 Q    Is that the only thing that's changed?

20 A    Magnificent.

21 Q    So in your view, is the settlement paying buying

22 finality of any distinct claims against the released parties

23 that might exist at the time of the settlement?

24 A    Correct.

25 Q    And the M2 parties are responsible for making that

1  settlement payment, right?

2  A     Parties, correct.

3  Q     Yes.  Let's go back to Tab 5 in the settlement

4  agreement, which begins on Page 37.  And then I'm going to

5  have you turn to Paragraph 9 of the settlement, which is on

6  Page 41 of 47.

7  A     Okay.

8  Q     And before we get into the substance, you're aware that

9  on March 5th, the Debtor and the UCC filed a revised

10 proposed order for the 9019 motion?

11 A     Correct.

12 Q     And you're aware that that order included revised

13 language for this Paragraph 9?

14 A     Correct.

15 Q     Let's take -- so, before we turn to this, let's take a

16 look at page, or excuse me, document ECF 1432, which is at

17 Tab 7 of your binder.

18 A     Yeah.

19 Q     All right.  And this is the new proposed order; do you

20 recognize that?

21 A     Yeah.

22 Q     Now I understand that there's been some changes

23 announced today, but I want to understand how this new

24 proposed order came about first.

25       So when is the first time that you learned of the plan

1  to submit a revised proposed order?

2  A    I wouldn't be able to identify a date.

3  Q    Fair to say it was between March 1st and March 5th?

4  A    I wouldn't be able to identify it.  There's a lot going

5  on in my life.

6  Q    I understand.  Was it before you were deposed?

7  A    No, I think it was after I was deposed.

8  Q    Was it after the hearing in this case started on March

9  1st?

10  A    I believe so.

11  Q    Did you request that the Debtor and UCC submit a

12  revised proposed order?

13  A    No.

14  Q    Did any of the M2 parties request that?

15  A    I don't think so.

16  Q    Do you understand how it came to be that a revised

17  proposed order was submitted?

18  A    No.

19  Q    What's the first time you saw a draft of this document?

20  A    On PACER.

21  Q    So you didn't see it before it was filed?

22  A    Correct.

23  Q    You see on the front page here, it says that Exhibit B

24  is a redlined draft of Paragraph 6 of 9 of the settlement

25  agreement.  Do you see that?

1   A     One second.  I lost you.  Where?

2   Q     On the very front page of this notice of revised

3   proposed order.

4   A     Take me back.

5   Q     It's on the very first page.  Do you see it says,

6   "Please take further notice that attached to this notice is

7   Exhibit B," -- oh, excuse me -- "notice as Exhibit B is a

8   redline of Paragraphs 6 and 9 of the settlement agreement."

9   Do you see that?

10  A     Okay.

11  Q     Let's turn to Exhibit B, which begins on Page 11 of 13.

12  And then let's turn to Page 12 because that's --

13  A     I lost you.

14  Q     -- where the redlines are.

15  A     I lost you.  Which tab?

16  Q     We are in Tab 7.

17  A     Okay.  Page?

18  Q     And we are on Page 12 of 13.

19        THE COURT:  12 of 18?  Or --

20        THE WITNESS:  12 of 13, Judge.

21  BY MS. MEYERS:

22  Q     And it's on your screen as well, Mr. Lefkowitz.  Now --

23        THE COURT:  Oh, sorry.  I'm just catching my own

24  place here.

25        MS. MEYERS:  It's okay.

1              THE COURT:  I apologize.

2              MS. MEYERS:  It's Tab 7.

3              THE COURT:  Yeah, I'm --

4              MS. MEYERS:  And --

5              THE COURT:  -- with you.

6              MS. MEYERS:  And -- okay.

7              THE COURT:  I'm with you.

8              MS. MEYERS:  Okay.  Great.

9   BY MS. MEYERS:

10  Q    Now before we get into this, do you understand how to

11  decipher a redline?

12  A    Yes, but I had nothing to do with this redline.

13  Q    I understand.  So 9(a) starts out "The effectiveness of

14  this agreement is conditioned upon the entry of an order of

15  the Court in form and substance acceptable to the M2 parties

16  approving this agreement pursuant to Rule 9019."  Do you see

17  that?

18  A    Yes.

19  Q    So does this mean that the agreement is not effective

20  unless there is an order approving the settlement agreement

21  in a form and substance acceptable to you?

22  A    I don't know what this redline means.

23  Q    Do you understand --

24  A    You know what I mean?  You know what I know is what was

25  announced in court today.  I have no idea about this

1  document.  I've never seen this redline before so --

2  Q    Well, Mr. Lefkowitz, this is the first line of the

3  current settlement agreement, and this has not been changed.

4  So this is the first line --

5  A    Let's go to the settlement agreement.  Why are you

6  taking me to a redline?

7  Q    Well, because -- yes.  Let's go to the settlement.

8  Let's turn to Paragraph 9.  Okay.  Are you there?

9  A    No.  Where?

10 Q    We are back in Tab 5, and at Paragraph 9, which is on

11 Page 41 of 47.

12 A    41 of 47.  Yeah.

13 Q    Okay.  Do you see that at the beginning of 9(a), the

14 language reads "The effectiveness of this agreement is

15 conditioned upon the entry of an order of the Court in form

16 and substance acceptable to the M2 parties approving the

17 agreement pursuant to Rule 9019 of the Federal Rules of

18 Bankruptcy Procedure."  Do you see that language?

19 A    Yes.

20 Q    Okay.  Does this mean that the agreement is not

21 effective unless there is an order that is acceptable to

22 you?

23 A    We proposed a change today.

24 Q    I am asking about this language in the old agreement.

25 A    History.

1  Q    Well, until there is something on file that shows what

2  the language is going to be, I'm going to ask you about the

3  language that's in --

4  A    Sure.

5  Q    -- the current agreement and in the proposed order

6  that's on file with the court, okay?

7       So I'm asking you this language that says, "The

8  effectiveness of this agreement is conditioned upon the

9  entry of an order of the Court in form and substance

10 acceptable to the M2 parties approving the agreement

11 pursuant to Rule 9019 of the Federal Rules of Bankruptcy

12 Procedure," I'm asking is -- does that mean that the order

13 needs to be acceptable to you?

14 A    To all parties.

15 Q    You are a director of all of the M2 parties except for

16 one or two; is that correct?

17 A    So, I'm not the sole decision authority.

18 Q    Well, I think you --

19 A    I'm a director, but I still have to report in some of

20 these.

21 Q    Well, you're the only director of M2 Hold Co; isn't

22 that right?

23 A    Yeah.  But M2 Hold Co is only one entity here.

24 Q    Right.  But if it's not acceptable to M2 Hold Co, it's

25 not acceptable to the M2 parties; isn't that right?

1    A     Yeah, but the other M2 parties can accept it.

2    Q     Doesn't this require that it needs to be in a form and

3    substance acceptable to all the M2 parties?

4    A     But that doesn't mean it has to be unanimous.

5    Q     Your understanding is that if YesCare thinks that the

6    order's okay and M2 Hold Co and M2 Loan Co don't think the

7    order's okay, that this agreement would still become

8    effective?

9    A     I don't think YesCare will go into a contentious with

10   their lender, but if Geneva says no and YesCare says yes,

11   YesCare will, you know, whoever writes the check.

12   Q     Okay.  And we don't know who that is right now?

13   A     No.

14   Q     Okay.  So we don't know who the order needs to be

15   acceptable to?

16   A     To all parties.

17   Q     Okay.  Right.  And you are --

18   A     But it doesn't have to be a unanimous consent.

19   Q     Okay.  And is that explained in this agreement?

20   A     It can get clarified in the certain order.

21   Q     Right.  Is it your understanding that this language is

22   going to change based off of what your counsel just

23   represented?

24   A     Correct.

25   Q     Would it be acceptable if an order approving the 9019

1   settlement in some way limited the releases set forth in

2   Paragraph 7?

3   A    Absolutely not.

4   Q    Right.  It wouldn't be acceptable if any of the

5   creditors could still pursue claims against the released

6   parties; is that right?

7   A    Correct.

8   Q    Would the M2 parties still pay the settlement amount if

9   that was the case?

10  A    No.

11  Q    Will you fund the $40 million dollars if there's a risk

12  that a court could vacate the settlement order on appeal?

13  A    You've got to clarify this hypothetical question.

14  Q    If this Court approves the --

15  A    The settlement.

16  Q    -- the settlement agreement as it currently stands with

17  the new clarification, would you pay the money if that order

18  could be vacated by an appellate court?

19  A    I think Ms. Hayward said that we're going to pay upon a

20  final order.

21  Q    And that's a final order approving the settlement, not

22  confirming a bankruptcy --

23  A    Correct.

24  Q    So just to be clear, you wouldn't cause the funds to be

25  released until all the appeals are exhausted with respect to

1  the order approving the 9019?

2  A    Most certainly.

3  Q    You would pay the settlement funds before the appeals

4  have been exhausted with respect to the order approving the

5  settlement?

6  A    Now let's be very clear.  We're buying -- you said

7  before that I testified that I'm buying peace.  You deliver

8  peace; we deliver your $40 million dollars.

9  Q    I understand.  Do you consider there to be peace if an

10 order could be overturned on appeal?

11 A    The 9019 motion?

12 Q    Yes.

13 A    No.

14 Q    Right.  So until the appeals have been exhausted with

15 respect to the order, a hypothetical order approving the

16 settlement, you would not release the funds until those

17 appeals have been exhausted?

18 A    Or if you're smart enough, you don't appeal.

19 Q    Right.  So the reason you wouldn't fund until the

20 appeals have been exhausted is because there is a risk that

21 you pay the money and then don't get the release, right?

22 A    Exactly.

23 Q    So if there isn't a final order granting you a complete

24 release, there's no funding, right?

25 A    I think that's the shopping cart, right?

1  Q    We could turn back to Page 7, or excuse me, Tab 7, and

2  turn to Exhibit B, which is on Page 12, and this is the

3  redline.  And I understand that you don't have anything to

4  do with this redline, but what I want to ask you is this

5  latter part here where it says, "The effectiveness of the

6  agreement is also conditioned on the entry of a final order

7  of the Court that is not the subject of appeal confirming

8  the Chapter 11 Plan," you understand that that language is

9  going to change in the future?

10 A    Yes.

11 Q    Mr. Lefkowitz, I think you told me at your deposition

12 that you had an informal law education; is that right?

13 A    Okay.

14 Q    Did you not tell -- is that incorrect?

15 A    Yes.

16 Q    Have you read the TCC's opposition to the Rule 9019

17 motion?

18 A    No.

19 Q    are you familiar with the Antelope case from the Fifth

20 Circuit?

21 A    No.

22 Q    You have no understanding of what happened in that

23 case?

24 A    I didn't look into it.

25 Q    Do you have any understanding -- strike that.  You

1   referenced a shopping cart, I believe, right?  What's your

2   understanding of the claims in that shopping cart?

3   A    So let's first do the cast of characters.  Who's

4   pushing the cart, who's checking out the cart.

5   Q    That's not my question, Mr. Lefkowitz.

6   A    But I'll answer you the way I want to answer it.

7             THE COURT:  No, you won't.  You'll answer --

8             THE WITNESS:  I'm sorry, Judge.

9             THE COURT:  -- the question.  I'm sorry.  You just

10  get to answer the questions, and your lawyer gets to ask you

11  questions.  That's just the way it works.

12            THE WITNESS:  Okay.  Sorry.

13            THE COURT:  So, Counsel --

14            No worries.

15  BY MS. MEYERS:

16  Q    So my question is what is your understanding of the

17  claims that are in the shopping cart, basically the claims

18  that are being released under the settlement agreement?

19  A    All sorts of claims.

20  Q    Can you be more specific?

21  A    Whatever claims possible.

22  Q    Are any wrongful death claims against YesCare asserted

23  on a successor liability theory in the shopping cart?

24  A    I wouldn't know.

25  Q    So you don't know if the settlement agreement is

1   approved, you have no idea whether an individual with a

2   wrongful death claim against Tehum could then pursue that

3   claim against YesCare in the U.S. court system?

4   A    Depending if YesCare is liable.

5   Q    So it's your understanding that some of those types of

6   claims may not be released under the settlement agreement?

7   A    Could be.

8   Q    Do you know one way or the other?

9   A    You have to identify the claim for me to give you the

10  proper answer.

11  Q    So the claim that I'm talking about is a claim for

12  wrongful death that is a claim --

13  A    That happened when?

14  Q    -- a claim arising from conduct by Corizon Health pre-

15  divisive merger, --

16  A    Right.

17  Q    -- a claim for wrongful death that a court claimant

18  would then assert against YesCare on a --

19  A    How?

20  Q    -- theory of successor liability.

21  A    That would be released.

22  Q    So your understanding is that if the settlement is

23  approved, that wrongful death claimant could not sue

24  YesCare, right?

25  A    Correct.

1   Q    Mr. Lefkowitz, are you aware that Mr. Barton, a

2   representative of the UCC, testified at this hearing earlier

3   this month?

4   A    Not aware.

5   Q    So you're not aware that he testified he believes a new

6   Chapter 11 plan would be opposed in this case?

7   A    I didn't listen to his testimony.

8   Q    Is it your understanding that the Debtor and the --

9   excuse me.  Strike that.  Is it your understanding that the

10  Debtor and UCC could propose a plan that does not include

11  the releases set forth in Paragraph 7 of the settlement

12  agreement?

13  A    But today, based on today's modification, it doesn't

14  matter.

15  Q    Why doesn't it matter?

16  A    How does it matter to the released parties?

17  Q    So you're not -- so, in your view, the -- you would

18  have a final, unappealable order confirming --

19  A    The settlement.

20  Q    -- the settlement, and those releases could not be

21  revisited when there was a Chapter 11 plan?

22  A    Final is final.  Against the released parties.

23  Q    So your understanding is that the Debtor and UCC could

24  not propose a plan that does not include the releases in

25  Paragraph 7 assuming there is a final, non-appealable order

1  of the settlement agreement?

2  A    I'm not following you.

3  Q    Okay.

4  A    The way I understand it, --

5  Q    I --

6  A    -- the plan and the confirmation has to do with the

7  division of the funds.  Settlement is between the settling

8  parties and the release.

9  Q    Okay.  My question is: If the Court approves the

10  settlement, --

11  A    Correct.

12  Q    -- the 9019 motion, and all the appeals are exhausted,

13  so there's a final unappealable order --

14  A    Correct.

15  Q    -- approving the settlement --

16  A    Correct.

17  Q    -- is it your understanding that the Debtor and UCC

18  could not propose a plan that did not align with that

19  settlement?

20  A    Why is that?

21  Q    So they could propose a plan that has nothing that's

22  required in the settlement agreement?

23  A    Settlement is over and done with.  It's final.  You

24  guys can file a plan and do whatever you wish.  Divide the

25  money up.

1  Q    Okay.  Let's take a step back and talk about Corizon

2  Health, Inc., right?

3  A    Sure.

4  Q    Pre-divisive merger.  Perigrove 1018 became the

5  beneficial owner of Corizon Health, Inc. in December 2021;

6  is that right?

7  A    Correct.

8  Q    And Perigrove 1018 acquired Corizon's direct and

9  indirect parent companies in that transaction, right?

10 A    Correct.

11 Q    And at the time of this acquisition, you were a

12 director of Perigrove 1018?

13 A    Correct.

14 Q    Who authorized that acquisition on behalf of Perigrove

15 1018?

16 A    Who authorized the acquisition of Corizon?

17 Q    On behalf of Perigrove 1018.

18 A    I was the last ultimate decision on it.

19 Q    And you negotiated that acquisition; is that correct?

20 A    Correct.

21 Q    Corizon Health was acquired by Perigrove 1018 from the

22 Flax Group; is that right?

23 A    No, the parent companies.

24 Q    What parent companies are you referring to?

25 A    M2 Hold Co.

1   Q     You acquired M2 Hold Co; isn't that right?

2   A     Again, you asked me before Corizon.  Corizon's

3   grandfather was acquired.

4   Q     Okay.  So who did Perigrove 1018 acquire --

5   A     From?

6   Q     -- acquire M2 Hold Co from, I guess, is the question.

7   A     From the Flax Group.

8   Q     From the Flax Group.  And that's because at that time,

9   the Flax Group owned Corizon Health, right?

10  A     They owned M2 Hold Co.

11  Q     Okay.  Do you remember I asked you this question at

12  your deposition?

13  A     Which one?  Which question?

14  Q     Whether Corizon Health was owned by the Flax Group

15  prior to the acquisition.

16  A     I don't remember.  I'm sure it was in that line of

17  questioning.

18  Q     Can we turn to Tab 1, which is also your deposition

19  transcript from February 8th, and turn to Page 32.  And

20  directing your attention to line 14, do you see, question,

21  "Corizon Health used to be owned by the Flax Group,

22  correct?"

23  A     Yeah.

24  Q     Witness, "I'm not aware of it."

25  A     Yeah.

1   Q    Question, "You're not aware that Corizon Health used to

2   be owned by the Flax Group, correct?"

3   A    Right.

4   Q    "You never had any interactions with the Flax Group?

5   No."  Was that accurate testimony?

6   A    I never spoke to Michael Flax or the Flax.  I only

7   dealt with their general counsel.

8   Q    And that's someone employed by the Flax Group?

9   A    Representative.

10  Q    And you do understand that Corizon Health was

11  beneficially owned by the Flax Group before Perigrove 1018?

12  A    You're playing with the word beneficial.  I said the

13  grandfather was, which was M2 Hold Co.

14  Q    I understand the distinction.  Thank you.  Before

15  Perigrove 1018 acquired Corizon Health and its parent

16  companies, was there an investigation into Corizon's

17  business?

18  A    Investigation or due diligence?

19  Q    Due diligence.

20  A    Yes.

21  Q    And fair to say that at that time, you had a basic

22  understanding of Corizon's assets and liabilities?

23  A    Correct.

24  Q    And Corizon had a fair amount of liabilities, right?

25  A    And fair amount of assets.

1    Q     When Perigrove 1018 acquired beneficial interest in

2    Corizon Health, Corizon wasn't making any money; is that

3    right?

4    A     Correct.

5    Q     The business wasn't doing well.

6    A     It was under duress.

7    Q     And that's in part due to the tort liability, right?

8    A     No.

9    Q     What was it a result of?

10   A     Loss of contracts.

11   Q     Anything else?

12   A     That was the main downfall.

13   Q     The loss of contracts?

14   A     Yeah.

15   Q     What about -- how would you -- strike that.  Having an

16   excessive amount of tort liability is going to cause duress

17   to a company; would you agree with that?

18   A     I don't know what excessive is, but the main reason

19   that they were under duress is they went from 1.3 billion to

20   200 million.

21   Q     And do you have an understanding of why that was?

22   A     COVID.

23   Q     COVID.  And what about COVID caused that?

24   A     Short on staffing.

25   Q     Do you have an understanding as to why Corizon was

1   losing contracts?

2   A     Short on staffing.

3   Q     So because they could not provide the services that

4   they had contracted to provide, people were dropping them;

5   is that your understanding?

6   A     That's the way you articulate it, but it was the lack

7   of confidence of to staff it up according to staffing

8   matrix.

9   Q     How do you know that that was the issue?

10  A     Due diligence.

11  Q     And it's your testimony that the mounting professional

12  liability claims had nothing to do with why Corizon was in

13  distress?

14  A     Absolutely not.

15  Q     Absolutely not, that's not your testimony, or that had

16  nothing to do with it?

17  A     I said it had -- I said absolutely that was not the

18  causing factor.

19  Q     I believe you testified that when Perigrove 1018

20  acquired beneficial interest in Corizon, the plan was to

21  turn the business around; is that right?

22  A     Correct.

23  Q     And you believed that you could turn Corizon's business

24  around, right?

25  A     Absolutely.

1   Q    And did that plan involve dealing with Corizon's tort

2   liabilities?

3   A    That too.

4   Q    But the tort debt liability wasn't the cause of the

5   distress?

6   A    Correct.

7   Q    That plan involved settling certain tort claims; is

8   that right?

9   A    It's part of the business.

10  Q    And paying some of those claims out, right?

11  A    We did.

12  Q    And litigating some of those tort claims, right?

13  A    We did.

14  Q    I'm going to show you Debtor's Exhibit 26, which is in

15  Tab 8 of your binder.

16       MS. MEYERS:  And for the record, this is

17  confidential so if you could not put it up.  Do we have an

18  objection to having it on the screen?

19       MR. BROOKNER:  I don't know.  She's checking.

20       MS. MEYERS:  Okay.

21       MS. HAYWARD:  Your Honor, when it's on the screen,

22  is it available on Webex as well or not?

23       THE COURT:  My understanding is no, but why don't

24  we just keep it really simple and not do it?

25       MS. MEYERS:  All right.  Thank you, Your Honor.

1        MR. BROOKNER:  What page are we on?

2        MS. MEYERS:  I am on Debtor's Exhibit 26, and it's

3   in Tab 8 of the binder --

4        MR. BROOKNER:  Oh, okay.

5        MS. MEYERS:  -- we provided to you.

6        MR. BROOKNER:  I'm sorry.  Sorry to interrupt.

7        MS. MEYERS:  That's okay.

8   BY MS. MEYERS:

9   Q    Mr. Lefkowitz, have you ever seen this document before?

10  A    No.

11  Q    Okay.  Do you see that it says Corizon -- excuse me --

12  Tehum Care Services Ten-Year Historical Closed Claims

13  Payment History?

14  A    yeah.

15  Q    And are you -- I understand you haven't seen this

16  document, but if you could turn to the second page.  Do you

17  see at the bottom it says, "This is a summary of voluminous

18  data produced on December 28, 2023 at" --

19  A    Yeah.

20  Q    Yeah.  So do you have any reason to doubt the accuracy

21  of the --

22  A    No.

23  Q    -- information in here?  Okay.  Now before we move on

24  to the actual data, Tehum has only existed since mid-2022

25  after the divisive merger, at least under that name,

1    correct?

2    A      Correct.

3    Q      And before that, it was Corizon Health, right?

4    A      Correct.

5    Q      And Corizon Health existed before Perigrove 1018

6    acquired it in December of 2021, right?

7    A      Correct.

8    Q      So this claims history goes back ten years.  Do you see

9    that?

10   A      I think there's a history of 40 years.

11   Q      Okay.  So you understand that most of these claims were

12   settled before the bankruptcy filing; is that fair?

13   A      Yes.

14   Q      Let's look at the pro se cases first.  You see that

15   there are out of 2,358 claims, only 121 resulted in payment?

16   A      Yes.

17           MR. BROOKNER:  Your Honor, objection.

18           THE COURT:  Basis?

19           MR. BROOKNER:  Mr. Lefkowitz has testified he's

20   never seen this document.  He's unfamiliar with it.  So I

21   guess if counsel just wants him to read what the document

22   says, that's fine, but he has no personal knowledge of this

23   document.

24           THE COURT:  Counsel, what's your response?

25           MS. MEYERS:  I --

1        THE COURT:  For what purpose is it offered?

2        MS. MEYERS:  So Mr. Lefkowitz has testified that

3  he's generally familiar with the business when they acquired

4  it and I'm asking -- I'm going to ask him if he's aware of

5  this information which is summarized in a document produced

6  by the Debtor.

7        THE COURT:  What's your response to that?

8        MR. BROOKNER:  He just testified he's never seen

9  this document and has no knowledge.

10        THE COURT:  He doesn't have personal knowledge.

11  I'm not sure how helpful it would be, but if you want to ask

12  him general questions, I think that's fair.

13        MS. MEYERS:  Thank you, Your Honor.

14  BY MS. MEYERS:

15  Q    So first of all, Mr. Lefkowitz, are you aware that

16  there were pro se claims against Corizon Health?

17  A    Yes.

18  Q    And do you understand that at least some of those

19  claims were paid?

20  A    I paid them myself.

21  Q    You paid some of them yourself.  Now it says on this

22  chart that approximately 5 percent of the claims were paid.

23  Do you see that?

24  A    Correct.

25  Q    Is that consistent with your understanding of the

1  Debtor's claim payments?

2  A    So it's not just the Debtor; it's the entire industry.

3  A pro se claimant is anyone that goes into the library and

4  writes on the back of an envelope with his handwriting,

5  files a claim, and the District Court accepts it.

6       And it takes about $5,000 to defend it, so we write a

7  $2,500 check, and they accept it.  We make 2,500; they make

8  2,500, and that's what you see on this document -- $5,000.

9  Q    Okay.  So my question was a little bit different.  Is

10 the statistic here that about approximately 5 percent of pro

11 se claims got paid out; is that consistent with your

12 understanding of the Debtor, how the Debtor was paying out

13 pro se claims?

14 A    Yeah.  The rest got dismissed.

15 Q    And you say that this chart indicates that over

16 $800,000 were paid in connection with pro se claims.  Do you

17 see that?

18 A    Correct.

19 Q    Is that also consistent with your understanding of the

20 Debtor's payment to pro se claimants?

21 A    And the industry.

22 Q    So fair to say that it's your understanding that

23 Corizon, now Tehum, did pay some pro se claims?

24 A    Correct.

25 Q    It just wasn't very much.

1    A     What's that?

2    Q     It just wasn't -- only 5 percent.

3    A     Five percent of what?

4    Q     Strike that.  It's your understanding that Corizon, now

5    Tehum, did pay some pro se claimants for their claims.

6    A     Yes.

7    Q     And it's your understanding that it just was not very

8    many that were paid out?

9    A     They either get dismissed or they get paid.

10   Q     Let's take a look at the representative cases.

11   A     Right.

12   Q     Do you see that it says out of 859, 37 -- or excuse me;

13   strike that -- 376 resulted in payment?

14   A     Correct.

15   Q     Is that consistent with your recollection of how

16   Corizon was paying out representative claims?

17   A     Correct.

18   Q     So over 43 percent?

19   A     By the way, this is not just tort claims.

20   Q     Okay.  What other claims are included in here to your

21   understanding?

22   A     Workman's comp.

23   Q     Okay.  And do you see that this shows that 64.5 million

24   was paid out in connection with representative claims?

25   A     Yes.

1    Q     Do you have any reason to doubt the accuracy of that

2    number?

3    A     No.

4    Q     That sounds about right to you?

5    A     No, I don't doubt it.

6    Q     So my question, Mr. Lefkowitz, is how was Corizon

7    Health going to make money when it had to deal with -- it

8    was paying out so much?

9    A     So much of what?

10   Q     It was paying so much to creditors on their various

11   claims against the entity.

12   A     I don't get it.  It's part of the business.  You pay

13   for medical supplies, you pay for staffing, and you settle

14   claims.  So what is the question?

15   Q     My question is you said that Corizon was losing

16   contracts, correct?

17   A     Right.

18   Q     And so it was losing revenue; is that fair?

19   A     Correct.

20   Q     Okay.  So how was it going to make money if it was

21   paying out $64 million to claimants over a ten-year period?

22   A     You build up the revenue.

23   Q     You build up the revenue.

24   A     Correct.

25   Q     It's not about reducing the tort liability?

1   A     Not at all.

2   Q     Mr. Lefkowitz, I'm going to have you turn to Tab 10,

3   which TCC Exhibit 342.

4   A     Yes.

5         MS. MEYERS:  And this is also a confidential

6   document so let's not put it up.  But -- and I believe

7   Debtor's counsel will correct me if I'm wrong -- I believe

8   that this is in evidence on stipulation of the parties.

9   BY MS. MEYERS:

10  Q     Do you recognize this document, Mr. Lefkowitz?

11  A     Yes.

12  Q     This reflects communications between you and Scott King

13  on March 15, 2022, right?

14  A     Scott King?  Where does it say Scott King here?

15  Q     If you go down, it says on March 15, 2022, at 9 --

16  A     Wait, wait, wait.  We're not on the same tab.

17  Q     Are you in Tab 10?

18  A     No, I'm in Tab 11.  Sorry.

19  Q     So -- no, that's okay.  So, do you --

20  A     Okay.

21  Q     -- recognize this document, Mr. Lefkowitz?

22  A     I don't, but I can read it.

23  Q     Do you see that this is an email chain between you and

24  Scott King on March 15, 2022?

25  A     Okay.

1   Q    And who is Scott King?

2   A    General counsel of Corizon.

3   Q    Is he still the general counsel of Corizon or of Tehum?

4   A    No.

5   Q    Is he general counsel of CHS TX?

6   A    I believe so.

7   Q    And you're communicating on a Corizon Health email

8   address; do you see that?

9   A    Correct.

10  Q    Okay.  When did you get that email address?

11  A    I don't know.

12  Q    Did you hold a position at Corizon Health at this time?

13  A    Yes.

14  Q    And what was that position?

15  A    Director.

16  Q    You were a director.  Do you see that Mr. King writes

17  to you that the next installment payment of 166,667 in Brian

18  Perry's settlement is due today?

19  A    Yes.

20  Q    Okay.  It says this is the drug overdose/wrongful death

21  case out of Oregon, and the current payment due represents

22  the seventh out of 12 monthly installments.  Do you see

23  that?

24  A    Correct.

25  Q    So the settlement here is a settlement to a personal

1  injury claimant of Corizon Health; is that right?

2  A    Correct.

3  Q    And that creditor is named Brian Perry it looks like.

4  A    Correct.

5  Q    So this is a claim that Corizon Health settled; is that

6  right?

7  A    Correct.

8  Q    And as of March 15, 2022, only part of that settlement

9  had been paid out; is that your understanding?

10 A    Seemed like some -- you know, it was running on some

11 terms.  Seventh payment, seven out of 12.

12 Q    So do you see that Mr. King then writes "I think we

13 should pay this next installment and then after the

14 divisional merger, negotiate down the remaining amount due"?

15 A    Okay.

16 Q    Did I read that correctly?

17 A    Yeah.

18 Q    Okay.  Do you understand what Mr. King is referring to

19 when he says divisional merger?

20 A    No.  I mean, I can imagine what it means, but --

21 Q    What do you --

22 A    -- I don't know what this email says.  Negotiating

23 down.

24 Q    I'm asking you if you understand what Mr. King is

25 referring to when he says divisional merger.

1    A    A reference date.

2    Q    What do you understand he's referring to when he says

3    divisional merger?

4    A    This is in March.  I think we -- there was a divisional

5    merger right after.  So, you know, the liabilities were

6    shifting between the two companies and who had to pick up on

7    the liability.

8    Q    Okay.  So he's referring to Corizon Health's divisional

9    merger that happened in May of 2022, right?

10   A    Correct.

11   Q    Okay.  And so, that divisional merger was at least

12   contemplated in March of 2022, right?

13   A    Could be.

14   Q    Do you know whether it was contemplated at that time?

15   A    I don't have the dates here now, no.

16   Q    Were you involved in the planning of the divisional

17   merger at all?

18   A    Yes.

19   Q    Okay.  And when did you begin planning that process?

20   A    Right around that time, but I don't know if it was

21   March 15 or 16.

22   Q    Understood.  Do you understand why Mr. King is

23   suggesting negotiating down the remaining amount due under a

24   settlement after the divisional merger has occurred?

25   A    It happens all the time.

1    Q    And why does that happen all the time?

2    A    That settlements get negotiated.

3    Q    Why would the -- it would be easier to negotiate a

4    settlement amount down after a divisional merger?

5    A    Had nothing to do with it.

6    Q    So he just --

7    A    There's re-trading of settlements all the time.

8    Q    Okay.  So he's mentioning the divisional merger here,

9    but that has nothing to do with it?

10   A    I don't think so.

11   Q    In your view, would Corizon be in a better position to

12   negotiate down a settlement payment after the divisive

13   merger?

14   A    No.

15   Q    Do you see at the bottom that Mr. King says, "Let us

16   know if we have approval to proceed with the payment"?

17   A    Correct.

18   Q    Do you see that?  And you respond, "Okay," right?

19   A    Right.

20   Q    Why is Mr. King seeking your approval to make this

21   payment?

22   A    To fund it.

23   Q    I'm sorry?

24   A    To fund it.

25   Q    To fund it.  Why is your approval necessary to fund it?

1  A    Because I funded settlements to the tune of $30

2  million.

3  Q    Where did you fund -- where did the money come from to

4  fund that settlement?

5  A    From our outside companies.

6  Q    And what companies are you referring to when you say

7  that?

8  A    Some of the M2 parties.

9  Q    So I believe your testimony was that the divisive

10 merger had nothing to do with being able to negotiate down

11 the settlement.  So what would be a basis for Corizon to

12 request a lower settlement amount paid out?

13 A    It happens all the time.  You make -- it seems like

14 this was a settlement of 12 times, 166, you base 7.  You're

15 at the final stretch.  You go back to the ambulance chaser,

16 and you negotiate a settlement.  Take some less, take it

17 now.  Happens all the time.

18 Q    But just to be clear, this was a settlement that was

19 already finalized, right?  I mean, you're making --

20 A    Yeah, yeah.  Even after final settlements, you still go

21 back and negotiate and say you can't pay, but maybe you take

22 something less and re-finalize it.

23 Q    So --

24 A    There's re-trading of settlement all the time in tort

25 cases.

1  Q    Okay.  So what about the settlement agreement that's

2  the subject of the 9019 motion?

3  A    I'm talking tort cases; I'm not talking 9019.

4  Q    Right.  So --

5  A    You're not going to get this release if you don't get

6  the $40 million dollars for laying cash.

