1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 23-90086-11
                              §     HOUSTON, TEXAS
5   TEHUM CARE SERVICES,      §     WEDNESDAY,
    INC.,                     §     MARCH 27, 2024
6            DEBTOR.          §     9:35 A.M. TO 9:16 P.M.

7                     **CONTINUATION OF TRIAL**

8
          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
9              UNITED STATES BANKRUPTCY JUDGE

10

11

12        APPEARANCES:              SEE NEXT PAGE

13        ELEC. RECORDING OFFICER:  ZILDE COMPEAN

14        CASE MANAGER:             ROSARIO SALDANA

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

1                              **APPEARANCES:**

2    FOR COMMITTEE OF TORT              D. Cameron Moxley, Esq.
     CLAIMANTS:                         Eric Goodman, Esq.
3                                       BROWN RUDNICK LLP
                                        7 Times Square
4                                       New York, NY 10036

5    FOR THE DEBTOR:                    Jason S. Brookner, Esq.
                                        GRAY REED & MCGRAW, LLP
6                                       1601 Elm Street,
                                        Suite 4600
7                                       Dallas, TX 75201

8    FOR THE OFFICIAL COMMITTEE OF      Nicholas Zluticky, Esq.
     UNSECURED CREDITORS:               STINSON, LLP
9                                       1201 Walnut, Suite 2700
                                        Kansas City, MO 64106

10

11   FOR THE U.S. TRUSTEE:             Ha Minh Nguyen, Esq.
                                        OFFICE OF THE UNITED
12                                        STATES TRUSTEE
                                        515 Rusk Street
13                                      Suite 3516
                                        Houston, TX 77002

14

15   FOR RMSC PLAINTIFFS:              Johnie J. Patterson, Esq.
                                        WALKER & PATTERSON, P.C.
16                                      P.O. Box 61301
                                        Houston, TX 77208-1301

17

18   FOR SAINT ALPHONSUS HEALTH
     SYSTEM:                            MEHAFFY WEBER
19                                      James Blake Hamm, Esq.
                                        PO Box 16
20                                      Beaumont, TX  77704
                                        409-835-5011
21
     FOR CAPITAL REGION MEDICAL
22   CENTER:                            JONES MURRAY, LLP
                                        Erin Jones, Esq.
23                                      602 Sawyer St., Ste. 400
                                        Houston, TX  77007
24                                      832-529-1999

25   (See Also Electronic Appearances.)

1                              **INDEX**

2

Witness:                 Direct    Cross    Redirect    Recross

3

DAVID BARTON
4   By Mr. Zluticky          .         .        124          .
    By Mr. Moxley            11         .         .          125
5

6   MICHAEL ATKINSON
    By Mr. Goodman          129         .        357          .
7   By Mr. Kaufman           .         230        .           .
    By Mr. Hemenway          .         313        .          359
8   By Mr. Patterson         .         323        .           .

9   MATTHEW DUNDON
    By Mr. Zluticky         362         .         .           .
10  By Mr. Moxley            .         424        .           .

11

12  EXHIBITS:                       Marked    Offered    Received

13  (None offered.)

14

15  CLOSING:
    By Mr. Brookner              448
16  By Mr. Zluticky             462
    By Mr. Hamm                 488
17  By Ms. Jones                489
    By Mr. Nguyen               490
18  By Mr. Goodman              504

19                              **\*\*\***

20

21

22

23

24

25

1        **HOUSTON, TEXAS; WEDNESDAY, MARCH 27, 2024; 9:35 A.M.**

2              THE COURT:  Good morning, everyone.  Today is

3    March 27th.  This is Judge Lopez.  If you just give me about

4    a minute, we will get started.

5              I'm going to ask the parties -- this is a

6    continuation in the Tehum case.  I'm going to ask parties to

7    just make electronic appearances, save a little time.  And

8    we'll just be able to continue.  If you just give me one

9    moment and we will get started.

10        (Pause in the proceeding.)

11             THE COURT:  Okay.  Good morning.

12             MR. MOXLEY:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. MOXLEY:  Your Honor, would you like

15   appearances first?  I just want to check on that.

16             THE COURT:  No, no, no.  I --

17             MR. MOXLEY:  Okay.  Very good.

18             THE COURT:  Just state your name for the Record

19   when we start and we'll be good.

20             MR. MOXLEY:  Of course, Your Honor.  Cameron

21   Moxley of Brown Rudnick for the TCC, Judge.

22             Your Honor, I thought we may just begin very

23   briefly.  There -- I don't believe there are any

24   housekeeping matters.  I don't think there's a new proposed

25   order this morning.

```
1              THE COURT:  Okay.

2              MR. MOXLEY:  So, we -- we thought we would just

3    give a line up with the sort of witness today.

4              THE COURT:  Okay.

5              MR. MOXLEY:  So I think we're -- we're continuing

6    with the cross-examination of Mr. Barton, which is continued

7    from March 1st.

8              I think on -- on the continued cross is

9    approximately 90 minutes, or so.  It depends a little bit on

10   how that goes.

11             THE COURT:  Okay.

12             MR. MOXLEY:  There's -- I imagine there will be

13   some redirect.

14             Then we would move to the TCC's expert witness,

15   Mr. Atkinson.

16             THE COURT:  Okay.

17             MR. MOXLEY:  I think we have probably

18   approximately one hour on direct for that.  I'm not sure how

19   much cross will be for that.  And then we would move to

20   Mr. Dundon.

21             I think our -- our, you know, I don't know how

22   much there would be for direct on Mr. Dundon.  But just for

23   the TCC, I think we're expecting a pretty short cross-

24   examination for him, maybe 30 minutes or so.

25             THE COURT:  Okay.
```

1          MR. MOXLEY:  So that -- I think there -- from our

2    perspective, at least, we don't really have any doubt that

3    we'll get through the witnesses today and -- and through

4    closings.

5          THE COURT:  Okay.

6          MR. MOXLEY:  So that's -- that's our perspective,

7    Judge.

8          THE COURT:  Okay.

9       (Pause in the proceeding.)

10         THE COURT:  Let me hear from the Debtor's side.

11   You all -- sounds like this is where we're going --

12         MR. BROOKNER:  I think we actually --

13         THE COURT:  -- finish with the Barton cross.

14         MR. BROOKNER:  -- are in agreement for a change

15   here, Your Honor.

16         THE COURT:  Atkinson.

17         MR. MOXLEY:  That sounds fine to us, Your Honor.

18         MR. BROOKNER:  -- and then cross.

19         THE COURT:  And I've given everyone how much time

20   I'm giving everyone for closing?  Did I already tell

21   everyone?

22         MR. BROOKNER:  We actually -- we -- we thought it

23   was 20 minutes.  So --

24         THE COURT:  Yeah.

25         MR. BROOKNER:  -- we -- we -- we have no more than

1  25 minutes of argument.

2         THE COURT:  Yeah.  I -- I'd say --

3         MR. BROOKNER:  Of closing, I mean.  Sorry.

4         MR. MOXLEY:  Same, same on our, Judge.

5         THE COURT:  Okay.  Good.  I -- was going to shut

6  you all down at 30 minutes per side.  And so --

7         MR. BROOKNER:  If you give us 30 each we'll be

8  good to go.

9         THE COURT:  Yeah.  Okay.  And that includes any

10  joinders, I think, 30 minutes each side so that you all have

11  to figure all that out.

12         MR. BROOKNER:  The Debtor and the Committee split

13  the 30 or we have 30 each?

14         THE COURT:  No, you will not have 30 each.

15  Thirty -- thirty minutes per side.

16         MR. BROOKNER:  Okay.  Got it.

17         THE COURT:  That's what I mean.

18         MR. BROOKNER:  Got it.  Okay.

19         MR. ZLUTICKY:  Thank you, Judge.

20         THE COURT:  All right.

21         MR. ZLUTICKY:  Then with that, I think, we can

22  get -- the only other, I guess, housekeeping point, Your

23  Honor, is --

24         THE COURT:  Cause then I got to give them an hour.

25  And I'm not giving them an hour.

1          MR. BROOKNER:  Point taken.

2          THE COURT:  No.  No.  That's -- that's on me.

3     (Laughter.)

4          MR. ZLUTICKY:  And then, Your Honor, just to make

5     sure in order of witnesses.  We're starting with Mr. Barton.

6          MR. MOXLEY:  Yes.

7          THE COURT:  Barton, Atkinson, Dundon.

8          MR. ZLUTICKY:  And Atkinson, Dundon?

9          MR. MR. MOXLEY:  Yes.

10          MR. ZLUTICKY:  Okay.  That's fine.

11          MR. MOXLEY:  Yes.  Okay.

12          And Judge, on that, you know, yesterday I know

13     that the Court was -- mentioned the point about the order of

14     witnesses and are we going out of order, and when -- when do

15     cases close.

16          Mr. -- I think what we -- we would want to make

17     sure we do, at whatever time the Court wants to hear it, is

18     just make sure we move into evidence, the designated

19     testimony of YesCare's witness, who is

20     outside -- Mr. Sprouse, who -- who we put in the -- in the

21     initial filing, Judge, before the trial.  We had designated

22     that testimony.

23          THE COURT:  Why don't we do it right before

24     closing?

25          MR. MOXLEY:  Very good, Judge.  We'll do that.

```
1              THE COURT:  Okay.
2              MR. MOXLEY:  Thank you, Judge.
3              THE COURT:  That'll be perfect.
4              MR. MOXLEY:  Okay.
5              MR. BROOKNER:  I don't --
6              THE COURT:  Or we're --
7              MR. BROOKNER:  May I address counsel directly,
8   Your Honor?
9              THE COURT:  Yeah.  Of course.
10             MR. BROOKNER:  I don't think we've ever seen
11  proposed designations --
12             MR. MOXLEY:  They were -- they were --
13             MR. BROOKNER:  -- even if -- that's problem.
14             MR. MOXLEY:  They were filed.
15             MR. BROOKNER:  They were?
16             MR. MOXLEY:  Yes, they were filed.
17             We -- we can take it up.  We don't want to
18  waste --
19             MR. BROOKNER:  All right.  Fine.
20             MR. MOXLEY:  Yes.  I'm happy to work with you, but
21  we -- they were filed.  Yes.  Okay.
22             THE COURT:  Okay.
23             MR. BROOKNER:  Okay.
24             MR. MOXLEY:  Very good.
25             THE COURT:  At -- at least we'll -- we'll take up
```

1  depo designations at the end of -- once all the witnesses

2  are done and -- and everybody's rights are preserved.  Why

3  don't we just say that?

4          MR. MOXLEY:  That's fine, Judge.

5          THE COURT:  Okay.

6          MR. MOXLEY:  We just wanted to make sure there

7  wasn't a situation where we accidentally closed and then

8  Court didn't get that.  Okay.  Very good.

9          THE COURT:  You got it.

10         MR. MOXLEY:  So with that, Judge, I think we'll

11 just continue with Mr. Barton.

12         THE COURT:  Okay.  Mr. Barton, come on up.

13     (Pause in the proceeding.)

14         THE COURT:  Are those Barton binders by the way?

15         MR. MOXLEY:  Yes, Your Honor.

16         While -- while Mr. Barton is taking a seat, let me

17 just say for the Record, I believe the Court at the bench

18 and the witness have two binders; one is again the

19 transcripts, they're the hearing transcripts, as well as his

20 deposition transcript.  And the other are documents we may

21 reference in the course of examination.

22         THE COURT:  Okay.

23         MR. MOXLEY:  And those will also come up on the

24 screen as well, Judge.

25         THE COURT:  All righty.

1          MR. MOXLEY:  They've been passed out around the

2    courtroom as well.

3          THE COURT:  Mr. Barton, I -- I know that you were

4    sworn in originally.  But let me just double swear you in

5    just to make sure you -- you're -- make sure that we have a

6    clean Record on that.

7          Will you please raise your right hand?

8       (Witness sworn.)

9          THE COURT:  Okay.  Counsel, you may proceed.

10         MR. MOXLEY:  Thank you, Judge.

11               CROSS-EXAMINATION (RESUMED)

12   BY MR. MOXLEY:

13   Q    Good morning, Mr. Barton.

14   A    Good morning.  Nice to see you.

15   Q    Nice to see you as well.  We've had a chance to meet a

16   couple of times now, it's good to see you again.  Cameron

17   Moxley, of course for the Record, Mr. Barton for the TCC.

18       Mr. Barton, we're, of course, picking up on your cross-

19   examination continued from March 1st.  You're aware of that.

20   A    Yes.

21   Q    Okay.  Mr. Barton, since Court adjourned on March 1st,

22   have you discussed or communicated electronically with

23   anyone about the topics on which you testified?

24   A    I've communicated with individuals about the case.

25   I've not met with anyone to prepare for further testimony.

1   Q    Okay.  When you say "about the case," were they -- were

2   those communications with anyone about the topics of your

3   testimony?

4   A    Well, we've had a meeting of the Creditors' Committee.

5   And I think we -- we may have talked about issues that arose

6   in my testimony.

7   Q    Okay.  Did you talk about your testimony?

8   A    No.

9   Q    Okay.  Are there issues that -- did any of those

10  discussions impact in any way what you -- what you had

11  testified about or cause you to rethink or which to change

12  any of your testimony?

13  A    No.

14  Q    Okay.  So you mentioned the one meeting.  Was it -- was

15  it one meeting, sir, with the -- with the UCC?

16  A    I believe we've had just one meeting.  We would

17  ordinarily have met Monday, but we postponed, given

18  the -- the -- the proceedings.

19  Q    Okay.  Outside of that one meeting with the UCC, did

20  you have any other communications with anyone about the

21  topics of your testimony?

22  A    No, not about the topics of my testimony.

23  Q    Did you have any other meetings with anyone or

24  communications with anyone about the case?

25  A    Yes.

1  Q    Okay.  Who was that?

2  A    The members of the Committee, counsel for the

3  Committee, and you know, some people, you know, gave me, you

4  know, after my testimony last time, and they said good job,

5  stuff like that.

6  Q    Okay.  Nothing about substance.

7  A    Correct.

8  Q    Okay.  What about the Stoel Rives firm?  Did you speak

9  with them about your testimony?

10 A    I spoke with Brian Glover after my testimony.  I wanted

11 guidance --

12 Q    Well --

13 A    -- attorney/client privilege conversation.

14      We did not talk about the substance of my testimony.

15 Q    Well let me just make sure I'm clear.

16      Did you want guidance with respect to the testimony you

17 were going to give in this case?

18 A    The Judge had, at the end of my testimony last time,

19 made it clear that I was not to talk about the -- the

20 substance of my testimony.  And I wanted guidance on what

21 that meant, and how I would -- how best to comply with that.

22 Q    I see.  Okay.  And that -- that was the topic that you

23 discussed with Mr. Glover.

24 A    Yes.

25 Q    Okay.  Did you communicate with anyone else about your

1   testimony in this case since March 1st?

2   A     Anyone else?

3   Q     Other than the Committee, those who attended that

4   meeting, and Mr. Glover.

5   A     I -- and was the question about the case?

6   Q     Yes, sir.

7   A     Yeah.  I did.  I spoke with my wife and -- and she

8   offered support and -- and there were conversations like

9   that.

10  Q     Okay.  Is it fair to say, Mr. Barton, that you had no

11  communications with anyone about the substance of your

12  testimony that you will -- that you have given or that you

13  will give today?

14  A     That is fair to say.

15  Q     Okay.  Mr. Barton, the Rule 9019 motion that is the

16  subject of this hearing, it's a joint motion by the Debtor

17  and the UCC, right?

18  A     That's correct.

19  Q     And at the time it was filed, it attached a form of

20  settlement agreement on which the Debtor and UCC had agreed,

21  right?

22  A     Correct.

23  Q     And the UCC had approved that form of settlement

24  agreement that was attached to the Rule 9019 motion,

25  correct?

1  A     Yes.

2  Q     How mechanically did that approval get effectuated?

3  Was there a vote?

4  A     Yes.

5  Q     What was the outcome of the vote?

6  A     Are you asking me the numbers?

7  Q     I'm -- just the result was to move forward with the

8  motion?

9  A     Yes.

10  Q     Okay.  Was it a unanimous vote?

11  A     Yes.

12  Q     Mr. Barton, you testified on direct examination that

13  the most important reason from the Committee's perspective

14  whether UCC supports the settlement is because it gets money

15  into the hands of creditors now, right?

16  A     Right.

17  Q     And by now, quote unquote "now," your word, you meant

18  the settlement payment would be made quote "upon

19  confirmation of a plan that's not yet before the Court,"

20  right?

21  A     I meant upon confirmation of the plan.

22  Q     Okay.  What is your understanding as you sit here today

23  as to what the deal is with respect to when the settlement

24  payment must be made?

25  A     The settlement payment, you mean the 40 million?

1  Q    Yes, sir.

2  A    Upon plan confirmation.

3  Q    Okay.  Are you not aware that the timing of that

4  settlement payment has now changed?

5  A    I'm not sure I understand the question.

6  Q    Okay.  Are you aware that as of a new filing on March

7  5th, four days after you began your testimony, there is a

8  new form of order sought to be approved by the Rule 9019

9  motion?

10 A    I'm aware there's a new form of order, yes.

11 Q    Did anyone communicate with you about that new proposed

12 order?

13 A    Yes.

14 Q    Who?

15 A    Mr. Zluticky.

16 Q    Anyone else?

17 A    I believe there was discussion among the Committee.

18 Q    When did Mr. Zluticky first raise that issue with you

19 with respect to the new proposed form of order?

20 A    I think it was shortly after my testimony, day or two.

21 Q    Before March 5th?  Before it was filed?

22 A    Yes.  I believe so.

23 Q    Has it been explained to you that the timing of the

24 settlement payment under that new proposed form of order is

25 different than the timing of the settlement payment under

1  the previously proposed form of order that was filed with

2  the -- with the motion?

3  A    Don't believe I've had a discussion on that very

4  specific topic.

5  Q    Okay.  Did the UCC meet to discuss the new proposed

6  form of order?

7  A    We -- I don't believe we had a discussion

8  about -- about the proposed order.

9  Q    When did you -- when -- when was that meeting?

10 A    We met, oh I think it was the Monday after my

11 testimony.

12 Q    Was it March 5th?

13 A    It would have been -- I'm not sure.  I'd have to look

14 at my calendar.

15 Q    So the hearing began on March -- on Friday, March 1st.

16 That's when you testified, correct?

17 A    Yes.

18 Q    Okay.  So I'll just represent to you that the Monday

19 after that was March 4th.

20 A    Okay.  I am not sure.  I would have to look at my

21 calendar to tell you when -- when that Committee met.

22 Q    The second day of this hearing was on Tuesday, March

23 5th.  Did your meeting happen before the second day of this

24 hearing?

25 A    I -- I would have to look at my calendar.  I -- I don't

 1  know.  I would have to look at my calendar

 2  to -- we've -- we've moved meetings a lot due to the -- the

 3  proceedings.  I -- I really would just have to --

 4  Q    Okay.

 5  A    -- look at my calendar.

 6  Q    Whenever that meeting was -- well, let me

 7  strike -- strike that.

 8       Would you agree with me that that meeting happened

 9  either Monday, Tuesday, or Wednesday early that following

10  week after your testimony.

11  A    I would have to look at my calendar.

12          MR. BROOKNER:  Objection, Your Honor.  He's asked

13  the same question five times.  He's given the same answer --

14          MR. MOXLEY:  I'd like to --

15          MR. BROOKNER:  -- five time.

16          THE COURT:  Overruled.

17  BY MR. MOXLEY:

18  Q    Go ahead, sir.

19  A    I would have to look at my calendar to see when those

20  meetings were -- happened.  I could do that if you would

21  like.

22  Q    But your -- just to be clear, your testimony is you're

23  not sure -- are you even sure whether the meeting happened

24  that week?

25  A    It -- it may have been the following week.

1   Q     Oh, okay.

2   A     Yeah.

3   Q     Did -- when the new proposed form of order was first

4   raised to you, had it already been filed?

5   A     I don't believe so.

6   Q     Okay.  When the meeting was held among the UCC, had the

7   new -- had the new proposed form of order already been

8   filed?

9   A     That's what I'm not sure about.  I'd have to look at my

10  calendar.

11  Q     You're just now sure.

12  A     Yeah.

13  Q     Okay.  Okay.  Thank you, sir.

14        Whenever this meeting was, were all the members of the

15  UCC present at it?

16  A     I think there may have been one absence.

17  Q     Okay.  Were all the members -- we talked before about

18  the fact that the members are represented by their own

19  individual counsel as well, correct?

20        That's set forth in the UCC appointment order that the

21  counsel's identified for each, correct?

22  A     Right.  Okay.

23  Q     My question is simply --

24  A     Yes.

25  Q     -- were all the -- were all the members' counsel

1  present for the meeting?

2  A    No.  I believe there was an absence.

3  Q    Okay.  Was the absence of counsel and a member, is that

4  the same member?  Was -- was that member simply not

5  represented at that meeting?  Or was it -- were all members

6  represented in some way, either because they personally

7  attended or by their counsel?

8  A    I believe there was -- there was a member who was not

9  there personally or represented.

10 Q    I see.  Okay.

11      Was -- was that member one of the personal injury

12 claimants?

13 A    I don't believe so.

14 Q    Okay.  Were you -- you were present at the meeting.

15 A    Yes.

16 Q    Okay.  At that meeting, did anyone walk through the

17 changes in the new proposed form of order?

18 A    There was discussion by email about changes that were

19 being made, pursuant to the Judge's questions about the

20 settlement agreement.

21      There is discussion by email about clarifying changes.

22 There was no dissent to making those clarifying changes.

23      I don't believe there was substantial discussion about

24 it at the meeting.

25 Q    There wasn't substantial discussion about the new

1  proposed form of order at the meeting.

2  A    I -- that, I -- I -- it was -- I think there was a

3  topic about it.  I don't believe there was a controversy

4  about it, or extended discussion about it.

5  Q    Okay.  Okay.  Among the -- among the -- strike that.

6       During the discussions about the new proposed form of

7  order, was the UCC advised that the date on which the

8  settlement payment would be -- would be made had changed?

9       MR. ZLUTICKY:  Your Honor, I'm going to object to

10  the extent that this calls for information that was

11  communicated from an attorney.  It's attorney/client

12  privilege.  If -- if the witness can answer without invading

13  the privilege, I don't think I have a, necessarily, an

14  objection to the form of that question.  But it is calling

15  for information about communication from counsel.

16       THE COURT:  Let's find out.  Can you answer the

17  question?  Mr. Barton?

18       THE WITNESS:  I -- I don't recall discussion of

19  the timing.

20       (Pause in the proceeding.)

21  BY MR. MOXLEY:

22  Q    At -- at all?

23  A    I don't recall discussion about timing.

24  Q    You previously testified that you did not have any

25  discussions with counsel about the topics on which you

1  testified.

2      One of the topics on which you testified was when the

3  settlement payment would be made and why that was important

4  to you, right?  Is it still the case that you had no

5  discussions -- I just want to make sure I'm clear.  You had

6  no discussions with counsel with respect to when the

7  settlement payment would be made under the new proposed form

8  of order.

9  A    I don't recall such discussions.

10  Q    Did the UCC approve the new form of order before it was

11  filed?

12  A    We did not take a vote on it.

13  Q    Has the UCC approved it at any point?

14  A    There -- it -- there was discussion by email, no

15  dissent.  It -- it was not a controversial change.

16  Q    But no vote was taken, right?

17  A    No vote was taken, that's true.

18  Q    A vote was taken of the prior -- with respect to the

19  prior order.

20  A    Yeah.

21  Q    Are you aware that -- well let me ask you this,

22  Mr. Perry.

23      Were you personally involved, I take it from your

24  answers --

25  A    Barton.

1  Q    I'm sorry, Mr. Barton.

2  A    Right.

3  Q    I was going to -- I was going to reference something

4  Mr. Perry said, so I -- forgive me, Mr. Barton.  Let me

5  start my question again.

6       Mr. Barton, were you personally involved in any of the

7  negotiations surrounding the new proposed form of order?

8  A    I was not personally involved in the negotiations, no.

9  Q    Okay.

10 A    I was kept apprised of what was going on and consulted.

11 Q    In -- describe for me in what way you were kept

12 apprised and consulted.

13 A    Through counsel.

14 Q    In -- in real time as the negotiations were happening?

15 A    There was at least one phone call.  So I wouldn't say

16 in real time as they were happening.

17 Q    Do you -- and, and again, not a memory test. But do you

18 know as you sit there when that phone call took place?

19 A    No.

20 Q    Are you aware that Mr. Perry -- you know who Mr. Perry

21 is, of course, yes?

22 A    Yes.

23 Q    Okay.  Are you aware that Mr. Perry testified that the

24 new form of order was not finalized until he said literally

25 minutes before it was filed with the Court on March 5th?

1    You aware that he testified that way?

2    A    I -- I did read Russell Perry's testimony.  I probably

3    saw that and it wouldn't surprise me.

4    Q    Okay.

5         (Pause in the proceeding.)

6    BY MR. MOXLEY:

7    Q    So the UCC did not review the new proposed form of

8    order in the minutes between when it was finalized and when

9    it was filed, correct?

10   A    Correct.

11   Q    Okay.  Do you know who was involved in negotiating the

12   new form of order?

13   A    I know our -- the UCC's counsel was.

14   Q    Okay.  And -- and just -- in -- in terms of the human

15   beings who were involved for the -- for the UCC's counsel,

16   who was that?

17   A    It would have been Nick Zluticky, would have been Zack

18   Hemmingway, although I don't know Zack's role in those

19   negotiations.

20   Q    Do you know if anyone else retained by the UCC in this

21   case was involved with those discussions?

22   A    I don't.

23   Q    You don't.  Your answer was yeah, I don't know.

24   A    I don't know.

25   Q    Okay.  I just didn't hear you, sir.  I wasn't being

1  difficult.

2      Did you review any -- did you personally, Mr. Barton,

3  review any drafts of the new proposed order before it was

4  filed?

5  A    I did not review drafts.  I was aware of the direction

6  that was being taken.

7  Q    You say you were aware of the direction, but you

8  weren't aware that the timing of the settlement payment had

9  changed, correct?

10 A    Correct.

11 Q    Do you know who first raised the idea of changing the

12 form of proposed order?

13 A    I don't.

14 Q    Was it the UCC?

15 A    Well, I recall during my testimony there were questions

16 about the order.  And -- and I -- I believe during my

17 testimony there may have been discussions about clarifying.

18 Q    Okay.  My -- my --

19 A    Yeah.

20 Q    I appreciate that, sir.

21 A    Yeah.

22 Q    My question's just slightly different.

23     Do you know if it was the UCC who first suggested among

24 the parties who ended up changing the form of proposed

25 order, that it ought to be changed?

1   A     The UCC did not formally initiate that request.  But I

2   think flowing from, you know, the proceedings last time I

3   was here, I certainly supported clarifying the order, the

4   proposed order and the settlement agreement if it would

5   help.

6        (Pause in the proceeding.)

7            MR. MOXLEY:  Your Honor, can I just have one

8   moment, please?

9            THE COURT:  Uh-huh.

10           MR. MOXLEY:  Judge, may I just have one moment?

11           THE COURT:  Uh-huh.

12       (Pause in the proceeding.)

13           MR. MOXLEY:  Thank you, Judge.  Apologize for

14   that.

15           THE COURT:  Uh-huh.

16  BY MR. MOXLEY:

17  Q     Mr. Barton, was a draft of the new form of order, to

18  your knowledge, provided to the TCC before it was filed?

19  A     To the TCC?

20  Q     Yes, sir.

21  A     I don't know.

22  Q     So the settlement as it existed at the time the Rule

23  9019 motion was filed provided for the payment of the

24  settlement proceeds of the effective date of the plan,

25  correct?

1  A    That's my understanding.

2  Q    Okay.  Let's look at Tab 3 of your binder.  And

3  I'm -- there -- there's two binders.  Oh, sorry, sir.  It's

4  the white binders, the white set of binders there.

5       There's one binder on the cover that says Barton

6  transcripts binder.  And there's another that just says

7  Barton binder.  So I want you to look at the Barton binder.

8  A    Barton binder.

9  Q    Yes, sir.

10  A    Tab 3?

11  Q    Tab 3.

12  A    Okay.

13       (Voices speaking off the Record.)

14       MR. MOXLEY:  Your Honor, may Mr. Margaret

15  (phonetic) have presenter rights?

16       THE COURT:  Yes.

17       (Pause in the proceeding.)

18       THE COURT:  How do I find you there?

19       (Pause in the proceeding.)

20       THE COURT:  You just --

21       (Pause in the proceeding.)

22       THE COURT:  That way you can turn your camera on

23  and I can find you real fast.

24       (Court confers off the Record.)

25  BY MR. MOXLEY:

1  Q    Now, Mr. Barton, these will be on your screen as well.

2  You're welcome to look in the binder.  But it may be helpful

3  to see the screen as well.

4       Okay.  So, sir, if you could just turn to Page 41 of 47

5  of the filing.  And it's on your screen now as well.

6  A    And this is the -- this is the original motion --

7  Q    Yes, sir.

8  A    -- that's -- that's correct.

9       You see at the top you can see that it was filed on

10 January 16th, 2024?

11 A    Yes.

12 Q    Okay.  And if you look at Section, Paragraph 9(a) on

13 that page.  You see conditions precedent, conditions

14 precedent?  You see that?

15 A    Yes.

16 Q    Okay.  And if you look there at -- at 9(a), it says,

17           "The effectiveness of this agreement is

18           conditioned upon the entry of an order

19           of the Court in form and substance

20           acceptable to the M2 parties approving

21           this agreement, pursuant to Rule 9019 of

22           the Federal Rules of Bankruptcy

23           Procedure and the entry of an order of

24           the Court confirming a Chapter 11 Plan

25           containing to the fullest extent

 1          permitted by applicable law the

 2          following provisions:"

 3      And then there's romanettes (i) through (vi).  Do you

 4  see that?

 5  A    Yes.

 6  Q    Okay.  And the revised form of order there changed the

 7  trigger date for the settlement payment from confirmation to

 8  a final non-appealable order.

 9      You're not aware of that, are you?

10  A    Can you show me?

11  Q    I -- I can.  But my question before you --

12  A    Yeah.

13  Q    -- do that is, are you aware of that?

14  A    It's not something I focused on.

15  Q    Okay.  So let's look at Tab 19 of your binder.

16  Q    And if you see Tab 19, let me know when you're there,

17  sir.

18  A    Tab 19?

19  Q    Yes, sir.  Nineteen, one nine.

20  A    Yes.

21  Q    Are you at that document, sir?

22  A    I am.

23  Q    Okay.  And if you look at that document, you'll see it

24  was filed -- you see at the top you can see the stamp from

25  the Court that says March 5th, 2024 at Docket 1432.  And you

1    see it says, "Notice of Revised Proposed Order."  Do you see

2    that?

3    A    Yes.

4    Q    Okay.  And if you flip with me to Page 3.

5    A    Uh-huh.

6    Q    I'm sorry.  Page 3 of the redline, which is Page 6 of

7    13 on the top.

8         (Pause in the proceeding.)

9             THE WITNESS:  I'm not seeing that.

10   BY MR. MOXLEY:

11   Q    So if you just turn a few pages in, if you look at the

12   top of the -- of the document, there's numbers that says

13   Page 1 of 2 of --

14   A    Here we go.

15   Q    Okay.  I'm at Page 6 of 13.  Are you there?

16   A    Yes.

17   Q    Okay.  Can you see there, there's a new -- you

18   understand that there's the underlined and different colored

19   font there indicates a change, correct?

20   A    (No audible response.)

21   Q    Okay.  So you see that it says Paragraph 9 of the

22   settlement agreement stricken and replaced in its entirety

23   with the following.  If you just read with me, sir.

24        You see there's a new Paragraph 9, "Conditions

25   Precedent."  And at A is says,

1          "The effectiveness of this agreement is

2          conditioned upon the entry of an order

3          of the Court in form and substance

4          acceptable to the M2 parties approving

5          this agreement, pursuant to Rule 9019 of

6          the Federal Rules of Bankruptcy

7          Procedure and the entry of a final order

8          of the Court that is not the subject of

9          an appeal, confirming a Chapter 11 Plan,

10          containing, to the fullest extent

11          permitted by applicable law, the

12          following provisions."

13     And there's romanettes (i) through (v) that follow.  Do

14 you see that?

15 A    I see.  And I see the -- the change that you're --

16 Q    You see the change.

17 A    -- you're focusing on.

18 Q    Yeah.

19     Do you have an understanding as to how that change from

20 the order -- from the timing of a settlement payment

21 arriving at confirmation versus arriving at final non-

22 appealable order impacts your testimony with respect to this

23 settlement agreement?

24 A    Yeah.  Well, you know, this change is in -- in

25 reviewing the changes, is -- is not something I focused on.

1  But here's -- now that you're directing my attention to it,

2  you know, my thought is that this is probably in there in

3  order to protect your right to ask for an appeal, if there's

4  an order.

5  Q    Are you aware that if there -- the settlement payment

6  were to have arrived under the prior construct, it is

7  something arrived at confirmation that the TCC and any party

8  could still appeal?

9  A    Yes.

10  Q   So that wasn't the purpose of the change, was it?

11  A   No.  I don't think that follows.  It still could be the

12  purpose of the change.

13  Q   Okay.  Well let me just make sure that I understand

14  what your understanding is.

15       Under the revised form or order that was filed on March

16  5th, the settlement money, the $40 million, it doesn't show

17  up until there's a final order that can't be appealed any

18  longer, correct?

19  A   Barely.

20  Q   You have that understanding now.

21  A   Yes.

22  Q   Okay.  You know how long the appellate process takes?

23  A   It could take a while.

24  Q   Could take two or three years.

25  A   Uh-huh.

1   Q    You agree with that?

2   A    It could take -- I -- I don't know if it would take two

3   to three years, but it could take a year at least.

4   Q    Okay.  Let's look at the --

5        (Pause in the proceeding.)

6   BY MR. MOXLEY:

7   Q    Actually, Mr. Barton, let me make sure I understand.

8        Four days after the hearing on the Rule 9019 motion was

9   underway, the Debtor changed a condition to when the

10  settlement payment would actually arrive from at

11  confirmation to a final non-appealable order, which you just

12  acknowledged would add a lot of time to when that payment

13  would arrive.

14           MR. BROOKNER:  Objection to the question.

15           THE WITNESS:  I don't have knowledge of that.

16           MR. MOXLEY:  I haven't finished my questions.  I

17  haven't my finished my question.

18           MR. BROOKNER:  He started to acknowledge.  Go

19  ahead.

20           THE WITNESS:  Yeah.  I -- I don't think if --

21  BY MR. MOXLEY:

22  Q    I have -- there's not a question pending, sir.  Let me

23  ask you a question.  Okay?

24  A    Okay.

25  Q    Do you still support the settlement?

1    A    I do.

2    Q    You just learned of this term in this moment.  But you

3    still support it?

4    A    So under the initial plan, there could have been an

5    appeal as well.

6    Q    Yes, sir.

7    Q    And -- and I -- I don't, sitting here today, know how

8    that appeal would have affected the settlement payment.

9    And -- and -- I -- I am not confident sitting here today

10   that this is going to result in a delay that wouldn't have

11   resulted in another circumstance.

12   Q    I see.  So you just simply didn't know that the

13   settlement payment having to arrive at confirmation under

14   the prior construct would happen regardless of whether or

15   not there was an appeal.

16   A    I don't know whether it would happen -- whether or not

17   it would.

18        I don't know whether the payment would have been made

19   if there was an appeal.

20   Q    Okay.  Is this still a joint motion?

21   A    Yes.

22   Q    The UCC still supports --

23   A    Yes.

24   Q    How do you know that, sir?

25   A    We have had a meeting of the Committee since this was

1  filed and --

2  Q    Right.  But you're the Chair of that Committee.  And

3  you didn't know about the timing of when the settlement

4  payment would arrive having changed.

5       I take it that since you didn't know about, you don't

6  know if your other members of your Committee know about

7  either, right?

8  A    Every member of the Committee has seen this document.

9  Q    Okay.  But you're the Chair of the Committee and you

10 weren't aware of the impact of this change, right?

11 A    I didn't focus on that particular change.

12 Q    Okay.  Do you have any confidence that any other member

13 of the Committee who are not lawyers may have focused on

14 that change?

15 A    I suspect some of them did.

16 Q    Okay.  But you had no conversations with them about

17 that, right?

18 A    I did not.

19 Q    As you understand it, sir, when is -- or what is the

20 current deal with respect to when the settlement payment

21 will be paid?

22 A    I -- I think that it's, as you -- I think it's in the

23 section you just showed to me.

24 Q    Oh, I see.

25      So you're not aware, either, that the settling parties

1  made an oral representation in Court that they would change

2  that term again?

3  A    I don't follow your question.

4  Q    Right.  You don't, do you?  'Cause you don't -- you're

5  not aware of that.

6  A    No, I don't understand your question.

7  Q    Okay.  Are you aware that a counsel for the settling

8  parties stood up in the courtroom on Monday and offered to

9  modify this -- this term again to a different date?

10 A    I am not aware of that.

11 Q    Right.  You don't actually know what the deal is right

12 now, do you?

13 A    I wouldn't agree with that.

14 Q    What is the deal, sir?  When is the settlement payment

15 under the current deal supposed to arrive?  What's your

16 understanding?

17 A    I think it's as set out in the provision you just

18 showed me.

19 Q    Okay.  So if I represented to you that counsel for the

20 settling parties offered in court, in open court, on Monday

21 to change that date again, you're not aware of that, right?

22 A    I'm not aware of what was said in open court on Monday.

23 Q    Okay.  So if you're not aware of that, would you agree

24 with me that it's fair to say that the UCC does not know, as

25 you sit here today, what the deal is?

1          MR. ZLUTICKY:  Objection, Your Honor.  It

2   misstates the witness' testimony.

3          THE COURT:  Overruled.

4          MR. MOXLEY:  Okay.

5          THE WITNESS:  So we're -- we're working through

6   difficult issues quickly trying to be efficient.  And if

7   there are still open issues, there -- there may still be

8   open issues.

9          One of the -- well, and so, if this needs to be

10  resolved, let's resolve it.  If there's an issue here, let's

11  deal with it.  But I -- I'm not at all upset that there was

12  a -- a -- that this was addressed in open court on Monday.

13  Sounds like maybe there's an issue here that needs to be

14  addressed.  And I'm glad it is.

15  BY MR. MOXLEY:

16  Q    Mr. Barton, you're -- you're a lawyer.

17  A    Yeah.

18  Q    You're a lawyer, right?

19  A    Yeah.

20  Q    Is that how it works?  That you make a motion to -- for

21  the Court to approve a settlement agreement, but the -- what

22  the settlement agreement is constantly moves throughout the

23  hearing.  Is that how it works?

24  A    When there's back and forth like this and we're trying

25  to get a settlement so that we can get dollars in folks'

1  hands, yeah, and issues are raised that need to be addressed

2  in order to bring you on board, perhaps.  Yeah.  I mean,

3  that seems to me that it can work that way, yes.

4  Q    So what -- what is -- what is your understanding of

5  what Judge Lopez is asked to approve today?  What -- what's

6  the deal?

7  A    As far as I know, the deal is as you -- is -- is

8  the -- is in the motion that has been filed.

9       (Pause in the proceeding.)

10          THE WITNESS:  And I doubt the -- I'll leave it at

11  that.

12  BY MR. MOXLEY:

13  Q    In response to the UCC's counsel's questions to you,

14  Mr. Barton, on direct examination, you testified that the

15  most important factor from the UCC's perspective was that

16  the settlement payment would be made now at confirmation.

17  You recall that?

18  A    I think I said that it -- it was important to me that

19  money get into the hands of creditors quickly, yes.

20  Q    That's no longer the case; is that right?

21  A    I still want money to get into the hands of creditors

22  quickly.

23  Q    Would you agree with me that the timing of the

24  settlement payment is a material change?

25  A    I don't know.

1    Q    You don't know one way or the other whether or not when

2    the settlement payment will arrive is a material change?

3    A    No, I don't know.  Because an appeal under the original

4    proposed order, an appeal may have delayed it as well.  So,

5    no.  I don't know if it's a material change.

6    Q    And that -- and the reason you don't know is because

7    you're uncertain of the point you just mentioned about

8    whether an appeal from the prior order would change that.

9    That's the reason.

10   A    At least one reason, yes.

11   Q    There are other reasons?

12   A    Not that I can think of now.  But I -- I don't know if

13   it's a material change.

14   Q    Do you understand that under the initial plan the

15   settling parties, those obligated to make the payment, bore

16   the risk that -- that confirmation order would be vacated on

17   appeal?

18   A    I'm not aware.

19   Q    Okay.  You understand that under the new version that

20   no settlement money, the 40 million will arrive until all

21   appeals are exhausted?

22   A    I understand that the current language says that the

23   money won't be due until there is a final order, subject to

24   appeal.

25   Q    Who -- who do you think ought to bear that risk?  The

1  creditors or the settling party, the appellate risk.

2  A    Well, I would like money to get into the hands of -- of

3  creditors as fast as possible.  And if there's an answer to

4  that question that makes it more likely that money gets into

5  the hands of creditors as fast as possible, I prefer that

6  outcome.

7  Q    Right.  And that was the outcome that you negotiated

8  for in the first form of the settlement agreement, right?

9  A    Well, there's different language.  I -- I don't,

10 sitting here today, know that the -- the different language

11 in the agreement now has any different effect than the prior

12 language.

13 Q    Would -- would you prefer -- let me make sure I

14 understand.

15 A    Yeah.

16 Q    Would you prefer a settlement where Mr. Lefkowitz,

17 YesCare, the M2 parties who are obligated to make those

18 payments, must pay the money even if there is an appeal?

19 A    I would.

20 Q    Okay.  You prefer that over a deal where the settling

21 parties, the M2 parties, obligated to make those payments

22 could withhold payment until the appellate process ran its

23 course, right?

24 A    Can you repeat that question?  I'm sorry.

25 Q    You would prefer that deal, one where they had to pay

1   now at confirmation, to a deal where they didn't have to pay

2   until the appellate process ran its course, right?

3   A    I'm not sure.  The -- I would like money to get into

4   the hands of creditors as fast as possible.

5   Q    Okay.

6   A    But if the money is going to be taken away by an

7   appellate process, I think that could get pretty messy.

8   Q    Okay.  You were in the courtroom on -- on the first day

9   of this hearing on March 1st, right?

10  A    Yes.

11  Q    Do you recall before testimony began there was some

12  discussion amongst the Court and some of the lawyers?  You

13  recall there was some discussion?

14  A    Yes.

15  Q    Okay.  You recall that Judge Lopez raised some

16  questions with respect to wanting to understand the trigger

17  date?  What triggered the settlement payment to be paid?

18  You recall that?

19  A    I do.

20  Q    It was important to the Court to know when the payment

21  would arrive, right?

22  A    I -- I won't speak for the Court.

23  Q    Okay.  There was some questions about that, that fair.

24  That's fair.

25  A    Yes.

1  Q    It was -- there were -- the Judge had some questions

2  about that, right?

3  A    Yes.

4  Q    Okay.  Do you have any questions about that today?

5  Would you like to know when the settlement payment's going

6  to arrive?

7  A    I would like to know when the settlement will arrive,

8  will -- will -- will be paid, yes.

9  Q    Do you know why the timing of when the settlement

10  payment will arrive changed?

11  A    No.  I'm not sure that the timing changes.

12  It -- there's -- there's now a -- a statement in there that

13  says that it will be, you know, paid when there's a final

14  order not subject to appeal.

15  Q    Uh-huh.

16  A    At the -- yeah, you know, I -- I think it's likely that

17  the -- the -- the party that might appeal and create the

18  delay would be the TCC.

19      So my hope would be that you would not appeal the order

20  and we get an order approving the settlement.  But I don't

21  know -- I -- I don't have enough information to be able to

22  say which provision, the modified trigger or the earlier

23  version, is more beneficial to creditors.  I would have to

24  think about that.

25  Q    Right.  You'd have to think about it.  And no one's

1  talked to you about this change or its import, correct?

2  A    They're moving very fast --

3  Q    Yeah.  See --

4  A    -- trying to get stuff done.

5  Q    So you -- you just -- you -- I -- and I -- and I'm

6  not -- I'm not being difficult with you.  So I'm just trying

7  to understand the facts.

8       You just don't know, because no one talked to you about

9  the -- this change, correct?

10 A    I -- I -- I -- that's fair.  That's fair.

11 Q    Okay.  Okay.  Who -- let me ask you this.  And I

12 appreciate that you're not sure who bears the appellate

13 risk, under either the old construct, cause you weren't

14 advised about that or the new construct, right?

15 A    I'm not sure.

16 Q    Right.

17      Let's assume, just assume for the sake of my questions,

18 that the case is that under the prior construct the payment

19 would come in regardless of whether anybody appealed.  It

20 would come in.  Appeals could happen.  The money would come

21 in.

22      And assume with me that under the new construct, that's

23 not the case.  Money won't arrive until a final, non-

24 appealable order is obtained.  Who does that benefit?  Who

25 does the new construct benefit?

1    A     I don't know.

2    Q     Well we can agree it's not better for creditors, right?

3    A     I don't know.  I -- because I don't -- one of the

4    things on my mind right now is, let's suppose the settlement

5    is approved.  Let's suppose the payments are made.  And

6    let's suppose cash starts going to the creditors.

7          But there's an appeal.  Let's suppose you win --

8    Q     Uh-huh.

9    A     -- that appeal.

10         I don't know what happens next.  I don't know how good

11   that is for creditors, right?  So I don't know whether it's

12   better to wait for an appeal or not. I'd have to think about

13   that.

14   Q     Well, respectfully, sir, you're a lawyer.  And I

15   appreciate that.

16   A     Yeah.

17   Q     But you also have counsel.  And from that answer I take

18   it counsel has not advised you as to what happens in those

19   circumstances.

20   A     I don't know what happens in those circumstances --

21   Q     Right.

22   A     -- that's all I can say.

23   Q     Right.  Understood.

24         (Pause in the proceeding.)

25   BY MR. MOXLEY:

1  Q    So you don't know that under the prior order it was the

2  settling parties, those obligated to pay who bore that risk.

3       And that if the money came in and was distributed to

4  creditors, they got to keep it.  You don't know that.

5  A    I don't know.

6  Q    If that was the case, if that was the case, would that

7  change your view?

8  A    If the creditors could keep any money that was

9  disbursed, even if we lost an appeal, that would seem to me

10 to be better.  Right.  Get the money in their hands as fast

11 as possible in a way that they can keep it.

12 Q    The way that they can keep it, right.

13      So if that was the case, that's a deal that you would

14 have preferred, correct?

15 A    I think that's probably fair.

16 Q    Right.  Right.

17      (Pause in the proceeding.)

18 BY MR. MOXLEY:

19 Q    Let me ask you this, Mr. Barton:

20      Does it bother you, as you sit there today, that you

21 haven't been advised on these issues?

22 A    No.

23 Q    Why is that?

24 A    Um -- you raised good questions that I wish I had

25 asked.  Let's put it that way.

1  Q    And you wish you had asked those questions.

2      But you also wish that somebody had talked to you about

3  these changes before you got and took the stand today?

4  A    I have no criticism of counsel in their -- in

5  their -- they're very good at keeping me and all members of

6  the Committee up-to-date on what's going on.

7      We just didn't happen to discuss this particular issue.

8  Q    Okay.  Let me just make sure I understand a couple of

9  things, Mr. Barton.

10     You testified that you would want money to be paid

11 quickly and the creditors could keep it, right?

12 A    Yes.

13 Q    Okay.  And a change to the agreement that put off the

14 payment of the date by one or two years, that'd be something

15 you would not want, generally.

16 A    Generally.

17 Q    Okay.  And if the agreement were changed to put the

18 payment date off by one to two years, you would want the UCC

19 to understand that and make an informed decision about that,

20 right?

21 A    That's fair.

22 Q    The UCC should make informed decisions, right?

23 A    Yes.

24 Q    Did the UCC make an informed decision as to whether or

25 not to support this new proposed form or order?

1  A     They had the information and -- and there was no -- no

2  dissent from the -- but there's no objections to the -- the

3  revisions.

4  Q    Do you think if somebody had told the members that this

5  new form of order provides that the settlement money won't

6  arrive for one to two years --

7  A     It doesn't provide that.

8  Q    Okay.  Let me -- okay.  Let me just ask you this

9  question, sir.

10  A     Okay.

11  Q    Do you think -- I'll take the one to two years out.

12       Do you think if somebody told the members that under

13  the prior construct, money would arrive at confirmation, you

14  get to keep it.  Under the new construct, money does not

15  arrive at confirmation.  You have to wait for the appellate

16  process, however long that takes.  And only arrives if we

17  get to a final, non-appealable order.

18       You think there might have been a dissent then?

19  A     Well, I don't know if the two situations you described

20  are the -- the actual situations.  But even so, I -- I can't

21  comment on what other members of the Committee might have

22  thought.

23  Q    Right.  Because you don't know, right?  That

24  didn't -- that scenario didn't happen.  The Committee wasn't

25  informed of the difference between the two proposed orders,

1  correct?

2  A    We were given the redline.  And so, yes, we were

3  informed of the -- the differences.

4  Q    Right.  You were given the redline.  There was a

5  discussion, but there wasn't a discussion about this.

6  A    I don't recall a discussion about this particular

7  issue.

8  Q    Has the UCC bargained for the settlement payment to be

9  placed into escrow now that it will be delayed until a

10  final, non-appealable order?

11  A    I don't know.

12  Q    You just don't know.

13  A    I don't.

14  Q    Do you think that would make sense to do?

15  A    I don't know.

16  Q    Not something you were -- that's been discussed with

17  you, right?

18  A    I don't know.

19  Q    Well at least make sure, okay.

20  A    Yes.

21  Q    I asked if that was something that has been discussed

22  with you.  Do you -- do you know whether or not somebody's

23  talked to you about whether or not the settlement payment

24  ought to be put in escrow, given that there's a new time lag

25  when it arrives?

1  A    There has not been a discussion of escrow recently.

2  Q    Now the -- the settlement agreement that's before the

3  Court on the Rule 9019 motion, the original one, that was

4  filed on -- in January, that one was signed by everybody,

5  right?

6  A    Yes.

7  Q    The UCC signed it.

8  A    I believe so.

9  Q    Okay.  I can show it to you if you'd like.  I mean,

10  but --

11  A    No, I believe so.

12  Q    Yeah.  Okay.  And -- and -- and the settling parties

13  signed it, right.  Mr. Lefkowitz signed it on behalf of a

14  number of entities, correct?  Correct?

15  A    I -- I don't know the answer to that question.

16  Q    Okay.  That's -- that's fine.  That's fine.  Let's just

17  look at it quickly.  I just want to make sure

18  you're -- you're comfortable and clear on this.

19      So if we could go to Tab 3 in the binder, sir?

20  A    Yes.

21          MR. MOXLEY:  And just for the Record, this is the

22  Rule 9019 motion.  It's at Docket 1259.  And it attaches the

23  form -- the original form of the settlement agreement.

24  BY MR. MOXLEY:

25  Q    If you go to the very last page, sir, Page 47 of 47,

1    very last page of the document.

2    A    Yes.

3    Q    You see Mr. Lefkowitz' signature there on behalf of a

4    number of entities?

5    A    I do.

6    Q    Okay.  And if you look at one page earlier, Page 45 of

7    47, you see that Mr. Zluticky from the Stinson Law Firm

8    signed on behalf of the UCC?

9    A    Yes.

10   Q    So you agreed to be bound by this agreement if it was

11   approved by the Court, right?  What a contract --

12   A    Yes.

13   Q    -- is.

14   A    Yes.

15   Q    And didn't Mr. Lefkowitz and all the entities on whose

16   behalf he signed also agreed to be bound by this if the

17   Court approved it?

18   A    Yes.

19   Q    So the -- the M2 parties, Mr. Lefkowitz, all the

20   signatories to this agreement, bound themselves to the terms

21   set forth in this agreement, correct?

22   A    Yes.

23   Q    Okay.  So the M2 parties and the signatories who were

24   obligated under Section 4 to make the settlement payments,

25   if the settlement was approved, and if the plan was

1  confirmed, they agreed to pay that money if those conditions

2  were met, correct?

3  A    Yes.

4  Q    Now the timing of when the settlement payment will

5  arrive has changed, they no longer have to pay at

6  confirmation.  What consideration did the UCC receive for

7  agreeing to this contract modification?

8  A    I -- I'm not sure --

9  Q    Uh-huh.

10 A    -- that the changes that you pointed me to actually do

11 change the -- the date on which payment is to be made.  But

12 to answer your question, but I am not aware we received any

13 consideration for that particular change.

14 Q    If the idea of the settlement agreement was that the

15 form of the settlement agreement and the form of order

16 approving it could change if only some of the parties to it

17 wanted it to change, even if other parties got no

18 consideration for those changes, is it even a binding

19 contract?

20        MR. ZLUTICKY:  Objection, Your Honor, to the

21 extent that it calls for a legal conclusion.  He's not

22 testifying as a lawyer.

23        THE COURT:  I'll -- I'll sustain that.  But

24 he's -- he's the -- at least he can understand whether

25 there's a -- no.  I'll sustain the objection.

1              MR. MOXLEY:  Okay.  Thank you, Your Honor.

2    BY MR. MOXLEY:

3    Q    Mr. Barton, let me ask you -- let me ask it this way.

4         You're a lawyer.  If the contract is signed and

5    executed and parties are obligated to do certain things, if

6    one of them is allowed to change a material term of that

7    contract unilaterally, is that a binding contract at all?

8    A    I can imagine situations in which it would be.

9    Q    Is it -- is it -- you're familiar, again, you're a

10   lawyer.  Are you familiar with agreements to agree?  Is it

11   really just an agreement to agree?

12             MR. ZLUTICKY:  Objection, Your Honor.  To ask the

13   witness to give a legal conclusion.  He's not testifying as

14   a lawyer.

15             THE COURT:  I -- I don't think legal -- I don't

16   think agreeing to agree is a legal conclusion.  I'll

17   overruled.  I think he can answer if he knows the answer.

18             THE WITNESS:  No, I don't think this is an

19   agreement to agree.

20   BY MR. MOXLEY:

21   Q    Okay.  How is it not if -- if one or more of the

22   parties, but not all of the parties, insist on a change and

23   they're allowed to do that?

24   A    Well, to the extent I understand the process here, the

25   settlement agreement needs to get the approval of the Court.

1   And if what you're asking is for an additional set of

2   signatures on the settlement agreement, I mean, we -- we

3   could get them.

4   Q    Let's -- let's suppose that was the process.

5   A    Yeah.

6   Q    That you needed to get an additional set of signatures.

7        Given what you've seen today, and I think you called

8   them good questions that I raised to you --

9   A    Yes.

10  Q    -- today, would you seek additional advice from counsel

11  before you signed?

12       (Pause in the proceeding.)

13            THE WITNESS:  Before I signed?

14  BY MR. MOXLEY:

15  Q    Yes, sir.

16  A    Before the Committee signed?

17  Q    Before the Committee signed.

18  A    I -- I don't know.

19  Q    So if the process were as you just described it, that

20  hypothetical process, and I -- I said you're the Chair of

21  the Committee, sign this new form of agreement.  Is it your

22  testimony that absent having any conversations with the

23  other members, holding a vote, getting advice on when the

24  settlement payment will actually arrive, whether or not the

25  settlement payment should be put in escrow, you would just

1  sign without getting any answers to any of those questions?

2  A    That's not what I said.

3  Q    Okay.  Well then that's my question now.  Is -- would

4  you sign under those circumstances, or would you want

5  answers to those questions?

6  A    I would be interested in answers to those questions.

7  Q    Right.  And you wouldn't sign until you got answers to

8  those questions, right?

9  A    That is probably true.

10 Q    Mr. Barton, you testified on direct examination about

11 the view you have formed of the settling parties, meaning

12 YesCare, M2 Loan Co., Paragrove (phonetic), and

13 Mr. Lefkowitz, right?  Do you recall that?

14 A    What -- what about them?

15 Q    You -- you recall giving testimony on direct about your

16 view, the view that you have formed, of them, yes?  Okay.

17 A    I recall.

18 Q    And that view is that you don't trust them, right?

19 A    Yes.

20 Q    And you have that view because you've seen the

21 fraudulent transfers and the efforts to hide money from

22 creditors.  That was your testimony, right?

23 A    Yes.

24 Q    Now the UCC and its professionals expended a

25 significant amount of time investigating the fraudulent

1  transfers, right?

2  A    Yes.

3  Q    And the estate incurred significant expenses

4  investigating the fraudulent transfers, right?

5  A    Yes.

6  Q    Is it fair to say that Mr. Lefkowitz as a Director of

7  the M2 parties and as the sole member of the Debtor, could

8  have easily instructed counsel for YesCare and the M2

9  parties to cooperate with the UCC's discovery requests to

10 save everyone time and expense?

11 A    Could you ask the question again?

12 Q    Is it fair to say that Mr. Lefkowitz, as a Director of

13 the M2 parties, and as the sole member of the Debtor, could

14 have easily instructed counsel for YesCare and the M2

15 parties to cooperate with the UCC's discovery requests to

16 save everyone time and expenses?

17          MR. BROOKNER:  Objection, Your Honor.

18 Speculation.  Anything's possible.

19          THE COURT:  Sustained.

20 BY MR. MOXLEY:

21 Q    Now, Mr. Barton, Mr. Lefkowitz and the settling parties

22 don't have to pay for a long time, and you don't trust them

23 because you've seen them hide money from creditors.

24 A    I don't agree that they don't have a pay for a long

25 time.

1  Q    Okay.  They don't have to pay until there's a final,

2  non-appealable order is your -- your current understanding,

3  right?  That may or may not be the case, but that's your

4  current understanding, right?

5  A    My current understanding.

6  Q    Okay.  Doesn't a payment date that could be far into

7  the future, or just some time into the future, introduce

8  risks that settling parties that you don't trust could

9  behave in some way that you've seen them behave in the past?

10 A    No.  The risk I see is that -- that the TCC will appeal

11 this and delay, that I see.

12 Q    That's the risk that you see.

13 A    Yes.  Okay.

14 Q    Does the UCC have any concern now about this being an

15 illusory settlement payment?

16 A    No.

17 Q    Would you trust financial information from the settling

18 parties if you or your advisors did not take steps to

19 verify?

20 A    Can you run -- can you say that question again?  I

21 do --

22 Q    Of course.  Of course.

23 A    -- couldn't hear what --

24 Q    Of course.  And if I'm talking too quickly, just tell

25 me.

1  A    Okay.

2  Q    Mr. Barton, would you trust financial information from

3  the settling parties if you or your advisors did not take

4  steps to verify it?

5  A    I don't know.

6  Q    You testified you don't trust them, right?

7  A    Yeah.

8  Q    And that's because they hide money from creditors,

9  right?  That's what you testified before?

10  A    One reason, yes.

11  Q    Okay.  There are -- there are other reasons you don't

12  trust them as well, correct?

13  A    Yeah.

14  Q    Okay.  So my question is simple.  If they gave you

15  financial information, you'd want your advisors to verify

16  it.

17  A    I --

18              MR. BROOKNER:  Objection, Your Honor.

19              THE WITNESS:  I don't know what the --

20              MR. BROOKNER:  Whose financial information are we

21  talking about here?

22              MR. MOXLEY:  I -- I think the questioning was

23  clear, but I'll rephrase it, Your Honor.

24              THE COURT:  Okay.

25  BY MR. MOXLEY:

1  Q    I'm talking about the settling parties.  You understand

2  the settling -- who the settling parties are.

3  A    Yes.

4  Q    Okay.  Would your -- would you trust financial

5  information from the settling parties if you or your

6  advisors did not take steps to verify it?

7         MR. BROOKNER:  Same objection, Your Honor.  Which

8  financial information?

9         MR. MOXLEY:  We just defined it.  The settling

10 parties.

11        THE COURT:  The settling parties is my

12 understanding.

13        THE WITNESS:  I -- I don't know.  I mean, I'd have

14 to look at the information in question.  But in general, it

15 would be a good thing for us to verify it, yes.

16 BY MR. MOXLEY:

17 Q    And you -- you would prefer that financial information,

18 if possible, be audited, right?

19      (Pause in the proceeding.)

20 A    Depends on the kind of information we're talking about.

21 Depends on the information we're talking about.

22 Q    Okay.  But, Mr. Barton, you're -- you're -- you're in-

23 house counsel at a major hospital.  You've been practicing

24 for some time.

25      Would you agree with me that it's better, all things

1   considered, to have audited financial information versus

2   unaudited financial information?

3   A    It -- it is -- it is easier to rely on audited

4   financial information than unaudited financial information.

5   Q    Particularly when the information is coming from people

6   you don't trust, right?

7   A    Fair.

8   Q    Okay.

9        Let's switch gears, Mr. Barton, and discuss St. Luke's

10   litigation in Idaho.  You testified on direct, that in

11   addition to suing Corizon, St. Luke's also seeks a recovery

12   on a successor liability basis against other defendants,

13   right?

14   A    Yes.

15   Q    Okay.  And St. Luke's actually filed a motion to amend

16   its complaint against Corizon one day after this bankruptcy

17   was filed, right?

18   A    That's right.

19   Q    And Tab 16 and 18 in your binder, sir, if you'd just

20   like to have them open generally for yourself, those are

21   the -- those are the motion papers that St. Luke's filed in

22   the United States District Court in the District of Idaho,

23   correct?

24   A    What it looks like.

25   Q    Okay.  And at Tab 16, sir, the motion itself, you can

1   see that St. Luke's in that amended -- in that -- in that

2   motion to amend its complaint sought to name YesCare Corp,

3   CHS TX, Inc., Ms. Tirschwell, Mr. King, John Doe entities,

4   and John Doe natural persons as defendants, right?

5   A    Yes.

6   Q    And St. Luke's in that amendment seeks to recover from

7   those entities and -- and individuals on a successor

8   liablity basis, right?  I'm sorry from the -- from the

9   entities on a successor liability basis, right?

10  A    We do.

11  Q    And St. Luke's lead counsel in that case, I believe you

12  testified, is the former United States Attorney for the

13  District of Idaho, right?

14  A    Right.

15  Q    I -- I -- I take it that it's safe to assume that your

16  lead counsel in that case is a talented and experienced

17  attorney, right?

18  A    She certainly is.

19  Q    St. Luke's thought that this was a meritorious

20  amendment to file, right?

21  A    Yes.

22  Q    Right.  St. Luke's doesn't go around filing

23  frivolously, does it?

24  A    No.

25  Q    Now you're the Deputy General Counsel of St. Luke's

1  right?

2  A    That's correct.

3  Q    So let's -- let's look at Tab 18, which is -- which is

4  the -- the memorandum, the brief in support of the motion to

5  amend.  Let me know when you're there, sir.

6  A    I'm there.

7  Q    Okay.  Now if you turn in it -- if you turn to --

8       (Pause in the proceeding.)

9         MR. MOXLEY:  Sorry one second.  I've got the wrong

10  tab.  I did.

11  BY MR. MOXLEY:

12  Q    I apologize.  If you could turn to Tab 17, that's the

13  complaint?

14       (Pause in the proceeding.)

15         THE WITNESS:  Tab 17?

16  BY MR. MOXLEY:

17  Q    Yes.  Tab 17 is the proposed amended complaint.

18       (Pause in the proceeding.)

19  BY MR. MOXLEY:

20  Q    And if you could turn in that Paragraph 57, which is on

21  Page 13 of 21.

22  A    Yeah.

23  Q    You on Paragraph 57, sir?

24  A    (No audible response.)

25  Q    Okay.  You see at Paragraph 57 in the proposed -- in

1  St. Luke's proposed amended complaint that St. Luke's

2  alleged that YesCare's website holds itself out as having 40

3  plus years of experience, provided care for over 1 million

4  patients for more than 475 correctional facilities, and that

5  YesCare has effectively stepped into the shoes of Corizon

6  Health; you see that?

7          MR. ZLUTICKY:  Objection, Your Honor.  This

8  document's not in evidence.  It's hearsay.  If there's a

9  question about what the document may say for the fact that

10 it was said, fine.  But otherwise, this is a hearsay

11 document.

12         MR. MOXLEY:  Your Honor, I'm not -- I'm not asking

13 for the admission of the document into evidence.  I'm -- I'm

14 showing him the document for his benefit.

15         I could ask him about what Paragraph 57 says and

16 not put it in front of him.  That seems unfair to the

17 witness.

18         MR. ZLUTICKY:  Well, what's the -- what's the point?

19 If it's not impeachment, you can't ask about hearsay

20 document.

21         MR. MOXLEY:  It's cross-examination.  Of course, I

22 can ask him about this document.

23         THE COURT:  Yeah.  He can ask about the document.

24 But I do -- and the statement in Paragraph 57 is not going

25 to be offered for the truth of the matter.

1            MR. MOXLEY:  It is not, Your Honor.

2            THE COURT:  Okay.  Then I'll allow it.

3            MR. MOXLEY:  Thank you, Judge.

4            THE WITNESS:  Is there a question?

5    BY MR. MOXLEY:

6    Q    The question was, do you see that?

7    A    I do see that.

8    Q    Okay.  My question now for you, sir, as the Deputy

9    General Counsel of St. Luke's who filed this proposed

10   amended complaint, is St. Luke's had a basis to make those

11   allegations, based on what it found on the internet, right?

12         (Pause in the proceeding.)

13            THE WITNESS:  Yes.

14   BY MR. MOXLEY:

15   Q    YesCare didn't exist for 40 years.  We know that,

16   right?

17   A    Right.

18   Q    And that was obvious to St. Luke's just from looking at

19   the website, right?

20   A    That YesCare didn't exist for 40 years?

21   Q    Yes, sir.

22   A    Well, I think it's also just obvious from the -- the

23   nature of the divisional merger.

24   Q    Right.

25   A    Yeah.

1  Q    Let me ask you, sir, did -- did you -- did you

2  personally in your role at St. Luke's, did you approve the

3  filing of these motions papers?

4  A    No.  And I -- I'd like to clarify something if I

5  could --

6  Q    Please.

7  A    -- about that.

8       I testified last time accurately that I am responsible

9  at St. Luke's for non-malpractice litigation.

10 Q    Uh-huh.

11 A    This case, interestingly enough, is one that I was not

12 responsible for.

13 Q    Okay.

14 A    So, it was just for reasons of who had availability and

15 expertise, handed to one of my colleagues.

16 Q    Uh-huh.

17 A    If this litigation revives, it will come back to me.

18      But I did not have any role in preparing this document.

19 I kept oversight and was aware of major events in the

20 Corizon ligitation.  But I did not manage that litigation.

21 Q    Okay.  No, and I appreciate that clarification.  And

22 I'm sure my next couple of questions don't need to be asked.

23 But just so the Record's clear, I'm going to ask them.

24      The person, your colleague, who approved this, that

25 colleague wouldn't have -- wouldn't have approved a proposed

1  amended complaint that had no basis, correct?

2  A    I think that's fair.

3  Q    Okay.  Now you testified on the first day of the

4  hearing on March 1st that you are not aware of the *Kelley*

5  (phonetic) case in the Federal District Court in Michigan.

6  Do you recall that?

7  A    I do recall that.

8  Q    Okay.

9  A    And -- and may I clarify something about that as well?

10 Q    You're welcome to, sir.

11 A    Yeah.  I -- I -- I Googled it after we talked.

12 Q    Okay.

13 A    I am aware of the case.  I -- I don't know it by

14 *Kelley.*  We talked about it in the -- in the Committee as

15 Ian Cross' case.  And I just -- the name Kelley didn't ring

16 a bell for me.

17 Q    I see.

18 A    I apologize for that.

19 Q    Okay.  So you're aware of it as Ian Cross' case?

20 A    Yeah.

21 Q    Okay.  Can I -- can -- if I refer to it as the *Kelley*

22 case today, you understand what case I'm talking about then?

23 A    I do, yes.

24 Q    Okay.  So let me -- well let me -- given that, let me

25 just ask you something -- let me ask you then before to make

1  sure we're on the same page.

2       So when I asked you about the *Kelley* case before, now

3  just substitute in Ian Cross' case, and I said, would it

4  surprise you to hear that a Federal Court in Michigan in Ian

5  Cross' case, had ruled that CHS TX could be added as a

6  Defendant on a successor liability theory of recovery in a

7  pending case against Corizon.

8       Would that -- would that surprise you today?

9  A    Yeah.  When we talked last time, I -- I, you know, I

10 wasn't aware that specific holding of the case.  But I -- I

11 guess it wouldn't surprise me.

12 Q    Okay.

13 A    Again, I've now read the case and --

14 Q    I see.

15 A    -- I don't think I'm surprised by anything in it.

16 Q    So thank you for clarifying that, Mr. Barton.

17 A    Yeah.

18 Q    So just to be clear then, so -- so if I had referred to

19 it as Ian -- Ian Cross' case when I was questioning you on

20 March 1st, you still wouldn't have actually known the

21 holding of the *Kelley* case, right?

22 A    That's fair.

23 Q    Okay.  All right.

24      So let's look at St. Luke's motion, this at now is at

25 Tab 18 if we could.  This the motion to amend St. Luke's

1  complaint.

2  A    Yes.

3  Q    And if you turn with me, sir, to Page 6 of that brief.

4  A    What tab is it?

5  Q    Oh, sure.  That's Tab 18.

6  Q    And just for the Record, we're now within the

7  St. Luke's brief in support of its motion --

8  A    Okay.

9  Q    -- to amend the complaint.

10       If you turn to Page 6.

11       (Pause in the proceeding.)

12  BY MR. MOXLEY:

13  Q    Are you there, sir?

14  A    Yes.

15  Q    You see in the second paragraph on that page the case

16  of *Kelley versus Corizon Health* in the Eastern District of

17  Michigan that's cited?

18  A    Yes.

19  Q    And do you see, if you look at Page 7, the second full

20  paragraph, you see the *Kelley* case is cited again?

21  A    Yes.

22  Q    And if you look at the top of Page 8.  You'll see the

23  *Kelley* case cited again, the top of Page 8.  You see that?

24  A    Yes.

25  Q    And if you look at a little further down on that page,

1  again Page 8, a second time *Kelley* case is cited on Page 8,

2  right?

3  A    Yes.

4  Q    And then if you turn to Page 12, you'll see the *Kelley*

5  case is cited there again, right?

6  A    Yes.

7  Q    So St. Luke's cited the *Kelley* case five times in a

8  15-page brief.

9       (Pause in the proceeding.)

10 BY MR. MOXLEY:

11 Q    You weren't aware of this brief when it was filed,

12 though, right?

13 A    No, I wasn't.

14 Q    Okay.  But --

15 A    I -- I was aware that we are moving to amend.  That's

16 it.

17 Q    Right.  Right.  Okay.

18      But your colleague wouldn't have authorized a brief

19 that didn't have a good faith basis for it, right?

20 A    That's fair.

21 Q    Are you aware that the -- that the *Jackson versus*

22 *Corizon* case in the Eastern District of Michigan also

23 reached the same conclusion as the *Kelley* case on the same

24 day?

25 A    I'm not.

1  Q    Okay. Now St. Luke's alleged in the motion at pages 12

2  to 13, I'm looking two lines up from the bottom.

3              "Although there has been a name change

4              and some rebranding efforts, YesCare is

5              effectively a continuation of Corizon.

6              It has all of Corizon's assets,

7              employees, and almost all the same

8              Directors and Officers as Corizon.

9              Further, YesCare's website essentially

10             holds itself out as Corizon by claiming

11             it has over 40 years."

12      And it continues.  You see that?

13  A    I see that.

14  Q    And it goes on to talk about website and YesCare's

15  purported experience set forth in the website, right?

16      (Pause in the proceeding.)

17              THE WITNESS:  Yes.

18  BY MR. MOXLEY:

19  Q    And you -- you yourself testified earlier in this

20  hearing back on March 1st, that you're aware that YesCare

21  has held itself out as continuing Corizon's business, right?

22  A    Yeah.

23  Q    Now St. Luke's lawyers and Stoel Rives, who I -- I know

24  are very experienced and talented as we discussed, they made

25  these argument on February 14th, 2023, the day after the

1  Tehum bankruptcy filing happened on February 13th, right?

2       (Pause in the proceeding.)

3  BY MR. MOXLEY:

4  Q    Right?

5  A    Yes.

6  Q    Okay.  So St. Luke's didn't require a ten month

7  investigation to determine that it was appropriate for

8  St. Luke's to seek to hold YesCare, CHS TX and others,

9  liable for the damages that Corizon owed St. Luke's, did it?

10 A    No.  And I don't know what our chances of success are.

11 But there's a good faith basis for that claim.  I don't

12 think I'd ever denied that.

13 Q    Right.  And the discussion -- but the discussion of

14 successor liablity in the Rule 9019 motion, I know you would

15 agree with me -- or I -- I take it you would agree with me,

16 that's at Paragraph 46 of that motion, right?

17 A    Pardon me.  I didn't understand the question.

18 Q    Sure.  The discussion of successor liablity in the Rule

19 9019 motion is limited to Paragraph 46 in the motion,

20 correct?

21 A    I -- I don't know.  I'd have to look at the motion.

22 Q    Okay.  We can look at that.

23      But let me -- before we do that, let me just -- let me

24 just ask you, your lawyers for St. Luke's saw fit to cite

25 the *Kelley* decision five times in a 15-page brief and

1   thought it useful to immediately amend the complaint to try

2   to recover damages Corizon owed it from YesCare and CHS TX,

3   and other people.

4       But the UCC's position is that, pursuing successor

5   liablity, would be a novel theory unlikely to succeed; is

6   that right?

7   A   I novel theory whose -- where the chances of success

8   are unpredictable.

9   Q   Did the UCC take into account all of the arguments for

10  successor liability and veil piercing that St. Luke's was

11  able to advance over a year ago?

12  A   I think they considered the -- they're aware of the

13  cases that we cited and the -- and the websites.

14  Q   Well did St. Luke's give the UCC's legal advisors their

15  research --

16  A   We did not.

17  Q   -- so they would know?

18  A   We did not.

19  Q   Okay.  I think you made reference in response to

20  questions on direct examination to the Texas Business

21  Organizations Code previously; you recall that?

22  A   Yeah.

23  Q   Okay.  And that statute's also referenced in Paragraph

24  46 of the motion, right?  We can look at it.  Let's look at

25  it.  Let's look at it.  Just turn to Tab 3.

1  A    Yes.

2  Q    Are you at Paragraph 46 of the -- of the Rule 9019

3  motion, sir?

4  A    I am.

5  Q    Okay.

6  A    Well, I'm looking at it on the screen.

7  Q    Looking at it on the screen.  Okay.  Very good.

8       And you see the reference there to the Texas Business

9  Organization statute.

10 A    Yes.

11 Q    And Paragraph 46 states, we'll just -- we'll just read

12 it so we're all on the same page.

13              "In addition to presenting a novel legal

14              theory, recovery under such a successor

15              liablity theory would require a court of

16              competent jurisdiction to disregard the

17              relevant portions of Texas Business

18              Organization Code more directly than

19              under the fraudulent transfer context."

20 A    Right.

21 Q    You see that?  And -- and you testified on the first

22 day of this hearing that the Texas statute, I believe you

23 words were, would have to be overturned to bring successor

24 liablity claims, right?

25 A    Yeah.

1  Q    Okay.  Have you read the Texas Business Organizations

2  Code?

3  A    I have.

4  Q    Are you familiar with Section 10.901 of the statute?

5  A    I am.

6  Q    You are.  Well, we can look at that in a minute.

7       But I think you testified on direct that successor

8  liability provides a creditor with a right to bring a

9  lawsuit against its successor entity, right?

10 A    Right.

11 Q    Okay.  And alter ego, the alter ego doctrine, that

12 provides a creditor with certain rights, vis-à-vis a

13 beneficial owner or officer, director, right?

14 A    Right.

15 Q    Okay.  It provides a right -- the alter ego doctrine

16 provides a right for a creditor to sue a beneficial owner,

17 or director, or officer of the company, right?

18 A    Can you repeat that question, please?  I'm sorry, I

19 didn't catch it.

20 Q    Yes, sir.  That's okay.

21      The alter ego doctrine, I believe you testified to this

22 on direct.  But the alter ego doctrine provides a right to a

23 creditor to sue directors or officers of the company, right?

24 A    Right.

25 Q    Okay.  And fraudulent transfer law provides a creditor

1  with certain righs to avoid transactions, right?

2  A    Right.

3  Q    So let -- let's look -- let's look at the section of

4  the Texas Business Organizations Code that you testified you

5  read.  That's at Tab 12 --

6        (Pause in the proceeding.)

7  BY MR. MOXLEY:

8  Q    -- of your binder.

9  A    Uh-huh.

10  Q    Do you have Section 10.901 of the Texas Business

11  Organizations Code in front of you, sir?

12  A    I do.

13  Q    Okay.  And you see that it provides,

14            "This Code does not affect, nullify, or

15            repeal the anti-trust law, or abridge

16            any right or rights of any creditor

17            under existing laws."

18        You see that?

19  A    I do.

20  Q    Now were you aware of that provision of the Texas

21  Business Organizations Code prior to looking at it just now.

22  A    Yes.

23  Q    You were.  You read it before, right?

24  A    Yes.

25  Q    Okay.  Well, thinking now about this provision of the

1   Code, the arguments that St. Luke's advanced in its motion

2   to amend, we know at the very least that the Stoel Rives

3   firm, your lawyers in Idaho, did not see the need to make

4   the argument that the Texas Business Organizations Code

5   needed to be overturned in order to -- in order to move to

6   amend to have YesCare, CHS TX, and the others as Defendants

7   on a successor liability theory, right?

8           MR. ZLUTICKY:  Objection, Your Honor.  The witness

9   has already stated that he wasn't aware.  He doesn't have

10  personal knowledge of the filing of this case, and the

11  filing of this amendment.

12          MR. MOXLEY:  Your -- Your Honor, he -- he

13  testified that he had general oversight of the process, even

14  though that -- on that particular day, I guess, he was busy.

15  And -- and so it went to a colleague.

16          But he said he still has oversight.  And he said

17  that if this case is dismissed and that case is continuing,

18  it's coming back to him.  He's -- he's familiar with the

19  motion.

20          THE COURT:  What's the relevance of all this,

21  counsel?

22          MR. MOXLEY:  The -- the relevance, Your Honor, is

23  his own -- his own employer moved to bring a successor

24  liablity claim and didn't make the argument that the UCC now

25  says would have to be made in order to bring that argument.

1          THE COURT:  Can't we just rely on the papers?

2          MR. MOXLEY:  We -- we can, sir.  I was wanted the

3    witness to be able to have an opportunity.

4          THE COURT:  Just saying, but he -- he didn't file

5    the lawsuit.  So I don't -- I don't know what -- I'm not

6    sure what I get out of someone who tells me that they

7    weren't involved in the actual filing of the lawsuit, or why

8    these decisions were made as to why they felt that way then

9    or how they feel now.  I --

10         MR. MOXLEY:  Thank you, Judge.  We can move on.

11      (Pause in the proceeding.)

12   BY MR. MOXLEY:

13   Q    Mr. Barton, you -- you testified earlier in this

14   hearing that your understanding is claims against YesCare on

15   a successor liability basis are estate causes of action,

16   right?

17   A    Can you repeat that question?

18   Q    Of course, sir.

19      You -- you testified earlier in this hearing on March

20   1st that your understanding is claims against YesCare on a

21   successor liability basis are estate causes of action,

22   right?

23   A    On the successor liablity basis, yes.

24   Q    Okay.

25         (Pause in the proceeding.)

1  BY MR. MOXLEY:

2  Q    Let -- let me just ask you one -- one quick question

3  before we move on to this line of questioning, sir.

4       If -- if the bankruptcy case is dismised, and if the

5  Idaho litigation then proceeds, is it your intention, as the

6  person with oversight of that case, to still utilize the

7  Stoel Rives firm?

8            MR. ZLUTICKY:  Objection, Your Honor.  Calls for

9  speculation.

10           THE COURT:  Sustained.

11  BY MR. MOXLEY:

12  Q    Mr. Barton, at your deposition -- strike that.

13       Let -- let me just go back for a quick second, sir.

14  So -- so just again, so we're on the same page.

15       Your testimony on March 1st was that your understanding

16  is that claims against YesCare on a successor liability

17  basis are estate causes of action, right?

18       (Pause in the proceeding.)

19           THE WITNESS:  Yes.

20  BY MR. MOXLEY:

21  Q    Okay.  Now at your deposition, you were -- would you

22  agree with me that you were incredulous when I asked about

23  someone taking the position that any claims against YesCare

24  might be settled by this agreement?

25  A    Well, I -- I think at the deposition, the -- the claim

1   was made that -- that claims that did not belong to the

2   estate might be settled.  So that was my, the source of my

3   incredulity.

4   Q    Okay.

5   A    Yeah.

6   Q    Well let's -- let's look at your deposition, then --

7   A    All right.

8   Q    -- so we can be clear about this.

9        So in your transcripts binder, sir.  There's a second

10  binder there.  The very first tab, Tab A, is your deposition

11  transcript.

12       And when you have that -- when you have that in front

13  of you, if you could turn to Page 314 --

14  A    Of which tab?

15  Q    Tab A, sir.

16  A    Okay.

17  Q    It's the deposition transcript.

18  A    Yes.

19  Q    And if you could look with me on Page 314, beginning at

20  Line 18.

21  A    Yes.

22  Q    I asked you:

23            "Q   Mr. Barton, would it also surprise

24            you if the claims asserted against

25            YesCare by injury tort claimants,"

1      Mr. Coffman interjected an objection.  Then my question

2    continued.

3           "Were viewed by one of the settling

4           parties as being settled by the

5           settlement agreement attached to the

6           Rule 9019 motion."

7      Mr. Coffman, again, interjected an objection.  And

8    Mr. Zutlicky as well.

9      And then your answer was:

10          "A   I think you know my answer.  The

11          settlement agreement settles claims of

12          the estates, that's plain on its face.

13          So it would be a surprise to me if

14          someone had that incorrect view."

15   Right?

16          MR. ZLUTICKY:  Objection, Your Honor.  This is

17   improper impeachment.  This isn't inconsistent with the

18   witness' prior testimony.

19          MR. MOXLEY:  I believe it is inconsistent, Your

20   Honor.

21          THE COURT:  No, I -- overruled.

22          THE WITNESS:  This is -- this is what I just said.

23   That my incredulity would be that someone thought that

24   claims other than estate claims were settled at the

25   mediation.

1  BY MR. MOXLEY:

2  Q    So you -- you never mentioned during your deposition

3  anything to me when I asked you these questions about Fifth

4  Circuit law, right?

5  A    I said the settlement agreement settles claims of the

6  estate.  That's plains on it -- that's plain on its face.  I

7  stand by that testimony.

8  Q    Right.  My question was different just now, though,

9  sir.

10       My question was, when I asked you questions about what

11  was settled and what was not settled in the settlement

12  agreement, none of your answers reference Circuit law, did

13  they?

14  A    I don't recall talking about Circuit law.

15  Q    And you never mentioned in any way -- any way in which

16  a claim against YesCare, held by a tort claimant, could be

17  settled and released under this agreement, right?

18  A    I don't think we had that discussion, right.

19  Q    When did you forumulate the view that you now hold that

20  claims against YesCare on a successor liablity basis are

21  estate causes of action?

22  A    I don't know.

23  Q    It was after you deposition, right?

24  A    No, I don't think so.  I don't know.

25  Q    Was it after the TCC was formed?

1  A     May have been.

2  Q     It may have been after you reached the first $37

3  million settlement, right?

4  A     I don't know.

5  Q     Why -- why is it that in any of the public filings that

6  have been made regarding the value and strength of these

7  claims, is nothing said about sucessor liability other than

8  Paragraph 46 of the motion?

9          MR. ZLUTICKY:  Objection, Your Honor.  It

10 misstates the Record.

11         THE COURT:  I -- I'm going to sustain the

12 objection.

13         MR. MOXLEY:  Okay.  Thank you, Judge.

14 BY MR. MOXLEY:

15 Q    Mr. Barton --

16         (Pause in the proceeding.)

17 BY MR. MOXLEY:

18 Q    Do you know where in any public filing a person with a

19 tort claim against the YesCare on a successor liability

20 basis might look to learn that their claim is being released

21 under the settlement agreement if it's approved?

22 A    I believe it's discussed in the -- the plan documents

23 that are no longer -- that we're no longer seeking to -- to

24 have approved.  But I believe it's in there.

25 Q    Okay.  And -- and is it your view, just -- I just want

1   to understand what your view is.

2   A     Yeah.

3   Q     Is it your view that that discussion in those plan

4   documents, that's sufficient to inform folks that

5   their -- that their personal injury or wrongful death claim

6   is being released?

7              MR. BROOKNER:  Your Honor, objection.

8   This -- this is mistating a legal conlclusion.  There's an

9   assumption in here that something wrong with somebody else

10  is being released without a legal finding as to who owns the

11  FIN (phonetic).

12             You know that our contentions that the law is that

13  successor liablity claims are property of the estate.

14             THE COURT:  Okay.  Both of you -- both of you all

15  are --

16             MR. MOXLEY:  I can move on, Your Honor.

17             THE COURT:  Yeah.  But I -- I also like objections

18  to just object.  And I like responses to just be responsive

19  on just focus of evidence.

20             So, I'll, I mean, I -- I would have overruled the

21  objection.  Because I think the question was where would you

22  find this information --

23             MR. MOXLEY:  That is --

24             THE COURT:  -- and whether that information would

25  be found in the motion that someone would be reading that

1  the Judge is being asked to approve if they read it.

2         That's -- I don't know if that's reaching a legal

3  conclusion or not.  But I think that was the basis of the

4  question.  So I would overrule.

5         But if you want to move on, I get it.

6         MR. MOXLEY:  No, I'd like an answer to that

7  question, then, Judge.

8  BY MR. MOXLEY:

9  Q    Where would -- where would somebody look?

10 A    Can you -- can you repeat the question?

11 Q    Yes.  Where would a -- where would a claimant who has a

12 personal injury or wrongful death claim, look to -- to -- to

13 learn what you -- what you now have the understanding of,

14 that it's the Debtor's position that successor liablity

15 claims against YesCare are being released by that settlement

16 agreement?

17 A    So it's not the Debtor's position.  So it -- the -- my

18 understanding is that the law in this Circuit is that the

19 successor liability claims would be the property of the

20 estate.

21       But if this Court or this Circuit rules otherwise, then

22 they wouldn't be.

23       (Pause in the proceeding.)

24         THE WITNESS:  But it's not my position that

25 they're the property of the estate.  It's not the UCC's

1  position.  It's not the Debtor's position as far as I know.

2  BY MR. MOXLEY:

3  Q    Are the UCC's views regarding whether the proposed

4  settlement is reasonable, based on its view regarding the

5  Texas Divisional Merger statute?

6  A    Can you repeat the question.

7  Q    Yes, sir.

8       Are the UCC's views regarding whether the proposed

9  settlement is reasonable, based on the the UCC's views

10 regarding the Texas Divisional Merger statute?

11 A    We -- the -- the Texas Divisional Merger statute is

12 relevant.  But, no, I wouldn't say that our view is -- is

13 based --

14 Q    Okay.

15 A    I mean, maybe -- maybe in part, but certainly not

16 primarily on -- on considerations about the -- the business

17 code.

18 Q    Okay.  Well let me ask.

19      Did the UCC base its decision, at least in part, to

20 support the settlement on the legal argument made in

21 Paragraph 46 of the Rule 9019 motion?

22 A    I believe we felt it would be challenging in this

23 context to -- to get the Court to -- to get a court to

24 disregard the separate nature of YesCare and Corizon.

25      I -- I think that was a component of our thinking.

1  Q    Okay.  Do you think that St. Luke's and the UCC have

2  taken consistent positions on the impact of the Texas

3  statute on successor liability claims?

4       (Pause in the proceeding.)

5          THE WITNESS:  Are you asking whether there's an

6  inconsistency between what the UCC says and what St. Luke's

7  says in its briefing?

8  BY MR. MOXLEY:

9  Q    Yes, sir.

10 A    I'm not aware of any inconsistency.  We put forth in

11 our argument that's available to us.  I don't know if we're

12 going to win it.

13      We believe, in this case, we have that same argument.

14 We don't think we're likely to win it.  So we're going to

15 try a different way to get money into the hands of

16 creditors.  It's not available to St. Luke's in the

17 civil -- in, you know, in our civil complaint.  We don't

18 have the ability to go to a different court and -- and get

19 our money a different way.

20 Q    So, thank you for that answer, sir.

21      Let me just be clear now, then.  So you are familiar

22 with the arguments that were made in the brief in support of

23 St. Luke's motion to amend its complaint in Idaho; is that

24 right?

25 A    You've --

1            MR. ZLUTICKY:  Objection, Your Honor.

2            MR. MOXLEY:  He just testified that way, Your

3   Honor.

4            THE COURT:  What's the basis of the objection?

5            MR. ZLUTICKY:  Sure, the witness previously

6   testified that he wasn't aware the arguments and then he

7   just showed him the arguments.

8            THE WITNESS:  Yeah.  He showed me the arguments.

9            THE COURT:  Sustained.

10        (Pause in the proceeding.)

11  BY MR. MOXLEY:

12  Q    St. Luke's is on the UCC, correct?

13  A    Yes.

14  Q    Does it seem odd to you, Mr. Barton, that St. Luke's

15  would claim it considers CHS TX on successor liability in

16  Idaho and that the UCC would say that argument is novel?

17  A    No.  It doesn't seem inconsistent.

18       Indeed, it -- it is on the strength of that argument,

19  right, that we -- that there is an argument that the entire

20  divisional merger is fraudulent and could be undone.

21       It is partly on the basis of that argument that we were

22  able to extract $54 million here.  That the argument,

23  there -- there is an argument there to disregard the

24  separate nature of the -- the entities here.

25       We just don't know that it's worth gambling the

1   creditors' money to make that argument.

2   Q    I think --

3   A    It's a very different situation than a private litigant

4   faces in making that argument.

5   Q    My question, though, Mr. Barton, is that -- is that

6   St. Luke's didn't make the argument in Idaho that you'd have

7   to disregard or overturn the Texas statute.  It just brought

8   a successor liablity claim, or tried to, right?

9            MR. ZLUTICKY:  Objection, Your Honor.  The witness

10  already stated that he wasn't aware of the argument that

11  St. Luke's made in Idaho.

12           THE COURT:  I think the point is established that

13  there was an argument made in Idaho that wasn't made today.

14  I think if that's the point, then I -- I get it.

15           MR. MOXLEY:  Thank -- thank you, Judge.  I'll move

16  on.  Thank you.

17       (Pause in the proceeding.)

18           MR. MOXLEY:  Your Honor, I'm -- I'm going to shift

19  to a -- a new topic.  I'm happy to continue.  But I just

20  wanted to raise that in case the Court or the witness would

21  like a break.

22           THE COURT:  Don't worry about me.  You worry about

23  your examining --

24           MR. MOXLEY:  Okay, Judge.

25           THE COURT:  But we can check with the witness.  Do

1    you?

2              THE WITNESS:  No, I'm fine.

3              MR. MOXLEY:  Very good.

4              THE COURT:  All right.

5              MR. MOXLEY:  We'll just carry on, Judge.  Thank

6    you.

7              THE COURT:  Just from a timing standpoint, how

8    much more time do you think you got?

9              MR. MOXLEY:  Your Honor, I believe --

10        (Pause in the proceeding.)

11             MR. MOXLEY:  I -- maybe -- maybe 30 minutes.

12             THE COURT:  Let's go.

13             MR. MOXLEY:  Okay.  Then very good, Judge.

14             Your Honor -- Your Honor, I apologize.  It might

15   take slightly longer depending on the answers.

16             THE COURT:  No, no, no.  I understand.

17             MR. MOXLEY:  Thank you, Judge.

18   BY MR. MOXLEY:

19   Q    Okay.  Mr. Barton, do you recall testifying previously

20   about your concern -- on direct about your concerns that a

21   dismissal would have a negative impact on *pro se* claimants,

22   particularly, currently incarcerated *pro se* claimants?

23   A    Yes.

24   Q    Are you aware of the Amicus filing in this this case by

25   the ACLU and other organizations?

1  A    I am.

2  Q    Have you read that Amicus filing?

3  A    I have.

4  Q    Okay.  And I appreciate, Mr. Barton, that you're

5  concerned about *pro se* incarcerated claimants.

6       But, respectfully, you saw who those organizations

7  were.  Would you agree with me that those organizations may

8  know better than you about what may be best for incarcerated

9  claimants in this case?

10 A    I -- I suspect they do.  And the point that they made

11 is that it's very important to have -- be very careful about

12 notice to incarcerated Plaintiff.  And that is something

13 that the Committee has taken very seriously since the

14 beginning.

15 Q    And you're -- you're familiar with the -- the -- having

16 read the document, you're familiar with the organizations

17 who filed that Amicas filing, correct?

18 A    Not all of them.  I'm certainly familiar with the ACLU.

19 Q    Generally, you're familiar with those organizations,

20 right?

21 A    Some of them I hadn't heard of.

22 Q    Okay.  Well, would you agree with me that those

23 organizations would be interested in enhancing and not

24 diminishing incarcerated claimants' access to justice?

25 A    Okay.

1   Q    You -- you would agree with that, right?

2   A    Okay.

3   Q    Well, no.  I'd like to answer -- I'd like an answer,

4   Mr. Barton.

5        My question is, and I'll ask -- I'll ask about an

6   organization that I think you said specifically you're

7   familiar with.

8   A    Yes.

9   Q    Do you think the ACLU is interested in enhancing or

10  diminishing incarcerated prisoners' access to justice.

11  A    They are -- they are likely interested in enhancing it.

12  Q    Right.  And those organizations support dismissal of

13  this bankruptcy case, don't they?

14  A    Yes.  Though it's interesting they, the ACLU brief,

15  cites the -- your motion to dismiss as a reason for

16  its -- for its Amicus brief and for the -- for its decision

17  to oppose the settlement.

18       I do think there are things in your brief that are

19  inaccurate.  And so I -- I don't know if -- if ACLU would

20  feel the need to oppose the settlement if they had all the

21  facts.

22  Q    Let me ask you this:  Given that Amicus filing, we know

23  that those organizations are aware of this case now, right?

24  A    Yes.  Apparently through your brief.

25  Q    What's your basis for that?

1  A    A statement in the -- in the ACLU's brief that --

2  Q    That's -- that's your only -- that's your only basis

3  for that statement, correct?

4  A    Yes, sir.

5  Q    Okay.  And given the filing, we know that not only are

6  they aware of the case, our brief, they're -- they're aware

7  that there are *pro se* claimants who are incarcerated who

8  have claims in this case, right?

9  A    Yes.

10  Q    What facts do you think -- you had testified

11  that -- that you saw a reference in the ACLU's brief to our

12  motion to dismiss.  And if -- you think if they had all the

13  facts, that you don't know what their position would be?

14      What -- what facts do you think would change the ACLU's

15  position?

16          MR. ZLUTICKY:  Objection, Your Honor.

17          THE COURT:  Sustained.

18      (Pause in the proceeding.)

19  BY MR. MOXLEY:

20  Q    In response to Mr. Zulitcky's questions about whether

21  the UCC considered dismissing this case, you testified on

22  direct examination that the UCC weighed that option

23  carefully, right?

24  A    Yes.

25  Q    But you were concered about *pro se* incarcerated

1    peoples' rights.

2    A    We were, indeed.

3    Q    Did the UCC reach out to any of the organizations who

4    filed the Amicus brief that were -- that are focused on

5    incarcerated peoples' rights and their access to justice,

6    and get their perspective, or ask them questions about why

7    they support dismissal?

8    A    You're asking if we reached out to the individuals

9    who -- to the entities that filed that Amicus brief?

10   Q    I am.

11   A    I'm not aware that we did.

12   Q    You as the Chair --

13   A    I don't know if we did.

14   Q    Okay.  You as the Chairperson of the UCC didn't

15   instruct your counsel, or your advisors to do that, did you?

16   A    No.

17   Q    The Amici raised the concern in their brief, which I

18   know you read.  And so I'm assuming you saw, that if the

19   settlement is approved and a plan confirmed, it would pave

20   the way for future medical care providers in prison systems

21   to again file for bankruptcy to avoid paying creditors,

22   including tort claimants, what they're owed.

23        Do you share that concern?

24             MR. ZLUTICKY:  Objection, Your Honor.

25             THE COURT:  No.  I think that's fair.  Overruled.

1          THE WITNESS:  You know, my focus, the focus of the

2   Committee, is on getting money into the hands of our

3   creditors.

4          I -- I -- I will say that the -- the effect of

5   what happens on -- on other cases in the future is secondary

6   to that.

7   BY MR. MOXLEY:

8   Q    Okay.  So that may have been a fact, irrespective of

9   our brief, why the ACLU took the position it does with

10  respect to dismissal right?

11         MR. ZLUTICKY:  Objection.

12         MR. MOXLEY:  I'll withdraw the question.

13         THE WITNESS:  I have no idea.  Well -- it --

14         MR. MOXLEY:  I withdraw --

15         THE COURT:  I'm going to -- I'm going to sustain

16  the objection.  I'm --

17         MR. MOXLEY:  I'll -- I'll move on.

18         THE COURT:  Yeah.  Go ahead.

19         MR. MOXLEY:  Thank you, Judge.

20  BY MR. MOXLEY:

21  Q    Let's switch gears, Mr. Barton.

22       Am I correct that the UCC does not support the last

23  plan on file, the second amended plan; is that right?

24  A    That's correct.

25  Q    Okay.  And so if this settlement is approved, and if

1   a -- then -- then the -- I think you testified the plan

2   would be that the TCC and the -- strike that.

3         I take it that if this Rule 9019 motion is granted, the

4   intention of the UCC would be to go back and mediate with

5   the TCC and other interested parties to try to come up with

6   a plan structure; is that right?

7   A    That is the idea.

8   Q    So putting aside the amount of dollars that flow in

9   under the -- under this settlement versus the last

10  settlement that's no longer being -- being pursued, is there

11  any other aspect of the last filed plan, second amended

12  plan, that the UCC does not support?

13             MR. ZLUTICKY:  Objection, Your Honor.

14             THE COURT:  What's the objection?

15             MR. ZLUTICKY:  He's already said that he doesn't

16  support the plan entirely.  And he's now asking what

17  specific provisions he wouldn't support in the future.

18  That's calling for speculation.

19             MR. MOXLEY:  No, Your Honor, I -- well, may I be

20  heard, Your Honor?

21             THE COURT:  Yeah.  Go ahead.  Of course.

22             MR. MOXLEY:  Okay.  Thank you.

23             THE COURT:  I was waiting on you.

24             MR. MOXLEY:  I'm sorry.

25             THE COURT:  I said I was waiting on your response.

1           MR. MOXLEY:  Oh, thank you, Judge.  Thank you,

2   Judge.

3           Your Honor, he testified before they no longer

4   support the prior plan, they support this plan.  My question

5   is simply, is -- I'm actually would like to know the answer

6   to what Mr. Zutlicky just said.

7           Is it the entirety of it or are there -- or is it

8   just the dollars, just the consideration that comes in.

9   Because I -- I suspect, Judge, that the answer is --

10          THE COURT:  I -- I don't -- I don't want you to --

11          MR. MOXLEY:  Okay.

12          THE COURT:  -- suspect what the answer is.

13  I -- I -- I think he could answer what parts of the second

14  amended plan they didn't specifically, the Committee

15  opposed.  I think that's a fair question.

16          MR. ZLUTICKY:  Well, Your Honor, the -- the

17  Committee did oppose the plan as a whole.  And that's --

18          THE COURT:  Yeah.  But I'm saying, but I think he

19  can testify.  He's the Chair of the Committee.  He can

20  testify as to what -- what his understanding was about what

21  the Committee objected to.

22          THE WITNESS:  So, hit me with the question again.

23          MR. MOXLEY:  Yes, of course, Mr. Barton.

24  BY MR. MOXLEY:

25  Q    My -- my question is, putting aside the amount of

1  dollars that change with respect to -- with respect to the

2  settlement from the last settlement to this settlement, are

3  there any other aspects of the last filed plan, the second

4  amended plan, that the UCC does not support?

5  A    Well I think it -- it -- it's all up in the air.

6       So, we went into the last mediation with, the UCC did,

7  on the understanding that we were going to be talking about

8  the amount of money to bring into the estate and make

9  available to creditors.  That would be the subject of the

10 mediation.

11      And that we would not include, as part of the

12 mediation, any discussion of the plan by which the dollars

13 would be distributed.  And so, I think it's fair to say,

14 based on that history, that there isn't anything in

15 that -- in the -- in the existing plans that isn't up for

16 discussion with you all.

17 Q    Okay.  Thank you, sir.

18      Were you aware, Mr. Barton, that immediately after the

19 Rule 9019 motion and the TCC's motion to dismiss were filed

20 on January 16th, that the TCC reached out to your Committee

21 and requested mediation and proposed that the parties stay

22 litigation while that mediation took place?

23 A    I'm sorry.  I missed the first part of that.  Can

24 you -- I apolgize.  My hearing is not great.

25 Q    No, that's okay.  Let me just talk into the microphone

1   more.

2        Mr. Barton, my question was, were you aware that

3   immediately after the Rule 9019 motion and the motion to

4   dismiss were filed on January 16th, that the TCC reached out

5   to your Committee and requested mediation, and proposed that

6   the parties stay litigation while that mediation took place?

7   A    Mediation on what subject?

8   Q    My -- my question is, are you aware that that -- that

9   that happened?

10  A    Not sitting here today.

11  Q    No one brought that to your attention.

12  A    I don't know if anyone brought that to my attention.

13  Q    So you -- you just learned that -- and I appreciate you

14  don't want to necessarily take my word for it.

15       But if that happened, you're hearing about that for the

16  first time.

17  A    I don't know if I'm hearing about it for the first

18  time.

19            MR. ZLUTICKY:  Objection, Your Honor.

20            THE COURT:  I'm -- I'm not sure.  He said he

21  didn't -- he said he's not aware if he knew of not.  And I'm

22  not sure what that means.

23            I'm not sure if that means he's -- I'm -- I'm not

24  sure what the answer that is.  So I think it's fair for him

25  to ask a little bit more questions, to try to understand

1    that.

2              THE WITNESS:  I don't recall learning that

3    information.

4         (Pause in the proceeding.)

5    BY MR. MOXLEY:

6    Q    Well let me ask you this question.

7         Are you aware that the UCC's counsel informed the TCC

8    that the UCC was unwilling to mediate in January?

9    A    That the TCC was unwilling to mediate in January?

10   Q    That the UCC was unwilling to meet -- your Committee

11   was unwilling to mediate with the Committee that I

12   represent.

13   A    I -- I'm not aware of that.

14   Q    Okay.  Did you, as the Chair of that Committee,

15   instruct your counsel to tell the TCC's counsel that the UCC

16   was unwilling to mediate in January?

17   A    Did I -- what was the question there?

18   Q    You're the Chair of the UCC, correct?

19   A    Yes.

20   Q    As the Chair, did you instruct your counsel to tell the

21   TCC's counsel that the UCC was unwilling to mediate with the

22   TCC in January?

23   A    I -- I did not give that instruction.

24   Q    So --

25        (Pause in the proceeding.)

1  BY MR. MOXLEY:

2  Q    Well, given that you didn't give that instruction,

3  I'm -- I'm really confused, Mr. Barton, how -- how is it

4  that the UCC, I guess, through its advisors was unwilling to

5  mediate with the TCC in January, but you're willing to meet

6  with us after the settlement is approved.  Why -- why is

7  that?

8  A    I -- I don't know.  I'm not aware of any refusal to

9  mediate.

10 Q    Do you think that if the Rule 9019 motion is granted,

11 that the effect would essentially be that the amount of

12 money that the settling parties would pay would be capped at

13 what it is now?

14       MR. ZLUTICKY:  Objection, Your Honor.  Calls for

15 speculation.

16       THE COURT:  Overruled.

17       THE WITNESS:  Can you repeat the question?

18 BY MR. MOXLEY:

19 Q    Do you think that if the Court granted the Rule 9019

20 motion, the amount of money that the settling parties would

21 pay would be capped at what it is now?

22 A    Well, there are -- there are -- well, I -- I don't know

23 if it would be capped.

24 Q    Okay.

25 A    Yeah.

1   Q     Let me ask you this.  You've -- you've -- you've

2   participated in a lot of the negotiations and the

3   mediations, right?  I'm not asking for any substance of

4   mediation.  But you participated in them, right?

5   A     Yes.

6   Q     Okay.  So if the Court grants the motion that says the

7   $54 million settlement is approved, do you think it's likely

8   that the settling parties who are obligated to make payments

9   under that agreement would pay more money than the amount

10  the Court has already approved?

11  A     I don't.

12  Q     Right.

13  A     There are other claims that -- that the estate has,

14  such as against the Flax (phonetic) Group.  So more money

15  might be made available to creditors eventually.

16        But I agree.  I mean, the -- the money that we're

17  paying in exchange for a release.  And I don't anticipate

18  that they'll be willing to pay more once they get out of it.

19  Q     Mr. Barton, do you recall that Mr. Zutlicky asked you

20  some questions on direct regarding how the UCC takes into

21  account the views of its two members who are personal injury

22  claimants?

23  A     Yes.

24  Q     The UCC's past votes on whether to pursue certain

25  issues or take certain actions have not always been

DAVID BARTON - CROSS BY MR. MOXLEY                 101

1   unaimous, right?

2   A    Correct.

3   Q    The UCC was not unaimous in supporting one of the

4   bankruptcy plans that was filed in this case by the Debtor

5   and the UCC previously, right?

6   A    Right.

7   Q    At least one member of the UCC voted against one of the

8   prior bankruptcy plans in this case that was supported by

9   the Debtor and the UCC, right?

10  A    Correct.

11  Q    Was that UCC member who voted against one of those

12  prior bankruptcy plans in this case the holder of a personal

13  injury wrongful death claim?

14  A    Yes.

15  Q    Are you aware that the Debtor has objected to two

16  claims made by TCC members?

17  A    Yes.  Well, when you -- what claims are -- do you have

18  in mind?

19  Q    Well, my question, sir, is you understand that there

20  are members on the TCC, right, the Tort Claimants Committee.

21  Yes?

22  A    Yes.

23  Q    Okay.  My question is, are you aware -- and

24  those -- and some of the members have filed proofs of claim

25  in this bankruptcy case; you're aware of that.

1   A    Yes.

2   Q    Okay.  My question now, sir, is are you aware that the

3   Debtor has objected to two claims made by the TCC members?

4   A    I think I would need to know what claims you have in

5   mind before answering that question.

6   Q    Okay.  You're not --

7   A    I'm now sure I know.

8   Q    You're just not sure.

9   A    I'm not sure.

10  Q    Okay.  That's fine.

11       Are you aware of any investigation by the Debtor into

12  the validity of St. Luke's claim.

13  A    By the Debtor.

14  Q    Yes, sir.

15  A    I'm not.

16  Q    Has the UCC investigated the validity of St. Luke's

17  claim?

18  A    No.

19  Q    That -- that -- that's kind of -- that's laughable,

20  right?  That they wouldn't do that.

21  A    I don't know if it's laughable.  They haven't done it.

22  Q    Well it seemed like you just laughed.

23       (Laughter.)

24  BY MR. MOXLEY:

25  Q    Okay.  Are you aware, Mr. Barton -- well, let me strike

1   that.

2       Did you hear the testimony in this case on Monday?  Did

3   you participate in that hearing?

4   A    I did not participate in the hearing.  I've read the

5   testimony of Russell Perry.

6   Q    Okay.  Did you read the testimony of Mr. Lefkowitz?

7   A    I did not.

8   Q    Okay.  Did anybody advise you that Mr. Lefkowitz

9   characterized St. Luke's claim in court on Monday as the

10  most fictitious claim in the entire case and said that

11  St. Lukes is not owed a dime.

12  A    I got a report from counsel about that.

13  Q    Okay.

14      (Pause in the proceeding.)

15  BY MR. MOXLEY:

16  Q    If St. Luke's claim is fictitous, as Mr. Lefkowitz

17  characterized it, would that mean that the non-personal

18  injury claims aggregate value in this case would be

19  substantially reduced?

20  A    St. Luke claim is not fictitious.  But if it were,

21  what's the question?

22  Q    Would the non-personal injury claims in this case, the

23  aggregate amount, be substantially reduced.

24          MR. ZLUTICKY:  Objection, Your Honor.  Calls for

25  speculation.

1             THE COURT:  I -- I just think it's a matter of

2    math.  You take one out, it gets less.

3             MR. MOXLEY:  Right.

4             THE COURT:  That's the point we're trying to get

5    to?

6             THE WITNESS:  It -- it's that --

7             THE COURT:  I get it.

8             THE WITNESS:  Yes.  I mean, we've got a $32

9    million claim.

10   BY MR. MOXLEY:

11   Q    That's the point.

12   A    And that total number of claims if we withdrew it,

13   which we have no intention of doing.  But if we withdrew it,

14   that would reduce it by the amount of the claim.

15   Q    By -- by more than $30 million, right?

16   A    Yes.

17   Q    Okay.  If this bankruptcy case is dismissed, whether

18   people get paid or not would depend on their ability to

19   prove their claims in the U.S. Civil Justice System, right?

20   A    Yes.

21   Q    And St. Luke's would have to continue in the U.S. Civil

22   Justice System, right?

23   A    Yes.

24   Q    But if the settlement's approved, and a plan is

25   confirmed, then St. Luke's would not continue in the U.S.

1  Civil Justice System, right?

2  A    That's right.

3  Q    And you want the settlement approved and a plan

4  confirmed, right?

5  A    I do.

6  Q    So St. Luke's doesn't want to have to continue in the

7  U.S. Civil Justice System.  It wants the settlement, right?

8  A    The Committee wants the settlement approved.  I don't

9  know what St. Luke's view is.

10 Q    Okay.  Well does St. Luke's -- you're the Deputy

11 General Counsel of St. Luke's.  Does St. Luke's support the

12 settlement?

13 A    That -- I don't think that's a live question.  They've

14 not been asked whether they support or don't support the

15 settlement.

16 Q    Well, Mr. Barton, St. Luke's filed a statement on the

17 Docket in this case --

18 A    Well, I -- sorry.

19 Q    -- in support of the settlement, didn't they?

20 A    The Committee supports the settlement.  And the

21 St. Luke's representative on the Committee supports the

22 settlement.

23 Q    And didn't St. Luke's itself, as a claimant, file an

24 independent statement?

25 A    And we did.  I'm sorry.  You're -- thank you.  You

1   reminded me, yes.  We did support the settlement.

2   Q    You did, right?

3   A    Thank you.

4   Q    Okay.  Okay.  All right.

5        So there's not doubt, just be sure the Record's clear.

6   A    Fair enough.

7   Q    There's no doubt that St. Luke's itself supports the

8   settlement, right?

9   A    Fair enough.

10  Q    Okay.

11       (Pause in the proceeding.)

12  BY MR. MOXLEY:

13  Q    Now if Mr. Lefcowitz is correct about the merits of

14  St. Luke's claim, that it's fictitious.

15  A    Yes.

16  Q    That would mean if it was litigated, you probably

17  wouldn't recover anything in the Civil Justice System,

18  right?

19          MR. ZLUTICKY:  Objection, Your Honor.  We're past

20  math.  This calls for speculation.

21          MR. MOXLEY:  No.  I'm asking about the merits of

22  the claim, Your Honor.  And where -- why it is -- I'm going

23  somewhere with this, Judge.  And I think that's a fair

24  question.

25          THE COURT:  I -- I -- can you ask the question

1  again?

2          MR. MOXLEY:  Yes.

3  BY MR. MOXLEY:

4  Q    My question is, if -- if the claim, as Mr. Lefkowitz

5  characterized it as fictitious, I'm asking if he agrees that

6  St. Luke's would be unlikely to succeed in its litigation in

7  Idaho.

8          MR. ZLUTICKY:  Your Honor, same objection.  Just

9  because you're going somewhere doesn't mean you can ask

10 improper questions to get there.

11         THE COURT:  I -- I -- why don't you get to where

12 you're going, cause I'm not sure.  He disagrees with

13 Mr. Lefkowitz' -- so saying if Mr. Lefkowitz is right, I'm

14 not really sure what that does for me.  It's just two people

15 disagreeing about a claim that I know nothing about, so --

16         MR. MOXLEY:  I'll -- I'll get where I'm going,

17 then, Judge.

18         THE COURT:  Go ahead.

19         MR. MOXLEY:  I'm going.  Thank you, Your Honor.

20 BY MR. MOXLEY:

21 Q    Let me ask you this, Mr. Barton:

22      If the settlement is approved and a plan confirmed that

23 results in the creation of a liquidation trust, like the one

24 contemplated by the second amended plan.  Then there would

25 be a process for how claims would be handled, right?

1  A     Right.

2  Q     Okay.  So let's look back at the last filed plan.

3  That's at -- that's at Tab -- that's at 18.  That's at

4  Tab 18 in your binder.

5        (Voices speaking off the Record.)

6  BY MR. MOXLEY:

7  Q     Sorry.  Tab 8.  I apologize.  Thank you.

8        (Pause in the proceeding.)

9  BY MR. MOXLEY:

10 Q     And if you see at the top of those pages, and it'll

11 come up on your screen, too, Mr. Barton.  But if you see at

12 the top of those pages there of 177.  I'd ask you to turn

13 with me to Page 46 of 177.

14 A     Sorry.  I'm not seeing this.  What -- what's the tab?

15 Q     Tab 8.

16 A     Tab 8.

17 Q     And, Mr. Barton, just for your convenience, I'll

18 just -- I'll just note it's on the screen.  You're obviously

19 welcome to see the whole document in the binder.  But I just

20 wanted you to know that.

21 A     Okay.

22 Q     So at Page 46 of -- of 177 of the -- of what is TCC

23 Exhibit 27, which is the Second Amended Disclosure Statement

24 and its attachment.

25 A     Yes.

1  Q    You see that there is a section entitled, "Liquidation

2  Trust Claims Administration Process."  You see that?

3  A    I do.

4  Q    And if you look at the third paragraph down, the very

5  final paragraph on that page.  It says,

6              "If a holder of a Class IV non-personal

7              injury claim does not choose to receive

8              the $5,000 expedited distribution, such

9              holder will be required under the terms

10             of the Liquidation Trust Agreement to

11             participate in a mediation.  Mediation

12             is an out-of-court claims process where

13             the holder will meet with the

14             liquidation trustee and a neutral

15             facilitator to potentially agree on an

16             amount for an allowed claim.

17             Before the mediation occurs, the

18             liquidation trustee will make a

19             settlement proposal to the holder, and

20             the holder may respond with additional

21             information if they do not wish to

22             accept the liquidation trustee's

23             proposal.

24             If the claim is resolved through or

25             before mediation, nothing further will

1            be required before distributions can be

2            made on the claim."

3       You see that?

4            MR. ZLUTICKY:  Objection, Your Honor.  What's the

5  relevance of this?

6            THE COURT:  I don't know.  I -- I think he can say

7  he saw -- he sees it.  Now -- and then I think we're going

8  to get to the next question --

9            MR. MOXLEY:  Yes.

10            THE COURT:  -- which may -- which may draw a

11  relevance objection or not.  I don't know.

12            I don't know where we're going with it, but I

13  guess we're going to find out real --

14            MR. ZLUTICKY:  I'll be quiet, but I'll stick

15  around.

16            THE WITNESS:  But I so see it.

17  BY MR. MOXLEY:

18  Q    Okay.  If --

19       (Pause in the proceeding.)

20  BY MR. MOXLEY:

21  Q    If a liquidation trustee made a proposal to St. Lukes'

22  and St. Luke's accepted it under the prior plan, there would

23  be no judicial review whatsoever, right?

24            MR. ZLUTICKY:  Objection, Your Honor.  Calls for

25  speculation.

1          MR. MOXLEY:  We need to know his understanding --

2          THE COURT:  That causes -- that causes of a legal

3    conclusion.

4          MR. ZLUTICKY:  It's also calling for a legal

5    conclusion.  Also, I'm questioning the relevance.  It's

6    already been established this isn't the plan.

7          MR. MOXLEY:  May I be heard, Your Honor?

8          THE COURT:  I -- I -- why don't we stick with

9    mine.  I think it calls for a legal conclusion.

10       (Laughter.)

11         THE COURT:  I think that works.

12         MR. MOXLEY:  Your Honor, may I -- may I just be

13   heard briefly.  We -- I think we need to know his

14   understanding of how the prior plan worked because it -- it

15   impacts the settlement agreement and understanding why it is

16   they support the settlement agreement.

17         This -- there were two previously-proposed

18   plans --

19         THE COURT:  I -- I --

20         MR. MOXLEY:  -- that this Committee suported,

21   Judge.

22         THE COURT:  I know.  But I -- I guess -- I think

23   you can ask him if that was his understanding as to how he

24   can -- but he can't say whether it would have required

25   judicial review or not.

1        MR. MOXLEY:  Okay.

2        THE COURT:  I --

3        MR. MOXLEY:  I appreciate that.  Thank you, Your

4   Honor.

5   BY MR. MOXLEY:

6   Q    Is that your understanding of how the claims would have

7   been handled under the prior process?

8   A    My understanding is as it's set out here in -- in this

9   paragraph.

10  Q    Okay.

11       And your understanding of the prior process was that if

12  that process played out as described there, and St. Luke's

13  accepted the offer that was made, then no one other than

14  St. Luke's and the Trustee would know the amount of the

15  settlement, correct?

16       MR. ZLUTICKY:  Objection, Your Honor.  Again, this

17  calls for a legal conclusion on the terms of the plan that's

18  no longer in effect.

19       MR. MOXLEY:  Your Honor, we think this is highly

20  relevant --

21       THE COURT:  Relevant --

22       MR. MOXLEY:  -- to why --

23       THE COURT:  I think he can explain his

24  understanding.  I think that's what he can do.  Not how it

25  may actually work or not work.  I think -- but I think he

1   can certainly explain his understanding.

2          THE WITNESS:  Can you repeat the question?

3   BY MR. MOXLEY:

4   Q    Is it your understanding that under the prior process

5   in the second amened plan, if the Trustee made a -- or the

6   mediator made an offer to St. Luke's that it accepted, let's

7   say for the full amount.  Let's say the offered $30 million

8   and you accepted it.  The people who would know about that

9   would be St. Luke's, and the Trustee, and the mediator,

10  correct?

11  A    I -- those people would know about it.

12  Q    No one else would know about it, right?

13  A    I -- I don't know that.

14  Q    That's not -- okay.  You still don't know.  Okay.

15        (Pause in the proceeding.)

16  BY MR. MOXLEY:

17  Q    Do you know how the liqudation trustee was selected

18  under the prior plan?

19  A    Um -- I don't know how they were selected.

20  Q    Well, let me just see if I can refresh --

21  A    Yeah.

22  Q    -- your recollection as to how the process previously

23  was.

24        So if you could turn to Page 92 of 177?

25        (Pause in the proceeding.)

1    BY MR. MOXLEY:

2    Q    Are you there, sir?

3    A    Not quite.

4    Q    Okay.

5    A    Yeah.

6    Q    And if you look at Definition 73 there, sir.  You see,

7              "Liquidation trustee is defined as

8              meaning the trustee of the liquidation

9              trust who shall be selected by the

10             Committee in consultation with the

11             Debtor,"

12   A    Yes.

13   Q    "And who shall be named in the plan supplement."

14        Does that refresh your recollection of the process,

15   sir?

16   A    No.  I mean, I think that that point -- that 73 is

17   true, though.

18   Q    Okay.

19   A    Yeah.

20   Q    You're the Chair of the UCC, right?

21   A    Yeah.  Uh-huh.

22   Q    So if the Committee that you chair that will select the

23   trustee in consultation with the Debtor, who will be

24   resonsible for determining what the offer will be, or

25   would -- would have been to St. Luke's under this old

1  process, right?

2  A    According to Paragraph 73 there, yes, sir.

3  Q    So does that set up a situation where the Committee

4  could -- you, as the Chair of the Committee, could -- could

5  pick a trustee who would allow the claim in the full amount

6  and no one woule know about it?

7        MR. ZLUTICKY:  Objection, Your Honor.  Calls for

8  speculation.  Calls for a legal conclusion.

9        THE COURT:  Yeah.  Give me a little more credit,

10  too.  I don't think I would have approved that.  But -- but

11  go ahead.

12     (Laughter.)

13        MR. ZLUTICKY:  Objection, Your Honor, you would

14  have never approved that.

15        THE COURT:  But as proposed, I -- I get it.

16  BY MR. MOXLEY:

17  Q    That's what was proposed, right?

18  A    Well what was proposed?

19  Q    Well, but that what was previously -- that was the

20  process that was previously proposed, right?

21  A    Seventy-three, it -- it in Paragraph seventy-three is

22  what was proposed.

23  Q    Okay.  Is a system under which a trustee that you

24  helped pick, who then gets to determine the amount of your

25  claim and your share of whatever funds are available,

1  without any oversight and without anyone else even knowing,

2  is that better than the U.S. Civil Justice System?

3         MR. ZLUTICKY:  Objection, Your Honor.  It's

4  calling for speculation.  It's also calling for an

5  evaluation of the U.S. legal system.

6         It's not been established the witness is an expert

7  on the U.S. legal system.

8         THE COURT:  I'm going to overrule.  He can -- he

9  can answer the question.

10         THE WITNESS:  So let me just emphatically reject

11  any suggest that somehow St. Luke's is manipulating the

12  bankruptcy process to benefit itself personally.  There's

13  nothing to suggest that.

14         So I guess I don't understand where your questions

15  are coming from.

16  BY MR. MOXLEY:

17  Q   My questions are coming from understanding what the

18  process that you supported twice was.

19         The prior process that you supported twice would have

20  laid out that exact scenario where St. Luke's would have

21  picked the person.

22  A   No.  Not St. Luke's, the Committee.

23  Q   The Committee would have picked the person who would

24  have made that determination as to what offer to make to

25  St. Luke's, right?

1  A    I assume that selection would be subject to judicial

2  oversight.  And there would be all kinds of mechanisms in

3  place to prevent any kind of funny business.

4  Q    Well you also heard from the Judge, I think, this

5  system probably never would have been confirmed, right?

6  A    I don't know.  But it is not presently before the

7  Court.  And no one is seeking its confirmation.

8  Q    Mr. Barton, the Stinson firm represents a number of

9  Tehum's general unsecured creditors or their affiliates in

10 matters outside of this bankruptcy case, right?

11 A    Can you say that again?

12 Q    The Stinson firm, who represents the UCC, correct?

13 A    Yes.

14 Q    The Stinson firm represents a number of Tehum's general

15 unsecured creditors or their affiliates in matters outside

16 of this bankruptcy case, right?

17 A    I -- I -- I don't know who Stinson represents.

18 Q    Do -- do you -- do you know -- you have no knowledge of

19 that?

20 A    I don't know who Stinson represents.

21 Q    Have you see Stinson's employment retention filing in

22 this case?

23 A    I don't know.

24 Q    Okay.  Let me -- let me see if I can refresh your

25 recollection.  Let me show you what's at Tab -- it's

1  actually in the sleeve of your binder.  So in your binder

2  sleeve.

3           MR. BROOKNER:  Objection, Your Honor.  He said I

4  don't recall.  He said I don't know.  You can't refresh

5  recollection of somebody who doesn't know.

6           MR. MOXLEY:  I asked him if he had seen the

7  document and he said he didn't know.  So I'm going to show

8  him the document.  And let's see if it -- let's see if he

9  knows about it.

10           THE COURT:  Fine with that.

11       (Pause in the proceeding.)

12  BY MR. MOXLEY:

13  Q    Mr. Barton, do you have the -- do you have the -- the

14  Declaration of Mr. Zluticky?  It's filed in this case at

15  Docket 321?

16  A    Yes.

17  Q    Okay.  Have you seen this document before?

18  A    I don't believe so.

19  Q    Mr. Zluticky is an attorney with Stinson representing

20  the UCC, correct?

21  A    Oh, I'm sorry.  I have seen this Declaration.  I -- I

22  thought you were describing a different document.  I have

23  seen this Declaration, I believe.

24  Q    Okay.  Very good.

25  A    Yeah.

1   Q    Glad we found that out.  Thank you, sir.

2        (Pause in the proceeding.)

3   BY MR. MOXLEY:

4   Q    Are you aware of whether this Declaration has been

5   supplemented or amended in the nearly one year since it was

6   filed?

7   A    I'm not.

8   Q    Okay.  Let's look at Paragraph 8 of this Declaration.

9        (Pause in the proceeding.)

10  BY MR. MOXLEY:

11  Q    If you're looking at Paragraph 8 of the Declaration,

12  you see there's a subsection (b).

13  A    Uh-huh.

14  Q    That says, "Stinson currently represents the parties in

15  interest listed on the attached Exhibit 1."  It goes on from

16  there.  Do you see that?

17  A    (No audible response.)

18  Q    And it says, "In matters" -- it says -- let me

19  ask -- let me ask a clean question, sir, I apologize.

20       If you look at Paragraph 8(b), it reads,

21            "Stinson currently represents the

22            parties in interest listed on the

23            Attached Exhibit 1, or an afffiliate,

24            subsidiary, or related to any thereof,

25            in matters wholly unrelated to this

1              Chapter 11 case."

2       Do you see that?

3       (Pause in the proceeding.)

4              THE WITNESS:  Where are you reading?

5  BY MR. MOXLEY:

6  Q    I'm -- I'm at Paragraph 8, which is Page 3 of the

7  document.

8  A    8(b), yes.

9  Q    You see that?

10 A    I do.

11 Q    Okay.  And you see there's a reference in -- in

12 subsection (c) to an Exhibit 2?

13 A    Yes.

14 Q    And the description there is that those entities listed

15 on Exhibit 2 are ones where was just some uncertainty within

16 Stinson whether or not they represented that creditor

17 outside of the case; do you see that?

18 A    Yes.

19 Q    Okay.  Mr. Barton, who are the members of the UCC?

20 A    Who are the members of the UCC?

21 Q    Yes.  And I -- I'd be happy to show you the appointment

22 notice if that would help you.  But if you know them off the

23 top of your head, I'm happy to do it that way as well.

24 A    St. Luke's, Saint Alphonsus, Rachell Garwood, Latricia

25 Ravell (phonetic), Capital Region Medical Center --

1        (Pause in the proceeding.)

2            THE WITNESS:  And I forget their name, but it's

3   got Staffing in the name.

4   BY MR. MOXLEY:

5   Q    Maxim Healthcare Staffing?

6   A    Maxim Healthcare Staffing.

7   Q    And is there one more, sir?

8   A    I think there's one more.  And I'm -- I'm just blanking

9   on it.

10  Q    Is that Truman (phonetic) Medical Center?

11  A    Truman Medical Center.

12  Q    So looking back at the Stinson retention application

13  Declaration.  Let's look at Exhibit 1 to that.  So that

14  begins on Page 8.

15  A    Yes.

16  Q    And if you look through the list, you can see it's

17  a -- it's a lengthy -- well I won't describe it as lengthy.

18  I'll strike that.

19       But you see there's a list that spans from Page 8 to

20  Page 12.  Do you see that?

21  A    Yes.

22  Q    Okay.  Do you see that St. Luke's is on this list?

23  A    I don't.

24       (Pause in the proceeding.)

25  BY MR. MOXLEY:

1  Q    Let me draw your attention to -- at the top -- or

2  Page 10 about six, six rows down.

3  A    Yes.  That's --

4       (Pause in the proceeding.)

5  BY MR. MOXLEY:

6  Q    You see St. Luke's Health System on the list?

7  A    Yes.  We -- it -- but it says St. Luke's Hospital,

8  Kansas City.

9  Q    Let's go back to the very first page of Exhibit 1.  Do

10 you see there's a parties in interest and there's a Stinson

11 client?

12 A    Yes.

13 Q    Do you see --

14 A    St. Luke's Health System does not have a hospital in

15 Kansas City.

16 Q    Okay.  Okay.  Thank you for clarifying.

17 A    St. Luke's Health System of -- of Idaho is not.

18 Q    Okay.  Very good.

19 A    Yeah.  And -- and we're not affiliated with any

20 St. Luke's branded facility anywhere else.

21 Q    Okay.

22 A    So that's common name for a hospital.

23 Q    Okay.

24 A    St. Luke's has nothing --

25 Q    Very good.

1   A      -- to do with us.

2   Q      Thank you for -- thank you for clarifying.

3   A      Yeah.

4          (Pause in the proceeding.)

5          MR. MOXLEY:  Your Honor, may I just take one

6   moment?

7          THE COURT:  Of course.

8          MR. MOXLEY:  Thank you, Judge.

9          (Pause in the proceeding.)

10         MR. MOXLEY:  I think we can probably wrap up our

11  cross-examination very quickly if we could just have a

12  five-minute break.

13         THE COURT:  Of course.

14         MR. MOXLEY:  That would -- that would be very

15  helpful, Judge.

16         THE COURT:  Okay.  I'll come back in five minutes.

17  Thank you.

18         MR. MOXLEY:  Thank you, Judge.

19         THE CLERK:  All rise.

20         (Recess taken from 11:34 a.m. to 11:44 a.m.)

21         THE COURT:  Okay.  We're back on the Record in

22  Tehum.

23         Counsel, you may proceed.

24         MR. MOXLEY:  Thank you, Judge.  I just have a

25  couple more questions.

1              THE COURT:  Okay.

2                    CROSS-EXAMINATION (CONT'D)

3   BY MR. MOXLEY:

4   Q   Mr. Barton, do you know if any of the other members of

5   the UCC are represented by the Stinson firm in matters

6   unrelated to this case?

7   A   I don't.

8   Q   Okay.  Thank you for confirming that, sir.

9              MR. MOXLEY:  Your Honor, I have no further

10  questions at this time.  I'll pass the witness.

11             THE COURT:  Thank you.  Any Redirect?

12             MR. ZLUTICKY:  Your Honor, before Redirect, does

13  anybody else have any Cross of this witness?

14             THE COURT:  I don't --

15             MR. NGUYEN:  I have no Cross, yes.

16             THE COURT:  Okay.  Thank you.

17             MR. ZLUTICKY:  I just didn't want to step on

18  anybody's toes.

19             THE COURT:  Nope.  You got it.  Thank you.

20       (Pause in the proceeding.)

21                    REDIRECT EXAMINATION

22  BY MR. ZUTLICKY:

23  Q   Mr. Barton, earlier you were asked about some changes

24  to the settlement agreement that was filed on March 5th?

25  A   Yes.

1  Q    And that was after your testimony on March 1st?

2  A    Yes.

3  Q    One of the subjects of your testimony on March 1st was

4  the timing of the settlement payment.  Do you recall that?

5  A    Yes.

6  Q    Okay.  So did you view that as a subject of your

7  testmony?

8  A    Yes.

9  Q    And, therefore, something you and I weren't allowed to

10  disscuss?

11  A    Yes.

12  Q    And so you and I didn't discuss the timing of the

13  payment between your testimony on March 1st and today?

14  A    Thank you.

15  Q    Per the Judge's instruction?

16  A    Yes.

17         MR. ZLUTICKY:  Pass the witness, Your Honor.

18  Thanks.

19         THE COURT:  Thank you.  Any further questions?

20         MR. MOXLEY:  One very briefly, Your Honor.

21                    RECROSS-EXAMINATION

22  BY MR. MOXLEY:

23  Q    You testified under cross-examination moments ago,

24  though, today, Mr. Barton, that you did have discussions

25  with counsel about that new proposed form of order, correct?

1   A     Yes.

2   Q     Okay.  To your knowledge, did other members of

3   the -- the UCC have any discussions with counsel outside of

4   the one meeting that you attended?

5   A     Not to my knowledge.

6             MR. MOXLEY:  Thank you.  No further questions.

7             THE COURT:  Any further question?

8             MR. ZLUTICKY:  No further questions.

9             THE COURT:  Thank you very much for your time,

10  Mr. Barton.

11            THE WITNESS:  Do I leave these here?

12            THE COURT:  Yes.

13            MR. MOXLEY:  You don't have to take them.

14            THE COURT:  Unless you just like them, I'll let

15  you --

16       (Witness steps down.)

17            MR. MOXLEY:  Your Honor, may I approach?

18            THE COURT:  Yes, of course.

19            MR. MOXLEY:  Thank you.

20            THE COURT:  Let's see.  What would be the next

21  plan?  I'm just thinking in terms of timing.  At some point

22  folks are going to ask me to eat.  And maybe not sure if now

23  makes time -- makes sense to do that and then we can start

24  fresh.

25            MR. GOODMAN:  I think it does.  While we actually

1    used the benefit of yesterday to, I think, dramatically

2    streamline and try to condense Mr. Atkinson's direct.

3           I do anticipate that there's going to be a lot of

4    folks who are going to want to cross --

5           THE COURT:  Uh-huh.

6           MR. GOODMAN:  -- him, not just the Debtor, but

7    even perhaps Mr. Patterson will want to cross him as well.

8    So that could go on.

9           THE COURT:  Yeah.

10          MR. GOODMAN:  So I do think rather than make

11   everyone --

12          THE COURT:  Yeah.  Why don't we -- why don't

13   we -- why don't we take our lunch break now and just come

14   back at 12:45.

15          MR. GOODMAN:  Perfect.  Thank you.

16          THE COURT:  And -- and be ready to go.  Thank you.

17          MR. GOODMAN:  Thank you.

18          THE CLERK:  All rise.

19          THE COURT:  Everyone's excused.  I'm just going to

20   shut stuff down over and get myself organized.  Please go.

21          MR. GOODMAN:  Thank you for everything.

22          THE COURT:  Thank you.

23       (Recess taken from 11:47 a.m. to 12:45 p.m.)

24          THE CLERK:  All rise.

25          (Pause in the proceeding.)

1          THE COURT:  Good afternoon.  This is Judge Lopez.

2    Today is March 27th.  Time is 12:46.  We're going to

3    continue on the Record in the Tehum case.

4          Okay.  Counsel, if you can state your name for the

5    Record and how we will be proceding.

6          MR. GOODMAN:  Your Honor, Eric Goodman, Brown

7    Rudnick, counsel for the Official Committee of Tort

8    Claimants.

9          The next witness that will be called today is

10   Michael Atkinson.  He is the financial advisor to the TCC

11   and he has filed for his Declaration and report in

12   connection with this matter.  So --

13         THE COURT:  Okay.

14         MR. GOODMAN:  -- we're moving forward with his

15   testmony today.

16         THE COURT:  Okay.  Thank you.

17         In terms of giving presenter roles to someone, do

18   I need to -- okay.  So can we switch it over the left table.

19         Okay.  Mr. Atkinson, let me swear you in.  Can you

20   please raise your right hand.

21      (Witness sworn.)

22         THE COURT:  Okay.  Thank you very much.  We will

23   proceed with examination.

24         Mr. Atkinson, I just ask that you please just make

25   sure you speak into the mic to make sure that you have a

1   clean Record.  It should pick you up if it's in the general

2   direction.  And if any point there's an objection that is

3   lodged, please give me an opportunity to resolve the

4   objection.

5           THE WITNESS:  Okay.

6           THE COURT:  Thank you.  All righty, counsel you

7   may -- oh, by the way, if you need a break at any point,

8   just let me know.

9           THE WITNESS:  Thank you.  Appreciate that.

10          THE COURT:  All right.  Mr. Goodman, you may

11  proceed.

12          MR. GOODMAN:  Thank you, Your Honor.  And thank

13  you for suggesting that we take lunch when we did.  That was

14  a perfect -- prefectly timed break.

15                      DIRECT EXAMINATION

16  BY MR. GOODMAN:

17  Q    Mr. Atkinson, good afternoon.

18  A    Good afternoon.

19  Q    Can you please state your name for the Record?

20  A    Sure.  Michael Atkinson.

21  Q    Okay.  And where are you employed?

22  A    I'm employed by Province.

23  Q    Okay.  What is your title at Province?

24  A    I am a principle.

25  Q    Okay.  And how long have you held that position?

1  A    I've been with Province for seven years, and I've been

2  a principle the whole time.

3  Q    Okay.  And what are your responsibilities at Province?

4  A    I run Creditors' Committee cases, Debtor cases, and

5  some litigation matters as well.

6  Q    Okay.  Can you please describe your professional

7  background prior to Province?

8  A    Sure.  Prior to Province, I worked for a firm called

9  Protivity (phonetic) for ten years, where I was a Managing

10 Director.  Before that, I was with my own firm called Penta

11 (phonetic) Advisory Services for about five years.  And then

12 before that I was with Navigan (phonetic) Consulting.  And

13 then before that I was with a company called CW Amos

14 (phonetic) a regional accounting firm.

15     But the whole time I've been doing bankruptcy

16 restructuring work.

17 Q    Do you specialize in any particular field?

18 A    Bankruptcy restructuring primarily.

19 Q    Okay.  And do you specialize in bankruptcies involving

20 tort claims?

21 A    In the last seven years, I've represented a little over

22 15 mass tort cases for the Debtor and a couple outside, I

23 mean, serving for the Committee and a couple outside of

24 bankruptcy as well.

25 Q    And how long have you worked in the restructuring?

1   A    For 32 years.

2   Q    Thirty-two years.  Okay.

3        Have you been retained in other Chapter 11 cases?

4   A    I have.

5   Q    Okay.  How many creditor committess have you

6   represented?

7   A    I've probably represented almost a hundred Creditors

8   Committees in my career.

9   Q    Okay.  And how many Debtors-in-possession have you

10  represented?

11  A    Over 30.

12  Q    Thirty.  Okay.

13       And how many post-confirmation trusts have you

14  represented?

15  A    I have represented close to 50 post-confirmation

16  trusts.

17  Q    Have you served as an expert witness in any avoidance

18  actions?

19  A    I have.

20  Q    Okay.  Can you tell me about that?

21  A    I have served as an expert witness in avoidance actions

22  in many of the post-confirmation trusts that I've been

23  involved in.

24       We've had fraudulent conveyance actions.  We had

25  preference actions probably done hundreds of thousands of

1  preference actions.  Have testified, at least seven times in

2  preference cases, which is kind of rare.  And I've testified

3  numerous times in fraudulent conveyance actions as well.

4  Q    Oh, yes.  So that would involve the kind of work that

5  would take place, you know, if a trust were formed here and

6  that trust were then pursuing claims, right?

7  A    Yes.  That's correct.

8  Q    Do you have experience serving as a Trustee who

9  adjudicates claims?

10 A    I do.

11 Q    You do?

12 A    I do, yeah.

13 Q    Okay.  Do you have experience serving as a Trustee who

14 has pursued insurance recoveries?

15 A    I do.  I have done that.

16 Q    Okay.  Do you have experience serving as a Trustee who

17 has pursued other litigation causes of action.

18 A    Yes, I have.

19 Q    Okay.  Are you currently serving as a Trustee in any

20 bankruptcy cases?

21 A    I am.

22 Q    Okay.  Which ones?

23 A    I'm the Trustee in the Meloncrot (phonetic) bankruptcy.

24 Q    Okay.  Have you been hired before as a claims expert?

25 A    I have.

1  Q    Okay.  Are you a claims expert for a form Bankruptcy

2  Judge Chapman (phonetic) in the *Whittaker* (phonetic) case?

3  A    I am.  Judge Chapman's the future claims rep and I am

4  her -- her claims expert.

5  Q    In that bankruptcy case?

6  A    In that bankruptcy case, yes.

7  Q    Where's that case pending?

8  A    It's in -- I think it's in Delaware.

9  Q    Okay.  And do you represent former Bankruptcy Judge

10 Barbara Houser (phonetic) in the bankruptcy -- or sorry, in

11 the Boy Scouts post-confirmation trust?

12 A    Yes.  I did the Boy Scouts' bankruptcy for the victims

13 in that case.  I was the claims expert for then.  And then

14 Judge Houser post-bankruptcy hired me to help her with the

15 claims.

16 Q    Okay.  And are you currently involved in the *HonX* case

17 before Judge Isgur?

18 A    The *HonX* case thankfully just got -- went effective.

19 So -- but I was the claims expert in that case with Judge

20 Isgur.  And then I was hired by the post-confirmation

21 Trustee in that case to deal -- help deal with the claims as

22 well.

23 Q    Okay.  And that would be the administration of the

24 claims after the bankruptcy?

25 A    Correct.

1  Q     Where did you attend school?

2  A     I went to school and got an undergrad degree, a B.S. in

3  Finance from Tufts University.  And then I got an M.B.A.

4  from Loyola University.

5  Q     Okay.  Do you have any professional certifications?

6  A     I -- I do.

7  Q     Are you a certified public accountant?

8  A     I -- I am.

9  Q     Okay.  How long have you been a certified public

10 accountant?

11 A     Probably more than 25 years.

12 Q     Are you a certified insolvency and restructuring

13 advisor?

14 A     I am.

15 Q     How long have you been a certified insolvency and

16 restructuring advisor?

17 A     Over 20 years.

18 Q     What does it mean to be a certfied restructuring

19 advisor?

20 A     You have to have practice in the bankruptcy

21 restructuring profession for, I think, over five years.  And

22 then there are classes that you have to take, and exams.

23 And then there's a continuing education component as well.

24 Q     Okay.  Are you a accredited evaluation professional?

25 A     I am.

1    Q    Okay.  How long have you been an accredited valuation

2    professional?

3    A    I've been with -- that's with the AICPA.  I've been one

4    of those for over 20 years.

5    Q    Okay.  Are you a certified valuation analyst?

6    A    I am.

7    Q    Okay.  How long have been a certified valuation

8    analyst?

9    A    Over 20 years as well.

10   Q    Okay.  What does it mean to be a certified valuation

11   analyst?

12   A    In order to get that credential, you have to have done

13   a certain number of valuations.  I think you have to submit

14   a number of valuations to peer review.  And then there are

15   tests and classes you need to take to pass and then

16   ultimately become one.  And then there's continuing

17   education you need to stay up with.

18   Q    Okay.  Do you have experience valuing claims against a

19   Debtor in bankruptcy cases?

20   A    I -- I do.

21   Q    Okay.  And do you have experience valuing causes of

22   action that could be asserted by a Debtor in bankruptcy

23   cases?

24   A    Yes, I do.

25   Q    Okay.  Roughly, how many years have you done that kind

1   of work?

2   A    I would say since I started working, so 32 years.

3   Q    Okay.  Do you have experience valuing claims and causes

4   of action in bankruptcy cases involving mass tort liability?

5   A    I do.

6   Q    Can you describe that experience?

7   A    I've been hired in, I think, seven or eight cases where

8   I was the claims expert for tort Committees.

9        So I was the claims expert in *HonX* I mentioned.  I was

10  the claims expert in *Cypress* no, not *Cypress Pines*.  I was a

11  claims expert in *Boy Scouts.*  I was the claims expert in,

12  there's a case called *Barrett Minerals* in front of Judge

13  Isgur as well that I'm a claims expert.

14       I'm the claims expert in the *Whittaker* case for the

15  future claims rep.  And I'm sure there are others.  But

16  those are the ones that come to time.

17  Q    Okay.  And all those cases involve tort liability.

18  A    Yes.  They do.

19  Q    Are you a certified fraud examiner?

20  A    I am.

21  Q    How long have you been a certified fraud examiner?

22  A    For a little over 20 years, as well.

23  Q    And what does it mean to be a certified fraud examiner?

24  A    I think you have to have experience, requisite

25  experience.  I -- I was involved in the *Enron* case years

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                    137

1   ago.  And done a lot of check kiting and ponzi scheme cases

2   along -- in -- throughout my career.

3        But ultimately, there's tests that you take, and

4   classes you take.  And then ultimately you have to continue

5   with education beyond that.

6   Q    Are you a -- are you certified in financial forensics?

7   A    I am.

8   Q    How long have you been certified in financial

9   forensics?

10  A    Over 20 years as well.

11  Q    Do you prepare a report in this case?

12  A    I -- I did.

13  Q    Okay.  Could you go to Tab binder that's TCC 321 for

14  folks who are using the other binders.

15  A    Okay.

16       (Pause in the proceeding.)

17  BY MR. GOODMAN:

18  Q    Do you have that open?

19  A    I do.

20  Q    Can you identify this document?

21  A    Yes.  This is my Declaration in this case.

22  Q    Okay.  Does that Declaration include a report that you

23  prepared?

24  A    It does.

25  Q    Generally speaking, what materials did you review in

1  creating our report?

2  A     So generally, I have a list of documents in my Appendix

3  A that I relied upon.  But there were about 600,000 pages of

4  documents that were produced in the case.  So I reviewed

5  those.

6        On certain documents, I've identified in my report that

7  you were in that production.  Separately, I looked at the

8  filings in the bankruptcy case.  I looked at deposition

9  transcripts, and some publically available documents as

10  well.

11  Q     Okay.  Did you arrive at any conclusions?

12  A     I did.

13  Q     Okay.  We'll walk through each of your opinions in your

14  report in a moment.  But could you provide us with a say,

15  high level summary of the conclusions that you were able to

16  reach?

17  A     Sure.  So, ultimately I reviewed the 9019 motion, as

18  well as the plan and Disclosure Statement.  And then all of

19  the supporting documents that I was able to find.  I came to

20  six conclusions in -- in the summary sort of --

21        From a summary perspective, I believe my first opinion

22  is there's not sufficient information to quanitify the fair

23  value of the potential avoidance actions that arrived out of

24  the May, 2022 divisional merger.

25        My second opinion is that it appears that the UCC and

1   Debtor do not put much weight on the successor liability and

2   did not consider the alter ego claims in, at least the stuff

3   that I've reviewed.

4       The third opinion is that there's insufficient

5   infomraiton to determine the current financial wherewithal

6   of the current ability to pay of YesCare and its

7   subsidiaries.

8       The fourth opinion is the Debtor's calculation in their

9   Disclosure Statement related to personal injury claims was

10  flawed.  It was based on 2014 data.  And their source has

11  2023 data.  So updating for that, I think increases the

12  claims by about 17 percent.

13      The fifth is that the plan is -- that was on file

14  originally, the only one I've seen, called for two different

15  trusts.  And I did not think the treatment of the creditors

16  in that trusts were -- was fair amongst them.

17      And then my opinion is that the Debtor did not appear

18  to have a business to reorganize or rehabilitate in the

19  Chapter 11 case.

20  Q    Okay.  Thank you for that.

21      Do you believe that your testimony may be helpful in

22  assisting the Court in understanding the TCC's positions in

23  this case?

24  A    I do.

25  Q    And do you believe that your testmiony may also be

1  helpful in assisting the Court in answering some of the

2  questions that gets raised in this hearing?

3  A      I do.

4  Q      Okay.

5          MR. GOODMAN:  Your Honor, at this time, I would

6  tender Mr. Atkinson as an expert in the field of financial

7  restructing, mass torts evaluation?

8          THE COURT:  Any objection?

9          MR. KAUFMAN:  It's a very broad category.  I think

10 we can just take him up on cross or I can do a *voir dire*

11 now, which ever the Court prefers.

12         THE COURT:  What do you -- which one are you

13 asking me for?

14         MR. KAUFMAN:  Well, at -- tell me again the

15 category that -- that we're tendering him as a financial

16 expert on?

17         MR. GOODMAN:  Financial restructuring, mass tort

18 work, and valuation.

19         MR. KAUFMAN:  Yeah.  So, Your Honor, I did take

20 his deposition.  I understood he -- he had some experience

21 on some things, but not experience on other things.

22         I think, as we get his opinions, I can just go

23 through on cross why he may not have the experience

24 requisite to give opinions on certain things.  And I -- and

25 I'll raise those as we go if that's helpful.

1        (Pause in the proceeding.)

2            THE COURT:  Are you -- you objecting to him being

3   qualified as an expert on those two issues?

4            MR. KAUFMAN:  No.  But as we get into his

5   opinions, we may find that his opinions --

6            MR. GOODMAN:  I think he's an allowed --

7            MR. KAUFMAN:  -- don't fall within those

8   categories.

9            THE COURT:  Okay.  All right.  He's qualified on

10  those.

11           MR. GOODMAN:  Thank you.

12       (Pause in the proceeding.)

13  BY MR. GOODMAN:

14  Q    Okay.  Mr. Atkinson?

15  A    Yes.

16  Q    When were you retained by the TCC?

17  A    I was retained by the TCC December 19th in 2023.

18  Q    Okay.  What did you do after you were hired by the TCC?

19  A    Shortly after we were hired, we started looking at

20  documents that were on the Docket.  And we put together a

21  document request list that we sent over to the Debtor, to

22  Mr. Perry, I think primarily.  But maybe I copied some other

23  people as well.

24  Q    Okay.  Did you request any targeted items?

25  A    I did. We tried to -- I usually try to find things that

1  I think are most relevant, not to overwhelm the Debtor.  I

2  think I had 42 items or so in my list, my original list.

3  Q    Okay.  When did you start to receive documents?

4  A    Mr. Perry responded to me the same day that I sent my

5  email saying that there was a -- a production that had been

6  provided to Brown Rudnick, my counsel, which I was not aware

7  of.

8       And I reached out to Brown Rudnick, and because of the

9  holidays, I think I got access just after Christmas.  So

10 around December 27th I think.

11 Q    Okay.  When did you receive the YesCare financial

12 statements?

13 A    There were -- in that initial production, there was

14 YesCare financials related to the divisional merger, so

15 right at the time of the divisional merger.

16      But I did not receive the YesCare financials and the

17 production associated with YesCare until the -- January

18 31st, I think --

19 Q    Okay.

20 A    -- of 2024.

21 Q    Okay.  And when did you complete your investigation and

22 finalize your report?

23 A    My report was finalized the date that it was submitted,

24 which was February 23rd, 2024.

25 Q    Okay.  Did your team go through the documents that the

1   Debtor and the UCC produced?

2   A    Yes.  We -- we tried to do targeted searches, searching

3   for financial records, documents related to the divisional

4   merger, some of -- there were some transactions that we were

5   focused on and, obviously, there was claims that we were

6   focused on as well.

7   Q    Okay.  Are you familiar with the Rule 9019 motion that

8   the Debtor and the UCC filed?

9   A    I am.

10  Q    Okay.  And when was the Rule 9019 motion filed?

11  A    That was filed January 16th, 2024.

12  Q    Okay.  Is that something that you considered in

13  drafting your report?

14  A    It is.

15  Q    Okay.  Are you generally aware of the causes of action

16  decribed in the Rule 9019 motion?

17  A    I am.

18  Q    Okay.

19       Could we put Paragraph -- if you go to TCC 125, it's

20  Tab 2 in your binder, Mr. Atkinson.  I just wanted to as you

21  some questions about Paragraph 27 of the motion.

22  A    Okay.

23  Q    Okay.  You have a screen and the binder, great.

24       Do you have a general understanding regarding the first

25  three avoidance actions identified in Paragraph 27 of the

1  Rule 9019 motion?

2  A    I do.

3  Q    Okay.  And what is that?

4  A    These are avoidance actions where money was paid by the

5  Debtor.  And they're contending, related to the first two,

6  that they're fraudulent transfers.  And then just other

7  transfers that went to the benefit of a third party.

8       I think the M2 Loan Co. -- M2 Loan Co. amounts were

9  about $25 million.  Geneva, I believe was close to five.

10 And the payments to -- for the benefit of Paragrove

11 (phonetic), were about $900,000.

12 Q    Okay.  Are you aware of any substantive differences

13 between the TCC on the on hand and the UCC on the other

14 hands, regarding those avoidance actions?

15 A    No, I'm not.

16 Q    Okay.  Do you have a view as to the value of those

17 avoidance actions?

18 A    I do.  I, you know, they -- they seem to be to me --

19          MR. KAUFMAN:  Your Honor, I -- I'm sorry.  I have

20 to object to this answer.  This is something that I did ask

21 about in his deposition.  It sounds like he's now giving

22 valuations that he said he was not ready to give --

23          THE COURT:  Yeah.

24          MR. KAUFMAN:  -- a month ago.

25          MR. GOODMAN:  Your Honor, I think that --

1              THE COURT:  Yeah.

2              MR. GOODMAN:  -- he gets to ask his questions when

3    he does cross.

4              THE COURT:  Yeah.  I think you get to cross him on

5    it.

6              MR. KAUFMAN:  That's fine.  I can do that.

7              MR. PATTERSON:  Your Honor, may objection would

8    be -- calls for an opinion beyond the scope of his

9    purported -- let me just qualify that, legal opinion.

10             He's asking for causes of action.

11             THE COURT:  Repeat the question.

12             MR. GOODMAN:  I'll get to that, Your Honor.  But

13   actually, I'm -- I'm very concerned by that objection.  This

14   document was filed under seal in this case.  And it's only

15   been provided to parties who have signed on to the

16   Protective Order.

17             If Mr. Patterson has --

18             THE WITNESS:  I -- I can speak to that.

19             MR. GOODMAN:  -- has -- if Mr. Patterson has seen

20   this document, that would imply someone in this courtroom

21   has violated the Protective Order in this case.

22             THE WITNESS:  Yeah.  And -- and the Protective

23   Order actually allows the parties who produced the documents

24   under the confidentiality designation to use them however we

25   want.

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                146

1              I provided Mr. Patterson a redacted copy that
2  redacted the parts that referenced confidential information.
3              MR. KAUFMAN:  Your Honor --
4              THE COURT:  I just need to see the order.
5              MR. KAUFMAN:  Protective order doesn't work that
6  way, Your Honor.
7              THE COURT:  Well, no.  Why don't we just pull up
8  the Protective Order, then I can see it.
9              MR. KAUFMAN:  Should we take a break on that?
10  This is actually a very important issue, cause this
11  implies --
12              THE COURT:  No, no.  It is.
13              MR. KAUFMAN:  -- a break.
14              THE COURT:  But -- but if someone can -- I'll
15  take -- I'll take a few minutes.  But I also want someone to
16  just tell me what the Docket number of the Protective Order
17  is so that I can read it while parties are thinking about
18  it.
19              MR. GOODMAN:  Sure.
20              THE COURT:  There's a pending question of
21  what -- at some point he's probably going to have to reask
22  it.
23              MR. GOODMAN:  That's fine with me.
24              THE COURT:  So we'll just consider that fact.
25              THE WITNESS:  Thank you.

 1          THE COURT:  Go down, but --

 2      (Pause in the proceeding.)

 3          THE COURT:  I just want to know the Docket number.

 4          MR. PATTERSON:  I think -- and I get -- we got to

 5  get there to the order.  But I'm -- I'm just curious to how

 6  we can put an expert up for questioning and not have his

 7  report -- I haven't given it to anybody.  I've read it.

 8          So if Mr. Goodman expects me to cross examine or

 9  question his witness, his expert, without the report, which

10  really is the guiderails for what he's going to tell the

11  Court, I -- I don't understand if he thinks this gives him

12  some benefit.  But --

13          THE COURT:  No.

14          MR. PATTERSON:  -- makes no sense.

15          THE COURT:  I -- I got it.  I'm just trying to

16  deal with step one and step two --

17          MR. PATTERSON:  Yeah.

18          THE COURT:  -- on this.

19          MR. PATTERSON:  Yeah.  Just --

20          MR. KAUFMAN:  Docket number is 1186.

21          MR. PATTERSON:  It's 1186, Your Honor.  Just a few

22  things to qualify.  I just want to make sure the Court

23  understands.

24          THE COURT:  No, no, no.  Let's just deal with

25  things in stages here, 1186.  You all talk.  I'll give

1  you -- how much time you think you need?

2         MR. GOODMAN:  Oh, I do recall these provisions.  A

3  couple things I'll point out just quickly, Your Honor.

4         We're the producing party of this document.

5         THE COURT:  No, no, no.  I -- I can read it.  I

6  just want to know how much time you think you all need.

7         I'm going to go back and read Docket 1186 and I'll

8  just go back -- just give me about --

9         MR. GOODMAN:  Five?

10        THE COURT:  -- a few -- about five minutes.  All

11 right.

12        MR. GOODMAN:  Okay.

13        THE COURT:  Actually, it's 1:06.  I'm come back at

14 1:15.  Thank you.

15        MR. GOODMAN:  Thank you.

16        THE CLERK:  All rise.

17     (Recess taken from 1:06 p.m. to 1:29 p.m.)

18        THE COURT:  I want Mr. Kaufman to come up, too.  I

19 want to make a party to this.

20        So let's just deal with this from a first

21 principle standpoint.  There was a -- I -- I signed kind of

22 a Stipulation and Agreed Confidentiality Protective Order at

23 Docket 1186 on December 6th, 2023.

24        Okay.  So it's -- Mr. Goodman, you're telling me

25 that this report was provided, pursuant to this Stipulation

1  and Protective Order?

2          MR. GOODMAN:  That's correct, Your Honor.

3          THE COURT:  It was -- was it -- would you consider

4  it what the parties agreed that it was considered designated

5  material?  Designated?  Was it designated confidential or

6  highly confidential?

7          MR. GOODMAN:  Yeah.  Your Honor, it was filed

8  under seal with the Court, pursuant to the Protective Order.

9  So, yes.  The answer is yes.

10         THE COURT:  Yeah.  And let's see.

11     (Pause in the proceeding.)

12         THE COURT:  All righty.

13     (Pause in the proceeding.)

14         MR. GOODMAN:  Your Honor, I'd like to propose a

15  solution.

16         THE COURT:  Yep.  Hold on a second.  We got to

17  deal with first principles.

18         MR. GOODMAN:  Okay.

19         THE COURT:  Mr. Kaufman you said you get to use it

20  however you want.  What does that mean and tell me the

21  paragraph that you're pointing to.

22         MR. KAUFMAN:  Of course, Your Honor.  You -- you

23  started by going to the defintion of designated materials.

24         THE COURT:  Right.

25         MR. KAUFMAN:  The designated materials we're

1  talking about here are what the Debtor produced and what

2  YesCare produced, not what the TCC produced, because as you

3  can see from the report itself, it's not marked as

4  confidential.

5           It does cite to confidential --

6           THE COURT:  Right.  But --

7           MR. KAUFMAN:  -- information.

8           THE COURT:  Right.

9           MR. KAUFMAN:  So if you look at -- you've got the

10 defniition of designated materials and producing parties.

11          THE COURT:  Right.

12          MR. KAUFMAN:  If you look at Paragraph 26 of your

13 order --

14          THE COURT:  Okay.

15          MR. KAUFMAN:  Which is the bottom of Page 11.

16          THE WITNESS:  Yeah.

17          MR. KAUFMAN:  It says "Use of designated

18 marterials by the producing party."

19          Here the producing parties are the Debtor and

20 YesCare.  It says,

21          "Nothing in this order effects the

22          rights of the producing party to use

23          the --use or disclose its own designated

24          materials in any way."

25          THE COURT:  Right.

1          MR. KAUFMAN:  Of course the report itself is not

2    designated materials.  What is are the references to the

3    designated material.

4          As I said, I redacted all references from the

5    report to those designated materials and produced the report

6    to -- or shared the report with Mr. Atkinson.

7       (Court reading.)

8          THE COURT:  Tell me where in my -- okay, so,

9    sounds like this doesn't apply.  But tell me where you get

10   to the use -- you said you -- you get to share your own

11   produced material.

12         If something was filed under the seal by the TCC,

13   tell me how you get to use that?

14         MR. KAUFMAN:  So it was filed under seal, pursuant

15   to the Protective Order because of it's references to

16   the -- the protected material, the designated material.

17         THE COURT:  Pursuant to the Debtor's designation

18   of protective material, which makes it the Debtor's report.

19   So the Debtor can do what it -- what it wants to do.

20         MR. GOODMAN:  Well, again, Your Honor, it was not

21   produced.  It's not produced materials.  It's filed with the

22   Court.

23         THE COURT:  I'm talking about the Madera materials

24   that you produced, that then got designated, and then report

25   incorporated designated material.

1          MR. KAUFMAN:  That's correct, Your Honor.

2          THE COURT:  Okay.  Mr. Goodman, what's your

3  solution?

4          MR. GOODMAN:  First, I don't agree with that

5  characterization, cause it is our report.

6          Here's my solution, Your Honor.  We would like

7  authority or leave to, I mean, if they're gong to be sharing

8  our report, yeah, that was --

9          THE COURT:  Well, could --

10         MR. GOODMAN:  -- without other parties, we would

11 simply ask that we be permitted to file Mr. Akinsons's

12 Declaration with this report publicly on the Dockets.  But

13 everyone in the case can see it.

14         THE COURT:  I've got no issues.

15         MR. PATTERSON:  I don't mind redacting a copy and

16 sending it to Mr. Goodman to file.

17         MR. GOODMAN:  No, no.

18         THE COURT:  No, no.

19         MR. PATTERSON:  Give him the same copy of it --

20         THE COURT:  No.  I think he's going to file his

21 own completely unredacted copy on the Docket.

22         MR. PATTERSON:  We like -- we would

23 like -- and -- and if -- if -- I don't know if it was

24 actually shaed in the redacted form, but I'm just

25 suggesting.

1          I think the solution to this is just permit us

2   without the report with the Court so that everyone in the

3   case has it.

4          MR. GOODMAN:  We would object to that, cause it

5   does include many references, some -- most out of context of

6   confidential information, not just of the Debtor, but --

7          THE COURT:  No.  No.  What I want -- what I want

8   on the Docket is exactly what Mr. Patteron saw and I want it

9   filed on the Docket.  That's how we'll proceed.

10          MR. PATTERSON:  Yeah.  Or -- of, Judge also,

11   something else I think the witness may be struck.  The 37(c)

12   is an obligation to produce the report. Or Rule 26.

13          THE COURT:  It's Rule 26(a).

14          MR. PATTERSON:  And --

15          THE COURT:  And it doesn't apply.  It doesn't

16   apply.

17          MR. PATTERSON:  -- 37 says --

18          THE COURT:  Rule 26(a), let's just take it one

19   step at a time.

20          MR. PATTERSON:  Rght.

21          THE COURT:  Doesn't apply --

22          MR. PATTERSON:  To contested matters.

23          THE COURT:  -- to contested matters.

24          MR. PATTERSON:  That's right.

25          But if there are -- they -- they were produced, I

1   mean, they were created. They're not required to --

2              THE COURT:  Uh-huh.

3              MR. PATTERSON:  -- as -- as under Rule 26.  But if

4   they do and they're going to put a -- an expert on the

5   stand, they've got to be produced.  They've got to be

6   shared.  And 37(c) says if they're not, you don't get the

7   witness.

8              So if they want to fight about not

9   sharing -- look, they can't have it both ways.  They can't

10  have an expert to get up and --

11             THE COURT:  I think he's going to --

12             MR. PATTERSON:  -- and not allow me to monitor

13  what he says, based upon the fact --

14             THE COURT:  But I --

15             MR. PATTERSON:  -- he's put in his report.

16             THE COURT:  My understanding is that this is going

17  to proceed.  It's just going to proceed in -- with the

18  redaction.

19             You're going to be able to ask your questions

20  based on the redacted --

21             MR. GOODMAN:  Your Honor, again, but I --

22             THE COURT:  -- portion of it.

23             MR. GOODMAN:  -- I -- I -- I don't --

24             THE COURT:  But I would --

25             MR. GOODMAN:  I'm sorry, Your Honor.

1              THE COURT:  Go ahead.

2              MR. GOODMAN:  I don't know for a fact that what

3    was sent to --

4              THE COURT:  No.  No.  But I think --

5              MR. GOODMAN:  -- Patterson was redacted.

6              THE COURT:  -- you get to -- I think --

7              MR. GOODMAN:  I want -- I would like the

8    transmittal email, like whatever -- however it was produced

9    to him --

10             MR. PATTERSON:  He's suggesting that someone's not

11   being candid with --

12             THE COURT:  No, no.  I just think --

13             MR. PATTERSON:  -- the Court also.

14             THE COURT:  I think people are entitled to see it.

15   I think --

16             MR. PATTERSON:  What was that?

17             THE COURT:  No, no, no.  I think

18   Mr. Kaufman -- what I think we should do, Mr. Kaufman, you

19   should -- I should step off the bench.  Maybe Mr. Atkinson

20   just feel like you'd have to be up there.

21             You share the email, or however it was transmitted

22   with the other side.  You get to see what was redacted.  And

23   then we'll proceed.

24             Get it on the Docket.  Once it's on the Docket,

25   someone call me.  I'll come out.  We'll proceed.

1          MR. GOODMAN:  You -- you want the transmittal

2    email or just the redacted?

3          THE COURT:  No.  No.  I just need the report on

4    file.  And I don't need, you know, whereas on this day the

5    Court held a hearing.  Like just file it and call it what

6    you want, as long as it's all clear.

7          But -- but if there's any issue with -- before it

8    gets on file that you're saying doesn't it, you know,

9    anything, call me.  I'll come out.  I'll make the call.  But

10   if the parties agree that this is the redacted version of

11   the report, and it's the report that's here, then get it on

12   the Docket and then we'll proceed.

13         MR. GOODMAN:  Perfect.  I think we can continue

14   with the questioning, Your Honor.  I don't want the --

15         THE COURT:  No, no.  I know that.

16         MR. GOODMAN:  Okay.

17         THE COURT:  I'm just saying, I don't -- I don't

18   want to proceed until we get that on the Docket, cause I

19   think now we're all on -- we'll be on the same page.  I

20   just -- I don't want to forget about that.

21         MR. GOODMAN:  Oh, okay.

22         THE COURT:  That's fine -- just so -- but you need

23   a chance to see it.

24         But once you see it, then let's let it hit the

25   Docket and then we'll go on.

 1          MR. GOODMAN:  Very well.  Thank you, Your Honor.

 2          THE COURT:  All righty.  So anyway, I'll stay here

 3 for a minute or two and then I'll -- I'll step off and

 4 Mr. Atkinson at some point we'll get to you.

 5          MR. PATTERSON:  Your Honor, do you want me to

 6 share it with Ms. Saldana as well?

 7          THE COURT:  Nope.

 8          MR. PATTERSON:  Okay.

 9          THE COURT:  That's the last thing I want.

10          MR. PATTERSON:  Okay.

11          THE COURT:  Only when it hits the Docket.

12       (Pause in the proceeding.)

13          THE COURT:  All righty, folks.

14       (Recess taken from 1:36 p.m. to 1:44 p.m.)

15          THE CLERK:  All rise.

16          THE COURT:  Okay.  We're back on the Record in

17 Tehum.  It is my understanding that at Docket Number 1479

18 there was a report that is filed.

19          Let's jump right back into the examination,

20 Mr. Goodman.

21          And Mr. Atkinson, I'm going to make them show

22 the -- make them start with a new question for you.

23          THE WITNESS:  I appreciate that.

24       (Laughter)

25                  DIRECT EXAMINATION (CONT'D)

1   BY MR. GOODMAN:

2   Q     So, Mr. Atkinson, the last question that you answered

3   was, are you aware of any substantive differences between

4   the TCC and the UCC on the three avoidance claims identified

5   in Paragraph 27 of the Rule 9019 motion.

6         You answered that question, as I recall.  So we're

7   going to move on to the next topic.  Okay?

8   A     Okay.

9   Q     Very good.  Okay.

10        Does your report contain a description of facts that

11  you uncovered in the course of your investigation involving

12  the creation of new entities in 2022 by YesCare to bid on

13  contracts involving prison and jail health?

14        MR. PATTERSON:  Objection, Your Honor.  He's

15  leading the witness.

16        THE COURT:  Overruled.

17        THE WITNESS:  Yes, it does.

18  BY MR. GOODMAN:

19  Q     And where is that in your report?

20  A     Paragraph 11, Paragraph --

21        (Pause in the proceeding.)

22        THE WITNESS:  -- 15, Paragraph 17, 18 and 19.

23  BY MR. GOODMAN:

24  Q     Okay.  Can you please describe for the Court the facts

25  that you discovered in the course of your investigation on

1  these issues?

2  A    Sure.

3         MR. KAUFMAN:  So, Your Honor, this is where we

4  would object.  I appreciate that he is an expert in the

5  field of valuations and the field of avoidance actions  But

6  giving lay opinoins on facts that he reviewed is a different

7  matter.

8         He's not qualified as an expert on that fact -- on

9  that matter.

10         THE COURT:  I don't -- I don't -- I think he's

11  just talking about what's in his report.

12         MR. KAUFMAN:  Correct, Your Honor.

13         MR. PATTERSON:  And my objection, Your Honor, is

14  that's hearsay.  He's just going to read from his report.

15         THE COURT:  I -- I agree.

16         MR. PATTERSON:  We don't care what --

17         THE COURT:  I agree if he's just going to read

18  from the report, but I think if he can talk about it --

19         MR. PATTERSON:  Okay.

20         THE COURT:  -- I think that's one thing.

21         MR. PATTERSON:  Well they stuck it up in front of

22  him --

23         THE COURT:  Well, I think we can just ask him --

24         MR. PATTERSON:  -- for him to read.

25         THE COURT:  I think we can take it down and he

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                    160

1   can -- he can answer the question and people can refresh.

2              MR. PATTERSON:  Right.

3              THE COURT:  What's the other point.

4              MR. PATTERSON:  As long as he doesn't have it in

5   front of him.

6              THE COURT:  Yes.

7              MR. PATTERSON:  That's correct.

8         (Pause in the proceeding.)

9              THE WITNESS:  I can jump through all the hoops you

10  got.

11             THE COURT:  Please proceed.

12             THE WITNESS:  Okay.  So what we found in the

13  discovery were probably 15 plus emails that were pre-

14  devisive merger where we had Mr. Lefkowitz, we had the CEO

15  of the company, we had the CFO of the company, we had the

16  Chief Legal Officer of the company, and various other

17  Corizon Employees that were setting up entities outside of

18  the Debtor.  They were setting up entities that were owned

19  by YesCare and by the -- the CEO of Corizon, but not the

20  Debtor.

21             And they were actively bidding on, at least two,

22  RFP's for -- one for the state of Arizona, one for the state

23  of Alabama, where they were putting together RFP's which

24  basically, you know, said in some of them, formerly known as

25  Corizon.

1          They referenced that they had 5,000 employees at

2    YesCare.  They referenced different -- different programs

3    that Corizon had that YesCare did not have yet.

4          They were, you know, bidding outside of the, you

5    know, basically using estate resources and bidding on

6    contracts for an entity that was not owned by the Debtor,

7    pre-divisive merger.

8    BY MR. GOODMAN:

9    Q    Okay.  So just to be clear.  These new entities that

10   were being created, those were not owned by the Debtor?

11   A    That's correct.

12   Q    And do you know how many entitites were created?

13   A    We don't know for sure.  In the documents that were

14   produced, there was an Excel schedule that referenced 25.

15   We've seen documents in the discovery that clearly

16   identified I think it was up to eight of them that were set

17   up pre-divisive merger.

18   Q    Okay.  And one of these new entities was CHS of

19   Alabama?

20   A    Correct.

21   Q    Okay.  So that means YesCare existed prior to the

22   divisional merger?

23          MR. KAUFMAN:  Objection, Your Honor.

24          MR. PATTERSON:  Objection, Your Honor.

25          MR. PATTERSON:  Leading the witness.

1          THE COURT:  Sustained.

2   BY MR. GOODMAN:

3   Q    Do you know when YesCare was formed?

4   A    Yes, there was an email that I looked at in the -- in

5   the production where Mr. Lefkowitz opened -- set up YesCare.

6   I think it was in January, 2022.

7   Q    In January, 2022 was prior to the divisional merger.

8   A    Correct.  The divisional merger was in May of '22.

9   Q    Okay.  Now I want to get to an opinion that you set

10  forth in your report.

11       Could you go to Page 10, Paragraph 11?

12          MR. GOODMAN:  I'll put this up, because I now know

13  that this has been redacted by the Debtor.

14       (Pause in the proceeding.)

15  BY MR. GOODMAN:

16  Q    Okay.  I want to just go over the opinion, and then I'm

17  going to ask you some questions about it.

18       So you see on Page 10, Paragraph 11, the sentence

19  begins,

20              "These facts suggest a possible scheme

21              to deliberately defraud the creditors of

22              Corizon Health as it appears that

23              business was being funneled away from

24              Corizon Health prior to the divisive

25              merger, creating further doubt on the

1            reliability of the fairness opinion as

2            well as the financial statements and

3            management projections relied on in

4            creating the fairness opinion.

5            In providing support, the YesCare and

6            its subsidiaries are mere continuations

7            or alter egos --"

8          MR. KAUFMAN:  Objection, Your Honor.  We're just

9    reading a report.  This is hearsay.

10   BY MR. GOODMAN:

11   Q    -- "of Corizon Health, the Debtor."

12         MR. PATTERSON:  I'm going to object.  It's not in

13   evidence.

14         THE COURT:  Yes.

15         MR. PATTERSON:  It's hearsay.  He's just reading

16   from some random document.

17         MR. GOODMAN:  I haven't asked the question yet,

18   Your Honor.

19            I -- I was just trying to stop the just reading

20   of the report through question form, since we already talked

21   about the witness not doing it.

22         THE COURT:  Let's just get to the question.

23   BY MR. GOODMAN:

24   Q    Mr. Atkinson, do you see the part that I just read.

25         MR. KAUFMAN:  Okay.  I'll object to that question.

1        THE COURT:  Sustained.  Why don't you just ask him

2   a question?

3   BY MR. GOODMAN:

4   Q    Mr. Atkinson, how did you reach that conclusion?

5   A    I reached that conclusion through the documents that

6   were produced by the Debtor and the series of emails that I

7   reviewed that clearly showed Debtor executives setting up

8   entitities that were not owned by the Debtor and using the

9   Debtor resources to sort of bid on RFP's that would not

10  benefit the Debtor.

11  Q    So are the Debtor's executives helping competitors at

12  this point?

13  A    They were helping an --

14        MR. PATTERSON:  Objection, Your Honor.  That's

15  opinion testify that he's not qualified to give.

16        THE COURT:  What was he qualified as an expert on?

17        MR. GOODMAN:  Mass tort, valuation, and financial

18  restructuring.

19        THE COURT:  So tell me how that question falls

20  into one of those two.

21        MR. GOODMAN:  Because with respect to the

22  financial restructuring and also on the mass tort, cause

23  we're talking about fraudulent claims and claims arising

24  from the fraud that occurred here.

25        This would go to his valuation of causes of action

1   that are part of the settlement, Your Honor.

2            MR. KAUFMAN:  And -- and if I could be heard on

3   it -- well, go ahead, Your Honor.

4            THE COURT:  Go ahead.

5            MR. KAUFMAN:  As I -- as I said at the outset.

6            THE COURT:  I was surprised you didn't *voir dire*

7   the witness.

8            MR. KAUFMAN:  And -- and I'm happy to at this --

9            THE COURT:  A little to late for that, but -- but

10  go ahead.

11           MR. KAUFMAN:  So this report, I -- I have no

12  problem, no -- no issue with Mr. Atkinson opining on the

13  value of mass tort claims, which I think is well within his

14  baileywick.

15           But I agree with what Mr. Patterson's saying.

16  We're now getting into a different area which is opining on

17  some emails that he read which he doesn't have the basis to

18  give opinion.

19           THE COURT:  I tend to agree with that.

20           If he wants to talk about docs he reviewed and how

21  he formed valuations, or how he thinks the other folks

22  didn't form valuations, and things, I think that's fair

23  game.

24           And I think figuring out whether someone was

25  competing against someone else, that feels more --

1          MR. GOODMAN:  Your Honor, I'll withdraw the

2    question.

3          THE COURT:  -- investigative.

4          MR. GOODMAN:  I'll withdraw the question.

5          THE COURT:  Okay.

6      (Pause in the proceeding.)

7    BY MR. GOODMAN:

8    Q    Okay.  Mr. Atkinson, based on the documents that you

9    reviewed, well actually, let me back up.

10       Are the emails that you just referred to, documents

11   that are referenced in your report.

12   A    They are.

13   Q    And where are those referenced?

14   A    They're referenced in -- in footnotes related to the

15   paragraphs that I mentioned earlier, Paragraphs 11, 15, 17,

16   18, 19.

17   Q    Okay.  And based on the documents that you did review,

18   can you tell who was involved in this scheme?.

19   A    Yes.

20   Q    Who is that?

21          MR. PATTERSON:  Objection, Your Honor.

22   Clarification.

23          THE COURT:  Objection to the characterization as a

24   scheme.  I got it.  Sustained.

25          MR. PATTERSON:  And I'm also objecting, Your

1  Honor, referencing documents that aren't available.  These

2  are part of the redaction.

3          MR. GOODMAN:  Your Honor, I would be estatic if we

4  could file an unredacted version --

5          MR. PATTERSON:  No.  I know you would.

6          MR. GOODMAN:  -- of this report.  Because it's not

7  his stuff.  But he's -- he's always willing to --

8          THE COURT:  Yeah.  But -- but -- yeah.  I'm going

9  to overrule that objection.  I think -- I think this -- I

10 think a lot of this could have been brought to me before.

11 And parties just waited to kind of raise the argument today.

12         And we are where we are.  You -- you can ask your

13 next question.  Go ahead.

14         MR. GOODMAN:  Okay.

15 BY MR. GOODMAN:

16 Q    All right.  I want to get rid of the word "scheme."

17      Based on the documents that you reviewed, Mr. Atkinson,

18 can you tell who was involved in this conduct?

19 A    The emails have Mr. Lefkowitz named in them.  He sent

20 some of the emails.  Sarah Tirschwell, who was the CEO.

21 Scott King who's the Chief Legal Officer.  Jeff Shoreley

22 (phonetic) who's the CFO.  And there are other parties that

23 worked for Corizon that were also included on those emails.

24 Q    Okay.  And, Mr. Atkinson, in your 30 plus years of

25 experience involving financial restructuring, have you

1  valuated claims before for breach of fiduciary duty?

2  A     I have.

3  Q     Okay.  Based on what you discovered here in this case,

4  do you think that the Debtor may have the claim for breach

5  of fiduciary duty.

6  A     They may.

7            MR. PATTERSON:  Objection, Your Honor.  Opinion

8  beyond the scope, even the broad scope that -- that he --

9            THE COURT:  I agree.  He gets to value them, but

10 he doesn't get to say whether they exist or not.

11     (Pause in the proceeding.)

12           MR. GOODMAN:  I don't know if you can value

13 without knowing if it exists.

14           THE COURT:  But he's forming the opinion as to

15 whether they exist or not.  That's what you've asked him,

16 whether -- whether you think there's a valid claim for it,

17 right?

18           MR. GOODMAN:  I -- actually, carefully worded this

19 one to say may have.  I didn't say that they did.  I

20 suggested that they might.

21     (Laughter.)

22           THE COURT:  Sustained.  Objection is sustained.

23     (Pause in the proceeding.)

24 BY MR. GOODMAN:

25 Q     Based on the conduct -- the conduct that you

1  discovered, do you think that that could give rise to any

2  claims that could be asserted by the Debtor's estate?

3          MR. PATTERSON:  Objection, Your Honor.  Beyond the

4  scope of this.

5          THE COURT:  Yeah.  I agree.  Sustained.

6          MR. GOODMAN:  Okay.

7      (Pause in the proceeding.)

8  BY MR. GOODMAN:

9  Q    Based on the information that you discovered,

10 Mr. Atkinson, what steps would you recommend that estate

11 fiduciaries take in this case.

12         MR. PATTERSON:  Objection, Your Honor.  Again,

13 beyond the scope of what he's qualified.

14         THE COURT:  Sustained.

15      (Pause in the proceeding.)

16 BY MR. GOODMAN:

17 Q    Mr. Atkinson, you've represented Creditors Committees

18 before; have you not?

19 A    I have.

20 Q    And you have -- how many Creditors Committees have you

21 represented?

22 A    Almost a hundred.

23 Q    You represented Debtors before have you not?

24 A    I have.

25 Q    Do you advise Debtors on whether they should consider

1   pursuing causes of action?

2          MR. PATTERSON:  Objection, Your Honor.  He's

3   leading the witness.

4          THE COURT:  Overruled.

5          THE WITNESS:  Yes.

6   BY MR. GOODMAN:

7   Q   Okay.  And how do you generally go about providing that

8   advice?

9   A   We review the documents that -- we review the emails,

10  we review the underlying financial information, and we

11  provide counsel with the evidence, similar to this that

12  we're talking about here.

13  Q   Okay.  And if you were to perform that function in this

14  case, what would you do?

15         MR. PATTERSON:  Objection, Your Honor.  It calls

16  for speculation.  And any opinion would be beyond the scope

17  of what he's qualified for.

18         THE COURT:  Overruled.

19         THE WITNESS:  I'm sorry.  Can you repeat the

20  question?

21  BY MR. GOODMAN:

22  Q   If you were to perform that same function here, what

23  would you do with the evidence that you discovered?

24  A   I -- the evidence that I found seems pretty clear that

25  entities were being set up outside the Debtor.

1       I'd want to appreciate, you know, the value that was

2   being taken away.   Cause it certainly goes to valuation.

3   You know, one of the things that these things directly

4   affect is the divisive merger and the future value of the

5   business, YesCare.

6       And whether Corizon assets were taken outside of

7   the -- of the value -- outside of their own value and given

8   to YesCare pre-merger and did it affect the valuation

9   ultimately for what was transferred away.

10  Q    Okay.   When you said "valuation," what are you

11  referring to?

12  A    I'm referring to the divisive merger valuation.   So at

13  the time of the divisive merger, the entities were split

14  into two.   You had YesCare and you had RemainCo. and Tehum,

15  and ultimately what -- how much value went in each

16  direction.

17  Q    Okay.   And how would this pertain to that valuation?

18  A    It would --

19          MR. PATTERSON:   I'm going to object, Your Honor.

20  Vagueness of the question to "that" in the question, Your

21  Honor.   Form of the question.

22          THE COURT:   Overruled.

23          THE WITNESS:   It would go to the projected cash

24  flows of the business.

25          So management put together projections for the

1   business.  Those projections had cash flows going forward of

2   like $300 million, which was generally where the unaudited

3   financials said, you know, cash flows were.

4             And they projected over time a slight increase

5   each year successively.  But one of the contracts that we

6   found, we know YesCare ultimately got.  It was a billion

7   dollar contract for the State of Alabama.

8             MR. KAUFMAN:  I'm going to object to this part to

9   this part of his answer.  Goes to hearsay.  There's no

10  foundation that he has any firsthand knowledge of a contract

11  that YesCAre got.

12            THE COURT:  Does an expert need to have firsthand

13  knowledge?

14            MR. KAUFMAN:  If he's going to testify about the

15  substance.

16            THE COURT:  Just answer my question.  Does an

17  expert need to have firsthand knowledge of things --

18            MR. KAUFMAN:  No, but he's not an expert --

19            THE COURT:  -- that he's opining upon.

20            MR. KAUFMAN:  -- on this topic.

21            THE COURT:  That's a better objection.

22            What's -- Mr. Patterson?

23            MR. PATTERSON:  I would -- same objection, Your

24  Honor.  Beyond the scope and he -- any testimony would be

25  opinion.  And if he testified beyond the scope of what he's

1   been qualified for, he does have to have knowledge.

2           He can rely on hearsay with this.

3           THE COURT:  Okay.  I -- I think you're objection

4   is outside the scope, not just he doesn't have personal

5   knowledge.

6           MR. PATTERSON:  Yes.

7           THE COURT:  Did I understand that?

8           What's your response, counsel?

9           MR. GOODMAN:  No.  I think Mr. Atkinson here is

10  already offered in his report opinions that's offered at the

11  time that that we filed our oppositions for everyone and

12  their side has known about this.

13          THE COURT:  Can you repeat the question?

14          MR. GOODMAN:  Sure.  I think that we could move on

15  to the next --

16          THE COURT:  Okay.

17          MR. GOODMAN:  -- I think at this point.  That's

18  fine.

19  BY MR. GOODMAN:

20  Q   Want to turn to the divisional merger itself,

21  Mr. Atkinson.

22  A   Yeah.

23  Q   Where in your report do you discuss the avoidance

24  claims involving the divisional merger?

25  A   I talk about the divisional merger avoidance claims in

1  two places.  In the summary of my opinion, Paragraph 1.  And

2  then -- on -- on Page 7, Section 4, Paragraph 9, starting on

3  Paragraph 9.

4  Q    Okay.  What opinions are you offering to the Court on

5  this issue?

6  A    The opinion that I'm offering is that there's not

7  sufficient information to quanitify the fair value of the

8  potential avoidance actions arising out of the May 2022

9  divisional merger.

10 Q    Okay.  And these are avoidance actions that are

11 described in the Rule 9019 motion?

12 A    Yes, they are.

13 Q    Okay.  And was this a cause of action that you were

14 asked by the TCC to value?

15 A    It was one of them, yes.

16 Q    Okay.  And what did you do to evaluate and value this

17 cause of action, I think back in January of 2024?

18 A    We looked at financial statements, unaudited financial

19 statements, that existed.  We looked at the FTI fairness

20 opinion that was produced that had some relevant financial

21 information, again, unaudited financial information and

22 projections.

23      We looked at the documents that were uploaded by the

24 Debtor, as well as documents related to the divisional

25 merger.

1  Q    Okay.  And you were involved in a lot of cases

2  involving mass tort bankruptcies, correct?

3  A    Yes.

4  Q    Okay.  When a Committee is formed in a case like this

5  one, what is the standard process that takes place in terms

6  of information sharing between a Committee and a Debtor?

7            MR. PATTERSON:  Objection, Your Honor.  Calls for

8  speculation.  Improper opinion testify he isn't qualified --

9            THE COURT:  I --

10            MR. GOODMAN:  Actually, this is --

11            THE COURT:  Overruled.  This is right --

12            MR. GOODMAN:  -- right in his wheelhouse.

13            THE COURT:  -- in his wheelhouse.  So I -- I think

14  you can answer that question.

15            MR. GOODMAN:  I don't think it gets more in his

16  wheelhouse, Your Honor.

17            THE WITNESS:  So --

18            MR. PATTERSON:  And it's a -- but to state my

19  objection, Your Honor.  Is the Court considering him an

20  expert in -- in running Committees?  Of being members or?

21            THE COURT:  No.  I don't think that's at all.

22            I think he's just talking about his process, his

23  personal process and how he does his work.

24            MR. PATTERSON:  Okay.

25            THE COURT:  So I think I'll take it for that

1    purposes.

2            THE WITNESS:  So in the, you know, almost a

3    hundred Committee cases that I've done in my career, one of

4    the first things I do is I reach out to the Debtor, Debtor's

5    FA, or Debtor's CRO and I introduce myself in an email or in

6    person.

7            And I suggest to them some documents that I would

8    like to get from them.  I try to keep it simple.  And then

9    usually the next step is the Debtors, because they

10   have -- the Debtor's financial people have been working on

11   the case for much longer than us because they bring their

12   pre-bankruptcy.

13           They generally have an agenda.  And they usually

14   put on a presentation about the financial condition of the

15   company, the projections of the business, where the

16   bankruptcy is going.

17           That's, you know most -- 90 plus percent of the

18   time, that's they way the case goes.

19   BY MR. GOODMAN:

20   Q    Okay.  So in your experience in restructuring field,

21   does the Debtor typically want the Committee to have access

22   to its information and analysis?

23           MR. PATTERSON:  Objection, Your Honor.  Relevance

24   and beyond the scope.

25           THE COURT:  Overruled.

1          THE WITNESS:  Yes.  The, you know, bankruptcy is

2     about consensus.  So, generally what we experience is the

3     Debtors want to give us their views and support for whatever

4     their opinions are.

5     BY MR. GOODMAN:

6     Q     And why is that?

7     A     To get consensus.  Cause ultimately, the bankruptcy,

8     you know, there's a plan.  And they'll -- they'll need

9     votes.  And the Committees are an important component to

10    that.  And it also saves costs.

11    Q     In your experience, is that important for the Debtor if

12    it wants to build consensus?

13          THE COURT:  I --

14          MR. GOODMAN:  Sorry.  I'm going to withdraw that

15    question.

16          THE WITNESS:  Yeah.

17          MR. GOODMAN:  Bad question.

18    BY MR. GOODMAN:

19    Q     Okay.  Mr. Atkinson, did the Debtor in this case act in

20    the matter consistent with how you've Debtors act in other

21    cases?

22          MR. PATTERSON:  Objection, Your Honor.

23          THE COURT:  Yeah.  Sustained.

24          MR. GOODMAN:  Okay.

25          (Pause in the proceeding.)

1              THE COURT:  I don't even know what that means,

2  like --

3              MR. PATTERSON:  The objection?

4              THE COURT:  No.

5              MR. PATTERSON:  Oh, I'm sorry.

6              THE COURT:  How Debtors are supposed to act in a

7  case.

8         (Pause in the proceeding.)

9              MR. GOODMAN:  Okay.

10  BY MR. GOODMAN:

11  Q    And, Mr. Atkinson, you've also been involved in cases

12  where there are multiple Committees, correct?

13  A    Yes, I have.

14  Q    Okay.  And do those cases involved information sharing

15  processes?

16  A    Yes.  I'm currently in three cases that have --

17              MR. KAUFMAN:  Objection.  Non-responsive.  It was

18  a yes or no questions.

19              THE COURT:  No.  And I think he can answer.  But

20  I -- I just think it's irrelevant as to what people are

21  doing in other cases.  And -- and why they're doing them.

22  And the processes under other cases.

23              I've got 60 cases I can think of off the top of my

24  head.  And everyone is different.  And every -- could be

25  multiple Committees, different Committees, same -- I

1   don't -- tell me -- tell me what the Judge has signed.  Tell

2   me the process.  Tell me when the Committees got formed.

3   I'll tell you how they're acting.

4          I just think it's -- I think it goes outside the

5   scope of what this expert testified to.  Although, he's

6   probably lived it far more than all of us.

7          But I don't -- I don't see how relevant it is for

8   purposes of today.  I think the lawyers can make that

9   argument.

10         MR. GOODMAN:  I think I'll just get back to the

11  facts of this case, Your Honor.

12         THE COURT:  Okay.

13         MR. GOODMAN:  Thank you.

14         THE COURT:  Thank you.

15  BY MR. GOODMAN:

16  Q    You know, so what happened here in terms of the, you

17  know, interaction between the TCC, the Debtor, the TCC and

18  the UCC?

19  A    So related to the Debtor, we got production from the

20  Debtor that I've mentioned which, I think, was about 600

21  pages of documents.

22         We did not get any analysis from the Debtor related to

23  the settlement that had occurred.  Insurance, you know, how

24  they got to their insurance amounts.  How they got to their

25  claiom amounts.

1       Although, their -- their Disclosure Statement has some

2   math related to that.  But we -- there was -- there was no

3   presentation here that sort of tried to, you know give us

4   what the Debtor was thinking and how they to the outcome.

5       We weren't -- I was -- there was a mediation.  I know

6   the TCC was there.  I was not hired as of yet.  So

7   we -- I've seen little to no information related to how we

8   get to the 9019 and the settlements.

9   Q    Okay.  Did the Debtors produce the YesCare financials?

10  A    So the YesCare financials were ultimately, yes, they

11  did.  They were produced to me.  In the initial production,

12  there was only one.  And I reached out to the Debtor in I

13  think January 2nd to try to get --

14          MR. KAUFMAN:  Your Honor, this was a yes or no

15  question.  I let it go a little bit.  It's -- it's

16  continuing.  It's non-responsive.

17          THE COURT:  Overruled.

18          THE WITNESS:  So on January 2nd I reached out to

19  the Debtor, cause I had just gotten the documents right

20  before New Years.  And I went through them and I only saw

21  one -- one -- basically one financial statement for YesCare.

22          And I asked the Debtor -- Debtor's counsel, Gray

23  Reed if there was more.  And they told me, I can't believe

24  they told me there was not at the time.  But ultimately, we

25  found out later that there was.  And we got the production

1  much later.

2  BY MR. GOODMAN:

3  Q    Okay.  Can you go to Tab 3 in your binder?  This is TCC

4  Exhibit 331.

5       (Pause in the proceeding.)

6  BY MR. GOODMAN:

7  Q    Do you see this?

8  A    Yes.

9  Q    Okay.  And if you -- this is an email string.  But do

10  you see the email, I think it was sent by you on

11  January 2nd, 2024.  It begins, "Hi, Lydia."  Do you see that

12  email?

13  A    I do.

14  Q    Did you send that email?

15  A    I did.

16  Q    Why did you sent that email?

17  A    Because I had reviewed the financial documents

18  there -- all the documents that were produced.  And I did

19  not see many, if any, financial information -- financial

20  information related to YesCare.  I think I saw just a couple

21  of documents.

22       And I was surprised.  So I reached out to Gray Reed and

23  Lydia to find out if I was missing something.

24  Q    Okay.  And did you get a response to your email?

25  A    I did.

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                     182

1   Q     And when did you get the response?

2   A     I got the response the same day, later -- later that

3   night.

4   Q     And what was the response?

5   A     The response was that the Debtor does not have any

6   YesCare financials related -- post the divisive merger other

7   than the balance sheet showing the allocation on -- and then

8   she also said that she reached out to counsel for YesCare.

9         And YesCare indicated that they would not be producing

10  any financial information.  She put this in bold,

11            "other than the balance sheets

12            referenced above.  If you have further

13            questions, requests -- requests related

14            to YesCare, please contact Melissa

15            Hayward to discuss."

16  Q    Okay.  At the time you got this response, what did this

17  email indicate to you regarding the Debtor's investigations?

18            MR. KAUFMAN:  Objection, Your Honor.  That calls

19  for speculation.

20       (Pause in the proceeding.)

21            THE COURT:  Can you ask the question again?

22  BY MR. GOODMAN:

23  Q     When you received the response, what did that email

24  indicate to you regarding the Debtor's investigations?

25            THE COURT:  Overruled.

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                    183

1         THE WITNESS:  I was surprised that the Debtor did

2   not have financial information for YesCare beyond the

3   divisive merger.  And it was limited to this information.

4   BY MR. GOODMAN:

5   Q    Okay.  Based on the response that you got from Debtor's

6   counsel, did you think at that time that you had all the

7   information that the Debtor had regarding the YesCare

8   financials?

9   A    Yeah.  I thought Ms. Webb was pretty in the -- in her

10  response to me, so yes.  I thought I did.

11  Q    Okay.  Did the Debtor and the UCC ultimately produce

12  more financial statements for YesCare?

13  A    Yes.

14  Q    Can you tell me about that?

15  A    The -- where we -- we were concerned that we didn't

16  have financial information.  To the TCC started moving to

17  serve subpoenas.  And at some point in time, I think it was

18  late January, January 31st, the Debtor came forward and said

19  that they had not produced, I think it was the whole YesCare

20  production, which was about 8,000 documents.

21        And they gave that to me January 31st.

22  Q    Okay.  And your report was filed February 23rd; is that

23  correct?

24  A    Correct.

25  Q    Okay.  Now as of January 31st were you facing any

1    deadlines?

2    A    Yes.

3    Q    What were those?

4    A    Well I had to get my report done in the next three

5    weeks.

6    Q    Got it.  Okay.

7         Shifting gears, Mr. Atkinson.  Did you review the

8    FTI -- FTI fairness opinion?

9    A    I did.

10   Q    Okay.  What is a fairness opinion?

11   A    A fairness opinion, my experience is a bit of a rubber

12   stamp related to a transaction that's usually done by an

13   investment banker where they point to management's

14   projections and financial information to sort of justify a

15   transaction.

16   Q    Okay.  Was the FTI fairness opinion at all helpful to

17   you and the work that you were undertaking here to value

18   these claims?

19   A    Not particularly, no.

20   Q    Why is that?

21   A    FTI, as almost all fairness opinions do, relied on

22   Debtor's financial statements, which again, are unaudited

23   here, and relied on Debtor's projections.  And did not

24   verify those and test those amounts.

25   Q    Okay.

1          (Pause in the proceeding.)

2    BY MR. GOODMAN:

3    Q    Do you recall reviewing a letter sent by Reed -- Reed

4    Smith on behalf of FTI in the course of preparing a report?

5              MR. KAUFMAN:  Your Honor, I'm just objecting,

6    because I didn't hear the name of the law firm.

7              MR. GOODMAN:  Sorry.  I'll -- I'll say it again --

8              THE COURT:  Go ahead.

9              MR. GOODMAN:  -- if I mumbled.  Apologies.

10             THE COURT:  Okay.

11   BY MR. GOODMAN:

12   Q    Do you recall reviewing a letter sent by Reed Smith,

13   law firm Reed Smith.

14             MR. KAUFMAN:  I thought you said Gray Reed Smith.

15             THE COURT:  He did.

16             MR. GOODMAN:  Did I really?

17             THE COURT:  You said -- you said Gray Reed.

18             MR. GOODMAN:  I will -- I'm going to begin all

19   over again.

20   BY MR. GOODMAN:

21   Q    Do you recall reviewing a letter sent by Reed Smith on

22   behalf of FTI.

23   A    I do.

24   Q    Okay.  What did that letter show?

25             MR. KAUFMAN:  Objection.

1          THE COURT:  What's the objection?

2          MR. KAUFMAN:  Hearsay.  This is not -- definitely

3   outside the scope of his expert opinions.  He's just talking

4   about a letter that was sent to someone that's not even --

5          THE COURT:  I thought it went to the fairness

6   opinion and valuation issue.

7          MR. GOODMAN:  Yes.

8          THE COURT:  I -- and I think he can say what it

9   says in the --

10         MR. KAUFMAN:  What the Court will hear is that

11  this has nothing to do with the actual valuation.

12         THE COURT:  Well when we get there, I'm sure

13  you'll make the objection.  But for right now, let's just

14  take things one step at a time.  Overruled.

15         THE WITNESS:  The -- the letter said that it was

16  basically a cease and desist.  Because what -- the -- what

17  the first day Declaration for Mr. Perry where he described

18  what FTI did, they said was incorrect related to what FTI's

19  fairness opinion actually was.

20  BY MR. GOODMAN:

21  Q    Okay.  Did that letter from Reed Smith have any impact

22  on your views as to whether or not the FTI fairness opinion

23  was helpful?

24  A    Not particularly, no.

25  Q    Why is that?

1  A    Because I didn't put a lot of weight on the fairness

2  opinion to begin with.

3  Q    Okay.

4       (Pause in the proceeding.)

5  BY MR. GOODMAN:

6  Q    Did you review the financial statements of the Debtor

7  and the UCC ultimately produced?

8  A    I did.

9  Q    Okay.  Were those financial statements unaudited?

10  A    They were.

11  Q    Okay.  Had there been situations in your experience

12  where you have given credit to unaudited financial

13  statements when giving -- doing valuation work?

14       MR. PATTERSON:  I'm going to object, Your Honor.

15  He's leading this witness.

16       THE COURT:  Sustained.

17       (Pause in the proceeding.)

18  BY MR. GOODMAN:

19  Q    Have you ever given credit to an unaudited financial

20  statement?

21       MR. PATTERSON:  Objection, Your Honor.  Relevance.

22  What he's ever done in the past has no bearing.

23       THE COURT:  Overruled.

24       MR. KAUFMAN:  Your Honor, I will also object that

25  in his deposition he said the exact opposite of what I think

1   he's being led into saying.

2          THE COURT:  I'm -- I'm sure you'll -- I'm sure

3   you'll raise it on cross.  Overruled.

4          THE WITNESS:  I have used unaudited financial

5   statements before.  Most of the cases I'm involved in have

6   audited financial statements.  But most of the analysis that

7   I do involves mid-year sort of transactions.  So I do look

8   at unaudited financial statements between audits.

9          And certainly there are situations in the past

10  where I had private companies, you know, years ago, that we

11  would have used the unaudited.  But we would have verified

12  that information.

13  BY MR. GOODMAN:

14  Q    Okay.  But in this case, in your opinion, you know,

15  could you rely on the unaudited financial statements that

16  were given to you for YesCare?

17  A    I did not.  I did not believe I could.

18  Q    And why is that?

19  A    Because of what I found in discovery related to what

20  YesCare was doing, and the Debtor's executives were doing

21  related to setting up entities outside of YesCare, related

22  to the fact that we saw pretty significant amounts of

23  fraudulent transfers going out the door, the fact that we

24  had a Texas two-step here in this case.

25          There were numerous reasons why I would want to verify

1  those financial statements.

2  Q    Okay.  Thank you.

3       Did you consider whether Corizon Health owed any

4  secured debt prior to the divisional merger?

5  A    I did.

6  Q    Okay.  What documents did you review on that issue?

7  A    I think there -- there were numerous documents that FTI

8  fairness opinion had a balance sheet that the financial

9  statements that were filed, or provided, in discovery.

10 There was the divisive merger documents, and deposition

11 transcripts as well.

12 Q    Okay.  Do you recall if Mr. Dundon addressed this issue

13 at his deposition?

14 A    I do.

15 Q    Okay.  And his deposition testimony, is that something

16 that you considered in the course of preparing a report?

17 A    I did.

18 Q    Okay.  Do you recall what Mr. Dundon had to say on this

19 topic?

20 A    Mr. Dundon said --

21       MR. KAUFMAN:  This is -- this calls for hearsay,

22 again, outside the scope of his report.

23       THE COURT:  Experts can rely on hearsay in forming

24 their opinions.  And -- and I think that's what this is

25 going to.

1       MR. KAUFMAN:  Okay.  It didn't appear that it was

2  going into his opinions, but if --

3       THE COURT:  At least he -- at least he gets to ask

4  the question, and then we get to figure out whether his

5  conclusion falls inside and outside of the scope of it.

6  So --

7       MR. PATTERSON:  Well, I would follow-up with that

8  objection, Your Honor.  He didn't ask what he relied on.

9  Simply factual it's a hearsay statement.  So what someone

10  said was --

11       THE COURT:  I thought -- I thought his preliminary

12  question was, did you rely on that in the formation of your

13  opinion and he said, yes.  And then he said well, what did

14  Mr. Dundon say.

15       So I'm allowing it for that purposes.

16       MR. GOODMAN:  Thank you.  That is the purpose for

17  which it is intended.  Thank you.

18       THE WITNESS:  So what Mr. Dundon said related to

19  the debt, was that the debt was really equity.  And it was

20  equity before the divisive merge.

21  BY MR. GOODMAN:

22  Q    Okay.  And did you have any reason to disagree with

23  Mr. Dundon on whether the debt was equity before the

24  divisive merger?

25  A    I --

1          MR. PATTERSON:  Objection, Your Honor.  It goes

2  beyond the scope and would just be opinion testimony.

3  Either he relied on it or he didn't.

4          THE COURT:  It's to say why he didn't rely on,

5  though.  So overruled.

6          THE WITNESS:  Can you -- I'm sorry.  Can you

7  repeat the question?

8  BY MR. GOODMAN:

9  Q    You know, why don't we go to just Tab 5 and bring up

10 the testimony I think you've been referring to so that we

11 can all see it?

12         It's TCC 144, Page 88, Line 14.

13         (Pause in the proceeding.)

14 BY MR. GOODMAN:

15 Q    Before we dig into this, I mean, the secured debt

16 issue.  That was something that was -- was that something

17 that was important to you in terms of forming an opinion

18 regarding the value of these claims?

19 A    Yes.

20 Q    Okay.  And generally speaking, why was that?

21 A    When you have a divisive merger, you're dividing the

22 company into two -- two different companies.

23         And you have assets on one side, and you have assets in

24 the other.  And you have liabilities on one side, and

25 liabilities in the other.  And you basically get to a net

1    asset value.

2        And if you have a, I mean, in this -- in this instance

3    you have about $100 million of debt on the YesCare side.

4    And if it's not debt, it's equity.  It makes the YesCare

5    value go up by $100 million.

6    Q    Okay.  And I think the testimony I meant to refer to

7    actually starts on Line 24, 24.

8            MR. GOODMAN:  I am just --

9        (Pause in the proceeding.)

10   BY MR. GOODMAN:

11   Q    You see that testimony in your -- your binder, sir?

12           MR. KAUFMAN:  Your Honor, I'm objecting now.

13   Because I'm looking through Mr. Atkinson's report.  I don't

14   see any reference to this in his report.

15           MR. GOODMAN:  Yes, it is.  I think you can ask

16   that question on cross.

17           THE COURT:  No, I think --

18           MR. GOODMAN:  Well, Your Honor, I'd also like just

19   to make an observation.  We were -- we're in a contested

20   matter under Rule 26.  I know that the other side didn't see

21   fit to produce any expert reports, which is their

22   perrogative.

23           But, you know, our -- our witness did.  I -- I

24   don't know that this concept of Mr. Atkinson is, you know,

25   penalized for having a report, you know, suddenly means that

1   that rule now springs into existence and applies.

2          I think he can testify as to his opinions

3   generally.  I -- I do recall, specifically, that this is

4   referenced in ths report.

5          MR. KAUFMAN:  Your Honor, I'm -- I guess I'm

6   asking where in the report it is and where would I have had

7   an opportunity to ask questions at his deposition about this

8   piece of testimony that he's just now made up.

9          THE COURT:  Out of report about -- what's the

10  report?  What's the question?

11         MR. GOODMAN:  I -- I'm just -- he previously was

12  talking about how he reviewed, considered, and

13  relied -- relied on testimony that Mr. Dundon gave.

14         I'm now just showing that testimony, you know,

15  to --

16         THE COURT:  Correct.

17         MR. GOODMAN: -- to him to confirm it.

18         MR. KAUFMAN:  This isn't --

19         THE COURT:  Is it -- is it -- is it in his report?

20  Dundon?

21         MR. GOODMAN:  Yes.

22         THE COURT:  All right.

23         MR. KAUFMAN:  There are referencings -- references

24  to Dundon's testimony generally.  There are no references to

25  what we're talking about now in terms of equitization of the

1  M2 debt.

2          THE COURT:  Yeah.

3          MR. KAUFMAN:  That's my problem.  I didn't have an

4  opportunity to ask him questions about this.

5          THE COURT:  Did you ask him questions about

6  Dundon's testimony?

7          MR. KAUFMAN:  Oh, yes.

8          THE COURT:  Did you -- did you ask him if he

9  relied on any other opinions and such?

10         MR. KAUFMAN:  Oh, yes.

11         THE COURT:  Then what's the question?

12         MR. GOODMAN:  And, Your Honor, I -- I think we're

13 at cross-examination before I'm done -- done with my direct.

14         THE COURT:  Yeah.  I'll see where this goes.  And

15 if I -- if I need to, I'll strike it.  Go ahead.

16         MR. PATTERSON:  Okay.  Just further, Judge, for

17 the Record.  Again, it's not a conclusion that he has in his

18 report that I can find.  I've had it for an hour, but it's

19 not a conclusion.

20         And so this is wholly outside the boundaries of

21 what he said he was going to testify to.

22         THE COURT:  I'm going to allow it.

23         MR. PATTERSON:  This --

24         THE COURT:  I'm going to allow it, and then

25 everybody can cross him on it.  And if I -- if I give it no

1  weight or it's also out of bounds, then I -- I'll exclude

2  it.

3        Go ahead.

4     (Pause in the proceeding.)

5  BY MR. GOODMAN:

6  Q    Okay.  Again, Mr. Atkinson, you'reviewed Mr. Dundon's

7  deposition transcript in the course of preparing your

8  report; is that correct?

9  A    Yes, I -- I did.

10 Q    Okay.  And did you find testimony that Mr. Dundon gave

11 on this issue of debt equitization helpful to you?

12 A    Yes, I quoted it in my report in Paragraph 9.

13 I'm -- I -- I wrote,

14           "Additionally Mr. Dundon testified at

15           his deposition that without being able

16           to credit the large amount of assumption

17           of debt, I think it's unlikely that FTI

18           would have passed favorably upon the

19           divisional merger."

20 Q    Ah, so you did reference this in your report.

21 A    I did.

22 Q    I thought you did.  Okay.

23       (Pause in the proceeding.)

24 BY MR. GOODMAN:

25 Q    Okay.  And --

1       MR. KAUFMAN:  Your Honor, I'll just ask to strike

2   that sidebar comment.

3       THE COURT:  No.  No, no, no, no.  You -- you

4   invited that one.  I -- little control of action, we're

5   get -- we'll get there.

6       Okay.  Please proceed.

7       MR. GOODMAN:  Thank you, Your Honor.

8   BY MR. GOODMAN:

9   Q   Okay.  Again, so just coming back to the -- the import

10  of the impact of this debt equitization, how did this

11  impact?

12  A   I'm sorry.  Go ahead.

13  Q   Sorry, I -- I got distracted by that one.  Try again

14  before we move on.

15      So again, why was the equitization of the secured debt

16  important to you?

17  A   Because if you looked at the fairness opinion that FTI

18  did, they included the debt.  And in including the debt, the

19  value of YesCare was $100 million lower than it would be if

20  you took the debt out and made it equity.

21  Q   This could be one of the reasons why the FTI opinion,

22  fairness opinion, was wrong; could it?

23  A   The FTI -- it could have been.  I -- I don't know the

24  answer to that.

25  Q   Okay.  How does the Alabama contract factor into the

1  analysis as to the value of the assets that were assigned to

2  YesCare under the divisional merger?

3          MR. ZLUTICKY:  Objection, Your Honor.  Vague.  I

4  don't know what he means by Alabama contract.  There's been

5  no discuss of it in particular.

6          THE COURT:  Why don't you set a little foundation.

7          MR. GOODMAN:  Sure.

8  BY MR. GOODMAN:

9  Q    Mr. Atkinson, are you aware of a --

10         THE COURT:  I think it's fair.

11  BY MR. GOODMAN:

12  Q    -- contract that was being pursued with the state of

13  Alabama?

14  A    I am.

15  Q    What do you kow about that?

16  A    We -- we found support, third-party support.  There

17  were a number of articles related to the Alabama contract.

18       There was an article that announced that YesCare had

19  won the contract.  There was a article that said that they

20  got -- it got taken away again.  And then there was another

21  article that said that it came back again.

22       And this -- this is all consistent with the documents

23  we found in discovery where they were bidding on the Alabama

24  contract.

25       The contract in -- in the articles was for over a

1  billion dollars.  It was over 4 ½ years.  It started in

2  2023, in April of 2023.

3      So that's -- that's -- that's what I know about that

4  contract.

5  Q   Okay.  Now that we've laid the -- some foundation, I'm

6  going to come back to my question.

7      How does the Alabama contract factor into the analysis

8  as to the value of the assets that were assigned to YesCare

9  under the divisional merger?

10 A   So, the Debtors produced projections that were part of

11 FTI's fairness opinion.  Those projections had about $300

12 million of revenue each year.  It grew over time,

13 the -- which was consistent with where Corizon was prior to

14 the divisional merger.

15     The Alabama contract, as I mentioned was a

16 billion -- over a billion dollars over 4 ½ years.  So it's

17 about $200 million a year, kind of growing over time.

18     And it would be over a 40 percent increase in the

19 amount.  So instead of 300, it could be 500 million more.

20 Not sure exactly, but that's -- that's why it's relevant.

21 It goes to the future value of YesCare.

22     So understanding contracts that were being bid on and

23 the likelihood of winnning, and the fact that the divisional

24 merger happened like a month before or a month and a half

25 before, they were awarded that contract were all things that

1   I was interest in.

2   Q    Okay.  Recall you previously testified that YesCare did

3   produce some financial statements, correct?

4   A    Yes, they did.

5   Q    And what is the date of the last financial statement

6   that YesCare produced?

7   A    February, 2023.

8   Q    Okay.  Did that financial statement reflect the value

9   of the Alabama contract?

10  A    I do not believe it did.

11  Q    Okay.  Would financial statements in subsequent months

12  include it?

13  A    I would believe it would.

14          MR. KAUFMAN:  Your Honor, I -- objection.

15          This is speculation.  He doesn't know anything

16  about when the Alabama contract actually started, when

17  revenues would come in.

18          MR. GOODMAN:  Oh, okay.  I'm going to lay some

19  foundation testimony, Your Honor.  I withdraw.

20  BY MR. GOODMAN:

21  Q    Mr. Atkinson, do you know when the Alabama contract

22  started?

23  A    Yeah.  The Alabama contract started in April of 2023.

24  Q    Okay.  And the last financial statement produced by

25  YesCar was dated that date?

1  A    Februray, 2023.

2  Q    Okay.  So that's just before the contract would have

3  began, correct?

4  A    Correct.

5  Q    Okay.  And you previously testified, you said that

6  the -- why don't we strike that.

7      Did YesCare produce any financial statements post-

8  February, 2023?

9  A    It did not.

10  Q    Not.  Okay.

11  Q    Were you interested -- were you interested in the

12  course of performing your work and seeing financial

13  statements from YesCare that would have post-dated February,

14  2023?

15  A    I was.

16  Q    Why is that?

17  A    Because I wanted to see the impact of the Alabama

18  contract on the financial statements.

19  Q    Okay.  Did you ever get that information?

20  A    I did not.

21  Q    Did you provide input on the TCC's discovery requests

22  in this case?

23  A    I did.

24  Q    Do you normally provide impact on discovery requests

25  when you're working on case?

1    A    I do.

2    Q    Why do you do that?

3    A    Because there are financial aspects to most things that

4    we do in bankruptcy.  And it's helpful to the -- to the TCC

5    if I'm helping provide context.

6    Q    Okay.  Did you provide input on the subpoena that the

7    TCC sent to YesCare?

8    A    I did.

9    Q    Okay.  I want to go ahead and show you Exhibit TCC 344.

10   It's Tab 6 in your binder.

11        (Pause in the proceeding.)

12   BY MR. GOODMAN:

13   Q    Have you seen this before, Mr. Atkinson?

14   A    I have.

15   Q    Okay.  Is it your understanding that the TCC did serve

16   a subpoena on YesCare?

17   A    Yes.

18   Q    Okay.  Did YesCare ever produce the financial

19   information post-February, 2023 that you wanted?

20   A    No.

21   Q    It did not.  Okay.

22        What actions did the TCC take to try to obtain that

23   information?

24   A    We -- we put together the subpoena.  We -- I believe we

25   tried to serve it on counsel.  Counsel refused to accept

1   service.

2        And I think counsel was out of town, or was in a trial,

3   or something.  So eight days after we tried to, you know,

4   get counsel to accept the subpoena, we're -- we had to go

5   back to the drawing board and serve the subpoena directly on

6   YesCare.

7   Q    Okay.  Do you know if the TCC took any actions to try

8   to obtain more time so that it could get that information?

9   A    We did.

10  Q    What -- what actions did the TCC take?

11  A    We wrote a letter to the Court sort of outlining the

12  issues and trying to get more time.

13  Q    Okay.  I'm going to go to Tab 7.  This is a publicly

14  filed document on the Court's Docket at 1301.

15       (Pause in the proceeding.)

16  BY MR. GOODMAN:

17  Q    You see that document in your binder?

18  A    Yes.  I have it.

19  Q    Okay.  Is this the letter that you were reerring to?

20            MR. KAUFMAN:  Your Honor, I'll -- I'm objecting

21  just based on the timing.  This letter pre-dates the

22  subpoena that we just looked at.

23            THE COURT:  Yeah.

24            MR. KAUFMAN:  I don't think this is the letter

25  he's referring to.

1              THE COURT:  I'm a little uncomfortable with

2    experts testifying about what happened and what got filed in

3    my case.

4              I thought -- I like my experts nice and

5    independent from what's going on.

6              MR. GOODMAN:  Okay.  We can move on, Your Honor.

7              THE COURT:  Thank you.

8              MR. GOODMAN:  Okay.

9    BY MR. GOODMAN:

10   Q    So just coming back, you wanted additional information

11   from YesCare, correct?

12   A    Yes.

13   Q    Okay.  And you had worked with the TCC to send a

14   subpoena to YesCare, correct?

15   A    Yes.

16   Q    And TCC, to your knowledge, was trying to seek

17   additional time to get that information, correct?

18             MR. PATTERSON:  Objection, Your Honor.  He's

19   leading the witness.

20             THE COURT:  Sustained.

21        (Pause in the proceeding.)

22   BY MR. GOODMAN:

23   Q    To your knowledge did the TCC try to obtain additional

24   time --

25             MR. PATTERSON:  Objection, Your Honor.  He's

1    leading the witness.

2              MR. GOODMAN:  To --

3              THE COURT:  And -- and I don't -- I don't -- I

4    think he can testify if he got the docs or if he didn't, not

5    efforts that the TCC did or on behalf.

6              And for somebody -- if TCC wants to put a witness

7    up to talk about what they did in the case, but I'm not sure

8    that this is outside of the scope about what the expert, I

9    think, can testify on, or he's qualified to testify on.

10             MR. GOODMAN:  Okay.

11         (Pause in the proceeding.)

12   BY MR. GOODMAN:

13   Q    Okay.  So it's January of 2024, and you're trying to

14   complete the analysis regarding the value of the avoidance

15   actions pertaining to the divisional merger, you know, end

16   of the day, you know -- sorry.  Strike that.

17         (Pause in the proceeding.)

18   BY MR. GOODMAN:

19   Q    Okay.  Sorry.

20         You previouslly said that you didn't have any financial

21   statement of YesCare that occurred after February, 2023,

22   correct?

23   A    Yes.

24   Q    Okay.  So you didn't have anything at this point that

25   showed the impact of the Alabama contract.

1          MR. PATTERSON:  Objection, Your Honor.

2  BY MR. GOODMAN:

3  Q    Is that your prior testimony?

4          MR. PATTERSON:  He's leading the witness.

5          THE COURT:  Sustained.

6  BY MR. GOODMAN:

7  Q    Without the information, right, that YesCare wouldn't

8  make available to you, could you value the avoidance action

9  derising out of the divisional merger?

10          MR. PATTERSON:  Objection, Your Honor.  Sidebar

11  comment.  And it's character -- it's argumentative and asks

12  for hearsay.  And it's beyond the scope of what he can

13  testify to.

14      (Pause in the proceeding.)

15          THE COURT:  I'm going to overrule the question.

16  But I'm going to ask you:

17          Could -- did you -- were you -- did you feel that

18  based on the information that was provided to you that you

19  could perform the analysis.

20          THE WITNESS:  I did not.

21          THE COURT:  Okay.

22  BY MR. GOODMAN:

23  Q    Why couldn't you perform the analysis, given this

24  information wasn't available to you?

25  A    I think understanding what YesCare is worth, and

1  understanding the projections, and if they were accurate,

2  and the -- what -- had the impact of the Alabama contract

3  are all things that are very relevant to the determination

4  of the divisional merger asset value.

5  Q    Okay.  So is that why you reached the opinion that you

6  did in your report that you can't assign a value to those

7  claims?

8  A    That's correct.

9  Q    Okay.  Was it surprising to you that the Debtor and the

10 UCC wanted to support this setlement that includes the

11 avoidance claims --

12           MR. PATTERSON:  Objection, Your Honor.

13 BY MR. GOODMAN:

14 Q    -- arising out of the --

15           MR. PATTERSON:  I'm sorry.  Objection, Your Honor.

16           THE COURT:  Whether he was surprised or not

17 surprised I think is irrelevant.  I'll sustain the -- what I

18 think the objection would have been.

19           MR. GOODMAN:  Moving on, Your Honor.

20 BY MR. GOODMAN:

21 Q    Mr. Atkinson, does your report discuss successor

22 liability and alter ego issues?

23 A    It does.

24 Q    Now where in your report is that?

25 A    There's a summary of my opinion in Paragraph 2, and

1  then Page 10, Section 5, starting on Paragraph 12.

2  Q    Okay.  And what opinions are you able to offer to the

3  Court regarding these potential causes of action?

4  A    My opinion is that it does not appear to me that the

5  UCC nor the Debtor put much weight on the causes of action

6  that they asserted related to successor liability.  Or

7  apparently did not put any weight on the alter ego

8  arguments.

9  Q    Okay.  What information --

10            MR. KAUFMAN:  Your Honor, I'm going to move to

11  strike that.  That's beyond the scope of what he's actually

12  been designated as an expert to do.

13            THE COURT:  Overruled.

14  BY MR. GOODMAN:

15  Q    Mr. Atkinson, what information do you need to value

16  claims involving successor liability and alter ego?

17  A    You need to understand three things, essentially.

18        You need to understand the claims against the Debtor,

19  the GUC claims and the tort claims.  You need to understand

20  the ability to pay the parties that you're pursing.  And you

21  need to understand how good your claims are.

22  Q    Okay.  Is the starting to the analysis the claims

23  against the Debtor?

24  A    Yes, I would say so.

25  Q    Okay.  Did you try to value the claims against the

1  Debtor?

2  A     Yes.

3  Q     Okay.  You tell me about that.

4  A     Sure.  We got information related to the GUC claims and

5  we got information related to the tort claims.  There was

6  some settlement history for about ten years.

7      We reviewed the settlement history.  The Debtor,

8  ultimately in their, even though they had the settlement

9  history, did not use the settlement history.  They used a

10  third-party source for determining what the value of the

11  claims were in their Disclosure Statement.

12      I similarly came to the same conclusion.  And I did not

13  rely on the -- the underlying settlement data that there

14  provided.  I noticed that one, we have a 200 -- like it was

15  224 claims at the time I was looking at it.  I think it's

16  240 now.  So not a lot of claims, relative to most of the

17  cases that I'm involved in.

18      And when I got into the details of the data, there

19  were, for example, if you looked at death claims, there were

20  some being paid at $5,000 a claim and some being paid at $6

21  million a claim.

22      And that was -- that really carried on throughout the

23  various types of claims.  So it was very dispurgent.  So

24  I -- I did not think I had information that I could value

25  the claims with.

1  Q    Okay.  Is there a claims register in this case?

2  A    There is.

3  Q    Did you review it?

4  A    I did.

5  Q    Okay.  If you added up all of the claims in the claims

6  register in this case using a calculator, what would be

7  the -- what would the personal injury claims be worth?

8  A    I think if you didn't take out duplicates it's over a

9  billion dollars.  And if you take out duplicates, it's like

10 775,000 million.

11 Q    Okay.  Is that number in the Disclosure Statement?

12 A    It is.

13 Q    Okay.  Would adding up all the claims in this -- would

14 adding up all of the claims in the claims register using a

15 calculator be the proper way to value personal injury

16 claims?

17 A    No.

18 Q    Okay.  Did the Debtor produce any claims analysis to

19 you?

20 A    They gave me settlement data, but no -- no analysis

21 of -- other than the Disclosure Statement where they applied

22 math to the number of claims in the case and applied

23 averages from some third-party sources.

24 Q    Okay.  Did the Debtor share any of its work product

25 with you on this issue?

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                    210

1   A     No.

2   Q     Did the UCC produce any claims analysis to you?

3   A     No.

4   Q     Okay.  Has the UCC shared any of its work products with

5   the TCC regarding claims analysis?

6   A     No.

7   Q     Were there any obvious errors of the Debtors' reported

8   valuation of personal injury and wrongful death claims in

9   the Disclosure Statement?

10  A     Yes.

11  Q     What was that?

12  A     The Debtors relied on a -- a third-party source that's

13  a database that's put together by the federal government in

14  an article that referenced that.

15        And the settlement data they used from that source for

16  medical malpractice cases was -- they used the 2014 data

17  point.  And the -- the source data had medical malpractice

18  claims, you know, additional claims that happened from 2014

19  to 2023.

20        And they had a number for -- you could get to a number

21  for 2023.  So it -- to get to, you know, to use it for

22  today, you needed to bring it forward to 2023.

23             THE COURT:  Is that a really basic back-up

24  question, the third-party source, can you just give me a

25  little bit more information just so I have --

1         THE WITNESS:  Sure.

2         THE COURT:  -- decent understanding of it.  No,

3  just based on your understanding.

4         I don't -- is it -- is it a website?

5         THE WITNESS:  Yeah.  It's a -- it's a -- it's a

6  government website.  Department of Health, I think, and

7  Human Services tracks medical malpractice settlements and

8  judgment for -- like since 1992.

9         THE COURT:  Got it.

10        THE WITNESS:  So, yeah.

11        THE COURT:  Got it.

12     (Pause in the proceeding.)

13        MR. GOODMAN:  Want to make sure the Judge has no

14  further questions.

15        THE COURT:  No, no, no.  I'm sorry.  I just wanted

16  to make sure I -- I thought that's what you were referring

17  to.  I just wanted to make sure that --

18  BY MR. GOODMAN:

19  Q   To be clear, Mr. Atkinson, his questions are more

20  important than mine.

21  A   I -- I get that.

22  Q   Okay.  Mr. Atkinson, did you consider settling data?

23  A   I did.

24  Q   Tell me about that.

25  A   I looked at the settlement data.  And as I mentioned

MICHAEL ATKINSON - DIRECT BY MR. GOODMAN                    212

1   earlier, I noticed that -- I think I have ten years of

2   settlement data from the Debtor.  There were no judgments in

3   the settlement data.

4        The -- the settlements that we did have were, you know,

5   pretty diverse in -- in these fairly unique situations

6   related to each claim, compared to other mass torts that

7   I've been involved in.

8   Q    Okay.  In this case, do you think that you could use

9   the settlement data to accurately value the tort claims?

10  A    I do not believe so, no.

11  Q    Why is that?

12  A    Because the -- the -- as I mentioned when you looked at

13  the -- the payouts were so widespread for each type of

14  claim, that I just don't think it's fair to the claimants to

15  value their claims based on the historical settlement data.

16       I think there's a small population.  And I think it's a

17  mangeable one.

18  Q    Okay.  But in other cases, have you been able to

19  estimate the value of tort claims using settlement data?

20  A    I have.

21  Q    Okay.  But not this one.

22  A    Correct.  Not this one.

23       Other cases like miso cases, there's a lot more data

24  out there, the types of injuries are more consistent.  And

25  the -- and the -- there's just usually a lot more medical

1  information related to it.

2  Q    Okay.  Given the number of claims in this case, what

3  approach do you think should be utilized to value the

4  claims?

5  A    I think they should be analyzed on a claim-by-claim

6  basis.  We -- I had a case with Judge Isgur where we

7  utilized the PIK system.  And we went out and sent out

8  questionairre to get more information.  Maybe something like

9  that would be helpful here.

10      But probably, you probably would need a medical expert

11  to help determine the claim amounts.

12  Q    And what is the PIK form?

13  A    It's personal information questionairre.

14      So it's a -- in -- in *HonX,* me and the other claims

15  expert, the one for the future claims rep, created the

16  questionairre to get additional information that would be

17  helpful -- that we both thought would be helpful to value

18  the claims.

19  Q    Okay.  And the *HonX* case, that's pending in the

20  Southern District of Texas, right?

21  A    Yeah.  It's here.

22  Q    Okay.  So in your opinion, if parties in this case

23  really wanted to do a more detailed claims analysis, are

24  there bankruptcy tools that are available to do that?

25  A    Yes.

1  Q     But sitting here today, do you have access to the

2  information that you would need to do the claims-by-claims

3  analysis that you were discussing?

4  A     I do not.

5  Q     Okay.  When did you begin analyzing the claims in this

6  case?

7  A     Probably around the time -- we got the -- we got the

8  database around December 27th.  So, soon after that we

9  probably started looking at the claims information.

10 Q     Okay.  And when did the Debtor again file the Rule 9019

11 motion?

12 A     January 16th.

13 Q     Okay.  Sitting here today, are you able to offer an

14 opinion regarding the aggregate value of the claims against

15 the Debtor?

16 A     I am not.

17 Q     Okay.  And what does that mean in terms of your ability

18 to then value potential causes of action based on successor

19 liability and alter ego.

20        MR. PATTERSON:  Objection, Your Honor.  That's

21 beyond the scope of expertise.  Wasn't qualified to testify.

22        THE COURT:  Yeah.  I -- I --

23        MR. GOODMAN:  Actually, Your Honor, I'm trying to

24 help the Court understand why it is that we can't value the

25 claims as sort of a foundational question.

1          THE COURT:  Why don't you just ask the question.

2    I'll let you ask the question now.

3          MR. GOODMAN:  Okay.

4    BY MR. GOODMAN:

5    Q    What's the connection, Mr. Atkinson, between the fact

6    that you don't have information that you need to value the

7    claims against the Debtor and then, in turn, trying to value

8    claims involving successor liablity, alter ego.

9          MR. KAUFMAN:  And, Your Honor, just for the

10   Record, this is the same -- the same motion to strike I

11   made.

12          There's no foundation that he's an expert in

13   valuing successor liablity  or alter ego theories.

14          THE COURT:  Overruled.

15          MR. KAUFMAN:  And the fact --

16          THE COURT:  Overruled.  You can answer the

17   question.

18          THE WITNESS:  Well at the heart of successor

19   liability and alter ego, is what there -- the claim's were.

20   And certainly, I'm a claims expert.

21          So I -- I do not believe without having claims

22   information, I can't determine one of the three most

23   important things to what a successor liablity or alter ego

24   claim would be, which is what are the claims worth.

25   What -- how much can the parties pay.  And then ultimately,

1   how good is the case.

2   BY MR. GOODMAN:

3   Q     Okay.  But your report, though, does include a range,

4   right, or 135 million to 187 million, correct?

5             MR. PATTERSON:  Objection.  Leading the witness.

6   He's now testifying two different ways.  Or he's asking him

7   to testify two different ways.

8             THE COURT:  Overruled.  You can answer.

9             It's a -- really kind of a foundational question.

10            MR. GOODMAN:  Yeah.

11            THE WITNESS:  Yes.  So I -- I do have a range in

12  my report.  The range is, as I mentioned, understanding what

13  the claims' values are, which I do not believe I can value.

14  But the Debtor has valued them in their dislosure statement.

15            The -- both the GUC and the tort claims and the

16  value, if I correct for that, that one mistake related to

17  PI's, bringing them to 2023 values, the -- the range in the

18  Debtor's materials is 135 to $185 million.

19            And the reason I included that is I wanted to give

20  perspective to the Court as to, at least based on the

21  Debtor's numbers, how significant that claim could be.

22  Again, it's -- it's -- it's a component of what's a alter

23  ego or successor liability claim worth, which is the value

24  of the claims.

25  BY MR. GOODMAN:

1  Q    Okay.  In your report, I believe you opine on -- on

2  whether the Debtor and the UCC actually evaluated potential

3  causes of action based on successor liability and alter ego?

4  Where is that?

5       (Pause in the proceeding.)

6  BY MR. GOODMAN:

7  Q    I'm sorry.  Is that on Page 10?

8            THE COURT:  Why don't you just ask him the

9  question and not really --

10 BY MR. GOODMAN:

11 Q    Yeah.  That's -- Mr. Atkinson, are you offering an

12 opinion today on whether you think the Debtor and UCC

13 actually evaluated those causes of action in connection with

14 the settlement?

15           MR. KAUFMAN:  And I'll object to that form of that

16 question.

17           THE COURT:  Overruled.

18 BY MR. GOODMAN:

19 Q    The question is, are you --

20           THE COURT:  Yeah.  Overruled.

21           THE WITNESS:  Yes, I am.

22           In Paragraph --

23           THE COURT:  Just -- just tell me what the opinion

24 is.

25           THE WITNESS:  Sure.  My -- my opinion is that the

1  Debtor did not calculate or include that in their analysis.

2  They highlighted in their 9019 motion four other causes of

3  action.

4          They highlighted the three fraudulent conveyances.

5  And then they highlighted the -- the divisional merger

6  amount.  They did not highlight the alter ego or successor

7  liability.

8          There's additional testimony that I've reviewed

9  from David Barton, the UCC's designee, who pointed to the

10 9019 motion.

11         There's additional documents that I've seen

12 related to the -- the Disclosure Statement and what's

13 written in the Disclosure Statement.

14         There's not an emphasis on alter ego or successor

15 liability.  I believe, based on just the sheer math of how

16 big the claims are from the Debtor, it's the -- by far the

17 largest claim in this case.

18         And the claims that the Debtor did -- Debtor and

19 UCC did settle, the three -- the three fraudulent conveyance

20 claims' gross amount is about $30 million.  And the divisive

21 merger, if you just take what the -- what the UCC's

22 financial advisor says, and you take out the debt of $100

23 million, you'd be another $100 million claim.

24         Again, I don't think that the value is there

25 related to what is YesCare worth.  But there's substantial

1   amount of value that the Debtors -- Debtors and UCC settled.

2   But I don't see that this settlement -- the ultimate

3   settlement, the $54 million settlement included an alter ego

4   or -- or successor liability, based on what I've seen.

5        (Pause in the proceeding.)

6   BY MR. GOODMAN:

7   Q    Okay.  I want to shift gears, Mr. Atkinson, and talk

8   about how much money the tort claimants might get if a

9   settlement is approved.  This Court asked that question.

10  You need to be mindful of that.

11       Here -- here's the question, Mr. Atkinson, could you

12  tell just from the settlement that's before the Court in the

13  9019 motion, just from that itself, how much money would to

14  go tort claimants?

15            MR. KAUFMAN:  Objection.  This -- this is way

16  beyond the scope of his expert opinion.

17            THE COURT:  What's your response counsel?

18            MR. GOODMAN:  I -- I think this is actually a

19  foundational question.  But it's more of an issue.  And,

20  perhaps, the Court's already -- understands this that

21  without the plan to allocate --

22            THE COURT:  Yeah.  I don't want you testifying.  I

23  don't want you testifying to -- I --

24       (Pause in the proceeding.)

25            THE COURT:  I'm going to overrule.  He can -- he

1    can answer.

2            THE WITNESS:  No.

3    BY MR. GOODMAN:

4    Q    Okay.  And why is that?

5    A    Cause I don't have sufficient information to

6    determine --

7    Q    Okay.

8    A    -- a claim.

9    Q    Is there a plan on file in this case yet -- or sorry.

10        There -- there was a plan on file in this case,

11   correct?

12   A    Yes.  There was.

13   Q    Okay.

14   A    And there's no longer one is my understanding.  And

15   without one, it's hard to know what the claims are worth.

16   Q    Okay.  And in your experience as a financial

17   restructuring advisor, do you -- have you reviewed plans of

18   reorganization?

19           MR. PATTERSON:  Objection, Your Honor.  It's

20   beyond the scope.  Opinion and what he does in other cases,

21   especially beyond claims analysis, is not relevant.

22           THE COURT:  I think it's just if he reviews plans

23   is the question.  It's more of a foundational question.  And

24   we can go.  So I'll overrule the objection.  He can answer.

25           THE WITNESS:  Yes, I do.

1  BY MR. GOODMAN:

2  Q    Okay.  In the course of the work that you did here for

3  the TCC, did you evalute the plan that was currently on

4  file?

5  A    I did.

6  Q    Okay.  Does your report contain any opinions regarding

7  the fairness of the proposed allocation under the plan?

8           MR. KAUFMAN:  Objection.  This is irrelevant.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yes, it does.

11  BY MR. GOODMAN:

12  Q    And where is that in your report?

13  A    It is on -- it's on Page 21, Section 8, starting on

14  Paragraph 30.

15  Q    Okay.  And what opinions did you reach?

16  A    My opinion big picture was that the -- the plan that

17  was on file was not treating, you know, GUC claims and tort

18  clais fairly or evenly.

19       Essentially, there were a couple of things that I

20  notices.  There -- there's more assured assets, like cash

21  and the ERC creditors.  And they were disproportionately

22  being allocated to the GUC Trust.  So the GUC Trust was

23  getting about 70 percent of the cash and the -- and the ERC

24  credits.

25       And then on the flip side, the litigation aspect, which

1  are more speculative were disproportionaltely allocated to

2  the tort claimants Committee, 70 percent to them versus 30

3  percent.

4      So the dollars were -- were disproportionately

5  allocated relative to the claim values.  And then the last

6  point is, the claim amounts that were used to determine what

7  the Debtors have put together were understated the amount of

8  PI claims -- the dollar amount of PI claims.  Cause they

9  used the 2014 dollars, not 2023.

10 Q   Okay.  Could -- could you or anyone help the Court

11 understand how much tort claimants would get solely based on

12 the settlement that's before the Court.

13         MR. KAUFMAN:  Again, Your Honor.  Object.  This is

14 not relevant.  It's outside the scope of his expertise.

15 And --

16         THE COURT:  I just think it's -- help me with the

17 relevance.

18         MR. GOODMAN:  It's a question that you asked at

19 the beginning of the case, Your Honor.

20         THE COURT:  Yeah.  I -- I'm okay with that.  You

21 can -- you can ask something else.

22         THE WITNESS:  No.

23 BY MR. GOODMAN:

24 Q   Okay.  And why is that?

25 A   Because I do not have sufficient information -- I do

1   not have a plan.  So I'm -- it's impossible for me to

2   determine the amount.

3   Q    Okay.  Do you have any views regarding the insurance

4   assets in this case?

5   A    I do.

6   Q    Okay.  Do you deal with insurance issues in mass tort

7   bankruptcies?

8            MR. KAUFMAN:  Your Honor, objection.  This is

9   irrelevant.  And, again, on deposition --

10            THE COURT:  The insurance you find it irrelevant?

11            MR. KAUFMAN:  You'll find out, if I could take him

12   on *voir dire* on this point.  He told me in his deposition he

13   didn't look at the insurance.

14            THE COURT:  Yeah.  That was the -- that was the

15   whole -- that was the whole pre-you want to take it up now

16   question.

17            So I'm going to -- I'm going to let you cross him.

18   And we'll -- we'll -- it'll go to the weight, his testimony.

19   He can go.

20            THE WITNESS:  So I am the trustee in the

21   Mallencrot (phonetic) Trust.  We're pursuing insurance

22   in -- in that estate.  We've been pursing insurance in

23   Purdue.

24            I've had a lot of experience with cases where

25   insurance has been pursued.  It has been my experience that

1  it takes a long time to get insurance, particularly in mass

2  tort cases.

3          In the *Boy Scouts* I was actively involved with

4  negotiations for getting some insurance monies paid.  And

5  I'm involved with the post-confirmation trust now.  And what

6  we're -- what we're finding is the insurance companies

7  basically make you litigate like each claim, essentially.

8          And it takes a long time.  And they have good

9  counsel.  And you're essentially paying them.  So it's

10 a -- it's a hard road to getting paid in these mass tort

11 cases.

12 BY MR. GOODMAN:

13 Q    Okay.  Does that mean that insurance assets usually

14 need to be discounted?

15     (Pause in the proceeding.)

16          THE WITNESS:  They're just hard to value.

17          MR. PATTERSON:  Objection, Your Honor.  He's

18 leading the witness.

19          MR. GOODMAN:  Okay.

20          THE COURT:  Sustained.

21     (Pause in the proceeding.)

22 BY MR. GOODMAN:

23 Q    Do you have any views regarding the value of the ERC

24 credits in this case?

25 A    I do.  ERC credits, I -- I've -- I have -- in other

1  cases we have pursued them.  As long as you have a -- a

2  company that's deserving of them and you do the math

3  correctly, which I know they have a consultant here.

4  Generally, you get those paid.

5      So I don't have any concerns about them getting paid.

6  Q    Okay.  Now does your report contain any opinions

7  regarding whether the Debtor has a business to reorganize?

8  A    It does.

9  Q    Okay.  And what page of your report is that on?

10              MR. KAUFMAN:  Objection.  This -- relevance.

11              THE COURT:  What -- what is the relevance here?

12              MR. GOODMAN:  Actually, it's interesting, Your

13  Honor.  We served an RFA on the Debtor and asked them to

14  admit that they had no business to reorganize.  And they

15  actually denied the RFA.

16              So because of that --

17              MR. KAUFMAN:  It's a little more nuance than that.

18              THE COURT:  I know.  But I -- I think we can just

19  then rely on that moreso than anything else.

20              I mean, what's he going to -- I'm not sure

21  he -- I'm not sure what he can testify to.

22              MR. KAUFMAN:  We've -- we've also acknowledged

23  that since since our first day pleadings.

24              So it's not really up for dispute.  It's not

25  relevant what is opinions are.

1           THE COURT:  I agree.

2           MR. GOODMAN:  Okay.

3      (Pause in the proceeding.)

4           MR. GOODMAN:  I'm sorry.  I'm a little confused,

5  Your Honor.

6           So do you not want him to offer any testimony on

7  the analysis that he did on whether the Debtor has a

8  business to reorganize?

9           THE COURT:  I think they've admitted that they

10 don't.  So I'm not sure what the analysis is going to show

11 that -- unless -- unless I think, to my understanding,

12 counsel just said.  He just said it in the first day

13 business, I think -- first day papers that they don't have a

14 business to reorganize.

15          So I think with that admission, I'm not sure.  I

16 think we're -- everybody's going to reach the same

17 conclusion on that.

18          MR. KAUFMAN:  Okay.  Thank you, Your Honor.

19          MR. GOODMAN:  Save some time.  Thank you.

20          MR. KAUFMAN:  Okay.  Good.

21          MR. GOODMAN:  The whole things stipulated to.

22          THE COURT:  Yeah.

23          MR. GOODMAN:  I'm not going over it.

24          THE COURT:  No, no.  If -- if -- in other words,

25 if it's stipulated to, then I think we can move on.

1          MR. GOODMAN:  Okay.  Perfect.  Thank you, Your

2   Honor.  Saves time.

3   BY MR. GOODMAN:

4   Q    All right.  Home stretch, Mr. Atkinson.

5        (Pause in the proceeding.)

6   BY MR. GOODMAN:

7   Q    Okay.  Were you tasked with offering any opinions by

8   the TCC regarding plan releases in this case?

9   A    I was not.

10  Q    Okay.  Were you tasked with offering any legal opinions

11  regarding what is or is not in the state causes of action?

12  A    I was not.

13  Q    Okay.  Are you offering any opinions today as to

14  whether dismissal is better than a bankruptcy settlement?

15  A    No.

16  Q    No.  Okay.

17       All right.  Mr. Atkinson, do you adopt your Declaration

18  as your testimony in this case?

19  A    I do.

20          MR. GOODMAN:  With that, Your Honor.

21          MR. PATTERSON:  I'm going to object to that cause

22  that's hearsay.

23          MR. GOODMAN:  I would pass the witness.

24          MR. PATTERSON:  He can't adopt hearsay.

25          THE COURT:  I'm not -- I'm not sure what that

1    really means.  But --

2            MR. PATTERSON:  I don't either, so his testimony

3    is his testimony.  He can't defer and say if I didn't say

4    it, but it's in my report, then I really said it.  So --

5            THE COURT:  Okay.  I don't -- I don't think he

6    said that, though, either, though.

7            MR. PATTERSON:  Well, I think that's what he's

8    trying to do.

9            THE COURT:  I got it.

10           MR. PATTERSON:  He's trying to adopt.

11           THE COURT:  But let's -- let's see if he gets

12   there.

13           MR. KAUFMAN:  Yeah.  Until the point that they

14   offer the report into evidence, I think I'm okay with that

15   general statement.  But I agree with Mr. Patterson, we would

16   object if they're trying to move that into evidence.

17           THE COURT:  We'll have to see.  I'll let you

18   proceed.

19           MR. GOODMAN:  I --

20           THE COURT:  The -- the preemptive strikes is what

21   I'm after.  I'd -- I want to see the blow and then --

22        (Laughter.)

23           THE COURT:  -- or the statement.

24           MR. GOODMAN:  I -- I am actually ready to -- to

25   pass the witness, Your Honor.

1           THE COURT:  Okay.

2           MR. GOODMAN:  Do we want to give everyone break?

3   I don't need one, but I'm just --

4           THE COURT:  Let me ask the witness.

5           THE WITNESS:  I'm good if you are.

6           THE COURT:  Okay.

7           MR. KAUFMAN:  Your Honor, I would like to

8   consolidate, cause there are lot of things that I thought we

9   were going to cover that we didn't.  I'd like to --

10          THE COURT:  Sure.  How much time do you think you

11  need.

12          MR. KAUFMAN:  Can I have ten minutes?

13          THE COURT:  Yeah.  All right.  We'll take a

14  10-minute break.

15          And, Mr. Atkinson, I remind you that you're still

16  under oath.

17          THE WITNESS:  Okay.

18          THE COURT:  Thank you.

19          THE CLERK:  All rise.

20      (Recess taken from 2:56 p.m to 3:09 p.m.)

21          THE CLERK:  All rise.

22          THE COURT:  Okay.  We're back on the Record in

23  Tehum, beginning with cross-examination.

24          MR. KAUFMAN:  For the Court, Aaron Kaufman for the

25  Debtor.

                          CROSS-EXAMINATION

BY MR. KAUFMAN:

Q    Mr. Atkinson, good to see you again.

A    Thank you.

Q    Last time we met for this, it was in the DC office of
Brown Rudnick for your deposition, right?

A    Yes.  That's correct.

Q    And that was a little over a month ago on
February 26th, right?

A    That makes sense, yeah.

Q    And during that deposition, we talked about your
background.  You covered some of that on Direct, right?

A    Yes.

Q    It's basically you have 30-plus years of experience
covering hundreds of Debtors, Committees,
official/unofficial Committees, right?

A    Yes.  That's right.

Q    And those Committees and those cases cover a wide
variety of industries; is that fair?

A    Yes.  That's fair.

Q    Many of those cases included claims arising from mass
torts.  I think you said seven or eight, right?

A    Yeah, probably more than that, but yes.

Q    Okay.  More than that.  So more than seven or eight
over 30 years?

1  A     Yes.

2  Q     Okay.  For example, I think you mentioned was the *HonX*

3  case, right?

4  A     Yes.

5  Q     And that concerned some asbestos liabilities, right?

6  A     That's right.

7  Q     And we'll discuss that a little more later, but

8  ultimately you supported a settlement, a global settlement,

9  in the *HonX* case, right?

10 A     That's correct.

11 Q     Another case you mentioned very briefly, I thought I

12 heard you talked about the *Purdue Pharmacy* case, right?

13 A     *Purdue Pharma*, yes.

14 Q     *Purdue Pharma*, thank you.

15       And that involved a wide variety of mass tort claims

16 arising from the opioid epidemic, right?

17 A     Opioid-related claims, yes.

18 Q     And you submitted a Declaration in support of the

19 settlement and the Plan confirmation in that case, right?

20 A     That's correct.

21 Q     And we'll come back to this in a few minutes, too, but

22 is it fair to say -- I think you did in your Declaration --

23 that the *Purdue Pharma* settlement, the Sackler settlement in

24 the *Purdue* case was an imperfect solution.

25       Does that sound familiar?

1  A    It could be.  I don't know one way or the other.  I

2  don't remember that.

3  Q    You don't remember saying or at least adopting the

4  statement that the settlement was an imperfect solution that

5  nevertheless is superior to any other available alternative

6  for the majority of *Purdue's* creditors?  You don't remember

7  saying that?

8  A    I probably did.

9  Q    It was a few years ago, right?

10 A    Yeah, unfortunately, because that case has not been

11 confirmed still.

12 Q    It's before the Supreme Court?

13 A    Yeah, correct.

14 Q    You were also one of the financial advisors that worked

15 with the Brown Rudnick firm and others for an Unofficial

16 Committee in the *Boy Scouts of America* case.  I think you

17 mentioned that, right?

18 A    Yes.

19 Q    And the *Boy Scouts* case involved some claims arising

20 from misconduct, sexual abuse, right?

21 A    Yes.

22 Q    And your client supported the Plan in that case, right?

23 A    The Unofficial Tort Committee supported the Plan, yes.

24 Q    Just out of curiousity, did the Court approve the fees

25 to be paid for the Unofficial Tort Committee in that case?

1   A    I do not believe they did.

2   Q    It was like $21 million, right?

3   A    That's correct.  I believe that's right.

4   Q    They were -- again, the Court didn't approve the Debtor

5   to pay those fees, right?

6   A    I don't believe that they did.  I don't know if it's

7   been filed yet, but I don't think the Court has.

8   Q    There's a published opinion denying those fees, right?

9   A    Okay.  Got it.

10  Q    Would you agree that the TCC's constituents, the tort

11  claimants, are a subset of the UCC's constituents in this

12  case?

13  A    They should be, yes.

14  Q    So the UCC represents all creditors?  The TCC

15  represents a subset of all creditors?

16  A    Yes.  And it's weird --

17  Q    It's just a yes or no question.

18  A    Okay, sorry.

19  Q    Thank you.

20       Are you aware of the costs that have been incurred by

21  the TCC in this case?

22  A    Generally, not specifically.

23  Q    Yeah, and when we spoke a month ago, I think you told

24  me that you were not aware, right?

25  A    Correct.

1   Q     And also when we spoke about a month ago, you were not

2   aware of any budgets that the TCC had approved for

3   litigation costs --

4         (Counsel confer.)

5         And when we spoke a month ago, you were not aware of

6   any budgets that the TCC had approved concerning the

7   litigation costs for the TCC to object to the 9019 motion

8   and file it's motion to dismiss, right?

9             MR. GOODMAN:  Objection, Your Honor.  I think this

10  is well outside the scope of the witness's assigned asks.  I

11  just raise this issue because I think we're trying to get

12  through today and --

13            MR. KAUFMAN:  He's a financial advisor for the

14  TCC.  I'm just asking what he's done within the scope of his

15  duties.

16            THE COURT:  Right, but he was designated as an

17  expert in this case.  I'll give you a little bit of leeway

18  'cause I'm been admittedly a little flexible here, but the

19  fact that he's the -- he's an FA, he's not testifying in

20  this capacity as one, he's testifying in the capacity as an

21  expert.  So if that somehow relates to that analysis, I'm

22  all for it.  But if not, then find a happy home.

23            MR. GOODMAN:  Your Honor, the point of making his,

24  you know, questions regarding budgets and how much fees

25  they've incurred and we've incurred, I don't think that's --

1           MR. KAUFMAN:  I don't know if Your Honor read the

2    motion to compel filed this morning, but it kind of relates

3    to this.

4           THE COURT:  Let me just tell you, I didn't.

5        (Laughter)

6           THE COURT:  I think I'm 100 percent zoned in on

7    the analysis in front of me, and so.

8           MR. GOODMAN:  Thank you.

9           THE COURT:  Let's go.

10           THE WITNESS:  Okay.  Do you mind repeating?  I'm

11   sorry.

12           MR. KAUFMAN:  Not at all.

13           THE COURT:  He's going to ask a whole other

14   question.

15           MR. KAUFMAN:  I'm going to ask a whole other

16   question.

17           THE WITNESS:  Okay, okay, good.  Thank you.

18   BY MR. KAUFMAN:

19   Q    Have you seen the fee statements filed by the TCC's

20   professionals in this cse?

21   A    I've seen mine.  I don't know that I've seen anyone

22   else's.

23   Q    So you're not aware that the TCC's professionals have

24   billed the estate $2.4 million through February of this

25   case, are you?

1          MR. GOODMAN:  Objection, Your Honor.  First, this

2   case (indiscernible).  I'm just not sure how that's relevant

3   to any of the opinions he actually has testified on in this

4   case.

5          THE COURT:  What's the relevance, counsel?

6          MR. KAUFMAN:  The relevance is part of his

7   opinions in his report -- and maybe we didn't cover this on

8   Direct, but part of his opinions were the net -- the net

9   that would be distributable out of the settlement and we

10  made some assumptions.  We had a demonstrative and I'm

11  trying to understand what he expects the TCC to incur.

12         THE COURT:  Well, I'll allow a little bit of it.

13  I'll overrule the objection.

14         MR. KAUFMAN:  This is just one or two more

15  questions, then I'll be done.

16  BY MR. KAUFMAN:

17  Q    Are you aware that it's $2.4 million since February?

18  A    No.  I think I said I have not seen that.

19  Q    So you're not aware that the fees incurred from

20  November when the TCC was appointed through the end of

21  February is already more than the UCC's professionals billed

22  for all of last year?  You aware of that?

23  A    I'm not aware of that.

24  Q    We spent quite a bit of time in your deposition a

25  little over six, maybe seven hours about a month ago, right?

1  A    It was a long time.

2  Q    And you told me about your recent case experience,

3  *HonX*, *Water Gremlins, Kitty Whitaker, Purdue, Arrow, Boy*

4  *Scouts,* among others, right

5  A    Yes.

6  Q    But in your 30 years of working this restructuring

7  space, you don't actually have any experience with

8  divisional mergers under Texas law, do you?

9  A    I do not.

10 Q    So it's fair to say you've never valued claims arising

11 from a divisional merger?

12 A    No.

13 Q    It's not fair to say that?

14 A    No, I'm sorry.  I misunderstood your question.  Would

15 you ask it again?

16 Q    Is it fair to say that you've never valued causes of

17 action arising from a Texas divisional merger?

18 A    I have not.

19 Q    Did you hear Mr. Perry's testimony -- well, I guess let

20 me ask you this:  Have you attended the hearings so far int

21 his case, the first three days?

22 A    I have not.

23 Q    Have you read any transcripts from the hearings?

24 A    I have not.

25 Q    Have you spoken with anybody about what statements were

1  made on the record at those hearings?

2  A    I'm sure there were comments that I've heard, but you

3  know, it's one-off comments.

4  Q    Okay.  So would it surprise you to hear that Mr. Perry

5  testified on March 5th and again on Monday, three weeks

6  later, that about a quarter of the total 241 personal injury

7  claims were allocated to CHSTX under the divisional merger?

8  Would that surprise you?

9  A    That would surprise me, yes.

10  Q    So you dispute that?

11  A    I dispute that.  I'm confused -- I don't know

12  specifically what you're speaking about, but these are

13  claims against -- so these are claims against Corizon

14  because they -- are you saying that somehow the contracts

15  were assumed by YesCare?

16  Q    Have you read the plan of divisional merger?

17  A    I have, I have, but I'm trying to understand what

18  you're being specific about.

19  Q    You're familiar with the provisions of the Texas

20  divisional merger that say claims from these contracts that

21  are being allocated to YesCare, the claims go with the

22  contracts and YesCare is responsible for those tort claims.

23  Are you familiar with that?

24  A    I am, but I would thinkt that --

25  Q    And that covers 60 of the filed Proofs of Claim in this

1   case, right?

2   A    Yeah, but I don't know that I agree with what you're

3   saying.

4   Q    Because you've never dealt with the Texas divisional

5   merger?

6   A    No, based on what I've read in the doucments.

7   Q    Are you a lawyer?

8   A    I am not.

9   Q    And again, you don't have any experience reviewing

10  plans of divisional merger, do you?

11  A    I have not.

12  Q    Is it fair to say that TCC didn't ask you to opine on

13  how the divisional merger might have affected tort claimants

14  and their rights to pursue Defendants?

15  A    I don't think I opined on that, no.

16  Q    So for example, the two TCC members that you were asked

17  about on Direct, that the Debtor objected to -- that's Paris

18  Morgan and Elizabeth Frederick -- you have no opinion of

19  whether those claims are actually validly asserted against

20  the Debtor, do you?

21  A    I don't remember being asked about that on Direct.

22  Q    So that's a no, you weren't asked to opine?

23  A    I have no idea what you're talking about.

24  Q    So is it fair to say you're not offering opinions on

25  that?

1  A    I don't understand your question.  Maybe you can

2  rephrase it.

3  Q    Are you familiar -- do you know who Elizabeth Frederick

4  is?

5  A    Yes.

6  Q    Who is she?

7  A    She's a member of the Committee.

8  Q    Okay.  And she's filed a Proof of Claim in this case,

9  right?

10  A    That's my understanding, yes.

11  Q    Do you know what contracts, which facility her claim

12  arising from?

13  A    I do not.

14  Q    Would it surprise you to know it was Florida?

15  A    But I didn't know it would surprise me.  Anything would

16  surprise me.

17  Q    So if the Florida contract was allocated to YesCare,

18  CHSTX under the divisional merger and the plan of divisional

19  merger says any personal injury claims arising from those

20  allocated contracts goes to CHSTX, her claim would be

21  against that entity, right?

22  A    It sounds like a legal conclusion.

23  Q    And you're not offering any opinions on that?

24  A    I'm not, no  Sorry, now I get it.

25  Q    Thank you.

1    So I want to talk about what you are offering opinions

2  on and for the purposes of this exercise, your report is in

3  the white binder to your right, if you want to refer to it,

4  feel free.  This isn't a memory test.

5  A    Okay.

6  Q    But you talked about in your Direct that there were six

7  categories, six opinions that you were offering, right?

8  A    Yes.

9  Q    And so I want to quickly go through those and I will

10  cover it, we'll drill down as we go.

11    First, you were asked to opine on the potential claims

12  arising from the divisional merger, the 2022 Texas

13  divisional merger, right?

14  A    Yes.

15  Q    And ultimately your conclusion was you had no opinion

16  to offer because you have insufficient information, right?

17  A    That's fair.

18  Q    In fact, at the top of page 7 in your report, there's

19  in bold -- I think you commented on bold in your Direct,

20  "There is insufficient information to value the potential

21  avoidance actions arising out of the divisional merger."

22    Did I read that correctly?

23  A    Are you -- I'm confused about the --

24  Q    Page 7, in the middle of the page.

25  A    Oh, Page 7 of my report?

1   Q     Of your report.

2   A     Okay.  I was on -- in a different section.

3         Yes.  I see the heading, the headings are bolded, yes.

4   Q     Did I read it right?

5   A     I didn't comment on bold.

6   Q     There's insufficient of value --

7         THE COURT:  Hold on just a second.  You guys are

8   interrupting each other.

9         Go ahead and ask your question and I want you to

10  answer.

11  BY MR. KAUFMAN:

12  Q     At the top -- you see at the top of Page 7, maybe it's

13  in the middle?

14  A     I see it.

15  Q     It says, "There is insufficient information to value

16  the potential avoidance actions arising out of the

17  divisional merger."

18  A     I see that.

19  Q     Is that consistent with what your conclusion is?

20  A     Yes.

21  Q     So you're not offering any opinions about the value of

22  potential avoidance actions arising from the divisional

23  merger, are you?

24  A     Well, my opinion is there's insufficient information,

25  which I think is an opinion.

1  Q    And you're not aware of any -- well, strike that.  Let

2  me withdraw that.

3       The second opinion in your report that you covered in

4  Direct was you were asked to opine on whether the Debtor or

5  the UCC gave sufficient weight to successor liability and

6  alter ego theories, right?

7  A    Yes.

8  Q    And so we'll come back to this when I drill down, but

9  just as as quick aside, you would agree with me, wouldn't

10  you, that it's not uncommon to release those kinds of

11  theories in the context of a global settlement, right?

12  A    If they're paid for, yes.

13  Q    And in fact, you supported global releases in the

14  *Purdue* case and the *HonX* case, among others, right?

15  A    Because they were paid for.

16  Q    And you assumed that those were released?

17  A    I would assume so, yes.

18  Q    Third, you were asked to assess whether YesCare and the

19  other settlement parties have sufficient financial

20  wherewithal to pay a larger settlement for a larger

21  judgment, right?

22  A    Correct.

23  Q    And again, your report says you didn't have sufficient

24  information to do that, right?  That's on Page 17, if you

25  need to refer.

MICHAEL ATKINSON - CROSS BY MR. KAUFMAN                    244

1  A    That's my opinion is there's insufficient information

2  to know if they do.

3  Q    So for purposes of your opinions today, you've just

4  assumed for the analysis of successor liability and alter

5  ego theories, that they do, right?

6  A    Yes.  We requested --

7  Q    Just a yes or no question.  Mr. Goodman can ask you to

8  clean that up on Redirect.

9  A    Okay.

10 Q    As we discussed in your -- hold on, if contrary

11 information about the financial wherewithal of YesCare or

12 settlement parties comes to light, would you agree with me

13 that that just would reduce the value of those claims?

14 A    Verified financial information, or?

15 Q    If information -- financial information about YesCare

16 and the other settlement parties comes to light, if you

17 learn new information that says, oh, YesCare is just not

18 worth that much, all that would do is reduce the value of

19 these alter ego successory liability theories, wouldn't it?

20 A    Yeah, if I was able to confirm that, yes.

21 Q    Mr. Atkinson, have you heard any testimony -- I guess

22 you haven't.  Have you heard from anyone else about the

23 testimony in this case that the Debtor or the UCC discounted

24 the settlement value based on the settlement parties'

25 inability to pay?

1  A    I did not hear that related to the trial, no.

2  Q    Did you hear it anywhere else?

3  A    No, no.

4  Q    So the forth category in your report is that the Debtor

5  improperly estimated the range of tort claims in the

6  Disclosure Statement that was filed in October, right?

7  A    Yes.

8  Q    But that Disclosure Statement was filed before the

9  mediation in December, right?

10  A    Yes.

11  Q    And it was filed before you were hired by the TCC,

12  right?

13  A    Correct.

14  Q    And it was filed before you requested specific

15  information about this case, right?

16  A    Yes.  Because I was not hired before that.

17  Q    And that specific information is the ten-year analysis,

18  the ten-year payment history analysis that's summarized in

19  the Debtor UCC'S Exhibit 26 to your left there, if you want

20  to look at it.

21  A    That the Debtors didn't rely on in their Disclosure

22  Statement?

23  Q    Correct.

24  A    Okay.

25  Q    Because the Disclosure Statement was in October.  You

1   were hired in December, right?

2   A    But the data existed before that, right?

3   Q    Right.  And nobody is asking the Court to approve that

4   today, are they?

5   A    The Disclosure Statement?

6   Q    Correct.

7   A    It doesn't -- my understanding is it's not up for

8   approval.

9   Q    Okay.  Are you to say that you requested that ten-year

10  payment data?

11  A    I don't remember if it was ten years, but we'd

12  definitely look for payment data.

13  Q    And you -- I'm sorry.

14       You said in your Direct that you gave some input on the

15  information that the TCC was seeking from the Debtor, right?

16  A    I said that -- again, I just don't remember if we asked

17  for ten years or not.  I asked for settlement data.

18  Q    Now I'm talking about your testimony on Direct.  You

19  told Mr. Goodman that you gave input on what the TCC

20  requested from the Debtor.  Do you remember saying that?

21  A    That was, I think, a subpoena that would have been much

22  later than the data --

23  Q    Are you saying that you didn't give any input on the

24  Debtors or the UCC's request for this ten-year payment data?

25  It's a yes or no question.

1  A    The data that you're referring to was given to me by

2  the Debtor.  I sent a list of 42 things I wanted.  The

3  Debtor said there's a data room with 600,000 pages in it, so

4  I don't think they created the 600,000 pages based on me,

5  like, hours earlier asking for data.  So the data was

6  provided -- unrelated.

7  Q    Mr. Atkinson, can you turn to Exhibit 36 in the

8  notebook?

9  A    Which notebook.  I'm sorry.

10 Q    Volume II.

11          MR. GOODMAN:  Your Honor, I just -- can counsel

12 let the witness answer the question?

13          MR. KAUFMAN:  These are yes or no questions, Your

14 Honor, I want him to answer.

15          THE COURT:  Well, then you can move to strike, but

16 you've got to let him finish.

17          I'm not sure that last one was a yes or no.

18          MR. KAUFMAN:  And I misspoke, it's Exhibit 63.

19 BY MR. KAUFMAN:

20 Q    Let me know when you're there, sir.

21 A    I'm there now.

22 Q    We're talking about information you requested.  You

23 said you sent a list of 42 documents, right?

24 A    I did.

25 Q    And that's in this email chain, isn't it?

1          MR. KAUFMAN:  And for the Record, Your Honor, 63

2    is Docket No. 1410-63 and it's been admitted.

3          THE WITNESS:  Yes.  This includes that, yes.

4    BY MR. KAUFMAN:

5    Q    Okay.  And do you see at the top of the page, there's

6    an email from Ms. Webb who I think you mentioned on Direct.

7    A    Which page, just so I know.

8    Q    First page of Exhibit 63, Page 1 of 7 at the top.

9    A    Okay.  Got it.

10         Yes.  I see the email from Ms. Webb.

11   Q    Okay.  And that lists -- I can't count them here, but

12   probably close to a dozen, maybe more, of documents with

13   Bates labels all highly confidential, attorney's eyes only,

14   right?

15   A    Yes.

16   Q    And that included the ten-year payment history that

17   we're talking about now, isn't it?

18   A    Yeah, all I was saying is I don't know if it was -- if

19   I asked for ten years.  I did ask for payment data, yes.

20   Q    And you got it, right?

21   A    I did, yes.

22   Q    On December 28th?

23   A    Yes.

24   Q    Which was nine days after you were hired?

25   A    Correct.

1   Q    Three days after Christmas?

2   A    Three days after Christmas, yes.

3   Q    The fifth category in your -- that you talked about on

4   Direct was that the ulta plan that's not before the Court

5   anymore, unfairly allocated estate assets between the tort

6   claimants and the non-tort claimants, right?

7   A    Yes.

8   Q    And finally, the sixth category is that the Debtor is

9   not operating, right, which was never in dispute?

10  A    That's what you told me, yes.

11  Q    So in your deposition, I asked if you intended to offer

12  any opinions or testimony beyond those six categories.  Do

13  you recall?

14  A    I recall you asking me that, yes.

15  Q    You said, no, you weren't aware of any, right?

16  A    I said I was not aware of any at the time, yes.

17  Q    So let's talk about what's not in your report.  First,

18  there's an appendix to your report, right?

19  A    Yes.

20  Q    And I think you talked about this on Direct, the

21  appendix is what you relied upon for the opinions in your

22  report, right?

23  A    There are things that I considered, yeah.  I mean, I

24  relied -- I think we talked about this in my deposition.  I

25  relied on my experience, as well.

1   Q      Understood.

2   A      Yeah.

3   Q      But specific documents pertaining to this case, if you

4   didn't cite it in your report, then you just didn't rely on

5   it, or you didn't find it relevant to your opinion, right?

6   A      I think I tried to list the things that I relied upon,

7   yes.

8   Q      Okay.  Do you remember saying -- and this is -- if you

9   want to look at the small binder on Tab B, it has your

10  deposition.  Let's look specifically at Page 53.

11         Tell me when you're there.

12  A      I am there.

13  Q      Starting on Line 3, see, I asked you:

14         "Question:  Okay.  Did you review documents other than

15  what's in the appendix?

16         "Answer:  I'm sure I did, yes.

17         "Question:  Okay.  So is it fair to assume that if you

18  reviewed it, but didn't put it in your appendix, you decided

19  that you didn't need to rely upon that document.  Is that

20  fair?"

21         Mr. Moxley objected and you answered:

22         "It wasn't something that made its way into my report

23  and so it's not something I relied on for the opinions I

24  have."

25         Does that refresh your recollection?

1    A     Yes.

2    Q     Is that still accurate?

3    A     Yeah.  I mean, I think I said before that, that the

4    spirit of what I was trying to capture was everything that

5    was in my report, so that was the goal.

6    Q     My question was:  Is what you said in this excerpt

7    right here that I just read to you, was that accurate at the

8    time?  You were under oath then, you're under oath now.

9    A     Yeah, it's related -- the whole thing is related to

10   each other, but yes.

11   Q     Okay.  So two key documents that you didn't cite in

12   your appendix to your report were, one, Exhibit No. 26 and

13   the underlying ten-year payment data, right?

14   A     Yes.  I agree with that.

15   Q     You didn't put it in your report?

16   A     Did not.

17   Q     And another thing you didn't put in your report -- and

18   we'll talk about this a little more in a few moments -- is

19   the contract profitability, or the profitability by contract

20   that the Debtor produced to you.  And that's admitted as

21   Debtor UCC Exhibit 73, right?

22   A     Correct.

23   Q     I think you told me last month that your analysis also

24   didn't take into account other sources or recovery that may

25   be available for tort claimants, like insurance, right?  Do

1   you remember that?

2   A    I don't remember that.  I don't know the context, but I

3   definitely have the insurance listed as -- in my report.

4   Q    Sure, but I asked you about this and let's turn to

5   Page 151 of your deposition.

6   A    Okay.

7   Q    This is going to be a long excerpt, so get ready.

8   A    Okay.  I'm getting there.

9   Q    It starts on Page 21.

10  A    151, you said?

11  Q    151, Line 21:

12       "Question:  Well you said you reviewed the Disclosure

13  Statement, right?

14       "Answer:  I did.

15       "Question:  Okay.  And the Disclosure Statement

16  discloses the availability of other assets, such as

17  insurance, employee retention credits, causes of action that

18  are not being released.  Do you see that?

19       "Answer:  Yes.

20       "Question:  Do you have any reason to dispute that

21  those are accurate disclosures?

22       "Answer:  That they exist you mean, that those causes

23  of action exist?

24       "Question:  That those other assets are available for

25  recovery to creditors?

1        "Answer:  I'm aware they exist, yes.

2        "Question:  Okay.  You haven't done an assessment of

3   the value of those other causes of action, other assets and

4   insurance?

5        "Answer:  I have not."

6        And skip down -- well, let me stop there.  Does that

7   refresh your recollection?

8   A    Yes.

9   Q    Okay.  Now turn to Page 303 because this came up again

10  a couple of hours later.

11       And look at Line 9:

12       "Question:  Those are tax credits, the insurance

13  policies and other lawsuits, right?

14       "Answer:  Yes.  That's my understanding.

15       "Question:  14, do you intend to offer any opinions or

16  testimony on the value of those assets?

17       "Answer:  I do not.

18       "Question:  And just to make sure I understood you

19  correctly, you have not analyzed the insurance policies that

20  are available to creditors in this case?

21       "Answer:  I have not."

22       Does that refresh your recollection?

23  A    Sure.

24  Q    So let me ask my question again.  Your analysis does

25  not include or does not take into account sources of

1  recovery for creditors, like insurance, right?

2  A    I disagree with that.  I think that you're

3  mischaracterizing what I said.  What I -- can I respond, or?

4  Q    I think Mr. Goodman can ask you to clean this up on

5  Redirect.

6  A    Okay.  That's fine.

7  Q    So I just want to be clear on what's in your -- what

8  actually is in your opinions.  You're not offering

9  evaluation of the tort claims filed in this case, right?

10  A    That's correct.

11  Q    But you are an expert in that area, right?

12  A    I am.

13  Q    And you're not able to offer opinions on the value of

14  the claims arising from the divisional merger, right?

15  A    I don't have information to do that.

16  Q    So no, you're not offering opinions?

17  A    I'm not.

18  Q    And you're not able to offer opinions on the value of

19  other avoidance actions, right?  Fraudulent transfers?  We

20  talked about this.

21  A    That's correct.

22  Q    And you're not able to offer opinions on the value or

23  the financial wherewithal of the YesCare and other

24  settlement parties, are you?

25  A    I don't have information to do that.

1  Q     So you're not offering those opinions?

2  A     I'm not.

3  Q     And you're not offering any opinions as to what a fair

4  settlement amount should be in this case, are you?

5  A     I don't have information to do that, so no.

6  Q     Again, the answer is no?

7  A     No.

8  Q     I want to cover one thing you did talk about in your

9  Direct because it's in -- as we found out, it is in your

10 report -- and that's the topic of the equitization of the M2

11 debt.  Do you recall that testimony?

12 A     I do.

13 Q     You relied on Mr. Dundon's deposition for purposes of

14 that analysis, right?

15 A     I did.  Everything happened in mediation, so I didn't

16 know what happened.

17 Q     Okay.  Do you understand that is hotly contested by M2,

18 the equitization and recharacterization of its debt?

19 A     I don't know the answer to that.

20 Q     You don't know, so you just assume that Mr. Dundon was

21 correct in his analysis, right?

22 A     That was my only data point.

23 Q     If you stuck around until Mr. Dundon testifies, you

24 might hear that he understands that was hotly contested and

25 up for dispute, right?

1          MR. GOODMAN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    BY MR. KAUFMAN:

4    Q    Since you issued your report on February 23rd, nothing

5    new has been produced, right?

6    A    Not that I'm aware of.  I don't think so, no.

7    Q    So let's drill down onto the topics of your analysis.

8    First I want to talk -- we're going to go out of order a

9    little bit.  I want to talk about the tort claim valuations

10   first.

11         For the Record, you did review that ten-year history

12   that the Debtor produced to you on December 28th, right?

13   A    I did.

14   Q    And you said -- I think you told me you tried to make

15   sense of it, right?

16   A    I don't remember what I said.  I did review the data

17   and I saw that it was inconsistent.  So --

18   Q    And you told me you didn't generate any specific output

19   after reviewing and trying to analyze that data, right?

20   A    I did not.

21   Q    Okay.  And you didn't cite it in your report.  We

22   covered this, right?

23   A    I did not.

24   Q    And you didn't engage with Mr. Perry to get an

25   understanding of what this data captured, right?

1  A    I had his Disclosure Statement estimate -- he didn't

2  rely on it, either.

3  Q    Right.  He didn't rely on it in the October Disclosure

4  Statement, but after you received these data points in

5  December, you told me, you tried to make sense of it,

6  couldn't, and didn't even both to call the Debtor and see

7  how they could make sense of it for you, right?

8  A    Well, the Debtor hadn't.  I didn't -- they literally --

9  Q    Yes or no question.  Did you or did you not contact

10  Mr. Perry to try to make sense of it?

11  A    I did not.

12  Q    And in fact, that's actually because you didn't even

13  realize you had that data until February; is that right?

14  A    That's not true.

15  Q    Okay.  Let's turn to Page 271 of your deposition.

16       Starting on line 19.  Let me know when you're there.

17  A    Go ahead.

18  Q    "Question:  Did you ask for a meeting with the Debtor's

19  representatives to better understand the historical payments

20  in the spreadsheet you referenced?

21       "Answer:  I think that unfortunately the Excel file I

22  got was after the pivot had occurred.  I don't, you know,

23  thre was some mix-up, I think, early on where people thought

24  we had the documents we didn't have, and I believe the Excel

25  file -- don't hold me to this, but my memory is that we

1  didn't get it until February 3rd or 5th, or something like

2  that."

3        Right?

4  A    I said don't hold me to this.  And I was wrong.

5  Clearly I got it earlier.

6  Q    In December.

7  A    And I reviewed it earlier.

8  Q    And the pivot you're talking about is when the TCC

9  filed its motion to dismiss and when the Debtor and UCC

10 filed their 9019, right?

11 A    In the 9019.

12 Q    About mid-January?

13 A    Yes.

14 Q    So you had a full 2-1/2 weeks by the time you were

15 hired to engage with the Debtor on this point, but you

16 didn't?

17 A    Over the holidays, yes.

18 Q    Well, I think we talked about you got the data three

19 days after Christmas, right?

20 A    The 27th.

21 Q    You were sending emails to the Debtor in that time,

22 weren't you?

23 A    Yeah, on this January 2nd, I sent an email about stuff

24 I was still missing.

25 Q    Okay.  But you didn't ask for a call with Mr. Perry,

1  did you?

2  A    I did not, no.

3  Q    And you said this in your Direct, I think you

4  characterized the ten-year payment data as "widespread,"

5  right?

6  A    (No audible response.)

7  Q    Those are the words I wrote down in your testimony.

8  You didn't remember saying "widespread?"

9  A    If you give me a second to respond, I'd love to do

10 that.  I'm sorry.

11 Q    Sorry, you looked like you were thinking and I was

12 trying to help you remember.

13 A    I was not.  I don't -- appreciate though.

14     I was -- when -- I'm just trying to make sure I

15 understand the context of what you're asking me.  So when I

16 looked at the claimant data --

17 Q    I'm just asking if you used the word "widespread."

18 A    Can I answer your question?

19 Q    Yeah, my question was:  Did you use the word

20 "widespread?"

21 A    Well, I don't recall what I said specific.

22 Q    And do you remember using the words "massively

23 different" or "wildly diverse" when I asked you about this

24 in your deposition?

25 A    I'm sure I did.

1  Q    So you discounted the ten-year payment history, right?

2  A    I did not think the ten-year payment history was

3  helpful for estimating the claims in this case.

4  Q    So you discounted it?

5  A    I did, just like the Debtor did.

6  Q    Well, again, we talked about this.  You didn't

7  ask -- the ten-year payment history didn't come to you until

8  you asked for this after you were hired in December, right?

9  A    Yeah, the ten-year --

10 Q    So you understand the Debtor doesn't --

11          MR. GOODMAN:  Your Honor?

12          MR. KAUFMAN:  It's a yes or no question.  He gave

13 me a yes, and I --

14          THE COURT:  You're cutting him off, right, and

15 then you're not really phrasing them like yes or no

16 questions.  There's a -- you're kind of leaving the door

17 open.  You want to tighten the question up.  You can get

18 there, but you're not.  But you can't cut him off after he

19 starts.

20          In other words, saying stuff like, "So you didn't

21 really do that, did you?  That kind of opens the door to me

22 to say all kind of stuff that I did or didn't do.  You can

23 get there on a yes or no.  It's just not there yet.

24          MR. KAUFMAN:  All right.  Let's try this -- let's

25 try this again, apologies.

1  BY MR. KAUFMAN:

2  Q    I think you characterized it this way, so correct me if

3  I'm not saying this right.

4       What was in the Disclosure Statement was not specific

5  to this case, right, as it relates to the tort claims?

6  A    I don't agree with that.

7  Q    You don't agree that the Disclosure Statement

8  estimation of tort claims was not specific to this case

9  based -- because it was based on a public database?

10 A    I don't even understand how to respond to that.  You're

11 saying the Debtor's Disclosure Statement for this case and

12 the estimates the Debtor put together do not relate to this

13 case?

14 Q    I'm using your words.  And we can look at your

15 deposition if you want to.

16 A    No.  I'm just trying to understand what you're asking

17 me.  Are you telling me that I said that or are you telling

18 me -- you're asking me a question?

19 Q    The ten-year data that you requested --

20 A    Okay.

21 Q    -- and got is specific to this case because it concerns

22 payment data that the Debtor had made historically, right?

23 A    It was settlement data the Debtor made, yes.

24 Q    But specific to this case.

25 A    Yes.

1  Q    But the claims estimation that was given in the

2  liquidation analysis from October is not specific to this

3  case because it was based on -- I think you talked about

4  this on your direct, it was just using public information

5  and projecting it out based on the number of tort claims in

6  this case.

7  A    It was based on the number of claims in this case but

8  the per claim amount was not in this case.

9  Q    So you would agree with me that between the two, the

10  public information in the government database or the

11  Debtor's ten-year history, one's specific, one's not, so the

12  specific one, the ten-year payment history, would be a

13  better way to --

14  A    No, I --

15  Q    -- assess claims.

16  A    -- completely disagree with that.

17  Q    You think the public information in the database would

18  be better.

19  A    I don't know that which is better but I don't agree

20  that one is better than the other.

21  Q    Well one gives a higher valuation for claims, right?

22  A    One includes judgments and one does not.

23  Q    You're saying this ten-year specific payment history

24  doesn't include judgments against the Debtor.

25  A    I don't believe there are judgments --

1  Q    You don't know that, though, do you?

2  A    I don't believe there was.

3  Q    You don't believe but you don't know that, do you?

4  A    I don't know that, no.

5       (Pause in the proceedings.)

6  Q    You would -- you'd consider yourself an expert in the

7  area of value and tort claims in mass tort cases, right?

8  A    Yes.

9  Q    In fact that's why you were hired in this case, right?

10 A    It's one of the reasons, yes.

11 Q    But the TCC didn't ask you to do that work, did they?

12           MR. GOODMAN:  Objection, Your Honor.  I think

13 that's false.

14           THE COURT:  No, I think he can answer.

15           MR. GOODMAN:  Okay.

16 BY MR. KAUFMAN:

17 A    I think they anticipated me doing that work, yes.

18 Q    But then you didn't that work, did you?

19 A    I didn't have information to do that work.

20 Q    So that's a no.

21 A    I tried to but I didn't have the information to do it.

22 Q    I'm so glad you used that word.  Are you a Star Wars

23 fan?

24 A    Star Wars, no.

25 Q    So you don't know the famous Yoda saying, do or do not,

1   there is no try, you're not familiar with that.

2   A    I have no idea what you're talking about.

3          MR. GOODMAN:  Objection, Your Honor, I'm not sure

4   the relevance of that.

5   Q    You didn't do it, though, did you?

6   A    I couldn't do it.  I didn't have sufficient information

7   or time.

8   Q    Well, and I have to quibble with you.  You said they --

9   the TCC expected you to do that work, right?  That's what

10  you just said.

11  A    It was one of the things that when I pitched the case

12  that I was entasked to try to do.

13  Q    And when I asked you about this last month, you told me

14  they didn't ask you to do that; you remember that?

15  A    I don't recall that, no.

16  Q    Let's look at page 27 of your deposition, start at line

17  ten.

18          "QUESTION:  Have you been hired as a claims expert

19          in this case?

20          "ANSWER:  I've not been asked as of yet to do

21          that.  So, no, it's certainly something that I

22          could do if needed.

23          "QUESTION:  Do you intend to offer a claims expert

24          analysis in this case?

25          "ANSWER:  Only insofar as what's in my report,

1              that would be my answer."

2    You remember that?

3    A    Yes.

4    Q    And there's no claims valuation in your report other

5    than an upward adjustment of the Debtor's debt.

6    A    Because I didn't have information to do it.

7    Q    It's just a yes or no question, right?

8    A    No, I don't know which -- you want to --

9    Q    You didn't do a claims analysis for purposes of this

10   case, did you?

11   A    I did not.

12   Q    Even -- you didn't do a claims analysis in this case

13   even though, as you characterized on direct, 240 tort claims

14   is a manageable size, right?

15   A    Yes, I believe it's a manageable size, yes.

16   Q    It's much more manageable than in your other cases like

17   *Purdue* and *Boy Scouts*, right?

18   A    Most of them, yes.

19   Q    You said a claim pool of this limited size, 240, you

20   would want to do things like interview some of the

21   claimants, maybe get a medical examiner, right?

22   A    Yes.

23   Q    But you didn't do that in this case, did you?

24   A    I didn't have time.

25   Q    You didn't have time.

1   A     No.

2   Q     How long would it take?

3   A     More than the two weeks I had to do my report.

4   Q     Did you do a sampling?

5   A     No.

6   Q     You have six tort claimant committee -- six tort

7   claimants on your committee, right?

8   A     We do.

9   Q     Did you interview any of them?

10  A     I did not.

11  Q     The motion also references Ms. Grisham, Mr. Hall, a few

12  others; did you interview any of them?

13  A     No.

14  Q     Did you interview any of the incarcerated pro se

15  claimants?

16  A     I did not.

17  Q     You didn't interview anyone, did you?

18  A     I did not.

19  Q     I just asked you about the pro se incarcerated

20  individuals.  You realize that that represents over half of

21  your claim pool, right?

22  A     The -- of the 240 you're saying.

23  Q     Yes.

24  A     Yes.

25  Q     You didn't interview a single one, did you?

1   A    I did not.

2   Q    No one on your team did either, did they?

3   A    We did not.

4   Q    And you didn't review any other proofs of claim either,

5   did you?

6   A    We reviewed proofs of claim.

7   Q    Did you review the underlying pleadings in their

8   lawsuits?

9   A    I didn't personally but I'm sure people on my team did.

10  Q    I need you to turn to page 228 of your deposition.

11  A    Sure.

12  Q    Because you gave me a different answer last month.

13  A    Okay.

14  Q    At line 18 I asked, do you intend to review these

15  claims and the pleadings filed in the underlying lawsuits

16  between now and your testimony in this hearing?  Answer:  I

17  don't believe so, no.

18       Did you change your answer after we spoke a month ago?

19  A    No.

20  Q    You read the TCC's motion to dismiss, right?

21  A    I did.

22  Q    Let's turn to a new topic.  You spent quite a bit of

23  time talking about valuing successor liabilities and alter

24  ego theories on your direct; do you recall that?

25  A    I do.  I remember talking about that.

1    Q    Your contention is that the Debtor and the UCC gave

2    insufficient or no weight to alter ego or successor

3    liability theories, right?

4    A    That's my view, yes.

5    Q    And that's -- your assessment in that regard is based

6    at least in part on your view that the 9019 motion doesn't

7    even mention the world alter ego, right?

8    A    That's one of the things, yeah.

9    Q    And you also contend that the 9019 motion doesn't list

10   successor liability theories in the bullet points in that

11   infamous paragraph 27 that we keep putting up on the board,

12   right?

13   A    It's not in the beginning, yes.

14   Q    I'm sorry?

15   A    It's not in the beginning of that 9019, no.

16   Q    It's not in that bullet-pointed list, right?

17   A    Correct, yeah.

18   Q    But it is mentioned later, right?

19   A    Yeah, paragraph 42 or something --

20   Q    And it is listed specifically in the settlement

21   agreement, right?

22   A    As a release I think, yeah.

23   Q    We talked about the *Purdue* case briefly; you remember

24   you said you submitted a declaration in support of the

25   *Purdue* settlement and confirmation of the plan in *Purdue*.

1   A     I do.

2   Q     And your declaration, you might want to pull this up,

3   it's behind tab A in that little binder next to your

4   deposition.  That declaration was submitted under penalty of

5   perjury, right?

6   A     Correct.

7   Q     And you attached a letter to your declaration, right?

8   A     Yes.

9   Q     And in paragraph 26 of your declaration, so this is on

10  page nine of 37 at the top -- at the docket -- the date the

11  Court file-stamped.

12  A     Okay.

13  Q     You with me.

14  A     Yes.

15  Q     You say, I believe that the official committee's view

16  of the plan is accurately set forth in the attached UCC

17  letter; you see that?

18  A     I see that.

19  Q     Okay.  So would you say that you were adopting the

20  statements of the UCC letter in your declaration?

21  A     (No audible response.)

22  Q     Why else would you attach it if you weren't adopting

23  the statements in the letter?

24  A     Are you asking me two different questions?  Yes, I

25  agree with that.

1  Q    Let's turn to page 30 of the UCC -- 30 of your

2  declaration which now gets into the UCC letter.  You with

3  me.

4  A    I'm confused about what document you have me looking

5  at.

6  Q    Oh, I'm looking at your declaration.

7  A    In my declaration, yeah.  This --

8  Q    No, no, your *Purdue* declaration you have.

9  A    Oh, my *Purdue* one, okay, sorry.

10 Q    Yes.  So for the record, this was filed in the *Purdue*

11 case, which is 19-23649, docket number 3460; do you see that

12 at the top?

13 A    I do.

14 Q    And then I'm looking at page 30 of 37; are you with me?

15 A    Yeah, I am now.

16 Q    Let's look at the paragraph, the second full paragraph

17 right above section seven, the one that starts to be clear;

18 do you see that?

19 A    (No audible response.)

20 Q    You see where --

21 A    Yeah.  Okay.

22 Q    You with me.  You say, to be clear, the UCC does not

23 believe the Sacklers' settlement reflects the full value of

24 the claims against the Sacklers and related parties before

25 taking these -- taking other factors into account.

1      Moreover, the UCC acknowledges that many creditors,

2  including those who have suffered the most harm as a result

3  of the Sacklers role in the opioid crisis, may view the

4  proposed Sackler settlement unfavorably.

5      Indeed, the UCC understands why certain creditors

6  believe the Sacklers should be forced to give up more, if

7  not all, of their wealth in exchange for the releases

8  proposed under the plan.

9      Notwithstanding the foregoing -- and this is what I

10 mentioned earlier -- the UCC views the Sacklers settlement

11 as an imperfect solution that nevertheless is superior to

12 any other available alternatives for the majority of

13 Purdue's creditors.  Do you remember adopting that statement

14 in --

15 A    I do.

16 Q    -- the *Purdue* case?

17 A    I do.

18 Q    And that released alter ego theories and successor

19 liability theories, right?

20 A    I believe it did.

21 Q    And alter ego theories in the Sackler context were

22 front and center on the UCC's mind, right?

23 A    It was why we got $7 billion, or should be getting $7

24 billion.

25 Q    So turn to me a few pages to page 34 of 37 at the top.

1  You with me?

2  A    I am.

3  Q    Let's look at section D, the one that says the plan

4  represents a reasonable resolution of claims against the

5  Sacklers and related parties; do you see that section?

6  A    Yes.

7  Q    And there's a chart there, right?

8  A    Yes.

9  Q    Four rows on that chart, right?

10  A    Yes.

11  Q    Just like four bullet points in paragraph 27 of the

12  9019 motion; you see that?

13  A    Yes.

14  Q    I see intentional fraudulent conveyances, constructive

15  fraudulent conveyances, breach of fiduciary duty, and unjust

16  enrichment.  That's all that's listed in that chart, right?

17  A    Correct.

18  Q    Doesn't say anything about alter ego theories, does it?

19  A    Yeah, the main --

20  Q    A yes or no question.

21  A    You can --

22  Q    Mr. Goodman --

23  A    (Indiscernible).

24  Q    Mr. Goodman --

25  A    Can I correct --

1   Q    -- will ask you on Redirect to clean this up.  It's a

2   yes or no question.  Does it say the word alter ego theories

3   in there?

4   A    I do not see it.

5   Q    Thank you.  And just so we're clear, you don't take the

6   position that the absence of the word alter ego theory or

7   successor liability theory from that chart on page 34 of

8   your declaration in the *Purdue* case means that the UCC

9   ignored or gave insufficient weight to those theories in

10  that case, do you?

11  A    We weren't focused on those theories in that case.

12  Q    You weren't focused on alter ego theories in *Purdue*.

13  A    No, we were not focused on alter ego theories, no.

14  Q    You weren't.  I just want to make sure I heard you

15  right.  The UCC was not focused on alter ego theories in the

16  *Purdue* case.

17  A    We were focused on the fraudulent conveyances.

18  Q    I thought you just told me that the reason you got $7

19  billion was because you were focused on alter ego theories.

20  Did I mishear you?

21  A    I misspoke earlier.

22  Q    But you do take the position in this case that because

23  the word's alter ego or successor liability theory don't

24  appear on that bullet point list on paragraph seven -- 27 of

25  the UCC in the Debtor's joint motion, they must have given

1  insufficient weight in this case; is that your position?

2  A    Correct.

3  Q    And again you would agree with me that it's not

4  uncommon to release those theories in the context of a

5  global settlement, right?

6  A    Global settlement means global so everything's

7  released.

8  Q    So that's a yes?

9  A    Yes.

10  Q    In fact, you supported such a settlement in the *Hoenig*

11  case, right?

12  A    Yes.

13  Q    And you supported it in that *Purdue* case, right?

14  A    Yes.

15  Q    And when I asked you about your experience assessing

16  the merits of alter ego and successor liability theories

17  before, you couldn't give me a single example of a court

18  accepting your testimony on those theories, could you?

19  A    I don't think so, no.

20  Q    We spent eight hours on the record in your deposition,

21  right?

22  A    We didn't talk about that for eight hours but yes.

23  Q    That's fair, we didn't talk about it for eight hours.

24  But we did spend quite a bit of time talking about that; is

25  that fair?

1   A    Yes.

2   Q    And similarly in all this time we spent talking about

3   alter ego theories and successor liability theories, in your

4   deposition you didn't give me a single example of a case

5   where you actually litigated alter ego or successor

6   liability theories to a successful judgment, did you?

7   A    We did not litigate it, no.  They were settled.

8   Q    In your 30 years of experience in this industry, not

9   one case was litigated to judgment on those theories.

10  A    None that I was involved in.

11  Q    Let's talk about how you value those theories, even

12  though you don't have experience litigating them to

13  judgment.  You said that you start with the financial

14  wherewithal of the targets, right?

15  A    I think I -- well, I don't know if I said that in my

16  deposition.  I said today is something different than that.

17  Q    You did.  You actually said two different things in

18  your deposition; do you remember?

19  A    I have no idea what --

20  Q    Today you said a third thing.  So I want to understand

21  where we actually start with assessing it.  Where do you

22  think we start with assessing the merits and the value of

23  successor liability and alter ego theories?

24  A    Today I said that we start with the value of the claims

25  in the case.

1   Q     The tort claims.

2   A     The tort -- well, both tort and the GUC claims.

3   Q     Okay.  And when I asked you this in your deposition,

4   you said you start with the financial wherewithal of the

5   target, right?

6   A     I may have said that.  It's -- all three things are

7   important so I don't know that which matters the most.  But

8   I would think now that you would want to start with the

9   claims if I was going to tell you what you would do.

10  Q     Okay.  And again I've heard three -- you said three

11  things right?  Just now.

12  A     I said three things just now.

13  Q     Okay.  What's the third thing?

14  A     The third is how good are your claims.

15  Q     How good the theories are.

16  A     Well, the support for the theories.

17  Q     Okay.  We're going to come back to that.  But you

18  assumed for purposes of your report and your testimony today

19  that alter ego and successor liability theories are strong

20  in this case, right?

21  A     I believe so, yes.

22  Q     Let's just talk about it now.  And that's based on some

23  emails that you read, right?  In part at least.

24  A     In part, yes.

25  Q     And the other part of it is that one opinion that

1   counsel told you to read, right?

2   A     That would be another reason, yes.

3   Q     Anything else?  I asked you about this in your

4   deposition.  You said that was it, right?

5   A     I don't know what I said in my deposition.  You want to

6   show me, I'm happy to look at it.

7   Q     Would you agree with me that that's -- that was the

8   entirety of your analysis.  The strength of the opinions are

9   the emails you read and the opinion you read, right?

10  A     There were a lot of emails I read but yes.

11  Q     Okay.  But still those two broad categories, the emails

12  you read and the *Kelley* decision that we talked about,

13  right?

14  A     Yes.

15  Q     Okay.  And so you assumed based on what counsel told

16  you about the *Kelley* opinion that that lends support to

17  successor liability theories in this case, right?

18  A     Just related to that opinion, yes, I relied on counsel

19  for that opinion.

20  Q     We have to talk about the merits of the case, right,

21  the merits of successor liability or alter ego theories as

22  legal theories, right?

23  A     Yes.

24  Q     And you're not a lawyer.

25  A     I am not.

1  Q     So you don't have an understanding of what that *Kelley*

2  decision says outside of what counsel told you that it says,

3  right?

4  A     That's fair.

5  Q     And other than that one *Kelley* decision that we've

6  talked about, you weren't here but we've mentioned this

7  every day of trial.  Other than that one decision, you're

8  not aware of any definitive legal authorities that lends

9  support to the strength of successor liability or alter ego

10 theories that would apply in this case, are you?

11             MR. GOODMAN:  Your Honor, I think counsel --

12 objection.  I think counsel has just established for, I

13 don't know, third or fourth time that Mr. Atkinson's not a

14 lawyer and is not offering a legal opinion --

15             MR. KAUFMAN:  This is a different --

16             MR. GOODMAN:  He's asking him questions about

17 legal research, and I don't see how that's relevant.

18             MR. KAUFMAN:  It's a different question.

19             THE COURT:  I'll allow it.

20             MR. KAUFMAN:  Do you need me to re-ask,

21 Mr. Atkinson?

22             THE WITNESS:  If you don't mind.

23             MR. KAUFMAN:  Not a problem.

24 BY MR. KAUFMAN:

25 Q     You're not aware of any legal, definitive legal

1  authorities in general -- let me withdraw that and start

2  fresh.

3       You're not aware of any definitive legal theories that

4  lend support to the strength of successor liability or alter

5  ego theories that would apply in this case, are you?

6  A    I'm not a lawyer so no.

7  Q    Right.  And you told me that to give opinions on the

8  merits of successor liability or alter ego theories in the

9  context of this settlement, you would need to know the law

10 on those theories, right?

11 A    I would think so, yes.

12 Q    But you don't know.

13 A    I'm not a lawyer.

14 Q    So you don't know, right?

15 A    I'm not a lawyer so no.

16 Q    No, you don't know.  I just need a clear answer.

17 A    No.

18       (Pause in the proceedings.)

19 Q    Let's turn to a different -- slightly different matter.

20 You didn't try to value any estate causes of action in this

21 case, right?

22 A    I tried to value the -- yeah, I did try to.

23 Q    You're saying now that you tried to value estate causes

24 of action.

25 A    I tried to value the divisional merger.

1  Q    Okay.  Get that notebook back out.  We got to go back

2  through it.  All right, page 292, let's go to line 18.  Oh,

3  sorry, I need to go back a little bit.  Page 292, starting

4  on line eight.

5           "QUESTION:  And what about valuation of estate

6           causes of action, was that something that TCC

7           asked you to do.

8           "ANSWER:  I think I looked at that and considered

9           that it's a -- you know, it's speculative

10          litigation.  My experience is it's very difficult

11          to value those things.  So that's my opinion.  I

12          don't think it's something that -- it's not

13          something that I tried to do.  And I don't think

14          it's frankly something that's easily done or

15          really at all well."

16 You remember that statement, you didn't try to do it?

17 A    I don't even understand what I'm responding to in

18 reading this so I've no idea.

19 Q    Well, the question's right there on line eight through

20 ten.  What about valuation of estate causes of action, was

21 that something that TCC asked you to do?  And you didn't ask

22 me to clarify that then, did you?

23 A    I didn't.  But I -- as I sit here now, I don't know

24 what the estate causes of action are.

25 Q    Okay.  Then so you're not offering any opinions on

1   that, are you?

2   A    I don't know which cause of action you're referring to.

3   Q    Estate causes of action, that's my question.

4   A    I don't know which one specifically.

5   Q    Ones that are being settled in this case.  You didn't

6   value those, did you?

7   A    I tried to value the divisional merger.  I did not

8   have --

9   Q    But you told me a month ago you didn't try --

10  A    My expert reports --

11  Q    -- because it was too speculative.

12  A    -- literally says I tried to and I didn't have

13  sufficient information to do it so I did not do it.

14  Q    Let's quickly go back to that *Kelley* decision.  You

15  said you don't have an -- you didn't have an understanding

16  of what that *Kelley* opinion says other than what you

17  discussed with counsel, right?

18  A    I think that's fair.

19  Q    But you did tell me that the *Kelley* decision is just

20  one court considering the specific facts before it, right?

21  Do you remember telling me that?

22  A    Yes.

23  Q    And you don't know if any other tort claimants in this

24  bankruptcy case have actually asserted alter ego or

25  successor liability theories in their lawsuits, do you?

1  Other than Mr. *Kelley*.

2  A    I'm not aware.

3  Q    Are you aware that fewer than five tort claimants,

4  including Mr. *Kelley*, have actually tried to assert alter

5  ego and successor liability theories in their lawsuits?

6           MR. GOODMAN:  Objection, Your Honor, asked and

7  answered.

8           THE COURT:  Overruled.

9  BY MR. KAUFMAN:

10 A    I'm not aware.

11 Q    But in your report -- and I think you talked about this

12 in your direct testimony -- you say that you would expect

13 any settlement of those theories, successor liability and

14 alter ego, to pay tort claimants in full or close to in

15 full, right?  That's at the bottom of paragraph three of

16 your report if you need to refresh your recollection.

17 A    Yes.

18 Q    Top of page five.

19 A    Yes.

20 Q    And that statement is caveat -- has two very big

21 caveats, doesn't it?

22 A    It does.

23 Q    Okay.  First, you've assumed that YesCare and the

24 settlement parties can pay any amount, right?

25 A    Yeah, that's correct.

1   Q     And, two, you didn't discount the litigation risks, did

2   you?

3   A     Not in that analysis, no.

4   Q     Because you're not a lawyer.

5   A     I am not a lawyer, correct.

6   Q     And you also didn't factor in litigation risk as a

7   discount because you haven't been involved in the case long

8   enough, right?

9   A     (No audible response.)

10  Q     I can cite you the deposition if you'd like to

11  refresh --

12  A     Well, I'm sure --

13  Q     -- your recollection.

14  A     -- I don't know the context but I'm sure I said that.

15  Q     Let's -- let me help you refresh your recollection.

16  Look --

17  A     Okay.

18  Q     -- at page 363.

19  A     Okay.

20  Q     Line six.

21  A     Okay.

22  Q     Start on line four.  You said, I've not adjusted for

23  litigation risk.

24  A     Okay.

25  Q     My question was, I understand that, I'm trying to

1  understand why, why not.  Answer:  Well, I mean, I think the

2  reality is we've only been in this case for a very short

3  period of time and we did not put together the sort of

4  document discovery that was done here.  But based on the

5  limited discovery that we've had access to, it seems like

6  the claims are pretty strong.  You see that?

7  A    Yes.

8  Q    But again your assumption that the claims are strong

9  are based on that one *Kelley* decision, right?  And some

10  emails.

11  A    Yes.  A number of emails, yes.

12  Q    But you have no understanding of what that opinion

13  actually says, and you're not a lawyer, right?

14  A    I'm not a lawyer.

15  Q    And you have no understanding of what that opinion

16  says, outside of what counsel told you to assume, right?

17  A    That's what I said earlier, yes.

18  Q    So you say in your report, and you testified on direct,

19  that your assessment of alter ego and successor liability

20  theories is based on your review of emails and that one

21  Michigan magistrate opinion, right?

22        (Pause in the proceedings.)

23  A    I mean, there's a lot of emails but yes.

24  Q    But you don't know the legal standards applicable to

25  alter ego or successor liability theories, right, because

1   you're not a lawyer.

2   A    Yes.

3   Q    And you don't know whether that Michigan opinion

4   resolved the claims on the merits, do you?

5   A    I do not.

6   Q    And you don't know whether that opinion extended to

7   CHSTX or YesCare Corp. or both, do you?

8   A    I thought -- I think I remember it going to just CH

9   Texas, I think.

10  Q    Okay.  It didn't extend beyond that, did it?

11  A    I don't believe it did.

12  Q    Or any other settlement parties for that matter, right?

13  A    I don't believe it did.  I don't believe the Court

14  understood what it was ruling on.  But I don't believe it

15  did.

16  Q    You don't think the Court understood what it was ruling

17  on.

18  A    Yeah.  I don't know what the -- I don't know anything

19  about the case, that case.  But I know the discovery that I

20  had in this case clearly indicates there's other entities

21  that are out there.  So I don't know if the Court

22  appreciated that.

23           MR. KAUFMAN:  Okay.  Well, Mr. Goodman can clean

24  that up on redirect.

25  Q    But you don't know even -- you don't even know what law

1  the Michigan magistrate applied in that case, do you?

2  A    I'm not a lawyer.

3  Q    Did they apply Texas law?

4  A    I don't believe they applied Texas law, no.

5  Q    Would it surprise you to learn that the Michigan

6  magistrate had to make an eerie guess about what Michigan

7  law even was?  Do you understand what that means?

8  A    I have no idea.

9  Q    And did you realize that the Michigan magistrate

10  opinion in the *Kelley* case actually contemplated that the

11  result might have been different if Texas law applied; did

12  you know that?

13          MR. GOODMAN:  Your Honor, objection again, I mean,

14  Mr. Atkinson I think has testified over and over again that

15  he's not a lawyer.  To ask him to repeatedly opine on a

16  case --

17          MR. KAUFMAN:  Just asking if he knows.

18          MR. GOODMAN:  -- (indiscernible).

19          THE COURT:  Just -- I think he's just asking if he

20  knows, so I'll overrule.

21          THE WITNESS:  I do not.

22  BY MR. KAUFMAN:

23  Q    Would it surprise you to learn sitting here today that

24  that opinion, the *Kelley* opinion, actually dismissed

25  Mr. Kelley's alter ego theories?

1  A    I don't know any -- it's not surprising.  I don't know.

2  Q    Wouldn't you need to know these sorts of things to give

3  an appropriate litigation discount or litigation risk

4  discount so --

5  A    I didn't give one.

6  Q    But you would need to know these to give one, right?

7  A    Potentially, yes.

8  Q    So your view that the alter ego theories and the

9  successor liability theories should pay to our claimants in

10 full or close to in full without factoring litigation risks,

11 right?

12 A    (No audible response.)

13 Q    Is -- let me ask this again.  You look confused.  Your

14 view in your report in your testimony today was that tort

15 claimants should be paid more is without giving any

16 consideration to these litigation risks, right?

17 A    No.

18 Q    Let's turn to a new topic.  You talked about in direct

19 the financial wherewithal of the settlement parties, and

20 your view is you just don't have enough information, right?

21 A    Correct.

22 Q    And that's because in part you didn't get the YesCare

23 information until the end of January, right?

24 A    I never got the Yes Care information I needed, so no.

25 Q    Right.  But the financial statements from YesCare you

MICHAEL ATKINSON - CROSS BY MR. KAUFMAN                288

1  did get, went through February 23rd.  I think you said that

2  in your direct, right?

3  A    Yes.  I didn't know if -- yes, that's correct.

4  Q    But they were unaudited, right?

5  A    They were unaudited, correct.

6  Q    And you have discomfort relying on unaudited reports.

7  I think we talked about this in your deposition.

8  A    Yeah, particularly in this case, yes.

9  Q    Well, in fact you told me in your deposition you

10 couldn't think of a single case in your 30 years' history

11 that you've ever relied upon unaudited reports; don't you

12 remember saying that?

13 A    I don't remember what I said.  But I'm sure that I --

14 if I verified them, I would rely on them.

15 Q    And you didn't try to verify them in this case, did

16 you?

17 A    I didn't have information sufficient to verify them.

18 Q    Did you hear -- well, I guess you didn't hear

19 Mr. Perry's testimony.  Would it surprise you to ear that

20 Mr. Perry testified in his March 5th testimony that he was

21 able to verify certain datapoints that allowed him to feel

22 comfortable relying on the unaudited financial for the

23 general purpose of showing the downward trend?

24 A    I'm not aware that we have financials, so it would

25 surprise me.  I'm not aware we have financials on

1  February 20, 2023.  And that's what I'm most interested in.

2  So if he found them and then looked at those, then I would

3  be very surprised.

4  Q    But you did review the audited financials for Corizon

5  before the divisional merger, right?

6  A    From like four years ago.

7  Q    From 2017 through 2019, right?

8  A    Yeah.  From years ago.

9  Q    And those were verified by E&Y, Ernst & Young, right?

10 A    That's correct.

11 Q    And I think you told me your wife used to work for her

12 so you couldn't distrust them just --

13 A    I think I said the opposite of -- no, I'm -- no, that's

14 true, that's true.

15 Q    You would agree with me that based on your review of

16 those audited financials from 2017 through 2019 that there

17 was a downward trend in operations, right?

18 A    There was, yes.

19 Q    Okay.  And Mr. Perry's contention is that that downward

20 trend continued after 2020, right; are you aware of that?

21 Did you review his deposition transcript?

22 A    I would be surprised that that's the case because I

23 think the Debtor's projections in the fairness opinion had

24 revenue increasing over time.

25 Q    Those were projections.

1   A     Right.  So why would you --

2   Q     After the divisional merger.

3   A     Right.  But why would you project them going up if the

4   downward -- if it's a downward shift?

5   A     I'm -- you're talking about projections from 2022

6   forward, right?

7   A     Correct.

8   Q     After Perigrove took over.

9   A     Correct.

10  Q     Okay.  I'm talking about before Perigrove took over,

11  from 2020 until 2022.

12  A     Okay.

13  Q     Would it surprise you to hear that the Debtor noticed a

14  downward trend during that period of time?

15  A     I don't know one way or the other.

16  Q     And it's not just the Debtor that viewed the unaudited

17  financials showing a downward trend.  The UCC also believed

18  that; are you aware of that?  You said you reviewed

19  Mr. Dundon's deposition.

20  A     I did.  I don't recall that.

21  Q     Are you saying that they shouldn't have relied on

22  unaudited financials?

23  A     I believe that they should have been -- in this case

24  they should have been verified.

25  Q     Okay.  But you told me in your deposition that you had

1  no reason to distrust the unaudited financials for 2020; do

2  you remember that?

3  A    I don't remember that.  I don't remember what the --

4  Q    Because that was before Perigrove took over, right?

5  A    That may be the case.  I don't recall.  It's kind of

6  not relevant so I'm not sure why.

7  Q    It's not relevant that the Debtor was suffering a

8  downward trend from 2017 until 2022 you're --

9  A    No, the 2020 financials were not relevant.  If I had

10 financials I could rely on all the way through, then it

11 would be relevant.

12 Q    Okay.  So you discounted all unaudited financials

13 altogether, right, because you couldn't rely on them.

14 A    I think it's fair that I did not rely on the unaudited

15 financials in this case.

16 Q    Okay.  You would agree with me that Corizon, as an

17 organization with its 300 million of revenue, is much

18 smaller company that the average company you typically deal

19 with, right?

20 A    Well I would say in my career it's probably in the

21 middle of the companies I deal with.  But my -- in recent

22 years, much larger companies.

23 Q    Okay.  Let's look at page 353 of your deposition, just

24 so we're clear.  Look at line 18; are you there?

25 A    Yeah.

1  Q    I ask you, question, would you consider Tehum Care

2  Services or I guess Corizon and Valitas, would you consider

3  that big company based on -- I guess I -- that was poor --

4  bad English.  But would you consider that a big company

5  based on compared to the other that you typically represent?

6      And your answer is, it's smaller than the average

7  company I look at, yes.

8  A    Currently, yes.

9  Q    Okay.  You would agree with me that audited financials

10 cost money, right?

11 A    Yes.

12 Q    And starting in mid-2020, which you have financials up

13 through the end of 2019, starting in mid-2020, Corizon's

14 debt and equity were owned by the same company, the Flex

15 Group, right?

16 A    Yes.

17 Q    And that's a totally private company, right?

18 A    Yes.

19 Q    So all the debt and equity are now private, there's no

20 reason to have audited financials anymore, is there?

21 A    I guess they decided that, yes.

22 Q    Well, other than to give a financial advisor such as

23 yourself some comfort in a third party's verification of

24 financial statements, is there any other benefit for a

25 distressed company like Corizon to pay for financial audits?

1  A    Well, if they were going to sell the business, there

2  could be benefits.

3  Q    And they did try to see the business in 2021, didn't

4  they?

5  A    They did.

6  Q    Okay.  And did you review those emails?

7  A    I -- well, I'm sure I did.  I don't recall them

8  specifically.

9  Q    So you're familiar that there were investment bankers

10  that were hired in 2021, right?

11  A    I did know that, yes.

12  Q    Okay.  And the investment bankers surveyed the market

13  to see if competitors or other strategics would purchase the

14  company, right?

15  A    (No audible response.)

16  Q    Bird (phonetic), Centurion, to name a few.

17  A    I'm sure they did, yes.

18  Q    And they all passed, didn't they?

19  A    That's what I'm understanding, yes.

20  Q    Let's turn to another component that you talked about

21  in your direct, the Alabama contract; you recall your

22  testimony from earlier this afternoon?

23  A     Yes.

24  Q    You have some experience with government contracts and

25  the RFP bidding process, correct?

1   A     Yes.

2   Q     Okay.  And -- but your knowledge of the Alabama

3   contract is limited to your review of what was on the

4   internet, right?

5   A     And what I found in the discovery.

6   Q     In the discovery --

7   A     In the emails that I reviewed.

8   Q     Okay.  But as it relates to the terms of the Alabama

9   contract, all you have to go on is what you found on the

10  internet, right?

11  A     That's right.  We did not get financials beyond

12  February, 2023.

13  Q     In fact, in the bottom of page 17 and the top of page

14  18 of your report, that's all you cite to is public

15  information on the internet, right?

16  A     That's correct.

17  Q     So you don't actually know when CHSTX or CHSAL or any

18  other YesCare entity actually started receiving revenues

19  under that contract, do you?

20  A     That's part of the problem, yes.

21  Q     Okay.  For all you know, the contract could still be

22  under negotiation, right?

23  A     Well, based on the third party source that we had,

24  these articles, it seems like it's not.  And if we had

25  gotten financials, then I'd know.

1   Q    And we saw the subpoena on your direct.  Do you

2   remember what the date of the subpoena was?

3   A    Date of the subpoena, I do not remember the date of the

4   subpoena.

5   Q    Not a memory test.  It was December 6th; do you dispute

6   that?  I'm sorry, February 6th.

7   A    I was going to say it's definitely not December.

8   Q    February 6th of 2024, any reason to dispute that?

9   A    No.

10  Q    Okay.  But you don't even know when that was served, do

11  you?

12  A    We tried to serve it, I think, on counsel, and it was

13  not successful.

14  Q    I'm just asking for what you know.  Do you --

15  A    I'm trying to remember.  Give me one second to think

16  about it.  We tried to serve it on counsel.  I remember

17  seeing -- I don't remember a specific date, though.

18  Q    You don't know when it was served, do you?

19  A    I know it was very late in the game because we were --

20  because we lost eight days trying to serve it on counsel,

21  and then we ended up having to send someone to serve it on

22  YesCare in Tennessee.

23  Q    But you first raised this issue with the Debtor and the

24  UCC on January 2nd, according to the email that we saw in

25  your direct, right?

1  A    Right.  The email of where they told me it didn't

2  exist.

3  Q    Yeah.  And still the TCC waited a month to do anything

4  about it, right?

5  A    I don't know that that's fair or true.

6  Q    In your report you estimate that YesCare would have

7  received $230 million a year under this Alabama contract,

8  right?  That's gross revenues, right?

9  A    Yes.

10  Q    Okay.  And that's just based on simple math, a billion

11  divided by 54 months, right?

12  A    I think so, yes.

13  Q    So just simple math, right?

14  A    Yes.

15  Q    You don't actually know what revenue is paid under that

16  contract, do you?

17  A    I do not.

18  Q    And you don't know whether that contract is actually

19  profitable for YesCare, do you?

20  A    I do not.

21  Q    And you don't -- do you know anything about the

22  profitability of the Debtor's contracts historically?

23  A    I -- well we have the unaudited financials, yes.

24  Q    And in fact the Debtor produced a report to you showing

25  you exactly how profitable every contract it ever had going

1  back many years, right?

2  A    I know the Debtor's provided that to me.  I --

3  Q    And that's Exhibit 73 in the Debtor UCC book right next

4  to you, right?

5  A    I can look at it if you want me to.

6  Q    You're welcome to.  Oh, you know what, it's not in

7  there because it's a native file.  Are you familiar with the

8  profitability by contract --

9  A    I remember --

10  Q    -- Excel spreadsheet?

11  A    I remember looking at that.  I have the same issues,

12  though, because I was not able to verify that information.

13  Q    Well you didn't even know you had it, though, did you?

14  A    On the day that we -- you deposed me, now.

15  Q    Okay.  That's right.  When I deposed you, you told me

16  that you don't remember seeing it, right?

17  A    Yeah, my team had looked at it, I had not.

18  Q    And you told me you were going to have words with

19  someone on your team because it wasn't cited in your report,

20  right?

21  A    I don't remember that specifically but I'm sure I did.

22  Q    Let's look at page -- it starts on page 413 of your

23  deposition.

24  A    Okay.

25  Q    And let's look at line 17.  Question:  Okay, so if you

1   didn't cite to the reports given to you in the production,

2   the profitability by contract reports, you just didn't rely,

3   you didn't find it relevant to cite it in your report, or I

4   -- and Mr. Moxley said that you had already answered that.

5        You continued, or I didn't see it, one or the other

6   because I know did search terms to look through things.  And

7   my question was, if it was emailed to you directly, can we

8   assume you saw it?

9           "ANSWER:  I don't know that you can assume that,

10          no.  Someone on my team should have seen it if it

11          was emailed to me directly.

12          "QUESTION:  You'll have words with them later.

13          "ANSWER:  Yes, yes exactly."

14  You remember that now?

15  A    I do.

16  Q    Did you have words with them?

17  A    I did.  We --

18  Q    Just a yes or no question.  Mr. Goodman can clean this

19  up on redirect.

20  A    Okay.

21  Q    As it pertains to the new Alabama contract, you don't

22  actually know whether YesCare's performance under the

23  contract was profitable, do you?

24  A    We do not, no.  We did not get financial information.

25  Q    Okay.  And you didn't hear Mr. Perry's testimony that

1  the majority of the Debtor's contracts were historically

2  unprofitable, did you, because you weren't here in court?

3  A    I was not here.

4  Q    You don't know what YesCare spends on overhead to

5  service the Alabama contract, do you?

6  A    I do not know.

7  Q    And you didn't look and see what the Debtor

8  historically spent to service contracts, did you?

9  A    That's correct.

10 Q    You don't know what YesCare's SG and A, selling general

11 and administrative, expenses are for this contract, do you?

12 A    I do not know.

13 Q    And again you didn't look at the Debtor's historical SG

14 and A either, did you?

15 A    I did not.

16 Q    And, likewise, you don't know what contracts YesCare

17 may have lost since the divisional merger in 2022, do you?

18 A    I did -- I do not.

19 Q    So while you've assumed in your report that YesCare's

20 generating $230 million of revenue more a year, all that is

21 is speculation, right?

22 A    Because I don't have information.

23 Q    Because you don't know YesCare's actual cash flow and

24 its actual profitability, right?

25 A    That's correct.

1  Q    And you didn't try to extrapolate based on historical

2  cashflow or historical profitability, did you?

3  A    I don't think that's appropriate.

4  Q    So you didn't do that, did you?

5  A    No.

6  Q    Let's turn to a new topic.  You said you didn't try to

7  value potential fraudulent transfer claims that were

8  described in the 9019, did you?  I think we already looked

9  at this in your deposition; you remember that statement?

10 A    That's true.

11 Q    Okay.  But you agree with me that it is relatively easy

12 to quantify fraudulent transfer claims that are based on

13 just transfers of cash, right?

14 A    Yes.

15 Q    And that's what the $30 million that we're talking

16 about is, right?

17 A    Yes, for the first three.

18 Q    Right.  And you said you have extensive experience

19 litigating those sorts of fraudulent transfer.

20 A    Fraudulent transfers, yes.

21 Q    And actual fraudulent transfers.

22 A    Yeah, both.

23 Q    Okay.  So you're familiar -- because you've been

24 liquidating trustee or plan trustee in a number of cases

25 before, you're familiar with what sorts of factors you

1  should consider before you litigate or when you decide to

2  settle those claims, right?

3  A    Yes, with counsel, yes.

4  Q    Yeah.  You look at likelihood of success on the merits,

5  the cost of litigation, what money you have to go pursue

6  that litigation, and what creditors would think of a

7  settlement, right?

8  A    Yes.

9  Q    Did you do that in this case?

10  A    Did not.

11  Q    So you don't know one way or the other whether $54

12  million is sufficient to settle the claims in this case, do

13  you?

14  A    I was not in mediation so I do not know.

15  Q    And that's because you want more information to assess

16  the settlement, right?

17  A    Yeah.  I'd love to understand what, you know, what the

18  Debtor -- how the Debtor and the UCC got to their

19  conclusion, but they have not shared that with me.

20  Q    And you didn't even ask for a meeting with Mr. Perry,

21  did you?

22  A    I did not.

23  Q    You didn't even ask for a meeting with Mr. Dundon or

24  any of the Committeemen of the UCC members, did you?

25  A    I did not.

1  Q    And you told me in your deposition that the top three

2  pieces of information that you would want to help you assess

3  the merits of the $54 million settlement are a tort claim

4  valuation, right, that's one.

5  A    Okay.

6  Q    Audited financials, that's two, right?

7  A    Okay.

8  Q    Yes or no.

9  A    I don't remember this so --

10 Q    Oh, okay.  Let's look at page 120 of your deposition,

11 line 16.

12 A    Okay.

13 Q    One of the most important pieces of information that

14 the TCC would absolutely need before it can make an

15 assessment as to the fair settlement value, there was an

16 objection.

17      You answered, for me, I think it's probably three

18 things that are most important.  I think a more detailed

19 claims analysis would be one of them.

20      I think verified third party -- verified financial

21 records, including projections and underlying support for

22 them, and I think support for the Defendant's financial --

23 current financial wherewithal, third-party support for that.

24      Did I read that right?

25 A    Yes.

1    Q    You still agree with that.

2    A    (No audible response.)

3    Q    Sir, I can't tell if you're thinking.

4    A    I'm just reading it.  Do you mind give --

5    Q    Oh, not at all.

6    A    -- me a second.  Okay.

7    Q    Not at all.

8    A    Thank you.  I think that's fair.

9    Q    Okay.  So on that first point, tort claim valuations or

10   valuation of claims, you didn't hear Mr. Perry talk about

11   the ten-year payment history in his direct testimony, did

12   you?

13   A    I did not.

14   Q    Okay.  Do you dispute that historically a hundred

15   percent of all pro se claimants settle or receive less than

16   a hundred thousand dollars; do you dispute that?

17   A    I don't recall that but that would not surprise me.

18   Q    Why don't we look at exhibit -- Debtor and UCC Exhibit

19   26?  It's in the volume two.  It's the first exhibit in

20   volume two.  Oh, it's not the first.  Are you with me on

21   Exhibit 26?

22   A    I'm on 26.

23        MR. KAUFMAN:  Let's flip to that second page.  And

24   for the record, Your Honor, this is filed under seal at

25   14 -- docket 1413-2.

1  Q    You with me, Mr. Atkinson?

2  A    I am.

3  Q    Okay.  At the top of page two, see that the gray is the

4  pro se's.

5  A    Yes.

6  Q    Do you agree with me -- do you have any reason to

7  dispute that in the last ten years all 100 percent of pro se

8  litigants have settled or received less than a hundred

9  thousand dollars; do you see that?

10  A    I cannot tell if the ones out to the right are gray or

11  dark blue.  They look gray to me.

12  Q    Yeah, well look at the left side.  Do you see the

13  hundred percent above the bar in the gray?

14  A    Oh, okay.

15  Q    Any reason to dispute that?

16  A    I don't recall the underlying data but I -- that's what

17  the schedule shows, yes.

18  Q    Any reason to think Mr. Perry and his team are wrong

19  here?

20  A    I don't -- I just don't know.

21  Q    And let's look at the next line, the next bar, the blue

22  bar.  That's the represented claims; 72.3 percent have

23  settled or received a hundred thousand dollars or less.  Do

24  you see that?

25  A    I do.

1    Q    Any reason to dispute that?

2    A    Again, I don't -- just don't know.

3    Q    Your team had the data, right?

4    A    Correct.

5    Q    And they didn't do this analysis, did they?

6    A    We did look at these claims.

7    Q    Did you --

8    A    I don't -- we didn't create these charts, no.  I mean,

9    my experience with tort claims is historical settlements,

10   particularly when you have a distressed Debtor and they're

11   not pursuing, you know, other claimants that have money, the

12   settlements are low, and particularly prison cases as well.

13   Q    Company hasn't been distressed for ten years, though,

14   has it?

15   A    The company has not been -- well, the audited

16   financials, you know, as you said, were going -- trending

17   downward.

18   Q    Yeah.  But it was profitable until at least 2016,

19   wasn't it?

20   A    It was profitable, yes.

21   Q    Okay.  And this payment history goes back way beyond

22   that, right?

23   A    Yes.  I don't know the details on these claim

24   settlements.

25   Q    But you reviewed the ten-year claim history, didn't

1  you?

2  A    I know what the numbers on the page -- I saw the

3  numbers on the page, yes.

4  Q    Okay.  But you didn't do a analysis, a summary like

5  this for yourself to understand -- I mean, you said

6  widespread, massively different, words like that.  But you

7  didn't put them on a chart to see if that was in fact true.

8  A    Oh, I did do -- I did -- not this chart.  I -- this is

9  not a chart that I would have created.

10  Q    I hesitate to ask this question, but how did you come

11  up with the conclusion that they were wildly, massively

12  disparate, or whatever words you used, if you didn't even

13  try to put them on a chart to see just how widespread they

14  were?

15  A    We did have charts.

16  Q    Okay.  And you didn't produce those, did you?

17  A    I didn't rely on them, no.

18  Q    You didn't put them in your report.

19  A    I did not rely on them.

20  Q    Again we talked about this.  The pro se incarcerated

21  individual claimants in this case represents over half of

22  your claim pool, doesn't it?

23  A    I think with the new claims that have been filed after

24  the bar date, my understanding it's gone up.  And I think

25  the Debtor said that those are pro se's.

1          Before that it was about a third I think were -- or

2     two-thirds were pro se's and one-third were not.  I think --

3     as when there's 240 claims.

4          But I think now there's been 18 more claims or

5     something like that --

6     Q    Sixty of those are against YesCare so they're not even

7     our claims, right?

8     A    I don't know that I understand that or agree with that.

9     Q    So on the second point, we're talking about the things

10    that you need to assess, whether 54 million is the right

11    number, understanding the claim pool is one.

12         The second was having audited financials or third-party

13    verified financials, right?

14    A    Yes.

15    Q    Okay.  And you've said that you don't -- you can't rely

16    on the unaudited financials in this case because of

17    Perigrove conduct, right?

18    A    I think a number of things but that was one of them.

19    Q    And that's your view, right?

20    A    It's my -- yeah, my view.

21    Q    But the Debtor and the UCC have a different view, don't

22    they?

23    A    I don't know what their view is.

24    Q    And then on your final point regarding the settling

25    party's financial wherewithal, you've already agreed with me

1  that if you get new information that shows that they

2  actually can't pay infinite settlement amounts, all that

3  does is lower the settlement value, right?

4  A    If I'm comfortable with it, yes.

5  Q    Let's turn to another topic, the best interest of

6  creditors; you're familiar with that phrase.

7  A    Yes.

8  Q    You've been doing this for 30 years, you're comfortable

9  knowing what's in the best interest of creditors.

10  A    I do as from a non-lawyer perspective.

11  Q    Understood.  Outside of relying on TCC counsel and what

12  they told you to assume, you took no steps to actually

13  assess what was in the best interest of creditors in this

14  case, right?

15  A    Related to what?

16  Q    Understanding what's best for your constituents.

17  A    I don't know that I follow your question.

18  Q    Okay.  Let's look at page 234 because I asked you this

19  before -- of your deposition, 234, line three.  You with me?

20  A    I am there now.

21  Q    The question was, what steps have you undertaken --

22          MR. KAUFMAN:  Who's hitting the mic?

23          THE WITNESS:  Oh, that was me.

24  BY MR. KAUFMAN:

25  Q    Question was, what steps have you undertaken to find

1  out what the tort claimants actually want out of this

2  bankruptcy case.  There was an objection.  What steps have I

3  personally taken?  I don't -- I think I've relied on counsel

4  for that.  Do you remember that testimony?

5  A    Yes.

6  Q    So you took no steps other than relying on your counsel

7  to understand what your constituents actually want.

8  A    Well counsel was talking to them much longer than I

9  was.

10 Q    And we've established you didn't talk to them, right?

11 A    Correct.

12 Q    And you're not aware that any of your committee members

13 spoke to incarcerated individuals, are you?

14 A    I don't know.  I imagine they did, though.

15 Q    The fact is, Mr. Atkinson, you don't know whether

16 dismissal is actually best for your tort claimant

17 constituents, do you?

18         MR. GOODMAN:  Your Honor, I want to object.  And I

19 think we asked Mr. Atkinson specifically if he's offering

20 any opinion (indiscernible) and he said no.

21         THE COURT:  Overruled.  He can answer.

22         MR. KAUFMAN:  You want me to ask again?

23         THE WITNESS:  If you don't mind.  I'm sorry.

24         MR. KAUFMAN:  Yeah.

25 BY MR. KAUFMAN:

MICHAEL ATKINSON - CROSS BY MR. KAUFMAN                    310

1   Q     You don't actually know whether dismissal is in the

2   best interest of your tort constituent creditors, do you?

3   A     I do not know.

4   Q     And you would agree with me that there are other

5   alternatives for the tort claimants, other than going into

6   the back -- going back into the tort system, right?

7   A     Yes, there's other options.

8   Q     In fact, when we talked about this in your deposition,

9   you said, well someone can write a bigger check, right?

10  A     At some point I did say that, yes.

11  Q     Yeah.  But no one's offering to write a bigger check,

12  are they?

13  A     I don't know that they are or aren't.

14        (Pause in the proceedings.)

15  Q     And even if someone was offering to write a bigger

16  check, you're not even in a position to assess whether

17  that's a big enough check, are you?

18  A     I am not.

19  Q     And yet the TCC is asking the Court to deny this

20  settlement and dismiss the case, right?

21  A     Yes.

22  Q     So let's play this out.  You don't know as we sit here

23  today which tort claimants are presently asserting successor

24  or alter -- successor liability or alter ego theories in

25  their litigation, right?

1  A     Correct.

2  Q     And you don't know for certainty that CHSTX or YesCare

3  or any of its subsidiaries actually have financial

4  wherewithal to pay judgments in the tort system, do you?

5  A     It's not been provided to me.

6  Q     You don't know, right?

7  A     Well, I would assume they do because it would have

8  saved a lot of time and money if they told us.

9  Q     But you don't know, do you?

10 A     I do not know.

11 Q     You don't know how long litigation would take for these

12 tort claimants in the tort system to get judgments, do you?

13 A     Not specifically, no.

14 Q     And you don't know how long -- even if they were

15 successful, how long it would take them to collect on those

16 judgments, do you?

17 A     I don't know.

18 Q     And the only settlement on the table, the one that the

19 Debtor and the UCC are proposing, is this 54 million and

20 change that's before the Court, right?

21 A     That's my understanding, yes.

22 Q     And the only real party in interest that's standing in

23 their way of approving this settlement and distributing

24 money to your constituents is the TCC, right?

25 A     I don't know that we're the only party.  I mean, it

MICHAEL ATKINSON - CROSS BY MR. KAUFMAN                    312

1  hasn't been decided yet, right?

2  Q    The only party making arguments in this hearing, aren't

3  you?

4  A    I don't know.

5  Q    the other witnesses that have been called so far,

6  aren't you?

7  A    I haven't been in trial so I don't know.

8  Q    Despite all these unknowns, the UTC -- the TCC is

9  seeking dismissal and threatening to appeal for years,

10 right?

11 A    Well, we're seeking dismissal.  I don't think you have

12 to appeal if we win that.

13 Q    You didn't hear Mr. Goodman say that if you loose,

14 you're just going to appeal?

15 A    I was not in trial so I don't know if he said that.

16 Q    Do you have any reason to doubt that a TCC will appeal

17 an order approving the settlement?

18 A    I -- we don't think the settlement's fair.  And we

19 don't have the information to verify it so, yeah, we --

20 until we know that, we are against it.

21 Q    Have any opinions on whether that appeal would be

22 successful?

23 A    I'm not a lawyer.

24           MR. KAUFMAN:  Pass the witness, Your Honor.

25           THE COURT:  Okay.  Let me ask you, Mr. Atkinson.

 1   I know we've been going for a while.

 2              THE WITNESS:  It's up to you.  I'm good either

 3   way.

 4              THE COURT:  Okay.

 5              MR. KAUFMAN:  I feel like it was just five

 6   minutes.

 7              MR. HEMENWAY:  I'll be quick, Your Honor.

 8              THE COURT:  No, no, no.  I want you to take as

 9   much time as you need.  I just want -- I'm just --

10              MR. HEMENWAY:  I just meant if --

11              THE COURT:  -- getting us --

12              MR. HEMENWAY:  -- you're planning for a break.

13              THE COURT:  No, no.  How much time you -- how

14   much --

15              MR. HEMENWAY:  Short 10-15 minutes.

16              THE COURT:  Okay.  Let's keep going.  I just

17   wanted to check with the witness.

18              MR. HEMENWAY:  Thank you.

19              Good afternoon, Mr. Atkinson.  Zach Hemenway for

20   the Unsecured Creditors Committee.  We met last month as

21   well.

22              THE WITNESS:  Yeah.

23                         CROSS-EXAMINATION

24   BY MR. HEMENWAY:

25   Q   Mr. Atkinson, you testified earlier about the Alabama

1  contract, and you said it represented I believe a 40 percent

2  increase over the pre-divisional merger projections for

3  YesCare; is that right?

4  A     Yes.

5  Q     So you're familiar with those projections, I assume.

6  A     That were in the FTI fairness opinion.

7  Q     And you're aware, are you not, that Corizon's revenue

8  has run a downward trend leading up to the divisional

9  merger?  I think you alluded to that earlier with

10 Mr. Kaufman.

11 A     The unaudited financials showed that, yes.

12 Q     So you were aware that the revenues were going down.

13 A     Well that's what the unaudited financials show, yes.

14 Q     Okay.  I'll take that as a yes.  Did the projection you

15 reviewed assume that that trend would continue or that it

16 would reverse?

17 A     I'm sorry, can you repeat that?

18 Q     Did the projections you're talking about, the pre-

19 divisional merger projections of YesCare after the

20 divisional merger, did they assume that that trend would

21 continue downward or that it would reverse and revenue would

22 increase?

23 A     It -- the revenue was increasing each year in the

24 projections.

25 Q     And that's because the projections assumed YesCare

1  would keep existing profitable contracts and get new ones,

2  isn't it?

3  A    I do not know what was baked into those assumptions.

4  Q    Are you assuming they projected years in the future and

5  assumed the company would not pursue any new contracts?

6  Q    Well, I assumed that they were pursuing new contracts

7  historically and were unsuccessful and it came going down.

8  So I don't know what the assumption was going forward.  I

9  have no idea.

10  Q    Do you have any understanding of how the prison

11  healthcare business works?

12  A    I do.

13  Q    And you understand they pursue new contracts from time

14  to time.

15  A    Yes.

16  Q    And that contracts expire or are terminated.

17  A    Correct.

18  Q    Okay.  And do you agree with me that it assumed that

19  they would keep profitable contracts or keep some contracts

20  following divisional merger?

21  A    The projections you're saying, yeah, I assumed that

22  there are some contracts to stay on and some that drop off

23  and maybe new ones --

24  Q    And the revenue had to come from somewhere, didn't it?

25  A    I'm sorry?

1  Q    The revenue had to come from somewhere, didn't it?

2  A    Yes.

3  Q    Okay.  That didn't happen, Mr. Atkinson, did it?  Well

4  it didn't keep all their contracts, did they?

5  A    I assume that they lost some -- I don't know that for

6  sure.

7  Q    You don't know.

8  A    I don't know.

9  Q    Okay.  You said he found out about the Alabama contract

10 by reading public coverage of it; is that right?

11 A    Correct.

12 Q    Newspaper articles, that kind of thing.

13 A    Yes, some articles.

14 Q    So you're telling me that you didn't notice that in the

15 same articles talking about YesCare getting that contract,

16 they noted that a New Mexico contract had been terminated

17 two years early that same month.

18 A    I did not see that, no.

19 Q    Okay.  You weren't looking for information on the

20 Alabama contract, huh?

21 A    I just was looking at it because that was highlighted

22 in the documents that I reviewed that the Debtor produced.

23 They did not see New Mexico in that.

24 Q    Okay.  And you didn't look to see if they lost any

25 other contracts, it sounds like.

1  A    I just -- I really just wanted to get the actual

2  financials so I know exactly what happened instead of

3  guessing.

4  Q    But the actual financials and the Alabama news

5  coverage, right?

6  A    Well, no, I wanted the actual financials and I wouldn't

7  need to look at the Alabama --

8         MR. HEMENWAY:  I'll move on.

9         THE WITNESS:  Okay.

10 BY MR. HEMENWAY:

11 Q    Mr. Atkinson, you haven't reviewed the insurance

12 policies in this case, have you?

13 A    I have not.

14 Q    And you're aware we mediated with two insurance

15 companies in this case.  You didn't attend either of those

16 mediations.

17 A    Yeah, I think they all happened before I was hired.

18 Q    Sure.  So you would agree with me, would you not, that

19 the discussions of insurance you had with Mr. Goodman

20 earlier about timing and what insurance companies do, that's

21 based solely on your experiences in other cases, isn't it?

22 A    That's true.

23 Q    You don't actually know anything about what the

24 insurance companies might do in this case.

25 A    I don't know specifically what they would do in this

1  case, no.

2  Q    Do you -- I mean I guess you're -- by your caveat

3  there, you're referring to the fact that you have dealt with

4  insurance companies in other cases.  Back to my question

5  that's solely the basis of your opinion.

6  A    Correct.

7  Q    We talked earlier about the concept that the debt that

8  came to YesCare in the divisional merger may have been

9  equitized rather than a secured debt; is that right?

10 A    Yes.

11 Q    Is that a concept you're familiar with in your 30 years

12 of experience?

13 A    Yes.

14 Q    And you told Mr. Goodman that distinction is important

15 to your analysis of the divisional merger; is that right?

16 A    I don't remember saying it's important.  But it's -- I

17 do think it's important to know that if that's true.

18 Q    I mean, if it's not important, why'd you talk about it

19 today?

20 A    Oh, I don't know.  He brought it up.  I'm not asking

21 the questions.

22 Q    I thought you said it was important.  But, I mean, do

23 you agree with me that it's important to the analysis?

24 A    Yeah.  At the end of the day you have assets on -- and

25 liabilities on both sides of the equation.  And if the

1  liabilities go away, it makes the value on one side go up.

2  Q    And you're aware that the Debtor and the UCC don't

3  agree on that issue, aren't you?

4  A    I'm not aware of that.

5  Q    You're not aware of that.

6  A    I mean, I heard that today but I did not know that

7  before

8  Q    You didn't see that in any of the pleadings, Disclosure

9  Statement.

10 A    I think I saw that in the Disclosure Statement.

11 Q    So you're not aware of it, but you also saw it in a

12 Disclosure Statement --

13 A    I just -- when you referenced the Disclosure Statement,

14 you reminded me that --

15 Q    Oh, okay.

16 A    -- I saw it there.

17 Q    So you were aware of it, you just forgot when I asked

18 you the question the first time.

19 A    Correct.

20 Q    Okay, thank you.  And are you aware that the parties

21 that were participating in the divisional merger, they also

22 dispute that characterization?

23 A    I'm not aware.  But I'm not surprised that they do.

24 Q    Okay.  And I believe you testified that you're relying

25 on Mr. Dundon's analysis on that issue.

1  Q    That's was -- what Mr. Dundon said so I was just

2  referencing that that was his opinion.

3  Q    But do you do your own analysis?

4  A    I did not know.

5  Q    Okay.  So are you relying on Mr. Dundon's analysis or

6  do you just have no thoughts on it whatsoever?

7  A    I do not have an opinion on the value of the divisional

8  merger.  So I don't get to a conclusion in my reports so,

9  no, I'm not relying on it.

10  Q    When Mr. Kaufman asked you about Mr. Dundon's analysis

11  and whether you did your own, you said, that all happened in

12  mediation; is that right?

13  A    I may have said that.  I don't remember the context

14  but --

15  Q    I just want to understand what you meant there.  You're

16  suggesting the UCC conducted its analysis on an issue at the

17  mediation and that's why you couldn't do your own.

18  A    Oh, no.  I don't think I was referring to why I

19  couldn't do my own.

20  Q    Okay.  But you didn't do your own.

21  A    I have not, no.

22  Q    Okay.  So it's a concept you're familiar with, you've

23  testified it's important to the analysis of the divisional

24  merger, but you didn't think it was worth looking into

25  yourself.

MICHAEL ATKINSON - CROSS BY MR. HEMENWAY                321

1  A    The -- as I said before, I do not have sufficient

2  information to value YesCare and, therefore, I cannot value

3  the divisional merger.  And so --

4  Q    But my question, sir, was about the debt, the secure

5  debt that the Debtor had prior to the divisional merger.

6  A    Right.  I'm familiar with that.

7  Q    You've read Mr. Dundon's testimony.  Do you -- did he

8  say that he needed YesCare financials to do that?

9  A    I believe he needs YesCare financials.  He apparently

10 does not.

11 Q    Okay.  But the searches that you had your team do, they

12 didn't try to look at how that secured debt was treated

13 prior to the divisional merger.

14 A    We definitely looked at the debt prior to the

15 divisional merger.  We saw that it was there.  We know it

16 was in the FTI's fairness opinion.

17          MR. HEMENWAY:  Okay.  So you just didn't do

18 anything else with it.  Sorry, I'll withdraw.  That's not a

19 question.

20 Q    You also said that the UCC hadn't claimed -- hadn't

21 shred any claims analysis with you, correct?  You told

22 Mr. Goodman that.

23 A    That's correct.

24 Q    So you're not aware that I provided the TCC with our

25 analysis of pro se incarcerated claims?

1   A     I am not aware of that, no.

2   Q     Or that I sent it to TCC counsel at their request on

3   December 19th.

4   A     I'm not aware of that, no.

5   Q     Okay.  Would you agree with me then that when you said

6   the UCC hadn't provided its claim analysis to the TCC, you

7   just meant that I'd sent it to these gentleman and not to

8   you?

9   A     If that's true, I don't know.

10          MR. HEMENWAY:  Okay.  That's all I have, Your

11  Honor.

12          THE COURT:  Thank you.

13          Let me just -- Mr. Patterson, before you get

14  started, how much time do you think you've got?  I'm just

15  thinking what are we --

16          MR. PATTERSON:  Probably about like last night,

17  about 30 minutes, --

18          THE COURT:  Why don't we --

19          MR. PATTERSON:  -- 30, 40 minutes.

20          THE COURT:  Why don't we just take like a ten-

21  minute break and then we'll get started?  Be a good time

22  to start.

23          THE CLERK:  All rise.

24      (Recess taken from 4:44 p.m. to 4:55 p.m.)

25          THE COURT:  Okay, this is Judge Lopez.

1   March 27th.  We are back on the Record in Tehum.  The time

2   is now 4:55.  We'll continue with cross-examination.

3            Mr. Patterson, you may proceed.

4            MR. PATTERSON:  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6   BY MR. PATTERSON:

7   Q    Mr. Atkinson, who -- I assumed you were hired to do

8   the -- that you came here to testify about today, right?

9   A    Yes.

10  Q    And who hired you?

11  A    The TCC Committee.

12  Q    And who specifically contacted you?

13  A    I was contacted by counsel to pitch with other

14  Plaintiff advisors to the Committee to get hired for the

15  work.

16  Q    All right.  And how much were you paid?

17  A    I've been paid zero dollars so far.

18  Q    How much have you accrued?

19  A    I think it's a little over $500,000.

20  Q    And have you sent that bill to the Committee?

21  A    I do not believe so, no.  Part of the bill I sent, but

22  I think maybe one month.  I don't recall.

23  Q    And for how many months work is that 500,000?

24  A    I've been hired since December 19th.

25  Q    So you don't send monthly?  Was it a flat fee?

1  A    No it was not a flat fee.

2  Q    Hourly?

3  A    Hourly, yeah.

4  Q    Plus expenses?

5  A    Correct.

6  Q    And did you enter into a contract with the Committee?

7  A    No.  The way it works in bankruptcy is you submit to

8  the Court an application to be employed.  The Court approves

9  that application.  And then each bill has to go to the Court

10 to get approved.  And then the Debtor pays that bill.

11 Q    I got you.  That's how it works.  So with respect to

12 your work, what were you initially hired to do?

13 A    I was hired to assist the Tort Committee in this case.

14 There was a number of things that they asked us to look

15 into.  They asked us to look into the prior settlement, the

16 prior Disclosure Statement, the claims in the case.  Those

17 are some of the things they asked me to do.

18 Q    What about the claims?

19 A    They wanted -- at one point in time, you know, the

20 claims estimation is something that I told the Committee I

21 could do.  So that's what they were interested in.

22 Q    Claims estimation since we had a lot of tort claims,

23 right?

24 A    Yes.  Since -- well both tort claims and general

25 unsecured claims.

MICHAEL ATKINSON - CROSS BY MR. PATTERSON                    325

1  Q    And let's go to your report or your Declaration, I

2  guess.  Were you given any instructions on conclusions that

3  you should reach?

4  A    Nothing that I should reach.  I was -- the only one

5  that I recall being asked about was whether there was a

6  business to be reorganized by counsel.  So that's the only

7  one that counsel asked me if I could look into that.  And I

8  did.

9  Q    Okay.  Let me ask it in a different way.  Did counsel

10 instruct you a particular outcome that they needed on any of

11 these issues?

12 A    No.

13 Q    On any issues that weren't reported?

14 A    No.

15 Q    You weren't given any instructions whatsoever regarding

16 analyzing the proposed 9019?

17 A    I wasn't given specific instructions on anything, no.

18 Q    And with respect to your Declaration or what everyone

19 has referred to as your report, how many drafts did you

20 prepare?

21 A    The way I do my reports is I have one file and I just

22 continue to update that file.  So I don't -- however often I

23 changed it.  We started working on it soon after the

24 January 16th 9019 was filed.

25 Q    You keep all your versions?

1  A    It's one version, so I keep -- continue to update it.

2  Q    So if I were to look at it, I couldn't tell what was

3  changed from day one?

4  A    I don't know if you could or couldn't.  I'm not sure.

5  Q    All right.  Now, do you periodically send that draft to

6  your lawyers?

7  A    When I got finished or got close to being finished, I

8  sent a draft to the lawyers, yes.

9  Q    And did they make changes?

10  A    I do not recall if they did or did not, no.  They

11  wouldn't make changes directly to it.  They would discuss it

12  with me.  But I just don't recall if there were changes made

13  here.

14  Q    Okay.  Well, you said they wouldn't.  Did they discuss

15  changes with you?

16  A    I don't recall if they did.

17        (Pause in the proceedings.)

18  Q    And I believe you testified that your expertise or your

19  work really is in the mass torts arena, right?

20  A    That's not true.

21  Q    Oh it's not true?

22  A    No.

23  Q    Where is it?

24  A    I've been doing bankruptcy, general bankruptcy work for

25  over 30 years.  I do valuations, I do expert witness

1   testimony and in recent years I've been doing some mass tort

2   cases.

3   Q    That's just a new -- a new thing you've been working

4   on?

5   A    Well the last seven years.  So, that new.

6   Q    I see. And would you consider this case a mass tort

7   case?

8   A    Not really.  It includes tort claims and there's a tort

9   Committee.  But I wouldn't call it a mass tort, no.

10  Q    Is it because the claims are so dissimilar, right?

11  A    It's because there's only 200 and some of them.

12  Q    Right, and they're all different?  Mass tort is going

13  to be a lot of claims.  A lot more than we have here plus a

14  lot of similar claims, right?  Asbestos exposure, ear drum

15  damage, right?  All the same.

16  A    Well the damages are different in -- so there's

17  different types of ear drum damages.  There's different

18  types of asbestos damage, different type of Ameso

19  (phonetic).

20  Q    Same cause?

21  A    Same what?

22  Q    Same causation?

23  A    Correct.  I think the causation here is medical care.

24  Poor medical care.

25  Q    You have Med Mal, right?  You have sexual abuse, right?

1   A     Yep.

2   Q     Wrongful death?  Are you agreeing with me or --

3   A     I don't know what you're asking me.

4   Q     The different types of claims in this case.  They're

5   not all the same.  It's not the same causation, would you

6   agree with me?

7   A     There are definitely different causes of action in this

8   case.  Different causes or different types of claims is the

9   right way to say it.

10  Q     Unlike a mass tort case where there's a single or maybe

11  two causation -- common causation points for each claim,

12  right?

13  A     That's not true.

14  Q     Really?

15  A     Really.

16  Q     Okay, so asbestos.  One multiple hundred causes or just

17  one the asbestos?

18  A     You were generalizing mass tort cases.  And I would

19  consider the boy scouts a mass tort case.  And there was

20  lots of different types of issues in that case.

21  Q     Well it was all sexual abuse, right?

22  A     There was different types of sexual abuse.  But it was

23  sexual abuse --

24  Q     Sexual abuse.

25  A     Well here it's medical malpractice.  Different types of

1   medical malpractice.  But it's still medical malpractice.

2   Q    Sexual abuse is medical malpractice?

3   A    No, I'm saying there's different types of medical

4   malpractice.  In this case there's different types of sexual

5   abuse in the boy scouts.

6   Q    Are you suggesting that this case involved 200 similar

7   claims?

8   A    No.

9   Q    Okay, why are you arguing that there's a single

10  causation?

11  A    I sorry.  I didn't mean to argue.  Go ahead.

12  Q    I'm asking you, are you?  Are you suggesting to this

13  Court that this involves 200 single source claims?

14  A    No.

15  Q    Med Mal?

16  A    No.  Go ahead.

17  Q    I get to determine that.  You don't get to tell me, all

18  right?

19  A    Okay.

20  Q    Okay.  So answer my question and we'll move along.

21  What are you suggesting then?  You seem to be pushing back

22  when I suggest this is not a mass tort case.  Other than the

23  numbers, right.  I agree with you.

24  A    I'm not pushing back.  I would agree.

25  Q    You would agree with me it's not a mass tort case other

MICHAEL ATKINSON - CROSS BY MR. PATTERSON                    330

1   than the numbers, right?   We both agree that 200 isn't

2   enough to classify as a mass tort, but it's not a single

3   cause or one or two cause case, right?

4   A     Correct.

5   Q     All right.   That affects your ability to review the

6   claims; does it not?

7   A     It affects, yes.

8         (Pause in the proceedings.)

9   Q     Now I went through your report.   And granted I only had

10  a couple of hours.   Let me ask you -- and I haven't heard

11  today.   I want to approach this a little bit differently.

12  Maybe a little simpler to satisfy Mr. Goodman.   It's simple.

13        Do you support the proposed settlement that's been

14  provided to the Court?

15  A     Mike Atkinson?

16  Q     Yes.

17  A     No.

18  Q     Your analysis?

19  A     No, does not.

20  Q     And why?

21  A     Because I don't have sufficient information to

22  determine whether it's a good settlement or not.

23  Q     Okay.   So you can't tell the Court in your expert

24  opinion that the settlement proposal is adequate, right?   Is

25  that fair?

1   A     Yes.

2   Q     But you also -- let's look at it from both directions.

3   You also can't sit there and say in your expert opinion it's

4   a bad settlement offer, can you?

5   A     I think without having sufficient information, it's a

6   bad settlement offer.  If I knew -- if I had all the

7   information I needed, then I could or opine on whether it's

8   good or bad.

9   Q     Well, that sounds to me like it would you're looking

10  for a particular outcome.  If you're telling, under oath,

11  you don't have information sufficient information, isn't it

12  true that you don't have sufficient information to say it's

13  good or it's bad, right?

14  A     That's fair.

15  Q     Okay.  And I thought you just disagreed with me.  You

16  can't tell the Court that it's a bad deal, can you?

17  A     I cannot tell the Court that it's good or bad.

18  Q     That's right.  And so why would you then jump to the

19  conclusion that you need information to show that it's a bad

20  deal?  Isn't that what you said?

21  A     Well, you know, look there's information that we need

22  and we wanted and we requested it from the parties.

23  Q     Right.

24  A     If the information was going to give us comfort that

25  the deal was good, you would think that they would give it

1  to us.  They have not given it to us.

2  Q    Well, that's an assumption on your part.

3  A    Well, I think it's a fair assumption.  It's a concern

4  that we have --

5  Q    You might think it is.  But everyone might not, right?

6  Because how do you know what to ask for if you don't know

7  what's there?

8  A    I know --

9  Q    And maybe the assumption is you don't like the

10  information that was given to you, so you say I need

11  something different.  Maybe that's a good assumption?

12  A    Is that a question?

13  Q    Yes, it is.

14  A    Can you rephrase it, I can't understand the question.

15  Q    Well, you're saying that it's fair to assume that the

16  information that you don't have is bad for the person who

17  has the information, right?  Is that what you're suggesting?

18  A    I'm saying we've requested the information.  If the

19  information would help prove the settlement is good, you

20  would think that they would provide it to us.

21  Q    Okay.

22  A    And they have not provided it to us.

23  Q    All right.  And I'm telling you that you do have some

24  information, but you refused to utilize it so I'm going to

25  assume it shows that the offer is good.  Isn't that the same

1   as you're doing?

2   A    No, --

3   Q    It's not, why?

4   A    -- what you just said is absolutely not true.

5   Q    Why?

6   A    I'm using the -- you just said I'm not using the

7   information I've gotten.

8   Q    Correct.

9   A    I am trying to use the information I've gotten.

10  Q    And did you use the --

11          MR. GOODMAN:  Your Honor, I think (indiscernible).

12          MR. PATTERSON:  All right and that's a speaking

13  objection.  That's a speaking objection.

14          THE COURT:  Go ahead and ask your next question,

15  Mr. Patterson.

16          MR. PATTERSON:  Thank you, Your Honor.

17  BY MR. PATTERSON:

18  Q    You have -- I think you said multiple times through

19  your statement un-audited financials, right?

20  A    Yes.

21  Q    Okay.  Now you've refused to utilize those to perform

22  any analysis with respect to the divisional merger or the

23  third party causes of action; isn't that right?

24  A    No, it's not right.

25  Q    Did you do the analysis?

1   A     I have incomplete information to do the analysis.

2   So --

3   Q     Listen to my question.

4          MR. GOODMAN:  Your Honor, --

5          THE WITNESS:  Can I --

6   BY MR. PATTERSON:

7   Q     Listen to my question.  All right.  Did you do the

8   analysis, yes or no?

9   A     No.

10  Q     All right.  And you didn't do it, why?

11  A     Because I did not have sufficient information to do it.

12  Q     All right.  What were you missing?

13  A     Related to -- there's different things that I'm

14  missing. One of the things I'm missing is YesCare financials

15  beyond February 2023.  The ability to verify those

16  financials.

17      I'm missing information from the Debtor that where they

18  opine on what the claims are.  It's based on a claims

19  analysis.  That is something that is done on a claim by

20  claim basis so that we can all agree that it is the right

21  outcome.

22      I don't have sufficient information for those two

23  things.

24  Q     Okay.  Post 2023 financials for YesCare, right?

25  Correct?

1  A     Correct.

2  Q     And the Debtor claim analysis, right?  Or anything

3  else?

4  A     So that I can be comfortable with it.  So I need those

5  things to support.

6  Q     Support, right?  You do have some information, right/

7  A     I don't have --

8  Q     You do have YesCare financials, correct?

9  A     Through February 2023.

10  Q     Okay.  So that's a yes or no question.  So, just try to

11  focus and we'll go faster.  All right.  You do have YesCare

12  financials; is that correct?

13  A     I have some, yes.

14  Q     Okay.  And you didn't use them to perform any analysis,

15  did you?  Yes or no?

16  A     I did not do an analysis, no.

17  Q     All right.  To me, that concludes you refuse to use the

18  information that you had to do an analysis, correct?

19  A     No.

20  Q     Why?  Where's the analysis then?

21  A     In order to do the analysis that would be appropriate,

22  I need all the information.

23  Q     I didn't say appropriate analysis.

24          MR. GOODMAN:  Your Honor,

25          THE WITNESS:  Can I finish?

1          MR. PATTERSON:  I said analysis.

2          THE COURT:  You've got to let him finish,

3   Mr. Patterson.

4   BY MR. PATTERSON:

5   Q    You don't need to raise your voice.  Just answer my

6   question.

7   A    Ask another one.

8   Q    Nope, I like that one.

9   A    I don't know what it was.  Do you mind repeating it?

10  Q    All right.  You refused to utilize the information that

11  you did have to do an analysis.  I didn't say to do an

12  appropriate analysis.  I said to do an analysis.  Isn't that

13  true?

14  A    Yes, that's true.

15  Q    All right.  And so it's not that you didn't have the

16  information, is that you didn't have information that you

17  liked, right?

18  A    It's not about liking it.  It's about have the

19  information that I need to do a proper analysis.

20  Q    Okay, is that a standard.  Is that some kind of

21  standard in one of your professional licensed organizations

22  that says you can't use that?

23  A    I want to get to a conclusion that's correct --

24  Q    No, listen to my question again.  See, is there a

25  standard in one of your licensing organizations that tells

1  you that would be a violation of a standard in doing the

2  evaluation by using un-audited financial statements?

3  A    I don't know one way or the other.

4  Q    Okay.  So it's not you're a governing board or an

5  ethical obligation that keeps you from performing this

6  analysis utilizing a certain form of data.  It's that your

7  personal opinion, you don't want to use it, right?

8  A    No that's not true.  I'm not --

9  Q    Okay, what's keeping you from using it then?

10 A    -- I'm not comfortable that the information I have is

11 accurate.

12 Q    Okay, that's a personal opinion.

13          MR. GOODMAN:  Your Honor.

14          THE COURT:  You've got to let him finish,

15 Mr. Patterson.

16          MR. PATTERSON:  And you probably need to stand

17 when you address the court.

18          THE COURT:  Guys, we're --

19 BY MR. PATTERSON:

20 Q    So, --

21          THE COURT:  Hold on folks.  I'm not doing it.

22 Let's just ask questions.  Let's get to answers.

23 BY MR. PATTERSON:

24 Q    Okay, so you have financial information that you're not

25 comfortable with, right?

1  A    I've have incomplete financial information that I'm not

2  comfortable with.

3  Q    Okay, what's incomplete about it?  Let's take it --

4  there's two pieces there.  What's incomplete about it?

5  A    I don't have sufficient information to verify what I

6  have and I do not have information beyond 2023 for YesCare.

7  Q    All right.  Now, let's think about it a minute.  You

8  testified at length about emails and letters you found in

9  discovery and you reviewed them and you utilized them in

10  coming to your opinions, right?

11  A    Correct.

12  Q    Did you verify that those were true and correct?

13  A    The emails that were provided --

14  Q    Yeah,

15  A    -- in discovery --

16  Q    Right.

17  A    -- that they were true and correct?

18  Q    Right.

19  A    They were produced by the Debtor and the Debtor's

20  email.

21  Q    I understand.  I understand.  And my question though

22  is, did you verify them in any way?

23  A    I did not.

24  Q    Did you ask someone to authenticate them?

25  A    I did not.

1  Q    So similar to the financial information you choose to

2  utilize and rely on some information that's not proven true

3  and accurate.  And you choose not to use some, right?

4  A    Well that's not completely true.  The stuff that I

5  relied on -- the emails that I relied on -- we went out and

6  looked for third party verification and we found articles

7  that said that YesCare was proposing to Alabama.  It said

8  that YesCare was proposing to Arizona, which is consistent

9  with the emails that we saw in the documents.

10 Q    Okay, I wasn't referring to the Alabama specifically

11 the emails.  You referred to some emails that you said led

12 you to believe, to suspect that there were bad things going

13 on in creating these new entities.  Do you remember that?

14 A    Yes.

15 Q    Okay.  Did you verify those emails?

16 A    The emails referred to the Alabama contract, they

17 referred to --

18 Q    No, no.  Listen to me.  You testified earlier that

19 pre-petition there were entities that were being created

20 that were unrelated to the Debtor.  And that raised concerns

21 with you, right?  Do you remember that?

22 A    I do remember that.

23 Q    Right.  And you said you found out about those

24 creations through emails, right?

25 A    Yes.

1    Q    And letters and communications that were in discovery,

2    right?

3    A    Yes.

4    Q    Okay.  And you relied upon those, right?

5    A    I did, I included them in my report.

6    Q    I know their included.  We just talked about them.  I'm

7    asking did you rely on them?

8    A    I did.

9    Q    Okay.  Did you verify them?

10   A    Yes, I did.  I looked at -- to some extent, I looked at

11   articles.  Those emails that we were referring to talk about

12   the Alabama contract.  They talk about setting up these

13   Alabama entities.  They talk about setting up the Arizona

14   entity.

15       And I found third party articles about YesCare

16   proposing on those contracts and getting those contracts.

17   So it is completely consistent with emails that I saw.

18   Q    Okay.

19       (Pause in the proceedings.)

20   Q    You had no information -- correct me if I'm wrong --

21   but you're telling us you had no information to corroborate

22   any of the unaudited financial information that was

23   provided?

24   A    That's not true.

25   Q    Okay.  So there was some information that would

1  corroborate it?

2  A    There was some information that would be corroborate

3  it.

4  Q    Okay.  But you still didn't want to use it for an

5  analysis, right?

6  A    It was a component of the analysis.  I did not have

7  other pieces that I needed.

8  Q    All right.

9       (Pause in the proceedings.)

10 Q    Were you told by anyone not to use unaudited financial

11 information?

12 A    No.

13 Q    Have you ever used unaudited financial information to

14 create evaluation?

15 A    Yes.

16 Q    Just not this case?

17 A    I didn't think it was appropriate in this case, no.

18 Q    All right.

19      (Pause in the proceedings.)

20 Q    The claim analysis, you said you didn't have the

21 Debtor's claim analysis so you couldn't do your own, right?

22 A    That's not what I said.

23 Q    Okay.  I'm sorry.  You said you were missing

24 information and that's why you couldn't do an analysis to

25 tell the Court -- to show the Court to support your

1   conclusion that the settlement is not in the best interest

2   of the creditors?

3   A    What I need for related to the claims is I believe the

4   claims need to be valued on a claim-by-claim basis.

5   Q    Okay.

6   A    And that analysis, I've not seen.

7   Q    Are you capable of doing that?

8   A    With time, yes it could be done.

9   Q    Okay.  Did you start?

10  A    No.

11  Q    Did you do a sampling?

12  A    Did not.

13  Q    Why?

14  A    Because we pivoted to try and do the report, because we

15  had limited time.

16  Q    But that's the essences of the report; is it not?

17  A    It is not.

18  Q    What is?

19  A    The essences of the report ultimately is I do not have

20  information, sufficient information to have a conclusion.

21  Q    You rushed to the conclusion I don't have what I need,

22  that's what I need to put in the report?

23  A    I did not rush to the conclusion, no.

24  Q    You just said that's right where you went to when you

25  had to do the report, you had to get on paper that you

1  didn't have sufficient information?

2  A    No, we --

3  Q    That's why you didn't start your claim analysis, right?

4  A    That is not right.  We started working on -- we started

5  working on trying to value the claims and we did not have

6  sufficient time to do that.

7  Q    Oh, now you did you start.  I thought you just told me

8  you didn't start it.

9  A    No --

10  Q    Now you did start.

11  A    -- no, we always start it.  We sent out a discovery

12  request list.  We try to get information to try to do the

13  analysis --

14  Q    A request?

15  A    Yeah.

16  Q    To do a claim analysis?

17  A    Yes.

18  Q    Why -- who would you send discovery to, to do a claim

19  analysis?

20  A    No, we sent discovery request to get information from

21  the Debtor to see what they had done.

22  Q    Wait --

23  A    Since they had already approved -- they had already

24  settled the claims.

25  Q    Why do you care what the Debtor done?  I thought you

MICHAEL ATKINSON - CROSS BY MR. PATTERSON                344

1  were doing your own analysis?

2  A    Well the Debtor settled the claims.  There's a 9019

3  saying this is a fair out come.  I assume the Debtor had

4  done an analysis.  I think that's a good, fair starting

5  point.

6  Q    Why wouldn't you do your own?  That's what I'm asking

7  you.

8  A    There was not enough time to do that.

9  Q    How much time are we talking about?

10  A    I don't know.  It's 240 claims.  I don't know who all

11  the claimants are.  I couldn't do that on my own any way.

12  It's something that would have to be done in conjunction

13  with the Debtor.

14  Q    Wait a minute you just said there wasn't enough time.

15  And I asked you how much time and you said you didn't know.

16  A    I don't know specifically, no.

17  Q    Well how did you know there wasn't enough time then?

18  A    Because what ended up happening was the 9019 was filed

19  on January 16th and we pivoted to -- we had to work with the

20  information that we had at that point in time.

21  Q    Okay.  And why didn't you do a sampling of claims

22  analysis?

23  A    I didn't think a sampling -- the size that we could

24  probably do, would probably not be helpful.

25  Q    Probably?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1    A    Yeah.  Most definitely if you go back and look at the

2    settlement data.  The claims were disbursed as far as a

3    death claims were paid 5,000 in some instances and paid 6

4    million in other instances.

5    Q    I could not understand what that last answer was.  Tell

6    me what you were trying to explain, again.

7    A    I'm saying that the claims information that we had

8    gotten from the Debtor was -- showed very large variances

9    and the types of claims, as you pointed out, were very

10   diverse.

11        So my view was the claims needed to be done on a claim

12   by claim basis.

13   Q    Okay.  I think we've done that like three times.

14   You've told me that three times.  And I'm asking you why

15   didn't you get started on that?

16   A    In order to do the proper claims analysis here, every

17   claim needs to be valued.

18   Q    Of course.

19   A    You can't take a sampling of the claims to get to the

20   right answer.

21   Q    Of course.  But for an expert report you can take a

22   sample, right.  And extrapolate from that.  You're an

23   expert, right?

24   A    Yes, that's essentially what the Debtor's did.  Is they

25   took an average settlement amount and they applied it to the

1  number of claims that are out there and that's the number

2  they went with.

3       I personally believe in this case, that you need to

4  look at each claim individually to get to the right answer.

5  Q    I agree.  And why didn't you get started?  I keep

6  asking you that.

7  A    I did not have time to do that.

8  Q    And how much time would you need?

9  A    I don't know -- I don't know who all the -- I don't

10 know the contact information for the claimants.  In order to

11 do that properly in bankruptcy, we've done this before.  As

12 I mentioned, the Debtors sends out PIK form.

13 Q    Yeah.

14 A    We get information back.  Probably need medical

15 experts.  It takes time.

16 Q    Right.  But you're the -- I think you're the expert,

17 right?

18 A    Correct.  But I couldn't just go out and --

19 Q    Okay.

20 A    -- start contacting the creditors and --

21 Q    Why?

22 A    Because I just couldn't do that not --

23 Q    Why?

24 A    -- the way bankruptcy works.  I'd have to go through

25 the Court.

1    Q     That's not how bankruptcy works?

2    A     No, that's not how claims estimation is done.

3    Q     How is it done?  Tell me then.

4    A     You use the information that the Debtor has and if the

5    Debtor doesn't have the proper information, the Debtor

6    requests --

7    Q     What information?

8    A     -- it by --  Each claim here is different and unique.

9    Q     Yes.

10   A     We need medical experts to look at the claims.

11   Q     Why would the Debtor have the medical experts?

12   A     Because the Debtor is settling these causes of actions

13   that I believe in order to properly value the claims, they

14   should have done this analysis.

15   Q     It appears that your report is more of I don't like

16   what they did, but I'm not going to tell you what I think,

17   right?

18   A     No, that's not true.

19   Q     So, your expert opinion, Mr. Atkinson.  The tort

20   claimants that are incarcerated, are they to be considered

21   separately or differently?

22   A     I think all claimants should be considered together.  I

23   don't know why you would differentiate the claims.

24   Q     You don't.  So Mr. Goodman's client, medical

25   malpractice claims, represented by Brown Rudnick, is going

1  to get the same result as the incarcerated pro se in your

2  expert opinion?

3          MR. GOODMAN:  Objection, Your Honor.  Brown

4  Rudnick does not represent any --

5          MR. PATTERSON:  Oh, good Lord.

6          THE COURT:  I'm taking it as a hypothetical.  A

7  firm that is represented versus a pro se.  That's how I'll

8  construe the question.

9          MR. GOODMAN:  Yes.

10         MR. PATTERSON:  Yes, Your Honor.

11         THE WITNESS:  So are you suggesting -- I just want

12  to make sure I answer your question.  Are you saying

13  incarcerated people, none of them have lawyers, is that what

14  you're suggesting?  They're all pro se.

15  BY MR. PATTERSON:

16  Q    I'm not suggesting anything.  You're the expert,

17  Mr. Atkinson.

18  A    Well you just -- you gave me -- I think you gave me a

19  hypothetical.

20  Q    Answer my question.

21  A    I'm trying to.

22  Q    Okay.

23  A    You gave me a hypothetical.

24  Q    Right.

25  A    You said an incarcerated claimant --

1   Q     Pro se.

2   A     You didn't say pro se before.  Now you're saying pro

3   se.  And that's the distinction --

4   Q     Well, Mr. Goodman interrupted me, so.  Pro se.

5   A     Okay, so can you repeat the question now I don't

6   want --

7   Q     Sure.  Are you suggesting that a claimant with the same

8   claim, medical malpractice, took out the appendix and there

9   was nothing with the appendix.  Whatever it is.  Medical

10  malpractice.

11        One of them is represented by Brown Rudnick.  One of

12  them is incarcerated and is pro se.  Are you suggesting to

13  this Court that the outcome of those two cases is identical

14  as an expert?

15  A     In what context?

16  Q     The result of getting paid a dollar amount.

17  A     Well in bankruptcy if the claims are both good, they

18  should both get paid the same amount of money.

19  Q     Sure.

20  A     So if they're the same claim, they should get paid the

21  same amount of money.

22  Q     That's right.  And how about out of bankruptcy?

23  A     Well I think out of bankruptcy, people that have

24  counsel generally get paid more.

25  Q     That's right.  And so can you conclude, as an expert

1  then, that a dismissal of this case would work a detriment

2  to those pro se incarcerated individuals with Tort claims?

3  A    I can't conclude that, no.

4  Q    How?  Are you now suggesting that they end up the same?

5  A    We don't know how much their going to get paid.

6  Q    Correct.  But you're an expert.  Tell me.  In your

7  expert opinion, is that pro se incarcerated plaintiff going

8  to end up with anywhere near Brown and Rudnick's client?  At

9  the end of the day, the same tort injury.

10  A    Again, I don't know -- you're giving me a hypothetical.

11  I don't know the answer to that.

12  Q    You're an expert though.  You're a claims expert,

13  right?

14  A    I am, yes.

15  Q    I'm asking you a claims question.  Why don't you want

16  to answer?  Do you not like the answer?

17  A    No, I just don't understand the question.

18  Q    Please, what part do you not understand?

19  A    Go ahead, ask it again.

20  Q    We'll walk through it.  Tell me which part you don't'

21  understand.

22  A    Go ahead and ask me again.

23  Q    No, I want to know what part you don't understand.

24  A    I don't --

25  Q    You just told me under oath you don't understand my

1  question.

2        THE COURT:  Both of you are being argumentative to

3  each other.  And I just want to tone the temperature a

4  little bit.  So go ahead an ask another question.

5  BY MR. PATTERSON:

6  Q    Are you suggesting, as an expert, that pro se litigants

7  fair no worse outside of bankruptcy than litigants with

8  counsel?

9  A    Some pro se -- on average pro se litigants do worse

10 than ones with counsel.

11 Q    That's right. And in this case, more particularly,

12 these incarcerated plaintiffs, pro se plaintiffs, who were

13 injured while in prison.  Are you suggesting they're going

14 to do the same or better than claimants who have counsel if

15 this case is dismissed?

16 A    I'm not suggesting that, no.

17 Q    Okay.  Will you agree with me they'll do worse?

18 A    They more likely than not would do worse without

19 counsel.

20 Q    Okay.  So, as far as the pro se litigants, generally

21 speaking -- I'm not talking about this 9019 -- but generally

22 speaking, the pro se litigants would fair better with this

23 bankruptcy in tact, operating, than not.  Would you agree

24 with me?

25 A    I don't know that I agree with that, no.

1    Q    Okay, tell me why.

2    A    There's not a plan in my file.  I don't know what

3    the --

4    Q    I'm not talking about -- I said generally.  Generally.

5    Not under a particular plan.  Generally in getting paid.

6    A    I don't know the answer to that.

7    Q    Why?  You're an expert.

8    A    I am an expert, but I don't know all the facts in order

9    to determine that.

10   Q    I just gave you the facts.  The facts of this case.

11   Will these pro se litigants do better in a bankruptcy case

12   administration with this Judge sitting on the bench than

13   dismissing the case and telling them to go be your own

14   lawyer in federal district court of New York?

15   A    I guess it depends on what happens with this case.

16   Q    Mr. Atkinson, it's a general question.  I'm going to

17   give you one more chance --

18   A    If you --

19   Q    -- just be honest okay.  Just be honest.

20   A    I'm trying to.

21   Q    I know you don't like the answer, because of who's

22   paying you, right?  Or who hired you.  But you've got to be

23   honest, right?  You're an expert you have a credibility

24   issue here.  Right?

25            MR. GOODMAN:  Your Honor, objection.  This is

1   getting really argumentative.

2             THE COURT:  Sustained.

3        (Pause in the proceedings.)

4   BY MR. PATTERSON:

5   Q    Is there value to an alter ego claim?

6   A    I need more context than that.

7   Q    Nope.

8   A    Okay, I can't answer that question.

9   Q    Why?

10  A    Because I don't know if there's ability to pay, I don't

11  know if there's -- there's a lot of factors that --

12  Q    No, to an alter ego claim.  Not to an underlying claim,

13  but to an alter ego claim, itself.  Forget about everything

14  else.  Alter Ego.  Is there a value to that claim?

15  A    I can't answer that question.

16  Q    Why?

17  A    I can't.  I don't understand the question.  You're not

18  giving me details to answer the question.

19  Q    What details do you need?

20  A    I don't know.  Is it a legal question that you are

21  asking me?

22  Q    No.  You're an evaluation expert.  You've talked about

23  the value of alter ego claims.

24  A    Correct.

25  Q    Okay, tell me what you need to know.

1  A    I need to know who's bringing the claim.

2  Q    I am.

3  A    Okay.  I need to know who we're -- who you're pursuing.

4  Q    I'm suing Chase Bank.

5  A    Okay.  So Chase Bank has the money to pay you?

6  Q    Billions.

7  A    And I need to know how good your claim is.

8  Q    Excellent.  I'm the lawyer.

9  A    Then there's value.

10  Q    Okay, how much?

11  A    I don't know -- what is -- I don't know the answer to

12  that.

13  Q    I don't either.  Does an alter ego claim have it?

14  That's my only claim in the lawsuit, alter ego.

15  A    The alter ego claim would be, you know, whatever the

16  value of your damages are.  So if you're a claimant in this

17  case and you're owed $10 and there's an alter ego claim and

18  the party you're pursuing has $10, then you have a good

19  case, excellent case because you're the lawyer.  Then it's

20  worth $10.

21  Q    Okay.  So it's a collection.  It's a pass-through.

22  It's a way to collect my damages caused by something else,

23  right?

24  A    Correct.

25  Q    So if I have a $10 tort claim, my claim is $10 and

1  someone says, well Mr. Atkinson you didn't consider you

2  alter ego claim.  Right?  Does that change the value of my

3  $10 claim?

4  A    It does not.

5  Q    Right.  Zero.  And so if I'm valuing claims, why do I

6  need to consider and talk about the value of -- the

7  hypothetical value of an alter ego claim?

8  A    Because we're ultimately trying to value what's going

9  to be paid on that claim.

10 Q    Right.

11 A    The settlement amount.

12 Q    Outside of bankruptcy, right?  But it doesn't effect

13 the $10 tort claim.  It talks about collectability.  Right?

14 A    The $10 tort claim would be entitled -- under your

15 hypothetical where it's you're the lawyer -- it's entitled

16 to $10.

17 Q    Right.  Right.  Irrespectable alter ego.  Right?

18 A    Well because of alter ego in your hypothetical.

19 Q    The Debtor pays it or somebody else pays it, right?

20 It's still a $10 claim.

21 A    It is still a $10 claim.

22 Q    Right.  And so you're suggestion that they didn't even

23 mention alter ego in their valuations, doesn't really make

24 sense, right?

25 A    No, that's not true.

1  Q    Why?  Does it alter the value of the claims?

2  A    It alters the settlement of -- this whole thing is

3  about the settlement amount.  There's a 9019.  They've

4  settled the claims for $54 million.

5  Q    Right.

6  A    So what's the value of the successor liability claim?

7  The Debtor's have estimated their claims in this case at 135

8  to 187 million.

9  Q    Right.

10 A    If, in your hypothetical you are the lawyer and you're

11 pursuing Chase Bank for that amount of money, the amount

12 should be -- and you have a good case, the amount should be

13 135 million or 187 million.

14 Q    It goes --

15 A    To how much you can get paid.

16 Q    Right.  And you don't know whether that's a good deal

17 or not as proposed by the Debtor, right?

18 A    I don't have sufficient information --

19 Q    That's right.  You don't know if it's good or bad.

20 A    I don't have --

21 Q    It may be good, it may be bad.  Right?

22 A    Yes, sir.

23 Q    Okay, so what was the purpose of your testimony today

24 if you don't know if it's good or bad?

25 A    There's a 9019 on file.  We're trying to decide whether

1  it should be approved or not.

2  Q    Right.

3  A    And we're trying to understand what went into deciding

4  it was a good deal.

5  Q    Right.

6  A    And I don't have information to determine if it's a

7  good deal or not.  Or a bad deal.

8  Q    Great.

9         MR. PATTERSON:  No further questions, Judge.

10        THE COURT:  Thank you.  Any further cross?  Any

11  redirect?

12        Okay, please proceed.

13        MR. GOODMAN:  Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15  BY MR. GOODMAN:

16  Q    Mr. Atkinson, would it be reasonable in your view to

17  support a settlement without adequate information?

18  A    No.

19  Q    Okay.  Mr. Atkinson, do you know who has the burden of

20  proof on the Rule 9019 Motion?

21  A    The Debtor does.

22        MR. KAUFMAN:  Objection.

23        THE COURT:  Yeah, I'll sustain.

24  BY MR. GOODMAN:

25  Q    Mr. Atkinson, is it fair to say that the TCC

1  desperately wants YesCare financial information?

2  A    Yes.

3  Q    Is it also correct that to day, YesCare has not

4  produced its current financials?

5              MR. KAUFMAN:  Objection, leading.

6              THE COURT:  Overruled.

7              THE WITNESS:  That's correct.

8  BY MR. GOODMAN:

9  Q    Okay.  Has YesCare opened its books and records to the

10 TCC?

11 A    It has not.

12 Q    Has any of the settlement parties produced their

13 current financials?

14 A    I have not seen them, no.

15 Q    Has Mr. Lefkowitz produced current financials?

16 A    He has not.

17 Q    Have any of the settlement parties made their books and

18 records available?

19 A    They have not.

20 Q    Okay.  So how could you verify the financial statement

21 for YesCare if YesCare won't make its books and records

22 available?

23 A    I can't.

24 Q    And how could you determine if YesCare would have a

25 problem paying a judgment, if YesCare won't product it's

1  current financial record?

2  A     I can't.

3  Q     Okay.

4          MR. KAUFMAN:  Still leading.

5          THE COURT:  Overruled.

6  BY MR. GOODMAN:

7  Q     My last question.  Let's see if we can get through it.

8  What does it tell you in all of your experience in the

9  restructuring field, that YesCare financials are a central

10  issue in this case?  And yet the Debtor wants to settle

11  claims against YesCare without the information.

12         MR. KAUFMAN:  Objection, Your Honor.

13         THE COURT:  I'll sustain that.

14         MR. GOODMAN:  Nothing further.

15         THE COURT:  Any Cross?

16         MR. KAUFMAN:  No further questions.

17      (Pause in the proceedings.)

18                          RECROSS-EXAMINATION

19  BY MR. HEMENWAY:

20  Q     Mr. Atkinson I've just got one question after that.

21  Your testimony is that it's vital to get YesCare's

22  financials, right?  I think that's what you said, it's

23  vital.

24  A     I don't know if I said vital.  But it's important.  I

25  can't value the claims without it.


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1   Q     You can't do your job, right?

2   A     Yes.

3   Q     Okay.  Yet you billed this estate $500,000 when you

4   know all along you can't do your job?

5   A     I didn't know all along I wasn't going to get the

6   financials.  We've been trying to get them from the

7   beginning since we've been hired.

8   Q     But if you can't do your job, what's the -- right?

9   You're telling the Court I can't do anything without this,

10  this data.  You haven't come and gotten an order for it,

11  right?  Yet we've got $3 million worth of lawyers and

12  $500,000 worth of experts that are all saying we can't do

13  our job without these financials, right?

14  A     Yes.

15          MR. HEMENWAY:  No further questions.

16          THE COURT:  Further questions?

17      (No audible response.)

18          THE COURT:  Thank you very much for your time,

19  Mr. Atkinson.

20      (Witness steps down.)

21          MR. KAUFMAN:  Your Honor, just very briefly.

22          THE COURT:  Oh, I think he was first.  So he gets

23  to first.

24          MR. ZLUTICKY:  I apologize for being slightly

25  quicker.  The next witness is Mr. Matt Dundon.  He's not in

1  the courtroom.  So I would need just a minute to bring him

2  into the courtroom.

3          THE COURT:  Okay.

4          MR. GOODMAN:  I apologize for not standing when I

5  objected, Your Honor.  But given the pace of things, it's

6  hard for me to actually get up off the seat.  So I'm sorry.

7          THE COURT:  Let's just get -- how long do you

8  think it will take to get Mr. Dundon in?

9          MR. ZLUTICKY:  We're grabbing him right now, Your

10 Honor.

11          THE COURT:  Okay, let's get him.

12     (Pause in the proceedings.)

13          THE COURT:  Mr. Zluticky, from a timing

14 standpoint, how much direct do you have?  I'm just trying to

15 get a sense of tonight to talk about.

16          MR. ZLUTICKY:  Your Honor, I'm trying to -- I was

17 trying to pare down at the last break.  I'm hoping it will

18 be under an hour.

19          THE COURT:  Okay.  And in terms of cross, what do

20 you expect?

21          MR. MOXLEY:  Your Honor, we'd probably expect 15

22 to 20 minutes.

23          THE COURT:  Okay.

24          MR. ZLUTICKY:  Your Honor, the Official Committee

25 of Unsecured Creditors would call Matt Dundon.

1          THE COURT:  Okay, Mr. Dundon, why don't you come

2     up?  What about binders?  Does anyone need to grab binders

3     or any of that stuff?

4          MR. ZLUTICKY:  Mr. Dundon, for the Record, there's

5     going to be two black binders on your left.  And those will

6     be the ones that we refer to if we need to refer to them

7     today.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right, Mr. Dundon, can you please

10    raise your right hand?

11       (Witness sworn.)

12          THE COURT:  Okay, we'll let the Record reflect the

13    witness has been properly sworn in.

14          MR. ZLUTICKY:  Your Honor, may I approach the

15    witness to give him some water?

16          THE COURT:  Yes, of course.

17                     DIRECT EXAMINATION

18    BY MR. ZLUTICKY:

19    Q    Please state your name for the Record.

20    A    Matthew Dundon.

21    Q    What company do you work for?

22    A    Dundon Advisors, LLC.

23    Q    How long have you worked there?

24    A    A little more than eight years.

25    Q    What is your job title?

1    A     Principal.

2    Q     Do you have a bachelor's degree?

3    A     I do.

4    Q     From what university?

5    A     From the University of California, Berkley.

6    Q     Do you have any post graduate degrees?

7    A     I do.

8    Q     What kind of degree?

9    A     I have a law degree.

10   Q     From what university?

11   A     From the University of Chicago.

12   Q     When did you graduate from the University of Chicago

13   school of Law?

14   A     1998.

15   Q     Where did you work after law school?

16   A     I initially worked at the new York office of Willkie

17   Farr and Gallagher.

18   Q     At some point did you leave the private practice of

19   law?

20   A     I did.

21   Q     Approximately when was that?

22   A     2003.

23   Q     And what did you do after you left the private practice

24   of law?

25   A     I went into the Fixed Income and Distressed business.

1  Q     And then at some point you founded Dundon Advisors; is

2  that right?

3  A     That's right.

4  Q     When did you start Dundon Advisors?

5  A     In February of 2016.

6  Q     What kind of work have you performed at Dundon Advisors

7  since 2016?

8  A     We primarily advise institutional clients on distressed

9  and litigation investments.  And we offer restructuring

10  advisory service to creditors, Debtors, and other stake

11  holders.

12  Q     Gave you been an advisor to the Unsecured Creditors

13  Committee at Dundon Advisors?

14  A     I have.

15  Q     Approximately how many times?

16  A     Around 100.

17  Q     Have you been advisor to Tort Claim Committees at

18  Dundon Advisors?

19  A     I have.

20  Q     How many times?

21  A     Depending on how you define tort claim Committees.  A

22  dozen or so.

23  Q     Okay.  Would that be both joint and unofficial?

24  A     Yes.

25  Q     Have you been a litigation trustee or liquidating

1  trustee in bankruptcy case?

2  A     I have.

3  Q     Have you worked on cases involving mass torts?

4  A     Yes.

5  Q     Okay.  Tell me a little bit about that experience.

6  A     So, we are regularly engaged both by law firms and

7  groups of law firms and groups of mass tort plaintiffs who

8  have claims against distressed companies that may be in or

9  contemplating going into bankruptcy.

10     And we also advise other creditors in cases that are

11 mass tort centric.

12 Q     Do you have an understanding of what avoidance actions

13 are?

14 A     I do.

15 Q     What is that understanding?

16 A     Avoidance actions are efforts to claw back transfers

17 that were preferences under the Bankruptcy Code or

18 fraudulent under the Bankruptcy Code or applicable state

19 law.

20 Q     What experience do you have with avoidance actions that

21 help you form this understanding?

22 A     So avoidance actions are at least potentially an asset

23 of virtually every bankruptcy estate that we come across in

24 any side of our business.

25 Q     Have you valued potential avoidance actions at Dundon

1   Advisors?

2   A     Yes.

3   Q     Can you please tell me about your experience valuing

4   potential avoidance actions?

5        MR. MOXLEY:  Your Honor, I'd like to object to the

6   question, Judge.  I specifically, Your Honor will recall

7   that we made a motion to compel, a joint motion to compel

8   motion in limine at the outset of the hearing and the Court

9   denied that motion.

10       But without prejudice subject to our ability to

11  object to questions when they illicit testimony.  That the

12  witness was specifically instructed not to answer during

13  deposition.

14       And at Mr. Dundon's deposition, I specifically

15  asked if he would offer any testimony at the hearing as to

16  the value of avoidance actions in support of the motion and

17  he was instructed to not to answer that question.

18       So, Judge, on that basis, I don't think it's

19  appropriate to solicit testimony from Mr. Dundon today given

20  that we were foreclosed for being able to ask questions

21  about that at the deposition on privilege grounds.

22       MR. ZLUTICKY:  Your Honor, I'm not asking

23  Mr. Dundon the specific evaluation question.  I'm asking him

24  about his experience.  I also think this is consistent with

25  what we've been doing thus far, possible subject for cross.

1              THE COURT:  Yeah, but you're not going to -- I'm

2    fine with you asking about his experience.  But if there's a

3    specific topic that's shut down and he couldn't answer it,

4    he's not going to be able to talk about it today.

5              MR. ZLUTICKY:  I understand.

6              MR. MOXLEY:  Your Honor, what's the relevance of

7    his experience valuing avoidance actions?  He can't offer an

8    opinion on avoidance actions.

9              THE COURT:  I don't know.  But the fact that he's

10   done the experience, I'm fine with it.  It's background.

11   But I think if he gets into specifics, I'll preserve the

12   objection.

13             MR. MOXLEY:  Thank you, Judge.

14             MR. ZLUTICKY:  And, Your Honor, he did talk about

15   it at his deposition.  But we can get to that --

16             THE COURT:  Okay.

17             MR. ZLUTICKY:  -- we can cross that bridge if we

18   need to.

19             THE COURT:  Okay.

20   BY MR. ZLUTICKY:

21   Q    So, Mr. Dundon, please tell me your experience valuing

22   potential avoidance actions at Dundon?

23   A    So in a significant subset of the bankruptcy cases in

24   which we have some role, avoidance actions appear promising.

25   And so we take the next step and begin to think about their

1  value.

2  Q    Have you valued potential successor liability or alter

3  ego claims at Dundon?

4  A    Yes.

5  Q    Can you describe that experience for the Court?

6  A    So, in a high proportion of large and complex cases,

7  there's often a controlling private equity sponsor, a lender

8  that one could argue was in control.  Somebody who bought

9  some significant portion of assets before a financial

10  distress or during financial distress.

11      And we look at those entities as potentially also being

12  on the hook for the debt owed to our clients or owed to

13  creditors in the case.

14  Q    Do you have experience pursuing or settling those types

15  of claims?

16  A    Yes.

17  Q    And do those experiences help inform your view

18  regarding the potential causes of action in this case?

19  A    Yes.

20  Q    Is Dundon Advisor the financial advisor to the UCC in

21  this case?

22  A    Yes.

23  Q    And if I say UCC, you and I can understand I mean the

24  official Committee of unsecured creditors?

25  A    I do understand it that way.

1  Q    And so I don't want to retread a lot of old ground

2  here, Mr. Dundon.  David Barton previously testified on this

3  case on behalf of the UCC.  He testified of the UCC meets at

4  least once a week.

5       Do you attend most of those meetings?

6  A    I do.

7  Q    Have you spoken with members of the UCC at those

8  meetings?

9  A    I have.

10 Q    Have you spoken with members of the UCC outside those

11 meetings?

12 A    I have.

13 Q    In the 12 months as you've served as financial advisor

14 to the UCC, have you formed a view on the level of

15 engagement with the UCC in this bankruptcy case?

16 A    I have.

17 Q    What is that view?

18 A    It's exceptionally high.

19 Q    Why do you say that?

20 A    I've been involved with lots of official Committees

21 over the past eight years.  And I've observed that quite

22 often there are only one or two members who are really

23 engaged.  Many times, most Committee members --

24 unfortunately sometimes all Committee members -- just take

25 the lead of their professionals.

1       Whereas in this case I've seen a very high level of

2  intellectual engagement.  A lot of push back of you and me

3  and other people to make sure that we're giving good advise

4  and that the decisions are the right ones.

5  Q    Do some of the members of the UCC have contract claims

6  against the Debtor?

7  A    Yes.

8  Q    Do some of the members of the UCC have personal injury

9  or tort claims against the Debtor?

10 A    Yes.

11 Q    Do the tort claimant or personal injury claimant

12 members on the UCC attend those meetings either personally

13 or through their respective counsel?

14 A    Yes.

15 Q    Does the UCC listen to those members?

16 A    Yes.

17 Q    Does that include you as its financial advisor?

18 A    Very much so.

19 Q    Have you spoken with personal injury or tort claimant

20 members of the UCC or their respective counsel, inside

21 meetings of the UCC?

22 A    Yes.

23 Q    What about outside of the meeting?

24 A    That as well.

25 Q    Have you formed a view on the level of sophistication

1   engagement of the tort claimant or personally injury members

2   of the UCC in this bankruptcy case?

3   A    I have.

4   Q    What is that view?

5   A    That it's high.

6   Q    Why do you say that?

7   A    One of the two personal injury claimant members is

8   represented by a partner at one of the plaintiff law firms

9   in the country that participates very aggressively and

10  effectively in bankruptcies and has a lot of sophistication.

11       The others represented by a plaintiff law firm that has

12  considerable bankruptcy experience in my knowledge and then

13  also has a very well regarded bankruptcy lawyer working on

14  the team.

15  Q    I want to now shift to the UCC's investigation in this

16  case.

17  A    Okay.

18  Q    When did the UCC start its investigation?

19  A    Immediately after it was formed and hired its

20  professionals.

21  Q    What did you know about the investigation needs of the

22  UCC when you were being engaged?

23  A    I assumed that we were going to be looking at the major

24  headings that people are concerned about in divisional

25  mergers.  Including, you know, fraudulent transfers as well

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                     372

1  as the standard things of what are the preferences breaches

2  the fiduciary duty and the like.

3  Q    Did the UCC identify areas that were required

4  investigation in this bankruptcy case?

5  A    It did.

6  Q    so, if you could please turn to Exhibit 1 in Volume 1

7  in of your black binder.  It wouldn't be that binder.  It

8  would be one of the one's next.  Volume one.

9        (Pause in the proceedings.)

10            MR. ZLUTICKY:  And, Your Honor, just for the

11  Record that's Docket number 1410 -- 1410.

12            THE COURT:  Thank you.

13  BY MR. ZLUTICKY:

14  Q    So this is the rule 9019 motion.  Do you see that?

15  A    I do.

16  Q    have you reviewed this document before?

17  A    I have.

18  Q    Are you familiar with it?

19  A    I believe I am.

20  Q    Are some of the areas of the UCC's investigation

21  described in the Rule 9019 Motion?

22  A    Yes.

23  Q    Are all of the areas of the UCC's investigation

24  described in the Rule 9019 Motion?

25  A    No.

1  Q     Why not?

2  A     The 9019 Motion had to focus on issues that were most

3  significant in the minds of the parties to the agreement.

4  Q     If you could please turn to Tab 18 in your notebook?

5  It's Exhibit 18.

6       (Pause in the proceedings.)

7           MR. ZLUTICKY:  And Your Honor this is Docket

8  1410-18.

9  BY MR. ZLUTICKY:

10  Q    This is the Second Amended Disclosure Statement filed

11  in this case.  Do you see that?

12  A     I do.

13  Q    does the Second Amended Disclosure Statement -- well

14  let me back up for a moment, Mr. Dundon.  I apologize.  Are

15  you familiar with this document?

16  A     I am.

17  Q    have you reviewed this document before?

18  A     I have.

19  Q    Does the Second Amended Disclosure Statement include

20  other areas of the UCC's investigation in addition to what's

21  described in the Rule 9019 Motion?

22  A     It does.

23  Q    Are all of the areas of the UCC's investigation

24  described in either the motion or the Disclosure Statement?

25  A     No.

1  Q     Why not?

2  A     In the case of the Disclosure Statement, the objective

3  was to focus on the most material issues that would inform

4  creditors how to vote on the Plan, which is the purpose of

5  the Disclosure Statement.

6  Q     Was the divisional merger one of the areas investigated

7  by the UCC in this case?

8  A     It was.

9  Q     Do you have an understanding of what the divisional

10  merger is, that's been described in this case?

11  A     Yes.

12  Q     Okay.  And what is that understanding?

13  A     A series of transactions were undertaken under Texas

14  Corporate Law.  The results of which was that substantial

15  all the operating assets that the Debtor had owned became

16  property of the YesCare entity.

17      Which assumed only a subset of liabilities associated

18  with those assets.  And the Debtor retained the balance of

19  the -- excuse me -- the balance of the liabilities and

20  Moreland did some subset of assets as well as a funding

21  agreement.

22  Q     Were there other areas of investigation the UCC pursued

23  in addition to the divisional merger?

24  A     Yes.

25  Q     Was one of those areas transfers made by the Debtor to

1  some of the settlement parties prior to the bankruptcy

2  filing?

3  A     Yes.

4  Q     Did the UCC investigate potential successor liability

5  claims against the settlement parties?

6  A     Yes.

7  Q     Did the UCC investigate potential alter ego claims

8  against the settlement parties?

9  A     Yes.

10 Q     Did the UCC investigate potential breach of fiduciary

11 duty claims against the settlement parties?

12 A     Yes.

13 Q     Can you describe your involvement in those

14 investigations?

15 A     So, I led the work of my team on the advisors looking

16 at the business and financial elements and issues in

17 questions that those investigations brought to light.

18 Q     Did you review documents produced to the UCC in this

19 case?

20 A     I did.

21 Q     Do you know how many?

22 A     No.

23 Q     How would you characterize the amount of documents you

24 reviewed?

25 A     A lot.

1  Q     Did you and your team analyze those documents?

2  A     Yes.

3  Q     did you provide updates to the UCC members on the

4  status of the investigation?

5  A     Yes.

6  Q     What kinds of documents did you and your team look at?

7  A     So we reviewed financial statements, bank records.  We

8  reviewed a variety of documents that related to the

9  divisional merger and its back drop.  We reviewed material

10 contracts of the Debtors business.

11 Q     Did you review deposition transcripts?

12 A     Yes.

13 Q     Did the UCC receive all the information it asked for in

14 its investigation of the settlement parties?

15 A     No.

16 Q     Why not?

17 A     This kind of investigation you never get everything

18 that you ask for.

19 Q     Did the UCC receive enough information to conduct its

20 investigation?

21 A     Yes.

22 Q     Why do you say that?

23 A     We relevant picture on divisional merger, on potential

24 avoidance actions and a number of other items that we

25 thought were relevant and potentially had value from a

1  litigation settlement perspective.

2  Q    So we're going to turn back to Tab 1, the Rule 9019

3  motion.

4  A    Okay.

5  Q    It's Docket 1410-1.  Paragraph 27.

6  A    Yes.

7  Q    That paragraph outlines categories of potential claims

8  against the settlement parties.  Do you see that in

9  Paragraph 27?

10  A    I do.

11  Q    And it lists four main categories.  Is that right?

12  A    It does.

13  Q    Are those the only potential claims against the

14  settlement parties that the UCC identified?

15  A    No.

16  Q    And that's not what this does, does it?

17  A    It does not say that.

18  Q    What types of additional claims against the settlement

19  parties did the UCC identify?

20  A    So breach of fiduciary duty, successor liability, alter

21  ego among others.

22  Q    After completing its investigation, did the UCC

23  identify potential claims against YesCare arising out of the

24  divisional merger?

25  A    It did.

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                    378

1   Q     What are those claims?

2   A     They're primarily claims that the fraudulent

3   transfer -- excuse me.  The divisional merger was, it self a

4   fraudulent transfer.

5   Q     Are there any other potential claims against YesCare?

6   A     Yes.

7   Q     Like what?

8   A     Like successor liability.

9   Q     Why does the UCC believe that the divisional merger was

10  a fraudulent transfer?

11  A     We believe it might be found to be a fraudulent

12  transfer because it was a transaction that occurred while

13  the Debtor was insolvent or possessed unreasonably small

14  capital or was rendered insolvent or insufficiently

15  capitalized by the transaction.

16        And it was a transaction whereby it gave more to

17  YesCare in value than it got.

18  Q     Are you familiar with FTI Financial Advisors?

19  A     I am.

20  Q     Did FTI prepare a fairness opinion on the divisional

21  merger?

22  A     It did.

23  Q     Have you reviewed it?

24  A     I have.

25  Q     Are you familiar with it?

1  A    I would say I am.

2  Q    What was FTI's opinion about the divisional merger?

3  A    That it was fair to the Debtor's creditors.

4  Q    What is the UCC's view of that fairness?

5  A    That it's not reliable.

6  Q    Why is that?

7  A    Two primary reasons.  The first is that it liens

8  heavily on a purported assumption of debt in the divisional

9  merger around $100 million of debt that moved from the

10  Debtor to YesCare.

11     Many thinks that that was -- excuse me -- that had been

12  equitized before that transfer.  So there was no value

13  received by the Debtor in being relieved of that debt.

14          MR. MOXLEY:  Your Honor, objection.  I would move

15  to strike the last answer.  At Mr. Dundon's deposition, --

16  and Your Honor, if you'd like a copy of the transcript I'd

17  be happy to give you one for the purpose of my objection.

18          But at his deposition, I asked him about FTI's

19  analysis on that point.  And he mentioned something similar

20  to what he just said.  I asked him if he could tell me why

21  that was his view.  And he said -- and I can show you the

22  transcript.  But he said that he could not do so without

23  invading privilege communication.

24          I think it's inappropriate now that he comes with

25  this information when he was not able to answer those

1    questions at deposition.

2            THE COURT:  Counsel?

3            MR. ZLUTICKY:  Your Honor, we did not instruct

4    Mr. Dundon not to answer questions about valuation in his

5    deposition.  And if he can point to the portion of the

6    transcript that show that.

7            THE COURT:  Did he say that though?  In other

8    words, did he answer the question that he couldn't answer it

9    on the basis of privilege?

10           MR. ZLUTICKY:  Oh we're just talking about FTI.

11   So I believe that he did -- I mean, we can look at the

12   transcript.

13           THE COURT:  Why don't we -- why don't we just

14   check?

15           MR. MOXLEY:  Can we just do that judge?  You don't

16   mind?

17           THE COURT:  Not at all.

18           MR. ZLUTICKY:  Your Honor, if we're just talking

19   about FTI like at this point, I can withdraw that question

20   and move on to a different topic.

21           THE COURT:  All right.

22           MR. ZLUTICKY:  Very good, thank you, Judge.

23           MR. MOXLEY:  Well, Your Honor, I think there was

24   an answer to it though and I think my motion to strike.  I

25   think we need to check that.

1              THE COURT:  No, I'll strike the answer and if you

2     want to come back to it, you certainly can if you want to.

3              MR. ZLUTICKY:  Thank you, Your Honor.

4     BY MR. ZLUTICKY:

5     Q    What is the UCC's view of the merits of the potential

6     fraudulent transfer claims against YesCare?

7     A    They have merit.

8     Q    Why do you say that?

9     A    Because we believe that the first leg of the --

10    speaking about the fraudulent transfer -- the first leg of

11    insolvency of unreasonably small capitalization is met.

12         And then the second let, we think that there's a good

13    argument that the value of the assets that went to YesCare

14    preceded the consideration received by the Debtor.

15    Q    If we could turn to Paragraph 46 of this settlement

16    motion that's in front of you, the Rule 9019 motion.

17         (Pause in the proceedings.)

18    A    I'm there.

19    Q    It says, "The UCC and the Debtor have also evaluated

20    the viability of potential claims against CHS, Texas/YesCare

21    based on the divisional merger under theories based on or

22    derivative of successor liability."

23         Do you see that in Paragraph 46?

24    A    I do.

25    Q    Those potential claims included successor liability,

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                382

1  right?

2  A    Yes.

3  Q    What other potential claims are included in that

4  evaluation described in Paragraph 46?

5  A    Alter ego.

6  Q    So the UCC evaluated potential alter ego claims against

7  the settlement parties?

8  A    It did.

9  Q    what is the UCC's views of the merits of the potential

10 alter ego claims against the settlement parties?

11 A    We think that they could be asserted, but they would be

12 heavy lift to fail.

13 Q    Why is that?

14 A    Fundamentally it would require that a Court would find

15 that the divisional merger was not capable of achieving the

16 intent of separately assets and liabilities.  And having a

17 successor that didn't bear the liabilities that were

18 intended to be left behind.

19      And to our knowledge, there's been no court that's ever

20 delivered, you know, a final judgment that's held a theory

21 such as that.

22 Q    what is the UCC's views on the merits of potential

23 successor liability claims against YesCare?

24 A    Similar.

25 Q    Are there any other reasons for that other than what

1  you just described?

2  A    No, that's the --

3         MR. MOXLEY:  Objection, Your Honor.  I think this

4  calls for a legal conclusion.  The likelihood of success on

5  the merits of a cause of action I'm not sure that Mr. Dundon

6  is qualified to answer that, Your Honor.

7         THE COURT:  Overruled.  You can answer.

8         THE WITNESS:  I think the Committee, you know, in

9  making its decision with my advice and counsel's advice

10  didn't see that there was a home run there.

11  BY MR. ZLUTICKY:

12  Q    Why not?

13  A    Similarly because it seems to be in the face of the --

14  of what the divisional merger statute is intended to

15  achieve.

16  Q    Does the UCC know whether YesCare disputes potential

17  successor liability claims?

18  A    It does dispute them.

19  Q    Does the UCC know whether the other settling parties

20  dispute potential alter ego claims?

21  A    They do.

22  Q    So the first category of causes of action that are in

23  Paragraph 27, are the pre-petition fraudulent transfers.  Do

24  you see that?

25  A    I do.

1   Q      What are those?

2   A      Those are a series of transfers between the Debtor on

3   one hand and certain settlement parties in the other hand,

4   that didn't appear to have significant receptacle value.

5   Q      How were the identified in the investigation?

6   A      They were identified on the books and records of the

7   Debtor primarily bank records.

8   Q      Did the UCC calculate the potential damages from these

9   causes of action?

10  A      Yes.

11  Q      And how would you describe that calculation?

12          MR. MOXLEY:  Objection, Your Honor.  This is the

13  same objection that I made earlier.  We're talking about now

14  the valuation of the avoidance action.

15          MR. ZLUTICKY:  He absolutely ask Mr. Dundon these

16  questions in his deposition and he provided the answers.

17          THE COURT:  We can just check the transcript.

18          MR. MOXLEY:  Are we -- are we limiting this to

19  the -- may I direct a question to counsel, Your Honor?

20          THE COURT:  Why don't you just talk -- here's what

21  I just like to do actually.  Why don't we just take --

22  Mr. Dundon just so we can -- maybe you-all can -- does it

23  make sense for you-all to talk for a view minutes to figure

24  the scope of where you're going?

25          MR. MOXLEY:  Sure.

1          THE COURT:  And then just so we can have a clean

2  Record while we do this.  Mr. Dundon, we're going to take

3  about five minutes and then we'll -- you're free to.  We'll

4  come back on in about five minutes.  Thank you.

5      (Recess taken from 6:04 p.m. to 6:09 p.m.)

6          THE COURT:  Alrighty.  This is Judge Lopez back

7  on the Record in Tehum.

8          You may have heard the fire alarm.  It is my

9  understanding it is just two separate floors that they're

10 going to do.  At some point, I feel better if they actually

11 got to our floor.  I'd feel like they cared about me a

12 little bit, but they haven't done it yet. But --

13      (Laughter.)

14          MR. ZLUTICKY:  Maybe our floor is fine.

15          THE COURT:  It's just a lot of mixed feelings

16 about that.

17          Okay, folks, back on the Record in Tehum.  Very

18 serious matters.  Okay, let's talk.

19          MR. MOXLEY:  Your Honor, I'm happy to have the

20 session now if you'd like to have there be a question, and

21 I --

22          THE COURT:  Yeah, why don't we do that?

23          But what I would like is, is there a transcript

24 just so I know I can flip to it --

25          MR. MOXLEY:  Yes, Judge.

1          THE COURT:  -- whenever it's quick.

2          MR. MOXLEY:  I've handed one to your Clerk.

3          THE COURT:  Thank you.  That's what I needed to

4  know.

5          Alright.  Mr. Dundon, I apologize for the

6  interruption and the bad joke.  Let's proceed.

7                DIRECT EXAMINATION (CONT'D)

8  BY MR. ZLUTICKY:

9  Q     So, I believe the last question that I asked was, how

10 would you describe the UCC's calculation of the potential

11 damages from the pre-petition transfers?

12 A     We had the bank records.  We looked at the aggregate

13 cash that went out to Transferees.  We looked at any cash

14 that came back, and we asked about any non-cash value that

15 might have come back.

16 Q     Was that a complex transaction calculation?

17 A     No.

18 Q     Why not?

19 A     Because the cash was visible on the bank records and

20 we were not provided any even purported information about

21 reciprocal value that was non-cash.

22 Q     Does the UCC have a precise number for potential

23 damages for each of these causes of action?

24 A     Yes.

25 Q     So, if you look at paragraph -- let's start at

1  Paragraph 28.

2  A     Yes.

3  Q     So, there's a calculation on Paragraph 28 of the total

4  amounts transferred to M2 Loan Co., and it listed

5  approximately $24.5 million.

6            Do you see that?

7  A     That's right.  That's the net.

8  Q     And so, that number is that the value of those claims?

9  A     No.

10 Q     Why not?

11 A     So, to get the value, you have to take into account

12 the risk that a Court would disagree with you, that the

13 transfers were fraudulent.  You have to subtract an estimate

14 for litigation cost.  You have to subtract the time value of

15 money.  It can take a long time to get awards and to collect

16 on them.  And you have to make some provision for partial or

17 entire non-collectability even of an award that you've

18 obtained.

19 Q     What kind of impact does that have on the value of

20 potential claims?

21 A     Avoidance actions like this is a very significant one.

22 Q     Explain that.

23 A     So, those discounting factors I just laid out, you

24 know, litigation risk, collection risk, time value of money,

25 litigation cost just add up to a big haircut.

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                388

1    Q     Now, I want to talk about the fraudulent transfer

2    claim based on the divisional merger itself that we were

3    talking about earlier; how is that claim identified in the

4    investigation?

5    A     I would say that every divisional merger or you know,

6    we consider that as a target.

7    Q     And you were aware of the occurrence of the divisional

8    merger before you were engaged in this matter?

9    A     I was.

10   Q     Did the UCC attempt to calculate the potential damages

11   from the fraudulent transfer action related to the

12   divisional merger?

13   A     Yes.

14   Q     And what number was the UCC trying to calculate there?

15   A     One, a calculation or a determination that the Debtor

16   was insolvent or rendered insolvent or (indiscernible)

17   capitalized.  So, kind of that leg.  And then, the other leg

18   was the value of the assets, were they more than any

19   consideration received back from (indiscernible) to the

20   Debtor?

21   Q     And when you say the value of the assets, what assets

22   are you talking about?

23   A     So, we're talking in this case about the business

24   operations.

25   Q     The business operations of the Debtor that were

1  transferred to CSS Texas?

2  A    Yes.

3  Q    And that's at the time of the divisional merger in May

4  of 2022?

5  A    Correct.

6  Q    What was your role in that process of the

7  investigation?

8  A    I led a team of colleagues to primarily focus on what

9  the value of those business operations was at that time.

10 Q    Who assisted you in that effort?

11 A    Primarily, my colleagues Heather Barlow and Lee Rooney

12 (phonetic).

13 Q    Did you and your colleagues calculate the potential

14 damages from the avoidance action is as it relates to the

15 divisional merger?

16 A    Yes.

17 Q    And how did you do that?

18 A    So, we --

19        MR. MOXLEY:  Objection, Your Honor.  This may be

20 the point where I need to object.  And I would just draw

21 your attention, Your Honor, if you have the transcript

22 Binder there.  I'm at Page 140 of the transcript, Line 15.

23 And I just want to say, before I read this, that --

24        THE COURT:  Hold on a second.  Let me just get

25 there before you say anything.

 1              MR. MOXLEY:  Yes, Judge.

 2              THE COURT:  140?

 3              MR. MOXLEY:  140, yes, Judge.

 4              THE COURT:  Okay.

 5              MR. MOXLEY:  And Your Honor, I just want to say

 6    for the Record that the TCC respects Mr. Dundon's

 7    qualifications and his experience as a restructuring

 8    professional, it's just a matter of what the -- what the

 9    record is.  So, the question at the deposition that I asked

10    at Page 140, Line 15 was "Mr. Dundon" --

11              THE COURT:  That's the only nice thing I've heard

12    today about --

13              MR. MOXLEY:  Oh.

14         (Laughter.)

15              MR. MOXLEY:  There you go.

16              THE COURT:  Go ahead.

17              MR. MOXLEY:  Happy to provide a nice comment for

18    once, Judge.

19              So, I asked Mr. Dundon, I said, "Mr. Dundon, will

20    you offer any testimony at the hearing as to the value of

21    the avoidance claims in support of the motion?"

22              THE COURT:  Yes.

23              MR. MOXLEY:  And Mr. Zluticky interposed an

24    objection to the form, and then he said, "This seeks

25    information protected by attorney-client privilege and of

1  the work product doctrine.  I'm instructing the witness not

2  to answer the question," and Mr. Kaufman then said, "The

3  Debtor joins the objection and appreciates the instruction

4  of Counsel."  So, I asked if he would offer an opinion as to

5  the value of the avoidance claims in support of the motion.

6  He was instructed not to answer that question by the UCC,

7  and the Debtor's Counsel joined.

8              MR. ZLUTICKY:  Trying not to interrupt, Your

9  Honor.

10             So, two things, No. 1, he's asking if he's going

11 to offer testimony.  This was on, you know, this was mid-

12 February before we filed our witness and exhibit list.  He's

13 asking for the mental impressions of Counsel.  The real

14 question is did he ask Mr. Dundon about the value, about the

15 calculation?  And for that, we need to turn to a Page 87 of

16 the transcript, Lines 8 through. 25.

17             THE COURT:  I don't want you to read it.

18             MR. ZLUTICKY:  I'm not going to read it, Your

19 Honor.

20             THE COURT:  No, no, I'm just asking in general.

21             MR. ZLUTICKY:  Yeah, and that's not the only

22 place either, Your Honor, but we can start there.

23             THE COURT:  But what's the -- tell me what you

24 think he can talk about.

25             MR. ZLUTICKY:  Your Honor, if you if you turn to

1    Page 88 as well --

2            THE COURT:  Yeah.

3            MR. ZLUTICKY:  Mr. Dundon's going through his

4    analysis of what the value was of NewCo and RemainCo.

5    Continues on for several pages thereafter, but the idea that

6    he wasn't allowed to get answers on this topic is just

7    completely incorrect.

8            THE COURT:  Well, I don't know if it's completely

9    incorrect.  If he's going to testify about this stuff here,

10   I'm good with it.  You're saying if he goes outside of the

11   scope of this depo, that the stuff that he said in the

12   depo --

13           MR. MOXLEY:  Right, we asked if he's going to

14   offer an opinion at the hearing, and we were told he wasn't

15   allowed to tell me that.

16           THE COURT:  Right.

17           MR. MOXLEY:  And so, I don't know if this is his

18   actual opinion or what.  Yes, of course, he can say some of

19   the other facts that he relayed here, but --

20           THE COURT:  Right.

21           MR. MOXLEY:  -- I don't know if he's offering an

22   expert opinion on that, Your Honor.  He hasn't been tendered

23   as an expert yet, but I if he's going to offer an opinion as

24   to what the value of those is, I think that that's

25   inappropriate, Judge, given the prior instruction.  And I

1  don't know what these facts, these really are other than

2  that and I don't think they've been tendered yet.

3              MR. ZLUTICKY:  Your Honor, the --

4              THE COURT:  Hold on, hold on, hold on.

5              MR KAUFMAN:  And the Debtor would like to be

6  heard at some point on this as well.

7              THE COURT:  Sure, I don't -- I got it, he can

8  talk about this, but if he's going to be asked the specific

9  question, is there an opinion as to the value?  You're going

10 to have to point me to something where he gives an opinion

11 of the value that's counter to everyone shutting him down on

12 this point.

13             MR KAUFMAN:  Yes.  Thank you, Your Honor.

14             So, if you look at Page 88 and 89, in particular,

15 one of the questions was, "So, Mr. Dundon, the avoidance

16 claims based on the divisional merger could be worth up

17 to" --

18             THE COURT:  Yeah, but he also asked -- right,

19 that's where things get a little, that's where things I

20 think get a little murky for the TCC because you just told

21 him not to offer an opinion of value.  So, maybe he's

22 offering something, but it's not going to be the opinion of

23 value because you just told him not to do it.

24             MR. ZLUTICKY:  Well, Your Honor --

25             THE COURT:  And the Debtor joined and appreciated

1  the comments.

2          MR. ZLUTICKY:  Understood, Your Honor.

3          I think there's a distinction between figuring

4  out what Mr. Dundon did for the UCC, and what the UCC's

5  views are, and who the UCC is going to list on a witness and

6  exhibit list.  He was able to ask Mr. Dundon about the

7  work --

8          THE COURT:  "Will you offer testimony at the

9  hearing as to the value of the avoidance claim?" "Objection

10  to the form of the question. It seeks information

11  protected." "Will you offer any testimony as to the value of

12  the avoidance claims in support of the motion?"

13          MR KAUFMAN:  It was that first part of the

14  question that the Debtor joined the objection.

15          THE COURT:  That's not what you said here.

16  Unless you can point me to something that that's what you

17  said.

18          MR KAUFMAN:  It was asking for what might have

19  been shared at mediation.

20          THE COURT:  That's not what's not what was asked

21  here.  That's not what you joined to.  I'm looking at

22  Page 141.

23          MR KAUFMAN:  It was the lead up, and also this

24  was --

25          THE COURT:  I'm just telling you what you said.

1    I'm just going on what the text says.  "Mr. Dundon, will you

2    offer any opinions at the hearing on the value of the PI

3    claims?"  That got shut down.  "Will you offer any testimony

4    as to the value of the avoidance claims?"  That got shut

5    down.

6              MR. ZLUTICKY:  Your Honor --

7              THE COURT:  Just saying he can't testify

8    inconsistent with where he got shut down.

9              MR. ZLUTICKY:  Your Honor, there are other points

10   in the deposition where he absolutely goes through in

11   detail --

12             THE COURT:  I know, but you shut him down on the

13   on the on "Are you going to show up today and talk about

14   it?"  In other words, the question here is "Are you going to

15   show up at the hearing and provide a value of the opinion?"

16   and you shut him down and said don't talk about that.  So, I

17   mean, how's he going to talk about it today?  That's the

18   question.  I agree with you.  He said it and he talks about

19   stuff in other places but when asked -- I don't even know

20   how it's privileged as to whether he's going to -- well, I

21   guess, "Will you offer any testimony?" and he wasn't allowed

22   to answer that question.  It really goes to whether he's

23   going to offer any testimony today.  That was considered

24   attorney-client privilege.

25             MR KAUFMAN:  I don't know how Mr. -- go ahead.

1          MR. ZLUTICKY:  And work product doctrine, Your

2  Honor, because --

3          THE COURT:  How is it work product if --

4          MR. ZLUTICKY:  Well, it's the mental impressions

5  of --

6          THE COURT:  -- somebody is asking is the guy

7  going to show up to hearing?  It's not mental impressions.

8  Are you going to show up and offer an opinion on value?

9  Will you offer testimony at the hearing?  The answer could

10  have been "I don't know if they're going to call me or not,"

11  but how is that privileged work product?  I guess it -- I

12  don't know.

13          MR. MOXLEY:  We don't believe it is, Your Honor.

14          MR KAUFMAN:  I don't know how Mr. Dundon knows

15  that without conferring without conferring with Counsel.

16          THE COURT:  Huh?

17          MR KAUFMAN:  I don't know how Mr. Dunson would

18  have any way to say yes or not to that without conferring

19  with Counsel?

20          THE COURT:  Right, he could have conferred with

21  counsel, but he got shut down --

22          MR. ZLUTICKY:  Well --

23          THE COURT:  -- by both of you.

24          MR. ZLUTICKY:  Well, Your Honor, there's nothing

25  that Mr. Dundon is going to testify about the methodology

1  that he did on behalf of the UCC here, that Mr. Moxley was

2  not able to depose him on.  This is not trial by surprise.

3          THE COURT:  Yeah, but just look at what y'all did

4  in this deposition, right?  You told him not to offer any

5  value.  That's what you did.  In other words, he can testify

6  to the words that he sent, but he is not going to be able to

7  testify.  I'm not sure if I can qualify it as an opinion of

8  value from the UCC.  That I think because I think he got

9  shut down when asked if he was going to do that or not.  I

10 mean, I don't --

11         MR. ZLUTICKY:  Your Honor, we're not offering

12 this as an expert opinion of what the value is.  We're

13 offering it to show what the UCC did and what the UCC views

14 are.

15         THE COURT:  I --

16         MR. ZLUTICKY:  Mr. Moxley, was able to discover

17 all of that information through the deposition.

18         THE COURT:  I think he can talk about what he,

19 kind of the Page 80, what I would call if you flip to it,

20 the Page 88, 89 --

21         MR. ZLUTICKY:  There's Page 69 as well, Your

22 Honor, and it continues on from there.  There are multiple

23 valuation methodologies that were used.  Mr. Moxley did ask

24 him questions about those methodologies.

25         THE COURT:  I think --

1          MR. ZLUTICKY:  He was not instructed not to

2   answer.

3          THE COURT:  I think he can talk about

4   methodology, but the ultimate conclusion, I'm not sure we

5   get there.  But from the UCC's perspective, I don't --

6          MR. MOXLEY:  Thank you, Your Honor.

7          THE COURT:  All right.  In other words, we're

8   going to play it like if it was fair game at the depot.  I

9   think to the most part it's fair game if you're going to get

10  into methodology but if he's the ultimately now concludes a

11  value, because I suspect that was going to be the follow up

12  question --

13         MR. MOXLEY:  Right, Your Honor.  Right, because

14  what we can go through some of the methodologies, he can

15  talk about some of the facts, but at the end of the day,

16  that is --

17         THE COURT:  I mean, he testified to the views,

18  right?

19         MR. MOXLEY:  Yes.

20         THE COURT:  Like what the UCC viewed, and I'll

21  take it for what it's worth.

22         MR. ZLUTICKY:  And Your Honor, he also testified

23  as to what the UCC said the value was in the deposition.

24         MR. MOXLEY:  But this is the problem, though,

25  Judge, is how that --

1       THE COURT:  I know but it goes it goes to weight

2  to me in terms of like, what do I consider that an official

3  opinion of value when he was told it was unclear whether he

4  was going to do it or not, I just, I got to call it fair.

5       MR. MOXLEY:  Thank you. Judge.

6       THE COURT:  All right, let's go.

7  BY MR. ZLUTICKY:

8  Q    So, Mr. Dundon, how did you and your colleagues

9  perform that calculation on the fraudulent transfer claim

10  arising out of the divisional merger?

11  A    So, the heart of this was trying to come to a value or

12  valuation range for those businesses that those contracts

13  and operations that moved to YesCare and we sought to apply

14  the three kind of common business valuation approaches.  The

15  first is a market multiple approach, second, a comparable

16  transaction approach, and the third, a discounted present

17  value of future cash flows.

18  Q    Okay.  So, let's back up for a moment.  YesCare or CHS

19  Texas was receiving a lot of or most of the Debtor's

20  operational assets in the divisional merger, right?

21  A    Yes.

22  Q    And that included contracts that were allocated to CHS

23  Texas in the divisional merger?

24  A    Yes.

25  Q    Did you analyze the financial performance of those

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                    400

1  existing contracts?

2  A     We did.

3  Q     Earlier you mentioned three different methodologies;

4  why did you use multiple methods to calculate that number?

5  A     So, each valuation method has certain acuities and

6  also certain imprecisions, and when you apply more than one,

7  you hopefully get a better view on what value truly is.

8  Q     I believe you said the first was a market multiple

9  approach; how does that work generally?

10 A     So, you try to find a publicly traded company that has

11 a business that is similar to the business you're trying to

12 value, and then you compute a ratio of its market enterprise

13 value to ideally its earnings before interest, taxes,

14 depreciation, and amortization, but also sometimes its

15 revenue.  And total enterprise value is the sum of its

16 market capitalization and its net debt.

17 Q     How did you do the market multiple calculation here

18 then?

19 A     So, we identified some companies in the prison

20 services business and the correctional services business

21 where we could make a determination of a market enterprise

22 value and where we knew, in this case, the revenue, because

23 the Debtor's businesses had generated negative EBITDA pretty

24 consistently.  So, we weren't going to get a relevant data

25 point with looking at multiples of enterprise value to

1   EBITDA.

2   Q     So, what was the result of your calculation?

3   A     So, we came to a very a broad range of value between

4   zero, using EBITDA multiples, and about $75 million.

5             MR. MOXLEY:  I just object, Your Honor, to note

6   that the Court should take that hat answer for what it's

7   worth in light of the discussion we had previously, Judge.

8             THE COURT:  Uh-huh.

9             MR. MOXLEY:  Thank you.

10  BY MR. ZLUTICKY:

11  Q     How much weight would you generally afford to the

12  market multiple approach?

13  A     Generally, we would afford a high weight to it.

14  Q     Did you afford it a high weight here?

15  A     It's hard to because we had to use the revenue

16  multiple which is not that reliable.

17  Q     Why did you have to use a revenue multiple?

18  A     Because the EBITDA of the Debtors, the historic EBITDA

19  was negative.

20            THE COURT:  When you mean the Debtor, who are you

21  referring to in the historical financials?

22            MR. DUNDON:  So, the operations of, the business

23  operations through the divisional merger date.  So, the

24  various prison health care contracts.  In the aggregate,

25  they plus overhead generated negative earnings per interest,

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                402

1  tax, depreciation --

2            THE COURT:  Yes, but are you talking pre or post

3  divisional merger.  That's what I'm --

4            MR. DUNDON:  Pre, pre.

5            THE COURT:  So, which entity are you -- that's

6  what I'm just trying to make sure I've got my entities

7  right.  Which --

8            MR. DUNDON:  Corizon.

9            THE COURT:  Okay, okay.  No, when you said the

10 Debtor, I just -- that's why I was trying to note whether

11 you meant pre or post.

12           MR. DUNDON:  Thank you Your Honor.

13           THE COURT:  Okay.

14           MR. DUNDON:  Yeah, the Corizon businesses up to

15 the May 22nd divisional merger.

16           THE COURT:  Got it, thank you.

17           No, no, and I apologize.  I just want to make

18 sure I've got my entities straight.

19 BY MR. ZLUTICKY:

20 Q    So, Mr. Dundon, just so I'm clear, you're talking

21 about the calculation for the number for Corizon Health,

22 Inc., which is now known as to Tehum Care Services, Inc.?

23 A    Right, when it had its operating businesses.

24 Q    Okay, and that's the operating business enterprise

25 that was allocated to CHS Texas?

1    A        Correct.

2    Q        You didn't use a market multiple approach utilizing

3    EBITDA here, why?

4    A        Well, in a sense, we used it because it would mean the

5    company was worthless, right, as a data point because it had

6    negative EBITDA, which means any multiple produces a zero

7    valuation.  In another sense, you could argue that we

8    disregarded it to use revenue because it was an available

9    indicia that produced a meaningful positive number.

10   Q        But you said utilizing a revenue multiple is less

11   reliable?

12   A        That's right.

13   Q        Why is that?

14   A        Because the same level of revenue can produce very

15   different levels of, let's call it normalized profit margin.

16   And so, that's generally what people -- at least, the

17   potential to generate profit in the future.  If a business

18   is losing money now is really what you're going for in

19   valuation because that's what people are paying for is

20   earnings.

21   Q        You said the comparable transactions approach was the

22   second approach, is that right?

23   A        Yes.

24   Q        How does that work?

25   A        So, you look for the purchase or sale or spinoff of a

1  business that had similarities to the business that you're

2  trying to value and for which valuation data is available

3  about the purchase price or the transaction.  Typically, a

4  multiple of once again, EBITDA, or revenue, or sometimes

5  book value, or other data points that people use to jump off

6  on value.

7  Q     Were you able to do that analysis here?

8  A     No.

9  Q     Why not?

10 A     We couldn't identify a good universe of comparable

11 transactions that we thought was useful.

12 Q     And where did you look?

13 A     Publicly available information about the industry,

14 industry databases.

15 Q     And why wasn't there more information for you to go

16 on?

17 A     Well, there was plenty of information.  There just

18 weren't enough transactions.

19 Q     And the third approach you mentioned was the

20 discounted cash flow approach; is that right?

21 A     Yes.

22 Q     Can you describe that methodology?

23 A     So, in that methodology, you use your learning about

24 the historical operations, assets, and other characteristics

25 of the business to project the cash flow that it will

1    generate over into the future, and then you discount that

2    cash flow back to present value, also using what we call a

3    terminal multiple on the final years cash flow.  And that

4    involves two things, the projection of cash flow and then

5    secondly, the determination of a proper discount rate.  And

6    the discount rate is typically a weighted average cost of

7    capital, which in this effort, we have to devise.

8    Q    So, before we get into that methodology in more

9    detail, I want to just go back really quick on the

10   comparable transactions.  What weight does it -- well,

11   strike that.

12        So, on the comparable transactions approach, does the

13   fact that this business was a correctional facility health

14   care business have an impact on utilizing the comparable

15   transactions approach?

16   A    In a sense, there just aren't a lot of players in the

17   space and the transactions, when they occur, tend to be

18   private.  So, you don't know don't have the relevant

19   multiple data.  And overall, it's just not a very popular

20   space for institutional investors for political reasons.

21   Q    So, back to the discounted cash flow approach; how did

22   you factor in existing contracts that were being allocated

23   to YesCare in utilizing that approach?

24   A    So, as we thought about future cash flows, we made an

25   assumption of, maybe an optimistic assumption that the

1  company would allow its negative gross profit contracts, of

2  which it had some, roll off or it would renegotiate those

3  contracts to generate positive margin, that it would not

4  renew or extend contracts that burned money, and that it

5  would also, you know, some of those contracts might be

6  restructured to generate positive gross profit, and the

7  company would go out into the market and win some additional

8  positive gross margin contracts so it could have positive

9  cash flow in the future.

10 Q      So, your analysis went contract by contract?

11 A      It utilized a contract power system.

12        (Automated phone recording.)

13 Q      How did the performance vary contract by contract?

14 A      So, as of the divisional merger date, there were some

15 bad contracts that were in the company that generated, were

16 significant money losers.

17 Q      Can you give us an example?

18 A      The State of Maryland contract is the most

19 conspicuous.

20 Q      Why do you say that?

21 A      It just was a big contract in percentage of revenue

22 terms and it lost a lot of money.

23 Q      And so, what assumptions did you make as to the

24 existing contracts that were being allocated to CHS Texas?

25        Hold your answer.

1          (Announcement regarding courthouse alarm system.)

2               MR. ZLUTICKY:  Now, I really hope we don't hear

3    that again.

4          (Laughter.)

5    BY MR. ZLUTICKY:

6    Q    What assumptions did you make as to existing

7    contracts?

8    A    So, the projections assumed that the contract mix that

9    the company had would move to a contract mix that would

10   support positive cash flow in the future.

11   Q    And what about future contracts?  How did you factor

12   that in?

13   A    We assumed that they would win some positive gross

14   profit contracts.

15   Q    Are you familiar with a contract that YesCare

16   purportedly entered into with the state of Alabama in 2023?

17   A    I am.

18   Q    Did you review that contract?

19   A    I reviewed what on its face appears to be that

20   contract.

21   Q    Did your methodology assume that YesCare would win

22   contracts like the Alabama contract?

23   A    It assumed that it would, as I said, it would win some

24   positive gross profit contracts and lose some negative gross

25   profit.

1  Q     You do know that it's been reported as totaling $1

2  billion in revenue, though, right?

3  A     Over many years, yes.

4  Q     So, is that contract worth $1 billion?

5  A     No.

6  Q     Why not?

7  A     That contract is worth, really, you know, a multiple

8  of the annual EBITDA or cash flow it can generate.

9  Q     What was the result of your DCF analysis?

10 A     The result of our DCF analysis was that, you know, the

11 central tendency of value was between 13 and 35 million.

12 Q     Have you ever used the DCF methodology before?

13 A     Yes.

14 Q     How many times?

15 A     Hundreds of times.

16 Q     What weight do you typically ascribe to the DCF

17 methodology in your analysis?

18 A     A high weight.

19 Q     Did you afford a higher weight than the market

20 multiple approach here?

21 A     Yes.

22 Q     Why is that?

23 A     Because, as we said, the market multiple approach had

24 to draw heavily on revenue multiples, which are just less

25 reliable.

1    Q      So, that --

2              THE COURT:  I'm sorry.  Can I ask a question?

3              MR. ZLUTICKY:  Yeah, go ahead.

4              THE COURT:  Has your -- has your DCF analysis

5    ever been produced?

6              MR. DUNDON:  Your Honor, no, it has not.

7              THE COURT:  Okay.

8              MR. ZLUTICKY:  The underlying documents that

9    Mr. Dundon reviewed that were discussed in his deposition

10   have all been produced.

11             THE COURT:  No, I'm just asking, like, is there

12   something -- I'm typically used to seeing a DCF and then I

13   can look at my own stuff and look at the exit multiple and

14   see what -- I just want to know if I'm just getting

15   testimony, or am I going to look at a DCF and get kind of

16   the runs and then look at some of the backup -- you know,

17   kind of I get it not an expert report.  I'm just trying to

18   understand if there's a Docket because if there is, I'd like

19   to look at it but if it's just testimony, then I'll just

20   take really good notes.

21             MR. ZLUTICKY:  It is just testimony, Your Honor.

22             THE COURT:  Okay.  No, no.  No, this is not a

23   particular (indiscernible) I just need to know.  Sometimes,

24   I like to take notes on docs.  Sometimes I like to just take

25   good notes.  So, this is a good note.

1          Please proceed.

2   BY MR. ZLUTICKY:

3   Q     So, Mr. Dunn, this analysis, was that prepared for the

4   UCC in advance of the mediations?

5   A     It was.

6   Q     And I believe that you testified that that was an oral

7   presentation that you made to the UCC?

8   A     Yes.

9   Q     So, is that 13 to 35 million a precise number?

10  A     No.

11  Q     Why not?

12  A     Because it relies upon projections and estimates going

13  out several years and assumptions about what would happen in

14  the business.  So, it has a decent level of approximation

15  and --

16  Q     So, does the UCC just use your calculation to see how

17  much the business enterprise, how much that fraudulent

18  transfer claim is worth?

19  A     It's one of a number of data points.

20  Q     Does that number factor in litigation risk?

21  A     No.

22  Q     How would litigation risk impact that number?

23  A     So, significantly.

24  Q     In what way?

25  A     So, we sort of thought of three major buckets of

1    litigation risk in this leg of the fraudulent transfer.  The

2    first is that to disagree with our valuation of the assets,

3    any eventual opinion might say the assets were worth much

4    more than at the time of the divisional merger then the

5    range I just spoke about, or much less, and, you know,

6    obviously, much less is the one that creates the risk.

7    Excuse me. The Court could -- you know, a critical issue is

8    this transfer of the purported secured debt.  The Court

9    could just reach the opposite conclusion from the one that

10   we had, that that debt had been equitized, and then you're

11   in a very difficult world.  And then finally, you know, I

12   think there's a risk a Court could just find that you can't

13   have a fraudulent transfer in a divisional merger, and it's

14   a transaction that is not amenable to analysis under

15   Bankruptcy Code or applicable state fraudulent transfer

16   laws.

17   Q     What about the cost of litigation?  Is that number

18   factor in the cost of litigation?

19   A     It does not.

20   Q     How does that impact the analysis?

21   A     Reduce the value significantly of any prospective

22   avoidance award.

23   Q     Why is that?

24   A     This kind of litigation is extremely expensive.

25   Q     Does that number factor in what the impact would be in

1  terms of time to litigate or (indiscernible).

2  A     It does not, nor the time to collect the judgment if

3  you got it.

4  Q     And how does that impact the number?

5  A     Very significantly.  In a time of relatively high

6  interest rates, you have a very significant time value of

7  money.

8  Q     So, let's discuss successor liability and alter ego.

9  We've already talked briefly about investigating those

10 potential claims; do you have any understanding of the UCC's

11 view of the likelihood of success on those claims?

12 A     I do.

13 Q     And what is that view?

14 A     I think they view that that those claims would be a

15 heavy lift to succeed.

16 Q     Why is that?

17 A     I think, you know, most importantly, it would require

18 a novel decision that that a transferee in a divisional

19 merger could take on liability in that fashion.

20 Q     What would the potential damages be for a successor

21 liability claim?

22          MR. MOXLEY:  Objection, Your Honor, I think that

23 calls for (indiscernible).

24          THE COURT:  Overruled.

25          You can answer.

1    BY MR. ZLUTICKY:

2    A     So, you know conceptually it's whichever is less of

3    the amount of liability to which the successor is deemed to

4    succeed, and that successor's ability to pay both that

5    liability and whatever other liabilities it has.

6    Q     So, you said it's the lesser of those two things; why

7    is that?

8    A     Well, you know, nobody has to pay more than the

9    liability to which they succeeded but lots of people might

10   succeed to liabilities have liabilities, including, but not

11   limited to those to which they succeed, that exceed the

12   their assets.  Therefore, they're going to pay those

13   liabilities in part or perhaps not at all.

14   Q     And when you're looking at successor liability claims,

15   then one of the things you're looking at is the value of the

16   enterprise, the continued enterprise, right?

17   A     That's right.

18   Q     And that would be CHS Texas?

19   A     YesCare, whatever it goes by.

20   Q     And that's the current value, rot as of the divisional

21   merger, right?

22   A     Right, the value as the hypothetical value as of when

23   you get this judgment or award.

24   Q     So, on the fraudulent transfer claim that we were

25   focused on, it was as of the date of the transfer, right?

1  A      Right.

2  Q      But now we're talking about current valuation?

3  A      Right, ability to pay.

4  Q      What did you look at to try to see what that number

5  would be?

6  A      So, we had projections.  We had done a -- before our

7  DCF valuation, we had done a lot of thinking about what kind

8  of cash flow and hence value this company might have in the

9  future.  We had the benefit of a few additional quarters of

10  financial data that came after the divisional merger to help

11  us sort of think about that story.  And so, that's what we

12  thought about.

13  Q      But those financial statements didn't include this

14  Alabama contract, right?

15  A      That's right, yeah.

16  Q      And so, what impact did that have on your analysis?

17  A      So, our scenarios for the future of YesCare had always

18  assumed they would be winning contracts with positive gross

19  margin, and they would be ditching incumbent contracts with

20  negative gross margin.  So, it's consistent.

21  Q      But that isn't quite consistent with how they

22  performed historically, was it?

23  A      That's right, but, you know, as I testified earlier,

24  we made the assumption that the people who took this company

25  over would be attempting to run it well.

1  Q     The other of the two numbers. Right, the total amount

2  of the claims, would that mean just utilizing the amounts

3  outlined in the proofs of claim?

4  A     No.

5  Q     Why not?

6  A     Because, you know, many proofs of claim may be

7  disallowed and many proofs of claim may be allowed in less

8  than their face amount.

9  Q     Mr. Dundon, do you know if the UCC received input from

10 creditors outside the Committee during this bankruptcy case?

11 A     It did.

12 Q     Does that include pro se claimants?

13 A     Yes.

14 Q     Does that include incarcerated creditors?

15 A     Yes.

16 Q     Do you know if the UCC received input from creditors

17 counsel outside the Committee during this case?

18 A     It did.

19 Q     How do you know that?

20 A     Some of that contact came through me.  Some of that

21 contact I learned about in discussions among Committee

22 members and Committee professionals.

23 Q     And in what form did that come in?

24 A     I think it came in in all different media, phone

25 calls, emails, in person conversations in this courtroom and

1   the hallways outside this courtroom.

2   Q     Was Mr. Ian Cross one such counsel?

3   A     I understand so, yes.

4   Q     Okay, did the UCC consider Mr. Cross's input and

5   information about his client's cases in Michigan during that

6   process?

7   A     Yes.

8   Q     In what way?

9   A     I think, you know, it was discussed among the

10  Committee.  There were various analyses and considerations

11  made.

12  Q     And you've heard the discussion of we'll call it the

13  Kelly case?  You're aware of that case?

14  A     I have.

15  Q     Did the UCC review that opinion that was entered in

16  Mr. Cross's case on behalf of William Kelly?

17  A     It did.

18  Q     What way did the UCC place on that opinion in

19  evaluating successor liability?

20  A     Not very much.

21  Q     Why not?

22  A     I think the UCC's view was that it was a kind of a --

23        MR. MOXLEY:  Objection, Your Honor, this

24  definitely calls for (indiscernible).

25        THE COURT:  Overruled.

1           THE WITNESS:    So, I think it's the UCC's view,

2    not necessarily, the UCC's view that it was a procedural and

3    preliminary decision that didn't or has not yet given rise

4    to any award of judgment or any final or definitive decision

5    that would imply that there was successor liability.

6    BY MR. ZLUTICKY:

7    Q    Has the UCC analyzed the proofs of claim in this case?

8    A    Yes.

9    Q    In what way?

10   A    The proofs of claim register was reviewed and analyzed

11   across a number of dimensions.

12   Q    What kind of things were you looking for when

13   analyzing the purser claim?

14   A    We were looking for who the claimants were, what they

15   were making claims for, the amounts they were asserting if

16   they were asserting any amounts, whether or not they were

17   represented by counsel, who else might be on the hook for

18   the liabilities, insurers, co-defendants.

19   Q    Why did the UCC do that analysis?

20   A    Important for framing an overall strategy and working

21   on a plan and other things in the management of the case.

22   Q    And is that work that Dundon advisors did alone?

23   A    No.

24   Q    Who else worked on that process with Dundon?

25   A    You and your partners, Committee counsel.

MATTHEW DUNDON - DIRECT BY MR. ZLUTICKY                    418

1  Q     You mentioned one of the things the UCC looked for is

2  whether claimants were pro se; how did the Committee do

3  that?

4  A     There are a number of indicia on a proof of claim that

5  that somebody has counsel.  You know, claims can be a box

6  check on the signature block there are contact information,

7  notices of appearance.

8  Q     Why was that important for the UCC to understand?

9  A     I think the UCC has a view that the pro se claims are

10 more likely to be disallowed or allowed in lower amounts

11 than represented claims.

12 Q     Is one of the things the UCC looked for, whether

13 certain creditors were currently incarcerated.

14 A     Yes.

15 Q     As of the bar date, right?

16 A     Yes.

17 Q     How did the UCC do that?

18 A     Primarily through the return address. So, there's kind

19 of a distinctive formula with, with prisoner numbers that

20 that has to be put, and they often will list it.  Prison

21 facility has the address.

22         MR. ZLUTICKY:  Your Honor, I was thinking if we

23 could maybe take a five-minute break.  I think I do have

24 some things I can cut out of my direct to shorten it up

25 considerably.

1             THE COURT:  Okay, sure.

2             All right, it's 6:53; why don't we just say 7:00?

3             MR. ZLUTICKY:  That sounds good.

4             Thank you so much, Your Honor.

5             THE CLERK:  All rise.

6        (Recess taken from 6:53 p.m. to 7:01 p.m.)

7             THE CLERK:  All rise.

8             THE COURT:  All righty.

9             MR. ZLUTICKY:  Thank you very much for the break,

10   Your Honor.  I was able to, I think, cut things down so we

11   can get on.

12            THE COURT:  Okay.

13            MR. ZLUTICKY:  I barely have another 5 to 10

14   minutes.

15            THE COURT:  Okay.

16                  DIRECT EXAMINATION (CONT'D)

17   BY MR. ZLUTICKY:

18   Q    Mr. Dundon, you're familiar with the settlement that's

19   the subject of the Rule 9019 motion; is that right?

20   A    I am.

21   Q    And I don't want to belabor the point because we've

22   already been over this with Mr. Barton, but under the

23   settlement, does the Debtor's estate give up the remaining

24   assets it owns, like employee retention tax credits, and

25   other causes of action?

1  A     It does not.

2  Q     Does the Debtor also have other avoidance actions

3  against non-settlement parties that it can pursue in this

4  case?

5  A     It does.

6  Q     Can you give me an example?

7  A     Probably the most interesting are against the former

8  owner of the company, the Plaxford (phonetic).

9  Q     So in addition to the money from the settlement, there

10 is potentially more money coming in in the form of tax

11 credits and avoidance actions; is that right?

12 A     Yes.

13 Q     Does that factor in any insurance money that might be

14 paid by insurers to the estate?

15 A     No, that's even more money that might come in.

16 Q     Does that factor in any insurance money that may be

17 paid to creditors who have covered claims?

18 A     It does not.

19 Q     Does the settlement impact creditor's rights as to the

20 Debtor's insurance?

21 A     No.

22 Q     Have you reviewed information regarding the Debtor's

23 professional liability insurance policies in this case?

24 A     I believe I have or someone on my team has.

25 Q     Do some creditors have other sources of recovery

1  outside of estate funds and insurance?

2  A    They do.

3  Q    What would be an example of that source?

4  A    So many of the personal injury creditors and perhaps

5  some of the commercial creditors have claims on what were

6  the Debtor's clients, the State and local Corrections

7  Departments.

8  Q    So you're familiar with the claim of Latricia Revelle

9  (phonetic), one of the Committee members?

10 A    Yes.

11 Q    And she's represented in this case by Mr. Patterson,

12 who's in the courtroom today.  Do you know if Ms. Revelle

13 has asserted a claim against anyone other than Corizon?

14 A    Yes.

15 Q    Okay.  Was that the City of New York?

16 A    Right, the Department of Corrections or both.

17 Q    And that's an example of another potential source of

18 funds to pay a creditor for its injury?

19 A    Yes.

20 Q    Does the settlement take away or waive those recovery

21 sources?

22 A    No.

23 Q    If anyone has a direct claim against someone other than

24 the Debtor, is that claim being released under the

25 settlement?

1    A    It is not.

2    Q    Does the UCC believe the settlement is a fair result

3    for creditors?

4    A    Yes.

5    Q    Why?

6    A    That taking into account all the risks and upsides and

7    downsides, it believed that the estate causes of action that

8    are being released are being released for fair

9    consideration.

10   Q    And you're aware the the Official Committee of Tort

11   Claimants, the "TCC," has objected to the settlement motion,

12   right?

13   A    Yes.

14   Q    And are you aware that the TCC has also filed a motion

15   to dismiss this bankruptcy case?

16   A    Yes.

17   Q    Through your experience on the UCC, have you formed a

18   view on whether dismissing the bankruptcy case would be a

19   good result for all creditors?

20   A    I have.

21   Q    What is that view.

22   A    I believe it would be a bad result for creditors.

23   Q    Why is that?

24   A    I think it would leave them with the need -- with a

25   causes of action against likely a badly administratively

1  insolvent state, and having to chase YesCare and a lot of

2  other settling parties in lots of courts all around the

3  country for a long amount of time with a very uncertain

4  result.

5  Q    And the UCC has opposed the motion to dismiss; is that

6  right?

7  A    It has.

8  Q    Did the UCC take into account what would happen to

9  pro se claimants if this case were dismissed when opposing

10  the motion to dismiss?

11  A    I believe it did.

12  Q    And what would happen?

13  A    Nothing good.

14  Q    Why is that?

15  A    As I said, I think they would be in the position where

16  the claims they have against Tehum would likely receive no

17  recovery due to Tehum not having any money or ability to get

18  money or any businesses.  And then they would basing the

19  need to chase YesCare and other Defendants, as I said, all

20  around the country, you know, for a long amount of time with

21  a very uncertain result, none of which a pro se claimant is

22  going to be in a position to do with any likely success.

23  Q    And you're aware that over 100 claims filed in this

24  case are from pro se claimants?

25  A    Yes.  That's what the Committee's claims analysis

1   implies.

2              MR. ZLUTICKY:  Your Honor, I pass the witness.

3              THE COURT:  Okay.  Thank you.

4              Let's go to cross-examination -- oh, I should say,

5   Mr. Kaufman, do you have any questions?

6              MR. KAUFMAN:  Mr. Zluticky handled it just fine.

7              THE COURT:  Okay.  Any more?  Anybody else have

8   direct questioning supports the motion?

9          (No audible response.)

10             THE COURT:  Okay.  Let's get to Cross.

11             MR. MOXLEY:  Thank you, Your Honor. For the

12  Record, Cameron Moxley of Brown Rudnick for the TCC.

13                         CROSS-EXAMINATION

14  BY MR. MOXLEY:

15  Q    Good evening, Mr. Dundon.

16  A    Good evening to you.

17  Q    Mr. Dundon, you and I had a chance to meet before.

18  It's nice to see you, sir.

19  A    Good to you see you again.

20       Do you have any binders for me?

21  Q    Thank you.  Thank you, sir.

22  A    I have a bunch of binders.

23  Q    Yes.  I have it right here.

24             THE COURT:  I haven't seen anyone just ask for

25  one, you know?

1       (Laughter)

2           THE WITNESS:  I spoke.  I wasn't sure.  I've got a

3   lot in front of me.

4           MR. MOXLEY:  May I approach, Your Honor.

5           THE COURT:  Absolutely.

6           Yes, I have one, thank you.

7   BY MR. MOXLEY:

8   Q    Okay.  Mr. Dundon, you did not submit a written report

9   in this case, correct?

10  A    Yes.

11  Q    Were you asked to prepare a written report?

12  A    No.

13  Q    I believe you testified on Direct that the UCC

14  concluded that the value of the assets that went to YesCare

15  as a result of the divisional merger was somewhere between

16  zero and $75 million, right?

17  A    The market multiple analysis supported a range like

18  that.

19  Q    Okay.  When I asked you at your deposition of whether

20  or not Dundon Advisors has a writing of its market multiple

21  analysis, you were instructed not to answer that question,

22  right?

23  A    I don't recall.

24  Q    In your binder, sir, at Tab 1, there's your deposition

25  transcript.  If you could just turn with me, please, to

1 | Page 75 of that?

2 | A    Okay.  I'm there.

3 | Q    And if you're on Page 75 now, sir, look with me at

4 | Line 8.

5 | A    Okay.

6 | Q    See, I asked you, "Does Dundon Advisors have any

7 | writing that sets forth its market multiple valuation

8 | analysis."  And you see Mr. Zluticky instructed you not to

9 | answer the question and Mr. Kaufman for the Debtor joined

10 | the objection and the instruction.

11 |      Do you see that?

12 | A    I do see that.

13 | Q    Okay.  You were also instructed not to answer my

14 | question at deposition of whether or not Dundon Advisors has

15 | a writing of the DCF analysis, correct?

16 | A    I don't know.

17 | Q    Okay.  Let's just check that quickly at Page 79 of your

18 | deposition transcript.

19 | A    Yes.

20 | Q    And if you'd look with me at Line 14 on Page 79?

21 | A    Uh-huh.

22 | Q    You see I said -- I asked you, "Is Dundon Advisors DCF

23 | analysis set forth in a writing?"  You were again instructed

24 | not to answer.

25 |      Do you see that?

1   A     I do.

2   Q     Okay.  It's your impression, Mr. Dundon that the UCC

3   developed a general view of value of the avoidance actions,

4   but not a specific dollar figure value, right?

5   A     In the aggregate, yes.

6   Q     Now switching gears for a second, sir, the UCC does not

7   consider the purported assumption of secured debt by CHS

8   Texas, Inc., to have been of any value to Tehum Care

9   Services, the Debtor, because the UCC considers that debt to

10  have been equitized before the divisional merger occurred,

11  right?

12  A     That was my testimony.

13  Q     And when I asked you at your deposition what the basis

14  for the view is, you were cautioned not to reveal privileged

15  or mediation information and under those circumstances you

16  testified you couldn't answer my question; is that right?

17  A     I recall.

18  Q     Do you recall that?

19  A     Yes.

20  Q     Okay.  You're not aware, Mr. Dundon, of the UCC

21  allocating any particular portion of the $54 million

22  settlement amount toward the potential avoidance actions

23  arising from the divisional merger, right?

24  A     Yes.

25  Q     And Dundon Advisors ascribed no weight to FTI's letter

MATTHEW DUNDON - CROSS BY MR. MOXLEY                    428

1   concerning the divisional merger transaction because

2   of -- what I think your view was -- of it's erroneous

3   assumptions, right?

4   A    I think our view was that it wasn't reliable.

5   Q    And it wasn't reliable because you thought there were

6   erroneous assumptions made in it, correct?

7   A    Yes.

8   Q    Okay.  And you believe FTI's analysis wasn't reliable

9   because -- I think you said the most important concern you

10  had was that FTI had assumed that the purportedly assumed

11  debt of 100 million was valid and enforceable as secured

12  debt, and you disagreed with that, right?

13  A    I don't know exactly how FTI put it, but as a general

14  matter, that appeared to be the case.

15  Q    And you disagreed with that, correct?

16  A    Yes.

17  Q    At your deposition, you didn't think you could tell me

18  why you disagreed with that, though, without invading

19  attorney/client privilege, right?

20  A    If you say I said that, I'm sure you're right.

21  Q    Well, let's just check it to be sure.  I don't want you

22  to be uncomfortable with it, sir.  Let's turn to Page 104 of

23  your deposition transcript for the Record.

24  A    Okay.

25              MR. MOXLEY:  And Your Honor, I'll just note for

1  the Record that Mr. Dundon's transcript for identification

2  purposes is at TCC Exhibit 1.4.

3            THE COURT:  Thank you.

4  BY MR. MOXLEY:

5  Q    Mr. Dundon, if you're at Page 104 of your transcript,

6  do you see that beginning at Line -- sorry.

7       (Pause in the proceedings.)

8  BY MR. MOXLEY:

9  Q    Yeah, if you look at -- sorry, if you look at Page 105.

10  I apologize, at Line 3.  See my question to you was:  "Okay.

11  So you mentioned that FTI assumes that the purportedly

12  assumed debt of $100 million was valid and enforceable as

13  secured debt as an erroneous assumption.  Were there any

14  other erroneous assumptions that you identified in FTI's

15  opinion?"  There was an instruction or a caution and you

16  said you couldn't answer that question without invading

17  those privileges.

18       Do you see that?

19  A    I do.

20  Q    And then my next question to you at the bottom of

21  Page 105 was, "Mr. Dundon, why was the debt unenforceable?"

22  And you had -- you received the same cautions from counsel,

23  and your answer at Line 20 on Page 106 was, "I cannot answer

24  the question without invading those privileges."

25       Do you see that?

MATTHEW DUNDON - CROSS BY MR. MOXLEY          430

1   A     Yes.

2   Q     Now Mr. Dundon, on Direct Examination just now you

3   testified that you are familiar with -- strike that, sorry.

4   Just a second.

5        (Pause in the proceedings.)

6            MR. MOXLEY:  I apologize, Mr. Dundon.  I'll ask

7   you a new question, sir.

8            THE WITNESS:  Okay.

9   BY MR. MOXLEY:

10  Q     On Direct you testified that the UCC investigated

11  breach of fiduciary duty, and you were involved in that

12  investigation, correct?

13  A     Yes.

14  Q     Okay.  Have you read Mr. Atkinson's Declaration?

15  A     I have.

16  Q     Did your investigation into breach of fiduciary duty

17  issues reveal that Corizon Health executives set up YesCare

18  Corp. and several of its operating subsidiaries, including

19  CHS Alabama, LLC, and CHS Arizona, LLC, in the months

20  leading up to the closing of the divisional merger?

21  A     I don't know that our investigations revealed it, but I

22  became aware of it.

23  Q     When did you become aware of that?

24  A     I couldn't tell you.

25  Q     Did you become aware of it when you read Mr. Atkinson's

1  Declaration?

2  A    No, before.

3  Q    Before that?

4  A    Yes.

5  Q    Did you become aware of it before the Rule 9019 motion

6  was filed?

7  A    I believe I was aware of it at or before the mediation,

8  so at least one of them.

9  Q    But those facts that your investigation revealed, they

10 weren't referenced in the Rule 9019 motion, were they?

11 A    I don't have the 9019 motion in front of me, but so I

12 don't know if they were or were not.

13 Q    Okay.  Did you investigation reveal that Corizon Health

14 executives, including CEO Sarah Tershwell (phonetic), CLO

15 Scott King, and others were already pitching new RFPs under

16 at least two of those entities, CHS Alabama and CHS Arizona,

17 before the divisional merger took place?

18 A    So I was aware that activity of that sort was

19 happening.

20 Q    And you learned about that at the same time frame

21 before the mediation?

22 A    I believe so, yes.

23 Q    Were you aware that from your investigation, that

24 Corizon executives pitched the CHS entities of being

25 comprised of former Corizon Health clinical and

1  administrative employees before the divisional merger?

2  A    I don't know at that level of particularity what I was

3  aware of.

4  Q    In your view with the projections, the financial

5  projections that you reviewed in this case, did they take

6  into account the Alabama contract that you testified about

7  on Direct?

8  A    I don't know that I reviewed any financial projections.

9  Q    Okay.  Did you review any financial statements at all

10  that took into account the Alabama contract that you

11  testified about on Direct?

12  A    No.

13  Q    Did you receive any YesCare financial statements,

14  audited or unaudited, after February of 2023?

15  A    I do not believe I did.

16  Q    Are you aware -- well, let me ask you:  Were you in the

17  courtroom today when Mr. Barton testified?

18  A    No.

19  Q    Are you aware that Mr. Barton -- you know who he is,

20  yes?

21  A    Yes.

22  Q    Okay.  Are you aware that Mr. Barton testified that he

23  does not trust the SK or the M2 parties?

24  A    I don't know what he's testified to.

25  Q    Okay.  Has he ever talked to you about that?

1  A     It's fair to say he's not a fan of them.

2  Q     Okay.  Okay.  And are you aware that the reason that --

3  one of the reasons that Mr. Barton is not a fan of them is

4  because he has seen their fraudulent transfers and seen them

5  hide money from creditors?

6  A     I don't want to characterize why he thinks what he

7  thinks.

8  Q     Okay.  Do you have -- do you know -- as a matter of

9  fact, do you know what informs his view that he's not a fan

10 of them?

11        MR. ZLUTICKY:  Objection, Your Honor.  He just

12 said he doesn't know and doesn't want to characterize what

13 other people think.  This calls for speculation.

14        THE COURT:  Overruled, he can answer if he knows.

15        THE WITNESS:  I think he's had a lot of -- he and

16 his client or his employer had a lot of unpleasant dealings

17 with them.

18 BY MR. MOXLEY:

19 Q     And the nature of those unpleasant dealings has to do

20 with fraudulent transfers and hiding money from creditors,

21 right?

22 A     Among other things perhaps.

23 Q     Do you disagree with Mr. Barton's view as to the

24 trustworthiness of YesCare and the M2 parties?

25 A     I would say I have a very different experience of them,

1  so I don't know that my opinions can be compared to his

2  opinions.

3  Q    Okay.  I appreciate that answer.

4       I think my question was slightly different, though, so

5  I'm just going to reask my question, sir.

6       My question is:  Do you disagree with Mr. Barton about

7  the trustworthiness of Mr. Lefkowitz and the M2 parties?

8  A    I've not been -- I don't have an opinion.  That's not

9  what I've been called to think about.

10 Q    Okay.  In your dealings with them, and in light of what

11 you have learned from your investigation, do you think

12 Mr. Lefkowitz and the M2 parties are trustworthy?

13 A    I have worked -- I don't feel I need to trust them, so

14 I don't have an opinion that they are or are not

15 trustworthy.  I'm trying to not make decisions that require

16 me to have such a deal.

17 Q    Okay.  You relied on financial information they

18 provided you, though, correct?

19 A    Relied on financial information the Debtors'

20 professionals provided to us.

21 Q    And you only had unaudited financial statements from

22 YesCare, correct?

23 A    That's correct.

24 Q    And none of those financial statements for the period

25 after 2019 were audited by an independent party, right?

1  A     I don't recall seeing any audited opinions.

2  Q     You testified near the end of your Direct Examination

3  by the UCC's counsel that you are familiar with the

4  settlement that is the subject of the Rule 9019 motion,

5  right?

6  A     I believe I did.

7  Q     Okay.  What is the form of proposed Order on the

8  Rule 9019 motion that the Court is asked to rule on?

9  A     I don't know that I understand that question.

10  Q     Okay.  Is the form of the Order that the UCC seeks the

11  Court to rule on, the form of Order that was filed with the

12  Rule 9019 motion on January 16th?

13  A     No.

14  Q     Is the form of Order that the UCC asked the Court to

15  rule on, the form of Order that was filed on March 5th?

16  A     I don't know.

17  Q     Is the form of Order that the UCC is asking the Court

18  to rule on in any way modified by the verbal proposal made

19  by counsel to the settling parties in court on Monday?

20  A     I was not in court on Monday.

21  Q     Do you know anything about that?

22  A     I am aware that there's been some changes to the --

23  when the cash portion of the settlement is to be paid.

24  Q     Are there any other changes that you're aware of?

25  A     I don't know.

1  Q     Have you seen the new proposed form of Order that was

2  filed on March 5th?

3  A     I believe I saw that, yes.

4  Q     Okay.  Is it your understanding that the UCC has voted

5  to approve the March 5th form of Order?

6          MR. ZLUTICKY:  Your Honor, I'm going to object.

7  The witness said he didn't know how the March 5th Order.

8          THE COURT:  If he can stipulate to that, then that

9  answers the question for me.

10         Do you have any more?

11         MR. MOXLEY:  I thought he -- maybe I

12 misunderstood, so let me ask him another question, Your

13 Honor?

14         THE COURT:  Sure.

15 BY MR. MOXLEY:

16 Q    Mr. Dundon, I'm not trying to trick you.  I thought you

17 testified that you were not aware of whether or not the --

18 you know what?  Let me just -- sorry.

19    My question is a simple one, sir.  Do you know what

20 form of proposed Order the Court is being asked to rule on

21 on this Rule 9019 motion?

22 A    I believe I understand the substance of what we're

23 asking the Court to approve.

24 Q    Okay.  The substance.  My question is do you know what

25 form of Order, what writing is the Court asked to rule on?

1  A    I think I have a general awareness, but I'm not one of

2  the Committee's lawyers.

3  Q    Okay.  You just don't know?

4  A    I know from a business perspective what I believe our

5  clients are asking the Court to do and why.

6  Q    Okay.  Are you aware of whether or not there is the

7  possibility that the UCC and the Debtor may propose a new

8  proposed form of Order that is in any way different from the

9  proposed form of Order that was filed on March 5th?

10 A    Anything is possible.

11 Q    Are there current discussions ongoing with respect to

12 the new proposed form of Order?

13 A    As I said, I'm aware that there are discussions about

14 when the cash is to be funded.

15 Q    There are active discussions going on about that right

16 now?

17 A    I don't know.  I know that there has been evolution of

18 that.

19 Q    And is it your understanding that that evolution has

20 now ended or is it continuing to evolve?

21 A    I believe that the Committee supports a concept

22 about -- so it's -- I think there is a handshake or there is

23 an agreement, but once again, I'm not -- that's not

24 my -- it's specific things where the lawyers are, is not my

25 domain.

1  Q    All right.  So as you sit here today, you can't point

2  the Court to the specific proposed Order that the UCC is

3  asking the Court to approve; is that correct?

4  A    Perhaps.

5       MR. MOXLEY:  Okay.  Your Honor, may I step away

6  for just a moment?

7       THE COURT:  Of course.

8     (Pause in the proceedings.)

9       MR. MOXLEY:  Mr. Dundon, thank you for your time.

10 I have no further questions.

11      THE COURT:  Okay.  Any -- let me ask anyone who

12 opposes the motion have any questions for this witness -- or

13 I should say the 9019?

14    (No audible response.)

15      THE COURT:  Okay.  Any Redirect?

16                    REDIRECT EXAMINATION

17 BY MR. ZLUTICKY:

18 Q    Mr. Dundon, you were asked about the recharacterization

19 of the M2 LoanCo debt to Equity.  Do you recall that in your

20 cross-examination?

21 A    I do.

22 Q    Did the Stinson firm analyze that issue?

23 A    I believe you did, yes.

24 Q    Okay.  Was the Dundon firm the one in charge of that

25 analysis?

1  A    No.  That was for the lawyers.  Recharacterization as

2  equity is often a legal issue, yes.

3          MR. ZLUTICKY:  No further questions, Your Honor.

4  Thank you.

5          THE COURT:  Any other questions?

6          MR. MOXLEY:  Your Honor, I have no further

7  questions.

8          After the witness steps down, we do have some

9  housekeeping.

10         THE COURT:  Okay.  Mr. Dundon, thank you very much

11  for your time.

12         THE WITNESS:  Thank you, Your Honor.

13      (Witness steps down.)

14         THE COURT:  Okay.  Let me just ask:  Does any

15  other side have any other witnesses for tonight to present?

16         Just in terms of witnesses.

17         MR. MOXLEY:  Your Honor, we have no other

18  witnesses, but we don't want to close just yet until we do

19  those --

20         THE COURT:  No, no, no, I got it.  No, no.  I'm

21  just talking is there anyone else we're putting on the stand

22  tonight?  That's what I'm trying to figure out.

23         MR. ZLUTICKY:  Not from the UCC, Your Honor.

24         THE COURT:  Okay.  In terms of --

25         MR. KAUFMAN:  Not from the Debtor either.

1          THE COURT:  I know there's a sprout issue, I

2   think, or a couple of designations that I should consider?

3          MR. ZLUTICKY:  Yes, Judge.

4          THE COURT:  Okay.  Why don't we talk about those

5   then we'll talk housekeeping.

6          MR. ZLUTICKY:  Okay, very good.

7          THE COURT:  I don't want anyone to read into them.

8   If the parties agree to it, you can just tell me what they

9   are and I can read them.

10         MR. ZLUTICKY:  Well, Your Honor -- sorry, go

11  ahead.

12         MS. MEYERS:  Your Honor, the deposition

13  designations for Mr. Sprouse were included in our Amended

14  Witness List.  Well, it was in our initial Exhibit List and

15  is in our Amended Witness and Exhibit List on -- at Docket

16  1428.

17         THE COURT:  1428.

18         MS. MEYERS:  And Mr. --

19         THE COURT:  Do you know what exhibit number it was

20  or 1428-dash -- I can find it but just so we're clean.

21         MS. MEYERS:  We can identify that for you, Your

22  Honor.

23         THE COURT: Okay.

24         MS. MEYERS:  I just want to clarify.  So we are

25  only moving in Mr. Sprouse's designations, which begin on

1    Page 8.  We had designated Mr. Lefkowitz' testimony in the

2    event he didn't show up, but we're not moving that.

3               THE COURT:  All right.

4               MR. ZLUTICKY:  As far as deposition designations,

5    there's been no evidence that YesCare witnesses unable to

6    appear, so we would object to designating YesCare's

7    testimony without some indication or some foundation to use

8    deposition transcripts is here.

9               MS. MEYERS:  Your Honor, our understanding is

10   YesCare is based in Tennessee and would be outside the

11   subpoena power of this Court.  We couldn't compel them to

12   show up here.

13              MR. ZLUTICKY:  It's still the burden of the moving

14   party to demonstrate some inability of that witness to be

15   here today or inability to subpoena that witness.  There's

16   just no foundation for that.

17              MS. MEYERS:  Yeah, Your Honor, the inability to

18   subpoena the witness to appear at trial is the fact that

19   they are based in Tennessee and a subpoena to show up at a

20   court in Texas would be --

21              THE COURT:  Outside of my --

22              MS. MEYERS:  -- unenforceable.

23              THE COURT:  I'll it under consideration.

24              What I want to know is when looking at the entire

25   and you designating -- or you're just the depo designations

1    that you have a 11428 dash -- you're going to give me a

2    number, right?

3              MS. MEYERS:  We have not -- we're not moving in

4    the entire transcript.  We have designated specific

5    portions, which are listed.

6              THE COURT:  That's right.  And that's what's

7    listed at the 1428 exhibit?

8              MS. MEYERS:  Yes.

9              THE COURT:  All righty.

10             MS. MEYERS:  It is starting on Page 8 and it goes

11   on from there.

12             THE COURT:  But do you know what -- it's 1428 dash

13   -- or is it that document 1428 itself?

14             MS. MEYERS:  The Docket 1428 is our Exhibit List

15   and Witness List and we list out the designations in there.

16   I can get back to Your Honor about the --

17             THE COURT:  Ah, okay.  No, no, no, no, no, that's

18   perfect, that's perfect, okay.

19             MS. MEYERS:  -- the transcript.

20             THE COURT:  Thank you.  I will take that.

21             MR. KAUFMAN:  I'm so sorry, Your Honor.  The

22   deposition transcript is for identification purposes at

23   TCC 343.

24             THE COURT:  Got it.

25             MR. ZLUTICKY:  And Your Honor, we would just -- we

1  made some objections in those excerpts.  We want to preserve

2  those.

3          THE COURT:  Yep.  They're going to -- absolutely.

4          MR. ZLUTICKY:  We'd also want an opportunity to

5  counter-designate since we didn't know that this was going

6  to be the issue.  We understood that there would be some

7  foundational evidence of why YesCare couldn't be here and

8  there's not.

9          So to the extent the Court does want to consider,

10 will consider the designations, we would want an opportunity

11 to counter designate --

12         MS. MEYERS:  Your Honor?

13         MR. ZLUTICKY:  -- as I would imagine YesCare

14 would, as well.

15         THE COURT:  YesCare is not going to do anything

16 because they're not here.  They're not going to -- they're

17 not here to talk.  They can speak for themselves.

18         MR. ZLUTICKY:  Ms. Hayward was here, as Your Honor

19 recalls.  She's unable to be here right now.

20         MS. MEYERS:  Your Honor?

21     (Automatic announcement.)

22         MS. MEYERS:  Your Honor, if I may briefly?  I

23 apologize.

24         We included Mr. Sprouse's designations.

25         THE COURT:  Yeah, I know.  It's on the Witness and

1    Exhibit List.  So if anybody wanted to counter designate,

2    they could counter designate --

3              MS. MEYERS:  Thank you, yes.

4              THE COURT:  -- based on that, so.

5              Here's what I'm going to -- let me just ask -- and

6    I'll take that under advisement.  I'm going to go back and

7    read it and go over everything.

8              And I consider the evidentiary record closed.

9              MS. MEYERS:  I have an additional housekeeping

10   issue on that point, Your Honor, if I may?

11             THE COURT:  Okay.

12             MS. MEYERS:  And just so opposing counsel is

13   aware, early in the proceeding they had identified a list of

14   exhibits that they were willing to stipulate to their

15   admission.  Some of those we had listed and others we wanted

16   to see how the evidence came in and I was hoping to identify

17   a number of other exhibits we'd like to move in, based off

18   of our understanding that Debtors and the UCC did not have

19   an objection to those exhibits.

20             THE COURT:  Have you-all conferred about this?

21             MR. ZLUTICKY:  Not since the hearing started, no.

22             THE COURT:  I'll give you a couple minutes just to

23   confer so we know what's there.

24             MS. MEYERS:  Okay.

25             THE COURT:  But here's what I will tell everyone

1   and you can think about this, too.

2            I'll step off for a few minutes.  I can give

3   everyone an opportunity to close now.  I'm not ruling

4   tonight.  I'm going to take all this under advisement.  It's

5   probably going to take me seven to ten days.  I'm going to

6   read it on the Record.  I'm not going to go back.

7            I don't want to give you a date, but it'll be

8   somewhere within the next seven to ten days to kind of -- so

9   you're looking -- I don't know, seven to ten days.  I don't

10  want to do the math now, but at the time it makes sense.

11           And I'm just -- people can come back in person,

12  fine.  I'm just going to read it into the Record all at one

13  time.  So you can figure out whether you want to do closing

14  now or if you want to pick a time tomorrow, or -- well,

15  tomorrow would be the time.  And if you want to go now, you

16  can go now.  If somebody wants time to kind of organize

17  their thoughts, but if not, we're just going to go thirty

18  minutes straight up each side and then we'll be done.

19           MR. ZLUTICKY:  The Debtor is ready to close.  I

20  think we'd all like to close tonight.  If we need to confer

21  very quickly so we can close the evidentiary record.

22           THE COURT:  Okay.  I'll give you five minutes,

23  then we'll go.

24           MS. MEYERS:  Thank you, Your Honor.

25           THE CLERK:  All rise.

1        (Recess taken from 7:32 p.m. to 7:38 p.m.)

2              THE COURT:  Counsel.

3              MS. MEYERS:  I just conferred with Mr. Kaufman to

4    confirm that Debtors and UCC were in agreement on the

5    following exhibits.  And so --

6              THE COURT:  All right.

7              MS. MEYERS:  -- I would like to move in, to the

8    extent it's not already in, TCC 132, TCC 133, TCC, 136, --

9              THE COURT:  Okay.

10             MS. MEYERS:  -- TCC 137, TCC 143, --

11             THE COURT:  Okay.

12             MS. MEYERS:  -- TCC 156, --

13             THE COURT:  Okay.

14             MS. MEYERS:  -- TCC 159, --

15             THE COURT:  Okay.

16             MS. MEYERS:  -- TCC 160 and 161 -- yes?

17             MR. SPEAKER:  Your Honor, can I take a picture of

18   this in the courtroom?

19             THE COURT:  When she's done.  Don't --

20             MR. SPEAKER:  Oh, when she's done.

21             THE COURT:  Yeah.

22             MS. MEYERS:  TCC 164, TCC 184, TCC 185, --

23             THE COURT:  You can just give me the numbers.

24             MS. MEYERS:  All right, 186, 187, 206, 207, 208,

25   209, 210, I believe 229 is already in evidence, but if not,

1    229.

2              And then I think we're moving on to the

3    confidential exhibits here which are 238, 239, and 239-A,

4    which I believe is the --

5              THE COURT:  Yeah.

6              MS. MEYERS:  -- native, 240 and 240-A, 241, 243,

7    244, 245, 246, 247, 248, 249, 250, 251, 308, 309, 310, 311,

8    312, 313, 314, and 315.

9              And I have the native files on a drive if I may

10   approach.

11             THE COURT:  Yes, please, so long as it's only --

12   okay, any other exhibits?

13             MR. SPEAKER:  No.

14             THE COURT:  Okay.  Can I consider the evidentiary

15   record closed?

16             MR. KAUFMAN:  Yes, Your Honor, from the Debtor.

17             THE COURT:  Okay.  UCC.

18             MR. HEMENWAY:  Yes, Your Honor.

19             THE COURT:  Tort claims Committee.

20             MS. MEYERS:  Yes.

21             THE COURT:  Okay.  The Record is now officially

22   closed.  Let's go right to closing.  Let me get my timer

23   out.

24             Do I need to give presenter roles to anyone or any

25   of that stuff before we go, Debtor's side?

1          (No audible response.)

2              Okay.  Ready whenever you are.

3                        CLOSING

4          BY MR. BROOKNER:  Just press start.  Good evening,

5    Your Honor, Jason Brookner as you know from Gray Reed for

6    the Debtor.

7              I had my whole closing prewritten before Monday.

8    And then it changed.  It rewrote itself because particularly

9    one question and one answer that brought out everything that

10   the Debtor and the UCC have believed up until now.

11             And this one answer and one question prove,

12   without question, without doubt, that the TCC is doing

13   nothing other than blindly following a playbook that it's

14   used in other mass tort and divisional merger cases with no

15   independent analysis and no independent thought.

16             And here's the question and here's the answer from

17   Mr. Griffith's cross-examination.  Your Honor asked him, and

18   I quote, as a fact witness here on behalf of the TCC, do you

19   have any perspective on what incarcerated pro se claimants

20   think about this settlement.

21             And the answer was, and I quote, I don't have that

22   answer.

23             So as the testimony on Monday made clear, Your

24   Honor, more than half of the TCC's constituents are

25   incarcerated pro se litigants.

1          Mr. Griffiths allegedly talked to three or four of

2     them but never asked any of them about the settlement, never

3     talked to any of them about the settlement.

4          He didn't know if anyone else had spoken to any of

5     the incarcerated pro se claimants about the settlement.  And

6     he had no idea about any of their views.

7          He could not explain how or why the TCC came to

8     its conclusion that dismissal is in the creditors' best

9     interest or why the settlement should not be approved.  But

10    wait, there's more.

11         Today's cross-examination of Mr. Atkinson made

12    several other very important things very clear.

13         First, he again confirmed that nobody had spoken

14    to any of the tort claimants.

15         Second, he clearly didn't offer any opinions on

16    whether dismissal is better for creditors than the

17    settlement.

18         Third, he didn't value the claims to be released

19    under the settlement.

20         Fourth, he could not opine on whether the proposed

21    settlement is good, bad, or otherwise.

22         Fifth, amazingly Province affirmatively chose not

23    to do the work.  They didn't use the unaudited financials

24    with which they were provided to even attempt to come up

25    with a value for YesCare.

1        The TCC, Your Honor, has not done the work.  In

2   fact, they affirmatively chose not to do the work.

3        The only thing the TCC has done in four months of

4   its existence is spend millions of dollars of creditors'

5   money to seek to dismiss a case that's nine months old at

6   the time they were appointed.

7        Now, think about that for a minute.  Millions of

8   dollars have been spent in just four months after nine

9   months of investigations and negotiations simply because the

10  TCC reflexively doesn't like this settlement, but they can't

11  tell you why.  And they can't validate why it's not a good

12  settlement.

13       The TCC was provided unquestionably, indisputably,

14  with hundreds of thousands of documents, over half a million

15  pages, immediately upon its formation in November of 2023.

16       But rather than hunker down, ask the hard

17  questions, meaningfully participate in the second mediation,

18  analyze the information that was provided in discovery to

19  the best of their ability, analyze the claims pool, ask for

20  more information, attempt to negotiate for a larger

21  settlement or for how the settlement proceed should be

22  divvied up, they did nothing but immediately focus all of

23  their efforts on dismissal, with zero substantive engagement

24  with the Debtor or the UCC on anything other than the

25  discovery pertaining to the motion to dismiss.

1          And the reality, Your Honor, is that the dismissal

2    effort started before the December mediation which -- with

3    Mr. Sontchi and before the TCC even authorized its counsel

4    to work on dismissal.

5          The fee statements clearly show that counsel

6    started preparing the motion to dismiss almost immediately

7    upon being hired.  And, in fact, counsel was working on the

8    motion to dismiss while they were sitting in the mediation.

9          I find this personally, as a bankruptcy

10   professional and as counsel to the Debtor in this case, I

11   find this and the way things have unfolded in the last four

12   months to be astounding, a manifest waste of time and

13   resources.  And it's all without any constructive dialogue.

14         And then we get to trial and what happens?  Over

15   four full days, long days the TCC didn't produce one iota of

16   evidence as to why this settlement is not in creditors' best

17   interest or how dismissal is in creditors' best interest.

18         And, again, to repeat the phrase that I'm going to

19   -- you're going to hear from me over and over again in the

20   next 17 minutes, because they didn't do the work.  They

21   didn't do the work.

22         And taken as a whole, Your Honor, the TCC has not

23   functioned in the way an official Committee should function.

24         It has instead acted as an intellectually

25   dishonest amalgamation of people who have now spent millions

1    of dollars in creditors' money for what's nothing more than

2    a public relations gambit.  That's all that this has been.

3            Their pursuit of dismissal has nothing to do with

4    the TCC's constituents or what's in their best interest or

5    what's otherwise in the best interest of the creditor

6    constituency as a whole.

7            And they haven't done the work and, as a result,

8    they have been unable to meet their burden of proof.

9            And then on cross-examination Mr. Griffiths -- I'm

10   sorry, on direct examination, my mistake, on direct

11   Mr. Griffiths had the audacity to testify that the

12   settlement was not reached in good faith and that the

13   parties did not negotiate in good faith.

14           And you know what, Your Honor?  He wasn't even in

15   the room.  He wasn't at Fulbright's office in New York.  He

16   was on the phone.  He has no idea -- is this off on purpose?

17           Was I being too loud?

18           THE CLERK:  Test it.

19           MR. BROOKNER:  Okay.  He has no idea what

20   happened, who was in the room, who came out of the room,

21   what was said in different rooms, or anything else.

22           And then during the cross-examination by

23   Mr. Lefkowitz, the TCC itself had the audacity to imply that

24   the only reason the Debtor and the UCC are pursuing approval

25   of this settlement is so that their professional fees can be

1  paid.  We both know that neither of those things is true.

2          And I'll tell Your Honor I am personally

3  profoundly offended by that.  Mr. Zluticky is profoundly

4  offended by that, that the TCC would come into this

5  courtroom without any evidence and callously and carelessly

6  throw around those kinds of allegations and make that kind

7  of innuendo about counsel, knowing full well that the public

8  is listening, that the press is on the line.

9          It's egregious.  It's unprofessional.  It's

10  detestable.

11          But if you take a step back and you look at what's

12  happened and you think about it, that's all they have.

13  That's all they have, because if the TCC had any real facts

14  or any real evidence, Your Honor, or any law in its favor

15  that supported its arguments, you would have heard it.  But

16  you didn't.

17          And when you don't have the facts and you don't

18  have the law, you sling the mud.  And that's all they have

19  done.

20          If anyone isn't acting in good faith here, if

21  anyone is not acting in good faith here, it's the TCC

22  because as we now know, they didn't do the work.

23          Let's contrast that, if you will, with the actions

24  a true fiduciary has taken in this case and how a true

25  fiduciary operates, and that's what the UCC in this case has

1    done.

2           They've done the work.  They've done it.  And that

3    was clear from Mr. Barton's testimony and Mr. Dundon's

4    testimony.

5           The UCC has thoughtfully and painstakingly

6    reviewed hundreds of thousands of pages of documents, taken

7    depositions, analyzed information, researched the law, asked

8    questions, talked to their own constituents, dug in and made

9    hard decisions based on the facts discovered and the law

10   that prevails.

11          They spent months getting after it.  And did they

12   seek to dismiss?  No.  Why?  Because facts matter, Your

13   Honor, facts matter.

14          And this case is distinguishable from every other

15   divisional merger case that's ever existed.  The UCC

16   understood and continues to understand that the best path

17   forward for this case is reaching a value maximizing

18   consensual resolution, if possible, rather than incurring

19   the time and expense of nuclear war.

20          And as a result, the UCC came to mediation, a deal

21   was cut.  And make no mistake about it, if no deal had been

22   cut, Mr. Zluticky and his team were ready to pull out the

23   litigation stops.

24          We then went back to another mediation for reasons

25   we're all familiar with, and we cut another deal.  And here

1  we are.

2          And the UCC is compromised not just of trade

3  creditors, Your Honor, but also two personal injury

4  claimants who are both formally incarcerated individuals and

5  who are both pursuing claims on behalf of and alongside

6  additional incarcerated and formally incarcerated

7  individuals.

8          And collectively these plaintiffs have alleged

9  claims in excess of $70 million.

10          The UCC and its professionals have -- and its

11  members have spoken to many of their constituents:  trade

12  creditors, inmates, and others.  Since the start of this

13  case they have had tons of calls and emails to and from

14  their constituents.  And that includes pro se claimants.

15          If the UCC didn't believe the settlement was a

16  good deal, didn't think it was better than dismissal, and

17  otherwise thought there could be more and better recoveries

18  for constituents through alternate means, I promise you

19  Mr. Zluticky would have been here on a motion for derivative

20  standing or a motion to dismiss a long time ago.

21          The Debtor in the UCC, just as I told you on

22  opening, they want to put real dollars into the pockets of

23  real people.  And that's what this settlement will allow to

24  happen.

25          And the only impediment, Your Honor, the only

1    impediment to getting it done sooner rather than later,

2    assuming of course that you approve the deal, is the TCC.

3           Make no mistake about it and no -- you nor anyone

4    else should make any mistakes about it.  It's the TCC that

5    will impede distributions to creditors.

6           It's the TCC that will impair and impede putting

7    monies into people's pockets; not the Debtor, not the UCC,

8    not the settling parties, and not anybody else.

9           So now taking a step back that I've gotten that

10   out of my system, let's look at what I told you at opening.

11   Let's track through what's happened at trial.

12          The first thing I told you when I opened was that

13   this was not a bad faith filing and it was not encouraged by

14   (indiscernible) to dismiss this case.

15          It's now clear that we're not talking about bad

16   faith filings anymore, only dealing with the merits of the

17   9019 motion and whether you should then dismiss if the

18   settlement's not approved.

19          Next I told you this was not a sub rosa plan

20   because the settlement doesn't impact individual claims,

21   doesn't preclude anyone's day in court, doesn't allocate

22   consideration among creditors or classes of claims, and that

23   all it does is bring value into the estate to be divvied up

24   pursuant to a plan that needs to be negotiated and filed

25   after Your Honor approves this settlement.

1          The evidence has unquestionably borne this out,

2   along with the modifications and clarifications that we made

3   to the settlement agreement, both in the March 5th amended

4   proposed form of order, as well as the announcement made on

5   the Record by Ms. Hayward on Monday.

6          It should now be clear there are no third party

7   releases, only the estate's claims are being settled and

8   released, and the settlement stands alone, divorced from the

9   plan process.

10         Once you approve the settlement, hopefully,

11  theoretically the DIP funding will come in.  And once there

12  is a final non-appealable order on the settlement, the $40

13  million settlement payment will be made.

14         And so on that note let's talk about

15  administrative insolvency because I know Your Honor's talked

16  about that, you want to hear about it.

17         The evidence is undisputed the Debtor has $5

18  million in DIP funding coming in once you approve, $2

19  million of which is already sitting in escrow.  We can't use

20  it until you approve the settlement.

21         There are between ten and $20 million in the RC

22  credits that we're waiting on.  There's insurance money,

23  there's the $40 million in cash coming from the settlement.

24  And then there's some miscellaneous what I'll call cat and

25  dog litigations that may be out there, couple of million

1  dollars worth.

2          You then asked about distributable value.  We gave

3  you a demonstrative, which I can hand up again if you wish,

4  on Mr. Perry's direct examination showing a range of

5  distributable value between 49 and $62 million.

6          How far that number goes down depends almost

7  entirely on the TCC, whether they appeal your order, how far

8  up they go, and whatever other things they want to do to

9  impede the progress of this Chapter 11 case.

10          But no matter what they do, there will be more

11  than enough cash from the sources that I just described to

12  cover administrative claims and make a distribution to

13  unsecured creditors.

14          On the law, the magisterial *Jackson Brewing* case,

15  the court evaluates three factors as you know:  the

16  probability of success in the litigation with due

17  consideration for the uncertainty in the fact in the law,

18  the complexity and likely duration of the litigation and the

19  attendant expense, inconvenience, and delay, and "all other

20  factors bearing on the wisdom of the compromise."

21          The Court does not conduct a mini trial on the

22  merits.  And when viewed it as a whole -- when viewed as a

23  whole, at this point it should be easy for the Court to

24  determine that these matters are complex, uncertain, time-

25  consuming, and expensive.

1           No court has issued anything close to a definitive

2   merits ruling on the Texas divisional merger statute,

3   whether a divisional merger is a fraudulent conveyance,

4   whether it can be invoided (sic), whether it could be

5   unwound.

6           We all know that there is significant uncertainty

7   in the law here.  And the arguments and issues are novel,

8   complex.  The litigation will unquestionably be time-

9   consuming and expensive.  And the outcomes are all highly

10  uncertain.

11          And the same holds true even for the more

12  straightforward claims of avoiding potentially fraudulent

13  transfers, successor liability, veil piercing, alter ego,

14  et cetera.  These are never easy claims to succeed on.

15  They're always time consuming, they're always expensive to

16  prosecute.

17          Mr. Lefkowitz was clear on his examination that he

18  and the potential litigation targets will fight. They're not

19  going down easy.  They're not going down without a hard and

20  vigorous defense.  They think they have good defenses.

21          And Mr. Lefkowitz's exact words were that if the

22  settlement agreement is not approved, and I quote, all Hell

23  breaks loose.

24          The TCC at some point also referenced a claim for

25  misappropriate of business opportunity which we didn't hear

1  about until the testimony started and they started crossing

2  Mr. Barton.

3          But that's nothing more than a claim for breach of

4  fiduciary duty, the flavor of which is either usurpation of

5  a corporate opportunity or breach of the duty of loyalty but

6  by implication that tracks along with the other claims

7  stemming from the divisional merger.

8          And the TCC hasn't produced any evidence to show

9  you that there's no complexity, that the outcomes are

10  certain, that the litigation won't be time consuming, or

11  that the litigation won't be painfully expensive.

12          You can just look at how much has been spent in

13  the last four months on nothing more than the motion to

14  dismiss.  And you can multiply that in magnitudes as to what

15  this litigation will cost if it goes forward and how long it

16  will take.

17          We then have all other factors bearing on the

18  wisdom of the compromise, *Foster Mortgage*, which tells that

19  this catchall takes account of two things.

20          First, the prime interest of -- sorry, the

21  paramount interest of creditors with deference to their

22  reasonable views, and the extent to which the product -- the

23  settlement is the product of arm's length bargaining and not

24  fraud or collusion.

25          If we take the second piece of that first, there's

1  no question there was arm's length bargaining here.  And

2  there was no fraud and there was no collusion.

3          The testimony is clear that there were two

4  mediations conducted by two different mediators with all

5  constituents represented by counsel.

6          The Debtor has a chief restructuring officer who's

7  been running the show since day one.  And the UCC is an

8  independent fiduciary.  This is not a case of the Debtor

9  cutting a deal with itself or the sole director cutting a

10 deal with himself.  Hard bargains were driven.

11         And the Debtor's sole director and CRO both

12 testified how the CRO's been running the show from day one.

13 And he has not in any way been impeded in the exercise of

14 his fiduciary duty to maximize value.

15         All right, the settlement -- have to jump because

16 I've got to give Mr. Zluticky a chance here.

17         The settlement provides closure, it provides

18 definitiveness.  It's a pot of money that can be distributed

19 in due course.  Once a plan is confirmed, it's tangible,

20 real, now.

21         And the only inhibitor to the timing is the TCC

22 appealing.  Denying the settlement and sending people back

23 to a freefall litigation is a mistake.  It's the wrong thing

24 to do.  It's the wrong thing at the wrong time.

25         I have a bunch more, Your Honor.  I'm going to --

1  the last thing I'm going to say is the postscript is that we

2  also have the exclusivity in DIP financing motions that are

3  up for approval that need to be dealt with.  And we would

4  respectfully submit both of those motions should be granted.

5        The evidentiary predicate for those has been

6  wrapped in with everything else.  And the Debtors

7  respectfully submit that the burden of proof has been met

8  and that the evidence supports granting those two motions.

9        And I apologize to Mr. Zluticky for running a

10 little bit over my allotted time.

11       THE COURT:  Thank you.

12     (Pause in the proceedings.)

13                         CLOSING

14       BY MR. ZLUTICKY:  Good evening, Your Honor.  Nick

15 Zluticky for the Official Committee of Unsecured Creditors.

16       Your Honor, in the four days we've been here on

17 this motion, the Debtor and the Committee have shown by a

18 preponderance of the evidence that the settlement is a sound

19 exercise of the Debtor's business judgment, falls well

20 within the range of reasonableness of settlement of these

21 claims, and satisfies each of the factors set forth in

22 *Jackson Brewing* and *Foster Mortgage*.

23       This is a settlement that should be approved.

24       I want to talk about four things this evening.

25 First, I want to go through the money that will actually be

1  available to creditors in this case as a result of the

2  settlement.

3          Your Honor was focused on this in opening, and for

4  good reason.  Creditors deserve to know how much the estate

5  is getting and when the creditors will be paid.

6          THE COURT:  What settlement am I approving?

7          MR. ZLUTICKY:  Your Honor, you're approving a

8  settlement of the estate's claims.  It's a --

9          THE COURT:  No, what I'm saying, which version of

10 it?

11         MR. ZLUTICKY:  So, Your Honor, it's -- it has

12 admittedly evolved.  It's the March 5th order.  However,

13 Ms. Hayward made a comment --

14         THE COURT:  How do I view that in light of -- I'm

15 just asking Dundon said he didn't know about it.  Barton

16 said he didn't know about it.  Lefkowitz said he hadn't

17 focused on it.  So how do I focus on that being the order?

18 How do I know that that's the deal?

19         MR. ZLUTICKY:  Well, Your Honor, the March --

20         THE COURT:  I know that the Debtor supports it.  I

21 don't know if the Committee supports it.

22         MR. ZLUTICKY:  Your Honor, the Committee does

23 support it.  They would not have --

24         THE COURT:  Not what they testified to.  Tell me

25 what witness testified that they had read it, focused on it,

1  and supported it.

2         MR. ZLUTICKY:  Well, Mr. Barton said --

3         THE COURT:  Just want you to know which one.

4         MR. ZLUTICKY:  I understand.  Mr. Barton did say

5  that he knew about the settlement change.

6         THE COURT:  Not what I asked.  Tell me how the --

7  does the Committee support it?  What version am I approving?

8  That's what -- I just need to know what version am I

9  approving?

10        You're -- we're talking about -- and I'm not even

11 sure -- I've got questions for them, too.  I'm not even sure

12 what to do with Ms. Haywood's statements when I'm not even

13 sure Mr. Lefkowitz spoke for all the M2 parties.

14        And I don't even think he knew who the -- what

15 they were doing towards the end.  And I know he didn't

16 represent one of the Perigrove entities.  It may have been

17 LLC.  I'm not sure what to do with that.

18        MR. ZLUTICKY:  Your Honor, --

19        THE COURT:  Maybe I can say I'll approve it

20 subject to everything -- everyone coming back and coming

21 back and saying something.  But I don't know what version

22 I'm approving.

23        I got questions for them -- I got one question for

24 them, too.  But that's the question that I've got.  And I

25 had to ask it to you because your folks -- one said they

1  didn't focus on it.  The other one said he didn't know about

2  it until today.

3          MR. ZLUTICKY:  Your Honor, the reason why

4  Mr. Barton didn't have all that information is because we

5  followed your instruction to the letter.  We did not want to

6  talk about --

7          THE COURT:  I got it.

8          MR. ZLUTICKY:  -- the subject of his testimony.

9          THE COURT:  I got it, no, I'm not faulting anyone.

10  I'm just saying how do I approve something that I'm not sure

11  the UCC has absolutely approved?  I know what counsel's

12  telling me but --

13          MR. ZLUTICKY:  Yeah.

14          THE COURT:  -- the witnesses, and Barton

15  certainly, doesn't look like there's been a meeting to

16  approve the amended settlement.

17          I know that there's a signed deal.  What do I do

18  with that?  I mean, I can -- I don't need your approval.  I

19  can approve it based on what the Debtor wants.  But that's

20  the question.  I'm -- what does the Committee support?

21          MR. ZLUTICKY:  Your Honor, the Committee supports

22  each of the versions of this settlement that's been

23  announced, including the one that was filed on March the

24  5th.

25          We did not have an official meeting.  We

1  circulated the redline to all of the members.  They all had

2  opportunity to comment and review and approve it.

3          This Committee has approved that deal.  I have kept

4  this Committee apprised every step of the way.  Their --

5          THE COURT:  Well I'm sure you have.

6          MR. ZLUTICKY:  -- engagement level is high.

7          THE COURT:  Okay.

8          MR. ZLUTICKY:  And the Committee has absolutely

9  supported this deal, I promise on -- I am certain --

10         THE COURT:  Okay.

11         MR. ZLUTICKY:  -- that if the Court approves this

12 deal, the Committee has signed off on it.

13         THE COURT:  Okay.

14         MR. ZLUTICKY:  Your Honor, I also want to go

15 through the claims being settled and what's not being

16 settled.  I want to walk through each category of the claims

17 that are being settled, what the evidence showed on the

18 viability and the value.

19         And then I want to discuss why the Committee

20 believes this settlement's in the best interest of

21 creditors.

22         THE COURT:  Okay.

23         MR. ZLUTICKY:  And so first let's talk about the

24 money.  It's $54 million to the estate.

25         In addition, DIP liens are forgiven, which means

1    employee retention credits of between 19 and 25 million and

2    other causes of action worth up to five million are realized

3    for the estate.

4            All tolled, after administrative expenses are

5    paid, which continue to grow every day admitted, we estimate

6    that between 55 and $65 million will be available to

7    creditors.

8            This is not theoretical.  It's not illusory.  It's

9    millions of dollars that can be equitably distributed to

10   creditors who have been trying to chase down money for

11   years.

12           This money is real.  It is to be paid to the

13   estate once the settlement is approved.  And it will provide

14   a clear path to a meaningful recovery for creditors in this

15   case.  That is a good outcome for all creditors.  And it is

16   far better than the alternative that TCC proposes.

17           So let's go through what's being settled.  The

18   testimony from the witnesses and the plain language of the

19   agreement are clear that the settlement covers only the

20   estate's claims against the settlement parties.

21           THE COURT:  What do I do about the releases?

22           MR. ZLUTICKY:  Your Honor, the releases are of the

23   estate's claims.  The change on March 5th --

24           THE COURT:  I'm talking about the extra folks, the

25   folks who no one's talked about for the last four days.

1          MR. ZLUTICKY:  The parties that are in addition to

2    the M2 parties, Your Honor, they are getting a release under

3    this agreement of the estate's causes of action against

4    them.

5          THE COURT:  Right.

6          MR. ZLUTICKY:  And so as we go through what is

7    being settled and what's not, we'll discuss those claims and

8    what the viability and value of -- is of those claims.

9          THE COURT:  Who valued those claims?

10         MR. ZLUTICKY:  So the UCC did.  We looked at all

11   of them.  The problem --

12         THE COURT:  That's what I'm saying.

13         MR. ZLUTICKY:  -- is every -- yeah.

14         THE COURT:  But I got a chart and I got a DCF.  I

15   don't even know what the WAC is on the DCF, don't know what

16   the discount is, don't know how it got valued because no one

17   would provide that information.

18         That was -- so I don't know what the inputs are

19   for DCF, right, which can value -- I don't know what the

20   sensitivity analysis that was done for it, I don't know what

21   to do with that.  I'm being honest.

22         That's why I was asking if folks wanted to think

23   about this stuff today.  I don't know what to do with a DCF

24   where I haven't seen the input.

25         I certainly -- what Mr. Patterson is saying is

1  weighing heavy because it's practical, it's straight to it,

2  the value of the claims and what people considered with no

3  paperwork, right.  I got it you thought about it.

4        The range of values that were given I think is

5  there.  But I don't know what to do with that.

6        MR. ZLUTICKY:  Well, the range of values to us

7  represents the upside, right.  What do we get if we win?

8        And then you have to look at what are the risks

9  associated with pursuing them.  And when you focus on those

10 risks, this settlement is a reasonable settlement that falls

11 within --

12        THE COURT:  But it keeps changing, right?  That's

13 the -- right, it keeps changing from I think what Judge

14 Sontchi negotiated was money comes in at confirmation

15 period.

16        Now it's money comes in, we take the opt-out out,

17 money comes in on a final order, subject to appeal, then it

18 now shifted to money comes in upon the final order approving

19 the 9019.

20        I -- believe me, I've got questions for the other

21 side.  And I think Mr. Griffiths -- I've got questions about

22 that and that's coming so you don't have to worry about

23 that.

24        I just want to know -- I get the Debtor's

25 perspective, I get the Committee's perspective.  It's the

1  math that troubles me.

2         I'm -- maybe it's just that's the most money we

3  were able to get in mediation and that -- we're going to put

4  real money in people's hands.  And that's --

5         MR. ZLUTICKY:  Well, --

6         THE COURT:  -- certainly important for sure

7  because it certainly looks like not a whole lot of people

8  spoke to pro se litigants, which is really surprising.

9         MR. ZLUTICKY:  Your Honor, I did.  I mean, you

10 asked me to give out my direct dial office line at a hearing

11 months ago.  I did.

12        THE COURT:  Oh, no, I know.

13        MR. ZLUTICKY:  I've spoken with dozens of pro se

14 litigants.

15        THE COURT:  I'm talking about the tort claims

16 Committee.  It's coming.

17        MR. ZLUTICKY:  Your Honor, the basic terms of the

18 agreement have not changed.  The prior --

19        THE COURT:  That's not true.

20        MR. ZLUTICKY:  -- version --

21        THE COURT:  That's not true.  It's changed.

22        MR. ZLUTICKY:  Well, Your Honor, the original

23 agreement --

24        THE COURT:  Right, one was going to get paid under

25 the plan when now one's going to get paid on the 9019.  But

1  we don't even know if -- that's significant.  That's a

2  different deal change.  One had an opt-out, one had plan

3  terms.  Now the plan terms are out.  The deal has changed.

4          MR. ZLUTICKY:  Well, what hasn't changed --

5          THE COURT:  Money hasn't changed.

6          MR. ZLUTICKY:  Right.  Your Honor, what hasn't

7  been changed is what is being paid and what is being

8  released.

9          THE COURT:  I think that's fair.

10          MR. ZLUTICKY:  It's the estate's claims that are

11  being released, and that has not changed.  And it's $54

12  million that's being paid, and that has not changed.

13          The timing of that payment, it's changed.  I don't

14  think it's changed by that much.  If you look at the

15  original agreement, it was to be paid on the effective date,

16  not upon plan confirmation, on the effective date.

17          There were conditions for what were required for

18  the plan to go effective.  And it was certainly possible --

19          THE COURT:  Someone find me the settlement

20  agreement.  I know --

21          MR. ZLUTICKY:  Are you talking about it's Docket

22  Number 1410-1, Your Honor.

23          THE COURT:  And that was good, thank you.

24      (Pause in the proceedings.)

25          MR. ZLUTICKY:  Your Honor, if you look at 9(a)

472

1    romanette (v), --

2            THE COURT:  1410, Exhibit 1.

3            MR. ZLUTICKY:  Yeah, 1410-1.

4            THE COURT:  Just pulling it up, I'm sorry.  All

5    right.

6            MR. ZLUTICKY:  If you go to 9(a) romanette five, --

7            THE COURT:  Nine, "A," romanette (v).

8            MR. ZLUTICKY:  -- this is the original agreement

9    that was filed in January, and it required exculpations,

10   plan injunctions, and required gatekeeping provisions

11   substantially similar to those that are in the current plan

12   to ensure the finality of the plan and confirmation order.

13           THE COURT:  Are you looking at Paragraph 9(a)?

14           MR. ZLUTICKY:  Yes.  So --

15           THE COURT:  I'm looking at the actual settlement

16   agreement.

17           MR. ZLUTICKY:  I'm looking at the settlement

18   agreement as well, Your Honor.

19           THE COURT:  I'm looking at something --

20           MR. ZLUTICKY:  So I'm looking --

21           THE COURT:  -- different then.

22           MR. ZLUTICKY:  -- at section nine of the

23   settlement agreement.

24           THE COURT:  Hold on.  I'm going to put it up on

25   the screen so we can all look at it.

1          MR. ZLUTICKY:  Sure.  It's subsection "A,"

2   romanette five.

3          THE COURT:  Hang on.  I'm doing something wrong.

4   It's me.  Okay, it's me.  All right.  Go ahead.  There's

5   9(a).  Am I looking at the wrong thing?

6          MR. ZLUTICKY:  So, Your Honor, when we go to

7   subsection five at the very bottom of the page, --

8          THE COURT:  Here?

9          MR. ZLUTICKY:  Yes.

10          THE COURT:  Okay.

11          MR. ZLUTICKY:  So it's exculpations, plan

12   injunctions, and required gatekeeping (indiscernible)

13   substantially similar to those that are in the current plan

14   to ensure the finality of the plan and the confirmation

15   order.

16          THE COURT:  Right.  That's talking about

17   exculpation, injunctions, and gatekeeper provisions.

18          MR. ZLUTICKY:  Right.  And --

19          THE COURT:  This says the agreement wasn't even

20   going to be effective.  So I was going to -- you all were

21   asking me to approve a 9019 that wouldn't -- an agreement

22   that wouldn't even be effective until there was a

23   confirmation order.

24          MR. ZLUTICKY:  That's correct.  And there was --

25          THE COURT:  Right.  So that's why I -- that's what

1  made me start prompting does this look like an RSA.

2         MR. ZLUTICKY:  Right.  And I understand Your

3  Honor's question.  We don't believe it ever was an RSA.

4  We're not talking about class treatment, we're not talking

5  about recoveries --

6         THE COURT:  No, but you are asking me to approve

7  an agreement that isn't -- that's based upon something else

8  getting filed in the future and then getting confirmed, and

9  which we haven't seen, right.

10        So this is -- in other words, I will have approved

11 an agreement, but you couldn't -- not encouraging anyone to

12 appeal, but I don't know how they could appeal something

13 that may or may never go into effect, right.

14        It just floats into the night because we don't

15 know what plan confirmation looks like.  We don't even know.

16 We don't know.

17        MR. ZLUTICKY:  Well, Your Honor, on --

18        THE COURT:  That's what this says.  But I got it,

19 that's not the deal now.

20        MR. ZLUTICKY:  Right.  But your --

21        THE COURT:  Assuming that I -- assuming that

22 Mr. Lefkowitz can speak for all the M2 parties and which

23 he's not a director of one and didn't know about the others.

24        MR. ZLUTICKY:  Well, the M2 parties' counsel,

25 Melissa Hayward, does represent all of the M2 parties and

1   has consistently confirmed that since November.

2           And she spoke on their behalf and said that they

3   agreed to that provision, regardless of who Mr. Lefkowitz

4   does or does not act on behalf of.

5           THE COURT:  Okay.  That's helpful to know.  Okay.

6           MR. ZLUTICKY:  And so my view is that we were out

7   -- under the prior version of this agreement, we were going

8   to have to get a final confirmation order.

9           THE COURT:  To get paid.

10          MR. ZLUTICKY:  To -- in order to have the money

11  come in to go effective.  So now --

12          THE COURT:  Wait.  It's to ensure the finality,

13  not that there was a final order.  I think you all know how

14  to draft these things.  And that's not what that says.

15          MR. ZLUTICKY:  Okay.  Well, I --

16          THE COURT:  That says you got to put exculpation,

17  plan injunctions, and gatekeepers to ensure the finality of

18  the plan in the confirmation order, which means that --

19  well, that would have been an interesting question as to

20  what that meant.

21          That means to me that that's got to be in there.

22  That may not have been -- I got it.  We're not in this land

23  again.  That's what that would have meant to me.

24          MR. ZLUTICKY:  Well, Your Honor, look, --

25          THE COURT:  We're not in that land anymore.

 1  But --

 2          MR. ZLUTICKY:  -- that's my fault.

 3          THE COURT:  -- it's -- no, it's an interesting

 4  question.

 5          MR. ZLUTICKY:  I should have written it better.

 6          THE COURT:  It's an interesting question.

 7          MR. ZLUTICKY:  But the intention of the parties

 8  was that things need to be final in order for the 40 million

 9  to come in.

10          THE COURT:  Okay.  No, that's good to know.

11          MR. ZLUTICKY:  And, you know, I should have done a

12  better job of --

13          THE COURT:  Well, no, --

14          MR. ZLUTICKY:  -- drafting the --

15          THE COURT:  -- no, because in other places, final

16  order was used, right.  Like --

17          MR. ZLUTICKY:  Right.

18          THE COURT:  -- in romanette (vi) you used the term

19  final order.  Here you used finality of the order.  So, you

20  know, the texturalist in me said that's what this means

21  here, it doesn't mean that up there, it's got to mean

22  something different because they used different words within

23  the same paragraph.

24          MR. ZLUTICKY:  I understand, Your Honor.

25          THE COURT:  Okay.

1          MR. ZLUTICKY:  The intention was --

2          THE COURT:  No, but I got it.  That was the

3  intention, that was the intention.

4          MR. ZLUTICKY:  Yeah.

5          THE COURT:  Okay.

6          MR. ZLUTICKY:  And so the reason for the March 5th

7  change was to make it clear that they need that finality.

8          What Ms. Hayward said on the Record was that that

9  finality does not need to come in the form of a confirmation

10  order.  That finality can come in the form of a final order

11  approving the 9019 that is not the subject of an appeal.

12          THE COURT:  Okay.

13          MR. ZLUTICKY:  And so that is the settlement that

14  the Court is being asked to approve today, is not one where

15  $40 million comes in after plan confirmation.  It is where

16  $40 million comes in after a final, non-appealable order on

17  a 9019.

18          So if it is not appealed on the fifteenth day, the

19  money --

20          THE COURT:  The money comes in.

21          MR. ZLUTICKY:  Well, the money will come in

22  90 days after that 15th day, so 105 days, yes, that's

23  correct.

24          THE COURT:  If you've got a binding agreement, in

25  other words, for the money to come in.

1           MR. ZLUTICKY:  We have a binding agreement and

2   it's -- and the thing that was the most important to my

3   Committee is they do not get a release until every penny of

4   that money comes in.  That was the thing that was most

5   critical to us when we were evaluating the terms of the

6   settlement.

7           So now that we've gone through that, Your Honor,

8   and we've confirmed that there is no opt-in, opt-out, it's a

9   straightforward compromise to release the estate's claims in

10  addition for the 54 million and waiver of more than $30

11  million in flied claims, including the DIP lien.

12          Now, the TCC is going to tell you that the

13  settlement is a complex web of hidden releases of valuable

14  claims disguised as a straightforward compromise.  They're

15  wrong.

16          The TCC continues to go back to this contrived

17  analogy of a grocery cart at the supermarket.  But they're

18  forgetting what we're doing here.  You have to put

19  everything on the conveyor belt to check out in Bankruptcy

20  Court.

21          The UCC identified and evaluated these claims and

22  many others.  We determined which claims are the most

23  valuable based on all the legal and practical considerations

24  that go into that equation, the strength of the claims,

25  potential damages, and the cost, time, and likelihood of

1    recovery.

2         And now the TCC says it's done some of those same

3    things and it's reached a different conclusion as to which

4    claims are the most valuable.

5         But the Court doesn't have to decide who's right.

6    What we are doing here is presenting our evidence as to why

7    we believe the settlement is reasonable and in the best

8    interest of creditors.

9         The Court heard evidence from the Debtor and the

10   Committee that one category of claims, the money transferred

11   out, the fraudulent transfers was approximately 31 million.

12        These types of claims are straightforward but

13   they're not without difficulty.

14        The Court heard evidence that the transferees

15   dispute these claims and that the potential litigation will

16   be vigorously defended.  The Debtor and the Committee had to

17   factor that in to a potential settlement recovery.

18        We also had to factor in the time the judgment.

19   This litigation would be constantly for the estate.

20        And even if the estate obtained a judgment, there

21   was a real risk that such judgment would beget further

22   litigation and creditors to ultimately be able to collect

23   anything.

24        These settlement decisions are not made in a

25   vacuum.  In reaching the settlement, the Committee members

1   were keenly aware of just how long litigation could take and

2   how expensive it would be because prior to February 13th,

3   2023, the Committee members each was living through this

4   same type of litigation against these same parties.

5          Mr. Barton testified it's been five years.  And

6   all they have is a motion for summary judgment pending after

7   five years.

8          There's no reason to expect that litigation now

9   against those same parties would be any less expensive or

10  take any less time.

11         Once the Debtor and the Committee took into

12  account all of those factors, it's clear that the discount

13  that we had to apply in mediation in a settlement was

14  consequential.

15         And these are the claims, these transfers, these

16  31 million, they're the claims that on their face have the

17  most merit, the claims that would be the easiest to prove

18  and pursue.

19         So that takes us to the second category of claims,

20  the claims arising out of the divisional merger.  And I go

21  back to something Your Honor said during opening.  This case

22  is not a referendum on divisional mergers under Texas law.

23  We agree.

24         The job of the Debtor and the UCC in this case was

25  to focus not on divisional mergers as a concept but on this

1    divisional merger and apply the facts of this divisional

2    merger to the law to reach a conclusion on the viability of

3    those claims.

4           This is not a mini trial on these claims.  That is

5    not what is required to approve a 9019.  But let me be

6    clear, these are complex claims that largely assert legal

7    theories that to the extent they exist under Texas law at

8    all have not been applied to divisional mergers.

9           In short, when it comes to all of these divisional

10   merger claims, we're in uncharted waters.  That is why this

11   Committee focused its efforts on applying well-established

12   law to the facts of this divisional merger by attacking it

13   as fraudulent transfer.

14          All bankruptcy courts have extensive experience

15   with fraudulent transfers and evaluating those claims.  And

16   the Committee believes that the Debtor's valuable

17   operational assets were transferred to CHS Texas for less

18   than reasonably equivalent value and with the intent to

19   hinder, delay, and defraud the Debtor's creditors.

20          In evaluating those claims, though, it was

21   important for the Committee to understand the value of what

22   was allocated to CHS Texas in the divisional merger, so the

23   value of Corizon at the time of the divisional merger.

24          And it was the Committee's goal in mediation to

25   make that number the highest number it could possibly be.

1          But there were two significant hurdles to clear.
2    First, --

3          THE COURT:  You got two minutes.

4          MR. ZLUTICKY:  Thank you, Your Honor.

5          We're dealing with a company that itself was on
6    the verge of a bankruptcy liquidation December 2021.  It was
7    in dire financial straits before the divisional merger.

8          And the evidence showed that in the months leading
9    up to the divisional merger, the Debtor operated with
10   negative cash flows and negative EBITDA.

11         We reviewed the financials of the Debtor and
12   YesCare, and it showed that the divisional merger allowed
13   YesCare to not have these professional liability claims.
14   But it didn't turn an unprofitable company into a profitable
15   one.  YesCare was simply not worth $100 million.

16         And remember this assumes a victory on the
17   recharacterization issue which is not a slam dunk.  The
18   Debtor doesn't even agree with us on that.  We would have to
19   win on that before we even get to the value of a fraudulent
20   transfer claim.

21         The other claims, successor liability, alter ego,
22   they're better understood as potential remedies arising out
23   of or relating to the divisional merger because under Texas
24   law, they're not independent causes of action.  They're
25   remedies that are enforced only in very limited

1   circumstances.

2          Now, the TCC is going to tell you that these

3   claims are a slam dunk and that they're worth somewhere

4   between 136 and $187 million.  And they're wrong.  It's the

5   value of the potential damages of the lesser of the amount

6   of the liabilities or the value of the successor.

7          And here, the successor is not valuable.  And

8   here, that may -- and in other cases that may not have

9   mattered.  Where Johnson and Johnson has $160 billion market

10  cap, the amount of its liabilities are the measure.

11         But here, this Debtor, what was transferred the

12  successor simply isn't worth that much.

13         Absent a settlement, the Debtor and the Committee

14  would be the test case for all of these theories of

15  liability, unchartered waters.  And in the face of a $54

16  million settlement, it would be irresponsible to throw that

17  away for a series of lottery tickets.

18         We do not gamble with creditors' recoveries.

19  Instead, we investigate, we litigate, and when circumstance

20  are right, sometimes we settle.

21         And make no mistake, if we didn't settle, this

22  Committee was coming.  We were fully prepared to seek

23  standing to pursue any and all claims and causes of action.

24  And it would have been expensive and it would have taken

25  years.

1          And I don't know if we would win.  But we would

2   have done it anyway.  You want to know why?  Because that's

3   the right thing to do.  And that's our mandate, to maximize

4   recovery for creditors.

5          We believe this settlement does that.  It's

6   supported by *Jackson Brewing*.

7       (Automated operator interrupts.)

8          MR. ZLUTICKY:  It's supported by *Foster Mortgage*.

9   And --

10          THE COURT:  Thank you very much.

11          MR. ZLUTICKY:  Yes, thank you, Your Honor.

12          MR. PATTERSON:  Judge, can I -- I know I may be

13   aside or not but I don't know if I'm allocated.  I'm not --

14   I don't need 30 minutes.

15          THE COURT:  I'll give you a few minutes,

16   Mr. Patterson.

17          MR. PATTERSON:  Thank you, Judge.

18          But as a -- as an individual creditor, Judge, I've

19   got a couple of things to say.

20          One, is this a great deal?  No, it's not a great

21   deal.  And am I overjoyed with this deal?  No, not really.

22          But like I said -- and I think really what the

23   evidence showed you was, look, we were given really two

24   choices by the Court, by the circumstances.  Do we want this

25   case dismissed or would we take this settlement?

1          I think if nothing else the evidence has showed

2   you the dismissal is not the -- dismissal does not treat the

3   creditor body better than a continuation of this bankruptcy

4   case.

5          I think if nothing else came out of the evidence

6   over the days, I think the Court can make that finding, that

7   it's not in the best interest of really anyone except maybe

8   the lawyers to dismiss this case.

9          The settlement -- again, and I think you got it.

10  I look at it really for my clients in a much simpler manner.

11  I appreciate the detail and I appreciate the technicality of

12  what we're going through.  And it's important.  And if we're

13  going to do it, it needs to be done right.

14         But I'm looking at it for my client's in a much

15  broader perspective, like we started, and I think like the

16  evidence showed you that is it close to a hundred?  No.  Is

17  it close to 60 or 50 percent?  Yeah, I think so, you know.

18         And is that what I can get for my clients?  Yeah,

19  that's probably pretty close, you know.  I'm going to go and

20  they're going to pay their contingency fee, and maybe I hit

21  a homerun.  Maybe I suck and maybe it's a terrible jury.

22  All of those things have to be taken into consideration.

23         And overall we have to support it because the

24  alternative is a dismissal.  And, quite frankly, personally

25  I've got -- I can't -- I cannot advocate for a process that

1    leaves 70 or 60 percent of the creditor body in essence with

2    nothing.

3            And we know that.  We know that the incarcerated

4    pro se litigants are going to get probably zero if this case

5    is dismissed.  Zero.  Or a thousand dollars, maybe.

6            The frustration for me is along those same lines

7    is that we have a Committee that supposedly represents these

8    people.

9            I haven't been that active for the very reason is

10   my -- our clients -- my clients don't have the kind of money

11   to spend for me to continue to do this and monitor

12   everything.  I think I've hit the high points.

13           But we have a group of really good lawyers, some

14   of the best lawyers in the country billing outrageous

15   amounts of money, probably earned outrageous amounts of

16   money.

17           But they can't tell us anything about these folks,

18   about these people that maybe they're frivolous claims,

19   maybe some of them are.

20           But from what I've heard and the people I've

21   talked to, they're some people that really need

22   representation.

23           They could really benefit from these group of

24   lawyers, really benefit, like from potentially getting

25   nothing to maybe getting 50 percent of a real value of a

1    claim, to someone listen to them, look at their claim.

2            And it's not being done.  That's -- I guess that's

3    the frustrating part of this settlement.  I don't know if

4    they end up getting left behind in the end anyway if our

5    Committee doesn't even talk to them.  And so I'm off field.

6            We support it, Judge.  It's not a great deal.  But

7    I think given the alternative, it's pretty good, and we

8    would support it.

9            THE COURT:  Thank you.

10           Mr. Nguyen, just given me -- are you in support or

11   opposed?

12           MR. NGUYEN:  I oppose, Your Honor.

13           THE COURT:  Okay.  If you just give me two

14   minutes, I just got to just check on something just to make

15   sure that --

16           MR. NGUYEN:  Sure.

17           THE COURT:  -- folks know that they're going to

18   let us out.  Just give me two minutes and I'll come right

19   back.

20           THE CLERK:  All rise.

21       (Recess taken from 8:30 a.m. to 8:33 a.m.)

22           THE COURT:  Okay.  Yes, counsel.

23           MR. HAMM:  Yes, Your Honor.  My client filed a

24   joinder in favor.  Can I just have one minute?

25           THE COURT:  Yeah, absolutely.

1          MR. HAMM:  Thank you, Your Honor.

2                        CLOSING

3          BY MR. HAMM:  So my client is Saint Alphonsus.

4    They're a healthcare system from Idaho, have a $15 million

5    unsecured claim in the case, and we're a member of the

6    Committee.

7          There are two sets of numbers that haven't changed

8    that convinced my client to vote in favor of settlement,

9    okay.  And those sets of numbers are zero to 75 million and

10   13 to 35 million.

11         The uncontroverted evidence that was given in

12   these sets of hearings regarding number one, the value of

13   the money changed at the time of divisional merger, but more

14   importantly to us, the value of YesCare now.

15         When that hard, bitter pill was delivered to my

16   client, it changed our perspective.

17         At the beginning of the case we were just like

18   them.  We wanted it dismissed.  Been chasing them for years,

19   and we were angry, and we had big eyes.

20         But, again, what the Court heard is the same thing

21   we heard, and that's the value of what we're chasing.

22         And given the circumstances of this case and that

23   we're not talking about asking for more money, we're talking

24   about getting this or dismissal, Saint Alphonsus

25   respectfully requests that you deny the motion to dismiss

1    and approve the 9019.

2              THE COURT:  Thank you.

3              MR. SPEAKER:  Thank you.

4              MS. JONES:  Your Honor, I'll ask for 30 seconds.

5    It won't be past a couple minutes.

6              THE COURT:  You got it.

7                         CLOSING

8              BY MS. JONES:  Erin Jones for Capital Region

9    Medical Center and The Curators of the University of

10   Missouri wanting to remind Your Honor that we're here.

11             I had this case and another lawyer asking

12   questions or spending a lot of time in the courtroom.  But

13   I've attended and appeared and listened to all four days of

14   the hearing.

15             I wanted the Court to know that my clients support

16   the settlement.  We heard Mr. Lefkowitz testify that this

17   case is in bankruptcy because a receiver was about to be

18   appointed over YesCare.  Those were my clients.

19             So they might do well outside of bankruptcy.  They

20   were doing well outside of bankruptcy.  And they're still

21   here, they're still supporting this settlement, they still

22   believe it's a better deal for the estate.

23             We've heard a lot of threats of delay.  This

24   settlement's not going to be good because we can delay it

25   and we can keep money out of the hands of creditors.

1          I don't think that goes to prove or to meet the

2   burden of dismissal.  And it certainly doesn't take away

3   from whether the settlement should be approved by the Court.

4          So we ask the Court to deny the notion to dismiss

5   and approve the settlement.

6          THE COURT:  Thank you.  Mr. Nguyen.

7          MR. NGUYEN:  Your Honor, the U.S. Trustee filed an

8   objection.  We didn't file a joinder so --

9          THE COURT:  Yes.

10          MR. NGUYEN:  -- I'm going to ask for a little bit

11  more than one minute.  My side of the table have graciously

12  said --

13          THE COURT:  All righty.

14          MR. NGUYEN:  -- that they would share about five

15  minutes with me.  And I think that should be enough.

16                        CLOSING

17          BY MR. NGUYEN:  Your Honor, we made a lot of

18  points and legal arguments in our objection.

19          I actually don't know what -- which order and

20  which settlement is going to get entered so, Your Honor, we

21  do still stand on all of the arguments that we made in our

22  objection to the 9019.

23          I haven't seen a new proposed order.  It can

24  change tomorrow.  I have no idea.

25          THE COURT:  I hope not.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          MR. NGUYEN:  But I do want to highlight some

2    points that concerns the U.S. Trustee with the 9019.  And

3    now -- the one point I wanted to highlight is the question

4    that Your Honor asked, what exactly does this settlement

5    lock in?

6          From the testimony of Mr. Lefkowitz and Mr. Perry,

7    what they make clear is that you are locking in the

8    releases.  Under the 9019, you will be ruling that the

9    releases meet the 9019 standard, it's a fair compromise,

10   there's consideration, and the releases to the non-Debtor

11   relate to the bankruptcy administration.

12          If Your Honor makes that finding, collateral

13   estoppel will prevent us from challenging these releases at

14   confirmation.

15          Also, Your Honor, there's an element of a

16   nonconsensual third-party release here which I will explain

17   in a second.  But let's talk about the releases that are in

18   this settlement that you're asked to grant today.

19          We don't even have information as to which party

20   is contributing to the settlement and why certain

21   individuals or entities are getting a release.

22          For example, did the Court hear anything about DG

23   Realty Management, LLC?  Who are the officers and directors

24   of DGL Realty Management, LLC.  Their attorneys for DJ

25   Realty Management under the release you're going to be

1  signing will also get a release.

2           Who is Jennifer Lenae Finger (phonetic)?  Who is

3  Beverly Michelle Rice (phonetic)?  What are these parties

4  contributing to the settlement and why are they entitled to

5  a release?

6           What is -- Isaac Lefkowitz, he was on the witness

7  stand.  What is he contributing to the settlement to get a

8  release?  What Mr. Lefkowitz testified is he's going to be

9  contributing between ten and $40 million.  He doesn't know.

10          But would Your Honor just sign it, give us the

11  release?  We'll figure it out later.

12          Again, Judge, I just wanted to point out -- and I

13  think Your Honor points this out.  And I think Mr. Lefkowitz

14  confirmed that -- confirmed it in his testimony.

15          These are not mutual releases.  These parties from

16  the version that we have seen, Mr. Lefkowitz can turn around

17  and sue these parties who are giving him the release.

18          And really I struggle with this one, Your Honor,

19  and thinking about the 9019 standard.  How can you possibly

20  know that this settlement, which contains dozens, if not

21  hundreds, of releases for parties that you have no idea it's

22  within their -- the realm of reasonableness?

23          How can you approve that?  You don't know what

24  causes of actions that certain -- the Debtor has or certain

25  third party has.  There's just no evidence of why these

1    parties are entitled to release.

2            And I think that's very problematic because the

3    releases, as Mr. Lefkowitz explained on the witness stand,

4    is they're material.

5            If he doesn't get a release, you don't get no --

6    any money.  If you get money, you have to release them,

7    everyone goes home.  That -- those were his words.

8            But let's talk about this nonconsensual third

9    party release aspect of the settlement.  It's a little bit

10    confusing.  It took me a little while to understand it.  But

11    Mr. Perry and Mr. Lefkowitz and -- testified at length as to

12    the four buckets.

13            I think it's the infamous Paragraph 27, which is

14    the -- and I want to focus on the last bucket:  potential

15    avoidance action arising out of the May, 2022 divisional

16    merger.

17            Mr. Perry testified that this includes successor

18    liability and alter ego claims which I believe testimony was

19    that he believed that there was little value to these claims

20    because the theories are novel and would require a court to

21    disregard the Texas Business Organizational Code.

22            Because of the use of the divisive merger in this

23    case, claims of successor liabilities and alter egos are

24    extraordinarily valuable to the individual tort claimants in

25    this case.

1        You know that from Mr. Barton's testimony today.

2   The very next day after the bankruptcy case they went and

3   amended their complaints to add successor liability as far

4   as their complaint.

5        If a tort claimant has a pre-divisional merger

6   claim, that claim must pass through to YesCare in order for

7   that tort claimant to be fully compensated for his injury.

8        You sign this release, Your Honor, you're taking

9   away those successor liability and you're essentially

10  telling these tort claimants, yeah, you have the right to

11  sue, but you're going to be suing a shell company that

12  YesCare and other parties that were part of the divisional

13  merger that took assets from here.

14       And you will be precluding these tort claimants

15  from pursuing the parties responsible for the shell company

16  that exists before you.

17       For example, you heard about -- a lot about

18  Michael Kelly and Ian Cross who -- throughout these

19  hearings.  I think Mr. Lefkowitz described Ian Cross as a

20  crook and an ambulance chaser.  But he represents a tort

21  claimant by the name of William Kelly.

22       Mr. Kelly, according to the Debtor's own risk

23  management, this is not a pro se Debtor writing on a napkin

24  of what he thinks his claim is worth.

25       This is from Sigma Risk Management that analyzes

1    claims against Corizon.  And they say his injuries, the

2    floor is about 750,000, we saw the chart, with the high end

3    being several million dollars.

4           If Your Honor signed this settlement over the

5    objection of Mr. Kelly, which he did file an objection to,

6    you would be absolving YesCare and other non-Debtor parties

7    listed as release party of Mr. Kelly's claim on successor

8    liability or alter ego.

9           Mr. Kelly would be enjoined from bringing this

10   successor liability claim.  And how do we know that he would

11   be enjoined?  Says it right there on the proposed order.

12          Every creditor shall be enjoined from pursuing any

13   and all claims and causes of actions against the release

14   party that are property of the Debtor's estate released

15   under Paragraph 7 of this agreement.

16          That by definition, Your Honor, is a nonconsensual

17   third-party release.

18          The Supreme Court may tell you that you might have

19   some authority to do that.  But that's not the state of the

20   law today.

21          In the Fifth Circuit, nonconsensual third-party

22   release are not allowed.  There's no option for tort

23   claimants like Mr. Kelly or other tort claimants.  Both say

24   tort claim.

25          Your Honor, if you look at your Docket, I think

1  there are a lot of letters from pro se claimants.  You can

2  read those letters.  You can --

3          THE COURT:  I've read them all.

4          MR. NGUYEN:  Yes, Your Honor.  And I don't stand

5  up here and pretend to be a civil rights lawyer.  I don't

6  pretend to know what's in the best interest of pro se

7  creditors.

8          But I think if you read those letters, you'll hear

9  from those incarcerated creditors and what they think about

10  this case and their views on the settlement.  Those in the

11  letters.

12          And in addition, Your Honor, I think I had many

13  discussion with the ACLU and other nonprofits throughout

14  this case.  These people work with pro se creditors all the

15  time.  I think Your Honor should, if Your Honor hasn't

16  already, take a look at their amicus brief.

17          THE COURT:  I've read them.

18          MR. NGUYEN:  Yeah, thank you, Your Honor.

19          So let's go back.  I'm going to finish up here.

20  Nonconsensual third-party release are not allowed here.

21  There's no option for people like Mr. Kelly to opt-out or

22  say, hey, I don't want to be part of this deal, I want to

23  keep my successor claims against Corizon, YesCare, or

24  whatever the successor entity is.

25          Your Honor, tort claimants have substantive due

1  process rights, constitutional rights to seek compensation

2  for injuries before a jury.  And by signing this order, you

3  would be taking a critical piece of that from tort claimants

4  like Mr. Kelly to be fully compensated for their injuries.

5          You're going to be telling Mr. Kelly, yeah, you

6  still have the right to sue but go ahead and just sue the

7  shell company that YesCare, who just purchased your

8  successor liability claim, you can't go after.

9          I think that's really problematic given the 28 USC

10 I think 157(b)(2)(B), which limits your authority with

11 respect to personal injury and wrongful death claims by

12 extinguishing or severely limiting the recovery of these

13 claims through the signing of this settlement which contains

14 these nonconsensual third party releases.

15         Your Honor would be exceeding your -- the scope of

16 your authority as given by Congress as well.

17         And briefly I just want to make some observation.

18 During the opening, the testimony from the witnesses, you

19 heard about this litigation black hole or litigation chaos.

20 I think Mr. Brookner put up a illustration of black hole to

21 demonstrate what is out there.

22         I candidly don't understand this usage.  I know

23 there was -- it's not a litigation black hole.  It's the

24 American justice system.  Is it perfect?  No.  But that's

25 what we have in this country for tort claimants to seek

1    redress for their injury.

2          I don't think it's a litigation black hole.

3    That's just simply the American justice system.  And that's

4    the system we have for people who have injuries, and that's

5    how they get redress and compensation for their injuries.

6          From the TCC side, in a lot of the letters you've

7    seen on your Docket from pro se claimants, the nonprofit

8    groups that work with these people, that's where they're

9    asking you to let them go back.

10         They're -- they know the American justice system,

11   it's not perfect.  But that's where they want to be.  And we

12   shouldn't be the one that tells them that -- tell them that

13   we know better.

14         And also I --

15         THE COURT:  But aren't you at least a little

16   troubled that it's unclear whether any of them, folks who

17   wrote the letters, like may not even know that there's a

18   settlement on the table?

19         MR. NGUYEN:  Absolutely, Your Honor.  And that's

20   why then the --

21         THE COURT:  Like the folks who wrote letters on

22   the Docket may not actually know that someone could

23   potentially put, I don't know, some bucks in the -- yeah, I

24   got it they want to go back.

25         MR. NGUYEN:  There are --

1          THE COURT:  I'm just, you know, and I'm not saying

2  that the settlement should be approved or not.  I got to --

3          MR. NGUYEN:  Right.

4          THE COURT:  -- sit back and think about

5  everything.  And there are depo designations I haven't read.

6  I'm going to consider everything.  Just -- I'm just

7  concerned about a lot.

8          MR. NGUYEN:  Yes, Your Honor.  And --

9          THE COURT:  You know, including, --

10          MR. NGUYEN:  -- like everyone --

11          THE COURT:  -- you know, Mr. Mr. Lefkowitz's

12  perspective on who they are as well.  I don't think anyone

13  really -- I think, you know, because they were pro se, they

14  were really described I'd say in a demeaning way.  And that

15  troubled me as well.  So I'm troubled on some end.

16          I'm troubled that, you know, they were deemed, you

17  know, folks who write stuff on the back of napkins and

18  toilet paper and treated and discussed in that way.

19          But I wanted to hear how people really felt, and

20  sometimes it's just best to stay quiet and let people tell

21  you what they really think.

22          I don't know if that approves the settlement or

23  not.  And I know that's going outside the bounds of where

24  you're going.  But I -- you know, it's still a creditor.

25          MR. NGUYEN:  Correct, Your Honor.

1           THE COURT:  You know, --

2           MR. NGUYEN:  It is deeply -- and I will share,

3    Your Honor, I've written to correction facilities because an

4    inmate's mother called me because he wanted to participate

5    at a 341 meeting.  I wrote to the corrections facility.

6           And the response I got back was, you know, you

7    don't wear a black robe, you know, you really can't tell the

8    correction facility what to do, so we're not going to allow

9    this incarcerated creditor to participate in a 341 meeting.

10          Those are the problems that exist within this

11   case.  I know there some -- I mean, --

12          THE COURT:  Yeah.

13          MR. NGUYEN:  -- it exists within the bankruptcy

14   case and exists outside the bankruptcy case.  I'm sure there

15   are several pro se claimants that missed the bar date don't

16   understand the appropriate form to file claims.  These

17   problem -- it --

18          THE COURT:  Happens.

19          MR. NGUYEN:  -- happens inside and outside of the

20   bankruptcy.

21          But I just want to go back to that phrase,

22   litigation chaos, all Hell breaking loose, which is

23   Mr. Lefkowitz's word.

24          But chaos for who?  Because chaos for YesCare?

25   YesCare isn't a Debtor in this case, Your Honor.  Tehum is

1    the Debtor.  Tehum has no operation, no employee.

2              It was a product of a divisive merger orchestrated

3    by the same parties that are asking you to give them broad

4    and nonconsensual third-party releases.  I don't think

5    there's litigation chaos for the Debtor.

6              There may be litigation chaos for YesCare and all

7    their individual and entities under I guess the release

8    party.

9              But I candidly don't think it's appropriate for

10   this Court to go out of its way to provide relief for a non-

11   Debtor.  There's a place for YesCare in the bankruptcy

12   system, of course there is.  But YesCare must come in and

13   put all of its assets on the table, not orchestrate a

14   divisive merger scheme and --

15             THE COURT:  I don't think divisive mergers are

16   schemes, but I got it.

17             MR. NGUYEN:  Yes.  So if YesCare comes in, you

18   know, we can talk about their appropriate use of bankruptcy.

19             There is a grand bargain in bankruptcy, and I

20   think I mentioned it at the opening.  These non-Debtor

21   parties should not get the benefit of the system without the

22   burden.

23             And lastly, Your Honor, with respect to dismissal,

24   I think this is the third try.  A lot of money have been

25   spent in this case.  The --

```
1              THE COURT:  No, I got it, I got --
2              MR. NGUYEN:  -- burn rate is high.
3              THE COURT:  I got it.
4              MR. NGUYEN:  The --
5              THE COURT:  And let me just say, I --
6              MR. NGUYEN:  Yes.
7              THE COURT:  -- divisive mergers can be done for
8    different reasons.  And there are a bunch of different cases
9    going on.  I am not commenting on any other case, --
10             MR. NGUYEN:  Understood.
11             THE COURT:  -- only commenting on the facts here.
12   I just this one I -- you know, people -- it -- hard for me
13   to -- well, I'll let people tell me otherwise.  But divisive
14   merger that was done a year before and then, you know, files
15   for bankruptcy I think is in different shoes.
16             And that doesn't mean that people -- that all
17   divisive mergers are done for right reasons or for wrong
18   reasons.  I just -- I didn't wear the robe on any of those
19   other cases.  I wore the robe for this case.  And so that's
20   the -- those are the facts in front of me.
21             I'm just saying so that it's said.
22             MR. NGUYEN:  Understood, Your Honor.
23             THE COURT:  I think when people think about
24   divisive mergers, they -- you know, it gets into a policy
25   fight.  But that's not what I do.
```

1        MR. NGUYEN:  Correct, Your Honor.  But I think

2   under the facts and circumstances of --

3        THE COURT:  No, I got --

4        MR. NGUYEN:  -- this case, you --

5        THE COURT:  -- what you're doing.  I got what

6   you're doing.

7        MR. NGUYEN:  You can't ignore those facts.  It is

8   a transaction between insiders through the use of divisive

9   merger.  I think it's all relevant to your consideration of

10  the 9019.

11       THE COURT:  I think that's fair.

12       MR. NGUYEN:  Your Honor, lastly, I think the

13  administrative burden on this is too high.  We're at the

14  third try.  We don't believe that the settlement should be

15  approved.  Your Honor should stop the bleeding now, allow --

16       THE COURT:  But if I dismiss, what does dismissal

17  look like?

18       MR. NGUYEN:  Your Honor, it's a straight

19  dismissal, no structure dismissal, the U.S. Trustee doesn't

20  support a structure dismissal.

21       I think the TCC would be appropriate with

22  dismissal.  This case is dismissed, appear Judge Lopez,

23  signed.  That's all it is.

24       THE COURT:  Okay.  Thank you.

25       MR. NGUYEN:  Thank you, Your Honor.

1           (Pause in the proceedings.)

2                THE COURT:  Good evening.

3                MR. GOODMAN:  Good evening, Your Honor.  I want

4    the water.

5                Three ways I could go about this.  First, I would

6    like to ask the Court if you have any questions for me.  I

7    do have a closing argument prepared.  But your questions

8    are --

9                THE COURT:  No, go ahead --

10                MR. GOODMAN:  -- the most important thing to me.

11                THE COURT:  -- and make your closing argument.  I

12    do have a couple of questions but I -- you probably heard a

13    few of them already out there.

14                I'll let you address it as you see fit.  I should

15    stay quiet and listen to you and then ask questions at the

16    end.

17                MR. GOODMAN:  Very good.  Thank you, Your Honor.

18                               CLOSING

19                BY MR. GOODMAN:  Eric Goodman for the Official

20    Committee of Tort Claimants in this case.

21                Your Honor, the word is a more malleable place

22    than people car to think.  We have choices, and the choices

23    that we make are important.

24                When we walk into a new mass tort case, whether it

25    involves defective airbags, wildfires in California, the

1  opioid crisis, decades of sexual abuse, asbestos cancer, or

2  here, cruel and unusual punishment, we know that our job is

3  to try to find the best outcome for the victims, all of the

4  victims, whether they're represented by counsel or whether

5  they're pro se.

6          And that is what we have tried to do here by

7  moving for dismissal of this case and by objecting to the

8  proposed settlement.

9          I know Your Honor is focused on the Rule 9019

10  factors so I want to talk about those first.  First, we know

11  that this is an insider settlement.

12          You heard Mr. Lefkowitz testify.  Even without the

13  benefit of his testimony, you can already see his name on

14  all of the relevant documents.  He is behind every entity,

15  including almost all of the released parties.

16          Mr. Lefkowitz is trying to control both the

17  plaintiff and the Debtor and defendant in litigation, so

18  this is an insider deal that should be evaluated as such.

19          We, TCC, do not view Mr. Perry as an independent

20  fiduciary.  He was selected by Mr. Lefkowitz.  And under

21  Mr. Perry's watch, tax credits that are apparently now worth

22  nearly $25 million were handed over to the commercial

23  claimants.

24          What Mr. Perry cares about, based on the testimony

25  that he gave before Your Honor, is that the tort victims are

1   barred from pursuing their claims against YesCare and

2   Mr. Lefkowitz because without that, there is no settlement

3   here.

4          We do -- also do not view the UCC as having served

5   as a fair broker either.  We have heard that apparently they

6   are ones who did orchestrate and at one time advocated for a

7   settlement that effectively sells the pain and suffering of

8   our constituency and then uses the proceeds of that sale to

9   pay the commercial creditors.

10          The Court knows we offered to suspend all

11   litigation back in January and return to mediation.  And the

12   UCC and the Debtor both said no.

13          I fount out today from Mr. Barton that he didn't

14   even know that we had asked to begin mediation back in

15   January after the pleadings were filed.  And I found that to

16   be very concerning.

17          But if the Court does cap the amount that

18   Mr. Lefkowitz must pay for finality in this case and all of

19   the litigation against him and Corizon and YesCare and all

20   of those entities, I don't see how there could possibly be

21   enough money in this case to satisfy the demands of just the

22   tort victims.

23          Next, we know that the Debtor is a manufactured

24   entity.  There is no business to reorganize.  This is not a

25   mass tort case where the tortfeasor submits itself and its

1   assets to the Bankruptcy Court's jurisdiction; just the

2   opposite, Your Honor.

3           Mr. Lefkowitz was clear that the non-Debtor

4   released parties are the ones seeking a discharge.

5           As I said a few weeks ago, the Debtor here does

6   not even own a leasehold interest in the McDonald's.  It's

7   only assets are the estate causes of action that

8   Mr. Lefkowitz is trying to control and settle.

9           Mr. Lefkowitz even testified that the Debtor, in

10  his view, was not insolvent and is not in financial

11  distress.  And I don't know that there was even contrary

12  evidence on that issue.

13          What do the creditors think?  The tort claimants

14  are the largest creditor group in this case.  And I would

15  submit they're what this case is and has always been about.

16          They are the largest group in terms of number and

17  amount.  Mr. Lefkowitz could settle with the commercial

18  creditors tomorrow if this case is dismissed.

19          In fact, I think some have already indicated here

20  that they're willing to waive the flag of surrender and

21  settle for lower amounts.  In fact, I think Mr. Barton said

22  that he is tired of pursuing defendants that commit fraud.

23          But in our view, the Court really needs to pay

24  careful attention to the views of the tort victims in this

25  case.

1          THE COURT:  Which ones?

2          MR. GOODMAN:  All of them, every single one.

3          THE COURT:  I haven't heard about pro se's.  I had

4    a plaintiff's lawyer stand up here and tell me he wants to

5    go back to State Court.  That's what Mr. Griffiths testified

6    really about.  So I don't know what to think about other

7    tort victims because I didn't hear from them.

8          MR. GOODMAN:  Your Honor, you have heard from the

9    ones who have filed joinders --

10          THE COURT:  I did.

11          MR. GOODMAN:  -- in this case.

12          THE COURT:  That's true.

13          MR. GOODMAN:  I will let the Court know that we do

14   receive a lot of phone calls from them.  Mr. Zimmerman, co-

15   counsel here, is responsible as the primary point of contact

16   for handling those.

17          But I would also say this, Your Honor, --

18          THE COURT:  How could I feel about going out

19   there?  And I got it, he's not on the Committee, right?

20   He's the lawyer for someone for the Committee but is not

21   really a Committee member.

22          But to say that you spoke to three to four people

23   and like didn't even mention that there was like a potential

24   settlement on the table, I don't know who's being heard.

25          And I'm not -- and clearly I'm not questioning the

1  work of the Equity Committee or who they've spoken to or

2  not.

3          I just know in terms of the Record that I have in

4  front of me, I'm concerned.  I don't know how to valuate a

5  settlement.

6          I got it, the plaintiffs folks want to go back

7  because that's what they do.  They want to go back to State

8  Court.  And when I asked why you want to go back to State

9  Court, because he said he can go cut a deal.

10          Maybe he's worried about his contingency fee.  I

11  don't know why it is.  But I know -- I just know what he

12  said.

13          I've already expressed my views at this counter

14  that I don't think plaintiff's lawyers are just ambulance

15  chasers, and people in prison don't write -- aren't folks

16  who just write stuff on toilet paper.  So I'm conflicted

17  about everything in this case.

18          The one question I do have for you -- just give me

19  a minute -- connection with your motion to dismiss.  It did

20  come to mind.  I was looking at my notes.  I knew I had one

21  for you.

22          MR. GOODMAN:  Wonderful.

23          THE COURT:  Here's the question.  I can certainly

24  appreciate that the tort claims Committee got formed when it

25  got formed, right.  So it didn't -- wasn't here like, you

1  know, first two weeks of the case kind of stuff, right.

2          So that -- let's -- you know, that's -- this case

3  has been around for a lot of -- little -- well, over a year

4  now.  Well, no, yes, wow, a year, over a year.

5          But those tort claimants have been here.  Some of

6  them have been represented by counsel.  Not one of them

7  filed a motion to dismiss the case on bad faith.

8          How do I weigh a motion to dismiss at this stage

9  when the underlying people who formed the Committee, some of

10  them have been here the entire time and represented by

11  counsel, and not one of them filed a motion either remotely

12  questioning that I should dismiss this case for bad faith?

13          You know, do I -- in other words, do I just look

14  at what happened in the past or do I have to then now think

15  about the nine months that happened, the nine, ten months

16  that occurred between then and now when no one questioned --

17  you know, I got it, the Committee got formed.

18          But does that mean that the underlying people can

19  now come in and ask for something they didn't ask for ten

20  months ago?  That's the question.  And I'm wondering as I've

21  been thinking about a lot of different stuff.

22          MR. GOODMAN:  Yes.  And I'll tell you why.

23          Tort claimants and our Committee wanted to move to

24  dismiss this case instantly.  In fact, we had to convince

25  that we wanted to go to the mediation and at least hear

1  these guys out before we took that step.  That was the first

2  thing that came to your -- their mind.

3          And I will say this, Your Honor, if you think

4  about the victims here and their attorneys, right, you and I

5  are bankruptcy specialists, right.  I've been doing this

6  over 20 years.

7          I know that you are a very good bankruptcy judge

8  and had a ton of experience before you took the bench.  We

9  know bankruptcy.  We know what tools you can use.

10          We know how to object to plans, Disclosure

11  Statements.  We know how to file motions to dismiss because

12  that's the world that we live in.

13          That is not the world that a pro se claimant lives

14  in.  That's not the world that Scott Griffiths lives in.

15  He's not a bankruptcy lawyer.

16          THE COURT:  You're right.

17          MR. GOODMAN:  Most of the lawyers who have been

18  out chasing Corizon representing inmates, representing

19  people who have been harmed, families who lost their

20  children, who lost their parents, they don't know all the

21  levers that you pull in a bankruptcy case.

22          And when this case got filed, they didn't really

23  understand what was going on, right?  I mean, you think

24  about how much information came out between the different

25  Disclosure Statements that were filed in this case.  You

1  think about how little information, how little transparency

2  there was.

3          I mean, they -- think about this for a moment,

4  Your Honor.  You're a tort victim, right.  You've lost your

5  daughter because of malpractice, right.  She's dead.

6          You hire a lawyer to represent you.  They're not a

7  bankruptcy expert.  They're in this -- the State Court

8  system, that's where they spend their life.

9          I'm sure if I came into their courts I would be

10  just as lost as they would be in this court, right?

11          And they know, they hear about a divisive merger,

12  they hear that the entity that they had been litigating

13  against for a significant period of time, right, has just

14  said we're going to assign all the liabilities over here,

15  we're going to put all the assets over here, and, you know,

16  the bankruptcy proceeding, you know, follows after that.

17          I have to give Mr. Cross a lot of props in terms

18  of, you know, figuring out to amend his, you know, complaint

19  against Corizon, you know, to add CHS Texas in that

20  litigation.  That was a smart litigation move on his part to

21  do that.

22          But then to find out that there's a bankruptcy

23  proceeding and now it's all stayed, right.

24          Again, I live in this world.  I understand it, I

25  get it, right.  But I know that others don't.

1          And our job is to represent them in this case.

2     And I just -- I look at the case, I look at what it's about,

3     I look at the fundamental issue.

4          And I know, Your Honor, you said you don't want to

5     deal with the policy issue.  I've heard you say it several

6     times now.  I think you said, you know, this is a policy

7     fight, the Texas Two-Step, not where you want to go.  And I

8     get it, okay.

9          But you can't avoid this, right.  This has been

10    brought to you.  And whether you want to deal with it or

11    not, I don't think --

12         THE COURT:  No, and I --

13         MR. GOODMAN:  -- you have the choice.

14         THE COURT:  -- should be clear about what I mean

15    by that.  In other words, the -- there are some people who

16    favor them, there are some folks who just don't favor them

17    point blank.

18         You know, you can read the literature about this

19    stuff and you go -- I -- that's not my job is to pick a side

20    and say all divisional mergers, if one shows up on my door

21    then immediately it's bad and those who did it are bad, too.

22    That's what I mean by that.  And that's -- and I hope -- if

23    I wasn't really clear about that, I hope I am now.

24         It's I got it, it's at my door, I've got to deal

25    with it.

1          But the fact that it's here doesn't mean that the

2   people who did it are automatically -- they may prove

3   themselves to be not one way or the other.

4          But the fact that there's a case that's in front

5   of me that's that way, I've got to deal with the facts that

6   I've got on and not just say, this by, you know, on its own,

7   on its face equals bad.  That's what I mean.  And I --

8   that's all I meant by that.

9          MR. GOODMAN:  And, Your Honor, I think I basically

10  did a fall down on Monday of this week.  I told you, right,

11  I don't quarrel with the Texas divisional merger statute.

12          THE COURT:  Yeah.  I mean but I'm saying that's

13  all I meant by that.  And I --

14          MR. GOODMAN:  But I will say this.  And I think,

15  you know, attorney for the U.S. Trustee gave one of the best

16  closing arguments I've seen in some time because he hit on

17  what is really the central issue, what is what I would say

18  in some ways the policy issue.

19          And I couldn't tell from your comment if you

20  wanted to confront it or not, but I don't think you can

21  avoid it.  And the question really is this, right.

22          Can a tortfeasor, any tortfeasor -- and here it's

23  Corizon Health.  But can any tortfeasor undertake a

24  divisional merger that is fraudulent, right, just

25  fraudulent, then file a bankruptcy and then use that

1   bankruptcy proceeding to settle and forever bar victims from

2   having access to our justice system?

3            When they say, approve the settlement, approve the

4   settlement, bird in hand, bird in hand, think about what

5   you'd be doing, right?

6            Under there view of what is a State cause of

7   action, right, every remedy, every recourse that the victims

8   would have on account of their injury, on account of the

9   death of their daughter is taken away from them.

10           The doors of our U.S. court system would be welded

11  shut.  Not a single one of them could go before a court and

12  seek justice for what happened to them.  How can you do

13  that?

14           I just -- I can't.  I don't understand how a

15  Bankruptcy Court could say to victims, people who have gone

16  through this, that I'm just going to say you can't go to

17  court, you can't sue the Debtor anymore, right, because

18  like, you know, they're the Debtor, they're gone.

19           You can't sue Mr. Lefkowitz, you can't sue

20  YesCare, you can't sue CHS Texas, you can't sue every single

21  released party, known or unknown, right, to seek

22  compensation for that injury.

23           What's left?  There's nothing left.  There's

24  nowhere for them to go.  They get to go to a trust, right,

25  with whatever happens to be there, and that's it, that's the

1    only remedy you have.  How can that be a legitimate use of a

2    bankruptcy?

3            I don't get it.  I just don't get it.  I don't

4    understand how a bankruptcy proceeding could be used in that

5    manner.  It's just contrary to everything that I have ever

6    learned about bankruptcy process, restructuring.

7            And, you know, this is coming from someone -- I

8    love bankruptcy.  Like, I mean, I grew up in a Bankruptcy

9    Court.  I finished law school, I was clueless.  I was taken

10   under the wing of a bankruptcy judge in Youngstown, Ohio.

11           And, you know, he used to tell me, you know, we

12   work late, we work this late, right.  If a steel company

13   comes in the door and says, filing for bankruptcy, we need

14   first day relief because we've got to pay our employees

15   tomorrow, right, we did everything that it took, right.

16           That was a bankruptcy where you had a company that

17   needed help.  It was a real company, right, was in financial

18   distress.

19           I spent significant time working on automotive

20   cases, right, employees who were scared, they want to know

21   am I losing my job or not, right.

22           And the bankruptcy system, to me, to the extent

23   that it tries to breathe life into companies that are in

24   distress, that's great.

25                   THE COURT:  How do I --

1        MR. GOODMAN:  But that's not what this is.

2        THE COURT:  Yeah, but let me just contrast that.

3    There is nothing I can tell someone who has been victimized

4    in a tort just in -- period, okay.

5        And I'm going to ask you a separate question, but

6    no one should read that I'm comparing "X" to "Y."  I'm just

7    talking about bankruptcy.

8        Automotive case, union, someone who's been working

9    for a union 30 years and believe they're going to -- right,

10   some automotive company files for bankruptcy, seeks to do

11   something to a collective bargaining agreement.

12       And all of a sudden what they've been thinking

13   they're going to be entitled to, someone comes into court,

14   how do you tell them -- how do you tell somebody who's been

15   in a mine for 25 years that all of a sudden their contract

16   is going to be, you know, the deal that they thought they

17   had, some person in a robe can sign an order and change all

18   that?

19       How do you tell somebody who's invested their

20   401(k) in something and all of a sudden they find out it's a

21   Ponzi scheme and now all of a sudden the few dollars that

22   they got in connection with the Ponzi scheme they now have

23   to give back, the offense of now having to give back money

24   when after they lost everything, and the few bucks that they

25   did get they now have to give back?

1         How do you tell somebody who invested their entire

2   401(k) in a deal and now -- well, forget the -- let's just

3   say they invested all their life savings in a company and

4   now that company goes to bankruptcy, and now because of the

5   priority of the Bankruptcy Code, they don't receive a dollar

6   before everybody else gets something, they're going to get

7   wiped out in the case?

8         How do you tell somebody -- like those questions

9   are really hard.  And they weigh on bankruptcy judges every

10  day.  And I don't mean the physical and the emotional pain

11  that a tort victim has gone through.  I don't even have the

12  words.

13        And I'm not trying to compare it.  I'm just trying

14  to say, you know, I get what you're saying.  The question is

15  not the pain, just the creditor position, does it put them

16  in any different place, you know?

17        They don't get to sue anyone either.  None of

18  these folks who I've described get to sue anyone.  And I'm

19  sure they'd like to.

20        How do I distinguish between -- that's what -- am

21  I back to just saying, divisional mergers no, but if you're

22  -- you know, Wes Moreland, yes, you know?  That's the

23  question that I've got.

24        And I don't have good answers for it.  I'm just

25  thinking out loud with you since you're raising the policy

1  and what bankruptcy is for and whether it's good or bad.

2  That's -- these are the questions that run through my mind

3  as I --

4          MR. GOODMAN:  Yeah.

5          THE COURT:  -- right.

6          MR. GOODMAN:  I mean, I think when I was working --

7          THE COURT:  Because it may not just be a

8  divisional merger case.  Next time it can be, you know, I

9  didn't have some of these other cases that didn't involve

10 divisional mergers but they were really serious stuff was

11 going on and really serious allegations going on.  And those

12 cases are continuing, what do I do?

13         You know, it's -- and there's no consoling any of

14 those folks as well.  And I don't want to name cases but you

15 know which ones I'm talking about that are still going.  How

16 do you balance that with what we're talking about today?

17         MR. GOODMAN:  I think you and I know a real Debtor

18 when we see one.

19         THE COURT:  Okay.

20         MR. GOODMAN:  I think when I was working on Dana

21 (phonetic), I think you were working on *Enron* from what you

22 just said.

23         Look, I mean, if a company comes into bankruptcy,

24 right, and it submits itself and its assets to the

25 jurisdiction of a Bankruptcy Court, right, there is an

1    adjustment of the creditor, you know, company relationship.

2    That's Bankruptcy Code, that's how it works, right.

3              You have a real company that files, put all their

4    assets before the Court.  YesCare didn't file for

5    bankruptcy.  YesCare's financial statements are a mystery to

6    this day.

7              Mr. Lefkowitz didn't file for bankruptcy.

8              Think of all the released parties in this case,

9    right.  This case is nothing other than releasing people

10   from tort liability.  That's the entire purpose of the case,

11   right.

12             I mean, when you file a company and they come to

13   you and they say, I have no business to reorganize, right, I

14   have virtually no assets -- look at the letter that they --

15   that Tehum sent to United States Senate.

16             Remember that, the first sentence or really our

17   only -- really only assets are the estate causes of action,

18   right.

19             Estate causes of auction, what does that mean?

20   Well, we don't know.  Right, you couldn't know it from

21   reading the 9019 motion.

22             You know, the pro se claimants who have been, you

23   know, doing their best to follow along and understand what's

24   going on in this case, I don't think any of them when they

25   read the 9019 motion thought my claim for my pain and

1  suffering against all of the parties that I could think to

2  hold responsible and actually recover something is what's

3  being sold.

4          I mean, I can't fathom how any of them could have

5  read that in a 9019 -- and they're really smart bankruptcy

6  lawyers who I think would have read that 9019 motion and not

7  figured it out, right.

8          But now we know, right.  You heard Mr. Perry,

9  right.  They kind of finally came clean during this

10 proceeding, right.

11         This case is a hundred percent about making sure

12 that the people who were harmed, people who were injured

13 can't seek justice in the U.S. court system, right.

14         Mr. Lefkowitz just flat out said, I'm here to get

15 a discharge.

16         But you know what?  He's not a Debtor, right.

17         All the cases that I worked on before I got

18 involved in my first Texas Two-Step were, in my view,

19 bankruptcy proceedings along the lines what I've just kind

20 of always known, right.  It was steel companies, it was

21 automotive companies, it was, you know, Takata manufactured

22 airbags.

23         I mean, when Takata was trying to figure out, you

24 know, who in the entity could file for bankruptcy, they were

25 like, we've got to check every box.  We're going to put

1    everyone into bankruptcy we can because we need the

2    protection of the U.S. court system.

3         We need the Bankruptcy Court to authorize the sale

4    transaction so we can preserve these jobs and keep making

5    these products because, unfortunately, when you make

6    defective airbags, you've got to replace all the ones that

7    you made, right, and continue to make new ones.

8         Working on the PG and E case in California, again,

9    there was no one there who was trying to avoid being in

10   bankruptcy, you know.  That was a company that, you know,

11   mismanagement problems, wildfires, families dead, right.

12   Horrible, horrible case.  But the whole company filed for

13   bankruptcy.  They made all of the disclosures, right.

14        The folks who are here are seeking a discharge.

15   And look at the settlement, look at the releases.  It's a

16   discharge for hundreds of people, right.

17        And not a single one of them has taken on the

18   benefits or burdens of a bankruptcy case.  I don't know how

19   to process that.  It's so foreign from every other

20   bankruptcy proceeding that I've ever worked on or even read

21   about.  It's just different.

22        And it's not right.  It's just not right.

23        THE COURT:  Thank you.

24        MR. GOODMAN:  Thank you.

25        THE COURT:  All right, folks.  Given me all plenty

1   to think about.  I very much appreciate the time and the

2   effort that went into this.  These are very difficult

3   issues.

4          My hope is to try to get you something within the

5   next ten days.  But I -- what I won't do -- well, I guess

6   what I will do is I will -- I don't know if I'll file

7   something but I will let you know kind of when -- give me

8   about a week or so.  I'll know if I still need to take some

9   more time and think about it.

10          But I'm not going to spend -- I'm going to read it

11   into the Record whatever I do.  And I -- you know, you're

12   farm more concerned about an answer than whether I blue-

13   booked correctly on a case or something so -- but I will

14   read cases.  It'll be a full decision into the Record on

15   both.

16          Folks, I don't have many -- you -- if -- I know

17   that we're going to be leaving tonight.  You're welcome to

18   just leave your stuff on the side.

19          I've got a couple of case tomorrow.  But as long

20   as you kind of put them in an area if somebody needs to come

21   tomorrow and to come pick stuff up.

22          I thank every one, and I wish everyone a good day.

23   Thank you.

24          THE CLERK:  All rise.

25          THE COURT:  Everyone's excused.  I'm just going to

1   completely log off and get my stuff.  Thank you.

2        (Hearing adjourned at 9:17 p.m.)

3                        * * * * *

4            *I certify that the foregoing is a correct*

5   *transcript to the best of my ability due to the condition of*

6   *the electronic sound recording of the ZOOM/video/telephonic*

7   *proceedings in the above-entitled matter.*

8   */S/ MARY D. HENRY*

9   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

10  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

11  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

12  *JTT TRANSCRIPT #68448*

13  *DATE FILED:  APRIL 7, 2024*

14

15

16

17

18

19

20

21

22

23

24

25