**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DISCLOSURE STATEMENT REGARDING JOINT
CHAPTER 11 PLAN OF THE TORT CLAIMANTS' COMMITTEE,
<u>OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR</u>**

**BROWN RUDNICK LLP**
David J. Molton (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
D. Cameron Moxley (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Meghan McCafferty (*pro hac vice*)
Amir Shachmurove (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email:   dmolton@brownrudnick.com
         egoodman@brownrudnick.com
         cmoxley@brownrudnick.com
         gcicero@brownrudnick.com
         mmccafferty@brownrudnick.com
         ashachmurove@brownrudnick.com

*Co-Counsel to the Tort Claimants' Committee*

**BERRY RIDDELL LLC**
        Michael W. Zimmerman
6750 E. Camelback Road, Suite #100
        Scottsdale, AZ 85251
        Telephone: (480) 385-2727
        Email:   mz@berryriddell.com

*Co-Counsel to the Tort Claimants' Committee*

**STINSON LLP**
Nicholas Zluticky (SD TX Bar No. 3846893)
Zachary Hemenway (SD TX Bar No. 3856801)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Email:   nicholas.zluticky@stinson.com
         zachary.hemenway@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Micheal W. Bishop (TX Bar No. 02354860)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
Amber M. Carson (TX Bar No. 24075610)
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7127
Facsimile: (713) 986-5966
Email:   jbrookner@grayreed.com
         mbishop@grayreed.com
         akaufman@grayreed.com
         lwebb@grayreed.com
         acarson@grayreed.com

*Counsel to the Debtor and Debtor in Possession*

---

[1]    The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

**UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT CHAPTER 11 PLAN.**

**THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF A CHANNELING INJUNCTION PURSUANT TO SECTIONS 105(a) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4, CLASS 6, AND CLASS 9 CLAIMS, *I.E.*, CLAIMANTS WHO HAVE NOT OPTED OUT OF THE CONSENSUAL CLAIMANT RELEASE (AS DEFINED IN THE PLAN), TO SEPARATE TRUSTS. CLAIMANTS WHO ELECT TO OPT-OUT OF THE CONSENSUAL CLAIMANT RELEASE SHALL HAVE NO RIGHT TO RECOVER FROM THE TRUSTS, BUT MAY PURSUE CERTAIN RECOVERIES IN THE CIVIL JUSTICE SYSTEM.**

**THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.**

### DISCLOSURE STATEMENT

### SOLICITATION OF VOTES TO ACCEPT OR REJECT JOINT
### CHAPTER 11 PLAN OF THE TORT CLAIMANTS' COMMITTEE,
### OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR

> ### RECOMMENDATION
>
> **The Plan is proposed jointly by the Tort Claimants' Committee (the "TCC"), the Official Committee of Unsecured Creditors (the "UCC" and, together with the TCC, collectively, the "Committees"), and the Debtor. The TCC, the UCC, and the Debtor believe the Plan maximizes the recovery for creditors and provides the best process for creditors to preserve their rights and receive payment on their claims. The TCC, the UCC, and the Debtor strongly recommend that all holders of claims entitled to cast ballots vote to _accept_ the Plan.**

### WHAT IS THIS DOCUMENT, AND WHY AM I RECEIVING IT?

This is the Disclosure Statement for the Chapter 11 Plan (the "Plan") for Tehum Care Services, Inc., formerly known as Corizon Health Services, Inc., a Texas corporation (the "Debtor"), proposed jointly by the Committees and the Debtor. Because the Committees and the Debtor are jointly proposing the Plan and support its adoption, they are referred to as "the Proponents" of the Plan.

You are receiving this information because you have filed a Proof of Claim against the Debtor, or you were otherwise listed as a party in interest in the Debtor's bankruptcy case. In accordance with the Bankruptcy Code, the Committees and the Debtor are sending you the information in this Disclosure Statement to allow you to decide how to vote (if applicable) or whether to respond to the Plan. Please read below for more information.

### WHO SENT ME THIS INFORMATION?

This Disclosure Statement has been prepared by the Committees and the Debtor. The Bankruptcy Court has determined that this document contains the necessary information to fairly inform you about the Plan so that you may make an informed decision on how to vote.

### WHAT IS THE TORT CLAIMANTS' COMMITTEE?

The Tort Claimants' Committee was appointed in the Chapter 11 Case by the United States Trustee, a division of the United States Department of Justice. The Tort Claimants' Committee is a group of six creditors in the case whose claims against the Debtor are based on tort claims. The Tort Claimants' Committee's duty is to represent the interests of all creditors who have claims against the Debtor based in tort, including personal injury and wrongful death.

The Tort Claimants' Committee played a central role in drafting the Plan and this Disclosure Statement. The Tort Claimants' Committee fully supports the Plan. The Tort Claimants' Committee believes the Plan protects the rights of tort claimants, provides a fair and reasonable settlement of claims that could have been asserted against certain insider and related parties, and that the Plan will fairly distribute the Estate's funds among all claimants, including tort claimants.

### WHAT IS THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS?

The Official Committee of Unsecured Creditors was appointed in the Chapter 11 Case by the United States Trustee, a division of the United States Department of Justice. The UCC is a group of seven unsecured creditors whose claims are based on various types of claims against the Debtor, including without limitation, claims against the Debtor based on tort. The Committee's duty is to represent all unsecured creditors' interests in the bankruptcy case.

The UCC played a central role in drafting the Plan and this Disclosure Statement.  The UCC fully supports the Plan.  The UCC believes the Plan protects the rights of all creditors, provides a fair and reasonable settlement of claims that could have been asserted against certain insider and related parties, and that the Plan will fairly distribute the Estate's funds among all creditors.

### HOW DO I KNOW IF THE PLAN IS GOOD FOR ME?

The Committees and the Debtor believe that the Plan is in the best interests of all creditors.  The Plan was drafted by and is supported by the Committees, who have a duty to act in the best interest of creditors and are made up of members who are creditors seeking to be paid by the Debtor.

### WHAT ARE THE SOURCES OF PAYMENTS TO BE MADE UNDER THE PLAN?

The primary source of payments to be made under the proposed Plan will come from cash settlement payments aggregating $50 million.  The payment of these funds will be made pursuant to a global settlement which was reached in July 2024 following extensive mediation that included the TCC, the UCC, the Debtor, and certain insiders and other parties related to the Debtor.  The Plan incorporates the terms of this global settlement.

Because the global settlement was negotiated by the TCC, the UCC, and the Debtor, each of which is an estate fiduciary, the settlement is referred to and defined in the Plan as the "Estate Party Settlement," and is so termed in the subsequent provisions of this Disclosure Statement.  The terms of this settlement are set forth in ARTICLE IV and ARTICLE IX of the Plan and are discussed in greater detail in this Disclosure Statement.  One of the key benefits of the Estate Party Settlement is that it is based on a consensual release structure that affords claimants the option of participating in the Plan Trusts or litigating in the Civil Justice System.

If the Estate Party Settlement is approved and if each of the Settlement Payments are made and received by the Trusts, then the Released Parties, which include the Debtor's parent company, other related parties or entities it owns and controls, and certain of its directors and officers, will receive a release of certain estate claims or estate causes of action.  These claims include avoidance actions belonging to the Debtor's Estate, such as claims for fraudulent transfer associated with transfers of funds from the Debtor's accounts, claims for fraudulent transfer associated with the Debtor's restructuring, including the divisional merger with CHS TX, Inc. discussed more fully in this Disclosure Statement, other claims against CHS TX, Inc. and YesCare Corp. based on theories relating to that divisional merger, and preference claims involving transfers to Debtor-related entities prior to bankruptcy.

Due to the circumstances surrounding the divisional merger and subsequent bankruptcy filing, the Debtor's assets include significant Estate Causes of Action.  The Plan resolves the Estate Causes of Action asserted against the Released Parties through a settlement that goes into full force and effect after the proposed Settlement Payments have been made and are received by the Plan Trusts.  To be clear, if even one of the Settlement Payments is not made when due and in accordance with the Plan, then the Released Parties will not receive the benefit of the proposed settlement of the Estate Causes of Action against them.

Under the settlement, the Debtor will receive an aggregate of $50 million in cash, plus releases of certain claims made against the Debtor, including a release of the obligation to repay loans totaling $22.7 million made to the Debtor during this bankruptcy case, release of a lien on tax refund proceeds that was granted as part of that loan, and a release of over $24 million in unsecured claims that could otherwise dilute the pool of unsecured creditors.  In exchange for the cash payments, the loan forgiveness, and the release of claims, the Plan provides broad releases in favor of certain insider and related parties, including YesCare Corp., CHS TX, Inc., Geneva Consulting, M2 LoanCo, Perigrove, and other related entities and individuals.

The $50 million in cash payments, including interest thereon, will be allocated between the two Plan Trusts.  One trust, the PI/WD Trust, will be established to pay "Channeled PI/WD Trust Claims"—namely, the PI/WD claims asserted by holders of PI/WD claims who do not opt-out of the plan releases and elect to recover from the PI/WD Trust.  The second trust, the GUC Trust, will be established to pay "Channeled GUC Trust Claims"—namely, the GUC claims asserted by holders of GUC claims that do not opt-out of the plan releases and elect to recover from the GUC Trust.  The $50 million Settlement Payment, and the net Employee Retention Credit (discussed below), are

considered "sacred funds" that must be contributed to the Plan Trusts. These funds cannot be used for any purpose in the Chapter 11 Case, including the payment of administrative claims and professional fees and expenses.

Neither the Estate Party Settlement nor the Plan incorporating that settlement require creditors to forego claims against the parties released in the settlement without their consent. The Plan gives creditors the option to opt-out of the Plan and Estate Party Settlement and instead pursue any rights that such creditors would have had prior to the Petition Date to seek recovery from YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. Claimants who choose to opt-out will be permitted to pursue those claims but in doing so, will be choosing not to participate in the settlement or receive any distributions from the Plan Trusts. The Plan also gives certain creditors the option to opt-out in order to pursue insurance proceeds that may be available and provides for a corresponding waiver of or adjustment in distributions if a creditor receives insurance proceeds.

In addition to the Settlement Payments, the Debtor believes it may be entitled to a significant Employee Retention Credit ("ERC") from the Internal Revenue Service. Any tax credits, net of any offset rights the Internal Revenue Service may have for outstanding priority tax liabilities, will be available to the Estate for payment of creditors who have not opted out of participation in the Estate Party Settlement.

Finally, other Estate claims and causes of action may exist against third parties other than those released under the Estate Party Settlement and the Plan. The Debtor and the Committee believe these claims and causes of action may provide additional recoveries for creditors. The right to pursue Estate Causes of Action against parties other than the Released Parties is being preserved and the Trusts will jointly have the ability to pursue those Estate Causes of Action under the Plan.

### WHEN AND HOW MUCH MONEY WILL I RECEIVE UNDER THE PLAN?

The amount that you will receive and when you receive it will depend on what type of claim you have and what choices you make on your enclosed ballot.

First, if the amount in your Proof of Claim was less than $5,000, or if you choose to accept $5,000 in full settlement of your claim, you will be entitled to receive those funds once it has been confirmed that you have met the basic requirements for eligibility and you have signed a release of those claims, subject to the provisions of the PI/WD Trust Distribution Procedures, including those provisions regarding lien resolution set forth in Article IV.M of the PI/WD Trust Distribution Procedures. The basic requirements, which are called Threshold Requirements, are having a proof of claim filed before the deadline that has all required information, a sworn verification, which can be either in the proof of claim or provided later, and confirming that the claim has not already been dismissed.

If your claim is for more than $5,000 and you do not choose to accept $5,000 for your claim, you will have additional choices to make that will determine whether you will receive payments under the Plan. You can decide whether you choose to participate in the Plan or instead opt-out and instead pursue your claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. If you choose to opt-out in this manner, you will be choosing not to participate in the Plan Trusts and will not receive any payments from the Plan Trusts, and that decision is final.

Regardless of what type of claim you have, you may choose to receive the $5,000 settlement or choose to opt-out and pursue your claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. If your claim is a personal injury or wrongful death claim and you do not choose to accept the $5,000 and do not choose to opt-out and pursue claims your claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System, you may choose to opt-out solely for the purpose of pursuing your rights under any insurance policies that you believe apply to your claim. If you choose to opt-out solely to seek insurance proceeds, you may name the Debtor as a Defendant and seek recovery from the Debtor's insurers. If you choose this option, you may be able to receive funds from insurance recovery. As outlined in more detail in the opt-out section below, if you make this choice, you may be eligible to return to the PI/WD Trust and seek the payments outlined in the rest of this section rather than insurance proceeds provided certain terms and conditions are met.

If you do not choose to accept the $5,000 settlement or opt-out, the amount of money and timing for payments will be decided by Trustees, who are neutral parties hired to address the claims in this case. The claims against the Debtor fall into two broad categories: (1) PI/WD claims, which are claims relating to alleged personal injury tort or wrongful death claims, generally arising out allegations of medical malpractice, abuse, or neglect at facilities in which the Debtor served as a health care provider; and (2) Non-PI/WD Claims or GUC Claims, which are generally contract and trade claims based on the Debtor's contractual duties owed to contract counterparties and/or the Debtor's obligations owed to third parties.

As discussed in greater detail in this Disclosure Statement, there are important differences between these groups of claims, and the two separate groups of creditors are sharing equally in the proceeds of the Estate Party Settlement. In order to account for the existence and impact of these differences, the Plan proposes to create two separate trusts to administer and distribute money to these two different classes of creditors, and each trust will be funded with one-half of funds received by the estate through the Estate Party Settlement, the tax refunds, or any other sources other than insurance. If you have a claim that is a PI/WD claim and do not accept the $5,000 settlement or opt-out, your claim will be resolved by the PI/WD Trust, which will be implemented by the PI/WD Trustee. If you have a claim that is not a PI/WD claim and do not accept the $5,000 settlement or opt-out, your claim will be resolved by the GUC Trust, which is implemented by the GUC Trustee.

If you have a PI/WD claim, you will first provide information about your claim to the PI/WD Trustee. The PI/WD Trustee will determine the value of each PI/WD claim individually, based first on basic eligibility requirements. One of the basic eligibility requirements is that the claimant timely filed a personalized proof of claim. The PI/WD Trust is a limited fund. Other than the funding provided for under the Plan, no additional funding is contemplated. Thus, if the universe of eligible claims were to expand unexpectedly after this Disclosure Statement is approved, then claimants who timely filed personalized proofs of claim would see their recoveries diluted. The PI/WD Trust includes guardrails and eligibility criteria that are intended to avoid such an outcome and ensure that expectations are consistent with actual outcomes. One such guardrail is that each claimant must have timely filed a personalized proof of claim against the Debtor. This requirement applies regardless of whether a claimant may be included in, or represented by, a purported class action, class suit, class proof of claim, or similar representative action.

The PI/WD Trustee will then categorize the eligible claims based on the type of claim, meaning the type of injury or damage suffered in accordance with the PI/WD Trust Distribution Procedures attached to this Disclosure Statement as **Exhibit B**. The type of claim will provide a base value for the claim, which the PI/WD Trustee will then adjust based on factors that may impact the claim value. For example, a PI/WD claim based on wrongful death will be assigned a dollar value between $1.2 million and $1.597 million. If you accept the PI/WD Trustee's proposed value for the claim, that value will be a final determination of value for your claim as against the PI/WD Trust. If you disagree with the PI/WD Trustee's proposed value or determination of eligibility, you will have the opportunity to request a reconsideration in accordance with the PI/WD Trust Distribution Procedures.

Once the value of your PI/WD claim is determined, that value will determine your share of distributions from the Plan. In order to make sure everyone with PI/WD claims receives their fair share, the PI/WD Trustee will determine an initial payment percentage to be paid to you and other holders of claims based on the final determination of value. Everyone whose claims have been determined in a final determination will receive the same payment percentage, which will be based on the final determination amount, and the PI/WD Trustee will determine the percentage based on the amount of assets available to distribute. As the amount of assets available for distribution increases, the PI/WD Trustee will determine when additional payments should be made and will make those payments in the same way, with each claimant receiving same percentage of the final value of their claim.

For example, if the total amount of all allowed PI/WD claims is $90 million, and the PI/WD Trust assets available for distribution are worth $30 million, then each claimant would receive distributions equal to 33.3% of the value of his or her claim ($30 million / $90 million = 33.3%). The trust assets available for distribution are the numerator and the total amount of allowed claims is the denominator. In this scenario (*i.e.*, assuming a final payment percentage of 33.3%), the holder of an allowed PI/WD claim for wrongful death valued at $1.2 million would receive payments totaling $400,000, subject to the provisions of the PI/WD Trust Distribution Procedures, including those provisions regarding lien resolution set forth in Article IV.M of the PI/WD Trust Distribution Procedures. This Disclosure Statement includes the TCC's best estimate as to the range of potential recoveries and describes the risk factors that are relevant thereto. The payment percentage for PI/WD claim could be less than 33.3%. The TCC's

projections as to potential recoveries for PI/WD claimants who elect to participate in the PI/WD Trust (i.e., the "high" and the "low" is attached to this Disclosure Statement at **Schedule 3**.

