# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DISCLOSURE STATEMENT REGARDING JOINT**
**CHAPTER 11 PLAN OF THE TORT CLAIMANTS' COMMITTEE,**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR**

**BROWN RUDNICK LLP**
David J. Molton (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
D. Cameron Moxley (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Meghan McCafferty (*pro hac vice*)
Amir Shachmurove (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email:   dmolton@brownrudnick.com
            egoodman@brownrudnick.com
            cmoxley@brownrudnick.com
            gcicero@brownrudnick.com
            mmccafferty@brownrudnick.com
            ashachmurove@brownrudnick.com

*Co-Counsel to the Tort Claimants' Committee*

**BERRY RIDDELL, LLC**
Michael W. Zimmerman
6750 E. Camelback Road, Suite #100
Scottsdale, AZ 85251
Telephone: (480) 385-2727
Email:   mz@berryriddell.com

*Co-Counsel to the Tort Claimants' Committee*

**STINSON LLP**
Nicholas Zluticky (SD TX Bar No. 3846893)
Zachary Hemenway (SD TX Bar No. 3856801)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Email:   nicholas.zluticky@stinson.com
            zachary.hemenway@stinson.com

*Counsel to the Official Committee of Unsecured*
*Creditors*

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Micheal W. Bishop (TX Bar No. 02354860)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
Amber M. Carson (TX Bar No. 24075610)
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7127
Facsimile: (713) 986-5966
Email:   jbrookner@grayreed.com
            mbishop@grayreed.com
            akaufman@grayreed.com
            lwebb@grayreed.com
            acarson@grayreed.com

*Counsel to the Debtor and Debtor in Possession*

---

[1]    The last four digits of the Debtor's federal tax identification number is 8853.  The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT CHAPTER 11 PLAN.

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF A CHANNELING INJUNCTION PURSUANT TO SECTIONS 105(a) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4, CLASS 6, AND CLASS 9 CLAIMS, *I.E.*, CLAIMANTS WHO HAVE NOT OPTED OUT OF THE CONSENSUAL CLAIMANT RELEASE (AS DEFINED IN THE PLAN), TO SEPARATE TRUSTS. CLAIMANTS WHO ELECT TO OPT-OUT OF THE CONSENSUAL CLAIMANT RELEASE SHALL HAVE NO RIGHT TO RECOVER FROM THE TRUSTS, BUT MAY PURSUE CERTAIN RECOVERIES IN THE CIVIL JUSTICE SYSTEM.

THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

<u>DISCLOSURE STATEMENT</u>

**SOLICITATION OF VOTES TO ACCEPT OR REJECT JOINT
CHAPTER 11 PLAN OF THE TORT CLAIMANTS' COMMITTEE,
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR**

<div style="border:1px solid black; padding:10px;">

<u>**RECOMMENDATION**</u>

**The Plan is proposed jointly by the Tort Claimants' Committee (the "<u>TCC</u>"), the Official Committee of Unsecured Creditors (the "<u>UCC</u>" and, together with the TCC, collectively, the "<u>Committees</u>"), and the Debtor.  The TCC, the UCC, and the Debtor believe the Plan maximizes the recovery for creditors and provides the best process for creditors to preserve their rights and receive payment on their claims.  The TCC, the UCC, and the Debtor strongly recommend that all holders of claims entitled to cast ballots vote to *<u>accept</u>* the Plan.**

</div>

### WHAT IS THIS DOCUMENT, AND WHY AM I RECEIVING IT?

This is the Disclosure Statement for the Chapter 11 Plan (the "<u>Plan</u>") for Tehum Care Services, Inc., formerly known as Corizon Health Services, Inc., a Texas corporation (the "<u>Debtor</u>"), proposed jointly by the Committees and the Debtor.  Because the Committees and the Debtor are jointly proposing the Plan and support its adoption, they are referred to as "the Proponents" of the Plan.

You are receiving this information because you have filed a Proof of Claim against the Debtor, or you were otherwise listed as a party in interest in the Debtor's bankruptcy case.  In accordance with the Bankruptcy Code, the Committees and the Debtor are sending you the information in this Disclosure Statement to allow you to decide how to vote (if applicable) or whether to respond to the Plan.  Please read below for more information.

### WHO SENT ME THIS INFORMATION?

This Disclosure Statement has been prepared by the Committees and the Debtor.  The Bankruptcy Court has determined that this document contains the necessary information to fairly inform you about the Plan so that you may make an informed decision on how to vote.

### WHAT IS THE TORT CLAIMANTS' COMMITTEE?

The Tort Claimants' Committee was appointed in the Chapter 11 Case by the United States Trustee, a division of the United States Department of Justice.  The Tort Claimants' Committee is a group of six creditors in the case whose claims against the Debtor are based on tort claims.  The Tort Claimants' Committee's duty is to represent the interests of all creditors who have claims against the Debtor based in tort, including personal injury and wrongful death.

The Tort Claimants' Committee played a central role in drafting the Plan and this Disclosure Statement.  The Tort Claimants' Committee fully supports the Plan.  The Tort Claimants' Committee believes the Plan protects the rights of tort claimants, provides a fair and reasonable settlement of claims that could have been asserted against certain insider and related parties, and that the Plan will fairly distribute the Estate's funds among all claimants, including tort claimants.

### WHAT IS THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS?

The Official Committee of Unsecured Creditors was appointed in the Chapter 11 Case by the United States Trustee, a division of the United States Department of Justice.  The UCC is a group of seven unsecured creditors whose claims are based on various types of claims against the Debtor, including without limitation, claims against the Debtor based on tort.  The Committee's duty is to represent all unsecured creditors' interests in the bankruptcy case.

The UCC played a central role in drafting the Plan and this Disclosure Statement.  The UCC fully supports the Plan.  The UCC believes the Plan protects the rights of all creditors, provides a fair and reasonable settlement of claims that could have been asserted against certain insider and related parties, and that the Plan will fairly distribute the Estate's funds among all creditors.

**HOW DO I KNOW IF THE PLAN IS GOOD FOR ME?**

The Committees and the Debtor believe that the Plan is in the best interests of all creditors.  The Plan was drafted by and is supported by the Committees, who have a duty to act in the best interest of creditors and are made up of members who are creditors seeking to be paid by the Debtor.

**WHAT ARE THE SOURCES OF PAYMENTS TO BE MADE UNDER THE PLAN?**

The primary source of payments to be made under the proposed Plan will come from cash settlement payments aggregating $50 million.  The payment of these funds will be made pursuant to a global settlement which was reached in July 2024 following extensive mediation that included the TCC, the UCC, the Debtor, and certain insiders and other parties related to the Debtor.  The Plan incorporates the terms of this global settlement.

Because the global settlement was negotiated by the TCC, the UCC, and the Debtor, each of which is an estate fiduciary, the settlement is referred to and defined in the Plan as the "Estate Party Settlement," and is so termed in the subsequent provisions of this Disclosure Statement.  The terms of this settlement are set forth in ARTICLE IV and ARTICLE IX of the Plan and are discussed in greater detail in this Disclosure Statement.  One of the key benefits of the Estate Party Settlement is that it is based on a consensual release structure that affords claimants the option of participating in the Plan Trusts or litigating in the Civil Justice System.

If the Estate Party Settlement is approved and if each of the Settlement Payments are made and received by the Trusts, then the Released Parties, which include the Debtor's parent company, other related parties or entities it owns and controls, and certain of its directors and officers, will receive a release of certain estate claims or estate causes of action.  These claims include avoidance actions belonging to the Debtor's Estate, such as claims for fraudulent transfer associated with transfers of funds from the Debtor's accounts, claims for fraudulent transfer associated with the Debtor's restructuring, including the divisional merger with CHS TX, Inc. discussed more fully in this Disclosure Statement, other claims against CHS TX, Inc. and YesCare Corp. based on theories relating to that divisional merger, and preference claims involving transfers to Debtor-related entities prior to bankruptcy.

Due to the circumstances surrounding the divisional merger and subsequent bankruptcy filing, the Debtor's assets include significant Estate Causes of Action.  The Plan resolves the Estate Causes of Action asserted against the Released Parties through a settlement that goes into full force and effect after the proposed Settlement Payments have been made and are received by the Plan Trusts.  To be clear, if even one of the Settlement Payments is not made when due and in accordance with the Plan, then the Released Parties will not receive the benefit of the proposed settlement of the Estate Causes of Action against them.

Under the settlement, the Debtor will receive an aggregate of $50 million in cash, plus releases of certain claims made against the Debtor, including a release of the obligation to repay loans totaling $22.7 million made to the Debtor during this bankruptcy case, release of a lien on tax refund proceeds that was granted as part of that loan, and a release of over $24 million in unsecured claims that could otherwise dilute the pool of unsecured creditors.  In exchange for the cash payments, the loan forgiveness, and the release of claims, the Plan provides broad releases in favor of certain insider and related parties, including YesCare Corp., CHS TX, Inc., Geneva Consulting, M2 LoanCo, Perigrove, and other related entities and individuals.

The $50 million in cash payments, including interest thereon, will be allocated between the two Plan Trusts.  One trust, the PI/WD Trust, will be established to pay "Channeled PI/WD Trust Claims"—namely, the PI/WD claims asserted by holders of PI/WD claims who do not opt-out of the plan releases and elect to recover from the PI/WD Trust.  The second trust, the GUC Trust, will be established to pay "Channeled GUC Trust Claims"—namely, the GUC claims asserted by holders of GUC claims that do not opt-out of the plan releases and elect to recover from the GUC Trust.  The $50 million Settlement Payment, and the net Employee Retention Credit (discussed below), are

considered "sacred funds" that must be contributed to the Plan Trusts. These funds cannot be used for any purpose in the Chapter 11 Case, including the payment of administrative claims and professional fees and expenses.

Neither the Estate Party Settlement nor the Plan incorporating that settlement require creditors to forego claims against the parties released in the settlement without their consent. The Plan gives creditors the option to opt-out of the Plan and Estate Party Settlement and instead pursue any rights that such creditors would have had prior to the Petition Date to seek recovery from YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. Claimants who choose to opt-out will be permitted to pursue those claims but in doing so, will be choosing not to participate in the settlement or receive any distributions from the Plan Trusts. The Plan also gives certain creditors the option to opt-out in order to pursue insurance proceeds that may be available and provides for a corresponding waiver of or adjustment in distributions if a creditor receives insurance proceeds.

In addition to the Settlement Payments, the Debtor believes it may be entitled to a significant Employee Retention Credit ("ERC") from the Internal Revenue Service. Any tax credits, net of any offset rights the Internal Revenue Service may have for outstanding priority tax liabilities, will be available to the Estate for payment of creditors who have not opted out of participation in the Estate Party Settlement.

Finally, other Estate claims and causes of action may exist against third parties other than those released under the Estate Party Settlement and the Plan. The Debtor and the Committee believe these claims and causes of action may provide additional recoveries for creditors. The right to pursue Estate Causes of Action against parties other than the Released Parties is being preserved and the Trusts will jointly have the ability to pursue those Estate Causes of Action under the Plan.

### WHEN AND HOW MUCH MONEY WILL I RECEIVE UNDER THE PLAN?

The amount that you will receive and when you receive it will depend on what type of claim you have and what choices you make on your enclosed ballot.

First, if the amount in your Proof of Claim was less than $5,000, or if you choose to accept $5,000 in full settlement of your claim, you will be entitled to receive those funds once it has been confirmed that you have met the basic requirements for eligibility and you have signed a release of those claims, subject to the provisions of the PI/WD Trust Distribution Procedures, including those provisions regarding lien resolution set forth in Article IV.M of the PI/WD Trust Distribution Procedures. The basic requirements, which are called Threshold Requirements, are having a proof of claim filed before the deadline that has all required information, a sworn verification, which can be either in the proof of claim or provided later, and confirming that the claim has not already been dismissed.

If your claim is for more than $5,000 and you do not choose to accept $5,000 for your claim, you will have additional choices to make that will determine whether you will receive payments under the Plan. You can decide whether you choose to participate in the Plan or instead opt-out and instead pursue your claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. If you choose to opt-out in this manner, you will be choosing not to participate in the Plan Trusts and will not receive any payments from the Plan Trusts, and that decision is final.

Regardless of what type of claim you have, you may choose to receive the $5,000 settlement or choose to opt-out and pursue your claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. If your claim is a personal injury or wrongful death claim and you do not choose to accept the $5,000 and do not choose to opt-out and pursue claims your claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System, you may choose to opt-out solely for the purpose of pursuing your rights under any insurance policies that you believe apply to your claim. If you choose to opt-out solely to seek insurance proceeds, you may name the Debtor as a Defendant and seek recovery from the Debtor's insurers. If you choose this option, you may be able to receive funds from insurance recovery. As outlined in more detail in the opt-out section below, if you make this choice, you may be eligible to return to the PI/WD Trust and seek the payments outlined in the rest of this section rather than insurance proceeds provided certain terms and conditions are met.

If you do not choose to accept the $5,000 settlement or opt-out, the amount of money and timing for payments will be decided by Trustees, who are neutral parties hired to address the claims in this case. The claims against the Debtor fall into two broad categories: (1) PI/WD claims, which are claims relating to alleged personal injury tort or wrongful death claims, generally arising out allegations of medical malpractice, abuse, or neglect at facilities in which the Debtor served as a health care provider; and (2) Non-PI/WD Claims or GUC Claims, which are generally contract and trade claims based on the Debtor's contractual duties owed to contract counterparties and/or the Debtor's obligations owed to third parties.

As discussed in greater detail in this Disclosure Statement, there are important differences between these groups of claims, and the two separate groups of creditors are sharing equally in the proceeds of the Estate Party Settlement. In order to account for the existence and impact of these differences, the Plan proposes to create two separate trusts to administer and distribute money to these two different classes of creditors, and each trust will be funded with one-half of funds received by the estate through the Estate Party Settlement, the tax refunds, or any other sources other than insurance. If you have a claim that is a PI/WD claim and do not accept the $5,000 settlement or opt-out, your claim will be resolved by the PI/WD Trust, which will be implemented by the PI/WD Trustee. If you have a claim that is not a PI/WD claim and do not accept the $5,000 settlement or opt-out, your claim will be resolved by the GUC Trust, which is implemented by the GUC Trustee.

If you have a PI/WD claim, you will first provide information about your claim to the PI/WD Trustee. The PI/WD Trustee will determine the value of each PI/WD claim individually, based first on basic eligibility requirements. One of the basic eligibility requirements is that the claimant timely filed a personalized proof of claim. The PI/WD Trust is a limited fund. Other than the funding provided for under the Plan, no additional funding is contemplated. Thus, if the universe of eligible claims were to expand unexpectedly after this Disclosure Statement is approved, then claimants who timely filed personalized proofs of claim would see their recoveries diluted. The PI/WD Trust includes guardrails and eligibility criteria that are intended to avoid such an outcome and ensure that expectations are consistent with actual outcomes. One such guardrail is that each claimant must have timely filed a personalized proof of claim against the Debtor. This requirement applies regardless of whether a claimant may be included in, or represented by, a purported class action, class suit, class proof of claim, or similar representative action.

The PI/WD Trustee will then categorize the eligible claims based on the type of claim, meaning the type of injury or damage suffered in accordance with the PI/WD Trust Distribution Procedures attached to this Disclosure Statement as **Exhibit B**. The type of claim will provide a base value for the claim, which the PI/WD Trustee will then adjust based on factors that may impact the claim value. For example, a PI/WD claim based on wrongful death will be assigned a dollar value between $1.2 million and $1.597 million. If you accept the PI/WD Trustee's proposed value for the claim, that value will be a final determination of value for your claim as against the PI/WD Trust. If you disagree with the PI/WD Trustee's proposed value or determination of eligibility, you will have the opportunity to request a reconsideration in accordance with the PI/WD Trust Distribution Procedures.

Once the value of your PI/WD claim is determined, that value will determine your share of distributions from the Plan. In order to make sure everyone with PI/WD claims receives their fair share, the PI/WD Trustee will determine an initial payment percentage to be paid to you and other holders of claims based on the final determination of value. Everyone whose claims have been determined in a final determination will receive the same payment percentage, which will be based on the final determination amount, and the PI/WD Trustee will determine the percentage based on the amount of assets available to distribute. As the amount of assets available for distribution increases, the PI/WD Trustee will determine when additional payments should be made and will make those payments in the same way, with each claimant receiving same percentage of the final value of their claim.

For example, if the total amount of all allowed PI/WD claims is $90 million, and the PI/WD Trust assets available for distribution are worth $30 million, then each claimant would receive distributions equal to 33.3% of the value of his or her claim ($30 million / $90 million = 33.3%). The trust assets available for distribution are the numerator and the total amount of allowed claims is the denominator. In this scenario (*i.e.*, assuming a final payment percentage of 33.3%), the holder of an allowed PI/WD claim for wrongful death valued at $1.2 million would receive payments totaling $400,000, subject to the provisions of the PI/WD Trust Distribution Procedures, including those provisions regarding lien resolution set forth in Article IV.M of the PI/WD Trust Distribution Procedures. This Disclosure Statement includes the TCC's best estimate as to the range of potential recoveries and describes the risk factors that are relevant thereto. The payment percentage for PI/WD claim could be less than 33.3%. The TCC's

projections as to potential recoveries for PI/WD claimants who elect to participate in the PI/WD Trust (i.e., the "high" and the "low" is attached to this Disclosure Statement at **Schedule 3**.

If you have a claim that is not a PI/WD claim, your claim is referred to as a general unsecured claim or GUC claim. For those claims, the GUC Trustee will first evaluate your claim on basic eligibility requirements. If the GUC Trustee determines your claim is legally valid, the PI/WD Trustee will evaluate your claim and provide you a proposed value for your claim. If you accept the PI/WD Trustee's proposed value for the claim, that value will be a final determination of value for your claim. If you disagree with the PI/WD Trustee's proposed value or determination of eligibility, you will have the opportunity to request a reconsideration with an additional neutral party, who may recommend that the trustee revise its conclusion. If the neutral does not recommend revision, or if it does and the trustee declines to accept that recommendation, you can ask the Bankruptcy Court to make a final determination of the value of your claim.

Once the value of your GUC claim is determined, that value will determine your share of distributions from the Plan. In order to make sure everyone with GUC claims receives their fair share, the GUC Trustee will determine an initial payment percentage to be paid to you and other holders of claims based on the final determination of value. Everyone whose claims have been determined in a final determination will receive the same payment percentage, which will be based on the final determination amount, and the GUC Trustee will determine the percentage based on the amount of assets available to distribute. As the amount of assets available for distribution increases, the GUC Trustee will determine when additional payments should be made and will make those payments in the same way, with each claimant receiving the same percentage of the final value of their claim.

## WHY SHOULD I VOTE "YES" TO THE PLAN?

You should vote "yes" in support of the Plan because the Committees and the Debtor believe the Plan maximizes the value of the Debtor's assets, incorporates a settlement which provides for a fair and reasonable resolution to the Estate's claims, and outlines a process to get funds to creditors fairly and efficiently. The Committees and the Debtor worked diligently through multiple mediations to negotiate terms of a settlement that is favorable and ensures meaningful recoveries for creditors.

To be clear, you can vote "yes" and opt-out. Opting out of the Consensual Claimant Release and voting in favor of the Plan are two separate things. Parties who elect to opt-out, which is their right, may support the confirmation of the Plan because it may present the fastest path for them to pursue claims in the Civil Justice System. If the Plan is confirmed, (i) opt-out creditors will be free to pursue their claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System, and (ii) any opt-out creditor will not face litigation over whether their claims against YesCare Corp., CHS TX Inc., or any other alleged successor entity, to the extent asserted under the doctrine of successor liability, are Estate Causes of Action that can be settled by the Debtor's Estate. Parties who want the PI/WD Trust to be funded and go into effect may also want to vote in favor of and accept the Plan because if the Plan is not confirmed, then there will be no PI/WD Trust.

If the Plan is approved, creditors will receive significant value through cash, release of claims against the Debtor, rights to tax credits, refunds, and other Estate Causes of Action. If the Plan is not approved, the bankruptcy case will likely be converted to a chapter 7 liquidation, and a trustee will be appointed to pursue litigation or settlement with the same parties who are proposing to fund the Estate Party Settlement. A vote for the Plan will ensure that the Plan is approved by the Bankruptcy Court so that distributions can be made in the near term and so that claimant who want to return to the Civil Justice System can do so.

## WHAT IF I VOTE "NO" TO THE PLAN?

If the Debtor and Committee fail to collect the requisite number of "yes" votes, there is a chance that the Plan will not be approved by the Bankruptcy Court. By voting "no," you are not waiving your rights to distributions under the Plan, but you may be putting the Plan at risk of not being approved.

### WHAT IF I WANT TO OPT-OUT OF THE SETTLEMENT IN THE PLAN?

Each ballot or notice sent with the Court approved solicitation packet will contain an option for you to opt-out of the settlement and releases contained in the Plan in order to bring or continue actions against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. If you choose to accept a $5,000 settlement on your ballot, you may not choose to opt-out.

**If you choose this option, you will not be able to participate in the Plan Trusts.  Choosing to opt-out in this manner is an irrevocable choice, and the TCC and UCC encourage you to consult with counsel prior to electing this option.**

Claimants cannot opt-out of the Consensual Claimant Release under the Plan and participate in the Plan Trust.  Participating in the Plan Trusts is akin to entering into a voluntary settlement with YesCare and its insiders and affiliates.  YesCare will not fund the settlement payments unless it and non-debtor insiders and affiliates receive a release similar in scope to the release that a claimant would be required to sign as a condition to entering into a voluntary settlement outside of bankruptcy.  The Consensual Claimant Release mirrors this type of release.

To be clear, the decision to opt-out of the Consensual Claimant Release or not opt-out and participate in the Plan Trusts will have no impact on your ability to pursue co-liable parties, including governmental claimants, that are not Released Parties.  Participating in the Plan Trusts is akin to entering into a good faith settlement with one of several defendants in the tort system.  The plaintiff can continue to pursue co-liable defendants that do not settle.  If you want to receive a distribution from a Plan Trust and retain the right to seek recoveries from governmental units, you should not opt-out of the Consensual Claimant Release.

### WHAT IF I WANT TO OPT-OUT OF THE DISTRIBUTIONS IN THE PLAN TO PURSUE AN INSURANCE RECOVERY?

Each ballot or notice sent with the Court approved solicitation packet will also contain an option for you to opt-out of the settlement and releases contained in the Plan to bring or continue actions in the Civil Justice System against the Debtor for the purpose of pursuing a recovery of insurance proceeds.  Choosing this option is not opting out of the settlement in the Plan.  If you choose this option, you may include additional appropriate co-defendants in these actions as long as they are not the parties being released in the settlement.  If you choose to accept a $5,000 settlement on your ballot, you may not choose to opt-out of the settlement and releases contained in the Plan to bring or continue actions against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System, and you may not choose the option to bring or continue actions in the Civil Justice System against the Debtor for the purpose of pursuing a recovery of insurance proceeds.

Claimants who make this election will still be deemed to provide the Consensual Claimant Release and are not true opt-outs in this respect.  Rather, their recoveries will be limited to available insurance coverage, if any, unless they elect to return to the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures.  By providing the Consensual Claimant Release, these claimants will have the ability to test the waters in the Civil Justice System to pursue insurance recoveries while, at the same time, retaining an ability to return to the PI/WD Trust under certain circumstances.  Information regarding the insurance policies that may provide coverage for PI/WD claims is attached hereto at **Schedule 2**.

The TCC anticipates that PI/WD claimants who make this election will promptly enter into mediation with potentially responsible insurers and other parties that may be co-liable for the applicable PI/WD Claims and that are also insureds under the policies.  Claimants that are considering this option should carefully review this Disclosure Statement and the TDPs and consult with their legal counsel before making any decisions.  The inclusion of this option was important to the TCC because it should enable PI/WD claimants with access to significant insurance recoveries with the ability to obtain those recoveries in a manner similar to what could happen if this Chapter 11 Case were converted to chapter 7 and no Plan is confirmed.  Thus, the Plan supported by the TCC and the UCC should satisfy the so-called "best interests" test under the Bankruptcy Code.

**WHERE DO I SEND MY BALLOT OR OPT-OUT FORM?**

Your ballot form should be mailed to Verita Global, the Debtor's Solicitation Agent.  Alternatively, you may fill out your ballot online using the electronic key and password mailed to you.

*YOUR BALLOT OR OPT-OUT FORM WILL NOT BE COUNTED IF YOU SEND IT TO THE BANKRUPTCY COURT OR ANYONE OTHER THAN VERITA GLOBAL.*

**DO I NEED TO HIRE AN ATTORNEY TO EXPLAIN MY OPTIONS TO ME?**

The Proponents have prepared this Disclosure Statement in plain English wherever possible in order to make it easier for creditors to understand.  However, the Proponents encourage all parties to seek legal counsel before making any decisions.  If you do not already have legal counsel, the Committees encourage you to contact counsel for the respective Committees and seek their assistance in answering questions or helping you locate appropriate counsel.

If you need help filling out your ballot, you are welcome to call Verita Global, the Debtor's Claims Agent, at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International).  Please note, however, that Verita Global, as well as counsel to the Debtor and counsels to the Committee, are not your attorneys and cannot offer you legal advice.

If you want to object to the Plan or this Disclosure Statement, the Debtor and the Committee encourage you to hire counsel to file an appearance on your behalf.

**WHAT ARE THE DEADLINES FOR ME TO RESPOND?**

Below are the key dates and deadlines relevant to the Plan:

- Ballots and Opt-Out Forms Due:
- Confirmation Objection Deadline:
- Hearing to Consider Confirmation of the Plan:

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN AS A DESCRIPTION OF THE PLAN AND THE CHAPTER 11 CASE, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE LEGAL EFFECT OF THE PLAN ON HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING, AND CONTAINS ESTIMATES, FORECASTS AND ASSUMPTIONS WHICH MAY PROVE TO BE MATERIALLY DIFFERENT FROM ACTUAL RESULTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATE ON WHICH THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR INDEPENDENT VERIFICATION.  THE INFORMATION CONTAINED HEREIN AND THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON OTHER THAN THOSE CONTAINED HEREIN SHOULD NOT BE RELIED UPON.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL TO THE DEBTOR AND THE COMMITTEE.

THE SECURITIES AND EXCHANGE COMMISSION HAS NEITHER APPROVED NOR DISAPPROVED THIS DISCLOSURE STATEMENT, NOR HAS IT PASSED UPON THE ADEQUACY OR ACCURACY OF THE STATEMENTS CONTAINED HEREIN.

**TABLE OF CONTENTS**

Page

I.   **General Information** ....................................................................................................................**1**
     A.   Purpose of this Disclosure Statement ..................................................................................1
     B.   General Information Concerning Chapter 11 ......................................................................1
     C.   General Information Concerning Treatment of Claims and Interests ................................1
     D.   Classes Impaired under a Plan ............................................................................................2
     E.   Voting and Opt-Out Rights .................................................................................................3
          1.   Voting on the Plan ....................................................................................................3
          2.   Opt-Out Rights..........................................................................................................3
     F.   Confirmation and Consummation .......................................................................................3
          1.   Acceptance of the Plan .............................................................................................3
          2.   Confirmation Without Acceptance By All Impaired Classes ...................................4
          3.   Best Interests Test .....................................................................................................4

II.  **Background and Events Leading Up to Chapter 11**...................................................................**5**
     A.   The Debtor's Business and Operations ...............................................................................5
     B.   Perigrove Acquisition .........................................................................................................5
     C.   Transfers to Geneva Consulting, LLC and M2 LoanCo, LLC ...........................................6
     D.   The Divisional Merger .........................................................................................................6
     E.   Events Leading to Chapter 11 .............................................................................................7

III. **The Debtor's Chapter 11 Case** ...............................................................................................**8**
     A.   Post-Filing Activities ..........................................................................................................8
          1.   The DIP Motion and the DIP Orders .......................................................................8
          2.   The Stay Extension Motion and Adversary Proceeding ...........................................8
          3.   Data Incident .............................................................................................................9
          4.   The Trustee Motion ...................................................................................................9
          5.   The Initial Mediations ...............................................................................................9
          6.   The Formation of the Tort Claimants' Committee. ................................................10
          7.   The Second Mediation. ...........................................................................................10
          8.   The Motion to Approve Settlement and Motion to Dismiss. ..................................10
          9.   Potential Estate Causes of Action. .........................................................................11
          10.  The Third Mediation ...............................................................................................14
          11.  The Estate Party Settlement. ..................................................................................14
     B.   Exclusivity .........................................................................................................................16
     C.   Bar Date .............................................................................................................................16
     D.   Claims Against the Debtor .................................................................................................16
          1.   In General ................................................................................................................16
          2.   Administrative Expense Claims and Professional Fee Claims ...............................16
          3.   DIP Claims ..............................................................................................................17
          4.   Synergi Administrative Claim .................................................................................17
          5.   Priority State and Federal Tax Claims ....................................................................17

IV.  **The Plan** ....................................................................................................................................**17**
     A.   Summary of Key Plan Provisions ......................................................................................18
     B.   Treatment of Classes of Claims and Interests ...................................................................19
          1.   Class 1 — Other Priority Claims ............................................................................19
          2.   Class 2 — Other Secured Claims ............................................................................19
          3.   Class 3 — Convenience Claims...............................................................................20
          4.   Class 4 — Channeled General Unsecured Claims ..................................................20
          5.   Class 5 — Opt-Out General Unsecured Claims ......................................................21
          6.   Class 6 — Channeled PI/WD Claims ......................................................................21
          7.   Class 7 — Opt-Out PI/WD Claims .........................................................................22
          8.   Class 8 — Opt-Out Insured PI/WD Claim ..............................................................22

|  |  | 9. | Class 9 — Channeled Indirect Claims | 23 |
|  |  | 10. | Class 10 — Opt-Out Indirect Claims | 24 |
|  |  | 11. | Class 11 — Interests in the Debtor | 24 |
|  | C. | Settlement, Release, Exculpation, and Injunction Provisions | | 24 |
|  |  | 1. | Released Parties, Settlement Parties and Exculpated Parties | 24 |
|  |  | 2. | Estate Release | 25 |
|  |  | 3. | Other Releases | 25 |
|  |  | 4. | Exculpation | 27 |
|  |  | 5. | Injunction | 27 |
|  |  | Reservations | 28 | |
|  |  | Enforcement | 29 | |
|  |  | Termination of Channeling Injunction | | 29 |
|  |  | Tolling of Statute of Limitations | | 29 |

**V.** **The GUC Trust and the PI/WD Trust** **30**
|  | A. | The Trusts Generally | 30 |
|  | B. | Preservation of Causes of Action | 30 |
|  | C. | The GUC Trust | 31 |
|  |  | 1. | GUC Trust Assets | 31 |
|  |  | 2. | GUC Trust Claims Administration Process. | 31 |
|  |  | 3. | GUC Trust Distributions. | 32 |
|  | D. | The PI/WD Trust | 32 |
|  |  | 1. | PI/WD Trust Assets | 32 |
|  |  | 2. | PI/WD Trust Claims Administration Process. | 32 |
|  |  | 3. | PI/WD Claims Allowance. | 34 |

**VI.** **Risk Factors** **34**
|  | A. | Bankruptcy Law Considerations | 34 |
|  |  | 1. | The Debtor Will Consider All Available Alternatives if the Plan Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor | 34 |
|  |  | 2. | Risks Related to Confirmation and Consummation of the Plan | 34 |
|  | B. | Risks Related to Recoveries Under the Plan | 36 |
|  |  | 1. | Estimated Recoveries to Holders of Allowed Claims and Interests Are Based on Assumptions and May Vary from Actual Recoveries | 36 |
|  |  | 2. | Litigation Matters | 37 |
|  | C. | Miscellaneous Risk Factors and Disclaimers | 37 |
|  |  | 1. | The Financial Information Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed | 37 |
|  |  | 2. | No Legal or Tax Advice Is Provided by This Disclosure Statement | 37 |
|  |  | 3. | No Admissions Made | 37 |
|  |  | 4. | Failure to Identify Litigation Claims or Projected Objections | 38 |
|  |  | 5. | Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors | 38 |
|  |  | 6. | No Representations Outside This Disclosure Statement Are Authorized | 38 |
|  |  | 7. | No Duty to Update | 38 |

**VII.** **Certain U.S. Federal Tax Consequences of the Plan** **38**
|  | A. | Introduction | 38 |
|  | B. | Certain U.S. Federal Income Tax Consequences to the Debtor | 39 |
|  | C. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Classes 4 and 5 | 40 |
|  |  | 1. | Tax Treatment of the GUC Trust and GUC Claimants | 40 |
|  |  | 2. | Tax Treatment of the PI/WD Trust and PI/WD Claimants | 42 |
|  | D. | Accrued Interest | 42 |
|  | E. | Market Discount | 42 |

F.      Withholding and Information Reporting......................................................................43

**VIII.**    **Conclusion and Recommendation...........................................................................43**

<u>**SCHEDULES AND EXHIBITS**</u>

Schedule 1        Liquidation Analysis

Schedule 2        Professional Liability Insurance Policy Information

Schedule 3        PI/WD Claimant Recovery Analysis

Exhibit A         Chapter 11 Plan

Exhibit B         Form of PI/WD Trust Distribution Procedures

Exhibit C         Form of PI/WD Trust Agreement

Exhibit D         Form of GUC Trust Agreement

## I.  General Information

### A.      Purpose of this Disclosure Statement.

This Disclosure Statement has been prepared by the Plan Proponents to provide information to enable Holders of Claims and Interests, who are entitled to vote on the Plan, to make an informed judgment about the Plan. Confirmation of the Plan pursuant to chapter 11 of the Bankruptcy Code depends, in part, upon the receipt of a sufficient number of votes in favor of the Plan.  However, Holders of Claims and Interests whose Claims and Interests, respectively, are unimpaired are deemed to have conclusively accepted the Plan and are not entitled to vote thereon. As set forth in this Disclosure Statement, Holders of Claims in Classes 1 and 2 are unimpaired and deemed to have accepted the Plan.  Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10 are impaired and entitled to vote to accept or reject the Plan.  Holders of Interests in Class 11 are impaired and deemed to have rejected the Plan.

On November 13, 2024, after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Solicitation Order"), pursuant to section 1125 of the Bankruptcy Code, approving this Disclosure Statement as containing "adequate information."  "Adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the Holders of Claims and Interests in the Chapter 11 Case, that would enable such hypothetical investor to make an informed judgment about the Plan.

### B.      General Information Concerning Chapter 11.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor in possession attempts to reorganize, or liquidate, its business for the benefit of itself, its creditors and equity interest holders.

The commencement of a chapter 11 case creates an Estate, comprised of all legal and equitable interests of the debtor in property as of the date the petition is filed, wherever located and by whomever held.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. The Debtor is operating as a debtor in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362(a) of the Bankruptcy Code provides for, among other things, an automatic stay of all attempts to collect prepetition debts against the debtor or to otherwise interfere with the debtor's property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the time a chapter 11 plan is confirmed under section 1129 of the Bankruptcy Code.

The formulation of a plan is the principal purpose of a chapter 11 case.  A plan sets forth the means for satisfying the claims against and equity interests in the debtor.  Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case.  A debtor is generally then given 60 additional days during which it may solicit acceptance of its plan.  The deadlines may be extended or reduced by the court upon a showing of "cause."  In this case, the Debtor's exclusive right to file and solicit a plan was extended multiple times, but has expired.

### C.      General Information Concerning Treatment of Claims and Interests.

A chapter 11 plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  After a chapter 11 plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a chapter 11 plan must classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides claims and equity interests into classes and sets forth the treatment for each class.  In accordance with section 1123(a) of the Bankruptcy Code, Administrative Claims have not been classified in the Plan.  A debtor is also required, under section 1122 of the Bankruptcy Code, to classify claims and equity interests into classes that contain claims and equity interests that are substantially similar

to the other claims and equity interests in such class.  The Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122.

The table below provides a summary of the classification, description, and treatment of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Article IV.B of this Disclosure Statement.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Convenience Claims | Impaired | Entitled to Vote |
| 4 | Channeled GUC Claims | Impaired | Entitled to Vote |
| 5 | Opt-Out GUC Claims | Impaired | Entitled to Vote |
| 6 | Channeled PI/WD Claims | Impaired | Entitled to Vote |
| 7 | Opt-Out PI/WD Claims | Impaired | Entitled to Vote |
| 8 | Opt-Out Insured PI/WD Claims | Impaired | Entitled to Vote |
| 9 | Channeled Indirect Claims | Impaired | Entitled to Vote |
| 10 | Opt-Out Indirect Claims | Impaired | Entitled to Vote |
| 11 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.**     **Classes Impaired under a Plan.**

Only classes of impaired claims or equity interests may vote to accept or reject a plan.  A class is "impaired" if the legal, equitable, or contractual rights relating to the claims or equity interests in that class are modified by the plan.  Modification for purposes of determining impairment, however, does not include curing defaults or reinstating maturity.  Classes of claims or equity interests that are not "impaired" under a chapter 11 plan, and each member of such class, are conclusively deemed to have accepted the plan and thus are not entitled to vote.  Similarly, classes of claims or equity interests that will neither receive nor retain any property under a plan are deemed to not have accepted the plan and are thus not entitled to vote.  Accordingly, acceptances of a plan will only be solicited from holders of claims and/or equity interests in impaired classes that may receive distributions under the plan.

As set forth in section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a chapter 11 plan unless, with respect to such class, the plan:  (1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default: (a) cures any such default that occurred before or after the commencement of the case, other

than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as it existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; (d) if the claim or interest arises from a failure to perform a non-monetary obligation (other than a default from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A)), compensates the holder (other than the debtor or an insider) for any actual pecuniary loss incurred by the holder as a result of such failure; and (e) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

All Holders of Claims in Classes 1 and 2 are unimpaired, as they will be paid in full. As a result, all Holders of Claims in Classes 1 and 2 are conclusively deemed to have accepted the Plan. Holders of Claims in Class 11 will receive no distributions or interest under the Plan, and as a result are deemed to have rejected the Plan pursuant to the Bankruptcy Code. The Committees and Debtor are seeking the votes of Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10.

**E.      Voting and Opt-Out Rights.**

**1.      Voting on the Plan.**

Any Holder of a Claim whose Claim is not scheduled or scheduled as disputed, contingent, or unliquidated must have timely filed, or be deemed to have timely filed, a personalized Proof of Claim prior to the Claims Bar Date, and any Holder of a Claim that failed to do so shall not be entitled to vote on the Plan. Holders of Claims in Classes 3-10 who timely filed, or are deemed to have timely filed, a personalized Proof of Claim are impaired under the Plan and are entitled to vote to accept or reject the Plan. A Ballot casting a vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such Ballot was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**2.      Opt-Out Rights.**

The Plan provides two separate and mutually exclusive opt-out options which can be elected on each Ballot. First, Holders of all Claims may elect to opt-out of the Plan and the settlement incorporated therein and choose to pursue claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System. This election must be made prior to the Voting Deadline. This election is irrevocable and a Holder of a Claim who makes this election will be ineligible to participate in distributions from the Plan Trusts.

Second, Holders of PI/WD claims may elect to opt-out of the Plan for the purpose of pursuing recoveries available under the Debtor's insurance policies. This election must be made prior to the Voting Deadline. Holders of Claims who make this election will not be entitled to receive distributions from the PI/WD Trust beyond any insurance recoveries they receive. This election is automatically reversed ninety (90) days after the Effective Date unless the Holder of the Claim provides written notice otherwise and may be subsequently reversed if the PI/WD Trustee determines that certain criteria outlined in the PI/WD Trust Documents are met.

**F.      Confirmation and Consummation.**

There are two methods by which a plan may be confirmed: (i) the "acceptance" method, pursuant to which all impaired classes of claims and interests have voted in the requisite amounts to accept the plan and the plan otherwise complies with section 1129(a) of the Bankruptcy Code; and (ii) the "cram-down" method under section 1129(b) of the Bankruptcy Code, which is available even if classes of claims vote against the Plan.

**1.      Acceptance of the Plan.**

A plan is accepted by an impaired class of claims if the holders of at least two-thirds (⅔) in amount and more than one-half (½) in number of the allowed claims in such class actually voting vote to accept the plan. A plan is

accepted by an impaired class of equity interests if holders of at least two-thirds (⅔) in amount of allowed equity interests in such class actually voting vote to accept the plan.

**BALLOTS THAT ARE SIGNED BUT THAT DO NOT EXPRESSLY INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL BE DISREGARDED.**

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class entitled to vote or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or equity interest in such class (*see* discussion of "Best Interests Test" below).

2.      **Confirmation Without Acceptance By All Impaired Classes.**

Under section 1129 of the Bankruptcy Code, the Debtor has the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by a class of Claims.

A plan may be confirmed notwithstanding its rejection by one or more classes of claims or equity interests if, in addition to satisfying the applicable requirements of section 1129(a) of the Bankruptcy Code, the plan (1) is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan and (2) does not "discriminate unfairly."

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of unsecured claims if, with respect to such dissenting class either (a) the plan provides that each holder of a claim of such class receive or retain property of a value equal to the allowed amount of such claim, or (b) no holders of junior claims or equity interests receive or retain any property under the plan on account of such junior claims or interests.

This fair and equitable standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or equity interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property under the plan on account of such claims or interests.  The Proponents believe that if a non-consensual confirmation is necessary, the requirements for non-consensual confirmation will be met and the Plan will be confirmed despite its rejection by any impaired dissenting Class of Claims.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Proponents believe that the Plan meets this requirement with respect to any Class of Claims that might reject the Plan, because classes of equal rank are treated equally under the Plan.

3.      **Best Interests Test.**

Notwithstanding acceptance of the Plan by each impaired Class, in order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in an impaired Class who has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides for each Holder of a Claim or Interest in such Class to receive or retain on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount each such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

In this case, the Debtor is liquidating. As a result, and by implication, constituents will receive under the Plan at least what they would otherwise receive if the chapter 11 case was converted and the Debtor was liquidated in chapter 7. To demonstrate compliance with the best interests test, the Debtor, in consultation with the Committees, and with the assistance of its financial advisor, prepared the liquidation analysis attached hereto as **Schedule 1**.  The liquidation analysis shows that the value of the distributions provided to Holders of Allowed Claims under the Plan

would be the same or greater than under a hypothetical chapter 7 liquidation.  Accordingly, the Proponents believe that the Plan is in the best interests of creditors.

## II.   Background and Events Leading Up to Chapter 11

### A.   The Debtor's Business and Operations.

The Debtor (formerly known as Corizon Health, Inc., a Texas corporation) was a nationwide provider of correctional healthcare, providing services in multiple states across the United States.[1]  In the ordinary course of its business, the Debtor entered into agreements with various (typically governmental) entities under which the Debtor would provide, or arrange for the provision of, healthcare services to certain inmates or detainees of the contract counterparty.

### B.   Perigrove Acquisition.

By the end of 2021, the Debtor was facing dire financial conditions due to loss of major governmental contracts and significant litigation exposure.

In December 2021, the Debtor's ultimate parent, M2 HoldCo, LLC ("HoldCo") was acquired by Perigrove 1018, LLC ("Perigrove 1018").  Perigrove 1018 is affiliated with Perigrove, LLC ("Perigrove").  The Debtor believes that prior to the Perigrove acquisition, the Debtor's secured lender was M2 LoanCo, LLC ("LoanCo").  The Debtor contends that the loans were originated by other lenders in 2017 and acquired by LoanCo in or around June 2020.  LoanCo is an affiliate of the Debtor by common ownership.  The Committee disputes that this purported lender-borrower relationship was genuine and believes that the purported debt obligation was canceled and/or converted to equity by the actions, transactions, course of dealing, tax filings, and statements of the Debtor and LoanCo.  When Perigrove 1018 acquired HoldCo, it also acquired LoanCo.  The Debtor believes that as of February 28, 2022, the amount of secured debt owed by the Debtor to LoanCo was in excess of $97.8 million.

The Debtor's organizational structure as it existed in December 2021, when HoldCo was acquired by Perigrove 1018, was as follows:

---

[1]    In this section, all references to "Debtor" include any predecessor entity that merged into the Debtor as a result of the transactions discussed below.



**C.     Transfers to Geneva Consulting, LLC and M2 LoanCo, LLC.**

In December 2021, the Debtor's immediate parent company, Valitás Health Services, Inc. ("Valitás Health") entered into a Consulting Agreement with Geneva Consulting, LLC ("Geneva"). Geneva is related to Perigrove. The Consulting Agreement called for an initial retainer of $3 million with $500,000 monthly payments for the duration of the agreement. Between December 2021 and May 2022, Valitás Health paid Geneva $5.5 million, consisting of the initial $3 million retainer, plus five monthly installments of $500,000 each.

Also in December 2021, the Debtor and its subsidiary Corizon, LLC each opened a bank account at Signature Bank (the "Signature Accounts"). The remainder of the Debtor's bank accounts, all of which pre-dated the Perigrove acquisition, were at Bank of America. Individuals affiliated with Perigrove were the sole signors on the Signature Accounts. The Debtor's CFO and existing management did not have access to the Signature Accounts. Between December 2021 and May 2022, $23.3 million was transferred from the Debtor's Bank of America accounts to the Signature Accounts.

Between December 2021 and November 2022, the Debtor transferred approximately $24.5 million from the Signature Accounts to LoanCo. LoanCo has disputed this aggregate amount. During the same period, the Debtor made additional transfers to Perigrove, DG Realty Management LLC and PharmaCorr LLC, entities related to Perigrove. However, the Debtor received subsequent transfers in the same amounts of the outgoing transfers that were made to these entities.

**D.     The Divisional Merger.**

In early 2022, the Debtor's board of directors, with the help of outside counsel, began considering restructuring alternatives other than bankruptcy. One restructuring option was a combination merger and divisional merger under the Texas Business Organizations Code (the "TBOC")—a statutory framework that allows one or more corporate entities to merge into one or more surviving or new legal entities and allocate assets and historical liabilities among the resulting entities.

In May 2022, the Debtor and several of its affiliates, including Corizon, LLC, Valitás Health, and Corizon Health of New Jersey, LLC (collectively, the "Merger Entities") executed a corporate reorganization effectuated

through two merger transactions under the TBOC: a combination merger and a divisional merger. The following steps comprised the combination merger:

     a.     On April 28, 2022, the Debtor (previously incorporated in Delaware) converted to a Texas corporation.

     b.     The Debtor and each Merger Entity merged pursuant to a plan of combination merger under Texas law (the "Combination Merger").

     c.     The Debtor filed the Certificate of Combination Merger with the Texas Secretary of State on May 2, 2022, and the Combination Merger became effective on May 5, 2022.

     d.     The Debtor was the sole survivor of the Combination Merger and was vested with all assets and liabilities of the Merger Entities. The Merger Entities ceased to exist.

The Debtor then effectuated a divisional merger as follows:

     a.     The Debtor drafted the Plan of Divisional Merger (the "Plan of Divisional Merger"), which provided that CHS TX, Inc. ("CHS") would be formed and documented which assets and liabilities were to remain with the Debtor and which were to be allocated to CHS.

     b.     The approved Plan of Divisional Merger was in writing and included all information required by the TBOC.

     c.     The Debtor filed the Certificate of Merger and Certificate of Formation for CHS. with the Texas Secretary of State on May 3, 2022, and the divisional merger became effective on May 5, 2022.

     d.     LoanCo and the Debtor agreed to a funding agreement (the "Funding Agreement") pursuant to which LoanCo would pay or cause to be paid funding to the Debtor up to an aggregate cap of $15 million for payment of the Debtor's costs of operations and certain liabilities that arose prior to the divisional merger.

     e.     On May 11, 2022, the Texas Secretary of State approved and accepted the Certificate of Merger and Certificate of Formation for CHS, effective as of May 5, 2022. CHS was subsequently acquired by YesCare Corp. ("YesCare").

     f.     On June 1, 2022, the Debtor changed its name from Corizon Health, Inc. to Tehum Care Services, Inc.

Pursuant to the divisional merger, the Debtor remained in existence and was allocated and remained vested with all inactive and expired customer contracts, as well as all historical liabilities related to such contracts. The Plan of Divisional Merger agreement states that in return, the Debtor was released from its secured debt obligations to LoanCo, which were allocated to CHS. As part of the divisional merger, the Debtor was allocated $1 million in cash, as well as the right to draw on the $15 million Funding Agreement.

**E.     Events Leading to Chapter 11.**

After the divisional merger, the Debtor was no longer an operating entity with active contracts or medical service providers. Between May 2022 and February 2023, the Debtor sought to wind down its remaining business out of court. During the same period, LoanCo asserts that it caused over $39 million to be paid to the Debtor's creditors pursuant to the Funding Agreement and a subsequent loan agreement.

However, the Debtor continued to be plagued by litigation. On November 1, 2022, the Debtor entered into a Claims Management Services Agreement with Sigma RM, LLC ("Sigma"). Sigma represents that it is owned by a

group of the Debtor's former in-house counsel and litigation support staff. Pursuant to that Claims Management Services Agreement, the Debtor paid Sigma $150,000 per month.

The prepetition lawsuits filed against the Debtor generally fall into three categories: (a) vendor lawsuits, typically asserting breach of contract claims against the Debtor for unpaid invoices; (b) PI/WD lawsuits, typically asserting medical malpractice and related claims against the Debtor; and (c) employment lawsuits, asserting employment discrimination or similar claims against the Debtor.

This ongoing litigation and potential exposure ultimately led the Debtor to conclude a chapter 11 process was necessary to maximize and expedite creditor recoveries.

### III. The Debtor's Chapter 11 Case

The Debtor's Chapter 11 Case was commenced by the filing of a voluntary chapter 11 petition on February 13, 2023 (the "Petition Date").[2] The Chapter 11 Case is pending before the Honorable Christopher M. López in the United States Bankruptcy Court for the Southern District of Texas.

**A.    Post-Filing Activities.**

**1.    The DIP Motion and the DIP Orders.**

As of the Petition Date, the Debtor had no cash on hand and because it was no longer an operating entity, had no means to obtain additional revenues. The Debtor was not allocated any tangible real property under the divisional merger and, as of the Petition Date, though the Debtor was the beneficiary under the Funding Agreement, it did not appear that any additional amounts were available thereunder.[3] As a result, the Debtor was left with only potential Estate causes of action, tax refunds and similar receivables as potential collateral for post-petition financing.

On March 15, 2023, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 185] (the "DIP Motion"). The DIP Motion set forth the terms of a senior secured loan facility in an aggregate principal amount of up to $10,000,000 (the "DIP Facility") funded by LoanCo.

On March 22, 2023, the Bankruptcy Court held a hearing and entered the *Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 243] (the "First Interim DIP Order"), which has been amended and supplemented pursuant to Docket No. 476 (the "Second Interim DIP Order"), Docket No. 579 (the "Third Interim DIP Order") Docket No. 993 (the "Fourth Interim DIP Order), and Docket No. 1669 (the "Fifth Interim DIP Order," and together with the First Interim DIP Order, Second Interim DIP Order, Third Interim DIP Order, and Fourth Interim DIP Order, the "DIP Orders").

**2.    The Stay Extension Motion and Adversary Proceeding.**

On February 17, 2023, the Debtor filed its *Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 7] (the "Original Stay Motion"). By the Original Stay Motion, the Debtor sought to confirm the automatic

---

[2]    On February 14, 2023, the Debtor also filed a voluntary chapter 11 petition in the U.S. Bankruptcy Court for the Western District of Missouri, Case No. 23-40176-can11, which was administratively closed on March 2, 2023. The same day, February 14, 2023, the Debtor removed a pending lawsuit filed by plaintiffs The Curators of The University of Missouri and Capital Region Medical Center against the Debtor, CHS TX, Inc, and YesCare Corp.

[3]    The Debtor's professionals conducted an analysis of the amounts distributed pursuant to the Funding Agreement and determined that LoanCo funded at least $15 million to the Debtor's costs of operation and certain liabilities that arose prior to the divisional merger.

stay applied to, or extend the automatic stay to cover, certain Non-Debtor Indemnified Parties (as defined in the Original Stay Motion) that were party to the Debtor's prepetition lawsuits.

On March 3, 2023, the Bankruptcy Court entered its *Order Regarding Debtor's Emergency Motion to Extend and Enforce the Automatic Stay* [Docket No. 118] (the "Stay Order"). The Stay Order extended the automatic stay for 75 days to cover the litigation claims set forth on Exhibit 1 thereto.

On March 23, 2023, the Debtor commenced Adversary Proceeding No. 23-03049 (the "Adversary Proceeding") by filing its (i) *Complaint Seeking (I)(A) a Declaratory Judgment that the Automatic Stay Applies to Certain Claims and Causes of Actions Asserted Against Certain Non-Debtors and (B) an Extension of the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) a Preliminary Injunction Related to Such Actions* [Adv. No. 23-03049, Docket No. 1] (the "Adversary Complaint") and (ii) *Motion for an Order (I)(A) Declaring that the Automatic Stay Applies to Certain Claims and Causes of Action Asserted against Certain Non-Debtors and (B) Extending the Automatic Stay to Certain Non-Debtors, or in the Alternative, (II) Preliminary Enjoining Such Actions* [Adv. No. 23-03049, Docket No. 2] (the "Adversary Stay Motion"). The Adversary Stay Motion sought substantially the same relief as the Original Stay Motion.

The Adversary Stay Motion was set for hearing on May 17, 2023. All matters related to the Stay Order were subsequently adjourned to a date no earlier than August 31, 2023 [Docket No. 841]. At the Bankruptcy Court's suggestion, the Debtor has entered into stipulations with certain plaintiffs allowing them to proceed with their litigation under the circumstances set forth in the stipulations. *See* Docket Nos. 237, 463, 578, 641, 645, 888, 898, 966, 977, 992, and 1063. As set forth by the Bankruptcy Court on April 11, 2024, the Stay Order has expired.

### 3.    Data Incident.

While this case was pending, the Debtor received notice of a data incident that could have impacted data belonging to the Debtor and other parties. Promptly after receiving such notice, the Debtor submitted a notice of claim to its applicable insurance carrier and engaged special data incident counsel. The Debtor's special counsel has not identified potential causes of action or liabilities with respect to the Debtor arising out of or related to the incident.

### 4.    The Trustee Motion.

On June 30, 2023, certain creditors filed a motion seeking the appointment of a chapter 11 trustee. *See Various Creditors' Motion to Appoint a Chapter 11 Trustee* [Docket No. 731] (the "Trustee Motion"). The Trustee Motion contained various allegations of prepetition fraud by the Debtor's sole director, as well as postpetition misstatements by the same individual. The Debtor objected to the Trustee Motion. Neither the United States Trustee nor the UCC joined in the Trustee Motion.

On September 5, 2023, the Bankruptcy Court held a hearing on the Trustee Motion. During the hearing, the UCC opposed the Trustee Motion. After considering the evidence and arguments of counsel, the Bankruptcy Court found that cause did not exist to appoint a chapter 11 trustee and denied the Motion. *See* Docket No. 932.

### 5.    The Initial Mediations.

On May 22, 2023, the Bankruptcy Court entered its *Stipulation and Agreed Order Regarding Appointment of a Mediator and Governing Related Mediation Procedures* [Docket No. 603] (the "Mediation Order"). The Mediation Order appointed the Honorable David R. Jones, then a current United States Bankruptcy Judge for the Southern District of Texas ("Judge Jones"), to mediate, among other things, (i) the releases sought in connection with the DIP Facility, (ii) the maximization of assets to be distributed through a chapter 11 plan, (iii) the Estate's claims against Debtor affiliates and related third parties, and (iv) the relief requested in the Adversary Complaint and Adversary Stay Motion. The Mediation Order also ordered the Debtor to invite its liability insurance carriers to participate in mediation(s).

In the first eight months of the case, the UCC and the Debtor participated in three (3) separate mediations pursuant to the Mediation Order, each as described below.

(a)        **The LSA Mediation.**

On July 13 and 14, 2023, Judge Jones conducted a mediation between the Debtor, the UCC, and Lone Star Alliance, Inc. ("LSA").

(b)        **The First Mediation.**

On August 21, 22 and 23, 2023, Judge Jones conducted a mediation between the Debtor, the UCC, YesCare, its wholly owned subsidiaries (including CHS TX, Inc.), Geneva, Perigrove 1018, Perigrove, HoldCo, LoanCo, and PharmaCorr LLC.[4]  This mediation focused on resolving the Estate's claims against these affiliate entities and certain related parties and individuals, including claims relating to the transfers referenced in Article II.C above, as well as claims relating to or arising out of the divisional merger.  The mediation resulted in a settlement which was ultimately abandoned by the Parties.

(c)        **The Lexington Mediation.**

On September 28, 2023, the Debtor, the UCC, and Lexington Insurance Company ("Lexington") participated in a mediation before Judge Jones.  The goal of the mediation was to reach an agreed-upon path to maximize the insurance proceeds available for claims that fall within the Debtor's professional liability policies issued by Lexington.

On October 7, 2023, as a result of a recently filed lawsuit, the *Wall Street Journal* published a story in which Judge Jones confirmed that he has been in a long-term romantic relationship with a lawyer who represented YesCare at the mediation.  This relationship was not disclosed to the Debtor or the UCC and the Debtor and the UCC were unaware of this relationship prior to the article's publication.  Shortly after the *Wall Street Journal* story, Judge Jones resigned his position.

6.        **The Formation of the Tort Claimants' Committee.**

In October 2023, in response to a request from certain PI/WD creditors and in accordance with the Bankruptcy Code, the United States Trustee constituted the Tort Claimants' Committee, consisting of a group of creditors who hold PI/WD claims against the Debtor.  The Tort Claimants' Committee immediately began gathering information in order to participate in mediation and settlement discussions and better understand the claims and estate causes of action in the case.

7.        **The Second Mediation.**

On November 8, 2023, the Debtor, the UCC, and the Settlement Parties filed a Stipulation and Proposed Order Regarding Appointment of Judge Christopher S. Sontchi and Governing Related Mediation Procedures seeking an Order from the Court authorizing a Second Mediation before a new mediator, Christopher S. Sontchi, former Chief Judge for the United States Bankruptcy Court for the District of Delaware.  This Second Mediation was held in December 2023, with the TCC, the UCC, the Settling Parties, and the Debtor participating.  The UCC, the Debtor and the Settlement Parties reached agreement on a proposed global settlement at the Second Mediation.  The TCC declined to join this proposed settlement, and subsequently opposed it.

8.        **The Motion to Approve Settlement and Motion to Dismiss.**

Following the Second Mediation, the UCC and the Debtor filed a motion asking the Court to approve the proposed global settlement reached at the Second Mediation.  The Motion to Approve the Settlement was supported by the members of the UCC and a subset of creditors.  The TCC, the United States Trustee, and a separate subset of creditors opposed the approval of the global settlement based on their assertions that the releases contained therein were improper and the amount of funds being contributed by the Settling Parties was insufficient.

---

[4]    YesCare, Geneva, Perigrove 1018, Perigrove, HoldCo, LoanCo, and PharmaCorr LLC are collectively referred to herein as the "Settling Parties."

At the same time, the TCC filed a Motion to Dismiss alleging that the Debtor had filed the bankruptcy case in bad faith due to the circumstances surrounding and emerging out of the divisional merger.  The United States Trustee and a subset of creditors supported the Motion to Dismiss, while the Debtor, the UCC, and a separate subset of creditors opposed it.

The Court set dates for an evidentiary hearing on both the Motion to Approve the Settlement and the Motion to Dismiss, and the TCC, UCC, and the Debtor engaged in extensive discovery prior to that hearing.  Following a multi-day hearing, the Court denied both motions and encouraged the parties to engage in further discussion aimed at seeking a mutually agreeable resolution.

9.  **Potential Estate Causes of Action.**

As outlined in the UCC's and the Debtor's motion to approve the proposed settlement reached at the Second Mediation, the UCC and the Debtor identified four main potential Estate Causes of Action against the Released Parties:

- **Avoidance Actions Against M2 Loan Co**.  At all relevant times, M2 LoanCo had two directors—Isaac Lefkowitz and Alan Rubenstein. M2 LoanCo had no employees and did not maintain e-mail records on its own server.  Based on the Debtor's and the UCC's review of the Debtor's bank records, and following formal and informal inquiries to Mr. Lefkowitz, Jeff Sholey (the Debtor's former CFO and YesCare's current CEO) and other members of the Debtor's former accounting staff, the Debtor and the UCC identified the following transfers made by the Debtor from its bank accounts to M2 LoanCo:

| | |
|---|---|
| 12/29/2021 | $10,000,000.00 |
| 12/30/2021 | $5,000,000.00 |
| 1/4/2022 | $2,300,000.00 |
| 1/5/2022 | $600,000.00 |
| 1/31/2022 | $5,000,000.00 |
| 2/18/2022 | $600,000.00 |
| 3/8/2022 | $10,000,000.00 |
| 3/9/2022 | ($10,000,000.00) |
| 5/17/2022 | $1,000,000.00 |
| 11/14/2022 | $25,572.19 |
| 11/14/2022 | $12,583.00 |
| **Total to M2 LoanCo** | **$24,538,155.19** |

Although M2 LoanCo disputes the Debtor's and the UCC's characterization of these transfers listed above,[5] the Debtor and the UCC believe the Estate could bring claims to avoid and recover these transfers as fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes.

- **Avoidance Actions Against Geneva**.  Perigrove 1018 acquired the equity ownership of the Debtor and M2 LoanCo from the Flacks Group in early December 2021, days before the Flacks Group had planned to commence a chapter 11 bankruptcy proceeding for the Debtor.  Within days of such acquisition, Perigrove 1018 appointed one of its directors, Isaac Lefkowitz, as the decision-maker for all of the companies. Mr. Lefkowitz, in turn, caused the Debtor to enter into a "Consulting Agreement" with Geneva on or about December 8, 2021.  The "Consulting Agreement" is between Valitás Health Services, Inc. and Geneva Consulting, LLC.  Mr. Lefkowitz signed the Consulting Agreement as the "Interim CEO" for Valitás.  A director listed on Perigrove's website signed the

---

5  For example, M2 LoanCo contends that it transferred $3.5 million and $1.5 million to Corizon on March 23, 2023, and March 24, 2023, respectively, and those transfers are not accounted for as credits in the chart above.

Consulting Agreement as "Director" of Geneva. Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon Health, Inc., and Jeff Sholey, the then CFO of Corizon Health, Inc., to transfer substantial sums to Geneva under the Consulting Agreement. On December 8, 2021, the Debtor transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement. The Debtor then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement. In all, the Debtor transferred $5.5 million to Geneva before the Petition Date.

| 12/9/2021 | $3,000,000.00 |
|---|---|
| 1/11/2022 | $500,000.00 |
| 2/7/2022 | $500,000.00 |
| 3/1/2022 | $500,000.00 |
| 4/1/2022 | $500,000.00 |
| 5/2/2022 | $500,000.00 |
| **Total to Geneva** | **$5,500,000.00** |

The Debtor and the UCC believe the Estate could bring claims to avoid and recover these transfers as fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes. Geneva disputes these claims.

- **Avoidance Actions Against Perigrove 1018-Related Parties**. In addition to the $30 million identified above, the Debtor and the UCC identified additional sums, totaling approximately $956,700, paid to Amerisource Bergen—a third-party vendor—to satisfy obligations of PharmaCorr, which ceased being a subsidiary of the Debtor under the Flacks Group's ownership and control:

| 1/31/2022 | $500,000.00 |
|---|---|
| 2/15/2022 | $456,707.08 |
| **Total to Amerisource Bergen** | **$956,707.08** |

Based on the records reviewed by the Debtor and the UCC, the Debtor and the UCC believe that Estate could bring claims to avoid and recover these transfers from Amerisource Bergen, PharmaCorr, or other related entities that benefited from the payment. Such transfers may be considered fraudulent transfers under 11 U.S.C. § 548 and applicable state fraudulent transfer statutes. PharmaCorr disputes these claims.

- **Avoidance Actions Related to the Divisional Merger**. As mentioned above, the transactions effectuated as part of the Divisional Merger caused the allocation of the Debtor's active contracts, employee assets, and other viable assets to CHS. The UCC believes that this allocation effectuated a "transfer" that may be subject to avoidance under 11 U.S.C. §§ 544 and 548 or other applicable state fraudulent transfer statutes. The Debtor and the UCC further believe that the financial advisory firm engaged to provide a fairness opinion on the transaction reached its fairness conclusions by relying on inaccurate information. The UCC believes that, had the financial advisory firm received accurate financials and disclosures, it would not have made the findings or recommendations reflected in the fairness opinion. When a fraudulent transfer claim is based on the transfer of an asset rather than an amount of money, damages for the transfer are calculated based on the value of the transferred asset at the time of the transfer. As a result, any potential damages for this claim would be based on a calculation of the value of the transferred assets as of the Divisional Merger.

As outlined in its opposition to the UCC's and the Debtor's motion to approve the proposed settlement reached at the Second Mediation, the TCC believes the following additional claims may have potential value:

- **Fraudulent Transfer Claims**.  The TCC agrees with the UCC the Estate could bring claims for fraudulent transfer based on the Divisional Merger.  The TCC believes that the Divisional Merger can be unwound as a fraudulent transfer.  State law allows for avoidance of actual fraudulent transfers made on or within 4 years before the petition date.  *See* Tex. Bus. & Comm. Code § 24.005.  The Divisional Merger occurred within the past 4 years, and the TCC asserts that the Divisional Merger was done with the actual intent to hinder, delay, and defraud creditors.  The Divisional Merger can also be challenged as a constructive fraud.  *Id.* at § 24.005(a)(2).  The Divisional Merger allocated the Debtor—an entity with no business operations—with little besides liabilities.  The Debtor was stripped of its assets.   The TCC's position is that Texas divisive merger statute does not sanction fraud.  The Texas statute does not "abridge any right or rights of any creditor under existing law."  Tex. Bus. Org. Code § 10.901.  When a party undertakes a "divisional merger" that is fraudulent, creditors can assert an array of rights and remedies under state law, including the right to challenge the transaction as a fraudulent transfer.  At least one court that has considered the application of fraudulent transfer law to a divisional merger has held that a divisional merger conducted under Texas law can be avoided as a fraudulent transfer.  *See, e.g., Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*, No. 21-03023-JCW (Bankr. W.D.N.C. July 7, 2022) (holding that it would be "contrary to all Anglo-American notions of fraudulent conveyance law" for the victims of a fraudulent divisional merger conducted under Texas law to have "no recourse" against the entity that received the operating assets).

- **Doctrine of Successor Liability**.  The TCC asserts that YesCare, CHS TX, and/or their affiliates are liable as the successor to Corizon Health, Inc.  Under state law, successor liability is not a cause of action.  Rather, successor liability is an equitable doctrine or a theory of liability that transfers liability for a claim from a predecessor to a successor when certain factors are present.  A successor may become liable for the debts of the predecessor when the transaction amounts to a consolidation or de facto merger, the transaction is fraudulent or done with the intent to escape liability, or the purchaser is a mere continuation of the seller.  The TCC asserts that YesCare is a mere continuation of Corizon Health, Inc. and that its business operations are identical.  The TCC asserts that the Divisional Merger was fraudulent and was done with the intent to escape liability, and that there was a continuity of shareholders, normal business operations continued without interruption, and the Debtor commenced a bankruptcy proceeding shortly after its creation.  The doctrine of successor liability imposes on YesCare all the Debtor's liabilities.  All claimants of the Debtor may have a path to recover in full on account of their claims in the Civil Justice System.  The TCC believes these issues have already been litigated, with at least one Court holding that CHS TX may be liable as Corizon's successor.  *See Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022) (adding CHS TX, Inc. [NewCo] as a defendant in a prepetition action and finding "[c]onsidering the totality of the circumstances here, I find that CHS TX is a mere continuation of pre-division Corizon . . . . Evidently, CHS TX picked up right where Corizon left off.  Indeed, CHS TX holds itself out to clients as Corizon's successor.").

- **Alter Ego / Veil Piercing**.  The TCC asserts that Debtor's beneficial owners are also liable as the Debtor's alter ego.  Alter ego and veil piercing are also not causes of action.  They are also equitable doctrines or legal remedies.  Alter ego and veil piercing theories do not create new causes of action.  Rather, they impose liability on the company's owner when certain factors are present.  These factors include:  the parent and subsidiary have common stock ownership, common directors or officers, the parent and subsidiary have common business departments, the parent and subsidiary file consolidated financial statements, the parent finances the subsidiary, the parent caused the incorporation of the subsidiary, the subsidiary operated with grossly inadequate capital, the parent pays salaries and other expenses of subsidiary, the subsidiary receives no business except that given by the parent, the parent uses the subsidiary's property as its own, the daily operations of the two corporations are not kept separate, and the subsidiary does not observe corporate formalities.  Here, the TCC asserts there is common beneficial and actual ownership, common directors and officers, the parent finances the subsidiary, the Debtor was grossly undercapitalized at its inception, and the Debtor has no business functions.  The alter ego doctrine may impose all the Debtor's liabilities on the company's owner.

- **Breach of Fiduciary Duty and Corporate Theft**.  The TCC asserts that the Estate has claims against Corizon Health executives for breach of fiduciary duty and corporate theft.  The TCC's investigation indicated that Corizon executives set up YesCare Corp. and several of its operating subsidiaries, including CHS AL, LLC and CHS AZ, LLC, in the months leading up to the closing of the Divisional Merger.  Evidence produced in the case showed that Corizon Health executives and others were already pitching new RFPs under at least two of these entities—CHS AL, LLC and CHS AZ, LLC—before the Divisional Merger ever took place.  It appears that Corizon executives pitched these CHS entities as being comprised of former Corizon Health clinical and administrative employees" before the Divisional Merger.  These facts suggest business was being funneled away from Corizon Health prior to the Divisional Merger and may support claims for breach of fiduciary duty and corporate theft.

### 10.    The Third Mediation.

Following the Court's denial of the settlement motion and the motion to dismiss, the TCC, UCC, Debtor, and Settling Parties agreed to convene for a Third Mediation before former Judge Sontchi.  The Third Mediation began with in-person meetings involving the key parties on May 17, 2024, and continued for the following 8 weeks via email, telephone, and additional in-person communication and negotiation.  Ultimately, these renewed efforts were successful, resulting in the Estate Party Settlement agreed to by the TCC, UCC, Debtor, and the Settling Parties and incorporated into the Plan.

### 11.    The Estate Party Settlement.

As set forth in this Disclosure Statement, the Estate Party Settlement reached at the Third Mediation provides substantial value to the Estate and funds a distribution process that will result in significant recoveries for creditors.  It also avoids the risks of litigation of Estate Causes of Action against the Released Parties.

As described herein, the Estate Party Settlement resolves Estate Causes of Action against the Released Parties on behalf of the Debtor and its bankruptcy Estate, and grants releases to the persons and entities who would be potential defendants and their officers and directors, including the following specific individuals:

- Yitzchak Lefkowitz a/k/a Isaac Lefkowitz, a director of the Debtor who also holds or held roles at related entities;
- Sara Ann Tirschwell, former Chief Executive Officer at Corizon Health, Inc. and YesCare;
- Ayodeji Olawale Ladele, Executive Vice President and Chief Medical Officer at Corizon Health, Inc. and YesCare;
- Beverly Michelle Rice, Senior Director and Assistant Controller at Corizon Health, Inc. and YesCare;
- Jeffrey Scott King, former Chief Legal Officer at Corizon Health, Inc. and current Executive Vice President and Chief Legal Officer at YesCare;
- Jennifer Lynne Finger, former Assistant General Counsel at Corizon Health, Inc. and current Assistant General Counsel at YesCare; and
- Frank Jeffrey Sholey, former Chief Financial Officer at Corizon Health, Inc. and current Chief Executive Officer at YesCare.

The Estate Party Settlement does not necessarily resolve potential claims individual creditors may have against YesCare Corp., CHS TX, Inc., or any other alleged successor entity.  Instead, pursuant to the Plan, which incorporates the Estate Party Settlement, creditors who believe they may have individual claims against these parties may elect to opt-out of participating in the Estate Party Settlement and instead pursue their claims against YesCare Corp., CHS TX, Inc., or any other alleged successor entity under the doctrine of successor liability in the Civil Justice System.

Below is a summary of the key terms of the Estate Party Settlement:

- The Settlement Parties shall pay or cause to be paid to the PI/WD Trust and GUC Trust, as applicable, aggregate Cash in the amount of Fifty Million Dollars ($50,000,000.00) (the "Settlement Payment"), with two million ($2,000,000) to be paid on the Effective Date and the remaining Forty-Eight Million Dollars ($48,000,000.00) paid in monthly installments over thirty (30) months with interest at 6.00% per annum.

- If the Settlement Parties fail to make the required payments on time, they receive a "grace period" of five business days to make the payment. If the Settlement Parties fail to make the payment after the "grace period" and that failure is not waived by both creditor trusts, the releases and injunctions contained in the Plan are terminated and void, meaning that creditors and the estate may bring claims against the Released Parties.

- The Settlement Payment will be allocated between the PI/WD Trust and the GUC Trust on a 50/50 basis and will be used to pay administration of those trusts and claims of unsecured creditors, meaning no funds from the Settlement Payment will be used to pay Administrative Claims, Professional Fee Claims, Priority Claims, or Secured Claims.

- The Settlement Parties have the option to terminate the settlement if more than 5% in number of Voting PI/WD Claimants elect to opt out of the Consensual Claimant Release and who, by doing so, irrevocably elect to pursue their PI/WD Claims in the Civil Justice System with no right to return to or recover from the PI/WD Trust. Holders of PI/WD Claims who elect to pursue their PI/WD Claims in the Civil Justice System for the purpose of pursuing a recovery from one or more PI/WD Insurance Companies and who do not opt out of the Consensual Claimant Release shall not be considered "opt outs" for the purpose of calculating whether the participation percentage has been met..

- The Settlement Parties release and waive all claims and causes of action against the Debtor and its Estate upon the Effective Date, and the Settlement Parties and Released Parties release and waive all claims against creditors who do not opt out of the release and the Settlement upon the Final Payment Date.

- On the Final Payment Date, the Released Parties will receive the benefit of the Consensual Claimant Release (*i.e.*, the release being granted in favor of the Released Parties by claimants who do not opt-out of the Consensual Claimant Release), and the release of all Estate Causes of Action asserted against the Released Parties.

- Claimants who opt out will have the ability to assert claims against YesCare Corp., CHS TX, Inc., and other alleged successor entity based on the doctrine of successor liability. This is clearly set forth in Article III.D and Article IX.K of Plan. Claimants who opt-out, however, will not have the ability to assert Avoidance Actions, including fraudulent transfer claims, and other Estate Causes of Action against the Released Parties because those Causes of Action will be settled under the Estate Party Settlement.

- The Estate and all creditors who do not opt-out of the release and the Settlement agree to release all claims against the Released Parties once the Settlement Parties have fulfilled their obligations to pay the full settlement amount. The above description of the Estate Party Settlement is a summary only. The actual terms of the Plan control.

The Estate Party Settlement was the product of lengthy, hard-fought arms-length negotiations. The TCC, UCC and the Debtor are all mindful of their respective fiduciary obligations to act in the best interest of the Estate and all creditors and have evaluated the Estate Party Settlement from that perspective. Each group strongly believes the Estate Party Settlement, on the terms and conditions set forth in the Plan, is fair, equitable, and in the best interest of both the creditors and the Debtor's Estate.

**B.      Exclusivity.**

The Debtor's exclusivity period has expired.

**C.      Bar Date.**

The deadline for all creditors, including Governmental Units, to file proofs of claim against the Debtor was August 14, 2023.  Any references in the Plan or Disclosure Statement to any Claims or Interests shall not constitute an admission of the existence, nature, extent, or enforceability thereof.

**D.      Claims Against the Debtor.**

**1.      In General.**

The Claims against the Debtor can largely be separated into two categories: PI/WD claims and non-PI/WD claims, which are referred to as GUC claims herein and in the Plan.  Pursuant to the Plan, funds from the Estate Party Settlement and other sources of funding will be divided between two separate trusts, one for PI/WD claims and one for GUC claims and will be distributed to the applicable claimants pursuant to the processes outlined in the Plan in the applicable trust documents.

**2.      Administrative Expense Claims and Professional Fee Claims.**

Based on the terms of the Estate Party Settlement, the Proponents believe that sufficient funds should exist under the DIP Facility to pay Allowed Administrative Expense and Allowed Professional Fee claims as of the date of entry of the Confirmation Order or shortly thereafter.

Except as otherwise provided by a Final Order entered by the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the Debtor, the TCC and the UCC no later than the Administrative Claims Bar Date.  Each request for payment of an Administrative Claim must set forth, at a minimum, (a) the name of the Holder of the Administrative Claim, (b) the amount of the Administrative Claim and (c) a detailed basis for the Administrative Claim.  A request for payment of an Administrative Claim that has been properly and timely Filed and served shall become an Allowed Administrative Claim unless an objection is filed by the date that is thirty (30) days after such request has been Filed and served.  If a timely objection is Filed, the Administrative Claim in question shall become Allowed only to the extent set forth in a Final Order of the Bankruptcy Court.

Any failure to File a request for payment of an Administrative Claim by the Administrative Claims Bar Date shall result in the Administrative Claim in question being discharged and released as of the Effective Date, and its Holder being forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtor, its Estate, or any other Entity.  Any requests for payment of Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtor, or further order of the Bankruptcy Court.

All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330 and/or 331 for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the TCC, the UCC, the DIP Lender, the Debtor and the United States Trustee no later than the first Business Day that is thirty (30) days after the Effective Date.  Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and be subject to approval by the Bankruptcy Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case.  The last date to object to such final fee application shall be the twenty-first (21st) day after such fee application has been Filed and all final fee applications shall be set for hearing at the same time, as the Bankruptcy Court's calendar permits, after consultation with counsel to the TCC, the UCC, the DIP Lender, and the Debtor, *provided, however*, that if an objection is Filed to any final fee application, then the deadline to object to any and all final fee applications shall be extended for all parties in interest for an additional seven (7) days and, for any party whose Professional(s) is subject to an objection Filed within the twenty-one (21) day period

above, the deadline for such party to object to any and all final fee applications shall be extended for an additional fourteen (14) days.  Neither Trustee shall have standing to object to any Professional Fee Claims.

### 3.     DIP Claims.

The DIP Claims arising under the DIP Order that accrued prior to August 23, 2023 will be released on the Effective Date pursuant to the Estate Party Settlement.

Notwithstanding anything in the Plan to the contrary, to the extent that the Court disallows payment of any fees and expenses of Estate Professionals set forth in the Approved Budget (as defined in the DIP Order), and that such order or orders by the Court cause on a final basis the total amount of Allowed Administrative Claims and Professional Fee Claims to be less than the Commitment Amount (as defined in the DIP Order), then (i) if this Plan has been confirmed and gone effective, 90 percent (90%) of the difference between the Commitment Amount and the total amount of Allowed Administrative Claims and Professional Fee Claims shall be promptly returned to the DIP Lender, whether such funds are held in the Professional Fee Escrow Accounts or another account, or (ii) if confirmation of this Plan has been denied, then 100 percent (100%) of the difference between the Commitment Amount and the total amount of Allowed Administrative Claims and Professional Fee Claims shall be promptly returned to the DIP Lender, whether such funds are held in the Professional Fee Escrow Accounts or another account.

### 4.     Synergi Administrative Claim.

In full and final satisfaction, settlement, release, and discharge of any Administrative Claim arising under or in respect of the Synergi Order and the agreements referenced therein, Synergi shall be entitled to receive Cash from the ERC Fund equal to the amount of such Administrative Claim pursuant to and in accordance with the Synergi Order. For the avoidance of doubt, nothing in the Plan shall modify the Synergi Order, including the payments terms and conditions set forth therein.

### 5.     Priority State and Federal Tax Claims.

The Proponents believe that, as of the Confirmation Date, there will be approximately $8.5 million owing in respect of Priority State and Federal Tax Claims.  Each federal Governmental Unit that holds an Allowed Priority Tax Claim will receive, at the sole option of the Debtor or GUC Trustee, as applicable, either:  (1) payment by the later of (a) 90 days after the date on which such Claim becomes Allowed or as soon as reasonably practicable thereafter, or (b) 10 days after the date which the ERC Fund is funded; or (2) regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

## IV.  **The Plan**

Section IV of this Disclosure Statement is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the Plan, the Plan Supplement and any attachments to the Plan.  **Although the statements contained in this Disclosure Statement include summaries of the provisions of the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all related terms and provisions and should not be relied upon for a comprehensive discussion of the Plan**.  Instead, reference is made to the Plan, the Plan Supplement and any attachments to the Plan for the full and complete statements of such terms and provisions.  The Plan itself, in addition to the Plan Supplement and any attachments to the Plan will control in all respects.  To the extent there are any inconsistencies between this Section IV and the Plan, the Plan Supplement and any attachments to the Plan, the Plan, Plan Supplement, and the attachments to the Plan, as applicable, shall govern.

A.      **Summary of Key Plan Provisions.**

| Article | Plan Pages | Summary |
|---------|-----------|---------|
| I | 1-18 | **Definitions and Rules of Interpretation**.  This Article contains the definitions used throughout the Plan, as well as conventions for computing time and determining the governing law that will apply to various provisions in the Plan. |
| II | 18-21 | **Administrative and Priority Claims**.  This Article details the treatment for certain Priority and Administrative Claims, such as state and federal taxes, post-bankruptcy loans and compensation of bankruptcy professionals.  These types of claims are afforded higher payment priority under the Bankruptcy Code and, thus, the Debtor must ensure that they are paid or otherwise dealt with before the Plan can provide payments to other General Unsecured Claims. |
| III | 21-28 | **Classification, Treatment, and Voting of Claims and Interests**.  This Article summarizes the different categories of claims and details the varying treatments for each class of Claims.  A more detailed description of the Plan treatment is set forth immediately below in Article IV.B of this Disclosure Statement. |
| IV | 28-41 | **Means for Implementation of the Plan**.  This Article contains the various provisions that are critical to the implementation of the Plan, including the creation of the PI/WD Trust and GUC Trust, as further detailed in Article IV of the Plan.  Among other matters, Article IV of the Plan specifies how assets will vest in each of the Trusts and how Retained Causes of Action will be preserved for the benefit of creditors. |
| V | 41-43 | **Treatment of Executory Contracts and Unexpired Leases**.  This Article details how Executory Contracts and Unexpired Leases will be treated under the Plan.  By default, unless otherwise specified in the Plan, a Plan Supplement or separate motion filed with the Bankruptcy Court, all Executory Contracts and Unexpired Leases will be rejected.  The Debtor's rights under insurance policies will be preserved under this Article. |
| VI | 43-44 | **Provisions Regarding Distributions**.  This Article details how distributions will be managed after the Effective Date. |
| VII | 44-45 | **Reserves Administered by the GUC Trustee**.  To ensure timely and proper payment of Priority, Administrative and Other Secured Claims consistent with Article II of the Plan, this Article requires the Debtor or GUC Trustee to establish and maintain reserves for payment of Allowed Administrative and Priority Claims, as well as Other Secured Claims. |
| VIII | 46-47 | **Procedures for Resolving Certain Contingent, Unliquidated, and Disputed Claims and Interests**.  This Article details how certain contingent, unliquidated and disputed Claims will be handled after the Effective Date. |

| Article | Plan Pages | Summary |
|---------|-----------|---------|
| IX | 47-53 | **Settlement, Releases, Injunctions, and Related Provisions**.  As summarized further in Article IV.C of this Disclosure Statement, Article IX of the Plan contains the lien release (Article IX.B), Estate Release (Article IX.C), Consensual Claimant Release (Article IX.D), and releases by the Debtor and the Settlement Parties of Holders of Claims in Classes 4, 6, 8, and 9 (Article IX.E).  This Article also includes provisions dealing with Exculpations (Article IX.F), the Channeling Injunction (Article IX.I), other injunctions (Articles IX.J-K), terms of the injunctions and stays (Article IX.H), insurance provisions (Article IX.L), retention of liability (Article IX.N), and compromises and settlements (Article IX.A and M). |
| X | 53-55 | **Conditions Precedent to Confirmation and Effective Date**.  This Article lists the various conditions precedent to the Confirmation and the Effective Date of the Plan.  As set forth in Article X.C of the Plan, any of these conditions may be waived by joint agreement of the Proponents. |
| XI | 55 | **Modification, Revocation or Withdrawal of the Plan**.  This Article details the terms for the Proponents to modify, revoke or withdraw the Plan.  The Proponents do not anticipate making material modifications to the Plan, nor do they anticipate revoking or withdrawing the Plan. |
| XII | 55-57 | **Retention of Jurisdiction**.  All plans contain provisions regarding the items over which the Bankruptcy Court retains jurisdiction after confirmation and the effective date.  Article XII enumerates 19 different types of matters over which the Bankruptcy Court shall retain jurisdiction to decide, should they become issues in the future. |
| XIII | 57-60 | **Miscellaneous Provisions**.  The last few pages of the Plan contain various miscellaneous provisions, such as where to send notice and how to find the Plan Supplement and other documents. |

**B.      Treatment of Classes of Claims and Interests.**

To the extent a Class contains Allowed Claims or Interests, the classification of Allowed Claims and Interests is specified below.

**1.      Class 1 — Other Priority Claims**

(a)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash from the Administrative and Priority Claims Reserve on (or as soon as reasonably practicable after) the later of (i) the Effective Date or (ii) thirty (30) days after such Other Priority Claim becomes Allowed, or (iii) such date on which the Holder of such Other Priority Claim and the Debtor or Trustees, as applicable, shall otherwise agree in writing.

(b)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**2.      Class 2 — Other Secured Claims**

(a)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the sole option of the Debtor or the  GUC Trustee, as applicable, either:

(i)      payment in full in Cash on the later of (w) the Effective Date (or as soon as reasonably practicable thereafter), (x) the date on which such Other Secured Claim becomes Allowed, (y) the date payment on account of such Other Secured Claim is due; or (z) the date on which the Holder of such Allowed Other Secured Claim and the Debtor or the GUC Trustee, as applicable, shall otherwise agree in writing;

(ii)     collateral securing such Allowed Other Secured Claim; or

(iii)    other treatment that renders such Allowed Other Secured Claim Unimpaired.

(b)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**3.**    **Class 3 — Convenience Claims**

(a)    *Treatment*:  On the first Business Day that is thirty (30) days following the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash.

(b)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Convenience Claims are entitled to vote to accept or reject the Plan.

**4.**    **Class 4 — Channeled General Unsecured Claims**

(a)    *Treatment*:

(i)      On the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Channeled GUC Claim agrees to less favorable treatment, each Holder of an Allowed Channeled GUC Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the GUC Trust.  Thereafter each such Holder shall receive Cash distributions from the GUC Trust in accordance with the terms and conditions set forth in the GUC Trust Documents.  Distributions from the GUC Trust to Holders of Allowed Channeled GUC Claims shall be on a Pro Rata basis with all other holders of GUC Trust beneficial interests in accordance with the terms of the GUC Trust Agreement.  Holders of Channeled GUC Claims shall not receive any payment from the GUC Trust unless and until such Claims are resolved in accordance with the GUC Trust Documents. The GUC Trust Agreement establishes the method by with the Channeled GUC Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid.  Except as provided in the Plan, Holders of Channeled GUC Claims shall be enjoined from prosecuting or filing any Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(ii)     Notwithstanding the above, each Holder of an Allowed Channeled GUC Claim shall have the option on the Ballot to elect for an Expedited GUC Distribution. Any Holder of a GUC Claim who elects for the Expedited GUC Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the Consensual Claimant Release.  An election on the Ballot for an Expedited GUC Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot.  An Expedited GUC Distribution shall be paid by the GUC Trustee on the later of (a) the Effective Date or (b) within ten (10) business days after such GUC Claim becomes an Allowed Claim by Final Order, provided, however, that the GUC

Trustee shall not be required to pay such Expedited GUC Distribution until the first Business Day on which the GUC Trust has sufficient Cash on hand to make the Expedited GUC Distribution and satisfy the reserve requirements set forth in the GUC Trust Documents.

(b)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Channeled GUC Claims are entitled to vote to accept or reject the Plan.

**5.     Class 5 — Opt-Out General Unsecured Claims**

(a)     *Treatment*:  On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out GUC Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its GUC Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action.  Except for the foregoing, Holders of Opt-Out GUC Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan. Consistent with the foregoing, each Holder of an Opt-Out GUC Claim may elect to pursue recovery on account of its GUC Claim from any of the Released Parties.  Holders of Opt-Out GUC Claims shall not receive, and shall have no right to receive, a Distribution from the GUC Trust.

(b)     *Voting*:  Class 5 is impaired under the Plan.  Holders of Opt-Out GUC Claims are entitled to vote to accept or reject the Plan.

**6.     Class 6 — Channeled PI/WD Claims**

(a)     *Treatment*:

(i)     Holders of Allowed Channeled PI/WD Claims shall be entitled to receive a distribution from the PI/WD Trust from the PI/WD Trust Assets.  As of the Effective Date, the Debtor's liability for all Channeled PI/WD Claims shall be both incurred in full and assumed by the PI/WD Trust without further act, deed, or Court order and shall be administered and paid from the PI/WD Trust as set forth in the PI/WD Trust Documents.  Holders of Channeled PI/WD Claims shall not receive any payment from the PI/WD Trust unless and until such Claims are resolved in accordance with the PI/WD Trust Documents.  The PI/WD Trust Distribution Procedures establish the method by with the Channeled PI/WD Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid.  Except as provided in the Plan, Holders of Channeled PI/WD Claims shall be enjoined from prosecuting any outstanding or filing future Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(ii)     Notwithstanding the above, and at all times subject to the requirements in Article III.B of the Plan, each Holder of an Allowed Channeled PI/WD Claim shall have the option on the Ballot to elect for an Expedited PI/WD Claim Distribution. Any Holder of a Channeled PI/WD Claim who elects for the Expedited PI/WD Claim Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the Consensual Claimant Release. An election on the Ballot for an Expedited PI/WD Claim Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot. An Expedited PI/WD Claim Distribution shall be paid by the PI/WD Trustee within sixty (60) days following the Effective Date, subject to the terms of the PI/WD Trust Distribution Procedures, provided, however, that the PI/WD Trustee shall not be required to pay such Expedited PI/WD Distribution until the first Business Day on which the PI/WD Trust has sufficient Cash on hand to make the Expedited PI/WD Distribution and satisfy the reserve requirements set forth in the PI/WD Trust Documents.

(b)     *Voting*: Class 6 is Impaired under the Plan. Holders of Channeled PI/WD Claims are entitled to vote to accept or reject the Plan.

**7.     Class 7 — Opt-Out PI/WD Claims**

(a)     *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out PI/WD Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its PI/WD Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action. Except for the foregoing, Holders of an Opt-Out PI/WD Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Plan pursuant to the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan. Consistent with the foregoing, each Holder of an Opt-Out PI/WD Claim may elect to pursue recovery on account of its PI/WD Claim from any of the Released Parties. Holders of Opt-Out PI/WD Claims shall not receive, and shall have no right to receive, a Distribution from the PI/WD Trust.

(b)     *Voting*: Class 7 is impaired under the Plan. Holders of Opt-Out PI/WD Claims are entitled to vote to accept or reject the Plan.

**8.     Class 8 — Opt-Out Insured PI/WD Claim**

(a)     *Treatment*:

(i)     The Holders of Opt-Out Insured PI/WD Claims shall be entitled to seek recovery on account of such Claims from any PI/WD Insurance Company. Such Holders shall be entitled to name as a defendant in any proceeding commenced or continued in the Civil Justice System the Debtor, the PI/WD Trust, and any other person or entity to the extent permitted under applicable law, *provided*, *however*, that such Holder may not name a Released Party as a defendant other than the Debtor. Claims that could have been asserted against the Debtor may be asserted against the PI/WD Trust, which will have the liabilities and defenses of the Debtor, subject to the limitations below on any such Opt-Out Insured PI/WD Claim established through litigation. If such proceeding is commenced or continued, the PI/WD Trustee shall provide notice to and seek

defense from each PI/WD Insurance Company that the PI/WD Trustee determines may have an obligation to provide coverage in accordance with the terms of each applicable PI/WD Insurance Policy. The PI/WD Trust shall have no obligation to appear and defend any lawsuit commenced against the PI/WD Trust if the applicable PI/WD Insurance Company refuses to cover any and/or all defense costs. The PI/WD Trust shall have no obligation to satisfy any Insurance Policy's deductible or self-insured retention per claim or in the aggregate. Holders of Opt-Out Insured PI/WD Claims shall not be entitled to receive any recovery from the PI/WD Trust or the Debtor on account of such Claim other than a recovery that is funded exclusively by an insurance recovery under a PI/WD Insurance Policy.

(ii)     Each Holder of an Opt-Out Insured PI/WD Claim shall automatically be deemed to return to the PI/WD Trust on the ninetieth (90th) day following the Effective Date unless such Holder provides written notice to the PI/WD Trust that such Holder intends to remain an Opt-Out for purposes of pursuing insurance recoveries in the Civil Justice System. This deadline may be extended in accordance with the PI/WD Trust Documents. Holders of Opt-Out Insured PI/WD Claims who elect to remain in the Civil Justice System for the purpose of pursuing insurance recoveries after this deadline may elect to return to the PI/WD Trust in accordance with the PI/WD Trust Documents. Any Holder of an Opt-Out Insured PI/WD Claim that returns to the PI/WD Trust in accordance with the PI/WD Trust Documents shall be treated as the Holder of Channeled PI/WD Claim under the Plan and the PI/WD Trust Documents.

(b)     *Voting*: Class 8 is impaired under the Plan. Holders of Opt-Out Insured PI/WD Claims are entitled to vote to accept or reject the Plan.

**9.     Class 9 — Channeled Indirect Claims**

(a)     *Treatment*:

(i)     Any Channeled Indirect Claim shall be Disallowed to the extent provided by section 502(e) and shall be subordinated to the extent provided by section 509(c) of the Bankruptcy Code or applicable law.

(ii)     As of the Effective Date, (a) the Debtor's liability for all Allowed Channeled Indirect Claims that are Allowed Indirect PI/WD Claims shall be both incurred in full and assumed by the PI/WD Trust without further act, deed, or Court order and shall be administered and paid from the PI/WD Trust as set forth in the PI/WD Trust Documents, and (b) the Debtor's liability for all Allowed Channeled Indirect Claims that are Allowed Indirect GUC Claims shall be both incurred in full and assumed by the GUC Trust without further act, deed, or Court order and shall be administered and paid from the GUC Trust as set forth in the Plan and the GUC Trust Agreement.

(iii)     Holders of Allowed Channeled Indirect Claims that are Allowed Indirect PI/WD Claims shall not receive any payment from the PI/WD Trust unless and until such Claims are resolved in accordance with the PI/WD Trust Documents. The PI/WD Trust Distribution Procedures establish the method by with such Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid. Holders of Allowed Channeled Indirect Claims that are Allowed Indirect GUC Claims shall not receive any payment from the GUC Trust unless and until such Claims are resolved in accordance with the Plan and the GUC Trust Agreement. Except as provided in the Plan, Holders of Channeled Indirect Claims shall be enjoined from prosecuting any outstanding or filing future Claims against the

Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(b)  *Voting*:  Class 9 is Impaired under the Plan.  Holders of Channeled Indirect Claims are entitled to vote to accept or reject the Plan.

**10.  Class 10 — Opt-Out Indirect Claims**

(a)  *Treatment*:  On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out Indirect Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its Indirect Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action.  Except for the foregoing, Holders of an Opt-Out Indirect Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Plan pursuant to the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan.  Consistent with the foregoing, each Holder of an Opt-Out Indirect Claim may elect to pursue recovery on account of its Indirect Claim from any of the Released Parties.  Holders of Opt-Out Indirect Claims shall not receive, and shall have no right to receive, a Distribution from the PI/WD Trust or the GUC Trust.

(b)  *Voting*:  Class 10 is impaired under the Plan.  Holders of Opt-Out Indirect Claims are entitled to vote to accept or reject the Plan.

**11.  Class 11 — Interests in the Debtor**

(c)  *Treatment*:  On the Effective Date, all Interests in the Debtor shall be cancelled, released, discharged, and extinguished.  Holders of Interests in the Debtor shall not receive or retain any property on account of such Interests.

(d)  *Voting*:  Class 11 is Impaired under the Plan.  Holders of Interests in the Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**C.  Settlement, Release, Exculpation, and Injunction Provisions.**

Article IX of the Plan provides for certain settlements, releases, injunctions, and exculpations, including third-party releases of and for the Debtor, the Released Parties, or the Exculpated Parties, as applicable.

The Proponents believe that the settlements, releases, injunctions, and exculpations set forth in the Plan are appropriate and in accordance with applicable law because, among other things, the releases are narrowly tailored to the Debtor and the Chapter 11 Case, and the Released Parties have contributed value to the Debtor, which facilitated the Debtor's ability to propose and pursue confirmation of the Plan.  The Proponents further believe that such releases, exculpations, and injunctions are a necessary part of the Plan.  The Proponents will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of confirmation of the Plan.

**1.  Released Parties, Settlement Parties and Exculpated Parties.**

"*Released Parties*" means collectively the following, in each case in its capacity as such with each being a "*Released Party*":  (a) the Debtor; (b) Russell Perry, the Debtor's Chief Restructuring Officer; (c) the Committees and their respective members; (d) the Professionals; (e) the GUC Trustee; (f) the PI/WD Trustee; (g) the Settlement Parties; (h) M2 EquityCo LLC; (i) Valitás Intermediate Holdings Inc.; (j) Valitás Health Services, Inc.; (k) M2 Pharmacorr

Equity Holdings LLC; (l) Pharmacorr/M2 LLC; (m) Pharmacorr Holdings LLC; (n) Endeavor Distribution LLC; (o) Yes Care Holdings LLC; (p) Sigma RM, LLC; (q) DG Realty Management LLC; (r) Scaracor LLC; (s) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (t) Sara Ann Tirschwell; (u) Ayodeji Olawale Ladele; (v) Beverly Michelle Rice; (w) Jeffrey Scott King; (x) Jennifer Lynne Finger; (y) Frank Jeffrey Sholey; (z) FTI Capital Advisors, LLC, and for each Entity listed in (a) through (z), each of their respective current and former officers, directors, managers, employees, contractors, agents, attorneys, and other professional advisors, Insiders, and Affiliates; *provided*, *however*, that a Non-Released Party shall not be a "Released Party."

The Settlement Parties are collectively, YesCare Corp., its wholly owned subsidiaries (including CHS TX, Inc.), Geneva Consulting, LLC, Perigrove 1018, LLC, Perigrove, LLC, M2 HoldCo, LLC, M2 LoanCo, LLC, and PharmaCorr LLC.

The Exculpated Parties are, collectively, and in each case in its capacity as such: (a) the TCC, (b) the members of the TCC, (d) the UCC, (e) the members of the UCC; and (f) the Mediator.

2.      **Estate Release.**

Article IX.C of the Plan provides for releases of certain claims and causes of action the Debtor may hold against the Released Parties, including derivative claims. The Estate Release is not effective until the Final Payment Date, upon which date the amounts required by the Estate Party Settlement will have been paid in full.

**As of the Final Payment Date, except for the claims or theories of recover or remedies distributed to or retained by Holders of Opt-Out GUC Claims, Holders of Opt-Out PI/WD Claims, and Holders of Opt-Out Indirect Claims, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Released Party shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor, its Estate, and each of their respective successors or assigns, including the Trusts, of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, the Payment Agreement, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in the Plan shall not be construed to release any Insurance Actions or any post-Effective Date obligations under the Estate Party Settlement or any document, instrument, or agreement executed to implement the Estate Party Settlement. If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IX.C shall be void. If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts. Any Released Party may enforce the Estate Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose. The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.**

3.      **Other Releases.**

Article IX.D of the Plan provides for releases of certain Claims and Causes of Action Consenting Claimants may hold against the Released Parties.

"*Consenting Claimant*" means a Consenting Indirect Claimant, a Consenting GUC Claimant, and/or Consenting PI/WD Claimant, regardless of whether any such Claimant receives a Distribution and so long as such Claimant has previously consented to the Consensual Claimant Release in accordance with the procedures set forth in the Plan.

"*Consenting Indirect Claimant*" means:  (a) any Holder of an Indirect Claim that votes to accept or is deemed to accept the Plan **and** who does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release; and (b) any Holder of an Indirect Claim that abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** that does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release.  No Holder of an Opt-Out Indirect Claim shall be a Consenting Indirect Claimant.

"*Consenting GUC Claimant*" means:  (a) any Holder of a GUC Claim that votes to accept or is deemed to accept the Plan **and** that does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release; (b) any Holder of a GUC Claim that abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** that does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release; and (c) any Holder of a GUC Claim that elects to receive an Expedited GUC Distribution.  No Holder of an Opt-Out GUC Claim shall be a Consenting GUC Claimant.

"*Consenting PI/WD Claimant*" means:  (a) any Holder of a PI/WD Claim who votes to accept or is deemed to accept the Plan **and** who does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release, including any who elect to pursue insurance recoveries under and consistent with **Article IV.C.**; (b) any Holder of a PI/WD Claim who abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** who does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release; and (c) any Holder of a PI/WD Claim who elects to receive an Expedited PI/WD Claim Distribution.  No Holder of an Opt-Out PI/WD Claim shall be a Consenting PI/WD Claimant.

**As of the Final Payment Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate the Estate Party Settlement, as an integral component of the Plan, to the maximum extent permitted under applicable law, all Consenting Claimants shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each Released Party of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that the releases set forth in this Article IX.D shall not, and shall not be construed to:  (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents.  If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IX.D shall be void.  If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts.  Any Released Party may**

enforce the Consensual Claimant Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose.  The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.

Article IX.E of the Plan provides for releases of Claims and Causes of Action the Released Parties and the Debtor are providing to Consenting Claimants pursuant to the Plan.

**As of the Final Payment Date, for good and valuable consideration, the adequacy of which is hereby confirmed, as an integral component of the Plan, to the maximum extent permitted under applicable law, Released Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Holders of Claims in Class 4 (Channeled GUC Claims), Class 6 (Channeled PI/WD Claims), Class 8 (Opt-Out Insured PI/WD Claims), and Class 9 (Channeled Indirect Claims) of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any such Holder, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that the releases set forth in this Article IX.E shall not, and shall not be construed to:  (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents.**

4.    **Exculpation.**

Article IX.F of the Plan provides for the release and exculpation of the Exculpated Parties for certain acts or omissions taken in connection with the Chapter 11 Case.  The Exculpation contains a carve-out for actual fraud, willful misconduct or gross negligence.

**As of the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest, for any claim or cause of action arising from the Petition Date through the Effective Date, arising from, relating to, or connected with the administration of the Chapter 11 Case, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be deemed to have, participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code.  Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

5.    **Injunction.**

Article IX.I of the Plan outlines the Channeling Injunction that will be imposed pursuant to the Plan upon Channeled Claims.  Channeled Claims are Claims as to which the Holder of the Claim has not opted-out, or, as to claims where the Holder has opted-out for the purpose of pursuing recovery from an insurance company, has opted out and has not returned to the PI/WD Trust in accordance with its procedures.

As outlined in Article IX.I of the Plan, the Channeling Injunction will provide that the sole recourse for Holders of Channeled Claims that are eligible for compensation will be the applicable trust, and the Holders of Channeled Claims will have no right so assert those claims against the Debtor or any Released Party.

**As of the Effective Date, to facilitate the liquidation of Channeled Claims by the Trusts and the preserve and promote the settlement framework contemplated by and provided for in the Plan, including the Estate Party Settlement, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under the Bankruptcy Code, the Bankruptcy Court shall issue the channeling injunction set forth in this <u>Article IX.I</u> (the "<u>Channeling Injunction</u>").**

**Subject to the terms of <u>Article IX.I.5</u>, and while the Channeling Injunction is in full force and effect as to any Channeled Claim, (a) the sole recourse of any Holder of a Channeled PI/WD Trust Claim that is eligible for compensation under the PI/WD Trust Distribution Procedures on account of such Channeled PI/WD Trust Claim shall be to and against the PI/WD Trust pursuant to the PI/WD Trust Documents, and such Holder shall have no right to assert such Channeled PI/WD Trust Claim or any Claim against the Debtor against any Released Party, and (b) the sole recourse of any Holder of a Channeled GUC Trust Claim that is eligible for compensation under the Plan and the GUC Trust Agreement on account of such Channeled GUC Trust Claim shall be to and against the GUC Trust, and such Holder shall have no right to assert such Channeled GUC Trust Claim or any Claim against the Debtor against any Released Party. Accordingly, on or after the Effective Date, and subject to the terms of <u>Article IX.I.5</u>, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled Claim shall be stayed, restrained, and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Released Party with respect to any such Channeled Claim, other than from the Trusts, including:**

(a) **commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Released Party, or any property or interest in property of any Released Party;**

(b) **enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Released Party, or any property or interest in property of any Released Party;**

(c) **creating, perfecting or otherwise enforcing in any manner, whether directly or indirectly, any encumbrance of any kind against any Released Party, or any property or interest in property of any Released Party;**

(d) **asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Released Party, or any property or interest in property of any Released Party; or**

(e) **taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Trusts, except in conformity and compliance with the Plan Documents with respect to any such Channeled Claim.**

**Reservations.**

**Notwithstanding anything to the contrary in this <u>Article IX.I</u>, this Channeling Injunction shall not enjoin:**

(a) **the rights of Holders of Channeled PI/WD Trust Claims to assert such Claims against the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures;**

(b) **the rights of Holders of Channeled GUC Trust Claims to assert such Claims against the GUC Trust in accordance with the Plan and the GUC Trust Agreement;**

(c) **the rights of Holders of Channeled Claims to assert such Claims against any Released Party if the Channeling Injunction is terminated under <u>Article IX.I.5</u>;**

(d) **the Trusts from enforcing their rights under the Plan and the Confirmation Order;**

(e) **the rights of the Trusts to prosecute any action against an Insurance Company based on or arising from a PI/WD Insurance Policy or a GUC Insurance Policy;**

(f) **the rights of the Trusts to prosecute any Retained Estate Causes of Action; and**

(g) **the rights of Holders of Channeled Claims to seek recovery from any Person, Entity, or Governmental Unit that is not a Released Party on account of their Channeled Claims or any other claim or Cause of Action.**

**Enforcement.**

**Any Released Party may enforce the Channeling Injunction before the Bankruptcy Court, which shall retain jurisdiction for such purpose.  The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.**

**Termination of Channeling Injunction.**

**The Channeling Injunction and all protections afforded to the Released Parties set forth in this <u>Article IX.I</u> shall terminate automatically (or not take effect) as to the Holder of any Channeled Claims if a Settlement Payment Default occurs and is not cured within Settlement Payment Cure Period or waived by both the PI/WD Trustee and GUC Trustee in accord with <u>Article IV.B.2</u>, or if the Estate Release or the Consensual Claimant Release become void under <u>Article IV.B.7</u>, <u>Article IV.B.9</u> or <u>Article IV.B.12</u>.**

**Tolling of Statute of Limitations.**

**While the Channeling Injunction is in effect as to any Channeled Claim, and for ninety (90) days following the termination of the Channeling Injunction under <u>Article IX.I.5</u>, the running of any relevant Statute of Limitations shall be tolled as to any Channeled Claim.  Upon the termination of the Channeling Injunction, the PI/WD Trustee and the GUC Trustee shall file a notice on the docket of the Chapter 11 Case and provide notice to beneficiaries of the Trusts that the Estate Party Settlement did not become effective and that such beneficiaries have ninety (90) days from the date of termination to commence Causes of Action against the Released Parties.**

Article IX.L of the Plan includes an injunction against interference with the Plan.

**Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.  The negotiation, settlement, and resolution of any Claims and Interest under the Plan shall not operate to excuse any Party from its obligations under any contracts, Insurance Policies, or other agreements, notwithstanding any terms of such contracts, Insurance Policies or agreements or provisions of non-bankruptcy law.**

**As of the Effective Date, neither YesCare Corp., CHS TX, Inc. nor any other alleged successor entity may assert in any litigation involving an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System that such Claims, to the extent asserted against YesCare Corp., CHS TX, Inc., or any other successor based on the doctrine of successor liability are barred, released, discharged, or impaired by the Confirmation Order, the Plan, or the Estate Release.  The right to assert such Claims based on**

the doctrine of successor liability has been received or retained by the Holders of such Claims under **Article III.D**, and the Holders of such Claims shall have a Claim against Debtor solely to the extent necessary to preserve and enforce such right.  Subject to the foregoing, YesCare Corp.'s, CHS TX, Inc.'s, or any other alleged successor entity's claims, rights, and defenses to any action brought by the Holder of an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System are expressly preserved under the Plan, including the rights of YesCare Corp., CHS TX, Inc., or any other alleged successor entity to contest liability for Opt-Out GUC Claims, Opt-Out PI/WD Claims, or Opt-Out Indirect Claims and to argue that they are not liable as successors to the Debtor based on the facts of the underlying action and/or the requirements for imposing successor liability under applicable law.

Article IX.K of the Plan includes an injunction against interference with Opt-Out Rights.

As of the Effective Date, neither YesCare Corp., CHS TX, Inc. nor any other alleged successor entity may assert in any litigation involving an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System that such Claims, to the extent asserted against YesCare Corp., CHS TX, Inc., or any other successor based on the doctrine of successor liability are barred, released, discharged, or impaired by the Confirmation Order, the Plan, or the Estate Release.  The right to assert such Claims based on the doctrine of successor liability has been received or retained by the Holders of such Claims under **Article III.D**, and the Holders of such Claims shall have a Claim against Debtor solely to the extent necessary to preserve and enforce such right.  Subject to the foregoing, YesCare Corp.'s, CHS TX, Inc.'s, or any other alleged successor entity's claims, rights, and defenses to any action brought by the Holder of an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System are expressly preserved under the Plan, including the rights of YesCare Corp., CHS TX, Inc., or any other alleged successor entity to contest liability for Opt-Out GUC Claims, Opt-Out PI/WD Claims, or Opt-Out Indirect Claims and to argue that they are not liable as successors to the Debtor based on the facts of the underlying action and/or the requirements for imposing successor liability under applicable law.

## V.   The GUC Trust and the PI/WD Trust

### A.   The Trusts Generally.

The Plan provides for Channeled Claims to be addressed by two separate trusts which will share equally in estate assets for distribution.  Holders of Channeled PI/WD Trust Claims (Class 6) and Holders of Channeled Indirect PI/WD Claims (a subset of Class 9) will have their claims resolved by the PI/WD Trust.  Holders of Opt-Out Insured PI/WD Claims (Class 8) will also have their claims resolved by the PI/WD Trust to the extent their claims are deemed to return to the PI/WD Trust or if the Holder elects to return to the PI/WD Trust in accordance with the PI/WD Trust Documents.  Holders of Channeled General Unsecured Claims (Class 4) and Holders of Channeled Indirect General Unsecured Claims (a subset of Class 9) will have their claims resolved by the GUC Trust.

### B.   Preservation of Causes of Action.

Except as otherwise provided in this Plan, an agreement or document entered into in connection with the Plan, or in a Final Order of the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and as set forth more fully in the Disclosure Statement, the Debtor reserves and, as of the Effective Date, assigns to the GUC Trust and the PI/WD Trust  the Estate Causes of Action identified in the Plan Supplement as Retained Causes of Action. On and after the Effective Date, the GUC Trustee (in its own capacity and as agent for the PI/WD Trust, may pursue Retained Causes of Action on behalf of the GUC Trust and the PI/WD Trust.  Retained Causes of Action may be commenced, prosecuted, and settled by the GUC Trust, with the prior written consent of the PI/WD Trust, with the net proceeds of such Retained Causes of Action be split between the PI/WD Trust and the GUC Trust on a 50/50 basis. The PI/WD Trustee and the GUC Trustee shall confer in good faith regarding (i) the retention of professionals to represent the GUC Trust (in its own capacity and as agent for the PI/WD Trust) with respect to the Retained Causes of Action on behalf of the Trusts, and (ii) all matters relating to the administration of the Retained Causes of Action; provided, however, notwithstanding the foregoing, the GUC Trust shall be required to obtain the consent of the PI/WD Trust for any material matter, including the filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of the Retained Causes of Action, which could affect the PI/WD Trust.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Estate Cause of Action against it as any indication that the GUC Trustee or the PI/WD Trustee, as appropriate, will not pursue all available Estate Causes of Action against it.  Unless any Estate Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the GUC Trustee and PI/WD Trustee expressly reserve all Estate Causes of Action for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Estate, and (ii) all matters relating to the administration of the Retained Causes of Action; *provided*, *however*, notwithstanding the foregoing, the GUC Trust shall be required to obtain the consent of the PI/WD Trust for any material matter, including the filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of the Retained Causes of Action which could affect the PI/WD Trust.

The Debtor, the GUC Trustee, or the PI/WD Trustee, as applicable, reserves such Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  Subject to the foregoing consent rights of the PI/WD Trust, the GUC Trust shall retain and shall have, including through its authorized agents or representatives, the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**C.     The GUC Trust.**

Holders of claims subject to resolution by the GUC Trust will receive distributions, if applicable, in accordance with the terms of the GUC Trust Agreement.  A copy of the proposed GUC Trust Agreement is attached hereto as **Exhibit B**.

**1.     GUC Trust Assets.**

Pursuant to the Plan, the GUC Trust Assets will consist primarily of 50% of the Settlement Payments received pursuant to the Estate Party Settlement, 50% of ERC funds received by the Estate, and 50% interest in the causes of action retained by the estate and any proceeds thereof.  The GUC Trust will also receive assignment of certain insurance rights, information needed to conduct its business, and any income, profits, gains, and proceeds realized, received, or derived from GUC Trust Assets.

**2.     GUC Trust Claims Administration Process.**

Holders of valid Channeled GUC Claims and Channeled Indirect GUC Claims will receive payment from the GUC Trust via a multi-step process set forth in the GUC Trust Agreement.

A Holder of a GUC Claim will have the opportunity on the Ballot to elect to receive an Expedited Distribution of $5,000 in return for a full release of its Claim rather than participating in the entire claim valuation and distribution process outlined in the Plan and GUC Trust Documents.  If a Holder of the Claim elects the Expedited Distribution, there are only two further steps in the process to receive payment.  First, the GUC Trustee, who is in charge of the GUC Trust, will confirm whether the Holder of such a claim meets threshold eligibility requirements.  These requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.  If the GUC Trustee determines the threshold requirements have been met, the Holder of the applicable Class 3 convenience claim be required to execute an appropriate release.  Upon execution of the release, the Holder of the claim will be entitled to receive the Expedited payment and will receive no further distribution on their claim.

If a Holder of a Channeled GUC Claim (Class 4) or a Channeled Indirect GUC Claim (subset of Class 9) does not choose to receive a $5,000 Expedited Distribution, they will be required under the terms of the GUC Trust Agreement to participate in a process for valuation of their claim that will determine the Allowed Claim Amount for that claim. That process will be conducted as follows:

First, the GUC Trustee will determine whether threshold eligibility requirements have been met.  As noted above, these requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.  For Indirect Claims, additional eligibility requirements must be met.  Those additional requirements include a determination that the claim is valid and not subject to disallowance under the Code or applicable law, and a showing that the Holder of the Indirect Claim has paid in full the liability or obligation of the GUC Trust to a claimant to whom the GUC Trust would have otherwise had a liability, that the claim is not subject to a valid defense, and that both the claimant who received the funds and the Holder of the Indirect Claim have or will have fully released the GUC Trust.

Next, the GUC Trustee will evaluate each claim individually in accordance with the GUC Trust Documents, and based on the documentation provided by a Claimant, the GUC Trustee will determine whether the claim is legally valid or invalid.  If the GUC Trustee determines additional information is needed for this analysis, the trustee will issue deficiency notices identifying information requested to potentially cure the deficiency.  If the GUC Trustee determines a claim is legally invalid and ineligible for compensation, the trustee will provide written notice of this determination to the claimant.

Once the GUC Trustee has determined a claim is legally valid, the trustee will utilize appropriate procedures to determine value of each claim (the "Proposed Allowed Claim Amount") and will provide notice to the claimant as to this determination.  If the claimant accepts the Proposed Allowed Claim Amount, that amount will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

If a claimant disagrees with the GUC Trustee's determination as to the validity of a claim or the GUC Trustee's Proposed Allowed Claim Amount, the claimant may submit a request for reconsideration, and the decision will be reviewed in a non-binding alternative dispute resolution process in which additional information may be provided.  The GUC Trustee may accept or reject any recommendations from this process.  If the GUC Trustee rejects the recommendations, the trustee will file a written objection to the claim, in which case the dispute will be resolved by the Bankruptcy Court.

If the value and validity of a claim is resolved via the alternative dispute resolution process, any other agreement of the trustee, or by final order of the Bankruptcy Court, then the agreed or ordered value of the claim will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

### 3.       GUC Trust Distributions.

Holders of valid Channeled GUC Claims and Channeled Indirect GUC Claims will receive payment from the GUC Trust via a multi-step process set forth in the GUC Trust Documents.

### D.       The PI/WD Trust.

Holders of claims subject to resolution by the PI/WD Trust will receive distributions, if applicable, in accordance with the terms of the PI/WD Trust Agreement.  A copy of the proposed PI/WD Trust Agreement is attached hereto as **Exhibit C**.

### 1.       PI/WD Trust Assets.

On the Effective Date, the PI/WD Trust will be funded with (i) fifty percent (50%) of the Cash from the Initial Settlement

### 2.       PI/WD Trust Claims Administration Process.

Holders of Allowed Personal Injury Claims will receive payment from the PI/WD Trust via a multi-step process set forth in the PI/WD Trust Agreement.

A Holder of a PI/WD Claim will have the opportunity on the Ballot to elect to receive an Expedited Distribution of $5,000 in return for a full release of its Claim rather than participating in the entire claim valuation and

distribution process outlined in the Plan and PI/WD Trust Documents.  If a Holder of the Claim elects the Expedited Distribution, there are only two further steps in the process to receive payment.  First, the PI/WD Trustee, who is in charge of the PI/WD Trust, will confirm whether the Holder of such a claim meets threshold eligibility requirements.  These requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.  Second, if the PI/WD determines the threshold requirements have been met, the Holder of the applicable Class 3 convenience claim will be required to execute an appropriate release.  Upon execution of the release, the Holder of the claim will be entitled to receive the Expedited payment and will receive no further distribution on their claim.

If a Holder of a Channeled PI/WD Claim (Class 6) or a Channeled Indirect PI/WD Claim (subset of Class 9) does not choose to receive a $5,000 Expedited Distribution, they will be required under the terms of the PI/WD Trust Documents to participate in a process for valuation of their claim to determine the Allowed Claim Amount for that claim. That process will be conducted as follows:

First, the PI/WD Trustee will determine whether threshold eligibility requirements have been met.  As noted above, these requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.  For Indirect Claims, additional eligibility requirements must be met.  Those additional requirements include a determination that the claim is valid and not subject to disallowance under the Code or applicable law, and a showing that the Holder of the Indirect Claim has paid in full the liability or obligation of the PI/WD Trust to a claimant to whom the PI/WD Trust would have otherwise had a liability, that the claim is not subject to a valid defense, and that both the claimant who received the funds and the Holder of the Indirect Claim have or will have fully released the PI/WD Trust.

Next, the Holder of a claim will make a Trust Claim Submission, providing the PI/WD Trustee detailed information about the claim, including records and documents requested by the trustee and cooperation in any written or oral questions the trustee may have regarding the claim.  A more detailed description of the Trust Claim Submission requirements is outlined in the next section.  Other than claims where the Holder elects to receive an Expedited Distribution, no recovery will be provided to a Holder of a claim who does not submit a Trust Claim Submission.  However, the PI/WD Trustee may waive the requirement to provide records or documents if doing so would not impact the trustee's ability to evaluate the claim and requiring the records would constitute an undue hardship.

The PI/WD Trustee will evaluate each Trust Claim Submission individually in accordance with the PI/WD Trust Documents.  The PI/WD Trustee will first determine whether the claim is legally valid and thus allowed or legally invalid and ineligible for compensation.  If the PI/WD Trustee determines additional information is needed for this analysis, the trustee will issue deficiency notices identifying information requested to potentially cure the deficiency.  If the PI/WD Trustee determines a claim is legally invalid and ineligible for compensation, the trustee will provide written notice of this determination to the claimant.

Once the PI/WD Trustee has determined a claim is legally valid, the trustee will the utilize the procedures outlined in the PI/WD Trust Documents to determine value of each claim (the "Proposed Allowed Claim Amount") and will provide notice to the claimant as to this determination. If the claimant accepts the Proposed Allowed Claim Amount, that amount will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

If a claimant disagrees with the PI/WD Trustee's determination as to the validity of a claim or the PI/WD Trustee's Proposed Allowed Claim Amount, the claimant may submit a request for reconsideration, and the decision will be reviewed in a non-binding alternative dispute resolution process in which additional information may be provided.  The PI/WD Trustee may accept or reject any recommendations from this process.  If the PI/WD Trustee rejects the arbitrators' recommendation, the PI/WD Trustee's Proposed Allowed Claim Amount will constitute a final determination.

Once the value and validity of a claim is resolved, whether by acceptance of the Proposed Allowed Claim Amount, completion of the alternative dispute resolution process, or other agreement of the PI/WD Trustee, then the agreed or ordered value of the claim will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

**3.** **PI/WD Claims Allowance.**

The prior section describes the claims administration process for the PI/WD Trust. One part of that process is determining the Proposed Allowed Claim Amount for each Allowed PI/WD Trust claim. This analysis as to personal injury claims is outlined in Article VI of the PI/WD Trust Distribution Procedures.

The PI/WD Trustee's determination will be based on Trust Claim Submissions. In accordance with the PI/WD Trust Documents, these submissions must include applicable medical records, a written, audio, or video narrative describing the injury, evidence of location of incarceration, and to the extent the claim includes wrongful death, a death certificate or applicable medical record evidencing the decedent's death. Where appropriate, the PI/WD Trustee may obtain these records from third parties, including where the claimant does not have counsel.

The PI/WD Trustee will evaluate personal injury claims using a Claims Matrix that separates personal injury claims into five types of personal injuries to provide initial guidance for claim value and applying certain scaling factors to adjust those base values. Those scaling factors include the nature and circumstances of the injury, the impact of the injury, and the amount of out-of-pocket medical expenses faced by a claimant. If a personal injury claim does not fit within one of the five types identified in the Claims Matrix, the PI/WD Trustee will determine which tier the claim best fits in.

## VI. <u>Risk Factors</u>

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTOR WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PLAN SUPPLEMENT AND THE OTHER DOCUMENTS REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASE. THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S RESTRUCTURING AND CONSUMMATION OF THE PLAN.**

**A.** **Bankruptcy Law Considerations.**

**1.** **The Debtor Will Consider All Available Alternatives if the Plan Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor.**

If the transactions contemplated by the Plan are not implemented, the Proponents will consider all available alternatives, including filing an alternative chapter 11 plan, converting to chapter 7, and any other transaction that would maximize the value of the Debtor's Estate. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtor than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Case, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

**2.** **Risks Related to Confirmation and Consummation of the Plan.**

**(a)** **Conditions Precedent to Confirmation May Not Occur.**

As more fully set forth in Article X of the Plan, the occurrence of confirmation and the Effective Date are each subject to a number of conditions precedent. If each condition precedent to confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place. In the event that the Plan is not confirmed or is not consummated, the Chapter 11 Case will likely convert to a case under chapter 7 of the Bankruptcy Code.

(b)      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Proponents believe the classification of Claims and Interests under the Plan complies with the requirements of the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and the Proponents may need to modify the Plan. Such modification could require a re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Plan's classifications of Claims and Interests is not appropriate.

(c)      **The Debtor May Not Be Able to Satisfy the Voting Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Proponents may need to seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan. The Proponents do not believe that any such transaction exists or is likely to exist that would be more beneficial than the Plan.

(d)      **The Proponents May Not Be Able to Secure Confirmation.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular Class under the plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

Subject to the limitations contained in the Plan, the Proponents reserve the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e)      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including third-party releases relating to claims and causes of action that may otherwise be asserted against the Debtor or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and, therefore, may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Plan because the Released Parties, the Debtor, and Exculpated Parties have made significant contributions to the Debtor's proposed exit from chapter 11 and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The

Plan's release and exculpation provisions are an inextricable component of Plan and the significant recovery it affords to Holders of Allowed Claims.

> (f)     **The Debtor May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Proponents believe that the Plan satisfies these requirements, and the Proponents may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

> (g)     **The Chapter 11 Case May Be Converted to a Case under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Proponents believe that liquidation under chapter 7 would result in significantly decreased distributions being made to creditors than those provided for in the Plan because: (a) it is unlikely that the Estate Party Settlement would be consummated outside of the protections of the Plan, (b) significant additional administrative expenses would result from the appointment of a chapter 7 trustee, and (c) additional litigation that a chapter 7 trustee might institute could take years to advance and conclude before Holders of Allowed Claims would see any recovery.

> (h)     **The Chapter 11 Case May Be Dismissed.**

If the Bankruptcy Court finds that the Debtor has incurred substantial or continuing loss or diminution to the Estate and lacks the ability to effectuate substantial consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss the Chapter 11 Case. In such event, the Proponents would be unable to confirm the Plan, which may ultimately result in significantly decreased distributions to creditors than those provided for in the Plan.

> (i)     **Risk of Non-Occurrence of the Plan Effective Date.**

Although the Proponents believe the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived by the Proponents, the Effective Date will not take place.

**B.     Risks Related to Recoveries Under the Plan.**

> **1.     Estimated Recoveries to Holders of Allowed Claims and Interests Are Based on Assumptions and May Vary from Actual Recoveries.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtor), including: (a) the successful confirmation of the Plan; (b) an assumed date for the

occurrence of the Effective Date; (c) the ability of GUC Trustee and the PI/WD Trustee to successfully reduce the amount of Non-Personal Injury Claims and Personal Injury Claims, respectively; and (d) the ability of Holders to exhaust all remedies and obtain separate recovery against applicable insurance policies, if any

The Debtor and the Committees believe the Debtor's Estate is entitled to receive a substantial ERC, and the ERC forms a portion of the recovery to be made available under the Plan. However, there can be no assurance when, or in what amount, the ERC will actually be paid, and as of the date hereof it appears that the processing of ERC applications may be subject to significant delay.

Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Proponents cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

## 2. Litigation Matters.

The Debtor is party to certain lawsuits, legal proceedings, and claims arising out of its business operations. The Debtor cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Case operates as a stay with respect to the commencement or continuation of litigation against the Debtor that was or could have been commenced before the commencement of the Chapter 11 Case. In addition, the Debtor's liability with respect to litigation stayed by the commencement of the Chapter 11 Case generally is subject to settlement and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtor may be subject to settlement and release in connection with the Chapter 11 Case.

It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the GUC Trustee or PI/WD Trustee may become party to, nor the final resolution of such litigation. The impact of any such litigation on recoveries could be material.

## C. Miscellaneous Risk Factors and Disclaimers.

### 1. The Financial Information Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed.

In preparing this Disclosure Statement, the Proponents relied on financial data derived from the Debtor's books and records that was available at the time of such preparation. While the Proponents believe that such financial information fairly reflects the Debtor's financial condition, the Proponents are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to this Disclosure Statement) is without inaccuracies.

### 2. No Legal or Tax Advice Is Provided by This Disclosure Statement.

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal and financial advisor(s) with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to confirmation.

### 3. No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtor and Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Interests, or any other parties in interest.

4. **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  Subject to the release provisions of the Plan, the GUC Trustee or the PI/WD Trustee may seek to investigate, file, and prosecute Claims and may object to Claims after confirmation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5. **Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors.**

The Proponents' respective counsel and financial advisor have relied upon information provided to them in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Proponents have performed certain due diligence in connection with the preparation of this Disclosure Statement and the exhibits to this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to this Disclosure Statement.

6. **No Representations Outside This Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  Those who are entitled to vote to accept or reject the Plan should promptly report unauthorized representations or inducements to counsel to the Debtor, counsel to the Committee, and the Office of the United States Trustee for the Southern District of Texas.

7. **No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## VII.   Certain U.S. Federal Tax Consequences of the Plan

A. **Introduction.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtor has not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of such Holder's individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtor within the meaning of the Tax Code, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, or the base erosion and anti-abuse tax, non-U.S. taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, and passive foreign investment companies).

Further, other than for Holder of PI/WD Claims, this summary assumes that each Holder holds only Claims in a single Class and holds each Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to (1) Holders that have Claims that are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (Classes 1, 2, and 3), or (2) Holders that are deemed to reject the Plan (Classes 6 and 7).

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CLAIM HOLDER IN LIGHT OF SUCH CLAIM HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  HOLDERS OF ALLOWED CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**B.**      **Certain U.S. Federal Income Tax Consequences to the Debtor.**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("CODI"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including equity interests in the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

As a result of the transactions contemplated by the Plan, the Debtor expects to realize CODI. The exact amount of any CODI that will be realized by the Debtor, and the amount of any tax attributes required to be reduced, cannot be known with certainty at this time.

**C.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Classes 4 and 5.**

The following discussion assumes that the Debtor will undertake the transactions currently contemplated by the Plan.  Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Plan.

**1.     Tax Treatment of the GUC Trust and GUC Claimants.**

**(a)     U.S. Federal Income Tax Consequences to the GUC Trust Beneficiaries.**

In general, a GUC Trust Beneficiary will recognize gain or loss in connection with the establishment of the GUC Trust in an amount equal to the difference between (i) the fair market value of its undivided interest in the GUC Trust Assets consistent with its economic rights in the GUC Trust and (ii) the adjusted tax basis of the Allowed GUC Claim or exchanged therefor.  Pursuant to the Plan, the GUC Trustee will in good faith value the assets transferred to the GUC Trust, and all parties must consistently use such valuation for all U.S. federal income tax purposes.

Any gain or loss recognized with respect to an Allowed GUC Claim may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year.  The amount of cash received by a Holder in respect of accrued but unpaid interest or OID should be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting.  Each Holder of an Allowed GUC Claim is urged to consult its tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder's aggregate tax basis in its undivided interest in the GUC Trust Assets (other than those allocable to Disputed Claims) will generally equal the fair market value of such interest, and a Holder's holding period in such assets generally will begin the day following establishment of the GUC Trust.

**(b)     U.S. Federal Income Tax Classification of the GUC Trust.**

The GUC Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to sections 671 through 679 of the Tax Code, with no objective to continue or engage in the conduct of a trade of business. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The GUC Trust will be structured with the intention of complying with such general criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee, and Holders of interests in the GUC Trust) shall treat the transfer of GUC Trust Assets to the GUC Trust as (i) a transfer of the GUC Trust Assets directly to Holders of GUC Trust Interests (other than to the extent GUC Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to the GUC Trust of GUC Trust Assets in exchange for GUC Trust Interests. Accordingly, Holders of GUC Trust Interests should be treated for U.S. federal income tax purposes as the grantors and deemed owners of the GUC Trust and thus, the direct owners of their respective share of GUC Trust Assets (other than such GUC Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the GUC Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the GUC Trust and the GUC Trust Beneficiaries could vary from those discussed herein.

(c)        **General Tax Reporting by the GUC Trust and Holders of GUC Trust Interests.**

In accordance with the treatment of the GUC Trust as a liquidating trust for U.S. federal income tax purposes, all parties must treat the GUC Trust as a grantor trust of which the Holders of GUC Trust Interests are the owners and grantors, and treat the Holders of GUC Trust Interests as the direct owners of an undivided interest in the GUC Trust Assets (other than any assets allocable to Disputed Claims) for all U.S. federal income tax purposes, consistent with their economic interests therein. The GUC Administrator will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).

Items of taxable income, gain, loss, deduction, and/or credit of the GUC Trust (other than otherwise accounted for in a "disputed ownership fund") shall be allocated among the holders of GUC Trust Interests in accordance with their relative ownership of GUC Trust Interests.

As soon as reasonably practicable after the Effective Date, the GUC Trustee shall make (or cause to be made) a good faith valuation of the GUC Trust Assets, and such valuation shall be used consistently by all parties for United States federal income tax purposes. The GUC Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the GUC Trust that are required by any government unit for taxing purposes.

The U.S. federal income tax obligations of a holder with respect to its GUC Trust Interests are not dependent on the GUC Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Trust's income even if the GUC Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions, a distribution of cash by the GUC Trust will not be separately taxable to a holder of GUC Trust Interest as the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC Trust). Holders of GUC Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the GUC Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements. Thus in the case of any non-U.S. Holders, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). Non-U.S. Holders are urged to consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including holding GUC Trust Interests.

The GUC Trustee will also work with the Post-Effective Date Debtor to ensure that any distributions made in respect of Claims that are in the nature of compensation for services are subject to appropriate payroll withholding and reporting, and that any applicable payroll taxes associated therewith are properly remitted. The employer portion of any payroll taxes attributed to Claims that are in the nature of compensation for services shall be borne solely by the Post-Effective Date Debtor. Holders of such Claims are urged to consult their tax advisors with respect to the U.S. federal, state and local income tax consequences of the Plan, including holding GUC Trust Interests.

(d)        **Tax Reporting for GUC Trust Assets Allocable to Disputed Claims.**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (i) may elect to treat any GUC Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (ii) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to such reserve (including any gain recognized upon the disposition of such assets). All distributions from such reserve (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will generally be treated as received by holders in respect of their Claims as if distributed by the Debtors at such time. All parties (including, without limitation, the Debtors, the GUC Trustee, and the holders of GUC Trust Interests) will be required to report for tax purposes consistently with the foregoing. A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

2.        **Tax Treatment of the PI/WD Trust and PI/WD Claimants**.

(a)        **U. S Federal Income Tax Treatment of PI/WD Claimants.**

The Plan provides that on the Effective Date, the PI/WD Trust shall be established in accordance with the terms of the PI/WD Trust Agreement and the Plan.  The Plan further provides that the PI/WD Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of a PI/WD Claim generally is not expected to be treated as receiving a distribution from the PI/WD Trust unless and until such holder is entitled to receive that distribution directly. The U.S. federal income tax consequences to a U.S. Holder of a PI/WD Claim generally will depend upon the nature and origin of the PI/WD Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a PI/WD Claim may not be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages received on account of personal physical injuries or physical sickness, within the meaning section 104 of the Tax Code, which includes wrongful death. However, in the event a payment is treated as attributable to medical expense deductions allowed under section 213 of the Tax Code for a prior taxable year, such payment may be taxable as ordinary income to the U.S. Holder. To the extent a payment from the PI/WD Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, including wrongful death, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of PI/WD Claims will depend on facts particular to each holder, all U.S. Holders of PI/WD Claims are urged to consult their own tax advisors as to their proper tax treatment under their particular facts and circumstances.

(b)        **U.S. Federal Income Tax Treatment of the PI/WD Trust.**

The Plan provides that the PI/WD Trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the remainder of this discussion assumes that this treatment is respected. The Plan further provides that all parties will be required to treat the PI/WD Trust as a qualified settlement fund for all applicable tax reporting purposes.

The PI/WD Trust will be subject to U.S. federal income tax on its modified gross income, if any, at the highest marginal rate provided under the Tax Code for a trust in a taxable year. The PI/WD Trust's modified gross income means its gross income less certain allowed deductions, including but not limited to administration fees, expenses for accounting and legal services, claims processing expenses and other expenses. The Trustee of the PI/WD Trust, as administrator, will be required to file tax returns on behalf of the PI/WD Trust and will be responsible for causing the PI/WD Trust to pay all taxes, if any, imposed on its modified gross income.

D.        **Accrued Interest.**

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest, not previously included in income for U.S. federal income tax purposes, such amount should be taxable to the Holder as interest income.  Conversely, a Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtor.  The Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal.

E.        **Market Discount.**

The "market discount" provisions of the Tax Code provide that some or all of any gain realized by a U.S. Holder who is a Holder of a Claim, and who exchanges the Claim for any amount may be treated as ordinary income to said Holder instead of capital gains to the extent of "market discount" on the debt instruments constituting the exchanged Claim.

A debt instrument is generally considered to have been acquired at a "market discount" if it is acquired other than upon the instrument's original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (i) the sum of remaining payments on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to one quarter of one percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

When a U.S. Holder disposes of Allowed Claims in a taxable disposition, the gain recognized should be treated as ordinary to the extent of market discount accrued while the Allowed Claims were considered held by the U.S. Holder of the debt instrument. However, the foregoing recognition would not occur if the U.S. Holder elected to include market discount in its income as the market discount accrued (*i.e.* if the Holder of the Claim elected to accrue on a constant interest method).

## F.      Withholding and Information Reporting.

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless the recipient is exempt, such as a corporation. Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (i) is a corporation or other person exempt from backup withholding and, when required, demonstrates this or (ii) is a United States Person (as defined by section 7701(a)(30) of the Tax Code) that provides a correct taxpayer identification number ("TIN") on Internal Revenue Service Form W-9 (or a suitable substitute form) and provides the other information and makes the representations required by such form and complies with the other requirements of the backup withholding rules. A Holder may become subject to backup withholding if, among other things, the Holder (i) fails to properly report interest and dividends for U.S. federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN. A Holder that does not provide a correct TIN also may be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax. The U.S. federal income tax liability of a person subject to backup withholding is reduced by the amount of tax withheld as backup withholding. If backup withholding results in an overpayment of U.S. federal income tax, the Holder may obtain a refund of the overpayment by properly and timely filing a claim for refund with the IRS.

## VIII.      Conclusion and Recommendation

For all of the reasons set forth in this Disclosure Statement, the Proponents believe confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Proponents urge all Holders of Claims who are entitled to vote to **ACCEPT** the Plan, and to duly complete and return their Ballots in accordance with the instructions on the Ballots. The Voting Deadline is 5:00 p.m. prevailing Central Time on **February 21, 2024**. To be counted, your Ballot must be fully completed, executed, and actually received by the Claims Agent by the Voting Deadline.

*[Remainder of page left intentionally blank.]*

Dated:   November 13, 2024
        Houston, TX

**Tort Claimants' Committee**

By:    */s/ Paris Morgan and Nathan Alvarez*
Name:  Paris Morgan and Nathan Alvarez
Title: Co-Chairs

- and -

**Official Committee of Unsecured Creditors**

By:    */s/ David Barton*
Name: David Barton
Title: Chair

- and -

**Tehum Care Services, Inc.**

By:    */s/ Russell Perry*
Name: Russell Perry
Title: Chief Restructuring Officer

**Schedule 1**

**Liquidation Analysis**

Tehum Care Services, Inc.
Case No. 23-90086
Liquidation Analysis
Best Interests Test

| ($ in thousands) | Note | Chapter 7 Liquidation Book Value (Unliquidated) | Percentage Low | Percentage High | Liquidation Value Low | Liquidation Value High | Chapter 11 - Joint Plan Book Value (Unliquidated) | Percentage Low | Percentage High | Liquidation Value Low | Liquidation Value High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| 1 Unrestricted Cash and Equivalents | A | $ - | 0.0% | 0.0% | $ - | $ - | $ - | 0.0% | 0.0% | $ - | $ - |
| 2 Employee Retention Credits, gross | B | 25,960.0 | 40.6% | 100.0% | 10,544.3 | 25,960.0 | 25,960.0 | 40.6% | 100.0% | 10,544.3 | 25,960.0 |
| 3 Insurance Proceeds & Third-Party Recoveries | C | 18,761.3 | 5.3% | 53.3% | 1,000.0 | 10,000.0 | 18,761.3 | 5.3% | 53.3% | 1,000.0 | 10,000.0 |
| 4 Causes of Action Proceeds | D | - | 100.0% | 100.0% | - | 53,000.0 | - | 0.0% | 0.0% | - | 3,000.0 |
| 5 Estate Party Settlement, Including Interest | E | - | 0.0% | 0.0% | - | - | 53,437.5 | 100.0% | 100.0% | 53,437.5 | 53,437.5 |
| **6 Gross Proceeds from Estate Assets** | | **$ 44,721.3** | | | **$ 11,544.3** | **$ 88,960.0** | **$ 98,158.8** | | | **$ 64,981.8** | **$ 92,397.5** |
| 7 *Less:* Employee Retention Credits Setoff by Priority Federal Tax Claims | F | | | | $ (8,239.4) | $ (8,239.4) | | | | $ (8,239.4) | $ (8,239.4) |
| 8 *Less:* Employee Retention Credits - Synergi Administrative Fee (dkt 723) | G | | | | (149.4) | (1,148.9) | | | | (149.4) | (1,148.9) |
| **9 Chapter 7 Liquidation Costs** | | | | | | | | | | | |
| 10 Chapter 7 Trustee Fees | H | | | | $ (99.1) | $ (2,421.6) | | | | $ - | $ - |
| 11 Chapter 7 Professional Fees | I | | | | (1,000.0) | (22,200.0) | | | | - | - |
| **12 Total Chapter 7 Liquidation Costs** | | | | | **$ (1,099.1)** | **$ (24,621.6)** | | | | **$ -** | **$ -** |
| **13 Remaining Proceeds Available for Distribution** | | | | | **$ 2,056.3** | **$ 54,950.1** | | | | **$ 56,593.0** | **$ 83,009.2** |
| 14 Budgeted Chapter 11 Administrative Costs | J | | | | $ (23,479.9) | $ (23,479.9) | | | | $ (23,479.9) | $ (23,479.9) |
| 15 Other Administrative Expense Claims | K | | | | (900.5) | (1,515.0) | | | | - | - |
| 16 DIP Facility Funding - Principal Only | L | | | | 20,407.9 | 20,407.9 | | | | 23,479.9 | 23,479.9 |
| **17 Incurred but Unpaid Administrative Expenses** | | | | | **$ (3,972.5)** | **$ (4,587.0)** | | | | **$ -** | **$ -** |
| **18 Remaining Proceeds Available for Distribution after Unfunded Administrative Costs** | | | | | **$ -** | **$ 50,363.1** | | | | **$ 56,593.0** | **$ 83,009.2** |

| ($ in thousands) | Note | Chapter 7 Liquidation Estimated Claims Low | Estimated Claims High | Recovery % Low | Recovery % High | Estimated Recovery $ Low | Estimated Recovery $ High | Chapter 11 - Joint Plan Estimated Claims Low | Estimated Claims High | Recovery % Low | Recovery % High | Estimated Recovery $ Low | Estimated Recovery $ High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **19 Proceeds Available for Distribution after Unfunded Administrative Costs** | | | | | | **$ -** | **$ 50,363.1** | | | | | **$ 56,593.0** | **$ 83,009.2** |
| 20 Super Priority DIP Facility Obligations | M | $ 22,506.6 | $ 22,506.6 | 0.0% | 100.0% | $ - | $ 22,506.6 | $ 25,628.6 | $ 25,628.6 | 0.0% | 0.0% | $ 56,593.0 | $ 83,009.2 |
| **21 Proceeds Available for Distribution after Super Priority Claims** | | | | | | **$ -** | **$ 27,856.5** | | | | | **$ 56,593.0** | **$ 83,009.2** |
| **22 Incremental Administrative Claims** | | | | | | | | | | | | | |
| 23 Plan Trusts' Professional Fees | N | $ - | $ - | 0.0% | 0.0% | $ - | $ - | $ 4,000.0 | $ 4,000.0 | 100.0% | 100.0% | $ 4,000.0 | $ 4,000.0 |
| 24 Post-Effective Date United States Trustee Fees | O | - | - | 0.0% | 0.0% | - | - | 453.9 | 673.3 | 100.0% | 100.0% | 453.9 | 673.3 |
| **25 Total Administrative Claims** | | **$ -** | **$ -** | | | **$ -** | **$ -** | **$ 4,453.9** | **$ 4,673.3** | | | **$ 4,453.9** | **$ 4,673.3** |
| **26 Proceeds Available for Distribution after Administrative Claims** | | | | | | **$ -** | **$ 27,856.5** | | | | | **$ 52,139.0** | **$ 78,335.9** |
| 27 Unclassified - Priority State Tax Claim | P | $ 302.4 | $ 302.4 | 0.0% | 100.0% | $ - | $ 302.4 | $ 302.4 | $ 302.4 | 100.0% | 100.0% | $ 302.4 | $ 302.4 |
| 28 Class 1 - Other Priority Claims | Q | 775.3 | 775.3 | 0.0% | 100.0% | - | 775.3 | 775.3 | 775.3 | 100.0% | 100.0% | 775.3 | 775.3 |
| 29 Class 2 - Other Secured Claims | R | - | - | 0.0% | 0.0% | - | - | - | - | 0.0% | 0.0% | - | - |
| **30 Proceeds Available for Distribution after Priority / Secured Claims** | | | | | | **$ -** | **$ 26,778.8** | | | | | **$ 51,061.3** | **$ 77,258.2** |
| 31 Class 3 - Convenience Claims | S | $ 100.5 | $ 100.5 | 0.0% | 100.0% | $ - | $ 100.5 | $ 100.5 | $ 100.5 | 100.0% | 100.0% | $ 100.5 | $ 100.5 |
| 32 Class 4 / 5 - Non-Personal Injury General Unsecured Claims | T | 124,348.0 | 99,348.0 | 0.0% | 15.9% | - | 15,840.7 | 100,000.0 | 75,000.0 | 24.4% | 44.0% | 24,395.3 | 33,029.8 |
| 33 Class 6 / 7 / 8 - Personal Injury General Unsecured Claims | U | 112,253.3 | 67,970.0 | 0.0% | 15.9% | - | 10,837.6 | 112,253.3 | 67,970.0 | 23.7% | 64.9% | 26,565.5 | 44,128.0 |
| 34 Class 9 / 10 - Indirect Claims | V | - | - | 0.0% | 0.0% | - | - | - | - | 0.0% | 0.0% | - | - |
| **35 Total Class 3-10 Claims** | | **$ 236,701.8** | **$ 167,418.5** | | | **$ -** | **$ 26,778.8** | **$ 212,353.8** | **$ 143,070.5** | | | **$ 51,061.3** | **$ 77,258.2** |
| **36 Total Proceeds Distributed Net of Setoffs** | | | | | | **$ 2,149.1** | **$ 77,648.6** | | | | | **$ 56,742.4** | **$ 84,158.1** |

Tehum Care Services, Inc.
Case No. 23-90086
Liquidation Analysis
Chapter 11 Trust Recovery Analysis

| ($ in thousands) | Note | Chapter 11 - GUC Trust Book Value (Unliquidated) | Percentage Low | High | Liquidation Value Low | High | Chapter 11 - PI/WD Trust Book Value (Unliquidated) | Percentage Low | High | Liquidation Value Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| 1 Unrestricted Cash and Equivalents | A | $ - | 0.0% | 0.0% | $ - | $ - | $ - | 0.0% | 0.0% | - | - |
| 2 Employee Retention Credits, gross | B | 12,980.0 | 40.6% | 100.0% | 5,272.2 | 12,980.0 | 12,980.0 | 40.6% | 100.0% | 5,272.2 | 12,980.0 |
| 3 Insurance Proceeds & Third-Party Recoveries | C | - | 0.0% | 0.0% | - | - | 18,761.3 | 5.3% | 53.3% | 1,000.0 | 10,000.0 |
| 4 Causes of Action Proceeds | D | - | 100.0% | 100.0% | - | 1,500.0 | - | 0.0% | 100.0% | - | 1,500.0 |
| 5 Estate Party Settlement, Including Interest | E | 26,718.8 | 100.0% | 100.0% | 26,718.8 | 26,718.8 | 26,718.8 | 100.0% | 100.0% | 26,718.8 | 26,718.8 |
| **6 Gross Proceeds from Estate Assets** | | **$ 39,698.8** | | | **$ 31,990.9** | **$ 41,198.8** | **$ 58,460.0** | | | **$ 32,990.9** | **$ 51,198.8** |
| 7 *Less:* Employee Retention Credits Setoff by Priority Federal Tax Claims | F | | | | $ (4,119.7) | $ (4,119.7) | | | | $ (4,119.7) | $ (4,119.7) |
| 8 *Less:* Employee Retention Credits - Synergi Administrative Fee (dkt 723) | G | | | | (74.7) | (574.4) | | | | (74.7) | (574.4) |
| **9 Chapter 7 Liquidation Costs** | | | | | | | | | | | |
| 10 Chapter 7 Trustee Fees | H | | | | $ - | $ - | | | | $ - | $ - |
| 11 Chapter 7 Professional Fees | I | | | | - | - | | | | - | - |
| **12 Total Chapter 7 Liquidation Costs** | | | | | **$ -** | **$ -** | | | | **$ -** | **$ -** |
| **13 Remaining Proceeds Available for Distribution** | | | | | **$ 27,796.5** | **$ 36,504.6** | | | | **$ 28,796.5** | **$ 46,504.6** |
| 14 Budgeted Chapter 11 Administrative Costs | J | | | | $ (11,740.0) | $ (11,740.0) | | | | $ (11,740.0) | $ (11,740.0) |
| 15 Other Administrative Expense Claims | K | | | | | | | | | | |
| 16 DIP Facility Funding - Principal Only | L | | | | 11,740.0 | 11,740.0 | | | | 11,740.0 | 11,740.0 |
| **17 Incurred but Unpaid Administrative Expenses** | | | | | **$ -** | **$ -** | | | | **$ -** | **$ -** |
| **18 Remaining Proceeds Available for Distribution after Unfunded Administrative Costs** | | | | | **$ 27,796.5** | **$ 36,504.6** | | | | **$ 28,796.5** | **$ 46,504.6** |

| ($ in thousands) | Note | Chapter 11 - GUC Trust Estimated Claims Low | High | Recovery % Low | High | Estimated Recovery $ Low | High | Chapter 11 - PI/WD Trust Estimated Claims Low | High | Recovery % Low | High | Estimated Recovery $ Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **19 Remaining Proceeds Available for Distribution after Unfunded Administrative Costs** | | | | | | **$ 27,796.5** | **$ 36,504.6** | | | | | **$ 28,796.5** | **$ 46,504.6** |
| 20 Super Priority DIP Facility Obligations | M | $ 12,814.3 | $ 12,814.3 | 0.0% | 0.0% | $ - | $ - | $ 12,814.3 | $ 12,814.3 | 0.0% | 0.0% | $ - | $ - |
| **21 Proceeds Available for Distribution after Super Priority Claims** | | | | | | **$ 27,796.5** | **$ 36,504.6** | | | | | **$ 28,796.5** | **$ 46,504.6** |
| **22 Incremental Administrative Claims** | | | | | | | | | | | | | |
| 23 Plan Trusts' Professional Fees | N | $ 2,000.0 | $ 2,000.0 | 100.0% | 100.0% | $ 2,000.0 | $ 2,000.0 | $ 2,000.0 | $ 2,000.0 | 100.0% | 100.0% | $ 2,000.0 | $ 2,000.0 |
| 24 Post-Effective Date United States Trustee Fees | O | 223.0 | 296.6 | 100.0% | 100.0% | 223.0 | 296.6 | 231.0 | 376.6 | 100.0% | 100.0% | 231.0 | 376.6 |
| **25 Total Administrative Claims** | | **$ 2,223.0** | **$ 2,296.6** | | | **$ 2,223.0** | **$ 2,296.6** | **$ 2,231.0** | **$ 2,376.6** | | | **$ 2,231.0** | **$ 2,376.6** |
| **26 Proceeds Available for Distribution after Administrative Claims** | | | | | | **$ 25,573.5** | **$ 34,208.0** | | | | | **$ 26,565.5** | **$ 44,128.0** |
| 27 Unclassified - Priority State Tax Claim | P | $ 302.4 | $ 302.4 | 100.0% | 100.0% | $ 302.4 | $ 302.4 | $ - | $ - | 0.0% | 0.0% | $ - | $ - |
| 28 Class 1 - Other Priority Claims | Q | 775.3 | 775.3 | 100.0% | 100.0% | 775.3 | 775.3 | - | - | 0.0% | 0.0% | - | - |
| 29 Class 2 - Other Secured Claims | R | - | - | 0.0% | 0.0% | - | - | - | - | 0.0% | 0.0% | - | - |
| **30 Proceeds Available for Distribution after Priority / Secured Claims** | | | | | | **$ 24,495.8** | **$ 33,130.2** | | | | | **$ 26,565.5** | **$ 44,128.0** |
| 31 Class 3 - Convenience Claims | S | $ 100.5 | $ 100.5 | 100.0% | 100.0% | $ 100.5 | $ 100.5 | $ - | $ - | 0.0% | 0.0% | $ - | $ - |
| 32 Class 4 / 5 - Non-Personal Injury General Unsecured Claims | T | 100,000.0 | 75,000.0 | 24.4% | 44.0% | 24,395.3 | 33,029.8 | - | - | 0.0% | 0.0% | - | - |
| 33 Class 6 / 7 / 8 - Personal Injury General Unsecured Claims | U | - | - | 0.0% | 0.0% | - | - | 112,253.3 | 67,970.0 | 23.7% | 64.9% | 26,565.5 | 44,128.0 |
| 34 Class 9 / 10 - Indirect Claims | V | - | - | 0.0% | 0.0% | - | - | - | - | 0.0% | 0.0% | - | - |
| **35 Total Class 3-10 Claims** | | **$ 100,100.5** | **$ 75,100.5** | | | **$ 24,495.8** | **$ 33,130.2** | **$ 112,253.3** | **$ 67,970.0** | | | **$ 26,565.5** | **$ 44,128.0** |
| **36 Total Proceeds Distributed Net of Setoffs** | | | | | | **$ 27,871.2** | **$ 37,079.1** | | | | | **$ 28,871.2** | **$ 47,079.1** |

<u>**Liquidation Analysis**</u>

As a condition to confirmation, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find that each creditor in an impaired class of creditors—*i.e.*, Classes 3–10 under the *Joint Chapter 11 Plan of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor* (Docket No. 1739) (the "<u>Plan</u>")[1]—has either accepted the Plan or will receive or retain, on the Effective Date of the Plan, property on account of such claim in an amount not less than the creditor would receive in a hypothetical Chapter 7 liquidation.

Below is a hypothetical liquidation analysis (the "<u>Liquidation Analysis</u>"), illustrating what creditors would likely receive were the Debtor's Chapter 11 case converted to a Chapter 7 liquidation on the Effective Date of the Plan.

This Liquidation Analysis compares recoveries under the Plan to hypothetical creditor recoveries were the Debtor's assets to be disposed of under the direction of a Chapter 7 trustee, without the benefit of the Estate Party Settlement which is the foundation of the Plan.

On the whole, as illustrated in this Liquidation Analysis, without the benefit of the Estate Party Settlement, administrative costs will be higher, and net distributable proceeds to creditors would be lower. For this reason, the Debtor and the Committees, as Proponents of the Plan, believe that creditors will achieve higher recoveries under the Plan than if the Debtor was liquidated under Chapter 7.

## I.    <u>Limitations and Key Assumptions Underlying the Hypothetical Liquidation</u>

**THE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES DESCRIBED ABOVE AND MAY NOT BE USED FOR ANY OTHER PURPOSE.**

This Liquidation Analysis was prepared by the Plan Proponents and their respective financial advisors and counsel. The Liquidation Analysis contains numerous estimates, based upon a review of the Debtor's records and other documentation. The claims that could be asserted and allowed in a Chapter 7 liquidation, including unpaid Chapter 11 administrative claims (including the DIP Claims, which are being fully released under the Plan pursuant to the Estate Party Settlement, but which would not be released in a Chapter 7 liquidation), and additional administrative claims that will be incurred by a Chapter 7 trustee and the trustee's new professionals, including wind-down costs and Chapter 7 trustee fees, have been estimated.

The Liquidation Analysis also includes estimates of the aggregate value of claims, by claim class, as described in the Plan, as the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims. Unless specifically referenced in the Notes below, the amount of claims reflected in the Liquidation Analysis is based on the proofs of claim actually filed on or before the general bar date, which was August 14, 2023. **Therefore, the estimates of claims set**

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of the ultimate distributions to be made under the Plan.

**THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THIS LIQUIDATION ANALYSIS.**

The assumptions utilized in developing this Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Plan Proponents or a hypothetical Chapter 7 trustee at the present time. For example, in a hypothetical Chapter 7 liquidation, it is unknown how quickly litigants will seek relief from the automatic stay, and how the timing of litigation may impact creditors' rights in the Debtor's various insurance policies. Accordingly, there can be no assurance that the values assumed in the Liquidation Analysis will be realized if the Debtor's assets were actually liquidated under Chapter 7 of the Bankruptcy Code. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Plan Proponents recognize that there are other potential liquidation alternatives that are not presented in the Liquidation Analysis, including alternatives that would give rise to further reduced and delayed creditor recoveries.

**THE PLAN PROPONENTS RESERVE THE RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THIS LIQUIDATION ANALYSIS, INCLUDING A CHANGE TO THE UNDERLYING ASSUMPTIONS AND ANALYSIS.**

**General Assumptions**

The following general assumptions were considered by the Plan Proponents and their advisors as assumptions that would be applicable in any hypothetical Chapter 7 liquidation.

1. **Timing Considerations of Chapter 7 Case**

The Liquidation Analysis assumes an orderly liquidation of the Debtor over a 3-month period commencing on or around December 31, 2024 (the "Conversion Date"). This timeline assumes substantially all of the Debtor's assets (other than insurance proceeds, litigation proceeds, and recoveries from causes of action to be pursued by the Chapter 7 trustee) will be realized by March 31, 2025, representing a three-month period following the Conversion Date.

There can be no assurance, however, that a liquidation would be completed in such a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtor's assets would in fact ever be realized. In reality, proceeds from litigation and insurance will take months (if not years) to realize if the case is converted to Chapter 7. Moreover, there can be no guarantee that a Chapter 7 trustee will realize greater value from causes of action than the $50.0 million settlement amount that is part of the Estate Party Settlement.

2.      **Professionals Involved in the Chapter 7 Case**

As part of a hypothetical Chapter 7 case, the Plan Proponents assume a Chapter 7 trustee would choose to retain certain professionals, including counsel, financial advisors, and potentially others, to provide expertise and assistance in the Debtor's liquidation.  The Liquidation Analysis assumes that the Chapter 7 trustee would replace the Debtor's existing professionals with new professionals who do not have the same level of background knowledge as the Debtor's existing professionals.

It is possible that the Chapter 7 trustee would retain the Committees' professionals to assist in the pursuit of certain estate causes of action to avoid duplication of effort and expense.

3.      **Trustee Fees for Chapter 7 Administration**

Under section 326(a) of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Chapter 7 trustee's services not to exceed three percent (3%) of the moneys disbursed or turned over in the case by the Chapter 7 trustee to parties in interest in excess of $1 million, excluding the Debtor, but including holders of secured claims.  The Plan Proponents assume in the Liquidation Analysis that such fees would be approximately three percent (3%) of gross liquidation proceeds.

4.      **Additional Claims**

Conversion of the Debtor's Chapter 11 case to Chapter 7 will trigger additional costs of administration that do not otherwise exist under the proposed Plan.  Additionally, the DIP Claims proposed to be released under the Plan would not be released in a Chapter 7 case. Examples of these kinds of Claims include tax liabilities triggered upon liquidation, Claims related to rejection of executory contracts, higher DIP Claims and other litigation Claims. These claims could be significant and will be entitled to priority in payment over General Unsecured Claims in the Chapter 7 distribution waterfall.  No adjustment has been made for these potential claims unless specified in the assumptions and notes to the Liquidation Analysis.

5.      **Basis of Presentation**

The hypothetical Liquidation Analysis is based on the unaudited balance sheet and other documentation of the Debtor as of August 31, 2024, with certain adjustments to reflect anticipated activity through the Conversion Date.

6.      **Additional Assumptions for Liquidation**

The Plan Proponents assume a liquidation would be conducted pursuant to Chapter 7 of the Bankruptcy Code, with a Chapter 7 trustee appointed to manage the bankruptcy estate. The Chapter 7 trustee would be responsible for liquidating the Debtor's assets in a manner intended to maximize the recovery to creditors.  Because the Debtor ceased operating in April 2022, the major components of the liquidation process would be as follows:

- pursuing Causes of Action, including avoidance actions under Chapter 5 of the Bankruptcy Code, which are too speculative to value;[2]

- administering and managing costs and post-conversion expenses related to the monetization of estate assets, such as costs associated with litigation, claims reconciliation costs, estate wind down costs, and Chapter 7 trustee and professional fees; and

- distributing net proceeds to claimants in accordance with the priority scheme under Chapter 7 of the Bankruptcy Code.

## II. Consummation of the Plan Will Provide Greater Value to Creditors than a Chapter 7 Liquidation

Because distributions to creditors in a hypothetical Chapter 7 liquidation, as reflected in the Liquidation Analysis, will be significantly lower relative to the forecasted recoveries under the Plan, the Plan Proponents believe that consummation of the Plan will provide greater value to such holders than would a liquidation under Chapter 7 of the Bankruptcy Code.

## III. Notes to Liquidation Analysis

### A. Unrestricted Cash and Equivalents

The Debtor has not operated since April 2022 and as such, has no ability to generate cash flow. The only source of cash since the Petition Date has been from the DIP Facility. The Debtor maintains no unrestricted cash balance and therefore the value of Unrestricted Cash and Equivalents is zero.

### B. Employee Retention Credits ("ERC")

Employee Retention Credits represent refundable tax credits, authorized by the CARES Act, for keeping employees on payroll during the COVID-19 pandemic during calendar years 2020 and 2021. The Debtor believes these tax credits would be pursued in either Chapter 7 or Chapter 11, and that the recovery estimates would be the same in either scenario. The recovery amounts are presented before payment of Allowed Priority Federal Tax Claims and Allowed Administrative Claims of Synergi Partners, Inc. (*see* Docket No. 723).

---

[2]   Under the Estate Party Settlement, the Trusts will receive $50.0 million, without incurring any additional litigation costs or expenses to pursue or collect such amounts. For creditors to recover more in a hypothetical Chapter 7 liquidation, a Chapter 7 trustee would not only have to prove damages in excess of $50.0 million, but the Chapter 7 trustee would also have to actually collect an amount in excess of $50.0 million to account for trustee fees and other expenses, including contingency professionals. Finally, the Chapter 7 trustee would have to complete this process faster than the expected approximately 30-month time frame under the Plan—where the settlement amounts will be paid in monthly installments starting on the Effective Date.

C.    **Insurance Proceeds & Third-Party Recoveries**

The high- and low-end recoveries reflected in Line 3 are the Debtor's best estimate as to the range of potential insurance recoveries based upon the Debtor's high-level review of the claims made under the Debtor's various insurance policies and the remaining limits thereunder.  Any recoveries from insurance are believed to be the same in either Chapter 7 or Chapter 11.  However, the key distinction is that the Plan offers a fair and efficient mechanism (as detailed in PI/WD Trust Distribution Procedures and further illustrated in Schedule 3 to the Disclosure Statement) for claimants to settle their claims and be paid from insurance.  Conversely, a Chapter 7 liquidation would leave every creditor to fend for itself without any way to ensure that proceeds are available for all personal injury claimants, rather than those who get their judgments first.  A Chapter 7 trustee would likely allow the automatic stay to lift for all claimants so that pro se litigants and other incarcerated individuals, most without access to counsel or judicial resources, would be at a severe disadvantage in the "race to the courthouse" that may exhaust proceeds under the Debtor's various insurance policies before most individuals have their day in court.  Additionally, there is no way to determine how the potential recoveries from third parties might be distributed to creditors in either Chapter 7 or Chapter 11.

D.    **Causes of Action Proceeds**

Potential recoveries in this line represent recoveries on any and all claims or causes of action owned by the Estate, but not including Insurance Proceeds & Third-Party Recoveries from Note C.  As noted in the Plan and Disclosure Statement, the Plan proposes to settle certain of the Estate's potential Causes of Action against the Settlement Parties for $50.0 million.  The Plan Proponents believe there are approximately $5.0 million in avoidance actions other than those settled as part of the Estate Party Settlement.  Of that amount, the Plan Proponents believe the range of realistic recoveries is between $0 and $3.0 million.  Further, the Plan Proponents believe that there are risks that Chapter 7 trustee would not be able to liquidate the Estate's claims against the Settlement Parties for an amount in excess of the $50.0 million Estate Party Settlement amount.  As a result, the low-end of recoveries in Line 4 reflects a $0 recovery on the Estate's claims against the Settlement Parties and other causes of action.  The $50.0 million high-end in Line 4 reflects the Trusts recovering the same $50.0 million as the Estate Party Settlement, plus an additional $3.0 million in other avoidance actions.  The same assumptions are made for the Chapter 11 scenario, with the $50.0 million Estate Party Settlement reflected in Line 5 and discussed below.

E.    **Estate Party Settlement**

The Estate Party Settlement provides significant value to claimants under the Plan.  The cash component of the Estate Party Settlement is in the aggregate principal amount of $50.0 million and interest of $3.4 million, to be paid to the Trusts for distribution to Holders of Allowed Channeled Claims, payable in multiple installments as follows:  (i) $2.0 million in Cash on the Effective Date, and (ii) $48.0 million in Cash plus 6% in Cash Interest paid to the Trusts in monthly principal installments of $3.5 million and $3.0 million in the first

two months and $1.5 million every month for the next 27 months with a final payment of $1.0 million.  The first payment is to be made 30 days after the Effective Date.

**F.**     **Employee Retention Credits Setoff by Priority Federal Tax Claims**

The Internal Revenue Service ("IRS") has filed amended Priority Federal Tax Claims totaling approximately $8.2 million.  The Debtor assumes that the IRS will offset its Claims against the Employee Retention Credits.  The Liquidation Analysis therefore deducts this amount from Gross Proceeds from Estate Assets in both the Chapter 11 and 7 scenarios.

**G.**     **Employee Retention Credits—Synergi Administrative Fee [Docket No. 723]**

Pursuant to order of the Bankruptcy Court at Docket No. 723, Synergi has an Allowed Administrative Claim calculated as 10% of the refundable ERC returns filed by the Debtor after June 27, 2023 (the date of entry of the order) and actually approved and paid in cash to the Debtor or its successor.  The Debtor filed ERC returns after June 27 for 2020 in the aggregate amount of approximately $7.6 million.  Before June 27, 2023, the Debtor filed ERC returns for 2021 in the aggregate amount of approximately $9.1 million.  Subsequently, the debtor filed approximately $9.2 million in ERC returns for 2020 and 2021 in addition to the $16.7 million originally filed after June 27, 2023. The Debtor assumes the IRS will combine the ERC credits for 2020 and 2021, and offset the approximate $8.2 million in priority IRS claims, and remit the balance to the Debtor.  For purposes of calculating the Synergi fee, the Debtor assumes the total priority IRS claim is allocated pro rata to each of 2020 and 2021, which results in the reflected fee to Synergi.

**H.**     **Chapter 7 Trustee Fees**

The Liquidation Analysis assumes hypothetical Chapter 7 trustee fees would be as set forth in section 326(a) of the Bankruptcy Code.  The Plan Proponents assume that Chapter 7 trustee fees will be approximately 3% of Gross Proceeds from Estate Assets (Line 6).

**I.**     **Chapter 7 Professional Fees**

Chapter 7 Professional Fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the Chapter 7 trustee.  In the Liquidation Analysis, Chapter 7 Professional Fees are estimated to be approximately $1.0 million plus a 40% contingency fee on the Causes of Action Proceeds (Line 4).  This amount may fluctuate based on the length and complexity of the wind-down process and could be substantially greater if the claims cannot be resolved without the need for substantial litigation.

**J.**     **Chapter 11 Administrative Costs**

Chapter 11 Administrative Expenses represent the costs associated with the administration of the Debtor's Chapter 11 case including professional fees and other administrative expenses through the Effective Date of the Plan.  The Chapter 11 Administrative Costs of approximately $23.5 million represent the total administrative expenses for the Chapter 11 case, comprised of: (i) approximately $12.4 million, of incurred and paid administrative claims through September 20, 2024; (ii) approximately $8.9 million, of incurred but unpaid

administrative claims through September 20, 2024; and (iii) approximately $2.1 million in incremental Administrative Claims expected to be incurred for the remainder of the Chapter 11 case through the anticipated Effective Date.  The actual Administrative Claims may be higher as a result of the additional hearings required to obtain approval of the Plan and Disclosure Statement.

The Chapter 7 scenario assumes the same as the Chapter 11 scenario above, except the Plan does not receive final approval.  Unpaid, incremental expenses will remain outstanding and must be paid by the hypothetical Chapter 7 trustee before there can be distributions to General Unsecured Creditors.

### K.    Other Administrative Expense Claims

This line includes filed or anticipated Administrative Claims for entities other than estate professionals who have provided services to the Debtor during the Chapter 11 Case.  As discussed in the Disclosure Statement, Sigma Risk Management ("Sigma") is likely to seek payment for its postpetition services of approximately $3.0 million.  For illustrative purposes, the Liquidation Analysis assumes a range for ultimate Allowed Administrative Claims, mostly consisting of claims filed by Sigma.  In the Chapter 11 scenario, there would be no recovery without an increase in the DIP funding; therefore, no recovery is currently assumed in the Chapter 11 scenario.

In a hypothetical Chapter 7 liquidation, unpaid Chapter 11 Administrative Claims are senior in rights to payment to General Unsecured Claims and must be paid in full before General Unsecured Claims may receive a distribution.  Thus, under this illustration, the Liquidation Analysis assumes that the Chapter 7 will be unable to pay the allowed Chapter 11 Administrative Expenses in full, meaning that under the low-end scenario, there will be no funds left to pay holders of General Unsecured Claims, as these Administrative Claims will consume all remaining proceeds of the estate.

### L.    DIP Facility Funding - Principal Only

The Chapter 11 DIP Facility Funding of $23.5 million represents the total principal amount of DIP funding estimated to be received by the Debtor, comprised of: (i) approximately $13.2 million, of funded DIP draws through September 20, 2024; (ii) approximately $9.7 million in incremental DIP draws; and (iii) use of approximately $0.6 million of the $1.0 million back-stop allowed for professional fees and expenses.

The Chapter 7 scenario assumes a Plan is not confirmed and therefore the final $2.5 million due upon confirmation is funded, nor does the estimated $0.6 million of the $1.0 million back stop.

It is important to note that this represents the principal only and does not include PIK interest or funding fees.

**M.**   **DIP Claims**

In the Chapter 11 scenario, the DIP Claims represent the total DIP Ending Balance including principal, PIK interest, funding fees, and $0.6 million of the $1.0 million back stop less the amounts that will be released pursuant to the Estate Party Settlement.

In the Chapter 7 scenario, DIP Claims will be lower because the final $2.5 million in funding due upon confirmation and the $0.6 million back stop are assumed to not be funded.

It is important to note that in the absence of advances made under the DIP Facility, the Chapter 7 trustee would still have to pay Chapter 11 administrative expenses for the same amount.

**N.**   **Plan Trusts' Professional Fees**

This line estimates the projected expenses associated with the Personal Injury Trust and the GUC Liquidating Trustee professional fees to be incurred after the Effective Date, as well as other wind down expenses necessary to discharge the duties and responsibilities of the respective Trusts.

These expected costs of $2.0 million for each of the GUC Trust and PI/WD Trust, respectively are estimated to be incurred in the Chapter 11 scenario in both the low and high scenarios.  However, the actual amounts could differ based on the length and complexity of the wind-down processes and could be higher or lower than the amounts assumed herein.

**O.**   **Post-Effective Date United States Trustee Fees**

These fees represent the statutory fees payable to the United States Trustee in the Chapter 11 scenario and are approximately 0.8% of total distributions estimated to be made to creditors.  No UST fees will be required in the Chapter 7 liquidation scenario.  Instead, the Chapter 7 trustee will be entitled to a fee of up to 3% for all distributions made from the estate.

**P.**   **Unclassified – Priority State Tax Claims**

This category includes approximately $302.4 thousand of state tax claims entitled to priority treatment under the Bankruptcy Code.

In the Chapter 11 scenario, all Priority State Tax Claims are estimated to receive 100% recovery in both the low and high scenarios, respectively.  To the extent all or a portion of any of these claims are disallowed or reduced, additional funds could be available for distribution to holders of General Unsecured Claims.

In the Chapter 7 scenario, the priority state tax claims will receive 0% recovery in the low-end scenario because there will not be sufficient funds on hand to pay such claims.

Q.     **Class 1 – Other Priority Claims**

This category includes proofs of claim filed as "priority claims" in the approximate amount of $775.3 thousand, excluding the state and federal priority tax claims discussed above.

In the Chapter 11 scenario, all Other Priority Claims are estimated to receive 100% recovery.

R.     **Class 2 – Other Secured Claims**

This category includes proofs of claims filed as "secured claims" in the approximate amount of $16.4 million. These proofs of claim include the following: (i) claims filed by a group of insurance companies purportedly secured by approximately $14 million cash deposits held by such insurance companies, but allocated to CHS TX, Inc. in the divisional merger (*see* KCC Claim Nos. 583 & 584; *see also* Docket No. 810); and (ii) claims filed by trade vendors purportedly secured by equipment in the possession or control of the Debtor.

Plan Proponents do not believe that the insurance companies are entitled to any distribution as secured creditors from the cash held by the estate because, among other things, the collateral purportedly securing such claims has been allocated to CHS TX, Inc. pursuant to the divisional merger. While Plan Proponents do not believe any such creditors are entitled to a distribution as secured creditors from the cash proceeds available, such creditors may be entitled to seek recovery as general unsecured creditors and nothing in the Plan prohibits such creditors from asserting such an unsecured claim or a Plan Proponent, the GUC Trustee, or any other party in interest from objecting to the same. To the extent the Debtor still possess any equipment leased from or financed by a trade vendor, such equipment will be tendered back to such creditor. As a result, all of these "Other Secured Claims" have been zeroed out and removed from the Liquidation Analysis because the Plan Proponents do not believe any such creditors are entitled to a distribution from the cash proceeds available.

S.     **Class 3 – Convenience Claims**

Convenience Claims represent any Claim that would otherwise be a General Unsecured Claim that is Allowed in the amount of $5,000 or less.

Proofs of claim filed in the approximate amount of $100.5 thousand are assumed to receive 100% recovery in both the Chapter 11 low and high scenarios, and no recovery in the Chapter 7 low recovery scenarios.

T.     **Class 4 / 5 – Non-Personal Injury Claims**

Proofs of claim filed in the approximate amount of $138.6 million. The Debtor and UCC estimates Non-Personal Injury Claims could be allowed in the range of $75.0 million-$100.0 million, excluding settlement party proof of claim amounts. Depending on the ultimate amounts Allowed, and all of the other factors discussed herein, these claims could

recover between 24.4% and 44.0% under the Plan.  Chapter 7 claims include settlement party proof of claim amounts.

U.  **Class 6 / 7 / 8 – Personal Injury Claims**

Proofs of claim filed in the approximate face amount of $1.1 billion.  The TCC values Personal Injury Claims in the range of $68.0 million – $112.3 million based on applying the proposed Trust Distribution Procedures to filed / pending claims. These claims could recover between 23.7% and 64.9% under the Plan.

V.  **Class 9 / 10 – Indirect Claims**

Proofs of claim filed in the approximate amount of $10.4 million.  As set forth in the Plan, these claims will receive the same treatment as provided under section 509 of the Bankruptcy Code, which provides for such claims to be subrogated to the claims that are paid, but subordinated until such claims are paid in full.

**<u>Schedule 2</u>**

**Professional Liability Insurance Policy Information**

| 6797138 | Valitas Health Services, Inc. | **Lexington** | 1/1/2013 - 1/1/2014 | Occurance | Generally $1 M but varies by state. As low as $250k in FL. | $35 M | no | | Generally equal to limits amount | AZ excluded |
|---|---|---|---|---|---|---|---|---|---|---|
| 6796367 | Valitas Health Services, Inc. | **Lexington** | 8/31/2013 - 8/31/2014 | Occurance | $500k (physicians only) | $1.5 M per physician | yes | | none | Limited to certain Philadelphia and Pittsburgh locations. |
| 6797600 | Valitas Health Services, Inc. | **Lexington** | 1/1/2014 - 1/1/2015 | Occurance | Generally $1 M but varies by state. As los as $250k in IN and FL. | $48 M | no | | Generally equal to limits amount | AZ excluded |
| 6796367 | Valitas Health Services, Inc. | **Lexington** | 8/31/2014 - 3/1/2016 | Occurance | $500k (physicians only) | $1.5 M per physician | yes | | none | Limited to certain Philadelphia and Pittsburgh locations. |
| 6797914 | Valitas Health Services, Inc. | **Lexington** | 1/1/2015 - 1/1/2016 | Occurance | Generally $1 M per contractor but varies in some states, particularly FL and IA where $250k | $48 M | no | | Generally equal to limits amount | AZ excluded |
| 4-100092 | Valitas Health Services, Inc. | **Lone Star Alliance** | 1/1/2016 - 1/1/2017 | Occurance | Varies by state from $250k to $3 M w/ agg. limit for all insured usually twice indiv. limit or more. (Incident limits capped at $2 M until agg SIR satisfied.) | $22 M - Some states exempt from Agg. Limits cap | no | | Generally equal to limits amount | AZ excluded |
| 4-100159 | Valitas Health Services, Inc. | **Lone Star Alliance** | 1/1/2017 - 1/1/2018 | Occurance | Varies by state from $250k to $3 M w/ agg. limit for all insured usually twice indiv. limit or more. (Incident limits capped at $2 M until agg SIR satisfied.) | $22.5 M - Some states exempt from Agg. Limits cap | no | | Generally equal to limits amount | AZ excluded |

| 4-453668 | Valitas Health Services, Inc. | **Lone Star Alliance** | 1/1/2018 - 1/1/2019 | Occurance | Varies by state from $250k to $3 M w/ agg. limit for all insured usually twice indiv. limit or more. (Incident limits capped at $2 M until agg SIR satisfied.) | $24 M - Some states exempt from Agg. Limits cap | no | | Generally equal to limits amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| 4-454719 | Valitas Health Services, Inc. | **Lone Star Alliance** | 1/1/2019 - 1/1/2020 | Occurance | Varies by state from $250k to $3 M w/ agg. limit for all insured usually twice indiv. limit or more. (Incident limits capped at $2 M until agg SIR satisfied.) | $21 M - Some states exempt from Agg. Limits cap | no | | Generally equal to limits amount | AZ excluded |
| 4-455844 | Valitas Health Services, Inc. | **Lone Star Alliance** | 1/1/2020 - 1/1/2021 | Occurance | Varies by state from $250k to $3 M w/ agg. limit for all insured usually twice indiv. limit or more. (Incident limits capped at $2 M until agg SIR satisfied.) | $21 M - Some states exempt from Agg. Limits cap | no | | Generally equal to limits amount | AZ excluded |
| 4-455388 | Valitas Health Services, Inc. | **Lone Star Alliance** | Tail policy for 1/1/2020 - 1/1/2021 policy period allowing reporting to 7/1/2021 | Occurance | Varies by state from $250k to $3 M w/ agg. limit for all insured usually twice indiv. limit or more. (Incident limits capped at $2 M until agg SIR satisfied.) | $21 M - Some states exempt from Agg. Limits cap | no | | Generally equal to limits amount | AZ excluded |

# EXCESS POLICIES

| Policy Number | Insured | Insurer | Policy Period | Claims Made / Occurance Type Policy | Per Incident / Per Claim Limits | Aggregate Limits (Initially available per policy terms) | Notes |
|---|---|---|---|---|---|---|---|
| B0180C121204 | Corizon | Underwriters (Beazley) | 1/1/2012 - 1/1/2013 | Claims made | $10 M | $10 M | Underlying $5 M not including costs |
| B0180C131204 | Corizon | Underwriters (Beazley) | 1/1/2013 - 1/1/2014 | Claims made | $10 M | $10 M | Underlying $5 M not including costs. AZ and  WI excluded. |
| B0180PD1431204 | Corizon | Underwriters (Beazley) | 1/1/2014 - 1/1/2015 | Claims made | $10 M | $10 M | Underlying $5 M not including costs |
| B0180PD1531204 | Corizon | Underwriters (Beazley) | 1/1/2015 - 1/1/2016 | Claims made | $10 M | $10 M | Underlying $5 M not including costs. AZ and WI excluded. |
| 5-10038 | Valitas Health Services, Inc. | Coverys | 3/4/2016 - 3/4/2017 | Claims made | $8 M | $8 M | Underlying is Lone Star 4-100109. Substantially follows form |
| 5-10229 | Valitas Health Services, Inc. | Coverys | 3/4/2017 - 3/4/2018 | Claims made | $8 M | $8 M | Underlying is Lone Star 4-453898. Substantially follows form |
| 5-10262 | Valitas Health Services, Inc. | Coverys | 3/4/2018 - 3/4/2019 | Claims made | $8 M | $8 M | Underlying is Lone Star 4-453898. Substantially follows form |
| 005TN000025399 | Valitas Health Services, Inc. | Coverys | 3/4/2019 - 7/1/2019 with an extended reporting period until 7/1/2021 with no increase in limits | Claims made | $8 M | $8 M | Underlying is Lone Star 4-453898. Substantially follows form |
| HPS0000015 | Valitas Health Services, Inc. | Nationwide/Scottsdale | 1/1/2016 - 1/1/ 2017 | Claims made | $10 M | $10 M | Underlying $5 M per claim not including costs.  AZ and WI excluded. |
| HPS0000036 | Valitas Health Services, Inc. | Nationwide/Scottsdale | 1/1/2017 - 1/1/2018 | Claims made | $10 M | $10 M | Underlying $5 M per claim not including costs.  AZ and WI excluded. |

| HPS0000058 | Valitas Health Services, Inc. | Nationwide/Scottsdale | 1/1/2018 - 1/1/2019 | Claims made | $10 M | $10 M | Underlying $5 M per claim not including costs.  AZ and WI excluded. |
| HPS0000093 | Valitas Health Services, Inc. | Nationwide/Scottsdale | 1/1/2019 - 1/1/2020 | Claims made | $10 M | $10 M | Underlying $2 M per claim not including costs with $2M aggregate and then $5M per claim with no aggregate.  AZ and WI excluded. |
| HPS0000146 | Valitas Health Services, Inc. | Nationwide/Scottsdale | 1/1/2020 - 1/1/2021 | Claims Made | $10 M | $10 M | Generally, underlying $2 M per claim not including costs with $2M aggregate and then $5M per claim with no aggregate.  Also excess of Ironshore policy #004334400 and then with $4M aggregate cap.  AZ excluded. |
| HPS0000232 | Valitas Health Services, Inc. | Nationwide/Scottsdale | 1/1/2021 - 1/1/2022 | Claims Made | $10 M | $10 M | Generally, underlying $2 M per claim not including costs with $2M aggregate and then $5M per claim with no aggregate.  Also excess of Ironshore policy #HC7AAB65W8001 and then with $4M aggregate cap.  AZ excluded. |

## Notes to Schedule 2

**Coverys' Specialty Insurance Company ("Coverys") makes the following contentions:**

Coverys, an Insurance Company that provided certain insurance policies to the Debtor or its predecessor, contends that each of the Coverys policies contains clauses prescribing the contractual rights and obligations of Coverys and its insureds.  Coverys also contends that the Coverys policy 005TN000025399 was in effect from 3/4/2019 until cancellation effective 7/1/2019.  Additionally, Coverys contends that an "Extended Reporting Period" was issued for the period 7/1/20190-7/1/2021, but that endorsement did not extend the policy period beyond 7/1/2019 and did not increase or supplement the applicable limits of liability. Coverys also contends that its four policies had limits, respectively, of $8,000,000 per Claim (not per "Incident") and $8,000,000 in aggregate limits.  Coverys also contends that the 2017 and 2019 policies were eroded by payment of claims prepetition and coverage released for such claims.  Coverys also contends that Lone Star, another insurer assigned a separate policy number, 40455388, to its "tail" for 7/1/2019 to 7/1/21, and that Lone Star has separate limits of liability for its "tail."  Coverys contends that, nonetheless, the Coverys' extended reporting endorsement discussed above does not have separate limits. Rather, according to Coverys, the insured received two additional years to report certain claims to Coverys, and the $8,000,000 aggregate limit for the policy as issued with a 3/4/2019 inception date was the limit available for the policy period and tail.  Additionally, Coverys contends that no Coverys policy "follows form" to Lone Star's tail – meaning, according to Coverys, that the Coverys policed did not follow all of the terms of the underlying Lone Star Policies or that there are additional or conflicting terms in the Coverys policies.

**Lexington Healthcare ("Lexington") makes the following contentions:**

Lexington, an Insurance Company that provided certain insurance policies to the Debtor or its predecessor, contends the following:

An Endorsement to each of the Lexington Healthcare liability policy numbers 6797138 (eff. 1/1/12-1/1/13), 6797138 (eff. 1/1/13-1/1/14), 6797600 (eff. 1/1/14-1/1/15), 6797914 (eff. 1/1/15-1/1/16) each provide for a Retrospective Premium obligation and each such Endorsement includes the following language:

> If the First Named Insured fails to pay any additional premiums owed under this endorsement, then we [Lexington] ***shall subtract*** such additional premiums from any outstanding future loss payments under this policy.  (Emphasis added).

Lexington may take the position that Claimant's potential recovery from these policies is adversely effected or eliminated by this Endorsement.

Additionally, Lexington advises that the list of Lexington policies in Section 2 of this Disclosure Statement does not include all policies that Lexington has ever issued to the Debtor and its predecessors, but there are no claims known to Debtor now pending that are believed to be covered under policies not listed.  Further, while the list of Lexington polices presents the Debtor's understanding as to aggregates for the Lexington Policies, Lexington advises that it calculates some difference as to certain of the listed aggregates for certain of the Lexington Policies.  All parties' rights are reserved with respect to these amounts.

**Potential Additional Policies:**

The Tort Claimant' Committee has received information that suggests there may be additional policies that might be available to respond to claims against the Debtor but the Tort Claimant's Committee has

# Notes to Schedule 2

not been able to verify the existence or terms to these policies at this time.  Those potential additional policies may be identified as the following:

- Lexington Policy No. 6440014 (eff. 10/1/09-10/1/10); Occurrence-based. Limits of $1m; $3m. Policy Aggregate of $25,806,990
- Lexington Policy No. 6440014 (eff. 10/1/10-1/1/12); Occurrence-based. Limits of $1m; $3m. Policy Aggregate of $30,999,879


Older ASG Policies (no copies currently available)

- Lexington Policy 6801364 (eff. 1/1/02-1/1/03)
- Lexington Policy 6791649 (eff. 1/1/03-1/1/04)
- Lexington Policy 6791416 (eff. 1/1/04-1/1/05)
- Lexington Policy 6793309 (eff. 1/1/05-1/1/06)
- Lexington Policy 6793839 (eff. 1/1/06-1/1/07)
- Lexington Policy 6795042 (eff. 1/1/08-1/1/10)
- Lexington Policy 6440015 (eff. 1/1/10-1/1/12)


PA Only Policies (physicians only)

- Lexington Policy 6796367 (eff. 8/31/09-8/31/10); Occurrence. Limits of $500k per physician; $1.5m per physician aggregate
- Lexington Policy 6796367 (eff. 8/31/10-8/31/11); Occurrence. Limits of $500k per physician; $1.5m per physician aggregate
- Lexington Policy 6796367 (eff. 8/31/11-8/31/12); Occurrence. Limits of $500k per physician; $1.5m per physician aggregate


PA Only Policies (ASG)

- Lexington Policy 6796366 (eff. 9/1/09-9/1/10); Occurrence. Limits of $500k per physician; $1.5m per physician aggregate; $1m Non Physician; $2m aggregate
- Lexington Policy 6796728 (eff. 9/1/10-9/1/11); Occurrence. Limits of $500k per physician; $1.5m per physician aggregate; $1m Non Physician; $2m aggregate


AZ Only Policies

- Lexington Policy No. 9389853 (eff. 3/4/13-3/4/14); Claims Made. Limits of $10m; $10m. $50K SIR
- Lexington Policy No. 6797662 (eff. 3/4/14-3/4/15); Claims Made. Limits of $10m; $10m. $50K SIR
- Lexington Policy No. 6797964 (eff. 3/4/15-3/4/16); Claims Made. Limits of $10m; $10m. $50K SIR (Agg limit exhausted)


Older Physicians and Surgeons Policies (ASG)

## Notes to Schedule 2

- Lexington Policy No. 6801415 (eff. 9/1/03-9/1/04); Claims Made. Limits of $500k; $1.5m aggregate

**<u>Potential Corrections as to Policy Aggregate Limits:</u>**

The Tort Claimant' Committee has received information that suggests that the schedule above may incorrectly describe the Aggregate Limits amounts with respect to two of the policies listed.  The Tort Claimant's Committee has not been able to confirm this information at this time.  The information received suggests the following identified policies have Aggregate Limits as indicated below:

- Lexington Policy No. 6797138 (eff. 1/1/13-1/1/14) - $38,533,977 Policy Aggregate
- Lexington Policy No. 6797600 (eff. 1/1/14-1/1/15) - $46,163,209 Policy Aggregate

**<u>Schedule 3</u>**

**PI/WD Claimant Recovery Analysis**

**TEHUM - ILLUSTRATIVE CHANNELED PI/WD CLAIM RECOVERIES**

| Tier | Est. Claims Count | | TDP Values | | Aggregate Claim Value | | Nominal Avg. Recoveries per Channeled PI/WD Claim | |
| | High Recovery | Low Recovery | Base Matrix Value | Maximum Matrix Value | At Base Matrix Value | At Max. Matrix Value | High Recovery [1] | Low Recovery [2] |
| | | | | | | | At Base Matrix Value | At Max. Matrix Value |
|---|---|---|---|---|---|---|---|---|
| 1 | 35 | 39 | $ 1,200,000 | $ 1,597,200 | $ 42,000,000 | $ 62,290,800 | $ 779,073 | $ 377,988 |
| 2 | 33 | 51 | $ 600,000 | $ 798,600 | 19,800,000 | 40,728,600 | $ 389,536 | $ 188,994 |
| 3 | 18 | 20 | $ 200,000 | $ 266,200 | 3,600,000 | 5,324,000 | $ 129,845 | $ 62,998 |
| 4 | 49 | 58 | $ 50,000 | $ 66,550 | 2,450,000 | 3,859,900 | $ 32,461 | $ 15,750 |
| 5 | 24 | 10 | $ 5,000 | $ 5,000 | 120,000 | 50,000 | $ 3,246 | $ 1,183 |
| Total | 159 | 178 | | | $ 67,970,000 | $ 112,253,300 | $ 277,534 | $ 167,079 |

| Estimated Payment Percentage | 64.9% | 23.7% |
|---|---|---|

[1] High Recovery assumes that claims that were dismissed or received a defense verdict and claims that did not name Corizon in pre-petition litigation are not compensable. All other claims are assumed compensable. High Recovery categorizes the 15 claims with unknown injuries in Tier 5. All claims are valued using Base Matrix Values.

[2] Low Recovery assumes only claims that were dismissed or received a defense verdict are not compensable. All other claims are assumed compensable. Low Recovery categorizes the 15 claims whose injury is unknown as Tier 2 claims. All claims are valued at the Maximum Matrix Values.

**TEHUM - ILLUSTRATIVE PAYMENT PERCENTAGE ANALYSIS**

|  |  | Nominal | |
|---|---|---|---|
| ($ in thousands) |  | High Recovery | Low Recovery |
| 1 | Employee Retention Credits, gross | 12,980 | 5,272 |
| 2 | Causes of Actions Proceeds | 1,500 | - |
| 3 | Insurance and Third-Party Recoveries | 10,000 | 1,000 |
| 4 | Global Settlement, Including Interest | 26,719 | 26,719 |
| 5 | **Gross Proceeds from Estate Assets** | **$ 51,199** | **$ 32,991** |
|  |  |  |  |
| 6 | Less: Employee Retention Credits Setoff by Priority Federal Tax Claims | (4,120) | (4,120) |
| 7 | Less: Employee Retention Credits - Synergi Administrative Fee (Dkt 723) | (574) | (75) |
| 8 | **Proceeds Available for PI/WD Trust and GUC Trust** | **$ 46,505** | **$ 28,796** |
|  |  |  |  |
| 9 | Less: Plan Trusts' Professional Fees | (2,000) | (2,000) |
| 10 | Less: Post-Effective Date US Trustee Fees | (377) | (231) |
| 11 | **Channeled PI/WD Trust Claims Recoveries** | **$ 44,128** | **$ 26,566** |
|  |  |  |  |
| 12 | Channeled PI/WD Trust Claims | 67,970 | 112,253 |
| 13 | ***Estimated Recovery Percentage for Channeled PI/WD Trust Claims*** | ***64.9%*** | ***23.7%*** |

**Exhibit A**

**Chapter 11 Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TEHUM CARE SERVICES, INC.,[1] | ) Case No. 23-90086 (CML) |
| | ) |
| Debtor. | ) |
| | ) |

### JOINT CHAPTER 11 PLAN OF THE TORT CLAIMANTS'
### COMMITTEE, OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR

**BROWN RUDNICK LLP**
David J. Molton (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
D. Cameron Moxley (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Meghan McCafferty (*pro hac vice*)
Amir Shachmurove (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email:  dmolton@brownrudnick.com
        egoodman@brownrudnick.com
        cmoxley@brownrudnick.com
        gcicero@brownrudnick.com
        mmccafferty@brownrudnick.com
        ashachmurove@brownrudnick.com

*Co-Counsel to the Tort Claimants' Committee*

**BERRY RIDDELL, LLC**
Michael W. Zimmerman
6750 E. Camelback Road, Suite #100
Scottsdale, AZ 85251
Telephone: (480) 385-2727
Email:  mz@berryriddell.com

*Co-Counsel to the Tort Claimants' Committee*

**STINSON LLP**
Nicholas Zluticky (SD TX Bar No. 3846893)
Zachary Hemenway (SD TX Bar No. 3856801)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Email:  nicholas.zluticky@stinson.com
        zachary.hemenway@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Micheal W. Bishop (TX Bar No. 02354860)
Aaron M. Kaufman (TX Bar No. 24060067)
Lydia R. Webb (TX Bar No. 24083758)
Amber M. Carson (TX Bar No. 24075610)
1300 Post Oak Boulevard, Suite 2000
Houston, TX 77056
Telephone: (713) 986-7127
Facsimile: (713) 986-5966
Email:  jbrookner@grayreed.com
        mbishop@grayreed.com
        akaufman@grayreed.com
        lwebb@grayreed.com
        acarson@grayreed.com

*Counsel to the Debtor and Debtor in Possession*

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF A CHANNELING INJUNCTION PURSUANT TO SECTIONS 105(a) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4, CLASS 6, AND CLASS 9 CLAIMS, *I.E.*, CLAIMANTS WHO HAVE NOT OPTED OUT OF THE CONSENSUAL CLAIMANT RELEASE (AS DEFINED HEREIN), TO SEPARATE TRUSTS. CLAIMANTS WHO ELECT TO OPT OUT OF THE CONSENSUAL CLAIMANT RELEASE SHALL HAVE NO RIGHT TO RECOVER FROM THE TRUSTS, BUT MAY PURSUE RECOVERIES IN THE CIVIL JUSTICE SYSTEM.

---

[1]   The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

**TABLE OF CONTENTS**

Page

INTRODUCTION.................................................................................................................................1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
      GOVERNING LAW, AND OTHER REFERENCES......................................................1
    A.     Defined Terms................................................................................................... 1
    B.     Rules of Interpretation.....................................................................................17
    C.     Computation of Time.......................................................................................18
    D.     Governing Law.................................................................................................18
    E.     Reference to Monetary Figures.......................................................................18
    F.     Controlling Document......................................................................................18

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS...................................................18
    A.     Administrative Claims.....................................................................................19
    B.     Professional Fee Claims...................................................................................19
    C.     DIP Claims.......................................................................................................20
    D.     Synergi Administrative Claim..........................................................................21
    E.     Priority Tax Claims (Federal and State)..........................................................21

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS.........21
    A.     Classification of Claims and Interests.............................................................21
    B.     Requirement to File a Personalized Proof of Claim Form by All Claimants, Including
        Those Who Are Part of Representative Action.................................................21
    C.     Voting Requirements........................................................................................21
    D.     Opt-Out Deadline.............................................................................................22
    E.     Summary of Classification...............................................................................22
    F.     Treatment and Voting of Classes of Claims and Interests...............................22
        1.     Class 1 — Other Priority Claims...........................................................22
        2.     Class 2 — Other Secured Claims..........................................................23
        3.     Class 3 — Convenience Claims.............................................................23
        4.     Class 4 — Channeled GUC Claims.......................................................23
        5.     Class 5 — Opt-Out GUC Claims..........................................................24
        6.     Class 6 — Channeled PI/WD Claims....................................................24
        7.     Class 7 — Opt-Out PI/WD Claims.......................................................25
        8.     Class 8 — Opt-Out Insured PI/WD Claim............................................25
        9.     Class 9 — Channeled Indirect Claims...................................................26
        10.    Class 10 — Opt-Out Indirect Claims....................................................27
        11.    Class 11 — Interests in the Debtor.......................................................27
    G.     Elimination of Vacant Classes.........................................................................27
    H.     Voting Classes; Presumed Acceptance by Non-Voting Classes.....................27
    I.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code...............28

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN............................................28
    A.     Sources of Consideration for Plan Distributions.............................................28
    B.     The Estate Party Settlement.............................................................................28
        1.     The Settlement Payment........................................................................28
        2.     Settlement Payment Default...................................................................28
        3.     Allocation of Settlement Payment.........................................................29
        4.     Use of Settlement Payment....................................................................29
        5.     Right of Termination Based on Voting Results......................................29
        6.     Settlement Parties' Release of Certain Claims.......................................29
        7.     Release by the Consenting Claimants of the Released Parties................30

|   | 8. | Releases by the Debtor and the Settlement Parties of Holders of Claims in Classes 4, 6, 8, and 9 | 30 |
|   | 9. | Release of Estate Causes of Action Against the Released Parties | 31 |
|   | 10. | Forbearance from Prosecuting Released Estate Causes of Action | 31 |
|   | 11. | Claim Over | 31 |
|   | 12. | Voiding of Releases in Favor of the Released Parties | 32 |
| C. | | Opt-Out Insured PI/WD Claims | 32 |
| D. | | PI/WD Trust to Resolve All Channeled PI/WD Trust Claims | 32 |
| E. | | General Settlement of Claims | 32 |
| F. | | Post-Effective Date Debtor, GUC Trust, and PI/WD Trust | 33 |
|   | 1. | Post-Effective Date Debtor and GUC Trust | 33 |
|   | 2. | PI/WD Trust | 36 |
| G. | | Corporate Action | 39 |
| H. | | Effectuating Documents; Further Transactions | 40 |
| I. | | Exemptions from Certain Taxes and Fees | 40 |
| J. | | Preservation of Causes of Action | 40 |
| K. | | Dissolution of Committees and Cessation of Fee and Expense Payments | 41 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ... 41
| A. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 41 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 41 |
| C. | Cure of Defaults and Objections to Cure and Assumption | 42 |
| D. | Insurance Policies | 42 |
| E. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 42 |
| F. | Reservation of Rights | 43 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ... 43
| A. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 43 |
|   | 1. | Delivery of Distributions in General | 43 |
|   | 2. | Minimum; De Minimis Distributions | 43 |
|   | 3. | Undeliverable Distributions and Unclaimed Property | 43 |
| B. | | Manner of Payment | 44 |
| C. | | Compliance Matters | 44 |
| D. | | Allocation Between Principal and Accrued Interest | 44 |
| E. | | Setoffs and Recoupment | 44 |

**ARTICLE VII. RESERVES ADMINISTERED BY THE GUC TRUSTEE** ... 44
| A. | Establishment of Reserve Accounts | 44 |
| B. | Administrative and Priority Claims Reserve | 45 |
| C. | Other Secured Claims Reserve | 45 |
| D. | Debtor's Lack of Interest in Distribution Reserve Accounts | 45 |

**ARTICLE VIII. PROCEDURES FOR RESOLVING CERTAIN CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS** ... 45
| A. | Applicability | 45 |
| B. | Allowance of Disputed Claims and Interests | 45 |
| C. | Claims Administration Responsibilities | 46 |
| D. | Estimation of Claims and Interests | 46 |
| E. | Adjustment to Claims Without Objection | 46 |
| F. | No Distributions Pending Allowance | 46 |
| G. | Disallowance of Claims | 46 |
| H. | Claim Amendment Deadline | 47 |
| I. | Distributions After Allowance | 47 |
| J. | No Interest | 47 |

**ARTICLE IX. SETTLEMENT, RELEASES, INJUNCTIONS, AND RELATED PROVISIONS** ....................47
    A.    Compromise and Settlement of Claims, Interests, and Controversies ..............................47
    B.    **Release of Liens** .................................................................................................................48
    C.    **Estate Release** ....................................................................................................................48
    D.    **Consensual Claimant Release** .........................................................................................49
    E.    **Releases by the Debtor and the Settlement Parties of Holders of Claims in Classes 4,**
          **6, 8, and 9** ..........................................................................................................................49
    F.    **Exculpation** .......................................................................................................................50
    G.    Recoupment .........................................................................................................................50
    H.    **Term of Injunctions or Stays** ..........................................................................................50
    I.    **Channeling Injunction** .....................................................................................................50
          1.    Purpose ..................................................................................................................50
          2.    Protections Afforded to Released Parties ..............................................................50
          3.    Reservations ..........................................................................................................51
          4.    Enforcement ..........................................................................................................52
          5.    Termination of Channeling Injunction ..................................................................52
          6.    Tolling of Statute of Limitations ...........................................................................52
    J.    **Injunction against Interference with the Plan** ...............................................................52
    K.    **Injunction against Interference with Opt-Out Rights** ..................................................52
    L.    Insurance Provision .............................................................................................................52
    M.    Claim Over ...........................................................................................................................53
    N.    Retention of Liability ..........................................................................................................53

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE** ....................53
    A.    Conditions Precedent to the Confirmation of the Plan ......................................................53
    B.    Conditions Precedent to the Effective Date .......................................................................54
    C.    Waiver of Conditions Precedent .........................................................................................55
    D.    Substantial Consummation .................................................................................................55

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ..........................55
    A.    Modification of Plan ...........................................................................................................55
    B.    Revocation or Withdrawal of Plan .....................................................................................55

**ARTICLE XII. RETENTION OF JURISDICTION** ...........................................................................55
    A.    Jurisdiction ..........................................................................................................................55

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ..........................................................................57
    A.    Additional Documents ........................................................................................................57
    B.    Statutory Fees ......................................................................................................................57
    C.    Reservation of Rights ..........................................................................................................57
    D.    Successors and Assigns .......................................................................................................57
    E.    Service of Documents .........................................................................................................57
    F.    Entire Agreement ................................................................................................................59
    G.    Plan Supplement Exhibits ...................................................................................................59
    H.    Non-Severability .................................................................................................................59
    I.    Good Faith ...........................................................................................................................59
    J.    Waiver or Estoppel .............................................................................................................59
    K.    No Attorney's Fees ..............................................................................................................60
    L.    Closing of Chapter 11 Case ................................................................................................60

# INTRODUCTION

The Official Committee of Tort Claimants, the Official Committee of Unsecured Creditors, and Tehum Care Services, Inc., *f/k/a* Corizon Health Services, the above-captioned debtor and debtor in possession hereby propose the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in Article I of the Plan.

Nothing in the Plan or the Plan Documents constitutes an admission by the Debtor as to the existence, merits, or amount of the Debtor's actual present or future liability on account of any Claim or demand except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date. All PI/WD Claims in Class 6 shall be finally determined by the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures, without any further right to seek review or adjudication of such claims by any court, including the Bankruptcy Court. All PI/WD Claims in Class 7 shall be finally determined in the Civil Justice System. Claimants who opt out of the Consensual Claimant Release shall have no right to recover from the PI/WD Trust or the GUC Trust.

Reference is made to the Disclosure Statement for a discussion of the Debtor's history, business, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including Distributions to be made under this Plan. The Disclosure Statement also provides a summary of the Plan. YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THIS PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE: (I) VOTING TO ACCEPT OR REJECT THE PLAN; OR (II) MAKING ANY ELECTION ON YOUR BALLOT TO EXERCISE YOUR RIGHT TO PURSUE YOUR CLAIMS AGAINST ANY INSURER OR RELEASED PARTY.

Furthermore, there are other agreements and documents, some of which will be filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement, or the Disclosure Statement as exhibits and schedules. All such exhibits and schedules are incorporated into and are a part of this Plan as if set forth in full herein.

Subject to section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and this Plan, the Official Tort Claimants' Committee, the Official Committee of Unsecured Creditors, and the Debtor reserve the right, upon the written consent of each, to alter, amend, modify, revoke, or withdraw this Plan prior to its Substantial Consummation.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

*A.    Defined Terms*

Unless context otherwise requires, or defined above, the capitalized and italicized terms used herein have the respective meanings set forth below:

1.    "*Accrued Professional Fees*" means, as of any date, all of a Professional's then-unpaid accrued fees and reimbursable expenses for services rendered in the Chapter 11 Case up to and including such date, whether or not such Professional has then filed an application for the Allowance and payment of such fees and expenses. No amount of a Professional's fees or expenses denied by a Final Order of the Bankruptcy Court shall constitute Accrued Professional Fees.

2.    "*Administrative Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case arising on or before the Effective Date that is allowable under section 503(b) of the Bankruptcy Code and entitled to priority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

3.    "*Administrative Claims Bar Date*" means the deadline for filing requests for payment of Administrative Claims (other than Professional Fee Claims) which shall be the first Business Day that is thirty (30) days following the Effective Date, unless otherwise specifically set forth in the Plan or a Final Order.

4.        "*Administrative and Priority Claims Reserve*" means a reserve established by the Debtor on the Effective Date to be used to pay Holders of all Allowed Priority Claims and Allowed Administrative Claims, to the extent the same have not been paid in full on or before the Effective Date.

5.        "*Administrative Claims Objection Deadline*" means the first Business Day that is twenty-one (21) days following the Administrative Claims Bar Date, unless otherwise specifically set forth in the Plan or a Final Order.

6.        "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.        "*Allowed*" means, with reference to any Claim: (a) a GUC Claim or an Indirect GUC Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date and as to which no objection has been interposed on or before the Claims Objection Deadline or such other applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court; (b) a GUC Claim or an Indirect GUC Claim that is listed in the Schedules and is not identified as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed and as to which no objection has been interposed on or before the Claims Objection Deadline; (c) a GUC Claim or an Indirect GUC Claim that is resolved in a manner consistent with the GUC Trust Agreement and the Plan or that is Allowed pursuant to a Final Order of the Bankruptcy Court; (d) a PI/WD Claim or an Indirect PI/WD Claim that is resolved in a manner consistent with the PI/WD Trust Distribution Procedures and the Plan; or (e) an Administrative Claim or Professional Fee Claim that is Allowed under the Plan or in a Final Order of the Bankruptcy Court; *provided*, that notwithstanding the foregoing, unless expressly waived by the Plan, the Allowed amount of any Claim or Administrative Claim shall be subject to, and shall not exceed the limitations or maximum amounts permitted by, the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. "Allowance" and "Allowing" have correlative meanings.

8.        "*Asset*" means any right, title, and interest of the Debtor, of any nature in property of any kind and form, wherever located and whether tangible or intangible, including real property, personal property, and intellectual property, as specified in section 541 of the Bankruptcy Code.

9.        "*Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases (with proposed cure amounts and assignee) that will be assumed by the Debtor and assigned to the applicable assignee, which list shall be included in the Plan Supplement.

10.       "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination or other claims, causes of action or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, causes of action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such claim(s), cause(s) of action or remedy(ies) were commenced prior to the Effective Date.

11.       "*Ballot*" means the forms of ballots approved by the Bankruptcy Court and provided to Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10 to indicate their votes to accept or reject the Plan and, to extent applicable, make certain elections, as defined in the Solicitation Procedures Motion, to the extent consistent with the Solicitation Procedures Order.

12.       "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect and as may be hereafter amended.

13.       "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court of the United States having jurisdiction over the Chapter 11 Case.

14.       "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as now in effect or hereafter amended.

15.  "*Bar Date*" means, as applicable, (i) the Claims Bar Date, (ii) any other date or dates established or to be established by this Plan or by a Final Order of the Bankruptcy Court setting a deadline by which Proofs of Claim must be Filed and (iii) the Administrative Claims Bar Date.

16.  "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

17.  "*Cash*" or "*$*" means legal tender of the United States of America.

18.  "*Causes of Action*" means any claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.

19.  "*Channeled Claim*" means a Channeled GUC Trust Claim or a Channeled PI/WD Trust Claim, as the context may require.

20.  "*Channeled GUC Claim*" means a GUC Claim asserted by a GUC Claimant that does not opt out of the Consensual Claimant Release.

21.  "*Channeled GUC Trust Claim*" means (a) a Channeled GUC Claim and (b) an Indirect GUC Claim that is a Channeled Indirect Claim.

22.  "*Channeled Indirect Claim*" means an Indirect Claim asserted by an Indirect Claimant that does not opt out of the Consensual Claimant Release.

23.  "*Channeled PI/WD Claim*" means a PI/WD Claim asserted by a PI/WD Claimant (a) who does not opt out of the Consensual Claimant Release or (b) who does not opt out to pursue his or her PI/WD Claims in the Civil Justice System for the purpose of pursuing a recovery from one or more PI/WD Insurance Companies, *provided, however,* that an Opt-Out Insured PI/WD Claim shall become a Channeled PI/WD Claim if the Holder of the Opt-Out Insured PI/WD Claim elects or is deemed to elect to return to the PI/WD Trust under and in accordance with the PI/WD Trust Distribution Procedures.  A PI/WD Claim asserted by the Holder of an Opt-Out PI/WD Claim shall not be a Channeled PI/WD Claim.

24.  "*Channeled PI/WD Trust Claim*" means (a) a Channeled PI/WD Claim and (b) an Indirect PI/WD Claim that is a Channeled Indirect Claim.

25.  "*Channeling Injunction*" means the injunction set forth in **Article IX.I** to be issued pursuant to, and included in, the Confirmation Order.  For the avoidance of doubt, the Channeling Injunction shall only apply to Channeled Claims asserted by Consenting Claimants.

26.  "*Chapter 11 Case*" means the above-captioned chapter 11 bankruptcy case of the Debtor.

27.  "*Civil Justice System*" means any non-bankruptcy federal, state, foreign, cross-border, or international adjudicatory system, whether private or public, judicial, administrative, arbitral, or mediative, or adversarial or non-adversarial.

28.  "*Claim*" means any claim against the Debtor, as defined in section 101(5) of the Bankruptcy Code.

29.  "*Claimant*" means a Holder of a Claim.

30.  "*Claims Agent*" means Verita Global.

31.      "*Claims Bar Date*" means the last date to file Proofs of Claim against the Debtor, which was August 14, 2023, for all creditors including Governmental Units.

32.      "*Claims Objection Deadline*" means, (I) for Claims that are not channeled to the GUC Trust or the PI/WD Trust, the first Business Day that is one hundred eighty days (180) days after the Effective Date unless extended by order of the Bankruptcy Court; (II) for Channeled GUC Trust Claims, such Claims will be subject to the deadlines in the GUC Trust Agreement; and (III) for Channeled PI/WD Trust Claims, such Claims will be subject to the deadlines in the PI/WD Trust Distribution Procedures.

33.      "*Claims Register*" means the official register of Claims against and Interests in the Debtor maintained by the Claims Agent.

34.      "*Class*" means any category of Holders of Claims or Interests classified by this Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

35.      "*Committees*" means, collectively, the UCC and the TCC.

36.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case. "Confirm," "Confirmed" and "Confirmability" shall have correlative meanings.

37.      "*Confirmation Date*" means the date that the Confirmation Order is entered on the docket of the Chapter 11 Case.

38.      "*Confirmation Hearing*" means the hearing held before the Bankruptcy Court to consider Confirmation of the Plan, as such hearing may be continued from time to time.

39.      "*Confirmation Objection Deadline*" means the date that is at least fourteen (14) Business Days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

40.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Committees, the Debtor, and the Settling Parties.

41.      "*Consensual Claimant Release*" means the consensual releases granted by the Consenting Claimants in favor of the Released Parties as set forth in **Article IV.B.7** and **Article IX.D**.

42.      "*Consenting Claimant*" means a Consenting Indirect Claimant, a Consenting GUC Claimant, and/or Consenting PI/WD Claimant, regardless of whether any such Claimant receives a Distribution and so long as such Claimant has previously consented to the Consensual Claimant Release in accordance with the procedures set forth in the Plan.

43.      "*Consenting Indirect Claimant*" means: (a) any Holder of an Indirect Claim that votes to accept or is deemed to accept the Plan **and** who does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release; and (b) any Holder of an Indirect Claim that abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** that does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release.  No Holder of an Opt-Out Indirect Claim shall be a Consenting Indirect Claimant.

44.      "*Consenting GUC Claimant*" means: (a) any Holder of a GUC Claim that votes to accept or is deemed to accept the Plan **and** that does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release; (b) any Holder of a GUC Claim that abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** that does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release; and (c) any Holder of a GUC Claim that elects to receive an Expedited GUC Distribution.  No Holder of an Opt-Out GUC Claim shall be a Consenting GUC Claimant.

45.      "*Consenting PI/WD Claimant*" means: (a) any Holder of a PI/WD Claim who votes to accept or is deemed to accept the Plan **and** who does not check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release, including any who elect to pursue insurance recoveries under and consistent with **Article IV.C.**; (b) any Holder of a PI/WD Claim who abstains from voting on the Plan, votes to reject the Plan, or is deemed to reject the Plan **and** who does not (i) check the box on the Opt-Out Release Form to affirmatively opt out of the Consensual Claimant Release or (ii) object to the Plan in respect of the Consensual Claimant Release; and (c) any Holder of a PI/WD Claim who elects to receive an Expedited PI/WD Claim Distribution.  No Holder of an Opt-Out PI/WD Claim shall be a Consenting PI/WD Claimant.

46.      "*Consummation*" means the occurrence of the Effective Date.

47.      "*Convenience Claim*" means any GUC Claim in an Allowed amount that is less than or equal to Five Thousand Dollars ($5,000.00).

48.      "*Cooperation Agreement*" means the cooperation agreement between the PI/WD Trust and the GUC Trust to be entered into on the Effective Date governing the Retained Causes of Action and other joint assets to be received by and administered by the Trusts under the Plan.

49.      "*Court*" means the Bankruptcy Court, the District Court, or any court with appellate jurisdiction over any order entered by the Bankruptcy Court and/or the District Court in the Chapter 11 Case, as applicable.

50.      "*Cure Claim*" means a Claim based on the Debtor's default under an Executory Contract or an Unexpired Lease to be assumed and assigned by the Debtor under section 365 of the Bankruptcy Code, as set forth on the Assumed Executory Contract and Unexpired Lease List, other than with respect to a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

51.      "*Debtor*" means Tehum Care Services, Inc. f/k/a Corizon Health, Inc., a Texas corporation, in its capacity as a debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

52.      "*Debtor Professional Fee Claim*" means any Professional Fee Claim by a Professional who has been retained by the Debtor.

53.      "*Debtor Professional Fee Escrow Account*" means the segregated account established for the payment of Debtor Professional Fee Claims.

54.      "*DIP Claims*" means all Claims of the DIP Lender arising under and pursuant to the DIP Facility, the DIP Documents, and the DIP Order.

55.      "*DIP Credit Agreement*" means that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* attached to the DIP Order as Exhibit 1, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

56.      "*DIP Documents*" means, collectively, the DIP Credit Agreement, the DIP Order, and all other agreements, documents, and instruments related thereto, as may be amended, modified, restated, or supplemented from time to time.

57.      "*DIP Facility*" means the senior secured debtor in possession term loan facility, as provided for under the DIP Documents and authorized pursuant to the DIP Order.

58.      "*DIP Lender*" means M2 LoanCo, LLC, in its capacity as the DIP Lender (as defined in the DIP Order) as supplemented in subsequent orders.

59.      "*DIP Lien*" means any lien granted under the DIP Facility.

60.        "*DIP Order*" means, collectively, (a) the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Docket No. 243], and (b) all additional interim orders entered by the Bankruptcy Court authorizing the Debtor to incur postpetition obligations thereunder, and otherwise amending, supplementing, or modifying such authority from time to time, including the *Fifth Interim DIP Order (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 1669].

61.        "*Disallowed*" means any Claim or Interest or portion thereof that is Disputed, not Allowed or is otherwise disallowed under the Trust Documents or the Plan.

62.        "*Disclosure Statement*" means that certain disclosure statement relating to the Plan, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code, which is in form and substance acceptable to the Committees, the Debtor, and the Settling Parties.

63.        "*Disclosure Statement Hearing*" means the hearing held before the Bankruptcy Court to consider the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as such hearing may be continued from time to time.

64.        "*Disclosure Statement Objection Deadline*" means the date that is at least fourteen (14) Business Days prior to the date first set by the Bankruptcy Court for the Disclosure Statement Hearing.

65.        "*Disclosure Statement Order*" means an order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Committees, the Debtor, and the Settling Parties: (a) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code; (b) fixing the amounts of Claims solely for voting purposes and not for purposes of distributions; (c) approving the Voting Procedures; and (d) authorizing solicitation of the Plan.

66.        "*Disputed*" means any GUC Claim, Indirect GUC Claim, Convenience Claim, Secured Claim, Other Secured Claim, Priority Tax Claim, Other Priority Claim, or Interest or portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Proof of Interest or a motion for payment has been timely Filed with the Bankruptcy Court, to the extent the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.

67.        "*Distribution*" means Cash, property, interests in property or other value distribution to Holders of Allowed Claims, or their respective designated agents, including the GUC Trust Beneficiaries and the PI/WD Trust Beneficiaries, as applicable under this Plan, or any Trust Agreement governing the Trusts created under this Plan.

68.        "*Distribution Date*" means the date on which the GUC Trustee or the PI/WD Trustee, as applicable, first makes distributions to Holders of Allowed Channeled GUC Trust Claims or Holders of Allowed Channeled PI/WD Trust Claims as provided in the Plan and the Trust Documents.

69.        "*Distribution Reserve Accounts*" means the Cash reserve accounts established pursuant to this Plan, including but not limited to the Administrative and Priority Claims Reserve and the Other Secured Claims Reserve. The term "Distribution Reserve Accounts" does not include the Professional Fee Escrow Accounts.

70.        "*District Court*" means the United States District Court for the Southern District of Texas.

71.        "*Effective Date*" means the later of the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in **Article X.B** have been satisfied or waived.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

72.     "*Encumbrance*" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

73.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.     "*ERC Fund*" means a segregated account to be funded by the proceeds of employee retention tax credits received by the Debtor or the GUC Trust and the PI/WD Trust, as applicable.

75.     "*Estate*" means the estate of the Debtor as created under section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Case.

76.     "*Estate Assets*" means all Assets held by the Estate prior to the Effective Date.

77.     "*Estate Causes of Action*" means Causes of Action owned, held, or capable of being asserted by, under, through or on behalf of the Debtor or its Estate, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtor or its Estate, and all other actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estate, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions under chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise.  Without limiting the foregoing, Estate Causes of Action shall include:  (a) Causes of Action that prior to the Petition Date could have been asserted by the Debtor on its own behalf under applicable state law, including Causes of Action seeking to impose liability based on (i) the doctrine of successor liability, or (ii) the doctrines of alter ego or veil piercing; (b) Causes of Action that seek to impose liability for a Claim against the Debtor on any non-Debtor based on a theory of liability that is not specific to one or more particular creditors and is common to all creditors of the Debtor and can be asserted by the Debtor under applicable state law; and (c) all other Causes of Action that are property of the Estate under the Bankruptcy Code, including any other form of derivative or vicarious liability for liabilities of the Debtor.

78.     "*Estate Party Settlement*" means the settlement among the Committees, the Debtor and the Settling Parties set forth in **Article IV.B**.

79.     "*Estate Release*" means the release of the Released Estate Causes of Action to be given by the Debtor and its Estate to the Released Parties, as set forth in **Article IV.B.9** and **Article IX.C**.

80.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the TCC, (b) the members of the TCC, (d) the UCC, (e) the members of the UCC; and (f) the Mediator.

81.     "*Expedited GUC Distribution*" means a one-time Cash payment from the GUC Trust in the amount of Five Thousand Dollars ($5,000.00), to be made to a Holder of a GUC Claim that irrevocably elects, as evidenced on a Ballot timely and validly submitted by such Holder, to have such GUC Claim reduced to Five Thousand Dollars ($5,000.00) and paid (upon Allowance) in full and final satisfaction of such GUC Claim.

82.     "*Expedited PI/WD Claim Distribution*" means a one-time Cash payment from the PI/WD Trust in the amount of Five Thousand Dollars ($5,000.00), to be made to a Holder of a PI/WD Claim that irrevocably elects, as evidenced on a Ballot timely and validly submitted by such Holder, or at such later time as permitted by the PI/WD Trust Distribution Procedures, to have such PI/WD Claim reduced to Five Thousand Dollars ($5,000.00) and paid (upon Allowance) in full and final satisfaction of such PI/WD Claim.

83.     "*Executory Contract*" means a contract to which the Debtor is a party, including all amendments thereto, that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

84.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Case with the Bankruptcy Court or its authorized designee, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

85.     "*Final Decree*" means the decree contemplated in Bankruptcy Rule 3022.

86.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or the District Court in the event the reference is withdrawn in respect of a contested matter or adversary proceeding, entered by the Clerk of the Bankruptcy Court, or the District Court, as applicable, on the docket in the Chapter 11 Case (whether in the Bankruptcy Court or the District Court), which has not been reversed, modified, amended, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reconsideration, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reconsideration, re-argument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reconsideration, re-argument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or the District Court, as applicable, shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari shall have been denied, or a new trial, reconsideration, re-argument, or rehearing shall have been denied or resulted in no modification or amendment of such order or judgment, and the time to take any further appeal, petition for certiorari, or move for a new trial, reconsideration, re-argument, or rehearing shall have expired; provided, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment.  The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

87.     "*Final Payment Date*" means the date that the Final Settlement Payment is received by the Trusts.

88.     "*Final Settlement Payment*" is defined in **Article IV.B.1**.

89.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

90.     "*GUC Claim*" means any Claim against the Debtor that is not a PI/WD Claim, an Administrative Claim, a Secured Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim.  The term GUC Claim does not include Indirect GUC Claims.  The term GUC Claim includes any GUC Claim against the Debtor regardless of whether such Claim is alleged to have been allocated to CHS TX, Inc. or YesCare Corp. under the Plan of Divisional Merger.

91.     "*GUC Claimant*" means the Holder of a GUC Claim.

92.     "*GUC Data Records*" means all files, documents, and information which the Debtor or a Settling Party has acquired, and which contain evidence potentially related to GUC Claims, Indirect GUC Claims, or Retained GUC Trust Causes of Action.

93.     "*GUC Data Transfer*" means the transfer of the GUC Data Records to the GUC Trust so as to enable the recipient to have full access and utilization of the Data Records to the same extent available to the transferor.

94.     "*GUC Insurance Action*" means any claim, Cause of Action, or right of the Debtor, under the laws of any jurisdiction, against any Insurance Company, arising from or related to a GUC Insurance Policy, including: (a) any such Insurance Company's failure to provide coverage or otherwise pay under a GUC Insurance Policy; (b) the refusal of any GUC Insurance Company to compromise and settle any GUC Claim or Indirect GUC Claim under or pursuant to any GUC Insurance Policy; (c) the interpretation or enforcement of the terms of any GUC Insurance Policy with respect to any GUC Claim or Indirect GUC Claim; (d) any conduct by any Insurance Company in respect to a GUC Claim or an Indirect GUC Claim constituting "bad faith" conduct or that could otherwise give rise to extra-

contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Person with respect to a GUC Insurance Policy.

95. "*GUC Insurance Action Recoveries*" means the right to receive the proceeds or benefits of any GUC Insurance Action

96. "*GUC Insurance Assignment*" means the assignment and transfer to the GUC Trust of (a) the GUC Insurance Actions, (b) the GUC Insurance Action Recoveries, and (c) all other rights, claims, benefits, or Causes of Action of the Debtor under or with respect to the GUC Insurance Policies (but not the policies themselves).

97. "*GUC Insurance Company*" means any Insurance Company that may have liability under a GUC Insurance Policy.

98. "*GUC Insurance Policy*" means any Insurance Policy currently or previously in effect at any time on or before the Effective Date naming the Debtor (or any past or present predecessor or subsidiary of the Debtor) as an insured (whether as the primary or additional insured, or by virtue of being a subsidiary to the named insured), or otherwise alleged to afford the Debtor insurance coverage, upon which any claim could have been, has been, or may be made with respect to any GUC Claim or Indirect GUC Claim, including the policies listed in the Schedules.

99. "*GUC Trust*" means that certain trust that will come into existence on the Effective Date to address and resolve Channeled GUC Trust Claims which shall be formed pursuant to and governed by the provisions of the Plan and the GUC Trust Agreement.

100. "*GUC Trust Agreement*" means the agreement establishing and governing the GUC Trust dated as of the Effective Date.

101. "*GUC Trust Assets*" means all Assets and Estate Assets allocated to the GUC Trust pursuant to the GUC Trust Agreement and the Plan, as applicable, and in each case, as amended, supplemented, restated, or otherwise modified from time to time, including: (a) 50% of the Settlement Payments; (b) 50% of the ERC Fund; (c) 50% interest in the Retained Causes of Action and the proceeds thereof; (d) Retained GUC Trust Causes of Action; (e) the GUC Insurance Assignment; (f) the GUC Data Transfer; (g) 50% of the Debtor's remaining Assets, including Cash, (h) any other funds or Assets allocated to the GUC Trust under the Plan; and (h) any income, profits, gains, and proceeds realized, received, or derived from GUC Trust Assets.

102. "*GUC Trust Beneficiaries*" means the Holders of Channeled GUC Trust Claims whose Claims are to be resolved by the GUC Trust under the Plan.

103. "*GUC Trust Documents*" means, collectively, (a) the GUC Trust Agreement, (b) the Confirmation Order, and (c) any other agreements, instruments, and documents governing the establishment, administration, and operation of the GUC Trust, as the same may be amended or modified from time to time in accordance with the terms thereof.

104. "*GUC Trustee*" means the trustee of the GUC Trust, who shall be selected by the UCC, in consultation with the Debtor, and who shall be named in the Plan Supplement, and is thereafter subject to the provisions of the GUC Trust Agreement.

105. "*Holder*" means any Person or Entity holding a Claim or an Interest.

106. "*Impaired*" means, with respect to a Class of Claims or Interests or a Claim or Interest, a Class of Claim or Claim or Interest or an Interest that is "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

107. "*Indirect Claims*" means, collectively, Indirect GUC Claims and Indirect PI/WD Claims.

108.     "*Indirect GUC Claim*" means a Claim against the Debtor for contribution, indemnification, reimbursement, or subrogation of any entity that is liable with the Debtor on a GUC Claim held by another creditor, whether contractual or implied by law and whether in the nature of or sounding in contract, tort, warranty, statute, common law, or any other theory of law or equity whatsoever.

109.     "*Indirect PI/WD Claim*" means a Claim against the Debtor for defense, contribution, indemnification, reimbursement, or subrogation of any entity that is liable with the Debtor on a PI/WD Claim held by another creditor, whether contractual or implied by law and whether in the nature of or sounding in contract, tort, warranty, statute, common law, or any other theory of law or equity whatsoever.

110.     "*Indirect Claimant*" means the Holder of an Indirect Claim.

111.     "*Initial Settlement Amount*" is defined in **Article IV.B.1**.

112.     "*Injunctions*" means the Insurance Entity Injunction, and any other injunctions entered by the Bankruptcy Court in connection with Confirmation of the Plan.

113.     "*Insider*" means an "insider" as defined in section 101(31) of the Bankruptcy Code.

114.     "*Installment Settlement Payment*" is defined in **Article IV.B.1**.

115.     "*Insurance Action*" means a GUC Insurance Action or a PI/WD Insurance Action, as the context may require.

116.     "*Insurance Action Recoveries*" means the right to receive the proceeds or benefits of any Insurance Action.

117.     "*Insurance Company*" means any insurance company, insurance syndicate, coverage holder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that has issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under or with respect to, any Insurance Policy.

118.     "*Insurance Coverage Defense*" means all defenses at law or in equity that any Insurance Company may have under applicable law or under any Insurance Policy to provide insurance coverage or a defense or to perform any other action arising out of or related to PI/WD Claims, Indirect PI/WD Claims, GUC Claims or Indirect GUC Claims or in response to a PI/WD Insurance Action, except for (a) any defense that the PI/WD Insurance Assignment or the GUC Insurance Assignment is invalid or unenforceable or otherwise breaches the terms of such coverage; or (b) any defense that the Debtor filed for bankruptcy and/or the discharge or release of the Debtor from liability for any Claims pursuant to the Plan, breaches the terms of such coverage; or that either of the foregoing (a) through (b), operates to, or otherwise results in, the elimination of or the reduction in any obligation such Insurance Company may have under rights assigned to the PI/WD Trust or the GUC Trust, including in providing coverage for liabilities assumed by the PI/WD Trust or the GUC Trust that were or are liabilities of the Debtor.

119.     "*Insurance Policy*" means any insurance policies issued prior to the Effective Date to the Debtor or under which the Debtor has sought or may seek coverage.

120.     "*Insurance Proceeds*" means any proceeds recovered under the Insurance Policies.

121.     "*Interim Compensation Order*" means the *Amended Agreed Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 1646].

122.     "*Interest*" means any equity security, as defined in section 101(16) of the Bankruptcy Code.

123.     "*IRS*" means the Internal Revenue Service.

124. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

125. "*Local Bankruptcy Rules*" means the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas as now in effect or hereafter amended.

126. "*Mediator*" means Judge Christopher S. Sontchi (ret.) in his capacity as a Court-appointed mediator in the Chapter 11 Case.

127. "*Non-Released Parties*" means (a) James Gassenheimer, Charles Gassenheimer, James Hyman, Michael Flacks, and Flacks Group LLC, and, as appropriate, their predecessors, successors, assigns, and present and former shareholders, members, Affiliates, subsidiaries, employees, agents, brokers, adjusters, managing agents, claims gents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such; (b) any Entity co-liable with one or more Released Parties, including a Governmental Unit, on any Claim; and (c) any PI/WD Insurance Company and GUC Insurance Company.

128. "*Opt-Out GUC Claim*" means a GUC Claim asserted by GUC Claimant that opts out of the Consensual Claimant Release and, by doing so, irrevocably elects to pursue its GUC Claim in the Civil Justice System with no right to return to or recover from the GUC Trust.

129. "*Opt-Out Insured PI/WD Claim*" means a PI/WD Claim asserted by a PI/WD Claimant who elects on his or her Ballot to pursue his or her PI/WD Claims in the Civil Justice System for the purpose of pursuing a recovery from one or more PI/WD Insurance Companies, subject to the right to return to and recover from the PI/WD Trust under and in accordance with the PI/WD Trust Distribution Procedures, and who does **not** opt out of the Consensual Claimant Release.

130. "*Opt-Out PI/WD Claim*" means a PI/WD Claim asserted by a PI/WD Claimant who opts out of the Consensual Claimant Release and who, by doing so, irrevocably elects to pursue his or her PI/WD Claim in the Civil Justice System with no right to return to or recover from the PI/WD Trust.

131. "*Opt-Out Indirect Claim*" means an Indirect Claim asserted by Indirect Claimant that opts out of the Consensual Claimant Release and, by doing so, irrevocably elects to pursue its Indirect Claim in the Civil Justice System with no right to return to or recover from the Trusts.

132. "*Opt-Out Release Form*" means the form approved by the Bankruptcy Court for opting out of the Consensual Claimant Release. Claimants may vote to accept the Plan on a Ballot and, at the same time, elect to opt out of the Consensual Claimant Release.

133. "*Ordinary Course Professional*" means a Professional employed by the Debtor pursuant to the Ordinary Course Professionals Order.

134. "*Ordinary Course Professionals Order*" means the *Amended Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 638].

135. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Case.

136. "*Other Secured Claim*" means any Secured Claim, other than a DIP Claim.

137. "*Other Secured Claims Reserve*" means a reserve established by the Debtor on the Effective Date to be used to pay Holders of all Other Secured Claims, to the extent the same have not been paid prior to the Effective Date.

138.    "*Payment Agreement*" means the Payment Agreement for Insurance and Risk Management Services dated January 1, 2012, by and between National Union Fire Insurance Company of Pittsburgh, PA and the Debtor that was allocated to CHS, TX, Inc. along with certain collateral to secure the obligations thereunder, pursuant to the Plan of Divisional Merger.

139.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code and includes any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity, or governmental unit.

140.    "*Petition Date*" means February 13, 2023, the date on which the Debtor commenced the Chapter 11 Case.

141.    "*PI/WD*" means personal injury or wrongful death.

142.    "*PI/WD Claim*" means any unsecured Claim against the Debtor that is attributable to, arises from, is based upon, relates to, or results from an alleged personal injury tort or wrongful death claim within the meaning of 28 U.S.C. § 157(b)(2)(B), including any PI/WD Claim against the Debtor regardless of whether such Claim is alleged to have been allocated to CHS TX, Inc. or YesCare Corp. under the Plan of Divisional Merger. The term PI/WD Claim does not include Indirect PI/WD Claims.

143.    "*PI/WD Claimant*" means the Holder of a PI/WD Claim.

144.    "*PI/WD Data Records*" means all files, documents, and information which the Debtor or a Settling Party has acquired, and which contain evidence potentially related to PI/WD Claims, Indirect PI/WD Claims, or Retained PI/WD Trust Causes of Action, including all documents reflecting insurance retention, expense costs and/or deductibles regarding PI/WD Claims.

145.    "*PI/WD Data Transfer*" means the transfer of the PI/WD Data Records to the PI/WD Trust so as to enable the recipient to have full access and utilization of the Data Records to the same extent available to the transferor.

146.    "*PI/WD Insurance Action*" means any claim, Cause of Action, or right of the Debtor, under the laws of the applicable jurisdiction, against any Insurance Company, arising from or related to a PI/WD Insurance Policy, including:  (a) any such Insurance Company's failure to provide coverage or otherwise pay under a PI/WD Insurance Policy; (b) the refusal of any PI/WD Insurance Company to compromise and settle any PI/WD Claim under or pursuant to any PI/WD Insurance Policy; (c) the interpretation or enforcement of the terms of any PI/WD Insurance Policy with respect to any PI/WD Claim; (d) any conduct by any Insurance Company in respect to a PI/WD Claim constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Person with respect to a  PI/WD Insurance Policy.

147.    "*PI/WD Insurance Action Recoveries*" means the right to receive the proceeds or benefits of any PI/WD Insurance Action.

148.    "*PI/WD Insurance Assignment*" means the assignment and transfer to the PI/WD Trust of (a) the PI/WD Insurance Actions, (b) the PI/WD Insurance Action Recoveries, and (c) all other rights, claims, benefits, or Causes of Action of the Debtor under or with respect to the PI/WD Insurance Policies (but not the policies themselves).

149.    "*PI/WD Insurance Company*" means any Insurance Company that may have liability under a PI/WD Insurance Policy.

150.    "*PI/WD Insurance Policy*" means any Insurance Policy currently or previously in effect at any time on or before the Effective Date naming the Debtor (or any past or present predecessor or subsidiary of the Debtor) as an insured (whether as the primary or additional insured, or by virtue of being a subsidiary to the named insured), or otherwise alleged to afford the Debtor insurance coverage, upon which any claim could have been, has been, or may

be made with respect to any PI/WD Claim or Indirect PI/WD Claim, including the policies listed on Schedule 2 to the Disclosure Statement.

151.    "*PI/WD Trust*" means that certain trust that will come into existence on the Effective Date to address and resolve Channeled PI/WD Trust Claims, which shall be formed pursuant to, and governed by, the provisions of the Plan and the PI/WD Trust Agreement.

152.    "*PI/WD Trust Agreement*" means the agreement establishing and governing the PI/WD Trust dated as of the Effective Date.

153.    "*PI/WD Trust Assets*" means all Assets and Estate Assets allocated to the PI/WD Trust pursuant to the PI/WD Trust Agreement and the Plan, as applicable, and in each case, as amended, supplemented, restated, or otherwise modified from time to time, including: (a) 50% of the Settlement Payments; (b) 50% of the ERC Fund; (c) 50% interest in the Retained Causes of Action and the proceeds thereof; (d) Retained PI/WD Trust Causes of Action; (e) the PI/WD Insurance Assignment; (f) the PI/WD Data Transfer; (g) 50% of the Debtor's remaining Assets, including Cash, (h) any other funds or Assets allocated to the PI/WD Trust under the Plan; and (h) any income, profits, gains, and proceeds realized, received, or derived from PI/WD Trust Assets.

154.    "*PI/WD Trust Beneficiaries*" means the Holders of Channeled PI/WD Trust Claims whose Claims are to be resolved by the PI/WD Trust under the Plan.

155.    "*PI/WD Trust Distribution Procedures*" means the trust distribution procedures for Channeled PI/WD Trust Claims, as the same may be amended or modified from time to time in accordance with the terms thereof and the PI/WD Trust Agreement, which shall be acceptable to the TCC and the UCC.

156.    "*PI/WD Trust Documents*" means, collectively, (a) the PI/WD Trust Agreement, (b) the PI/WD Trust Distribution Procedures, (c) the Confirmation Order, and (d) any other agreements, instruments, and documents governing the establishment, administration, and operation of the PI/WD Trust, as the same may be amended or modified from time to time in accordance with the terms thereof.

157.    "*PI/WD Trustee*" means the trustee of the PI/WD Trust, who shall be selected by the TCC, in consultation with the UCC, and who shall be named in the Plan Supplement, and is thereafter subject to the provisions of the PI/WD Trust Agreement.

158.    "*Plan*" means this chapter 11 plan, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

159.    "*Plan of Divisional Merger*" means that certain *Agreement and Plan of Divisional Merger*, dated as of May 1, 2022, by Corizon Health, Inc.

160.    "*Plan Document*" means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, all of which shall be in form and substance as provided herein.

161.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be filed in one or more parts or volumes at least fourteen (14) calendar days prior to the Confirmation Objection Deadline, as the same may be amended, supplemented, or modified from time to time on the terms set forth herein, containing, without limitation: (a) the Assumed Executory Contract and Unexpired Lease List; (b) a schedule of Retained Causes of Action; (c) the Cooperation Agreement; (d) the Settlement Payment Schedule; (e) the identity of the GUC Trustee; (f) the identity of the PI/WD Trustee; (g) the identity of the GUC Trust Advisory Committee; and (h) the identity of the PI/WD Trust Advisory Committee.

162.    "*Post-Effective Date Debtor*" means the Debtor, the GUC Trust, or any successor thereto after the Effective Date responsible for winding down the Debtor's Estate and implementing the terms of the Plan.

163.     "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

164.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against the Debtor that is entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

165.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in such Class.

166.     "*Professional*" means any Person retained by the TCC, the UCC, or the Debtor pursuant to a Final Order of the Bankruptcy Court entered under sections 327, 328, 330, 331, 363, or 1103 of the Bankruptcy Code.

167.     "*Professional Fee Claim*" means any Claim of a Professional or other Person for Allowance of compensation and/or reimbursement of costs or expenses incurred in the Chapter 11 Case for the period from the Petition Date to and including the Effective Date under sections 328, 330 or 331 of the Bankruptcy Code.

168.     "*Professional Fee Escrow Accounts*" means the segregated accounts funded from Cash as of the Effective Date in an amount equal to the Professional Fee Escrow Amount as of such date, solely for the purpose of paying all Allowed Professional Fee Claims in accordance with the Plan.

169.     "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Fees as of the Effective Date, as estimated by the Professionals in accordance with **Article II.B**.

170.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 and 3002.

171.     "*Proof of Interest*" means a proof of Interest Filed in the Debtor's Chapter 11 Case.

172.     "*Proponents*" means the TCC, the UCC and the Debtor, together, as joint proponents of the Plan.

173.     "*Released Claims*" means all claims or Causes of Action, including any Estate Causes of Action, against a Released Party that are released under the Plan and the Confirmation Order.

174.     "*Released Estate Cause of Action*" means any Estate Cause of Action against a Released Party that is released under **Article IV.B.9** and **Article IX.C** of the Plan.

175.     "*Released Parties*" means collectively the following, in each case in its capacity as such with each being a "*Released Party*": (a) the Debtor; (b) Russell Perry, the Debtor's Chief Restructuring Officer; (c) the Committees and their respective members; (d) the Professionals; (e) the GUC Trustee; (f) the PI/WD Trustee; (g) the Settlement Parties; (h) M2 EquityCo LLC; (i) Valitás Intermediate Holdings Inc.; (j) Valitás Health Services, Inc.; (k) M2 Pharmacorr Equity Holdings LLC; (l) Pharmacorr/M2 LLC; (m) Pharmacorr Holdings LLC; (n) Endeavor Distribution LLC; (o) Yes Care Holdings LLC; (p) Sigma RM, LLC; (q) DG Realty Management LLC; (r) Scaracor LLC; (s) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (t) Sara Ann Tirschwell; (u) Ayodeji Olawale Ladele; (v) Beverly Michelle Rice; (w) Jeffrey Scott King; (x) Jennifer Lynne Finger; (y) Frank Jeffrey Sholey; (z) FTI Capital Advisors, LLC, and for each Entity listed in (a) through (z), each of their respective current and former officers, directors, managers, employees, contractors, agents, attorneys, and other professional advisors, Insiders, and Affiliates; *provided*, *however*, that a Non-Released Party shall not be a "Released Party."

176.     "*Releasing Parties*" means collectively the following, in each case in its capacity as such with each being a "*Releasing Party*": (a) the Debtor; (b) the Settlement Parties; and (c) Consenting Claimants.

177.     "*Retained Causes of Action*" means all Causes of Action that are Estate Causes of Action, including (a) those Causes of Action scheduled in the Plan Supplement as "retained;" (b) all defenses to any Claim, including all defenses under section 502 of the Bankruptcy Code; (c) with respect to any Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted;

(d) any other Causes of Action that the Debtor would have had under applicable law if the Chapter 11 Case had not occurred (including any Causes of Action against co-defendants); and (e) any Cause of Action of the Debtor under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise. Retained Causes of Action shall not include the Released Estate Causes of Action to the extent such Causes of Action are released pursuant to the Estate Release. For the avoidance of doubt, the term Retained Causes of Action shall include the Released Estate Causes of Action if the Estate Release does not go into effect due to a Settlement Payment Default or is otherwise voided under **Article IV.B.7**, **Article IV.B.9** or **Article IV.B.12**.

178.    "*Retained GUC Trust Causes of Action*" means, in addition to the Retained Causes of Action transferred to the GUC Trust pursuant to the Plan, (a) all defenses to any GUC Claim or any Indirect GUC Claim, including all defenses under section 502 of the Bankruptcy Code; (c) with respect to any GUC Claim or any Indirect GUC Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (d) any other Causes of Action that the Debtor would have had under applicable law if the Chapter 11 Case had not occurred (including any Causes of Action against co-defendants) relating to a GUC Claim or an Indirect GUC Claim; and (e) any Cause of Action of the Debtor under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to a GUC Claim or an Indirect GUC Claim.

179.    "*Retained PI/WD Trust Causes of Action*" means, in addition to the Retained Causes of Action transferred to the PI/WD Trust pursuant to the Plan, (a) all defenses to any PI/WD Claim or any Indirect PI/WD Claim, including all defenses under section 502 of the Bankruptcy Code; (c) with respect to any PI/WD Claim or any Indirect PI/WD Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (d) any other Causes of Action that the Debtor would have had under applicable law if the Chapter 11 Case had not occurred (including any Causes of Action against co-defendants) relating to a PI/WD Claim or an Indirect PI/WD Claim; and (e) any Cause of Action of the Debtor under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to a PI/WD Claim or an Indirect PI/WD Claim.

180.    "*Schedules*" means, collectively, the schedule of assets and liabilities, schedule of Executory Contracts and Unexpired Leases and statement of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code, if any, as such schedules may be amended, modified, or supplemented from time to time.

181.    "*Secured*" means, with respect to any Claim, the extent to which the Claim is: (a) secured by a Lien on property of a Debtor's Estate as set forth in the Plan, as agreed to by the holder of such Claim and the Debtor, or as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

182.    "*Settlement Parties*" or "*Settling Parties*" means, collectively, YesCare Corp., its wholly owned subsidiaries (including CHS TX, Inc.); Geneva Consulting, LLC; Perigrove 1018, LLC; Perigrove, LLC; M2 HoldCo, LLC; M2 LoanCo, LLC; and PharmaCorr LLC.

183.    "*Settling Parties Releases*" means those releases given by the Settling Parties to the Estate.

184.    "*Settlement Payment*" is defined in **Article IV.B.1**.

185.    "*Settlement Payment Cure Period*" is defined in **Article IV.B.2**.

186.    "*Settlement Payment Default*" is defined in **Article IV.B.2**.

187.    "*Settlement Payment Default Cure Notice*" is defined in **Article IV.B.2**.

188. "*Settlement Payment Schedule*" means the payment schedule for the Installment Settlement Payments.

189. "*Solicitation Procedures Motion*" means the *Joint Motion of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor for Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Claim Holders, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief*, as filed and as may be amended from time and time.

190. "*Solicitation Procedures Order*" means any order of the Bankruptcy Court establishing the procedures for the solicitation of votes to accept or reject the Plan.

191. "*Statute of Limitations*" means any statutes of limitations, statutes of repose, or similar rules of law or equity that may preclude a party from commencing, filing, or continuing any Claim or Cause of Action against another party, including the Released Parties.

192. "*Substantial Consummation*" has the meaning set forth in 11 U.S.C. § 1101(2).

193. "*Synergi*" means Synergi Partners, Inc.

194. "*Synergi Order*" means the *Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365(a) and Fed. R. Bankr. P. 6006 (I) Authorizing the Assumption of a Client Services Agreement, as Modified; and (II) Granting Related Relief* (Docket No. 723).

195. "*TCC*" means the Official Tort Claimants' Committee appointed in the Chapter 11 Case by the U.S. Trustee, as the same may be reconstituted from time to time.

196. "*TCC Professional Fee Claim*" means any Professional Fee Claim by a Professional who has been retained by the TCC.

197. "*TCC Professional Fee Escrow Account*" means the segregated account established for the payment of TCC Professional Fee Claims.

198. "*Transfer*" has the meaning set forth in section 101(54) of the Bankruptcy Code. "Transferee" shall have a correlative meaning.

199. "*Trust*" or "*Trusts*" means either or both of the GUC Trust and the PI/WD Trust, as the context may require.

200. "*Trust Agreement*" or "*Trust Agreements*" means either or both of the GUC Trust Agreement and the PI/WD Trust Agreement, as applicable.

201. "*Trust Documents*" means, collectively, (a) the Trust Agreements, (b) the PI/WD Trust Distribution Procedures, (c) the Confirmation Order, and (d) any other agreements, instruments, and documents governing the establishment, administration, and operation of the Trusts, as the same may be amended or modified from time to time in accordance with the terms thereof.

202. "*Trustee*" or "*Trustees*" means either or both of the GUC Trustee and the PI/WD Trustee, as applicable.

203. "*UCC*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the Office of the United States Trustee, as the same may be reconstituted from time to time.

204.     "*UCC Professional Fee Claim*" means any Professional Fee Claim by a Professional who has been retained by the UCC.

205.     "*UCC Professional Fee Escrow Account*" means the segregated account established for the payment of UCC Professional Fee Claims.

206.     "*U.S.*" means the United States of America.

207.     "*Unexpired Lease*" means a lease to which the Debtor is a party, including all amendments thereto, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

208.     "*Uniform Commercial Code*" means the Uniform Commercial Code as adopted by the applicable state.

209.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

210.     "*U.S. Trustee*" means the Office of the United States Trustee.

211.     "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6).

212.     "*Voting PI/WD Claimants*" means Holders of PI/WD Claims who prior to the Voting Deadline timely filed, or were deemed to have timely filed, a personalized Proof of Claim, or whose PI/WD Claims are scheduled as undisputed, noncontingent, and liquidated in the Schedules.

213.     "*Voting Deadline*" means the date established by the Solicitation Procedures Order by which all Persons entitled to vote on the Plan must vote to accept or reject the Plan.

214.     "*Voting Procedures*" means those certain procedures approved by the Bankruptcy Court for soliciting and tabulating votes to accept or reject the Plan cast by holders of Claims entitled to vote on the Plan. The Voting Procedures shall be in form and substance reasonably acceptable to the Committees, the Debtor, and the Settling Parties.

215.     "*Wind-Down Officer*" means the person described in **Article IV.F**.

B.     *Rules of Interpretation*

For purposes of the Plan, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise provided in the Plan, any reference in the Plan to a  contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (4) any reference to a Person as a holder of a Claim or Interest includes that Person's successors and assigns; (5) unless otherwise stated, all references in the Plan to Articles are references to Articles of the Plan, as the same may be amended or modified from time to time in accordance with the terms hereof; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Article or clause contained in the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (9) any effectuating provisions, including those relating to PI/WD Claims,

may be interpreted by the PI/WD Trustee in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, and such interpretation shall control in all respects to the extent permitted by the PI/WD Trust Agreement, the PI/WD Trust Distribution Procedures and the Plan, as applicable; (10) any effectuating provisions, including those relating to GUC Claims, may be interpreted by the GUC Trustee in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, and such interpretation shall control in all respects to the extent permitted by the GUC Trust Agreement and the Plan, as applicable; (11) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (12) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (12) any reference to a Person's "subsidiaries" means its direct and indirect subsidiaries.

C.      *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan, except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control; *provided, that*, corporate governance matters relating to the Debtor, or the GUC Trust or PI/WD Trust, as applicable, shall be governed by the laws of the state or other jurisdiction of incorporation or organization of such entity, as applicable. For the avoidance of doubt, the substantive law governing any Claim shall be determined by applicable choice of law principles and without regard to the Chapter 11 Case.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Controlling Document*

In the event of an inconsistency (i) between the Confirmation Order, this Plan, the Plan Supplement or any other instrument or document created or executed pursuant to this Plan, and any Trust Agreement, the Confirmation Order shall control; (ii) between this Plan, the Plan Supplement or any other instrument or document created or executed pursuant to this Plan, and any Trust Agreement, this Plan shall control; (iii) between the Plan Supplement or any other instrument or document created or executed pursuant to this Plan and any Trust Agreement, the Plan Supplement or any other instrument or document created or executed pursuant to this Plan shall control; and (iv) between this Plan and the Disclosure Statement, this Plan shall control.

The provisions of this Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each and the Trust Documents shall be incorporated by reference into the Confirmation Order; *provided*, that, if there is determined to be any inconsistency between any provisions of this Plan and any provision of the Confirmation Order and such inconsistency cannot be reconciled, the provisions of the Confirmation Order shall govern and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, solely to the extent of such inconsistency.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Claims have not been classified and shall be treated as follows:

A.     *Administrative Claims*

In full and final satisfaction, settlement, release, and discharge of any Allowed Administrative Claim against the Debtor, except to the extent the Debtor (with the consent of the TCC and the UCC) and a Holder of an Allowed Administrative Claim (other than Professional Fee Claims, which are governed by **Article II.B**) against the Debtor agrees to a less favorable treatment of such Administrative Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Administrative Claim shall receive Cash in an amount equal to the Allowed amount of such Administrative Claim.

Except as otherwise provided by a Final Order entered by the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the Debtor, the TCC and the UCC no later than the Administrative Claims Bar Date. Each request for payment of an Administrative Claim must set forth, at a minimum, (a) the name of the Holder of the Administrative Claim, (b) the amount of the Administrative Claim and (c) a detailed basis for the Administrative Claim. A request for payment of an Administrative Claim that has been properly and timely Filed and served shall become an Allowed Administrative Claim unless an objection is filed by the date that is thirty (30) days after such request has been Filed and served. If a timely objection is Filed, the Administrative Claim in question shall become Allowed only to the extent set forth in a Final Order of the Bankruptcy Court.

Any failure to File a request for payment of an Administrative Claim by the Administrative Claims Bar Date shall result in the Administrative Claim in question being discharged and released as of the Effective Date, and its Holder being forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtor, its Estate, or any other Entity. Any requests for payment of Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtor, or further order of the Bankruptcy Court.

B.     *Professional Fee Claims*

1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330 and/or 331 for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the TCC, the UCC, the DIP Lender, the Debtor and the United States Trustee no later than the first Business Day that is thirty (30) days after the Effective Date. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and be subject to approval by the Bankruptcy Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case. The last date to object to such final fee application shall be the twenty-first (21st) day after such fee application has been Filed and all final fee applications shall be set for hearing at the same time, as the Bankruptcy Court's calendar permits, after consultation with counsel to the TCC, the UCC, the DIP Lender, and the Debtor, *provided*, *however*, that if an objection is Filed to any final fee application, then the deadline to object to any and all final fee applications shall be extended for all parties in interest for an additional seven (7) days and, for any party whose Professional(s) is subject to an objection Filed within the twenty-one (21) day period above, the deadline for such party to object to any and all final fee applications shall be extended for an additional fourteen (14) days. Neither Trustee shall have standing to object to any Professional Fee Claims.

2.        Professional Fee Escrow Amount

Estate Professionals shall estimate their Accrued Professional Fees as of the Effective Date and deliver such estimate to the TCC, the UCC, and the Debtor at least five (5) Business Days prior to the anticipated Effective Date. If a Professional does not provide such estimate, the TCC, the UCC, and the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Escrow Amount, provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional.

3.        Professional Fee Escrow Accounts

On the Effective Date, the Debtor shall fund the Professional Fee Escrow Accounts with Cash in an amount equal to the Professional Fee Escrow Amount plus a reasonable cushion amount determined by the TCC, the UCC, and the Debtor. The TCC Professional Fee Escrow Account will be funded with Cash sufficient to pay the Professional Fee estimate for the TCC's Professionals, which account shall be held and administered by the PI/WD Trustee. The UCC Professional Fee Escrow Account will be funded with Cash sufficient to pay the Professional Fee estimate for the UCC's Professionals, which account shall be held and administered by the GUC Trustee. The Debtor Professional Fee Escrow Account will be funded with Cash sufficient to pay the Professional Fee estimate for the Debtor's Professionals, which account shall be held and administered by the GUC Trustee, solely and exclusively in his capacity as Wind-Down Officer of the Debtor. The Professional Fee Escrow Accounts shall be held for the sole benefit of the Professionals until all Allowed Professional Fee Claims have been paid in full. For the avoidance of doubt, the PI/WD Trust Assets and the GUC Trust Assets shall not be used to pay any Professional Fee Claims in the Chapter 11 Case.

Funds held in the Professional Fee Escrow Accounts shall not be considered property of the Debtor's Estate or of the Trusts. Funds held in the Professional Fee Escrow Accounts shall be administered in accordance with the terms of this Plan, which terms shall be reflected in the Trust Agreements and the exhibits thereto. Professional Fees owing on account of Allowed Professional Fee Claims shall be paid in Cash from funds held in the applicable Professional Fee Escrow Accounts as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court or authorized to be paid under the Interim Compensation Order. No Liens, Claims, interests, charges, or other Encumbrances or liabilities of any kind shall encumber the Professional Fee Escrow Accounts in any way, and neither Trustee shall have any discretion over whether or when to make payments on account of Allowed Professional Fee Claims other than as set forth in this **Article II.B**. To the extent that there are insufficient funds in the Professional Fee Escrow Accounts to satisfy all Allowed Professional Fee Claims in full, any such Allowed Professional Fee Claims (or portions thereof that remain unpaid from the Professional Fee Escrow Accounts) shall be paid as an Allowed Administrative Claim in accordance with **Article II.A**.

4.        Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the GUC Trustee and PI/WD Trustee, as applicable, may, in the ordinary course of business and without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pay the reasonable, actual, and documented legal, professional, or other fees and expenses incurred on or after the Effective Date in connection with administering the GUC Trust and the PI/WD Trust out of the GUC Trust Assets and the PI/WD Trust Assets, as applicable, and in accordance with the Plan, GUC Trust Agreement, and PI/WD Trust Agreement, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered to either Trust after such date shall terminate.

C.    *DIP Claims*

DIP Claims shall be fully and forever discharged and released on the Effective Date pursuant to the Estate Party Settlement set forth in **Article IV.B.6** and **Article IX.A**.

Notwithstanding anything in this Plan to the contrary, to the extent that the Court disallows payment of any fees and expenses of Estate Professionals set forth in the Approved Budget (as defined in the DIP Order), and that

such order or orders by the Court cause on a final basis the total amount of Allowed Administrative Claims and Professional Fee Claims to be less than the Commitment Amount (as defined in the DIP Order), then (i) if this Plan has been confirmed and gone effective, 90 percent (90%) of the difference between the Commitment Amount and the total amount of Allowed Administrative Claims and Professional Fee Claims shall be promptly returned to the DIP Lender, whether such funds are held in the Professional Fee Escrow Accounts or another account, or (ii) if confirmation of this Plan has been denied, then 100 percent (100%) of the difference between the Commitment Amount and the total amount of Allowed Administrative Claims and Professional Fee Claims shall be promptly returned to the DIP Lender, whether such funds are held in the Professional Fee Escrow Accounts or another account.

D.    *Synergi Administrative Claim*

In full and final satisfaction, settlement, release, and discharge of any Administrative Claim arising under or in respect of the Synergi Order and the agreements referenced therein, Synergi shall be entitled to receive Cash from the ERC Fund equal to the amount of such Administrative Claim pursuant to and in accordance with the Synergi Order. For the avoidance of doubt, nothing in the Plan shall modify the Synergi Order, including the payments terms and conditions set forth therein.

E.    *Priority Tax Claims (Federal and State)*

Except to the extent that a federal Governmental Unit Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each federal Governmental Unit Holder of such Allowed Priority Tax Claim will receive, at the sole option of the Debtor or the Trustees, as applicable, either:  (1) an amount of Cash from the ERC Fund equal to the amount of such Allowed Priority Tax Claim by the later of (a) ninety (90) days after the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, or (b) ten (10) days after the date on which the ERC Fund is funded; or (2) regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date. For the avoidance of doubt, federal Governmental Unit Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

For purposes of organization, voting, and all matters related to Confirmation, and except as otherwise provided herein, all Claims (other than Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims) against and Interests in the Debtor are classified as set forth in this **Article III**.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims described in **Article II** have not been classified and are excluded from the following Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes.  Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim that is not Allowed for distribution purposes (if applicable) or any Claim that has been satisfied, released, or otherwise settled prior to the Effective Date.

B.    *Requirement to File a Personalized Proof of Claim Form by All Claimants, Including Those Who Are Part of Representative Action*

Any Holder of a Claim must have filed a Proof of Claim on account of his or her personal Claim by the Claims Bar Date even if such Holder may purport to be included in, or represented by, a purported class action, class suit, class Proof of Claim, or similar representative action filed against the Debtor with respect to such Holder's Claim, regardless of whether or not said action was ever certified or authorized by a court of competent jurisdiction.  If the

Holder of a Claim has not filed a personalized Proof of Claim, the Holder of that Claim shall not be entitled to any distribution from the Trusts.

C.      *Voting Requirements*

Any Holder of a Claim whose Claim is not scheduled or is scheduled as disputed, contingent, or unliquidated must have timely filed, or be deemed to have timely filed, a personalized Proof of Claim prior to the Claims Bar Date, and any Holder of a Claim that failed to do so shall not be entitled to vote on the Plan.

D.      *Opt-Out Deadline*

The Opt-Out Release Form shall be used by all Holders of Claims against the Debtor that wish not to grant, and therefore elect to opt-out of, the Consensual Claimant Release set forth in **Article IX.D** of the Plan.  Any Holder of a Claim who wishes and intends to elect to opt out of the Consensual Claimant Release set forth in **Article IX.D** of the Plan must do so prior to the Voting Deadline.

E.      *Summary of Classification*

The following table designates the Classes of Claims against, and Interests in, the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Convenience Claims | Impaired | Entitled to Vote |
| 4 | Channeled GUC Claims | Impaired | Entitled to Vote |
| 5 | Opt-Out GUC Claims | Impaired | Entitled to Vote |
| 6 | Channeled PI/WD Claims | Impaired | Entitled to Vote |
| 7 | Opt-Out PI/WD Claims | Impaired | Entitled to Vote |
| 8 | Opt-Out Insured PI/WD Claim | Impaired | Entitled to Vote |
| 9 | Channeled Indirect Claims | Impaired | Entitled to Vote |
| 10 | Opt-Out Indirect Claims | Impaired | Entitled to Vote |
| 11 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

F.    *Treatment and Voting of Classes of Claims and Interests*

1.    Class 1 — Other Priority Claims

(a)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash from the Administrative and Priority Claims Reserve on (or as soon as reasonably practicable after) the later of (i) the Effective Date or (ii) thirty (30) days after such Other Priority Claim becomes Allowed, or (iii) such date on which the Holder of such Other Priority Claim and the Debtor or Trustees, as applicable, shall otherwise agree in writing.

(b)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Secured Claims

(a)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the sole option of the Debtor or the GUC Trustee, as applicable, either:

(i)    payment in full in Cash on the later of (w) the Effective Date (or as soon as reasonably practicable thereafter), (x) the date on which such Other Secured Claim becomes Allowed, (y) the date payment on account of such Other Secured Claim is due; or (z) the date on which the Holder of such Allowed Other Secured Claim and the Debtor or the GUC Trustee, as applicable, shall otherwise agree in writing;

(ii)    the collateral securing such Allowed Other Secured Claim; or

(iii)    such other treatment that renders such Allowed Other Secured Claim Unimpaired.

(b)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Convenience Claims

(a)    *Treatment*: On the first Business Day that is thirty (30) days following the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash.

(b)    *Voting*: Class 3 is Impaired under the Plan. Holders of Convenience Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 — Channeled GUC Claims

(a)    *Treatment*:

(i)    On the Effective Date (or as soon as reasonably practicable thereafter) except to the extent that a Holder of an Allowed Channeled GUC Claim agrees to less favorable treatment, each Holder of an Allowed Channeled GUC Claim shall receive, in full and final satisfaction of such Claim, a beneficial interest in the

GUC Trust.  Thereafter each such Holder shall receive Cash distributions from the GUC Trust in accordance with the terms and conditions set forth in the GUC Trust Documents.  Distributions from the GUC Trust to Holders of Allowed Channeled GUC Claims shall be on a Pro Rata basis with all other holders of GUC Trust beneficial interests in accordance with the terms of the GUC Trust Agreement.  Holders of Channeled GUC Claims shall not receive any payment from the GUC Trust unless and until such Claims are resolved in accordance with the GUC Trust Documents.  The GUC Trust Agreement establishes the method by with the Channeled GUC Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid.  Except as provided in the Plan, Holders of Channeled GUC Claims shall be enjoined from prosecuting or filing any Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(ii)     Notwithstanding the above, each Holder of an Allowed Channeled GUC Claim shall have the option on the Ballot to elect for an Expedited GUC Distribution. Any Holder of a GUC Claim who elects for the Expedited GUC Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the Consensual Claimant Release. An election on the Ballot for an Expedited GUC Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot. An Expedited GUC Distribution shall be paid by the GUC Trustee on the later of (a) the Effective Date or (b) within ten (10) business days after such GUC Claim becomes an Allowed Claim by Final Order, provided, however, that the GUC Trustee shall not be required to pay such Expedited GUC Distribution until the first Business Day on which the GUC Trust has sufficient Cash on hand to make the Expedited GUC Distribution and satisfy the reserve requirements set forth in the GUC Trust Documents.

(b)     *Voting*: Class 4 is Impaired under the Plan.  Holders of Channeled GUC Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 — Opt-Out GUC Claims

(a)     *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out GUC Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its GUC Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action.  Except for the foregoing, Holders of Opt-Out GUC Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan. Consistent with the foregoing, each Holder of an Opt-Out GUC Claim may elect to pursue recovery on account of its GUC Claim from any of the Released Parties.  Holders of Opt-Out GUC Claims shall not receive, and shall have no right to receive, a Distribution from the GUC Trust.

(b)     *Voting*: Class 5 is impaired under the Plan.  Holders of Opt-Out GUC Claims are entitled to vote to accept or reject the Plan.

6.      Class 6 — Channeled PI/WD Claims

    (a)      *Treatment*:

        (i)      Holders of Allowed Channeled PI/WD Claims shall be entitled to receive a distribution from the PI/WD Trust from the PI/WD Trust Assets.  As of the Effective Date, the Debtor's liability for all Channeled PI/WD Claims shall be both incurred in full and assumed by the PI/WD Trust without further act, deed, or Court order and shall be administered and paid from the PI/WD Trust as set forth in the PI/WD Trust Documents.  Holders of Channeled PI/WD Claims shall not receive any payment from the PI/WD Trust unless and until such Claims are resolved in accordance with the PI/WD Trust Documents.  The PI/WD Trust Distribution Procedures establish the method by with the Channeled PI/WD Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid.  Except as provided in the Plan, Holders of Channeled PI/WD Claims shall be enjoined from prosecuting any outstanding or filing future Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

        (ii)     Notwithstanding the above, and at all times subject to the requirements in **Article III.B**, each Holder of an Allowed Channeled PI/WD Claim shall have the option on the Ballot to elect for an Expedited PI/WD Claim Distribution.  Any Holder of a Channeled PI/WD Claim who elects for the Expedited PI/WD Claim Distribution shall be deemed to have (a) voted to accept the Plan and (b) consented and agreed to and not opted out of the Consensual Claimant Release.  An election on the Ballot for an Expedited PI/WD Claim Distribution shall be irrevocable, shall be conclusive and controlling, and shall govern over any and all other markings on the Ballot.  An Expedited PI/WD Claim Distribution shall be paid by the PI/WD Trustee within sixty (60) days following the Effective Date, subject to the terms of the PI/WD Trust Distribution Procedures, provided, however, that the PI/WD Trustee shall not be required to pay such Expedited PI/WD Distribution until the first Business Day on which the PI/WD Trust has sufficient Cash on hand to make the Expedited PI/WD Distribution and satisfy the reserve requirements set forth in the PI/WD Trust Documents.

    (b)      *Voting*: Class 6 is Impaired under the Plan.  Holders of Channeled PI/WD Claims are entitled to vote to accept or reject the Plan.

7.      Class 7 — Opt-Out PI/WD Claims

    (a)      *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out PI/WD Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its PI/WD Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action.  Except for the foregoing, Holders of an Opt-Out PI/WD Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Plan pursuant to the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan.  Consistent with the foregoing, each Holder of an Opt-Out PI/WD Claim may elect to pursue recovery on account of its PI/WD Claim from any of the

Released Parties. Holders of Opt-Out PI/WD Claims shall not receive, and shall have no right to receive, a Distribution from the PI/WD Trust.

(b)    *Voting*: Class 7 is impaired under the Plan. Holders of Opt-Out PI/WD Claims are entitled to vote to accept or reject the Plan.

8.    Class 8 — Opt-Out Insured PI/WD Claim

(a)    *Treatment*:

(i)    The Holders of Opt-Out Insured PI/WD Claims shall be entitled to seek recovery on account of such Claims from any PI/WD Insurance Company. Such Holders shall be entitled to name as a defendant in any proceeding commenced or continued in the Civil Justice System the Debtor, the PI/WD Trust, and any other person or entity to the extent permitted under applicable law, *provided, however*, that such Holder may not name a Released Party as a defendant other than the Debtor. Claims that could have been asserted against the Debtor may be asserted against the PI/WD Trust, which will have the liabilities and defenses of the Debtor, subject to the limitations below on the Claimants' right to recover on any such Opt-Out Insured PI/WD Claim established through litigation. If such proceeding is commenced or continued, the PI/WD Trustee shall provide notice to and seek defense from each PI/WD Insurance Company that the PI/WD Trustee determines may have an obligation to provide coverage in accordance with the terms of each applicable PI/WD Insurance Policy. The PI/WD Trust shall have no obligation to appear and defend any lawsuit commenced against the PI/WD Trust if the applicable PI/WD Insurance Company refuses to cover any and/or all defense costs. The PI/WD Trust shall have no obligation to satisfy any Insurance Policy's deductible or self-insured retention per claim or in the aggregate. Holders of Opt-Out Insured PI/WD Claims shall not be entitled to receive any recovery from the PI/WD Trust or the Debtor on account of such Claim other than a recovery that is funded exclusively by an insurance recovery under a PI/WD Insurance Policy.

(ii)    Each Holder of an Opt-Out Insured PI/WD Claim shall automatically be deemed to return to the PI/WD Trust on the ninetieth (90th) day following the Effective Date unless such Holder provides written notice to the PI/WD Trust that such Holder intends to remain an Opt-Out for purposes of pursuing insurance recoveries in the Civil Justice System. This deadline may be extended in accordance with the PI/WD Trust Documents. Holders of Opt-Out Insured PI/WD Claims who elect to remain in the Civil Justice System for the purpose of pursuing insurance recoveries after this deadline may elect to return to the PI/WD Trust in accordance with the PI/WD Trust Documents. Any Holder of an Opt-Out Insured PI/WD Claim that returns to the PI/WD Trust in accordance with the PI/WD Trust Documents shall be treated as the Holder of Channeled PI/WD Claim under the Plan and the PI/WD Trust Documents.

(b)    *Voting*: Class 8 is impaired under the Plan. Holders of Opt-Out Insured PI/WD Claims are entitled to vote to accept or reject the Plan.

9.    Class 9 — Channeled Indirect Claims

(a)    *Treatment*:

(i)    Any Channeled Indirect Claim shall be Disallowed to the extent provided by section 502(e) and shall be subordinated to the extent provided by section 509(c) of the Bankruptcy Code or applicable law.

(ii)   As of the Effective Date, (a) the Debtor's liability for all Allowed Channeled Indirect Claims that are Allowed Indirect PI/WD Claims shall be both incurred in full and assumed by the PI/WD Trust without further act, deed, or Court order and shall be administered and paid from the PI/WD Trust as set forth in the PI/WD Trust Documents, and (b) the Debtor's liability for all Allowed Channeled Indirect Claims that are Allowed Indirect GUC Claims shall be both incurred in full and assumed by the GUC Trust without further act, deed, or Court order and shall be administered and paid from the GUC Trust as set forth in the Plan and the GUC Trust Agreement.

(iii)   Holders of Allowed Channeled Indirect Claims that are Allowed Indirect PI/WD Claims shall not receive any payment from the PI/WD Trust unless and until such Claims are resolved in accordance with the PI/WD Trust Documents. The PI/WD Trust Distribution Procedures establish the method by with such Claims will be resolved and how such Claims will be submitted, processed, liquidated, and paid. Holders of Allowed Channeled Indirect Claims that are Allowed Indirect GUC Claims shall not receive any payment from the GUC Trust unless and until such Claims are resolved in accordance with the Plan and the GUC Trust Agreement. Except as provided in the Plan, Holders of Channeled Indirect Claims shall be enjoined from prosecuting any outstanding or filing future Claims against the Released Parties in any forum whatsoever, including any state, federal, or non-U.S. court.

(b)   *Voting*: Class 9 is Impaired under the Plan. Holders of Channeled Indirect Claims are entitled to vote to accept or reject the Plan.

10.   Class 10 — Opt-Out Indirect Claims

(a)   *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Opt-Out Indirect Claim shall retain or receive, in full and final satisfaction of such Claim, the claims or theories of recovery or remedies based on the doctrine of successor liability that such Holder held and could have asserted against YesCare Corp., CHS TX, Inc., or any other alleged successor entity immediately prior to the Petition Date as part of or in connection with its Indirect Claim and that became, as of the Petition Date, part of the claims or theories of recovery or remedies that could have been asserted by the Debtor as an Estate Cause of Action. Except for the foregoing, Holders of an Opt-Out Indirect Claims may not assert any Estate Causes of Action to the extent that (a) such Estate Cause of Action is settled and released under the Plan pursuant to the Estate Release or (b) such Estate Cause of Action is a Retained Estate Cause of Action that is transferred to the Trusts under the Plan. Consistent with the foregoing, each Holder of an Opt-Out Indirect Claim may elect to pursue recovery on account of its Indirect Claim from any of the Released Parties. Holders of Opt-Out Indirect Claims shall not receive, and shall have no right to receive, a Distribution from the PI/WD Trust or the GUC Trust.

(b)   *Voting*: Class 10 is impaired under the Plan. Holders of Opt-Out Indirect Claims are entitled to vote to accept or reject the Plan.

11.   Class 11 — Interests in the Debtor

(a)   *Treatment*: On the Effective Date, all Interests in the Debtor shall be cancelled, released, discharged, and extinguished. Holders of Interests in the Debtor shall not receive or retain any property on account of such Interests.

(b)   *Voting*: Class 11 is Impaired under the Plan. Holders of Interests in the Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

G.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, such class shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

I.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

To the extent any Class is impaired under the Plan and such Class fails to accept this Plan in accordance with section 1126(c) or (d) of the Bankruptcy Code, the Proponents hereby request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. The Proponents reserve the right to modify the Plan in accordance with **Article XI** to the extent, if any, that Plan confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration for Plan Distributions*

Sources of consideration for Plan distributions shall be Cash in the Debtor's possession prior to the Effective Date, the GUC Trust Assets and the PI/WD Trust Assets.

B.      *The Estate Party Settlement*

The Committees, the Debtor, and the Settlement Parties have reached a global resolution of all issues among them in the Chapter 11 Case. Pursuant to Bankruptcy Rule 9019, the Plan does, and shall, constitute a compromise, settlement, and release of all potential claims by and among the Settlement Parties on the terms set forth below. Entry of the Confirmation Order shall constitute approval of the resolution set forth below, which shall become fully effective upon the Final Payment Date.

1.      <u>The Settlement Payment</u>

The Settlement Parties shall pay or cause to be paid to the PI/WD Trust and GUC Trust, as applicable, aggregate Cash in the amount of Fifty Million Dollars ($50,000,000.00) (the "<u>Settlement Payment</u>"), as follows: (i) on or before the Effective Date, the Settlement Parties shall pay or cause to be paid to the Debtor's estate Cash in the amount of Two Million Dollars ($2,000,000.00) (the "<u>Initial Settlement Amount</u>") which shall be contributed to the PI/WD Trust and the GUC Trust on the Effective Date. The remaining Forty-Eight Million Dollars ($48,000,000.00) shall be paid over thirty (30) months with interest at 6.00% per annum on the unpaid balance based on the Settlement Payment Schedule, with each installment payment (each an "<u>Installment Settlement Payment</u>") being due on the fifteenth (15th) day of each month (or, if such day is not a Business Day, the next succeeding Business Day) until all Installment Settlement Payments have been made, with the final installment (the "<u>Final Settlement Payment</u>"), being made no later than thirty (30) months after the Effective Date (or, if such day is not a Business Day, the next succeeding Business Day).

2.      Settlement Payment Default

The Settlement Parties' failure to timely pay or cause to be paid the Initial Settlement Amount or any of the Installment Settlement Payments shall constitute a "Settlement Payment Default."  A Settlement Payment Default may be declared if the Installment Settlement Payments are not made on or before the applicable payment date or within a "grace period" of five (5) Business Days from such date, *provided, however*, that, in the event the expiration date of the "grace period" occurs on a Friday it will be extended to the following Monday.  Upon occurrence of a Settlement Payment Default, the Debtor or either Trustee, shall promptly provide written notice of the Settlement Payment Default (a "Settlement Payment Default Cure Notice") to counsel for the Settlement Parties at the following email addresses:  *mhayward@haywardfirm.com, kristian.gluck@nortonrosefulbright.com, julie.harrison@nortonrosefulbright.com.*  In addition, contemporaneously with the declaration of a Settlement Payment Default, the Debtor or either Trustee shall file the Settlement Payment Default Cure Notice on the docket for the Chapter 11 Case.  The Settlement Parties shall cure the Settlement Payment Default by making the missed Installment Settlement Payment within five (5) Business Days of receipt of the Settlement Payment Default Cure Notice (the "Settlement Payment Cure Period").  If a Settlement Payment Default occurs and is not cured within Settlement Payment Cure Period or waived in writing by both the PI/WD Trustee and GUC Trustee, all Plan injunctions, stays, or releases provided in favor of the Released Parties that are in effect under the Plan shall be deemed terminated and void.  All Statute of Limitations for all Claims and Causes of Action against the Released Parties held by the Debtor, the Estate, the PI/WD Trust, the GUC Trust, and Holders of Channeled Claims shall be tolled and extended to the first Business Day that is ninety (90) days after the termination of the Channeling Injunction if the Settlement Payment Default is not timely cured or waived in writing by both the PI/WD Trustee and the GUC Trustee.  Notice of any waiver by the PI/WD Trustee and the GUC Trustee described in this paragraph must be filed on the docket for the Chapter 11 Case.  If the Settlement Payment Default is not timely cured or waived in writing, the Channeling Injunction will be terminated and the PI/WD Trustee and the GUC Trustee shall file a notice on the docket of the Chapter 11 Case and provide notice to beneficiaries of the Trusts that the Estate Party Settlement did not become effective and that such beneficiaries have ninety (90) days from the date of termination to commence Causes of Action against the Released Parties.

3.      Allocation of Settlement Payment

The Settlement Payment shall be split between the PI/WD Trust and the GUC Trust on a 50/50 basis.  Half of the Initial Settlement Amount shall be paid to the PI/WD Trust, and the other half shall be paid to the GUC Trust.  Half of each Installment Settlement Payment (including the Final Settlement Payment) shall be paid to the PI/WD Trust, and the other half shall be paid to the GUC Trust.

4.      Use of Settlement Payment

Under no circumstances shall any portion of the funds received pursuant to the Settlement Payment be used to pay Administrative Claims, Professional Fee Claims, Priority Claims, or Secured Claims of any type.  Funds received pursuant to the Settlement Payment shall be distributed to the GUC Trust or PI/WD Trust, as applicable, and used for the cost administration of such Trusts and for making distributions to Trust Beneficiaries on the terms and conditions set forth in the Trust Documents.

5.      Right of Termination Based on Voting Results

No later than the latter to occur of (i) ten (10) days after the Voting Deadline, or ten (10) days prior to the Confirmation Hearing, the Settlement Parties shall have the option to terminate the Estate Party Settlement if more than 5% in number of Voting PI/WD Claimants elect to opt out of the Consensual Claimant Release and who, by doing so, irrevocably elect to pursue their PI/WD Claims in the Civil Justice System with no right to return to or recover from the PI/WD Trust. Holders of PI/WD Claims who elect to pursue their PI/WD Claims in the Civil Justice System for the purpose of pursuing a recovery from one or more PI/WD Insurance Companies and who do not opt out of the Consensual Claimant Release shall not be considered "opt outs" for the purpose of calculating whether the participation percentage has been met.  The Settlement Parties may only elect this option to terminate the Estate Party Settlement by providing written notice to the Committees and the Debtor and by filing such notice on the docket in the Chapter 11 Case.  If the Settlement Parties do not timely elect to terminate the Estate Party Settlement, the

Settlement Parties shall be deemed to have waived the ability to terminate the Estate Party Settlement. If the Settlement Parties terminate the Estate Party Settlement based on this termination right, the Settlement Parties specifically reserve, and shall not be deemed to have waived or released any rights or claims, including with respect to the DIP Loan or any of the Settlement Parties' Proofs of Claim filed in the Chapter 11 Case.

      6.      <u>Settlement Parties' Release of Certain Claims</u>

On the Effective Date, the Settling Parties shall release and waive all Claims and Causes of Action against the Debtor and its Estate, including the DIP Lender's Claims under the DIP Order and the DIP Facility, the Proof of Claim filed by Geneva Consulting LLC (Claims Register No. 572 for $315,032.97), and the Proof of Claim filed by M2 LoanCo, LLC (Claims Register No. 589 for $24,032,965), which Claims shall be Disallowed for all purposes and expunged from the Claims Register. The Settling Parties will have no right to seek indemnification from the Trusts and will not assert any claims against the Trusts.

      7.      <u>Release by the Consenting Claimants of the Released Parties</u>

**As of the Final Payment Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate the Estate Party Settlement, as an integral component of the Plan, to the maximum extent permitted under applicable law, all Consenting Claimants shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each Released Party of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided, however,* that the releases set forth in this Article IV.B.7 shall not, and shall not be construed to: (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents. If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IV.B.7 shall be void. If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts. Any Released Party may enforce the Consensual Claimant Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose. The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.**

      8.      <u>Releases by the Debtor and the Settlement Parties of Holders of Claims in Classes 4, 6, 8, and 9</u>

**As of the Final Payment Date, for good and valuable consideration, the adequacy of which is hereby confirmed, as an integral component of the Plan, to the maximum extent permitted under applicable law, Released Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Holders of Claims in Class 4 (Channeled GUC Claims), Class 6 (Channeled PI/WD Claims), Class 8 (Opt-Out Insured PI/WD Claims), and Class 9 (Channeled Indirect Claims) of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or**

before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any such Holder, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that the releases set forth in this Article IV.B.8 shall not, and shall not be construed to:  (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents.

9.     Release of Estate Causes of Action Against the Released Parties

As of the Final Payment Date, except for the claims or theories of recover or remedies distributed to or retained by Holders of Opt-Out GUC Claims, Holders of Opt-Out PI/WD Claims, and Holders of Opt-Out Indirect Claims, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Released Party shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor, its Estate, and each of their respective successors or assigns, including the Trusts, of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, the Payment Agreement, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in the Plan shall not be construed to release any Insurance Actions or any post-Effective Date obligations under the Estate Party Settlement or any document, instrument, or agreement executed to implement the Estate Party Settlement.  If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IV.B.9 shall be void.  If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts.  Any Released Party may enforce the Estate Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose.  The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.

10.     Forbearance from Prosecuting Released Estate Causes of Action

The Trusts shall forbear from asserting or prosecuting any Released Estate Causes of Action between the Effective Date and the Final Payment Date unless a Settlement Payment Default occurs and is not cured within Settlement Payment Cure Period or waived by both the PI/WD Trustee and GUC Trustee.  While this forbearance period is in effect, and for ninety (90) days following the termination of such forbearance period, the running of any relevant Statute of Limitations shall be tolled as to any Released Estate Causes of Action.

11.     Claim Over

It is the intent of the parties to the Estate Party Settlement that:  (a) the contributions made by the Settling Parties to the Trusts should be the sole payments the Released Parties shall make to address the Released Claims; (b) a claim by a Consenting Claimant against any non-party arising out of a Released Claim should not result in any additional payment by any Released Party; and (c) the settlement effectuated through the Plan meets the requirements of the Uniform Contribution Among Tortfeasors Act and any similar state or federal law or doctrine that reduces or discharges a Released Party's liability to any other parties.  This Plan provides, and the Confirmation Order will specify, that the Estate Party Settlement is a good faith settlement that bars any Cause of Action by a non-Released Party against any Released Party for contribution, for indemnification, or otherwise seeking to recover any amounts paid by or awarded against that non-Released Party and paid or awarded to any Consenting Claimant by way of settlement, judgment, or otherwise on any claim that would be a Released Claim were such non-Released Party a Released Party to the extent that a good-faith settlement has such an effect in accordance with applicable law.

12.     Voiding of Releases in Favor of the Released Parties

**If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth in Article IV.B.7 and Article IV.B.9 in favor of the Released Parties shall be void.  If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extend to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts.**

C.      *Opt-Out Insured PI/WD Claims*

Each Holder of a PI/WD Claim shall have the right on his or her Ballot to make an election to pursue his or her PI/WD Claims in the Civil Justice System for the purpose of pursuing a recovery from one or more PI/WD Insurance Companies, subject to the right to return to and recover from the PI/WD Trust under and in accordance with the PI/WD Trust Distribution Procedures.  To make this election and become the Holder of an Opt-Out Insured PI/WD Claim, such Holder cannot opt out of the Consensual Claimant Release.  Such Holder shall be entitled to name as a defendant in any proceeding commenced or resumed in the Civil Justice System the Debtor, the PI/WD Trust, and any other person or entity to the extent permitted under applicable law, *provided, however*, that such Holder may not name a Released Party as a defendant other than the Debtor.  Claims that could have been asserted against the Debtor may be asserted against the PI/WD Trust, which will have the liabilities and defenses of the Debtor, subject to the limitations below on the Claimants' right to recover on any such Opt-Out Insured PI/WD Claim established through litigation.  If such proceeding is commenced or continued, the PI/WD Trustee shall provide notice to and seek defense from each PI/WD Insurance Company that the PI/WD Trustee determines may have an obligation to provide coverage in accordance with the terms of each applicable PI/WD Insurance Policy.  The PI/WD Trust shall have no obligation to appear and defend any lawsuit commenced against the PI/WD Trust if the applicable PI/WD Insurance Company refuses to cover all defense costs.  The PI/WD Trust shall have no obligation to satisfy any Insurance Policy's deductible or self-insured retention per claim or in the aggregate.  Holders of Opt-Out Insured PI/WD Claims shall not be entitled to receive any recovery from the PI/WD Trust or the Debtor on account of such Claim that is not funded exclusively by an insurance recovery under a PI/WD Insurance Policy.  If the Holder of an Opt-Out Insured PI/WD Claim is deemed or elects to return to the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures, his or her PI/WD Claim shall be become a Channeled PI/WD Claim under the Plan and the PI/WD Trust Distribution Procedures, *provided, however*, that such Claim shall remain a Class 8 Claim.  Holders of Opt-Out Insured PI/WD Claims may engage in mediation with an PI/WD Insurance Company to resolve their PI/WD Claims.  Parties to such mediation may include the PI/WD Trust.  If an Opt-Out Insured PI/WD Claim is resolved through such mediation, that parties thereto shall include in any settlement or release executed in connection therewith an acknowledgement by the Holder of the settled Opt-Out Insured PI/WD Claim that such Holder's PI/WD Claim is being resolved by such settlement and that, as a result, such Holder's PI/WD Claim shall not become a Channeled PI/WD Claim under the Plan.

D.     *PI/WD Trust to Resolve All Channeled PI/WD Trust Claims*

The PI/WD Trust shall be established to administer, process, settle, resolve, liquidate, satisfy, and pay all Allowed Channeled PI/WD Trust Claims.  All Channeled PI/WD Trust Claims shall be subject to the Channeling Injunction.  The PI/WD Trust shall be funded with the PI/WD Trust Assets.  Before the Effective Date, no Released Party may object to any PI/WD Claims, and any pending objections to any PI/WD Claims filed by a Released Party as of the date this Plan is filed with the Bankruptcy Court shall be deemed to be withdrawn without prejudice.  PI/WD Claims that are not channeled to the PI/WD Trust shall be treated in a manner consistent with **Article III** of the Plan.

E.     *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

F.     *Post-Effective Date Debtor, GUC Trust, and PI/WD Trust*

1.     <u>Post-Effective Date Debtor and GUC Trust</u>

(a)     Establishment of the GUC Trust

On the Effective Date, the GUC Trust shall be established in accordance with the terms of the GUC Trust Agreement and the Plan. The GUC Trust shall be established to liquidate the GUC Trust Assets and make distributions in accordance with the Plan, Confirmation Order, and GUC Trust Agreement, and in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust. The GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. Accordingly, the GUC Trust Beneficiaries shall be treated for U.S. federal income tax purposes (i) as direct recipients of undivided interests in the GUC Trust Assets (other than to the extent the GUC Trust Assets are allocable to Disputed Claims) and as having immediately contributed such assets to the GUC Trust, and (ii) thereafter, as the grantors and deemed owners of the GUC Trust and thus, the direct owners of an undivided interest in the GUC Trust Assets (other than such GUC Trust Assets that are allocable to Disputed Claims).

(b)     Purposes of the GUC Trust

The purposes of the GUC Trust shall be to assume responsibility for Channeled GUC Trust Claims, and, among other things:  (1) to hold, preserve, maximize, and administer the GUC Trust Assets, (2) to liquidate the GUC Trust Assets, and (3) to administer, process, settle, resolve, liquidate, satisfy, and pay all Allowed Channeled GUC Trust Claims in a fair, consistent, and equitable manner in accordance with the terms of the GUC Trust Documents and the Plan.  The GUC Trust shall also have responsibility for the Retained Causes of Action (on behalf of itself and its beneficiaries as well as on behalf of the PI/WD Trust and its beneficiaries, subject to the provisions and consent rights of the PI/WD Trust, as set forth in **Article IV.J**, with the net proceeds of such Retained Causes of Action to be split between the PI/WD Trust and the GUC Trust on a 50/50 basis.

(c)     Assumption of Channeled GUC Trust Claims by the GUC Trust

On the Effective Date or as otherwise provided herein, and without further action of any Person, the GUC Trust shall assume the liabilities, obligations, and responsibilities of the Debtor for all Channeled GUC Trust Claims as set forth in the Plan.  Subject to the rights of the PI/WD Trust, as discussed below, the GUC Trust shall have control over the Retained GUC Trust Causes of Action, and the GUC Trust shall thereby be the estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with the right to enforce each of the Retained GUC Trust Causes of Action, and the proceeds of the recoveries on any of the Retained GUC Trust Causes of Action shall be deposited in and become the property of the GUC Trust, and the GUC Trust shall have the right to enforce

the Plan and any of the other Plan Documents according to their respective terms, including the right to receive the GUC Trust Assets as provided in the Plan.

(d)     Transfer of the GUC Trust Assets to the GUC Trust

On the Effective Date, pursuant to sections 1123, 1141(b), and 1141(c) of the Bankruptcy Code, all right, title, and interest in and to the GUC Trust Assets shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the GUC Trust free and clear of all Liens, Claims, Encumbrances, interests, and rights of any nature, whether at law or in equity, of any Person or Entity.  The GUC Trust shall be the Debtor's Estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to any transfers on the Effective Date pertaining to the GUC Trust Assets.  To the extent any of the GUC Trust Assets are not transferred to the GUC Trust on the Effective Date pursuant to the Plan, then as soon as such assets accrue or become transferable after the Effective Date, they shall automatically and immediately transfer to the GUC Trust free and clear of all Encumbrances and Claims or other interests of any Person.  The GUC Trust shall be the Debtor's Estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to any transfers after the Effective Date pertaining to the GUC Trust Assets.

(e)     GUC Trust as Successor in Interest to the Debtor

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtor shall be deemed to have resigned and the GUC Trustee shall be appointed as the sole manager, director, and officer of the Post-Effective Date Debtor and shall succeed to the powers of the Debtor's managers, directors, and officers.  From and after the Effective Date, the GUC Trustee shall be the sole representative of, and shall act for, the Post-Effective Date Debtor.  The Post-Effective Date Debtor or the GUC Trustee, as applicable, shall be deemed to be substituted in lieu of the Debtor as the proper party in interest in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtor or the GUC Trustee to file motions or substitutions of parties or counsel in any such matter.

(f)     Disposition of Trust Assets

The GUC Trust shall have the ability and authority to dispose administer, invest, and monetize the GUC Trust Assets and use the GUC Trust Assets, including the proceeds thereof, to make distributions to the Holders of Channeled GUC Trust Claims in accordance with the GUC Trust Documents.

(g)     GUC Trustee

The GUC Trustee shall be the persons identified in the Plan Supplement.  Any successor GUC Trustee shall be selected in accordance with the terms of the GUC Trust Agreement.  For purposes of performing its duties and fulfilling its obligations under the GUC Trust Agreement and the Plan, the GUC Trustee shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  On and after the Effective Date, the GUC Trustee and its designees or representatives shall have the exclusive right to object to, Allow, or otherwise resolve any Channeled GUC Trust Claim, subject to the terms hereof and the GUC Trust Documents.

(h)     GUC Trust as Successor to the Debtor and Its Estate

In addition to all powers enumerated in the GUC Trust Agreement, in the Plan, and in the Confirmation Order, from and after the Effective Date, the GUC Trust shall succeed to all the rights and standing of the Debtor and its Estate with respect to the Retained GUC Trust Causes of Action.  The GUC Trust will be automatically appointed on the Effective Date as a representative of the Debtor's Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.  The GUC Trust will have the exclusive authority and power to:  among other things, (a) administer, object to, and settle Channeled GUC Trust Claims; (b) dispose of GUC Trust Assets, (c) make distributions to Holders of Allowed Channeled GUC Trust Claims in accordance with the Plan and the GUC Trust

Agreement, including the GUC Trust Agreement; and (d) carry out the provisions of the Plan relating to the GUC Trust and the Channeled GUC Trust Claims, including commencing, prosecuting, and settling all Retained GUC Trust Causes of Action for the benefit Holders of Channeled GUC Trust Claims. The GUC Trust shall succeed to all the rights and powers of the Debtor and its Estate with respect to all Retained GUC Trust Causes of Action, and the GUC Trust shall be substituted and will replace the Debtor, its Estate, any official committee appointed in the Chapter 11 Case, in all such Retained GUC Trust Causes of Action, whether or not such claims are pending in filed litigation.

(i)     GUC Trust Advisory Committee

There shall be a GUC Trust Advisory Committee (the "GUC TAC") for the GUC Trust. The GUC TAC shall consist of [●] members. The initial members of the GUC TAC shall be selected by the UCC and will be identified in the Plan Supplement. Each of the member of the GUC TAC shall serve in accordance with the terms of the GUC Trust Agreement. Successor GUC TAC members shall be selected pursuant to the terms of the GUC Trust Agreement. The GUC Trustee and any claims administrator appointed by the GUC Trustee shall evaluate all Channeled GUC Trust Claims on an independent basis and shall operate in accordance with the GUC Trust Documents, the Plan and Confirmation Order and in accordance with applicable ethical rules.

(j)     Assignment of Claims and Defenses

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtor shall be deemed to assign any and all Claims and defenses to the GUC Trust that arise from or relate to the Channeled GUC Trust Claims, including any Claims and defenses against co-defendants.

(k)     Investment Guidelines

All monies held in the GUC Trust shall be invested, subject to the investment guidelines enumerated in the GUC Trust Agreement.

(l)     Privileged Information

Any attorney-client privilege, work-product privilege, common-interest communications with Insurance Companies, protection, or privilege granted by joint defense, common interest, and/or other privilege or immunity of the Debtor relating, in whole or in part, to any Channeled GUC Trust Claim shall be irrevocably transferred to and vested in the GUC Trust as of the Effective Date. The transfers or assignment of any privileged information will vest solely in the GUC Trust and not the GUC TAC, any other Person, committee, or subcomponent of the GUC Trust, or any Person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Channeled GUC Trust Claim.

(m)     Certain Tax Matters of the GUC Trust

The GUC Trustee shall file tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with the Plan. The GUC Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items is respect of any assets allocable to, or retained on account of, Disputed Claims) will be allocated to each holder of GUC Trust Interests in accordance with their relative ownership of GUC Trust Interests. As soon as possible after the Effective Date, the GUC Trustee shall make a good faith valuation of the GUC Trust Assets, and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The GUC Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the GUC Trust for all taxable periods through the dissolution thereof. Nothing in **Article IV.F** shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code. The GUC Trustee (1) may timely elect to treat any GUC Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the GUC Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing. The GUC Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the

U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

(n)      Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, the GUC Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the GUC Trust, including the GUC Insurance Actions, Channeled GUC Trust Claims, and the Retained GUC Trust Causes of Action. Without limiting the foregoing, on and after the Effective Date, the GUC Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtor of the Post-Effective Date Debtor, if deemed necessary or appropriate by the GUC Trust.

(o)      GUC Trust Discovery

The GUC Trust is authorized pursuant to Bankruptcy Rule 2004 and/or other applicable discovery rules to receive information pursuant to the GUC Data Transfer. The authorization of any discovery request pursuant to this provision shall not be construed to deprive the recipient of such discovery request of any applicable privilege or immunity from discovery. The GUC Trust shall be able to take whatever steps are necessary to enforce such discovery obligations pursuant to Bankruptcy Rule 2004, Civil Rule 45, other court resolution processes, under bankruptcy law, and applicable non-bankruptcy law. Nothing herein shall abridge or affect the rights of the GUC Trust or the GUC Trustee to discovery in any proceeding or litigation brought by the GUC Trust or the GUC Trustee.

(p)      GUC Trust Independence

No Released Party (other than the GUC Trustee, the UCC, and their current and former attorneys, professionals, and advisors) shall have any rights or involvement in the GUC Trust, including its management or operation, or in connection with the GUC Trust Documents. Nothing in the Plan creates any rights or obligations that may give rise to a claim or Cause of Action by such Released Party against the GUC Trust or any Holder of a Channeled GUC Trust Claim.

(q)      GUC Trustee as Wind-Down Officer of Debtor

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtor shall be deemed to have resigned and the GUC Trustee shall be appointed as the sole manager, director, and officer of the Post-Effective Date Debtor (the "Wind-Down Officer") and in such capacity shall succeed to the powers of the Debtor's managers, directors, and officers. From and after the Effective Date, the Wind-Down Officer shall be the sole representative of, and shall act for, the Post-Effective Date Debtor. The Post-Effective Date Debtor or the Wind-Down Officer, as applicable, shall be deemed to be substituted in lieu of the Debtor as the proper party in interest in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtor or the Wind-Down Officer to file motions or substitutions of parties or counsel in any such matter. In addition, the Wind-Down Officer shall have the power to administer the responsibilities of the Debtor, including, but not limited to (i) effectuating the process to wind down, dissolve and liquidate the Estate and distribute any remaining assets in accordance with the Plan, including taking any steps to dissolve, liquidate, or take other similar action with respect to the Debtor, including by terminating the corporate or organizational existence of the Debtor, (ii) implement, enforce, comply with and effectuate, as applicable, all provisions of the Plan and the obligations under the Plan, including without limitation the administration, protection, monetization of the tangible and intangible assets and rights to assets of the Post-Effective Date Debtor, (iii) prepare and file appropriate tax returns and other reports on behalf of the Debtor and pay taxes or other obligations owed by the Debtor, (iv) enter into and consummate any transactions for the purpose of dissolving the Debtor, (v) take such actions as are necessary or appropriate to close the Debtor's Chapter 11 Case.

2.     PI/WD Trust

(a)     Establishment of the PI/WD Trust

On the Effective Date, the PI/WD Trust shall be established in accordance with the Plan Documents.  The PI/WD Trust is intended to qualify as a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code and, to the extent permitted under applicable law, for state and local income tax purposes.  All PI/WD Trust Assets contributed to the PI/WD Trust under the Plan shall be deemed to be contributed by the Debtor and Its Estate.

(b)     Purposes of the PI/WD Trust

The purposes of the PI/WD Trust shall be to assume responsibility for Channeled PI/WD Trust Claims, maximize the value of the PI/WD Insurance Action Recoveries, pursue the Retained PI/WD Trust Causes of Action, and, among other things:  (1) to hold, preserve, maximize, and administer the PI/WD Trust Assets, (2) to liquidate the PI/WD Trust Assets, and (3) to administer, process, settle, resolve, liquidate, satisfy, and pay all Allowed Channeled PI/WD Trust Claims in a fair, consistent, and equitable manner in accordance with the terms of the PI/WD Trust Documents and the Plan.  The PI/WD Trust shall also have rights with respect to the Retained Causes of Action, subject to the provisions and consent rights of the PI/WD Trust, as set forth in **Article IV.J**, with the net proceeds of such Retained Causes of Action to be split between the PI/WD Trust and the GUC Trust on a 50/50 basis.

(c)     Assumption of Channeled PI/WD Trust Claims by the PI/WD Trust

On the Effective Date or as otherwise provided herein, and without further action of any Person, the PI/WD Trust shall assume the liabilities, obligations, and responsibilities of the Debtor for all Channeled PI/WD Trust Claims as set forth in the Plan.  The PI/WD Trust shall have control over the Retained PI/WD Trust Causes of Action and the PI/WD Insurance Actions, and the PI/WD Trust shall thereby be the estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with the right to enforce each of the Retained PI/WD Trust Causes of Action and the PI/WD Insurance Actions, and the proceeds of the recoveries on any of the Retained PI/WD Trust Causes of Action or the PI/WD Insurance Actions shall be deposited in and become the property of the PI/WD Trust, and the PI/WD Trust shall have the right to enforce the Plan and any of the other Plan Documents according to their respective terms, including the right to receive the PI/WD Trust Assets as provided in the Plan.

(d)     Transfer of the PI/WD Trust Assets to the PI/WD Trust

On the Effective Date, pursuant to sections 1123, 1141(b), and 1141(c) of the Bankruptcy Code, all right, title, and interest in and to the PI/WD Trust Assets shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the PI/WD Trust free and clear of all Liens, Claims, Encumbrances, interests, and rights of any nature, whether at law or in equity, of any Person or Entity.  The PI/WD Trust shall be the Debtor's Estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to any transfers on the Effective Date pertaining to the PI/WD Trust Assets.  To the extent any of the PI/WD Trust Assets are not transferred to the PI/WD Trust on the Effective Date pursuant to the Plan, then as soon as such assets accrue or become transferable after the Effective Date, they shall automatically and immediately transfer to the PI/WD Trust free and clear of all Encumbrances and Claims or other interests of any Person.  The PI/WD Trust shall be the Debtor's Estate representative pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to any transfers after the Effective Date pertaining to the PI/WD Trust Assets.

(e)     Disposition of Trust Assets

The PI/WD Trust shall have the ability and authority to administer, invest and monetize the PI/WD Trust Assets and use the PI/WD Trust Assets, including the proceeds thereof, to make distributions to the Holders of Channeled PI/WD Trust Claims in accordance with the PI/WD Trust Documents.

(f)      PI/WD Trustee

The PI/WD Trustee shall be the person identified in the Plan Supplement.  Any successor PI/WD Trustee shall be selected in accordance with the terms of the PI/WD Trust Agreement.  For purposes of performing their duties and fulfilling their obligations under the PI/WD Trust Agreement and the Plan, the PI/WD Trustee shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  On and after the Effective Date, the PI/WD Trustee and its designees or representatives shall have the exclusive right to object to, Allow, or otherwise resolve any Channeled PI/WD Trust Claim, subject to the terms hereof and the PI/WD Trust Documents.  On and after the Effective Date, the Debtor, the GUC Trustee and its designees or representatives shall have no right to object to, Allow, or otherwise resolve any Channeled PI/WD Trust Claim.

(g)      PI/WD Trust as Successor to the Debtor and Its Estate

In addition to all powers enumerated in the PI/WD Trust Agreement, in the Plan, and in the Confirmation Order, from and after the Effective Date, the PI/WD Trust shall succeed to all the rights and standing of the Debtor and its Estate with respect to the Retained PI/WD Trust Causes of Action.  The PI/WD Trust will be automatically appointed on the Effective Date as a representative of the Debtor's Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.  The PI/WD Trust will have the exclusive authority and power to:  among other things, (a) administer, object to, and settle Channeled PI/WD Trust Claims; (b) dispose of PI/WD Trust Assets, (c) make distributions to Holders of Allowed Channeled PI/WD Trust Claims in accordance with the Plan and the PI/WD Trust Agreement, including the PI/WD Trust Distribution Procedures; and (d) carry out the provisions of the Plan relating to the PI/WD Trust and the Channeled PI/WD Trust Claims, including commencing, prosecuting, and settling all Retained PI/WD Trust Causes of Action for the benefit Holders of Channeled PI/WD Trust Claims.  The PI/WD Trust shall succeed to all of the rights and powers of the Debtor and its Estate with respect to all Retained PI/WD Trust Causes of Action, and the PI/WD Trust shall be substituted and will replace the Debtor, its Estate, any official committee appointed in the Chapter 11 Case, in all such Retained PI/WD Trust Causes of Action, whether or not such claims are pending in filed litigation.

(h)      PI/WD Trust Advisory Committee

There shall be a Trust Advisory Committee (the "TAC") for the PI/WD Trust.  The TAC shall consist of [●] members.  The initial members of the TAC shall be selected by the TCC and will be identified in the Plan Supplement.  Each of the member of the TAC shall serve in accordance with the terms of the PI/WD Trust Agreement.  Successor TAC members shall be selected pursuant to the terms of the PI/WD Trust Agreement.  No TAC member, in his or her capacity as such, shall have any right, or involvement in, the application of the PI/WD Trust Distribution Procedures to any Channeled PI/WD Trust Claim or the Allowance of any Channeled PI/WD Trust Claim under the PI/WD Trust Distribution Procedures.  The PI/WD Trustee and any claims administrator appointed pursuant to the PI/WD Trust Documents shall evaluate all Channeled PI/WD Trust Claim on an independent basis and shall operate in accordance with the PI/WD Trust Documents, the Plan and Confirmation Order and in accordance with applicable ethical rules.

(i)      PI/WD Trust Distribution Procedures

On the Effective Date, the PI/WD Trust Distribution Procedures shall become effective, and the PI/WD Trustee shall implement the PI/WD Trust Distribution Procedures in accordance with the terms of the PI/WD Trust Documents to reach fair, reasonable, and equitable settlements between the Holder of each Allowed Channeled PI/WD Trust Claim and the PI/WD Trust.  The PI/WD Trust Distribution Procedures shall not be used to determine the liability of any Governmental Unit that may be co-liable with the PI/WD Trust for a Channeled PI/WD Trust Claim.  From and after the Effective Date, the PI/WD Trustee shall have the authority to administer, amend, supplement, or modify the PI/WD Trust Distribution Procedures solely in accordance with the terms thereof and the PI/WD Trust Documents and the Plan.

(j)        Assignment of Claims and Defenses

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtor shall be deemed to assign any and all Claims and defenses to the Trust that arise from or relate to the Channeled PI/WD Trust Claims, including any Claims and defenses against co-defendants.

(k)        Investment Guidelines

All monies held in the PI/WD Trust shall be invested, subject to the investment guidelines enumerated in the Trust Agreement.

(l)        Privileged Information

Any attorney-client privilege, work-product privilege, common-interest communications with Insurance Companies, protection, or privilege granted by joint defense, common interest, and/or other privilege or immunity of the Debtor relating, in whole or in part, to any Channeled PI/WD Trust Claim shall be irrevocably transferred to and vested in the PI/WD Trust as of the Effective Date. The transfers or assignment of any privileged information will vest solely in the PI/WD Trust and not the TAC, any other Person, committee, or subcomponent of the PI/WD Trust, or any Person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Channeled PI/WD Trust Claim.

(m)        Certain Tax Matters of the PI/WD Trust

The PI/WD Trust is intended to qualify as a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code. The PI/WD Trustee shall be the "administrator" of the PI/WD Trust as such term is used in Treasury Regulation Section 1.468B-2(k)(3) and shall be responsible for filing all tax returns of the PI/WD Trust. The PI/WD Trust shall be responsible for the payment of any taxes imposed on the PI/WD Trust or the PI/WD Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the PI/WD Trust Agreement. The P/WD Trustee may request an expedited determination of taxes on the PI/WD Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the PI/WD Trust for all taxable periods through the dissolution of the PI/WD Trust.

(n)        Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, the PI/WD Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the PI/WD Trust, including the PI/WD Insurance Actions, Channeled PI/WD Trust Claims, and the Retained PI/WD Trust Causes of Action. Without limiting the foregoing, on and after the Effective Date, the PI/WD Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtor of the Post-Effective Date Debtor, if deemed necessary or appropriate by the PI/WD Trust. Furthermore, without limiting the foregoing, the PI/WD Trust shall be empowered to maintain, administer, preserve, or pursue the PI/WD Insurance Actions and the PI/WD Insurance Action Recoveries.

(o)        PI/WD Trust Discovery

The PI/WD Trust is authorized pursuant to Bankruptcy Rule 2004 and/or other applicable discovery rules to receive information pursuant to the PI/WD Data Transfer. The authorization of any discovery request pursuant to this provision shall not be construed to deprive the recipient of such discovery request of any applicable privilege or immunity from discovery. The PI/WD Trust shall be able to take whatever steps are necessary to enforce such discovery obligations pursuant to Bankruptcy Rule 2004, Civil Rule 45, other court resolution processes, under bankruptcy law, and applicable non-bankruptcy law. Nothing herein shall abridge or affect the rights of the PI/WD Trust or the PI/WD Trustee to discovery in any proceeding or litigation brought by the PI/WD Trust or the PI/WD Trustee.

(p)     PI/WD Trust Independence

No Released Party (other than the PI/WD Trustee, the TCC, and their current and former attorneys, professionals, and advisors) shall have any rights or involvement in the PI/WD Trust, including its management or operation, or in connection with the PI/WD Trust Documents. Nothing in the Plan creates any rights or obligations that may give rise to a claim or Cause of Action by such Released Party against the PI/WD Trust or any Holder of a Channeled PI/WD Trust Claim.

G.     *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or in any of the documents contained the Plan Supplement (including any action to be undertaken by the Post-Effective Date Debtor or the Wind-Down Officer, as applicable) shall be deemed authorized and approved, and, to the extent taken by the Debtor prior to the Effective Date, ratified, confirmed and approved without any requirement for further action by Holders of Claims or Interests, the Debtor, or any other Entity in all respects. All matters provided for in the Plan involving the corporate structure of the Debtor or the Post-Effective Date Debtor, as applicable, and any corporate action required by the Debtor or the Post-Effective Date Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtor or the Post-Effective Date Debtor, as applicable.

Upon the Effective Date or as soon as reasonably practicable thereafter, after making all distributions required to be made under the Plan, the Debtor shall be deemed to have been dissolved and terminated and the Wind-Down Officer shall be responsible for effectuating such dissolution. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Post-Effective Date Debtor or the Wind-Down Officer, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtor or Post-Effective Date Debtor. The authorizations and approvals contemplated by this **Article IV.E** shall be effective notwithstanding any requirements under non-bankruptcy law.

H.     *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Post-Effective Date Debtor, the PI/WD Trustee, or GUC Trustee, as may be applicable, is authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the documents contained in the Plan Supplement, in the name of and on behalf of the Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

I.     *Exemptions from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, no transfers of property under the Plan shall be subject in any way to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, including but not limited to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in either Trust; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan. Each appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

J.      *Preservation of Causes of Action*

Except as otherwise provided in this Plan, an agreement or document entered into in connection with the Plan, or in a Final Order of the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and as set forth more fully in the Disclosure Statement, the Debtor reserves and, as of the Effective Date, assigns to the GUC Trust and the PI/WD Trust the Estate Causes of Action identified in the Plan Supplement as Retained Causes of Action. On and after the Effective Date, the GUC Trustee (in its own capacity and as agent for the PI/WD Trust), may pursue Retained Causes of Action on behalf of the GUC Trust and the PI/WD Trust in accordance with the Cooperation Agreement. Retained Causes of Action may be commenced, prosecuted, and settled by the GUC Trust, with the prior written consent of the PI/WD Trust, with the net proceeds of such Retained Causes of Action be split between the PI/WD Trust and the GUC Trust on a 50/50 basis. The PI/WD Trustee and the GUC Trustee shall confer in good faith regarding (i) the retention of professionals to represent the GUC Trust (in its own capacity and as agent for the PI/WD Trust) with respect to the Retained Causes of Action on behalf of the Trusts, and (ii) all matters relating to the administration of the Retained Causes of Action; *provided*, *however*, notwithstanding the foregoing, the GUC Trust shall be required to obtain the consent of the PI/WD Trust for any material matter, including the filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of the Retained Causes of Action, which could affect the PI/WD Trust.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Estate Cause of Action against it as any indication that the GUC Trustee or the PI/WD Trustee, as appropriate, will not pursue all available Estate Causes of Action against it. Unless any Estate Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the GUC Trustee and PI/WD Trustee expressly reserve all Estate Causes of Action for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Estate, and (ii) all matters relating to the administration of the Retained Causes of Action; *provided*, *however*, notwithstanding the foregoing, the GUC Trust shall be required to obtain the consent of the PI/WD Trust for any material matter, including the filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of the Retained Causes of Action which could affect the PI/WD Trust.

The Debtor, the GUC Trustee, or the PI/WD Trustee, as applicable, reserves such Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. Subject to the foregoing consent rights of the PI/WD Trust, the GUC Trust shall retain and shall have, including through its authorized agents or representatives, the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

K.      *Dissolution of Committees and Cessation of Fee and Expense Payments*

On the Effective Date, the Committees will dissolve, and the members of the Committees and the Committees' Professionals will cease to have any role arising from or relating to the Chapter 11 Case; *provided*, that the Committees shall have post-Effective Date standing to object to Administrative Claims and Professional Fee Claims and shall be entitled to file a Professional Fee Claim for services related thereto and otherwise provided before the Effective Date, subject to rights of any party in interest to object thereto; *provided* further, that any disputes involving Professional Fees have been resolved by a Final Order and all deadlines specified in **Article II.B** have passed or expired. For the avoidance of any doubt, the Committees will not dissolve on the Effective Date, and will continue in existence until the resolution of final fee applications in the manner, and according to the schedule, set forth in **Article II.B**. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or the Committees' Professionals to represent either the GUC Trustee or PI/WD Trustee or to be compensated or reimbursed per the Plan and the GUC Trust Agreement or PI/WD Trust Agreement in connection with such representation.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.  *Assumption or Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless an Executory Contract or Unexpired Lease: (1) was previously assumed or rejected by the Debtor; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a pending motion to assume or assume and assign filed on or before the Effective Date; or (4) is identified on the Assumed Executory Contract and Unexpired Lease List. Entry of the Confirmation Order shall constitute a Bankruptcy Court order pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments, or rejections described above as of the Effective Date.

B.  *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be the subject of a Proof of Claim Filed with the Claims Agent and served on the Post-Effective Date Debtor, the GUC Trustee and the PI/WD Trustee no later than thirty (30) days after the later of (i) the Effective Date or (ii) the date of entry of a Bankruptcy Court order approving such rejection. Such Proof of Claim may be objected to in accordance with the provisions of **Article VIII** and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that is not the subject of a timely Filed Proof of Claim shall be Disallowed for all purposes in this Chapter 11 Case, discharged, and forever barred.

C.  *Cure of Defaults and Objections to Cure and Assumption*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

The Debtor shall provide notices of proposed cure amounts to counterparties to Executory Contracts and Unexpired Leases as part of the Plan Supplement. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, assumption and assignment, or related cure amount must be Filed, served, and actually received by counsel to the Debtor, a proposed assignee, and the Committees no later than the Confirmation Objection Deadline. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assignment, or cure amount will be deemed to have assented to such assumption, assignment, or cure amount.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed for all purposes in this Chapter 11 Case, discharged, forever barred, and expunged without further notice to or action, order, or approval of the Bankruptcy Court.**

D.  *Insurance Policies*

Notwithstanding anything to the contrary herein, each of the PI/WD Insurance Policies, the GUC Insurance Policies, and any agreements, documents, or instruments relating thereto issued to or entered into by the Debtor prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtor; *provided*, *however*, that to the extent any such Insurance Policy is determined by Final Order to be an Executory Contract, then, notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a

motion to assume such Insurance Policy and assign the same to the PI/WD Trust if a PI/WD Trust Asset, or to the GUC Trust if a GUC Trust Asset. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to any PI/WD Insurance Policy or GUC Insurance Policy, and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any PI/WD Insurance Policy or GUC Insurance Policy shall be indefeasible.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Except as otherwise provided in a Final Order, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease on Schedule G of the Debtor's Schedules, nor anything contained in the Plan, or the Plan Supplement, shall constitute an admission by the Debtor or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Post-Effective Date Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or the Trustees, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease to assume or reject it, including by rejecting such contract or lease effective as of the Confirmation Date.

## <u>ARTICLE VI.</u>
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan or the applicable Trust Agreement, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Effective Date by the Trustees or other third parties, as applicable: (a) to the party designated to receive payment on any Proof of Claim or Proof of Interest; or (b) at the addresses set forth in any written notices of address changes delivered to the applicable Trustee after the Effective Date. Neither the Post-Effective Date Debtor nor either of the Trustees shall incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

2.      <u>Minimum; De Minimis Distributions</u>

No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim unless provided otherwise in one of the Trust Agreements, as applicable.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the GUC Trustee or the PI/WD Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the GUC Trust or the PI/WD Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court, for distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

Neither the GUC Trustee nor the PI/WD Trustee nor their respective agents and attorneys are under a duty to take any action to either (a) attempt to locate any Holder, or (b) obtain an executed Internal Revenue Service Form W-9 from any Holder; provided that in their sole discretion, the GUC Trustee or the PI/WD Trustee, as applicable may periodically publish notice of unclaimed distributions.

If, at the time either of the Trusts terminates there remains unclaimed property in such Trust, such property shall be donated by the applicable Trustee to the Anthony H.N. Schnelling Endowment Fund maintained by the American Bankruptcy Institute, to assist in the provision of resources for research and education, provided that such fund is a tax-exempt entity in good standing under applicable laws.

B.      *Manner of Payment*

At the option of the applicable Trustee, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

C.      *Compliance Matters*

In connection with the Plan and all distributions hereunder, to the extent applicable, the Trustees are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan or pursuant to the GUC Trust Agreement and the PI/WD Trust Agreement shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Trustees shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Trustees reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

D.      *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

E.      *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, the Post-Effective Date Debtor and the Trustees may, pursuant to the Bankruptcy Code, applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that such Post-Effective Date Debtor or Trustee, as applicable, may hold against the Holder of such Allowed Claim. In no event shall any Claim Holder be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Post-Effective Date Debtor or either Trustee (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to implement such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

**ARTICLE VII.**
**RESERVES ADMINISTERED BY THE GUC TRUSTEE**

A.      *Establishment of Reserve Accounts*

The GUC Trustee shall either establish or take assignment of each of the Distribution Reserve Accounts, which, notwithstanding anything to the contrary contained in this Plan, may be effectuated by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the GUC Trustee. In the event that the Debtor has established one or more of the Distribution Reserve Accounts prior to the Effective Date, such Distribution Reserve Accounts shall be transferred to the GUC Trust on the Effective Date and administered by the GUC Trustee under the terms of the Plan.

B.      *Administrative and Priority Claims Reserve*

On or before the Effective Date, the Debtor shall establish the Administrative and Priority Claims Reserve. The Administrative and Priority Claims Reserve shall be used by the GUC Trustee to pay Allowed Administrative and Priority Claims. If all or any portion of an Administrative or Priority Claim shall become a Disallowed Claim, then the amount on deposit in the Administrative and Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in such Reserve, shall remain in the Administrative and Priority Claims Reserve to the extent that the GUC Trustee determines necessary to ensure that the Cash remaining in the Administrative and Priority Claims Reserve is sufficient to ensure that all Allowed Administrative and Priority Claims will be paid in accordance with the Plan.

C.      *Other Secured Claims Reserve*

On the Effective Date if appropriate, the Debtor shall establish the Other Secured Claims Reserve by depositing Cash proceeds from the sale of assets securing the Other Secured Claims, if any. The Other Secured Claims Reserve shall be used by the GUC Trustee to pay Allowed Other Secured Claims to the extent not satisfied by the return of the assets securing the Allowed Other Secured Claim. If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve or be transferred out of the Other Secured Claims Reserve to the extent that the GUC Trustee determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan.

D.      *Debtor's Lack of Interest in Distribution Reserve Accounts*

The Debtor shall not have any reversionary or other interest in or with respect to any of the Distribution Reserve Accounts.

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CERTAIN CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS

A.     *Applicability*

All Disputed Secured Claims, Priority Tax Claims, Other Priority Claims, and Convenience Claims, against the Debtor shall be subject to the provisions of this **Article VIII**. All Administrative Claims shall be determined and, if Allowed, paid in accordance with **Article II**. None of the terms or provision of this **Article VIII** shall apply to Channeled GUC Trust Claims, which shall be exclusively processed, liquidated, Allowed, and paid by the GUC Trustee in accordance with the GUC Trust Documents and the Plan. None of the terms or provision of this **Article VIII** shall apply to Channeled PI/WD Trust Claims, which shall be exclusively processed, liquidated, Allowed, and paid by the PI/WD Trustee in accordance with the PI/WD Trust Documents and the Plan.

B.     *Allowance of Disputed Claims and Interests*

After the Effective Date, the GUC Trustee shall have and retain any and all rights and defenses the Debtor had with respect to any Secured Claims, Priority Tax Claims, Other Priority Claims, Convenience Claims, or Interests immediately prior to the Effective Date. Except as expressly provided in the Plan or in any Final Order of the Bankruptcy Court entered prior to the Effective Date (including the Confirmation Order and the DIP Order), no Secured Claim, Priority Tax Claim, Other Priority Claim, or Convenience Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan, the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Case Allowing such Claim. All Interests, Secured Claims, Priority Tax Claims, Other Priority Claims, and Convenience Claims that have been Allowed or otherwise disposed of prior to the Effective Date pursuant to a Final Order of the Court pursuant to Bankruptcy Rule 9019 or otherwise, if any, shall remain binding on all parties.

C.     *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date the GUC Trustee shall have, with respect to Other Secured Claims, Priority Tax Claims, Other Priority Claims, Convenience Claims, and Interests, the sole authority to: (1) file, withdraw, or litigate to judgment objections to such Claims or Interests; (2) settle or compromise any such Disputed Claims or Interests without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and direct the Claims Agent to adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the GUC Trustee shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Other Secured Claims, Priority Tax Claims, Other Priority Claims, Convenience Claims, and Interests.

D.     *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtor or the GUC Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Secured Claims, Priority Tax Claims, Other Priority Claims, and Convenience Claims or Interests that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any such Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the GUC Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the GUC Trustee without the GUC Trustee having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes Allowed.

G.      *Disallowance of Claims*

Any Claim held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of any such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Trustees.

**EXCEPT AS PROVIDED HEREIN OR IN AN ORDER OF THE BANKRUPTCY COURT,  ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE AUTOMATICALLY DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL BY, FROM OR OF THE BANKRUPTCY COURT, THE DEBTOR OR THE GUC TRUSTEE.  HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

H.      *Claim Amendment Deadline*

**ANY AMENDMENTS TO ANY CLAIM TIMELY FILED BY THE CLAIMS BAR DATE MUST BE MADE WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE.  ANY AMENDMENTS FILED MORE THAN THIRTY (30) DAYS AFTER THE EFFECTIVE DATE SHALL BE DEEMED INEFFECTIVE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH AMENDED CLAIMS.**

I.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the GUC Trustee shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled as of the Effective Date under the terms of the GUC Trust Documents, without any interest to be paid on account of such Claim or Interest.

J.      *No Interest*

Unless otherwise specifically provided for by the Plan or the Confirmation Order, or unless otherwise required by applicable bankruptcy law, no post-petition interest shall accrue or be paid on any Claim or Interest and no Holder of any Claim or Interest shall be entitled to interest accruing on or after the Petition Date.

## ARTICLE IX.
## SETTLEMENT, RELEASES, INJUNCTIONS, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable. The treatment provided for Channeled PI/WD Trust Claims under the Plan and the PI/WD Trust Documents incorporates and reflects a proposed settlement framework of such Claims against the Debtor. In consideration for the distributions and other benefits provided under the Plan and the PI/WD Trust Documents, as of the Effective Date, the provisions of the Plan and the PI/WD Trust Documents, shall constitute a good-faith settlement for Channeled PI/WD Trust Claims relating to the contractual, legal, equitable and subordination rights that Holders of Channeled PI/WD Trust Claims may have with respect to such Claims under the Plan or any distribution to be made on account of such Claims. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the settlement framework for all Channeled PI/WD Trust Claims, as well as a finding by the Bankruptcy Court that such settlement framework, to the extent followed by and used by the PI/WD Trust, will result in Allowed Claim amounts that are fair, reasonable, and equitable under the circumstances of this Chapter 11 Case and for the limited purpose of determining the Debtor's liability and obligation to pay such Allowed Channeled PI/WD Trust Claim, *provided*, *however*, that such finding shall not determine in any respect the liability of a Governmental Unit for such Claim, which liability shall be determined through litigation and/or settlement separate and apart from the Plan and the Chapter 11 Case in all respects. On the Effective Date, the Settling Parties shall release and waive all Claims and Causes of Action against the Debtor and its Estate, including the DIP Lender's Claims under the DIP Order and the DIP Facility, the Proof of Claim filed by Geneva Consulting LLC (Claims Register No. 572 for $315,032.97), and the Proof of Claim filed by M2 LoanCo, LLC (Claims Register No. 589 for $24,032,965), which Claims shall be Disallowed for all purposes and expunged from the Claims Register. The Settling Parties will have no right to seek indemnification from the Trusts and will not assert any claims against the Trusts.

B.      **Release of Liens**

**On the Effective Date, all mortgages, deeds of trust, Liens (including the DIP Liens), pledges, or other security interests against any property of the Estate shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens (including the DIP Liens), pledges, or other security interests shall revert automatically to the Debtor and its successors and assigns, including the Trusts. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Debtor or the Trustees to evidence the release of such Lien (including the DIP Lien), including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens (including the DIP Liens).**

C.      **Estate Release**

**As of the Final Payment Date, except for the claims or theories of recover or remedies distributed to or retained by Holders of Opt-Out GUC Claims, Holders of Opt-Out PI/WD Claims, and Holders of Opt-Out Indirect Claims, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Released Party shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally,**

irrevocably, and forever released and discharged by the Debtor, its Estate, and each of their respective successors or assigns, including the Trusts, of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, the Payment Agreement, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in the Plan shall not be construed to release any Insurance Actions or any post-Effective Date obligations under the Estate Party Settlement or any document, instrument, or agreement executed to implement the Estate Party Settlement. If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IX.C shall be void. If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts. Any Released Party may enforce the Estate Release before the Bankruptcy Court, which shall retain jurisdiction for such purpose. The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.

D.     **Consensual Claimant Release**

As of the Final Payment Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate the Estate Party Settlement, as an integral component of the Plan, to the maximum extent permitted under applicable law, all Consenting Claimants shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each Released Party of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided, however,* that the releases set forth in this Article IX.D shall not, and shall not be construed to:  (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents. If, following the Final Payment Date, any portion of the Settlement Payment is clawed back from the Trusts and not promptly replaced by any of the other Settling Parties upon demand, the releases set forth this Article IX.D shall be void. If such releases become void, then the relevant Statute of Limitations applicable to any claim or Cause of Action that could then be asserted against the Released Parties shall be tolled and extended to the date that is ninety (90) days following the date that such releases become void and notice of the same is published by the Trusts. Any Released Party may enforce the Consensual Claimant Release before the Bankruptcy Court, which shall retain jurisdiction for such

purpose. The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.

E. *Releases by the Debtor and the Settlement Parties of Holders of Claims in Classes 4, 6, 8, and 9*

As of the Final Payment Date, for good and valuable consideration, the adequacy of which is hereby confirmed, as an integral component of the Plan, to the maximum extent permitted under applicable law, Released Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Holders of Claims in Class 4 (Channeled GUC Claims), Class 6 (Channeled PI/WD Claims), Class 8 (Opt-Out Insured PI/WD Claims), and Class 9 (Channeled Indirect Claims) of and from any and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, the Plan of Divisional Merger, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between the Debtor and any such Holder, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of Plan confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that the releases set forth in this Article IX.E shall not, and shall not be construed to: (a) release any post-Effective Date obligations under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; (b) impair any recoveries that may be sought with respect to any Insurance Actions; or (c) modify, reduce, impair or otherwise affect the ability of any Consenting Claimants to recover from the Trusts in accordance with the Plan and the Trust Documents.

F. *Exculpation*

As of the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest, for any claim or cause of action arising from the Petition Date through the Effective Date, arising from, relating to, or connected with the administration of the Chapter 11 Case, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. The Exculpated Parties shall be deemed to have, participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code. Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

G. *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtor or the Post-Effective Date Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays

contained in the Plan or the Confirmation Order, including the Channeling Injunction, shall remain in full force and effect in accordance with their terms.

I. *Channeling Injunction*

1. **Purpose**

As of the Effective Date, to facilitate the liquidation of Channeled Claims by the Trusts and the preserve and promote the settlement framework contemplated by and provided for in the Plan, including the Estate Party Settlement, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under the Bankruptcy Code, the Bankruptcy Court shall issue the channeling injunction set forth in this **Article IX.I** (the "**Channeling Injunction**").

2. **Protections Afforded to Released Parties**

Subject to the terms of **Article IX.I.5**, and while the Channeling Injunction is in full force and effect as to any Channeled Claim, (a) the sole recourse of any Holder of a Channeled PI/WD Trust Claim that is eligible for compensation under the PI/WD Trust Distribution Procedures on account of such Channeled PI/WD Trust Claim shall be to and against the PI/WD Trust pursuant to the PI/WD Trust Documents, and such Holder shall have no right to assert such Channeled PI/WD Trust Claim or any Claim against the Debtor against any Released Party, and (b) the sole recourse of any Holder of a Channeled GUC Trust Claim that is eligible for compensation under the Plan and the GUC Trust Agreement on account of such Channeled GUC Trust Claim shall be to and against the GUC Trust, and such Holder shall have no right to assert such Channeled GUC Trust Claim or any Claim against the Debtor against any Released Party. Accordingly, on or after the Effective Date, and subject to the terms of **Article IX.I.5**, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled Claim shall be stayed, restrained, and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Released Party with respect to any such Channeled Claim, other than from the Trusts, including:

(a) commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Released Party, or any property or interest in property of any Released Party;

(b) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Released Party, or any property or interest in property of any Released Party;

(c) creating, perfecting or otherwise enforcing in any manner, whether directly or indirectly, any encumbrance of any kind against any Released Party, or any property or interest in property of any Released Party;

(d) asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Released Party, or any property or interest in property of any Released Party; or

(e) taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or any Plan Document or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Trusts, except in conformity and compliance with the Plan and any Plan Document with respect to any such Channeled Claim.

3.    **Reservations**

**Notwithstanding anything to the contrary in this Article IX.I, this Channeling Injunction shall not enjoin:**

(a)    **the rights of Holders of Channeled PI/WD Trust Claims to assert such Claims against the PI/WD Trust in accordance with the PI/WD Trust Distribution Procedures;**

(b)    **the rights of Holders of Channeled GUC Trust Claims to assert such Claims against the GUC Trust in accordance with the Plan and the GUC Trust Agreement;**

(c)    **the rights of Holders of Channeled Claims to assert such Claims against any Released Party if the Channeling Injunction is terminated under Article IX.I.5;**

(d)    **the Trusts from enforcing their rights under the Plan and the Confirmation Order;**

(e)    **the rights of the Trusts to prosecute any action against an Insurance Company based on or arising from a PI/WD Insurance Policy or a GUC Insurance Policy;**

(f)    **the rights of the Trusts to prosecute any Retained Estate Causes of Action; and**

(g)    **the rights of Holders of Channeled Claims to seek recovery from any Person, Entity, or Governmental Unit that is not a Released Party on account of their Channeled Claims or any other claim or Cause of Action.**

4.    **Enforcement**

**Any Released Party may enforce the Channeling Injunction before the Bankruptcy Court, which shall retain jurisdiction for such purpose.  The Released Parties shall not seek to recover the cost or expense of such enforcement action from the Trusts.**

5.    **Termination of Channeling Injunction**

**The Channeling Injunction and all protections afforded to the Released Parties set forth in this Article IX.I shall terminate automatically (or not take effect) as to the Holder of any Channeled Claims if a Settlement Payment Default occurs and is not cured within Settlement Payment Cure Period or waived by both the PI/WD Trustee and GUC Trustee in accord with Article IV.B.2, or if the Estate Release or the Consensual Claimant Release become void under Article IV.B.7, Article IV.B.9 or Article IV.B.12.**

6.    **Tolling of Statute of Limitations**

**While the Channeling Injunction is in effect as to any Channeled Claim, and for ninety (90) days following the termination of the Channeling Injunction under Article IX.I.5, the running of any relevant Statute of Limitations shall be tolled as to any Channeled Claim.  Upon the termination of the Channeling Injunction, the PI/WD Trustee and the GUC Trustee shall file a notice on the docket of the Chapter 11 Case and provide notice to beneficiaries of the Trusts that the Estate Party Settlement did not become effective and that such beneficiaries have ninety (90) days from the date of termination to commence Causes of Action against the Released Parties.**

J.    *Injunction against Interference with the Plan*

**Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.  The negotiation, settlement, and resolution of any Claims and Interest under the Plan shall not operate to excuse**

any Party from its obligations under any contracts, Insurance Policies, or other agreements, notwithstanding any terms of such contracts, Insurance Policies or agreements or provisions of non-bankruptcy law.

K.    **Injunction against Interference with Opt-Out Rights**

As of the Effective Date, neither YesCare Corp., CHS TX, Inc. nor any other alleged successor entity may assert in any litigation involving an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System that such Claims, to the extent asserted against YesCare Corp., CHS TX, Inc., or any other successor based on the doctrine of successor liability are barred, released, discharged, or impaired by the Confirmation Order, the Plan, or the Estate Release. The right to assert such Claims based on the doctrine of successor liability has been received or retained by the Holders of such Claims under **Article III.D**, and the Holders of such Claims shall have a Claim against Debtor solely to the extent necessary to preserve and enforce such right. Subject to the foregoing, YesCare Corp.'s, CHS TX, Inc.'s, or any other alleged successor entity's claims, rights, and defenses to any action brought by the Holder of an Opt-Out GUC Claim, an Opt-Out PI/WD Claim, or an Opt-Out Indirect Claim in the Civil Justice System are expressly preserved under the Plan, including the rights of YesCare Corp., CHS TX, Inc., or any other alleged successor entity to contest liability for Opt-Out GUC Claims, Opt-Out PI/WD Claims, or Opt-Out Indirect Claims and to argue that they are not liable as successors to the Debtor based on the facts of the underlying action and/or the requirements for imposing successor liability under applicable law.

L.    *Insurance Provision*

Nothing in the Plan, the Plan Documents, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, any order or opinion entered on appeal from the Confirmation Order, or any valuation of Claims (either individually or in the aggregate) in the Chapter 11 Case shall, with respect to any Insurance Company (including a PI/WD Insurance Company or a GUC Insurance Company): (i) constitute any adjudication, judgment, trial, hearing on the merits, finding, conclusion, other determination establishing the coverage obligation of any such Insurance Company for any Claim; or (ii) limit the right of any such Insurance Company to assert any Insurer Coverage Defense; *provided, however*, that with respect to (i) and (ii), (y) the transfer of rights to the PI/WD Trust pursuant to the PI/WD Insurance Assignment and the transfer of rights to the GUC Trust pursuant to the GUC Insurance Assignment shall be valid and enforceable, and (z) the discharge or release of the Debtor or any Released Party from any Claims or Causes of Action under the Plan shall not affect the liability of any such Insurance Company. The establishment of any claim in litigation against the PI/WD Trust in its capacity as the Debtor's representative shall be deemed the establishment of a claim against the Debtor under any available Insurance Policy.

M.    *Claim Over*

The Estate Party Settlement is a good faith settlement that bars any Cause of Action by a non-Released Party against any Released Party for contribution, for indemnification, or otherwise seeking to recover any amounts paid by or awarded against that non-Released Party and paid or awarded to any Consenting Claimant by way of settlement, judgment, or otherwise on any claim that would be a Released Claim were such non-Released Party a Released Party to the extent that a good-faith settlement has such an effect in accordance with applicable law.

N.    *Retention of Liability*

Nothing in the Plan, the Plan Documents, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order, shall constitute any adjudication, judgment, trial, hearing on the merits, finding, conclusion, or other determination establishing that any non-Released Party shall not be deemed to be (i) liable with the Debtor by reason of any theory of law or equity or (ii) liable (or continue to be liable) for their respective liabilities to any holder of a Claim by reason of any theory of law or equity. Neither the Plan nor the Plan Documents shall in anyway reduce, limit, discharge or release any non-Released Party, including any Governmental Unit that may be co-liable with the Debtor on account of any Claim (including a PI/WD Claim), or any Insurance Company.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

A.     *Conditions Precedent to the Confirmation of the Plan*

Confirmation of the Plan shall not occur unless each of the following conditions precedent has been satisfied or waived in accordance with **Article X.C**:

1.     The Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtor, the Committees, and the Settling Parties; and

2.     The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to the Committees, the Debtor and the Settling Parties.  These findings and determinations shall, among other things, provide that:

(a)     the Plan and the Plan Documents comply with all applicable provisions of the Bankruptcy Code, including sections 1129 and 1123 of the Bankruptcy Code;

(b)     the Channeling Injunction is to be implemented in connection with the Trusts and shall be in full force and effect on the Effective Date;

(c)     upon the Effective Date, each of the Trusts shall assume the liabilities of the Debtor with respect to the Channeled Claims channeled to such Trust and have authority to administer, process, settle, resolve, liquidate, satisfy, and pay all such Channeled Claims;

(d)     the PI/Trust shall be funded with the PI/Trust Assets, which shall be used to resolve and pay Channeled PI/WD Trust Claims;

(e)     the GUC Trust shall be funded with the GUC Assets, which shall be used to resolve and pay Channeled GUC Trust Claims;

(f)     the GUC Data Transfer has been delivered to the GUC Trust and the PI/WD Data Transfer has been delivered to the PI/WD Trust;

(g)     the GUC Insurance Assignment is authorized and permissible as provided in the Plan and under section 1123(a)(5) of the Bankruptcy Code, notwithstanding any terms of any GUC Insurance Policies or provisions of applicable law that are argued to prohibit the delegation, assignment, or other transfer of such rights, and the GUC Trust is a proper party to assert the liability of the Debtor to trigger such insurance rights; and

(h)     the PI/WD Insurance Assignment is authorized and permissible as provided in the Plan and under section 1123(a)(5) of the Bankruptcy Code, notwithstanding any terms of any PI/WD Insurance Policies or provisions of applicable law that are argued to prohibit the delegation, assignment, or other transfer of such rights, and the PI/WD Trust is a proper party to assert the liability of the Debtor to trigger such insurance rights.

B.     *Conditions Precedent to the Effective Date*

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date shall occur on the first Business Day on which each of the following conditions precedent has been satisfied or waived pursuant to **Article X.C**:

1.     the Bankruptcy Court shall have entered the Confirmation Order and it shall be a Final Order and not subject to appeal;

2. the Settlement Parties shall have funded the Initial Settlement Amount;

3. the GUC Trust shall be established and funded with the GUC Trust Assets, and the GUC Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the GUC Trust Agreement;

4. the PI/WD Trust shall be established and funded with the GUC Trust Assets, and the PI/WD Trustee and the PI/WD Trust Advisory Committee shall have been appointed in accordance with the provisions of the Plan and the terms of the PI/WD Trust Agreement;

5. the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

6. substantially final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed;

7. the Administrative and Priority Claims Reserve shall have been established and fully funded;

8. the Professional Fee Escrow Accounts shall have been established and fully funded so as to permit distributions on account of Allowed Professional Fee Claims in accordance with **Article II.B**; and

9. the Other Secured Claims Reserve shall have been established and fully funded.

C. *Waiver of Conditions Precedent*

The Proponents, together by joint agreement, and with respect to the condition precedent that the Confirmation Order be a Final Order not subject to appeal, together with the Settling Parties, may agree to waive any of the conditions to set forth in **Article X.A** and **Article X.B** at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

D. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## <u>ARTICLE XI.</u>
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification of Plan*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1125 and 1125 of the Bankruptcy Code, the Proponents may jointly propose in writing to alter, amend, or modify materially the Plan prior to or after Confirmation. Holders of Claims and Interests that have accepted the Plan shall be deemed to have accepted the Plan as altered, amended, or modified; *provided, however*, that any Holders of Claims and Interests who were deemed to accept the Plan because such Claims or Interests were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modifications, such Claims and Interests continue to be Unimpaired. For purposes of this **Article XI** only, after the Effective Date, the Trustees shall be deemed a Proponent entitled to seek amendment of the Plan under section 1127 of the Bankruptcy Code.

B. *Revocation or Withdrawal of Plan*

The Proponents reserve the right to jointly revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Proponents jointly revoke or withdraw the Plan, or if the Confirmation Date

or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

<h2 style="text-align:center">ARTICLE XII.<br>RETENTION OF JURISDICTION</h2>

*A.    Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code for, among other things, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Channeled GUC Trust Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, Convenience Claims, and Interests, including the resolution of any request for payment of any such Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of such Claims or Interests, except as otherwise expressly provided in the Plan;

2.    hear and determine all matters relating to Professional Fee Claims;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Channeled GUC Trust Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, Convenience Claims, and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to such distributions under the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    enter and implement such orders as may be necessary or appropriate to execute, implement, interpret, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Case and (b) the Plan, the Confirmation Order, the Trust Agreements, and all settlements (including the Estate Party Settlement), contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.    enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.    adjudicate, decide, or resolve any and all matters related to the Plan (including the Estate Party Settlement);

9.    issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation, implementation or enforcement

of the Plan, including all settlements (including the Estate Party Settlement), releases, exculpations and injunctions provided for under the Plan;

10.    resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, implementation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under all settlements (including the Estate Party Settlement), agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order;

11.    hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the releases, injunctions, and other provisions contained in **Article IX**, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan (including the Estate Party Settlement), the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

12.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order, including the Confirmation Order;

14.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15.    hear and determine all matters relating to the settlement and release provisions contained in **Article IV** and the releases, injunctions, and exculpations contained in **Article IX**;

16.    enforce all orders previously entered by the Bankruptcy Court;

17.    hear any other matter not inconsistent with the Bankruptcy Code; and

18.    enter an order or Final Decree concluding or closing the Chapter 11 Case.

## <u>ARTICLE XIII.</u>
## MISCELLANEOUS PROVISIONS

A.    *Additional Documents*

On or before the Effective Date, the Proponents may jointly file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor, the GUC Trustee, or the PI/WD Trustee, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

B.    *Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a), including fees and expenses payable to the U.S. Trustee, will be paid by the applicable Trustee for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

C.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Proponents with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of either of the Proponents with respect to Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, affiliated investment funds or investment vehicles, managed accounts or funds, investment managers, advisors, and sub-advisors with discretionary authority, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents*

All notices, requests, and demands relating to the Plan shall be in writing to be effective and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

**If to the TCC:**

Brown Rudnick LLP
Attention:  Eric R. Goodman and Gerard T. Cicero
Seven Times Square
New York, NY  10036
E-mail:     egoodman@brownrudnick.com; gcicero@brownrudnick.com

and

Berry Riddell LLC
Attention:  Michael W. Zimmerman
6750 E. Camelback Road, Suite #100
Scottsdale, AZ  85251
E-mail:     mz@berryriddell.com

**If to the UCC:**

David Barton, Chairperson for Official Committee
of Unsecured Creditors of Tehum Care Services, Inc.
190 E. Bannock Street
Boise, ID 83712
Email:     bartond@slhs.org

with copies to:

Stinson LLP
Attention:  Nicholas Zluticky and Zachary Hemenway
1201 Walnut, Suite 2900
Kansas City, MO 64106
E-mail:     nicholas.zluticky@stinson.com; zachary.hemenway@stinson.com

**If to the Debtor:**

> Tehum Care Services, Inc.
> Attention: Russell Perry, Chief Restructuring Officer
> 2021 McKinney Avenue, Suite 340
> Dallas, TX 75201
> E-mail:   russell.perry@ankura.com

with copies to:

> Gray Reed
> Attention:  Jason S. Brookner and Aaron M. Kaufman
> 1300 Post Oak Boulevard, Suite 2000
> Houston, TX 77056
> E-mail:   jbrookner@grayreed.com; akaufman@grayreed.com

**If to the Settling Parties:**

> Norton Rose Fulbright LLP
> Attention:  Kristian Gluck and Julie Harrison
> 2200 Ross Avenue, Suite 3600
> Dallas, TX  75201
> Email:   kristian.gluck@nortonrosefulbright.com; julie.harrison@nortonrosefulbright.com

> Hayward PLLC
> Attention:  Melissa S. Hayward
> 10501 N. Central Expy., Suite 106
> Dallas, TX  75231
> Email:   MHayward@HaywardFirm.com

**If to the PI/WD Trustee, to:**

> [Address to be provided in the Plan Supplement]

**If to the GUC Trustee, to:**

> [Address to be provided in the Plan Supplement]

After the Effective Date, the Trustees shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Trustees are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

F.      *Entire Agreement*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.      *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. The Plan Supplement is available upon written request to Debtor's counsel or Committee counsel at the addresses above, by downloading such exhibits and documents for free from the Claims

Agent's website at https://veritaglobal.net/tehum, or from the Bankruptcy Court's website for a fee at https://ecf.txsb.uscourts.gov/. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

### H.      Non-Severability

If, prior to Plan confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable; *provided*, that at the request of the Debtor and the Committees, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted; *provided*, that any such alteration or interpretation shall be acceptable to the Debtor and the Committees. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtor; and (3) non-severable and mutually dependent.

### I.      Good Faith

Upon entry of the Confirmation Order and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor, the Committees, the Exculpated Parties, and the Released Parties will be deemed to have solicited votes on the Plan, or otherwise participated in the Plan process, in good faith and in compliance with the Bankruptcy Code, and, therefore, no such parties, individuals, or the Trustees will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or participation in the Plan process.

### J.      Waiver or Estoppel

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor, the Committees, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### K.      No Attorney's Fees

Except for the fees of Professionals, no attorneys' fees shall be paid by the Debtor or the Trustees with respect to any Claim or Interest unless otherwise specified in the Plan or by a Final Order of the Bankruptcy Court.

### L.      Closing of Chapter 11 Case

The Trustees shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

[*Remainder of page left intentionally* blank.]

Dated:   November 13, 2024
         Houston, TX

**Tort Claimants' Committee**

By:    _/s/ Paris Morgan and Nathan Alvarez_
Name:  Paris Morgan and Nathan Alvarez
Title: Co-Chairs

- and -

**Official Committee of Unsecured Creditors**

By:    _/s/ David Barton_
Name: David Barton
Title: Chair

- and -

**Tehum Care Services, Inc.**

By:    _/s/ Russell Perry_
Name: Russell Perry
Title: Chief Restructuring Officer

**Exhibit B**

**Form of PI/WD Trust Distribution Procedures**

**TEHUM CARE SERVICES, INC.**

**TRUST DISTRIBUTION PROCEDURES FOR PERSONAL INJURY CLAIMS**

### ARTICLE I
### PURPOSE AND GENERAL GUIDELINES

    **A.**    <u>**Purpose.**</u>  The purpose of the Personal Injury Trust (or the "**Trust**") is to, among other things, (i) assume legal liability for Channeled PI/WD Trust Claims—*i.e.*, Channeled PI/WD Claim, which are referred to herein as "**Personal Injury Claims**" and Channeled Indirect PI/WD Claims, which are referred to herein as "**Indirect Claims**"—pursuant to the terms of the Plan, (ii) prosecute and assert the Retained Trust Causes of Action and the PI/WD Retained Trust Causes of Action, (iii) to hold, preserve, maximize, liquidate, and administer the PI/WD Trust Assets (the "**Trust Assets**") for the benefit of the beneficiaries of the Trust, (iv) liquidate the Trust Assets, (v) employ procedures to allow valid Trust Claims (as further set forth herein) in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Personal Injury Claim**" or an "**Allowed Indirect Claim**"), (vi) determine an allowed liability amount for each Allowed Trust Claim (the "**Allowed Claim Amount**"), and (vii) process and direct payment of all Allowed Trust Claims. These Trust Distribution Procedures (the "**TDPs**") are adopted pursuant to the PI/WD Trust Agreement (the "**Trust Agreement**") and have been approved as fair, equitable, and reasonable by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). The TDPs are designed to provide fair, equitable, and substantially similar treatment for Allowed Trust Claims. The TDPs provide the means for resolving all Trust Claims that were assumed by the Trust and for which the Debtor had or is alleged to have legal responsibility. As set forth in the Trust Agreement, the PI/WD Trustee (the "**Trustee**") will implement and administer the TDPs, with the goals of securing the just, speedy, fair, reasonable, and cost-efficient determination of every Trust Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Trust Claims as set forth herein, and obtaining and maximizing the benefits of the Trust Assets.

    **B.**    <u>**General Principles.**</u>  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Trust Claims, the TDPs are founded on the following principles:

        1.    objective claim eligibility criteria;

        2.    clear and reliable proof requirements;

        3.    administrative transparency;

        4.    a rigorous review and evidentiary process that requires the Trustee to determine and reach final determinations and to achieve Allowed Claim Amounts that are fair and reasonable;

        5.    robust audit procedures to verify the submission and payment of valid Trust Claims; and

        6.    independence of the Trust and the Trustee.

**C.    Payment of Allowed Personal Injury Claims and Insurance Recoveries.** Pursuant to the Plan, the Trust has assumed the legal liability for, and obligation to pay, Allowed Trust Claims.  The Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Claimants who are determined by the Trustee to hold Allowed Personal Injury Claims under the TDP.  The amounts that certain Claimants who are determined by the Trustee to hold Allowed Trust Claims will be paid on account of their Allowed Trust Claims will depend on, among other things, the Trust's ability to liquidate and recover the proceeds of the assigned insurance rights and other causes of action.  The amount of any installment payments, initial payments, or payment percentages established under the TDPs or the Trust Agreement are not the equivalent of (i) any Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Allowed Trust Claim has against the Debtor, as assumed by the Trust.  For example, if the Allowed Claim Amount of a Personal Injury Claim is $1 million and the Initial Payment Percentage is 10% (such that the Trust can afford to pay the Personal Injury Claimant $100,000 on account of the Personal Injury Claim), the Debtor's legal liability, or obligation to pay, shall be $1 million (*i.e.*, the Allowed Claim Amount) and shall not be the amount that the Trust can afford to pay the Personal Injury Claimant.

**D.    Interpretation.**  In the event of any ambiguity or conflict between the terms of the TDPs, the Trust Agreement, the Plan and the Confirmation Order, each document shall have controlling effect in the following rank order:  (1) the Confirmation Order, (2) the Plan, (3) the Trust Agreement, and (4) the TDPs.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

**A.    Incorporation of Plan Definitions.**  Capitalized terms used but not defined in the TDPs have the meanings ascribed to them in the Plan or the Trust Agreement and such definitions are incorporated in the TDPs by reference.

**B.    Definitions.**  The following terms have the respective meanings set forth below:

1.    "**Acceptance and Release**" shall have the meaning set forth in ARTICLE VIII.D.

2.    "**ADR Procedures**" shall have the meaning set forth in ARTICLE IV.K.

3.    "**Allowed Claim Amount**" shall have the meaning set forth in ARTICLE I.A.

4.    "**Allowed Claim Notice**" shall have the meaning set forth in ARTICLE IV.I.

5.    "**Allowed Personal Injury Claim**" shall have the meaning set forth in ARTICLE I.A.

6.    "**Base Matrix Value**" shall mean the base case value for each tier of Personal Injury Type (labeled as such in the Claims Matrix and more specifically defined

and described in ARTICLE VI.D) to be used to value Personal Injury Claims and that may be identified in connection with the description of the Scaling Factors in ARTICLE VI.C.

7.      "**Basic Claim Submission**" shall mean the submission of Identifying Information to the Trust and the election to make or not make the Expedited Distribution Election.

8.      "**Channeled Indirect PI/WD Claim**" shall have the meaning ascribed to it in the Plan.

9.      "**Channeled PI/WD Claim**" shall have the meaning ascribed to it in the Plan.

10.     "**Channeled PI/WD Trust Claim**" shall have the meaning ascribed to it in the Plan.

11.     "**Claims Matrix**" shall mean (as specifically defined and described in ARTICLE VI.C and ARTICLE VI.D) a table scheduling the five tiers of Personal Injury Types, and identifying the Base Matrix Value, and Maximum Matrix Value for each tier.

12.     "**Claim Notice**" shall have the meaning set forth in ARTICLE IV.I.

13.     "**Claimant**" shall mean the holder of a Personal Injury Claim or the holder of an Indirect Claim.

14.     "**Claims Audit Program**" shall have the meaning set forth in ARTICLE IV.L.

15.     "**Disallowed Claim**" shall have the meaning set forth in ARTICLE IV.F.

16.     "**Disallowed Claim Notice**" shall have the meaning set forth in ARTICLE IV.H.

17.     "**Exigent Claim**" shall mean an Exigent Health Claim or an Exigent Hardship Claim.

18.     "**Exigent Hardship Claim**" shall mean a Personal Injury Claim that is compensable hereunder, for which the Trustee, in his or her sole discretion, determines that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income.

19.     "**Exigent Health Claim**" shall mean a Personal Injury Claim for which the Personal Injury Claimant has provided a declaration or affidavit made under penalty of perjury by a physician who has examined the Personal Injury Claimant within one hundred and twenty (120) days of the declaration or affidavit in which the physician states that there is substantial medical doubt that the Personal Injury Claimant will survive beyond six (6) months from the date of the declaration or affidavit.

20.     "**Expedited Distribution**" shall have the meaning set forth in ARTICLE V.A.

21.     "**Expedited Distribution Election**" shall mean an irrevocable election made by an individual to receive an Expedited Distribution on account of a Personal Injury Claim.

22.     "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which Personal Injury Claims shall be initially reviewed by the Trust.

23.     "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Trust initially reviews Trust Claims Submissions.

24.     "**Final Determination**" shall have the meaning set forth in ARTICLE IV.J.

25.     "**Identifying Information**" shall mean, with respect to the holder of a Trust Claim, the holder's:  (a) name; (b) address; (c) social security number (if the holder has one); and (d) counsel serving as the holder's representative (if any) and such counsel's address.

26.     "**Indirect Claim**" means a Channeled Indirect PI/WD Claim.

27.     "**Indirect Claimant**" shall mean the holder of an Indirect Claim.

28.     "**Indirect Claim Criteria**" shall have the meaning set forth in ARTICLE VII.A.

29.     "**Initial Claims Filing Date**" shall mean the date on which the Trust first provides notice that it is able to accept Trust Claim Submissions.

30.     "**Initial Payment Percentage**" shall have the meaning set forth in ARTICLE VIII.B.

31.     "**Insured Lawsuit**" shall have the meaning set forth in ARTICLE IX.D.

32.     "**Insured Personal Injury Claim**" shall have the meaning set forth in ARTICLE IX.A.

33.     "**Maximum Matrix Values**" shall mean the value for each tier of Personal Injury Type (labeled as such in the Claims Matrix and more specifically defined and described in ARTICLE VI.D) that represents the maximum Allowed Claim Amount achievable for an Allowed Personal Injury Claim assigned to a given tier after applicable of the Scaling Factors described in ARTICLE VI.E.

34.     "**Opt Out Return Election**" shall have the meaning set forth in ARTICLE IX.C.

4

35.   "**Personal Injury Claim**" shall be a Channeled PI/WD Claim.

36.   "**Personal Injury Claimant**" shall mean the holder of a Personal Injury Claim.

37.   "**Personal Injury Claim Criteria**" shall have the meaning set forth in ARTICLE VI.A.

38.   "**Personal Injury Types**" shall have the meaning set forth in ARTICLE VI.C.

39.   "**Potentially Liable Party**" means any party that is potentially co-liable with the Trust for a Trust Claim, including governmental entities.  Potentially Liable Parties shall not include any Released Party.

40.   "**Proposed Allowed Claim Amount**" shall have the meaning set forth in ARTICLE IV.I.

41.   "**Reconsideration Request**" shall have the meaning set forth in ARTICLE IV.K.

42.   "**Reconsideration Deadline**" shall have the meaning set forth in ARTICLE IV.K.

43.   "**Released Parties**" shall have the meaning ascribed to it in the Plan.

44.   "**Scaling Factors**" shall have the meaning set forth in ARTICLE VI.C.

45.   "**Submitted Claim**" shall have the meaning set forth in ARTICLE IV.E.

46.   "**Supplemental Payment Percentage**" shall have the meaning set forth in ARTICLE VIII.C.

47.   "**TAC**" shall mean the Trust Advisory Committee that represents the interests of holders of Personal Injury Claims pursuant to the Plan and Trust Agreement.

48.   "**Threshold Criteria**" shall have the meaning set forth in ARTICLE IV.D.

49.   "**Trust Claim**" means a Channeled PI/WD Trust Claim or a Channeled Indirect PI/WD Claim.

50.   "**Trust Claim Submission**" shall have the meaning set forth in ARTICLE IV.E.

51.   "**Trust Claim Submission Date**" shall have the meaning set forth in ARTICLE IV.E.

**C.   Interpretation; Application of Definitions and Rules of Construction.**  For purposes of the TDP, unless otherwise provided herein:  (1) whenever from the context it is

appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's estate, successors, and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the TDPs as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of the TDPs may be reasonably interpreted by the Trustee in such a manner that is consistent with the overall purpose and intent of the TDPs without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in the TDPs are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by the TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; (8) "or" is not exclusive; and (9) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

## ARTICLE III
## TDP ADMINISTRATION

     **A.**    **Administration.**  Pursuant to the Plan and the Trust Agreement, the Trust and the TDPs shall be administered by the Trustee subject to the consultation and consent provisions applicable to the TAC.

     **B.**    **Powers and Obligations.**  The powers and obligations of the Trustee, and the consultation and consent provisions applicable to the TAC are set forth in the Trust Agreement. For the avoidance of doubt, the TAC shall have no authority or ability to modify, reject, or influence any claim review or Allowed Claim Amount determination under the TDPs.

     **C.**    **Consent Procedures.**  The Trustee shall obtain the consent of the TAC on any amendments to the TDPs pursuant to ARTICLE XI.A, and on such matters as are otherwise required below and in Section 5.14 of the Trust Agreement.  Such consent shall not be unreasonably withheld, conditioned or delayed.

     **D.**    **Extension of Deadlines.**  The Trustee with the consent of the TAC may extend any deadlines set forth in the TDPs.

## ARTICLE IV
## GENERAL TRUST PROVISIONS

     **A.**    **Confidentiality.**  Documents submitted to the Trust by a Claimant are for the sole benefit of the Trust and not third parties or defendants.  All submissions to the Trust by a Claimant, including Trust Claim Submission and any documents submitted therewith, shall be treated as made during settlement discussions between the Claimant and the Trust and are intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Trust will preserve the confidentiality of such Claimant submissions and shall disclose the contents thereof only to such persons as authorized by the Claimant, the TDPs, or in response to a valid subpoena of such materials, seeking

non-privileged, non-mediation protected materials, issued by the Bankruptcy Court, the United States District Court for the Southern District of Texas, or any other court of competent jurisdiction. The Trust shall provide counsel for the Claimant, or if unrepresented, the Personal Injury Claimant, with a copy of any such subpoena immediately upon being served. In such a case, the Trust shall provide notice to counsel for the Claimant, or if unrepresented, the Personal Injury Claimant, to allow such party sufficient time to object to the production. The Trust shall on its own initiative or upon request of the Claimant or Claimants in question take all necessary and appropriate steps to preserve all privileges. Notwithstanding anything in the foregoing to the contrary, the Trust may disclose information, documents, or other materials reasonably necessary in the Trust's judgment to (i) one or more consultants and professionals (including a third party claims processing firm) retained by the Trust to assist in the administration of the Trust Claims, and (ii) preserve, obtain, litigate, resolve, or settle insurance coverage, or pursue any other claims transferred or assigned to the Trust by the holder of the Trust Claim or operation of the Plan; *provided*, *however*, that the Trust shall take all steps reasonably feasible to preserve the further confidentiality of such information, documents, and materials.

      **B.**    **FIFO Claims Process Queuing and Exigent Claims.** Except as otherwise provided herein with respect to Exigent Claims, the Trust shall commence review of all Trust Claim Submissions for processing purposes on a FIFO basis, provided, however, that nothing herein shall require the Trust to complete the review of any Trust Claim prior to reviewing and paying any subsequently filed Trust Claims. A Claimant's position in the FIFO Processing Queue shall be determined as of the Claimant's Trust Claim Submission Date. A Claimant that seeks recovery on account of an Exigent Claim shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under the TDPs.

      **C.**    **Statute of Limitations or Repose.** The statute of limitations and the choice of law determination applicable to claims against the Trust shall be determined by reference to the tort system where a claim was pending on the Petition Date, or where such a claim could have been timely and properly filed as asserted by the Claimant. To be considered timely submitted and eligible for compensation, all Trust Claims filed against the Trust must either (a) in the case of claims first filed in the tort system against the Debtor prior to the Petition Date, have been filed prior to the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system, and such claim must not have been dismissed prior to the Petition Date; or (b) in the case of claims not filed against the Debtor in the tort system prior to the Petition Date, have been filed with the Trust prior to the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of a Basic Claim Submission with the Trust. For the purpose of applying the TDPs, the running of the applicable statute of limitations or repose shall be tolled as of the earliest of: (a) the actual filing of a claim against the Debtor prior to the Petition Date in the tort system; (b) the date specified by agreement or otherwise among the Debtor and/or the Trust, on the one hand, and the applicable claimant, on the other hand, (or, if none, the date of the agreement) in the case of tolling prior to the Petition Date by an agreement or otherwise, provided such tolling was still in effect on the Petition Date; or (c) the Petition Date. The tolling as of the Petition Date shall run and exhaust as of 30 days after the Effective Date of the Plan. If a Trust Claim meets any of the tolling provisions in the foregoing sentence and the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, it shall be treated as timely filed if a Basic Claim

Submission in respect of such claim is filed with the Trust within sixth (60) days after the Initial Claims Filing Date.

**D.    Threshold Eligibility.**  To be eligible to potentially receive compensation from the Trust on account of a Trust Claim, each Claimant must:

> (1)    have timely filed, or have been deemed to have timely filed, a Proof of Claim with the Bankruptcy Court;
>
> (2)    have personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Proof of Claim to so provide such verification;
>
> (3)    have filed a Proof of Claim that is free of material defect such that the Trustee is able to determine from the Proof of Claim that Trust Claim is *prima facie* valid and is not barred by any applicable federal or state statute of limitations or repose; and
>
> (4)    have not previously had his or her Trust Claim dismissed on the merits or have received payments on his or her Trust Claim so that no recovery from the Trust would be permissible under the TDP, including ARTICLE X.

Trust Claims asserted by Claimants who do not satisfy this threshold eligibility criteria (the "**Threshold Criteria**") shall be deemed by the Trustee to be Disallowed Claims after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.H, and shall not be paid by the Trust.

**E.    Trust Claim Submissions.**  Other than Personal Injury Claimants who make the Expedited Distribution Election, each Claimant who elects to pursue recovery from the Trust pursuant to the TDPs must submit his or her Trust Claim for settlement, valuation, and allowance in the manner and on the forms (including via electronic portal) prescribed by the Trust (each, a "**Trust Claim Submission**").  To properly make a Trust Claim Submission, each submitting Claimant must (i) complete a questionnaire; (ii) produce all records and documents requested by the Trustee; and (iii) consent to and cooperate in any written or oral examinations requested by the Trustee.  Additional information that must be submitted for Personal Injury Claims as a part of the Trust Claim Submission is set forth in ARTICLE VI.B, and additional information that must be submitted for Indirect Claims as part of the Trust Claims Submission is set forth in ARTICLE VII.B.  The date on which a Claimant submits the Trust Claim Submission to the Trust shall be the "**Trust Claim Submission Date.**"  Other than an Expedited Distribution, no recovery shall be provided to a Claimant who does not submit a Trust Claim Submission and his or her claim shall be deemed by the Trustee to be a Disallowed Claim after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.H.  To complete the evaluation of each Trust Claim submitted through a Trust Claim Submission (each a "**Submitted Claim**"), the Trust also may, but is not required to, obtain additional information or supplemental information from the Claimant or from other parties.  Notwithstanding anything contained in the TDPs, the Trustee may waive any requirement to provide records or documents if doing so would not impair the Trust's ability

to fully evaluate a Trust Claim in accordance with the TDPs and requiring such records or documents would constitute an undue hardship for the Claimant.

**F.**    **Claims Evaluation.**    The Trust shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth herein to determine, based on the evidence obtained by the Trust, whether a Submitted Claim should be allowed.  After a review of the documentation provided by the Claimant in his or her Trust Claim Submission and any follow-up materials, the Trust will determine the Trust Claim to be either (i) legally valid and an Allowed Personal Injury Claim or an Allowed Indirect Claim or (ii) legally invalid and ineligible for compensation (a "**Disallowed Claim**").

**G.**    **Deficiency Notices.**    If the Trust Claim Submission does not include evidence that is presumptively reliable, or the Trust otherwise determines that additional evidence is reasonably required to establish the validity or amount of a Trust Claim, the Trust may issue deficiency notices to Claimants identifying the information requested by the Trust to cure the deficiency.  The failure to provide information requested by the Trust shall be grounds for the Trustee to determine that a claim is a Disallowed Claim.

**H.**    **Disallowed Claims.**    If the Trustee determines that a Submitted Claim is a Disallowed Claim, the Trustee shall provide written notice of his or her determination to the relevant Claimant (an "**Disallowed Claim Notice**").  If the Trustee determines that a Submitted Claim is a Disallowed Claim, the Trustee will not perform the Allowed Trust Claim valuation analysis described herein.

**I.**    **Allowed Trust Claims.**    If the Trustee determines that a Submitted Claim is an Allowed Trust Claim, the Trustee shall utilize the procedures described in ARTICLE VI.C to determine the value of Personal Injury Claims and the procedures described in ARTICLE VII.C to determine the value for Indirect Claims (each, a "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in ARTICLE IV.J below.  The Trustee shall have the right to develop additional procedures necessary to determine the value of any Trust Claims that are not subject to ARTICLE VI or ARTICLE VII so that they are valued in accordance with state law or, if applicable, other non-bankruptcy law and result in values consistent with values ascribed to other Trust Claims under the TDPs.

**J.**    **Claims Determination.**    If the Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth hereinafter in ARTICLE IV.K has been exhausted, the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Trust Claim, operating as a final settlement for such Trust Claim and a determination of the Debtor's liability for such Trust Claim (a "**Final Determination**"), and the holder of such Allowed Trust Claim shall be approved for payment in accordance with ARTICLE VIII.A, subject to the Claimant executing the Acceptance and Release set forth in ARTICLE VIII.D.

**K.**    **ADR Procedures for Reconsideration Requests.**    A Claimant may make a request for reconsideration of (i) a determination that his or her Submitted Claim is ineligible for

compensation, or (ii) the valuation of the Submitted Claim by the Trust (a "**Reconsideration Request**") within ninety (90) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice (the "**Reconsideration Deadline**").  Any Claimant who fails to submit a Reconsideration Request to the Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Trust Claim or the Proposed Allowed Claim Amount.  The Trustee shall develop non-binding arbitration dispute resolution procedures (the "**ADR Procedures**") to resolve Reconsideration Requests.  Disputes over the validity of a Trust Claim shall be eligible for reconsideration and resolution under the ADR Procedures.  The Claimant may submit further evidence in support of the Submitted Claim with the Reconsideration Request.  The arbitrators will reconsider the Submitted Claim—including all new information provided by the Claimant in the Reconsideration Request—and will have the discretion to maintain the prior determination or determine that the Submitted Claim in question is an Allowed Trust Claim or should receive a new Proposed Allowed Claim Amount.  If the arbitrators determine upon reconsideration that a Submitted Claim is an Allowed Trust Claim and/or should receive a new Proposed Allowed Claim Amount, the arbitrators will deliver their recommendation to the Trustee.  The Trustee is not bound by the arbitrators' determination.  The Trustee may accept or reject the arbitrators' recommendation.  If the Trustee rejects the arbitrators' recommendation for any reason, the Trust's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand, and the Trust will provide a Claim Notice to the Claimant of such result.  In any event, the Allowed Claim Amount, if any, set by the Trustee at the conclusion of the ADR Procedures will constitute a Final Determination and the holder of such Allowed Trust Claim shall be approved for payment in accordance with ARTICLE VIII.A, subject to the Claimant executing the Acceptance and Release set forth in ARTICLE VIII.D.  In no event will a Trust Claim that has completed the reconsideration process be subject to any further reconsideration.

      **L.**    **Claims Audit Program.**  The Trustee may institute procedures for auditing the reliability of evidence submitted to the Trust involving Trust Claims for which the Trust has legal responsibility (the "**Claims Audit Program**").  The Trustee may utilize the services of a third-party claims processing facility to assist in the evaluation of Trust Claims submitted to the Trust.  The filing of any Trust Claim with the Trust, regardless of the treatment sought, shall constitute consent for the Trust to release to any entity overseeing the Claims Audit Program all information submitted to the Trust on behalf of the Claimant and to disclose the status of any such Trust Claim and the amount and date of any payments on account of such Trust Claim.  Any Claimant subject to the Claims Audit Program shall cooperate and provide the Trust with non-privileged information reasonably requested by the Trust and, if requested by the Trust, authorization to obtain information such Claimant has submitted to any other trusts or third parties relating to such Claimant's Trust Claim.  If an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by disallowing the Trust Claim or by other means including requiring the return of any payments received from the Trust and requiring the claimant to pay the costs associated with the audit, as well as any other appropriate action or sanction.

      **M.**    **Medical Liens.**  The Trust may, but is not required, to account for all known outstanding governmental medical liens, if any, currently owed by the Claimant.  The resolution of all such liens shall be an obligation of the Claimant although the Trust may determine to offset to any payment on account of a Trust Claim to resolve any such liens.  The Trustee may retain the services of a lien resolution administrator to identify, resolve, and satisfy, in accordance with

applicable law, certain Claimant governmental repayment obligations, including but not limited to, Medicare (Parts A and B), Medicaid, and other governmental liens.

## ARTICLE V
## EXPEDITED DISTRIBUTIONS

**A.** **Expedited Payment Criteria.**  A Personal Injury Claimant who meets the following criteria may elect to resolve his or her Personal Injury Claim for an expedited distribution of $5,000 (the "**Expedited Distribution**"):  (i) Personal Injury Claimant made an Expedited Distribution Election in his or her Basic Claim Submission to the Trust or otherwise in accordance with the Plan and Confirmation Order; and (ii) the Personal Injury Claimant satisfies the Threshold Criteria.

**B.** **Process and Payment of Expedited Distributions.**  Personal Injury Claimants who have elected to receive the Expedited Distribution and who met the Threshold Criteria, shall be entitled to receive their Expedited Payment upon executing an appropriate release.  A Personal Injury Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Personal Injury Claim against the Trust and will not be eligible to receive any further distribution on account of their Personal Injury Claim from the Trust.

## ARTICLE VI
## CLAIMS ALLOWANCE PROCESS FOR PERSONAL INJURY CLAIMS

**A.** **General Criteria for Evaluating Submitted Claims.**  In addition to satisfying the Threshold Criteria, to be eligible to receive compensation from the Trust on account of a Personal Injury Claim, each Personal Injury Claimant must have a Personal Injury Claim against the Debtor that is (i) valid under applicable state or federal law, and (ii) not subject to (y) disallowance under section 502 of the Bankruptcy Code, including subsection (b) thereof, or (z) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law.  The foregoing requirements are herein referred to as the "**Personal Injury Claim Criteria.**"  Personal Injury Claims asserted by Personal Injury Claimants who do not satisfy the Personal Injury Claim Criteria shall be deemed by the Trustee to be Disallowed Claims after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.H, and shall not be paid by the Trust.

**B.** **Trust Claim Submissions for Personal Injury Claims.**  To properly make a Trust Claim Submission, each submitting Personal Injury Claimant, in addition to completing and filing a Basic Claim Submission with the Trust, must provide:

(i) **Medical Records**.  Medical records or other medical evidence that contain information sufficient to support a diagnosis or treatment of any alleged injury for which the Personal Injury Claimant seeks compensation.

(ii) **Description of Injury**.  A written narrative or an audio or video recording detailing the Personal Injury Claimant's injury or treatment, including a timeline of such injury or treatment.  This may be provided by an attorney, personal representative, or family member for Personal Injury Claims involving wrongful death.

(iii) **Location of Incarceration**.  Evidence sufficient to show that the Personal Injury Claimant was incarcerate at one or more facilities which the Debtor (or its predecessor) operated and provided medical services and the approximate starting and ending dates (where applicable) of incarceration at each facility.

(iv) **Wrongful Death**.  To the extent that the submission involves a Personal Injury Claimant who is deceased, the decedent's death certificate or a medical record providing proof of death.

The date on which the foregoing is submitted to the Trust by a Personal Injury Claimant shall be the Trust Claim Submission Date for the applicable Personal Injury Claim.  The Trustee may order medical records, death certificates, or obtain documents from third parties, including in circumstances where the Personal Injury Claimant does not have legal representation.

C.  **Valuation of Allowed Personal Injury Claims.**  If a Personal Injury Claimant has satisfied the Personal Injury Claim Criteria and has submitted the required Trust Claims Submission, then it shall have an Allowed Personal Injury Claim and his or her Personal Injury Claim shall be valued by the Trust in accordance with the claims matrix hereinafter (the "**Claims Matrix**") that schedules five types of personal injury types (the "**Personal Injury Types**") and designates for each Personal Injury Type a Base Matrix Value, a Maximum Matrix Value, and certain scaling factors (the "**Scaling Factors**") identified hereinafter to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Personal Injury Claims.  The Personal Injury Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values that are set forth in the Matrix have all been selected and derived with the intention of achieving a fair and reasonable Personal Injury Claim valuation range considering the best available information, considering the settlement, verdict and/or judgments that Personal Injury Claimants would receive in the tort system absent the bankruptcy.  The Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Personal Injury Claim.  The Proposed Allowed Claim Amount for an Allowed Personal Injury Claim shall be deemed to be the Debtor's liability for such Personal Injury Claim (*i.e.*, the claimant's right to payment for his or her Personal Injury Claim), irrespective of how much the holder of such Personal Injury Claim receives from the Trust pursuant to the payment provisions set forth in ARTICLE VIII.  In no circumstance shall the amount of the Debtor's legal obligation to pay any Personal Injury Claim be determined to be any payment percentages hereunder or under the Trust Agreement (rather than the liquidated value of such Personal Injury Claim as determined under the TDP).

D.  **Claims Matrix**.  The Claims Matrix establishes five tiers of Personal Injury Type and provides the range of potential Allowed Claim Amounts assignable to an Allowed Personal Injury Claim in each tier.  The first two columns of the Claims Matrix delineate the five possible tiers to which an Allowed Personal Injury Claim can be assigned based on the nature of the Personal Injury.  The Base Matrix value column for each tier represents the default Allowed Claim Amount for an Allowed Personal Injury Claim assigned to a given tier (the "**Base Matrix Value**"). The maximum Matrix value column for each tier represents the maximum Allowed Claim Amount for an Allowed Personal Injury Claim assigned to a given tier after application of the Scaling Factors described in ARTICLE VI.E (the "**Maximum Matrix Value**").   The ultimate

distribution(s) to the holder of an Allowed Personal Injury Claim that has received a Final Determination may vary upward or downward from the holder's Allowed Claim Amount based on the payment percentages determined by the Trustee.  If an Allowed Personal Injury Claim would fall into more than one tier, it will be placed in the highest applicable tier.  A Personal Injury Claimant cannot have multiple Allowed Personal Injury Claims assigned to different tiers.  To the extent that a Personal Injury Claim does not fit within any of the five tiers, the Trustee, at his or her discretion, will determine the tier.

| Tier | Type of Personal Injury | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Wrongful Death | $1,200,000 | $1,597,200 |
| 2 | Amputation (*e.g.*, Amputation of Limb or Loss of Testicle), Complete or Significant Loss of Mobility (*e.g.*, Paralysis of Arms & Legs, Quadriplegia, Untreated Bone Breaks), Neurological and Cognitive Issues (*e.g.*, Stroke, Parkinson's), Cancer (*e.g.*, Failure to Treat/Diagnose Various Cancers), Organ Rupture / Failure (*e.g.*, Colon Rupture, Renal Failure), Sexual Abuse or Assault. | $600,000 | $798,600 |
| 3 | Infections and Immunological Issues (*e.g.*, Failure to Treat Resulting in Fibrosis, Meningitis, or Other), Cardiac and Vascular Problems (*e.g.*, Heart Attack, Heart Damage), Extreme Pain and Suffering (*e.g.*, Untreated Bowel Incontinence, Untreated Withdrawal). | $200,000 | $266,200 |
| 4 | Pain and Suffering (*e.g.*, Untreated Pain, Emotional Distress), Digestive and Abdominal Issues (*e.g.*, Untreated Crohns Disease, Hernia, Enlarged Prostate), Sensory Impairment (*e.g.*, Complete or Incomplete Loss of Vision, Hearing), Injuries and Traumas (*e.g.*, Bone Breaks, Joint Injuries). | $50,000 | $66,550 |
| 5 | Other Injuries (*e.g.*, COVID-19). | $5,000 | $5,000 |

    **E.**    **Scaling Factors.**  After the Trustee has assigned an Allowed Personal Injury Claim to one of the five tiers in the Claims Matrix, the Trustee may, in his discretion, adjust the Proposed Allowed Claim amount upward through the application of the following Scaling Factors:

        (i)    **Nature and Circumstances of Personal Injury**.  To account for particularly severe personal injury or aggravating circumstances, the Trustee may assign a Scaling Factor of up to 1.1 to each Allowed Personal Injury Claim.

        (ii)    **Impact of Personal Injury**.  To account for the particularly severe impact of the alleged personal injury on the Personal Injury Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, the Trustee may assign a Scaling Factor of up to 1.1.

        (iii)    **Substantial Medical Expenses**.  To account for Personal Injury Claims that result in substantial out-of-pocket medical expenses for which the Personal Injury Claimant has not received and does not expect to receive reimbursement, the Trustee may assign a Scaling Factor of up to 1.1.

The Base Matrix Values already provides for the base case scenario of a victim of personal injury who suffered the typical level of personal injury within the tier to which the Allowed Personal Injury Claim was assigned.  By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base Matrix Value assigned to a Claim is not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Personal Injury Claim is 1.1, the Proposed Allowed Claim Amount for the Allowed Personal Injury Claim will be increased by 10%, the result of multiplying the Base Matrix Value of the Allowed Personal Injury Claim by 1.1.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Matrix Value of the Allowed Personal Injury Claim.  By way of example, if an Allowed Personal Injury Claim is determined by the Trustee to be a tier 2 claim (Base Matrix Value of $600,000) with a Scaling Factor of 1.1 for the nature and circumstances of the Personal Injury, and a Scaling Factor of 1.1 for the impact of the Personal Injury, the Proposed Allowed Claim Amount for the Allowed Personal Injury Claim would be calculated as $600,000 x 1.1 x 1.1 = $726,000.

    **F.**    **Liquidated Judgments.**  Notwithstanding the process of valuing Allowed Personal Injury Claims set forth in this ARTICLE VI, if (1) prior to the Effective Date an Allowed Personal Injury Claim was liquidated by a judgment of a court of competent jurisdiction that has not been reversed or vacated on appeal, (2) such judgment is not secured by a bond or other collateral such that the judgment can be satisfied by a source other than the Trust, and (3) the holder of such Allowed Personal Injury Claim did not elect to Opt Out under Article [●] of the Plan, then the Proposed Allowed Claim Amount shall be determined in accordance with the TDPs, provided, however, that if the amount of the judgment is below the Maximum Matrix Value for the applicable tier of injury or the Personal Injury Claimant agrees to voluntarily reduce his or her judgment to the Maximum Matrix Value for the applicable tier of injury, the Trustee may adopt the judgment amount as the Proposed Allowed Claim Amount.

      **G.**    **Disputes Involving Personal Injury Claims.**  A Personal Injury Claimant may make a request for reconsideration under ARTICLE IV.K.

<div align="center">

**ARTICLE VII**
**INDIRECT CLAIMS**

</div>

      **A.**    **Indirect Claim Eligibility Criteria.**  In addition to the threshold eligibility criteria for Trust Claims set forth in ARTICLE IV.A, to be eligible to receive compensation from the Trust on account of an Indirect Claim, each Indirect Claimant must:

        (i)    have a valid Indirect Claim against the Debtor that is (a) valid under applicable state or federal law, and (b) not subject to (y) disallowance under section 502 of the Bankruptcy Code, including subsection (b) thereof, or (z) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law; and

        (ii)    must establish to the Trust's satisfaction that:

            (a)    such Indirect Claimant has paid in full the liability and/or obligation of the Trust to a Personal Injury Claimant to whom the Trust would otherwise have had a liability or obligation under the TDPs (and which has not been paid by the Trust);

            (b)    the Indirect Claim is not otherwise subject to a valid defense; and

            (c)    the Personal Injury Claimant and the Indirect Claimant have or will have forever and fully released the Trust in respect of the Indirect Claim.

The foregoing requirements are herein referred to as the "**Indirect Claim Criteria**." Indirect Claims asserted by Indirect Claimants who do not satisfy the Indirect Claim Criteria shall be deemed by the Trustee to be Disallowed Claims after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.H, and shall not be paid by the Trust.

      **B.**    **Indirect Claimant Trust Claim Submission.**  To properly make a Trust Claim Submission, each submitting Indirect Claimant must, in addition to completing and filing a Basic Claim Submission with the Trust, submit documents sufficient to establish to the Trust's satisfaction that the Indirect Claimant satisfies the Indirect Claim Criteria. The Trust may develop any additional claim forms for Indirect Claimants so that appropriate documentation is provided by each Indirect Claimant to substantiate and pay Indirect Claims. The date on which the foregoing is submitted to the Trust by an Indirect Claimant shall be the Trust Claim Submission Date for the applicable Indirect Claim.

      **C.**    **Allowance of Indirect Claims.**  If an Indirect Claimant has satisfied the Indirect Claim Criteria and has submitted the required Trust Claims Submission, then it shall have an Allowed Personal Injury Claim and its Indirect Claim shall be valued by the Trust in accordance with applicable law; *provided*, *however*, no Indirect Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has paid to the related Personal Injury Claimant in respect

<div align="center">15</div>

of such claim for which the Trust would have liability, and in no event shall any Indirect Claim exceed the Allowed Claim Amount of the related Personal Injury Claim as determined under the TDPs.  In any case where the Indirect Claimant has satisfied the claim of a Personal Injury Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain a release for the benefit of the Trust substantially in the form and substance of the release provided in Exhibit 1-2.  If the Indirect Claimant can show that it has paid such liability or obligation of the Trust to a Personal Injury Claimant and the Trust has not already paid the Personal Injury Claimant, and the Indirect Claimant provides a release of the Trust pursuant to a document substantially in the form and substance of the release provided in Exhibit 1-2 for the Personal Injury Claim, then the Indirect Claim may be allowable pursuant to the procedures described herein.  In no event shall any Indirect Claimant have any rights against the Trust superior to the rights that the Personal Injury Claimant to whose claim the Indirect Claim relates would have against the Trust under applicable law and the TDPs, including any rights with respect to timing, amount, priority, or manner of payment.

**D.**     **Disputes Involving Indirect Claims.**  An Indirect Claimant may make a request for reconsideration under ARTICLE IV.K.

**E.**     **Offset.**  The liquidated value of any Indirect Claim paid by the Trust shall be treated as an offset to or reduction of the Allowed Claim Amount of any related Personal Injury Claim that has been or will be submitted to the Trust.

### ARTICLE VIII
### PAYMENT OF FINAL DETERMINATION

**A.**     **Payment Upon Final Determination.**  Only after the Trustee has established an Initial Payment Percentage in accordance with Section [●] of the Trust Agreement, then once there is a Final Determination of a Trust Claim pursuant to pursuant to ARTICLE IV.J (based on a final settlement reached in accordance with ARTICLE VI and/or ARTICLE VII), will the Claimant receive a payment of such Final Determination based on the Payment Percentage then in effect as described in ARTICLE VIII.B and ARTICLE VIII.C.

**B.**     **Initial Payment Percentage.**  After there is a Final Determination of the Trust Claim, the Trust shall pay an initial distribution (the "**Initial Distribution**") based on the Initial Payment Percentage established by the Trustee in accordance with the Trust Agreement.

**C.**     **Supplemental Payment Percentage.**  When the Trustee determines that the then-current estimates of the Trust's assets and its liabilities, as well as the then-estimated value of then-pending Trust Claims, warrant additional distributions on account of the Final Determinations, the Trustee shall set a supplemental payment percentage in accordance with the Trust Agreement (the "**Supplemental Payment Percentage**").  Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose Trust Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then-existing aggregate payment percentage.  For the avoidance of doubt, the Allowed Claim Amount of each Allowed Trust Claim after Final Determination shall be deemed to be the Debtor's liability for such Allowed Trust Claim irrespective of how much the holder of such Trust Claim

16

actually receives from the Trust pursuant to the payment provisions set forth in this ARTICLE VIII. For example, if the Allowed Claim Amount for an Allowed Personal Injury Claim that has received a Final Determination is $600,000, even if the Trust distributes less than $600,000 to the Personal Injury Claimant on account of such Allowed Personal Injury Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Personal Injury Claim is still $600,000.

**D.** **Acceptance and Release.** For an Allowed Trust Claim to receive payment from the Trust, the Claimant must submit, as a precondition to receiving such payment from the Trust, an executed acceptance and release (the "**Acceptance and Release**"), which shall include a release of the Trust, the Trustee, the TAC, and each of their respective Representatives. The Acceptance and Release shall be in the form attached hereto as Exhibit 1-1 (Expedited Distributions), Exhibit 1-2 (Personal Injury Claims), and Exhibit 1-3 (Indirect Claims). The Acceptance and Release shall be available for completion electronically and may be executed by the Claimant or his or her representative through DocuSign or a similar authorized electronic signature program, or such other simplified and expedient means as the Trust may adopt.

## ARTICLE IX
## INSURANCE RIGHTS AND RECOVERIES

**A.** **Rights Against Insurance Companies.** Pursuant to the Plan, the Trust has received the Debtor's rights and obligations under the Insurance Policies. For any Personal Injury Claim that the Trust determines is an Allowed Personal Injury Claim, the Trust will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials whether any Insurance Company issued coverage that is available to respond to such Personal Injury Claim (an "**Insured Personal Injury Claim**"). The Trust may determine that multiple Insurance Companies have responsibility for an Insured Personal Injury Claim. The Trust shall seek reimbursement for each Insured Personal Injury Claim that is an Insured Personal Injury Claim, including the Proposed Allowed Claim Amount, from the applicable Insurance Company(ies) pursuant to the Insurance Policies and applicable law, subject to the Trustee's discretion as to the manner and extent of efforts to obtain insurance coverage that is economically reasonable. The Trust shall have the ability to exercise all the rights and interests in the Insurance Policies assigned to the Trust as set forth in the Plan, including the right to resolve any disputes with an Insurance Company regarding its obligation to pay some or all of an Insured Personal Injury Claim, and to enter into agreements with any Insurance Company. The Trust will have the ability to request further information from Personal Injury Claimants in connection with seeking reimbursement for Insured Personal Injury Claims. To the extent that the Trustee deems it advisable or beneficial, the Trustee may resolve an Insurance Company's potential liability for multiple Insured Personal Injury Claims or all Insured Personal Injury Claims at one time for an aggregate settlement amount.

**B.** **Insurance Recoveries.** Amounts recovered from an Insurance Company in satisfaction of an Insured Personal Injury Claim shall be allocated as follows: *first*, to the payment of any professional fees and expenses or contingency fees that were incurred by the Trust in the course of pursuing the recovery; *second*, to the Personal Injury Claimant whose Insured Personal Injury Claim resulted in the recovery to the extent necessary to provide for the full payment of the Allowed Claim Amount of such Personal Injury Claim; and *third*, after such Personal Injury

Claimant has received the full payment of the Allowed Claim Amount of such Personal Injury Claim, such recoveries shall be treated as Trust Assets generally available to pay Trust expenses or to be distributed generally to holders of Allowed Trust Claims.  If the Trustee has elected to resolve an Insurance Company's potential liability for multiple Insured Personal Injury Claims or all Insured Personal Injury Claims at one time for an aggregate settlement amount, the Trustee will allocate the proceeds recovered as follows:  ***first***, to the payment of any professional fees and expenses or contingency fees that were incurred by the Trust in the course of pursuing the recovery and then; ***second***, in a reasonable manner, to each of the Personal Injury Claimants whose Insured Personal Injury Claims supported the aggregate claim against the Insurance Company resulting in the aggregate resolution.

      **C.**    **Opt Out Claimants.**  Personal Injury Claimants who elect to "Opt Out" to the tort system under the Plan and also elect to limit their recovery in the tort system to available insurance coverage, may elect to return to the Trust and have their Personal Injury Claims evaluated and paid hereunder as if such Personal Injury Claimant had not elected to "Opt Out."  Each such Personal Injury Claimant shall automatically be deemed to return to the Trust on the ninetieth (90th) day following the Effective Date unless he or she provides written notice to the Trust that he or she intends to remain an Opt Out for purposes of pursuing insurance recoveries in the tort system.  Personal Injury Claimants who elect to remain in the tort system for the purpose of pursuing insurance recoveries after this deadline may elect to return to the Trust (an "**Opt Out Return Election**") if such Personal Injury Claimant can show the following:  (1) the Personal Injury Claimant timely submitted a Basic Claim Submission to the Trust and indicated that the Personal Injury Claimant had elected to Opt Out and pursue available insurance coverage; (2) the Personal Injury Claimant satisfies factors One through Three of the Threshold Criteria; (3) the Personal Injury Claimant's claim was not dismissed or the subject of an adjudication of no liability or no damages; and (4) the Personal Injury Claimant believes that he or she will be unable to obtain an insurance recovery that is greater than the payment such Personal Injury Claimant would likely receive an account of his or her Allowed Personal Injury Claim as determined under the TDPs due to, *inter alia*, the insurance coverage available to pay the liquidated Personal Injury Claim has been fully or partially exhausted.  An Opt Out Return Election must be exercised within three (3) years from the Initial Claims Filing Date.

      **D.**    **Tender to Insurance Company for Opt Outs.**  The Personal Injury Claimant may assert its Personal Injury Claim against the Trust as if the Personal Injury Claimant were asserting such claim against the Debtor and the discharge in the Plan had not been issued.  The Personal Injury Claimant may name any person or entity that is not a Released Party to the extent permitted by applicable law.  If the Personal Injury Claimant is authorized to file a lawsuit against the Trust under the Plan, the Trustee shall determine whether any Insurance Company issued coverage that is available to respond to such Personal Injury Claim (an "**Insured Lawsuit**").  The Trustee shall provide notice to and seek defense from each Insurance Company that the Trustee determines may have an obligation to provide coverage in accordance with the terms of each applicable Insurance Policy.  The Trust shall have no obligation to appear and defend an Insured Lawsuit if the applicable Insurance Company refuses to cover any and/or all defense costs.  The Trust shall have no obligation to satisfy any Insurance Policy's deductible or self-insured retention per claim or in the aggregate.  Any Insured Lawsuit must be filed by the Personal Injury Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  Pursuant to the Plan, a Personal Injury Claimant who limits

their recovery in the tort system with respect to the Debtor or any Released Party to available insurance coverage shall not be entitled to receive any recovery from the Trust that is not funded by an insurance recovery paid specifically with respect to that Personal Injury Claimant. To the extent a Personal Injury Claimant names any defendants that are persons or entities that are not Released Parties, the Personal Injury Claimant may collect any claim established from such defendant subject to and in accordance with ARTICLE X.

       **E.**    **Mediation.** The Trustee may mediate with any Insurance Company that issued coverage that is available to respond to any Insured Personal Injury Claim. If the Trustee determines, in his or her sole and absolute discretion, that (1) an Insurance Company is willing to engage in good faith mediation to resolve its coverage obligations with respect to an Insured Personal Injury Claim, (2) the coverage available is likely to provide for the full payment or a substantial payment of the Proposed Allowed Claim Amount for the Allowed Personal Injury Claim by the Insurance Company, and (3) participation in the mediation is unlikely to unduly delay payment to the Personal Injury Claimant, then notwithstanding anything contained in the TDPs, including ARTICLE VIII, the Trustee may defer the payment of the Allowed Personal Injury Claim until the conclusion of such mediation.

<div align="center">

**ARTICLE X**
**EXCESS RECOVERIES**

</div>

       **A.**    **Limitation on Trust Recovery.** A Claimant may not recover more than the Allowed Claim Amount from the Trust when taking into consideration recoveries obtained from other Potentially Liable Parties and, in the case of Personal Injury Claimants who elect to "Opt Out" to the tort system to pursue insurance, available insurance recoveries. The sole source of recovery for Personal Injury Claimants who do not elect to "Opt Out" to the tort system and who do not elect to pursue recoveries from Potentially Liable Parties is from the Trust. Personal Injury Claimants who elect to pursue recoveries from Potentially Liable Parties may obtain recoveries from sources other than the Trust on account of their Personal Injury Claims. If a Personal Injury Claimant recovers on account of his or her Personal Injury Claim an amount from a Potentially Liable Party, an insurer, or any source other than the Trust that results in such Personal Injury Claimant recovering the Allowed Claim Amount of such Personal Injury Claims as determined under the TDPs, then notwithstanding anything contained herein, such Personal Injury Claimant shall not be entitled to receive an additional recovery from the Trust on account of such Personal Injury Claim. For example, if the Allowed Claim Amount for an Allowed Personal Injury Claim is $600,000, and the Personal Injury Claimant has received distributions from the Trust totaling $200,000, and the Personal Injury Claimant then recovers $400,000 from a Potentially Liable Party or any source other than the Trust such that his or her total recovery is $600,000 on account of such Personal Injury Claim, then such Personal Injury Claimant shall not be entitled to receive any further recovery from the Trust, including in circumstances where the Supplemental Payment Percentage is over 33.3%. The Trustee may ask Personal Injury Claimants if they intend to pursue recoveries on account of their Personal Injury Claims from sources other than the Trust and to provide the Trustee with updates regarding such pursuits. Personal Injury Claimants who obtain such recoveries shall immediately inform the Trust.

       **B.**    **Excess Recovery.** If a Personal Injury Claimant were to receive a distribution from the Trust on account of his or her Personal Injury Claim and then obtain a recovery from a

Potentially Liable Party or any source other than the Trust on account of his or her Personal Injury Claim such that the Personal Injury Claimant is placed in a position where he or she has recovered more than the Allowed Claim Amount of such Personal Injury Claim as determined under the TDPs, then such Personal Injury Claimant shall be required to return or deliver to the Trust the portion of such recovery that causes such Personal Injury Claimant's total recovery on account of such Personal Injury Claim to exceed the Allowed Claim Amount, provided, however, that in no circumstance shall a Personal Injury Claimant be required to return or deliver to the Trust an amount greater than the distributions received from the Trust on account of his or her Personal Injury Claim.  For example, if the Allowed Claim Amount for an Allowed Personal Injury Claim is $600,000, and the Personal Injury Claimant has received distributions from the Trust totaling $200,000, and the Personal Injury Claimant then recovers $500,000 from a Potentially Liable Party such that his or her total recovery is $700,000, then such Personal Injury Claimant shall be required to return $100,000 to the Trust.  If the Allowed Claim Amount for an Allowed Personal Injury Claim is $600,000, and the Personal Injury Claimant has received distributions from the Trust totaling $200,000, and the Personal Injury Claimant then recovers $2,000,000 from a Potentially Liable Party such that his or her total recovery is $2,200,000, then such Personal Injury Claimant shall be required to return $200,000 to the Trust (*i.e.*, the distributions received from the Trust on account of his or her Personal Injury Claim).

**C.**   **Potentially Liable Parties.**  Nothing in the TDPs, nor any action taken pursuant to the TDPs, shall determine, limit, reduce, or impact the liability of any Potentially Liable Party for a Trust Claim.  Potentially Liable Parties are not third-party beneficiaries, and their liability for any Trust Claim shall not be determined by, or by reference to, the TDPs.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

**A.**   **Amendments.**  Except as otherwise provided herein, the TDPs may be amended with the written consent of the Trustee and the TAC, as provided in the Trust Agreement.  The consent of the TAC shall not be unreasonably withheld.  Nothing herein is intended to preclude the TAC from proposing to the Trustee, in writing, amendments to the TDPs.  Notwithstanding the foregoing, absent Bankruptcy Court approval after appropriate notice and opportunity to be heard, the TDPs may not be modified or amended in a material manner that would have the effect of (i) providing for materially different treatment for Trust Claims or (ii) cause the TDPs to be otherwise inconsistent with the Trust Agreement, the Plan, or the Confirmation Order.

**B.**   **Severability.**  Should any provision contained in the TDPs be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the TDPs.

**C.**   **Governing Law.**  Each Trust Claim shall be evaluate under the laws of the jurisdiction in which the Trust Claim arose.

## **EXHIBIT 1-1**

FORM OF ACCEPTANCE AND RELEASE
(EXPEDITED DISTRIBUTION)

## ACCEPTANCE AND RELEASE (EXPEDITED DISTRIBUTION)

To receive an Expedited Distribution (as defined below) from the Trust (the "**Trust**") created pursuant to the Chapter 11 Plan of Reorganization for Tehum Care Services, Inc., dated as of [●], 2024 (the "**Plan**"), the holder of a Personal Injury Claim must execute and submit to the Trust this acceptance and release (the "**Release**"). **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient**.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**," "**Plan**," and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section. All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, having subject matter jurisdiction over the Chapter 11 Case.

"**Chapter 11 Case**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court and currently styled *In re Tehum Care Services, Inc..*, Bankruptcy Case No. 23-90086 (CML).

"**Debtor**" means Tehum Care Services, Inc., the debtor and debtor-in-possession in the Chapter 11 Case.

"**Expedited Distribution**" means the compensation a Claimant receives from the Trust on behalf of the Claimant's Personal Injury Claim in the amount of $5,000.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to execute this Release on behalf of the Personal Injury Claimant.

"**Personal Injury Claim**" means a Personal Injury Claim asserted by an individual (or an individual's estate) against the Debtor for alleged personal injury, wrongful death, or other similar Claim or Cause of Action arising out of or relating to an injury or death allegedly caused by the Debtor.

"**Personal Injury Claimant**" means the holder of a Personal Injury Claim who (a) has satisfied the eligibility criteria section forth in the Trust Distribution Procedures, (b) has had his or her Personal Injury Claim assumed by the Trust for evaluation, resolution, and payment pursuant to the Plan, and (c) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Released Parties**" means the Trust, the Trustee, and the TAC and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, Trustee, insurers, beneficiaries,

administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, and the TAC.

"**TAC**" means the Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RECITALS

**A.**     **WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court on [●] and became effective on [●].

**B.**     **WHEREAS**, the Plan provides for the assumption of Personal Injury Claims against the Debtor by the Trust and for the treatment of Personal Injury Claims against the Debtor through the Trust.

**C.**     **WHEREAS**, the Claimant has accepted an Expedited Distribution in the amount of $[_____] from the Trust on account of his or her Personal Injury Claim and agrees to execute this Release in consideration of the benefit of such Expedited Distribution.

## RELEASE

Each of the foregoing Recitals is hereby incorporated into this Release by reference and is made apart of this Release as if fully restated herein.

In consideration of the benefit of an Expedited Distribution from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, Trustee, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, and covenant not to sue the Released Parties for my Personal Injury Claim, whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") and fully discharge the Released Parties of their duties and responsibilities (to the extent applicable) under the Trust Documents, including any agreement, document, instrument or certification contemplated by the Trust Documents, from the beginning of time through the execution date of this Release.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Expedited Distribution or any component thereof, and I understand and agree that I shall be

solely responsible for compliance with all tax laws with respect to the Expedited Distribution, to the extent applicable.

Claimant or Legal Representative Printed Name:    _____

Claimant or Legal Representative Signature:    _____

Date:    _____

**<u>EXHIBIT 1-2</u>**

FORM OF ACCEPTANCE AND RELEASE
(PERSONAL INJURY CLAIM)

## <u>ACCEPTANCE AND RELEASE (PERSONAL INJURY CLAIM)</u>

To receive payment on account of an Award (as defined below) from the Trust (the "**Trust**") created pursuant to the Chapter 11 Plan of Reorganization for Tehum Care Services, Inc., dated as of [●], 2024 (the "**Plan**"), the holder of a Personal Injury Claim must execute and submit to the Trust this acceptance and release (the "**Release**").  **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below).  A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient**.

## <u>DEFINITIONS</u>

The definitions set forth above for the terms "**Trust**," "**Plan**," and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.  All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

"**Award**" means the compensation a Claimant receives from the Trust on behalf of the Claimant's Personal Injury Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, having subject matter jurisdiction over the Chapter 11 Case.

"**Chapter 11 Case**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court and currently styled *In re Tehum Care Services, Inc..*, Bankruptcy Case No. 23-90086 (CML).

"**Debtor**" means Tehum Care Services, Inc., the debtor and debtor-in-possession in the Chapter 11 Case.

"**Governmental Payor**" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to execute this Release on behalf of the Personal Injury Claimant.

"**Lien**" or "**Liens**" means (i) any statutory lien of a Governmental Payor or Medicare Part C or Part D Program sponsor, or (ii) any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any other payer or provider, where there is a legal obligation to withhold payment of an Award, or some portion thereof, to a Personal Injury Claimant under applicable federal or state law or for the Personal Injury Claimant to reimburse the Government Payor, other payer or provider for amounts paid on the Personal Injury Claimant's behalf in connection with the Claimant's Personal Injury Claim.

"**Lien Resolution Administrator**" means that person or entity, retained by the Trustee to resolve Medicare Program Part A and B liens, Medicaid Program liens, and Medicare Part C Program liens, using the information provided by the Personal Injury Claimant.

"**Medicaid Program**" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1, *et seq*.

"**Medicare Part C or Part D Program**" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with Centers for Medicare & Medicaid Services ("**CMS**").

"**Medicare Program**" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*.

"**Personal Injury Claim**" means a Personal Injury Claim asserted by an individual (or an individual's estate) against the Debtor for alleged personal injury, wrongful death, or other similar Claim or Cause of Action arising out of or relating to an injury or death allegedly caused by the Debtor.

"**Personal Injury Claimant**" means the holder of a Personal Injury Claim who (a) has satisfied the eligibility criteria section forth in the Trust Distribution Procedures, (b) has had his or her Personal Injury Claim assumed by the Trust for evaluation, resolution, and payment pursuant to the Plan, and (c) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Released Parties**" means the Trust, the Trustee, and the TAC and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, Trustee, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, and the TAC.

"**TAC**" means the Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RECITALS

A.     **WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court on [●] and became effective on [●].

B.     **WHEREAS**, the Plan provides for the assumption of Personal Injury Claims against the Debtor by the Trust and for the treatment of Personal Injury Claims against the Debtor through the Trust.

2

**C.** **WHEREAS**, the Claimant has received and accepted an Award in the amount of $[_____] from the Trust on account of his or her Personal Injury Claim and agrees to execute this Release in consideration of the benefit of such Award.

## RELEASE

Each of the foregoing Recitals is hereby incorporated into this Release by reference and is made apart of this Release as if fully restated herein.

In consideration of the benefit of an Award from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, Trustee, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitle to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, and covenant not to sue the Released Parties for my Personal Injury Claim against the Debtor, whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") and fully discharge the Released Parties of their duties and responsibilities (to the extent applicable) under the Trust Documents, including any agreement, document, instrument or certification contemplated by the Trust Documents, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I hereby acknowledge that I am solely and ultimately responsible for the satisfaction and discharge of all Liens. I shall use my best efforts to resolve all known Liens.

Notwithstanding my responsibilities to resolve all known Liens, I hereby authorize the Lien Resolution Administrator to resolve all Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens, as set forth in the definition of Lien Resolution Administrator above. The Lien Resolution Administrator shall use best efforts to resolve the Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens on my behalf.

In further consideration of the benefit of an Award, I do hereby release, forever discharge, hold harmless, and covenant not to sue the Released Parties from all Claims arising from, relating to, resulting from or in any way connected to, in whole or in part, any act, or failure to act, of the Lien Resolution Administrator. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Claim released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I hereby acknowledge and agree that to the extent my information is incorrect or incomplete to any substantial degree, after reasonable diligence by the Lien Resolution Administrator, which

results in the Lien Resolution Administrator being unable to properly verify coverage or identify Liens for which the Lien Resolution Administrator is responsible, then the Lien Resolution Administrator shall have no further responsibility for such unknown/unresolved Liens.

I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name: _____

Claimant or Legal Representative Signature: _____

Date: _____

**EXHIBIT 1-3**

FORM OF ACCEPTANCE AND RELEASE
(INDIRECT CLAIM)

## ACCEPTANCE AND RELEASE (INDIRECT CLAIM)

To receive payment on account of an Award (as defined below) from the Trust (the "**Trust**") created pursuant to the Chapter 11 Plan of Reorganization for Tehum Care Services, Inc., dated as of [●], 2024 (the "**Plan**"), the holder of an Indirect Claim must execute and submit to the Trust this acceptance and release (the "**Release**").  **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below).  A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient**.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**," "**Plan**," and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.  All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

"**Award**" means the compensation a Claimant receives from the Trust on behalf of the Claimant's Indirect Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, having subject matter jurisdiction over the Chapter 11 Case.

"**Chapter 11 Case**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court and currently styled *In re Tehum Care Services, Inc..*, Bankruptcy Case No. 23-90086 (CML).

"**Debtor**" means Tehum Care Services, Inc., the debtor and debtor-in-possession in the Chapter 11 Case.

"**Indirect Claim**" means a liquidated or unliquidated, contingent or non-contingent Personal Injury Claim against the Debtor for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction).

"**Indirect Claimant**" means the holder of an Indirect Claim who (a) has satisfied the eligibility criteria section forth in the Trust Distribution Procedures, (b) has had its Indirect Claim assumed by the Trust for evaluation, resolution, and payment pursuant to the Plan, and (c) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to execute this Release on behalf of the Personal Injury Claimant.

"**Released Parties**" means the Trust, the Trustee, and the TAC and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, Trustee, insurers, beneficiaries,

administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, and the TAC.

"**TAC**" means the Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trustee**" means [●] or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RECITALS

A.      **WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court on [●] and became effective on [●].

B.      **WHEREAS**, the Plan provides for the assumption of Personal Injury Claims against the Debtor by the Trust and for the treatment of Personal Injury Claims against the Debtor through the Trust.

C.      **WHEREAS**, the Claimant has received and accepted an Award in the amount of $[_____] from the Trust on account of its Indirect Claim and agrees to execute this Release in consideration of the benefit of such Award.

## RELEASE

Each of the foregoing Recitals is hereby incorporated into this Release by reference and is made apart of this Release as if fully restated herein.

In consideration of the benefit of an Award from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, Trustee, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, and covenant not to sue the Released Parties for my Indirect Claim, whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") and fully discharge the Released Parties of their duties and responsibilities (to the extent applicable) under the Trust Documents, including any agreement, document, instrument or certification contemplated by the Trust Documents, from the beginning of time through the execution date of this Release.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name: _____

Claimant or Legal Representative Signature: _____

Date: _____

**Exhibit C**

**Form of PI/WD Trust Agreement**

# PRIMARY POLICIES

| Policy Number | Insured | Insurer | Policy Period | Claims Made or Occurance Type Policy | Generally Applicable Per Incident Limits | Aggregate Limits | Policy Clearly Requires Insurer to Provide Defense of All Claims | Retro Date | Generally applicable SIR per incident | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 6793692 | America Service Group Inc; Prison Health Services, Inc. | Lexington | 9/1/2005 - 9/1/2006 | Claims made | $500k per doctor /$1 M for entity | $2 M per incident | yes | 9/1/2005 | $0 | Applies only to PA |
| 9389853 | Valitas Health Services, Inc. | Lexington | 3/4/2013 - 3/4/2014 | Claims made | $10 M | $10 M | no | 3/4/2013 | $50k | Applies to AZ only. |
| 6797662 | Valitas Health Services, Inc. | Lexington | 3/4/2014 - 3/4/2015 | Claims made | $10 M | $10 M | no | 3/4/2013 | $50k | Applies to AZ only. |
| 6797964 | Valitas Health Services, Inc. | Lexington | 3/4/2015 - 3/4/2016 | Claims made | $10 M | $10 M | no | 3/4/2013 | $50k | Applies to AZ only. |
| 4-100109* | Valitas Health Services, Inc. | Lone Star Alliance | 3/4/2016 - 3/4/2017 | Claims made | $2 M | $6 M | no | 3/4/2013 | $50k | Applies only to AZ. |
| 4-100167* | Valitas Health Services, Inc. | Lone Star Alliance | 3/4/2017 - 3/4/2018 | Claims made | $2 M | $6 M | no | 3/4/2013 | $50k | Applies only to AZ. |
| 4-453898* | Valitas Health Services, Inc. | Lone Star Alliance | 3/4/2018 - 3/4/2019 | Claims made | $2 M | $6 M | no | 3/4/2013 | $50k | Applies only to AZ. |
| 4-454898* | Valitas Health Services, Inc. | Lone Star Alliance | 3/4/2019 - 3/4/2020 | Claims made | $2 M | $6 M | no | 3/4/2013 | $50k | Applies only to AZ.  Reporting period extended to 7/1/ 2021. |
| 4334400 | Corizon | Ironshore | 1/1/2020 - 1/1/2021 | Claims made | $1 M | $3 M | no | 3/1/2020 | $50k | Applies only to Arlington Co. VA |
| HC7AAB65W8001 | Corizon | Ironshore | 3/1/2021 - 3/1/2022 | Claims made | $1 M | $3 M | no | 3/1/2020 | $50k | Applies only to Arlington Co. VA |
| G-COP-600001 | Valitas Health Services, Inc. | COPIC | 1/1/2021 - 1/1/2022 | Claims made | Varies by state with lowest $500k in PA | $12 M | no | 1/1/2021 | Generally equal to limits | |
| G-AMS-600001 | Valitas Health Services, Inc. | Applied Medico- Legal Solutions | 1/1/2022 - 1/1/2023 | Claims made | Varies by state with lowest $500k in PA | $24 M | no | 1/1/2021 | Generally equal to limits | |
| G-AMS-600001 | YesCare Corp | Applied Medico- Legal Solutions | 1/1/2023 - 1/1/2024 | Claims made | Varies by state with lowest $500k in PA | $17 M | no | 1/1/2021 | Generally equal to limits | |
| 6797138 | Valitas Health Services, Inc. | Lexington | 1/1/2012 - 1/1/2013 | Occurance | Generally $1 M but varies by state.  As low as $250k in IN. | $35 M | no | | Generally equal to limits amount | |
| 6796367 | Valitas Health Services, Inc. | Lexington | 8/31/2012 - 8/31/2013 | Occurance | $500k (physicians only) | $1.5 M per physician | yes | | none | Limited to certain Philadelphia locations. |
| 6796728 | Valitas Health Services, Inc. | Lexington | 9/1/2012 - 1/1/2013 | Occurance | Generally $500k per doctor / $1 M others | $1.5 M per physician / $2 M non-physician insureds | yes | | none | PA only |

**TEHUM PERSONAL INJURY SETTLEMENT TRUST AGREEMENT**


**DATED AS OF [  ], 2024**


**PURSUANT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE
TORT CLAIMANTS' COMMITTEE, OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, AND DEBTOR FOR TEHUM CARE SERVICES, INC.**

# TABLE OF CONTENTS

ARTICLE 1.   AGREEMENT OF TRUST ...................................................................... 2

Section 1.1    Creation and Name. ............................................................................... 2

Section 1.2    Purposes. ............................................................................................... 2

Section 1.3    Transfer of Assets. ................................................................................ 2

Section 1.4    Acceptance of Assets. ........................................................................... 3

Section 1.5    Receipt of Proceeds. .............................................................................. 3

Section 1.6    Beneficiaries. ........................................................................................ 3

Section 1.7    Jurisdiction. .......................................................................................... 3

Section 1.8    Privileged and Confidential Information. ............................................... 4

Section 1.9    Relation-back election. .......................................................................... 4

Section 1.10   Relationship to Plan. ............................................................................. 4

ARTICLE 2.   POWERS AND TRUST ADMINISTRATION. ...................................... 4

Section 2.1    Powers. ................................................................................................. 4

Section 2.2    Limitations on the Trustee and TAC. ..................................................... 8

Section 2.3    General Administration. ......................................................................... 8

Section 2.4    Accounting. ........................................................................................... 8

Section 2.5    Financial Reporting. .............................................................................. 8

Section 2.6    Claims Reporting. .................................................................................. 9

Section 2.7    Names and addresses. ............................................................................ 9

Section 2.8    Transfers of the Trust Corpus. ............................................................... 9

ARTICLE 3.   ACCOUNTS, INVESTMENTS, EXPENSES ......................................... 9

Section 3.1    Accounts. .............................................................................................. 9

Section 3.2    Investment Guidelines. .......................................................................... 10

Section 3.3    Payment of Trust Operating Expenses. ................................................... 10

ARTICLE 4.   CLAIMS ADMINISTRATION AND DISTRIBUTIONS ...................... 10

Section 4.1    Claims Administration and Distributions. .............................................. 10

Section 4.2    Applicability and Review of Payment Percentage. ................................. 11

Section 4.3    Supplemental Payments. ........................................................................ 11

Section 4.4    Manner of Payment. .............................................................................. 12

Section 4.5    Delivery of Distributions. ...................................................................... 12

Section 4.6    Medicare Reimbursement and Reporting Obligations. ........................... 12

i

ARTICLE 5.   TRUSTEE; DELAWARE TRUSTEE .................................................................. 13

Section 5.1    Number of Trustees. ....................................................................................... 13

Section 5.2    Term of Service, Successor Trustee. .............................................................. 13

Section 5.3    Appointment of Successor Trustee. ............................................................... 13

Section 5.4    Trust Meetings. ............................................................................................... 14

Section 5.5    Compensation and Expenses of Trustee. ....................................................... 14

Section 5.6    Trustee's Independence. ................................................................................. 15

Section 5.7    Standard of Care; Exculpation. ...................................................................... 15

Section 5.8    Protective Provisions. .................................................................................... 16

Section 5.9    Indemnification. ............................................................................................. 17

Section 5.10   Bond. .............................................................................................................. 18

Section 5.11   Delaware Trustee. ........................................................................................... 18

Section 5.12   Meeting Minutes. ........................................................................................... 21

Section 5.13   Matters Requiring Consultation with TAC. ................................................... 21

Section 5.14   Matters Requiring Consent of TAC. .............................................................. 22

Section 5.15   Trustee's and TAC's Employment of Professionals. ...................................... 22

ARTICLE 6.   TRUST ADVISORY COMMITTEE ................................................................. 22

Section 6.1    Members; Action by Members. ...................................................................... 22

Section 6.2    Duties. ............................................................................................................ 23

Section 6.3    TAC Information Rights. ................................................................................ 23

Section 6.4    [Reserved.] ...................................................................................................... 23

Section 6.5    Term of Office. ............................................................................................... 23

Section 6.6    Appointment of Successor. ............................................................................. 23

Section 6.7    Compensation and Expenses of the TAC. ...................................................... 24

Section 6.8    Procedures for Consultation with and Obtaining the Consent of the TAC. .......... 24

ARTICLE 7.   GENERAL PROVISIONS .................................................................................. 25

Section 7.1    Irrevocability. ................................................................................................. 25

Section 7.2    Term; Termination. ......................................................................................... 25

Section 7.3    Outgoing Trustee Obligations. ....................................................................... 26

Section 7.4    Taxes. .............................................................................................................. 27

Section 7.5    Modification. ................................................................................................... 28

Section 7.6    Communications. ............................................................................................ 28

Section 7.7    Severability. .................................................................................................... 28

Section 7.8     Notices. ........................................................................................... 28

Section 7.9     Successors and Assigns. .................................................................... 29

Section 7.10    Limitation on Transferability; Beneficiaries' Interests. ................. 29

Section 7.11    Exemption from Registration. .......................................................... 30

Section 7.12    Entire Agreement; No Waiver .......................................................... 30

Section 7.13    Headings. ........................................................................................... 30

Section 7.14    Governing Law .................................................................................. 30

Section 7.15    Dispute Resolution. ........................................................................... 31

Section 7.16    Waiver of Jury Trial. ........................................................................ 32

Section 7.17    Effectiveness. .................................................................................... 32

Section 7.18    Counterpart Signatures. .................................................................... 32


EXHIBIT 1      AGGREGATE SETTLEMENT CONSIDERATION ........................... 1

EXHIBIT 2      CERTIFICATE OF TRUST ................................................................. 1

EXHIBIT 3      TRUST DISTRIBUTION PROCEDURES FOR PERSONAL INJURY
               CLAIMS ................................................................................................ 1

EXHIBIT 4      TCC PROFESSIONAL FEE ESCROW ACCOUNT ........................... 1

EXHIBIT 5      INVESTMENT GUIDELINES ............................................................. 1

## TEHUM PERSONAL INJURY SETTLEMENT TRUST AGREEMENT

This Tehum Personal Injury Settlement Trust Agreement (this "**Trust Agreement**"), dated as of [  ], 2024, and effective as of the Effective Date, is entered in accordance with the *Joint Chapter 11 Plan of Reorganization of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor for Tehum Care Services, Inc.*, dated [  ], 2024 (as it may be amended, modified, or supplemented, the "**Plan**"),[1] by Tehum Care Services, Inc. (the "**Debtor**"); [  ] as trustee (together with any successor serving in such capacity, the "**Trustee**"); [  ] as the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"); and the members of the Trust Advisory Committee who are the individuals further identified on the signature pages here (together with any successors serving in such capacity, the "**TAC**").

## RECITALS

(A)    Contemporaneously with the execution of this Trust Agreement, Debtor will have reorganized under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the United States Bankruptcy Court for the Southern District of Texas ("**Bankruptcy Court**"), administered and known as *In re: Tehum Care Services, Inc.*, Case No. 23-90086 (CML) (the "**Chapter 11 Case**").

(B)    Debtor is executing this Trust Agreement in its capacity as Settlor to implement the Plan and to create the PI/WD Trust (the "**Trust**") for the benefit of the holders of Channeled PI/WD Claims and Channeled Indirect PI/WD Claims (collectively, the "**Trust Claims**").

(C)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(D)    The Plan and Confirmation Order provide, among other things, for the creation of the PI/WD Trust to satisfy the Trust Claims in accordance with this Trust Agreement, the Plan and the Confirmation Order.

(E)    The Bankruptcy Court held in the Confirmation Order that all the prerequisites for the Channeling Injunction have been satisfied, and such Channeling Injunction is fully effective and enforceable as provided in the Plan and Confirmation Order with respect to the Trust Claims.

(F)    The Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded in accordance with the Plan, the Aggregate Settlement Consideration (as defined in Section 1.3), as described in **Exhibit 1** shall be transferred to and vested in the Trust free and clear of all liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or its affiliates, any creditor or any other entity, other than as provided in the Channeling Injunction with respect to the Trust Claims.

---

[1]    All capitalized terms used but not otherwise defined herein shall have their respective meanings as set forth in the Plan or in the Confirmation Order, as applicable, or, if not defined therein, as set forth in the TDPs (as defined in Section 1.2 below).

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1.
## AGREEMENT OF TRUST

Section 1.1 *Creation and Name.* There is here by created a trust known as the "**Tehum Personal Injury Settlement Trust**" which is the PI/WD Trust provided for and referred to in the Plan.  The Trustee may transact the business and affairs of the Trust in the name of the Tehum Personal Injury Settlement Trust and references herein to the Trust shall include the Trustee acting on behalf of the Trust.  It is the intention of the parties hereto that the Trust created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§ 3801 *et seq*. (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement, including the Exhibits hereto (the Confirmation Order, the Plan and this Trust Agreement, including all Exhibits hereto, which includes the TDPs as defined in Section 1.2 below, collectively, the "**Trust Documents**"), constitute the governing instruments of the Trust.  The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

Section 1.2 *Purposes.* The purposes of the PI/WD Trust shall be to assume responsibility for Channeled PI/WD Trust Claims, maximize the value of the PI/WD Insurance Action Recoveries, pursue the Retained PI/WD Trust Causes of Action, and, among other things:  (1) to hold, preserve, maximize, and administer the PI/WD Trust Assets, (2) to liquidate the PI/WD Trust Assets, and (3) to administer, process, settle, resolve, liquidate, satisfy, and pay all Allowed Channeled PI/WD Trust Claims in a fair, consistent, and equitable manner in each case in accordance with the Trust Distributions Procedures for Personal Injury Claims attached hereto as **Exhibit 3** (the "**TDPs**"). The PI/WD Trust shall also have rights with respect to the Retained Causes of Action, subject to the provisions and consent rights of the PI/WD Trust, as set forth in **Article IV.J** of the Plan, with the net proceeds of such Retained Causes of Action to be split between the PI/WD Trust and the GUC Trust on a 50/50 basis.  For the avoidance of doubt, all Channeled PI/WD Claims and Channeled Indirect PI/WD Claims asserted against the Debtor in the Chapter 11 Case shall be resolved exclusively in accordance with the TDPs.

Section 1.3 *Transfer of Assets.* Pursuant to the Plan, on the Effective Date, the Trust will receive and hold all right, title and interest in and to the consideration described in Article IV.D of the Plan and set forth on **Exhibit 1** hereto (the "**Aggregate Settlement Consideration**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**").[2]  The Aggregate Settlement Consideration shall be transferred to the Trust free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or its affiliates, any creditor or any other person or entity, other than as provided in the Channeling

---

[2]   **Exhibit 1** shall identify:  All Assets and Estate Assets allocated to the PI/WD Trust pursuant to the PI/WD Trust Agreement and the Plan, as applicable, and in each case, as amended, supplemented, restated, or otherwise modified from time to time, including:  (a) 50% of the Settlement Payments; (b) 50% of the ERC Fund; (c) 50% interest in the Retained Causes of Action and the proceeds thereof; (d) Retained PI/WD Trust Causes of Action; (e) the PI/WD Insurance Assignment; (f) the PI/WD Data Transfer; (g) 50% of the Debtor's remaining Assets, including Cash, (h) any other funds or Assets allocated to the PI/WD Trust under the Plan; and (i) any income, profits, gains, and proceeds realized, received, or derived from PI/WD Trust Assets.

Injunction with respect to the Trust Claims. The Debtor shall execute and deliver such documents to the Trust as the Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Aggregate Settlement Consideration to the Trust.

Section 1.4    *Acceptance of Assets*.

(a)    In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly accepts the transfer to the Trust of the Aggregate Settlement Consideration, subject to the terms of the Trust Documents. The Trust shall succeed to all of the Debtor's respective right, title, and interest, including all legal privileges, in the Aggregate Settlement Consideration and neither the Debtor nor any other person or entity transferring such Aggregate Settlement Consideration will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the Aggregate Settlement Consideration, or the Trust.

(b)    Except as otherwise provided in the Plan, Confirmation Order or Trust Documents, the Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Trust Claims that the Debtor had or would have had under applicable law.

(c)    No provision herein or in the TDPs shall be construed or implemented in a manner that would cause the Trust to fail to qualify as a "qualified settlement fund" under Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code (as the same may be amended from time to time, the "**IRC**") (the "**QSF Regulations**").

(d)    Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or other terms of the Plan or Confirmation Order.

(e)    In this Trust Agreement and the TDPs, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

Section 1.5    *Receipt of Proceeds*. The proceeds of any sale of Trust Assets or recoveries from any litigation or claims of the Trust will be deposited in the Trust's accounts and become the property of the Trust.

Section 1.6    *Beneficiaries.*

(a)    The beneficial owners (within the meaning of the Act) of the Trust shall be the holders of allowable Trust Claims ("**Allowed Trust Claims**") (the "**Beneficiaries**").

(b)    The Beneficiaries shall be subject to the terms of this Trust Agreement and Trust Documents, including without limitation, the TDPs.

Section 1.7    *Jurisdiction.* The Bankruptcy Court shall have continuing jurisdiction with respect to the Trust; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

Section 1.8     *Privileged and Confidential Information*. The transfer or assignment of any privileged information to the Trustee shall not result in the destruction or waiver of any applicable privileges pertaining thereto.  Further, with respect to any such privileges: (a) they are transferred to or contributed for the purpose of enabling the Trustee to perform his or her duties to administer the Trust; (b) they are vested solely in the Trustee, on behalf of the Trust, and not in the TAC, or any other person, committee or subcomponent of the Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Trust Claim; and (c) the Trustee shall keep, handle and maintain such privileged information. Notwithstanding the foregoing, nothing shall preclude the Trustee from providing privileged information to any insurance company as necessary to preserve, secure, or obtain the benefit of any rights under any insurance policy.

Section 1.9     *Relation-back election*. The Trustee and the Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Trust as coming into existence as a qualified settlement fund as of the earliest possible date.

Section 1.10     *Relationship to Plan*. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order.  To the extent that there is conflict between the provisions of this Trust Agreement, the TDPs, the provisions of the Plan or the Confirmation Order, each document shall have controlling effect in the following order:  (1) the Confirmation Order; (2) the Plan; (3) this Trust Agreement; and (4) the TDPs.

## ARTICLE 2.
## POWERS AND TRUST ADMINISTRATION

Section 2.1     *Powers.*

(a)     The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "qualified settlement fund" under the QSF Regulations. Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

The Trustee is and shall act as the fiduciary to the Trust in accordance with the provisions of this Trust Agreement. The Trustee shall administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in Section 1.2 above and in the manner prescribed by the Trust Documents.  The Trustee will implement and administer the TDPs with the goals of securing the just, speedy, fair, reasonable, and cost-efficient determination of every Trust Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Trust Claims as set forth herein, and obtaining and maximizing the benefits of the Trust Assets.

(b)     Subject to the limitations set forth in the Trust Documents, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or advisable to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or

hereafter permitted under the laws of the State of Delaware.  Nothing in the Trust Documents or any related document shall require the Trustee to take any action if the Trustee reasonably believes that such action is contrary to law.  In addition to all powers enumerated in the Trust Documents, including, but not limited to, the Trustee's powers and authority in respect of the interpretation, application of definitions and rules of construction set forth in Article I of the Plan to the fullest extent set forth therein, from and after the Effective Date, the Trust shall succeed to all of the rights and standing of the Debtor with respect to the Aggregate Settlement Consideration in its capacity as a trust administering assets for the benefit of the Beneficiaries.

(c)     Except as required by applicable law or the Trust Documents, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(d)     Without limiting the generality of Sections 2.1(a) and (b) above, and except as limited in the Trust Documents and by applicable law, the Trustee shall have the power to:

(i)     supervise and administer the Trust in accordance with the Trust Documents, including the TDPs;

(ii)     adopt procedures to determine Allowed Trust Claims and determine an allowed liability amount for each Allowed Trust Claim (the "**Allowed Claim Amount**") in accordance with the TDPs (including an Expedited Distribution);

(iii)     establish an initial payment percentage (the "**Initial Payment Percentage**") with respect to Allowed Trust Claims and adjust the Initial Payment Percentage and any Supplemental Payment Percentage(s) as set forth in Sections 4.2 and 4.3 below;

(iv)     receive and hold the Trust Assets, and exercise all rights with respect thereto including the right to vote and sell any securities that are included in such funds;

(v)     invest the monies held from time to time by the Trust in accordance with Section 3.2;

(vi)     sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper and consistent with the other terms of the Trust Documents;

(vii)     enter into leasing, financing or other agreements with third parties, as determined by the Trustee, in his or her discretion, to be useful in carrying out the purposes of the Trust;

(viii)     determine and pay liabilities and pay all fees and expenses incurred in administering the Trust, managing the Trust Assets and making distributions in accordance with the Trust Documents (the "**Trust Operating Expenses**");

(ix)     establish accounts and reasonable reserves within the Trust, as determined by the Trustee, in his or her discretion, to be necessary, prudent or useful in

5

administering the Trust and to establish and administer the TCC Professional Fee Escrow Account in accordance with Exhibit 4;

        (x)     sue, be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, including without limitation the power to take any action in the best interest of the Trust in the event of a Settlement Payment Default as set forth in the Plan;

        (xi)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and authorities as this Trust Agreement provides or the fiduciary duties of the Trustee permits and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

        (xii)   pay reasonable compensation and reimbursement of expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, valuation, auditing and alternative dispute resolution services and activities as the Trust requires;

        (xiii)  compensate the Trustee, Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee, the Delaware Trustee, and the TAC members, for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

        (xiv)  compensate the Trustee, and any professionals with whom the Trustee has consulted prior to the Effective Date, for services, costs and expenses incurred prior to the Effective Date;

        (xv)   execute and deliver such instruments as the Trustee considers advisable or necessary in administering the Trust;

        (xvi)  timely file such income tax and other tax returns and statements required to be filed and timely pay all taxes, if any, required to be paid from the Trust Assets and comply with all applicable tax reporting and withholding obligations;

        (xvii)  require, in respect of any distribution of Trust Assets, the timely receipt of properly executed documentation (including, without limitation, Internal Revenue Service ("**IRS**") Form W-9) as the Trustee determines in his or her discretion necessary or appropriate to comply with applicable tax laws;

        (xviii)  resolve all applicable lien resolution matters;

        (xix)  register as a responsible reporting entity ("**RRE**") and timely submit all reports under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**") as required under Section 4.6 below;

(xx)    determine the form(s) of acceptance and release required to be executed by a Beneficiary in connection with a distribution on account of an Allowed Trust Claim in accordance with the TDPs;

(xxi)   enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of the Trust Documents;

(xxii)  in accordance with Section 5.9 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.7(a) below) solely from the Trust Assets and to the fullest extent permitted by law;

(xxiii) delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable investment advisors or investment managers without liability for any action taken or omission made because of any such delegation;

(xxiv) delegate any or all of the authority conferred with respect to the protection, preservation, and monetization of any non-cash Trust Assets;

(xxv)  initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all legal actions and other proceedings related to any asset, liability, or responsibility of the Trust;

(xxvi)  enter into structured settlements and other similar arrangements with any Beneficiary (including a minor or other person in need of special consideration) upon such terms as the Trustee and such Beneficiary (or such Beneficiary's counsel or other authorized person) agree, in all cases in accordance with the TDPs;

(xxvii) contract for the establishment and continuing maintenance of a website (the "**Trust Website**") to aid in communicating information to the Beneficiaries and their counsel or other authorized persons;

(xxviii) take any and all actions appropriate or necessary in order to carry out the terms of the Trust Documents;

(xxix) except as otherwise expressly provided in the Trust Documents, exercise any other powers now or hereafter conferred upon or permitted to be exercised by a trustee under the laws of the State of Delaware; and

(xxx)   at the Trustee's sole discretion, retain one or more consultants in order to assist the Trustee in evaluating and determining whether one or more Trust Claims may be fraudulent.

(e)     The Trustee shall consult with the TAC on the matters set forth in Section 5.13 below.  The Trustee shall obtain the consent of the TAC prior to taking action with respect to the matters as set forth in Section 5.14 below, as and to the extent set forth therein.

Section 2.2     *Limitations on the Trustee and TAC.*

    (a)     Notwithstanding anything in the Trust Documents to the contrary, the Trustee shall not do or undertake any of the following:

    (i)     guaranty any debt;

    (ii)     make or enter into any loan of Trust Assets;

    (iii)     make any transfer or distribution of Trust Assets other than those authorized by the Trust Documents;

    (iv)     engage in any trade or business with respect to the Trust Assets or proceeds therefrom, provided, however, that the Trustee shall hold, manage, protect and monetize the Trust Assets which shall not be deemed to constitute a trade or business;

    (v)     engage in any investment of the Trust Assets, other than as explicitly authorized by this Trust Agreement; and

    (vi)     engage in any activities inconsistent with the treatment of the Trust as a "qualified settlement fund" within the meaning of the QSF Regulations.

Section 2.3     *General Administration.* The Trustee shall act in accordance with the Trust Documents.  The initial mailing address of the Trust shall be Tehum Personal Injury Settlement Trust, [    ] and the Trustee may change the mailing address in his or her discretion.

Section 2.4     *Accounting.* The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year.  The Trustee shall maintain the books and records relating to the Trust Assets and income and the payment of Trust Operating Expenses and other liabilities of the Trust.  The detail of these books and records and the duration of time during which the Trustee shall keep such books and records shall be such as to allow the Trustee to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustee shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of Trust liabilities.

Section 2.5     *Financial Reporting.*

    (a)     The Trustee shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustee, to audit the Annual Report.  Within one hundred twenty (120) days following the end of each calendar year, the Trustee shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements.  The Trustee shall publish a copy of such Annual Report on the Trust Website when such report is filed with the Bankruptcy Court.

(b)      All materials filed with the Bankruptcy Court pursuant to this Section 2.5 need not be served on any parties in the Chapter 11 Case but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

Section 2.6      *Claims Reporting.* Within one hundred twenty (120) days following the end of each calendar year, the Trustee shall cause to be prepared and filed with the Bankruptcy Court an annual report containing a summary regarding the number and type of Allowed Trust Claims disposed of during the period covered by the financial statements (the "**Annual Claims Report**").  The Trustee shall post a copy of the Annual Claims Report on the Trust Website when such report is filed with the Bankruptcy Court.

Section 2.7      *Names and addresses*. The Trust shall keep a register (the "**Register**") in which the Trust shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Trust Documents.  The Trustee may rely upon this Register for the purposes of delivering distributions or notices.  In preparing and maintaining this Register, the Trustee may rely on the name and address of each Trust Claim holder as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Beneficiary to the Trust.  The Trust may deliver distributions and notices to counsel for any Beneficiary identified in such Beneficiary's proof of claim or proper notice of a name or address change.

Section 2.8      *Transfers of the Trust Corpus*. To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court or other competent court of jurisdiction.

## ARTICLE 3.
## ACCOUNTS, INVESTMENTS, EXPENSES

Section 3.1      *Accounts.*

(a)      The Trustee shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each a "**Financial Institution**").  Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with Debtor or their affiliated persons or others.  Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(b)      The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

(c)      The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Beneficiaries and the payment of Trust Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**").  Any such Trust

Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

(d)     The Trustee shall establish a separate subaccount of the Trust to receive funds designated under the Plan for the TCC Professional Fee Escrow Account, which shall be administered exclusively in accordance with the terms set forth on Exhibit 4 hereto.

Section 3.2     *Investment Guidelines.*

(a)     The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as Exhibit 5 (the "**Investment Guidelines**").

(b)     The Trust may hold certain non-liquid assets.  The Trustee shall own, protect, oversee, insure, and monetize such non-liquid assets in accordance with the Trust Documents.  This Section 3.2(b) is intended to modify the application to the Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)     Cash proceeds received by the Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the Trust as set forth in Section 1.2 above.

Section 3.3     *Payment of Trust Operating Expenses.*All Trust Operating Expenses shall be payable out of the Trust Assets.  None of the Trustee, Delaware Trustee, the TAC, the Beneficiaries nor any of their officers, agents, advisors, professionals, or employees shall be personally liable for the payment of any Trust Operating Expense or any other liability of the Trust.

## ARTICLE 4.
## CLAIMS ADMINISTRATION AND DISTRIBUTIONS

Section 4.1     *Claims Administration and Distributions*.

(a)     The Trust shall fairly and reasonably compensate Allowed Trust Claims and shall pay up to the full value of such claims, solely in accordance with the Trust Documents, including the TDPs.  The TDPs shall be subject to amendment or modification only to the extent expressly set forth in the TDPs.

(b)     The Trustee shall develop non-binding arbitration dispute resolution procedures (the "**ADR Procedures**") to resolve Reconsideration Requests.  The Trustee shall employ individuals to serve as the arbitrators to implement the ADR Procedures for Reconsideration Requests in accordance with the TDPs, giving due weight in the selection process to prior service as a retired judge with tort experience.

(c)     The Trustee may institute procedures for auditing the reliability of evidence submitted to the Trust involving Trust Claims for which the Trust has legal responsibility (the "**Claims Audit Program**").  The Trustee may employ third-party service providers to assist the Trust with the Claims Audit Program.

10

Section 4.2     _Applicability and Review of Payment Percentage._

(a)     Because there is uncertainty in the prediction of both the total amount of the Trust's liabilities and the amount of the Trust Assets, no guarantee can be made as to the total payment the Trust will be able to pay for any Allowed Trust Claim.  The Trustee shall determine from time to time the percentage of value that holders of Allowed Trust Claims are likely to receive from the Trust Assets available for distribution on account of compensable Allowed Trust Claims.  As soon as practicable after the Effective Date, the Trustee shall establish an Initial Payment Percentage.

(b)     The Initial Payment Percentage shall apply to all Allowed Trust Claims to be paid by the Trust until the Trustee, after consultation with the TAC, determines that the Initial Payment Percentage should be changed and that such change shall continue to allow to the Trust shall be in a financial position to pay holders of similar Allowed Trust Claims in substantially the same manner.

(c)     No less frequently than once every twelve (12) months, the Trustee shall undertake an evaluation of the Initial Payment Percentage.  The Trustee may evaluate the Initial Payment Percentage at shorter intervals if the Trustee deems such evaluation is appropriate or if requested to do so by the TAC.

Section 4.3     _Supplemental Payments._

(a)     When the Trustee determines that the then-current estimates of the Trust's assets and its liabilities, as well as then-estimated value of then-pending Trust Claims, warrant additional distributions on account of the Final Determinations, the Trustee shall, after consultation with the TAC, set a supplemental payment percentage (the "**Supplemental Payment Percentage**").  Thereafter, from time to time, the Trustee, after consultation with the TAC, may set additional Supplemental Payment Percentages.  All Supplemental Payment Percentages shall be implemented after the Trustee determines that the Trust shall continue to be in a financial position to pay holders of similar Allowed Trust Claims in substantially the same manner.

(b)     The Trust shall not be obligated to make any distribution to a Beneficiary if the amount of the distribution would be less than $[100.00] and the distribution to such Beneficiary shall be suspended for future payment.  At such time as the amount of a current distribution plus all suspended distributions to a Beneficiary shall aggregate in excess of $[100.00], then the Trust shall direct the payment of such aggregate distribution to the Beneficiary, subject to Section 4.5(c) below.

(c)     Notwithstanding anything herein or in the TDPs, the Trustee reserves all powers expressly granted to him or her by the Plan and the Confirmation Order with respect to the administration of Trust Claims.

11

Section 4.4    _Manner of Payment._Distributions from the Trust to the Beneficiaries may be made by the Trustee on behalf of the Trust or by a disbursing agent retained by the Trust to make distributions on behalf of the Trust.

Section 4.5    _Delivery of Distributions._

(a)    Distributions shall be payable to the Beneficiary (or to counsel for the Beneficiary) on the date approved for distribution by the Trustee (the "**Distribution Date**") in accordance with the terms of the Trust Documents, including the TDPs. With respect to each Approved Trust Claim approved for payment, distributions shall be made only after the Trustee has determined that all obligations of the Trust with respect to each such Allowed Trust Claim have been satisfied.  In the event that any distribution to a Beneficiary is returned as undeliverable, no further distribution to such Beneficiary shall be made unless and until the Trustee has been notified of the then current address of such Beneficiary, at which time such distribution shall be made to such Beneficiary without interest; provided, however, that all distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date.  After such date, (i) all unclaimed property or interests in property shall revert to the Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), (ii) the Trust Claim of such Beneficiary shall be released, settled, compromised and forever barred as against the Trust, and (iii) all unclaimed property interests shall be distributed to other Beneficiaries in accordance with the Trust Documents, as if the Trust Claim of such Beneficiary had been disallowed as of the date the undeliverable distribution was first made.  The Trustee shall take reasonable efforts to obtain a current address for any Beneficiary with respect to which any distribution is returned as undeliverable.

(b)    No Trust Asset or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

(c)    Notwithstanding any provision in the Trust Documents to the contrary, no payment shall be made to any Beneficiary on account of any Allowed Trust Claim if the Trustee determines that the costs of making such distribution is greater than the amount of the distribution to be made.

Section 4.6    _Medicare Reimbursement and Reporting Obligations._

(a)    The Trust shall register as an RRE under the reporting provisions of section 111 of the MMSEA.

(b)    The Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust.  The Trust, in its capacity as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)    Before making distributions to Beneficiaries (or Beneficiaries' counsel), in respect of any Allowed Trust Claim, the Trustee shall obtain a certification that said Beneficiary (or such Beneficiary's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Allowed Trust Claim.

# ARTICLE 5.
## TRUSTEE; DELAWARE TRUSTEE

Section 5.1    _Number of Trustees._ In addition to the Delaware Trustee appointed pursuant to Section 5.11 hereof, there shall be one (1) Trustee.  The initial Trustee shall be [                    ].  For the avoidance of doubt, there shall be at least one (1) Trustee serving at all times (in addition to the Delaware Trustee).

Section 5.2    _Term of Service, Successor Trustee._

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) below, (iii) his or her removal pursuant to Section 5.2(c) below, and (iv) the termination of the Trust pursuant to Section 7.2 below.

(b)    The Trustee may resign at any time upon written notice to the TAC with such notice filed with the Bankruptcy Court.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by consent of the TAC in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard.  Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder.  For the avoidance of doubt, any removal of the Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

Section 5.3    _Appointment of Successor Trustee._

(a)    In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any successor Trustee, such vacancy shall be filled by the TAC as set forth herein. The TAC will nominate an individual to serve as successor Trustee.  If the majority of the TAC then in office agree upon a successor Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Trustee.  In the event that a majority of the TAC then in office cannot agree on a successor Trustee, the matter will be resolved pursuant to Section 7.16 below.

(b)     Immediately upon the appointment of any successor Trustee pursuant to Section 5.3(a) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) above, (iii) his or her removal pursuant to Section 5.2(c) above, and (iv) the termination of the Trust pursuant to Section 7.2 below.

Section 5.4     *Trust Meetings.*

(a)     **Regular Meeting**.  The Trustee shall hold regular Trust meetings with the TAC not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Trustee.  For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustee contemplated by this Section 5.4.

(b)     **Special Meetings**.  Special meetings of the Trustee may be called by the Trustee by giving written notice to the TAC not less than one (1) Business Day prior to the date of the meeting.  Any such notice shall include the time, place, and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication.  Notice shall be addressed or delivered to the address as shown upon the records of the Trust or as may have been given to the Trustee for purposes of notice.  Notice by overnight courier shall be deemed to have been given one (1) Business Day after the time that written notice is provided to such overnight courier.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)     **Participation in Meetings by Telephone Conference**.  The Trustee may convene, and persons may participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another. Participation in a meeting pursuant to this Section 5.4(c) shall constitute presence in person at such meeting.

(d)     **Waiver of Notice**.  Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting shall constitute a waiver of notice of such meeting. Neither the business to be transacted at, nor the purpose of, any Trust meeting need be specified in any waiver of notice.

(e)     **Adjournment**.  A meeting may be adjourned by the Trustee to another time and place.

Section 5.5     *Compensation and Expenses of Trustee.*The Trustee shall receive compensation from the Trust for his or her services as Trustee. The initial amount of the Trustee's compensation

shall be $[     ] per month for the year ended December 31, 2024, and shall be adjusted annually thereafter (at a per month rate) in accordance with the Trustee's customary compensation practices, subject to the consent of the TAC, which consent shall not be unreasonably withheld or delayed. The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by the Trustee in the course of carrying out his or her duties as Trustee in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trust.  The amounts paid to the Trustee for compensation and expenses shall be disclosed in the Annual Report.

Section 5.6   _Trustee's Independence._

(a)     The Trustee shall not, during his or her service, hold a financial interest in, act as attorney or agent for or serve as any other professional for the Debtor or its affiliated persons. No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a Trust Claim in the Chapter 11 Case.  For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)     The Trustee, and the Delaware Trustee, shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)     Persons dealing with the Trust, the Trustee, and the Delaware Trustee with respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust, the Trustee or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustee, the Delaware Trustee, the Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

Section 5.7   _Standard of Care; Exculpation._

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean the Trustee, the Delaware Trustee, the members of the TAC, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors, or professionals (collectively, the "**Trust Indemnified Parties**").

(b)     No Trust Indemnified Party shall be liable to the Trust, any other Trust Indemnified Party, any Beneficiary or any other Person for any damages arising out of the creation, operation, administration, enforcement or termination of the Trust, except in the case of such Trust Indemnified Party's willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.  To the fullest extent permitted by applicable law, the Trust Indemnified Parties shall have no liability for any action in performance of their duties under this Trust Agreement taken in good faith with or without the advice of counsel, accountants, appraisers and other professionals retained by the Trust Indemnified Parties.  None of the provisions of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their respective rights and powers.  Any Trust Indemnified Party may

rely, without inquiry, upon writings delivered to it under any of the Trust Documents, which the Trust Indemnified Party reasonably believes to be genuine and to have been given by a proper person. Notwithstanding the foregoing, nothing in this Section 5.7 shall relieve the Trust Indemnified Parties from any liability for any actions or omissions arising out of the willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction; provided that in no event will any such person be liable for punitive, exemplary, consequential or special damages under any circumstances. Any action taken or omitted by the Trust Indemnified Parties with the approval of the Bankruptcy Court, or any other court of competent jurisdiction, will conclusively be deemed not to constitute willful misconduct, bad faith, or fraud.

(c)     The Trust Indemnified Parties shall not be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any Person in connection with the affairs of the Trust or for any liabilities or obligations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud, and all Persons claiming against the Trust Indemnified Parties, or otherwise asserting claims of any nature in connection with affairs of the Trust, shall look solely to the Trust Assets for satisfaction of any such claims.

(d)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood and agreed by the parties hereto and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties, provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee, the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.7 and its subparts.

(e)     The Trust Indemnified Parties shall be indemnified to the fullest extent permitted by law by the Trust against all liabilities arising out of the creation, operation, administration, enforcement or termination of the Trust, including actions taken or omitted in fulfillment of their duties with respect to the Trust, except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(f)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

Section 5.8     _Protective Provisions._

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.8.

(b)     In the event the Trustee retains counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all

communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder.  A successor to any Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege.  No Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustee has duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Beneficiaries, it is hereby understood and agreed by the Parties and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustee, provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.7 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.

(e)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties, and powers hereunder.

(f)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

Section 5.9     *Indemnification.*

(a)     Without the need for further court approval, the Trust hereby indemnifies, holds harmless, and defends the Trust Indemnified Parties in the performance of their duties hereunder to the fullest extent that a trust, including a statutory trust organized under the laws of the State of Delaware, is entitled to indemnify, hold harmless and defend such persons against any and all liabilities, expenses, claims, damages or losses (including attorneys' fees and costs) incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to or after the Effective Date in connection with the formation, establishment, funding or operations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by final order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)      The Trustee shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)      The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

Section 5.10   _Bond._ The Trustee and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 5.11   _Delaware Trustee._

(a)      There shall at all times be a Delaware Trustee.  The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware, or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder.  The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)      The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein.

18

The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act.  There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for the acts or omissions of the Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, or fraud.  The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.  The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 5.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee, provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 5.11(d) below, provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee.  If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees

and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement.  The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement.  The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee.  The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument, or document, other than this Trust Agreement.  Neither the Delaware Trustee nor any of its directors, officers, employees, agents, or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Trust, the Trustee, or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party.  The Delaware Trustee may assume performance by all such persons of their respective obligations.  The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person.  The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not, be regarded as making nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or

20

governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(i)      In no event shall the Delaware Trustee be responsible or liable for any action taken in good faith, errors in judgement or any special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Delaware Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(j)      The Delaware Trustee is hereby authorized to take such action as the Trustee specifically directs in written instructions delivered to the Delaware Trustee and shall have no liability for acting in accordance therewith. The Delaware Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

(k)      Notwithstanding anything herein to the contrary, the Delaware Trustee shall not be required to take any action that is in violation of applicable law.

(l)      The Corporate Transparency Act (31 U.S.C § 5336) and its implementing regulations (collectively, the "**CTA**"), may require the Trust to file reports with the Financial Crimes Enforcement Network ("**FinCEN**") from time to time.  It shall be the Trustee's duty and not the Delaware Trustee's duty to cause the Trust to make such filings, as applicable, and to cause the Trust to comply with its obligations under the CTA, if any.  The parties hereto acknowledge that the Delaware Trustee acts solely as a directed trustee at the direction of the Trustee hereunder and that the Trustee is and shall deemed to be the party with the power and authority to exercise substantial control over the Trust.

Section 5.12   _Meeting Minutes_. The minutes of Trust meetings shall be kept in written form (which may be electronic) at such place or places designated by the Trustee.

Section 5.13   _Matters Requiring Consultation with TAC_. The Trustee shall consult with the TAC on each of the following:

(a)      The form(s) of acceptance and release to be executed by a Beneficiary for an Expedited Distribution and for a Personal Injury Claim and an Indirect Claim;

(b)      An annual estimate of the budget for the Trust Operating Expenses;

(c)      The determination of the Initial Payment Percentage, any subsequent adjustment to the Initial Payment Percentage, and any Supplemental Payment Percentage; and

(d)      The form and substance of the questionnaire required in connection with a Trust Claim Submission under the TDPs.

Section 5.14    *Matters Requiring Consent of TAC*. The Trustee shall obtain the consent of the TAC, or, otherwise, Bankruptcy Court approval in the event of a dispute in accordance with Section 7.16 hereof, for the items listed below:

(a)    Any proposed modification to the indemnification provisions of the Trust Agreement;

(b)    Any proposed sale, transfer or exchange of Trust Assets above $[     ] (any proposed sale of Trust Assets below such amount shall not require TAC consent);

(c)    Any proposed material modifications to the Trust Agreement and/or the TDPs, if and as required by the consent provisions set forth therein;

(d)    Any proposed removal of the Trustee in accordance with Section 5.2(c);

(e)    Any proposed extension of the deadlines set forth in the TDPs; and

(f)    Any proposed modification to the compensation of the Trustee after December 31, 2024.

The consent of the TAC shall not be unreasonably withheld, conditioned, or delayed.

Section 5.15    *Trustee's and TAC's Employment of Professionals.*

(a)    The Trustee may, but is not required to, retain and/or consult accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed appropriate by the Trustee to assist in matters for the Trust within the Trustee's purview (the "**Trust Professionals**").

(b)    The TAC may, but is not required to, retain and/or consult, legal counsel and such other parties deemed appropriate by the TAC to assist in matters within the TAC's purview (the "**TAC Professionals**"), provided that no TAC Professionals may be retained to act on behalf of any holder of a Trust Claim.  The Trust shall promptly reimburse, or pay directly if so requested, the TAC for all reasonable and documented fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder.

**ARTICLE 6.**
**TRUST ADVISORY COMMITTEE**

Section 6.1    *Members; Action by Members.*The TAC shall be composed of [●] members appointed to represent the interests of holders of Trust Claims.  The initial TAC members shall be the following: [●].  Except as otherwise set forth in the Trust Documents, the TAC shall act by majority vote of TAC members then serving, <u>provided</u>, <u>however</u>, the TAC may continue to act in

the event of one or more vacancies on the TAC, in which case majority vote of the TAC members then serving shall be required for action by the TAC.

Section 6.2      *Duties.* The members of the TAC shall serve in a fiduciary capacity representing holders of Trust Claims.  The TAC shall not have any fiduciary duties or responsibilities to any party other than holders of Trust Claims.  Except for the duties and obligations expressed in this Trust Agreement and the TDPs, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Trust, the other parties hereto, or any Beneficiary, such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the TDPs.

Section 6.3      *TAC Information Rights*. The TAC shall have reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any), and information available to the Trustee, which access shall be made available as determined by the Trustee in his or her discretion.

Section 6.4      [Reserved.]

Section 6.5      *Term of Office.*

(a)      Each member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) below, (iii) his or her removal pursuant to Section 6.5(c) below, and (iv) the termination of the Trust pursuant to Section 7.2 below.

(b)      A member of the TAC may resign at any time by written notice to the other members of the TAC and the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)      A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the member of the TAC has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings. Such removal shall require the majority vote of the other members of the TAC and such removal shall take effect only upon the approval of the Bankruptcy Court.

Section 6.6      *Appointment of Successor.*

(a)      In the event of a TAC member vacancy, the remaining TAC members shall propose an individual as successor, subject to the approval of the Trustee, which approval may not be unreasonably withheld.  In the event a successor TAC member is not appointed within sixty (60) days following the occurrence of such vacancy, the Bankruptcy Cour may appoint a successor TAC member upon motion of the Trustee.

(b)     Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) above, (iii) his or her removal pursuant to Section 6.5(c) above, and (iv) the termination of the Trust pursuant to Section 7.2 below.

(c)     No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member.  No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 6.7     *Compensation and Expenses of the TAC.* The members of the TAC shall not be entitled to compensation for their services but shall be reimbursed promptly for all reasonable and documented ordinary and customary out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, subject to the limitation of Section 7.16 below.  The Trust shall include a description of the amounts paid under this Section 6.7 in the Annual Report to be filed with the Bankruptcy Court and posted on the Trust's Website.

Section 6.8     *Procedures for Consultation with and Obtaining the Consent of the TAC.*

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the TAC pursuant to Section 5.13 above, the Trustee shall provide the TAC with written advance notice of the matter under consideration, to the extent practicable, and with all relevant information and documents concerning the matter as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the consultants and other advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee, to the extent practicable.

(ii)     In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 6.8(a), the Trustee shall take into consideration the time required for the TAC to meet and consult as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least five (5) Business Days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived in writing by the TAC or at a meeting where the TAC and Trustee are present, or the Trustee determines in his reasonable discretion that definitive action is required earlier.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to the Trust Documents, the Trustee shall provide the TAC with a written notice stating that its consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the

proposed action as is requested by the TAC and as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust consultants and other advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     For matters requiring the consent of the TAC:

(A)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee, in writing, of its consent or its objection to the proposed action within five (5) Business Days of receiving the original request for consent from the Trustee, unless the Trustee extends the time for such response. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee, in writing, of its consent or its objections to the action within five (5) Business Days of receiving notice regarding such request (or within such additional time as may be granted by the Trustee in his or her discretion), the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(B)     If, after following the procedures specified in this Section 6.8(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 7.16 below, provided, however in that event the TAC shall have the burden of proof to show the validity of the TAC's objection.

## ARTICLE 7.
## GENERAL PROVISIONS

Section 7.1     _Irrevocability._ To the fullest extent permitted by applicable law, the Trust is irrevocable. The Settlor shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) have any rights or role with respect to the management or operation of the Trust, or the Trustee's administration of the Trust.

Section 7.2     _Term; Termination._

(a)     The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the following provisions.

(b)     The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Trust because (i) all reasonably expected assets have been collected by the Trust, (ii) all distributions have been made to the extent set forth in the TDPs, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and Trust Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

(c)     Following the dissolution and distribution of the Trust Assets, the Trust shall terminate, and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(d)     After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed, and shall retain the books, records, documents, and files that shall have been delivered to or created by the Trustee until the date required by applicable law.  At the Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of: (i) the first anniversary of the filing of the Certificate of Cancelation of the Trust, and (ii) the date until which the Trustee is required by applicable law to retain such books, records, documents and files.

(e)     If, at the time of the termination of the Trust there remains unclaimed property in such Trust, such property shall be donated by the Trustee to the Anthony H.N. Schnelling Endowment Fund maintained by the American Bankruptcy Institute, to assist in the provision of resources for research and education, provided that such fund is a tax-exempt entity in good standing under applicable laws.

(f)     Upon termination of the Trust and accomplishment of all activities described in this agreement, the Trustee and its professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Trustee or his agents or representatives).  The Trustee may, at the expense of the Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

Section 7.3     *Outgoing Trustee Obligations*. In the event of the resignation or removal of the Trustee, the resigning or removed Trustee shall:

(a)     execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

(b)     deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee;

(c)     otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee; and

(d)     irrevocably appoint the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place, and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust

Agreement.  Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment.  The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

Section 7.4    *Taxes*.

(a)    The Trust is intended to qualify as a "qualified settlement fund" within the meaning of the QSF Regulations.

(b)    The Trustee shall be the "administrator" of the Trust within the meaning of the QSF Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust, if any, out of the Trust Assets, which assets may be sold by the Trustee to the extent necessary to satisfy tax liabilities of the Trust, (ii) comply with all applicable tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of Trust as a qualified settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(c)    As soon as reasonably practicable after the Effective Date, but in no event later than one hundred twenty (120) days thereafter, the Trust shall make a good faith valuation of the Aggregate Settlement Consideration and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes.  In connection with the preparation of the valuation contemplated hereby, the Trust shall be entitled to retain such professionals and advisors as the Trustee shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as he or she determines to be appropriate or necessary.

(d)    The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed or paid for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect such tax information (including tax identification numbers) as in his or her sole discretion is deemed necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement.  In order to receive distributions, all Beneficiaries shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes.  The Trustee may refuse to make a payment or distribution unless or until such information is delivered; provided, however, that, upon the delivery of such information, the Trustee shall make such delayed payment or distribution, without interest.  Notwithstanding the foregoing, if a person fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Trust.  In no event shall any escheat to any federal, state or local government or any other entity.

Section 7.5      _Modification._

(a)      Material modifications to this Trust Agreement, including Exhibits hereto, may be made only with the consent of the Trustee, the TAC (which consent in each case shall not be unreasonably withheld, conditioned or delayed) and subject to the approval of the Bankruptcy Court; provided, however, that the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make minor corrective or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement, provided such minor corrective or clarifying amendments shall not take effect until ten (10) days after notice to the Bankruptcy Court.  Except as permitted pursuant to the preceding sentence, the Trustee shall not modify this Trust Agreement in any manner that is inconsistent with the Plan or the Confirmation Order without the approval of the Bankruptcy Court.  The Trustee shall file notice of any modification of this Trust Agreement with the Bankruptcy Court and post such notice on the Trust Website.

(b)      Notwithstanding subsection (a) of this Section 7.5, no material modifications may be made to this Section 7.5 of this Trust Agreement without the consent of the Trustee, the unanimous consent of the TAC, and subject to the approval of the Bankruptcy Court.

(c)      Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) the Trust's qualified settlement fund status under the QSF Regulations, or (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee.

Section 7.6      _Communications._The Trustee shall establish and maintain the Trust Website and post on the Trust Website the information required by this Trust Agreement, and such other information as the Trustee determines.

Section 7.7      _Severability._If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 7.8      _Notices._Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing

or by electronic transmittal to each of the other parties listed below in compliance with the terms hereof.

To the Trustee:

with a copy (which shall not constitute notice) to:

To the Delaware Trustee:

with a copy (which shall not constitute notice) to:
To the TAC:

All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

Section 7.9      *Successors and Assigns*. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Trustee, the TAC, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of the Trust and the Trustee, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.11 above.

Section 7.10     *Limitation on Transferability; Beneficiaries' Interests*. The Beneficiaries' interests in the Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on distributions;

and (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, the Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, the Beneficiaries shall have an undivided beneficial interest only in cash assets of but only to the extent such cash assets are declared by the Trustee to be distributable as distributions in accordance with the Trust Documents. For the avoidance of doubt, the Beneficiaries shall have only such rights as expressly set forth in the Trust Documents.

Section 7.11    *Exemption from Registration*. The Parties hereto intend that the rights of the Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

Section 7.12    *Entire Agreement; No Waiver*. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

Section 7.13    *Headings*. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

Section 7.14    *Governing Law*. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware

Trustee, the TAC, or the FCR set forth or referenced in this Trust Agreement.  12 Del. C. § 3540 shall not apply to the Trust.

Section 7.15     *Dispute Resolution.*

      (a)     Except as provided in Section 5.2(c) (Removal of Trustee for Cause), the dispute resolution procedures of this Section 7.16 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto (other than the Delaware Trustee), and the Beneficiaries hereof, arising under or with respect to this Trust Agreement.  For the avoidance of doubt, this section does not apply to the Delaware Trustee in any respect.

      (b)     **Informal Dispute Resolution**.  Any dispute under this Trust Agreement shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**").  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed fifteen (15) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties.  If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

      (c)     **Formal Dispute Resolution**.  If the Trustee and TAC consent, a dispute hereunder may be resolved by alternative dispute resolution.

      (d)     **Judicial Review**.  The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.7 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute.  The motion must be filed within seven (7) days of receipt of the last counterparty's statement of position pursuant to the preceding subparagraph.  The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation, and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Trust. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court. In the case of any dispute pursuant to this Section 7.16(d), if the dispute arose pursuant to the consent provisions of Section 5.14 or Section 7.5, the Court shall initially determine, by a preponderance of the evidence, whether the party or parties who withheld consent were reasonable in such action.  If the Court so determines, then the Court will determine whether the requested action is in the best interests of the Trust and its Beneficiaries.

      (e)     Notwithstanding anything to the contrary in this Trust Agreement, the Trust shall bear the reasonable costs and expenses of the TAC in connection with any dispute that arises under this Trust Agreement.

Section 7.16   _Waiver of Jury Trial_. Each party hereto and each Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

Section 7.17   _Effectiveness_. This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

Section 7.18   _Counterpart Signatures_. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.  A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email, or other means of electronic transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

_[SIGNATURE PAGES TO FOLLOW]_

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

SETTLOR:

TRUSTEE:

DELAWARE TRUSTEE:

TAC MEMBER:

TAC MEMBER:

TAC MEMBER:

TAC MEMBER:

TAC MEMBER:

*[Signature Page to Trust Agreement]*

**EXHIBIT 1**
**AGGREGATE SETTLEMENT CONSIDERATION**

**EXHIBIT 2**
**CERTIFICATE OF TRUST**

**EXHIBIT 3**
**TRUST DISTRIBUTION PROCEDURES FOR PERSONAL INJURY CLAIMS**

**EXHIBIT 4**
**TCC PROFESSIONAL FEE ESCROW ACCOUNT**

**EXHIBIT 5**
**INVESTMENT GUIDELINES**

**Exhibit D**

**Form of GUC Trust Agreement**

**TEHUM GUC LIQUIDATING TRUST AGREEMENT**

**Dated as of \_\_\_, 2024**

**PURSUANT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE TORT CLAIMANTS' COMMITTEE, OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR FOR TEHUM CARE SERVICES, INC.**

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ...................................................................2

    1.1        Creation and Name ..............................................................2
    1.2        Purposes ............................................................................2
    1.3        Transfer of Assets ..............................................................2
    1.4        Acceptance of Assets and Assumption of Liabilities ...................3
    1.5        Receipt of Proceeds ...........................................................3
    1.6        Beneficiaries .....................................................................3
    1.7        Jurisdiction .......................................................................4

ARTICLE II POWERS, TRUST ADMINISTRATION, AND REPORTING ...............4

    2.1        Powers ..............................................................................4
    2.2        General Administration .......................................................6
    2.3        Claims Administration ........................................................6
    2.4        Reporting ..........................................................................6

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS ...........................7

    3.1        Accounts ...........................................................................7
    3.2        Investment Guidelines ........................................................7
    3.3        Payment of Operating Expenses ...........................................8

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE .............................................9

    4.1        Number ............................................................................9
    4.2        Term of Service .................................................................9
    4.3        Compensation and Expenses of the Trustee ............................10
    4.4        Standard of Care; Exculpation ............................................11
    4.5        Protective Provisions .........................................................11
    4.6        Indemnification ................................................................12
    4.7        Trustee Independence ........................................................13
    4.8        No Bond ..........................................................................13
    4.9        Reliance by the Trustee ......................................................13
    4.12      Delaware Trustee ..............................................................14
    4.13      Trust Meetings ..................................................................16
    4.14      Matters Requiring Consultation with TAC ..............................17
    4.15      Matters Requiring Consent of TAC .......................................17
    4.16      Trustee's and TAC's Employment of Professionals ...................17

ARTICLE V TAX MATTERS ........................................................................18

    5.1        Treatment of Aggregate Settlement Consideration Transfer ........18
    5.2        Income Tax Status .............................................................18
    5.3        Tax Returns ......................................................................18
    5.4        Withholding of Taxes and Reporting Related to GUC Trust Operations ...19
    5.5        Valuation .........................................................................19
    5.6        Expedited Determination of Taxes ........................................20

i

ARTICLE VI ..................................................................................................................20

    6.1       Members; Action by Members. ......................................................................20
    6.2       Duties. ...........................................................................................................20
    6.3       TAC Information Rights ................................................................................20
    6.4       [Reserved.] ...................................................................................................20
    6.5       Term of Office. .............................................................................................20
    6.6       Appointment of Successor .............................................................................21
    6.7       Compensation and Expenses of the TAC. .....................................................21
    6.8       Procedures for Consultation with and Obtaining the Consent of the TAC. 21

ARTICLE VII GENERAL PROVISIONS .......................................................................23

    7.1       Irrevocability ................................................................................................23
    7.2       Term; Termination. .......................................................................................23
    7.3       Amendments .................................................................................................23
    7.4       Severability ..................................................................................................24
    7.5       Notices. .........................................................................................................24
    7.6       Successors and Assigns ................................................................................25
    7.7       Limitation on GUC Trust Interests for Securities Laws Purposes .............25
    7.8       Exemption from Registration .......................................................................25
    7.9       Entire Agreement; No Waiver ......................................................................25
    7.10     Headings. ......................................................................................................25
    7.11     Governing Law .............................................................................................25
    7.12     Dispute Resolution .......................................................................................26
    7.13     Effectiveness ................................................................................................27
    7.14     Counterpart Signatures .................................................................................27

## TEHUM GUC LIQUIDATING TRUST AGREEMENT

This Tehum GUC Liquidating Trust Agreement (this "**Trust Agreement**"), dated as of [ ], 2024, and effective as of the Effective Date, is entered into pursuant to the *Joint Chapter 11 Plan of Reorganization of the Tort Claimants' Committee, Official Committee of Unsecured Creditors and Debtor for Tehum Care Services, Inc.,* dated [ ], 2024 (as may be further amended or modified, the "**Plan**"),[1] by Tehum Care Services, Inc., (the "**Debtor**"), [ ] as trustee (together with any successor serving in such capacity, the "**Trustee**"); Wilmington Trust, National Association (the "**Delaware Trustee**"); and the members of the Trust Advisory Committee who are the individuals further identified on the signature pages hereto (together with any successors serving in such capacity, the "**TAC**").

## RECITALS

(A)     Contemporaneously with the execution of this Trust Agreement, Debtor will have reorganized under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the United States Bankruptcy Court for the Southern District of Texas ("**Bankruptcy Court**"), administered and known as *In re: Tehum Care Services, Inc.*, Case No. 23-90086 (CML) (the "**Chapter 11 Case**").

(B)     Debtor is executing this Trust Agreement in its capacity as Settlor to implement the Plan and to create the GUC Trust (the "**Trust**") for the benefit of the holders of Channeled GUC Claims and Channeled Indirect GUC Claims (collectively, the "**GUC Trust Claims**").

(C)     The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(D)     The Plan and Confirmation Order provide, among other things, for the creation of the GUC Trust to satisfy the GUC Trust Claims in accordance with this Trust Agreement, the Plan and the Confirmation Order.

(E)     The Bankruptcy Court held in the Confirmation Order that all the prerequisites for the Channeling Injunction have been satisfied, and such Channeling Injunction is fully effective and enforceable as provided in the Plan and Confirmation Order with respect to the GUC Trust Claims.

(F)     The Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded in accordance with the Plan, the Aggregate Settlement Consideration (as defined in Section 1.3), as described in **Exhibit 1** shall be transferred to and vested in the Trust free and clear of all liens, encumbrances, charges, claims, interests or other

---

[1]     All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

liabilities of any kind of the Debtor or its affiliates, any creditor or any other entity, other than as provided in the Channeling Injunction with respect to the GUC Trust Claims.

(G)     The Trustee shall also serve in the capacity of Wind-Down Officer of the Debtor in accordance with the terms of the Confirmation Order, the Plan, and the terms set forth in **Exhibit 2.**

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE I
## AGREEMENT OF TRUST

**1.1     Creation and Name.**  There is hereby created a trust known as the "Tehum GUC Liquidating Trust." The Trustee of the GUC Trust may transact the business and affairs of the GUC Trust in the name of the GUC Trust, and references herein to the GUC Trust shall include the Trustee acting on behalf of the GUC Trust. It is the intention of the parties hereto that the Trust created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§ 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement, including the Exhibits hereto (the Confirmation Order, the Plan and this Trust Agreement, including all Exhibits hereto, collectively, the "**Trust Documents**"), constitute the governing instruments of the Trust.  It is the intention of the Parties that the GUC Trust qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and that this Trust Agreement constitute the governing instrument of the GUC Trust, except with respect to any Disputed Ownership Fund. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 3**.

**1.2     Purposes**.  The purposes of the GUC Trust are to:

(a)     hold, preserve, maximize, and administer the GUC Trust Assets,

(b)     liquidate the GUC Trust Assets,

(c)     administer, process, settle, resolve, liquidate, satisfy, and pay all Allowed Channeled GUC Trust Claims in a fair, consistent, and equitable manner in accordance with the terms of the GUC Trust Documents and the Plan, and

(d)     Be responsible for the Retained Causes of Action (on behalf of itself and its beneficiaries as well as on behalf of the PI/WD Trust and its beneficiaries, subject to the provisions and consent rights of the PI/WD Trust, as set forth in **Article IV.J** of the Plan, with the net proceeds of such Retained Causes of Action to be split between the PI/WD Trust and the GUC Trust on a 50/50 basis.

**1.3     Transfer of Assets.**Pursuant to the Plan, on the Effective Date, the Trust will receive and hold all right, title and interest in and to the consideration described in Article IV.D of the Plan and set forth on **Exhibit 1** hereto (the "**Aggregate Settlement Consideration**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the

"**Trust Assets**").[2]  The Aggregate Settlement Consideration shall be transferred to the Trust free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or its affiliates, any creditor or any other person or entity, other than as provided in the Channeling Injunction with respect to the GUC Trust Claims.  The Debtor shall execute and deliver such documents to the Trust as the Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Aggregate Settlement Consideration to the Trust.

### 1.4     Acceptance of Assets and Assumption of Liabilities.

(a)     In furtherance of the purposes of the GUC Trust, the GUC Trust hereby expressly accepts the transfer to the GUC Trust of the Aggregate Settlement Consideration in the time and manner as, and subject to the terms, contemplated in the Plan.

(b)     In furtherance of the purposes of the GUC Trust, except as otherwise provided in this Trust Agreement or the Plan, the GUC Trust shall have and retain any and all rights and defenses the Debtor had with respect to any GUC Trust Claims immediately before the Effective Date to the extent necessary to administer such Claims in accordance with this Trust Agreement and the Plan.

(c)     Notwithstanding anything to the contrary herein, no provision herein shall be construed or implemented in a manner that would cause the GUC Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(d)     In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### 1.5     Receipt of Proceeds.  The proceeds of any sale of Trust Assets or recoveries from any litigation or claims of the Trust will be deposited in the Trust's accounts and become the property of the Trust.

### 1.6     Beneficiaries.

(a)     The beneficial owners (within the meaning of the Act) of the Trust shall be the holders of allowable GUC Trust Claims (the "**GUC Trust Beneficiaries**").

(b)     The GUC Trust Beneficiaries shall be subject to the terms of this Trust

---

[2]     **Exhibit 1** shall identify: All Assets and Estate Assets allocated to the GUC Trust pursuant to the GUC Trust Agreement and the Plan, as applicable, and in each case, as amended, supplemented, restated, or otherwise modified from time to time, including: (a) 50% of the Settlement Payments; (b) 50% of the ERC Fund; (c) 50% interest in the Retained Causes of Action and the proceeds thereof; (d) Retained GUC Trust Causes of Action; (e) the GUC Insurance Assignment; (f) the GUC Data Transfer; (g) 50% of the Debtor's remaining Assets, including Cash, (h) any other funds or Assets allocated to the GUC Trust under the Plan; and (i) any income, profits, gains, and proceeds realized, received, or derived from GUC Trust Assets.

Agreement and Trust Documents.

**1.7** **Jurisdiction**.  The Bankruptcy Court shall have continuing jurisdiction over the GUC Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the GUC Trust.

<div align="center">

**ARTICLE II**
**POWERS, TRUST ADMINISTRATION, AND REPORTING**

</div>

**2.1** **Powers.**

(a)     The Trustee is and shall act as a fiduciary to the GUC Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the GUC Trust in accordance with the purposes set forth in Section 1.2 above and the Plan. Subject to the limitations set forth in this Trust Agreement and the Plan, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the GUC Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 below, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or as otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the Aggregate Settlement Consideration and exercise all rights with respect thereto;

(ii)     invest the monies held from time to time by the GUC Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)     incur expenses and other obligations of the GUC Trust necessary to carry out the purposes of the GUC Trust in accordance with the Plan, and pay or satisfy such obligations from the GUC Trust as set forth in the Plan;

(iv)     establish such funds, reserves, and accounts within the GUC Trust, as the Trustee deems useful in carrying out the purposes of the GUC Trust including the establishment and administration of the UCC Professional Fee Escrow Account in accordance with **Exhibit 5**;

(v)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the GUC Trust Claims;

<div align="center">4</div>

(vi)     establish, supervise, and administer the GUC Trust and make distributions to GUC Trust Beneficiaries pursuant to the terms of this Trust Agreement and the Plan;

(vii)    appoint such officers and retain such consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the GUC Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(viii)   pay reasonable compensation from the GUC Trust for any of the GUC Trust's consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the GUC Trust requires;

(ix)     pay reasonable compensation from the GUC Trust for the Trustee, the Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(x)      compensate the Trustee, and any professionals with whom the Trustee has consulted prior to the Effective Date, for services, costs and expenses incurred prior to the Effective Date;

(xi)     enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the GUC Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

(xii)    in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xiii)   commence and pursue the Retained Preference Actions, and manage and administer any proceeds thereof in accordance with the Plan; and

(xiv)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)     The GUC Trust shall not have the power to guarantee any debt of other persons.

(e)        The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the GUC Trust.

(f)        The Trustee shall consult with the TAC on the matters set forth in Section 4.14 below.  The Trustee shall obtain the consent of the TAC prior to taking action with respect to the matters as set forth in Section 4.15 below, as and to the extent set forth therein.

## 2.2        General Administration.

(a)        The Trustee shall act in accordance with the Trust Documents. In the event of a conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)        The Trustee shall (i) timely file such tax returns and pay any taxes imposed on the GUC Trust in accordance with Section 5.3, (ii) comply with all applicable reporting and withholding obligations in accordance with Section 5.4, (iii) satisfy all requirements necessary to qualify and maintain qualification of the GUC Trust as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund, and (iv) take no action that could cause the GUC Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(c)        Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his position as such.

2.3        **Claims Administration**.  In accordance with the terms set forth in Exhibit 4, the Trustee shall administer, dispute, object to, compromise, or otherwise resolve all GUC Trust Claims.

## 2.4        Reporting.

(a)        The Trustee shall timely prepare, file and distribute such statements, reports and submissions to the extent required by applicable law.

(b)        The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the GUC Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants.  The Annual Report shall be made available to the GUC Trust Beneficiaries by means of actual notice, provided, however, the Trustee may post the Annual Report on a website maintained by the GUC Trust in lieu of actual notice to each GUC Trust Beneficiary (unless otherwise required by law) (the "**Website**").

**ARTICLE III**
**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

3.1     **Accounts.**

(a)     The Trustee shall maintain one or more accounts (the "**Trust Accounts**") on behalf of the GUC Trust with one or more financial depository institutions (each a "**Financial Institution**").

(b)     Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Debtor or its affiliated persons. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(c)     The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a) above.

(d)     The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the GUC Trust Beneficiaries and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and, except as specifically designated as such in accordance with the provisions of Section 5.3(c) below, are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

(e)     The Trustee shall establish a separate subaccount of the Trust to receive funds designated under the Plan for the UCC Professional Fee Escrow Account, which shall be administered exclusively in accordance with the terms set forth on Exhibit 5 hereto.

3.2     **Investment Guidelines.**

(a)     The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 6** (the "**Investment Guidelines**").

(b)     In the event the GUC Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Trust Documents. This Section 3.2(b) is intended to modify the application to the GUC Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)     Cash proceeds received by the GUC Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the GUC Trust as set forth in Section 1.2 above.

**3.3     Payment of Operating Expenses.**

All operating expenses of the GUC Trust shall be paid from the GUC Trust as provided in the Plan.  None of the Trustee, Delaware Trustee, the TAC, the GUC Trust Beneficiaries, nor any of their officers, agents, advisors, professionals, or employees shall be personally liable for the payment of any operating expense or other liability of the GUC Trust. Distributions to GUC Trust Beneficiaries.

(a)     The Trustee will make distributions to GUC Trust Beneficiaries in a fair, consistent and equitable manner in accordance with this Trust Agreement, the Plan and the Confirmation Order.

(b)     Distributions to GUC Trust Beneficiaries shall be made, as determined by the Trustee in his or her discretion subject to the terms of the Plan, provided, however, the GUC Trust must distribute at least annually to the GUC Trust Beneficiaries its net income plus all net proceeds from the sale of assets, except that the GUC Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims and contingent liabilities (including disputed claims).

(c)     The GUC Trust may withhold or deduct from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding in accordance with Section 5.4 below). Any Trust Assets which are undistributable in accordance with this Section 3.3 as of the termination of the GUC Trust shall (i) revert to the GUC Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary); (ii) the GUC Trust Claim with respect to such undistributable amount shall be released, settled, compromised and forever barred, and (iii) the undistributable amount shall be reallocated to the other GUC Trust Claims, in accordance with provisions of the Plan and this Trust Agreement.

(d)     The Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to GUC Trust Beneficiaries; provided, however, that such distribution agent shall have no greater authority than, and shall be subject to the same restrictions as, the Trustee under this Trust Agreement.

(e)     Subject to Bankruptcy Rule 9010, any distribution to a GUC Trust Beneficiary shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) at the address set forth in any written notices of address changes delivered to the Trustee after the date of any related proof of Claim; or (3) at the address reflected in the schedules if no proof of Claim is filed with the Trustee (as to GUC Trust Claims administered by the GUC Trust) and the Trustee has not received a written notice of a change of address.  Except as set forth in the Plan, if any GUC Trust Distribution or other communication from the GUC Trust is returned as undeliverable, no further GUC Trust Distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address.  Undeliverable GUC Trust Distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a GUC Trust Distribution becomes deliverable or (ii) such undeliverable GUC Trust Distribution becomes an Unclaimed Distribution pursuant to the provisions of the Plan and this Trust Agreement.  Except

as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any GUC Trust Beneficiary.

(f)     After final GUC Trust Distributions have been made in accordance with the Plan, the Confirmation Order and this Trust Agreement, and adequate provision has been made for all final obligations of the GUC Trust, the Trustee shall have the authority to direct the remaining Trust Assets to a tax-exempt organization as selected by the Trustee in his or her discretion.

(g)     Checks issued to GUC Trust Beneficiaries shall be null and void if not negotiated within one hundred eighty (180) calendar days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Trustee by the GUC Trust Beneficiary to whom such check was originally issued.  Any GUC Trust Claim in respect of such a voided check shall be made within one hundred eighty (180) calendar days after the date of issuance of such check.  If no request is made as provided in the preceding sentence, the check shall be deemed undistributable and shall be subject to the provisions of Section 3.3(c).

(h)     Cash payments to foreign GUC Trust Beneficiaries may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(i)     The Trustee shall have the discretion to determine the timing of GUC Trust Distributions in the most efficient and cost-effective manner possible; provided, however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

(j)     Notwithstanding any provision in the Trust Agreement, the Plan or the Confirmation Order to the contrary, the Trustee, in the Trustee's sole discretion, may decline to make any distribution of $100 or less, due to the economic inefficiency of making a distribution of such a *de minimis* amount.

## ARTICLE IV
## TRUSTEE; DELAWARE TRUSTEE

**4.1**     **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.12 below, there shall be one (1) Trustee who shall be the person named on the signature pages hereof.

**4.2**     **Term of Service.**

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the GUC Trust pursuant to Section 7.2 below.

(b)     The Trustee may resign at any time upon written notice filed with the Bankruptcy Court and delivered to the TAC. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by the consent of the TAC in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean (i) fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony, in each case whether or not connected to the GUC Trust, or (ii) a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder. For the avoidance of doubt, any removal of the Trustee pursuant to this Section 4.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)     In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the TAC as set forth herein. The TAC will nominate an individual to serve as successor Trustee.  If the majority of the TAC then in office agree upon a successor Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Trustee.  In the event that a majority of the TAC then in office cannot agree on a successor Trustee, the matter will be resolved pursuant to Section 7.12 below.

(e)     Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the GUC Trust pursuant to Section 7.2 below.

**4.3     Compensation and Expenses of the Trustee.**

(a)     The Trustee shall be compensated for his or her service as Trustee in the amount of $750 per hour for services in 2024 (subject to annual increases consistent with the Trustee's practice and subject to the consent of the TAC, which consent shall not be unreasonably withheld or delayed), paid monthly.

(b)     The GUC Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder. The GUC Trust will reimburse the Trustee for fees and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date, (such amount not to exceed $50,000), which shall be paid promptly after the Effective Date.

(c)     The GUC Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3.

**4.4**     **Standard of Care; Exculpation.**

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, (iii) the TAC and (iv) the officers, employees, consultants, advisors, and agents of each of the GUC Trust, the Trustee, and the TAC.

(b)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the GUC Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the GUC Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or this Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the GUC Trust.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the GUC Trust or the GUC Trust Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The GUC Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

**4.5**     **Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)     In the event the Trustee retains counsel (including at the expense of the GUC Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. Such attorney-client privilege shall be vested solely in the Trustee, on behalf of the Trust, and not in the TAC, or any other person, committee or subcomponent of the Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a GUC Trust Claim. A successor Trustee shall succeed to and hold

the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(d)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)     In the exercise or administration of the GUC Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**4.6     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the GUC Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust Assets.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the GUC Trust shall be paid by the GUC Trust from the GUC Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the GUC Trust. The Trustee may, in his or her discretion, authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)    The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**4.7**    **Trustee Independence.**  The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Debtor. The Trustee shall not act as an attorney, agent, or other professional for any GUC Trust Beneficiary or any holder of any GUC Trust Claim. For the avoidance of doubt, this Section 4.7 shall not be applicable to the Delaware Trustee.

**4.8**    **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.9**    **Reliance by the Trustee**.  The Trustee may absolutely rely, and shall be fully protected in acting or refraining from acting if he or she relies upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he or she has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.  In the absence of gross negligence, willful misconduct, or fraud in respect of the Trustee's duties as found by a final and non-appealable court of competent jurisdiction, or material breach of this Trust Agreement, the Trustee may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting (or, if applicable, not acting) thereon. The Trustee shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Trust Agreement, the Plan or any other document executed in connection therewith, and the Trustee shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

### 4.12    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.12, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.12(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the GUC Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the GUC Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the GUC Trust or the GUC Trust Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the GUC Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed

by the Trustee in accordance with the terms of Section 4.12(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.12(d) below; provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the GUC Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the GUC Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the GUC Trust and the Delaware Trustee, which compensation shall be paid by the GUC Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the

performance or any action of the GUC Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### 4.13    Trust Meetings.

(a)     **Regular Meeting**. The Trustee shall hold regular Trust meetings with the TAC not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Trustee.  For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustee contemplated by this Section 4.13.

(b)     **Special Meetings**.  Special meetings of the Trustee may be called by the Trustee by giving written notice to the TAC not less than one (1) Business Day prior to the date of the meeting.  Any such notice shall include the time, place, and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication.  Notice shall be addressed or delivered to the address as shown upon the records of the Trust or as may have been given to the Trustee for purposes of notice.  Notice by overnight courier shall be deemed to have been given one (1) Business Day after the time that written notice is provided to such overnight courier.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)     **Participation in Meetings by Telephone Conference**.  The Trustee may convene, and persons may participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another. Participation in a meeting pursuant to this Section 4.13(c) shall constitute presence in person at such meeting.

(d)     **Waiver of Notice**.  Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed

with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting shall constitute a waiver of notice of such meeting. Neither the business to be transacted at, nor the purpose of, any Trust meeting need be specified in any waiver of notice.

(e)     **Adjournment**.  A meeting may be adjourned by the Trustee to another time and place.

**4.14   Matters Requiring Consultation with TAC**. The Trustee shall consult with the TAC on each of the following:

(a)     The form(s) of acceptance and release to be executed by a GUC Trust Beneficiary for an Expedited Distribution or Non-Expedited Distribution, as set forth on Exhibit 4; and

(b)     Any extraordinary circumstance which could have a material impact on the Trust.

**4.15   Matters Requiring Consent of TAC**. The Trustee shall obtain the consent of the TAC, or, otherwise, Bankruptcy Court approval in the event of a dispute in accordance with Section 7.12 hereof, for the items listed below:

(a)     Any proposed modification to the indemnification provisions of the Trust Agreement;

(b)     Any proposed sale, transfer or exchange of Trust Assets above $[    ] (any proposed sale of Trust Assets below such amount shall not require TAC consent);

(c)     Any proposed material modifications to the Trust Agreement, including Exhibit 4 thereto;

(d)     Any proposed removal of the Trustee in accordance with Section 4.2(c); and

(e)     Any proposed modification to the compensation of the Trustee after December 31, 2024.

The consent of the TAC shall not be unreasonably withheld, conditioned, or delayed.

**4.16   Trustee's and TAC's Employment of Professionals.**

(a)     The Trustee may, but is not required to, retain and/or consult accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed appropriate by the Trustee to assist in matters for the Trust within the Trustee's purview.

(b)     The TAC may, but is not required to, retain and/or consult, legal counsel and such other parties deemed appropriate by the TAC to assist in matters within the TAC's purview (the "**TAC Professionals**"), provided that no TAC Professionals may be retained to act on behalf of any holder of a GUC Trust Claim.  The Trust shall promptly reimburse, or pay directly if so requested, the TAC for all reasonable and documented fees and costs associated with the

TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder.

## ARTICLE V
## TAX MATTERS

**5.1    Treatment of Aggregate Settlement Consideration Transfer.**  For all United States federal income tax purposes, all Parties shall treat the transfer of the Settlement Consideration to the GUC Trust as (i) a transfer of the Aggregate Settlement Consideration (subject to any obligations related to those assets) directly to the GUC Trust Beneficiaries, followed by (ii) the transfer by such GUC Trust Beneficiaries of such Aggregate Settlement Consideration to the GUC Trust in exchange for an interest in the GUC Trust (a "**GUC Trust Interest**") (other than the Trust Assets allocable to Disputed Claims and held as a "disputed ownership fund" within the meaning of Section 1.468B-9 of the Treasury Regulations ("**Disputed Ownership Fund**")). Accordingly, the GUC Trust Beneficiaries shall be treated for United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Aggregate Settlement Consideration (other than the Trust Assets allocable to the Disputed Ownership Fund).

**5.2    Income Tax Status.**

(a)    For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and other than as provided pursuant to Section 5.3(c), this GUC Trust shall be treated as a liquidating trust pursuant to Section 301.7701-4(d) of the Treasury Regulations and as a grantor trust pursuant to Sections 671-679 of the IRC. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

(b)    The GUC Trust shall at all times to be administered so as to constitute a domestic trust for United States federal income tax purposes.

**5.3    Tax Returns.**

(a)    In accordance with Section 6012 of the IRC and Section 1.671-4(a) of the Treasury Regulations, the Trustee shall file with the IRS annual tax returns for the GUC Trust on Form 1041 as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations. In addition, the Trustee shall file in a timely manner for the GUC Trust such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. The GUC Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items is respect of any assets allocable to, or retained on account of, the Disputed Ownership Fund) will be allocated to the GUC Trust Beneficiaries in accordance with their relative ownership of GUC Trust Interests.  Within a reasonable time following the end of the taxable year, the GUC Trust shall send to each GUC Trust Beneficiary a separate statement setting forth such GUC Trust Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such GUC Trust Beneficiary to report such items on his/her applicable income tax return.

(b)     The GUC Trust shall be responsible for payment, from the GUC Trust, of any taxes imposed on the GUC Trust (including any taxes imposed on the Disputed Ownership Fund) or the Trust Assets.  In accordance therewith, any taxes imposed on the Disputed Ownership Fund or its assets will be paid from the GUC Trust.

(c)     The Trustee may timely elect to treat any Trust Assets allocable to Disputed Claims to a Disputed Ownership Fund, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a Disputed Ownership Fund election is made, all parties (including the Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.  The GUC Trust shall file all income tax returns with respect to any income attributable to the Disputed Ownership Fund and shall pay from the GUC Trust all U.S. federal, state and local income taxes attributable to such Disputed Ownership Fund based on the items of income, deduction, credit, or loss allocable thereto.

**5.4**     **Withholding of Taxes and Reporting Related to GUC Trust Operations.**  The GUC Trust shall comply with all withholding, deduction and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the GUC Trust shall be subject to any applicable withholding, deduction and reporting requirements. The Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, deduction, payment, and reporting requirements. All amounts properly withheld or deducted from distributions to a GUC Trust Beneficiary as required by applicable law and paid over to the applicable taxing authority for the account of such GUC Trust Beneficiary shall be treated as part of the GUC Trust Distribution to such GUC Trust Beneficiary. To the extent that the operation of the GUC Trust or the liquidation of the Trust Assets creates a tax liability imposed on the GUC Trust, the GUC Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the GUC Trust payable without Bankruptcy Court order. Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All GUC Trust Beneficiaries shall be required to provide any information necessary to effect the withholding and reporting of such taxes. The Trustee may require each GUC Trust Beneficiary to furnish to the GUC Trust (or its designee) its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8BEN, Form W-8BENE-E, or Form W-9) (the "**Tax Documents**"). The Trustee may condition any and all distributions to any GUC Trust Beneficiary upon the timely receipt of properly executed Tax Documents and receipt of such other documents as the Trustee reasonably requests, and in accordance with the Plan. [Notwithstanding any of the foregoing provisions of this Section 5.4, to the extent that any distributions to be made from the GUC Trust that constitute compensation as wages ("**Wage Distributions**"), the GUC Trust shall not bear any liability for the employer portion of any payroll taxes applicable to Wage Distributions, which shall be borne by the Post-Effective Date Debtor.]

**5.5**     **Valuation.**  Within 180 days after the Effective Date, the Trustee shall make a good faith valuation of the Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all United States federal income tax purposes. The Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the GUC Trust that are required by any governmental unit.

5.6      **Expedited Determination of Taxes**.   The Trustee may request an expedited determination of taxes of the GUC Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the termination of the GUC Trust.

<div align="center">

**ARTICLE VI**
**TRUST ADVISORY COMMITTEE**

</div>

6.1      **Members; Action by Members.** The TAC shall be composed of [●] members appointed to represent the interests of holders of GUC Trust Claims.   The initial TAC members shall be the following: [●].   Except as otherwise set forth in the Trust Documents, the TAC shall act by majority vote of TAC members then serving, provided, however, the TAC may continue to act in the event of one or more vacancies on the TAC, in which case majority vote of the TAC members then serving shall be required for action by the TAC.

6.2      **Duties.** The members of the TAC shall serve in a fiduciary capacity representing holders of GUC Trust Claims.   The TAC shall not have any fiduciary duties or responsibilities to any party other than holders of GUC Trust Claims.   Except for the duties and obligations expressed in this Trust Agreement, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.   To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Trust, the other parties hereto, or any Beneficiary, such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement.

6.3      **TAC Information Rights**. The TAC shall have reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any), and information available to the Trustee, which access shall be made available as determined by the Trustee in his or her discretion.

6.4      **[Reserved.]**

6.5      **Term of Office.**

(a)      Each member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) below, (iii) his or her removal pursuant to Section 6.5(c) below, and (iv) the termination of the Trust pursuant to Section 7.2 below.

(b)      A member of the TAC may resign at any time by written notice to the other members of the TAC and the Trustee.   Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)      A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the member of the TAC has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust or a consistent pattern of neglect and failure to perform or

<div align="center">20</div>

to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings. Such removal shall require the majority vote of the other members of the TAC and such removal shall take effect only upon the approval of the Bankruptcy Court.

**6.6    Appointment of Successor.**

(a)    In the event of a TAC member vacancy, the remaining TAC members shall propose an individual as successor, subject to the approval of the Trustee, which approval may not be unreasonably withheld.  In the event a successor TAC member is not appointed within sixty (60) days following the occurrence of such vacancy, the Bankruptcy Cour may appoint a successor TAC member upon motion of the Trustee.

(b)    Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) above, (iii) his or her removal pursuant to Section 6.5(c) above, and (iv) the termination of the Trust pursuant to Section 7.2 below.

(c)    No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member.  No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.7    Compensation and Expenses of the TAC.**The members of the TAC shall not be entitled to compensation for their services but shall be reimbursed promptly for all reasonable and documented ordinary and customary out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, subject to the limitation of Section 7.16 below.  The Trust shall include a description of the amounts paid under this Section 6.7 in the Annual Report to be filed with the Bankruptcy Court and posted on the Trust's Website.

**6.8    Procedures for Consultation with and Obtaining the Consent of the TAC.**

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC pursuant to Section 4.14 above, the Trustee shall provide the TAC with written advance notice of the matter under consideration, to the extent practicable, and with all relevant information and documents concerning the matter as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the consultants and other advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee, to the extent practicable.

(ii)    In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 6.8(a), the Trustee shall take into consideration the time required for the TAC to meet and consult as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least five (5) Business Days

after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived in writing by the TAC or at a meeting where the TAC and Trustee are present, or the Trustee determines in his reasonable discretion that definitive action is required earlier.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to the Trust Documents, the Trustee shall provide the TAC with a written notice stating that its consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is requested by the TAC and as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust consultants and other advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     For matters requiring the consent of the TAC:

(A)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee, in writing, of its consent or its objection to the proposed action within five (5) Business Days of receiving the original request for consent from the Trustee, unless the Trustee extends the time for such response. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee, in writing, of its consent or its objections to the action within five (5) Business Days of receiving notice regarding such request (or within such additional time as may be granted by the Trustee in his or her discretion), the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(B)     If, after following the procedures specified in this Section 6.8(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 7.15 below, provided, however in that event the TAC shall have the burden of proof to show the validity of the TAC's objection.

## ARTICLE VII
## GENERAL PROVISIONS

**7.1**    **Irrevocability**.  To the fullest extent permitted by applicable law, the GUC Trust is irrevocable.

**7.2**    **Term; Termination.**

(a)    The term for which the GUC Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 7.2.

(b)    The Trustee shall make continuing efforts to monetize any non-liquid Trust Assets.

(c)    The Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional Retained Preference Actions is not likely to yield sufficient additional Cash to justify further pursuit of such claims, or (b) all distributions of Cash and other Trust Assets required to be made by the Trustee under the Plan and this Trust Agreement have been made in accordance with provisions of the Plan and this Trust Agreement, provided, however, that in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of any extension period), determines that a fixed period extension is necessary to facilitate or complete the recovery on and liquidation of the Trust Assets (the "**Dissolution Date**").

(d)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the GUC Trust by the Trustee and payment of all of the liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the GUC Trust shall be distributed or disbursed in accordance with Section 3.3 and Section 5.3(c) above.

(e)    Following the dissolution and distribution of the assets of the GUC Trust, the GUC Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the GUC Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the GUC Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

**7.3**    **Amendments**.  Any amendment to or modification of this Trust Agreement may be made in writing and only with the consent of the Trustee, the TAC (which consent in each case shall not be unreasonably withheld, conditioned or delayed) and subject to the approval Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any

requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, neither this Trust Agreement, nor any Exhibit to this Trust Agreement, shall be modified or amended in any way that could jeopardize, impair, or modify the GUC Trust's "liquidating trust" status. Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. Notwithstanding any other provision of this Trust Agreement, no material modifications may be made to this Section 7.5 of this Trust Agreement without the consent of the Trustee, the unanimous consent of the TAC, and subject to the approval of the Bankruptcy Court.

> **7.4**   **<u>Severability</u>**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

> **7.5**   **<u>Notices.</u>**

> > (a)   Notices to GUC Trust Beneficiaries shall be given in accordance with such person's claims form submitted to the GUC Trust.

> > (b)   Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the GUC Trust:


With a copy (which shall not constitute notice) to:


To the Delaware Trustee:


With a copy (which shall not constitute notice) to:

To the TAC:

(c)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

**7.6     Successors and Assigns**.  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the GUC Trust, the Delaware Trustee, the Trustee, the TAC, and their respective successors and assigns, except that neither the GUC Trust, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.12 (d), and in the case of the Trustee in accordance with Section 4.2(d) above.

**7.7     Limitation on GUC Trust Interests for Securities Laws Purposes**.  GUC Trust Interest (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**7.8     Exemption from Registration**.  The Parties hereto intend that the interests of the GUC Trust Beneficiaries under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**7.9     Entire Agreement; No Waiver**.  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**7.10     Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**7.11     Governing Law**.  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to

the GUC Trust, the Trustee, the Delaware Trustee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the TAC, or the Delaware Trustee set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the GUC Trust.

**7.12** **Dispute Resolution**.

(a)     Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 7.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 7.12 shall not apply to the Delaware Trustee in any respect.

(b)     **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing

party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 7.12(d) below.

(d)    **Judicial Review**.   The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.7 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute.  The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph.  The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the GUC Trust.  Each counterparty shall respond to the motion within the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.Notwithstanding anything to the contrary in this Trust Agreement, the Trust shall bear the reasonable costs and expenses of the TAC in connection with any dispute that arises under this Trust Agreement.

7.13    **Effectiveness**.  This Trust Agreement shall become effective on the Effective Date.

7.14    **Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

**TRUSTEE**

_____

**DELAWARE TRUSTEE**

By: _____

**TAC MEMBER**

By:_____

**TAC MEMBER**

By:_____

**TAC MEMBER**

By:_____

**TAC MEMBER**

By:_____

**TAC MEMBER**

By:_____

[Signature Page to GUC Trust Agreement]

**EXHIBIT 1.**
**AGGREGATE SETTLEMENT CONSIDERATION**

Exhibit 1-1

**EXHIBIT 2.**
**DEBTOR WIND-DOWN ADMINISTRATION**

The individual designated as the Trustee under this Trust Agreement shall also perform duties related to the Wind-Down of the Debtor, in his capacity as a Wind-Down Officer. The Wind-Down Officer shall be named as an insured in connection with his role as Wind-Down Officer during the wind down period of the Debtor's Estate or until the termination of the Debtor's corporate or other existence, with such insurance to provide a tail period thereafter for the Wind-Down Officer. In furtherance of the Plan, on the Effective Date, Trustee, in his capacity as Wind-Down Officer, shall periodically consult with the Trustee of the PI/WD Trust, on matters the Wind-Down Officer deems necessary or desirable, on matters concerning the winding down of the Debtor's Estates and upon the request of the PI/WD Trustee.

A.     **Administration of the Wind-Down**. Post-Effective Date the Trustee, in his capacity as Wind-Down Officer, shall administer the responsibilities of the Debtor, including, but not limited to:

(i)      effectuating the process to wind down, dissolve and liquidate the Estates and distribute any remaining assets in accordance with the Plan, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to the Debtor and any direct or indirect subsidiary of a Debtor, if and to the extent necessary, including by terminating the corporate or organizational existence of the Debtor and each such subsidiary.

(ii)     implementing, enforcing, complying with and effectuate, as applicable, all provisions of the Plan and the obligations under the Plan.

(iii)    preparing and filing appropriate tax returns and other reports on behalf of the Debtor and pay taxes or other obligations owed by the Debtor (including, without limitation, any Allowed Administrative Expense Claims and Allowed Priority Tax Claims).

(iv)    entering into and consummating any transactions for the purpose of dissolving the Debtor.

(v)     winding down the affairs of the Debtor, if and to the extent necessary, including establishing any administrative reserves necessary, and taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to the Debtor, including by terminating the corporate or organizational existence of the Debtor.

(vi)    taking such actions as are necessary or appropriate to close any of the Debtor's Chapter 11 Cases.

(vii)   maintaining the books and records and accounts of the Debtor and resolving issues pertaining to the retention or disposal of the books and records of the Debtor.

Exhibit 2-1

(viii)    providing periodic reports and updates to the GUC Trust and the PI/WD Trust, no less than quarterly, regarding the status of the administration of the Wind-Down of the Debtor.

(ix)    to the extent not made on or prior to the Effective Date, making distributions on behalf of the Debtor, including through the disbursing agents, to parties that are not GUC Trust Beneficiaries or PI/WD Trust Beneficiaries (including, without limitation, the holders of Allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims), pursuant to the Plan from funds of the Debtor on the Effective Date to make such distributions.

(x)    paying the expenses of the Wind-Down from the Debtor's assets, including insurance for the Wind-Down Officer.

(xi)    funding the GUC Trust and the PI/WD Trust on a 50/50 basis any net assets or net proceeds of the Debtor in anticipation of the dissolution of the Debtor.

B.    **Books and Records of Wind-Down**. The Trustee, in his capacity as Wind-Down Officer, shall maintain, in respect of the Wind-Down of the Debtor Estates, all books and records of the Debtor, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof.

C.    **Tax Reporting and Payments for Wind-Down**. The Trustee, in his capacity as Wind-Down Officer, may request an expedited determination of taxes of the Debtor, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtor for all taxable periods through dissolution.

D.    **ERC Credits**. The Trustee, in his capacity as Wind-Down Officer, shall pursue the benefits of the ERC Credits of the Debtor for all taxable periods through dissolution and the proceeds thereof shall be paid over to the GUC Trust and the PI/WD Trust on a 50/50 basis promptly upon receipt.

Exhibit 2-2

**EXHIBIT 3.**
**CERTIFICATE OF TRUST OF THE**
**TEHUM GUC LIQUIDATING TRUST**


This Certificate of Trust of the TEHUM GUC LIQUIDATING TRUST (the "*Trust*") is being duly executed and filed by the undersigned Trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

Name. The name of the statutory trust formed hereby is:


**TEHUM GUC LIQUIDATING TRUST**

Delaware Trustee. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:


Effective Date. This Certificate of Trust shall be effective on [   ], 2024.

Exhibit 3-1

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

TRUSTEE:                                        DELAWARE TRUSTEE:

By: _____                     By: _____

Exhibit 3-2

**EXHIBIT 4.**
**GUC TRUST CLAIMS ADMINISTRATION PROCESS**

**A.  Expedited Claims**

A Holder of a GUC Trust Claim, who made such selection to receive an Expedited Distribution on the Ballot, may receive an Expedited Distribution of $5,000 in return for a full release of its Claim.

If a Holder of the Claim elects the Expedited Distribution, there are only two further steps in the process to receive payment.  First, the GUC Trustee, will confirm whether the Holder of such a claim meets threshold eligibility requirements.  These requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.  If the GUC Trustee determines the threshold requirements have been met, the Holder of the applicable Class 3 convenience claim will be required to execute a release.  Upon execution of the release, the Holder of the claim will be entitled to receive the Expedited payment and will receive no further distribution on their claim.

**B.  Non-Expedited Claims**

If a Holder of a Channeled GUC Claim (Class [_]) or a Channeled Indirect GUC Claim (subset of Class 9) does not choose to receive a $5,000 Expedited Distribution, they will be required under the terms of the GUC Trust Agreement, including this Exhibit 4, to participate in a process for valuation of their claim that will determine the Allowed Claim Amount for that claim, conducted as follows:

First, the GUC Trustee will determine whether threshold eligibility requirements have been met. As noted in Section A. above, these requirements include timely filing of a proof of claim without material defects, an attestation, and a determination that the claim has not been previously dismissed.

For Indirect Claims, additional eligibility requirements must be met.  Those additional requirements include a determination that the claim is valid and not subject to disallowance under the Code or applicable law, and a showing that the Holder of the Indirect Claim has paid in full the liability or obligation of the GUC Trust to a claimant to whom the GUC Trust would have otherwise had a liability, that the claim is not subject to a valid defense, and that both the claimant who received the funds and the Holder of the Indirect Claim have or will have fully released the GUC Trust.

Next, the GUC Trustee will evaluate each claim individually in accordance with the GUC Trust Documents, and based on the documentation provided by a Claimant, the GUC Trustee will determine whether the claim is legally valid or invalid.  If the GUC Trustee determines additional information is needed for this analysis, the GUC Trustee will issue deficiency notices identifying information requested to potentially cure the deficiency.  If the GUC Trustee determines a claim

Exhibit 4-1

is legally invalid and ineligible for compensation, the trustee will provide written notice of this determination to the claimant.

Once the GUC Trustee has determined a claim is legally valid, the trustee will utilize appropriate procedures to determine value of each claim (the "Proposed Allowed Claim Amount") and will provide notice to the claimant as to this determination. If the claimant accepts the Proposed Allowed Claim Amount, that amount will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

If a claimant disagrees with the GUC Trustee's determination as to the validity of a claim or the GUC Trustee's Proposed Allowed Claim Amount, the claimant may submit a request for reconsideration, and the decision will be reviewed in a non-binding alternative dispute resolution process in which additional information may be provided.  If a claimant does not submit a request for reconsideration, the Proposed Allowed Claim Amount will be deemed the Allowed Claim Amount for the claim.  The GUC Trustee may accept or reject any recommendations from the alternative dispute resolution process.  If the GUC Trustee accepts those recommendations in whole or in part, the GUC Trustee will provide notice to the claimant of a revised Proposed Claim Amount.  If the GUC Trustee rejects the recommendations or the claimant rejects the revised Proposed Claim Amount, the trustee will file a written objection to the claim, in which case the dispute will be resolved by the Bankruptcy Court.

If the value and validity of a claim is resolved via the alternative dispute resolution process, any other agreement of the trustee, or by final order of the Bankruptcy Court, then the agreed or ordered value of the claim will become the Allowed Claim Amount for the claim and operate as a final determination of the Debtor's liability for the claim.

Exhibit 4-2

**EXHIBIT 5.**
**UCC PROFESSIONAL FEE ESCROW ACCOUNT**

Exhibit 5-1

**EXHIBIT 6.**
**<u>INVESTMENT GUIDELINES</u>**

Consistent with the provisions of Rev. Proc. 94-45 and notwithstanding any other provision of the Trust Agreement, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

Exhibit 6-1