IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TEHUM CARE SERVICES, INC.,[1] | ) | Case No. 23-90086 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF RUSSELL A. PERRY IN SUPPORT OF THE JOINT
CHAPTER 11 PLAN OF THE TORT CLAIMANTS' COMMITTEE,
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND DEBTOR**

Russell A. Perry declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Restructuring Officer of Tehum Care Services, Inc., the above-captioned debtor and debtor in possession (the "Debtor"). I am also a Senior Managing Director of Ankura Consulting Group, LLC ("Ankura"). I was retained by the Debtor as Chief Restructuring Offer on February 13, 2023 (the "Petition Date"), shortly before the Debtor's chapter 11 petition was filed. I submit this declaration (this "Declaration") in support of the *Joint Chapter 11 Plan of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor* [Docket No. 1739] (as may be amended or supplemented from time to time, the "Plan").[2]

2. As the Debtor's Chief Restructuring Officer ("CRO") I am responsible for overseeing the operations and financial activities of the Debtor, including measuring the cash flow needs of the Debtor, monitoring cash flow, managing business relationships, assisting with the administration of the chapter 11 process, and financial planning, including arranging for debtor in

---

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

4931-5359-3628

possession financing.  Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge of the Debtor's operations and finances; (b) my review of certain relevant documents; (c) information provided to me by Ankura professionals working under my direction and supervision; (d) information provided to me by members of the Debtor's former management, professionals and others working for the Debtor, or their respective other advisors; or (e) my opinion based upon my experience and knowledge.  References to title 11 of the United States Code (the "Bankruptcy Code"), the chapter 11 process, and related legal matters are based on my understanding of such due to my experience, or as explained to me by counsel.  I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Debtor.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3. I hold a bachelor's degree in agribusiness, an MBA degree from Texas A&M University, and I am a CFA® charterholder.  I have more than fifteen years of restructuring and bankruptcy-related experience, with a focus on the U.S. healthcare market.  During that time, I have advised and assisted distressed companies across various complex financial, operational, and strategic situations, including serving in interim management, Chief Transformation Officer, Chief Restructuring Officer, Strategic Restructuring Advisor, and Independent Manager positions.  My experience includes financial statement analysis, financial projection development, liquidity and cash management, M&A support, stakeholder negotiations, balance sheet recapitalization and restructuring, postpetition financing and sourcing, and bankruptcy preparation and administration.

4. I have played a key role in many successful chapter 11 restructurings in this District and others, including *In re Pipeline Health System, LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 2, 2022); *In re SQLC Senior Living Ctr. at Corpus Christi Inc.*, No. 2:19-bk-20063 (DRJ) (Bankr. S.D. Tex. Feb. 8, 2019); *In re Tarrant County Senior Living Ctr., Inc. d/b/a The Stayton at*

2

*Museum Way*, No. 19-33756 (SGJ) (Bankr. N.D. Tex. Nov. 5, 2019); *In re Trident Holding Co., LLC*, No. 19-10384 (SHL) (Bankr. S.D.N.Y. Feb. 10, 2019); *In re Virginia United Methodist Homes of Williamsburg, Inc.*, No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 1, 2013); *In re Franciscan Cmtys. St. Mary of the Woods*, No. 1:11-bk-19865 (JPS) (Bankr. N.D. Ohio Nov. 21, 2011); *In re the Clare at Water Tower*, No. 11-46151 (TAB) (Bankr. N.D. Ill. Nov. 14, 2011); *In re Fairview Village* No. 1:11-bk-04392 (TAB) (Bankr. N.D. Ill. Feb. 4, 2011); and *In re Forum Health*, No. 9-40795 (KW) (Bankr. N.D. Ohio Mar. 16, 2009). I have also served as Strategic Restructuring Advisor, as a member of interim management, and as independent manager in other confidential, out-of-court matters.

