```
                    UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                     .
 IN RE:                              .  Case No. 23-90086
                                     .  Chapter 11
 TEHUM CARE SERVICES, INC.,          .
                                     .  515 Rusk Street
                                     .  Houston, TX 77002
                Debtor.              .
                                     .  Monday, March 3, 2025
 . . . . . . . . . . . . . . . . .   .  10:01 a.m.



                 TRANSCRIPT OF CONFIRMATION HEARING
             BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY COURT JUDGE


 APPEARANCES:


  For the Debtor:              Gray Reed & McGraw LLP
                               By:  JASON S. BROOKNER, ESQ.
                                    AARON M. KAUFMAN, ESQ.
                               1601 Elm Street, Suite 4600
                               Dallas, TX 75201
                               469-320-6132

 For the Official             Stinson LLP
 Unsecured Creditors'         By:  NICHOLAS ZLUTICKY, ESQ.
 Committee:                    By:  ZACHARY H. HEMENWAY, ESQ.
                                    MIRANDA SWIFT, ESQ.
                               1201 Walnut, Ste 2700
                               Kansas City, MO 64106
                               816-842-8600

  APPEARANCES CONTINUED.


  Audio Operator:              Yesenia Lila, ECR


  Transcription Company:       Access Transcripts, LLC
                               10110 Youngwood Lane
                               Fishers, IN 46048
                               (855) 873-2223
                               www.accesstranscripts.com
```

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES (Continued):


For the Committee of      Brown Rudnick LLP
Tort Claimants:           By:  ERIC GOODMAN, ESQ.
                               GERARD T. CICERO, ESQ.
                          7 Times Square
                          New York, NY 10036
                          212-209-4800

                          Berry Riddell LLC
                          By:  MICHAEL W. ZIMMERMAN
                          6750 E Camelback Rd, Suite 100
                          Scottsdale, AZ 85251
                          480-385-2727

For the U.S. Trustee:     Office of the United States Trustee
                          By:  HA MINH NGUYEN, ESQ.
                          By:  ANDREW JIMENEZ, ESQ.
                          515 Rusk St, Ste 3516
                          Houston, TX 77002
                          202-590-7962

For the Lexington         Zeichner Ellman & Krause LLP
Insurance Company:        By:  BRYAN D. LEINBACH, ESQ.
                          730 Third Avenue
                          New York, NY 10017
                          (212) 223-0400

For the Putative Class    OnderLaw, LLC
in Susan Foster,          By:  MARTIN L. DAESCH, ESQ.
Robert Schaff, M.D. v.    110 East Lockwood Avenue
Corizon Health Inc.:      St. Louis, MO 63119
                          (314) 408-6136

For Wage Claimants:       Andrew B. Jones P.C.
                          By:  ANDREW B. JONES, ESQ.
                          1479 W. Robinwood Lane
                          Fresno, CA 93711


For Various Entities      Gallagher Evelius & Jones LLP
Affiliated with the       By:  DAVID G. SOMMER, ESQ.
University of Maryland    218 North Charles Street, Suite 400
Medical System:           Baltimore, MD 21201
                          (410) 727-7702

Also Present:             RUSSELL PERRY

                          DARLENE CALDRON

                          NATHAN ALVAREZ

                          DAVID BARTON
```

1

1          (Proceedings commence at 10:01 a.m.)

2          THE COURT:  23-90086, Tehum Care Services, here on

3   plan confirmation.

4          Give everyone a moment to get settled in.

5          MR. BROOKNER:  Good morning, Your Honor.  Jason

6   Brookner and Aaron Kaufman from Gray Reed on behalf of the

7   debtor.

8          THE COURT:  Good morning.

9          MR. PERRY:  And Russell.

10          MR. BROOKNER:  Oh, I'm sorry.  And Russell Perry, the

11   chief restructuring officer from Ankura Consulting.

12          THE COURT:  Good morning.

13          MR. GOODMAN:  Good morning, Your Honor.  Eric

14   Goodman, Gerard Cicero, and Michael Zimmerman on behalf of the

15   Official Committee of Tort Claimants.

16          THE COURT:  Good morning.

17          MR. GOODMAN:  Good morning.

18          MR. ZLUTICKY:  Good morning, Your Honor.  Nick

19   Zluticky, Zach Hemenway, and Miranda Swift for the Official

20   Committee of Unsecured Creditors.

21          THE COURT:  Good morning.

22          MR. NGUYEN:  Good morning, Your Honor.  Ha Mihn

23   Nguyen for the U.S. Trustee, I also have Andrew Jimenez from my

24   office.

25          THE COURT:  Good morning.

1           MR. DAESCH:  Morning, Your Honor.  I'm Martin Daesch

2    from St. Louis Onderlaw.  I have a few of the employees as

3    clients.

4           THE COURT:  Good morning.

5           MR. DAESCH:  Good morning.

6           THE COURT:  OnderLaw.  Like, the same OnderLaw that

7    was here last week?

8           MR. PERRY:  Yes.

9           THE COURT:  Ah.

10          MR. PERRY:  Yeah.  Jim was here testifying.

11          THE COURT:  That's fantastic.  Great.

12          MR. PERRY:  Same one.  Thank you, Your Honor.

13          THE COURT:  Thank you.  Good morning.

14          MR. PERRY:  It looks like worlds colliding.

15          THE COURT:  No, no, they got off easy.  They only got

16   out at 8:30 Mr. Nguyen.  Yeah, they can't stay here that late.

17   Okay.  Good morning.

18          MR. BROOKNER:  Good morning.  So what I --

19          THE COURT:  I -- well, I should ask if anyone on the

20   line wishes to make an appearance.  Please hit five star and

21   I'm going to unmute your line.

22          MR. ALVAREZ:  -- Alvarez.

23          THE COURT:  830 number?

24          MR. ALVAREZ:  Good morning.  Nathan Alvarez, here

25   from the TCC.

