**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*, | Case No. 23-90086 (CML) |
| Debtors. | (Jointly Administered) |

**AMICI CURIAE'S BRIEF IN SUPPORT OF
TORT OBJECTORS [DKT. NO. 2366]**

Jaqueline Aranda Osorno
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
jaosorno@publicjustice.net

*Counsel for Worth Rises
and Public Justice*

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**INTEREST OF AMICUS CURIAE** .................................................................. 1

**BACKGROUND** ................................................................................................. 2

    **I. Wellpath and Other Private Prison Healthcare Companies Profit at the Expense of Incarcerated People's Wellbeing** .................. 4

    **II. Wellpath Has Inflicted Immeasurable and Preventable Suffering** ........................................................................................................ 6

    **III. The Consequences of Private Equity's Growing Footprint in the Correctional Healthcare and Broader Healthcare Sector** .................. 9

**ARGUMENT** ..................................................................................................... 11

    **I. Wellpath Will Be Insolvent Without Changes to its Business Practices** ........................................................................................................ 12

      *A. Wellpath relies on Licensed Practical Nurses (LPNs) performing work outside their legal scope of practice* .............................................. 13

      *B. Wellpath intentionally limits access to higher levels of care* .. 14

      *C. Wellpath defends their business practices in bad faith* ........... 15

    **II. Allowing Wellpath to Continue Operating as Usual Will Harm Not Just Those Subject to Its Care, But Anyone Receiving Privatized Care in Both Correctional and Non-Correctional Settings** ........................................................................................................ 16

**CONCLUSION** ................................................................................................. 18

# AMICI CURIAE'S BRIEF IN SUPPORT OF TORT OBJECTORS [DKT. NO. 2366]

## INTRODUCTION

If Debtors (collectively, "Wellpath") are absolved of years of tort liability and allowed to emerge from these proceedings with no obligation to change its business model, it is but certain that thousands of people across the country will continue to be significantly injured, and even killed, under Wellpath's care. Worth Rises and Public Justice submits this brief as amici curiae in support of Claimants Layla Capaci, Teesha Graham, and Cary Moone (collectively the "Tort Objectors"). We urge the Court to consider the inevitable consequences that will flow from this Court's confirmation of the proposed reorganization plan (the "Plan"). As explained below, without changes to its business practices, Wellpath will continue to accrue significant tort liability. Confirmation of a plan that does not hold Wellpath accountable for the harm it has inflicted will also encourage competitors to misuse the bankruptcy system to wipe their slates clean. The quality of private correctional health care nationwide will only deteriorate. The Plan should not be confirmed.

## INTEREST OF AMICUS CURIAE

**Worth Rises** is a national non-profit advocacy organization dedicated to dismantling the prison industry and ending the exploitation of those it touches.[1] The organization is a leading expert on the prison industry and the

---

[1] Worth Rises and Public Justice are 501(c)(3) nonprofit organizations and are not publicly held corporations. Accordingly, Worth Rises and Public Justice do not have any parent corporation, and have no shares owned by any publicly held corporation. Further, no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than amici, their members, and their counsel contributed money to fund this brief.

1

ways it exploits and harms incarcerated people, their families, and our communities at large. It studies, documents, and organizes against the commercialization of the U.S. carceral system, including the entities that profit from incarceration and related industries. The organization also regularly engages with impacted communities and aims to ensure incarcerated people receive necessary redress when they have received substandard medical care.

**Public Justice** is a national public interest legal organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting corporate and governmental misconduct. The organization maintains an Access to Justice Project that pursues litigation and advocacy efforts to remove procedural obstacles that unduly restrict the ability of consumers, workers, and people whose civil rights have been violated to seek redress in the civil court system. Public Justice has engaged in significant advocacy efforts to prevent abuse of the bankruptcy system to evade civil liability, which hinders and delays justice for survivors of corporate wrongdoing. For example, Public Justice has authored multiple amici curiae briefs urging bankruptcy courts to prevent corporations from using the "Texas Two-Step" to avoid tort liability, including in the *In Re Tehum* proceedings in this Court.