7  Q    Could you turn back to Tab 9, please, which is TCC

8  Exhibit 352?  This is also confidential.

9  A    Uh-huh.

10  Q    Do you recognize this document, Mr. Lefkowitz?

11  A    No.

12  Q    Do you see that you're on this email as a recipient?

13  A    Okay.

14  Q    And this is a February 25, 2022 email from Scott King

15  --

16  A    Okay.

17  Q    -- to you and Jeff Sholey; is that right?

18  A    Okay.

19  Q    And who is Jeff Sholey?

20  A    He was the CFO at Corizon.

21  Q    And you were a director at this time as well?

22  A    Correct.

23  Q    Do you see where in the subject line, it says, "FYI, J

24  & J TX divisional merger news"?

25  A    Okay.

1          MR. BROOKNER:  Objection, Your Honor.  The

2    document's not in evidence.  There are issues with it.  It's

3    hearsay.  If she wants to try to put it in and talk about

4    it, she can.  Otherwise, it's inappropriate just to be

5    talking about the document until the proper foundation is

6    laid.

7          THE COURT:  Agree.

8          MS. MEYERS:  Your Honor, I'm happy to move the

9    document into evidence.  I was going to lay a bit more

10   foundation about it.

11         THE COURT:  Yeah.  I'll let you try to lay more

12   foundation.

13   BY MS. MEYERS:

14   Q    Do you have any reason to doubt that you received this

15   email?

16   A    Yes.

17   Q    Why?

18   A    It's a news link.  I don't open any news link emails.

19   Q    You understand it was sent to your email address

20   though, right?

21   A    It goes straight into spam.

22         MS. MEYERS:  Your Honor, I would move this into

23   evidence not for the truth of the matter asserted, but as to

24   Mr. Lefkowitz's state of mind.  He is the one who caused

25   Tehum to file for bankruptcy, and his motives in filing the

1  bankruptcy are at issue, especially on the TCC's motion to

2  dismiss.

3           And so whether he is knowledgeable about other

4  bankruptcies that are similar to Tehum's prior to his filing

5  is relevant.

6           THE COURT:  Mr. Brookner, your response?

7           MR. BROOKNER:  There's no foundation.  It's

8  hearsay.  He said he never saw the document.

9           THE COURT:  Yeah.  I'm going to sustain the

10 objection.  I don't know if it goes to his state of mind if

11 he says he never saw it.  I don't know if this went into

12 spam or not, but that's what he's saying.  So if that's the

13 case, then --

14          MS. MEYERS:  May I just ask a couple more

15 foundational questions?

16          THE COURT:  I think that's fair.

17          MS. MEYERS:  Okay.

18 BY MS. MEYERS:

19 Q    So Mr. Lefkowitz, can you say definitively that you

20 never read this email sitting here today?

21 A    I don't recall this email, but the minute I see it's a

22 news link, I have a policy.  I instruct all news links to go

23 into spam.

24 Q    Mr. Lefkowitz though, this is an email from Scott King.

25 A    To?

1    Q    No, it's from Scott King.

2    A    To?

3    Q    To you and Mr. Sholey.

4    A    So if it's addressed to me and it has a news link, it

5    doesn't come to me.

6    Q    So based off of the subject line, it doesn't indicate

7    that it's a news link.  Do you see that?  It says, "FYI."

8    A    It has a news link in the body of the email.  A major

9    blow to plaintiff's.  Judge keeps bankruptcy -- bankruptcy

10   news it says, news link.  So I can tell you with certainty I

11   never saw this document.

12   Q    You can testify with certainty that you never read this

13   document?

14   A    Correct.

15   Q    Do you typically not read emails you receive from Scott

16   King?

17   A    I do.

18   Q    You do typically not read emails from Scott King?

19   A    No, I do read emails, but I don't read just link news.

20   Q    So if he's sending you news that's relevant to your

21   business, you don't read it?

22   A    Don't read it.  I don't read news at all, by the way.

23   Q    Okay.  Mr. Lefkowitz, who came up with the idea of

24   doing a divisional merger?

25   A    It was the former CEO.

1  Q    And who is that, is that Mr. -- excuse me.  Strike

2  that.  Who is that?

3  A    Ms. Ishwell (phonetic).

4  Q    It was his idea?

5  A    Her.

6  Q    Oh, excuse me.  Her.  When did you first become

7  familiar with the concept of the Texas two-step?

8  A    Right around that time.

9  Q    Had you followed any of the Johnson & Johnson

10 bankruptcy proceedings?

11 A    No.

12 Q    When did you first reach the conclusion that Corizon

13 should undergo a Texas divisional merger?

14 A    In consultation with White & Case.

15 Q    And do you have an understanding as to why Corizon's

16 former CEO wanted to do a divisional merger?

17 A    I don't recall the exact circumstances.  I do recall

18 that we wanted to divide the business into two line of

19 businesses.

20 Q    And what two lines of business was that?

21 A    Between prison and jails.

22 Q    What business purpose did that serve?

23 A    One company should serve prisons; another company

24 should serve -- the Debtors should be in charge of serving

25 jails.

ISAAC LEFKOWITZ - CROSS BY MS. MEYERS                    281

1  Q     And is that how the divisional merger was actually

2  structured?

3  A     That was the idea, but never got materialized.

4  Q     Okay.  So that's not how assets were distributed

5  between CHS TX and --

6  A     I said line of business.  I'm not saying assets or

7  liabilities.

8  Q     How do you -- how would you split up those two lines of

9  business in a divisional merger?

10 A     No, it's got nothing to do with the divisional merger.

11 It's about which line of business to go after.

12 Q     So the idea was that you were no longer going to be

13 pursuing one of those lines of business?

14 A     No, the idea was that YesCare was going to pursue line

15 business A, and the Debtor back then, Tehum, is going to

16 pursue line business of B.

17 Q     Okay.  And what's A and what's B?

18 A     Prisons and jails.

19 Q     Prisons is A, which is now --

20 A     Or prison could be B.  Prisons and jails.

21 Q     You don't know which was which?

22 A     It doesn't matter.  That was just an example.  Now

23 let's forget about A and B.  YesCare was going to go after

24 prisons, and Tehum was going to go after jails.

25 Q     And I think you said that's not how the divisional

1  merger ended up working out; is that right?

2  A    No, because ultimately, Tehum had to file for

3  bankruptcy.

4  Q    Before you completed the divisional merger, how did you

5  think that it would help the two businesses that you

6  described?

7  A    It's two different line of revenue and expenses.

8  Q    And how would those businesses be aided by being

9  separate is my question.

10 A    It's two different administrative expenses, two

11 different insurance policies, two different workman comp,

12 two different financial arrangement, two different staffing

13 matrix, two different marketing.  It's two different line of

14 business.

15 Q    I understand it's two different lines of business, but

16 how does it help one of those lines of business to be

17 separated from the other is my question.

18 A    Because if you're focused in what you're doing, you

19 succeed.  If you do it all, you don't succeed.

20 Q    What's the tangible benefit that you thought the

21 divisional merger would yield for the correctional health

22 services business that Corizon had at that time?

23 A    To be able -- well, it was besides, you know, getting

24 additional contracts, additional staffing, and to be able to

25 insure the company.

1  Q     To be able to insure the company.

2  A     Insurance, correct.

3  Q     So was there, at the time, was there an issue insuring

4  Corizon Health?

5  A     The entire industry was suffering from it.

6  Q     Well, I'm asking about Corizon Health specifically.

7  Was Corizon having difficulty getting insurance?

8  A     Getting new insurance.

9  Q     And why was that?

10 A     Because no insurance company wants to take on based on,

11 you know, a company that's under duress.

12 Q     And your testimony is that that duress was a result of

13 --

14 A     Drop of contracts.

15 Q     And it has nothing to do with the tort liabilities?

16 A     Correct.  I'm talking insurance, other insurance.

17 Q     Okay.

18 A     Not just tort insurance.

19 Q     But Corizon did have tort liability insurance, correct?

20 A     Correct.

21 Q     Okay.  And was that --

22 A     And by the way, the case that was mentioned today, you

23 know which case I'm talking about, the Arizona case?

24 Wrongful death that your colleague was mentioning is fully

25 insured.  Talking about being transparent with the Court.

1   100 percent insured.  There's not even a legitimate creditor

2   here, the one that filed the joinder.

3   Q    Was Corizon having difficulty obtaining tort liability

4   insurance at the time of the divisive merger?

5   A    Entire industry had it.

6   Q    I'm asking about Corizon.

7   A    Yes.

8   Q    Mr. Lefkowitz, you're an experienced business person,

9   right?

10  A    If you say so.

11  Q    Would you agree with that?

12  A    Experienced in what?

13  Q    In running a business.

14  A    Depending which business.  I know nothing about the

15  restaurant business.

16  Q    Are you experienced in running a correctional

17  healthcare business?

18  A    Healthcare.

19  Q    Healthcare.  And you wouldn't take a course that you

20  thought would cost the business more money, right?

21  A    Say it again.

22  Q    You wouldn't undertake a transaction that you thought

23  would cost the business more money, right?

24  A    You know, sometimes you take on costing more money for

25  a long vision, a long future.

1  Q    Right.  But the goal of that would ultimately be to

2  improve revenue down the road, right?

3  A    Correct.

4  Q    A little money now to make more money later, right?

5  A    Correct.

6  Q    So wouldn't a transaction that reduced the costs of a

7  business also be an appealing transaction?

8  A    In general, yeah, of course.

9  Q    So wouldn't it have been appealing to Corizon Health to

10 undergo a transaction that would reduce its tort liability

11 obligations?

12 A    But it didn't.

13 Q    It didn't.

14 A    No.  We broke up the tort liabilities.  YesCare took on

15 a lot of tort liabilities in the divisional merger, much

16 more than was left behind.  All the existing contract tort

17 liabilities went over to YesCare.

18 Q    But if there was a mechanism to resolve tort claims at

19 a discount, you would take it, right?

20 A    Hypothetically?

21 Q    Yeah.

22 A    Every day.

23 Q    Right.  Because that would benefit the company, right?

24 A    Yes.

25 Q    Now Mr. Lefkowitz, I think you just said you're

1  familiar with the law firm White & Case, right?

2  A    Correct.

3  Q    And are you aware that that firm represented Johnson &

4  Johnson?

5  A    No.

6  Q    When did you first come into contact with White & Case?

7  A    Right at the time of the divisional merger.

8  Q    And so that was in approximately May of 2022; is that

9  your testimony?

10 A    Right around that time.

11 Q    And so, the first time you came into contact with White

12 & Case was for the entities involved in this settlement

13 agreement; is that fair?

14 A    Correct.

15 Q    Can we turn to your transcript behind Tab 2, at Page 49

16 -- excuse me, Page 59.

17         THE COURT:  Counsel, before we go, I may have to

18 let kind of the AC folks know how late we're going to go

19 today.

20         MS. MEYERS:  I'm --

21         THE COURT:  Just a --

22         MS. MEYERS:  -- very happy to take a break, Your

23 Honor.

24         THE COURT:  Okay.  Why don't we just -- and maybe

25 we can just talk.  How much longer do you think you have?

1  This is not -- this is just more me just so I can kind of do

2  the admin stuff on the back end.  All right.

3          MR. GOODMAN:  Eric Goodman of Brown Rudnick,

4  counsel for the TCC.  We were really hoping to get three

5  witnesses today.

6          THE COURT:  Yeah.

7          MR. GOODMAN:  I think we're on track to do that.

8          THE COURT:  Uh-huh.

9          MR. GOODMAN:  One thing I am not entirely clear

10  about is how late we can go this evening.

11          THE COURT:  That's what I'm trying to -- that's

12  where I'm looking.  I'm trying to get a sense of timing and

13  that I think will certainly be helpful.

14          MR. GOODMAN:  I think the goal was to complete

15  three today, three tomorrow or three on Wednesday, --

16          THE COURT:  Uh-huh.

17          MR. GOODMAN:  -- 3, 6, and then we're done.  I'm

18  hoping closing can be done efficiently.  I think we're

19  probably no more than 20 minutes on that.  So that's sort of

20  our hope and objective today.

21          THE COURT:  Uh-huh.

22          MR. GOODMAN:  If we have a ten-minute break, I

23  think we might be able to come back with a better sense of

24  time as to when.

25          THE COURT:  Can you just let my courtroom deputy

1  know in terms of just your time estimate, just so I can

2  coordinate on the back end and be AC and coverage and all

3  that stuff?  But just the goal would be to finish with

4  Mr. Lefkowitz today and then --

5            MR. GOODMAN:  Mr. Griffiths.

6            THE COURT:  -- Mr. Griffiths is back here.

7            MR. GOODMAN:  I think he's going to be --

8            THE COURT:  Do you have a sense of how long

9  Griffiths will go?

10           MR. GOODMAN:  I think at most two hours all in.

11           THE COURT:  Two hours all in on Griffiths?

12           MR. GOODMAN:  Yes.

13           THE COURT:  Okay.  All right.  That's helpful.

14  Thank you.

15           Mr. Lefkowitz, if you need to take a break, let's

16  do this.  Take about a ten-minute break.  And then I would

17  just remind you that you're still under oath and not to

18  speak to anyone about your testimony.

19           THE CLERK:  Please rise.

20       (Recess taken from 3:57 p.m. to 4:17 p.m.)

21           THE COURT:  Okay.  Back on the Record in Tehum.

22  It is my understanding that we're talking potentially 7:30,

23  8:00 o'clock tonight to try to get it done.  Okay, let's do

24  it.

25           Okay, Mr. Lefkowitz, I remind you that you're

1    still under oath.

2              Counsel, you may proceed.

3              MS. MEYERS:  Thank you, Your Honor.

4                   CROSS-EXAMINATION (CONT'D)

5    BY MS. MEYERS:

6    Q    Mr. Lefkowitz, before we took a break we were talking

7    about White & Case; do you remember that?

8    A    Yes.

9    Q    Okay.  And I apologize to ask again but when did you

10   first come into contact with White & Case?

11   A    Don't recall the exact date.

12   Q    Do you have --

13   A    It was prior to the divisional merger.

14   Q    It was prior to the divisional merger.  And was -- and

15   that was in connection with the divisional merger that you

16   first came into contact --

17   A    Correct.

18   Q    -- with White & Case.  Can you please turn to Tab 2 in

19   your binder and turn to Page 59?  And I'm directing your

20   testimony to line one where it says, when did you first come

21   into contact --

22   A    One second.  Fifty-nine is blank here.

23   Q    It's under -- it's Tab 2.  I believe you're in Tab 1.

24   Okay.  And do you see where it says, when did you first come

25   into contact with White & Case, answer --

1   A      Which line?

2   Q      Line one.

3   A      Yeah.

4   Q      When did you first come into contact with White & Case?

5   Answer, early 2022 or early '22.

6   A      Okay.

7   Q      And was that contact in connection with Corizon?  No,

8   not that it matters.  It had nothing to do with any of the

9   entities at issues in this bankruptcy case.  Answer, I first

10  started with White when I -- I first started with White &

11  Case, correct.

12  A      Okay.

13  Q      And then do you see below at line 11, when did you

14  first come into contact with White & Case in connection with

15  any of the entities involved in this bankruptcy case?

16  Sometime mid-2022.  So is it correct that you had worked

17  with White & Case before you worked with them in connection

18  with Corizon?

19  A      No.

20  Q      That's not correct.

21  A      No.  The reference to Corizon was in mid-'22.  And I

22  was in contact with a lawyer that worked at White & Case,

23  not White & Case engaged in early '22.

24  Q      Okay.  And so the first time that you spoke to White &

25  Case in connection with the Corizon entities was in mid-

1   2022.

2   A    Correct.

3   Q    Now, White & Case represented M2 LoanCo; is that right?

4   A    As well.

5   Q    You say as well, as well as what?

6   A    I think they represented YesCare.

7   Q    Did you select White & Case to represent M2 LoanCo?

8   A    No.

9   Q    Who selected White & Case?

10  A    Mr. Rubenstein.

11  Q    That's the other director of M2 LoanCo.

12  A    Correct.

13  Q    Was it M2 LoanCo that undertook the divisional merger

14  on behalf of Corizon?

15  A    No.

16  Q    Can you turn to Tab 4 in your binder, please?

17  A    Yeah.

18  Q    And turn to Page 17 of this transcript.  And do you see

19  starting on line 17, --

20  A    Yeah.

21  Q    -- you're speaking with the U.S. Trustee; do you see

22  that?

23  A    Yeah.

24  Q    And you say in the second sentence, M2 LoanCo undertook

25  to fund the divisional merger on behalf of the Debtor

1  without expecting to get it paid back.

2  A    That's the funding agreement.

3  Q    Okay.  So they funded it but they did not undertake the

4  divisional merger; that's your testimony.

5  A    Correct.

6  Q    And you said White & Case also represented YesCare.

7  A    Correct.

8  Q    And did you select White & Case to represent YesCare?

9  A    No.

10 Q    Okay.  Who did that?

11 A    Former CEO.

12 Q    For the record, what's that individual's name?

13 A    Ms. Tirschwell.

14 Q    Did White & Case ever represent Perigrove 1018?

15 A    No.

16 Q    What about Perigrove, LLC?

17 A    No, not to my knowledge.

18 Q    Okay.  And what about premerger Corizon Health?

19 A    I believe White & Case did do some work for Corizon

20 pre.

21 Q    Okay.  Let's turn to Tab 11 in your binder, which is

22 TCC Exhibit 115.

23         MS. MEYERS:  And, for the record, this is marked

24 as confidential.

25         THE COURT:  Which tab, counsel?

1          MS. MEYERS:  It's Tab 11.

2          THE COURT:  Oh, thank you.

3          MS. MEYERS:  TCC 115.

4    BY MS. MEYERS:

5    Q    Mr. Lefkowitz, do you remember I showed you this

6    document at your deposition?

7    A    Okay.

8    Q    Do you recognize this document?

9    A    From the deposition.

10   Q    Do you recognize it from before the deposition?

11   A    Vaguely.  I mean, I know the accountant.

12   Q    You do.

13   A    Yeah.

14   Q    Okay.  Can we turn to Page 58 of the confidential

15   transcript, which is behind Tab 2?  And actually I

16   apologize.  We're going to have to go back to Page 54.

17   A    Fifty-four in which tab?

18   Q    In the same tab.  It's just --

19   A    This one.

20   Q    Let me start over.  Okay, your testimony is that you

21   are familiar with the contents of this --

22   A    Correct.

23   Q    -- TCC 115.

24   A    I mean, reading it I can tell you what it is.

25   Q    I understand.  But had you seen it before I showed it

1  to you at your deposition?

2  A    I don't recall now.

3  Q    You don't recall.  Do you recall telling me at your

4  deposition that you didn't recognize that document?

5  A    No.

6  Q    Okay.  So let's turn to page 54 of your confidential

7  transcript, which is behind Tab 2.

8  A    Fifty-four.

9  Q    And I'm just going back to this page to show you that

10 at line six, Exhibit 5 was marked, and that's TCC

11 Exhibit 115.  And then on Page 58 of that same transcript,

12 at line 18:

13          "QUESTION:  Mr. Lefkowitz, do you recognize this

14          document?

15          "ANSWER:  No.

16          "QUESTION:  You've never seen this document

17          before.

18          "ANSWER:  I don't recognize it."

19 A    Right.

20 Q    Was that accurate at that time?

21 A    Still accurate.

22 Q    It's still accurate.  So how are you familiar with the

23 contents of --

24 A    I just read it.

25 Q    -- that document?  You just read it just now.

1  A    I can tell you each word what it means.

2  Q    Let's turn back to TCC Exhibit 115, which again is

3  behind Tab 11.

4  A    Okay.

5       (Pause in the proceedings.)

6  Q    Directing your attention just to the first page, do you

7  see that at the top right corner it says White & Case and

8  Corizon Health?

9  A    Yes.

10 Q    And then this presentation is titled, "Project Orange

11 Presentation to the Board of Directors," right?

12 A    Right.

13 Q    And it's dated May 1st, 2022.

14 A    Correct.

15 Q    Were you on the board of directors of Corizon Health at

16 -- as of May 1st, 2022?

17 A    I was a director of M2 HoldCo, not of Corizon.

18 Q    Okay.  Earlier you said you were a director of Corizon

19 Health as of March, 2022.  Did that change between March and

20 May.

21 A    Corizon Health.

22 Q    Corizon Health.

23 A    I was never a director of the subsidiaries.  I was

24 always a director of the upper grandfather.  I think that's

25 what I testify.

1  Q    I believe earlier when I asked you about the emails

2  with your Corizon Health email address, didn't you testify

3  that you were a director of Corizon Health, Inc. in March of

4  2022?

5  A    You didn't -- you know, you didn't ask inc.  You asked

6  Corizon.  Corizon was a brand under the grandfather.

7  Q    Okay.  So what position did you hold, if any, at

8  Corizon Health, Inc. as of May 1st, 2022?

9  A    I don't think I held any position in inc.

10 Q    Okay.  So why did you have a Corizon Health email

11 address?

12 A    Okay, so let's do this one more time.  So Corizon, when

13 I went into Corizon, there were 5,000 employees with 5,000

14 email addresses.  You mean to say all 5,000 people that had

15 a email address of Corizon was a director of Corizon?

16 Q    That's not my question, Mr. Lefkowitz.

17 A    So I was a director of the grandfather company that we

18 acquired from Flex Group.  And one of the brands was

19 Corizon, and that's why I got a Corizon email address.

20 Q    Okay.

21 A    But Corizon Health, Inc., a subsidiary, I don't believe

22 I was a director of that corporation called Corizon Health,

23 Inc.

24 Q    Okay.  So you were not a member of the board of

25 directors of Corizon Health, Inc. as of May 1st, 2022.

1  A    I don't believe so.

2         MS. MEYERS:  Okay.  Thank you for clarifying.

3  Q    And just so I understand your testimony is that you had

4  a Corizon health email address because of a position you

5  held at one of the M2 entities.

6  A    Perigrove 1018 entity.

7  Q    Okay.  So other than when I showed you this document at

8  your deposition, --

9  A    Right.

10 Q    -- you said you've never seen this before.

11 A    Correct, before the deposition.

12 Q    Do you understand what Project Orange refers to?

13 A    I guess the divisional merger.  I didn't pick the name.

14 Q    Do you recall the planning process for the divisional

15 merger?

16 A    It was Ms. Tirschwell's project.

17 Q    Were you involved at all in that process?

18 A    I was more notified and updated but I wasn't involved,

19 no.

20 Q    Okay.  So how often would you get updates?

21 A    I don't know.

22 Q    Did you make any approvals in connection with the

23 planning of the divisional merger?

24 A    Planning, no, but ultimately of the execution.

25 Q    And what parts of the execution?

1    A    M2 was going to fund $15 million.

2    Q    Did White & Case ever give you updates?

3    A    I believe so.

4    Q    Okay.  Can we turn to Page 6 of this document, please,

5    which is marked Debtor 29986?

6    A    Okay.

7    Q    Do you see the first bullet point says, as the board

8    has previously discussed, the dire financial situation of

9    Corizon Health, Inc., the company, has rendered it unable to

10   satisfy its secured debt obligations, let alone its

11   unsecured debt, which includes an increasing number of

12   professional liability claims; do you see that?

13   A    Yeah.

14   Q    Is that an accurate statement of the state of Corizon

15   Health business in May of 2022?

16   A    Some of it.

17   Q    What part is not accurate?

18   A    The let alone.

19   Q    I'm sorry?

20   A    Let alone.  I never saw this document before.  You're

21   asking me now to read the document and give you an opinion

22   on it.  I would never write the word "let alone."

23   Q    I understand.  But I'm asking is the factual

24   information set forth in this document accurate to your

25   knowledge, based off of your involvement in Corizon Health?

1   A      No.  As I'm reading the second paragraph it's not

2   accurate.  It's a hundred million, not 90 million.

3   Q      Well I was asking you about the first paragraph.  So is

4   the information set forth in that first paragraph on this

5   page accurate to your knowledge?

6   A      Like I said, I don't think so.

7   Q      And you said because of the word let alone or the

8   phrase let alone.  Is there anything else that's inaccurate

9   in that paragraph?

10  A      Yeah.  I don't believe that it had to do with the

11  unsecured creditors or the increasing number professional

12  liabilities.  I still don't believe it today, I didn't

13  believe it then.  I know exactly what the professional

14  liabilities are.

15  Q      And how do you know exactly what the professional

16  liabilities are?

17  A      Because I have a team of 12 lawyers monitoring it on a

18  daily basis.

19  Q      Okay.  And wasn't the -- weren't those lawyers White &

20  Case at this point?

21  A      No.

22  Q      Okay.  So you're doubting what White & Case put in this

23  presentation.

24  A      I'm not doubting.  I don't know what they did.  I don't

25  know who they presented it.  And I don't know if this was

1  just a general discussion.  But I can tell you that it was

2  not the professional liability claims that led to the

3  divisional merger.

4  Q    Okay.  Do you see in the second sub-bullet under that

5  paragraph we just looked at it says the company and/or its

6  subsidiaries are named as defendants in more than 600

7  pending professional liability lawsuits?  The actuarial

8  estimate of the company's total exposure on account of

9  pending and threatened professional liability claims is

10 approximately 88 million; do you see that?

11 A    Yes.

12 Q    is that an accurate statement of Corizon Health's

13 exposure to professional liability claims as of May, 2022?

14 A    Absolutely not.

15 Q    So that's another inaccuracy in this document that

16 White & Case --

17 A    Definitely not 88 million.

18 Q    Okay.  Is it more or less than that?

19 A    Far less.

20 Q    It's far less.

21 A    Correct.

22 Q    And what's your basis to say that?

23 A    Again, there's a team of 12 attorneys that monitor

24 every single case as it comes, as it gets filed, as it gets

25 settled, as it gets litigated.  And we have that matrix.  I

1  had it then, I had it throughout the course, and I have it

2  today.

3  Q    Has that been produced to the TCC?

4  A    I'm sure it did.

5  Q    Okay.

6           THE WITNESS:  Oh, by the way, I was in the meeting

7  with Mr. Goodman at Norton's office and I pulled in the --

8           MS. MEYERS:  Mr. Lefkowitz, I'm going to stop you --

9           THE WITNESS:  I'm going to --

10           MS. MEYERS:  I don't want you to get into --

11           THE WITNESS:  No, no, you asked me a question

12  whether it was produced.  And I called in the Sigma team and

13  I told Mr. Goodman, here's the Sigma team, they're ready to

14  produce anything and everything on that matrix.  Are you

15  interested in looking at the claim matrix.  And his response

16  was, we'll let you know.  And he never did.

17           So anything that was produced was produced to the

18  Debtor, it was produced to the UCC, it was produced to the

19  U.S. Trustee.  Mr. Goodman was not interested in those

20  numbers.

21           MS. MEYERS:  Your Honor, I'd move to strike that

22  as invading the mediation privilege.

23           THE COURT:  Well, you asked the question, he

24  answered it.  I'm going to allow it.

25           MS. MEYERS:  Okay.  I appreciate that.

1          MR. BROOKNER:  Your Honor, I'm sorry to interrupt.

2    But can Mr. Lefkowitz pull back from the mic just a little

3    bit?  Because it's really -- it might impact the recording

4    and the transcript.

5          THE COURT:  I'll let the courtroom deputy make the

6    calls on those things.  But I appreciate the assistance.

7    BY MS. MEYERS:

8    Q    So if it was not the professional liability claims that

9    were impacting Corizon Health's business, shouldn't they be

10   paid in full by the company?

11   A    Every claim should be paid in full as much as they

12   deserve to be paid.  There's a lot of fictitious claims.

13   Q    And who decides if it's fictitious, Mr. Lefkowitz?

14   A    You have two members on your committee that are not

15   even creditors.  They haven't even filed a claim.

16   Q    Mr. Lefkowitz, --

17   A    Yes.

18   Q    -- I'm -- you're not answering my question.

19   A    Right.

20   Q    My question is who decides whether a claim is

21   fictitious or not?

22   A    From the Debtor's side?

23   Q    No, in the U.S. tort system.

24   A    You take a look at the claim, look at the sheet of 2500

25   claims that we dismissed 1500 claims of fictitious claim.

1   You don't believe that every tort claim that's filed is a

2   real claim.  Some are real, some get paid, some get

3   litigated, some get settled, and some get dismissed for not

4   being real.

5       There are two members on your committee that are not

6   real.

7   Q    So going back to the subparagraph here, what about this

8   subparagraph is inaccurate?

9   A    The 88 million.

10  Q    Any other part of that?

11  A    Six hundred and pending professional liability cases.

12  Most of it is pro se cases at the value of 2500 a case.

13  That's not the reason why there's a divisional merger.  This

14  is fluff here.

15  Q    So White & Case that was retained by M2 LoanCo was

16  providing fluff to the Corizon Health board of directors.

17  A    I don't know what they did.  I've never seen this

18  document before the deposition.

19  Q    If you look to the second major bullet point, it says,

20  the company's deteriorating financial condition and its

21  exposure to professional liability litigation have

22  negatively impacted -- affected its ability to retain

23  existing contracts as well as win new business.  Competitors

24  with stronger balance sheets have gained a distinct

25  advantage.  Is that an accurate statement of the state of

1    Corizon Health in May of 2022?

2    A    Absolutely not.  Competitors have far more greater tort

3    exposure than Corizon has.

4    Q    Okay.  So this is White & Case again putting inaccurate

5    information or presentation to the Corizon Health --

6    A    I don't know what this PowerPoint is.

7    Q    Let's turn to the tenth page, which is Debtor 2990.

8    A    Yes.

9    Q    Do you see that this is entitled proposed transaction?

10   A    Correct.

11   Q    And is this -- does this accurately set forth the

12   basics of the Corizon Health divisional merger?

13   A    Absolutely not.

14   Q    So it's inaccurate that there were two entities

15   created, NewCo and RemainCo?

16   A    No, that is accurate.

17   Q    Okay.  And NewCo is CHS Texas, correct?

18   A    He's talking about an Aesop (phonetic) structure here,

19   never existed.

20   Q    Was RemainCo Corizon now Tehum?

21   A    Correct.

22   Q    Do you see that it says YesCare is identified as a

23   newly formed entity?

24   A    Correct.

25   Q    Do you recall that YesCare was already formed in May of

1  2022?

2  A    And what's the date of this document?

3  Q    This document is dated May 1st, 2022.

4  A    That's not called newly.

5  Q    I'm saying is it your understanding that YesCare was

6  already formed as of May 1st, 2022?

7  A    I don't know when it was formed.

8  Q    So, Mr. Lefkowitz, you've disagreed with a lot of the

9  information provided in this presentation.  In your own

10  words, what was the purpose of the divisive merger?

11  A    To divide two lines of business.

12  Q    Okay.  And that's the jails and the prisons.

13  A    Correct.

14  Q    Are you aware that White & Case has filed a proof of

15  claim in this bankruptcy case?

16  A    Not aware.

17  Q    Turn to Tab 18.

18  A    I think White & Case was paid in full.

19  Q    Let's turn to Tab 18.

20  A    Yeah.

21  Q    You see that this is a proof of claim from the Tehum

22  bankruptcy?

23  A    Yes.

24  Q    And do you see under part one the creditor's identified

25  as White & Case.

1  A     Correct.

2  Q     Okay.  And on Page 2, Question 7, do you see that the

3  amount listed is five hundred and ninety-nine thousand --

4  A     Correct.

5  Q     -- and 93 dollars?

6  A     Expect a paid in full receipt.

7              THE COURT:  Hold on.

8              MR. PATTERSON:  Don't mean to interrupt, Judge,

9  but if she could refer to the exhibit numbers.  Not all of

10  us -- we don't have enough notebooks for everyone.  And I'm

11  sure that people listening don't know, but I have no idea

12  what exhibit, for example, tab -- the tabs don't refer to

13  the Exhibit List that's been provided so --

14             THE COURT:  Counsel, to the extent you can.

15             MS. MEYERS:  This does not have an exhibit number,

16  Your Honor.

17             THE COURT:  This does not have an exhibit number,

18  got it.  So this is just the -- is it fair to say it's --

19  I'm looking at proof of claim number 620?

20             MS. MEYERS:  Proof of claim number 620, yes.

21             THE COURT:  Filed in this case by White & Case.

22             MS. MEYERS:  Yes.

23             THE COURT:  Okay.  But to the extent you -- there

24  is an exhibit number, if someone can just say it out loud, --

25             MS. MEYERS:  Of course.

1        THE COURT:  -- I very much appreciate it.  Thank
2  you.
3        MS. MEYERS:  Yes, that's -- you're welcome.
4  BY MS. MEYERS:
5  Q    Okay.  So if we turn -- so does this refresh your
6  recollection that White & Case was not paid in full?
7  A    I know White & Case is paid in full.  Expect a payment
8  receipt paid in full by White & Case.  So there's another
9  $600,000 less in the claim roster.
10 Q    If you could turn to the third page, you see that this
11 was executed on August 14th, 2023.
12 A    Correct.
13 Q    So as of that date White & Case had not been paid in
14 full; is that right?
15 A    White & Case is paid in full.  White & Case is not owed
16 one dime from this Debtor.  White & Case filed a claim by
17 error.  White & Case will not collect any money from the
18 creditors' pool of money.
19 Q    So you're saying that this is an erroneous proof of
20 claim.
21 A    Correct.
22 Q    So as of August 14th, 2023, it's your testimony that
23 White & Case had been paid in full.
24 A    Correct.
25 Q    When was White & Case paid in full?