If you have a claim that is not a PI/WD claim, your claim is referred to as a general unsecured claim or GUC claim.  For those claims, the GUC Trustee will first evaluate your claim on basic eligibility requirements.  If the GUC Trustee determines your claim is legally valid, the PI/WD Trustee will evaluate your claim and provide you a proposed value for your claim.  If you accept the PI/WD Trustee's proposed value for the claim, that value will be a final determination of value for your claim.  If you disagree with the PI/WD Trustee's proposed value or determination of eligibility, you will have the opportunity to request a reconsideration with an additional neutral party, who may recommend that the trustee revise its conclusion.  If the neutral does not recommend revision, or if it does and the trustee declines to accept that recommendation, you can ask the Bankruptcy Court to make a final determination of the value of your claim.

Once the value of your GUC claim is determined, that value will determine your share of distributions from the Plan.  In order to make sure everyone with GUC claims receives their fair share, the GUC Trustee will determine an initial payment percentage to be paid to you and other holders of claims based on the final determination of value.  Everyone whose claims have been determined in a final determination will receive the same payment percentage, which will be based on the final determination amount, and the GUC Trustee will determine the percentage based on the amount of assets available to distribute.  As the amount of assets available for distribution increases, the GUC Trustee will determine when additional payments should be made and will make those payments in the same way, with each claimant receiving the same percentage of the final value of their claim.

## WHY SHOULD I VOTE "YES" TO THE PLAN?

You should vote "yes" in support of the Plan because the Committees and the Debtor believe the Plan maximizes the value of the Debtor's assets, incorporates a settlement which provides for a fair and reasonable resolution to the Estate's claims, and outlines a process to get funds to creditors fairly and efficiently.  The Committees and the Debtor worked diligently through multiple mediations to negotiate terms of a settlement that is favorable and ensures meaningful recoveries for creditors.

To be clear, you can vote "yes" and opt-out.  Opting out of the Consensual Claimant Release and voting in favor of the Plan are two separate things.  Parties who elect to opt-out, which is their right, may support the confirmation of the Plan because it may present the fastest path for them to pursue claims in the Civil Justice System. If the Plan is confirmed, (i) opt-out creditors will be free to pursue their claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System, and (ii) any opt-out creditor will not face litigation over whether their claims against YesCare Corp., CHS TX Inc., or any other alleged successor entity, to the extent asserted under the doctrine of successor liability, are Estate Causes of Action that can be settled by the Debtor's Estate.  Parties who want the PI/WD Trust to be funded and go into effect may also want to vote in favor of and accept the Plan because if the Plan is not confirmed, then there will be no PI/WD Trust.

If the Plan is approved, creditors will receive significant value through cash, release of claims against the Debtor, rights to tax credits, refunds, and other Estate Causes of Action.  If the Plan is not approved, the bankruptcy case will likely be converted to a chapter 7 liquidation, and a trustee will be appointed to pursue litigation or settlement with the same parties who are proposing to fund the Estate Party Settlement.  A vote for the Plan will ensure that the Plan is approved by the Bankruptcy Court so that distributions can be made in the near term and so that claimant who want to return to the Civil Justice System can do so.

## WHAT IF I VOTE "NO" TO THE PLAN?

If the Debtor and Committee fail to collect the requisite number of "yes" votes, there is a chance that the Plan will not be approved by the Bankruptcy Court.  By voting "no," you are not waiving your rights to distributions under the Plan, but you may be putting the Plan at risk of not being approved.

**WHAT IF I WANT TO OPT-OUT OF THE SETTLEMENT IN THE PLAN?**

Each ballot or notice sent with the Court approved solicitation packet will contain an option for you to opt-out of the settlement and releases contained in the Plan in order to bring or continue actions against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. If you choose to accept a $5,000 settlement on your ballot, you may not choose to opt-out.

**If you choose this option, you will not be able to participate in the Plan Trusts. Choosing to opt-out in this manner is an irrevocable choice, and the TCC and UCC encourage you to consult with counsel prior to electing this option.**

Claimants cannot opt-out of the Consensual Claimant Release under the Plan and participate in the Plan Trust. Participating in the Plan Trusts is akin to entering into a voluntary settlement with YesCare and its insiders and affiliates. YesCare will not fund the settlement payments unless it and non-debtor insiders and affiliates receive a release similar in scope to the release that a claimant would be required to sign as a condition to entering into a voluntary settlement outside of bankruptcy. The Consensual Claimant Release mirrors this type of release.

To be clear, the decision to opt-out of the Consensual Claimant Release or not opt-out and participate in the Plan Trusts will have no impact on your ability to pursue co-liable parties, including governmental claimants, that are not Released Parties. Participating in the Plan Trusts is akin to entering into a good faith settlement with one of several defendants in the tort system. The plaintiff can continue to pursue co-liable defendants that do not settle. If you want to receive a distribution from a Plan Trust and retain the right to seek recoveries from governmental units, you should not opt-out of the Consensual Claimant Release.

**WHAT IF I WANT TO OPT-OUT OF THE DISTRIBUTIONS IN THE PLAN TO PURSUE AN INSURANCE RECOVERY?**

Each ballot or notice sent with the Court approved solicitation packet will also contain an option for you to opt-out of the settlement and releases contained in the Plan to bring or continue actions in the Civil Justice System against the Debtor for the purpose of pursuing a recovery of insurance proceeds. Choosing this option is not opting out of the settlement in the Plan. If you choose this option, you may include additional appropriate co-defendants in these actions as long as they are not the parties being released in the settlement. If you choose to accept a $5,000 settlement on your ballot, you may not choose to opt-out of the settlement and releases contained in the Plan to bring or continue actions against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System, and you may not choose the option to bring or continue actions in the Civil Justice System against the Debtor for the purpose of pursuing a recovery of insurance proceeds.

Claimants who make this election will still be deemed to provide the Consensual Claimant Release and are not true opt-outs in this respect. Rather, their recoveries will be limited to available insurance coverage, if any, unless they elect to return to the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures. By providing the Consensual Claimant Release, these claimants will have the ability to test the waters in the Civil Justice System to pursue insurance recoveries while, at the same time, retaining an ability to return to the PI/WD Trust under certain circumstances. Information regarding the insurance policies that may provide coverage for PI/WD claims is attached hereto at **Schedule 2**.

The TCC anticipates that PI/WD claimants who make this election will promptly enter into mediation with potentially responsible insurers and other parties that may be co-liable for the applicable PI/WD Claims and that are also insureds under the policies. Claimants that are considering this option should carefully review this Disclosure Statement and the TDPs and consult with their legal counsel before making any decisions. The inclusion of this option was important to the TCC because it should enable PI/WD claimants with access to significant insurance recoveries with the ability to obtain those recoveries in a manner similar to what could happen if this Chapter 11 Case were converted to chapter 7 and no Plan is confirmed. Thus, the Plan supported by the TCC and the UCC should satisfy the so-called "best interests" test under the Bankruptcy Code.

## WHERE DO I SEND MY BALLOT OR OPT-OUT FORM?

Your ballot form should be mailed to Verita Global, the Debtor's Solicitation Agent.  Alternatively, you may fill out your ballot online using the electronic key and password mailed to you.

*YOUR BALLOT OR OPT-OUT FORM WILL NOT BE COUNTED IF YOU SEND IT TO THE BANKRUPTCY COURT OR ANYONE OTHER THAN VERITA GLOBAL.*

## DO I NEED TO HIRE AN ATTORNEY TO EXPLAIN MY OPTIONS TO ME?

The Proponents have prepared this Disclosure Statement in plain English wherever possible in order to make it easier for creditors to understand.  However, the Proponents encourage all parties to seek legal counsel before making any decisions.  If you do not already have legal counsel, the Committees encourage you to contact counsel for the respective Committees and seek their assistance in answering questions or helping you locate appropriate counsel.

If you need help filling out your ballot, you are welcome to call Verita Global, the Debtor's Claims Agent, at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International).  Please note, however, that Verita Global, as well as counsel to the Debtor and counsels to the Committee, are not your attorneys and cannot offer you legal advice.

If you want to object to the Plan or this Disclosure Statement, the Debtor and the Committee encourage you to hire counsel to file an appearance on your behalf.

## WHAT ARE THE DEADLINES FOR ME TO RESPOND?

Below are the key dates and deadlines relevant to the Plan:

- Ballots and Opt-Out Forms Due:
- Confirmation Objection Deadline:
- Hearing to Consider Confirmation of the Plan:

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN AS A DESCRIPTION OF THE PLAN AND THE CHAPTER 11 CASE, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE LEGAL EFFECT OF THE PLAN ON HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING, AND CONTAINS ESTIMATES, FORECASTS AND ASSUMPTIONS WHICH MAY PROVE TO BE MATERIALLY DIFFERENT FROM ACTUAL RESULTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATE ON WHICH THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR INDEPENDENT VERIFICATION.  THE INFORMATION CONTAINED HEREIN AND THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON OTHER THAN THOSE CONTAINED HEREIN SHOULD NOT BE RELIED UPON. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL TO THE DEBTOR AND THE COMMITTEE.

THE SECURITIES AND EXCHANGE COMMISSION HAS NEITHER APPROVED NOR DISAPPROVED THIS DISCLOSURE STATEMENT, NOR HAS IT PASSED UPON THE ADEQUACY OR ACCURACY OF THE STATEMENTS CONTAINED HEREIN.

**<u>TABLE OF CONTENTS</u>**

Page

I. **General Information** ..................................................................................................................... 1
    A.   Purpose of this Disclosure Statement ................................................................... 1
    B.   General Information Concerning Chapter 11 ......................................................... 1
    C.   General Information Concerning Treatment of Claims and Interests ..................... 1
    D.   Classes Impaired under a Plan .............................................................................. 2
    E.   Voting and Opt-Out Rights ................................................................................... 3
          1.     Voting on the Plan ................................................................................... 3
          2.     Opt-Out Rights ....................................................................................... 3
    F.   Confirmation and Consummation .......................................................................... 3
          1.     Acceptance of the Plan ............................................................................ 3
          2.     Confirmation Without Acceptance By All Impaired Classes ................... 4
          3.     Best Interests Test .................................................................................. 4

II. **Background and Events Leading Up to Chapter 11** ................................................................ 5
    A.   The Debtor's Business and Operations .................................................................. 5
    B.   Perigrove Acquisition ............................................................................................ 5
    C.   Transfers to Geneva Consulting, LLC and M2 LoanCo, LLC .............................. 6
    D.   The Divisional Merger ........................................................................................... 6
    E.   Events Leading to Chapter 11 ............................................................................... 7

III. **The Debtor's Chapter 11 Case** .............................................................................................. 8
    A.   Post-Filing Activities ............................................................................................ 8
          1.     The DIP Motion and the DIP Orders ...................................................... 8
          2.     The Stay Extension Motion and Adversary Proceeding .......................... 8
          3.     Data Incident ........................................................................................... 9
          4.     The Trustee Motion ................................................................................. 9
          5.     The Initial Mediations ............................................................................. 9
          6.     The Formation of the Tort Claimants' Committee. ................................. 10
          7.     The Second Mediation. ............................................................................ 10
          8.     The Motion to Approve Settlement and Motion to Dismiss. ................... 10
          9.     Potential Estate Causes of Action. ........................................................... 11
          10.    The Third Mediation. .............................................................................. 14
          11.    The Estate Party Settlement. .................................................................. 14
    B.   Exclusivity ............................................................................................................ 15
    C.   Bar Date ................................................................................................................ 16
    D.   Claims Against the Debtor ..................................................................................... 16
          1.     In General ................................................................................................ 16
          2.     Administrative Expense Claims and Professional Fee Claims ................. 16
          3.     DIP Claims .............................................................................................. 17
          4.     Synergi Administrative Claim ................................................................. 17
          5.     Priority State and Federal Tax Claims ................................................... 17

IV. **The Plan** ................................................................................................................................. 17
    A.   Summary of Key Plan Provisions .......................................................................... 18
    B.   Treatment of Classes of Claims and Interests ....................................................... 19
          1.     Class 1 — Other Priority Claims ............................................................ 19
          2.     Class 2 — Other Secured Claims ............................................................ 19
          3.     Class 3 — Convenience Claims ............................................................... 20
          4.     Class 4 — Channeled General Unsecured Claims .................................... 20
          5.     Class 5 — Opt-Out General Unsecured Claims ...................................... 21
          6.     Class 6 — Channeled PI/WD Claims ...................................................... 21
          7.     Class 7 — Opt-Out PI/WD Claims ......................................................... 22
          8.     Class 8 — Opt-Out Insured PI/WD Claim .............................................. 22

ix

|   | 9. | Class 9 — Channeled Indirect Claims | 23 |
|   | 10. | Class 10 — Opt-Out Indirect Claims | 24 |
|   | 11. | Class 11 — Interests in the Debtor | 24 |
| C. | | Settlement, Released Parties, Exculpation, and Injunction Provisions | 24 |
|   | 1. | Released Parties, Settlement Parties and Exculpated Parties | 24 |
|   | 2. | Estate Release | 25 |
|   | 3. | Other Releases | 25 |
|   | 4. | Exculpation | 27 |
|   | 5. | Injunction | 27 |
|   | | Reservations | 28 |
|   | | Enforcement | 29 |
|   | | Termination of Channeling Injunction | 29 |
|   | | Tolling of Statute of Limitations | 29 |

**V.    The GUC Trust and the PI/WD Trust ........................................................................30**
| A. | | The Trusts Generally | 30 |
| B. | | Preservation of Causes of Action | 30 |
| C. | | The GUC Trust | 31 |
|   | 1. | GUC Trust Assets | 31 |
|   | 2. | GUC Trust Claims Administration Process. | 31 |
|   | 3. | GUC Trust Distributions. | 32 |
| D. | | The PI/WD Trust | 32 |
|   | 1. | PI/WD Trust Assets | 32 |
|   | 2. | PI/WD Trust Claims Administration Process. | 32 |
|   | 3. | PI/WD Claims Allowance. | 34 |

**VI.    Risk Factors ...........................................................................................................34**
| A. | | Bankruptcy Law Considerations | 34 |
|   | 1. | The Debtor Will Consider All Available Alternatives if the Plan Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor | 34 |
|   | 2. | Risks Related to Confirmation and Consummation of the Plan. | 34 |
| B. | | Risks Related to Recoveries Under the Plan | 36 |
|   | 1. | Estimated Recoveries to Holders of Allowed Claims and Interests Are Based on Assumptions and May Vary from Actual Recoveries. | 36 |
|   | 2. | Litigation Matters | 37 |
| C. | | Miscellaneous Risk Factors and Disclaimers | 37 |
|   | 1. | The Financial Information Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed | 37 |
|   | 2. | No Legal or Tax Advice Is Provided by This Disclosure Statement | 37 |
|   | 3. | No Admissions Made | 37 |
|   | 4. | Failure to Identify Litigation Claims or Projected Objections | 38 |
|   | 5. | Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors | 38 |
|   | 6. | No Representations Outside This Disclosure Statement Are Authorized | 38 |
|   | 7. | No Duty to Update | 38 |

**VII.    Certain U.S. Federal Tax Consequences of the Plan .................................................38**
| A. | | Introduction | 38 |
| B. | | Certain U.S. Federal Income Tax Consequences to the Debtor | 39 |
| C. | | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Classes 4 and 5 | 40 |
|   | 1. | Tax Treatment of the GUC Trust and GUC Claimants | 40 |
|   | 2. | Tax Treatment of the PI/WD Trust and PI/WD Claimants | 42 |
| D. | | Accrued Interest | 42 |
| E. | | Market Discount | 42 |

      F.       Withholding and Information Reporting ............................................................................. 43

**VIII.**    **Conclusion and Recommendation** ................................................................................................ **43**

## SCHEDULES AND EXHIBITS

Schedule 1       Liquidation Analysis

Schedule 2       Professional Liability Insurance Policy Information

Schedule 3       PI/WD Claimant Recovery Analysis

Exhibit A        Chapter 11 Plan

Exhibit B        Form of PI/WD Trust Distribution Procedures

Exhibit C        Form of PI/WD Trust Agreement

Exhibit D        Form of GUC Trust Agreement

## I.   General Information

**A.      Purpose of this Disclosure Statement.**

This Disclosure Statement has been prepared by the Plan Proponents to provide information to enable Holders of Claims and Interests, who are entitled to vote on the Plan, to make an informed judgment about the Plan. Confirmation of the Plan pursuant to chapter 11 of the Bankruptcy Code depends, in part, upon the receipt of a sufficient number of votes in favor of the Plan. However, Holders of Claims and Interests whose Claims and Interests, respectively, are unimpaired are deemed to have conclusively accepted the Plan and are not entitled to vote thereon. As set forth in this Disclosure Statement, Holders of Claims in Classes 1 and 2 are unimpaired and deemed to have accepted the Plan. Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10 are impaired and entitled to vote to accept or reject the Plan. Holders of Interests in Class 11 are impaired and deemed to have rejected the Plan.

On [●], after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Solicitation Order"), pursuant to section 1125 of the Bankruptcy Code, approving this Disclosure Statement as containing "adequate information." "Adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the Holders of Claims and Interests in the Chapter 11 Case, that would enable such hypothetical investor to make an informed judgment about the Plan.

**B.      General Information Concerning Chapter 11.**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor in possession attempts to reorganize, or liquidate, its business for the benefit of itself, its creditors and equity interest holders.