**Solicitation and Noticing**

5. On October 2, 2024, the Debtor, Official Committee of Unsecured Creditors (the "UCC"), and Official Committee of Tort Claimants (the "TCC, and together with the Debtor and the UCC, the "Plan Proponents") filed the Plan and the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 1740] (as may be amended or supplemented from time to time, the "Disclosure Statement"). A supplement to the Disclosure Statement was filed on November 4, 2024 [Docket No. 1788] and the Plan Supplement was filed on February 7, 2025 [Docket No. 1955].

6. On November 13, 2024, the Court entered an Order which, among other things:

   a. approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code;

   b. approved procedures for soliciting votes to accept or reject the Plan;

   c. established voting-related deadlines; and

   d. set a hearing on March 3, 2025 to consider confirmation of the Plan.

*See* Docket No. 1813 (the "Solicitation Order").

3

4931-5359-3628

7. On November 20, 2024, the Debtor's Claims Agent transmitted, among other things, the solicitation procedures, the Plan, the Disclosure Statement, an Opt-Out Release Form, and a Ballot with voting instructions to the holders of claims in Classes 3, 4, 5,6,7, 8, 9, and 10. *See* Docket No. 1852; *see also* supplemental certificates of service filed at Docket Nos. 1960, 1958, 1928, 1925, 1868, 1867.

8. It is my understanding that the holders of Claims in Classes 3 through 10 are the only parties entitled to vote on the Plan, and as a result, no other holders of Claims or Interests were provided Ballots. All other parties were served with the Opt-Out Release Form, Notice of Non-Voting Status, and/or Confirmation Hearing Notice, as applicable and pursuant to the Solicitation Order. *See* Docket No. 1852.

9. Based on the foregoing, it is my belief that the Debtor and its co-Plan Proponents have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Solicitation Order.

## **The Plan**

10. Based on my experience, I believe the Plan meets all of the confirmation requirements of section 1129(a) of the Bankruptcy Code and that the Plan should be confirmed.

11. The Plan, and all documents and agreements necessary to implement the transactions contemplated by the Plan, are the product of extensive arm's-length negotiations among the Plan Proponents and the Settlement Parties. I believe the Plan Proponents have proposed the Plan in good faith. The Plan was not filed for the purpose of avoiding tax or securities laws. Rather, the Plan was proposed with the goal of liquidating the Debtor's assets and establishing the two Plan trusts to ensure an efficient and equitable distribution of assets to the Debtor's creditors. Throughout the negotiation of the Plan and the Debtor's chapter 11 case, I believe the Debtor has upheld its fiduciary duties to stakeholders, protected the interests of all

constituents with an even hand, and negotiated the Plan to provide the most value attainable for stakeholders. As a result, I believe that the prompt confirmation and consummation of the Plan is in the best interests of the Debtor, its creditors, and all parties in interest.

12. Furthermore, I believe that the Plan provides adequate means for implementation. Article IV and other provisions of the Plan set forth the means for implementation of the Plan by describing (a) the sources of consideration for Plan distributions, (b) the Estate Party Settlement, (c) the establishment of the GUC Trust and PI/WD Trust, (d) the role of the GUC Trustee with respect to winding down the Debtor, and (e) the role of the PI/WD Trustee, including with respect to pursuing Retained PI/WD Trust Causes of Action. In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtor's liquidation, such as the retention of Estate Causes of Action and the rejection of certain contracts.

13. The Plan classifies Claims and Interests into the following eleven (11) classes.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Convenience Claims | Impaired | Entitled to Vote |
| 4 | Channeled GUC Claims | Impaired | Entitled to Vote |
| 5 | Opt-Out GUC Claims | Impaired | Entitled to Vote |
| 6 | Channeled PI/WD Claims | Impaired | Entitled to Vote |
| 7 | Opt-Out PI/WD Claims | Impaired | Entitled to Vote |
| 8 | Opt-Out Insured PI/WD Claim | Impaired | Entitled to Vote |
| 9 | Channeled Indirect Claims | Impaired | Entitled to Vote |
| 10 | Opt-Out Indirect Claims | Impaired | Entitled to Vote |
| 11 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

14. Each Class of Claims and Interests in the Debtor, as specified in the Plan, consists of Claims or Interests which are substantially similar in nature. Furthermore, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan.