```
 1              THE COURT:  Good morning.  A 212 number?
 2              MR. LEINBACH:  Good morning.  Bryan Leinbach,
 3   Zeichner Ellman & Krause, on behalf of VARG companies.  Just
 4   here to listen.
 5              THE COURT:  All right.  Good morning.  A 310 number?
 6              MS. CALDRON:  Hi, this is Darlene Caldron with
 7   Verita.
 8              THE COURT:  Good morning.
 9              MS. CALDRON:  Good morning.
10              THE COURT:  Yes.  Okay.  Now I know how to pronounce
11   it.  Oh, I've been wrong in trying to figure out how to
12   pronounce it.  Verita.  All right.  I'm on it.  Anonymous.  A
13   559 number?
14              MR. JONES:  Yes, Your Honor.  Andrew Jones, I
15   represent 80 or 70 wage claimants.
16              THE COURT:  Okay.  Good morning.  Mr. Brookner, good
17   morning.
18              MR. BROOKNER:  Thank you, Your Honor.  Good morning.
19   What I'd like to do is propose an order of operations for you
20   to approve or not.  And then we can go.  So the proposal would
21   be that I say just a couple of quick words, just to set the
22   table and then I'll turn it over to Mr. Zluticky for the UCC.
23   Then Mr. Goodman for the TCC.  Then if there's any objecting
24   parties, I know the U.S. Trustee still has a pending objection.
25   The other objections should all be resolved at this point.
```

1          THE COURT:  Okay.

2          MR. BROOKNER:  Then I'll come back up and do the

3  evidentiary presentation.  And then to the extent other

4  proponent counsel has something they can come up.  The

5  objectors and then hopefully we can close and --

6          THE COURT:  Okay.

7          MR. BROOKNER:  -- get out of here.

8          THE COURT:  So let me just ask, if I have unmuted

9  your line, I'd ask that you please keep your phone on mute just

10 so we can all hear each other in the courtroom.  I have unmuted

11 a 410 number.

12         MR. SOMMER:  Yes.  Good morning, Your Honor.  It's

13 David Sommer for various entities affiliated with the

14 University of Maryland Medical System.

15         THE COURT:  Okay.

16         MR. SOMMER:  I'm here to listen in.

17         THE COURT:  Good morning.

18         MR. SOMMER:  Good morning.

19         THE COURT:  All right, Mr. Brookner?

20         MR. BROOKNER:  Yes, Your Honor.

21         THE COURT:  You may proceed.

22         MR. BROOKNER:  Thank you, Your Honor.  And by the

23 way, I neglected to mention that when Mr. Goodman comes up for

24 the TCC, he's going to run through the plan and the mechanics

25 and all of that, so --

1          THE COURT:  Understood.

2          MR. BROOKNER:  Okay.  So from the debtor's

3   perspective, Your Honor, from myself and Mr. Kaufman and

4   Mr. Perry, we could not be happier to be here today in what is

5   effectively a consensual plan.  All voting classes have voted

6   in favor of the plan.  And as I mentioned, we only have one

7   objection remaining, which is that of the U.S. Trustee.  There

8   are a lot of thanks to go around, but I'm not going to turn

9   this into an academy award speech.  I think everyone in the

10  courtroom knows the role that they played and how hard we all

11  worked to be able to get here and the job that we were able to

12  accomplish to be here today on a consensual basis.

13         We filed an initial form of proposed confirmation

14  order at Docket Number 2010-3 on Friday afternoon, excuse me,

15  along with a modified plan, which is at Docket Number 2010-1,

16  which is the clean version and 2010-2, which is the marked

17  version.  And last night around 4:30, five o'clock or so, we

18  filed a revised proposed form of confirmation order at Docket

19  Number 12.  That has both a marked version as well as a fully

20  conformed version with all of the exhibits so that if Your

21  Honor is inclined to sign the order, you can just take that and

22  go with it, unless there are some other changes we have to

23  make.

24         I'll just tell you the big changes in the

25  confirmation order.  There was just some nicky-nacky cleanup

1  fixing some sentences, fixing some language.  We added

2  Paragraph 125, which was requested by Ms. Funk to deal with

3  some Idaho issues.  She, I believe, is happy with that

4  paragraph.  And -- right, so unless the Court has any questions

5  for me, I'm done and I'll turn it over to other proponent

6  counsel.

7            THE COURT:  Okay.

8            MR. BROOKNER:  Thank you, Your Honor.

9            THE COURT:  Thank you.  Mr. Zluticky.  Good morning.

10           MR. ZLUTICKY:  Good morning, Your Honor.  Nick

11  Zluticky for the Official Committee of Unsecured Creditors.

12  We're here today to seek confirmation of what the parties

13  believe is significant.  As Mr. Goodman's going to go into more

14  detail shortly, this plan is a great result for all creditors,

15  including our shared clients.  The headline of course, is $50

16  million up to 24 million in tax credits and additional

17  litigation recoveries resulting in as much as 75 million in

18  distributable cash to creditors.  But it's not just about the

19  dollar figure here.  The structure of the plan ensures

20  equitable, efficient distributions and does so with the buy-in

21  from the creditors of benefits.  And as the Court will see from

22  the evidence, the plan meets all the evidence of 1129(a), but

23  most importantly, it's in the best interests of all creditors

24  and it should be confirmed.

25            And when we were here before Your Honor in November

1  on the disclosure statement, I said that it was not the time

2  for remarks or statements of appreciation.  But unlike

3  Mr. Brookner, I am going to thank a few folks because I believe

4  that time's reserved for today.  As Your Honor knows, this case

5  is one of one.  We've been here through a lot of twists and

6  turns most of which none of us would've expected.  But in one

7  key way, this case is like so many other Chapter 11 cases and

8  that it resulted in a plan that's good for creditors.  It's a

9  case where the key parties worked through their disagreements

10  and came together to create a resolution that maximizes estate

11  assets to benefit everyone who was dragged into this bankruptcy

12  case.  And make no mistake, this is not the debtor's plan.  It

13  is not the UCC's plan.  It is not the TCC's plan.  This is a

14  joint plan that was created and proposed by all three parties

15  together, working together.  And it's a great result.

16          And so if Your Honor will permit me, I'd like to take

17  just a few moments to thank a few parties and people who've

18  worked hard to achieve this result for all creditors.  First

19  and foremost, I want to thank Your Honor.  Thank you for doing

20  what was right in this case for pushing the parties to resolve

21  their differences and try to come to a resolution that would

22  put money in the hands of folks who need it the most.  Thank

23  you for refusing to dismiss this case despite a multi-day trial

24  and many parties urging this court to grant the dismissal

25  motion.  This court made hard decisions that forced the parties

1   to go back to their respective drawing boards, come back to the

2   mediation table with opening -- open minds and work tirelessly

3   toward a settlement that we're all proud to present today.  I'm

4   a big believer that people do not always have to agree, but we

5   should all try to understand one another and the reasons for

6   our actions.

7            And while I'm confident Your Honor did not always

8   agree with the decisions that we or other parties made in this

9   case and there may have been just a time or two where we might

10  not have agreed with the particular court decision, we have

11  always felt that the parties have been heard, understood and

12  that the Court's rulings were sometimes tough, but always fair.

13  Thank you.  And to retired bankruptcy judge, Christopher

14  Sanchi, our mediator, I want to express my sincere appreciation

15  for his relentless commitment to bringing the parties together

16  to reach a resolution in this case.  Let's be honest, when

17  Mr. Sanchi was asked to come into this case as our mediator,

18  things were a bit of a mess.  That's putting it mildly.  But

19  rather than let that distract from or derail the mediating

20  process, he remain laser focused on understanding each party's

21  positions, challenging them were appropriate and gently, but

22  firmly and consistently pushing everyone toward the goal of

23  resolution.  Mr. Sanchi even stepped up and multiple times

24  after July, when issues came up and many other mediators

25  would've told the parties to just go figure it out for

1    themselves.  I firmly believe so, because he believed in the

2    overall goal, providing fair and equitable relief to a

3    vulnerable credit group using the toolbox of the bankruptcy

4    code.

5              I want to thank the debtor and its professionals.

6    Mr. Perry, Mr. Asano, the rest of the Ankura team.

7    Mr. Brookner, Ms. Webb, Mr. Kaufman, Ms. Carson, Ms. England,

8    the entire Gray Reed team.  We started this case as adversaries

9    fighting tooth and nail over a DIP loan and extension to stay,

10   the investigation and the mediation.  But even while we fought,

11   sometimes quite loudly, I was consistently impressed with their

12   professionalism, their incredibly hard work, the quality of

13   their work and their ability to disagree with respect.  Over

14   the course of this case, we've taken quite a journey together,

15   especially the past 18 months.  And I can now say after working

16   against them for a long time and with them for a long time, I

17   definitely prefer working with them.  We've been fortunate to

18   have formed strong working relationships and friendships with

19   the Gray Reed and Ankura teams.  And there's no one I would

20   rather stand up next to and present this plan with than them.

21             To the TCC, I want to express my sincere appreciation

22   for their tireless efforts, their zealous advocacy for their

23   clients and the working relationships we've developed with them

24   over the last several months.  The TCC was put in a very tough

25   position in this case, appointed almost a year after the

1  petition date and just weeks before a scheduled second

2  mediation in New York.  Mr. Atkinson and the Provence team and

3  Mr. Molton, Mr. Goodman, Mr. Cicero, Mr. Moxley,

4  Ms. Sieger-Grim and the entire Brown Rudnick team and

5  Mr. Zimmerman at Barry Riddell all were more than up to the

6  task at times we battled with them, but those fights were

7  always professional.  Although I do think technically there's

8  still a pending Motion for Sanctions that you filed against our

9  firm.  So it's still pending before Your Honor.  So all rights

10  are reserved, of course.  But in all seriousness litigating

11  with the TCC helped move this case closer to a resolution.

12  Their collaboration and leadership on the plan was essential.

13  And in short, this does not happen without their hard work and

14  their willingness to lay down arms and work together on a plan

15  of which I think we can all be proud.  And so Eric to you and

16  your entire team, thank you very much.

17          To the settling parties.  M2, YesCare, Peargrove,

18  Mr. Lefkowitz, I want to say thank you for stepping up and

19  committing to a settlement that will provide a meaningful

20  recovery for creditors in this case.  It didn't have to end

21  like this.  And at several moments, it almost didn't.  There

22  were many times in this case where we were on the precipice of

23  ending settlement discussions, conversion or dismissal and

24  about to begin a years long journey of litigation, massive

25  legal fees and significantly delayed and diminished creditor

1    recoveries.  Instead.  At each inflection point, the settling
2    parties expressed the desire to come to a compromise if
3    possible.  It wasn't easy.  Both committees said things about
4    the settling parties that could be difficult to forgive or
5    forget, but they remained committed to exploring a settlement.
6    This settlement requires a significant contribution from the
7    settling parties.  And while nothing in this settlement is an
8    admission of any kind, I do think that the fact that the funds
9    would be used to make meaningful distributions to incarcerated
10   and formerly incarcerated individuals was a driving factor for
11   them in this deal.  I may have disagreed with the settling
12   parties many times on many issues, but I always felt that
13   creditors were heard and their views were considered.  And this
14   case also gave us the opportunity to work closely with
15   Mr. Gluck and Ms. Harrison of the Norton Rose Firm, and
16   Ms. Hayward, and I truly appreciate and I'm immensely grateful
17   for their collaborative nature of their professionals and for
18   their patience, grace, good humor, hard work, and our working
19   relationship in this case.
20           To all the creditors in this case, I want to express
21   humility and gratitude for patience, trust, participation, and
22   engagement for your willingness to speak up and let your voices
23   be heard.  Many of the people in the courtroom and dialed in
24   remotely have been here since the beginning, and in more than
25   two years since this case was filed, have been consistently

1  engaged while remaining respectful of the parties, the

2  professionals in the bankruptcy process, even in the face of

3  delays, uncertainty, and frustration.

4      And I'm happy to stand up here now and say that as Mr.

5  Goodman's going to explain in detail, you made your voices

6  heard and overwhelmingly approve this plan and this global

7  resolution.  I know I speak for the entire UCC and its

8  professionals, so I say, thank you.  Your voices matter, and we

9  look forward to delivering on the goal we've been working

10  towards since day one, putting real money in the hands of

11  creditors in this case.  This plan accomplishes that.

12      To each of the members of the UCC, I don't think

13  words can adequately express the full depth of just how much

14  work they put into this case and how much I appreciate each one

15  of them.  They stayed committed to the goal of maximizing

16  creditors recovery since day one, and that's no small thing.

17  They started this case fighting with the debtors and the

18  settling parties conducting a lengthy and arduous investigation

19  and going into a mediation, unsure of the outcome.  And what

20  happened next, no one expected, and it tested the medal of each

21  committee member as they were thrown into the chaos of the

22  unknown.

23      And then a separate TCC was formed, lines were drawn,

24  putting the two committees against each other in a series of

25  disputes and hearings.  They were as difficult to endure as

1    they were to litigate.  The names committee members we called,

2    the things said, no voluntary estate fiduciary should have to

3    go through, and yet they did.  They held together against all

4    odds and throughout controversies, remaining United by purpose

5    in a common goal that the creditors in this case deserve better

6    and it was UCC's mission to focus on that, above all else.  And

7    I'm pleased to stand up here and say that the committee

8    delivered.

9         Strongest bonds are often formed in the toughest of

10   circumstances, and I'm incredibly grateful for all of their

11   work and for the friendships that we've formed in this case,

12   and in some instances, especially their counsel.  While the

13   record shows each of the committee members, it is important to

14   thank, just for a moment, Bryan Glover, Blake Hamm, Holly Hamm,

15   Rebecca Bailey, Eric Monzo, and Jason Levin, all outside

16   counsel for committee members, none of them paid by the estate,

17   all of whom provided thoughtful, creative, outstanding input to

18   their clients and the committee as a whole, and we would not be

19   here today with their efforts.

20        And finally, I would like to thank my team:

21   Mr. Hemenway, Ms. Swift, the entire Stinson team, Mr. Dundon,

22   Ms. Barlow, and Mr. Rooney of Dundon Advisors.  I'm proud of

23   everything we've done together for the creditors in this case.

24   And so it's with a profound sense of gratitude and humility

25   that I'd like to turn the podium over to Mr. Goodman who's done

 1   incredible work for his clients in this case, and who's going

 2   to walk everyone through this plan that we all created,

 3   implemented, and solicited, together as a team.  Thank you,

 4   Your Honor.

 5            THE COURT:  Thank you.

 6            Mr. Goodman, I haven't seen you in a while.  It's

 7   good to see you.

 8            MR. GOODMAN:  Good to see you, Your Honor.

 9            I'm going to be up here for a little bit.

10            THE COURT:  Okay.

11            MR. GOODMAN:  It's important for our committee to

12   make sure the Court kind of understands how we got here where

13   we are today what's changed, what's different so if you'll

14   indulge me, we will kind of go through the presentation.  I am

15   going to kind of, just in terms of providing some context in

16   terms of helping to explain the plan and its benefits to many

17   parties in interest in this case, I will be going back over

18   some of the history in this case.  I just want to say up front

19   that the debtor's professionals, the UCC's professionals, and

20   the TCC's professionals have all been getting along extremely

21   well the last couple months, so I don't mean to be going

22   through the history in a way, you know, is inconsiderate.  I

23   just want to -- it's important later on for the Court to

24   understand how this sort of impacts everyone in the case.  So I

25   just wanted to say that up front.

```
1                   THE COURT:  Okay.

2                   MR. GOODMAN:  I'd also like to thank the United

3    States Trustees office.  We've worked very closely with them

4    throughout the entire case and really appreciate their

5    involvement.

6                   THE COURT:  Okay.

7                   MR. GOODMAN:  Yeah.  We have a presentation.  I

8    decided to just go old school --

9                   THE COURT:  Yeah.

10                  MR. GOODMAN:  -- and use paper.  May I approach?

11                  THE COURT:  Yes.  Can you just hand it to my

12   courtroom deputy?  Thank you.

13                  MR. GOODMAN:  You now, I heard a lot about the ELMO

14   the last time, but anyway, now I'm going to stay away from

15   technology.  We're just going to go with paper.

16                  THE COURT:  Okay.

17                  MR. GOODMAN:  Your Honor, I do note roughly a year

18   ago, I was standing there to my right, arguing for the

19   dismissal of the bankruptcy proceeding, and now we are here

20   today as a plan proponent.  What changed?  I want to explain

21   what happened, and I would begin by explaining it this way.