## BACKGROUND

Owned by private equity giant HIG Capital, Wellpath is one of the largest providers of correctional health care services in the United States. On any given day, Wellpath is contractually responsible for providing care to more than 200,000 people in carceral facilities across the country, including prisons,

2

jails, and immigration detention centers. That responsibility is a considerable one: incarcerated people are wholly reliant on those that incarcerate them to access medical care. Accordingly, the Eighth Amendment guarantees the provision of constitutionally adequate medical and mental healthcare, regardless of whether the care is being provided directly by the government or by a private company. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (establishing constitutional right to adequate medical care for incarcerated people); *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (explaining that private prison companies and their employees are subject to liability for constitutional violations under 42 U.S.C. § 1983 because they perform "a government function traditionally reserved to the state").

Since its creation in 2018, when Wellpath was created through the merger of Correct Care Solutions (CCS) with Correctional Medical Group Companies (CMGS), Wellpath has continued its corporate predecessors' history of providing substandard care. *See* Jim Baker, *HIG Capital's and Wellpath's Correctional Healthcare Investment Risks*, Private Equity Stakeholder Project, at 2 (June 2019), https://tinyurl.com/mwjvf7mh (showing Wellpath's corporate organizational structure). When HIG Capital acquired CCS in 2018, CCS had been named in almost 1,400 federal lawsuits in the preceding decade. *Id.* at 1. Similarly, CMGS, which had been owned by HIG Capital since 2013, had paid out millions in tort and personal injury settlements. *Id.* That pattern has largely been unbroken or even gotten worse under HIG Capital's ownership. At the time Wellpath filed its Chapter 11 petition, Wellpath faced roughly 1,500 lawsuits, the vast majority relating to

3

Wellpath's provision of medical care. Debtors' Emergency Mot. at ¶ 1, ECF No. 17.

### I. Wellpath and Other Private Prison Healthcare Companies Profit at the Expense of Incarcerated People's Wellbeing

The private correctional healthcare industry emerged in the 1980s in the wake of *Estelle v. Gamble*. Jason Szep, et al, *Public Jails, Private Care: US Jails Are Outsourcing Medical Care – and the Death Toll is Rising*, Reuters (Oct. 26, 2020), https://tinyurl.com/f3kj7ej (surveying 523 jails across the country). By 2018, 62% of the jails surveyed had privatized healthcare. *Id.* Today, correctional healthcare is a multibillion-dollar industry dominated by a handful of large companies, Wellpath being the largest. Michael Fenne, *Privatized prison healthcare seeks profit at patients' expense*, Private Equity Stakeholder Project (Oct. 17, 2023), https://tinyurl.com/ycypyp3d . https://tinyurl.com/ycypyp3d. .

Correctional healthcare contract payment models can take two forms, "cost-plus" or capitated. *See Prison Health Care: Costs and Quality*, Pew Charitable Trusts, at 12 (2017), https://tinyurl.com/56j9ymts. Under a cost-plus model, expenses pass from the vendor to the government, plus an additional charge for arranging and providing care. *Id.* Meanwhile, under a capitated model where there is a fixed, per-person cost, the financial risk—and reward—is belongs to the contractor. *Id.* Because under a capitated model the contractor can only profit if it spends less than the fixed payment, this model encourages companies to avoid expenses that may eat into their bottom line. Fenne, *supra*. Common cost-cutting strategies include employing staffing models that rely on less qualified medical (and therefore, cheaper) staff

4

providing care outside their legal scope of work, staffing too leanly to meet the population's needs, limiting access to emergent care, and delaying care in general. *Id.*; Blake Ellis and Melanie Hicken, *CNN Investigation Exposes Preventable Deaths and Dangerous Care in Jails and Prisons across the Country*, CNN (June 25, 2019), https://tinyurl.com/y382en22.