1  A    I don't know when.  But I can tell you with certainty

2  that White & Case is not owed any money by this Debtor.

3  Q    Was it paid in full after the --

4  A    I don't know if it --

5  Q    -- filed for bankruptcy?

6  A    -- after or before.  I can just tell you that White &

7  Case is not owed any money.

8  Q    So you don't know whether White & Case was paid in full

9  before --

10  A    Before or after.

11  Q    -- or after.

12  A    Correct.

13  Q    Okay.  And you don't know whether White & Case was in

14  fact -- but your testimony is that White & Case was paid in

15  full as of August 14th, 2023, when this --

16  A    I don't know if --

17  Q    -- proof of claim --

18  A    -- it was 14, 15, or 13.  White & Case is not a

19  creditor in this case.

20  Q    I understand that but, Mr. Lefkowitz, I'm trying to --

21  A    I know, but you're trying to narrow down a date and I

22  don't have the date.  I'm just telling you White & Case is

23  not owed any money.

24       MS. MEYERS:  Mr. Lefkowitz, I want you to answer

25  my question, please.

1          THE WITNESS:  Sure.

2   BY MS. MEYERS:

3   Q    My --

4          THE WITNESS:  Ask the question.

5   Q    -- question is, is that can you say for certain that as

6   of August 14th, 2023 White & Case had been paid in full?

7   A    No, I cannot say for certain a date.  All I can --

8   you're zeroing on a creditor that claims $600,000 is owed to

9   them.

10        And I'm telling you they're not owed.  They're paid in

11  full, and they will not collect any money.  They will not

12  ask for any money.  If you pay them, they'll send you the

13  money back because they're paid in full.

14  Q    Okay.  So is it possible that White & Case filed this

15  proof of claim on August 14th, 2023, having not been paid in

16  full, and they have since been paid in full?

17  A    I don't know.  I don't manage the claims register.  I

18  do know there's a lot of fictitious claims.

19  Q    And you think --

20  A    One of them that's an erroneous claim is the White &

21  Case claim.

22  Q    Okay.  You seem to know that they're paid in full.  How

23  do you know that?

24  A    I know that.

25  Q    How?

1  A    Because I keep communicating with them in other

2  matters.

3  Q    Okay.  And who paid White & Case in full?

4  A    I don't know whose -- whether they were paid by the

5  Debtor or they paid by the sister companies or the settling

6  parties or they just wipe the bill off and paid in full.  I

7  don't know the exact circumstances.  But I had a

8  conversation with them and I asked them whether the Debtor

9  owes them money, and they said no.

10  Q    When did you have that conversation?

11  A    Few months ago.

12  Q    So after this bankruptcy case was filed.

13  A    Yes.

14  Q    And after they filed this proof of claim.

15  A    Yes.

16  Q    We could turn to the thirteenth page of the document.

17  And I apologize, the page numbers start over and over again.

18  A    Which tab?

19  Q    This is in the same tab, the -- still the White & Case.

20  It's the page that starts with what looks like a White &

21  Case invoice to Corizon Health, Inc.

22  A    What's the page number?

23          THE COURT:  Oh, which -- you're looking at --

24  you're still looking at the proof of claim at Tab 18.

25          MS. MEYERS:  Yes.

1          THE COURT:  After the proof of claim after the

2   addendum, it looks like an attachment to the addendum.

3          MS. MEYERS:  Yes, that's correct, Your Honor.

4          THE COURT:  Okay.

5          MR. BROOKNER:  Objection, Your Honor.

6          THE COURT:  Just making sure that -- yes,

7   Mr. Brookner.

8          MR. BROOKNER:  Yeah, we have to do something with

9   this document.  It's not in evidence to my knowledge.  We

10  got to move it in or stop talking about it, I think.

11         THE COURT:  Counsel.

12         MS. MEYERS:  Your Honor, I'm just asking the

13  witness questions about this and whether -- and I'm planning

14  to try to refresh his recollection on something he already

15  testified to.

16         THE COURT:  Why don't you ask him and then see if

17  we can get there?

18         MS. MEYERS:  Okay.

19         THE COURT:  But it's cross-examination, right?  I

20  don't -- so I don't know if we -- I think sometimes you get

21  to cross people with docs.  But --

22         MS. MEYERS:  Yes.

23         THE COURT:  No, go ahead.

24         MS. MEYERS:  I agree, Your Honor.  Thank you.

25         THE COURT:  Go ahead.

1   BY MS. MEYERS:

2   Q    Okay, Mr. Lefkowitz, do you see an invoice from White &

3   Case to Corizon Health?  I believe it's actually the second

4   page that's dated -- it says invoice date May 6th, 2022?

5   A    Yes.

6   Q    Okay.  And then if you flip to the next page, do you

7   see that there are a list of redacted timekeeper --

8   A    Yes.

9   Q    -- descriptions?  Do you see that the date of the first

10  timekeeper entry is January 25th, 2022?

11  A    Yes.

12  Q    Does that refresh your recollection that White & Case

13  was involved earlier than mid-2022 --

14  A    No.

15  Q    -- in connection with Corizon?  No, it doesn't.

16  A    Haven't seen this invoices before.

17  Q    So how do you know that they've been paid in full if

18  you've never seen their invoices?

19  A    I told you.  I spoke to White & Case couple of months

20  ago, and they say they're not owed money by this Debtor,

21  they're paid in full.  It's not clear?

22           MS. MEYERS:  Very clear, thank you.

23  BY MS. MEYERS:

24  Q    White & Case is getting released under the settlement

25  agreement; isn't that right?

1  A    What has that got to do with their invoices?

2  Q    I'm -- can you answer my question?

3  A    If they're in the settlement agreement as the list of

4  parties, yes.

5  Q    Yes.  So the section -- Subsection (u) in Paragraph 7

6  lists attorneys of the released parties as --

7  A    Okay.

8  Q    -- also released parties, right?

9  A    Okay.

10 Q    And you said they were M2 LoanCo's attorneys, right?

11 A    And YesCare's attorneys.

12 Q    Okay.  So let's talk about Corizon Health after the

13 divisive merger.

14 A    Okay.

15 Q    When was Corizon renamed as Tehum?

16 A    Sometimes thereafter.

17 Q    Do you have an approximation of how long after the

18 divisive merger it was renamed?

19 A    No.

20 Q    Before --

21 A    There's an official filing.

22 Q    It was before they filed for bankruptcy, though, right?

23 A    I believe so.

24 Q    After the divisional merger, Tehum had no operating

25 business; is that right?

ISAAC LEFKOWITZ - CROSS BY MS. MEYERS                    314

1  A     They were planning to operate.

2  Q     How were they planning to operate?

3  A     They were going to develop a jail healthcare business.

4  Q     Okay.  But at the -- after the divisive merger, Tehum

5  had no active contracts, right?

6  A     Correct.

7  Q     Okay.  And it had no employees, right?

8  A     Correct.

9  Q     And it had no supplies.

10  A     Supplies you buy on demand.

11  Q     Okay.  So they didn't have any at that time.

12  A     No healthcare provider has supplies.  They buy them on

13  demand.

14  Q     It just had -- at that time it just had liabilities

15  associated with expired contracts; is that right?

16  A     With huge amount of knowledge how to go after the

17  business.

18  Q     And after the divisional merger, you were Tehum's sole

19  director, right?

20  A     Correct.

21  Q     And that's still true today.

22  A     Correct.

23  Q     So -- and is it still true that there's no employees of

24  Tehum today?

25  A     No, because they filed for bankruptcy.

1   Q      Okay.  So aren't you essentially the Debtor,

2   Mr. Lefkowitz?

3   A      And there's a CRO.

4   Q      Okay.  And Mr. Perry was appointed the day of the

5   bankruptcy filing; is that right?

6   A      Correct.

7   Q      So I believe at your deposition I asked you if you were

8   aware of any efforts to bring in new business to Tehum, and

9   you said, no; is that still accurate?

10  A      At what point?

11  Q      After the divisive merger.

12  A      No, I don't -- no, I disagree with that.

13  Q      Okay.  What efforts did you make after the divisive

14  merger to bring in new business?

15  A      There was a plan to jumpstart a new company.

16  Q      I understand there was a plan.  What active steps did

17  you take to execute that plan?

18  A      Interviewed appropriate people to run it.

19  Q      Who'd you interview?

20  A      Doctors, physicians, nurses.

21  Q      How many did you interview?

22  A      Remember, but it was an active plan.

23         (Pause in the proceedings.)

24  Q      But you would agree absent execution of that plan there

25  was no going concern business, right?

1   A    There was a going concern.  It had 40 years of knowhow,

2   it had assets, it had liabilities, and it had a plan how to

3   go into a new business of servicing the jails until it got

4   forced into bankruptcy.

5        (Pause in the proceedings.)

6   Q    Mr. Lefkowitz, could you turn to page -- to, excuse me,

7   Tab 4 and go to Page 64 and 65 of that transcript?

8             THE COURT:  Is that the -- what is that?  Is

9   that --

10            MS. MEYERS:  This is a transcript from the

11   June 13th, 341 Meeting.

12            THE COURT:  Docket 911.

13            MS. MEYERS:  911-3, yes, Your Honor.

14            THE COURT:  Okay.  Is this the -- is this admitted

15   into evidence or this just --

16            MS. MEYERS:  This is not admitted into evidence, --

17            THE COURT:  Okay.

18            MS. MEYERS:  -- Your Honor.

19   BY MS. MEYERS:

20   Q    Mr. Lefkowitz, could you look at your statement

21   beginning on Page 64, line 24?

22   A    Yeah.

23   Q    Corizon merged with Corizon Health.  They then merged

24   with CHS Texas, and then they divided.  So Corizon does not

25   have operations but it has liabilities and it has certain

1   claims of assets; do you see that?

2   A    Yes.

3   Q    Is that accurate?

4   A    Yes.  Operations means new contract.

5   Q    And has that ever changed?

6   A    Didn't get a chance.

7   Q    Have you sought -- have you on behalf of Corizon -- or,

8   excuse me, now Tehum, have you sought any new contracts?

9   A    Contract is through an RFP.  It's a municipal process.

10  It's a very long process.

11  Q    Have you sought any?

12  A    You can't.  If you're in bankruptcy, you can't.  It's

13  -- you're dead on arrival.

14  Q    I understand.  I'm saying between the divisive merger

15  and the time that Tehum filed for bankruptcy, did you seek

16  out any new contracts?

17  A    That's not the way you do it.  You first build your

18  staffing.

19  Q    Mr. Lefkowitz, I'm asking did you do that?

20  A    Yeah, we started planning a new business.

21  Q    No, I'm asking did you seek any new contracts between

22  when Tehum filed for bankruptcy -- or, excuse me, --

23  A    I don't know --

24  Q    -- between the divisive merger --

25  A    I don't know what seeking new contracts is.  I can

1  teach you the nature of how you get a contract but it's not

2  about seeking a contract.  There is a calendar.

3      Every six months, every nine months counties and cities

4  put out for request for proposals.  It's -- you can seek all

5  you want, you're not going to get it.  But in order to get

6  it, you have to have the right structure.

7  Q    And that's --

8  A    And from the divisional merger until the bankruptcy

9  that was in the planning.  And it got knocked out of its

10 feet.

11 Q    And you were running that entire process.

12 A    Correct.

13 Q    And it never got past interviewing certain staff

14 members; is that right?

15 A    It passed what?

16 Q    You said that to effectuate this plan --

17 A    Right.

18 Q    -- you interviewed doctors and nurses.

19 A    Right, potential staffing.

20 Q    Did you hire any of them?

21 A    You don't hire until you get a contract.

22 Q    Okay.  And so what contracts were you planning to go

23 after?

24 A    Jails and counties.

25 Q    Okay.  Did you identify any specific ones?

1   A     Yes.

2   Q     Which ones?

3   A     We were actively involved in the State of Georgia to

4   take over 14 jails.

5   Q     Okay.  Tehum was.

6   A     Yes.

7   Q     Okay.  And that's after the divisive merger and before

8   the bankruptcy.

9   A     Correct.

10  Q     Okay.  And how much would that contract have been

11  worth?

12  A     About 75 million.

13  Q     And what stage in that process did you get to?

14  A     Attorney negotiations.

15  Q     Are you familiar with an entity called CHS Alabama?

16  A     Yes.

17  Q     All right.  Who owns that entity?

18  A     CHS Texas.

19  Q     Okay.  And when was CHS Alabama formed?

20  A     Don't know the exact date.

21  Q     Do you know whether it was prior to the divisional

22  merger?

23  A     I don't believe so.

24  Q     So it was after.

25  A     I don't know.  Public filing.

1  Q     Did CHS Alabama bid on any contracts?

2  A     Yes.

3  Q     And what contracts were those?

4  A     State of Alabama.

5  Q     Was CHS Alabama ever a subsidiary of Corizon Health,

6  Inc.?

7  A     No.

8  Q     It was only a subsidiary of CHS Texas.

9  A     Correct.

10 Q     So that would mean it was formed after the division

11 merger.

12 A     I don't know what it means.  But if you're asking me if

13 it was from Corizon, no.

14 Q     Are you -- is CHS Alabama a subsidiary of YesCare?

15 A     I don't believe so.

16 Q     Is it an indirect subsidiary of YesCare?

17 A     I don't know.

18 Q     Well isn't CHS Texas a subsidiary of YesCare?

19 A     Yes.

20 Q     Okay.  And is -- and isn't CHS Alabama a subsidiary of

21 CHS Texas?

22 A     I don't know the definition of an indirect subsidiary.

23 Q     You didn't answer my question.  Is CHS --

24 A     No, you asked me if it's an indirect subsidiary.  I

25 said I don't know.

1  Q    My most recent question, --

2  A    No.

3  Q    -- Mr. Lefkowitz, was, is CHS Alabama a subsidiary of

4  CHS Texas?

5  A    I don't know.

6  Q    And you said that CHS Alabama bid on a contract with

7  the State of Alabama; is that right?

8  A    Correct.

9  Q    And did it get that contract?

10 A    I believe so.

11 Q    And when did that happen?

12 A    Sometimes in '23.

13 Q    So after Tehum filed for bankruptcy.

14 A    Correct.

15 Q    Were any employees of -- or officers of former Corizon

16 Health involved in CHS Alabama's efforts to secure that

17 contract?

18 A    The entire correctional industry in the United States

19 is a former Corizon employee.

20 Q    Okay.  So the answer's yes?

21 A    At some point, you know, it's 40 years of employment.

22 If you're on the correctional industry, then you must have

23 worked for Corizon at one point.

24 Q    Why would Corizon Health personnel help CHS Alabama

25 secure a contract with the State of Alabama when CHS Alabama

1    was not owned by Corizon?

2    A    I think you just made an incorrect statement.

3    Q    How is it incorrect?

4    A    I don't believe Corizon Health helped CHS Alabama.

5    Q    Well, certain -- you said certain employees of CHS

6    helped.

7    A    That's not what you asked.  You asked if -- you asked

8    me before if the employees of CHS Alabama are former Corizon

9    employees.  And my answer was the entire correctional

10   industry are former Corizon employees.

11        So how does -- then you followed up with question, why

12   would Corizon employees help.  They're not Corizon

13   employees.

14   Q    So my question was did any employees of Corizon Health,

15   were any of them involved in CHS Alabama's efforts to secure

16   the contract with the State of Alabama?

17   A    I don't think so.

18   Q    You don't think so.

19   A    No.

20   Q    When did CHS Alabama start preparing materials to

21   obtain the Alabama contract?

22   A    I don't know.

23   Q    Do you know whether it was prior to the divisional

24   merger?

25   A    Divisional merger was in '22.

1    Q      Yes.

2    A      I don't believe so.

3           (Pause in the proceedings.)

4    Q      Has Tehum ever had the resources available to pay out

5    its creditors in full?

6    A      I believe so.

7    Q      When was that?

8    A      Still has today.

9    Q      Tehum has the -- enough resources to pay all

10   creditors --

11   A      Absolutely.

12   Q      -- in full.  So why file for bankruptcy?

13   A      Because there was a receivership motion by a hospital

14   in Missouri.  That's what forced it in.

15   Q      I thought that the only assets of Tehum were claims

16   against other entities.

17   A      You heard this morning from Mr. Perry there is 30

18   million in ERC credits.

19   Q      Okay.  So is St. Luke's going to be paid in full; is

20   that your testimony?

21   A      St. Luke's is not owed one dime.  It is the most

22   fictitious claim in the entire claim roster.  That claim is

23   originated from 2014, a $31 million claim.  You believe

24   there's a hospital in the entire country that gives $30

25   million credit to a commercial client or does it get cut off

1    after 300,000?

2         They just took a billable rate, if you know what

3    billable rates in a hospital, and converted it to an invoice

4    and created a claim.

5         If they get paid on this $30 million claim, it's far

6    more than what they're going to get in the Idaho courts.

7    They're not owed a dime.  Corizon paid every single bill to

8    St. Luke's in full.

9    Q    Mr. Lefkowitz, you understand that in the U.S. tort

10   system, you don't get to decide whether a claim is

11   fictitious or not, right?

12   A    You were asking about St. Luke's.

13   Q    I'm asking --

14   A    St. Luke's is not a court.

15   Q    I'm asking a different question, Mr. Lefkowitz.

16   A    Right.

17   Q    I'm asking you do you understand that in the U.S. tort

18   system, you personally do not get to decide whether a claim

19   is fictitious or not?

20   A    One second.  So the way I settled at least $40 million

21   in tort claims in this company is I met with the plaintiff's

22   attorney, let's call him an ambulance chaser, and we went

23   through the legitimacy of his claim.

24        And businessman to businessman I proved to them that

25   it's not a legitimate claim, and there is no cause here, and

1   you will not get paid.  So it's just about chasing the

2   litigation.  That is on the represented cases.

3       The pro se cases, 90 percent of the pro se cases,

4   attorneys declined to take them on.  So they settle.

5       So when you say that I don't get to decide, I don't

6   decide.  It's a negotiationment (sic) of settlement.  Same

7   thing what the insurance company does.

8   Q    Mr. Lefkowitz, you said that you were personally

9   involved with efforts to obtain new business for Tehum; is

10  that correct?

11  A    Exactly.

12  Q    Okay.  Can we turn to the second -- Tab 2, which --

13  A    Yes.

14  Q    -- is your confidential transcript --

15  A    Yes.

16  Q    -- from your February 8th, 2024 deposition?  And turn

17  to Page 85.

18      And then if you go down to the very bottom, do you see

19  I asked a question that will turn onto the next page?  After

20  the divisional merger, are you aware of Tehum ever having an

21  active contract?  Answer:  I am not aware.

22  A    Correct.

23  Q    Are you aware of any contracts that it sought out?

24  Answer:  No.

25  A    Correct.  It's still correct.

1  Q    So what was the Georgia contract that you were just

2  talking about?

3  A    Talking about acquisition of a company that has 14

4  contracts.

5  Q    So you don't consider that seeking out new contracts

6  you -- it's an acquisition.

7  A    Correct.

8  Q    And you didn't tell me about that when I asked you?

9  A    You didn't ask me.  You asked me about contracts.

10  Q    So you don't think that acquiring a company that has

11  contracts that would then be operated by Tehum is seeking

12  out new contracts.

13  A    Exactly.

14  Q    Mr. Lefkowitz, you understand that some of Tehum's

15  creditors are families who lost loved ones, right?

16  A    Yes.

17  Q    Okay.  And you understand that some of Tehum's

18  creditors are people that were seriously injured as well,

19  right?

20  A    Some.

21  Q    Okay.  And you don't really -- but you don't care that

22  whether these people are fairly compensated, do you?

23  A    You're wrong.

24  Q    Okay.  Let's go to your transcript.

25        MS. MEYERS:  Actually, can you pull up the video?

1    This is confidential transcript Page 184-12 through 185-1.

2            THE WITNESS:  Which tab?

3            MS. MEYERS:  That is in Tab 2.

4            THE WITNESS:  Which page?

5            MS. MEYERS:  184, line 12; 185, line 1.

6            THE COURT:  If anybody's going to pull up a video,

7    let me just tell you to stop.  We can read stuff into the

8    transcript.  I don't need to --

9            MS. MEYERS:  Okay.

10            THE COURT:  -- hear it.

11            MS. MEYERS:  Thank you, Your Honor.

12            MR. BROOKNER:  Your Honor, I've let this go on for

13    quite a while.  I do -- I'm not sure if it's an objection or

14    a comment.  But this deposition behind Tab 2 was not

15    Mr. Lefkowitz in his capacity as a Tehum representative or

16    otherwise.  He was a 30(b)(6) representative for M2 LoanCo

17    in this deposition.

18            MS. MEYERS:  That's not accurate, Your Honor.

19    This is the confidential portion of Mr. Lefkowitz's

20    deposition in his individual capacity --

21            MR. BROOKNER:  Is that --

22            MS. MEYERS:  -- that I took on April 8th, yes.

23            MR. BROOKNER:  Oh, I'm sorry, his individual,

24    correct, his individual capacity, not his capacity as a

25    representative of the Debtor or the Debtor's 30(b)(6) or

1  anything of the sort.

2          THE WITNESS:  Exactly.

3          THE COURT:  Okay.  Let's continue.

4          MS. MEYERS:  All right.

5  BY MS. MEYERS:

6  Q    On Page 84, line 12, --

7  A    Yes.

8  Q    -- I asked you, are you aware that there was a proposed

9  plan in connection with Tehum's bankruptcy?

10          "ANSWER:  I am aware, yeah.

11          "QUESTION:  Okay.  And do you have any

12          understanding of who that plan proposed to

13          distribute assets among creditors?

14          "ANSWER:  I personally don't care.

15          "QUESTION:  You don't care personally?"

16  Yeah, absolutely not.

17          "QUESTION:  Okay.  So you don't care if someone is

18          overcompensated or under -- if someone is

19          undercompensated.

20          "ANSWER:  Me, personally?

21          "QUESTION:  Yeah.

22          "ANSWER:  I care about my wife and kids."

23  Is that your testimony?

24  A    Yeah.  But you need to be transparent for the Court.  I

25  was at the deposition wearing several hats, corporate hats

1  and personal hats.  And you asked me, you personally, Isaac

2  Lefkowitz, do you personally care how money gets

3  distributed.  I said, no, personally I don't care.  Do you

4  personally care if someone gets overcompensated or

5  undercompensated?  And again I answered, personally, no.

6       What does it got to do with personally?  As far as the

7  Debtor, yes.  As far as the settlement parties, yes.

8  Personally, I don't care today either.

9  Q    You've said many times you think a lot of the claims

10  against Tehum are fictitious, right?

11  A    I still believe so.

12  Q    Okay.  You think that inmates are writing illegitimate

13  claims on the back of napkins or envelops.

14  A    Not only inmates, even people who are no longer

15  inmates.

16  Q    Okay.  And the United States of America tort system

17  accepts those claims.

18  A    No.  The United States adopted a tort act because of

19  the -- because they were clogging the system.  So the reason

20  tort act trying to filter out what's legitimate and what's

21  not legitimate.

22  Q    Can we turn to this is in the first tab, transcript

23  Page 46, line 19?

24  A    Forty-six.

25            MS. HAYWARD:  Your Honor, I just for the record

1  want to object that this is sort of improper impeachment.

2          THE COURT:  Yeah.  I -- you've been asking a lot

3  of questions.  I'm not really sure it's been inconsistent

4  with what he's been saying.  I think the last one didn't

5  seem too inconsistent with what he's been saying if -- I'm

6  just going to look at these a little closer.

7          But we'll -- what page are you going to?  Let's

8  see if this one --

9          MS. MEYERS:  I'll move on, Your Honor.

10          THE COURT:  Okay.

11  BY MS. MEYERS:

12  Q    How does an inmate who has died write a false claim on

13  the back of a napkin, Mr. Lefkowitz?

14  A    Because if a inmate commits suicide because he had a

15  mental illness or he overdoses because he smuggled drugs

16  into prison, how is that Corizon's Health liability, other

17  than just being a named caretaker of hardworking people that

18  wake up 5:00 o'clock in the morning to provide care to these

19  people?

20  Q    I'm asking you how does a -- someone who has died write

21  a false claim and submit it in this bankruptcy?

22  A    Oh, an estate, the estate files the false claim.

23  Q    Okay.  So the family members.

24  A    Or the ambulance chaser, me and crosses of the world.

25  Q    So you think that these claims -- a lot of these claims

1   are fictitious because the claimant is a criminal; is that

2   your testimony?

3   A     No.  It's got nothing to do with a criminal.  It's the

4   entire healthcare system in the entire country suffering,

5   hospitals, nursing homes, long-term care.  Everybody suffers

6   from the same.  Person dies, everyone's fooled.  Some are

7   legitimate.  There are malpractice.  People are human, they

8   make mistakes.  Doctors make mistakes, nurses make mistakes.

9   But there is no deprived indifference.

10  Q     But your testimony here today is that a lot of these

11  claims are fictitious, right?

12  A     I know from the 600 claims, I can go and check you off

13  each claim which is a legitimate claim or not.  And being a

14  director of the Debtor, I'll do so when it comes to the

15  settlement.  I mean when it comes to distribution.

16  Q     Okay.  So your testimony is that you get to decide

17  whether a claim --

18  A     I'm get to decide.

19  Q     -- is legitimate or --

20  A     I get to tell you who is real and who is not real.  For

21  instance, the Rikers case that keeps on being brought up

22  here is a fake case, doesn't exist.

23  Q     Do you think that the Bankruptcy Court should bar

24  Tehum's creditors from the U.S. tort system?

25  A     Absolutely not.

1  Q    Well you said you would only pay the settlement amount

2  if there was finality for these claims; wasn't that your

3  testimony?

4  A    No.

5  Q    That wasn't your testimony.

6  A    Against the claims against the M2 parties; your

7  successor liability claims, your alter ego claims, these

8  type of claims.

9  Q    Okay.  So you think that creditors who have successor

10 liability claims against the released parties should be

11 barred from using the U.S. tort system, right?

12 A    If it's released, it's released.

13 Q    Right.  So, right, in order for you to get finality, --

14 A    We pay.

15 Q    -- you need to --

16 A    We pay, you take a distribution and you're released.

17 Q    Right.  In order to get finality, those tort claimants

18 can't go to the U.S. tort system, right?

19 A    Not if they get paid.  You can't have the cake and eat

20 it, too.

21 Q    For you to get the finality you want, certain creditors

22 need to be essentially silenced from using the U.S. tort

23 system, right?

24 A    No, they don't need to be silenced.  They take the

25 payment and they go home.  And they'll get more than what

1   they get in litigation.  The pro se claimants are going to

2   get more, according to the settlement plan, than they would

3   have gotten any time, anywhere.

4   Q    You know that for sure.

5   A    Yes, positive.

6   Q    Have you ever represented tort victims in a --

7   A    I been --

8   Q    -- litigation?

9   A    -- involved in tort victim litigations all day long,

10  every day of my life.

11  Q    You've represented tort victims --

12  A    No, I paid them.

13  Q    -- in a litigation.  Do you believe that for YesCare to

14  increase its profits, these tort victims need to be barred

15  from the tort system?

16  A    Absolutely not.

17  Q    So why are we in this bankruptcy case, Mr. Lefkowitz?

18  A    Because there was a hospital in Missouri that wanted

19  install a receiver and to stop everything in its tracks.

20  You forgot that we paid out close to $40 million prior to

21  bankruptcy, after the divisional merger.  Those are real

22  money, 40 million bucks.

23  Q    Tehum filed for bankruptcy on February 13th, 2023; is

24  that right?

25  A    Correct.

1  Q    And I think we've already gone over, that was your

2  decision to file for bankruptcy --

3  A    Ultimately, correct.

4  Q    -- on behalf of -- And you retained Mr. Perry of Ankura

5  to be Tehum's chief restructuring officer, right?

6  A    Correct.

7  Q    Why did you select Mr. Perry?

8  A    First, we looked at another firm and we realize they

9  don't have the expertise.

10     And then we looked at the Ankura firm that had an in-

11  depth knowhow of how the healthcare system works, so we

12  hired Ankura.  It wasn't Mr. Perry particular.  It was

13  Ankura.

14  Q    What was the other firm that you looked into?

15  A    The Getzler firm.

16  Q    So you said earlier that the Debtor can pay all claims

17  in full.

18  A    Legitimate claims.

19  Q    All legitimate claims.

20  A    Correct.

21  Q    And those are claims that you deem to be legitimate.

22  A    That we, not me personally.

23  Q    We being who?

24  A    All the attorneys involved in the PLI.

25  Q    Okay.  And who are those attorneys?

1   A      The Sigma team.

2   Q      Okay.  Anyone else that you're including in that group,

3   other than you and the Sigma team?

4   A      No.

5   Q      So is the Debtor in financial distress right now?

6   A      I don't think so.

7   Q      So your testimony is the only reason the Debtor's in

8   bankruptcy is because of the receivership.

9   A      Correct.  Now, obviously the claims are in the billions

10  of dollars.  But those are telephone numbers.

11  Q      You said Ms. Tirschwell was the CEO of Corizon Health.

12  A      Correct.

13  Q      Is she still the CEO?

14  A      No.

15  Q      When did she leave?

16  A      Sometimes in '23.

17  Q      Did you ever communicate with her about the divisional

18  merger?

19  A      She was updating me, yes.

20  Q      Did she ever express to you that she thought it was a

21  good idea?

22  A      I don't recall the exact expression.

23  Q      Why did she leave?

24  A      Oh, she got into disgruntle argument with one of the

25  clients.

1    Q    And when was that?

2    A    Sometimes in '23.

3    Q    Will she get a -- strike that.

4         Will Ms. Tirschwell get a release under the settlement?

5    A    I believe so.

6    Q    You think she did a good job as CEO?

7    A    No.

8    Q    Why not?

9         MS. HAYWARD:  Objection, Your Honor.  At this

10   point it seems that we've gone a little bit afield and

11   become a little cumulative.  I'm not sure how this line of

12   questioning goes to either settlement or the motion to

13   dismiss.

14        THE COURT:  Counsel, what's your response?

15        MS. MEYERS:  I'm done with this line of

16   questioning, Your Honor, --

17        THE COURT:  Okay.

18        MS. MEYERS:  -- so I -- if he would answer the

19   question pending, I have no further questions on that.

20        THE COURT:  Actually can you repeat the question

21   so I can make sure?

22        MS. MEYERS:  I said why don't you think that

23   Ms. Tirschwell did a good job?

24   BY MS. MEYERS:

25   A    If she did a good job, she would still be CEO.

1  Q    Okay.  You said a moment ago that you referenced

2  ambulance chasers.

3  A    Yeah.  It's a phrase in the industry.

4  Q    I understand --

5  A    The only reason why I'm saying that phrase is because I

6  heard in previous hearings the cry that inmates,

7  incarcerated people don't have access to being represented.

8  And that's absolutely false.

9       As soon as there's an incident, they trip over each

10 other, the PLI attorneys, to chase these clients.  It's when

11 they decide that there is no merits to the case, that's when

12 they go pro se.

13 Q    Do you know who Ian Cross is?

14 A    Oh, yeah.

15 Q    Would you call him an ambulance chaser?

16 A    I'm calling him a crook.

17 Q    He's counsel for William Kelly; do you know that?

18 A    Right.

19 Q    Okay.  And you're -- are you aware that Sigma has

20 estimated that claim to be a high risk for the Debtor?

21 A    Yes.

22 Q    Okay.  With a value between 750,000 and almost two

23 million, right?

24 A    Correct.

25 Q    Okay.  Is that fictitious?

1   A    The two million is fictitious.

2   Q    Is the 750,000 fictitious?

3   A    It's high but we were ready to pay more than that.

4   Q    Okay.  So Mr. Kelly's is not one of the claims you

5   claim to be fictitious.

6   A    No.  Mr. Cross is.  He's not looking out for his

7   client's interest.  He's looking out for his contingency

8   fee.

9   Q    You understand that Mr. Kelly has an active successor

10  liability claim against CHS Texas, right?

11  A    I don't follow that case but it's okay.

12  Q    Is that fictitious?

13  A    Sure it is.

14  Q    Why?

15  A    Because there is no successor liability.

16  Q    And how do you know that?

17  A    Because I know the division of assets and liabilities.

18  Q    Are you a lawyer?

19  A    Do you need to be a lawyer to know the liability of the

20  -- of success?

21  Q    Well I'm asking do you understand the elements that

22  need to be met to establish successor liability.

23  A    Yes.

24  Q    You do.

25  A    Yes.

1          MS. HAYWARD:  Your Honor, at this point I am going
2   to object under 403 to the extent that she asked this
3   witness about merits of litigation that has not been filed,
4   that is subject to being settled in this case.
5      I do not believe this is the appropriate place to
6   conduct a trial, per se, or ask this witness questions
7   which, you know, would be at issue in litigation later on if
8   it were brought.
9          THE COURT:  Counsel.
10          MS. MEYERS:  Your Honor, Mr. Lefkowitz has said
11   multiple times that he thinks these claims are fictitious,
12   that the amounts are too high.  And I'm simply trying to
13   understand why he thinks that.
14          THE COURT:  I'll let you ask a question or two
15   more.  But I get -- I think he's been very clear about why
16   he thinks they're fictitious.  And I think we're starting to
17   get to the asked and answered phase of this.
18          THE WITNESS:  But, Judge, I want to correct.  I
19   didn't say that all claims are fictitious.
20          THE COURT:  I never said you did, and I apologize
21   if I communicated that.
22   BY MS. MEYERS:
23   Q    Tehum's bankruptcy isn't the first time you caused an
24   entity to file for bankruptcy, is it, Mr. Lefkowitz?
25          MS. HAYWARD:  Objection, relevance.