The commencement of a chapter 11 case creates an Estate, comprised of all legal and equitable interests of the debtor in property as of the date the petition is filed, wherever located and by whomever held. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. The Debtor is operating as a debtor in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362(a) of the Bankruptcy Code provides for, among other things, an automatic stay of all attempts to collect prepetition debts against the debtor or to otherwise interfere with the debtor's property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the time a chapter 11 plan is confirmed under section 1129 of the Bankruptcy Code.

The formulation of a plan is the principal purpose of a chapter 11 case. A plan sets forth the means for satisfying the claims against and equity interests in the debtor. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case. A debtor is generally then given 60 additional days during which it may solicit acceptance of its plan. The deadlines may be extended or reduced by the court upon a showing of "cause." In this case, the Debtor's exclusive right to file and solicit a plan was extended multiple times, but has expired.

**C.      General Information Concerning Treatment of Claims and Interests.**

A chapter 11 plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. After a chapter 11 plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a chapter 11 plan must classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides claims and equity interests into classes and sets forth the treatment for each class. In accordance with section 1123(a) of the Bankruptcy Code, Administrative Claims have not been classified in the Plan. A debtor is also required, under section 1122 of the Bankruptcy Code, to classify claims and equity interests into classes that contain claims and equity interests that are substantially similar

to the other claims and equity interests in such class.  The Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122.

The table below provides a summary of the classification, description, and treatment of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Article IV.B of this Disclosure Statement.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Convenience Claims | Impaired | Entitled to Vote |
| 4 | Channeled GUC Claims | Impaired | Entitled to Vote |
| 5 | Opt-Out GUC Claims | Impaired | Entitled to Vote |
| 6 | Channeled PI/WD Claims | Impaired | Entitled to Vote |
| 7 | Opt-Out PI/WD Claims | Impaired | Entitled to Vote |
| 8 | Opt-Out Insured PI/WD Claims | Impaired | Entitled to Vote |
| 9 | Channeled Indirect Claims | Impaired | Entitled to Vote |
| 10 | Opt-Out Indirect Claims | Impaired | Entitled to Vote |
| 11 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      Classes Impaired under a Plan.**

Only classes of impaired claims or equity interests may vote to accept or reject a plan.  A class is "impaired" if the legal, equitable, or contractual rights relating to the claims or equity interests in that class are modified by the plan.  Modification for purposes of determining impairment, however, does not include curing defaults or reinstating maturity.  Classes of claims or equity interests that are not "impaired" under a chapter 11 plan, and each member of such class, are conclusively deemed to have accepted the plan and thus are not entitled to vote.  Similarly, classes of claims or equity interests that will neither receive nor retain any property under a plan are deemed to not have accepted the plan and are thus not entitled to vote.  Accordingly, acceptances of a plan will only be solicited from holders of claims and/or equity interests in impaired classes that may receive distributions under the plan.

As set forth in section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a chapter 11 plan unless, with respect to such class, the plan:  (1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default: (a) cures any such default that occurred before or after the commencement of the case, other

than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as it existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; (d) if the claim or interest arises from a failure to perform a non-monetary obligation (other than a default from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A)), compensates the holder (other than the debtor or an insider) for any actual pecuniary loss incurred by the holder as a result of such failure; and (e) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

All Holders of Claims in Classes 1 and 2 are unimpaired, as they will be paid in full.  As a result, all Holders of Claims in Classes 1 and 2 are conclusively deemed to have accepted the Plan. Holders of Claims in Class 11 will receive no distributions or interest under the Plan, and as a result are deemed to have rejected the Plan pursuant to the Bankruptcy Code.  The Committees and Debtor are seeking the votes of Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10.

**E.       Voting and Opt-Out Rights.**

**1.       Voting on the Plan.**

Any Holder of a Claim whose Claim is not scheduled or scheduled as disputed, contingent, or unliquidated must have timely filed, or be deemed to have timely filed, a personalized Proof of Claim prior to the Claims Bar Date, and any Holder of a Claim that failed to do so shall not be entitled to vote on the Plan.  Holders of Claims in Classes 3-10 who timely filed, or are deemed to have timely filed, a personalized Proof of Claim are impaired under the Plan and are entitled to vote to accept or reject the Plan.  A Ballot casting a vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such Ballot was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**2.       Opt-Out Rights.**

The Plan provides two separate and mutually exclusive opt-out options which can be elected on each Ballot. First, Holders of all Claims may elect to opt-out of the Plan and the settlement incorporated therein and choose to pursue claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System.  This election must be made prior to the Voting Deadline.  This election is irrevocable and a Holder of a Claim who makes this election will be ineligible to participate in distributions from the Plan Trusts.

Second, Holders of PI/WD claims may elect to opt-out of the Plan for the purpose of pursuing recoveries available under the Debtor's insurance policies.  This election must be made prior to the Voting Deadline.  Holders of Claims who make this election will not be entitled to receive distributions from the PI/WD Trust beyond any insurance recoveries they receive.  This election is automatically reversed ninety (90) days after the Effective Date unless the Holder of the Claim provides written notice otherwise and may be subsequently reversed if the PI/WD Trustee determines that certain criteria outlined in the PI/WD Trust Documents are met.

**F.       Confirmation and Consummation.**

There are two methods by which a plan may be confirmed:  (i) the "acceptance" method, pursuant to which all impaired classes of claims and interests have voted in the requisite amounts to accept the plan and the plan otherwise complies with section 1129(a) of the Bankruptcy Code; and (ii) the "cram-down" method under section 1129(b) of the Bankruptcy Code, which is available even if classes of claims vote against the Plan.

**1.       Acceptance of the Plan.**

A plan is accepted by an impaired class of claims if the holders of at least two-thirds (⅔) in amount and more than one-half (½) in number of the allowed claims in such class actually voting vote to accept the plan.  A plan is

accepted by an impaired class of equity interests if holders of at least two-thirds (⅔) in amount of allowed equity interests in such class actually voting vote to accept the plan.

**BALLOTS THAT ARE SIGNED BUT THAT DO NOT EXPRESSLY INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL BE DISREGARDED.**

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class entitled to vote or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or equity interest in such class (*see* discussion of "Best Interests Test" below).

### 2. Confirmation Without Acceptance By All Impaired Classes.

Under section 1129 of the Bankruptcy Code, the Debtor has the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by a class of Claims.

A plan may be confirmed notwithstanding its rejection by one or more classes of claims or equity interests if, in addition to satisfying the applicable requirements of section 1129(a) of the Bankruptcy Code, the plan (1) is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan and (2) does not "discriminate unfairly."

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of unsecured claims if, with respect to such dissenting class either (a) the plan provides that each holder of a claim of such class receive or retain property of a value equal to the allowed amount of such claim, or (b) no holders of junior claims or equity interests receive or retain any property under the plan on account of such junior claims or interests.

This fair and equitable standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or equity interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property under the plan on account of such claims or interests. The Proponents believe that if a non-consensual confirmation is necessary, the requirements for non-consensual confirmation will be met and the Plan will be confirmed despite its rejection by any impaired dissenting Class of Claims.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Proponents believe that the Plan meets this requirement with respect to any Class of Claims that might reject the Plan, because classes of equal rank are treated equally under the Plan.

### 3. Best Interests Test.

Notwithstanding acceptance of the Plan by each impaired Class, in order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in an impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides for each Holder of a Claim or Interest in such Class to receive or retain on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount each such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

In this case, the Debtor is liquidating. As a result, and by implication, constituents will receive under the Plan at least what they would otherwise receive if the chapter 11 case was converted and the Debtor was liquidated in chapter 7. To demonstrate compliance with the best interests test, the Debtor, in consultation with the Committees, and with the assistance of its financial advisor, prepared the liquidation analysis attached hereto as **Schedule 1**. The liquidation analysis shows that the value of the distributions provided to Holders of Allowed Claims under the Plan

would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Proponents believe that the Plan is in the best interests of creditors.

## II.   Background and Events Leading Up to Chapter 11

**A.    The Debtor's Business and Operations.**

The Debtor (formerly known as Corizon Health, Inc., a Texas corporation) was a nationwide provider of correctional healthcare, providing services in multiple states across the United States.[1]  In the ordinary course of its business, the Debtor entered into agreements with various (typically governmental) entities under which the Debtor would provide, or arrange for the provision of, healthcare services to certain inmates or detainees of the contract counterparty.

**B.    Perigrove Acquisition.**

By the end of 2021, the Debtor was facing dire financial conditions due to loss of major governmental contracts and significant litigation exposure.

In December 2021, the Debtor's ultimate parent, M2 HoldCo, LLC ("HoldCo") was acquired by Perigrove 1018, LLC ("Perigrove 1018").  Perigrove 1018 is affiliated with Perigrove, LLC ("Perigrove").  The Debtor believes that prior to the Perigrove acquisition, the Debtor's secured lender was M2 LoanCo, LLC ("LoanCo").  The Debtor contends that the loans were originated by other lenders in 2017 and acquired by LoanCo in or around June 2020. LoanCo is an affiliate of the Debtor by common ownership.  The Committee disputes that this purported lender-borrower relationship was genuine and believes that the purported debt obligation was canceled and/or converted to equity by the actions, transactions, course of dealing, tax filings, and statements of the Debtor and LoanCo.  When Perigrove 1018 acquired HoldCo, it also acquired LoanCo.  The Debtor believes that as of February 28, 2022, the amount of secured debt owed by the Debtor to LoanCo was in excess of $97.8 million.

The Debtor's organizational structure as it existed in December 2021, when HoldCo was acquired by Perigrove 1018, was as follows:

---

[1]    In this section, all references to "Debtor" include any predecessor entity that merged into the Debtor as a result of the transactions discussed below.



C.      **Transfers to Geneva Consulting, LLC and M2 LoanCo, LLC.**

In December 2021, the Debtor's immediate parent company, Valitás Health Services, Inc. ("<u>Valitás Health</u>") entered into a Consulting Agreement with Geneva Consulting, LLC ("<u>Geneva</u>").  Geneva is related to Perigrove. The Consulting Agreement called for an initial retainer of $3 million with $500,000 monthly payments for the duration of the agreement. Between December 2021 and May 2022, Valitás Health paid Geneva $5.5 million, consisting of the initial $3 million retainer, plus five monthly installments of $500,000 each.

Also in December 2021, the Debtor and its subsidiary Corizon, LLC each opened a bank account at Signature Bank (the "<u>Signature Accounts</u>"). The remainder of the Debtor's bank accounts, all of which pre-dated the Perigrove acquisition, were at Bank of America.  Individuals affiliated with Perigrove were the sole signors on the Signature Accounts.  The Debtor's CFO and existing management did not have access to the Signature Accounts. Between December 2021 and May 2022, $23.3 million was transferred from the Debtor's Bank of America accounts to the Signature Accounts.

Between December 2021 and November 2022, the Debtor transferred approximately $24.5 million from the Signature Accounts to LoanCo.  LoanCo has disputed this aggregate amount.  During the same period, the Debtor made additional transfers to Perigrove, DG Realty Management LLC and PharmaCorr LLC, entities related to Perigrove. However, the Debtor received subsequent transfers in the same amounts of the outgoing transfers that were made to these entities.

D.      **The Divisional Merger.**

In early 2022, the Debtor's board of directors, with the help of outside counsel, began considering restructuring alternatives other than bankruptcy.  One restructuring option was a combination merger and divisional merger under the Texas Business Organizations Code (the "<u>TBOC</u>")—a statutory framework that allows one or more corporate entities to merge into one or more surviving or new legal entities and allocate assets and historical liabilities among the resulting entities.

In May 2022, the Debtor and several of its affiliates, including Corizon, LLC, Valitás Health, and Corizon Health of New Jersey, LLC (collectively, the "<u>Merger Entities</u>") executed a corporate reorganization effectuated

through two merger transactions under the TBOC:  a combination merger and a divisional merger.  The following steps comprised the combination merger:

    a.      On April 28, 2022, the Debtor (previously incorporated in Delaware) converted to a Texas corporation.

    b.      The Debtor and each Merger Entity merged pursuant to a plan of combination merger under Texas law (the "Combination Merger").

    c.      The Debtor filed the Certificate of Combination Merger with the Texas Secretary of State on May 2, 2022, and the Combination Merger became effective on May 5, 2022.

    d.      The Debtor was the sole survivor of the Combination Merger and was vested with all assets and liabilities of the Merger Entities. The Merger Entities ceased to exist.

The Debtor then effectuated a divisional merger as follows:

    a.      The Debtor drafted the Plan of Divisional Merger (the "Plan of Divisional Merger"), which provided that CHS TX, Inc. ("CHS") would be formed and documented which assets and liabilities were to remain with the Debtor and which were to be allocated to CHS.

    b.      The approved Plan of Divisional Merger was in writing and included all information required by the TBOC.

    c.      The Debtor filed the Certificate of Merger and Certificate of Formation for CHS. with the Texas Secretary of State on May 3, 2022, and the divisional merger became effective on May 5, 2022.

    d.      LoanCo and the Debtor agreed to a funding agreement (the "Funding Agreement") pursuant to which LoanCo would pay or cause to be paid funding to the Debtor up to an aggregate cap of $15 million for payment of the Debtor's costs of operations and certain liabilities that arose prior to the divisional merger.

    e.      On May 11, 2022, the Texas Secretary of State approved and accepted the Certificate of Merger and Certificate of Formation for CHS, effective as of May 5, 2022.  CHS was subsequently acquired by YesCare Corp. ("YesCare").

    f.      On June 1, 2022, the Debtor changed its name from Corizon Health, Inc. to Tehum Care Services, Inc.

Pursuant to the divisional merger, the Debtor remained in existence and was allocated and remained vested with all inactive and expired customer contracts, as well as all historical liabilities related to such contracts. The Plan of Divisional Merger agreement states that in return, the Debtor was released from its secured debt obligations to LoanCo, which were allocated to CHS.  As part of the divisional merger, the Debtor was allocated $1 million in cash, as well as the right to draw on the $15 million Funding Agreement.

## E.    Events Leading to Chapter 11.

After the divisional merger, the Debtor was no longer an operating entity with active contracts or medical service providers.  Between May 2022 and February 2023, the Debtor sought to wind down its remaining business out of court.  During the same period, LoanCo asserts that it caused over $39 million to be paid to the Debtor's creditors pursuant to the Funding Agreement and a subsequent loan agreement.

However, the Debtor continued to be plagued by litigation.  On November 1, 2022, the Debtor entered into a Claims Management Services Agreement with Sigma RM, LLC ("Sigma").  Sigma represents that it is owned by a

group of the Debtor's former in-house counsel and litigation support staff. Pursuant to that Claims Management Services Agreement, the Debtor paid Sigma $150,000 per month.

The prepetition lawsuits filed against the Debtor generally fall into three categories: (a) vendor lawsuits, typically asserting breach of contract claims against the Debtor for unpaid invoices; (b) PI/WD lawsuits, typically asserting medical malpractice and related claims against the Debtor; and (c) employment lawsuits, asserting employment discrimination or similar claims against the Debtor.

This ongoing litigation and potential exposure ultimately led the Debtor to conclude a chapter 11 process was necessary to maximize and expedite creditor recoveries.

### III.  The Debtor's Chapter 11 Case

The Debtor's Chapter 11 Case was commenced by the filing of a voluntary chapter 11 petition on February 13, 2023 (the "Petition Date"). The Chapter 11 Case is pending before the Honorable Christopher M. López in the United States Bankruptcy Court for the Southern District of Texas.

**A.      Post-Filing Activities.**

**1.      The DIP Motion and the DIP Orders.**

As of the Petition Date, the Debtor had no cash on hand and because it was no longer an operating entity, had no means to obtain additional revenues. The Debtor was not allocated any tangible real property under the divisional merger and, as of the Petition Date, though the Debtor was the beneficiary under the Funding Agreement, it did not appear that any additional amounts were available thereunder.[2] As a result, the Debtor was left with only potential Estate causes of action, tax refunds and similar receivables as potential collateral for post-petition financing.

On March 15, 2023, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 185] (the "DIP Motion"). The DIP Motion set forth the terms of a senior secured loan facility in an aggregate principal amount of up to $10,000,000 (the "DIP Facility") funded by LoanCo.

On March 22, 2023, the Bankruptcy Court held a hearing and entered the *Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 243] (the "First Interim DIP Order"), which has been amended and supplemented pursuant to Docket No. 476 (the "Second Interim DIP Order"), Docket No. 579 (the "Third Interim DIP Order") Docket No. 993 (the "Fourth Interim DIP Order), and Docket No. 1669 (the "Fifth Interim DIP Order," and together with the First Interim DIP Order, Second Interim DIP Order, Third Interim DIP Order, and Fourth Interim DIP Order, the "DIP Orders").

**2.      The Stay Extension Motion and Adversary Proceeding.**

On February 17, 2023, the Debtor filed its *Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 7] (the "Original Stay Motion"). By the Original Stay Motion, the Debtor sought to confirm the automatic stay applied to, or extend the automatic stay to cover, certain Non-Debtor Indemnified Parties (as defined in the Original Stay Motion) that were party to the Debtor's prepetition lawsuits.

---

[2]     The Debtor's professionals conducted an analysis of the amounts distributed pursuant to the Funding Agreement and determined that LoanCo funded at least $15 million to the Debtor's costs of operation and certain liabilities that arose prior to the divisional merger.

On March 3, 2023, the Bankruptcy Court entered its *Order Regarding Debtor's Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 118] (the "Stay Order"). The Stay Order extended the automatic stay for 75 days to cover the litigation claims set forth on Exhibit 1 thereto.