15. Furthermore, it is my understanding that the Plan provides the same treatment for each Claim or Interest of a particular Class. Put simply, all Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.

## Voting Results

16. I have reviewed the voting results, which are memorialized in the *Declaration of Darlene S. Calderon Regarding the Solicitation and Tabulation of Votes in the Joint Chapter 11 Plan of the Tort Claimants' Committee, Official Committee of Unsecured Creditors, and Debtor* [Docket No. 1993] (the "Voting Report"). Below is a chart summarizing the results:[3]

| Class | Description | Not Tabulated | Members Voted | Members Accepted | Members Rejected | % Members Accepted | % Members Rejected | Total $ Voted | $ Accepted | $ Rejected | % $ Accepted | % $ Rejected | Class Accepted or Rejected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Convenience Claims | 1 | 14 | 14 | 0 | 100.00% | 0.00% | $14.00 | $14.00 | $0.00 | 100.00% | 0.00% | Accepted |
| 4 | Channeled General Unsecured Claims | 0 | 136 | 135 | 1 | 99.26% | 0.74% | $136.00 | $135.00 | $1.00 | 99.26% | 0.74% | Accepted |
| 5 | Opt-Out General Unsecured Claims | 0 | 5 | 5 | 0 | 100.00% | 0.00% | $5.00 | $5.00 | $0.00 | 100.00% | 0.00% | Accepted |
| 6 | Channeled PI/WD Claims | 3 | 169 | 169 | 0 | 100.00% | 0.00% | $169.00 | $169.00 | $0.00 | 100.00% | 0.00% | Accepted |
| 7 | Opt-Out PI/WD Claims | 0 | 9 | 6 | 3 | 66.67% | 33.33% | $9.00 | $6.00 | $3.00 | 66.67% | 33.33% | Accepted |
| 8 | Opt-Out Insured PI/WD Claims | 0 | 32 | 32 | 0 | 100.00% | 0.00% | $32.00 | $32.00 | $0.00 | 100.00% | 0.00% | Accepted |
| 9 | Channeled Indirect Claims | 0 | 1 | 1 | 0 | 100.00% | 0.00% | $1.00 | $1.00 | $0.00 | 100.00% | 0.00% | Accepted |
| 10 | Opt-Out Indirect Claims | 0 | 30 | 29 | 1 | 96.67% | 3.33% | $30.00 | $29.00 | $1.00 | 96.67% | 3.33% | Accepted |

17. Based on the Voting Report, it is my belief and understanding that the Plan satisfies all requirements of the Bankruptcy Code and Bankruptcy Rules in order to obtain confirmation and to effectuate the Estate Party Settlement contained therein.

18. The Plan provides the Settlement Parties a right to terminate the Estate Party Settlement "if more than 5% in number of Voting PI/WD Claimants elect to opt out of the Consensual Claimant Release." Plan, Art. IV.B.5. Per the Voting Report, of no fewer than 243 Voting PI/WD Claimants, only 12 PI/WD Claimants elected to opt out of the Consensual Claimant Release. This falls below the 5% threshold agreed upon in the Plan. Thus, the Settling Parties do not have the right to terminate the Estate Party Settlement under the Plan.

---

[3] The Voting Report also indicates that Verita received four additional opt out forms without the corresponding ballots.

19. Under the Plan, Classes 1 and 2 are unimpaired and are deemed to have accepted the Plan. The Voting Report indicates that all Classes entitled to vote—*i.e.*, Classes 3, 4, 5, 6, 7, 8, 9, and 10—have unanimously accepted the Plan. The only Class that does not accept the Plan is Class 11 (Interests in the Debtor), which is deemed to reject the Plan because Interests in the Debtor are being cancelled without a distribution to such holders. Such treatment is the same treatment holders of Interests would receive through a chapter 7 liquidation. Under chapter 7, a trustee would be appointed to administer the estates, to liquidate the Debtor's remaining assets, and to make distributions to creditors and equity interest holders. The costs and expense of the chapter 7 trustee and their professionals would be paid before general unsecured claims and equity interest holders.