22   There is a difference between a house that's built on a rock

23   versus a building that's built on sand.  The foundation is

24   extremely important.  Houses built on sand, as you know, don't

25   hold up.  Houses that are built on rock do hold up.  And
```

1    Chapter 11 plans are actually no different, in my view.  Plans

2    that are sort of built with the right foundation, withstand

3    scrutiny, and we, in this case, wanted to build or tried to

4    build a Chapter 11 plan that was built on rock.

5            I personally worked on the Chapter 11 plans and the

6    Takata bankruptcy, PG&E's bankruptcy in Northern California, as

7    well as the Boy Scouts bankruptcy before Judge Silverstein in

8    Delaware, and also helped write the solicitation procedures in

9    both PG&E and the Boy Scouts case.  It took everything that we

10   learned from those cases to be able to put this plan together.

11   Sometimes plans require major surgery.  That's not unique to

12   this or any other case.  Sometimes you have to start over, find

13   a rock, and build something that works.  And as I will explain,

14   in this presentation, we built the plan that is now before the

15   Court on the rock of consent, specifically, the informed

16   consent of the tort claimants.

17           So before I get into the mechanics of the plan, I

18   think it would help the Court to understand our committee a

19   little bit, and sort of the perspective that they brought into

20   the bankruptcy case.  Our committee, each member was appointed

21   by the United States Trustee, as is the case in any bankruptcy

22   case.  Our committee had the ability to retain estate

23   professionals to represent the interests of the tort claimants.

24   All of our members are tort claimants, all six of them, but I

25   would note that most of our members are parents who lost their

1  children, a daughter -- also, a daughter who lost her mother

2  due to her incarceration and what happened in that instance.

3  All of these folks were incarcerated, but they were not

4  obviously, sentenced to die.  The professionals in this case

5  took direction from the members of the TCC.  And in fact, I

6  will let the Court know that every single action that the TCC

7  took in this case was based on the unanimous consent of the

8  TCC.  We did not take any votes until consensus was reached.

9  And I would note that I personally would not take a position

10  that caused me to be against a father who lost a son, or a

11  mother who lost her daughter.

12            I would also note throughout this entire bankruptcy

13  case, we never compromise our core values.  And I'd like to

14  just briefly go over what those values were, or are to us.

15  First, human life has value.  Our country rejects cruel and

16  unusual punishment.  The tort claimants have legal, equitable,

17  and constitutional rights, including the right to a trial by

18  jury.  We followed the plain language of 28 U.S.C. 1411 to the

19  letter.  We wanted to make sure that there was a path to fair

20  compensation, and we believe that consensual settlements would

21  be more likely to deliver fair compensation than a non-

22  consensual settlement.  We wanted to make sure that there was a

23  path to full recovery for all of the tort claimants, and we

24  wanted to ensure that there was a fair allocation of the

25  settlement proceeds.

1          However, and I will note this, and I'm really glad to

2    see Mr. Tripati on the phone today.  I'm hoping that he can

3    hear me.  If he --

4          THE COURT:  He can.

5          MR. GOODMAN:  He can?

6          MR. TRIPATI:  I can.

7          THE COURT:  I know.

8          MR. GOODMAN:  Wonderful.

9          MR. TRIPATI:  I can.  Thank you.

10         Morning, Your Honor.

11         MR. GOODMAN:  Our plan unequivocally rejects Purdue

12   releases, it rejects non-consensual third party releases, and

13   it rejects anything that would be considered even remotely

14   equivalent to a Purdue release.  That, in our view, was sand,

15   and we were not going to build our plan upon that.  We also

16   wanted to ensure that there was an extended period to vote on

17   the plan to ensure adequate notice.  Another point that I would

18   like to make, because this is a bankruptcy case that filed

19   after a divisional merger, the committee here would not accord

20   any weight to the fact that a divisional merger took place

21   prior to the bankruptcy case.  We disregarded the debtor and

22   instead, looked to the, in our view, the real party in

23   interest, which would be YesCare.

24         The opt-out mechanism that I'm going to get into in

25   detail, creates essentially a pass through, in this case, to

1   CHS Texas and YesCare, the parties to whom the operating assets
2   were allocated when the divisional merger took place back in
3   May of 2022.   The plan is in substance, a settlement between
4   the claimants on the one hand, on YesCare -- I say YesCare et
5   al., because there's other folks that fall into that umbrella,
6   on the other hand.   And the settlement values, and I will get
7   into this in a moment, are based on the claims as asserted
8   against YesCare, okay?

9           So now, to kind of briefly go back through.   This is,
10  of course, when we came into the case, the Court knows there
11  was already a settlement in the works and there was already a
12  plan that was on file.   And of course, we scrutinized those
13  documents as soon as we were appointed and retained as its
14  counsel to the committee.   And in our view, the prior plan
15  contained non-consensual third party releases.   It was in
16  effect, constructed around that concept, but in a different
17  way.   In the Purdue bankruptcy case, you would note that the
18  plan itself says non-consensual third party release.   It's
19  pretty easy to spot.   But there's also another variant of this,
20  and this is not just an issue, with respect to this plan.   In
21  fact, it's been, you know -- you know, tried and utilized in
22  many other cases, some of which are pending, some of which went
23  to decision.   You can sort of see some strains of this in the
24  Antelope case that I think originated here and went up on
25  appeal.

1          And just to sort of go over how this sort of can work

2     and why we sort of think of it as a non-consensual third party

3     release, the -- sort of the first step is that the debtor will

4     assert or argue that the claimant's claims, again, based on the

5     injuries that the claimant suffered and not the debtor, are

6     property of the estate, to the extent that they're asserted

7     against non-debtor parties under doctrines, like the doctrine

8     of successor liability.  Under this theory of what is estate

9     property, the claimants were in an effect, divested of their

10    rights on the petition date without notice or compensation, and

11    I would argue that the sort of implication would be that the

12    mere happenstance of bankruptcy means that the debtor now owns

13    claims that it could not have asserted on its own behalf, prior

14    to the commencement of the case under applicable state law.

15         The next step in the structure involves the

16    negotiation of a settlement that would be intended to have the

17    legal effect of enjoining claimants from pursuing their claims

18    in the civil justice system.  If approved, the claimants would

19    then not be able to exercise their right to trial by jury.  The

20    claimant's claims against parties like YesCare and CHS Texas

21    would be deemed settled by the debtor in the bankruptcy case.

22         THE COURT:  The debtor settles the property of the

23    estate issue.

24         MR. GOODMAN:  Yeah.  Right.  Yeah.  I'm going to get

25    into the infirmities.  I'm just kind of laying out what this

1  looks like.

2         THE COURT:  No, no, no.  I'm just making sure -- I

3  understand the argument.

4         MR. GOODMAN:  Yeah.

5         THE COURT:  Yeah.  I'm just making sure that I'm

6  following that you're talking about the debtor settling and

7  that -- an estate cause of action and that it could include

8  theoretically, a successor liability claim.  So therefore, if

9  you settle the claim, it -- you don't like that it would

10  prevent -- potentially prevent a third party from suing a

11  parent, if you will.

12         MR. GOODMAN:  Right.  And what's different about

13  those claims is that unlike avoidance actions or claims that

14  the debtor could have asserted on its own behalf before the

15  commencement of the bankruptcy case, these are claims that the

16  claimants would've asserted on their own behalf prior to the

17  bankruptcy case.  So the party that suffered the damages is not

18  the debtor.  The party that would have the standing, from

19  constitutional standpoint, is the claimant who suffered the

20  injury.

21         So the next sort of progression or step in this plan

22  structure is then to come before the Court and ask the Court to

23  approve the settlement.  And we would argue that the release in

24  this context could be considered non-consensual because the

25  claimant's consent is really not sought or required.  Right.

1   And then -- and again, if approved, the claimant would be

2   stripped of the rights without notice or compensation, and then

3   denied access to the civil justice system.

4          And in the case of a personal injury, wrongful death

5   claim denied the right to trial by jury.  The other, you know,

6   issue that we took pointed out or found concerning to us when

7   we came into the bankruptcy case, again, not from the

8   beginning, but you know, towards the middle, if you will, is

9   that there was in our view an unfair allocation of estate

10  assets.  The prior plan did attempt to allocate the settlement

11  of the estate claims.  Again, claims that reflected the pain

12  and suffering of tort claimants to commercial claimants.  The

13  allocation of the proceeds did not, in our view, match the

14  claims against the estate.  Tort claimants in our view

15  represent 50 percent or more of the total claims asserted

16  against the debtor.  So to have them allocated principally to

17  commercial creditors and us was problematic.

18         So the Court ruled on the motion to dismiss, denied

19  on the 90 19 settlement before the Court was also denied.

20  Following the Court's ruling, denying the motion to dismiss and

21  the rule 90 19 settlement, the TCC and its professionals took

22  the pen on the planned documents.  I will note, if you were to

23  take the time, and I'm not suggesting that you should, and went

24  through all of the fee applications and monthly statements for

25  the months of May, June, July and August, you would see a lot

1   of heavy lifting and a lot of work being done on our part.  And

2   again, as I said, it took every ounce of experience that I, you

3   know, have working on bankruptcy cases involving tort claims,

4   you know, to even begin to sort of create something along these

5   lines and the structure I would maintain really, you know, did

6   its job in this case, but we'll get into that in a minute.

7           But the TCC professionals did function as the primary

8   architect of the plan and the trust distribution procedures for

9   the personal injury, wrongful death claims, which I think

10  particularly when it comes to the trust distribution

11  procedures, it was really important for us to be heavily

12  involved in that process in terms of the values and the

13  mechanics and how that was going to work.  But we did seek to

14  create a new plan structure based entirely on a consensual

15  release.

16          So what happens when you move into a consensual

17  release framework?  A lot of important things happen when you

18  move into a consensual release framework.  First off, all of

19  the opt-outs now have a clear right to return to the civil

20  justice system and to litigate.  And that includes Mr. Tripati.

21  He did opt out from the consensual claimant release and the

22  plan.  And he does have the right now to return to the civil

23  justice system and to pursue his claims.  Opt-outs do not face

24  any cap or limitation on the damages that they can seek and

25  recover.  Our plan does not say that you can choose between

1   $100,000 and the ability to pay a $5,000 fee for the right to

2   litigate and recover no more than $105,000.  This is not an

3   opt-out that would be considered illusory by any stretch of the

4   imagination.  Whatever the jury awards, that is exactly what

5   the claimant can then seek to recover from the defendants in

6   that action.  They are returned to the civil justice system

7   without limitation again on the damages that they can seek.

8           THE COURT:  I remember there was a prior version of

9   the plan that essentially funneled everyone to kind of a

10  mandatory mediation at the very beginning.  This one seems, if

11  you opted out, you're really out.  Like --

12          MR. GOODMAN:  Correct.

13          THE COURT:  -- out of the case.  And then you can go

14  and return and whatever.  Like there's not, kind of a multi

15  step process to get out.  The literally -- the opt-out gets you

16  out.  If I understand it correctly.

17          MR. GOODMAN:  That is 100 percent accurate.

18          THE COURT:  I just want to make sure I'm

19  understanding.

20          MR. GOODMAN:  And in fact, we also even

21  completely got rid of the gate keeping mechanism as well.  So

22  there is no pre-screening requirement.  I mean, if a party has

23  their case in the civil justice system and there's Mr. Kelly, I

24  believe up in Michigan who also opted out and wants to pursue

25  that litigation.  As soon as the plan goes effective, they are

1   free to appear in federal court and continue their case, ask

2   for a jury to be paneled and have their case heard and have it

3   tried in that forum.  Obviously, if someone were to assert a

4   fraudulent transfer claim and that litigation, I think that

5   some would come back and see you, Your Honor, because that is

6   part of what is being settled here.  But in terms of the claim,

7   the personal injury, wrongful death claims an opt-out is free

8   to continue that litigation in the civil justice system.

9            THE COURT:  Got it.

10           MR. GOODMAN:  And also very important to us, the plan

11  specifically enjoins CHS TX and YesCare from taking the

12  position in that litigation that the claims that are being

13  asserted against them under the doctrine of successful

14  liability were somehow settled in this bankruptcy case as

15  estate claims.  So the plan specifically says, no, right.  This

16  is not a situation where someone opts out, they go back to

17  Michigan and then they're told, wait, oh, sorry, but your claim

18  against these parties was actually part of that settlement.  So

19  there's really no point to you continuing your litigation.

20           In fact, in our situation, that's one of the benefits

21  that we provided to the opt-outs is they have clarity that

22  their, you know, claim was not settled in this bankruptcy

23  proceeding and they're free to pursue that litigation.  And of

24  course, you know, the decision to opt out here as we discussed

25  at the disclosure statement hearing was completely divorced

1  from the plan voting and was also done with a 90-day notice

2  period.  And just put a pin in that 90 day notice concept.  I

3  want to come back to that in a few minutes.

4         So it -- which then meant that folks who wanted to

5  opt out could at the same time vote in favor of the plan.  And

6  that's exactly what happened.  The majority of the opt-outs in

7  our case are those who voted.  Not all opt-outs actually voted,

8  but of the ones that did they are a consenting class here.  So

9  this is not a situation where the opt-outs said I'm opting out