Unsurprisingly, many if not most correctional health care contracts are structured under a capitated model. And unsurprisingly, the drive to increase profits has resulted in the widespread and systemic provision of substandard care. A 2020 Reuters investigation, Dying Inside, revealed that jails with privatized healthcare had higher death rates on average than facilities where medical care was provided by the government. Jason Szep, et al, *Public Jails, Private Care: US Jails Are Outsourcing Medical Care – and the Death Toll is Rising*, Reuters (Oct. 26, 2020), https://tinyurl.com/f3kj7ej (17 deaths per 10,000 inmates for jails with privatized healthcare compared to 13 deaths in publicly-run units). Wellpath is an active contributor to these alarming statistics; recent independent monitoring at Monterey County, California jail revealed that "18 out of 19 deaths between 2016 and 2023 either were preventable or involved a violation of Wellpath's implementation plan." Paul Dudley, *KSBW 8 Investigates: Deaths at the Monterey County Jail,* KSBW (Mar. 20, 2024), https://tinyurl.com/42evu3hp.

## II. Wellpath Has Inflicted Immeasurable and Preventable Suffering



In November 2018, Marcus Mays was booked into an Illinois county jail, where he reported to the Wellpath intake nurse that he had a history of *grand mal* seizures and that he took medication for this condition. *Hirsch v. Will Cnty. et al,* No. 19 CV 7398, 2023 WL 11899190, *1 (N.D. Ill. Oct. 17, 2023). Other than making a note of this serious situation, the nurse did nothing, despite the fact that Mr. Mays had been discharged from a hospital immediately before his booking at the jail. The doctor in charge of providing care at the facility reviewed Mr. Mays's chart and he also did nothing. For eleven days, Mr. Mays was not given any anti-seizure medication, did not see a medical provider, and was not sufficiently monitored. *Id.* Mr. Mays ultimately had a massive seizure and died locked in his cell. *Id.*



In April 2020, Mark Frazier fell in his cell in a Pennsylvania state prison and sustained a head injury. *Carter v. Wellpath LLC*, No. 2:22-CV-01050-JDW, 2023 WL 6323095, at *1 (E.D. Pa. Sept. 28, 2023). A nurse took him to the infirmary, where he stayed for three hours before someone finally called an ambulance. *Id.* When emergency personnel arrived, Mr. Frazier had a seizure. *Id.* He was transported to a nearby hospital via helicopter, where he was diagnosed with a subdural hemorrhage. *Id.* He died several days later. *Id.*

6



In June 2021, Abby Angelo was found dead in a Colorado jail where Wellpath operated. *Est. of Angelo v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, No. 1:23-CV-01607-CNS-STV, 2024 WL 2274080, at *1 (D. Colo. May 20, 2024). Upon her arrival at the jail, Ms. Angelo's oxygen saturation was slightly below normal. *Id.* Over the next several days, she reported her body hurting and feeling tired or unwell. *Id.* Ms. Angelo was seen by a licensed practical nurse (LPN) on her sixth day in custody, at which point her oxygen saturation was below the level at which emergency care is recommended. *Id.* She was given acetaminophen and an inhaler and the nurse documented in her notes that no follow up was required. *Id.* Ms. Angelo's health continued to deteriorate and two days later, she was put on an opiate withdrawal protocol although her symptoms were inconsistent with withdrawal. *Id.* at *3. Two days after that, Ms. Angelo died from tricuspid valve endocarditis, a heart infection that can usually be treated with a course of antibiotics. *Id.* at *4.



In late May 2019, at approximately three and a half months pregnant, Lauren Kent was incarcerated in a Texas county jail, where medical providers confirmed her pregnancy upon her booking. *Kent v. Collin Cnty., Texas*, No. 4:21-CV-412-SDJ, 2022 WL 949963, at *2 (E.D. Tex. Mar. 29, 2022). She saw a physician's assistant about a week later, and shortly after, began experiencing abdominal pain, cramping, and vaginal bleeding. *Id.* Over the next month, Ms. Kent