1              MS. MEYERS:  Your Honor, the TCC's motion calls

2    into question whether this bankruptcy was filed in bad

3    faith.  And if the individual who authorized this

4    bankruptcy, Mr. Lefkowitz, has used this tactic before, if

5    this is his modus operandi for dealing with undesirable

6    litigation, that's relevant to assessing his state of mind

7    when he filed this bankruptcy case.

8              MR. BROOKNER:  The Debtor objects to this line of

9    questioning as well, Your Honor.  You already told us you're

10   not interested in hearing about bad faith, that this case is

11   nine months old.  You're either going to approve the

12   settlement or you're going to dismiss the case.  Good faith,

13   bad faith is not relevant at this point in the proceedings.

14             THE COURT:  I personally don't find it relevant,

15   counsel.  But I -- if you want to establish a point, but I

16   don't want you going down a long road.

17             I think -- why don't you just ask another question

18   for me, for my purposes?

19             MS. MEYERS:  I understand, Your Honor.  I can move

20   on.

21   BY MS. MEYERS:

22   Q    Mr. Lefkowitz, am I correct that you don't like how the

23   American tort system handles the types of claims that are

24   pending against Tehum?

25   A    Absolutely wrong.

1  Q    Didn't you say that the American tort system accepts

2  illegitimate claims written by inmates on the back of

3  napkins?

4         MS. HAYWARD:  Objection again, Your Honor,

5  relevance, and asked and answered.  And this (indiscernible)

6  cumulative.

7         THE COURT:  No.  I think you can answer this one.

8         Overruled.

9  BY MS. MEYERS:

10 A    No.  I said it's very simple to file a claim being an

11 inmate without being vetted by counsel.  In our case itself,

12 in the Debtor case, the Court accepts letters from inmates.

13 Q    In this bankruptcy case.

14 A    Yes.

15 Q    I'm asking about the tort system --

16 A    Same thing happens in the District Court.  Anyone with

17 a pencil and an envelope can file a case.  But when you get

18 injured in a car accident, you can't do that.

19 Q    You understand, though, that it's the function of the

20 U.S. Court system to decide whether a claim is legitimate or

21 not, right?

22 A    I have no qualm about it.

23 Q    Right.  It's not up to you --

24 A    Correct.

25 Q    -- whether it's legitimate.  A court will decide.

1  A    Correct.

2  Q    Okay.

3  A    But we can defend it.

4  Q    Of course.

5  A    Vigorously.

6  Q    And I would expect you to do so.  But do --

7  A    We're also defending employees that are being sued

8  which now the company's being sued out of courtesy of being

9  our employees.  Your clients in the committee are suing

10  former nurses where Corizon is not a defendant, and we're

11  defending it.

12  Q    Do you think that you have more control over dealing

13  with illegitimate claims in a bankruptcy process?

14  A    Absolutely not.

15  Q    Well, isn't the Debtor settling personal injury claims

16  or alter ego claims against these released parties?

17  A    All claims, creditors' claims, workman comps claims, --

18  Q    So --

19  A    -- all claims.  You're just part of the pool.

20  Q    To your understanding would Tehum be able to settle

21  personal injury claims against YesCare asserted on a

22  successor liability theory if they weren't in bankruptcy?

23  A    I didn't follow that line.

24  Q    You don't know.

25  A    I didn't follow that line of question.

1  Q    Your -- here, let me ask it a different way.  In your

2  view, does the Debtor's bankruptcy estate own the wrongful

3  death claims against YesCare that would be asserted by a

4  Tehum creditor on a successor liability theory?

5  A    The estate owns all claims.

6  Q    The estate owns those claims.

7  A    Of course.

8  Q    Okay.  So it can settle those claims under this 9019

9  settlement, right?

10 A    Correct.

11 Q    Okay.  And if the Debtor's estate did not own those

12 claims, you couldn't settle them in this release.

13 A    They don't own it, they own -- they can only settle if

14 they own it.

15 Q    So what's your understanding of how the Debtor can

16 settle a successor liability claim against YesCare?

17 A    YesCare is just a party and part of the M2 parties as a

18 participant in the settlement.  You want us to participate

19 in the settlement.  We're asking for a release in return.

20 It's a simple business transaction.

21 Q    Okay.  So it's your understanding that at this point in

22 time the Debtor owns and controls wrongful death claims

23 against YesCare or CHS Texas that are on a successor

24 liability or alter ego theory.

25 A    I didn't say that.  I said the Debtor owns all claims.

1  You start listing them as individual claims.  They own all

2  claims.

3  Q    Well, they don't own direct claims that a creditor

4  might have against YesCare, right?

5  A    No.

6  Q    Okay.  But they own a claim that a creditor has against

7  the Debtor and could assert against YesCare on a successor --

8  A    Exactly.

9  Q    -- liability theory.  Okay.

10  A    Which, by the way, is an impossible.  How could you own

11  -- how could you have a claim against YesCare when YesCare

12  wasn't born when the claim existed, other than successor

13  liability?

14  Q    When did the Debtor become the owner of a wrongful

15  death claim against YesCare asserted on a successor

16  liability theory, for instance?

17  A    I don't know.  That's a legal conclusion.

18  Q    You don't know the answer to that.

19  A    No.

20  Q    Did it own those claims before it filed for bankruptcy?

21  A    Not a bankruptcy lawyer.

22  Q    But if the settlement is approved, is it your

23  understanding that any tort creditor with a successor

24  lability claim against, for instance, YesCare or you, would

25  be barred from pursuing their claims in the tort system?

1   A    You keep saying tort.  To me, it doesn't make a

2   difference if it's tort, secured, unsecured, UCC, United

3   States Trustee, U.S. government, doesn't matter.  It's a

4   global settlement.

5   Q    So you understand that the Debtor is settling all of

6   these derivative claims.

7   A    Exactly.

8   Q    And would you agree that having this control over the

9   wrongful death claims on a successor liability theory was a

10  reason for the bankruptcy filing?

11  A    No.

12  Q    But you did want to use the bankruptcy process to

13  discharge those liabilities against the released parties,

14  right?

15  A    Let's start out again.  Let's be very clear.  It was

16  litigation the State of Missouri on the eve of a state judge

17  appointing a trustee in all the companies.  And that's when

18  we picked to file for bankruptcy, to stay that matter.

19  Everything else came along with it under the Bankruptcy

20  Code.  But it wasn't designed for tort.

21  Q    Okay.  But --

22  A    In fact, I would have wished that tort I can settle

23  outside bankruptcy.

24  Q    You -- can you repeat that?

25  A    I would have wished if I would have had the capability

1   of settling tort claims outside of bankruptcy because I

2   believe that some of the tort claimants are going to pull

3   out money from this pool far more than they would have

4   pulled out in a commercial settlement.

5   Q    So why not allow the tort claimants to not take a part

6   of the settlement and go after you in the tort system?

7   A    I don't -- I'm not a bankruptcy law legislator.  This

8   is -- we're in bankruptcy, we settling in bankruptcy, it's a

9   global settlement, it's a global release.  We're not going

10  to rewrite the Code.

11  Q    But if you wanted to --

12  A    It would have been my wish list before we got pushed

13  into bankruptcy.

14  Q    So would you amend the settlement agreement to provide

15  that creditors can --

16  A    No.

17  Q    -- opt-out?  No?  Why not?

18  A    It was mediated.  This is how we settled it.

19  Q    Would you have lost the ability to settle these claims

20  if a receiver had been appointed?

21  A    I don't think so.  But it would have created a lot of

22  chaos in the 5,000 employees.  We funded this week the

23  hundred and eighteenth payroll, close to a billion dollars

24  in payroll, to 5,000 nurses to take home a paycheck.

25  Q    When you say "we," who are you talking about?

1  A     YesCare.

2  Q     YesCare.

3  A     To M2 LoanCo.  If a receiver would have come in, 5,000

4  employees would have been on the unemployment line.

5  Q     But you understand that through this settlement

6  agreement, if it's approved, it will discharge the

7  liabilities of creditors against the released parties.

8  A     Yes.  Everybody goes home.

9  Q     Okay.  And just to be clear, other than the Debtor, the

10  released parties are not Debtors, are not the Debtor in this

11  case, right?

12  A     Called the M2 settlement parties.

13  Q     Right.  They're -- none of the -- well, excuse me.

14  Most of the M2 parties are not in bankruptcy, correct?

15  A     I don't think any of them are.

16  Q     So unless the non-Debtor release parties get a

17  discharge of their tort liability, then there's not a

18  payment of $40 million; is that right?

19        MR. BROOKNER:  Your Honor, objection.  This is --

20  the document speaks for itself.  This has been asked and

21  answered about ten times already.

22        THE COURT:  I don't know if it's been ten but I do

23  believe it's been asked and answered.  I'm -- so I'll

24  sustain the objection.

25  BY MS. MEYERS:

1   Q    Let's talk about the DIP loan, Mr. Lefkowitz.  M2

2   LoanCo is the DIP lender, that's right?

3   A    Correct.

4   Q    And I think you've said you're one of the two directors

5   of M2 LoanCo.

6   A    Yes.

7   Q    Other than the settlement we discussed earlier, is the

8   DIP lender -- or is the DIP loan the Debtor's only source of

9   cash in this case?

10  A    No.

11  Q    What's its other source of cash?

12  A    Mr. Perry testified.

13  Q    What's your understanding of the other source of cash?

14  A    Insurance proceeds, ERC credits, clawbacks.

15  Q    Are you aware of any other sources, other than the ones

16  you just mentioned?

17  A    Mr. Perry -- I learned this morning, which I didn't

18  know, there's still receivables coming in.

19  Q    The DIP loan provides the Debtor with a source of funds

20  to pay the professionals in this case; is that correct?

21  A    Professionals, insurance, counting, FA's.

22  Q    And there is a budget for the DIP loan, right?

23  A    Correct.

24  Q    Does that budget need to be approved by anyone?

25  A    Yes.

1    Q     Who?

2    A     By M2.

3    Q     Okay.  And who at M2 would approve that?

4    A     Between me and Mr. Rubenstein.

5    Q     There's no one else, it would be you or Mr. Rubenstein.

6    A     Correct.

7    Q     Have you approved any DIP budgets in this case?

8    A     Yes.  Until the last one where Brown Rudnick refused to

9    give us a number.

10   Q     Does M2 LoanCo need to approve the DIP budget before

11   any funds are advanced to the Debtor?

12   A     No.  Before we agree to the terms of the loan and then

13   Ankura gives M2 weekly reports.

14   Q     Has M2 LoanCo approved a budget that includes fees for

15   the Debtor's professionals?

16   A     Yes.

17   Q     And has M2 Loan Co made funds available to pay the

18   Debtor's professionals in this case?

19   A     Yes, to the tune of ten or $11 million now.

20   Q     So M2 LoanCo has advanced what'd you say, $2 million --

21   A     Eleven.

22   Q     -- to the Debtor's -- I'm sorry?

23   A     To the tune of 11 million.

24   Q     Eleven million dollars.

25   A     Two ones.

1   Q    Okay.  So M2 LoanCo has advanced $11 million to pay the

2   Debtor's professionals.

3   A    Correct.

4   Q    And when was that?

5   A    Over the last year or so.

6   Q    Has M2 LoanCo approved a budget that includes fees for

7   the UCC's professionals?

8   A    Yes.

9   Q    Okay.  And has M2 LoanCo made funds available to pay

10  the UCC's professionals?

11  A    Correct.

12  Q    And how much has M2 LoanCo advanced for the UCC's

13  professionals?

14  A    I don't know that number but it was in the $11 million

15  that went out of M2's coffers into the Debtor's account.

16  Q    Okay.  So your testimony is that M2 LoanCo has funded

17  $11 million --

18  A    Date.

19  Q    -- to date to pay both the Debtor's professionals and

20  the UCC's professionals.

21  A    All the professionals.

22  Q    Where does M2 LoanCo get the money to advance to the

23  Debtor under the DIP facility?

24         MS. HAYWARD:  Objection, relevance.

25         MR. BROOKNER:  Objection, relevance.

1          THE COURT:  Counsel, what's your response?

2          MS. MEYERS:  Your Honor, I want to understand if

3   it's coming from a different party.  That's relevant

4   particularly given that M2 LoanCo is supposed to be funding

5   part of the settlement.

6          MS. HAYWARD:  If they borrow it from a bank, if

7   they -- I mean, what difference does it make where the money

8   comes from, as long as the money is coming in and funding?

9   And 11 million has been funded.

10          THE COURT:  No, I disagree.  I think we get to

11  know -- I don't know -- I just need to know if it's coming

12  from a source outside of M2 LoanCo or whether M2 LoanCo has

13  the funds to lend.  I think that's a fair question so I'll

14  let you ask that.

15  BY MS. MEYERS:

16  Q    Do you need me to repeat the question?

17  A    No.  I can answer you.  So M2 LoanCo funded $15 million

18  in funding agreement.  M2 LoanCo funded $24 million over the

19  funding agreement.  M2 LoanCo funded $11 million to date.

20  They undertook to fund another $5 million to -- or $4

21  million, to the tune of total of $15 million.  So obviously

22  M2 LoanCo has funds to fund.

23          THE WITNESS:  And I also want to notify the Court,

24  Your Honor, we were a DIP lender in one of your other cases

25  here in this court as well.

1              THE COURT:  Okay.

2    BY MS. MEYERS:

3    Q    Mr. Lefkowitz, that didn't ask -- answer my question.

4    I understand --

5    A    You're asking where M2 LoanCo has funds.

6    Q    I'm asking where -- you mentioned that they funded a

7    large number of money.  Where did that money come from?

8    A    From the company, M2 LoanCo.

9    Q    It came from M2 LoanCo.

10   A    Correct.

11   Q    It didn't come from any other source that provided the

12   money to M2 LoanCo.

13   A    Obviously they don't have a printing press in their

14   basement, you know.  It's a company that makes money.

15   Q    So did it come from M2 LoanCo's bank account?

16   A    Yes.

17   Q    Are you aware that as of January 31st, 2024 the

18   Debtor's professionals stated that they're owed over $4

19   million?

20   A    Not aware.

21   Q    Let's take a look at Tab 21 in TCC -- which is TCC

22   Exhibit 161.

23   A    Tab 21.

24   Q    Yes, Tab 21.

25   A    Yeah.

1  Q    And do you see that this is the Debtor's response to

2  interrogatories that were served by the TCC?

3  A    Okay.

4  Q    And do you have any reason to doubt the representations

5  of Debtor's counsel in this document?

6  A    No.

7  Q    See that it says that Gray Reed's owed over $2.5

8  million?

9  A    Okay.  I don't follow their invoices.

10 Q    See that it says that Ankura's owed $1.4 million?

11 A    Okay.

12 Q    And --

13 A    But it doesn't say that they have $2 million sitting in

14 the escrow account.

15 Q    Explain what you mean by that.

16 A    There's presently $2 million in the Debtor's escrow

17 account waiting to be released to professionals.

18 Q    Two million, 2.5 million, you said.

19 A    I don't know the exact number but it's north of two

20 million.

21 Q    Okay.  And that would cover Gray Reed's outstanding

22 fees, right?

23 A    I don't know what it's covered.  I'm not managing the

24 checking account.  It's Ankura that does it.

25 Q    Okay.  And Baker Hostettler it says is owed $23,000,

1   see that?

2   A    Okay.

3   Q    And it says KCC Consulting is owed $169,000; do you see

4   that?

5   A    Okay.

6   Q    So fair to say these fees haven't been paid as of

7   January 1st, --

8   A    I don't know.

9   Q    -- 2024.

10  A    I don't pay fees.

11  Q    But you don't have any reason to doubt what the Debtor

12  says, the Debtor's --

13  A    I don't --

14  Q    -- counsel says.

15  A    I don't get involved in paying fees.  All I'm getting

16  involved is funding to make sure that fees are getting paid.

17  There's $2 million in the account, another $3 million on its

18  way.

19  Q    Are you aware that as of February 2nd, 2024, the UCC's

20  counsel are owed approximately $600,000?

21  A    No, I'm not aware.

22  Q    Let's take a look at Tab 19, which is TCC Exhibit 133.

23  A    Okay.

24  Q    And do you see that this is the UCC's counsel -- or,

25  excuse me, the UCC response to interrogatories served by the

1    TCC?

2              THE COURT:  I got to tell you, counsel, I get what

3    you're doing.  But if he says he doesn't know, then putting

4    a document in there that shows what the number is I don't

5    think -- I'm not sure for what purpose you're using it.

6              MS. MEYERS:  Move on, Your Honor.

7              THE COURT:  Okay.

8              MS. MEYERS:  That's fine.

9              THE COURT:  Thank you.

10   BY MS. MEYERS:

11   Q    You would agree that the Debtor and TCC's professionals

12   have incurred fees since February 2nd, 2024, right?

13   A    I don't know.

14   Q    You don't know.

15   A    This was supposed to be settled by February.  This was

16   supposed to be long gone and paid.

17   Q    Right.  But the Debtor's and UCC counsel, for instance,

18   attended your deposition on February 8th, right?

19   A    Okay.

20   Q    Do you remember that?

21   A    Yes.

22   Q    Okay.  And you're aware that they've been attending

23   this hearing before the Court, right?

24   A    Yes.

25   Q    Do you know how much the Debtor's professionals are

1  currently owed today?

2  A    All I know is that they burned $11 million to date in

3  one year.  I don't know who's owed what.  I don't run the

4  accounting.

5  Q    Okay.  So I assume it's the same answer for the UCC's

6  professionals.

7  A    Exactly.

8  Q    Okay.  Does the DIP budget make funds available to pay

9  the Debtor and UCC's professionals without restriction?

10  A    Correct.

11  Q    That's correct.

12  A    Without restriction.

13  Q    Let's take a look at TCC Exhibit 2, which is Tab 17.

14  Do you recognize this as the motion for entry of the fifth

15  interim DIP order?

16  A    Okay.

17  Q    Seventeen.

18  A    Yes.

19  Q    And to your knowledge has the fifth interim DIP order

20  been entered?

21  A    No.

22  Q    Let's turn to the proposed order which starts on

23  Page 10 of 16.

24  A    10, I don't have Page 10.

25  Q    If you look at the top of the document, do you --

1  A     Oh, --

2  Q     -- see where it says --

3  A     -- I'm sorry.

4  Q     -- where it says Page 10 of 16?

5  A     Okay, got it.

6  Q     Okay.  Are you familiar with this proposed order?

7  A     Not necessarily, but the contents of.

8  Q     You're familiar with the contents.

9  A     Right.

10 Q     Okay.  And did you contribute to the contents in any

11 way?

12 A     From the M2 side, yeah.

13 Q     Okay.  So on behalf of M2, did you request certain

14 terms be included in this proposed order?

15 A     I don't know if I needed to request but I was involved.

16 Q     Let's turn to Paragraph 2 of the proposed order, which

17 starts on Page 11.  Do you see that this sets out conditions

18 for access to the DIP facility and cash collateral?

19 A     Correct.

20 Q     Okay.  And one of those conditions is that the Court

21 enter an order granting the 9019 motion; do you see that?

22 A     Correct.

23 Q     Okay.  So if the Court denies the 9019 motion, will M2

24 LoanCo advance any funds to pay the Debtor's professionals?

25 A     No.

1   Q    And what about the UCC professionals?

2   A    M2 would not continue funding.

3   Q    Okay.

4   A    Unless you can increase the collateral.

5   Q    Why does the proposed order condition DIP funds on the

6   approval of the 9019 motion?

7   A    Because of the settlement.  They're being asked to

8   forgive $15 million.

9   Q    So --

10  A    They're getting something in return.

11  Q    Right.  So if that settlement's not approved, M2 --

12  A    M2 does not forgive and M2 forecloses on its

13  collateral.

14  Q    Right.  So there's no more --

15  A    There's no --

16  Q    -- available under the DIP facility at that point.

17  A    And there's no more assets available to the Debtor and

18  creditors either.

19  Q    And that's a condition that M2 LoanCo demanded.

20  A    In the first order.

21  Q    What -- so if the Court denies the 9019 motion, Gray

22  Reed won't get paid their outstanding fees; is that right?

23  A    No one will get paid there because no one will fund it.

24  Money doesn't grow on trees.

25  Q    Okay.  So Ankura, Mr. Perry, they won't get paid

1   either.

2   A    Maybe they can utilize it from the estate.  But the

3   first $11 million is going to come back to M2 under the

4   secured loan.

5   Q    Okay.  So if the Court denies the 9019 motion, there is

6   no more available under the DIP facility to pay any of the

7   professionals.

8   A    Correct, unless you come up with new arrangements.

9   Q    Is there any side agreement by which the professionals

10  could get paid if the 9019 motion is denied?

11  A    I don't know of any side agreements.

12  Q    So you understand that Mr. Perry's paid out of the

13  Debtor's estate, correct?

14  A    Yes.

15  Q    Okay.  And --

16  A    Not Mr. Perry, it's Ankura.

17        MS. MEYERS:  Yes, excuse me, thank you.

18        THE WITNESS:  Okay.

19        MS. MEYERS:  Ankura gets paid out of the Debtor's

20  estate.

21  BY MS. MEYERS:

22  Q    And the Debtor needs money from M2 LoanCo to pay Ankura

23  in full; isn't that right?

24  A    Or they can get it from someone else.  There's other

25  DIP lenders around.

1   Q     Were there any other DIP lenders that came forward when

2   the DIP facility was initially put in place?

3   A     No.

4   Q     So according to this proposed order, the Debtor can

5   only get money from M2 LoanCo if the Court approves the --

6   grants the 9019 motion, right?

7   A     This particular order.

8   Q     Yes, this particular order.

9   A     Correct.

10  Q     So the money from M2 LoanCo under the DIP facility is

11  conditioned on the approval of the settlement that provides

12  for the releases set forth therein, right?

13           MS. HAYWARD:  Objection, asked and answered.

14           THE COURT:  Sustained.

15       (Pause in the proceedings.)

16  BY MS. MEYERS:

17  Q     Does the DIP financing structure make it such that the

18  Debtor's professionals have to secure the releases in the

19  settlement agreement in order to get paid?

20  A     I don't think so.

21  Q     Well how is that not the case?

22  A     M2 is funding a Debtor in possession.  M2 has limited

23  collateral.  And M2 is ready to fund only for the purpose

24  that a settlement gets approved.  The settlement doesn't get

25  approved, let them go find another DIP lender and let them

1  do the proceeds which whatever they wish, as long as the

2  first $11 million gets paid under the first four orders.

3  Seems Mr. Perry has over $30 million in assets.

4  Q    Right.  But the way this is set up with this order

5  conditioning DIP funding on an order granting the 9019

6  motion, doesn't that mean that if the Debtor's professionals

7  cannot get the settlement approved that includes the

8  releases for the released parties, that they are not going

9  to get paid?

10 A    I'm not certain they're not going to get paid.  There's

11 other monies.  They're claiming $4 million in bills.

12 There's over $30 million in what's coming in.  I don't know

13 what you --

14 Q    They get paid under the M2 LoanCo DIP facility, right?

15 A    Does it matter where they're getting paid from?

16 Q    I'm asking if the Debtor's professionals cannot get an

17 order granting the settlement that includes the releases,

18 they are not going to get paid from funds under the M2 --

19 A    I don't think --

20 Q    -- LoanCo DIP facility.

21 A    -- so.  I don't think so.  You're making a conclusion

22 that's not true.  M2 LoanCo is ready to fund another five

23 million in DIP financing, provided that there is a 9019

24 motion approved.

25 Q    Right.

1  A     Should the 9019 motion not get approved, that doesn't

2  mean that the professionals will not get paid.   There's

3  money in the estate.   They're going to get paid.

4  Q    They're not going to get paid from M2 LoanCo, though,

5  right?

6  A     I don't know who they're going to get paid from.   But

7  M2 Loan is not funding.   You want to get paid from M2

8  LoanCo, come up with additional collateral, we'll fund you

9  or we'll fund the Debtor and we'll pay.

10 Q    Mr. Lefkowitz, my question's very simple.

11 A     It's not so simple because you keep asking the same

12 question.   I keep giving you a very clear businesslike

13 answer.

14     M2 LoanCo not only is ready to fund, already has

15 funded.   We wired $2 million.   It's sitting in escrow

16 account.   There's another $3 million earmarked to be wired

17 to the Debtor so they can pay their professional fees.

18 Q    That's if the 9019 motion is granted.

19 A     If the 1990 motion is granted, then those DIP loans,

20 because it's in the same order, will get funded.

21     If the 1990 motion does not get, the DIP loan doesn't

22 get approved either.   If the DIP loan doesn't get approved,

23 then they're -- Mr. Gray Reed and Mr. Ankura, there is 400

24 DIP lenders in the country, go find yourself another DIP

25 lender.

1   Q    Thank you.  Mr. Lefkowitz, could you look at

2   Paragraph 5 of the proposed order?

3            THE COURT:  Which tab are we on?

4            MS. MEYERS:  This is still in Tab 17.

5            THE COURT:  Thank you.

6            MS. MEYERS:  It's page -- Paragraph 5 of the

7   proposed --

8            THE COURT:  Which --

9            MS. MEYERS:  -- order starts on Page 12 of 16.

10           THE COURT:  We're looking at the original proposed

11  order or the -- I'm just trying to think about which --

12           MS. MEYERS:  This is the proposed order for the

13  fifth interim DIP order.

14           THE COURT:  For the DIP.

15           MS. MEYERS:  Yes.

16           THE COURT:  Got it.  Thank you.

17           MS. MEYERS:  You're welcome.

18  BY MS. MEYERS:

19  A    Okay.

20  Q    Okay.  And then directing your attention to subpart

21  "B," says that two million will be advanced on February

22  20th, provided that the DIP lender's obligation to fund the

23  February advance shall not become due until either the

24  Bankruptcy Court has entered an order approving the 9019

25  motion or the TCC has agreed in writing not to object to the

1  Court's approval of the 9019 motion; do you see that?

2  A    Obviously Paragraph B is going to have to get, you

3  know, modified because February 20th is history.

4  Q    Right.  And you understand that the TCC does not -- has

5  objected to the 9019 motion, right?

6  A    Obviously.

7  Q    Right.  And you're aware that they've actually moved to

8  dismiss this case, right?

9  A    Yes.

10  Q    Okay.  So is that a problem for this case,

11  Mr. Lefkowitz, in your view?

12  A    I think it's a problem for everyone.

13  Q    Why is that?

14  A    Because basically you're just pushing everybody back

15  into litigation, everything's going to get destroyed.

16  Q    I think we discussed earlier -- you know what, strike

17  that.

18      Mr. Lefkowitz, can you please turn to Tab 14, which is

19  TCC Exhibit 120?

20  A    Yes.

21  Q    You're at Tab 14, TCC Exhibit 120, Mr. Lefkowitz?

22  A    Yes.

23  Q    Okay.  Do you recognize this document as a letter from

24  various U.S. senators --

25  A    Yes.

1    Q    -- to you and Mr. Sholey?

2    A    Yes.

3    Q    And this is a letter directed to you in your capacity

4    as the sole director of Tehum, right?

5    A    Yes.

6    Q    At your deposition you said you've never seen this

7    document before; do --

8    A    Correct.

9    Q    -- you remember that?  Okay.  And I think you said you

10   couldn't care less about this document, right?

11   A    Well now I do.

12   Q    Now you do; why is that?

13   A    Because you leaked information -- at the deposition,

14   you leaked information to the press.

15   Q    I did?

16   A    Yes.  Your -- I or your team.  Your questioning -- your

17   line of questioning was reported in the press while I was

18   sitting at a deposition.

19        So if you're asking me what this is, this is a hit

20   piece.  They don't know what they wrote here.  This is all

21   copy, paste from blogs.  None of this makes any sense.

22   Q    Are you calling into the -- into question the

23   authenticity of a letter from the U.S. Senate?

24   A    I didn't say authenticity.  I said copy, paste.

25   Q    You see this letter's dated October 24th, 2023, right?

1    A     Correct.

2    Q     Okay.  So that's months before your deposition, right?

3    A     But you know there's another letter, right, the other

4    letter, the exhibit that you showed Mr. Perry?  It's not the

5    same letter.

6    Q     Okay.  You had never seen this document before as of

7    your deposition, right?

8    A     Correct.

9    Q     Okay.  And in fact I think you refused to read it at

10   your deposition.  Have you --

11   A     Exactly.

12   Q     -- read it since then?

13   A     No.  It's a political piece.

14   Q     So you authorized Tehum to file for bankruptcy, right?

15   A     Correct.

16   Q     But you don't care that nine U.S. senators wrote a

17   letter to you stating that they believe that the --

18            MS. HAYWARD:  Objection, hearsay --

19   Q     -- bankruptcy was --

20            MS. HAYWARD:  -- as to what the letter says or

21   what the senators state within the letter.

22            THE COURT:  When --

23            MS. MEYERS:  I'm asking for his personal knowledge

24   about this.

25            THE COURT:  Yeah, I don't think she actually asked

1  the question.  Counsel, why don't you just let her finish

2  the question?

3  BY MS. MEYERS:

4  Q    I'm asking you --

5  A    Yes.

6  Q    -- if you don't care that nine U.S. senators --

7  A    Are questioning --

8  Q    -- question -- have questioned whether --

9  A    The Texas Two-Step law and the bankruptcy law, correct.

10         MS. MEYERS:  Mr. Lefkowitz, please let me ask --

11         THE WITNESS:  Sure.

12         MS. MEYERS:  -- my question.

13         THE WITNESS:  Go right ahead.

14         MS. MEYERS:  Thank you.

15  BY MS. MEYERS:

16  Q    I'm asking is it your testimony that you don't care

17  whether nine U.S. senators believe that Tehum's bankruptcy

18  was undertaken "to manipulate bankruptcy law with the aim of

19  skirting accountability for harms that incarcerated

20  individuals have endured under Corizon's care?"

21         MR. BROOKNER:  Objection, that's hearsay, quoting

22  a document not in evidence, etcetera.

23         MS. MEYERS:  Your Honor, I'm not offering it for --

24         THE COURT:  Well, --

25         MS. MEYERS:  -- the truth of matter --

1          MR. BROOKNER:  It doesn't matter.  She's --

2          THE COURT:  Yeah, but --

3          MR. BROOKNER:  I'm sorry, Your Honor.

4          THE COURT:  Hold on a second, folks.

5          MR. BROOKNER:  I'm sorry.

6          THE COURT:  But you didn't point him to something

7  in here to -- he says he's never seen the document, now

8  you're quoting from a document that he's never seen.

9          I think we at least have to kind of -- presuming

10 that what you're quoting is actually in the document -- and

11 it very well may be.  But I think you can ask him a general

12 question.  I just -- I have no idea if -- like --

13         MS. MEYERS:  Let me --

14         THE COURT:  -- where to take the question.

15         MS. MEYERS:  Let me back up a little bit.

16         MS. HAYWARD:  Your Honor, also I raise a relevance

17 objection.

18         THE WITNESS:  I think it's outrageous that you're

19 putting on the record this questioning.  You're feeding the

20 press on the screen.  You're giving tidbits to the press.

21 That's what you're doing.  It's got nothing to do with the

22 settlement --

23         THE COURT:  Hold on a second, folks.

24         THE WITNESS:  It's got nothing --

25         THE COURT:  Yeah, I know --

1         THE WITNESS:  Sorry.

2         THE COURT:  -- we -- I'm going to let you finish

3   your questioning.  How much longer do you have, counsel?

4         MS. MEYERS:  I would say no more than ten, 15

5   minutes, Your Honor.

6         THE COURT:  Okay.  Let's just get through it.

7   Let's go.  And then we'll take a break.

8   BY MS. MEYERS:

9   Q    Mr. Lefkowitz, you acknowledge that this --

10        THE COURT:  Hold on a second, folks.  I just want

11  questions asked, questions answered.

12        THE WITNESS:  Sorry.

13        THE COURT:  No, it's completely fine.  It's late

14  in the day.  We're a little hot, still hot outside in Texas.

15  And the -- it starts to get you in the windows here.

16        So why don't you just take another ten minutes and

17  then we'll take our break.  Thank you.

18  BY MS. MEYERS:

19  Q    But this is a document that was sent to you, right?

20  A    Okay.

21  Q    It says that here.

22  A    Could say it but I didn't receive it.

23  Q    Okay.  Are you aware that Tehum's bankruptcy counsel

24  responded to this letter?

25  A    I heard about it.  I didn't read the Tehum's response.

1    Q    Okay.  So this letter did make it to Tehum; that fair?

2    A    I don't know.

3    Q    Well how could Tehum's counsel have responded to a

4    letter that they never received?

5    A    Through a phone call.  How do I know?  You're asking me

6    if I have direct knowledge if Tehum's counsel received it.

7    Sitting here today, I swear I don't know if Tehum's counsel

8    received it.

9    Q    Okay.

10            THE COURT:  Just to be clear, Mr. Lefkowitz,

11   you've never -- you never -- your testimony is that you

12   never received a copy of this letter.

13            THE WITNESS:  Correct.

14            THE COURT:  Okay.

15   BY MS. MEYERS:

16   Q    You're aware of this letter now, though, right?

17   A    Yes.  It was -- it's on the screen.  It was on the

18   screen in the morning.

19   Q    But you haven't taken a look at it since your

20   deposition.