On March 23, 2023, the Debtor commenced Adversary Proceeding No. 23-03049 (the "Adversary Proceeding") by filing its (i) *Complaint Seeking (I)(A) a Declaratory Judgment that the Automatic Stay Applies to Certain Claims and Causes of Actions Asserted Against Certain Non-Debtors and (B) an Extension of the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) a Preliminary Injunction Related to Such Actions* [Adv. No. 23-03049, Docket No. 1] (the "Adversary Complaint") and (ii) *Motion for an Order (I)(A) Declaring that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted against Certain Non-Debtors and (B) Extending the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) Preliminary Enjoining Such Actions* [Adv. No. 23-03049, Docket No. 2] (the "Adversary Stay Motion"). The Adversary Stay Motion sought substantially the same relief as the Original Stay Motion.

The Adversary Stay Motion was set for hearing on May 17, 2023. All matters related to the Stay Order were subsequently adjourned to a date no earlier than August 31, 2023 [Docket No. 841]. At the Bankruptcy Court's suggestion, the Debtor has entered into stipulations with certain plaintiffs allowing them to proceed with their litigation under the circumstances set forth in the stipulations. *See* Docket Nos. 237, 463, 578, 641, 645, 888, 898, 966, 977, 992, and 1063. As set forth by the Bankruptcy Court on April 11, 2024, the Stay Order has expired.

### 3.      Data Incident.

While this case was pending, the Debtor received notice of a data incident that could have impacted data belonging to the Debtor and other parties. Promptly after receiving such notice, the Debtor submitted a notice of claim to its applicable insurance carrier and engaged special data incident counsel. The Debtor's special counsel has not identified potential causes of action or liabilities with respect to the Debtor arising out of or related to the incident.

### 4.      The Trustee Motion.

On June 30, 2023, certain creditors filed a motion seeking the appointment of a chapter 11 trustee. *See Various Creditors' Motion to Appoint a Chapter 11 Trustee* [Docket No. 731] (the "Trustee Motion"). The Trustee Motion contained various allegations of prepetition fraud by the Debtor's sole director, as well as postpetition misstatements by the same individual. The Debtor objected to the Trustee Motion. Neither the United States Trustee nor the UCC joined in the Trustee Motion.

On September 5, 2023, the Bankruptcy Court held a hearing on the Trustee Motion. During the hearing, the UCC opposed the Trustee Motion. After considering the evidence and arguments of counsel, the Bankruptcy Court found that cause did not exist to appoint a chapter 11 trustee and denied the Motion. *See* Docket No. 932.

### 5.      The Initial Mediations.

On May 22, 2023, the Bankruptcy Court entered its *Stipulation and Agreed Order Regarding Appointment of a Mediator and Governing Related Mediation Procedures* [Docket No. 603] (the "Mediation Order"). The Mediation Order appointed the Honorable David R. Jones, then a current United States Bankruptcy Judge for the Southern District of Texas ("Judge Jones"), to mediate, among other things, (i) the releases sought in connection with the DIP Facility, (ii) the maximization of assets to be distributed through a chapter 11 plan, (iii) the Estate's claims against Debtor affiliates and related third parties, and (iv) the relief requested in the Adversary Complaint and Adversary Stay Motion. The Mediation Order also ordered the Debtor to invite its liability insurance carriers to participate in mediation(s).

In the first eight months of the case, the UCC and the Debtor participated in three (3) separate mediations pursuant to the Mediation Order, each as described below.

(a)        **The LSA Mediation.**

On July 13 and 14, 2023, Judge Jones conducted a mediation between the Debtor, the UCC, and Lone Star Alliance, Inc. ("LSA").

(b)        **The First Mediation.**

On August 21, 22 and 23, 2023, Judge Jones conducted a mediation between the Debtor, the UCC, YesCare, its wholly owned subsidiaries (including CHS TX, Inc.), Geneva, Perigrove 1018, Perigrove, HoldCo, LoanCo, and PharmaCorr LLC.[3]  This mediation focused on resolving the Estate's claims against these affiliate entities and certain related parties and individuals, including claims relating to the transfers referenced in Article II.C above, as well as claims relating to or arising out of the divisional merger.  The mediation resulted in a settlement which was ultimately abandoned by the Parties.

(c)        **The Lexington Mediation.**

On September 28, 2023, the Debtor, the UCC, and Lexington Insurance Company ("Lexington") participated in a mediation before Judge Jones.  The goal of the mediation was to reach an agreed-upon path to maximize the insurance proceeds available for claims that fall within the Debtor's professional liability policies issued by Lexington.

On October 7, 2023, as a result of a recently filed lawsuit, the *Wall Street Journal* published a story in which Judge Jones confirmed that he has been in a long-term romantic relationship with a lawyer who represented YesCare at the mediation.  This relationship was not disclosed to the Debtor or the UCC and the Debtor and the UCC were unaware of this relationship prior to the article's publication.  Shortly after the *Wall Street Journal* story, Judge Jones resigned his position.

6.        **The Formation of the Tort Claimants' Committee.**

In October 2023, in response to a request from certain PI/WD creditors and in accordance with the Bankruptcy Code, the United States Trustee constituted the Tort Claimants' Committee, consisting of a group of creditors who hold PI/WD claims against the Debtor.  The Tort Claimants' Committee immediately began gathering information in order to participate in mediation and settlement discussions and better understand the claims and estate causes of action in the case.

7.        **The Second Mediation.**

On November 8, 2023, the Debtor, the UCC, and the Settlement Parties filed a Stipulation and Proposed Order Regarding Appointment of Judge Christopher S. Sontchi and Governing Related Mediation Procedures seeking an Order from the Court authorizing a Second Mediation before a new mediator, Christopher S. Sontchi, former Chief Judge for the United States Bankruptcy Court for the District of Delaware.  This Second Mediation was held in December 2023, with the TCC, the UCC, the Settling Parties, and the Debtor participating.  The UCC, the Debtor and the Settlement Parties reached agreement on a proposed global settlement at the Second Mediation.  The TCC declined to join this proposed settlement, and subsequently opposed it.

8.        **The Motion to Approve Settlement and Motion to Dismiss.**

Following the Second Mediation, the UCC and the Debtor filed a motion asking the Court to approve the proposed global settlement reached at the Second Mediation.  The Motion to Approve the Settlement was supported by the members of the UCC and a subset of creditors.  The TCC, the United States Trustee, and a separate subset of creditors opposed the approval of the global settlement based on their assertions that the releases contained therein were improper and the amount of funds being contributed by the Settling Parties was insufficient.

---

3        YesCare, Geneva, Perigrove 1018, Perigrove, HoldCo, LoanCo, and PharmaCorr LLC are collectively referred to herein as the "Settling Parties."

At the same time, the TCC filed a Motion to Dismiss alleging that the Debtor had filed the bankruptcy case in bad faith due to the circumstances surrounding and emerging out of the divisional merger. The United States Trustee and a subset of creditors supported the Motion to Dismiss, while the Debtor, the UCC, and a separate subset of creditors opposed it.

The Court set dates for an evidentiary hearing on both the Motion to Approve the Settlement and the Motion to Dismiss, and the TCC, UCC, and the Debtor engaged in extensive discovery prior to that hearing. Following a multi-day hearing, the Court denied both motions and encouraged the parties to engage in further discussion aimed at seeking a mutually agreeable resolution.

9. **Potential Estate Causes of Action.**

As outlined in the UCC's and the Debtor's motion to approve the proposed settlement reached at the Second Mediation, the UCC and the Debtor identified four main potential Estate Causes of Action against the Released Parties:

- **Avoidance Actions Against M2 Loan Co**. At all relevant times, M2 LoanCo had two directors—Isaac Lefkowitz and Alan Rubenstein. M2 LoanCo had no employees and did not maintain e-mail records on its own server. Based on the Debtor's and the UCC's review of the Debtor's bank records, and following formal and informal inquiries to Mr. Lefkowitz, Jeff Sholey (the Debtor's former CFO and YesCare's current CEO) and other members of the Debtor's former accounting staff, the Debtor and the UCC identified the following transfers made by the Debtor from its bank accounts to M2 LoanCo:

| | |
|---|---|
| 12/29/2021 | $10,000,000.00 |
| 12/30/2021 | $5,000,000.00 |
| 1/4/2022 | $2,300,000.00 |
| 1/5/2022 | $600,000.00 |
| 1/31/2022 | $5,000,000.00 |
| 2/18/2022 | $600,000.00 |
| 3/8/2022 | $10,000,000.00 |
| 3/9/2022 | ($10,000,000.00) |
| 5/17/2022 | $1,000,000.00 |
| 11/14/2022 | $25,572.19 |
| 11/14/2022 | $12,583.00 |
| **Total to M2 LoanCo** | **$24,538,155.19** |

Although M2 LoanCo disputes the Debtor's and the UCC's characterization of these transfers listed above,[4] the Debtor and the UCC believe the Estate could bring claims to avoid and recover these transfers as fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes.

- **Avoidance Actions Against Geneva**. Perigrove 1018 acquired the equity ownership of the Debtor and M2 LoanCo from the Flacks Group in early December 2021, days before the Flacks Group had planned to commence a chapter 11 bankruptcy proceeding for the Debtor. Within days of such acquisition, Perigrove 1018 appointed one of its directors, Isaac Lefkowitz, as the decision-maker for all of the companies. Mr. Lefkowitz, in turn, caused the Debtor to enter into a "Consulting Agreement" with Geneva on or about December 8, 2021. The "Consulting Agreement" is between Valitás Health Services, Inc. and Geneva Consulting, LLC. Mr. Lefkowitz signed the Consulting Agreement as the "Interim CEO" for Valitás. A director listed on Perigrove's website signed the

---

[4] For example, M2 LoanCo contends that it transferred $3.5 million and $1.5 million to Corizon on March 23, 2023, and March 24, 2023, respectively, and those transfers are not accounted for as credits in the chart above.

Consulting Agreement as "Director" of Geneva. Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon Health, Inc., and Jeff Sholey, the then CFO of Corizon Health, Inc., to transfer substantial sums to Geneva under the Consulting Agreement. On December 8, 2021, the Debtor transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement. The Debtor then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement. In all, the Debtor transferred $5.5 million to Geneva before the Petition Date.

| 12/9/2021 | $3,000,000.00 |
|---|---|
| 1/11/2022 | $500,000.00 |
| 2/7/2022 | $500,000.00 |
| 3/1/2022 | $500,000.00 |
| 4/1/2022 | $500,000.00 |
| 5/2/2022 | $500,000.00 |
| **Total to Geneva** | **$5,500,000.00** |

The Debtor and the UCC believe the Estate could bring claims to avoid and recover these transfers as fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes. Geneva disputes these claims.

- **Avoidance Actions Against Perigrove 1018-Related Parties**.  In addition to the $30 million identified above, the Debtor and the UCC identified additional sums, totaling approximately $956,700, paid to Amerisource Bergen—a third-party vendor—to satisfy obligations of PharmaCorr, which ceased being a subsidiary of the Debtor under the Flacks Group's ownership and control:

| 1/31/2022 | $500,000.00 |
|---|---|
| 2/15/2022 | $456,707.08 |
| **Total to Amerisource Bergen** | **$956,707.08** |

Based on the records reviewed by the Debtor and the UCC, the Debtor and the UCC believe that Estate could bring claims to avoid and recover these transfers from Amerisource Bergen, PharmaCorr, or other related entities that benefited from the payment.  Such transfers may be considered fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes.  PharmaCorr disputes these claims.

- **Avoidance Actions Related to the Divisional Merger**.  As mentioned above, the transactions effectuated as part of the Divisional Merger caused the allocation of the Debtor's active contracts, employee assets, and other viable assets to CHS.  The UCC believes that this allocation effectuated a "transfer" that may be subject to avoidance under 11 U.S.C. §§ 544 and 548 or other applicable state fraudulent transfer statutes.  The Debtor and the UCC further believe that the financial advisory firm engaged to provide a fairness opinion on the transaction reached its fairness conclusions by relying on inaccurate information.  The UCC believes that, had the financial advisory firm received accurate financials and disclosures, it would not have made the findings or recommendations reflected in the fairness opinion.  When a fraudulent transfer claim is based on the transfer of an asset rather than an amount of money, damages for the transfer are calculated based on the value of the transferred asset at the time of the transfer.  As a result, any potential damages for this claim would be based on a calculation of the value of the transferred assets as of the Divisional Merger.

As outlined in its opposition to the UCC's and the Debtor's motion to approve the proposed settlement reached at the Second Mediation, the TCC believes the following additional claims may have potential value:

- **Fraudulent Transfer Claims**.  The TCC agrees with the UCC the Estate could bring claims for fraudulent transfer based on the Divisional Merger.  The TCC believes that the Divisional Merger can be unwound as a fraudulent transfer.  State law allows for avoidance of actual fraudulent transfers made on or within 4 years before the petition date.  *See* Tex. Bus. & Comm. Code § 24.005.  The Divisional Merger occurred within the past 4 years, and the TCC asserts that the Divisional Merger was done with the actual intent to hinder, delay, and defraud creditors.  The Divisional Merger can also be challenged as a constructive fraud.  *Id.* at § 24.005(a)(2).  The Divisional Merger allocated the Debtor—an entity with no business operations—with little besides liabilities.  The Debtor was stripped of its assets.   The TCC's position is that Texas divisive merger statute does not sanction fraud.  The Texas statute does not "abridge any right or rights of any creditor under existing law." Tex. Bus. Org. Code § 10.901.  When a party undertakes a "divisional merger" that is fraudulent, creditors can assert an array of rights and remedies under state law, including the right to challenge the transaction as a fraudulent transfer.  At least one court that has considered the application of fraudulent transfer law to a divisional merger has held that a divisional merger conducted under Texas law can be avoided as a fraudulent transfer.  *See, e.g., Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*, No. 21-03023-JCW (Bankr. W.D.N.C. July 7, 2022) (holding that it would be "contrary to all Anglo-American notions of fraudulent conveyance law" for the victims of a fraudulent divisional merger conducted under Texas law to have "no recourse" against the entity that received the operating assets).

- **Doctrine of Successor Liability**.  The TCC asserts that YesCare, CHS TX, and/or their affiliates are liable as the successor to Corizon Health, Inc.  Under state law, successor liability is not a cause of action.  Rather, successor liability is an equitable doctrine or a theory of liability that transfers liability for a claim from a predecessor to a successor when certain factors are present.  A successor may become liable for the debts of the predecessor when the transaction amounts to a consolidation or de facto merger, the transaction is fraudulent or done with the intent to escape liability, or the purchaser is a mere continuation of the seller.  The TCC asserts that YesCare is a mere continuation of Corizon Health, Inc. and that its business operations are identical.  The TCC asserts that the Divisional Merger was fraudulent and was done with the intent to escape liability, and that there was a continuity of shareholders, normal business operations continued without interruption, and the Debtor commenced a bankruptcy proceeding shortly after its creation.  The doctrine of successor liability imposes on YesCare all the Debtor's liabilities.  All claimants of the Debtor may have a path to recover in full on account of their claims in the Civil Justice System.  The TCC believes these issues have already been litigated, with at least one Court holding that CHS TX may be liable as Corizon's successor.  *See Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022) (adding CHS TX, Inc. [NewCo] as a defendant in a prepetition action and finding "[c]onsidering the totality of the circumstances here, I find that CHS TX is a mere continuation of pre-division Corizon . . . . Evidently, CHS TX picked up right where Corizon left off.  Indeed, CHS TX holds itself out to clients as Corizon's successor.").

- **Alter Ego / Veil Piercing**.  The TCC asserts that Debtor's beneficial owners are also liable as the Debtor's alter ego.  Alter ego and veil piercing are also not causes of action.  They are also equitable doctrines or legal remedies.  Alter ego and veil piercing theories do not create new causes of action.  Rather, they impose liability on the company's owner when certain factors are present.  These factors include:  the parent and subsidiary have common stock ownership, common directors or officers, the parent and subsidiary have common business departments, the parent and subsidiary file consolidated financial statements, the parent finances the subsidiary, the parent caused the incorporation of the subsidiary, the subsidiary operated with grossly inadequate capital, the parent pays salaries and other expenses of subsidiary, the subsidiary receives no business except that given by the parent, the parent uses the subsidiary's property as its own, the daily operations of the two corporations are not kept separate, and the subsidiary does not observe corporate formalities.  Here, the TCC asserts there is common beneficial and actual ownership, common directors and officers, the parent finances the subsidiary, the Debtor was grossly undercapitalized at its inception, and the Debtor has no business functions.  The alter ego doctrine may impose all the Debtor's liabilities on the company's owner.

- **Breach of Fiduciary Duty and Corporate Theft**.  The TCC asserts that the Estate has claims against Corizon Health executives for breach of fiduciary duty and corporate theft.  The TCC's investigation indicated that Corizon executives set up YesCare Corp. and several of its operating subsidiaries, including CHS AL, LLC and CHS AZ, LLC, in the months leading up to the closing of the Divisional Merger.  Evidence produced in the case showed that Corizon Health executives and others were already pitching new RFPs under at least two of these entities—CHS AL, LLC and CHS AZ, LLC—before the Divisional Merger ever took place.  It appears that Corizon executives pitched these CHS entities as being comprised of former Corizon Health clinical and administrative employees" before the Divisional Merger.  These facts suggest business was being funneled away from Corizon Health prior to the Divisional Merger and may support claims for breach of fiduciary duty and corporate theft.