20. As reflected in the liquidation analysis attached as <u>Schedule 1</u> to the Disclosure Statement, which is filed at Docket No. 1815-2, PDF Pages 60–72 of 270, and which I incorporate herein, the total estimated amount of cash available to pay creditor claims after payment of administrative expense claims would range from $0.00 to $50,363,100. In a chapter 7 case, Classes 1 and 3 would receive between 0.0% (low scenario) and 100.0% (high scenario), and Classes 4, 5, 6, 7, and 8 would receive between 0.0% (low scenario) and 15.9% (high scenario), in each case lower than the estimated percentage potential recovery to such classes in this chapter 11 case. The liquidation analysis estimates that Classes 9 and 10 will not receive a recovery under any scenario, in light of their indirect claims against the Debtor. To the extent the Debtor still possesses any collateral securing Class 2 Allowed Other Secured Claims, the Debtor proposes to convey such collateral or its cash equivalent back to such creditors, which is effectively the same treatment that these creditors would receive in a hypothetical chapter 7 scenario. It is therefore

7

my understanding the Plan satisfies the "best interests" test embodied by section 1129(a)(7) of the Bankruptcy Code.

21. I understand that, under section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the deemed rejection by a class of claims or equity interests so long as the plan satisfies all the requirements of section 1129(a) of the Bankruptcy Code and the plan does not discriminate unfairly and is fair and equitable with respect to such non-accepting class or classes. I believe that the Plan may be confirmed as to Class 11 pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Based on my review of the Plan, I believe that the Plan does not discriminate unfairly against any Class of Claims or Interests, as all similarly situated holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale. Moreover, the Plan provides that no holder of a Claim or Interest junior to the rejecting Classes will receive or retain any property under the Plan on account of such junior Claim or Interest. For these reasons, I believe that the Plan satisfies section 1129(b) of the Bankruptcy Code and may be confirmed.

22. I also believe that the Plan is feasible. The Plan provides that, unless otherwise ordered or agreed, Other Priority Claims, Other Secured Claims, Allowed Administrative Claims, and Allowed Priority Tax Claims will be paid in full. Pursuant to the Estate Party Settlement, all of the DIP Lender's Claims under the DIP Order and the DIP Facility, and all Claims filed by Geneva Consulting LLC and M2 LoanCo, LLC, shall be fully and forever discharged and released on the Effective Date. Furthermore, the Plan and the Plan Supplement establish the GUC Trust and PI/WD Trust to administer the terms of the Plan. The Plan Proponents have therefore established that the Plan provides for sufficient funds to satisfy all requirements and obligations under the Plan.

23. The Plan and Plan Supplement provide required disclosures regarding management of the Debtor and the trusts. The Plan Supplement discloses the proposed trustees of each trust. The Plan provides that on the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtor shall be deemed to have resigned and the GUC Trustee shall be appointed as the sole manager, director, and officer of the Post-Effective Date Debtor and shall succeed to the powers of the Debtor's managers, directors, and officers. These disclosures are consistent with the interests of Holders of Claims and Interests and public policy, thereby satisfying sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code.

### Exculpation, Releases, and Injunctions

24. I understand that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code, and I have been informed that they are consistent with applicable precedent. The Plan embodies a settlement of certain claims and causes of action between the Plan Proponents and various creditors, including the Settlement Parties. These potential claims and causes of action were analyzed by the Plan Proponents and their respective advisors.

25. I believe that the exculpation, releases, and injunctions contained in Articles IV and IX of the Plan are critical to bringing closure to the Debtor and all parties in interest and to maximizing recoveries for all stakeholders. I believe they are proposed in good faith, integral to the Plan, supported by the Plan Proponents, and appropriate under the circumstances and should be approved.