10 and voting.  No.  Besides that should really tell the Court

11 something about our opt-out.  These are people who are saying

12 I'm opting out and I'm voting yes, I'm voting to accept this

13 plan.

14        So who benefits from this structure and, you know,

15 how does this work?  What are the consequences to the parties

16 in the case?  Obvious parties who benefit are the claimants who

17 want to litigate like Mr. Tripati.  In fact, he gets what he

18 wants.  The opt-outs that we spoke to obviously are huge fans

19 of our plan.  They voted in favor of it.  The class of claims

20 that includes the folks who opted out is a consenting class

21 under our plan, based on the voting results, they now have a

22 clear path back to the civil justice system where they can

23 litigate their claims, including using the doctrine of

24 successful liability.  They don't face any -- they don't face

25 uncertainty over whether the claims based on the injuries that

1  they suffered are being settled without their consent.  And the

2  TCC, I want to point out, is incredibly respectful of the

3  decision made by any claimant to opt out.  You know, we --

4  Mr. Tripati made a -- an informed decision on this point.  We

5  don't begrudge any opt-outs.  This was their decision to make

6  and theirs alone.  And in fact, that was critical for us,

7  because in our view for the release here to be considered

8  consensual, there actually had to be consent.

9           So the next, you know, folks who obviously want to

10  litigate, you know, again, supportive of our plan and one great

11  aspect to this, is that the high value claims that, you know,

12  perhaps don't fit into our trust system are not forced into the

13  trust system, right?  Our plan is not a one size fits all

14  mechanism.  You know, we did not proceed based on the view that

15  unless everyone is required to participate in the settlement,

16  settlement is not possible.  We got to settlement at a very

17  high percentage, but the folks who decided to opt out, you

18  know, do now have the ability to seek significantly higher

19  recoveries in the civil justice system.  Again, if they hit a

20  judgment for $5 million, that's theirs to attempt to collect,

21  they're not capped or limited in any way by the TDP because

22  they're not -- their claim isn't being liquidated in that

23  fashion.  Likewise, if they strike out, they strike out and

24  that's how litigation works.  So that's the benefit to the

25  folks who are opt-outs.

1          This structure also had incredibly profound

2    consequences for the parties who want to settle.  So let's talk

3    about the parties who are, you know -- are participating in our

4    settlement.  Our plan constitutes a settlement of claims.  This

5    is set forth clearly in Article 4E.  The claimants are

6    exchanging their claims against non debtor parties and the

7    debtor for a claim against a settlement trust.  The trust

8    distribution procedures for personal injury, wrongful death

9    claims specify how all PIW claims will be valued.  The

10   disclosure statement provided claimants with a forecast of the

11   likely payment percentage and the claimants who participate

12   will receive a pro rata share of the trust assets.  Again, when

13   we did see an objection at the disclosure statement phase where

14   someone suggested, but what if, you know, people show up early,

15   are they going to get all the money and there's not going to be

16   anything left for the folks at the end?  Impossible.

17          The way that our trust works, the way the trust

18   agreement is set up, the claims are all going to be liquidated,

19   then everyone will get a pro rata recovery.  In fact, in our

20   disclosure statement, we forecast that could be between 20 to

21   40 percent, you know, depending how the claims are liquidated,

22   what the trust assets look like.  But everyone's payment

23   percentage will be identical.  So you know, folks who show up

24   on day one versus day 14 should get paid -- should -- will get

25   paid the same.  As -- again, as I noted, the plan is a

1    settlement of claims is set forth in Article 4E.  The release

2    that is being provided to the defendants does occur by

3    operation of the plan, which is why our opt-out occurs at this

4    stage, right?  It occurs here, right now.  So that folks are

5    not forced into the plan settlement.  If that's something that

6    they don't want to participate in.

7              THE COURT:  If someone who opts out of the entire

8    system, if I confirm the plan, when can they go seek?

9              MR. GOODMAN:  As soon as the plan goes effective.

10   Our hope would be Mr. Tripati, again, under our plan is getting

11   exactly what he has said he wants.

12             THE COURT:  Right.

13             MR. GOODMAN:  Which is the ability to go to the civil

14   justice system.

15             THE COURT:  Bought there and goes to --

16             MR. GOODMAN:  So those -- as soon as our plan goes

17   effective, the keys turn, the door is open and they are free to

18   proceed in the civil justice system.  Again, be fought very

19   hard for Mr. -- Mr. Tripati in this case, as well as every

20   other -- everyone else who opted out.

21             THE COURT:  Okay.

22             MR. GOODMAN:  Again, in this structure, obviously the

23   folks who are settling a critical issue is that they receive

24   adequate information about how the claims are going to be

25   valued and paid so that they can make an informed decision.

1   And again, as I said earlier, our trust is not a one size fits

2   all solution, but I think it is viewed as incredibly beneficial

3   by many claimants who would prefer a settlement as opposed to,

4   you know, litigating in the civil justice system.  Our process

5   then sets up what I would call a second settlement that occurs

6   between the claimant and the trust.

7            The trust, as I said, will evaluate all of the claim

8   submissions in accordance with the trust distribution

9   procedures that were part of the disclosure statement.

10  Eligible claimants would then receive an award and then the

11  claimants would exchange their claim against the trust for an

12  award that would entitle them to receive a distribution.

13  Right.  So the first exchange is claim against non debtors and

14  debtor in the civil justice system for claim against the trust.

15  And then the next move happens within the trust, which is

16  taking your claim against the trust and now accepting the

17  award, which is then what entitles you to the pro rata

18  distribution under our procedures.  And again, then

19  distributions will be made to the claimants based on the trust

20  assets and a key and critical trust asset is the PIWD trust

21  share of the settlement proceeds, which is, you know, $25

22  million, again, I think paid over two years.  Might be a little

23  longer than that.

24            But again, hope by the time all of the last claims

25  are allowed, and when the, you know -- the payments are

1    received, we're hoping that lines up nicely.  The folks who

2    want to settle, there's another aspect of this that is

3    extremely beneficial to them.  And again, this derives from the

4    fact that we abandoned the non-consensual structure and moved

5    into a consensual structure.  The settlement here is not

6    contingent upon the Court approving any non-consensual releases

7    or anything that could be considered controversial.  In fact,

8    this was a big issue for us.  I would just note that the Purdue

9    case, which filed for bankruptcy, September 16th, 2019, you

10   know, it's now 2025 and no claimants in the Purdue case have

11   received payment.  The case went up to the Supreme Court.  It

12   was reversed, remanded back down.

13           I have some general understanding that discussions

14   are still ongoing as you would expect, nothing beyond that, of

15   course.  But you know, the point is that litigation, you know,

16   as the Sackler sort of demand for that 100 percent finality

17   existed out there, you're in a structure where the payments to

18   the claimants who actually want to settle are contingent upon

19   what you would term extraordinary bankruptcy relief, which is

20   not good for the claimants who do want to settle and get paid.

21   So the claimants here can settle against YesCare.  The other

22   issue, and this is sort of coming back to the full payment path

23   and sort of put a pin in that because we'll kind of get back to

24   this later, but they also have the ability under our plan to

25   pursue additional recoveries from co-liable parties, which

1   would include governmental entities.  So we actually have a
2   very elaborate structure built into our case that sets the
3   guardrails and parameters for that to happen and, too.

4           So just to sort of ask the question that might be on
5   your mind, what this means is that a claimant can show up to
6   the trust and they can settle against one of the two
7   defendants, right?  Defendant A is Corizon Defendant B may be
8   the state of Arizona.  So under this structure, they are
9   settling with Corizon et al, right.  And that's, you know, a
10  settlement with one defendant in that litigation.  They can
11  receive the payment from the settlement trust, so they get a
12  distribution.  So it's like we're on the steps of the
13  courthouse and we have two defendants and one says, look, will
14  you take X?  And if the answer to that is yes, then you can
15  settle with that party.  They're not then going into court.
16  And, you know, the plan is no different.  If a party so
17  desires, they have the ability under our plan to pursue an
18  additional recovery from the state if they, you know, properly
19  name them and they're part of that litigation.  So there is a
20  potential for an additional recovery beyond what they could
21  recover from the trust.

22          And again, we did not, you know, release those co-
23  liable parties.  But there are provisions in our plan, I would
24  note, that function just like a settlement would outside of
25  bankruptcy, the claim over provision.  If someone says, I'm out

1   I'm tapping out, I'm settling, I'm not part of this litigation

2   anymore.  You know, under applicable law, to the extent that

3   applies, that would prevent the party that says, no, I want to

4   litigate, from then coming back and seeking --

5             THE COURT:  Coming back.

6             MR. GOODMAN:  -- yes.  So again, this is an added

7   protection that we built in for YesCare's benefit.  This was

8   something that was not in the prior plan, but it was something

9   that we put in to this plan to make sure that they got the full

10  benefit of entering into a good faith settlement as a -- in the

11  context of this bankruptcy case.

12            And again, it's our view and hope that if this new

13  plan is confirmed, the victims will likely receive payments

14  this year.  And again, not, you know, years and years from now

15  when, you know, appeals are pursued.  So again, Mr. Tripati

16  gets what he is looking for in terms of his ability to go to

17  the civil justice system and pursue his claims, and the parties

18  who want to settle are getting what they want, because they

19  then can participate in the settlement structure under this

20  plan.

21            Another benefit to the parties who want to settle is

22  the fact that our settlement is what I would call market

23  tested.  You know, one of the issues that I -- we have with the

24  estate claim settlement structure is that in that context or in

25  that sort of formula, you have the debtor and non-debtor

1   defendants negotiating between themselves a price or a

2   settlement that then gets brought to the Court for approval.

3          Under the opt-out structure, which is this new plan,

4   right, the price is included in the plan that is then subject

5   to a vote and subject to an opt-out.  So what that means is

6   that if the price here had been too low, right, the claimants

7   had said no that's not enough money from me in terms of my

8   claim, I would rather opt out and go litigate, then the

9   participation percentage would've been very, very low.  You

10  would've seen tons of opt-outs.  People would've said, I'm not

11  participating in this.

12         If the price is set right, then you end up with a

13  percentage aligned with what you see here before you today,

14  which is a very, very high participation percentage, because we

15  were able to get the funding for the claimants up

16  significantly.  I know this is sort of rough math, but our

17  estimate was that under the prior settlement, we thought that

18  by the time you took into account all of the, you know, fees in

19  the bankruptcy case, everything, it could have netted about $8

20  million to the -- to the claimants.  Our structure now is a

21  number north of 25 million.  So that's over a 300 percent

22  increase.

23         And this was actually something that we did sort of a

24  sounding board with our committee members.  We went to them and

25  we said, look, if we value your claim in this way and then you

1  receive this payment percentage, is that something that you

2  would accept?  And we had to sort of make sure that all of them

3  were comfortable with that before we even went to market to

4  find out what the rest of the Tort claimants thought.  But

5  because of that opt-out mechanism, you ended up with a market

6  test, if you will, when we did the solicitation in this case,

7  which was very important.

8           In fact, the 300 percent increase wasn't terribly

9  surprising to me.  You know, one of the things that I have

10  noted in other cases is that when you're in that non-consensual

11  structure, you typically are at a much lower funding point than

12  you are when you have a market test that occurs.

13          Again, an obvious data point, you know, along those

14  lines is, of course, the Aearo case before Judge Graham in

15  Indiana, where in the bankruptcy proceeding, you know, it was

16  offered, you know, here is your one and only offer, $1 billion.

17  And you can only get this in this bankruptcy proceeding.  And

18  as soon as Judge Graham said case dismissed.  You know, I think

19  it was in less than two months, there was an out of court

20  settlement.  Well, of course, that's a consensual settlement,

21  right?  That's not, you know, the non-consensual one.  And I

22  believe that was in the $6 billion range.  So we didn't go from

23  one to six.  We went from eight to 25.  But again, you can see

24  the increase when you're operating in the consensual structure.

25          So again, profound impact on the parties who wanted

1    to participate in the settlement.  The TDPs explain how the

2    claims were valued.  The disclosure statement explains the

3    payoff, the percentage.  Again, if everything had been set

4    differently, we might have seen a lot more opt-outs, in which

5    event our plan wouldn't be confirmable.

6         So this brings me to the next party that I think has

7    benefited significantly from this plan structure, and that is

8    YesCare.  And some people may say, well, Eric, what do you

9    mean?  You came up with a plan that benefits YesCare?  And my

10   answer is, yes, I did.  The key thing here is that we have

11   eliminated the risk that a future court would find that the

12   estate claim settlement doesn't prevent claimants from

13   asserting claims under the doctrine of successor liability.

14        And I'm just going to kind of take a step back for a

15   moment and talk about the Emoral decision under the Third

16   Circuit.  Obviously, that's an out of circuit case, but it is a

17   case that deals with the doctrine of successor liability.  And

18   in that case, the Third Circuit held that the debtor could