7

continued to ask to see a doctor, expressing concern that her pregnancy was further along than she initially thought. *Id.* She was eventually seen by medical staff, who noted no "signs of life threatening bleeding" and instructed to keep a sanitary pad count to prove she was bleeding enough to need emergency medical care. *Id.* at *3. On her thirty-sixth day in custody, she was finally seen by a provider, who found that Ms. Kent had a severe urinary tract infection. Two days later, after continued cramping and bleeding, Ms. Kent went into labor and delivered a stillborn baby into a toilet. *Id.* Ms. Kent reflected, "[l]ooking back, I think about how if they had done the bare minimum for me, they would have detected the infection earlier. They wouldn't have had to take me anywhere. I wonder if my baby's life would have been saved." Lauren Kent, *A Texas Jail Delayed My Prenatal Care to Keep Costs Down. Then I Had a Miscarriage*, The Marshall Project (July 7, 2023), https://tinyurl.com/mrxafp22.

Mr. May's, Mr. Frazier's, Ms. Angelo's, and Ms. Kent's stories are reflective of a larger pattern of systemic neglect and indifference. For example, in August 2021, the United States Attorney's Office for the Central District of California found reasonable cause to believe that the San Luis Obispo County Jail had engaged in a pattern or practice of failing to provide incarcerated people with adequate medical care in violation of their constitutional rights, specifically noting that "Wellpath and its staff appear not to take seriously" medical concerns raised by incarcerated people. U.S. Department of Justice, Letter Regarding Investigation of San Luis Obispo County Jail at 5-9 (Aug. 31, 2021), https://tinyurl.com/33uy524a. In December 2023, twelve United States

8

Senators sent a letter to Wellpath expressing "deep concern with reports that Wellpath is providing inadequate health care in prisons and jails across the United States," including by delaying and denying care, providing inadequate staffing, and failing to follow internal company policies, including policies relating to mortality reviews and suicide watch. Ex. 1 to Proposed Amicus Brief at 16-22, ECF No. 323-1. Most recently, and shortly before this Chapter 11 petition was filed, Wellpath agreed to pay at least $250,000 in civil contempt fees after it was unable to cure years of well-documented and ongoing violations of a settlement agreement at the Monterey County Jail. Stipulation and Order Re Civil Contempt, *Hernandez v. Cnty. of Monterey*, No. 13-cv-02354, ECF No. 945 (N.D. Cal. Oct. 29, 2024). The full fine amount may reach up to $1 million, and Wellpath faces the potential for additional contempt fines, (potentially in excess of $1 million) every six months until it corrects its constitutional deficiencies. Paul Dudley, *Monterey County Jail's Health Care Provider Fined, Questions About Bankruptcy Linger*, KSBW Action News (Nov. 25, 2024), https://tinyurl.com/3xaxj6tp. Notably, the County of Monterey is in the process of reviewing bids for correctional health services. According to the Request for Proposal, bidders must carry appropriate liability insurance. *See* Katie Rodriguez, *With Wellpath's contract set to expire, County opens bids for jail health care providers*, Monterey County Now (Feb. 27, 2025), https://tinyurl.com/3cbtedbf. The County will evaluate potential vendors' compliance and penalties in prior contracts. *Id*. Wellpath does not appear well-positioned to win contract renewal.

**III.  The Consequences of Private Equity's Growing Footprint in the Correctional Healthcare and Broader Healthcare Sector**

9

Increasingly, private equity firms are involved in a disproportionately high number of bankruptcies, accounting for eleven percent of all corporate bankruptcies and fifty-six percent of all large corporate bankruptcies (those involving liabilities exceeding $500 million at the time of filing) in 2024 despite accounting for only six and a half percent of the U.S. economy. Valentina Dabos, *Private Equity Bankruptcy Tracker*, PESP (Feb. 12, 2025); *see* Bankruptcy Tracker, https://tinyurl.com/2ndh4jc8 (showing that three HIG Capital-owned companies filed bankruptcy petitions in 2024). In 2024, private equity was also overrepresented in healthcare bankruptcies, accounting for seven of the eight largest healthcare-related bankruptcies of the year, and twenty-one percent of all healthcare bankruptcies. Dabos, *supra*. These numbers are unsurprising, as the private equity model prefers short-term profits and rapid value extraction over the long-term stability of the companies in their portfolios. *Id*. Private equity firms have demonstrated overreliance on cost-cutting measures and aggressive financial policies that have limited long-term prospects. *Id*. Focusing on immediate financial gains can lead to significant mismanagement and economic instability, contributing to higher bankruptcy rates among private equity-owned firms. *Id*. Such is the case here, where Wellpath's inability to recognize that its business model necessarily results in the infliction of preventable and serious harm demonstrates the existence of a corporate ethos that will continue to prioritize profit over human lives.