21   A    Right.

22   Q    Well let's look at Tab 15, which is TCC Exhibit 16 --

23   116, excuse me.

24   A    Right.

25   Q    So I showed you this document at your deposition as

1  well, right?

2  A    Right.

3  Q    Okay.  And this is Tehum's --

4  A    Response.

5  Q    -- response to the letter that we just looked at.

6  A    Correct.

7        THE COURT:  I'm sorry, I just have quick question.

8  So there was a letter written by nine U.S. senators, and

9  your testimony is you've never seen this letter before it

10 was written, before your deposition.

11       THE WITNESS:  Even before the deposition, correct.

12       THE COURT:  Okay.  Thank you.

13       MS. MEYERS:  Okay.

14 BY MS. MEYERS:

15 Q    So and you said you've never seen this document before

16 either, right?

17 A    Correct.

18 Q    So as the sole director of Tehum, you don't know how

19 this response to a letter from nine senators was prepared.

20 A    I heard this morning that Mr. Perry and Mr. Gray Reed.

21 They didn't involve me in this response.

22       MS. MEYERS:  Your Honor, I would move in TCC

23 Exhibit 116 into evidence.

24       THE COURT:  Objection --

25       MS. MEYERS:  It's a statement of a party opponent.

1   It's the Debtor's --

2           MR. BROOKNER:  I think it's already in, Your

3   Honor.

4           THE COURT:  Oh.

5           MS. MEYERS:  Is it?  Okay.

6           MR. BROOKNER:  Yeah.

7           THE COURT:  To the extent it it's not, it is now.

8       (TCC Exhibit 116 was received in evidence.)

9       (Pause in the proceedings.)

10  BY MS. MEYERS:

11  Q    Let's turn to Tab 16, if you could, in TCC Exhibit 121.

12  A    Okay.

13          MS. MEYERS:  It's Tab 16, TCC Exhibit 121.  So

14  this is not in evidence.

15  Q    So have you seen this document before, --

16  A    No.

17  Q    -- Mr. Lefkowitz?  Okay.

18  A    Be up to me, I wouldn't respond to any of these

19  documents.

20  Q    I'm sorry?

21  A    I said would be up to me, I would not -- I wouldn't

22  spend any legal money to respond to these documents.

23  Q    And why is that?

24  A    Because it's all political pieces.  It's got nothing to

25  do with reality.

1  Q    But does it concern you that nine U.S. senators have

2  taken an interest in what's going on in this bankruptcy

3  case?

4  A    That's what they're in Washington for.  Let them do

5  legislation, let them undo laws, let them change, let them

6  change the Bankruptcy Code, let them change the Texas Two-

7  Step.  But we have done nothing wrong.

8  Q    I understand that that's your position.  I'm asking you

9  as the sole director of Tehum does it concern you that U.S.

10 senators have taken an interest in this bankruptcy process?

11 A    No, because they've written letters to every competitor

12 of ours.  They've -- they're anti-correctional healthcare.

13 So it's known it's a political piece in Washington that

14 states and federal government should take back healthcare.

15 It's got nothing to do with me or it got nothing to do with

16 the 5,000 employees of YesCare.

17         MS. MEYERS:  If I could just step away one second,

18 Your Honor.

19         THE COURT:  Sure.

20         MS. MEYERS:  I have no further questions, Your

21 Honor.

22         THE COURT:  Okay, thank you.

23         Does anyone else have any questions for this

24 witness?

25     (No audible response.)

1           Any Redirect?

2           MR. BROOKNER:  Nothing from the Debtor, Your

3  Honor.

4           THE COURT:  Okay, thank you.

5           Mr. Lefkowitz, thank you very much for your time.

6           THE WITNESS:  Thank you.

7      (Witness steps down.)

8           THE COURT:  Yes.

9           MS. HAYWARD:  I think we were just standing for

10  the Court, Your Honor.

11          THE COURT:  Oh, no.  I was just --

12     (Laughter)

13          THE COURT:  -- going to -- just giving to the

14  witness --

15          MS. HAYWARD:  We expected a break maybe.  I --

16          THE COURT:  Just trying to --

17          MR. BROOKNER:  (Indiscernible), Your Honor.

18          THE COURT:  Just in terms of housekeeping, in

19  terms of the next witness, are we going to get done in time

20  or --

21          MR. SPEAKER:  Yeah, we're going to get there, Your

22  Honor, we will.

23          THE COURT:  All right.  I'm going to give you all

24  a hard 8:00 o'clock to do that.

25          MR. SPEAKER:  We will --

1            THE COURT:  Let's take five minutes and then we'll

2   come back.  Thank you.

3            THE CLERK:  All rise.

4        (Recess taken from 6:03 p.m. to 6:17 p.m.)

5            THE COURT:  Be seated.  Okay.  Back on the Record

6   in Tehum.  But before we -- oh, go ahead, counsel.

7            MR. MOXLEY:  No, please, Your Honor.  I'm sorry.

8            THE COURT:  No, I was just going to ask, it sounds

9   like we're going now to --

10            MR. MOXLEY:  Mr. Griffiths.

11            THE COURT:  -- this is one of your witnesses,

12   right?

13            MR. MOXLEY:  Yes, that's right, Your Honor.

14            THE COURT:  So I just want to know if movants have

15   rested at this point, or whether we're going -- or whether

16   we're still going out of order.  I just kind of --

17            MR. MOXLEY:  I think we're --

18            THE COURT:  -- want to make sure that I understood

19   kind of what we were doing.

20            MR. MOXLEY:  Still going out of order, Your Honor.

21            THE COURT:  Just so we're all on the same page.

22            MR. ZLUTICKY:  Your Honor, we are going out of

23   order, so on --

24            THE COURT:  Perfect.

25            MR. ZLUTICKY:  -- Wednesday, we'll pick up David

1 Barton, who's the UCC representative who the Court heard

2 testimony --

3          THE COURT:  Oh, yes.

4          MR. ZLUTICKY:  -- I think, the first day.  And

5 then we'll have Matt Dundon, of Dundon Financial, also.

6          THE COURT:  Oh, perfect, okay, thank you.  Just

7 wanted to make sure that -- that's what I wanted to make

8 sure the record was clear about.

9          MR. ZLUTICKY:  Yes, Your Honor.

10          THE COURT:  Okay.  All right.

11          MR. MOXLEY:  Your Honor, Cameron Moxley for TCC.

12 As Your Honor just referenced on the Record, we are taking

13 the witnesses out of order, no particular party's rested

14 just yet.  We would call to the stand now, Scott Griffiths.

15          THE COURT:  Okay.  Mr. Griffiths, come on up.

16          MR. MOXLEY:  And Your Honor, as Mr. Griffiths' is

17 taking his seat, I'll just note that I have provided to the

18 Court, I believe you have it, and at the bench now, Your

19 Honor, a copy of the binder.  There's one for Mr. Griffiths

20 at the witness stand.  And copies have been distributed

21 around the courtroom as well.

22          MR. MOXLEY:  Okay.  Thank you.  Okay.

23          THE COURT:  Mr. Griffiths, can you please raise

24 your right hand?

25      (Witness sworn.)

1        THE COURT:  Okay.  And let the Record reflect that

2   the witness has been properly sworn in.  Counsel, you may

3   proceed.

4        MR. MOXLEY:  Thank you, Judge.

5            DIRECT EXAMINATION OF SCOTT GRIFFITHS

6   BY MR. MOXLEY:

7   Q    Good afternoon, Mr. Griffiths.

8   A    Good afternoon.

9   Q    Sir, in questioning today, we may make some reference

10  to the official Committee of Tort Claimants.  May you and I

11  understand each other if we use the phrase TCC, to refer to

12  the official Committee of Tort Claimants?

13  A    Sure.

14  Q    Okay.  Mr. Griffiths, approximately when was the TCC

15  appointed?

16  A    The TCC was appointed, I believe, November 20, 2023.

17  Q    And Mr. Griffiths, what is your connection to the TCC?

18  A    I'm an attorney.  I represent a member of the TCC,

19  Nathan Alvarez.

20  Q    And is Mr. Alvarez in the courtroom today, sir?

21  A    Nathan Alvarez couldn't make it today.  He was here on

22  day one of trial, of this hearing.  But he's not here today.

23  He had a transmission problem.  He was on his way in and he

24  had transmission issues.

25  Q    Thank you.  I hope everything's okay with Mr. Alvarez'

1  vehicle.  Have you been deposed in connection with this

2  case, sir?

3  A    I was deposed.

4  Q    In what capacity were you deposed?

5  A    The TCC's 30(b)(6).

6  Q    And does the TCC hold meetings?

7  A    They do.

8  Q    How often?

9  A    Weekly.

10  Q    And do you typically attend those meetings?

11  A    Typically I attend them, yes.  I think I've missed one.

12  Q    Okay.  After the TCC was appointed, Mr. Griffiths, what

13  initial steps did it take?

14  A    It engaged the counsel, Brown Rudnick.  Michael

15  Zimmerman engaged Michael Atkinson and Provence, and then

16  began investigation as to claims.

17  Q    Okay.

18  A    Causes of action.

19  Q    You mentioned the TCC engaged Provence and Mr. Atkinson

20  as an advisor.  Has he prepared a declaration or report in

21  connection with this case?

22  A    He did.

23  Q    Okay.  And when was Mr. Atkinson's report completed?

24  A    I believe it was February 23, 2024.

25  Q    And when in time, Mr. Griffiths, were you deposed as

1    the TCC's Rule 30(b)(6) designee?

2    A    About two weeks before.  I think it was February 12,

3    2024.

4    Q    At the time of your deposition, was the TCC's

5    investigation still ongoing?

6    A    It was.

7    Q    What was the TCC investigating?

8    A    Just potential causes of action in this case.

9    Q    Did the TCC identify any potential causes of action?

10   A    We did.  We identified four causes of action that are

11   kind of mentioned in the 9019 motion, and then three

12   additional causes of action.

13   Q    Tell the Court what additional three causes of action

14   TCC's investigation identified?

15   A    There were causes of action identified for missed

16   business opportunities, or misappropriated business

17   opportunities.  And then the alter ego and successor

18   liability claims.

19   Q    Okay.  You mentioned, Mr. Griffiths, that the first

20   four are addressed in the Rule 9019 motion.  Let's just look

21   for efficiency sake quickly at that motion.  That's Tab 2 of

22   the binder you have there in front of you, sir.  If you look

23   at Tab 2, you'll find what's marked as TCC Exhibit 125.  You

24   see this is the Rule 9019 motion itself?

25   A    Yes.

SCOTT GRIFFITHS - DIRECT BY MR. MOXLEY                    380

1  Q    Okay.  And if you look at Paragraph 27, of that motion,

2  which is on page, just for the record, 12 of the document?

3  A    Page 12, yeah.

4  Q    Are you there, sir?

5  A    Yeah.

6  Q    And you see the list of A through D, as part of

7  Paragraph 27 there.  Are those the four that you had in

8  mind?

9  A    Those are the four, yes.

10  Q    Okay.  With respect to the first three of those on the

11  list, the potential avoidance actions related to the

12  transfers to M-2, Geneva, and that benefitted Pharmacore

13  (phonetic) and Peregrow (phonetic).

14      Do the TCC's views as to those causes of action

15  generally align with the Debtors and UCC's views on those

16  causes of action as they are outlined in the Rule 9019

17  motion?

18  A    Generally, yes, they do.

19  Q    Okay.  Does the TCC agree that those transfers that

20  would be the subject of those causes of action total

21  approximately $30.5 million, as set forth in the transaction

22  tables for those causes of action in the Rule 9019 motion?

23  A    Yes.

24  Q    And what are the TCC's views on the likelihood of

25  success on the merits of the avoidance actions concerning

1  those transfers involving M-2, Geneva, and Peregrow,

2  Pharmacore?

3  A    The likelihood of success is high.  There's not really

4  any defenses to it.  They're standard, they seem to be

5  standard claw back provisions that are done in bankruptcy

6  cases, especially considering the timing of these transfers

7  and the filing of the petition.

8  Q    And what are the TCC's views, Mr. Griffiths, on the

9  amount of a judgment that could be obtained on these causes

10 of action?

11 A    I believe there'd be a full amount, the 30.5 million.

12 Q    Okay.  Let's talk a little bit now about that fourth

13 set of causes of action, those arising out of divisional

14 merger.  Those are addressed by the Debtor and the UCC at

15 Paragraph 34 of the Rule 9019 motion, right?

16 A    Yes.

17 Q    Okay.  Was the TCC able to determine the value of the

18 assets ultimately transferred to YesCare as part of the

19 divisional merger?

20 A    No.

21 Q    Is the value of assets ultimately transferred to

22 YesCare as part of the divisional merger something that you

23 think is knowable?

24 A    I think it's knowable, yes.

25 Q    How would you go about finding out that information?

1  A    Well, we had Mr. Atkinson and the Provence firm look at

2  that, and they came back and said there really isn't any way

3  to know given the information that was given to them.

4  Q    Okay.  So your understanding of Mr. Atkinson's

5  conclusion is that he wasn't able to value the assets

6  ultimately transferred to YesCare, is that right?

7  A    That's what he says in his report, yes.

8  Q    Okay.  What does that -- strike that.  And what's your

9  understanding about why that is that Mr. Atkinson wasn't

10  able to reach a conclusion?

11  A    Just I think if I remember right, the information

12  wasn't provided, not enough was given to them, to him to be

13  able to make a determination through his investigation.

14  Q    Okay.  And what does the lack of information with

15  respect to the value of the assets ultimately transferred to

16  YesCare, what does that lack of information tell you about

17  the -- strike that.

18      What does the lack of information with respect to the

19  value of the assets ultimately transferred to YesCare mean

20  with respect to the TCC's views on the value of the causes

21  of action arising from the divisional merger?

22  A    Well, I mean we don't know the value.  There's no way

23  to know what the value of that is right now.

24  Q    Okay.  But looking at Paragraph 34 of the Rule 9019

25  motion, those causes of action arising from the divisional

1   merger, those are part of what's being settled under the

2   Rule 9019 motion if the settlement agreement is approved,

3   correct?

4   A    That's my understanding, yes.

5   Q    Okay.  And that's even though that no value is

6   particularly ascribed to them by the Debtor or by the TCC,

7   right?

8   A    Correct.

9   Q    Okay.  And how -- so those causes of action arising

10  from the divisional merger if the settlement agreement is

11  approved would be released, is that right?

12  A    They would be released, and really nothing given in

13  consideration for those.  To my understanding, nothing would

14  be given in consideration for those.

15  Q    What's your and the TCC's views on the likelihood of

16  success on the merits of the causes of action arising from

17  the divisional merger?

18  A    Well, we, like before, think that's a very high --

19  excuse me.  This chair.

20  Q    The chair?

21  A    Yeah, sorry.  We think it's a very high likelihood of

22  success.  There's really like a clear intent to defraud --

23  in the TCC's mind, a clear intent to defraud the estate here

24  because all the assets have been moved from the Debtor away,

25  and not only the assets but like contracts and business.

1  Q    You think that the Texas Business Organizations Code

2  creates any barrier to bringing causes of action arising out

3  of the divisional merger?

4  A    I do not think --

5           MR. PATTERSON:  I'm going to object, Your Honor.

6  I don't think he's here as an expert.  That's an opinion,

7  that's a legal opinion regarding that.

8           MR. MOXLEY:  Your Honor, as Your Honor knows, the

9  motion itself sets forth a view with respect to whether or

10 not those claims are likely to succeed, or whether the

11 theories they're based on are novel or not.  And as Your

12 Honor I know knows, both Mr. Barton and Mr. Perry have also

13 testified on that.

14          Mr. Barton's not an expert witness.  He was

15 permitted on behalf of the UCC to testify with respect to

16 his views with respect to the Texas Business Organizations

17 Code being a barrier.  And we would like for the TCC to be

18 able to have its witness testify as to the TCC's views with

19 respect to that code provision.

20          MR. PATTERSON:  That doesn't change who this

21 witness is.

22          THE COURT:  Yeah.

23          MR. PATTERSON:  They may not have objected to it,

24 but he's not an expert.

25          THE COURT:  I think that's right.  Sustained.

1            MR. MOXLEY:  Let me show you paragraph -- strike

2   that.

3            What are the TCC's views on the value of the

4   causes of action arising from the divisional merger?

5            MR. PATTERSON:  Same objection, Your Honor, that's

6   opinion testimony and valuation, and he's not here as an

7   expert.

8            MR. MOXLEY:  I'm not asking him for an expert

9   valuation, Your Honor.  The other --

10           THE COURT:  How are you using the term value?

11  Just in terms of just how you're defining it.  That's more

12  where I'm going.

13           MR. MOXLEY:  Okay.  We're trying to understand,

14  sir, whether or not -- we're trying to be able to have

15  Mr. Griffiths provide his views with respect to whether or

16  not the claims arising from the divisional merger have

17  value.  So understand whether he thinks they have value.

18           The Debtor and the UCC in their motion and their

19  witnesses have testified with respect to their views with

20  respect to those causes of action likely have any value,

21  whether they're novel, whether they should be discounted.

22           THE COURT:  Yeah, I know.  I'm going to allow just

23  whether he thinks they have value, and then we'll see where

24  this goes in terms of further questions.  So you can answer

25  the question.

1   BY MR. MOXLEY:

2   Q    So I'm going to rephrase that question, Mr. Griffiths.

3   Do you think that the causes of action arising from the

4   divisional merger that the TCC investigated have any value?

5   A    I do, yes.

6           MR. MOXLEY:  What's that view based on?

7           MR. PATTERSON:  Objection, well, I'm sorry.

8           THE COURT:  Go ahead.  What's that view based on?

9           MR. GRIFFITHS:  The view's just based on --

10          THE COURT:  The question?

11          MR. GRIFFITHS:  -- the idea that the material, the

12  avoidance action that we're talking about, my understanding

13  of the avoidance action is that it's the business entity or

14  the business assets of the Debtor have been moved to either

15  CJIS Texas (phonetic) or YesCare, and they didn't get

16  anything in return.  But we don't know what that number is.

17  We just know that it has value.

18  BY MR. MOXLEY:

19  Q    Mr. Griffiths, are the TCC's views about the settlement

20  informed by the Texas Divisional Merger statute?

21  A    I guess maybe repeat that, or restate it?

22  Q    Yes.  Are the TCC's views about the settlement informed

23  by the Texas Divisional Merger statute?

24  A    I guess to an extent, the Texas Divisional, or the

25  Texas Business Code that I've seen just simply says that the

SCOTT GRIFFITHS - DIRECT BY MR. MOXLEY                 387

1   creditors' rights won't be abridged, right.

2   Q    Does the TCC think that any discount should be given to

3   the avoidance claims based on the Texas statute?

4   A    No.

5            MS. ENGLAND:  Objection, Your Honor, we're back to

6   the same legal conclusions that expert testimony about the

7   impact --

8            THE COURT:  I'm not sure he testified about the

9   impact.  He's just wondering whether there ought to be a

10  discount, right, in terms of --

11           MR. MOXLEY:  That's right.

12           THE COURT:  -- the settlement.  Now I think this

13  is going towards the settlement, not the merits of the

14  settlement as opposed to kind of what he thinks the right

15  number should be, and in an expert capacity so I'll let you.

16  Overruled.  He can answer the question.

17           MR. GRIFFITHS:  Can you reask?

18  BY MR. MOXLEY:

19  Q    I'll reask it, Mr. Griffiths.  Does the TCC think that

20  any discount should be given to the avoidance claims based

21  on the Texas statute?

22  A    No.

23  Q    And why is that, sir?

24  A    The Texas statute is pretty straightforward about being

25  -- rights, creditors won't be abridged.

1  Q    Is there a particular provision of the Texas statute

2  that you have in mind in that last answer?

3  A    I think it's --

4           THE COURT:  Now you're getting into the --

5           MR. MOXLEY:  Okay.  I'll --

6           THE COURT:  Quoting statute land, and so go ahead.

7           MR. MOXLEY:  -- move on, Your Honor.  Thank you.

8  BY MR. MOXLEY:

9  Q    So you mentioned, Mr. Griffiths, that there were seven

10 claims or causes of action TCC identified, the first four of

11 which were covered by the Rule 9019 motion.  And you

12 identified three additional ones in your testimony a few

13 moments ago.  Do you recall that?

14 A    Yes.

15 Q    What was the next cause of action that TCC identified

16 in its investigation?

17 A    The misappropriation of business opportunity.

18 Q    Explain what you mean by that?

19 A    Well, my understanding is that in -- prior to or at the

20 time of the divisional merger, Corizon or Tehum employees,

21 officers, agents created multiple companies and entities

22 that would be able to compete with or answer to RFP.  And I

23 think I heard Mr. Lefkowitz discuss that as well.

24      But different entities were able to start using

25 Corizon's knowledge or the fact that they've been out

1   25 years, or 30 years, you know, hold themselves out as
2   experienced in the health care field for corrections.  And
3   so they were able to start submitting for RFP's and get
4   contracts.
5   Q    Approximately how many such entities did the TCC's
6   investigation reveal were created?
7   A    I think I saw in Mr. Atkinson's report 25 plus, but I
8   don't think we know the number.
9              MR. PATTERSON:  Object, Your Honor, that's
10  hearsay.  It's reading from a report.  Hearsay -- it's not
11  here.
12             MR. MOXLEY:  Your Honor --
13             MR. PATTERSON:  His knowledge is reading someone
14  else's --
15             THE COURT:  Hold on a second.  I've got the
16  objection.  What's the response?
17             MR. MOXLEY:  Your Honor, the response is, this
18  witness from the TCC is describing the investigation and
19  what was found in the investigation.  He is an attorney.
20             THE COURT:  It's not offered for the truth of the
21  matter.  It's just background in terms of what he did for
22  the investigation.
23             MR. MOXLEY:  Background and what the investigation
24  revealed.
25             THE COURT:  Overruled.  He can answer.

1  BY MR. MOXLEY:

2  Q    And I believe that you did answer.  But let me just ask

3  the question again so the record is clean.  Approximately

4  how many of those entities were created that the TCC's

5  investigation found?

6  A    My understanding is 25 plus.

7            MR. MOXLEY:  Is one of those opportunities a

8  contract with the Alabama prison system?

9            MR. PATTERSON:  We'd have the same objection, Your

10 Honor.  The basis of the question lends itself to this is

11 true.  If he's testifying he knows this to be a fact, we

12 don't have a basis for that other than the report.

13           The way you described it was, this is what they

14 found out or was reported to the committee.  He's now

15 testifying that it is, in fact, the truth.  I don't know, he

16 hasn't testified to the basis of that other than reading it

17 in a report --

18           MR. MOXLEY:  Your Honor, may I be heard?

19           THE COURT:  Uh-huh.

20           MR. MOXLEY:  Your Honor, it is the same objection,

21 and Your Honor's ruling from the last objection should apply

22 here as well.  This is a factual question about what the

23 TCC's investigation uncovered.  The TCC is a committee.  It

24 has to speak through someone.

25           Mr. Griffiths has testified that he has attended

1   all but one of the committee's weekly meetings.  He's

2   familiar with the investigation and what was found in it.

3   And I think he has knowledge of that, and he should be able

4   to testify as to what --

5                THE COURT:  Right.

6                MR. MOXLEY:  -- the investigation revealed.

7                THE COURT:  And I'm taking his testimony for what

8   it's worth, for what his understanding is and not

9   necessarily that there are actually 25 entities formed.  I

10  mean I don't have knowledge of that, but I can take it that

11  they -- so I'll allow for that purpose, as to his

12  understanding based on this investigation.

13               MR. MOXLEY:  Thank you, Judge.

14  BY MR. MOXLEY:

15  Q    So Mr. Griffiths, let me ask my question again.  Is one

16  of those opportunities a contract with the Alabama prison

17  system?

18  A    That's my understanding, yes.

19  Q    What's your understanding of the amount of that

20  contract?  How much is it worth?

21  A    I believe it's -- what I've heard is a billion dollars.

22  Q    Okay.  What are the TCC's views regarding the value of

23  the business opportunities that were misappropriated?

24  A    Well, it starts at a billion.

25               MR. PATTERSON:  I'm going to object, Your Honor.

1  Now valuation --

2           THE COURT:  Yeah, I'll sustain that one.

3  BY MR. MOXLEY:

4  Q    Mr. Griffiths, what's your understanding of whether or

5  not the misappropriated business opportunities have value?

6  A    Well, I believe, and my understanding is that they do

7  have value, and there are probably other contracts as well.

8  We don't know.

9           MR. PATTERSON:  I'll object to the last part of

10 his speculation, Your Honor, speculating that --

11          THE COURT:  Overruled.

12          MR. MOXLEY:  Oh, I'm sorry.  You can answer the

13 question, Mr. Griffiths.

14          THE COURT:  I think he already did.

15          MR. MOXLEY:  Oh, sorry, I apologize.  I was

16 waiting for the answer.  Apologize.

17 BY MR. MOXLEY:

18 Q    And what was your answer, Mr. Griffiths?

19 A    Well, I'll just say that we know that it has value, and

20 we believe there are more contracts.

21 Q    Okay.  And does the TCC have a view regarding the

22 likelihood of success on the merits of the misappropriation

23 of business opportunities causes of action?

24 A    Well, we believe that we'd be successful with that as

25 well.  We think that there's a clear attempt to defraud the

1  creditors here.  I think that the trail would show that

2  there'd be these opportunities have been lost and contracts

3  have been given to entities that have been formed.

4  Q    Does the TCC's views regarding the value of the claims

5  from misappropriation of business opportunities inform the

6  TCC's view of the proposed settlement?

7  A    I'm sorry, what?

8  Q    Do the TCC's views regarding the value of the claims

9  for misappropriation of business opportunities inform the

10 TCC's view of the proposed settlement?

11 A    Well, I'm sorry.  I guess I'm just missing your

12 question.

13 Q    Sure.  Does the fact that the TCC believes there is

14 value to those claims?

15 A    Okay.

16 Q    Strike that.  Do you have an understanding of whether

17 or not those claims would be released by the settlement

18 agreement?

19 A    My understanding is that those claims would be released

20 by the settlement agreement.

21        MR. PATTERSON:  Objection as to relevance, Your

22 Honor.  As best evidence, we have a document.  What he

23 believes doesn't matter.

24        THE COURT:  Overruled.

25        MR. PATTERSON:  We have a proposed agreement.

1          THE COURT:  It's his understanding.  I think

2  that's fair.  Overruled.

3  BY MR. MOXLEY:

4  Q    Go ahead, Mr. Griffiths.

5  A    Repeat the question, please?

6  Q    Sure.  The question, Mr. Griffiths, is -- let me do it

7  a slightly different way if I could.  It's okay.  Let me

8  just do it a slightly different way.  What is the TCC's

9  understanding of what effect on the misappropriation of

10  business opportunities claims, the settlement agreement

11  would have?  How would the settlement agreement affect those

12  claims?

13  A    The settlement agreement would dismiss those, or

14  release those claims.

15  Q    Okay.  And are those claims, to your knowledge, to the

16  TCC's knowledge, are they addressed explicitly in the

17  Rule 9019 motion?

18  A    No.

19  Q    And does the fact that those claims would be released,

20  and that they're not addressed by the Rule 9019 motion but

21  they would be released, does that inform the TCC's view of

22  whether or not this is a good settlement?

23  A    Well, the TCC -- yeah, the TCC does not believe that

24  it's a good settlement when business opportunities have been

25  lost and directors and agents and officers of Corizon have

1  created competing companies and have lost business for

2  Corizon for those other companies.

3  Q    Okay.  Are the claims from misappropriation of business

4  opportunities in the shopping cart or grocery cart as we've

5  been using that analogy in this case?

6  A    That analogy, yes.

7  Q    Yeah.

8  A    Yes, it is.

9  Q    Okay.  And does the settlement appear to take the value

10 of those claims into consideration?

11 A    It doesn't put a value to them so it doesn't really

12 take them into consideration.

13 Q    Okay.  So they're in the grocery cart, but they're not

14 valued, is that right?

15 A    Yes.

16 Q    Okay.  And you mentioned there was a sixth claim or

17 cause of action that the TCC identified with respect to

18 successor liability, is that right?

19 A    Successor liability, yes.

20 Q    Can you just explain what that is?

21 A    Successor liability would be continuing -- or it's a

22 way to recover from entities that continue on the business

23 of a tortfeasor.  So in this particular case, if Corizon has

24 creditors or they're a tortfeasor, and there's a way to

25 recover, you can recover against Corizon or Tehum, the

1  Debtor.  And then their successor liability would allow

2  continuing companies to be used for recovery as well.

3  Q    And are the underlying claims you have in mind with

4  respect to these successor liability theories of recovery,

5  are the underlying claims the personal injury and wrongful

6  death claims against the Debtor?

7  A    Personal injury --

8            MR. PATTERSON:  Your Honor, leading the witness.

9            THE COURT:  Sustained.

10  BY MR. MOXLEY:

11  Q    What are the underlying claims on which the successor

12  liability theory of recovery would be asserted?

13  A    Sure, personal injury, wrongful death, section 1983,

14  14th Amendment, Eighth Amendment, cruel and unusual

15  punishment.

16  Q    What's the harm alleged?

17  A    Wrongful death, personal injury, the 14th Amendment,

18  Eighth Amendment, cruel and unusual punishment, those types

19  of claims.

20  Q    And who suffered those damages?

21  A    Either inmates, or if in the case the inmate's passed

22  away, their families.

23  Q    Did the Debtor suffer any damages on the personal

24  injury or wrongful death or section 1983 claims?

25  A    No.

SCOTT GRIFFITHS - DIRECT BY MR. MOXLEY          397

1   Q    And who would the defendants on those successor

2   liability theories of recovery be?

3   A    My understanding it would be YesCare, maybe CHS Texas

4   at this point, and I don't know, based on what I heard

5   Mr. Lefkowitz talk about, CHS Alabama as well.

6   Q    Why those entities?

7   A    Because they've continued on the business, and hold

8   themselves out as Corizon.

9   Q    And you mentioned, Mr. Griffiths, that you represent

10  Mr. Alvarez?

11  A    I do.

12  Q    He's a member of the TCC?

13  A    He is.

14  Q    Would you describe for the Court the nature of

15  Mr. Alvarez' injury?

16  A    Sure.  And for the Court to know, I am an ambulance

17  chasing inmate representing attorney, right, and that was

18  kind of talked about.  But the nature of his injuries is he

19  was in prison, and when he was in prison, he broke his tibia

20  and fibula which are the two bones that go down just above

21  your ankle.

22       And when he broke those, it took him 30 days to get to

23  see a doctor, a surgeon.  But the surgeon that they sent him

24  to -- I'm sorry, let me take that back.  The second day

25  after his injury, they took him to the hospital, and the

1   hospital gave him a CT scan and told him that he needed

2   surgery.        Corizon made a decision to pull him away and

3   return him to the prison.  Thirty days later, they took him

4   to an arm surgeon, someone who deals with the wrists and

5   elbows.

6           MR. PATTERSON:  Your Honor, I hate to interrupt.

7   This is all hearsay.

8           MR. MOXLEY:  Your Honor --

9           MR. PATTERSON:  This is not relevant.

10          MR. MOXLEY:  -- I'd like to ask the witness have

11  an opportunity to answer the question.  I asked him to

12  describe the --

13          THE COURT:  I'm going to overrule it.  I do -- I

14  find it relevant.  I'm not sure -- I think is that that's

15  what his client's alleging happened.  So overruled.

16  BY MR. MOXLEY:

17  Q    Go ahead, Mr. Griffiths.

18  A    All right.  So on day two, he got an MRI, or sorry, a

19  CT scan that showed his bone was broken and the doctors at

20  the hospital, Yuma Regional Medical Center told him that he

21  needed to have surgery.  Corizon had him returned to the

22  prison.

23      At day 30, they sent him to a surgeon, Dr. Runyon

24  (phonetic), also that works next to the Yuma Regional

25  Medical Center, and Dr. Runyon only works on wrists and

1   elbows.  And Dr. Runyon said, hey, you probably need

2   surgery, you need to go back and get this looked at.

3       They took him to the hospital twice for more MRI's, or

4   CT scans and imaging.  He saw Dr. McClure who's a surgeon at

5   Yuma Regional Medical Center, and she also recommended

6   surgery.  And at day 101, after his broke his leg, Corizon

7   had him sent to see Dr. Ahlmed (phonetic), also at the Yuma

8   Regional Medical Center.

9       And Dr. Ahlmed said, hey, you need surgery but if

10  you're not going to get it, let's give you physical therapy.

11  Now along the way, he didn't get a cast or a boot.  He only

12  got an Ace bandage and a crutch, and then sometimes along

13  the way, he got a wheelchair.

14  Q    What is the outlook for Mr. Alvarez with respect to

15  these injuries?

16  A    He still hasn't had any surgery.  He finished his

17  physical therapy in July, 2019, and was discharged in the

18  beginning of August.  He didn't have the surgery and he

19  still has a broken leg today, or his leg's been healed but

20  his leg's healed kind of cattywampus so he -- I joke with

21  him but as I say, he walks like a pirate, because his one

22  foot that walks forward and the other one walks off to the

23  side.

24  Q    Was Mr. Alvarez injured prior to the divisional merger?

25  A    He was.  It was February, 2019.

1    Q     You're Mr. Alvarez' attorney, correct?

2    A     That's correct.

3    Q     Could Mr. Alvarez seek to recover damages for his

4    injuries against YesCare and CHS Texas on a successor

5    liability theory of recovery?