   10. **The Third Mediation.**

Following the Court's denial of the settlement motion and the motion to dismiss, the TCC, UCC, Debtor, and Settling Parties agreed to convene for a Third Mediation before former Judge Sontchi.  The Third Mediation began with in-person meetings involving the key parties on May 17, 2024, and continued for the following 8 weeks via email, telephone, and additional in-person communication and negotiation.  Ultimately, these renewed efforts were successful, resulting in the Estate Party Settlement agreed to by the TCC, UCC, Debtor, and the Settling Parties and incorporated into the Plan.

   11. **The Estate Party Settlement.**

As set forth in this Disclosure Statement, the Estate Party Settlement reached at the Third Mediation provides substantial value to the Estate and funds a distribution process that will result in significant recoveries for creditors.  It also avoids the risks of litigation of Estate Causes of Action against the Released Parties.

As described herein, the Estate Party Settlement resolves Estate Causes of Action against the Released Parties on behalf of the Debtor and its bankruptcy Estate, and grants releases to the persons and entities who would be potential defendants and their officers and directors, including the following specific individuals:

- Yitzchak Lefkowitz a/k/a Isaac Lefkowitz, a director of the Debtor who also holds or held roles at related entities;
- Sara Ann Tirschwell, former Chief Executive Officer at Corizon Health, Inc. and YesCare;
- Ayodeji Olawale Ladele, Executive Vice President and Chief Medical Officer at Corizon Health, Inc. and YesCare;
- Beverly Michelle Rice, Senior Director and Assistant Controller at Corizon Health, Inc. and YesCare;
- Jeffrey Scott King, former Chief Legal Officer at Corizon Health, Inc. and current Executive Vice President and Chief Legal Officer at YesCare;
- Jennifer Lynne Finger, former Assistant General Counsel at Corizon Health, Inc. and current Assistant General Counsel at YesCare; and
- Frank Jeffrey Sholey, former Chief Financial Officer at Corizon Health, Inc. and current Chief Executive Officer at YesCare.

The Estate Party Settlement does not necessarily resolve potential claims individual creditors may have against YesCare Corp., CHS TX, Inc., or any other alleged successor entity.  Instead, pursuant to the Plan, which incorporates the Estate Party Settlement, creditors who believe they may have individual claims against these parties may elect to opt-out of participating in the Estate Party Settlement and instead pursue their claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System.

Below is a summary of the key terms of the Estate Party Settlement:

- The Settlement Parties shall pay or cause to be paid to the PI/WD Trust and GUC Trust, as applicable, aggregate Cash in the amount of Fifty Million Dollars ($50,000,000.00) (the "Settlement Payment"), with two million ($2,000,000) to be paid on the Effective Date and the remaining Forty-Eight Million Dollars ($48,000,000.00) paid in monthly installments over thirty (30) months with interest at 6.00% per annum.

- If the Settlement Parties fail to make the required payments on time, they receive a "grace period" of five business days to make the payment.  If the Settlement Parties fail to make the payment after the "grace period" and that failure is not waived by both creditor trusts, the releases and injunctions contained in the Plan are terminated and void, meaning that creditors and the estate may bring claims against the Released Parties.

- The Settlement Payment will be allocated between the PI/WD Trust and the GUC Trust on a 50/50 basis and will be used to pay administration of those trusts and claims of unsecured creditors, meaning no funds from the Settlement Payment will be used to pay Administrative Claims, Professional Fee Claims, Priority Claims, or Secured Claims.

- The Settlement Parties have the option to terminate the settlement if more than 5% of holders of PI/WD claims entitled to vote on the Plan elect to opt-out of the release of claims against the Released Parties and in doing so give up their right to recover from the PI/WD Trust.

- The Settlement Parties release and waive all claims and causes of action against the Debtor and its Estate upon the Effective Date, and the Settlement Parties and Released Parties release and waive all claims against creditors who do not opt out of the release and the Settlement upon the Final Payment Date.

- On the Final Payment Date, the Released Parties will receive the benefit of the Consensual Claimant Release (*i.e.*, the release being granted in favor of the Released Parties by claimants who do not opt-out of the Consensual Claimant Release), and the release of all Estate Causes of Action asserted against the Released Parties.

- Claimants who opt out will have the ability to assert claims against YesCare Corp., CHS TX, Inc., and other alleged successor entity based on the doctrine of successor liability.  This is clearly set forth in Article III.D and Article IX.K of Plan.  Claimants who opt-out, however, will not have the ability to assert Avoidance Actions, including fraudulent transfer claims, and other Estate Causes of Action against the Released Parties because those Causes of Action will be settled under the Estate Party Settlement.

- The Estate and all creditors who do not opt-out of the release and the Settlement agree to release all claims against the Released Parties once the Settlement Parties have fulfilled their obligations to pay the full settlement amount.  The above description of the Estate Party Settlement is a summary only.  The actual terms of the Plan control.

The Estate Party Settlement was the product of lengthy, hard-fought arms-length negotiations.  The TCC, UCC and the Debtor are all mindful of their respective fiduciary obligations to act in the best interest of the Estate and all creditors and have evaluated the Estate Party Settlement from that perspective.  Each group strongly believes the Estate Party Settlement, on the terms and conditions set forth in the Plan, is fair, equitable, and in the best interest of both the creditors and the Debtor's Estate.

**B.** **Exclusivity.**

The Debtor's exclusivity period has expired.

C.     **Bar Date.**

The deadline for all creditors, including Governmental Units, to file proofs of claim against the Debtor was August 14, 2023.  Any references in the Plan or Disclosure Statement to any Claims or Interests shall not constitute an admission of the existence, nature, extent, or enforceability thereof.

D.     **Claims Against the Debtor.**

   1.     **In General.**

The Claims against the Debtor can largely be separated into two categories: PI/WD claims and non-PI/WD claims, which are referred to as GUC claims herein and in the Plan.  Pursuant to the Plan, funds from the Estate Party Settlement and other sources of funding will be divided between two separate trusts, one for PI/WD claims and one for GUC claims and will be distributed to the applicable claimants pursuant to the processes outlined in the Plan in the applicable trust documents.

   2.     **Administrative Expense Claims and Professional Fee Claims.**

Based on the terms of the Estate Party Settlement, the Proponents believe that sufficient funds should exist under the DIP Facility to pay Allowed Administrative Expense and Allowed Professional Fee claims as of the date of entry of the Confirmation Order or shortly thereafter.

Except as otherwise provided by a Final Order entered by the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the Debtor, the TCC and the UCC no later than the Administrative Claims Bar Date.  Each request for payment of an Administrative Claim must set forth, at a minimum, (a) the name of the Holder of the Administrative Claim, (b) the amount of the Administrative Claim and (c) a detailed basis for the Administrative Claim.  A request for payment of an Administrative Claim that has been properly and timely Filed and served shall become an Allowed Administrative Claim unless an objection is filed by the date that is thirty (30) days after such request has been Filed and served.  If a timely objection is Filed, the Administrative Claim in question shall become Allowed only to the extent set forth in a Final Order of the Bankruptcy Court.

Any failure to File a request for payment of an Administrative Claim by the Administrative Claims Bar Date shall result in the Administrative Claim in question being discharged and released as of the Effective Date, and its Holder being forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtor, its Estate, or any other Entity.  Any requests for payment of Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtor, or further order of the Bankruptcy Court.

All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330 and/or 331 for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the TCC, the UCC, the DIP Lender, the Debtor and the United States Trustee no later than the first Business Day that is thirty (30) days after the Effective Date.  Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and be subject to approval by the Bankruptcy Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case.  The last date to object to such final fee application shall be the twenty-first (21st) day after such fee application has been Filed and all final fee applications shall be set for hearing at the same time, as the Bankruptcy Court's calendar permits, after consultation with counsel to the TCC, the UCC, the DIP Lender, and the Debtor, *provided*, *however*, that if an objection is Filed to any final fee application, then the deadline to object to any and all final fee applications shall be extended for all parties in interest for an additional seven (7) days and, for any party whose Professional(s) is subject to an objection Filed within the twenty-one (21) day period above, the deadline for such party to object to any and all final fee applications shall be extended for an additional fourteen (14) days.  Neither Trustee shall have standing to object to any Professional Fee Claims.

3.        **DIP Claims.**

The DIP Claims arising under the DIP Order that accrued prior to August 23, 2023 will be released on the Effective Date pursuant to the Estate Party Settlement.

Notwithstanding anything in the Plan to the contrary, to the extent that the Court disallows payment of any fees and expenses of Estate Professionals set forth in the Approved Budget (as defined in the DIP Order), and that such order or orders by the Court cause on a final basis the total amount of Allowed Administrative Claims and Professional Fee Claims to be less than the Commitment Amount (as defined in the DIP Order), then (i) if this Plan has been confirmed and gone effective, 90 percent (90%) of the difference between the Commitment Amount and the total amount of Allowed Administrative Claims and Professional Fee Claims shall be promptly returned to the DIP Lender, whether such funds are held in the Professional Fee Escrow Accounts or another account, or (ii) if confirmation of this Plan has been denied, then 100 percent (100%) of the difference between the Commitment Amount and the total amount of Allowed Administrative Claims and Professional Fee Claims shall be promptly returned to the DIP Lender, whether such funds are held in the Professional Fee Escrow Accounts or another account.

4.        **Synergi Administrative Claim.**

In full and final satisfaction, settlement, release, and discharge of any Administrative Claim arising under or in respect of the Synergi Order and the agreements referenced therein, Synergi shall be entitled to receive Cash from the ERC Fund equal to the amount of such Administrative Claim pursuant to and in accordance with the Synergi Order. For the avoidance of doubt, nothing in the Plan shall modify the Synergi Order, including the payments terms and conditions set forth therein.

5.        **Priority State and Federal Tax Claims.**

The Proponents believe that, as of the Confirmation Date, there will be approximately $8.5 million owing in respect of Priority State and Federal Tax Claims. Each federal Governmental Unit that holds an Allowed Priority Tax Claim will receive, at the sole option of the Debtor or GUC Trustee, as applicable, either: (1) payment by the later of (a) 90 days after the date on which such Claim becomes Allowed or as soon as reasonably practicable thereafter, or (b) 10 days after the date which the ERC Fund is funded; or (2) regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

## IV.  <u>The Plan</u>

Section IV of this Disclosure Statement is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the Plan, the Plan Supplement and any attachments to the Plan. **Although the statements contained in this Disclosure Statement include summaries of the provisions of the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all related terms and provisions and should not be relied upon for a comprehensive discussion of the Plan**. Instead, reference is made to the Plan, the Plan Supplement and any attachments to the Plan for the full and complete statements of such terms and provisions. The Plan itself, in addition to the Plan Supplement and any attachments to the Plan will control in all respects. To the extent there are any inconsistencies between this Section IV and the Plan, the Plan Supplement and any attachments to the Plan, the Plan, Plan Supplement, and the attachments to the Plan, as applicable, shall govern.

**A.       Summary of Key Plan Provisions.**

| Article | Plan Pages | Summary |
|---------|-----------|---------|
| I | 1-18 | **Definitions and Rules of Interpretation**.   This Article contains the definitions used throughout the Plan, as well as conventions for computing time and determining the governing law that will apply to various provisions in the Plan. |
| II | 18-21 | **Administrative and Priority Claims**.  This Article details the treatment for certain Priority and Administrative Claims, such as state and federal taxes, post-bankruptcy loans and compensation of bankruptcy professionals.  These types of claims are afforded higher payment priority under the Bankruptcy Code and, thus, the Debtor must ensure that they are paid or otherwise dealt with before the Plan can provide payments to other General Unsecured Claims. |
| III | 21-28 | **Classification, Treatment, and Voting of Claims and Interests**.  This Article summarizes the different categories of claims and details the varying treatments for each class of Claims.  A more detailed description of the Plan treatment is set forth immediately below in Article IV.B of this Disclosure Statement. |
| IV | 28-41 | **Means for Implementation of the Plan**.  This Article contains the various provisions that are critical to the implementation of the Plan, including the creation of the PI/WD Trust and GUC Trust, as further detailed in Article IV of the Plan.  Among other matters, Article IV of the Plan specifies how assets will vest in each of the Trusts and how Retained Causes of Action will be preserved for the benefit of creditors. |
| V | 41-43 | **Treatment of Executory Contracts and Unexpired Leases**.  This Article details how Executory Contracts and Unexpired Leases will be treated under the Plan.   By default, unless otherwise specified in the Plan, a Plan Supplement or separate motion filed with the Bankruptcy Court, all Executory Contracts and Unexpired Leases will be rejected.  The Debtor's rights under insurance policies will be preserved under this Article. |
| VI | 43-44 | **Provisions Regarding Distributions**.  This Article details how distributions will be managed after the Effective Date. |
| VII | 44-45 | **Reserves Administered by the GUC Trustee**.  To ensure timely and proper payment of Priority, Administrative and Other Secured Claims consistent with Article II of the Plan, this Article requires the Debtor or GUC Trustee to establish and maintain reserves for payment of Allowed Administrative and Priority Claims, as well as Other Secured Claims. |
| VIII | 46-47 | **Procedures for Resolving Certain Contingent, Unliquidated, and Disputed Claims and Interests**.   This Article details how certain contingent, unliquidated and disputed Claims will be handled after the Effective Date. |

| Article | Plan Pages | Summary |
|---------|-----------|---------|
| IX | 47-53 | **Settlement, Releases, Injunctions, and Related Provisions**.  As summarized further in Article IV.C of this Disclosure Statement, Article IX of the Plan contains the lien release (Article IX.B), Estate Release (Article IX.C), Consensual Claimant Release (Article IX.D), and releases by the Debtor and the Settlement Parties of Holders of Claims in Classes 4, 6, 8, and 9 (Article IX.E).  This Article also includes provisions dealing with Exculpations (Article IX.F), the Channeling Injunction (Article IX.I), other injunctions (Articles IX.J-K), terms of the injunctions and stays (Article IX.H), insurance provisions (Article IX.L), retention of liability (Article IX.N), and compromises and settlements (Article IX.A and M). |
| X | 53-55 | **Conditions Precedent to Confirmation and Effective Date**.  This Article lists the various conditions precedent to the Confirmation and the Effective Date of the Plan.  As set forth in Article X.C of the Plan, any of these conditions may be waived by joint agreement of the Proponents. |
| XI | 55 | **Modification, Revocation or Withdrawal of the Plan**.  This Article details the terms for the Proponents to modify, revoke or withdraw the Plan.  The Proponents do not anticipate making material modifications to the Plan, nor do they anticipate revoking or withdrawing the Plan. |
| XII | 55-57 | **Retention of Jurisdiction**.  All plans contain provisions regarding the items over which the Bankruptcy Court retains jurisdiction after confirmation and the effective date.  Article XII enumerates 19 different types of matters over which the Bankruptcy Court shall retain jurisdiction to decide, should they become issues in the future. |
| XIII | 57-60 | **Miscellaneous Provisions**.  The last few pages of the Plan contain various miscellaneous provisions, such as where to send notice and how to find the Plan Supplement and other documents. |

**B.**     **Treatment of Classes of Claims and Interests.**

To the extent a Class contains Allowed Claims or Interests, the classification of Allowed Claims and Interests is specified below.

**1.**     **Class 1 — Other Priority Claims**

(a)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash from the Administrative and Priority Claims Reserve on (or as soon as reasonably practicable after) the later of (i) the Effective Date or (ii) thirty (30) days after such Other Priority Claim becomes Allowed, or (iii) such date on which the Holder of such Other Priority Claim and the Debtor or Trustees, as applicable, shall otherwise agree in writing.

(b)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**2.**     **Class 2 — Other Secured Claims**

(a)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the sole option of the Debtor or the GUC Trustee, as applicable, either:

(i)        payment in full in Cash on the later of (w) the Effective Date (or as soon as reasonably practicable thereafter), (x) the date on which such Other Secured Claim becomes Allowed, (y) the date payment on account of such Other Secured Claim is due; or (z) the date on which the Holder of such Allowed Other Secured Claim and the Debtor or the GUC Trustee, as applicable, shall otherwise agree in writing;

(ii)       collateral securing such Allowed Other Secured Claim; or

(iii)      other treatment that renders such Allowed Other Secured Claim Unimpaired.

(b)      *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**3.      Class 3 — Convenience Claims**

(a)      *Treatment*: On the first Business Day that is thirty (30) days following the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash.

(b)      *Voting*: Class 3 is Impaired under the Plan. Holders of Convenience Claims are entitled to vote to accept or reject the Plan.