26. <u>Estate Releases.</u> I believe that the Debtor releases contained in Articles IV.9 and IX.C. of the Plan are fair, reasonable, and in the best interest of the Debtor's Estate under the facts and circumstances of this chapter 11 case. The Debtor's releases of the non-Debtor Released

Parties were heavily negotiated by the Plan Proponents and the Released Parties in good faith, at arm's length, and without collusion or fraud.

27. Moreover, the Released Parties and each of their respective Professionals participated in the extensive negotiation, formulation, and effectuation of the transactions contemplated in the Plan, including the Estate Party Settlement and the Settlement Payment, and the Settlement Parties agreed to waive their claims against the Debtor's estate, thereby providing consideration. While the Plan Proponents believe that there are potential claims against the Released Parties that are meritorious, recovery of damages for the Estate nevertheless presents a challenge. Each claim would be subject to defenses, and the Estate would be required to pursue lengthy, costly litigation to achieve a final judgment, including appeals. I believe that the proposed consideration from the Released Parties, in exchange for the releases, is fair and reasonable and that entering into these releases is an exercise of my reasonable business judgment.

28. <u>Releases of Holders of Class 4, 6, 8, and 9 Claims</u>. Similarly, I believe that the Debtor and Released Party releases of Holders of Class 4, 6, 8, and 9 Claims contained in Articles IV.8 and IX.E. of the Plan meet the applicable standard for approval because they are fair, reasonable, and in the best interests of the Debtor's Estate and stakeholders under the circumstances of this chapter 11 case. The Holders of Class 4, 6, 8, and 9 Claims provided consideration to the Debtor by consenting to releases of the Debtor and the Released Parties, thereby helping to effectuate the transactions contemplated in the Plan and the Estate Party Settlement. Furthermore, I do not believe that the Debtor has any colorable claims or causes of action against any of the Holders of Class 4, 6, 8, and 9 Claims that would provide a material benefit to creditor recoveries were such claims or causes of action pursued.

29. <u>Consensual Claimant Releases</u>.  I believe that the third-party releases of the Released Parties by the Consenting Claimants contained in Articles IV.B.7 and IX.D. of the Plan are appropriate.  These releases are negotiated terms of, and in accordance with, the Plan.  I believe that without these releases, the Plan could not become effective, thus jeopardizing recoveries to most creditors.  Indeed, the Estate Party Settlement provides that the Settlement Parties may terminate the Estate Party Settlement if more than five percent in number of Voting PI/WD Claimants elect to opt out of the Consensual Claimant Release.  The third-party releases provide the Released Parties with a level of finality they deemed necessary to justify funding the Settlement Payment.  Furthermore, the Released Parties and each of their respective Professionals participated in the negotiation, formulation, and effectuation of the transactions contemplated in the Plan, including the Estate Party Settlement and the Settlement Payment, and the Released Parties agreed to mutual releases of the Consenting Claimants, in each case providing consideration to the Consenting Claimants.  All of the Consenting Claimants consented to these releases by not opting out under the Plan.

30. <u>Exculpations</u>.  The Plan's exculpation provision is the product of arm's-length negotiations and was critical to obtaining the support for the Plan.  The Exculpated Parties participated in this chapter 11 case in reliance upon the protections afforded to those constituents by the exculpation. At all times during this chapter 11 case, the Exculpated Parties have acted within the scope of their respective duties, engaged in good faith and arm's length negotiations, and have taken appropriate actions in connection with all of their respective activities relating to the support, solicitation, and consummation of the Plan, including all matters in this chapter 11 case leading up to the filing of the Plan.  I believe the Court's findings of good faith with respect to the Debtor should also extend to the Exculpated Parties.  Based on my experience, I believe the

11

4931-5359-3628

exculpation provision and the scope of the parties exculpated thereby meets all of the relevant and applicable requirements and should be approved.

### **Conclusion**

31. For these reasons, as well as those to be stated on the record by counsel and contained in the other pleadings filed by the Debtor, UCC, and TCC in support of confirmation, I believe the Plan should be confirmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated: February 27, 2025         */s/ Russell A. Perry*
                                 Russell A. Perry
                                 Chief Restructuring Officer