19   settle what were Tort claims that were asserted against the --

20   a successor to the debtor as part of the settlement of estate

21   claims.  The debtor had sold its assets prior to the filing to

22   a purchaser.  The asset purchase agreement explicitly said that

23   the purchaser was not assuming any of the Tort liabilities.

24        So there was no claim that the debtor could have

25   brought for breach of contract.  In fact, just the contrary;

1    the contract said the purchaser isn't taking these things.  But

2    the Tort victims turned around and brought, you know, the claim

3    against the purchaser, who was the successor to the debtor and

4    argued under New York law that they had the ability to pursue

5    those claims.

6           The Third Circuit, in its analysis in the <u>Emoral</u>

7    case, did what you would expect.  They began by looking at

8    state law, as is required under the Supreme Court's ruling in

9    <u>Butner</u>, and then undertook sort of a brief <u>Erie</u> analysis to

10   sort of try to take a -- make a guess as to what New York law

11   would say or would whether New York law would or would not

12   recognize a cause of action for successor liability.  The Third

13   Circuit performed its <u>Erie</u> analysis.  And based on that, it

14   reached the conclusion that New York would recognize a cause of

15   action for successor liability.  But if you look carefully at

16   that opinion, the -- an <u>Erie</u> analysis was based on citations to

17   federal bankruptcy court rulings.  It was not based on

18   citations to any state court decisions.

19          After the <u>Emoral</u> case was decided by the Third

20   Circuit -- and again, it's, you know, years in the past --

21   several New York appellate courts -- these are state appellate

22   courts -- parties came before, you know, the New York state

23   courts and said, I am suing this person for successor

24   liability.  And the defendant said, move to dismiss, that's not

25   a thing, right?  And it went up on appeal, and the New York

1  courts of appeals have now uniformly held that New York law, in

2  fact, does not recognize a cause of action for successor

3  liability.  So if the Third Circuit were confronted with that

4  same case today and had, you know, to decide <u>Emoral</u>, and if it

5  were to, you know, follow or rule based on what state law says,

6  I don't know that it could reach the same holding that it

7  reached in that case.

8          So what does this mean for YesCare?  Well, if you

9  think about <u>Butner</u>, <u>Kaplan</u>, <u>Erie</u>, <u>Emoral</u>, you have to sort of

10  recognize that there is sort of risk or infirmity in that

11  structure.  In fact, there is litigation pending today in the

12  Third Circuit on this exact issue.

13          THE COURT:  Talking about the <u>Whittaker Daniels</u>?

14          MR. GOODMAN:  Yes.

15          THE COURT:  Yeah.

16          MR. GOODMAN:  Yeah.  So again, <u>Emoral</u> could be

17  overruled.  We are obviously in the Fifth Circuit, not the

18  Third Circuit.  You have Fifth Circuit case law, like <u>Educators</u>

19  <u>Group Health Trust</u> and other decisions talking about who

20  suffered the harm, looking at state law.  You know, there was a

21  concern on our part, you know, that YesCare would've been a

22  situation, to sort of play this out, where they enter into a

23  settlement of estate claims thinking that they're buying a

24  finality, they pay $40 million, and then it turns out that the

25  car has no wheels, no steering wheel, and they actually, you

1  know, did not get the benefit of the bargain.

2         Under our structure, YesCare now knows exactly what

3  they're buying, right?  Because of our structure, everyone who

4  is saying, I'm in this settlement, I'm participating in the

5  settlement, YesCare can look at this population of claimants

6  and say, it is worth paying this money to settle all of these

7  claims in a consolidated proceeding.  I know that I've got 12,

8  you know, opt-outs over here and I'm going to have to deal with

9  them.  But in terms of recognizing this at the front end, we

10 put YesCare in a position where they could appropriately price

11 the settlement before they were locked into it.

12        And that was part of the walk right mechanism that we

13 gave them in the plan.  We basically said, look, I understand

14 you don't want to buy something until you know what you're

15 buying.  And if I were in your shoes, I would feel the exact

16 same way.  So we're going to use this Chapter 11 process to

17 define with specificity what it is that you're purchasing with

18 the settlement, you know?  And again, if we had had a ton of

19 opt-outs, then YesCare could have said, look, we're not getting

20 what we thought we were getting, we're going to walk away.  And

21 I would've said, I respect that, we're going to give you the

22 right to do so.

23        And -- or they could have said, alternatively you

24 triggered our walk right, but we're not going to walk.  But it

25 -- still, it would've been their choice, right, to make in that

1   context.  So by moving into the structure, we put YesCare in a

2   situation where now they know exactly what they're purchasing

3   and what they're getting out of the settlement.  And in fact,

4   the release that is part of this is similar in scope to the

5   release that a claimant would be required to sign to settle

6   with YesCare outside of bankruptcy.  So that's sort of how we

7   thought about it in that context.

8          And again, the claimants who are participating in the

9   settlement trust now have exchanged their claim in the civil

10  justice system for the claim against the settlement trust.

11  They will get that payment from the trust.  They will not be

12  able to darken the door of YesCare or any other party again,

13  because they will, you know, obviously be releasing those

14  claims as a part of this.

15          THE COURT:  It's funny that you mentioned -- when I

16  read these provisions, I think it just provides clarity for me

17  as to kind of some of the thinking.  So I appreciate it.  I

18  thought you were -- that this plan was trying to kind of just

19  provide clarity on both sides.  So if you opt out, this is

20  what, you know, you're -- we'll try to give you the best

21  clarity on kind of what that means to opt out.  If you don't

22  opt out, then clarity as to kind of what you will receive and

23  stuff.  But then at the same time, you who are putting in the

24  money, you now have clarity so that kind of all parties

25  understood, to the best of everyone's ability, the deal.

1  But -- and part of that was to remove this kind of litigation

2  risk that is happening elsewhere that could find itself ashore

3  here.

4           That's -- that was my -- what I was reading it from.

5  And I know that there's still objections there, but just in

6  terms of the deal, it seemed so that -- which I very much

7  appreciate, you know, obviously it's subject to objection.  But

8  I appreciated at least the concept of trying to give everyone

9  kind of a sense of that five years from now or two years from

10 now --

11          MR. GOODMAN:  Yeah.

12          THE COURT:  -- someone isn't showing up in 2027

13 telling me, you know, hey, we got to think about this.  That's

14 not what we were talking about there.  At least it's -- at

15 least we have a clean record as to kind of what everybody

16 understands the deal to be.

17          MR. GOODMAN:  Yeah.  Again, we figured we had one

18 shot at this.  One shot.  So we came into this with what I

19 would say, respect for everyone.  You know, no one's

20 overreaching.  Everyone is going to come forward and try to put

21 something that's -- on the table that's fair to everybody.  And

22 when I say everybody, I include YesCare in that too, because it

23 has to work for them for it, you know, to work for the

24 claimants and everyone else.

25          The other thing, you know, that we fixed or sort of

 1  changed was the allocation.  We noted, you know, few moments
 2  ago, the prior plan was based on what we considered to be an
 3  unfair allocation.  In our view, the Tort claimants are at
 4  least 50 percent of the total liability, and they weren't
 5  getting at least 50 percent of the share of the settlement
 6  proceeds, which, you know, created, you know, an issue for us.
 7  We now have a 50/50 allocation under the plan.  And I would
 8  note that I don't know that if we would have had the leverage
 9  in the case to get to that, absent the Court's ruling on the
10  9019, I can't say that for certain because, you know, who knows
11  what would've happened.

12          But we are at a point in the case now where we do
13  have that 50/50 allocation.  And again, that was critical for
14  our standpoint in terms of getting the votes, because we needed
15  that cash.  We needed to be able to show to folks here's what
16  you're going to get on account of your claim under the TDP, if
17  you don't opt out.  And again, at the $8 million funding level,
18  I know I didn't have enough gas in the tank.  I would've ran
19  out on the freeway and the car never would've gotten to where
20  it needed to go.

21          So coming back to the voting issue.  Notice,
22  obviously, is a -- is an important issue in the case.  The U.S.
23  Trustee -- I thank them for this -- have raised this over and
24  over again.  And that was something that was extremely
25  important to us.  In our case, we did use a 90-day notice

1   period.  And, you know, as a threshold matter, that was

2   obviously necessary for us to make sure that the claimants in

3   this specific case had an opportunity to review the plan

4   documents, consult with their attorneys, and make an informed

5   decision.  In terms of getting documents to parties who were

6   incarcerated, there's additional time that it takes for that to

7   occur.

8        But I will just sort of make this observation from

9   prior cases, you know, as well as this one.  Providing extended

10  notice is not always about the number of claims.  It actually

11  has a lot more to do with who the claimants are.  You know, if

12  you look at the Boy Scouts case again, I know it too well,

13  because I helped write the procedures in that case.  It was

14  170 days notice to the victims of sexual abuse.  PG&E ended up

15  being 170 days as well.  It actually started off, I think, in

16  the 120 ballpark, but it got extended in terms of the voting

17  deadline got pushed further because there was a realization

18  that there were a lot of folks, you know, in rural areas that

19  had just not really fully comprehended what was even going on

20  in the bankruptcy proceedings.  So it was extended for them.

21       Purdue, I believe, was roughly 150 days in terms of

22  the voting.  You know, we weren't in that "ballpark," but we

23  knew that we needed at least 90 to sort of get this done and

24  get this done right.  So we -- the threshold matter in terms of

25  thinking that through, we started off with the view that we

1   needed to build in time for the claimants to just get the

2   documents.  You know, obviously, claimants have jobs.  Some are

3   incarcerated.  You know, they have lives that they're leading.

4          So we had to sort of build in a time period for them

5   to just receive the information as a threshold matter.  On top

6   of that, we then had to build in time for them to review the

7   documents get the mailing, see our letter hopefully read it.

8   Whether they cracked the disclosure statement or not, you know,

9   I'm sure some did, we wanted to make sure that they read

10  that -- those documents and saw it and understood what was

11  going on.

12          And then more critically, because a lot of our

13  claimants here, we have a mix of pro ses and we have some who

14  are represented, we wanted to allow time for the claimants who

15  do have representation to consult with their lawyers and talk

16  to them and find out what's going on.  In fact, I will note

17  that the first 30 days of the solicitation period in this case

18  was more or less a dead period for us.  We just didn't hear

19  anything from anyone.  And then the phone really started to

20  ring and we got a lot of phone calls, I think it was probably

21  between day 30 and 60 where we got the most phone calls.

22          And it was interesting because a lot of the people

23  who reached out to us were lawyers.  They were state court

24  counsel and they wanted to understand what was going on in the

25  bankruptcy and how did this work?  And for some we were on the

1   call for, you know, 15, 20 minutes, some the calls were, you

2   know, longer than that.  But we wanted to make sure that the

3   lawyers who represented the claimants really understood the

4   bankruptcy.  And a lot of them, you know, came into it

5   thinking, oh gosh, you know, I don't want to release my claims.

6   You know, should I opt out?  Is that a good thing?

7           And as we sort of explained it to them, you know, a

8   lot of the phone calls ended with an a heartfelt thank you and

9   a decision that, in fact, they did not want to opt out.  They

10  wanted to be part of the settlement, you know, proceeding.  But

11  again, we wanted to make sure that everyone went into this eyes

12  wide open and we wanted to make sure that everyone understood

13  it.  So we had to allow time for that.  We also did a virtual

14  town hall event and we worked closely with public justice and

15  other interest groups to ensure that we had appropriate

16  outreach to pro se claimants.  And we did receive a lot of

17  responses from pro ses in terms of the voting.

18          So -- okay.  I just went over that.  So following

19  this whole process again, and the other thing I just wanted to

20  note, and just in terms of baking in the whole 90-day period,

21  it was actually between 60 and 90 where we saw a lot of the

22  votes come back.  So just in terms of breaking it up, it was

23  kind of in that window where we really got a lot of folks

24  coming back and mailing the documents in.  We would receive

25  periodic reports, obviously, from Verita, who did a fantastic

1  job in this proceeding.  Of course, you know, every week you

2  log in, you see the report.  Where are we?  How are we doing?

3  You know, what does the vote look like?  You know, how many

4  opt-outs do we have?

5           You know, we were tracking this very closely and then

6  we saw that, you know, sort of movement up between the 60 to

7  90-day period.  And that's where we felt like, hey, we really

8  got this -- got this right in terms of -- in terms of how that

9  worked.  So with respect to the U.S. Trustee, I know that they

10  have their, you know, pending objection, but I would say that I

11  actually think this was a very good, good case for an opt-out

12  plan, and there are several reasons why.

13           First, the Court set a bar date in this case.  So we

14  had a defined universe of claimants.  So that was obviously

15  very beneficial.  This is not a case involving latent injuries.

16  And also, I would also note that most of the claims here are at

17  least two years old.  The injury had to occur prior to the

18  May 2022 divisional merger to be included in this bankruptcy

19  case.  If your claim arose after the divisional merger,

20  obviously it would be YesCare who would have the

21  responsibility.  So if the debtors cease to be an operating

22  entity after the divisional merger, we're not dealing with

23  folks who got injured in the last three months, and you know,

24  may still be at the point where they're dealing with doctor

25  visits and haven't even thought about, you know, consulting

1  with a lawyer.

2        You're dealing here with people who were injured, you

3  know, two years ago.  And if they have thought, you know, to