Most recently, this Court confirmed a Chapter 11 plan of private equity-owned YesCare's corporate predecessor (Tehum) after two years of contentious

litigation. Dietrich Knaut, *Prison health company wins approval for $75 million bankruptcy deal*, Reuters (Mar. 3, 2025), https://tinyurl.com/yk66pf23; *see* Michael Fenne, *YesCare Dodges Liability for Prison Conditions: Merger, Division, and Bankruptcy*, Private Equity Stakeholder Project (Oct. 2023), https://tinyurl.com/4zbt397v. It is notable that under that plan, tort claimants were given a true opt-out opportunity that would allow them to pursue alternative theories of liability against YesCare, so YesCare did not succeed at completely eliminating their tort liability as they'd originally intended.

Private equity's appetite for risk, particularly in sectors of the economy that impact vulnerable populations, should be of particular concern to all who grapple with how to best promote justice and prevent misuse of the bankruptcy system—including this Court.

## ARGUMENT

Wellpath has presented this Court with a plan of reorganization that fails to demonstrate future solvency. As explained by Tort Objectors, Wellpath's plan is based on unsupported financial projections that underestimate its future liabilities and ignore other market uncertainties, such as the potential loss of contracts. Worth Rises and Public Justice write to provide additional context for how Wellpath's business practices will continue to result in the accrual of significant tort liability, and to urge the Court to consider the public policy implications of confirmation of the Plan.

## I. Wellpath Will Be Insolvent Without Changes to its Business Practices

A closer look at the correctional health industry helps explain why Wellpath has amassed so much tort liability, and why it will continue to do so.[2] It should go without saying, but quality healthcare, including correctional healthcare, must be provided by or under the supervision of licensed medical providers. This is particularly critical for incarcerated populations who are medically complex groups that have "significantly higher rates of infections, chronic diseases, mental illness, and substance use disorders than the public." Policy Research Associates, Inc., *Toolkit for writing an RFP to contract for healthcare services in a correctional or detention institution.* https://tinyurl.com/3kakf5p6 ("RFP Toolkit") at 1-2. Given these vulnerabilities, correctional health providers can provide adequate care only if they establish systems that provide timely access to the appropriate level of care.

Wellpath routinely fails to do this in two significant ways. First, Wellpath relies on less qualified (and cheaper) nurses providing the bulk of care. Second, Wellpath's contracts and related policies discourage referrals to higher levels of care, including both escalation from nurses to medical providers within the facility, and to specialists and emergency rooms when those needs arise. Wellpath's disregard for the wellbeing of those it serves is evident not just in the number of lawsuits against it, but in their aggressive litigation defense strategies, which multiple courts across the county have

---

[2] Worth Rises and Public Justice use the term "tort liability" as shorthand for liability relating to the provision of medical and mental health care, which may arise under the Eighth Amendment or tort law (e.g., personal injury, wrongful death, negligence).

12

sanctioned. With these practices left unchanged, Wellpath will likely find themselves before a bankruptcy court again.