6    A     He could.

7    Q     What does the Debtor in the settlement agreement

8    proposing to do with Mr. Alvarez' cause of action against

9    YesCare on a successor liability theory of recovery?

10   A     If the settlement goes through, then his case is going

11   to be settled as part of that settlement.

12   Q     Would that claim be released?

13   A     It would be released.

14   Q     Does Mr. Alvarez know that?

15   A     He does know that.

16   Q     Does Mr. Alvarez want the Debtor to release his claim

17   against YesCare under successor liability theory of

18   recovery?

19   A     Yes, without waiving the attorney client privilege, he

20   wants to continue his litigation against Corizon or Tehum

21   and everybody else.

22   Q     To you knowledge, is there any document in the record

23   in this case that attributes a dollar figure estimate to

24   Mr. Alvarez' injury?

25   A     I've seen for a brief moment a document in this case

1  that had a value ascribed to his case, yes.

2  Q    What was that value ascribed?

3  A    400,000 to $749,000.

4  Q    Do you know whether under the proposed settlement

5  Mr. Alvarez would recover something in the range that you

6  just mentioned?

7  A    I wouldn't think that he would.  I don't know because

8  there's no numbers that have been formally put down, and we

9  don't know how much would go to any of the tort claimants at

10 all, or in the tort claimant pool.  So but I have, you know,

11 just a pretty good idea that he wouldn't get anything close

12 to 400,000, to 749,000.

13 Q    Does the TCC know what the aggregate value is of the

14 wrongful death and personal injury causes of action that

15 could be asserted against YesCare and its relevant

16 affiliates, or subsidiaries on a successor liability theory

17 of recovery?

18 A    My understanding is no.  I mean the TCC doesn't have

19 any understanding about --

20      (Pause in the proceedings.)

21         THE COURT:  It's just one of those days, folks.

22      (Pause in the proceedings.)

23         THE COURT:  Why don't we -- I don't know how long

24 this is going to last.  I apologize.  But it's going to be

25 loud.  Well, I'm going to step off.  Maybe I can try to

1  figure out how long this is going to last.  I'll step off.

2  Why don't you -- you can step down, and we'll figure out --

3  how much longer do you think you have?

4           MR. MOXLEY:  Not much longer, Your Honor.

5           THE COURT:  What does that mean?

6           MR. MOXLEY:  Oh, I would guess 15 minutes --

7           THE COURT:  All right.  Let's --

8           MR. MOXLEY:  -- or less.

9           THE COURT:  Well, we're going -- let's keep going

10 until this starts.

11          MR. MOXLEY:  Okay.  Thank you, Judge.

12 BY MR. MOXLEY:

13 Q    So I think right before the announcement started,

14 Mr. Griffiths, you were testifying with respect to the TCC

15 not knowing what the aggregate value of the wrongful death

16 and personal injury causes of action are worth in this case,

17 right?

18 A    That is correct.

19 Q    Okay.  Is that something that you wanted Mr. Atkinson

20 to consider?

21 A    Yes.

22 Q    Okay.  Has the TCC been able to formulate a view on the

23 aggregate value of the causes of action against YesCare and

24 CHS Texas on a successor liability theory of recovery?

25 A    It has not.

1   Q     And why is that?

2   A     Because we relied on Mr. Atkinson for that and he

3   wasn't given enough information to make those

4   determinations.

5   Q     Those are -- the successor liability claims, just going

6   back to our analogy, they're in the shopping cart but we

7   don't have a value for them, correct?

8   A     That's correct.

9   Q     Okay.  And the final claim or cause of action that you

10  identified, or that the TCC identified in the course of its

11  investigation, I believe your reference was alter ego

12  liability, is that right?

13  A     That's correct.

14  Q     What's that?

15  A     Alter ego theory of recovery is again, if a tortfeasor

16  has -- if there's a judgment on tortfeasor, you can pursue,

17  go after an alter ego.  And the alter ego is someone who's

18  controlled, or has -- is either control or calling the shots

19  for other companies.  In this case, Corizon.

20       So I think I heard Mr. Lefkowitz talk this morning or

21  this afternoon about, you know, he was a director of Corizon

22  and multiple other entities that are all involved in this.

23  So I would consider him an alter ego.

24  Q     And what's the harm alleged with respect to an alter

25  ego theory of recovery?

1  A    It would be the same claims.  It'd be personal injury,

2  wrongful death, section 1983, 14th Amendment, Eighth

3  Amendment, cruel and unusual punishment, etcetera.

4  Q    And how suffered the damages?

5  A    Again the inmates or their families.

6  Q    Did the Debtor suffer any damages?

7  A    No.

8  Q    And you mentioned Mr. Lefkowitz would be a potential

9  defendant in an alter ego -- on an alter ego theory of

10 recovery basis.  Why him again?

11 A    Because he was in control of those entities at the time

12 of the divisional merger.

13 Q    And what's your understanding of the Debtor's position

14 on what happens to causes of action or theories of recovery

15 based on alter ego under this settlement agreement?

16 A    That they would be released or settled.

17          MR. MOXLEY:  If this case is dismissed,

18 Mr. Griffiths, could Mr. Alvarez seek to recover damages for

19 his injuries from, for example, Mr. Lefkowitz, on a alter

20 ego theory of liability?

21          MR. PATTERSON:  Objection, Your Honor.  This calls

22 for speculation, calls for a legal conclusion.

23          MR. MOXLEY:  Your Honor, he is Mr. Alvarez'

24 attorney.

25          THE COURT:  I know but I'm still sustaining.

1              MR. MOXLEY:  Okay.  Thank you, Judge.

2    BY MR. MOXLEY:

3    Q    Let me ask you this, Mr. Griffiths.  If this bankruptcy

4    case is dismissed, with respect to Mr. Alvarez' litigation -

5    -

6    A    Yes.

7    Q    -- what will be his next steps?

8    A    The next steps -- if this bankruptcy is dismissed,

9    assuming that all of the -- if there's any appeals, if

10   there's anything else that happens and any other delays,

11   we'll resume litigation in the District Court in Arizona.

12        We'll name -- also I think file either a Rule 15 motion

13   or some other motion to name successor entities and also

14   alter ego theories.

15   Q    And has the TCC been able to formulate a view with

16   respect to the value of the wrongful death and personal

17   injury claims in the aggregate that could be brought on an

18   alter ego theory of recovery?

19   A    No.

20   Q    And why is that?

21   A    For the same reasons as before.  The information wasn't

22   provided to our financial advisor.

23   Q    But those too are in the shopping cart, right, the

24   alter ego claims?

25   A    That's correct.

SCOTT GRIFFITHS - DIRECT BY MR. MOXLEY                406

1  Q    Even though we don't know what they're valued at?

2  A    That is correct.

3  Q    Mr. Griffiths, you attended the mediation in December,

4  correct?

5  A    I did.

6  Q    Okay.  Were you in the courtroom when Mr. Lefkowitz was

7  testifying today?

8  A    I was in the courtroom, yes.

9  Q    Did you hear Mr. Lefkowitz reference being willing to,

10 or offering, I'm not sure what the testimony exactly was,

11 data to the TCC?  Do you recall that testimony?

12 A    I did not see any -- I do recall the testimony.  I

13 didn't recall seeing anything like that at all.

14 Q    Okay.  To your knowledge, did the TCC receive any such

15 data from Mr. Lefkowitz?

16 A    To my knowledge, no.

17 Q    And you heard Mr. Lefkowitz discuss pro se cases and

18 how those cases in his view are typically ones where lawyers

19 have refused to bring them.  Do you recall that testimony?

20 A    I remember calling and talking about pro se and things

21 quite a bit, yeah.

22 Q    And I believe you told the Court a few moments ago that

23 part of your work is to represent prisoners in connection

24 with prison rights type cases, is that right?

25 A    That's correct.  I've been doing it for 12 years.

1  Q    Do you have any personal knowledge of the pro se

2  petition process?

3  A    I know a little bit about it.  Pro se, he kind of

4  described it as being they could write a complaint or write

5  a letter on the back of an envelope and send it to the

6  District Court, and it'll be in -- you know, it's a case.

7  That's not necessarily always true.

8       28 USC 1915 creates a system where the District Court

9  judges will take a pro se filing when they haven't paid a

10 filing fee.  So it's more like a pro se forma pauperis.  I

11 don't even know how to pronounce it.

12          MS. ENGLAND:  Your Honor, we're now getting into

13 expert testimony of the process.

14          THE COURT:  I agree.

15          MR. MOXLEY:  Your Honor, may I just be heard on

16 that briefly, Your Honor?

17          THE COURT:  No.

18          MR. MOXLEY:  Okay.  Thank you, Judge.

19 BY MR. MOXLEY:

20 Q    Okay.  Are you aware of Corizon's pre-bankruptcy

21 settlement history?

22 A    I'm familiar with it, yes.

23 Q    Okay.  Have you seen Debtor's Exhibit 26 before, the

24 document that gives the 10-year history?

25 A    I did, yeah.

1          MR. MOXLEY:  Okay.  Outside of bankruptcy, are you

2   aware that some pro se claimants were able to settle their

3   claims?

4          MR. PATTERSON:  Objection, Your Honor, leading the

5   witness.

6          THE COURT:  Can you repeat that question?

7          MR. MOXLEY:  Yes, Your Honor.  I'll rephrase it,

8   Judge.

9          THE COURT:  Okay.

10  BY MR. MOXLEY:

11  Q    You testified before that you had -- you're familiar

12  with the pre-bankruptcy settlement history?

13  A    Yes.

14  Q    Okay.  What's your understanding of that?

15  A    That Corizon settles cases pre-bankruptcy.  I've been

16  part of those.

17  Q    You personally have some experience --

18  A    Yeah.  I've represented inmates for the last 12 years.

19  Q    Okay.  What do you take away, Mr. Griffiths, from your

20  personal experience in settling some of those cases and in

21  the work that you do, what do you take away from the fact

22  that some pro se claimants have been able to settle claims

23  with Corizon?

24  A    That there are serious claims that need to be settled,

25  and I think Mr. Lefkowitz even kind of touched a little bit

1   on that today, that there are cases that they settle.

2   Q    Do you know if all prisoners injured by Corizon have

3   filed proofs of claim in this bankruptcy case?

4   A    I don't know if that's the case.

5   Q    Do you think that it's likely to be the case?

6   A    I think it's --

7               MR. PATTERSON:  Objection, Your Honor, that's

8   speculation.

9               THE COURT:  Sustained.

10  BY MR. MOXLEY:

11  Q    Is the TCC concerned about victims who may have missed

12  the bar date?

13  A    The TCC is very concerned about that, yes.

14  Q    What's your understanding as to how much would be

15  available to pay toward claims if the settlement is

16  approved?

17  A    Well, I don't have any basis for knowing a number.  I

18  would think that the number would be $8-10 million, but I

19  don't know because in the settlement agreement, most recent

20  discussions, there hasn't been a percentage allocated to the

21  tort claimant.  So there's way to know what the numbers

22  would be.

23  Q    Does the range that you just referenced, does that come

24  from somewhere?

25  A    Well, the first version, the first settlement agreement

SCOTT GRIFFITHS - DIRECT BY MR. MOXLEY                    410

1  that was proposed had, I think -- it was eight, or eight and

2  a half million dollars --

3           THE COURT:  Hold on.

4       (Pause in the proceedings.)

5           THE COURT:  Let's keep pushing.

6           MR. MOXLEY:  Okay.

7  BY MR. MOXLEY:

8  Q    I think you testified, Mr. Griffiths, that you were

9  testifying about where the range that you testified about

10 came from?

11 A    Yeah, I think there was like some number in the

12 original settlement agreement that was earmarked for the

13 tort claimants, and I think that was eight to eight and a

14 half million dollars.

15 Q    And that amount would be for all the tort claimants,

16 right?

17 A    For all tort claimants, and my understanding is

18 administration fees of the trust but I don't know that to be

19 true.

20 Q    Okay.  You've heard some testimony -- were you here on

21 the first day of the hearing?

22 A    I was.

23 Q    Did you hear Mr. Barton testify?

24 A    I did hear him testify, yes.

25 Q    Did you hear his testimony with respect to whether or

1  not he thought the settlement was in the best interest of

2  creditors?

3  A    Yes.

4  Q    Okay.  And do you have a view as to whether or not this

5  settlement is in the best interest of creditors?

6  A    Excuse me, yes.

7  Q    What's that view?

8  A    I do have a view, and the view is it's not in the best

9  interest of creditors.  Excuse me.  It's not in the best

10  interest of creditors for a lot of reasons, but I mean, we

11  don't know any of the numbers that would be, you know, given

12  to pro se inmates, or to any tort claimant at all.  There's

13  no way to know.

14      There was a lot of talk on that first day as well.  It

15  wasn't necessarily testimony but there was talk about

16  putting money in people's pockets but no one will put a

17  number to it.  So there's no way to know that this

18  settlement actually has any benefit to people at all.

19  Q    Now you appreciate, Mr. Griffiths, that the settlement

20  agreement doesn't actually prescribe any particular

21  allocation between tort claimants and commercial creditors,

22  correct?

23  A    That's right.

24  Q    Okay.  So we don't really know yet what will be

25  ascribed to the tort claimants, right?

1  A    That's right.

2  Q    Okay.  When you attended that -- switch gears for a

3  quick second.  Mr. Griffiths, you had mentioned about

4  attending the December mediation.  In your view, did the

5  Debtor and UCC mediate in good faith?

6  A    In my view, no.  I mean that was -- I attended

7  telephonically to it but I didn't see that there was good

8  interaction or much to be done, much interaction between the

9  TCC and UCC or the Debtor.  So from my perspective, no, it

10 didn't seem that it was.

11 Q    Do you believe this settlement agreement that is sought

12 to be approved was negotiated in good faith?

13 A    I don't think so, no.

14 Q    And why is that?

15 A    I don't think it was negotiated in good faith because

16 it totally skips out on the avoidance actions for the

17 divisional merger itself, didn't take into -- with the

18 contracts that left, right, that misappropriated business

19 opportunities.  Really no assessment of the other claims for

20 successor liability and alter ego at all.

21 Q    Mr. Griffiths, do you think that the personal injury

22 and wrongful death claimants would be better off in the

23 event of dismissal?

24 A    Absolutely.  I feel that way very strongly because I

25 think that they'll be able to -- the inmates and the cases

1    that already in process will be able to resume.  And if it's

2    dismissed, then we'll have Tehum as a defendant.

3        We'll name them and then be able to make our motions

4    for successor liability and alter ego, and then we'll be

5    able to continue with the claims that we have.

6    Q    Do you have -- what concerns do you have if this

7    settlement were approved?

8    A    If the settlement's approved then I'm afraid of a

9    couple things.  One, that it's going to take years to

10   appeal, right.  It's going to take multiple levels of

11   appeals.  And people don't get younger, right, they get

12   older.

13       People that are sick, they die, right.  So I think

14   people that have claims, legitimate, may not ever get to see

15   anything from it if it's approved.

16            THE COURT:  Isn't that the same concern of

17   somebody who went through trial process?  Aren't there

18   appeals that can be taken in your case as well, right?  It

19   cuts both ways on that point, doesn't it?

20            MR. GRIFFITHS:  It does, Your Honor, but to maybe

21   bring Mr. Lefkowitz back in here.  There's a lot of

22   negotiations that happened, renegotiations that happened.

23   Settlements have happened so --

24            THE COURT:  But that's what he's saying on this

25   side, right?

1          MR. GRIFFITHS:  And from my perspective, Your

2    Honor, I would tell you that if this was dismissed and

3    litigation resumes, then you get back to having serious

4    conversations about the merit of the case, and opportunity

5    to be able to settle the case.

6          THE COURT:  I was just talking about the timing

7    aspect, right.  You're saying people don't get any younger.

8    I suspect, I think both sides are presuming that it's going

9    to take years, and I don't really know what to do with that.

10   I'm just putting it out there.  Go ahead.

11         MR. MOXLEY:  Thank you, Judge.

12         MR. GRIFFITHS:  And then I mean I think I --

13         THE COURT:  He gets to ask a question.  Go ahead,

14   please.  I'm sorry.

15         MR. MOXLEY:  Well -- and Your Honor, I appreciate

16   that.

17   BY MR. MOXLEY:

18   Q    In case, Mr. Griffiths, did you have something more

19   responsive to the Judge's question that you wanted to say?

20   A    Well, I don't that it was -- regarding the timing of

21   it, right, I think there's already -- it's already been held

22   up long enough, right, and so if this matter is dismissed,

23   it gets reverted back to the courts.

24         It doesn't go into a black hole of litigation because

25   I've heard Mr. Buckner (phonetic) say, it's already set,

1  right.  The way I look at this, all of our cases have been

2  stayed, right, because of the automatic stay, and been held

3  for a year now while this has been going on, right.

4      And then my other concern, just to finish with your

5  question, my other concern is this is repeated, right.  This

6  situation gets repeated.  Not only does -- if the bankruptcy

7  -- if it's not dismissed, then all of the private prison

8  entities, medical providers can continue this process of

9  running until they get large litigation risks, right.

10      They get judgments piling up against them, and then

11 they can just go into bankruptcy.  And then we heard

12 Mr. Lefkowitz talk about how he renegotiates.  In this case,

13 you can use bankruptcy to renegotiate, right.

14      He's forcing bankruptcy, and his example, the $160,000

15 settlement that he had where he's making monthly payments,

16 that stops, right.  At least that's my impression of what he

17 said is it stops.  And so he's able to renegotiate those

18 things that he negotiated in good faith, using the

19 bankruptcy.   So I think it's kind of a tool, and I think

20 that this particular population is captive, right.  They're

21 prisoners, can't really go anywhere, can't really do

22 anything about choosing other providers or calling for their

23 own --

24          MS. ENGLAND:  Your Honor, narrative.

25          THE COURT:  No.  I'm going to allow him to answer

1   the question.

2              MR. GRIFFITHS:  I mean they just don't get a

3   choice.  I'll close up.  But they don't get a choice in

4   their care.  They are reliant on this system, and there's

5   not even competition in the Arizona prisons or any other

6   prisons.                There's not like Corizon and Senterian

7   (phonetic) and Wexford.  There's only one provider.  And so

8   if that provider doesn't provide care, they don't have a

9   choice.  And so they're forced into all of this.

10        (Pause in the proceedings.)

11              MR. MOXLEY:  Thank you, Mr. Griffiths, for your

12   time.  Your Honor, I have no more questions at this time.

13              THE COURT:  Okay.  I don't know when our floor is

14   coming, but let's keep pushing.

15              MS. ENGLAND:  Seems like (indiscernible).

16              THE COURT:  I apologize if anyone's listening as

17   to what is going on, why we keep pausing.  There's actually

18   a fire alarm test going on in the building at this time, and

19   so we're -- we will likely pause at some point, and I will

20   let everyone know, or folks will likely hear when it's our

21   time.  But let's proceed.

22              MS. ENGLAND:  Good afternoon, Your Honor.

23              THE COURT:  But it is a test, right.  Let's just

24   be clear.

25              MS. ENGLAND:  I guess it's evening at this point,

1  Your Honor.  But good evening, my name is London England on

2  behalf of the Debtors.

3                      CROSS-EXAMINATION

4  BY MS. ENGLAND:

5  Q    And Mr. Griffiths, it's good to see you again, and I'm

6  sure also nice to do this on a countdown clock.  So the last

7  time I saw you was February 12th, of this year, for your

8  deposition.  Is that right?

9  A    That's correct.

10  Q    And at the deposition --

11  A    I'm sorry.  I did see you the first day of trial.

12  Q    You're right which candidly I don't remember what day

13  that was at this point.  But a couple weeks ago?

14  A    Yeah.

15  Q    At your February 12th deposition, you weren't

16  testifying in your individual capacity.  You made clear that

17  you were testifying on behalf of the TCC as a whole, is that

18  right?

19  A    That's correct.

20  Q    And that committee was formed November 20, 2023?

21  A    Yes.

22  Q    And at the time, you hadn't missed a meeting yet?

23  A    That's correct.

24  Q    You told me at that time that you prepared to represent

25  the TCC and felt prepared to testify that day, is that fair?

1   A     To the extent that I could, yes, yeah, absolutely.

2   Q     Now one of the things that we heard today was that on

3   February 12th, your investigation was still ongoing, is that

4   fair?

5   A     Yes.

6   Q     So we heard a lot today about some conclusions, and I'm

7   going to try to in the interest of time walk through those

8   quickly.  But first, on February 12th, we talked about who

9   the TCC believes it represents.  And you told me that it was

10  specifically for the benefit of inmates or families of

11  inmates, is that right?

12  A     Well, tort claimants and that's -- my understanding is

13  inmates and families of inmates.

14  Q     And you specifically thought that tort claimants like

15  employment torts were not part of your committee's

16  representation, is that right?

17  A     I remember a little bit about that.  I don't remember

18  the exact words that I testified to, yeah.

19  Q     So you agree that at least on February 20th, you did

20  not think that you were representing anyone bringing an

21  employment tort against the Debtor, is that fair?

22  A     I don't recall what I believed then.  The Tort Claimant

23  Committee that I focus on and that I'm working with and the

24  population I work with is inmates and inmate families.

25  Q     But specifically in addition to representing the TCC as

1  a whole, you actually represent two creditors in this case,

2  is that right?

3  A     Yes.

4  Q     Now Mr. Alvarez is a member of the TCC?

5  A     Yes.

6  Q     And you also represent Mr. Robinson, right?

7  A     That's correct.

8  Q     And both of those claimants have medical malpractice

9  claims, is that right?

10 A     Give me just a moment.  I believe Mr. Alvarez has a

11 medical malpractice, 1983, and I think that Mr. Robinson is

12 just a 1983.  I'm just making sure that I'm clear with you

13 on those.

14 Q     Okay.  And both of them are either currently or

15 formerly incarcerated individuals, is that a fair

16 characterization?

17 A     Yes, one is not and one is.

18 Q     And I think one of the things that you clarified at the

19 close of your direct testimony was that if this case was

20 dismissed, one of the things that you had planned to do in

21 the future is amend the causes of action that you filed on

22 their behalf, in their current litigation, to add successor

23 liability claims.  Is that fair?

24 A     That's fair.

25 Q     So before this bankruptcy case was filed, neither

1  Mr. Alvarez, nor Mr. Robinson had asserted any successor

2  liability claims, is that fair?

3  A    That's fair.  If I can just clarify though, they didn't

4  have really knowledge of it until the notice of bankruptcy

5  is filed in the case.  So a successor liability claim, they

6  had no knowledge of the divisional merger.  They wouldn't

7  have been able to do that.

8  Q    It's your testimony that neither Mr. Alvarez nor

9  Mr. Robinson was capable of bringing claims against -- for

10  successor liability under your representation prior to this

11  bankruptcy?

12  A    They weren't informed about the divisive merger.

13  Corizon, Tehum did not comply with the rules that require

14  noticing in the real parties in interest.  And so we had no

15  idea that there was another company, there was anything else

16  happening in this case until the notice of bankruptcy was

17  filed.

18       Then I picked up the phone and called the attorneys and

19  of course, they just read me the filing.  They just said

20  filed.  But that's when we found out.  So the successor

21  liability and alter ego theories number one, couldn't have

22  been because we had the parties already named, litigation

23  was already going on.

24       And then also we had taken a little bit of factual

25  background here, right.  The investigation had to go on to

1  find out just how bad some of the events were, and in my

2  words, the bad events, right.  All of the events leading up

3  to the successor liability, all the background to discuss --

4  excuse me.

5       Successor liability and alter ego claims, things that

6  we've talked about, those have been developed in this

7  bankruptcy case.  So until that point, they didn't have the

8  ability to make those claims or those causes of action.

9  Q    And to be clear, part of the reason is that you sued

10 the Debtor because the Debtor was the one who provided the

11 medical care to both Mr. Alvarez and Mr. Robinson, is that

12 right?

13 A    The care, or lack thereof, yes.

14 Q    Now you also mentioned that you had attended mediation

15 with Judge Sontchi, in New York, virtually, and that was

16 done December 14th, is that right?

17 A    That sounds right, yeah.  I don't remember the date.

18 Q    And that's the settlement that we're here today for the

19 Court to decide whether or not to approve, arose out of that

20 mediation, is that right?

21 A    A version of the settlement that we're here to talk

22 about today arose there.  I believe it's been modified

23 slightly and some redlines were done from what was proposed

24 on December 14th.  I think that's my understanding.

25 Q    Now you took the position last time we spoke that the

1  TCC would file an objection until there's certainty about

2  the amount of the settlement funds that will be directed to

3  the TCC members, is that right?

4  A    I believe so.  I don't remember.  I'm sure you could

5  point me to some deposition.

6  Q    So regardless of the amount of money that the

7  settlement includes, until the TCC knows exactly how much of

8  the allocation would be given to its members, the TCC plans

9  to object, is that fair?

10  A    I don't know.  I believe that --

11           MR. MOXLEY:  Objection.

12           MR. GRIFFITHS:  I leave that for the --

13           MR. MOXLEY:  -- Your Honor.  I think that goes

14  into attorney client privilege as well.  I'm not sure he can

15  speculate as to what the TCC will do under certain

16  hypothetical scenarios.

17           THE COURT:  He can answer if he knows without

18  revealing attorney client privilege.

19           MR. GRIFFITHS:  Yeah, I won't reveal any attorney

20  client privilege.  I don't know that would come up for the

21  TCC to decide.  I'm not a TCC member.  I just attend the

22  meetings and listen.

23  BY MS. ENGLAND:

24  Q    Okay.  You also have taken the position that the TCC

25  doesn't know what the appropriate amount of money to settle

1  the estate causes of action for, is that right?

2  A    That's correct.

3          MS. ENGLAND:  And when we spoke before, you didn't

4  know whether or not the TCC had undertaken any analysis of

5  Fifth Circuit law, for example, to determine whether or not

6  successor liability is an estate cause of action, is that

7  right?

8          MR. MOXLEY:  Objection, Your Honor.  Mr. Griffiths

9  wasn't allowed to speak with respect to his understanding of

10 the law in response to my questions.  I'm not sure how he

11 can now speak to questions about his understanding of the

12 law in response to Ms. England's --

13         THE COURT:  I don't think they were asking his

14 understanding of the law.  I think they were just asking if

15 he had considered it.  I think that's a different question.

16         MS. ENGLAND:  Had an analysis been done at all?

17         THE COURT:  Yeah.  And so I'll overrule the

18 objection.

19         MR. GRIFFITHS:  At the time that we spoke before,

20 no.

21 BY MS. ENGLAND:

22 Q    And in fact, you told me that the TCC was exclusively

23 relying on counsel and experts for any valuation of whether

24 or not -- excuse me, any consideration of whether or not

25 successor liability claims were property of the estate, is

1    that right?

2    A    Yes.

3    Q    You also took the position that you didn't know what

4    type -- at the time, you didn't know what type of causes of

5    action would even be appropriate for the estate to release,

6    and that was on February 12, 2024, is that fair?

7    A    At the time, yes.

8    Q    No, February 12, 2024, was almost a month after the TCC

9    filed its motion to dismiss, is that right?

10   A    I don't know the date that the motion to -- I don't

11   recall the date the motion to dismiss was filed.

12   Q    Sure.  If I told you the motion to dismiss was filed on

13   January 16, 2024, would it be fair to say that you and I

14   spoke a month after that?

15   A    About a month, yeah.

16          MS. ENGLAND:  And at the time that the motion to

17   dismiss was filed, I asked you whether or not the TCC made

18   sure that the facts included in that motion was true.  Do

19   you recall that?

20          MR. MOXLEY:  Objection, Your Honor, improper

21   impeachment.  Ask the question then we can go --

22          THE COURT:  Yeah, I'll sustain that.

23   BY MS. ENGLAND:

24   Q    It's true, Mr. Griffiths, that the TCC relied

25   exclusively on counsel and experts to make sure that the

SCOTT GRIFFITHS - CROSS BY MS. ENGLAND                425

1  facts alleged in the motion to dismiss is true, isn't that

2  right?

3  A    Yeah, I don't know how else -- I mean the TCC is a

4  committee of tort claimants.  Yes, they rely on counsel and

5  they rely on experts to do that, yes.

6  Q    And the last time we spoke, we discussed -- I think you

7  called them a document dump, but is it fair to say that you

8  recall discussing the hundreds of thousands of documents

9  that have been produced in this case?

10  A    Yes.

11  Q    And in February 16 -- or excuse me, February 12, 2024,

12  you knew that you had access to those documents but you

13  hadn't reviewed them, is that fair?

14  A    Correct.  And I think the number that I learned about

15  later was about 600,000 pages of documents that were given

16  to us a week before the second mediation.  And if you want a

17  little more on that, that's four full pallets of paper, copy

18  paper in boxes.

19  Q    So it's fair to say that the Debtors produced a lot of

20  information that the TCC could rely on in forming its

21  opinions before it filed the motion to dismiss?

22  A    Sure.

23  Q    But regardless, the TCC had unanimously decided to file

24  the motion to dismiss right away after it was formed, is

25  that right?

1   A     The TCC members discussed and wanted to do whatever

2   they could to continue with their cases, and an option that

3   we discussed, or that was discussed on the meetings was a

4   motion to dismiss, and they did not until January 16, 2024.

5   So they wanted to but they did not.

6   Q     But you're aware that your counsel began billing for

7   drafting the motion to dismiss a full week before you

8   attended mediation with Judge Sontchi, is that right?

9   A     I don't know that.  I'm sorry.

10  Q     Have you reviewed the fee statements that your counsel

11  has provided?

12  A     I've seen them but I haven't reviewed them line item

13  wise, no.

14  Q     Did the TCC authorize their counsel to begin drafting a

15  motion to dismiss before even attending mediation with the

16  Debtor and the UCC in this case?

17  A     I don't recall if they did.

18  Q     When we spoke before, I don't believe that you had read

19  the divisional merger documents.  Have you read the

20  divisional merger documents?

21  A     What are the divisional merger documents?  I'm sorry.

22  Q     Have you read the divisional merger agreement in this

23  case?

24  A     No.

25            MS. ENGLAND:  At the time testifying on behalf of

1  the TCC, the TCC didn't know whether there were personal

2  injury claims including claimants in the bankruptcy case

3  whose causes of action had been allocated as CHS Texas, is

4  that right?

5           MR. MOXLEY:  Objection, Your Honor, once again,

6  improper impeachment, going to the transfer before even

7  asked the question here.

8           THE COURT:  Yeah.  Why don't you lay a little more

9  foundation.

10 BY MS. ENGLAND:

11 Q    You're aware that as part of the divisional merger,

12 certain assets or liabilities were allocated to CHS Texas?

13 A    Yes, generally, yes.

14 Q    But sitting here today, do you know whether or not any

15 of the people who filed proofs of claim in this case have

16 causes of action that were allocated to CHS Texas?

17 A    Sitting here today, I don't know that answer.

18 Q    Now on February 12th, is it fair to say that you didn't

19 know how many of the claims on the docket were filed by tort

20 claimants?

21 A    On February 12th, that is correct.

22 Q    Sitting here today, have you changed your opinion?

23 A    That I don't know the number that was --

24 Q    Do you know how many of the claims that were filed in

25 this case were filed by tort claimants?

1  A     I don't know the exact number.  I could estimate but it

2  would be a complete estimation so --

3  Q     And do you know how many of the claims that were filed

4  in this case were filed by pro se individuals?

5  A     The answer to that is no.

6  Q     Now I understand that the TCC's goal is for this case

7  to be dismissed, is that right?

8  A     Currently, yes, that's the goal.

9  Q     If this case was dismissed, everyone would just resume

10 litigation in whatever form that they had originally filed

11 their lawsuit, is that fair?

12 A     That's fair.

13 Q     There would be no regionalized or multi-district method

14 for consolidating party claims?

15 A     I wouldn't know that.  I don't know.  I am not aware of

16 anything like that at all, right.  And I want to go back to

17 your prior question --

18         THE COURT:  You don't get to do that.  Now you're

19 being a lawyer.  You just get to answer a question.

20         MR. GRIFFITHS:  Ask your question again then,

21 please?

22         MS. ENGLAND:  Unfortunately that's several and I

23 wouldn't know where to go back to.  But at the last time we

24 spoke, we also talked about the Disclosure Statement.  And

25 you didn't know one way or the other whether the valuation

1  of the Debtor or its assets in the Disclosure Statement was

2  correct.  Do you, sitting here today, know whether or not

3  the value in the Disclosure Statement is correct?

4          MR. MOXLEY:  Objection, Your Honor.  I don't think

5  the question is compound, but it does once again refer to

6  the transcript before we've asked the question.  I would

7  just request --

8          THE COURT:  No, overruled.

9          MR. GRIFFITHS:  Can you repeat the question?  I'm

10  sorry.

11  BY MS. ENGLAND:

12  Q    Sure.  There's a valuation of the Debtor and its assets

13  in the Disclosure Statement.  Do you know whether or not the

14  value is correct?

15  A    No.

16          THE COURT:  Counsel, but I get your point that if

17  one refers to a February 12th transcript and then asks a new

18  question, then perhaps you've got to be careful with that.

19  You can ask the question like that, but if you start

20  referring to something else, then you probably need to get

21  to the transcript.

22          MS. ENGLAND:  Understood, Your Honor.

23          THE COURT:  But I get the point.

24  BY MS. ENGLAND:

25  Q    If this case was dismissed today, you don't know how

1  much money the Debtor has, right?