**4.      Class 4 — Channeled General Unsecured Claims**

(a)      *Treatment*:

(i)        On the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Channeled GUC Claim agrees to less favorable treatment, each Holder of an Allowed Channeled GUC Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the GUC Trust. Thereafter each such Holder shall receive Cash distributions from the GUC Trust in accordance with the terms and conditions set forth in the GUC Trust Documents. Distributions from the GUC Trust to Holders of Allowed Channeled GUC Claims shall be on a Pro Rata basis with all other holders of GUC Trust beneficial interests in accordance with the terms of the GUC Trust Agreement. Holders of Channeled GUC Claims shall not receive any payment from the GUC Trust unless and until such Claims are resolved in accordance with the GUC Trust Documents. The GUC Trust Agreement establishes the method by with the Channeled GUC Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid. Except as provided in the Plan, Holders of Channeled GUC Claims shall be enjoined from prosecuting or filing any Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(ii)      Notwithstanding the above, each Holder of an Allowed Channeled GUC Claim shall have the option on the Ballot to elect for an Expedited GUC Distribution. Any Holder of a GUC Claim who elects for the Expedited GUC Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the Consensual Claimant Release. An election on the Ballot for an Expedited GUC Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot. An Expedited GUC Distribution shall be paid by the GUC Trustee on the later of (a) the Effective Date or (b) within ten (10) business days after such GUC Claim becomes an Allowed Claim by Final Order, provided, however, that the GUC

Trustee shall not be required to pay such Expedited GUC Distribution until the first Business Day on which the GUC Trust has sufficient Cash on hand to make the Expedited GUC Distribution and satisfy the reserve requirements set forth in the GUC Trust Documents.

(b)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Channeled GUC Claims are entitled to vote to accept or reject the Plan.

**5.     Class 5 — Opt-Out General Unsecured Claims**

(a)     *Treatment*:  On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out GUC Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its GUC Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action.  Except for the foregoing, Holders of Opt-Out GUC Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan. Consistent with the foregoing, each Holder of an Opt-Out GUC Claim may elect to pursue recovery on account of its GUC Claim from any of the Released Parties.  Holders of Opt-Out GUC Claims shall not receive, and shall have no right to receive, a Distribution from the GUC Trust.

(b)     *Voting*:  Class 5 is impaired under the Plan.  Holders of Opt-Out GUC Claims are entitled to vote to accept or reject the Plan.

**6.     Class 6 — Channeled PI/WD Claims**

(a)     *Treatment*:

(i)     Holders of Allowed Channeled PI/WD Claims shall be entitled to receive a distribution from the PI/WD Trust from the PI/WD Trust Assets.  As of the Effective Date, the Debtor's liability for all Channeled PI/WD Claims shall be both incurred in full and assumed by the PI/WD Trust without further act, deed, or Court order and shall be administered and paid from the PI/WD Trust as set forth in the PI/WD Trust Documents.  Holders of Channeled PI/WD Claims shall not receive any payment from the PI/WD Trust unless and until such Claims are resolved in accordance with the PI/WD Trust Documents.  The PI/WD Trust Distribution Procedures establish the method by with the Channeled PI/WD Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid.  Except as provided in the Plan, Holders of Channeled PI/WD Claims shall be enjoined from prosecuting any outstanding or filing future Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(ii)    Notwithstanding the above, and at all times subject to the requirements in Article III.B of the Plan, each Holder of an Allowed Channeled PI/WD Claim shall have the option on the Ballot to elect for an Expedited PI/WD Claim Distribution. Any Holder of a Channeled PI/WD Claim who elects for the Expedited PI/WD Claim Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the Consensual Claimant Release. An election on the Ballot for an Expedited PI/WD Claim Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot. An Expedited PI/WD Claim Distribution shall be paid by the PI/WD Trustee within sixty (60) days following the Effective Date, subject to the terms of the PI/WD Trust Distribution Procedures, provided, however, that the PI/WD Trustee shall not be required to pay such Expedited PI/WD Distribution until the first Business Day on which the PI/WD Trust has sufficient Cash on hand to make the Expedited PI/WD Distribution and satisfy the reserve requirements set forth in the PI/WD Trust Documents.

(b)    *Voting*: Class 6 is Impaired under the Plan. Holders of Channeled PI/WD Claims are entitled to vote to accept or reject the Plan.

**7.**    **Class 7 — Opt-Out PI/WD Claims**

(a)    *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out PI/WD Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its PI/WD Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action. Except for the foregoing, Holders of an Opt-Out PI/WD Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Plan pursuant to the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan. Consistent with the foregoing, each Holder of an Opt-Out PI/WD Claim may elect to pursue recovery on account of its PI/WD Claim from any of the Released Parties. Holders of Opt-Out PI/WD Claims shall not receive, and shall have no right to receive, a Distribution from the PI/WD Trust.

(b)    *Voting*: Class 7 is impaired under the Plan. Holders of Opt-Out PI/WD Claims are entitled to vote to accept or reject the Plan.

**8.**    **Class 8 — Opt-Out Insured PI/WD Claim**

(a)    *Treatment*:

(i)    The Holders of Opt-Out Insured PI/WD Claims shall be entitled to seek recovery on account of such Claims from any PI/WD Insurance Company. Such Holders shall be entitled to name as a defendant in any proceeding commenced or continued in the Civil Justice System the Debtor, the PI/WD Trust, and any other person or entity to the extent permitted under applicable law, *provided*, *however*, that such Holder may not name a Released Party as a defendant other than the Debtor. Claims that could have been asserted against the Debtor may be asserted against the PI/WD Trust, which will have the liabilities and defenses of the Debtor, subject to the limitations below on any such Opt-Out Insured PI/WD Claim established through litigation. If such proceeding is commenced or continued, the PI/WD Trustee shall provide notice to and seek

defense from each PI/WD Insurance Company that the PI/WD Trustee determines may have an obligation to provide coverage in accordance with the terms of each applicable PI/WD Insurance Policy. The PI/WD Trust shall have no obligation to appear and defend any lawsuit commenced against the PI/WD Trust if the applicable PI/WD Insurance Company refuses to cover any and/or all defense costs. The PI/WD Trust shall have no obligation to satisfy any Insurance Policy's deductible or self-insured retention per claim or in the aggregate. Holders of Opt-Out Insured PI/WD Claims shall not be entitled to receive any recovery from the PI/WD Trust or the Debtor on account of such Claim other than a recovery that is funded exclusively by an insurance recovery under a PI/WD Insurance Policy.

(ii)  Each Holder of an Opt-Out Insured PI/WD Claim shall automatically be deemed to return to the PI/WD Trust on the ninetieth (90th) day following the Effective Date unless such Holder provides written notice to the PI/WD Trust that such Holder intends to remain an Opt-Out for purposes of pursuing insurance recoveries in the Civil Justice System. This deadline may be extended in accordance with the PI/WD Trust Documents. Holders of Opt-Out Insured PI/WD Claims who elect to remain in the Civil Justice System for the purpose of pursuing insurance recoveries after this deadline may elect to return to the PI/WD Trust in accordance with the PI/WD Trust Documents. Any Holder of an Opt-Out Insured PI/WD Claim that returns to the PI/WD Trust in accordance with the PI/WD Trust Documents shall be treated as the Holder of Channeled PI/WD Claim under the Plan and the PI/WD Trust Documents.

(b)  *Voting*: Class 8 is impaired under the Plan. Holders of Opt-Out Insured PI/WD Claims are entitled to vote to accept or reject the Plan.

**9.  Class 9 — Channeled Indirect Claims**

(a)  *Treatment*:

(i)  Any Channeled Indirect Claim shall be Disallowed to the extent provided by section 502(e) and shall be subordinated to the extent provided by section 509(c) of the Bankruptcy Code or applicable law.

(ii)  As of the Effective Date, (a) the Debtor's liability for all Allowed Channeled Indirect Claims that are Allowed Indirect PI/WD Claims shall be both incurred in full and assumed by the PI/WD Trust without further act, deed, or Court order and shall be administered and paid from the PI/WD Trust as set forth in the PI/WD Trust Documents, and (b) the Debtor's liability for all Allowed Channeled Indirect Claims that are Allowed Indirect GUC Claims shall be both incurred in full and assumed by the GUC Trust without further act, deed, or Court order and shall be administered and paid from the GUC Trust as set forth in the Plan and the GUC Trust Agreement.

(iii)  Holders of Allowed Channeled Indirect Claims that are Allowed Indirect PI/WD Claims shall not receive any payment from the PI/WD Trust unless and until such Claims are resolved in accordance with the PI/WD Trust Documents. The PI/WD Trust Distribution Procedures establish the method by with such Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid. Holders of Allowed Channeled Indirect Claims that are Allowed Indirect GUC Claims shall not receive any payment from the GUC Trust unless and until such Claims are resolved in accordance with the Plan and the GUC Trust Agreement. Except as provided in the Plan, Holders of Channeled Indirect Claims shall be enjoined from prosecuting any outstanding or filing future Claims against the

Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(b)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Channeled Indirect Claims are entitled to vote to accept or reject the Plan.

10.     **Class 10 — Opt-Out Indirect Claims**

(a)     *Treatment*:  On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out Indirect Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its Indirect Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action.  Except for the foregoing, Holders of an Opt-Out Indirect Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Plan pursuant to the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan.  Consistent with the foregoing, each Holder of an Opt-Out Indirect Claim may elect to pursue recovery on account of its Indirect Claim from any of the Released Parties.  Holders of Opt-Out Indirect Claims shall not receive, and shall have no right to receive, a Distribution from the PI/WD Trust or the GUC Trust.

(b)     *Voting*:  Class 10 is impaired under the Plan.  Holders of Opt-Out Indirect Claims are entitled to vote to accept or reject the Plan.

11.     **Class 11 — Interests in the Debtor**

(c)     *Treatment*:  On the Effective Date, all Interests in the Debtor shall be cancelled, released, discharged, and extinguished.  Holders of Interests in the Debtor shall not receive or retain any property on account of such Interests.

(d)     *Voting*:  Class 11 is Impaired under the Plan.  Holders of Interests in the Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**C.     Settlement, Release, Exculpation, and Injunction Provisions.**

Article IX of the Plan provides for certain settlements, releases, injunctions, and exculpations, including third-party releases of and for the Debtor, the Released Parties, or the Exculpated Parties, as applicable.

The Proponents believe that the settlements, releases, injunctions, and exculpations set forth in the Plan are appropriate and in accordance with applicable law because, among other things, the releases are narrowly tailored to the Debtor and the Chapter 11 Case, and the Released Parties have contributed value to the Debtor, which facilitated the Debtor's ability to propose and pursue confirmation of the Plan.  The Proponents further believe that such releases, exculpations, and injunctions are a necessary part of the Plan.  The Proponents will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of confirmation of the Plan.

1.     **Released Parties, Settlement Parties and Exculpated Parties.**

"*Released Parties*" means collectively the following, in each case in its capacity as such with each being a "*Released Party*":  (a) the Debtor; (b) Russell Perry, the Debtor's Chief Restructuring Officer; (c) the Committees and their respective members; (d) the Professionals; (e) the GUC Trustee; (f) the PI/WD Trustee; (g) the Settlement Parties; (h) M2 EquityCo LLC; (i) Valitás Intermediate Holdings Inc.; (j) Valitás Health Services, Inc.; (k) M2 Pharmacorr

Equity Holdings LLC; (l) Pharmacorr/M2 LLC; (m) Pharmacorr Holdings LLC; (n) Endeavor Distribution LLC; (o) Yes Care Holdings LLC; (p) Sigma RM, LLC; (q) DG Realty Management LLC; (r) Scaracor LLC; (s) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (t) Sara Ann Tirschwell; (u) Ayodeji Olawale Ladele; (v) Beverly Michelle Rice; (w) Jeffrey Scott King; (x) Jennifer Lynne Finger; (y) Frank Jeffrey Sholey; (z) FTI Capital Advisors, LLC, and for each Entity listed in (a) through (z), each of their respective current and former officers, directors, managers, employees, contractors, agents, attorneys, and other professional advisors, Insiders, and Affiliates; *provided*, *however*, that a Non-Released Party shall not be a "Released Party."

The Settlement Parties are collectively, YesCare Corp., its wholly owned subsidiaries (including CHS TX, Inc.), Geneva Consulting, LLC, Perigrove 1018, LLC, Perigrove, LLC, M2 HoldCo, LLC, M2 LoanCo, LLC, and PharmaCorr LLC.

The Exculpated Parties are, collectively, and in each case in its capacity as such: (a) the TCC, (b) the members of the TCC, (d) the UCC, (e) the members of the UCC; and (f) the Mediator.

###### 2.    Estate Release.

Article IX.C of the Plan provides for releases of certain claims and causes of action the Debtor may hold against the Released Parties, including derivative claims.  The Estate Release is not effective until the Final Payment Date, upon which date the amounts required by the Estate Party Settlement will have been paid in full.

**As of the Final Payment Date, except for the claims or theories of recover or remedies distributed to or retained by Holders of Opt-Out GUC Claims, Holders of Opt-Out PI/WD Claims, and Holders of Opt-Out Indirect Claims, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Released Party shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor, its Estate, and each of their respective successors or assigns, including the Trusts, of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, the Payment Agreement, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in the Plan shall not be construed to release any Insurance Actions or any post-Effective Date obligations under the Estate Party Settlement or any document, instrument, or agreement executed to implement the Estate Party Settlement.  If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IX.C shall be void.  If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts.  Any Released Party may enforce the Estate Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose.  The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.**

###### 3.    Other Releases.

Article IX.D of the Plan provides for releases of certain Claims and Causes of Action Consenting Claimants may hold against the Released Parties.

"*Consenting Claimant*" means a Consenting Indirect Claimant, a Consenting GUC Claimant, and/or Consenting PI/WD Claimant, regardless of whether any such Claimant receives a Distribution and so long as such Claimant has previously consented to the Consensual Claimant Release in accordance with the procedures set forth in the Plan.

"*Consenting Indirect Claimant*" means: (a) any Holder of an Indirect Claim that votes to accept or is deemed to accept the Plan **and** who does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release; and (b) any Holder of an Indirect Claim that abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** that does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release. No Holder of an Opt-Out Indirect Claim shall be a Consenting Indirect Claimant.

"*Consenting GUC Claimant*" means: (a) any Holder of a GUC Claim that votes to accept or is deemed to accept the Plan **and** that does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release; (b) any Holder of a GUC Claim that abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** that does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release; and (c) any Holder of a GUC Claim that elects to receive an Expedited GUC Distribution. No Holder of an Opt-Out GUC Claim shall be a Consenting GUC Claimant.

"*Consenting PI/WD Claimant*" means: (a) any Holder of a PI/WD Claim who votes to accept or is deemed to accept the Plan **and** who does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release, including any who elect to pursue insurance recoveries under and consistent with **Article IV.C**.; (b) any Holder of a PI/WD Claim who abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** who does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release; and (c) any Holder of a PI/WD Claim who elects to receive an Expedited PI/WD Claim Distribution. No Holder of an Opt-Out PI/WD Claim shall be a Consenting PI/WD Claimant.

**As of the Final Payment Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate the Estate Party Settlement, as an integral component of the Plan, to the maximum extent permitted under applicable law, all Consenting Claimants shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each Released Party of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that the releases set forth in this Article IX.D shall not, and shall not be construed to: (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents. If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IX.D shall be void. If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts. Any Released Party may**

enforce the Consensual Claimant Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose.  The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.

Article IX.E of the Plan provides for releases of Claims and Causes of Action the Released Parties and the Debtor are providing to Consenting Claimants pursuant to the Plan.

**As of the Final Payment Date, for good and valuable consideration, the adequacy of which is hereby confirmed, as an integral component of the Plan, to the maximum extent permitted under applicable law, Released Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Holders of Claims in Class 4 (Channeled GUC Claims), Class 6 (Channeled PI/WD Claims), Class 8 (Opt-Out Insured PI/WD Claims), and Class 9 (Channeled Indirect Claims) of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any such Holder, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that the releases set forth in this Article IX.E shall not, and shall not be construed to:  (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents.**

4.      **Exculpation.**

Article IX.F of the Plan provides for the release and exculpation of the Exculpated Parties for certain acts or omissions taken in connection with the Chapter 11 Case.  The Exculpation contains a carve-out for actual fraud, willful misconduct or gross negligence.

**As of the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest, for any claim or cause of action arising from the Petition Date through the Effective Date, arising from, relating to, or connected with the administration of the Chapter 11 Case, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be deemed to have, participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code.  Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

5.      **Injunction.**

Article IX.I of the Plan outlines the Channeling Injunction that will be imposed pursuant to the Plan upon Channeled Claims.  Channeled Claims are Claims as to which the Holder of the Claim has not opted-out, or, as to claims where the Holder has opted-out for the purpose of pursuing recovery from an insurance company, has opted out and has not returned to the PI/WD Trust in accordance with its procedures.

As outlined in Article IX.I of the Plan, the Channeling Injunction will provide that the sole recourse for Holders of Channeled Claims that are eligible for compensation will be the applicable trust, and the Holders of Channeled Claims will have no right so assert those claims against the Debtor or any Released Party.