4  reach out and pursue a claim they've already had a lot of time

5  to do that.  So that, again, was very helpful.  Again, we used

6  an extended notice period, and as I noted, a significant amount

7  of the vote did come in between that 60 and 90 day point after

8  we began solicitation.

9        We had a very high voting participation in this case.

10  You know, I often see less than 50 percent of filed tort claims

11  actually vote on a plan.  I remember working on the Takata case

12  and driving down the street to the airport, I would see

13  billboards about Honda vehicles and go in, and I actually drove

14  in Acura at the time, so I even got the notice.  It turns out I

15  didn't need a new airbag, but I was just, you know, amazed at

16  just how much press and everything went into this, and yet less

17  than 50 percent of Honda owners actually showed up to get their

18  new airbag.

19        So we understand that there's a difference between,

20  you know, folks who are entitled to the new airbag versus the

21  ones that actually respond to the notice plan.  We actually had

22  a very high participation percentage in this case.  I think we

23  were over 50 percent based on filed proofs of claim, which

24  shows in my mind that we had a very engaged claimant population

25  that was following this case and knew what was going on.  And

1  again, the majority of the claimants who opted out of the

2  settlement trust did, in fact, vote to accept the plan.

3          Other thing I would note about this particular case,

4  there was no consolidated proceeding involving claims against

5  Corizon before the bankruptcy case.  It wasn't like there was

6  an MDL or a JCCP or anything like that, where everyone who was

7  bringing claims was bringing it in one forum.  In effect, what

8  we did, and Judge Sontchi even said, Eric, do you realize

9  you're doing this?  And I said, no, but I think you're correct.

10 We created a plan that effectively transformed the debtor's

11 bankruptcy case into an MDA -- MDL style settlement, if you

12 think about it.

13         We created an environment where YesCare and Corizon

14 could effectuate a global settlement that did not exist prior

15 to the bankruptcy case.  So to resolve this case, we actually

16 used the tools that you would see in a civil litigation system

17 in order to effectuate a settlement structure that worked and

18 created the contours of this Chapter 11 plan.  In fact, I've

19 heard it argued before, and again, I think this was something,

20 you know, came up in Aearo that bankruptcy is better than the

21 civil justice system.

22         That's really never made sense to me.  I think our

23 plan shows that the two can coexist, you know, quite nicely.

24 You know, again, the right to appear -- and I speak to

25 Mr. Tripati on this, and as well as every other opt-out -- the

1   right that they have to appear, to be heard, and to seek just

2   compensation for their injury is a fundamental right.  You

3   know, bankruptcy, in my view, has never rejected the Seventh

4   Amendment or the Fifth Amendment.  And we came through with a

5   plan that we believe preserves everyone's rights, again,

6   including the right to a jury trial and the right to recover a

7   full award, however it is determined, whether it's a zero or a

8   large number, that is preserved.

9          So why so few opt-outs?  That was kind of an

10  interesting thing.  I wanted to sort of deal with that one,

11  because someone said, well, look, if they can opt out, they can

12  go get this huge award in the civil justice system, you know,

13  how did you end up with just 12, right?  And I think the answer

14  to that is we just offered the tort claimants more money,

15  right?  We offered them a point where they could look at the

16  proceeding and they could say, yeah, this is a number that I

17  would take to settle this claim.  And that translate --

18  translated into a very high level of participation, and again,

19  made it worthwhile for YesCare to want to go forward with the

20  settlement.

21          And again, as I noted earlier, just taking the money

22  from the trust, it doesn't -- does not mean that you are

23  foreclosed from pursuing co-defendants.  The duty to provide

24  healthcare to incarcerated claimants is a nondelegable duty.

25  Both Corizon and the governmental entity at issue could be co-

1    liable for damages, and plaintiffs here under our -- under this

2    plan can enter into the good faith settlement with Corizon,

3    release Corizon and others from the case, and they are not

4    precluded or prevented in any way, shape, or form from seeking

5    additional recoveries, which again, means that they do have a

6    path to get paid in full if they want to pursue that additional

7    litigation.  Many may decide that they don't.

8           Other planned modifications that we made along the

9    way, we changed the classification scheme.  Different

10   treatment, obviously, means separate classes.  We did not try

11   to put dissimilar claims together in a single class and treat

12   them differently.  Far from it.  You'll note that there are a

13   lot of classes under this plan, each one of which is an

14   accepting class and doing it that way eliminated the need for

15   voting estimation.  If you recall, I think the State of Idaho

16   appeared at the disclosure statement hearing and said, wait a

17   second.  You know, I -- you know, I -- my claim is liquidated

18   and I want to have more power from a voting standpoint.  I

19   don't want to see my claim diluted in a class of other parties.

20          And we explained that that's not at all what we're

21   trying to do at all.  In fact, you're in your own class from a

22   voting standpoint.  You know, Idaho was placed into the class

23   with other indirect claimants, and by indirect, I don't mean --

24   indirect is sometimes the wrong word, but their claims for

25   subrogation, contribution, indemnification they're not --

1              THE COURT:  Oh, that's right.  I remember.  I

2   remember.

3              MR. GOODMAN:  Yeah.  So those claimants, the people

4   with those kinds of claims, we didn't lump them all together.

5   We put them in their own spot.  We let them vote.  And again,

6   they were overwhelmingly voted to accept the plan, but they

7   didn't really have to worry that their interests or that their

8   views were going to be sort of drowned out because they were

9   thrown together with other parties.

10             Again, we were not trying to force a plan on them or

11  anyone, you know, where the parties in the particular class

12  didn't like it and did not believe that they wanted to accept

13  the plan.  Disclosure statement issues, again, we dealt with

14  this at a disclosure statement hearing, but again, I want to

15  emphasize, we tried to be completely transparent with everyone

16  in this case.  We explained how the claims will be valued with

17  the TDPs.  We explained what the payment percentage would be.

18             Absolutely no suggestion that claimants will be paid

19  in full.  In fact, they will not be paid in full under our

20  plan.  We solicited votes using Court-approved disclosure

21  statement and solicitation procedures.  All ballots were cast

22  by the claimants.  No one exercised the claimant's right to

23  vote for them.  And the claimants who did vote, each one of

24  them filed a proof of claim in the bankruptcy case.

25             So in my view, everyone won.  No denial of access to

1  the civil justice system.  Mr. Tripati has been jumping -- you

2  know, saying I don't want to be forced into a settlement.  And

3  we fought very hard for him to have his rights and to pursue

4  the -- his recovery in the civil justice system, no denial of

5  the right to a jury trial, full opt-out, preserves the

6  constitutional rights.  The TCC has stayed true to its word

7  that it would not support a plan that attempted to deprive tort

8  claimants of the right to a jury trial.  There was a 300

9  percent increase in compensation for tort claimants, I would

10 argue in large part, because it was a market tested process.

11         The tort claimants here were given a real choice, and

12 I would also note, if you went back and kind of did the

13 analysis on the back end, we discovered that we think the

14 commercial claimants actually are doing better under this plan

15 structure than under other prior scenarios.  So this was a

16 situation where the rising tide really did lift all of the

17 boats in the case.

18         I would submit that YesCare is also a major winner

19 here as well.  The consensual releases, in my view, are better

20 than an estate release.  The consensual release, again, is

21 similar in scope to what an out of bankruptcy settlement would

22 involve in terms of the scope of the release.  YesCare also

23 preserved its insurance rights for opt-outs.  We didn't try to,

24 you know, take YesCare's insurance coverage away from them in

25 any way, shape, or form.  So if they do have insurance, they

1  could respond to an opt-out claim in the civil justice system.

2  That is preserved and it is available to YesCare.

3          Again, we're also not in a situation where YesCare is

4  in danger of paying for an estate release, only to find out

5  later on that the release doesn't preclude litigation against

6  it.  And I would also note, as the bankruptcy case ends and we

7  go effective, no more professional fee spend.  That comes to an

8  end in -- as well.

9          So I would also sort of note -- I haven't sort of

10 mentioned the government entities or -- and the fact that they

11 can be sued.  They also do benefit from this plan structure as

12 well.  A lot of the governmental claimants, again, if you're a

13 co-liable party, when the other defendant steps up and pays

14 significant money to settle the claim, obviously plaintiff can

15 only recover once on account of a single injury.

16          So even though they do continue to face litigation

17 potentially in the civil justice system, at least a portion of

18 the claim has now been satisfied or paid by a co-defendant.

19 And in fact, it may be the case that some claimants decide

20 since they have received some recovery, they don't want to

21 pursue further litigation.  But that, of course, is going to be

22 -- is going to be their choice.

23          So I would submit we would not be here today if

24 YesCare had demanded a plan that guaranteed them 100 percent

25 finality.  We got to 95 percent finality, but not 100.  We

1    wouldn't be here today if a single member of the TCC had

2    opposed the plan and thought it was unfair to them or their

3    children.  We wouldn't be here today if YesCare had decided to

4    walk away and abandon the bankruptcy case after Your Honor

5    ruled on the 9019 motion.  We wouldn't be here today if the

6    allocation between the tort claimants and the commercial

7    claimants was unfair and we wouldn't -- I submit, be here today

8    if the Court had approved the 9019 settlement.  We got here

9    because you know, you said no to both of us.  And we got to a

10   better spot.  I would also just note and sort of coming to the

11   end here that we did listen very carefully to all the tort

12   claimants in this case.

13        The claimants obviously do not choose their

14   healthcare provider while they're in prison.  They are by

15   definition involuntary creditors as all tort claimants are.  To

16   accord them respect, it made sense to us that we had to build a

17   plan that was based on their consent.  We gave them a choice to

18   participate in the settlement or to exercise their rights.  I

19   believe that we're down to a point now where I think the last

20   remaining claim objection is from the United States Trustee.

21   We do not face -- and I want to just say this because I have

22   never got to say this before.  We do not face a single

23   confirmation objection from an insurer.  No insurer objections.

24   We have resolved those issues at the disclosure statement

25   hearing.  They filed their reservations of rights in case we

1   change something, you know, at the last minute.  Of course, we

2   did not change anything.  As far as they're concerned, it has

3   remained intact.

4        We had some comments from the state of Tennessee

5   Department of Revenue.  Those changes were implemented.  We

6   received requests from Maryland regarding a reservation of

7   rights, which we included.  Over the weekend, we finished up

8   with the State of Idaho.  We were able to accept their

9   revisions as well in the confirmation order.  So you have now

10  filed with the Court on the proposed confirmation order.  And I

11  think the last, you know, objection, the U.S. Trustee.  I know

12  Mr. Tripati, I think also filed papers at the disclosure

13  statement hearing.  But again, I hope he has listened or heard

14  today that we did what he did not want.  We got rid of what he

15  found offensive in terms of the plan.  In fact, we worked

16  extremely hard to do that.

17       So final thought, I am a huge fan of the band U2, and

18  in closing argument, I made to you on the hearing on the

19  Rule 9019 motion, I actually borrowed a phrase that I heard

20  from an interview I watched with Paul Hewston also known as

21  Bono.  Good voice.  And a point that he made in the interview

22  is that, and I think it was in response to a lot of the

23  cynicism that you see in the world today, the world is more

24  malleable than most people think.  The choices that we make

25  matter.  And here, I just wanted to specifically thank the

1   members of the TCC in this case.  The TCC here made a choice

2   that they would only support a plan if and only if the

3   constitutional rights of the opt-outs are preserved.

4         Every single member of the TCC is a participant in

5   the settlement.  There are no TCC members who opted out.  So

6   when they were fighting so hard for that opt out, they weren't

7   doing it because of their own personal financial situation.

8   They were doing it because they believed it was the right thing

9   for them to do.  That was their choice.  They did not want to

10  be in a situation where they were settling if that meant that

11  another claimant was losing their constitutional rights.  And

12  it was at their direction specifically that we developed this

13  plan and we came up with this architecture for them.  We would

14  not be here today without them.  We not be here with this plan

15  absent they're just utter commitments to their fiduciary duties

16  to all claimants in the case, including the opt-outs.  I don't

17  think I can get through the rest of this.  I do have a little

18  more to say, but I am very grateful for everyone who

19  participated in the bankruptcy case.  And I hope that this plan

20  is confirmed and that the settlement can go effective and the

21  claimants can receive some sense of meaning and move on with

22  their lives.  Thank you.

23        THE COURT:  Thank you.  Let me just ask, is there

24  anyone else in the courtroom who supports the plan that wishes

25  to be heard?  Is there anyone on the line who supports the plan

1  and wishes to be heard?

2          MR. ALVAREZ:  My name is Nathan Alvarez and I will

3  support this plan.

4          THE COURT:  Yes, sir.  Can you state your name one

5  more time for me?

6          MR. ALVAREZ:  Yes, sir.  Yes.  Nathan Alvarez.

7          THE COURT:  Thank you very much.

8          MR. ALVAREZ:  Thank you.

9          THE COURT:  Mr. Alvarez, and are you an attorney or

10  you just a representative?

11          MR. ALVAREZ:  Member of the TCC.

12          THE COURT:  Ah, perfect.  Thank you very much.  Thank

13  you very much, Mr. Alvarez.  I just wanted to make sure we had

14  a good clean record.  Thank you.

15          MR. ALVAREZ:  Yes, sir.  Thank you.

16          THE COURT:  Anyone else wish to be heard?  Okay.  Let