### A. *Wellpath relies on Licensed Practical Nurses (LPNs) performing work outside their legal scope of practice*

Care in correctional settings is either "episodic" or "urgent/emergent." Episodic care, which people in correctional settings often refer to as a "sick call," refers to non-urgent requests to see medical staff for any ailments. Because of the clinical complexity of the incarcerated population, "even seemingly minor complaints" could involve symptoms that "could flag a serious, even life-threatening, medical condition. Therefore, they should be evaluated by the members of the health care team with the most training." Model RFP at 94. But to cut costs, Wellpath frequently adopts staffing models that rely on nurses—specifically, LPNs—to provide care that is outside of their legal scope of practice, including evaluating patients and creating treatment plans without supervision. The distinction between Registered Nurses (RNs) and LPNs is critical. As a leading correctional health expert, Dr. Marc Stern, has explained, "[w]hile both are legitimately referred to as nurses, their training and legal and safe scopes of practice are very different. In simple terms, with a few exceptions, LPNs may only collect patient data, report it to an RN or provider, and carry out a care plan directed by an RN or provider. RNs may also evaluate collected patient data to arrive at an assessment (nursing diagnosis) and design a care plan based on that assessment. Thus RNs may conduct a broad range of nursing activities independently whereas LPNs may not." Federal Rule 706 Expert Report to the Court, *Jensen v. Thornell*, Case

No. CV-12-00601-PHX-ROS, 2024 WL 3933237, ECF No. 3379 (D. Ariz. Jan. 19, 2024),

The results of Wellpath's nurse-heavy staffing models are disastrous for both those who receive care and those who give it. Nurses often know that they are working outside of their expertise but may feel like they have no other option if the alternative is that their patients will get no care at all, ultimately exposing themselves to individual liability. Incarcerated people suffer the consequences, sometimes with their life. *See, e.g.*, *Est. of Angelo*, 2024 WL 2274080, at *8-11 (discussing the failures leading to Abby Angelo's death and noting that LPNs could be liable for failing to refer Ms. Angelo to a more qualified medical provider despite exhibiting "obviously serious symptoms").

### B.     ***Wellpath intentionally limits access to higher levels of care***

In addition to staffing structures that gatekeep access to suitably qualified medical providers within the facility (to the extent those positions are actually filled), Wellpath's capitated payment models discourage referrals to outside specialists or emergent care because paying for those services eats into profits. *See e.g., Steel v. Alameda Cnty. Sheriff's Off.*, 428 F. Supp. 3d 235, 242–43 (N.D. Cal. 2019) (noting that the fact that under the contract Wellpath was solely responsible for all costs related to services outside the jail supported plaintiff's argument that there was "a financial incentive and imperative for CFMG to refuse and withhold inpatient hospitalization services. Wellpath explicitly promotes their reduction of offsite transport and offsite medical care. *See Kent*, 2022 WL 949963, at *2 (E.D. Tex. Mar. 29, 2022) (discussing Wellpath's"Cost Containment Program"). And again, the consequences are deadly. *See, e.g.*, *Carter v. Wellpath LLC*, No. 2:22-CV-01050-JDW, 2023 WL

14

6323095, at *1 (E.D. Pa. Sept. 28, 2023) (noting a three-hour delay in calling an ambulance for a serious head injury resulting in death).

It is also noteworthy that, even when Wellpath does utilize other providers, it has a track record of failing to timely pay for subcontractors' services, such as ambulance companies. *See, e.g.*, Dan Landrigan, *MI EMS Agencies Struggle to Stay Afloat; Plead for State to Pay $6 Million Owed by Prison Medical Company*, Journal of Emergency Medical Services (Mar. 17, 2025), https://tinyurl.com/25vfe3a4. These practices result in community health care providers' reticence to provide critical services to incarcerated people, contributing to systemically deficient care.

### C. *Wellpath defends their business practices in bad faith*

The Tort Objectors argue that the Plan was not proposed in good faith. This is not a new approach for Wellpath, whose litigation defense strategies commonly include engaging in obstructionist stalling tactics, raising borderline frivolous arguments, and document destruction. *See e.g., Estate of Moreno v. Corr. Healthcare Cos., Inc.*, 2020 WL 5740265, at *10 (E.D. Wash. June 1, 2020) ("Defendants repeatedly failed to provide responsive discovery to Plaintiffs, even after being compelled to do so by this Court"); *Estate of Stewart v. Coos County*, 2023 WL 4002680, at *9 (D. Or. June 14, 2023) ("Wellpath Defendants misled both Plaintiff and the Court concerning the availability of the deleted emails for months and the Court has no reason to believe that a lesser sanction will prevent further deceptive representations by the Wellpath Defendants."); *Est. of Butterfield v. Wellpath*, LLC, 2024 WL 4355160, at *8 (D. Or. Jan. 29, 2024) ("Wellpath pursued discovery with the same avoidant