2  A    No.

3  Q    If this case was dismissed today, you don't know how

4  much money any individual tort claimant would receive in

5  litigation?

6  A    That answer's no.  I do know that there'd be some

7  money.  I heard Mr. Lefkowitz say there's a lot of money

8  today so there's a lot of money.

9  Q    Well, one of the pool's of money that you're aware of

10  is also that some of the tort claimants may be entitled to

11  insurance proceeds, is that right?

12  A    Well, maybe, yes.  I don't know anything about that.

13  Q    You don't know anything about whether or not there is

14  insurance available for tort claimants in this case?

15  A    I'm not aware, no.

16  Q    Mr. Griffiths, are you aware that your clients, at

17  docket 915 both filed objections regarding the Lone Star

18  Arizona settlement because they believe their entitled to

19  money under their Lone Star policies?

20  A    No, I don't know.

21           MS. ENGLAND:  Your Honor, I'll pass the witness.

22           THE COURT:  Thank you.

23                      CROSS-EXAMINATION

24  BY MR. HEMENWAY:

25  Q    I was going to say good afternoon, but I guess it's

1  good evening now.

2  A    That's right.

3  Q    I'm Zach Hemenway, for the UCC.  We met last month at

4  your deposition.  Good to see you again.

5  A    Yeah, good to see you again as well.

6  Q    Now Mr. Griffiths, you're not a bankruptcy

7  practitioner, are you?

8  A    No.

9  Q    And you've never been involved with a committee?

10 A    No.

11 Q    Your practice as you alluded to, I think you said

12 you've spent the last 12 years representing inmates?

13 A    Chasing ambulances, yes.

14 Q    Personal injury claims, things like that?

15 A    Yes.

16      MR. HEMENWAY:  Mr. Griffiths, there's not a

17 difference between a breach of fiduciary duty claim and a

18 claim for misappropriation of business opportunity, is

19 there?

20      MR. MOXLEY:  Objection, Your Honor, calls for a

21 legal conclusion.

22      MR. HEMENWAY:  He testified about the claims

23 earlier, Your Honor.  I'm asking his understanding.

24      MR. MOXLEY:  And there were an awful lot of

25 objections, Judge.

1          THE COURT:  Yeah, he can testify to his

2    understanding.

3          MR. GRIFFITHS:  I think that they'd be distinct

4    claims but I'd have to look into a little bit more.  I

5    didn't pull Westlaw up here to --

6    BY MR. HEMENWAY:

7    Q    How would they be distinct?

8    A    Well, I think that the fiduciary duties don't have to

9    just be limited to the opportunities for business alone.

10   Fiduciary duties can be in terms of like how you people

11   treat in your workplace as well so I think there could be

12   distinctions in how you raise those claims.

13   Q    Do you believe that a claim for misappropriation of

14   business opportunity is a subset of the category of breach

15   of fiduciary duty?

16   A    Could be, yeah.

17   Q    And you were here when Mr. Barton testified on the

18   second day of trial, weren't you?

19   A    I was here.  I attended telephonically.  I was back in

20   Phoenix though.

21   Q    So you recall that Mr. Barton testified that the UCC

22   investigated claims relating to breach of fiduciary duty?

23   A    I don't recall him -- I will tell you that I was back

24   at work so I was listening and getting interruptions too.

25   Q    Understood.  Not a memory test today.  When you were

1  talking about that claim, you mentioned, I believe, it was

2  25 plus entities that you believe were formed in connection

3  with that claim?

4  A    Correct.

5  Q    You don't know if any of those entities was actually

6  awarded a contract though, do you?

7  A    My understanding is that it was CHS Alabama.

8  Q    You believe CHS Alabama was awarded a contract?

9  A    Yes.

10 Q    And what's that based on?

11 A    Well, I've read that in the Atkinson report.

12 Q    And sticking with that claim, the TCC filed an

13 objection to the settlement motion, correct?

14 A    Correct.

15 Q    It filed a motion to dismiss?

16 A    Yes.

17 Q    Do either of those even mention misappropriation of

18 business opportunity?

19 A    I don't know off the top of my head, no.

20 Q    The TCC's position, I believe you testified about

21 successor liability earlier, and is it correct, though, the

22 TCC's position is that each of the creditors could

23 successfully bring a claim based on successor liability?

24 A    I think they'd have a chance to do that.

25 Q    And is that based on the Kelly Michigan case?

SCOTT GRIFFITHS - CROSS BY MR. HEMENWAY                    434

1   A     Yes.

2   Q     If I could have you turn to the -- actually, is it your

3   understanding that the Kelly case allowed a party to pursue

4   successor liability against YesCare?

5   A     Not against YesCare.  I think it was CHS Texas in the

6   Kelly case.

7   Q     Okay.  And if I could have you turn to -- it's Tab 5 in

8   your binder.  It's TCC Exhibit 300.  And it is that Kelly

9   case.

10  A     Okay.

11  Q     Are you with me?

12  A     I have it here, yeah.

13        MR. HEMENWAY:  Now --

14        MR. MOXLEY:  Your Honor, just one second.  I think

15  I have this, sorry.

16        MS. ENGLAND:  It's your binder.

17        MR. MOXLEY:  Oh, it's my binder.

18        MR. HEMENWAY:  Yeah.

19        MR. MOXLEY:  Okay.  I apologize, Your Honor.

20  BY MR. HEMENWAY:

21  Q     Drafting off opposing counsel here.  You testified

22  earlier about your understanding of Texas law, and I'm not

23  asking you to opine as a legal expert.  I want to know your

24  understanding.

25        I believe you said your understanding as the TCC's

1  representative is that the Texas Divisional Merger statute

2  allows a party to pursue successor liability, is that

3  correct?

4  A    It does in the sense that it doesn't abridge -- the

5  Texas code doesn't abridge creditors rights.

6  Q    Okay.  Could you turn to Page 25, in that Kelly

7  opinion.  And I'm going to read from Page 25.  It says under

8  the Texas Business Organizations Code, a single business

9  organization may undergo a merger which it divides into two

10 or more new entities.  Do you understand that to describe a

11 divisional merger?

12 A    Sure.

13 Q    It says the predivision corporation may allocate its

14 assets and liabilities freely among the new entities and

15 each new entity, at least as a matter of Texas law, is

16 liable only for the liabilities assigned to it under the

17 plan of merger?

18 A    Okay.

19 Q    Is that consistent with your understanding of Texas

20 law?

21 A    Well, I don't really -- my limited understanding of

22 Texas law, sure.  It aligns with that.

23 Q    That aligns with your understanding that --

24 A    My limited understanding --

25 Q    Okay.

SCOTT GRIFFITHS - CROSS BY MR. HEMENWAY                    436

1    A    -- of Texas law.

2    Q    You mentioned earlier that the TCC doesn't have a view

3    as to the value of the claims, the proofs of claim in this

4    case, is that correct?

5    A    It doesn't have like an idea of the value of them?

6    Q    Ms. England asked if the TCC has a view of the value,

7    of the aggregate value of the -- well, actually, I

8    apologize, I believe it was your counsel.  Asked if the TCC

9    has a view of the aggregate value of the proofs of claim in

10   this case, and I believe you said that they do not, is that

11   right?

12   A    That's correct.

13           MR. MOXLEY:  Objection, Your Honor.  It misstates

14   the testimony.

15           THE COURT:  I'll sustain that.

16           MR. HEMENWAY:  I'll just ask the question.

17   BY MR. HEMENWAY:

18   Q    Does the TCC have a view of the aggregate value of the

19   proofs of claim in this case?

20   A    I don't know what it is.

21   Q    You don't know if the TCC has one, or you don't know

22   what it is?

23   A    I don't know what it is.  The TCC, the committee, the

24   six members of the committee, I don't know if they have a

25   value, a known value of that either.

SCOTT GRIFFITHS - CROSS BY MR. HEMENWAY                437

1  Q    I'm asking about the TCC as an entity here that's

2  trying to oppose the settlement.

3  A    Right.

4  Q    Does the TCC have a view of the value of the proofs of

5  claim?

6  A    Well, okay, an exact number, they don't have an exact

7  number.  I don't have an exact number.  We know the number

8  is very high.

9  Q    You know the number's very high?

10 A    Yeah.

11 Q    And what's that based on?

12 A    A couple of the proofs of claim that they have seen in

13 --

14 Q    So the face value of the proofs of claim?

15 A    Yeah.

16 Q    You talked a little bit earlier about the mediation

17 that occurred with Global Mediation in December.  I believe

18 you testified that the UCC and Debtor didn't negotiate in

19 good faith in that mediation.  You didn't attend that

20 mediation in person, did you, Mr. Griffiths?

21 A    I did not.

22 Q    In fact, both the UCC and Debtor met with the TCC

23 without you present, didn't they?

24 A    Without me physically present, sure, of course.

25 Q    You were virtually present for all the meetings?

1  A    Hold on.  You're asking about the meetings, or at the

2  mediation?

3  Q    For all discussion with the TCC's counsel?

4  A    At the mediation, yeah, I was online all day.

5  Q    Okay.  And you understand, sir, that everyone involved

6  in those negotiations has a fiduciary duty under the

7  bankruptcy code?

8  A    Yes.

9  Q    And you obviously weren't present for any negotiations

10 that occurred -- that weren't in the room that you were in

11 attendance virtually?

12 A    That's correct.

13 Q    Okay.  Mr. Griffiths, the TCC has two separate law

14 firms representing it, correct?

15 A    Correct.

16 Q    And you, I believe, told us that the TCC engaged Barry

17 Rudell to be its local counsel in Arizona, is that right?

18 A    Mike Zimmerman, Barry Rudell, yes.

19 Q    And your other counsel is Brown Rudnick?

20 A    That's correct.

21 Q    And the TCC hired them because they're experienced with

22 the Texas Two Step, is that right?

23 A    That's correct.

24 Q    And that experience is filing motions to dismiss

25 bankruptcy filings in Texas Two Step cases?

SCOTT GRIFFITHS - CROSS BY MR. HEMENWAY                    439

1  A     Among others.

2            MR. MOXLEY:  Objection, Your Honor, argumentative.

3            THE COURT:  Overruled.  It's been a long day.

4            MR. GRIFFITHS:  Among other things, yes.

5  BY MR. HEMENWAY:

6  Q     Did the TCC review Brown Rudnick's employment

7  application filed in this case?

8  A     Yes.

9  Q     What about Provence?

10 A     I believe that they did.  I know that the TCC approved

11 the hiring of all of these firms.

12 Q     Has the TCC reviewed Brown Rudnick's fee statements?

13 A     Yes.

14 Q     How about Barry Rudell's?

15 A     Yes.

16 Q     And has the TCC signed off on those statements?

17 A     Yes.

18 Q     So from that review and sign off, I assume you're aware

19 that the TCC's attorneys have billed around $2 million for

20 their first three months of work in this case?

21 A     That sounds right.

22 Q     And you understand that doesn't include this month, or

23 any of this trial?

24 A     Uh-huh.

25 Q     You understand that the money to pay those fees comes

1  out of estate assets, is that right?

2  A    That's my understanding.

3          MR. MOXLEY:  Objection, Your Honor, I know he's

4  answered the question but this calls for a legal conclusion.

5          THE COURT:  Just his understanding as to -- he's

6  the representative of TCC.

7          MR. HEMENWAY:  I mean, Your Honor has talked about

8  --

9          THE COURT:  He can understand how you get paid so

10 --

11         MR. HEMENWAY:  Yeah, Your Honor asked -- or

12 counsel asked the UCC's witness about money that would be

13 available to creditors and that's what I'm asking this

14 witness about.

15 BY MR. HEMENWAY:

16 Q    Do you understand that any recovery the estate gets for

17 creditors gets reduced by those fees?

18 A    Yes.

19 Q    We talked about Arizona insurance earlier, and I guess

20 you said that you weren't aware of anything regarding

21 Arizona insurance, is that right?

22 A    I'm not familiar with -- excuse me.  I'm familiar with

23 the idea that there's discussion around whether Arizona

24 policies, there are Arizona policies.  I don't know what

25 policies may or may not be in effect.  So I'm not really

1  speaking to that.  And I really don't know anything about

2  other states insurance.

3  Q    You said you reviewed the amended Disclosure Statement

4  that was filed in this case, is that right?

5  A    Awhile back, yes.

6  Q    Did you review the portions of that relating to

7  insurance coverage?

8  A    I don't recall that.

9  Q    Okay.  Let's take a look at Exhibit 18, and that is the

10 second amended Disclosure Statement at schedule two.

11         THE COURT:  Which binder are we looking at?

12         MR. HEMENWAY:  Do we have that, in this one?  It

13 should be in tab --

14         MS. ENGLAND:  Our binder, the black binder.

15         THE COURT:  Yeah.

16         MR. HEMENWAY:  Well, yeah, the black binder.

17         MR. GRIFFITHS:  Volume one, or two?

18         MR. HEMENWAY:  Volume one, Exhibit 18.

19         THE COURT:  You said 18?

20         MR. HEMENWAY:  And I'm looking for 1410, the

21 appendix two.  Actually, we'll come back to that,

22 Mr. Griffiths.  I apologize.  Page 72, going back to my --

23         MR. GRIFFITHS:  The little numbers at the top?

24         MR. HEMENWAY:  Yeah, Page 72.  It has been a long

25 day, Your Honor.  Appreciate your patience.

1    THE COURT:  No, take your time.

2    MR. HEMENWAY:  All right.

3  BY MR. HEMENWAY:

4  Q    So I want to focus on the first five lines there, on

5  Page 72.  You see those rows with the little cross next to

6  them?

7  A    I do see the rows with the cross on them, yeah.

8  Q    And you see down below, the notes, those are LSA

9  Arizona policies?

10 A    Okay.  I see what it says.

11 Q    Now you were sitting in the back of the courtroom and

12 heard Mr. Perry earlier talk about some of these columns.

13 Do you recall what Mr. Perry said about what a self-insured

14 retention is?

15 A    I know briefly what a self-insured retention is but not

16 from anything that he said today.

17 Q    You've heard that compared to a deductible?

18 A    I did hear him make that --

19 Q    An amount that has to be met for an insurance company

20 to pay out on a claim?

21 A    Right.

22 Q    And those numbers in that column for those five

23 policies, they're all either zero, or up to 50,000, is that

24 right?

25 A    In which column?

1   Q    The outstanding self-insured retention?

2   A    Can you ask your -- I see the column.

3   Q    I said those are either zero, or a number up to 50,000,

4   is that right?

5   A    For the Arizona --

6   Q    Or the first five rows there?

7   A    First five, yes.

8   Q    And the number next to that, the aggregate unpaid

9   limits, you heard Mr. Perry explain that's money available

10  under the policy that hasn't been paid out, is that right?

11  A    I don't recall him -- I remember him talking today

12  about it.  I wasn't looking at this document at that time.

13  Q    You understand the concept of insurance policy limits?

14  A    Policy limits, yes.

15  Q    And you understand that to be money available that

16  hasn't been paid out?

17  A    Okay.  Yeah.

18  Q    So if we go down that column, you see it's 3-5 million

19  for each year except one year where it's 400,000.  And I'll

20  represent to you those numbers for the five years add up to

21  about $18 million.

22  A    Okay.

23  Q    So would you agree with me that there are insurance

24  proceeds available to you and Arizona tort claimants based

25  on that table?

1  A    Based on this table, yes.

2  Q    And that includes the tort claimants that make up the

3  majority of the TCC?

4  A    I don't know.  I mean --

5  Q    You don't know who makes up the TCC?

6  A    I know several of them are Arizona based but I don't

7  think all of them are.  I don't know.

8  Q    Okay.  But there are six members so would you agree

9  several could be --

10  A    Yeah.

11  Q    -- the majority?  Would you consider $18 million to be

12  valuable to creditors in this case?

13  A    It would -- yes.  I would consider it to have value.

14  Q    All right.  Let's turn to -- this would be TCC

15  Exhibit 178.  So it's going to be your white binder.  It

16  would have 178 in it.

17  A    Do you know which tab it is in the white binder?

18        MR. HEMENWAY:  You know what, let's just -- we'll

19  just move on.  This could be 130.

20        MR. MOXLEY:  I don't know that he has a copy of

21  that.

22        MR. HEMENWAY:  Yeah, I'll lend you my copy, how

23  about that.  So this is -- permission to approach the

24  witness, Your Honor?

25        THE COURT:  Yes, of course.

1  BY MR. HEMENWAY:

2  Q    So Exhibit 178, are you familiar with that document?

3  A    Very, very high level --

4  Q    Sure.  And you understand that's the TCC's motion to

5  dismiss filed in this case?

6  A    Yes.

7  Q    Okay.  If you go to Paragraph 74, you see that?

8  A    Paragraph 70?

9  Q    Paragraph 74?  You see in Paragraph 74 where it says

10  the Debtors rights to insurance policies have little to no

11  value?

12  A    Paragraph 74?  Okay.

13  Q    Is the TCC referring to these Arizona policies here?

14  A    Possibly.

15  Q    So would you agree with me that whoever wrote this has

16  a different concept of valuable than you and other creditors

17  may?

18  A    Sure.

19  Q    You told Ms. England that the TCC doesn't know how many

20  proofs of claim were filed by pro se claimants, is that

21  right?

22  A    Yeah, if I'm speaking for the TCC, I don't know the

23  answer to that question.

24  Q    And knowing that answer could impact the TCC's analysis

25  because pro se claimants will often settle claims for less,

1  right?

2  A     Sure.

3  Q     In fact, they often will settle for nothing, or next to

4  nothing, is that right?

5  A     I don't think they'd settle for nothing, but yes, next

6  to nothing.  It just depends.

7            MR. HEMENWAY:  And we've seen from documents and

8  testimony that the Debtor believes there are approximately

9  100 proofs of claim filed by pro se claimants.  Do you have

10  reason to disagree with that number?

11           MR. MOXLEY:  Objection, Your Honor, that question

12  is vague.  He's seen documents and testimony.

13           THE COURT:  I'll sustain that objection.

14           MR. HEMENWAY:  Okay.

15  BY MR. HEMENWAY:

16  Q     Mr. Perry's testimony which you were present for

17  outlined an analysis of claims in this case?

18  A     Okay.

19  Q     And I believe he said around 100 claims.  Does that

20  sound right to you?

21  A     I don't recall his testimony so I don't know.

22  Q     Would you expect that a lot of the pro se claims would

23  be inflated numbers?  Higher numbers than the value of the

24  claim?

25  A      I don't know.  What do you mean by that?  I'm not

1  trying to be difficult.

2  Q    Are pro se claims typically seeking higher numbers than

3  the value of the claim?

4  A    In the proof of claim?

5  Q    In the proof of claim, or in what they file with the

6  court?

7  A    You're asking if they're seeking higher numbers, higher

8  -- I don't know what you mean?

9  Q    An inflated number, a number that is significantly

10 higher than what the value of the claim would be if it was

11 decided by a court?

12 A    I don't know that I could -- well, decided by jury,

13 probably in most of those cases.  But I don't know that I

14 have any information to answer your question.

15 Q    Okay.  I'd like to go to your deposition testimony.

16 And let's go to Page 170.  Do you have that copy of your

17 deposition there?  It should be in your white binder.

18 A    Yeah, I got to close this other one.

19 Q    I apologize.  Take your time.  So are you with me on

20 Page 170?

21 A    Yes.

22 Q    So Ms. England asked you if -- referenced something

23 earlier, but she said so you mentioned in your experience,

24 typically a pro se incarcerated person when they're filing a

25 claim or a lawsuit, there's going to be a lot of zeroes at

1  the end of that claim.  She said is that fair.

2      Your answer was yeah, I think I said six zeroes because

3  they all want a million bucks.  So when you said that you

4  don't have information to know if pro se claims are

5  typically inflated, you were saying something different than

6  what you're saying there?

7  A    Yeah.  What you were saying is whether they'd be

8  inflated versus what they would get in court.  I corrected

9  you and said what a jury might given them.  And then this

10 question that Ms. England asked is about the proofs of claim

11 if I recall right.  I'm not looking at my whole deposition

12 testimony.  So those are three different valuations.

13 Q    Understood.  Now you've never filed a proof of claim,

14 have you, Mr. Griffiths?

15 A    The answer is no.

16 Q    In fact, you --

17 A    I don't know that I have.

18 Q    -- engage counsel to file proofs of claim on behalf of

19 your clients in this case?

20 A    Yes, that's correct.

21 Q    So you don't have any reason to think that a proof of

22 claim would be any different than a lawsuit, do you?

23 A    I'm sorry, what?

24 Q    You don't have any reason to think the amount someone

25 seeks in a proof of claim would be any different than what

1  you're referring to in a lawsuit, do you?

2  A    In a lawsuit, I typically don't make a demand for a

3  specific amount of money, but the proof of claim, in my

4  understanding, requires that.

5  Q    I understand.  I think it was pro se claimants.  Do you

6  believe that pro se claimants are good at litigating?

7  A    The answer is some are good at litigating and some are

8  not good at litigating.

9  Q    And that's not what you told me last month, is it?

10  A    I don't recall what I told you last month.

11  Q    Okay.  Let's go to your --

12  A    Sorry.

13  Q    -- deposition testimony.

14  A    That's fine.

15  Q    We're going to go ahead and pull that up.  If you could

16  turn to Page 95, and it's 95 and 96.  So Ms. London was

17  asking you some questions about the TCC's position, and she

18  said about the TCC's position as to what pro se litigants

19  might do in this case.  And she asked how is that different

20  from their typical right to litigate against Corizon in

21  federal District Court.

22  A    I'm sorry, where are you at so I can just follow along.

23  Q    I'm starting at 95, 20.

24  A    95, thank you.

25  Q    And your counsel objected, and you said I don't think

1  it's any different.  My candid opinion is that pro se

2  litigants, people who are usually in prison, pro se

3  litigants, aren't very good at litigating, right, and so

4  they already have a tough time with the basic set of courts.

5          MR. MOXLEY:  Your Honor, objection.  I would just

6  ask if we could ask that if we could reask this question

7  with the entirety of the question.  There's a lead in here

8  that --

9          MR. HEMENWAY:  That's fine.

10          MR. MOXLEY:  -- makes it --

11          MR. HEMENWAY:  I'm trying to work with the time I

12  have, but I'm happy to read the full question.

13          MR. MOXLEY:  Ask him to read the full question.

14          MR. HEMENWAY:  Do you want me to repeat, or are

15  you --

16          MR. MOXLEY:  You need say it the first time.

17          MR. HEMENWAY:  All right.  So the full question is

18  how -- the reason I'm asking is I'm trying to understand how

19  this would be different so the TCC takes the position that

20  the opt in and opt out provision would be difficult for an

21  incarcerated individuals to navigate.

22          How is that different than their typical right to

23  litigate against Corizon in federal District Court.  And I

24  believe I already read your answer.

25          MR. MOXLEY:  Your Honor, objection.

1        THE COURT:  I get the point.  I can read it.  I've

2  read it.  I got what it says.

3  BY MR. HEMENWAY:

4  Q    So your testimony there was that pro se litigants

5  struggle with the basic court system, correct?

6  A    Yes, most of them do.

7  Q    Isn't the TCC telling the Court that if this case is

8  dismissed, those pro se claimants are going to need to

9  successfully litigate successor liability against YesCare?

10 A    I guess so, yes.  That could be the outcome.  But I

11 think this question, quite honestly, is talking about the

12 opt in and opt out provisions, and I'm -- again, you just

13 kind of cherry picked some paragraphs here, but I --

14 Q    We don't need --

15 A    Of course you don't.

16 Q    -- a colloquy.

17 A    But --

18        MR. MOXLEY:  Objection, Your Honor.

19        THE COURT:  No.  Hold on a second.

20        MR. HEMENWAY:  Not answering the question.

21        THE COURT:  Yeah, he's not answering the question.

22 You get to ask questions.  He gets to answer them.

23        MR. HEMENWAY:  Thank you, Your Honor.

24        THE COURT:  And you don't get to -- that's the way

25 it works.  And then you could put people on redirect.  Now

1    there wasn't a question.  Ask the question, answer it.

2    BY MR. HEMENWAY:

3    Q    So speaking of that dismissal, you talked earlier about

4    that you didn't think it was a litigation chaos, or a

5    litigation black hole I believe.  You understand that if the

6    case is dismissed, everybody goes back to where they

7    started?

8    A    That's correct.

9    Q    And you, yourself have described that as a race to the

10   courthouse, haven't you?

11   A    Could be a race to the courthouse, yes.

12   Q    And in a race to the courthouse, resources matter,

13   don't they?

14   A    Yes.

15   Q    That's not a race that a pro se litigant would

16   typically win, is it?

17   A    (No verbal response.)

18   Q    We need an oral answer, Mr. Griffiths?

19   A    I don't know what -- I guess I don't know what you're

20   asking me to say.  You have a law firm that's outside of

21   prison, right, someone with a computer, maybe an education

22   in law can make a filing, type up, you know, whatever they

23   need to type up and get filed through ECR.

24        And an inmate will use pencil and envelope to file a

25   motion.  I don't know.  But -- so the race to the courthouse

1  is -- that's what I'm referring to there.

2  Q    Okay.  Mr. Griffiths, you told us in February that TCC

3  hadn't taken a position on the settlement because it was --

4  it didn't have enough information, is that right?

5  A    I believe so, yes.

6  Q    In fact, you said if the TCC had more information, it

7  might decide the settlement is a good deal?

8  A    Sure.

9  Q    And the additional information you referred to

10  included, in part, more information on the value of the

11  personal injury claims in this case?

12  A    Maybe value of the personal injury claims but more to

13  the point of -- I think what I was referring to was like how

14  much the other causes of action, right.  We don't have

15  enough information to be able to assess the fraudulent

16  conveyance --

17  Q    I understand your testimony there.  My question was

18  different.  It was -- and some of the information you

19  mentioned was more information about the value of the

20  personal injury claims in this case, was it not?

21  A    Maybe -- where are you looking at?  Where are your

22  reading?

23  Q    I'm just asking if that's something that you've

24  referenced as being something that would help the TCC

25  evaluate whether the settlement's a good deal?

1  A    Yeah, I think that we would have -- I think it would

2  behoove everybody to have medical people look at these files

3  and to get an idea of what these cases are about.

4  Q    And the TCC hasn't done any of that analysis though,

5  has it?

6  A    To my knowledge, no.  I don't think there's enough

7  information for them to do that.

8  Q    And your understanding was that the TCC's expert,

9  Mr. Atkinson was conducting an analysis of the value of the

10 claims, the creditor claims in this case, is that right?

11 A    Yes.

12 Q    And is it your understanding that he did that analysis?

13 A    He did what he could, yes, from that.

14 Q    Did he do the analysis or not?  Does Mr. Atkinson

15 present his opinion of the value of the creditor claims in

16 this case?

17 A    You can ask him.  I think he's testifying Wednesday.

18 Q    I'm asking your understanding because you told me that

19 he was doing the analysis?

20 A    That's my understanding, yes.  So you can ask him what

21 that is.

22 Q    You also told us that you believed he was analyzing the

23 value of insurance, is that right?

24 A    I believe that's part of what it is, yes.

25 Q    And is it your understanding that he did that analysis?

SCOTT GRIFFITHS - CROSS BY MR. HEMENWAY                    455

1  A     That's my understanding.

2  Q     Okay.  And have you read Mr. Atkinson's report that was

3  an exhibit to the TCC's objection to the 9019 motion?

4  A     The answer is yes.

5  Q     And is it your understanding that that report contains

6  an analysis of the value of the creditors claims in the

7  case?

8  A     In what regard?  I'm sorry.

9  Q     You told me you've read Mr. Atkinson's report.  I'm

10 asking if your understanding is that it contains a value --

11 an analysis of the value of the creditor claims in this

12 case?

13 A     Well, that's what his report is, yes.

14 Q     That's what his report is?

15 A     Yeah.

16 Q     And is it your understanding that his report contains

17 an analysis of the value of insurance in this case?

18 A     I don't recall that.  It might be in there but I don't

19 recall that.

20 Q     So you believed he was doing it but you're not sure if

21 it's in the report?

22 A     Yeah, I'm not looking at the report here, and I'm not -

23 -

24 Q     So we talked about the settlement a lot today, and I

25 understand as I said earlier that the TCC's position is that

1  it opposes the settlement because it doesn't have enough

2  information to evaluate the deal, is that right?

3  A    Yes, generally, yes.

4  Q    So the TCC is not opposed to any settlement in this

5  case, correct?

6  A    I don't think -- yeah, I don't think the TCC is opposed

7  to a settlement.  I think it needs to have a fair, full

8  valuation of the --

9  Q    Okay.  And when we spoke last month, you told me that

10  TCC's position was that if there's a settlement that makes

11  sense and is fair, the creditors should take it?

12  A    Correct.

13  Q    Is that still your position?

14  A    If it's a fully informed decision then yes.

15          MR. HEMENWAY:  That's all I have.

16          THE COURT:  Thank you.

17          MR. HEMENWAY:  Pass the witness.

18          THE COURT:  Any -- Mr. Patterson?

19          MR. PATTERSON:  Yes, sir.

20          THE COURT:  I'll let you go.  I hear something's

21  coming up so I may -- I hear it in the background.  So but

22  let's proceed.  Mr. Patterson?

23                    CROSS-EXAMINATION

24  BY MR. PATTERSON:

25  Q    Mr. Griffiths, just -- I think you told me, or you told

1   the Court that your practice is primarily tort litigation,

2   personal injury?

3   A    Personal injury.  I also --

4   Q    Okay.

5   A    -- do family law too.

6   Q    And you have represented people that are incarcerated?

7   A    Correct.

8   Q    And incarcerated throughout the time that the

9   litigation is going on?

10  A    Yes.

11  Q    And so you're also familiar with pro se litigants that

12  are incarcerated, correct?

13  A    I am familiar with them.

14  Q    Right.  And you understand at least somewhat the

15  troubles or problems that they have in litigating their

16  claims?

17  A    Yes, I mean I don't know what problems -- yes, there

18  are procedural issues.  They don't have access to materials.

19  They don't have access to a law library, things like that.

20  Q    And would it be fair to say that they are predominantly

21  less successful than say you are?

22  A    Yes.

23  Q    And why is that?

24  A    Because of they're incarcerated.  They lack those

25  resources.

1  Q    Right.  Okay.  Can you tell me or tell the Court, or

2  describe the makeup of the body that you represent as a

3  member of TCC?

4          MR. MOXLEY:  Objection, Your Honor, witness is not

5  a member of the TCC.

6          THE COURT:  He's here, but he can tell me who's on

7  the TCC.

8          MR. PATTERSON:  Sure.

9          THE COURT:  I think that's where Mr. Patterson was

10  going.

11          MR. GRIFFITHS:  I can tell you most.  I mean I can

12  give you like a high level of it.  I don't -- they're not

13  all my clients.  I represent Nathan Alvarez, and Nathan

14  Alvarez is the only surviving person who survived prison.

15  The other five members are people who represent like

16  wrongful death, loss of family members and things like that.

17  BY MR. PATTERSON:

18  Q    And are you familiar with the makeup of the body of

19  people that is represented by the TCC?

20  A    I don't know what you're asking.  I'm sorry.

21  Q    Okay.  How --

22  A    I'm not trying to be difficult.

23  Q    Describe for me who the TCC represents?  You came up

24  and you testified that you believe that this is in the best

25  interest and that the committee is supporting it.  I want to

1  know who you're speaking for?  Can you tell us who these

2  people are generally --

3  A     Sure.

4         MR. PATTERSON:  -- that the TCC represents, or

5  purports to represent?

6         MR. MOXLEY:  I'll just note asked and answered,

7  Your Honor.

8         THE COURT:  Overruled.

9         MR. GRIFFITHS:  Yeah.  I can answer the question.

10 To the extent that they're family members of people who've

11 died in prison, have wrongful death claims, have cruel and

12 unusual punishment claims, right.  They're -- if you're

13 asking for like the types of claims that they are, I can

14 talk a little bit about the wrongful death.

15        I think that was kind of mentioned in our motion

16 the type of claim that it is.  If you're asking for anything

17 more personal, I don't know everybody personally.  I know

18 Nathan Alvarez personally.  I don't know necessarily

19 everybody else.  Latonda (phonetic) Smith, I know her

20 personally.

21 BY MR. PATTERSON:

22 Q    What percentage are pro se litigants that are

23 incarcerated, do you know?

24 A    I don't know the answer.  Pro se, I don't know how you

25 would know that.  Nationally and in Arizona, I only work in

1  Arizona.

2  Q    Right.  Well, there was allegations in the TCC's motion

3  to dismiss that there are approximately 200 personal claims

4  on file, right?

5  A    Okay.

6  Q    And there was also testimony about 100 of those are

7  filed by pro se litigants, right?

8  A    Okay.

9  Q    So would you say that about half of your constituents

10 are unrepresented, pro se or incarcerated tort claimants?

11 A    I would say a much larger percentage.

12 Q    Much larger than 50 percent, right?

13 A    Sure.

14 Q    So how many -- are there any incarcerated tort

15 claimants on the committee?

16 A    No.

17 Q    And how many did you talk to?

18 A    How many who?

19 Q    Incarcerated pro se claimants did you talk to?

20 A    I've talked to, I think three or four.

21 Q    About this settlement?

22 A    I haven't talked to them about the settlement, no.

23 Q    What did you talk to them about?

24 A    I've talked to them about the proceedings in this case.

25 They call and they ask questions, or I've been asked by the

1  District Court to reach out to them because they have

2  pending litigation going on against Corizon and they have

3  trial dates.