**As of the Effective Date, to facilitate the liquidation of Channeled Claims by the Trusts and the preserve and promote the settlement framework contemplated by and provided for in the Plan, including the Estate Party Settlement, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under the Bankruptcy Code, the Bankruptcy Court shall issue the channeling injunction set forth in this <u>Article IX.I</u> (the "<u>Channeling Injunction</u>").**

**Subject to the terms of <u>Article IX.I.5</u>, and while the Channeling Injunction is in full force and effect as to any Channeled Claim, (a) the sole recourse of any Holder of a Channeled PI/WD Trust Claim that is eligible for compensation under the PI/WD Trust Distribution Procedures on account of such Channeled PI/WD Trust Claim shall be to and against the PI/WD Trust pursuant to the PI/WD Trust Documents, and such Holder shall have no right to assert such Channeled PI/WD Trust Claim or any Claim against the Debtor against any Released Party, and (b) the sole recourse of any Holder of a Channeled GUC Trust Claim that is eligible for compensation under the Plan and the GUC Trust Agreement on account of such Channeled GUC Trust Claim shall be to and against the GUC Trust, and such Holder shall have no right to assert such Channeled GUC Trust Claim or any Claim against the Debtor against any Released Party.  Accordingly, on or after the Effective Date, and subject to the terms of <u>Article IX.I.5</u>, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled Claim shall be stayed, restrained, and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Released Party with respect to any such Channeled Claim, other than from the Trusts, including:**

> (a) **commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Released Party, or any property or interest in property of any Released Party;**

> (b) **enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Released Party, or any property or interest in property of any Released Party;**

> (c) **creating, perfecting or otherwise enforcing in any manner, whether directly or indirectly, any encumbrance of any kind against any Released Party, or any property or interest in property of any Released Party;**

> (d) **asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Released Party, or any property or interest in property of any Released Party; or**

> (e) **taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Trusts, except in conformity and compliance with the Plan Documents with respect to any such Channeled Claim.**

**Reservations.**

**Notwithstanding anything to the contrary in this <u>Article IX.I</u>, this Channeling Injunction shall not enjoin:**

(a)        **the rights of Holders of Channeled PI/WD Trust Claims to assert such Claims against the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures;**

(b)        **the rights of Holders of Channeled GUC Trust Claims to assert such Claims against the GUC Trust in accordance with the Plan and the GUC Trust Agreement;**

(c)        **the rights of Holders of Channeled Claims to assert such Claims against any Released Party if the Channeling Injunction is terminated under <u>Article IX.I.5</u>;**

(d)        **the Trusts from enforcing their rights under the Plan and the Confirmation Order;**

(e)        **the rights of the Trusts to prosecute any action against an Insurance Company based on or arising from a PI/WD Insurance Policy or a GUC Insurance Policy;**

(f)        **the rights of the Trusts to prosecute any Retained Estate Causes of Action; and**

(g)        **the rights of Holders of Channeled Claims to seek recovery from any Person, Entity, or Governmental Unit that is not a Released Party on account of their Channeled Claims or any other claim or Cause of Action.**

**Enforcement.**

**Any Released Party may enforce the Channeling Injunction before the Bankruptcy Court, which shall retain jurisdiction for such purpose. The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.**

**Termination of Channeling Injunction.**

**The Channeling Injunction and all protections afforded to the Released Parties set forth in this <u>Article IX.I</u> shall terminate automatically (or not take effect) as to the Holder of any Channeled Claims if a Settlement Payment Default occurs and is not cured within Settlement Payment Cure Period or waived by both the PI/WD Trustee and GUC Trustee in accord with <u>Article IV.B.2</u>, or if the Estate Release or the Consensual Claimant Release become void under <u>Article IV.B.7</u>, <u>Article IV.B.9</u> or <u>Article IV.B.12</u>.**

**Tolling of Statute of Limitations.**

**While the Channeling Injunction is in effect as to any Channeled Claim, and for ninety (90) days following the termination of the Channeling Injunction under <u>Article IX.I.5</u>, the running of any relevant Statute of Limitations shall be tolled as to any Channeled Claim. Upon the termination of the Channeling Injunction, the PI/WD Trustee and the GUC Trustee shall file a notice on the docket of the Chapter 11 Case and provide notice to beneficiaries of the Trusts that the Estate Party Settlement did not become effective and that such beneficiaries have ninety (90) days from the date of termination to commence Causes of Action against the Released Parties.**

Article IX.L of the Plan includes an injunction against interference with the Plan.

**Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan. The negotiation, settlement, and resolution of any Claims and Interest under the Plan shall not operate to excuse any Party from its obligations under any contracts, Insurance Policies, or other agreements, notwithstanding any terms of such contracts, Insurance Policies or agreements or provisions of non-bankruptcy law.**

**As of the Effective Date, neither YesCare Corp., CHS TX, Inc. nor any other alleged successor entity may assert in any litigation involving an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System that such Claims, to the extent asserted against YesCare Corp., CHS TX, Inc., or any other successor based on the doctrine of successor liability are barred, released, discharged, or impaired by the Confirmation Order, the Plan, or the Estate Release. The right to assert such Claims based on**

the doctrine of successor liability has been received or retained by the Holders of such Claims under **Article III.D,** and the Holders of such Claims shall have a Claim against Debtor solely to the extent necessary to preserve and enforce such right. **Subject to the foregoing, YesCare Corp.'s, CHS TX, Inc.'s, or any other alleged successor entity's claims, rights, and defenses to any action brought by the Holder of an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System are expressly preserved under the Plan, including the rights of YesCare Corp., CHS TX, Inc., or any other alleged successor entity to contest liability for Opt-Out GUC Claims, Opt-Out PI/WD Claims, or Opt-Out Indirect Claims and to argue that they are not liable as successors to the Debtor based on the facts of the underlying action and/or the requirements for imposing successor liability under applicable law.**

Article IX.K of the Plan includes an injunction against interference with Opt-Out Rights.

**As of the Effective Date, neither YesCare Corp., CHS TX, Inc. nor any other alleged successor entity may assert in any litigation involving an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System that such Claims, to the extent asserted against YesCare Corp., CHS TX, Inc., or any other successor based on the doctrine of successor liability are barred, released, discharged, or impaired by the Confirmation Order, the Plan, or the Estate Release. The right to assert such Claims based on the doctrine of successor liability has been received or retained by the Holders of such Claims under Article III.D,** and the Holders of such Claims shall have a Claim against Debtor solely to the extent necessary to preserve and enforce such right. **Subject to the foregoing, YesCare Corp.'s, CHS TX, Inc.'s, or any other alleged successor entity's claims, rights, and defenses to any action brought by the Holder of an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System are expressly preserved under the Plan, including the rights of YesCare Corp., CHS TX, Inc., or any other alleged successor entity to contest liability for Opt-Out GUC Claims, Opt-Out PI/WD Claims, or Opt-Out Indirect Claims and to argue that they are not liable as successors to the Debtor based on the facts of the underlying action and/or the requirements for imposing successor liability under applicable law.**

## V.   The GUC Trust and the PI/WD Trust

### A.   The Trusts Generally.

The Plan provides for Channeled Claims to be addressed by two separate trusts which will share equally in estate assets for distribution. Holders of Channeled PI/WD Trust Claims (Class 6) and Holders of Channeled Indirect PI/WD Claims (a subset of Class 9) will have their claims resolved by the PI/WD Trust. Holders of Opt-Out Insured PI/WD Claims (Class 8) will also have their claims resolved by the PI/WD Trust to the extent their claims are deemed to return to the PI/WD Trust or if the Holder elects to return to the PI/WD Trust in accordance with the PI/WD Trust Documents. Holders of Channeled General Unsecured Claims (Class 4) and Holders of Channeled Indirect General Unsecured Claims (a subset of Class 9) will have their claims resolved by the GUC Trust.

### B.   Preservation of Causes of Action.

Except as otherwise provided in this Plan, an agreement or document entered into in connection with the Plan, or in a Final Order of the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and as set forth more fully in the Disclosure Statement, the Debtor reserves and, as of the Effective Date, assigns to the GUC Trust and the PI/WD Trust  the Estate Causes of Action identified in the Plan Supplement as Retained Causes of Action. On and after the Effective Date, the GUC Trustee (in its own capacity and as agent for the PI/WD Trust, may pursue Retained Causes of Action on behalf of the GUC Trust and the PI/WD Trust.  Retained Causes of Action may be commenced, prosecuted, and settled by the GUC Trust, with the prior written consent of the PI/WD Trust, with the net proceeds of such Retained Causes of Action be split between the PI/WD Trust and the GUC Trust on a 50/50 basis. The PI/WD Trustee and the GUC Trustee shall confer in good faith regarding (i) the retention of professionals to represent the GUC Trust (in its own capacity and as agent for the PI/WD Trust) with respect to the Retained Causes of Action on behalf of the Trusts, and (ii) all matters relating to the administration of the Retained Causes of Action; provided, however, notwithstanding the foregoing, the GUC Trust shall be required to obtain the consent of the PI/WD Trust for any material matter, including the filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of the Retained Causes of Action, which could affect the PI/WD Trust.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Estate Cause of Action against it as any indication that the GUC Trustee or the PI/WD Trustee, as appropriate, will not pursue all available Estate Causes of Action against it. Unless any Estate Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the GUC Trustee and PI/WD Trustee expressly reserve all Estate Causes of Action for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Estate, and (ii) all matters relating to the administration of the Retained Causes of Action; *provided*, *however*, notwithstanding the foregoing, the GUC Trust shall be required to obtain the consent of the PI/WD Trust for any material matter, including the filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of the Retained Causes of Action which could affect the PI/WD Trust.

The Debtor, the GUC Trustee, or the PI/WD Trustee, as applicable, reserves such Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. Subject to the foregoing consent rights of the PI/WD Trust, the GUC Trust shall retain and shall have, including through its authorized agents or representatives, the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**C.      The GUC Trust.**

Holders of claims subject to resolution by the GUC Trust will receive distributions, if applicable, in accordance with the terms of the GUC Trust Agreement. A copy of the proposed GUC Trust Agreement is attached hereto as **Exhibit B**.

**1.      GUC Trust Assets.**

Pursuant to the Plan, the GUC Trust Assets will consist primarily of 50% of the Settlement Payments received pursuant to the Estate Party Settlement, 50% of ERC funds received by the Estate, and 50% interest in the causes of action retained by the estate and any proceeds thereof. The GUC Trust will also receive assignment of certain insurance rights, information needed to conduct its business, and any income, profits, gains, and proceeds realized, received, or derived from GUC Trust Assets.

**2.      GUC Trust Claims Administration Process.**

Holders of valid Channeled GUC Claims and Channeled Indirect GUC Claims will receive payment from the GUC Trust via a multi-step process set forth in the GUC Trust Agreement.

A Holder of a GUC Claim will have the opportunity on the Ballot to elect to receive an Expedited Distribution of $5,000 in return for a full release of its Claim rather than participating in the entire claim valuation and distribution process outlined in the Plan and GUC Trust Documents. If a Holder of the Claim elects the Expedited Distribution, there are only two further steps in the process to receive payment. First, the GUC Trustee, who is in charge of the GUC Trust, will confirm whether the Holder of such a claim meets threshold eligibility requirements. These requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed. If the GUC Trustee determines the threshold requirements have been met, the Holder of the applicable Class 3 convenience claim be required to execute an appropriate release. Upon execution of the release, the Holder of the claim will be entitled to receive the Expedited payment and will receive no further distribution on their claim.

If a Holder of a Channeled GUC Claim (Class 4) or a Channeled Indirect GUC Claim (subset of Class 9) does not choose to receive a $5,000 Expedited Distribution, they will be required under the terms of the GUC Trust Agreement to participate in a process for valuation of their claim that will determine the Allowed Claim Amount for that claim. That process will be conducted as follows:

First, the GUC Trustee will determine whether threshold eligibility requirements have been met.  As noted above, these requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.  For Indirect Claims, additional eligibility requirements must be met.  Those additional requirements include a determination that the claim is valid and not subject to disallowance under the Code or applicable law, and a showing that the Holder of the Indirect Claim has paid in full the liability or obligation of the GUC Trust to a claimant to whom the GUC Trust would have otherwise had a liability, that the claim is not subject to a valid defense, and that both the claimant who received the funds and the Holder of the Indirect Claim have or will have fully released the GUC Trust.

Next, the GUC Trustee will evaluate each claim individually in accordance with the GUC Trust Documents, and based on the documentation provided by a Claimant, the GUC Trustee will determine whether the claim is legally valid or invalid.  If the GUC Trustee determines additional information is needed for this analysis, the trustee will issue deficiency notices identifying information requested to potentially cure the deficiency.  If the GUC Trustee determines a claim is legally invalid and ineligible for compensation, the trustee will provide written notice of this determination to the claimant.

Once the GUC Trustee has determined a claim is legally valid, the trustee will utilize appropriate procedures to determine value of each claim (the "Proposed Allowed Claim Amount") and will provide notice to the claimant as to this determination.  If the claimant accepts the Proposed Allowed Claim Amount, that amount will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

If a claimant disagrees with the GUC Trustee's determination as to the validity of a claim or the GUC Trustee's Proposed Allowed Claim Amount, the claimant may submit a request for reconsideration, and the decision will be reviewed in a non-binding alternative dispute resolution process in which additional information may be provided.  The GUC Trustee may accept or reject any recommendations from this process.  If the GUC Trustee rejects the recommendations, the trustee will file a written objection to the claim, in which case the dispute will be resolved by the Bankruptcy Court.

If the value and validity of a claim is resolved via the alternative dispute resolution process, any other agreement of the trustee, or by final order of the Bankruptcy Court, then the agreed or ordered value of the claim will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

### 3.    GUC Trust Distributions.

Holders of valid Channeled GUC Claims and Channeled Indirect GUC Claims will receive payment from the GUC Trust via a multi-step process set forth in the GUC Trust Documents.

### D.    The PI/WD Trust.

Holders of claims subject to resolution by the PI/WD Trust will receive distributions, if applicable, in accordance with the terms of the PI/WD Trust Agreement.  A copy of the proposed PI/WD Trust Agreement is attached hereto as **Exhibit C**.

### 1.    PI/WD Trust Assets.

On the Effective Date, the PI/WD Trust will be funded with (i) twenty-three percent (23%) of the Cash from the Initial Settlement

### 2.    PI/WD Trust Claims Administration Process.

Holders of Allowed Personal Injury Claims will receive payment from the PI/WD Trust via a multi-step process set forth in the PI/WD Trust Agreement.

A Holder of a PI/WD Claim will have the opportunity on the Ballot to elect to receive an Expedited Distribution of $5,000 in return for a full release of its Claim rather than participating in the entire claim valuation and

distribution process outlined in the Plan and PI/WD Trust Documents. If a Holder of the Claim elects the Expedited Distribution, there are only two further steps in the process to receive payment. First, the PI/WD Trustee, who is in charge of the PI/WD Trust, will confirm whether the Holder of such a claim meets threshold eligibility requirements. These requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed. Second, if the PI/WD determines the threshold requirements have been met, the Holder of the applicable Class 3 convenience claim will be required to execute an appropriate release. Upon execution of the release, the Holder of the claim will be entitled to receive the Expedited payment and will receive no further distribution on their claim.

If a Holder of a Channeled PI/WD Claim (Class 6) or a Channeled Indirect PI/WD Claim (subset of Class 9) does not choose to receive a $5,000 Expedited Distribution, they will be required under the terms of the PI/WD Trust Documents to participate in a process for valuation of their claim to determine the Allowed Claim Amount for that claim. That process will be conducted as follows:

First, the PI/WD Trustee will determine whether threshold eligibility requirements have been met. As noted above, these requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed. For Indirect Claims, additional eligibility requirements must be met. Those additional requirements include a determination that the claim is valid and not subject to disallowance under the Code or applicable law, and a showing that the Holder of the Indirect Claim has paid in full the liability or obligation of the PI/WD Trust to a claimant to whom the PI/WD Trust would have otherwise had a liability, that the claim is not subject to a valid defense, and that both the claimant who received the funds and the Holder of the Indirect Claim have or will have fully released the PI/WD Trust.

Next, the Holder of a claim will make a Trust Claim Submission, providing the PI/WD Trustee detailed information about the claim, including records and documents requested by the trustee and cooperation in any written or oral questions the trustee may have regarding the claim. A more detailed description of the Trust Claim Submission requirements is outlined in the next section. Other than claims where the Holder elects to receive an Expedited Distribution, no recovery will be provided to a Holder of a claim who does not submit a Trust Claim Submission. However, the PI/WD Trustee may waive the requirement to provide records or documents if doing so would not impact the trustee's ability to evaluate the claim and requiring the records would constitute an undue hardship.

The PI/WD Trustee will evaluate each Trust Claim Submission individually in accordance with the PI/WD Trust Documents. The PI/WD Trustee will first determine whether the claim is legally valid and thus allowed or legally invalid and ineligible for compensation. If the PI/WD Trustee determines additional information is needed for this analysis, the trustee will issue deficiency notices identifying information requested to potentially cure the deficiency. If the PI/WD Trustee determines a claim is legally invalid and ineligible for compensation, the trustee will provide written notice of this determination to the claimant.

Once the PI/WD Trustee has determined a claim is legally valid, the trustee will the utilize the procedures outlined in the PI/WD Trust Documents to determine value of each claim (the "Proposed Allowed Claim Amount") and will provide notice to the claimant as to this determination. If the claimant accepts the Proposed Allowed Claim Amount, that amount will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

If a claimant disagrees with the PI/WD Trustee's determination as to the validity of a claim or the PI/WD Trustee's Proposed Allowed Claim Amount, the claimant may submit a request for reconsideration, and the decision will be reviewed in a non-binding alternative dispute resolution process in which additional information may be provided. The PI/WD Trustee may accept or reject any recommendations from this process. If the PI/WD Trustee rejects the arbitrators' recommendation, the PI/WD Trustee's Proposed Allowed Claim Amount will constitute a final determination.