17  me hear from the Office of the United States Trustee.  Good

18  morning, Mr. Nguyen.

19          MR. NGUYEN:  Good morning, Your Honor.  Ha with the

20  U.S. Trustee, Your Honor.  I will be brief.  I'm going to start

21  off by congratulating everyone in the room for this plan.  This

22  is the -- you don't see this plan every day.  It has a lot of

23  unique functions.  It brings a lot of consensus and it kind of

24  resolved the Texas two step if you think about it.

25          THE COURT:  No comment.

1          MR. NGUYEN:  But Your Honor, we did file a limited

2    objection.  We didn't hit you with the 40 pager that we

3    normally do.  It was a three-page part.  We had some issues

4    with exculpation, but Mr. Cicero called me and we were able to

5    resolve the exculpation issue.  As to the third party releases,

6    it's not always opt in opt out.  It -- it's -- our issue is

7    where -- how do we get the consent, and whether we have consent

8    here to extinguish non debtors' rights against other non

9    debtor.  And then that's the issue.  We're -- I'm not up here

10   pounding my fist and making a federal case out of this one.  We

11   filed this objection based on principle.  We -- we're appealing

12   the decision in the container store.  So it's being heard by

13   the district court.  We just want to make sure that someone

14   don't come back and say, yeah, because you like Mr. Goodman,

15   you didn't object to his opt-out.

16          THE COURT:  No, no, no.  I understand.

17          MR. NGUYEN:  So that was a limited objection.  I

18   think this is a great plan.  I think the parties worked really

19   hard and I'm happy to sit down and be overruled and have you

20   confirm this plan.  Thank you.

21          THE COURT:  Thank you.  Does anyone else wish to be

22   heard?  Before I rule, last question: are there any docs that

23   you wish to get into the record?

24          MR. BROOKNER:  That -- that's what I want to do, Your

25   Honor, was just go through the quick evidentiary presentation.

1          THE COURT:  Okay.

2          MR. BROOKNER:  We filed a witness and exhibit list --

3    just so -- we need the record right.  We filed the witness and

4    exhibit list at Docket Number 2006 on the 27th, joint witness

5    and exhibit list.  We have 16 exhibits for purposes of proving

6    up the 1129 elements.  Exhibit 7, 8, 9 and 10 are four

7    declarations.  And in order they are the declaration of

8    Ms. Caldron, who is on the line, from Verita.  David Barton

9    from the UCC is Exhibit 8.  Exhibit 9 is Mr. Perry's

10   declaration as the CRO and Exhibit 10 is Mr. Alvarez's

11   declaration from the TCC.  And so with those declarations and

12   the other exhibits, we would respectfully submit that the 1129

13   confirmation elements have been met in this case.

14          THE COURT:  Okay.  Thank you.

15          MR. BROOKNER:  And of course, the declarants are all

16   available for cross.

17          THE COURT:  Thank you.  Does anyone else wish to be

18   heard in connection with this case?  Just give me one minute.

19   I want to look at one thing.  Okay.  So before the Court is

20   consideration of plan confirmation in the Tehum Care Services,

21   Chapter 11 case.  This is a court proceeding under 28 U.S.C.

22   157 being the Court has jurisdiction under 28 U.S.C. 1334.

23   Note, this case was filed -- wow -- February 13th, 2023.  So

24   over two years ago here.  I know Mr. Goodman outlined a good

25   amount of the history here.  There was an official committee of

1    unsecured creditors that was appointed and worked in incredibly

2    hard to try to reach a consensual plan with the debtors who

3    worked incredibly hard under their very difficult

4    circumstances.  The nature of the debtors and their business

5    and what they did led to what I would call unique factors, a

6    large number provide healthcare to in incarcerated individuals

7    who -- and there were a number of torts claims that were

8    pending as of the petition date and litigation and certain

9    states involved, state governmental agencies were involved.

10   Plaintiff's lawyers suing both the debtor, its parent and just

11   it -- lots of litigation in involved.  A large number of

12   insurance companies wanting to make sure.

13            And when a bankruptcy case gets filed, everyone

14   naturally want to ensure that their rights were protected, that

15   there was a fair process.  The debtor engaged in extensive

16   mediation for quite some time.  I did not approve a mediation

17   deal initially.  I also didn't -- and TCC came along a year

18   into a case, which presents unique dynamics, because now you

19   have a new committee with -- who's got their own fiduciary

20   duties there involved.  And they filed a Motion to Dismiss the

21   case, and there was a 9019 put on the table with a new

22   mediator.  And I denied both of them.  I don't take any pride

23   in that.  I was really just trying to be as fair, but it was

24   extensive litigation and it kind of really -- I knew that it

25   was going to -- going to be a kind of a crucial point in the

1   case, right?  Because everybody was either going to have to go

2   back to the drawing boards or just rely on appellate rights.

3           And parties went back to the drawing board, including

4   non-debtor parties.  And what they've come up with now is I --

5   well, obviously, I don't think -- I'm unaware of another

6   Chapter 11 plan that kind of has these features.  I don't think

7   it -- I don't think it exists.  I don't plan -- don't pretend

8   to know every case that's been filed, but I know this case.  So

9   what I would say is presents very unique features.  The

10  opportunity to opt-out of the entire case is something I've

11  never seen or quite frankly heard of before.  The ability, no

12  caps on damages, ensuring have no -- the settlement of a kind

13  of on a successor liability theory has been resolved in

14  avoiding litigation about that.  And because that litigation

15  usually shows up about a year or two later, really kind of a

16  allowing someone who wants their day in court actually have it.

17          And so kind of there's so many in every mass tort

18  case, there's always kind of the tension between a mass tort

19  litigation and bankruptcy.  And I think this Chapter 11 plan

20  has really been an effort to try to kind of not create, and

21  there's some inherent conflicts that I think arise, not -- when

22  -- just because of the nature of the automatic stay and what

23  that does.  And creating property of the estate creates

24  inherent, just freezes a lot.  And certain things come into the

25  estate.  And I think there's been a real effort to try to make

1  all this work.

2          It is also, I think this plan also -- Mr. Nguyen, I

3  think you laid it out really well, and I don't want to kind of

4  summarize what you said.  I -- I'd rather let your statements

5  speak for themselves, but there -- there's an incredible amount

6  of just kind of work between the debtor, the TCC and the UCC to

7  try to inform people about kind of what was going to happen,

8  what was going on in their case a 90 day solicitation period.

9  I take -- I -- I'm really happy to see Mr. Tripati here, who I

10  know has filed a number of papers in the case.  Mr. Tripati,

11  I've read everything that you've read and, I've seen your face

12  every time.  I -- I'm really happy --

13          MR. TRIPATI:  Thank you.

14          THE COURT:  -- that we've been able to quite frankly,

15  allow you to appear in court.  I don't know how that worked

16  out, but I'm really happy that it did.  That you were able to

17  appear by video and be able to listen to court hearings.  I'm

18  elated that you were able to participate in the court system.

19  It gives me great comfort that a disclosure statement went out

20  and that you understood and that you had the opportunity to ask

21  questions and that you were able to make an informed decision

22  about what you wanted to do.  I just take great comfort in the

23  process that that happened here.  Every case is different.  I

24  can -- I'm only speaking for this case, but I'm very

25  comfortable that --

1          MR. TRIPATI:  Thank you.

2          THE COURT:  -- and I take Mr. -- I take comfort that

3   the UCC and the TCC people had questions, that you were able to

4   answer questions and that could range from an individual.

5   Could also be, as you indicated, Mr. Goodman, a plaintiff's

6   lawyer who just wanted to kind of understand kind of how all

7   this works.  And I think just answering questions like that.  I

8   think this is one of the cases where I think if someone

9   would've been really confused about what was going on, they may

10  have shown up today and said, I still don't kind of get it, but

11  no one did.  So I take great comfort here.

12         I'm satisfied that each of the 1129 factors has been

13  satisfied here.  I'm comfortable that -- you know, I agree with

14  you, Mr. Goodman, I think you got to look -- every case is

15  different.  And in this case, I think, you know, I take comfort

16  that parties who were going to vote got the information, one,

17  and two, that they were able to exercise their votes.  And

18  sometimes that means people vote.  Sometimes it means people

19  don't.  But it's -- the duty is to get the information to them.

20         And so I'm comfortable that there's been a -- that

21  constitutional due process has been satisfied here.  I know

22  that, again, there is a limited objection from the Office of

23  the United States Trustee with respect to the opt-out.  But I

24  think the opt-out actually works really well here and I'll

25  overrule the objection.  I think there's a couple of unique

1  features here that I think are different than any other case

2  that, quite frankly, that we normally see.  One, the ability to

3  opt out the entire system and two --

4          But opting out really means kind of opting out.

5  You're not forced into another system that kind of then prevent

6  -- has a couple of hurdles to jump through before you leave.

7  And maybe those are right in some cases.  I'm just noting here

8  there seems to be kind of a true opt-out and no caps on

9  damages, so people will have their day -- if that's what they

10  want, is their day in court, they will have them.  It's not for

11  me to judge why a lot of people elected to opt in or kind of

12  stay in, I should say, or not opt out of the entire thing.

13          I think people get to make their own decisions for

14  whatever they want and one of them could very well be they want

15  -- saw the amount of money they were going to get and just

16  thought that was good.  I mean, the ability to get paid.

17  Everybody's decisions are different and it's not for me to

18  judge why.  What I do take -- what I do look out for is that

19  they kind of got informed and they were -- they got sufficient

20  and adequate information to make an informed decision.

21          So I also think -- I think being able to opt out of

22  the entire system -- I think having kind of consistent where if

23  you were going to opt out of the releases, but then you could

24  also kind of opt out of the plan, I think also is -- kind of

25  makes conceptual sense to me in a case in -- where someone

1   potentially could be -- I think there could be confusion if one

2   were to opt into this, but then being able to opt out to that.

3   I think kind of having clean opt-outs I think made a lot of

4   sense.

5           And I think, again, looking at Mr. Tripati here gives

6   me comfort that people understood exactly the way the papers

7   were supposed to work.  And there were lawyers and committee

8   members and paid professionals in this case with -- who took

9   their fiduciary duties seriously, and were willing to explain

10  it to people and you can't ask for more than that.

11          And I understand the objection of the United States

12  Trustee.  I overrule it, but I just think this case is so

13  different than every other case that we see in terms of facts

14  on the ground and the way that the system works.  I very much

15  appreciate the presentation.  I think we have a robust record.

16  It gives me comfort that this plan was filed in good faith.

17  This case satisfies every applicable section of 1129.  I

18  reviewed the proposed settlements between the parties that are

19  incorporated into the plan, and I'm going to approve them as in

20  the best interest of the estate.

21          The debtors have exercised their sound business

22  judgment.  9019 standards are approved here.  I've read the

23  changes to the plan on the proposed confirmation order and I'm

24  comfortable and I'm going to sign that order.  I look at folks

25  like Mr. Val Ealy (phonetic) who I see who has been here from

1  the very beginning of the case.  I want to thank folks like

2  Mr. Ealy.  I want to thank each member of the TCC.  I want to

3  thank the Office of the United States Trustee.  I want to thank

4  each member of the official committee.  I want to thank each of

5  their individual members as well.  I want to thank the debtors

6  and their professionals.  I want to thank the CRO.  I want to

7  thank every person who's participated in this case.

8          At some point, you were kind of -- probably at some

9  point in the case, everyone was on the opposite side of the

10 debtor.  At some point in this case, everyone -- so I think the

11 process worked kind of the way it was supposed to, but I also

12 agree with the need for kind of ending the case, too.  And so I

13 think we've had some lively hearings, this not being one of

14 them, but some interesting testimony on the stand that we will

15 all take with us.  I thank everyone.  It has been an -- it has

16 been my true honor to preside over these proceedings.  It has

17 been my honor to be your judge in this case.

18          I've really tried to, at every stage, just kind of do

19 what the seal behind me and the oath requires of me to do,

20 which is to try to just take every matter that is before you

21 and try to rule based upon the rule law and the facts to the

22 best of my ability.  And that's what I've tried to do.  So in

23 some instances, I think the debtor has won on some things.  And

24 some I said no to, but it was always because I thought that was

25 the right ruling based upon the facts.

1          And certainly, people have disagreed with certain --
2    some of my rulings, but I think the job of a judge is to not
3    kind of -- is to just rule and not put your thumb on the scale
4    so much every now and then.  It's to just kind of take every
5    matter and rule.  And this one, I'm comfortable with where we
6    are.  I -- I've also never seen an -- kind of an opt-out where
7    you can kind of -- kind of settle with one group but not settle
8    with everyone.  That's a very unique feature with -- within
9    kind of a process here.

10         So I really want to thank debtor's counsel as well.
11   I cannot -- this is probably one of the more, from a debtor
12   side case, an incredibly difficult case and kind of keeping an
13   even hand and going through multiple mediators.  I think
14   Judge Sontchi is about as good as you're going to get in the
15   country at being a judge.  Also very direct, and I can only
16   imagine, oh, it must have been -- now he was on the bench.  I
17   see him.  No reason it'd be any different getting in front of
18   people.

19         So a heart -- heartfelt thanks to Judge Sontchi for
20   participating here.  I confirm this plan and thank everyone,
21   and I'll get this signed and I'll get it on the docket.  Thank
22   you.

23         MR. BROOKNER:  I'm sorry, Your Honor.  I just -- I
24   didn't hear you admit the exhibits and I want to make sure that
25   the record is clear on --