behavior, requiring years of repeated emails, inquiries, conferences, and motions to compel . . . the Court finds Wellpath's deceptive behavior throughout discovery probative of their intent."); *Marziale v. Correct Care Sols., LLC*, 2021 WL 1423277, at *3 (E.D. Ark. Jan. 27, 2021) ("[P]erhaps most troubling, are the repeated representations by counsel for CCS that all discovery material had been produced when, in fact, those representations were untrue."), adopted by 2021 WL 1030978 (E.D. Ark. Mar. 17, 2021); Order, *Early v. State of Arizona, et al.*, Case No. CV 16-00031-PHX-SPL (D. Ariz. May 22, 2018) (sanctioning one of Wellpath's predecessors for denying the existence of nursing protocols that its own witnesses described during depositions); *see also* Conrad Wilson, *Oregon jail health care provider destroyed evidence and tried to cover it up, judge finds*, Oregon Public Radio (Oct. 3, 2024), https://tinyurl.com/bdf4r8pa (reporting on Wellpath's 2019 record retention policy, which was internally referred to as the "purge").

## II. Allowing Wellpath to Continue Operating as Usual Will Harm Not Just Those Subject to Its Care, But Anyone Receiving Privatized Care in Both Correctional and Non-Correctional Settings

Private healthcare companies, and particularly private correctional companies "have made a business out of avoiding consequences" for the serious harm they inflict on their patients. Devontae Torriente, *How 'Bankruptcy' Lets Private Prison Contractors Evade Accountability*, The Appeal (Feb. 26, 2025), https://theappeal.org/bankruptcy-lets-private-prison-contractors-evade-accountability/; *see* Eileen O'Grady, *Private equity healthcare bankruptcies show no signs of slowing*, Private Equity Stakeholder Project (Aug. 1, 2024);

16

Background Section II, *supra*. These bankruptcies include correctional health care providers Armor Health and Corizon Health (now operating as YesCare). *See* Prison Legal News, *Armor Health Liquidates Assets—to Firm's Founder* (Nov. 2024), https://tinyurl.com/yrujjrut; Knaut, *supra*. Given the large market share that Wellpath and YesCare occupy, should Wellpath succeed here, it may well encourage other companies to similarly misuse the bankruptcy system to remain competitive with companies that will now have clean slates.

Much has been written about "social debt" bankruptcies—such as the one here. *See* Jonathan C. Lipson, *The Rule of the Deal: Bankruptcy Bargains and Other Misnomers*, 97 Am. Bankr. L.J. 41, 43 (2023) (defining "social debt" as "financial liability for serious (e.g., criminal) misconduct, often involving violations of health and safety laws"); Abbye Atkinson, *Who's Afraid of Bankruptcy*, 138 Harv. L. Rev. 1317 (March 2025) (reviewing Professor Melissa Jacoby's *Unjust Debts: How Our Bankruptcy System Makes America More Unequal)*. "The most important questions in [these] bankruptcies will involve transparency and accountability: how did the misconduct occur, and do we have some confidence that those responsible have, in fact, been held accountable in a legally and socially acceptable way?" Lipson, at 43. Without changes to Wellpath's business practices, many of those who have been harmed by Wellpath would say that the answer to the latter question is a resounding "no." This Plan should not be approved.

## CONCLUSION

For the foregoing reasons, and for the reasons described by the Tort Objectors, Worth Rises and Public Justice urge the Court to deny confirmation of the Chapter 11 Plan.

Dated: April 22, 2025

Submitted,

*/s/ Jaqueline Aranda Osorno*
Jaqueline Aranda Osorno
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
jaosorno@publicjustice.net

*Counsel for Worth Rises and Public Justice*