4  Q    All right.  But you didn't happen to mention the

5  proposed settlement to them?

6  A    I don't recall that I did, no.  Talked to --

7  Q    Is there a reason why?

8  A    Because -- the reason why is I'm one attorney --

9  Q    Well, that was funny?  I didn't catch the joke if it

10  was.

11  A    Well, I don't understand why you're so angry about it,

12  but --

13  Q    I'm not angry.  I'm asking you a question.  You talked

14  to these pro se litigants.  You're here supposedly espousing

15  their views on the settlement.  You talked to three or four

16  but you didn't mention it to them, and I'm trying to get at,

17  how do you know that this is in their best interest?

18  A    How do I -- wait.  Well, first of all, in the TCC, in

19  the committee itself, we talk about those issues.  They talk

20  about it.  And they know that they don't want to take a

21  settlement --

22  Q    Who's they?

23  A    The TCC members, the committee members.

24  Q    How many of them are incarcerated pro se litigants?

25  A    Four of them.  Well, they're not incarcerated.  They're

1   survivors of incarcerated folks.

2   Q    Okay.  And my question was how many are incarcerated

3   pro se litigants since that's more than half of the

4   constituency of the TCC?

5   A    On the TCC, there are no incarcerated pro se.

6   Q    On the committee itself, not --

7   A    On the committee itself.

8   Q    And so sitting around talking about it, doesn't get

9   their views?

10  A    Correct, in a committee meeting, it doesn't, no.

11  Q    Right.  It doesn't get their views.  You talked to

12  some.  You didn't ask them.  How many of the committee

13  members talked to incarcerated pro se litigants about this

14  settlement?

15  A    I don't know the answer to that question.

16  Q    Well, how do you know what your constituency wants if

17  over half have never been talked to about it?

18  A    I don't know.

19  Q    Well, then how did you come here today to say this is

20  in the best interest if you have no idea about over half of

21  your constituency?  We're just going to leave them out in

22  the dark?

23  A    I don't have an answer for you because --

24           MR. PATTERSON:  You're going to presume to know?

25           MR. MOXLEY:  Objection, Your Honor, compound.  I

1  think we're harassing the witness.

2          THE COURT:  I don't.  Let's continue.

3          MR. PATTERSON:  These 20 lawyers presume to know?

4  How many of them look like they've ever been incarcerated?

5  Look around the room?

6          MR. MOXLEY:  Objection.

7          MR. PATTERSON:  How many?

8          THE COURT:  Yeah, I'll sustain that one.

9  BY MR. PATTERSON:

10 Q    So how did you come to this conclusion, how?  Might

11 over half might you have no idea?

12 A    My conclusion is reached because when I talk to the

13 inmates, their value of the claims and the value of their

14 claims, when they talk about what they want to get done with

15 their claims is far outside of the value of anything that

16 was in -- could have been computed to be given to them as

17 part of the first settlement.

18 Q    Okay.  But you just said you talked to three or four,

19 and you didn't even mention it to them?

20 A    Because that -- I didn't talk to them about the

21 settlement agreement.

22 Q    Right.

23 A    That's what you asked about.

24 Q    And that's what we're here today about.

25 A    Right.  No, but you're asking me --

1    Q    You just said it's in their best interest?  How can you

2    say that?  That's my question.

3    A    Are you going to let me answer?

4    Q    If you have an answer, I'd love for you to.

5    A    Sure.  I don't talk to them about the settlement

6    agreement per se.

7    Q    My question was why?

8    A    You didn't let me answer.

9              MR. PATTERSON:  Why?

10             MR. MOXLEY:  Your Honor --

11             THE COURT:  You got to let him finish,

12   Mr. Patterson.  Let him finish answer.  So go ahead.

13             MR. GRIFFITHS:  Thank you.  When I have a

14   conversation with them, the conversations that do occur,

15   first of all, are privileged.  But when I do talk to them

16   about the value of their claims or what they think they're

17   trying to get done with their claims, they have a high value

18   on those claims.  And it doesn't match anything, wouldn't

19   come even close to the universe.

20             THE COURT:  I guess the question is as a member,

21   as a fact witness --

22             MR. GRIFFITHS:  Yeah.

23             THE COURT:  -- here on behalf of the TCC, do you

24   have any perspective on what incarcerated pro se plaintiffs

25   think about this settlement agreement?

1          MR. GRIFFITHS:  I don't have that answer.

2          THE COURT:  Okay.

3          MR. GRIFFITHS:  I don't.

4          THE COURT:  I think that's --

5          MR. PATTERSON:  All right.

6   BY MR. PATTERSON:

7   Q    So you also talked about -- multiple times, you've

8   indicated a lack of information, right?

9   A    Okay.

10  Q    How many times has the committee come here and said,

11  Judge Lopez, they're not giving me what we need?

12  A    The TCC, or the UCC?

13  Q    The TCC?  You said you couldn't give answers because

14  you just didn't have the information.

15  A    Sure.

16  Q    How many times did you come down here and tell the

17  judge, Judge, we're not getting cooperation.  They're

18  withholding information that we need.  How many times?

19  A    I don't know the answer to that.  I don't think that we

20  have.  I think the UCC did at the beginning of this case and

21  it was kind of a long, drawn out -- that's my understanding

22  of the docket generally.

23  Q    So you waited till the day of the hearing to complain

24  about the lack of information, and now you want to rely on

25  that, right?

1  A    I don't think that we've waited on anything.

2  Q    Well, did you come before today and tell the judge we

3  need your help to get information so we can do our analysis?

4  A    I think that the committee was formed in November.  I

5  think that they were asked three weeks later to go to a

6  mediation that they had just recently gotten 600,000 plus

7  documents given to them.

8       They went and tried to participate.  And then they

9  continued their investigation.  We've continued to do so

10 until the point that the 9019 motion was filed.  Then we

11 filed a motion to dismiss, and an objection to the 9019.

12      And then our expert report was done, and that's when

13 Mr. Atkinson says of the documents I reviewed, I don't have

14 enough to make a decision.  So at this point, maybe we do

15 come back to the Court and say we don't enough.  But we're

16 here for a hearing on whether the 9019 is approved, or a

17 motion to dismiss is granted.

18 Q    Well, no, the basis of your objection is you're unable

19 to value several things that you say are important, right?

20 A    Correct.

21 Q    Okay.  And you wait till the day of the hearing to tell

22 the Judge you didn't get what you needed?  I'm asking you

23 why did you wait until today to tell everyone we need more

24 information?

25 A    I don't think anybody's waited until today to tell

1  anybody about that.  I think --

2  Q    Okay.  Tell me when you came here and told the Judge

3  you needed this information?

4  A    I think that this hearing had been set, and had been

5  set -- the start of this hearing had been set prior to the

6  date that Mr. Atkinson's report was due, or was finalized.

7  So forgive me for not predicting with three months and

8  600,000 pages of documents, the answers to all the questions

9  and being able to approach Judge Lopez, and then go through

10 motion practice in time for this hearing.

11 Q    How do the pro se incarcerated litigants get paid if

12 this case is dismissed?

13 A    The pro se incarcerated litigants can continue their

14 cases.

15 Q    I know they can.  How do they get paid?

16 A    They would get paid from the Debtor.  They'd get paid

17 from any other sources of revenue that they have in the

18 recovery.

19 Q    And based upon your experience, what are the odds of

20 that?

21 A    Based on my experience and also the chart itself,

22 they're low.

23 Q    Very low, right?

24 A    Right.

25 Q    And what are the chances of them getting their

1  percentage payout in this bankruptcy case if they filed a

2  claim, or maybe the committee might do something to file

3  claims for them, what are the odds that they get their

4  percentage share payment if the bankruptcy case remains and

5  there's a plan confirmed?

6            MR. MOXLEY:  Objection, Your Honor, calls for

7  legal conclusion.

8            MR. PATTERSON:  Judge, he's the one that testified

9  --

10            THE COURT:  Yeah.

11            MR. PATTERSON:  -- they're better off with a

12  dismissal.

13            THE COURT:  He did.  I'll allow it.  I don't know

14  if he can answer from a bankruptcy perspective but I think -

15  - I get the point, Mr. Patterson.

16            MR. PATTERSON:  All right.

17  BY MR. PATTERSON:

18  Q    Let's go -- I want to talk to you a minute, and I know

19  we're running late, and I'm almost done.  I want to talk to

20  you a little bit about these claims that you say have not

21  been considered by the committee or the people that are

22  supporting these 9019.  And I think you referred to them

23  generically as successor liability and alter ego claims,

24  right?

25  A    Okay.

1  Q    Am I correct, is that yes or no, not okay?

2  A    Yes.

3  Q    Yes, you agree with me?  Those are the claims you say

4  have been ignored by the committee and the Debtor, right?

5  A    Right.  And the loss of business opportunity as well.

6  Q    Lost opportunity?

7  A    Yeah.

8  Q    That was the breach of fiduciary duty, right?

9  A    If you want to call it that, yeah.

10 Q    No, I want to call it how you describe it.  Is that a

11 breach of fiduciary duty that you talked about?

12 A    They could be a breach of fiduciary duty.  I think

13 that's what the other counsel was saying.

14 Q    I know it could be.  Is that what you were talking

15 about though when --

16 A    No, I called it the misappropriation of business

17 opportunity.  That's what I called it.

18 Q    All right.

19 A    And you'd be corrected.

20 Q    Walk me through this now.  You represent Mr. Alvarez,

21 that's correct?

22 A    Correct.

23 Q    Let's say that Mr. Alvarez, I don't know anything about

24 his claim.  But his personal injury claim is determined by a

25 jury to be $100, right?

1  A     Okay.

2  Q     $100.  What does his right to the successor liability,

3  how much does that increase his claim?

4  A     For successor liability, it doesn't.

5  Q     It's zero, right?

6  A     Right.

7  Q     How much does his alter ego claim increase his $100

8  claim?

9  A     It doesn't increase his $100 claim.

10 Q     It's zero also, right?

11 A     Right.

12 Q     And how much does the misappropriation of business

13 opportunity increase his $100 claim?

14 A     It doesn't.

15 Q     It doesn't.  And why is that?  Explain to the Court why

16 it doesn't affect his claim at all?

17 A     Because in your example, $100 is a jury award, or court

18 award of some sort, or something.

19 Q     For his personal injury?

20 A     That's correct.

21 Q     His first personal injury?

22 A     Understood.

23 Q     All right.

24 A     However he stands to recover better if Tehum, which is

25 the tortfeasor in this case, or Corizon, if they're bankrupt

1  or an entity that doesn't have any resources, he can make a

2  recovery from those other sources.

3  Q    These are methods of collection, right?  They're not

4  damage claims?

5  A    Not necessarily.

6  Q    No, not necessarily.  They're not, are they?  They are

7  not damage claims?

8  A    No, the last two are not.  The last two, the alter ego

9  and successor liability, they're not necessarily damage

10 claims.  Those are methods of recovery.

11 Q    Right.

12 A    The lost business opportunity though, and the billion

13 dollar contract that walked out the door because the

14 officers and directors of Corizon make it so that you can't

15 evaluate this plan fairly.  The 9019 plan is an incomplete,

16 half-baked plan because those things aren't in the --

17 Q    Let's wait on my question, all right.  And my question

18 is who has that misappropriation claim?  Does Mr. Alvarez

19 have a misappropriation claim?

20 A    No.

21 Q    No, he doesn't.  And do any of those tort claimants?

22 A    No.

23 Q    No.

24 A    They're still causes of actions.

25 Q    So when you're evaluating the 9019 --

SCOTT GRIFFITHS - CROSS BY MR. PATTERSON                    472

1   A      Right.

2   Q      -- and you're comparing to recovery for the creditors,

3   why does it come into play?  You tell me.  If none of them

4   have that claim, it doesn't affect their recovery.  Their

5   claim is the same, right?

6   A      It potentially increases the amount of the 9019

7   settlement numbers.  The amount in the shopping cart.

8   Q      Okay.  I don't like the shopping cart.  My wife is way

9   smarter than that.  All right.  She doesn't need a shopping

10  cart.  She understands this.

11  A      Okay.

12  Q      All right.  So I don't want to hear about shopping

13  cart.

14  A      I'm just using the analogy --

15  Q      Tell me about the claims.

16  A      -- that's been --

17          MR. PATTERSON:  You're a lawyer.

18          MR. MOXLEY:  Objection, Your Honor.

19          MR. PATTERSON:  What's the objection?

20          MR. MOXLEY:  So the witness can answer the

21  question in a way that --

22          THE COURT:  Well, I'm --

23          MR. PATTERSON:  That's not an evidentiary

24  objection.

25          THE COURT:  Hold on.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1        MR. PATTERSON:  That's I don't like the question.

2        MR. MOXLEY:  Oh, that's the objection.  He's

3   harassing the witness at this point.

4        THE COURT:  Wait, hold on a second folks.  I'm not

5   sure there actually was a question.  Why don't you ask the

6   question, Mr. Patterson.

7        MR. PATTERSON:  All right.

8        THE COURT:  I know you don't -- I know we got into

9   like I don't like shopping carts.  I'm not really sure that

10  was a question.  So if we can get a question for the

11  witness.

12  BY MR. PATTERSON:

13  Q    How does it affect Mr. Alvarez' recovery?

14  A    If Mr. Alvarez -- if there's a settlement in this case,

15  it could potentially greatly increase his recovery in the

16  settlement.

17  Q    Does it increase his claim?  His claim's still $100,

18  right?

19  A    Well, we wouldn't get to the part of a claim, like a

20  jury award or court award if there's a settlement.

21  Q    And if the case is dismissed, where are you going to

22  bring, you, his lawyer, this misappropriation claim?  Where

23  are you going to bring it?

24  A    Where am I bring a misappropriation claim?

25  Q    Yeah.

SCOTT GRIFFITHS - CROSS BY MR. PATTERSON                    474

1  A    I don't know.  I'll think of a theory and throw it in

2  District Court with --

3  Q    You'll have to dream it up because you don't have

4  standing, isn't that correct?

5  A    We'll have to see.  I don't know.  I haven't evaluated

6  --

7  Q    What do you mean you'll have to see?

8  A    -- that, but the fact of the matter is there would be

9  alternate forms of recovery in the terms of alter ego and

10  successor liability that could be done.

11  Q    And you would agree with me --

12  A    And have --

13  Q    -- would you not that this alter ego is a collection

14  theory only, right?

15  A    It's --

16  Q    It's a responsibility allocation, right?

17  A    That's a way to say it, yes.

18  Q    Does it change the pool of claims, the 200 claims on

19  file, it doesn't change that at all, does it?

20  A    No.

21  Q    All right.  It only accesses additional funds

22  potentially?

23  A    Correct.

24  Q    If you can find someone else that's liable?

25  A    Right.

SCOTT GRIFFITHS - CROSS BY MR. PATTERSON                    475

1   Q    And that's what this 9019 does, right?

2   A    I'm sorry.  The 9019 does what?

3   Q    Accesses additional funds based upon this potential

4   exposure for these third parties, right?

5   A    Sure.

6   Q    All right.  But you can't come today and tell the Court

7   whether that's a sufficient number or an insufficient

8   number, right?

9   A    Right.

10   Q    Because you said you didn't get the information?

11   A    Correct.

12   Q    All right.  So you can't -- you nor your expert's going

13   to be able to opine on that at all because today, you say, I

14   don't have enough information, right?

15   A    I won't speak for Mr. Atkinson, but yes.

16   Q    Well, did you read his report?

17   A    I did.

18   Q    What does he say about it?

19   A    That's what he says about it.

20   Q    He can't say because he doesn't have enough information

21   today, right?

22   A    Right.

23   Q    So you can't take a position whether it's a good number

24   or a bad number?

25   A    I can say it's a incomplete number.

1   Q    You say it, but it's not based on anything, right?

2   A    Based on the fact that it's an incomplete study, yes.

3   Q    Okay.

4   A    I can say it's incomplete.  That's what I can say.

5   Q    You can say it's incomplete?

6   A    I don't have enough information.

7   Q    Right.  Same with the successor liability, right?

8   A    Right.

9   Q    I won't go through the whole thing, but again --

10  A    That's fine.

11  Q    -- but again, you and your expert say oh, today we

12  can't tell you whether it's good or bad because we don't

13  have enough information, right?

14  A    Okay.  Right.

15  Q    No, that's yes or no, not okay?  Yes or no?

16  A    Yes.

17  Q    All right.  And just like prior question, you didn't

18  come in here before today and say, Judge Lopez, we need your

19  help getting this information, right?

20            MR. MOXLEY:  Objection, Your Honor.  I can do it

21  on redirect but objection to that question.

22            THE COURT:  Overruled.

23            MR. PATTERSON:  Right.

24            MR. GRIFFITHS:  Can you ask the question again,

25  please?

1  BY MR. PATTERSON:

2  Q    Sure.  You didn't come to Judge Lopez before today, and

3  say, Judge, we need your help because we're not getting

4  information we need on the successor liability analysis?

5  A    Correct.

6  Q    All right.  And just briefly, to finish this up, you

7  believe -- I think is what you testified to under oath, that

8  a dismissal is better off because of the black hole of

9  litigation that the bankruptcy's going to create, right?  Is

10 that what you said?

11 A    Well, I was using Mr. Bruckner's statement from, or his

12 description of how if the case was dismissed, if the

13 bankruptcy is dismissed, the claims go back into a black

14 hole, and I don't think that that's true.  It's not.

15 Q    How many pending State Court cases were there

16 prepetition --

17 A    I don't know.

18 Q    -- tort points?  You have no idea?

19 A    I don't know.

20 Q    You do any investigation?

21 A    Did I, no.

22 Q    Yeah.  So how do you know that it's better in the State

23 Court system or the federal court system outside of

24 bankruptcy?  Would it make a difference to you if I told you

25 there were 10,000 tort cases pending on the petition date in

```
 1  3,000 different jurisdictions?  Does that change your
 2  analysis --
 3  A     No.
 4  Q     -- to say we have the opportunity to bring them all in
 5  one location and resolve the issues here?
 6  A     Here, sure.  It might, if there were numbers that you
 7  could say each claimant gets this but I haven't heard that
 8  there's any kind of number given to them.  So I think that -
 9  -
10  Q     Right.
11  A     And I do believe that the inmates, the TCC members, I
12  know the TCC members want to resume their own independent
13  litigation.
14  Q     Right.
15  A     Whatever comes from it.
16  Q     Of course, because they're sitting at this table,
17  right?  They're all lawyers?
18  A     The TCC --
19  Q     All the lawyers say we want to go back to court and
20  continue litigating, right?
21  A     Sure.
22  Q     But over half of your constituency don't have lawyers
23  and they're in prison?
24  A     Okay.
25  Q     What do you mean okay?
```

1  A    Okay.

2  Q    So you're going to listen to the middle-aged white guys

3  instead of the guys in prison that have these claims?

4  A    I would let them litigate the claims that they have.

5  Q    And you know for a fact that they're less successful

6  and they're probably going to get zero, but you're okay as

7  speaking on behalf of the committee saying, yeah, let them

8  go take care of themselves?  We're lawyers, we're going to

9  be okay, right?

10  A    I'm okay with it but I think that's the better result,

11  yeah.

12         MR. PATTERSON:  Okay.  Great.  No further

13  questions, Judge.

14         THE COURT:  Okay.  Redirect?

15         MR. MOXLEY:  I have some redirect, Your Honor.

16         THE COURT:  Okay.

17         MR. MOXLEY:  If I may?

18                    REDIRECT EXAMINATION

19  BY MR. MOXLEY:

20  Q    Mr. Griffiths, are you aware that in the weeks leading

21  up to this hearing, there were a number of discovery

22  conferences in Judge Lopez' courtroom?

23  A    I'm not aware of that.

24         MR. PATTERSON:  Objection, Your Honor, leading the

25  witness.

1           THE COURT:  Sustained.

2    BY MR. MOXLEY:

3    Q    Now you were asked some questions by counsel just now

4    with respect to why didn't the TCC come to the Court with

5    respect to discovery issues prior.  Do you recall that

6    testimony?

7    A    Sure.

8    Q    Are you aware one way or the other whether or not the

9    TCC did that?

10   A    I don't know.

11   Q    Are you aware one way or the other whether or not the

12   TCC filed a motion to compel, a combined motion to compel

13   and motion in limine?

14          MR. PATTERSON:  Objection, leading the witness.

15          MR. MOXLEY:  I'm asking if he's aware --

16          THE COURT:  Overruled.  If he's aware, he asked if

17   he's aware.

18          MR. GRIFFITHS:  I do remember the motion in

19   limine, yes.

20          MR. MOXLEY:  Would you recall that motion in

21   limine being a combined motion in limine and motion to

22   compel?

23          MR. PATTERSON:  Objection, Your Honor.

24          THE COURT:  That I'll sustain.

25          MR. GRIFFITHS:  I do remember that it --

1          THE COURT:  Hold on.  That was sustained.  You get

2    to ask another question though.

3    BY MR. MOXLEY:

4    Q    You were asked some questions, Mr. Griffiths, about how

5    you reached conclusions with respect -- or without talking

6    to certain incarcerated people about the settlement.  Do you

7    recall that?

8    A    Yes.

9    Q    Are your conclusions based on anything other than

10   conversations that you may have had with the claimants?

11   A    No.

12          MR. MOXLEY:  Are they based on -- have you taken

13   into account with respect to your views analysis that the

14   TCC has undertaken?

15          MR. PATTERSON:  Objection, Your Honor, leading.

16          THE COURT:  Sustained.

17   BY MR. MOXLEY:

18   Q    Mr. Griffiths, you were asked some questions about how

19   you reached conclusions and what those conclusions were

20   based on.  Do you recall those questions?

21   A    Yes.

22   Q    Okay.  Please tell the Court what the basis for your

23   conclusions with respect to your views on the settlement

24   agreement are based on?

25   A    My conclusions regarding the settlement?

1   Q    Yes, sir.

2   A    Is that this particular set of victims, the people in

3   the Tort Claimant Committee, right, the tort claimants, they

4   need to have remedy in the courts.  And what happens with

5   the settlement in this case is it settles claims, kind of

6   blankets and -- there's no plan yet that's determined for

7   distributing what little funds there will be.

8        So my belief is that the best plan and the TCC's belief

9   is the best plan is to dismiss this, and then litigate their

10  cases so they can get their day in court.

11  Q    Do you know, Mr. Griffiths, whether the TCC filed a

12  motion to compel?

13  A    I believe that they did.

14  Q    Did you know whether the TCC served a subpoena on

15  YesCare?

16          MR. PATTERSON:  Objection, Your Honor, leading the

17  witness.

18          THE COURT:  I'll overrule that on this question.

19          MR. GRIFFITHS:  I'm sorry.  What was your --

20  BY MR. MOXLEY:

21  Q    The question was, Mr. Griffiths, do you know whether

22  the TCC served a subpoena on YesCare?

23  A    I don't know.  I'm sorry, I don't know.

24          MR. MOXLEY:  Do you know if YesCare produced any

25  documents in response to any subpoenas?

1              MS. ENGLAND:  Objection --

2              THE COURT:  I just sustained.

3   BY MR. MOXLEY:

4   Q    Do you know whether the TCC sought additional time to

5   conduct discovery?

6   A    I believe that the TCC did request more time.

7   Q    You recall Mr. Hemenway asking you some questions about

8   what would happen if this case is dismissed, and

9   specifically asked you whether pro se claimants would be in

10  a position where they would have to assert successor

11  liability claims on their own?

12  A    Yes.

13  Q    You recall those questions, yes?

14  A    Yes.

15  Q    Are you aware of any amicus filings in this case?

16  A    I am aware of at least one.

17             MR. PATTERSON:  Objection, Your Honor, leading the

18  witness.

19             MR. MOXLEY:  I'm asking if the witness is aware of

20  the filing in the case?

21             MR. PATTERSON:  He's providing him information --

22             THE COURT:  Yeah.

23             MR. PATTERSON:  -- and encouraging him to say yes.

24             MR. MOXLEY:  Your Honor, a leading question

25  asks -- it implies the answer.  I'm not --

1          THE COURT:  I know what a leading question is.

2          MR. MOXLEY:  I know you do.

3      (Crosstalk.)

4          MR. PATTERSON:  -- aware of your question.  I mean

5  maybe he didn't tell.  But you're asking if he's aware of --

6          THE COURT:  That's exactly, but that's the point

7  is that he wasn't aware, and now you're then now asking

8  questions about whether he's aware of something after he

9  said he wasn't aware.  So I'll sustain the objection.

10         MR. MOXLEY:  Well, I don't -- thank you, Judge.

11 BY MR. MOXLEY:

12 Q    Let me ask you this, Mr. Griffiths.  Do you think that

13 the premise of Mr. Hemenway's question is accurate, that pro

14 se claimants would be left on their own if this case was

15 dismissed?

16 A    That's not fully true.

17 Q    Okay.  What do you mean by that?

18 A    Well, there's been a lot of attention that's been drawn

19 to this case from this, and I think that there's attorneys

20 that would respond to and answer phone calls from pro se

21 litigants.

22         MR. PATTERSON:  Objection, Your Honor, that's pure

23 speculation and hearsay based on --

24         THE COURT:  It's speculation for sure.  I'll

25 sustain.  I'll strike.  In other words, the witness

1   testified earlier that he thought they'd be worse off, and

2   now he can't turn around and say, but they might be able to

3   get some lawyers because of something.  It's just, it's

4   inconsistent with his answer so --

5          MR. MOXLEY:  I think -- respectfully, Your Honor,

6   if I may just be heard briefly on that?

7          THE COURT:  Not really.

8          MR. MOXLEY:  Okay.  Thank you, Judge.

9          THE COURT:  No, I mean you can, but in other

10  words, what we're going to do is then Recross and then I'm

11  going to let Mr. Patterson come up and start asking whether

12  he thought about that when he gave the answer that they were

13  going to be worse off and he was fine continuing with his

14  clients litigation, right.  It's just -- you can open the

15  door if you want.  I'll --

16         MR. MOXLEY:  I understand, Your Honor.  I'll

17  withdraw the question.

18         THE COURT:  That's where I'm going.

19         MR. MOXLEY:  You already ruled on it the question

20  so there's no question.  I understand, Judge.

21  BY MR. MOXLEY:

22  Q   Mr. Griffiths, you testified earlier in response to

23  questions from counsel that you reviewed Mr. Atkinson's

24  report, correct?

25  A   That's correct.

1  Q    Okay.  Does that inform your views with respect to the

2  settlement agreement?

3  A    It does.

4  Q    In what way?

5  A    In the way that I feel that the settlement agreement is

6  incomplete.  It can't be fully known.  It's inadequate in

7  the sense that it's leaving out claims.

8         MR. MOXLEY:  Your Honor, may I have just one

9  moment?

10        THE COURT:  Of course.

11        MR. MOXLEY:  Thank you, Judge.  Your Honor, I have

12  no further questions.  Thank you.

13        THE COURT:  Any further?

14        MS. ENGLAND:  Nothing further.

15        THE COURT:  All right.  Well?

16                 RECROSS-EXAMINATION

17        MR. PATTERSON:  Quick because I know everyone

18  wants to leave.

19  BY MR. PATTERSON:

20  Q    You talked about claims, Mr. Griffiths, and I won't

21  recount your testimony but let me ask you on question.  Have

22  you looked at the claims register?

23        MR. MOXLEY:  Your Honor, this is outside the

24  context of --

25        MR. PATTERSON:  It's not.  The very last question

that he asked him --

THE COURT: Overruled.

MR. PATTERSON: Thank you, Your Honor.

BY MR. PATTERSON:

Q Have you looked at the claims register?

A Not lately, no.

Q No. I didn't say lately. I said have you looked at the claims register?

A Yes.

Q When?

A A long time ago.

Q How long ago?

A I don't recall.

Q Prior to the bar date?

A No, it was after that.

Q Okay. And at what meeting did the TCC as a committee sit down and go through the claims that are on the claims docket?

A We haven't discussed that at a meeting.

Q You haven't analyzed the claims?

A Not on a TCC meeting.

Q Has the TCC asked someone to analyze the claims?

A Mr. Atkinson.

Q I thought you said he wasn't able to do it because he didn't have enough information?

1  A    I don't know about the claims register part.
2  Q    No?  You said claims, he couldn't come up with a number
3  for the claims because he didn't have enough information?
4  That's what you said, isn't it?
5  A    I think it referenced getting medical -- having a
6  medical review of that, yes.
7  Q    No?  That's not what you said.  You said he couldn't
8  come up with a number, a claim number because he didn't --
9  because the Debtor didn't give him enough information.
10 Isn't that what you said?
11 A    I guess at this point I don't recall what I said.
12 Thank you.
13 Q    Okay.  Well, let's start fresh then.  Did Mr. Atkinson
14 give you a number of claims against the Debtor, a dollar
15 amount?
16 A    I don't recall.
17 Q    Did you review the report?
18 A    I did.
19 Q    Okay.  And so now your testimony, when you say he
20 wasn't able to come up with a number of claims, tort claims,
21 is that testimony no good now because you're here under
22 oath, Mr. Griffiths?
23 A    I'm aware.
24 Q    Well, it doesn't seem like you're remembering, and so
25 what is it?  Did someone give you that number?

1  A     What number are you talking about?

2  Q     The only number we've talked about on my Recross with

3  you which is the total number of tort claims against the

4  Debtor?  That's the only number we've talked about.

5  A     Well, you mentioned 3,000 claims over 1,000

6  jurisdictions, or 10,000 claims over 3,00 jurisdictions.

7  Q     Okay.  That's your recollection?

8  A     Well, you --

9  Q     Really, Mr. Griffiths?

10 A     -- mentioned a bunch of numbers.  I don't know what

11 you're talking about so my answer is I don't know.

12 Q     That's your memory is that I represented to you there

13 were 3,000 claims filed in this case?

14 A     It was a hypothetical, I think, that you did.

15 Q     That's right.  So why bring it up now?  Why?  My

16 question to you is did anyone give the committee an estimate

17 of the dollar amount of tort claims against the Debtor?

18 A     No.

19 Q     And why was that?

20 A     Because I don't think that there's enough information

21 for them to know.

22 Q     That's right.  That's what you said earlier, right?

23 Now my question is why didn't you just give them the claims

24 register?

25 A     Give who, Mr. Atkinson?  He has --

SCOTT GRIFFITHS - RECROSS BY MR. PATTERSON                490

1  Q     Whoever it is you paid money from the estate to come up

2  with this report?

3  A     He has access to those things.  I'm not the one that

4  provides that.

5  Q     Okay.  And you read it and he says I don't have

6  information to estimate the dollar amount of claims and the

7  Debtor.  Did you not pick up the phone and go, dude, we have

8  a claims register here?  It's free.  You have a calculator.

9  You just put a plus sign between each of those claims that

10 have been filed.  Did you tell him that?

11 A     No.

12 Q     Did the committee do it on their own?

13 A     The committee, the TCC members?

14 Q     Yes.

15 A     No.  I'm sure they didn't.

16 Q     Did you tell this big group of lawyers here to get one

17 of the paralegals to get a calculator and add them up, for

18 $3 million, they didn't add up the claims on the register,

19 Mr. Griffiths?

20 A     (No verbal response.)

21 Q     You're raising your hands like you're baffled?  I'm

22 sorry if I'm confusing you.  Did you ask your lawyer, your

23 team of lawyers to do that?

24 A     The TCC has asked the lawyers, the team of lawyers and

25 Mr. Atkinson to complete an investigation.

1  Q     And all that money, no one thought to look at the

2  claims register?

3  A     I don't know.

4          MR. PATTERSON:  No further questions, Judge.

5          THE COURT:  Any further questions?

6          MR. MOXLEY:  Your Honor, may I have just one

7  moment?

8          THE COURT:  Of course.

9          MR. MOXLEY:  Your Honor, just briefly.

10          MR. MOXLEY:  Mr. Griffiths, does the Disclosure

11  Statement contain a number that represents the base amount

12  of the proofs of claim that have been filed in this case?

13          MR. PATTERSON:  Objection, Your Honor, leading the

14  witness.

15          MR. MOXLEY:  Your Honor, counsel is --

16          THE COURT:  Overruled.

17          MR. MOXLEY:  -- aware of what's -- thank you,

18  Judge.

19          THE COURT:  He can answer the question.

20          MR. GRIFFITHS:  I don't recall.  I believe it

21  does, but I don't recall specifically where in the

22  Disclosure Statement.

23          MR. MOXLEY:  Thank you, Mr. Griffiths.  I have no

24  further questions, Your Honor.

25              THE COURT:  All right, folks.  I believe -- any

1   other questions before I let this witness off?

2        (No audible response.)

3            THE COURT:  All right, folks, thank you very much

4   for your time.  We'll start at 9:30 on Wednesday.  Thank

5   you.

6            Everyone is excused.  Thank you.

7        (Proceeding adjourned at 8:26 p.m.)

8                        *  *  *  *  *

9        *I certify that the foregoing is a correct*

10  *transcript to the best of my ability produced from the*

11  *electronic sound recording of the Zoom/telephonic*

12  *proceedings in the above-entitled matter.*

13  *   /S./   MARY D. HENRY*

14  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17  *JTT TRANSCRIPT #68423*

18  *DATE FILED:  MARCH 28, 2024*

19

20

21

22

23

24

25