Once the value and validity of a claim is resolved, whether by acceptance of the Proposed Allowed Claim Amount, completion of the alternative dispute resolution process, or other agreement of the PI/WD Trustee, then the agreed or ordered value of the claim will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

3.        **PI/WD Claims Allowance.**

The prior section describes the claims administration process for the PI/WD Trust.  One part of that process is determining the Proposed Allowed Claim Amount for each Allowed PI/WD Trust claim.  This analysis as to personal injury claims is outlined in Article VI of the PI/WD Trust Distribution Procedures.

The PI/WD Trustee's determination will be based on Trust Claim Submissions.  In accordance with the PI/WD Trust Documents, these submissions must include applicable medical records, a written, audio, or video narrative describing the injury, evidence of location of incarceration, and to the extent the claim includes wrongful death, a death certificate or applicable medical record evidencing the decedent's death.  Where appropriate, the PI/WD Trustee may obtain these records from third parties, including where the claimant does not have counsel.

The PI/WD Trustee will evaluate personal injury claims using a Claims Matrix that separates personal injury claims into five types of personal injuries to provide initial guidance for claim value and applying certain scaling factors to adjust those base values.  Those scaling factors include the nature and circumstances of the injury, the impact of the injury, and the amount of out-of-pocket medical expenses faced by a claimant.  If a personal injury claim does not fit within one of the five types identified in the Claims Matrix, the PI/WD Trustee will determine which tier the claim best fits in.

## VI.  Risk Factors

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTOR WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PLAN SUPPLEMENT AND THE OTHER DOCUMENTS REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASE.  THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S RESTRUCTURING AND CONSUMMATION OF THE PLAN.**

A.        **Bankruptcy Law Considerations.**

1.        **The Debtor Will Consider All Available Alternatives if the Plan Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor.**

If the transactions contemplated by the Plan are not implemented, the Proponents will consider all available alternatives, including filing an alternative chapter 11 plan, converting to chapter 7, and any other transaction that would maximize the value of the Debtor's Estate.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtor than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Case, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

2.        **Risks Related to Confirmation and Consummation of the Plan.**

(a)        **Conditions Precedent to Confirmation May Not Occur.**

As more fully set forth in Article X of the Plan, the occurrence of confirmation and the Effective Date are each subject to a number of conditions precedent.  If each condition precedent to confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place.  In the event that the Plan is not confirmed or is not consummated, the Chapter 11 Case will likely convert to a case under chapter 7 of the Bankruptcy Code.

(b) **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Proponents believe the classification of Claims and Interests under the Plan complies with the requirements of the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and the Proponents may need to modify the Plan.  Such modification could require a re-solicitation of votes on the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Plan's classifications of Claims and Interests is not appropriate.

(c) **The Debtor May Not Be Able to Satisfy the Voting Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Proponents may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.  The Proponents do not believe that any such transaction exists or is likely to exist that would be more beneficial than the Plan.

(d) **The Proponents May Not Be Able to Secure Confirmation.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that:  (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular Class under the plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

Subject to the limitations contained in the Plan, the Proponents reserve the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e) **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including third-party releases relating to claims and causes of action that may otherwise be asserted against the Debtor or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and, therefore, may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Plan because the Released Parties, the Debtor, and Exculpated Parties have made significant contributions to the Debtor's proposed exit from chapter 11 and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The

Plan's release and exculpation provisions are an inextricable component of Plan and the significant recovery it affords to Holders of Allowed Claims.

        (f)        **The Debtor May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Proponents believe that the Plan satisfies these requirements, and the Proponents may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

        (g)        **The Chapter 11 Case May Be Converted to a Case under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Proponents believe that liquidation under chapter 7 would result in significantly decreased distributions being made to creditors than those provided for in the Plan because: (a) it is unlikely that the Estate Party Settlement would be consummated outside of the protections of the Plan, (b) significant additional administrative expenses would result from the appointment of a chapter 7 trustee, and (c) additional litigation that a chapter 7 trustee might institute could take years to advance and conclude before Holders of Allowed Claims would see any recovery.

        (h)        **The Chapter 11 Case May Be Dismissed.**

If the Bankruptcy Court finds that the Debtor has incurred substantial or continuing loss or diminution to the Estate and lacks the ability to effectuate substantial consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss the Chapter 11 Case. In such event, the Proponents would be unable to confirm the Plan, which may ultimately result in significantly decreased distributions to creditors than those provided for in the Plan.

        (i)        **Risk of Non-Occurrence of the Plan Effective Date.**

Although the Proponents believe the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived by the Proponents, the Effective Date will not take place.

**B.**        **Risks Related to Recoveries Under the Plan.**

        **1.**        **Estimated Recoveries to Holders of Allowed Claims and Interests Are Based on Assumptions and May Vary from Actual Recoveries.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtor), including: (a) the successful confirmation of the Plan; (b) an assumed date for the

occurrence of the Effective Date; (c) the ability of GUC Trustee and the PI/WD Trustee to successfully reduce the amount of Non-Personal Injury Claims and Personal Injury Claims, respectively; and (d) the ability of Holders to exhaust all remedies and obtain separate recovery against applicable insurance policies, if any

The Debtor and the Committees believe the Debtor's Estate is entitled to receive a substantial ERC, and the ERC forms a portion of the recovery to be made available under the Plan.  However, there can be no assurance when, or in what amount, the ERC will actually be paid, and as of the date hereof it appears that the processing of ERC applications may be subject to significant delay.

Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Proponents cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**2.        Litigation Matters.**

The Debtor is party to certain lawsuits, legal proceedings, and claims arising out of its business operations. The Debtor cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Case operates as a stay with respect to the commencement or continuation of litigation against the Debtor that was or could have been commenced before the commencement of the Chapter 11 Case.  In addition, the Debtor's liability with respect to litigation stayed by the commencement of the Chapter 11 Case generally is subject to settlement and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtor may be subject to settlement and release in connection with the Chapter 11 Case.

It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the GUC Trustee or PI/WD Trustee may become party to, nor the final resolution of such litigation.  The impact of any such litigation on recoveries could be material.

**C.        Miscellaneous Risk Factors and Disclaimers.**

**1.        The Financial Information Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Proponents relied on financial data derived from the Debtor's books and records that was available at the time of such preparation.  While the Proponents believe that such financial information fairly reflects the Debtor's financial condition, the Proponents are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to this Disclosure Statement) is without inaccuracies.

**2.        No Legal or Tax Advice Is Provided by This Disclosure Statement.**

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal and financial advisor(s) with regard to any legal, tax, and other matters concerning its Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to confirmation.

**3.        No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtor and Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Interests, or any other parties in interest.

4.      **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  Subject to the release provisions of the Plan, the GUC Trustee or the PI/WD Trustee may seek to investigate, file, and prosecute Claims and may object to Claims after confirmation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5.      **Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors.**

The Proponents' respective counsel and financial advisor have relied upon information provided to them in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Proponents have performed certain due diligence in connection with the preparation of this Disclosure Statement and the exhibits to this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to this Disclosure Statement.

6.      **No Representations Outside This Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  Those who are entitled to vote to accept or reject the Plan should promptly report unauthorized representations or inducements to counsel to the Debtor, counsel to the Committee, and the Office of the United States Trustee for the Southern District of Texas.

7.      **No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## VII.   Certain U.S. Federal Tax Consequences of the Plan

A.      **Introduction.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtor has not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of such Holder's individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtor within the meaning of the Tax Code, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, or the base erosion and anti-abuse tax, non-U.S. taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, and passive foreign investment companies).

Further, other than for Holder of PI/WD Claims, this summary assumes that each Holder holds only Claims in a single Class and holds each Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to (1) Holders that have Claims that are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (Classes 1, 2, and 3), or (2) Holders that are deemed to reject the Plan (Classes 6 and 7).

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code).  For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CLAIM HOLDER IN LIGHT OF SUCH CLAIM HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  HOLDERS OF ALLOWED CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**B.        Certain U.S. Federal Income Tax Consequences to the Debtor.**

In general, absent an exception, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including equity interests in the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

As a result of the transactions contemplated by the Plan, the Debtor expects to realize CODI. The exact amount of any CODI that will be realized by the Debtor, and the amount of any tax attributes required to be reduced, cannot be known with certainty at this time.

**C.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Classes 4 and 5.**

The following discussion assumes that the Debtor will undertake the transactions currently contemplated by the Plan.  Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Plan.

**1.      Tax Treatment of the GUC Trust and GUC Claimants.**

**(a)      U.S. Federal Income Tax Consequences to the GUC Trust Beneficiaries.**

In general, a GUC Trust Beneficiary will recognize gain or loss in connection with the establishment of the GUC Trust in an amount equal to the difference between (i) the fair market value of its undivided interest in the GUC Trust Assets consistent with its economic rights in the GUC Trust and (ii) the adjusted tax basis of the Allowed GUC Claim or exchanged therefor.  Pursuant to the Plan, the GUC Trustee will in good faith value the assets transferred to the GUC Trust, and all parties must consistently use such valuation for all U.S. federal income tax purposes.

Any gain or loss recognized with respect to an Allowed GUC Claim may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year.  The amount of cash received by a Holder in respect of accrued but unpaid interest or OID should be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting.  Each Holder of an Allowed GUC Claim is urged to consult its tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder's aggregate tax basis in its undivided interest in the GUC Trust Assets (other than those allocable to Disputed Claims) will generally equal the fair market value of such interest, and a Holder's holding period in such assets generally will begin the day following establishment of the GUC Trust.

**(b)      U.S. Federal Income Tax Classification of the GUC Trust.**

The GUC Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to sections 671 through 679 of the Tax Code, with no objective to continue or engage in the conduct of a trade of business. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The GUC Trust will be structured with the intention of complying with such general criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee, and Holders of interests in the GUC Trust) shall treat the transfer of GUC Trust Assets to the GUC Trust as (i) a transfer of the GUC Trust Assets directly to Holders of GUC Trust Interests (other than to the extent GUC Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to the GUC Trust of GUC Trust Assets in exchange for GUC Trust Interests. Accordingly, Holders of GUC Trust Interests should be treated for U.S. federal income tax purposes as the grantors and deemed owners of the GUC Trust and thus, the direct owners of their respective share of GUC Trust Assets (other than such GUC Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the GUC Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the GUC Trust and the GUC Trust Beneficiaries could vary from those discussed herein.

(c)      **General Tax Reporting by the GUC Trust and Holders of GUC Trust Interests.**

In accordance with the treatment of the GUC Trust as a liquidating trust for U.S. federal income tax purposes, all parties must treat the GUC Trust as a grantor trust of which the Holders of GUC Trust Interests are the owners and grantors, and treat the Holders of GUC Trust Interests as the direct owners of an undivided interest in the GUC Trust Assets (other than any assets allocable to Disputed Claims) for all U.S. federal income tax purposes, consistent with their economic interests therein. The GUC Administrator will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).

Items of taxable income, gain, loss, deduction, and/or credit of the GUC Trust (other than otherwise accounted for in a "disputed ownership fund") shall be allocated among the holders of GUC Trust Interests in accordance with their relative ownership of GUC Trust Interests.

As soon as reasonably practicable after the Effective Date, the GUC Trustee shall make (or cause to be made) a good faith valuation of the GUC Trust Assets, and such valuation shall be used consistently by all parties for United States federal income tax purposes. The GUC Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the GUC Trust that are required by any government unit for taxing purposes.

The U.S. federal income tax obligations of a holder with respect to its GUC Trust Interests are not dependent on the GUC Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Trust's income even if the GUC Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions, a distribution of cash by the GUC Trust will not be separately taxable to a holder of GUC Trust Interest as the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC Trust). Holders of GUC Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the GUC Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements. Thus in the case of any non-U.S. Holders, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). Non-U.S. Holders are urged to consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including holding GUC Trust Interests.

The GUC Trustee will also work with the Post-Effective Date Debtor to ensure that any distributions made in respect of Claims that are in the nature of compensation for services are subject to appropriate payroll withholding and reporting, and that any applicable payroll taxes associated therewith are properly remitted. The employer portion of any payroll taxes attributed to Claims that are in the nature of compensation for services shall be borne solely by the Post-Effective Date Debtor. Holders of such Claims are urged to consult their tax advisors with respect to the U.S. federal, state and local income tax consequences of the Plan, including holding GUC Trust Interests.

(d)      **Tax Reporting for GUC Trust Assets Allocable to Disputed Claims.**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (i) may elect to treat any GUC Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (ii) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to such reserve (including any gain recognized upon the disposition of such assets). All distributions from such reserve (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will generally be treated as received by holders in respect of their Claims as if distributed by the Debtors at such time. All parties (including, without limitation, the Debtors, the GUC Trustee, and the holders of GUC Trust Interests) will be required to report for tax purposes consistently with the foregoing. A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

2.      **Tax Treatment of the PI/WD Trust and PI/WD ClaimantsU. S Federal Income Tax Treatment of PI/WD Claimants.**

The Plan provides that on the Effective Date, the PI/WD Trust shall be established in accordance with the terms of the PI/WD Trust Agreement and the Plan. The Plan further provides that the PI/WD Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of a PI/WD Claim generally is not expected to be treated as receiving a distribution from the PI/WD Trust unless and until such holder is entitled to receive that distribution directly. The U.S. federal income tax consequences to a U.S. Holder of a PI/WD Claim generally will depend upon the nature and origin of the PI/WD Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a PI/WD Claim may not be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages received on account of personal physical injuries or physical sickness, within the meaning section 104 of the Tax Code, which includes wrongful death. However, in the event a payment is treated as attributable to medical expense deductions allowed under section 213 of the Tax Code for a prior taxable year, such payment may be taxable as ordinary income to the U.S. Holder. To the extent a payment from the PI/WD Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, including wrongful death, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of PI/WD Claims will depend on facts particular to each holder, all U.S. Holders of PI/WD Claims are urged to consult their own tax advisors as to their proper tax treatment under their particular facts and circumstances.

(b)      **U.S. Federal Income Tax Treatment of the PI/WD Trust.**

The Plan provides that the PI/WD Trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the remainder of this discussion assumes that this treatment is respected. The Plan further provides that all parties will be required to treat the PI/WD Trust as a qualified settlement fund for all applicable tax reporting purposes.

The PI/WD Trust will be subject to U.S. federal income tax on its modified gross income, if any, at the highest marginal rate provided under the Tax Code for a trust in a taxable year. The PI/WD Trust's modified gross income means its gross income less certain allowed deductions, including but not limited to administration fees, expenses for accounting and legal services, claims processing expenses and other expenses. The Trustee of the PI/WD Trust, as administrator, will be required to file tax returns on behalf of the PI/WD Trust and will be responsible for causing the PI/WD Trust to pay all taxes, if any, imposed on its modified gross income.

**D.**      **Accrued Interest.**

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest, not previously included in income for U.S. federal income tax purposes, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtor. The Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal.

**E.**      **Market Discount.**

The "market discount" provisions of the Tax Code provide that some or all of any gain realized by a U.S. Holder who is a Holder of a Claim, and who exchanges the Claim for any amount may be treated as ordinary income to said Holder instead of capital gains to the extent of "market discount" on the debt instruments constituting the exchanged Claim.

A debt instrument is generally considered to have been acquired at a "market discount" if it is acquired other than upon the instrument's original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (i) the sum of remaining payments on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to one quarter of one percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

When a U.S. Holder disposes of Allowed Claims in a taxable disposition, the gain recognized should be treated as ordinary to the extent of market discount accrued while the Allowed Claims were considered held by the U.S. Holder of the debt instrument. However, the foregoing recognition would not occur if the U.S. Holder elected to include market discount in its income as the market discount accrued (*i.e.* if the Holder of the Claim elected to accrue on a constant interest method).

## F. Withholding and Information Reporting.

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless the recipient is exempt, such as a corporation. Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (i) is a corporation or other person exempt from backup withholding and, when required, demonstrates this or (ii) is a United States Person (as defined by section 7701(a)(30) of the Tax Code) that provides a correct taxpayer identification number ("TIN") on Internal Revenue Service Form W-9 (or a suitable substitute form) and provides the other information and makes the representations required by such form and complies with the other requirements of the backup withholding rules. A Holder may become subject to backup withholding if, among other things, the Holder (i) fails to properly report interest and dividends for U.S. federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN. A Holder that does not provide a correct TIN also may be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax. The U.S. federal income tax liability of a person subject to backup withholding is reduced by the amount of tax withheld as backup withholding. If backup withholding results in an overpayment of U.S. federal income tax, the Holder may obtain a refund of the overpayment by properly and timely filing a claim for refund with the IRS.

## VIII. Conclusion and Recommendation

For all of the reasons set forth in this Disclosure Statement, the Proponents believe confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Proponents urge all Holders of Claims who are entitled to vote to **ACCEPT** the Plan, and to duly complete and return their Ballots in accordance with the instructions on the Ballots. The Voting Deadline is 5:00 p.m. prevailing Central Time on [●]. To be counted, your Ballot must be fully completed, executed, and actually received by the Claims Agent by the Voting Deadline.

[*Remainder of page left intentionally* blank.]

Dated:   October 2, 2024
         Houston, TX

**Tort Claimants' Committee**

By:      _/s/ Paris Morgan and Nathan Alvarez_
Name:  Paris Morgan and Nathan Alvarez
Title: Co-Chairs

- and -

**Official Committee of Unsecured Creditors**

By:      _/s/ David Barton_
Name: David Barton
Title: Chair

- and -

**Tehum Care Services, Inc.**

By:      _/s/ Russell Perry_
Name: Russell Perry
Title: Chief Restructuring Officer