```
 1              THE COURT:  They are admitted.

 2          (Joint Exhibits 7 through 10 admitted into evidence)

 3              THE COURT:  I appreciate it.  They -- all the record

 4   will speak for itself, but I'm admitting it.  I'm also going to

 5   make a finding that the debtors and every professional who's

 6   appeared before me has acted with the utmost good faith in

 7   their efforts here, in addition to kind of the exculpation

 8   here.  But obviously, the CRO has operated in good faith.  I

 9   find that the mediator, Mr. Sontchi, has operated in good faith

10   as well.

11              I have zero knowledge of what took place in

12   mediation.  I just know that there was a plan that got put by

13   the mediator that was rejected by me and folks came back and

14   got back into a room and came up with a very consensual process

15   and buy-in from every committee.  And the TCC, I would note,

16   was 100 percent, at one point, committed to dismissing this

17   case.  The fact that we are here and that I have an individual

18   member of the TCC who got on the phone and participated and

19   told me that he's for it, it -- I take great comfort that there

20   are various constituencies who supported.

21              I -- everything is admitted.  Thank you very much.

22   Anything else we need to take care of today?

23              MR. BROOKNER:  I just wanted to say, thank you, Your

24   Honor.  Nothing further from the debtor.

25              THE COURT:  Okay.  Alrighty, folks.  Thank you very
```

1  much.  You're excused.  I'm going to sign your --

2             UNIDENTIFIED:  Thank you, Your Honor.

3             THE COURT:  -- obligation order.  Thank you.  We're

4  adjourned.

5        (Proceedings concluded at 11:42 a.m.)

6                          * * * * *

7

8

9

10

11

12

13

14               **C E R T I F I C A T I O N**

15

16             I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428     DATE: March 6, 2025

25  ACCESS TRANSCRIPTS, LLC